**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,<br><br>Plaintiffs,<br>v.<br>APOTEX INC., AND APOTEX CORP,<br><br>Defendants. | C.A. No. 24-64-JLH<br>**(CONSOLIDATED)**<br>**JURY TRIAL DEMANDED**<br>▬▬▬▬▬▬▬ |
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,<br><br>Plaintiffs,<br>v.<br>SLAYBACK PHARMA LLC,<br><br>Defendant. | C.A. No. 24-65-JLH<br>**(CONSOLIDATED)**<br>**JURY TRIAL DEMANDED**<br>▬▬▬▬▬▬▬ |

## OPENING BRIEF IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF DAMAGES

Neal C. Belgam (No. 2721)
Daniel A. Taylor (No. 6934)
SMITH KATZENSTEIN & JENKINS LLP
1000 N. West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

Attorneys for Defendants
*Slayback Pharma LLC*

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants
Apotex Inc. and Apotex Corp.*

Dated: June 5, 2026

**TABLE OF CONTENTS**

I.  Summary of argument.................................................................................................... 1

II.  Nature and stage of the proceedings ...................................................................... 2

III.  BACKGROUND ........................................................................................................ 2

 A.  Before Any Allegedly Infringing Conduct, Eagle Hemorrhages Cash Due to a Stock Repurchase Agreement, the Collapse of a Channel-Stuffing Scheme, and Delisting from Nasdaq.......................................................... 3

 B.  Eagle Restates Additional Financial Reports........................................... 5

 C.  Due to Its Financial Malfeasance and Mismanagement, Eagle Defaults on Its Credit Agreement With JP Morgan. ................................................ 5

 D.  Eagle Turns to Blue Owl After Breaching Its Agreement With JP Morgan. ......... 6

IV.  Argument ................................................................................................................. 7

 A.  Eagle's Alleged "Damages" Are Not Recoverable as Patent Damages. ............... 7

 B.  Eagle Has Not Established—And Cannot Establish—But-For or Proximate Causation.......................................................................................................... 10

  1.  Eagle Has No Evidence of But-For Causation. ....................................... 10

  2.  Eagle's Financial Deterioration Was Not Reasonably Foreseeable to Defendants. ........................................................................................ 13

V.  CONCLUSION......................................................................................................... 14

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ajinomoto Co. v. Archer-Daniels-Midland Co.*,
1996 WL 621835 (D. Del. Oct. 21, 1996) ................................................................8

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
106 F. Supp. 3d 506 (M.D. Pa. 2015) .....................................................................9

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*,
246 F.3d 1336 (Fed. Cir. 2001)...............................................................................11

*Gen. Motors Corp. v. Devex Corp.*,
461 U.S. 648, 103 S. Ct. 2058, 76 L. Ed. 2d 211 (1983)........................................10

*Minco, Inc. v. Combustion Eng'g, Inc.*,
95 F.3d 1109 (Fed. Cir. 1996)................................................................................11

*Moore U.S.A., Inc. v. Standard Reg. Co.*,
229 F.3d 1091 (Fed. Cir. 2000)..........................................................................11, 12

*Network Appliance, Inc. v. Bluearc Corp.*,
2005 WL 1530222 (N.D. Cal. June 27, 2005) .......................................................14

*Rite-Hite Corp. v. Kelley Co.*,
56 F.3d 1538 (Fed. Cir. 1995) (en banc)........................................................9, 10, 11

*Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*,
637 F.3d 1269 (Fed. Cir. 2011)................................................................................7

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*,
939 F.2d 1540 (Fed. Cir. 1991)..............................................................................10

*Velo-Bind, Inc. v. Minnesota Min. & Mfg. Co.*,
647 F.2d 965 (9th Cir. 1981) ..................................................................................9

*Volterra Semiconductor Corp. v. Primarion, Inc.*,
2013 WL 6905555 (N.D. Cal. Dec. 31, 2013)..........................................................8

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*,
198 F. Supp. 3d 366 (D. Del. 2016) (Stark, J.) ...................................................8, 14

**Statutes**

35 U.S.C. § 284.................................................................................................8, 9, 15

## I.    SUMMARY OF ARGUMENT

Eagle seeks approximately ▮▮▮▮▮ in purported "damages" consisting of financing costs it incurred in connection with a sale of its royalty stream to a third-party lender, Blue Owl Capital Inc. These costs are not patent damages: They are not lost profits caused by a competitor's displacement of Eagle's sales (in the form of lost sales or price erosion). Nor are they a reasonable royalty designed to compensate for use of Eagle's purported intellectual property. They are, instead, the price Eagle paid for its own financial mismanagement—costs imposed by a private lender in a financing transaction that Eagle was forced into because it had destroyed its own creditworthiness through an illicit channel-stuffing scheme, serial accounting failures, and defaults on its existing credit obligations. Connecting these self-inflicted expenses to any alleged infringing conduct by Apotex or Slayback requires multiple layers of inference, speculation, and assumption. Worse, it requires the Court to ignore what actually happened. And, most important, none of these logic leaps is supported by evidence (but the alternative explanations certainly are).

To guard against patent owners recovering such remote, indirect consequential damages, the law requires a showing of causation—both but-for and proximate. Eagle has established neither. The undisputed record tells a straightforward story: Eagle was forced to seek alternative financing because it defaulted on its credit obligations to JP Morgan. That default had nothing to do with Apotex or Slayback. It occurred because Eagle failed to make timely and accurate financial filings with the Securities and Exchange Commission—a failure triggered by Eagle's desperate attempt to conceal the collapse of an illicit channel-stuffing scheme involving an entirely different product (PEMFEXY®). Eagle has no one but itself to blame for the ensuing financial catastrophe that followed—including Nasdaq delisting, resignation of top executives, ▮▮▮▮▮ ▮▮▮▮▮, and near-total evaporation of its cash reserves. Defendants played no role in any of this;

1

indeed, this entire chain of events unfolded before any allegedly infringing conduct even began. Nor was any of it a foreseeable result of any allegedly infringing conduct by Defendants—Eagle actively hid its financial rot from the public for as long as it could.

The Court should not permit Eagle to shift onto Defendants the costs of Eagle's own financial recklessness by repackaging them as "patent damages." Defendants are entitled to partial summary judgment on Eagle's claim for damages, in so far as they relate to losses arising from the Blue Owl Agreement.

## II.      NATURE AND STAGE OF THE PROCEEDINGS

On January 17, 2024, Plaintiff Eagle Pharmaceuticals, Inc. ("Eagle") filed suit against Defendants Apotex Inc. and Apotex Corp. ("Apotex"), Slayback Pharma LLC, and Azurity Pharmaceuticals, Inc. ("Slayback") (collectively, "Defendants") alleging infringement of U.S. Patent Nos. 11,844,783 (the "'783 patent") and 11,872,214 (the "'214 patent"). On January 17, 2025, Eagle filed a separate action, alleging infringement of U.S. Patent No. 12,138,248 (the "'248 patent") by the same Apotex NDA Product. The actions have been consolidated.

On February 2, 2026, the Court entered an Order granting the parties' stipulation to dismiss with prejudice all claims, counterclaims, and defenses relating to the '783 patent, with no effect on the remaining patents-in-suit. Accordingly, the remaining asserted patents in this consolidated action are the '214 patent and the '248 patent.

## III.      BACKGROUND

Eagle entered into a royalty purchase agreement in March 2025 with an entity that was provided capital funds managed by Blue Owl, through which Eagle sold its royalty interest in annual net sales of BENDEKA,® for $69 million (the "Blue Owl Agreement"). (CSF ¶ 14.) Eagle seeks approximately ███ in damages arising from its decision to enter into the Blue Owl Agreement, which it has apportioned to each Defendant based on the percentage of their respective sales (i.e., ████████ ███████████████). (Ex. 25 ¶ 170; Ex. 26 ¶ 166.)

2

**A.    Before Any Allegedly Infringing Conduct, Eagle Hemorrhages Cash Due to a Stock Repurchase Agreement, the Collapse of a Channel-Stuffing Scheme, and Delisting from Nasdaq.**

In 2021, Eagle held nearly ▮▮▮▮▮▮▮ in cash and cash equivalents. (CSF ¶ 2.) But by 2023—before any allegedly infringing conduct began—its cash balance had plummeted ***almost 90%*** to a mere ▮▮▮▮▮▮▮. (*See id.*) There are two obvious explanations for this shocking decline.

*First*, in March 2020, Eagle's board approved a common stock repurchase program (the "Share Repurchase Program") providing for ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (CSF ¶ 3.) From August 2016 through the third quarter of 2023, Eagle ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (*Id.*) Simultaneously, Eagle's debt increased in 2022 and 2023. (*Id.*)

*Second*, Eagle failed to file its Q3 2023 financial report with the SEC in a timely manner due to the collapse of revenue-inflating scheme involving one of its wholesalers. On November 9, 2023, Eagle announced it would delay the release of its Q3 2023 results pending review of potential adjustments relating to the reporting of sales of PEMFEXY®, expecting to revise its 2023 full year guidance downward. (CSF at 4.) That same day, Eagle filed SEC Form 12b-25, stating it was "reviewing and expect[ed] potential adjustments to reserves for returns and price adjustments of approximately $15.0 million to $20.0 million. (*Id.*) Eagle reported that "these potential adjustments primarily relate to returns and a price adjustment for PEMFEXY® substantially stemming from slower-than anticipated pull-through from one wholesale customer predominantly due to expiry of inventory." (*Id.*) As time would eventually tell, this was a late-stage symptom of a channel-stuffing scheme: a deceptive business practice in which a manufacturer floods its wholesalers and distributors with inventory in order to recognize sales on its balance sheet, only to have suffer a massive loss when the excess product is returned later down the road.[1] *See generally* Ex. 23.

---

[1] "Channel stuffing is the practice of shipping products to distributors and booking the revenue, even if the distributor cannot sell the products and ultimately returns them a few months later. This unethical (and potentially illegal) practice has long been used to reach sales quotas and to inflate

Things began to snowball from there. Later in November 2023, Eagle received notice from Nasdaq that, due to the delay in the third quarter 2023 filing, Eagle was no longer in compliance with continued listing requirements for timely filing of all periodic financial reports with the SEC. (CSF ¶ 5.)

On the same day as the Nasdaq notice, Eagle announced that its founder, president, and CEO Scott Tarrif would resign: "'After consideration of various alternatives, including termination with or without cause, the Board accepted Mr. Tarriff's resignation. Mr. Tarriff will be on leave until his last day of employment with the Company on December 31, 2023.'" (*Id.*) The following month, Eagle's audit committee announced the need for a hard restatement of its Q2 2023 financial report, stating that the previously published report, as filed with the SEC, "should no longer be relied upon and should be restated." (CSF ¶ 6.)

As a result of the financial malfeasance, Eagle, its former CEO, and its former CFO were named as defendants in *Miller v. Eagle Pharmaceuticals, Inc. et al.*, a putative class action filed in the United States District Court for the District of New Jersey in December 2023. (CSF ¶ 27.) The plaintiffs in that action alleged that Eagle violated federal securities laws by failing to disclose material adverse facts about Eagle's business, operations, and prospects relating to its product PEMFEXY® during the period of August 8, 2023 through November 28, 2023. *Id.*

Eagle's woes continued into 2024. It failed to file its 2023 10-K in a timely manner, which resulted in yet another warning letter from Nasdaq. (CSF ¶ 7.) Eagle admitted there could be no assurance that it would "'be able to regain compliance or maintain compliance with the rule or other listing requirements.'" (*Id.*)

Eagle's prophecy eventually became reality. In May 2024, it received a notice from Nasdaq initiating a process to delist Eagle's securities because Eagle had failed to timely file its quarterly report (Form 10-Q) for the quarter ended September 30, 2023, and also failed to timely file its annual report

---

revenues, albeit for the short time before the products are returned." *Palmer v. Reali*, 211 F. Supp. 3d 655, 662 n.4 (D. Del. 2016).

(Form 10-K) for the year ended Dember 31, 2023. (CSF ¶ 8.) Eagle's stock was suspended from trading on October 3, 2024 and on November 15, 2024, Eagle announced that it intended to delist its stock from Nasdaq. (*Id.*)

### B.    Eagle Restates Additional Financial Reports.

In November 2024, Eagle recruited Christopher Krawtschuk as CFO, with Mr. Krawtschuk's principal task being to correct Eagle's devastating financial statement errors from 2022 and 2023. (*See* CSF ¶ 9.)  Mr. Krawtschuk



By November 21, 2024, Eagle's Audit Committee concluded that its audited consolidated financial statements for the fiscal year ended December 31, 2022 and its unaudited financial statements for quarters ended June 30, 2022, September 30, 2022, and March 31, 2023 should not "'be relied upon and the financial statements should be restated.'" (CSF ¶ 13.)

### C.    Due to Its Financial Malfeasance and Mismanagement, Eagle Defaults on Its Credit Agreement With JP Morgan.

On November 1, 2022, Eagle entered into the Third Amended and Restated Credit Agreement (the "Credit Agreement") with JPMorgan Chase Bank, N.A., as administrative agent ("JPMorgan"). (CSF ¶ 14.)

As a result of Eagle's financial reporting errors from 2022 and 2023 relating to PEMFEXY®, Eagle was unable to produce its 2024 financial statement. (*See* CSF ¶ 15.)

5

Considering those financial statements did not fairly present the Eagle's financial condition, this constituted an event of default under the Credit Agreement, placing Eagle in default as of both December 31, 2023 and December 31, 2024. (*See* CSF ¶ 16.)

In August 2024, Eagle entered into the Limited Waiver and Fourth Amendment to Third Amended and Restated Credit Agreement (the "Fourth Amendment Agreement"), which, among other things required ████████████████████████████████████████████ under the Fourth Amendment Agreement. (CSF ¶ 17.) JP Morgan also accelerated repayment of its loan, forcing Eagle to ███████████████ from December 2024 to September 2025. (CSF ¶ 18.)

Eagle needed to raise capital to repay these amounts, but was effectively closed out from considering traditional lending arrangements from other banks due to its default on the Credit Agreement. (CSF ¶ 20.)

**D.    Eagle Turns to Blue Owl After Breaching Its Agreement With JP Morgan.**

Eagle was forced to pursue royalty monetization to pay down its debt because ████████████ ████████████████████████████████████████████████████ ████████████████████ ████████████████████████████████████████ and Eagle officially entered into the Blue Owl Agreement on March 31, 2025, for an upfront cash payment of $69.0 million. (CSF ¶ 22.)

Eagle entered into the Blue Owl Agreement to secure the capital necessary to meet its obligations under the JPMorgan Credit Agreement, namely, using "the net proceeds from the transaction to reply in full [Eagle's] existing Third Amended and Restated Credit Agreement, dated November 1, 2022 . . . including the remaining balance under a drawn term loan of █████████, as well as █████████ under a revolving credit facility." (CSF ¶ 23.)

During the first quarter of 2025, Eagle repaid $5.0 million of the amount outstanding under the term loan. On March 31, 2025, the net proceeds from the Blue Owl Agreement were used to repay, in full, all amounts outstanding under the Credit Agreement, which included $32.5 million under the term loan

6

and $25.0 million under the revolving loans. In connection with the repayment, the Credit Agreement was terminated and may no longer be utilized for borrowings. (CSF ¶ 24.)

Some, but not all the proceeds from the Blue Owl Agreement were used to pay down the Credit Agreement debt; $9–$10 million in funds were used for other corporate purposes. (CSF ¶ 25.)

As of October 2025, ███████████████████████████████████████ ████████ (CSF ¶ 26.) In financial statements, Eagle ██████████████████████████ ████████████████████████████████████████████████████

(*Id.*)

## IV.    **ARGUMENT**

Whether a particular category of asserted damages is legally compensable is a question of law. *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1287 (Fed. Cir. 2011). Where the patentee's theory of recovery is too remote or attenuated, courts routinely resolve the issue on summary judgment. *See, e.g.*, *W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, 198 F. Supp. 3d 366, 380 (D. Del. 2016) (Stark, J.) (granting summary judgment because alleged pre-assignment lost profits "could not have been reasonably foreseen" by the accused infringer); *Volterra Semiconductor Corp. v. Primarion, Inc.*, 2013 WL 6905555, at *19 (N.D. Cal. Dec. 31, 2013) (granting summary judgment against lost-profits theory premised on parent's loss of subsidiary value); *Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 1996 WL 621835, at *3 (D. Del. Oct. 21, 1996) ("[L]osses sustained to a shareholder because the corporation was injured are not reasonably foreseeable losses."). For the reasons set forth below, Eagle's Blue Owl theory of damages is precisely the type of attenuated claim that warrants summary disposition.

### A.    **Eagle's Alleged "Damages" Are Not Recoverable as Patent Damages.**

Eagle seeks approximately ████████ in aggregate "damages" arising from its decision to seek alternative financing from a third-party lender, Blue Owl. (*See* Ex. 25 ¶ 170; Ex. 26 ¶ 166.) Specifically,

7

these purported damages consist of financing costs associated with the sale of Eagle's royalty stream for BENDEKA® to Blue Owl. (CSF ¶ 22.) These are not patent damages in any recognized sense, they are financing charges imposed by a lender—arising from Eagle's business decision to borrow against future royalties. (CSF ¶¶ 20–23.) The ▮▮▮▮▮▮ does not represent lost sales, displaced market share, or any traditional measure of infringement harm. Rather, it represents in the price tag on a private-credit transaction that Eagle entered because its own misconduct had closed every other door – not because of anything Defendants did.

Under the Patent Act, a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. Patent damages are calculated in one of two ways: (1) lost profits, *i.e.*, "the profits the patentee lost from the infringement"; or (2) "a reasonable royalty." *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 106 F. Supp. 3d 506, 512 (M.D. Pa. 2015) (quoting *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983)). Both of these methodologies seek to quantify the money that would flow to the patentee resulting from infringement, *i.e.*, the lost sales/lower prices of the patented product or the lost ability to derive revenue from licensing the patent.

more remote, speculative, downstream impacts to the patentee are not simply recoverable as patent damages. *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1546 (Fed. Cir. 1995) (en banc); *see also Velo-Bind, Inc. v. Minnesota Min. & Mfg. Co.*, 647 F.2d 965, 973 (9th Cir. 1981) ("[T]here are many elements of damage which may be caused by an infringement and yet which are unrecoverable as a matter of law. Indirect consequential damages are not recoverable . . . ."). So, for example, if a company loses revenue because of patent infringement and is thus less valuable as a company, the lost revenue is recoverable, but the secondary impact of lost business value is not. *Rite-Hite Corp.*, 56 F.3d at 1546 ("remote consequences, such as . . . loss in value of shares

of common stock of a patentee corporation caused indirectly by infringement are not compensable"). Eagle's decision to spend ████████ in financing costs is not a patent damage because it is neither a lost profit, nor a form of a reasonable royalty.  At most, this sum reflects the exact type of "remote consequences" that are "not compensable" under § 284.  *Id.*

Tellingly, Eagle's own damages expert, Dr. Vellturo, does not affirmatively opine that Eagle's Blue Owl costs are properly considered damages under the patent statute. (*See* Ex. 25 ¶ 170 (relying entirely on an understanding from counsel to attribute the costs as damages due to Apotex); Ex. 26 ¶ 166 (same assumptions regarding Slayback).) That is understandable. The Blue Owl costs do not reflect a delta in money that would flow to Eagle but for Defendants' allegedly infringing conduct. Rather those costs reflect a theoretical use for that money once it came in the door. But like a change in value of a company, that difference—to the extent it exists—is not a patent damage. *Id.* Dr. Vellturo's equivocation on whether these damages constitute "lost profits" underscores that they do not fit within any recognized category of patent damages. If Eagle's own expert cannot definitively establish what these damages are, the Court should not permit Eagle to recover them.

The Federal Circuit has recognized that the patent statute addresses compensating a patentee for the time value of money damages, not financing costs untethered to any infringement. *Cf. Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 656 (1983) (finding prejudgment interest was meant to compensate "the forgone use of the money between the time of infringement and the date of the judgment"). For example, in *Uniroyal*, the Federal Circuit considered Rudkin-Wiley's argument that its "poor financial condition during the pendency of the litigation required it to finance its operations with monies borrowed at rates above the prime rate" not in determining damages, but rather in considering whether the district court's selection of the prime rate for

9

prejudgment interest was an abuse of discretion. *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1546 (Fed. Cir. 1991). Rudkin-Wiley's need to finance is the same as the Blue Owl costs here – not patent damages, but a financing charge, not recoverable as patent damages.

**B.      Eagle Has Not Established—And Cannot Establish—But-For or Proximate Causation.**

Even if the Court were to accept Eagle's characterization of these "damages" as "lost profits," the law guards against over-zealous patent owners by imposing traditional causation requirements before they may recover such remote, consequential damages. Eagle must prove a "reasonable probability that 'but for' the infringement, it would have" not suffered the alleged loss. *Rite-Hite Corp..*, 56 F.3d at 1545 (quoting *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964)). In addition, Eagle's damages are "limited by the issue of foreseeability," imposed in terms of "proximate cause." *Id.* at 1546. Accordingly, "the patent holder may recover for an injury caused by the infringement [only] if it was or should have been reasonably foreseeable by an infringing competitor in the relevant market, broadly defined." *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1118 (Fed. Cir. 1996). To recover on its Blue Owl theory, then, Eagle must establish both but-for and proximate causation linking Defendants' alleged infringement and the ██████████ financing costs it seeks as "damages." It has established neither—and the undisputed record forecloses any possibility that it could.

**1.      Eagle Has No Evidence of But-For Causation.**

Eagle's evidentiary showing on causation is nonexistent. Its damages expert, Dr. Vellturo, expressly admits that he is "not opining on causation." (Ex. 29 ¶ 79.) He instead "assume[s] that the damages associated with the Blue Owl Agreement are properly attributable to Apotex's infringement." (Ex. 29 ¶ 79.) In his Opening Report, Dr. Vellturo further qualified his entire Blue Owl calculation with the caveat that he "understand[s] from counsel" that Blue Owl-related losses

10

"can be attributable as damages due to Apotex's infringement." (Ex. 25 ¶ 170; Ex. 26 ¶ 166 (same assumption as to Slayback).) But causation cannot be assumed—it must be proven with competent evidence. The only other purported evidence of causation is a conclusory, self-interested statement from Eagle's CFO, Mr. Krawtschuk, that ████████████████████████████████████ ███████████████████████████████████████████████████████████ (Ex. 25 ¶ 169; Ex. 26 ¶ 165.) But that is not competent evidence that lost profits *caused by the Defendants' allegedly infringing activity resulted in Eagle's inability to meet its obligations to JPMorgan*, which is the relevant causal question. *See Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1340 (Fed. Cir. 2001); *Moore U.S.A., Inc. v. Standard Reg. Co.*, 229 F.3d 1091, 1112 (Fed. Cir. 2000) ("A party may not overcome a grant of summary judgment by merely offering conclusory statements.").

Eagle's threadbare causation theory collapses entirely upon even a cursory examination of Eagle's financial trajectory leading up to its decision to seek alternative financing from Blue Owl in March 2025. As detailed above, significant discrepancies in Eagle's accounting practices relating to its PEMFEXY® product resulted in a cascade of devastating consequences beginning in November 2023, before any alleged infringement occurred. *See, e.g.*, Section III.A–C, *supra*. These included, but were not limited to: a Nasdaq notice of non-compliance on November 27, 2023 (CSF ¶ 5); the November 27, 2023 resignation of Eagle's founder and CEO (*id.*); an audit-committee conclusion in December 2023 that Eagle's June 30, 2023 financial statements "should no longer be relied upon and should be restated" (CSF ¶ 6); an additional Nasdaq deficiency notice in April 2024, (CSF ¶ 7); a delisting notice in May 2024 (CSF ¶ 8); suspension of trading on October 3, 2024 (*id.*); and Eagle's announcement on November 15, 2024 that it would delist from

Nasdaq (*id.*). Every one of these events was Eagle's own doing—and every one preceded or was contemporaneous with the alleged infringement.

Unsurprisingly, from 2021 to 2023, Eagle's cash position had deteriorated dramatically from nearly ███████████████████████ in cash and cash equivalents. (CSF ¶ 2.) All before any alleged infringement by Defendants.

In its financial statements, Eagle ██████████████████████████ ████████████████████████████████████████████ ██████████████████████████████ (CSF ¶ 26.) With significantly less available cash and mounting debt, Eagle's financial health only worsened when its actions caused it to default on its loan obligations with JP Morgan. (CSF ¶¶ 14–19.) ████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████ Eagle's failures to deliver timely financial statements resulted in several waiver and amendment agreements with respect to its credit agreement with JPMorgan. (CSF ¶ 17.) These ████████████ included an acceleration of repayment of the outstanding principal of the credit line extended to Eagle—a sum totaling over ████████—over a period of nine months. (CSF ¶ 18; Ex. 25 at Ex. 19 ("Eagle Quarterly Cash Flow and But-For Profits Q1 2024–Q3 2025").)

Put simply, over roughly the same time period as Defendants' alleged infringement, Eagle suffered catastrophic losses stemming from poor financial and accounting decisions that were in no way remotely related to anything having to do with Eagle's bendamustine business. As Apotex's expert, Dr. Korenko, summarized: "Eagle's failure to produce audited financial statements resulted in a breach of the JPMorgan credit agreement, which in turn resulted in a tightening of credit terms under these amendment agreements by JPMorgan that *led Eagle to enter*

*the Blue Owl Agreement*" to repay the JPMorgan facility in full. (Ex. 3 ¶ 99 (emphasis added).) Eagle does not and cannot account for these intervening events in its theory of causation.

Beyond Eagle's deteriorating financial condition, Dr. Vellturo's damages calculation also suffers from a fatal flaw in that it rests upon the assumption that Eagle would not have entered the Blue Owl deal but for the collective infringement of three separate defendants – Apotex, Slayback and Baxter. (Ex. 28 at 251:6–252:18 ("I did it under the maintained hypothesis there was no infringement by any of the three defendants.").) Dr. Vellturo has not—and cannot—isolate the portion of Eagle's alleged losses attributable solely to any on Defendant's conduct. This is yet another reason why the alleged infringement of either Apotex or Slayback, standing alone, is insufficient to establish but-for causation for the Blue Owl damages. Eagle cannot hold Apotex or Slayback individually liable for costs that, even under Eagle's own theory, required the combined conduct of three separate actors.

### 2. Eagle's Financial Deterioration Was Not Reasonably Foreseeable to Defendants.

Even if Eagle could cobble together a triable case on but-for causation (it cannot), the undisputed facts independently demonstrate that it cannot prove proximate causation. None of the intervening factors that led Eagle to enter the Blue Owl Agreement were reasonably foreseeable to Defendants. These factors were either too remote from any alleged infringement or involved information that was not publicly available to Defendants. Specifically, Defendants contend that the following could not have been reasonably foreseen: (1) Eagle's illicit channel-stuffing scheme involving PEMFEXY® and its undisclosed inventory-holding arrangement with wholesaler McKesson; (2) the breakdown of Eagle's internal accounting controls, leading to material misstatements in its financial reports; (3) Eagle's need to delay and ultimately restate multiple quarters of financial statements, including FY 2022 and the quarterly statements for Q2 2022, Q3

13

2022, Q1 2023, and Q3 2023; (4) the resignation of Eagle's founder and CEO on November 29, 2023; (5) Nasdaq's notice of non-compliance on November 27, 2023, followed by an additional deficiency notice in April 2024, a delisting notice in May 2024, and suspension of trading on October 3, 2024; (6) Eagle's ultimate decision to voluntarily delist from Nasdaq on November 15, 2024; (7) Eagle's catastrophic deterioration in cash position from nearly ███████████ ████████████████████—driven by its own misconduct rather than any market competition; (8) Eagle's default on its JPMorgan credit agreement due to its failure to timely produce audited financial statements and maintain required financial covenants; (9) JPMorgan's decision to tighten and accelerate Eagle's repayment obligations; and (10) Eagle's consequent need to enter into the Blue Owl financing arrangement on unfavorable terms to repay JPMorgan.

Each of these events was the product of Eagle's own financial mismanagement, not the natural or foreseeable consequence of any alleged infringement by Apotex or Slayback. *See W.L. Gore*, 198 F. Supp. 3d at 380 (granting summary judgment because alleged damages "could not have been reasonably foreseen" by accused infringer); *Network Appliance, Inc. v. Bluearc Corp.*, 2005 WL 1530222, at *14 (N.D. Cal. June 27, 2005) (rejecting damages theory where particular injury was not reasonably foreseeable). Eagle cannot use Defendants as an insurance policy against the consequences of its own wrongdoing.

## V.     **CONCLUSION**

For the foregoing reasons, the Court should grant Defendants' motion for partial summary judgment and preclude Eagle from recovering the approximately ████████ in purported damages associated with the Blue Owl Agreement. Eagle cannot recover from Apotex and Slayback financing charges it racked up as a result of its own poor financial planning decisions by dressing them up as "patent damages" or "lost profits." The only tangential connection between these costs

and this case is that the asset Eagle borrowed against happened to be its BENDEKA® royalty stream. That tenuous, incidental link is insufficient as a matter of law to support an award of damages under 35 U.S.C. § 284, and the Court should so hold.

Dated: June 5, 2026

Of Counsel:
Deepro R. Mukerjee
Lance A. Soderstrom
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Center
New York, NY 10020-1605
212.940.8800
deepro.mukerjee@katten.com
lance.soderstrom@katten.com

Jitendra Malik
Joseph M. Janusz
KATTEN MUCHIN ROSENMAN LLP 550
South Tryon Street, Suite 2900
Charlotte, NC 28202
704.444.2000
jitty.malik@katten.com
joe.janusz@katten.com

Christopher B. Ferenc
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Ave., NW., Suite 800
Washington, DC 20006
202.625.3500
christopher.ferenc@katten.com

Rachel L. Schweers
Matthew T. Messina
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe St.
Chicago, IL 60661
312.902.5200
rachel.schweers@katten.com
matthew.messina@katten.com

   /s/ Kennth L. Dorsney _____
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants*
*Apotex Inc. and Apotex Corp.*

_/s/ Daniel A. Taylor_
Neal C. Belgam (No. 2721)
Daniel A. Taylor (No. 6934)
SMITH KATZENSTEIN & JENKINS LLP
1000 N. West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

_Attorneys for Defendants_
_Slayback Pharma LLC_