**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC, <br><br> Plaintiffs, <br> v. <br> APOTEX INC., AND APOTEX CORP, <br><br> Defendants. | C.A. No. 24-64-JLH <br> **(CONSOLIDATED)** <br> **JURY TRIAL DEMANDED** <br> ▮▮▮▮▮▮▮▮▮ |
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC, <br><br> Plaintiffs, <br> v. <br> SLAYBACK PHARMA LLC, <br><br> Defendant. | C.A. No. 24-65-JLH <br> **(CONSOLIDATED)** <br> **JURY TRIAL DEMANDED** <br> ▮▮▮▮▮▮▮▮▮ |

### DECLARATION OF MATTHEW T. MESSINA IN SUPPORT DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF DAMAGES (VOL. 1 – EXHIBITS 1-9)

Neal C. Belgam (No. 2721)
Daniel A. Taylor (No. 6934)
SMITH KATZENSTEIN & JENKINS LLP
1000 N. West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

Attorneys for Defendants
*Slayback Pharma LLC*

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants
Apotex Inc. and Apotex Corp.*

Dated: June 5, 2026

I, Matthew T. Messina, declare as follows:

1. I am an attorney with the law firm Katten Muchin Rosenman LLP and counsel to Defendants Apotex Inc. and Apotex Corp. (together, "Apotex") in the above-captioned matter. I make this declaration in support of Defendants' Motion for Summary Judgment of Noninfringement.

2. Attached as **Exhibit 1** is a true and correct copy of U.S. Patent No. 11,872,214.

3. Attached as **Exhibit 2** is a true and correct copy of the First Amended Complaint (D.I. 22).

4. Attached as **Exhibit 3** is a true and correct copy of excerpts of the Expert Report of Dr. George Korenko, Ph.D. in this matter, dated March 16, 2026.

5. Attached as **Exhibit 4** is a true and correct copy of a public SEC filing

6. Attached as **Exhibit 5** is a true and correct copy of a public SEC filing.

7. Attached as **Exhibit 6** is a true and correct copy of a public SEC filing.

8. Attached as **Exhibit 7** is a true and correct copy of a public SEC filing.

9. Attached as **Exhibit 8** is a true and correct copy of a public SEC filing.

10. Attached as **Exhibit 9** is a true and correct copy of a public SEC filing.

11. Attached as **Exhibit 10** is a true and correct copy of a document produced as EAGLEBEN-SA_00347447.

12. Attached as **Exhibit 11** is a true and correct copy of a document produced as EAGLEBEN-SA 00366581.

13. Attached as **Exhibit 12** is a true and correct copy of a press release dated November 9, 2023.

14. Attached as **Exhibit 13** is a true and correct copy of a public SEC filing.

15. Attached as **Exhibit 14** is a true and correct copy of excerpts of Christopher Krawtschuk's deposition transcript, dated December 5, 2025.

16.     Attached as **Exhibit 15** is a true and correct copy of a press release dated November 29, 2023.

17.     Attached as **Exhibit 16** is a true and correct copy of a press release dated November 29, 2023.

18.     Attached as **Exhibit 17** is a true and correct copy of a public SEC filing.

19.     Attached as **Exhibit 18** is a true and correct copy of a press release dated April 12, 2024.

20.     Attached as **Exhibit 19** is a true and correct copy of a press release dated May 22, 2024.

21.     Attached as **Exhibit 20** is a true and correct copy of a press release dated November 15, 2024.

22.     Attached as **Exhibit 21** is a document produced as EAGLEBEN-SA_00347437.

23.     Attached as **Exhibit 22** is a press release dated March 31, 2025, and produced as EAGLEBEN-SA_00367197.

24.     Attached as **Exhibit 23** is an Amended Class Action Complaint for Violations of the Federal Security Laws, dated July 11, 2025.

25.     Attached as **Exhibit 24** is a document produced as EAGLEBEN-SA_00346062.

26.     Attached as **Exhibit 25** is a true and correct copy of excerpts of the Supplemental Expert Report of Dr. Christopher Vellturo, Ph.D. in this matter, dated March 6, 2026.

27.     Attached as **Exhibit 27** is a true and correct copy of a public SEC filing.

28.     Attached as **Exhibit 28** is a true and correct copy of excerpts of Dr. Christopher Vellturo's deposition transcript, dated April 29, 2026.

29.     Attached as **Exhibit 29** is a true and correct copy of excerpts of the Reply Expert Report of Dr. Christopher Vellturo, Ph.D. in this matter, dated April 13, 2026.

_____/s/ Matthew T. Messina_____
Matthew T. Messina

EXHIBIT 1

US011872214B2

(12) **United States Patent**
Palepu et al.

(10) **Patent No.:**     **US 11,872,214 B2**
(45) **Date of Patent:**        *Jan. 16, 2024

(54) **FORMULATIONS OF BENDAMUSTINE**

(71) Applicant: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

(72) Inventors: **Nagesh R. Palepu**, Southampton, PA (US); **Philip Christopher Buxton**, Uxbridge (GB)

(73) Assignee: **Eagle Pharmaceuticals, Inc.**, Woodcliff Lake, NJ (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **18/081,251**

(22) Filed: **Dec. 14, 2022**

(65) **Prior Publication Data**

US 2023/0115693 A1      Apr. 13, 2023

**Related U.S. Application Data**

(63) Continuation of application No. 17/412,623, filed on Aug. 26, 2021, which is a continuation of application No. 16/509,920, filed on Jul. 12, 2019, now Pat. No. 11,103,483, which is a continuation of application No. 16/015,656, filed on Jun. 22, 2018, now abandoned, which is a continuation of application No. 15/432,335, filed on Feb. 14, 2017, now Pat. No. 10,010,533, which is a continuation of application No. 15/013,436, filed on Feb. 2, 2016, now Pat. No. 9,572,797, which is a continuation of application No. 14/031,879, filed on Sep. 19, 2013, now Pat. No. 9,265,831, which is a continuation of application No. 13/016,473, filed on Jan. 28, 2011, now Pat. No. 8,609,707.

(60) Provisional application No. 61/299,100, filed on Jan. 28, 2010.

(51) **Int. Cl.**
| | |
|---|---|
| *A61K 9/08* | (2006.01) |
| *A61K 47/10* | (2017.01) |
| *A61K 47/18* | (2017.01) |
| *A61P 35/00* | (2006.01) |
| *A61K 31/4184* | (2006.01) |
| *A61K 47/20* | (2006.01) |
| *A61K 47/12* | (2006.01) |
| *A61K 47/22* | (2006.01) |
| *A61K 9/00* | (2006.01) |

(52) **U.S. Cl.**
CPC ........... *A61K 31/4184* (2013.01); *A61K 9/08* (2013.01); *A61K 47/10* (2013.01); *A61K 47/12* (2013.01); *A61K 47/18* (2013.01); *A61K 47/20* (2013.01); *A61K 47/22* (2013.01); *A61K 9/0019* (2013.01)

(58) **Field of Classification Search**
CPC ...... A61K 31/4184; A61K 9/08; A61K 47/10; A61K 47/12; A61K 47/18; A61K 47/20; A61K 47/22; A61K 9/0019
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,071,620 | A | 1/1978 | Sklar |
| 4,711,906 | A | 12/1987 | Von et al. |
| 4,879,286 | A | 11/1989 | Alam et al. |
| 5,204,335 | A | 4/1993 | Sauerbier et al. |
| 5,223,515 | A | 6/1993 | Mikura et al. |
| 5,741,523 | A | 4/1998 | Teagarden et al. |
| 7,252,799 | B2 | 8/2007 | Miekka et al. |
| 7,772,274 | B1 | 8/2010 | Palepu |
| 8,076,366 | B2 | 12/2011 | Courvoisier et al. |
| 8,344,006 | B2 | 1/2013 | Drager et al. |
| 8,389,558 | B2 | 3/2013 | Alakhov et al. |
| 8,609,707 | B2 | 12/2013 | Palepu et al. |
| 8,791,270 | B2 | 7/2014 | Brittain et al. |
| 9,000,021 | B2 | 4/2015 | Sundaram et al. |
| 9,034,908 | B2 | 5/2015 | Sundaram |
| 9,144,568 | B1 | 9/2015 | Sundaram |
| 9,265,831 | B2 | 2/2016 | Palepu et al. |
| 9,572,796 | B2 | 2/2017 | Palepu et al. |
| 9,572,797 | B2 | 2/2017 | Palepu et al. |
| 9,572,887 | B2 | 2/2017 | Sundaram |
| 9,572,888 | B2 | 2/2017 | Sundaram |
| 9,579,384 | B2 | 2/2017 | Sundaram et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 1850048 A | 10/2006 |
| CN | 101584668 A | 11/2009 |

(Continued)

OTHER PUBLICATIONS

Kumar et al. (AAPS PharmSciTech 2006;7(3):E1-E7) (Year: 2006).*
McGinity et al. (Journal of Pharmaceutical Sciences 1975;64(2):356-357) (Year: 1975).*

(Continued)

*Primary Examiner* — Ernst V Arnold
(74) *Attorney, Agent, or Firm* — BakerHostetler

(57)        **ABSTRACT**

Long term storage stable bendamustine-containing compositions are disclosed. The compositions can include bendamustine or a pharmaceutically acceptable salt thereof, and a pharmaceutically acceptable fluid which can include in some embodiments PEG, PG or mixtures thereof and an antioxidant or chloride ion source. The bendamustine-containing compositions have less than about 5% total impurities, on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

**9 Claims, No Drawings**

US 11,872,214 B2

Page 2

(56)    **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 9,597,397 B2 | 3/2017 | Sundaram |
| 9,597,398 B2 | 3/2017 | Sundaram |
| 9,597,399 B2 | 3/2017 | Sundaram |
| 10,010,533 B2 | 7/2018 | Palepu et al. |
| 2002/0102215 A1 | 8/2002 | Klaveness et al. |
| 2002/0122768 A1 | 9/2002 | Liu et al. |
| 2004/0014964 A1 | 1/2004 | Cheesman et al. |
| 2004/0043069 A1 | 3/2004 | Vanderbist et al. |
| 2005/0025702 A1 | 2/2005 | Decicco et al. |
| 2005/0042285 A1 | 2/2005 | Ukai et al. |
| 2006/0035945 A1 | 2/2006 | Attardo et al. |
| 2006/0128777 A1 | 6/2006 | Bendall et al. |
| 2006/0159713 A1 | 7/2006 | Brittain et al. |
| 2006/0205694 A1 | 9/2006 | Alonso et al. |
| 2007/0116729 A1 | 5/2007 | Palepu |
| 2008/0118544 A1 | 5/2008 | Wang |
| 2009/0082416 A1 | 3/2009 | Czarnik |
| 2009/0209606 A1 | 8/2009 | Bendall et al. |
| 2009/0264488 A1 | 10/2009 | Cooper et al. |
| 2009/0325978 A1 | 12/2009 | Onai et al. |
| 2010/0092474 A1 | 4/2010 | Gallagher et al. |
| 2010/0145266 A1 | 6/2010 | Orlowski |
| 2010/0216858 A1 | 8/2010 | Popek et al. |
| 2010/0247669 A1 | 9/2010 | Eliasof et al. |
| 2010/0273730 A1 | 10/2010 | Hsu et al. |
| 2011/0015244 A1 | 1/2011 | Alakhov et al. |
| 2011/0015245 A1 | 1/2011 | Alakhov et al. |
| 2011/0184036 A1 | 7/2011 | Palepu et al. |
| 2011/0190363 A1 | 8/2011 | Drager et al. |
| 2012/0059000 A1 | 3/2012 | Ren et al. |
| 2012/0071532 A1 | 3/2012 | Cooper et al. |
| 2012/0157505 A1 | 6/2012 | Labell et al. |
| 2012/0308516 A1 | 12/2012 | Hlavinka et al. |
| 2013/0041003 A1 | 2/2013 | Brittain et al. |
| 2013/0041004 A1 | 2/2013 | Drager et al. |
| 2013/0210878 A1 | 8/2013 | Soppimath et al. |
| 2013/0210879 A1 | 8/2013 | Palepu et al. |
| 2013/0217888 A1 | 8/2013 | Shrawat et al. |
| 2013/0253025 A1 | 9/2013 | Sundaram |
| 2014/0094496 A1 | 4/2014 | Sundaram |
| 2014/0275196 A1 | 9/2014 | Sundaram |
| 2018/0000789 A1 | 1/2018 | Palepu et al. |
| 2018/0000938 A1 | 1/2018 | Sundaram |
| 2018/0185488 A1 | 7/2018 | Sundaram |
| 2018/0296535 A1 | 10/2018 | Palepu et al. |
| 2018/0296536 A1 | 10/2018 | Palepu et al. |
| 2018/0369383 A1 | 12/2018 | Sundaram |
| 2019/0192659 A1 | 6/2019 | Sundaram |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| CN | 102164579 A | 8/2011 |
| DE | 80967 A | 1/1970 |
| DE | 159289 A1 | 3/1983 |
| JP | 09-508128 A | 8/1997 |
| JP | 2005-537285 A | 12/2005 |
| JP | 2008-526991 A | 7/2008 |
| JP | 2012-503666 A | 2/2012 |
| JP | 2012-525387 A | 10/2012 |
| JP | 2015-501814 A | 1/2015 |
| WO | 99/01118 A2 | 1/1999 |
| WO | 2001/097860 | 12/2001 |
| WO | 2001/097861 | 12/2001 |
| WO | 2001/098294 | 12/2001 |
| WO | 02/02125 A1 | 1/2002 |
| WO | 2006/054315 A1 | 5/2006 |
| WO | 2006/110551 A2 | 10/2006 |
| WO | 2010/036702 A1 | 4/2010 |
| WO | 2010/126676 A1 | 11/2010 |
| WO | 2010/148288 A2 | 12/2010 |
| WO | 2011/094565 A1 | 8/2011 |
| WO | 2011/103150 A2 | 8/2011 |
| WO | 2012/015810 A2 | 2/2012 |
| WO | 2013/142358 A1 | 9/2013 |

OTHER PUBLICATIONS

Wasylaschuk et al. (Journal of Pharmaceutical Sciences, vol. 96, No. 1, Jan. 2007:106-116). (Year: 2007).*

Pokorny et al., Antioxidants in Food: Practical Applications 2001, CRC Press, p. 324.

Poulsen, Introduction to Chemistry (2010).

Pramod K. Gupta, et al.. "Injectable Drug Development Techniques to Reduce Pain and Irritation", pp. 183, Informa Healthcare, 2008, ISBN 13: 978-1-5749-1095-7.

Preiss et al., "Pharmacological and clinical date of Bendamustine," 17th International Cancer Congress, pp. 1637-1640 (1998).

Preiss et al., Studies on the Pharmacokinetics of Bendamustine (Cytostasan®) in Humans, Pharmazie, 40(11):782-784 (1985).

R.A. Pethrick et al., Excerpt from Polymer Yearbook 13, CRC Press, Oct. 1, 1996, Technology & Engineering Vinogradova et al.

Rassachaert et al., "A phase 1 study of bendamustine hydrochloride administered once every 3 weeks in patients with solid tumors," Anti-Cancer Drugs, vol. 18 No. 5 pp. 587-595 (2007).

Remington's Pharmaceutical Sciences, 18th edition, (1990), p. 1322.

Remington's Pharmaceutical Sciences, 18th edition, (1990), pp. 1286-1288.

Remington's Pharmaceutical Sciences 1990 (Eighteenth Edition), Mack Publishing Company, Chapter 85, 1570-1580.

Renu Chadha, et al., Drug Carrier Systems for Anticancer Agents: A Review, Journal of Scientific & Industrial Reasearch, vol. 67, pp. 185-197, 2008.

Ribomustin Monograph (Updated Aug. 2005).

Ribomustin Monograph (Updated Jan. 2002).

Ribomustin Product Information, Janssen-Cilag Pty Ltd (Updated Sep. 15, 2016).

Rote Liste 1996 for Ribomustin (86 023).

Rote Liste 2003 for Ribomustin (86 045).

Rowe et al. Handbook of Pharmaceutical Excipients, 6th edition, 2009, pp. 454-455.

Rowe et al., "Handbook of Pharmaceutical Excipients," Pharmaceutical Press, 6th edition pp. 857 (extract from index) (2009).

Rowe, et al., (ed) Handbook of Pharmaceutical Excipients, 5th ed., Pharmaceutical Press, pp. 545-550, Polyethylene Glycol, 2006.

Safety Data Sheet, Lactic Acid, 88%, Columbus Chemical Industries, 2013.

Scasnar at al., Radiochemical Assay of Stability of 14C-Cytostasan Solutions During Preparation and Storage, Journal of Radioanalytical and Nuclear Chemistry, Articles 121(2):489-497 (1988).

Schoffski et al., "Weekly administration of bendamustine: A phase 1 study in patients with advanced progressive solid tumors," Annals of Oncology II, pp. 729-734 (2000).

Schoffski et al., Repeated administration of short infusions of bendamustine: a phase 1 study in patients with advanced progressive solid tumours, J. Cancer Res Clin Oncol, vol. 126 No. 1 pp. 41-47 (2000).

Schwanen et al., In vitro evaluation of bendamustine induced apoptosis in B-chronic lymphocytic leukemia, Leukemia 16:2096-2105 (2002).

SciFinder, Hydrolytic degradation of IMET 3393, American Chemical Society, 2018.

Seager et al., Structure of Products Prepared by Freeze-Drying Solutions Containing Organic Solvents, PDA Journal oi Pharmaceutical Science and Technology, 39(4):161-179 (1985).

Search History issued in connection with PCT/US2013/32295 dated May 10, 2013.

Shah et al., Physical, Chemical, and Bioavailability Studies of Parenteral Diazepam Formulations Containing Propylene Glycol and Polyethylene Glycol 400, Drug Development and Industrial Pharm.), 17:12, 1635-1654 (Oct. 20, 2008).

Sigma-Aldrich, Webpage Catalog for poly(ethylene glycol), http://www.sigmaaldrich.com/catalog/product/aldrich/202398?lang=en®ion- =US#, accessed Nov. 15, 2015 (2 pages).

Sikora, "Cancer drug development in the post-genomic age," Current Science, vol. 81 No. 5 pp. 549-554 (2001).

Spectra Analysis, Inc., Oxidative Degradation of Polyethyleneglycol . . . , Application Note 016, Mar. 2008.

US 11,872,214 B2

Page 3

(56)    **References Cited**

OTHER PUBLICATIONS

Spiegel et al., "Use of Nonaqueous Solvents in Parenteral Products," Journal of Pharmaceutical Sciences, vol. 52, No. 10 pp. 917-927 (1963).

Strickley, Solubilizing Excipients in Oral and Injectable Formulations, Pharmaceutical Research 21(2):201-230 (Feb. 2004).

Supplemental European Search Report issued in connection with PCT/US2011/022958 dated Dec. 16, 2013.

T. W. Graham Solomons, Organic Chemistry (John Wiley & Sons, 3d ed. 1984).

Tageja, Bendamustine: Safety and Efficacy in the Management of Indolent Non-Hodgkins Lymphoma, Clinical Medicine Insights: Oncology 2011:5 145-156.

Teagarden & Baker, Practical Aspects of Freeze-Drying of Pharmaceutical and Biological Products Using Non-Aqueous Co-Solvent Systems, Chapter 8 in Freeze-Drying/Lyophilization of Pharmaceutical and Biological Products, 239-76 (2nd Edition, Edited by Rey, L. & May, J., Marcel Dekker, New York) (2004).

Teagarden & Baker, Practical Aspects of Lyophilization Using Non-Aqueous Co-Solvent Systems, 15 Eur. J. Pharma. Sciences, 115-33 (2002).

*Teva Pharmaceuticals International GMBH, et al. v. Apotex Inc., et al*—Civil Action 1:17-cv-01164: Defendants Apotex Inc. and Apotex Corp.'s Answer to Complaint, Defenses and Counterclaims (Document 17), dated Nov. 27, 2017.

*Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.*—Civil Action No. 1:17-cv-01201: Answer to Complaint, Separate Defenses, and Counterclaims (Document 10), dated Sep. 15, 2017.

*Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.*—Civil Action No. 1:17-cv-01201: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 14), dated Oct. 6, 2017.

*Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi USA, LLC.*—Civil Action No. 1:17-cv-01201: Complaint (Document 1), dated Aug. 24, 2017.

*Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC.*, et al—Civil Action No. 1:18-cv-01586: Answer to Fresenius Kabi USA, LLC's Counterclaims (Document 13), dated Nov. 27, 2018.

*Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al*—Civil Action No. 1:18-cv-01586: Complaint (Document 1), dated Oct. 15, 2018.

*Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al*—Civil Action No. 1:18-cv-01586: Defendant Mylan Laboratories LTD.'s Answer to Complaint for Patent Infringement (Document 11), dated Nov. 9, 2018.

*Teva Pharmaceuticals International GMBH, et al. v. Fresenius Kabi, LLC., et al.*—Civil Action No. 1:18-cv-01586: Defendant Fresenius Kabi USA, LLC's Answer to Complaint, Separate Defenses, and Counterclaims (Document 9), dated Nov. 6, 2018.

*Teva Pharmaceuticals International GMBH, et al. v. Mylan Laboratories Limited*—Civil Action No. 1:17-cv-01790: Complaint (Document 1), dated Dec. 12, 2017.

*Teva Pharmaceuticals International GMBH, et al. v. Slayback Pharma Limited Liability Company*—Civil Action No. 1:18-cv-00117: Complaint (Document 1), dated Jan. 19, 2018.

*Teva Pharmaceuticals International GMBH, et al. v. Slayback Pharma Limited Liability Company*—Civil Action No. 1:18-cv-00117: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Addtional Defenses and Counterclaims (Document 9), dated Feb. 12, 2018.

*Teva Pharmaceuticals International GMBH, et al. v. Apotex Inc., etal*—Civil Action No. 1:17-cv-01164: Complaint (Document 1), dated Aug. 18, 2017.

Thiesen, "Bendamustine, a well-tollerated cytotoxic agent used in Germany for may years, is soon to be marketed in the rest of Europe for a range of indicatons including chronic lymphocytic leukaemia," pp. 1-4 (2010). Available at http://www.hospitalpharmacyeurope.com/featured-articles/bendamustine.

Third Party Submission in related EP2528602 based on PCT/US2011/022958 dated Nov. 19, 2013 (9 pages).

Thomas A. Jennings, Lyophilization, Introduction and Basic Principles (2006)(original copyright 1999).

Treanda (Highlights of prescribing information 2008) (Year: 2008).

Treanda, "Highlights of Prescribing Information," Treanda (bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-13 (2010).

Treanda, "Highlights of Prescribing Information," Treanda (bendamustine hydrochloride) for Injection, for intravenous infusion, pp. 1-6 (2008).

U.S. Pharmacopeia 32-NF-27-General Notices and Requirements (2009).

USP 24/NF 19 (2000) entry for Propylene Glycol (USP).

V.G. Vinogradova, et al., Polymer Yearbook 13, New Metal Chelates as Antioxidant Stabilizers for Polymers . . . , pp. 87-111, 1996.

V.M. Mikhal'chuk, et al., Antioxidative Stabilization of Polyethylene . . . , Russian Journal of Applied Chemistry, vol. 77, No. 1, pp. 131-135, 2004.

Vlok, Manual of Nursing, vol. 1 (9th edition), 1988.

W. Furst, et al., "About the Hydrolytic Decomposition of IMET 3393," Pharmazeutische Zentralhalle, vol. 108, Issue 9, pp. 608-614, 1969 (English translation and the original article).

Wayne P. Olson, Volatile Solvents for Drying and Microbial Kill in the Final Container, Pharmaceutical Engineering, 110-118(1997).

Weide et al., Bendamustine Mitoxantrome and Rituximab (BMR): A New Effective Regimen for Refractory or Relapsed Indolent Lymphomas, Leukemia & Lymphoma, 43(2):327-331 (2002).

Werner et al., Hydrolysis Products of Cancerostatic Cytostasan(Registered) (Bendamustine), 42 (4) Die Pharmazie, Govi Verlag Pharmazeutischer Verlag GMBH, Eschborn, DE, 272-73.

William H. Brown, Organic Chemistry 5th Edition, pp. 358-360, 2009.

Wittaya-Areekul and Nail, Freeze-Drying of tert-Butyl Alcohol/Water Cosolvent Systems: Effects of Formulation and Process Variables on Residual Solvents, Journal of Pharmaceutical Sciences 87(4):491-495 (1998).

Written Opinion issued in counterpart PCT/US2013/032289 dated Jun. 6, 2013.

Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 3, 2013.

Zimmerman et al., Elements of Organic Chemistry (1977).

Zips et al., "New Anticancer Agents: In Vitro and In Vivo Evaluation," In Vivo, vol. 19 pp. 1-8 (2005).

Zumdahl et al., Chemistry, 7th Ed. (2007).

Gandhi & Burger, Bendamustine in B cell malignancies: the new, 46-year old kid on the block, Clin Cancer Res. Dec. 15, 2009; 15(24):7456-7461.

Gibson et al., "Pharmaceutical preformulation and formulation: A practical guide from candidate drug selection to commercial dosage form", Informa Healthcare USA, 2009, vol. 199, 2d ed, pp. 1-559.

Glimelius et al., Bolus-Injection (2-4 min) Versus Short-term (10-20 min) Infusion of 5-Fluorouracil in Patients with Advanced Colorectal Cancer: a Prospective Randomised Trial, Eur J. Cancer, 34, 674-678 (1998).

Gust and Krauser, Investigations on the Stability of Bendamustin, a Cytostatic Agent of the Nitrogen Mustard Type I. Synthesis, Isolation, and Characterization of Reference Substances, in Monatshefte fur Chemie, 128:291-99 (1997).

Heider et al., Efficacy and Toxicity of Bendamustine in Patients with Relapsed Low-Grade non-Hodgkin's Lymphomas, Anticancer Drugs, 12, 725-729 (2001).

HFSA Guidelines, Journal of Cardiac Failure vol. 16 No. 6 (2010).

ICH Harmonised Tripartite Guideline, Stability testing of New Drug Substances and Products Q1A(R2), dated Feb. 6, 2003.

Interlocutory decision in Opposition proceedings of EP 2528602 issued Apr. 8, 2019.

International Conference on Harmonisation in Guideline on Impurities in New Drug Products: Availability, 62 Fed. Reg. 27, 454-27,461 (May 19, 1997).

International Search Report and Written Opinion for No. PCT/US2013/032289 dated Jun. 6, 2013. (5 Pages).

US 11,872,214 B2

Page 4

(56)            **References Cited**

OTHER PUBLICATIONS

International Search Report and Written Opinion issued in counterpart PCT/US2013/032295 dated Jun. 2013 (4 pages).

International Search Report and Written Opinion of International application based on PCT/US2011/022958, dated Apr. 2011 (8 pages).

Jay S. Trivedi, et al., Water-Insoluble Drug Formulation, 7. Solubilization Using CoSolvent Approach, pp. 141-168, 2000.

Jay S. Trivedi, Water-Insoluble Drug Formulation, Second Edition, 9 Solubilization Using Cosolvent Approach, pp. 161-194, 2008.

JC Price, Handbook of Pharm. Excipients, 5th Edition, Polyethylene Glycol, pp. 545-550, Aug. 9, 2005.

Jerry March, Advanced Organic Chemistry (4th ed., John Wiley & Sons, Inc. 1992).

John D. Roberts & Marjorie C. Caserio, Basic Principles of Organic Chemistry 612-13, 615-16, 617-18 (W. A. Benjamin, Inc., 2d ed. 1977).

Jonkman-de Vries et al., Pharmaceutical Development of (Investigational) Anticancer Agents for Parental Use—A Review, Drug Dev Ind Pharm. 22(6):475-494 (1996).

Julia A. Barman Balfour, et al., "Bendamustine", Drugs, vol. 61, No. 5, pp. 631-638, 2001.

Kalaycio. M., Clinical Experience With Bendamustine: A New Treatment for Patients With Chronic Lymphocytic Leukemia; Clin Leukemia. 2008; 2(4): 223-229.

Kenneth E. Avis, et al., Remington, Parenteral Preparations, Chapter 41, pp. 780-786, 2000.

Knauf et al., Bendamustine Versus Chlorambucil in Treatment-Naive Patients with B-Cell Chronic Lymphocytic Leukemia (B-CLL): Results of an International Phase III Study, Blood, 110(11), 609a (abstract 2043) (2007).

Koomans et al., Sodium Balance in Renal Failure: A Comparison of Patients with Normal Subjects Under Extremes of Sodium Intake, Hypertension 7:714-721 (1985).

Kurt H. Bauer, et al., Pharmazeutische Technologies, pp. 225-228, HW9, 1993.

Kurt H. Bauer, et al., Pharmazeutische Technologies, pp. 424-425, HW10, 1993.

Larry A. Gatlin, et al., Injectable Drug Development, 17. Formulation and Administration . . . Products, pp. 401-420.

Leonard & Jann, A New Synthesis of Aziridinium Salts. 2,2-Pentamethylene-1,1-tetramethyleneaziridinium Perchlorate A Prototype, 82 J. Am. Chemistry Soc'y 6418-6419 (1960).

Leoni et al., SDX-105 (Bendamustine), a Clinically Active Antineoplastic Agent Possesses a Unique Mechanism of Action, Abstract, 102(11) Blood, Abstract #2363 (Nov. 16, 2003).

Lian-Feng Huang, et al., Water-Insoluble Drug Formulation, Second Edition, Ch. 7. Formulation Strategies and Practice . . . Support, pp. 113-132.

Lissitchkov et al., Phase-I/II study to Evaluate Dose Limiting Toxicity, Maximum Tolerated Dose, and Tolerability of Bendamustine HCl in Pre-treated Patients With B-Chronic Lymphocytic Leukaemia (Binet stages B and C) Requiring Therapy, J. Cancer Res. Clin. Oncol. 132:99-104 (2006).

Liu (ed). Water-Insoluble Drug Formulation, 1st ed., CRC Press, Chapters 7 and 9, 2000.

Liu (ed). Water-Insoluble Drug Formulation, 2nd ed., CRC Press, Chapters 7 and 9, 2008.

Lyondell Tebol(Registered) 99, Tertiary Butyl Alcohol in Freeze-Drying Applications,(Lyondell Chemical Co., 2003).

Lyophilization of Biopharmaceuticals (Henry R. Costantino & Michael K. Pikal eds., Association of Pharmaceutical Scientists 2004).

Maas et al., "Stabilitat von Bendamustinhydrochlorid in Infusionslosungen," Die Pharmazie, Govi Verlag Pharmazeutischer Verlag Gmbh, vol. 49. No. 10 pp. 775-777 (1994). (Abstract Only).

Margolin et al., Shortening the Infusion Time of Anticancer Drugs: Who Will Benefit?, J. of Clinical Oncology, 25(19):2642-2643 (2007).

McGinity, et al., Journal of Pharmaceutical Sciences, Influence of Peroxide Impurities in Polyethylene Glycols . . . , vol. 64, No. 2 pp. 356-357, 1975.

Michael J. Akers, Remington, The Science and Practice of Pharmacy 21st Edition, Parenteral preparation, chapter 41, pp. 802-835, 2005.

Michael P. Gamcsik, et al., NMR Studies of the Conjugation . . . , J. Med. Chem., vol. 33, pp. 1009-1014, 1990.

National Kidney Foundation, "Clinical Practice Guidelines and Clinical Practice Recommendations" (http://kidneyfoundation.cachefly.net/professionals/KDOQI/guideline_upHD_PD_VA/hd_guide5.htm) (2006).

Neelam Seedher, et al., Solubilization of Nimesulide; Use of Co-solvents, Indian J. Pharm. Sci., vol. 65, No. 1, pp. 58-61, 2003.

Nema et al., Excipients and Their Use in Injectable Products, PDA J. Pharma. Sci. & Tech., 51(4):166-171 (Jul.-Aug. 1997).

Ni et al., Stabilization and Preformulation of Anticancer Drug-SarCNU, Int'1 J. of Pharma., 249:257-264 (2002).

Ni et al., Use of Pure t-Butanol as a Solvent for Freeze-Drying: A Case Study, Int'1. J. of Pharma., 226:39-46 (2001).

Nuijen et al., Pharmaceutical Development of a Parenteral Lyophilized Formulation of the Novel Antitumor Agent Aplidine, PDA J. Pharmaceut. Sci. and Technol. 54(3):193-208 (May-Jun. 2000).

O'Connor, Hydrolysis and Alkylating Reactivity of Aromatic Nitrogen Mustards, J.Chem. Soc. Perkin Trans. 2, 1933-1939(1991).

Orrie M. Friedman, et al., Colorimetric Estimation of Nitrogen . . . , Analytical Chemistry, pp. 906-910.

Ozegowski et al., IMET 3393, ?-[1-Methyl-5-bis-(Beta-chloroethyl)-amino-benzimidazolyl-(2)]-butyric acid hydrochloride, a new cytostatic agent from the benzimidazole mustard gas series, 110 Zbl Pharm. 1013-1019 (1971).

"Draft Note for Guidance on Excipients, Antioxidants and Antimicrobial Preservatives in the Dossier for Application for Marketing Authorisation of Medicinal Product", EMEA, 2003, pp. 1-10.

American Heart Association, "Living With Heart Failure" (https://www.heart.org/idc/groups/heart-public/@wcm/@hcm/@gwtg/documents/downloadable/ucm_309068.pdf) (2001).

American Society of Hospital Pharmacists. ASHP Technical Assistance Bulletin on Hospital Distribution and Control. Am J. Hosp. Pharm. 1980, 37:1097-103.

Armstrong et al., Separation of Drug Stereoisomers by the Formation of . . . beta-Cyclodextrin Inclusion Complexes, Science, vol. 232, pp. 1132-1135, May 30, 1986.

Baldi et al., Statistical Procedures for Optimizing the Freeze-Drying of a Model Drug in Tert-Butyl Alcohol: Water Mixtures, Eur. J. of Pharm. & Biopharm. 40(3):138-41 (1994).

Bergsagel et al., Effect of cyclophosphamide on Advanced Lung Cancer and the Hematological Toxicity of Large, Intermittent Intravenous Doses, Canad. Med. Ass. J., 98, 532-538 (1968).

Bernard Testa, et al., Hydrolysis in Drug and Prodrug Metabolism, pp. 681-684.

Biewenga et al. "The Pharmacology of the Antioxidant Lipoic Acid," Gen. Pharmac., 1997, 29, 3, 315-331.

Boylan et al., Parenteral Products, Chapter 12 in Banker, et al., Modern Pharmaceutics, Fourth Ed. (2002).

Brigitte C. Scott, et al., Lipoic and Dihydrolipoic Acids . . . , Free Rad. Res., vol. 20, No. 2, pp. 119-133, 1994.

Broadhead, Pharmaceutical Preformulation and Formulation, Chapter 9 in "Parenteral Dosage Forms," (Interpharm) 2001.

Canadian Society of Hospital Pharmacists: Guidelines for Drug-Use Control, 2008.

Center for Drug Evaluation and Research, Andrew Dmytrijuk, FDA Medical Review for the Approval of Bendeka (2015).

Cephalon, Inc., et al., v. Slayback Pharma Limited Liability Company—Civil Action No. 1:17-cv-01154: Joint Status Report (Document 164), dated Oct. 19, 2018.

Cerhalon, Inc, et al. v. Slayback Pharma Limited Liability Company—Civil Action No. 1:17-cv-01154: Complaint (Document 1), dated Aug. 16, 2017.

Cerhalon, Inc., et al., v. Slayback Pharma Limited Liability Company, et al.—Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims (Document 56), dated Mar. 5, 2018.

US 11,872,214 B2

Page 5

(56)  **References Cited**

OTHER PUBLICATIONS

*Cerhalon, Inc., et al.,* v. *Slayback Pharma Limited Liability Company, et al.*—Civil Action No. 1:17-cv-01154: Joint Claim Construction Chart (Document 94), dated Jul. 24, 2018.
*Cerhalon, Inc., et al.,* v. *Slayback Pharma Limited Liability Company, et al.*—Civil Action No. 1:17-cv-01154: Answer to Apotex Inc. and Apotex Corp.'s Counterclaims (Document 22), dated Dec. 18, 2017.
*Cerhalon, Inc., et al.,* v. *Slayback Pharma Limited Liability Company, et al.*—Civil Action No. 1:17-cv-01154: Answer to Slayback Pharma Limited Liability Company's Counterclaims, dated Oct. 20, 2017.
*Cerhalon, Inc., et al.,* v. *Slayback Pharma Limited Liability Company*—Civil Action No. 1:17-cv-00154: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint and Counterclaims (Document 11), dated Sep. 29, 2017.
Charles P. Carpenter, et al., A Study of the Polyethylene Glycols as Vehicles . . . , Journal of the American Pharmaceutical Association, vol. XII, No. 1.
Cheson et al., Bendamustine: Rebirth of an Old Drug, J. Clin. Oncol. 27,1492-1501 (2009).
Cheung et al., Safety and Pharmacokinetics of Bendamustine Rapid-Infusion Formulation, J. of Clinical Pharmacology 2017.00(0)1-11.
Chu et al., Common Chemotherapy Regimens in Clinical Practice, Physicians' Cancer Chemotherapy Drug Manual 2009.
Cyclobond(Registered) Handbook, A Guide to Using Cyclodextrin Bonded Phases for Chiral LC Separations, 6th ed., 2002, Advanced Separation Technologies, Inc., pp. 1-58, pp. 42-45.
Derry E. Wilman, Application of 15N Nuclear Magnetic Resonance . . . , J. Med. Chem., vol. 38, pp. 2256-2258, 1995.
E. Santacesaria, et al., Thermal Stability of Nonionic Polyoxyalkylene . . . , Journal of Applied Polymer Science, vol. 42, pp. 2053-2061, 1991.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Answer to Slayback Pharma LLC's Counterclaims (Document 13), dated Oct. 31, 2018.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Complaint (Document 1), dated Sep. 20, 2018.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01459: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims (Document 9), dated Oct. 10, 2018.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Answer to Slayback Pharma LLC's Counterclaims (Document 12), dated Jan. 3, 2019.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Complaint (Document 1), dated Dec. 11, 2018.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Defendant Slayback Pharma Limited Liability Company's Answer to Complaint, Additional Defenses, and Counterclaims(Document 11), public version dated Dec. 20, 2018.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Eagle Pharmaceuticals' Opposition to Slayback Pharma's Motion for Judgment on the Pleadings (Document 23), redacted-public version dated Feb. 12, 2019.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Opening Brief in Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 17), public version dated Jan. 11, 2019.
*Eagle Pharmaceuticals, Inc.* v. *Slayback Pharma LLC*—Civil Action No. 1:18-cv-01953: Reply Brief in Further Support of Slayback Pharma Limited Liability Company's Motion for Judgment on the Pleadings (Document 27), public verison dated Mar. 1, 2019.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Exhibit Index—Includes Confidential Information (Document 21), public version dated Sep. 7, 2018.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Complaint (Document 1), dated Jul. 19, 2018.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Defendant Hospira, Inc's Motion to Dismiss (Document 13), dated Aug. 31, 2018.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Hospira's Reply Brief in Support of its Motion to Dismiss Plaintiffs' Complaint (Document 29), public version dated Nov. 26, 2018.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Hospira, Inc's Brief in Support of its rule 12(b)(6) Motion to Dismiss Plaintiffs' Complain (Document 20), public version dated Sep. 7, 2018.
*Eagle Pharmaceuticals, Inc., et al.* v. *Hospira, Inc*—Civil Action No. 1:18-cv-01074: Plaintiffs' Opposition to Motion to Dismiss (Document 26), redacted-public version dated Nov. 2, 2018.
EC Safety Data Sheet: Ribomustin(Registered) 2007.
Eric Watson, et al., Kinetics of Phosphoramide Mustard . . . , Journal of Pharmaceutical Sciences, vol. 74, No. 12, pp. 1283-1292, 1985.
Eugene C. Corbett, Jr., Intravenous Fluids: It's More Than Just 'Fill 'Er up!', Series #52 Practical Gastroenterology 44-60 (2007).
Excipient—Drug Interactions in Parenteral Formulations', Akers et. al., Journal of Pharmaceutical Sciences, vol. 91, issue 11, pp. 2283-2300, Nov. 2002.
Flamberg et al., Low Temperature Vacuum Drying of Sterile Parenterals From Ethanol, Bulletin of the Parenteral Drug Association, 24(5):209-17 (1970).
Floss et al., Intravenous fluids principles of treatment, Clinical Pharmacist, 3:274-283 (Oct. 2011).
Friedberg et al., Bendamustine in Patients with Rituximab-Refractory Indolent and Transformed Non-Hodgkin's Lymphoma: Results from a Phase II Multicenter, Single-Agent Study, J. Clin. Oncol., 26(2):204-210 (2008).
Fujisawa Deutschland GmbH Ribomustin(Registered) Products and Technical Specifications.
*Cephalon, Inc., et al.,* v. *Slayback Pharma Limited Liability Company, et al.*, Civil Action No. 1:17-cv-01154: Responsive Expert Report of Juergen Siepmann, Ph.D., 525 pages.
*Cephalon, Inc., et al.,* v. *Slayback Pharma Limited Liability Company, et al.*, Civil Action No. 1:17-cv-01154: Opinion, dated Apr. 27, 2020, 70 pages.

* cited by examiner

US 11,872,214 B2

# 1
## FORMULATIONS OF BENDAMUSTINE

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 17/412,623, filed Aug. 26, 2021, which is a continuation of application Ser. No. 16/509,920, filed Jul. 12, 2019, now U.S. Pat. No. 11,103,483, which is a continuation of application Ser. No. 16/015,656, filed Jun. 22, 2018, now abandoned, which is a continuation of application Ser. No. 15/432,335, filed Feb. 14, 2017, now U.S. Pat. No. 10,010,533, issued Jul. 3, 2018, which is a continuation of application Ser. No. 15/013,436, filed Feb. 2, 2016, now U.S. Pat. No. 9,572,797, issued Feb. 21, 2017, which is a continuation of application Ser. No. 14/031,879, filed Sep. 19, 2013, now U.S. Pat. No. 9,265,831, issued Feb. 23, 2016, which is a continuation of application Ser. No. 13/016,473, filed Jan. 28, 2011, now U.S. Pat. No. 8,609,707, issued Dec. 17, 2013, which claims the benefit of U.S. Provisional Patent Application No. 61/299,100, filed Jan. 28, 2010, the contents of each of which are incorporated herein by reference.

### BACKGROUND OF THE INVENTION

Bendamustine free base is represented by the following structural formula (I)

(I)

Bendamustine is used in the treatment of a number of cancers including leukemias, Hodgkins disease and multiple myelomas. Bendamustine is the active ingredient of the commercial product Treanda™, a lyophilized powder for reconstitution.

Bendamustine exhibits rapid degradation upon reconstitution of the lyophilized product. Bendamustine undergoes hydrolysis by direct substitution rather than an addition elimination process due to the presence of the highly labile aliphatic chlorine atoms. Some of the main degradants of bendamustine are the monohydroxy compound known as HP1 (hydrolysis product 1) and dihydroxy compound HP2 (hydrolysis product 2). The monohydroxy compound appears as the main impurity at Relative Retention Time (RRT) 0.6 and the dihydroxy compound appears as the main impurity at RRT 0.27. Minor peaks appear at RRT 1.2, which are presently unknown.

The stability of bendamustine in water is measured in hours, and is therefore, not suitable for long-term storage in liquid form. The lyophile possesses good chemical stability. However, reconstitution of the lyophile is clinically inconvenient, taking 15-30 mins with implications of chemical instability. There is a need for ready to use (RTU) bendamustine formulations having enhanced stability.

# 2
## SUMMARY OF THE INVENTION

In other aspects of the invention, the bendamustine-containing compositions include a) a pharmaceutically acceptable fluid which contains one or more of propylene glycol, ethanol, polyethylene glycol, benzyl alcohol and glycofurol, and b) a stabilizing amount of a chloride salt. In other aspects of the invention, the bendamustine-containing compositions include DMSO (dimethyl sulfoxide) as part of the pharmaceutically acceptable fluid included therein. Regardless of the pharmaceutically acceptable fluid included, the amount of bendamustine included in the composition is preferably from about 20 mg/mL to about 60 mg/mL. Still further aspects of the invention include methods of treatment using bendamustine-containing compositions and kits containing the same.

One of the advantages of the inventive liquid compositions is that they have substantially improved long term stability when compared to currently available formulations. For example, the inventive bendamustine compositions are substantially free of impurities after at least about 15 months at a temperature of from about 5° C. to about 25° C. The inventive formulations are advantageously ready to use or ready for further dilution. Reconstitution of lyophilized powders is not required.

### DETAILED DESCRIPTION OF THE INVENTION

Unless defined otherwise, all technical and scientific terms used herein have the same meaning as is commonly understood by one of ordinary skill in the art to which this invention belongs. In the event that there is a plurality of definitions for a term herein, those in this section prevail unless stated otherwise.

As used herein, RRT is calculated by dividing the retention time of the peak of interest by the retention time of the main peak. Any peak with an RRT<1 elutes before the main peak, and any peak with an RRT>1 elutes after the main peak.

For purposes of the present invention, "substantially free of impurities" shall be understood to include bendamustine-containing compositions in which the amount of total impurities is less than about 5%, as calculated on a normalized peak area response ("PAR") basis as determined by high performance liquid chromatography ("HPLC") at a wavelength of 223 nm, after a period of about 15 months at a temperature of from about 5° C. to about 25° C. The amount of impurities is further calculated as being based upon the original amount bendamustine (or salt thereof) being present in the composition or formulation.

For purposes of the present invention, a pharmaceutically acceptable fluid is a fluid which is suitable for pharmaceutical use.

Preferably, the amount of any individual degradant in the inventive compositions does not exceed 2% PAR as determined by HPLC at a wavelength of 223 nm after storage periods of at least about 15 months at a temperature of from about 5° C. to about 25° C. In some aspects, the amount of time the inventive compositions demonstrate long term storage stability is at least about 18 months and preferably at least about 2 years when stored under the conditions described herein.

US 11,872,214 B2

3

In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions including:

a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including
   i) PEG, PG or mixtures thereof; and
   ii) a stabilizing amount of an antioxidant.

The total impurities in the inventive compositions resulting from the degradation of the bendamustine in the compositions is less than about 5% PAR as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of from about 5° C. to about 25° C., and thus have long term stability for at least the same period of time or longer. Preferably, the bendamustine-containing compositions demonstrate long term storage stability for at least about 2 years, especially when stored at the lower (refrigerated) temperatures. In one embodiment, the amount of total impurities in the inventive compositions resulting from the degradation of the bendamustine is less than about 3% PAR as determined by HPLC at a wavelength of 223 nm after at least about 2 years at a temperature of from about 5° C. to about 25° C.

In some aspects of the invention, the bendamustine concentration in the inventive compositions is from about 10 mg/mL to about 100 mg/mL, preferably 20 mg/mL to about 60 mg/mL. Preferably the bendamustine concentration in the inventive compositions is from about 25 mg/mL to about 50 mg/mL, and more preferably from about 30 mg/mL to about 50 mg/mL. It will be understood that compositions containing any useful concentration within the ranges, i.e. 10, 20, 25, 30, 35, 40, 45, 50, 55, 60 . . . 100 are contemplated. In other embodiments, the bendamustine concentration in the composition is about 50 mg/mL. In alternative aspects, the amount of bendamustine is outside these ranges but the amounts will be sufficient for single or multiple administrations of dosages generally regarded as effective amounts.

In several embodiments of the invention, pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof. Within this aspect, the pharmaceutically acceptable fluid is propylene glycol (PG) or polyethylene glycol (PEG). In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about 50% PEG and about 50% PG. Alternatively, pharmaceutically acceptable fluid includes about 95% PEG and about 5% PG. The amount of PEG and PG can also be varied within the ranges, i.e. the ratio of PEG:PG in the pharmaceutically acceptable fluid can range from about 95:5 to about 50:50. Within this range, is a pharmaceutically acceptable fluid containing about 75% PEG and about 25% PG, and preferably 80% PEG and 20% PG. In another embodiment, a pharmaceutically acceptable fluid can include about 85% PEG and about 15% PG while another preferred pharmaceutically acceptable fluid includes about 90% PEG and about 10% PG. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

Without meaning to be bound by any theory or hypothesis, the hydroxide of the polyethylene glycol molecule is less reactive than the hydroxides of propylene glycol. As a result, the ester forms at a slower rate in polyethylene glycol than propylene glycol and the resulting bendamustine degradants are unexpectedly and substantially reduced over

4

extended periods of time when PEG is a substantial part of the pharmaceutically acceptable fluid.

The bendamustine-containing compositions according to several preferred aspects of the invention include a stabilizing amount of an antioxidant. For purposes of the present invention, "stabilizing amount" shall be understood to include those amounts which increase or enhance the stability of the bendamustine in the compositions described herein. The presence of one or more antioxidants described herein thus contributes, at least in part to the long term stability of the composition. Within this guideline, suitable antioxidant concentrations in the compositions can range from about 2.5 mg/mL to about 35 mg/mL, and preferably from about 5 mg/mL to about 20 mg/mL or from about 10 mg/mL to about 15 mg/mL. In some other embodiments, the concentration of the antioxidant in the bendamustine-containing composition is about 5 mg/mL.

Suitable antioxidants for inclusion include those which are pharmaceutically acceptable for use in human and veterinary formulations although not limited to those currently regarded as safe by any regulatory authority. For example, the antioxidant can be selected from among lipoic acid, thioglycerol (also known as monothioglycerol) and analogs thereof, propyl gallate, methionine, cysteine, metabisulfites, sodium formaldehyde sulfoxylate, phenol-containing aromatic and aliphatic compounds, dihydrolipoic acid and mixtures of the foregoing. Preferably, the antioxidant is thioglycerol, lipoic acid or a mixture thereof. Some particularly preferred embodiments of the invention include thioglycerol.

In view of the foregoing, some preferred long term storage stable bendamustine-containing compositions in accordance with the invention compositions include:

I. a) bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including
   i) polyethylene glycol and propylene glycol; and
   ii) a stabilizing amount of thioglycerol; or

II. a) about 50 mg/mL bendamustine or a pharmaceutically acceptable salt thereof; and

b) a pharmaceutically acceptable fluid including
   i) about 90% PEG and about 10% PG; and
   ii) about 2.5 mg/mL thioglycerol.

Each of these compositions have the same stability profiles already described, i.e. having less than about 5% total impurities, PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

In accordance with other aspects of the invention, there are provided long term storage stable bendamustine-containing compositions, including:

a) bendamustine or a pharmaceutically acceptable salt thereof;

b) a pharmaceutically acceptable fluid including one or more of the following: PG, ethanol, PEG, benzyl alcohol and glycofurol; and

c) a stabilizing amount of a chloride salt.

These compositions also have the low levels of impurities and long term stability mentioned herein. Preferred pharmaceutically acceptable fluids include PG, PEG or ethanol in this embodiment of the invention. Preferably, the PEG is PEG 400. If desired, glycerin and/or 88% (w/w) lactic acid can be added to the pharmaceutically acceptable fluid.

Suitable chloride salts include but are not limited to organic chloride salts, sodium chloride, choline chloride, hydrochloride salts of amino acids and mixtures thereof. Thus, as will be appreciated by those of ordinary skill, one

US 11,872,214 B2

**5**

can select from among a number of suitable chloride salts and it is Applicants' intention that the scope of the invention includes all such chloride salts that are capable of being included in bendamustine-containing formulations for extended periods without having a deleterious effect on the drug. In one embodiment of the invention, the chloride salt concentration is from about 10 to about 300 mg/mL. In another embodiment, the chloride salt concentration is from about 50 to about 215 mg/mL. In one preferred embodiment, the chloride salt concentration is about 215 mg/mL.

In accordance with another aspect of the invention, there is provided long term storage stable bendamustine-containing compositions, including:

    a) bendamustine or a pharmaceutically acceptable salt thereof; and

    b) a pharmaceutically acceptable fluid including DMSO.

These compositions also have the low levels of impurities and long term stability mentioned herein. In some aspects, the bendamustine concentration in these compositions is from about 10 mg/mL to about 100 mg/mL. Preferably, the bendamustine concentration is from about 20 mg/mL to about 50 mg/mL, more preferably from about 25 mg/mL to about 50 mg/mL. In an alternative embodiment, the bendamustine concentration is about 50 mg/mL.

Another embodiment of the invention provides methods of treating cancer in mammals. The methods include administering to a mammal in need thereof an effective amount of one of the bendamustine-containing compositions described herein. Since the active ingredient portion of the inventive composition is an FDA-approved drug, those of ordinary skill will recognize that the doses of bendamustine employed in this aspect of the invention will be similar to those employed in any treatment regimens designed for bendamustine as marketed under the trade name TRE-ANDA. The patient package insert containing dosing information is incorporated herein by reference. The methods of treatment also include administering the inventive formulations for any purpose or physical condition for which bendamustine has been indicated as being useful.

Another embodiment of the invention includes methods of preparing bendamustine-containing compositions described herein. The methods include reconstituting lyophilized bendamustine in a pharmaceutically acceptable fluid containing one of the following:

    A) i) PEG, PG or mixtures thereof; and

      ii) a stabilizing amount of an antioxidant;

    B) i) one or more of PG, ethanol, PEG, benzyl alcohol and glycofurol; and

      ii) a stabilizing amount of a chloride salt; or

    C) DMSO.

The steps are carried out under pharmaceutically acceptable conditions for sterility and manufacturing.

In a further aspect of the invention, there are provided methods of controlling or preventing the formation of impurities in bendamustine-containing compositions during long term storage. The methods include combining an amount of bendamustine or a pharmaceutically acceptable salt thereof with a sufficient amount of a pharmaceutically acceptable fluid containing one of the following:

    A) i) PEG, PG or mixtures thereof; and

      ii) a stabilizing amount of an antioxidant;

    B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

      ii) a stabilizing amount of a chloride salt; or

    C) DMSO.

Further optional steps in accordance therewith include transferring one or more pharmaceutically acceptable doses

**6**

of the formulations into a suitable sealable container and storing the sealed container at a temperature of from about 5° C. to about 25° C. As a result of carrying out these steps, it is possible to control or substantially prevent the formation of impurities which otherwise occur with bendamustine-containing compositions during long term storage so that the artisan is provided with bendamustine-containing formulations having less than about 5% total impurities PAR as determined by HPLC at a wavelength of 223 nm, after at least about 15 months of storage at a temperature of from about 5° C. to about 25° C.

The compositions of the present invention can be packaged in any suitable sterile vial or container fit for the sterile storage of a pharmaceutical such as bendamustine. Suitable containers can be glass vials, polypropylene or polyethylene vials or other special purpose containers and be of a size sufficient to hold one or more doses of bendamustine.

A further aspect of the invention includes kits containing lyophilized bendamustine or a pharmaceutically acceptable salt thereof in a first container or vial; and, in a second container, a sufficient amount of a pharmaceutically acceptable fluid such as those described herein, i.e. one of the following:

    A) i) PEG, PG or mixtures thereof; and

      ii) a stabilizing amount of an antioxidant;

    B) i) one or more of PG, ethanol, PEG, glycofurol and benzyl alcohol; and

      ii) a stabilizing amount of a chloride salt; or

    C) DMSO.

For purposes of this embodiment, the amount of fluid which is sufficient is an amount which allows the bendamustine to be dissolved or dispersed to a degree which renders the liquid composition ready for use.

As will be appreciated by those of ordinary skill, the kit will contain other pharmaceutically necessary materials for storing and/or administering the drug, including instructions for storage and use, additional diluents, if desired, etc.

EXAMPLES

The following examples serve to provide further appreciation of the invention but are not meant in any way to restrict the effective scope of the invention.

Example 1

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in one of ethanol, propylene glycol and benzyl alcohol as indicated in Table 1 below. 215 mg/ml of choline chloride was added in half of the samples as a source of soluble chloride ions. The samples were maintained at 40° C. and analyzed periodically for drug content and total impurities. The results obtained are presented in Table 1.

TABLE 1

| Stability of Bendamustine HCl | | | | |
|---|---|---|---|---|
| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
| BDM - 10 mg/mL | | Initial | 10.43 | 0.27 |
| Choline chloride - | | | | |
| 215 mg/mL | 40° C. | 48 hrs | 10.48 | 1.27 |
| Ethanol qs to 1 mL | | 7 day | 10.26 | 2.11 |
| BDM - 10 mg/mL | | Initial | 10.55 | 0.27 |
| Ethanol qs to 1 mL | 40° C. | 48 hrs | 10.30 | 2.39 |
| | | 7 day | 9.55 | 6.66 |

US 11,872,214 B2

**7**

TABLE 1-continued

| | | | | |
|---|---|---|---|---|
| Stability of Bendamustine HCl | | | | |
| Formulation | Temp | Time | BDM mg/ml | % Total Impurities |
| BDM - 10 mg/mL | | Initial | 9.99 | 0.21 |
| Choline chloride - | 40° C. | 48 hrs | 9.95 | 0.60 |
| 215 mg/mL | | | | |
| Propylene glycol | | 7 day | 9.43 | 2.31 |
| qs to 1 mL | | | | |
| BDM - 10 mg/mL | | Initial | 9.68 | 0.21 |
| Propylene glycol | 40° C. | 48 hrs | 9.45 | 0.88 |
| qs to 1 mL | | 7 day | 9.00 | 3.44 |
| BDM - 10 mg/mL | | Initial | 9.95 | 1.19 |
| Choline Chloride - | 40° C. | 48 hrs | 9.89 | 3.51 |
| 215 mg/mL | | 7 day | 8.97 | 4.24 |
| Benzyl alcohol | | | | |
| qs to 1 mL | | | | |
| BDM - 10 mg/mL | | Initial | 9.52 | 0.33 |
| Benzyl alcohol qs | 40° C. | 48 hrs | 8.67 | 4.18 |
| to 1 mL | | 7 day | 7.49 | 7.84 |

Note:
In Table 1 the total % impurities include total contributions from peaks at various RRTs.

As shown in Table 1, the bendamustine formulations are very stable in solutions containing solvent and chloride salt. Table 1 shows that bendamustine, when dissolved at a concentration of about 10 mg/mL, in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of a chloride salt, such as choline chloride, had less than about 5% after at least 7 days storage at 40° C.

The data presented in Table 1 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of a chloride salt having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including ethanol alone exhibited more than 6.5 total degradants after 7 days storage at 40° C. The sample including benzyl alcohol alone exhibited more than 7.5% total degradants after 7 days storage at 40° C. Bendamustine-containing compositions with such high levels of degradation would not be suitable for long-term storage.

Example 2

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 10 mg/ml in DMSO. The samples were maintained at 40° C. and analyzed periodically for drug content and impurity profile. The results obtained are presented in Table 2.

TABLE 2

| | | | | |
|---|---|---|---|---|
| Stability of Bendamustine HCl in DMSO | | | | |
| Formulation | Temp | Time | Content (mg/mL) | % Total Imp |
| BDM - 10 mg/mL | | Initial | 10.2 | 0.23 |
| DMSO qs to 1 mL | 40° C. | 48 hrs | 9.80 | 0.30 |
| | | 1 week | 10.0 | 0.56 |

Note:
In Table 2 the total % impurities include total contributions from peaks at various RRTs

**8**

Table 2 shows that bendamustine, when dissolved in DMSO, had substantially no increase in total degradants. The data presented in Table 2 translates to bendamustine-containing compositions including DMSO having a shelf life of at least about 15 months at 5° C. and 25° C. In fact, such compositions are expected to have long term stability for periods beyond 15 months, i.e. up to 2 years or greater.

Example 3

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 20 mg/ml in polyethylene glycol 400 and 5 mg/ml of lipoic acid was added as a stabilizing antioxidant as indicated in Table 3 below. The samples were maintained at 40° C. or 25° C. and analyzed after 15 days for drug content and impurities. The results obtained are presented in Table 3.

TABLE 3

| | | | | | |
|---|---|---|---|---|---|
| Stability of Bendamustine (20 mg/ml) in PEG 400 and Antioxidants | | | | | |
| Antioxidant | T ° C. | Time days | % Initial | % Imp RRT 0.58 | % Total Imps |
| None | 25 | 15 | 97.6 | 2.08 | 2.28 |
| | 40 | 15 | 56.3 | 2.17 | 41.9 |
| Lipoic Acid | 25 | 15 | 98.5 | <LD | 0.23 |
| 5 mg/ml | 40 | 15 | 97.5 | 0.33 | 0.53 |

<LD = Below Level of Detection

As shown in Table 3, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as polyethylene glycol, in the presence of a stabilizing amount of an antioxidant, such as lipoic acid, had substantially no increase in total degradants after a period of 15 days. The data presented in Table 3 translates to bendamustine-containing compositions including a pharmaceutically acceptable fluid and a stabilizing amount of an antioxidant having a shelf life of at least about 15 months at 5° C. and 25° C.

The sample including PEG alone, on the other hand, which did not contain an antioxidant, did not exhibit stabilizing effects at 40° C. This sample had more than 40% more total impurities than the sample including lipoic acid. Bendamustine-containing compositions with such high levels of total impurities would not be suitable for long-term storage.

Example 4

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 5 mg/ml of thioglycerol, α-lipoic acid or dihydrolipoic acid was added as a stabilizing antioxidant as indicated in Table 4 below. The samples were maintained at 40° C. and analyzed after 15 days or one month for drug content and impurity profile as indicated in Table 4 below. The results obtained are presented in Table 4.

US 11,872,214 B2

9

TABLE 4

Stability of Bendamustine (50 mg/ml) in 90% PEG 400,
10% Propylene Glycol and Antioxidant

| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | HP1 0.59 | PG ester 1.10 | Total Imps |
|---|---|---|---|---|---|---|---|
| | | | | | | % Impurities RRT | % |
| Thioglycerol | 40 | initial | 48.8 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 48.5 | 99.4 | 0.06 | 0.20 | 0.71 |
| α-lipoic acid | 40 | initial | 49 | 100 | <LD | <LD | 0 |
| | 40 | 15 days | 48.8 | 99.6 | 0.19 | 0.13 | 0.32 |
| | 40 | 1 month | 48.7 | 99.4 | 0.34 | 0.26 | 0.79 |

TABLE 4-continued

Stability of Bendamustine (50 mg/ml) in 90% PEG 400,
10% Propylene Glycol and Antioxidant

| Antioxidant | T (° C.) | Time | Content (mg/mL) | % Initial | HP1 0.59 | PG ester 1.10 | Total Imps |
|---|---|---|---|---|---|---|---|
| | | | | | | % Impurities RRT | % |
| Dihydrolipoic acid | 40 | initial | 49.3 | 100 | <LD | <LD | 0 |
| | 40 | 1 month | 47.7 | 97.4 | 0.63 | 0.12 | 1.84 |

<LD = Below Level of Detection

As shown in Table 4, bendamustine, when dissolved in a pharmaceutically acceptable fluid, such as a combination of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of an antioxidant, such as thioglycerol, α-lipoic acid or dihydrolipoic acid, had substantially no increase in total degradants after a period of 1 month. This data supports the position that bendamustine-containing compositions according to the invention have a shelf life of at least about 2 years when stored at temperatures between 5° C. and 25° C.

Example 5

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in a mixture of polyethylene glycol 400 and propylene glycol as indicated in Table 5 below. 5 mg/ml of lipoic acid was added as a stabilizing antioxidant. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed after 1 week, 15 days or one month for drug content and impurity profile as indicated in Table 5 below. The results obtained are presented in Table 5.

TABLE 5

Stability of Bendamustine (50 mg/ml) and Lipoic Acid (5 mg/ml)
in PEG400 and Propylene glycol

| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | HP1 0.58 | PG ester 1.10 | PG ester 1.13 | Total Imp. |
|---|---|---|---|---|---|---|---|---|
| | | | | | | % Area of degradants | | % |
| BDM— | Initial | | 49.6 | 100 | BDL | BDL | BDL | 0.18 |
| 50 mg/mL | 40° C. | 1 W | 49.0 | 98.8 | 0.05 | 0.13 | BDL | 0.38 |
| Lipoic acid— | | 15 d | 48.3 | 97.4 | 0.08 | 0.26 | BDL | 0.55 |
| 5 mg/mL | | 1 M | 48.0 | 96.8 | 0.11 | 0.43 | 0.13 | 1.03 |
| PEG | 25° C. | 15 d | 49.6 | 100.0 | BDL | 0.10 | BDL | 0.30 |
| 400:PG | | 1 M | 48.4 | 97.6 | 0.05 | 0.19 | BDL | 0.43 |
| (75:25) qs to 1 mL | 5° C. | 1 M | 49.6 | 100.0 | BDL | 0.07 | BDL | 0.27 |
| BDM— | Initial | | 50.2 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 49.9 | 99.4 | BDL | 0.15 | BDL | 0.30 |
| Lipoic acid— | | 15 d | 49.1 | 97.8 | 0.06 | 0.35 | BDL | 0.73 |
| 5 mg/mL | | 1 M | 49.0 | 97.6 | 0.09 | 0.90 | 0.25 | 1.82 |
| PEG | 25° C. | 15 d | 49.9 | 99.4 | BDL | 0.12 | BDL | 0.32 |
| 400:PG | | 1 M | 49.7 | 99.0 | BDL | 0.25 | BDL | 0.59 |
| (50:50) qs to 1 mL | 5° C. | 1 M | 50.0 | 99.6 | BDL | 0.11 | BDL | 0.33 |
| BDM— | Initial | | 50.8 | 100 | BDL | BDL | BDL | 0.21 |
| 50 mg/mL | 40° C. | 1 W | 50.4 | 99.2 | BDL | 0.11 | BDL | 0.30 |
| Lipoic acid— | | 15 d | 49.7 | 97.8 | 0.07 | 0.17 | BDL | 0.43 |
| 5 mg/mL | | 1 M | 49.7 | 97.8 | 0.13 | 0.27 | 0.09 | 0.84 |
| PEG | 25° C. | 15 d | 50.8 | 100.0 | BDL | 0.10 | BDL | 0.26 |
| 400:PG | | 1 M | 50.8 | 100.0 | 0.05 | 0.14 | BDL | 0.39 |
| (90:10) qs to 1 mL | 5° C. | 1 M | 50.8 | 100.0 | BDL | 0.06 | BDL | 0.34 |

BDL = Below Detectable Limit

As shown in Table 5, bendamustine, when dissolved in certain mixtures of polyethylene glycol and propylene glycol and a stabilizing amount of lipoic acid, had substantially no increase in total degradants after a period of 1 month. The data presented in Table 5 translates to bendamustine-containing compositions having a shelf life of at least about 2 years when stored at temperatures between 5° C. and at 25° C.

Example 6

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol and α-lipoic acid was added as a stabilizing antioxidant as indicated in Table 6 below. The samples were maintained at 40° C., 25° C. and 5° C. and analyzed for drug content and impurity profile as indicated in Table 6 below. The results obtained are presented in Table 6.

US 11,872,214 B2

11          12

TABLE 6

| | | | | | | % Area of degradants | | | | | | | | % |
| Formulation | Temp | Time Per. | Amt. mg/ml | % of Initial | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | |

Stability of Bendamustine in 90% PEG 400, 10% PG and α-lipoic acid

| Formulation | Temp | Time Per. | Amt. mg/ml | % of Initial | 0.59 | 1.10 | 1.13 | 1.15 | 1.17 | 1.20 | 1.22 | 1.30 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BDM— | | Initial | 51.0 | 100 | 0.20 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.26 |
| 50 mg/mL | 40° C. | 1 M | 50.5 | 99.0 | 0.21 | 0.31 | 0.13 | 0.07 | 0.13 | 0.10 | <LD | <LD | 0.95 |
| α-lipoic | | 2 M | 49.7 | 97.5 | 0.22 | 0.71 | 0.28 | 0.14 | 0.12 | 0.21 | 0.12 | <LD | 2.02 |
| acid— | | 3 M | 48.7 | 95.5 | 0.22 | 1.01 | 0.45 | 0.21 | 0.14 | 0.37 | 0.16 | 0.05 | 2.96 |
| 10 mg/mL | 25° C. | 3 M | 50.5 | 99.0 | 0.20 | 0.36 | 0.07 | <LD | <LD | 0.10 | <LD | <LD | 0.73 |
| PEG | | 6 M | 50.4 | 98.8 | 0.22 | 0.60 | 0.17 | 0.06 | 0.06 | 0.09 | 0.10 | 0.08 | 1.44 |
| 400:PG | 5° C. | 6 M | 50.9 | 99.8 | 0.16 | 0.05 | <LD | <LD | <LD | <LD | <LD | <LD | 0.21 |
| (90:10) qs | | 12 M | 50.6 | 99.2 | 0.20 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | 0.38 |
| to 1 mL | | | | | | | | | | | | | |
| BDM— | | Initial | 50.3 | 100 | 0.18 | <LD | <LD | <LD | <LD | <LD | <LD | <LD | 0.18 |
| 50 mg/mL | 40° C. | 1 M | 50.0 | 99.4 | 0.19 | 0.32 | 0.08 | 0.06 | 0.08 | 0.06 | 0.06 | <LD | 0.85 |
| α-lipoic | | 2 M | 49.8 | 99.0 | 0.19 | 0.65 | 0.21 | 0.12 | 0.13 | 0.23 | 0.14 | 0.06 | 1.85 |
| acid— | | 3 M | 49.5 | 98.4 | 0.15 | 0.89 | 0.37 | 0.17 | 0.13 | 0.32 | 0.10 | <LD | 2.40 |
| 15 mg/mL | | 6 M | 47.0 | 93.4 | 0.20 | 1.76 | 0.66 | 0.19 | 0.31 | 0.47 | 0.33 | 0.17 | 4.93 |
| PEG | 25° C. | 3 M | 50.0 | 99.4 | 0.20 | 0.35 | 0.08 | <LD | <LD | <LD | 0.11 | <LD | 0.79 |
| 400:PG | | 6 M | 49.5 | 98.4 | 0.19 | 0.58 | 0.15 | 0.06 | 0.07 | 0.09 | 0.08 | 0.10 | 1.38 |
| (90:10) qs | 5° C. | 6 M | 50.3 | 100 | 0.17 | 0.06 | <LD | <LD | <LD | <LD | <LD | <LD | 0.23 |
| to 1 mL | | 12 M | 50.2 | 99.8 | 0.19 | 0.15 | <LD | <LD | <LD | <LD | <LD | <LD | 0.34 |

<LD = Below Level of Detection

The data reported in Table 6 along with the data in Table 5 demonstrates that bendamustine solutions are stable when dissolved in mixtures of PEG and PG and 5-15 mg/mL α-lipoic acid. As shown in Table 6, bendamustine, when dissolved in combinations of polyethylene glycol and propylene glycol, in the presence of a stabilizing amount of lipoic acid, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6-12 months at 5° C. and 25° C. The data corresponds to bendamustine solutions being stable under ambient or refrigerated storage conditions for well in excess of 2 years, and thus long term stable.

### Example 7

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 90% polyethylene glycol 400 and 10% propylene glycol. 2.5 mg/ml of thioglycerol was added as an antioxidizing agent. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 7 below. The results obtained are presented in Table 7.

TABLE 7

Stability of Bendamustine in 90% PEG 400, 10% PG and Thioglycerol

| Formulation | Temp | Time Per. | Amt mg/ml | % of Initial | 0.15 | 0.37 | 1.10 | 1.13 | 1.15 | 1.17 | 1.18 | 1.20 | 1.22 | % Total Imp. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BDM— | | Initial | 50.3 | 100 | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | BDL | 0.00 |
| 50 mg/mL | 40° C. | 15 d | 50.2 | 99.8 | BDL | BDL | 0.18 | BDL | BDL | BDL | 0.05 | 0.08 | BDL | 0.31 |
| Thio | | 1 M | 49.9 | 99.2 | BDL | 0.12 | 0.32 | 0.07 | BDL | BDL | 0.09 | 0.08 | BDL | 0.75 |
| glycerol— | | 2 M | 49.1 | 97.6 | BDL | 0.18 | 0.56 | 0.24 | 0.09 | 0.17 | 0.19 | 0.12 | 0.11 | 1.76 |
| 2.5 mg/mL | | 3 M | 48.8 | 97.0 | BDL | 0.23 | 0.85 | 0.34 | 0.16 | 0.30 | 0.34 | 0.29 | 0.19 | 2.94 |
| PEG | 25° C. | 3 M | 49.9 | 99.2 | 0.06 | 0.12 | 0.23 | 0.07 | BDL | 0.06 | 0.07 | 0.06 | BDL | 0.67 |
| 400:PG | | 6 M | 49.3 | 98.0 | BDL | 0.23 | 0.53 | 0.22 | 0.11 | BDL | 0.21 | 0.22 | 0.20 | 2.07 |
| (90:10) qs | | | | | | | | | | | | | | |
| to 1 mL | | | | | | | | | | | | | | |

BDL = Below Detectable Limit

US 11,872,214 B2

13

The stability is similar to that of α-lipoic acid samples in Example 6 above. As shown in Table 7, bendamustine, when dissolved in a combination of polyethylene glycol and propylene glycol, and a stabilizing amount of thioglycerol, had less than 3% increase in total degradants after a period of 3 months at 40° C. Additionally, the same compounds had substantially no increase in total degradants after a period of 6 months at 25° C. The data reported supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for about 2 years.

Example 8

Bendamustine-containing compositions were prepared by dissolving bendamustine HCl to a concentration of 50 mg/ml in 85% PEG 400 and 15% PG in the presence of 5 mg/ml of thioglycerol. The samples were maintained at 40° C. and 25° C. and analyzed for drug content and impurity profile as indicated in Table 8 below. The results obtained are presented in Table 8.

TABLE 8

| Stability of Bendamustine in 85% PEG 400, 15% PG and Thioglycerol | | | | | |
|---|---|---|---|---|---|
| Formulation | Temp. | Time Period | Content (mg/mL) | % of Initial | % Total Imp. |
| BDM - 50 mg/mL | Initial | | 51.5 | 100 | 0.12 |
| Thioglycerol - 5 mg/mL | 40° C. | 1 M | 50.4 | 97.9 | 1.18 |
| PEG 400:PG (85:15) qs | 25° C. | 1 M | 51.4 | 99.8 | 0.41 |
| to 1 mL | | 3 M | 50.4 | 97.9 | 1.21 |
| | 5° C. | 3 M | 51.0 | 99.0 | 0.26 |

The stability is similar to that of thioglycerol samples in Example 7 above. As reported in Table 8, total impurities did not exceed 2% at 40° C. or 25° C. storage over one month, or at 25° C. and 5° C. storage after three months. The data reported in Table 8 supports the conclusion that these bendamustine solutions are stable under ambient or refrigerated storage conditions for at least about 2 years if not longer.

14

We claim:

1. A sterile vial containing a liquid bendamustine-containing composition comprising

about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

2. The sterile vial of claim 1, wherein the antioxidant is monothioglycerol.

3. The sterile vial of claim 1, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

4. The composition of claim 1, wherein the composition is stable for at least about 15 months at 5° C. or for at least about 15 months at 25° C.

5. The sterile vial of claim 1, wherein the liquid bendamustine-containing composition further comprises ethanol.

6. A liquid bendamustine-containing composition comprising

100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid;

wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 25 mg/mL,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C.

7. The composition of claim 6, wherein the antioxidant is monothioglycerol.

8. The composition of claim 6, wherein the antioxidant is monothioglycerol in a concentration of about 5 mg/mL.

9. The composition of claim 6, further comprising ethanol.

*    *    *    *    *

EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC.,

Plaintiff,

v.

APOTEX INC., and APOTEX CORP.,

Defendants.

C.A. No. 24-cv-64-JLH

**JURY TRIAL DEMANDED**

## FIRST AMENDED COMPLAINT

Plaintiff Eagle Pharmaceuticals, Inc. ("Eagle"), by its attorneys, for its Complaint, alleges as follows:

1.      This is an action for patent infringement under the patent laws of the United States, Title 35, United States Code, to enjoin, and obtain damages resulting from, Apotex Inc. and Apotex Corp.'s (collectively, "Apotex") unauthorized importation into the United States, and use, sale, and/or offer for sale of products in the United States, that infringe at least one claim of Eagle's United States Patent Nos. 11,844,783 (the "'783 patent") and 11,872,214 (the "'214 patent") (collectively, the "Patents-in-Suit").

2.      Apotex submitted New Drug Application ("NDA") No. 215033 to the United States Food and Drug Administration ("FDA"), seeking approval to manufacture and sell a product that relies on data from bioavailability and/or bioequivalence studies contained in the Approved Labeling for Eagle's BELRAPZO®, 100 mg/4 mL (25 mg/mL) Bendamustine Hydrochloride Injection product, prior to the expiration of the Patents-in-Suit.

3.      On information and belief, the FDA granted approval of Apotex's NDA No. 215033 on December 7, 2022. Following said approval, Apotex began to import into the United

States, and/or use, sell, and/or offer to sell in the United States, its NDA Product, Bendamustine Hydrochloride Injection, 100 mg/4 mL (25 mg/mL) (the "Apotex NDA Product"), along with the Approved Labeling for the same.

## **PARTIES**

4.      Plaintiff Eagle is a corporation organized and existing under the laws of Delaware, with its corporate offices and principal place of business at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677.

5.      On information and belief, Defendant Apotex Inc. is a Canadian corporation with its principal place of business at 150 Signet Drive, Toronto, Ontario, Canada M9L 1T9.  Upon information and belief, Apotex Inc. is a generic pharmaceutical company that develops and manufactures generic versions of branded pharmaceutical products that it markets and distributes throughout the United States in concert with its subsidiary, Apotex Corp.

6.      On information and belief, Defendant Apotex Corp. is a Delaware corporation with its principal place of business at 2400 North Commerce Parkway, Suite 400, Weston, Florida 33326.  On information and belief, Apotex Corp. is a generic pharmaceutical company that develops and manufactures generic versions of branded pharmaceutical products that it markets and distributes throughout the United States.

7.      On information and belief, Apotex Corp. is a wholly-owned subsidiary of Apotex Inc.

8.      On information and belief, and consistent with their practice with respect to other drug products, Apotex Inc. and Apotex Corp. acted in concert to prepare and submit NDA No. 215033 to FDA and to import the Apotex NDA Product into the United States for sale, offer for sale, and use.  Indeed, in a notice letter provided to Eagle, those entities advised that "Apotex Inc.

2

and Apotex Corp. (collectively, 'Apotex') provide this notice of certification letter" and that "[p]ursuant to 21 C.F.R. § 314.52(c)(2), we advise you that the 505(b)(2) NDA submitted by Apotex has been assigned NDA No. 215033 by FDA."

9.      On information and belief, Apotex Inc. is in the business of, among other things, manufacturing, marketing, distributing, offering for sale, and selling generic products. As a part of this business, on information and belief, Apotex Inc., acting in concert with Apotex Corp., files NDAs and Abbreviated New Drug Applications ("ANDAs") with the FDA seeking approval to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of drug products that are covered by United States patents.

10.     On information and belief, Apotex Inc. and Apotex Corp. are agents of each other, and/or operate in concert as integrated parts of the same business group, and enter into agreements with each other that are nearer than arm's length, including with respect to the development, regulatory approval, marketing, sale, offer for sale, and distribution of pharmaceutical products throughout the United States, including in Delaware, and including with respect to the Apotex NDA Product.

11.     The Approved Labeling for the Apotex NDA Product recites that it is "Manufactured by: MSN Laboratories Private Limited, India" and "Manufactured for: Apotex Corp., Weston, Florida 33326." Approved Labeling for Apotex's NDA Product, (the "Approved Labeling"), available at https://www.accessdata.fda.gov/drugsatfda_docs/label/2022/215033s000l bl.pdf (last visited April 15, 2024). On information and belief, Apotex Corp. has imported and continues to import the Apotex NDA Product into the United States, and thereafter directly or indirectly markets, sells, and distributes the Apotex NDA Product throughout the United States, including in Delaware.

3

ME1 48131842v.1

12. Upon information and belief, and consistent with their practice with respect to other drug products, following FDA approval of NDA No. 215033, Apotex Inc. and Apotex Corp. acted, and continue to act, in concert to import, market, distribute, offer for sale, and sell the Apotex NDA Product throughout the United States and within Delaware.

## JURISDICTION AND VENUE

13. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) .

14. Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400(b), at least because Apotex Inc. is a foreign corporation that is subject to personal jurisdiction in this Court, and Apotex Corp. is incorporated in Delaware and therefore resides there for purposes of venue.

15. Based on the facts and causes alleged herein, and for additional reasons to be further developed through discovery if necessary, this Court has personal jurisdiction over Apotex Corp. and Apotex Inc.

16. This Court has personal jurisdiction over Apotex Corp. because, on information and belief, Apotex Corp. is a corporation organized and existing under the laws of the State of Delaware, has registered to do business in the State of Delaware, and has appointed a registered agent in Delaware to accept service of process at 3411 Silverside Road, Tatnall Building, Suite 104, Wilmington, Delaware 19810. Apotex Corp. has thus consented to jurisdiction in Delaware.

17. In addition, this Court also has personal jurisdiction over Apotex Corp. and Apotex Inc. because, among other things, on information and belief: (1) Apotex Inc., acting in concert with Apotex Corp., filed an NDA for the purpose of seeking approval to engage in the commercial manufacture, use, offer for sale, sale, and/or importation of the product described in NDA No. 215033 in the United States, including in Delaware; and (2) since NDA No. 215033 was approved,

4

Apotex Corp. and Apotex Inc. have been acting in concert and/or as agents of one another to import, market, distribute, offer for sale, and/or sell the Apotex NDA Product in the United States, including in Delaware.

18.     The Court also has personal jurisdiction over Apotex Corp. and Apotex Inc. because they have committed, aided, abetted, induced, contributed to, or participated in the commission of the tortious act of patent infringement that harmed and injured Eagle, a Delaware corporation.

19.     Apotex Inc. is subject to personal jurisdiction in Delaware because, among other things, Apotex Inc., itself and through its wholly-owned subsidiary Apotex Corp., has purposefully availed itself of the benefits and protections of Delaware's laws such that it should reasonably anticipate being haled into court here.  Upon information and belief, Apotex Inc., itself and through its subsidiary Apotex Corp., develops, manufactures, imports, markets, offers to sell, and/or sells drugs throughout the United States, including in the State of Delaware and therefore transacts business within the State of Delaware related to Eagle's claims, and/or has engaged in systematic and continuous business contacts within the State of Delaware.  In addition, Apotex Inc. is subject to personal jurisdiction in Delaware because, upon information and belief, it controls and dominates Apotex Corp. and therefore the activities of Apotex Corp. in this jurisdiction are attributed to Apotex Inc.  Further, Apotex Inc. is subject to personal jurisdiction in Delaware because, among other things, Apotex Inc., itself and through its wholly-owned subsidiary Apotex Corp., has purposefully availed itself of the benefits and protections of Delaware's laws such that it should reasonably anticipate being haled into court here specifically with regard to the Apotex NDA Product, which is the subject of NDA No. 215033.  In a notice letter provided to Eagle, those entities advised that "Apotex Inc. and Apotex Corp. (collectively, 'Apotex') provide this notice of

5

ME1 48131842v.1

certification letter" and that "[p]ursuant to 21 C.F.R. § 314.52(c)(2), we advise you that the 505(b)(2) NDA submitted by Apotex has been assigned NDA No. 215033 by FDA."

20. Apotex Inc. and Apotex Corp. have consented to jurisdiction in Delaware in many prior cases arising out of the filing of their drug applications, including the application for the product at issue in this litigation, and they have filed counterclaims in such cases. *See, e.g.*, *Senju Pharm. Co. v. Apotex Inc. & Apotex Corp.*, C.A. No. 12-159-SLR, D.I. 9 (D. Del. Mar. 16, 2012); *Alcon Pharm. Ltd. v. Apotex Inc. & Apotex Corp.*, C.A. No. 12-960-SLR, D.I. 6 (D. Del. July 23, 2012); *Pfizer Inc. v. Apotex Inc. & Apotex Corp.*, C.A. No. 12-809-SLR, D.I. 18 (D. Del. Aug. 27, 2012); *UCB, Inc. v. Apotex Corp. & Apotex Inc.*, C.A. No. 13-1209-LPS, D.I. 12 (D. Del. Sept. 9, 2013); *Pfizer Inc. v. Apotex Inc. & Apotex Corp.,* C.A. No. 13-1613-SLR, D.I. 8 (D. Del. Oct. 17, 2013); *Meda Pharm. Inc. v. Apotex Inc. & Apotex Corp.*, C.A. No. 14-1453-LPS, D.I. 93 (D. Del. Mar. 9, 2016); *Salix Pharm., Inc. v. Apotex Inc. & Apotex Corp.*, C.A. No. 15-880-GMS, D.I. 15 (D. Del. Mar. 14, 2016); *Forest Labs., LLC v. Apotex Corp. & Apotex Inc.*, C.A. No. 16-269-GMS, D.I. 8 (D. Del. May 4, 2016); *Amgen Inc. v. Apotex Inc. & Apotex Corp.*, C.A. No. 16-926-GMS, D.I. 13 (D. Del. Nov. 15, 2016); *Astellas Pharma Inc. v. Apotex Inc. & Apotex Corp.*, C.A. No. 16-976-JFB, D.I. 17 (D. Del. Jan. 17, 2017); *Onyx Therapeutics, Inc. v. Apotex Inc. & Apotex Corp.*, C.A. No. 16-1039-LPS, D.I. 14 (D. Del. Jan. 31, 2017); *Bristol-Myers Squibb Co. v. Apotex Inc. & Apotex Corp.*, C.A. No. 17-399-LPS, D.I. 8 (D. Del. May 4, 2017); *Bayer Healthcare LLC v. Apotex Inc. & Apotex Corp.*, C.A. No. 17-334-LPS, D.I. 10 (D. Del. May 22, 2017); *Teva Pharms. Int'l GmbH, et al. v. Apotex Inc. & Apotex Corp.*, C.A. No. 17-1164-CFC, D.I. 17 (D. Del. Nov. 27, 2017); *Merck Sharp & Dohme Corp. v. Apotex Inc. & Apotex Corp.*, C.A. No. 20-749-RGA, D.I. 7 (D. Del. Jun. 26, 2020); *Eagle Pharm. Inc. v. Apotex Inc. & Apotex. Corp.*, C.A. No. 21-1256-CFC, D.I. 12 (D. Del. Sept. 22, 2021).

6

21.     Alternatively, this Court has jurisdiction over Apotex Inc. under FEDERAL RULE OF CIVIL PROCEDURE 4(k)(2)(A) because: (a) Eagle's claims arise under federal law; (b) Apotex Inc. is a foreign defendant not subject to general personal jurisdiction in the courts of any state; and (c) Apotex Inc. has sufficient contacts with the United States as a whole, not least through its development of drug products for sale in the United States, such that this Court's exercise of jurisdiction over Apotex Inc. satisfies due process.

22.     For the above reasons, it would not be unfair or unreasonable for Apotex to litigate this action in this District, and there is personal jurisdiction over Apotex here.

## BACKGROUND

23.     BELRAPZO®, which contains bendamustine hydrochloride, is an alkylating drug that is indicated for the treatment of patients with chronic lymphocytic leukemia, as well as for the treatment of patients with indolent B-cell non-Hodgkin lymphoma that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.

24.     Eagle is the holder of NDA No. 205580 for BELRAPZO®, which has been approved by the FDA.

25.     The '783 patent, entitled "Formulations of Bendamustine" (Exhibit A hereto), was duly and legally issued on December 19, 2023.  Eagle is the owner and assignee of the '783 patent.  Eagle timely submitted the '783 patent to be listed in connection with BELRAPZO® in the FDA's publication *Approved Drug Products with Therapeutic Equivalence Evaluations*, also known as the "Orange Book."

26.     Claim 1 of the '783 patent recites:  A method of treating leukemia in a human in need thereof comprising

providing a liquid bendamustine-containing composition comprising

7

bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 20 mg/mL to about 60 mg/mL;

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of an antioxidant;

wherein the total impurities in the liquid bendamustine-containing composition resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C;

diluting the liquid bendamustine containing composition; and

intravenously administering the diluted composition to the human.

27. BELRAPZO® is a product that falls within the ambit of at least claim 1 of the '783 patent.

28. The '783 patent is also listed in the Orange Book for the drug product BENDEKA®, which is marketed by Teva Pharmaceuticals ("Teva") under a license from Eagle to Teva. BENDEKA® likewise is a drug product that falls within the ambit of at least claim 1 of the '783 patent.

29. The '214 patent, entitled "Formulations of Bendamustine" (Exhibit B hereto), was duly and legally issued on January 16, 2024. Eagle is the owner and assignee of the '214 patent. Eagle timely submitted the '214 patent to be listed in connection with BELRAPZO® in the Orange Book.

30. Claim 1 of the '214 patent recites: A sterile vial containing a liquid bendamustine-containing composition comprising

about 100 mg of bendamustine or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is about 25 mg/mL;

8

a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and

a stabilizing amount of antioxidant,

wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5 °C to about 25 °C.

31.     BELRAPZO® is a product that falls within the ambit of at least claim 1 of the '214 patent.

32.     The '214 patent is also listed in the Orange Book for BENDEKA®.  BENDEKA® likewise is a drug product that falls within the ambit of at least claim 1 of the '214 patent.

## **INFRINGEMENT BY APOTEX**

33.     On information and belief, Apotex's NDA Product received final approval from the FDA on December 7, 2022. *See* Drugs@FDA, Bendamustine, https://www.accessdata.fda.gov/scripts/cder/daf/index.cfm?event=overview.process&ApplNo= 215033 (last visited April 15, 2024).

34.     On information and belief, since the approval of Apotex's NDA No. 215033, Apotex has been importing its NDA Product into the United States, using its NDA Product in the United States, offering its NDA Product for sale in the United States, and selling its NDA Product in the United States.  Apotex's NDA Product, Bendamustine Hydrochloride Injection, is prominently listed as a product for sale by Apotex on the Apotex website.  *See* Apotex Bendamustine Hydrochloride Injection, https://www.apotex.com/products/us/detail.asp?m=701 48 (last visited April 15, 2024).

9

35. Upon information and belief, Apotex's NDA Product relies on data from bioavailability and/or bioequivalence studies contained in the approved labeling for BELRAPZO®. BELRAPZO® is approved for a 24-month shelf life. The Approved Labeling for Apotex's NDA Product does not identify any difference in stability between Apotex's NDA Product and BELRAPZO® and, upon information and belief, Apotex's NDA Product has the same or substantially similar stability as BELRAPZO® and/or as recited in the claims of the Patents-in-Suit.

36. Publicly available materials from the FDA's review of Apotex's NDA No. 215033 indicate that Apotex lacked "data under intermediate storage conditions," and that as a result, "the shelf life will be based [on] the available real time data. Accordingly, the FDA proposed, and [Apotex] accepted a reduced expiration dating period of **18-months** for the drug product when stored under refrigerated conditions . . ." encompassed by the claims. https://www.accessdata.fda.gov/drugsatfda_docs/nda/2023/215033Orig1s000ChemR.pdf. On information and belief, the FDA would not have approved Apotex's NDA Product with a shelf life of 18-months if it did not at least have sufficient stability under the claimed conditions to satisfy the stability limitations set forth in the claims of the Patents-in-Suit. Thus, on information and belief, the vials of the Apotex NDA Product imported into the United States, sold and/or offered for sale in the United States, and/or used in the United States satisfy the stability limitations set forth in the claims of the Patents-in-Suit.

37. The Approved Labeling for Apotex's NDA Product states that the active ingredient is bendamustine hydrochloride. *See* Approved Labeling at 1.

38. The Approved Labeling for Apotex's NDA Product states that the dosage strength is 25 mg/mL. *See id.*

ME1 48131842v.1

39.     The Approved Labeling for Apotex's NDA Product states that it contains polyethylene glycol ("PEG"), which is described and claimed as a pharmaceutically acceptable fluid in the Patents-in-Suit. *See id.* at 15-16. The Approved Labeling for Apotex's NDA Product further states that it contains ethanol, which is likewise described and claimed as a pharmaceutically acceptable fluid in the Patents-in-Suit. *See id.* Thus, the Apotex NDA Product contains "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally . . . ethanol," consistent with claim 1 of each of the Patents-in-Suit.

40.     Publicly available materials from the FDA's review of Apotex's NDA No. 215033 indicate that sodium hydroxide can be used "as needed to adjust pH of polyethylene glycol 400." Product Quality Review(s), Application No. 215033Orig1s000, available at https://www.accessdata.fda.gov/drugsatfda_docs/nda/2023/215033Orig1s000ChemR.pdf (last visited April 15, 2024) ("Product Quality Review") at p. 10.

41.     Sodium hydroxide is not a pharmaceutically acceptable fluid as that term is used in the specification of the '783 and '214 patents, nor is it a component of the pharmaceutically acceptable fluid in the Apotex NDA product. Thus, it is not pertinent to the "pharmaceutically acceptable fluid" limitation of claim 1 of each of the Patents-in-Suit.

42.     Indeed, in referring to the potential use of sodium hydroxide, the Apotex Approved Labeling does not describe sodium hydroxide as a component of Apotex's NDA Product, but rather notes that sodium hydroxide is used "to adjust the acidity *of polyethylene glycol 400 NF*" used to manufacture the Apotex NDA Product. Approved Labeling at 16. Thus, that fluid remains "*polyethylene glycol 400 NF*" and is not taken outside the confines of being a "pharmaceutically acceptable fluid" by any use of sodium hydroxide during its preparation.

11

43.     In other instances, on information and belief, Apotex's India-based manufacturer uses sodium hydroxide in batches of PEG that have a pH too low to be utilized as "polyethylene glycol 400 NF" and/or PEG 400 qualified to be utilized for pharmaceutical purposes.  In those instances, the use of sodium hydroxide renders said batch compliant with the monograph and/or specification for PEG and thus a "pharmaceutically acceptable fluid."

44.     Publicly available materials from the FDA's review of Apotex's NDA No. 215033 indicate that sodium hydroxide is used only "as needed to adjust pH of polyethylene glycol 400." Product Quality Review at p. 10.

45.     Therefore, on information and belief, while Apotex's Approved Labeling states that "sodium hydroxide is used to adjust the acidity of polyethylene glycol 400 NF," in Apotex's NDA Product (Approved Labeling at 16), sodium hydroxide is not used in each batch of the PEG used in the manufacture of the Apotex NDA Product.

46.     Even in an instance where sodium hydroxide is used to adjust the acidity of batches of PEG used to manufacture the Apotex NDA Product, on information and belief, sodium hydroxide is not a component of the product that is imported into the United States, sold and/or offered for sale in the United States, and/or used in the United States.  As explained on Apotex's Approved Labeling, sodium hydroxide is used as a pH adjuster and, on information and belief, is consumed by such use and/or is otherwise not a component of Apotex's NDA Product.

47.     Additionally, the use of sodium hydroxide is well known to those of skill in the art to adjust the pH of both pharmaceutical formulations generally, and of PEG specifically.  Sodium Hydroxide, National Library of Medicine, https://pubchem.ncbi.nlm.nih.gov/compound/Sodium-Hydroxide, (last visited April 15, 2024).  Thus, even where Apotex's India-based manufacturer uses sodium hydroxide to adjust the pH of PEG, a person of ordinary skill in the art would not

12

consider any such use to take the Apotex NDA Product outside the scope of the claim element "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol."

48.     The United States Pharmacopoeia-National Formulary, which publishes the official monograph standardizing PEG for FDA purposes, includes a pH range of 4.5 to 7.5, which allows the use of sodium hydroxide to adjust PEG's pH either within that range or to bring it into that range.  Exhibit C, USP Monograph for PEG at 1309.  Thus, any PEG that had sodium hydroxide used to adjust pH within (or into) that range would remain PEG, as a skilled artisan would consider the sodium hydroxide to be normally associated with PEG.

49.     The Approved Labeling for the Apotex NDA Product also recites that "[e]ach milliliter contains 25 mg of bendamustine hydrochloride, USP [and] . . . 5 mg monothioglycerol." *Id.*  The shared specification for the asserted patents indicates that monothioglycerol is an antioxidant and that 5 mg/mL is a stabilizing amount of an antioxidant.

50.     Upon information and belief, Apotex's NDA Product has less than about 5% peak area response of total impurities resulting from the degradation of the bendamustine, as determined by HPLC at a wavelength of 223 nm after at least 15 months at a temperature of from about 5 °C to about 25 °C.  Further, on February 13, 2022, Apotex sent Eagle a notice letter of a Paragraph IV certification concerning U.S. Patent No. 11,103,483, which is related to the Patents-in-Suit, shares a specification with them, and contains an identical claim limitation.  In that letter, Apotex did not contest that Apotex's NDA Product met that limitation.

51.     The Approved Labeling for Apotex's NDA Product recommends, instructs, and/or promotes administration to patients with chronic lymphocytic leukemia.  *See* Approved Labeling.

## COUNT I – INFRINGEMENT OF U.S. PATENT NO. 11,844,783

52.     Eagle incorporates each of the preceding paragraphs as if fully set forth herein.

ME1 48131842v.1

53.     As set forth herein, Apotex has offered its NDA Product for sale in the United States, sold its NDA Product in the United States, made or used its NDA Product in the United States, and/or imported its NDA Product into the United States.

54.     Upon information and belief, the importation, sale, offer for sale, and/or use of Apotex's NDA Product in conjunction with its Approved Labeling infringes one or more claims, including at least claim 1, of the '783 patent under 35 U.S.C. § 271(a), either literally and/or under the doctrine of equivalents, and/or Apotex induces or contributes to the inducement of the infringement of one or more claims, including at least claim 1, of the '783 patent under 35 U.S.C. § 271(b) and/or (c).

55.     The Approved Labeling for the Apotex NDA Product recommends, instructs, and/or encourages health care professionals to utilize the product in accordance with said Approved Labeling.  Section 2 of the Approved Labeling for the Apotex NDA Product contains specific instructions for "Intravenous Infusion," and specifically recommends, instructs, and/or encourages as follows:  "Aseptically withdraw the volume needed for the required dose from the 25 mg/mL solution as per Table A below and immediately transfer to a 500 mL infusion bag of one of the following diluents: -0.9% Sodium Chloride Injection, USP; or -2.5% Dextrose/0.45% Sodium Chloride Injection, USP." Approved Labeling at 4.  The Approved Labeling for the Apotex NDA Product also recommends, instructs, and/or encourages health care professionals to administer said product for purposes of treating CLL by reciting that "The recommended dosage is 100 mg/m2 administered intravenously over 30 minutes on Days 1 and 2 of a 28-day cycle, up to 6 cycles." *Id.* at 3.

56.     As reflected in that Approved Labeling, each milliliter of Apotex's NDA Product "contains 25 mg of bendamustine hydrochloride, USP, 38 mg (3.8%) absolute ethanol, 5 mg

14

monothioglycerol, NF in polyethylene glycol 400, and 0.08 mg sodium hydroxide is used to adjust the acidity of polyethylene glycol 400 NF." That Approved Labeling further directs healthcare providers to prescribe and administer Apotex's NDA Product for the treatment of leukemia.

57. Apotex's U.S. website encourages infringement. Apotex's NDA Product, Bendamustine Hydrochloride Injection, is predominantly featured in a banner on its homepage and advertised as "Therapeutically Equivalent to BELRAPZO®." https://www.apotex.com/us/home.

58. Apotex sought and obtained a therapeutic equivalence code for its NDA Product, which encourages healthcare providers to substitute the Apotex NDA Product for BELRAPZO® for all uses. *See* J9058, Injection, Bendamustine Hydrochloride (Apotex), 1 MG, https://www.hipaaspace.com/medical_billing/coding/healthcare.common.procedure.coding. system/pdf/j9058 (last visited April 15, 2024).

59. Apotex has actively induced infringement, and will continue to actively induce infringement of at least claim 1 of the '783 patent by way of the substance of its Approved Labeling and/or by way of its marketing of the Apotex NDA Product.

60. Apotex's infringement and/or inducement is willful. Upon information and belief, Apotex is aware of the '783 patent at least because Apotex is aware of Eagle's patent portfolio and has previously been involved in litigation concerning other patents related to the '783 patent. *See, e.g.*, *Eagle Pharm. Inc. v. Apotex Inc. & Apotex. Corp.*, C.A. No. 21-01256-CFC, D.I. 12 (D. Del. Sept. 22, 2021). Further, Apotex has been aware of the '783 patent and their related infringement at least since Eagle sent a letter to Apotex dated December 20, 2023, informing Apotex that the '783 patent had published and that Apotex's was infringing that patent through the importation, sale, offer for sale, and/or use of Apotex's NDA Product in conjunction with its Approved

15

Labeling.  Moreover, upon information and belief, Apotex has regularly monitored Eagle's patent filings and developments in the '783 patent family.

61.    Upon information and belief, Apotex has acted with full knowledge of the '783 patent and/or the application leading to the '783 patent, Application No. 18/081,238, and without a reasonable basis for believing that it would not be liable for infringing the '783 patent, actively inducing infringement of the '783 patent, and contributing to the infringement by others of the '783 patent.

62.    Unless Apotex is enjoined from infringing the '783 patent, actively inducing infringement of the '783 patent, and contributing to the infringement by others of the '783 patent, Eagle will suffer irreparable injury.  Eagle has no adequate remedy at law.

63.    Eagle has suffered monetary damages, including but not limited to lost profits, as a result of Apotex's infringement of the '783 patent.

### COUNT II – INFRINGEMENT OF U.S. PATENT NO. 11,872,214

64.    Eagle incorporates each of the preceding paragraphs as if fully set forth herein.

65.    As set forth herein, Apotex has offered its NDA Product for sale in the United States, sold its NDA Product in the United States, made or used its NDA Product in the United States, and/or imported its NDA Product into the United States.

66.    Upon information and belief, the importation, manufacture, sale, offer for sale, and/or use of Apotex's NDA Product in conjunction with its Approved Labeling infringes one or more claims, including at least claim 1, of the '214 patent under 35 U.S.C. § 271(a), either literally and/or under the doctrine of equivalents, and/or Apotex induces or contributes to the inducement of the infringement of one or more claims, including at least claim 1, of the '214 patent under 35 U.S.C. § 271(b) and/or (c).

16

67.     As reflected in its Approved Labeling, each milliliter of Apotex's NDA Product "contains 25 mg of bendamustine hydrochloride, USP, 38 mg (3.8%) absolute ethanol, 5 mg monothioglycerol, NF in polyethylene glycol 400, and 0.08 mg sodium hydroxide is used to adjust the acidity of  polyethylene glycol 400 NF." That Approved Labeling further indicates that Apotex's NDA Product is marketed in a 100 mg/4 mL vial.

68.     The foregoing actions by Apotex constitute infringement of the '214 patent, active inducement of infringement of the '214 patent, and contribution to the infringement by others of the '214 patent.

69.     Apotex's infringement and/or inducement is willful.  Upon information and belief, Apotex is aware of the '214 patent at least because Apotex is aware of Eagle's patent portfolio and has previously been involved in litigation concerning other patents related to the '214 patent. *See, e.g.*, *Eagle Pharm. Inc. v. Apotex Pharma LLC*, No. 21-1256-CFC, D.I. 9 (D. Del. Sept. 22, 2021). Further, Apotex has been aware of the '214 patent and their related infringement at least since Eagle sent a letter to Apotex dated January 16, 2024, informing Apotex that the '214 patent had published and that Apotex's was infringing that patent through the importation, sale, offer for sale, and/or use of Apotex's NDA Product in conjunction with its Approved Labeling.  Moreover, upon information and belief, Apotex has regularly monitored Eagle's patent filings and developments in the '214 patent family.

70.     Upon information and belief, Apotex has acted with full knowledge of the '214 patent and/or the application leading to the '214 patent, Application No. 18/081,251, and without a reasonable basis for believing that it would not be liable for infringing the '214 patent, actively inducing infringement of the '214 patent, and contributing to the infringement by others of the '214 patent.

ME1 48131842v.1

71. Unless Apotex is enjoined from infringing the '214 patent, actively inducing infringement of the '214 patent, and contributing to the infringement by others of the '214 patent, Eagle will suffer irreparable injury. Eagle has no adequate remedy at law.

72. Eagle has suffered monetary damages, including but not limited to lost profits, as a result of Apotex's infringement of the '214 patent.

## JURY DEMAND

73. Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Eagle hereby demands a trial by jury on all issues triable as such.

## PRAYER FOR RELIEF

WHEREFORE, Eagle requests the following relief:

(a) A judgment that Apotex has infringed, and induced and contributed to infringement of the Patents-in-Suit;

(b) A permanent injunction pursuant to, *inter alia*, 35 U.S.C. § 283 enjoining Apotex, their officers, agents, servants, employees and attorneys, and all persons acting in concert with them, from making, using, selling, offering for sale, marketing, distributing, or importing Apotex's NDA Product, or any product the making, using, offering for sale, sale, marketing, distribution, or importation of which infringes the Patents-in-Suit, or the inducement of or the contribution to any of the foregoing, prior to the expiration date of the Patents-in-Suit, inclusive of any extension(s) and additional period(s) of exclusivity;

(c) A judgment declaring that making, using, selling, offering for sale, marketing, distributing, or importing Apotex's NDA Product, or any product or compound the making, using, offering for sale, sale, marketing, distribution, or importation of which infringes the Patents-in-

ME1 48131842v.1

Suit, prior to the expiration date of the Patents-in-Suit, respectively, will infringe, actively induce infringement of, and/or contribute to the infringement by others of the Patents-in-Suit;

(d)     An award of Eagle's damages or other monetary relief to compensate Eagle for Apotex's past infringement and any continuing or future infringement of the Patents-in-Suit up until the date such judgement is entered, including pre- and post-judgement interest, costs, and disbursements as justified pursuant to 35 U.S.C. § 284;

(e)     A declaration that this case is an exceptional case and an award of attorneys' fees pursuant to 35 U.S.C. § 285;

(f)     An award of Eagle's costs and expenses in this action; and

(g)     Such further and other relief as this Court may deem just and proper.

Dated: April 15, 2024

OF COUNSEL:

Daniel G. Brown
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700

MCCARTER & ENGLISH, LLP

*/s/ Daniel M. Silver*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
Renaissance Centre
405 N. King Street, 8th Floor
Wilmington, Delaware 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiff Eagle Pharmaceuticals, Inc.*

19

ME1 48131842v.1

# EXHIBIT 3
# REDACTED IN ITS ENTIRETY

EXHIBIT 4

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

x    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2017**
**or**

o    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from _____ to _____ .**
**Commission File Number 001-36306**

# Eagle Pharmaceuticals, Inc.
(Exact Name of Registrant as Specified in its Charter)

| **Delaware** | **2834** | **20-8179278** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**50 Tice Boulevard, Suite 315**
**Woodcliff Lake, NJ 07677**
**(201) 326-5300**
(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

**Securities registered pursuant to Section 12(b) of the Act:**
**Common Stock (par value $0.001 per share), NASDAQ Global Market**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes x No o

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes o No x

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes x  No o

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes x  No o

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. o

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in 12b-2 of the Exchange Act.

| Large accelerated filer x | Accelerated filer o | Non-accelerated filer o (Do not check if a smaller reporting company) | Smaller reporting company o |
|---|---|---|---|

Emerging growth company o

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes o  No  x

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. o

The aggregate market value of voting Common Stock held by non-affiliates of the registrant was approximately $1,009,183,048 computed by reference to the last reported sale price of $78.89 per share as reported by The NASDAQ Global Market, as of the last business day of the registrant's most recently completed second fiscal quarter, June 30, 2017. This calculation does not reflect a determination that certain persons are affiliates of the registrant for any other purpose.

The number of shares outstanding of the registrant's common stock, $0.001 par value per share, as of February 20, 2018 was 14,862,015 shares.

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the definitive proxy statement for our 2018 annual meeting of stockholders, which is to be filed within 120 days after the end of the fiscal year ended December 31, 2017, are incorporated by reference into Part III of this Form 10-K, to the extent described in Part III.

**EAGLE PHARMACEUTICALS, INC.**

**ANNUAL REPORT ON FORM 10-K**

**For the fiscal year ended December 31, 2017**

| | | Page |
|---|---|---|
| **Part I** | | |
| Item 1. | Business | 5 |
| Item 1A. | Risk Factors | 31 |
| Item 1B. | Unresolved Staff Comments | 62 |
| Item 2. | Properties | 63 |
| Item 3. | Legal Proceedings | 63 |
| Item 4. | Mine Safety Disclosures | 66 |
| **Part II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 66 |
| Item 6. | Selected Financial Data | 68 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 69 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 85 |
| Item 8. | Financial Statements and Supplementary Data | 86 |
| Item 9. | Changes and Disagreements with Accountants on Accounting and Financial Disclosure | 86 |
| Item 9A. | Controls and Procedures | 86 |
| Item 9B | Other Information | 89 |
| **Part III** | | |
| Item 10. | Directors, Executive Officers and Corporate Governance | 89 |
| Item 11. | Executive Compensation | 89 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 89 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 89 |
| Item 14. | Principal Accounting Fees and Services | 90 |
| **Part IV** | | |
| Item 15. | Exhibits and Financial Statement Schedules | 90 |
| Item 16. | Form 10-K Summary | 93 |
| | Signatures | |

**Eagle Pharmaceuticals, Inc.**

**NOTE REGARDING FORWARD-LOOKING STATEMENTS**

The Eagle Pharmaceuticals, Inc. name and logo, the Eagle Biologics, Inc. name and logo, and Ryanodex®, are either registered trademarks or trademarks of Eagle Pharmaceuticals in the United States and/or other countries. All other trademarks, service marks or other tradenames appearing in this Annual Report on Form 10-K are the property of their respective owners. References to the "Company," "Eagle Pharmaceuticals," "Eagle," "we," "us" or "our" mean Eagle Pharmaceuticals, Inc., a Delaware corporation and its subsidiary, and references to "Eagle Biologics" mean Eagle Biologics, Inc.

This Annual Report on Form 10-K includes forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act, and Section 27A of the Securities Act of 1933, as amended, or the Securities Act. For this purpose, any statements contained herein regarding our strategy, future operations, financial position, future revenues, projected costs, prospects, plans and objectives of management, other than statements of historical facts, are forward-looking statements. These statements relate to future events or to our future financial performance and involve known and unknown risks, uncertainties and other factors which may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. Forward-looking statements include, but are not limited to, statements about:

- the success, cost and timing of our product development activities and clinical trials;
- our ability to obtain and maintain regulatory approval of our products and product candidates, and any related restrictions, limitations, and/or warnings in the label of an approved product;
- our ability to obtain funding for our operations;
- our plans to research, develop and commercialize our products and product candidates and our ability to successfully commercialize our products and product candidates;
- our ability to attract collaborators with development, regulatory and commercialization expertise;
- the size and growth potential of the markets for our products and product candidates, and our ability to serve those markets;
- the rate and degree of market acceptance of our products and product candidates;
- our ability to develop sales and marketing capabilities, whether alone or with potential future collaborators;
- the performance of our strategic collaborators and success of our current strategic collaborations;
- regulatory developments in the United States and foreign countries;
- the performance of our third-party suppliers and manufacturers;
- the success of competing drugs that are or become available;
- the loss of key scientific or management personnel;
- our use of the proceeds from our initial public offering; and subsequent follow-on offering;
- the accuracy of our estimates regarding expenses, future revenues, capital requirements and needs for additional financing;
- our expectations regarding our ability to obtain and maintain intellectual property protection for our product candidates;
- our ability to prevent or minimize the effects of Paragraph IV patent litigation; and
- our ability to successfully integrate our recent acquisition of Arsia Therapeutics, Inc into our business, including the possibility that the expected benefits of the transaction will not be fully realized by us or may take longer to realize than expected.

Forward-looking statements are statements that are not historical facts. Words such as "believes," "potential," "will," "could," "would," "should," "may," "intends," "anticipates," "plans," "enables," "potential," "entitles," "estimates," "projects," "predicts," and similar expressions are intended to identify forward-looking statements.

These forward-looking statements reflect our management's beliefs and views with respect to future events, are based on estimates and assumptions as of the date of this Annual Report on Form 10-K, and are subject to risks and uncertainties. Additionally, these statements are based upon information available to us as of the date of this Annual Report on Form 10-K, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain, and investors are cautioned not to unduly rely upon these statements. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. Some of these important factors include our "critical accounting estimates" described in Item 7 in Part II of this Annual Report on Form 10-K and the factors set forth under the caption "Risk Factors" in Item 1A in Part I of this Annual Report on Form 10-K. Moreover, we operate in a very competitive and rapidly changing

3

environment. Although we may elect to update forward-looking statements in the future, we specifically disclaim any obligation to do so (unless required by law), even if our estimates change, and readers should not rely on our forward-looking statements as representing our views as of any date subsequent to the date of this Annual Report on Form 10-K.

4

**PART I**

**Item 1. Business**

**Company Overview**

*Organization*

Eagle Pharmaceuticals, Inc. is a specialty pharmaceutical company registered at and with principal offices at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677. On November 16, 2016, we purchased all of the outstanding capital stock of Arsia Therapeutics, Inc. ("Arsia"), and subsequently changed its name to Eagle Biologics, Inc. ("Eagle Biologics").

*Business*

Our business model is to develop proprietary innovations to FDA-approved, injectable drugs, that offer commercial and/or functional advantages to currently available alternatives. We have historically been, and will continue to primarily be, focused on developing and commercializing injectable drugs, primarily in the critical care and oncology areas, using the United States Food and Drug Administration ("FDA")'s 505(b)(2) New Drug Application ("NDA") regulatory pathway. With our addition of Eagle Biologics, we hope to apply our proven market strategy to offer "biobetter" formulations, and to rapidly develop novel biologic products under the pathway provided by the Biologics Price Competition and Innovation Act, or BPCIA. In addition, we plan to continue to market and/or commercialize our products through marketing partners and/or through our internal direct sales force.

For each of our current and future pre-commercial products, we target market entry prior to the first generic or biosimilar drug with the goal of substantially converting the market by addressing the needs of stakeholders who ultimately use our products. We believe we can further extend commercial duration through new intellectual property protection and/or orphan drug exclusivity and three years of non-patent regulatory exclusivity for future product candidates, as provided under applicable law and regulations. We strive to enhance branded reference drugs to optimize their ease and safety of use for healthcare providers, produce less drug waste, lower cost to stakeholders, and create the opportunity for label expansion to additional indications. Our regulatory and commercial strategy is to introduce improved product formulations no later than the first generic or biosimilar competitor of the branded reference product, which provides us with the potential to extend the useful life of the product and realize superior pricing.

Our 505(b)(2) model has been validated by the approval and successful launches of our novel formulations of Argatroban and Ryanodex® (dantrolene sodium) ("Ryanodex") and the FDA approvals and launches of docetaxel injection, non-alcohol formulation ("Non-Alcohol Docetaxel Injection") and rapidly infused bendamustine RTD ("Bendeka"), licensed to and launched jointly with Teva Pharmaceutical Industries Ltd. ("Teva") in January of 2016. We are in the early stages of development with our biologics strategy and do not currently have any commercially approved biologics products.

Our product portfolio now includes four approved products: Argatroban; Ryanodex; docetaxel injection, non-alcohol formulation; and Bendeka. We have three commercial partners: Teva, which through its subsidiary Cephalon, Inc. ("Cephalon"), markets Bendeka, and Chiesi USA, Inc. ("Chiesi") and Sandoz Inc. ("Sandoz"), who pursuant to separate agreements market Argatroban.

We currently have multiple product candidates in advanced stages of development, and/or under review for approval by the FDA. Additionally, we have other exploratory candidates under a collaborative agreement entered into in January 2016 with Albany Molecular Research, Inc. ("AMRI"). Our advanced product candidates are EP-3101 (bendamustine RTD) ("EP-3101"), EP-4104 (dantrolene sodium for exertional heat stroke ("EHS")) ("EP-4104"), EGL-4104-C-1702 (dantrolene sodium for drug induced hyperthermia), EP-5101 (PEMFEXY™), a pemetrexed injection ready-to-dilute formulation ("EP-5101") and EGL-5385-C-1701 (fulvestrant). EP-3101 and EP-5101 have been tentatively approved by the FDA. EGL-5385-C-1701 and EP-4104, both unapproved, may address unmet medical needs in major specialty markets.

On March 18, 2016, we received a Complete Response Letter from the FDA stating that while the FDA's initial review of our NDA, for our ready to use ("RTU") bivalirudin candidate, EP-6101, a patented liquid intravenous form of Angiomax® for percutaneous transluminal angioplasty, was complete, they could not approve the application in its present form and are requesting additional information. The Company has elected not to pursue the application further or seek to exploit EP-6101 for various

5

reasons including the costs associated with addressing the information request in the FDA Complete Response Letter and because additional generic bivalirudin products are able to enter the market. In December of 2017 we divested the NDA for EP-6101 and its related intellectual property in settlement of a litigation matter with The Medicines Company.

In 2017 and the first quarter of 2018, we accomplished the following with respect to our product portfolio:

• On July 26, 2017, we received a Complete Response Letter from the FDA regarding our 505(b)(2) NDA for EP-4104 for the treatment of exertional heat stroke, in conjunction with external cooling methods. Based on our recent meeting with the FDA, we have agreed on a path forward and plan to conduct an additional clinical trial in August 2018 during the Hajj pilgrimage, similar to the study conducted during the Hajj in 2015.

• On September 20, 2017, we entered into a Product Collaboration and License Agreement, effective as of September 19, 2017, (the "SymBio License") with SymBio Pharmaceuticals Limited ("SymBio") for the rights to develop and commercialize EP-3101 and Bendeka (collectively, the "Products") in Japan. Under the SymBio License, SymBio will be responsible for all development of the Products in Japan and for obtaining and maintaining all regulatory approvals of the Products in Japan, with a target for regulatory approval of a Product in Japan in 2020. SymBio will bear all costs of development of the Products in Japan except that, if Japanese regulatory authorities require a certain clinical study to be conducted as a condition for approving one of the Products in Japan, we would share 50% of the out-of-pocket costs of that clinical study up to a specified dollar amount as a reduction to future royalty payments. We have assessed the probability of additional costs as remote and, therefore, have not deferred revenue on the SymBio License. SymBio will also be responsible, at its sole cost, for all marketing, promotion, distribution and sales of the Products in Japan and is obligated to launch the Products and meet certain minimum detailing, promotion and marketing commitments in connection with commercialization of the Products in Japan.

SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for chronic lymphocytic leukemia ("CLL"), relapsed or refractory low-grade non-hodgkin's lymphoma ("NHL"), mantle cell lymphoma ("MCL"), and as a first line treatment of low-grade NHL and MCL. Under the SymBio License, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

Pursuant to the terms of the SymBio License, Eagle and SymBio will enter into a separate supply agreement, under which we will be responsible for manufacturing and supplying the Products to SymBio for development and commercialization in Japan. After a period of time following launch of a Product, SymBio will have the right to assume the responsibility for manufacturing of the Products in and for Japan. Under the SymBio License, we will retain the right to control the prosecution, maintenance and enforcement of our patents covering the Products, both inside and outside of Japan.

Under the SymBio License, we earned an upfront non-refundable cash payment of $12.5 million in the third quarter of 2017, and we are eligible to receive a milestone payment upon approval of a Product in Japan and a milestone payment upon achievement of certain cumulative net sales of the Products in Japan, which can aggregate to a total of approximately $10.0 million (subject to currency fluctuations). After regulatory approval of a Product in Japan, we will also receive tiered, low double-digit royalties on net sales of the Products in Japan for so long as there are patents covering the Products in Japan or regulatory exclusivity for the Products in Japan.

• On October 23, 2017, the Company entered into an agreement with Worldwide Clinical Trials, Inc. to conduct a clinical trial for EGL-5385-C-1701. Approximately 600 healthy female subjects have been randomized across 12 sites. The study will evaluate the safety, tolerability, and pharmacokinetics of a single dose of EGL-5385-C-1701for Injectable Suspension versus the reference drug administered by IM injection in the gluteal muscle. We expect the study to be completed by September 2018.

• On October 27, 2017, the FDA granted tentative approval for the Company's EP-5101 for treatment of locally advanced or metastatic nonsquamous non-small cell lung cancer in combination with cisplatin; locally advanced or metastatic nonsquamous non-small cell lung cancer in patients whose disease has not progressed after four cycles of platinum-based first-line chemotherapy, as maintenance treatment; locally advanced or metastatic nonsquamous non-small cell lung cancer after prior chemotherapy as a single agent; and malignant pleural mesothelioma in patients whose disease is unresectable or who are otherwise not candidates for curative surgery in combination with cisplatin.

• During the first quarter of 2018, we filed an ANDA for our first product candidate co-developed with Albany Molecular Research, Inc, ("AMRI") and are awaiting FDA acceptance of the filing.

- On February 8, 2018, we entered into an amendment (the "Amendment") to the stock purchase agreement dated November 10, 2016 (the "Arsia SPA"), pursuant to which we acquired from Arsia Therapeutics, LLC (the "Seller") all of the outstanding capital stock of Arsia Therapeutics, Inc. (now Eagle Biologics). Pursuant to the Amendment, our obligations to make four separate milestone payments pursuant to the Arsia SPA, which could have aggregated to a total of $48 million, were terminated in exchange for a single payment of $15 million by us to the Seller.

In addition to building our product portfolio, we continue to develop our commercial organization. In preparation for near-term product launches, we have built an internal commercial team consisting of approximately 50 direct sales representatives, support staff and management who are a part of our independent commercial organization.

7

**Product Portfolio**

Our product portfolio consists of:

| Product | U.S. Brand Reference Drug | Description | Indication | Estimated Market Opportunity (amounts in millions) | Status |
|---|---|---|---|---|---|
| **Ryanodex® (dantrolene sodium)** | Dantrium®/ Revonto® | Muscle relaxant | Malignant hyperthermia | $75[2] | Approved (U.S.)/ launched August 2014; orphan drug exclusivity received for MH (U.S.) |
| **Argatroban** | Argatroban | Anti-coagulant; thrombin inhibitor | Heparin-induced thrombocytopenia | $99[2] | Approved (U.S.); marketed by Chiesi USA, Inc. and Sandoz |
| **Docetaxel Injection, Non-Alcohol formulation** | Docetaxel | Chemotherapeutic agent | Breast, non-small cell lung, prostate, head and neck cancers/ gastric adenocarcinoma | $75[2] | Approved (U.S.) in December 2015/ launched in January 2016; Eagle holds the exclusive right to market, sell and distribute in the U.S. |
| **BENDEKA™** | BENDEKA™ | Chemotherapeutic agent | CLL; Indolent NHL | $660[1] | Approved (U.S.) in December 2015; licensed to and marketed by Teva; orphan drug designation for CLL and NHL (U.S.) |
| **EP-3101 (bendamustine RTD)** | Treanda® | Chemotherapeutic agent | (CLL); Indolent (NHL) | $660[1] | Tentative approval (U.S.) for NHL and CLL in July 2014 |
| **EP-4104 (dantrolene sodium)** | No drug currently approved | Muscle relaxant | Exertional heat stroke | $400[2] | Orphan drug designation received for heat stroke (U.S.); IND submission in 2015; completed safety and efficacy study in December 2015; FDA granted fast track designation and NDA submitted in January 2016; additional clinical trial requested by FDA in 2017 |
| **EP-5101 (PEMFEXY™)** | Alimta | Chemotherapeutic agent | Lung cancer and mesothelioma | $1,101[1] | NDA submitted December 2016; tentative approval received in October 2017 |
| **EGL-5385-C-1701 (fulvestrant)** | Faslodex | Selective estrogen receptor degrader | Metastatic breast cancer | $500[1] | Pre-NDA submission |
| **EGL-4104-C-1702 (dantrolene sodium)** | No drug currently approved | Muscle relaxant | Drug induced hyperthermia | $400[2] | Pre-NDA submission |

[1] Based on publicly filed reports with the SEC.
[2] Based on independent market research and management's estimates extrapolated therefrom.

**Our Competitive Strengths**

*Our Purpose*

We believe that many currently available critical care and oncology injectable drugs and biopharmaceuticals have suboptimal characteristics that do not meet the needs of patients, physicians, nurses or pharmacists. These characteristics can impact safety, shelf life, convenience, waste, cost, and ease of use by practitioners and pharmacy staff. For instance, existing drugs may be

8

packaged inefficiently or come in formulations that require reconstitution or dilution, or which are otherwise difficult or inconvenient to prepare, and which could expose workers to cytotoxic compounds and can result in dosing errors. This can also lead to wasted quantities of drug, inefficiencies in staff time and constrained work flow, reduced shelf life and the need for multiple dosing of individual patients to complete treatment. Likewise the viscosity of many biologic products requires them to be delivered intravenously often in time consuming and sometimes painful treatments for patients. We believe there is a large and unmet market for developing injectable drugs that address the specific needs of patients, physicians, nurses and pharmacists to simplify their use, reduce waste and lower healthcare costs.

We believe that our management's unique knowledge of the industry as well as the biopharmaceutics formulation acumen presented by Eagle Biologics combine to enable us to compete effectively in the market for injectable therapeutics in both small and large molecule markets. We look to continue to exploit these strengths in order to build upon our portfolio of attractive assets.

We have and continue to engage physicians, nurses, pharmacists and key opinion leaders, to identify specific products where the characteristics described above present opportunities for product improvement. We evaluate the product opportunities presented by the stakeholders and determine whether or not they conform to our research and development planning. A key aspect of our evaluation is the intellectual property landscape for each product opportunity, including our ability to avoid infringing existing patents and the potential patentability of our modified version of the drug. We utilize our experienced team of formulators with extensive experience with injectable pharmaceuticals, and a track record of success in product development, regulatory relations, and quality assurance to develop improved products.

Because our products are differentiated from the branded reference drugs, we believe we are able to avoid infringing existing patents covering the branded reference drug allowing us to enter the existing market no later than applicable generic drugs, which may be subject to protracted patent litigation that delays market entry. Protracted litigation is a significant barrier to entry for competitors seeking approval of an ANDA referencing the branded reference product, and our early entry into the market leads to less price erosion due to constrained competition. Our patent estate includes 31 owned or exclusively-licensed U.S. issued patents and 14 filed U.S. patent applications, as well as several patents and patent applications that have been filed in various worldwide territories, that protect or will protect, as applicable the market value of our current portfolio of products. We believe that other potential barriers to entry for our competitors consist of the following:

- our early entry into the market allows us to influence usage patterns when fewer, if any, competitors exist and allows us to market our products as improved versions of the branded reference drug prior to or concurrent with any generic entry, thereby giving us the opportunity to capture significant market share at this early stage. We believe that such early entry into the market will limit later conversions into generic versions of the branded reference drugs, deterring competition and allowing us to maintain market share and favorable pricing;
- the potential for seven years of exclusivity upon approval of a 505(b)(2) NDA that receives orphan drug status; and
- the potential for three years of regulatory exclusivity for our future product candidates upon approval, if any, of a 505(b)(2) NDA supported by new clinical investigations (other than bioequivalence and bioavailability studies) essential to approval of the application.

Our product portfolio is focused on oncology, critical care, and orphan diseases and includes four approved products, two tentative approvals, and several distinct product candidates in advanced development. Additionally, we have other exploratory candidates under our collaborative agreement with AMRI, and are developing a "biobetters" pipeline at our subsidiary, Eagle Biologics. We believe that we can leverage our formulation and development expertise to achieve improved product attributes in terms of potential for longer stability, shorter infusion times, less waste and/or ease and safety of use for healthcare professionals and achieve longer commercial duration compared to generic competitors. We believe that our products may offer certain benefits as compared to existing injectable drugs which may include one or more of the following:

- improved safety through elimination of reconstitution in the pharmacy or in the acute care setting;
- reduction in the number of injections required;
- reduction in the volume of drug needed to be injected, potentially expanding the application to additional medical situations;
- reduction in the amount of diluent required to administer the drug;
- reduction in drug waste;
- reduction in drug infusion time; and
- potential label expansion to include additional indications.

**Our Strategy**

Our goal is to be a leading specialty pharmaceutical company focused on the development and commercialization of injectable

9

pharmaceutical products for use in acute care settings that represent an improvement over the currently marketed reference drug. Our strategy to achieve this goal includes:

*Enter the market no later than the first generic drug.*    We intend to enter the market no later than the first generic or biosimilar of the branded reference drug. During this period, the number of competitors is lowest and branded drugs are generally at peak or near peak value. This will allow us to influence usage patterns and market our products as improved versions, thereby achieving favorable pricing. Even if we enter the market simultaneously with, or after, the first generic drug, as a 505(b)(2) applicant, we would be able to enter the market without regard to any generic drug's 180-day exclusivity period.

*Retain commercial rights in the United States and selectively partner outside of the United States.*    In general, we believe that we can cost-effectively commercialize our products in the United States internally or through a contracted sales force and selected commercial arrangements, and thereby retain the commercial value of these products. We have established a small, contract specialty sales force focusing on GPOs, hospital systems and key stakeholders in acute care settings, primarily hospitals. Outside of the United States, we may utilize partners for the commercialization of our products.

*Strengthen our product portfolio.*    We intend to continue to strengthen our product portfolio in the areas of oncology, critical care and orphan diseases. We will continue to develop our current product portfolio and leverage our expertise to identify new products with suboptimal characteristics that present us with significant opportunity for revenue generation. In addition to our internal efforts, we will opportunistically in-license or acquire product candidates that fit our therapeutic areas of focus and meet our rigorous evaluation process.

*Continue to build a robust intellectual property portfolio.*    Our patent estate includes 31 owned or exclusively-licensed U.S. issued patents and 14 filed U.S. patent applications, as well as several that have been filed in various worldwide territories, that protect or will protect, as applicable the market value of our approved and pipeline products. We intend to continue to build our patent portfolio by filing for patent protection on new developments with respect to our product candidates that will not infringe patents that cover the branded reference drugs. We expect that these will, if issued, allow us to list our own patents in the Orange Book, to which potential competitors will be required to certify upon submission of their applications referencing our products, if approved.

**Our Products and Product Portfolio**

***EP-3101 and Bendeka (Licensed to Teva and SymBio) for Chronic Lymphocytic Leukemia and Non-Hodgkin's Lymphoma***

*Overview*

Bendamustine is an alkylating agent approved for use in CLL, and indolent B-cell NHL, that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen (which we refer to herein as the NHL indication).

*U.S. Marketed Bendamustine Products*

Teva currently markets its lyophilized bendamustine product under the trade name Treanda®. Teva ceased distribution of Treanda® liquid on March 30, 2016.

*Limitations of Marketed Bendamustine Products*

Treanda® is a lyophilized powder that requires reconstitution in water prior to use. A 500 mL intravenous (IV) administration is used over 30 or 60 minutes for CLL and NHL patients, respectively. The product is sold in single use vials creating an opportunity for product waste in certain applications.

*Eagle's Solution: EP-3101 and Bendeka*

The EP-3101 and Bendeka liquid formulations eliminate the need to reconstitute the drug prior to use, relative to the lyophilized presentation of Treanda®. As a result, we believe that relative to the lyophilized presentation of Treanda® there is less potential for dosing errors, less exposure to cytotoxic powders and a more efficient work flow.

Additionally, admixtures prepared with Bendeka contain lower sodium as compared with Treanda® which could be of benefit to the predominantly elderly, renally impaired and cardiovascular compromised patients. Also, Bendeka is available in a multi-use

10

vial, which allows infusion centers and hospitals to avoid needless waste of unused drug remaining after procedures with single use vials.

*EP-3101*

We developed EP-3101, a ready-to-dilute ("RTD"), multi-dose liquid with extended drug stability for use with a 500mL intravenous, or IV, infusion bag, for which we were granted tentative patent approval.

*Teva License- Bendeka*

Bendeka is the same RTD, multi-dose liquid formulation as EP-3101, with extended drug stability, but for use with a 50 mL IV infusion bag, which enables it to be administered in a shorter time-period than current drugs on the market and represents a label expansion from EP-3101. We received orphan drug designation for Bendeka for CLL and NHL in July 2014. We entered into the Cephalon License to market this product. *See License Agreements - Bendamustine License Agreement, below.*

**Argatroban for Heparin-Induced Thrombocytopenia**

Argatroban is an anti-coagulant originally developed for the treatment of heparin-induced thrombocytopenia ("HIT"). Our formulation of Argatroban, was our first product approved by the FDA and is marketed by Chiesi and Sandoz under separate agreements with us. *See License Agreements - License and Distribution Agreement - Chiesi; and Settlement Agreement and Related Supply and Distribution Agreement with Sandoz, below.*

*Currently-Marketed Argatroban Products*

Argatroban is currently sold by GlaxoSmithKline ("GSK"), West-ward, Chiesi and Sandoz. It is sold in 250mL (GSK and West-ward), 125mL (Sandoz) and 50mL (Chiesi and Sandoz) presentations. According to IMS Health, Argatroban had U.S. annual sales of $39 million in 2017.

*Limitations of Argatroban Marketed Products*

The branded form of argatroban from GSK and West-ward is supplied in a 2.5 mL vial with 100 mg/mL of active pharmaceutical ingredient. In this formulation, the current product requires 100-fold dilution for infusion, requiring the use of a 250 mL intravenous bag, typically resulting in approximately 30% waste primarily driven by prophylactic administration while waiting for HIT testing results, common infection control policies requiring change of intravenous bags every 24 hours and patient release from hospital prior to complete administration.

*Eagle's Solution: Argatroban Injection*

Our formulation of Argatroban is supplied in a single-use vial, containing 50mg of drug in a 50mL aqueous solution, where only 1% of the drug is wasted. Argatroban is ready to use and the vial label contains a ring sling for convenient IV pole administration. It was approved by the FDA on June 29, 2011, for treatment of HIT in patients.

**Docetaxel Injection, Non-Alcohol Formula**

On October 13, 2015, we in-licensed docetaxel injection, non-alcohol formulation from Teikoku. *See License Agreements - Teikoku License Agreement, below.* Docetaxel is an injectable oncology drug indicated for the treatment of non-small cell lung cancer, hormone refractory prostate cancer, gastric adenocarcinoma, and squamous cell carcinoma of the head and neck cancer.

*Limitations of Docetaxel Injection*

In June 2014, the FDA issued a Drug Safety Communication warning patients that docetaxel may cause symptoms of alcohol intoxication after treatment. Manufacturers of docetaxel formulations for domestic use were subsequently required to revise their product labels to reflect alcohol content and include a drug safety warning. Some U.S. hospitals and clinics require patients to wait two or more hours after treatment with docetaxel before they can be released.

11

Eagle's non-alcohol formulation of docetaxel was specifically developed to address the FDA concerns regarding the alcohol content and symptoms of intoxication.

### *Ryanodex® for Malignant Hyperthermia*

*Overview*

Dantrolene was first introduced to the U.S. market in 1979 and is currently the only drug approved to treat a rare genetic disorder called malignant hyperthermia ("MH"). There are only 500 to 800 cases of MH in the United States each year, qualifying dantrolene for orphan drug designation. This disease is triggered when a patient with this genetic predisposition has a surgical procedure and is exposed to certain inhaled anesthetics or the muscle relaxant, succinylcholine. When this exposure occurs, a metabolic response can be triggered in the patient resulting in an episode of MH that can be fatal if not treated immediately. Because dantrolene is the only approved drug available to treat MH, the Joint Commission on Accreditation of Healthcare Organizations, ("the Joint Commission") requires that all hospitals stock vials of this product at all times, generally in the operating room area.

*Currently-Preexisitng Dantrolene Products for MH*

The two preexisting injectable dantrolene drugs on the market for the treatment of MH, Dantrium® and Revonto®, are offered in a vial containing 20mg of lyophilized powder that requires mixing with 60mL of sterile water. We estimate that the addressable U.S. market opportunity for MH drugs is approximately $75 million per year.

*Limitations of Dantrium® and Revonto®*

When an MH crisis occurs during surgery, the surgical procedure is immediately discontinued and the anesthesiologist and others in the operating room quickly begin reconstituting dantrolene, often at the same time as performing other resuscitative efforts, in order to administer the drug to the patient as an IV push. Based on recommendations from the Malignant Hyperthermia Association of the United States ("MHAUS"), the recognized authority on treating MH in the United States, the recommended dose is 2.5mg/kg or higher. It is critically important that the drug be administered as rapidly as possible, as MH symptoms include tachycardia, elevated blood pressure, raised $CO_2$ levels and very high body temperature levels. If not treated immediately, the disease can be fatal.

Because of the dosing required in adult patients to reverse the MH symptoms and the current formulations of Dantrium® and Revonto®, it is often necessary to reconstitute 10 to 20 vials of dantrolene. As the current formulations are also poorly water soluble, this process generally takes up to 15 to 20 minutes at a point when time is critical and the patient is extremely unstable. Furthermore, the volume of diluent required to reconstitute Dantrium® and Revonto® means that the adult patient receives a significant volume of fluid (600mL to 1,200mL) as an IV infusion, which on occasion can result in detrimental secondary physiological consequences for the patient, such as pulmonary edema and extravasation, which can lead to tissue necrosis.

*Eagle's Solution: Ryanodex®*

We have developed a differentiated formulation of dantrolene sodium that was approved by the FDA in July 2014 and is currently sold under the brand name, Ryanodex®, for the treatment of MH. The presentation is a 5ml vial containing 250mg of dantrolene sodium in lyophilized powder form.

We believe that the immediate benefits of our Ryanodex® formulation are clinically significant in critical care situations. Specifically, Ryanodex® reduces the amount of time to reconstitute and administer dantrolene from 15 to 20 minutes with Dantrium® and Revonto®, to 1 minute, as the anesthesiologist will be able to mix and administer a dose of 250mg from a single vial of Ryanodex® in contrast to mixing and administering up to 12 or more vials of Dantrium® or Revonto®. A recent retrospective study conducted by MHAUS demonstrated that every 15-minute delay in treating MH resulted in a 7.8% increase in patient complications.

### *EP-4104 (dantrolene) for EHS*

EHS is a rare, sudden and unpredictable life-threatening medical condition. It is thought that symptoms and effects are correlated to MH and our research and development efforts suggest dantrolene may be beneficial for treating EHS.

12

EHS is one of the leading causes of death in athletes, including college and high-school students. EHS is also a leading cause of non-combat death in the military. EHS is a state of extreme hyperthermia (above 104°F) that occurs when heat that is generated by muscular exercise exceeds the body's ability to dissipate it. EHS typically affects seemingly healthy individuals during exercise and manifests within a few minutes to hours of such activity and is characterized by an increased core body temperature and central nervous system dysfunction including delirium, convulsions, and coma. Predisposing factors to EHS include a lack of heat acclimatization, poor physical fitness, dehydration, recent infection, exercising in warm and humid conditions and concurrent illness.

*Limitations of Current EHS Therapies*

There are currently no FDA-approved products that treat EHS, and patients continue to die or suffer significant morbidity from the condition. The current treatment regimen for EHS is not directed at the underlying cause of the disease, but is essentially symptomatic therapy. Currently, to treat EHS, the standard treatment includes body surface cooling by water immersion or ice packs and support of organ system function with a goal of accelerating the transfer of heat from the skin to the environment. Even if these cooling techniques are properly implemented patients are still subject to risk of brain damage, irreversible organ damage and death.

*Eagle's Solution: EP-4104*

EP-4104's presentation will initially be a 5mL vial containing 250mg of dantrolene in lyophilized powder form requiring reconstitution. We believe that EP-4104 may provide significant benefits over the current standard of care, which may not be readily available in most settings. Independent market research commissioned by us suggests that the worldwide peak annual revenue for EHS could exceed $400 million.

*EP-4104 Clinical Development and Regulatory Status*

In February 2016, the FDA granted Fast Track designation to our product candidate EP-4104 (i.e. Ryanodex® for the treatment of EHS). The FDA's Fast Track program facilitates the development and review of drugs intended to treat serious conditions and address an unmet medical need. A drug development program with Fast Track designation is afforded greater access to the FDA for the purpose of expediting the drug's development, review and potential approval to get important new drugs to the patient earlier.

On July 11, 2016, the FDA determined that no additional human safety and efficacy data would be required for the submission of EP-4101. Following the completion of additional animal studies the NDA was submitted on January 20, 2017.

On July 26, 2017, the Company received a Complete Response Letter from the FDA regarding its 505(b)(2) NDA for EP-4104, in conjunction with external cooling methods. The FDA has requested that the Company conduct an additional clinical trial for EP-4104. We are currently meeting with the FDA to seek agreement on such additional work.

### EP-5101 (PEMFEXY™) for Lung Cancer

EP-5101 is an IV-administered cancer agent indicated for locally advanced or metastatic non-small cell lung cancer and mesothelioma. We are developing EP-5101 as a ready-to-use/dilute liquid form of pemetrexed that will be available in a 25mg/mL per vial. Because our product, if approved, will be available in liquid form, product reconstitution will not be required, making EP-5101 a preferred formulation under the Joint Commission guidelines.

*Currently-Marketed Pemetrexed Product*

The branded form of a pemetrexed product is marketed by Lilly Pharmaceuticals as Alimta. Alimta is approved for use to treat non-small cell lung cancer and mesothelioma. Alimta's lyophilized formulation utilizes pemetrexed disodium. The product presentations for Alimta are 100mg and 500mg single use vials containing lyophilized power that must be reconstituted before patient administration. Once mixed, Alimta must be used within 24 hours due to product stability concerns. According to Lilly Pharmaceuticals, worldwide sales of Alimta for the 2016 calendar year were approximately $1.0 billion.

*Limitations of Alimta*

Alimta, a lyophilized pemetrexed disodium formulation requiring reconstitution, adds time to administration, presents cytotoxic

13

safety issues for healthcare professionals administering the drug and the potential for dosing errors. Because reconstitution of Alimta is generally not performed until the patient has cleared all tests necessary to receive the drug, this process contributes to a significant amount of time spent by such patients in infusion clinics. Additionally, this method of administration limits the number of patients that may be treated on any given day by such clinics. Furthermore, as with any oncology drug, cytotoxic vapors released through reconstitution can be potentially harmful to pharmacists, physicians and nurses. Moreover, dosing errors may occur during reconstitution, as incorrect amounts of diluent may be used. As a result, lyophilized formulations are less preferred by the Joint Commission as compared to an RTD product.

*Eagle's Solution: EP-5101 (PEMFEXY™)*

EP-5101 is an RTD liquid formulation of pemetrexed. As an RTD liquid formulation, EP-5101 will not require additional time for reconstitution and may avoid certain safety concerns to healthcare professionals, including reducing exposure to the drug's cytotoxic vapors during reconstitution by healthcare providers, and potential dosing errors during mixing. This could allow for a more efficient work flow within the infusion clinic and may result in an opportunity to reduce office staff and see more patients each day.

*EP-5101 (PEMFEXY™) Development and Regulatory Status*

We submitted an NDA for EP-5101 on December 30, 2016 for use in non-small cell lung cancer and mesothelioma. During February 2017, we received confirmation from the FDA that the filing was accepted. On October 27, 2017, we were granted tentative approval for EP-5101 by the FDA.

### EGL-5385-C-1701 (fulvestrant) for Breast Cancer

Fulvestrant is an injectable estrogen receptor antagonist. It is used for the treatment of hormone receptor positive advanced breast cancer for post-menopausal women whose disease has progressed following treatment with prior endocrine therapy.

*Currently-Marketed Fulvestrant Products*

The branded form of fulvestrant is Faslodex, a 500mg injectable product marketed by AstraZeneca. Worldwide sales of Faslodex were $941 million in 2017, which included US sales of $492 million.

*Limitations of Faslodex*

Faslodex is administered in two deep intramuscular injections of high viscosity product per dose of treatment (5 ml each) over 1-2 minutes into each buttock. The procedure is painful and Faslodex injection reactions have been associated with peripheral nerve adverse reactions, including risk of damaging the sciatic nerve.

*Eagle's Solution: EGL-5385-C-1701*

Eagle is pursuing development of an innovative formulation that would require a single injection using a smaller needle thus requiring less time to dose the product while potentially reducing the pain and adverse reactions to injection. The 500 mg dose would be delivered in a single low viscosity 5 mL injection.

### Additional Products in our Portfolio

We are pursuing several additional potential products and product indications that address broad indications such as oncology, emergency medicine, infectious diseases and others. We intend to use our novel and well-developed methods to identify ideal development candidates and to commercialize improved formulations of widely prescribed therapeutics.

In addition to our internal efforts, in January 2016 we entered into an agreement with AMRI to jointly develop and manufacture several select and complex parenteral drug products for registration and subsequent commercialization in the United States.

Under the terms of the agreement, AMRI will develop and initially provide cGMP manufacturing and analytical support for the registration of the new product candidates. We will be responsible for advancing the product candidates through clinical trials and regulatory submissions.

14

*Eagle Biologics*

On November 16, 2016, we acquired Arsia Therapeutics, Inc. and subsequently changed its name to Eagle Biologics, Inc. Eagle Biologics was founded in 2013 as an early stage corporation focused on using proprietary technology to significantly improve both approved and novel biologic pharmaceutical products. The technology we acquired in the acquisition enables low-viscosity, high-concentration monoclonal antibody (mAb) formulations to be delivered subcutaneously. Our aim is threefold: (i) to improve the formulation of biologic products thereby providing a market advantage with a differentiated product; (ii) to create IP around the formulation optimization extending market exclusivity, and (iii) to do so in an efficient manner, using as much reference-product data as possible to minimize clinical trial time and expense. The opportunity is driven by a library of patent protected excipients for use in pharmaceutical products.

Our plan for our biologics business is to partner with large pharmaceutical and biotech companies to improve the delivery of marketed biologics by eliminating IV infusions in favor of subcutaneous (SC) routes of administration or, in cases where a SC product exists, to reduce the volume or number of injections. Currently, Eagle Biologics has feasibility study agreements in place with multiple partners to apply its technology to designated proteins. Once proof of concept has been established, and an opportunity is identified with a particular protein, Eagle Biologics plans to enter into a License and Development Agreement with the sponsor company to develop and seek FDA approval for the "biobetter." As of this filing, Eagle Biologics has no product in late stage development.

The formulation and development of biologic and/or biosimilar drugs is a highly competitive business and competition includes some of the industry's largest and well-funded pharmaceutical companies. Eagle Biologics will seek opportunities in this growing field to develop and market its "bio-better" products through collaborations with these companies.

**Sales and Marketing**

Historically, we have chosen to out-license the commercial rights for products we have developed, such as Argatroban which launched in the United States in 2011 and is sold by Chiesi as Argatroban in the United States and Canada under an exclusive license from us. Additionally, in 2013 we decided to license certain rights to commercialize Argatroban in the United States to Sandoz as part of a settlement of a paragraph IV dispute between the parties. Sandoz has developed strong relationships with the pharmaceutical group purchasing organizations and wholesalers, providing stronger commercial terms for Argatroban with these important customers.

On February 13, 2015, we entered into the Cephalon License, for U.S. and Canadian rights to our bendamustine rapid infusion product for treatment of patients with CLL and patients with NHL. Pursuant to the terms of the Cephalon License, Cephalon is responsible for all U.S. commercial activities for the product including promotion and distribution, and we are responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies.

On November 4, 2015, we entered into the Spectrum Agreement under which Spectrum agreed to dedicate 80% of its 32-person Corporate Accounts Sales Team's time to selling and marketing up to six of our products over a period of at least 18 months. We have paid Spectrum a base fee of $12.8 million through June 2017 to provide such services including marketing and selling docetaxel injection, non-alcohol formulation. We had the option to extend the initial term of this agreement by six months to December 31, 2017 at our sole election. The Company elected not to exercise that option and the Spectrum Agreement has expired.

Other than with respect to products subject to existing commercialization arrangements, we intend to commercialize our product portfolio in the United States with our commercial organization. In preparation for near-term product launches and to expand our footprint in the Ryanodex® for MH market we have built an internal commercial team consisting of approximately 50 direct sales representatives, support staff and management who are a part of our independent commercial organization.

**Manufacturing**

We do not own any manufacturing facilities. The manufacture of sterile injectables is highly reliant on very complex sterile techniques and personnel aseptic techniques which present significant challenges and requires specialized expertise. Further, sterile processes have a high level of scrutiny by regulatory agencies. Consequently, we utilize a network of third party manufacturers for production of our products. All manufacturers are monitored and evaluated by our quality department to assess compliance with regulatory requirements and our internal quality standards and benchmarks.

Historically, sterile injectable manufacturers have, from time to time, had quality control difficulties. If non-conformances occur, remediation, such as temporary voluntary closure or renovations of major production facilities, could be costly and time consuming, resulting in cascading and persistent shortages. Moreover, high rates of capacity utilization may also limit the ability of

15

manufacturers to perform routine maintenance and keep facilities in state of compliance which can lead to product recalls or other supply disruptions.

We have a highly experienced quality group that works with and regularly inspects or meets with our manufacturers to review the manufacturing process for our products and to provide input on quality issues. We have recognized the risk of such supply chain disruptions and approached the situation through risk management strategies designed to mitigate the effects of such disruptions. These include having our products and product candidates manufactured at more than one site around the world. While this creates additional effort and requires maintaining dialog and traveling to and overseeing production at a number of facilities, we believe our manufacturing risks are better managed by utilizing a range of third party manufacturers at diverse locations. We seek to minimize the risk of catastrophic events that could occur if our products were manufactured in a single location. Currently, with the exception of one site, no contract manufacturer produces more than one product for us. We currently utilize two manufacturing sites in India and four manufacturing site in the United States. We plan to manufacture the additional products in our portfolio at additional sites in the United States.

**Intellectual Property and Exclusivity**

We strive to protect and enhance the proprietary technologies that we believe are important to our business. We seek to obtain and maintain patents for any patentable aspects of our products or product candidates, their methods of use and any other inventions that are important to our business model and maintaining a competitive advantage over generic competitors. Our success will depend significantly on our ability to obtain and maintain patent and other proprietary protection for commercially important technology, inventions and know-how related to our business, defend and enforce our patents, maintain our licenses to use intellectual property owned by third parties, preserve the confidentiality of our trade secrets and operate without infringing the valid and enforceable patents and other proprietary rights of third parties. We also rely on know-how, continuing technological innovation and in-licensing opportunities to develop, strengthen, and maintain our proprietary position in the fields targeted by our products and product candidates.

**Patents and Patent Applications**

We are the exclusive licensee under our license with Lyotropic to a family of patents and applications that relate to low volume formulations of dantrolene, and methods of treatment using dantrolene. There are eight issued U.S. patents, and two pending U.S. patent applications, along with foreign counterparts that include both issued patents and pending applications. The issued U.S. patents cover low volume formulations of dantrolene in reconstitutable and in ready to use liquid form. We expect that the issued patents will expire no later than July 1, 2025.

We are the sole owner of 13 issued patents, two pending U.S. patent applications, and multiple patents and/or corresponding foreign filings for patent applications in a number of jurisdictions covering various formulations and methods of use of bendamustine. We are currently prosecuting these applications, which, if issued, would expire between 2031 and 2033.

We are the sole owner of a portfolio of issued U.S. patents and pending applications, and corresponding issued foreign patents and patent applications in a range of countries that cover various formulations and methods of use of argatroban. We expect that our issued patents in the United States will expire no later than September 26, 2027, and our applications, if issued, will expire no later than October 9, 2027.

We are the owner of U.S. Patent 8,431,539 expiring July 20, 2031 and covering daptomycin.

Eagle also has a robust patent portfolio of issued and/or pending U.S. patent applications and corresponding foreign patent application in a range of countries that cover its biologics platform technologies. We are the sole owner of U.S. Patent No. 9,833,513 expiring January 31, 2036. We project our applications, if issued, will expire September 11, 2034.

**Trade Secrets and Proprietary Information**

Trade secrets play an important role in protecting our products and provide protection beyond patents and regulatory exclusivity. The scale-up and commercial manufacture of our products involves processes, custom equipment, and in-process and release analytical techniques that we believe are unique to us. We also seek to preserve the integrity and confidentiality of our proprietary technology and processes by maintaining physical security of our premises and physical and electronic security of our information technology systems. While we have confidence in these security measures, individuals, organizations and systems, agreements or security measures may be breached, and we may not have adequate remedies for any breach. In addition, our proprietary technology and processes may otherwise become known or be independently discovered by competitors. To the extent that our employees,

16

consultants, scientific advisors, contractors or any future collaborators use intellectual property owned by others in their work for us, disputes may arise as to the rights in related or resulting know-how and inventions. We seek to protect our proprietary information, including our trade secrets and proprietary know-how, by requiring third parties with whom we contract for services related to our products, including manufacturing services to agree to terms in our agreements with such third parties that protect our confidential and trade secret information. We also require our employees, consultants and other advisors to execute proprietary information and confidentiality agreements upon the commencement of their employment or engagement. These agreements generally provide that all confidential information developed or made known during the course of the relationship with us be kept confidential and not be disclosed to third parties except in specific circumstances. In the case of our employees, the agreements also typically provide that all inventions resulting from work performed for us, utilizing our property or relating to our business and conceived or completed during employment shall be our exclusive property to the extent permitted by law. Where appropriate, agreements we obtain with our consultants also typically contain similar assignment of invention obligations. Further, we require confidentiality agreements from entities that receive our confidential data or materials.

**License Agreements**

*License Agreement with Lyotropic Therapeutics, Inc.*

In October 2008, we entered into a license and sublicense agreement with Lyotropic Therapeutics, Inc., ("Lyotropic"), under which we were granted an exclusive license under Lyotropic's intellectual property rights relating to dantrolene, and an exclusive worldwide sublicense under certain nanocrystal technology relating to a formulation of dantrolene licensed by Alkermes, Inc. (as successor in interest to Elan Pharma International Limited), or Alkermes, to Lyotropic under an August 2004 license agreement between Alkermes and Lyotropic. On August 3, 2016, the Company amended our agreement with Lyotropic Therapeutics, Inc. to reduce future royalties related to Ryanodex net sales to 3% (subject to further reduction upon the occurrence of certain triggering events) in exchange for $15 million.

*License and Development Agreement with Chiesi*

In September 2009, we entered into a license and development agreement with The Medicines Company which was assigned by the Medicines Company to Chiesi on September 24, 2016. Under the agreement, Chiesi has an exclusive license under our patent and other intellectual property rights in argatroban to commercialize Argatroban products in the United States and Canada, and a right of first negotiation to commercialize Argatroban in other countries (except the right of first negotiation does not apply to China unless and until we regain rights to commercialize Argatroban products in China).

Under this agreement, we received an upfront lump sum payment of $5.0 million. Additionally, we are obligated to share equally gross profits with Chiesi that we receive from Sandoz pursuant to the Sandoz Supply and Distribution Agreement and Chiesi is obligated to share equally with us the gross profits it receives from sales of Argatroban product in the United States.

*Settlement Agreement and Related Supply and Distribution Agreement with Sandoz*

In January 2013, we entered into a settlement agreement with Sandoz to resolve the lawsuit we brought against Sandoz claiming infringement of our issued U.S. patents 7,589,106 and 7,687,516, based on Sandoz's filing of ANDA No. 203743, in which Sandoz requested approval from the FDA for distribution of Argatroban prior to the expiration of such patents. In connection with, and at the same time as the settlement agreement, we also entered into a Supply and Distribution Agreement with Sandoz, under which we agreed to supply unbranded (generic) Argatroban in 50mg/50mL vials, which we define as an Authorized Generic Product, to Sandoz through our contract manufacturer for exclusive distribution to Sandoz's customers in the United States.

Under the terms of the Supply and Distribution Agreement, Sandoz is obligated to pay us a percentage in the range of 85 to 95 percent of the net profits for all Authorized Generic Product sold by Sandoz. Also, under the terms of the Supply and Distribution Agreement, Sandoz will continue to market argatroban in 125mg/125mL vials, which we define as a Sandoz Product, and Sandoz is obligated to pay us a percentage in the range of 60 to 70 percent of the net profits of all Sandoz Product sold by Sandoz.

*Development and License Agreement with SciDose (Argatroban and bivalirudin)*

In June 2007 we entered into a development and license agreement with SciDose, LLC ("SciDose") in which SciDose assigned us certain patents relating to Argatroban, bivalirudin, and two additional products under development or ("the SciDose Subject Products") and granted us an exclusive, sub-licensable, worldwide (excluding China for all products except ANDA products containing bivalirudin) license under SciDose's intellectual property rights to develop, make, use, sell and import parenteral formulations of the SciDose Subject Products (and including all other formulations for one of the additional products under

17

Under the terms of this Agreement, no further milestone payments are due to SciDose. We are required to make royalty payments based on gross profits of sales of the SciDose Subject Products by us and our affiliates (i) at 15% for Bivalirudin products, pursuant to an amendment in 2015, and at 50% for other SciDose Subject Products that achieve regulatory approval and are commercialized on the basis of a 505(b)(2) application (provided that we are entitled to recoup all of our expenses related to the development of a product commercialized under a 505(b)(2) application prior to splitting the profits we receive from such product), (ii) at 30% with respect to SciDose Subject Products that are commercialized on the basis of an ANDA application and (iii) at 20% with respect to other Scidose subject products. Our royalty obligations continue on a product-by-product basis until the later of ten years after the first commercial sale of each SciDose Subject Product and the expiration of the last valid claim covering such SciDose Subject Product, subject to certain customary reductions in the event that there is no valid patent claim covering the manufacture, use, import or sale of such SciDose Subject Product in a country in the territory.

*Development and License Agreement with Robert One, LLC (bendamustine)*

In March 2008 we entered into a development and license agreement with Robert One, LLC ("Robert One") in which Robert One assigned to us certain patents relating to bendamustine and four additional 505(b)(2) products and/or ANDA products under development ("the Robert One (bendamustine) Subject Products") and granted us an exclusive, sub-licensable, license under Robert One's intellectual property rights to develop make, use, sell and import Robert One (bendamustine) Subject Products worldwide (excluding China) with respect to bendamustine and other 505(b)(2) product applications and in North America with respect to ANDA product applications.

Under the terms of this Agreement no further milestone payments are due to Robert One. We are required to make royalty payments based on gross profits of sales of the Robert One (bendamustine) Subject Products by us and our affiliates in the Territory (i) at 10%, pursuant to an amendment in 2013, for bendamustine products and (ii) at 50% for products, other than bendamustine products, that achieve regulatory approval and are commercialized on the basis of a 505(b)(2) application (provided that we are entitled to recoup all of our expenses related to the development of a product commercialized under a 505(b)(2) application prior to splitting the profits we receive from such product), and (iii) at 30% with respect to products, other than bendamustine products, that are commercialized on the basis of an ANDA application. Our royalty obligations continue on a product-by-product basis until the later of ten years after the first commercial sale of each Robert One (bendamustine) Subject Product and the expiration of the last valid claim covering such Robert One (bendamustine) Subject Product, subject to certain reductions in the event that there is no valid patent claim covering the manufacture, use, import or sale of such Robert One (bendamustine) Subject Product in a country in the territory.

*Development and License Agreement with Robert One, LLC (pemetrexed)*

In February 2009 we entered into a development and license agreement with Robert One, in which Robert One assigned to us certain patents relating to pemetrexed and four additional 505(b)(2) products and/or ANDA products under development ("the Robert One 2009 Subject Products") and granted us an exclusive, sub-licensable, license under Robert One's intellectual property rights to develop make, use, sell and import Robert One 2009 Subject Products worldwide (excluding China) with respect to pemetrexed and other 505(b)(2) product applications and in North America with respect to ANDA product applications.

Under the terms of this Agreement no further milestone payments are due to Robert One. We are required to make royalty payments based on gross profits of sales of the Robert One 2009 Subject Product by us and our affiliates in the Territory (i) at 25% for pemetrexed parental formulation (ii) at 50% for Robert One 2009 Subject Products other than pemetrexed that achieve regulatory approval and are commercialized on the basis of a 505(b)(2) application (provided that we are entitled to recoup all of our expenses related to the development of a product commercialized under a 505(b)(2) application prior to splitting the profits we receive from such product), and (ii) at 30% with respect to Robert One 2009 Subject Products other than pemetrexed that are commercialized on the basis of an ANDA application. Our royalty obligations continue on a product-by-product basis until the later of ten years after the first commercial sale of each Robert One 2009 Subject Product and the expiration of the last valid claim covering such Robert One 2009 Subject Product, subject to certain reductions in the event that there is no valid patent claim covering the manufacture, use, import or sale of such Robert One 2009 Subject Product in a country in the territory.

*Bendamustine License Agreement*

On February 13, 2015, we submitted an NDA to the FDA for Bendeka which was approved by the FDA on December 8, 2015. Also, on February 13, 2015, we entered into the Cephalon License with Cephalon, for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. Subsequently, with the consent of the Company, Cephalon assigned to

18

Teva Pharmaceuticals International GmbH ("TPIG") all of Cephalon's rights and obligations under the Cephalon License. Accordingly, all references to "Cephalon" or to the "Cephalon License" and the related supply agreements for Bendeka should be read and construed as references to TPIG and to the license agreement and supply agreements for Bendeka to which the Company and TPIG are now parties. Pursuant to the terms of the Cephalon License, Cephalon is responsible for all U.S. commercial activities for the product including promotion and distribution, and we are responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies. Additionally, under the terms of the Cephalon License, the Company received an upfront cash payment of $30 million, received a $15 million milestone payment in January 2016 in connection with the FDA approval of Bendeka in December 2015, received a $40 million milestone in the fourth quarter of 2016 in connection with the receipt of the J-Code for Bendeka and in Q1 of 2017, Bendeka reached $500 million in cumulative net sales, triggering an additional $25 million sales-based milestone payment. In addition, the royalty payments of 20% of net sales of the product that the Company was entitled to receive increased to 25% on receipt of the J-Code. In connection with the Cephalon License, the Company has entered into a supply agreement with Cephalon, pursuant to which the Company is responsible for supplying product to Cephalon. During the quarter-ended September 30, 2016, the Company entered into an amendment to that certain Exclusive License Agreement (the "Cephalon License") with Cephalon and the related supply agreements for Bendeka. The amendment expands the geographical scope of the rights granted under the original agreement to include certain territories outside the US and Canada. In accordance with this amendment, the Company recorded $1.75 million in license and other revenue on the statements of operations for the year-ended December 31, 2016. The Company is also eligible to receive up to $750 thousand on each regulatory approval received in certain additional territories, not to exceed $2.25 million, as well as royalties on future sales.

*Cephalon Settlement and License Agreement*

In connection with the Cephalon License, on February 13, 2015, we entered into the Cephalon Settlement Agreement with Cephalon, pursuant to which the parties agreed to settle the pending patent infringement claims against each other regarding Cephalon's US Patent No. 8,791,270, under which we agreed to enter into a Consent Judgment regarding the '270 patent. As part of the Cephalon Settlement Agreement, Cephalon has agreed to waive its orphan drug exclusivities for the treatment of patients with CLL and patients with NHL.

*Teikoku License Agreement*

On October 13, 2015, we entered into the Teikoku Agreement, whereby Teikoku granted to us a royalty-bearing, exclusive right and license under and to Teikoku's patent rights and know how to make, use, market, commercialize, and offer for sale Non-Alcohol Docetaxel Injection described in NDA 205934. Pursuant to the agreement, following the FDA's approval of NDA 205934 which happened on December 22, 2015, Teikoku also assigned NDA 205934 to us. In consideration for the license and assignment, we made an upfront payment to Teikoku upon signing and an additional milestone payment of $4.85 million upon Teikoku's submission of the NDA transfer letter to the FDA in February 2016. In addition, commencing with the first commercial sale of the product, we will pay to Teikoku a royalty based on the gross margin generated by the product. The royalty owed to Teikoku will be reduced by a double-digit percentage for any sales in a period during which the product is not covered by a valid claim within the Teikoku patent rights.

*SymBio Product Collaboration and License Agreement*

On September 20, 2017, we entered into the SymBio License with SymBio for the rights to develop and commercialize EP-3101 and Bendeka (collectively, the "Products") in Japan. Under the SymBio License, SymBio will be responsible for all development of the Products in Japan and for obtaining and maintaining all regulatory approvals of the Products in Japan, with a target for regulatory approval of a Product in Japan in 2020. SymBio will bear all costs of development of the Products in Japan except that, if Japanese regulatory authorities require a certain clinical study to be conducted as a condition for approving one of the Products in Japan, we would share 50% of the out-of-pocket costs of that clinical study up to a specified dollar amount as a reduction to future royalty payments. Based on our assessment of the probability of additional costs, we have not deferred revenue on the SymBio License. SymBio will also be responsible, at its sole cost, for all marketing, promotion, distribution and sales of the Products in Japan and is obligated to launch the Products and meet certain minimum detailing, promotion and marketing commitments in connection with commercialization of the Products in Japan.

SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma ("MCL"), and as a first line treatment of low-grade NHL and MCL. Under the SymBio License, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

19

Pursuant to the terms of the SymBio License, Eagle and SymBio will enter into a separate supply agreement, under which we will be responsible for manufacturing and supplying the Products to SymBio for development and commercialization in Japan. After a period of time following launch of a Product, SymBio will have the right to assume the responsibility for manufacturing of the Products in and for Japan. Under the SymBio License, we will retain the right to control the prosecution, maintenance and enforcement of our patents covering the Products, both inside and outside of Japan.

Under the SymBio License, we earned an upfront non-refundable cash payment of $12.5 million in the third quarter of 2017, and we are eligible to receive a milestone payment upon approval of a Product in Japan and a milestone payment upon achievement of certain cumulative net sales of the Products in Japan. After regulatory approval of a Product in Japan, we will also receive tiered, low double-digit royalties on net sales of the Products in Japan for so long as there are patents covering the Products in Japan or regulatory exclusivity for the Products in Japan.

**Competition**

The pharmaceutical and biotechnology industries are intensely competitive and subject to rapid and significant technological change. Our competitors include organizations such as major multinational pharmaceutical companies, established biotechnology companies, specialty pharmaceutical companies and generic drug companies. Many of our competitors have greater financial and other resources than we have, such as more commercial resources, larger research and development staffs and more extensive marketing and manufacturing organizations. As a result, these companies may obtain marketing approval more rapidly than we are able and may be more effective in selling and marketing their products. Smaller or early stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large, established companies.

Our competitors may succeed in developing, acquiring or licensing on an exclusive basis technologies and drug products that are more effective or less costly than products that we are currently selling through partners or developing or that we may develop, which could render our products obsolete and noncompetitive. We expect any products that we develop and commercialize to compete on the basis of, among other things, efficacy, safety, convenience of administration and delivery, price and the availability of reimbursement from government and other third-party payers. We also expect to face competition in our efforts to identify appropriate collaborators or partners to help commercialize our product portfolio in our target commercial markets.

**Government Regulation**

*FDA Approval Process for Drugs and Biologics*

In the United States, pharmaceutical products are subject to extensive regulation by the FDA. The FDCA, and in the case of biologics, the Public Health Service Act ("PHSA") and other federal and state statutes and regulations, govern, among other things, the research, development, testing, manufacture, storage, recordkeeping, approval, labeling, promotion and marketing, distribution, post-approval monitoring and reporting, sampling, and import and export of pharmaceutical products. Failure to comply with applicable FDA or other requirements may subject a company to a variety of administrative or judicial sanctions, such as FDA refusal to approve pending applications, clinical holds, warning or untitled letters, product recalls, product seizures, total or partial suspension of production or distribution, withdrawal of product from the market, injunctions, fines, civil penalties and criminal prosecution.

FDA approval is required before any new unapproved drug biologic or dosage form, including a new use of a previously approved drug, can be marketed in the United States. The process required by the FDA before a new drug may be marketed in the United States generally involves:
- completion of pre-clinical laboratory and animal testing and formulation studies in compliance with the FDA's current good laboratory practice ("cGLP") regulations;
- submission to the FDA of an Investigational New Drug ("IND") application for human clinical testing which must become effective before human clinical trials may begin in the United States;
- approval by an independent institutional review board ("IRB") at each clinical trial site before each trial may be initiated;
- performance of adequate and well-controlled human clinical trials in accordance with current good clinical practices ("cGCP") to establish the safety and efficacy of the proposed drug product for each intended use;
- satisfactory completion of an FDA pre-approval inspection of the facility or facilities at which the product is manufactured to assess compliance with the FDA's cGMP regulations to assure that the facilities, methods and controls are adequate to preserve the drug's identity, strength, quality and purity;
- submission to the FDA of an NDA or BLA;
- satisfactory completion of a potential review by an FDA advisory committee, if applicable; and
- FDA review and approval of the NDA or BLA.

20

The preclinical and clinical testing and approval process takes many years and the actual time required to obtain approval, if any, may vary substantially based upon the type, complexity and novelty of the product or disease.

Preclinical tests include laboratory evaluation of product chemistry, formulation and toxicity, as well as animal studies to assess the characteristics and potential safety and efficacy of the product. The conduct of the preclinical tests must comply with federal regulations and requirements, including cGLPs. The results of preclinical testing are submitted to the FDA as part of an IND application along with other information, including information about product chemistry, manufacturing and controls and a proposed clinical trial protocol. Long-term preclinical tests, such as animal tests of reproductive toxicity and carcinogenicity, may continue after the IND application is submitted.

The IND application automatically becomes effective 30 days after receipt by the FDA, unless the FDA, within the 30-day time period, raises concerns or questions relating to one or more proposed clinical trials and places the clinical trial on a clinical hold, including concerns that human research subjects will be exposed to unreasonable health risks. In such a case, the IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin. A separate submission to an existing IND application must also be made for each successive clinical trial conducted during product development. Further, an independent IRB, covering each site proposing to conduct the clinical trial must review and approve the plan for any clinical trial and informed consent information for subjects before the trial commences at that site and it must monitor the study until completed. The FDA, the IRB, or the sponsor may suspend a clinical trial at any time on various grounds, including a finding that the subjects or patients are being exposed to an unacceptable health risk or for failure to comply with the IRB's requirements, or may impose other conditions. Clinical trials involve the administration of the investigational new drug to healthy volunteers or patients under the supervision of a qualified investigator in accordance with cGCP requirements, which include the requirement that all research subjects provide their informed consent in writing for their participation in any clinical trial. Sponsors of clinical trials generally must register and report, at the NIH-maintained website ClinicalTrials.gov, key parameters of certain clinical trials. For purposes of an NDA or BLA submission and approval, human clinical trials are typically conducted in the following sequential phases, which may overlap or be combined:

Phase 1:    In Phase 1, through the initial introduction of the drug into healthy human subjects or patients, the drug is tested to assess metabolism, pharmacokinetics, pharmacological actions, side effects associated with increasing doses, and, if possible, early evidence on effectiveness.

Phase 2:    Phase 2 usually involves trials in a limited patient population to determine the effectiveness of the drug for a particular indication, dosage tolerance and optimum dosage, and to identify common adverse effects and safety risks.

Phase 3:    Phase 3 trials are undertaken to obtain the additional information about clinical efficacy and safety in a larger number of patients, typically at geographically dispersed clinical trial sites, to permit the FDA to evaluate the overall benefit-risk relationship of the drug and to provide adequate information for the labeling of the drug. In most cases, the FDA requires two adequate and well controlled Phase 3 clinical trials to demonstrate the efficacy of the drug. A single Phase 3 trial with other confirmatory evidence may be sufficient in rare instances where the study is a large multicenter trial demonstrating internal consistency and a statistically persuasive finding of a clinically meaningful effect on mortality, irreversible morbidity or prevention of a disease with a potentially serious outcome and confirmation of the result in a second trial would be practically or ethically impossible.

After completion of the required clinical testing, an application is prepared and submitted to the FDA. FDA approval of the NDA is required before marketing of the product may begin in the United States. The NDA or BLA must include the results of all preclinical, clinical and other testing and a compilation of data relating to the product's pharmacology, chemistry, manufacture and controls. Under federal law, the submission of most applications is subject to a substantial application user fee, and the manufacturer and/or sponsor under an approved application is also subject to annual product and establishment user fees.

The FDA has 60 days from its receipt of an NDA or BLA to determine whether the application will be accepted for filing based on the agency's threshold determination that it is sufficiently complete to permit substantive review. The FDA may request additional information rather than accept an application for filing. In this event, the application must be resubmitted with the additional information and is subject to payment of additional user fees. The resubmitted application is also subject to review before the FDA accepts it for filing. Once the submission is accepted for filing, the FDA begins an in-depth substantive review. Under PDUFA the FDA has agreed to certain performance goals in the review of NDAs and BLAs through a two-tiered classification system, Standard Review and Priority Review. Priority Review designation is given to drugs that offer major advances in treatment, or provide a treatment where no adequate therapy exists. The FDA endeavors to review applications subject to Standard Review within ten to twelve months, whereas the FDA's goal is to review Priority Review applications within six to eight months, depending on whether the drug is a new molecular entity.

21

The FDA may refer applications for novel drug products or drug products which present difficult questions of safety or efficacy to an advisory committee for review, evaluation and recommendation as to whether the application should be approved and under what conditions.

Before approving an NDA or a BLA, the FDA will typically inspect one or more clinical sites to assure compliance with cGCP requirements. Additionally, the FDA will inspect the facility or the facilities at which the drug is manufactured. The FDA will not approve the product unless it determines that the manufacturing process and facilities are in compliance with cGMP requirements and are adequate to assure consistent production of the product within required specifications and the application contains data that provide substantial evidence that the drug is safe and effective in the indication studied.

After the FDA evaluates the NDA or BLA and the manufacturing facilities, it issues either an approval letter or a complete response letter to indicate that the review cycle for an application is complete and that the application is not ready for approval. A tentative approval is issued to a 505(b)(2) NDA if the sponsor must await the expiration of an Orange Book listed patent covering the reference product. A complete response letter generally outlines the deficiencies in the submission and may require substantial additional testing, or information, in order for the FDA to reconsider the application. Even with submission of this additional information, the FDA may ultimately decide that an application does not satisfy the regulatory criteria for approval. If, or when, the deficiencies have been addressed to the FDA's satisfaction in a resubmission of the application, the FDA will issue an approval letter. An approval letter authorizes commercial marketing of the drug with specific prescribing information for specific indications.

As a condition of NDA or BLA approval, the FDA may require a Risk Evaluation and Mitigation Strategies ("REMS") program to help ensure that the benefits of the drug outweigh the potential risks. If the FDA determines a REMS program is necessary during review of the application, the drug sponsor must agree to the REMS plan at the time of approval. A REMS program may be required to include various elements, such as a medication guide or patient package insert, a communication plan to educate healthcare providers of the drug's risks, limitations on who may prescribe or dispense the drug, or other elements to assure safe use, such as special training or certification for prescribing or dispensing, dispensing only under certain circumstances, special monitoring and the use of patient registries. In addition, the REMS must include a timetable to periodically assess the strategy. The requirement for a REMS program can materially affect the potential market and profitability of a drug.

Moreover, product approval may require substantial post-approval testing and surveillance to monitor the drug's safety or efficacy, and the FDA has the authority to prevent or limit further marketing of a product based on the results of these post-marketing programs. Once granted, product approvals may be withdrawn if compliance with regulatory standards is not maintained or problems are identified following initial marketing. Drugs may be marketed only for the approved indications and in accordance with the provisions of the approved label, and, even if the FDA approves a product, it may limit the approved indications for use for the product or impose other conditions, including labeling or distribution restrictions or other risk-management mechanisms.

Further changes to some of the conditions established in an approved application, including changes in indications, labeling, or manufacturing processes or facilities, require submission and FDA approval of a new NDA/BLA or NDA/BLA supplement before the change can be implemented, which may require us to develop additional data or conduct additional pre-clinical studies and clinical trials. An NDA supplement for a new indication typically requires clinical data similar to that in the original application, and the FDA uses the similar procedures in reviewing supplements as it does in reviewing original applications.

*Post-Approval Requirements*

Once an NDA or BLA is approved, a product will be subject to pervasive and continuing regulation by the FDA, including, among other things, requirements relating to drug listing and registration, recordkeeping, periodic reporting, product sampling and distribution, adverse event reporting and advertising, marketing and promotion, including standards and regulations for direct to consumer advertising, off-label promotion, industry-sponsored scientific and educational activities and promotional activities involving the internet. Drugs may be marketed only for the approved indications and in accordance with the provisions of the approved labeling. While physicians may prescribe for off-label uses, manufacturers may only promote for the approved indications and in accordance with the provisions of the approved label. The FDA and other agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses, and a company that is found to have improperly promoted off-label uses may be subject to significant liability.

In addition, quality-control, drug manufacture, packaging and labeling procedures must continue to conform to cGMPs after approval. Drug manufacturers and certain of their subcontractors are required to register their establishments with the FDA and certain state agencies. Registration with the FDA subjects entities to periodic unannounced and announced inspections by the FDA and these state agencies, during which the agency inspects manufacturing facilities to assess compliance with cGMPs. Accordingly,

22

manufacturers must continue to expend time, money, and effort in the areas of production and quality-control to maintain compliance with cGMPs. Regulatory authorities may withdraw product approvals or request product recalls if a company fails to comply with regulatory standards, if it encounters problems following initial marketing, or if previously unrecognized problems are subsequently discovered. The FDA may also impose a REMS requirement on a drug already on the market if the FDA determines, based on new safety information, that a REMS is necessary to ensure that the drug's benefits outweigh its risks. In addition, regulatory authorities may take other enforcement action, including, among other things, warning letters, the seizure of products, injunctions, consent decrees placing significant restrictions on or suspending manufacturing operations, refusal to approve pending applications or supplements to approved applications, civil penalties and criminal prosecution.

In addition, the distribution of prescription pharmaceuticals is subject to the Prescription Drug Marketing Act ("PDMA") which regulates the distribution of drugs and drug samples at the federal level, and sets minimum standards for the registration and regulation of drug distributors by the states. A growing majority of states also impose certain drug pedigree requirements on the sale and distribution of prescription drugs.

The FDA may require post-approval studies and clinical trials if the FDA finds that scientific data, including information regarding related drugs, deem it appropriate. The purpose of such studies would be to assess a known serious risk or signals of serious risk related to the drug or to identify an unexpected serious risk when available data indicate the potential for a serious risk. The FDA may also require a labeling change if it becomes aware of new safety information that it believes should be included in the labeling of a drug.

*The Hatch-Waxman Amendments*

*ANDA Approval Process*

The Hatch-Waxman Act, established abbreviated FDA approval procedures for drugs that are shown to be equivalent to proprietary drugs previously approved by the FDA through its NDA process. Approval to market and distribute these drugs is obtained by filing an ANDA with the FDA. An ANDA is a comprehensive submission that contains, among other things, data and information pertaining to the active pharmaceutical ingredient, drug product formulation, specifications and stability of the generic drug, as well as analytical methods, manufacturing process validation data and quality control procedures. Premarket applications for generic drugs are termed abbreviated because they generally do not include preclinical and clinical data to demonstrate safety and effectiveness. Instead, a generic applicant must demonstrate that its product is bioequivalent to the innovator drug. In certain situations, an applicant may obtain ANDA approval of a generic product with a strength or dosage form that differs from a referenced innovator drug pursuant to the filing and approval of an ANDA Suitability Petition. The FDA will approve the generic product as suitable for an ANDA application if it finds that the generic product does not raise new questions of safety and effectiveness as compared to the innovator product. A product is not eligible for ANDA approval if the FDA determines that it is not equivalent to the referenced innovator drug, if it is intended for a different use, or if it is not subject to an approved Suitability Petition. However, such a product might be approved under an NDA, with supportive data from clinical trials.

*505(b)(2) NDAs*

As an alternative path to FDA approval for modifications to formulations or uses of products previously approved by the FDA, an applicant may submit an NDA under Section 505(b)(2) of the FDCA. Section 505(b)(2) was enacted as part of the Hatch-Waxman Amendments and permits the filing of an NDA where at least some of the information required for approval comes from studies not conducted by, or for, the applicant. If the 505(b)(2) applicant can establish that reliance on FDA's previous findings of safety and effectiveness is scientifically appropriate, it may eliminate the need to conduct certain preclinical or clinical studies of the new product. The FDA may also require companies to perform additional studies or measurements, including clinical trials, to support the change from the approved branded reference drug. The FDA may then approve the new product candidate for all, or some, of the label indications for which the branded reference drug has been approved, as well as for any new indication sought by the 505(b)(2) applicant.

*Orange Book Listing*

In seeking approval for a drug through an NDA, including a 505(b)(2) NDA, applicants are required to list with the FDA certain patents whose claims cover the applicant's product. Upon approval of an NDA, each of the patents listed in the application for the drug is then published in the Orange Book. Any applicant who files an ANDA seeking approval of a generic equivalent version of a drug listed in the Orange Book or a 505(b)(2) NDA referencing a drug listed in the Orange Book must certify to the FDA that (1) no patent information on the drug product that is the subject of the application has been submitted to the FDA; (2) such patent has expired; (3) the date on which such patent expires; or (4) such patent is invalid or will not be infringed upon by the manufacture,

23

use or sale of the drug product for which the application is submitted. This last certification is known as a paragraph IV certification. A notice of the paragraph IV certification must be provided to each owner of the patent that is the subject of the certification and to the holder of the approved NDA to which the ANDA or 505(b)(2) application refers. The applicant may also elect to submit a "section viii" statement certifying that its proposed label does not contain (or carves out) any language regarding the patented method-of-use rather than certify to a listed method-of-use patent.

If the reference NDA holder and patent owners assert a patent challenge directed to one of the Orange Book listed patents within 45 days of the receipt of the paragraph IV certification notice, the FDA is prohibited from approving the application until the earlier of 30 months from the receipt of the paragraph IV certification expiration of the patent, settlement of the lawsuit or a decision in the infringement case that is favorable to the applicant. The ANDA or 505(b)(2) application also will not be approved until any applicable non-patent exclusivity listed in the Orange Book for the branded reference drug has expired as described in further detail below.

*Non-Patent Exclusivity*

In addition to patent exclusivity, the holder of the NDA for the listed drug may be entitled to a period of non-patent exclusivity, during which the FDA cannot approve an ANDA or 505(b)(2) application that relies on the listed drug. For example, a pharmaceutical manufacturer may obtain five years of non-patent exclusivity upon NDA approval of a new chemical entity, or NCE, which is a drug that contains an active moiety that has not been approved by FDA in any other NDA. An "active moiety" is defined as the molecule or ion responsible for the drug substance's physiological or pharmacological action. During the five year exclusivity period, the FDA cannot accept for filing any ANDA seeking approval of a generic version of that drug or any 505(b)(2) NDA for the same active moiety and that relies on the FDA's findings regarding that drug, except that FDA may accept an application for filing after four years if the follow-on applicant makes a paragraph IV certification.

A drug, including one approved under Section 505(b)(2), may obtain a three-year period of exclusivity for a particular condition of approval, or change to a marketed product, such as a new formulation for a previously approved product, if one or more new clinical studies (other than bioavailability or bioequivalence studies) was essential to the approval of the application and was conducted/sponsored by the applicant. Should this occur, the FDA would be precluded from approving any ANDA or 505(b)(2) application for the protected modification until after that three-year exclusivity period has run. However, unlike NCE exclusivity, the FDA can accept an application and begin the review process during the exclusivity period.

*FDA Approval for Biosimilars*

In 2010, the Biologics Price Competition and Innovation Act (BPCIA) was enacted creating a statutory pathway for licensure of biological products that are biosimilar to, and possibly interchangeable with, reference biological products licensed under the PHSA. The BPCIA grants innovator manufacturers 12 years of exclusivity from the date of approval of the original, or reference, BLA before approving licenses for biosimilars. Innovators may also be entitled to a potential six-month extension of exclusivity if the results of pediatric studies are provided to the FDA. The BPCIA establishes procedures by which the biosimilar applicant is to provide information about its application and product to the reference product sponsor. The BPCIA also details how information about potentially relevant patents is shared between the sponsors and how litigation may proceed prior to approval of the biosimilar application. The BPCIA, like the Hatch Waxman Act, provides a period of exclusivity for the first biosimilar to obtain license from FDA as interchangeable with the reference product.

*Orphan Drug Designation and Exclusivity*

The Orphan Drug Act provides incentives for the development of products intended to treat rare diseases or conditions. Under the Orphan Drug Act, the FDA may grant orphan designation to a drug or biological product intended to treat a rare disease or condition, which is generally a disease or condition that affects fewer than 200,000 individuals in the United States, or more than 200,000 individuals in the United States and for which there is no reasonable expectation that the cost of developing and making a drug or biological product available in the United States for this type of disease or condition will be recovered from sales of the product. If a sponsor demonstrates that a drug is intended to treat rare diseases or conditions, the FDA will grant orphan designation for that product for the orphan disease indication. Orphan designation must be requested before submitting an NDA. After the FDA grants orphan product designation, the identity of the therapeutic agent and its potential orphan use are disclosed publicly by the FDA. Orphan drug designation, however, does not convey any advantage in, or shorten the duration of, the regulatory review and approval process.

Orphan drug designation provides manufacturers with research grants, tax credits and eligibility for orphan drug exclusivity. If a product that has orphan drug designation subsequently receives the first FDA approval of the active moiety for that disease or

condition for which it has such designation, the product is entitled to orphan drug exclusivity, which for seven years prohibits the FDA from approving another product with the same active ingredient for the same indication, except in limited circumstances. If a drug designated as an orphan product receives marketing approval for an indication broader than the orphan indication for which it received the designation, it will not be entitled to orphan drug exclusivity. Orphan exclusivity will not bar approval of another product under certain circumstances, including if a subsequent product with the same active ingredient for the same indication is shown to be clinically superior to the approved product on the basis of greater efficacy or safety, or providing a major contribution to patient care, or if the company with orphan drug exclusivity is not able to meet market demand. Further, the FDA may approve more than one product for the same orphan indication or disease as long as the products contain different active ingredients. Moreover, competitors may receive approval of different products for the indication for which the orphan product has exclusivity or obtain approval for the same product but for a different indication for which the orphan product has exclusivity. As a result, even if one of our product candidates receives orphan exclusivity, we may still be subject to competition. Orphan exclusivity also could block the approval of one of our products for seven years if a competitor obtains approval of the same drug or if our product candidate is determined to be contained within the competitor's product for the same indication or disease.

*International Regulation*

In addition to regulations in the United States, we are and will be subject to a variety of foreign regulations regarding development, approval, commercial sales and distribution of our products. Whether or not we obtain FDA approval for a product, we must obtain the necessary approvals by the comparable regulatory authorities of foreign countries before we can commence clinical trials or marketing of the product in those countries. The approval process varies from country to country and can involve additional product testing and additional review periods, and the time may be longer or shorter than that required to obtain FDA approval. The requirements governing, among other things, the conduct of clinical trials, product licensing, pricing and reimbursement vary greatly from country to country. Regulatory approval in one country does not ensure regulatory approval in another, but a failure or delay in obtaining regulatory approval in one country may negatively impact the regulatory process in others. If we fail to comply with applicable foreign regulatory requirements, we may be subject to fines, suspension or withdrawal of regulatory approvals, product recalls, seizure of products, operating restrictions and criminal prosecution.

*Other Healthcare Laws and Compliance Requirements*

In the United States, the research, manufacturing, distribution, marketing, sale and promotion of drug products and medical devices are subject to numerous regulations by various federal, state and local authorities in addition to the FDA including, but not limited to, the U.S. Federal Communications Commission, the U.S. Department of Justice, HHS and its various enforcement divisions, such as the Centers for Medicare and Medicaid Services ("CMS"), the Office of Inspector General ("OIG"), the Office for Human Research Protections ("OHRP"), and the Office of Research Integrity ("ORI"), state Attorneys General, state Medicaid Fraud Control Units, or MFCUs, and other state and local government agencies. Healthcare laws and regulations that may govern our business include the following.

The federal Anti-Kickback Statute prohibits, among other things, any person or entity, including a prescription drug manufacturer, or a party acting on its behalf, from knowingly and willfully soliciting, receiving, offering or paying any remuneration, directly or indirectly, overtly or covertly, in cash or in kind to induce in return for either the referral of an individual, or the purchase, recommendation, leasing, ordering or furnishing of a good, facility, item, or service, for which payment may be made in whole or in part under a federal healthcare program such as the Medicare and Medicaid programs. This statute has been interpreted broadly to apply to, among other things, arrangements between pharmaceutical manufacturers, on one hand, and prescribers, purchasers, and formulary managers, on the other. The term "remuneration" expressly includes kickbacks, bribes or rebates and also has been broadly interpreted to include anything of value, including for example, gifts, discounts, the furnishing of supplies or equipment, credit arrangements, payments of cash, waivers of payments, ownership interests and providing anything at less than its fair market value. There are a number of statutory exceptions and regulatory safe harbors protecting certain business arrangements from prosecution. Failure to meet all of the requirements of a particular applicable statutory exception or safe harbor does not make the conduct per se illegal under the federal Anti-Kickback Statute. Instead, the legality of the arrangement will be evaluated on a case-by-case basis based on a cumulative review of all of its facts and circumstances. Our practices may not meet all of the criteria for safe harbor protection from federal Anti-Kickback Statute liability in all cases. Additionally, the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010 (collectively, the "ACA"), among other things, amended the intent standard under the federal Anti-Kickback Statute such that a person or entity no longer needs to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation. The ACA also provided that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act (discussed below). Further, many states have adopted laws similar to the federal Anti-Kickback Statute, and some of these state laws may be broader in scope in that some of these state laws extend to all payors and may not contain safe harbors.

25

Federal civil and criminal false claims laws and civil monetary penalty laws, including the federal civil False Claims Act, which prohibit, among other things, any person or entity from knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval by the federal government or knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim to the federal government. The "*qui tam*" provisions of the federal civil False Claims Act allow a private individual to bring a civil action on behalf of the federal government alleging that the defendant has submitted a false claim to the federal government, and potentially to share in any monetary recovery. In recent years, the number of suits brought by private individuals has increased dramatically. In addition, various states have enacted false claims laws analogous to the federal civil False Claims Act. Many of these state laws are broader in scope and apply to all payors, and therefore, are not limited to only those claims submitted to the federal government. There are many potential bases for liability under the federal civil False Claims Act. Liability arises, primarily, when an entity knowingly submits, or causes another to submit, a false claim for reimbursement to the federal government. The federal civil False Claims Act has been used to assert liability on the basis of kickbacks and other improper referrals, improperly reported government pricing metrics such as Best Price or Average Manufacturer Price, and improper promotion of off-label uses not expressly approved by the FDA in a drug's label. Our future activities relating to the reporting of discount and rebate information and other information affecting federal, state and third party reimbursement of our products, and the sale and marketing of our products and our service arrangements or data purchases, among other activities, may be subject to scrutiny under these laws. Additionally, the civil monetary penalties statute, among other things, imposes fines against any person or entity that is determined to have presented or caused to be presented claims to a federal healthcare program that the person or entity knows or should know is for an item or service that was not provided as claimed or otherwise is false or fraudulent.

Also, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") created several additional federal criminal statutes that prohibit healthcare fraud and false statements relating to healthcare matters. The healthcare fraud statute prohibits knowingly and willfully executing a scheme to defraud any healthcare benefit program, including private third-party payors. The false statements statute prohibits knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items or services. Like the federal Anti-Kickback Statute, the ACA amended certain of these federal criminal statutes such that a person or entity no longer needs to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation.

In addition, we may be subject to, or our marketing activities may be limited by, data privacy and security regulation by both the federal government and the states in which we conduct our business. HIPAA and its implementing regulations established uniform standards for certain "covered entities," which are certain healthcare providers, health plans and healthcare clearinghouses, as well as their business associates, governing the conduct of specified electronic healthcare transactions and protecting the security and privacy of protected health information. The American Recovery and Reinvestment Act of 2009, commonly referred to as the economic stimulus package, included the Health Information Technology for Economic and Clinical Health Act ("HITECH"), which expanded certain of HIPAA's privacy and security standards. Among other things, HITECH makes HIPAA's security standards and certain privacy standards directly applicable to business associates. HITECH also created four new tiers of civil monetary penalties, amended HIPAA to make civil and criminal penalties directly applicable to business associates, and gave state attorneys general new authority to file civil actions for damages or injunctions in federal courts to enforce the federal HIPAA laws and seek attorneys' fees and costs associated with pursuing federal civil actions.

Additionally, federal transparency laws, including the federal Physician Payments Sunshine Act created under Section 6002 of the ACA and its implementing regulations require that certain manufacturers of drugs, devices, biologics, and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) report annually to CMS information related to "payments or other transfers of value" made or distributed to physicians (defined to include doctors of medicine, dentists, optometrists, podiatrists and chiropractors), generally, with some exceptions, and teaching hospitals, or to entities or individuals at the request of, or designated on behalf of, the physicians and teaching hospitals. Additionally, applicable manufacturers and applicable group purchasing organizations are required to report annually to the CMS certain ownership and investment interests held by physicians (as defined above) and their immediate family members.

There are also an increasing number of analogous state laws that require manufacturers to file reports with states on pricing and marketing information, such as tracking and reporting of gifts, compensations, other remuneration and items of value provided to health care professionals and health care entities. Many of these laws contain ambiguities as to what is required to comply with the laws. Several states have also enacted legislation requiring pharmaceutical companies to, among other things, establish and implement commercial compliance programs, file periodic reports with the state, make periodic public disclosures on sales, marketing, pricing, clinical trials and other activities and/or register their sales representatives. Certain state laws also regulate manufacturers' use of identifiable data. These laws may affect our sales, marketing and other promotional activities by imposing administrative and compliance burdens. In addition, given the lack of clarity with respect to these laws and their implementation,

26

our reporting actions could be subject to the penalty provisions of the pertinent state and federal authorities.

If our operations are found to be in violation of any of the health regulatory laws described above or any other laws that apply to us, we may be subject to penalties, including criminal and significant civil monetary penalties, damages, fines, individual imprisonment, disgorgement, contractual damages, reputational harm, exclusion from participation in government healthcare programs, integrity obligations, injunctions, recall or seizure of products, total or partial suspension of production, denial or withdrawal of pre-marketing product approvals, private qui tam actions brought by individual whistleblowers in the name of the government or refusal to allow us to enter into supply contracts, including government contracts and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations. We are unable to predict whether we would be subject to actions under these laws or the impact of such actions. However, the cost of defending such claims, as well as any sanctions imposed, could adversely affect our financial performance.

To the extent that any of our products are sold in a foreign country, we also may be subject to similar foreign laws and regulations, which may include, for instance, the U.S. Foreign Corrupt Practices Act, the U.K. Anti-Bribery Act, applicable post-marketing requirements, including safety surveillance, anti-fraud and abuse laws and implementation of corporate compliance programs and reporting of payments or transfers of value to healthcare professionals.

*Third-Party Payor Coverage and Reimbursement*

The commercial success of our approved product portfolio, as well as our pre-clinical and clinical product portfolio, if and when approved, will depend, in part, upon the availability of coverage and adequate reimbursement from third-party payors at the federal, state and private levels. Patients who are prescribed treatments for their conditions and providers performing the prescribed services generally rely on third-party payors to reimburse all or part of the associated healthcare costs. Sales of our product portfolio will therefore depend substantially, both domestically and abroad, on the extent to which the costs of our product portfolio will be paid by health maintenance, managed care, pharmacy benefit, and/or similar healthcare management organizations, or are reimbursed by government health administration authorities, such as Medicare and Medicaid, private health coverage insurers and other third-party payors. The market for our product portfolio will depend significantly on access to third-party payors' formularies, or lists of treatments for which third-party payors provide coverage and reimbursement.

Also, third-party payors are developing increasingly sophisticated methods of controlling healthcare costs. Further, coverage and reimbursement for therapeutic products can differ significantly from payor to payor. As a result, the coverage determination process will require us to provide scientific and clinical support for the use of our products to each payor separately, with no assurance that adequate coverage and reimbursement will be obtained. The cost of pharmaceuticals and medical devices continues to generate substantial governmental and third-party payor scrutiny. We expect that the pharmaceutical industry will experience continued pricing pressures due to the trend toward managed healthcare, the increasing influence of managed care organizations and additional legislative and administrative proposals. Our results of operations and business could be adversely affected by current and future third-party payor policies as well as healthcare legislative and administrative reforms.

Some third-party payors also require pre-approval of coverage for new or innovative devices or drug therapies before they will reimburse healthcare providers who use such therapies. While we cannot predict whether any proposed cost-containment measures will be adopted or otherwise implemented in the future, these requirements or any announcement or adoption of such proposals could have a material adverse effect on our ability to obtain adequate prices for our product portfolio and to operate profitably.

In international markets, reimbursement and healthcare payment systems vary significantly by country, and many countries have instituted price ceilings on specific products and therapies. There can be no assurance that our products will be considered medically reasonable and necessary for a specific indication, that our products will be considered cost-effective by third-party payors, that an adequate level of reimbursement will be available or that the third-party payors' reimbursement policies will not adversely affect our ability to sell our products profitably.

*Healthcare Reform*

In the United States and foreign jurisdictions, the legislative landscape continues to evolve. There have been a number of legislative and regulatory changes to the healthcare system that will likely affect our future operations. In particular, there have been and continue to be a number of initiatives at the United States federal and state levels that seek to reduce healthcare costs, improve access, and improve quality.

By way of example, in March 2010, the ACA was passed, which significantly changed health care financing by both governmental and private insurers. The provisions of the ACA of importance to the pharmaceutical and biotechnology industry include, among

27

others, the following:

- an annual, nondeductible fee on any entity that manufactures or imports certain branded prescription drugs and biologic agents, apportioned among these entities according to their market share in certain government healthcare programs;
- an increase in the statutory minimum rebates a manufacturer must pay under the Medicaid Drug Rebate Program to 23.1% and 13% of the average manufacturer price for most branded and generic drugs, respectively;
- new methodologies by which rebates owed by manufacturers under the Medicaid Drug Rebate Program are calculated for drugs that are inhaled, infused, instilled, implanted or injected, and for drugs that are line extension products;
- a new Medicare Part D coverage gap discount program, in which manufacturers must agree to offer 50% (and 70% commencing January 1, 2019) point-of-sale discounts to negotiated prices of applicable brand drugs to eligible beneficiaries during their coverage gap period, as a condition for the manufacturer's outpatient drugs to be covered under Medicare Part D;
- extension of manufacturers' Medicaid rebate liability to covered drugs dispensed to individuals who are enrolled in Medicaid managed care organizations, unless the drug is subject to discounts under the 340B drug discount program;
- expansion of eligibility criteria for Medicaid programs by, among other things, allowing states to offer Medicaid coverage to additional individuals and by adding new mandatory eligibility categories for certain individuals with income at or below 133% of the Federal Poverty Level thereby potentially increasing manufacturers' Medicaid rebate liability;
- expansion of the entities eligible for discounts under the Public Health Service pharmaceutical pricing program;
- expansion of healthcare fraud and abuse laws, including the federal civil False Claims Act and the federal Anti-Kickback Statute, new government investigative powers, and enhanced penalties for noncompliance;
- a licensure framework for follow-on biologic products;
- a new Patient-Centered Outcomes Research Institute to oversee, identify priorities in, and conduct comparative clinical effectiveness research, along with funding for such research;
- new requirements under the federal Physician Payments Sunshine Act for manufacturers to report information related to payments and other transfers of value made to physicians and teaching hospitals as well as ownership or investment interests held by physicians and their immediate family members; and,
- a new requirement to annually report certain drug samples that manufacturers and distributors provide to licensed practitioners, or to pharmacies of hospitals or other healthcare entities.

Some of the provisions of the ACA have yet to be implemented, and there have been judicial and Congressional challenges to certain aspects of the ACA, as well as recent efforts by the U.S. Presidential administration to repeal or replace certain aspects of the ACA. Since January 2017, the U.S. President has signed two Executive Orders and other directives designed to delay the implementation of certain provisions of the ACA or otherwise circumvent some of the requirements for health insurance mandated by the ACA. . Concurrently, Congress has considered legislation that would repeal or repeal and replace all or part of the ACA. While Congress has not passed comprehensive repeal legislation, two bills affecting the implementation of certain taxes under the ACA have been signed into law. The Tax Cuts and Jobs Act of 2017 includes a provision repealing, effective January 1, 2019, the tax-based shared responsibility payment imposed by the ACA on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate". Additionally, on January 22, 2018, the U.S. President signed a continuing resolution on appropriations for fiscal year 2018 that delayed the implementation of certain ACA-mandated fees, including the so-called "Cadillac" tax on certain high cost employer-sponsored insurance plans, the annual fee imposed on certain health insurance providers based on market share, and the medical device excise tax on non-exempt medical devices. Further, the Bipartisan Budget Act of 2018, or the BBA, among other things, amends the ACA, effective January 1, 2019, to close the coverage gap in most Medicare drug plans, commonly referred to as the "donut hole". Congress may consider additional legislation to repeal or repeal and replace other elements of the ACA.

Other healthcare legislative changes have been proposed and adopted since the ACA was enacted. For example, in August 2011, the President signed into law the Budget Control Act of 2011, which, among other things, created the Joint Select Committee on Deficit Reduction to recommend proposals in spending reductions to Congress. The Joint Select Committee on Deficit Reduction did not achieve its targeted deficit reduction of at least $1.2 trillion for the years 2013 through 2021, triggering the legislation's automatic reductions to several government programs. These reductions include aggregate reductions to Medicare payments to providers of up to 2% per fiscal year, which went into effect on April 1, 2013 and, following passage of subsequent legislation, including the BBA, will remain in effect through 2027 unless additional Congressional action is taken. Additionally, in January 2013, President Obama signed into law the American Taxpayer Relief Act of 2012, which, among other things, further reduced Medicare payments to several providers, including hospitals, imaging centers, and cancer treatment centers, and increased the statute of limitations period for the government to recover overpayments to providers from three to five years. These new laws may result in additional reductions in Medicare and other healthcare funding, which could have a material adverse effect on our customers and accordingly, our financial operations.

28

In addition, the Drug Supply Chain Security Act signed into law on November 27, 2013 imposes on manufacturers of certain pharmaceutical products new obligations related to product tracking and tracing, among others, which will be phased in over ten years.  Among the requirements of this new legislation, manufacturers subject to this federal law will be required to provide certain information regarding the drug product to individuals and entities to which product ownership is transferred, label drug product with a product identifier, and keep certain records regarding the drug product.  The transfer of information to subsequent product owners by manufacturers will eventually be required to be done electronically. Covered manufacturers will also be required to verify that purchasers of the manufacturers' products are appropriately licensed.  Further, under this new legislation, covered manufacturers will have drug product investigation, quarantine, disposition, and notification responsibilities related to counterfeit, diverted, stolen,  and intentionally adulterated products, as well as products that are the subject of fraudulent transactions or which are otherwise unfit for distribution such that they would be reasonably likely to result in serious health consequences or death.

We expect that additional state and federal healthcare reform measures will be adopted in the future. For example, there has been increasing legislative and enforcement interest in the United States with respect to specialty drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drugs. For example, in January 2016, CMS issued a final rule regarding the Medicaid drug rebate program. The final rule, effective April 1, 2016, among other things, revises the manner in which the "average manufacturer price" is to be calculated by manufacturers participating in the program and implements certain amendments to the Medicaid rebate statute created under the ACA. Further, the current U.S. Presidential administration's budget proposal for fiscal year 2019 contains further drug price control measures that could be enacted during the 2019 budget process or in other future legislation, including, for example, measures to permit Medicare Part D plans to negotiate the price of certain drugs under Medicare Part B, to allow some states to negotiate drug prices under Medicaid, and to eliminate cost sharing for generic drugs for low-income patients. While any proposed measures will require authorization through additional legislation to become effective, Congress and the current U.S. Presidential administration have each indicated that it will continue to seek new legislative and/or administrative measures to control drug costs. At the state level, legislatures are increasingly passing legislation and implementing regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing. Any additional healthcare reform measures could further constrain our business and/or limit the amounts that federal and state governments will pay for healthcare products and services, which could result in reduced demand for our product portfolio or additional pricing pressures.

*Other Regulatory Requirements*

We are also subject to various laws and regulations regarding laboratory practices, the experimental use of animals, and the use and disposal of hazardous or potentially hazardous substances in connection with our research. In each of these areas, as above, the FDA and other government agencies have broad regulatory and enforcement powers, including, among other things, the ability to levy fines and civil penalties, suspend or delay issuance of approvals, seize or recall products, and withdraw approvals, any one or more of which could have a material adverse effect on us.

## Employees

As of December 31, 2017, we had a total of 108 employees in the United States, including 5 Eagle Biologics employees, and two full-time consultants in India. Of these 108 employees, 27 were in research and development, 9 were in regulatory affairs and quality control compliance, 47 were in sales and marketing, 15 were in administration and 10 were in finance. None of our employees are represented by a labor union or subject to a collective bargaining agreement. We have not experienced any work stoppage and consider our relations with our employees to be good.

## Segments and Geographic Information

We view our operation and manage our business as one reporting segment since the majority of our revenues are from royalties. For information regarding revenue and other information regarding our results of operations for each of our last three fiscal years, please refer to our financial statements included in this Annual Report on Form 10-K, and Management's Discussion and Analysis of Financial Condition and Results of Operations included in Item 7 of this Annual Report on Form 10-K.

## Corporate Information

We were incorporated in Delaware in January 2007. Our principal executive offices are located at 50 Tice Boulevard, Suite 315,

Woodcliff Lake, New Jersey 07677, and our telephone number is (201) 326-5300.

**Available Information**

Our corporate website address is www.eagleus.com. Information contained on or accessible through our website is not a part of this Annual Report on Form 10-K, and the inclusion of our website address in this Annual Report on Form 10-K is an inactive textual reference only. We make our Annual Reports on Form 10-K, Quarterly reports on Form 10-Q, Current Reports on Form 8-K and all amendments to those reports available free of charge on our website as soon as reasonably practicable after we file such reports with, or furnish such reports to, the Securities and Exchange Commission, or SEC.

30

**Item 1A. Risk Factors**

   *Investing in our common stock involves a high degree of risk. You should consider carefully the risks and uncertainties described below in addition to the other information included or incorporated by reference in this Annual Report on Form 10-K, as well as our other public filings with the Securities and Exchange Commission. If any of the following risks actually occur, our business, financial condition or results of operations would likely suffer. In that case, the trading price of our common stock could fall. In addition to the risk factors identified under the captions below, the operation and results of our business are subject to risks and uncertainties identified elsewhere in this Annual Report on Form 10-K as well as general risks and uncertainties such as those relating to general economic conditions and demand in the market for our products.*

31

**Risks Related to Our Financial Condition and Need for Additional Capital**

*We have a history of operating losses and have only recently achieved profitability. If we cannot sustain profitability, our business, prospects, operating results and financial condition would be materially harmed.*

To date, we have focused primarily on developing a broad product portfolio and have obtained final regulatory approval for five products. Some of our product candidates will require substantial additional development time and resources before we would be able to receive regulatory approvals, implement commercialization strategies and begin generating revenue from product sales. Although we had net income of $51.9 million for the year ended December 31, 2017, $81.5 million for the year ended December 31, 2016 and $2.6 million for the year ended December 31, 2015, we incurred significant net losses prior to 2015. As of December 31, 2017, we had retained earnings of $26.3 million.

We have devoted most of our financial resources to product development and may not generate significant revenue from sales of our product candidates in the near-term, if ever. To date, only Argatroban, diclofenac-misoprostol, Ryanodex, Non-Alcohol Docetaxel Injection and Bendeka have been commercialized.

Because of the numerous risks and uncertainties associated with pharmaceutical product development, we are unable to fully predict the timing or amount of our expenses, but we expect to continue to incur substantial expenses, which we expect to increase as we expand our development activities and product portfolio. As a result of the foregoing, we may incur losses and negative cash flows in the future. We believe that our existing cash and cash equivalents, together with interest thereon, are sufficient to fund our operations for a minimum of twelve months.

*If we fail to obtain additional financing, we could be forced to delay, reduce or eliminate our product development programs.*

Developing pharmaceutical products, including conducting preclinical studies and clinical trials, is expensive. We expect our development expenses to substantially increase in connection with our ongoing activities, particularly as we advance our clinical programs, both internally and through our joint development agreement with AMRI.

Changing circumstances beyond our control may cause us to consume capital more rapidly than we currently anticipate. For example, our product commercialization or development efforts could encounter technical or other difficulties that could increase our development costs more than we expect. In any event, we may require additional capital prior to obtaining regulatory approval for, or commercializing, any additional product candidates.

In addition, attempting to secure additional financing may divert our management from our day-to-day activities, which may adversely affect our ability to develop and commercialize additional product candidates. We cannot guarantee that future financing will be available in sufficient amounts or on terms acceptable to us, if at all. If we are unable to raise additional capital when required or on acceptable terms, we may be required to:

- significantly delay, scale back or discontinue the development or commercialization of our product candidates;

- seek corporate partners for our products and product candidates at an earlier stage than otherwise would be desirable or on terms that are less favorable than might otherwise be available;

- relinquish or license on unfavorable terms, our rights to technologies or products, or to product candidates that we otherwise would seek to develop or commercialize ourselves; or

- significantly curtail, or cease, operations.

The occurrence of any of these factors could have a material adverse effect on our business, operating results and prospects.

*We may sell additional equity or incur debt to fund our operations, which may result in dilution to our stockholders and impose restrictions on our business.*

In order to raise additional funds to support our operations, we may sell additional equity or incur debt, which could adversely impact our stockholders, as well as our business. The sale of additional equity or convertible debt securities would result in the issuance of additional shares of our capital stock and dilution to all of our stockholders. The incurrence of indebtedness, including under the credit agreement we entered into in January 2017 and subsequently amended and restated in August 2017, which we refer to as the Credit Agreement, would result in increased fixed payment obligations. In addition, the incurrence of indebtedness could result in certain restrictive covenants, such as limitations on our ability to incur additional debt, limitations on our ability to acquire, sell or license intellectual property rights and other operating restrictions that could adversely impact our ability to conduct our business.

32

We may not have enough available cash or be able to raise additional funds on satisfactory terms, if at all, through equity or debt financings to repay our indebtedness at the time any such repayment is required (causing a default under such indebtedness), which could have a material adverse effect on our business, financial condition and results of operations.

**Risks Related to Regulatory Approval**

***We cannot give any assurance that we will receive regulatory approval for our product candidates, which is necessary before they can be commercialized.***

Our business and future success are substantially dependent on our ability to successfully and timely develop, obtain regulatory approval for, and commercialize our product candidates. Any delay or setback in the development of any of these product candidates could adversely affect our business. In addition, the process for obtaining regulatory approval to market biologic products is expensive, often takes many years, and can vary substantially based on the type, complexity and novelty of the product candidate involved. Our planned development, approval and commercialization of these product candidates may fail to be completed in a timely manner or at all. The FDA or other foreign regulatory agency may refuse or delay approval of our product candidates for failure to collect sufficient clinical or animal safety data and require us or our collaborators to conduct additional clinical or animal safety studies, which may cause lengthy delays and increased costs to our programs. We cannot provide assurance that we will be able to obtain approval for any of our product candidates from the FDA or any foreign regulatory authority or that we will obtain such approval in a timely manner. If we do not obtain regulatory approval of new products or additional indications for existing products, or are significantly delayed or limited in doing so, our revenue growth will be adversely affected, we may experience surplus inventory, or our business may be materially harmed and we may need to significantly curtail operations. For example, in March of 2016 we received a Complete Response Letter from the FDA stating that while their initial review of our NDA for EP-6101 was complete, they could not approve the application in its present form and requested additional information. We have elected not to pursue the application further or seek to exploit EP-6101 for various reasons including the costs associated with addressing the information request in the FDA's Complete Response Letter and because additional generic bivalirudin products have entered or are entering the market. Additionally, in July of 2017 we received a Complete Response Letter from the FDA regarding our 505(b)(2) NDA for EP-4104 for the treatment of EHS, in conjunction with external cooling methods. The FDA has requested that the Company conduct an additional clinical trial for EP-4104. We are currently meeting with the FDA to seek agreement on such additional work, but there can be no assurance that the FDA will ultimately approve the NDA, or if so, in a timely fashion.

***If we are unable to differentiate our products or product candidates from branded reference drugs or existing generic therapies for similar treatments, or if the FDA or other applicable regulatory authorities approve generic products that compete with any of our products or product candidates, the ability to successfully commercialize our product candidates would be adversely affected.***

Our strategy is to enter the market no later than the first generic or biosimilar to the applicable branded reference drug. We expect to compete against branded reference drugs and to compete with their generic counterparts that will be sold for a lower price. Although we believe that our products and product candidates will be clinically differentiated from branded reference drugs and their generic counterparts, if any, it is possible that such differentiation will not impact our market position. If we are unable to achieve significant differentiation for our products or product candidates against other drugs, the opportunity for our products and product candidates to achieve premium pricing and be commercialized successfully would be adversely affected.

In addition to existing branded reference drugs and the related generic products, the FDA or other applicable regulatory authorities may approve generic products that compete directly with our products or product candidates, if approved. Once an NDA, including a 505(b)(2) application, is approved, the product covered thereby becomes a "listed drug" which can, in turn, be cited by potential competitors in support of approval of an ANDA. The Federal Food, Drug and Cosmetic Act ("FDCA"), FDA regulations and other applicable regulations and policies provide incentives to manufacturers to create modified, non-infringing versions of a drug to facilitate the approval of an ANDA for generic substitutes. These manufacturers might only be required to conduct a relatively inexpensive study to show that their product has the same active ingredient(s), dosage form, strength, route of administration and conditions of use or labeling as our products or product candidates and that the generic product is bioequivalent to ours, meaning it is absorbed in the body at the same rate and to the same extent as our products or product candidates. These generic equivalents, which must meet the same quality standards as branded pharmaceuticals, would be significantly less costly than ours to bring to market and companies that produce generic equivalents are generally able to offer their products at lower prices. Thus, after the introduction of a generic competitor, a significant percentage of the sales of any branded product is typically lost to the generic product. Accordingly, competition from generic equivalents of our products or product candidates would materially adversely impact our ability to successfully commercialize our product candidates or negatively impact our ability to gain market acceptance and market share for our products.

33

***If the FDA does not conclude that our product candidates satisfy the requirements for the regulatory approval, or if the requirements for approval of any of our product candidates are not as we expect, the approval pathway for our product candidates will likely take significantly longer, cost significantly more and encounter significantly greater complications and risks than anticipated, and in any case may not be successful.***

We intend to seek FDA approval through the 505(b)(2) regulatory pathway for those small molecule product candidates described in this Annual Report on Form 10-K and will likewise pursue an equivalent regulatory strategy for the biologic product candidates developed by Eagle Biologics. The Drug Price Competition and Patent Term Restoration Act of 1984, also known as the Hatch-Waxman Act, added Section 505(b)(2) to the FDCA. Section 505(b)(2) permits the filing of an NDA where at least some of the information required for approval comes from studies that were not conducted by or for the applicant. While the regulatory pathway of a biobetter is less developed, we believe through collaborative deals we can achieve a similar result allowing us to rely on data previously generated.

If the FDA does not allow us to pursue the regulatory pathway for our product candidates as anticipated, we may need to conduct additional clinical trials, provide additional data and information and meet additional standards for regulatory approval. If this were to occur, the time and financial resources required to obtain FDA approval for our product candidates would likely substantially increase. Moreover, the inability to pursue such regulatory pathway could result in new competitive products reaching the market faster than our product candidates, which could materially adversely impact our competitive position and prospects. Even if we are allowed to pursue our chosen regulatory pathway for a product candidate, we cannot assure you that we will receive the requisite or timely approvals for commercialization of such product candidate.

In addition, we expect that our competitors will file citizens' petitions with the FDA in an attempt to persuade the FDA that our product candidates, or the clinical studies that support their approval, contain deficiencies. Such actions by our competitors could delay or even prevent the FDA from approving any NDA or BLA that we submit.

***Clinical development is a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results. Failure can occur at any stage of clinical development.***

Clinical testing, even when utilizing the 505(b)(2) pathway or its equivalent, is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure can occur at any time during the clinical trial process, even with active ingredients that have previously been approved by the FDA as safe and effective. The results of preclinical studies and early clinical trials of our product candidates may not be predictive of the results of later stage clinical trials. A number of companies in the biopharmaceutical industry have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier trials.

Our product candidates are in various stages of development, from early stage to late stage. Clinical trial failures may occur at any stage and may result from a multitude of factors both within and outside our control, including flaws in formulation, adverse safety or efficacy profile and flaws in trial design, among others. If the trials result in negative or inconclusive results, we or our collaborators may decide, or regulators may require us, to discontinue trials of the product candidates or conduct additional clinical trials or preclinical studies. For example, the FDA has requested that the Company conduct an additional clinical trial for EP-4104. We are currently meeting with the FDA to seek agreement on such additional work, but there can be no assurance that the FDA will ultimately approve the NDA, or if so, in a timely fashion. In addition, data obtained from trials and studies are susceptible to varying interpretations, and regulators may not interpret our data as favorably as we do, which may delay, limit or prevent regulatory approval. For these reasons, our future clinical trials may not be successful.

We do not know whether any future clinical trials we may conduct will demonstrate consistent or adequate efficacy and safety to obtain regulatory approval to market our product candidates. If any product candidate for which we are conducting clinical trials is found to be unsafe or lack efficacy, we will not be able to obtain regulatory approval for it. If we are unable to bring any of our current or future product candidates to market, our business would be materially harmed and our ability to create long-term stockholder value will be limited.

***Delays in clinical trials are common and have many causes, and any delay could result in increased costs to us and could jeopardize or delay our ability to obtain regulatory approval and commence product sales. We may also find it difficult to enroll patients in our clinical trials, which could delay or prevent development of our product candidates.***

We may experience delays in clinical trials of our product candidates. Our planned clinical trials may not begin on time, have an effective design, enroll a sufficient number of patients or be completed on schedule, if at all. Our clinical trials can be delayed for a variety of reasons, including:

- inability to raise or delays in raising funding necessary to initiate or continue a trial;

- delays in obtaining regulatory approval to commence a trial;

- delays in reaching agreement with the FDA on final trial design;

34

- imposition of a clinical hold for safety reasons or following an inspection of our clinical trial operations or trial sites by the FDA or other regulatory authorities;

- delays in reaching agreement on acceptable terms with prospective contract research organizations, or CROs, and clinical trial sites, or failure by such CROs to carry out the clinical trial at each site in accordance with the terms of our agreements with them;

- delays in obtaining required institutional review board, or IRB, approval at each site;

- difficulties or delays in having patients complete participation in a trial or return for post-treatment follow-up;

- clinical sites electing to terminate their participation in one of our clinical trials, which would likely have a detrimental effect on subject enrollment;

- time required to add new clinical sites; or

- delays by our contract manufacturers to produce and deliver sufficient supply of clinical trial materials.

If initiation or completion of our planned clinical trials is delayed for any of the above reasons or other reasons, our development costs may increase, our regulatory approval process could be delayed and our ability to commercialize and commence sales of our product candidates could be materially harmed, which could have a material adverse effect on our business.

In addition, identifying and qualifying patients to participate in clinical trials of our product candidates is critical to our success. The timing of our clinical trials depends on the speed at which we can recruit patients to participate in testing our product candidates as well as completion of required follow-up periods. We may not be able to identify, recruit and enroll a sufficient number of patients, or those with required or desired characteristics or to complete our clinical trials in a timely manner. Patient enrollment and completion of the trials is affected by factors including:

- severity of the disease under investigation;

- design of the trial protocol;

- size of the patient population;

- eligibility criteria for the trial in question;

- perceived risks and benefits of the product candidate under trial;

- proximity and availability of clinical trial sites for prospective patients;

- availability of competing therapies and clinical trials;

- efforts to facilitate timely enrollment in clinical trials;

- patient referral practices of physicians; and

- ability to monitor patients adequately during and after treatment.

***Our products or product candidates may cause adverse effects or have other properties that could delay or prevent their regulatory approval or limit the scope of any approved label or market acceptance, or result in significant negative consequences following marketing approval, if any.***

As with many pharmaceutical and biological products, treatment with our products or product candidates may produce undesirable side effects or adverse reactions or events. Although our products or product candidates containing active ingredients that have already been approved and the side effects arising from the use of the active ingredient or class of drug in our products or product candidates are generally known, our products or product candidates may still cause undesirable side effects. These could be attributed to the active ingredient or class of drug or to our unique formulation of such products or product candidates, or other potentially harmful characteristics. Such characteristics could cause us, our IRBs, clinical trial sites, the FDA or other regulatory authorities to interrupt, delay or halt clinical trials and could result in a more restrictive label or the delay, denial or withdrawal of regulatory approval, which may harm our business, financial condition and prospects significantly.

Further, if any of our products cause serious or unexpected side effects after receiving market approval, a number of potentially significant negative consequences could result, including:

- regulatory authorities may withdraw their approval of the product or impose restrictions on its distribution;

- the FDA may require implementation of a Risk Evaluation and Mitigation Strategy, or REMS;

- regulatory authorities may require the addition of labeling statements, such as warnings or contraindications;

35

- we may be required to change the way the product is administered or conduct additional clinical studies;

- we could be sued and held liable for harm caused to patients; or

- our reputation may suffer.

Any of these events could prevent us from achieving or maintaining market acceptance of the affected product or product candidate and could substantially increase the costs of commercializing our products and product candidates.

***The regulatory approval processes of the FDA and comparable foreign authorities are lengthy, time-consuming and inherently unpredictable, and if we are ultimately unable to obtain regulatory approval for our product candidates, our business will be substantially harmed.***

The time required to obtain approval by the FDA and comparable foreign authorities is unpredictable but typically takes many years following the commencement of clinical trials and depends upon numerous factors, including the substantial discretion of the regulatory authorities. In addition, approval policies, regulations or the type and amount of clinical data necessary to gain approval may change during the course of a product candidate's clinical development and may vary among jurisdictions. To date, we have obtained regulatory approval for five NDA products, but no BLA products, and we have multiple NDA product candidates in advanced stages of development and other exploratory candidates under development. However, it is possible that none of our existing product candidates or any product candidates we may seek to develop in the future will ever obtain regulatory approval in the United States or other jurisdictions.

Our product candidates could fail to receive regulatory approval for many reasons, including the following:

- the FDA or comparable foreign regulatory authorities may disagree that our changes to branded reference drugs or existing biologic drugs meet the criteria for our chosen regulatory pathway or foreign regulatory pathways;

- we may be unable to demonstrate to the satisfaction of the FDA or comparable foreign regulatory authorities that a product candidate is safe and effective or comparable to its branded reference product for its proposed indication;

- the results of any clinical trials we conduct may not meet the level of statistical significance required by the FDA or comparable foreign regulatory authorities for approval;

- we may be unable to demonstrate that a product candidate's clinical and other benefits outweigh its safety risks;

- the FDA or comparable foreign regulatory authorities may fail to approve the manufacturing processes or facilities of third party manufacturers with which we contract for clinical and commercial supplies; and

- the approval policies or regulations of the FDA or comparable foreign regulatory authorities may change significantly in a manner rendering our clinical data insufficient for approval.

This lengthy approval process as well as the unpredictability of future clinical trial results may result in our failing to obtain regulatory approval to market our product candidates, which would harm our business, results of operations and prospects significantly.

In addition, even if we were to obtain approval, regulatory authorities may approve any of our product candidates for fewer or more limited indications than we request, may grant approval contingent on the performance of costly post-marketing clinical trials or may approve a product candidate with a label that does not include the labeling claims necessary or desirable for the successful commercialization of that product candidate. Any of the foregoing scenarios could harm the commercial prospects for our product candidates.

We have no experience submitting BLAs and have limited experience using the 505(b)(2) regulatory pathway to submit an NDA or any similar drug approval filing to the FDA, and we cannot be certain that any of our product candidates will receive regulatory approval. For example, in March of 2016 we received a Complete Response Letter from the FDA stating that while their initial review of our NDA for EP-6101 was complete, they could not approve the application in its present form and requested additional information. We have elected not to pursue the application further or seek to exploit EP-6101 for various reasons including the costs associated with addressing the information request in the FDA's Complete Response Letter and because additional generic bivalirudin products have entered or are entering the market. Additionally, in July of 2017 we received a Complete Response Letter from the FDA regarding our 505(b)(2) NDA for Ryanodex for the treatment of EHS, in conjunction with external cooling methods. The FDA has requested that the Company conduct an additional clinical trial for EP-4104. We are currently meeting with the FDA to seek agreement on such additional clinical work, but there can be no assurance that the FDA will ultimately approve the NDA, or if so, in a timely fashion.

If we do not receive regulatory approvals for our product candidates, we may not be able to continue our operations. Even if we successfully obtain regulatory approvals to market one or more of our product candidates, our revenue will be dependent, to a significant extent, upon the size of the markets in the territories for which we gain regulatory approval. If the markets for patients

36

or indications that we are targeting are not as significant as we estimate, we may not generate significant revenue from sales of such products, if approved.

***An NDA submitted under Section 505(b)(2) subjects us to the risk that we may be subject to a patent infringement lawsuit that would delay or prevent the review or approval of our product candidates.***

Some of our product candidates will be submitted to the FDA for approval under Section 505(b)(2) of the FDCA. Section 505(b)(2) permits the submission of an NDA where at least some of the information required for approval comes from studies that were not conducted by, or for, the applicant and on which the applicant has not obtained a right of reference. The 505(b)(2) application would enable us to reference published literature and/or the FDA's previous findings of safety and effectiveness for the branded reference drug. For NDAs submitted under Section 505(b)(2) of the FDCA, the patent certification and related provisions of the Hatch-Waxman Act apply. In accordance with the Hatch-Waxman Act, such NDAs may be required to include certifications, known as paragraph IV certifications, that certify that any patents listed in the Patent and Exclusivity Information Addendum of the FDA's publication, Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the Orange Book, with respect to any product referenced in the 505(b)(2) application, are invalid, unenforceable or will not be infringed by the manufacture, use or sale of the product that is the subject of the 505(b)(2) NDA.

Under the Hatch-Waxman Act, the holder of patents that the 505(b)(2) application references may file a patent infringement lawsuit after receiving notice of the paragraph IV certification. Filing of a patent infringement lawsuit against the filer of the 505(b)(2) applicant within 45 days of the patent owner's receipt of notice triggers a one-time, automatic, 30-month stay of the FDA's ability to approve the 505(b)(2) NDA, unless patent litigation is resolved in the favor of the paragraph IV filer or the patent expires before that time. Accordingly, we may invest a significant amount of time and expense in the development of one or more product candidates only to be subject to significant delay and patent litigation before such product candidates may be commercialized, if at all. In addition, a 505(b)(2) application will not be approved until any non-patent exclusivity, such as exclusivity for obtaining approval of a new chemical entity, or NCE, listed in the Orange Book for the referenced product has expired. The FDA may also require us to perform one or more additional clinical studies or measurements to support the change from the branded reference drug, which could be time-consuming and could substantially delay our achievement of regulatory approvals for such product candidates. The FDA may also reject our future 505(b)(2) submissions and require us to file such submissions under Section 505(b)(1) of the FDCA, which would require us to provide extensive data to establish safety and effectiveness of the drug for the proposed use and could cause delay and be considerably more expensive and time-consuming. These factors, among others, may limit our ability to successfully commercialize our product candidates.

Companies that produce branded reference drugs routinely bring litigation against abbreviated new drug application, or ANDA, or 505(b)(2) applicants that seek regulatory approval to manufacture and market generic and reformulated forms of their branded products. These companies often allege patent infringement or other violations of intellectual property rights as the basis for filing suit against an ANDA or 505(b)(2) applicant. Likewise, patent holders may bring patent infringement suits against companies that are currently marketing and selling their approved generic or reformulated products.

Litigation to enforce or defend intellectual property rights is often complex and often involves significant expense and can delay or prevent introduction or sale of our product candidates. If patents are held to be valid and infringed by our product candidates in a particular jurisdiction, we would, unless we could obtain a license from the patent holder, be required to cease selling in that jurisdiction and may need to relinquish or destroy existing stock in that jurisdiction. There may also be situations where we use our business judgment and decide to market and sell our approved products, notwithstanding the fact that allegations of patent infringement(s) have not been finally resolved by the courts, which is known as an "at-risk launch." The risk involved in doing so can be substantial because the remedies available to the owner of a patent for infringement may include, among other things, damages measured by the profits lost by the patent owner and not necessarily by the profits earned by the infringer. In the case of a willful infringement, the definition of which is subjective, such damages may be increased up to three times. Moreover, because of the discount pricing typically involved with bioequivalent and, to a lesser extent, 505(b)(2), products, patented branded products generally realize a substantially higher profit margin than bioequivalent and, to a lesser extent, 505(b)(2), products, resulting in disproportionate damages compared to any profits earned by the infringer. An adverse decision in patent litigation could have a material adverse effect on our business, financial position and results of operations and could cause the market value of our common stock to decline.

***The FDA and other regulatory agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses.***

If we are found to have improperly promoted off-label uses of our products or product candidates, if approved, we may become subject to significant liability. Such enforcement has become more common in the industry. The FDA and other regulatory agencies strictly regulate the promotional claims that may be made about prescription products, such as our product candidates, if approved. In particular, a product may not be promoted for uses that are not approved by the FDA or such other regulatory agencies as reflected in the product's approved labeling. If we receive marketing approval for our product candidates for our proposed indications, physicians may nevertheless use our products for their patients in a manner that is inconsistent with the approved

37

label, if the physicians personally believe in their professional medical judgment it could be used in such manner. However, if we are found to have promoted our products for any off-label uses, the federal government could levy civil, criminal and/or administrative penalties, and seek fines against us. The FDA or other regulatory authorities could also request that we enter into a consent decree or a corporate integrity agreement, or seek a permanent injunction against us under which specified promotional conduct is monitored, changed or curtailed. If we cannot successfully manage the promotion of our product candidates, if approved, we could become subject to significant liability, which would materially adversely affect our business and financial condition.

***Our business is subject to extensive regulatory requirements and our approved product and product candidates that obtain regulatory approval will be subject to ongoing and continued regulatory review, which may result in significant expense and limit our ability to commercialize such products.***

Even after a product is approved, we remain subject to ongoing FDA and other regulatory requirements governing the labeling, packaging, storage, distribution, safety surveillance, advertising, promotion, import, export, record-keeping and reporting of safety and other post-market information. The holder of an approved NDA or BLA is obligated to monitor and report adverse events, or AEs, and any failure of a product to meet the specifications in the application. The holder of an approved NDA or BLA must also submit new or supplemental applications and obtain FDA approval for certain changes to the approved product, product labeling or manufacturing process. Advertising and promotional materials must comply with FDA rules and are subject to FDA review, in addition to other potentially applicable federal and state laws. In addition, the FDA may impose significant restrictions on the approved indicated uses for which the product may be marketed or on the conditions of approval. For example, a product's approval may contain requirements for potentially costly post-approval studies and surveillance to monitor the safety and efficacy of the product, or the imposition of a REMS program.

Manufacturers of drug products and their facilities are subject to payment of user fees and continual review and periodic inspections by the FDA and other regulatory authorities for compliance with current good manufacturing practices, or cGMP, and adherence to commitments made in the drug application. If we or a regulatory agency discovers previously unknown problems with a product, such as AEs of unanticipated severity or frequency, or problems with the facility where the product is manufactured, a regulatory agency may impose restrictions relative to that product or the manufacturing facility, including requiring product recall, notice to physicians, withdrawal of the product from the market or suspension of manufacturing.

If we or our products or product candidates or our manufacturing facilities fail to comply with applicable regulatory requirements, a regulatory agency may:

- issue warning letters or untitled letters asserting that we are in violation of the law;

- impose restrictions on the marketing or manufacturing of the product;

- seek an injunction or impose civil, criminal and/or administrative penalties, damages, assess monetary fines, require disgorgement, consider exclusion from participation in Medicare, Medicaid and other federal health care programs and require curtailment or restructuring of our operations;

- suspend or withdraw regulatory approval;

- suspend any ongoing clinical trials;

- refuse to approve a pending application or supplements to an application submitted by us;

- seize product; or

- refuse to allow us to enter into government contracts.

Similar post-market requirements may apply in foreign jurisdictions in which we may seek approval of our products. Any government investigation of alleged violations of law could require us to expend significant time and resources in response and could generate negative publicity. The occurrence of any event or penalty described above may inhibit our ability to commercialize our products and generate revenues.

In addition, the FDA's regulations, policies or guidance may change and new or additional statutes or government regulations in the United States and other jurisdictions may be enacted that could prevent or delay regulatory approval of our product candidates or further restrict or regulate post-approval activities. For example, the Food and Drug Administration Safety and Innovation Act, or FDASIA, requires the FDA to issue new guidance on permissible forms of Internet and social media promotion of regulated medical products, and the FDA may soon specify new restrictions on this type of promotion. We cannot predict the likelihood, nature or extent of adverse government regulation that may arise from pending or future legislation or administrative action, either in the United States or abroad. If we are not able to achieve and maintain regulatory compliance, we may not be permitted to market our products and/or product candidates, which would adversely affect our ability to generate revenue and achieve or maintain profitability.

38

*Our employees, independent contractors, principal investigators, consultants, commercial partners and vendors may engage in misconduct or other improper activities, including non-compliance with regulatory standards and requirements and insider trading.*

We are exposed to the risk that our employees, independent contractors, principal investigators, consultants, commercial partners and vendors may engage in fraudulent conduct or other illegal activity. Misconduct by these parties could include intentional, reckless and/or negligent conduct that violates (1) the laws of the United States FDA and similar foreign regulatory bodies, including those laws requiring the reporting of true, complete and accurate information to such regulatory bodies; (2) health care laws and regulations, including fraud and abuse laws of the United States and similar foreign fraudulent misconduct laws; and (3) laws requiring the reporting of financial information or data accurately. Specifically, the promotion, sales and marketing of health care items and services, as well as certain business arrangements in the health care industry are subject to extensive laws designed to prevent misconduct, including fraud, kickbacks, self-dealing and other abusive practices. These laws may restrict or prohibit a wide range of pricing, discounting, marketing, structuring and commission(s), certain customer incentive programs and other business arrangements generally. Activities subject to these laws also involve the improper use of information obtained in the course of patient recruitment for clinical trials. It is not always possible to identify and deter employee and other third-party misconduct. The precautions we take to detect and prevent inappropriate conduct may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to comply with these laws. If any such actions are instituted against us, and we are not successful in defending ourselves, those actions could have a significant impact on our business, including the imposition of civil, criminal and administrative penalties, damages, monetary fines, individual imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings, and curtailment of our operations, any of which could adversely affect our ability to operate our business and our results of operations.

*Any relationships with health care professionals, principal investigators, consultants, customers (actual and potential) and third party payors, in addition to our general business operations, are and will continue to be subject, directly or indirectly, to federal and state health care fraud and abuse laws, marketing expenditure tracking and disclosure, or sunshine laws, government price reporting and health information privacy and security laws. If we are unable to comply, or have not fully complied, with such laws, we could face penalties, including, without limitation, civil, criminal and administrative penalties, damages, monetary fines, disgorgement, individual imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings and curtailment or restructuring of our operations.*

Our business operations and activities may be directly, or indirectly, subject to various federal, state and local fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute and the federal civil False Claims Act. These laws may impact, among other things, our current activities with principal investigators and research subjects, as well as current, proposed and future sales, marketing and education programs. In addition, we may be subject to patient data privacy and security regulation by the federal government, state governments and foreign jurisdictions in which we conduct our business, as well as transparency requirements. The U.S. healthcare laws and regulations that may affect our ability to operate include, but are not limited to:

- the federal Anti-Kickback Statute, which prohibits, among other things, knowingly and willfully soliciting, receiving, offering or paying any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind, to induce, or in return for, either the referral of an individual, or the purchase, lease, order or recommendation of any good, facility, item or service for which payment may be made, in whole or in part, under a federal health care program, such as the Medicare and Medicaid programs;

- federal civil and criminal false claims laws and civil monetary penalty laws, including the federal civil False Claims Act, which prohibit and impose penalties for, among other things, individuals or entities knowingly presenting, or causing to be presented, claims for payment or approval from the federal government including Medicare, Medicaid or certain other governmental health care programs that are false or fraudulent or knowingly making or causing to be made a false statement to improperly avoid, decrease or conceal an obligation to pay money to the federal government. The Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, or collectively, ACA, among other things, amends the intent requirement of the federal Anti-Kickback Statute and criminal healthcare fraud statutes such that a person or entity no longer needs to have actual knowledge of this statute or specific intent to violate it. In addition, the ACA provides that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act;

- the federal Health Insurance Portability and Accountability Act of 1996, or HIPAA, which created additional federal criminal statutes that prohibit knowingly and willfully executing, or attempting to execute, a scheme to defraud any health care benefit program or obtain, by means of false or fraudulent pretenses, representations or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, regardless of the payor

39

(e.g., public or private) and knowingly and willfully falsifying, concealing or covering up by any trick or device a material fact or making any materially false statements in connection with the delivery of, or payment for, health care benefits, items or services relating to health care matters;

- HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, or HITECH, and their respective implementing regulations, which impose requirements on certain covered health care providers, health plans and health care clearinghouses as well as their respective business associates that perform services for them that involve the use, or disclosure of, individually identifiable health information, relating to the privacy, security and transmission of individually identifiable health information without appropriate authorization;

- the federal Physician Payments Sunshine Act, created under Section 6002 of the Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, collectively, ACA, and its implementing regulations, which requires certain manufacturers of drugs, devices, biologicals and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) to report annually to the United States Department of Health and Human Services' Centers for Medicare & Medicare Services, or CMS, information related to payments or other transfers of value made to physicians (defined to include doctors, dentists, optometrists, podiatrists and chiropractors) and teaching hospitals, as well as ownership and investment interests held by physicians and their immediate family members;

- federal consumer protection and unfair competition laws, which broadly regulate marketplace activities and activities that potentially harm consumers;

- federal government price reporting laws, changed by ACA to, among other things, increase the minimum Medicaid rebates owed by most manufacturers under the Medicaid Drug Rebate Program and offer such rebates to additional populations, that require us to calculate and report complex pricing metrics to government programs, where such reported prices may be used in the calculation of reimbursement and/or discounts on our marketed drugs. Participation in these programs and compliance with the applicable requirements may subject us to potentially significant discounts on our products, increased infrastructure costs and potentially limit our ability to offer certain marketplace discounts;

- the Foreign Corrupt Practices Act, a United States law which regulates certain financial relationships with foreign government officials (which could include, for example, certain medical professionals); and

- state law equivalents of each of the above federal laws, such as anti-kickback, false claims, consumer protection and unfair competition laws which may apply to our business practices, including but not limited to, research, distribution, sales and marketing arrangements as well as submitting claims involving health care items or services reimbursed by any third party payors, including commercial insurers; state laws that require pharmaceutical companies to comply with the pharmaceutical industry's voluntary compliance guidelines and the relevant compliance guidance promulgated by the federal government that otherwise restricts payments that may be made to health care providers; state laws that require drug manufacturers to file reports with states regarding marketing information, such as the tracking and reporting of gifts, compensations and other remuneration and items of value provided to health care professionals and entities (compliance with such requirements may require investment in infrastructure to ensure that tracking is performed properly, and some of these laws result in the public disclosure of various types of payments and relationships, which could potentially have a negative effect on our business and/or increase enforcement scrutiny of our activities); and state laws governing the privacy and security of health information in certain circumstances, many of which differ from each other in significant ways, thus complicating compliance efforts.

In addition, any sales of our products or product candidates once commercialized outside the United States will also likely subject us to foreign equivalents of the health care laws mentioned above, among other foreign laws.

Efforts to ensure that our business arrangements will comply with applicable health care laws may involve substantial costs. It is possible that governmental and enforcement authorities will conclude that our business practices may not comply with current or future statutes, regulations or case law interpreting applicable fraud and abuse or other health care laws and regulations. If our operations are found to be in violation of any of the laws described above or any other governmental regulations that apply to us, we may be subject to, without limitation, civil, criminal and administrative penalties, damages, monetary fines, disgorgement, individual imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, imprisonment, diminished profits and future earnings and curtailment or restructuring of our operations, any of which could adversely affect our ability to operate.

***We are required to obtain regulatory approval for each of our products in each jurisdiction in which we intend to market such products, and the inability to obtain such approvals would limit our ability to realize their full market potential.***

In order to market products outside of the United States, we must comply with numerous and varying regulatory requirements of other countries regarding safety and efficacy. Clinical trials conducted in one country may not be accepted by regulatory authorities in other countries, and regulatory approval in one country does not mean that regulatory approval will be obtained in any other country. However, the failure to obtain regulatory approval in one jurisdiction may adversely impact our ability to obtain regulatory approval in another jurisdiction. Approval processes vary among countries and can involve additional product testing and validation and additional administrative review periods. Seeking foreign regulatory approval could result in difficulties and costs for us and require additional non-clinical studies or clinical trials which could be costly and time consuming. Regulatory requirements can vary widely from country to country and could delay or prevent the introduction of our products in those countries. If we fail to comply with regulatory requirements in international markets or to obtain and maintain required approvals, or if regulatory approval in international markets is delayed, our target market will be reduced and our ability to realize the full market potential of our products will be harmed.

***If we fail to develop, acquire or in-license other product candidates or products, our business and prospects will be limited.***

Our long-term growth strategy is to develop and commercialize a portfolio of product candidates in addition to our existing product candidates. We may also acquire or in-license such product candidates. Although we have internal research and development capacity that we believe will enable us to make improvements to existing compounds or active ingredients, we do not have internal drug discovery capabilities to identify and develop entirely new chemical entities or compounds. As a result, our primary means of expanding our pipeline of product candidates is to develop improved formulations and delivery methods for existing FDA-approved products and/or select and acquire or in-license product candidates for the treatment of therapeutic indications that complement or augment our current targets, or that otherwise fit into our development or strategic plans on terms that are acceptable to us. Developing new formulations of existing products or identifying, selecting and acquiring or in-licensing promising product candidates requires substantial technical, financial and human resources expertise. Efforts to do so may not result in the actual development, acquisition or in-license of a particular product candidate, potentially resulting in a diversion of our management's time and the expenditure of our resources with no resulting benefit. If we are unable to add additional product candidates to our pipeline, our long-term business and prospects will be limited.

### Risks Related to Commercialization of Our Products and Product Candidates

***Our commercial success depends upon attaining significant market acceptance of our products and product candidates, if approved, among physicians, nurses, pharmacists, patients and the medical community.***

Even if we obtain regulatory approval for our product candidates, our products and product candidates may not gain market acceptance among physicians, nurses, pharmacists, patients, the medical community or third party payors, which is critical to commercial success. Market acceptance of our products and any product candidate for which we receive approval depends on a number of factors, including:

- the timing of market introduction of the product candidate as well as competitive products;

- the clinical indications for which the product candidate is approved;

- the convenience and ease of administration to patients of the product candidate;

- the potential and perceived advantages of such product candidate over alternative treatments;

- the cost of treatment in relation to alternative treatments, including any similar generic treatments;

- the availability of coverage and adequate reimbursement and pricing by third party payors and government authorities;

- relative convenience and ease of administration;

- any negative publicity related to our or our competitors' products that include the same active ingredient;

- the prevalence and severity of adverse side effects, including limitations or warnings contained in a product's FDA-approved labeling; and

- the effectiveness of sales and marketing efforts.

Even if a potential product displays a favorable efficacy and safety profile in preclinical studies and clinical trials, market acceptance of the product will not be known until after it is launched. If our products or product candidates, if approved, fail to achieve an adequate level of acceptance by physicians, nurses, pharmacists, patients and the medical community, we will be unable to generate significant revenues, and we may not become or remain profitable.

***Guidelines and recommendations published by government agencies can reduce the use of our products and product candidates.***

Government agencies promulgate regulations and guidelines applicable to certain drug classes which may include our products and product candidates that we are developing. Recommendations of government agencies may relate to such matters as usage,

41

dosage, route of administration and use of concomitant therapies. Regulations or guidelines suggesting the reduced use of certain drug classes which may include our products and product candidates that we are developing or the use of competitive or alternative products as the standard of care to be followed by patients and health care providers could result in decreased use of our product candidates or negatively impact our ability to gain market acceptance and market share.

*If we are unable to establish sales and marketing capabilities or if our commercial partners do not adequately perform, the commercial opportunity for our products may be diminished.*

Although we intend to establish a commercial organization to promote certain of our approved products in the United States, we currently have limited experience, and the cost of establishing and maintaining such an organization may exceed the benefit of doing so. We have very limited prior experience in the marketing, sale and distribution of pharmaceutical products and there are significant risks involved in building and managing a sales organization, including our ability to hire, retain and incentivize qualified individuals, generate sufficient sales leads, provide adequate training to sales and marketing personnel and effectively manage a geographically dispersed sales and marketing team.

On November 4, 2015, we entered into the Spectrum Agreement under which Spectrum agreed to sell and market one of our products through June 2017. We had the option to extend the initial term of this agreement by six months to December 31, 2017 at our sole election, but we elected not to exercise that option and the Spectrum agreement has expired.

We and any other commercialization partner we engage in the future may not be able to attract, hire, train and retain qualified sales and sales management personnel. If we or our future partners, if any, are not successful in maintaining an effective number of qualified sales personnel, our ability to effectively market and promote our products may be impaired. Even if we are able to effectively build and maintain such sales personnel, such efforts may not be successful in commercializing our products.

The efforts of our partners in many instances would likely be outside our control. If any future partner is unsuccessful in their efforts, or we are unable to maintain such commercial partnerships or to effectively establish alternative arrangements for our products, our business could be adversely affected.

*A substantial portion of our total revenues is derived from sales of a limited number of products.*

We derive a substantial portion of our revenue from royalties derived from the sales of one product: Bendeka. This product is sold by our partner Teva Pharmaceuticals. During the year ended December 31, 2017, Bendeka accounted for approximately 79% of our total revenue. The sale of our products can be significantly influenced by the efforts of our partners, which are out of our control, as well as market conditions and regulatory actions. We may experience decreases in the sale of our products in the future as a result of actions taken by our competitors, such as price reductions or entry into the market for competing products, or as a result of regulatory actions related to our products or competing products, which could have a material impact on our results of operations and financial condition.

*If we obtain approval to commercialize any approved products outside of the United States, a variety of risks associated with international operations could materially adversely affect our business.*

We may enter into agreements with third parties to market our products outside the United States. We expect that we will be subject to additional risks related to entering into international business relationships, including:

- different regulatory requirements for drug approvals in foreign countries;

- differing payor reimbursement regimes, governmental payors or patient self-pay systems and price controls;

- reduced protection for intellectual property rights;

- unexpected changes in tariffs, trade barriers and regulatory requirements;

- economic weakness, including inflation, or political instability in particular foreign economies and markets;

- compliance with tax, employment, immigration and labor laws for employees living or traveling abroad;

- foreign taxes, including withholding of payroll taxes;

- foreign currency fluctuations, which could result in increased operating expenses and reduced revenue, and other obligations incident to doing business in another country;

- workforce uncertainty in countries where labor unrest is more common than in the United States;

- production shortages resulting from any events affecting raw material supply or manufacturing capabilities abroad; and

- business interruptions resulting from geopolitical actions, including war and terrorism, or natural disasters including earthquakes, typhoons, floods and fires.

42

*We face significant competition from other biotechnology and pharmaceutical companies, and our operating results will suffer if we fail to compete effectively.*

The biopharmaceutical industries are intensely competitive and subject to rapid and significant technological change. Many of our competitors both in the United States and internationally, include major multinational pharmaceutical companies, biotechnology companies and universities and other research institutions. For example, Argatroban is currently marketed in the United States by, among others, GlaxoSmithKline, or GSK, and West-Ward Pharmaceuticals, or West-Ward. Dantrolene for malignant hyperthermia is marketed in the US by Par Pharmaceutical and US WorldMeds. Docetaxel in marketed in the US by, among others, Sanofi and Sandoz. While our formulations of these products are distinct, and we believe improvements, compared to those competitors mentioned, competition from these products on factors such as price and availability effect our commercial efforts. Additionally, we must compete with alternative drug treatments (as opposed to alternative formulations) for many of the indications that our products are approved to treat.

Many of our competitors have substantially greater financial, technical and other resources, such as larger research and development staff and experienced marketing and manufacturing organizations. Mergers and acquisitions in the biotechnology and pharmaceutical industries may result in even more resources being concentrated in our competitors. As a result, these companies may obtain regulatory approval more rapidly than we are able and may be more effective in selling and marketing their products as well. Smaller or early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large, established companies. Competition may increase further as a result of advances in the commercial applicability of technologies and greater availability of capital for investment in these industries. Our competitors may succeed in developing, acquiring or licensing on an exclusive basis drug products or drug delivery technologies that are more effective or less costly than our products or any product candidate that we are currently developing or that we may develop. In addition, our competitors may file citizens' petitions with the FDA in an attempt to persuade the FDA that our products, or the clinical studies that support their approval, contain deficiencies. Such actions by our competitors could delay or even prevent the FDA from approving any application we submit.

We believe that our ability to successfully compete will depend on, among other things:

- the efficacy and safety of our products and product candidates, including as relative to marketed products and product candidates in development by third parties;

- the time it takes for our product candidates to complete clinical development and receive marketing approval;

- the ability to maintain a good relationship with regulatory authorities;

- the ability to commercialize and market any of our product candidates that receive regulatory approval;

- the price of our products, including in comparison to branded or generic competitors;

- whether coverage and adequate levels of reimbursement are available under private and governmental health insurance plans, including Medicare;

- the ability to protect intellectual property rights related to our products and product candidates;

- the ability to manufacture on a cost-effective basis and sell commercial quantities of our products and product candidates that receive regulatory approval; and

- acceptance of any of our products and product candidates that receive regulatory approval by physicians and other health care providers.

If our competitors market products that are more effective, safer or less expensive than our products or product candidates, or that reach the market sooner than our product candidates, we may enter the market too late in the cycle and may not achieve commercial success. In addition, the biopharmaceutical industry is characterized by rapid technological change. Because we have limited research and development capabilities, it may be difficult for us to stay abreast of the rapid changes in each technology. If we fail to stay at the forefront of technological change, we may be unable to compete effectively. Technological advances or products developed by our competitors may render our technologies, products or product candidates obsolete, less competitive or not economical.

*We could incur substantial costs and disruption to our business and delays in the launch of our product candidates if our competitors and/or collaborators bring legal actions against us, which could harm our business and operating results.*

We cannot predict whether our competitors or potential competitors, some of whom we collaborate with, may bring legal actions against us based on our research, development and commercialization activities, as well as any product candidates or products resulting from these activities, claiming, among other things, infringement of their intellectual property rights, breach of contract or other legal theories. If we are forced to defend any such lawsuits, whether they are with or without merit or are ultimately

43

determined in our favor, we may face costly litigation and diversion of technical and management personnel. These lawsuits could hinder our ability to enter the market early with our product candidates and thereby hinder our ability to influence usage patterns when fewer, if any, of our potential competitors have entered such market, which could adversely impact our potential revenue from such product candidates or negatively impact our ability to gain market acceptance and market share for our products.

Some of our competitors have substantially greater resources than we do and could be able to sustain the cost of litigation to a greater extent and for longer periods of time than we could. Furthermore, an adverse outcome of a dispute may require us: to pay damages, potentially including treble damages and attorneys' fees, if we are found to have willfully infringed a party's patent or other intellectual property rights; to cease making, licensing or using products that are alleged to incorporate or make use of the intellectual property of others; to expend additional development resources to reformulate our products or prevent us from marketing a certain drug; and to enter into potentially unfavorable royalty or license agreements in order to obtain the rights to use necessary technologies. Royalty or licensing agreements, if required, may be unavailable on terms acceptable to us, or at all.

***If we are unable to achieve and maintain adequate levels of coverage and reimbursement for our products or product candidates, if approved, their commercial success may be severely hindered.***

Successful sales of our products and any other approved product candidates depend on the availability of adequate coverage and reimbursement from third party payors. Patients who are prescribed medications for the treatment of their conditions generally rely on third party payors to reimburse all or part of the costs associated with their prescription drugs. Adequate coverage and reimbursement from governmental health care programs, such as Medicare and Medicaid, and commercial payors is critical to new product acceptance. Coverage decisions may depend upon clinical and economic standards that disfavor new drug products when more established or lower cost therapeutic alternatives are already available or subsequently become available. Reimbursement by a third party payor may depend upon a number of factors, including but not limited to, the third party payor's determination that use of a product is: a covered benefit under its health plan; safe, effective, and medically necessary; appropriate for the specific patient; cost-effective; and/or neither cosmetic, experimental, nor investigational.

Assuming we obtain coverage for a given product, the resulting reimbursement payment rates might not be adequate or may require co-payments that patients find unacceptably high. Patients are unlikely to use our products unless coverage is provided and reimbursement is adequate to cover a significant portion of the cost of our products.

In addition, the market for our products and our product candidates will depend significantly on access to third party payors' drug formularies, or lists of medications for which third party payors provide coverage and reimbursement. The industry competition to be included in such formularies often leads to downward pricing pressures on pharmaceutical companies. Also, third party payors may refuse to include a particular branded drug in their formularies or otherwise restrict patient access through formulary controls or otherwise to a branded drug when a less costly generic equivalent or other alternative is available.

Third party payors, whether foreign or domestic, or governmental or commercial, are developing increasingly sophisticated methods of controlling health care costs. In addition, in the United States, no uniform policy requirement for coverage and reimbursement for drug products exists among third party payors. Therefore, coverage and reimbursement for drug products can differ significantly from payor to payor. As a result, the coverage determination process is often a time-consuming and costly process that could require us to provide scientific, clinical and cost effectiveness support for the use of our products to each payor separately, with no assurance that coverage and adequate reimbursement will be applied consistently or obtained in the first instance. Even if we obtain coverage for a given product, the resulting reimbursement payment rates might not be adequate for us to achieve or sustain profitability.

Further, we believe that future coverage and reimbursement will likely be subject to increased restrictions both in the United States and in international markets. Third party coverage and reimbursement for our commercial products, and our pre-clinical and clinical product candidates for which we may receive regulatory approval, may not be available or adequate in either the United States or international markets, which could have a material adverse effect on our business, results of operations, financial condition and prospects.

***Current and future legislation may increase the difficulty and cost for us to commercialize our product candidates and affect the prices we may obtain for our products.***

The United States and some foreign jurisdictions are considering, or have enacted, a number of legislative and regulatory proposals to change the health care system in ways that could affect our ability to sell our products and our product candidates profitably, once they are approved for sale. Among policy makers and payors in the United States and elsewhere, there is significant interest in promoting changes in health care systems with the stated goals of containing health care costs, improving quality and/or expanding access. In the United States, the pharmaceutical industry has been a particular focus of these efforts and has been significantly affected by major legislative initiatives.

While the United States Supreme Court has previously upheld the constitutionality of certain elements of the ACA, we expect additional challenges and amendments to the ACA will continue in the future. For example, since January 2017, the U.S. President has signed two Executive Orders and other directives designed to delay the implementation of certain provisions of the ACA or

44

otherwise circumvent some of the requirements for health insurance mandated by the ACA. Concurrently, Congress has considered legislation that would repeal or repeal and replace all or part of the ACA. While Congress has not passed comprehensive repeal legislation, two bills affecting the implementation of certain taxes under the ACA have been signed into law. The Tax Cuts and Jobs Act of 2017 includes a provision repealing, effective January 1, 2019, the tax-based shared responsibility payment imposed by the ACA on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate". Additionally, on January 22, 2018, the U.S. President of the U.S. signed a continuing resolution on appropriations for fiscal year 2018 that delayed the implementation of certain ACA-mandated fees, including the so-called "Cadillac" tax on certain high cost employer-sponsored insurance plans, the annual fee imposed on certain health insurance providers based on market share, and the medical device excise tax on non-exempt medical devices. Further, the Bipartisan Budget Act of 2018, or the BBA, among other things, amends the ACA, effective January 1, 2019, to increase from 50 percent to 70 percent the point-of-sale discount that is owed by pharmaceutical manufacturers who participate in Medicare Part D and to close the coverage gap in most Medicare drug plans, commonly referred to as the "donut hole". We cannot assure you that the ACA, as currently enacted or as amended in the future, or any follow-on substitute legislation will not adversely affect our business and financial results and we cannot predict how future federal or state legislative or administrative changes relating to healthcare reform will affect our business.

In addition, other legislative changes have been proposed and adopted since the ACA was enacted. For example, in August 2011, President Obama signed into law the Budget Control Act of 2011, which, among other things, created the Joint Select Committee on Deficit Reduction to recommend proposals for spending reductions to Congress. The Joint Select Committee on Deficit Reduction did not achieve its targeted deficit reduction of at least $1.2 trillion for the years 2013 through 2021, triggering the legislation's automatic reductions to several government programs. These reductions include aggregate reductions to Medicare payments to providers of up to 2% per fiscal year, which went into effect on April 1, 2013 and, following passage of the Bipartisan Budget Act of 2015 as well as other legislative amendments, including the BBA, will remain in effect through 2027 unless additional Congressional action is taken. Additionally, in January 2013, President Obama signed into law the American Taxpayer Relief Act of 2012, which, among other things, further reduced Medicare payments to several providers and increased the statute of limitations period for the government to recover overpayments to providers from three to five years.

Further, under the Drug Supply Chain Security Act signed into law on November 27, 2013, certain drug manufacturers will be subject to product identification, tracing and verification requirements, among others,  that are designed to improve the detection and removal of counterfeit, stolen, contaminated or otherwise potentially harmful drugs from the U.S. drug supply chain.  These requirements will be phased in over several years and compliance with this new law will likely increase the costs of the manufacture and distribution of drug products, which could have an adverse effect on our financial condition.

Additionally, there has been increasing legislative and enforcement interest in the United States with respect to specialty drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries and proposed and adopted federal and state legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drugs. For example, in January 2016, CMS issued a final rule regarding the Medicaid drug rebate program. The final rule, effective April 1, 2016, among other things, revised the manner in which the "average manufacturer price" is to be calculated by manufacturers participating in the program and implements certain amendments to the Medicaid rebate statute created under the ACA. Further, the current U.S. Presidential administration's budget proposal for fiscal year 2019 contains further drug price control measures that could be enacted during the 2019 budget process or in other future legislation, including, for example, measures to permit Medicare Part D plans to negotiate the price of certain drugs under Medicare Part B, to allow some states to negotiate drug prices under Medicaid, and to eliminate cost sharing for generic drugs for low-income patients. While any proposed measures will require authorization through additional legislation to become effective, Congress and the current U.S. Presidential administration have each indicated that it will continue to seek new legislative and/or administrative measures to control drug costs. At the state level, legislatures are increasingly passing legislation and implementing regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing. The full impact of these laws, as well as other new laws and reform measures that may be proposed and adopted in the future remains uncertain, but may result in additional reductions in Medicare and other health care funding, or higher production costs which could have a material adverse effect on our customers and, accordingly, our financial operations.

**Risks Related to Our Reliance on Third Parties**

***We rely on third parties to conduct our preclinical studies and clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines, we may not be able to obtain regulatory approval for or commercialize our product candidates and our business could be substantially harmed.***

45

We have relied upon and plan to continue to rely upon third party CROs to monitor and manage data for our preclinical and clinical programs. We rely on these parties for execution of our preclinical studies and clinical trials, and control only certain aspects of their activities. Nevertheless, we are responsible for ensuring that each of our trials is conducted in accordance with the applicable protocol, legal, regulatory and scientific standards and our reliance on the CROs does not relieve us of our regulatory responsibilities. We and our CROs are required to comply with FDA regulations and other laws regarding current good clinical practice, or GCP, which are also required by the Competent Authorities of the Member States of the European Economic Area and comparable foreign regulatory authorities in the form of International Council for Harmonization, or ICH, guidelines for all of our products in clinical development. Regulatory authorities enforce GCP through periodic inspections of trial sponsors, principal investigators and trial sites. If we or any of our CROs fail to comply with applicable GCP, the clinical data generated in our clinical trials may be deemed unreliable and the FDA or comparable foreign regulatory authorities may require us to perform additional clinical trials before approving our marketing applications. We cannot assure you that upon inspection by a given regulatory authority, such regulatory authority will determine that any of our clinical trials comply with GCP regulations. In addition, our clinical trials must be conducted with product produced under cGMP regulations. While we have agreements governing activities of our CROs, we have limited influence over their actual performance. In addition, portions of the clinical trials for our product candidates are expected to be conducted outside of the United States, which will make it more difficult for us to monitor CROs and perform visits of our clinical trial sites and will force us to rely heavily on CROs to ensure the proper and timely conduct of our clinical trials and compliance with applicable regulations, including GCP. Failure to comply with applicable regulations in the conduct of the clinical trials for our product candidates may require us to repeat clinical trials, which would delay the regulatory approval process.

Some of our CROs have an ability to terminate their respective agreements with us if, among other reasons, it can be reasonably demonstrated that the safety of the subjects participating in our clinical trials warrants such termination, if we make a general assignment for the benefit of our creditors or if we are liquidated. If any of our relationships with these third party CROs terminate, we may not be able to enter into arrangements with alternative CROs or to do so on commercially reasonable terms. In addition, our CROs are not our employees, and except for remedies available to us under our agreements with such CROs, we cannot control whether or not they devote sufficient time and resources to our preclinical and clinical programs. If CROs do not successfully carry out their contractual duties or obligations or meet expected deadlines, if they need to be replaced or if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols, regulatory requirements or for other reasons, our clinical trials may be extended, delayed or terminated and we may not be able to obtain regulatory approval for or successfully commercialize our product candidates. Consequently, our results of operations and the commercial prospects for our product candidates would be harmed, our costs could increase substantially and our ability to generate revenue could be delayed significantly.

Switching or adding additional CROs involves additional cost and requires management time and focus. In addition, there is a natural transition period when a new CRO commences work. As a result, delays occur, which can materially impact our ability to meet our desired clinical development timelines. Though we carefully manage our relationships with our CROs, there can be no assurance that we will not encounter challenges or delays in the future or that these delays or challenges will not have a material adverse impact on our business, financial condition and prospects.

***If any of our current strategic collaborators fail to perform their obligations or terminate their agreements with us, the development and commercialization of the product candidates under such agreements could be delayed or terminated and our business could be substantially harmed.***

On February 13, 2015, we entered into the Cephalon License, with Cephalon for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. Pursuant to the terms of the Cephalon License, Cephalon is responsible for all U.S. commercial activities for the product including promotion and distribution, and we are responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies.

This strategic collaboration may not be scientifically or commercially successful due to a number of important factors, including the following:

- If we fail to maintain any regulatory approvals, or otherwise materially breach the agreement, we may not receive all anticipated royalty payments.
- Cephalon has significant discretion in determining the efforts and resources that it will apply to their strategic collaboration with us. The timing and amount of any cash payments, and royalties that we may receive under such agreements will depend on, among other things, the efforts, allocation of resources and the commercialization of our product by Cephalon under the Cephalon License;
- Cephalon currently markets a competitive bendamustine product, Treanda®, in the United States. In addition, it is possible that Cephalon may develop and commercialize, either alone or with others, or be acquired by a company that has, products that are similar to or competitive with the product candidates that they license from us;
- Cephalon may change the focus of their commercialization efforts or pursue higher-priority programs;

46

- Cephalon may terminate its strategic collaboration with us on short notice, which could make it difficult for us to attract new strategic collaborators or adversely affect how we are perceived in the scientific and financial communities;
- Cephalon has the right to maintain or defend our intellectual property rights licensed to them in their territories, and, although we may have the right to assume the maintenance and defense of our intellectual property rights if they do not, our ability to do so may be compromised by our strategic collaborators' acts or omissions; and
- Cephalon may not comply with all applicable regulatory requirements, or fail to report safety data in accordance with all applicable regulatory requirements.
- If Cephalon fails to effectively commercialize our product, we may not be able to replace them with another collaborator.
- If our agreement with Cephalon terminates, we are required to pay them a portion of our future profits on the product.

  Any of these events could have a material adverse effect on our business, results of operations and our ability to achieve future profitability, and could cause our stock price to decline.

***We rely on third parties to manufacture commercial supplies of our products and clinical supplies of our product candidates, and we intend to rely on third parties to manufacture commercial supplies of any other approved products. The commercialization of any of our products could be stopped, delayed or made less profitable if those third parties fail to provide us with sufficient quantities of product or fail to do so at acceptable quality levels or prices or fail to maintain or achieve satisfactory regulatory compliance.***

We do not own any manufacturing facilities, and we do not currently, and do not expect in the future, to independently conduct any aspects of our product manufacturing and testing, or other activities related to the clinical development and commercialization of our product candidates. We currently rely, and expect to continue to rely, on third parties with respect to these items, and control only certain aspects of their activities.

Any of these third parties may terminate their engagements with us at any time. If we need to enter into alternative arrangements, it could delay our product candidate development and product commercialization activities. Our reliance on these third parties reduces our control over these activities but does not relieve us of our responsibility to ensure compliance with all required legal, regulatory and scientific standards and any applicable trial protocols. If these third parties do not successfully carry out their contractual duties, meet expected deadlines or conduct our studies in accordance with regulatory requirements or our stated study plans and protocols, we will not be able to complete, or may be delayed in completing, clinical trials required to support future regulatory submissions and approval of our product candidates.

Our products and product candidates are highly reliant on very complex sterile techniques and personnel aseptic techniques. The facilities used by our third-party manufacturers to manufacture our products and product candidates must be approved by the applicable regulatory authorities pursuant to inspections that will be conducted after we submit our NDA to the FDA. If any of our third-party manufacturers cannot successfully manufacture material that conforms to our specifications and the applicable regulatory authorities' strict regulatory requirements, or pass regulatory inspection, they will not be able to secure or maintain regulatory approval for the manufacturing facilities. In addition, we have no control over the ability of third-party manufacturers to maintain adequate quality control, quality assurance and qualified personnel. Quality problems in manufacturing are linked to a majority of shortages of sterile injectable drugs. Some of the largest manufacturers of sterile injectable drugs have had serious quality problems leading to the temporary voluntary closure or renovations of major production facilities. Further, as we scale up manufacturing of our product candidates and conduct required stability testing, product packaging, equipment and process-related issues may require refinement or resolution in order for us to proceed with our planned clinical trials and obtain regulatory approval for commercialization of our product candidates. In the future, for example, we may identify impurities in the product manufactured for us for commercial supply, which could result in increased scrutiny by the regulatory agencies, delays in our clinical program and regulatory approval, increases in our operating expenses, or failure to obtain or maintain approval for our product candidates. If the FDA or any other applicable regulatory authority does not approve these facilities to manufacture our products or if they withdraw any such approval in the future, or if our suppliers or third-party manufacturers decide they no longer want to manufacture our products, we may need to find alternative manufacturing facilities, which would significantly impact our ability to develop, obtain regulatory approval for or market our products or product candidates.

More generally, manufacturers of pharmaceutical products often encounter difficulties in production, particularly in scaling up and validating initial production. These problems include difficulties with production costs and yields, quality control, including stability of the product, quality assurance testing, shortages of qualified personnel, as well as compliance with strictly enforced federal, state and foreign regulations. Additionally, our manufacturers may experience manufacturing difficulties due to resource constraints or as a result of labor disputes or unstable political environments. If our manufacturers were to encounter any of these difficulties, or otherwise fail to comply with their contractual obligations, our ability to make product candidates available for clinical trials and development purposes or to further commercialize our products or product candidates in the United States would be jeopardized. Any delay or interruption in our ability to meet commercial demand may result in the loss of potential revenues and could adversely affect our ability to gain market acceptance for approved products. In addition, any delay or interruption in

the supply of clinical trial supplies could delay the completion of clinical trials, increase the costs associated with maintaining clinical trial programs and, depending upon the period of delay, require us to commence new clinical trials at additional expense or terminate clinical trials completely. Additionally, if supply from one approved manufacturer is interrupted, there could be a significant disruption in commercial supply. Regulatory agencies may also require additional studies if a new manufacturer is relied upon for commercial production. Switching manufacturers may involve substantial costs and is likely to result in a delay in our desired clinical and commercial timelines.

The occurrence of any of these factors could have a material adverse effect on our business, results of operations, financial condition and prospects.

*The design, development, manufacture, supply, and distribution of our products and product candidates is highly regulated and technically complex.*

All entities involved in the preparation of therapeutics for clinical trials or commercial sale, including our existing contract manufacturers for our products and product candidates, are subject to extensive regulation. Components of a finished therapeutic product approved for commercial sale or used in late-stage clinical trials must be manufactured in accordance with cGMP and equivalent foreign standards. These regulations govern manufacturing processes and procedures (including record keeping) and the implementation and operation of quality systems to control and assure the quality of investigational products and products approved for sale. Poor control of production processes can lead to the introduction of adventitious agents or other contaminants, or to inadvertent changes in the properties or stability of our products or product candidates that may not be detectable in final product testing. The development, manufacture, supply, and distribution of our products, as well as our other product candidates, is highly regulated and technically complex. We, along with our third-party providers, must comply with all applicable regulatory requirements of the FDA and foreign authorities.

We, or our contract manufacturers, must supply all necessary documentation in support of our regulatory filings for our products and product candidates on a timely basis and must adhere to the FDA's good laboratory practices, or GLP, and cGMP regulations enforced by the FDA through its facilities inspection program, and the equivalent standards of the regulatory authorities in other countries. Any failure by our third-party manufacturers to comply with cGMP or failure to scale-up manufacturing processes, including any failure to deliver sufficient quantities of product candidates in a timely manner, could lead to a delay in, or failure to obtain, regulatory approval of any of our product candidates. Our facilities and quality systems and the facilities and quality systems of some or all of our third-party contractors must also pass a pre-approval inspection for compliance with the applicable regulations as a condition of regulatory approval of our product candidates or any of our other potential products. In addition, the regulatory authorities in any country may, at any time, audit or inspect a manufacturing facility involved with the preparation of our product candidates or our other potential products or the associated quality systems for compliance with the regulations applicable to the activities being conducted. If these facilities and quality systems do not pass a pre-approval plant inspection, FDA approval of our product candidates, or the equivalent approvals in other jurisdictions, will not be granted.

Regulatory authorities also may, at any time following approval of a product for sale, audit our manufacturing facilities or those of our third-party contractors. If any such inspection or audit identifies a failure to comply with applicable regulations or if a violation of our product specifications or applicable regulations occurs independent of such an inspection or audit, we or the relevant regulatory authority may require remedial measures that may be costly and/or time-consuming for us or a third party to implement and that may include the temporary or permanent suspension of a clinical trial or commercial sales or the temporary or permanent closure of a facility. Any such remedial measures imposed upon us or third parties with whom we contract could materially harm our business. If we or any of our third-party manufacturers fail to maintain regulatory compliance, the FDA can impose regulatory sanctions including, among other things, refusal to approve a pending application for a new drug product or biological product or revocation of a pre-existing approval. As a result, our business, financial condition and results of operations may be materially harmed.

*We rely on limited sources of supply for our products and product candidates, and any disruption in the chain of supply may impact production and sales of our products and cause delay in developing and commercializing our product candidates.*

We currently have relationships with only one third party for the manufacture of each of our most advanced products and product candidates. Because of the unique equipment and process for manufacturing our products transferring manufacturing activities to an alternate supplier would be a time-consuming and costly endeavor, and there are only a limited number of manufacturers that we believe are capable of performing this function for us. Switching finished drug suppliers may involve substantial cost and could result in a delay in our desired clinical and commercial timelines. If any of these single-source manufacturers breaches or terminates their agreements with us, we would need to identify an alternative source for the manufacture and supply of product candidates to us for the purposes of our development and commercialization of the applicable products. Identifying an appropriately qualified source of alternative supply for any one or more of these product candidates could be time consuming, and we may not be able to do so without incurring material delays in the development and commercialization of our product candidates, which could harm our financial position and commercial potential for our products. Any alternative vendor would also need to be qualified through

48

an NDA supplement which could result in further delay. The FDA or other regulatory agencies outside of the United States may also require additional studies if we appoint a new manufacturer for supply of our product candidates that differs from the manufacturer used for clinical development of such product candidates. For our other product candidates, we expect that only one supplier will initially be qualified as a vendor with the FDA. If supply from the approved vendor is interrupted, there could be a significant disruption in commercial supply.

These factors could cause the delay of clinical trials, regulatory submissions, required approvals or commercialization of our product candidates, cause us to incur higher costs and prevent us from commercializing them successfully. Furthermore, if our suppliers fail to deliver the required commercial quantities of components and active pharmaceutical ingredient on a timely basis and at commercially reasonable prices, and we are unable to secure one or more replacement suppliers capable of production at a substantially equivalent cost, our clinical trials may be delayed or we could lose potential revenue.

***We may not be successful in establishing development and commercialization collaborations which could adversely affect, and potentially prohibit, our ability to develop our product candidates.***

Because developing pharmaceutical products, conducting clinical trials, obtaining regulatory approval, establishing manufacturing capabilities and marketing approved products are expensive, we are exploring collaborations with third parties outside of the United States that have more resources and experience. We may, however, be unable to advance the development of our products and product candidates in territories outside of the United States, which may limit the market potential for this product candidate. For example, our Eagle Biologics business strategy relies heavily on our ability to successfully consummate and execute under these collaboration agreements.

In situations where we enter into a development and commercial collaboration arrangement for a product candidate, we may also seek to establish additional collaborations for development and commercialization in territories outside of those addressed by the first collaboration arrangement for such product candidate. There are a limited number of potential partners, and we expect to face competition in seeking appropriate partners. We have entered into collaboration and promotion agreements with third parties, such as the Spectrum Agreement and the agreement with AMRI, but there is no assurance these arrangements will be successful. If we are unable to enter into any future development and commercial collaborations and/or sales and marketing arrangements on acceptable terms, if at all, we may be unable to successfully develop and seek regulatory approval for our product candidates and/or effectively market and sell future approved products, if any, in all of the territories outside of the United States where it may otherwise be valuable to do so.

***We may not be successful in maintaining development and commercialization collaborations, and any partner may not devote sufficient resources to the development or commercialization of our product candidates or may otherwise fail in development or commercialization efforts, which could adversely affect our ability to develop certain of our product candidates and our financial condition and operating results.***

On February 13, 2015, we entered into the Cephalon License, with Cephalon for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. If we are able to establish additional collaboration arrangements, any such collaborations, in addition to the collaboration with Cephalon, may not ultimately be successful, which could have a negative impact on our business, results of operations, financial condition and prospects. If we partner with a third party for development and commercialization of a product or product candidate, including Cephalon, we can expect to relinquish some or all of the control over the future success of that product or product candidate to the third party. It is possible that a partner may not devote sufficient resources to the development or commercialization of our product candidate or may otherwise fail in development or commercialization efforts, in which event the development and commercialization of such product candidate could be delayed or terminated and our business could be substantially harmed. In addition, the terms of any collaboration or other arrangement that we establish may not prove to be favorable to us or may not be perceived as favorable, which may negatively impact the trading price of our common stock. In some cases, we may be responsible for continuing development of a product candidate or research program under a collaboration, and the payment we receive from our partner may be insufficient to cover the cost of this development. Moreover, collaborations and sales and marketing arrangements are complex and time consuming to negotiate, document and implement, and they may require substantial resources to maintain.

We may be subject to a number of additional risks associated with our collaborations with third parties, the occurrence of which could cause collaboration arrangements to fail. Conflicts may arise between us and our partners, such as conflicts concerning the interpretation of clinical data, the achievement of milestones, the interpretation of financial provisions or the ownership of intellectual property developed during the collaboration. If any such conflicts arise, a partner could act in its own self-interest, which may be adverse to our interests. Any such disagreement between us and a partner could result in one or more of the following, each of which could delay or prevent the development or commercialization of our product candidates and harm our business:

- reductions in the payment of royalties or other payments we believe are due pursuant to the applicable collaboration arrangement;

49

- actions taken by a partner inside or outside our collaboration which could negatively impact our rights or benefits under our collaboration; and
- unwillingness on the part of a partner to keep us informed regarding the progress of its development and commercialization activities or to permit public disclosure of the results of those activities.

***If we are unable to maintain our group purchasing organization, or GPO, relationships, our revenues could decline and future profitability could be jeopardized.***

Most of the end-users of injectable pharmaceutical products have relationships with GPOs whereby such GPOs provide such end-users access to a broad range of pharmaceutical products from multiple suppliers at competitive prices and, in certain cases, exercise considerable influence over the drug purchasing decisions of such end-users. Hospitals and other end-users contract with the GPO of their choice for their purchasing needs. We currently derive, and expect to continue to derive, a large percentage of our revenue from end-user customers that are members of a small number of GPOs. Maintaining strong relationships with these GPOs will require us to continue to be a reliable supplier, remain price competitive and comply with FDA regulations. The GPOs with whom we have relationships may have relationships with companies that sell competing products, and such GPOs may earn higher margins from these products or combinations of competing products or may prefer products other than ours for other reasons. If we are unable to maintain our GPO relationships, sales of our products and revenue could decline.

***We rely on a limited number of pharmaceutical wholesalers to distribute our products.***

As is typical in the pharmaceutical industry, we rely upon pharmaceutical wholesalers in connection with the distribution of our products. A significant amount of our products are sold to end-users under GPO pricing arrangements through a limited number of pharmaceutical wholesalers. If we are unable to maintain our business relationships with these pharmaceutical wholesalers on commercially acceptable terms, it could have a material adverse effect on our sales and may prevent us from achieving profitability.

***Our approved products may not achieve expected levels of market acceptance.***

Even if we are able to obtain regulatory approvals for our product candidates, the success of those products is dependent upon market acceptance. Levels of market acceptance for our product candidates could be affected by several factors, including:

- the availability of alternative products from our competitors;
- the price of our products relative to those of our competitors;
- the timing of our market entry;
- the ability to market our products effectively at the retail level;
- the perception of patients and the healthcare community, including third-party payers, regarding the safety efficacy and benefits of our drug products compared to those of competing products; and
- the acceptance of our products by government and private formularies.

Some of these factors are not within our control, and our products may not achieve expected levels of market acceptance. Additionally, continuing and increasingly sophisticated studies of the proper utilization, safety and efficacy of pharmaceutical products are being conducted by the industry, government agencies and others which may call into question the utilization, safety and efficacy of previously marketed products. In some cases, studies have resulted, and may in the future result, in the discontinuance of product marketing or other risk management programs such as the need for a patient registry.

### Risks Related to Our Business Operations and Industry

***Our future success depends on our ability to retain key executives and to attract, retain and motivate qualified personnel.***

We are highly dependent on the principal members of our executive team, which include our Chief Executive Officer, Chief Financial Officer, Chief Medical Officer, and President and Chief Commercial Officer. The loss of these executives' services may adversely impact the achievement of our objectives. Any of our executive officers could leave our employment at any time, as all of our employees are "at will" employees. Recruiting and retaining other qualified employees for our business, including scientific and technical personnel, will also be critical to our success. There is currently a shortage of skilled executives in our industry, which is likely to continue. As a result, competition for skilled personnel is intense and the turnover rate can be high. We may not be able to attract and retain personnel on acceptable terms given the competition among numerous pharmaceutical companies for individuals with similar skill sets. In addition, failure to succeed in clinical studies may make it more challenging to recruit and retain qualified personnel. The inability to recruit key executives or the loss of the services of any executive or key employee might impede the progress of our development and commercialization objectives.

***We will need to expand our organization, and we may experience difficulties in managing this growth, which could disrupt our operations.***

50

As of December 31, 2017 we had a total of 108 employees in the United States and two full-time consultants in India. As our company matures, we expect to expand our employee base to increase our managerial, scientific and engineering, operational, sales, marketing, financial and other resources and to hire more consultants and contractors. Future growth would impose significant additional responsibilities on our management, including the need to identify, recruit, maintain, motivate and integrate additional employees, consultants and contractors. Also, our management may need to divert a disproportionate amount of its attention away from our day-to-day activities and devote a substantial amount of time to managing these growth activities. For example, on November 16, 2016, we acquired Arsia Therapeutics, Inc. (now Eagle Biologics). We may not be able to effectively manage the expansion of our operations, such as the Arsia acquisition, which may result in weaknesses in our infrastructure and give rise to operational mistakes, loss of business opportunities, loss of employees and reduced productivity among remaining employees. Future growth could require significant capital expenditures and may divert financial resources from other projects, such as the development of our existing or future product candidates. If our management is unable to effectively manage our growth, our expenses may increase more than expected, our ability to generate and/or grow revenue could be reduced and we may not be able to implement our business strategy. Our future financial performance and our ability to sell our products and commercialize our product candidates, if approved, and compete effectively will depend, in part, on our ability to effectively manage any future growth.

***Our recent acquisition of Arsia Therapeutics may not provide us with the long-term value we expected.***

Our acquisition of Arsia Therapeutics, Inc. (now Eagle Biologics) and the purchase price of such was based on a series of long-term assumptions and estimates. However, there can be no assurance that these expectations will be completely realized, and we cannot ensure that we will be able to manage the risks associated with integrating Eagle Biologic's operations and product candidates into our existing business and infrastructure. Unexpected difficulties may be disruptive to our ongoing development efforts, put a strain on our existing personnel, infrastructure and business and divert management's time and attention. As a result of these or other problems and risks, we may never realize the full potential or we may never generate significant value from this transaction.

***We face potential product liability, and, if successful claims are brought against us, we may incur substantial liability.***

The use of our product candidates in clinical trials (if any), and the sale of our products and any product candidates for which we obtain marketing approval, exposes us to the risk of product liability claims. Product liability claims might be brought against us by consumers, health care providers, pharmaceutical companies or others selling or otherwise coming into contact with our products, other approved future products and our product candidates. If we cannot successfully defend against product liability claims, we could incur substantial liability and costs. In addition, regardless of merit or eventual outcome, product liability claims may result in:

- impairment of our business reputation;

- withdrawal of clinical study participants;

- costs due to related litigation;

- distraction of management's attention from our primary business;

- substantial monetary awards to patients or other claimants;

- the inability to commercialize our product candidates; and

- decreased demand for our products and our product candidates, if approved for commercial sale.

Our current product liability insurance coverage may not be sufficient to reimburse us for any expenses or losses we may suffer. Moreover, insurance coverage is becoming increasingly expensive and in the future we may not be able to maintain insurance coverage at a reasonable cost or in sufficient amounts to protect us against losses due to liability. On occasion, large judgments have been awarded in class action lawsuits based on drugs that had unanticipated adverse effects. A successful product liability claim or series of claims brought against us could cause our stock price to decline and, if judgments exceed our insurance coverage, could adversely affect our results of operations and business.

***We rely significantly on information technology and any failure, inadequacy, interruption or security lapse of that technology, including any cybersecurity incidents, could harm our ability to operate our business effectively.***

Despite the implementation of security measures, our internal computer systems and those of third parties with which we contract are vulnerable to damage from cyber-attacks, computer viruses, unauthorized access, natural disasters, terrorism, war and telecommunication and electrical failures. System failures, accidents or security breaches could cause interruptions in our operations, and could result in a material disruption of our product development and clinical activities and business operations, in addition to possibly requiring substantial expenditures of resources to remedy. Cybersecurity attacks in particular are evolving and include, but are not limited to, malicious software, attempts to gain unauthorized access to data and other electronic security

51

breaches that could lead to disruptions in systems, misappropriation of our confidential or otherwise protected information and corruption of data. The loss, theft or sabotage of product development or clinical trial data could result in delays in our regulatory approval efforts and significantly increase our costs to recover or reproduce the data. To the extent that any disruption or security breach were to result in a loss of, or damage to, our data or applications, or inappropriate disclosure of confidential or proprietary information, we could incur liability and our development programs and the development of our product candidates could be delayed.

***Business interruptions could delay us in the process of developing our product candidates and could disrupt our sales of any products we may sell.***

Our headquarters are located in Woodcliff Lake, New Jersey. If we encounter any disruptions to our operations at this building or if it were to shut down for any reason, including by fire, natural disaster, such as a hurricane, tornado or severe storm, power outage, systems failure, labor dispute or other unforeseen disruption, then we may be prevented from effectively operating our business. We do not carry insurance for natural disasters and we may not carry sufficient business interruption insurance to compensate us for losses that may occur. Any losses or damages we incur could have a material adverse effect on our business operations.

***We may be constrained by our obligations under our Credit Agreement to operate our business to its full potential.***

Our Credit Agreement contains customary representations and warranties and customary affirmative and negative covenants, including, among other things, restrictions on indebtedness, liens, investments, mergers, dispositions, prepayment of other indebtedness and dividends and other distributions. Under the terms of the Credit Agreement, we are required to comply with (a) a maximum senior secured net leverage ratio, (b) a maximum total net leverage ratio and (c) a minimum fixed charge coverage ratio. These terms may restrict our ability to operate our business in the manner we deem most effective or desirable, and may restrict our ability to fund our operations through new public offerings of our common stock or strengthen our candidate development pipeline through acquisitions or licenses which cause us to exceed our maximum senior secured net leverage ratio.

Although we have not currently drawn on the Credit Agreement, failure to comply with the representations and warranties or affirmative and negative covenants could constitute an event of default which, if continued beyond the cure period, would allow the administrative agent, at the request of or with the consent of the lenders holding a majority of the loans and commitments under the facility, to terminate the commitments of the lenders to make further loans and declare all the obligations of the loan parties under the Credit Agreement to be immediately due and payable, either of which could harm our business.

**Risks Related to Our Intellectual Property**

***If we are unable to obtain or protect intellectual property rights related to any of our product candidates, we may not be able to compete effectively in our market.***

We rely upon a combination of patents, trade secret protection and confidentiality agreements to protect the intellectual property related to our products and our product candidates. The strength of patents in the biotechnology and pharmaceutical field involves complex legal and scientific questions and can be uncertain. The patent applications that we own or in-license may fail to result in issued patents with claims that cover the products in the United States or in foreign countries or territories. If this were to occur, early generic competition could be expected against our products and our product candidates in development. There may be relevant prior art relating to our patents and patent applications which could invalidate a patent or prevent a patent from issuing based on a pending patent application. In particular, because the active pharmaceutical ingredients in many of our product candidates have been on the market as separate products for many years, it is possible that these products have previously been used off-label in such a manner that such prior usage would affect the validity of our patents or our ability to obtain patents based on our patent applications.

Even if patents do successfully issue, third parties may challenge their validity, enforceability or scope, which may result in such patents being narrowed or invalidated. Any adverse outcome in these types of matters could result in one or more generic versions of our products being launched before the expiration of the listed patents, which could adversely affect our ability to successfully execute our business strategy to increase sales of our products and would negatively impact our financial condition and results of operations, including causing a significant decrease in our revenues and cash flows.

Furthermore, even if they are unchallenged, our patents and patent applications may not adequately protect our intellectual property or prevent others from designing around our claims. If the patent applications we hold with respect to our products or product candidates fail to issue or if their breadth or strength of protection is threatened, it could dissuade companies from collaborating with us to develop them and threaten our ability to commercialize our product candidates. We cannot offer any assurances about which, if any, patents will issue or whether any issued patents will be found not invalid and not unenforceable or will go unthreatened by third parties. Further, if we encounter delays in regulatory approvals, the period of time during which we could market our

52

product candidates under patent protection could be reduced. If third parties have filed such patent applications, an interference proceeding in the United States can be provoked by a third party or instituted by us to determine who was the first to invent any of the subject matter covered by the patent claims of our applications.

In addition to the protection afforded by patents, we rely on trade secret protection and confidentiality agreements to protect proprietary know-how that is not patentable, processes for which patents are difficult to enforce and any other elements of our drug development and reformulation processes that involve proprietary know-how, information or technology that is not covered by patents. For example, we maintain trade secrets with respect to certain of the formulation and manufacturing techniques related to our products and our product candidates. Although we generally require all of our employees to assign their inventions to us, and all of our employees, consultants, advisors and any third parties who have access to our proprietary know-how, information or technology to enter into confidentiality agreements, we cannot provide any assurances that all such agreements have been duly executed or that our trade secrets and other confidential proprietary information will not be disclosed or that competitors will not otherwise gain access to our trade secrets or independently develop substantially equivalent information and techniques. We also seek to preserve the integrity and confidentiality of our data and trade secrets by maintaining physical security of our premises and physical and electronic security of our information technology systems. While we have confidence in these individuals, organizations and systems, agreements or security measures may be breached, and we may not have adequate remedies for any breach. In addition, our trade secrets may otherwise become known or be independently discovered by competitors. Additionally, if the steps taken to maintain our trade secrets are deemed inadequate, we may have insufficient recourse against third parties for misappropriating the trade secret. In addition, others may independently discover our trade secrets and proprietary information. For example, the FDA, as part of its Transparency Initiative, is currently considering whether to make additional information publicly available on a routine basis, including information that we may consider to be trade secrets or other proprietary information, and it is not clear at the present time how the FDA's disclosure policies may change in the future, if at all.

Our ability to obtain patents is highly uncertain because, to date, some legal principles remain unresolved, there has not been a consistent policy regarding the breadth or interpretation of claims allowed in patents in the United States and the specific content of patents and patent applications that are necessary to support and interpret patent claims is highly uncertain due to the complex nature of the relevant legal, scientific and factual issues. Changes in either patent laws or interpretations of patent laws in the United States and other countries may diminish the value of our intellectual property or narrow the scope of our patent protection. For example, on September 16, 2011, the Leahy-Smith America Invents Act, or the Leahy-Smith Act, was signed into law. The Leahy-Smith Act includes a number of significant changes to United States patent law. These include provisions that affect the way patent applications will be prosecuted and may also affect patent litigation. The United States Patent and Trademark Office, or USPTO, has developed new and untested regulations and procedures to govern the full implementation of the Leahy-Smith Act, and many of the substantive changes to patent law associated with the Leahy-Smith Act, and in particular, the first to file provisions, only became effective in March 2013. The Leahy-Smith Act has also introduced procedures making it easier for third-parties to challenge issued patents, as well as to intervene in the prosecution of patent applications. Finally, the Leahy-Smith Act contains new statutory provisions that still require the USPTO to issue new regulations for their implementation and it may take the courts years to interpret the provisions of the new statute. Accordingly, it is too early to tell what, if any, impact the Leahy-Smith Act will have on the operation of our business and the protection and enforcement of our intellectual property. However, the Leahy-Smith Act and its implementation could increase the uncertainties and costs surrounding the prosecution of our patent applications and the enforcement or defense of our issued patents. An inability to obtain, enforce and defend patents covering our proprietary technologies would materially and adversely affect our business prospects and financial condition.

Further, the laws of some foreign countries do not protect proprietary rights to the same extent or in the same manner as the laws of the United States. As a result, we may encounter significant problems in protecting and defending our intellectual property both in the United States and abroad. For example, if the issuance to us, in a given country, of a patent covering an invention is not followed by the issuance, in other countries, of patents covering the same invention, or if any judicial interpretation of the validity, enforceability, or scope of the claims in, or the written description or enablement in, a patent issued in one country is not similar to the interpretation given to the corresponding patent issued in another country, our ability to protect our intellectual property in those countries may be limited. Changes in either patent laws or in interpretations of patent laws in the United States and other countries may materially diminish the value of our intellectual property or narrow the scope of our patent protection. If we are unable to prevent material disclosure of the non-patented intellectual property related to our technologies to third parties, and there is no guarantee that we will have any such enforceable trade secret protection, we may not be able to establish or maintain a competitive advantage in our market, which could materially adversely affect our business, results of operations and financial condition.

***Our drug development strategy relies heavily upon the 505(b)(2) regulatory pathway, which requires us to certify that we do not infringe upon third-party patents covering approved drugs. Such certifications typically result in third-party claims of intellectual property infringement, the defense of which will be costly and time consuming, and an unfavorable outcome in any litigation may prevent or delay our development and commercialization efforts which would harm our business.***

53

Litigation or other proceedings to enforce or defend intellectual property rights are often complex in nature, may be very expensive and time-consuming, may divert our management's attention from other aspects of our business and may result in unfavorable outcomes that could adversely impact our ability to launch and market our product candidates, or to prevent third parties from competing with our products and product candidates.

There is a substantial amount of litigation, both within and outside the United States, involving patent and other intellectual property rights in the biotechnology and pharmaceutical industries, including patent infringement lawsuits, interferences, oppositions and inter party reexamination proceedings before the USPTO. Numerous United States and foreign issued patents and pending patent applications, which are owned by third parties, exist in the fields in which we and our collaborators are developing product candidates. As the biotechnology and pharmaceutical industries expand and more patents are issued, the risk increases that our product candidates may be subject to claims of infringement of the patent rights of third parties.

In particular, our commercial success depends in large part on our avoiding infringement of the patents and proprietary rights of third parties for existing approved drug products. Because we utilize the 505(b)(2) regulatory pathway for the approval of our products and product candidates, we rely in whole or in part on studies conducted by third parties related to those approved drug products. As a result, upon filing with the FDA for approval of our product candidates, we will be required to certify to the FDA that either: (1) there is no patent information listed in the FDA's Orange Book with respect to our NDA; (2) the patents listed in the Orange Book have expired; (3) the listed patents have not expired, but will expire on a particular date and approval is sought after patent expiration; or (4) the listed patents are invalid or will not be infringed by the manufacture, use or sale of our proposed drug product. When we submit a paragraph IV certification to the FDA, a notice of the paragraph IV certification must also be sent to the patent owner once our 505(b)(2) NDA is accepted for filing by the FDA. The third party may then initiate a lawsuit against us to defend the patents identified in the notice. The filing of a patent infringement lawsuit within 45 days of receipt of the notice automatically prevents the FDA from approving our NDA until the earliest of 30 months or the date on which the patent expires, the lawsuit is settled, or the court reaches a decision in the infringement lawsuit in our favor. If the third party does not file a patent infringement lawsuit within the required 45-day period, our NDA will not be subject to the 30-month stay.

In addition to paragraph IV litigation noted above, third-party owners of patents may generally assert that we are employing their proprietary technology without authorization. There may be third-party patents or patent applications with claims to materials, formulations, methods of manufacture or methods for treatment related to the use or manufacture of our products and/or our product candidates. Because patent applications can take many years to issue, there may be currently pending or subsequently filed patent applications which may later result in issued patents that may be infringed by our products or product candidates. If any third-party patents were held by a court of competent jurisdiction to cover aspects of our product candidates, including the formulation, method of use, any method or process involved in the manufacture of any of our product candidates, any molecules or intermediates formed during such manufacturing process or any other attribute of the final product itself, the holders of any such patents may be able to block our ability to commercialize our product candidates unless we obtain a license under the applicable patents, or until such patents expire. In either case, such a license may not be available on commercially reasonable terms or at all.

Parties making claims against us may request and/or obtain injunctive or other equitable relief, which could effectively block our ability to further develop and commercialize one or more of our product candidates on a temporary or permanent basis. Defense of these claims, regardless of their merit, would involve substantial litigation expense and would be a substantial diversion of employee resources from our business. In the event of a successful claim of infringement against us, we may have to pay substantial damages, including treble damages and attorneys' fees for willful infringement, obtain one or more licenses from third parties, pay royalties or redesign our infringing products or manufacturing processes, which may be impossible or require substantial time and monetary expenditure. We cannot predict whether any such license would be available at all or whether it would be available on commercially reasonable terms. Furthermore, even in the absence of litigation, we may need to obtain licenses from third parties to advance our research, manufacture clinical trial supplies or allow commercialization of our product candidates. We may fail to obtain any of these licenses at a reasonable cost or on reasonable terms, if at all. In that event, we would be unable to further develop and commercialize one or more of our product candidates, which could harm our business significantly. We cannot provide any assurances that third party patents do not exist which might be enforced against our products, resulting in either an injunction prohibiting our sales, or, with respect to our sales, an obligation on our part to pay royalties and/or other forms of compensation to third parties.

***If we fail to comply with our obligations in the agreements under which we license rights to technology from third parties, or if the license agreements are terminated for other reasons, we could lose license rights that are important to our business.***

We are a party to a number of technology licenses that are important to our business and expect to enter into additional licenses in the future. Our existing license agreements impose, and we expect that future license agreements will impose, on us, various development, regulatory and/or commercial diligence obligations, payment of milestones and/or royalties and other obligations. Additionally, one of our existing license agreements is a sublicense from a third party who is not the original licensor of the intellectual property at issue. Under these agreements, we must rely on our licensor to comply with their obligations under the primary license agreements under which such third party obtained rights in the applicable intellectual property, where we may

54

have no relationship with the original licensor of such rights. If our licensors fail to comply with their obligations under these upstream license agreements, the original third-party licensor may have the right to terminate the original license, which may terminate our sublicense. If this were to occur, we would no longer have rights to the applicable intellectual property unless we are able to secure our own direct license with the owner of the relevant rights, which we may not be able to do at a reasonable cost or on reasonable terms, which may impact our ability to continue to develop and commercialize our product candidates and companion diagnostic incorporating the relevant intellectual property. If we fail to comply with our obligations under our license agreements, or we are subject to a bankruptcy or insolvency, the licensor may have the right to terminate the license. In the event that any of our important technology licenses were to be terminated by the licensor, we would likely cease further development of the related program or be required to spend significant time and resources to modify the program to not use the rights under the terminated license.

***We may be involved in lawsuits to protect or enforce our patents or the patents of our licensors, which could be expensive, time consuming and unsuccessful.***

Competitors may infringe our patents or the patents of our licensors. To counter infringement or unauthorized use, we may be required to file infringement claims, which can be expensive and time-consuming. In addition, in an infringement proceeding, a court may decide that a patent of ours or our licensors is not valid or is unenforceable, or may refuse to stop the other party from using the technology at issue on the grounds that our patents do not cover the technology in question. An adverse result in any litigation or defense proceedings could put one or more of our patents at risk of being invalidated or interpreted narrowly and could put our patent applications at risk of not being issued.

Interference proceedings provoked by third parties or brought by us may be necessary to determine the priority of inventions with respect to our patents or patent applications or those of our collaborators or licensors. An unfavorable outcome could require us to cease using the related technology or to attempt to license rights to it from the prevailing party. Our business could be harmed if the prevailing party does not offer us a license on commercially reasonable terms. Our defense of litigation or interference proceedings may fail and, even if successful, may result in substantial costs and distract our management and other employees. We may not be able to prevent, alone or with our licensors, misappropriation of our intellectual property rights, particularly in countries where the laws may not protect those rights as fully as in the United States.

Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation. There could also be public announcements of the results of hearings, motions or other interim proceedings or developments. If securities analysts or investors perceive these results to be negative, it could have a material adverse effect on the price of our common stock.

***The patents and the patent applications that we have covering our products are limited to specific formulations, methods of use and processes, and our market opportunity for our products and our product candidates may be limited by the lack of patent protection for the active ingredients and by competition from other formulations and delivery methods that may be developed by competitors.***

Patent protection on the active ingredients in our currently marketed products (Ryanodex, Bendeka, Argatroban and Non-Alcohol Docetaxel Injection) has expired, and there is therefore no composition of matter patent protection available for the active ingredient in such products. This is also the case with respect to our other product candidates. We have obtained, and continue to seek to obtain patent protection of other aspects of our products and our product candidates, including specific formulations, methods of use and processes, which may not be as effective as composition of matter coverage in preventing work-arounds by competitors. As a result, generic products that do not infringe the claims of our issued patents covering formulations, methods of use and processes are, or may be, available while we are marketing our products. Competitors who obtain the requisite regulatory approval could be able to commercialize products with the same active ingredients as our product candidates so long as the competitors do not infringe any process, use or formulation patents that we have developed for our products, subject to any regulatory exclusivity we may be able to obtain for our products.

The number of patents and patent applications covering products containing the same active ingredient as our products and our product candidates indicates that competitors have sought to develop and may seek to commercialize competing formulations that may not be covered by our patents and patent applications. The commercial opportunity for our products and our product candidates could be significantly harmed if competitors are able to develop and commercialize alternative formulations of our products and our product candidates that are different from ours and do not infringe our issued patents covering our products.

***Ryanodex® (dantrolene sodium), Argatroban, Bendeka ® and Non-Alcohol Docetaxel Injection have been approved by the FDA, and we anticipate that other product candidates will be approved by the FDA in the future. Once our products are on the market, one or more third parties may also challenge the patents that we control covering our products, which could result in the invalidation or unenforceability of some or all of the relevant patent claims of our issued patents covering our products. Obtaining and maintaining our patent protection depends on compliance with various procedural, document submission, fee***

55

*payment and other requirements imposed by governmental patent agencies, and our patent protection could be reduced or eliminated for non-compliance with these requirements.*

Ryanodex, Argatroban, Bendeka and Non-Alcohol Docetaxel Injection have been approved by the FDA, and we anticipate that other product candidates will be approved by the FDA in the future. One or more third parties may also challenge the patents that we control covering our products in court or the USPTO, which could result in the invalidation or unenforceability of some or all of the relevant patent claims of our issued patents covering our products.

If we or one of our licensing partners initiated legal proceedings against a third party to enforce a patent covering one of our products or product candidates, the defendant could counterclaim that the patent covering our product or product candidate is invalid and/or unenforceable. In patent litigation in the United States, defendant counterclaims alleging invalidity and/or unenforceability are common, and there are numerous grounds upon which a third party can assert invalidity or unenforceability of a patent. Third parties may also raise similar claims before administrative bodies in the United States or abroad, even outside the context of litigation. Such mechanisms include re-examination, post grant review, and equivalent proceedings in foreign jurisdictions (e.g., opposition proceedings). Such proceedings could result in revocation or amendment to our patents in such a way that they no longer cover our products or product candidates. The outcome following legal assertions of invalidity and unenforceability is unpredictable. With respect to the validity question, for example, we cannot be certain that there is no invalidating prior art, of which we, our patent counsel and the patent examiner were unaware during prosecution. If a defendant were to prevail on a legal assertion of invalidity and/or unenforceability, we would lose at least part, and perhaps all, of the patent protection on our products or product candidates. Such a loss of patent protection could have a material adverse impact on our business.

Periodic maintenance fees on any issued patent are due to be paid to the USPTO and foreign patent agencies in several stages over the lifetime of the patent. The USPTO and various foreign governmental patent agencies require compliance with a number of procedural, documentary, fee payment and other similar provisions during the patent application process. While an inadvertent lapse can in many cases be cured by payment of a late fee or by other means in accordance with the applicable rules, there are situations in which non-compliance can result in abandonment or lapse of the patent or patent application, resulting in partial or complete loss of patent rights in the relevant jurisdiction. Non-compliance events that could result in abandonment or lapse of a patent or patent application include, but are not limited to, failure to respond to official actions within prescribed time limits, non-payment of fees and failure to properly legalize and submit formal documents. If we or our licensors that control the prosecution and maintenance of our licensed patents fail to maintain the patents and patent applications covering our products and product candidates, our competitors might be able to enter the market, which would have a material adverse effect on our business, financial condition and results of operations.

***We may be subject to claims that our employees, consultants or independent contractors have wrongfully used or disclosed confidential information of third parties.***

We employ individuals who were previously employed at other biotechnology or pharmaceutical companies. We may be subject to claims that we or our employees, consultants or independent contractors have inadvertently or otherwise used or disclosed confidential information of our employees' former employers or other third parties. We may also be subject to claims that former employers or other third parties have an ownership interest in our patents. Litigation may be necessary to defend against these claims. There is no guarantee of success in defending these claims, and if we are successful, litigation could result in substantial cost and be a distraction to our management and other employees.

***We may be subject to claims challenging the inventorship or ownership of our patents and other intellectual property.***

We may also be subject to claims that former employees, collaborators or other third parties have an ownership interest in our patents or other intellectual property. We may be subject to ownership disputes in the future arising, for example, from conflicting obligations of consultants or others who are involved in developing our products or product candidates and companion diagnostic. Litigation may be necessary to defend against these and other claims challenging inventorship or ownership. If we fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights, such as exclusive ownership of, or right to use, valuable intellectual property. Such an outcome could have a material adverse effect on our business, financial condition and results of operations. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees.

***Intellectual property rights do not necessarily address all potential threats to our competitive advantage.***

The degree of future protection afforded by our intellectual property rights is uncertain because intellectual property rights have limitations, and may not adequately protect our business or permit us to maintain our competitive advantage. The following examples are illustrative:

- others may be able to make compounds that are similar to our products or product candidates but that are not covered by the claims of the patents that we own or have exclusively licensed;

56

- we or our licensors or future collaborators might not have been the first to make the inventions covered by the issued patent or pending patent application that we own or have exclusively licensed;

- we or our licensors or future collaborators might not have been the first to file patent applications covering certain of our inventions;

- others may independently develop similar or alternative technologies or duplicate any of our technologies without infringing our intellectual property rights;

- it is possible that our pending patent applications will not lead to issued patents;

- issued patents that we own or have exclusively licensed may be held invalid or unenforceable as a result of legal challenges by our competitors;

- our competitors might conduct research and development activities in countries where we do not have patent rights and then use the information learned from such activities to develop competitive products for sale in our major commercial markets;

- we may not develop additional proprietary technologies that are patentable; and

- the patents of others may have an adverse effect on our business, financial condition and results of operations.

Should any of these events occur, they could significantly harm our business, results of operations and prospects.

**Risks Related to Ownership of Our Common Stock**

*Our stock price may continue to fluctuate significantly.*

Our initial public offering was completed in February 2014 at a public offering price of $15.00 per share. The trading price of our common stock has fluctuated significantly in the past and is likely to be volatile. Our stock price could be subject to wide fluctuations in response to a variety of factors, including the following:

- any delay in filing an NDA for any of our product candidates and any adverse development or perceived adverse development with respect to the FDA's review of that NDA;

- failure to successfully execute our commercialization strategy with respect to our approved products or any other approved product in the future;

- adverse results or delays in clinical trials, if any;

- significant lawsuits, including patent or stockholder litigation;

- inability to obtain additional funding;

- failure to successfully develop and commercialize our product candidates;

- changes in laws or regulations applicable to our product candidates;

- inability to obtain adequate product supply for our product candidates, or the inability to do so at acceptable prices;

- unanticipated serious safety concerns related to the use of our products or any of our product candidates;

- adverse regulatory decisions;

- introduction of new products or technologies by our competitors;

- entry into new markets by our competitors;

- failure to meet or exceed product development or financial projections we provide to the public;

- failure to meet or exceed the estimates and projections of the investment community;

- the perception of the pharmaceutical industry by the public, legislatures, regulators and the investment community;

- announcements of significant acquisitions, strategic partnerships, joint ventures or capital commitments by us or our competitors;

- disputes or other developments relating to proprietary rights, including patents, litigation matters and our ability to obtain patent protection for our technologies;

- additions or departures of key scientific or management personnel;

57

- changes in the market valuations of similar companies;

- sales of our common stock by us or our stockholders in the future;

- the trading volume of our common stock;

- changes in the collective short interest in our common stock; and

- additional repurchases of our common stock, if any, pursuant to our recently announced share repurchase program.

The stock market in general, and The NASDAQ Stock Market, or NASDAQ, in particular, has experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of listed companies. Broad market and industry factors may negatively affect the market price of our common stock, regardless of our actual operating performance.

In addition, the market price of our shares of common stock could be subject to wide fluctuations in response to many risk factors listed in this section, and others beyond our control, including:

- actual or anticipated fluctuations in our financial condition and operating results;

- actual or anticipated changes in our growth rate relative to our competitors;

- announcements of significant acquisitions, strategic partnerships, joint ventures, collaborations, or capital commitments;

- issuance of new or updated research or reports by securities analysts;

- fluctuations in the valuation of companies perceived by investors to be comparable to us;

- share price and volume fluctuations attributable to short interest positions and/or inconsistent trading volume levels of our shares;

- disputes or other developments related to proprietary rights, including patents, litigation matters, and our ability to obtain patent protection for our technologies;

- announcement or expectation of additional debt or equity financing efforts;

- sales of our common stock by us, our insiders or our other stockholders; and

- general economic and market conditions.

These and other market and industry factors may cause the market price and demand for our common stock to fluctuate substantially, regardless of our actual operating performance, which may limit or prevent investors from readily selling their shares of common stock and may otherwise negatively affect the liquidity of our common stock. In addition, the stock market in general, and NASDAQ and biopharmaceutical companies in particular, have experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of these companies. In the past, when the market price of a stock has been volatile, holders of that stock have instituted securities class action litigation against the company that issued the stock. For example, in May 2016, we became party to a federal securities class action lawsuit, and although it was dismissed in October 2017, we incurred substantial costs defending such lawsuit. Such lawsuit, as well as similar lawsuits instituted in the future, could result in substantial additional costs to us and could also divert the time and attention of our management.

***Our principal stockholders and management own a significant percentage of our stock and will be able to exert significant control over matters subject to stockholder approval.***

As of December 31, 2017, our executive officers, directors, 5% or greater stockholders and their affiliates beneficially own the majority of our voting stock. These stockholders will have the ability to influence us through this ownership position. These stockholders may be able to determine all matters requiring stockholder approval. For example, these stockholders, acting together, may be able to control elections of directors, amendments of our organizational documents or approval of any merger, sale of assets or other major corporate transaction. This may prevent or discourage unsolicited acquisition proposals or offers for our common stock that you may believe are in your best interest as one of our stockholders.

***We previously identified a material weakness in our internal control over financial reporting, which has now been remediated. Nevertheless, if we experience additional material weaknesses or deficiencies in the future or otherwise fail to maintain an effective system of internal controls, we may not be able to accurately or timely report our financial condition or results of operations, which may adversely affect investor confidence in us and, as a result, the market price of our common stock.***

Effective internal controls over financial reporting are necessary for us to provide reliable financial reports and, together with adequate disclosure controls and procedures, are designed to prevent fraud. Any failure to implement required new or improved controls, or difficulties encountered in their implementation, could cause us to fail to meet our reporting obligations. In addition,

58

any testing by us conducted in connection with Section 404 of the Sarbanes-Oxley Act, or the subsequent testing by our independent registered public accounting firm, may reveal deficiencies in our internal controls over financial reporting that are deemed to be material weaknesses or that may require prospective or retroactive changes to our condensed financial statements or identify other areas for further attention or improvement. Inferior internal controls could also cause investors to lose confidence in our reported financial information, which could have a negative effect on the trading price of our common stock. A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.

In connection with the preparation of our consolidated financial statements as of and for the year ended December 31, 2016, we had identified a material weakness in our internal control over financial reporting related to our controls over the preparation of the annual tax provision. During the year ended December 31, 2017, we executed on our remediation plan for this material weakness, and we concluded that the previous material weakness has been remediated.

We will continually assess the progress of the initiatives and our system of internal controls and will take further actions as deemed necessary; however, there can be no assurance that we will be successful in maintaining an effective system of internal controls, identifying additional control deficiencies or material weaknesses in the future, or accurately and timely reporting our financial condition and results of operations.

***We have incurred significant increased costs as a result of operating as a public company, and our management is required to devote substantial time to new compliance initiatives.***

As a public company, we are incurring significant legal, accounting and other expenses that we did not incur as a private company.

For example, as a public company, we are now subject to the reporting requirements of the Exchange Act, which require, among other things, that we file with the SEC, annual, quarterly and current reports with respect to our business and financial condition. We have incurred and will continue to incur costs associated with the preparation in filing of these reports. In addition, the Sarbanes-Oxley Act, as well as rules subsequently implemented by the SEC, and NASDAQ have imposed various other requirements on public companies and we have incurred and will continue to incur costs associated with compliance with such requirements. In July 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act, or the Dodd-Frank Act, was enacted. There are significant corporate governance and executive compensation related provisions in the Dodd-Frank Act that required the SEC to adopt additional rules and regulations in these areas such as "say on pay" and proxy access. Stockholder activism, the current political environment and the current high level of government intervention and regulatory reform may lead to substantial new regulations and disclosure obligations, which may lead to additional compliance costs and impact (in ways we cannot currently anticipate) the manner in which we operate our business. Our management and other personnel need to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations will increase our legal and financial compliance costs and will make some activities more time-consuming and costly. For example, we expect these rules and regulations to make it more difficult and more expensive for us to obtain director and officer liability insurance and we may be required to incur substantial costs to maintain our current levels of such coverage.

***Sales of a substantial number of shares of our common stock in the public market by our existing stockholders could cause our stock price to fall.***

Sales of a substantial number of shares of our common stock by our existing stockholders in the public market or the perception that these sales might occur, could depress the market price of our common stock and could impair our ability to raise capital through the sale of additional equity securities. We are unable to predict the effect that such sales may have on the prevailing market price of our common stock.

As of February 20, 2018 we had 14,862,015 shares of common stock outstanding, all of which, other than shares held by our directors and certain officers, are eligible for sale in the public market, subject in some cases to compliance with the requirements of Rule 144, including volume limitations and manner of sale requirements.

In addition, shares issued upon exercise of vested options are eligible for sale. Sales of stock by these stockholders could have a material adverse effect on the trading price of our common stock.

Certain holders of our securities are entitled to rights with respect to the registration of their shares under the Securities Act of 1933, as amended, or the Securities Act. Registration of these shares under the Securities Act would result in the shares becoming freely tradable without restriction under the Securities Act. Any sales of securities by these stockholders could have a material adverse effect on the trading price of our common stock.

59

*Future issuances of our common stock or rights to purchase our common stock, including pursuant to our equity incentive plans, could result in additional dilution of the percentage ownership of our stockholders and could cause our stock price to fall.*

We expect that significant additional capital will be needed in the future to continue our planned operations. To the extent we raise additional capital by issuing equity securities, our stockholders may experience substantial dilution. We may sell common stock, convertible securities or other equity securities in one or more transactions at prices and in a manner we determine from time to time. If we sell common stock, convertible securities or other equity securities in more than one transaction, investors may be materially diluted by subsequent sales. These sales may also result in material dilution to our existing stockholders, and new investors could gain rights superior to our existing stockholders.

Pursuant to our 2014 Equity Incentive Plan, or the 2014 Plan, our management is authorized to grant stock options and other equity-based awards to our employees, directors and consultants. The number of shares available for future grant under the 2014 Plan will automatically increase each year by 6% of all shares of our capital stock outstanding as of December 31 of the prior calendar year, subject to the ability of our board of directors to take action to reduce the size of the increase in any given year. Currently, we plan to register the increased number of shares available for issuance under the 2014 Plan each year. If our board of directors elects to increase the number of shares available for future grant by the maximum amount each year, our stockholders may experience additional dilution, which could cause our stock price to fall.

*We are at risk of securities class action and similar litigation.*

In the past, securities class action litigation has often been brought against a company following a decline in the market price of its securities. This risk is especially relevant for us because pharmaceutical companies have experienced significant stock price volatility in recent years. On May 31, 2016, a federal securities class action suit was brought against us seeking compensatory damages in connection with, among other things, the EP-6101 Complete Response Letter, as described in more detail in Item 6, Legal Proceedings. Such lawsuit was dismissed with prejudice in August 2017, however, any similar litigation in the future, could result in substantial cost and a diversion of management's attention and resources, which could harm our business.

*We have broad discretion in the use of the net proceeds from our recently completed initial public offering and follow-on offering and may not use them effectively.*

Our management has broad discretion in the application of the net proceeds from our initial public offering and follow-on offering. Because of the number and variability of factors that will determine our use of the net proceeds from these offerings, their ultimate use may vary substantially from their currently intended use. The failure by our management to apply these funds effectively could harm our business. Pending their use, we may continue to invest the net proceeds from our public offerings in short-term, investment-grade, interest-bearing securities. These investments may not yield a favorable return to our stockholders.

*Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.*

Under Section 382 of the Internal Revenue Code of 1986, as amended, or the Code, if a corporation undergoes an "ownership change," generally defined as a greater than 50% change (by value) in its equity ownership over a three year period, the corporation's ability to use its pre-change net operating loss carryforwards and other pre-change tax attributes, such as research tax credits, to offset its post-change income may be limited. In addition, we may experience ownership changes in the future as a result of subsequent shifts in our stock ownership. As a result, if we earn net taxable income, our ability to use our pre-change net operating loss carryforwards to offset U.S. federal taxable income may be subject to limitations, which could potentially result in increased future tax liability to us.

*We do not intend to pay cash dividends on our common stock so any returns will be limited to the value of our stock.*

We have never declared or paid any cash dividend on our common stock. We currently anticipate that we will retain future earnings for the development, operation and expansion of our business and do not anticipate declaring or paying any cash dividends for the foreseeable future. Any future determinations to pay cash dividends will be made at the discretion of our board of directors, subject to applicable laws, and will depend on a number of factors, including our financial condition, results of operations, capital requirements, contractual restrictions (such as our Credit Facility), general business conditions, and any other factors that our board of directors may deem relevant. Any return to stockholders will therefore be limited to the appreciation of their stock.

*There is no assurance that our stock repurchase program will result in repurchases of our common stock or enhance long term stockholder value.*

Repurchases of our common stock pursuant to our stock repurchase program could affect our stock price and increase its volatility and will reduce the market liquidity for our stock. The existence of a stock repurchase program could also cause our stock price to be higher than it would be in the absence of such a program. Additionally, any future repurchases would diminish our cash

reserves, which could impact our ability to pursue possible future strategic opportunities and acquisitions. There can be no assurance that any stock repurchases will, in fact, occur, or, if they occur, that they will enhance stockholder value.

***Provisions in our amended and restated certificate of incorporation and bylaws, as well as provisions of Delaware law, could make it more difficult for a third party to acquire us or increase the cost of acquiring us, even if doing so would benefit our stockholders or remove our current management.***

Some provisions of our charter documents and Delaware law may have anti-takeover effects that could discourage an acquisition of us by others, even if an acquisition would be beneficial to our stockholders and may prevent attempts by our stockholders to replace or remove our current management. These provisions include:

- authorizing the issuance of "blank check" preferred stock, the terms of which may be established and shares of which may be issued without stockholder approval;

- limiting the removal of directors by the stockholders;

- creating a classified board of directors;

- prohibiting stockholder action by written consent, thereby requiring all stockholder actions to be taken at a meeting of our stockholders;

- eliminating the ability of stockholders to call a special meeting of stockholders; and

- establishing advance notice requirements for nominations for election to the board of directors or for proposing matters that can be acted upon at stockholder meetings.

These provisions may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors, which is responsible for appointing the members of our management. In addition, we are subject to Section 203 of the Delaware General Corporation Law, which generally prohibits a Delaware corporation from engaging in any of a broad range of business combinations with an interested stockholder for a period of three years following the date on which the stockholder became an interested stockholder, unless such transactions are approved by our board of directors. This provision could have the effect of delaying or preventing a change of control, whether or not it is desired by or beneficial to our stockholders. Further, other provisions of Delaware law may also discourage, delay or prevent someone from acquiring us or merging with us.

***The recently passed comprehensive tax reform bill could adversely affect our business and financial condition.***

On December 22, 2017, the Tax Cuts and Jobs Act was signed into law, significantly revising the Code. The newly enacted federal income tax law, among other things, contains significant changes to corporate taxation, including reduction of the corporate tax rate from a top marginal rate of 35% to a flat rate of 21%, limitation of the tax deduction for interest expense to 30% of adjusted earnings (except for certain small businesses), limitation of the deduction for NOLs to 80% of current year taxable income and elimination of NOL carrybacks, one time taxation of offshore earnings at reduced rates regardless of whether they are repatriated, elimination of U.S. tax on foreign earnings (subject to certain important exceptions), immediate deductions for certain new investments instead of deductions for depreciation expense over time, and modifying or repealing many business deductions and credits. Notwithstanding the reduction in the corporate income tax rate, the overall impact of the new federal tax law is uncertain and our business and financial condition could be adversely affected. In addition, it is uncertain if and to what extent various states will conform to the newly enacted federal tax law. The impact of this tax reform on holders of our common stock is also uncertain and could be adverse. We urge our stockholders to consult with their legal and tax advisors with respect to this legislation and the potential tax consequences of investing in or holding our common stock.

**Item 1B. Unresolved Staff Comments**

None.

62

**Item 2. Properties**

As of December 31, 2017 we conducted all of our commercial operations for Eagle Pharmaceuticals, Inc. at our 20,497 square foot leased office space located at 50 Tice Boulevard, Suite 315, Woodcliff Lake, NJ 07677. The term of the lease is for 60 months, expiring on June 30, 2020. Prior to May 31, 2013 we were located at 470 Chestnut Ridge Road, Woodcliff Lake, NJ 07677 since September 2007.

For Eagle Pharmaceuticals, Inc., as of December 31, 2017, we conduct certain non-outsourced research and development operations at a leased space located at 26021 Pala, Mission Viejo, CA 92691 (the "Mission Viejo Property"). The lease for the Mission Viejo Property is for ten years, expiring on December 31, 2027.

For Eagle Biologics, Inc. as of December 31, 2017, we conducted all of our non-outsourced operations at a leased space located at One Kendall Square Building 1400, Suite 301, Cambridge, MA 02139. The term of the lease is 24 months expiring on September 30, 2018.

We consider our current facilities suitable and adequate to meet our current needs.

**Item 3. Legal Proceedings**

**Commercial Litigation**

*In Re: Taxotere (Docetaxel)*

On February 1, 2017, the Company was named as a defendant, among various other manufacturers, in several product liability suits that are consolidated in the U.S. District Court for the Eastern District of Louisiana as part of MDL 2740 (Civil Action No 2:16 md-2740). The claims are for personal injuries allegedly arising out of the use of docetaxel.

In March 2017, the Company reached agreements in principle with the Plaintiffs' Steering Committee in this matter to voluntarily dismiss the Company from all of the lawsuits in which it was named and from the master complaint. The Company is in the process of working with the other parties in this matter to have it removed from the Multidistrict litigation entirely.  As part of the agreement, in the event a case is brought in the future with facts that justify the Company's inclusion, the plaintiffs reserved the right to include the Company in such matter.  The plaintiffs have filed several additional lawsuits since the parties' agreement in principle to dismiss, and the Company is in the process of working with plaintiffs to explore the possibility of dismissing those lawsuits.  The Company believes that it has substantial meritorious defenses to these cases and maintains product liability insurance against such cases. However, litigation is inherently uncertain and the Company cannot predict the outcome of this litigation. These actions, if successful, or if our indemnification arrangements or insurance do not provide sufficient coverage against such claims, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Medicines Company v. Eagle*

On February 2, 2016, The Medicines Company ("MDCO") filed a complaint in the U.S. District Court for the District of New Jersey against the Company, SciDose LLC and TherDose Pharma Pvt. Ltd. (collectively the "Defendants") relating to the Defendants' work on a novel ready-to-use bivalirudin injection product ("EP-6101"). MDCO amended that complaint in April of 2016. The complaint cites the May 7, 2008 License and Development Agreement (the "LDA") between the Defendants and MDCO, which was terminated by the Company on September 17, 2013. In October 2017, the Defendants moved to dismiss the action for lack of subject matter jurisdiction and to stay discovery. In December 2017, while those motions were pending, the parties entered into a settlement agreement pursuant to which Defendants agreed to pay $1.7 million and assign to MDCO all intellectual property rights relating to EP-6101. As a result of the settlement, the court entered a stipulation and order of dismissal, with prejudice, of all claims on January 24, 2017.

*Bauer v. Eagle*

On May 31, 2016, a federal securities class-action lawsuit (captioned Bauer v. Eagle Pharmaceuticals, Inc., et al., Case No. 16-cv-03091-JLL-JAD) was filed in the United States District Court for the District of New Jersey against the Company and the Company's Chief Executive Officer. On August 1, 2016, plaintiffs Blake Bauer, Brent Kawamura and Guarang Patel (the "EGRX Investors Group"), filed a motion requesting the Court to appoint the EGRX Investors Group as lead plaintiff and Kirby McInerney

63

LLP as lead counsel. The motion was granted on September 9, 2016. On October 31, 2016, the EGRX Investors Group filed an amended class action complaint (the "Amended Complaint") against the defendants, seeking compensatory damages and an award of costs and expenses, including attorneys' and experts' fees. The Amended Complaint alleged that defendants violated sections 10(b) and 20(a) of the Securities Exchange Act, as amended, by making false and/or misleading statements about, among other things: (a) EP-6101, (b) the Company's expectations regarding the NDA submitted for EP-6101, and (c) the Company's business prospects. On December 16, 2016, defendants filed a motion to dismiss the Amended Complaint. Plaintiffs opposed that motion on January 30, 2017. Defendants filed their reply on March 1, 2017. On May 19, 2017, the Court granted defendants motion to dismiss and dismissed the Amended Complaint without prejudice. On June 1, 2017, the Court entered an order granting plaintiffs until July 3, 2017 to file an amended complaint. Plaintiffs did not file an amended complaint on or before July 3, 2017 and, therefore, on August 2, 2017, the Court entered an order dismissing the case with prejudice and directing the clerk to close the case. On August 31, 2017, plaintiffs filed a notice of appeal to the United States Court of Appeals for the Third Circuit, indicating their intent to appeal from the Court's May 19, 2017 and August 2, 2017 orders. On October 4, 2017, plaintiffs-appellants filed a motion to withdraw their appeal and, on October 5, 2017, the Court of Appeals issued an order dismissing the appeal without costs to either party.

*Eagle v. Burwell*

On April 27, 2016, the Company filed an action in the U.S. District Court for the District of Columbia against the FDA and other federal defendants seeking an order requiring the FDA to grant us orphan drug exclusivity for Bendeka for the treatment of CLL and indolent B-cell NHL. The Company believes Bendeka is entitled to orphan drug exclusivity as a matter of law, and that the FDA's decision violates federal law and is inconsistent with the holding of the U.S. District Court for the District of Columbia in Depomed Inc. v. U.S. Department of Health and Human Services. The parties have filed all substantive motions and pleadings and anticipate either a schedule for oral argument or a disposition from the court in 2018.

*Eagle v. Eli Lilly*

On August 24, 2017, the Company filed an antitrust complaint in the United States District Court for the District of New Jersey against Eli Lilly and Company ("Lilly"), Case No. 2:17-CV-06415. The complaint alleges that Lilly engaged in anticompetitive conduct which restrained competition by delaying and blocking the Company's launch of a competing pemetrexed injection product (to compete with Lilly's Alimta). Lilly has accepted service and answered the complaint on October 27, 2017. Lily also filed a motion to transfer this case to Delaware on October 27, 2017. Eagle filed a motion to oppose such transfer on November 6, 2017. No other dates or proceedings have been scheduled as of the date of the filing of this Annual Report on Form 10-K. The Company believes it has valid claims against Lilly and the right to seek injunctive relief and damages. However, litigation is inherently uncertain, and the Company cannot predict the outcome of this litigation.

**Patent Litigation**

*Eli Lilly and Company. v. Eagle Pharmaceuticals, Inc. (PEMFEXY$^{TM}$ (Pemetrexed))*

On August 14, 2017, Lilly filed suit against the Company in the United States District Court for the Southern District of Indiana (the "Indiana Suit"). Lilly alleged patent infringement based on the filing of the Company's 505(b)(2) NDA seeking approval to manufacture and sell the Company's EP-5101. EP-5101, if finally approved by FDA, will be a branded alternative to Alimta®, which is indicated (in combination with cisplatin) (a) for the treatment of patients with malignant pleural mesothelioma, or (b) for the initial treatment of locally advanced or metastatic nonsquamous non-small cell lung cancer. Alimta® also is indicated as a single-agent for the treatment of patients with locally advanced or metastatic nonsquamous non-small cell lung cancer after prior chemotherapy. Alimta® also is indicated for maintenance treatment of patients with locally advanced or metastatic nonsquamous non-small cell lung cancer whose disease has not progressed after four cycles of platinum-based first-line chemotherapy.

On September 8, 2017, Eagle moved to dismiss the Indiana Suit for improper venue. On September 11, 2017, Lilly voluntarily dismissed the Indiana Suit. It then filed a complaint in the United States District Court for the District of Delaware, alleging similar patent infringement claims (the "Delaware Suit"). Eagle answered and filed various counterclaims in the Delaware Suit on October 3, 2017. Lilly answered Eagle's counterclaims on October 24, 2017. The Court held a scheduling conference on December 11, 2017 and set trial in the Delaware Suit to begin on September 9, 2019. The Delaware Suit is pending.

*Eagle Pharmaceuticals, Inc., et al. v. Slayback Pharma Limited Liability Company; Eagle Pharmaceuticals, Inc., et al. v. Apotex Inc. and Apotex Corp.; Eagle Pharmaceuticals, Inc., et al. v. Fresenius Kabi USA, LLC; Eagle Pharmaceuticals, Inc., et al. v. Mylan Laboratories Limited - (BENDEKA®)*

64

BENDEKA®, which contains bendamustine hydrochloride, is an alkylating drug that is indicated for the treatment of patients with chronic lymphocytic leukemia, as well as for the treatment of patients with indolent B-cell non-Hodgkin's lymphoma that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen. Four companies - Slayback Pharma Limited Liability Company ("Slayback"), Apotex Inc. and Apotex Corp. ("Apotex"), Fresenius Kabi USA, LLC ("Fresenius"), and Mylan Laboratories Limited ("Mylan") - have filed Abbreviated New Drug Applications ("ANDA's") referencing BENDEKA® that include challenges to one or more of the BENDEKA® Orange Book-listed patents.

The Company, Cephalon, Inc. and/or Teva Pharmaceuticals International GMBH (together the "Patentees"), filed separate suits against Slayback, Apotex, Fresenius and Mylan in the United States District Court for the District of Delaware on August 16, 2017 (Slayback ("Slayback I")), August 18, 2017 (Apotex), August 24, 2017 (Fresenius), December 12, 2017 (Mylan), and January 19, 2018 (Slayback ("Slayback II")). In these Complaints, the Patentees allege infringement of the challenged patents, namely U.S. Patent Nos. 8,791,270 and 9,572,887 against Slayback (Slayback I and Slayback II), and of U.S. Patent Nos. 8,609,707, 8,791,270, 9,000,021, 9,034,908, 9,144,568, 9,265,831, 9,572,796, 9,572,797, 9,572,887, 9,579,384, 9,597,397, 9,597,398, 9,597,399 against Fresenius, Apotex, and Mylan. Slayback, Apotex, Fresenius, and Mylan answered their Complaints and some filed various counterclaims on September 29, 2017 (Slayback I), February 12, 2018 (Slayback II), November 27, 2017, September 15, 2017, and February 14, 2018, respectively. The Patentees answered the Slayback I, Fresenius, and Apotex counterclaims on October 20, 2017, October 6, 2017, and December 18, 2017, respectively. The Slayback I, Apotex, Fresenius and Mylan cases have been consolidated for all purposes, with Trial scheduled to begin September 3, 2019. All five cases are pending.

The FDA is stayed from approving Apotex's, Fresenius', and Mylan's ANDA's until the earlier of (1) January 7, 2020, January 14, 2020, and April 30, 2020, respectively (the "30-month stay dates"); and (2) a court decision that each of the challenged patents is not infringed, invalid or unenforceable. The 30-month stay dates may be shortened or lengthened if either party to the action fails to reasonably cooperate in expediting the action. The FDA cannot approve Slayback's ANDA until March 2033.

65

**Item 4. Mine Safety Disclosures**

Not applicable.

**PART II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

Our common stock has been listed on the NASDAQ Global Market under the symbol "EGRX" since February 12, 2014. Prior to that date, there was no public trading market for our common stock. The following table sets forth the high and low sales prices per share of our common stock during each quarter within the two most recently completed fiscal years as reported on the NASDAQ Global Market:

|  | | High | Low |
|---|---|---|---|
| **Year Ended December 31, 2017** | | | |
| 4th quarter | $ | 63.67 | 48.84 |
| 3rd quarter | $ | 83.80 | 45.05 |
| 2nd quarter | $ | 97.15 | 68.38 |
| 1st quarter | $ | 86.00 | 61.10 |
| **Year Ended December 31, 2016** | | | |
| 4th quarter | $ | 87.78 | 54.70 |
| 3rd quarter | $ | 71.37 | 38.20 |
| 2nd quarter | $ | 58.93 | 33.02 |
| 1st quarter | $ | 88.47 | 35.10 |

*Record Holders*

As of February 20, 2018, we had 6 holders of record of our common stock. The actual number of shareholders is greater than this number of record holders and includes shareholders who are beneficial owners but whose shares are held in street name by brokers and other nominees. This number of holders of record also does not include shareholders whose shares may be held in trust by other entities. The closing price per share of our common stock on February 20, 2018 was $62.95.

*Dividends*

We have never declared or paid a cash dividend on our common stock. We currently intend to retain any future earnings and do not expect to pay any dividends in the foreseeable future. In addition, our Credit Facility imposes contractual restrictions on us with respect to paying cash dividends. Any future determinations to pay cash dividends will be made at the discretion of our board of directors, subject to applicable laws, and will depend on a number of factors, including our financial condition, results of operations, capital requirements, contractual restrictions, general business conditions, and any other factors that our board of directors may deem relevant.

*Stock Performance Graph*

*The following information shall not be deemed to be "soliciting material" or to be "filed" with the SEC or subject to Regulation 14A or 14C under the Securities Exchange Act of 1934, as amended, or the Exchange Act, or to the liabilities of Section 18 of the Exchange Act, and will not be deemed to be incorporated by reference into any filing of Eagle Pharmaceuticals, Inc. under the Exchange Act or the Securities Act of 1933, as amended, or the Securities Act, except to the extent we specifically incorporate it by reference into such filing.*

66

The following graph shows a comparison from February 12, 2014 (the date our common stock commenced trading on the Nasdaq Global Market) through December 31, 2017 of the cumulative total return for our common stock, and the NASDAQ Composite Index and The NASDAQ Biotechnology Index. The graph assumes that $100 was invested at the market close on February 12, 2014 in the common stock of Eagle Pharmaceuticals, Inc, the NASDAQ Composite Index and The NASDAQ Biotechnology Index and assumes reinvestments of dividends. The stock price performance of the following graph is not necessarily indicative of future stock price performance.



**Comparison of 46 Month Cumulative Total Return**
**Assumes initial investment $100**
**December 31, 2017**

| Company / Index | 02/12/14 | 06/30/14 | 12/31/14 | 06/30/15 | 12/31/15 | 06/30/16 | 12/31/16 | 06/30/17 | 12/31/17 |
|---|---|---|---|---|---|---|---|---|---|
| Eagle Pharmaceuticals, Inc | $ 100 | $ 112 | $ 138 | $ 630 | $ 691 | $ 302 | $ 618 | $ 615 | $ 416 |
| NASDAQ Composite | $ 100 | $ 105 | $ 113 | $ 119 | $ 119 | $ 115 | $ 128 | $ 146 | $ 164 |
| NASDAQ Biotechnology | $ 100 | $ 99 | $ 119 | $ 144 | $ 132 | $ 101 | $ 104 | $ 121 | $ 125 |

*Recent Sales of Unregistered Securities*

None.

*Use of Proceeds from Public Offerings of Common Stock*

On February 18, 2014, we closed our initial public offering whereby we sold 3,350,000 shares of common stock, at a public offering price of $15.00 per share, before underwriting discounts and expenses. On March 18, 2014, the underwriters Piper Jaffray & Co. and William Blair & Company, L.L.C., acting as representatives of each of the underwriters, exercised an over-allotment option granted in connection with the offering of 100,000 shares of common stock at the initial public offering price, less the underwriter discount. The aggregate net proceeds received by us from the offering were approximately $46.1 million.

On March 20, 2015, we completed an underwritten public offering (the "Follow-on Offering") of 1,518,317 shares of common stock, including the exercise by the underwriters Piper Jaffray & Co. and William Blair & Company, L.L.C., acting as representatives of each of the underwriters, of a 30-day option to purchase an additional 198,041 shares of common stock. Of the shares sold,

1,388,517 shares were issued and offered by the Company and 129,800 shares were offered by certain selling stockholders. All of the shares were offered at a price to the public of $42.00 per share. The net proceeds from this offering, after deducting underwriting discounts and commissions and other offering expenses payable by us, were approximately $54.3 million. We did not receive any proceeds from the shares sold by the selling stockholders. The securities described above were offered by us pursuant to a shelf registration statement declared effective by the SEC on March 13, 2015.

We invested the net proceeds received from the above offerings in cash equivalents and other short-term investments in accordance with our investment policy. There has been no material change in the planned use of proceeds from our initial public offering as described in our final prospectus filed with the SEC pursuant to Rule 424(b).

*Issuer Purchases of Equity Securities*

The following table provides information about purchases of our equity securities during the three months ended December 31, 2017:

| Period | Total Number of Shares Purchased (1) | Average Price Paid per Share | Total Number of Shares Purchased as Part Publicly Announced Plans or Programs (2)(3) | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Programs |
|---|---|---|---|---|
| | | | | (dollars in thousands) |
| October 1, 2017 to October 31, 2017 | — | $ — | — | 99,192 |
| November 1, 2017 to November 30, 2017 | 54,924 | $ 54.62 | 3,000 | 99,189 |
| December 1, 2017 to December 31, 2017 | 36,334 | $ 55.04 | 2,000 | 99,187 |
| **Total** | 91,258 | $ 54.79 | 5,000 | |

(1) All shares repurchased by the Company in this table were repurchase pursuant to the Share Repurchase Program, described below and elsewhere in this Annual Report on Form 10-K.

(2) On August 9, 2016, the Company announced a share repurchase program approved by the Company's board of directors authorizing the repurchase of up to $75.0 million of the Company's common stock (the "Share Repurchase Program"). Under the Share Repurchase Program, the Company is authorized to repurchase shares through open market purchases, privately-negotiated transactions or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. The Share Repurchase Program has no time limit and may be suspended or discontinued completely at any time.

(3) On August 9, 2017, the Company announced a new share repurchase program approved by the Board, under which the Company may repurchase up to $100 million of its outstanding common stock (the "New Share Repurchase Program"). Under the New Share Repurchase Program, the Company may repurchase shares through open market purchases, privately-negotiated transactions or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. The New Share Repurchase Program has no time limit and may be suspended or discontinued completely at any time.

*Securities Authorized for Issuance Under Equity Compensation Plans*

Information about securities authorized for issuance under our equity compensation plans is incorporated herein by reference to Item 12 of Part III of this annual report on Form 10-K.

**Item 6. Selected Financial Data**

The following table sets forth our selected financial data for the periods and as of the dates indicated. The following selected financial data should be read in conjunction with our audited financial statements and the related notes thereto included elsewhere in this Annual Report on Form 10-K and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this Annual Report on Form 10-K.

The statement of operations data for the years ended December 31, 2017, 2016, 2015, three months ended December 31, 2014 and 2013, and the years ended September 30, 2014 and 2013, respectively, and the balance sheet data as of December 31, 2017, 2016, 2015 and 2014, and September 31, 2014 and 2013 are derived from our financial statements. All previously reported share and per share amounts of our common stock, including shares of common stock underlying stock options and warrants, throughout

68

this Annual Report have been retroactively adjusted to reflect our 1-for-6.53329 reverse stock split of our shares of common stock effective on February 18, 2014. Our audited financial statements have been prepared in U.S. dollars in accordance with U.S. GAAP.

Our historical results for any prior period are not necessarily indicative of results to be expected in any future period, and our results for any interim period are not necessarily indicative of results to be expected for a full fiscal year.

| | Year Ended December 31, | | | Three Months Ended December 31, | | Year Ended September 30, | |
| Statement of Operations Data: | 2017 | 2016 | 2015 | 2014 | 2013 | 2014 | 2013 |
|---|---|---|---|---|---|---|---|
| | (in thousands except share and per share amounts) | | | | | | |
| Total revenue | $ 236,707 | $ 189,482 | $ 66,227 | $ 5,600 | $ 5,492 | $ 19,099 | $ 13,679 |
| Cost of product sales | 33,714 | 35,785 | 7,762 | 1,782 | 2,670 | 5,042 | 7,381 |
| Cost of royalty revenue | 23,472 | 19,521 | 7,885 | 2,707 | 1,954 | 6,672 | — |
| Research and development | 32,607 | 28,289 | 27,855 | 3,986 | 2,589 | 16,816 | 9,795 |
| Selling, general and administrative | 71,416 | 53,329 | 20,165 | 3,690 | 1,344 | 9,326 | 4,958 |
| Income (loss) from Operations | 73,990 | 53,351 | 2,560 | (6,565) | (3,065) | (18,757) | (8,455) |
| (Provision for) benefit from income taxes | (21,002) | 28,026 | (3) | 1,059 | — | 1,295 | 899 |
| Net income (loss) attributable to common stockholders | 51,943 | 81,453 | 2,571 | (5,506) | (4,387) | (19,643) | (9,885) |
| Income (loss) per share attributable to common stockholders- basic | $ 3.44 | $ 5.24 | $ 0.17 | $ (0.39) | $ (1.44) | $ (1.97) | $ (3.25) |
| Income (loss) per share attributable to common stockholders- diluted | $ 3.27 | $ 4.96 | $ 0.16 | $ (0.39) | $ (1.44) | $ (1.97) | $ (3.25) |
| Weighted average common shares outstanding- basic | 15,102,890 | 15,533,681 | 15,250,154 | 14,032,828 | 3,048,131 | 9,955,937 | 3,044,308 |
| Weighted average common shares outstanding- diluted | 15,908,211 | 16,434,104 | 16,253,781 | 14,032,828 | 3,048,131 | 9,955,937 | 3,044,308 |

| | December 31, | | | | September 30, | |
| Balance Sheet Data: | 2017 | 2016 | 2015 | 2014 | 2014 | 2013 |
|---|---|---|---|---|---|---|
| | (in thousands) | | | | | |
| Cash and cash equivalents | $ 114,657 | $ 52,820 | $ 79,083 | $ 34,869 | $ 22,722 | $ 10,456 |
| Short-term investments | — | — | — | — | 19,999 | — |
| Accounts receivable | 53,821 | 42,194 | 26,267 | 11,956 | 7,296 | 5,124 |
| Total assets | 270,060 | 214,320 | 124,605 | 50,094 | 53,411 | 18,103 |
| Total current liabilities | 47,302 | 40,965 | 34,262 | 22,186 | 20,315 | 14,342 |
| Retained earnings (Accumulated deficit) | 26,284 | (25,659) | (107,112) | (109,683) | (104,177) | (102,136) |
| Total stockholders' equity | $ 179,144 | $ 151,226 | $ 90,343 | $ 27,908 | $ 33,096 | $ (87,929) |

### Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

*The following discussion and analysis of financial condition and results of operations is provided to enhance the understanding of, and should be read in conjunction with, Part I, Item 1, "Business" and Item 8, "Financial Statements and Supplementary Data." For information on risks and uncertainties related to our business that may make past performance not indicative of future results, or cause actual results to differ materially from any forward-looking statements, see "Special Note Regarding Forward-Looking Statements," and Part I, Item 1A, "Risk Factors."*

**Overview**

Our business model is to develop proprietary innovations to FDA-approved, injectable drugs, that offer commercial and/or functional advantages to currently available alternatives. We have historically been, and will continue to primarily be, focused on developing and commercializing injectable drugs, primarily in the critical care and oncology areas, using the United States Food and Drug Administration ("FDA")'s 505(b)(2) New Drug Application ("NDA") regulatory pathway. With our addition of Eagle Biologics, we hope to apply our proven market strategy to offer "biobetter" formulations, and to rapidly develop novel biologic products under the pathway provided by the Biologics Price & Competition Act. In addition, we plan to continue to market and/or commercialize our products through marketing partners and/or through our internal direct sales force.

Our product portfolio now includes four approved products: Argatroban; Ryanodex; docetaxel injection, non-alcohol formulation; and Bendeka. We have three commercial partners: Teva Pharmaceutical Industries Ltd. ("Teva"), which through its subsidiary Cephalon, Inc. ("Cephalon"), markets Bendeka, and Chiesi USA, Inc. ("Chiesi") and Sandoz Inc. ("Sandoz"), who pursuant to separate agreements market Argatroban.

We currently have multiple product candidates in advanced stages of development, and/or under review for approval by the FDA. Additionally, we have other exploratory candidates under a collaborative agreement entered into in January 2016 with Albany Molecular Research, Inc. ("AMRI"). Our advanced candidates are EP-3101 (bendamustine RTD) ("EP-3101"), EP-4104 (dantrolene sodium for exertional heat stroke ("EHS")) ("EP-4104"), EGL-4104-C-1702 (dantrolene sodium for drug induced hyperthermia), EP-5101 (PEMFEXY™), a pemetrexed injection ready-to-dilute formulation ("EP-5101") and EGL-5385-C-1701 (fulvestrant). EP-3101 and EP-5101 have been tentatively approved by the FDA. EGL-5385-C-1701 and EP-4104, both unapproved, may address unmet medical needs in major specialty markets.

**Recent Developments**

On August 9, 2016, the Company announced a share repurchase program approved by the Company's board of directors authorizing the repurchase of up to $75.0 million of the Company's common stock (the "Share Repurchase Program"). On August 9, 2017, the Company announced a new share repurchase program approved by the Board, under which the Company may repurchase up to an additional $100 million of its outstanding common stock (the "New Share Repurchase Program"). Under the Share Repurchase Program and the New Share Repurchase Program, the Company is authorized to repurchase shares through open market purchases, privately-negotiated transactions or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. The Share Repurchase Programs have no time limit and may be suspended or discontinued completely at any time. The specific timing and amount of repurchases will vary based on available capital resources and other financial and operational performance, market conditions, securities law limitations, and other factors. The repurchases will be made using the Company's cash resources. In any period, cash used in financing activities related to shares repurchased may differ from the comparable change in stockholders' equity, reflecting timing differences between the recognition of share repurchase transactions and their settlement for cash. The Company repurchased 566,838 shares of common stock for $37.0 million in the year ended December 31, 2016, and a total of 674,857 shares of common stock for $43.8 million in the year ended December 31, 2017.

On January 26, 2017, the Company entered into a Credit Agreement (the "Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent ("Agent") and the lenders party thereto. The Credit Agreement provides for a three-year $50 million revolving credit facility (the "Credit Facility"), none of which was drawn at closing. The Credit Facility includes a $5 million letter of credit subfacility.

On July 26, 2017, we received a Complete Response Letter from the FDA regarding its 505(b)(2) NDA for Ryanodex for the treatment of exertional heat stroke, in conjunction with external cooling methods. Based on our recent meeting with the FDA, we have agreed on a path forward and plan to conduct an additional clinical trial in August 2018 during the Hajj pilgrimage, similar to the study conducted during the Hajj in 2015.

On August 8, 2017, the Company entered into an Amended and Restated Credit Agreement (the "Amended Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") and the lenders party thereto, which amended and restated the Company's existing credit agreement, dated as of January 26, 2017. The Amended Credit Agreement provides for a three-year $50 million revolving credit facility and a three-year $100 million term loan facility (which are collectively referred to as the "Amended Credit Facility"). At closing, which occurred on August 8, 2017, $50 million of the term loan facility was drawn, and none of the revolving credit facility has been drawn. The Company may make one other draw on the term loan facility on or before February 4, 2018. The Company has elected not to draw down further on the term loan facility. The Amended Credit Facility includes a $5 million letter of credit subfacility. The Company anticipates that the draw at closing and future draws under the Amended Credit Facility, if any, will be used to finance the New Share Repurchase Program (as defined below) and for other corporate purposes. Loans under the Amended Credit Facility bear interest, at the Company's option, at a rate equal to either

70

(a) the LIBOR rate, plus an applicable margin ranging from 2.25% to 3.00% per annum, based upon the total net leverage ratio (as defined in the Amended Credit Agreement), or (b) the prime lending rate, plus an applicable margin ranging from 1.25% to 2.00% per annum, based upon the total net leverage ratio. The Company is required to pay a commitment fee on the unused portion of the Amended Credit Facility at a rate ranging from 0.35% to 0.45% per annum based upon the total net leverage ratio. The Company is permitted to terminate or reduce the revolving commitments or term commitments of the lenders and to make voluntary prepayments at any time subject to break funding payments. The Company is required to make mandatory prepayments of outstanding indebtedness under the Amended Credit Agreement (a) upon receipt of proceeds from certain sales, transfers or other dispositions, casualty and other condemnation events and the incurrence of certain indebtedness other than indebtedness permitted, subject to customary reinvestment exceptions and (b) in the case that the aggregate amount of all outstanding loans and letters of credit issued under the Amended Credit Facility exceed the aggregate commitment of all lenders under the Amended Credit Facility.

On September 20, 2017, we entered into a Product Collaboration and License Agreement, effective as of September 19, 2017, (the "SymBio License") with SymBio Pharmaceuticals Limited ("SymBio") for the rights to develop and commercialize EP-3101 and Bendeka (collectively, the "Products") in Japan. Under the SymBio License, SymBio will be responsible for all development of the Products in Japan and for obtaining and maintaining all regulatory approvals of the Products in Japan, with a target for regulatory approval of a Product in Japan in 2020. SymBio will bear all costs of development of the Products in Japan except that, if Japanese regulatory authorities require a certain clinical study to be conducted as a condition for approving one of the Products in Japan, we would share 50% of the out-of-pocket costs of that clinical study up to a specified dollar amount as a reduction to future royalty payments. Based on our assessment of the probability of additional costs, we have not deferred revenue on the SymBio License. SymBio will also be responsible, at its sole cost, for all marketing, promotion, distribution and sales of the Products in Japan and is obligated to launch the Products and meet certain minimum detailing, promotion and marketing commitments in connection with commercialization of the Products in Japan.

SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma ("MCL"), and as a first line treatment of low-grade NHL and MCL. Under the SymBio License, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

Pursuant to the terms of the SymBio License, Eagle and SymBio will enter into a separate supply agreement, under which we will be responsible for manufacturing and supplying the Products to SymBio for development and commercialization in Japan. After a period of time following launch of a Product, SymBio will have the right to assume the responsibility for manufacturing of the Products in and for Japan. Under the SymBio License, we will retain the right to control the prosecution, maintenance and enforcement of our patents covering the Products, both inside and outside of Japan.

Under the SymBio License, we earned an upfront non-refundable cash payment of $12.5 million in the third quarter of 2017, and we are eligible to receive a milestone payment upon approval of a Product in Japan and a milestone payment upon achievement of certain cumulative net sales of the Products in Japan, which can aggregate to a total of approximately $10.0 million (subject to currency fluctuations). After regulatory approval of a Product in Japan, we will also receive tiered, low double-digit royalties on net sales of the Products in Japan for so long as there are patents covering the Products in Japan or regulatory exclusivity for the Products in Japan.

On October 23, 2017, the Company entered into an agreement with Worldwide Clinical Trials, Inc. to conduct a clinical trial for EGL-5385-C-1701. A group study of healthy female subjects have been randomized across 12 sites. The study will evaluate the safety, tolerability, and pharmacokinetics of a single dose of EGL-5385-C-1701 for Injectable Suspension versus the reference drug administered by IM injection in the gluteal muscle. We expect the study to be completed by September 2018.

On October 27, 2017, the FDA granted tentative approval for the Company's EP-5101 for locally advanced or metastatic nonsquamous non-small cell lung cancer in combination with cisplatin; locally advanced or metastatic nonsquamous non-small cell lung cancer in patiensts whose disease has not progressed after four cycles of platinum-based first-line chemotherapy, as maintenance treatment; locally advanced or metastatic nonsquamous non-small cell lung cancer after prior chemotherapy as a single agent; and malignant pleural mesothelioma in patients whose disease is unresectable or who are otherwise not candidates for curative surgery in combination with cisplatin.

During the first quarter of 2018, we filed an ANDA for our first product candidate co-developed with AMRI and are awaiting FDA acceptance of the filing.

On February 8, 2018, we entered into an amendment (the "Amendment") to the stock purchase agreement dated November 10, 2016 (the "Arsia SPA"), pursuant to which we acquired from Arsia Therapeutics, LLC (the "Seller") all of the outstanding capital stock of Arsia Therapeutics, Inc. (now Eagle Biologics). Pursuant to the Amendment, our obligations to make four separate milestone

71

payments pursuant to the Arsia SPA, which could have aggregated to a total of $48 million, were terminated in exchange for a single payment of $15 million by us to the Seller.

**Financial Operations Overview**

*Revenue*

Our revenue consists of product sales, royalty revenue and license and other revenue.

*Product Sales*. We recognize revenues from product sales of Bendeka, Ryanodex, Argatroban, Non-Alcohol Docetaxel Injection, and diclofenac-misoprostol. Sales of Bendeka are sold to our commercial partner Teva. Argatroban is sold directly to our commercial partners Chiesi and Sandoz. Sales to our commercial partners are typically made at little or no profit for resale. Ryanodex, Non-Alcohol Docetaxel Injection, launched in February 2016, and diclofenac-misoprostol are sold directly to wholesalers, hospitals and surgery centers through a third party logistics partner. Diclofenac-misoprostol was divested in March 2016, however, we may continue to market diclofenac-misoprostol until such time that the purchaser is able to launch the product.

We typically enter into agreements with group purchasing organizations acting on behalf of their hospital members, in connection with the hospitals' purchases of our direct commercial products. Based on these agreements, most of our hospital customers have contracted prices for products and volume-based rebates on product purchases. These amounts are estimated and recorded at the time of sale. In the case of discounted pricing, we typically pay a chargeback, representing the difference between price invoiced to the wholesaler and the customer contract price.

*Royalty revenue*. We recognize revenue from royalties based on a percentage of Teva's net sales of Bendeka and Sandoz's and Chiesi's gross profit of Argatroban, both net of discounts, returns and allowances incurred by our commercial partners. Royalty revenue is recognized as earned in accordance with contract terms when it can be reasonably estimated and collectability is reasonably assured.

*License and other revenue.*

Our revenues may either be in the form of the recognition of deferred revenues upon milestone achievement for which cash has already been received or recognition of revenue upon milestone achievement, the payment for which is reasonably assured to be received in the future.

The primary factors that determine our revenues derived from Bendeka are:

- the level of orders submitted by our commercial partner, Teva;

- the rate at which Teva can convert the current market to Bendeka;

- the level of institutional demand for Bendeka;

- unit sales prices charged by our commercial partner, net of any sales reserves; and

- the level of orders submitted by wholesalers, hospitals and surgery centers.

The primary factors that may determine our revenues derived from Argatroban are:

- the level of orders submitted by our commercial partners, Sandoz and Chiesi;

- the level of institutional demand for Argatroban; and

- unit sales prices charged by our commercial partners, net of any sales reserves.

The primary factors that may determine our revenues derived from Non-Alcohol Docetaxel Injection, Ryanodex and diclofenac-misoprostol and our future products are:

- the effectiveness of our sales force and co-promotion partner, Spectrum Pharmaceuticals, Inc. ("Spectrum");

- the level of orders submitted by wholesalers, hospitals and surgery centers;

- the level of institutional demand for our products; and

- unit sales prices, net of any sales reserves.

**Cost of Revenues**

Cost of revenue consists of the costs associated with producing our products for our commercial partners. In particular, our cost of revenue includes production costs of our products paid to a contract manufacturing organization coupled with shipping and

72

customs charges, cost of royalty and the amortization of intangible assets. Cost of revenue may also include the effects of product recalls, if applicable.

### Research and Development

Costs for research and development are charged to expense as incurred and include; employee-related expenses including salaries, benefits, travel and stock-based compensation expense for research and development personnel, expenses incurred under agreements with contract research organizations, contract manufacturing organizations and service providers that assist in conducting clinical and preclinical studies, costs associated with preclinical activities and development activities, costs associated with regulatory operations, and depreciation expense for assets used in research and development activities.

Costs for certain development activities, such as clinical studies, are recognized based on an evaluation of the progress to completion of specific tasks using data such as patient enrollment, clinical site activations, or information provided to the Company by its vendors on their actual costs incurred. Payments for these activities are based on the terms of the individual arrangements, which may differ from the patterns of costs incurred, and are reflected in the condensed consolidated financial statements as prepaid expenses or accrued expenses as deemed appropriate. Recoveries of previously recognized research and development expenses from third parties are recorded as a reduction to research and development expense in the period it becomes realizable.

### Selling, General and Administrative

Selling, general and administrative costs consist primarily of salaries, benefits and other related costs, including stock-based compensation for executive, finance, selling and operations personnel. Selling, general and administrative expenses also include facility and related costs, professional fees for legal, consulting, tax and accounting services, insurance, selling, marketing, market research, advisory board and key opinion leaders, depreciation and general corporate expenses. We expect that our selling, general and administrative expenses will increase with the potential of further commercialization of our product candidates particularly as we continue to grow our commercial organization.

### Income Taxes

We account for income taxes using the liability method in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC"), Topic 740, "Income Taxes" ("ASC 740"). Deferred tax assets and liabilities are determined based on temporary differences between financial reporting and tax bases of assets and liabilities and are measured by applying enacted rates and laws to taxable years in which differences are expected to be recovered or settled. Further, the effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that the rate changes. A valuation allowance is required when it is "more likely than not" that all or a portion of deferred tax assets will not be realized. In the 4th quarter of 2016, the Company reversed its valuation allowance on our net deferred tax assets (See Note 8. Income Taxes). ASC 740 also prescribes a comprehensive model for how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that the company has taken or expects to take on a tax return, including a decision whether to file or not file a return in a particular jurisdiction. We recognize any interest and penalties accrued related to unrecognized tax benefits as income tax expense.

### Results of Operations

#### Comparison of Years Ended December 31, 2017 and December 31, 2016

#### Revenues

| | Year Ended December 31, | | | | Increase / (Decrease) | |
|---|---|---|---|---|---|---|
| | | 2017 | | 2016 | | |
| | | | (in thousands) | | | |
| Product sales | $ | 45,327 | $ | 40,646 | $ | 4,681 |
| Royalty revenue | | 153,880 | | 99,040 | | 54,840 |
| License and other revenue | | 37,500 | | 49,796 | | (12,296) |
| Total revenue | $ | 236,707 | $ | 189,482 | $ | 47,225 |

Total revenue increased $47.2 million in the year ended December 31, 2017 to $236.7 million as compared to $189.5 million in the year ended December 31, 2016.

Product sales increased approximately $4.7 million in the year ended December 31, 2017, primarily driven by increases in product sales of Ryanodex of $5.9 million and Non-Alcohol Docetaxel Injection of $1.2 million. These increases were partially offset by decreases of $1.2 million in net product sales of Bendeka and $0.4 million in net product sales of Argatroban. In addition, there

73

was a $0.8 million decrease in net product sales of diclofenac-misoprostol as the Company sold certain intellectual property related to this product in March 2016.

Royalty revenue increased $54.8 million in the year ended December 31, 2017, primarily as a result of increased Bendeka market share on Teva sales amplified by an increase in the Bendeka royalty rate from 20% to 25% upon receipt of the J-code, partially tempered by a decrease in Argatroban royalties.

License and other revenue decreased for the year ended December 31, 2017 as compared to the year ended December 31, 2016. For the year ended December 31, 2017, we realized a $25.0 million milestone under the Cephalon agreement related to Teva reaching $500 million in cumulative net sales of Bendeka and a $12.5 million upfront cash payment earned under the SymBio License Agreement. License and other revenue for the year ended December 31, 2016 was comprised of a $40.0 million milestone related to the receipt of the J-code for Bendeka, $6.0 million recognized from an asset sale in fiscal 2010 (which had previously been deferred), $2.0 million as the Company met certain one-time performance obligations and $1.8 million related to the amendment of the license and supply agreement with Teva, expanding the territories for commercial sale of Bendeka.

### Cost of Revenue

| | Year Ended December 31, | | (Decrease) / |
|---|---|---|---|
| | 2017 | 2016 | Increase |
| | (in thousands) | | |
| Cost of product sales | $ 33,714 | $ 35,785 | $ (2,071) |
| Cost of royalty revenue | 23,472 | 19,521 | 3,951 |
| Total cost of revenue | $ 57,186 | $ 55,306 | $ 1,880 |

Cost of revenue increased $1.9 million in the year ended December 31, 2017 to $57.2 million as compared to $55.3 million in the year ended December 31, 2016.

Cost of product sales decreased $2.1 million in the year ended December 31, 2017, primarily as a result of decreased product sales of Bendeka, Argatroban, and diclofenac-misoprostol, offset by increases in product sales of Ryanodex and Non-Alcohol Docetaxel Injection.

Cost of royalty revenue increased $4.0 million in the year ended December 31, 2017 as a result of an increase in the cost of product royalty for Bendeka, offset by a decrease in the cost of product royalty for Argatroban.

### Research and Development

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | Increase |
| | (in thousands) | | |
| Research and development | $ 32,607 | $ 28,289 | $ 4,318 |

Research and development expenses increased approximately $4.3 million in the year ended December 31, 2017 to $32.6 million as compared to $28.3 million in the year ended December 31, 2016. The increase resulted from an increase in project spending for EGL-5385-C-170, EP-4104, EGL-4104-C-1702, certain other projects and an increase in salary and other personnel-related expenses due to increased headcount. These increases were partially offset by a decrease in project spending for EP-6101 and EP-5101. Additionally, during the year ended December 31, 2016 we received certain cost reimbursements from a commercial partner for $1.6 million and a $2.4 million credit from a supplier related to the resolution of a dispute.

### Selling, General and Administrative

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2017 | 2016 | Increase |
| | (in thousands) | | |
| Selling, general and administrative | $ 71,416 | $ 53,329 | $ 18,087 |

74

Selling, general and administrative expenses increased approximately $18.1 million in the year ended December 31, 2017 to $71.4 million as compared to $53.3 million in the year ended December 31, 2016.

This increase is principally related to a $10.2 million increase in salary and personnel related expenses, including stock-based compensation, as we build out areas to support the growing needs of the business and sales force, $3.0 million increase in sales and marketing spend in preparation for the launch of Ryanodex for exertional heat stroke, $1.7 million increase in professional fees mainly for legal matters, $1.4 million increase in amortization expense related to the Biologics developed technology intangible asset, $0.8 million increase in travel related expenses, and a $1.0 million increase in miscellaneous expenses.

*Gain on sale of asset*

On March 29, 2016, we entered into the Diclofenac Asset Purchase Agreement pursuant to which we sold certain intellectual property related to diclofenac-misoprostol in the United States. In consideration of the assets and rights sold under the Diclofenac Asset Purchase Agreement, we received a one-time payment at closing of $1.75 million, which was included in operating expenses.

*Asset Impairment Charge*

During the year ended December 31, 2017, the Company experienced a decline in customer contracts and saw a drop in market pricing for Non-Alcohol Docetaxel Injection. Accordingly, the Company estimated the fair value of our Non-Alcohol Docetaxel Injection product and determined the carrying amount of the intangible asset was no longer fully recoverable, resulting in a pre-tax, non-cash asset impairment charge of $7.2 million.

*Change in Fair Value of Contingent Consideration*

Contingent consideration, which primarily consists of potential milestone payments and royalty obligations, is recorded in the Company's consolidated balance sheets at its estimated fair value at the acquisition date, in accordance with the acquisition method of accounting. The fair value of the acquisition-related contingent consideration is remeasured each reporting period, with changes in fair value recorded in the Company's consolidated statements of income. The fair value measurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement as defined in fair value measurement accounting.

A change in fair value of contingent consideration was recorded for the year ended December 31, 2017 resulting in income of $7.4 million, net. This includes adjustments to the fair values of the liabilities associated with Non-Alcohol Docetaxel Injection, which was remeasured as a result of changes in forecasted revenues for the product. Also included in the amount was a change in the fair value of contingent consideration liability from the acquisition of Eagle Biologics. In February 2018, the Company amended the Eagle Biologics Stock Purchase Agreement and has paid $15 million for all remaining obligations for milestone payments under that agreement.

*Legal Settlement*

On February 2, 2016, The Medicines Company ("MDCO") filed a complaint in the U.S. District Court for the District of New Jersey against the Company, SciDose LLC and TherDose Pharma Pvt. Ltd. (collectively the "Defendants") relating to the Defendants' work on a novel ready-to-use bivalirudin injection product ("EP-6101"). MDCO amended that complaint in April of 2016. The complaint cites the May 7, 2008 License and Development Agreement (the "LDA") between the Defendants and MDCO, which was terminated by the Company on September 17, 2013. In October 2017, the Defendants moved to dismiss the action for lack of subject matter jurisdiction and to stay discovery. In December 2017, while those motions were pending, the parties entered into a settlement agreement pursuant to which Defendants agreed to pay $1.7 million and assign to MDCO all intellectual property rights relating to EP-6101. As a result of the settlement, the parties entered into a stipulation dismissing all claims with prejudice.

*Other Income and Expense*

|  | Year Ended December 31, | | Increase |
|  | 2017 | 2016 | |
|  | (in thousands) | | |
| Interest income | $ 91 | $ 84 | $ 7 |
| Interest expense | (1,136) | (8) | (1,128) |
| Total other income, net | $ (1,045) | $ 76 | $ (1,121) |

Interest expense increased for the year ended December 31, 2017 related to the amortization of debt issuance costs and interest incurred on long-term debt.

75

*(Provision for) benefit from income taxes*

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | **2017** | | **2016** | |
| | *(in thousands)* | | | |
| *(Provision for) benefit from income taxes* | $ | (21,002) | $ | 28,026 |
| Effective tax rate | | 29% | | (52)% |

We recorded a $21.0 million provision for income taxes for the year ended December 31, 2017 as compared to a $28.0 million benefit for income taxes for the year ended December 31, 2016.

The (provision for) benefit from income taxes were based on the applicable federal and state tax rates for those periods.  For periods with a loss before benefit for income taxes, favorable tax items result in an increase in the effective tax rate, while unfavorable tax items result in a decrease in the effective tax rate. For periods with income before provision for income taxes, favorable tax items result in a decrease in the effective tax rate, while, unfavorable tax items result in an increase in the effective tax rate.

The tax provision for the year ended December 31, 2017 reflects an effective tax rate of 29%. The difference between the notional U.S. statutory federal income tax rate and our effective tax rate includes favorable rate items such as exercise of stock options in the period and credits from research and development activity and unfavorable items such as state tax and a valuation adjustment to our net deferred tax asset as of December 31, 2017 to reflect the new U.S. statutory federal income tax rate from tax reform.

The tax benefit for the year ended December 31, 2016 is due to the release of a previously carried tax valuation allowance on our net deferred tax assets including net operating loss carryforwards and the tax benefit related to the exercises of stock options during 2016. This was partially offset by the tax on 2016 earnings. Our decision to remove the valuation allowance on the Company's net deferred tax assets considered our significant income in 2016 which translated to our becoming a tax payer in 2016 and our outlook on prospective earnings and taxable income driven by Bendeka royalty and milestone revenues.

### Net Income

Net income for the year ended December 31, 2017 was $51.9 million as compared to a net income of $81.5 million for the year ended December 31, 2016, as a result of the factors discussed above.

### Comparison of Years Ended December 31, 2016 and December 31, 2015

### Revenues

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | | **2015** | | **Increase** | |
| | *(in thousands)* | | | | | |
| Product sales | $ | 40,646 | $ | 12,968 | $ | 27,678 |
| Royalty revenue | | 99,040 | | 8,259 | | 90,781 |
| License and other revenue | | 49,796 | | 45,000 | | 4,796 |
| Total revenue | $ | 189,482 | $ | 66,227 | $ | 123,255 |

Total revenue increased $123.3 million in the year ended December 31, 2016 to $189.5 million as compared to $66.2 million in the year ended December 31, 2015.

Product sales increased approximately $27.7 million in the year ended December 31, 2016 to $40.6 million as compared to $13.0 million in the year ended December 31, 2015. This increase was due to $17.4 million in net product sales of Bendeka (launched in January 2016), $3.9 million in net product sales of Non-Alcohol Docetaxel Injection (launched in February 2016), an increase of $5.6 million in net product sales of Ryanodex and an increase of $1.0 million in net product sales of Argatroban. These increases were partially offset by a decrease in diclofenac-misoprostol product sales of $0.2 million.

Royalty revenue increased $90.8 million in the year ended December 31, 2016 to $99.0 million as compared to $8.3 million in the year ended December 31, 2015 primarily as a result of royalties on Teva sales since the Bendeka launch in January 2016.

76

License and other revenue increased $4.8 million in the year ended December 31, 2016 to $49.8 million as compared to $45.0 million in the year ended December 31, 2015, as a result of the Cephalon License. License and other revenue for the year ended December 31, 2016 was comprised of a $40.0 million milestone related to the receipt of the J-code for Bendeka, $6.0 million recognized from an asset sale in fiscal 2010 (which had previously been deferred), $2.0 million as the Company met certain one-time performance obligations and $1.8 million related to the amendment of the license and supply agreement with Teva, expanding the territories for commercial sale of Bendeka. License and other revenue for the year ended December 31, 2015 included $30 million of revenue from the license of Bendeka and $15 million on the FDA approval milestone of Bendeka.

### *Cost of Revenue*

| | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2016 | | 2015 | | Increase |
| | (in thousands) | | | | |
| Cost of product sales | $ | 35,785 | | 7,762 | $ | 28,023 |
| Cost of royalty revenue | | 19,521 | | 7,885 | | 11,636 |
| Total cost of revenue | $ | 55,306 | $ | 15,647 | $ | 39,659 |

Cost of revenue increased $39.7 million in the year ended December 31, 2016 to $55.3 million as compared to $15.6 million in the year ended December 31, 2015.

Cost of product sales increased $28.0 million in the year ended December 31, 2016 to $35.8 million as compared to $7.8 million in the year ended December 31, 2015 mainly resulted from sales related to new products Bendeka and Non-Alcohol Docetaxel Injection, both launched in the first quarter of 2016.

Cost of royalty revenue increased $11.6 million in the year ended December 31, 2016 to $19.5 million as compared to $7.9 million in the year ended December 31, 2015, primarily as a result of the cost of product royalty for Bendeka, Non-Alcohol Docetaxel Injection, and Argatroban.

### *Research and Development*

| | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2016 | | 2015 | | Increase |
| | (in thousands) | | | | |
| Research and development | $ | 28,289 | $ | 27,855 | $ | 434 |

Research and development expenses increased approximately $0.4 million in the year ended December 31, 2016 to $28.3 million as compared to $27.9 million in the year ended December 31, 2015. The increases resulted from an increase in project spending for EGL-5385-C-1701, EP-6101, certain other projects and an increase in salary and other personnel-related expenses due to increased headcount. These increases were partially offset by certain cost reimbursements from our commercial partners for $1.6 million, a $2.4 million credit from our supplier related to a dispute resolution, a decrease in project spending for EP-4104 and EP-5101 and non-recurrence in project spending for EP-3101.

### *Selling, General and Administrative*

| | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2016 | | 2015 | | Increase |
| | (in thousands) | | | | |
| Selling, general and administrative | $ | 53,329 | $ | 20,165 | $ | 33,164 |

Selling, general and administrative expenses increased approximately $33.1 million in the year ended December 31, 2016 to $53.3 million as compared to $20.2 million in the year ended December 31, 2015.

This increase is principally related to a $13.1 million increase in salary and personnel related expenses as we build out areas to support the growing needs of the business and sales force, $10.0 million increase in sales and marketing expenses, $5.0 million

77

increase in legal and other professional fees, $1.0 million increase in travel related expenses, and a $2.2 million increase in miscellaneous expenses.

*Gain on sale of asset*

On March 29, 2016, we entered into the Diclofenac Asset Purchase Agreement pursuant to which we sold certain intellectual property related to diclofenac-misoprostol in the United States. In consideration of the assets and rights sold under the Diclofenac Asset Purchase Agreement, we received a one-time payment at closing of $1.75 million, which was included in operating expenses.

*Other Income and Expense*

| | Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2016 | 2015 | Increase/(Decrease) | |
| | (in thousands) | | | |
| Interest income | $ 84 | $ 25 | $ 59 | |
| Interest expense | (8) | (11) | 3 | |
| Total other income, net | $ 76 | $ 14 | $ 62 | |

Other income and (expense) increased by $0.1 million for the year ended December 31, 2016 to income of $76 thousand as compared to an expense of $14 thousand for the year ended December 31, 2015. The increase in other income and (expense) was due to the increase in interest income.

*Benefit from (provision for) income taxes*

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| | (in thousands) | |
| *Benefit from (provision for) income taxes* | $ 28,026 | $ (3) |
| Effective tax rate | (52)% | —% |

The benefit from (provision for) income taxes was based on the applicable federal and state tax rates for those periods. For periods with a loss before benefit for income taxes, favorable tax items result in an increase in the effective tax rate, while unfavorable tax items result in a decrease in the effective tax rate. For periods with income before provision for income taxes, favorable tax items result in an decrease in the effective tax rate, while, unfavorable tax items result in an increase in the effective tax rate. The tax benefit for the year ended December 31, 2016 is due to the release of a previously carried tax valuation allowance on our net deferred tax assets including net operating loss carryforwards and the tax benefit related to the exercises of stock options during 2016. This was partially offset by the tax on 2016 earnings. Our decision to remove the valuation allowance on the Company's net deferred tax assets considered our significant income in 2016 which translated to our becoming a tax payer in 2016 and our outlook on prospective earnings and taxable income driven by Bendeka royalty and milestone revenues. For the year ended December 31, 2015, the Company carried a valuation allowance on its net deferred tax assets. As a result we recorded a minimal tax provision for the period. (see Note to Consolidated Financial Statements - Note 8. Income Taxes).

*Net Income*

Net income for the year ended December 31, 2016 was $81.5 million as compared to a net income of $2.6 million for the year ended December 31, 2015, as a result of the factors discussed above.

**Liquidity and Capital Resources**

Our primary uses of cash are to fund working capital requirements, product development costs, operating expenses as well as strategic business and product acquisitions and repurchases of our common stock. Cash and cash equivalents were $114.7 million, and $52.8 million as of December 31, 2017 and December 31, 2016, respectively.

For the year ended December 31, 2017, we realized net income of $51.9 million. As of December 31, 2017, we had a working capital surplus of $141.4 million. For the year ended December 31, 2016, we realized net income of $81.5 million. Although the Company has incurred significant losses since its inception in January 2007, we recently became profitable and have retained earnings of $26.3 million as of December 31, 2017.

78

We believe that future cash flows from operations will be sufficient to fund our currently anticipated working capital requirements.

The Company expects to use future loans, if any, under the Credit Facility (described above under "Recent Developments"), for general corporate purposes and any strategic acquisitions.

*Operating Activities:*

Net cash provided by operating activities for the year ended December 31, 2017 was $58.9 million. Net income for the same period was $51.9 million offset by non-cash adjustments of approximately $36.5 million principally from deferred income taxes, depreciation, amortization of intangible assets, stock-based compensation expense, asset impairment charge, amortization of debt issuance costs, and change in fair value of contingent consideration. Net changes in working capital decreased cash provided from operating activities by $29.6 million, due to an increase in accounts receivable of $11.6 million, an increase in inventory of $2.4 million partially offset by a decrease in prepaid expenses and other current assets of $2.0 million, a decrease in accounts payable of $8.5 million, a decrease in accrued expenses and other current liabilities of $9.1 million. The total amount of accounts receivable at December 31, 2017 was approximately $53.8 million, which included approximately $13.3 million from product sales, $36.4 million from royalty income, and $4.1 million related to cost reimbursements, all with payment terms of 45 days. Royalty income is receivable with terms of 45 days and starts at the end of the quarter to which it relates, the immediately preceding quarter.

Net cash provided by operating activities for the year ended December 31, 2016 was $53.2 million. Net income for the same period was $81.5 million reduced by non-cash adjustments of approximately $19.6 million principally from deferred income taxes, depreciation, amortization of intangible assets and stock-based compensation expense. Net changes in working capital decreased cash provided from operating activities by $8.6 million, due to an increase in accounts receivable of $15.9 million, an increase in prepaid expenses and other current assets of $9.4 million partially offset by an increase in accounts payable of $10.7 million, a decrease in inventories of $12.3 million and a decrease in deferred revenue of $6.0 million. The total amount of accounts receivable at December 31, 2016 was approximately $42.2 million, which included approximately $10.1 million from product sales and approximately $32.0 million from royalty income, all with payment terms of 45 days. Royalty income is receivable with terms of 45 days and starts at the end of the quarter to which it relates, the immediately preceding quarter.

Net cash used in operating activities for the year ended December 31, 2015 was $9.7 million. Net income for the same period was $2.6 million adjusted by non-cash adjustments of approximately $4.4 million from depreciation, stock-based compensation expense and retirement of fixed assets. Net changes in working capital decreased cash from operating activities by approximately $16.7 million principally due to an increase in accounts receivable of $14.3 million, an increase in inventories of $13.8 million partially offset by an increase in accrued expenses and other liabilities of $11.9 million. Accounts payable and accrued expenses increased primarily due to accrued royalties payable, accrued cost of revenue, accrued inventory purchases on increased commercial activity, and accrued research and development. Inventories increased significantly in preparation for the launch of Bendeka in January 2016. Accounts receivable increased primarily due to the $15.0 million milestone royalty earned under the Cephalon License agreement. The total amount of accounts receivable at December 31, 2015 was approximately $26.3 million, which included approximately $2.0 million of product sales and approximately $24.2 million of royalty income, all with payment terms of 45 days and approximately $0.1 million of other receivables. Royalty income is receivable with terms of 45 days and starts at the end of the quarter to which it relates, the immediately preceding quarter.

*Investing Activities:*

During the year ended December 31, 2017, we invested $0.8 million related to the purchase of the Ryanodex intangible. During the year ended December 31, 2016, we purchased Non-Alcohol Docetaxel Injection for $4.8 million, the Ryanodex intangible for $14.3 million and Eagle Biologics for $26.9 million of net cash acquired. We divested diclofenac-misoprostol for proceeds of $1.8 million.

During the years ended December 31, 2016 and 2015, we invested $62.0 million, and $106.0 million, in U.S. Treasury securities, and redeemed $62.0 million and $106.0 million of short- term investments.

During the years ended December 31, 2017, 2016 and 2015, we invested $4.4 million, $1.6 million, and $1.9 million, respectively, for the purchase of property and equipment.

*Financing Activities:*

Net cash provided by financing activities for the year ended December 31, 2017 was $8.1 million, primarily resulting from $50.0 million in proceeds from debt issuance and the issuance of common stock for stock option exercises of $4.3 million. This was offset by $43.8 million in cash settlements on repurchases of common stock, a $1.2 million payment of debt financing costs, and a $1.3 million payment of debt principal.

Net cash used in financing activities for the year ended December 31, 2016 was $33.7 million primarily resulting from $37.0 million in repurchases of 566,838 shares of our common stock and a $0.3 million payment of contingent consideration partially offset by the issuance of common stock for stock option exercises of $3.6 million.

79

Net cash provided by financing activities for the year ended December 31, 2015 was $55.8 million primarily resulting from $54.3 million on the issuance of our common stock from the Follow-on Offering and proceeds from stock option exercises of $1.5 million.

**Contractual Obligations**

Our future material contractual obligations include the following (in thousands):

| Obligation | Total | 2018 | 2019 | 2020 | 2021 | 2022 | Beyond |
|---|---|---|---|---|---|---|---|
| Operating leases (2) | $ 2,494 | $ 670 | $ 674 | $ 395 | $ 117 | $ 120 | $ 518 |
| Credit facility | 48,750 | 5,000 | 5,000 | 38,750 | — | — | — |
| Acquisition consideration | 15,000 | 15,000 | — | — | — | — | — |
| Purchase obligations (1) | 61,307 | 61,307 | — | — | — | — | — |
| Total obligations | $ 127,551 | $ 81,977 | $ 5,674 | $ 39,145 | $ 117 | $ 120 | $ 518 |

(1) At December 31, 2017, the Company has purchase obligations in the amount of $61,307 which represent the contractual commitments under contract manufacturing and supply agreements with suppliers. The obligation under the supply agreement is primarily for finished product, inventory, and research and development.

(2) The Company leases its office and lab space under lease agreements that expire on June 30, 2020 and December 31, 2027. Rental expense was $664, $634, and $514, for the year ended December 31, 2017, 2016, and 2015, respectively. The remaining future lease payments under the operating lease are $2,494 as of December 31, 2017, payable monthly through June 30, 2020 and December 31, 2027.

**Recent Accounting Pronouncements**

*Recent Accounting Pronouncements - Not Yet Adopted*

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update 2014-09, "Revenue from Contracts with Customers" (Topic 606) (ASU 2014-09). In March, April, May and December 2016, the FASB issued additional guidance related to Topic 606.

The new standard will supersede nearly all existing revenue recognition guidance. Under Topic 606, an entity is required to recognize revenue upon transfer of promised goods or services to customers in an amount that reflects the expected consideration to be received in exchange for those goods or services. Topic 606 defines a five-step process in order to achieve this core principle, which may require the use of judgment and estimates, and also requires expanded qualitative and quantitative disclosures relating to the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers, including significant judgments and estimates used. The new standard also defines accounting for certain costs related to origination and fulfillment of contracts with customers, including whether such costs should be capitalized. The new standard permits adoption either by using (i) a full retrospective approach for all periods presented in the period of adoption or (ii) a modified retrospective approach where the new standard is applied in the financial statements starting with the year of adoption. Under both approaches, cumulative impact of the adoption is reflected as an adjustment to retained earnings (accumulated equity (deficit)) as of the earliest date presented in accordance with the new standard.

In July 2015, the FASB deferred the effective date of the new revenue standard for interim and annual periods beginning after December 15, 2017 (previously December 15, 2016). The Company has implemented the new guidance as of January 1, 2018 using the modified retrospective approach. The Company has evaluated Topic 606, and has assessed existing and historical contracts to identify possible differences in the timing of revenue recognition under the new revenue standard. During this evaluation, both senior management and the Audit Committee have been updated as to progress and findings on a frequent basis. The Company has substantially completed our evaluation of the effect that the updated standard will have on our consolidated financial statements and related disclosures. Adoption of the new guidance will not have a material impact on our consolidated financial statements and our recognition will be consistent with our historical accounting policies.

In January 2016, the FASB issued ASU 2016-01, which revises the guidance in ASC 825-10, Recognition and Measurement of Financial Assets and Financial Liabilities, and provides guidance for the recognition, measurement, presentation, and disclosure of financial assets and liabilities. The guidance is effective for reporting periods (interim and annual) beginning after December 15, 2017, for public companies. We do not expect this ASU to have an impact on our consolidated financial statements.

80

In February 2016, the FASB issued Accounting Standards Update No. 2016-02, Leases. The new standard establishes a right-of-use (ROU) model that requires a lessee to record a ROU asset and a lease liability on the balance sheet for all leases with terms longer than 12 months. Leases will be classified as either finance or operating, with classification affecting the pattern of expense recognition in the income statement. The new standard is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. A modified retrospective transition approach is required for lessees for capital and operating leases existing at, or entered into after, the beginning of the earliest comparative period presented in the financial statements, with certain practical expedients available. The adoption of this new standard will increase assets and liabilities on our balance sheet when adopted. We are still fully assessing the overall impact of this ASU on our financial position and results of operations.

In January 2017, the FASB issued guidance to simplify the measurement of goodwill. The guidance eliminates Step 2 from the goodwill impairment test. Instead, under the amendments in this guidance, an entity should perform its annual or interim goodwill impairment test by comparing the fair value of a reporting unit with its carrying amount. An entity should recognize an impairment charge for the amount by which the carrying amount exceeds the reporting unit's fair value; however the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit. Additionally, an entity should consider income tax effects from any tax deductible goodwill on the carrying amount of the reporting unit when measuring the goodwill impairment loss. The guidance also eliminates the requirements for any reporting unit with a zero or negative carrying amount to perform a qualitative assessment and, if it fails that qualitative test, to perform Step 2 of the goodwill impairment test. An entity is required to disclose the amount of goodwill allocated to each reporting unit with a zero or negative carrying amount of net assets. The guidance is effective for public business entities for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years, and early adoption is permitted for interim or annual goodwill impairment tests performed for testing dates after January 1, 2017. The guidance must be adopted on a prospective basis. We do not expect this guidance to have an impact on our consolidated financial statements.

In January 2017, the FASB issued guidance clarifying the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions or disposals of assets or businesses. The guidance provides a screen to determine when an integrated set of assets and activities is not a business, provides a framework to assist entities in evaluating whether both an input and substantive process are present, and narrows the definition of the term output. The guidance is effective for public business entities for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years, and early adoption is permitted. The guidance must be adopted on a prospective basis. We will consider the guidance for future transactions.

*Recent Adopted Accounting Pronouncements*

In March 2016, the FASB issued ASU 2016-09, Compensation - Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting. The amendments are intended to improve the accounting for employee share-based payments and affect all organizations that issue share-based payment awards to their employees. Several aspects of the accounting for share-based payment award transactions are simplified, including: (a) income tax consequences; (b) classification of awards as either equity or liabilities; and (c) classification on the statement of cash flows. For public companies, the amendments are effective for annual periods beginning after December 15, 2016, and interim periods within those annual periods. In 2016, we early adopted this ASU. With the adoption of this ASU, the Company continues to estimate forfeitures in the calculation of stock-based compensation.

**Off-Balance Sheet Arrangements**

We do not have any off-balance sheet arrangements that have, or are reasonably likely to have, a current or future material effect on our financial condition, changes in financial condition, revenue or expenses, results of operations, liquidity, capital expenditures or capital resources.

**Impact of Inflation**

While it is difficult to accurately measure the impact of inflation due to the imprecise nature of the estimates required, we believe the effects of inflation, if any, on our results of operations and financial condition have been immaterial.

**Critical Accounting Policies and Estimates**

Our management's discussion and analysis of our financial condition and results of operations is based on our financial statements, which have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). The preparation of these financial statements requires us to make estimates and judgments that affect our reported assets and liabilities, revenues and expenses, and other financial information. Actual results may differ significantly from these estimates under different assumptions

and conditions. In addition, our reported financial condition and results of operations could vary due to a change in the application of a particular accounting standard.

We regard an accounting estimate or assumption underlying our financial statements as a "critical accounting estimate" where:

- the nature of the estimate or assumption is material due to the level of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change; and

- the impact of the estimates and assumptions on financial condition or operating performance is material.

Our significant accounting policies are more fully described in Note 2 to our financial statements included in this Annual Report on Form 10-K. Not all of these significant accounting policies, however, require that we make estimates and assumptions that we believe are "critical accounting estimates." We have discussed our accounting policies with the audit committee of our board of directors, and we believe that our estimates relating to revenue recognition, accounting for fair value of warrant liabilities and share-based compensation described below are "critical accounting estimates."

*Revenue Recognition*

Revenue recognition determines the timing of certain expenses, such as commissions and royalties. Revenue results are difficult to predict, and any shortfall in revenue or delay in recognizing revenue could cause operating results to vary significantly from quarter to quarter and year to year. Royalty revenues, based on net sales by licensees, are recorded as revenue for the period in which those sales are made by the licensees. License fees are recorded over the life of the license. Deferred revenue is recognized upon the achievement of milestones. Other deferred revenue is amortized over the life of the underlying agreement.

We recognize revenue in accordance with SEC Staff Accounting Bulletin, or SAB, No. 104, Revenue Recognition, and Statement of Financial Accounting Standards, or ASC 605, Revenue Recognition.

*Product sales*. We recognize net revenues from products manufactured and supplied to our commercial partners, when the following four basic revenue recognition criteria under the related accounting guidance are met: (1) persuasive evidence of an arrangement exists; (2) delivery has occurred or services have been rendered; (3) the fee is fixed or determinable; and (4) collectability is reasonably assured. Prior to the shipment of our manufactured products, we conduct initial product release and stability testing in accordance with current good manufacturing practices, or cGMP. Sales to our commercial partners are presented gross primarily because the Company is the primary obligor in the arrangement, is responsible to ensure that the product is produced in accordance with the related supply agreement and bears risk of loss while the inventory is in-transit to the commercial partner.

Revenue on sales to end users for Non-Alcohol Docetaxel Injection, Ryanodex and diclofenac-misoprostol are recorded net of chargebacks, rebates, returns, prompt pay discounts, wholesaler fees and other deductions. Our products are contracted with a limited number of oncology distributors and hospital buying groups with narrow differences in ultimate realized contract prices used to estimate our chargeback and rebate reserves. The Company has a product returns policy on some of its products that allows the customer to return pharmaceutical products within a specified period of time both prior to and subsequent to the product's expiration date. The Company's estimate of the provision for returns is analyzed quarterly and is based upon many factors, including historical experience of actual returns and analysis of the level of inventory in the distribution channel, if any. The Company has terms on sales of Ryanodex by which the Company does not accept returns. The Company believes that the reserves it has established are reasonable based upon current facts and circumstances. Applying different judgments to the same facts and circumstances could result in the estimated amount for reserves to vary.

*Royalty revenue*. We recognize revenue from royalties based on our commercial partners' net sales of products. Royalties are recognized as earned in accordance with contract terms when they can be reasonably estimated and collectability is reasonably assured. Our commercial partners are obligated to report their net product sales and the resulting royalty due to us within 60 days from the end of each quarter. Based on historical product sales, royalty receipts and other relevant information, we accrue royalty revenue each quarter and subsequently true-up when we receive royalty reports from our commercial partners.

*Collaborative arrangements*. We recognize revenue from reimbursements received in connection with feasibility studies and development work for third parties when our contractual services are performed, provided collectability is reasonably assured. Our principal costs under these arrangements include our personnel conducting research and development, and our allocated overhead, as well as research and development performed by outside contractors or consultants.

We recognize revenues from non-refundable up-front license fees received under collaboration arrangements ratably over the performance period as determined under the collaboration agreement (estimated development period in the case of development

82

arrangements, and contract period or longest patent life in the case of supply and distribution arrangements). If the estimated performance period is subsequently modified, we will modify the period over which the up-front license fee is recognized accordingly on a prospective basis. Upon termination of a collaboration agreement, any remaining non-refundable license fees received by us, which had been deferred, are generally recognized in full. All such recognized revenues are included in collaborative licensing and development revenue in our statements of operations. We recognize revenue from milestone payments received under collaboration arrangements when earned, provided that the milestone event is substantive, its achievability was not reasonably assured at the inception of the agreement, we have no further performance obligations relating to the event and collectability is reasonably assured. If these criteria are not met, we recognize milestone payments ratably over the remaining period of our performance obligations under the collaboration agreement.

*Stock-based compensation*

We account for stock-based compensation under ASC, 718 "Accounting for Stock Based Compensation." All stock-based awards granted to non-employees are accounted for at their fair value in accordance with ASC 718, and ASC 505, " Accounting for Equity Instruments that are Issued to Other Than Employees for Acquiring, or in Conjunction with Selling, Goods or Services," under which compensation expense is generally recognized over the vesting period of the award. Determining the amount of stock-based compensation to be recorded requires us to develop estimates of fair values of stock options as of the grant date.

We account for stock-based compensation by measuring and recognizing compensation expense for all stock-based payments made to employees and directors based on estimated grant date fair values. We use the straight-line method to allocate compensation cost to reporting periods over each optionee's requisite service period, which is generally the vesting period. We estimate the fair value of our stock-based awards to employees and directors using the Black-Scholes option valuation model, or Black-Scholes model. The Black-Scholes model requires the input of subjective assumptions, including the expected stock price volatility, the calculation of expected term, forfeitures and the fair value of the underlying common stock on the date of grant, among other inputs. The risk-free interest rate was determined with the implied yield currently available for zero-coupon U.S. government issues with a remaining term approximating the expected life of the options. In 2016, as we adopted ASU 2016-09, we made a policy election to estimate forfeitures in the calculation of stock based compensation.

*Income Taxes*

 We use the asset and liability method of accounting for income taxes. Deferred tax assets and liabilities are determined based on differences between the financial reporting and tax bases of assets and liabilities and are measured using the enacted tax rates and laws that are expected to be in effect when the differences are expected to reverse. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in the period that such tax rate changes are enacted. The measurement of a deferred tax asset is reduced, if necessary, by a valuation allowance if it is more likely than not that some portion or all of the deferred tax asset will not be realized. We use a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more-likely-than-not to be sustained upon examination by taxing authorities. We have not identified any uncertain income tax positions that could have a material impact to the consolidated financial statements. Although we believe that the judgments and estimates discussed herein are reasonable, actual results could differ, and we may be exposed to losses or gains that could be material.

*Intangible Assets*

Our definite-lived intangible assets include product licenses, product rights and developed technology. These intangible assets were originally recorded at fair value for business combinations and at relative fair value based on the purchase price for asset acquisitions, and are stated net of accumulated amortization. Each intangible asset is amortized over their remaining estimated useful life, ranging from 5 to 20 years. The estimated useful lives directly impact the amount of amortization expense recorded for these assets on a quarterly and annual basis. In addition, we test for impairment of definite-lived intangible assets when events or circumstances indicate that the carrying value of the assets may not be recoverable. Judgment is used in determining when these events and circumstances arise. If we determine that the carrying value of the assets may not be recoverable, judgment and estimates are used to assess the fair value of the assets and to determine the amount of any impairment loss. If the fair value of an intangible asset is determined to be lower than its carrying value, we could be exposed to an impairment charge that could be material.

*Goodwill*

Goodwill relates to the acquisition of Eagle Biologics and represents the excess of the total purchase consideration over the fair value of acquired assets and assumed liabilities. Goodwill is not amortized, but is subject to periodic review for impairment. As a result, the amount of goodwill is directly impacted by the estimates of the fair values of the assets acquired and liabilities assumed. Goodwill is reviewed annually and whenever events or changes in circumstances indicate that the carrying amount of the goodwill

83

might not be recoverable. Judgment is used in determining when these events and circumstances arise. We perform our review of goodwill on our one reporting unit. If we determine that the carrying value of the assets may not be recoverable, judgment and estimates are used to assess the fair value of the assets and to determine the amount of any impairment loss.

*Contingent consideration*

We have agreements with third-parties with contingent consideration and milestone payments that are potentially payable by us, as more fully described in Note 12, "Acquisitions" in the accompanying notes to the consolidated financial statements. These payments are contingent upon achieving sales, development and/or regulatory milestones that may or may not ever be achieved. Therefore, our requirement to make or receive such payments in the future or at all is highly uncertain.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

Market risk is the risk of change in fair value of a financial instrument due to changes in interest rates, equity prices, creditworthiness, financing, exchange rates or other factors. We are exposed to market risk related to changes in interest rates. As of December 31, 2017, we had cash and cash equivalents of $114.7 million held primarily in money market mutual funds. Our primary exposure to market risk is interest rate sensitivity, which is affected by changes in the general level of U.S. interest rates, however, due to the short-term duration of our money market mutual funds and the low risk profile of our investments, an immediate one percent change in interest rates would not have a material effect on the fair market value of our portfolio.

85

**Item 8. Financial Statements and Supplementary Data**

Our Financial Statements and Supplementary Data and Report of Independent Registered Public Accounting Firm appear beginning on page F-1 attached to this Annual Report on Form 10-K.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

N/A

**Item 9A. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

As of December 31, 2017, an evaluation was conducted under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and Rule 15d-15(e) of the Exchange Act). Based on this evaluation, such officers have concluded that our disclosure controls and procedures were effective as of December 31, 2017. Management has concluded that our consolidated financial statements included in this Annual Report on Form 10-K fairly present, in all material respects, our financial condition, results of operations and cash flows for the periods presented therein.

*Remediation of Previous Material Weakness in Internal Control Over Financial Reporting*

In connection with the preparation of our consolidated financial statements as of and for the year ended December 31, 2016, we had identified a material weakness in our internal control over financial reporting related to our controls over the preparation of the annual tax provision. During the year ended December 31, 2017, the Company has executed on its remediation plan for this material weakness and the material weakness has been remediated.

86

**Management's Annual Report on Internal Control Over Financial Reporting**

The management of Eagle Pharmaceuticals, Inc. ("Eagle") has prepared, and is responsible for, Eagle's financial statements and related footnotes. These financial statements have been prepared in conformity with U.S. generally accepted accounting principles. Eagle's management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Securities Exchange Act of 1934 as a process designed by, or under the supervision of the Company's principal executive and principal financial officers and effected by the Company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of Eagle's assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of Eagle are being made only in accordance with authorizations of management and directors of Eagle; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of Eagle's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. Eagle's management conducted an assessment of the Company's internal control over financial reporting as of December 31, 2017 based upon the criteria established in "Internal Control - Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework).

In addition, the effectiveness of our internal control over financial reporting as of December 31, 2017 has been audited by BDO USA, LLP, an independent registered public accounting firm, as stated in its report set forth below.


/s/ Scott Tarriff

Chief Executive Officer and Director

(Principal Executive Officer)


/s/ Pete A. Meyers

Chief Financial Officer

(Principal Accounting and Financial Officer)


**Changes in Internal Control Over Financial Reporting**

During 2017, the Company executed on its remediation plan with respect to the material weakness identified as of December 31, 2016. As part of this remediation plan, the Company executed on strengthening our tax provision review controls with improved documentation standards and oversight, formalizing a policy and procedure for the communication and review of non-routine tax matters by senior management and as appropriate, engaging external tax advisors for advice with respect to non-routine tax matters. Additionally, we have engaged a nationally recognized accounting firm to review our quarterly and annual tax provisions and to advise on any applicable rule or tax-related changes. There were no other changes to controls during the quarter ended December 31, 2017 that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.

87

**Report of Independent Registered Public Accounting Firm**

Shareholders and Board of Directors
Eagle Pharmaceuticals, Inc.
Woodcliff Lake, NJ

**Opinion on Internal Control over Financial Reporting**

We have audited Eagle Pharmaceuticals, Inc. internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2017, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of Eagle Pharmaceuticals, Inc. as of December 31, 2017 and 2016, the related consolidated statements of income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2017, and the related notes, and our report dated February 26, 2018 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying "Item 9A, Management's Report on Internal Control over Financial Reporting". Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of internal control over financial reporting in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ BDO USA, LLP
Woodbridge, NJ
February 26, 2018

88

**Item 9B. Other information.**

None.

**PART III**

**Item 10. Directors, Executive Officers and Corporate Governance**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 11. Executive Compensation**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 13.   Certain Relationships and Related Transactions and Director Independence**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

89

**Item 14. Principal Accountant Fees and Services**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

<div align="center">

**PART IV**

</div>

**Item 15. Exhibits and Financial Statement Schedules**

**(a) Documents filed as part of this report.**

The following documents are filed as part of this report:

### 1. Financial Statements

See Index to Financial Statements at Item 8 herein.

### 2. Financial Statement Schedules

Financial statement schedules have been omitted in this report because they are not applicable, not required under the instructions, or the information requested is set forth in the financial statements or related notes thereto.

### 3. Exhibits

The exhibits listed in the below index to exhibits are filed as part of, or incorporated by reference into, this report.

| Exhibit Number | | Description |
|---|---|---|
| 2.1 | | Stock Purchase Agreement, dated as of November 10, 2016, by and among Eagle Pharmaceuticals, Inc., Arsia Therapeutics, LLC, Arsia Therapeutics, Inc., Amy Schulman, as the Seller Representative, and each person that executed a joinder to the Purchase Agreement (incorporated herein by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed with the Commission on November 14, 2016) ), as amended by Amendment No. 1 to Stock Purchase Agreement, dated as of February 8, 2018 (incorporated herein by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K, SEC File No. 001-36306, filed with the Commission on February 14, 2018) |
| 3.2 | | Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.2 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 3.4 | | Amended and Restated Bylaws (incorporated by reference to Exhibit 3.4 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 4.1 | | Form of Common Stock Certificate of the Registrant (incorporated by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 4.2 | | Third Amended and Restated Investor Rights Agreement, dated April 11, 2013, by and among the Registrant and certain of its stockholders (incorporated by reference to Exhibit 4.2 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.1 | | Form of Indemnification Agreement by and between the Registrant and its directors and officers (incorporated by reference to Exhibit 10.1 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.2 | † | Eagle Pharmaceuticals, Inc. 2007 Incentive Compensation Plan and Form of Stock Option Agreement thereunder (incorporated by reference to Exhibit 10.2 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), as amended December 15, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |

<div align="center">

90

</div>

| | | |
|---|---|---|
| 10.3 | † | Eagle Pharmaceuticals, Inc. 2014 Equity Incentive Plan, as amended and restated, and Form of Stock Option Agreement, Notice of Exercise and Stock Option Grant Notice thereunder (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015), as amended with an additional form of Stock Option Agreement (incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |
| 10.4 | † | Eagle Pharmaceuticals, Inc. 2014 Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.4 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 22, 2014) |
| 10.5 | † | Eagle Pharmaceuticals, Inc. Non-Employee Director Compensation Policy (incorporated by reference to Exhibit 10.5 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 22, 2014) |
| 10.6 | † | Employment Agreement by and between the Registrant and Scott Tarriff dated March 8, 2007, as amended (incorporated by reference to Exhibit 10.6 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 10.7 | † | Offer Letter by and between the Registrant and Adrian Hepner dated December 11, 2014 (incorporated by reference to Exhibit 10.7 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 15, 2017) as amended by entry into the Eagle Pharmaceuticals, Inc. Officer Severance Benefit Plan on April 29, 2016 (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.8 | † | Offer Letter by and between the Registrant and Steven L. Krill dated September 7, 2011 (incorporated by reference to Exhibit 10.8 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.9 | † | Offer Letter by and between the Registrant and David Riggs dated November 7, 2013 (incorporated by reference to Exhibit 10.9 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) as amended by entry into the Eagle Pharmaceuticals, Inc. Officer Severance Benefit Plan on April 29, 2016 (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.10 | † | Lease Agreement between the Registrant and Mack-Cali Chestnut Ridge L.L.C. dated May 28, 2013, as amended on July 1, 2013 (incorporated by reference to Exhibit 10.10 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on March 16, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K , SEC File No. 001-36306, filed March 20, 2015) |
| 10.11 | (a)* | Development and License Agreement, by and between the Registrant and SciDose, LLC, dated September 24, 2007, as amended March 18, 2008, May 22, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.11(a) to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.11 | (b)* | Development and License Agreement, by and between the Registrant and SciDose, LLC, dated June 12, 2007, as amended March 18, 2008, March 25, 2008, December 3, 2008, May 22, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.11(b) to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on August 5, 2015 (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.12 | * | License and Sublicense Agreement, by and between the Registrant and Lyotropic Therapeutics, Inc., dated October 16, 2008 (incorporated by reference to Exhibit 10.12 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.13 | * | License and Development Agreement, by and between the Registrant and The Medicines Company, effective as of September 24, 2009, as amended January 2010 and September 1, 2012 (incorporated by reference to Exhibit 10.13 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.14 | * | Supply Agreement, by and between the Registrant and The Medicines Company, dated September 24, 2009 (incorporated by reference to Exhibit 10.14 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.15 | * | Agreement for the Supply of Argatroban and Topotecan, by and between the Registrant and Cipla Limited, dated December 14, 2012, as amended August 30, 2013 (incorporated by reference to Exhibit 10.15 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.16 | * | Supply and Distribution Agreement, by and between the Registrant and Sandoz AG, dated January 28, 2013 (incorporated by reference to Exhibit 10.16 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.17 | * | Development and License Agreement, by and between the Registrant and Robert One, LLC (bendamustine), dated March 18, 2008, as amended November 11, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.17 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |

| 10.18 | * | Development and License Agreement, by and between the Registrant and Robert One, LLC (pemetrexed), dated February 13, 2009, as amended May 22, 2009, December 23, 2010 and July 16, 2013 (incorporated by reference to Exhibit 10.18 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on August 5, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.19 | * | Exclusive License Agreement, by and between the Registrant and Cephalon, Inc., dated February 13, 2015 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q/A, SEC File No. 001-36306, filed February 12, 2016) |
| 10.20 | * | Settlement and License Agreement, by and between the Registrant and Cephalon, Inc., dated February 13, 2015 (incorporated by reference to Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed May 15, 2015) |
| 10.21 | † | Eagle Pharmaceuticals, Inc. Officer Severance Benefit Plan (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.22 | † | Form of Letter Agreement (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |
| 10.23 | * | License Agreement, by and between the Registrant and Teikoku Pharma USA, Inc., dated October 13, 2015 (incorporated by reference to Exhibit 10.23 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 29, 2016) |
| 10.24 | * | Co-Promotion Agreement, by and between the Registrant and Spectrum Pharmaceuticals, Inc., dated November 4, 2015 (incorporated by reference to Exhibit 10.23 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 29, 2016) |
| 10.25 | † | Offer Letter by and between the Registrant and David Pernock dated January 2, 2017 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 19, 2016) |
| 10.26 | † | Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated January 26, 2017 (incorporated by reference to Exhibit 10.26 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 15, 2017) as amended and restated by the Amended and Restated Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated August 8, 2017 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 9, 2017) |
| 10.27 | † | Amendment to License and Sublicense Agreement, by and between the Registrant and Lyotropic Therapeutics, Inc., dated August 3, 2016 (incorporated by reference to Exhibit 10.27 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 15, 2017) |
| 10.28 | | Offer Letter between the Registrant and Pete A. Meyers dated May 12, 2017 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed May 15, 2017) |
| 10.29 | * | Product Collaboration and License Agreement, by and between the Registrant and SymBio Pharmaceuticals Limited, effective as of September 19, 2017 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed November 8, 2017) |
| 10.30 | | Separation Agreement by and between the Registrant and David Riggs dated January 24, 2018 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed January 30, 2018) |
| 10.31 | (1)† | Form of Restricted Stock Unit Grant Package (2014 Equity Incentive Plan) |
| 10.32 | (1)† | Form of Performance Stock Unit Grant Package (2014 Equity Incentive Plan) |
| 21.1 | (1) | List of subsidiaries of Eagle Pharmaceuticals, Inc. |
| 23.1 | (1) | Consent of BDO USA, LLP, an Independent Registered Public Accounting Firm |
| 24.1 | | Power of Attorney (incorporated by reference to this signature page of this Annual Report on Form 10-K) |
| 31.1 | (1) | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 31.2 | (1) | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 32.1 | (1) | Certifications of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | | XBRL Instance Document |

92

| 101.SCH | XBRL Taxonomy Extension Schema Document |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | XBRL Taxonomy Extension Labels Linkbase Document |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase Document |

†Management contract or compensatory plan or arrangement.

*Confidential treatment granted as to certain portions, which portions are omitted and filed separately with the Securities and Exchange Commission.

(1) Filed herewith.

**Item 16. Form 10-K Summary**

None.

<div align="center">

**SIGNATURES**

</div>

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on February 26, 2018.

**EAGLE PHARMACEUTICALS, INC.**

By:   /s/ Scott Tarriff
      Scott Tarriff
      Chief Executive Officer and Director
      (Principal Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

<div align="center">

**POWER OF ATTORNEY**

</div>

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Scott Tarriff and Pete A. Meyers, and each of them, his true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or either of them, or their or his substitutes or substitute, may lawfully do or cause to be done by virtue hereof.

93

| Signature | Title | Date |
|---|---|---|
| /S/ SCOTT TARRIFF<br>Scott Tarriff | Chief Executive Officer and Director<br>(Principal Executive Officer) | February 26, 2018 |
| /S/ PETE A. MEYERS<br>Pete A. Meyers | Chief Financial Officer<br>(Principal Accounting and Financial Officer) | February 26, 2018 |
| /S/ MICHAEL GRAVES<br>Michael Graves | Chairman of the Board of Directors | February 26, 2018 |
| /S/ STEVEN RATOFF<br>Steven Ratoff | Member of the Board of Directors | February 26, 2018 |
| /S/ SANDER FLAUM<br>Sander Flaum | Member of the Board of Directors | February 26, 2018 |
| /S/ DOUGLAS L. BRAUNSTEIN<br>Douglas L. Braunstein | Member of the Board of Directors | February 26, 2018 |
| /S/ ROBERT L. GLENNING<br>Robert L. Glenning | Member of the Board of Directors | February 26, 2018 |
| /S/ RICHARD A. EDLIN<br>Richard A. Edlin | Member of the Board of Directors | February 26, 2018 |

94

**INDEX TO FINANCIAL STATEMENTS OF
EAGLE PHARMACEUTICALS, INC.**

**APPENDIX A**

|  | **Page** |
|---|---|
| Report of Independent Registered Public Accounting Firm | F- 2 |
| Consolidated Balance Sheets | F- 3 |
| Consolidated Statements of Operations | F- 4 |
| Consolidated Statements of Changes in Stockholders' Equity (Deficit) | F- 5 |
| Consolidated Statements of Cash Flows | F- 6 |
| Notes to Consolidated Financial Statements | F- 8 |

F- 1

**Report of Independent Registered Public Accounting Firm**

Shareholders and Board of Directors
Eagle Pharmaceuticals, Inc.
Woodcliff Lake, NJ

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Eagle Pharmaceuticals Inc. as of December 31, 2017 and 2016, the related consolidated statements of income, stockholders' equity, and cash flows for each of the three years ended December 31, 2017, and the related notes. In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2017 and 2016, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2017**,** in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2017, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated February 26, 2018 expressed an unqualified opinion thereon.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ BDO USA, LLP
We have served as the Company's auditors since 2007.
Woodbridge, NJ
February 26, 2018

F- 2

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(In thousands, except share and per share amounts)**

| | December 31, 2017 | December 31, 2016 |
|---|---|---|
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 114,657 | $ 52,820 |
| Accounts receivable, net | 53,821 | 42,194 |
| Inventory | 5,118 | 2,739 |
| Prepaid expenses and other current assets | 15,101 | 11,357 |
| Total current assets | 188,697 | 109,110 |
| Property and equipment, net | 6,820 | 3,316 |
| Intangible assets, net | 23,322 | 33,372 |
| Goodwill | 39,743 | 39,743 |
| Deferred tax asset, net | 11,354 | 28,643 |
| Other assets | 124 | 136 |
| Total assets | $ 270,060 | $ 214,320 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current liabilities:** | | |
| Accounts payable | $ 11,981 | $ 14,716 |
| Accrued expenses | 15,391 | 25,237 |
| Current portion of contingent consideration | 15,055 | 1,012 |
| Current portion of long-term debt | 4,875 | — |
| Total current liabilities | 47,302 | 40,965 |
| Contingent consideration, less current portion | 709 | 22,129 |
| Long-term debt, less current portion | 42,905 | — |
| Commitments and contingencies | | |
| **Stockholders' equity:** | | |
| Preferred stock, 1,500,000 shares authorized and no shares issued or outstanding as of December 31, 2017 and 2016 | — | — |
| Common stock, $0.001 par value; 50,000,000 shares authorized; 16,089,439 and 15,890,862 issued as of December 31, 2017 and 2016, respectively | 16 | 16 |
| Additional paid in capital | 233,639 | 213,872 |
| Retained earnings (Accumulated deficit) | 26,284 | (25,659) |
| Treasury stock, at cost, 1,241,695 and 566,838 shares as of December 31, 2017 and 2016, respectively | (80,795) | (37,003) |
| Total stockholders' equity | 179,144 | 151,226 |
| Total liabilities and stockholders' equity | $ 270,060 | $ 214,320 |

See accompanying notes to consolidated financial statements

F- 3

**EAGLE PHARMACEUTICALS, INC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except share and per share amounts)**

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2017 | | 2016 | | 2015 |
| **Revenue:** | | | | | | |
| Product sales | $ | 45,327 | $ | 40,646 | $ | 12,968 |
| Royalty revenue | | 153,880 | | 99,040 | | 8,259 |
| License and other revenue | | 37,500 | | 49,796 | | 45,000 |
| Total revenue | | 236,707 | | 189,482 | | 66,227 |
| **Operating expenses:** | | | | | | |
| Cost of product sales | | 33,714 | | 35,785 | | 7,762 |
| Cost of royalty revenue | | 23,472 | | 19,521 | | 7,885 |
| Research and development | | 32,607 | | 28,289 | | 27,855 |
| Selling, general and administrative | | 71,416 | | 53,329 | | 20,165 |
| Gain on sale of asset | | — | | (1,750) | | — |
| Asset impairment charge | | 7,235 | | — | | — |
| Change in fair value of contingent consideration | | (7,377) | | 957 | | — |
| Legal settlement | | 1,650 | | — | | — |
| Total operating expenses | | 162,717 | | 136,131 | | 63,667 |
| Income from operations | | 73,990 | | 53,351 | | 2,560 |
| Interest income | | 91 | | 84 | | 25 |
| Interest expense | | (1,136) | | (8) | | (11) |
| Total other (expense) income | | (1,045) | | 76 | | 14 |
| **Income before income tax (provision) benefit** | | 72,945 | | 53,427 | | 2,574 |
| Income tax (provision) benefit | | (21,002) | | 28,026 | | (3) |
| **Net income** | $ | 51,943 | $ | 81,453 | $ | 2,571 |
| Earnings per share attributable to common stockholders: | | | | | | |
| Basic | $ | 3.44 | $ | 5.24 | $ | 0.17 |
| Diluted | $ | 3.27 | $ | 4.96 | $ | 0.16 |
| Weighted average number of common shares outstanding: | | | | | | |
| Basic | | 15,102,890 | | 15,533,681 | | 15,250,154 |
| Diluted | | 15,908,211 | | 16,434,104 | | 16,253,781 |

See accompanying notes to consolidated financial statements

F- 4

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIT)**
(In thousands)

| | Common Stock | | Additional Paid-In Capital | Treasury Stock | (Accumulated Deficit) Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Number of Shares | Amount | | | | |
| **Balance at December 31, 2014** | **14,037** | **14** | **137,577** | **—** | **(109,683)** | **27,908** |
| Stock-based compensation expense | — | — | 4,051 | — | — | 4,051 |
| Issuance of common stock upon exercise of stock option grants | 211 | — | 1,482 | — | — | 1,482 |
| Issuance of common stock in connection with follow-on public offering, including underwriter's over-allotment, net of offering costs and underwriter's discount | 1,389 | 1 | 54,330 | — | — | 54,331 |
| Net income | — | — | — | | 2,571 | 2,571 |
| **Balance at December 31, 2015** | **15,637** | **15** | **197,440** | **—** | **(107,112)** | **90,343** |
| Stock-based compensation expense | — | — | 9,768 | — | — | 9,768 |
| Issuance of common stock upon exercise of stock option grants | 214 | 1 | 3,618 | — | — | 3,619 |
| Common stock repurchases | — | — | — | (37,003) | — | (37,003) |
| Net income | — | — | — | — | 81,453 | 81,453 |
| Common stock issued for the Eagle Biologics acquisition | 40 | — | 3,046 | — | — | 3,046 |
| **Balance at December 31, 2016** | **15,891** | **16** | **213,872** | **(37,003)** | **(25,659)** | **151,226** |
| Stock-based compensation expense | | | 15,429 | | | 15,429 |
| Issuance of common stock upon exercise of stock option grants | 198 | — | 4,338 | | | 4,338 |
| Common stock repurchases | | | | (43,792) | | (43,792) |
| Net income | | | | | 51,943 | 51,943 |
| **Balance at December 31, 2017** | **16,089** | **$ 16** | **$ 233,639** | **$ (80,795)** | **$ 26,284** | **$ 179,144** |

See accompanying notes to consolidated financial statements

F- 5

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**

(In thousands)

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2017** | | **2016** | | **2015** |
| **Cash flows from operating activities:** | | | | | | |
| Net income | $ | 51,943 | $ | 81,453 | $ | 2,571 |
| Adjustments to reconcile net income to net cash provided by (used in) operating activities: | | | | | | |
| Deferred income taxes | | 17,289 | | (30,116) | | — |
| Depreciation expense | | 932 | | 641 | | 112 |
| Amortization expense | | 2,815 | | 948 | | — |
| Stock-based compensation | | 15,429 | | 9,768 | | 4,051 |
| Change in fair value of contingent consideration | | (7,377) | | 957 | | — |
| Amortization of debt issuance cost | | 222 | | — | | — |
| Gain on sale of diclofenac-misoprostol | | — | | (1,750) | | — |
| Asset impairment charge | | 7,235 | | — | | — |
| Loss on disposal of fixed assets | | — | | — | | 273 |
| **Changes in operating assets and liabilities:** | | | | | | |
| Increase in accounts receivable | | (11,627) | | (15,919) | | (14,311) |
| (Increase) decrease in inventory | | (2,379) | | 12,303 | | (13,800) |
| Decrease (increase) in prepaid expenses and other assets | | 1,993 | | (9,430) | | (323) |
| (Decrease) increase in accounts payable | | (8,460) | | 10,668 | | 356 |
| Decrease in deferred revenue | | — | | (6,000) | | (520) |
| (Decrease) increase in accrued expenses and other liabilities | | (9,096) | | (316) | | 11,873 |
| Net cash provided by (used in) operating activities | | 58,919 | | 53,207 | | (9,718) |
| **Cash flows from investing activities:** | | | | | | |
| Purchase of property and equipment | | (4,436) | | (1,590) | | (1,881) |
| Purchase of short term investments | | — | | (62,000) | | (105,999) |
| Maturities of short term investments | | — | | 62,000 | | 105,999 |
| Payment for Docetaxel acquisition | | — | | (4,850) | | — |
| Payment for Ryanodex intangible asset | | (750) | | (14,250) | | — |
| Purchase of Eagle Biologics, net of cash acquired | | — | | (26,860) | | — |
| Proceeds from sale of diclofenac-misoprostol | | — | | 1,750 | | — |
| Net cash used in investing activities | | (5,186) | | (45,800) | | (1,881) |
| **Cash flows from financing activities:** | | | | | | |
| Repurchases of common stock | | (43,792) | | (37,003) | | — |
| Payment of contingent consideration | | — | | (286) | | — |
| Proceed from debt issuance | | 50,000 | | — | | — |
| Payment of debt principal | | (1,250) | | — | | — |
| Payment of debt financing costs | | (1,192) | | — | | — |
| Proceeds from issuance of common stock from follow-on public offering, net of issuance costs | | — | | — | | 54,331 |
| Proceeds from common stock option exercise | | 4,338 | | 3,619 | | 1,482 |
| Net cash provided by (used in) financing activities | | 8,104 | | (33,670) | | 55,813 |
| **Net increase (decrease) in cash** | | 61,837 | | (26,263) | | 44,214 |
| **Cash and cash equivalents at beginning of period** | | 52,820 | | 79,083 | | 34,869 |
| **Cash and cash equivalents at end of period** | $ | 114,657 | $ | 52,820 | $ | 79,083 |

See accompanying notes to consolidated financial statements

F- 6

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In thousands)

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| **Supplemental disclosures of cash flow information:** | | | |
| **Cash paid during the period for:** | | | |
| Income taxes | $ 10,542 | $ 2,800 | $ 482 |
| Interest | 651 | 8 | 11 |
| **Non-cash operating activities** | | | |
| Landlord contribution to leasehold improvements recorded as deferred rent | — | — | 367 |
| **Non-cash investing activities** | | | |
| Value of common stock issued for the Eagle Biologics acquisition | — | 3,046 | — |
| **Non-cash financing activities** | | | |
| Contingent consideration - business acquisitions | — | 22,470 | — |

See accompanying notes to consolidated financial statements

F- 7

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(In thousands, except share and per share amounts)**

## 1. Organization and Business

Eagle Pharmaceuticals, Inc. (the Company, or Eagle, or we) is a specialty pharmaceutical company focused on developing and commercializing injectable products, primarily in the critical care and oncology areas, using the Food and Drug Administration's ("FDA's") 505(b)(2) NDA regulatory pathway. The Company's business model is to develop proprietary innovations to FDA-approved, injectable drugs, referred to as branded reference drugs, that offer favorable attributes to patients and healthcare providers. The Company has five products currently being sold in the United States under various license agreements in place with commercial partners, including a ready-to-use formulation of Argatroban, Ryanodex®,(dantrolene sodium) ("Ryanodex), diclofenac-misoprostol and docetaxel injection, non-alcohol formulation ("Non-Alcohol Docetaxel Injection") and rapidly infused bendamustine RTD ("Bendeka"). The Company has a number of products currently under development and certain products may be subject to license agreements.

On February 13, 2015, the Company submitted a New Drug Application or NDA to the FDA for Bendeka, which was approved by the FDA on December 7, 2015. Also on February 13, 2015, the Company entered into an Exclusive License Agreement (the "Cephalon License") with Cephalon, Inc. ("Cephalon"), a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd. ("Teva"), for U.S. and Canadian rights to Bendeka for treatment of patients with chronic lymphocytic leukemia ("CLL") and patients with non-Hodgkin's lymphoma ("NHL"). Subsequently, with the consent of the Company, Cephalon assigned to Teva Pharmaceuticals International GmbH ("TPIG") all of Cephalon's rights and obligations under the Cephalon License. Accordingly, all references to "Cephalon" or to the "Cephalon License" and the related supply agreements for Bendeka should be read and construed as references to TPIG and to the license agreement and supply agreements for Bendeka to which the Company and TPIG are now parties. Pursuant to the terms of the Cephalon License, Cephalon will be responsible for all U.S. commercial activities for the product including promotion and distribution, and the Company is responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies. In connection with the Cephalon License, the Company has entered into a supply agreement with Cephalon, pursuant to which the Company is responsible for supplying product to Cephalon. During the quarter-ended September 30, 2016, the Company entered into an amendment to the Cephalon License and supply agreements for Bendeka. The amendment expands the geographical scope of the rights granted under the original agreement to include territories outside the US and Canada. In accordance with this agreement, the Company recorded $1.75 million in license and other revenue on the condensed consolidated statements of operations. The Company is also eligible to receive up to $750 thousand on each regulatory approval received in certain additional territories, not to exceed $2.25 million, and royalties on future sales.

Additionally, under the terms of the Cephalon License, the Company received an upfront cash payment of $30 million in February 2015, received a $15 million milestone payment related to the FDA approval of Bendeka in December 2015, received $40 million in November 2016 related to the receipt of a unique, product-specific billing code, J-code (J9034), for Bendeka and received $25 million in March 2017 for an additional sales-based milestone payment. In addition, the Company was entitled to receive royalty payments of 20% of net sales of the product, which increased to 25% on receipt of the J-code.

On January 11, 2016, the Company entered into an agreement with Albany Molecular Research, Inc. ("AMRI") to jointly develop and manufacture several select and complex parenteral drug products for registration and subsequent commercialization in the United States. Under the terms of the agreement, AMRI will develop and initially provide cGMP manufacturing and analytical support for the registration of the new product candidates. The Company and AMRI will share the costs of development, with 37.5% paid by the Company and 62.5% paid by AMRI. The Company will be responsible for advancing the product candidates through clinical trials and regulatory submissions.

On March 18, 2016, the Company received a Complete Response Letter from the FDA stating that while their initial review of our NDA, for our ready to use ("RTU") bivalirudin candidate, EP-6101, a patented liquid intravenous form of Angiomax® for percutaneous transluminal angioplasty, was complete, they could not approve the application in its present form and requested additional information. The Company has elected not to pursue the application further or seek to exploit EP-6101 for various reasons including the costs associated with addressing the information request in the FDA Complete Response Letter and because additional generic bivalirudin products are able to enter the market. In December of 2017, we divested the NDA for EP-6101 and its related IP in settlement of a litigation with The Medicines Company.

On March 24, 2016, the FDA denied the Company's request for seven years of orphan drug exclusivity in the U.S., for Bendeka. In April 2016, we filed a lawsuit against the FDA arguing that Bendeka is entitled to orphan drug exclusivity as a matter of law (see Note 14 - Legal Proceedings). On July 2, 2014, the FDA granted us orphan drug designations for Bendeka for the treatment of CLL and indolent B-cell NHL. The designations were based on a plausible hypothesis that Bendeka is "clinically superior" to

F- 8

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

a drug previously approved for the same indications. Generally, an orphan-designated drug is eligible for seven years of marketing exclusivity for the orphan-designated indications upon approval of the drug for those indications. If granted, orphan drug exclusivity for Bendeka would run for seven years from December 7, 2015, the date Bendeka was approved.

On March 29, 2016, the Company entered into an asset purchase agreement (the "Diclofenac Asset Purchase Agreement") pursuant to which the Company sold certain intellectual property related to diclofenac-misoprostol in the United States. In consideration of the assets and rights sold under the Diclofenac Asset Purchase Agreement, the Company received a one-time payment at closing of $1.75 million which was recognized as a gain in the first quarter of 2016. In consideration of the rights granted under the agreement, the purchaser will pay the Company a 25% royalty on net profits of diclofenac-misoprostol in the territory for five years from the date of sale. The Company may continue to market diclofenac-misoprostol until such time that the purchaser is able to launch the product.

On August 3, 2016, the Company amended our agreement with Lyotropic Therapeutics, Inc. to reduce future royalties related to Ryanodex net sales from 15% to 3% (subject to further reduction upon the occurrence of certain triggering events) in exchange for $15 million, which we recorded as an intangible asset (see Note 13 Intangible assets, net).

On August 9, 2016, the Company announced a share repurchase program approved by the Company's board of directors authorizing the repurchase of up to $75.0 million of the Company's common stock (the "Share Repurchase Program"). On August 9, 2017, the Company announced a new share repurchase program approved by the Board, under which the Company may repurchase up to an additional $100 million of its outstanding common stock (the "New Share Repurchase Program"). Under the Share Repurchase Program and the New Share Repurchase Program, the Company is authorized to repurchase shares through open market purchases, privately-negotiated transactions or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. The Share Repurchase Programs have no time limit and may be suspended or discontinued completely at any time. The specific timing and amount of repurchases will vary based on available capital resources and other financial and operational performance, market conditions, securities law limitations, and other factors. The repurchases will be made using the Company's cash resources. In any period, cash used in financing activities related to shares repurchased may differ from the comparable change in stockholders' equity, reflecting timing differences between the recognition of share repurchase transactions and their settlement for cash. The Company repurchased 566,838 shares of common stock for $37.0 million in the year ended December 31, 2016, and a total of 674,857 shares of common stock for $43.8 million in the year ended December 31, 2017.

On November 16, 2016 the Company entered into an agreement to acquire Arsia Therapeutics ("Arsia"), an early-stage biotechnology firm with proprietary viscosity-reducing technology and formulation know-how and subsequently renamed the subsidiary Eagle Biologics, Inc. ("Eagle Biologics"). Under the terms of the stock purchase agreement, we paid approximately $27.2 million in cash and 40,200 shares of Eagle common stock worth $3.0 million at closing. We also agreed to pay up to $48 million in additional payments upon the completion of certain milestones, for aggregate potential payments of $78 million. As part of the agreement, Eagle Biologics founders and Massachusetts Institute of Technology professors, Dr. Robert Langer and Dr. Alexander Klibanov, as well as other key members of the Eagle Biologics team, entered into agreements to work with Eagle to develop new formulations and solve delivery challenges in the large molecules space (see Note 12. Acquisitions).

On January 26, 2017, the Company entered into a Credit Agreement (the "Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent ("Agent") and the lenders party thereto. The Credit Agreement provides for a three-year $50 million revolving credit facility (the "Credit Facility"), none of which was drawn at closing. The Credit Facility includes a $5 million letter of credit subfacility.

On July 26, 2017, we received a Complete Response Letter from the FDA regarding its 505(b)(2) NDA for Ryanodex for the treatment of exertional heat stroke, in conjunction with external cooling methods. Based on the recent meeting with the FDA, we have agreed on a path forward and plan to conduct an additional clinical trial in August 2018 during the Hajj pilgrimage, similar to the study conducted during the Hajj in 2015.

On August 8, 2017, the Company entered into an Amended and Restated Credit Agreement (the "Amended Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") and the lenders party thereto, which amended and restated the Company's existing credit agreement, dated as of January 26, 2017. The Amended Credit Agreement provides for a three-year $50 million revolving credit facility and a three-year $100 million term loan facility (which are collectively referred to as the "Amended Credit Facility"). At closing, which occurred on August 8, 2017, $50 million of the term loan facility was drawn, and

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

none of the revolving credit facility has been drawn.  The Company may make one other draw on the term loan facility on or before February 4, 2018. The Company has elected not to draw down further on the term loan facility. The Amended Credit Facility includes a $5 million letter of credit subfacility.  The Company anticipates that the draw at closing and future draws under the Amended Credit Facility, if any, will be used to finance the New Share Repurchase Program (as defined below) and for other corporate purposes.  Loans under the Amended Credit Facility bear interest, at the Company's option, at a rate equal to either (a) the LIBOR rate, plus an applicable margin ranging from 2.25% to 3.00% per annum, based upon the total net leverage ratio (as defined in the Amended Credit Agreement), or (b) the prime lending rate, plus an applicable margin ranging from 1.25% to 2.00% per annum, based upon the total net leverage ratio.  The Company is required to pay a commitment fee on the unused portion of the Amended Credit Facility at a rate ranging from 0.35% to 0.45% per annum based upon the total net leverage ratio.  The Company is permitted to terminate or reduce the revolving commitments or term commitments of the lenders and to make voluntary prepayments at any time subject to break funding payments.  The Company is required to make mandatory prepayments of outstanding indebtedness under the Amended Credit Agreement (a) upon receipt of proceeds from certain sales, transfers or other dispositions, casualty and other condemnation events and the incurrence of certain indebtedness other than indebtedness permitted, subject to customary reinvestment exceptions and (b) in the case that the aggregate amount of all outstanding loans and letters of credit issued under the Amended Credit Facility exceed the aggregate commitment of all lenders under the Amended Credit Facility.

On September 20, 2017, the Company entered into a Product Collaboration and License Agreement, effective as of September 19, 2017, (the "SymBio License Agreement") with SymBio Pharmaceuticals Limited ("SymBio") for the rights to develop and commercialize the Company's bendamustine hydrochloride ready-to-dilute injection product and rapid infusion injection product (collectively, the "Products") in Japan. Under the License Agreement, SymBio will be responsible for all development of the Products in Japan and for obtaining and maintaining all regulatory approvals of the Products in Japan, with a target for regulatory approval of a Product in Japan in 2020. SymBio will bear all costs of development of the Products in Japan except that, if Japanese regulatory authorities require a certain clinical study to be conducted as a condition for approving one of the Products in Japan, Eagle would share 50% of the out-of-pocket costs of that clinical study up to a specified dollar amount as a reduction to future royalty payments. Based on the Company's assessment of the probability of additional costs, we have not deferred revenue on the Symbio License Agreement. SymBio will also be responsible, at its sole cost, for all marketing, promotion, distribution and sales of the Products in Japan and is obligated to launch the Products and meet certain minimum detailing, promotion and marketing commitments in connection with commercialization of the Products in Japan.

SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma ("MCL"), and as a first line treatment of low-grade NHL and MCL. Under the SymBio License Agreement, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

Pursuant to the terms of the SymBio License Agreement, the Company and SymBio will enter into a separate supply agreement, under which the Company will be responsible for manufacturing and supplying the Products to SymBio for development and commercialization in Japan. After a period of time following launch of a Product, SymBio will have the right to assume the responsibility for manufacturing of the Products in and for Japan. Under the SymBio License Agreement, the Company will retain the right to control the prosecution, maintenance and enforcement of the Company's patents covering the Products, both inside and outside of Japan.

Under the SymBio License Agreement, the Company earned an upfront non-refundable cash payment of $12.5 million in the third quarter of 2017, and is eligible to receive a milestone payment upon approval of a Product in Japan and a milestone payment upon achievement of certain cumulative net sales of the Products in Japan, which can aggregate to a total of approximately $10.0 million (subject to currency fluctuations). After regulatory approval of a Product in Japan, the Company will also receive tiered, low double-digit royalties on net sales of the Products in Japan for so long as there are patents covering the Products in Japan or regulatory exclusivity for the Products in Japan.

On October 23, 2017, the Company entered into an agreement with Worldwide Clinical Trials, Inc. to conduct a clinical trial for fulvestrant. A group study of healthy female subjects have been randomized across 12 sites. The study will evaluate the safety, tolerability, and pharmacokinetics of a single dose of fulvestrant for Injectable Suspension versus the reference drug administered by IM injection in the gluteal muscle. We expect the study to be completed by September 2018.

On October 27, 2017, the FDA granted tentative approval for the Company's EP-5101 for locally advanced or metastatic nonsquamous non-small cell lung cancer in combination with cisplatin; locally advanced or metastatic nonsquamous non-small

F- 10

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

cell lung cancer in patients whose disease has not progressed after four cycles of platinum-based first-line chemotherapy, as maintenance treatment; locally advanced or metastatic nonsquamous non-small cell lung cancer after prior chemotherapy as a single agent; and malignant pleural mesothelioma in patients whose disease is unresectable or who are otherwise not candidates for curative surgery in combination with cisplatin.

During the first quarter of 2018, the Company filed an ANDA for our first product candidate co-developed with Albany Molecular Research, Inc, ("AMRI") and are awaiting FDA acceptance of the filing.

On February 8, 2018, we entered into an amendment (the "Amendment") to the stock purchase agreement dated November 10, 2016 (the "Arsia SPA"), pursuant to which we acquired from Arsia Therapeutics, LLC (the "Seller") all of the outstanding capital stock of Arsia Therapeutics, Inc. (now Eagle Biologics). Pursuant to the Amendment, our obligations to make four separate milestone payments pursuant to the Arsia SPA, which could have aggregated to a total of $48 million, were terminated in exchange for a single payment of $15 million to the Seller.

## 2. Summary of Significant Accounting Policies

### Use of Estimates

These financial statements are presented in U.S. dollars and are prepared in accordance with U.S. GAAP. The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported in the condensed financial statements including disclosure of contingent assets and contingent liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period and accompanying notes. The Company's critical accounting policies are those that are both most important to the Company's financial condition and results of operations and require the most difficult, subjective or complex judgments on the part of management in their application, often as a result of the need to make estimates about the effect of matters that are inherently uncertain. Because of the uncertainty of factors surrounding the estimates or judgments used in the preparation of the financial statements, actual results may materially vary from these estimates.

### Reclassifications

Certain reclassifications have been made to prior year amounts to conform with the current year presentation.

### Cash and Cash Equivalents

The Company considers all highly liquid investments with an original maturity of three months or less to be cash equivalents. All cash and cash equivalents are held in United States financial institutions. The carrying amount of cash and cash equivalents approximates its fair value due to its short-term nature.

The Company, at times, maintains balances with financial institutions in excess of the FDIC limit.

### Fair Value Measurements

U.S. GAAP establishes a framework for measuring fair value under generally accepted accounting principles and enhances disclosures about fair value measurements. Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Valuation techniques used to measure fair value must maximize the use of observable inputs and minimize the use of unobservable inputs. The standard describes the following fair value hierarchy based on three levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value:

- Level 1: Quoted prices in active markets for identical assets or liabilities.
- Level 2: Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.
- Level 3: Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

The fair value of interest-bearing cash, cash equivalents, accounts receivable and accounts payable approximate fair value due to their life being short term in nature, and are classified as Level 1 for all periods presented.

The fair value of debt is classified as Level 2 for the period presented and approximates its fair value due to the variable interest rate.

The fair value of the contingent consideration/accrued royalty is classified as Level 3 for the periods presented.

**Intangible Assets**

*Other Intangible Assets, Net*

The Company capitalizes and includes in intangible assets the costs of acquired product licenses and developed technology purchased individually or identified in a business combination. Intangible assets are recorded at fair value at the time of their acquisition and stated net of accumulated amortization. The Company amortizes its definite-lived intangible assets using either the straight-line or accelerated method, based on the useful life of the asset over which it is expected to be consumed utilizing expected undiscounted future cash flows. We will evaluate the potential impairment of intangible assets if events or changes in circumstances indicate that the carrying amount of the assets may not be fully recoverable or that the useful lives of these assets are no longer appropriate. Events giving rise to impairment are an inherent risk in our industry and many factors cannot be predicted. Factors that we consider in deciding when to perform an impairment review include significant changes in our forecasted projections for the asset or asset group for reasons including, but not limited to, significant under-performance of a product in relation to expectations, significant changes or planned changes in our use of the assets, significant negative industry or economic trends, and new or competing products that enter the marketplace. The impairment test is based on a comparison of the undiscounted cash flows expected to be generated from the use of the asset group and its eventual disposition to the carrying value of the asset group. If impairment is indicated, the asset is written down by the amount by which the carrying value of the asset exceeds the related fair value of the asset with the related impairment charge recognized within the statements of income. We identified an impairment to our intangible asset for Non-Alcohol Docetaxel Injection in the third quarter of 2017 (See Note 13. Intangible Assets, Net).

With respect to determining an asset's fair value and useful life, because this process involves management making certain estimates and these estimates form the basis of the determination of whether or not an impairment charge should be recorded, these estimates are considered to be critical accounting estimates.

*Goodwill*

Goodwill represents the excess of purchase price over the fair value of net assets acquired in the Eagle Biologics acquisition. Goodwill is not amortized, but is evaluated for impairment on an annual basis, in the fourth quarter, or more frequently if events or changes in circumstances indicate that the reporting unit's goodwill is less than its carrying amount. We did not identify any impairment to goodwill during the periods presented.

**Acquisition-Related Contingent Consideration**

Contingent consideration related to a business combination is recorded on the acquisition date at the estimated fair value of expected future payments of consideration based on achievement of commercial or regulatory milestones and royalty payments on future product sales. Such fair value is measured based on the consideration expected to be transferred using probability-weighted assumptions and discounted back to present value. The discount rate used is determined at the time of the acquisition in accordance with accepted valuation methods. The fair value of the acquisition-related contingent consideration is re-measured at the estimated fair value at each reporting period with the change in fair value recognized as income or expense in the consolidated statements of income.

**Concentration of Major Customers and Vendors**

The Company is dependent on commercial partners to market and sell Argatroban and Bendeka. The Company's customers for Argatroban are its commercial and licensing partners, therefore, the Company's future revenues are highly dependent on these collaboration and distribution arrangements.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

The total revenues and accounts receivables broken down by major customers as a percentage of the total are as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2017** | **2016** | **2015** |
| **Net revenues** | | | |
| Cephalon, Inc. (Teva) - See Revenue Recognition | 79% | 79% | 68% |
| The Medicines Company /Chiesi USA, Inc. | 2% | 4% | 14% |
| Other | 19% | 17% | 18% |
| | 100% | 100% | 100% |

| | December 31, | |
| --- | --- | --- |
| | **2017** | **2016** |
| **Accounts receivable** | | |
| Cephalon, Inc. (Teva) - See Revenue Recognition | 74% | 74% |
| Other | 26% | 26% |
| | 100% | 100% |

Currently, for Argatroban and Bendeka, the Company uses one vendor as its sole source supplier, because of the unique equipment and process for manufacturing and transferring manufacturing activities to an alternate supplier is a time consuming and costly endeavor.

*Inventory*

Inventory is recorded at the lower of cost or market, with cost determined on a first-in first-out basis. The Company periodically reviews the composition of inventory in order to identify obsolete, slow-moving or otherwise non-saleable items. If non-saleable items are observed and there are no alternate uses for the inventory, the Company will record a write-down to net realizable value in the period that the decline in value is first recognized. In most instances, inventory is shipped from the Company's vendor directly to the Company's customers.

*Property and Equipment*

Property and equipment are stated at cost. Depreciation is recorded over the estimated useful lives of the assets utilizing the straight-line method. Leasehold improvements are being amortized over the shorter of their useful lives or the lease term.

*Research and Development Expense*

Costs for research and development are charged to expense as incurred and include; employee-related expenses including salaries, benefits, travel and stock-based compensation expense for research and development personnel, expenses incurred under agreements with contract research organizations, contract manufacturing organizations and service providers that assist in conducting clinical and preclinical studies, costs associated with preclinical activities and development activities, costs associated with regulatory operations, and depreciation expense for assets used in research and development activities.

Costs for certain development activities, such as clinical studies, are recognized based on an evaluation of the progress to completion of specific tasks using data such as patient enrollment, clinical site activations, or information provided to the Company by its vendors on their actual costs incurred. Payments for these activities are based on the terms of the individual arrangements, which may differ from the patterns of costs incurred, and are reflected in the condensed consolidated financial statements as prepaid expenses or accrued expenses as deemed appropriate. Recoveries of previously recognized research and development expenses from third parties are recorded as a reduction to research and development expense in the period it becomes realizable.

*Advertising and Marketing*

Advertising and marketing costs are expensed as incurred. Advertising and marketing costs were $17,770, $14,784, and $4,752 for the year ended December 31, 2017, 2016, and 2015, respectively.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

*Income Taxes*

We account for income taxes using the liability method in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC"), Topic 740 - Income Taxes ("ASC 740"). Deferred tax assets and liabilities are determined based on temporary differences between financial reporting and tax bases of assets and liabilities and are measured by applying enacted rates and laws to taxable years in which differences are expected to be recovered or settled. Further, the effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that the rate changes. A valuation allowance is required when it is "more likely than not" that all or a portion of deferred tax assets will not be realized. Since our inception, we have incurred substantial cumulative losses and through the third quarter of 2016 we recorded a full valuation allowance against our net deferred tax assets which was largely made up of our net operating loss carryforward. In the fourth quarter of 2016, the Company reversed the reserve on its net deferred tax asset (see Note 8. Income Taxes). ASC 740 also prescribes a comprehensive model for how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that the company has taken or expects to take on a tax return, including a decision whether to file or not file a return in a particular jurisdiction. We recognize any interest and penalties accrued related to unrecognized tax benefits as income tax expense.

*Revenue Recognition*

*Product revenue* - The Company recognizes net revenue on sales to its commercial partners and to end users. In each instance, revenue is recognized only when the price is fixed and determinable, persuasive evidence of an arrangement exists, delivery has occurred or services have been rendered and collectability is reasonably assured.

Revenue on sales to commercial partners relates to Argatroban and Bendeka. The Company's commercial partners can return product within specified timeframes if the product does not meet certain inspection tests. Sales to our commercial partners are presented gross primarily because the Company is the primary obligor in the arrangement, is responsible to ensure that the product is produced in accordance with the related supply agreement and bears risk of loss while the inventory is in-transit to the commercial partner.

Revenue on sales to end users for Non-Alcohol Docetaxel Injection, Ryanodex and diclofenac-misoprostol are recorded net of chargebacks, rebates, returns, prompt pay discounts, wholesaler fees and other deductions. Our products are contracted with a limited number of oncology distributors and hospital buying groups with narrow differences in ultimate realized contract prices used to estimate our chargeback and rebate reserves. The Company has a product returns policy on some of its products that allows the customer to return pharmaceutical products within a specified period of time both prior to and subsequent to the product's expiration date. The Company's estimate of the provision for returns is analyzed quarterly and is based upon many factors, including historical experience of actual returns and analysis of the level of inventory in the distribution channel, if any. The Company has terms on sales of Ryanodex by which the Company does not accept returns. The Company believes that the reserves it has established are reasonable based upon current facts and circumstances. Applying different judgments to the same facts and circumstances could result in the estimated amount for reserves to vary.

*Royalty Revenue* — The Company recognizes revenue from license arrangements with its commercial partners' net sales of products. Royalties are recognized as earned in accordance with contract terms when they can be reasonably estimated and collectability is reasonably assured. The Company's commercial partners are obligated to report their net product sales and the resulting royalty due to the Company within 25 days for Bendeka and 60 days for Argatroban from the end of each quarter. Based on historical product sales, royalty receipts and other relevant information, the Company accrues royalty revenue each quarter and subsequently determines a true-up when it receives royalty reports from its commercial partners. Historically, these true-up adjustments have been immaterial.

*License and other revenue* — The Company analyzes each element of its licensing agreements to determine the appropriate revenue recognition. The terms of the license agreement may include payment to us of non-refundable up-front license fees, milestone payments if specified objectives are achieved, and/or royalties on product sales. The Company recognizes revenue from upfront payments over the period of significant involvement under the related agreements unless the fee is in exchange for products delivered or services rendered that represent the culmination of a separate earnings process and no further performance obligation exists under the contract.

F- 14

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

When a sale combines multiple elements upon performance of multiple services, the Company allocates revenue for transactions that include multiple elements to each unit of accounting which is a deliverable or combination of deliverables under the arrangement that has stand-alone value to the counter-party based on its relative selling price, and recognizes revenue for each unit of accounting when the revenue recognition criteria have been met. The Company follows the selling price hierarchy as outlined in the guidance Revenue Recognition ASC Topic 605 - Multiple-Deliverable Revenue Arrangements. The guidance provides a hierarchy to determine the selling price to be used for allocating revenue to deliverables: (i) vendor-specific objective evidence ("VSOE"), (ii) third-party evidence ("TPE") if available and when VSOE is not available, and (iii) best estimate of the selling price ("BESP") if neither VSOE nor TPE is available. The Company uses BESP to determine the stand-alone selling price for such deliverables. The Company has an established process for developing BESP, which incorporates pricing practices, historical selling prices, the effect of market conditions as well as entity-specific factors. Estimated selling price is monitored and evaluated on a regular basis to ensure that changes in circumstances are accounted for in a timely manner.

The Company recognizes milestone payments as revenue upon the achievement of specified milestones only if (1) the milestone payment is non-refundable, (2) substantive effort is involved in achieving the milestone, (3) the amount of the milestone is reasonable in relation to the effort expended or the risk associated with achievement of the milestone, and (4) the milestone is at risk for both parties. If any of these conditions are not met, we defer the milestone payment and recognize it as revenue over the estimated period of performance under the contract.

As described above, under the terms of the Cephalon License, the Company received an upfront cash payment of $30 million, received a milestone payment of $15 million for regulatory approval, received $40 million milestone upon receipt of the J-Code and received $25 million in an additional sales based milestone payment for reaching $500 million in net product sales of Bendeka. In 2015, $30 million upfront payment was allocated between the license issued to Cephalon and obtaining and maintaining regulatory approvals and conducting post-approval clinical studies using the Company's best estimate of selling price for each deliverable.  The full $30 million was recognized as income in the first quarter of 2015, as the Company substantially completed its requirements for obtaining regulatory approval, which consisted of filing an NDA, on February 13, 2015, and the remaining obligations were estimated to require minimal effort. On December 7, 2015, the FDA approved Bendeka (50 mL bendamustine hydrochloride) marking the achievement of a milestone which entitled the Company to a $15 million payment which was received in January 2016. The Company received a $40 million milestone payment in November 2016 upon receipt of the unique J-Code. Additionally, this event triggered an increase in the royalty rate from 20% to 25% of Bendeka net sales. In March 2017, the Company received a $25 million sales-based milestone payment for reaching $500 million in net product sales.

As discussed above, under the SymBio License Agreement, the Company earned an upfront non-refundable cash payment of $12.5 million during third quarter of 2017.

*Collaborative licensing and development revenue* — The Company recognizes revenue from reimbursements received in connection with feasibility studies and development work for third parties when its contractual services are performed, provided collectability is reasonably assured. Its principal costs under these agreements include its personnel conducting research and development, its allocated overhead, as well as the research and development performed by outside contractors or consultants.

Upon termination of a collaboration agreement, any remaining non-refundable license fees received by the Company, which had been deferred, are generally recognized in full. All such recognized revenues are included in collaborative licensing and development revenue in its statements of income. The Company recognizes revenue from milestone payments received under collaboration agreements when earned, provided that the milestone event is substantive, its achievability was not reasonably assured at the inception of the agreement, the Company has no further performance obligations relating to the event, and collectability is reasonably assured. If these criteria are not met, the Company recognizes milestone payments ratably over the remaining period of its performance obligations under the collaboration agreement.

***Stock-Based Compensation***

The Company accounts for stock-based compensation using the fair value provisions of ASC 718, Compensation - Stock Compensation that requires the recognition of compensation expense, using a fair-value based method, for costs related to all stock-based payments including stock options and restricted stock. This topic requires companies to estimate the fair value of the stock-based awards on the date of grant for options issued to employees and directors and record expense over the employees service periods, which are generally the vesting period of the equity awards.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

The Company accounts for stock-based compensation by measuring and recognizing compensation expense for all stock-based payments made to employees and directors based on estimated grant date fair values. The straight-line method is used to allocate compensation cost to reporting periods over each optionee's requisite service period, which is generally the vesting period. The fair value of our stock-based awards to employees and directors is estimated using the Black-Scholes option valuation model, or Black-Scholes model. The Black-Scholes model requires the input of subjective assumptions, including the expected stock price volatility, the calculation of expected term, forfeitures and the fair value of the underlying common stock on the date of grant, among other inputs. The risk-free interest rate is determined with the implied yield currently available for zero-coupon U.S. government issues with a remaining term approximating the expected life of the options.

*Earnings Per Share*

Basic earnings per common share is computed using the weighted average number of shares outstanding during the period. Diluted earnings per share is computed in a manner similar to the basic earnings per share, except that the weighted-average number of shares outstanding is increased to include all common shares, including those with the potential to be issued by virtue of warrants, options, convertible debt and other such convertible instruments. Diluted earnings per share contemplate a complete conversion to common shares of all convertible instruments only if they are dilutive in nature with regards to earnings per share.

The anti-dilutive common shares equivalents outstanding at December 31, 2017, 2016, and 2015 were as follows:

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2017** | **2016** | **2015** |
| Options | 1,592,548 | 869,957 | 96,610 |

The following table sets forth the computation for basic and diluted net income per share for December 31, 2017, 2016, and 2015:

|  | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
|  | **2017** | | **2016** | | **2015** | |
| **Numerator** | | | | | | |
| Numerator for basic and diluted earnings per share-net income | $ | 51,943 | | 81,453 | $ | 2,571 |
| **Denominator** | | | | | | |
| Basic weighted average common shares outstanding | | 15,102,890 | | 15,533,681 | | 15,250,154 |
| Dilutive effect of stock options | | 805,321 | | 900,423 | | 1,003,627 |
| Diluted weighted average common shares outstanding | | 15,908,211 | | 16,434,104 | | 16,253,781 |
| **Basic net income per share** | | | | | | |
| Basic net income per share | $ | 3.44 | $ | 5.24 | $ | 0.17 |
| **Diluted net income per share** | | | | | | |
| Diluted net income per share | $ | 3.27 | $ | 4.96 | $ | 0.16 |

*Recent Accounting Pronouncements*

*Recent Accounting Pronouncements - Not Yet Adopted*

In May 2014, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update 2014-09, "Revenue from Contracts with Customers" (Topic 606) (ASU 2014-09). In March, April, May and December 2016, the FASB issued additional guidance related to Topic 606.

The new standard will supersede nearly all existing revenue recognition guidance. Under Topic 606, an entity is required to recognize revenue upon transfer of promised goods or services to customers in an amount that reflects the expected consideration to be received in exchange for those goods or services. Topic 606 defines a five-step process in order to achieve this core principle,

F- 16

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

which may require the use of judgment and estimates, and also requires expanded qualitative and quantitative disclosures relating to the nature, amount, timing and uncertainty of revenue and cash flows arising from contracts with customers, including significant judgments and estimates used. The new standard also defines accounting for certain costs related to origination and fulfillment of contracts with customers, including whether such costs should be capitalized. The new standard permits adoption either by using (i) a full retrospective approach for all periods presented in the period of adoption or (ii) a modified retrospective approach where the new standard is applied in the financial statements starting with the year of adoption. Under both approaches, cumulative impact of the adoption is reflected as an adjustment to retained earnings (accumulated equity (deficit)) as of the earliest date presented in accordance with the new standard.

In July 2015, the FASB deferred the effective date of the new revenue standard for interim and annual periods beginning after December 15, 2017 (previously December 15, 2016). The Company has implemented the new guidance as of January 1, 2018 using the modified retrospective approach. The Company has evaluated Topic 606, and has assessed existing and historical contracts to identify possible differences in the timing of revenue recognition under the new revenue standard. During this evaluation, both senior management and the Audit Committee have been updated as to progress and findings on a frequent basis. The Company has substantially completed our evaluation of the effect that the updated standard will have on our consolidated financial statements and related disclosures. Adoption of the new guidance will not have a material impact on our consolidated financial statements and our recognition will be consistent with our historical accounting policies.

In January 2016, the FASB issued ASU 2016-01, which revises the guidance in ASC 825-10, Recognition and Measurement of Financial Assets and Financial Liabilities, and provides guidance for the recognition, measurement, presentation, and disclosure of financial assets and liabilities. The guidance is effective for reporting periods (interim and annual) beginning after December 15, 2017, for public companies. We do not expect this ASU to have an impact on our consolidated financial statements.

In February 2016, the FASB issued Accounting Standards Update No. 2016-02, Leases. The new standard establishes a right-of-use (ROU) model that requires a lessee to record a ROU asset and a lease liability on the balance sheet for all leases with terms longer than 12 months. Leases will be classified as either finance or operating, with classification affecting the pattern of expense recognition in the income statement. The new standard is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. A modified retrospective transition approach is required for lessees for capital and operating leases existing at, or entered into after, the beginning of the earliest comparative period presented in the financial statements, with certain practical expedients available. The adoption of this new standard will increase assets and liabilities on our balance sheet when adopted. We are still fully assessing the overall impact of this ASU on our financial position and results of operations.

In January 2017, the FASB issued guidance to simplify the measurement of goodwill. The guidance eliminates Step 2 from the goodwill impairment test. Instead, under the amendments in this guidance, an entity should perform its annual or interim goodwill impairment test by comparing the fair value of a reporting unit with its carrying amount. An entity should recognize an impairment charge for the amount by which the carrying amount exceeds the reporting unit's fair value; however the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit. Additionally, an entity should consider income tax effects from any tax deductible goodwill on the carrying amount of the reporting unit when measuring the goodwill impairment loss. The guidance also eliminates the requirements for any reporting unit with a zero or negative carrying amount to perform a qualitative assessment and if it fails that qualitative test, to perform Step 2 of the goodwill impairment test. An entity is required to disclose the amount of goodwill allocated to each reporting unit with a zero or negative carrying amount of net assets. The guidance is effective for public business entities for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years, and early adoption is permitted for interim or annual goodwill impairment tests performed for testing dates after January 1, 2017. The guidance must be adopted on a prospective basis. We do not expect this guidance to have an impact on our consolidated financial statements.

In January 2017, the FASB issued guidance clarifying the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions or disposals of assets or businesses. The guidance provides a screen to determine when an integrated set of assets and activities is not a business, provides a framework to assist entities in evaluating whether both an input and substantive process are present, and narrows the definition of the term output. The guidance is effective for public business entities for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years, and early adoption is permitted. The guidance must be adopted on a prospective basis. We will consider the guidance for future transactions.

F- 17

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

*Recent Adopted Accounting Pronouncements*

In March 2016, the FASB issued ASU 2016-09, Compensation - Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting. The amendments are intended to improve the accounting for employee share-based payments and affect all organizations that issue share-based payment awards to their employees. Several aspects of the accounting for share-based payment award transactions are simplified, including: (a) income tax consequences; (b) classification of awards as either equity or liabilities; and (c) classification on the statement of cash flows. For public companies, the amendments are effective for annual periods beginning after December 15, 2016, and interim periods within those annual periods. In 2016, we early adopted this ASU. With the adoption of this ASU, the Company continues to estimate forfeitures in the calculation of stock-based compensation.

**3. Inventory**

Inventory consists of the following:

|  | December 31, | | | |
| --- | --- | --- | --- | --- |
|  | **2017** | | **2016** | |
| Raw material | $ | 2,489 | $ | 1,131 |
| Work in process | | 931 | | 900 |
| Finished products | | 1,698 | | 708 |
| | $ | 5,118 | $ | 2,739 |

**4. Property and Equipment**

Property and equipment consists of the following:

|  | December 31, | | | | Estimated Useful Life (years) |
| --- | --- | --- | --- | --- | --- |
|  | **2017** | | **2016** | | |
| Furniture and equipment | $ | 1,187 | $ | 1,121 | 7 |
| Office equipment | | 513 | | 513 | 3 |
| Equipment | | 2,962 | | 2,059 | 7 |
| Leasehold improvements | | 4,596 | | 1,129 | 2 |
| | | 9,258 | | 4,822 | |
| Less accumulated depreciation | | (2,438) | | (1,506) | |
| Property and equipment, net | $ | 6,820 | $ | 3,316 | |

Depreciation expense amounted to $932, $641, and $112, for the year ended December 31, 2017, 2016, and 2015, respectively.

F- 18

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

**5. Balance Sheet Accounts**

*Prepaid and Other Current Assets*

Prepaid and other current assets consist of the following:

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | | 2016 | |
| | | | | |
| Advances to commercial manufacturers | $ | 2,389 | $ | 7,600 |
| Prepaid FDA user fee | | 1,369 | | 1,592 |
| Prepaid insurance | | 116 | | 135 |
| Prepaid research and development | | 1,069 | | 21 |
| Prepaid income taxes | | 9,597 | | 1,654 |
| All other | | 561 | | 355 |
| Total Prepaid expenses and other current assets | $ | 15,101 | $ | 11,357 |

*Accrued Expenses*

Accrued expenses consist of the following:

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | | 2016 | |
| Accrued expenses | | | | |
| Royalties payable to commercial partners | $ | 4,310 | $ | 9,068 |
| Accrued research & development | | 936 | | 3,528 |
| Accrued professional fees | | 1,254 | | 2,094 |
| Accrued salary and other compensation | | 4,811 | | 6,003 |
| Accrued product costs | | 2,657 | | 2,856 |
| All other | | 1,423 | | 1,688 |
| Total Accrued expenses | $ | 15,391 | $ | 25,237 |

**6. Debt**

On January 26, 2017, the Company entered into a Credit Agreement (the "Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent ("Agent") and the lenders party thereto. The Credit Agreement provides for a three-year $50 million revolving credit facility (the "Credit Facility"), none of which was drawn at closing. The Credit Facility includes a $5 million letter of credit subfacility.

On August 8, 2017, the Company entered into an Amended and Restated Credit Agreement (the "Amended Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") and the lenders party thereto, which amended and restated the Company's existing credit agreement, dated as of January 26, 2017.  The Amended Credit Agreement provides for a three-year $50 million revolving credit facility and a three-year $100 million term loan facility (which are collectively referred to as the "Amended Credit Facility"). The Company recorded $0.3 million of debt extinguishment costs related to the amendment included in selling, general and administrative expenses during the year ended December 31, 2017. As of December 31, 2017, the Company has $1.0 million of unamortized deferred debt issuance costs as part of long-term debt in our condensed consolidated balance sheets.

F- 19

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

At closing, $50 million of the term loan facility was drawn, and none of the revolving credit facility has been drawn. The Company was permitted to make one other draw on the term loan facility on or before February 4, 2018. The Company has elected not to draw down further on the term loan facility. The Amended Credit Facility includes a $5 million letter of credit subfacility.  The Company anticipates that the draw at closing and future draws under the Amended Credit Facility, if any, will be used to finance the New Share Repurchase Program (as defined below) and for other corporate purposes.  Loans under the Amended Credit Facility bear interest, at the Company's option, at a rate equal to either (a) the LIBOR rate, plus an applicable margin ranging from 2.25% to 3.00% per annum, based upon the total net leverage ratio (as defined in the Amended Credit Agreement), or (b) the prime lending rate, plus an applicable margin ranging from 1.25% to 2.00% per annum, based upon the total net leverage ratio.  The Company is required to pay a commitment fee on the unused portion of the Amended Credit Facility at a rate ranging from 0.35% to 0.45%per annum based upon the total net leverage ratio.  The Company is permitted to terminate or reduce the revolving commitments or term commitments of the lenders and to make voluntary prepayments at any time subject to break funding payments.  The Company is required to make mandatory prepayments of outstanding indebtedness under the Amended Credit Agreement (a) upon receipt of proceeds from certain sales, transfers or other dispositions, casualty and other condemnation events and the incurrence of certain indebtedness other than indebtedness permitted, subject to customary reinvestment exceptions and (b) in the case that the aggregate amount of all outstanding loans and letters of credit issued under the Amended Credit Facility exceed the aggregate commitment of all lenders under the Amended Credit Facility. The Company is obligated to repay the term loan facility on the last day of each March, June, September and December in an aggregate principal amount equal to 2.5% during the term of the loan.

| Debt Maturities | as of December 31, 2017 | |
|---|---|---|
| 2018 | $ | 5,000 |
| 2019 | | 5,000 |
| 2020 | | 38,750 |
| Total debt | $ | 48,750 |

## 7. Common Stock and Stock-Based Compensation

On August 9, 2016, the Company announced a share repurchase program approved by the Company's board of directors authorizing the repurchase of up to $75.0 million of the Company's common stock (the "Share Repurchase Program"). On August 9, 2017, the Company announced a new share repurchase program approved by the Board, under which the Company may repurchase up to an additional $100 million of its outstanding common stock (the "New Share Repurchase Program"). Under the Share Repurchase Program and the New Share Repurchase Program, the Company is authorized to repurchase shares through open market purchases, privately-negotiated transactions or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. The Share Repurchase Programs have no time limit and may be suspended or discontinued completely at any time. The specific timing and amount of repurchases will vary based on available capital resources and other financial and operational performance, market conditions, securities law limitations, and other factors. The repurchases will be made using the Company's cash resources. In any period, cash used in financing activities related to shares repurchased may differ from the comparable change in stockholders' equity, reflecting timing differences between the recognition of share repurchase transactions and their settlement for cash.

We repurchased the following shares of common stock with cash resources:

| | Year Ended December 31, | | | |
|---|---|---|---|---|
| | 2017 | | 2016 | |
| Shares of common stock repurchased | | 674,857 | | 566,838 |
| Value of common stock repurchased | $ | 43,792 | $ | 37,003 |

F- 20

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

In December 2007, the Company's board of directors approved the 2007 Incentive Compensation Plan (the "2007 Plan") enabling the Company to grant multiple stock based awards to employees, directors and consultants, the most common being stock options and restricted stock awards. In November 2013, the Company's board of directors approved the 2014 Equity Incentive Plan (the "2014 Plan") which became effective on February 11, 2014. The 2007 Plan was terminated upon the effectiveness of the 2014 Plan and all shares available for issuance under the 2007 Plan were made available under the 2014 Plan. The 2014 Plan provides for the awards of incentive stock options, non-qualified stock options, restricted stock, restricted stock units and other stock-based awards. Awards generally vest equally over a period of four years from grant date. Vesting is accelerated under a change in control of the Company or in the event of death or disability to the recipient. In the event of termination, any unvested shares or options are forfeited. At the Company's annual meeting of stockholders held on August 4, 2015, the stockholders approved an amendment to the 2014 Plan to, among other things, increase the number of shares of common stock authorized for issuance thereunder by 500,000 shares. After accounting for such increase, and as of such amendment, the Company has reserved and made available 2,204,312 shares of common stock for issuance under the 2014 Plan.

The fair value of stock options granted to employees, directors, and consultants is estimated using the following assumptions:

|  | Year Ended December 31, | | |
|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Risk-free interest rate | 1.70% - 2.42% | 0.94% - 2.34% | 1.42% - 2.09% |
| Volatility | 28.56% - 37.63% | 30.95% - 32.36% | 28.4% - 32.9% |
| Expected term (in years) | 5.50-7.0 years | 5.04-7.0 years | 5.5-7.0 years |
| Expected dividend yield | 0.0% | 0.0% | 0.0% |

The Company recognized share-based compensation in its statements of operations for the year ended December 31, 2017, 2016, and 2015 as follows:

|  | Year Ended December 31, | | |
|  | 2017 | 2016 | 2015 |
|---|---|---|---|
| Selling, general and administrative | $ 11,486 | $ 7,073 | $ 2,780 |
| Research and development | 3,943 | 2,695 | 1,271 |
| Total | $ 15,429 | $ 9,768 | $ 4,051 |

The following table is a summary of the Company's stock options issued to employees, directors and consultants (amounts in thousands except per share amounts):

|  | Number of Stock Option Shares | Weighted Average Exercise Price | Non-Exercisable | Exercisable |
|---|---|---|---|---|
| **Outstanding at December 31, 2015** | **1,844,842** | **$ 25.16** | **1,176,140** | **668,702** |
| Granted | 792,500 | 81.61 | | |
| Exercised | (214,194) | 16.94 | | |
| Forfeited or expired | (98,230) | | | |
| **Outstanding at December 31, 2016** | **2,324,918** | **$ 44.53** | **1,281,208** | **1,043,710** |
| Granted | 925,329 | 83.94 | | |
| Exercised | (197,895) | 21.78 | | |
| Forfeited or expired | (265,784) | | | |
| **Outstanding at December 31, 2017** | **2,786,568** | **$ 57.13** | **1,349,339** | **1,437,229** |

F- 21

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

The weighted-average grant-date fair value of options granted during the year ended December 31, 2017, 2016, and 2015 was $32.83, $27.79, and $15.92, respectively. As of December 31, 2017, there was $23,256 of unrecognized compensation cost, which will be expensed over the next 4 fiscal years. The total intrinsic value of options exercised during the year ended December 31, 2017 was $10,897.

The weighted average contractual terms of options outstanding as of December 31, 2017, 2016, and 2015 was 7.0, 7.0, and 7.5 years, respectively.

The aggregate pre-tax intrinsic value of options outstanding as of December 31, 2017, 2016, and 2015 was $33.7 million, $59.2 million, and $54.7 million, respectively.

## 8. Income Taxes

The components of our (provision for) benefit from income taxes is as follows:

| | | Year Ended December 31, | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | 2017 | | 2016 | | 2015 |
| Current: | | | | | | |
| Federal | $ | (1,304) | $ | (1,175) | $ | — |
| State | | (2,409) | | (919) | | (3) |
| | $ | (3,713) | $ | (2,094) | $ | (3) |
| Deferred: | | | | | | |
| Federal | | (18,045) | | 29,553 | | — |
| State | | 756 | | 567 | | — |
| | $ | (17,289) | $ | 30,120 | $ | — |
| | | | | | | |
| (Provision for) benefit from income taxes | $ | (21,002) | $ | 28,026 | $ | (3) |

The table below provides reconciliation between the statutory federal income tax rate and the effective rate of income tax expense for each of the periods shown as follows. For periods with a loss before benefit for income taxes, favorable tax items result in an increase in the effective tax rate, while unfavorable tax items result in a decrease in the effective tax rate. For periods with income before provision for income taxes, favorable tax items result in an decrease in the effective tax rate, while, unfavorable tax items result in an increase in the effective tax rate.

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2017 | 2016 | 2015 |
| Federal statutory tax rate | 35 % | 35 % | 34 % |
| State income taxes, net of federal benefit | 3 % | 3 % | — % |
| Tax benefit on stock option exercises | (4)% | (7)% | — % |
| Tax credits | (10)% | (3)% | (10)% |
| Other | — % | (1)% | 1 % |
| Revaluation of net deferred tax assets due to U.S. tax reform | 5 % | N/A | N/A |
| Change in valuation allowance | — % | (79)% | (25)% |
| **Effective tax rate** | 29 % | (52)% | — % |

F- 22

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amount of assets and liabilities for financial reporting and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets were as follows:

| | December 31, | |
| --- | --- | --- |
| | **2017** | **2016** |
| Deferred tax assets | | |
| Net operating loss carryforward | $ 151 | $ 17,700 |
| Stock based compensation | 6,454 | 5,185 |
| Research and development and other tax credit carryforwards | 5,190 | 4,993 |
| Accrued bonus and other employee-related expenses | 240 | 1,946 |
| Prepaid R&D expenses | 964 | 1,643 |
| Other | 1,405 | 285 |
| Total deferred tax assets | 14,404 | 31,752 |
| Deferred tax liabilities | | |
| Intangible assets | 1,655 | 2,944 |
| Prepaid expenses | 28 | 80 |
| Fixed assets | 1,172 | 78 |
| Other | 195 | 7 |
| Total deferred tax liabilities | 3,050 | 3,109 |
| Valuation allowance | — | — |
| **Net deferred tax assets** | $ 11,354 | $ 28,643 |

The recently enacted Tax Cuts and Jobs Act (the "Tax Act") significantly revised U.S. corporate income tax law by, among other things, reducing the corporate income tax rate to 21% and implementing a modified territorial tax system. In response to the Tax Act, the SEC issued SAB 118 which allows issuers to recognize provisional estimates of the impact of the Tax Act in their financial statements and adjust in the period in which the estimate becomes finalized, or in circumstances where estimates cannot be made, to disclose and recognize within a one year measurement period.

Implementation of the Tax Act resulted in an approximate $3.4 million charge for the revaluation of the Company's net deferred tax assets during the year ended December 31, 2017. In reaching these estimates, the Company utilized all available guidance and notices issued by the U.S. Department of the Treasury. These amounts are to be considered provisional and are not currently able to be finalized given the complexity of the underlying calculations. The Company will update and conclude its accounting as additional information is obtained, which is contingent on the timing of issuance of regulatory guidance.

As a result of recently attaining profitability and the expectation that substantially all net operating loss carryforwards would be utilized in 2017, the Company engaged a third party provider to perform a formal tax evaluation to determine maximum research and development credits that are available based on current law. This project resulted in the engagement of professional technical experts and the investment of significant time to evaluate historical records to identify the maximum credits as permitted by the relevant tax law. This project was concluded in the connection with the preparation of the current year financial statements. As a result of the evaluation of historical records and data, our tax filings, and various tax law interpretations related to the R&D credit availability, additional tax credits were determined. The Company considers the additional credits to result from new information that was not feasibly knowable before the commencement of a formal study, and the results are recorded in the current year as a change in accounting estimate. The adjustment recorded was an increase in tax credits of $5.5 million and a reduction of income tax expense.

In the year ended December 31, 2016, we released a previously carried tax valuation allowance on our net deferred tax assets including net operating loss carryforwards and the tax benefit related to the exercises of stock options. Our decision to remove the valuation allowance on the Company's net deferred tax assets considered our significant income in 2016 which translated to our becoming a tax payer in 2016 and our outlook on prospective earnings and taxable income driven by Bendeka royalty and milestone revenues.

F- 23

As of December 31, 2017, the Company had federal and state net operating loss carryforwards of approximately $0.7 million and $1.0 million. The Company also had a federal research and development tax credit carryforward of approximately $4.0 million. The net operating loss and tax credit carryforwards will expire at various times through 2035.

In July 2006, the Financial Accounting Standards Board ("FASB") issued ASC 740-10, Uncertainty in Income Taxes, which defines the threshold for recognizing the benefits of tax-return positions in the financial statements as "more-likely-than-not" to be sustained by the taxing authorities. This statement also requires explicit disclosure requirements about a Company's uncertainties related to their income tax position, including a detailed roll forward of tax benefits taken that do not qualify for financial statement recognition.

The Company files income tax returns in the U.S. federal jurisdiction and several states. Given that the company has incurred tax losses since its inception, all of the Company's tax years are effectively open to examination. The Company has no amount recorded for any unrecognized tax benefits as of December 31, 2017. The Company regularly evaluates its tax positions for additional unrecognized tax benefits and associated interest and penalties, if applicable. There are many factors that are considered when evaluating these tax positions including: interpretation of tax laws, recent tax litigation on a position, past audit or examination history, and subjective estimates and assumptions.

### 9. License Agreements of Development and Commercialization Rights

*Development*

On February 13, 2015, the Company submitted a New Drug Application or NDA to the FDA for Bendeka, which was approved by the FDA on December 7, 2015. Also, on February 13, 2015, the Company entered into the Cephalon License for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. Pursuant to the terms of the Cephalon License, Cephalon will be responsible for all U.S. commercial activities for the product including promotion and distribution, and the Company is responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies. Additionally, under the terms of the Cephalon License, the Company received an upfront cash payment of $30 million, in January 2016, received a $15 million milestone payment related to the FDA approval of Bendeka in December 2015, received $40 million related to the receipt of the J-code for Bendeka and is currently eligible to receive up to $25 million in an additional sales-based milestone payment. In addition, the Company was entitled to receive royalty payments of 20% of net sales of the product which increased to 25% on receipt of the J-code in November 2016. In connection with the Cephalon License, the Company has entered into a supply agreement with Cephalon, pursuant to which the Company is responsible for supplying product to Cephalon.

On October 13, 2015, the Company entered into the Teikoku Agreement to market, sell and distribute Non-Alcohol Docetaxel Injection, an investigational product intended for the treatment of breast cancer, non-small cell lung cancer, prostate cancer, gastric adenocarcinoma, and head and neck cancer. The NDA for Non-Alcohol Docetaxel Injection for these indications was approved by the FDA on December 22, 2015. Under the terms of the agreement, the Company paid an upfront cash payment upon executing the agreement which was expensed and is included in research and development in the consolidated statements of operation for the year ended December 31, 2015 and an additional payment of $4,850 we capitalized (See Note 12. Acquisitions) upon FDA approval and NDA transfer to Eagle, which occurred in January 2016, and double-digit royalties on gross profits.

On September 20, 2017, the Company entered into a Product Collaboration and License Agreement, effective as of September 19, 2017, (the "SymBio License Agreement") with SymBio Pharmaceuticals Limited ("SymBio") for the rights to develop and commercialize the Company's bendamustine hydrochloride ready-to-dilute injection product and rapid infusion injection product (collectively, the "Products") in Japan. Under the License Agreement, SymBio will be responsible for all development of the Products in Japan and for obtaining and maintaining all regulatory approvals of the Products in Japan, with a target for regulatory approval of a Product in Japan in 2020. SymBio will bear all costs of development of the Products in Japan except that, if Japanese regulatory authorities require a certain clinical study to be conducted as a condition for approving one of the Products in Japan, Eagle would share 50% of the out-of-pocket costs of that clinical study up to a specified dollar amount as a reduction to future royalty payments. Based on the Company's assessment of the probability of additional costs, we have not deferred revenue on the SymBio License Agreement. SymBio will also be responsible, at its sole cost, for all marketing, promotion, distribution and sales of the Products in Japan and is obligated to launch the Products and meet certain minimum detailing, promotion and marketing commitments in connection with commercialization of the Products in Japan.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma ("MCL"), and as a first line treatment of low-grade NHL and MCL. Under the SymBio License Agreement, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

Pursuant to the terms of the SymBio License Agreement, the Company and SymBio will enter into a separate supply agreement, under which the Company will be responsible for manufacturing and supplying the Products to SymBio for development and commercialization in Japan. After a period of time following launch of a Product, SymBio will have the right to assume the responsibility for manufacturing of the Products in and for Japan. Under the SymBio License Agreement, the Company will retain the right to control the prosecution, maintenance and enforcement of the Company's patents covering the Products, both inside and outside of Japan.

Under the SymBio License Agreement, the Company earned an upfront non-refundable cash payment of $12.5 million in the third quarter of 2017, and is eligible to receive a milestone payment upon approval of a Product in Japan and a milestone payment upon achievement of certain cumulative net sales of the Products in Japan. After regulatory approval of a Product in Japan, the Company will also receive tiered, low double-digit royalties on net sales of the Products in Japan for so long as there are patents covering the Products in Japan or regulatory exclusivity for the Products in Japan.

The Company has entered into several product development agreements with development partners whereby the Company acquired the exclusive rights in the United States and, in most cases, worldwide rights to a total of thirty-three products for ten years following first commercial sale of each product. The Company will share varying percentages of the profits after, in most cases, recapturing development, legal and certain operating costs, from the sales of the products with the development partners if the products are commercialized. The Company expenses these costs as incurred.

**10. Asset Sales**

During fiscal year 2010 and 2011, the Company divested another non-core product and received proceeds of $6,500, comprised of $5,500 as a signing milestone which is recorded in deferred revenues and $500 for the initiation of technology transfer of which $250 remains in deferred revenues and a second payment of $500 for the completion of the technology transfer of which $250 remains in deferred revenues. Under the terms of this agreement, the licensor must obtain all of the following milestones in order for the Company to earn the revenues. These milestones are a) the receipt of an approval letter from the FDA, b) acknowledgment from the FDA that no further clinical studies will be needed and c) an approval letter from the FDA.

The Company, through various requests for information, was informed by the licensor in 2016 that it had voluntarily withdrawn the filing of the product application from the FDA in a prior year. Under the terms of the agreement, the milestones required to earn the $6,000 previously included in deferred revenue all related to the filing. The voluntary withdrawal of the filing by the licensor relieved the Company of further obligation with regard to performance under the milestones. Accordingly, during the quarter ended March 31, 2016, the Company recognized the $6,000 as license and other income.

On March 29, 2016, the Company entered into the Diclofenac Asset Purchase Agreement pursuant to which the Company sold certain intellectual property related to diclofenac-misoprostol in the United States. In consideration of the assets and rights sold under the Diclofenac Asset Purchase Agreement, the Company received a one-time payment at closing of $1.75 million, which was recognized as a gain in the first quarter of 2016. In consideration of the rights granted under the Diclofenac Asset Purchase Agreement, the purchaser will pay the Company a 25% royalty on net profits of diclofenac-misoprostol in the territory for five years from the date of sale. The Company may continue to market diclofenac-misoprostol until such time that the purchaser is able to launch.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

## 11. Commitments

Our future material contractual obligations include the following:

| Obligation | Total | | 2018 | | 2019 | | 2020 | | 2021 | | 2022 | | Beyond |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating leases (2) | $ | 2,494 | $ | 670 | $ | 674 | $ | 395 | $ | 117 | $ | 120 | $ | 518 |
| Credit facility | | 48,750 | | 5,000 | | 5,000 | | 38,750 | | — | | — | | — |
| Acquisition consideration | | 15,000 | | 15,000 | | — | | — | | — | | — | | — |
| Purchase obligations (1) | | 61,307 | | 61,307 | | — | | — | | — | | — | | — |
| Total obligations | $ | 127,551 | $ | 81,977 | $ | 5,674 | $ | 39,145 | $ | 117 | $ | 120 | $ | 518 |

(1) At December 31, 2017, the Company has purchase obligations in the amount of $61,307 which represent the contractual commitments under contract manufacturing and supply agreements with suppliers. The obligation under the supply agreement is primarily for finished product, inventory, and research and development.

(2) The Company leases its office and lab space under lease agreements that expire on June 30, 2020 and December 31, 2027. Rental expense was $664, $634, and $514, for the year ended December 31, 2017, 2016, and 2015, respectively. The remaining future lease payments under the operating lease are $2,494 as of December 31, 2017, payable monthly through June 30, 2020 and December 31, 2027.

## 12. Acquisitions

### Acquisition of Docetaxel-Injection, Non-Alcohol Formula

On October 13, 2015, the Company entered into the Teikoku Agreement with Teikoku to market, sell and distribute Non-Alcohol Docetaxel Injection, an investigational product intended for the treatment of breast cancer, non-small cell lung cancer, prostate cancer, gastric adenocarcinoma, and head and neck cancer. The NDA for Non-Alcohol Docetaxel Injection for these indications was approved by the FDA on December 22, 2015. Under the terms of the agreement, the Company paid $4,850 upon FDA approval and NDA transfer to the Company, which occurred on January 12, 2016. The Company will also pay 25% royalties on future gross profits to Teikoku. The Company accounted for the transaction as a purchase of a business in 2016, in accordance with ASC 805 *Business Combinations*.

The Company has measured the fair value of the future royalty payment using its own assumptions of future profitability of Non-Alcohol Docetaxel Injection. Acquisition contingent consideration is measured at fair value on a recurring basis using unobservable inputs; which accordingly represents a Level 3 measurement within the fair value hierarchy. Any change in fair value of the contingent consideration subsequent to the acquisition date is recognized in operating income within the condensed statement of operations.

During the year ended December 31, 2017, the Company recorded a change in the fair value of contingent consideration of $6.2 million. This was primarily driven by adjustments to the fair values of the liabilities associated with Non-Alcohol Docetaxel Injection, which was remeasured due to the loss of a customer and other market conditions identified during the 3rd quarter of 2017 for the product and partially offset by accretion for the time value of money.

F- 26

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

The following table represents a reconciliation of the change in the fair value measurement of the contingent consideration liability, which was recorded in the Company's condensed consolidated statements of income:

| Opening Balance January 12, 2016 | Changes in fair value | Payment of contingent consideration | Closing Balance December 31, 2016 | Changes in fair value | Payment of contingent consideration | Closing Balance December 31, 2017 |
|---|---|---|---|---|---|---|
| $ 6,370 | $ 856 | $ (286) | $ 6,940 | $ (6,176) | $ — | $ 764 |

Total consideration of $11,220, which is comprised of the $4,850 cash paid on FDA approval and NDA transfer to the Company and the fair value of contingent consideration has been attributed to the intangible asset for Non-Alcohol Docetaxel Injection product rights.

**Eagle Biologics Acquisition**

On November 16, 2016, the Company entered into a stock purchase agreement ("Arsia SPA") to acquire Arsia Therapeutics ("Arsia" "Seller"), an early-stage biotechnology firm with proprietary viscosity-reducing technology and formulation know-how and subsequently renamed the subsidiary Eagle Biologics, Inc. ("Eagle Biologics"). Under the terms of the stock purchase agreement, we paid approximately $27.2 million in cash and 40,200 shares of Eagle common stock worth $3.0 million at closing. We also agreed to pay up to $48 million in additional payments upon the completion of certain milestones, for aggregate potential payments of $78 million. As part of the agreement, Eagle Biologics founders and Massachusetts Institute of Technology professors, Dr. Robert Langer and Dr. Alexander Klibanov, as well as other key members of the Eagle Biologics team, entered into agreements to work with Eagle to develop new formulations and solve delivery challenges in the large molecules space.

On February 8, 2018, we entered into an amendment (the "Amendment") to the Arsia SPA. Pursuant to the Amendment, our obligations to make four separate milestone payments pursuant to the Arsia SPA, which could have aggregated to a total of $48 million, were terminated in exchange for a single payment of $15 million to the Seller.

The acquisition was accounted for as a business combination in accordance with ASC 805 which requires the assets acquired and liabilities assumed from Eagle Biologics were recorded as the acquisition date at their respective fair values. Eagle Biologics' results of operations are included in the financial statements from the date of acquisition.

Eagle Biologics' platform technology enables subcutaneous administration of high-dose biologics through improved formulation. Eagle Biologics has developed early-stage partnerships with major pharmaceutical companies to apply its technology to their biosimilar molecules, create subcutaneous versions of currently-marketed IV products and produce high-concentration formulations of clinical candidates. In addition to acquiring the technology platform, the Company plans to establish a Biologics Innovation Center in Kendall Square in Cambridge, Massachusetts.

The following table summarizes the consideration transferred to acquire Eagle Biologics at the date of acquisition:

| The aggregate consideration consisted of: | Preliminary fair value |
|---|---|
| Cash consideration paid | $ 27,209 |
| Common stock issued *(i)* | 3,046 |
| Fair value of contingent consideration payable to seller(long term) *(ii)* | 16,100 |
| Total consideration | $ 46,355 |

*(i)* Under the stock purchase agreement, the number of common shares to be issued to the seller is equal to $2.7 million divided by the average of the closing day price per share for the thirty (30) trading days prior to the Closing Date. The average price of the common stock of 30 days prior to closing was $68.18. Accordingly, the number of common stock to be issued to the

F- 27

seller was determined at 40,200 shares ($2.7 million/$68.18 per share). The fair value of the common stock issued was determined based on the closing price of Eagle's common stock on November 16, 2016.

*(ii)* Under the stock purchase agreement, the contingent consideration includes four separate milestone payments which could aggregate to a total of $48 million payable to the seller upon achievement of certain clinical, regulatory and development milestones. These milestone payments are also subject to acceleration under certain circumstances described in the Purchase Agreement. In accordance with the provisions of ASC 805-30-25-5, each unit of contingent consideration is recognized at the acquisition date fair value. The acquisition date fair value of the contingent consideration is $16.1 million and has been classified as other liabilities within non-current liabilities. Such fair values are determined based on a probabilistic model with weights assigned on the likelihood of the Company achieving the clinical, regulatory and development milestones as well as acceleration event in the future. Each unit of contingent consideration is classified as a liability in the balance sheet and would be subsequently measured at fair value on each reporting date. Any future change in fair would be recognized in the statement of operations.

During the year ended December 31, 2017, the Company recorded a change in the fair value of contingent consideration of $1.2 million mostly related to the amendment of the Arsia stock purchase agreement on February 8, 2018.

| Opening Balance November 16, 2016 | Changes in fair value | Payment of contingent consideration | Closing Balance December 31, 2016 | Changes in fair value | Payment of contingent consideration | Closing Balance December 31, 2017 |
|---|---|---|---|---|---|---|
| $ 16,100 | $ 101 | $ — | $ 16,201 | $ (1,201) | $ — | $ 15,000 |

## 13. Intangible Assets, Net

The gross carrying amounts and net book value of our intangible assets are as follows:

| | Useful Life (In Years) | Gross Carrying Amount | Accumulated Amortization | Impairment Charge | Net Book Value |
|---|---|---|---|---|---|
| | | | **December 31, 2017** | | |
| Docetaxel product rights | 10 | $ 11,220 | $ (1,164) | $ (7,235) | $ 2,821 |
| Ryanodex intangible | 20 | 15,000 | (777) | — | 14,223 |
| Developed technology | 5 | 8,100 | (1,822) | — | 6,278 |
| Total | | $ 34,320 | $ (3,763) | $ (7,235) | $ 23,322 |

| | Useful Life (In Years) | Gross Carrying Amount | Accumulated Amortization | Net Book Value |
|---|---|---|---|---|
| | | | **December 31, 2016** | |
| Docetaxel product rights | 18 | $ 11,220 | $ (571) | $ 10,649 |
| Ryanodex intangible | 20 | 15,000 | (174) | 14,826 |
| Developed technology | 5 | 8,100 | (203) | 7,897 |
| Total | | $ 34,320 | $ (948) | $ 33,372 |

Amortization expense amounted to $2,815, $948, and $0, for the year ended December 31, 2017, 2016, and 2015, respectively.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

*Intangible Asset Impairment*

During the year ended December 31, 2017, the Company experienced a decline in customer contracts and saw a drop in market pricing for Non-Alcohol Docetaxel Injection. Accordingly, the Company estimated the fair value of our Non-Alcohol Docetaxel Injection product and determined the carrying amount of the intangible asset was no longer fully recoverable, resulting in a pre-tax, non-cash asset impairment charge of $7.2 million during the year ended December 31, 2017.

*Estimated Amortization Expense for Intangible Assets*

Based on definite-lived intangible assets recorded as of December 31, 2017, and assuming that the underlying assets will not be impaired and that the Company will not change the expected lives of the assets, future amortization expenses are estimated as follows:

|  | Estimated Amortization Expense |  |
|---|---|---|
| Year Ending December 31, | | |
| 2018 | $ | 2,430 |
| 2019 | | 3,084 |
| 2020 | | 3,161 |
| 2021 | | 3,052 |
| 2022 | | 1,734 |
| All other | | 9,861 |
| Total estimated amortization expense | $ | 23,322 |

## 14. Legal Proceedings

*In Re: Taxotere (Docetaxel)*

On February 1, 2017, the Company was named as a defendant, among various other manufacturers, in several product liability suits that are consolidated in the U.S. District Court for the Eastern District of Louisiana as part of MDL 2740 (Civil Action No 2:16 md-2740). The claims are for personal injuries allegedly arising out of the use of docetaxel.

In March 2017, the Company reached agreements in principle with the Plaintiffs' Steering Committee in this matter to voluntarily dismiss the Company from all of the lawsuits in which it was named and from the master complaint. The Company is in the process of working with the other parties in this matter to have it removed from the Multidistrict litigation entirely.  As part of the agreement, in the event a case is brought in the future with facts that justify the Company's inclusion, the plaintiffs reserved the right to include the Company in such matter.  The plaintiffs have filed several additional lawsuits since the parties' agreement in principle to dismiss, and the Company is in the process of working with plaintiffs to explore the possibility of dismissing those lawsuits.  The Company believes that it has substantial meritorious defenses to these cases and maintains product liability insurance against such cases. However, litigation is inherently uncertain and the Company cannot predict the outcome of this litigation. These actions, if successful, or if our indemnification arrangements or insurance do not provide sufficient coverage against such claims, could adversely affect the Company and could have a material adverse effect on the Company's business, results of operations, financial condition and cash flows.

*Medicines Company v. Eagle*

On February 2, 2016, The Medicines Company ("MDCO") filed a complaint in the U.S. District Court for the District of New Jersey against the Company, SciDose LLC and TherDose Pharma Pvt. Ltd. (collectively the "Defendants") relating to the Defendants' work on a novel ready-to-use bivalirudin injection product ("EP-6101"). MDCO amended that complaint in April of 2016. The complaint cites the May 7, 2008 License and Development Agreement (the "LDA") between the Defendants and MDCO, which was terminated by the Company on September 17, 2013. In October 2017, the Defendants moved to dismiss the action for

F- 29

lack of subject matter jurisdiction and to stay discovery. In December 2017, while those motions were pending, the parties entered into a settlement agreement pursuant to which Defendants agreed to pay $1.7 million and assign to MDCO all intellectual property rights relating to EP-6101. As a result of the settlement, the parties entered into a stipulation dismissing all claims with prejudice.

*Bauer v. Eagle*

On May 31, 2016, a federal securities class-action lawsuit (captioned Bauer v. Eagle Pharmaceuticals, Inc., et al., Case No. 16-cv-03091-JLL-JAD) was filed in the United States District Court for the District of New Jersey against the Company and the Company's Chief Executive Officer. On August 1, 2016, plaintiffs Blake Bauer, Brent Kawamura and Guarang Patel (the "EGRX Investors Group"), filed a motion requesting the Court to appoint the EGRX Investors Group as lead plaintiff and Kirby McInerney LLP as lead counsel. The motion was granted on September 9, 2016. On October 31, 2016, the EGRX Investors Group filed an amended class action complaint (the "Amended Complaint") against the defendants, seeking compensatory damages and an award of costs and expenses, including attorneys' and experts' fees. The Amended Complaint alleged that defendants violated sections 10(b) and 20(a) of the Securities Exchange Act, as amended, by making false and/or misleading statements about, among other things: (a) EP-6101, (b) the Company's expectations regarding the NDA submitted for EP-6101, and (c) the Company's business prospects. On December 16, 2016, defendants filed a motion to dismiss the Amended Complaint. Plaintiffs opposed that motion on January 30, 2017. Defendants filed their reply on March 1, 2017. On May 19, 2017, the Court granted defendants motion to dismiss and dismissed the Amended Complaint without prejudice. On June 1, 2017, the Court entered an order granting plaintiffs until July 3, 2017 to file an amended complaint. Plaintiffs did not file an amended complaint on or before July 3, 2017 and, therefore, on August 2, 2017, the Court entered an order dismissing the case with prejudice and directing the clerk to close the case. On August 31, 2017, plaintiffs filed a notice of appeal to the United States Court of Appeals for the Third Circuit, indicating their intent to appeal from the Court's May 19, 2017 and August 2, 2017 orders. On October 4, 2017, plaintiffs-appellants filed a motion to withdraw their appeal and, on October 5, 2017, the Court of Appeals issued an order dismissing the appeal without costs to either party.

*Eagle v. Burwell*

On April 27, 2016, the Company filed an action in the U.S. District Court for the District of Columbia against the FDA and other federal defendants seeking an order requiring the FDA to grant us orphan drug exclusivity for Bendeka for the treatment of CLL and indolent B-cell NHL. The Company believes Bendeka is entitled to orphan drug exclusivity as a matter of law, and that the FDA's decision violates federal law and is inconsistent with the holding of the U.S. District Court for the District of Columbia in Depomed Inc. v. U.S. Department of Health and Human Services. The parties have filed all substantive motions and pleadings and anticipate either a schedule for oral argument or a disposition from the court in 2018.

*Eagle v. Eli Lilly*

On August 24, 2017, the Company filed an antitrust complaint in the United States District Court for the District of New Jersey against Eli Lilly and Company ("Lilly"), Case No. 2:17-CV-06415. The complaint alleges that Lilly engaged in anticompetitive conduct which restrained competition by delaying and blocking the Company's launch of a competing pemetrexed injection product (to compete with Lilly's Alimta). Lilly has accepted service and answered the complaint on October 27, 2017. Lily also filed a motion to transfer this case to Delaware on October 27, 2017. Eagle filed a motion to oppose such transfer on November 6, 2017. No other dates or proceedings have been scheduled as of the date of the filing of this Annual Report on Form 10-K. The Company believes it has valid claims against Lilly and the right to seek injunctive relief and damages. However, litigation is inherently uncertain, and the Company cannot predict the outcome of this litigation.

**Patent Litigation**

*Eli Lilly and Company. v. Eagle Pharmaceuticals, Inc. (PEMFEXY™ (Pemetrexed))*

On August 14, 2017, Lilly filed suit against the Company in the United States District Court for the Southern District of Indiana (the "Indiana Suit"). Lilly alleged patent infringement based on the filing of the Company's 505(b)(2) NDA seeking approval to manufacture and sell the Company's EP-5101. EP-5101, if finally approved by FDA, will be a branded alternative to Alimta®, which is indicated (in combination with cisplatin) (a) for the treatment of patients with malignant pleural mesothelioma, or (b) for

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

the initial treatment of locally advanced or metastatic nonsquamous non-small cell lung cancer. Alimta® also is indicated as a single-agent for the treatment of patients with locally advanced or metastatic nonsquamous non-small cell lung cancer after prior chemotherapy. Alimta® also is indicated for maintenance treatment of patients with locally advanced or metastatic nonsquamous non-small cell lung cancer whose disease has not progressed after four cycles of platinum-based first-line chemotherapy.

On September 8, 2017, Eagle moved to dismiss the Indiana Suit for improper venue. On September 11, 2017, Lilly voluntarily dismissed the Indiana Suit. It then filed a complaint in the United States District Court for the District of Delaware, alleging similar patent infringement claims (the "Delaware Suit"). Eagle answered and filed various counterclaims in the Delaware Suit on October 3, 2017. Lilly answered Eagle's counterclaims on October 24, 2017. The Court held a scheduling conference on December 11, 2017 and set trial in the Delaware Suit to begin on September 9, 2019. The Delaware Suit is pending.

*Eagle Pharmaceuticals, Inc., et al. v. Slayback Pharma Limited Liability Company; Eagle Pharmaceuticals, Inc., et al. v. Apotex Inc. and Apotex Corp.; Eagle Pharmaceuticals, Inc., et al. v. Fresenius Kabi USA, LLC; Eagle Pharmaceuticals, Inc., et al. v. Mylan Laboratories Limited - (BENDEKA®)*

BENDEKA®, which contains bendamustine hydrochloride, is an alkylating drug that is indicated for the treatment of patients with chronic lymphocytic leukemia, as well as for the treatment of patients with indolent B-cell non-Hodgkin's lymphoma that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen. Four companies - Slayback Pharma Limited Liability Company ("Slayback"), Apotex Inc. and Apotex Corp. ("Apotex"), Fresenius Kabi USA, LLC ("Fresenius"), and Mylan Laboratories Limited ("Mylan") - have filed Abbreviated New Drug Applications ("ANDA's") referencing BENDEKA® that include challenges to one or more of the BENDEKA® Orange Book-listed patents.

The Company, Cephalon, Inc. and/or Teva Pharmaceuticals International GMBH (together the "Patentees"), filed separate suits against Slayback, Apotex, Fresenius and Mylan in the United States District Court for the District of Delaware on August 16, 2017 (Slayback ("Slayback I")), August 18, 2017 (Apotex), August 24, 2017 (Fresenius), December 12, 2017 (Mylan), and January 19, 2018 (Slayback ("Slayback II")). In these Complaints, the Patentees allege infringement of the challenged patents, namely U.S. Patent Nos. 8,791,270 and 9,572,887 against Slayback (Slayback I and Slayback II), and of U.S. Patent Nos. 8,609,707, 8,791,270, 9,000,021, 9,034,908, 9,144,568, 9,265,831, 9,572,796, 9,572,797, 9,572,887, 9,579,384, 9,597,397, 9,597,398, 9,597,399 against Fresenius, Apotex, and Mylan. Slayback, Apotex, Fresenius, and Mylan answered their Complaints and some filed various counterclaims on September 29, 2017 (Slayback I), February 12, 2018 (Slayback II), November 27, 2017, September 15, 2017, and February 14, 2018, respectively. The Patentees answered the Slayback I, Fresenius, and Apotex counterclaims on October 20, 2017, October 6, 2017, and December 18, 2017, respectively. The Slayback I, Apotex, Fresenius and Mylan cases have been consolidated for all purposes, with Trial scheduled to begin September 3, 2019. All five cases are pending.

The FDA is stayed from approving Apotex's, Fresenius', and Mylan's ANDA's until the earlier of (1) January 7, 2020, January 14, 2020, and April 30, 2020, respectively (the "30-month stay dates"); and (2) a court decision that each of the challenged patents is not infringed, invalid or unenforceable. The 30-month stay dates may be shortened or lengthened if either party to the action fails to reasonably cooperate in expediting the action. The FDA cannot approve Slayback's ANDA until March 2033.

F-31

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

**15. Selected Quarterly Financial Data - Unaudited**

A summary of quarterly financial information for the year ended December 31, 2017 and 2016 is as follows:

| | For the Quarter Ended | | | | | | | | | Total Fiscal Year 2017 | |
| | March 31, 2017 | | June 30, 2017 | | September 30, 2017 | | December 31, 2017 | | | | |
| | | | | | | (in thousands except share and per share amounts) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $ | 76,793 | $ | 50,108 | $ | 63,021 | $ | 46,785 | $ | 236,707 | |
| Income from operations | $ | 32,696 | $ | 5,902 | $ | 24,950 | $ | 10,442 | $ | 73,990 | |
| Net income attributable to common stockholders | $ | 22,924 | $ | 4,503 | $ | 15,431 | $ | 9,085 | $ | 51,943 | |
| Income per share attributable to common stockholders- basic | $ | 1.50 | $ | 0.30 | $ | 1.03 | $ | 0.61 | $ | 3.44 | |
| Income per share attributable to common stockholders- diluted | $ | 1.42 | $ | 0.28 | $ | 0.98 | $ | 0.58 | $ | 3.27 | |

| | For the Quarter Ended | | | | | | | | | Total Fiscal Year 2016 | |
| | March 31, 2016 | | June 30, 2016 | | September 30, 2016 | | December 31, 2016 | | | | |
| | | | | | | (in thousands except share and per share amounts) | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Revenue | $ | 29,591 | $ | 40,918 | $ | 37,833 | $ | 81,140 | $ | 189,482 | |
| Income from operations | $ | (897) | $ | 13,656 | $ | 12,308 | $ | 28,284 | $ | 53,351 | |
| Net income attributable to common stockholders | $ | (896) | $ | 13,099 | $ | 11,952 | $ | 57,298 | $ | 81,453 | |
| Income per share attributable to common stockholders- basic | $ | (0.06) | $ | 0.84 | $ | 0.77 | $ | 3.75 | $ | 5.24 | |
| Income per share attributable to common stockholders- diluted | $ | (0.06) | $ | 0.80 | $ | 0.73 | $ | 3.52 | $ | 4.96 | |

**Note 16. Related Party Transaction**

During the year ended December 31, 2017, the Company obtained legal services with respect to certain regulatory matters from Greenberg Traurig, LLP totaling $1.3 million, of which $0.0 million was payable as of December 31, 2017. Richard A. Edlin, a member of the Company's Board, is an attorney and shareholder of Greenberg Traurig, LLP.

F- 32

**EXHIBIT 10.31**

**EAGLE PHARMACEUTICALS, INC.**

**RESTRICTED STOCK UNIT GRANT NOTICE**
**(2014 EQUITY INCENTIVE PLAN)**

Eagle Pharmaceuticals, Inc. (the "***Company***"), pursuant to its 2014 Equity Incentive Plan (as amended, the "***Plan***"), hereby awards to Participant a Restricted Stock Unit Award for the number of shares of the Company's Common Stock ("***Restricted Stock Units***") set forth below (the "***Award***"). The Award is subject to all of the terms and conditions as set forth in this notice of grant (this "***Restricted Stock Unit Grant Notice***"), and in the Plan and the Restricted Stock Unit Award Agreement (the "***Award Agreement***"), both of which are attached hereto and incorporated herein in their entirety. Capitalized terms not explicitly defined herein shall have the meanings set forth in the Plan or the Award Agreement. In the event of any conflict between the terms in this Restricted Stock Unit Grant Notice or the Award Agreement and the Plan, the terms of the Plan shall control.

Participant: __
Date of Grant: __
Vesting Commencement Date: __
Number of Restricted Stock Units: __

**Vesting Schedule:**          [_____, subject to Participant's Continuous Service through each such vesting date.]

**Issuance Schedule:**          Subject to any Capitalization Adjustment, one share of Common Stock (or its cash equivalent, at the discretion of the Company) will be issued for each Restricted Stock Unit that vests at the time set forth in Section 6 of the Award Agreement.

**Additional Terms/Acknowledgements:** Participant acknowledges receipt of, and understands and agrees to, this Restricted Stock Unit Grant Notice, the Award Agreement and the Plan. Participant further acknowledges that as of the Date of Grant, this Restricted Stock Unit Grant Notice, the Award Agreement and the Plan set forth the entire understanding between Participant and the Company regarding the acquisition of the Common Stock pursuant to the Award specified above and supersede all prior oral and written agreements on the terms of this Award, with the exception, if applicable, of (i) restricted stock unit awards or options previously granted and delivered to Participant, (ii) the written employment agreement, offer letter or other written agreement entered into between the Company and Participant specifying the terms that should govern this specific Award, and (iii) any compensation recovery policy that is adopted by the Company or is otherwise required by applicable law.

By accepting this Award, Participant acknowledges having received and read the Restricted Stock Unit Grant Notice, the Award Agreement and the Plan and agrees to all of the terms and conditions set forth in these documents. Participant consents to receive Plan documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

**EAGLE PHARMACEUTICALS, INC.    PARTICIPANT:**

By: __    __

Signature    Signature

Title: __    Date: __

Date: __

**ATTACHMENTS**:  Award Agreement

**ATTACHMENT I**

**EAGLE PHARMACEUTICALS, INC.**

**2014 EQUITY INCENTIVE PLAN**
**RESTRICTED STOCK UNIT AWARD AGREEMENT**

Pursuant to the Restricted Stock Unit Grant Notice (the "***Grant Notice***") and this Restricted Stock Unit Award Agreement (the "***Agreement***"), Eagle Pharmaceuticals, Inc. (the "***Company***") has awarded you ("***Participant***") a Restricted Stock Unit Award (the "***Award***") pursuant to the Company's 2014 Equity Incentive Plan (as amended, the "***Plan***") for the number of Restricted Stock Units/shares indicated in the Grant Notice. Capitalized terms not explicitly defined in this Agreement or the Grant Notice shall have the same meanings given to them in the Plan. The terms of your Award, in addition to those set forth in the Grant Notice, are as follows.

1.          **GRANT OF THE AWARD.** This Award represents the right to be issued on a future date one (1) share of Common Stock for each Restricted Stock Unit that vests on the applicable vesting date(s) (subject to any adjustment under Section 3 below) as indicated in the Grant Notice. As of the Date of Grant, the Company will credit to a bookkeeping account maintained by the Company for your benefit (the "***Account***") the number of Restricted Stock Units/shares of Common Stock subject to the Award. Notwithstanding the foregoing, the Company reserves the right to issue you the cash equivalent of Common Stock, in part or in full satisfaction of the delivery of Common Stock in connection with the vesting of the Restricted Stock Units, and, to the extent applicable, references in this Agreement and the Grant Notice to Common Stock issuable in connection with your Restricted Stock Units will include the potential issuance of its cash equivalent pursuant to such right. This Award was granted in consideration of your services to the Company.

2.      **VESTING.** Subject to the limitations contained herein, your Award will vest, if at all, in accordance with the vesting schedule provided in the Grant Notice. Vesting will cease upon the termination of your Continuous Service and the Restricted Stock Units credited to the Account that were not vested on the date of such termination will be forfeited at no cost to the Company and you will have no further right, title or interest in or to such Award or the shares of Common Stock to be issued in respect of such portion of the Award.

3.      **NUMBER OF SHARES.** The number of Restricted Stock Units subject to your Award may be adjusted from time to time for Capitalization Adjustments, as provided in the Plan. Any additional Restricted Stock Units, shares, cash or other property that becomes subject to the Award pursuant to this Section 3, if any, shall be subject, in a manner determined by the Board, to the same forfeiture restrictions, restrictions on transferability, and time and manner of delivery as applicable to the other Restricted Stock Units and shares covered by your Award. Notwithstanding the provisions of this Section 3, no fractional shares or rights for fractional shares of Common Stock shall be created pursuant to this Section 3. Any fraction of a share will be rounded down to the nearest whole share.

4.      **SECURITIES LAW COMPLIANCE**. You may not be issued any Common Stock under your Award unless the shares of Common Stock underlying the Restricted Stock Units are either (i) then registered under the Securities Act, or (ii) the Company has determined that such issuance would be exempt from the registration requirements of the Securities Act. Your Award must also comply with other applicable laws and regulations governing the Award, and you shall not receive such Common Stock if the Company determines that such receipt would not be in material compliance with such laws and regulations.

5.      **TRANSFER RESTRICTIONS**. Prior to the time that shares of Common Stock have been delivered to you, you may not transfer, pledge, sell or otherwise dispose of this Award or the shares issuable in respect of your Award, except as expressly provided in this Section 5. For example, you may not use shares that may be issued in respect of your Restricted Stock Units as security for a loan. The restrictions on transfer set forth herein will lapse upon delivery to you of shares in respect of your vested Restricted Stock Units.

(a)      **Death**. Your Award is transferable by will and by the laws of descent and distribution. At your death, vesting of your Award will cease and your executor or administrator of your estate shall be entitled to receive, on behalf of your estate, any Common Stock or other consideration that vested but was not issued before your death.

(b)      **Domestic Relations Orders.** Upon receiving written permission from the Board or its duly authorized designee, and provided that you and the designated transferee enter into transfer and other agreements required by the Company, you may transfer your right to receive the distribution of Common Stock or other consideration hereunder, pursuant to a domestic relations order, marital settlement agreement or other divorce or separation instrument as permitted by applicable law that contains the information required by the Company to effectuate the transfer. You are encouraged to discuss the proposed terms of any division of this Award with the Company General Counsel prior to finalizing the domestic relations order or marital settlement agreement to verify that you may make such transfer, and if so, to help ensure the required information is contained within the domestic relations order or marital settlement agreement.

6.      **DATE OF ISSUANCE.**

(a)      The issuance of shares in respect of the Restricted Stock Units is intended to comply with Treasury Regulations Section 1.409A-1(b)(4) and will be construed and administered in such a manner. Subject to the satisfaction of the Withholding Obligation set forth in Section 11 of this Agreement, in the event one or more Restricted Stock Units vests, the Company shall issue to you one (1) share of Common Stock for each Restricted Stock Unit that vests on the applicable vesting date(s) (subject to any adjustment under Section 3 above, and subject to any different provisions in the Grant Notice). Each issuance date determined by this paragraph is referred to as an "***Original Issuance Date***".

(b)      If the Original Issuance Date falls on a date that is not a business day, delivery shall instead occur on the next following business day. In addition, if:

(i)      the Original Issuance Date does not occur (1) during an "open window period" applicable to you, as determined by the Company in accordance with the Company's then-effective policy on trading in Company securities, or (2) on a date when you are otherwise permitted to sell shares of Common Stock on an established stock exchange or stock market (including but not limited to under a previously established written trading plan that meets the requirements of Rule 10b5-1 under the Exchange Act and was entered into in compliance with the Company's policies (a "***10b5-1 Arrangement***")), *and*

(ii)      either (1) a Withholding Obligation does not apply, or (2) the Company decides, prior to the Original Issuance Date, (A) not to satisfy the Withholding Obligation by withholding shares of Common Stock from the shares otherwise due, on the Original Issuance Date, to you under this Award, and (B) not to permit you to enter into a "same day sale" commitment with a broker-dealer pursuant to Section 11 of this Agreement (including but not limited to a commitment under a 10b5-1 Arrangement) and (C) not to permit you to pay your Withholding Obligation in cash,

then the shares that would otherwise be issued to you on the Original Issuance Date will not be delivered on such Original Issuance Date and will instead be delivered on the first business day when you are not prohibited from selling shares of the Company's Common Stock in the open public market, but in no event later than December 31 of the calendar year in which the Original Issuance Date occurs (that is, the last day of your taxable year in which the Original Issuance Date occurs), or, if and only if permitted in a manner that complies with Treasury Regulations Section 1.409A-1(b)(4), no later than the date that is the 15th day of the third calendar month of the applicable year following the year in which the shares of Common Stock under this Award are no longer subject to a "substantial risk of forfeiture" within the meaning of Treasury Regulations Section 1.409A-1(d).

**(c)** The form of delivery (e.g. a stock certificate or electronic entry evidencing such shares) shall be determined by the
Company.

Case 1:24-cv-00064-JLH   Document 471   Filed 08/07/26   Page 167 of 942 PageID #:
15388

**7. DIVIDENDS.** You shall receive no benefit or adjustment to your Award with respect to any cash dividend, stock dividend or other distribution that does not result from a Capitalization Adjustment; provided, however, that this sentence will not apply with respect to any shares of Common Stock that are delivered to you in connection with your Award after such shares have been delivered to you.

**8. RESTRICTIVE LEGENDS.** The shares of Common Stock issued in respect of your Award shall be endorsed with appropriate legends as determined by the Company.

**9. EXECUTION OF DOCUMENTS.** You hereby acknowledge and agree that the manner selected by the Company by which you indicate your consent to your Grant Notice is also deemed to be your execution of your Grant Notice and of this Agreement. You further agree that such manner of indicating consent may be relied upon as your signature for establishing your execution of any documents to be executed in the future in connection with your Award.

**10. AWARD NOT A SERVICE CONTRACT**.

**(a)** Nothing in this Agreement (including, but not limited to, the vesting of your Award or the issuance of the shares in respect of your Award), the Plan or any covenant of good faith and fair dealing that may be found implicit in this Agreement or the Plan shall: (i) confer upon you any right to continue in the employ or service of, or affiliation with, the Company or an Affiliate; (ii) constitute any promise or commitment by the Company or an Affiliate regarding the fact or nature of future positions, future work assignments, future compensation or any other term or condition of employment or affiliation; (iii) confer any right or benefit under this Agreement or the Plan unless such right or benefit has specifically accrued under the terms of this Agreement or Plan; or (iv) deprive the Company of the right to terminate you at will and without regard to any future vesting opportunity that you may have.

**(b)** By accepting this Award, you acknowledge and agree that the right to continue vesting in the Award pursuant to the vesting schedule provided in the Grant Notice may not be earned unless (in addition to any other conditions described in the Grant Notice and this Agreement) you continue as an employee, director or consultant at the will of the Company and affiliate, as applicable (not through the act of being hired, being granted this Award or any other award or benefit) and that the Company has the right to reorganize, sell, spin-out or otherwise restructure one or more of its businesses or Affiliates at any time or from time to time, as it deems appropriate (a "*reorganization*"). You acknowledge and agree that such a reorganization could result in the termination of your Continuous Service, or the termination of Affiliate status of your employer and the loss of benefits available to you under this Agreement, including but not limited to, the termination of the right to continue vesting in the Award. You further acknowledge and agree that this Agreement, the Plan, the transactions contemplated hereunder and the vesting schedule set forth herein or any covenant of good faith and fair dealing that may be found implicit in any of them do not constitute an express or implied promise of continued engagement as an employee or consultant for the term of this Agreement, for any period, or at all, and shall not interfere in any way with the Company's right to terminate your Continuous Service at any time, with or without your cause or notice, or to conduct a reorganization.

**11. WITHHOLDING OBLIGATION.**

(a) On each vesting date, and on or before the time you receive a distribution of the shares of Common Stock in respect of your Restricted Stock Units, and at any other time as reasonably requested by the Company in accordance with applicable tax laws, you hereby authorize any required withholding from the Common Stock issuable to you and/or otherwise agree to make adequate provision, including in cash, for any sums required to satisfy the federal, state, local and foreign tax withholding obligations of the Company or any Affiliate that arise in connection with your Award (the "*Withholding Obligation*").

(b) By accepting this Award, you acknowledge and agree that the Company or any Affiliate may, in its sole discretion, satisfy all or any portion of the Withholding Obligation relating to your Restricted Stock Units by any of the following means or by a combination of such means: (i) causing you to pay any portion of the Withholding Obligation in cash; (ii) withholding from any compensation otherwise payable to you by the Company; (iii) withholding shares of Common Stock from the shares of Common Stock issued or otherwise issuable to you in connection with the Award with a Fair Market Value (measured as of the date shares of Common Stock are issued pursuant to Section 6) equal to the amount of such Withholding Obligation; provided, however, that the number of such shares of Common Stock so withheld will not exceed the amount necessary to satisfy the Withholding Obligation using the maximum statutory withholding rates for federal, state, local and foreign tax purposes, including payroll taxes, that are applicable to supplemental taxable income; and *provided*, further, that to the extent necessary to qualify for an exemption from application of Section 16(b) of the Exchange Act, if applicable, such share withholding procedure will be subject to the express prior approval of the Board or the Company's Compensation Committee; and/or (iv) permitting or requiring you to enter into a "same day sale" commitment, if applicable, with a broker-dealer that is a member of the Financial Industry Regulatory Authority (a "*FINRA Dealer*"), pursuant to this authorization and without further consent, whereby you irrevocably elect to sell a portion of the shares to be delivered in connection with your Restricted Stock Units to satisfy the Withholding Obligation and whereby the FINRA Dealer irrevocably commits to forward the proceeds necessary to satisfy the Withholding Obligation directly to the Company and/or its Affiliates. Unless the Withholding Obligation is satisfied, the Company shall have no obligation to deliver to you any Common Stock or any other consideration pursuant to this Award.

(c) In the event the Withholding Obligation arises prior to the delivery to you of Common Stock or it is determined after the delivery of Common Stock to you that the amount of the Withholding Obligation was greater than the amount withheld by the Company, you agree to indemnify and hold the Company harmless from any failure by the Company to withhold the proper amount.

**12.    TAX CONSEQUENCES.** The Company has no duty or obligation to minimize the tax consequences to you of this Award and shall not be liable to you for any adverse tax consequences to you arising in connection with this Award. You are hereby advised to consult with your own personal tax, financial and/or legal advisors regarding the tax consequences of this Award and by signing the Grant Notice, you have agreed that you have done so or knowingly and voluntarily declined to do so. You understand that you (and not the Company) shall be responsible for your own tax liability that may arise as a result of this investment or the transactions contemplated by this Agreement.

**13.    UNSECURED OBLIGATION.** Your Award is unfunded, and as a holder of a vested Award, you shall be considered an unsecured creditor of the Company with respect to the Company's obligation, if any, to issue shares or other property pursuant to this Agreement. You shall not have voting or any other rights as a stockholder of the Company with respect to the shares to be issued pursuant to this Agreement until such shares are issued to you pursuant to Section 6 of this Agreement. Upon such issuance, you will obtain full voting and other rights as a stockholder of the Company. Nothing contained in this Agreement, and no action taken pursuant to its provisions, shall create or be construed to create a trust of any kind or a fiduciary relationship between you and the Company or any other person.

**14.    NOTICES**. Any notice or request required or permitted hereunder shall be given in writing (including electronically) and will be deemed effectively given upon receipt or, in the case of notices delivered by mail by the Company to you, five (5) days after deposit in the United States mail, postage prepaid, addressed to you at the last address you provided to the Company. The Company may, in its sole discretion, decide to deliver any documents related to participation in the Plan and this Award by electronic means or to request your consent to participate in the Plan by electronic means. By accepting this Award, you consent to receive such documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

**15.    HEADINGS**. The headings of the Sections in this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement or to affect the meaning of this Agreement.

**16.    MISCELLANEOUS**.

**(a)**    The rights and obligations of the Company under your Award shall be transferable by the Company to any one or more persons or entities, and all covenants and agreements hereunder shall inure to the benefit of, and be enforceable by, the Company's successors and assigns.

**(b)**    You agree upon request to execute any further documents or instruments necessary or desirable in the sole determination of the Company to carry out the purposes or intent of your Award.

**(c)**    You acknowledge and agree that you have reviewed your Award in its entirety, have had an opportunity to obtain the advice of counsel prior to executing and accepting your Award and fully understand all provisions of your Award.

**(d)**    This Agreement shall be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or national securities exchanges as may be required.

**(e)**    All obligations of the Company under the Plan and this Agreement shall be binding on any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation, or otherwise, of all or substantially all of the business and/or assets of the Company.

**17.    GOVERNING PLAN DOCUMENT**. Your Award is subject to all the provisions of the Plan, the provisions of which are hereby made a part of your Award, and is further subject to all interpretations, amendments, rules and regulations which may from time to time be promulgated and adopted pursuant to the Plan. Your Award (and any compensation paid or shares issued under your Award) is subject to recoupment in accordance with The Dodd–Frank Wall Street Reform and Consumer Protection Act and any implementing regulations thereunder, any clawback policy adopted by the Company and any compensation recovery policy otherwise required by applicable law. No recovery of compensation under such a clawback policy will be an event giving rise to a right to voluntarily terminate employment upon a resignation for "good reason," or for a "constructive termination" or any similar term under any plan of or agreement with the Company.

**18.    EFFECT ON OTHER EMPLOYEE BENEFIT PLANS.** The value of the Award subject to this Agreement shall not be included as compensation, earnings, salaries, or other similar terms used when calculating benefits under any employee benefit plan (other than the Plan) sponsored by the Company or any Affiliate except as such plan otherwise expressly provides. The Company expressly reserves its rights to amend, modify, or terminate any or all of the employee benefit plans of the Company or any Affiliate.

**19.    SEVERABILITY**. If all or any part of this Agreement or the Plan is declared by any court or governmental authority to be unlawful or invalid, such unlawfulness or invalidity shall not invalidate any portion of this Agreement or the Plan not declared to be unlawful or invalid. Any Section of this Agreement (or part of such a Section) so declared to be unlawful or invalid shall, if possible, be construed in a manner which will give effect to the terms of such Section or part of a Section to the fullest extent possible while remaining lawful and valid.

**20.    OTHER DOCUMENTS**. You hereby acknowledge receipt or the right to receive a document providing the information required by Rule 428(b)(1) promulgated under the Securities Act. In addition, you acknowledge receipt of the Company's policy permitting certain individuals to sell shares only during certain "window" periods and the Company's insider trading policy, in effect from time to time.

**21.**   **AMENDMENT.** This Agreement may not be modified, amended or terminated except by an instrument in writing, signed by you and by a duly authorized representative of the Company. Notwithstanding the foregoing, this Agreement may be amended solely by the Board by a writing which specifically states that it is amending this Agreement, so long as a copy of such amendment is delivered to you, and provided that, except as otherwise expressly provided in the Plan, no such amendment materially adversely affecting your rights hereunder may be made without your written consent. Without limiting the foregoing, the Board reserves the right to change, by written notice to you, the provisions of this Agreement in any way it may deem necessary or advisable to carry out the purpose of the Award as a result of any change in applicable laws or regulations or any future law, regulation, ruling, or judicial decision, provided that any such change shall be applicable only to rights relating to that portion of the Award which is then subject to restrictions as provided herein.

**22.**   **COMPLIANCE WITH SECTION 409A OF THE CODE.** This Award is intended to be exempt from the application of Section 409A of the Code, including but not limited to by reason of complying with the "short-term deferral" rule set forth in Treasury Regulation Section 1.409A-1(b)(4) and any ambiguities herein shall be interpreted accordingly. Notwithstanding the foregoing, if it is determined that the Award fails to satisfy the requirements of the short-term deferral rule and is otherwise not exempt from, and determined to be deferred compensation subject to Section 409A of the Code, this Award shall comply with Section 409A to the extent necessary to avoid adverse personal tax consequences and any ambiguities herein shall be interpreted accordingly. If it is determined that the Award is deferred compensation subject to Section 409A and you are a "Specified Employee" (within the meaning set forth in Section 409A(a)(2)(B)(i) of the Code) as of the date of your "Separation from Service" (as defined in Section 409A), then the issuance of any shares that would otherwise be made upon the date of your Separation from Service or within the first six (6) months thereafter will not be made on the originally scheduled date(s) and will instead be issued in a lump sum on the date that is six (6) months and one day after the date of the Separation from Service, with the balance of the shares issued thereafter in accordance with the original vesting and issuance schedule set forth above, but if and only if such delay in the issuance of the shares is necessary to avoid the imposition of adverse taxation on you in respect of the shares under Section 409A of the Code. Each installment of shares that vests is intended to constitute a "separate payment" for purposes of Treasury Regulation Section 1.409A-2(b)(2).

\* \* \* \* \*

This Restricted Stock Unit Award Agreement shall be deemed to be signed by the Company and the Participant upon the signing by the Participant of the Restricted Stock Unit Grant Notice to which it is attached.

**EXHIBIT 10.32**

**EAGLE PHARMACEUTICALS, INC.**

**PERFORMANCE STOCK UNIT GRANT NOTICE**
**(2014 EQUITY INCENTIVE PLAN)**

Eagle Pharmaceuticals, Inc. (the "***Company***"), pursuant to its 2014 Equity Incentive Plan (as amended, the "***Plan***"), hereby awards to Participant a Performance Stock Unit Award for the number of shares of the Company's Common Stock ("***Performance Stock Units***") set forth below (the "***Award***"). The Award is subject to all of the terms and conditions as set forth in this notice of grant (this "***Performance Stock Unit Grant Notice***"), and in the Plan and the Performance Stock Unit Award Agreement (the "***Award Agreement***"), both of which are attached hereto and incorporated herein in their entirety. Capitalized terms not explicitly defined herein shall have the meanings set forth in the Plan or the Award Agreement. In the event of any conflict between the terms in this Performance Stock Unit Grant Notice or the Award Agreement and the Plan, the terms of the Plan shall control.

Participant: ___
Date of Grant: ___
Vesting Commencement Date: ___
Target Number of Performance Stock Units: ___
Maximum Number of Performance Stock Units: ___

**Vesting Schedule:**        See Exhibit A hereto.

In addition, this Award shall be an "Equity Award" within the meaning of that certain Equity Award Vesting Acceleration Benefit Letter Agreement, dated [_____], by and between you and the Company (the "***Acceleration Benefit Letter***") and may be eligible for accelerated vesting if and to the extent provided therein.

**Issuance Schedule:**       Subject to any Capitalization Adjustment, one share of Common Stock (or its cash equivalent, at the discretion of the Company) will be issued for each Performance Stock Unit that vests at the time set forth in Section 6 of the Award Agreement.

**Additional Terms/Acknowledgements:** Participant acknowledges receipt of, and understands and agrees to, this Performance Stock Unit Grant Notice, the Award Agreement and the Plan. Participant further acknowledges that as of the Date of Grant, this Performance Stock Unit Grant Notice, the Award Agreement and the Plan set forth the entire understanding between Participant and the Company regarding the acquisition of the Common Stock pursuant to the Award specified above and supersede all prior oral and written agreements on the terms of this Award, with the exception, if applicable, of (i) restricted stock unit awards or options previously granted and delivered to Participant, (ii) the Acceleration Benefit Letter, and (iii) any compensation recovery policy that is adopted by the Company or is otherwise required by applicable law.

By accepting this Award, Participant acknowledges having received and read the Performance Stock Unit Grant Notice, the Award Agreement and the Plan and agrees to all of the terms and conditions set forth in these documents. Participant consents to receive Plan documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

**EAGLE PHARMACEUTICALS, INC.   PARTICIPANT:**

By: ___   ___
        Signature    Signature

Title: ___   Date: ___

Date: ___

**ATTACHMENTS**: Award Agreement

**ATTACHMENT I**

**EAGLE PHARMACEUTICALS, INC.**

**2014 EQUITY INCENTIVE PLAN**
**PERFORMANCE STOCK UNIT AWARD AGREEMENT**

Pursuant to the Performance Stock Unit Grant Notice (the "***Grant Notice***") and this Performance Stock Unit Award Agreement (the "***Agreement***"), Eagle Pharmaceuticals, Inc. (the "***Company***") has awarded you ("***Participant***") a Performance Stock Unit Award (the "***Award***") pursuant to the Company's 2014 Equity Incentive Plan (as amended, the "***Plan***") for the number of Performance Stock Units/shares indicated in the Grant Notice. Capitalized terms not explicitly defined in this Agreement or the Grant Notice shall have the same meanings given to them in the Plan. The terms of your Award, in addition to those set forth in the Grant Notice, are as follows.

1.        **GRANT OF THE AWARD.** This Award represents the right to be issued on a future date one (1) share of Common Stock for each Performance Stock Unit that vests on the applicable vesting date(s) (subject to any adjustment under Section 3 below) as indicated in the Grant Notice. As of the Date of Grant, the Company will credit to a bookkeeping account maintained by the Company for your benefit (the "***Account***") the number of Performance Stock Units/shares of Common Stock subject to the Award. Notwithstanding the foregoing, the Company reserves the right to issue you the cash equivalent of Common Stock, in part or in full satisfaction of the delivery of Common Stock in connection with the vesting of the Performance Stock Units, and, to the extent applicable, references in this Agreement and the Grant Notice

to Common Stock issuable in connection with your Performance Stock Units will include the potential issuance of its cash equivalent pursuant to such right. This Award was granted in consideration of your services to the Company.

2.　　**VESTING.** Subject to the limitations contained herein, your Award will vest, if at all, in accordance with the vesting schedule provided in the Grant Notice. Vesting will cease upon the termination of your Continuous Service and the Performance Stock Units credited to the Account that were not vested on the date of such termination will be forfeited at no cost to the Company and you will have no further right, title or interest in or to such Award or the shares of Common Stock to be issued in respect of such portion of the Award.

3.　　**NUMBER OF SHARES.** The number of Performance Stock Units (including the Target Number of Performance Stock Units and the Maximum Number of Performance Stock Units set forth in the Grant Notice) subject to your Award may be adjusted from time to time for Capitalization Adjustments, as provided in the Plan. Any additional Performance Stock Units, shares, cash or other property that becomes subject to the Award pursuant to this Section 3, if any, shall be subject, in a manner determined by the Board, to the same forfeiture restrictions, restrictions on transferability, and time and manner of delivery as applicable to the other Performance Stock Units and shares covered by your Award. Notwithstanding the provisions of this Section 3, no fractional shares or rights for fractional shares of Common Stock shall be created pursuant to this Section 3. Any fraction of a share will be rounded down to the nearest whole share.

4.　　**SECURITIES LAW COMPLIANCE**. You may not be issued any Common Stock under your Award unless the shares of Common Stock underlying the Performance Stock Units are either (i) then registered under the Securities Act, or (ii) the Company has determined that such issuance would be exempt from the registration requirements of the Securities Act. Your Award must also comply with other applicable laws and regulations governing the Award, and you shall not receive such Common Stock if the Company determines that such receipt would not be in material compliance with such laws and regulations.

5.　　**TRANSFER RESTRICTIONS**. Prior to the time that shares of Common Stock have been delivered to you, you may not transfer, pledge, sell or otherwise dispose of this Award or the shares issuable in respect of your Award, except as expressly provided in this Section 5. For example, you may not use shares that may be issued in respect of your Performance Stock Units as security for a loan. The restrictions on transfer set forth herein will lapse upon delivery to you of shares in respect of your vested Performance Stock Units.

**Death**. Your Award is transferable by will and by the laws of descent and distribution. At your death, vesting of your Award will cease and your executor or administrator of your estate shall be entitled to receive, on behalf of your estate, any Common Stock or other consideration that vested but was not issued before your death.

**Domestic Relations Orders.** Upon receiving written permission from the Board or its duly authorized designee, and provided that you and the designated transferee enter into transfer and other agreements required by the Company, you may transfer your right to receive the distribution of Common Stock or other consideration hereunder, pursuant to a domestic relations order, marital settlement agreement or other divorce or separation instrument as permitted by applicable law that contains the information required by the Company to effectuate the transfer. You are encouraged to discuss the proposed terms of any division of this Award with the Company General Counsel prior to finalizing the domestic relations order or marital settlement agreement to verify that you may make such transfer, and if so, to help ensure the required information is contained within the domestic relations order or marital settlement agreement.

6.　　**DATE OF ISSUANCE.**

The issuance of shares in respect of the Performance Stock Units is intended to comply with Treasury Regulations Section 1.409A-1(b)(4) and will be construed and administered in such a manner. Subject to the satisfaction of the Withholding Obligation set forth in Section 11 of this Agreement, in the event one or more Performance Stock Units vests, the Company shall issue to you one (1) share of Common Stock for each Performance Stock Unit that vests on the applicable vesting date(s) (subject to any adjustment under Section 3 above, and subject to any different provisions in the Grant Notice). Each issuance date determined by this paragraph is referred to as an "***Original Issuance Date***".

If the Original Issuance Date falls on a date that is not a business day, delivery shall instead occur on the next following business day. In addition, if:

(i)　the Original Issuance Date does not occur (1) during an "open window period" applicable to you, as determined by the Company in accordance with the Company's then-effective policy on trading in Company securities, or (2) on a date when you are otherwise permitted to sell shares of Common Stock on an established stock exchange or stock market (including but not limited to under a previously established written trading plan that meets the requirements of Rule 10b5-1 under the Exchange Act and was entered into in compliance with the Company's policies (a "***10b5-1 Arrangement***")), *and*

(ii)　either (1) a Withholding Obligation does not apply, or (2) the Company decides, prior to the Original Issuance Date, (A) not to satisfy the Withholding Obligation by withholding shares of Common Stock from the shares otherwise due, on the Original Issuance Date, to you under this Award, and (B) not to permit you to enter into a "same day sale" commitment with a broker-dealer pursuant to Section 11 of this Agreement (including but not limited to a commitment under a 10b5-1 Arrangement) and (C) not to permit you to pay your Withholding Obligation in cash,

then the shares that would otherwise be issued to you on the Original Issuance Date will not be delivered on such Original Issuance Date and will instead be delivered on the first business day when you are not prohibited from selling shares of the Company's Common Stock in the open public market, but in no event later than December 31 of the calendar year in which the Original Issuance Date occurs (that is, the last day of your taxable year in which the Original Issuance Date occurs), or, if and only if permitted in a manner that complies with Treasury Regulations Section 1.409A-1(b)(4), no later than the date that is the 15th day of the third calendar month of the applicable year following the

year in which the shares of Common Stock under this Award are no longer subject to a "substantial risk of forfeiture" within the meaning of Treasury Regulations Section 1.409A-1(d).

The form of delivery (*e.g.*, a stock certificate or electronic entry evidencing such shares) shall be determined by the Company.

**7.        DIVIDENDS.** You shall receive no benefit or adjustment to your Award with respect to any cash dividend, stock dividend or other distribution that does not result from a Capitalization Adjustment; provided, however, that this sentence will not apply with respect to any shares of Common Stock that are delivered to you in connection with your Award after such shares have been delivered to you.

**8.        RESTRICTIVE LEGENDS.** The shares of Common Stock issued in respect of your Award shall be endorsed with appropriate legends as determined by the Company.

**9.        EXECUTION OF DOCUMENTS.** You hereby acknowledge and agree that the manner selected by the Company by which you indicate your consent to your Grant Notice is also deemed to be your execution of your Grant Notice and of this Agreement. You further agree that such manner of indicating consent may be relied upon as your signature for establishing your execution of any documents to be executed in the future in connection with your Award.

**10.        AWARD NOT A SERVICE CONTRACT**.

Nothing in this Agreement (including, but not limited to, the vesting of your Award or the issuance of the shares in respect of your Award), the Plan or any covenant of good faith and fair dealing that may be found implicit in this Agreement or the Plan shall: (i) confer upon you any right to continue in the employ or service of, or affiliation with, the Company or an Affiliate; (ii) constitute any promise or commitment by the Company or an Affiliate regarding the fact or nature of future positions, future work assignments, future compensation or any other term or condition of employment or affiliation; (iii) confer any right or benefit under this Agreement or the Plan unless such right or benefit has specifically accrued under the terms of this Agreement or Plan; or (iv) deprive the Company of the right to terminate you at will and without regard to any future vesting opportunity that you may have.

By accepting this Award, you acknowledge and agree that the right to continue vesting in the Award pursuant to the vesting schedule provided in the Grant Notice may not be earned unless (in addition to any other conditions described in the Grant Notice and this Agreement) you continue as an employee, director or consultant at the will of the Company and affiliate, as applicable (not through the act of being hired, being granted this Award or any other award or benefit) and that the Company has the right to reorganize, sell, spin-out or otherwise restructure one or more of its businesses or Affiliates at any time or from time to time, as it deems appropriate (a "*reorganization*"). You acknowledge and agree that such a reorganization could result in the termination of your Continuous Service, or the termination of Affiliate status of your employer and the loss of benefits available to you under this Agreement, including but not limited to, the termination of the right to continue vesting in the Award. You further acknowledge and agree that this Agreement, the Plan, the transactions contemplated hereunder and the vesting schedule set forth herein or any covenant of good faith and fair dealing that may be found implicit in any of them do not constitute an express or implied promise of continued engagement as an employee or consultant for the term of this Agreement, for any period, or at all, and shall not interfere in any way with the Company's right to terminate your Continuous Service at any time, with or without your cause or notice, or to conduct a reorganization.

**11.        WITHHOLDING OBLIGATION.**

(a)    On each vesting date, and on or before the time you receive a distribution of the shares of Common Stock in respect of your Performance Stock Units, and at any other time as reasonably requested by the Company in accordance with applicable tax laws, you hereby authorize any required withholding from the Common Stock issuable to you and/or otherwise agree to make adequate provision, including in cash, for any sums required to satisfy the federal, state, local and foreign tax withholding obligations of the Company or any Affiliate that arise in connection with your Award (the "*Withholding Obligation*").

(b)    By accepting this Award, you acknowledge and agree that the Company or any Affiliate may, in its sole discretion, satisfy all or any portion of the Withholding Obligation relating to your Performance Stock Units by any of the following means or by a combination of such means: (i) causing you to pay any portion of the Withholding Obligation in cash; (ii) withholding from any compensation otherwise payable to you by the Company; (iii) withholding shares of Common Stock from the shares of Common Stock issued or otherwise issuable to you in connection with the Award with a Fair Market Value (measured as of the date shares of Common Stock are issued pursuant to Section 6) equal to the amount of such Withholding Obligation; provided, however, that the number of such shares of Common Stock so withheld will not exceed the amount necessary to satisfy the Withholding Obligation using the maximum statutory withholding rates for federal, state, local and foreign tax purposes, including payroll taxes, that are applicable to supplemental taxable income; and *provided*, further, that to the extent necessary to qualify for an exemption from application of Section 16(b) of the Exchange Act, if applicable, such share withholding procedure will be subject to the express prior approval of the Board or the Company's Compensation Committee; and/or (iv) permitting or requiring you to enter into a "same day sale" commitment, if applicable, with a broker-dealer that is a member of the Financial Industry Regulatory Authority (a "*FINRA Dealer*"), pursuant to this authorization and without further consent, whereby you irrevocably elect to sell a portion of the shares to be delivered in connection with your Performance Stock Units to satisfy the Withholding Obligation and whereby the FINRA Dealer irrevocably commits to forward the proceeds necessary to satisfy the Withholding Obligation directly to the Company and/or its Affiliates. Unless the Withholding Obligation is satisfied, the Company shall have no obligation to deliver to you any Common Stock or any other consideration pursuant to this Award.

(c)    In the event the Withholding Obligation arises prior to the delivery to you of Common Stock or it is determined after the delivery of Common Stock to you that the amount of the Withholding Obligation was greater than the amount withheld by the Company, you agree to indemnify and hold the Company harmless from any failure by the Company to withhold the proper amount.

**12.        TAX CONSEQUENCES.** The Company has no duty or obligation to minimize the tax consequences to you of this Award and shall not be liable to you for any adverse tax consequences to you arising in connection with this Award. You are hereby advised to consult

with your own personal tax, financial and/or legal advisors regarding the tax consequences of this Award and by signing the Grant Notice, you have agreed that you have done so or knowingly and voluntarily declined to do so. You understand that you (and not the Company) shall be responsible for your own tax liability that may arise as a result of this investment or the transactions contemplated by this Agreement.

13.        **UNSECURED OBLIGATION.** Your Award is unfunded, and as a holder of a vested Award, you shall be considered an unsecured creditor of the Company with respect to the Company's obligation, if any, to issue shares or other property pursuant to this Agreement. You shall not have voting or any other rights as a stockholder of the Company with respect to the shares to be issued pursuant to this Agreement until such shares are issued to you pursuant to Section 6 of this Agreement. Upon such issuance, you will obtain full voting and other rights as a stockholder of the Company. Nothing contained in this Agreement, and no action taken pursuant to its provisions, shall create or be construed to create a trust of any kind or a fiduciary relationship between you and the Company or any other person.

14.        **NOTICES**. Any notice or request required or permitted hereunder shall be given in writing (including electronically) and will be deemed effectively given upon receipt or, in the case of notices delivered by mail by the Company to you, five (5) days after deposit in the United States mail, postage prepaid, addressed to you at the last address you provided to the Company. The Company may, in its sole discretion, decide to deliver any documents related to participation in the Plan and this Award by electronic means or to request your consent to participate in the Plan by electronic means. By accepting this Award, you consent to receive such documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

15.        **HEADINGS**. The headings of the Sections in this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement or to affect the meaning of this Agreement.

16.        **MISCELLANEOUS**.

The rights and obligations of the Company under your Award shall be transferable by the Company to any one or more persons or entities, and all covenants and agreements hereunder shall inure to the benefit of, and be enforceable by, the Company's successors and assigns.

You agree upon request to execute any further documents or instruments necessary or desirable in the sole determination of the Company to carry out the purposes or intent of your Award.

You acknowledge and agree that you have reviewed your Award in its entirety, have had an opportunity to obtain the advice of counsel prior to executing and accepting your Award and fully understand all provisions of your Award.

This Agreement shall be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or national securities exchanges as may be required.

All obligations of the Company under the Plan and this Agreement shall be binding on any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation, or otherwise, of all or substantially all of the business and/or assets of the Company.

17.        **GOVERNING PLAN DOCUMENT**. Your Award is subject to all the provisions of the Plan, the provisions of which are hereby made a part of your Award, and is further subject to all interpretations, amendments, rules and regulations which may from time to time be promulgated and adopted pursuant to the Plan. Your Award (and any compensation paid or shares issued under your Award) is subject to recoupment in accordance with The Dodd–Frank Wall Street Reform and Consumer Protection Act and any implementing regulations thereunder, any clawback policy adopted by the Company and any compensation recovery policy otherwise required by applicable law. No recovery of compensation under such a clawback policy will be an event giving rise to a right to voluntarily terminate employment upon a resignation for "good reason," or for a "constructive termination" or any similar term under any plan of or agreement with the Company.

18.        **EFFECT ON OTHER EMPLOYEE BENEFIT PLANS.** The value of the Award subject to this Agreement shall not be included as compensation, earnings, salaries, or other similar terms used when calculating benefits under any employee benefit plan (other than the Plan) sponsored by the Company or any Affiliate except as such plan otherwise expressly provides. The Company expressly reserves its rights to amend, modify, or terminate any or all of the employee benefit plans of the Company or any Affiliate.

19.        **SEVERABILITY**. If all or any part of this Agreement or the Plan is declared by any court or governmental authority to be unlawful or invalid, such unlawfulness or invalidity shall not invalidate any portion of this Agreement or the Plan not declared to be unlawful or invalid. Any Section of this Agreement (or part of such a Section) so declared to be unlawful or invalid shall, if possible, be construed in a manner which will give effect to the terms of such Section or part of a Section to the fullest extent possible while remaining lawful and valid.

20.        **OTHER DOCUMENTS**. You hereby acknowledge receipt or the right to receive a document providing the information required by Rule 428(b)(1) promulgated under the Securities Act. In addition, you acknowledge receipt of the Company's policy permitting certain individuals to sell shares only during certain "window" periods and the Company's insider trading policy, in effect from time to time.

21.        **AMENDMENT.** This Agreement may not be modified, amended or terminated except by an instrument in writing, signed by you and by a duly authorized representative of the Company. Notwithstanding the foregoing, this Agreement may be amended solely by the Board by a writing which specifically states that it is amending this Agreement, so long as a copy of such amendment is delivered to you, and provided that, except as otherwise expressly provided in the Plan, no such amendment materially adversely affecting your rights hereunder may be made without your written consent. Without limiting the foregoing, the Board reserves the right to change, by written notice to you, the

provisions of this Agreement in any way it may deem necessary or advisable to carry out the purpose of the Award as a result of any change in applicable laws or regulations or any future law, regulation, ruling, or judicial decision, provided that any such change shall be applicable only to rights relating to that portion of the Award which is then subject to restrictions as provided herein.

**22.** **COMPLIANCE WITH SECTION 409A OF THE CODE**. This Award is intended to be exempt from the application of Section 409A of the Code, including but not limited to by reason of complying with the "short-term deferral" rule set forth in Treasury Regulation Section 1.409A-1(b)(4) and any ambiguities herein shall be interpreted accordingly. Notwithstanding the foregoing, if it is determined that the Award fails to satisfy the requirements of the short-term deferral rule and is otherwise not exempt from, and determined to be deferred compensation subject to Section 409A of the Code, this Award shall comply with Section 409A to the extent necessary to avoid adverse personal tax consequences and any ambiguities herein shall be interpreted accordingly. If it is determined that the Award is deferred compensation subject to Section 409A and you are a "Specified Employee" (within the meaning set forth in Section 409A(a)(2)(B)(i) of the Code) as of the date of your "Separation from Service" (as defined in Section 409A), then the issuance of any shares that would otherwise be made upon the date of your Separation from Service or within the first six (6) months thereafter will not be made on the originally scheduled date(s) and will instead be issued in a lump sum on the date that is six (6) months and one day after the date of the Separation from Service, with the balance of the shares issued thereafter in accordance with the original vesting and issuance schedule set forth above, but if and only if such delay in the issuance of the shares is necessary to avoid the imposition of adverse taxation on you in respect of the shares under Section 409A of the Code. Each installment of shares that vests is intended to constitute a "separate payment" for purposes of Treasury Regulation Section 1.409A-2(b)(2).

\* \* \* \* \*

This Performance Stock Unit Award Agreement shall be deemed to be signed by the Company and the Participant upon the signing by the Participant of the Performance Stock Unit Grant Notice to which it is attached.

## EXHIBIT A
## PERFORMANCE VESTING TERMS

The Performance Stock Units awarded hereunder shall vest, if at all, based on the performance of the Company's Common Stock during the period commencing on January 1, 2018 and ending on January 21, 2021 (the "***Performance Period***") as follows, subject to the terms and conditions of the Plan, the Grant Notice, the Agreement and this **Exhibit A**:

1. If the closing price of the Company's Common Stock, as quoted on Nasdaq, does not equal or exceed $85.92 during any 30 consecutive trading-day period during the Performance Period, then none of the Performance Stock Units will be eligible to vest hereunder.

2. If during any 30 consecutive trading-day period during the Performance Period the closing price of the Company's Common Stock equals or exceeds $85.92, then a number of Performance Stock Units equal to the Target Number of Performance Stock Units set forth in the Grant Notice shall vest on the last day of the Performance Period, subject to the Participant's Continuous Service through such vesting date.

3. If during any 30 consecutive trading-day period during the Performance Period the closing price of the Company's Common Stock, as quoted on Nasdaq, equals or exceeds $110.00, then a number of Performance Stock Units equal to 200 percent of the Target Number of Performance Stock Units set forth in the Grant Notice shall vest on the last day of the Performance Period, subject to the Participant's Continuous Service through such vesting date.

4. If during any 30 consecutive trading-day period during the Performance Period the closing price of the Company's Common Stock, as quoted on Nasdaq, equals or exceeds $120.00, then a number of Performance Stock Units equal to 250 percent of the Target Number of Performance Stock Units set forth in the Grant Notice shall vest on the last day of the Performance Period, subject to the Participant's Continuous Service through such vesting date.

5. If during any 30 consecutive trading-day period during the Performance Period the closing price of the Company's Common Stock, as quoted on Nasdaq, equals or exceeds $134.25, then a number of Performance Stock Units equal to the Maximum Number of Performance Stock Units set forth in the Grant Notice shall vest on the last day of the Performance Period, subject to the Participant's Continuous Service through such vesting date.

6. The following additional provisions shall also apply to this Award:

(a) Except as otherwise provided herein, while the Common Stock performance targets above may be achieved at any time during the Performance Period, no Performance Stock Units shall vest unless the Participant remains in Continuous Service through the last day of the Performance Period.

(b) Upon achievement of any of the Common Stock performance targets above during the Performance Period, the corresponding number of Performance Stock Units shall be eligible to vest on the last day of the Performance Period, notwithstanding the performance of the Company's Common Stock following the achievement of such target.

(c) For purposes of clarity, in no event shall the Participant be eligible to vest with respect to more than the Maximum Number of Performance Stock Units specified in the Grant Notice.

(d) In the event that the Company issues a dividend that does not constitute a Capitalization Adjustment and that does not result in an adjustment to the number of Performance Stock Units awarded hereunder pursuant to Section 3 of the Agreement and/or

Section 9(a) of the Plan, then, for purposes of determining whether any of the Common Stock performance targets above have been achieved, the fair market value of such divided per share of Common Stock shall be added to the closing price of the Company's Common Stock as quoted on Nasdaq.

(e)    If a Change in Control occurs during the Performance Period, then the number of Performance Stock Units eligible to vest hereunder (the "***Change in Control Vesting Number***") shall be determined based on the per-share of Common Stock consideration received by the Company's stockholders in such Change in Control (the "***Change in Control Price***"). For example, if the Change in Control Price is $120 per share, then the Change in Control Vesting Number shall be 250 percent of the Target Number of Performance Stock Units.

(i)    If in connection with such Change in Control, this Award is assumed, substituted for, or continued by the surviving or acquiring company (or its parent entity), (including the conversion of this Award into a right to receive a cash payment equal to the Change in Control Price), then a number of Performance Stock Units equal to the Change in Control Vesting Number shall vest on the last day of the Performance Period, subject to the Participant's Continuous Service through such vesting date.

(ii)    If, in connection with a Change in Control, this Award shall terminate and will not be so assumed, substituted for, or continued by the successor or acquiring entity in such Change in Control, then, subject to the Participant's Continuous Service through the closing date of such Change in Control, a number of Performance Stock Units equal to the Change in Control Vesting Number shall vest effective immediately prior to, but subject to the consummation of, such Change in Control.

(f)    Any Performance Stock Units subject to the Award, to the extent unvested and outstanding, shall automatically terminate and be forfeited, without the payment of any consideration to Participant, on the earlier of (1) the date of termination of Participant's Continuous Service (after giving effect to any accelerated vesting under the Acceleration Benefit Letter) and (2) the last date of the Performance Period.

Exhibit 21.1

**Subsidiaries of Eagle Pharmaceuticals, Inc.**

| **Name of Subsidiary** | **Jurisdiction of Incorporation** |
| --- | --- |
| Eagle Biologics, Inc. (formerly Arsia Therapeutics, Inc.) | Delaware |

<u>Consent of Independent Registered Public Accounting Firm</u>

Eagle Pharmaceuticals, Inc.
Woodcliff Lake, New Jersey


We hereby consent to the incorporation by reference in the Registration Statement on Form S3 (No. 333-202592) and Form S-8 (Nos. 333-216839, 333-213683, 333-206729 and 333-194056) of Eagle Pharmaceuticals, Inc. (the "Company") of our reports dated February 26, 2018, relating to the consolidated financial statements, and the effectiveness of the Company's internal control over financial reporting, which appear in this Form 10-K.

/s/ BDO USA, LLP
Woodbridge, New Jersey
February 26, 2018

**Exhibit 31.1**

**Certification of Principal Executive Officer**

I, Scott Tarriff, certify that:

1.  I have reviewed this annual report on Form 10-K of Eagle Pharmaceuticals, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 26, 2018

/s/ Scott Tarriff

Scott Tarriff
Chief Executive Officer
(Principal Executive Officer)

**Exhibit 31.2**

**Certification of Principal Financial and Accounting Officer**

I, Pete A. Meyers, certify that:

1. I have reviewed this annual report on Form 10-K of Eagle Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 26, 2018

/s/ Pete A. Meyers

Pete A. Meyers
Chief Financial Officer
(Principal Accounting and Financial Officer)

**Exhibit 32.1**

<div align="center">

**Certification Pursuant to**

**18 U.S.C. Section 1350,**

**As Adopted Pursuant to**

**Section 906 of the Sarbanes-Oxley Act of 2002**

</div>

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), **Scott Tarriff**, President and Chief Executive Officer of Eagle Pharmaceuticals, Inc. (the "Company"), and **Pete A. Meyers**, Chief Financial Officer of the Company, each hereby certifies that, to the best of his knowledge:

1.      The Company's Annual Report on Form 10-K for the period ended December 31, 2017 (the "Annual Report"), to which this Certification is attached as Exhibit 32.1, fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act, and

2.      The information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**In Witness Whereof**, the undersigned have set their hands hereto as of the 26th day of February, 2018.

/s/ Scott Tarriff                  /s/ Pete A. Meyers

Scott Tarriff              Pete A. Meyers

Chief Executive Officer          Chief Financial Officer

(Principal Executive Officer)          (Principal Financial and Accounting Officer)

This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Eagle Pharmaceuticals, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing.

EXHIBIT 5

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

**(Mark One)**

x   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2018**
**or**

o   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from _____ to _____ .**
**Commission File Number 001-36306**

# Eagle Pharmaceuticals, Inc.
(Exact Name of Registrant as Specified in its Charter)

| **Delaware** | **2834** | **20-8179278** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**50 Tice Boulevard, Suite 315**
**Woodcliff Lake, NJ 07677**
**(201) 326-5300**
(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

**Securities registered pursuant to Section 12(b) of the Act:**
**Common Stock (par value $0.001 per share), NASDAQ Global Market**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes o No x

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes o No x

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes  x   No  o

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes  x   No  o

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. o

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in 12b-2 of the Exchange Act.

Large accelerated filer x          Accelerated filer o          Non-accelerated filer o          Smaller reporting company o

Emerging growth company o

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes  o   No  x

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. o

The aggregate market value of voting Common Stock held by non-affiliates of the registrant was approximately $703,596,009 computed by reference to the last reported sale price of $75.66 per share as reported by The NASDAQ Global Market, as of the last business day of the registrant's most recently completed second fiscal quarter, June 30, 2018. This calculation does not reflect a determination that certain persons are affiliates of the registrant for any other purpose.

The number of shares outstanding of the registrant's common stock, $0.001 par value per share, as of February 22, 2019 was 13,924,296 shares.

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the definitive proxy statement for our 2019 annual meeting of stockholders, which is to be filed within 120 days after the end of the fiscal year ended December 31, 2018, are incorporated by reference into Part III of this Form 10-K, to the extent described in Part III.

**EAGLE PHARMACEUTICALS, INC.**

**ANNUAL REPORT ON FORM 10-K**

**For the fiscal year ended December 31, 2018**

**Part I**

| | | Page |
|---|---|---|
| Item 1. | Business | 5 |
| Item 1A. | Risk Factors | 30 |
| Item 1B. | Unresolved Staff Comments | 61 |
| Item 2. | Properties | 62 |
| Item 3. | Legal Proceedings | 62 |
| Item 4. | Mine Safety Disclosures | 62 |

**Part II**

| | | |
|---|---|---|
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 63 |
| Item 6. | Selected Financial Data | 66 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 67 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 82 |
| Item 8. | Financial Statements and Supplementary Data | 83 |
| Item 9. | Changes and Disagreements with Accountants on Accounting and Financial Disclosure | 83 |
| Item 9A. | Controls and Procedures | 83 |
| Item 9B | Other Information | 86 |

**Part III**

| | | |
|---|---|---|
| Item 10. | Directors, Executive Officers and Corporate Governance | 86 |
| Item 11. | Executive Compensation | 86 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 86 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 86 |
| Item 14. | Principal Accounting Fees and Services | 86 |

**Part IV**

| | | |
|---|---|---|
| Item 15. | Exhibits and Financial Statement Schedules | 87 |
| Item 16. | Form 10-K Summary | 89 |
| | Signatures | |

**Eagle Pharmaceuticals, Inc.**

**NOTE REGARDING FORWARD-LOOKING STATEMENTS**

The Eagle Pharmaceuticals, Inc. name and logo, the Eagle Biologics, Inc. name and logo, and Ryanodex®, are either registered trademarks or trademarks of Eagle Pharmaceuticals, Inc. in the United States and/or other countries. All other trademarks, service marks or other tradenames appearing in this Annual Report on Form 10-K are the property of their respective owners. Solely for convenience, trademarks and trade names referred to in this report may appear without the ® or TM symbols. References to the "Company," "Eagle Pharmaceuticals," "Eagle," "we," "us" or "our" mean Eagle Pharmaceuticals, Inc., a Delaware corporation and its subsidiary, and references to "Eagle Biologics" mean Eagle Biologics, Inc.

This Annual Report on Form 10-K includes forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act, and Section 27A of the Securities Act of 1933, as amended, or the Securities Act. For this purpose, any statements contained herein regarding our strategy, future operations, financial position, future revenues, projected costs, prospects, plans and objectives of management, other than statements of historical facts, are forward-looking statements. These statements relate to future events or to our future financial performance and involve known and unknown risks, uncertainties and other factors which may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. Forward-looking statements include, but are not limited to, statements about:

- the success, cost and timing of our product development activities and clinical trials;
- our ability to obtain and maintain regulatory approval of our products and product candidates, and any related restrictions, limitations, and/or warnings in the label of an approved product;
- our ability to obtain funding for our operations;
- our plans to research, develop and commercialize our products and product candidates and our ability to successfully commercialize our products and product candidates;
- our ability to attract collaborators with development, regulatory and commercialization expertise;
- the size and growth potential of the markets for our products and product candidates, and our ability to serve those markets;
- the rate and degree of market acceptance of our products and product candidates;
- our ability to develop sales and marketing capabilities, whether alone or with potential future collaborators;
- the performance of our strategic collaborators and success of our current strategic collaborations;
- regulatory developments in the United States and foreign countries;
- the performance of our third-party suppliers and manufacturers;
- the success of competing drugs that are or become available;
- the loss of key scientific or management personnel;
- our use of the proceeds from our initial public offering; and subsequent follow-on offering;
- the accuracy of our estimates regarding expenses, future revenues, capital requirements and needs for additional financing;
- our expectations regarding our ability to obtain and maintain intellectual property protection for our product candidates; and
- our ability to prevent or minimize the effects of Paragraph IV patent litigation.

Forward-looking statements are statements that are not historical facts. Words such as "believes," "potential," "will," "could," "would," "should," "may," "intends," "anticipates," "plans," "enables," "potential," "entitles," "estimates," "projects," "predicts," and similar expressions are intended to identify forward-looking statements.

These forward-looking statements reflect our management's beliefs and views with respect to future events, are based on estimates and assumptions as of the date of this Annual Report on Form 10-K, and are subject to risks and uncertainties. Additionally, these statements are based upon information available to us as of the date of this Annual Report on Form 10-K, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain, and investors are cautioned not to unduly rely upon these statements. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. Some of these important factors include our "critical accounting estimates" described in Item 7 in Part II of this Annual Report on Form 10-K and the factors set forth under the caption "Risk Factors" in Item 1A in Part I of this Annual Report on Form 10-K. Moreover, we operate in a very competitive and rapidly changing environment. Although we may elect to update forward-looking statements in the future, we specifically disclaim any obligation

3

to do so (unless required by law), even if our estimates change, and readers should not rely on our forward-looking statements as representing our views as of any date subsequent to the date of this Annual Report on Form 10-K.

4

Case 1:24-cv-00064-JLH    Document 471    Filed 08/07/26    Page 185 of 942 PageID #: 15406

to do so (unless required by law), even if our estimates change, and readers should not rely on our forward-looking statements as representing our views as of any date subsequent to the date of this Annual Report on Form 10-K.

**PART I**

**Item 1. Business**

**Company Overview**

*Organization*

Eagle Pharmaceuticals, Inc. is a specialty pharmaceutical company registered at and with principal offices at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677. On November 16, 2016, we purchased all of the outstanding capital stock of Arsia Therapeutics, Inc. ("Arsia"), and subsequently changed its name to Eagle Biologics, Inc. ("Eagle Biologics").

*Business*

Our business model is to develop proprietary innovations to FDA-approved, injectable drugs, that offer commercial and/or functional advantages to currently available alternatives. We have historically been, and will continue to primarily be, focused on developing and commercializing injectable drugs, primarily in the critical care and oncology areas, using the United States Food and Drug Administration ("FDA")'s 505(b)(2) New Drug Application ("NDA") regulatory pathway. With our addition of Eagle Biologics, we hope to apply our market strategy to offer "biobetter" formulations, and to develop novel biologic products under the pathway provided by the Biologics Price Competition and Innovation Act ("BPCIA"). In addition, we plan to continue to market and/or commercialize our products through marketing partners and/or through our internal direct sales force.

For each of our current and future pre-commercial products, we target market entry no later than the entry of the first generic or biosimilar drug with the goal of substantially converting the market by addressing the needs of stakeholders who ultimately use our products. We believe we can further extend commercial duration through new intellectual property protection and/or orphan drug exclusivity and three years of non-patent regulatory exclusivity for future product candidates, as provided under applicable law and regulations. We strive to enhance branded reference drugs to optimize their ease and safety of use for healthcare providers, produce less drug waste, lower cost to stakeholders, and create the opportunity for label expansion to additional indications.

Our 505(b)(2) model has been validated by the approval and successful launches of our novel formulations of Argatroban and Ryanodex® (dantrolene sodium) ("Ryanodex") and Eagle's bendamustine ready-to-dilute ("RTD") 500ml solution ("Big Bag" or "Belrapzo"); marketed by Eagle, and rapidly infused bendamustine RTD ("Bendeka"); marketed by Teva, licensed to and launched jointly with Teva Pharmaceutical Industries Ltd. ("Teva") in January 2016. We are in the early stages of development with our biologics strategy and do not currently have any commercially approved biologics products.

Our product portfolio now includes four approved products: Argatroban; Ryanodex; Belrapzo; and Bendeka. We have three commercial partners: Teva, which through its subsidiary Cephalon, Inc. ("Cephalon") markets Bendeka, and Chiesi USA, Inc. ("Chiesi") and Sandoz Inc. ("Sandoz"), who pursuant to separate agreements market Argatroban.

We currently have multiple product candidates in advanced stages of development, and/or under review for approval by the FDA. Additionally, we have other exploratory candidates under a collaborative agreement entered into in January 2016 with Albany Molecular Research, Inc. ("AMRI"). Our advanced product candidates are EP-4104 (dantrolene sodium for exertional heat stroke ("EHS")) ("EP-4104"), EP-5101 (PEMFEXY™), a pemetrexed injection ready-to-dilute formulation ("EP-5101") and EGL-5385-C-1701 (fulvestrant). EP-5101 has been tentatively approved by the FDA. EGL-5385-C-1701 and EP-4104, both unapproved, may address unmet medical needs in major specialty markets.

In 2018, we accomplished the following with respect to our product portfolio:

- On April 16, 2018, we announced the FDA's acceptance of our Abbreviated New Drug Application ("ANDA") filing for vasopressin injection, 1ml. This product is the generic version of Endo International plc's original Vasostrict® formulation, which is indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines.

5

- On May 15, 2018, the FDA granted final approval for our ready-to-dilute bendamustine hydrochloride solution in a 500ml admixture ("Big Bag") for the treatment of patients with chronic lymphocytic leukemia ("CLL") and patients with indolent B-cell non-Hodgkin lymphoma ("NHL") that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen. We immediately launched this product upon FDA approval.

- On August 30, 2018, we announced the completion of enrollment of our second clinical study to further evaluate the safety and efficacy of Ryanodex (dantrolene sodium for injectable suspension) for the treatment of exertional heat stroke, an investigational new indication for the product.

- On October 3, 2018, we announced we had entered into an agreement with the United States Army Medical Research Institute of Chemical Defense, the nation's leading science and technology laboratory in the area of medical chemical countermeasures research and development, to conduct a study to evaluate the neuroprotective effects of Ryanodex.

- On November 27, 2018, we announced positive results of a pre-clinical study conducted to evaluate the effects of Ryanodex in Acute Radiation Syndrome.

In addition to building our product portfolio, we continue to develop our commercial organization. We have built an internal commercial team consisting of approximately 50 direct sales representatives, support staff and management who are a part of our independent commercial organization.

6

**Product Portfolio**

Our product portfolio consists of:

| Product | U.S. Brand Reference Drug | Description | Indication | Estimated Market Opportunity (amounts in millions) | Status |
|---|---|---|---|---|---|
| **Ryanodex® (dantrolene sodium)** | Dantrium®/ Revonto® | Muscle relaxant | Malignant hyperthermia | $75[2] | Approved (U.S.)/ launched August 2014; orphan drug exclusivity received for MH (U.S.) |
| **Argatroban** | Argatroban | Anti-coagulant; thrombin inhibitor | Heparin-induced thrombocytopenia | $99[2] | Approved (U.S.); marketed by Chiesi USA, Inc. and Sandoz |
| **BENDEKA™** | BENDEKA™ | Chemotherapeutic agent | CLL; Indolent NHL | $642[1] [3] | Approved (U.S.) in December 2015; licensed to and marketed by Teva; orphan drug designation for CLL and NHL (U.S.) |
| **Belrapzo (bendamustine RTD)** | Treanda® | Chemotherapeutic agent | (CLL); Indolent (NHL) | $642[1] [3] | Approved (U.S.) and launched for CLL and NHL in May 2018 |
| **EP-4104 (dantrolene sodium)** | No drug currently approved | Muscle relaxant | Exertional heat stroke | $400[2] | Orphan drug designation received for heat stroke (U.S.); IND submission in 2015; completed safety and efficacy study in December 2015; FDA granted fast track designation and NDA submitted in January 2016; additional clinical trial requested by FDA in 2017 |
| **EP-5101 (PEMFEXY™)** | Alimta | Chemotherapeutic agent | Lung cancer and mesothelioma | $1,131[1] | NDA submitted December 2016; tentative approval received in October 2017 |
| **EGL-5385-C-1701 (fulvestrant)** | Faslodex | Selective estrogen receptor degrader | Metastatic breast cancer | $537[1] | Pre-NDA submission |
| **Vasopressin injection 1ml** | Vasostrict | Crash cart item in hospital settings | Indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines | $454 [1] | FDA accepted our ANDA filing |

[1] Based on publicly filed reports with the SEC.
[2] Based on independent market research and management's estimates extrapolated there from.
[3] Benedeka and Belrapzo are part of the same estimated market opportunity.

**Our Competitive Strengths**

**Our Purpose**

We believe that many currently available critical care and oncology injectable drugs and biopharmaceuticals have suboptimal characteristics that do not meet the needs of patients, physicians, nurses or pharmacists. These characteristics can impact safety, shelf life, convenience, waste, cost, and ease of use by practitioners and pharmacy staff. For instance, existing drugs may be

packaged inefficiently or come in formulations that require reconstitution or dilution, or which are otherwise difficult or inconvenient to prepare, and which could expose workers to cytotoxic compounds and can result in dosing errors. This can also lead to wasted quantities of drug, inefficiencies in staff time and constrained work flow, reduced shelf life and the need for multiple dosing of individual patients to complete treatment. Likewise the viscosity of many biologic products requires them to be delivered intravenously often in time consuming and sometimes painful treatments for patients. We believe there is a large and unmet market for developing injectable drugs that address the specific needs of patients, physicians, nurses and pharmacists to simplify their use, reduce waste and lower healthcare costs.

We believe that our management's unique knowledge of the industry as well as the biopharmaceutics formulation acumen presented by Eagle Biologics combine to enable us to compete effectively in the market for injectable therapeutics in both small and large molecule markets. We look to continue to exploit these strengths in order to build upon our portfolio of attractive assets.

We have and continue to engage physicians, nurses, pharmacists and key opinion leaders, to identify specific products where the characteristics described above present opportunities for product improvement. We evaluate the product opportunities presented by the stakeholders and determine whether or not they conform to our research and development planning. A key aspect of our evaluation is the intellectual property landscape for each product opportunity, including our ability to avoid infringing existing patents and the potential patentability of our modified version of the drug. We utilize our experienced team of formulators with extensive experience with injectable pharmaceuticals, and a track record of success in product development, regulatory relations, and quality assurance to develop improved products.

Because our products are differentiated from the branded reference drugs, we believe we are able to avoid infringing existing patents covering the branded reference drug allowing us to enter the existing market no later than applicable generic drugs, which may be subject to protracted patent litigation that delays market entry. Protracted litigation is a significant barrier to entry for competitors seeking approval of an ANDA referencing the branded reference product, and our early entry into the market leads to less price erosion due to constrained competition. Our patent estate includes over 30 owned or exclusively-licensed U.S. issued patents and over 10 filed U.S. patent applications, as well as several patents and patent applications that have been filed in various worldwide territories, that we believe protect or will protect, as applicable the market value of our current portfolio of products. We believe that other potential barriers to entry for our competitors consist of the following:

- our early entry into the market allows us to influence usage patterns when fewer, if any, competitors exist and allows us to market our products as improved versions of the branded reference drug prior to or concurrent with any generic entry, thereby giving us the opportunity to capture significant market share at this early stage. We believe that such early entry into the market will limit later conversions into generic versions of the branded reference drugs, deterring competition and allowing us to maintain market share and favorable pricing;
- the potential for seven years of exclusivity upon approval of a 505(b)(2) NDA that receives orphan drug status; and
- the potential for three years of regulatory exclusivity for our future product candidates upon approval, if any, of a 505(b)(2) NDA supported by new clinical investigations (other than bioequivalence and bioavailability studies) essential to approval of the application.

Our product portfolio is focused on oncology, critical care, and orphan diseases and includes four approved products, a tentative approval, and several distinct product candidates in advanced development. Additionally, we have other exploratory candidates under our collaborative agreement with AMRI, and are developing a "biobetters" pipeline at our subsidiary, Eagle Biologics. We believe that we can leverage our formulation and development expertise to achieve improved product attributes in terms of potential for longer stability, shorter infusion times, less waste and/or ease and safety of use for healthcare professionals and achieve longer commercial duration compared to generic competitors. We believe that our products may offer certain benefits as compared to existing injectable drugs which may include one or more of the following:

- improved safety through elimination of reconstitution in the pharmacy or in the acute care setting;
- reduction in the number of injections required;
- reduction in the volume of drug needed to be injected, potentially expanding the application to additional medical situations;
- reduction in the amount of diluent required to administer the drug;
- reduction in drug waste;
- reduction in drug infusion time; and
- potential label expansion to include additional indications.

**Our Strategy**

Our goal is to be a leading specialty pharmaceutical company focused on the development and commercialization of injectable

8

pharmaceutical products for use in acute care settings that represent an improvement over the currently marketed reference drug. Our strategy to achieve this goal includes:

*Enter the market no later than the first generic drug.*    We intend to enter the market no later than the first generic or biosimilar of the branded reference drug. During this period, the number of competitors is lowest and branded drugs are generally at peak or near peak value. This will allow us to influence usage patterns and market our products as improved versions, thereby achieving favorable pricing. Even if we enter the market simultaneously with, or after, the first generic drug, as a 505(b)(2) applicant, we would be able to enter the market without regard to any generic drug's 180-day exclusivity period.

*Retain commercial rights in the United States and selectively partner outside of the United States.*    In general, we believe that we can cost-effectively commercialize our products in the United States internally or through a contracted sales force and selected commercial arrangements, and thereby retain the commercial value of these products. We have established a small, contract specialty sales force focusing on GPOs, hospital systems and key stakeholders in acute care settings, primarily hospitals. Outside of the United States, we may utilize partners for the commercialization of our products.

*Strengthen our product portfolio.*    We intend to continue to strengthen our product portfolio in the areas of oncology, critical care and orphan diseases. We will continue to develop our current product portfolio and leverage our expertise to identify new products with suboptimal characteristics that present us with significant opportunity for revenue generation. In addition to our internal efforts, we will opportunistically in-license or acquire product candidates that fit our therapeutic areas of focus and meet our rigorous evaluation process.

*Continue to build a robust intellectual property portfolio.*    Our patent estate includes over 30 owned or exclusively-licensed U.S. issued patents and over 10 filed U.S. patent applications, as well as several that have been filed in various worldwide territories, that protect or will protect, as applicable the market value of our approved and pipeline products. We intend to continue to build our patent portfolio by filing for patent protection on new developments with respect to our product candidates that will not infringe patents that cover the branded reference drugs. We expect that these will, if issued, allow us to list our own patents in the Orange Book, to which potential competitors will be required to certify upon submission of their applications referencing our products, if approved.

**Our Products and Product Portfolio**

***Belrapzo and Bendeka (Licensed to Teva and SymBio) for Chronic Lymphocytic Leukemia and Non-Hodgkin's Lymphoma***

*Overview*

Bendamustine is an alkylating agent approved for use in CLL, and indolent B-cell NHL, that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen (which we refer to herein as the NHL indication).

*U.S. Marketed Bendamustine Products*

Teva currently markets its lyophilized bendamustine product under the trade name Treanda®. Teva ceased distribution of Treanda® liquid on March 30, 2016.

*Limitations of Marketed Bendamustine Products*

Treanda® is a lyophilized powder that requires reconstitution in water prior to use. A 500 mL intravenous (IV) administration is used over 30 or 60 minutes for CLL and NHL patients, respectively. The product is sold in single use vials creating an opportunity for product waste in certain applications.

*Eagle's Solution: Belrapzo and Bendeka*

The Belrapzo and Bendeka liquid formulations eliminate the need to reconstitute the drug prior to use, relative to the lyophilized presentation of Treanda®. As a result, we believe that relative to the lyophilized presentation of Treanda® there is less potential for dosing errors, less exposure to cytotoxic powders and a more efficient work flow.

Additionally, admixtures prepared with Bendeka contain lower sodium as compared with Treanda® which could be of benefit to the predominantly elderly, renally impaired and cardiovascular compromised patients. Also, Bendeka is available in a multi-use

vial, which allows infusion centers and hospitals to avoid needless waste of unused drug remaining after procedures with single use vials.

*Big Bag*

On May 15, 2018, the FDA granted final approval for Big Bag, a ready-to-dilute ("RTD"), multi-dose liquid with extended drug stability for use with a 500mL intravenous, or IV, infusion bag.

*Teva License- Bendeka*

Bendeka is the same RTD, multi-dose liquid formulation as Belrapzo, with extended drug stability, but for use with a 50 mL IV infusion bag, which enables it to be administered in a shorter time-period than current drugs on the market and represents a label expansion from Belrapzo. We received orphan drug designation for Bendeka for CLL and NHL in July 2014. We entered into the Cephalon License to market this product. *See License Agreements - Bendamustine License Agreement, below.*

### Argatroban for Heparin-Induced Thrombocytopenia

Argatroban is an anti-coagulant originally developed for the treatment of heparin-induced thrombocytopenia ("HIT"). Our formulation of Argatroban, was our first product approved by the FDA and is marketed by Chiesi and Sandoz under separate agreements with us. *See License Agreements - License and Distribution Agreement - Chiesi; and Settlement Agreement and Related Supply and Distribution Agreement with Sandoz, below.*

*Currently-Marketed Argatroban Products*

Argatroban is currently sold by GlaxoSmithKline ("GSK"), West-ward, Chiesi and Sandoz. It is sold in 250mL (GSK and West-ward), 125mL (Sandoz) and 50mL (Chiesi and Sandoz) presentations. According to IQVIA Holdings Inc., Argatroban had U.S. annual sales of $39 million in 2018.

*Limitations of Argatroban Marketed Products*

The branded form of argatroban from GSK and West-ward is supplied in a 2.5 mL vial with 100 mg/mL of active pharmaceutical ingredient. In this formulation, the current product requires 100-fold dilution for infusion, requiring the use of a 250 mL intravenous bag, typically resulting in approximately 30% waste primarily driven by prophylactic administration while waiting for HIT testing results, common infection control policies requiring change of intravenous bags every 24 hours and patient release from hospital prior to complete administration.

*Eagle's Solution: Argatroban Injection*

Our formulation of Argatroban is supplied in a single-use vial, containing 50mg of drug in a 50mL aqueous solution, where only 1% of the drug is wasted. Argatroban is ready to use and the vial label contains a ring sling for convenient IV pole administration. It was approved by the FDA on June 29, 2011, for treatment of HIT in patients.

### Ryanodex® for Malignant Hyperthermia

*Overview*

Dantrolene was first introduced to the U.S. market in 1979 and is currently the only drug approved to treat a rare genetic disorder called malignant hyperthermia ("MH"). There are only 500 to 800 cases of MH in the United States each year, qualifying dantrolene for orphan drug designation. This disease is triggered when a patient with this genetic predisposition has a surgical procedure and is exposed to certain inhaled anesthetics or the muscle relaxant, succinylcholine. When this exposure occurs, a metabolic response can be triggered in the patient resulting in an episode of MH that can be fatal if not treated immediately. Because dantrolene is the only approved drug available to treat MH, the Joint Commission on Accreditation of Healthcare Organizations, (the "Joint Commission") requires that all hospitals stock vials of this product at all times, generally in the operating room area.

*Currently-Preexisitng Dantrolene Products for MH*

The two preexisting injectable dantrolene drugs on the market for the treatment of MH, Dantrium® and Revonto®, are offered in a vial containing 20mg of lyophilized powder that requires mixing with 60mL of sterile water. We estimate that the addressable

10

U.S. market opportunity for MH drugs is approximately $75 million per year.

*Limitations of Dantrium® and Revonto®*

When an MH crisis occurs during surgery, the surgical procedure is immediately discontinued and the anesthesiologist and others in the operating room quickly begin reconstituting dantrolene, often at the same time as performing other resuscitative efforts, in order to administer the drug to the patient as an IV push. Based on recommendations from the Malignant Hyperthermia Association of the United States ("MHAUS"), the recognized authority on treating MH in the United States, the recommended dose is 2.5mg/kg or higher. It is critically important that the drug be administered as rapidly as possible, as MH symptoms include tachycardia, elevated blood pressure, raised $CO_2$ levels and very high body temperature levels. If not treated immediately, the disease can be fatal.

Because of the dosing required in adult patients to reverse the MH symptoms and the current formulations of Dantrium® and Revonto®, it is often necessary to reconstitute 10 to 20 vials of dantrolene. As the current formulations are also poorly water soluble, this process generally takes up to 15 to 20 minutes at a point when time is critical and the patient is extremely unstable. Furthermore, the volume of diluent required to reconstitute Dantrium® and Revonto® means that the adult patient receives a significant volume of fluid (600mL to 1,200mL) as an IV infusion, which on occasion can result in detrimental secondary physiological consequences for the patient, such as pulmonary edema and extravasation, which can lead to tissue necrosis.

*Eagle's Solution: Ryanodex®*

We have developed a differentiated formulation of dantrolene sodium that was approved by the FDA in July 2014 and is currently sold under the brand name, Ryanodex®, for the treatment of MH. The presentation is a 5ml vial containing 250mg of dantrolene sodium in lyophilized powder form.

We believe that the immediate benefits of our Ryanodex® formulation are clinically significant in critical care situations. Specifically, Ryanodex® reduces the amount of time to reconstitute and administer dantrolene from 15 to 20 minutes with Dantrium® and Revonto®, to 1 minute, as the anesthesiologist will be able to mix and administer a dose of 250mg from a single vial of Ryanodex® in contrast to mixing and administering up to 12 or more vials of Dantrium® or Revonto®. A recent retrospective study conducted by MHAUS demonstrated that every 15-minute delay in treating MH resulted in a 7.8% increase in patient complications.

**EP-4104 (dantrolene) for Exertional Heat Stroke ("EHS")**

EHS is a rare, sudden and unpredictable life-threatening medical condition. It is thought that symptoms and effects are correlated to MH and our research and development efforts suggest dantrolene may be beneficial for treating EHS.

EHS is one of the leading causes of death in athletes, including college and high-school students. EHS is also a leading cause of non-combat death in the military. EHS is a state of extreme hyperthermia (above 104°F) that occurs when heat that is generated by muscular exercise exceeds the body's ability to dissipate it. EHS typically affects seemingly healthy individuals during exercise and manifests within a few minutes to hours of such activity and is characterized by an increased core body temperature and central nervous system dysfunction including delirium, convulsions, and coma. Predisposing factors to EHS include a lack of heat acclimatization, poor physical fitness, dehydration, recent infection, exercising in warm and humid conditions and concurrent illness.

*Limitations of Current EHS Therapies*

There are currently no FDA-approved products that treat EHS, and patients continue to die or suffer significant morbidity from the condition. The current treatment regimen for EHS is not directed at the underlying cause of the disease, but is essentially symptomatic therapy. Currently, to treat EHS, the standard treatment includes body surface cooling by water immersion or ice packs and support of organ system function with a goal of accelerating the transfer of heat from the skin to the environment. Even if these cooling techniques are properly implemented patients are still subject to risk of brain damage, irreversible organ damage and death.

*Eagle's Solution: EP-4104*

EP-4104's presentation will initially be a 5mL vial containing 250mg of dantrolene in lyophilized powder form requiring reconstitution. We believe that EP-4104 may provide significant benefits over the current standard of care, which may not be

11

readily available in most settings. Independent market research commissioned by us suggests that the worldwide peak annual revenue for EHS could exceed $400 million.

*EP-4104 Clinical Development and Regulatory Status*

In February 2016, the FDA granted Fast Track designation to our product candidate EP-4104 (i.e. Ryanodex® for the treatment of EHS). The FDA's Fast Track program facilitates the development and review of drugs intended to treat serious conditions and address an unmet medical need. A drug development program with Fast Track designation is afforded greater access to the FDA for the purpose of expediting the drug's development, review and potential approval to get important new drugs to the patient earlier.

On July 11, 2016, the FDA determined that no additional human safety and efficacy data would be required for the submission of EP-4101. Following the completion of additional animal studies the NDA was submitted on January 20, 2017.

On July 26, 2017, we received a Complete Response Letter from the FDA regarding our 505(b)(2) NDA for Ryanodex for the treatment of exertional heat stroke ("EHS"), in conjunction with external cooling methods. Based on our meeting with the FDA, the Company conducted an additional clinical trial in August 2018 during the Hajj pilgrimage, similar to the study conducted during the Hajj in 2015. On August 30, 2018, we announced the completion of enrollment of our second clinical study to further evaluate the safety and efficacy of Ryanodex. During the 2018 Hajj, overall emergency room visits were dramatically decreased from previous years due to well-implemented crowd management, lower temperatures, lower humidity and other external factors. As a result, the number of EHS patients available for study enrollment was also significantly less than in previous years, and therefore much lower than anticipated. The preliminary assessment of patients enrolled is consistent with the data from the study conducted in 2015, in which patients dosed with Ryanodex plus Standard of Care ("SOC") showed an additive benefit compared to patients receiving SOC only. We intend to complete the analysis of the data and meet with the U.S. Food and Drug Administration to discuss next steps in 2019.

### *EP-5101 (PEMFEXY™) for Lung Cancer*

EP-5101 is an IV-administered cancer agent indicated for locally advanced or metastatic non-small cell lung cancer and mesothelioma. We are developing EP-5101 as a ready-to-use/dilute liquid form of pemetrexed that will be available in a 25mg/mL per vial. Because our product, if approved, will be available in liquid form, product reconstitution will not be required, making EP-5101 a preferred formulation under the Joint Commission guidelines.

*Currently-Marketed Pemetrexed Product*

The branded form of a pemetrexed product is marketed by Lilly Pharmaceuticals as Alimta. Alimta is approved for use to treat non-small cell lung cancer and mesothelioma. Alimta's lyophilized formulation utilizes pemetrexed disodium. The product presentations for Alimta are 100mg and 500mg single use vials containing lyophilized power that must be reconstituted before patient administration. Once mixed, Alimta must be used within 24 hours due to product stability concerns. According to Lilly Pharmaceuticals, worldwide sales of Alimta for the 2017 calendar year were approximately $1.0 billion.

*Limitations of Alimta*

Alimta, a lyophilized pemetrexed disodium formulation requiring reconstitution, adds time to administration, presents cytotoxic safety issues for healthcare professionals administering the drug and the potential for dosing errors. Because reconstitution of Alimta is generally not performed until the patient has cleared all tests necessary to receive the drug, this process contributes to a significant amount of time spent by such patients in infusion clinics. Additionally, this method of administration limits the number of patients that may be treated on any given day by such clinics. Furthermore, as with any oncology drug, cytotoxic vapors released through reconstitution can be potentially harmful to pharmacists, physicians and nurses. Moreover, dosing errors may occur during reconstitution, as incorrect amounts of diluent may be used. As a result, lyophilized formulations are less preferred by the Joint Commission as compared to an RTD product.

*Eagle's Solution: EP-5101 (PEMFEXY™)*

EP-5101 is an RTD liquid formulation of pemetrexed. As an RTD liquid formulation, EP-5101 will not require additional time for reconstitution and may avoid certain safety concerns to healthcare professionals, including reducing exposure to the drug's cytotoxic

12

vapors during reconstitution by healthcare providers, and potential dosing errors during mixing. This could allow for a more efficient work flow within the infusion clinic and may result in an opportunity to reduce office staff and see more patients each day.

*EP-5101 (PEMFEXY™) Development and Regulatory Status*

We submitted an NDA for EP-5101 on December 30, 2016 for use in non-small cell lung cancer and mesothelioma. During February 2017, we received confirmation from the FDA that the filing was accepted. On October 27, 2017, we were granted tentative approval for EP-5101 by the FDA.

### *EGL-5385-C-1701 (fulvestrant) for Breast Cancer*

Fulvestrant is an injectable estrogen receptor antagonist. It is used for the treatment of hormone receptor positive advanced breast cancer for post-menopausal women whose disease has progressed following treatment with prior endocrine therapy.

*Currently-Marketed Fulvestrant Products*

The branded form of fulvestrant is Faslodex, a 500mg injectable product marketed by AstraZeneca plc. Worldwide sales of Faslodex were $941 million in 2017, which included US sales of $492 million.

*Limitations of Faslodex*

Faslodex is administered in two deep intramuscular injections of high viscosity product per dose of treatment (5 ml each) over 1-2 minutes into each buttock. The procedure is painful and Faslodex injection reactions have been associated with peripheral nerve adverse reactions, including risk of damaging the sciatic nerve.

*Eagle's Solution: EGL-5385-C-1701*

On October 30, 2018, we announced that the Company's fulvestrant formulation has not met the primary pharmacokinetic endpoint evaluating the bioequivalence of the Company's formulation compared to Faslodex in its open label, randomized, pharmacokinetic and safety study conducted in 600 healthy female volunteers across multiple U.S. sites. Eagle continues to pursue development of an innovative formulation that would require a single injection using a smaller needle thus requiring less time to dose the product while potentially reducing the pain and adverse reactions to injection. The 500 mg dose would be delivered in a single low viscosity 5 mL injection.

### *Additional Products in our Portfolio*

*Vasopressin*

Vasopressin injection is indicated to increase blood pressure in adults with vasodilatory shock who remain hypotensive despite fluids and catecholamines. We filed and ANDA in April 2018 for a generic version of VASOSTRICT® (vasopressin IV solution (infusion)), which variously covers either vasopressin-containing pharmaceutical compositions or methods of using a vasopressin-containing dosage form to increase blood pressure in humans. In May 2018, the NDA owner filed a lawsuit against us within the 45-day deadline to invoke a 30-month stay of FDA approval pursuant to the Hatch-Waxman legislative scheme. In August 2018, Eagle filed an answer and a counterclaim for non-infringement and invalidity of asserted patents. A claim construction hearing is scheduled for May 2019, with a bench trial scheduled for May 2020.

*Other Opportunities*

We are pursuing several additional potential products and product indications that address broad indications such as oncology, emergency medicine, infectious diseases and others. We intend to use our novel and well-developed methods to identify ideal development candidates and to commercialize improved formulations of widely prescribed therapeutics.

In addition to our internal efforts, in January 2016 we entered into an agreement with AMRI to jointly develop and manufacture several select and complex parenteral drug products for registration and subsequent commercialization in the United States.

Under the terms of the agreement, AMRI will develop and initially provide cGMP manufacturing and analytical support for the registration of the new product candidates. We will be responsible for advancing the product candidates through clinical trials and regulatory submissions.

13

*Eagle Biologics*

On November 16, 2016, we acquired Arsia Therapeutics, Inc. and subsequently changed its name to Eagle Biologics, Inc. Eagle Biologics was founded in 2013 as an early stage corporation focused on using proprietary technology to significantly improve both approved and novel biologic pharmaceutical products. The technology we acquired in the acquisition enables low-viscosity, high-concentration monoclonal antibody (mAb) formulations to be delivered subcutaneously.  Our aim is threefold: (i) to improve the formulation of biologic products thereby providing a market advantage with a differentiated product; (ii) to create IP around the formulation optimization extending market exclusivity, and (iii) to do so in an efficient manner, using as much reference-product data as possible to minimize clinical trial time and expense. The opportunity is driven by a library of patent protected excipients for use in pharmaceutical products.

Our plan for our biologics business is to partner with large pharmaceutical and biotech companies to improve the delivery of marketed biologics by eliminating IV infusions in favor of subcutaneous ("SC") routes of administration or, in cases where a SC product exists, to reduce the volume or number of injections.  Currently, Eagle Biologics has feasibility study agreements in place with multiple partners to apply its technology to designated proteins. Once proof of concept has been established, and an opportunity is identified with a particular protein, Eagle Biologics plans to enter into a License and Development Agreement with the sponsor company to develop and seek FDA approval for the "biobetter." As of this filing, Eagle Biologics has no product in late stage development.

The formulation and development of biologic and/or biosimilar drugs is a highly competitive business and competition includes some of the industry's largest and well-funded pharmaceutical companies. Eagle Biologics will seek opportunities in this growing field to develop and market its "bio-better" products through collaborations with these companies.

**Sales and Marketing**

Historically, we have chosen to out-license the commercial rights for products we have developed, such as Argatroban and is sold by both Chiesi under an exclusive license from us, and by Sandoz as part of a settlement of a paragraph IV dispute between the parties and rights to our bendamustine rapid infusion product for treatment of patients with CLL and patients with NHL pursuant to the terms of the Cephalon License.

Other than with respect to products subject to existing commercialization arrangements, we intend to commercialize our product portfolio in the United States with our commercial organization. To expand our footprint in the Ryanodex® for MH market we have built an internal commercial team consisting of approximately 50 direct sales representatives, support staff and management who are a part of our independent commercial organization.

**Manufacturing**

We do not own any manufacturing facilities. The manufacture of sterile injectables is highly reliant on very complex sterile techniques and personnel aseptic techniques which present significant challenges and requires specialized expertise. Further, sterile processes have a high level of scrutiny by regulatory agencies. Consequently, we utilize a network of third party manufacturers for production of our products. All manufacturers are monitored and evaluated by our quality department to assess compliance with regulatory requirements and our internal quality standards and benchmarks.

Historically, sterile injectable manufacturers have, from time to time, had quality control difficulties. If non-conformances occur, remediation, such as temporary voluntary closure or renovations of major production facilities, could be costly and time consuming, resulting in cascading and persistent shortages. Moreover, high rates of capacity utilization may also limit the ability of manufacturers to perform routine maintenance and keep facilities in state of compliance which can lead to product recalls or other supply disruptions.

We have a highly experienced quality group that works with and regularly inspects or meets with our manufacturers to review the manufacturing process for our products and to provide input on quality issues. We have recognized the risk of such supply chain disruptions and approached the situation through risk management strategies designed to mitigate the effects of such disruptions. These include having our products and product candidates manufactured at more than one site around the world. While this creates additional effort and requires maintaining dialog and traveling to and overseeing production at a number of facilities, we believe our manufacturing risks are better managed by utilizing a range of third party manufacturers at diverse locations. We seek to minimize the risk of catastrophic events that could occur if our products were manufactured in a single location. Currently, with the exception of one site, no contract manufacturer produces more than one product for us. We currently utilize two manufacturing sites in India and four manufacturing site in the United States. We plan to manufacture the additional products in our portfolio at additional sites in the United States.

14

**Intellectual Property and Exclusivity**

We strive to protect and enhance the proprietary technologies that we believe are important to our business. We seek to obtain and maintain patents for any patentable aspects of our products or product candidates, their methods of use and any other inventions that are important to our business model and maintaining a competitive advantage over generic competitors. Our success will depend significantly on our ability to obtain and maintain patent and other proprietary protection for commercially important technology, inventions and know-how related to our business, defend and enforce our patents, maintain our licenses to use intellectual property owned by third parties, preserve the confidentiality of our trade secrets and operate without infringing the valid and enforceable patents and other proprietary rights of third parties. We also rely on know-how, continuing technological innovation and in-licensing opportunities to develop, strengthen, and maintain our proprietary position in the fields targeted by our products and product candidates.

**Patents and Patent Applications**

We are the exclusive licensee under our license with Lyotropic to a family of patents and applications that relate to low volume formulations of dantrolene, and methods of treatment using dantrolene. There are eight issued U.S. patents, and several pending U.S. patent applications, along with foreign counterparts that include both issued patents and pending applications. The issued U.S. patents cover low volume formulations of dantrolene in reconstitutable and in ready to use liquid form. We expect that the issued patents will expire no later than July 1, 2025.

We are the sole owner of over 10 issued patents, several pending U.S. patent applications, and multiple patents and/or corresponding foreign filings for patent applications in a number of jurisdictions covering various formulations and methods of use of bendamustine. We are currently prosecuting these applications, which, if issued, would expire between 2031 and 2033.

We are the sole owner of a portfolio of issued U.S. patents and pending applications, and corresponding issued foreign patents and patent applications in a range of countries that cover various formulations and methods of use of Argatroban. We expect that our issued patents in the United States will expire no later than September 26, 2027, and our applications, if issued, will expire no later than October 9, 2027.

We are the owner of U.S. Patent 8,431,539 expiring July 20, 2031 and covering daptomycin.

Eagle also has a patent portfolio of issued and/or pending U.S. patent applications and corresponding foreign patent application in a range of countries that cover its biologics platform technologies. We are the sole owner of U.S. Patent Nos. 9,833,513, 9,913,905 and 9,925,263 expiring between 2034 and 2036.

**Trade Secrets and Proprietary Information**

Trade secrets play an important role in protecting our products and provide protection beyond patents and regulatory exclusivity. The scale-up and commercial manufacture of our products involves processes, custom equipment, and in-process and release analytical techniques that we believe are unique to us. We also seek to preserve the integrity and confidentiality of our proprietary technology and processes by maintaining physical security of our premises and physical and electronic security of our information technology systems. While we have confidence in these security measures, individuals, organizations and systems, agreements or security measures may be breached, and we may not have adequate remedies for any breach. In addition, our proprietary technology and processes may otherwise become known or be independently discovered by competitors. To the extent that our employees, consultants, scientific advisors, contractors or any future collaborators use intellectual property owned by others in their work for us, disputes may arise as to the rights in related or resulting know-how and inventions. We seek to protect our proprietary information, including our trade secrets and proprietary know-how, by requiring third parties with whom we contract for services related to our products, including manufacturing services to agree to terms in our agreements with such third parties that protect our confidential and trade secret information. We also require our employees, consultants and other advisors to execute proprietary information and confidentiality agreements upon the commencement of their employment or engagement. These agreements generally provide that all confidential information developed or made known during the course of the relationship with us be kept confidential and not be disclosed to third parties except in specific circumstances. In the case of our employees, the agreements also typically provide that all inventions resulting from work performed for us, utilizing our property or relating to our business and conceived or completed during employment shall be our exclusive property to the extent permitted by law. Where appropriate, agreements we obtain with our consultants also typically contain similar assignment of invention obligations. Further, we require confidentiality agreements from entities that receive our confidential data or materials.

15

*License Agreement with Lyotropic Therapeutics, Inc.*

In October 2008, we entered into a license and sublicense agreement with Lyotropic Therapeutics, Inc., ("Lyotropic"), under which we were granted an exclusive license under Lyotropic's intellectual property rights relating to dantrolene, and an exclusive worldwide sublicense under certain nanocrystal technology relating to a formulation of dantrolene licensed by Alkermes, Inc. (as successor in interest to Elan Pharma International Limited), or Alkermes, to Lyotropic under an August 2004 license agreement between Alkermes and Lyotropic. On August 3, 2016, the Company amended our agreement with Lyotropic Therapeutics, Inc. to reduce future royalties related to Ryanodex net sales to 3% (subject to further reduction upon the occurrence of certain triggering events) in exchange for $15 million.

*License and Development Agreement with Chiesi*

In September 2009, we entered into a license and development agreement with The Medicines Company which was assigned by the Medicines Company to Chiesi on September 24, 2016. Under the agreement, Chiesi has an exclusive license under our patent and other intellectual property rights in argatroban to commercialize Argatroban products in the United States and Canada, and a right of first negotiation to commercialize Argatroban in other countries (except the right of first negotiation does not apply to China unless and until we regain rights to commercialize Argatroban products in China).

Under this agreement, we received an upfront lump sum payment of $5.0 million. Additionally, we are obligated to share equally gross profits with Chiesi that we receive from Sandoz pursuant to the Sandoz Supply and Distribution Agreement and Chiesi is obligated to share equally with us the gross profits it receives from sales of Argatroban product in the United States.

*Settlement Agreement and Related Supply and Distribution Agreement with Sandoz*

In January 2013, we entered into a settlement agreement with Sandoz to resolve the lawsuit we brought against Sandoz claiming infringement of our issued U.S. patents 7,589,106 and 7,687,516, based on Sandoz's filing of ANDA No. 203743, in which Sandoz requested approval from the FDA for distribution of Argatroban prior to the expiration of such patents. In connection with, and at the same time as the settlement agreement, we also entered into a Supply and Distribution Agreement with Sandoz, under which we agreed to supply unbranded (generic) Argatroban in 50mg/50mL vials, which we define as an Authorized Generic Product, to Sandoz through our contract manufacturer for exclusive distribution to Sandoz's customers in the United States.

Under the terms of the Supply and Distribution Agreement, Sandoz is obligated to pay us a percentage in the range of 85 to 95 percent of the net profits for all Authorized Generic Product sold by Sandoz. Also, under the terms of the Supply and Distribution Agreement, Sandoz will continue to market argatroban in 125mg/125mL vials, which we define as a Sandoz Product, and Sandoz is obligated to pay us a percentage in the range of 60 to 70 percent of the net profits of all Sandoz Product sold by Sandoz.

*Development and License Agreement with SciDose (Argatroban and bivalirudin)*

In June 2007 we entered into a development and license agreement with SciDose, LLC ("SciDose") in which SciDose assigned us certain patents relating to Argatroban, bivalirudin, and two additional products under development or (the "SciDose Subject Products") and granted us an exclusive, sub-licensable, worldwide (excluding China for all products except ANDA products containing bivalirudin) license under SciDose's intellectual property rights to develop, make, use, sell and import parenteral formulations of the SciDose Subject Products (and including all other formulations for one of the additional products under development).

Under the terms of this Agreement, no further milestone payments are due to SciDose. We are required to make royalty payments based on gross profits of sales of the SciDose Subject Products by us and our affiliates (i) at 15% for Bivalirudin products, pursuant to an amendment in 2015, and at 50% for other SciDose Subject Products that achieve regulatory approval and are commercialized on the basis of a 505(b)(2) application (provided that we are entitled to recoup all of our expenses related to the development of a product commercialized under a 505(b)(2) application prior to splitting the profits we receive from such product), (ii) at 30% with respect to SciDose Subject Products that are commercialized on the basis of an ANDA application and (iii) at 20% with respect to other Scidose subject products. Our royalty obligations continue on a product-by-product basis until the later of ten years after the first commercial sale of each SciDose Subject Product and the expiration of the last valid claim covering such SciDose Subject Product, subject to certain customary reductions in the event that there is no valid patent claim covering the manufacture, use, import or sale of such SciDose Subject Product in a country in the territory.

16

*Development and License Agreement with Robert One, LLC (bendamustine)*

In March 2008 we entered into a development and license agreement with Robert One, LLC ("Robert One") in which Robert One assigned to us certain patents relating to bendamustine and four additional 505(b)(2) products and/or ANDA products under development (the "Robert One (bendamustine) Subject Products") and granted us an exclusive, sub-licensable, license under Robert One's intellectual property rights to develop make, use, sell and import Robert One (bendamustine) Subject Products worldwide (excluding China) with respect to bendamustine and other 505(b)(2) product applications and in North America with respect to ANDA product applications.

Under the terms of this Agreement no further milestone payments are due to Robert One. We are required to make royalty payments based on gross profits of sales of the Robert One (bendamustine) Subject Products by us and our affiliates in the Territory (i) at 10%, pursuant to an amendment in 2013, for bendamustine products and (ii) at 50% for products, other than bendamustine products, that achieve regulatory approval and are commercialized on the basis of a 505(b)(2) application (provided that we are entitled to recoup all of our expenses related to the development of a product commercialized under a 505(b)(2) application prior to splitting the profits we receive from such product), and (iii) at 30% with respect to products, other than bendamustine products, that are commercialized on the basis of an ANDA application. Our royalty obligations continue on a product-by-product basis until the later of ten years after the first commercial sale of each Robert One (bendamustine) Subject Product and the expiration of the last valid claim covering such Robert One (bendamustine) Subject Product, subject to certain reductions in the event that there is no valid patent claim covering the manufacture, use, import or sale of such Robert One (bendamustine) Subject Product in a country in the territory.

*Development and License Agreement with Robert One, LLC (pemetrexed)*

In February 2009 we entered into a development and license agreement with Robert One, in which Robert One assigned to us certain patents relating to pemetrexed and four additional 505(b)(2) products and/or ANDA products under development ("the Robert One 2009 Subject Products") and granted us an exclusive, sub-licensable, license under Robert One's intellectual property rights to develop make, use, sell and import Robert One 2009 Subject Products worldwide (excluding China) with respect to pemetrexed and other 505(b)(2) product applications and in North America with respect to ANDA product applications.

Under the terms of this Agreement no further milestone payments are due to Robert One. We are required to make royalty payments based on gross profits of sales of the Robert One 2009 Subject Product by us and our affiliates in the Territory (i) at 25% for pemetrexed parental formulation (ii) at 50% for Robert One 2009 Subject Products other than pemetrexed that achieve regulatory approval and are commercialized on the basis of a 505(b)(2) application (provided that we are entitled to recoup all of our expenses related to the development of a product commercialized under a 505(b)(2) application prior to splitting the profits we receive from such product), and (ii) at 30% with respect to Robert One 2009 Subject Products other than pemetrexed that are commercialized on the basis of an ANDA application. Our royalty obligations continue on a product-by-product basis until the later of ten years after the first commercial sale of each Robert One 2009 Subject Product and the expiration of the last valid claim covering such Robert One 2009 Subject Product, subject to certain reductions in the event that there is no valid patent claim covering the manufacture, use, import or sale of such Robert One 2009 Subject Product in a country in the territory.

*Bendamustine License Agreement*

On February 13, 2015, we submitted an NDA to the FDA for Bendeka which was approved by the FDA on December 8, 2015. Also, on February 13, 2015, we entered into the Cephalon License with Cephalon, for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. Subsequently, with the consent of the Company, Cephalon assigned to Teva Pharmaceuticals International GmbH ("TPIG") all of Cephalon's rights and obligations under the Cephalon License. Accordingly, all references to "Cephalon" or to the "Cephalon License" and the related supply agreements for Bendeka should be read and construed as references to TPIG and to the license agreement and supply agreements for Bendeka to which the Company and TPIG are now parties. Pursuant to the terms of the Cephalon License, Cephalon is responsible for all U.S. commercial activities for the product including promotion and distribution, and we are responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies. Additionally, under the terms of the Cephalon License, the Company received an upfront cash payment of $30 million, received a $15 million milestone payment in January 2016 in connection with the FDA approval of Bendeka in December 2015, received a $40 million milestone in the fourth quarter of 2016 in connection with the receipt of the J-Code for Bendeka and in Q1 of 2017, Bendeka reached $500 million in cumulative net sales, triggering an additional $25 million sales-based milestone payment. In addition, the royalty payments of 20% of net sales of the product that the Company was entitled to receive increased to 25% on receipt of the J-Code. In connection with the Cephalon License, the Company has entered into a supply agreement with Cephalon, pursuant to which the Company is responsible for supplying product to Cephalon. During the quarter-ended September 30, 2016, the Company entered into an amendment to that certain Exclusive License Agreement

17

(the "Cephalon License") with Cephalon and the related supply agreements for Bendeka. The amendment expands the geographical scope of the rights granted under the original agreement to include certain territories outside the US and Canada. In accordance with this amendment, the Company recorded $1.75 million in license and other revenue on the statements of operations for the year-ended December 31, 2016. The Company is also eligible to receive up to $750.0 thousand on each regulatory approval received in certain additional territories, not to exceed $2.25 million, as well as royalties on future sales.

*Cephalon Settlement and License Agreement*

On February 13, 2015, we entered into the Cephalon Settlement Agreement with Cephalon, in connection with the Cephalon License, pursuant to which the parties agreed to settle the pending patent infringement claims against each other regarding Cephalon's US Patent No. 8,791,270, under which we agreed to enter into a Consent Judgment regarding the '270 patent. As part of the Cephalon Settlement Agreement, Cephalon has agreed to waive its orphan drug exclusivities for the treatment of patients with CLL and patients with NHL.

*SymBio Product Collaboration and License Agreement*

On September 20, 2017, we entered into the SymBio License with SymBio for the rights to develop and commercialize EP-3101 and Bendeka (collectively, the "Products") in Japan. Under the SymBio License, SymBio will be responsible for all development of the Products in Japan and for obtaining and maintaining all regulatory approvals of the Products in Japan, with a target for regulatory approval of a Product in Japan in 2020. SymBio will bear all costs of development of the Products in Japan except that, if Japanese regulatory authorities require a certain clinical study to be conducted as a condition for approving one of the Products in Japan, we would share 50% of the out-of-pocket costs of that clinical study up to a specified dollar amount as a reduction to future royalty payments. Based on our assessment of the probability of additional costs, we have not deferred revenue on the SymBio License. SymBio will also be responsible, at its sole cost, for all marketing, promotion, distribution and sales of the Products in Japan and is obligated to launch the Products and meet certain minimum detailing, promotion and marketing commitments in connection with commercialization of the Products in Japan.

SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma ("MCL"), and as a first line treatment of low-grade NHL and MCL. Under the SymBio License, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

Pursuant to the terms of the SymBio License, Eagle and SymBio will enter into a separate supply agreement, under which we will be responsible for manufacturing and supplying the Products to SymBio for development and commercialization in Japan. After a period of time following launch of a Product, SymBio will have the right to assume the responsibility for manufacturing of the Products in and for Japan. Under the SymBio License, we will retain the right to control the prosecution, maintenance and enforcement of our patents covering the Products, both inside and outside of Japan.

Under the SymBio License, we earned an upfront non-refundable cash payment of $12.5 million in the third quarter of 2017, and we are eligible to receive a milestone payment upon approval of a Product in Japan and a milestone payment upon achievement of certain cumulative net sales of the Products in Japan. After regulatory approval of a Product in Japan, we will also receive tiered, low double-digit royalties on net sales of the Products in Japan for so long as there are patents covering the Products in Japan or regulatory exclusivity for the Products in Japan.

**Competition**

The pharmaceutical and biotechnology industries are intensely competitive and subject to rapid and significant technological change. Our competitors include organizations such as major multinational pharmaceutical companies, established biotechnology companies, specialty pharmaceutical companies and generic drug companies. Many of our competitors have greater financial and other resources than we have, such as more commercial resources, larger research and development staffs and more extensive marketing and manufacturing organizations. As a result, these companies may obtain marketing approval more rapidly than we are able and may be more effective in selling and marketing their products. Smaller or early stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large, established companies.

Our competitors may succeed in developing, acquiring or licensing on an exclusive basis technologies and drug products that are more effective or less costly than products that we are currently selling through partners or developing or that we may develop, which could render our products obsolete and noncompetitive. We expect any products that we develop and commercialize to compete on the basis of, among other things, efficacy, safety, convenience of administration and delivery, price and the availability

18

of reimbursement from government and other third-party payors. We also expect to face competition in our efforts to identify appropriate collaborators or partners to help commercialize our product portfolio in our target commercial markets.

**Government Regulation**

*FDA Approval Process for Drugs and Biologics*

In the United States, pharmaceutical products are subject to extensive regulation by the FDA. The FDCA, and in the case of biologics, the Public Health Service Act ("PHSA") and other federal and state statutes and regulations, govern, among other things, the research, development, testing, manufacture, storage, recordkeeping, approval, labeling, promotion and marketing, distribution, post-approval monitoring and reporting, sampling, and import and export of pharmaceutical products. Failure to comply with applicable FDA or other requirements may subject a company to a variety of administrative or judicial sanctions, such as FDA refusal to approve pending applications, clinical holds, warning or untitled letters, product recalls, product seizures, total or partial suspension of production or distribution, withdrawal of product from the market, injunctions, fines, civil penalties and criminal prosecution.

FDA approval is required before any new unapproved drug biologic or dosage form, including a new use of a previously approved drug, can be marketed in the United States. The process required by the FDA before a new drug may be marketed in the United States generally involves:

- completion of pre-clinical laboratory and animal testing and formulation studies in compliance with the FDA's current good laboratory practice ("cGLP") regulations;
- submission to the FDA of an Investigational New Drug ("IND") application for human clinical testing which must become effective before human clinical trials may begin in the United States;
- approval by an independent institutional review board ("IRB") at each clinical trial site before each trial may be initiated;
- performance of adequate and well-controlled human clinical trials in accordance with current good clinical practices ("cGCP") to establish the safety and efficacy of the proposed drug product for each intended use;
- satisfactory completion of an FDA pre-approval inspection of the facility or facilities at which the product is manufactured to assess compliance with the FDA's cGMP regulations to assure that the facilities, methods and controls are adequate to preserve the drug's identity, strength, quality and purity;
- submission to the FDA of an NDA or BLA;
- satisfactory completion of a potential review by an FDA advisory committee, if applicable; and
- FDA review and approval of the NDA or BLA.

The preclinical and clinical testing and approval process takes many years and the actual time required to obtain approval, if any, may vary substantially based upon the type, complexity and novelty of the product or disease.

Preclinical tests include laboratory evaluation of product chemistry, formulation and toxicity, as well as animal studies to assess the characteristics and potential safety and efficacy of the product. The conduct of the preclinical tests must comply with federal regulations and requirements, including cGLPs. The results of preclinical testing are submitted to the FDA as part of an IND application along with other information, including information about product chemistry, manufacturing and controls and a proposed clinical trial protocol. Long-term preclinical tests, such as animal tests of reproductive toxicity and carcinogenicity, may continue after the IND application is submitted.

The IND application automatically becomes effective 30 days after receipt by the FDA, unless the FDA, within the 30-day time period, raises concerns or questions relating to one or more proposed clinical trials and places the clinical trial on a clinical hold, including concerns that human research subjects will be exposed to unreasonable health risks. In such a case, the IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin. A separate submission to an existing IND application must also be made for each successive clinical trial conducted during product development. Further, an independent IRB, covering each site proposing to conduct the clinical trial must review and approve the plan for any clinical trial and informed consent information for subjects before the trial commences at that site and it must monitor the study until completed. The FDA, the IRB, or the sponsor may suspend a clinical trial at any time on various grounds, including a finding that the subjects or patients are being exposed to an unacceptable health risk or for failure to comply with the IRB's requirements, or may impose other conditions. Clinical trials involve the administration of the investigational new drug to healthy volunteers or patients under the supervision of a qualified investigator in accordance with cGCP requirements, which include the requirement that all research subjects provide their informed consent in writing for their participation in any clinical trial. Sponsors of clinical trials generally must register and report, at the NIH-maintained website ClinicalTrials.gov, key parameters of certain clinical trials. For purposes of an NDA or BLA submission and approval, human clinical trials are typically conducted in the following sequential phases, which may overlap or be combined:

19

Phase 1:    In Phase 1, through the initial introduction of the drug into healthy human subjects or patients, the drug is tested to assess metabolism, pharmacokinetics, pharmacological actions, side effects associated with increasing doses, and, if possible, early evidence on effectiveness.

Phase 2:    Phase 2 usually involves trials in a limited patient population to determine the effectiveness of the drug for a particular indication, dosage tolerance and optimum dosage, and to identify common adverse effects and safety risks.

Phase 3:    Phase 3 trials are undertaken to obtain the additional information about clinical efficacy and safety in a larger number of patients, typically at geographically dispersed clinical trial sites, to permit the FDA to evaluate the overall benefit-risk relationship of the drug and to provide adequate information for the labeling of the drug. In most cases, the FDA requires two adequate and well controlled Phase 3 clinical trials to demonstrate the efficacy of the drug. A single Phase 3 trial with other confirmatory evidence may be sufficient in rare instances where the study is a large multicenter trial demonstrating internal consistency and a statistically persuasive finding of a clinically meaningful effect on mortality, irreversible morbidity or prevention of a disease with a potentially serious outcome and confirmation of the result in a second trial would be practically or ethically impossible.

After completion of the required clinical testing, an application is prepared and submitted to the FDA. FDA approval of the NDA is required before marketing of the product may begin in the United States. The NDA or BLA must include the results of all preclinical, clinical and other testing and a compilation of data relating to the product's pharmacology, chemistry, manufacture and controls. Under federal law, the submission of most applications is subject to a substantial application user fee, and the manufacturer and/or sponsor under an approved application is also subject to annual product and establishment user fees.

The FDA has 60 days from its receipt of an NDA or BLA to determine whether the application will be accepted for filing based on the agency's threshold determination that it is sufficiently complete to permit substantive review. The FDA may request additional information rather than accept an application for filing. In this event, the application must be resubmitted with the additional information and is subject to payment of additional user fees. The resubmitted application is also subject to review before the FDA accepts it for filing. Once the submission is accepted for filing, the FDA begins an in-depth substantive review. Under PDUFA the FDA has agreed to certain performance goals in the review of NDAs and BLAs through a two-tiered classification system, Standard Review and Priority Review. Priority Review designation is given to drugs that offer major advances in treatment, or provide a treatment where no adequate therapy exists. The FDA endeavors to review applications subject to Standard Review within ten to twelve months, whereas the FDA's goal is to review Priority Review applications within six to eight months, depending on whether the drug is a new molecular entity.

The FDA may refer applications for novel drug products or drug products which present difficult questions of safety or efficacy to an advisory committee for review, evaluation and recommendation as to whether the application should be approved and under what conditions.

Before approving an NDA or a BLA, the FDA will typically inspect one or more clinical sites to assure compliance with cGCP requirements. Additionally, the FDA will inspect the facility or the facilities at which the drug is manufactured. The FDA will not approve the product unless it determines that the manufacturing process and facilities are in compliance with cGMP requirements and are adequate to assure consistent production of the product within required specifications and the application contains data that provide substantial evidence that the drug is safe and effective in the indication studied.

After the FDA evaluates the NDA or BLA and the manufacturing facilities, it issues either an approval letter or a complete response letter to indicate that the review cycle for an application is complete and that the application is not ready for approval. A tentative approval is issued to a 505(b)(2) NDA if the sponsor must await the expiration of an Orange Book listed patent covering the reference product. A complete response letter generally outlines the deficiencies in the submission and may require substantial additional testing, or information, in order for the FDA to reconsider the application. Even with submission of this additional information, the FDA may ultimately decide that an application does not satisfy the regulatory criteria for approval. If, or when, the deficiencies have been addressed to the FDA's satisfaction in a resubmission of the application, the FDA will issue an approval letter. An approval letter authorizes commercial marketing of the drug with specific prescribing information for specific indications.

As a condition of NDA or BLA approval, the FDA may require a Risk Evaluation and Mitigation Strategies ("REMS") program to help ensure that the benefits of the drug outweigh the potential risks. If the FDA determines a REMS program is necessary during review of the application, the drug sponsor must agree to the REMS plan at the time of approval. A REMS program may be required to include various elements, such as a medication guide or patient package insert, a communication plan to educate healthcare providers of the drug's risks, limitations on who may prescribe or dispense the drug, or other elements to assure safe use, such as special training or certification for prescribing or dispensing, dispensing only under certain circumstances, special

20

monitoring and the use of patient registries. In addition, the REMS must include a timetable to periodically assess the strategy. The requirement for a REMS program can materially affect the potential market and profitability of a drug.

Moreover, product approval may require substantial post-approval testing and surveillance to monitor the drug's safety or efficacy, and the FDA has the authority to prevent or limit further marketing of a product based on the results of these post-marketing programs. Once granted, product approvals may be withdrawn if compliance with regulatory standards is not maintained or problems are identified following initial marketing. Drugs may be marketed only for the approved indications and in accordance with the provisions of the approved label, and, even if the FDA approves a product, it may limit the approved indications for use for the product or impose other conditions, including labeling or distribution restrictions or other risk-management mechanisms.

Further changes to some of the conditions established in an approved application, including changes in indications, labeling, or manufacturing processes or facilities, require submission and FDA approval of a new NDA/BLA or NDA/BLA supplement before the change can be implemented, which may require us to develop additional data or conduct additional pre-clinical studies and clinical trials. An NDA supplement for a new indication typically requires clinical data similar to that in the original application, and the FDA uses the similar procedures in reviewing supplements as it does in reviewing original applications.

*Post-Approval Requirements*

Once an NDA or BLA is approved, a product will be subject to pervasive and continuing regulation by the FDA, including, among other things, requirements relating to drug listing and registration, recordkeeping, periodic reporting, product sampling and distribution, adverse event reporting and advertising, marketing and promotion, including standards and regulations for direct to consumer advertising, off-label promotion, industry-sponsored scientific and educational activities and promotional activities involving the internet. Drugs may be marketed only for the approved indications and in accordance with the provisions of the approved labeling. While physicians may prescribe for off-label uses, manufacturers may only promote for the approved indications and in accordance with the provisions of the approved label. However, companies may share truthful and not misleading information that is otherwise consistent with a product's FDA approved labeling. The FDA and other agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses, and a company that is found to have improperly promoted off-label uses may be subject to significant liability.

In addition, quality-control, drug manufacture, packaging and labeling procedures must continue to conform to cGMPs after approval. Drug manufacturers and certain of their subcontractors are required to register their establishments with the FDA and certain state agencies. Registration with the FDA subjects entities to periodic unannounced and announced inspections by the FDA and these state agencies, during which the agency inspects manufacturing facilities to assess compliance with cGMPs. Accordingly, manufacturers must continue to expend time, money, and effort in the areas of production and quality-control to maintain compliance with cGMPs. Regulatory authorities may withdraw product approvals or request product recalls if a company fails to comply with regulatory standards, if it encounters problems following initial marketing, or if previously unrecognized problems are subsequently discovered. The FDA may also impose a REMS requirement on a drug already on the market if the FDA determines, based on new safety information, that a REMS is necessary to ensure that the drug's benefits outweigh its risks. In addition, regulatory authorities may take other enforcement action, including, among other things, warning letters, the seizure of products, injunctions, consent decrees placing significant restrictions on or suspending manufacturing operations, refusal to approve pending applications or supplements to approved applications, civil penalties and criminal prosecution.

In addition, the distribution of prescription pharmaceuticals is subject to the Prescription Drug Marketing Act ("PDMA") which regulates the distribution of drugs and drug samples at the federal level, and sets minimum standards for the registration and regulation of drug distributors by the states. A growing majority of states also impose certain drug pedigree requirements on the sale and distribution of prescription drugs.

The FDA may require post-approval studies and clinical trials if the FDA finds that scientific data, including information regarding related drugs, deem it appropriate. The purpose of such studies would be to assess a known serious risk or signals of serious risk related to the drug or to identify an unexpected serious risk when available data indicate the potential for a serious risk. The FDA may also require a labeling change if it becomes aware of new safety information that it believes should be included in the labeling of a drug.

*The Hatch-Waxman Amendments*

*ANDA Approval Process*

The Hatch-Waxman Act, established abbreviated FDA approval procedures for drugs that are shown to be equivalent to proprietary

21

drugs previously approved by the FDA through its NDA process. Approval to market and distribute these drugs is obtained by filing an ANDA with the FDA. An ANDA is a comprehensive submission that contains, among other things, data and information pertaining to the active pharmaceutical ingredient, drug product formulation, specifications and stability of the generic drug, as well as analytical methods, manufacturing process validation data and quality control procedures. Premarket applications for generic drugs are termed abbreviated because they generally do not include preclinical and clinical data to demonstrate safety and effectiveness. Instead, a generic applicant must demonstrate that its product is bioequivalent to the innovator drug. In certain situations, an applicant may obtain ANDA approval of a generic product with a strength or dosage form that differs from a referenced innovator drug pursuant to the filing and approval of an ANDA Suitability Petition. The FDA will approve the generic product as suitable for an ANDA application if it finds that the generic product does not raise new questions of safety and effectiveness as compared to the innovator product. A product is not eligible for ANDA approval if the FDA determines that it is not equivalent to the referenced innovator drug, if it is intended for a different use, or if it is not subject to an approved Suitability Petition. However, such a product might be approved under an NDA, with supportive data from clinical trials.

*505(b)(2) NDAs*

As an alternative path to FDA approval for modifications to formulations or uses of products previously approved by the FDA, an applicant may submit an NDA under Section 505(b)(2) of the FDCA. Section 505(b)(2) was enacted as part of the Hatch-Waxman Amendments and permits the filing of an NDA where at least some of the information required for approval comes from studies not conducted by, or for, the applicant. If the 505(b)(2) applicant can establish that reliance on FDA's previous findings of safety and effectiveness is scientifically appropriate, it may eliminate the need to conduct certain preclinical or clinical studies of the new product. The FDA may also require companies to perform additional studies or measurements, including clinical trials, to support the change from the approved branded reference drug. The FDA may then approve the new product candidate for all, or some, of the label indications for which the branded reference drug has been approved, as well as for any new indication sought by the 505(b)(2) applicant.

*Orange Book Listing*

In seeking approval for a drug through an NDA, including a 505(b)(2) NDA, applicants are required to list with the FDA certain patents whose claims cover the applicant's product. Upon approval of an NDA, each of the patents listed in the application for the drug is then published in the Orange Book. Any applicant who files an ANDA seeking approval of a generic equivalent version of a drug listed in the Orange Book or a 505(b)(2) NDA referencing a drug listed in the Orange Book must certify to the FDA that (1) no patent information on the drug product that is the subject of the application has been submitted to the FDA; (2) such patent has expired; (3) the date on which such patent expires; or (4) such patent is invalid or will not be infringed upon by the manufacture, use or sale of the drug product for which the application is submitted. This last certification is known as a paragraph IV certification. A notice of the paragraph IV certification must be provided to each owner of the patent that is the subject of the certification and to the holder of the approved NDA to which the ANDA or 505(b)(2) application refers. The applicant may also elect to submit a "section viii" statement certifying that its proposed label does not contain (or carves out) any language regarding the patented method-of-use rather than certify to a listed method-of-use patent.

If the reference NDA holder and patent owners assert a patent challenge directed to one of the Orange Book listed patents within 45 days of the receipt of the paragraph IV certification notice, the FDA is prohibited from approving the application until the earlier of 30 months from the receipt of the paragraph IV certification expiration of the patent, settlement of the lawsuit or a decision in the infringement case that is favorable to the applicant. The ANDA or 505(b)(2) application also will not be approved until any applicable non-patent exclusivity listed in the Orange Book for the branded reference drug has expired as described in further detail below.

*Non-Patent Exclusivity*

In addition to patent exclusivity, the holder of the NDA for the listed drug may be entitled to a period of non-patent exclusivity, during which the FDA cannot approve an ANDA or 505(b)(2) application that relies on the listed drug. For example, a pharmaceutical manufacturer may obtain five years of non-patent exclusivity upon NDA approval of a new chemical entity, or NCE, which is a drug that contains an active moiety that has not been approved by FDA in any other NDA. An "active moiety" is defined as the molecule or ion responsible for the drug substance's physiological or pharmacological action. During the five year exclusivity period, the FDA cannot accept for filing any ANDA seeking approval of a generic version of that drug or any 505(b)(2) NDA for the same active moiety and that relies on the FDA's findings regarding that drug, except that FDA may accept an application for filing after four years if the follow-on applicant makes a paragraph IV certification.

A drug, including one approved under Section 505(b)(2), may obtain a three-year period of exclusivity for a particular condition

22

of approval, or change to a marketed product, such as a new formulation for a previously approved product, if one or more new clinical studies (other than bioavailability or bioequivalence studies) was essential to the approval of the application and was conducted/sponsored by the applicant. Should this occur, the FDA would be precluded from approving any ANDA or 505(b)(2) application for the protected modification until after that three-year exclusivity period has run. However, unlike NCE exclusivity, the FDA can accept an application and begin the review process during the exclusivity period.

*FDA Approval for Biosimilars*

In 2010, the Biologics Price Competition and Innovation Act (BPCIA) was enacted creating a statutory pathway for licensure of biological products that are biosimilar to, and possibly interchangeable with, reference biological products licensed under the PHSA. The BPCIA grants innovator manufacturers 12 years of exclusivity from the date of approval of the original, or reference, BLA before approving licenses for biosimilars. Innovators may also be entitled to a potential six-month extension of exclusivity if the results of pediatric studies are provided to the FDA. The BPCIA establishes procedures by which the biosimilar applicant is to provide information about its application and product to the reference product sponsor. The BPCIA also details how information about potentially relevant patents is shared between the sponsors and how litigation may proceed prior to approval of the biosimilar application. The BPCIA, like the Hatch Waxman Act, provides a period of exclusivity for the first biosimilar to obtain license from FDA as interchangeable with the reference product.

*Orphan Drug Designation and Exclusivity*

The Orphan Drug Act provides incentives for the development of products intended to treat rare diseases or conditions. Under the Orphan Drug Act, the FDA may grant orphan designation to a drug or biological product intended to treat a rare disease or condition, which is generally a disease or condition that affects fewer than 200,000 individuals in the United States, or more than 200,000 individuals in the United States and for which there is no reasonable expectation that the cost of developing and making a drug or biological product available in the United States for this type of disease or condition will be recovered from sales of the product. If a sponsor demonstrates that a drug is intended to treat rare diseases or conditions, the FDA will grant orphan designation for that product for the orphan disease indication. Orphan designation must be requested before submitting an NDA. After the FDA grants orphan product designation, the identity of the therapeutic agent and its potential orphan use are disclosed publicly by the FDA. Orphan drug designation, however, does not convey any advantage in, or shorten the duration of, the regulatory review and approval process.

Orphan drug designation provides manufacturers with research grants, tax credits and eligibility for orphan drug exclusivity. If a product that has orphan drug designation subsequently receives the first FDA approval of the active moiety for that disease or condition for which it has such designation, the product is entitled to orphan drug exclusivity, which for seven years prohibits the FDA from approving another product with the same active ingredient for the same indication, except in limited circumstances. If a drug designated as an orphan product receives marketing approval for an indication broader than the orphan indication for which it received the designation, it will not be entitled to orphan drug exclusivity. Orphan exclusivity will not bar approval of another product under certain circumstances, including if a subsequent product with the same active ingredient for the same indication is shown to be clinically superior to the approved product on the basis of greater efficacy or safety, or providing a major contribution to patient care, or if the company with orphan drug exclusivity is not able to meet market demand. Further, the FDA may approve more than one product for the same orphan indication or disease as long as the products contain different active ingredients. Moreover, competitors may receive approval of different products for the indication for which the orphan product has exclusivity or obtain approval for the same product but for a different indication for which the orphan product has exclusivity. As a result, even if one of our product candidates receives orphan exclusivity, we may still be subject to competition. Orphan exclusivity also could block the approval of one of our products for seven years if a competitor obtains approval of the same drug or if our product candidate is determined to be contained within the competitor's product for the same indication or disease.

*International Regulation*

In addition to regulations in the United States, we are and will be subject to a variety of foreign regulations regarding development, approval, commercial sales and distribution of our products. Whether or not we obtain FDA approval for a product, we must obtain the necessary approvals by the comparable regulatory authorities of foreign countries before we can commence clinical trials or marketing of the product in those countries. The approval process varies from country to country and can involve additional product testing and additional review periods, and the time may be longer or shorter than that required to obtain FDA approval. The requirements governing, among other things, the conduct of clinical trials, product licensing, pricing and reimbursement vary greatly from country to country. Regulatory approval in one country does not ensure regulatory approval in another, but a failure or delay in obtaining regulatory approval in one country may negatively impact the regulatory process in others. If we fail to comply with applicable foreign regulatory requirements, we may be subject to fines, suspension or withdrawal of regulatory

23

approvals, product recalls, seizure of products, operating restrictions and criminal prosecution.

*Other Healthcare Laws and Compliance Requirements*

In the United States, the research, manufacturing, distribution, marketing, sale and promotion of drug products and medical devices are subject to numerous regulations by various federal, state and local authorities in addition to the FDA including, but not limited to, the U.S. Federal Communications Commission, the U.S. Department of Justice, the U.S. Department of Health and Human Services ("HHS") and its various enforcement divisions, such as the Centers for Medicare & Medicaid Services ("CMS"), the Office of Inspector General ("OIG"), the Office for Human Research Protections ("OHRP"), and the Office of Research Integrity ("ORI"), state Attorneys General, state Medicaid Fraud Control Units, or MFCUs, and other state and local government agencies. Healthcare laws and regulations that may govern our business include the following.

The federal Anti-Kickback Statute prohibits, among other things, any person or entity, including a prescription drug manufacturer, or a party acting on its behalf, from knowingly and willfully soliciting, receiving, offering or paying any remuneration, directly or indirectly, overtly or covertly, in cash or in kind to induce in return for either the referral of an individual, or the purchase, recommendation, leasing, ordering or furnishing of a good, facility, item, or service, for which payment may be made in whole or in part under a federal healthcare program such as the Medicare and Medicaid programs. This statute has been interpreted broadly to apply to, among other things, arrangements between pharmaceutical manufacturers, on one hand, and prescribers, purchasers, and formulary managers, on the other. The term "remuneration" expressly includes kickbacks, bribes or rebates and also has been broadly interpreted to include anything of value, including for example, gifts, discounts, the furnishing of supplies or equipment, credit arrangements, payments of cash, waivers of payments, ownership interests and providing anything at less than its fair market value. There are a number of statutory exceptions and regulatory safe harbors protecting certain business arrangements from prosecution. Failure to meet all of the requirements of a particular applicable statutory exception or safe harbor does not make the conduct per se illegal under the federal Anti-Kickback Statute. Instead, the legality of the arrangement will be evaluated on a case-by-case basis based on a cumulative review of all of its facts and circumstances. Our practices may not meet all of the criteria for safe harbor protection from federal Anti-Kickback Statute liability in all cases. Additionally, the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010 (collectively, the "ACA"), among other things, amended the intent standard under the federal Anti-Kickback Statute such that a person or entity no longer needs to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation. The ACA also provided that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act (discussed below). Further, many states have adopted laws similar to the federal Anti-Kickback Statute, and some of these state laws may be broader in scope in that some of these state laws extend to all payors and may not contain safe harbors.

Federal civil and criminal false claims laws and civil monetary penalty laws, including the federal civil False Claims Act, which prohibit, among other things, any person or entity from knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval by the federal government or knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim to the federal government. The "*qui tam*" provisions of the federal civil False Claims Act allow a private individual to bring a civil action on behalf of the federal government alleging that the defendant has submitted a false claim to the federal government, and potentially to share in any monetary recovery. In recent years, the number of suits brought by private individuals has increased dramatically. In addition, various states have enacted false claims laws analogous to the federal civil False Claims Act. Many of these state laws are broader in scope and apply to all payors, and therefore, are not limited to only those claims submitted to the federal government. There are many potential bases for liability under the federal civil False Claims Act. Liability arises, primarily, when an entity knowingly submits, or causes another to submit, a false claim for reimbursement to the federal government. The federal civil False Claims Act has been used to assert liability on the basis of kickbacks and other improper referrals, improperly reported government pricing metrics such as Best Price or Average Manufacturer Price, and improper promotion of off-label uses not expressly approved by the FDA in a drug's label. Our future activities relating to the reporting of discount and rebate information and other information affecting federal, state and third party reimbursement of our products, and the sale and marketing of our products and our service arrangements or data purchases, among other activities, may be subject to scrutiny under these laws.

Also, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") created several additional federal civil and criminal statutes that prohibit healthcare fraud and false statements relating to healthcare matters. The healthcare fraud statute prohibits knowingly and willfully executing a scheme to defraud any healthcare benefit program, including private third-party payors. The false statements statute prohibits knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items or services. Like the federal Anti-Kickback Statute, the ACA amended certain of these federal criminal statutes such that a person or entity no longer needs to have actual knowledge of the statute or specific intent to violate it in order to have committed

24

a violation.

In addition, we may be subject to, or our marketing activities may be limited by, data privacy and security regulation by both the federal government and the states in which we conduct our business. HIPAA and its implementing regulations established uniform standards for certain "covered entities," which are certain healthcare providers, health plans and healthcare clearinghouses, as well as their business associates, which are independent contractors or agents of covered entities that receive or obtain protected health information in connection with providing a service on behalf of a covered entity, governing the conduct of specified electronic healthcare transactions and protecting the security and privacy of protected health information. The American Recovery and Reinvestment Act of 2009, commonly referred to as the economic stimulus package, included the Health Information Technology for Economic and Clinical Health Act ("HITECH"), which expanded certain of HIPAA's privacy and security standards. Among other things, HITECH makes HIPAA's security standards and certain privacy standards directly applicable to business associates. HITECH also created four new tiers of civil monetary penalties, amended HIPAA to make civil and criminal penalties directly applicable to business associates, and gave state attorneys general new authority to file civil actions for damages or injunctions in federal courts to enforce the federal HIPAA laws and seek attorneys' fees and costs associated with pursuing federal civil actions.

Additionally, federal transparency laws, including the federal Physician Payments Sunshine Act created under Section 6002 of the ACA and its implementing regulations require that certain manufacturers of drugs, devices, biologics, and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) report annually to CMS information related to "payments or other transfers of value" made or distributed to physicians (defined to include doctors of medicine, dentists, optometrists, podiatrists and chiropractors), generally, with some exceptions, and teaching hospitals, or to entities or individuals at the request of, or designated on behalf of, physicians and teaching hospitals. Applicable manufacturers and applicable group purchasing organizations must also report annually to the CMS certain ownership and investment interests held by physicians (as defined above) and their immediate family members.

There are also an increasing number of analogous state laws that require manufacturers to file reports with states on pricing and marketing information, such as tracking and reporting of gifts, compensations, other remuneration and items of value provided to health care professionals and health care entities. Many of these laws contain ambiguities as to what is required to comply with the laws. Several states have also enacted legislation requiring pharmaceutical companies to, among other things, establish and implement commercial compliance programs, file periodic reports with the state, make periodic public disclosures on sales, marketing, pricing, clinical trials and other activities and/or register their sales representatives. Certain state laws also regulate manufacturers' use of identifiable data. These laws may affect our sales, marketing and other promotional activities by imposing administrative and compliance burdens. In addition, given the lack of clarity with respect to these laws and their implementation, our reporting actions could be subject to the penalty provisions of the pertinent state and federal authorities.

If our operations are found to be in violation of any of the health regulatory laws described above or any other laws that apply to us, we may be subject to penalties, including significant administrative, criminal and civil monetary penalties, damages, fines, imprisonment, disgorgement, contractual damages, reputational harm, exclusion from participation in government healthcare programs, integrity obligations, injunctions, recall or seizure of products, total or partial suspension of production, denial or withdrawal of pre-marketing product approvals, private qui tam actions brought by individual whistleblowers in the name of the government or refusal to allow us to enter into supply contracts, including government contracts and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations. We are unable to predict whether we would be subject to actions under these laws or the impact of such actions. However, the cost of defending such claims, as well as any sanctions imposed, could adversely affect our financial performance.

To the extent that any of our products are sold in a foreign country, we also may be subject to similar foreign laws and regulations, which may include, for instance, the U.S. Foreign Corrupt Practices Act, the U.K. Anti-Bribery Act, applicable post-marketing requirements, including safety surveillance, anti-fraud and abuse laws and implementation of corporate compliance programs and reporting of payments or transfers of value to healthcare professionals.

*Third-Party Payor Coverage and Reimbursement*

The commercial success of our approved product portfolio, as well as our pre-clinical and clinical product portfolio, if and when approved, will depend, in part, upon the availability of coverage and adequate reimbursement from third-party payors at the federal, state and private levels. Patients who are prescribed treatments for their conditions and providers performing the prescribed services generally rely on third-party payors to reimburse all or part of the associated healthcare costs. Sales of our product portfolio will therefore depend substantially, both domestically and abroad, on the extent to which the costs of our product portfolio will be paid by health maintenance, managed care, pharmacy benefit, and/or similar healthcare management organizations, or are reimbursed

25

by government health administration authorities, such as Medicare and Medicaid, private health coverage insurers and other third-party payors. The market for our product portfolio will depend significantly on access to third-party payors' formularies, or lists of treatments for which third-party payors provide coverage and reimbursement.

Also, third-party payors are developing increasingly sophisticated methods of controlling healthcare costs. Further, coverage and reimbursement for therapeutic products can differ significantly from payor to payor. As a result, the coverage determination process will require us to provide scientific and clinical support for the use of our products to each payor separately, with no assurance that adequate coverage and reimbursement will be obtained. The cost of pharmaceuticals and medical devices continues to generate substantial governmental and third-party payor scrutiny. We expect that the pharmaceutical industry will experience continued pricing pressures due to the trend toward managed healthcare, the increasing influence of managed care organizations and additional legislative and administrative proposals. Our results of operations and business could be adversely affected by current and future third-party payor policies as well as healthcare legislative and administrative reforms.

Some third-party payors also require pre-approval of coverage for new or innovative devices or drug therapies before they will reimburse healthcare providers who use such therapies. While we cannot predict whether any proposed cost-containment measures will be adopted or otherwise implemented in the future, these requirements or any announcement or adoption of such proposals could have a material adverse effect on our ability to obtain adequate prices for our product portfolio and to operate profitably.

In international markets, reimbursement and healthcare payment systems vary significantly by country, and many countries have instituted price ceilings on specific products and therapies. There can be no assurance that our products will be considered medically reasonable and necessary for a specific indication, that our products will be considered cost-effective by third-party payors, that an adequate level of reimbursement will be available or that the third-party payors' reimbursement policies will not adversely affect our ability to sell our products profitably.

*Healthcare Reform*

In the United States and foreign jurisdictions, the legislative landscape continues to evolve. There have been a number of legislative and regulatory changes to the healthcare system that will likely affect our future operations. In particular, there have been and continue to be a number of initiatives at the United States federal and state levels that seek to reduce healthcare costs, improve access, and improve quality.

By way of example, in March 2010, the ACA was passed, which significantly changed health care financing by both governmental and private insurers. The provisions of the ACA of importance to the pharmaceutical and biotechnology industry included, among others, the following:

- an annual, nondeductible fee on any entity that manufactures or imports certain branded prescription drugs and biologic agents, apportioned among these entities according to their market share in certain government healthcare programs;
- an increase in the statutory minimum rebates a manufacturer must pay under the Medicaid Drug Rebate Program to 23.1% and 13% of the average manufacturer price for most branded and generic drugs, respectively;
- new methodologies by which rebates owed by manufacturers under the Medicaid Drug Rebate Program are calculated for drugs that are inhaled, infused, instilled, implanted or injected, and for drugs that are line extension products;
- a new Medicare Part D coverage gap discount program, in which manufacturers must now agree to offer 70% point-of-sale discounts to negotiated prices of applicable brand drugs to eligible beneficiaries during their coverage gap period, as a condition for the manufacturer's outpatient drugs to be covered under Medicare Part D;
- extension of manufacturers' Medicaid rebate liability to covered drugs dispensed to individuals who are enrolled in Medicaid managed care organizations, unless the drug is subject to discounts under the 340B drug discount program;
- expansion of eligibility criteria for Medicaid programs by, among other things, allowing states to offer Medicaid coverage to additional individuals and by adding new mandatory eligibility categories for certain individuals with income at or below 133% of the Federal Poverty Level thereby potentially increasing manufacturers' Medicaid rebate liability;
- expansion of the entities eligible for discounts under the Public Health Service pharmaceutical pricing program;
- expansion of healthcare fraud and abuse laws, including the federal civil False Claims Act and the federal Anti-Kickback Statute, new government investigative powers, and enhanced penalties for noncompliance;
- a licensure framework for follow-on biologic products;
- a new Patient-Centered Outcomes Research Institute to oversee, identify priorities in, and conduct comparative clinical effectiveness research, along with funding for such research;
- new requirements under the federal Physician Payments Sunshine Act for manufacturers to report information related to payments and other transfers of value made to physicians and teaching hospitals as well as ownership or investment interests held by physicians and their immediate family members; and,

26

- a new requirement to annually report certain drug samples that manufacturers and distributors provide to licensed practitioners, or to pharmacies of hospitals or other healthcare entities.

Some of the provisions of the ACA have yet to be implemented, and there have been judicial and Congressional challenges to certain aspects of the ACA, as well as recent efforts by the U.S. Presidential administration to repeal or replace certain aspects of the ACA. Since January 2017, the U.S. President has signed two Executive Orders and other directives designed to delay the implementation of certain provisions of the ACA or otherwise circumvent some of the requirements for health insurance mandated by the ACA. Concurrently, Congress has considered legislation that would repeal or repeal and replace all or part of the ACA. While Congress has not passed comprehensive repeal legislation, two bills affecting the implementation of certain taxes under the ACA have been signed into law. The Tax Cuts and Jobs Act of 2017 (the "Tax Act") included a provision which repealed, effective January 1, 2019, the tax-based shared responsibility payment imposed by the ACA on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate". On January 22, 2018, the U.S. President signed a continuing resolution on appropriations for fiscal year 2018 that delayed the implementation of certain ACA-mandated fees, including the so-called "Cadillac" tax on certain high cost employer-sponsored insurance plans, the annual fee imposed on certain health insurance providers based on market share, and the medical device excise tax on non-exempt medical devices. The Bipartisan Budget Act of 2018, or the BBA, among other things, amended the ACA, effective January 1, 2019, to close the coverage gap in most Medicare drug plans, commonly referred to as the "donut hole". In July 2018, CMS published a final rule permitting further collections and payments to and from certain ACA qualified health plans and health insurance issuers under the ACA risk adjustment program in response to the outcome of federal district court litigation regarding the method CMS uses to determine this risk adjustment. On December 14, 2018, a Texas U.S. District Court Judge ruled that ACA is unconstitutional in its entirety because the "individual mandate" was repealed by Congress as part of the Tax Act. While the Texas U.S. District Court Judge, as well as the U.S. Presidential administration and CMS, have stated that the ruling will have no immediate effect pending appeal of the decision, it is unclear how this decision, subsequent appeals, and other efforts to repeal and replace ACA will impact ACA.

Other healthcare legislative changes have been proposed and adopted since the ACA was enacted. For example, in August 2011, the President signed into law the Budget Control Act of 2011, which, among other things, created the Joint Select Committee on Deficit Reduction to recommend proposals in spending reductions to Congress. The Joint Select Committee on Deficit Reduction did not achieve its targeted deficit reduction of at least $1.2 trillion for the years 2013 through 2021, triggering the legislation's automatic reductions to several government programs. These reductions include aggregate reductions to Medicare payments to providers of up to 2% per fiscal year, which went into effect on April 1, 2013 and, following passage of subsequent legislation, including the BBA, will remain in effect through 2027 unless additional Congressional action is taken. Additionally, in January 2013, President Obama signed into law the American Taxpayer Relief Act of 2012, which, among other things, further reduced Medicare payments to several providers, including hospitals, imaging centers, and cancer treatment centers, and increased the statute of limitations period for the government to recover overpayments to providers from three to five years. These new laws may result in additional reductions in Medicare and other healthcare funding, which could have a material adverse effect on our customers and accordingly, our financial operations.

In addition, the Drug Supply Chain Security Act signed into law on November 27, 2013 imposes on manufacturers of certain pharmaceutical products new obligations related to product tracking and tracing, among others, which will be phased in over ten years.  Among the requirements of this new legislation, manufacturers subject to this federal law will be required to provide certain information regarding the drug product to individuals and entities to which product ownership is transferred, label drug product with a product identifier, and keep certain records regarding the drug product.  The transfer of information to subsequent product owners by manufacturers will eventually be required to be done electronically. Covered manufacturers will also be required to verify that purchasers of the manufacturers' products are appropriately licensed.  Further, under this new legislation, covered manufacturers will have drug product investigation, quarantine, disposition, and notification responsibilities related to counterfeit, diverted, stolen,  and intentionally adulterated products, as well as products that are the subject of fraudulent transactions or which are otherwise unfit for distribution such that they would be reasonably likely to result in serious health consequences or death.

We expect that additional state and federal healthcare reform measures will be adopted in the future. For example, there has been increasing legislative and enforcement interest in the United States with respect to specialty drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drugs. For example, in January 2016, CMS issued a final rule regarding the Medicaid drug rebate program. The final rule, effective April 1, 2016, among other things, revises the manner in which the "average manufacturer price" is to be calculated by manufacturers participating in the program and implements certain amendments to the Medicaid rebate statute created under the ACA. Further, the current U.S. Presidential administration's budget proposal for fiscal year 2019 contains further drug price control measures

27

that could be enacted during the 2019 budget process or in other future legislation, including, for example, measures to permit Medicare Part D plans to negotiate the price of certain drugs under Medicare Part B, to allow some states to negotiate drug prices under Medicaid, and to eliminate cost sharing for generic drugs for low-income patients. Additionally, the current U.S. Presidential administration released a "Blueprint", or plan, to lower drug prices and reduce out of pocket costs of drugs that contains additional proposals to increase drug manufacturer competition, increase the negotiating power of certain federal healthcare programs, incentivize manufacturers to lower the list price of their products, and reduce the out of pocket costs of drug products paid by consumers. HHS has already started the process of soliciting feedback on some of these measures and, at the same, is immediately implementing others under its existing authority. For example, in September 2018, CMS announced that it will allow Medicare Advantage plans the option to use step therapy for Part B drugs beginning January 1, 2019, and in October 2018, CMS proposed a new rule that would require direct-to-consumer television advertisements of prescription drugs and biological products, for which payment is available through or under Medicare or Medicaid, to include in the advertisement the Wholesale Acquisition Cost, or list price, of that drug or biological product. On January 31, 2019, the HHS Office of Inspector General, proposed modifications to the federal Anti-Kickback Statute discount safe harbor for the purpose of reducing the cost of drug products to consumers which, among other things, if finalized, will affect discounts paid by manufacturers to Medicare Part D plans, Medicaid managed care organizations and pharmacy benefit managers working with these organizations. While some of these and other proposed measures may require authorization through additional legislation to become effective, Congress and the current U.S. Presidential administration have each indicated that it will continue to seek new legislative and/or administrative measures to control drug costs. At the state level, legislatures have increasingly passed legislation and implemented regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing. Any additional healthcare reform measures could further constrain our business and/or limit the amounts that federal and state governments will pay for healthcare products and services, which could result in reduced demand for our product portfolio or additional pricing pressures.

Additionally, on May 30, 2018, the Trickett Wendler, Frank Mongiello, Jordan McLinn, and Matthew Bellina Right to Try Act of 2017, or the Right to Try Act, was signed into law. The law, among other things, provides a federal framework for certain patients to access certain investigational new drug products that have completed a Phase I clinical trial and that are undergoing investigation for FDA approval. Under certain circumstances, eligible patients can seek treatment without enrolling in clinical trials and without obtaining FDA permission under the FDA expanded access program. There is no obligation for a drug manufacturer to make its drug products available to eligible patients as a result of the Right to Try Act.

*Other Regulatory Requirements*

We are also subject to various laws and regulations regarding laboratory practices, the experimental use of animals, and the use and disposal of hazardous or potentially hazardous substances in connection with our research. In each of these areas, as above, the FDA and other government agencies have broad regulatory and enforcement powers, including, among other things, the ability to levy fines and civil penalties, suspend or delay issuance of approvals, seize or recall products, and withdraw approvals, any one or more of which could have a material adverse effect on us.

**Employees**

As of December 31, 2018, we had a total of 96 employees and two full-time consultants. None of our employees are represented by a labor union or subject to a collective bargaining agreement. We have not experienced any work stoppage and consider our relations with our employees to be good.

**Corporate Information**

We were incorporated in Delaware in January 2007. Our principal executive offices are located at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677, and our telephone number is (201) 326-5300.

**Available Information**

Our corporate website address is www.eagleus.com. Information contained on or accessible through our website is not a part of this Annual Report on Form 10-K, and the inclusion of our website address in this Annual Report on Form 10-K is an inactive textual reference only. We make our Annual Reports on Form 10-K, Quarterly reports on Form 10-Q, Current Reports on Form 8-K and all amendments to those reports available free of charge on our website as soon as reasonably practicable after we file

28

such reports with, or furnish such reports to, the Securities and Exchange Commission, or SEC. You can access our filings through the SEC's internet site: www.sec.gov.

29

**Item 1A. Risk Factors**

Investing in our common stock involves a high degree of risk. You should consider carefully the risks and uncertainties described below in addition to the other information included or incorporated by reference in this Annual Report on Form 10-K, as well as our other public filings with the Securities and Exchange Commission. If any of the following risks actually occur, our business, financial condition or results of operations would likely suffer. In that case, the trading price of our common stock could fall. In addition to the risk factors identified under the captions below, the operation and results of our business are subject to risks and uncertainties identified elsewhere in this Annual Report on Form 10-K as well as general risks and uncertainties such as those relating to general economic conditions and demand in the market for our products.

**Risks Related to Our Financial Condition and Need for Additional Capital**

*We have a history of operating losses and have only recently achieved profitability. If we cannot sustain profitability, our business, prospects, operating results and financial condition would be materially harmed.*

We have focused primarily on developing a broad product portfolio and currently have final regulatory approval for four products. Some of our product candidates will require substantial additional development time and resources before we would be able to receive regulatory approvals, implement commercialization strategies and begin generating revenue from product sales. Although we had net income of $31.9 million for the year ended December 31, 2018, $51.9 million for the year ended December 31, 2017 and $81.4 million for the year ended December 31, 2016, we incurred significant net losses prior to 2015.

We have devoted most of our financial resources to product development and may not generate significant revenue from sales of our product candidates in the near-term, if ever. As of December 31, 2018, we commercialize the following products, Argatroban, Ryanodex, Belrapzo and Bendeka.

Because of the numerous risks and uncertainties associated with pharmaceutical product development, we are unable to fully predict the timing or amount of our expenses, but we expect to continue to incur substantial expenses, which we expect to increase as we expand our development activities and product portfolio. As a result of the foregoing, we may incur losses and negative cash flows in the future. We believe that our existing cash and cash equivalents, together with interest thereon, are sufficient to fund our operations for a minimum of twelve months.

*If we fail to obtain additional financing, we could be forced to delay, reduce or eliminate our product development programs.*

Developing pharmaceutical products, including conducting preclinical studies and clinical trials, is expensive. We expect our development expenses to substantially increase in connection with our ongoing activities, particularly as we advance our clinical programs, both internally and through our joint development agreement with AMRI. Changing circumstances beyond our control may cause us to consume capital more rapidly than we currently anticipate. For example, our product commercialization or development efforts could encounter technical or other difficulties that could increase our development costs more than we expect. In any event, we may require additional capital prior to obtaining regulatory approval for, or commercializing, any additional product candidates.

In addition, attempting to secure additional financing may divert our management from our day-to-day activities, which may adversely affect our ability to develop and commercialize additional product candidates. We cannot guarantee that future financing will be available in sufficient amounts or on terms acceptable to us, if at all. If we are unable to raise additional capital when required or on acceptable terms, we may be required to:

- significantly delay, scale back or discontinue the development or commercialization of our product candidates;
- seek corporate partners for our products and product candidates at an earlier stage than otherwise would be desirable or on terms that are less favorable than might otherwise be available;
- relinquish or license on unfavorable terms, our rights to technologies or products, or to product candidates that we otherwise would seek to develop or commercialize ourselves; or
- significantly curtail, or cease, operations.

The occurrence of any of these factors could have a material adverse effect on our business, operating results and prospects.

*We may sell additional equity or incur debt to fund our operations, which may result in dilution to our stockholders and impose restrictions on our business.*

In order to raise additional funds to support our operations, we may sell additional equity or incur debt, which could adversely impact our stockholders, as well as our business. The sale of additional equity or convertible debt securities would result in the issuance of additional shares of our capital stock and dilution to all of our stockholders. The incurrence of indebtedness, including under the credit agreement we entered into in January 2017 and subsequently amended and restated in August 2017, which we refer to as the Credit Agreement, would result in increased fixed payment obligations. In addition, the incurrence of indebtedness could result in certain restrictive covenants, such as limitations on our ability to incur additional debt, limitations on our ability to acquire, sell or license intellectual property rights and other operating restrictions that could adversely impact our ability to conduct our business.

31

We may not have enough available cash or be able to raise additional funds on satisfactory terms, if at all, through equity or debt financings to repay our indebtedness at the time any such repayment is required (causing a default under such indebtedness), which could have a material adverse effect on our business, financial condition and results of operations.

**Risks Related to Regulatory Approval**

*We cannot give any assurance that we will receive regulatory approval for our product candidates, which is necessary before they can be commercialized.*

Our business and future success are substantially dependent on our ability to successfully and timely develop, obtain regulatory approval for, and commercialize our product candidates. Any delay or setback in the development of any of these product candidates could adversely affect our business. In addition, the process for obtaining regulatory approval to market biologic products is expensive, often takes many years, and can vary substantially based on the type, complexity and novelty of the product candidate involved. Our planned development, approval and commercialization of these product candidates may fail to be completed in a timely manner or at all. The FDA or other foreign regulatory agency may refuse or delay approval of our product candidates for failure to collect sufficient clinical or animal safety data and require us or our collaborators to conduct additional clinical or animal safety studies, which may cause lengthy delays and increased costs to our programs. We cannot provide assurance that we will be able to obtain approval for any of our product candidates from the FDA or any foreign regulatory authority or that we will obtain such approval in a timely manner. If we do not obtain regulatory approval of new products or additional indications for existing products, or are significantly delayed or limited in doing so, our revenue growth will be adversely affected, we may experience surplus inventory, or our business may be materially harmed and we may need to significantly curtail operations. For example, in March 2016 we received a Complete Response Letter from the FDA stating that while their initial review of our NDA for EP-6101 was complete, they could not approve the application in its present form and requested additional information. We have elected not to pursue the application further or seek to exploit EP-6101 for various reasons including the costs associated with addressing the information request in the FDA's Complete Response Letter and because additional generic bivalirudin products have entered or are entering the market. Additionally, in July 2017 we received a Complete Response Letter from the FDA regarding our 505(b)(2) NDA for EP-4104 for the treatment of EHS, in conjunction with external cooling methods. The FDA requested that the Company conduct an additional clinical trial for EP-4104. The Company conducted an additional clinical trial in August 2018 during the Hajj pilgrimage, similar to the study conducted during the Hajj in 2015. On August 30, 2018, the Company announced the completion of enrollment of the Company's second clinical study to further evaluate the safety and efficacy of Ryanodex. During the 2018 Hajj, overall emergency room visits were dramatically decreased from previous years due to well-implemented crowd management, lower temperatures, lower humidity and other external factors. As a result, the number of EHS patients available for study enrollment was also significantly less than in previous years, and therefore much lower than anticipated. The preliminary assessment of patients enrolled is consistent with the data from the study conducted in 2015, in which patients dosed with Ryanodex plus Standard of Care ("SOC") showed an additive benefit compared to patients receiving SOC only. The Company intends to complete the analysis of the data and meet with the U.S. Food and Drug Administration to discuss next steps in 2019.

*If we are unable to differentiate our products or product candidates from branded reference drugs or existing generic therapies for similar treatments, or if the FDA or other applicable regulatory authorities approve generic products that compete with any of our products or product candidates, the ability to successfully commercialize our product candidates would be adversely affected.*

Our strategy is to enter the market no later than the first generic or biosimilar to the applicable branded reference drug. We expect to compete against branded reference drugs and to compete with their generic counterparts that will be sold for a lower price. Although we believe that our products and product candidates will be clinically differentiated from branded reference drugs and their generic counterparts, if any, it is possible that such differentiation will not impact our market position. If we are unable to achieve significant differentiation for our products or product candidates against other drugs, the opportunity for our products and product candidates to achieve premium pricing and be commercialized successfully would be adversely affected.

In addition to existing branded reference drugs and the related generic products, the FDA or other applicable regulatory authorities may approve generic products that compete directly with our products or product candidates, if approved. Once an NDA, including a 505(b)(2) application, is approved, the product covered thereby becomes a "listed drug" which can, in turn, be cited by potential competitors in support of approval of an ANDA. The Federal Food, Drug and Cosmetic Act ("FDCA"), FDA regulations and other applicable regulations and policies provide incentives to manufacturers to create modified, non-infringing versions of a drug to facilitate the approval of an ANDA for generic substitutes. These manufacturers might only be required to conduct a relatively inexpensive study to show that their product has the same active ingredient(s), dosage form, strength, route of administration and conditions of use or labeling as our products or product candidates and that the generic product is bioequivalent to ours, meaning it is absorbed in the body at the same rate and to the same extent as our products or product candidates. These generic equivalents, which must meet the same quality standards as branded pharmaceuticals, would be significantly less costly than ours to bring to market and companies that produce generic equivalents are generally able to offer their products at lower prices. Thus, after the

32

introduction of a generic competitor, a significant percentage of the sales of any branded product is typically lost to the generic product. Accordingly, competition from generic equivalents of our products or product candidates would materially adversely impact our ability to successfully commercialize our product candidates or negatively impact our ability to gain market acceptance and market share for our products.

***If the FDA does not conclude that our product candidates satisfy the requirements for the regulatory approval, or if the requirements for approval of any of our product candidates are not as we expect, the approval pathway for our product candidates will likely take significantly longer, cost significantly more and encounter significantly greater complications and risks than anticipated, and in any case may not be successful.***

We intend to seek FDA approval through the 505(b)(2) regulatory pathway for those small molecule product candidates described in this Annual Report on Form 10-K and will likewise pursue an equivalent regulatory strategy for the biologic product candidates developed by Eagle Biologics. The Drug Price Competition and Patent Term Restoration Act of 1984, also known as the Hatch-Waxman Act, added Section 505(b)(2) to the FDCA. Section 505(b)(2) permits the filing of an NDA where at least some of the information required for approval comes from studies that were not conducted by or for the applicant. While the regulatory pathway of a biobetter is less developed, we believe through collaborative deals we can achieve a similar result allowing us to rely on data previously generated.

If the FDA does not allow us to pursue the regulatory pathway for our product candidates as anticipated, we may need to conduct additional clinical trials, provide additional data and information and meet additional standards for regulatory approval. If this were to occur, the time and financial resources required to obtain FDA approval for our product candidates would likely substantially increase. Moreover, the inability to pursue such regulatory pathway could result in new competitive products reaching the market faster than our product candidates, which could materially adversely impact our competitive position and prospects. Even if we are allowed to pursue our chosen regulatory pathway for a product candidate, we cannot assure you that we will receive the requisite or timely approvals for commercialization of such product candidate.

In addition, we expect that our competitors will file citizens' petitions with the FDA in an attempt to persuade the FDA that our product candidates, or the clinical studies that support their approval, contain deficiencies. Such actions by our competitors could delay or even prevent the FDA from approving any NDA or BLA that we submit.

***Clinical development is a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results. Failure can occur at any stage of clinical development.***

Clinical testing, even when utilizing the 505(b)(2) pathway or its equivalent, is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure can occur at any time during the clinical trial process, even with active ingredients that have previously been approved by the FDA as safe and effective. The results of preclinical studies and early clinical trials of our product candidates may not be predictive of the results of later stage clinical trials. A number of companies in the biopharmaceutical industry have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier trials.

Our product candidates are in various stages of development, from early stage to late stage. Clinical trial failures may occur at any stage and may result from a multitude of factors both within and outside our control, including flaws in formulation, adverse safety or efficacy profile and flaws in trial design, among others. If the trials result in negative or inconclusive results, we or our collaborators may decide, or regulators may require us, to discontinue trials of the product candidates or conduct additional clinical trials or preclinical studies. For example, the FDA has requested that the Company conduct an additional clinical trial for EP-4104. We are currently meeting with the FDA to seek agreement on such additional work, but there can be no assurance that the FDA will ultimately approve the NDA, or if so, in a timely fashion. In addition, data obtained from trials and studies are susceptible to varying interpretations, and regulators may not interpret our data as favorably as we do, which may delay, limit or prevent regulatory approval. For these reasons, our future clinical trials may not be successful.

We do not know whether any future clinical trials we may conduct will demonstrate consistent or adequate efficacy and safety to obtain regulatory approval to market our product candidates. If any product candidate for which we are conducting clinical trials is found to be unsafe or lack efficacy, we will not be able to obtain regulatory approval for it. If we are unable to bring any of our current or future product candidates to market, our business would be materially harmed and our ability to create long-term stockholder value will be limited.

***Delays in clinical trials are common and have many causes, and any delay could result in increased costs to us and could jeopardize or delay our ability to obtain regulatory approval and commence product sales. We may also find it difficult to enroll patients in our clinical trials, which could delay or prevent development of our product candidates.***

We may experience delays in clinical trials of our product candidates. Our planned clinical trials may not begin on time, have an effective design, enroll a sufficient number of patients or be completed on schedule, if at all. Our clinical trials can be delayed for a variety of reasons, including:

- inability to raise or delays in raising funding necessary to initiate or continue a trial;

- delays in obtaining regulatory approval to commence a trial;

- delays in reaching agreement with the FDA on final trial design;

- imposition of a clinical hold for safety reasons or following an inspection of our clinical trial operations or trial sites by the FDA or other regulatory authorities;

- delays in reaching agreement on acceptable terms with prospective contract research organizations, or CROs, and clinical trial sites, or failure by such CROs to carry out the clinical trial at each site in accordance with the terms of our agreements with them;

- delays in obtaining required institutional review board, or IRB, approval at each site;

- difficulties or delays in having patients complete participation in a trial or return for post-treatment follow-up;

- clinical sites electing to terminate their participation in one of our clinical trials, which would likely have a detrimental effect on subject enrollment;

- time required to add new clinical sites; or

- delays by our contract manufacturers to produce and deliver sufficient supply of clinical trial materials.

If initiation or completion of our planned clinical trials is delayed for any of the above reasons or other reasons, our development costs may increase, our regulatory approval process could be delayed and our ability to commercialize and commence sales of our product candidates could be materially harmed, which could have a material adverse effect on our business.

In addition, identifying and qualifying patients to participate in clinical trials of our product candidates is critical to our success. The timing of our clinical trials depends on the speed at which we can recruit patients to participate in testing our product candidates as well as completion of required follow-up periods. We may not be able to identify, recruit and enroll a sufficient number of patients, or those with required or desired characteristics or to complete our clinical trials in a timely manner. Patient enrollment and completion of the trials is affected by factors including:

- severity of the disease under investigation;

- design of the trial protocol;

- size of the patient population;

- eligibility criteria for the trial in question;

- perceived risks and benefits of the product candidate under trial;

- proximity and availability of clinical trial sites for prospective patients;

- availability of competing therapies and clinical trials;

- efforts to facilitate timely enrollment in clinical trials;

- patient referral practices of physicians; and

- ability to monitor patients adequately during and after treatment.

***Our products or product candidates may cause adverse effects or have other properties that could delay or prevent their regulatory approval or limit the scope of any approved label or market acceptance, or result in significant negative consequences following marketing approval, if any.***

As with many pharmaceutical and biological products, treatment with our products or product candidates may produce undesirable side effects or adverse reactions or events. Although our products or product candidates containing active ingredients that have already been approved and the side effects arising from the use of the active ingredient or class of drug in our products or product candidates are generally known, our products or product candidates may still cause undesirable side effects. These could be attributed to the active ingredient or class of drug or to our unique formulation of such products or product candidates, or other potentially harmful characteristics. Such characteristics could cause us, our IRBs, clinical trial sites, the FDA or other regulatory authorities to interrupt, delay or halt clinical trials and could result in a more restrictive label or the delay, denial or withdrawal of regulatory approval, which may harm our business, financial condition and prospects significantly.

Further, if any of our products cause serious or unexpected side effects after receiving market approval, a number of potentially significant negative consequences could result, including:

34

- regulatory authorities may withdraw their approval of the product or impose restrictions on its distribution;

- the FDA may require implementation of a Risk Evaluation and Mitigation Strategy, or REMS;

- regulatory authorities may require the addition of labeling statements, such as warnings or contraindications;

- we may be required to change the way the product is administered or conduct additional clinical studies;

- we could be sued and held liable for harm caused to patients; or

- our reputation may suffer.

Any of these events could prevent us from achieving or maintaining market acceptance of the affected product or product candidate and could substantially increase the costs of commercializing our products and product candidates.

***The regulatory approval processes of the FDA and comparable foreign authorities are lengthy, time-consuming and inherently unpredictable, and if we are ultimately unable to obtain regulatory approval for our product candidates, our business will be substantially harmed.***

The time required to obtain approval by the FDA and comparable foreign authorities is unpredictable but typically takes many years following the commencement of clinical trials and depends upon numerous factors, including the substantial discretion of the regulatory authorities. In addition, approval policies, regulations or the type and amount of clinical data necessary to gain approval may change during the course of a product candidate's clinical development and may vary among jurisdictions. To date, we have obtained regulatory approval for five NDA products, but no BLA products, and we have multiple NDA product candidates in advanced stages of development and other exploratory candidates under development. However, it is possible that none of our existing product candidates or any product candidates we may seek to develop in the future will ever obtain regulatory approval in the United States or other jurisdictions.

Our product candidates could fail to receive regulatory approval for many reasons, including the following:

- the FDA or comparable foreign regulatory authorities may disagree that our changes to branded reference drugs or existing biologic drugs meet the criteria for our chosen regulatory pathway or foreign regulatory pathways;

- we may be unable to demonstrate to the satisfaction of the FDA or comparable foreign regulatory authorities that a product candidate is safe and effective or comparable to its branded reference product for its proposed indication;

- the results of any clinical trials we conduct may not meet the level of statistical significance required by the FDA or comparable foreign regulatory authorities for approval;

- we may be unable to demonstrate that a product candidate's clinical and other benefits outweigh its safety risks;

- the FDA or comparable foreign regulatory authorities may fail to approve the manufacturing processes or facilities of third party manufacturers with which we contract for clinical and commercial supplies; and

- the approval policies or regulations of the FDA or comparable foreign regulatory authorities may change significantly in a manner rendering our clinical data insufficient for approval.

This lengthy approval process as well as the unpredictability of future clinical trial results may result in our failing to obtain regulatory approval to market our product candidates, which would harm our business, results of operations and prospects significantly.

In addition, even if we were to obtain approval, regulatory authorities may approve any of our product candidates for fewer or more limited indications than we request, may grant approval contingent on the performance of costly post-marketing clinical trials or may approve a product candidate with a label that does not include the labeling claims necessary or desirable for the successful commercialization of that product candidate. Any of the foregoing scenarios could harm the commercial prospects for our product candidates.

We have no experience submitting BLAs and have limited experience using the 505(b)(2) regulatory pathway to submit an NDA or any similar drug approval filing to the FDA, and we cannot be certain that any of our product candidates will receive regulatory approval. For example, in March of 2016 we received a Complete Response Letter from the FDA stating that while their initial review of our NDA for EP-6101 was complete, they could not approve the application in its present form and requested additional information. We have elected not to pursue the application further or seek to exploit EP-6101 for various reasons including the costs associated with addressing the information request in the FDA's Complete Response Letter and because additional generic bivalirudin products have entered or are entering the market. Additionally, in July of 2017 we received a Complete Response Letter from the FDA regarding our 505(b)(2) NDA for Ryanodex for the treatment of EHS, in conjunction with external cooling methods. The FDA has requested that the Company conduct an additional clinical trial for EP-4104. We are currently meeting with the FDA

35

to seek agreement on such additional clinical work, but there can be no assurance that the FDA will ultimately approve the NDA, or if so, in a timely fashion.

If we do not receive regulatory approvals for our product candidates, we may not be able to continue our operations. Even if we successfully obtain regulatory approvals to market one or more of our product candidates, our revenue will be dependent, to a significant extent, upon the size of the markets in the territories for which we gain regulatory approval. If the markets for patients or indications that we are targeting are not as significant as we estimate, we may not generate significant revenue from sales of such products, if approved.

***An NDA submitted under Section 505(b)(2) subjects us to the risk that we may be subject to a patent infringement lawsuit that would delay or prevent the review or approval of our product candidates.***

Some of our product candidates will be submitted to the FDA for approval under Section 505(b)(2) of the FDCA. Section 505(b)(2) permits the submission of an NDA where at least some of the information required for approval comes from studies that were not conducted by, or for, the applicant and on which the applicant has not obtained a right of reference. The 505(b)(2) application would enable us to reference published literature and/or the FDA's previous findings of safety and effectiveness for the branded reference drug. For NDAs submitted under Section 505(b)(2) of the FDCA, the patent certification and related provisions of the Hatch-Waxman Act apply. In accordance with the Hatch-Waxman Act, such NDAs may be required to include certifications, known as paragraph IV certifications, that certify that any patents listed in the Patent and Exclusivity Information Addendum of the FDA's publication, Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the Orange Book, with respect to any product referenced in the 505(b)(2) application, are invalid, unenforceable or will not be infringed by the manufacture, use or sale of the product that is the subject of the 505(b)(2) NDA.

Under the Hatch-Waxman Act, the holder of patents that the 505(b)(2) application references may file a patent infringement lawsuit after receiving notice of the paragraph IV certification. Filing of a patent infringement lawsuit against the filer of the 505(b)(2) applicant within 45 days of the patent owner's receipt of notice triggers a one-time, automatic, 30-month stay of the FDA's ability to approve the 505(b)(2) NDA, unless patent litigation is resolved in the favor of the paragraph IV filer or the patent expires before that time. Accordingly, we may invest a significant amount of time and expense in the development of one or more product candidates only to be subject to significant delay and patent litigation before such product candidates may be commercialized, if at all. In addition, a 505(b)(2) application will not be approved until any non-patent exclusivity, such as exclusivity for obtaining approval of a new chemical entity, or NCE, listed in the Orange Book for the referenced product has expired. The FDA may also require us to perform one or more additional clinical studies or measurements to support the change from the branded reference drug, which could be time-consuming and could substantially delay our achievement of regulatory approvals for such product candidates. The FDA may also reject our future 505(b)(2) submissions and require us to file such submissions under Section 505(b)(1) of the FDCA, which would require us to provide extensive data to establish safety and effectiveness of the drug for the proposed use and could cause delay and be considerably more expensive and time-consuming. These factors, among others, may limit our ability to successfully commercialize our product candidates.

Companies that produce branded reference drugs routinely bring litigation against abbreviated new drug application, or ANDA, or 505(b)(2) applicants that seek regulatory approval to manufacture and market generic and reformulated forms of their branded products. These companies often allege patent infringement or other violations of intellectual property rights as the basis for filing suit against an ANDA or 505(b)(2) applicant. Likewise, patent holders may bring patent infringement suits against companies that are currently marketing and selling their approved generic or reformulated products.

Litigation to enforce or defend intellectual property rights is often complex and often involves significant expense and can delay or prevent introduction or sale of our product candidates. If patents are held to be valid and infringed by our product candidates in a particular jurisdiction, we would, unless we could obtain a license from the patent holder, be required to cease selling in that jurisdiction and may need to relinquish or destroy existing stock in that jurisdiction. There may also be situations where we use our business judgment and decide to market and sell our approved products, notwithstanding the fact that allegations of patent infringement(s) have not been finally resolved by the courts, which is known as an "at-risk launch." The risk involved in doing so can be substantial because the remedies available to the owner of a patent for infringement may include, among other things, damages measured by the profits lost by the patent owner and not necessarily by the profits earned by the infringer. In the case of a willful infringement, the definition of which is subjective, such damages may be increased up to three times. Moreover, because of the discount pricing typically involved with bioequivalent and, to a lesser extent, 505(b)(2), products, patented branded products generally realize a substantially higher profit margin than bioequivalent and, to a lesser extent, 505(b)(2), products, resulting in disproportionate damages compared to any profits earned by the infringer. An adverse decision in patent litigation could have a material adverse effect on our business, financial position and results of operations and could cause the market value of our common stock to decline.

***The FDA and other regulatory agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses.***

36

If we are found to have improperly promoted off-label uses of our products or product candidates, if approved, we may become subject to significant liability. Such enforcement has become more common in the industry. The FDA and other regulatory agencies strictly regulate the promotional claims that may be made about prescription products, such as our product candidates, if approved. In particular, a product may not be promoted for uses that are not approved by the FDA or such other regulatory agencies as reflected in the product's approved labeling. However, we may share truthful and not misleading information that is otherwise consistent with our products' FDA approved labeling. If we receive marketing approval for our product candidates for our proposed indications, physicians may nevertheless use our products for their patients in a manner that is inconsistent with the approved label, if the physicians personally believe in their professional medical judgment it could be used in such manner. However, if we are found to have promoted our products for any off-label uses, the federal government could levy civil, criminal and administrative penalties, and seek fines against us. The FDA or other regulatory authorities could also request that we enter into a consent decree or a corporate integrity agreement, or seek a permanent injunction against us under which specified promotional conduct is monitored, changed or curtailed. If we cannot successfully manage the promotion of our product candidates, if approved, we could become subject to significant liability, which would materially adversely affect our business and financial condition.

***Our business is subject to extensive regulatory requirements and our approved product and product candidates that obtain regulatory approval will be subject to ongoing and continued regulatory review, which may result in significant expense and limit our ability to commercialize such products.***

Even after a product is approved, we remain subject to ongoing FDA and other regulatory requirements governing the labeling, packaging, storage, distribution, safety surveillance, advertising, promotion, import, export, record-keeping and reporting of safety and other post-market information. The holder of an approved NDA or BLA is obligated to monitor and report adverse events, or AEs, and any failure of a product to meet the specifications in the application. The holder of an approved NDA or BLA must also submit new or supplemental applications and obtain FDA approval for certain changes to the approved product, product labeling or manufacturing process. Advertising and promotional materials must comply with FDA rules and are subject to FDA review, in addition to other potentially applicable federal and state laws. In addition, the FDA may impose significant restrictions on the approved indicated uses for which the product may be marketed or on the conditions of approval. For example, a product's approval may contain requirements for potentially costly post-approval studies and surveillance to monitor the safety and efficacy of the product, or the imposition of a REMS program.

Manufacturers of drug products and their facilities are subject to payment of user fees and continual review and periodic inspections by the FDA and other regulatory authorities for compliance with current good manufacturing practices, or cGMP, and adherence to commitments made in the drug application. If we or a regulatory agency discovers previously unknown problems with a product, such as AEs of unanticipated severity or frequency, or problems with the facility where the product is manufactured, a regulatory agency may impose restrictions relative to that product or the manufacturing facility, including requiring product recall, notice to physicians, withdrawal of the product from the market or suspension of manufacturing.

If we or our products or product candidates or our manufacturing facilities fail to comply with applicable regulatory requirements, a regulatory agency may:

- issue warning letters or untitled letters asserting that we are in violation of the law;

- impose restrictions on the marketing or manufacturing of the product;

- seek an injunction or impose civil, criminal and/or administrative penalties, damages, assess monetary fines, require disgorgement, consider exclusion from participation in Medicare, Medicaid and other federal health care programs and require curtailment or restructuring of our operations;

- suspend or withdraw regulatory approval;

- suspend any ongoing clinical trials;

- refuse to approve a pending application or supplements to an application submitted by us;

- seize product; or

- refuse to allow us to enter into government contracts.

Similar post-market requirements may apply in foreign jurisdictions in which we may seek approval of our products. Any government investigation of alleged violations of law could require us to expend significant time and resources in response and could generate negative publicity. The occurrence of any event or penalty described above may inhibit our ability to commercialize our products and generate revenues.

In addition, the FDA's regulations, policies or guidance may change and new or additional statutes or government regulations in the United States and other jurisdictions may be enacted that could prevent or delay regulatory approval of our product candidates

37

or further restrict or regulate post-approval activities. For example, the Food and Drug Administration Safety and Innovation Act, or FDASIA, requires the FDA to issue new guidance on permissible forms of Internet and social media promotion of regulated medical products, and the FDA may soon specify new restrictions on this type of promotion. We cannot predict the likelihood, nature or extent of adverse government regulation that may arise from pending or future legislation or administrative action, either in the United States or abroad. If we are not able to achieve and maintain regulatory compliance, we may not be permitted to market our products and/or product candidates, which would adversely affect our ability to generate revenue and achieve or maintain profitability.

*Our employees, independent contractors, principal investigators, consultants, commercial partners and vendors may engage in misconduct or other improper activities, including non-compliance with regulatory standards and requirements and insider trading.*

We are exposed to the risk that our employees, independent contractors, principal investigators, consultants, commercial partners and vendors may engage in fraudulent conduct or other illegal activity. Misconduct by these parties could include intentional, reckless and/or negligent conduct that violates (1) the laws of the United States FDA and similar foreign regulatory bodies, including those laws requiring the reporting of true, complete and accurate information to such regulatory bodies; (2) health care laws and regulations, including fraud and abuse laws of the United States and similar foreign fraudulent misconduct laws; and (3) laws requiring the reporting of financial information or data accurately. Specifically, the promotion, sales and marketing of health care items and services, as well as certain business arrangements in the health care industry are subject to extensive laws designed to prevent misconduct, including fraud, kickbacks, self-dealing and other abusive practices. These laws may restrict or prohibit a wide range of pricing, discounting, marketing, structuring and commission(s), certain customer incentive programs and other business arrangements generally. Activities subject to these laws also involve the improper use of information obtained in the course of patient recruitment for clinical trials. It is not always possible to identify and deter employee and other third-party misconduct. The precautions we take to detect and prevent inappropriate conduct may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to comply with these laws. If any such actions are instituted against us, and we are not successful in defending ourselves, those actions could have a significant impact on our business, including the imposition of civil, criminal and administrative penalties, damages, monetary fines, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings, and curtailment of our operations, any of which could adversely affect our ability to operate our business and our results of operations.

*Any relationships with health care professionals, principal investigators, consultants, customers (actual and potential) and third party payors, in addition to our general business operations, are and will continue to be subject, directly or indirectly, to federal and state health care fraud and abuse laws, marketing expenditure tracking and disclosure, or sunshine laws, government price reporting and health information privacy and security laws. If we are unable to comply, or have not fully complied, with such laws, we could face penalties, including, without limitation, civil, criminal and administrative penalties, damages, monetary fines, disgorgement, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings and curtailment or restructuring of our operations.*

Our business operations and activities may be directly, or indirectly, subject to various federal, state and local fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute and the federal civil False Claims Act. These laws may impact, among other things, our current activities with principal investigators and research subjects, as well as current, proposed and future sales, marketing and education programs. In addition, we may be subject to patient data privacy and security regulation by the federal government, state governments and foreign jurisdictions in which we conduct our business, as well as transparency requirements. The U.S. healthcare laws and regulations that may affect our ability to operate include, but are not limited to:

- the federal Anti-Kickback Statute, which prohibits, among other things, knowingly and willfully soliciting, receiving, offering or paying any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind, to induce, or in return for, either the referral of an individual, or the purchase, lease, order or recommendation of any good, facility, item or service for which payment may be made, in whole or in part, under a federal health care program, such as the Medicare and Medicaid programs. The Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, or collectively, ACA, among other things, amends the intent requirement of the federal Anti-Kickback Statute and criminal healthcare fraud statutes such that a person or entity no longer needs to have actual knowledge of this statute or specific intent to violate it. In addition, the ACA provides that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act;

- federal civil and criminal false claims laws and civil monetary penalty laws, including the federal civil False Claims Act, which prohibit and impose penalties for, among other things, individuals or entities knowingly presenting, or causing to be presented, claims for payment or approval from the federal government including Medicare, Medicaid or certain other

38

governmental health care programs that are false or fraudulent or knowingly making or causing to be made a false statement to improperly avoid, decrease or conceal an obligation to pay money to the federal government;

- the federal Health Insurance Portability and Accountability Act of 1996, or HIPAA, which created additional federal civil and criminal statutes that prohibit knowingly and willfully executing, or attempting to execute, a scheme to defraud any health care benefit program or obtain, by means of false or fraudulent pretenses, representations or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, regardless of the payor (e.g., public or private) and knowingly and willfully falsifying, concealing or covering up by any trick or device a material fact or making any materially false statements in connection with the delivery of, or payment for, health care benefits, items or services relating to health care matters;

- HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, or HITECH, and their respective implementing regulations, which impose requirements on certain health care providers, health plans and health care clearinghouses, known as covered entities, as well as their respective business associates, independent contractors or agents of covered entities that perform services for them that involve the use, or disclosure of, individually identifiable health information, relating to the privacy, security and transmission of individually identifiable health information without appropriate authorization;

- the federal Physician Payments Sunshine Act, created under Section 6002 of the ACA, and its implementing regulations, which requires certain manufacturers of drugs, devices, biologicals and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) to report annually to the United States Department of Health and Human Services' Centers for Medicare & Medicare Services, or CMS, information related to payments or other transfers of value made to physicians (defined to include doctors, dentists, optometrists, podiatrists and chiropractors) and teaching hospitals, as well as ownership and investment interests held by physicians and their immediate family members;

- federal consumer protection and unfair competition laws, which broadly regulate marketplace activities and activities that potentially harm consumers;

- federal government price reporting laws, changed by ACA to, among other things, increase the minimum Medicaid rebates owed by most manufacturers under the Medicaid Drug Rebate Program and offer such rebates to additional populations, that require us to calculate and report complex pricing metrics to government programs, where such reported prices may be used in the calculation of reimbursement and/or discounts on our marketed drugs. Participation in these programs and compliance with the applicable requirements may subject us to potentially significant discounts on our products, increased infrastructure costs and potentially limit our ability to offer certain marketplace discounts;

- the Foreign Corrupt Practices Act, a United States law which regulates certain financial relationships with foreign government officials (which could include, for example, certain medical professionals); and

- state law equivalents of each of the above federal laws, such as anti-kickback, false claims, consumer protection and unfair competition laws which may apply to our business practices, including but not limited to, research, distribution, sales and marketing arrangements as well as submitting claims involving health care items or services reimbursed by any third party payors, including commercial insurers; state laws that require pharmaceutical companies to comply with the pharmaceutical industry's voluntary compliance guidelines and the relevant compliance guidance promulgated by the federal government that otherwise restricts payments that may be made to health care providers; state laws that require drug manufacturers to file reports with states regarding marketing information, such as the tracking and reporting of gifts, compensations and other remuneration and items of value provided to health care professionals and entities (compliance with such requirements may require investment in infrastructure to ensure that tracking is performed properly, and some of these laws result in the public disclosure of various types of payments and relationships, which could potentially have a negative effect on our business and/or increase enforcement scrutiny of our activities), and drug pricing; state and local laws that require the registration of pharmaceutical sales representatives; and state laws governing the privacy and security of health information in certain circumstances, many of which differ from each other in significant ways, thus complicating compliance efforts.

In addition, any sales of our products or product candidates once commercialized outside the United States will also likely subject us to foreign equivalents of the health care laws mentioned above, among other foreign laws.

Efforts to ensure that our business arrangements will comply with applicable health care laws may involve substantial costs. It is possible that governmental and enforcement authorities will conclude that our business practices may not comply with current or future statutes, regulations or case law interpreting applicable fraud and abuse or other health care laws and regulations. If our operations are found to be in violation of any of the laws described above or any other governmental regulations that apply to us, we may be subject to, without limitation, civil, criminal and administrative penalties, damages,

39

monetary fines, disgorgement, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings and curtailment or restructuring of our operations, any of which could adversely affect our ability to operate.

***We are required to obtain regulatory approval for each of our products in each jurisdiction in which we intend to market such products, and the inability to obtain such approvals would limit our ability to realize their full market potential.***

In order to market products outside of the United States, we must comply with numerous and varying regulatory requirements of other countries regarding safety and efficacy. Clinical trials conducted in one country may not be accepted by regulatory authorities in other countries, and regulatory approval in one country does not mean that regulatory approval will be obtained in any other country. However, the failure to obtain regulatory approval in one jurisdiction may adversely impact our ability to obtain regulatory approval in another jurisdiction. Approval processes vary among countries and can involve additional product testing and validation and additional administrative review periods. Seeking foreign regulatory approval could result in difficulties and costs for us and require additional non-clinical studies or clinical trials which could be costly and time consuming. Regulatory requirements can vary widely from country to country and could delay or prevent the introduction of our products in those countries. If we fail to comply with regulatory requirements in international markets or to obtain and maintain required approvals, or if regulatory approval in international markets is delayed, our target market will be reduced and our ability to realize the full market potential of our products will be harmed.

***If we fail to develop, acquire or in-license other product candidates or products, our business and prospects will be limited.***

Our long-term growth strategy is to develop and commercialize a portfolio of product candidates in addition to our existing product candidates. We may also acquire or in-license such product candidates. Although we have internal research and development capacity that we believe will enable us to make improvements to existing compounds or active ingredients, we do not have internal drug discovery capabilities to identify and develop entirely new chemical entities or compounds. As a result, our primary means of expanding our pipeline of product candidates is to develop improved formulations and delivery methods for existing FDA-approved products and/or select and acquire or in-license product candidates for the treatment of therapeutic indications that complement or augment our current targets, or that otherwise fit into our development or strategic plans on terms that are acceptable to us. Developing new formulations of existing products or identifying, selecting and acquiring or in-licensing promising product candidates requires substantial technical, financial and human resources expertise. Efforts to do so may not result in the actual development, acquisition or in-license of a particular product candidate, potentially resulting in a diversion of our management's time and the expenditure of our resources with no resulting benefit. If we are unable to add additional product candidates to our pipeline, our long-term business and prospects will be limited.

### Risks Related to Commercialization of Our Products and Product Candidates

***Our commercial success depends upon attaining significant market acceptance of our products and product candidates, if approved, among physicians, nurses, pharmacists, patients and the medical community.***

Even if we obtain regulatory approval for our product candidates, our products and product candidates may not gain market acceptance among physicians, nurses, pharmacists, patients, the medical community or third party payors, which is critical to commercial success. Market acceptance of our products and any product candidate for which we receive approval depends on a number of factors, including:

- the timing of market introduction of the product candidate as well as competitive products;
- the clinical indications for which the product candidate is approved;
- the convenience and ease of administration to patients of the product candidate;
- the potential and perceived advantages of such product candidate over alternative treatments;
- the cost of treatment in relation to alternative treatments, including any similar generic treatments;
- the availability of coverage and adequate reimbursement by third party payors and government authorities;
- relative convenience and ease of administration;
- any negative publicity related to our or our competitors' products that include the same active ingredient;
- the prevalence and severity of adverse side effects, including limitations or warnings contained in a product's FDA-approved labeling; and
- the effectiveness of sales and marketing efforts.

Even if a potential product displays a favorable efficacy and safety profile in preclinical studies and clinical trials, market acceptance of the product will not be known until after it is launched. If our products or product candidates, if approved, fail to achieve an adequate level of acceptance by physicians, nurses, pharmacists, patients and the medical community, we will be unable to generate significant revenues, and we may not become or remain profitable.

***Guidelines and recommendations published by government agencies can reduce the use of our products and product candidates.***

Government agencies promulgate regulations and guidelines applicable to certain drug classes which may include our products and product candidates that we are developing. Recommendations of government agencies may relate to such matters as usage, dosage, route of administration and use of concomitant therapies. Regulations or guidelines suggesting the reduced use of certain drug classes which may include our products and product candidates that we are developing or the use of competitive or alternative products as the standard of care to be followed by patients and health care providers could result in decreased use of our product candidates or negatively impact our ability to gain market acceptance and market share.

***If we are unable to establish sales and marketing capabilities or if our commercial partners do not adequately perform, the commercial opportunity for our products may be diminished.***

Although we intend to establish a commercial organization to promote certain of our approved products in the United States, we currently have limited experience, and the cost of establishing and maintaining such an organization may exceed the benefit of doing so. We have very limited prior experience in the marketing, sale and distribution of pharmaceutical products and there are significant risks involved in building and managing a sales organization, including our ability to hire, retain and incentivize qualified individuals, generate sufficient sales leads, provide adequate training to sales and marketing personnel and effectively manage a geographically dispersed sales and marketing team.

We and any other commercialization partner we engage in the future may not be able to attract, hire, train and retain qualified sales and sales management personnel. If we or our future partners, if any, are not successful in maintaining an effective number of qualified sales personnel, our ability to effectively market and promote our products may be impaired. Even if we are able to effectively build and maintain such sales personnel, such efforts may not be successful in commercializing our products.

The efforts of our partners in many instances would likely be outside our control. If any future partner is unsuccessful in their efforts, or we are unable to maintain such commercial partnerships or to effectively establish alternative arrangements for our products, our business could be adversely affected.

***A substantial portion of our total revenues is derived from sales of a limited number of products.***

We derive a substantial portion of our revenue from royalties derived from the sales of one product: Bendeka. This product is sold by our partner Teva Pharmaceuticals. During the year ended December 31, 2018, Bendeka accounted for approximately 75% of our total revenue. The sale of our products can be significantly influenced by the efforts of our partners, which are out of our control, as well as market conditions and regulatory actions. We may experience decreases in the sale of our products in the future as a result of actions taken by our competitors, such as price reductions or entry into the market for competing products, or as a result of regulatory actions related to our products or competing products, which could have a material impact on our results of operations and financial condition.

***If we obtain approval to commercialize any approved products outside of the United States, a variety of risks associated with international operations could materially adversely affect our business.***

We may enter into agreements with third parties to market our products outside the United States. We expect that we will be subject to additional risks related to entering into international business relationships, including:

- different regulatory requirements for drug approvals in foreign countries;

- differing payor reimbursement regimes, governmental payors or patient self-pay systems and price controls;

- reduced protection for intellectual property rights;

- unexpected changes in tariffs, trade barriers and regulatory requirements;

- economic weakness, including inflation, or political instability in particular foreign economies and markets;

- compliance with tax, employment, immigration and labor laws for employees living or traveling abroad;

- foreign taxes, including withholding of payroll taxes;

- foreign currency fluctuations, which could result in increased operating expenses and reduced revenue, and other obligations incident to doing business in another country;

- workforce uncertainty in countries where labor unrest is more common than in the United States;

41

- production shortages resulting from any events affecting raw material supply or manufacturing capabilities abroad; and

- business interruptions resulting from geopolitical actions, including war and terrorism, or natural disasters including earthquakes, typhoons, floods and fires.

***We face significant competition from other biotechnology and pharmaceutical companies, and our operating results will suffer if we fail to compete effectively.***

The biopharmaceutical industries are intensely competitive and subject to rapid and significant technological change. Many of our competitors both in the United States and internationally, include major multinational pharmaceutical companies, biotechnology companies and universities and other research institutions. For example, Argatroban is currently marketed in the United States by, among others, GlaxoSmithKline, or GSK, and West-Ward Pharmaceuticals, or West-Ward. Dantrolene for malignant hyperthermia is marketed in the US by Par Pharmaceutical and US WorldMeds. Docetaxel in marketed in the US by, among others, Sanofi and Sandoz. While our formulations of these products are distinct, and we believe improvements, compared to those competitors mentioned, competition from these products on factors such as price and availability effect our commercial efforts. Additionally, we must compete with alternative drug treatments (as opposed to alternative formulations) for many of the indications that our products are approved to treat.

Many of our competitors have substantially greater financial, technical and other resources, such as larger research and development staff and experienced marketing and manufacturing organizations. Mergers and acquisitions in the biotechnology and pharmaceutical industries may result in even more resources being concentrated in our competitors. As a result, these companies may obtain regulatory approval more rapidly than we are able and may be more effective in selling and marketing their products as well. Smaller or early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large, established companies. Competition may increase further as a result of advances in the commercial applicability of technologies and greater availability of capital for investment in these industries. Our competitors may succeed in developing, acquiring or licensing on an exclusive basis drug products or drug delivery technologies that are more effective or less costly than our products or any product candidate that we are currently developing or that we may develop. In addition, our competitors may file citizens' petitions with the FDA in an attempt to persuade the FDA that our products, or the clinical studies that support their approval, contain deficiencies. Such actions by our competitors could delay or even prevent the FDA from approving any application we submit.

We believe that our ability to successfully compete will depend on, among other things:

- the efficacy and safety of our products and product candidates, including as relative to marketed products and product candidates in development by third parties;

- the time it takes for our product candidates to complete clinical development and receive marketing approval;

- the ability to maintain a good relationship with regulatory authorities;

- the ability to commercialize and market any of our product candidates that receive regulatory approval;

- the price of our products, including in comparison to branded or generic competitors;

- whether coverage and adequate levels of reimbursement are available under private and governmental health insurance plans, including Medicare;

- the ability to protect intellectual property rights related to our products and product candidates;

- the ability to manufacture on a cost-effective basis and sell commercial quantities of our products and product candidates that receive regulatory approval; and

- acceptance of any of our products and product candidates that receive regulatory approval by physicians and other health care providers.

If our competitors market products that are more effective, safer or less expensive than our products or product candidates, or that reach the market sooner than our product candidates, we may enter the market too late in the cycle and may not achieve commercial success. In addition, the biopharmaceutical industry is characterized by rapid technological change. Because we have limited research and development capabilities, it may be difficult for us to stay abreast of the rapid changes in each technology. If we fail to stay at the forefront of technological change, we may be unable to compete effectively. Technological advances or products developed by our competitors may render our technologies, products or product candidates obsolete, less competitive or not economical.

***We could incur substantial costs and disruption to our business and delays in the launch of our product candidates if our competitors and/or collaborators bring legal actions against us, which could harm our business and operating results.***

42

We cannot predict whether our competitors or potential competitors, some of whom we collaborate with, may bring legal actions against us based on our research, development and commercialization activities, as well as any product candidates or products resulting from these activities, claiming, among other things, infringement of their intellectual property rights, breach of contract or other legal theories. If we are forced to defend any such lawsuits, whether they are with or without merit or are ultimately determined in our favor, we may face costly litigation and diversion of technical and management personnel. These lawsuits could hinder our ability to enter the market early with our product candidates and thereby hinder our ability to influence usage patterns when fewer, if any, of our potential competitors have entered such market, which could adversely impact our potential revenue from such product candidates or negatively impact our ability to gain market acceptance and market share for our products.

Some of our competitors have substantially greater resources than we do and could be able to sustain the cost of litigation to a greater extent and for longer periods of time than we could. Furthermore, an adverse outcome of a dispute may require us: to pay damages, potentially including treble damages and attorneys' fees, if we are found to have willfully infringed a party's patent or other intellectual property rights; to cease making, licensing or using products that are alleged to incorporate or make use of the intellectual property of others; to expend additional development resources to reformulate our products or prevent us from marketing a certain drug; and to enter into potentially unfavorable royalty or license agreements in order to obtain the rights to use necessary technologies. Royalty or licensing agreements, if required, may be unavailable on terms acceptable to us, or at all.

***If we are unable to achieve and maintain adequate levels of coverage and reimbursement for our products or product candidates, if approved, their commercial success may be severely hindered.***

Successful sales of our products and any other approved product candidates depend on the availability of adequate coverage and reimbursement from third party payors. Patients who are prescribed medications for the treatment of their conditions generally rely on third party payors to reimburse all or part of the costs associated with their prescription drugs. Adequate coverage and reimbursement from governmental health care programs, such as Medicare and Medicaid, and commercial payors is critical to new product acceptance. Coverage decisions may depend upon clinical and economic standards that disfavor new drug products when more established or lower cost therapeutic alternatives are already available or subsequently become available. Reimbursement by a third party payor may depend upon a number of factors, including but not limited to, the third party payor's determination that use of a product is: a covered benefit under its health plan; safe, effective, and medically necessary; appropriate for the specific patient; cost-effective; and/or neither cosmetic, experimental, nor investigational.

Assuming we obtain coverage for a given product, the resulting reimbursement payment rates might not be adequate or may require co-payments that patients find unacceptably high. Patients are unlikely to use our products unless coverage is provided and reimbursement is adequate to cover a significant portion of the cost of our products.

In addition, the market for our products and our product candidates will depend significantly on access to third party payors' drug formularies, or lists of medications for which third party payors provide coverage and reimbursement. The industry competition to be included in such formularies often leads to downward pricing pressures on pharmaceutical companies. Also, third party payors may refuse to include a particular branded drug in their formularies or otherwise restrict patient access through formulary controls or otherwise to a branded drug when a less costly generic equivalent or other alternative is available.

Third party payors, whether foreign or domestic, or governmental or commercial, are developing increasingly sophisticated methods of controlling health care costs. In addition, in the United States, no uniform policy requirement for coverage and reimbursement for drug products exists among third party payors. Therefore, coverage and reimbursement for drug products can differ significantly from payor to payor. As a result, the coverage determination process is often a time-consuming and costly process that could require us to provide scientific, clinical and cost effectiveness support for the use of our products to each payor separately, with no assurance that coverage and adequate reimbursement will be applied consistently or obtained in the first instance. Even if we obtain coverage for a given product, the resulting reimbursement payment rates might not be adequate for us to achieve or sustain profitability.

Further, we believe that future coverage and reimbursement will likely be subject to increased restrictions both in the United States and in international markets. Third party coverage and reimbursement for our commercial products, and our pre-clinical and clinical product candidates for which we may receive regulatory approval, may not be available or adequate in either the United States or international markets, which could have a material adverse effect on our business, results of operations, financial condition and prospects.

***Current and future legislation may increase the difficulty and cost for us to commercialize our product candidates and affect the prices we may obtain for our products.***

The United States and some foreign jurisdictions are considering, or have enacted, a number of legislative and regulatory proposals to change the health care system in ways that could affect our ability to sell our products and our product candidates profitably, once they are approved for sale. Among policy makers and payors in the United States and elsewhere, there is significant interest in promoting changes in health care systems with the stated goals of containing health care costs, improving quality and/or expanding

43

access. In the United States, the pharmaceutical industry has been a particular focus of these efforts and has been significantly affected by major legislative initiatives.

By way of example, in March 2010, the ACA was passed, which significantly changed health care financing by both governmental and private insurers. Some of the provisions of the ACA have yet to be implemented, and there have been judicial and Congressional challenges to certain aspects of the ACA, as well as recent efforts by the U.S. Presidential administration to repeal or replace certain aspects of the ACA.. Since January 2017, the U.S. President has signed two Executive Orders and other directives designed to delay the implementation of certain provisions of the ACA or otherwise circumvent some of the requirements for health insurance mandated by the ACA. Concurrently, Congress has considered legislation that would repeal or repeal and replace all or part of the ACA. While Congress has not passed comprehensive repeal legislation, two bills affecting the implementation of certain taxes under the ACA have been signed into law. The Tax Cuts and Jobs Act of 2017, or Tax Act, included a provision which repealed, effective January 1, 2019, the tax-based shared responsibility payment imposed by the ACA on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate". On January 22, 2018, the U.S. President of the U.S. signed a continuing resolution on appropriations for fiscal year 2018 that delayed the implementation of certain ACA-mandated fees, including the so-called "Cadillac" tax on certain high cost employer-sponsored insurance plans, the annual fee imposed on certain health insurance providers based on market share, and the medical device excise tax on non-exempt medical devices. The Bipartisan Budget Act of 2018, or the BBA, among other things, amended the ACA, effective January 1, 2019, to increase from 50 percent to 70 percent the point-of-sale discount that is owed by pharmaceutical manufacturers who participate in Medicare Part D and to close the coverage gap in most Medicare drug plans, commonly referred to as the "donut hole". In July 2018, CMS published a final rule permitting further collections and payments to and from certain ACA qualified health plans and health insurance issuers under the ACA risk adjustment program in response to the outcome of federal district court litigation regarding the method CMS uses to determine this risk adjustment. On December 14, 2018, a Texas U.S. District Court Judge ruled that ACA is unconstitutional in its entirety because the "individual mandate" was repealed by Congress as part of the Tax Act. While the Texas U.S. District Court Judge, as well as the U.S. Presidential administration and CMS, have stated that the ruling will have no immediate effect pending appeal of the decision, it is unclear how this decision, subsequent appeals, and other efforts to repeal and replace ACA will impact ACA and our business. We cannot predict how future federal or state legislative or administrative changes relating to healthcare reform will affect our business.

In addition, other legislative changes have been proposed and adopted since the ACA was enacted. For example, in August 2011, President Obama signed into law the Budget Control Act of 2011, which, among other things, created the Joint Select Committee on Deficit Reduction to recommend proposals for spending reductions to Congress. The Joint Select Committee on Deficit Reduction did not achieve its targeted deficit reduction of at least $1.2 trillion for the years 2013 through 2021, triggering the legislation's automatic reductions to several government programs. These reductions include aggregate reductions to Medicare payments to providers of up to 2% per fiscal year, which went into effect on April 1, 2013 and, following passage of the Bipartisan Budget Act of 2015 as well as other legislative amendments, including the BBA, will remain in effect through 2027 unless additional Congressional action is taken. Additionally, in January 2013, President Obama signed into law the American Taxpayer Relief Act of 2012, which, among other things, further reduced Medicare payments to several providers and increased the statute of limitations period for the government to recover overpayments to providers from three to five years.

Further, under the Drug Supply Chain Security Act signed into law on November 27, 2013, certain drug manufacturers will be subject to product identification, tracing and verification requirements, among others,  that are designed to improve the detection and removal of counterfeit, stolen, contaminated or otherwise potentially harmful drugs from the U.S. drug supply chain.  These requirements will be phased in over several years and compliance with this new law will likely increase the costs of the manufacture and distribution of drug products, which could have an adverse effect on our financial condition.

Additionally, there has been increasing legislative and enforcement interest in the United States with respect to specialty drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries and proposed and adopted federal and state legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drugs. For example, in January 2016, CMS issued a final rule regarding the Medicaid drug rebate program. The final rule, effective April 1, 2016, among other things, revised the manner in which the "average manufacturer price" is to be calculated by manufacturers participating in the program and implements certain amendments to the Medicaid rebate statute created under the ACA. Further, the current U.S. Presidential administration's budget proposal for fiscal year 2019 contains further drug price control measures that could be enacted during the 2019 budget process or in other future legislation, including, for example, measures to permit Medicare Part D plans to negotiate the price of certain drugs under Medicare Part B, to allow some states to negotiate drug prices under Medicaid, and to eliminate cost sharing for generic drugs for low-income patients. Further, the U.S. Presidential administration released a "Blueprint", or plan, to lower drug prices and reduce out of pocket costs of drugs that contains additional proposals to increase drug manufacturer competition, increase the negotiating power of certain federal healthcare programs, incentivize manufacturers to lower the list price of their products, and reduce the out of pocket costs of drug products

44

paid by consumers. The Department of Health and Human Services, or HHS, has already started the process of soliciting feedback on some of these measures and, at the same, is immediately implementing others under its existing authority. For example, in September 2018, CMS announced that it will allow Medicare Advantage plans the option to use step therapy for Part B drugs beginning January 1, 2019, and in October 2018, CMS proposed a new rule that would require direct-to-consumer television advertisements of prescription drugs and biological products, for which payment is available through or under Medicare or Medicaid, to include in the advertisement the Wholesale Acquisition Cost, or list price, of that drug or biological product. On January 31, 2019, the U.S. Department of Health and Human Services, Office of Inspector General, proposed modifications to the federal Anti-Kickback Statute discount safe harbor for the purpose of reducing the cost of drug products to consumers which, among other things, if finalized, will affect discounts paid by manufacturers to Medicare Part D plans, Medicaid managed care organizations and pharmacy benefit managers working with these organizations. While some of these and other proposed measures may require authorization through additional legislation to become effective, Congress and the current U.S. Presidential administration have each indicated that it will continue to seek new legislative and/or administrative measures to control drug costs. At the state level, legislatures have increasingly passed legislation and implemented regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing. The full impact of these laws, as well as other new laws and reform measures that may be proposed and adopted in the future remains uncertain, but may result in additional reductions in Medicare and other health care funding, or higher production costs which could have a material adverse effect on our customers and, accordingly, our financial operations.

## Risks Related to Our Reliance on Third Parties

***We rely on third parties to conduct our preclinical studies and clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines, we may not be able to obtain regulatory approval for or commercialize our product candidates and our business could be substantially harmed.***

We have relied upon and plan to continue to rely upon third party CROs to monitor and manage data for our preclinical and clinical programs. We rely on these parties for execution of our preclinical studies and clinical trials, and control only certain aspects of their activities. Nevertheless, we are responsible for ensuring that each of our trials is conducted in accordance with the applicable protocol, legal, regulatory and scientific standards and our reliance on the CROs does not relieve us of our regulatory responsibilities. We and our CROs are required to comply with FDA regulations and other laws regarding current good clinical practice, or GCP, which are also required by the Competent Authorities of the Member States of the European Economic Area and comparable foreign regulatory authorities in the form of International Council for Harmonization, or ICH, guidelines for all of our products in clinical development. Regulatory authorities enforce GCP through periodic inspections of trial sponsors, principal investigators and trial sites. If we or any of our CROs fail to comply with applicable GCP, the clinical data generated in our clinical trials may be deemed unreliable and the FDA or comparable foreign regulatory authorities may require us to perform additional clinical trials before approving our marketing applications. We cannot assure you that upon inspection by a given regulatory authority, such regulatory authority will determine that any of our clinical trials comply with GCP regulations. In addition, our clinical trials must be conducted with product produced under cGMP regulations. While we have agreements governing activities of our CROs, we have limited influence over their actual performance. In addition, portions of the clinical trials for our product candidates are expected to be conducted outside of the United States, which will make it more difficult for us to monitor CROs and perform visits of our clinical trial sites and will force us to rely heavily on CROs to ensure the proper and timely conduct of our clinical trials and compliance with applicable regulations, including GCP. Failure to comply with applicable regulations in the conduct of the clinical trials for our product candidates may require us to repeat clinical trials, which would delay the regulatory approval process.

Some of our CROs have an ability to terminate their respective agreements with us if, among other reasons, it can be reasonably demonstrated that the safety of the subjects participating in our clinical trials warrants such termination, if we make a general assignment for the benefit of our creditors or if we are liquidated. If any of our relationships with these third party CROs terminate, we may not be able to enter into arrangements with alternative CROs or to do so on commercially reasonable terms. In addition, our CROs are not our employees, and except for remedies available to us under our agreements with such CROs, we cannot control whether or not they devote sufficient time and resources to our preclinical and clinical programs. If CROs do not successfully carry out their contractual duties or obligations or meet expected deadlines, if they need to be replaced or if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols, regulatory requirements or for other reasons, our clinical trials may be extended, delayed or terminated and we may not be able to obtain regulatory approval for or successfully commercialize our product candidates. Consequently, our results of operations and the commercial prospects for our product candidates would be harmed, our costs could increase substantially and our ability to generate revenue could be delayed significantly.

45

Switching or adding additional CROs involves additional cost and requires management time and focus. In addition, there is a natural transition period when a new CRO commences work. As a result, delays occur, which can materially impact our ability to meet our desired clinical development timelines. Though we carefully manage our relationships with our CROs, there can be no assurance that we will not encounter challenges or delays in the future or that these delays or challenges will not have a material adverse impact on our business, financial condition and prospects.

*If any of our current strategic collaborators fail to perform their obligations or terminate their agreements with us, the development and commercialization of the product candidates under such agreements could be delayed or terminated and our business could be substantially harmed.*

On February 13, 2015, we entered into the Cephalon License, with Cephalon for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. Pursuant to the terms of the Cephalon License, Cephalon is responsible for all U.S. commercial activities for the product including promotion and distribution, and we are responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies.

This strategic collaboration may not be scientifically or commercially successful due to a number of important factors, including the following:

- If we fail to maintain any regulatory approvals, or otherwise materially breach the agreement, we may not receive all anticipated royalty payments.
- Cephalon has significant discretion in determining the efforts and resources that it will apply to their strategic collaboration with us. The timing and amount of any cash payments, and royalties that we may receive under such agreements will depend on, among other things, the efforts, allocation of resources and the commercialization of our product by Cephalon under the Cephalon License;
- Cephalon currently markets a competitive bendamustine product, Treanda®, in the United States. In addition, it is possible that Cephalon may develop and commercialize, either alone or with others, or be acquired by a company that has, products that are similar to or competitive with the product candidates that they license from us;
- Cephalon may change the focus of their commercialization efforts or pursue higher-priority programs;
- Cephalon may terminate its strategic collaboration with us on short notice, which could make it difficult for us to attract new strategic collaborators or adversely affect how we are perceived in the scientific and financial communities;
- Cephalon has the right to maintain or defend our intellectual property rights licensed to them in their territories, and, although we may have the right to assume the maintenance and defense of our intellectual property rights if they do not, our ability to do so may be compromised by our strategic collaborators' acts or omissions; and
- Cephalon may not comply with all applicable regulatory requirements, or fail to report safety data in accordance with all applicable regulatory requirements.
- If Cephalon fails to effectively commercialize our product, we may not be able to replace them with another collaborator.
- If our agreement with Cephalon terminates, we are required to pay them a portion of our future profits on the product.
  Any of these events could have a material adverse effect on our business, results of operations and our ability to achieve future profitability, and could cause our stock price to decline.

*We rely on third parties to manufacture commercial supplies of our products and clinical supplies of our product candidates, and we intend to rely on third parties to manufacture commercial supplies of any other approved products. The commercialization of any of our products could be stopped, delayed or made less profitable if those third parties fail to provide us with sufficient quantities of product or fail to do so at acceptable quality levels or prices or fail to maintain or achieve satisfactory regulatory compliance.*

We do not own any manufacturing facilities, and we do not currently, and do not expect in the future, to independently conduct any aspects of our product manufacturing and testing, or other activities related to the clinical development and commercialization of our product candidates. We currently rely, and expect to continue to rely, on third parties with respect to these items, and control only certain aspects of their activities.

Any of these third parties may terminate their engagements with us at any time. If we need to enter into alternative arrangements, it could delay our product candidate development and product commercialization activities. Our reliance on these third parties reduces our control over these activities but does not relieve us of our responsibility to ensure compliance with all required legal, regulatory and scientific standards and any applicable trial protocols. If these third parties do not successfully carry out their contractual duties, meet expected deadlines or conduct our studies in accordance with regulatory requirements or our stated study plans and protocols, we will not be able to complete, or may be delayed in completing, clinical trials required to support future regulatory submissions and approval of our product candidates.

46

Our products and product candidates are highly reliant on very complex sterile techniques and personnel aseptic techniques. The facilities used by our third-party manufacturers to manufacture our products and product candidates must be approved by the applicable regulatory authorities pursuant to inspections that will be conducted after we submit our NDA to the FDA. If any of our third-party manufacturers cannot successfully manufacture material that conforms to our specifications and the applicable regulatory authorities' strict regulatory requirements, or pass regulatory inspection, they will not be able to secure or maintain regulatory approval for the manufacturing facilities. In addition, we have no control over the ability of third-party manufacturers to maintain adequate quality control, quality assurance and qualified personnel. Quality problems in manufacturing are linked to a majority of shortages of sterile injectable drugs. Some of the largest manufacturers of sterile injectable drugs have had serious quality problems leading to the temporary voluntary closure or renovations of major production facilities. Further, as we scale up manufacturing of our product candidates and conduct required stability testing, product packaging, equipment and process-related issues may require refinement or resolution in order for us to proceed with our planned clinical trials and obtain regulatory approval for commercialization of our product candidates. In the future, for example, we may identify impurities in the product manufactured for us for commercial supply, which could result in increased scrutiny by the regulatory agencies, delays in our clinical program and regulatory approval, increases in our operating expenses, or failure to obtain or maintain approval for our product candidates. If the FDA or any other applicable regulatory authority does not approve these facilities to manufacture our products or if they withdraw any such approval in the future, or if our suppliers or third-party manufacturers decide they no longer want to manufacture our products, we may need to find alternative manufacturing facilities, which would significantly impact our ability to develop, obtain regulatory approval for or market our products or product candidates.

More generally, manufacturers of pharmaceutical products often encounter difficulties in production, particularly in scaling up and validating initial production. These problems include difficulties with production costs and yields, quality control, including stability of the product, quality assurance testing, shortages of qualified personnel, as well as compliance with strictly enforced federal, state and foreign regulations. Additionally, our manufacturers may experience manufacturing difficulties due to resource constraints or as a result of labor disputes or unstable political environments. If our manufacturers were to encounter any of these difficulties, or otherwise fail to comply with their contractual obligations, our ability to make product candidates available for clinical trials and development purposes or to further commercialize our products or product candidates in the United States would be jeopardized. Any delay or interruption in our ability to meet commercial demand may result in the loss of potential revenues and could adversely affect our ability to gain market acceptance for approved products. In addition, any delay or interruption in the supply of clinical trial supplies could delay the completion of clinical trials, increase the costs associated with maintaining clinical trial programs and, depending upon the period of delay, require us to commence new clinical trials at additional expense or terminate clinical trials completely. Additionally, if supply from one approved manufacturer is interrupted, there could be a significant disruption in commercial supply. Regulatory agencies may also require additional studies if a new manufacturer is relied upon for commercial production. Switching manufacturers may involve substantial costs and is likely to result in a delay in our desired clinical and commercial timelines.

The occurrence of any of these factors could have a material adverse effect on our business, results of operations, financial condition and prospects.

***The design, development, manufacture, supply, and distribution of our products and product candidates is highly regulated and technically complex.***

All entities involved in the preparation of therapeutics for clinical trials or commercial sale, including our existing contract manufacturers for our products and product candidates, are subject to extensive regulation. Components of a finished therapeutic product approved for commercial sale or used in late-stage clinical trials must be manufactured in accordance with cGMP and equivalent foreign standards. These regulations govern manufacturing processes and procedures (including record keeping) and the implementation and operation of quality systems to control and assure the quality of investigational products and products approved for sale. Poor control of production processes can lead to the introduction of adventitious agents or other contaminants, or to inadvertent changes in the properties or stability of our products or product candidates that may not be detectable in final product testing. The development, manufacture, supply, and distribution of our products, as well as our other product candidates, is highly regulated and technically complex. We, along with our third-party providers, must comply with all applicable regulatory requirements of the FDA and foreign authorities.

We, or our contract manufacturers, must supply all necessary documentation in support of our regulatory filings for our products and product candidates on a timely basis and must adhere to the FDA's good laboratory practices, or GLP, and cGMP regulations enforced by the FDA through its facilities inspection program, and the equivalent standards of the regulatory authorities in other countries. Any failure by our third-party manufacturers to comply with cGMP or failure to scale-up manufacturing processes, including any failure to deliver sufficient quantities of product candidates in a timely manner, could lead to a delay in, or failure to obtain, regulatory approval of any of our product candidates. Our facilities and quality systems and the facilities and quality systems of some or all of our third-party contractors must also pass a pre-approval inspection for compliance with the applicable regulations as a condition of regulatory approval of our product candidates or any of our other potential products. In addition, the

47

regulatory authorities in any country may, at any time, audit or inspect a manufacturing facility involved with the preparation of our product candidates or our other potential products or the associated quality systems for compliance with the regulations applicable to the activities being conducted. If these facilities and quality systems do not pass a pre-approval plant inspection, FDA approval of our product candidates, or the equivalent approvals in other jurisdictions, will not be granted.

Regulatory authorities also may, at any time following approval of a product for sale, audit our manufacturing facilities or those of our third-party contractors. If any such inspection or audit identifies a failure to comply with applicable regulations or if a violation of our product specifications or applicable regulations occurs independent of such an inspection or audit, we or the relevant regulatory authority may require remedial measures that may be costly and/or time-consuming for us or a third party to implement and that may include the temporary or permanent suspension of a clinical trial or commercial sales or the temporary or permanent closure of a facility. Any such remedial measures imposed upon us or third parties with whom we contract could materially harm our business. If we or any of our third-party manufacturers fail to maintain regulatory compliance, the FDA can impose regulatory sanctions including, among other things, refusal to approve a pending application for a new drug product or biological product or revocation of a pre-existing approval. As a result, our business, financial condition and results of operations may be materially harmed.

***We rely on limited sources of supply for our products and product candidates, and any disruption in the chain of supply may impact production and sales of our products and cause delay in developing and commercializing our product candidates.***

We currently have relationships with only one third party for the manufacture of each of our most advanced products and product candidates. Because of the unique equipment and process for manufacturing our products transferring manufacturing activities to an alternate supplier would be a time-consuming and costly endeavor, and there are only a limited number of manufacturers that we believe are capable of performing this function for us. Switching finished drug suppliers may involve substantial cost and could result in a delay in our desired clinical and commercial timelines. If any of these single-source manufacturers breaches or terminates their agreements with us, we would need to identify an alternative source for the manufacture and supply of product candidates to us for the purposes of our development and commercialization of the applicable products. Identifying an appropriately qualified source of alternative supply for any one or more of these product candidates could be time consuming, and we may not be able to do so without incurring material delays in the development and commercialization of our product candidates, which could harm our financial position and commercial potential for our products. Any alternative vendor would also need to be qualified through an NDA supplement which could result in further delay. The FDA or other regulatory agencies outside of the United States may also require additional studies if we appoint a new manufacturer for supply of our product candidates that differs from the manufacturer used for clinical development of such product candidates. For our other product candidates, we expect that only one supplier will initially be qualified as a vendor with the FDA. If supply from the approved vendor is interrupted, there could be a significant disruption in commercial supply.

These factors could cause the delay of clinical trials, regulatory submissions, required approvals or commercialization of our product candidates, cause us to incur higher costs and prevent us from commercializing them successfully. Furthermore, if our suppliers fail to deliver the required commercial quantities of components and active pharmaceutical ingredient on a timely basis and at commercially reasonable prices, and we are unable to secure one or more replacement suppliers capable of production at a substantially equivalent cost, our clinical trials may be delayed or we could lose potential revenue.

***We may not be successful in establishing development and commercialization collaborations which could adversely affect, and potentially prohibit, our ability to develop our product candidates.***

Because developing pharmaceutical products, conducting clinical trials, obtaining regulatory approval, establishing manufacturing capabilities and marketing approved products are expensive, we are exploring collaborations with third parties outside of the United States that have more resources and experience. We may, however, be unable to advance the development of our products and product candidates in territories outside of the United States, which may limit the market potential for this product candidate. For example, our Eagle Biologics business strategy relies heavily on our ability to successfully consummate and execute under these collaboration agreements.

In situations where we enter into a development and commercial collaboration arrangement for a product candidate, we may also seek to establish additional collaborations for development and commercialization in territories outside of those addressed by the first collaboration arrangement for such product candidate. There are a limited number of potential partners, and we expect to face competition in seeking appropriate partners. We have entered into collaboration and promotion agreements with third parties, such as the Spectrum Agreement and the agreement with AMRI, but there is no assurance these arrangements will be successful. If we are unable to enter into any future development and commercial collaborations and/or sales and marketing arrangements on acceptable terms, if at all, we may be unable to successfully develop and seek regulatory approval for our product candidates and/or effectively market and sell future approved products, if any, in all of the territories outside of the United States where it may otherwise be valuable to do so.

48

*We may not be successful in maintaining development and commercialization collaborations, and any partner may not devote sufficient resources to the development or commercialization of our product candidates or may otherwise fail in development or commercialization efforts, which could adversely affect our ability to develop certain of our product candidates and our financial condition and operating results.*

On February 13, 2015, we entered into the Cephalon License, with Cephalon for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. If we are able to establish additional collaboration arrangements, any such collaborations, in addition to the collaboration with Cephalon, may not ultimately be successful, which could have a negative impact on our business, results of operations, financial condition and prospects. If we partner with a third party for development and commercialization of a product or product candidate, including Cephalon, we can expect to relinquish some or all of the control over the future success of that product or product candidate to the third party. It is possible that a partner may not devote sufficient resources to the development or commercialization of our product candidate or may otherwise fail in development or commercialization efforts, in which event the development and commercialization of such product candidate could be delayed or terminated and our business could be substantially harmed. In addition, the terms of any collaboration or other arrangement that we establish may not prove to be favorable to us or may not be perceived as favorable, which may negatively impact the trading price of our common stock. In some cases, we may be responsible for continuing development of a product candidate or research program under a collaboration, and the payment we receive from our partner may be insufficient to cover the cost of this development. Moreover, collaborations and sales and marketing arrangements are complex and time consuming to negotiate, document and implement, and they may require substantial resources to maintain.

We may be subject to a number of additional risks associated with our collaborations with third parties, the occurrence of which could cause collaboration arrangements to fail. Conflicts may arise between us and our partners, such as conflicts concerning the interpretation of clinical data, the achievement of milestones, the interpretation of financial provisions or the ownership of intellectual property developed during the collaboration. If any such conflicts arise, a partner could act in its own self-interest, which may be adverse to our interests. Any such disagreement between us and a partner could result in one or more of the following, each of which could delay or prevent the development or commercialization of our product candidates and harm our business:

- reductions in the payment of royalties or other payments we believe are due pursuant to the applicable collaboration arrangement;
- actions taken by a partner inside or outside our collaboration which could negatively impact our rights or benefits under our collaboration; and
- unwillingness on the part of a partner to keep us informed regarding the progress of its development and commercialization activities or to permit public disclosure of the results of those activities.

***If we are unable to maintain our group purchasing organization, or GPO, relationships, our revenues could decline and future profitability could be jeopardized.***

Most of the end-users of injectable pharmaceutical products have relationships with GPOs whereby such GPOs provide such end-users access to a broad range of pharmaceutical products from multiple suppliers at competitive prices and, in certain cases, exercise considerable influence over the drug purchasing decisions of such end-users. Hospitals and other end-users contract with the GPO of their choice for their purchasing needs. We currently derive, and expect to continue to derive, a large percentage of our revenue from end-user customers that are members of a small number of GPOs. Maintaining strong relationships with these GPOs will require us to continue to be a reliable supplier, remain price competitive and comply with FDA regulations. The GPOs with whom we have relationships may have relationships with companies that sell competing products, and such GPOs may earn higher margins from these products or combinations of competing products or may prefer products other than ours for other reasons. If we are unable to maintain our GPO relationships, sales of our products and revenue could decline.

***We rely on a limited number of pharmaceutical wholesalers to distribute our products.***

As is typical in the pharmaceutical industry, we rely upon pharmaceutical wholesalers in connection with the distribution of our products. A significant amount of our products are sold to end-users under GPO pricing arrangements through a limited number of pharmaceutical wholesalers. If we are unable to maintain our business relationships with these pharmaceutical wholesalers on commercially acceptable terms, it could have a material adverse effect on our sales and may prevent us from achieving profitability.

***Our approved products may not achieve expected levels of market acceptance.***

Even if we are able to obtain regulatory approvals for our product candidates, the success of those products is dependent upon market acceptance. Levels of market acceptance for our product candidates could be affected by several factors, including:

- the availability of alternative products from our competitors;
- the price of our products relative to those of our competitors;
- the timing of our market entry;

49

- the ability to market our products effectively at the retail level;
- the perception of patients and the healthcare community, including third-party payors, regarding the safety efficacy and benefits of our drug products compared to those of competing products; and
- the acceptance of our products by government and private formularies.

Some of these factors are not within our control, and our products may not achieve expected levels of market acceptance. Additionally, continuing and increasingly sophisticated studies of the proper utilization, safety and efficacy of pharmaceutical products are being conducted by the industry, government agencies and others which may call into question the utilization, safety and efficacy of previously marketed products. In some cases, studies have resulted, and may in the future result, in the discontinuance of product marketing or other risk management programs such as the need for a patient registry.

**Risks Related to Our Business Operations and Industry**

*Our future success depends on our ability to retain key executives and to attract, retain and motivate qualified personnel.*

We are highly dependent on the principal members of our executive team, which include our Chief Executive Officer, Chief Financial Officer, Chief Medical Officer, and President and Chief Operating Officer. The loss of these executives' services may adversely impact the achievement of our objectives. Any of our executive officers could leave our employment at any time, as all of our employees are "at will" employees. Recruiting and retaining other qualified employees for our business, including scientific and technical personnel, will also be critical to our success. There is currently a shortage of skilled executives in our industry, which is likely to continue. As a result, competition for skilled personnel is intense and the turnover rate can be high. We may not be able to attract and retain personnel on acceptable terms given the competition among numerous pharmaceutical companies for individuals with similar skill sets. In addition, failure to succeed in clinical studies may make it more challenging to recruit and retain qualified personnel. The inability to recruit key executives or the loss of the services of any executive or key employee might impede the progress of our development and commercialization objectives.

*We will need to expand our organization, and we may experience difficulties in managing this growth, which could disrupt our operations.*

As of December 31, 2018, we had a total of 96 employees in the United States and two full-time consultants in India. As our company matures, we expect to expand our employee base to increase our managerial, scientific and engineering, operational, sales, marketing, financial and other resources and to hire more consultants and contractors. Future growth would impose significant additional responsibilities on our management, including the need to identify, recruit, maintain, motivate and integrate additional employees, consultants and contractors. Also, our management may need to divert a disproportionate amount of its attention away from our day-to-day activities and devote a substantial amount of time to managing these growth activities. For example, on November 16, 2016, we acquired Arsia Therapeutics, Inc. (now Eagle Biologics). We may not be able to effectively manage the expansion of our operations, such as the Arsia acquisition, which may result in weaknesses in our infrastructure and give rise to operational mistakes, loss of business opportunities, loss of employees and reduced productivity among remaining employees. Future growth could require significant capital expenditures and may divert financial resources from other projects, such as the development of our existing or future product candidates. If our management is unable to effectively manage our growth, our expenses may increase more than expected, our ability to generate and/or grow revenue could be reduced and we may not be able to implement our business strategy. Our future financial performance and our ability to sell our products and commercialize our product candidates, if approved, and compete effectively will depend, in part, on our ability to effectively manage any future growth.

*Our acquisition of Arsia Therapeutics may not provide us with the long-term value we expected.*

Our acquisition of Arsia Therapeutics, Inc. (now Eagle Biologics) and the purchase price of such was based on a series of long-term assumptions and estimates. However, there can be no assurance that these expectations will be completely realized, and we cannot ensure that we will be able to manage the risks associated with integrating Eagle Biologic's operations and product candidates into our existing business and infrastructure. Unexpected difficulties may be disruptive to our ongoing development efforts, put a strain on our existing personnel, infrastructure and business and divert management's time and attention. As a result of these or other problems and risks, we may never realize the full potential or we may never generate significant value from this transaction.

*We face potential product liability, and, if successful claims are brought against us, we may incur substantial liability.*

The use of our product candidates in clinical trials (if any), and the sale of our products and any product candidates for which we obtain marketing approval, exposes us to the risk of product liability claims. Product liability claims might be brought against us by consumers, health care providers, pharmaceutical companies or others selling or otherwise coming into contact with our products, other approved future products and our product candidates. If we cannot successfully defend against product liability claims, we

50

could incur substantial liability and costs. In addition, regardless of merit or eventual outcome, product liability claims may result in:

- impairment of our business reputation;

- withdrawal of clinical study participants;

- costs due to related litigation;

- distraction of management's attention from our primary business;

- substantial monetary awards to patients or other claimants;

- the inability to commercialize our product candidates; and

- decreased demand for our products and our product candidates, if approved for commercial sale.

Our current product liability insurance coverage may not be sufficient to reimburse us for any expenses or losses we may suffer. Moreover, insurance coverage is becoming increasingly expensive and in the future we may not be able to maintain insurance coverage at a reasonable cost or in sufficient amounts to protect us against losses due to liability. On occasion, large judgments have been awarded in class action lawsuits based on drugs that had unanticipated adverse effects. A successful product liability claim or series of claims brought against us could cause our stock price to decline and, if judgments exceed our insurance coverage, could adversely affect our results of operations and business.

***We rely significantly on information technology and any failure, inadequacy, interruption or security lapse of that technology, including any cybersecurity incidents, could harm our ability to operate our business effectively.***

Despite the implementation of security measures, our internal computer systems and those of third parties with which we contract are vulnerable to damage from cyber-attacks, computer viruses, unauthorized access, natural disasters, terrorism, war and telecommunication and electrical failures. System failures, accidents or security breaches could cause interruptions in our operations, and could result in a material disruption of our product development and clinical activities and business operations, in addition to possibly requiring substantial expenditures of resources to remedy. Cybersecurity attacks in particular are evolving and include, but are not limited to, malicious software, attempts to gain unauthorized access to data and other electronic security breaches that could lead to disruptions in systems, misappropriation of our confidential or otherwise protected information and corruption of data. The loss, theft or sabotage of product development or clinical trial data could result in delays in our regulatory approval efforts and significantly increase our costs to recover or reproduce the data. To the extent that any disruption or security breach were to result in a loss of, or damage to, our data or applications, or inappropriate disclosure of confidential or proprietary information, we could incur liability and our development programs and the development of our product candidates could be delayed.

***Business interruptions could delay us in the process of developing our product candidates and could disrupt our sales of any products we may sell.***

Our headquarters are located in Woodcliff Lake, New Jersey. If we encounter any disruptions to our operations at this building or if it were to shut down for any reason, including by fire, natural disaster, such as a hurricane, tornado or severe storm, power outage, systems failure, labor dispute or other unforeseen disruption, then we may be prevented from effectively operating our business. We do not carry insurance for natural disasters and we may not carry sufficient business interruption insurance to compensate us for losses that may occur. Any losses or damages we incur could have a material adverse effect on our business operations.

***We may be constrained by our obligations under our Credit Agreement to operate our business to its full potential.***

Our Credit Agreement contains customary representations and warranties and customary affirmative and negative covenants, including, among other things, restrictions on indebtedness, liens, investments, mergers, dispositions, prepayment of other indebtedness and dividends and other distributions. Under the terms of the Credit Agreement, we are required to comply with (a) a maximum senior secured net leverage ratio, (b) a maximum total net leverage ratio and (c) a minimum fixed charge coverage ratio. These terms may restrict our ability to operate our business in the manner we deem most effective or desirable, and may restrict our ability to fund our operations through new public offerings of our common stock or strengthen our candidate development pipeline through acquisitions or licenses which cause us to exceed our maximum senior secured net leverage ratio.

Although we have not currently drawn on the Credit Agreement, failure to comply with the representations and warranties or affirmative and negative covenants could constitute an event of default which, if continued beyond the cure period, would allow the administrative agent, at the request of or with the consent of the lenders holding a majority of the loans and commitments under the facility, to terminate the commitments of the lenders to make further loans and declare all the obligations of the loan parties under the Credit Agreement to be immediately due and payable, either of which could harm our business.

**Risks Related to Our Intellectual Property**

***If we are unable to obtain or protect intellectual property rights related to any of our product candidates, we may not be able to compete effectively in our market.***

We rely upon a combination of patents, trade secret protection and confidentiality agreements to protect the intellectual property related to our products and our product candidates. The strength of patents in the biotechnology and pharmaceutical field involves complex legal and scientific questions and can be uncertain. The patent applications that we own or in-license may fail to result in issued patents with claims that cover the products in the United States or in foreign countries or territories. If this were to occur, early generic competition could be expected against our products and our product candidates in development. There may be relevant prior art relating to our patents and patent applications which could invalidate a patent or prevent a patent from issuing based on a pending patent application. In particular, because the active pharmaceutical ingredients in many of our product candidates have been on the market as separate products for many years, it is possible that these products have previously been used off-label in such a manner that such prior usage would affect the validity of our patents or our ability to obtain patents based on our patent applications.

Even if patents do successfully issue, third parties may challenge their validity, enforceability or scope, which may result in such patents being narrowed or invalidated. Any adverse outcome in these types of matters could result in one or more generic versions of our products being launched before the expiration of the listed patents, which could adversely affect our ability to successfully execute our business strategy to increase sales of our products and would negatively impact our financial condition and results of operations, including causing a significant decrease in our revenues and cash flows.

Furthermore, even if they are unchallenged, our patents and patent applications may not adequately protect our intellectual property or prevent others from designing around our claims. If the patent applications we hold with respect to our products or product candidates fail to issue or if their breadth or strength of protection is threatened, it could dissuade companies from collaborating with us to develop them and threaten our ability to commercialize our product candidates. We cannot offer any assurances about which, if any, patents will issue or whether any issued patents will be found not invalid and not unenforceable or will go unthreatened by third parties. Further, if we encounter delays in regulatory approvals, the period of time during which we could market our product candidates under patent protection could be reduced. If third parties have filed such patent applications, an interference proceeding in the United States can be provoked by a third party or instituted by us to determine who was the first to invent any of the subject matter covered by the patent claims of our applications.

In addition to the protection afforded by patents, we rely on trade secret protection and confidentiality agreements to protect proprietary know-how that is not patentable, processes for which patents are difficult to enforce and any other elements of our drug development and reformulation processes that involve proprietary know-how, information or technology that is not covered by patents. For example, we maintain trade secrets with respect to certain of the formulation and manufacturing techniques related to our products and our product candidates. Although we generally require all of our employees to assign their inventions to us, and all of our employees, consultants, advisors and any third parties who have access to our proprietary know-how, information or technology to enter into confidentiality agreements, we cannot provide any assurances that all such agreements have been duly executed or that our trade secrets and other confidential proprietary information will not be disclosed or that competitors will not otherwise gain access to our trade secrets or independently develop substantially equivalent information and techniques. We also seek to preserve the integrity and confidentiality of our data and trade secrets by maintaining physical security of our premises and physical and electronic security of our information technology systems. While we have confidence in these individuals, organizations and systems, agreements or security measures may be breached, and we may not have adequate remedies for any breach. In addition, our trade secrets may otherwise become known or be independently discovered by competitors. Additionally, if the steps taken to maintain our trade secrets are deemed inadequate, we may have insufficient recourse against third parties for misappropriating the trade secret. In addition, others may independently discover our trade secrets and proprietary information. For example, the FDA, as part of its Transparency Initiative, is currently considering whether to make additional information publicly available on a routine basis, including information that we may consider to be trade secrets or other proprietary information, and it is not clear at the present time how the FDA's disclosure policies may change in the future, if at all.

Our ability to obtain patents is highly uncertain because, to date, some legal principles remain unresolved, there has not been a consistent policy regarding the breadth or interpretation of claims allowed in patents in the United States and the specific content of patents and patent applications that are necessary to support and interpret patent claims is highly uncertain due to the complex nature of the relevant legal, scientific and factual issues. Changes in either patent laws or interpretations of patent laws in the United States and other countries may diminish the value of our intellectual property or narrow the scope of our patent protection. For example, on September 16, 2011, the Leahy-Smith America Invents Act, or the Leahy-Smith Act, was signed into law. The Leahy-Smith Act includes a number of significant changes to United States patent law. These include provisions that affect the way patent applications will be prosecuted and may also affect patent litigation. The United States Patent and Trademark Office,

or USPTO, has developed new and untested regulations and procedures to govern the full implementation of the Leahy-Smith Act, and many of the substantive changes to patent law associated with the Leahy-Smith Act, and in particular, the first to file provisions, only became effective in March 2013. The Leahy-Smith Act has also introduced procedures making it easier for third-parties to challenge issued patents, as well as to intervene in the prosecution of patent applications. Finally, the Leahy-Smith Act contains new statutory provisions that still require the USPTO to issue new regulations for their implementation and it may take the courts years to interpret the provisions of the new statute. Accordingly, it is too early to tell what, if any, impact the Leahy-Smith Act will have on the operation of our business and the protection and enforcement of our intellectual property. However, the Leahy-Smith Act and its implementation could increase the uncertainties and costs surrounding the prosecution of our patent applications and the enforcement or defense of our issued patents. An inability to obtain, enforce and defend patents covering our proprietary technologies would materially and adversely affect our business prospects and financial condition.

Further, the laws of some foreign countries do not protect proprietary rights to the same extent or in the same manner as the laws of the United States. As a result, we may encounter significant problems in protecting and defending our intellectual property both in the United States and abroad. For example, if the issuance to us, in a given country, of a patent covering an invention is not followed by the issuance, in other countries, of patents covering the same invention, or if any judicial interpretation of the validity, enforceability, or scope of the claims in, or the written description or enablement in, a patent issued in one country is not similar to the interpretation given to the corresponding patent issued in another country, our ability to protect our intellectual property in those countries may be limited. Changes in either patent laws or in interpretations of patent laws in the United States and other countries may materially diminish the value of our intellectual property or narrow the scope of our patent protection. If we are unable to prevent material disclosure of the non-patented intellectual property related to our technologies to third parties, and there is no guarantee that we will have any such enforceable trade secret protection, we may not be able to establish or maintain a competitive advantage in our market, which could materially adversely affect our business, results of operations and financial condition.

***Our drug development strategy relies heavily upon the 505(b)(2) regulatory pathway, which requires us to certify that we do not infringe upon third-party patents covering approved drugs. Such certifications typically result in third-party claims of intellectual property infringement, the defense of which will be costly and time consuming, and an unfavorable outcome in any litigation may prevent or delay our development and commercialization efforts which would harm our business.***

Litigation or other proceedings to enforce or defend intellectual property rights are often complex in nature, may be very expensive and time-consuming, may divert our management's attention from other aspects of our business and may result in unfavorable outcomes that could adversely impact our ability to launch and market our product candidates, or to prevent third parties from competing with our products and product candidates.

There is a substantial amount of litigation, both within and outside the United States, involving patent and other intellectual property rights in the biotechnology and pharmaceutical industries, including patent infringement lawsuits, interferences, oppositions and inter party reexamination proceedings before the USPTO. Numerous United States and foreign issued patents and pending patent applications, which are owned by third parties, exist in the fields in which we and our collaborators are developing product candidates. As the biotechnology and pharmaceutical industries expand and more patents are issued, the risk increases that our product candidates may be subject to claims of infringement of the patent rights of third parties.

In particular, our commercial success depends in large part on our avoiding infringement of the patents and proprietary rights of third parties for existing approved drug products. Because we utilize the 505(b)(2) regulatory pathway for the approval of our products and product candidates, we rely in whole or in part on studies conducted by third parties related to those approved drug products. As a result, upon filing with the FDA for approval of our product candidates, we will be required to certify to the FDA that either: (1) there is no patent information listed in the FDA's Orange Book with respect to our NDA; (2) the patents listed in the Orange Book have expired; (3) the listed patents have not expired, but will expire on a particular date and approval is sought after patent expiration; or (4) the listed patents are invalid or will not be infringed by the manufacture, use or sale of our proposed drug product. When we submit a paragraph IV certification to the FDA, a notice of the paragraph IV certification must also be sent to the patent owner once our 505(b)(2) NDA is accepted for filing by the FDA. The third party may then initiate a lawsuit against us to defend the patents identified in the notice. The filing of a patent infringement lawsuit within 45 days of receipt of the notice automatically prevents the FDA from approving our NDA until the earliest of 30 months or the date on which the patent expires, the lawsuit is settled, or the court reaches a decision in the infringement lawsuit in our favor. If the third party does not file a patent infringement lawsuit within the required 45-day period, our NDA will not be subject to the 30-month stay.

In addition to paragraph IV litigation noted above, third-party owners of patents may generally assert that we are employing their proprietary technology without authorization. There may be third-party patents or patent applications with claims to materials, formulations, methods of manufacture or methods for treatment related to the use or manufacture of our products and/or our product candidates. Because patent applications can take many years to issue, there may be currently pending or subsequently filed patent applications which may later result in issued patents that may be infringed by our products or product candidates. If any third-party patents were held by a court of competent jurisdiction to cover aspects of our product candidates, including the formulation,

53

method of use, any method or process involved in the manufacture of any of our product candidates, any molecules or intermediates formed during such manufacturing process or any other attribute of the final product itself, the holders of any such patents may be able to block our ability to commercialize our product candidates unless we obtain a license under the applicable patents, or until such patents expire. In either case, such a license may not be available on commercially reasonable terms or at all.

Parties making claims against us may request and/or obtain injunctive or other equitable relief, which could effectively block our ability to further develop and commercialize one or more of our product candidates on a temporary or permanent basis. Defense of these claims, regardless of their merit, would involve substantial litigation expense and would be a substantial diversion of employee resources from our business. In the event of a successful claim of infringement against us, we may have to pay substantial damages, including treble damages and attorneys' fees for willful infringement, obtain one or more licenses from third parties, pay royalties or redesign our infringing products or manufacturing processes, which may be impossible or require substantial time and monetary expenditure. We cannot predict whether any such license would be available at all or whether it would be available on commercially reasonable terms. Furthermore, even in the absence of litigation, we may need to obtain licenses from third parties to advance our research, manufacture clinical trial supplies or allow commercialization of our product candidates. We may fail to obtain any of these licenses at a reasonable cost or on reasonable terms, if at all. In that event, we would be unable to further develop and commercialize one or more of our product candidates, which could harm our business significantly. We cannot provide any assurances that third party patents do not exist which might be enforced against our products, resulting in either an injunction prohibiting our sales, or, with respect to our sales, an obligation on our part to pay royalties and/or other forms of compensation to third parties.

*If we fail to comply with our obligations in the agreements under which we license rights to technology from third parties, or if the license agreements are terminated for other reasons, we could lose license rights that are important to our business.*

We are a party to a number of technology licenses that are important to our business and expect to enter into additional licenses in the future. Our existing license agreements impose, and we expect that future license agreements will impose, on us, various development, regulatory and/or commercial diligence obligations, payment of milestones and/or royalties and other obligations. Additionally, one of our existing license agreements is a sublicense from a third party who is not the original licensor of the intellectual property at issue. Under these agreements, we must rely on our licensor to comply with their obligations under the primary license agreements under which such third party obtained rights in the applicable intellectual property, where we may have no relationship with the original licensor of such rights. If our licensors fail to comply with their obligations under these upstream license agreements, the original third-party licensor may have the right to terminate the original license, which may terminate our sublicense. If this were to occur, we would no longer have rights to the applicable intellectual property unless we are able to secure our own direct license with the owner of the relevant rights, which we may not be able to do at a reasonable cost or on reasonable terms, which may impact our ability to continue to develop and commercialize our product candidates and companion diagnostic incorporating the relevant intellectual property. If we fail to comply with our obligations under our license agreements, or we are subject to a bankruptcy or insolvency, the licensor may have the right to terminate the license. In the event that any of our important technology licenses were to be terminated by the licensor, we would likely cease further development of the related program or be required to spend significant time and resources to modify the program to not use the rights under the terminated license.

*We may be involved in lawsuits to protect or enforce our patents or the patents of our licensors, which could be expensive, time consuming and unsuccessful.*

Competitors may infringe our patents or the patents of our licensors. To counter infringement or unauthorized use, we may be required to file infringement claims, which can be expensive and time-consuming. In addition, in an infringement proceeding, a court may decide that a patent of ours or our licensors is not valid or is unenforceable, or may refuse to stop the other party from using the technology at issue on the grounds that our patents do not cover the technology in question. An adverse result in any litigation or defense proceedings could put one or more of our patents at risk of being invalidated or interpreted narrowly and could put our patent applications at risk of not being issued.

Interference proceedings provoked by third parties or brought by us may be necessary to determine the priority of inventions with respect to our patents or patent applications or those of our collaborators or licensors. An unfavorable outcome could require us to cease using the related technology or to attempt to license rights to it from the prevailing party. Our business could be harmed if the prevailing party does not offer us a license on commercially reasonable terms. Our defense of litigation or interference proceedings may fail and, even if successful, may result in substantial costs and distract our management and other employees. We may not be able to prevent, alone or with our licensors, misappropriation of our intellectual property rights, particularly in countries where the laws may not protect those rights as fully as in the United States.

Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation. There could

54

also be public announcements of the results of hearings, motions or other interim proceedings or developments. If securities analysts or investors perceive these results to be negative, it could have a material adverse effect on the price of our common stock.

*The patents and the patent applications that we have covering our products are limited to specific formulations, methods of use and processes, and our market opportunity for our products and our product candidates may be limited by the lack of patent protection for the active ingredients and by competition from other formulations and delivery methods that may be developed by competitors.*

Patent protection on the active ingredients in our currently marketed products (Ryanodex, Bendeka, Argatroban and Non-Alcohol Docetaxel Injection) has expired, and there is therefore no composition of matter patent protection available for the active ingredient in such products. This is also the case with respect to our other product candidates. We have obtained, and continue to seek to obtain patent protection of other aspects of our products and our product candidates, including specific formulations, methods of use and processes, which may not be as effective as composition of matter coverage in preventing work-arounds by competitors. As a result, generic products that do not infringe the claims of our issued patents covering formulations, methods of use and processes are, or may be, available while we are marketing our products. Competitors who obtain the requisite regulatory approval could be able to commercialize products with the same active ingredients as our product candidates so long as the competitors do not infringe any process, use or formulation patents that we have developed for our products, subject to any regulatory exclusivity we may be able to obtain for our products.

The number of patents and patent applications covering products containing the same active ingredient as our products and our product candidates indicates that competitors have sought to develop and may seek to commercialize competing formulations that may not be covered by our patents and patent applications. The commercial opportunity for our products and our product candidates could be significantly harmed if competitors are able to develop and commercialize alternative formulations of our products and our product candidates that are different from ours and do not infringe our issued patents covering our products.

*Ryanodex® (dantrolene sodium), Argatroban, Bendeka ® and Non-Alcohol Docetaxel Injection have been approved by the FDA, and we anticipate that other product candidates will be approved by the FDA in the future. Once our products are on the market, one or more third parties may also challenge the patents that we control covering our products, which could result in the invalidation or unenforceability of some or all of the relevant patent claims of our issued patents covering our products. Obtaining and maintaining our patent protection depends on compliance with various procedural, document submission, fee payment and other requirements imposed by governmental patent agencies, and our patent protection could be reduced or eliminated for non-compliance with these requirements.*

Ryanodex, Argatroban, Bendeka and Non-Alcohol Docetaxel Injection have been approved by the FDA, and we anticipate that other product candidates will be approved by the FDA in the future. One or more third parties may also challenge the patents that we control covering our products in court or the USPTO, which could result in the invalidation or unenforceability of some or all of the relevant patent claims of our issued patents covering our products.

If we or one of our licensing partners initiated legal proceedings against a third party to enforce a patent covering one of our products or product candidates, the defendant could counterclaim that the patent covering our product or product candidate is invalid and/or unenforceable. In patent litigation in the United States, defendant counterclaims alleging invalidity and/or unenforceability are common, and there are numerous grounds upon which a third party can assert invalidity or unenforceability of a patent. Third parties may also raise similar claims before administrative bodies in the United States or abroad, even outside the context of litigation. Such mechanisms include re-examination, post grant review, and equivalent proceedings in foreign jurisdictions (e.g., opposition proceedings). Such proceedings could result in revocation or amendment to our patents in such a way that they no longer cover our products or product candidates. The outcome following legal assertions of invalidity and unenforceability is unpredictable. With respect to the validity question, for example, we cannot be certain that there is no invalidating prior art, of which we, our patent counsel and the patent examiner were unaware during prosecution. If a defendant were to prevail on a legal assertion of invalidity and/or unenforceability, we would lose at least part, and perhaps all, of the patent protection on our products or product candidates. Such a loss of patent protection could have a material adverse impact on our business.

Periodic maintenance fees on any issued patent are due to be paid to the USPTO and foreign patent agencies in several stages over the lifetime of the patent. The USPTO and various foreign governmental patent agencies require compliance with a number of procedural, documentary, fee payment and other similar provisions during the patent application process. While an inadvertent lapse can in many cases be cured by payment of a late fee or by other means in accordance with the applicable rules, there are situations in which non-compliance can result in abandonment or lapse of the patent or patent application, resulting in partial or complete loss of patent rights in the relevant jurisdiction. Non-compliance events that could result in abandonment or lapse of a patent or patent application include, but are not limited to, failure to respond to official actions within prescribed time limits, non-payment of fees and failure to properly legalize and submit formal documents. If we or our licensors that control the prosecution and maintenance of our licensed patents fail to maintain the patents and patent applications covering our products and product

55

candidates, our competitors might be able to enter the market, which would have a material adverse effect on our business, financial condition and results of operations.

***We may be subject to claims that our employees, consultants or independent contractors have wrongfully used or disclosed confidential information of third parties.***

We employ individuals who were previously employed at other biotechnology or pharmaceutical companies. We may be subject to claims that we or our employees, consultants or independent contractors have inadvertently or otherwise used or disclosed confidential information of our employees' former employers or other third parties. We may also be subject to claims that former employers or other third parties have an ownership interest in our patents. Litigation may be necessary to defend against these claims. There is no guarantee of success in defending these claims, and if we are successful, litigation could result in substantial cost and be a distraction to our management and other employees.

***We may be subject to claims challenging the inventorship or ownership of our patents and other intellectual property.***

We may also be subject to claims that former employees, collaborators or other third parties have an ownership interest in our patents or other intellectual property. We may be subject to ownership disputes in the future arising, for example, from conflicting obligations of consultants or others who are involved in developing our products or product candidates and companion diagnostic. Litigation may be necessary to defend against these and other claims challenging inventorship or ownership. If we fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights, such as exclusive ownership of, or right to use, valuable intellectual property. Such an outcome could have a material adverse effect on our business, financial condition and results of operations. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees.

***Intellectual property rights do not necessarily address all potential threats to our competitive advantage.***

The degree of future protection afforded by our intellectual property rights is uncertain because intellectual property rights have limitations, and may not adequately protect our business or permit us to maintain our competitive advantage. The following examples are illustrative:

- others may be able to make compounds that are similar to our products or product candidates but that are not covered by the claims of the patents that we own or have exclusively licensed;

- we or our licensors or future collaborators might not have been the first to make the inventions covered by the issued patent or pending patent application that we own or have exclusively licensed;

- we or our licensors or future collaborators might not have been the first to file patent applications covering certain of our inventions;

- others may independently develop similar or alternative technologies or duplicate any of our technologies without infringing our intellectual property rights;

- it is possible that our pending patent applications will not lead to issued patents;

- issued patents that we own or have exclusively licensed may be held invalid or unenforceable as a result of legal challenges by our competitors;

- our competitors might conduct research and development activities in countries where we do not have patent rights and then use the information learned from such activities to develop competitive products for sale in our major commercial markets;

- we may not develop additional proprietary technologies that are patentable; and

- the patents of others may have an adverse effect on our business, financial condition and results of operations.

Should any of these events occur, they could significantly harm our business, results of operations and prospects.

**Risks Related to Ownership of Our Common Stock**

***Our stock price may continue to fluctuate significantly.***

Our initial public offering was completed in February 2014 at a public offering price of $15.00 per share. The trading price of our common stock has fluctuated significantly in the past and is likely to be volatile. Our stock price could be subject to wide fluctuations in response to a variety of factors, including the following:

56

- any delay in filing an NDA for any of our product candidates and any adverse development or perceived adverse development with respect to the FDA's review of that NDA;

- failure to successfully execute our commercialization strategy with respect to our approved products or any other approved product in the future;

- adverse results or delays in clinical trials, if any;

- significant lawsuits, including patent or stockholder litigation;

- inability to obtain additional funding;

- failure to successfully develop and commercialize our product candidates;

- changes in the structure of healthcare payment systems;

- changes in laws or regulations applicable to our product candidates;

- inability to obtain adequate product supply for our product candidates, or the inability to do so at acceptable prices;

- unanticipated serious safety concerns related to the use of our products or any of our product candidates;

- adverse regulatory decisions;

- introduction of new products or technologies by our competitors;

- entry into new markets by our competitors;

- failure to meet or exceed product development or financial projections we provide to the public;

- failure to meet or exceed the estimates and projections of the investment community;

- the perception of the pharmaceutical industry by the public, legislatures, regulators and the investment community;

- announcements of significant acquisitions, strategic partnerships, joint ventures or capital commitments by us or our competitors;

- disputes or other developments relating to proprietary rights, including patents, litigation matters and our ability to obtain patent protection for our technologies;

- additions or departures of key scientific or management personnel;

- changes in the market valuations of similar companies;

- sales of our common stock by us or our stockholders in the future;

- the trading volume of our common stock;

- changes in the collective short interest in our common stock; and

- additional repurchases of our common stock, if any, pursuant to our recently announced share repurchase program.

The stock market in general, and The Nasdaq Stock Market, or Nasdaq, in particular, has experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of listed companies. Broad market and industry factors may negatively affect the market price of our common stock, regardless of our actual operating performance.

In addition, the market price of our shares of common stock could be subject to wide fluctuations in response to many risk factors listed in this section, and others beyond our control, including:

- actual or anticipated fluctuations in our financial condition and operating results;

- actual or anticipated changes in our growth rate relative to our competitors;

- announcements of significant acquisitions, strategic partnerships, joint ventures, collaborations, or capital commitments;

- issuance of new or updated research or reports by securities analysts;

- fluctuations in the valuation of companies perceived by investors to be comparable to us;

- share price and volume fluctuations attributable to short interest positions and/or inconsistent trading volume levels of our shares;

- disputes or other developments related to proprietary rights, including patents, litigation matters, and our ability to obtain patent protection for our technologies;

- announcement or expectation of additional debt or equity financing efforts;

- sales of our common stock by us, our insiders or our other stockholders; and

- general economic and market conditions.

These and other market and industry factors may cause the market price and demand for our common stock to fluctuate substantially, regardless of our actual operating performance, which may limit or prevent investors from readily selling their shares of common stock and may otherwise negatively affect the liquidity of our common stock. In addition, the stock market in general, and NASDAQ and biopharmaceutical companies in particular, have experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of these companies. In the past, when the market price of a stock has been volatile, holders of that stock have instituted securities class action litigation against the company that issued the stock. For example, in May 2016, we became party to a federal securities class action lawsuit, and although it was dismissed in October 2017, we incurred substantial costs defending such lawsuit. Such lawsuit, as well as similar lawsuits instituted in the future, could result in substantial additional costs to us and could also divert the time and attention of our management.

***Our principal stockholders and management own a significant percentage of our stock and will be able to exert significant control over matters subject to stockholder approval.***

As of December 31, 2018, our executive officers, directors, 5% or greater stockholders and their affiliates beneficially own the majority of our voting stock. These stockholders will have the ability to influence us through this ownership position. These stockholders may be able to determine all matters requiring stockholder approval. For example, these stockholders, acting together, may be able to control elections of directors, amendments of our organizational documents or approval of any merger, sale of assets or other major corporate transaction. This may prevent or discourage unsolicited acquisition proposals or offers for our common stock that you may believe are in your best interest as one of our stockholders.

***We have incurred significant increased costs as a result of operating as a public company, and our management is required to devote substantial time to new compliance initiatives.***

As a public company, we are incurring significant legal, accounting and other expenses that we did not incur as a private company.

For example, as a public company, we are now subject to the reporting requirements of the Exchange Act, which require, among other things, that we file with the SEC, annual, quarterly and current reports with respect to our business and financial condition. We have incurred and will continue to incur costs associated with the preparation in filing of these reports. In addition, the Sarbanes-Oxley Act, as well as rules subsequently implemented by the SEC, and NASDAQ have imposed various other requirements on public companies and we have incurred and will continue to incur costs associated with compliance with such requirements. In July 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act, or the Dodd-Frank Act, was enacted. There are significant corporate governance and executive compensation related provisions in the Dodd-Frank Act that required the SEC to adopt additional rules and regulations in these areas such as "say on pay" and proxy access. Stockholder activism, the current political environment and the current high level of government intervention and regulatory reform may lead to substantial new regulations and disclosure obligations, which may lead to additional compliance costs and impact (in ways we cannot currently anticipate) the manner in which we operate our business. Our management and other personnel need to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations will increase our legal and financial compliance costs and will make some activities more time-consuming and costly. For example, we expect these rules and regulations to make it more difficult and more expensive for us to obtain director and officer liability insurance and we may be required to incur substantial costs to maintain our current levels of such coverage.

***Sales of a substantial number of shares of our common stock in the public market by our existing stockholders could cause our stock price to fall.***

Sales of a substantial number of shares of our common stock by our existing stockholders in the public market or the perception that these sales might occur, could depress the market price of our common stock and could impair our ability to raise capital through the sale of additional equity securities. We are unable to predict the effect that such sales may have on the prevailing market price of our common stock.

As of February 22, 2019 we had 13,924,296 shares of common stock outstanding, all of which, other than shares held by our directors and certain officers, are eligible for sale in the public market, subject in some cases to compliance with the requirements of Rule 144, including volume limitations and manner of sale requirements.

In addition, shares issued upon exercise of vested options are eligible for sale. Sales of stock by these stockholders could have a material adverse effect on the trading price of our common stock.

Certain holders of our securities are entitled to rights with respect to the registration of their shares under the Securities Act of 1933, as amended, or the Securities Act. Registration of these shares under the Securities Act would result in the shares becoming

freely tradable without restriction under the Securities Act. Any sales of securities by these stockholders could have a material adverse effect on the trading price of our common stock.

***Future issuances of our common stock or rights to purchase our common stock, including pursuant to our equity incentive plans, could result in additional dilution of the percentage ownership of our stockholders and could cause our stock price to fall.***

We expect that significant additional capital will be needed in the future to continue our planned operations. To the extent we raise additional capital by issuing equity securities, our stockholders may experience substantial dilution. We may sell common stock, convertible securities or other equity securities in one or more transactions at prices and in a manner we determine from time to time. If we sell common stock, convertible securities or other equity securities in more than one transaction, investors may be materially diluted by subsequent sales. These sales may also result in material dilution to our existing stockholders, and new investors could gain rights superior to our existing stockholders.

Pursuant to our 2014 Equity Incentive Plan, or the 2014 Plan, our management is authorized to grant stock options and other equity-based awards to our employees, directors and consultants. The number of shares available for future grant under the 2014 Plan will automatically increase each year by 6% of all shares of our capital stock outstanding as of December 31 of the prior calendar year, subject to the ability of our board of directors to take action to reduce the size of the increase in any given year. Currently, we plan to register the increased number of shares available for issuance under the 2014 Plan each year. If our board of directors elects to increase the number of shares available for future grant by the maximum amount each year, our stockholders may experience additional dilution, which could cause our stock price to fall.

***We are at risk of securities class action and similar litigation.***

In the past, securities class action litigation has often been brought against a company following a decline in the market price of its securities. This risk is especially relevant for us because pharmaceutical companies have experienced significant stock price volatility in recent years. On May 31, 2016, a federal securities class action suit was brought against us seeking compensatory damages in connection with, among other things, the EP-6101 Complete Response Letter, as described in more detail in Item 6, Legal Proceedings. Such lawsuit was dismissed with prejudice in August 2017, however, any similar litigation in the future, could result in substantial cost and a diversion of management's attention and resources, which could harm our business.

***We have broad discretion in the use of the net proceeds from our recently completed initial public offering and follow-on offering and may not use them effectively.***

Our management has broad discretion in the application of the net proceeds from our initial public offering and follow-on offering. Because of the number and variability of factors that will determine our use of the net proceeds from these offerings, their ultimate use may vary substantially from their currently intended use. The failure by our management to apply these funds effectively could harm our business. Pending their use, we may continue to invest the net proceeds from our public offerings in short-term, investment-grade, interest-bearing securities. These investments may not yield a favorable return to our stockholders.

***Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.***

Under Section 382 of the Internal Revenue Code of 1986, as amended, or the Code, if a corporation undergoes an "ownership change," generally defined as a greater than 50% change (by value) in its equity ownership over a three year period, the corporation's ability to use its pre-change net operating loss carryforwards and other pre-change tax attributes, such as research tax credits, to offset its post-change income may be limited. In addition, we may experience ownership changes in the future as a result of subsequent shifts in our stock ownership. As a result, if we earn net taxable income, our ability to use our pre-change net operating loss carryforwards to offset U.S. federal taxable income may be subject to limitations, which could potentially result in increased future tax liability to us.

***We do not intend to pay cash dividends on our common stock so any returns will be limited to the value of our stock.***

We have never declared or paid any cash dividend on our common stock. We currently anticipate that we will retain future earnings for the development, operation and expansion of our business and do not anticipate declaring or paying any cash dividends for the foreseeable future. Any future determinations to pay cash dividends will be made at the discretion of our board of directors, subject to applicable laws, and will depend on a number of factors, including our financial condition, results of operations, capital requirements, contractual restrictions (such as our Credit Facility), general business conditions, and any other factors that our board of directors may deem relevant. Any return to stockholders will therefore be limited to the appreciation of their stock.

***There is no assurance that our stock repurchase program will result in repurchases of our common stock or enhance long term stockholder value.***

59

Repurchases of our common stock pursuant to our stock repurchase program could affect our stock price and increase its volatility and will reduce the market liquidity for our stock. The existence of a stock repurchase program could also cause our stock price to be higher than it would be in the absence of such a program. Additionally, any future repurchases would diminish our cash reserves, which could impact our ability to pursue possible future strategic opportunities and acquisitions. There can be no assurance that any stock repurchases will, in fact, occur, or, if they occur, that they will enhance stockholder value.

***Provisions in our amended and restated certificate of incorporation and bylaws, as well as provisions of Delaware law, could make it more difficult for a third party to acquire us or increase the cost of acquiring us, even if doing so would benefit our stockholders or remove our current management.***

Some provisions of our charter documents and Delaware law may have anti-takeover effects that could discourage an acquisition of us by others, even if an acquisition would be beneficial to our stockholders and may prevent attempts by our stockholders to replace or remove our current management. These provisions include:

- authorizing the issuance of "blank check" preferred stock, the terms of which may be established and shares of which may be issued without stockholder approval;

- limiting the removal of directors by the stockholders;

- creating a classified board of directors;

- prohibiting stockholder action by written consent, thereby requiring all stockholder actions to be taken at a meeting of our stockholders;

- eliminating the ability of stockholders to call a special meeting of stockholders; and

- establishing advance notice requirements for nominations for election to the board of directors or for proposing matters that can be acted upon at stockholder meetings.

These provisions may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors, which is responsible for appointing the members of our management. In addition, we are subject to Section 203 of the Delaware General Corporation Law, which generally prohibits a Delaware corporation from engaging in any of a broad range of business combinations with an interested stockholder for a period of three years following the date on which the stockholder became an interested stockholder, unless such transactions are approved by our board of directors. This provision could have the effect of delaying or preventing a change of control, whether or not it is desired by or beneficial to our stockholders. Further, other provisions of Delaware law may also discourage, delay or prevent someone from acquiring us or merging with us.

***The recently passed comprehensive tax reform bill could adversely affect our business and financial condition.***

On December 22, 2017, the Tax Act was signed into law, significantly revising the Code.  The newly enacted federal income tax law, among other things, contains significant changes to corporate taxation, including reduction of the corporate tax rate from a top marginal rate of 35% to a flat rate of 21%, limitation on deductibility of executive compensation under regulation 162(m), limitation of the tax deduction for interest expense to 30% of adjusted earnings (except for certain small businesses), limitation of the deduction for NOLs to 80% of current year taxable income and elimination of NOL carrybacks, one time taxation of offshore earnings at reduced rates regardless of whether they are repatriated, elimination of U.S. tax on foreign earnings (subject to certain important exceptions), immediate deductions for certain new investments instead of deductions for depreciation expense over time, and modifying or repealing many business deductions and credits.  Notwithstanding the reduction in the corporate income tax rate, the overall impact of the new federal tax law is uncertain and our business and financial condition could be adversely affected.  In addition, it is uncertain if and to what extent various states will conform to the newly enacted federal tax law.  The impact of this tax reform on holders of our common stock is also uncertain and could be adverse.  We urge our stockholders to consult with their legal and tax advisors with respect to this legislation and the potential tax consequences of investing in or holding our common stock.

**Item 1B. Unresolved Staff Comments**

None.

61

**Item 2. Properties**

As of December 31, 2018 we conducted all of our commercial operations for Eagle Pharmaceuticals, Inc. at our 20,497 square foot leased office space located at 50 Tice Boulevard, Suite 315, Woodcliff Lake, NJ 07677. The term of the lease is for 60 months, expiring on June 30, 2020.

For Eagle Biologics, Inc. as of December 31, 2018, we conducted all of our non-outsourced operations at a leased space located at 47 Moulton St. Cambridge, MA 02138. The term of the lease is 60 months expiring on October 31, 2023.

We consider our current facilities suitable and adequate to meet our current needs.

**Item 3. Legal Proceedings**

The disclosures under Note 14. Legal Proceedings in the Consolidated Financial Statements included in Part IV, Item 15 of this report are incorporated into this Part I, Item 3 by reference.

**Item 4. Mine Safety Disclosures**

Not applicable.

62

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

Our common stock has been listed on the Nasdaq Global Market under the symbol "EGRX" since February 12, 2014. Prior to that date, there was no public trading market for our common stock.

*Record Holders*

As of February 22, 2019, we had 6 holders of record of our common stock. The actual number of shareholders is greater than this number of record holders and includes shareholders who are beneficial owners but whose shares are held in street name by brokers and other nominees. This number of holders of record also does not include shareholders whose shares may be held in trust by other entities. The closing price per share of our common stock on February 22, 2019 was $46.23.

*Dividends*

We have never declared or paid a cash dividend on our common stock. We currently intend to retain any future earnings and do not expect to pay any dividends in the foreseeable future. In addition, our Credit Facility imposes contractual restrictions on us with respect to paying cash dividends. Any future determinations to pay cash dividends will be made at the discretion of our board of directors, subject to applicable laws, and will depend on a number of factors, including our financial condition, results of operations, capital requirements, contractual restrictions, general business conditions, and any other factors that our board of directors may deem relevant.

*Stock Performance Graph*

*The following information shall not be deemed to be "soliciting material" or to be "filed" with the SEC or subject to Regulation 14A or 14C under the Securities Exchange Act of 1934, as amended, or the Exchange Act, or to the liabilities of Section 18 of the Exchange Act, and will not be deemed to be incorporated by reference into any filing of Eagle Pharmaceuticals, Inc. under the Exchange Act or the Securities Act of 1933, as amended, or the Securities Act, except to the extent we specifically incorporate it by reference into such filing.*

The following graph shows a comparison from February 12, 2014 (the date our common stock commenced trading on the Nasdaq Global Market) through December 31, 2018 of the cumulative total return for our common stock, and the Nasdaq Composite Index and The Nasdaq Biotechnology Index. The graph assumes that $100 was invested at the market close on February 12, 2014 in the common stock of Eagle Pharmaceuticals, Inc, the Nasdaq Composite Index and the Nasdaq Biotechnology Index and assumes reinvestments of dividends. The stock price performance of the following graph is not necessarily indicative of future stock price performance.

**Comparison of  58 Month Cumulative Total Return**
**Assumes initial investment $100**
**December 31, 2018**



| Company / Index | 2/12/14 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 | 12/31/17 | 6/30/18 | 12/31/18 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Eagle Pharmaceuticals, Inc | $ 100 | $ 112 | $ 138 | $ 630 | $ 691 | $ 302 | $ 618 | $ 615 | $ 416 | $ 590 | $ 314 |
| NASDAQ Composite | $ 100 | $ 105 | $ 113 | $ 119 | $ 119 | $ 115 | $ 128 | $ 146 | $ 164 | $ 179 | $ 158 |
| NASDAQ Biotechnology | $ 100 | $ 99 | $ 119 | $ 144 | $ 132 | $ 101 | $ 104 | $ 121 | $ 125 | $ 129 | $ 114 |

*Recent Sales of Unregistered Securities*

Pursuant to a Warrant to Purchase Common Stock, dated September 2018, the Company issued a warrant to FoxKiser LLP to purchase 7,467 shares of the Company's common stock at an exercise price of $66.96 per share in connection with certain services rendered to the Company. This warrant was issued in reliance on an exemption from registration under Section 4(2) of the Securities of 1933, as amended.

*Use of Proceeds from Public Offerings of Common Stock*

On February 18, 2014, we closed our initial public offering whereby we sold 3,350,000 shares of common stock, at a public offering price of $15.00 per share, before underwriting discounts and expenses. On March 18, 2014, the underwriters Piper Jaffray & Co. and William Blair & Company, L.L.C., acting as representatives of each of the underwriters, exercised an over-allotment option granted in connection with the offering of 100,000 shares of common stock at the initial public offering price, less the underwriter discount. The aggregate net proceeds received by us from the offering were approximately $46.1 million.

64

On March 20, 2015, we completed an underwritten public offering (the "Follow-on Offering") of 1,518,317 shares of common stock, including the exercise by the underwriters Piper Jaffray & Co. and William Blair & Company, L.L.C., acting as representatives of each of the underwriters, of a 30-day option to purchase an additional 198,041 shares of common stock. Of the shares sold, 1,388,517 shares were issued and offered by the Company and 129,800 shares were offered by certain selling stockholders. All of the shares were offered at a price to the public of $42.00 per share. The net proceeds from this offering, after deducting underwriting discounts and commissions and other offering expenses payable by us, were approximately $54.3 million. We did not receive any proceeds from the shares sold by the selling stockholders. The securities described above were offered by us pursuant to a shelf registration statement declared effective by the SEC on March 13, 2015.

We invested the net proceeds received from the above offerings in cash equivalents and other short-term investments in accordance with our investment policy. There has been no material change in the planned use of proceeds from our initial public offering as described in our final prospectus filed with the SEC pursuant to Rule 424(b).

*Issuer Purchases of Equity Securities*

The following table provides information about purchases of our equity securities during the three months ended December 31, 2018:

| Period | Total Number of Shares Purchased (1)(2)(3)(4)(5) | Average Price Paid per Share | Total Number of Shares Purchased as Part Publicly Announced Plans or Programs | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Programs |
|---|---|---|---|---|
| | | | | (dollars in thousands) |
| October 1, 2018 to October 31, 2018 | 7,458 | $ 63.99 | 7,458 | 150,000 |
| November 1, 2018 to November 30, 2018 | 702,988 | $ 49.99 | 702,988 | 110,000 |
| December 1, 2018 to December 31, 2018 | 297,146 | $ 49.99 | 297,146 | 100,000 |
| **Total** | 1,007,592 | $ 50.10 | 1,007,592 | |

(1) All shares repurchased by the Company in this table were repurchased pursuant to the Share Repurchase Programs, described below and elsewhere in this Annual Report on Form 10-K.

(2) On August 9, 2016, the Company announced a share repurchase program approved by the Company's Board authorizing the repurchase of up to $75.0 million of the Company's common stock (the "2016 Share Repurchase Program"). Under the 2016 Share Repurchase Program, the Company was authorized to repurchase shares through open market purchases, privately-negotiated transactions or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. The 2016 Share Repurchase Program was terminated by the Company's Board in connection with its approval of the 2018 Share Repurchase Program in October 2018.

(3) On August 9, 2017, the Company announced a new share repurchase program approved by the Board, under which the Company may repurchase up to $100 million of its outstanding common stock (the "2017 Share Repurchase Program"). Under the 2017 Share Repurchase Program, the Company may repurchase shares through open market purchases, privately-negotiated transactions or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. The 2017 Share Repurchase Program was terminated by the Company's Board in connection with its approval of the 2018 Share Repurchase Program in October 2018.

(4) On October 30, 2018, the Company announced a new repurchase program approved by the Board pursuant to which the Company may repurchase of up to $150 million of the its outstanding common stock, consisting of (i) up to $50 million in repurchases pursuant to an accelerated share repurchase agreement (the "ASR"), with JPMorgan Chase Bank, N.A. ("JPMorgan"), and (ii) up to $100 million in additional repurchases (collectively, the "2018 Share Repurchase Program"). In connection with its approval of the 2018 Share Repurchase Program, the Board terminated the Company's 2016 Share Repurchase Program and 2017 Share Repurchase Program in October 2018. Under the 2018 Share Repurchase Program, the Company is authorized to repurchase shares through open market purchases, privately-negotiated transactions, accelerated share repurchases or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. Under the 2018 Share Repurchase Program, the additional repurchases have no time limit and may be suspended or discontinued completely at any time. The specific timing and amount of repurchases will vary based on available capital resources and other financial and operational

65

performance, market conditions, securities law limitations, and other factors. The repurchases will be made using the Company's cash resources.

(5) In connection with the 2018 Share Repurchase Program, on October 30, 2018, the Company entered into the ASR with JPMorgan to repurchase an aggregate of $50 million of the Company's common stock. Under the terms of the ASR, the Company paid $50 million to JP Morgan on November 1, 2018, and received 702,988 shares, representing approximately 80% of the notional amount of the ASR, based on the closing price of $56.90 on October 29, 2018. Upon settlement of the ASR, the final number of shares repurchased were trued up based on the average of the daily volume weighted average share prices of the Company's common stock, less a discount, during the term of the ASR. The Company received 297,146 shares on December 6, 2018, the termination date.

*Securities Authorized for Issuance Under Equity Compensation Plans*

Information about securities authorized for issuance under our equity compensation plans is incorporated herein by reference to Item 12 of Part III of this annual report on Form 10-K.

**Item 6. Selected Financial Data**

The following table sets forth our selected financial data for the periods and as of the dates indicated. The following selected financial data should be read in conjunction with our audited financial statements and the related notes thereto included elsewhere in this Annual Report on Form 10-K and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this Annual Report on Form 10-K.

The statement of operations data for the years ended December 31, 2018, 2017, 2016, 2015, three months ended December 31, 2014, and the year ended September 30, 2014, respectively, and the balance sheet data as of December 31, 2018, 2017, 2016, 2015 and 2014, and September 31, 2014 are derived from our audited consolidated financial statements. All previously reported share and per share amounts of our common stock, including shares of common stock underlying stock options and warrants, throughout this Annual Report have been retroactively adjusted to reflect our 1-for-6.41 reverse stock split of our shares of common stock effective on February 18, 2014. Our audited consolidated financial statements have been prepared in U.S. dollars in accordance with U.S. GAAP.

Our historical results for any prior period are not necessarily indicative of results to be expected in any future period, and our results for any interim period are not necessarily indicative of results to be expected for a full fiscal year.

| Statement of Operations Data: | | Year Ended December 31, | | | | | | | | Three Months Ended December 31, | | Year Ended September 30, |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2018 | | 2017 | | 2016 | | 2015 | | 2014 | | 2014 |
| | | (in thousands except share and per share amounts) | | | | | | | | | | |
| Total revenue | $ | 213,312 | $ | 236,707 | $ | 189,482 | $ | 66,227 | $ | 5,600 | $ | 19,099 |
| Cost of product sales | | 42,374 | | 33,714 | | 35,785 | | 7,762 | | 1,782 | | 5,042 |
| Cost of royalty revenue | | 19,542 | | 23,472 | | 19,521 | | 7,885 | | 2,707 | | 6,672 |
| Research and development | | 44,419 | | 32,607 | | 28,289 | | 27,855 | | 3,986 | | 16,816 |
| Selling, general and administrative | | 60,509 | | 71,416 | | 53,329 | | 20,165 | | 3,690 | | 9,326 |
| Income (loss) from Operations | | 36,616 | | 73,990 | | 53,351 | | 2,560 | | (6,565) | | (18,757) |
| (Provision for) benefit from income taxes | | (2,135) | | (21,002) | | 28,026 | | (3) | | 1,059 | | 1,295 |
| Net income (loss) attributable to common stockholders | | 31,903 | | 51,943 | | 81,453 | | 2,571 | | (5,506) | | (19,643) |
| Income (loss) per share attributable to common stockholders- basic | $ | 2.16 | $ | 3.44 | $ | 5.24 | $ | 0.17 | $ | (0.39) | $ | (1.97) |
| Income (loss) per share attributable to common stockholders- diluted | $ | 2.09 | $ | 3.27 | $ | 4.96 | $ | 0.16 | $ | (0.39) | $ | (1.97) |
| Weighted average common shares outstanding- basic | | 14,768,625 | | 15,102,890 | | 15,533,681 | | 15,250,154 | | 14,032,828 | | 9,955,937 |
| Weighted average common shares outstanding- diluted | | 15,278,651 | | 15,908,211 | | 16,434,104 | | 16,253,781 | | 14,032,828 | | 9,955,937 |

| Balance Sheet Data: | | December 31, | | | | | | | | | | September 30, |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2018 | | 2017 | | 2016 | | 2015 | | 2014 | | 2014 |
| | | (in thousands) | | | | | | | | | | |
| Cash and cash equivalents | $ | 78,791 | $ | 114,657 | $ | 52,820 | $ | 79,083 | $ | 34,869 | $ | 22,722 |
| Short-term investments | | — | | — | | — | | — | | — | | 19,999 |
| Accounts receivable | | 66,486 | | 53,821 | | 42,194 | | 26,267 | | 11,956 | | 7,296 |
| Total assets | | 238,603 | | 270,060 | | 214,320 | | 124,605 | | 50,094 | | 53,411 |
| Total current liabilities | | 39,686 | | 47,302 | | 40,965 | | 34,262 | | 22,186 | | 20,315 |
| Retained earnings (Accumulated deficit) | | 58,187 | | 26,284 | | (25,659) | | (107,112) | | (109,683) | | (104,177) |
| Total stockholders' equity | $ | 160,762 | $ | 179,144 | $ | 151,226 | $ | 90,343 | $ | 27,908 | $ | 33,096 |

### Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

*The following discussion and analysis of financial condition and results of operations is provided to enhance the understanding of, and should be read in conjunction with, Part I, Item 1, "Business" and Item 8, "Financial Statements and Supplementary Data." For information on risks and uncertainties related to our business that may make past performance not indicative of future results, or cause actual results to differ materially from any forward-looking statements, see "Special Note Regarding Forward-Looking Statements," and Part I, Item 1A, "Risk Factors."*

**Overview**

Our business model is to develop proprietary innovations to FDA-approved, injectable drugs that offer commercial and/or functional advantages to currently available alternatives. We have historically been, and will continue to primarily be, focused on developing and commercializing injectable drugs, primarily in the critical care and oncology areas, using the United States Food and Drug Administration ("FDA")'s 505(b)(2) New Drug Application ("NDA") regulatory pathway. With our addition of Eagle Biologics, we hope to apply our market strategy to offer "biobetter" formulations, and to develop novel biologic products under the pathway

67

provided by the Biologics Price Competition and Innovation Act. In addition, we plan to continue to market and/or commercialize our products through marketing partners and/or through our growing internal direct sales force.

Our product portfolio now includes four approved products: Argatroban, Ryanodex® (dantrolene sodium) ("Ryanodex"), rapidly infused bendamustine RTD 50ml solution ("Bendeka") and Eagle's bendamustine RTD 500ml solution ("Big Bag" or "Belrapzo"). We have three commercial partners: Chiesi USA, Inc. ("Chiesi") and Sandoz Inc. ("Sandoz"), who, pursuant to separate agreements, market Argatroban and Teva Pharmaceutical Industries Ltd. ("Teva"), which, through its subsidiary Cephalon, Inc. ("Cephalon"), markets Bendeka®. Bendeka was commercially launched by Teva in January 2016. We launched Big Bag in May 2018 with our commercial team immediately after receiving FDA approval.

We currently have multiple product candidates in advanced stages of development and/or under review for approval by the FDA. Additionally, we have other product candidates under a collaborative agreement. Our advanced product candidates are EP-4104 (dantrolene sodium for exertional heat stroke ("EHS")) ("EP-4104"), EP-5101 (PEMFEXY™, a pemetrexed injection ready-to-dilute formulation) ("EP-5101") and EGL-5385-C-1701 (fulvestrant).

**Recent Developments**

On February 8, 2018, we entered into an amendment (the "Amendment") to the stock purchase agreement dated November 10, 2016 (the "Arsia SPA"). Pursuant to the Arsia SPA, we acquired from Arsia Therapeutics, LLC (the "Seller") all of the outstanding capital stock of Arsia Therapeutics, Inc. (now Eagle Biologics). Pursuant to the Amendment, our obligations to make four separate milestone payments pursuant to the Arsia SPA, which could have aggregated to a total of $48 million, were terminated in exchange for a single payment of $15 million to the Seller.

In March 2018, the Company announced that the United States Patent and Trademark Office (USPTO) issued a new patent to the Company's Eagle Biologics division. Patent number 9,925,263 will expire in March 2036 and is the third patent issued in the Eagle Biologics family of patents.

In March 2018, the FDA approved a second manufacturing site for Bendeka.

On April 16, 2018, the Company announced the FDA's acceptance of our ANDA filing for vasopressin injection, 1ml. This product is the generic version of Endo International plc's original Vasostrict® formulation, which is indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines. Vasostrict had approximately $400 million in brand sales in 2017.

On May 15, 2018, the FDA granted final approval for Eagle's ready-to-dilute bendamustine hydrochloride solution in a 500ml admixture for the treatment of patients with chronic lymphocytic leukemia (CLL) and patients with indolent B-cell non-Hodgkin lymphoma (NHL) that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.

On March 24, 2016 the FDA denied the Company's request for seven years of orphan drug exclusivity in the U.S., for Bendeka. In April 2016, the Company filed a lawsuit against the FDA arguing that Bendeka is entitled to orphan drug exclusivity as a matter of law (see Note 12. Legal Proceedings). On July 2, 2014, the FDA granted the Company orphan drug designations for Bendeka for the treatment of CLL and indolent B-cell NHL.  The designations were based on a plausible hypothesis that Bendeka is "clinically superior" to a drug previously approved for the same indications. Generally, an orphan-designated drug is eligible for seven years of marketing exclusivity for the orphan-designated indications upon approval of the drug for those indications. On June 8, 2018, the U.S. District Court for the District of Columbia (the "Court") issued a decision requiring the FDA to grant seven years of orphan drug exclusivity (ODE) in the U.S., for Bendeka, and on July 8, 2018 the FDA granted such ODE through December 2022.  In addition, on July 8, 2018, the FDA submitted a Motion to Alter or Amend the Judgement Pursuant to Rule 59(e), pursuant to which the FDA requested the Court amend its decision to make clear that the decision does not affect any applications referencing TREANDA.  The FDA's motion was denied by the Court on August 1, 2018 on the grounds that FDA was seeking an inappropriate advisory opinion.  On February 20, 2019, the FDA issued a decision in favor of the Company, regarding the scope of exclusivity for Bendeka. Pursuant to the decision, no bendamustine product (including generic versions of TREANDA) may launch in the United States until December 7, 2022 unless it is clinically superior to Bendeka. The Company expects to vigorously pursue the scope of its exclusivity grant.

In June 2018, as part of an ongoing organizational review, the Company began a restructuring initiative to rationalize its product portfolio and focus its physical sites. These measures include the discontinuation of manufacture and distribution of Non-Alcohol Docetaxel Injection and plans to rationalize research and development operations. The Company ceased selling Non-Alcohol Docetaxel Injection by September 30, 2018.

On July 26, 2017, we received a Complete Response Letter from the FDA regarding our 505(b)(2) NDA for Ryanodex for the treatment of exertional heat stroke ("EHS"), in conjunction with external cooling methods. Based on our meeting with the FDA, the Company conducted an additional clinical trial in August 2018 during the Hajj pilgrimage, similar to the study conducted during the Hajj in 2015. On August 30, 2018, we announced the completion of enrollment of our second clinical study to further evaluate the safety and efficacy of Ryanodex. During the 2018 Hajj, overall emergency room visits were dramatically decreased from previous years due to well-implemented crowd management, lower temperatures, lower humidity and other external factors. As a result, the number of EHS patients available for study enrollment was also significantly less than in previous years, and therefore much lower than anticipated. The preliminary assessment of patients enrolled is consistent with the data from the study conducted in 2015, in which patients dosed with RYANODEX plus Standard of Care ("SOC") showed an additive benefit compared to patients receiving SOC only. We intend to complete the analysis of the data and meet with the U.S. Food and Drug Administration to discuss next steps in 2019.

On September 26, 2018, we announced that the Compensation Committee of the Company's Board approved the appointment of David Pernock to the position of Chief Operating Officer effective as of September 1, 2018. In addition to his new role as Chief Operating Officer, Mr. Pernock has continued to serve as the Company's President.

On October 3, 2018, the Company announced that it entered into an agreement with the United States Army Medical Research Institute of Chemical Defense, the nation's leading science and technology laboratory in the area of medical chemical countermeasures research and development, to conduct a study to evaluate the neuroprotective effects of RYANODEX (dantrolene sodium).

On October 30, 2018, we announced that the Company's fulvestrant formulation has not met the primary pharmacokinetic endpoint evaluating the bioequivalence of the Company's formulation compared to Faslodex in its open label, randomized, pharmacokinetic and safety study conducted in 600 healthy female volunteers across multiple U.S. sites.

On October 30, 2018, the Company announced that its Board of Directors has approved a new share repurchase program providing for the repurchase of up to $150 million of the Company's outstanding common stock, consisting of (i) up to $50 million in repurchases pursuant to an accelerated share repurchase agreement (the "ASR") with JPMorgan Chase Bank, N.A. ("JPMorgan"), and (ii) up to $100 million in additional repurchases (the "2018 Share Repurchase Program"). In connection with its approval of the 2018 Share Repurchase Program, the Board terminated the Company's 2016 Share Repurchase Program and 2017 Share Repurchase Program in October 2018. During the fourth quarter of 2018, we repurchased 1,000,134 shares of outstanding common stock for $50 million pursuant to the ASR.

On November 27, 2018, the Company announced positive results of a pre-clinical study conducted to evaluate the effects of Ryanodex in Acute Radiation Syndrome.

**Financial Operations Overview**

*Revenue*

Our revenue consists of product sales, royalty revenue and license and other revenue.

*Product Sales.* Through the year ended December 31, 2018, we have recognized revenues from product sales of Bendeka, Argatroban, Ryanodex, Big Bag, Non-Alcohol Docetaxel Injection, and diclofenac-misoprostol. Sales of Bendeka are sold to our commercial partner Teva. Argatroban is sold directly to our commercial partners Chiesi and Sandoz. Sales to our commercial partners are typically made at little or no profit for resale. Ryanodex, Big Bag, Non-Alcohol Docetaxel Injection, and diclofenac-misoprostol have been sold directly to wholesalers, hospitals and surgery centers through a third party logistics partner. Diclofenac-misoprostol was divested in March 2016; however, we continued to market diclofenac-misoprostol through the first quarter of 2018 until such time that the purchaser was able to launch the product. As part of a restructuring initiative, we ceased selling Non-Alcohol Docetaxel Injection by September 30, 2018.

We typically enter into agreements with group purchasing organizations acting on behalf of their hospital members, in connection with the hospitals' purchases of our direct commercial products. Based on these agreements, most of our hospital customers have contracted prices for products and volume-based rebates on product purchases. These amounts are estimated and recorded at the time of sale. In the case of discounted pricing, we typically pay a chargeback, representing the difference between the price invoiced to the wholesaler and the customer contract price.

*Royalty revenue.* We recognize revenue from royalties based on a percentage of Teva's net sales of Bendeka and Sandoz's and Chiesi's gross profit of Argatroban, both net of discounts, returns and allowances incurred by our commercial partners. Royalty

69

revenue is recognized as earned in accordance with contract terms when it can be reasonably estimated and collectability is reasonably assured.

*License and other revenue.*

Our revenues may either be in the form of the recognition of deferred revenues upon milestone achievement for which cash has already been received or recognition of revenue upon milestone achievement, the payment for which is reasonably assured to be received in the future.

The primary factors that determine our revenues derived from Bendeka are:

- the level of orders submitted by our commercial partner, Teva;

- the rate at which Teva can convert the current market to Bendeka;

- the level of institutional demand for Bendeka;

- unit sales prices charged by our commercial partner, net of any sales reserves; and

- the level of orders submitted by wholesalers, hospitals and surgery centers.

The primary factors that may determine our revenues derived from Argatroban are:

- the level of orders submitted by our commercial partners, Sandoz and Chiesi;

- the level of institutional demand for Argatroban; and

- unit sales prices charged by our commercial partners, net of any sales reserves.

The primary factors that may determine our revenues derived from Ryanodex, Big Bag and our future products are:

- the effectiveness of our sales force;

- the level of orders submitted by wholesalers, hospitals and surgery centers;

- the level of institutional demand for our products; and

- unit sales prices, net of any sales reserves.

### Cost of Revenues

Cost of revenue consists of the costs associated with producing our products for our commercial partners. In particular, our cost of revenue includes production costs of our products paid to a contract manufacturing organization coupled with shipping and customs charges, cost of royalty and the amortization of intangible assets. Cost of revenue may also include the effects of product recalls, if applicable.

### Research and Development

Costs for research and development are charged to expense as incurred and include: employee-related expenses including salaries, benefits, travel and stock-based compensation expense for research and development personnel, expenses incurred under agreements with contract research organizations, contract manufacturing organizations and service providers that assist in conducting clinical and preclinical studies; costs associated with preclinical activities and development activities, costs associated with regulatory operations; and depreciation expense for assets used in research and development activities.

Costs for certain development activities, such as clinical studies, are recognized based on an evaluation of the progress to completion of specific tasks using data such as patient enrollment, clinical site activations, or information provided to the Company by its vendors on their actual costs incurred. Payments for these activities are based on the terms of the individual arrangements, which may differ from the patterns of costs incurred, and are reflected in the consolidated financial statements as prepaid expenses or accrued expenses as deemed appropriate.

### Selling, General and Administrative

Selling, general and administrative costs consist primarily of salaries, benefits and other related costs, including stock-based compensation for executive, finance, sales and operations personnel. Selling, general and administrative expenses also include facility and related costs, professional fees for legal, consulting, tax and accounting services, insurance, selling, marketing, market research, advisory board and key opinion leaders, depreciation and general corporate expenses.

### Income Taxes

We account for income taxes using the liability method in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC"), Topic 740, "Income Taxes" ("ASC 740").  Deferred tax assets and liabilities are

70

determined based on temporary differences between financial reporting and tax bases of assets and liabilities and are measured by applying enacted rates and laws to taxable years in which differences are expected to be recovered or settled. Further, the effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that the rate changes. A valuation allowance is required when it is "more likely than not" that all or a portion of deferred tax assets will not be realized. ASC 740 also prescribes a comprehensive model for how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that the Company has taken or expects to take on a tax return, including a decision whether to file or not file a return in a particular jurisdiction. We recognize any interest and penalties accrued related to unrecognized tax benefits as income tax expense.

**Results of Operations**

*Comparison of Years Ended December 31, 2018 and December 31, 2017*

*Revenues*

| | Year Ended December 31, | | | | Increase / (Decrease) | |
|---|---|---|---|---|---|---|
| | **2018** | | **2017** | | | |
| | (in thousands) | | | | | |
| Product sales | $ | 70,385 | $ | 45,327 | $ | 25,058 |
| Royalty revenue | | 142,927 | | 153,880 | | (10,953) |
| License and other revenue | | — | | 37,500 | | (37,500) |
| Total revenue | $ | 213,312 | $ | 236,707 | $ | (23,395) |

Product sales increased $25.1 million in the year ended December 31, 2018, primarily driven by the FDA approval and launch of Big Bag in May 2018 which generated $22.9 million of 2018 revenues accompanied by increases in product sales of Bendeka of $8.3 million and an increase for Ryanodex of $2.7 million. The increases were partially offset by decreases in product sales of Argatroban of $3.7 million, and in Non-Alcohol Docetaxel Injection of $3.8 million due to its discontinuation in September 2018.

Royalty revenue decreased $11.0 million in the year ended December 31, 2018, as a result of lower royalties on Bendeka.

License and other revenue for the year ended December 31, 2017, comprised of a $25.0 million milestone under the Cephalon agreement related to Teva reaching $500 million in cumulative net sales of Bendeka and a $12.5 million upfront cash payment earned under the SymBio License Agreement.

*Cost of Revenue*

| | Year Ended December 31, | | | | Increase / (Decrease) | |
|---|---|---|---|---|---|---|
| | **2018** | | **2017** | | | |
| | (in thousands) | | | | | |
| Cost of product sales | $ | 42,374 | $ | 33,714 | $ | 8,660 |
| Cost of royalty revenue | | 19,542 | | 23,472 | | (3,930) |
| Total cost of revenue | $ | 61,916 | $ | 57,186 | $ | 4,730 |

Cost of product sales increased $8.7 million in the year ended December 31, 2018, primarily as a result of increased product sales of Big Bag and Bendeka, offset by decreased product sales of Argatroban, Non-Alcohol Docetaxel Injection, and diclofenac-misoprostol.

Cost of royalty revenue decreased $3.9 million in the year ended December 31, 2018 due to the non-recurrence of both the $25.0 million milestone realized under the Cephalon agreement, related to Teva reaching $500 million in cumulative net sales of Bendeka, and the $12.5 million upfront cash payment earned under the SymBio License Agreement during the year ended December 31, 2017.

*Research and Development*

71

| | Year Ended December 31, | | | | | |
| | **2018** | | **2017** | | **Increase** | |
| | (in thousands) | | | | | |
| Research and development | $ | 44,419 | $ | 32,607 | $ | 11,812 |

The increase primarily resulted from an increase in project spending for EGL-5385-C-1701 relating to the clinical study, which completed randomization of 600 subjects in the first quarter of 2018.

### *Selling, General and Administrative*

| | Year Ended December 31, | | | | | |
| | **2018** | | **2017** | | **Decrease** | |
| | (in thousands) | | | | | |
| Selling, general and administrative | $ | 60,509 | $ | 71,416 | $ | (10,907) |

This decrease is principally related to a $14.5 million decrease in sales and marketing spend prior to an expected launch of Ryanodex for exertional heat stroke that did not occur and the non-recurrence of fees related to a co-promotion agreement during 2017 and $0.8 million decrease in professional fees. These decreases were partially offset by a $2.8 million increase in salary and personnel-related expenses, including stock-based compensation expense, as we build out areas to support the needs of the business.

### Restructuring Charge

As part of its ongoing organizational review, the Company engaged in a restructuring initiative to rationalize its product portfolio and focus its physical sites. These measures included the discontinuation of manufacture and distribution of Non-Alcohol Docetaxel Injection in June 2018 and plans to rationalize research and development operations. Charges consist of inventory and related reserves, certain asset impairment charges related to property, plant and equipment, and personnel related costs. The restructuring costs were $7,911 for the year ended December 31, 2018.

### *Asset Impairment Charge*

On June 30, 2018, we implemented a restructuring initiative resulting in the removal of Non-Alcohol Docetaxel Injection from our product portfolio. Sales for the product ceased entirely at the end of third quarter 2018. We have determined the carrying amount of the asset to no longer be recoverable, resulting in a pre-tax, non-cash asset impairment charge of $2.7 million during the year ended December 31, 2018.

### *Change in Fair Value of Contingent Consideration*

Contingent consideration, which primarily consists of potential milestone payments and royalty obligations, is recorded in our consolidated balance sheets at its estimated fair value at the acquisition date, in accordance with the acquisition method of accounting. The fair value of the acquisition-related contingent consideration is remeasured each reporting period, with changes in fair value recorded in our consolidated statements of income. The fair value measurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement as defined in fair value measurement accounting.

Contingent consideration gain of $0.8 million was recorded during the year ended December 31, 2018. This was primarily driven by adjustments to the fair values of the liabilities associated with Non-Alcohol Docetaxel Injection, which was remeasured as a result of the discontinuation of the product and partially offset by accretion for the time value of money.

### *Other Income and Expense*

| | Year Ended December 31, | | | | | |
| | **2018** | | **2017** | | **Increase** | |
| | (in thousands) | | | | | |
| Interest income | $ | 158 | $ | 91 | $ | 67 |
| Interest expense | | (2,736) | | (1,136) | | (1,600) |
| Total other income, net | $ | (2,578) | $ | (1,045) | $ | (1,533) |

72

Interest expense increased for the year ended December 31, 2018 related to the amortization of debt issuance costs and interest incurred on long-term debt.

### Provision for income taxes

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2018** | **2017** |
| | **(in thousands)** | |
| *Provision for income taxes* | $ (2,135) | $ (21,002) |
| Effective tax rate | 6% | 29% |

The provision for income taxes were based on the applicable federal and state tax rates for those periods. The effective tax rate for the year ended December 31, 2018 and 2017 reflects tax benefits related to stock option exercises in the period as well as credits for research and development activity (see Note to Consolidated Financial Statements - Note 8. Income Taxes).

As a result of the Tax Act, the federal statutory tax rate was reduced to 21% from 35% beginning in 2018. In addition, the Company's income tax provision for the year ended December 31, 2017 included a charge for the revaluation of net deferred tax assets due to the Tax Act.

### Net Income

Net income for the year ended December 31, 2018 was $31.9 million as compared to a net income of $51.9 million for the year ended December 31, 2017, as a result of the factors discussed above.

### Comparison of Years Ended December 31, 2017 and December 31, 2016

### Revenues

| | Year Ended December 31, | | Increase / (Decrease) |
| --- | --- | --- | --- |
| | **2017** | **2016** | |
| | **(in thousands)** | | |
| Product sales | $ 45,327 | $ 40,646 | $ 4,681 |
| Royalty revenue | 153,880 | 99,040 | 54,840 |
| License and other revenue | 37,500 | 49,796 | (12,296) |
| Total revenue | $ 236,707 | $ 189,482 | $ 47,225 |

Total revenue increased $47.2 million in the year ended December 31, 2017 to $236.7 million as compared to $189.5 million in the year ended December 31, 2016.

Product sales increased approximately $4.7 million in the year ended December 31, 2017, primarily driven by increases in product sales of Ryanodex of $5.9 million and Non-Alcohol Docetaxel Injection of $1.2 million. These increases were partially offset by decreases of $1.2 million in net product sales of Bendeka and $0.4 million in net product sales of Argatroban. In addition, there was a $0.8 million decrease in net product sales of diclofenac-misoprostol as the Company sold certain intellectual property related to this product in March 2016.

Royalty revenue increased $54.8 million in the year ended December 31, 2017, primarily as a result of increased Bendeka market share on Teva sales amplified by an increase in the Bendeka royalty rate from 20% to 25% upon receipt of the J-code, partially tempered by a decrease in Argatroban royalties.

License and other revenue decreased for the year ended December 31, 2017 as compared to the year ended December 31, 2016. For the year ended December 31, 2017, we realized a $25.0 million milestone under the Cephalon agreement related to Teva reaching $500 million in cumulative net sales of Bendeka and a $12.5 million upfront cash payment earned under the SymBio License Agreement. License and other revenue for the year ended December 31, 2016 was comprised of a $40.0 million milestone related to the receipt of the J-code for Bendeka, $6.0 million recognized from an asset sale in fiscal 2010 (which had previously been deferred), $2.0 million as the Company met certain one-time performance obligations and $1.8 million related to the amendment of the license and supply agreement with Teva, expanding the territories for commercial sale of Bendeka.

73

*Cost of Revenue*

| | Year Ended December 31, | | | | (Decrease) / Increase | |
|---|---|---|---|---|---|---|
| | 2017 | | 2016 | | | |
| | (in thousands) | | | | | |
| Cost of product sales | $ | 33,714 | $ | 35,785 | $ | (2,071) |
| Cost of royalty revenue | | 23,472 | | 19,521 | | 3,951 |
| Total cost of revenue | $ | 57,186 | $ | 55,306 | $ | 1,880 |

Cost of revenue increased $1.9 million in the year ended December 31, 2017 to $57.2 million as compared to $55.3 million in the year ended December 31, 2016.

Cost of product sales decreased $2.1 million in the year ended December 31, 2017, primarily as a result of decreased product sales of Bendeka, Argatroban, and diclofenac-misoprostol, offset by increases in product sales of Ryanodex and Non-Alcohol Docetaxel Injection.

Cost of royalty revenue increased $4.0 million in the year ended December 31, 2017 as a result of an increase in the cost of product royalty for Bendeka, offset by a decrease in the cost of product royalty for Argatroban.

*Research and Development*

| | Year Ended December 31, | | | | Increase | |
|---|---|---|---|---|---|---|
| | 2017 | | 2016 | | | |
| | (in thousands) | | | | | |
| Research and development | $ | 32,607 | $ | 28,289 | $ | 4,318 |

Research and development expenses increased approximately $4.3 million in the year ended December 31, 2017 to $32.6 million as compared to $28.3 million in the year ended December 31, 2016. The increase resulted from an increase in project spending for EGL-5385-C-170, EP-4104, EGL-4104-C-1702, certain other projects and an increase in salary and other personnel-related expenses due to increased headcount. These increases were partially offset by a decrease in project spending for EP-6101 and EP-5101. Additionally, during the year ended December 31, 2016 we received certain cost reimbursements from a commercial partner for $1.6 million and a $2.4 million credit from a supplier related to the resolution of a dispute.

*Selling, General and Administrative*

| | Year Ended December 31, | | | | Increase | |
|---|---|---|---|---|---|---|
| | 2017 | | 2016 | | | |
| | (in thousands) | | | | | |
| Selling, general and administrative | $ | 71,416 | $ | 53,329 | $ | 18,087 |

Selling, general and administrative expenses increased approximately $18.1 million in the year ended December 31, 2017 to $71.4 million as compared to $53.3 million in the year ended December 31, 2016.

This increase is principally related to a $10.2 million increase in salary and personnel related expenses, including stock-based compensation, as we build out areas to support the growing needs of the business and sales force, $3.0 million increase in sales and marketing spend in preparation for the launch of Ryanodex for exertional heat stroke, $1.7 million increase in professional fees mainly for legal matters, $1.4 million increase in amortization expense related to the Biologics developed technology intangible asset, $0.8 million increase in travel related expenses, and a $1.0 million increase in miscellaneous expenses.

*Gain on sale of asset*

On March 29, 2016, we entered into the Diclofenac Asset Purchase Agreement pursuant to which we sold certain intellectual property related to diclofenac-misoprostol in the United States. In consideration of the assets and rights sold under the Diclofenac Asset Purchase Agreement, we received a one-time payment at closing of $1.75 million, which was included in operating expenses.

*Asset Impairment Charge*

During the year ended December 31, 2017, the Company experienced a decline in customer contracts and saw a drop in market pricing for Non-Alcohol Docetaxel Injection. Accordingly, the Company estimated the fair value of our Non-Alcohol Docetaxel Injection product and determined the carrying amount of the intangible asset was no longer fully recoverable, resulting in a pre-tax, non-cash asset impairment charge of $7.2 million.

*Change in Fair Value of Contingent Consideration*

Contingent consideration, which primarily consists of potential milestone payments and royalty obligations, is recorded in the Company's consolidated balance sheets at its estimated fair value at the acquisition date, in accordance with the acquisition method of accounting. The fair value of the acquisition-related contingent consideration is remeasured each reporting period, with changes in fair value recorded in the Company's consolidated statements of income. The fair value measurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement as defined in fair value measurement accounting.

A change in fair value of contingent consideration was recorded for the year ended December 31, 2017 resulting in income of $7.4 million, net. This includes adjustments to the fair values of the liabilities associated with Non-Alcohol Docetaxel Injection, which was remeasured as a result of changes in forecasted revenues for the product. Also included in the amount was a change in the fair value of contingent consideration liability from the acquisition of Eagle Biologics. In February 2018, the Company amended the Eagle Biologics Stock Purchase Agreement and has paid $15 million for all remaining obligations for milestone payments under that agreement.

*Legal Settlement*

On February 2, 2016, The Medicines Company ("MDCO") filed a complaint in the U.S. District Court for the District of New Jersey against the Company, SciDose LLC and TherDose Pharma Pvt. Ltd. (collectively the "Defendants") relating to the Defendants' work on a novel ready-to-use bivalirudin injection product ("EP-6101"). MDCO amended that complaint in April of 2016. The complaint cites the May 7, 2008 License and Development Agreement (the "LDA") between the Defendants and MDCO, which was terminated by the Company on September 17, 2013. In October 2017, the Defendants moved to dismiss the action for lack of subject matter jurisdiction and to stay discovery. In December 2017, while those motions were pending, the parties entered into a settlement agreement pursuant to which Defendants agreed to pay $1.7 million and assign to MDCO all intellectual property rights relating to EP-6101. As a result of the settlement, the parties entered into a stipulation dismissing all claims with prejudice.

*Other Income and Expense*

| | Year Ended December 31, | | | | | |
| | 2017 | | 2016 | | Increase | |
| | (in thousands) | | | | | |
| Interest income | $ | 91 | $ | 84 | $ | 7 |
| Interest expense | | (1,136) | | (8) | | (1,128) |
| Total other income, net | $ | (1,045) | $ | 76 | $ | (1,121) |

Interest expense increased for the year ended December 31, 2017 related to the amortization of debt issuance costs and interest incurred on long-term debt.

*(Provision for) benefit from income taxes*

| | Year Ended December 31, | | | |
| | 2017 | | 2016 | |
| | (in thousands) | | | |
| *(Provision for) benefit from income taxes* | $ | (21,002) | $ | 28,026 |
| Effective tax rate | | 29% | | (52)% |

We recorded a $21.0 million provision for income taxes for the year ended December 31, 2017 as compared to a $28.0 million benefit for income taxes for the year ended December 31, 2016.

The (provision for) benefit from income taxes were based on the applicable federal and state tax rates for those periods. For periods with a loss before benefit for income taxes, favorable tax items result in an increase in the effective tax rate, while unfavorable

75

tax items result in a decrease in the effective tax rate. For periods with income before provision for income taxes, favorable tax items result in a decrease in the effective tax rate, while, unfavorable tax items result in an increase in the effective tax rate.

The tax provision for the year ended December 31, 2017 reflects an effective tax rate of 29%. The difference between the notional U.S. statutory federal income tax rate and our effective tax rate includes favorable rate items such as exercise of stock options in the period and credits from research and development activity and unfavorable items such as state tax and a valuation adjustment to our net deferred tax asset as of December 31, 2017 to reflect the new U.S. statutory federal income tax rate from tax reform.

The tax benefit for the year ended December 31, 2016 is due to the release of a previously carried tax valuation allowance on our net deferred tax assets including net operating loss carryforwards and the tax benefit related to the exercises of stock options during 2016. This was partially offset by the tax on 2016 earnings. Our decision to remove the valuation allowance on the Company's net deferred tax assets considered our significant income in 2016 which translated to our becoming a tax payer in 2016 and our outlook on prospective earnings and taxable income driven by Bendeka royalty and milestone revenues.

*Net Income*

Net income for the year ended December 31, 2017 was $51.9 million as compared to a net income of $81.5 million for the year ended December 31, 2016, as a result of the factors discussed above.

**Liquidity and Capital Resources**

Our primary uses of cash are to fund working capital requirements, product development costs, operating expenses as well as strategic business and product acquisitions and repurchases of our common stock. Cash and cash equivalents were $78.8 million, and $114.7 million as of December 31, 2018 and December 31, 2017, respectively.

For the year ended December 31, 2018, we realized net income of $31.9 million. As of December 31, 2018, we had a working capital surplus of $124.2 million. For the year ended December 31, 2017, we realized net income of $51.9 million.

We believe that future cash flows from operations will be sufficient to fund our currently anticipated working capital requirements for at least the next twelve months.

We expect to use future loans, if any, under the Credit Facility, for general corporate purposes and any strategic acquisitions.

*Operating Activities:*

Net cash provided by operating activities for the year ended December 31, 2018 was $52.4 million. Net income for the same period was $31.9 million offset by non-cash adjustments of approximately $28.4 million from deferred income taxes, depreciation, amortization of intangible assets, stock-based compensation expense, amortization of debt issuance costs, change in fair value of contingent consideration, asset impairment charge and fair value adjustment related to restructuring. Net changes in working capital decreased cash provided from operating activities by $7.9 million, due to an increase in accounts receivable of $12.7 million, an increase in inventory of $5.6 million, an increase in accrued expenses and other current liabilities of $8.1 million, an increase in other assets of $0.6 million partially offset by a decrease in prepaid expenses and other current assets of $4.8 million, and a decrease in accounts payable of $2.1 million. The total amount of accounts receivable at December 31, 2018 was approximately $66.5 million, which included approximately $25.3 million from product sales, $35.7 million from royalty income, and $5.5 million related to cost reimbursements. Receivables from our product sales have payment terms ranging from 30 to 75 days with select extended terms to wholesalers on initial purchases of product launch quantities. Our receivables from royalty revenue are due 45-days from the end of the quarter.

Net cash provided by operating activities for the year ended December 31, 2017 was $58.9 million. Net income for the same period was $51.9 million offset by non-cash adjustments of approximately $36.5 million principally from deferred income taxes, depreciation, amortization of intangible assets, stock-based compensation expense, asset impairment charge, amortization of debt issuance costs, and change in fair value of contingent consideration. Net changes in working capital decreased cash provided from operating activities by $29.6 million, due to an increase in accounts receivable of $11.6 million, an increase in inventory of $2.4 million partially offset by a decrease in prepaid expenses and other current assets of $2.0 million, a decrease in accounts payable of $8.5 million, a decrease in accrued expenses and other current liabilities of $9.1 million. The total amount of accounts receivable at December 31, 2017 was approximately $53.8 million, which included approximately $13.3 million from product sales, $36.4 million from royalty income, and $4.1 million related to cost reimbursements, all with payment terms of 45 days. Royalty income is receivable with terms of 45 days and starts at the end of the quarter to which it relates, the immediately preceding quarter.

Net cash provided by operating activities for the year ended December 31, 2016 was $53.2 million. Net income for the same period was $81.5 million reduced by non-cash adjustments of approximately $19.6 million principally from deferred income taxes, depreciation, amortization of intangible assets and stock-based compensation expense. Net changes in working capital decreased

76

cash provided from operating activities by $8.6 million, due to an increase in accounts receivable of $15.9 million, an increase in prepaid expenses and other current assets of $9.4 million partially offset by an increase in accounts payable of $10.7 million, a decrease in inventories of $12.3 million and a decrease in deferred revenue of $6.0 million. The total amount of accounts receivable at December 31, 2016 was approximately $42.2 million, which included approximately $10.1 million from product sales and approximately $32.0 million from royalty income, all with payment terms of 45 days. Royalty income is receivable with terms of 45 days and starts at the end of the quarter to which it relates, the immediately preceding quarter.

*Investing Activities:*

During the years ended December 31, 2018, 2017 and 2016, we invested $0.1 million, $4.4 million, and $1.6 million, respectively, for the purchase of property and equipment.

During the year ended December 31, 2017, we invested $0.8 million related to the purchase of the Ryanodex intangible.

During the year ended December 31, 2016, we purchased Non-Alcohol Docetaxel Injection for $4.9 million, the Ryanodex intangible for $14.3 million and Eagle Biologics for $26.9 million of net cash acquired. We divested diclofenac-misoprostol for proceeds of $1.8 million. We invested $62.0 million in U.S. Treasury securities and redeemed $62.0 million of short-term investments.

*Financing Activities:*

Net cash used in financing activities for the year ended December 31, 2018 was $88.1 million, primarily resulting from a $15 million payment of contingent consideration in connection with the Arsia Amendment, $73.1 million in cash settlements on repurchases of common stock, $3.7 million payment of debt financing costs and a $4.9 million payment of employee withholding tax for net option exercises. This was offset by the issuance of common stock for stock option exercises of $8.6 million.

Net cash provided by financing activities for the year ended December 31, 2017 was $8.1 million, primarily resulting from $50.0 million in proceeds from debt issuance and the issuance of common stock for stock option exercises of $4.3 million. This was offset by $43.8 million in cash settlements on repurchases of common stock, a $1.2 million payment of debt financing costs, and a $1.3 million payment of debt principal.

Net cash used in financing activities for the year ended December 31, 2016 was $33.7 million primarily resulting from $37.0 million in cash settlements on repurchases of common stock and a $0.3 million payment of contingent consideration partially offset by the issuance of common stock for stock option exercises of $3.6 million.

**Contractual Obligations**

Our future material contractual obligations include the following (in thousands):

| Obligation | Total | 2019 | 2020 | 2021 | 2022 | 2023 | Beyond |
|---|---|---|---|---|---|---|---|
| Operating leases (1) | $ 3,661 | $ 1,146 | $ 864 | $ 583 | $ 583 | $ 485 | $ — |
| Credit facility | 45,000 | 6,250 | 38,750 | — | — | — | — |
| Purchase obligations (2) | 29,333 | 29,333 | — | — | — | — | — |
| Total obligations | $ 77,994 | $ 36,729 | $ 39,614 | $ 583 | $ 583 | $ 485 | $ — |

(1) The Company leases its office and lab space under lease agreements that expire on June 30, 2020 and October 31, 2023. Rental expense was $571, $664, and $634, for the year ended December 31, 2018, 2017, and 2016, respectively. The remaining future lease payments under the operating leases, exclusive of any renewal option periods, are $3,661 as of December 31, 2018, payable monthly through June 30, 2020 and October 31, 2023.

(2) As of December 31, 2018, the Company has purchase obligations in the amount of $29,333 which represents the contractual commitments under contract manufacturing and supply agreements with suppliers. The obligation under the supply agreement is primarily for finished product, inventory, and research and development.

**Recent Accounting Pronouncements**

*Recent Accounting Pronouncements - Not Yet Adopted*

In February 2016, the Financial Accounting Standards Board (FASB) issued ASU No. 2016-02, *"Leases (Topic 842)"* (ASU 2016-02) to increase transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. Under the new guidance, lessees are required to

recognize a lease liability, which represents the discounted obligation to make future minimum lease payments, and a corresponding right-of-use asset on the balance sheet for most leases. In July 2018, the FASB issued ASU No. 2018-10, *"Codification Improvements to Topic 842, Leases"* (ASU 2018-10), which provides narrow amendments to clarify how to apply certain aspects of the new lease standard, and ASU No. 2018-11, *"Leases (Topic 842) - Targeted Improvements"* (ASU 2018-11), which addresses implementation issues related to the new lease standard. This guidance is effective for the Company as of January 1, 2019 and the Company will adopt this guidance using the modified retrospective approach and will recognize a cumulative-effect adjustment to the opening balance of Retained earnings in that period. This guidance includes a number of optional practical expedients that the Company may elect to apply, including an expedient that permits lease agreements that are twelve months or less to be excluded from the balance sheet. The Company is finalizing the impact that this new guidance will have on its consolidated financial statements, including its disclosures. The primary impact upon adoption will be the recognition, on a discounted basis, of the Company's minimum commitments under noncancelable operating leases as right of use assets and obligations on the consolidated balance sheets. This will not result in a significant increase in assets and liabilities on the Company's consolidated balance sheets. In preparation for the adoption of this guidance, the Company is finalizing the process of identifying and validating the Company's lease information and evaluating the impact that this new guidance will have on its processes and controls.

In January 2017, the FASB issued guidance to simplify the measurement of goodwill. The guidance eliminates Step 2 from the goodwill impairment test. Instead, under the amendments in this guidance, an entity should perform its annual or interim goodwill impairment test by comparing the fair value of a reporting unit with it's carrying amount. An entity should recognize an impairment charge for the amount by which the carrying amount exceeds the reporting unit's fair value; however, the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit. Additionally, an entity should consider income tax effects from any tax deductible goodwill on the carrying amount of the reporting unit when measuring the goodwill impairment loss. The guidance also eliminates the requirements for any reporting unit with a zero or negative carrying amount to perform a qualitative assessment and if it fails that qualitative test, to perform Step 2 of the goodwill impairment test. An entity is required to disclose the amount of goodwill allocated to each reporting unit with a zero or negative carrying amount of net assets. The guidance is effective for public business entities for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years, and early adoption is permitted for interim or annual goodwill impairment tests performed for testing dates after January 1, 2017. The guidance must be adopted on a prospective basis. We do not expect this guidance to have an impact on our consolidated financial statements.

*Recent Adopted Accounting Pronouncements*

The Company adopted ASC 606, Revenue from Contracts with Customers with a date of initial application of January 1, 2018. As a result, the Company has updated its accounting policy for revenue recognition to reflect the new standard. The adoption of ASC 606 represents a change in accounting principle that will more closely align revenue recognition with the delivery of the Company's services and will provide financial statement readers with enhanced disclosures. The Company applied Topic 606 using the modified retrospective method. The Company has elected to apply this initial application of the standard only to contracts that are not completed at the date of initial application. For contracts which were modified before the adoption date, the Company has not restated the contract for those modifications. Instead, the Company reflected the aggregate effect of all modifications when identifying the satisfied and unsatisfied performance obligations, determining the transaction price and allocating the transaction price, if necessary. The cumulative effect of initially applying the new revenue standard would be applied as an adjustment to the opening balance of retained earnings. The Company has analyzed this effect and found the adoption of the new guidance did not have a material impact on our consolidated financial statements and our recognition is consistent with our historical accounting policies.

In January 2016, the FASB issued ASU 2016-01, which revises the guidance in ASC 825-10, Recognition and Measurement of Financial Assets and Financial Liabilities, and provides guidance for the recognition, measurement, presentation, and disclosure of financial assets and liabilities. The guidance is effective for reporting periods (interim and annual) beginning after December 15, 2017, for public companies. The adoption of this guidance did not have a significant impact on our consolidated financial statements.

In January 2017, the FASB issued guidance clarifying the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions or disposals of assets or businesses. The guidance provides a screen to determine when an integrated set of assets and activities is not a business, provides a framework to assist entities in evaluating whether both an input and substantive process are present, and narrows the definition of the term output. The guidance is effective for public business entities for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years, and early adoption is permitted. The guidance must be adopted on a prospective basis. We will consider the guidance for future transactions.

**Off-Balance Sheet Arrangements**

We do not have any off-balance sheet arrangements that have, or are reasonably likely to have, a current or future material effect on our financial condition, changes in financial condition, revenue or expenses, results of operations, liquidity, capital expenditures or capital resources.

**Impact of Inflation**

While it is difficult to accurately measure the impact of inflation due to the imprecise nature of the estimates required, we believe the effects of inflation, if any, on our results of operations and financial condition have been immaterial.

**Critical Accounting Policies and Estimates**

Our management's discussion and analysis of our financial condition and results of operations is based on our financial statements, which have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). The preparation of these financial statements requires us to make estimates and judgments that affect our reported assets and liabilities, revenues and expenses, and other financial information. Actual results may differ significantly from these estimates under different assumptions and conditions. In addition, our reported financial condition and results of operations could vary due to a change in the application of a particular accounting standard.

We regard an accounting estimate or assumption underlying our financial statements as a "critical accounting estimate" where:

- the nature of the estimate or assumption is material due to the level of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change; and

- the impact of the estimates and assumptions on financial condition or operating performance is material.

Our significant accounting policies are more fully described in Note 2 to our financial statements included in this Annual Report on Form 10-K. Not all of these significant accounting policies, however, require that we make estimates and assumptions that we believe are "critical accounting estimates." We have discussed our accounting policies with the audit committee of our board of directors, and we believe that our estimates relating to revenue recognition, accounting for fair value of warrant liabilities and share-based compensation described below are "critical accounting estimates."

*Revenue Recognition*

Revenue is recognized when a customer obtains control of promised goods or services, in an amount that reflects the consideration which the entity expects to receive in exchange for those goods or services. To determine revenue recognition for arrangements that an entity determines are within the scope of ASC 606, the Company performs the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. The Company only applies the five-step model to contracts when it is probable that the entity will collect the consideration it is entitled to in exchange for the goods or services it transfers to the customer. At contract inception, once the contract is determined to be within the scope of ASC 606, the Company assesses the goods or services promised within each contract and determines those that are performance obligations, and assesses whether each promised good or service is distinct. The Company then recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when (or as) the performance obligation is satisfied. Sales, value add, and other taxes collected on behalf of third parties are excluded from revenue.

*Product revenue* - The Company recognizes net revenue on sales to its commercial partners and to end users. In each instance, revenue is generally recognized when the customer obtains control of the Company's product, which occurs at a point in time, and may be upon shipment or upon delivery based on the contractual shipping terms of a contract.

Revenue on sales to commercial partners relates to Argatroban and Bendeka. Sales to our commercial partners are presented gross because the Company is primarily responsible for fulfilling the promise to provide the product, is responsible to ensure that the product is produced in accordance with the related supply agreement and bears risk of loss while the inventory is in-transit to the commercial partner.

Revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring products or services to a customer. To the extent the transaction price includes variable consideration, the Company estimates the amount of variable consideration that should be included in the transaction price utilizing the expected value method to which the Company expects to be entitled. As such, revenue on sales to end users for Big Bag, Non-Alcohol Docetaxel Injection, and Ryanodex are recorded net of chargebacks, rebates, returns, prompt pay discounts, wholesaler fees and other deductions. Our products are

79

contracted with a limited number of oncology distributors and hospital buying groups with narrow differences in ultimate realized contract prices used to estimate our chargeback and rebate reserves. The Company has a product returns policy on some of its products that allows the customer to return pharmaceutical products within a specified period of time both prior to and subsequent to the product's expiration date. The Company's estimate of the provision for returns is analyzed quarterly and is based upon many factors, including historical experience of actual returns and analysis of the level of inventory in the distribution channel, if any. The Company has terms on sales of Ryanodex by which the Company does not accept returns. Variable consideration is included in the transaction price if, in the Company's judgment, it is probable that a significant future reversal of cumulative revenue under the contract will not occur. Estimates of variable consideration are made using the expected value method and determination of whether to include estimated amounts in the transaction price are based largely on an assessment of the Company's anticipated performance and all information (historical, current and forecasted) that is reasonably available. The Company believes that the estimates it has established are reasonable based upon current facts and circumstances. Applying different judgments to the same facts and circumstances could result in the estimated amounts to vary.

*Royalty Revenue* — The Company recognizes revenue from license arrangements with its commercial partners' net sales of products. In accordance with ASC 606-10-55-65, royalties are recognized when the subsequent sale of the commercial partner's products occurs. The Company's commercial partners are obligated to report their net product sales and the resulting royalty due to the Company within 25 days for Bendeka and 60 days for Argatroban from the end of each quarter. Based on historical product sales, royalty receipts and other relevant information, the Company accrues royalty revenue each quarter and subsequently determines a true-up when it receives royalty reports from its commercial partners. Historically, these true-up adjustments have been immaterial.

*License and other revenue* — The Company analyzes each element of its licensing agreements to determine the appropriate revenue recognition. The terms of the license agreement may include payment to us of non-refundable up-front license fees, milestone payments if specified objectives are achieved, and/or royalties on product sales. The Company recognizes revenue from upfront payments at a point in time, typically upon fulfilling the delivery of the associated intellectual property to the customer.

If the contract contains a single performance obligation, the entire transaction price is allocated to the single performance obligation. Contracts that contain multiple performance obligations require an allocation of the transaction price based on the estimated relative standalone selling prices of the promised products or services underlying each performance obligation. The Company determines standalone selling prices based on the price at which the performance obligation is sold separately. If the standalone selling price is not observable through past transactions, the Company estimates the standalone selling price taking into account available information such as market conditions and internally approved pricing guidelines related to the performance obligations.

The Company recognizes sales-based milestone payments as revenue upon the achievement of the cumulative sales amount specified in the contract in accordance with ASC 606-10-55-65. For those milestone payments which are contingent on the occurrence of particular future events, the Company determined that these need to be considered for inclusion in the calculation of total consideration from the contract as a component of variable consideration using the most-likely amount method. As such, the Company assesses each milestone to determine the probability and substance behind achieving each milestone. Given the inherent uncertainty of the occurrence of these future events, the Company will not recognize revenue from the milestone until there is not a high probability of a reversal of revenue, which typically occurs near or upon achievement of the event.

When determining the transaction price of a contract, an adjustment is made if payment from a customer occurs either significantly before or significantly after performance, resulting in a significant financing component. Applying the practical expedient in paragraph 606-10-32-18, the Company does not assess whether a significant financing component exists if the period between when the Company performs its obligations under the contract and when the customer pays is one year or less. None of the Company's contracts contained a significant financing component as of December 31, 2018.

*Collaborative licensing and development revenue* — The Company recognizes revenue from reimbursements received in connection with feasibility studies and development work for third parties when its contractual services are performed, provided collectability is reasonably assured. Its principal costs under these agreements include its personnel conducting research and development, its allocated overhead, as well as the research and development performed by outside contractors or consultants.

Upon termination of a collaboration agreement, any remaining non-refundable license fees received by the Company, which had been deferred, are generally recognized in full. All such recognized revenues are included in collaborative licensing and development revenue in its statements of income. The Company recognizes revenue from milestone payments received under collaboration agreements when earned, provided that the milestone event is substantive, its achievability was not reasonably assured at the inception of the agreement, the Company has no further performance obligations relating to the event, and collectability is reasonably assured. If these criteria are not met, the Company recognizes milestone payments ratably over the remaining period of its performance obligations under the collaboration agreement.

80

*Stock-Based Compensation*

The Company accounts for stock-based compensation using the fair value provisions of ASC 718, Compensation - Stock Compensation that requires the recognition of compensation expense, using a fair-value based method, for costs related to all stock-based payments including stock options and restricted stock. This topic requires companies to estimate the fair value of the stock-based awards on the date of grant for options issued to employees and directors and record expense over the employees' service periods, which are generally the vesting period of the equity awards.

The Company accounts for stock-based compensation by measuring and recognizing compensation expense for all stock-based payments made to employees and directors based on estimated grant date fair values. The straight-line method is used to allocate compensation cost to reporting periods over each optionee's requisite service period, which is generally the vesting period. The fair value of the Company's stock-based awards to employees and directors is estimated using the Black-Scholes option valuation model, or Black-Scholes model. The Black-Scholes model requires the input of subjective assumptions, including the expected stock price volatility, the calculation of expected term, forfeitures and the fair value of the underlying common stock on the date of grant, among other inputs. The risk-free interest rate is determined with the implied yield currently available for zero-coupon U.S. government issues with a remaining term approximating the expected life of the options.

*Income Taxes*

The Company accounts for income taxes using the liability method in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC"), Topic 740 - Income Taxes ("ASC 740"). Deferred tax assets and liabilities are determined based on temporary differences between financial reporting and tax bases of assets and liabilities and are measured by applying enacted rates and laws to taxable years in which differences are expected to be recovered or settled. Further, the effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that the rate changes. A valuation allowance is required when it is "more likely than not" that all or a portion of deferred tax assets will not be realized. ASC 740 also prescribes a comprehensive model for how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that the company has taken or expects to take on a tax return, including a decision whether to file or not file a return in a particular jurisdiction. We recognize any interest and penalties accrued related to unrecognized tax benefits as income tax expense.

*Other Intangible Assets, Net*

The Company capitalizes and includes in intangible assets the costs of acquired product licenses and developed technology purchased individually or identified in a business combination. Intangible assets are recorded at fair value at the time of their acquisition and stated net of accumulated amortization. The Company amortizes its definite-lived intangible assets using either the straight-line or accelerated method, based on the useful life of the asset over which it is expected to be consumed utilizing expected undiscounted future cash flows. The Company will evaluate the potential impairment of intangible assets if events or changes in circumstances indicate that the carrying amount of the assets may not be fully recoverable or that the useful lives of these assets are no longer appropriate. Events giving rise to impairment are an inherent risk in our industry and many factors cannot be predicted. Factors that we consider in deciding when to perform an impairment review include significant changes in our forecasted projections for the asset or asset group for reasons including, but not limited to, significant under-performance of a product in relation to expectations, significant changes or planned changes in our use of the assets, significant negative industry or economic trends, and new or competing products that enter the marketplace. The impairment test is based on a comparison of the undiscounted cash flows expected to be generated from the use of the asset group and its eventual disposition to the carrying value of the asset group. If impairment is indicated, the asset is written down by the amount by which the carrying value of the asset exceeds the related fair value of the asset with the related impairment charge recognized within the statements of income.

With respect to determining an asset's fair value and useful life, because this process involves management making certain estimates and these estimates form the basis of the determination of whether or not an impairment charge should be recorded, these estimates are considered to be critical accounting estimates.

*Goodwill*

Goodwill represents the excess of purchase price over the fair value of net assets acquired in the Eagle Biologics acquisition. Goodwill is not amortized, but is evaluated for impairment on an annual basis, in the fourth quarter, or more frequently if events or changes in circumstances indicate that the reporting unit's goodwill is less than it's carrying amount. The Company did not identify any impairment to goodwill during the periods presented.

81

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

Market risk is the risk of change in fair value of a financial instrument due to changes in interest rates, equity prices, creditworthiness, financing, exchange rates or other factors. We are exposed to market risk related to changes in interest rates. As of December 31, 2018, we had cash and cash equivalents of $78.8 million held primarily in money market mutual funds. Our primary exposure to market risk is interest rate sensitivity, which is affected by changes in the general level of U.S. interest rates, however, due to the short-term duration of our money market mutual funds and the low risk profile of our investments, an immediate one percent change in interest rates would not have a material effect on the fair market value of our portfolio.

Our exposure to interest rate risk also relates to our variable-rate indebtedness associated with our Amended Credit Agreement. As of December 31, 2018 and 2017, the aggregate principal amount of such variable-rate indebtedness was $44.4 million and $47.8 million, respectively. Borrowings under the Amended Credit Agreement may from time to time bear interest at variable rates, which rates are further described in Note 6. Debt in the Consolidated Financial Statements included in Part IV, Item 15 of this report. As of December 31, 2018 and 2017, a hypothetical 1% increase in the applicable rate would not have a material effect on the incremental annual interest expense related to our variable-rate debt borrowings.

**Item 8. Financial Statements and Supplementary Data**

Our Financial Statements and Supplementary Data and Report of Independent Registered Public Accounting Firm appear beginning on page F-1 attached to this Annual Report on Form 10-K.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Not Applicable.

**Item 9A. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

As of December 31, 2018, an evaluation was conducted under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and Rule 15d-15(e) of the Exchange Act). Based on this evaluation, such officers have concluded that our disclosure controls and procedures were effective as of December 31, 2018. Management has concluded that our consolidated financial statements included in this Annual Report on Form 10-K fairly present, in all material respects, our financial condition, results of operations and cash flows for the periods presented therein.

83

**Management's Annual Report on Internal Control Over Financial Reporting**

The management of Eagle Pharmaceuticals, Inc. ("Eagle") has prepared, and is responsible for, Eagle's financial statements and related footnotes. These financial statements have been prepared in conformity with U.S. generally accepted accounting principles. Eagle's management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Securities Exchange Act of 1934 as a process designed by, or under the supervision of the Company's principal executive and principal financial officers and effected by the Company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of Eagle's assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of Eagle are being made only in accordance with authorizations of management and directors of Eagle; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of Eagle's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. Eagle's management conducted an assessment of the Company's internal control over financial reporting as of December 31, 2018 based upon the criteria established in "Internal Control - Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework). Based on this assessment, our management has concluded that, as of December 31, 2018, our internal control over financial reporting was effective.

BDO USA, LLP, the independent registered public accounting firm that audits our consolidated financial statements, has issued its attestation report on the Company's internal control over financial reporting as of December 31, 2018. This attestation report appears below.

/s/ Scott Tarriff

Chief Executive Officer and Director

(Principal Executive Officer)


/s/ Pete A. Meyers

Chief Financial Officer

(Principal Accounting and Financial Officer)


**Changes in Internal Control Over Financial Reporting**

There have been no changes in the Company's internal control over financial reporting during the quarter ended December 31, 2018 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

84

**Report of Independent Registered Public Accounting Firm**

Shareholders and Board of Directors
Eagle Pharmaceuticals, Inc.
Woodbridge, NJ

**Opinion on Internal Control over Financial Reporting**

We have audited Eagle Pharmaceuticals, Inc. internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2018, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of Eagle Pharmaceuticals, Inc. as of December 31, 2018 and 2017, the related consolidated statements of income, stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2018, and the related notes, and our report dated February 28, 2019 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying "Item 9A, Management's Report on Internal Control over Financial Reporting". Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of internal control over financial reporting in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ BDO USA, LLP

Woodbridge, NJ

February 28, 2019

85

**Item 9B. Other information.**

None.

<div align="center">

**PART III**

</div>

**Item 10. Directors, Executive Officers and Corporate Governance**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 11. Executive Compensation**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 13.    Certain Relationships and Related Transactions and Director Independence**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 14. Principal Accountant Fees and Services**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

<div align="center">

86

</div>

PART IV

**Item 15. Exhibits and Financial Statement Schedules**

**(a) Documents filed as part of this report.**

The following documents are filed as part of this report:

### 1. Financial Statements

See Index to Financial Statements at Item 8 herein.

### 2. Financial Statement Schedules

Financial statement schedules have been omitted in this report because they are not applicable, not required under the instructions, or the information requested is set forth in the financial statements or related notes thereto.

### 3. Exhibits

The exhibits listed in the below index to exhibits are filed as part of, or incorporated by reference into, this report.

| Exhibit Number | | Description |
| --- | --- | --- |
| 2.1 | | Stock Purchase Agreement, dated as of November 10, 2016, by and among Eagle Pharmaceuticals, Inc., Arsia Therapeutics, LLC, Arsia Therapeutics, Inc., Amy Schulman, as the Seller Representative, and each person that executed a joinder to the Purchase Agreement (incorporated herein by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed with the Commission on November 14, 2016) ), as amended by Amendment No. 1 to Stock Purchase Agreement, dated as of February 8, 2018 (incorporated herein by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K, SEC File No. 001-36306, filed with the Commission on February 14, 2018) |
| 3.1 | | Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.2 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 3.2 | | Amended and Restated Bylaws (incorporated by reference to Exhibit 3.4 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 4.1 | | Form of Common Stock Certificate of the Registrant (incorporated by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 4.2 | | Third Amended and Restated Investor Rights Agreement, dated April 11, 2013, by and among the Registrant and certain of its stockholders (incorporated by reference to Exhibit 4.2 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.1 | | Form of Indemnification Agreement by and between the Registrant and its directors and officers (incorporated by reference to Exhibit 10.1 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.2 | † | Eagle Pharmaceuticals, Inc. 2007 Incentive Compensation Plan and Form of Stock Option Agreement thereunder (incorporated by reference to Exhibit 10.2 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), as amended December 15, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |
| 10.3 | † | Eagle Pharmaceuticals, Inc. 2014 Equity Incentive Plan, as amended and restated, and Form of Stock Option Agreement, Notice of Exercise and Stock Option Grant Notice thereunder (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015), as amended with an additional form of Stock Option Agreement (incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |
| 10.4 | † | Eagle Pharmaceuticals, Inc. 2014 Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.4 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 22, 2014) |
| 10.5 | † | Eagle Pharmaceuticals, Inc. Non-Employee Director Compensation Policy (incorporated by reference to Exhibit 10.5 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 22, 2014) |

87

| 10.6 | † | Employment Agreement by and between the Registrant and Scott Tarriff dated March 8, 2007, as amended (incorporated by reference to Exhibit 10.6 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 10.7 | † | Offer Letter by and between the Registrant and Adrian Hepner dated December 11, 2014 (incorporated by reference to Exhibit 10.7 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 15, 2017) as amended by entry into the Eagle Pharmaceuticals, Inc. Officer Severance Benefit Plan on April 29, 2016 (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.8 | † | Offer Letter by and between the Registrant and Steven L. Krill dated September 7, 2011 (incorporated by reference to Exhibit 10.8 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.9 | † | Lease Agreement between the Registrant and Mack-Cali Chestnut Ridge L.L.C. dated May 28, 2013, as amended on July 1, 2013 (incorporated by reference to Exhibit 10.10 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on March 16, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K , SEC File No. 001-36306, filed March 20, 2015) |
| 10.10 | * | Development and License Agreement, by and between the Registrant and SciDose, LLC, dated September 24, 2007, as amended March 18, 2008, May 22, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.11(a) to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.11 | * | Development and License Agreement, by and between the Registrant and SciDose, LLC, dated June 12, 2007, as amended March 18, 2008, March 25, 2008, December 3, 2008, May 22, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.11(b) to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on August 5, 2015 (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.12 | * | License and Sublicense Agreement, by and between the Registrant and Lyotropic Therapeutics, Inc., dated October 16, 2008 (incorporated by reference to Exhibit 10.12 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.13 | * | License and Development Agreement, by and between the Registrant and The Medicines Company, effective as of September 24, 2009, as amended January 2010 and September 1, 2012 (incorporated by reference to Exhibit 10.13 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.14 | * | Supply Agreement, by and between the Registrant and The Medicines Company, dated September 24, 2009 (incorporated by reference to Exhibit 10.14 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.15 | * | Agreement for the Supply of Argatroban and Topotecan, by and between the Registrant and Cipla Limited, dated December 14, 2012, as amended August 30, 2013 (incorporated by reference to Exhibit 10.15 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.16 | * | Supply and Distribution Agreement, by and between the Registrant and Sandoz AG, dated January 28, 2013 (incorporated by reference to Exhibit 10.16 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.17 | * | Development and License Agreement, by and between the Registrant and Robert One, LLC (bendamustine), dated March 18, 2008, as amended November 11, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.17 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.18 | * | Development and License Agreement, by and between the Registrant and Robert One, LLC (pemetrexed), dated February 13, 2009, as amended May 22, 2009, December 23, 2010 and July 16, 2013 (incorporated by reference to Exhibit 10.18 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on August 5, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.19 | * | Exclusive License Agreement, by and between the Registrant and Cephalon, Inc., dated February 13, 2015 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q/A, SEC File No. 001-36306, filed February 12, 2016) |
| 10.20 | * | Settlement and License Agreement, by and between the Registrant and Cephalon, Inc., dated February 13, 2015 (incorporated by reference to Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed May 15, 2015) |
| 10.21 | † | Eagle Pharmaceuticals, Inc. Officer Severance Benefit Plan (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.22 | † | Form of Letter Agreement (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |
| 10.23 | * | License Agreement, by and between the Registrant and Teikoku Pharma USA, Inc., dated October 13, 2015 (incorporated by reference to Exhibit 10.23 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 29, 2016) |
| 10.24 | * | Co-Promotion Agreement, by and between the Registrant and Spectrum Pharmaceuticals, Inc., dated November 4, 2015 (incorporated by reference to Exhibit 10.23 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 29, 2016) |
| 10.25 | † | Offer Letter by and between the Registrant and David Pernock dated January 2, 2017 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 19, 2016) |

88

| 10.26 | | Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated January 26, 2017 (incorporated by reference to Exhibit 10.26 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 15, 2017) as amended and restated by the Amended and Restated Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated August 8, 2017 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 9, 2017) |
| 10.27 | | Amendment to License and Sublicense Agreement, by and between the Registrant and Lyotropic Therapeutics, Inc., dated August 3, 2016 (incorporated by reference to Exhibit 10.27 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 15, 2017) |
| 10.28 | † | Offer Letter between the Registrant and Pete A. Meyers dated May 12, 2017 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed May 15, 2017) |
| 10.29 | * | Product Collaboration and License Agreement, by and between the Registrant and SymBio Pharmaceuticals Limited, effective as of September 19, 2017 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed November 8, 2017) |
| 10.30 | † | Separation Agreement by and between the Registrant and David Riggs dated January 24, 2018 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed January 30, 2018) |
| 10.31 | † | Form of Restricted Stock Unit Grant Package (2014 Equity Incentive Plan) (incoporated by reference to Exhibit 10.3 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 26, 2018) |
| 10.32 | † | Form of Performance Stock Unit Grant Package (2014 Equity Incentive Plan) (incorporated by reference to Exhibit 10.3 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 26, 2018) |
| 10.33 | † | Separation Agreement by and between the Registrant and Steven L. Krill, dated February 19, 2018 (incorporated by reference to Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed May 10, 2018) |
| 21.1 | (1) | List of subsidiaries of Eagle Pharmaceuticals, Inc. |
| 23.1 | (1) | Consent of BDO USA, LLP, an Independent Registered Public Accounting Firm |
| 24.1 | | Power of Attorney (incorporated by reference to this signature page of this Annual Report on Form 10-K) |
| 31.1 | (1) | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 31.2 | (1) | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 32.1 | (1) | Certifications of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | | XBRL Instance Document |
| 101.SCH | | XBRL Taxonomy Extension Schema Document |
| 101.CAL | | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF | | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB | | XBRL Taxonomy Extension Labels Linkbase Document |
| 101.PRE | | XBRL Taxonomy Extension Presentation Linkbase Document |

†Management contract or compensatory plan or arrangement.

*Confidential treatment granted as to certain portions, which portions are omitted and filed separately with the Securities and Exchange Commission.

(1) Filed herewith.

**Item 16. Form 10-K Summary**

None.

<p style="text-align:center"><strong>SIGNATURES</strong></p>

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on February 28, 2019.

<p style="text-align:center">89</p>

**EAGLE PHARMACEUTICALS, INC.**

By:    /s/ Scott Tarriff
     Scott Tarriff
     Chief Executive Officer and Director
     (Principal Executive Officer)


Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Scott Tarriff and Pete A. Meyers, and each of them, his true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or either of them, or their or his substitutes or substitute, may lawfully do or cause to be done by virtue hereof.

90

| Signature | Title | Date |
|-----------|-------|------|
| /S/ SCOTT TARRIFF<br>Scott Tarriff | Chief Executive Officer and Director<br>(Principal Executive Officer) | February 28, 2019 |
| /S/ PETE A. MEYERS<br>Pete A. Meyers | Chief Financial Officer<br>(Principal Accounting and Financial Officer) | February 28, 2019 |
| /S/ MICHAEL GRAVES<br>Michael Graves | Chairman of the Board of Directors | February 28, 2019 |
| /S/ STEVEN RATOFF<br>Steven Ratoff | Member of the Board of Directors | February 28, 2019 |
| /S/ SANDER FLAUM<br>Sander Flaum | Member of the Board of Directors | February 28, 2019 |
| /S/ DOUGLAS L. BRAUNSTEIN<br>Douglas L. Braunstein | Member of the Board of Directors | February 28, 2019 |
| /S/ ROBERT L. GLENNING<br>Robert L. Glenning | Member of the Board of Directors | February 28, 2019 |
| /S/ RICHARD A. EDLIN<br>Richard A. Edlin | Member of the Board of Directors | February 28, 2019 |

**INDEX TO FINANCIAL STATEMENTS OF
EAGLE PHARMACEUTICALS, INC.**

**APPENDIX A**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F- 2 |
| Consolidated Balance Sheets | F- 3 |
| Consolidated Statements of Operations | F- 4 |
| Consolidated Statements of Changes in Stockholders' Equity | F- 5 |
| Consolidated Statements of Cash Flows | F- 6 |
| Notes to Consolidated Financial Statements | F- 8 |

F- 1

**Report of Independent Registered Public Accounting Firm**

Shareholders and Board of Directors
Eagle Pharmaceuticals, Inc.
Woodcliff Lake, NJ

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Eagle Pharmaceuticals Inc. as of December 31, 2018 and 2017, the related consolidated statements of income, stockholders' equity, and cash flows for each of the three years ended December 31, 2018, and the related notes. In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2018 and 2017, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2018**,** in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2018, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated February 28, 2019 expressed an unqualified opinion thereon.

**Change in Accounting Principles**

On January 1, 2018, the Company adopted Accounting Standards Update 2014-09, Revenue from Contracts with Customers (Topic 606).  The effects of the adoption are described in Note 2 to the consolidated financial statements.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ BDO USA, LLP

We have served as the Company's auditor since 2007.

Woodbridge, NJ

February 28, 2019

---

F- 2

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED BALANCE SHEETS**
(In thousands, except share amounts)

| | December 31, 2018 | December 31, 2017 |
|---|---|---|
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 78,791 | $ 114,657 |
| Accounts receivable, net | 66,486 | 53,821 |
| Inventories | 8,304 | 5,118 |
| Prepaid expenses and other current assets | 10,263 | 15,101 |
| Total current assets | 163,844 | 188,697 |
| Property and equipment, net | 2,397 | 6,820 |
| Intangible assets, net | 18,103 | 23,322 |
| Goodwill | 39,743 | 39,743 |
| Deferred tax asset, net | 13,822 | 11,354 |
| Other assets | 694 | 124 |
| Total assets | $ 238,603 | $ 270,060 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current liabilities:** | | |
| Accounts payable | $ 9,917 | $ 11,981 |
| Accrued expenses | 23,519 | 15,391 |
| Current portion of contingent consideration | — | 15,055 |
| Current portion of long-term debt | 6,250 | 4,875 |
| Total current liabilities | 39,686 | 47,302 |
| Contingent consideration, less current portion | — | 709 |
| Long-term debt, less current portion | 38,155 | 42,905 |
| Commitments and contingencies | | |
| **Stockholders' equity:** | | |
| Preferred stock, 1,500,000 shares authorized and no shares issued or outstanding as of December 31, 2018 and 2017 | — | — |
| Common stock, $0.001 par value; 50,000,000 shares authorized; 16,504,283 and 16,089,439 shares issued as of December 31, 2018 and 2017, respectively | 17 | 16 |
| Additional paid in capital | 256,458 | 233,639 |
| Retained earnings | 58,187 | 26,284 |
| Treasury stock, at cost, 2,590,258 and 1,241,695 shares as of December 31, 2018 and 2017, respectively | (153,900) | (80,795) |
| Total stockholders' equity | 160,762 | 179,144 |
| Total liabilities and stockholders' equity | $ 238,603 | $ 270,060 |

See accompanying notes to consolidated financial statements

F- 3

**EAGLE PHARMACEUTICALS, INC**
**CONSOLIDATED STATEMENTS OF INCOME**
**(In thousands, except share and per share amounts)**

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2018** | | **2017** | | **2016** |
| **Revenue:** | | | | | | |
| Product sales | $ | 70,385 | $ | 45,327 | $ | 40,646 |
| Royalty revenue | | 142,927 | | 153,880 | | 99,040 |
| License and other revenue | | — | | 37,500 | | 49,796 |
| Total revenue | | 213,312 | | 236,707 | | 189,482 |
| **Operating expenses:** | | | | | | |
| Cost of product sales | | 42,374 | | 33,714 | | 35,785 |
| Cost of royalty revenue | | 19,542 | | 23,472 | | 19,521 |
| Research and development | | 44,419 | | 32,607 | | 28,289 |
| Selling, general and administrative | | 60,509 | | 71,416 | | 53,329 |
| Restructuring charge | | 7,911 | | — | | — |
| Gain on sale of asset | | — | | — | | (1,750) |
| Asset impairment charge | | 2,704 | | 7,235 | | — |
| Change in fair value of contingent consideration | | (763) | | (7,377) | | 957 |
| Legal settlement | | — | | 1,650 | | — |
| Total operating expenses | | 176,696 | | 162,717 | | 136,131 |
| Income from operations | | 36,616 | | 73,990 | | 53,351 |
| Interest income | | 158 | | 91 | | 84 |
| Interest expense | | (2,736) | | (1,136) | | (8) |
| Total other (expense) income, net | | (2,578) | | (1,045) | | 76 |
| **Income before income tax (provision) benefit** | | 34,038 | | 72,945 | | 53,427 |
| Income tax (provision) benefit | | (2,135) | | (21,002) | | 28,026 |
| **Net income** | $ | 31,903 | $ | 51,943 | $ | 81,453 |
| Earnings per share attributable to common stockholders: | | | | | | |
| Basic | $ | 2.16 | $ | 3.44 | $ | 5.24 |
| Diluted | $ | 2.09 | $ | 3.27 | $ | 4.96 |
| Weighted average number of common shares outstanding: | | | | | | |
| Basic | | 14,768,625 | | 15,102,890 | | 15,533,681 |
| Diluted | | 15,278,651 | | 15,908,211 | | 16,434,104 |

See accompanying notes to consolidated financial statements

F- 4

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
(In thousands)

| | Common Stock | | Additional Paid-In Capital | Treasury Stock | (Accumulated Deficit) Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Number of Shares | Amount | | | | |
| **Balance at December 31, 2015** | **15,637** | **$ 15** | **$ 197,440** | **$ —** | **$ (107,112)** | **$ 90,343** |
| Stock-based compensation expense | — | — | 9,768 | — | — | 9,768 |
| Issuance of common stock upon exercise of stock option grants | 214 | 1 | 3,618 | — | — | 3,619 |
| Common stock repurchases | — | — | — | (37,003) | — | (37,003) |
| Net income | — | — | — | — | 81,453 | 81,453 |
| Common stock issued for the Eagle Biologics acquisition | 40 | — | 3,046 | — | — | 3,046 |
| **Balance at December 31, 2016** | **15,891** | **16** | **213,872** | **(37,003)** | **(25,659)** | **151,226** |
| Stock-based compensation expense | — | — | 15,429 | — | — | 15,429 |
| Issuance of common stock upon exercise of stock option grants | 198 | — | 4,338 | — | — | 4,338 |
| Common stock repurchases | — | — | — | (43,792) | — | (43,792) |
| Net income | — | — | — | — | 51,943 | 51,943 |
| **Balance at December 31, 2017** | **16,089** | **16** | **233,639** | **(80,795)** | **26,284** | **179,144** |
| Stock-based compensation expense | — | — | 19,082 | — | — | 19,082 |
| Issuance of common stock upon exercise of stock option grants | 415 | 1 | 8,614 | — | — | 8,615 |
| Payments for employee net option exercises | — | — | (4,877) | — | — | (4,877) |
| Common stock repurchases | — | — | — | (73,105) | — | (73,105) |
| Net income | — | — | — | — | 31,903 | 31,903 |
| **Balance at December 31, 2018** | **16,504** | **$ 17** | **$ 256,458** | **$ (153,900)** | **$ 58,187** | **$ 160,762** |

See accompanying notes to consolidated financial statements

F- 5

# EAGLE PHARMACEUTICALS, INC.
## CONSOLIDATED STATEMENTS OF CASH FLOWS
(In thousands)

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2018** | | **2017** | | **2016** |
| **Cash flows from operating activities:** | | | | | | |
| Net income | $ | 31,903 | $ | 51,943 | $ | 81,453 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | | | | |
| Deferred income taxes | | (2,468) | | 17,289 | | (30,116) |
| Depreciation expense | | 1,155 | | 932 | | 641 |
| Amortization expense | | 2,515 | | 2,815 | | 948 |
| Stock-based compensation | | 19,082 | | 15,429 | | 9,768 |
| Change in fair value of contingent consideration | | (763) | | (7,377) | | 957 |
| Amortization of debt issuance costs | | 376 | | 222 | | — |
| Gain on sale of asset | | — | | — | | (1,750) |
| Asset impairment charge | | 2,704 | | 7,235 | | — |
| Non-cash restructuring charge | | 5,769 | | — | | — |
| **Changes in operating assets and liabilities which provided (used) cash:** | | | | | | |
| Accounts receivable | | (12,665) | | (11,627) | | (15,919) |
| Inventories | | (5,556) | | (2,379) | | 12,303 |
| Prepaid expenses and other current assets | | 4,838 | | 1,993 | | (9,430) |
| Other assets | | (570) | | — | | — |
| Accounts payable | | (2,064) | | (8,460) | | 10,668 |
| Deferred revenue | | — | | — | | (6,000) |
| Accrued expenses and other liabilities | | 8,128 | | (9,096) | | (316) |
| Net cash provided by operating activities | | 52,384 | | 58,919 | | 53,207 |
| **Cash flows from investing activities:** | | | | | | |
| Purchase of property and equipment | | (133) | | (4,436) | | (1,590) |
| Purchase of short term investments | | — | | — | | (62,000) |
| Maturities of short term investments | | — | | — | | 62,000 |
| Payment for Docetaxel acquisition | | — | | — | | (4,850) |
| Payment for Ryanodex intangible asset | | — | | (750) | | (14,250) |
| Purchase of Eagle Biologics, net of cash acquired | | — | | — | | (26,860) |
| Proceeds from sale of diclofenac-misoprostol | | — | | — | | 1,750 |
| Net cash used in investing activities | | (133) | | (5,186) | | (45,800) |
| **Cash flows from financing activities:** | | | | | | |
| Repurchases of common stock | | (73,105) | | (43,792) | | (37,003) |
| Payment of contingent consideration | | (15,000) | | — | | (286) |
| Proceeds from long-term debt | | — | | 50,000 | | — |
| Payment of debt principal | | (3,750) | | (1,250) | | — |
| Payment of debt financing costs | | — | | (1,192) | | — |
| Payments for employee net option exercises | | (4,877) | | — | | — |
| Proceeds from common stock option exercises | | 8,615 | | 4,338 | | 3,619 |
| Net cash (used in) provided by financing activities | | (88,117) | | 8,104 | | (33,670) |
| **Net (decrease) increase in cash and cash equivalents** | | (35,866) | | 61,837 | | (26,263) |
| **Cash and cash equivalents at beginning of period** | | 114,657 | | 52,820 | | 79,083 |

See accompanying notes to consolidated financial statements

F- 6

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In thousands)

|  | | Year Ended December 31, | | | | |
|  | | **2018** | | **2017** | | **2016** |
| --- | --- | --- | --- | --- | --- | --- |
| **Cash and cash equivalents at end of period** | $ | 78,791 | $ | 114,657 | $ | 52,820 |
|  | | | | | | |
| **Supplemental disclosures of cash flow information:** | | | | | | |
| **Cash paid during the period for:** | | | | | | |
| Income taxes | $ | 2,281 | $ | 10,542 | $ | 2,800 |
| Interest | | 2,084 | | 651 | | 8 |
| **Non-cash investing activities** | | | | | | |
| Value of common stock issued for the Eagle Biologics acquisition | | — | | — | | 3,046 |
| **Non-cash financing activities** | | | | | | |
| Contingent consideration - business acquisitions | | — | | — | | 22,470 |

See accompanying notes to consolidated financial statements

F- 7

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(In thousands, except share and per share amounts)

## 1. Organization and Business

Eagle Pharmaceuticals, Inc. (the "Company") is a specialty pharmaceutical company focused on developing and commercializing injectable products, primarily in the critical care and oncology areas, using the U.S. Food and Drug Administration's ("FDA's") 505(b)(2) New Drug Application ("NDA") regulatory pathway. The Company's business model is to develop proprietary innovations to FDA-approved injectable drugs, referred to as branded reference drugs, that offer favorable attributes to patients and healthcare providers. The Company has two products currently being sold in the United States under various license agreements in place with commercial partners; a ready-to-use formulation of Argatroban and rapidly infused bendamustine RTD 50ml solution ("Bendeka"). In addition, the Company directly sells two products in the United States; Eagle's bendamustine RTD 500ml solution ("Big Bag" or "Belrapzo") and Ryanodex®(dantrolene sodium) ("Ryanodex"). The Company has a number of products currently under development and certain products may be subject to license agreements. We view our operation and manage our business as one reporting segment since the majority of our revenues are from royalties.

On February 13, 2015, the Company submitted a NDA to the FDA for Bendeka, which was approved by the FDA on December 7, 2015. Also, on February 13, 2015, the Company entered into an Exclusive License Agreement (the "Cephalon License") with Cephalon, Inc. ("Cephalon"), a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd. ("Teva"), for U.S. and Canadian rights to Bendeka for treatment of patients with chronic lymphocytic leukemia ("CLL") and patients with non-Hodgkin's lymphoma ("NHL"). Subsequently, with the consent of the Company, Cephalon assigned to Teva Pharmaceuticals International GmbH ("TPIG") all of Cephalon's rights and obligations under the Cephalon License. Accordingly, all references to "Cephalon" or to the "Cephalon License" and the related supply agreements for Bendeka should be read and construed as references to TPIG and to the license agreement and supply agreements for Bendeka to which the Company and TPIG are now parties. Pursuant to the terms of the Cephalon License, Cephalon will be responsible for all U.S. commercial activities for the product including promotion and distribution, and the Company is responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies. In connection with the Cephalon License, the Company has entered into a supply agreement with Cephalon, pursuant to which the Company is responsible for supplying product to Cephalon. During the quarter-ended September 30, 2016, the Company entered into an amendment to the Cephalon License and supply agreements for Bendeka. The amendment expands the geographical scope of the rights granted under the original agreement to include territories outside the U.S. and Canada.

Additionally, under the terms of the Cephalon License, the Company received an upfront cash payment of $30 million in February 2015, earned a $15 million milestone payment related to the FDA approval of Bendeka in December 2015, earned $40 million in November 2016 related to the receipt of a unique, product-specific billing code, J-code (J9034), for Bendeka and earned $25 million in March 2017 for an additional sales-based milestone payment. In addition, the Company was entitled to receive royalty payments of 20% of net sales of the product, which increased to 25% on receipt of the J-code.

On August 9, 2016, the Company announced a share repurchase program approved by the Company's board of directors authorizing the repurchase of up to $75.0 million of the Company's common stock (the "Share Repurchase Program"). On August 9, 2017, the Company announced a new share repurchase program approved by the Board, under which the Company may repurchase up to an additional $100 million of its outstanding common stock (the "New Share Repurchase Program"). Under the Share Repurchase Program and the New Share Repurchase Program, the Company is authorized to repurchase shares through open market purchases, privately-negotiated transactions or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. The Share Repurchase Programs have no time limit and may be suspended or discontinued completely at any time. The specific timing and amount of repurchases will vary based on available capital resources and other financial and operational performance, market conditions, securities law limitations, and other factors. The repurchases will be made using the Company's cash resources. In any period, cash used in financing activities related to shares repurchased may differ from the comparable change in stockholders' equity, reflecting timing differences between the recognition of share repurchase transactions and their settlement for cash.

On October 30, 2018, the Company announced that its Board of Directors has approved a new share repurchase program providing for the repurchase of up to $150 million of the Company's outstanding common stock, consisting of (i) up to $50 million in repurchases pursuant to an accelerated share repurchase agreement (the "ASR") with JPMorgan Chase Bank, N.A. ("JPMorgan"), and (ii) up to $100 million in additional repurchases (the "2018 Share Repurchase Program"). In connection with its approval of the 2018 Share Repurchase Program, the Board terminated the Company's 2016 Share Repurchase Program and 2017 Share Repurchase Program in October 2018. During the fourth quarter of 2018, the Company repurchased 1,000,134 shares of outstanding common stock for $50 million pursuant to the ASR.

The Company repurchased 1,348,563 shares of common stock for $73.1 million during the year ended December 31, 2018 and an aggregate of 2,590,258 shares of common stock for $153.9 million through December 31, 2018.

On November 16, 2016 the Company entered into an agreement to acquire Arsia Therapeutics ("Arsia"), an early-stage biotechnology firm with proprietary viscosity-reducing technology and formulation know-how and subsequently renamed the subsidiary Eagle Biologics, Inc. ("Eagle Biologics"). Under the terms of the stock purchase agreement, we paid approximately $27.2 million in cash and 40,200 shares of Eagle common stock worth $3.0 million at closing. We also agreed to pay up to $48 million in additional payments upon the completion of certain milestones, for aggregate potential payments of $78 million.

On February 8, 2018, we entered into an amendment (the "Arsia Amendment") to the stock purchase agreement dated November 10, 2016 (the "Arsia SPA"), pursuant to which we acquired from Arsia Therapeutics, LLC (the "Seller") all of the outstanding capital stock of Arsia Therapeutics, Inc. (now Eagle Biologics). Pursuant to the Arsia Amendment, our obligations to make four separate milestone payments pursuant to the Arsia SPA, which could have aggregated to a total of $48 million, were terminated in exchange for a single payment of $15 million to the Seller.

In March 2018, the Company announced that the United States Patent and Trademark Office ("USPTO") issued a new patent to the Company's Eagle Biologics division. Patent number 9,925,263 will expire in March 2036 and is the third patent issued in the Eagle Biologics family of patents.

On July 26, 2017, the Company received a Complete Response Letter from the FDA regarding its 505(b)(2) NDA for Ryanodex for the treatment of exertional heat stroke ("EHS"), in conjunction with external cooling methods. Based on our meeting with the FDA, the Company conducted an additional clinical trial in August 2018 during the Hajj pilgrimage, similar to the study conducted during the Hajj in 2015. On August 30, 2018, the Company announced the completion of enrollment of the Company's second clinical study to further evaluate the safety and efficacy of Ryanodex. During the 2018 Hajj, overall emergency room visits were dramatically decreased from previous years due to well-implemented crowd management, lower temperatures, lower humidity and other external factors. As a result, the number of EHS patients available for study enrollment was also significantly less than in previous years, and therefore much lower than anticipated. The preliminary assessment of patients enrolled is consistent with the data from the study conducted in 2015, in which patients dosed with RYANODEX plus Standard of Care ("SOC") showed an additive benefit compared to patients receiving SOC only. The Company intends to complete the analysis of the data and meet with the U.S. Food and Drug Administration to discuss next steps in 2019.

On August 8, 2017, the Company entered into an Amended and Restated Credit Agreement (the "Amended Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") and the lenders party thereto, which amended and restated the Company's existing credit agreement, dated as of January 26, 2017. The Amended Credit Agreement provides for a three-year $50 million revolving credit facility and a three-year $100 million term loan facility (which are collectively referred to as the "Amended Credit Facility"). At closing, which occurred on August 8, 2017, $50 million of the term loan facility was drawn, and none of the revolving credit facility has been drawn. The Company may make one other draw on the term loan facility on or before February 4, 2018. The Company has elected not to draw down further on the term loan facility. The Amended Credit Facility includes a $5 million letter of credit subfacility. Loans under the Amended Credit Facility bear interest, at the Company's option, at a rate equal to either (a) the LIBOR rate, plus an applicable margin ranging from 2.25% to 3.00% per annum, based upon the total net leverage ratio (as defined in the Amended Credit Agreement), or (b) the prime lending rate, plus an applicable margin ranging from 1.25% to 2.00% per annum, based upon the total net leverage ratio. The Company is required to pay a commitment fee on the unused portion of the Amended Credit Facility at a rate ranging from 0.35% to 0.45% per annum based upon the total net leverage ratio. The Company is permitted to terminate or reduce the revolving commitments or term commitments of the lenders and to make voluntary prepayments at any time subject to break funding payments. The Company is required to make mandatory prepayments of outstanding indebtedness under the Amended Credit Agreement (a) upon receipt of proceeds from certain sales, transfers or other dispositions, casualty and other condemnation events and the incurrence of certain indebtedness other than indebtedness permitted, subject to customary reinvestment exceptions and (b) in the case that the aggregate amount of all outstanding loans and letters of credit issued under the Amended Credit Facility exceed the aggregate commitment of all lenders under the Amended Credit Facility.

On September 20, 2017, the Company entered into a Product Collaboration and License Agreement, effective as of September 19, 2017, (the "SymBio License Agreement") with SymBio Pharmaceuticals Limited ("SymBio") for the rights to develop and commercialize the Company's bendamustine hydrochloride ready-to-dilute injection product and rapid infusion injection product (collectively, the "Products") in Japan. Under the License Agreement, SymBio will be responsible for all development of the

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

Products in Japan and for obtaining and maintaining all regulatory approvals of the Products in Japan, with a target for regulatory approval of a Product in Japan in 2020. SymBio will bear all costs of development of the Products in Japan except that, if Japanese regulatory authorities require a certain clinical study to be conducted as a condition for approving one of the Products in Japan, Eagle would share 50% of the out-of-pocket costs of that clinical study up to a specified dollar amount as a reduction to future royalty payments. Based on the Company's assessment of the probability of additional costs, we have not deferred revenue on the Symbio License Agreement. SymBio will also be responsible, at its sole cost, for all marketing, promotion, distribution and sales of the Products in Japan and is obligated to launch the Products and meet certain minimum detailing, promotion and marketing commitments in connection with commercialization of the Products in Japan.

SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma ("MCL"), and as a first line treatment of low-grade NHL and MCL. Under the SymBio License Agreement, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

Pursuant to the terms of the SymBio License Agreement, the Company and SymBio will enter into a separate supply agreement, under which the Company will be responsible for manufacturing and supplying the Products to SymBio for development and commercialization in Japan. After a period of time following launch of a Product, SymBio will have the right to assume the responsibility for manufacturing of the Products in and for Japan. Under the SymBio License Agreement, the Company will retain the right to control the prosecution, maintenance and enforcement of the Company's patents covering the Products, both inside and outside of Japan.

Under the SymBio License Agreement, the Company earned an upfront non-refundable cash payment of $12.5 million in the third quarter of 2017, and is eligible to receive a milestone payment upon approval of a Product in Japan and a milestone payment upon achievement of certain cumulative net sales of the Products in Japan, which can aggregate to a total of approximately $10.0 million (subject to currency fluctuations). After regulatory approval of a Product in Japan, the Company will also receive tiered, low double-digit royalties on net sales of the Products in Japan for so long as there are patents covering the Products in Japan or regulatory exclusivity for the Products in Japan.

In March 2018, the FDA approved a second manufacturing site for Bendeka.

On April 16, 2018, the Company announced the FDA's acceptance of the Company's ANDA filing for vasopressin injection, 1ml. This product is the generic version of Endo International plc's original Vasostrict® formulation, which is indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines.

On May 15, 2018, the FDA granted final approval for Eagle's ready-to-dilute bendamustine hydrochloride solution in a 500ml admixture for the treatment of patients with chronic lymphocytic leukemia ("CLL") and patients with indolent B-cell non-Hodgkin lymphoma ("NHL") that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.

On March 24, 2016 the FDA denied the Company's request for seven years of orphan drug exclusivity in the U.S., for Bendeka. In April 2016, the Company filed a lawsuit against the FDA arguing that Bendeka is entitled to orphan drug exclusivity as a matter of law (see Note 12. Legal Proceedings). On July 2, 2014, the FDA granted the Company orphan drug designations for Bendeka for the treatment of CLL and indolent B-cell NHL. The designations were based on a plausible hypothesis that Bendeka is "clinically superior" to a drug previously approved for the same indications. Generally, an orphan-designated drug is eligible for seven years of marketing exclusivity for the orphan-designated indications upon approval of the drug for those indications. On June 8, 2018, the U.S. District Court for the District of Columbia (the "Court") issued a decision requiring the FDA to grant seven years of orphan drug exclusivity ("ODE") in the U.S., for Bendeka, and on July 8, 2018 the FDA granted such ODE through December 2022. In addition, on July 8, 2018, the FDA submitted a Motion to Alter or Amend the Judgement Pursuant to Rule 59(e), pursuant to which the FDA requested the Court amend its decision to make clear that the decision does not affect any applications referencing TREANDA. The FDA's motion was denied by the Court on August 1, 2018 on the grounds that FDA was seeking an inappropriate advisory opinion. On February 20, 2019, the FDA issued a decision in favor of the Company, regarding the scope of exclusivity for Bendeka. Pursuant to the decision, no bendamustine product (including generic versions of TREANDA) may launch in the United States until December 7, 2022 unless it is clinically superior to Bendeka. The Company expects to vigorously pursue the scope of its exclusivity grant.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

In June 2018, as part of an ongoing organizational review, the Company began a restructuring initiative to rationalize its product portfolio and focus its physical sites. These measures include the discontinuation of manufacture and distribution of Non-Alcohol Docetaxel Injection and plans to rationalize research and development operations. The Company ceased selling the product by September 30, 2018.

On October 3, 2018, the Company announced that it entered into an agreement with the United States Army Medical Research Institute of Chemical Defense, the nation's leading science and technology laboratory in the area of medical chemical countermeasures research and development, to conduct a study to evaluate the neuroprotective effects of RYANODEX® (dantrolene sodium).

On October 30, 2018, the Company announced that the Company's fulvestrant formulation has not met the primary pharmacokinetic endpoint evaluating the bioequivalence of the Company's formulation compared to Faslodex in its open label, randomized, pharmacokinetic and safety study conducted in 600 healthy female volunteers across multiple U.S. sites.

**2. Summary of Significant Accounting Policies**

*Use of Estimates*

These financial statements are presented in U.S. dollars and are prepared in accordance with U.S. GAAP. The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported in the financial statements including disclosure of contingent assets and contingent liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period and accompanying notes. The Company's critical accounting policies are those that are both most important to the Company's financial condition and results of operations and require the most difficult, subjective or complex judgments on the part of management in their application, often as a result of the need to make estimates about the effect of matters that are inherently uncertain. Because of the uncertainty of factors surrounding the estimates or judgments used in the preparation of the financial statements, actual results may materially vary from these estimates.

*Reclassifications*

Certain reclassifications have been made to prior year amounts to conform with the current year presentation. None of the reclassifications were significant.

*Cash and Cash Equivalents*

The Company considers all highly liquid investments with an original maturity of three months or less to be cash equivalents. All cash and cash equivalents are held in United States financial institutions. The carrying amount of cash and cash equivalents approximates its fair value due to its short-term nature.

The Company, at times, maintains balances with financial institutions in excess of the FDIC limit.

*Fair Value Measurements*

U.S. GAAP establishes a framework for measuring fair value under generally accepted accounting principles and enhances disclosures about fair value measurements. Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Valuation techniques used to measure fair value must maximize the use of observable inputs and minimize the use of unobservable inputs. The standard describes the following fair value hierarchy based on three levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value:

- Level 1: Quoted prices in active markets for identical assets or liabilities.
- Level 2: Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.
- Level 3: Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

The fair value of interest-bearing cash, cash equivalents, accounts receivable and accounts payable approximate fair value due to their life being short term in nature, and are classified as Level 1 for all periods presented.

The fair value of debt is classified as Level 2 for the periods presented and approximates its fair value due to the variable interest rate.

The fair value of the contingent consideration/accrued royalty is classified as Level 3 for the period presented.

*Intangible Assets*

*Other Intangible Assets, Net*

The Company capitalizes and includes in intangible assets the costs of acquired product licenses and developed technology purchased individually or identified in a business combination. Intangible assets are recorded at fair value at the time of their acquisition and stated net of accumulated amortization. The Company amortizes its definite-lived intangible assets using either the straight-line or accelerated method, based on the useful life of the asset over which it is expected to be consumed utilizing expected undiscounted future cash flows. The Company will evaluate the potential impairment of intangible assets if events or changes in circumstances indicate that the carrying amount of the assets may not be fully recoverable or that the useful lives of these assets are no longer appropriate. Events giving rise to impairment are an inherent risk in our industry and many factors cannot be predicted. Factors that we consider in deciding when to perform an impairment review include significant changes in our forecasted projections for the asset or asset group for reasons including, but not limited to, significant under-performance of a product in relation to expectations, significant changes or planned changes in our use of the assets, significant negative industry or economic trends, and new or competing products that enter the marketplace. The impairment test is based on a comparison of the undiscounted cash flows expected to be generated from the use of the asset group and its eventual disposition to the carrying value of the asset group. If impairment is indicated, the asset is written down by the amount by which the carrying value of the asset exceeds the related fair value of the asset with the related impairment charge recognized within the statements of income.

With respect to determining an asset's fair value and useful life, because this process involves management making certain estimates and these estimates form the basis of the determination of whether or not an impairment charge should be recorded, these estimates are considered to be critical accounting estimates.

*Goodwill*

Goodwill represents the excess of purchase price over the fair value of net assets acquired in the Eagle Biologics acquisition. Goodwill is not amortized, but is evaluated for impairment on an annual basis, in the fourth quarter, or more frequently if events or changes in circumstances indicate that the reporting unit's goodwill is less than it's carrying amount. The Company did not identify any impairment to goodwill during the periods presented.

*Acquisition-Related Contingent Consideration*

Contingent consideration related to a business combination is recorded on the acquisition date at the estimated fair value of the contingent payments. The acquisition date fair value is measured based on the consideration expected to be transferred using probability-weighted assumptions and discounted back to present value. The discount rate used is determined at the time of the acquisition in accordance with accepted valuation methods. The fair value of the acquisition-related contingent consideration is re-measured at the estimated fair value at each reporting period with the change in fair value recognized as income or expense in the consolidated statements of income.

*Concentration of Major Customers and Vendors*

The Company is dependent on commercial partners to market and sell Argatroban and Bendeka. The Company's customers for Argatroban and Bendeka are its commercial and licensing partners; therefore, the Company's future revenues are highly dependent on these collaboration and distribution arrangements. The Company earned a $25 million sales-based milestone payment in March 2017 for Bendeka.

Teva markets Bendeka through a license agreement with the Company. Pursuant to that license agreement, Teva pays the Company a royalty based on net sales of the product and also purchases the product from the Company. A disruption in this

F- 12

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

arrangement, caused by among other things, a supply disruption, loss of exclusivity or the launch of a superior product would have a material adverse effect of the Company's financial position, results of operations and cash flows.

The total revenues and accounts receivables broken down by major customers as a percentage of the total are as follows:

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2018** | **2017** | **2016** |
| **Net revenues** | | | |
| Cephalon, Inc. (Teva) - See Revenue Recognition | 75% | 79% | 79% |
| Other | 25% | 21% | 21% |
|  | 100% | 100% | 100% |

|  | December 31, | |
| --- | --- | --- |
|  | **2018** | **2017** |
| **Accounts receivable** | | |
| Cephalon, Inc. (Teva) - See Revenue Recognition | 61% | 74% |
| Other | 39% | 26% |
|  | 100% | 100% |

Currently, for Argatroban, the Company uses one vendor as its sole source supplier, because of the unique equipment and process for manufacturing and transferring manufacturing activities to an alternate supplier is a time consuming and costly endeavor.

*Inventories*

Inventories are recorded at the lower of cost or net realizable value, with cost determined on a first-in first-out basis. The Company periodically reviews the composition of its inventories in order to identify obsolete, slow-moving or otherwise non-saleable items. If non-saleable items are observed and there are no alternate uses for the inventories, the Company will record a write-down to net realizable value in the period that the decline in value is first recognized.

*Property and Equipment*

Property and equipment are stated at cost. Depreciation is recorded over the estimated useful lives of the assets utilizing the straight-line method. Leasehold improvements are being amortized over the shorter of their useful lives or the lease term.

*Research and Development Expense*

Costs for research and development are charged to expense as incurred and include; employee-related expenses including salaries, benefits, travel and stock-based compensation expense for research and development personnel; expenses incurred under agreements with contract research organizations, contract manufacturing organizations and service providers that assist in conducting clinical and preclinical studies; costs associated with preclinical activities and development activities, costs associated with regulatory operations; and depreciation expense for assets used in research and development activities.

Costs for certain development activities, such as clinical studies, are recognized based on an evaluation of the progress to completion of specific tasks using data such as patient enrollment, clinical site activations, or information provided to the Company by its vendors on their actual costs incurred. Payments for these activities are based on the terms of the individual arrangements, which may differ from the patterns of costs incurred, and are reflected in the consolidated financial statements as prepaid expenses or accrued expenses as deemed appropriate. Recoveries of previously recognized research and development expenses from third parties are recorded as a reduction to research and development expense in the period it becomes realizable.

*Advertising and Marketing*

Advertising and marketing costs are expensed as incurred. Advertising and marketing costs were $3,312, $17,770, and $14,784 for the year ended December 31, 2018, 2017, and 2016, respectively.

F- 13

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

*Income Taxes*

The Company accounts for income taxes using the liability method in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC"), Topic 740 - Income Taxes ("ASC 740").  Deferred tax assets and liabilities are determined based on temporary differences between financial reporting and tax bases of assets and liabilities and are measured by applying enacted rates and laws to taxable years in which differences are expected to be recovered or settled.  Further, the effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that the rate changes.  A valuation allowance is required when it is "more likely than not" that all or a portion of deferred tax assets will not be realized. ASC 740 also prescribes a comprehensive model for how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that the company has taken or expects to take on a tax return, including a decision whether to file or not file a return in a particular jurisdiction.  We recognize any interest and penalties accrued related to unrecognized tax benefits as income tax expense.

*Revenue Recognition*

Revenue is recognized when a customer obtains control of promised goods or services, in an amount that reflects the consideration which the entity expects to receive in exchange for those goods or services. To determine revenue recognition for arrangements that an entity determines are within the scope of ASC 606, the Company performs the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. The Company only applies the five-step model to contracts when it is probable that the entity will collect the consideration it is entitled to in exchange for the goods or services it transfers to the customer. At contract inception, once the contract is determined to be within the scope of ASC 606, the Company assesses the goods or services promised within each contract and determines those that are performance obligations, and assesses whether each promised good or service is distinct. The Company then recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when (or as) the performance obligation is satisfied. Sales, value add, and other taxes collected on behalf of third parties are excluded from revenue.

*Product revenue* - The Company recognizes net revenue on sales to its commercial partners and to end users. In each instance, revenue is generally recognized when the customer obtains control of the Company's product, which occurs at a point in time, and may be upon shipment or upon delivery based on the contractual shipping terms of a contract.

Revenue on sales to commercial partners relates to Argatroban and Bendeka. Sales to our commercial partners are presented gross because the Company is primarily responsible for fulfilling the promise to provide the product, is responsible to ensure that the product is produced in accordance with the related supply agreement and bears risk of loss while the inventory is in-transit to the commercial partner.

Revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring products or services to a customer. To the extent the transaction price includes variable consideration, the Company estimates the amount of variable consideration that should be included in the transaction price utilizing the expected value method to which the Company expects to be entitled. As such, revenue on sales to end users for Big Bag, Non-Alcohol Docetaxel Injection, Ryanodex are recorded net of chargebacks, rebates, returns, prompt pay discounts, wholesaler fees and other deductions. Our products are contracted with a limited number of oncology distributors and hospital buying groups with narrow differences in ultimate realized contract prices used to estimate our chargeback and rebate reserves. The Company has a product returns policy on some of its products that allows the customer to return pharmaceutical products within a specified period of time both prior to and subsequent to the product's expiration date. The Company's estimate of the provision for returns is analyzed quarterly and is based upon many factors, including historical experience of actual returns and analysis of the level of inventory in the distribution channel, if any. The Company has terms on sales of Ryanodex by which the Company does not accept returns. Variable consideration is included in the transaction price if, in the Company's judgment, it is probable that a significant future reversal of cumulative revenue under the contract will not occur. Estimates of variable consideration are made using the expected value method and determination of whether to include estimated amounts in the transaction price are based largely on an assessment of the Company's anticipated performance and all information (historical, current and forecasted) that is reasonably available. The Company believes that the estimates it has established are reasonable based upon current facts and circumstances. Applying different judgments to the same facts and circumstances could result in the estimated amounts to vary.

F- 14

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

*Royalty Revenue* — The Company recognizes revenue from license arrangements with its commercial partners' net sales of products. Royalties are recognized as earned in accordance with contract terms when they can be reasonably estimated and collectability is reasonably assured. The Company's commercial partners are obligated to report their net product sales and the resulting royalty due to the Company within 25 days for Bendeka and 15 days for Argatroban from the end of each quarter. Based on historical product sales, royalty receipts and other relevant information, the Company accrues royalty revenue each quarter and subsequently determines a true-up when it receives royalty reports from its commercial partners. Historically, these true-up adjustments have been immaterial.

*License and other revenue* — The Company analyzes each element of its licensing agreements to determine the appropriate revenue recognition. The terms of the license agreement may include payment to us of non-refundable up-front license fees, milestone payments if specified objectives are achieved, and/or royalties on product sales. The Company recognizes revenue from upfront payments at a point in time, typically upon fulfilling the delivery of the associated intellectual property to the customer.

If the contract contains a single performance obligation, the entire transaction price is allocated to the single performance obligation. Contracts that contain multiple performance obligations require an allocation of the transaction price based on the estimated relative standalone selling prices of the promised products or services underlying each performance obligation. The Company determines standalone selling prices based on the price at which the performance obligation is sold separately. If the standalone selling price is not observable through past transactions, the Company estimates the standalone selling price taking into account available information such as market conditions and internally approved pricing guidelines related to the performance obligations.

The Company recognizes sales-based milestone payments as revenue upon the achievement of the cumulative sales amount specified in the contract in accordance with ASC 606-10-55-65. For those milestone payments which are contingent on the occurrence of particular future events, the Company determined that these need to be considered for inclusion in the calculation of total consideration from the contract as a component of variable consideration using the most-likely amount method. As such, the Company assesses each milestone to determine the probability and substance behind achieving each milestone. Given the inherent uncertainty of the occurrence of these future events, the Company will not recognize revenue from the milestone until there is not a high probability of a reversal of revenue, which typically occurs near or upon achievement of the event.

As described above, under the terms of the Cephalon License, the Company received an upfront cash payment of $30 million, received a milestone payment of $15 million for regulatory approval, received a $40 million milestone upon receipt of the J-Code and received $25 million in an additional sales based milestone payment for reaching $500 million in net product sales of Bendeka. In 2015, $30 million upfront payment was allocated between the license issued to Cephalon and obtaining and maintaining regulatory approvals and conducting post-approval clinical studies using the Company's best estimate of selling price for each deliverable.  The full $30 million was recognized as income in the first quarter of 2015, as the Company substantially completed its requirements for obtaining regulatory approval, which consisted of filing an NDA, on February 13, 2015, and the remaining obligations were estimated to require minimal effort. On December 7, 2015, the FDA approved Bendeka (50 mL bendamustine hydrochloride) marking the achievement of a milestone which entitled the Company to a $15 million payment which was received in January 2016. The Company received a $40 million milestone payment in November 2016 upon receipt of the unique J-Code. Additionally, this event triggered an increase in the royalty rate from 20% to 25% of Bendeka net sales. In March 2017, the Company received a $25 million sales-based milestone payment for reaching $500 million in net product sales. As discussed above, under the SymBio License Agreement, the Company earned an upfront non-refundable cash payment of $12.5 million during the year ended December 31, 2017.

When determining the transaction price of a contract, an adjustment is made if payment from a customer occurs either significantly before or significantly after performance, resulting in a significant financing component. Applying the practical expedient in paragraph 606-10-32-18, the Company does not assess whether a significant financing component exists if the period between when the Company performs its obligations under the contract and when the customer pays is one year or less. None of the Company's contracts contained a significant financing component as of December 31, 2018.

*Collaborative licensing and development revenue* — The Company recognizes revenue from reimbursements received in connection with feasibility studies and development work for third parties when its contractual services are performed, provided collectability is reasonably assured. Its principal costs under these agreements include its personnel conducting research and development, its allocated overhead, as well as the research and development performed by outside contractors or consultants.

F- 15

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

Upon termination of a collaboration agreement, any remaining non-refundable license fees received by the Company, which had been deferred, are generally recognized in full. All such recognized revenues are included in collaborative licensing and development revenue in its statements of income. The Company recognizes revenue from milestone payments received under collaboration agreements when earned, provided that the milestone event is substantive, its achievability was not reasonably assured at the inception of the agreement, the Company has no further performance obligations relating to the event, and collectability is reasonably assured. If these criteria are not met, the Company recognizes milestone payments ratably over the remaining period of its performance obligations under the collaboration agreement.

*Stock-Based Compensation*

The Company accounts for stock-based compensation using the fair value provisions of ASC 718, Compensation - Stock Compensation that requires the recognition of compensation expense, using a fair-value based method, for costs related to all stock-based payments including stock options and restricted stock. This topic requires companies to estimate the fair value of the stock-based awards on the date of grant for options issued to employees and directors and record expense over the employees' service periods, which are generally the vesting period of the equity awards.

The Company accounts for stock-based compensation by measuring and recognizing compensation expense for all stock-based payments made to employees and directors based on estimated grant date fair values. The straight-line method is used to allocate compensation cost to reporting periods over each optionee's requisite service period, which is generally the vesting period. The fair value of the Company's stock-based awards to employees and directors is estimated using the Black-Scholes option valuation model, or Black-Scholes model. The Black-Scholes model requires the input of subjective assumptions, including the expected stock price volatility, the calculation of expected term, forfeitures and the fair value of the underlying common stock on the date of grant, among other inputs. The risk-free interest rate is determined with the implied yield currently available for zero-coupon U.S. government issues with a remaining term approximating the expected life of the options.

*Earnings Per Share*

Basic earnings per common share is computed using the weighted average number of shares outstanding during the period. Diluted earnings per share is computed in a manner similar to the basic earnings per share, except that the weighted-average number of shares outstanding is increased to include all common shares, including those with the potential to be issued by virtue of warrants, options, convertible debt and other such convertible instruments. Diluted earnings per share contemplate a complete conversion to common shares of all convertible instruments only if they are dilutive in nature with regards to earnings per share.

The anti-dilutive common shares equivalents outstanding at December 31, 2018, 2017, and 2016 were as follows:

|  | Year Ended December 31, | | |
|  | **2018** | **2017** | **2016** |
|---|---|---|---|
| Options | 1,824,728 | 1,592,548 | 869,957 |

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

The following table sets forth the computation for basic and diluted net income per share for December 31, 2018, 2017, and 2016:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| **Numerator** | | | |
| Numerator for basic and diluted earnings per share-net income | $ 31,903 | 51,943 | $ 81,453 |
| **Denominator** | | | |
| Basic weighted average common shares outstanding | 14,768,625 | 15,102,890 | 15,533,681 |
| Dilutive effect of stock options | 510,026 | 805,321 | 900,423 |
| Diluted weighted average common shares outstanding | 15,278,651 | 15,908,211 | 16,434,104 |
| **Basic net income per share** | | | |
| Basic net income per share | $ 2.16 | $ 3.44 | $ 5.24 |
| **Diluted net income per share** | | | |
| Diluted net income per share | $ 2.09 | $ 3.27 | $ 4.96 |

*Recent Accounting Pronouncements*

*Recent Accounting Pronouncements - Not Yet Adopted*

In February 2016, the Financial Accounting Standards Board (FASB) issued ASU No. 2016-02, *"Leases (Topic 842)"* (ASU 2016-02) to increase transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. Under the new guidance, lessees are required to recognize a lease liability, which represents the discounted obligation to make future minimum lease payments, and a corresponding right-of-use asset on the balance sheet for most leases. In July 2018, the FASB issued ASU No. 2018-10, *"Codification Improvements to Topic 842, Leases"* (ASU 2018-10), which provides narrow amendments to clarify how to apply certain aspects of the new lease standard, and ASU No. 2018-11, *"Leases (Topic 842) - Targeted Improvements"* (ASU 2018-11), which addresses implementation issues related to the new lease standard. This guidance is effective for the Company as of January 1, 2019 and the Company will adopt this guidance using the modified retrospective approach and will recognize a cumulative-effect adjustment to the opening balance of Retained earnings in that period. This guidance includes a number of optional practical expedients that the Company may elect to apply, including an expedient that permits lease agreements that are twelve months or less to be excluded from the balance sheet. The Company is finalizing the impact that this new guidance will have on its consolidated financial statements, including its disclosures. The primary impact upon adoption will be the recognition, on a discounted basis, of the Company's minimum commitments under noncancelable operating leases as right of use assets and obligations on the consolidated balance sheets, in a range between $3 million to $4 million. In preparation for the adoption of this guidance, the Company is finalizing the process of identifying and validating the Company's lease information and evaluating the impact that this new guidance will have on its processes and controls.

In January 2017, the FASB issued guidance to simplify the measurement of goodwill. The guidance eliminates Step 2 from the goodwill impairment test. Instead, under the amendments in this guidance, an entity should perform its annual or interim goodwill impairment test by comparing the fair value of a reporting unit with it's carrying amount. An entity should recognize an impairment charge for the amount by which the carrying amount exceeds the reporting unit's fair value; however, the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit. Additionally, an entity should consider income tax effects from any tax deductible goodwill on the carrying amount of the reporting unit when measuring the goodwill impairment loss. The guidance also eliminates the requirements for any reporting unit with a zero or negative carrying amount to perform a qualitative assessment and if it fails that qualitative test, to perform Step 2 of the goodwill impairment test. An entity is required to disclose the amount of goodwill allocated to each reporting unit with a zero or negative carrying amount of net assets. The guidance is effective for public business entities for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years, and early adoption is permitted for interim or annual goodwill impairment tests performed for testing dates after

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

January 1, 2017. The guidance must be adopted on a prospective basis. We do not expect this guidance to have an impact on our consolidated financial statements.

*Recent Adopted Accounting Pronouncements*

The Company adopted ASC 606, Revenue from Contracts with Customers with a date of initial application of January 1, 2018. As a result, the Company has updated its accounting policy for revenue recognition to reflect the new standard as detailed above. The adoption of ASC 606 represents a change in accounting principle that will more closely align revenue recognition with the delivery of the Company's services and will provide financial statement readers with enhanced disclosures. The Company applied Topic 606 using the modified retrospective method. The Company has elected to apply this initial application of the standard only to contracts that are not completed at the date of initial application. For contracts which were modified before the adoption date, the Company has not restated the contract for those modifications. Instead, the Company reflected the aggregate effect of all modifications when identifying the satisfied and unsatisfied performance obligations, determining the transaction price and allocating the transaction price, if necessary. The cumulative effect of initially applying the new revenue standard would be applied as an adjustment to the opening balance of retained earnings. The Company has analyzed this effect and found the adoption of the new guidance did not have a material impact on our consolidated financial statements and our recognition is consistent with our historical accounting policies.

In January 2016, the FASB issued ASU 2016-01, which revises the guidance in ASC 825-10, Recognition and Measurement of Financial Assets and Financial Liabilities, and provides guidance for the recognition, measurement, presentation, and disclosure of financial assets and liabilities. The guidance is effective for reporting periods (interim and annual) beginning after December 15, 2017, for public companies. The adoption of this guidance did not have a significant impact on our consolidated financial statements.

In January 2017, the FASB issued guidance clarifying the definition of a business with the objective of adding guidance to assist entities with evaluating whether transactions should be accounted for as acquisitions or disposals of assets or businesses. The guidance provides a screen to determine when an integrated set of assets and activities is not a business, provides a framework to assist entities in evaluating whether both an input and substantive process are present, and narrows the definition of the term output. The guidance is effective for public business entities for fiscal years beginning after December 15, 2017, including interim periods within those fiscal years, and early adoption is permitted. The guidance must be adopted on a prospective basis. We will consider the guidance for future transactions.

## 3. Inventories

Inventories consist of the following:

|  | December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2018 | | 2017 | |
| Raw materials | $ | 6,303 | $ | 2,489 |
| Work in process |  | 1,776 |  | 931 |
| Finished products |  | 225 |  | 1,698 |
|  | $ | 8,304 | $ | 5,118 |

## 4. Property and Equipment

Property and equipment consists of the following:

F- 18

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

| | December 31, | | | | Estimated Useful Life (years) |
| | 2018 | | 2017 | | |
|---|---|---|---|---|---|
| Furniture and equipment | $ | 1,117 | $ | 1,187 | 7 |
| Office equipment | | 546 | | 513 | 3 |
| Equipment | | 2,952 | | 2,962 | 7 |
| Leasehold improvements | | 1,129 | | 4,596 | 2 |
| | | 5,744 | | 9,258 | |
| Less accumulated depreciation | | (3,347) | | (2,438) | |
| Property and equipment, net | $ | 2,397 | $ | 6,820 | |

Depreciation expense amounted to $1,155, $932, and $641, for the year ended December 31, 2018, 2017, and 2016, respectively. During the year ended December 31, 2018, as part of the restructuring initiative, the Company recorded an asset impairment charge related to property and equipment, primarily related to leasehold improvements.

**5. Balance Sheet Accounts**

*Prepaid and Other Current Assets*

Prepaid and other current assets consist of the following:

| | December 31, | | | |
| | 2018 | | 2017 | |
|---|---|---|---|---|
| Advances to commercial manufacturers | $ | 2,700 | $ | 2,389 |
| Prepaid FDA user fee | | 1,540 | | 1,369 |
| Prepaid insurance | | 150 | | 116 |
| Prepaid research and development | | — | | 1,069 |
| Prepaid income taxes | | 5,739 | | 9,597 |
| All other | | 134 | | 561 |
| Total Prepaid expenses and other current assets | $ | 10,263 | $ | 15,101 |

*Accrued Expenses*

Accrued expenses consist of the following:

| | December 31, | | | |
| | 2018 | | 2017 | |
|---|---|---|---|---|
| Accrued expenses | | | | |
| Royalties payable to commercial partners | $ | 7,139 | $ | 4,310 |
| Accrued research & development | | 1,245 | | 936 |
| Accrued professional fees | | 2,408 | | 1,254 |
| Accrued salary and other compensation | | 5,049 | | 4,811 |
| Accrued product costs | | 5,869 | | 2,657 |
| All other | | 1,809 | | 1,423 |
| Total Accrued expenses | $ | 23,519 | $ | 15,391 |

F- 19

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

**6. Debt**

On January 26, 2017, the Company entered into a Credit Agreement (the "Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent ("Agent") and the lenders party thereto. The Credit Agreement provides for a three-year $50 million revolving credit facility (the "Credit Facility"), none of which was drawn at closing. The Credit Facility includes a $5 million letter of credit subfacility.

On August 8, 2017, the Company entered into an Amended and Restated Credit Agreement (the "Amended Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") and the lenders party thereto, which amended and restated the Company's existing credit agreement, dated as of January 26, 2017.  The Amended Credit Agreement provides for a three-year $50 million revolving credit facility and a three-year $100 million term loan facility (which are collectively referred to as the "Amended Credit Facility"). The Company recorded $0.3 million of debt extinguishment costs related to the amendment included in selling, general and administrative expenses during the year ended December 31, 2017. As of December 31, 2018, the Company has $0.6 million of unamortized deferred debt issuance costs as part of long-term debt in our consolidated balance sheets.

At closing, $50 million of the term loan facility was drawn, and none of the revolving credit facility has been drawn. The Company was permitted to make one other draw on the term loan facility on or before February 4, 2018. The Company has elected not to draw down further on the term loan facility. The Amended Credit Facility includes a $5 million letter of credit subfacility. Loans under the Amended Credit Facility bear interest, at the Company's option, at a rate equal to either (a) the LIBOR rate, plus an applicable margin ranging from 2.25% to 3.00% per annum, based upon the total net leverage ratio (as defined in the Amended Credit Agreement), or (b) the prime lending rate, plus an applicable margin ranging from 1.25% to 2.00% per annum, based upon the total net leverage ratio.  The Company is required to pay a commitment fee on the unused portion of the Amended Credit Facility at a rate ranging from 0.35% to 0.45% per annum based upon the total net leverage ratio.  The Company is permitted to terminate or reduce the revolving commitments or term commitments of the lenders and to make voluntary prepayments at any time subject to break funding payments.  The Company is required to make mandatory prepayments of outstanding indebtedness under the Amended Credit Agreement (a) upon receipt of proceeds from certain sales, transfers or other dispositions, casualty and other condemnation events and the incurrence of certain indebtedness other than indebtedness permitted, subject to customary reinvestment exceptions and (b) in the case that the aggregate amount of all outstanding loans and letters of credit issued under the Amended Credit Facility exceed the aggregate commitment of all lenders under the Amended Credit Facility. The Company is obligated to repay the term loan facility on the last day of each March, June, September and December in an aggregate principal amount equal to 2.5% during the term of the loan.

| Debt Maturities | as of December 31, 2018 |
|---|---|
| 2019 | 6,250 |
| 2020 | 38,750 |
| Total debt | $ 45,000 |

**7. Common Stock and Stock-Based Compensation**

**Common Stock**

On October 30, 2018, the Company announced a new repurchase program approved by the Board pursuant to which the Company may repurchase of up to $150 million of the its outstanding common stock, consisting of (i) up to $50 million in repurchases pursuant to an accelerated share repurchase agreement (the "ASR"), with JPMorgan Chase Bank, N.A. ("JPMorgan"), and (ii) up to $100 million in additional repurchases (collectively, the "2018 Share Repurchase Program"). In connection with its approval of the 2018 Share Repurchase Program, the Board terminated the Company's 2016 Share Repurchase Program and 2017 Share Repurchase Program in October 2018. Under the 2018 Share Repurchase Program, the Company is authorized to repurchase shares through open market purchases, privately-negotiated transactions, accelerated share repurchases or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. Under the 2018 Share Repurchase Program, the additional repurchases have no time limit and may be suspended or discontinued completely at any time. The specific timing and amount of repurchases will vary based on available capital resources and other

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

financial and operational performance, market conditions, securities law limitations, and other factors. The repurchases will be made using the Company's cash resources.

In connection with the 2018 Share Repurchase Program, on October 30, 2018, the Company entered into the ASR with JPMorgan to repurchase an aggregate of $50 million of the Company's common stock. Under the terms of the ASR, the Company paid $50 million to JP Morgan on November 1, 2018, and received 702,988 shares, representing approximately 80% of the notional amount of the ASR, based on the closing price of $56.90 on October 29, 2018. Upon settlement of the ASR, the final number of shares repurchased were trued up based on the average of the daily volume weighted average share prices of the Company's common stock, less a discount, during the term of the ASR. The Company received 297,146 shares on December 6, 2018, the termination date.

On August 9, 2016, the Company announced a share repurchase program approved by the Company's board of directors authorizing the repurchase of up to $75.0 million of the Company's common stock (the "Share Repurchase Program"). On August 9, 2017, the Company announced a new share repurchase program approved by the Board, under which the Company may repurchase up to an additional $100 million of its outstanding common stock (the "New Share Repurchase Program"). Under the Share Repurchase Program and the New Share Repurchase Program, the Company was authorized to repurchase shares through open market purchases, privately-negotiated transactions or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. These Share Repurchase Programs were terminated as noted above.

We repurchased the following shares of common stock with cash resources:

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | **2018** | **2017** |
| Shares of common stock repurchased | 1,348,563 | 674,857 |
| Value of common stock repurchased | $ 73,105 | $ 43,792 |

**Stock-Based Compensation**

In December 2007, the Company's board of directors approved the 2007 Incentive Compensation Plan (the "2007 Plan") enabling the Company to grant multiple stock-based awards to employees, directors and consultants, the most common being stock options and restricted stock awards. In November 2013, the Company's board of directors approved the 2014 Equity Incentive Plan (the "2014 Plan") which became effective on February 11, 2014. The 2007 Plan was terminated upon the effectiveness of the 2014 Plan and all shares available for issuance under the 2007 Plan were made available under the 2014 Plan. The 2014 Plan provides for the awards of incentive stock options, non-qualified stock options, restricted stock, restricted stock units and other stock-based awards. Awards generally vest equally over a period of four years from grant date. Vesting is accelerated under a change in control of the Company or in the event of death or disability to the recipient. In the event of termination, any unvested shares or options are forfeited. At the Company's annual meeting of stockholders held on August 4, 2015, the stockholders approved an amendment to the 2014 Plan to, among other things, increase the number of shares of common stock authorized for issuance thereunder by 500,000 shares. After accounting for such increase, and as of such amendment, the Company has reserved and made available 1,748,878 shares of common stock for issuance under the 2014 Plan.

During the year ended December 31, 2018, the Company introduced a new long-term incentive program with the objective to better align the share-based awards granted to management with the Company's focus on improving total shareholder return over the long-term. The share-based awards granted under this long-term incentive program consist of time-based stock options, time-based restricted stock units ("RSUs") and performance-based stock units ("PSUs"). PSUs are comprised of awards that vest upon achievement of certain share price appreciation conditions.

*Stock Options*

F- 21

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

The fair value of stock options granted to employees, directors, and consultants is estimated using the following assumptions:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| Risk-free interest rate | 2.30% - 3.07% | 1.70% - 2.42% | 0.94% - 2.34% |
| Volatility | 43.76% | 28.56% - 37.63% | 30.95% - 32.36% |
| Expected term (in years) | 5.50 - 6.08 years | 5.50 - 7.0 years | 5.04 - 7.0 years |
| Expected dividend yield | 0.0% | 0.0% | 0.0% |

The following table summarizes information about stock option activity related to the 2014 Plan:

| | Number of Stock Option Shares | Weighted Average Exercise Price (Per Share) | Non-Exercisable | Exercisable |
| --- | --- | --- | --- | --- |
| **Outstanding at December 31, 2016** | **2,324,918** | **$ 44.53** | **1,281,208** | **1,043,710** |
| Granted | 925,329 | 83.94 | | |
| Exercised | (197,895) | 21.78 | | |
| Forfeited or expired | (265,784) | | | |
| **Outstanding at December 31, 2017** | **2,786,568** | **$ 57.13** | **1,349,339** | **1,437,229** |
| Granted | 672,092 | 59.17 | | |
| Exercised | (502,322) | 17.19 | | |
| Forfeited or expired | (399,973) | | | |
| **Outstanding at December 31, 2018** | **2,556,365** | **$ 62.78** | **1,074,456** | **1,481,909** |

The weighted-average grant-date fair value of options granted during the year ended December 31, 2018, 2017, and 2016 was $26.73, $32.83, and $27.79, respectively. As of December 31, 2018, there was $20,148 of unrecognized stock-based compensation expense related to stock options that is expected to be recognized over a weighted average period of 2 years. The total intrinsic value of options exercised during the year ended December 31, 2018 was $24,418.

The weighted average contractual terms of options outstanding as of December 31, 2018, 2017, and 2016 was 7.3, 7.0, and 7.0 years, respectively.

The aggregate pre-tax intrinsic value of options outstanding as of December 31, 2018, 2017, and 2016 was $10.7 million, $33.7 million, and $59.2 million, respectively.

*RSUs*

Each vested time-based RSU represents the right of a holder to receive one of the Company's common shares. The fair value of each RSU granted was estimated based on the trading price of the Company's common shares on the date of grant.

The following table summarizes information about RSU activity related to the 2014 Plan:

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

| | Number of Restricted Stock Units | | Weighted Average Grant Date Fair Value (Per Share) |
|---|---:|---|---:|
| **Non-vested at December 31, 2017** | — | $ | — |
| Granted | 64,080 | | 59.04 |
| Vested | — | | — |
| Forfeited | (9,861) | $ | 59.14 |
| **Non-vested at December 31, 2018** | **54,219** | **$** | **59.02** |

As of December 31, 2018, there was $1,658 of unrecognized stock-based compensation expense related to non-vested RSUs that is expected to be recognized over a weighted average period of 3 years.

*PSUs*

The fair value of PSUs granted to employees was estimated using a monte carlo simulation model. Inputs used in the calculation include a risk-free interest rate of 2.06%, an expected volatility of 47%, contractual term of 3 years, and no expected dividend yield.

The following table summarizes information about PSU activity related to the 2014 Plan:

| | Number of Performance Stock Units | | Weighted Average Grant Date Fair Value (Per Share) |
|---|---:|---|---:|
| **Non-vested at December 31, 2017** | — | $ | — |
| Granted | 127,080 | | 90.19 |
| Vested | — | | — |
| Forfeited | (9,861) | $ | 90.19 |
| **Non-vested at December 31, 2018** | **117,219** | **$** | **90.19** |

As of December 31, 2018, there was $6,242 of unrecognized stock-based compensation expense related to non-vested PSUs that is expected to be recognized over a weighted average period of 2 years.

The Company recognized stock-based compensation in its consolidated statements of income for the year ended December 31, 2018, 2017, and 2016 as follows:

| | Year Ended December 31, | | | | | |
|---|---|---:|---|---:|---|---:|
| | | **2018** | | **2017** | | **2016** |
| Stock options | $ | 15,333 | $ | 15,429 | $ | 9,768 |
| PSUs | | 3,059 | | — | | — |
| RSUs | | 690 | | — | | — |
| Stock-based compensation expense | $ | 19,082 | $ | 15,429 | $ | 9,768 |
| | | | | | | |
| Selling, general and administrative | $ | 15,068 | $ | 11,486 | $ | 7,073 |
| Research and development | | 4,014 | | 3,943 | | 2,695 |
| Stock-based compensation expense | $ | 19,082 | $ | 15,429 | $ | 9,768 |

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

**8. Income Taxes**

The components of our (provision for) benefit from income taxes is as follows:

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2018** | | **2017** | | **2016** | |
| Current: | | | | | | |
| Federal | $ | (4,137) | $ | (1,304) | $ | (1,175) |
| State | | (466) | | (2,409) | | (919) |
| | $ | (4,603) | $ | (3,713) | $ | (2,094) |
| Deferred: | | | | | | |
| Federal | | 2,565 | | (18,045) | | 29,553 |
| State | | (97) | | 756 | | 567 |
| | $ | 2,468 | $ | (17,289) | $ | 30,120 |
| | | | | | | |
| (Provision for) benefit from income taxes | $ | (2,135) | $ | (21,002) | $ | 28,026 |

The reconciliation of the statutory U.S. Federal income tax rate to the Company's effective income tax rate is as follows;

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2018** | **2017** | **2016** |
| Federal statutory tax rate | 21 % | 35 % | 35 % |
| State income taxes, net of federal benefit | 1 % | 3 % | 3 % |
| Tax benefit on stock option exercises, net of forfeitures | (11)% | (4)% | (7)% |
| R&D tax credits and Orphan Drug credits | (7)% | (10)% | (3)% |
| Limitation on executive compensation | 3 % | N/A | N/A |
| Revaluation of net deferred tax assets due to U.S. tax reform | — % | 5 % | N/A |
| Change in valuation allowance | — % | — % | (79)% |
| Other | (1)% | — % | (1)% |
| **Effective tax rate** | 6 % | 29 % | (52)% |

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amount of assets and liabilities for financial reporting and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets were as follows:

F- 24

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

|  | December 31, | |
|---|---|---|
|  | 2018 | 2017 |
| Deferred tax assets | | |
| Net operating loss carryforward | $ — | $ 151 |
| Stock based compensation | 7,934 | 6,454 |
| Research and development and other tax credit carryforwards | 3,251 | 5,190 |
| Inventories | 1,767 | 764 |
| Employee-related expenses | 732 | 240 |
| Prepaid R&D expenses | 761 | 964 |
| Other | 64 | 641 |
| Total deferred tax assets | 14,509 | 14,404 |
| Deferred tax liabilities | | |
| Intangible assets | 280 | 1,655 |
| Prepaid expenses | 34 | 28 |
| Fixed assets | 282 | 1,172 |
| Other | 91 | 195 |
| Total deferred tax liabilities | 687 | 3,050 |
| Valuation allowance | — | — |
| **Net deferred tax assets** | $ 13,822 | $ 11,354 |

The Tax Cuts and Jobs Act (the "Tax Act") significantly revised U.S. corporate income tax law by, among other things, reducing the corporate income tax rate to 21% and implementing a modified territorial tax system. In response to the Tax Act, the SEC issued SAB 118 which allows issuers to recognize provisional estimates of the impact of the Tax Act in their financial statements and adjust in the period in which the estimate becomes finalized, or in circumstances where estimates cannot be made, to disclose and recognize within a one year measurement period.

Implementation of the Tax Act resulted in an approximate $3.4 million charge for the revaluation of the Company's net deferred tax assets during the year ended December 31, 2017. In reaching these estimates, the Company utilized all available guidance and notices issued by the U.S. Department of the Treasury. During 2018, the Company finalized the impact of the Tax Act. An immaterial adjustment was recorded in the year ended December 31, 2018.

As a result of recently attaining profitability and the expectation that substantially all net operating loss carryforwards would be utilized in 2017, the Company performed a formal tax evaluation to determine maximum research and development credits that are available based on current law.  As a result of the evaluation of historical records and data, our tax filings, and various tax law interpretations related to the R&D credit availability, additional tax credits were identified. The Company recorded an adjustment of such tax credits of $5.5 million resulting in a reduction of income tax expense in 2017.

In the year ended December 31, 2016, we released a previously carried tax valuation allowance on our net deferred tax assets including net operating loss carryforwards and the tax benefit related to the exercises of stock options. Our decision to remove the valuation allowance on the Company's net deferred tax assets considered our significant income in 2016 which translated to our becoming a tax payer in 2016 and our outlook on prospective earnings and taxable income driven by Bendeka royalty and milestone revenues.

As of December 31, 2018, the Company had no federal and state net operating loss carryforwards. The Company also had a federal research and development tax credit carryforward of approximately $3.2 million. The net operating loss and tax credit carryforwards will expire at various times through 2036.

In July 2006, the Financial Accounting Standards Board ("FASB") issued ASC 740-10, Uncertainty in Income Taxes, which defines the threshold for recognizing the benefits of tax-return positions in the financial statements as "more-likely-than-not" to be sustained by the taxing authorities. This statement also requires explicit disclosure requirements about a Company's uncertainties related to their income tax position, including a detailed roll forward of tax benefits taken that do not qualify for financial statement recognition.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
(In thousands, except share and per share amounts)

The Company files income tax returns in the U.S. federal jurisdiction and several states. Given that the company has incurred tax losses in most years since its inception, all of the Company's tax years are effectively open to examination. The Company has no amount recorded for any unrecognized tax benefits as of December 31, 2018. The Company regularly evaluates its tax positions for additional unrecognized tax benefits and associated interest and penalties, if applicable. There are many factors that are considered when evaluating these tax positions including: interpretation of tax laws, recent tax litigation on a position, past audit or examination history, and subjective estimates and assumptions.

**9. License Agreements of Development and Commercialization Rights**

*Development*

On February 13, 2015, the Company submitted a New Drug Application or NDA to the FDA for Bendeka, which was approved by the FDA on December 7, 2015. Also, on February 13, 2015, the Company entered into the Cephalon License for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. Pursuant to the terms of the Cephalon License, Cephalon will be responsible for all U.S. commercial activities for the product including promotion and distribution, and the Company is responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies. Additionally, under the terms of the Cephalon License, the Company received an upfront cash payment of $30 million, in January 2016, received a $15 million milestone payment related to the FDA approval of Bendeka in December 2015, received $40 million related to the receipt of the J-code for Bendeka and is currently eligible to receive up to $25 million in an additional sales-based milestone payment. In addition, the Company was entitled to receive royalty payments of 20% of net sales of the product which increased to 25% on receipt of the J-code in November 2016. In connection with the Cephalon License, the Company has entered into a supply agreement with Cephalon, pursuant to which the Company is responsible for supplying product to Cephalon.

On September 20, 2017, the Company entered into a Product Collaboration and License Agreement, effective as of September 19, 2017, (the "SymBio License Agreement") with SymBio Pharmaceuticals Limited ("SymBio") for the rights to develop and commercialize the Company's bendamustine hydrochloride ready-to-dilute injection product and rapid infusion injection product (collectively, the "Products") in Japan. Under the License Agreement, SymBio will be responsible for all development of the Products in Japan and for obtaining and maintaining all regulatory approvals of the Products in Japan, with a target for regulatory approval of a Product in Japan in 2020. SymBio will bear all costs of development of the Products in Japan except that, if Japanese regulatory authorities require a certain clinical study to be conducted as a condition for approving one of the Products in Japan, Eagle would share 50% of the out-of-pocket costs of that clinical study up to a specified dollar amount as a reduction to future royalty payments. Based on the Company's assessment of the probability of additional costs, we have not deferred revenue on the SymBio License Agreement. SymBio will also be responsible, at its sole cost, for all marketing, promotion, distribution and sales of the Products in Japan and is obligated to launch the Products and meet certain minimum detailing, promotion and marketing commitments in connection with commercialization of the Products in Japan.

SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma ("MCL"), and as a first line treatment of low-grade NHL and MCL. Under the SymBio License Agreement, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

Pursuant to the terms of the SymBio License Agreement, the Company and SymBio will enter into a separate supply agreement, under which the Company will be responsible for manufacturing and supplying the Products to SymBio for development and commercialization in Japan. After a period of time following launch of a Product, SymBio will have the right to assume the responsibility for manufacturing of the Products in and for Japan. Under the SymBio License Agreement, the Company will retain the right to control the prosecution, maintenance and enforcement of the Company's patents covering the Products, both inside and outside of Japan.

Under the SymBio License Agreement, the Company earned an upfront non-refundable cash payment of $12.5 million in the third quarter of 2017, and is eligible to receive a milestone payment upon approval of a Product in Japan and a milestone payment upon achievement of certain cumulative net sales of the Products in Japan. After regulatory approval of a Product in Japan, the Company will also receive tiered, low double-digit royalties on net sales of the Products in Japan for so long as there are patents covering the Products in Japan or regulatory exclusivity for the Products in Japan.

The Company has entered into several product development agreements with development partners whereby the Company acquired the exclusive rights in the United States and, in most cases, worldwide rights to a total of thirty-three products for ten years following

F- 26

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

first commercial sale of each product. The Company will share varying percentages of the profits after, in most cases, recapturing development, legal and certain operating costs, from the sales of the products with the development partners if the products are commercialized. The Company expenses these costs as incurred.

## 10. Asset Sales

During fiscal year 2010 and 2011, the Company divested a non-core product and received proceeds of $6,500, comprised of $5,500 as a signing milestone which is recorded in deferred revenues and $500 for the initiation of technology transfer of which $250 remains in deferred revenues and a second payment of $500 for the completion of the technology transfer of which $250 remains in deferred revenues. Under the terms of this agreement, the licensor must obtain all of the following milestones in order for the Company to earn the revenues. These milestones are a) the receipt of an approval letter from the FDA, b) acknowledgment from the FDA that no further clinical studies will be needed and c) an approval letter from the FDA.

The Company, through various requests for information, was informed by the licensor in 2016 that it had voluntarily withdrawn the filing of the product application from the FDA in a prior year. Under the terms of the agreement, the milestones required to earn the $6,000 previously included in deferred revenue all related to the filing. The voluntary withdrawal of the filing by the licensor relieved the Company of further obligation with regard to performance under the milestones. Accordingly, during the year ended December 31, 2016, the Company recognized $6,000 as license and other income.

In 2016, the Company entered into the Diclofenac Asset Purchase Agreement pursuant to which the Company sold certain intellectual property related to diclofenac-misoprostol in the United States. In consideration of the assets and rights sold under the Diclofenac Asset Purchase Agreement, the Company received a one-time payment at closing of $1,750, which was recognized as a gain in 2016. In consideration of the rights granted under the Diclofenac Asset Purchase Agreement, the purchaser will pay the Company a 25% royalty on net profits of diclofenac-misoprostol in the territory for five years from the date of sale.

## 11. Commitments

Our future material contractual obligations include the following:

| Obligation | Total | 2019 | 2020 | 2021 | 2022 | 2023 | Beyond |
|---|---|---|---|---|---|---|---|
| Operating leases (1) | $ 3,661 | $ 1,146 | $ 864 | $ 583 | $ 583 | $ 485 | $ — |
| Credit facility | 45,000 | 6,250 | 38,750 | — | — | — | — |
| Purchase obligations (2) | 29,333 | 29,333 | — | — | — | — | — |
| Total obligations | $ 77,994 | $ 36,729 | $ 39,614 | $ 583 | $ 583 | $ 485 | $ — |

(1) The Company leases its office and lab space under lease agreements that expire on June 30, 2020 and October 31, 2023. Rental expense was $571, $664, and $634, for the year ended December 31, 2018, 2017, and 2016, respectively. The remaining future lease payments under the operating leases, exclusive of any renewal option periods, are $3,661 as of December 31, 2018, payable monthly through June 30, 2020 and October 31, 2023.

(2) As of December 31, 2018, the Company has purchase obligations in the amount of $29,333 which represents the contractual commitments under contract manufacturing and supply agreements with suppliers. The obligation under the supply agreement is primarily for finished product, inventory, and research and development.

## 12. Acquisitions

### Acquisition of Docetaxel-Injection, Non-Alcohol Formula

On October 13, 2015, the Company entered into the Teikoku Agreement with Teikoku to market, sell and distribute Non-Alcohol Docetaxel Injection, an investigational product intended for the treatment of breast cancer, non-small cell lung cancer, prostate cancer, gastric adenocarcinoma, and head and neck cancer. The NDA for Non-Alcohol Docetaxel Injection for these indications was approved by the FDA on December 22, 2015. Under the terms of the agreement, the Company paid $4,850 upon FDA approval and NDA transfer to the Company, which occurred on January 12, 2016. The Company also paid 25% royalties on gross profits to Teikoku. The Company accounted for the transaction as a purchase of a business in 2016, in accordance with ASC 805 *Business Combinations*.

F-27

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

The Company has measured the fair value of the future royalty payment using its own assumptions of future profitability of Non-Alcohol Docetaxel Injection. Acquisition contingent consideration is measured at fair value on a recurring basis using unobservable inputs; which accordingly represents a Level 3 measurement within the fair value hierarchy. Any change in fair value of the contingent consideration subsequent to the acquisition date is recognized in operating income within the statement of operations.

During the year ended December 31, 2017, the Company recorded a change in the fair value of contingent consideration of $6.2 million. This was primarily driven by adjustments to the fair values of the liabilities associated with Non-Alcohol Docetaxel Injection, which was remeasured due to the loss of a customer and other market conditions identified during the third quarter of 2017 for the product and partially offset by accretion for the time value of money.

During the year ended December 31, 2018, the Company recorded an adjustment to the remaining contingent consideration to reflect the Company's decision to discontinue sales of Non-Alcohol Docetaxel Injection.

The following table represents a reconciliation of the change in the fair value measurement of the contingent consideration liability, which was recorded in the Company's consolidated statements of income:

| Closing Balance December 31, 2016 | Changes in fair value | Payment of contingent consideration | Closing Balance December 31, 2017 | Changes in fair value | Payment of contingent consideration | Closing Balance December 31, 2018 |
|---|---|---|---|---|---|---|
| $ 6,940 | $ (6,176) | $ — | $ 764 | $ (763) | $ (1) | $ — |

Total consideration of $11,220, which is comprised of the $4,850 cash paid on FDA approval and NDA transfer to the Company and the fair value of contingent consideration has been attributed to the intangible asset for Non-Alcohol Docetaxel Injection product rights.

**Eagle Biologics Acquisition**

On November 16, 2016, the Company entered into a stock purchase agreement ("Arsia SPA") to acquire Arsia Therapeutics ("Arsia" "Seller"), an early-stage biotechnology firm with proprietary viscosity-reducing technology and formulation know-how and subsequently renamed the subsidiary Eagle Biologics, Inc. ("Eagle Biologics"). Under the terms of the stock purchase agreement, we paid approximately $27.2 million in cash and 40,200 shares of Eagle common stock worth $3.0 million at closing. We also agreed to pay up to $48 million in additional payments upon the completion of certain milestones, for aggregate potential payments of $78 million.

On February 8, 2018, the Company entered into an amendment (the "Arsia Amendment") to the Arsia SPA. Pursuant to the Arsia Amendment, the Company's obligation to make four separate milestone payments pursuant to the Arsia SPA, which could have aggregated to a total of $48 million, were terminated in exchange for a single payment of $15 million to the Seller.

The acquisition was accounted for as a business combination in accordance with ASC 805, which requires the assets acquired and liabilities assumed from Eagle Biologics to be recorded on the acquisition date at their respective fair values. Eagle Biologics' results of operations are included in the financial statements from the date of acquisition.

Eagle Biologics' platform technology enables subcutaneous administration of high-dose biologics through improved formulation. Eagle Biologics has developed early-stage partnerships with major pharmaceutical companies to apply its technology to their biosimilar molecules, create subcutaneous versions of currently-marketed IV products and produce high-concentration formulations of clinical candidates. In addition to acquiring the technology platform, the Company plans to establish a Biologics Innovation Center in Kendall Square in Cambridge, Massachusetts.

The following table summarizes the consideration transferred to acquire Eagle Biologics at the date of acquisition:

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

| The aggregate consideration consisted of: | | **Preliminary fair value** |
|---|---|---|
| Cash consideration paid | $ | 27,209 |
| Common stock issued *(i)* | | 3,046 |
| Fair value of contingent consideration payable to seller (long term) *(ii)* | | 16,100 |
| Total consideration | $ | 46,355 |

*(i)* Under the stock purchase agreement, the number of common shares to be issued to the seller is equal to $2.7 million divided by the average of the closing day price per share for the thirty (30) trading days prior to the Closing Date. The average price of the common stock of 30 days prior to closing was $68.18. Accordingly, the number of common stock to be issued to the seller was determined at 40,200 shares ($2.7 million/$68.18 per share). The fair value of the common stock issued was determined based on the closing price of Eagle's common stock on November 16, 2016.

*(ii)* Under the Arsia SPA, the contingent consideration includes four separate milestone payments which could aggregate to a total of $48 million payable to the Seller upon achievement of certain clinical, regulatory and development milestones. These milestone payments are also subject to acceleration under certain circumstances described in the Arsia SPA. In accordance with the provisions of ASC 805-30-25-5, each unit of contingent consideration is recognized at the acquisition date fair value. The acquisition date fair value of the contingent consideration is $16.1 million and has been classified as other liabilities within non-current liabilities. Such fair values are determined based on a probabilistic model with weights assigned on the likelihood of the Company achieving the clinical, regulatory and development milestones as well as an acceleration event in the future. Each unit of contingent consideration is classified as a liability in the balance sheet and would be subsequently measured at fair value on each reporting date. Any future change in fair value would be recognized in the statement of operations. As described above, on February 8, 2018, the Company entered into the Arsia Amendment, pursuant to which the Company's obligations to make four separate milestone payments under the Arsia SPA were terminated in exchange for a single payment of $15 million to the Seller.

During the year ended December 31, 2017, the Company recorded a change in the fair value of contingent consideration of $1.2 million related to the Arsia Amendment.

The following table represents a reconciliation of the change in the fair value measurement of the contingent consideration liability, which was recorded in the Company's consolidated statements of income:

| Closing Balance December 31, 2016 | | Changes in fair value | | Payment of contingent consideration | | Closing Balance December 31, 2017 | | Changes in fair value | | Payment of contingent consideration | | Closing Balance December 31, 2018 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| $ | 16,201 | $ | (1,201) | $ | — | $ | 15,000 | $ | — | $ | (15,000) | $ | — |

F- 29

EAGLE PHARMACEUTICALS, INC.
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

**13. Intangible Assets, Net**

The gross carrying amounts and net book value of our intangible assets are as follows:

| | Useful Life (In Years) | Gross Carrying Amount | Accumulated Amortization | Accumulated Impairment Charges | Net Book Value |
|---|---|---|---|---|---|
| | | | **December 31, 2018** | | |
| Docetaxel product rights | 10 | $ 11,220 | $ (1,281) | $ (9,939) | $ — |
| Ryanodex intangible | 20 | 15,000 | (1,554) | — | 13,446 |
| Developed technology | 5 | 8,100 | (3,443) | — | 4,657 |
| Total | | $ 34,320 | $ (6,278) | $ (9,939) | $ 18,103 |

| | Useful Life (In Years) | Gross Carrying Amount | Accumulated Amortization | Accumulated Impairment Charge | Net Book Value |
|---|---|---|---|---|---|
| | | | **December 31, 2017** | | |
| Docetaxel product rights | 10 | $ 11,220 | $ (1,164) | $ (7,235) | $ 2,821 |
| Ryanodex intangible | 20 | 15,000 | (777) | — | 14,223 |
| Developed technology | 5 | 8,100 | (1,822) | — | 6,278 |
| Total | | $ 34,320 | $ (3,763) | $ (7,235) | $ 23,322 |

Amortization expense amounted to $2,515, $2,815, and $948, for the year ended December 31, 2018, 2017, and 2016, respectively.

*Intangible Asset Impairment*

During the year ended December 31, 2017, the Company experienced a decline in customer contracts and saw a drop in market pricing for Non-Alcohol Docetaxel Injection. Accordingly, the Company estimated the fair value of our Non-Alcohol Docetaxel Injection product and determined the carrying amount of the intangible asset was no longer fully recoverable, resulting in a pre-tax, non-cash asset impairment charge of $7.2 million during the year ended December 31, 2017.

On June 30, 2018, the Company implemented a restructuring initiative based on its assessment of the current product portfolio and made a decision to discontinue manufacture and distribution of Non-Alcohol Docetaxel Injection. The Company ceased selling the product by September 30, 2018. As a result, the Company recognized a pre-tax, non-cash asset impairment charge of $2.7 million during the year ended December 31, 2018.

*Estimated Amortization Expense for Intangible Assets*

Based on definite-lived intangible assets recorded as of December 31, 2018, and assuming that the underlying assets will not be impaired and that the Company will not change the expected lives of the assets, future amortization expenses are estimated as follows:

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

| | | Estimated Amortization Expense |
|---|---|---|
| Year Ending December 31, | | |
| 2019 | $ | 2,520 |
| 2020 | | 2,666 |
| 2021 | | 2,623 |
| 2022 | | 1,369 |
| 2023 | | 1,570 |
| All other | | 7,355 |
| Total estimated amortization expense | $ | 18,103 |

## 14. Legal Proceedings

In addition to the below legal proceedings, from time to time, we may be a party to litigation and subject to claims incident to the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, we currently believe that the final outcome of these ordinary course matters will not have a material adverse effect on our business. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

**Commercial Litigation**

*In Re: Taxotere (Docetaxel)*

On February 1, 2017, the Company was named as a defendant, among various other manufacturers, in several product liability suits that are consolidated in the U.S. District Court for the Eastern District of Louisiana as part of MDL 2740 (Civil Action No 2:16 md-2740). The claims are for personal injuries allegedly arising out of the use of docetaxel.

In March 2017, the Company reached agreements in principle with the Plaintiffs' Steering Committee in this matter to voluntarily dismiss the Company from all of the lawsuits in which it was named and from the master complaint. The Company is in the process of working with the other parties in this matter to have it removed from the Multidistrict litigation entirely.  As part of the agreement, in the event a case is brought in the future with facts that justify the Company's inclusion, the plaintiffs reserved the right to include the Company in such matter.  The plaintiffs have filed several additional lawsuits since the parties' agreement in principle to dismiss, and the Company is in the process of working with plaintiffs to explore the possibility of dismissing those lawsuits.

*Eagle v. Burwell*

On April 27, 2016, the Company filed an action in the U.S. District Court for the District of Columbia against the FDA and other federal defendants seeking an order requiring the FDA to recognize orphan drug exclusivity for Bendeka for the treatment of CLL and indolent B-cell NHL.  On June 8, 2018, the Court issued a decision requiring the FDA to recognize seven years of orphan drug exclusivity in the U.S. for Bendeka, and on July 6, 2018 the FDA recognized such ODE until December 7, 2022.  In addition, on July 6, 2018, the FDA submitted a Motion to Alter or Amend the Judgement Pursuant to Rule 59(e), pursuant to which the FDA requested that the Court amend its decision to make clear that the decision does not affect any applications referencing TREANDA.  The FDA's motion was denied by the Court on August 1, 2018 on the grounds that the FDA had not satisfied the standard for altering or amending the judgment.  The FDA and two intervenors have appealed the Court's final judgment to the U.S. Court of Appeals for the District of Columbia Circuit.  The briefing schedule issued by the Court of Appeals provides for briefing in those appeals to be completed by June 24, 2019. On February 20, 2019, the FDA issued a decision in favor of the Company, regarding the scope of exclusivity for Bendeka. Pursuant to the decision and provided that the Court's decision is not reversed upon appeal, no bendamustine product used to treat the same indications (including generic versions of TREANDA) may launch in the United States until December 7, 2022 unless it is clinically superior to Bendeka. The Company expects to vigorously pursue the scope of its exclusivity grant.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

*Eagle v. Eli Lilly*

On August 24, 2017, the Company filed an antitrust complaint in the United States District Court for the District of New Jersey ("New Jersey District Court") against Eli Lilly and Company ("Lilly").  The complaint alleges that Lilly engaged in anticompetitive conduct which restrained competition by delaying and blocking the Company's launch of a competing pemetrexed injection product (to compete with Lilly's Alimta). Lilly accepted service and answered the complaint on October 27, 2017. Lilly also filed a motion to transfer this case to Delaware on October 27, 2017. The Company filed a motion to oppose such transfer on November 6, 2017. On July 20, 2018, the New Jersey District Court transferred the case to Delaware. On November 27, 2018, the Delaware Court stayed the case at least until conclusion of the PEMFEXY™ patent trial described below.

**Patent Litigation**

*Eli Lilly and Company. v. Eagle Pharmaceuticals, Inc. (PEMFEXY™ (Pemetrexed))*

On August 14, 2017, Lilly filed suit against the Company in the United States District Court for the Southern District of Indiana (the "Indiana Suit").  Lilly alleged patent infringement based on the filing of the Company's 505(b)(2) NDA seeking approval to manufacture and sell the Company's EP-5101.  EP-5101, if finally approved by FDA, will be a branded alternative to Alimta®, which is indicated (in combination with cisplatin) (a) for the treatment of patients with malignant pleural mesothelioma, or (b) for the initial treatment of locally advanced or metastatic nonsquamous non-small cell lung cancer.  Alimta® also is indicated as a single-agent for the treatment of patients with locally advanced or metastatic nonsquamous non-small cell lung cancer after prior chemotherapy.  Alimta® also is indicated for maintenance treatment of patients with locally advanced or metastatic nonsquamous non-small cell lung cancer whose disease has not progressed after four cycles of platinum-based first-line chemotherapy.

On September 8, 2017, Eagle moved to dismiss the Indiana Suit for improper venue.  On September 11, 2017, Lilly voluntarily dismissed the Indiana Suit.  It then filed a complaint in the United States District Court for the District of Delaware, alleging similar patent infringement claims (the "Delaware Suit").  Eagle answered and filed various counterclaims in the Delaware Suit on October 3, 2017.  Lilly answered Eagle's counterclaims on October 24, 2017.  The Court held a scheduling conference on December 11, 2017 and set trial in the Delaware Suit to begin on September 9, 2019. On May 31, 2018, Eagle filed a Motion for Judgment on the Pleadings, which the Court denied on October 26, 2018. On January 23, 2019, the Court held a Markman hearing. Trial is scheduled to begin on September 9, 2019. The Delaware Suit is pending.

*Eagle Pharmaceuticals, Inc., et al. v. Slayback Pharma Limited Liability Company; Eagle Pharmaceuticals, Inc., et al. v. Apotex Inc. and Apotex Corp.; Eagle Pharmaceuticals, Inc., et al. v. Fresenius Kabi USA, LLC; Eagle Pharmaceuticals, Inc., et al. v. Mylan Laboratories Limited; Eagle Pharmaceuticals, Inc. et al. v. Hospira, Inc. - (BENDEKA®)*

BENDEKA®, which contains bendamustine hydrochloride, is an alkylating drug that is indicated for the treatment of patients with chronic lymphocytic leukemia, as well as for the treatment of patients with indolent B-cell non-Hodgkin's lymphoma that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen. Four companies - Slayback Pharma Limited Liability Company ("Slayback"), Apotex Inc. and Apotex Corp. ("Apotex"), Fresenius Kabi USA, LLC ("Fresenius"), and Mylan Laboratories Limited ("Mylan") - have filed Abbreviated New Drug Applications ("ANDA's") referencing BENDEKA® that include challenges to one or more of the BENDEKA® Orange Book-listed patents. Hospira, Inc. ("Hospira") a 505(b)(2) NDA.

The Company, Cephalon, Inc. and/or Teva Pharmaceuticals International GMBH (together the "Patentees"), filed separate suits against Slayback, Apotex, Fresenius, Mylan and Hospira in the United States District Court for the District of Delaware on August 16, 2017 (Slayback ("Slayback I")), August 18, 2017 (Apotex), August 24, 2017 (Fresenius), December 12, 2017 (Mylan), January 19, 2018 (Slayback ("Slayback II")), and July 19, 2018 (Hospira). In these Complaints, the Patentees allege infringement of the challenged patents, namely U.S. Patent Nos. 8,791,270 and 9,572,887 against Slayback (Slayback I and Slayback II), and of U.S. Patent Nos. 8,609,707, 8,791,270, 9,000,021, 9,034,908, 9,144,568, 9,265,831, 9,572,796, 9,572,797, 9,572,887, 9,579,384, 9,597,397, 9,597,398, 9,597,399 against Fresenius, Apotex, and Mylan, and of U.S. Patent Nos. 9,572,887, 10,010,533, 9,034,908, 9,144,568, 9,597,397, 9,597,398, 9,597,399, 9,000,021, 9,579,384 against Hospira. The parties stipulated to dismiss without prejudice U.S. Patent No. 8,791,270 as to Apotex, Fresenius and Mylan on July 24, 2018, August 2, 2018, and August 3, 2018,

F- 32

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

respectively. Slayback, Apotex, Fresenius, and Mylan answered their Complaints and some filed various counterclaims on September 29, 2017 (Slayback I), February 12, 2018 (Slayback II), November 27, 2017, September 15, 2017, and February 14, 2018, respectively. The Patentees answered the Slayback I, Slayback II, Fresenius, and Apotex counterclaims on October 20, 2017, March 5, 2018, October 6, 2017, and December 18, 2017, respectively. The Slayback I, Slayback II, Apotex, Fresenius and Mylan cases have been consolidated for all purposes, with Trial scheduled to begin September 3, 2019. On October 15, 2018, the Patentees filed a suit against Fresenius and Mylan in the United States District Court for the District of Delaware, alleging patent infringement of U.S. Patent Nos. 10,010,533 and 10,052,385. Hospira filed a motion to dismiss the case, which was fully briefed on November 16, 2018. All seven cases are pending.

The FDA is stayed from approving Apotex's, Fresenius', Mylan's ANDA's, and Hospira's 505(b)(2) application until the earlier of (1) January 7, 2020, January 14, 2020, April 30, 2020, and December 20, 2020 respectively (the "30-month stay dates"); and (2) a court decision that each of the challenged patents is not infringed, invalid or unenforceable. The 30-month stay dates may be shortened or lengthened if either party to the action fails to reasonably cooperate in expediting the action. The FDA cannot approve Slayback's ANDA until March 2033.

*Eagle Pharmaceuticals, Inc. v. Slayback Pharma Limited Liability Company*

Slayback Pharma Limited Liability Company ("Slayback") filed an ANDA referencing Eagle's Big Bag. Slayback's ANDA includes challenges to one or more of the Big Bag Orange Book-listed patents. On September 20, 2018, the Company filed a suit against Slayback in the United States District Court for the District of Delaware, alleging patent infringement of U.S. Patent Nos. 8,609,707, 9,265,831, 9,572,796, 9,572,797 and 10,010,533. On October 10, 2018, Slayback answered the Complaint and filed various counterclaims. On October 31, 2018, the Company answered Slayback's counterclaims. This case is currently stayed.

*Eagle Pharmaceuticals, Inc. v. Slayback Pharma Limited Liability Company*

Slayback filed a 505(b)(2) NDA referencing Eagle's Big Bag. Slayback's NDA includes challenges to one or more of the Big Bag Orange Book-listed patents. On December 11, 2018, the Company filed a suit against Slayback in the United States District Court for the District of Delaware, alleging patent infringement of U.S. Patent Nos. 9,265,831, 9,572,796, 9,572,797 and 10,010,533. On December 13, 2018, Slayback answered the Complaint and filed various counterclaims. This case is pending.

*Par Pharmaceutical, Inc. et al. v. Eagle Pharmaceuticals, Inc. (Vasopressin)*

On May 31, 2018, Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Endo Par Innovation Company, LLC (together "Par") filed suit against the Company in the United States District Court for the District of Delaware. Par alleged patent infringement based on the filing of the Company's Abbreviated New Drug Application ("ANDA") seeking approval to manufacture and sell the Company's vasopressin product. The Company's vasopressin product, if approved by FDA, will be an alternative to Vasostrict, which is indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines. The Company answered the complaint on August 6, 2018. Trial is scheduled to begin May 18, 2020. This suit is pending.

F- 33

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

## 15. Selected Quarterly Financial Data - Unaudited

A summary of quarterly financial information for the year ended December 31, 2018 and 2017 is as follows:

| | For the Quarter Ended | | | | | | | | | Total Fiscal Year 2018 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | March 31, 2018 | | June 30, 2018 | | September 30, 2018 | | December 31, 2018 | | | | |
| | (in thousands except share and per share amounts) | | | | | | | | | | |
| Revenue | $ | 46,626 | $ | 59,296 | $ | 51,337 | $ | 56,053 | $ | | 213,312 |
| Income from operations | $ | 2,305 | $ | 183 | $ | 18,402 | $ | 15,726 | $ | | 36,616 |
| Net income attributable to common stockholders | $ | 2,616 | $ | 2,659 | $ | 1,404 | $ | 25,224 | $ | | 31,903 |
| Income per share attributable to common stockholders- basic | $ | 0.18 | $ | 0.18 | $ | 0.94 | $ | 0.86 | $ | | 2.16 |
| Income per share attributable to common stockholders- diluted | $ | 0.17 | $ | 0.17 | $ | 0.91 | $ | 0.84 | $ | | 2.09 |

| | For the Quarter Ended | | | | | | | | | Total Fiscal Year 2017 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | March 31, 2017 | | June 30, 2017 | | September 30, 2017 | | December 31, 2017 | | | | |
| | (in thousands except share and per share amounts) | | | | | | | | | | |
| Revenue | $ | 76,793 | $ | 50,108 | $ | 63,021 | $ | 46,785 | $ | | 236,707 |
| Income from operations | $ | 32,696 | $ | 5,902 | $ | 24,950 | $ | 10,442 | $ | | 73,990 |
| Net income attributable to common stockholders | $ | 22,924 | $ | 4,503 | $ | 15,431 | $ | 9,085 | $ | | 51,943 |
| Income per share attributable to common stockholders- basic | $ | 1.50 | $ | 0.30 | $ | 1.03 | $ | 0.61 | $ | | 3.44 |
| Income per share attributable to common stockholders- diluted | $ | 1.42 | $ | 0.28 | $ | 0.98 | $ | 0.58 | $ | | 3.27 |

## 16. Restructuring

As part of its ongoing organizational review, the Company engaged in a restructuring initiative to rationalize its product portfolio and focus its physical sites. These measures included the discontinuation of manufacture and distribution of Non-Alcohol Docetaxel Injection in June 2018 and plans to rationalize research and development operations. Charges consist of inventory and related reserves, certain asset impairment charges related to property and equipment, and personnel related costs. The restructuring costs of $7,911 for the year ended December 31, 2018 has been recorded to Restructuring charge on the Consolidated Statements of Income. The Company also recorded an asset impairment charge for the remaining Intangible asset for Non-Alcohol Docetaxel Injection of $2,704 as well as an adjustment to remove the contingent consideration of $790 on the related line items in the Statements of Income for the year ended December 31, 2018. The Company does not expect to incur additional expenses related to this restructuring initiative. There is no liability remaining for the restructuring as of December 31, 2018.

## 17. Related Party Transaction

During the year ended December 31, 2018, the Company obtained legal services from Greenberg Traurig, LLP in exchange for $0.2 million. Richard A. Edlin, a member of the Company's Board, is an attorney and shareholder of Greenberg Traurig, LLP.

**Exhibit 21.1**

**Subsidiaries of Eagle Pharmaceuticals, Inc.**

| **Name of Subsidiary** | **Jurisdiction of Incorporation** |
|---|---|
| Eagle Biologics, Inc. (formerly Arsia Therapeutics, Inc.) | Delaware |

**Exhibit 23.1**

<u>Consent of Independent Registered Public Accounting Firm</u>

Eagle Pharmaceuticals, Inc.
Woodcliff Lake, New Jersey

We hereby consent to the incorporation by reference in the Registration Statement on Form S--3 (No. 333-202592) and Form S-8 (Nos. 333-228876, 333-216839, 333-213683, 333-206729 and 333-194056) of Eagle Pharmaceuticals, Inc. (the "Company") of our reports dated February 28, 2019, relating to the consolidated financial statements, and the effectiveness of the Company's internal control over financial reporting, which appear in this Form 10-K.

/s/ BDO USA, LLP
Woodbridge, New Jersey
February 28, 2019

**Exhibit 31.1**

## Certification of Principal Executive Officer

I, Scott Tarriff, certify that:

1. I have reviewed this annual report on Form 10-K of Eagle Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2019

/s/ Scott Tarriff

Scott Tarriff
Chief Executive Officer
(Principal Executive Officer)

**Exhibit 31.2**

### Certification of Principal Financial and Accounting Officer

I, Pete A. Meyers, certify that:

1. I have reviewed this annual report on Form 10-K of Eagle Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: February 28, 2019

/s/ Pete A. Meyers

Pete A. Meyers
Chief Financial Officer
(Principal Accounting and Financial Officer)

**Exhibit 32.1**

<div align="center">

**Certification Pursuant to**

**18 U.S.C. Section 1350,**

**As Adopted Pursuant to**

**Section 906 of the Sarbanes-Oxley Act of 2002**

</div>

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), **Scott Tarriff**, President and Chief Executive Officer of Eagle Pharmaceuticals, Inc. (the "Company"), and **Pete A. Meyers**, Chief Financial Officer of the Company, each hereby certifies that, to the best of his knowledge:

1. The Company's Annual Report on Form 10-K for the period ended December 31, 2018 (the "Annual Report"), to which this Certification is attached as Exhibit 32.1, fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act, and

2. The information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**In Witness Whereof**, the undersigned have set their hands hereto as of the 28th day of February, 2018.

/s/ Scott Tarriff                    /s/ Pete A. Meyers

Scott Tarriff                    Pete A. Meyers

Chief Executive Officer                    Chief Financial Officer

(Principal Executive Officer)            (Principal Financial and Accounting Officer)

This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Eagle Pharmaceuticals, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing.

EXHIBIT 6

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the fiscal year ended December 31, 2019**
or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**
**For the transition period from _____ to _____ .**
**Commission File Number 001-36306**

# Eagle Pharmaceuticals, Inc.
(Exact Name of Registrant as Specified in its Charter)

| **Delaware** | **2834** | **20-8179278** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**50 Tice Boulevard, Suite 315**
**Woodcliff Lake, NJ 07677**
**(201) 326-5300**
(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Trading symbol** | **Name of each exchange on which registered** |
|---|---|---|
| Common stock, $0.001 par value per share | EGRX | The Nasdaq Global Market |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes o No x

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes o No x

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes  x   No  o

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes  x   No  o

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in 12b-2 of the Exchange Act.

| Large accelerated filer | Accelerated filer | Non-accelerated filer | Smaller reporting company |
|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ |

Emerging growth company    ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. o

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No  x

The aggregate market value of voting Common Stock held by non-affiliates of the registrant was approximately $677,440,631 computed by reference to the last reported sale price of $55.68 per share as reported by The Nasdaq Global Market, as of the last business day of the registrant's most recently completed second fiscal quarter, June 30, 2019. This calculation does not reflect a determination that certain persons are affiliates of the registrant for any other purpose.

The number of shares outstanding of the registrant's common stock, $0.001 par value per share, as of February 24, 2020 was 13,679,350 shares.

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the definitive proxy statement for our 2020 annual meeting of stockholders, which is to be filed within 120 days after the end of the fiscal year ended December 31, 2019, are incorporated by reference into Part III of this Form 10-K, to the extent described in Part III.

**EAGLE PHARMACEUTICALS, INC.**

**ANNUAL REPORT ON FORM 10-K**

**For the fiscal year ended December 31, 2019**

**Part I** | Page
Item 1. | Business | 4
Item 1A. | Risk Factors | 27
Item 1B. | Unresolved Staff Comments | 57
Item 2. | Properties | 58
Item 3. | Legal Proceedings | 58
Item 4. | Mine Safety Disclosures | 58

**Part II**
Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 59
Item 6. | Selected Financial Data | 61
Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 62
Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 76
Item 8. | Financial Statements and Supplementary Data | 77
Item 9. | Changes and Disagreements with Accountants on Accounting and Financial Disclosure | 77
Item 9A. | Controls and Procedures | 77
Item 9B | Other Information | 80

**Part III**
Item 10. | Directors, Executive Officers and Corporate Governance | 80
Item 11. | Executive Compensation | 80
Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 80
Item 13. | Certain Relationships and Related Transactions, and Director Independence | 80
Item 14. | Principal Accounting Fees and Services | 80

**Part IV**
Item 15. | Exhibits and Financial Statement Schedules | 81
Item 16. | Form 10-K Summary | 84
| Signatures |

**Eagle Pharmaceuticals, Inc.**

### NOTE REGARDING FORWARD-LOOKING STATEMENTS

The Eagle Pharmaceuticals, Inc. name and logo, and Ryanodex®, are either registered trademarks or trademarks of Eagle Pharmaceuticals, Inc. in the United States and/or other countries. All other trademarks, service marks or other tradenames appearing in this Annual Report on Form 10-K are the property of their respective owners. Solely for convenience, trademarks and trade names referred to in this report may appear without the ® or TM symbols. References to the "Company," "Eagle Pharmaceuticals," "Eagle," "we," "us" or "our" mean Eagle Pharmaceuticals, Inc., a Delaware corporation and its subsidiaries, references to "Eagle Biologics" mean Eagle Biologics, Inc. and references to "Eagle Research Lab" mean Eagle Research Lab Limited.

This Annual Report on Form 10-K includes forward-looking statements within the meaning of Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act, and Section 27A of the Securities Act of 1933, as amended, or the Securities Act. For this purpose, any statements contained herein regarding our strategy, future operations, financial position, future revenues, projected costs, prospects, plans and objectives of management, other than statements of historical facts, are forward-looking statements. These statements relate to future events or to our future financial performance and involve known and unknown risks, uncertainties and other factors which may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. Forward-looking statements include, but are not limited to, statements about:

- the success, cost and timing of our product development activities and clinical trials;
- our ability to obtain and maintain regulatory approval of our products and product candidates, and any related restrictions, limitations, and/or warnings in the label of an approved product;
- our ability to obtain funding for our operations;
- our plans to research, develop and commercialize our products and product candidates and our ability to successfully commercialize our products and product candidates;
- our ability to attract collaborators with development, regulatory and commercialization expertise;
- the size and growth potential of the markets for our products and product candidates, and our ability to serve those markets;
- the rate and degree of market acceptance of our products and product candidates;
- our ability to develop sales and marketing capabilities, whether alone or with potential future collaborators;
- the performance of our strategic collaborators and success of our current strategic collaborations;
- regulatory developments in the United States and foreign countries;
- the performance of our third-party suppliers and manufacturers;
- the success of competing drugs that are or become available;
- the retention of key scientific or management personnel;
- our use of the proceeds from our initial public offering; and subsequent follow-on offering;
- the accuracy of our estimates regarding expenses, future revenues, capital requirements and needs for additional financing;
- our expectations regarding our ability to obtain and maintain intellectual property protection for our product candidates; and
- our ability to prevent or minimize the effects of Paragraph IV patent litigation.

Forward-looking statements are statements that are not historical facts. Words such as "believes," "potential," "will," "could," "would," "should," "may," "intends," "anticipates," "plans," "enables," "entitles," "estimates," "projects," "predicts," and similar expressions are intended to identify forward-looking statements.

These forward-looking statements reflect our management's beliefs and views with respect to future events, are based on estimates and assumptions as of the date of this Annual Report on Form 10-K, and are subject to risks and uncertainties. Additionally, these statements are based upon information available to us as of the date of this Annual Report on Form 10-K, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain, and investors are cautioned not to unduly rely upon these statements. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. Some of these important factors include our "critical accounting estimates" described in Item 7 in Part II of this Annual Report on Form 10-K and the factors set forth under the caption "Risk Factors" in Item 1A in Part I of this Annual Report on Form 10-K. Moreover, we operate in a very competitive and rapidly changing environment. Although we may elect to update forward-looking statements in the future, we specifically disclaim any obligation to do so (unless required by law), even if our estimates change, and readers should not rely on our forward-looking statements as representing our views as of any date subsequent to the date of this Annual Report on Form 10-K.

3

**PART I**

**Item 1. Business**

**Company Overview**

*Organization*

We are a pharmaceutical company registered at and with principal offices at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677, we also have a state-of-the-art R&D lab in Cambridge, Massachusetts.

*Business*

Our business model is to develop proprietary innovations to FDA-approved, injectable drugs, that offer commercial and/or functional advantages to currently available alternatives. We are focused on developing and commercializing injectable drugs, primarily in the Central Nervous System ("CNS") critical care and oncology areas, among other underserved therapeutic areas, using the U.S. Food and Drug Administration ("FDA")'s 505(b)(2) New Drug Application ("NDA") regulatory pathway. We market and/or commercialize our products through marketing partners and/or through our internal direct sales force.

For each of our current and future pre-commercial products, we target market entry no later than the entry of the first generic or as an approved 505(b)(2) NDA drug with the goal of substantially converting the market by addressing the needs of stakeholders who ultimately use our products. We believe we can further extend commercial duration through new intellectual property protection and/or orphan drug exclusivity and three years of non-patent regulatory exclusivity for future product candidates, as provided under applicable law and regulations. We strive to enhance branded reference drugs to optimize their ease and safety of use for healthcare providers, produce less drug waste, lower cost to stakeholders, and create the opportunity for label expansion to additional indications.

Our 505(b)(2) model has been validated by the approval and successful launches of our novel formulations of Ryanodex® (dantrolene sodium) ("Ryanodex") and Eagle's bendamustine ready-to-dilute ("RTD") 500ml solution ("Belrapzo"); marketed by Eagle, and rapidly infused bendamustine RTD ("Bendeka"); marketed by Teva Pharmaceutical Industries Ltd. ("Teva"), licensed to and launched jointly with Teva in 2016.

Our product portfolio now includes three approved products: Ryanodex; Belrapzo; and Bendeka. Our primary commercial partner is Teva, which through its subsidiary Cephalon, Inc. ("Cephalon") markets Bendeka.

On February 10, 2020, we received final approval from the FDA for our novel product PEMFEXY™ (pemetrexed for injection), a branded alternative to ALIMTA®.

We currently have multiple product candidates in advanced stages of development, and/or under review for approval by the FDA. Our advanced product candidates are EP-4104 (dantrolene sodium for exertional heat stroke ("EHS") and nerve agent exposure) ("EP-4104"), and EGL-5385-C-1701 ("fulvestrant"). EP-4104 and EGL-5385-C-1701, both unapproved, may address unmet medical needs in major specialty markets. Vasopressin is our first to file Abbreviated New Drug Application ("ANDA") that references Endo's Vasostrict® indicated to increase blood pressure in adults with vasodilatory shock who remain hypotensive despite fluids and catecholamines. Our ANDA submission was accepted for filing by the FDA in March 2018. These projects and others noted below have the potential to yield 5 product launches in the next 3 years.

In 2019 and in January and February 2020, we accomplished the following with respect to our product portfolio and our development projects:

- On February 21, 2019, the FDA issued a decision in favor of the Company regarding the scope of exclusivity for Bendeka™. Pursuant to the decision, no bendamustine product (including generic versions of TREANDA®) may launch in the United States until December 7, 2022 unless it is clinically superior to Bendeka. Prior to the decision, generic versions of TREANDA were poised to enter the market in November 2019.
- As of March 29, 2019, the Company and TPIG executed an amendment to the Cephalon License Agreement to terminate Teva's obligation to pay future milestones and royalties on Bendeka sales outside of the U.S., which included

4

an upfront cash payment of $9 million that was recorded as License and other revenue on the consolidated statements of income.

- On April 13, 2019, the Company and Teva Pharmaceutical Industries Ltd. ("Teva") entered into an Amendment to the Cephalon License Agreement ("Cephalon License"), amending the terms of the License Agreement to increase the U.S. royalty paid to the Company and re-allocate certain litigation expenses. Pursuant to the Amendment, beginning on October 1, 2019, the Company's royalty payment will increase from 25% to 30% of Bendeka net United States sales, provided that Bendeka's orphan drug exclusivity has not been rescinded, withdrawn or waived by such date. The royalty rate will increase by one percentage point on each anniversary of October 1, 2019 until it reaches 32%, and it will remain at 32% thereafter. The Amendment also extends the U.S. royalty term for Bendeka until it is no longer sold in the United States. The previous royalty term was set to expire in 2025. The extended term coincides with the bendamustine patents with expiries through 2033. Pursuant to the amendment, Eagle will continue to be responsible for the manufacture of Bendeka for the U.S. market for so long as it is sold in the United States.

- On April 22, 2019, the Centers for Medicare & Medicaid Services ("CMS") granted unique J code for Belrapzo.

- On May 7, 2019, the Company announced positive results of its study to evaluate the neuroprotective effects of Ryanodex secondary to nerve agent exposure, conducted with the United States Army Medical Research Institute of Chemical Defense.

- On August 5, 2019, the Company announced a clinical development plan to support the submission of a NDA for our fulvestrant formulation. Fulvestrant, an estrogen receptor antagonist with no agonist properties, is approved by the FDA for the treatment of advanced hormone-related breast cancers. The therapeutic effect of fulvestrant relies on its ability to inhibit estrogen receptors ("ER") in cancer cells by binding to and downregulating, or blocking, the ER in breast cancer cells. Eagle's original formulation of fulvestrant was studied in a clinical trial conducted in 2018 in healthy post-menopausal women. A detailed review of the study data led to the hypothesis that the unique properties of our formulation would potentially allow for greater inhibition of estrogen receptors. Based on this hypothesis, the Company completed additional work designed to further enhance our proprietary drug formulation. The Company met with the FDA and mutually agreed to a clinical program that could provide an efficient approval pathway for our fulvestrant formulation. The main goal of the clinical research program is to determine if the unique properties of our fulvestrant formulation will result in greater inhibition of estrogen receptors, potentially leading to improved efficacy outcomes, including lower disease progression rates, compared to current treatment options. The Company intends to begin a pilot study shortly in healthy female volunteers to evaluate the pharmacokinetics and safety of our formulation. Once the pilot study results are reviewed, a clinical pivotal trial designed to evaluate fulvestrant exposure and estrogen receptor inhibition based upon the parameters determined with the FDA will be conducted in a target patient population. Depending on recruitment rates and other factors, the Company believes the pivotal study could be completed within approximately 12 months of commencing enrollment.

- On October 7, 2019, we announced that our marketing partner SymBio Pharmaceuticals Limited ("SymBio") has submitted a New Drug Application ("NDA") for TREAKISYM ready-to-dilute ("RTD") liquid formulation in Japan. The NDA covers all indications for which TREAKISYM is currently approved (low-grade non-Hodgkin's lymphoma, mantle cell lymphoma, and chronic lymphocytic leukemia). SymBio expects to launch the TREAKISYM RTD product in the first quarter of 2021, after obtaining marketing authorization. Approval is expected in Q4 2020, which would trigger a $5 million milestone payment to Eagle. Potential payments to Eagle could reach $10 to $25 million per year in royalties and milestones.

- On November 12, 2019, we announced that the Company has recruited a total of 41 patients at the 2015, 2018 and 2019 Hajj pilgrimages. We have submitted a plan to the FDA that proposes reviewing the data collectively for all 41 patients. If FDA agrees with this plan, Eagle plans to resubmit the NDA for EHS in response to the Complete Response Letter received in 2017.

- On December 9, 2019, we announced that the Company has commenced dosing in a pilot clinical study to assess the unique characteristics of its fulvestrant product candidate, which has the potential to enhance ER inhibition and improve patient outcomes. The results of the pilot study will inform the design of the Company's pivotal trial, which Eagle expects to commence in 2020. Fulvestrant, an estrogen receptor antagonist with no agonist properties, is approved by the FDA for the treatment of advanced hormone-related breast cancers. Breast cancer is the most commonly diagnosed cancer in women, with approximately 290,000 women diagnosed in the U.S. annually and more than 2.8 million breast cancer survivors in the U.S. today.

- On December 13, 2019, we reached a settlement agreement with Eli Lilly and Company related to the Company's novel product, PEMFEXY™ (pemetrexed for injection), a branded alternative to ALIMTA®. The agreement provides for a release of all claims by the parties and allows for an initial entry of PEMFEXY™ into the market (equivalent to approximately a three week supply of current ALIMTA®utilization) on February 1, 2022 and a subsequent uncapped entry on April 1, 2022.

- On December 16, 2019, we announced that the FDA granted orphan drug designation (ODD) for Ryanodex® (dantrolene sodium) for the treatment of organophosphate exposure. Organophosphates are a class of chemicals that

5

include potent pesticides and chemical weapons, known as nerve agents. Acute intoxication with organophospates may result in severe consequences, including brain damage and death. About 2,700 people in the United States are treated for accidental exposure to organophosphate pesticides every year. Eagle is currently evaluating Ryanodex for the treatment of brain damage secondary to nerve agent exposure. If approved, Ryanodex would represent the first product available for this indication.

- On January 6, 2020, we issued a press release announcing a new research agreement with NorthShore University HealthSystem in Evanston, Illinois, focused on studying Ryanodex for traumatic brain injury (TBI) in animal models. TBI can acutely cause brain lesions that result in direct tissue damage that may prompt apoptotic cell mechanisms for several weeks post-injury, which may lead to worsened long-term outcomes. Disruption of certain intracellular mechanisms may affect cell functioning and survival.
- On January 7, 2020, Tyme Technologies, Inc. and Eagle Pharmaceuticals announced a strategic collaboration to advance oral SM-88 for the treatment of patients with cancer. SM-88 is an investigational agent in two Phase 2 studies for pancreatic cancer and in a Phase 2 study for prostate cancer. Data is expected in 2021.
- On January 9, 2020, we announced that the Company has resubmitted its New Drug Application ("NDA") for Ryanodex® (dantrolene sodium for injectable suspension) for the treatment of exertional heat stroke ("EHS"), in addition to body cooling, to the FDA. Eagle believes that this submission addresses the Complete Response Letter received in July 2017. A Prescription Drug User Fee Act ("PDUFA") date of six months is anticipated for this class of resubmissions.
- On January 13, 2020, we issued a press release announcing that the Company and the University of Pennsylvania had agreed on terms of a new exclusive worldwide license agreement for the development of dantrolene sodium for the potential treatment of people living with Alzheimer's disease, including an agreement to fund additional research and provisions regarding commercialization of products developed under the license.
- On February 10, 2020, we announced that it has received final approval from the FDA for its novel product, PEMFEXY™ (pemetrexed for injection), a branded alternative to ALIMTA®.

We have built an internal commercial team consisting of 47 direct sales representatives, support staff and management who are a part of our independent commercial organization.

**Our Competitive Strengths**

**Our Purpose**

We believe that many currently available CNS critical care and oncology injectable drugs and biopharmaceuticals have suboptimal characteristics that do not meet the needs of patients, physicians, nurses or pharmacists. These characteristics can impact safety, shelf life, convenience, waste, cost, and ease of use by practitioners and pharmacy staff. For instance, existing drugs may be packaged inefficiently or come in formulations that require reconstitution or dilution, or which are otherwise difficult or inconvenient to prepare, and which could expose workers to cytotoxic compounds and can result in dosing errors. This can also lead to wasted quantities of drug, inefficiencies in staff time and constrained work flow, reduced shelf life and the need for multiple dosing of individual patients to complete treatment. Likewise the viscosity of many biologic products requires them to be delivered intravenously often in time consuming and sometimes painful treatments for patients. We believe there is a large and unmet market for developing injectable drugs that address the specific needs of patients, physicians, nurses and pharmacists to simplify their use, reduce waste and lower healthcare costs.

We have and continue to engage physicians, nurses, pharmacists and key opinion leaders, to identify specific products where the characteristics described above present opportunities for product improvement. We evaluate the product opportunities presented by the stakeholders and determine whether or not they conform to our research and development planning. A key aspect of our evaluation is the intellectual property landscape for each product opportunity, including our ability to avoid infringing existing patents and the potential patentability of our modified version of the drug. We utilize our experienced team of formulators with extensive experience with injectable pharmaceuticals, and a track record of success in product development, regulatory relations, and quality assurance to develop improved products.

Because our products are differentiated from the branded reference drugs, we believe we are able to avoid infringing existing patents covering the branded reference drug allowing us to enter the existing market before applicable generic drugs, which may be subject to protracted patent litigation that delays market entry. Protracted litigation is a significant barrier to entry for competitors seeking approval of an ANDA referencing the branded reference product, and our early entry into the market leads to less price erosion due to constrained competition. Our patent holdings include over 30 owned or exclusively-licensed U.S. issued patents and over 10 filed U.S. patent applications, as well as several patents and patent applications that have been filed in various worldwide

6

territories, that we believe protect or will protect, as applicable the market value of our current portfolio of products. We believe that other potential barriers to entry for our competitors consist of the following:

- our early entry into the market allows us to influence usage patterns when fewer, if any, competitors exist and allows us to market our products as improved versions of the branded reference drug prior to or concurrent with any generic entry, thereby giving us the opportunity to capture significant market share at this early stage. We believe that such early entry into the market will limit later conversions into generic versions of the branded reference drugs, allowing us to maintain market share and favorable pricing;
- the potential for seven years of exclusivity upon approval of a 505(b)(2) NDA that receives orphan drug status; and
- the potential for three years of regulatory exclusivity for our future product candidates upon approval, if any, of a 505(b)(2) NDA supported by new clinical investigations (other than bioequivalence and bioavailability studies) essential to approval of the application.

Our product portfolio is focused on oncology, CNS critical care, and orphan diseases and includes five approved products, and several distinct product candidates in advanced development. Additionally, we have other exploratory candidates under our collaborative agreement with AMRI.

We believe that we can leverage our formulation and development expertise to achieve improved product attributes in terms of potential for longer stability, shorter infusion times, less waste and/or ease and safety of use for healthcare professionals and achieve longer commercial duration compared to generic competitors. We believe that our products may offer certain benefits as compared to existing injectable drugs which may include one or more of the following:

- improved safety through elimination of reconstitution in the pharmacy or in the acute care setting;
- reduction in the number of injections required;
- reduction in the volume of drug needed to be injected, potentially expanding the application to additional medical situations;
- reduction in the amount of diluent required to administer the drug;
- reduction in drug waste;
- reduction in drug infusion time; and
- potential label expansion to include additional indications.

**Our Strategy**

Our goal is to be a leading specialty pharmaceutical company focused on the development and commercialization of injectable pharmaceutical products for use in acute care settings that represent an improvement over the currently marketed reference drug. Our strategy to achieve this goal includes:

*Strengthen our product portfolio.* We intend to continue to strengthen our product portfolio in the areas of oncology, CNS critical care and orphan diseases. We will continue to develop our current product portfolio and leverage our expertise to identify new products with suboptimal characteristics that present us with significant opportunity for revenue generation. In addition to our internal efforts, we will opportunistically in-license or acquire product candidates that fit our therapeutic areas of focus and meet our rigorous evaluation process.

*Enter the market no later than the first generic drug.* We intend to enter the market no later than the first generic or biosimilar of the branded reference drug. During this period, the number of competitors is lowest and branded drugs are generally at peak or near peak value. This will allow us to influence usage patterns and market our products as improved versions, thereby achieving favorable pricing. Even if we enter the market simultaneously with, or after, the first generic drug, as a 505(b)(2) applicant, we would be able to enter the market without regard to any generic drug's 180-day exclusivity period.

*Retain commercial rights in the United States and selectively partner outside of the United States.* In general, we believe that we can cost-effectively commercialize our products in the United States internally or through a contracted sales force and selected commercial arrangements, and thereby retain the commercial value of these products. We have established a small, contract specialty sales force focusing on GPOs, hospital systems and key stakeholders in acute care settings, primarily hospitals. Outside of the United States, we may utilize partners for the commercialization of our products.

*Continue to build a robust intellectual property portfolio.* Our patent estate includes over 30 owned or exclusively-licensed U.S. issued patents and over 10 filed U.S. patent applications, as well as several that have been filed in various worldwide territories, that protect or will protect, as applicable the market value of our approved and pipeline products. We intend to continue to build

7

our patent portfolio by filing for patent protection on new developments with respect to our product candidates that will not infringe patents that cover the branded reference drugs. We expect that these will, if issued, allow us to list our own patents in the Orange Book, to which potential competitors will be required to certify upon submission of their applications referencing our products, if approved.

**Our Products and Product Portfolio**

***Belrapzo and Bendeka (Licensed to Teva and SymBio) for Chronic Lymphocytic Leukemia ("CLL") and Non-Hodgkin's Lymphoma ("NHL")***

*Overview*

Bendamustine is an alkylating agent approved for use in CLL, and indolent B-cell NHL, that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen (which we refer to herein as the NHL indication).

*U.S. Marketed Bendamustine Products*

Teva currently markets its lyophilized bendamustine product under the trade name Treanda®. Teva ceased distribution of Treanda® liquid on March 30, 2016.

*Limitations of Marketed Bendamustine Products*

Treanda® is a lyophilized powder that requires reconstitution in water prior to use. A 500 mL intravenous (IV) administration is used over 30 or 60 minutes for CLL and NHL patients, respectively. The product is sold in single use vials creating an opportunity for product waste in certain applications.

*Eagle's Solution: Belrapzo and Bendeka*

The Belrapzo and Bendeka liquid formulations eliminate the need to reconstitute the drug prior to use, relative to the lyophilized presentation of Treanda®. As a result, we believe that relative to the lyophilized presentation of Treanda® there is less potential for dosing errors, less exposure to cytotoxic powders and a more efficient work flow.

Additionally, admixtures prepared with Bendeka contain lower sodium as compared with Treanda® which could be of benefit to the predominantly elderly, renally impaired and cardiovascular compromised patients. Also, Bendeka is available in a multi-use vial, which allows infusion centers and hospitals to avoid needless waste of unused drug remaining after procedures with single use vials.

*Belrapzo*

On May 15, 2018, the FDA granted final approval for Belrapzo, a ready-to-dilute ("RTD"), multi-dose liquid with extended drug stability for use with a 500mL intravenous, or IV, infusion bag.

*Teva License- Bendeka*

Bendeka is the same RTD, multi-dose liquid formulation as Belrapzo, with extended drug stability, but for use with a 50 mL IV infusion bag, which enables it to be administered in a shorter time-period than current drugs on the market and represents a label expansion from Belrapzo. We received orphan drug designation for Bendeka for CLL and NHL in July 2014. We entered into the Cephalon License to market this product. *See License Agreements - Cephalon License Agreement, below.*

***Ryanodex® for Malignant Hyperthermia***

*Overview*

Dantrolene was first introduced to the U.S. market in 1979 and is currently the only drug approved to treat a rare genetic disorder called malignant hyperthermia ("MH"). There are only 500 to 800 cases of MH in the United States each year, qualifying dantrolene for orphan drug designation. This disease is triggered when a patient with this genetic predisposition has a surgical procedure and is exposed to certain inhaled anesthetics or the muscle relaxant, succinylcholine. When this exposure occurs, a metabolic response can be triggered in the patient resulting in an episode of MH that can be fatal if not treated immediately. Because dantrolene is the

8

only approved drug available to treat MH, the Joint Commission on Accreditation of Healthcare Organizations, (the "Joint Commission") requires that all hospitals stock vials of this product at all times, generally in the operating room area.

*Currently-Preexisitng Dantrolene Products for MH*

The two preexisting injectable dantrolene drugs on the market for the treatment of MH, Dantrium® and Revonto®, are offered in a vial containing 20mg of lyophilized powder that requires mixing with 60mL of sterile water. We estimate that the addressable U.S. market opportunity for MH drugs is approximately $75 million per year.

*Limitations of Dantrium® and Revonto®*

When an MH crisis occurs during surgery, the surgical procedure is immediately discontinued and the anesthesiologist and others in the operating room quickly begin reconstituting dantrolene, often at the same time as performing other resuscitative efforts, in order to administer the drug to the patient as an IV push. Based on recommendations from the Malignant Hyperthermia Association of the United States ("MHAUS"), the recognized authority on treating MH in the United States, the recommended dose is 2.5mg/kg or higher. It is critically important that the drug be administered as rapidly as possible, as MH symptoms include tachycardia, elevated blood pressure, raised $CO_2$ levels and very high body temperature levels. If not treated immediately, the disease can be fatal.

Because of the dosing required in adult patients to reverse the MH symptoms and the current formulations of Dantrium® and Revonto®, it is often necessary to reconstitute 10 to 20 vials of dantrolene. As the current formulations are also poorly water soluble, this process generally takes up to 15 to 20 minutes at a point when time is critical and the patient is extremely unstable. Furthermore, the volume of diluent required to reconstitute Dantrium® and Revonto® means that the adult patient receives a significant volume of fluid (600mL to 1,200mL) as an IV infusion, which on occasion can result in detrimental secondary physiological consequences for the patient, such as pulmonary edema and extravasation, which can lead to tissue necrosis.

*Eagle's Solution: Ryanodex®*

We have developed a differentiated formulation of dantrolene sodium that was approved by the FDA in July 2014 and is currently sold under the brand name, Ryanodex®, for the treatment of MH. The presentation is a 5ml vial containing 250mg of dantrolene sodium in lyophilized powder form.

We believe that the immediate benefits of our Ryanodex® formulation are clinically significant in CNS critical care situations. Specifically, Ryanodex® reduces the amount of time to reconstitute and administer dantrolene from 15 to 20 minutes with Dantrium® and Revonto®, to 1 minute, as the anesthesiologist will be able to mix and administer a dose of 250mg from a single vial of Ryanodex® in contrast to mixing and administering up to 12 or more vials of Dantrium® or Revonto®. A recent retrospective study conducted by MHAUS demonstrated that every 15-minute delay in treating MH resulted in a 7.8% increase in patient complications.

### EP-4104 (dantrolene) for Exertional Heat Stroke ("EHS")

EHS is a rare, sudden and unpredictable life-threatening medical condition. It is thought that symptoms and effects are correlated to MH and our research and development efforts suggest dantrolene may be beneficial for treating EHS.

EHS is one of the leading causes of death in athletes, including college and high-school students. EHS is also a leading cause of non-combat death in the military. EHS is a state of extreme hyperthermia (above 104°F) that occurs when heat that is generated by muscular exercise exceeds the body's ability to dissipate it. EHS typically affects seemingly healthy individuals during exercise and manifests within a few minutes to hours of such activity and is characterized by an increased core body temperature and central nervous system dysfunction including delirium, convulsions, and coma. Predisposing factors to EHS include a lack of heat acclimatization, poor physical fitness, dehydration, recent infection, exercising in warm and humid conditions and concurrent illness.

*Limitations of Current EHS Therapies*

There are currently no FDA-approved products that treat EHS, and patients continue to die or suffer significant morbidity from the condition. The current treatment regimen for EHS is not directed at the underlying cause of the disease, but is essentially symptomatic therapy. Currently, to treat EHS, the standard treatment includes body surface cooling by water immersion or ice packs and support of organ system function with a goal of accelerating the transfer of heat from the skin to the environment. Even

if these cooling techniques are properly implemented patients are still subject to risk of brain damage, irreversible organ damage and death.

*Eagle's Solution: EP-4104*

EP-4104's presentation will initially be a 5mL vial containing 250mg of dantrolene in lyophilized powder form requiring reconstitution. We believe that EP-4104 may provide significant benefits over the current standard of care, which may not be readily available in most settings. Independent market research commissioned by us suggests that the worldwide peak annual revenue for EHS could exceed $400 million.

*EP-4104 Clinical Development and Regulatory Status*

In February 2016, the FDA granted Fast Track designation to our product candidate EP-4104 (i.e. Ryanodex® for the treatment of EHS). The FDA's Fast Track program facilitates the development and review of drugs intended to treat serious conditions and address an unmet medical need. A drug development program with Fast Track designation is afforded greater access to the FDA for the purpose of expediting the drug's development, review and potential approval to get important new drugs to the patient earlier.

On July 11, 2016, the FDA determined that no additional human safety and efficacy data would be required for the submission of EP-4101. Following the completion of additional animal studies the NDA was submitted on January 20, 2017.

On July 26, 2017, the Company received a Complete Response Letter from the FDA regarding its 505(b)(2) NDA for Ryanodex for the treatment of exertional heat stroke ("EHS"), in conjunction with external cooling methods. Based on a meeting with the FDA, the Company conducted an additional clinical trial in August 2018 during the Hajj pilgrimage, similar to the study conducted during the Hajj in 2015. The Company enrolled additional patients in its controlled clinical study of Ryanodex® (dantrolene sodium for injectable suspension) for the treatment of exertional heat stroke ("EHS") patients during the 2019 Hajj pilgrimage held from August 9-14 in Saudi Arabia. The Company has recruited a total of 41 patients at the 2015, 2018 and 2019 Hajj pilgrimages. Eagle has submitted a plan to the FDA that proposes reviewing the data collectively for all 41 patients. If FDA agrees with this plan, Eagle plans to resubmit the New Drug Application ("NDA") for EHS.

**EP-4104 Ryanodex® (dantrolene sodium) for the treatment of organophosphate exposure *(Nerve Agents)***

Organophosphates are a class of chemicals that include potent pesticides and chemical weapons, known as nerve agents. Acute intoxication with organophospates may result in severe consequences, including brain damage and death. About 2,700 people in the United States are treated for accidental exposure to organophosphate pesticides every year. Eagle is currently evaluating Ryanodex for the treatment of brain damage secondary to nerve agent (NA) exposure. If approved, Ryanodex would represent the first product available for this indication.

We conducted an initial study in 2017 to evaluate the neuroprotective effects of Ryanodex in a rodent model of NA-induced brain damage. The animal study was conducted in a rat model of acute nerve agent (soman) exposure. Animals were randomized into each of the six study groups, including a positive control and a negative control group. Five groups received standard treatment with HI-6, atropine and midazolam. Four of the groups also received Ryanodex. Surviving animals were evaluated for neuropathology 24 hours post-soman exposure to assess the neuroprotective effects of Ryanodex in this well-established animal model.

In May 2019, we announced positive results of our study to evaluate the neuroprotective effects of Ryanodex®(dantrolene sodium) secondary to nerve agent (NA) exposure, conducted with the United States Army Medical Research Institute of Chemical Defense (USAMRICD), the nation's leading science and technology laboratory in the area of medical chemical countermeasures research and development. The study results show a p-value of 0.04 or less compared to the control group in six critical areas of the brain. We believe these results demonstrate the neuroprotective effects of Ryanodex. It has been hypothesized that nerve agent poisoning triggers intracellular calcium release in the body. The study data supports the proposed mechanism of action of Ryanodex, which modulates intracellular calcium in different organs including the brain.

*Limitations of Current Therapies*

While the standard treatment of atropine and oxime is essential after exposure to a nerve agent, these drugs are not neuroprotective. There are currently no FDA-approved products that treat acute intoxication with organophospates that may result in severe consequences, including brain damage and death.

10

*Eagle's Solution: Ryanodex*

Ryanodex's presentation will initially be an injectable suspension. We believe that Ryanodex may provide significant benefits over the current standard of care, which may not be readily available in most settings.

*EP-4104 Clinical Development and Regulatory Status*

On December 16, 2019, we announced that the FDA has granted orphan drug designation (ODD) for Ryanodex®(dantrolene sodium) for the treatment of organophosphate exposure. Eagle is currently evaluating Ryanodex for the treatment of brain damage secondary to nerve agent exposure. If approved, Ryanodex would represent the first product available for this indication.

The mission of the FDA's Office of Orphan Products Development (OOPD) is to advance the evaluation and development of products that demonstrate promise for the diagnosis and/or treatment of rare diseases or conditions that affect fewer than 200,000 people in the U.S. In fulfilling that task, the OOPD evaluates scientific and clinical data submissions from sponsors to identify and designate products as promising for rare diseases and to further advance scientific development of such promising medical products. Orphan drug designation provides incentives for sponsors to develop products for rare diseases. These incentives may include a partial tax credit for certain clinical trial expenditures, the waiver of certain FDA user fees, and potential eligibility for seven years of orphan drug marketing exclusivity, if approved.

FDA has recommended that, under the animal rule, an additional study be conducted in a second species. Eagle expects to file a supplement to the current NDA in the second half of 2020.

### EP-5101 (PEMFEXY™) for Lung Cancer

EP-5101 is an IV-administered cancer agent indicated for locally advanced or metastatic non-small cell lung cancer and mesothelioma. We have developed EP-5101 as a ready-to-use/dilute liquid form of pemetrexed that will be available in a 25mg/mL per vial. Because our product will be available in liquid form, product reconstitution will not be required, making EP-5101 a preferred formulation under the Joint Commission guidelines.

*Currently-Marketed Pemetrexed Product*

The branded form of a pemetrexed product is marketed by Eli Lilly and Company ("Lilly") as Alimta. Alimta is approved for use to treat non-small cell lung cancer and mesothelioma. Alimta's lyophilized formulation utilizes pemetrexed disodium. The product presentations for Alimta are 100mg and 500mg single use vials containing lyophilized power that must be reconstituted before patient administration. Once mixed, Alimta must be used within 24 hours due to product stability concerns. According to Lilly, worldwide sales of Alimta for the 2019 calendar year were approximately $2.1 billion.

*Limitations of Alimta*

Alimta, a lyophilized pemetrexed disodium formulation requiring reconstitution, adds time to administration, presents cytotoxic safety issues for healthcare professionals administering the drug and the potential for dosing errors. Because reconstitution of Alimta is generally not performed until the patient has cleared all tests necessary to receive the drug, this process contributes to a significant amount of time spent by such patients in infusion clinics. Additionally, this method of administration limits the number of patients that may be treated on any given day by such clinics. Furthermore, as with any oncology drug, cytotoxic vapors released through reconstitution can be potentially harmful to pharmacists, physicians and nurses. Moreover, dosing errors may occur during reconstitution, as incorrect amounts of diluent may be used. As a result, lyophilized formulations are less preferred by the Joint Commission as compared to an RTD product.

*Eagle's Solution: EP-5101 (PEMFEXY™)*

EP-5101 is an RTD liquid formulation of pemetrexed. As an RTD liquid formulation, EP-5101 will not require additional time for reconstitution and may avoid certain safety concerns to healthcare professionals, including reducing exposure to the drug's cytotoxic vapors during reconstitution by healthcare providers, and potential dosing errors during mixing. This could allow for a more efficient work flow within the infusion clinic and may result in an opportunity to reduce office staff and see more patients each day.

11

*EP-5101 (PEMFEXY™) Development and Regulatory Status*

We submitted an NDA for EP-5101 on December 30, 2016 for use in non-small cell lung cancer and mesothelioma. During February 2017, we received confirmation from the FDA that the filing was accepted. On October 27, 2017, we were granted tentative approval for EP-5101 by the FDA. On December 13, 2019, the Company reached a settlement agreement with Lilly related to PEMFEXY. The agreement provides for a release of all claims by the parties and allows for an initial entry of PEMFEXY into the market on February 1, 2022 and a subsequent uncapped entry on April 1, 2022. On February 10, 2020, we received final approval from the FDA for our novel product PEMFEXY™ (pemetrexed for injection), a branded alternative to ALIMTA®.

### EGL-5385-C-1701 (fulvestrant) for Breast Cancer

Fulvestrant is an injectable estrogen receptor antagonist. It is used for the treatment of hormone receptor positive advanced breast cancer for post-menopausal women whose disease has progressed following treatment with prior endocrine therapy.

*Currently-Marketed Fulvestrant Products*

The branded form of fulvestrant is Faslodex, a 500mg injectable product marketed by AstraZeneca plc. Worldwide sales of Faslodex were $1 billion in 2018, which included U.S. sales of $537 million.

*Limitations of Faslodex*

Faslodex is administered in two deep intramuscular injections of high viscosity product per dose of treatment (5 ml each) over 1-2 minutes into each buttock. The procedure is painful and Faslodex injection reactions have been associated with peripheral nerve adverse reactions, including risk of damaging the sciatic nerve.

*Eagle's Solution: EGL-5385-C-1701*

On August 5, 2019, the Company announced a clinical development plan to support the submission of a NDA for our fulvestrant formulation. Eagle's original formulation of fulvestrant was studied in a clinical trial conducted in 2018 in healthy post-menopausal women. A detailed review of the study data led to the hypothesis that the unique properties of our formulation would potentially allow for greater inhibition of estrogen receptors. Based on this hypothesis, the Company completed additional work designed to further enhance our proprietary drug formulation. The Company met with the FDA and mutually agreed to a clinical program that could provide an efficient approval pathway for our fulvestrant formulation. The main goal of the clinical research program is to determine if the unique properties of our fulvestrant formulation will result in greater inhibition of estrogen receptors, potentially leading to improved efficacy outcomes, including lower disease progression rates, compared to current treatment options.

On December 9, 2019, we announced that the Company has commenced dosing in a pilot clinical study to assess the unique characteristics of its fulvestrant product candidate, which has the potential to enhance estrogen receptor ("ER") inhibition and improve patient outcomes. The results of the pilot study will inform the design of the Company's pivotal trial, which Eagle expects to commence in 2020.

### Additional Products in our Portfolio

*Vasopressin*

Vasopressin injection is indicated to increase blood pressure in adults with vasodilatory shock who remain hypotensive despite fluids and catecholamines. We filed and ANDA in April 2018 for a generic version of VASOSTRICT® (vasopressin IV solution (infusion), which variously covers either vasopressin-containing pharmaceutical compositions or methods of using a vasopressin-containing dosage form to increase blood pressure in humans. In May 2018, the NDA owner filed a lawsuit against us within the 45-day deadline to invoke a 30-month stay of FDA approval pursuant to the Hatch-Waxman legislative scheme. In August 2018, Eagle filed an answer and a counterclaim for non-infringement and invalidity of asserted patents, and filed an amended answer and counterclaims on October 30, 2019. The court issued a Markman ruling on July 1, 2019. On December 20, 2019, Par dismissed with prejudice claims of three of the patents asserted against Eagle, and the Court entered an Order reflecting that dismissal on December 27, 2019. Mediation is scheduled to take place on March 3, 2020. Trial is scheduled to begin May 18, 2020.

*Other Opportunities*

We are pursuing several additional potential products and product indications that address broad indications such as oncology,

12

emergency medicine, infectious diseases and others. We intend to use our novel and well-developed methods to identify ideal development candidates and to commercialize improved formulations of widely prescribed therapeutics.

In addition to our internal efforts, in January 2016 we entered into an agreement with AMRI to jointly develop and manufacture several select and complex parenteral drug products for registration and subsequent commercialization in the United States.

Under the terms of the agreement, AMRI will develop and initially provide cGMP manufacturing and analytical support for the registration of the new product candidates. We will be responsible for advancing the product candidates through clinical trials and regulatory submissions.

**Sales and Marketing**

Other than products subject to existing commercialization arrangements, we commercialize our product portfolio in the United States with our commercial organization. Ryanodex and Belrapzo are marketed by our internal commercial team consisting of 47 direct sales representatives, support staff and management.

**Major Customer**

The Company is dependent on its commercial partner to market and sell Bendeka; therefore, the Company's future revenues are highly dependent on the collaboration and distribution arrangement with Teva.

Teva markets Bendeka through the Cephalon License. Pursuant to that license agreement, Teva pays the Company a royalty based on net sales of the product and also purchases the product from the Company. A disruption in this arrangement, caused by among other things, a supply disruption, loss of exclusivity or the launch of a superior product would have a material adverse effect of the Company's financial position, results of operations and cash flows.

The total revenues and accounts receivables broken down by major customers as a percentage of the total are as follows:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2019** | **2018** | **2017** |
| **Net revenues** | | | |
| Cephalon, Inc. (Teva) - See Revenue Recognition | 77% | 75% | 79% |
| Other | 23% | 25% | 21% |
|  | 100% | 100% | 100% |

**Manufacturing**

We do not own any manufacturing facilities. The manufacture of sterile injectables is highly reliant on very complex sterile techniques and personnel aseptic techniques which present significant challenges and requires specialized expertise. Further, sterile processes have a high level of scrutiny by regulatory agencies. Consequently, we utilize a network of third party manufacturers for production of our products. All manufacturers are monitored and evaluated by our quality department to assess compliance with regulatory requirements and our internal quality standards and benchmarks.

**Intellectual Property and Exclusivity**

We strive to protect and enhance the proprietary technologies that we believe are important to our business. We seek to obtain and maintain patents for any patentable aspects of our products or product candidates, their methods of use and any other inventions that are important to our business model and maintaining a competitive advantage over generic competitors. Our success will depend significantly on our ability to obtain and maintain patent and other proprietary protection for commercially important technology, inventions and know-how related to our business, defend and enforce our patents, maintain our licenses to use intellectual property owned by third parties, preserve the confidentiality of our trade secrets and operate without infringing the valid and enforceable patents and other proprietary rights of third parties. We also rely on know-how, continuing technological innovation and in-licensing opportunities to develop, strengthen, and maintain our proprietary position in the fields targeted by our products and product candidates.

13

**Patents and Patent Applications**

We are the exclusive licensee under our license with Lyotropic to a family of patents and applications that relate to low volume formulations of dantrolene, and methods of treatment using dantrolene. There are eight issued U.S. patents, and several pending U.S. patent applications, along with foreign counterparts that include both issued patents and pending applications. The issued U.S. patents cover low volume formulations of dantrolene in reconstitutable and in ready to use liquid form. We expect that the issued patents will expire no later than July 1, 2025.

We are the sole owner of over 10 issued patents, several pending U.S. patent applications, and multiple patents and/or corresponding foreign filings for patent applications in a number of jurisdictions covering various formulations and methods of use of bendamustine. We are currently prosecuting these applications, which, if issued, would expire between 2031 and 2033.

We are the owner of U.S. Patent No. 8,431,539 expiring July 20, 2031 and covering daptomycin.

Eagle also has a patent portfolio of issued and/or pending U.S. patent applications and corresponding foreign patent application in a range of countries that cover its biologics platform technologies. We are the sole owner of U.S. Patent Nos. 9,833,513, 9,913,905 and 9,925,263 expiring between 2034 and 2036.

**Trade Secrets and Proprietary Information**

Trade secrets play an important role in protecting our products and provide protection beyond patents and regulatory exclusivity. The scale-up and commercial manufacture of our products involves processes, custom equipment, and in-process and release analytical techniques that we believe are unique to us. We also seek to preserve the integrity and confidentiality of our proprietary technology and processes by maintaining physical security of our premises and physical and electronic security of our information technology systems. While we have confidence in these security measures, individuals, organizations and systems, agreements or security measures may be breached, and we may not have adequate remedies for any breach. In addition, our proprietary technology and processes may otherwise become known or be independently discovered by competitors. To the extent that our employees, consultants, scientific advisors, contractors or any future collaborators use intellectual property owned by others in their work for us, disputes may arise as to the rights in related or resulting know-how and inventions. We seek to protect our proprietary information, including our trade secrets and proprietary know-how, by requiring third parties with whom we contract for services related to our products, including manufacturing services to agree to terms in our agreements with such third parties that protect our confidential and trade secret information. We also require our employees, consultants and other advisors to execute proprietary information and confidentiality agreements upon the commencement of their employment or engagement. These agreements generally provide that all confidential information developed or made known during the course of the relationship with us be kept confidential and not be disclosed to third parties except in specific circumstances. In the case of our employees, the agreements also typically provide that all inventions resulting from work performed for us, utilizing our property or relating to our business and conceived or completed during employment shall be our exclusive property to the extent permitted by law. Where appropriate, agreements we obtain with our consultants also typically contain similar assignment of invention obligations. Further, we require confidentiality agreements from entities that receive our confidential data or materials.

**License Agreements**

*License Agreement with Lyotropic Therapeutics, Inc.*

In October 2008, we entered into a license and sublicense agreement with Lyotropic Therapeutics, Inc., ("Lyotropic"), under which we were granted an exclusive license under Lyotropic's intellectual property rights relating to dantrolene, and an exclusive worldwide sublicense under certain nanocrystal technology relating to a formulation of dantrolene licensed by Alkermes, Inc. (as successor in interest to Elan Pharma International Limited), or Alkermes, to Lyotropic under an August 2004 license agreement between Alkermes and Lyotropic. On August 3, 2016, the Company amended our agreement with Lyotropic Therapeutics, Inc. to reduce future royalties related to Ryanodex net sales to 3% (subject to further reduction upon the occurrence of certain triggering events) in exchange for $15 million.

*Development and License Agreement with Robert One, LLC (bendamustine)*

In March 2008 we entered into a development and license agreement with Robert One, LLC ("Robert One") in which Robert One assigned to us certain patents relating to bendamustine and four additional 505(b)(2) products and/or ANDA products under development (the "Robert One (bendamustine) Subject Products") and granted us an exclusive, sub-licensable, license under Robert One's intellectual property rights to develop make, use, sell and import Robert One (bendamustine) Subject Products worldwide

(excluding China) with respect to bendamustine and other 505(b)(2) product applications and in North America with respect to ANDA product applications.

Under the terms of this Agreement no further milestone payments are due to Robert One. We are required to make royalty payments based on gross profits of sales of the Robert One (bendamustine) Subject Products by us and our affiliates in the Territory (i) at 10%, pursuant to an amendment in 2013, for bendamustine products and (ii) at 50% for products, other than bendamustine products, that achieve regulatory approval and are commercialized on the basis of a 505(b)(2) application (provided that we are entitled to recoup all of our expenses related to the development of a product commercialized under a 505(b)(2) application prior to splitting the profits we receive from such product), and (iii) at 30% with respect to products, other than bendamustine products, that are commercialized on the basis of an ANDA application. Our royalty obligations continue on a product-by-product basis until the later of ten years after the first commercial sale of each Robert One (bendamustine) Subject Product and the expiration of the last valid claim covering such Robert One (bendamustine) Subject Product, subject to certain reductions in the event that there is no valid patent claim covering the manufacture, use, import or sale of such Robert One (bendamustine) Subject Product in a country in the territory.

*Development and License Agreement with Robert One, LLC (pemetrexed)*

In February 2009 we entered into a development and license agreement with Robert One, in which Robert One assigned to us certain patents relating to pemetrexed and four additional 505(b)(2) products and/or ANDA products under development ("the Robert One 2009 Subject Products") and granted us an exclusive, sub-licensable, license under Robert One's intellectual property rights to develop make, use, sell and import Robert One 2009 Subject Products worldwide (excluding China) with respect to pemetrexed and other 505(b)(2) product applications and in North America with respect to ANDA product applications.

Under the terms of this Agreement no further milestone payments are due to Robert One. We are required to make royalty payments based on gross profits of sales of the Robert One 2009 Subject Product by us and our affiliates in the Territory (i) at 25% for pemetrexed parental formulation (ii) at 50% for Robert One 2009 Subject Products other than pemetrexed that achieve regulatory approval and are commercialized on the basis of a 505(b)(2) application (provided that we are entitled to recoup all of our expenses related to the development of a product commercialized under a 505(b)(2) application prior to splitting the profits we receive from such product), and (ii) at 30% with respect to Robert One 2009 Subject Products other than pemetrexed that are commercialized on the basis of an ANDA application. Our royalty obligations continue on a product-by-product basis until the later of ten years after the first commercial sale of each Robert One 2009 Subject Product and the expiration of the last valid claim covering such Robert One 2009 Subject Product, subject to certain reductions in the event that there is no valid patent claim covering the manufacture, use, import or sale of such Robert One 2009 Subject Product in a country in the territory.

*Cephalon License Agreement*

On February 13, 2015, we submitted an NDA to the FDA for Bendeka which was approved by the FDA on December 8, 2015. Also, on February 13, 2015, we entered into the Cephalon License with Cephalon, for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. Subsequently, with the consent of the Company, Cephalon assigned to Teva Pharmaceuticals International GmbH ("TPIG") all of Cephalon's rights and obligations under the Cephalon License. Accordingly, all references to "Cephalon" or to the "Cephalon License" and the related supply agreements for Bendeka should be read and construed as references to TPIG and to the license agreement and supply agreements for Bendeka to which the Company and TPIG are now parties. Pursuant to the terms of the Cephalon License, Cephalon is responsible for all U.S. commercial activities for the product including promotion and distribution, and we are responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies. Additionally, under the terms of the Cephalon License, the Company received an upfront cash payment of $30 million, received a $15 million milestone payment in January 2016 in connection with the FDA approval of Bendeka in December 2015, received a $40 million milestone in the fourth quarter of 2016 in connection with the receipt of the J-Code for Bendeka and in Q1 of 2017, Bendeka reached $500 million in cumulative net sales, triggering an additional $25 million sales-based milestone payment. In addition, the royalty payments of 20% of net sales of the product that the Company was entitled to receive increased to 25% on receipt of the J-Code. In connection with the Cephalon License, the Company has entered into a supply agreement with Cephalon, pursuant to which the Company is responsible for supplying product to Cephalon. During the quarter-ended September 30, 2016, the Company entered into an amendment to that certain Exclusive License Agreement (the "Cephalon License") with Cephalon and the related supply agreements for Bendeka. The amendment expands the geographical scope of the rights granted under the original agreement to include certain territories outside the US and Canada. In accordance with this amendment, the Company recorded $1.75 million in license and other revenue on the statements of operations for the year-ended December 31, 2016. The Company is also eligible to receive up to $750 thousand on each regulatory approval received in certain additional territories, not to exceed $2.25 million, as well as royalties on future sales.

On April 13, 2019, the Company and Teva entered into an Amendment to the Cephalon License, amending the terms of the License Agreement to increase the U.S. royalty paid to the Company and re-allocate certain litigation expenses. Pursuant to the Amendment, beginning on October 1, 2019, the Company's royalty payment will increase from 25% to 30% of Bendeka net United States sales, provided that Bendeka's orphan drug exclusivity has not been rescinded, withdrawn or waived by such date. The royalty rate will increase by one percentage point on each anniversary of October 1, 2019 until it reaches 32%, and it will remain at 32% thereafter. The Amendment also extends the U.S. royalty term for Bendeka until it is no longer sold in the United States. The previous royalty term was set to expire in 2025. The extended term coincides with the bendamustine patents with expiries through 2033. Pursuant to the amendment, Eagle will continue to be responsible for the manufacture of Bendeka for the U.S. market for so long as it is sold in the United States.

In March 2019, we received an upfront cash payment of $9.0 million upon execution of an amendment to the Cephalon License to terminate Teva's obligation to pay future milestones and royalties on Bendeka sales outside of the U.S.

*Cephalon Settlement and License Agreement*

On February 13, 2015, we entered into the Cephalon Settlement Agreement with Cephalon, in connection with the Cephalon License, pursuant to which the parties agreed to settle the pending patent infringement claims against each other regarding Cephalon's US Patent No. 8,791,270, under which we agreed to enter into a Consent Judgment regarding the '270 patent. As part of the Cephalon Settlement Agreement, Cephalon has agreed to waive its orphan drug exclusivities for the treatment of patients with CLL and patients with NHL.

*SymBio Product Collaboration and License Agreement*

On September 20, 2017, we entered into the SymBio License with SymBio for the rights to develop and commercialize EP-3101 and Bendeka (collectively, the "Products") in Japan. Under the SymBio License, SymBio will be responsible for all development of the Products in Japan and for obtaining and maintaining all regulatory approvals of the Products in Japan, with a target for regulatory approval of a Product in Japan in 2020. SymBio will bear all costs of development of the Products in Japan except that, if Japanese regulatory authorities require a certain clinical study to be conducted as a condition for approving one of the Products in Japan, we would share 50% of the out-of-pocket costs of that clinical study up to a specified dollar amount as a reduction to future royalty payments. Based on our assessment of the probability of additional costs, we have not deferred revenue on the SymBio License. SymBio will also be responsible, at its sole cost, for all marketing, promotion, distribution and sales of the Products in Japan and is obligated to launch the Products and meet certain minimum detailing, promotion and marketing commitments in connection with commercialization of the Products in Japan.

SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma ("MCL"), and as a first line treatment of low-grade NHL and MCL. Under the SymBio License, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

Pursuant to the terms of the SymBio License, Eagle and SymBio will enter into a separate supply agreement, under which we will be responsible for manufacturing and supplying the Products to SymBio for development and commercialization in Japan. After a period of time following launch of a Product, SymBio will have the right to assume the responsibility for manufacturing of the Products in and for Japan. Under the SymBio License, we will retain the right to control the prosecution, maintenance and enforcement of our patents covering the Products, both inside and outside of Japan.

Under the SymBio License, we earned an upfront non-refundable cash payment of $12.5 million in the third quarter of 2017, and we are eligible to receive a milestone payment upon approval of a Product in Japan and a milestone payment upon achievement of certain cumulative net sales of the Products in Japan. After regulatory approval of a Product in Japan, we will also receive tiered, low double-digit royalties on net sales of the Products in Japan for so long as there are patents covering the Products in Japan or regulatory exclusivity for the Products in Japan.

On October 7, 2019, we announced that SymBio has submitted a NDA for TREAKISYM RTD liquid formulation in Japan. The NDA covers all indications for which TREAKISYM is currently approved (low-grade non-Hodgkin's lymphoma, mantle cell lymphoma, and chronic lymphocytic leukemia). SymBio expects to launch the TREAKISYM RTD product in the first quarter of 2021, after obtaining marketing authorization. Approval is expected in Q4 2020, which would trigger a $5 million milestone payment to Eagle. Potential payments to Eagle could reach $10 to $25 million per year in royalties and milestones.

16

The pharmaceutical and biotechnology industries are intensely competitive and subject to rapid and significant technological change. Our competitors include organizations such as major multinational pharmaceutical companies, established biotechnology companies, specialty pharmaceutical companies and generic drug companies. Many of our competitors have greater financial and other resources than we have, such as more commercial resources, larger research and development staffs and more extensive marketing and manufacturing organizations. As a result, these companies may obtain marketing approval more rapidly than we are able and may be more effective in selling and marketing their products. Smaller or early stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large, established companies.

Our competitors may succeed in developing, acquiring or licensing on an exclusive basis technologies and drug products that are more effective or less costly than products that we are currently selling through partners or developing or that we may develop, which could render our products obsolete and noncompetitive. We expect any products that we develop and commercialize to compete on the basis of, among other things, efficacy, safety, convenience of administration and delivery, price and the availability of reimbursement from government and other third-party payors. We also expect to face competition in our efforts to identify appropriate collaborators or partners to help commercialize our product portfolio in our target commercial markets.

**Government Regulation**

*FDA Approval Process for Drugs*

In the United States, pharmaceutical products are subject to extensive regulation by the FDA. The Federal Food, Drug and Cosmetic Act ("FDCA"), and in the case of biologics, the Public Health Service Act ("PHSA") and other federal and state statutes and regulations, govern, among other things, the research, development, testing, manufacture, storage, recordkeeping, approval, labeling, promotion and marketing, distribution, post-approval monitoring and reporting, sampling, and import and export of pharmaceutical products. Failure to comply with applicable FDA or other requirements may subject a company to a variety of administrative or judicial sanctions, such as FDA refusal to approve pending applications, clinical holds, warning or untitled letters, product recalls, product seizures, total or partial suspension of production or distribution, withdrawal of product from the market, injunctions, fines, civil penalties and criminal prosecution.

FDA approval is required before any new unapproved drug biologic or dosage form, including a new use of a previously approved drug, can be marketed in the United States. The process required by the FDA before a new drug may be marketed in the United States generally involves:

- completion of pre-clinical laboratory and animal testing and formulation studies in compliance with the FDA's current good laboratory practice ("cGLP") regulations;
- submission to the FDA of an Investigational New Drug ("IND") application for human clinical testing which must become effective before human clinical trials may begin in the United States;
- approval by an independent institutional review board ("IRB") at each clinical trial site before each trial may be initiated;
- performance of adequate and well-controlled human clinical trials in accordance with current good clinical practices ("cGCP") to establish the safety and efficacy of the proposed drug product for each intended use;
- satisfactory completion of an FDA pre-approval inspection of the facility or facilities at which the product is manufactured to assess compliance with the FDA's cGMP regulations to assure that the facilities, methods and controls are adequate to preserve the drug's identity, strength, quality and purity;
- submission to the FDA of an NDA or BLA;
- satisfactory completion of a potential review by an FDA advisory committee, if applicable; and
- FDA review and approval of the NDA or BLA.

The preclinical and clinical testing and approval process takes many years and the actual time required to obtain approval, if any, may vary substantially based upon the type, complexity and novelty of the product or disease.

Preclinical tests include laboratory evaluation of product chemistry, formulation and toxicity, as well as animal studies to assess the characteristics and potential safety and efficacy of the product. The conduct of the preclinical tests must comply with federal regulations and requirements, including cGLPs. The results of preclinical testing are submitted to the FDA as part of an IND application along with other information, including information about product chemistry, manufacturing and controls and a proposed clinical trial protocol. Long-term preclinical tests, such as animal tests of reproductive toxicity and carcinogenicity, may continue after the IND application is submitted.

The IND application automatically becomes effective 30 days after receipt by the FDA, unless the FDA, within the 30-day time

17

period, raises concerns or questions relating to one or more proposed clinical trials and places the clinical trial on a clinical hold, including concerns that human research subjects will be exposed to unreasonable health risks. In such a case, the IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin. A separate submission to an existing IND application must also be made for each successive clinical trial conducted during product development. Further, an independent IRB, covering each site proposing to conduct the clinical trial must review and approve the plan for any clinical trial and informed consent information for subjects before the trial commences at that site and it must monitor the study until completed. The FDA, the IRB, or the sponsor may suspend a clinical trial at any time on various grounds, including a finding that the subjects or patients are being exposed to an unacceptable health risk or for failure to comply with the IRB's requirements, or may impose other conditions. Clinical trials involve the administration of the investigational new drug to healthy volunteers or patients under the supervision of a qualified investigator in accordance with cGCP requirements, which include the requirement that all research subjects provide their informed consent in writing for their participation in any clinical trial. Sponsors of clinical trials generally must register and report, at the NIH-maintained website ClinicalTrials.gov, key parameters of certain clinical trials. For purposes of an NDA submission and approval, human clinical trials are typically conducted in the following sequential phases, which may overlap or be combined:

Phase 1:     In Phase 1, through the initial introduction of the drug into healthy human subjects or patients, the drug is tested to assess metabolism, pharmacokinetics, pharmacological actions, side effects associated with increasing doses, and, if possible, early evidence on effectiveness.

Phase 2:    Phase 2 usually involves trials in a limited patient population to determine the effectiveness of the drug for a particular indication, dosage tolerance and optimum dosage, and to identify common adverse effects and safety risks.

Phase 3:     Phase 3 trials are undertaken to obtain the additional information about clinical efficacy and safety in a larger number of patients, typically at geographically dispersed clinical trial sites, to permit the FDA to evaluate the overall benefit-risk relationship of the drug and to provide adequate information for the labeling of the drug. In most cases, the FDA requires two adequate and well controlled Phase 3 clinical trials to demonstrate the efficacy of the drug. A single Phase 3 trial with other confirmatory evidence may be sufficient in rare instances where the study is a large multicenter trial demonstrating internal consistency and a statistically persuasive finding of a clinically meaningful effect on mortality, irreversible morbidity or prevention of a disease with a potentially serious outcome and confirmation of the result in a second trial would be practically or ethically impossible.

After completion of the required clinical testing, an application is prepared and submitted to the FDA. FDA approval of the NDA is required before marketing of the product may begin in the United States. The NDA must include the results of all preclinical, clinical and other testing and a compilation of data relating to the product's pharmacology, chemistry, manufacture and controls. Under federal law, the submission of most applications is subject to a substantial application user fee, and the manufacturer and/or sponsor under an approved application is also subject to annual product and establishment user fees.

The FDA has 60 days from its receipt of an NDA to determine whether the application will be accepted for filing based on the agency's threshold determination that it is sufficiently complete to permit substantive review. The FDA may request additional information rather than accept an application for filing. In this event, the application must be resubmitted with the additional information and is subject to payment of additional user fees. The resubmitted application is also subject to review before the FDA accepts it for filing. Once the submission is accepted for filing, the FDA begins an in-depth substantive review. Under PDUFA the FDA has agreed to certain performance goals in the review of NDAs through a two-tiered classification system, Standard Review and Priority Review. Priority Review designation is given to drugs that offer major advances in treatment, or provide a treatment where no adequate therapy exists. The FDA endeavors to review applications subject to Standard Review within ten to twelve months, whereas the FDA's goal is to review Priority Review applications within six to eight months, depending on whether the drug is a new molecular entity.

The FDA may refer applications for novel drug products or drug products which present difficult questions of safety or efficacy to an advisory committee for review, evaluation and recommendation as to whether the application should be approved and under what conditions.

Before approving an NDA, the FDA will typically inspect one or more clinical sites to assure compliance with cGCP requirements. Additionally, the FDA will inspect the facility or the facilities at which the drug is manufactured. The FDA will not approve the product unless it determines that the manufacturing process and facilities are in compliance with cGMP requirements and are adequate to assure consistent production of the product within required specifications and the application contains data that provide substantial evidence that the drug is safe and effective in the indication studied.

After the FDA evaluates the NDA and the manufacturing facilities, it issues either an approval letter or a complete response letter

18

to indicate that the review cycle for an application is complete and that the application is not ready for approval. A tentative approval is issued to a 505(b)(2) NDA if the sponsor must await the expiration of an Orange Book listed patent covering the reference product. A complete response letter generally outlines the deficiencies in the submission and may require substantial additional testing, or information, in order for the FDA to reconsider the application. Even with submission of this additional information, the FDA may ultimately decide that an application does not satisfy the regulatory criteria for approval. If, or when, the deficiencies have been addressed to the FDA's satisfaction in a resubmission of the application, the FDA will issue an approval letter. An approval letter authorizes commercial marketing of the drug with specific prescribing information for specific indications.

As a condition of NDA or BLA approval, the FDA may require a Risk Evaluation and Mitigation Strategies ("REMS") program to help ensure that the benefits of the drug outweigh the potential risks. If the FDA determines a REMS program is necessary during review of the application, the drug sponsor must agree to the REMS plan at the time of approval. A REMS program may be required to include various elements, such as a medication guide or patient package insert, a communication plan to educate healthcare providers of the drug's risks, limitations on who may prescribe or dispense the drug, or other elements to assure safe use, such as special training or certification for prescribing or dispensing, dispensing only under certain circumstances, special monitoring and the use of patient registries. In addition, the REMS must include a timetable to periodically assess the strategy. The requirement for a REMS program can materially affect the potential market and profitability of a drug.

Moreover, product approval may require substantial post-approval testing and surveillance to monitor the drug's safety or efficacy, and the FDA has the authority to prevent or limit further marketing of a product based on the results of these post-marketing programs. Once granted, product approvals may be withdrawn if compliance with regulatory standards is not maintained or problems are identified following initial marketing. Drugs may be marketed only for the approved indications and in accordance with the provisions of the approved label, and, even if the FDA approves a product, it may limit the approved indications for use for the product or impose other conditions, including labeling or distribution restrictions or other risk-management mechanisms.

Further changes to some of the conditions established in an approved application, including changes in indications, labeling, or manufacturing processes or facilities, require submission and FDA approval of a new NDA or NDA supplement before the change can be implemented, which may require us to develop additional data or conduct additional pre-clinical studies and clinical trials. An NDA supplement for a new indication typically requires clinical data similar to that in the original application, and the FDA uses the similar procedures in reviewing supplements as it does in reviewing original applications.

*Post-Approval Requirements*

Once an NDA is approved, a product will be subject to pervasive and continuing regulation by the FDA, including, among other things, requirements relating to drug listing and registration, recordkeeping, periodic reporting, product sampling and distribution, adverse event reporting and advertising, marketing and promotion, including standards and regulations for direct to consumer advertising, off-label promotion, industry-sponsored scientific and educational activities and promotional activities involving the internet. Drugs may be marketed only for the approved indications and in accordance with the provisions of the approved labeling. While physicians may prescribe for off-label uses, manufacturers may only promote for the approved indications and in accordance with the provisions of the approved label. However, companies may share truthful and not misleading information that is otherwise consistent with a product's FDA approved labeling. The FDA and other agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses, and a company that is found to have improperly promoted off-label uses may be subject to significant liability.

In addition, quality-control, drug manufacture, packaging and labeling procedures must continue to conform to cGMPs after approval. Drug manufacturers and certain of their subcontractors are required to register their establishments with the FDA and certain state agencies. Registration with the FDA subjects entities to periodic unannounced and announced inspections by the FDA and these state agencies, during which the agency inspects manufacturing facilities to assess compliance with cGMPs. Accordingly, manufacturers must continue to expend time, money, and effort in the areas of production and quality-control to maintain compliance with cGMPs. Regulatory authorities may withdraw product approvals or request product recalls if a company fails to comply with regulatory standards, if it encounters problems following initial marketing, or if previously unrecognized problems are subsequently discovered. The FDA may also impose a REMS requirement on a drug already on the market if the FDA determines, based on new safety information, that a REMS is necessary to ensure that the drug's benefits outweigh its risks. In addition, regulatory authorities may take other enforcement action, including, among other things, warning letters, the seizure of products, injunctions, consent decrees placing significant restrictions on or suspending manufacturing operations, refusal to approve pending applications or supplements to approved applications, civil penalties and criminal prosecution.

In addition, the distribution of prescription pharmaceuticals is subject to the Prescription Drug Marketing Act ("PDMA") which regulates the distribution of drugs and drug samples at the federal level, and sets minimum standards for the registration and

19

regulation of drug distributors by the states. A growing majority of states also impose certain drug pedigree requirements on the sale and distribution of prescription drugs.

The FDA may require post-approval studies and clinical trials if the FDA finds that scientific data, including information regarding related drugs, deem it appropriate. The purpose of such studies would be to assess a known serious risk or signals of serious risk related to the drug or to identify an unexpected serious risk when available data indicate the potential for a serious risk. The FDA may also require a labeling change if it becomes aware of new safety information that it believes should be included in the labeling of a drug.

*The Hatch-Waxman Amendments*

*ANDA Approval Process*

The Hatch-Waxman Act, established abbreviated FDA approval procedures for drugs that are shown to be equivalent to proprietary drugs previously approved by the FDA through its NDA process. Approval to market and distribute these drugs is obtained by filing an ANDA with the FDA. An ANDA is a comprehensive submission that contains, among other things, data and information pertaining to the active pharmaceutical ingredient, drug product formulation, specifications and stability of the generic drug, as well as analytical methods, manufacturing process validation data and quality control procedures. Premarket applications for generic drugs are termed abbreviated because they generally do not include preclinical and clinical data to demonstrate safety and effectiveness. Instead, a generic applicant must demonstrate that its product is bioequivalent to the innovator drug. In certain situations, an applicant may obtain ANDA approval of a generic product with a strength or dosage form that differs from a referenced innovator drug pursuant to the filing and approval of an ANDA Suitability Petition. The FDA will approve the generic product as suitable for an ANDA application if it finds that the generic product does not raise new questions of safety and effectiveness as compared to the innovator product. A product is not eligible for ANDA approval if the FDA determines that it is not equivalent to the referenced innovator drug, if it is intended for a different use, or if it is not subject to an approved Suitability Petition. However, such a product might be approved under an NDA, with supportive data from clinical trials.

*505(b)(2) NDAs*

As an alternative path to FDA approval for modifications to formulations or uses of products previously approved by the FDA, an applicant may submit an NDA under Section 505(b)(2) of the FDCA. Section 505(b)(2) was enacted as part of the Hatch-Waxman Amendments and permits the filing of an NDA where at least some of the information required for approval comes from studies not conducted by, or for, the applicant. If the 505(b)(2) applicant can establish that reliance on FDA's previous findings of safety and effectiveness is scientifically appropriate, it may eliminate the need to conduct certain preclinical or clinical studies of the new product. The FDA may also require companies to perform additional studies or measurements, including clinical trials, to support the change from the approved branded reference drug. The FDA may then approve the new product candidate for all, or some, of the label indications for which the branded reference drug has been approved, as well as for any new indication sought by the 505(b)(2) applicant.

*Orange Book Listing*

In seeking approval for a drug through an NDA, including a 505(b)(2) NDA, applicants are required to list with the FDA certain patents whose claims cover the applicant's product. Upon approval of an NDA, each of the patents listed in the application for the drug is then published in the Orange Book. Any applicant who files an ANDA seeking approval of a generic equivalent version of a drug listed in the Orange Book or a 505(b)(2) NDA referencing a drug listed in the Orange Book must certify to the FDA that (1) no patent information on the drug product that is the subject of the application has been submitted to the FDA; (2) such patent has expired; (3) the date on which such patent expires; or (4) such patent is invalid or will not be infringed upon by the manufacture, use or sale of the drug product for which the application is submitted. This last certification is known as a paragraph IV certification. A notice of the paragraph IV certification must be provided to each owner of the patent that is the subject of the certification and to the holder of the approved NDA to which the ANDA or 505(b)(2) application refers. The applicant may also elect to submit a "section viii" statement certifying that its proposed label does not contain (or carves out) any language regarding the patented method-of-use rather than certify to a listed method-of-use patent.

If the reference NDA holder and patent owners assert a patent challenge directed to one of the Orange Book listed patents within 45 days of the receipt of the paragraph IV certification notice, the FDA is prohibited from approving the application until the earlier of 30 months from the receipt of the paragraph IV certification expiration of the patent, settlement of the lawsuit or a decision in the infringement case that is favorable to the applicant. The ANDA or 505(b)(2) application also will not be approved until any applicable non-patent exclusivity listed in the Orange Book for the branded reference drug has expired as described in further

20

*Non-Patent Exclusivity*

In addition to patent exclusivity, the holder of the NDA for the listed drug may be entitled to a period of non-patent exclusivity, during which the FDA cannot approve an ANDA or 505(b)(2) application that relies on the listed drug. For example, a pharmaceutical manufacturer may obtain five years of non-patent exclusivity upon NDA approval of a new chemical entity, or NCE, which is a drug that contains an active moiety that has not been approved by FDA in any other NDA. An "active moiety" is defined as the molecule or ion responsible for the drug substance's physiological or pharmacological action. During the five year exclusivity period, the FDA cannot accept for filing any ANDA seeking approval of a generic version of that drug or any 505(b)(2) NDA for the same active moiety and that relies on the FDA's findings regarding that drug, except that FDA may accept an application for filing after four years if the follow-on applicant makes a paragraph IV certification.

A drug, including one approved under Section 505(b)(2), may obtain a three-year period of exclusivity for a particular condition of approval, or change to a marketed product, such as a new formulation for a previously approved product, if one or more new clinical studies (other than bioavailability or bioequivalence studies) was essential to the approval of the application and was conducted/sponsored by the applicant. Should this occur, the FDA would be precluded from approving any ANDA or 505(b)(2) application for the protected modification until after that three-year exclusivity period has run. However, unlike NCE exclusivity, the FDA can accept an application and begin the review process during the exclusivity period.

*Orphan Drug Designation and Exclusivity*

The Orphan Drug Act provides incentives for the development of products intended to treat rare diseases or conditions. Under the Orphan Drug Act, the FDA may grant orphan designation to a drug or biological product intended to treat a rare disease or condition, which is generally a disease or condition that affects fewer than 200,000 individuals in the United States, or more than 200,000 individuals in the United States and for which there is no reasonable expectation that the cost of developing and making a drug or biological product available in the United States for this type of disease or condition will be recovered from sales of the product. If a sponsor demonstrates that a drug is intended to treat rare diseases or conditions, the FDA will grant orphan designation for that product for the orphan disease indication. Orphan designation must be requested before submitting an NDA. After the FDA grants orphan product designation, the identity of the therapeutic agent and its potential orphan use are disclosed publicly by the FDA. Orphan drug designation, however, does not convey any advantage in, or shorten the duration of, the regulatory review and approval process.

Orphan drug designation provides manufacturers with research grants, tax credits and eligibility for orphan drug exclusivity. If a product that has orphan drug designation subsequently receives the first FDA approval of the active moiety for that disease or condition for which it has such designation, the product is entitled to orphan drug exclusivity, which for seven years prohibits the FDA from approving another product with the same active ingredient for the same indication, except in limited circumstances. If a drug designated as an orphan product receives marketing approval for an indication broader than the orphan indication for which it received the designation, it will not be entitled to orphan drug exclusivity. Orphan exclusivity will not bar approval of another product under certain circumstances, including if a subsequent product with the same active ingredient for the same indication is shown to be clinically superior to the approved product on the basis of greater efficacy or safety, or providing a major contribution to patient care, or if the company with orphan drug exclusivity is not able to meet market demand. Further, the FDA may approve more than one product for the same orphan indication or disease as long as the products contain different active ingredients. Moreover, competitors may receive approval of different products for the indication for which the orphan product has exclusivity or obtain approval for the same product but for a different indication for which the orphan product has exclusivity. As a result, even if one of our product candidates receives orphan exclusivity, we may still be subject to competition. Orphan exclusivity also could block the approval of one of our products for seven years if a competitor obtains approval of the same drug or if our product candidate is determined to be contained within the competitor's product for the same indication or disease.

*International Regulation*

In addition to regulations in the United States, we are and will be subject to a variety of foreign regulations regarding development, approval, commercial sales and distribution of our products. Whether or not we obtain FDA approval for a product, we must obtain the necessary approvals by the comparable regulatory authorities of foreign countries before we can commence clinical trials or marketing of the product in those countries. The approval process varies from country to country and can involve additional product testing and additional review periods, and the time may be longer or shorter than that required to obtain FDA approval. The requirements governing, among other things, the conduct of clinical trials, product licensing, pricing and reimbursement vary greatly from country to country. Regulatory approval in one country does not ensure regulatory approval in another, but a failure

21

or delay in obtaining regulatory approval in one country may negatively impact the regulatory process in others. If we fail to comply with applicable foreign regulatory requirements, we may be subject to fines, suspension or withdrawal of regulatory approvals, product recalls, seizure of products, operating restrictions and criminal prosecution.

*Other Healthcare Laws and Compliance Requirements*

In the United States, the research, manufacturing, distribution, marketing, sale and promotion of drug products and medical devices are subject to numerous regulations by various federal, state and local authorities in addition to the FDA including, but not limited to, the U.S. Federal Communications Commission, the U.S. Department of Justice, the U.S. Department of Health and Human Services ("HHS") and its various enforcement divisions, such as the Centers for Medicare & Medicaid Services ("CMS"), the Office of Inspector General ("OIG"), the Office for Human Research Protections ("OHRP"), and the Office of Research Integrity ("ORI"), state Attorneys General, state Medicaid Fraud Control Units, or MFCUs, and other state and local government agencies. Healthcare laws and regulations that may govern our business include the following.

The federal Anti-Kickback Statute prohibits, among other things, any person or entity, including a prescription drug manufacturer, or a party acting on its behalf, from knowingly and willfully soliciting, receiving, offering or paying any remuneration, directly or indirectly, overtly or covertly, in cash or in kind to induce in return for either the referral of an individual, or the purchase, recommendation, leasing, ordering or furnishing of a good, facility, item, or service, for which payment may be made in whole or in part under a federal healthcare program such as the Medicare and Medicaid programs. This statute has been interpreted broadly to apply to, among other things, arrangements between pharmaceutical manufacturers, on one hand, and prescribers, purchasers, and formulary managers, on the other. The term "remuneration" expressly includes kickbacks, bribes or rebates and also has been broadly interpreted to include anything of value, including for example, gifts, discounts, the furnishing of supplies or equipment, credit arrangements, payments of cash, waivers of payments, ownership interests and providing anything at less than its fair market value. There are a number of statutory exceptions and regulatory safe harbors, which are narrowly drawn, protecting certain business arrangements from prosecution. Failure to meet all of the requirements of a particular applicable statutory exception or safe harbor does not make the conduct per se illegal under the federal Anti-Kickback Statute. Instead, the legality of the arrangement will be evaluated on a case-by-case basis based on a cumulative review of all of its facts and circumstances. Our practices may not meet all of the criteria for safe harbor protection from federal Anti-Kickback Statute liability in all cases. Additionally, the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010 (collectively, the "ACA"), among other things, amended the intent standard under the federal Anti-Kickback Statute such that a person or entity no longer needs to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation. The ACA also provided that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act (discussed below). Further, many states have adopted laws similar to the federal Anti-Kickback Statute, and some of these state laws may be broader in scope in that some of these state laws extend to all payors and may not contain safe harbors.

Federal civil and criminal false claims laws, including the federal civil False Claims Act, and civil monetary penalty laws, which prohibit, among other things, any person or entity from knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval by the federal government or knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim to the federal government. The "*qui tam*" provisions of the federal civil False Claims Act allow a private individual to bring a civil action on behalf of the federal government alleging that the defendant has submitted a false claim to the federal government, and potentially to share in any monetary recovery. In recent years, the number of suits brought by private individuals has increased dramatically. In addition, various states have enacted false claims laws analogous to the federal civil False Claims Act. Many of these state laws are broader in scope and apply to all payors, and therefore, are not limited to only those claims submitted to the federal government. There are many potential bases for liability under the federal civil False Claims Act. Liability arises, primarily, when an entity knowingly submits, or causes another to submit, a false claim for reimbursement to the federal government. The federal civil False Claims Act has been used to assert liability on the basis of kickbacks and other improper referrals, improperly reported government pricing metrics such as Best Price or Average Manufacturer Price, and improper promotion of off-label uses not expressly approved by the FDA in a drug's label. Our future activities relating to the reporting of discount and rebate information and other information affecting federal, state and third party reimbursement of our products, and the sale and marketing of our products and our service arrangements or data purchases, among other activities, may be subject to scrutiny under these laws.

Also, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") created several additional federal civil and criminal statutes that prohibit healthcare fraud and false statements relating to healthcare matters. The healthcare fraud statute prohibits knowingly and willfully executing a scheme to defraud any healthcare benefit program, including private third-party payors. The false statements statute prohibits knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits,

22

items or services. Like the federal Anti-Kickback Statute, the ACA amended certain of these federal criminal statutes such that a person or entity no longer needs to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation.

In addition, we may be subject to, or our marketing activities may be limited by, data privacy and security regulation by both the federal government and the states in which we conduct our business. HIPAA and its implementing regulations established uniform standards for certain "covered entities," which are certain healthcare providers, health plans and healthcare clearinghouses, as well as their business associates, which are independent contractors or agents of covered entities that receive or obtain protected health information in connection with providing a service on behalf of a covered entity, governing the conduct of specified electronic healthcare transactions and protecting the security and privacy of protected health information. The American Recovery and Reinvestment Act of 2009, commonly referred to as the economic stimulus package, included the Health Information Technology for Economic and Clinical Health Act ("HITECH"), which expanded certain of HIPAA's privacy and security standards. Among other things, HITECH makes HIPAA's security standards and certain privacy standards directly applicable to business associates. HITECH also created four new tiers of civil monetary penalties, amended HIPAA to make civil and criminal penalties directly applicable to business associates, and gave state attorneys general new authority to file civil actions for damages or injunctions in federal courts to enforce the federal HIPAA laws and seek attorneys' fees and costs associated with pursuing federal civil actions.

Additionally, federal transparency laws, including the federal Physician Payments Sunshine Act created under Section 6002 of the ACA and its implementing regulations require that certain manufacturers of drugs, devices, biologics, and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) report annually to CMS information related to "payments or other transfers of value" made or distributed to physicians (defined to include doctors of medicine, dentists, optometrists, podiatrists and chiropractors), generally, with some exceptions, and teaching hospitals, or to entities or individuals at the request of, or designated on behalf of, physicians and teaching hospitals. Applicable manufacturers and applicable group purchasing organizations must also report annually to the CMS certain ownership and investment interests held by physicians (as defined above) and their immediate family members.

There are also an increasing number of analogous state laws that require manufacturers to file reports with states on pricing and marketing information, such as tracking and reporting of gifts, compensations, other remuneration and items of value provided to health care professionals and health care entities. Many of these laws contain ambiguities as to what is required to comply with the laws. Several states have also enacted legislation requiring pharmaceutical companies to, among other things, establish and implement commercial compliance programs, file periodic reports with the state, make periodic public disclosures on sales, marketing, pricing, clinical trials and other activities and/or register their sales representatives. Certain state laws also regulate manufacturers' use of identifiable data. These laws may affect our sales, marketing and other promotional activities by imposing administrative and compliance burdens. In addition, given the lack of clarity with respect to these laws and their implementation, our reporting actions could be subject to the penalty provisions of the pertinent state and federal authorities.

If our operations are found to be in violation of any of the health regulatory laws described above or any other laws that apply to us, we may be subject to penalties, including significant administrative, criminal and civil monetary penalties, damages, fines, imprisonment, disgorgement, contractual damages, reputational harm, exclusion from participation in government healthcare programs, integrity obligations, injunctions, recall or seizure of products, total or partial suspension of production, denial or withdrawal of pre-marketing product approvals, private qui tam actions brought by individual whistleblowers in the name of the government or refusal to allow us to enter into supply contracts, including government contracts and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations. We are unable to predict whether we would be subject to actions under these laws or the impact of such actions. However, the cost of defending such claims, as well as any sanctions imposed, could adversely affect our financial performance.

To the extent that any of our products are sold in a foreign country, we also may be subject to similar foreign laws and regulations, which may include, for instance, the U.S. Foreign Corrupt Practices Act, the U.K. Anti-Bribery Act, applicable post-marketing requirements, including safety surveillance, anti-fraud and abuse laws and implementation of corporate compliance programs and reporting of payments or transfers of value to healthcare professionals.

*Third-Party Payor Coverage and Reimbursement*

The commercial success of our approved product portfolio, as well as our pre-clinical and clinical product portfolio, if and when approved, will depend, in part, upon the availability of coverage and adequate reimbursement from third-party payors at the federal, state and private levels. Patients who are prescribed treatments for their conditions and providers performing the prescribed services generally rely on third-party payors to reimburse all or part of the associated healthcare costs. In the United States, third-party

23

payors often rely upon Medicare coverage policy and payment limitations in setting their own coverage and reimbursement policies. However, decisions regarding the extent of coverage and amount of reimbursement to be provided for any product candidates that we develop will be made on a payor-by-payor basis. Sales of our product portfolio will therefore depend substantially, both domestically and abroad, on the extent to which the costs of our product portfolio will be paid by health maintenance, managed care, pharmacy benefit, and/or similar healthcare management organizations, or are reimbursed by government health administration authorities, such as Medicare and Medicaid, private health coverage insurers and other third-party payors. The market for our product portfolio will depend significantly on access to third-party payors' formularies, or lists of treatments for which third-party payors provide coverage and reimbursement.

Also, third-party payors are developing increasingly sophisticated methods of controlling healthcare costs. Further, coverage and reimbursement for therapeutic products can differ significantly from payor to payor. As a result, the coverage determination process will require us to provide scientific and clinical support for the use of our products to each payor separately, with no assurance that adequate coverage and reimbursement will be obtained. The cost of pharmaceuticals and medical devices continues to generate substantial governmental and third-party payor scrutiny. We expect that the pharmaceutical industry will experience continued pricing pressures due to the trend toward managed healthcare, the increasing influence of managed care organizations and additional legislative and administrative proposals. Our results of operations and business could be adversely affected by current and future third-party payor policies as well as healthcare legislative and administrative reforms.

Some third-party payors also require pre-approval of coverage for new or innovative devices or drug therapies before they will reimburse healthcare providers who use such therapies. While we cannot predict whether any proposed cost-containment measures will be adopted or otherwise implemented in the future, these requirements or any announcement or adoption of such proposals could have a material adverse effect on our ability to obtain adequate prices for our product portfolio and to operate profitably.

In international markets, reimbursement and healthcare payment systems vary significantly by country, and many countries have instituted price ceilings on specific products and therapies. There can be no assurance that our products will be considered medically reasonable and necessary for a specific indication, that our products will be considered cost-effective by third-party payors, that an adequate level of reimbursement will be available or that the third-party payors' reimbursement policies will not adversely affect our ability to sell our products profitably.

*Healthcare Reform*

In the United States and foreign jurisdictions, the legislative landscape continues to evolve. There have been a number of legislative and regulatory changes to the healthcare system that will likely affect our future operations. In particular, there have been and continue to be a number of initiatives at the United States federal and state levels that seek to reduce healthcare costs, improve access, and improve quality.

By way of example, in March 2010, the ACA was passed, which significantly changed health care financing by both governmental and private insurers. The provisions of the ACA of importance to the pharmaceutical and biotechnology industry included, among others, the following:

- an annual, nondeductible fee on any entity that manufactures or imports certain branded prescription drugs and biologic agents, apportioned among these entities according to their market share in certain government healthcare programs;
- an increase in the statutory minimum rebates a manufacturer must pay under the Medicaid Drug Rebate Program to 23.1% and 13% of the average manufacturer price for most branded and generic drugs, respectively;
- new methodologies by which rebates owed by manufacturers under the Medicaid Drug Rebate Program are calculated for drugs that are inhaled, infused, instilled, implanted or injected, and for drugs that are line extension products;
- a new Medicare Part D coverage gap discount program, in which manufacturers must now agree to offer 70% point-of-sale discounts to negotiated prices of applicable brand drugs to eligible beneficiaries during their coverage gap period, as a condition for the manufacturer's outpatient drugs to be covered under Medicare Part D;
- extension of manufacturers' Medicaid rebate liability to covered drugs dispensed to individuals who are enrolled in Medicaid managed care organizations, unless the drug is subject to discounts under the 340B drug discount program;
- expansion of eligibility criteria for Medicaid programs by, among other things, allowing states to offer Medicaid coverage to additional individuals and by adding new mandatory eligibility categories for certain individuals with income at or below 133% of the Federal Poverty Level thereby potentially increasing manufacturers' Medicaid rebate liability;
- expansion of the entities eligible for discounts under the Public Health Service pharmaceutical pricing program;
- expansion of healthcare fraud and abuse laws, including the federal civil False Claims Act and the federal Anti-Kickback Statute, new government investigative powers, and enhanced penalties for noncompliance;
- a licensure framework for follow-on biologic products;

24

- a new Patient-Centered Outcomes Research Institute to oversee, identify priorities in, and conduct comparative clinical effectiveness research, along with funding for such research;
- new requirements under the federal Physician Payments Sunshine Act for manufacturers to report information related to payments and other transfers of value made to physicians, as defined by such law, and teaching hospitals as well as ownership or investment interests held by physicians and their immediate family members; and,
- a new requirement to annually report certain drug samples that manufacturers and distributors provide to licensed practitioners, or to pharmacies of hospitals or other healthcare entities.

There have been judicial and Congressional challenges to certain aspects of the ACA, as well as efforts by the U.S. Presidential administration to repeal or replace certain aspects of the ACA. Since January 2017, the U.S. President has signed two Executive Orders and other directives designed to delay the implementation of certain provisions of the ACA or otherwise circumvent some of the requirements for health insurance mandated by the ACA. Concurrently, Congress has considered legislation that would repeal or repeal and replace all or part of the ACA. While Congress has not passed comprehensive repeal legislation, several bills affecting the implementation of certain taxes under the ACA have been signed into law. For example, the Tax Cuts and Jobs Act of 2017 (the "Tax Act") included a provision which repealed, effective January 1, 2019, the tax-based shared responsibility payment imposed by the ACA on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate". Additionally, the 2020 federal spending package permanently eliminated, effective January 1, 2020, the ACA-mandated "Cadillac" tax on high-cost employer-sponsored health coverage and medical device tax and, effective January 1, 2021, also eliminates the health insurer tax. The Bipartisan Budget Act of 2018, or the BBA, among other things, amended the ACA, effective January 1, 2019, to close the coverage gap in most Medicare drug plans, commonly referred to as the "donut hole". In December 2018, CMS published a new final rule permitting further collections and payments to and from certain ACA qualified health plans and health insurance issuers under the ACA risk adjustment program in response to the outcome of federal district court litigation regarding the method CMS uses to determine this risk adjustment. On December 14, 2018, a Texas U.S. District Court Judge ruled that ACA is unconstitutional in its entirety because the "individual mandate" was repealed by Congress as part of the Tax Act. Additionally, on December 18, 2019, the U.S. Court of Appeals for the 5th Circuit upheld the District Court ruling that the individual mandate was unconstitutional and remanded the case back to the District Court to determine whether the remaining provisions of the ACA are invalid as well. It is unclear how this decision, future decisions, subsequent appeals, and other efforts to repeal and replace ACA will impact ACA.

Other healthcare legislative changes have been proposed and adopted since the ACA was enacted. For example, in August 2011, the President signed into law the Budget Control Act of 2011, which, among other things, created the Joint Select Committee on Deficit Reduction to recommend proposals in spending reductions to Congress. The Joint Select Committee on Deficit Reduction did not achieve its targeted deficit reduction of at least $1.2 trillion for the years 2013 through 2021, triggering the legislation's automatic reductions to several government programs. These reductions include aggregate reductions to Medicare payments to providers of up to 2% per fiscal year, which went into effect on April 1, 2013 and, following passage of subsequent legislation, including the BBA, will remain in effect through 2029 unless additional Congressional action is taken. Additionally, in January 2013, President Obama signed into law the American Taxpayer Relief Act of 2012, which, among other things, further reduced Medicare payments to several providers, including hospitals, imaging centers, and cancer treatment centers, and increased the statute of limitations period for the government to recover overpayments to providers from three to five years. These new laws may result in additional reductions in Medicare and other healthcare funding, which could have a material adverse effect on our customers and accordingly, our financial operations.

In addition, the Drug Supply Chain Security Act signed into law on November 27, 2013 imposes on manufacturers of certain pharmaceutical products new obligations related to product tracking and tracing, among others, which will be phased in over ten years.  Among the requirements of this new legislation, manufacturers subject to this federal law will be required to provide certain information regarding the drug product to individuals and entities to which product ownership is transferred, label drug product with a product identifier, and keep certain records regarding the drug product.  The transfer of information to subsequent product owners by manufacturers will eventually be required to be done electronically. Covered manufacturers will also be required to verify that purchasers of the manufacturers' products are appropriately licensed.  Further, under this legislation, covered manufacturers will have drug product investigation, quarantine, disposition, and notification responsibilities related to counterfeit, diverted, stolen,  and intentionally adulterated products, as well as products that are the subject of fraudulent transactions or which are otherwise unfit for distribution such that they would be reasonably likely to result in serious health consequences or death.

We expect that additional state and federal healthcare reform measures will be adopted in the future. For example, there has been increasing legislative and enforcement interest in the United States with respect to specialty drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and

25

manufacturer patient programs, and reform government program reimbursement methodologies for drugs. For example, the current U.S. Presidential administration's budget proposal for fiscal year 2021 includes a $135 billion allowance to support legislative proposals seeking to reduce drug prices, increase competition, lower out-of-pocket drug costs for patients, and increase patient access to lower-cost generic and biosimilar drugs. Previously, the current U.S. Presidential administration released a "Blueprint", or plan, to lower drug prices and reduce out of pocket costs of drugs that contains additional proposals to increase drug manufacturer competition, increase the negotiating power of certain federal healthcare programs, incentivize manufacturers to lower the list price of their products, and reduce the out of pocket costs of drug products paid by consumers. HHS has solicited feedback on some of these measures and has implemented others under its existing authority. For example, in May 2019, CMS issued a final rule to allow Medicare Advantage Plans the option of using step therapy for Part B drugs beginning on January 1, 2020. The final rule codified a CMS policy change that was effective January 1, 2019. While some of these and other proposed measures may require additional authorization to become effective, Congress and the current U.S. Presidential administration have each indicated that it will continue to seek new legislative and/or administrative measures to control drug costs. At the state level, legislatures have increasingly passed legislation and implemented regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing. Any additional healthcare reform measures could further constrain our business and/or limit the amounts that federal and state governments will pay for healthcare products and services, which could result in reduced demand for our product portfolio or additional pricing pressures.

*Other Regulatory Requirements*

We are also subject to various laws and regulations regarding laboratory practices, the experimental use of animals, and the use and disposal of hazardous or potentially hazardous substances in connection with our research. In each of these areas, as above, the FDA and other government agencies have broad regulatory and enforcement powers, including, among other things, the ability to levy fines and civil penalties, suspend or delay issuance of approvals, seize or recall products, and withdraw approvals, any one or more of which could have a material adverse effect on us.

**Employees**

As of December 31, 2019, we had a total of 108 employees. None of our employees are represented by a labor union or subject to a collective bargaining agreement. We have not experienced any work stoppage and consider our relations with our employees to be good.

**Corporate Information**

We were incorporated in Delaware in January 2007. Our principal executive offices are located at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677, and our telephone number is (201) 326-5300.

**Available Information**

Our corporate website address is www.eagleus.com. Information contained on or accessible through our website is not a part of this Annual Report on Form 10-K, and the inclusion of our website address in this Annual Report on Form 10-K is an inactive textual reference only. We make our Annual Reports on Form 10-K, Quarterly reports on Form 10-Q, Current Reports on Form 8-K and all amendments to those reports available free of charge on our website as soon as reasonably practicable after we file such reports with, or furnish such reports to, the Securities and Exchange Commission, or SEC. You can access our filings through the SEC's internet site: www.sec.gov.

26

**Item 1A. Risk Factors**

Investing in our common stock involves a high degree of risk. You should consider carefully the risks and uncertainties described below in addition to the other information included or incorporated by reference in this Annual Report on Form 10-K, as well as our other public filings with the Securities and Exchange Commission. If any of the following risks actually occur, our business, financial condition or results of operations would likely suffer. In that case, the trading price of our common stock could fall. In addition to the risk factors identified under the captions below, the operation and results of our business are subject to risks and uncertainties identified elsewhere in this Annual Report on Form 10-K as well as general risks and uncertainties such as those relating to general economic conditions and demand in the market for our products.

27

*If we cannot sustain profitability, our business, prospects, operating results and financial condition would be materially harmed.*

We have focused primarily on developing a broad product portfolio and currently have final regulatory approval for a limited number of products. Some of our product candidates will require substantial additional development time and resources before we would be able to receive regulatory approvals, implement commercialization strategies and begin generating revenue from product sales. Although we had net income of $14.3 million for the year ended December 31, 2019, $31.9 million for the year ended December 31, 2018 and $51.9 million for the year ended December 31, 2017, we incurred significant net losses prior to 2015.

We have devoted most of our financial resources to product development and may not generate significant revenue from sales of our product candidates in the near-term, if ever. As of December 31, 2019, we commercialize the following main products, Ryanodex, Belrapzo and Bendeka.

Because of the numerous risks and uncertainties associated with pharmaceutical product development, we are unable to fully predict the timing or amount of our expenses, but we expect to continue to incur substantial expenses, which we expect to increase as we expand our development activities and product portfolio. As a result of the foregoing, we may incur losses and negative cash flows in the future. We believe that our existing cash and cash equivalents, together with interest thereon and expected operating cash flows, are sufficient to fund our future operations and debt costs for a minimum of twelve months.

*If we fail to obtain additional financing, we could be forced to delay, reduce or eliminate our product development programs.*

Developing pharmaceutical products, including conducting preclinical studies and clinical trials, is expensive. We expect our development expenses to substantially increase in connection with our ongoing activities, particularly as we advance our clinical programs, both internally and through our external joint development agreements, such as with AMRI. Changing circumstances beyond our control may cause us to consume capital more rapidly than we currently anticipate. For example, our product commercialization or development efforts could encounter technical or other difficulties that could increase our development costs more than we expect. In any event, we may require additional capital prior to obtaining regulatory approval for, or commercializing, any additional product candidates.

In addition, attempting to secure additional financing may divert our management from our day-to-day activities, which may adversely affect our ability to develop and commercialize additional product candidates. We cannot guarantee that future financing will be available in sufficient amounts or on terms acceptable to us, if at all. If we are unable to raise additional capital when required or on acceptable terms, we may be required to:

- significantly delay, scale back or discontinue the development or commercialization of our product candidates;

- seek corporate partners for our products and product candidates at an earlier stage than otherwise would be desirable or on terms that are less favorable than might otherwise be available;

- relinquish or license on unfavorable terms, our rights to technologies or products, or to product candidates that we otherwise would seek to develop or commercialize ourselves; or

- significantly curtail, or cease, operations.

The occurrence of any of these factors could have a material adverse effect on our business, operating results and prospects.

*We may sell additional equity or incur debt to fund our operations, which may result in dilution to our stockholders and impose restrictions on our business.*

In order to raise additional funds to support our operations, we may sell additional equity or incur debt, which could adversely impact our stockholders, as well as our business. The sale of additional equity or convertible debt securities would result in the issuance of additional shares of our capital stock and dilution to all of our stockholders. The incurrence of indebtedness results in increased fixed payment obligations. In addition, the incurrence of indebtedness also results in certain restrictive covenants, such as limitations on our ability to incur additional debt, limitations on our ability to acquire, sell or license intellectual property rights and other operating restrictions that could adversely impact our ability to conduct our business. On November 8, 2019, the Company entered into the Second Amended and Restated Credit Agreement (the "Revised Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") and the lenders party thereto, which replaced the Company's existing credit agreement, dated as of August 8, 2017 (the "Amended Credit Agreement"). The terms and amounts borrowed under the Revised Credit Agreement includes a drawn term loan of $40 million and a undrawn revolving credit facility of $110 million. The schedule of principal payments for the new term loan facility has been extended until November 8, 2022.

28

We may not have enough available cash or be able to raise additional funds on satisfactory terms, if at all, through equity or debt financings to repay our indebtedness at the time any such repayment is required (causing a default under such indebtedness), which could have a material adverse effect on our business, financial condition and results of operations.

## Risks Related to Regulatory Approval

*We cannot give any assurance that we will receive regulatory approval for our product candidates, which is necessary before they can be commercialized.*

Our business and future success are substantially dependent on our ability to successfully and timely develop, obtain regulatory approval for, and commercialize our product candidates. Any delay or setback in the development of any of these product candidates could adversely affect our business. For example, in January 2020, the Company has resubmitted its NDA for Ryanodex® (dantrolene sodium for injectable suspension) for the treatment of EHS, in addition to body cooling, to the FDA. Eagle believes that this submission addresses the Complete Response Letter received in July 2017. Although we believe that this submission addresses the Complete Response Letter received in July 2017, we may receive another Complete Response Letter, rather than approval, for this NDA. Our planned development, approval and commercialization of these product candidates may fail to be completed in a timely manner or at all. The FDA or other foreign regulatory agency may refuse or delay approval of our product candidates for failure to collect sufficient clinical or animal safety data and require us or our collaborators to conduct additional clinical or animal safety studies, which may cause lengthy delays and increased costs to our programs. We cannot provide assurance that we will be able to obtain approval for any of our product candidates from the FDA or any foreign regulatory authority or that we will obtain such approval in a timely manner. If we do not obtain regulatory approval of new products or additional indications for existing products, or are significantly delayed or limited in doing so, our revenue growth will be adversely affected, we may experience surplus inventory, or our business may be materially harmed and we may need to significantly curtail operations.

*If we are unable to differentiate our products or product candidates from branded reference drugs or existing generic therapies for similar treatments, or if the FDA or other applicable regulatory authorities approve generic products that compete with any of our products or product candidates, the ability to successfully commercialize our product candidates would be adversely affected.*

Our strategy is to enter the market no later than the first generic to the applicable branded reference drug. We expect to compete against branded reference drugs and to compete with their generic counterparts that will be sold for a lower price. Although we believe that our products and product candidates will be clinically differentiated from branded reference drugs and their generic counterparts, if any, it is possible that such differentiation will not impact our market position. If we are unable to achieve significant differentiation for our products or product candidates against other drugs, the opportunity for our products and product candidates to achieve premium pricing and be commercialized successfully would be adversely affected.

In addition to existing branded reference drugs and the related generic products, the FDA or other applicable regulatory authorities may approve generic products that compete directly with our products or product candidates, if approved. Once an NDA, including a 505(b)(2) application, is approved, the product covered thereby becomes a "listed drug" which can, in turn, be cited by potential competitors in support of approval of an ANDA. The Federal Food, Drug and Cosmetic Act ("FDCA"), FDA regulations and other applicable regulations and policies provide incentives to manufacturers to create modified, non-infringing versions of a drug to facilitate the approval of an ANDA for generic substitutes. These manufacturers might only be required to conduct a relatively inexpensive study to show that their product has the same active ingredient(s), dosage form, strength, route of administration and conditions of use or labeling as our products or product candidates and that the generic product is bioequivalent to ours, meaning it is absorbed in the body at the same rate and to the same extent as our products or product candidates. These generic equivalents, which must meet the same quality standards as branded pharmaceuticals, would be significantly less costly than ours to bring to market and companies that produce generic equivalents are generally able to offer their products at lower prices. Thus, after the introduction of a generic competitor, a significant percentage of the sales of any branded product is typically lost to the generic product. Accordingly, competition from generic equivalents of our products or product candidates would materially adversely impact our ability to successfully commercialize our product candidates or negatively impact our ability to gain market acceptance and market share for our products.

*If the FDA does not conclude that our product candidates satisfy the requirements for the regulatory approval, or if the requirements for approval of any of our product candidates are not as we expect, the approval pathway for our product candidates will likely take significantly longer, cost significantly more and encounter significantly greater complications and risks than anticipated, and in any case may not be successful.*

We intend to seek FDA approval through the 505(b)(2) regulatory pathway for those small molecule product candidates described in this Annual Report on Form 10-K.

The Drug Price Competition and Patent Term Restoration Act of 1984, also known as the Hatch-Waxman Act, added Section 505(b)(2) to the FDCA. Section 505(b)(2) permits the filing of an NDA where at least some of the information required for approval comes from studies that were not conducted by or for the applicant.

If the FDA does not allow us to pursue the regulatory pathway for our product candidates as anticipated, we may need to conduct additional clinical trials, provide additional data and information and meet additional standards for regulatory approval. If this were to occur, the time and financial resources required to obtain FDA approval for our product candidates would likely substantially increase. Moreover, the inability to pursue such regulatory pathway could result in new competitive products reaching the market faster than our product candidates, which could materially adversely impact our competitive position and prospects. Even if we are allowed to pursue our chosen regulatory pathway for a product candidate, we cannot assure you that we will receive the requisite or timely approvals for commercialization of such product candidate.

In addition, we expect that our competitors will file citizens' petitions with the FDA in an attempt to persuade the FDA that our product candidates, or the clinical studies that support their approval, contain deficiencies. Such actions by our competitors could delay or even prevent the FDA from approving any NDA that we submit.

***Clinical development is a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results. Failure can occur at any stage of clinical development.***

Clinical testing, even when utilizing the 505(b)(2) pathway or its equivalent, is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure can occur at any time during the clinical trial process, even with active ingredients that have previously been approved by the FDA as safe and effective. The results of preclinical studies and early clinical trials of our product candidates may not be predictive of the results of later stage clinical trials. A number of companies in the biopharmaceutical industry have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier trials.

Our product candidates are in various stages of development, from early stage to late stage. Clinical trial failures may occur at any stage and may result from a multitude of factors both within and outside our control, including flaws in formulation, adverse safety or efficacy profile and flaws in trial design, among others. If the trials result in negative or inconclusive results, we or our collaborators may decide, or regulators may require us, to discontinue trials of the product candidates or conduct additional clinical trials or preclinical studies. In addition, data obtained from trials and studies are susceptible to varying interpretations, and regulators may not interpret our data as favorably as we do, which may delay, limit or prevent regulatory approval. For these reasons, our future clinical trials may not be successful.

We do not know whether any future clinical trials we may conduct will demonstrate consistent or adequate efficacy and safety to obtain regulatory approval to market our product candidates. If any product candidate for which we are conducting clinical trials is found to be unsafe or lack efficacy, we will not be able to obtain regulatory approval for it. If we are unable to bring any of our current or future product candidates to market, our business would be materially harmed and our ability to create long-term stockholder value will be limited.

***Delays in clinical trials are common and have many causes, and any delay could result in increased costs to us and could jeopardize or delay our ability to obtain regulatory approval and commence product sales. We may also find it difficult to enroll patients in our clinical trials, which could delay or prevent development of our product candidates.***

We may experience delays in clinical trials of our product candidates. Our planned clinical trials may not begin on time, have an effective design, enroll a sufficient number of patients or be completed on schedule, if at all. Our clinical trials can be delayed for a variety of reasons, including:

- inability to raise or delays in raising funding necessary to initiate or continue a trial;

- delays in obtaining regulatory approval to commence a trial;

- delays in reaching agreement with the FDA on final trial design;

- imposition of a clinical hold for safety reasons or following an inspection of our clinical trial operations or trial sites by the FDA or other regulatory authorities;

- delays in reaching agreement on acceptable terms with prospective contract research organizations, or CROs, and clinical trial sites, or failure by such CROs to carry out the clinical trial at each site in accordance with the terms of our agreements with them;

- delays in obtaining required institutional review board, or IRB, approval at each site;

- difficulties or delays in having patients complete participation in a trial or return for post-treatment follow-up;

30

- clinical sites electing to terminate their participation in one of our clinical trials, which would likely have a detrimental effect on subject enrollment;

- time required to add new clinical sites; or

- delays by our contract manufacturers to produce and deliver sufficient supply of clinical trial materials.

If initiation or completion of our planned clinical trials is delayed for any of the above reasons or other reasons, our development costs may increase, our regulatory approval process could be delayed and our ability to commercialize and commence sales of our product candidates could be materially harmed, which could have a material adverse effect on our business.

In addition, identifying and qualifying patients to participate in clinical trials of our product candidates is critical to our success. The timing of our clinical trials depends on the speed at which we can recruit patients to participate in testing our product candidates as well as completion of required follow-up periods. We may not be able to identify, recruit and enroll a sufficient number of patients, or those with required or desired characteristics or to complete our clinical trials in a timely manner. Patient enrollment and completion of the trials is affected by factors including:

- severity of the disease under investigation;

- design of the trial protocol;

- size of the patient population;

- eligibility criteria for the trial in question;

- perceived risks and benefits of the product candidate under trial;

- proximity and availability of clinical trial sites for prospective patients;

- availability of competing therapies and clinical trials;

- efforts to facilitate timely enrollment in clinical trials;

- patient referral practices of physicians; and

- ability to monitor patients adequately during and after treatment.

***Our products or product candidates may cause adverse effects or have other properties that could delay or prevent their regulatory approval or limit the scope of any approved label or market acceptance, or result in significant negative consequences following marketing approval, if any.***

As with many pharmaceutical and biological products, treatment with our products or product candidates may produce undesirable side effects or adverse reactions or events. Although our products or product candidates containing active ingredients that have already been approved and the side effects arising from the use of the active ingredient or class of drug in our products or product candidates are generally known, our products or product candidates may still cause undesirable side effects. These could be attributed to the active ingredient or class of drug or to our unique formulation of such products or product candidates, or other potentially harmful characteristics. Such characteristics could cause us, our IRBs, clinical trial sites, the FDA or other regulatory authorities to interrupt, delay or halt clinical trials and could result in a more restrictive label or the delay, denial or withdrawal of regulatory approval, which may harm our business, financial condition and prospects significantly.

Further, if any of our products cause serious or unexpected side effects after receiving market approval, a number of potentially significant negative consequences could result, including:

- regulatory authorities may withdraw their approval of the product or impose restrictions on its distribution;

- the FDA may require implementation of a Risk Evaluation and Mitigation Strategy, or REMS;

- regulatory authorities may require the addition of labeling statements, such as warnings or contraindications;

- we may be required to change the way the product is administered or conduct additional clinical studies;

- we could be sued and held liable for harm caused to patients; or

- our reputation may suffer.

Any of these events could prevent us from achieving or maintaining market acceptance of the affected product or product candidate and could substantially increase the costs of commercializing our products and product candidates.

31

*The regulatory approval processes of the FDA and comparable foreign authorities are lengthy, time-consuming and inherently unpredictable, and if we are ultimately unable to obtain regulatory approval for our product candidates, our business will be substantially harmed.*

The time required to obtain approval by the FDA and comparable foreign authorities is unpredictable but typically takes many years following the commencement of clinical trials and depends upon numerous factors, including the substantial discretion of the regulatory authorities. In addition, approval policies, regulations or the type and amount of clinical data necessary to gain approval may change during the course of a product candidate's clinical development and may vary among jurisdictions. To date, we have obtained regulatory approval for five NDA products, but no BLA products, and we have multiple NDA product candidates in advanced stages of development and other exploratory candidates under development. However, it is possible that none of our existing product candidates or any product candidates we may seek to develop in the future will ever obtain regulatory approval in the United States or other jurisdictions.

Our product candidates could fail to receive regulatory approval for many reasons, including the following:

- the FDA or comparable foreign regulatory authorities may disagree that our changes to branded reference drugs or existing biologic drugs meet the criteria for our chosen regulatory pathway or foreign regulatory pathways;

- we may be unable to demonstrate to the satisfaction of the FDA or comparable foreign regulatory authorities that a product candidate is safe and effective or comparable to its branded reference product for its proposed indication;

- the results of any clinical trials we conduct may not meet the level of statistical significance required by the FDA or comparable foreign regulatory authorities for approval;

- we may be unable to demonstrate that a product candidate's clinical and other benefits outweigh its safety risks;

- the FDA or comparable foreign regulatory authorities may fail to approve the manufacturing processes or facilities of third party manufacturers with which we contract for clinical and commercial supplies; and

- the approval policies or regulations of the FDA or comparable foreign regulatory authorities may change significantly in a manner rendering our clinical data insufficient for approval.

This lengthy approval process as well as the unpredictability of future clinical trial results may result in our failing to obtain regulatory approval to market our product candidates, which would harm our business, results of operations and prospects significantly.

In addition, even if we were to obtain approval, regulatory authorities may approve any of our product candidates for fewer or more limited indications than we request, may grant approval contingent on the performance of costly post-marketing clinical trials or may approve a product candidate with a label that does not include the labeling claims necessary or desirable for the successful commercialization of that product candidate. Any of the foregoing scenarios could harm the commercial prospects for our product candidates.

We have limited experience using the 505(b)(2) regulatory pathway to submit an NDA or any similar drug approval filing to the FDA, and we cannot be certain that any of our product candidates will receive regulatory approval. There can be no assurance that the FDA will ultimately approve any submitted NDA by us in a timely fashion. For example, in March of 2016 we received a Complete Response Letter from the FDA stating that while their initial review of our NDA for EP-6101 was complete, they could not approve the application in its present form and requested additional information. We have elected not to pursue the application further or seek to exploit EP-6101 for various reasons including the costs associated with addressing the information request in the FDA's Complete Response Letter and because additional generic bivalirudin products have entered or are entering the market. Additionally, in July of 2017 we received a Complete Response Letter from the FDA regarding our 505(b)(2) NDA for Ryanodex for the treatment of EHS, in conjunction with external cooling methods. On January 9, 2020, we announced that the Company has resubmitted its NDA for RYANODEX® (dantrolene sodium for injectable suspension) for the treatment of EHS, in addition to body cooling, to the FDA. Although we believe that this submission addresses the Complete Response Letter received in July 2017, we may receive another Complete Response Letter, rather than approval, for this NDA.

If we do not receive regulatory approvals for our product candidates, we may not be able to continue our operations. Even if we successfully obtain regulatory approvals to market one or more of our product candidates, our revenue will be dependent, to a significant extent, upon the size of the markets in the territories for which we gain regulatory approval. If the markets for patients or indications that we are targeting are not as significant as we estimate, we may not generate significant revenue from sales of such products, if approved.

*An NDA submitted under Section 505(b)(2) subjects as to the risk that we may be subject to a patent infringement lawsuit that would delay or prevent the review or approval of our product candidates.*

Some of our product candidates will be submitted to the FDA for approval under Section 505(b)(2) of the FDCA. Section 505(b)(2) permits the submission of an NDA where at least some of the information required for approval comes from studies that were not conducted by, or for, the applicant and on which the applicant has not obtained a right of reference. The 505(b)(2) application would enable us to reference published literature and/or the FDA's previous findings of safety and effectiveness for the branded reference drug. For NDAs submitted under Section 505(b)(2) of the FDCA, the patent certification and related provisions of the Hatch-Waxman Act apply. In accordance with the Hatch-Waxman Act, such NDAs may be required to include certifications, known as paragraph IV certifications, that certify that any patents listed in the Patent and Exclusivity Information Addendum of the FDA's publication, Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the Orange Book, with respect to any product referenced in the 505(b)(2) application, are invalid, unenforceable or will not be infringed by the manufacture, use or sale of the product that is the subject of the 505(b)(2) NDA.

Under the Hatch-Waxman Act, the holder of patents that the 505(b)(2) application references may file a patent infringement lawsuit after receiving notice of the paragraph IV certification. Filing of a patent infringement lawsuit against the filer of the 505(b)(2) applicant within 45 days of the patent owner's receipt of notice triggers a one-time, automatic, 30-month stay of the FDA's ability to approve the 505(b)(2) NDA, unless patent litigation is resolved in the favor of the paragraph IV filer or the patent expires before that time. Accordingly, we may invest a significant amount of time and expense in the development of one or more product candidates only to be subject to significant delay and patent litigation before such product candidates may be commercialized, if at all. In addition, a 505(b)(2) application will not be approved until any non-patent exclusivity, such as exclusivity for obtaining approval of a new chemical entity, or NCE, listed in the Orange Book for the referenced product has expired. The FDA may also require us to perform one or more additional clinical studies or measurements to support the change from the branded reference drug, which could be time-consuming and could substantially delay our achievement of regulatory approvals for such product candidates. The FDA may also reject our future 505(b)(2) submissions and require us to file such submissions under Section 505(b)(1) of the FDCA, which would require us to provide extensive data to establish safety and effectiveness of the drug for the proposed use and could cause delay and be considerably more expensive and time-consuming. These factors, among others, may limit our ability to successfully commercialize our product candidates.

Companies that produce branded reference drugs routinely bring litigation against abbreviated new drug application, or ANDA, or 505(b)(2) applicants that seek regulatory approval to manufacture and market generic and reformulated forms of their branded products. These companies often allege patent infringement or other violations of intellectual property rights as the basis for filing suit against an ANDA or 505(b)(2) applicant. Likewise, patent holders may bring patent infringement suits against companies that are currently marketing and selling their approved generic or reformulated products.

Litigation to enforce or defend intellectual property rights is often complex and often involves significant expense and can delay or prevent introduction or sale of our product candidates. If patents are held to be valid and infringed by our product candidates in a particular jurisdiction, we would, unless we could obtain a license from the patent holder, be required to cease selling in that jurisdiction and may need to relinquish or destroy existing stock in that jurisdiction. There may also be situations where we use our business judgment and decide to market and sell our approved products, notwithstanding the fact that allegations of patent infringement(s) have not been finally resolved by the courts, which is known as an "at-risk launch." The risk involved in doing so can be substantial because the remedies available to the owner of a patent for infringement may include, among other things, damages measured by the profits lost by the patent owner and not necessarily by the profits earned by the infringer. In the case of a willful infringement, the definition of which is subjective, such damages may be increased up to three times. Moreover, because of the discount pricing typically involved with bioequivalent and, to a lesser extent, 505(b)(2), products, patented branded products generally realize a substantially higher profit margin than bioequivalent and, to a lesser extent, 505(b)(2), products, resulting in disproportionate damages compared to any profits earned by the infringer. An adverse decision in patent litigation could have a material adverse effect on our business, financial position and results of operations and could cause the market value of our common stock to decline.

***The FDA and other regulatory agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses.***

If we are found to have improperly promoted off-label uses of our products or product candidates, if approved, we may become subject to significant liability. Such enforcement has become more common in the industry. The FDA and other regulatory agencies strictly regulate the promotional claims that may be made about prescription products, such as our product candidates, if approved. In particular, a product may not be promoted for uses that are not approved by the FDA or such other regulatory agencies as reflected in the product's approved labeling. However, we may share truthful and not misleading information that is otherwise consistent with our products' FDA approved labeling. If we receive marketing approval for our product candidates for our proposed indications, physicians may nevertheless use our products for their patients in a manner that is inconsistent with the approved label, if the physicians personally believe in their professional medical judgment it could be used in such manner. However, if we are found to have promoted our products for any off-label uses, the federal government could levy civil,

33

criminal and administrative penalties, and seek fines against us. The FDA or other regulatory authorities could also request that we enter into a consent decree or a corporate integrity agreement, or seek a permanent injunction against us under which specified promotional conduct is monitored, changed or curtailed. If we cannot successfully manage the promotion of our product candidates, if approved, we could become subject to significant liability, which would materially adversely affect our business and financial condition.

***Our business is subject to extensive regulatory requirements and our approved product and product candidates that obtain regulatory approval will be subject to ongoing and continued regulatory review, which may result in significant expense and limit our ability to commercialize such products.***

Even after a product is approved, we remain subject to ongoing FDA and other regulatory requirements governing the labeling, packaging, storage, distribution, safety surveillance, advertising, promotion, import, export, record-keeping and reporting of safety and other post-market information. The holder of an approved NDA is obligated to monitor and report adverse events, or AEs, and any failure of a product to meet the specifications in the application. The holder of an approved NDA must also submit new or supplemental applications and obtain FDA approval for certain changes to the approved product, product labeling or manufacturing process. Advertising and promotional materials must comply with FDA rules and are subject to FDA review, in addition to other potentially applicable federal and state laws. In addition, the FDA may impose significant restrictions on the approved indicated uses for which the product may be marketed or on the conditions of approval. For example, a product's approval may contain requirements for potentially costly post-approval studies and surveillance to monitor the safety and efficacy of the product, or the imposition of a REMS program.

Manufacturers of drug products and their facilities are subject to payment of user fees and continual review and periodic inspections by the FDA and other regulatory authorities for compliance with current good manufacturing practices, or cGMP, and adherence to commitments made in the drug application. If we or a regulatory agency discovers previously unknown problems with a product, such as AEs of unanticipated severity or frequency, or problems with the facility where the product is manufactured, a regulatory agency may impose restrictions relative to that product or the manufacturing facility, including requiring product recall, notice to physicians, withdrawal of the product from the market or suspension of manufacturing.

If we or our products or product candidates or our manufacturing facilities fail to comply with applicable regulatory requirements, a regulatory agency may:

- issue warning letters or untitled letters asserting that we are in violation of the law;

- impose restrictions on the marketing or manufacturing of the product;

- seek an injunction or impose civil, criminal and/or administrative penalties, damages, assess monetary fines, require disgorgement, consider exclusion from participation in Medicare, Medicaid and other federal health care programs and require curtailment or restructuring of our operations;

- suspend or withdraw regulatory approval;

- suspend any ongoing clinical trials;

- refuse to approve a pending application or supplements to an application submitted by us;

- seize product; or

- refuse to allow us to enter into government contracts.

Similar post-market requirements may apply in foreign jurisdictions in which we may seek approval of our products. Any government investigation of alleged violations of law could require us to expend significant time and resources in response and could generate negative publicity. The occurrence of any event or penalty described above may inhibit our ability to commercialize our products and generate revenues.

In addition, the FDA's regulations, policies or guidance may change and new or additional statutes or government regulations in the United States and other jurisdictions may be enacted that could prevent or delay regulatory approval of our product candidates or further restrict or regulate post-approval activities. For example, the Food and Drug Administration Safety and Innovation Act, or FDASIA, requires the FDA to issue new guidance on permissible forms of Internet and social media promotion of regulated medical products, and the FDA may soon specify new restrictions on this type of promotion. We cannot predict the likelihood, nature or extent of adverse government regulation that may arise from pending or future legislation or administrative action, either in the United States or abroad. If we are not able to achieve and maintain regulatory compliance, we may not be permitted to market our products and/or product candidates, which would adversely affect our ability to generate revenue and achieve or maintain profitability.

***Our employees, independent contractors, principal investigators, consultants, commercial partners and vendors may engage in misconduct or other improper activities, including non-compliance with regulatory standards and requirements and insider trading.***

We are exposed to the risk that our employees, independent contractors, principal investigators, consultants, commercial partners and vendors may engage in fraudulent conduct or other illegal activity. Misconduct by these parties could include intentional, reckless and/or negligent conduct that violates (1) the laws of the FDA and similar foreign regulatory bodies, including those laws requiring the reporting of true, complete and accurate information to such regulatory bodies; (2) health care laws and regulations, including fraud and abuse laws of the United States and similar foreign fraudulent misconduct laws; and (3) laws requiring the reporting of financial information or data accurately. Specifically, the promotion, sales and marketing of health care items and services, as well as certain business arrangements in the health care industry are subject to extensive laws designed to prevent misconduct, including fraud, kickbacks, self-dealing and other abusive practices. These laws may restrict or prohibit a wide range of pricing, discounting, marketing, structuring and commission(s), certain customer incentive programs and other business arrangements generally. Activities subject to these laws also involve the improper use of information obtained in the course of patient recruitment for clinical trials. It is not always possible to identify and deter employee and other third-party misconduct. The precautions we take to detect and prevent inappropriate conduct may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to comply with these laws. If any such actions are instituted against us, and we are not successful in defending ourselves, those actions could have a significant impact on our business, including the imposition of civil, criminal and administrative penalties, damages, monetary fines, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings, and curtailment of our operations, any of which could adversely affect our ability to operate our business and our results of operations.

***Any relationships with health care professionals, principal investigators, consultants, customers (actual and potential) and third party payors, in addition to our general business operations, are and will continue to be subject, directly or indirectly, to federal and state health care fraud and abuse laws, marketing expenditure tracking and disclosure, or sunshine laws, government price reporting and health information privacy and security laws. If we are unable to comply, or have not fully complied, with such laws, we could face penalties, including, without limitation, civil, criminal and administrative penalties, damages, monetary fines, disgorgement, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings and curtailment or restructuring of our operations.***

Our business operations and activities may be directly, or indirectly, subject to various federal, state and local fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute and the federal civil False Claims Act. These laws may impact, among other things, our current activities with principal investigators and research subjects, as well as current, proposed and future sales, marketing and education programs. In addition, we may be subject to patient data privacy and security regulation by the federal government, state governments and foreign jurisdictions in which we conduct our business, as well as transparency requirements. The U.S. healthcare laws and regulations that may affect our ability to operate include, but are not limited to:

- the federal Anti-Kickback Statute, which prohibits, among other things, knowingly and willfully soliciting, receiving, offering or paying any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind, to induce, or in return for, either the referral of an individual, or the purchase, lease, order or recommendation of any good, facility, item or service for which payment may be made, in whole or in part, under a federal health care program, such as the Medicare and Medicaid programs. The Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, or collectively, ACA, among other things, amends the intent requirement of the federal Anti-Kickback Statute and criminal healthcare fraud statutes such that a person or entity no longer needs to have actual knowledge of this statute or specific intent to violate it. In addition, the ACA provides that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act;

- federal civil and criminal false claims laws, including the federal civil False Claims Act, and civil monetary penalty laws, which prohibit and impose penalties for, among other things, individuals or entities knowingly presenting, or causing to be presented, claims for payment or approval from the federal government including Medicare, Medicaid or certain other governmental health care programs that are false or fraudulent or knowingly making or causing to be made a false statement to improperly avoid, decrease or conceal an obligation to pay money to the federal government;

- the federal Health Insurance Portability and Accountability Act of 1996, or HIPAA, which created additional federal civil and criminal statutes that prohibit knowingly and willfully executing, or attempting to execute, a scheme to defraud any health care benefit program or obtain, by means of false or fraudulent pretenses, representations or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, regardless of the payor (e.g., public or private) and knowingly and willfully falsifying, concealing or covering up by any trick or device a material

35

fact of making any materially false statements in connection with the delivery of, or payment for, health care benefits, items or services relating to health care matters;

- HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, or HITECH, and their respective implementing regulations, which impose requirements on certain health care providers, health plans and health care clearinghouses, known as covered entities, as well as their respective business associates, independent contractors or agents of covered entities that perform services for them that involve the use, or disclosure of, individually identifiable health information, relating to the privacy, security and transmission of individually identifiable health information without appropriate authorization;

- the federal Physician Payments Sunshine Act, created under Section 6002 of the ACA, and its implementing regulations, which requires certain manufacturers of drugs, devices, biologicals and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) to report annually to the United States Department of Health and Human Services' Centers for Medicare & Medicare Services, or CMS, information related to payments or other transfers of value made to physicians (defined to include doctors, dentists, optometrists, podiatrists and chiropractors) and teaching hospitals, as well as ownership and investment interests held by such physicians and their immediate family members;

- federal consumer protection and unfair competition laws, which broadly regulate marketplace activities and activities that potentially harm consumers;

- federal government price reporting laws, changed by ACA to, among other things, increase the minimum Medicaid rebates owed by most manufacturers under the Medicaid Drug Rebate Program and offer such rebates to additional populations, that require us to calculate and report complex pricing metrics to government programs, where such reported prices may be used in the calculation of reimbursement and/or discounts on our marketed drugs. Participation in these programs and compliance with the applicable requirements may subject us to potentially significant discounts on our products, increased infrastructure costs and potentially limit our ability to offer certain marketplace discounts;

- the Foreign Corrupt Practices Act, a United States law which regulates certain financial relationships with foreign government officials (which could include, for example, certain medical professionals); and

- state law equivalents of each of the above federal laws, such as anti-kickback, false claims, consumer protection and unfair competition laws which may apply to our business practices, including but not limited to, research, distribution, sales and marketing arrangements as well as submitting claims involving health care items or services reimbursed by any third party payors, including commercial insurers; state laws that require pharmaceutical companies to comply with the pharmaceutical industry's voluntary compliance guidelines and the relevant compliance guidance promulgated by the federal government that otherwise restricts payments that may be made to health care providers; state laws that require drug manufacturers to file reports with states regarding marketing information, such as the tracking and reporting of gifts, compensations and other remuneration and items of value provided to health care professionals and entities (compliance with such requirements may require investment in infrastructure to ensure that tracking is performed properly, and some of these laws result in the public disclosure of various types of payments and relationships, which could potentially have a negative effect on our business and/or increase enforcement scrutiny of our activities), and drug pricing; state and local laws that require the registration of pharmaceutical sales representatives; and state laws governing the privacy and security of health information in certain circumstances, many of which differ from each other in significant ways, thus complicating compliance efforts.

In addition, any sales of our products or product candidates once commercialized outside the United States will also likely subject us to foreign equivalents of the health care laws mentioned above, among other foreign laws.

Efforts to ensure that our business arrangements will comply with applicable health care laws may involve substantial costs. It is possible that governmental and enforcement authorities will conclude that our business practices may not comply with current or future statutes, regulations or case law interpreting applicable fraud and abuse or other health care laws and regulations. If our operations are found to be in violation of any of the laws described above or any other governmental regulations that apply to us, we may be subject to, without limitation, significant civil, criminal and administrative penalties, damages, monetary fines, disgorgement, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings and curtailment or restructuring of our operations, any of which could adversely affect our ability to operate.

36

*We are required to obtain regulatory approval for each of our products in each jurisdiction in which we intend to market such products, and the inability to obtain such approvals would limit our ability to realize their full market potential.*

In order to market products outside of the United States, we must comply with numerous and varying regulatory requirements of other countries regarding safety and efficacy. Clinical trials conducted in one country may not be accepted by regulatory authorities in other countries, and regulatory approval in one country does not mean that regulatory approval will be obtained in any other country. However, the failure to obtain regulatory approval in one jurisdiction may adversely impact our ability to obtain regulatory approval in another jurisdiction. Approval processes vary among countries and can involve additional product testing and validation and additional administrative review periods. Seeking foreign regulatory approval could result in difficulties and costs for us and require additional non-clinical studies or clinical trials which could be costly and time consuming. Regulatory requirements can vary widely from country to country and could delay or prevent the introduction of our products in those countries. If we fail to comply with regulatory requirements in international markets or to obtain and maintain required approvals, or if regulatory approval in international markets is delayed, our target market will be reduced and our ability to realize the full market potential of our products will be harmed.

*If we fail to develop, acquire or in-license other product candidates or products, our business and prospects will be limited.*

Our long-term growth strategy is to develop and commercialize a portfolio of product candidates in addition to our existing product candidates. We may also acquire or in-license such product candidates. Although we have internal research and development capacity that we believe will enable us to make improvements to existing compounds or active ingredients, we do not have internal drug discovery capabilities to identify and develop entirely new chemical entities or compounds. As a result, our primary means of expanding our pipeline of product candidates is to develop improved formulations and delivery methods for existing FDA-approved products and/or select and acquire or in-license product candidates for the treatment of therapeutic indications that complement or augment our current targets, or that otherwise fit into our development or strategic plans on terms that are acceptable to us. Developing new formulations of existing products or identifying, selecting and acquiring or in-licensing promising product candidates requires substantial technical, financial and human resources expertise. Efforts to do so may not result in the actual development, acquisition or in-license of a particular product candidate, potentially resulting in a diversion of our management's time and the expenditure of our resources with no resulting benefit. If we are unable to add additional product candidates to our pipeline, our long-term business and prospects will be limited.

## Risks Related to Commercialization of Our Products and Product Candidates

*Our commercial success depends upon attaining significant market acceptance of our products and product candidates, if approved, among physicians, nurses, pharmacists, patients and the medical community.*

Even if we obtain regulatory approval for our product candidates, our products and product candidates may not gain market acceptance among physicians, nurses, pharmacists, patients, the medical community or third party payors, which is critical to commercial success. Market acceptance of our products and any product candidate for which we receive approval depends on a number of factors, including:

- the timing of market introduction of the product candidate as well as competitive products;

- the clinical indications for which the product candidate is approved;

- the convenience and ease of administration to patients of the product candidate;

- the potential and perceived advantages of such product candidate over alternative treatments;

- the cost of treatment in relation to alternative treatments, including any similar generic treatments;

- the availability of coverage and adequate reimbursement by third party payors and government authorities;

- relative convenience and ease of administration;

- any negative publicity related to our or our competitors' products that include the same active ingredient;

- the prevalence and severity of adverse side effects, including limitations or warnings contained in a product's FDA-approved labeling; and

- the effectiveness of sales and marketing efforts.

Even if a potential product displays a favorable efficacy and safety profile in preclinical studies and clinical trials, market acceptance of the product will not be known until after it is launched. If our products or product candidates, if approved, fail to achieve an adequate level of acceptance by physicians, nurses, pharmacists, patients and the medical community, we will be unable to generate significant revenues, and we may not become or remain profitable.

*Guidelines and recommendations published by government agencies can reduce the use of our products and product candidates.*

Government agencies promulgate regulations and guidelines applicable to certain drug classes which may include our products and product candidates that we are developing. Recommendations of government agencies may relate to such matters as usage, dosage, route of administration and use of concomitant therapies. Regulations or guidelines suggesting the reduced use of certain drug classes which may include our products and product candidates that we are developing or the use of competitive or alternative products as the standard of care to be followed by patients and health care providers could result in decreased use of our product candidates or negatively impact our ability to gain market acceptance and market share.

*If we are unable to establish sales and marketing capabilities or if our commercial partners do not adequately perform, the commercial opportunity for our products may be diminished.*

Although we intend to establish a commercial organization to promote certain of our approved products in the United States, we currently have limited experience, and the cost of establishing and maintaining such an organization may exceed the benefit of doing so. We have very limited prior experience in the marketing, sale and distribution of pharmaceutical products and there are significant risks involved in building and managing a sales organization, including our ability to hire, retain and incentivize qualified individuals, generate sufficient sales leads, provide adequate training to sales and marketing personnel and effectively manage a geographically dispersed sales and marketing team.

We and any other commercialization partner we engage in the future may not be able to attract, hire, train and retain qualified sales and sales management personnel. If we or our future partners, if any, are not successful in maintaining an effective number of qualified sales personnel, our ability to effectively market and promote our products may be impaired. Even if we are able to effectively build and maintain such sales personnel, such efforts may not be successful in commercializing our products.

The efforts of our partners in many instances would likely be outside our control. If any future partner is unsuccessful in their efforts, or we are unable to maintain such commercial partnerships or to effectively establish alternative arrangements for our products, our business could be adversely affected.

*A substantial portion of our total revenues is derived from sales of a limited number of products.*

We derive a substantial portion of our revenue from royalties derived from the sales of one product: Bendeka. This product is sold by our partner Teva Pharmaceuticals. During the year ended December 31, 2019, Bendeka accounted for approximately 77% of our total revenue. The sale of our products can be significantly influenced by the efforts of our partners, which are out of our control, as well as market conditions and regulatory actions. We may experience decreases in the sale of our products in the future as a result of actions taken by our competitors, such as price reductions or entry into the market for competing products, or as a result of regulatory actions related to our products or competing products, which could have a material impact on our results of operations and financial condition.

*If we obtain approval to commercialize any approved products outside of the United States, a variety of risks associated with international operations could materially adversely affect our business.*

We may enter into agreements with third parties to market our products outside the United States. We expect that we will be subject to additional risks related to entering into international business relationships, including:

- different regulatory requirements for drug approvals in foreign countries;

- differing payor reimbursement regimes, governmental payors or patient self-pay systems and price controls;

- reduced protection for intellectual property rights;

- unexpected changes in tariffs, trade barriers and regulatory requirements;

- economic weakness, including inflation, or political instability in particular foreign economies and markets;

- compliance with tax, employment, immigration and labor laws for employees living or traveling abroad;

- foreign taxes, including withholding of payroll taxes;

- foreign currency fluctuations, which could result in increased operating expenses and reduced revenue, and other obligations incident to doing business in another country;

- workforce uncertainty in countries where labor unrest is more common than in the United States;

- production shortages resulting from any events affecting raw material supply or manufacturing capabilities abroad; and

- business interruptions resulting from geopolitical actions, including war and terrorism, or natural disasters including earthquakes, typhoons, floods and fires or public health issues or pandemics including the coronavirus.

38

*We face significant competition from other biotechnology and pharmaceutical companies, and our operating results will suffer if we fail to compete effectively.*

The biopharmaceutical industries are intensely competitive and subject to rapid and significant technological change. Many of our competitors both in the United States and internationally, include major multinational pharmaceutical companies, biotechnology companies and universities and other research institutions. For example, Ryanodex, and products with dantrolene sodium as the API, is currently marketed in the United States by, among others, Endo International plc, Impax Laboratories, Inc., Hikma Pharmaceuticals, LLC, US WorldMeds, LLC, Mylan Institutional, LLC, and Elite Laboratories, Inc. While our formulations of this product is distinct, and we believe improvements, compared to those competitors mentioned, competition from these products on factors such as price and availability effect our commercial efforts. Additionally, we must compete with alternative drug treatments (as opposed to alternative formulations) for many of the indications that our products are approved to treat.

Many of our competitors have substantially greater financial, technical and other resources, such as larger research and development staff and experienced marketing and manufacturing organizations. Mergers and acquisitions in the biotechnology and pharmaceutical industries may result in even more resources being concentrated in our competitors. As a result, these companies may obtain regulatory approval more rapidly than we are able and may be more effective in selling and marketing their products as well. Smaller or early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large, established companies. Competition may increase further as a result of advances in the commercial applicability of technologies and greater availability of capital for investment in these industries. Our competitors may succeed in developing, acquiring or licensing on an exclusive basis drug products or drug delivery technologies that are more effective or less costly than our products or any product candidate that we are currently developing or that we may develop. In addition, our competitors may file citizens' petitions with the FDA in an attempt to persuade the FDA that our products, or the clinical studies that support their approval, contain deficiencies. Such actions by our competitors could delay or even prevent the FDA from approving any application we submit.

We believe that our ability to successfully compete will depend on, among other things:

- the efficacy and safety of our products and product candidates, including as relative to marketed products and product candidates in development by third parties;

- the time it takes for our product candidates to complete clinical development and receive marketing approval;

- the ability to maintain a good relationship with regulatory authorities;

- the ability to commercialize and market any of our product candidates that receive regulatory approval;

- the price of our products, including in comparison to branded or generic competitors;

- whether coverage and adequate levels of reimbursement are available under private and governmental health insurance plans, including Medicare;

- the ability to protect intellectual property rights related to our products and product candidates;

- the ability to manufacture on a cost-effective basis and sell commercial quantities of our products and product candidates that receive regulatory approval; and

- acceptance of any of our products and product candidates that receive regulatory approval by physicians and other health care providers.

If our competitors market products that are more effective, safer or less expensive than our products or product candidates, or that reach the market sooner than our product candidates, we may enter the market too late in the cycle and may not achieve commercial success. In addition, the biopharmaceutical industry is characterized by rapid technological change. Because we have limited research and development capabilities, it may be difficult for us to stay abreast of the rapid changes in each technology. If we fail to stay at the forefront of technological change, we may be unable to compete effectively. Technological advances or products developed by our competitors may render our technologies, products or product candidates obsolete, less competitive or not economical.

***We could incur substantial costs and disruption to our business and delays in the launch of our product candidates if our competitors and/or collaborators bring legal actions against us, which could harm our business and operating results.***

We cannot predict whether our competitors or potential competitors, some of whom we collaborate with, may bring legal actions against us based on our research, development and commercialization activities, as well as any product candidates or products resulting from these activities, claiming, among other things, infringement of their intellectual property rights, breach of contract or other legal theories. If we are forced to defend any such lawsuits, whether they are with or without merit or are ultimately determined in our favor, we may face costly litigation and diversion of technical and management personnel. These lawsuits could

39

hinder our ability to enter the market early with our product candidates and thereby hinder our ability to influence usage patterns when fewer, if any, of our potential competitors have entered such market, which could adversely impact our potential revenue from such product candidates or negatively impact our ability to gain market acceptance and market share for our products.

Some of our competitors have substantially greater resources than we do and could be able to sustain the cost of litigation to a greater extent and for longer periods of time than we could. Furthermore, an adverse outcome of a dispute may require us: to pay damages, potentially including treble damages and attorneys' fees, if we are found to have willfully infringed a party's patent or other intellectual property rights; to cease making, licensing or using products that are alleged to incorporate or make use of the intellectual property of others; to expend additional development resources to reformulate our products or prevent us from marketing a certain drug; and to enter into potentially unfavorable royalty or license agreements in order to obtain the rights to use necessary technologies. Royalty or licensing agreements, if required, may be unavailable on terms acceptable to us, or at all.

***If we are unable to achieve and maintain adequate levels of coverage and reimbursement for our products or product candidates, if approved, their commercial success may be severely hindered.***

Successful sales of our products and any other approved product candidates depend on the availability of adequate coverage and reimbursement from third party payors. Patients who are prescribed medications for the treatment of their conditions generally rely on third party payors to reimburse all or part of the costs associated with their prescription drugs. Adequate coverage and reimbursement from governmental health care programs, such as Medicare and Medicaid, and commercial payors is critical to new product acceptance. In the United States, third-party payors often rely upon Medicare coverage policy and payment limitations in setting their own coverage and reimbursement policies. However, decisions regarding the extent of coverage and amount of reimbursement to be provided for any product candidates that we develop will be made on a payor-by-payor basis. Coverage decisions may depend upon clinical and economic standards that disfavor new drug products when more established or lower cost therapeutic alternatives are already available or subsequently become available. Reimbursement by a third party payor may depend upon a number of factors, including but not limited to, the third party payor's determination that use of a product is: a covered benefit under its health plan; safe, effective, and medically necessary; appropriate for the specific patient; cost-effective; and/or neither cosmetic, experimental, nor investigational.

Assuming we obtain coverage for a given product, the resulting reimbursement payment rates might not be adequate or may require co-payments that patients find unacceptably high. Patients are unlikely to use our products unless coverage is provided and reimbursement is adequate to cover a significant portion of the cost of our products.

In addition, the market for our products and our product candidates will depend significantly on access to third party payors' drug formularies, or lists of medications for which third party payors provide coverage and reimbursement. The industry competition to be included in such formularies often leads to downward pricing pressures on pharmaceutical companies. Also, third party payors may refuse to include a particular branded drug in their formularies or otherwise restrict patient access through formulary controls or otherwise to a branded drug when a less costly generic equivalent or other alternative is available.

Third party payors, whether foreign or domestic, or governmental or commercial, are developing increasingly sophisticated methods of controlling health care costs. In addition, in the United States, no uniform policy requirement for coverage and reimbursement for drug products exists among third party payors. Therefore, coverage and reimbursement for drug products can differ significantly from payor to payor. As a result, the coverage determination process is often a time-consuming and costly process that could require us to provide scientific, clinical and cost effectiveness support for the use of our products to each payor separately, with no assurance that coverage and adequate reimbursement will be applied consistently or obtained in the first instance. Even if we obtain coverage for a given product, the resulting reimbursement payment rates might not be adequate for us to achieve or sustain profitability.

Further, we believe that future coverage and reimbursement will likely be subject to increased restrictions both in the United States and in international markets. Third party coverage and reimbursement for our commercial products, and our pre-clinical and clinical product candidates for which we may receive regulatory approval, may not be available or adequate in either the United States or international markets, which could have a material adverse effect on our business, results of operations, financial condition and prospects.

***Current and future legislation may increase the difficulty and cost for us to commercialize our product candidates and affect the prices we may obtain for our products.***

The United States and some foreign jurisdictions are considering, or have enacted, a number of legislative and regulatory proposals to change the health care system in ways that could affect our ability to sell our products and our product candidates profitably, once they are approved for sale. Among policy makers and payors in the United States and elsewhere, there is significant interest in promoting changes in health care systems with the stated goals of containing health care costs, improving quality and/or expanding access. In the United States, the pharmaceutical industry has been a particular focus of these efforts and has been significantly affected by major legislative initiatives.

By way of example, in March 2010, the ACA was passed, which significantly changed health care financing by both governmental and private insurers. There have been judicial and Congressional challenges to certain aspects of the ACA, as well as recent efforts by the U.S. Presidential administration to repeal or replace certain aspects of the ACA.. Since January 2017, the U.S. President has signed two Executive Orders and other directives designed to delay the implementation of certain provisions of the ACA or otherwise circumvent some of the requirements for health insurance mandated by the ACA. Concurrently, Congress has considered legislation that would repeal or repeal and replace all or part of the ACA. While Congress has not passed comprehensive repeal legislation, several bills affecting the implementation of certain taxes under the ACA have been signed into law. For example, the Tax Cuts and Jobs Act of 2017, or Tax Act, included a provision which repealed, effective January 1, 2019, the tax-based shared responsibility payment imposed by the ACA on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate". Additionally, the 2020 federal spending package permanently eliminated, effective January 1, 2020, the PPACA-mandated "Cadillac" tax on high-cost employer-sponsored health coverage and medical device tax and, effective January 1, 2021, also eliminates the health insurer tax. The Bipartisan Budget Act of 2018, or the BBA, among other things, amended the ACA, effective January 1, 2019, to increase from 50 percent to 70 percent the point-of-sale discount that is owed by pharmaceutical manufacturers who participate in Medicare Part D and to close the coverage gap in most Medicare drug plans, commonly referred to as the "donut hole". In December 2018, CMS published a new final rule permitting further collections and payments to and from certain ACA qualified health plans and health insurance issuers under the ACA risk adjustment program in response to the outcome of federal district court litigation regarding the method CMS uses to determine this risk adjustment. On December 14, 2018, a Texas U.S. District Court Judge ruled that ACA is unconstitutional in its entirety because the "individual mandate" was repealed by Congress as part of the Tax Act. On December 18, 2019, the U.S. Court of Appeals for the 5th Circuit upheld the District Court ruling that the individual mandate was unconstitutional and remanded the case back to the District Court to determine whether the remaining provisions of the PPACA are invalid as well. It is unclear how this decision, future decisions, subsequent appeals, and other efforts to repeal and replace ACA will impact ACA and our business. We cannot predict how future federal or state legislative or administrative changes relating to healthcare reform will affect our business.

In addition, other legislative changes have been proposed and adopted since the ACA was enacted. For example, in August 2011, President Obama signed into law the Budget Control Act of 2011, which, among other things, created the Joint Select Committee on Deficit Reduction to recommend proposals for spending reductions to Congress. The Joint Select Committee on Deficit Reduction did not achieve its targeted deficit reduction of at least $1.2 trillion for the years 2013 through 2021, triggering the legislation's automatic reductions to several government programs. These reductions include aggregate reductions to Medicare payments to providers of up to 2% per fiscal year, which went into effect on April 1, 2013 and, following passage of the Bipartisan Budget Act of 2015 as well as other legislative amendments, including the BBA, will remain in effect through 2029 unless additional Congressional action is taken. Additionally, in January 2013, President Obama signed into law the American Taxpayer Relief Act of 2012, which, among other things, further reduced Medicare payments to several providers and increased the statute of limitations period for the government to recover overpayments to providers from three to five years.

Further, under the Drug Supply Chain Security Act signed into law on November 27, 2013, certain drug manufacturers will be subject to product identification, tracing and verification requirements, among others, that are designed to improve the detection and removal of counterfeit, stolen, contaminated or otherwise potentially harmful drugs from the U.S. drug supply chain. These requirements will be phased in over several years and compliance with this law will likely increase the costs of the manufacture and distribution of drug products, which could have an adverse effect on our financial condition.

Additionally, there has been increasing legislative and enforcement interest in the United States with respect to drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries and proposed and adopted federal and state legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drugs. For example, the current U.S. Presidential administration's budget proposal for fiscal year 2021 includes a $135 billion allowance to support legislative proposals seeking to reduce drug prices, increase competition, lower out-of-pocket drug costs for patients, and increase patient access to lower-cost generic and biosimilar drugs. Further, the U.S. Presidential administration previously released a "Blueprint", or plan, to lower drug prices and reduce out of pocket costs of drugs that contains additional proposals to increase drug manufacturer competition, increase the negotiating power of certain federal healthcare programs, incentivize manufacturers to lower the list price of their products, and reduce the out of pocket costs of drug products paid by consumers. The Department of Health and Human Services, or HHS, has solicited feedback on some of these measures and has implemented others under its existing authority. For example, in May 2019, CMS issued a final rule to allow Medicare Advantage Plans the option of using step therapy for Part B drugs beginning on January 1, 2020. The final rule codified a CMS policy change that was effective January 1, 2019. While some of these and other proposed measures may require additional authorization to become effective, Congress and the current U.S. Presidential administration have each indicated that it will continue to seek new legislative and/or administrative measures to control drug costs. At the state level, legislatures have

41

increasingly passed legislation and implemented regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing. The full impact of these laws, as well as other new laws and reform measures that may be proposed and adopted in the future remains uncertain, but may result in additional reductions in Medicare and other health care funding, or higher production costs which could have a material adverse effect on our customers and, accordingly, our financial operations.

.


**Risks Related to Our Reliance on Third Parties**

***We rely on third parties to conduct our preclinical studies and clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines, we may not be able to obtain regulatory approval for or commercialize our product candidates and our business could be substantially harmed.***

We have relied upon and plan to continue to rely upon third party contract research organizations (each a "CRO") to monitor and manage data for our preclinical and clinical programs. We rely on these parties for execution of our preclinical studies and clinical trials, and control only certain aspects of their activities. Nevertheless, we are responsible for ensuring that each of our trials is conducted in accordance with the applicable protocol, legal, regulatory and scientific standards and our reliance on the CROs does not relieve us of our regulatory responsibilities. We and our CROs are required to comply with FDA regulations and other laws regarding current good clinical practice (" GCP"), which are also required by the Competent Authorities of the Member States of the European Economic Area and comparable foreign regulatory authorities in the form of International Council for Harmonization, or ICH, guidelines for all of our products in clinical development. Regulatory authorities enforce GCP through periodic inspections of trial sponsors, principal investigators and trial sites. If we or any of our CROs fail to comply with applicable GCP, the clinical data generated in our clinical trials may be deemed unreliable and the FDA or comparable foreign regulatory authorities may require us to perform additional clinical trials before approving our marketing applications. We cannot assure you that upon inspection by a given regulatory authority, such regulatory authority will determine that any of our clinical trials comply with GCP regulations. In addition, our clinical trials must be conducted with product produced under cGMP regulations. While we have agreements governing activities of our CROs, we have limited influence over their actual performance. In addition, portions of the clinical trials for our product candidates are expected to be conducted outside of the United States, which will make it more difficult for us to monitor CROs and perform visits of our clinical trial sites and will force us to rely heavily on CROs to ensure the proper and timely conduct of our clinical trials and compliance with applicable regulations, including GCP. Failure to comply with applicable regulations in the conduct of the clinical trials for our product candidates may require us to repeat clinical trials, which would delay the regulatory approval process.

Some of our CROs have an ability to terminate their respective agreements with us if, among other reasons, it can be reasonably demonstrated that the safety of the subjects participating in our clinical trials warrants such termination, if we make a general assignment for the benefit of our creditors or if we are liquidated. If any of our relationships with these third party CROs terminate, we may not be able to enter into arrangements with alternative CROs or to do so on commercially reasonable terms. In addition, our CROs are not our employees, and except for remedies available to us under our agreements with such CROs, we cannot control whether or not they devote sufficient time and resources to our preclinical and clinical programs. If CROs do not successfully carry out their contractual duties or obligations or meet expected deadlines, if they need to be replaced or if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols, regulatory requirements or for other reasons, our clinical trials may be extended, delayed or terminated and we may not be able to obtain regulatory approval for or successfully commercialize our product candidates. Consequently, our results of operations and the commercial prospects for our product candidates would be harmed, our costs could increase substantially and our ability to generate revenue could be delayed significantly.

Switching or adding additional CROs involves additional cost and requires management time and focus. In addition, there is a natural transition period when a new CRO commences work. As a result, delays occur, which can materially impact our ability to meet our desired clinical development timelines. Though we carefully manage our relationships with our CROs, there can be no assurance that we will not encounter challenges or delays in the future or that these delays or challenges will not have a material adverse impact on our business, financial condition and prospects.

***If any of our current strategic collaborators fail to perform their obligations or terminate their agreements with us, the development and commercialization of the product candidates under such agreements could be delayed or terminated and our business could be substantially harmed.***

In 2015, we entered into the Cephalon License, with Cephalon (Teva) for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. Pursuant to the terms of the Cephalon License, as has been amended from time to time,

42

Cephalon is responsible for all U.S. commercial activities for the product including promotion and distribution, and we are responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies.

This strategic collaboration may not be scientifically or commercially successful due to a number of important factors, including the following:

- If we fail to maintain any regulatory approvals, or otherwise materially breach the agreement, we may not receive all anticipated royalty payments.
- Cephalon has significant discretion in determining the efforts and resources that it will apply to their strategic collaboration with us. The timing and amount of any cash payments, and royalties that we may receive under such agreements will depend on, among other things, the efforts, allocation of resources and the commercialization of our product by Cephalon under the Cephalon License;
- Cephalon currently markets a competitive bendamustine product, Treanda®, in the United States. In addition, it is possible that Cephalon may develop and commercialize, either alone or with others, or be acquired by a company that has, products that are similar to or competitive with the product candidates that they license from us;
- Cephalon may change the focus of their commercialization efforts or pursue higher-priority programs;
- Cephalon may terminate its strategic collaboration with us on short notice, which could make it difficult for us to attract new strategic collaborators or adversely affect how we are perceived in the scientific and financial communities;
- Cephalon has the right to maintain or defend our intellectual property rights licensed to them in their territories, and, although we may have the right to assume the maintenance and defense of our intellectual property rights if they do not, our ability to do so may be compromised by our strategic collaborators' acts or omissions; and
- Cephalon may not comply with all applicable regulatory requirements, or fail to report safety data in accordance with all applicable regulatory requirements.
- If Cephalon fails to effectively commercialize our product, we may not be able to replace them with another collaborator.
- If our agreement with Cephalon terminates, we are required to pay them a portion of our future profits on the product.
  Any of these events could have a material adverse effect on our business, results of operations and our ability to achieve future profitability, and could cause our stock price to decline.

***We rely on third parties to manufacture commercial supplies of our products and clinical supplies of our product candidates, and we intend to rely on third parties to manufacture commercial supplies of any other approved products. The commercialization of any of our products could be stopped, delayed or made less profitable if those third parties fail to provide us with sufficient quantities of product or fail to do so at acceptable quality levels or prices or fail to maintain or achieve satisfactory regulatory compliance.***

We do not own any manufacturing facilities, and we do not currently, and do not expect in the future, to independently conduct any aspects of our product manufacturing and testing, or other activities related to the clinical development and commercialization of our product candidates. We currently rely, and expect to continue to rely, on third parties with respect to these items, and control only certain aspects of their activities.

Any of these third parties may terminate their engagements with us at any time. If we need to enter into alternative arrangements, it could delay our product candidate development and product commercialization activities. Our reliance on these third parties reduces our control over these activities but does not relieve us of our responsibility to ensure compliance with all required legal, regulatory and scientific standards and any applicable trial protocols. If these third parties do not successfully carry out their contractual duties, meet expected deadlines or conduct our studies in accordance with regulatory requirements or our stated study plans and protocols, we will not be able to complete, or may be delayed in completing, clinical trials required to support future regulatory submissions and approval of our product candidates.

Our products and product candidates are highly reliant on very complex sterile techniques and personnel aseptic techniques. The facilities used by our third-party manufacturers to manufacture our products and product candidates must be approved by the applicable regulatory authorities pursuant to inspections that will be conducted after we submit our NDA to the FDA. If any of our third-party manufacturers cannot successfully manufacture material that conforms to our specifications and the applicable regulatory authorities' strict regulatory requirements, or pass regulatory inspection, they will not be able to secure or maintain regulatory approval for the manufacturing facilities. In addition, we have no control over the ability of third-party manufacturers to maintain adequate quality control, quality assurance and qualified personnel. Quality problems in manufacturing are linked to a majority of shortages of sterile injectable drugs. Some of the largest manufacturers of sterile injectable drugs have had serious quality problems leading to the temporary voluntary closure or renovations of major production facilities. Further, as we scale up manufacturing of our product candidates and conduct required stability testing, product packaging, equipment and process-related issues may require refinement or resolution in order for us to proceed with our planned clinical trials and obtain regulatory approval for commercialization of our product candidates. In the future, for example, we may identify impurities in the product manufactured

43

for us for commercial supply, which could result in increased scrutiny by the regulatory agencies, delays in our clinical program and regulatory approval, increases in our operating expenses, or failure to obtain or maintain approval for our product candidates. If the FDA or any other applicable regulatory authority does not approve these facilities to manufacture our products or if they withdraw any such approval in the future, or if our suppliers or third-party manufacturers decide they no longer want to manufacture our products, we may need to find alternative manufacturing facilities, which would significantly impact our ability to develop, obtain regulatory approval for or market our products or product candidates.

More generally, manufacturers of pharmaceutical products often encounter difficulties in production, particularly in scaling up and validating initial production. These problems include difficulties with production costs and yields, quality control, including stability of the product, quality assurance testing, shortages of qualified personnel, as well as compliance with strictly enforced federal, state and foreign regulations. Additionally, our manufacturers may experience manufacturing difficulties due to resource constraints or as a result of labor disputes or unstable political environments. If our manufacturers were to encounter any of these difficulties, or otherwise fail to comply with their contractual obligations, our ability to make product candidates available for clinical trials and development purposes or to further commercialize our products or product candidates in the United States would be jeopardized. Any delay or interruption in our ability to meet commercial demand may result in the loss of potential revenues and could adversely affect our ability to gain market acceptance for approved products. In addition, any delay or interruption in the supply of clinical trial supplies could delay the completion of clinical trials, increase the costs associated with maintaining clinical trial programs and, depending upon the period of delay, require us to commence new clinical trials at additional expense or terminate clinical trials completely. Additionally, if supply from one approved manufacturer is interrupted, there could be a significant disruption in commercial supply. Regulatory agencies may also require additional studies if a new manufacturer is relied upon for commercial production. Switching manufacturers may involve substantial costs and is likely to result in a delay in our desired clinical and commercial timelines.

The occurrence of any of these factors could have a material adverse effect on our business, results of operations, financial condition and prospects.

***The design, development, manufacture, supply, and distribution of our products and product candidates is highly regulated and technically complex.***

All entities involved in the preparation of therapeutics for clinical trials or commercial sale, including our existing contract manufacturers for our products and product candidates, are subject to extensive regulation. Components of a finished therapeutic product approved for commercial sale or used in late-stage clinical trials must be manufactured in accordance with cGMP and equivalent foreign standards. These regulations govern manufacturing processes and procedures (including record keeping) and the implementation and operation of quality systems to control and assure the quality of investigational products and products approved for sale. Poor control of production processes can lead to the introduction of adventitious agents or other contaminants, or to inadvertent changes in the properties or stability of our products or product candidates that may not be detectable in final product testing. The development, manufacture, supply, and distribution of our products, as well as our other product candidates, is highly regulated and technically complex. We, along with our third-party providers, must comply with all applicable regulatory requirements of the FDA and foreign authorities.

We, or our contract manufacturers, must supply all necessary documentation in support of our regulatory filings for our products and product candidates on a timely basis and must adhere to the FDA's good laboratory practices, or GLP, and cGMP regulations enforced by the FDA through its facilities inspection program, and the equivalent standards of the regulatory authorities in other countries. Any failure by our third-party manufacturers to comply with cGMP or failure to scale-up manufacturing processes, including any failure to deliver sufficient quantities of product candidates in a timely manner, could lead to a delay in, or failure to obtain, regulatory approval of any of our product candidates. Our facilities and quality systems and the facilities and quality systems of some or all of our third-party contractors must also pass a pre-approval inspection for compliance with the applicable regulations as a condition of regulatory approval of our product candidates or any of our other potential products. In addition, the regulatory authorities in any country may, at any time, audit or inspect a manufacturing facility involved with the preparation of our product candidates or our other potential products or the associated quality systems for compliance with the regulations applicable to the activities being conducted. If these facilities and quality systems do not pass a pre-approval plant inspection, FDA approval of our product candidates, or the equivalent approvals in other jurisdictions, will not be granted.

Regulatory authorities also may, at any time following approval of a product for sale, audit our manufacturing facilities or those of our third-party contractors. If any such inspection or audit identifies a failure to comply with applicable regulations or if a violation of our product specifications or applicable regulations occurs independent of such an inspection or audit, we or the relevant regulatory authority may require remedial measures that may be costly and/or time-consuming for us or a third party to implement and that may include the temporary or permanent suspension of a clinical trial or commercial sales or the temporary or permanent closure of a facility. Any such remedial measures imposed upon us or third parties with whom we contract could materially harm our business. If we or any of our third-party manufacturers fail to maintain regulatory compliance, the FDA can impose regulatory sanctions including, among other things, refusal to approve a pending application for a new drug product or

44

biological product or revocation of a pre-existing approval. As a result, our business, financial condition and results of operations may be materially harmed.

***We rely on limited sources of supply for our products and product candidates, and any disruption in the chain of supply may impact production and sales of our products and cause delay in developing and commercializing our product candidates.***

We currently have relationships with only one third party for the manufacture of each of our most advanced products and product candidates. Because of the unique equipment and process for manufacturing our products transferring manufacturing activities to an alternate supplier would be a time-consuming and costly endeavor, and there are only a limited number of manufacturers that we believe are capable of performing this function for us. Switching finished drug suppliers may involve substantial cost and could result in a delay in our desired clinical and commercial timelines. If any of these single-source manufacturers breaches or terminates their agreements with us, we would need to identify an alternative source for the manufacture and supply of product candidates to us for the purposes of our development and commercialization of the applicable products. Identifying an appropriately qualified source of alternative supply for any one or more of these product candidates could be time consuming, and we may not be able to do so without incurring material delays in the development and commercialization of our product candidates, which could harm our financial position and commercial potential for our products. Any alternative vendor would also need to be qualified through an NDA supplement which could result in further delay. The FDA or other regulatory agencies outside of the United States may also require additional studies if we appoint a new manufacturer for supply of our product candidates that differs from the manufacturer used for clinical development of such product candidates. For our other product candidates, we expect that only one supplier will initially be qualified as a vendor with the FDA. If supply from the approved vendor is interrupted, there could be a significant disruption in commercial supply.

These factors could cause the delay of clinical trials, regulatory submissions, required approvals or commercialization of our product candidates, cause us to incur higher costs and prevent us from commercializing them successfully. Furthermore, if our suppliers fail to deliver the required commercial quantities of components and active pharmaceutical ingredient on a timely basis and at commercially reasonable prices, and we are unable to secure one or more replacement suppliers capable of production at a substantially equivalent cost, our clinical trials may be delayed or we could lose potential revenue.

***We may not be successful in establishing development and commercialization collaborations which could adversely affect, and potentially prohibit, our ability to develop our product candidates.***

Because developing pharmaceutical products, conducting clinical trials, obtaining regulatory approval, establishing manufacturing capabilities and marketing approved products are expensive, we are exploring collaborations with third parties outside of the United States that have more resources and experience. We may, however, be unable to advance the development of our products and product candidates in territories outside of the United States, which may limit the market potential for this product candidate.

In situations where we enter into a development and commercial collaboration arrangement for a product candidate, we may also seek to establish additional collaborations for development and commercialization in territories outside of those addressed by the first collaboration arrangement for such product candidate. There are a limited number of potential partners, and we expect to face competition in seeking appropriate partners. We have entered into collaboration and promotion agreements with third parties, such as the agreement with AMRI, but there is no assurance these arrangements will be successful. If we are unable to enter into any future development and commercial collaborations and/or sales and marketing arrangements on acceptable terms, if at all, we may be unable to successfully develop and seek regulatory approval for our product candidates and/or effectively market and sell future approved products, if any, in all of the territories outside of the United States where it may otherwise be valuable to do so.

***We may not be successful in maintaining development and commercialization collaborations, and any partner may not devote sufficient resources to the development or commercialization of our product candidates or may otherwise fail in development or commercialization efforts, which could adversely affect our ability to develop certain of our product candidates and our financial condition and operating results.***

On January 7, 2020, Tyme Technologies, Inc. and Eagle Pharmaceuticals announced a strategic collaboration to advance oral SM-88 for the treatment of patients with cancer. If we are able to establish additional collaboration arrangements, any such collaborations, in addition to the collaboration with Tyme, may not ultimately be successful, which could have a negative impact on our business, results of operations, financial condition and prospects. If we partner with a third party for development and commercialization of a product or product candidate, including Tyme, we can expect to relinquish some or all of the control over the future success of that product or product candidate to the third party. It is possible that a partner may not devote sufficient resources to the development or commercialization of our product candidate or may otherwise fail in development or commercialization efforts, in which event the development and commercialization of such product candidate could be delayed or terminated and our business could be substantially harmed. In addition, the terms of any collaboration or other arrangement that we establish may not prove to be favorable to us or may not be perceived as favorable, which may negatively impact the trading price of our common stock. In some cases, we may be responsible for continuing development of a product candidate or research program under a collaboration, and the payment we receive from our partner may be insufficient to cover the cost of this development.

45

Moreover, collaborations and sales and marketing arrangements are complex and time consuming to negotiate, document and implement, and they may require substantial resources to maintain.

We may be subject to a number of additional risks associated with our collaborations with third parties, the occurrence of which could cause collaboration arrangements to fail. Conflicts may arise between us and our partners, such as conflicts concerning the interpretation of clinical data, the achievement of milestones, the interpretation of financial provisions or the ownership of intellectual property developed during the collaboration. If any such conflicts arise, a partner could act in its own self-interest, which may be adverse to our interests. Any such disagreement between us and a partner could result in one or more of the following, each of which could delay or prevent the development or commercialization of our product candidates and harm our business:

- reductions in the payment of royalties or other payments we believe are due pursuant to the applicable collaboration arrangement;
- actions taken by a partner inside or outside our collaboration which could negatively impact our rights or benefits under our collaboration; and
- unwillingness on the part of a partner to keep us informed regarding the progress of its development and commercialization activities or to permit public disclosure of the results of those activities.

***If we are unable to maintain our group purchasing organization, ("GPO"), relationships, our revenues could decline and future profitability could be jeopardized.***

Most of the end-users of injectable pharmaceutical products have relationships with GPOs whereby such GPOs provide such end-users access to a broad range of pharmaceutical products from multiple suppliers at competitive prices and, in certain cases, exercise considerable influence over the drug purchasing decisions of such end-users. Hospitals and other end-users contract with the GPO of their choice for their purchasing needs. We currently derive, and expect to continue to derive, a large percentage of our revenue from end-user customers that are members of a small number of GPOs. Maintaining strong relationships with these GPOs will require us to continue to be a reliable supplier, remain price competitive and comply with FDA regulations. The GPOs with whom we have relationships may have relationships with companies that sell competing products, and such GPOs may earn higher margins from these products or combinations of competing products or may prefer products other than ours for other reasons. If we are unable to maintain our GPO relationships, sales of our products and revenue could decline.

***We rely on a limited number of pharmaceutical wholesalers to distribute our products.***

As is typical in the pharmaceutical industry, we rely upon pharmaceutical wholesalers in connection with the distribution of our products. A significant amount of our products are sold to end-users under GPO pricing arrangements through a limited number of pharmaceutical wholesalers. If we are unable to maintain our business relationships with these pharmaceutical wholesalers on commercially acceptable terms, it could have a material adverse effect on our sales and may prevent us from achieving profitability.

***Our approved products may not achieve expected levels of market acceptance.***

Even if we are able to obtain regulatory approvals for our product candidates, the success of those products is dependent upon market acceptance. Levels of market acceptance for our product candidates could be affected by several factors, including:

- the availability of alternative products from our competitors;
- the price of our products relative to those of our competitors;
- the timing of our market entry;
- the ability to market our products effectively at the retail level;
- the perception of patients and the healthcare community, including third-party payors, regarding the safety efficacy and benefits of our drug products compared to those of competing products; and
- the acceptance of our products by government and private formularies.

Some of these factors are not within our control, and our products may not achieve expected levels of market acceptance. Additionally, continuing and increasingly sophisticated studies of the proper utilization, safety and efficacy of pharmaceutical products are being conducted by the industry, government agencies and others which may call into question the utilization, safety and efficacy of previously marketed products. In some cases, studies have resulted, and may in the future result, in the discontinuance of product marketing or other risk management programs such as the need for a patient registry.

## Risks Related to Our Business Operations and Industry

***Our future success depends on our ability to retain key executives and to attract, retain and motivate qualified personnel.***

We are highly dependent on the principal members of our executive team, which include our Chief Executive Officer, Chief Financial Officer, Chief Medical Officer, and President and Chief Operating Officer. The loss of these executives' services may adversely impact the achievement of our objectives. Any of our executive officers could leave our employment at any time, as all of our employees are "at will" employees. Recruiting and retaining other qualified employees for our business, including scientific and technical personnel, will also be critical to our success. There is currently a shortage of skilled executives in our industry, which is likely to continue. As a result, competition for skilled personnel is intense and the turnover rate can be high. We may not be able to attract and retain personnel on acceptable terms given the competition among numerous pharmaceutical companies for individuals with similar skill sets. In addition, failure to succeed in clinical studies may make it more challenging to recruit and retain qualified personnel. The inability to recruit key executives or the loss of the services of any executive or key employee might impede the progress of our development and commercialization objectives.

***We will need to expand our organization, and we may experience difficulties in managing this growth, which could disrupt our operations.***

As of December 31, 2019, we had a total of 108 employees in the United States. As our company matures, we expect to expand our employee base to increase our managerial, scientific and engineering, operational, sales, marketing, financial and other resources and to hire more consultants and contractors. Future growth would impose significant additional responsibilities on our management, including the need to identify, recruit, maintain, motivate and integrate additional employees, consultants and contractors. Also, our management may need to divert a disproportionate amount of its attention away from our day-to-day activities and devote a substantial amount of time to managing these growth activities.

We may not be able to effectively manage the expansion of our operations which may result in weaknesses in our infrastructure and give rise to operational mistakes, loss of business opportunities, loss of employees and reduced productivity among remaining employees. Future growth could require significant capital expenditures and may divert financial resources from other projects, such as the development of our existing or future product candidates. If our management is unable to effectively manage our growth, our expenses may increase more than expected, our ability to generate and/or grow revenue could be reduced and we may not be able to implement our business strategy. Our future financial performance and our ability to sell our products and commercialize our product candidates, if approved, and compete effectively will depend, in part, on our ability to effectively manage any future growth.

***We face potential product liability, and, if successful claims are brought against us, we may incur substantial liability.***

The use of our product candidates in clinical trials (if any), and the sale of our products and any product candidates for which we obtain marketing approval, exposes us to the risk of product liability claims. Product liability claims might be brought against us by consumers, health care providers, pharmaceutical

companies or others selling or otherwise coming into contact with our products, other approved future products and our product candidates. If we cannot successfully defend against product liability claims, we could incur substantial liability and costs. In addition, regardless of merit or eventual outcome, product liability claims may result in:

- impairment of our business reputation;

- withdrawal of clinical study participants;

- costs due to related litigation;

- distraction of management's attention from our primary business;

- substantial monetary awards to patients or other claimants;

- the inability to commercialize our product candidates; and

- decreased demand for our products and our product candidates, if approved for commercial sale.

Our current product liability insurance coverage may not be sufficient to reimburse us for any expenses or losses we may suffer. Moreover, insurance coverage is becoming increasingly expensive and in the future we may not be able to maintain insurance coverage at a reasonable cost or in sufficient amounts to protect us against losses due to liability. On occasion, large judgments have been awarded in class action lawsuits based on drugs that had unanticipated adverse effects. A successful product liability claim or series of claims brought against us could cause our stock price to decline and, if judgments exceed our insurance coverage, could adversely affect our results of operations and business.

*We rely significantly on information technology and any failure, inadequacy, interruption or security lapse of that technology, including any cybersecurity incidents, could harm our ability to operate our business effectively.*

Despite the implementation of security measures, our internal computer systems and those of third parties with which we contract are vulnerable to damage from cyber-attacks, computer viruses, unauthorized access, natural disasters, terrorism, war and telecommunication and electrical failures. System failures, accidents or security breaches could cause interruptions in our operations, and could result in a material disruption of our product development and clinical activities and business operations, in addition to possibly requiring substantial expenditures of resources to remedy. Cybersecurity attacks in particular are evolving and include, but are not limited to, malicious software, attempts to gain unauthorized access to data and other electronic security breaches that could lead to disruptions in systems, misappropriation of our confidential or otherwise protected information and corruption of data. The loss, theft or sabotage of product development or clinical trial data could result in delays in our regulatory approval efforts and significantly increase our costs to recover or reproduce the data. To the extent that any disruption or security breach were to result in a loss of, or damage to, our data or applications, or inappropriate disclosure of confidential or proprietary information, we could incur liability and our development programs and the development of our product candidates could be delayed.

*Business interruptions could delay us in the process of developing our product candidates and could disrupt our sales of any products we may sell.*

Our headquarters are located in Woodcliff Lake, New Jersey. If we encounter any disruptions to our operations at this building or if it were to shut down for any reason, including by fire, natural disaster, such as a hurricane, tornado or severe storm, power outage, systems failure, labor dispute or other unforeseen disruption, then we may be prevented from effectively operating our business. We do not carry insurance for natural disasters and we may not carry sufficient business interruption insurance to compensate us for losses that may occur. Any losses or damages we incur could have a material adverse effect on our business operations.

*We may be constrained by our obligations under our Credit Agreement to operate our business to its full potential.*

Our Revised Credit Agreement contains customary representations and warranties and customary affirmative and negative covenants, including, among other things, restrictions on indebtedness, liens, investments, mergers, dispositions, prepayment of other indebtedness and dividends and other distributions. Under the terms of the Revised Credit Agreement, we are required to comply with (a) a maximum senior secured net leverage ratio, (b) a maximum total net leverage ratio and (c) a minimum fixed charge coverage ratio. These terms may restrict our ability to operate our business in the manner we deem most effective or desirable, and may restrict our ability to fund our operations through new public offerings of our common stock or strengthen our candidate development pipeline through acquisitions or licenses which cause us to exceed our maximum senior secured net leverage ratio.

Although we have not currently drawn on the Revised Credit Agreement, failure to comply with the representations and warranties or affirmative and negative covenants could constitute an event of default which, if continued beyond the cure period, would allow the administrative agent, at the request of or with the consent of the lenders holding a majority of the loans and commitments under the facility, to terminate the commitments of the lenders to make further loans and declare all the obligations of the loan parties under the Revised Credit Agreement to be immediately due and payable, either of which could harm our business.

## Risks Related to Our Intellectual Property

*If we are unable to obtain or protect intellectual property rights related to any of our product candidates, we may not be able to compete effectively in our market.*

We rely upon a combination of patents, trade secret protection and confidentiality agreements to protect the intellectual property related to our products and our product candidates. The strength of patents in the biotechnology and pharmaceutical field involves complex legal and scientific questions and can be uncertain. The patent applications that we own or in-license may fail to result in issued patents with claims that cover the products in the United States or in foreign countries or territories. If this were to occur, early generic competition could be expected against our products and our product candidates in development. There may be relevant prior art relating to our patents and patent applications which could invalidate a patent or prevent a patent from issuing based on a pending patent application. In particular, because the active pharmaceutical ingredients in many of our product candidates have been on the market as separate products for many years, it is possible that these products have previously been used off-label in such a manner that such prior usage would affect the validity of our patents or our ability to obtain patents based on our patent applications.

Even if patents do successfully issue, third parties may challenge their validity, enforceability or scope, which may result in such patents being narrowed or invalidated. Any adverse outcome in these types of matters could result in one or more generic versions

47

of our products being launched before the expiration of the listed patents, which could adversely affect our ability to successfully execute our business strategy to increase sales of our products and would negatively impact our financial condition and results of operations, including causing a significant decrease in our revenues and cash flows.

Furthermore, even if they are unchallenged, our patents and patent applications may not adequately protect our intellectual property or prevent others from designing around our claims. If the patent applications we hold with respect to our products or product candidates fail to issue or if their breadth or strength of protection is threatened, it could dissuade companies from collaborating with us to develop them and threaten our ability to commercialize our product candidates. We cannot offer any assurances about which, if any, patents will issue or whether any issued patents will be found not invalid and not unenforceable or will go unthreatened by third parties. Further, if we encounter delays in regulatory approvals, the period of time during which we could market our product candidates under patent protection could be reduced. If third parties have filed such patent applications, an interference proceeding in the United States can be provoked by a third party or instituted by us to determine who was the first to invent any of the subject matter covered by the patent claims of our applications.

In addition to the protection afforded by patents, we rely on trade secret protection and confidentiality agreements to protect proprietary know-how that is not patentable, processes for which patents are difficult to enforce and any other elements of our drug development and reformulation processes that involve proprietary know-how, information or technology that is not covered by patents. For example, we maintain trade secrets with respect to certain of the formulation and manufacturing techniques related to our products and our product candidates. Although we generally require all of our employees to assign their inventions to us, and all of our employees, consultants, advisors and any third parties who have access to our proprietary know-how, information or technology to enter into confidentiality agreements, we cannot provide any assurances that all such agreements have been duly executed or that our trade secrets and other confidential proprietary information will not be disclosed or that competitors will not otherwise gain access to our trade secrets or independently develop substantially equivalent information and techniques. We also seek to preserve the integrity and confidentiality of our data and trade secrets by maintaining physical security of our premises and physical and electronic security of our information technology systems. While we have confidence in these individuals, organizations and systems, agreements or security measures may be breached, and we may not have adequate remedies for any breach. In addition, our trade secrets may otherwise become known or be independently discovered by competitors. Additionally, if the steps taken to maintain our trade secrets are deemed inadequate, we may have insufficient recourse against third parties for misappropriating the trade secret. In addition, others may independently discover our trade secrets and proprietary information. For example, the FDA, as part of its Transparency Initiative, is currently considering whether to make additional information publicly available on a routine basis, including information that we may consider to be trade secrets or other proprietary information, and it is not clear at the present time how the FDA's disclosure policies may change in the future, if at all.

Our ability to obtain patents is highly uncertain because, to date, some legal principles remain unresolved, there has not been a consistent policy regarding the breadth or interpretation of claims allowed in patents in the United States and the specific content of patents and patent applications that are necessary to support and interpret patent claims is highly uncertain due to the complex nature of the relevant legal, scientific and factual issues. Changes in either patent laws or interpretations of patent laws in the United States and other countries may diminish the value of our intellectual property or narrow the scope of our patent protection. For example, on September 16, 2011, the Leahy-Smith America Invents Act, or the Leahy-Smith Act, was signed into law. The Leahy-Smith Act includes a number of significant changes to United States patent law. These include provisions that affect the way patent applications will be prosecuted and may also affect patent litigation. The United States Patent and Trademark Office, or USPTO, has developed new and untested regulations and procedures to govern the full implementation of the Leahy-Smith Act, and many of the substantive changes to patent law associated with the Leahy-Smith Act, and in particular, the first to file provisions, only became effective in March 2013. The Leahy-Smith Act has also introduced procedures making it easier for third-parties to challenge issued patents, as well as to intervene in the prosecution of patent applications. Finally, the Leahy-Smith Act contains new statutory provisions that still require the USPTO to issue new regulations for their implementation and it may take the courts years to interpret the provisions of the new statute. Accordingly, it is too early to tell what, if any, impact the Leahy-Smith Act will have on the operation of our business and the protection and enforcement of our intellectual property. However, the Leahy-Smith Act and its implementation could increase the uncertainties and costs surrounding the prosecution of our patent applications and the enforcement or defense of our issued patents. An inability to obtain, enforce and defend patents covering our proprietary technologies would materially and adversely affect our business prospects and financial condition.

Further, the laws of some foreign countries do not protect proprietary rights to the same extent or in the same manner as the laws of the United States. As a result, we may encounter significant problems in protecting and defending our intellectual property both in the United States and abroad. For example, if the issuance to us, in a given country, of a patent covering an invention is not followed by the issuance, in other countries, of patents covering the same invention, or if any judicial interpretation of the validity, enforceability, or scope of the claims in, or the written description or enablement in, a patent issued in one country is not similar to the interpretation given to the corresponding patent issued in another country, our ability to protect our intellectual property in those countries may be limited. Changes in either patent laws or in interpretations of patent laws in the United States and other countries may materially diminish the value of our intellectual property or narrow the scope of our patent protection. If we are

48

unable to prevent material disclosure of the non-patented intellectual property related to our technologies to third parties, and there is no guarantee that we will have any such enforceable trade secret protection, we may not be able to establish or maintain a competitive advantage in our market, which could materially adversely affect our business, results of operations and financial condition.

***Our drug development strategy relies heavily upon the 505(b)(2) regulatory pathway, which requires us to certify that we do not infringe upon third-party patents covering approved drugs. Such certifications typically result in third-party claims of intellectual property infringement, the defense of which will be costly and time consuming, and an unfavorable outcome in any litigation may prevent or delay our development and commercialization efforts which would harm our business.***

Litigation or other proceedings to enforce or defend intellectual property rights are often complex in nature, may be very expensive and time-consuming, may divert our management's attention from other aspects of our business and may result in unfavorable outcomes that could adversely impact our ability to launch and market our product candidates, or to prevent third parties from competing with our products and product candidates.

There is a substantial amount of litigation, both within and outside the United States, involving patent and other intellectual property rights in the biotechnology and pharmaceutical industries, including patent infringement lawsuits, interferences, oppositions and inter party reexamination proceedings before the USPTO. Numerous United States and foreign issued patents and pending patent applications, which are owned by third parties, exist in the fields in which we and our collaborators are developing product candidates. As the biotechnology and pharmaceutical industries expand and more patents are issued, the risk increases that our product candidates may be subject to claims of infringement of the patent rights of third parties.

In particular, our commercial success depends in large part on our avoiding infringement of the patents and proprietary rights of third parties for existing approved drug products. Because we utilize the 505(b)(2) regulatory pathway for the approval of our products and product candidates, we rely in whole or in part on studies conducted by third parties related to those approved drug products. As a result, upon filing with the FDA for approval of our product candidates, we will be required to certify to the FDA that either: (1) there is no patent information listed in the FDA's Orange Book with respect to our NDA; (2) the patents listed in the Orange Book have expired; (3) the listed patents have not expired, but will expire on a particular date and approval is sought after patent expiration; or (4) the listed patents are invalid or will not be infringed by the manufacture, use or sale of our proposed drug product. When we submit a paragraph IV certification to the FDA, a notice of the paragraph IV certification must also be sent to the patent owner once our 505(b)(2) NDA is accepted for filing by the FDA. The third party may then initiate a lawsuit against us to defend the patents identified in the notice. The filing of a patent infringement lawsuit within 45 days of receipt of the notice automatically prevents the FDA from approving our NDA until the earliest of 30 months or the date on which the patent expires, the lawsuit is settled, or the court reaches a decision in the infringement lawsuit in our favor. If the third party does not file a patent infringement lawsuit within the required 45-day period, our NDA will not be subject to the 30-month stay.

In addition to paragraph IV litigation noted above, third-party owners of patents may generally assert that we are employing their proprietary technology without authorization. There may be third-party patents or patent applications with claims to materials, formulations, methods of manufacture or methods for treatment related to the use or manufacture of our products and/or our product candidates. Because patent applications can take many years to issue, there may be currently pending or subsequently filed patent applications which may later result in issued patents that may be infringed by our products or product candidates. If any third-party patents were held by a court of competent jurisdiction to cover aspects of our product candidates, including the formulation, method of use, any method or process involved in the manufacture of any of our product candidates, any molecules or intermediates formed during such manufacturing process or any other attribute of the final product itself, the holders of any such patents may be able to block our ability to commercialize our product candidates unless we obtain a license under the applicable patents, or until such patents expire. In either case, such a license may not be available on commercially reasonable terms or at all.

Parties making claims against us may request and/or obtain injunctive or other equitable relief, which could effectively block our ability to further develop and commercialize one or more of our product candidates on a temporary or permanent basis. Defense of these claims, regardless of their merit, would involve substantial litigation expense and would be a substantial diversion of employee resources from our business. In the event of a successful claim of infringement against us, we may have to pay substantial damages, including treble damages and attorneys' fees for willful infringement, obtain one or more licenses from third parties, pay royalties or redesign our infringing products or manufacturing processes, which may be impossible or require substantial time and monetary expenditure. We cannot predict whether any such license would be available at all or whether it would be available on commercially reasonable terms. Furthermore, even in the absence of litigation, we may need to obtain licenses from third parties to advance our research, manufacture clinical trial supplies or allow commercialization of our product candidates. We may fail to obtain any of these licenses at a reasonable cost or on reasonable terms, if at all. In that event, we would be unable to further develop and commercialize one or more of our product candidates, which could harm our business significantly. We cannot provide any assurances that third party patents do not exist which might be enforced against our products, resulting in either an injunction prohibiting our sales, or, with respect to our sales, an obligation on our part to pay royalties and/or other forms of compensation to third parties.

*If we fail to comply with our obligations in the agreements under which we license rights to technology from third parties, or if the license agreements are terminated for other reasons, we could lose license rights that are important to our business.*

We are a party to a number of technology licenses that are important to our business and expect to enter into additional licenses in the future. Our existing license agreements impose, and we expect that future license agreements will impose, on us, various development, regulatory and/or commercial diligence obligations, payment of milestones and/or royalties and other obligations. Additionally, one of our existing license agreements is a sublicense from a third party who is not the original licensor of the intellectual property at issue. Under these agreements, we must rely on our licensor to comply with their obligations under the primary license agreements under which such third party obtained rights in the applicable intellectual property, where we may have no relationship with the original licensor of such rights. If our licensors fail to comply with their obligations under these upstream license agreements, the original third-party licensor may have the right to terminate the original license, which may terminate our sublicense. If this were to occur, we would no longer have rights to the applicable intellectual property unless we are able to secure our own direct license with the owner of the relevant rights, which we may not be able to do at a reasonable cost or on reasonable terms, which may impact our ability to continue to develop and commercialize our product candidates and companion diagnostic incorporating the relevant intellectual property. If we fail to comply with our obligations under our license agreements, or we are subject to a bankruptcy or insolvency, the licensor may have the right to terminate the license. In the event that any of our important technology licenses were to be terminated by the licensor, we would likely cease further development of the related program or be required to spend significant time and resources to modify the program to not use the rights under the terminated license.

*We may be involved in lawsuits to protect or enforce our patents or the patents of our licensors, which could be expensive, time consuming and unsuccessful.*

Competitors may infringe our patents or the patents of our licensors. To counter infringement or unauthorized use, we may be required to file infringement claims, which can be expensive and time-consuming. In addition, in an infringement proceeding, a court may decide that a patent of ours or our licensors is not valid or is unenforceable, or may refuse to stop the other party from using the technology at issue on the grounds that our patents do not cover the technology in question. An adverse result in any litigation or defense proceedings could put one or more of our patents at risk of being invalidated or interpreted narrowly and could put our patent applications at risk of not being issued.

Interference proceedings provoked by third parties or brought by us may be necessary to determine the priority of inventions with respect to our patents or patent applications or those of our collaborators or licensors. An unfavorable outcome could require us to cease using the related technology or to attempt to license rights to it from the prevailing party. Our business could be harmed if the prevailing party does not offer us a license on commercially reasonable terms. Our defense of litigation or interference proceedings may fail and, even if successful, may result in substantial costs and distract our management and other employees. We may not be able to prevent, alone or with our licensors, misappropriation of our intellectual property rights, particularly in countries where the laws may not protect those rights as fully as in the United States.

Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation. There could also be public announcements of the results of hearings, motions or other interim proceedings or developments. If securities analysts or investors perceive these results to be negative, it could have a material adverse effect on the price of our common stock.

*The patents and the patent applications that we have covering our products are limited to specific formulations, methods of use and processes, and our market opportunity for our products and our product candidates may be limited by the lack of patent protection for the active ingredients and by competition from other formulations and delivery methods that may be developed by competitors.*

Patent protection on the active ingredients in our currently marketed products (Ryanodex, Bendeka, Argatroban and Non-Alcohol Docetaxel Injection) has expired, and there is therefore no composition of matter patent protection available for the active ingredient in such products. This is also the case with respect to our other product candidates. We have obtained, and continue to seek to obtain patent protection of other aspects of our products and our product candidates, including specific formulations, methods of use and processes, which may not be as effective as composition of matter coverage in preventing work-arounds by competitors. As a result, generic products that do not infringe the claims of our issued patents covering formulations, methods of use and processes are, or may be, available while we are marketing our products. Competitors who obtain the requisite regulatory approval could be able to commercialize products with the same active ingredients as our product candidates so long as the competitors do not infringe any process, use or formulation patents that we have developed for our products, subject to any regulatory exclusivity we may be able to obtain for our products.

The number of patents and patent applications covering products containing the same active ingredient as our products and our product candidates indicates that competitors have sought to develop and may seek to commercialize competing formulations that may not be covered by our patents and patent applications. The commercial opportunity for our products and our product candidates

could be significantly harmed if competitors are able to develop and commercialize alternative formulations of our products and our product candidates that are different from ours and do not infringe our issued patents covering our products.

*Ryanodex® (dantrolene sodium), Belrapzo, and Bendeka ® among other products have been approved by the FDA, and we anticipate that other product candidates will be approved by the FDA in the future. Once our products are on the market, one or more third parties may also challenge the patents that we control covering our products, which could result in the invalidation or unenforceability of some or all of the relevant patent claims of our issued patents covering our products. Obtaining and maintaining our patent protection depends on compliance with various procedural, document submission, fee payment and other requirements imposed by governmental patent agencies, and our patent protection could be reduced or eliminated for non-compliance with these requirements.*

Ryanodex, Belrapzo, and Bendeka, among other of our products, have been approved by the FDA, and we anticipate that other product candidates will be approved by the FDA in the future. One or more third parties may also challenge the patents that we control covering our products in court or the USPTO, which could result in the invalidation or unenforceability of some or all of the relevant patent claims of our issued patents covering our products.

If we or one of our licensing partners initiated legal proceedings against a third party to enforce a patent covering one of our products or product candidates, the defendant could counterclaim that the patent covering our product or product candidate is invalid and/or unenforceable. In patent litigation in the United States, defendant counterclaims alleging invalidity and/or unenforceability are common, and there are numerous grounds upon which a third party can assert invalidity or unenforceability of a patent. Third parties may also raise similar claims before administrative bodies in the United States or abroad, even outside the context of litigation. Such mechanisms include re-examination, post grant review, and equivalent proceedings in foreign jurisdictions (e.g., opposition proceedings). Such proceedings could result in revocation or amendment to our patents in such a way that they no longer cover our products or product candidates. The outcome following legal assertions of invalidity and unenforceability is unpredictable. With respect to the validity question, for example, we cannot be certain that there is no invalidating prior art, of which we, our patent counsel and the patent examiner were unaware during prosecution. If a defendant were to prevail on a legal assertion of invalidity and/or unenforceability, we would lose at least part, and perhaps all, of the patent protection on our products or product candidates. Such a loss of patent protection could have a material adverse impact on our business.

Periodic maintenance fees on any issued patent are due to be paid to the USPTO and foreign patent agencies in several stages over the lifetime of the patent. The USPTO and various foreign governmental patent agencies require compliance with a number of procedural, documentary, fee payment and other similar provisions during the patent application process. While an inadvertent lapse can in many cases be cured by payment of a late fee or by other means in accordance with the applicable rules, there are situations in which non-compliance can result in abandonment or lapse of the patent or patent application, resulting in partial or complete loss of patent rights in the relevant jurisdiction. Non-compliance events that could result in abandonment or lapse of a patent or patent application include, but are not limited to, failure to respond to official actions within prescribed time limits, non-payment of fees and failure to properly legalize and submit formal documents. If we or our licensors that control the prosecution and maintenance of our licensed patents fail to maintain the patents and patent applications covering our products and product candidates, our competitors might be able to enter the market, which would have a material adverse effect on our business, financial condition and results of operations.

*We may be subject to claims that our employees, consultants or independent contractors have wrongfully used or disclosed confidential information of third parties.*

We employ individuals who were previously employed at other biotechnology or pharmaceutical companies. We may be subject to claims that we or our employees, consultants or independent contractors have inadvertently or otherwise used or disclosed confidential information of our employees' former employers or other third parties. We may also be subject to claims that former employers or other third parties have an ownership interest in our patents. Litigation may be necessary to defend against these claims. There is no guarantee of success in defending these claims, and if we are successful, litigation could result in substantial cost and be a distraction to our management and other employees.

*We may be subject to claims challenging the inventorship or ownership of our patents and other intellectual property.*

We may also be subject to claims that former employees, collaborators or other third parties have an ownership interest in our patents or other intellectual property. We may be subject to ownership disputes in the future arising, for example, from conflicting obligations of consultants or others who are involved in developing our products or product candidates and companion diagnostic. Litigation may be necessary to defend against these and other claims challenging inventorship or ownership. If we fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights, such as exclusive ownership of, or right to use, valuable intellectual property. Such an outcome could have a material adverse effect on our business, financial condition and results of operations. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees.

51

The degree of future protection afforded by our intellectual property rights is uncertain because intellectual property rights have limitations, and may not adequately protect our business or permit us to maintain our competitive advantage. The following examples are illustrative:

- others may be able to make compounds that are similar to our products or product candidates but that are not covered by the claims of the patents that we own or have exclusively licensed;

- we or our licensors or future collaborators might not have been the first to make the inventions covered by the issued patent or pending patent application that we own or have exclusively licensed;

- we or our licensors or future collaborators might not have been the first to file patent applications covering certain of our inventions;

- others may independently develop similar or alternative technologies or duplicate any of our technologies without infringing our intellectual property rights;

- it is possible that our pending patent applications will not lead to issued patents;

- issued patents that we own or have exclusively licensed may be held invalid or unenforceable as a result of legal challenges by our competitors;

- our competitors might conduct research and development activities in countries where we do not have patent rights and then use the information learned from such activities to develop competitive products for sale in our major commercial markets;

- we may not develop additional proprietary technologies that are patentable; and

- the patents of others may have an adverse effect on our business, financial condition and results of operations.

Should any of these events occur, they could significantly harm our business, results of operations and prospects.

**Risks Related to Ownership of Our Common Stock**

*Our stock price may continue to fluctuate significantly.*

Our initial public offering was completed in February 2014 at a public offering price of $15.00 per share. The trading price of our common stock has fluctuated significantly in the past and is likely to be volatile. Our stock price could be subject to wide fluctuations in response to a variety of factors, including the following:

- any delay in filing an NDA for any of our product candidates and any adverse development or perceived adverse development with respect to the FDA's review of that NDA;

- failure to successfully execute our commercialization strategy with respect to our approved products or any other approved product in the future;

- adverse results or delays in clinical trials, if any;

- significant lawsuits, including patent or stockholder litigation;

- inability to obtain additional funding;

- failure to successfully develop and commercialize our product candidates;

- changes in the structure of healthcare payment systems;

- changes in laws or regulations applicable to our product candidates;

- inability to obtain adequate product supply for our product candidates, or the inability to do so at acceptable prices;

- unanticipated serious safety concerns related to the use of our products or any of our product candidates;

- adverse regulatory decisions;

- introduction of new products or technologies by our competitors;

- entry into new markets by our competitors;

- failure to meet or exceed product development or financial projections we provide to the public;

52

- failure to meet or exceed the estimates and projections of the investment community;

- the perception of the pharmaceutical industry by the public, legislatures, regulators and the investment community;

- announcements of significant acquisitions, strategic partnerships, joint ventures or capital commitments by us or our competitors;

- disputes or other developments relating to proprietary rights, including patents, litigation matters and our ability to obtain patent protection for our technologies;

- additions or departures of key scientific or management personnel;

- changes in the market valuations of similar companies;

- sales of our common stock by us or our stockholders in the future;

- the trading volume of our common stock;

- changes in the collective short interest in our common stock; and

- additional repurchases of our common stock, if any, pursuant to our recently announced share repurchase program.

The stock market in general, and The Nasdaq Stock Market, or Nasdaq, in particular, has experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of listed companies. Broad market and industry factors may negatively affect the market price of our common stock, regardless of our actual operating performance.

In addition, the market price of our shares of common stock could be subject to wide fluctuations in response to many risk factors listed in this section, and others beyond our control, including:

- actual or anticipated fluctuations in our financial condition and operating results;

- actual or anticipated changes in our growth rate relative to our competitors;

- announcements of significant acquisitions, strategic partnerships, joint ventures, collaborations, or capital commitments;

- issuance of new or updated research or reports by securities analysts;

- fluctuations in the valuation of companies perceived by investors to be comparable to us;

- share price and volume fluctuations attributable to short interest positions and/or inconsistent trading volume levels of our shares;

- disputes or other developments related to proprietary rights, including patents, litigation matters, and our ability to obtain patent protection for our technologies;

- announcement or expectation of additional debt or equity financing efforts;

- sales of our common stock by us, our insiders or our other stockholders; and

- general economic and market conditions.

These and other market and industry factors may cause the market price and demand for our common stock to fluctuate substantially, regardless of our actual operating performance, which may limit or prevent investors from readily selling their shares of common stock and may otherwise negatively affect the liquidity of our common stock. In addition, the stock market in general, and Nasdaq and biopharmaceutical companies in particular, have experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of these companies. In the past, when the market price of a stock has been volatile, holders of that stock have instituted securities class action litigation against the company that issued the stock. For example, in May 2016, we became party to a federal securities class action lawsuit, and although it was dismissed in October 2017, we incurred substantial costs defending such lawsuit. Such lawsuit, as well as similar lawsuits instituted in the future, could result in substantial additional costs to us and could also divert the time and attention of our management.

***Our principal stockholders and management own a significant percentage of our stock and will be able to exert significant control over matters subject to stockholder approval.***

As of December 31, 2019, our executive officers, directors, 5% or greater stockholders and their affiliates beneficially own a significant percentage of our voting stock. These stockholders will have the ability to influence us through this ownership position. These stockholders may be able to influence all matters requiring stockholder approval. For example, these stockholders, acting together, may be able to influence elections of directors, amendments of our organizational documents or approval of any merger, sale of assets or other major corporate transaction. This may prevent or discourage unsolicited acquisition proposals or offers for our common stock that you may believe are in your best interest as one of our stockholders.

*We have incurred significant increased costs as a result of operating as a public company, and our management is required to devote substantial time to new compliance initiatives.*

As a public company, we are incurring significant legal, accounting and other expenses that we did not incur as a private company.

For example, as a public company, we are now subject to the reporting requirements of the Exchange Act, which require, among other things, that we file with the SEC, annual, quarterly and current reports with respect to our business and financial condition. We have incurred and will continue to incur costs associated with the preparation in filing of these reports. In addition, the Sarbanes-Oxley Act, as well as rules subsequently implemented by the SEC, and Nasdaq have imposed various other requirements on public companies and we have incurred and will continue to incur costs associated with compliance with such requirements. In July 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act, or the Dodd-Frank Act, was enacted. There are significant corporate governance and executive compensation related provisions in the Dodd-Frank Act that required the SEC to adopt additional rules and regulations in these areas such as "say on pay" and proxy access. Stockholder activism, the current political environment and the current high level of government intervention and regulatory reform may lead to substantial new regulations and disclosure obligations, which may lead to additional compliance costs and impact (in ways we cannot currently anticipate) the manner in which we operate our business. Our management and other personnel need to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations will increase our legal and financial compliance costs and will make some activities more time-consuming and costly. For example, we expect these rules and regulations to make it more difficult and more expensive for us to obtain director and officer liability insurance and we may be required to incur substantial costs to maintain our current levels of such coverage.

*Sales of a substantial number of shares of our common stock in the public market by our existing stockholders could cause our stock price to fall.*

Sales of a substantial number of shares of our common stock by our existing stockholders in the public market or the perception that these sales might occur, could depress the market price of our common stock and could impair our ability to raise capital through the sale of additional equity securities. We are unable to predict the effect that such sales may have on the prevailing market price of our common stock.

As of February 24, 2020 we had 13,679,350 shares of common stock outstanding, all of which, other than shares held by our directors and certain officers, are eligible for sale in the public market, subject in some cases to compliance with the requirements of Rule 144, including volume limitations and manner of sale requirements.

In addition, shares issued upon exercise of vested options are eligible for sale. Sales of stock by these stockholders could have a material adverse effect on the trading price of our common stock.

Certain holders of our securities are entitled to rights with respect to the registration of their shares under the Securities Act of 1933, as amended, ("the Securities Act"). Registration of these shares under the Securities Act would result in the shares becoming freely tradable without restriction under the Securities Act. Any sales of securities by these stockholders could have a material adverse effect on the trading price of our common stock.

*Future issuances of our common stock or rights to purchase our common stock, including pursuant to our equity incentive plans, could result in additional dilution of the percentage ownership of our stockholders and could cause our stock price to fall.*

We expect that significant additional capital will be needed in the future to continue our planned operations. To the extent we raise additional capital by issuing equity securities, our stockholders may experience substantial dilution. We may sell common stock, convertible securities or other equity securities in one or more transactions at prices and in a manner we determine from time to time. If we sell common stock, convertible securities or other equity securities in more than one transaction, investors may be materially diluted by subsequent sales. These sales may also result in material dilution to our existing stockholders, and new investors could gain rights superior to our existing stockholders.

Pursuant to our 2014 Equity Incentive Plan, ("the 2014 Plan"), our management is authorized to grant stock options and other equity-based awards to our employees, directors and consultants. The number of shares available for future grant under the 2014 Plan will automatically increase each year by 6% of all shares of our capital stock outstanding as of December 31 of the prior calendar year, subject to the ability of our board of directors to take action to reduce the size of the increase in any given year. Currently, we plan to register the increased number of shares available for issuance under the 2014 Plan each year. If our board of directors elects to increase the number of shares available for future grant by the maximum amount each year, our stockholders may experience additional dilution, which could cause our stock price to fall.

*We are at risk of securities class action and similar litigation.*

In the past, securities class action litigation has often been brought against a company following a decline in the market price of its securities. This risk is especially relevant for us because pharmaceutical companies have experienced significant stock price volatility in recent years. On May 31, 2016, a federal securities class action suit was brought against us seeking compensatory damages in connection with, among other things, the EP-6101 Complete Response Letter. Such lawsuit was dismissed with prejudice in August 2017, however, any similar litigation in the future, could result in substantial cost and a diversion of management's attention and resources, which could harm our business.

*We have broad discretion in the use of the net proceeds from our recently completed initial public offering and follow-on offering and may not use them effectively.*

Our management has broad discretion in the application of the net proceeds from our initial public offering and follow-on offering. Because of the number and variability of factors that will determine our use of the net proceeds from these offerings, their ultimate use may vary substantially from their currently intended use. The failure by our management to apply these funds effectively could harm our business. Pending their use, we may continue to invest the net proceeds from our public offerings in short-term, investment-grade, interest-bearing securities. These investments may not yield a favorable return to our stockholders.

*Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.*

Under Section 382 of the Internal Revenue Code of 1986, as amended, or the Code, if a corporation undergoes an "ownership change," generally defined as a greater than 50% change (by value) in its equity ownership over a three year period, the corporation's ability to use its pre-change net operating loss carryforwards and other pre-change tax attributes, such as research tax credits, to offset its post-change income may be limited. In addition, we may experience ownership changes in the future as a result of subsequent shifts in our stock ownership. As a result, if we earn net taxable income, our ability to use our pre-change net operating loss carryforwards to offset U.S. federal taxable income may be subject to limitations, which could potentially result in increased future tax liability to us.

*We do not intend to pay cash dividends on our common stock so any returns will be limited to the value of our stock.*

We have never declared or paid any cash dividend on our common stock. We currently anticipate that we will retain future earnings for the development, operation and expansion of our business and do not anticipate declaring or paying any cash dividends for the foreseeable future. Any future determinations to pay cash dividends will be made at the discretion of our board of directors, subject to applicable laws, and will depend on a number of factors, including our financial condition, results of operations, capital requirements, contractual restrictions (such as our Credit Facility), general business conditions, and any other factors that our board of directors may deem relevant. Any return to stockholders will therefore be limited to the appreciation of their stock.

*There is no assurance that our stock repurchase program will result in repurchases of our common stock or enhance long term stockholder value.*

Repurchases of our common stock pursuant to our stock repurchase program could affect our stock price and increase its volatility and will reduce the market liquidity for our stock. The existence of a stock repurchase program could also cause our stock price to be higher than it would be in the absence of such a program. Additionally, any future repurchases would diminish our cash reserves, which could impact our ability to pursue possible future strategic opportunities and acquisitions. There can be no assurance that any stock repurchases will, in fact, occur, or, if they occur, that they will enhance stockholder value.

*Provisions in our amended and restated certificate of incorporation and bylaws, as well as provisions of Delaware law, could make it more difficult for a third party to acquire us or increase the cost of acquiring us, even if doing so would benefit our stockholders or remove our current management.*

Some provisions of our charter documents and Delaware law may have anti-takeover effects that could discourage an acquisition of us by others, even if an acquisition would be beneficial to our stockholders and may prevent attempts by our stockholders to replace or remove our current management. These provisions include:

- authorizing the issuance of "blank check" preferred stock, the terms of which may be established and shares of which may be issued without stockholder approval;
- limiting the removal of directors by the stockholders;
- creating a classified board of directors;
- prohibiting stockholder action by written consent, thereby requiring all stockholder actions to be taken at a meeting of our stockholders;
- eliminating the ability of stockholders to call a special meeting of stockholders; and

55

- establishing advance notice requirements for nominations for election to the board of directors or for proposing matters that can be acted upon at stockholder meetings.

These provisions may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors, which is responsible for appointing the members of our management. In addition, we are subject to Section 203 of the Delaware General Corporation Law, which generally prohibits a Delaware corporation from engaging in any of a broad range of business combinations with an interested stockholder for a period of three years following the date on which the stockholder became an interested stockholder, unless such transactions are approved by our board of directors. This provision could have the effect of delaying or preventing a change of control, whether or not it is desired by or beneficial to our stockholders. Further, other provisions of Delaware law may also discourage, delay or prevent someone from acquiring us or merging with us.

***Our amended and restated bylaws provide that the Court of Chancery of the State of Delaware is the exclusive forum for certain disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees.***

Our amended and restated bylaws provide that the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for any derivative action or proceeding brought on behalf of the Company, any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Company to the Company or the Company's stockholders, any action asserting a claim arising pursuant to any provision of the Delaware General Corporation Law or any action asserting a claim governed by the internal affairs doctrine. This forum selection provision does not apply to suits brought to enforce a duty or liability created by the Securities Act or the Exchange Act or any claim for which the federal courts have exclusive jurisdiction.

This forum selection provision may limit a stockholder's ability to bring certain claims in a judicial forum that it finds favorable for disputes with us or any of our directors, officers, other employees or stockholders, which may discourage lawsuits with respect to such claims, although our stockholders will not be deemed to have waived our compliance with federal securities laws and the rules and regulations thereunder. If a court were to find this forum selection provision to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could adversely affect our business and financial condition.

***Recently passed comprehensive tax reform bill could adversely affect our business and financial condition.***

On December 22, 2017, the Tax Act was signed into law, significantly revising the Code.  The newly enacted federal income tax law, among other things, contains significant changes to corporate taxation, including reduction of the corporate tax rate from a top marginal rate of 35% to a flat rate of 21%, limitation on deductibility of executive compensation under regulation 162(m), limitation of the tax deduction for interest expense to 30% of adjusted earnings (except for certain small businesses), limitation of the deduction for NOLs to 80% of current year taxable income and elimination of NOL carrybacks, one time taxation of offshore earnings at reduced rates regardless of whether they are repatriated, elimination of U.S. tax on foreign earnings (subject to certain important exceptions), immediate deductions for certain new investments instead of deductions for depreciation expense over time, and modifying or repealing many business deductions and credits.  Notwithstanding the reduction in the corporate income tax rate, the overall impact of the new federal tax law is uncertain and our business and financial condition could be adversely affected.  In addition, it is uncertain if and to what extent various states will conform to the newly enacted federal tax law.  The impact of this tax reform on holders of our common stock is also uncertain and could be adverse.  We urge our stockholders to consult with their legal and tax advisors with respect to this legislation and the potential tax consequences of investing in or holding our common stock.

56

**Item 1B. Unresolved Staff Comments**

None.

57

Case 1:24-cv-00064-JLH    Document 471    Filed 08/07/26    Page 371 of 942 PageID #: 15592

Item 1B. Unresolved Staff Comments

None.

57

**Item 2. Properties**

As of December 31, 2019 we conducted all of our commercial operations for Eagle Pharmaceuticals, Inc. at our 20,497 square foot leased office space located at 50 Tice Boulevard, Suite 315, Woodcliff Lake, NJ 07677. The lease will expire in June 2025.

As of December 31, 2019, we conducted all of our non-outsourced operations at a leased space located at 47 Moulton St. Cambridge, MA 02138. The lease will expire in October 2023.

We consider our current facilities suitable and adequate to meet our current needs.

**Item 3. Legal Proceedings**

The disclosures under Note 13. Legal Proceedings in the Consolidated Financial Statements included in Part IV, Item 15 of this report are incorporated into this Part I, Item 3 by reference.

**Item 4. Mine Safety Disclosures**

Not applicable.

58

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

Our common stock has been listed on The Nasdaq Global Market under the symbol "EGRX" since February 12, 2014. Prior to that date, there was no public trading market for our common stock.

*Record Holders*

As of February 24, 2020, we had 4 holders of record of our common stock. The actual number of shareholders is greater than this number of record holders and includes shareholders who are beneficial owners but whose shares are held in street name by brokers and other nominees. This number of holders of record also does not include shareholders whose shares may be held in trust by other entities. The closing price per share of our common stock on February 24, 2020 was $51.10.

*Dividends*

We have never declared or paid a cash dividend on our common stock. We currently intend to retain any future earnings and do not expect to pay any dividends in the foreseeable future. In addition, our Credit Facility imposes contractual restrictions on us with respect to paying cash dividends. Any future determinations to pay cash dividends will be made at the discretion of our board of directors, subject to applicable laws, and will depend on a number of factors, including our financial condition, results of operations, capital requirements, contractual restrictions, general business conditions, and any other factors that our board of directors may deem relevant.

*Stock Performance Graph*

*The following information shall not be deemed to be "soliciting material" or to be "filed" with the SEC or subject to Regulation 14A or 14C under the Securities Exchange Act of 1934, as amended, ("the Exchange Act"), or to the liabilities of Section 18 of the Exchange Act, and will not be deemed to be incorporated by reference into any filing of Eagle Pharmaceuticals, Inc. under the Exchange Act or the Securities Act of 1933, as amended, ("the Securities Act"), except to the extent we specifically incorporate it by reference into such filing.*

The following graph shows a five year comparison from December 31, 2014 through December 31, 2019 of the cumulative total return for our common stock, and the Nasdaq Composite Index and The Nasdaq Biotechnology Index. The graph assumes that $100 was invested at the market close on December 31, 2014 in the common stock of Eagle Pharmaceuticals, Inc, the Nasdaq Composite Index and the Nasdaq Biotechnology Index. The stock price performance of the following graph is not necessarily indicative of future stock price performance.



**Comparison of 5 year Cumulative Total Return**
**Assumes initial investment $100**
**December 31, 2019**

| Company / Index | 12/31/14 | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 |
|---|---|---|---|---|---|---|
| Eagle Pharmaceuticals, Inc | $ 100 | $ 501 | $ 448 | $ 302 | $ 228 | $ 339 |
| Nasdaq Composite | $ 100 | $ 106 | $ 114 | $ 146 | $ 140 | $ 190 |
| NASDAQ Biotechnology | $ 100 | $ 111 | $ 87 | $ 105 | $ 95 | $ 118 |

*Recent Sales of Unregistered Securities*

Pursuant to a Warrant to Purchase Common Stock, dated September 2018, the Company issued a warrant to FoxKiser LLP to purchase 7,467 shares of the Company's common stock at an exercise price of $66.96 per share in connection with certain services rendered to the Company. This warrant was issued in reliance on an exemption from registration under Section 4(a)(2) of the Securities Act of 1933, as amended.

*Issuer Purchases of Equity Securities*

The following table provides information about purchases of our equity securities during the three months ended December 31, 2019:

| Period | Total Number of Shares Purchased (1)(2)(3)(4)(5) | Average Price Paid per Share | Total Number of Shares Purchased as Part Publicly Announced Plans or Programs | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Programs |
|---|---|---|---|---|
| | | | | (dollars in thousands) |
| October 1, 2019 to October 31, 2019 | — | $ — | — | 85,000 |
| November 1, 2019 to November 30, 2019 | 52,371 | $ 56.53 | 52,371 | 82,039 |
| December 1, 2019 to December 31, 2019 | — | $ — | — | 82,039 |
| **Total** | 52,371 | $ 56.53 | 52,371 | |

(1) All shares repurchased by the Company in this table were repurchased pursuant to the Share Repurchase Program. On October 30, 2018, the Company announced a new repurchase program approved by the Board that included up to $100 million in repurchases, the "2018 Share Repurchase Program". Under the 2018 Share Repurchase Program, the Company is authorized to repurchase shares through open market purchases, privately-negotiated transactions, accelerated share repurchases or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. Under the 2018 Share Repurchase Program, the additional repurchases have no time limit and may be suspended or discontinued completely at any time. The specific timing and amount of repurchases will vary based on available capital resources and other financial and operational performance, market conditions, securities law limitations, and other factors. The repurchases will be made using the Company's cash resources.

*Securities Authorized for Issuance Under Equity Compensation Plans*

Information about securities authorized for issuance under our equity compensation plans is incorporated herein by reference to Item 12 of Part III of this annual report on Form 10-K.

## Item 6. Selected Financial Data

The following table sets forth our selected financial data for the periods and as of the dates indicated. The following selected financial data should be read in conjunction with our audited financial statements and the related notes thereto included elsewhere in this Annual Report on Form 10-K and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this Annual Report on Form 10-K.

The statement of operations data for the years ended December 31, 2019, 2018, 2017, 2016, and 2015 and the balance sheet data as of December 31, 2019, 2018, 2017, 2016 and 2015, are derived from our audited consolidated financial statements. Our audited consolidated financial statements have been prepared in U.S. dollars in accordance with U.S. GAAP.

Our historical results for any prior period are not necessarily indicative of results to be expected in any future period.

| Statement of Operations Data: | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 |
| | (in thousands except share and per share amounts) | | | | |
| Total revenue | $ 195,892 | $ 213,312 | $ 236,707 | $ 189,482 | $ 66,227 |
| Cost of product sales | 47,891 | 42,374 | 33,714 | 35,785 | 7,762 |
| Cost of royalty revenue | 13,006 | 19,542 | 23,472 | 19,521 | 7,885 |
| Research and development | 36,810 | 44,419 | 32,607 | 28,289 | 27,855 |
| Selling, general and administrative | 76,370 | 60,509 | 71,416 | 53,329 | 20,165 |
| Income from Operations | 21,815 | 36,616 | 73,990 | 53,351 | 2,560 |
| Income tax provision (benefit) | 7,685 | 2,135 | 21,002 | (28,026) | 3 |
| Net income attributable to common stockholders | 14,313 | 31,903 | 51,943 | 81,453 | 2,571 |
| Earnings per share- basic | $ 1.04 | $ 2.16 | $ 3.44 | $ 5.24 | $ 0.17 |
| Earnings per share- diluted | $ 1.01 | $ 2.09 | $ 3.27 | $ 4.96 | $ 0.16 |
| Weighted average common shares outstanding- basic | 13,754,516 | 14,768,625 | 15,102,890 | 15,533,681 | 15,250,154 |
| Weighted average common shares outstanding- diluted | 14,138,733 | 15,278,651 | 15,908,211 | 16,434,104 | 16,253,781 |

| Balance Sheet Data: | December 31, | | | | |
|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 |
| | (in thousands) | | | | |
| Cash and cash equivalents | $ 109,775 | $ 78,791 | $ 114,657 | $ 52,820 | $ 79,083 |
| Accounts receivable | 48,004 | 66,486 | 53,821 | 42,194 | 26,267 |
| Total assets | 254,554 | 238,603 | 270,060 | 214,320 | 124,605 |
| Total current liabilities | 38,823 | 39,686 | 47,302 | 40,965 | 34,262 |
| Long-term debt, less current portion | 33,557 | 38,155 | 42,905 | — | — |
| Retained earnings (Accumulated deficit) | 72,500 | 58,187 | 26,284 | (25,659) | (107,112) |
| Total stockholders' equity | $ 179,174 | $ 160,762 | $ 179,144 | $ 151,226 | $ 90,343 |

### Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

*The following discussion and analysis of financial condition and results of operations is provided to enhance the understanding of, and should be read in conjunction with, Part I, Item 1, "Business" and Item 8, "Financial Statements and Supplementary Data." For information on risks and uncertainties related to our business that may make past performance not indicative of future results, or cause actual results to differ materially from any forward-looking statements, see "Special Note Regarding Forward-Looking Statements," and Part I, Item 1A, "Risk Factors."*

### Overview

Our business model is to develop proprietary innovations to FDA-approved, injectable drugs that offer commercial and/or functional advantages to currently available alternatives. We have historically been, and will continue to primarily be, focused on developing and commercializing injectable drugs, primarily in the CNS critical care and oncology areas, using the FDA's 505(b)(2) New Drug Application ("NDA") regulatory pathway. In addition, we plan to continue to market and/or commercialize our products through marketing partners and/or through our growing internal direct sales force.

62

Our product portfolio now includes three main approved products: Ryanodex; Belrapzo; and Bendeka. Our primary commercial partner is Teva, which through its subsidiary Cephalon, Inc. ("Cephalon") markets Bendeka.

We have final approval from the FDA for our novel product PEMFEXY™ (pemetrexed for injection), a branded alternative to ALIMTA®.

We currently have multiple product candidates in advanced stages of development, and/or under review for approval by the FDA. Our advanced product candidates are EP-4104 (dantrolene sodium for exertional heat stroke ("EHS")) ("EP-4104"), and EGL-5385-C-1701 (fulvestrant). EP-4104 and EGL-5385-C-1701, both unapproved, may address unmet medical needs in major specialty markets. Vasopressin is our first to file Abbreviated New Drug Application ("ANDA") that references Endo's Vasostrict® indicated to increase blood pressure in adults with vasodilatory shock who remain hypotensive despite fluids and catecholamines. Our ANDA submission was accepted for filing by the FDA in March 2018. These projects and others noted below have the potential to yield 5 product launches in the next 3 years.

In 2019 and in January 2020, we accomplished the following with respect to our product portfolio and our development projects:

- On April 13, 2019, the Company and Teva entered into an Amendment to the Cephalon License, amending the terms of the License Agreement to increase the U.S. royalty paid to the Company and re-allocate certain litigation expenses. Pursuant to the Amendment, beginning on October 1, 2019, the Company's royalty payment will increase from 25% to 30% of Bendeka net United States sales, provided that Bendeka's orphan drug exclusivity has not been rescinded, withdrawn or waived by such date. The royalty rate will increase by one percentage point on each anniversary of October 1, 2019 until it reaches 32%, and it will remain at 32% thereafter. The Amendment also extends the U.S. royalty term for Bendeka until it is no longer sold in the United States. The previous royalty term was set to expire in 2025. The extended term coincides with the bendamustine patents with expiries through 2033. Pursuant to the amendment, Eagle will continue to be responsible for the manufacture of Bendeka for the U.S. market for so long as it is sold in the United States.
- On May 7, 2019, the Company announced positive results of its study to evaluate the neuroprotective effects of Ryanodex secondary to nerve agent exposure, conducted with the United States Army Medical Research Institute of Chemical Defense.
- On August 5, 2019, the Company announced a clinical development plan to support the submission of a NDA for our fulvestrant formulation. Fulvestrant, an estrogen receptor antagonist with no agonist properties, is approved by the FDA for the treatment of advanced hormone-related breast cancers. The therapeutic effect of fulvestrant relies on its ability to inhibit estrogen receptors (ER) in cancer cells by binding to and downregulating, or blocking, the ER in breast cancer cells. Eagle's original formulation of fulvestrant was studied in a clinical trial conducted in 2018 in healthy post-menopausal women. A detailed review of the study data led to the hypothesis that the unique properties of our formulation would potentially allow for greater inhibition of estrogen receptors. Based on this hypothesis, the Company completed additional work designed to further enhance our proprietary drug formulation. The Company met with the FDA and mutually agreed to a clinical program that could provide an efficient approval pathway for our fulvestrant formulation. The main goal of the clinical research program is to determine if the unique properties of our fulvestrant formulation will result in greater inhibition of estrogen receptors, potentially leading to improved efficacy outcomes, including lower disease progression rates, compared to current treatment options. The Company intends to begin a pilot study shortly in healthy female volunteers to evaluate the pharmacokinetics and safety of our formulation. Once the pilot study results are reviewed, a clinical pivotal trial designed to evaluate fulvestrant exposure and estrogen receptor inhibition based upon the parameters determined with the FDA will be conducted in a target patient population. Depending on recruitment rates and other factors, the Company believes the pivotal study could be completed within approximately 12 months of commencing enrollment.
- On December 9, 2019, we announced that the Company has commenced dosing in a pilot clinical study to assess the unique characteristics of its fulvestrant product candidate, which has the potential to enhance estrogen receptor ("ER") inhibition and improve patient outcomes. The results of the pilot study will inform the design of the Company's pivotal trial, which Eagle expects to commence in 2020. Fulvestrant, an estrogen receptor antagonist with no agonist properties, is approved by the FDA for the treatment of advanced hormone-related breast cancers. Breast cancer is the most commonly diagnosed cancer in women, with approximately 290,000 women diagnosed in the U.S. annually and more than 2.8 million breast cancer survivors in the U.S. today.
- On December 13, 2019, we reached a settlement agreement with Eli Lilly and Company related to the Company's novel product, PEMFEXY™ (pemetrexed for injection), a branded alternative to ALIMTA®. The agreement provides for a release of all claims by the parties and allows for an initial entry of PEMFEXY™ into the market (equivalent to approximately a three week supply of current ALIMTA®utilization) on February 1, 2022 and a subsequent uncapped entry on April 1, 2022.

63

- On December 16, 2019, we announced that the FDA has granted orphan drug designation (ODD) for Ryanodex®(dantrolene sodium) for the treatment of organophosphate exposure. Organophosphates are a class of chemicals that include potent pesticides and chemical weapons, known as nerve agents. Acute intoxication with organophospates may result in severe consequences, including brain damage and death. About 2,700 people in the United States are treated for accidental exposure to organophosphate pesticides every year. Eagle is currently evaluating Ryanodex for the treatment of brain damage secondary to nerve agent exposure. If approved, Ryanodex would represent the first product available for this indication.

- On January 7, 2020, Tyme Technologies and Eagle Pharmaceuticals announced a strategic collaboration to advance oral SM-88 for the treatment of patients with cancer. SM-88 is an investigational agent in two Phase II studies for pancreatic cancer and in a Phase II study for prostate cancer. Data is expected in 2021.

- On January 9, 2020, we announced that the Company has resubmitted its New Drug Application ("NDA") for Ryanodex®(dantrolene sodium for injectable suspension) for the treatment of exertional heat stroke ("EHS"), in addition to body cooling, to the FDA. Eagle believes that this submission addresses the Complete Response Letter received in July 2017. A Prescription Drug User Fee Act ("PDUFA") date of six months is anticipated for this class of resubmissions.

**Financial Operations Overview**

*Revenue*

Our revenue consists of product sales, royalty revenue and license and other revenue.

*Product Sales*. As of December 31, 2019, our primary products were Bendeka, Ryanodex, and Belrapzo. Bendeka is sold to our commercial partner Teva. Argatroban is generally sold directly to our commercial partners Chiesi and Sandoz. Sales to our commercial partners are typically made at little or no profit for resale. Ryanodex and Belrapzo have been sold directly to wholesalers, hospitals and surgery centers through a third party logistics partner. Diclofenac-misoprostol was divested in March 2016. We continued to market diclofenac-misoprostol through the first quarter of 2018 until such time that the purchaser was able to launch the product. As part of a restructuring initiative, we ceased selling Non-Alcohol Docetaxel Injection by September 30, 2018.

We typically enter into agreements with group purchasing organizations acting on behalf of their hospital members, in connection with the hospitals' purchases of our direct commercial products. Based on these agreements, most of our hospital customers have contracted prices for products and volume-based rebates on product purchases. These amounts are estimated and recorded at the time of sale. In the case of discounted pricing, we typically pay a chargeback, representing the difference between the price invoiced to the wholesaler and the customer contract price.

*Royalty revenue.* We recognize revenue from royalties based on a percentage of Teva's net sales of Bendeka and Sandoz's and Chiesi's gross profit of Argatroban, both net of discounts, returns and allowances incurred by our commercial partners. Royalty revenue is recognized as earned in accordance with contract terms when it can be reasonably estimated and collectability is reasonably assured.

*License and other revenue.*

Our revenues may either be in the form of the recognition of deferred revenues upon milestone achievement for which cash has already been received or recognition of revenue upon milestone achievement, the payment for which is reasonably assured to be received in the future.

The primary factors that determine our revenues derived from Bendeka are:

- the level of orders submitted by our commercial partner, Teva;

- the rate at which Teva can convert the current market to Bendeka;

- the level of institutional demand for Bendeka;

- unit sales prices charged by our commercial partner, net of any sales reserves; and

- the level of orders submitted by wholesalers, hospitals and surgery centers.

The primary factors that may determine our revenues derived from Argatroban are:

- the level of orders submitted by our commercial partners, Sandoz and Chiesi;

- the level of institutional demand for Argatroban; and

- unit sales prices charged by our commercial partners, net of any sales reserves.

64

The primary factors that may determine our revenues derived from Ryanodex, Belrapzo and our future products are:

- the effectiveness of our sales force;
- the level of orders submitted by wholesalers, hospitals and surgery centers;
- the level of institutional demand for our products; and
- unit sales prices, net of any sales reserves.

### Cost of Revenues

Cost of revenue consists of the costs associated with producing our products for our commercial partners. In particular, our cost of revenue includes production costs of our products paid to a contract manufacturing organization coupled with shipping and customs charges, cost of royalty and the amortization of intangible assets. Cost of revenue may also include the effects of product recalls, if applicable.

### Research and Development

Costs for research and development are charged to expense as incurred and include: employee-related expenses including salaries, benefits, travel and stock-based compensation expense for research and development personnel, expenses incurred under agreements with contract research organizations, contract manufacturing organizations and service providers that assist in conducting clinical and preclinical studies; costs associated with preclinical activities and development activities, costs associated with regulatory operations; and depreciation expense for assets used in research and development activities.

Costs for certain development activities, such as clinical studies, are recognized based on an evaluation of the progress to completion of specific tasks using data such as patient enrollment, clinical site activations, or information provided to the Company by its vendors on their actual costs incurred. Payments for these activities are based on the terms of the individual arrangements, which may differ from the patterns of costs incurred, and are reflected in the consolidated financial statements as prepaid expenses or accrued expenses as deemed appropriate.

### Selling, General and Administrative

Selling, general and administrative costs consist primarily of salaries, benefits and other related costs, including stock-based compensation for executive, finance, sales and operations personnel. Selling, general and administrative expenses also include facility and related costs, professional fees for legal, consulting, tax and accounting services, insurance, selling, marketing, market research, advisory board and key opinion leaders, depreciation and general corporate expenses.

### Income Taxes

We account for income taxes using the liability method in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC"), Topic 740, "Income Taxes" ("ASC 740"). Deferred tax assets and liabilities are determined based on temporary differences between financial reporting and tax bases of assets and liabilities and are measured by applying enacted rates and laws to taxable years in which differences are expected to be recovered or settled. Further, the effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that the rate changes. A valuation allowance is required when it is "more likely than not" that all or a portion of deferred tax assets will not be realized. ASC 740 also prescribes a comprehensive model for how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that the Company has taken or expects to take on a tax return, including a decision whether to file or not file a return in a particular jurisdiction. We recognize any interest and penalties accrued related to unrecognized tax benefits as income tax expense.

### Results of Operations

**Comparison of Years Ended December 31, 2019 and December 31, 2018**

**Revenues**

|  | Year Ended December 31, | | Increase / |
|---|---|---|---|
|  | **2019** | **2018** | **(Decrease)** |
|  | (in thousands) | | |
| Product sales | $ 73,989 | $ 70,385 | $ 3,604 |
| Royalty revenue | 112,903 | 142,927 | (30,024) |
| License and other revenue | 9,000 | — | 9,000 |
| Total revenue | $ 195,892 | $ 213,312 | $ (17,420) |

Product sales increased $3.6 million in the year ended December 31, 2019, primarily driven by increases in product sales of Belrapzo of $6.8 million, which was due to volume increases and Bendeka of $6.4 million, which was also due to volume increases. The increased sales were partially offset by decreases in product sales of Ryanodex of $7.2 million due to lower volume on a low reorder cycle period and the discontinuation of Non-Alcohol Docetaxel Injection in September 2018 that resulted in a negative impact to revenues of $2.6 million.

Royalty revenue decreased $30.0 million in the year ended December 31, 2019 as a result of decreases in royalties on Teva's sales of Bendeka of $23.2 million and royalties on sales of Argatroban of $6.8 million.

License and other revenue for the year ended December 31, 2019 represents an upfront cash payment of $9.0 million upon execution of an amendment to the Cephalon License to terminate Teva's obligation to pay future milestones and royalties on Bendeka sales outside of the U.S.

*Cost of Revenue*

| | Year Ended December 31, | | | | Increase / (Decrease) | |
| | 2019 | | 2018 | | | |
| | (in thousands) | | | | | |
|---|---|---|---|---|---|---|
| Cost of product sales | $ | 47,891 | $ | 42,374 | $ | 5,517 |
| Cost of royalty revenue | | 13,006 | | 19,542 | | (6,536) |
| Total cost of revenue | $ | 60,897 | $ | 61,916 | $ | (1,019) |

Cost of product sales increased $5.5 million in the year ended December 31, 2019, primarily as a result of increased product sales of Belrapzo and Bendeka, partially offset by the discontinuation of Non-Alcohol Docetaxel Injection in September 2018 and decreased product sales of Ryanodex and Argatroban.

Cost of royalty revenue decreased $6.5 million in the year ended December 31, 2019 due to the decrease in royalty revenue for Bendeka and Argatroban.

*Research and Development*

The table below details the Company's research and development expenses by significant project for the periods presented.

| | Year Ended December 31, | | | | (Decrease) / Increase | |
| | 2019 | | 2018 | | | |
| | (in thousands) | | | | | |
|---|---|---|---|---|---|---|
| Fulvestrant "EGL-5385-C-1701" | $ | 5,053 | $ | 21,687 | $ | (16,634) |
| Vasopressin | | 7,779 | | 1,029 | | 6,750 |
| Ryanodex EHS "EP-4104" | | 5,192 | $ | 3,845 | | 1,347 |
| All other projects | | 3,980 | $ | 4,437 | | (457) |
| Salary and other personnel related | $ | 14,806 | $ | 13,421 | | 1,385 |
| Research and development | $ | 36,810 | $ | 44,419 | $ | (7,609) |

The decrease primarily resulted from a decrease in project spending for EGL-5385-C-1701 (the Company's fulvestrant formulation) relating to the clinical study which completed randomization of 600 subjects in the first half of 2018. This decrease was partially offset by increased spend related to the Company's vasopressin injection ANDA filing and spending on the resubmitted New Drug Application ("NDA") for Ryanodex® (dantrolene sodium for injectable suspension) for the treatment of exertional heat stroke ("EHS").

66

*Selling, General and Administrative*

| | Year Ended December 31, | | | | | Increase | |
| | 2019 | | 2018 | | | | |
| | (in thousands) | | | | | | |
| Selling, general and administrative | $ | 76,370 | $ | 60,509 | $ | | 15,861 |

This increase is primarily related to an increase of $9.6 million in external legal fees related to ongoing litigation matters, increased compensation costs, including stock compensation expense, of $6.6 million and $0.6 million increase in professional fees. These increases were partially offset by a decrease of $0.9 million in sales and marketing direct costs.

*Other Income, net*

| | Year Ended December 31, | | | | | Increase / Decrease | |
| | 2019 | | 2018 | | | | |
| | (in thousands) | | | | | | |
| Interest income | $ | 2,169 | $ | 158 | $ | | 2,011 |
| Interest expense | | (2,686) | | (2,736) | | | 50 |
| Other income | | 700 | | — | | | 700 |
| Total other income, net | $ | 183 | $ | (2,578) | $ | | 2,761 |

Interest income increased $2.0 million primarily due to the Company's short term investing initiatives with cash on hand throughout 2019 as compared to 2018.

Interest expense decreased primarily due to lower total long-term debt outstanding due to recurring principal payments required by the Revised Credit Agreement.

Other income represents an amount related to a settlement agreement executed in December 2019 with Eli Lilly and Company ("Lilly") related to the Company's product, PEMFEXY™ (pemetrexed for injection), a branded alternative to ALIMTA®. The agreement provides for a release of all claims by the parties related to an antitrust complaint filed by the Company and an alleged patent infringement based on the filing of the Company's 505(b)(2) NDA. The Settlement also allows for an initial entry of PEMFEXY™ into the market (equivalent to approximately a three week supply of current ALIMTA®utilization) on February 1, 2022 and a subsequent uncapped entry on April 1, 2022.

*Provision for income taxes*

| | Year Ended December 31, | | | |
| | 2019 | | 2018 | |
| | (in thousands) | | | |
| *Provision for income taxes* | $ | 7,685 | $ | 2,135 |
| Effective tax rate | | 35% | | 6% |

The provision for income taxes was based on the applicable federal and state tax rates for those periods. The effective tax rate for 2019 reflects the impact of certain non-deductible executive compensation partially offset by credits for research and development activity. The effective tax rate for 2018 reflects tax benefits related to stock option exercises in the period as well as credits for research and development activity partially offset by the impact of certain non-deductible executive compensation

*Net Income*

Net income for the year ended December 31, 2019 was $14.3 million as compared to a net income of $31.9 million for the year ended December 31, 2018, as a result of the factors discussed above.

*Comparison of Years Ended December 31, 2018 and December 31, 2017*

| | Year Ended December 31, | | | | Increase / (Decrease) | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | | |
| | (in thousands) | | | | | |
| Product sales | $ | 70,385 | $ | 45,327 | $ | 25,058 |
| Royalty revenue | | 142,927 | | 153,880 | | (10,953) |
| License and other revenue | | — | | 37,500 | | (37,500) |
| Total revenue | $ | 213,312 | $ | 236,707 | $ | (23,395) |

Product sales increased $25.1 million in the year ended December 31, 2018, primarily driven by the FDA approval and launch of Belrapzo in May 2018 which generated $22.9 million of 2018 revenues accompanied by increases in product sales of Bendeka of $8.3 million, of which $8.2 million was due to price increases and $0.1 million was due to volume increases. Additionally, product sales for Ryanodex increased by $2.7 million, of which $2.6 million was due to price increases and $0.1 million was due to volume increases. The increases were partially offset by decreases in product sales for Argatroban of $3.7 million, and in Non-Alcohol Docetaxel Injection of $3.8 million due to its discontinuation in September 2018.

Royalty revenue decreased $11.0 million in the year ended December 31, 2018, as a result of lower royalties on Bendeka.

License and other revenue for the year ended December 31, 2017, comprised of a $25.0 million milestone under the Cephalon agreement related to Teva reaching $500 million in cumulative net sales of Bendeka and a $12.5 million upfront cash payment earned under the SymBio License Agreement.

*Cost of Revenue*

| | Year Ended December 31, | | | | Increase / (Decrease) | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | | |
| | (in thousands) | | | | | |
| Cost of product sales | $ | 42,374 | $ | 33,714 | $ | 8,660 |
| Cost of royalty revenue | | 19,542 | | 23,472 | | (3,930) |
| Total cost of revenue | $ | 61,916 | $ | 57,186 | $ | 4,730 |

Cost of product sales increased $8.7 million in the year ended December 31, 2018, primarily as a result of increased product sales of Belrapzo and Bendeka, offset by decreased product sales of Argatroban, Non-Alcohol Docetaxel Injection, and diclofenac-misoprostol.

Cost of royalty revenue decreased $3.9 million in the year ended December 31, 2018 due to the non-recurrence of both the $25.0 million milestone realized under the Cephalon agreement, related to Teva reaching $500 million in cumulative net sales of Bendeka, and the $12.5 million upfront cash payment earned under the SymBio License Agreement during the year ended December 31, 2017.

*Research and Development*

| | Year Ended December 31, | | | | Increase / (Decrease) | |
|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | | |
| | (in thousands) | | | | | |
| Fulvestrant "EGL-5385-C-1701" | $ | 21,687 | $ | 10,245 | $ | 11,442 |
| Ryanodex EHS "EP-4104" | | 3,845 | | 2,987 | | 858 |
| Vasopressin | | 1,029 | | — | | 1,029 |
| Ryanodex OD / NA | | 810 | | 971 | | (161) |
| Pemetrexed "EP-5101" | | 290 | | 1,982 | | (1,692) |
| All other projects | | 3,337 | | 4,093 | | (756) |
| Salary and other personnel related | | 13,421 | | 12,329 | | 1,092 |
| Total research and development | $ | 44,419 | $ | 32,607 | $ | 11,812 |

The increase primarily resulted from an increase in project spending for EGL-5385-C-1701 relating to the clinical study, which completed randomization of 600 subjects in the first quarter of 2018.

*Selling, General and Administrative*

| | | Year Ended December 31, | | | | |
| | | 2018 | | 2017 | | Decrease |
| --- | --- | --- | --- | --- | --- | --- |
| | | (in thousands) | | | | |
| Selling, general and administrative | $ | 60,509 | $ | 71,416 | $ | (10,907) |

This decrease is principally related to a $14.5 million decrease in sales and marketing spend prior to an expected launch of Ryanodex for exertional heat stroke that did not occur and the non-recurrence of fees related to a co-promotion agreement during 2017 and $0.8 million decrease in professional fees. These decreases were partially offset by a $2.8 million increase in salary and personnel-related expenses, including stock-based compensation expense, as we build out areas to support the needs of the business.

**Restructuring Charge**

As part of its ongoing organizational review, the Company engaged in a restructuring initiative to rationalize its product portfolio and focus its physical sites. These measures included the discontinuation of manufacture and distribution of Non-Alcohol Docetaxel Injection in June 2018 and plans to rationalize research and development operations. Charges consist of inventory and related reserves, certain asset impairment charges related to property, plant and equipment, and personnel related costs. The restructuring costs were $7.9 million for the year ended December 31, 2018.

*Asset Impairment Charge*

On June 30, 2018, we implemented a restructuring initiative resulting in the removal of Non-Alcohol Docetaxel Injection from our product portfolio. Sales for the product ceased entirely at the end of third quarter 2018. We have determined the carrying amount of the asset to no longer be recoverable, resulting in a pre-tax, non-cash asset impairment charge of $2.7 million during the year ended December 31, 2018.

*Change in Fair Value of Contingent Consideration*

Contingent consideration, which primarily consists of potential milestone payments and royalty obligations, is recorded in our consolidated balance sheets at its estimated fair value at the acquisition date, in accordance with the acquisition method of accounting. The fair value of the acquisition-related contingent consideration is remeasured each reporting period, with changes in fair value recorded in our consolidated statements of income. The fair value measurement is based on significant inputs not observable in the market and thus represents a Level 3 measurement as defined in fair value measurement accounting.

Contingent consideration gain of $0.8 million was recorded during the year ended December 31, 2018. This was primarily driven by adjustments to the fair values of the liabilities associated with Non-Alcohol Docetaxel Injection, which was remeasured as a result of the discontinuation of the product and partially offset by accretion for the time value of money.

*Other Income and Expense*

| | | Year Ended December 31, | | | | |
| | | 2018 | | 2017 | | Increase |
| --- | --- | --- | --- | --- | --- | --- |
| | | (in thousands) | | | | |
| Interest income | $ | 158 | $ | 91 | $ | 67 |
| Interest expense | | (2,736) | | (1,136) | | (1,600) |
| Total other income, net | $ | (2,578) | $ | (1,045) | $ | (1,533) |

Interest expense increased for the year ended December 31, 2018 related to the amortization of debt issuance costs and interest incurred on long-term debt.

69

*Provision for income taxes*

|  | Year Ended December 31, | |
|---|---|---|
|  | **2018** | **2017** |
|  | **(in thousands)** | |
| *Provision for income taxes* | $ (2,135) | $ (21,002) |
| Effective tax rate | 6% | 29% |

The provision for income taxes were based on the applicable federal and state tax rates for those periods. The effective tax rate for the year ended December 31, 2018 and 2017 reflects tax benefits related to stock option exercises in the period as well as credits for research and development activity (see Note to Consolidated Financial Statements - Note 8. Income Taxes).

As a result of the Tax Act, the federal statutory tax rate was reduced to 21% from 35% beginning in 2018. In addition, the Company's income tax provision for the year ended December 31, 2017 included a charge for the revaluation of net deferred tax assets due to the Tax Act.

### *Net Income*

Net income for the year ended December 31, 2018 was $31.9 million as compared to a net income of $51.9 million for the year ended December 31, 2017, as a result of the factors discussed above.

### Liquidity and Capital Resources

Our primary uses of cash are to fund working capital requirements, product development costs, operating expenses as well as strategic business and product acquisitions and repurchases of our common stock. Cash and cash equivalents were $109.8 million, and $78.8 million as of December 31, 2019 and December 31, 2018, respectively.

For the year ended December 31, 2019, we recorded net income of $14.3 million. As of December 31, 2019, we had a working capital surplus of $140.6 million. For the year ended December 31, 2018, we recorded net income of $31.9 million.

We believe that future cash flows from operations will be sufficient to fund our currently anticipated working capital requirements for at least the next twelve months.

We expect to use future loans, if any, under the Credit Facility, for general corporate purposes and any strategic acquisitions.

### *Operating Activities:*

Net cash provided by operating activities for the year ended December 31, 2019 was $56.0 million. Net income for the same period was $14.3 million before non-cash adjustments of approximately $27.3 million from deferred income taxes, depreciation, amortization of intangible assets, stock-based compensation expense, and amortization of debt issuance costs. Net changes in working capital increased cash provided from operating activities by $14.4 million, due to a decrease in accounts receivable of $18.5 million primarily due to Belrapzo launch in 2018, a decrease in inventory of $1.7 million, an increase in accrued expenses and other liabilities of $4.1 million, partially offset by an increase in other assets of $0.6 million, a decrease in prepaid expenses and other current assets of $4.8 million, and a decrease in accounts payable of $4.5 million. The total amount of accounts receivable at December 31, 2019 was approximately $48.0 million. Receivables from our product sales have payment terms ranging from 30 to 75 days with select extended terms to wholesalers on initial purchases of product launch quantities. Our receivables from royalty revenue are due 45-days from the end of the quarter.

Net cash provided by operating activities for the year ended December 31, 2018 was $52.4 million. Net income for the same period was $31.9 million offset by non-cash adjustments of approximately $28.4 million from deferred income taxes, depreciation, amortization of intangible assets, stock-based compensation expense, amortization of debt issuance costs, change in fair value of contingent consideration, asset impairment charge and fair value adjustment related to restructuring. Net changes in working capital decreased cash provided from operating activities by $7.9 million, due to an increase in accounts receivable of $12.7 million, an increase in inventory of $5.6 million, an increase in accrued expenses and other liabilities of $8.1 million, an increase in other assets of $0.6 million partially offset by a decrease in prepaid expenses and other current assets of $4.8 million, and a decrease in accounts payable of $2.1 million. The total amount of accounts receivable at December 31, 2018 was approximately $66.5 million, which included approximately $25.3 million from product sales, $35.7 million from royalty income, and $5.5 million related to cost reimbursements. Receivables from our product sales have payment terms ranging from 30 to 75 days with select extended terms to wholesalers on initial purchases of product launch quantities. Our receivables from royalty revenue are due 45-days from the end of the quarter.

70

Net cash provided by operating activities for the year ended December 31, 2017 was $58.9 million. Net income for the same period was $51.9 million offset by non-cash adjustments of approximately $36.5 million principally from deferred income taxes, depreciation, amortization of intangible assets, stock-based compensation expense, asset impairment charge, amortization of debt issuance costs, and change in fair value of contingent consideration. Net changes in working capital decreased cash provided from operating activities by $29.6 million, due to an increase in accounts receivable of $11.6 million, an increase in inventory of $2.4 million partially offset by a decrease in prepaid expenses and other current assets of $2.0 million, a decrease in accounts payable of $8.5 million, a decrease in accrued expenses and other liabilities of $9.1 million. The total amount of accounts receivable at December 31, 2017 was approximately $53.8 million, which included approximately $13.3 million from product sales, $36.4 million from royalty income, and $4.1 million related to cost reimbursements, all with payment terms of 45 days. Royalty income is receivable with terms of 45 days and starts at the end of the quarter to which it relates, the immediately preceding quarter.

*Investing Activities:*

During the years ended December 31, 2019, 2018 and 2017, we invested $0.8 million, $0.1 million, and $4.4 million, respectively, for the purchase of property and equipment.

During the year ended December 31, 2017, we invested $0.8 million related to the purchase of the Ryanodex intangible.

*Financing Activities:*

Net cash used in financing activities for the year ended December 31, 2019 was $24.2 million, primarily resulting from principal payments for debt required by the Revised Credit Agreement of $6.0 million and payments related to the repurchases of our common stock of $18.0 million.

Net cash used in financing activities for the year ended December 31, 2018 was $88.1 million, primarily resulting from a $15 million payment of contingent consideration in connection with the Arsia Amendment, $73.1 million in cash settlements on repurchases of common stock, $3.7 million payment of debt financing costs and a $4.9 million payment of employee withholding tax for net option exercises. This was offset by the issuance of common stock for stock option exercises of $8.6 million.

Net cash provided by financing activities for the year ended December 31, 2017 was $8.1 million, primarily resulting from $50.0 million in proceeds from debt issuance and the issuance of common stock for stock option exercises of $4.3 million. This was offset by $43.8 million in cash settlements on repurchases of common stock, a $1.2 million payment of debt financing costs, and a $1.3 million payment of debt principal.

**Contractual Obligations**

Our future material contractual obligations include the following (in thousands):

| Obligation | Total | 2020 | 2021 | 2022 | 2023 | 2024 | Beyond |
|---|---|---|---|---|---|---|---|
| Operating leases (1) | $ 6,607 | $ 1,345 | $ 1,362 | $ 1,376 | $ 1,291 | $ 820 | $ 413 |
| Credit facility | 39,000 | 5,000 | 8,000 | 26,000 | — | — | — |
| Purchase obligations (2) | 18,329 | 18,329 | — | — | — | — | — |
| Total obligations | $ 63,936 | $ 24,674 | $ 9,362 | $ 27,376 | $ 1,291 | $ 820 | $ 413 |

(1) We lease our corporate office location. On August 8, 2019, we amended the lease for our corporate office location in order to rent additional office space and extend the term of our existing lease to June 30, 2025. The Company also leases its lab space under a lease agreement that expires on October 31, 2023. Rental expense was $1,146, $571, and $664, for the year ended December 31, 2019, 2018, and 2017, respectively. The remaining future lease payments under the operating leases, exclusive of any renewal option periods, are $6,607 as of December 31, 2019, payable monthly through June 30, 2025 and October 31, 2023.

(2) As of December 31, 2019, the Company has purchase obligations in the amount of $18,329 which represents the contractual commitments under contract manufacturing and supply agreements with suppliers. The obligation under the supply agreement is primarily for finished product, inventory, and research and development.

71

**Recent Accounting Pronouncements**

*Recent Accounting Pronouncements - Not Yet Adopted*

In June 2016, the FASB issued ASU 2016-13, Financial Instruments - Credit Losses which requires financial assets measured at amortized cost basis to be presented at the net amount expected to be collected. The measurement of expected credit losses is based on relevant information about past events, including historical experience, current conditions, and reasonable and supportable forecasts that affect the collectability of the reported amount. This standard is effective for fiscal years beginning after December 15, 2019 and we will adopt the standard effective January 1, 2020. We have performed an assessment and determined that adoption will not have a material impact on our consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, Fair Value Measurement (Topic 820): Disclosure Framework—Changes to the Disclosure Requirement for Fair Value Measurement ("ASU 2018-13"), which amends the disclosure requirements for fair value measurements. The amendments in ASU 2018-13 are effective for fiscal years beginning after December 15, 2019, with early adoption permitted. We have performed an assessment and determined that adoption will not have a material impact on our consolidated financial statements.

In December 2019, the FASB issued ASU 2019-12, *Simplifying the Accounting for Income Taxes*. The ASU simplifies the accounting for income taxes by removing certain exceptions to the general principles and also clarifies and amends existing guidance. This standard is effective beginning January 1, 2021, with early adoption permitted. We are currently assessing the impact this standard will have on our consolidated financial statements.

*Recently Adopted Accounting Pronouncements*

The Company adopted FASB ASU No. 2016-02, "Leases (Topic 842)" ("ASU 2016-02") as of January 1, 2019 to increase transparency and comparability among organizations, which included recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. Lessees are required to recognize a lease liability, which represents the discounted obligation to make future minimum lease payments, and a corresponding right-of-use asset on the balance sheet for most leases. The Company adopted ASU 2016-02 using the modified retrospective approach and did not recognized a cumulative-effect adjustment to the opening balance of Retained earnings. The Company elected a number of optional practical expedients permitted under the transition guidance within the new standard, which among other things, allowed us to carry forward the historical lease classification and that permits lease agreements that are twelve months or less to be excluded from the balance sheet. The primary impact upon adoption was the recognition, on a discounted basis, of the Company's minimum commitments under noncancelable operating leases as right of use assets and obligations on the consolidated balance sheets, in an amount of approximately $3 million as of the adoption date. The Company may enter into future long-term lease agreements or exercise renewal options contained in existing lease agreements that could have a material impact on the right of use assets and obligations reflected on the consolidated balance sheets.

**Off-Balance Sheet Arrangements**

We do not have any off-balance sheet arrangements that have, or are reasonably likely to have, a current or future material effect on our financial condition, changes in financial condition, revenue or expenses, results of operations, liquidity, capital expenditures or capital resources.

**Impact of Inflation**

While it is difficult to accurately measure the impact of inflation due to the imprecise nature of the estimates required, we believe the effects of inflation, if any, on our results of operations and financial condition have been immaterial.

**Critical Accounting Policies and Estimates**

Our management's discussion and analysis of our financial condition and results of operations is based on our financial statements, which have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). The preparation of these financial statements requires us to make estimates and judgments that affect our reported assets and liabilities, revenues and expenses, and other financial information. Actual results may differ significantly from these estimates under different assumptions and conditions. In addition, our reported financial condition and results of operations could vary due to a change in the application of a particular accounting standard.

We regard an accounting estimate or assumption underlying our financial statements as a "critical accounting estimate"

72

where:

- the nature of the estimate or assumption is material due to the level of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change; and

- the impact of the estimates and assumptions on financial condition or operating performance is material.

Our significant accounting policies are more fully described in Note 2 to our financial statements included in this Annual Report on Form 10-K. Not all of these significant accounting policies, however, require that we make estimates and assumptions that we believe are "critical accounting estimates." We have discussed our accounting policies with the audit committee of our board of directors, and we believe that our estimates relating to revenue recognition, share-based compensation, income taxes, other intangibles assets, net and goodwill described below are "critical accounting estimates."

*Revenue Recognition*

Revenue is recognized when a customer obtains control of promised goods or services, in an amount that reflects the consideration which the entity expects to receive in exchange for those goods or services. To determine revenue recognition for arrangements that an entity determines are within the scope of ASC 606, the Company performs the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. The Company only applies the five-step model to contracts when it is probable that the entity will collect the consideration it is entitled to in exchange for the goods or services it transfers to the customer. At contract inception, once the contract is determined to be within the scope of ASC 606, the Company assesses the goods or services promised within each contract and determines those that are performance obligations, and assesses whether each promised good or service is distinct. The Company then recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when (or as) the performance obligation is satisfied. Sales, value add, and other taxes collected on behalf of third parties are excluded from revenue.

*Product revenue -* The Company recognizes net revenue on sales to its commercial partners and to end users. In each instance, revenue is generally recognized when the customer obtains control of the Company's product, which occurs at a point in time, and may be upon shipment or upon delivery based on the contractual shipping terms of a contract.

Revenue on sales to commercial partners relates to Argatroban and Bendeka. Sales to our commercial partners are presented gross because the Company is primarily responsible for fulfilling the promise to provide the product, is responsible to ensure that the product is produced in accordance with the related supply agreement and bears risk of loss while the inventory is in-transit to the commercial partner.

Revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring products or services to a customer. To the extent the transaction price includes variable consideration, the Company estimates the amount of variable consideration that should be included in the transaction price utilizing the expected value method to which the Company expects to be entitled. As such, revenue on sales to end users for Belrapzo and Ryanodex are recorded net of chargebacks, rebates, returns, prompt pay discounts, wholesaler fees and other deductions. Our products are contracted with a limited number of oncology distributors and hospital buying groups with narrow differences in ultimate realized contract prices used to estimate our chargeback and rebate reserves. The Company has a product returns policy on some of its products that allows the customer to return pharmaceutical products within a specified period of time both prior to and subsequent to the product's expiration date. The Company's estimate of the provision for returns is analyzed quarterly and is based upon many factors, including historical experience of actual returns and analysis of the level of inventory in the distribution channel, if any. The Company has terms on sales of Ryanodex by which the Company does not accept returns. Variable consideration is included in the transaction price if, in the Company's judgment, it is probable that a significant future reversal of cumulative revenue under the contract will not occur. Estimates of variable consideration are made using the expected value method and determination of whether to include estimated amounts in the transaction price are based largely on an assessment of the Company's anticipated performance and all information (historical, current and forecasted) that is reasonably available. The Company believes that the estimates it has established are reasonable based upon current facts and circumstances. Applying different judgments to the same facts and circumstances could result in the estimated amounts to vary.

*Royalty Revenue* — The Company recognizes revenue from license arrangements with its commercial partners' net sales of products. In accordance with ASC 606-10-55-65, royalties are recognized when the subsequent sale of the commercial partner's products occurs. The Company's commercial partners are obligated to report their net product sales and the resulting royalty due to the Company within 25 days for Bendeka and 60 days for Argatroban from the end of each quarter. Based on historical product sales, royalty receipts and other relevant information, the Company accrues royalty revenue each quarter and subsequently determines a true-up when it receives royalty reports from its commercial partners. Historically, these true-up adjustments have been immaterial.

73

*License and other revenue* — The Company analyzes each element of its licensing agreements to determine the appropriate revenue recognition. The terms of the license agreement may include payment to us of non-refundable up-front license fees, milestone payments if specified objectives are achieved, and/or royalties on product sales. The Company recognizes revenue from upfront payments at a point in time, typically upon fulfilling the delivery of the associated intellectual property to the customer.

If the contract contains a single performance obligation, the entire transaction price is allocated to the single performance obligation. Contracts that contain multiple performance obligations require an allocation of the transaction price based on the estimated relative standalone selling prices of the promised products or services underlying each performance obligation. The Company determines standalone selling prices based on the price at which the performance obligation is sold separately. If the standalone selling price is not observable through past transactions, the Company estimates the standalone selling price taking into account available information such as market conditions and internally approved pricing guidelines related to the performance obligations.

The Company recognizes sales-based milestone payments as revenue upon the achievement of the cumulative sales amount specified in the contract in accordance with ASC 606-10-55-65. For those milestone payments which are contingent on the occurrence of particular future events, the Company determined that these need to be considered for inclusion in the calculation of total consideration from the contract as a component of variable consideration using the most-likely amount method. As such, the Company assesses each milestone to determine the probability and substance behind achieving each milestone. Given the inherent uncertainty of the occurrence of these future events, the Company will not recognize revenue from the milestone until there is not a high probability of a reversal of revenue, which typically occurs near or upon achievement of the event.

When determining the transaction price of a contract, an adjustment is made if payment from a customer occurs either significantly before or significantly after performance, resulting in a significant financing component. Applying the practical expedient in paragraph 606-10-32-18, the Company does not assess whether a significant financing component exists if the period between when the Company performs its obligations under the contract and when the customer pays is one year or less. None of the Company's contracts contained a significant financing component as of December 31, 2019.

*Collaborative licensing and development revenue* — The Company recognizes revenue from reimbursements received in connection with feasibility studies and development work for third parties when its contractual services are performed, provided collectability is reasonably assured. Its principal costs under these agreements include its personnel conducting research and development, its allocated overhead, as well as the research and development performed by outside contractors or consultants.

Upon termination of a collaboration agreement, any remaining non-refundable license fees received by the Company, which had been deferred, are generally recognized in full. All such recognized revenues are included in collaborative licensing and development revenue in its statements of income. The Company recognizes revenue from milestone payments received under collaboration agreements when earned, provided that the milestone event is substantive, its achievability was not reasonably assured at the inception of the agreement, the Company has no further performance obligations relating to the event, and collectability is reasonably assured. If these criteria are not met, the Company recognizes milestone payments ratably over the remaining period of its performance obligations under the collaboration agreement.

*Stock-Based Compensation*

The Company accounts for stock-based compensation using the fair value provisions of ASC 718, Compensation - Stock Compensation that requires the recognition of compensation expense, using a fair-value based method, for costs related to all stock-based payments including stock options and restricted stock. This topic requires companies to estimate the fair value of the stock-based awards on the date of grant for options issued to employees and directors and record expense over the employees' service periods, which are generally the vesting period of the equity awards.

The Company accounts for stock-based compensation by measuring and recognizing compensation expense for all stock-based payments made to employees and directors based on estimated grant date fair values. The straight-line method is used to allocate compensation cost to reporting periods over each optionee's requisite service period, which is generally the vesting period. The fair value of the Company's stock-based awards to employees and directors is estimated using the Black-Scholes option valuation model, or Black-Scholes model. The Black-Scholes model requires the input of subjective assumptions, including the expected stock price volatility, the calculation of expected term, forfeitures and the fair value of the underlying common stock on the date of grant, among other inputs. The risk-free interest rate is determined with the implied yield currently available for zero-coupon U.S. government issues with a remaining term approximating the expected life of the options.

*Income Taxes*

The Company accounts for income taxes using the liability method in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC"), Topic 740 - Income Taxes ("ASC 740"). Deferred tax assets and liabilities are determined based on temporary differences between financial reporting and tax bases of assets and liabilities and are measured by applying enacted rates and laws to taxable years in which differences are expected to be recovered or settled. Further, the effect

74

on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that the rate changes.  A valuation allowance is required when it is "more likely than not" that all or a portion of deferred tax assets will not be realized. ASC 740 also prescribes a comprehensive model for how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that the company has taken or expects to take on a tax return, including a decision whether to file or not file a return in a particular jurisdiction.  We recognize any interest and penalties accrued related to unrecognized tax benefits as income tax expense.

*Other Intangible Assets, Net*

The Company capitalizes and includes in intangible assets the costs of acquired product licenses and developed technology purchased individually or identified in a business combination. Intangible assets are recorded at fair value at the time of their acquisition and stated net of accumulated amortization. The Company amortizes its definite-lived intangible assets using either the straight-line or accelerated method, based on the useful life of the asset over which it is expected to be consumed utilizing expected undiscounted future cash flows. The Company will evaluate the potential impairment of intangible assets if events or changes in circumstances indicate that the carrying amount of the assets may not be fully recoverable or that the useful lives of these assets are no longer appropriate. Events giving rise to impairment are an inherent risk in our industry and many factors cannot be predicted. Factors that we consider in deciding when to perform an impairment review include significant changes in our forecasted projections for the asset or asset group for reasons including, but not limited to, significant under-performance of a product in relation to expectations, significant changes or planned changes in our use of the assets, significant negative industry or economic trends, and new or competing products that enter the marketplace. The impairment test is based on a comparison of the undiscounted cash flows expected to be generated from the use of the asset group and its eventual disposition to the carrying value of the asset group. If impairment is indicated, the asset is written down by the amount by which the carrying value of the asset exceeds the related fair value of the asset with the related impairment charge recognized within the statements of income.

With respect to determining an asset's fair value and useful life, because this process involves management making certain estimates and these estimates form the basis of the determination of whether or not an impairment charge should be recorded, these estimates are considered to be critical accounting estimates.

*Goodwill*

Goodwill represents the excess of purchase price over the fair value of net assets acquired in an acquisition. Goodwill is not amortized, but is evaluated for impairment on an annual basis, in the fourth quarter, or more frequently if events or changes in circumstances indicate that the reporting unit's goodwill is less than it's carrying amount. The Company did not identify any impairment to goodwill during the periods presented.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

Market risk is the risk of change in fair value of a financial instrument due to changes in interest rates, equity prices, creditworthiness, financing, exchange rates or other factors. We are exposed to market risk related to changes in interest rates. As of December 31, 2019, we had cash and cash equivalents of $109.8 million held primarily in money market mutual funds. Our primary exposure to market risk is interest rate sensitivity, which is affected by changes in the general level of U.S. interest rates, however, due to the short-term duration of our money market mutual funds and the low risk profile of our investments, an immediate one percent change in interest rates would not have a material effect on the fair market value of our portfolio.

Our exposure to interest rate risk also relates to our variable-rate indebtedness associated with our Revised Credit Agreement. As of December 31, 2019 and 2018, the aggregate principal amount of such variable-rate indebtedness was $39.0 million and $44.4 million, respectively. Borrowings under the Revised Credit Agreement may from time to time bear interest at variable rates, which rates are further described in Note 6. Debt in the Consolidated Financial Statements included in Part IV, Item 15 of this report. As of December 31, 2019 and 2018, a hypothetical 1% increase in the applicable rate would not have a material effect on the incremental annual interest expense related to our variable-rate debt borrowings.

<p style="text-align:center">76</p>

**Item 8. Financial Statements and Supplementary Data**

Our Financial Statements and Supplementary Data and Report of Independent Registered Public Accounting Firm appear beginning on page F-1 attached to this Annual Report on Form 10-K.

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Not Applicable.

**Item 9A. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

As of December 31, 2019, an evaluation was conducted under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and Rule 15d-15(e) of the Exchange Act). Based on this evaluation, such officers have concluded that our disclosure controls and procedures were effective as of December 31, 2019. Management has concluded that our consolidated financial statements included in this Annual Report on Form 10-K fairly present, in all material respects, our financial condition, results of operations and cash flows for the periods presented therein.

**Management's Annual Report on Internal Control Over Financial Reporting**

The management of Eagle Pharmaceuticals, Inc. ("Eagle") has prepared, and is responsible for, Eagle's financial statements and related footnotes. These financial statements have been prepared in conformity with U.S. generally accepted accounting principles. Eagle's management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Securities Exchange Act of 1934 as a process designed by, or under the supervision of the Company's principal executive and principal financial officers and effected by the Company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of Eagle's assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of Eagle are being made only in accordance with authorizations of management and directors of Eagle; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of Eagle's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. Eagle's management conducted an assessment of the Company's internal control over financial reporting as of December 31, 2019 based upon the criteria established in "Internal Control - Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework). Based on this assessment, our management has concluded that, as of December 31, 2019, our internal control over financial reporting was effective.

BDO USA, LLP, the independent registered public accounting firm that audits our consolidated financial statements, has issued its attestation report on the Company's internal control over financial reporting as of December 31, 2019. This attestation report appears below.

/s/ Scott Tarriff

Chief Executive Officer and Director

(Principal Executive Officer)

/s/ Pete A. Meyers

Chief Financial Officer

(Principal Accounting and Financial Officer)

**Changes in Internal Control Over Financial Reporting**

There have been no changes in the Company's internal control over financial reporting during the quarter ended December 31, 2019 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

78

**Report of Independent Registered Public Accounting Firm**

Board of Directors and Stockholders
Eagle Pharmaceuticals, Inc.
Woodcliff Lake, NJ

**Opinion on Internal Control over Financial Reporting**

We have audited Eagle Pharmaceuticals, Inc. (the "Company's") internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission (the COSO criteria). In our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of Eagle Pharmaceuticals, Inc. as of December 31, 2019 and 2018, the related consolidated statements of income, changes in stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2019, and the related notes, and our report dated March 2, 2020 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying "Item 9A, Management's Annual Report on Internal Control over Financial Reporting". Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of internal control over financial reporting in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ BDO USA, LLP

Woodbridge, NJ

March 2, 2020

**Item 9B. Other information.**

None.

<div align="center">

**PART III**

</div>

**Item 10. Directors, Executive Officers and Corporate Governance**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 11. Executive Compensation**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 13.    Certain Relationships and Related Transactions and Director Independence**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 14. Principal Accountant Fees and Services**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

<div align="center">

80

</div>

PART IV

**Item 15. Exhibits and Financial Statement Schedules**

**(a) Documents filed as part of this report.**

The following documents are filed as part of this report:

### 1. Financial Statements

See Index to Financial Statements at Item 8 herein.

### 2. Financial Statement Schedules

Financial statement schedules have been omitted in this report because they are not applicable, not required under the instructions, or the information requested is set forth in the financial statements or related notes thereto.

### 3. Exhibits

The exhibits listed in the below index to exhibits are filed as part of, or incorporated by reference into, this report.

| Exhibit Number | | Description |
|---|---|---|
| 3.1 | | Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.2 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 3.2 | | Amended and Restated Bylaws (incorporated by reference to Exhibit 3.4 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 4.1 | | Form of Common Stock Certificate of the Registrant (incorporated by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 4.2 | | Third Amended and Restated Investor Rights Agreement, dated April 11, 2013, by and among the Registrant and certain of its stockholders (incorporated by reference to Exhibit 4.2 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 4.3 | (1) | Description of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934. |
| 10.1 | † | Form of Indemnification Agreement by and between the Registrant and its directors and officers (incorporated by reference to Exhibit 10.1 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.2 | † | Eagle Pharmaceuticals, Inc. 2007 Incentive Compensation Plan and Form of Stock Option Agreement thereunder (incorporated by reference to Exhibit 10.2 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), as amended December 15, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |
| 10.3 | † | Eagle Pharmaceuticals, Inc. 2014 Equity Incentive Plan, as amended and restated, and Form of Stock Option Agreement, Notice of Exercise and Stock Option Grant Notice thereunder (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015), as amended with an additional form of Stock Option Agreement (incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |
| 10.4 | † | Eagle Pharmaceuticals, Inc. 2014 Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.4 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 22, 2014) |
| 10.5 | † | Eagle Pharmaceuticals, Inc. Non-Employee Director Compensation Policy (incorporated by reference to Exhibit 10.5 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 22, 2014) |
| 10.6 | † | Employment Agreement by and between the Registrant and Scott Tarriff dated March 8, 2007, as amended (incorporated by reference to Exhibit 10.6 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |

81

| | | |
|---|---|---|
| 10.7 | † | Offer Letter by and between the Registrant and Adrian Hepner, dated December 11, 2014 (incorporated by reference to Exhibit 10.7 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 15, 2017) as amended by entry into the Eagle Pharmaceuticals, Inc. Officer Severance Benefit Plan on April 29, 2016 (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.8 | | Lease Agreement between the Registrant and Mack-Cali Chestnut Ridge L.L.C. dated May 28, 2013, as amended on July 1, 2013 (incorporated by reference to Exhibit 10.10 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on March 16, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K , SEC File No. 001-36306, filed March 20, 2015) |
| 10.9 | * | Development and License Agreement, by and between the Registrant and SciDose, LLC, dated September 24, 2007, as amended March 18, 2008, May 22, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.11(a) to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.10 | * | Development and License Agreement, by and between the Registrant and SciDose, LLC, dated June 12, 2007, as amended March 18, 2008, March 25, 2008, December 3, 2008, May 22, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.11(b) to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on August 5, 2015 (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.11 | * | License and Sublicense Agreement, by and between the Registrant and Lyotropic Therapeutics, Inc., dated October 16, 2008 (incorporated by reference to Exhibit 10.12 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.12 | * | License and Development Agreement, by and between the Registrant and The Medicines Company, effective as of September 24, 2009, as amended January 2010 and September 1, 2012 (incorporated by reference to Exhibit 10.13 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.13 | * | Supply Agreement, by and between the Registrant and The Medicines Company, dated September 24, 2009 (incorporated by reference to Exhibit 10.14 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.14 | * | Agreement for the Supply of Argatroban and Topotecan, by and between the Registrant and Cipla Limited, dated December 14, 2012, as amended August 30, 2013 (incorporated by reference to Exhibit 10.15 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.15 | * | Supply and Distribution Agreement, by and between the Registrant and Sandoz AG, dated January 28, 2013 (incorporated by reference to Exhibit 10.16 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.16 | * | Development and License Agreement, by and between the Registrant and Robert One, LLC (bendamustine), dated March 18, 2008, as amended November 11, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.17 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.17 | * | Development and License Agreement, by and between the Registrant and Robert One, LLC (pemetrexed), dated February 13, 2009, as amended May 22, 2009, December 23, 2010 and July 16, 2013 (incorporated by reference to Exhibit 10.18 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on August 5, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.18 | * | Exclusive License Agreement, by and between the Registrant and Cephalon, Inc., dated February 13, 2015 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q/A, SEC File No. 001-36306, filed February 12, 2016) |
| 10.19 | * | Settlement and License Agreement, by and between the Registrant and Cephalon, Inc., dated February 13, 2015 (incorporated by reference to Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed May 15, 2015) |
| 10.20 | † | Eagle Pharmaceuticals, Inc. Officer Severance Benefit Plan (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015), as amended and restated by the Eagle Pharmaceuticals, Inc. Amended and Restated Severance Benefit Plan (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 16, 2019). |
| 10.21 | † | Form of Letter Agreement (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |
| 10.22 | * | License Agreement, by and between the Registrant and Teikoku Pharma USA, Inc., dated October 13, 2015 (incorporated by reference to Exhibit 10.23 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 29, 2016) |
| 10.23 | * | Co-Promotion Agreement, by and between the Registrant and Spectrum Pharmaceuticals, Inc., dated November 4, 2015 (incorporated by reference to Exhibit 10.23 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 29, 2016) |
| 10.24 | † | Offer Letter by and between the Registrant and David Pernock dated January 2, 2017 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 19, 2016) |

| 10.25 | | Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated January 26, 2017 (incorporated by reference to Exhibit 10.26 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 15, 2017) as amended and restated by the Amended and Restated Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated August 8, 2017 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 9, 2017), and as amended and restated by the Second Amended and Restated Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated November 8, 2019 (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed November 12, 2019). |
| 10.26 | | Amendment to License and Sublicense Agreement, by and between the Registrant and Lyotropic Therapeutics, Inc., dated August 3, 2016 (incorporated by reference to Exhibit 10.27 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 15, 2017) |
| 10.27 | † | Offer Letter between the Registrant and Pete A. Meyers dated May 12, 2017 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed May 15, 2017) |
| 10.28 | * | Product Collaboration and License Agreement, by and between the Registrant and SymBio Pharmaceuticals Limited, effective as of September 19, 2017 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed November 8, 2017) |
| 10.29 | † | Form of Restricted Stock Unit Grant Package (2014 Equity Incentive Plan) (incoporated by reference to Exhibit 10.3 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 26, 2018) |
| 10.30 | † | Form of Performance Stock Unit Grant Package (2014 Equity Incentive Plan) (incorporated by reference to Exhibit 10.3 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 26, 2018) |
| 10.31 | | Stock Purchase Agreement, dated as of November 10, 2016, by and among Eagle Pharmaceuticals, Inc., Arsia Therapeutics, LLC, Arsia Therapeutics, Inc., Amy Schulman, as the Seller Representative, and each person that executed a joinder to the Purchase Agreement (incorporated herein by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed with the Commission on November 14, 2016) ), as amended by Amendment No. 1 to Stock Purchase Agreement, dated as of February 8, 2018 (incorporated herein by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K, SEC File No. 001-36306, filed with the Commission on February 14, 2018) |
| 10.32 | (1) | Fifth Amendment to Lease Agreement between the Registrant and CAPSTONE TICE BLVD LLC. dated as of August 8, 2019 |
| 10.33 | | Fourth Amendment to Exclusive License Agreement, by and between the Registrant and Teva Pharmaceuticals International GmbH, dated April 12, 2019 (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q filed on May 7, 2019). |
| 10.34 | (1)+ | Settlement Agreement, by and between the Registrant and Eli Lilly and Company, dated December 13, 2019. |
| 10.35 | (1)+ | Co-Promotion Agreement with Tyme Technologies, Inc., dated January 7, 2020. |
| 10.36 | | Securities Purchase Agreement, between the Registrant and Tyme Technologies, Inc., dated January 7, 2020 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on January 8, 2020). |
| 21.1 | (1) | List of subsidiaries of Eagle Pharmaceuticals, Inc. |
| 23.1 | (1) | Consent of BDO USA, LLP, an Independent Registered Public Accounting Firm |
| 24.1 | | Power of Attorney (incorporated by reference to this signature page of this Annual Report on Form 10-K) |
| 31.1 | (1) | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 31.2 | (1) | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 32.1 | (2) | Certifications of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | | iXBRL Instance Document – the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | | iXBRL Taxonomy Extension Schema |
| 101.CAL | | iXBRL Taxonomy Extension Calculation Linkbase |
| 101.DEF | | iXBRL Taxonomy Extension Definition Linkbase |
| 101.LAB | | iXBRL Taxonomy Extension Labels Linkbase |
| 101.PRE | | iXBRL Taxonomy Extension Presentation Linkbase |
| 104 | | Cover Page Interactive Data File, formatted as Inline XBRL, contained in Exhibit 101 attachments |

†Management contract or compensatory plan or arrangement.

*Confidential treatment granted as to certain portions, which portions are omitted and filed separately with the Securities and Exchange Commission.

83

+Certain portions of the exhibit (indicated by asterisks) have been omitted because they are not material and would likely cause competitive harm to the registrant if publicly disclosed.

(1) Filed herewith.

(2) Furnished (and not filed) herewith pursuant to Item 601 (b)(32)(ii) of Regulation S-K.

**Item 16. Form 10-K Summary**

None.

<div align="center">

**SIGNATURES**

</div>

<div align="center">

84

</div>

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on March 2, 2020.

**EAGLE PHARMACEUTICALS, INC.**

By:    <u>/s/ Scott Tarriff</u>
      Scott Tarriff
      Chief Executive Officer and Director
      (Principal Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

## POWER OF ATTORNEY

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Scott Tarriff and Pete A. Meyers, and each of them, his true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or either of them, or their or his substitutes or substitute, may lawfully do or cause to be done by virtue hereof.

85

| Signature | Title | Date |
| --- | --- | --- |
| /S/ SCOTT TARRIFF<br>Scott Tarriff | Chief Executive Officer and Director<br>(Principal Executive Officer) | March 2, 2020 |
| /S/ PETE A. MEYERS<br>Pete A. Meyers | Chief Financial Officer<br>(Principal Accounting and Financial Officer) | March 2, 2020 |
| /S/ MICHAEL GRAVES<br>Michael Graves | Chairman of the Board of Directors | March 2, 2020 |
| /S/ STEVEN RATOFF<br>Steven Ratoff | Member of the Board of Directors | March 2, 2020 |
| /S/ JENNIFER K. SIMPSON<br>Jennifer K. Simpson | Member of the Board of Directors | March 2, 2020 |
| /S/ ROBERT L. GLENNING<br>Robert L. Glenning | Member of the Board of Directors | March 2, 2020 |
| /S/ RICHARD A. EDLIN<br>Richard A. Edlin | Member of the Board of Directors | March 2, 2020 |

86

**INDEX TO FINANCIAL STATEMENTS OF
EAGLE PHARMACEUTICALS, INC.**

**APPENDIX A**

|                                                                    | Page   |
| ------------------------------------------------------------------ | ------ |
| Report of Independent Registered Public Accounting Firm            | F- 2   |
| Consolidated Balance Sheets                                        | F- 4   |
| Consolidated Statements of Income                                  | F- 5   |
| Consolidated Statements of Changes in Stockholders' Equity         | F- 6   |
| Consolidated Statements of Cash Flows                              | F- 7   |
| Notes to Consolidated Financial Statements                         | F- 9   |

F- 1

**Report of Independent Registered Public Accounting Firm**

Shareholders and Board of Directors
Eagle Pharmaceuticals, Inc.
Woodcliff Lake, NJ

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheets of Eagle Pharmaceuticals, Inc. and subsidiaries (the "Company") as of December 31, 2019 and 2018, the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the three years in the period ended December 31, 2019, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) ("PCAOB"), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") and our report dated March 2, 2020 expressed an unqualified opinion thereon.

**Change in Accounting Principles**

On January 1, 2019, the Company adopted Accounting Standards Update 2016-02, *Leases*. The effects of the adoption are described in Note 2 to the consolidated financial statements.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that: (i) relates to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

As described in Note 2 to the consolidated financial statements, revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring products or services to a customer. To the extent the transaction price includes variable consideration, the Company estimates the amount that should be included in the transaction price to which the Company expects to be entitled. Estimates of variable consideration are made using the expected value method and based largely on an assessment of the Company's anticipated performance and relevant information (historical, current and forecasted) that is reasonably available. The Company enters into revenue contracts with oncology distributors and hospital buying groups that give rise to variable consideration, including chargebacks, rebates, returns, prompt pay discounts, wholesaler fees and other deductions.

We identified the Company's estimation of variable consideration related to chargebacks and returns for certain product sales made to oncology supply centers and hospital buying groups as a critical audit matter. These estimates included consideration of: (i) assumptions related to the calculation of the related variable consideration, and (ii) limited historical sales and chargeback information. Auditing these elements involved especially challenging auditor judgment and a high degree of auditor subjectivity.

The primary procedures we performed to address this critical audit matter included:

- Testing the design and operating effectiveness of certain controls relating to management's calculation and review of the variable consideration.
- Assessing the reasonableness of underlying assumptions through: (i) evaluating historical sales, chargeback activity and returns, (ii) reviewing relevant supporting details including contracts with hospital buying groups, and (iii) performing retrospective reviews utilizing available historical information compared to estimates made in prior periods.
- Testing the completeness and accuracy of management's calculations by re-performing or independently calculating the variable consideration and reviewing relevant source documents including sales data, chargebacks and assumptions related to returns. Also, on a sample basis, we agreed underlying data used in management's calculations to the audited trial balances, relevant source documents and revenue contract terms.

/s/ BDO USA, LLP

We have served as the Company's auditor since 2007.

Woodbridge, NJ

March 2, 2020

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED BALANCE SHEETS**
(In thousands, except share amounts)

|  | December 31, 2019 | December 31, 2018 |
|---|---|---|
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 109,775 | $ 78,791 |
| Accounts receivable, net | 48,004 | 66,486 |
| Inventories | 6,566 | 8,304 |
| Prepaid expenses and other current assets | 15,104 | 10,263 |
| Total current assets | 179,449 | 163,844 |
| Property and equipment, net | 2,202 | 2,397 |
| Intangible assets, net | 15,583 | 18,103 |
| Goodwill | 39,743 | 39,743 |
| Deferred tax asset, net | 13,669 | 13,822 |
| Other assets | 3,908 | 694 |
| Total assets | $ 254,554 | $ 238,603 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current liabilities:** | | |
| Accounts payable | $ 5,462 | $ 9,917 |
| Accrued expenses and other liabilities | 28,361 | 23,519 |
| Current portion of long-term debt | 5,000 | 6,250 |
| Total current liabilities | 38,823 | 39,686 |
| Other long-term liabilities | 3,000 | — |
| Long-term debt, less current portion | 33,557 | 38,155 |
| Total liabilities | 75,380 | 77,841 |
| Commitments and contingencies | | |
| **Stockholders' equity:** | | |
| Preferred stock, 1,500,000 shares authorized and no shares issued or outstanding as of December 31, 2019 and 2018 | — | — |
| Common stock, $0.001 par value; 50,000,000 shares authorized; 16,537,846 and 16,504,283 shares issued as of December 31, 2019 and 2018, respectively | 17 | 17 |
| Additional paid in capital | 278,518 | 256,458 |
| Retained earnings | 72,500 | 58,187 |
| Treasury stock, at cost, 2,907,687 and 2,590,258 shares as of December 31, 2019 and 2018, respectively | (171,861) | (153,900) |
| Total stockholders' equity | 179,174 | 160,762 |
| Total liabilities and stockholders' equity | $ 254,554 | $ 238,603 |

See accompanying notes to consolidated financial statements

F- 4

**EAGLE PHARMACEUTICALS, INC**
**CONSOLIDATED STATEMENTS OF INCOME**
**(In thousands, except share and per share amounts)**

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2019** | **2018** | **2017** |
| **Revenue:** | | | |
| Product sales | $ 73,989 | $ 70,385 | $ 45,327 |
| Royalty revenue | 112,903 | 142,927 | 153,880 |
| License and other revenue | 9,000 | — | 37,500 |
| Total revenue | 195,892 | 213,312 | 236,707 |
| **Operating expenses:** | | | |
| Cost of product sales | 47,891 | 42,374 | 33,714 |
| Cost of royalty revenue | 13,006 | 19,542 | 23,472 |
| Research and development | 36,810 | 44,419 | 32,607 |
| Selling, general and administrative | 76,370 | 60,509 | 71,416 |
| Restructuring charge | — | 7,911 | — |
| Asset impairment charge | — | 2,704 | 7,235 |
| Change in fair value of contingent consideration | — | (763) | (7,377) |
| Legal settlement | — | — | 1,650 |
| Total operating expenses | 174,077 | 176,696 | 162,717 |
| Income from operations | 21,815 | 36,616 | 73,990 |
| Interest income | 2,169 | 158 | 91 |
| Interest expense | (2,686) | (2,736) | (1,136) |
| Other income | 700 | — | — |
| Total other income (expense), net | 183 | (2,578) | (1,045) |
| **Income before income tax** | 21,998 | 34,038 | 72,945 |
| Income tax provision | 7,685 | 2,135 | 21,002 |
| **Net income** | $ 14,313 | $ 31,903 | $ 51,943 |
| Earnings per share: | | | |
| Basic | $ 1.04 | $ 2.16 | $ 3.44 |
| Diluted | $ 1.01 | $ 2.09 | $ 3.27 |
| Weighted average number of common shares outstanding: | | | |
| Basic | 13,754,516 | 14,768,625 | 15,102,890 |
| Diluted | 14,138,733 | 15,278,651 | 15,908,211 |

See accompanying notes to consolidated financial statements

F- 5

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
(In thousands)

| | Common Stock | | Additional Paid-In Capital | Treasury Stock | (Accumulated Deficit) Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|---|
| | Number of Shares | Amount | | | | |
| **Balance at December 31, 2016** | **15,891** | **$ 16** | **$ 213,872** | **$ (37,003)** | **$ (25,659)** | **$ 151,226** |
| Stock-based compensation expense | — | — | 15,429 | — | — | 15,429 |
| Issuance of common stock upon exercise of stock option grants | 198 | — | 4,338 | — | — | 4,338 |
| Common stock repurchases | — | — | — | (43,792) | — | (43,792) |
| Net income | — | — | — | — | 51,943 | 51,943 |
| **Balance at December 31, 2017** | **16,089** | **$ 16** | **$ 233,639** | **$ (80,795)** | **$ 26,284** | **$ 179,144** |
| Stock-based compensation expense | — | — | 19,082 | — | — | 19,082 |
| Issuance of common stock upon exercise of stock option grants | 415 | 1 | 8,614 | — | — | 8,615 |
| Payments for employee net option exercises | — | — | (4,877) | — | — | (4,877) |
| Common stock repurchases | — | — | — | (73,105) | — | (73,105) |
| Net income | — | — | — | — | 31,903 | 31,903 |
| **Balance at December 31, 2018** | **16,504** | **$ 17** | **$ 256,458** | **$ (153,900)** | **$ 58,187** | **$ 160,762** |
| Stock-based compensation expense | — | — | 21,998 | — | — | 21,998 |
| Issuance of common stock upon exercise of stock option grants | 34 | — | 260 | — | — | 260 |
| Payment of employee withholding tax upon vesting of stock-based awards | — | — | (198) | — | — | (198) |
| Common stock repurchases | | | | (17,961) | | (17,961) |
| Net income | — | — | — | — | 14,313 | 14,313 |
| **Balance at December 31, 2019** | **16,538** | **$ 17** | **$ 278,518** | **$ (171,861)** | **$ 72,500** | **$ 179,174** |

See accompanying notes to consolidated financial statements

F- 6

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In thousands)

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| **Cash flows from operating activities:** | | | |
| Net income | $ 14,313 | $ 31,903 | $ 51,943 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Deferred income taxes | 152 | (2,468) | 17,289 |
| Depreciation expense | 2,131 | 1,155 | 932 |
| Amortization expense | 2,520 | 2,515 | 2,815 |
| Stock-based compensation expense | 21,998 | 19,082 | 15,429 |
| Change in fair value of contingent consideration | — | (763) | (7,377) |
| Amortization of debt issuance costs | 480 | 376 | 222 |
| Asset impairment charge | — | 2,704 | 7,235 |
| Non-cash restructuring charge | — | 5,769 | — |
| **Changes in operating assets and liabilities which provided (used) cash:** | | | |
| Accounts receivable | 18,481 | (12,665) | (11,627) |
| Inventories | 1,739 | (5,556) | (2,379) |
| Prepaid expenses and other current assets | (4,841) | 4,838 | 1,993 |
| Other assets | (599) | (570) | — |
| Accounts payable | (4,455) | (2,064) | (8,460) |
| Accrued expenses and other liabilities | 4,067 | 8,128 | (9,096) |
| Net cash provided by operating activities | 55,986 | 52,384 | 58,919 |
| **Cash flows from investing activities:** | | | |
| Purchase of property and equipment | (777) | (133) | (4,436) |
| Payment for Ryanodex intangible asset | — | — | (750) |
| Net cash used in investing activities | (777) | (133) | (5,186) |
| **Cash flows from financing activities:** | | | |
| Repurchases of common stock | (17,961) | (73,105) | (43,792) |
| Payment of contingent consideration | — | (15,000) | — |
| Proceeds from long-term debt | — | — | 50,000 |
| Payment of debt | (6,000) | (3,750) | (1,250) |
| Payment of debt financing costs | (326) | — | (1,192) |
| Payment of employee withholding tax upon vesting of stock-based awards | (198) | — | — |
| Payments for employee net option exercises | — | (4,877) | — |
| Proceeds from common stock option exercises | 260 | 8,615 | 4,338 |
| Net cash (used in) provided by financing activities | (24,225) | (88,117) | 8,104 |
| **Net increase (decrease) in cash and cash equivalents** | 30,984 | (35,866) | 61,837 |
| **Cash and cash equivalents at beginning of period** | 78,791 | 114,657 | 52,820 |
| **Cash and cash equivalents at end of period** | $ 109,775 | $ 78,791 | $ 114,657 |

See accompanying notes to consolidated financial statements

F- 7

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In thousands)

|  | | Year Ended December 31, | | | | |
|  | | 2019 | | 2018 | | 2017 |
|---|---|---|---|---|---|---|
| **Supplemental disclosures of cash flow information:** | | | | | | |
| **Cash paid during the period for:** | | | | | | |
| Income taxes, net | $ | 6,673 | $ | 2,281 | $ | 10,542 |
| Interest | | 2,478 | | 2,084 | | 651 |
| Right-of-use asset obtained in exchange for lease obligation - lease amendment | | 3,716 | | — | | — |

See accompanying notes to consolidated financial statements
F- 8

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(In thousands, except share and per share amounts)

## 1. Organization and Business

Eagle Pharmaceuticals, Inc. (the "Company" or "we") is a specialty pharmaceutical company primarily focused on developing and commercializing injectable products, primarily in the Central Nervous System ("CNS") critical care and oncology areas, using the U.S. Food and Drug Administration's ("FDA's") 505(b)(2) New Drug Application ("NDA") regulatory pathway. The Company's business model is to develop proprietary innovations to FDA-approved injectable drugs, referred to as branded reference drugs, that offer favorable attributes to patients and healthcare providers. The Company has two products currently being sold in the United States under various license agreements in place with commercial partners; a ready-to-use formulation of Argatroban and rapidly infused bendamustine RTD 50ml solution ("Bendeka"). In addition, the Company directly sells two products in the United States; Eagle's bendamustine RTD 500ml solution ("Belrapzo") and Ryanodex®(dantrolene sodium) ("Ryanodex"). The Company has a number of products currently under development and certain products may be subject to license agreements. We view our operation and manage our business as one reporting segment since the majority of our revenues are from royalties.

On February 13, 2015, the Company submitted a NDA to the FDA for Bendeka, which was approved by the FDA on December 7, 2015. Also, on February 13, 2015, the Company entered into an Exclusive License Agreement (the "Cephalon License") with Cephalon, Inc. ("Cephalon"), a wholly-owned subsidiary of Teva Pharmaceutical Industries Ltd. ("Teva"), for U.S. and Canadian rights to Bendeka for treatment of patients with chronic lymphocytic leukemia ("CLL") and patients with non-Hodgkin's lymphoma ("NHL"). Subsequently, with the consent of the Company, Cephalon assigned to Teva Pharmaceuticals International GmbH ("TPIG") all of Cephalon's rights and obligations under the Cephalon License. Accordingly, all references to "Cephalon" or to the "Cephalon License" and the related supply agreements for Bendeka should be read and construed as references to TPIG and to the license agreement and supply agreements for Bendeka to which the Company and TPIG are now parties. Pursuant to the terms of the Cephalon License, Cephalon will be responsible for all U.S. commercial activities for the product including promotion and distribution, and the Company is responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies. In connection with the Cephalon License, the Company has entered into a supply agreement with Cephalon, pursuant to which the Company is responsible for supplying product to Cephalon. During the quarter-ended September 30, 2016, the Company entered into an amendment to the Cephalon License and supply agreements for Bendeka. This amendment expanded the geographical scope of the rights granted under the original agreement to include territories outside the U.S. and Canada.

Additionally, under the terms of the Cephalon License, the Company received an upfront cash payment of $30 million in February 2015, earned a $15 million milestone payment related to the FDA approval of Bendeka in December 2015, earned $40 million in November 2016 related to the receipt of a unique, product-specific billing code, J-code (J9034), for Bendeka and earned $25 million in March 2017 for an additional sales-based milestone payment. In addition, the Company was entitled to receive royalty payments of 20% of net sales of the product, which increased to 25% on receipt of the J-code.

On August 9, 2016, the Company announced a share repurchase program approved by the Company's board of directors authorizing the repurchase of up to $75.0 million of the Company's common stock (the "Share Repurchase Program"). On August 9, 2017, the Company announced a new share repurchase program approved by the Board, under which the Company may repurchase up to an additional $100 million of its outstanding common stock (the "New Share Repurchase Program"). Under the Share Repurchase Program and the New Share Repurchase Program, the Company is authorized to repurchase shares through open market purchases, privately-negotiated transactions or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. The Share Repurchase Programs have no time limit and may be suspended or discontinued completely at any time. The specific timing and amount of repurchases will vary based on available capital resources and other financial and operational performance, market conditions, securities law limitations, and other factors. The repurchases will be made using the Company's cash resources. In any period, cash used in financing activities related to shares repurchased may differ from the comparable change in stockholders' equity, reflecting timing differences between the recognition of share repurchase transactions and their settlement for cash.

On October 30, 2018, the Company announced that its Board of Directors has approved a new share repurchase program providing for the repurchase of up to $150 million of the Company's outstanding common stock, consisting of (i) up to $50 million in repurchases pursuant to an accelerated share repurchase agreement (the "ASR") with JPMorgan Chase Bank, N.A. ("JPMorgan"), and (ii) up to $100 million in additional repurchases (the "2018 Share Repurchase Program"). In connection with its approval of the 2018 Share Repurchase Program, the Board terminated the Company's 2016 Share Repurchase Program and 2017 Share Repurchase Program in October 2018. During the fourth quarter of 2018, the Company repurchased 1,000,134 shares of outstanding common stock for $50 million pursuant to the ASR.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

The Company repurchased 1,348,563 shares of common stock for $73.1 million during the year ended December 31, 2018 and an aggregate of 2,590,258 shares of common stock for $153.9 million through December 31, 2018.

On February 8, 2018, we entered into an amendment (the "Arsia Amendment") to the stock purchase agreement dated November 10, 2016 (the "Arsia SPA"), pursuant to which we acquired from Arsia Therapeutics, LLC (the "Seller") all of the outstanding capital stock of Arsia Therapeutics, Inc. Pursuant to the Arsia Amendment, our obligations to make four separate milestone payments pursuant to the Arsia SPA, which could have aggregated to a total of $48 million, were terminated in exchange for a single payment of $15 million to the Seller.

On November 8, 2019, the Company entered into the Second Amended and Restated Credit Agreement (the "Revised Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") and the lenders party thereto, which replaced the Company's existing credit agreement, dated as of August 8, 2017 (the "Amended Credit Agreement"). Refer to Note 6. "Debt" for further details.

On September 20, 2017, the Company entered into a Product Collaboration and License Agreement, effective as of September 19, 2017, (the "SymBio License Agreement") with SymBio Pharmaceuticals Limited ("SymBio") for the rights to develop and commercialize the Company's bendamustine hydrochloride ready-to-dilute injection product and rapid infusion injection product (collectively, the "Products") in Japan. Under the License Agreement, SymBio will be responsible for all development of the Products in Japan and for obtaining and maintaining all regulatory approvals of the Products in Japan, with a target for regulatory approval of a Product in Japan in 2020. SymBio will bear all costs of development of the Products in Japan except that, if Japanese regulatory authorities require a certain clinical study to be conducted as a condition for approving one of the Products in Japan, Eagle would share 50% of the out-of-pocket costs of that clinical study up to a specified dollar amount as a reduction to future royalty payments. Based on the Company's assessment of the probability of additional costs, we have not deferred revenue on the Symbio License Agreement. SymBio will also be responsible, at its sole cost, for all marketing, promotion, distribution and sales of the Products in Japan and is obligated to launch the Products and meet certain minimum detailing, promotion and marketing commitments in connection with commercialization of the Products in Japan.

SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma ("MCL"), and as a first line treatment of low-grade NHL and MCL. Under the SymBio License Agreement, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

Pursuant to the terms of the SymBio License Agreement, the Company and SymBio will enter into a separate supply agreement, under which the Company will be responsible for manufacturing and supplying the Products to SymBio for development and commercialization in Japan. After a period of time following launch of a Product, SymBio will have the right to assume the responsibility for manufacturing of the Products in and for Japan. Under the SymBio License Agreement, the Company will retain the right to control the prosecution, maintenance and enforcement of the Company's patents covering the Products, both inside and outside of Japan.

Under the SymBio License Agreement, the Company earned an upfront non-refundable cash payment of $12.5 million in the third quarter of 2017, and is eligible to receive a milestone payment upon approval of a Product in Japan and a milestone payment upon achievement of certain cumulative net sales of the Products in Japan, which can aggregate to a total of approximately $10.0 million (subject to currency fluctuations). After regulatory approval of a Product in Japan, the Company will also receive tiered, low double-digit royalties on net sales of the Products in Japan for so long as there are patents covering the Products in Japan or regulatory exclusivity for the Products in Japan.

In March 2018, the FDA approved a second manufacturing site for Bendeka.

On April 16, 2018, the Company announced the FDA's acceptance of the Company's ANDA filing for vasopressin injection, 1ml. This product is the generic version of Endo International plc's original Vasostrict® formulation, which is indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

On May 15, 2018, the FDA granted final approval for Eagle's ready-to-dilute bendamustine hydrochloride solution in a 500ml admixture for the treatment of patients with chronic lymphocytic leukemia ("CLL") and patients with indolent B-cell non-Hodgkin lymphoma ("NHL") that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.

On March 24, 2016 the FDA denied the Company's request for seven years of orphan drug exclusivity in the U.S., for Bendeka. In April 2016, the Company filed a lawsuit against the FDA arguing that Bendeka is entitled to orphan drug exclusivity as a matter of law (see Note 13. Legal Proceedings). On July 2, 2014, the FDA granted the Company orphan drug designations for Bendeka for the treatment of CLL and indolent B-cell NHL. The designations were based on a plausible hypothesis that Bendeka is "clinically superior" to a drug previously approved for the same indications. Generally, an orphan-designated drug is eligible for seven years of marketing exclusivity for the orphan-designated indications upon approval of the drug for those indications. On June 8, 2018, the U.S. District Court for the District of Columbia (the "Court") issued a decision requiring the FDA to grant seven years of orphan drug exclusivity ("ODE") in the U.S., for Bendeka, and on July 8, 2018 the FDA granted such ODE through December 2022. In addition, on July 8, 2018, the FDA submitted a Motion to Alter or Amend the Judgement Pursuant to Rule 59(e), pursuant to which the FDA requested the Court amend its decision to make clear that the decision does not affect any applications referencing TREANDA. The FDA's motion was denied by the Court on August 1, 2018 on the grounds that FDA was seeking an inappropriate advisory opinion. On February 20, 2019, the FDA issued a decision in favor of the Company, regarding the scope of exclusivity for Bendeka. Pursuant to the decision, no bendamustine product (including generic versions of TREANDA) may launch in the United States until December 7, 2022 unless it is clinically superior to Bendeka. The Company expects to vigorously pursue the scope of its exclusivity grant.

In June 2018, as part of an ongoing organizational review, the Company began a restructuring initiative to rationalize its product portfolio and focus its physical sites. These measures include the discontinuation of manufacture and distribution of Non-Alcohol Docetaxel Injection and plans to rationalize research and development operations. The Company ceased selling the product by September 30, 2018.

On October 3, 2018, the Company announced that it entered into an agreement with the United States Army Medical Research Institute of Chemical Defense, the nation's leading science and technology laboratory in the area of medical chemical countermeasures research and development, to conduct a study to evaluate the neuroprotective effects of Ryanodex® (dantrolene sodium).

On October 30, 2018, the Company announced that the Company's fulvestrant formulation has not met the primary pharmacokinetic endpoint evaluating the bioequivalence of the Company's formulation compared to Faslodex in its open label, randomized, pharmacokinetic and safety study conducted in 600 healthy female volunteers across multiple U.S. sites.

As of March 29, 2019, the Company and Teva Pharmaceutical Industries Ltd. ("Teva") executed an amendment to the Cephalon License Agreement to terminate Teva's obligation to pay future milestones and royalties on Bendeka sales outside of the U.S., which included an upfront cash payment of $9 million that was recorded as License and other revenue on the consolidated statements of income.

On April 13, 2019, the Company and Teva entered into an Amendment to the Cephalon License Agreement ("Cephalon License", amending the terms of the License Agreement to increase the U.S. royalty paid to the Company and re-allocated certain litigation expenses. Pursuant to the Amendment, beginning on October 1, 2019, the Company's royalty payment has increased from 25% to 30% of Bendeka net U.S. sales. The royalty rate will increase by one percentage point on each anniversary of October 1, 2019 until it reaches 32%, and it will remain at 32% thereafter. The Amendment also extends the U.S. royalty term for Bendeka until it is no longer sold in the United States. The previous U.S. royalty term was set to expire in 2025. The extended term coincides with the bendamustine patents with expiries through 2033. Pursuant to the amendment, Eagle will continue to be responsible for the manufacture of Bendeka for the U.S. market for so long as it is sold in the United States.

On May 7, 2019, the Company announced positive results of its study to evaluate the neuroprotective effects of Ryanodex secondary to nerve agent exposure, conducted with the United States Army Medical Research Institute of Chemical Defense.

On December 13, 2019, we reached a settlement agreement with Eli Lilly and Company related to the Company's novel product, PEMFEXY™ (pemetrexed for injection), a branded alternative to ALIMTA®. The agreement provides for a release of

F- 11

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

all claims by the parties and allows for an initial entry of PEMFEXY™ into the market (equivalent to approximately a three week supply of current ALIMTA®utilization) on February 1, 2022 and a subsequent uncapped entry on April 1, 2022.

On December 16, 2019, we announced that the FDA has granted orphan drug designation (ODD) for Ryanodex®(dantrolene sodium) for the treatment of organophosphate exposure. Organophosphates are a class of chemicals that include potent pesticides and chemical weapons, known as nerve agents. Acute intoxication with organophospates may result in severe consequences, including brain damage and death. About 2,700 people in the United States are treated for accidental exposure to organophosphate pesticides every year. Eagle is currently evaluating Ryanodex for the treatment of brain damage secondary to nerve agent exposure. If approved, Ryanodex would represent the first product available for this indication.

On January 6, 2020, we issued a press release announcing a new research agreement with NorthShore University HealthSystem in Evanston, Illinois, focused on studying Ryanodex for traumatic brain injury (TBI) in animal models. TBI can acutely cause brain lesions that result in direct tissue damage that may prompt apoptotic cell mechanisms for several weeks post-injury, which may lead to worsened long-term outcomes. Disruption of certain intracellular mechanisms may affect cell functioning and survival.

On January 7, 2020, Tyme Technologies, Inc. and the Company announced a strategic collaboration to advance oral SM-88 for the treatment of patients with cancer. SM-88 is an investigational agent in two Phase 2 studies for pancreatic cancer and in a Phase 2 study for prostate cancer. Data is expected in 2021.

On January 9, 2020, we announced that the Company has resubmitted its New Drug Application ("NDA") for Ryanodex®(dantrolene sodium for injectable suspension) for the treatment of exertional heat stroke ("EHS"), in addition to body cooling, to the FDA. Eagle believes that this submission addresses the Complete Response Letter received in July 2017. A Prescription Drug User Fee Act ("PDUFA") date of six months is anticipated for this class of resubmissions.

On January 13, 2020, we issued a press release announcing that the Company and the University of Pennsylvania had agreed on terms of a new exclusive worldwide license agreement for the development of dantrolene sodium for the potential treatment of people living with Alzheimer's disease, including an agreement to fund additional research and provisions regarding commercialization of products developed under the license.

On February 10, 2020, we announced that it has received final approval from the FDA for its novel product, PEMFEXY™ (pemetrexed for injection), a branded alternative to ALIMTA®.

## 2. Summary of Significant Accounting Policies

### Use of Estimates

These financial statements are presented in U.S. dollars and are prepared in accordance with U.S. GAAP. The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported in the financial statements including disclosure of contingent assets and contingent liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period and accompanying notes. The Company's critical accounting policies are those that are both most important to the Company's financial condition and results of operations and require the most difficult, subjective or complex judgments on the part of management in their application, often as a result of the need to make estimates about the effect of matters that are inherently uncertain. Because of the uncertainty of factors surrounding the estimates or judgments used in the preparation of the financial statements, actual results may materially vary from these estimates.

### Reclassifications

Certain reclassifications have been made to prior year amounts to conform with the current year presentation. None of the reclassifications were significant.

### Cash and Cash Equivalents

The Company considers all highly liquid investments with an original maturity of three months or less to be cash equivalents. All cash and cash equivalents are held in United States financial institutions. The carrying amount of cash and cash equivalents approximates its fair value due to its short-term nature.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

The Company, at times, maintains balances with financial institutions in excess of the FDIC limit.

*Fair Value Measurements*

U.S. GAAP establishes a framework for measuring fair value under generally accepted accounting principles and enhances disclosures about fair value measurements. Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Valuation techniques used to measure fair value must maximize the use of observable inputs and minimize the use of unobservable inputs. The standard describes the following fair value hierarchy based on three levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value:

- Level 1: Quoted prices in active markets for identical assets or liabilities.
- Level 2: Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.
- Level 3: Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

The fair value of interest-bearing cash, cash equivalents, accounts receivable and accounts payable approximate fair value due to their life being short term in nature, and are classified as Level 1 for all periods presented.

The fair value of debt is classified as Level 2 for the periods presented and approximates its fair value due to the variable interest rate.

The fair value of the accrued royalty is classified as Level 3 for the period presented.

*Intangible Assets*

*Other Intangible Assets, Net*

The Company capitalizes and includes in intangible assets the costs of acquired product licenses and developed technology purchased individually or identified in a business combination. Intangible assets are recorded at fair value at the time of their acquisition and stated net of accumulated amortization. The Company amortizes its definite-lived intangible assets using either the straight-line or accelerated method, based on the useful life of the asset over which it is expected to be consumed utilizing expected undiscounted future cash flows. The Company will evaluate the potential impairment of intangible assets if events or changes in circumstances indicate that the carrying amount of the assets may not be fully recoverable or that the useful lives of these assets are no longer appropriate. Events giving rise to impairment are an inherent risk in our industry and many factors cannot be predicted. Factors that we consider in deciding when to perform an impairment review include significant changes in our forecasted projections for the asset or asset group for reasons including, but not limited to, significant under-performance of a product in relation to expectations, significant changes or planned changes in our use of the assets, significant negative industry or economic trends, and new or competing products that enter the marketplace. The impairment test is based on a comparison of the undiscounted cash flows expected to be generated from the use of the asset group and its eventual disposition to the carrying value of the asset group. If impairment is indicated, the asset is written down by the amount by which the carrying value of the asset exceeds the related fair value of the asset with the related impairment charge recognized within the statements of income.

With respect to determining an asset's fair value and useful life, because this process involves management making certain estimates and these estimates form the basis of the determination of whether or not an impairment charge should be recorded, these estimates are considered to be critical accounting estimates.

*Goodwill*

Goodwill represents the excess of purchase price over the fair value of net assets acquired in the Eagle Biologics acquisition described in Note 11. Goodwill is not amortized, but is evaluated for impairment on an annual basis, in the fourth quarter, or more frequently if events or changes in circumstances indicate that the fair value of the reporting unit's goodwill is less than it's carrying amount. The Company did not identify any impairment to goodwill during the periods presented.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

*Acquisition-Related Contingent Consideration*

Contingent consideration related to a business combination is recorded on the acquisition date at the estimated fair value of the contingent payments. The acquisition date fair value is measured based on the consideration expected to be transferred using probability-weighted assumptions and discounted back to present value. The discount rate used is determined at the time of the acquisition in accordance with accepted valuation methods. The fair value of the acquisition-related contingent consideration is re-measured at the estimated fair value at each reporting period with the change in fair value recognized as income or expense in the consolidated statements of income.

*Concentration of Major Customers and Vendors*

The Company is dependent on its commercial partner to market and sell Bendeka; therefore, the Company's future revenues are highly dependent on the collaboration and distribution arrangement with Teva.

Teva markets Bendeka through a license agreement with the Company. Pursuant to that license agreement, Teva pays the Company a royalty based on net sales of the product and also purchases the product from the Company. A disruption in this arrangement, caused by among other things, a supply disruption, loss of exclusivity or the launch of a superior product would have a material adverse effect of the Company's financial position, results of operations and cash flows.

The total revenues and accounts receivables broken down by major customers as a percentage of the total are as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2019** | **2018** | **2017** |
| **Net revenues** | | | |
| Cephalon, Inc. (Teva) - See Revenue Recognition | 77% | 75% | 79% |
| Other | 23% | 25% | 21% |
| | 100% | 100% | 100% |

| | December 31, | |
| --- | --- | --- |
| | **2019** | **2018** |
| **Accounts receivable** | | |
| Cephalon, Inc. (Teva) - See Revenue Recognition | 80% | 61% |
| Other | 20% | 39% |
| | 100% | 100% |

*Inventories*

Inventories are recorded at the lower of cost or net realizable value, with cost determined on a first-in first-out basis. The Company periodically reviews the composition of its inventories in order to identify obsolete, slow-moving or otherwise non-saleable items. If non-saleable items are observed and there are no alternate uses for the inventories, the Company will record a write-down to net realizable value in the period that the decline in value is first recognized.

*Property and Equipment*

Property and equipment are stated at cost. Depreciation is recorded over the estimated useful lives of the assets utilizing the straight-line method. Leasehold improvements are being amortized over the shorter of their useful lives or the lease term.

*Research and Development Expense*

Costs for research and development are charged to expense as incurred and include; employee-related expenses including salaries, benefits, travel and stock-based compensation expense for research and development personnel; expenses incurred under agreements with contract research organizations, contract manufacturing organizations and service providers that assist in

conducting clinical and preclinical studies; costs associated with preclinical activities and development activities, costs associated with regulatory operations; and depreciation expense for assets used in research and development activities.

Costs for certain development activities, such as clinical studies, are recognized based on an evaluation of the progress to completion of specific tasks using data such as patient enrollment, clinical site activations, or information provided to the Company by its vendors on their actual costs incurred. Payments for these activities are based on the terms of the individual arrangements, which may differ from the patterns of costs incurred, and are reflected in the consolidated financial statements as prepaid expenses or accrued expenses as deemed appropriate. Recoveries of previously recognized research and development expenses from third parties are recorded as a reduction to research and development expense in the period it becomes realizable.

### *Advertising and Marketing*

Advertising and marketing costs are expensed as incurred. Advertising and marketing costs were $2,374, $3,312, and $17,770 for the year ended December 31, 2019, 2018, and 2017, respectively.

### *Income Taxes*

The Company accounts for income taxes using the liability method in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC"), Topic 740 - Income Taxes ("ASC 740"). Deferred tax assets and liabilities are determined based on temporary differences between financial reporting and tax bases of assets and liabilities and are measured by applying enacted rates and laws to taxable years in which differences are expected to be recovered or settled. Further, the effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that the rate changes. A valuation allowance is required when it is "more likely than not" that all or a portion of deferred tax assets will not be realized. ASC 740 also prescribes a comprehensive model for how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that the company has taken or expects to take on a tax return, including a decision whether to file or not file a return in a particular jurisdiction. We recognize any interest and penalties accrued related to unrecognized tax benefits as income tax expense.

### *Revenue Recognition*

Revenue is recognized when a customer obtains control of promised goods or services, in an amount that reflects the consideration which the entity expects to receive in exchange for those goods or services. To determine revenue recognition for arrangements that an entity determines are within the scope of ASC 606, the Company performs the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. The Company only applies the five-step model to contracts when it is probable that the entity will collect the consideration it is entitled to in exchange for the goods or services it transfers to the customer. At contract inception, once the contract is determined to be within the scope of ASC 606, the Company assesses the goods or services promised within each contract and determines those that are performance obligations, and assesses whether each promised good or service is distinct. The Company then recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when (or as) the performance obligation is satisfied. Sales, value add, and other taxes collected on behalf of third parties are excluded from revenue.

*Product revenue* - The Company recognizes net revenue on sales to its commercial partners and to end users. In each instance, revenue is generally recognized when the customer obtains control of the Company's product, which occurs at a point in time, and may be upon shipment or upon delivery based on the contractual shipping terms of a contract. Receivables from our product sales have payment terms ranging from 30 to 75 days with select extended terms to wholesalers on initial purchases of product launch quantities.

Revenue on sales to commercial partners relates primarily to Bendeka. Sales to our commercial partners are presented gross because the Company is primarily responsible for fulfilling the promise to provide the product, is responsible to ensure that the product is produced in accordance with the related supply agreement and bears risk of loss while the inventory is in-transit to the commercial partner.

Revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring products or services to a customer. To the extent the transaction price includes variable consideration, the Company estimates the amount of

F- 15

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

variable consideration that should be included in the transaction price utilizing the expected value method to which the Company expects to be entitled. As such, revenue on sales to end users for Belrapzo and Ryanodex are recorded net of chargebacks, rebates, returns, prompt pay discounts, wholesaler fees and other deductions. Our products are contracted with a limited number of oncology distributors and hospital buying groups with narrow differences in ultimate realized contract prices used to estimate our chargeback and rebate reserves. The Company has a product returns policy on some of its products that allows the customer to return pharmaceutical products within a specified period of time both prior to and subsequent to the product's expiration date. The Company's estimate of the provision for returns is analyzed quarterly and is based upon many factors, including historical experience of actual returns and analysis of the level of inventory in the distribution channel, if any. The Company has terms on sales of Ryanodex by which the Company does not accept returns. Variable consideration is included in the transaction price if, in the Company's judgment, it is probable that a significant future reversal of cumulative revenue under the contract will not occur. Estimates of variable consideration are made using the expected value method and determination of whether to include estimated amounts in the transaction price are based largely on an assessment of the Company's anticipated performance and all information (historical, current and forecasted) that is reasonably available. The Company believes that the estimates it has established are reasonable based upon current facts and circumstances. Applying different judgments to the same facts and circumstances could result in the estimated amounts to vary.

The Company recorded product sales as follows:

|  | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2019 | | 2018 | | 2017 | |
|  | (in thousands) | | | | | |
| Bendeka | $ | 31,182 | $ | 24,568 | $ | 16,225 |
| Belrapzo |  | 29,665 |  | 22,853 |  | — |
| Ryanodex |  | 13,039 |  | 20,195 |  | 17,500 |
| Other |  | 103 |  | 2,769 |  | 11,602 |
| Total Product Sales | $ | 73,989 | $ | 70,385 | $ | 45,327 |

*Royalty Revenue* — The Company recognizes revenue from license arrangements with its commercial partners' net sales of products. Royalties are recognized as earned in accordance with contract terms when they can be reasonably estimated and collectability is reasonably assured. The Company's commercial partners are obligated to report their net product sales and the resulting royalty due to the Company within 25 days for Bendeka from the end of each quarter. Based on historical product sales, royalty receipts and other relevant information, the Company accrues royalty revenue each quarter and subsequently determines a true-up when it receives royalty reports from its commercial partners. Historically, these true-up adjustments have been immaterial. Our receivables from royalty revenue are due 45-days from the end of the quarter.

*License and other revenue* — The Company analyzes each element of its licensing agreements to determine the appropriate revenue recognition. The terms of the license agreement may include payment to us of non-refundable up-front license fees, milestone payments if specified objectives are achieved, and/or royalties on product sales. The Company recognizes revenue from upfront payments at a point in time, typically upon fulfilling the delivery of the associated intellectual property to the customer.

If the contract contains a single performance obligation, the entire transaction price is allocated to the single performance obligation. Contracts that contain multiple performance obligations require an allocation of the transaction price based on the estimated relative standalone selling prices of the promised products or services underlying each performance obligation. The Company determines standalone selling prices based on the price at which the performance obligation is sold separately. If the standalone selling price is not observable through past transactions, the Company estimates the standalone selling price taking into account available information such as market conditions and internally approved pricing guidelines related to the performance obligations.

The Company recognizes sales-based milestone payments as revenue upon the achievement of the cumulative sales amount specified in the contract in accordance with ASC 606-10-55-65. For those milestone payments which are contingent on the occurrence of particular future events, the Company determined that these need to be considered for inclusion in the calculation of total consideration from the contract as a component of variable consideration using the most-likely amount method. As such,

F- 16

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

the Company assesses each milestone to determine the probability and substance behind achieving each milestone. Given the inherent uncertainty of the occurrence of these future events, the Company will not recognize revenue from the milestone until there is not a high probability of a reversal of revenue, which typically occurs near or upon achievement of the event.

As described above, under the terms of the Cephalon License, the Company received an upfront cash payment of $30 million, received a milestone payment of $15 million for regulatory approval, received a $40 million milestone upon receipt of the J-Code and received $25 million in an additional sales based milestone payment for reaching $500 million in net product sales of Bendeka. In 2015, $30 million upfront payment was allocated between the license issued to Cephalon and obtaining and maintaining regulatory approvals and conducting post-approval clinical studies using the Company's best estimate of selling price for each deliverable.   The full $30 million was recognized as income in the first quarter of 2015, as the Company substantially completed its requirements for obtaining regulatory approval, which consisted of filing an NDA, on February 13, 2015, and the remaining obligations were estimated to require minimal effort. On December 7, 2015, the FDA approved Bendeka (50 mL bendamustine hydrochloride) marking the achievement of a milestone which entitled the Company to a $15 million payment which was received in January 2016. The Company received a $40 million milestone payment in November 2016 upon receipt of the unique J-Code. Additionally, this event triggered an increase in the royalty rate from 20% to 25% of Bendeka net sales. In March 2017, the Company received a $25 million sales-based milestone payment for reaching $500 million in net product sales. As discussed above, under the SymBio License Agreement, the Company earned an upfront non-refundable cash payment of $12.5 million during the year ended December 31, 2017. In March 2019, the Company and TPIG executed an amendment to the Cephalon License Agreement to terminate Teva's obligation to pay future milestones and royalties on Bendeka sales outside of the U.S., which include an upfront cash payment of $9 million that was recorded as License and other revenue on the consolidated statements of income.

When determining the transaction price of a contract, an adjustment is made if payment from a customer occurs either significantly before or significantly after performance, resulting in a significant financing component. Applying the practical expedient in paragraph 606-10-32-18, the Company does not assess whether a significant financing component exists if the period between when the Company performs its obligations under the contract and when the customer pays is one year or less. None of the Company's contracts contained a significant financing component as of December 31, 2019.

*Collaborative licensing and development revenue* — The Company recognizes revenue from reimbursements received in connection with feasibility studies and development work for third parties when its contractual services are performed, provided collectability is reasonably assured. Its principal costs under these agreements include its personnel conducting research and development, its allocated overhead, as well as the research and development performed by outside contractors or consultants.

Upon termination of a collaboration agreement, any remaining non-refundable license fees received by the Company, which had been deferred, are generally recognized in full. All such recognized revenues are included in collaborative licensing and development revenue in its statements of income. The Company recognizes revenue from milestone payments received under collaboration agreements when earned, provided that the milestone event is substantive, its achievability was not reasonably assured at the inception of the agreement, the Company has no further performance obligations relating to the event, and collectability is reasonably assured. If these criteria are not met, the Company recognizes milestone payments ratably over the remaining period of its performance obligations under the collaboration agreement.

### Stock-Based Compensation

The Company accounts for stock-based compensation using the fair value provisions of ASC 718, Compensation - Stock Compensation that requires the recognition of compensation expense, using a fair-value based method, for costs related to all stock-based payments including stock options and restricted stock. This topic requires companies to estimate the fair value of the stock-based awards on the date of grant for options issued to employees and directors and record expense over the employees' service periods, which are generally the vesting period of the equity awards.

The Company accounts for stock-based compensation by measuring and recognizing compensation expense for all stock-based payments made to employees and directors based on estimated grant date fair values. The straight-line method is used to allocate compensation cost to reporting periods over each optionee's requisite service period, which is generally the vesting period. The fair value of the Company's stock-based awards to employees and directors is estimated using the Black-Scholes option valuation model, or Black-Scholes model. The Black-Scholes model requires the input of subjective assumptions, including the expected stock price volatility, the calculation of expected term, forfeitures and the fair value of the underlying common stock on the date

F- 17

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

of grant, among other inputs. The risk-free interest rate is determined with the implied yield currently available for zero-coupon U.S. government issues with a remaining term approximating the expected life of the options.

*Earnings Per Share*

Basic earnings per common share is computed using the weighted average number of shares outstanding during the period. Diluted earnings per share is computed in a manner similar to the basic earnings per share, except that the weighted-average number of shares outstanding is increased to include all common shares, including those with the potential to be issued by virtue of warrants, options, convertible debt and other such convertible instruments. Diluted earnings per share contemplate a complete conversion to common shares of all convertible instruments only if they are dilutive in nature with regards to earnings per share.

The anti-dilutive common shares equivalents outstanding at December 31, 2019, 2018, and 2017 were as follows:

|  | Year Ended December 31, | | |
|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Options | 2,454,077 | 1,824,728 | 1,592,548 |

The following table sets forth the computation for basic and diluted net income per share for December 31, 2019, 2018, and 2017:

|  | Year Ended December 31, | | |
|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| **Numerator** | | | |
| Numerator for basic and diluted earnings per share-net income | $ 14,313 | 31,903 | $ 51,943 |
| **Denominator** | | | |
| Basic weighted average common shares outstanding | 13,754,516 | 14,768,625 | 15,102,890 |
| Dilutive effect of stock options | 384,217 | 510,026 | 805,321 |
| Diluted weighted average common shares outstanding | 14,138,733 | 15,278,651 | 15,908,211 |
| **Basic net income per share** | | | |
| Basic net income per share | $ 1.04 | $ 2.16 | $ 3.44 |
| **Diluted net income per share** | | | |
| Diluted net income per share | $ 1.01 | $ 2.09 | $ 3.27 |

*Recent Accounting Pronouncements*

*Recent Accounting Pronouncements - Not Yet Adopted*

In June 2016, the FASB issued ASU 2016-13, Financial Instruments - Credit Losses which requires financial assets measured at amortized cost basis to be presented at the net amount expected to be collected. The measurement of expected credit losses is based on relevant information about past events, including historical experience, current conditions, and reasonable and supportable forecasts that affect the collectability of the reported amount. This standard is effective for fiscal years beginning after December 15, 2019 and we will adopt the standard effective January 1, 2020. We have performed an assessment and determined that adoption will not have a material impact on our consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, Fair Value Measurement (Topic 820): Disclosure Framework—Changes to the Disclosure Requirement for Fair Value Measurement ("ASU 2018-13"), which amends the disclosure requirements for fair value measurements. The amendments in ASU 2018-13 are effective for fiscal years beginning after December 15, 2019, with early adoption permitted. We have performed an assessment and determined that adoption will not have a material impact on our consolidated financial statements.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

In December 2019, the FASB issued ASU 2019-12, *Simplifying the Accounting for Income Taxes*. The ASU simplifies the accounting for income taxes by removing certain exceptions to the general principles and also clarifies and amends existing guidance. This standard is effective beginning January 1, 2021, with early adoption permitted. We are currently assessing the impact this standard will have on our consolidated financial statements.

*Recently Adopted Accounting Pronouncements*

The Company adopted FASB ASU No. 2016-02,"Leases (Topic 842)"("ASU 2016-02") as of January 1, 2019 to increase transparency and comparability among organizations, which included recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. Lessees are required to recognize a lease liability, which represents the discounted obligation to make future minimum lease payments, and a corresponding right-of-use asset on the balance sheet for most leases. The Company adopted ASU 2016-02 using the modified retrospective approach and did not recognized a cumulative-effect adjustment to the opening balance of Retained earnings. The Company elected a number of optional practical expedients permitted under the transition guidance within the new standard, which among other things, allowed us to carry forward the historical lease classification and that permits lease agreements that are twelve months or less to be excluded from the balance sheet. The primary impact upon adoption was the recognition, on a discounted basis, of the Company's minimum commitments under noncancelable operating leases as right of use assets and obligations on the consolidated balance sheets, of approximately $3 million. The Company may enter into future long-term lease agreements or exercise renewal options contained in existing lease agreements that could have a material impact on the right of use assets and obligations reflected on the consolidated balance sheets. Refer to Note 5 - Balance Sheet Accounts for further details.

## 3. Inventories

Inventories consist of the following:

| | December 31, 2019 | | December 31, 2018 | |
|---|---|---|---|---|
| Raw materials | $ | 2,460 | $ | 6,303 |
| Work in process | | 3,243 | | 1,776 |
| Finished products | | 863 | | 225 |
| | $ | 6,566 | $ | 8,304 |

## 4. Property and Equipment, net

Property and equipment consists of the following:

| | December 31, 2019 | | December 31, 2018 | | Estimated Useful Life (years) |
|---|---|---|---|---|---|
| Furniture and fixtures | $ | 1,188 | $ | 1,117 | 7 |
| Office equipment | | 1,094 | | 546 | 3 |
| Equipment | | 3,095 | | 2,952 | 7 |
| Leasehold improvements | | 1,144 | | 1,129 | 2 |
| | | 6,521 | | 5,744 | |
| Less accumulated depreciation | | (4,319) | | (3,347) | |
| Property and equipment, net | $ | 2,202 | $ | 2,397 | |

Depreciation expense related to property and equipment amounted to $972 and $1,155 for the year ended December 31, 2019 and 2018, respectively. During the year ended December 31, 2018, as part of the restructuring initiative, the Company recorded an asset impairment charge related to property and equipment, primarily related to leasehold improvements.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

### 5. Balance Sheet Accounts

*Prepaid and Other Current Assets*

Prepaid and other current assets consist of the following:

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2019** | | **2018** | |
| Advances to commercial manufacturers | $ | 2,462 | $ | 2,700 |
| Prepaid FDA user fee | | 6,345 | | 1,540 |
| Prepaid insurance | | 191 | | 150 |
| Prepaid income taxes | | 4,661 | | 5,739 |
| All other | | 1,445 | | 134 |
| Total Prepaid expenses and other current assets | $ | 15,104 | $ | 10,263 |

*Accrued Expenses and Other Liabilities*

Accrued expenses and other liabilities consist of the following:

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2019** | | **2018** | |
| Accrued expenses | | | | |
| Royalties payable to commercial partners | $ | 6,004 | $ | 7,139 |
| Accrued research & development | | 1,686 | | 1,245 |
| Accrued professional fees | | 1,926 | | 2,408 |
| Accrued salary and other compensation | | 8,083 | | 5,049 |
| Accrued product costs | | 8,364 | | 5,869 |
| All other | | 2,298 | | 1,809 |
| Total Accrued expenses and other liabilities | $ | 28,361 | $ | 23,519 |

*Adoption of FASB ASU No. 2016-02, "Leases (Topic 842)" as of January 1, 2019*

The Company leases its corporate office under an amended lease agreement that expires on June 30, 2025 (the "Corporate Office Lease"). The Corporate Office Lease was amended on August 8, 2019 to extend the term through such date and to increase the amount of leased office space. The Company also leases lab space under a lease agreement that expires on October 31, 2023 (the "Lab Space Lease"). The Company estimated the right of use asset and the corresponding lease liability, on a discounted basis, as of the adoption date of January 1, 2019. The future minimum lease payments under this Corporate Office Lease are approximately $4.0 million.

For the Company's two operating leases (the Corporate Office Lease and Lab Space Lease), the depreciation and interest expense components are combined and recognized ratably over the remaining term of the lease as research and development and selling, general and administrative in the Company's consolidated statements of operations, respectively.

The Company used its estimated incremental borrowing rate to calculate the present value of the ROU assets and lease liabilities as of the date of adoption date. The implicit interest rate related to the Company's two lease agreements was not known as of the date of adoption. Therefore, the Company calculated an incremental borrowing rate based on the rate of interest that the Company would have to pay to borrow on a collateralized basis over a similar term and amount equal to the lease payments in a similar economic environment.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

Lease related disclosures consist of the following:

|  | December 31, 2019 |
|---|---|
| Right of use (ROU) asset, net included in Other assets | $ 3,716 |
| Lease liability included with Other long-term liabilities | $ 3,000 |
| Lease liability included with Accrued expenses and other liabilities | $ 1,101 |
| YTD 2019 depreciation of ROU asset | $ 1,159 |
| YTD 2019 related rent expense | $ 1,146 |
| YTD operating cash flows from operating leases | $ 952 |
| YTD operating lease costs | $ 1,146 |
| Weighted-average remaining lease term - operating leases | 5.0 years |
| Weighted-average discount rate - operating leases | 6% |

As of December 31, 2019, the future minimum lease commitments for the Company's two leases were as follows:

| Total | 2020 | 2021 | 2022 | 2023 | 2024 | Beyond |
|---|---|---|---|---|---|---|
| $ 6,607 | $ 1,345 | $ 1,362 | $ 1,376 | $ 1,291 | $ 820 | $ 413 |

As of December 31, 2018, the future minimum lease commitments for the Company's two leases were as follows:

| Total | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| $ 3,661 | $ 1,146 | $ 864 | $ 583 | $ 583 | $ 485 |

**6. Debt**

On November 8, 2019, the Company entered into the Second Amended and Restated Credit Agreement (the "Revised Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") and the lenders party thereto, which replaced the Company's existing credit agreement, dated as of August 8, 2017 (the "Amended Credit Agreement"). The terms and amounts borrowed under the Revised Credit Agreement includes a drawn term loan of $40 million and a undrawn revolving credit facility of $110 million. The schedule of principal payments for the new term loan facility has been extended until November 8, 2022. The Company classified the current portion of long-term debt of $5 million on the consolidated balance sheet as of December 31, 2019. Per the terms of the Revised Credit Agreement, the Company is limited in its ability to pay dividends. As of December 31, 2019, the Company was in compliance with each of the senior secured net leverage ratio; total net leverage ratio; and fixed charge coverage ratio covenants.

The new term loan facility shall bear interest at the Adjusted LIBOR (equal to (a) the LIBOR for such Interest Period multiplied by (b) the Statutory Reserve Rate as established by Board of Governors of the Federal Reserve System of the United States of America) for the Interest Period in effect for such Borrowing plus the Applicable Rate as described below. The Agent and the Company may amend the Revised Credit Agreement to replace the LIBOR with a Benchmark Replacement, described below.

Loans under the Revised Credit Agreement bear interest at a rate equal to either (a) the LIBOR rate, plus an applicable margin ranging from 2.25% to 3.0% per annum, based upon the total net leverage ratio (as defined in the Revised Credit Agreement), or (b) the Benchmark Replacement which is defined as the greatest of the prime lending rate, or the NYFRB Rate (the rate for a federal funds transaction) in effect on such day plus ½ of 1% or the Adjusted LIBO Rate for a one month Interest Period on such day plus 1% plus an applicable margin ranging from 1.25% to 2.0% per annum, based upon the total net leverage ratio.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

The Company is required to pay a commitment fee on the unused portion of the new revolving credit facility in the Revised Credit Agreement at a rate ranging from 0.35% to 0.45% per annum based upon the total net leverage ratio.

As of December 31, 2019, the Company had $0.4 million of unamortized deferred debt issuance costs and $0.9 million of unamortized prepaid in its consolidated balance sheets.

| Debt Maturities | As of December 31, 2019 |
|---|---|
| 2020 | $ 5,000 |
| 2021 | 8,000 |
| 2022 | 26,000 |
| Total $ | 39,000 |

On August 8, 2017, the Company entered into an Amended and Restated Credit Agreement (the "Amended Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") and the lenders party thereto, which amended and restated the Company's then existing credit agreement, dated as of January 26, 2017. The Amended Credit Agreement provided for a 3-year $50 million revolving credit facility and a 3-year $100 million term loan facility (which are collectively referred to as the "Amended Credit Facility"). The Amended Credit Facility was subject to certain financial covenants.

On the date of the amendment, $50 million of the term loan facility was drawn, and none of the revolving credit facility had been drawn. The Amended Credit Facility included a $5 million letter of credit subfacility. Loans under the Amended Credit Facility bore interest, at the Company's option, at a rate equal to either (a) the LIBOR rate, plus an applicable margin ranging from 2.25% to 3.0% per annum, based upon the total net leverage ratio (as defined in the Amended Credit Agreement), or (b) the prime lending rate, plus an applicable margin ranging from 1.25% to 2.0% per annum, based upon the total net leverage ratio. The Company was required to pay a commitment fee on the unused portion of the Amended Credit Facility at a rate ranging from 0.35% to 0.45% per annum based upon the total net leverage ratio. The Company was permitted to terminate or reduce the revolving commitments or term commitments of the lenders and to make voluntary prepayments at any time subject to break funding payments. The Company was required to make mandatory prepayments of outstanding indebtedness under the Amended Credit Agreement (a) upon receipt of proceeds from certain sales, transfers or other dispositions, casualty and other condemnation events and the incurrence of certain indebtedness other than indebtedness permitted, subject to customary reinvestment exceptions and (b) in the case that the aggregate amount of all outstanding loans and letters of credit issued under the Amended Credit Facility exceed the aggregate commitment of all lenders under the Amended Credit Facility. The Company was obligated to repay the term loan facility on the last day of each March, June, September and December in an aggregate principal amount equal to 2.5% during the term of the loan.

## 7. Common Stock and Stock-Based Compensation

### Common Stock

On October 30, 2018, the Company announced a new repurchase program approved by the Board pursuant to which the Company may repurchase of up to $150 million of the its outstanding common stock, consisting of (i) up to $50 million in repurchases pursuant to an accelerated share repurchase agreement (the "ASR"), with JPMorgan Chase Bank, N.A. ("JPMorgan"), and (ii) up to $100 million in additional repurchases (collectively, the "2018 Share Repurchase Program"). In connection with its approval of the 2018 Share Repurchase Program, the Board terminated the Company's 2016 Share Repurchase Program and 2017 Share Repurchase Program in October 2018. Under the 2018 Share Repurchase Program, the Company is authorized to repurchase shares through open market purchases, privately-negotiated transactions, accelerated share repurchases or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. Under the 2018 Share Repurchase Program, the additional repurchases have no time limit and may be suspended or discontinued completely at any time. The specific timing and amount of repurchases will vary based on available capital resources and other

F- 22

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

financial and operational performance, market conditions, securities law limitations, and other factors. The repurchases will be made using the Company's cash resources.

In connection with the 2018 Share Repurchase Program, on October 30, 2018, the Company entered into the ASR with JPMorgan to repurchase an aggregate of $50 million of the Company's common stock. Under the terms of the ASR, the Company paid $50 million to JP Morgan on November 1, 2018, and received 702,988 shares, representing approximately 80% of the notional amount of the ASR, based on the closing price of $56.90 on October 29, 2018. Upon settlement of the ASR, the final number of shares repurchased were trued up based on the average of the daily volume weighted average share prices of the Company's common stock, less a discount, during the term of the ASR. The Company received 297,146 shares on December 6, 2018, the termination date.

On August 9, 2016, the Company announced a share repurchase program approved by the Company's board of directors authorizing the repurchase of up to $75.0 million of the Company's common stock (the "Share Repurchase Program"). On August 9, 2017, the Company announced a new share repurchase program approved by the Board, under which the Company may repurchase up to an additional $100 million of its outstanding common stock (the "New Share Repurchase Program"). Under the Share Repurchase Program and the New Share Repurchase Program, the Company was authorized to repurchase shares through open market purchases, privately-negotiated transactions or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act.

We repurchased the following shares of common stock with cash resources:

|  | Year Ended December 31, | | |
|  | 2019 | 2018 | 2017 |
|---|---|---|---|
| Shares of common stock repurchased | 317,429 | 1,348,563 | 674,857 |
| Value of common stock repurchased | $ 17,961 | $ 73,105 | $ 43,792 |

**Stock-Based Compensation**

In December 2007, the Company's board of directors approved the 2007 Incentive Compensation Plan (the "2007 Plan") enabling the Company to grant multiple stock-based awards to employees, directors and consultants, the most common being stock options and restricted stock awards. In November 2013, the Company's board of directors approved the 2014 Equity Incentive Plan (the "2014 Plan") which became effective on February 11, 2014. The 2007 Plan was terminated upon the effectiveness of the 2014 Plan and all shares available for issuance under the 2007 Plan were made available under the 2014 Plan. The 2014 Plan provides for the awards of incentive stock options, non-qualified stock options, restricted stock, restricted stock units and other stock-based awards. Awards generally vest equally over a period of four years from grant date. Vesting is accelerated under a change in control of the Company or in the event of death or disability to the recipient. In the event of termination, any unvested shares or options are forfeited. At the Company's annual meeting of stockholders held on August 4, 2015, the stockholders approved an amendment to the 2014 Plan to, among other things, increase the number of shares of common stock authorized for issuance thereunder by 500,000 shares. After accounting for such increase, and as of such amendment, the Company has reserved and made available 1,934,193 shares of common stock for issuance under the 2014 Plan.

During the year ended December 31, 2018, the Company introduced a new long-term incentive program with the objective to better align the share-based awards granted to management with the Company's focus on improving total shareholder return over the long-term. The share-based awards granted under this long-term incentive program consist of time-based stock options, time-based restricted stock units ("RSUs") and performance-based stock units ("PSUs"). PSUs are comprised of awards that vest upon achievement of certain share price appreciation conditions.

F- 23

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

*Stock Options*

The fair value of stock options granted to employees, directors, and consultants is estimated using the following assumptions:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| Risk-free interest rate | 1.42% - 2.61% | 2.30% - 3.07% | 1.70% - 2.42% |
| Volatility | 40.83% - 50.73% | 43.76% | 28.56% - 37.63% |
| Expected term (in years) | 1.51 - 9.41 years | 5.50 - 6.08 years | 5.50 - 7.0 years |
| Expected dividend yield | 0.0% | 0.0% | 0.0% |

The following table summarizes information about stock option activity related to the 2014 Plan:

| | Number of Stock Option Shares | Weighted Average Exercise Price (Per Share) | Non-Exercisable | Exercisable |
| --- | --- | --- | --- | --- |
| **Outstanding at December 31, 2017** | **2,786,568** | **$ 57.13** | **1,349,339** | **1,437,229** |
| Granted | 672,092 | 59.17 | | |
| Exercised | (502,322) | 17.19 | | |
| Forfeited or expired | (399,973) | | | |
| **Outstanding at December 31, 2018** | **2,556,365** | **$ 62.78** | **1,074,456** | **1,481,909** |
| Granted | **628,133** | $ 44.28 | | |
| Exercised | **(23,032)** | $ 10.33 | | |
| Forfeited or expired | **(65,305)** | | | |
| **Outstanding at December 31, 2019** | **3,096,161** | **$ 59.29** | **1,070,054** | **2,026,107** |

The weighted-average grant-date fair value of options granted during the year ended December 31, 2019, 2018, and 2017 was $22.18, $26.73, and $32.83, respectively. As of December 31, 2019, there was $19,051 of unrecognized stock-based compensation expense related to stock options that is expected to be recognized over a weighted average period of 2 years. The total intrinsic value of options exercised during the year ended December 31, 2019 was $1,068.

The weighted average contractual terms of options outstanding as of December 31, 2019, 2018, and 2017 was 6.8, 7.3, and 7.0 years, respectively.

The aggregate pre-tax intrinsic value of options outstanding as of December 31, 2019, 2018, and 2017 was $31.9 million, $10.7 million, and $33.7 million, respectively.

*RSUs*

Each vested time-based RSU represents the right of a holder to receive one of the Company's common shares. The fair value of each RSU granted was estimated based on the trading price of the Company's common shares on the date of grant.

F- 24

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

The following table summarizes information about RSU activity related to the 2014 Plan:

| | Number of Restricted Stock Units | | Weighted Average Grant Date Fair Value (Per Share) |
|---|---:|---|---:|
| **Non-vested at December 31, 2017** | — | $ | — |
| Granted | 64,080 | | 59.04 |
| Vested | — | | — |
| Forfeited | (9,861) | $ | 59.14 |
| **Non-vested at December 31, 2018** | **54,219** | **$** | **59.02** |
| Granted | 211,829 | $ | 42.17 |
| Vested | (13,555) | $ | 59.02 |
| Forfeited | (1,278) | $ | 52.19 |
| **Non-vested at December 31, 2019** | **251,215** | **$** | **44.84** |

As of December 31, 2019, there was $7,028 of unrecognized stock-based compensation expense related to non-vested RSUs that is expected to be recognized over a weighted average period of 3 years.

*PSUs*

The fair value of PSUs granted to employees was estimated using a monte carlo simulation model. Inputs used in the calculation include a risk-free interest rate of 2.06%, an expected volatility of 47%, contractual term of 3 years, and no expected dividend yield.

The following table summarizes information about PSU activity related to the 2014 Plan:

| | Number of Performance Stock Units | | Weighted Average Grant Date Fair Value (Per Share) |
|---|---:|---|---:|
| **Non-vested at December 31, 2017** | — | $ | — |
| Granted | 127,080 | | 90.19 |
| Vested | — | | — |
| Forfeited | (9,861) | $ | 90.19 |
| **Non-vested at December 31, 2018** | **117,219** | **$** | **90.19** |
| Granted | — | $ | — |
| Vested | — | $ | — |
| Forfeited | (1,038) | $ | 90.19 |
| **Non-vested at December 31, 2019** | **116,181** | **$** | **90.19** |

As of December 31, 2019, there was $3,098 of unrecognized stock-based compensation expense related to non-vested PSUs that is expected to be recognized over a weighted average period of 2 years.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

The Company recognized stock-based compensation in its consolidated statements of income for the year ended December 31, 2019, 2018, and 2017 as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2017** | |
| Stock options | $ | 16,394 | $ | 15,333 | $ | 15,429 |
| PSUs | | 3,062 | | 3,059 | | — |
| RSUs | | 2,542 | | 690 | | — |
| Stock-based compensation expense | $ | 21,998 | $ | 19,082 | $ | 15,429 |
| | | | | | | |
| Selling, general and administrative | $ | 17,556 | $ | 15,068 | $ | 11,486 |
| Research and development | | 4,442 | | 4,014 | | 3,943 |
| Stock-based compensation expense | $ | 21,998 | $ | 19,082 | $ | 15,429 |

## 8. Income Taxes

The components of our provision from income taxes is as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2017** | |
| Current: | | | | | | |
| Federal | $ | 6,689 | $ | 4,137 | $ | 1,304 |
| State | | 844 | | 466 | | 2,409 |
| | $ | 7,533 | $ | 4,603 | $ | 3,713 |
| Deferred: | | | | | | |
| Federal | | 392 | | (2,565) | | 18,045 |
| State | | (240) | | 97 | | (756) |
| | $ | 152 | $ | (2,468) | $ | 17,289 |
| | | | | | | |
| Provision for income taxes | $ | 7,685 | $ | 2,135 | $ | 21,002 |

The reconciliation of the statutory U.S. Federal income tax rate to the Company's effective income tax rate is as follows;

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2019** | **2018** | **2017** |
| Federal statutory tax rate | 21 % | 21 % | 35 % |
| State income taxes, net of federal benefit | 2 % | 1 % | 3 % |
| Tax benefit on stock option exercises, net of forfeitures | 1 % | (11)% | (4)% |
| R&D tax credits and Orphan Drug credits | (2)% | (7)% | (10)% |
| Limitation on executive compensation | 10 % | 3 % | N/A |
| Revaluation of net deferred tax assets due to U.S. tax reform | — % | — % | 5 % |
| Change in valuation allowance | 4 % | — % | — % |
| Other | (1)% | (1)% | — % |
| **Effective tax rate** | 35 % | 6 % | 29 % |

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amount of assets and liabilities for financial reporting and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets were as follows:

| | December 31, | |
| --- | --- | --- |
| | 2019 | 2018 |
| Deferred tax assets | | |
| Net operating loss carryforward | $ 243 | $ — |
| Stock based compensation | 10,647 | 7,934 |
| Research and development and other tax credit carryforwards | — | 3,251 |
| Inventories | 1,539 | 1,767 |
| Employee-related expenses | 51 | 732 |
| Prepaid R&D expenses | 620 | 761 |
| Intangible assets | 662 | — |
| ROU asset | 925 | — |
| Other | 1,017 | 64 |
| Total deferred tax assets | 15,704 | 14,509 |
| | | |
| Deferred tax liabilities | | |
| Intangible assets | — | 280 |
| Prepaid expenses | 43 | 34 |
| Fixed assets | 203 | 282 |
| Lease liability | 838 | — |
| Other | — | 91 |
| Total deferred tax liabilities | 1,084 | 687 |
| Valuation allowance | (951) | — |
| **Net deferred tax assets** | $ 13,669 | $ 13,822 |

The Tax Cuts and Jobs Act (the "Tax Act") enacted on December 22, 2017, significantly revised U.S. corporate income tax law by, among other things, reducing the corporate income tax rate to 21% and implementing a modified territorial tax system. In response to the Tax Act, the SEC issued SAB 118 which allows issuers to recognize provisional estimates of the impact of the Tax Act in their financial statements and adjust in the period in which the estimate becomes finalized, or in circumstances where estimates cannot be made, to disclose and recognize within a one year measurement period.

Implementation of the Tax Act resulted in an approximate $3.4 million charge for the revaluation of the Company's net deferred tax assets during the year ended December 31, 2017. In reaching these estimates, the Company utilized all available guidance and notices issued by the U.S. Department of the Treasury. During 2018, the Company finalized the impact of the Tax Act. An immaterial adjustment was recorded in the year ended December 31, 2018.

As a result of attaining profitability and the expectation that substantially all net operating loss carryforwards would be utilized in 2017, the Company performed a formal tax evaluation to determine maximum research and development credits that are available based on current law. As a result of the evaluation of historical records and data, our tax filings, and various tax law interpretations related to the R&D credit availability, additional tax credits were identified. The Company recorded an adjustment of such tax credits of $5.5 million resulting in a reduction of income tax expense in 2017.

In July 2006, the Financial Accounting Standards Board ("FASB") issued ASC 740-10, Uncertainty in Income Taxes, which defines the threshold for recognizing the benefits of tax-return positions in the financial statements as "more-likely-than-not" to be sustained by the taxing authorities. This statement also requires explicit disclosure requirements about a Company's uncertainties related to their income tax position, including a detailed roll forward of tax benefits taken that do not qualify for financial statement recognition.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

The Company files income tax returns in the U.S. federal jurisdiction and several states. Given that the company has incurred tax losses in most years since its inception, all of the Company's tax years are effectively open to examination. The Company is under audit by three states tax jurisdiction as of December 31, 2019. The Company has no amount recorded for any unrecognized tax benefits as of December 31, 2019. The Company regularly evaluates its tax positions for additional unrecognized tax benefits and associated interest and penalties, if applicable. There are many factors that are considered when evaluating these tax positions including: interpretation of tax laws, recent tax litigation on a position, past audit or examination history, and subjective estimates and assumptions.

**9. License Agreements of Development and Commercialization Rights**

*Development*

On February 13, 2015, the Company submitted a New Drug Application or NDA to the FDA for Bendeka, which was approved by the FDA on December 7, 2015. Also, on February 13, 2015, the Company entered into the Cephalon License for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. Pursuant to the terms of the Cephalon License, Cephalon will be responsible for all U.S. commercial activities for the product including promotion and distribution, and the Company is responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies. Additionally, under the terms of the Cephalon License, the Company received an upfront cash payment of $30 million, in January 2016, received a $15 million milestone payment related to the FDA approval of Bendeka in December 2015, received $40 million related to the receipt of the J-code for Bendeka and is currently eligible to receive up to $25 million in an additional sales-based milestone payment. In addition, the Company was entitled to receive royalty payments of 20% of net sales of the product which increased to 25% on receipt of the J-code in November 2016. In connection with the Cephalon License, the Company has entered into a supply agreement with Cephalon, pursuant to which the Company is responsible for supplying product to Cephalon. As of March 29, 2019, the Company and TPIG executed an amendment to the Cephalon License Agreement to terminate Teva's obligation to pay future milestones and royalties on Bendeka sales outside of the U.S., which included an upfront cash payment of $9 million that was recorded as License and other revenue on the consolidated statements of income. On April 13, 2019, we announced an expansion of our Cephalon License. Under the terms of the revised agreement, beginning on October 1, 2019, Eagle's royalty payment has increased from 25% to 30% of Bendeka net U.S. sales. The royalty rate will increase by one percentage point on each anniversary of October 1, 2019 until it reaches 32%, and it will remain at 32% thereafter. The revised agreement also extends the U.S. Bendeka royalty term until it is no longer sold in the United States. The previous U.S. royalty term was set to expire in 2025.

On September 20, 2017, the Company entered into a Product Collaboration and License Agreement, effective as of September 19, 2017, (the "SymBio License Agreement") with SymBio Pharmaceuticals Limited ("SymBio") for the rights to develop and commercialize the Company's bendamustine hydrochloride ready-to-dilute injection product and rapid infusion injection product (collectively, the "Products") in Japan. Under the License Agreement, SymBio will be responsible for all development of the Products in Japan and for obtaining and maintaining all regulatory approvals of the Products in Japan, with a target for regulatory approval of a Product in Japan in 2020. SymBio will bear all costs of development of the Products in Japan except that, if Japanese regulatory authorities require a certain clinical study to be conducted as a condition for approving one of the Products in Japan, Eagle would share 50% of the out-of-pocket costs of that clinical study up to a specified dollar amount as a reduction to future royalty payments. Based on the Company's assessment of the probability of additional costs, we have not deferred revenue on the SymBio License Agreement. SymBio will also be responsible, at its sole cost, for all marketing, promotion, distribution and sales of the Products in Japan and is obligated to launch the Products and meet certain minimum detailing, promotion and marketing commitments in connection with commercialization of the Products in Japan.

SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma ("MCL"), and as a first line treatment of low-grade NHL and MCL. Under the SymBio License Agreement, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

Pursuant to the terms of the SymBio License Agreement, the Company and SymBio will enter into a separate supply agreement, under which the Company will be responsible for manufacturing and supplying the Products to SymBio for development and commercialization in Japan. After a period of time following launch of a Product, SymBio will have the right to assume the responsibility for manufacturing of the Products in and for Japan. Under the SymBio License Agreement, the Company will retain the right to control the prosecution, maintenance and enforcement of the Company's patents covering the Products, both inside and outside of Japan.

F- 28

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

Under the SymBio License Agreement, the Company earned an upfront non-refundable cash payment of $12.5 million in the third quarter of 2017, and is eligible to receive a milestone payment upon approval of a Product in Japan and a milestone payment upon achievement of certain cumulative net sales of the Products in Japan. After regulatory approval of a Product in Japan, the Company will also receive tiered, low double-digit royalties on net sales of the Products in Japan for so long as there are patents covering the Products in Japan or regulatory exclusivity for the Products in Japan.

The Company has entered into several product development agreements with development partners whereby the Company acquired the exclusive rights in the United States and, in most cases, worldwide rights to a total of thirty-three products for ten years following first commercial sale of each product. The Company will share varying percentages of the profits after, in most cases, recapturing development, legal and certain operating costs, from the sales of the products with the development partners if the products are commercialized. The Company expenses these costs as incurred.

## 10. Commitments

Our future material contractual obligations include the following:

| Obligation | Total | 2020 | 2021 | 2022 | 2023 | 2024 | Beyond |
|---|---|---|---|---|---|---|---|
| Operating leases (1) | $ 6,607 | $ 1,345 | $ 1,362 | $ 1,376 | $ 1,291 | $ 820 | $ 413 |
| Credit facility | 39,000 | 5,000 | 8,000 | 26,000 | — | — | — |
| Purchase obligations (2) | 18,329 | 18,329 | — | — | — | — | — |
| Total obligations | $ 63,936 | $ 24,674 | $ 9,362 | $ 27,376 | $ 1,291 | $ 820 | $ 413 |

    (1) We lease our corporate office location. On August 8, 2019, we amended the lease for our corporate office location in order to rent additional office space and extend the term of our existing lease to June 30, 2025. The Company also leases its lab space under a lease agreement that expires on October 31, 2023. Rental expense was $1,146, $571, and $664, for the years ended December 31, 2019, 2018, and 2017, respectively. The remaining future lease payments under the operating leases, exclusive of any renewal option periods, are $6,607 as of December 31, 2019, payable monthly through June 30, 2025 and October 31, 2023.

    (2) As of December 31, 2019, the Company has purchase obligations in the amount of $18,329 which represents the contractual commitments under contract manufacturing and supply agreements with suppliers. The obligation under the supply agreement is primarily for finished product, inventory, and research and development.

## 11. Acquisitions

**Acquisition of Docetaxel-Injection, Non-Alcohol Formula**

On October 13, 2015, the Company entered into the Teikoku Agreement with Teikoku to market, sell and distribute Non-Alcohol Docetaxel Injection, an investigational product intended for the treatment of breast cancer, non-small cell lung cancer, prostate cancer, gastric adenocarcinoma, and head and neck cancer. The NDA for Non-Alcohol Docetaxel Injection for these indications was approved by the FDA on December 22, 2015. Under the terms of the agreement, the Company paid $4,850 upon FDA approval and NDA transfer to the Company, which occurred on January 12, 2016. The Company also paid 25% royalties on gross profits to Teikoku. The Company accounted for the transaction as a purchase of a business in 2016, in accordance with ASC 805 *Business Combinations*.

The Company has measured the fair value of the future royalty payment using its own assumptions of future profitability of Non-Alcohol Docetaxel Injection. Acquisition contingent consideration is measured at fair value on a recurring basis using unobservable inputs; which accordingly represents a Level 3 measurement within the fair value hierarchy. Any change in fair value of the contingent consideration subsequent to the acquisition date is recognized in operating income within the statement of operations.

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

During the year ended December 31, 2017, the Company recorded a change in the fair value of contingent consideration of $6.2 million. This was primarily driven by adjustments to the fair values of the liabilities associated with Non-Alcohol Docetaxel Injection, which was remeasured due to the loss of a customer and other market conditions identified during the third quarter of 2017 for the product and partially offset by accretion for the time value of money.

During the year ended December 31, 2018, the Company recorded an adjustment to the remaining contingent consideration to reflect the Company's decision to discontinue sales of Non-Alcohol Docetaxel Injection.

The following table represents a reconciliation of the change in the fair value measurement of the contingent consideration liability, which was recorded in the Company's consolidated statements of income:

| Closing Balance December 31, 2016 | Changes in fair value | Payment of contingent consideration | Closing Balance December 31, 2017 | Changes in fair value | Payment of contingent consideration | Closing Balance December 31, 2018 |
|---|---|---|---|---|---|---|
| $ 6,940 | $ (6,176) | $ — | $ 764 | $ (763) | $ (1) | $ — |

Total consideration of $11,220, which is comprised of the $4,850 cash paid on FDA approval and NDA transfer to the Company and the fair value of contingent consideration has been attributed to the intangible asset for Non-Alcohol Docetaxel Injection product rights.

**Eagle Biologics Acquisition**

On November 16, 2016, the Company entered into a stock purchase agreement ("Arsia SPA") to acquire Arsia Therapeutics ("Arsia" "Seller"), an early-stage biotechnology firm with proprietary viscosity-reducing technology and formulation know-how and subsequently renamed the subsidiary Eagle Biologics, Inc. ("Eagle Biologics"). Under the terms of the stock purchase agreement, we paid approximately $27.2 million in cash and 40,200 shares of Eagle common stock worth $3.0 million at closing. We also agreed to pay up to $48 million in additional payments upon the completion of certain milestones, for aggregate potential payments of $78 million.

On February 8, 2018, the Company entered into an amendment (the "Arsia Amendment") to the Arsia SPA. Pursuant to the Arsia Amendment, the Company's obligation to make four separate milestone payments pursuant to the Arsia SPA, which could have aggregated to a total of $48 million, were terminated in exchange for a single payment of $15 million to the Seller.

The acquisition was accounted for as a business combination in accordance with ASC 805, which requires the assets acquired and liabilities assumed from Eagle Biologics to be recorded on the acquisition date at their respective fair values. Eagle Biologics' results of operations are included in the financial statements from the date of acquisition.

The following table summarizes the consideration transferred to acquire Eagle Biologics at the date of acquisition:

| The aggregate consideration consisted of: | Final fair value |
|---|---|
| Cash consideration paid | $ 27,209 |
| Common stock issued *(i)* | 3,046 |
| Fair value of contingent consideration payable to seller (long term) *(ii)* | 15,000 |
| Total consideration | $ 45,255 |

    *(i)* Under the stock purchase agreement, the number of common shares to be issued to the seller is equal to $2.7 million divided by the average of the closing day price per share for the 30 trading days prior to the Closing Date. The average price of the common stock of 30 days prior to closing was $68.18. Accordingly, the number of common stock to be issued

F- 30

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

to the seller was determined at 40,200 shares ($2.7 million divided by $68.18 per share). The fair value of the common stock issued was determined based on the closing price of Eagle's common stock on November 16, 2016.

*(ii)* Under the Arsia SPA, the contingent consideration includes four separate milestone payments which could aggregate to a total of $48 million payable to the Seller upon achievement of certain clinical, regulatory and development milestones. In accordance with the provisions of ASC 805-30-25-5, each unit of contingent consideration is recognized at the acquisition date fair value. The acquisition date fair value of the contingent consideration was $16.1 million. Such fair values are determined based on a probabilistic model with weights assigned on the likelihood of the Company achieving the clinical, regulatory and development milestones as well as an acceleration event in the future. Each unit of contingent consideration is classified as a liability in the balance sheet and would be subsequently measured at fair value on each reporting date. Any future change in fair value would be recognized in the statement of operations. As described above, on February 8, 2018, the Company entered into the Arsia Amendment, pursuant to which the Company's obligations to make four separate milestone payments under the Arsia SPA were terminated in exchange for a single payment of $15 million to the Seller.

During the year ended December 31, 2017, the Company recorded a change in the fair value of contingent consideration of $1.2 million related to the Arsia Amendment.

The following table represents a reconciliation of the change in the fair value measurement of the contingent consideration liability, which was recorded in the Company's consolidated statements of income:

| Closing Balance December 31, 2016 | Changes in fair value | Payment of contingent consideration | Closing Balance December 31, 2017 | Changes in fair value | Payment of contingent consideration | Closing Balance December 31, 2018 |
|---|---|---|---|---|---|---|
| $ 16,201 | $ (1,201) | $ — | $ 15,000 | $ — | $ (15,000) | $ — |

## 12. Intangible Assets, Net

The gross carrying amounts and net book value of our intangible assets are as follows:

| | | December 31, 2019 | | | |
|---|---|---|---|---|---|
| | Useful Life (In Years) | Gross Carrying Amount | Accumulated Amortization | Accumulated Impairment Charges | Net Book Value |
| Ryanodex intangible | 20 | $ 15,000 | $ (2,454) | $ — | $ 12,546 |
| Developed technology | 5 | 8,100 | (5,063) | — | 3,037 |
| Total | | $ 23,100 | $ (7,517) | $ — | $ 15,583 |

| | | December 31, 2018 | | | |
|---|---|---|---|---|---|
| | Useful Life (In Years) | Gross Carrying Amount | Accumulated Amortization | Accumulated Impairment Charge | Net Book Value |
| Docetaxel product rights | 10 | $ 11,220 | $ (1,281) | $ (9,939) | $ — |
| Ryanodex intangible | 20 | 15,000 | (1,554) | — | 13,446 |
| Developed technology | 5 | 8,100 | (3,443) | — | 4,657 |
| Total | | $ 34,320 | $ (6,278) | $ (9,939) | $ 18,103 |

F- 31

Amortization expense amounted to $2,520, $2,515, and $2,815, for the year ended December 31, 2019, 2018, and 2017, respectively.

*Intangible Asset Impairment*

During the year ended December 31, 2017, the Company experienced a decline in customer contracts and saw a drop in market pricing for Non-Alcohol Docetaxel Injection. Accordingly, the Company estimated the fair value of our Non-Alcohol Docetaxel Injection product and determined the carrying amount of the intangible asset was no longer fully recoverable, resulting in a pre-tax, non-cash asset impairment charge of $7.2 million during the year ended December 31, 2017.

On June 30, 2018, the Company implemented a restructuring initiative based on its assessment of the current product portfolio and made a decision to discontinue manufacture and distribution of Non-Alcohol Docetaxel Injection. The Company ceased selling the product by September 30, 2018. As a result, the Company recognized a pre-tax, non-cash asset impairment charge of $2.7 million during the year ended December 31, 2018.

*Estimated Amortization Expense for Intangible Assets*

Based on definite-lived intangible assets recorded as of December 31, 2019, and assuming that the underlying assets will not be impaired and that the Company will not change the expected lives of the assets, future amortization expenses are estimated as follows:

| | | Estimated Amortization Expense |
|---|---|---|
| Year Ending December 31, | | |
| 2020 | $ | 2,666 |
| 2021 | | 2,623 |
| 2022 | | 1,369 |
| 2023 | | 1,570 |
| 2024 | | 1,570 |
| All other | | 5,785 |
| Total estimated amortization expense | $ | 15,583 |

## 13. Legal Proceedings

In addition to the below legal proceedings, from time to time, the Company may be a party to litigation and subject to claims incident to the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, the Company currently believes that the final outcome of these ordinary course matters, or matters discussed below, will not have a material adverse effect on the Company's business nor has the Company recorded any loss in connection with these matters because the Company believes that loss is neither probable nor estimable. Regardless of the outcome, litigation can have an adverse impact on the Company because of defense and settlement costs, diversion of management resources and other factors.

**Commercial Litigation**

*In Re: Taxotere (Docetaxel)*

On February 1, 2017, the Company was named as a defendant, among various other manufacturers, in several product liability suits that are consolidated in the U.S. District Court for the Eastern District of Louisiana as part of MDL 2740 (Civil Action No 2:16 md-2740). The claims are for personal injuries allegedly arising out of the use of docetaxel.

In March 2017, the Company reached agreements in principle with the Plaintiffs' Steering Committee in this matter to voluntarily dismiss the Company from all of the lawsuits in which it was named and from the master complaint. The Company is in the process of working with the other parties in this matter to have it removed from the Multidistrict litigation entirely. As part of the agreement, in the event a case is brought in the future with facts that justify the Company's inclusion, the plaintiffs reserved the right to include the Company in such matter. The plaintiffs have filed several additional lawsuits since the parties' agreement in principle to dismiss, and the Company is in the process of working with plaintiffs to explore the possibility of dismissing those lawsuits.

*Eagle v. Burwell*

On April 27, 2016, the Company filed an action in the U.S. District Court for the District of Columbia against the FDA and other federal defendants seeking an order requiring the FDA to recognize orphan drug exclusivity for Bendeka for the treatment of CLL and indolent B-cell NHL. On June 8, 2018, the Court issued a decision requiring the FDA to recognize seven years of orphan drug exclusivity in the U.S. for Bendeka, and on July 6, 2018 the FDA recognized such ODE until December 7, 2022. In addition, on July 6, 2018, the FDA submitted a Motion to Alter or Amend the Judgement Pursuant to Rule 59(e), pursuant to which the FDA requested that the Court amend its decision to make clear that the decision does not affect any applications referencing TREANDA. The FDA's motion was denied by the Court on August 1, 2018 on the grounds that the FDA had not satisfied the standard for altering or amending the judgment. The FDA and two intervenors have appealed the Court's final judgment to the U.S. Court of Appeals for the District of Columbia Circuit. Oral arguments occurred on October 17, 2019 and a decision is not expected until the Spring of 2020. On February 20, 2019, the FDA issued a decision in favor of the Company, regarding the scope of exclusivity for Bendeka. Pursuant to the FDA's decision, and unless the district court is reversed on appeal, no bendamustine product used to treat the same indications (including generic versions of TREANDA) may launch in the United States until December 7, 2022 unless it is clinically superior to Bendeka.

*Eagle v. Eli Lilly*

On August 24, 2017, the Company filed an antitrust complaint in the United States District Court for the District of New Jersey ("New Jersey District Court") against Eli Lilly and Company ("Lilly"). The complaint alleges that Lilly engaged in anticompetitive conduct which restrained competition by delaying and

blocking the Company's launch of a competing pemetrexed injection product (to compete with Lilly's Alimta). Lilly accepted service and answered the complaint on October 27, 2017. Lilly also filed a motion to transfer this case to Delaware on October 27, 2017. The Company filed a motion to oppose such transfer on November 6, 2017. On July 20, 2018, the New Jersey District Court transferred the case to Delaware. On November 27, 2018, the Delaware Court stayed the case at least until conclusion of the PEMFEXY™ patent trial described below. On December 16, 2019, the Delaware Court entered the Company and Lilly's stipulation dismissing this case with prejudice.

**Patent Litigation**

*Eli Lilly and Company. v. Eagle Pharmaceuticals, Inc. (PEMFEXY™ (Pemetrexed))*

On August 14, 2017, Lilly filed suit against the Company in the United States District Court for the Southern District of Indiana (the "Indiana Suit"). Lilly alleged patent infringement based on the filing of the Company's 505(b)(2) NDA seeking approval to manufacture and sell the Company's EP-5101. EP-5101, if finally approved by FDA, will be a branded alternative to Alimta®.

On September 8, 2017, Eagle moved to dismiss the Indiana Suit for improper venue. On September 11, 2017, Lilly voluntarily dismissed the Indiana Suit. It then filed a complaint in the United States District Court for the District of Delaware, alleging similar patent infringement claims (the "Delaware Suit"). Eagle answered and filed various counterclaims in the Delaware Suit on October 3, 2017. Lilly answered Eagle's counterclaims on October 24, 2017. The Court held a scheduling conference on December 11, 2017 and set trial in the Delaware Suit to begin on September 9, 2019, but later rescheduled trial to begin October 28, 2019. On May 31, 2018, Eagle filed a Motion for Judgment on the Pleadings, which the Court denied on October 26, 2018. On January 23, 2019, the Court held a Markman hearing. Trial took place from October 28, 2019 to October 31, 2019 and is scheduled to continue on December 12, 2019 through December 13, 2019. On December 13, 2019, the Company and Lilly settled this litigation. The agreement provides for a release of all claims by the parties and allows for an initial entry of PEMFEXY™ into the market (equivalent to approximately a three week supply of current ALIMTA® utilization) on February 1, 2022 and a subsequent uncapped entry on April 1, 2022. On December 16, 2019, the District Court entered the Company and Lilly's stipulation dismissing this case with prejudice.

*Eagle Pharmaceuticals, Inc., et al. v. Slayback Pharma Limited Liability Company; Eagle Pharmaceuticals, Inc., et al. v. Apotex Inc. and Apotex Corp.; Eagle Pharmaceuticals, Inc., et al. v. Fresenius Kabi USA, LLC; Eagle Pharmaceuticals, Inc., et*

F- 32

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

*al. v. Mylan Laboratories Limited; Eagle Pharmaceuticals, Inc. et al. v. Hospira, Inc; Eagle Pharmaceuticals, Inc. et al. v. Lupin, Ltd. And Lupin Pharmaceuticals, Inc.. - (Bendeka®)*

Bendeka, which contains bendamustine hydrochloride, is an alkylating drug that is indicated for the treatment of patients with chronic lymphocytic leukemia, as well as for the treatment of patients with indolent B-cell non-Hodgkin's lymphoma that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen. Five companies - Slayback Pharma Limited Liability Company ("Slayback"), Apotex Inc. and Apotex Corp. ("Apotex"), Fresenius Kabi USA, LLC ("Fresenius"), Mylan Laboratories Limited ("Mylan"), and Lupin, Ltd. And Lupin Pharmaceuticals, Inc. ("Lupin")- have filed Abbreviated New Drug Applications ("ANDA's") referencing Bendeka® that include challenges to one or more of the Bendeka® Orange Book-listed patents. Hospira, Inc. ("Hospira") filed a 505(b)(2) NDA.

The Company, Cephalon, Inc. and/or Teva Pharmaceuticals International GMBH (together the "Patentees"), filed separate suits against Slayback, Apotex, Fresenius, Mylan, Hospira, and Lupin in the United States District Court for the District of Delaware on August 16, 2017 (Slayback ("Slayback I")), August 18, 2017 (Apotex), August 24, 2017 (Fresenius), December 12, 2017 (Mylan), January 19, 2018 (Slayback ("Slayback II")), July 19, 2018 (Hospira), and July 2, 2019 (Lupin). In these Complaints, the Patentees allege infringement of the challenged patents, namely U.S. Patent Nos. 8,791,270 and 9,572,887 against Slayback (Slayback I and Slayback II), and of U.S. Patent Nos. 8,609,707, 8,791,270, 9,000,021, 9,034,908, 9,144,568, 9,265,831, 9,572,796, 9,572,797, 9,572,887, 9,579,384, 9,597,397, 9,597,398, 9,597,399 against Fresenius, Apotex, and Mylan, and of U.S. Patent Nos. 9,572,887, 10,010,533, 9,034,908, 9,144,568, 9,597,397, 9,597,398, 9,597,399, 9,000,021, 9,579,384 against Hospira, and of U.S. Patent Nos. 8,609,707, 9,000,021, 9,034,908, 9,144,568, 9,265,831, 9,572,796, 9,572,797, 9,572,887, 9,579,384, 9,597,397, 9,597,398, 9,597,399, 10,010,533, and 10,052,385 against Lupin. The parties stipulated to dismiss without prejudice U.S. Patent No. 8,791,270 as to Apotex, Fresenius and Mylan on July 24, 2018, August 2, 2018, and August 3, 2018, respectively. Slayback, Apotex, Fresenius, and Mylan answered their Complaints and some filed various counterclaims on September 29, 2017 (Slayback I), February 12, 2018 (Slayback II), November 27, 2017, September 15, 2017, and February 14, 2018, respectively. The Patentees answered the Slayback I, Slayback II, Fresenius, and Apotex counterclaims on October 20, 2017, March 5, 2018, October 6, 2017, and December 18, 2017, respectively. On October 15, 2018, the Patentees filed a suit against Fresenius and Mylan in the United States District Court for the District of Delaware, alleging patent infringement of U.S. Patent Nos. 10,010,533 and 10,052,385. The Slayback I, Slayback II, Apotex, Fresenius and Mylan cases have been consolidated for all purposes, and a bench trial in these cases began September 9, 2019 and concluded September 19, 2019. Hospira filed a motion to dismiss the case, which was fully briefed on November 16, 2018. On December 16, 2019, the United States District Court for the District of Delaware denied Hospira's motion to dismiss with respect to U.S. Patent No. 9,572,887 and granted that motion with respect to the remaining patents. Trial is set for November 15, 2021. All cases are pending.

The FDA is stayed from approving Apotex's, Fresenius', Mylan's, and Lupin's ANDA's, and Hospira's 505(b)(2) application, until the earlier of (1) January 7, 2020, January 14, 2020, April 30, 2020, November 21, 2021, and December 20, 2020 respectively (the "30-month stay dates"); and (2) a court decision that each of the challenged patents is not infringed, invalid, or unenforceable. The 30-month stay dates may be shortened or lengthened if either party to the action fails to reasonably cooperate in expediting the action. The FDA cannot approve Slayback's ANDA until March 2031.

*Eagle Pharmaceuticals, Inc. v. Slayback Pharma Limited Liability Company*

Slayback filed an ANDA referencing Eagle's Belrapzo NDA. Slayback's ANDA includes challenges to one or more of the Belrapzo Orange Book-listed patents. On September 20, 2018, the Company filed a suit against Slayback in the United States District Court for the District of Delaware, alleging patent infringement of U.S. Patent Nos. 8,609,707, 9,265,831, 9,572,796, 9,572,797 and 10,010,533. On October 10, 2018, Slayback answered the Complaint and filed various counterclaims. On October 31, 2018, the Company answered Slayback's counterclaims. This case is currently stayed.

*Eagle Pharmaceuticals, Inc. v. Slayback Pharma Limited Liability Company*

Slayback filed a 505(b)(2) NDA referencing Eagle's Belrapzo NDA. Slayback's NDA includes challenges to one or more of the Belrapzo Orange Book-listed patents. On December 11, 2018, the Company filed a suit against Slayback in the United States District Court for the District of Delaware, alleging patent infringement of U.S. Patent Nos. 9,265,831, 9,572,796, 9,572,797, and 10,010,533. On January 4, 2019, Slayback filed a motion for judgment on the pleadings. On May 9, 2019, the United States District Court for the District of Delaware granted Slayback's motion for judgment on the pleadings. On July 23,

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

2019, the Company filed an appeal of this decision with the United States Court of Appeals for the Federal Circuit. The Federal Circuit scheduled oral argument on March 4, 2020. That appeal is pending.

*Par Pharmaceutical, Inc. et al. v. Eagle Pharmaceuticals, Inc. (Vasopressin)*

On May 31, 2018, Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Endo Par Innovation Company, LLC (together "Par") filed suit against the Company in the United States District Court for the District of Delaware. Par alleged patent infringement based on the filing of the Company's ANDA seeking approval to manufacture and sell the Company's vasopressin product. The Company's vasopressin product, if approved by FDA, will be an alternative to Vasostrict, which is indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines. The Company answered the complaint on August 6, 2018, and filed an amended answer and counterclaims on October 30, 2019. The court issued a Markman ruling on July 1, 2019. On December 20, 2019, Par dismissed with prejudice claims of three of the patents asserted against Eagle, and the Court entered an Order reflecting that dismissal on December 27, 2019. Mediation is scheduled to take place on March 3, 2020. Trial is scheduled to begin May 18, 2020. This suit is pending.

*Eagle Pharmaceuticals, Inc. et al.v. Accord (Argatroban)*

On March 27, 2019, the Company and Chiesi filed suit against Accord Healthcare, Inc. ("Accord") in the United States District Court for the District of New Jersey (the "New Jersey suit") and in the United States District Court for the Middle District of North Carolina (the "North Carolina suit") (together "the suits"). The suits alleged patent infringement based on Accord's 505(b)(2) NDA seeking approval to manufacture and sell Accord's proposed argatroban product. On May 21, 2019, the Company and Chiesi voluntarily dismissed the North Carolina suit. On July 10, 2019, Accord moved for judgment on the pleadings in the New Jersey suit. The New Jersey suit is pending.

**14. Selected Quarterly Financial Data - Unaudited**

A summary of quarterly financial information for the year ended December 31, 2019 and 2018 is as follows:

| | For the Quarter Ended | | | | | | | | | Total Fiscal Year 2019 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | March 31, 2019 | | June 30, 2019 | | September 30, 2019 | | December 31, 2019 | | | | |
| | (in thousands except share and per share amounts) | | | | | | | | | | |
| Revenue | $ | 49,785 | $ | 56,702 | $ | 41,147 | $ | 48,258 | $ | | 195,892 |
| Gross Profit | $ | 36,685 | $ | 35,418 | $ | 26,225 | $ | 36,667 | $ | | 134,995 |
| Income (loss) from operations | $ | 12,169 | $ | 9,233 | $ | (2,484) | $ | 2,897 | $ | | 21,815 |
| Net income (loss) | $ | 8,973 | $ | 6,725 | $ | (2,390) | $ | 1,005 | $ | | 14,313 |
| Earnings (loss) per share- basic | $ | 0.64 | $ | 0.49 | $ | (0.17) | $ | 0.08 | $ | | 1.04 |
| Earnings (loss) per share- diluted | $ | 0.62 | $ | 0.48 | $ | (0.17) | $ | 0.08 | $ | | 1.01 |

F- 34

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

| | For the Quarter Ended | | | | Total Fiscal Year 2018 |
|---|---|---|---|---|---|
| | March 31, 2018 | June 30, 2018 | September 30, 2018 | December 31, 2018 | |
| | (in thousands except share and per share amounts) | | | | |
| Revenue | $ 46,626 | $ 59,296 | $ 51,337 | $ 56,053 | $ 213,312 |
| Gross Profit | $ 34,818 | $ 40,737 | $ 38,346 | $ 37,495 | 151,396 |
| Income from operations | $ 2,305 | $ 183 | $ 18,402 | $ 15,726 | $ 36,616 |
| Net income | $ 2,616 | $ 2,659 | $ 14,040 | $ 12,588 | $ 31,903 |
| Earnings per share- basic | $ 0.18 | $ 0.18 | $ 0.94 | $ 0.86 | $ 2.16 |
| Earnings per share- diluted | $ 0.17 | $ 0.17 | $ 0.91 | $ 0.84 | $ 2.09 |

## 15. Restructuring

As part of its ongoing organizational review, the Company engaged in a restructuring initiative to rationalize its product portfolio and focus its physical sites. These measures included the discontinuation of manufacture and distribution of Non-Alcohol Docetaxel Injection in June 2018 and plans to rationalize research and development operations. Charges consist of inventory and related reserves, certain asset impairment charges related to property and equipment, and personnel related costs. The restructuring costs of $7,911 for the year ended December 31, 2018 has been recorded to Restructuring charge on the Consolidated Statements of Income. The Company also recorded an asset impairment charge for the remaining Intangible asset for Non-Alcohol Docetaxel Injection of $2,704 as well as an adjustment to remove the contingent consideration of $790 on the related line items in the Statements of Income for the year ended December 31, 2018. The Company does not expect to incur additional expenses related to this restructuring initiative. There is no liability remaining for the restructuring as of December 31, 2018.

## 16. Related Party Transactions

During the year ended December 31, 2018, the Company obtained legal services from Greenberg Traurig, LLP in exchange for $0.2 million. Richard A. Edlin, a member of the Company's Board, is an attorney and shareholder of Greenberg Traurig, LLP.

On May 10, 2019, Hudson Executive Capital LP ("Hudson Capital") sold 100,000 shares of the Company's common stock and the Company purchased those100,000 shares in a block trade at a price of $56.14 per share. Douglas Braunstein is the Managing Partner of Hudson Capital and was a member of Eagle's Board of Directors at the time of the transaction.

## 17. Subsequent Event

On January 7, 2020, Tyme Technologies, Inc. ("Tyme") and the Company announced a strategic collaboration to advance oral SM-88 for the treatment of patients with cancer. SM-88 is an investigational agent in two Phase II studies for pancreatic cancer and in a Phase II study for prostate cancer. Data is expected in 2021. Under the terms of the securities purchase agreements,
Tyme is entitled to receive up to a total $40 million as follows; (a) an initial $20 million upfront. In return, we will receive 10 million restricted shares of Tyme's common stock at $2.00 per share; (b) a second $20 million milestone payment upon achieving primary endpoints in pivotal trial results or approval of a cancer indication in the U.S. for SM-88. This payment will be split into a $10 million milestone cash payment and a $10 million investment in Tyme at a 15% premium to the then prevailing market price. Under the terms of the co-promotion agreement, we will be responsible for 25% of the promotional sales effort of SM-88 and will receive 15% of net revenues of SM-88 in the U.S. Tyme retains all commercial rights to SM-88 outside the U.S. and reserves the right to repurchase our U.S. co-promotion right for $200 million.

F- 35

Exhibit 4.3

**DESCRIPTION OF SECURITIES**
**REGISTERED PURSUANT TO SECTION 12 OF THE**
**SECURITIES EXCHANGE ACT OF 1934**

The following description sets forth certain material terms and provisions of the securities of Eagle Pharmaceuticals, Inc. (the "Company") that are registered under Section 12 of the Securities Exchange Act of 1934, as amended, and is based on the provisions of our amended and restated certificate of incorporation, or certificate of incorporation, and amended and restated bylaws, or bylaws, and the applicable provisions of the Delaware General Corporation Law ("Delaware Law"). The following summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, the applicable provisions of Delaware law and our certificate of incorporation and bylaws, copies of which are incorporated by reference as an exhibit to the Annual Report on Form 10-K of which this Exhibit 4.3 is a part. We encourage you to read our amended and restated certificate of incorporation, our amended and restated bylaws and the applicable provisions of Delaware Law for additional information.

**General**

Our authorized capital stock consists of 50,000,000 shares of common stock, $0.001 par value per share, and 1,500,000 shares of preferred stock, $0.001 par value per share.

**Common Stock**

Holders of our common stock are entitled to one vote for each share held of record on all matters submitted to a vote of the stockholders, including the election of directors, and does not have cumulative voting rights. Accordingly, the holders of a majority of the shares of our common stock entitled to vote in any election of directors can elect all of the directors standing for election. Subject to preferences that may be applicable to any then outstanding preferred stock, the holders of common stock are entitled to receive dividends, if any, as may be declared from time to time by our board of directors out of legally available funds.

In the event of our liquidation, dissolution or winding up, holders of our common stock will be entitled to share ratably in the net assets legally available for distribution to stockholders after the payment of all of our debts and other liabilities, subject to the satisfaction of any liquidation preference granted to the holders of any then outstanding shares of preferred stock. All of our outstanding shares of common stock are fully paid and nonassessable.

Holders of our common stock have no preemptive, conversion or subscription rights, and there are no redemption or sinking fund provisions applicable to our common stock. The rights, preferences and privileges of the holders of our common stock are subject to, and may be adversely affected by, the rights of the holders of shares of any series of our preferred stock that we may designate and issue in the future.

The transfer agent and registrar for our common stock is American Stock Transfer & Trust Company LLC. Its address is 6201 15th Ave., Brooklyn, NY 11219. Its phone number is (718) 921-8200.

Our common stock is listed on the Nasdaq Global Market under the symbol "EGRX."

**Preferred Stock**

Under our certificate of incorporation, our board of directors has the authority, without further action by the stockholders (unless such stockholder action is required by applicable law or the rules of any stock exchange or market on which our securities are then traded), to designate and issue up to 1,500,000 shares of preferred stock in one or more series, to establish from time to time the number of shares to be included in each such series, to fix the rights, preferences and privileges of the shares of each wholly unissued series and any qualifications, limitations or restrictions thereon and to increase or decrease the number of shares of any such series, but not below the number of shares of such series then outstanding.

We will fix the designations, voting powers, preferences and rights of the preferred stock of each series, as well as the qualifications, limitations or restrictions thereof, in a certificate of designation relating to that series that describes the terms of the series of preferred stock we are offering before the issuance of that series of preferred stock. This description will include:

- the title and stated value;
- the number of shares we are offering;
- the liquidation preference per share;
- the purchase price;
- the dividend rate, period and payment date and method of calculation for dividends;
- whether dividends will be cumulative or non-cumulative and, if cumulative, the date from which dividends will accumulate;
- the procedures for any auction and remarketing, if any;
- the provisions for a sinking fund, if any;
- the provisions for redemption or repurchase, if applicable, and any restrictions on our ability to exercise those redemption and repurchase rights;
- any listing of the preferred stock on any securities exchange or market;
- whether the preferred stock will be convertible into our common stock, and, if applicable, the conversion price, or how it will be calculated, and the conversion period;
- whether the preferred stock will be exchangeable into debt securities, and, if applicable, the exchange price, or how it will be calculated, and the exchange period;
- voting rights, if any, of the preferred stock;
- preemptive rights, if any;
- restrictions on transfer, sale or other assignment, if any;
- whether interests in the preferred stock will be represented by depositary shares;

- a discussion of any material U.S. federal income tax considerations applicable to the preferred stock;
- the relative ranking and preferences of the preferred stock as to dividend rights and rights if we liquidate, dissolve or wind up our affairs;
- any limitations on the issuance of any class or series of preferred stock ranking senior to or on a parity with the series of preferred stock as to dividend rights and rights if we liquidate, dissolve or wind up our affairs; and
- any other specific terms, preferences, rights or limitations of, or restrictions on, the preferred stock.

Delaware Law provides that the holders of preferred stock will have the right to vote separately as a class (or, in some cases, as a series) on an amendment to our certificate of incorporation if the amendment would change the par value or, unless the certificate of incorporation provided otherwise, the number of authorized shares of the class or change the powers, preferences or special rights of the class or series so as to adversely affect the class or series, as the case may be. This right is in addition to any voting rights that may be provided for in the applicable certificate of designation.

Our board of directors may authorize the issuance of preferred stock with voting, exchange or conversion rights that could adversely affect the voting power or other rights of the holders of the common stock. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions and other corporate purposes, could, among other things, have the effect of delaying, deferring or preventing a change in our control that may otherwise benefit holders of our common stock and may adversely affect the market price of the common stock and the voting and other rights of the holders of common stock. It is not possible to state the actual effect of the issuance of any shares of preferred stock on the rights of holders of common stock until the board of directors determines the specific rights attached to that preferred stock. We have no current plans to issue any shares of preferred stock.

**Anti-Takeover Effects of Provisions of Our Amended and Restated Certificate of Incorporation and Bylaws**

Our certificate of incorporation and bylaws provide for our board of directors to be divided into three classes, with staggered three-year terms. Only one class of directors is elected at each annual meeting of our stockholders, with the other classes continuing for the remainder of their respective three-year terms. Because our stockholders do not have cumulative voting rights, our stockholders representing a majority of the shares of common stock outstanding will be able to elect all of our directors due to be elected at each annual meeting of our stockholders. In addition, our certificate of incorporation provides that subject to any limitations imposed by applicable law and subject to the rights of the holders of any series of Preferred Stock that may be designated from time to time, any vacancies on our Board of Directors resulting from death, resignation, disqualification, removal or other causes and any newly created directorships resulting from any increase in the number of directors, shall, unless the Board of Directors determines by resolution that any such vacancies or newly created directorships shall be filled by the stockholders and except as otherwise provided by applicable law, be filled only by the affirmative vote of a majority of the directors then in office, even though less than a quorum of the Board of Directors, and not by the stockholders. Our bylaws provide that all stockholder action must be effected at a duly called meeting of stockholders and not by written consent or electronic transmission, and that only the chairman of our board, our chief executive officer, or a majority of the authorized directors may call a special meeting of stockholders. Our certificate of incorporation requires a 66-2/3% stockholder vote for the amendment, repeal or modification of certain provisions of our certificate of incorporation relating to, among other things, the classification of our Board of Directors and filling of vacancies on our Board of Directors. Our certificate of incorporation and bylaws also require a 66-2/3% stockholder vote for the stockholders to adopt, amend or repeal certain provisions of our bylaws relating to stockholder proposals at annual meetings, director nominees and the number and term of office of directors.

The combination of the classification of our Board of Directors, the lack of cumulative voting and the 66-2/3% stockholder voting requirements will make it more difficult for our existing stockholders to replace our Board of Directors as well as for another party to obtain control of us by replacing our Board of Directors. Since our Board of Directors has the power to retain and discharge our officers, these provisions could also make it more difficult for existing stockholders or another party to effect a change in management. In addition, the authorization of undesignated preferred stock makes it possible for our Board of Directors to issue preferred stock with voting or other rights or preferences that could impede the success of any attempt to effect a change of our control.

These provisions may have the effect of deterring hostile takeovers or delaying changes in our control or in our management. These provisions are intended to enhance the likelihood of continued stability in the composition of our Board of Directors and in the policies they implement, and to discourage certain types of transactions that may involve an actual or threatened change of our control. These provisions are designed to reduce our vulnerability to an unsolicited acquisition proposal. The provisions also are intended to discourage certain tactics that may be used in proxy fights. However, such provisions could have the effect of discouraging others from making tender offers for our shares and, as a consequence, they also may inhibit fluctuations in the market price of our shares that could result from actual or rumored takeover attempts.

**Section 203 of Delaware Law**

We are subject to Section 203 of Delaware Law, or Section 203, which prohibits a Delaware corporation from engaging in any business combination with any interested stockholder for a period of three years after the date that such stockholder became an interested stockholder, with the following exceptions:

- before such date, the board of directors of the corporation approved either the business combination or the transaction that resulted in the stockholder becoming an interested stockholder;
- upon completion of the transaction that resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction began, excluding for purposes of determining the voting stock outstanding (but not the outstanding voting stock owned by the interested stockholder) those shares owned (i) by persons who are directors and also officers and (ii) employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer; or
- on or after such date, the business combination is approved by the board of directors and authorized at an annual or special meeting of the stockholders, and not by written consent, by the affirmative vote of at least 66-2/3% of the outstanding voting stock that is not owned by the interested stockholder.

In general, Section 203 defines business combination to include the following:

- any merger or consolidation involving the corporation and the interested stockholder;
- any sale, lease, transfer, pledge or other disposition of 10% or more of the assets of the corporation to or with the interested stockholder;
- subject to certain exceptions, any transaction that results in the issuance or transfer by the corporation of any stock of the corporation to the interested stockholder;

- any transaction involving the corporation that has the effect of increasing the proportionate share of the stock or any class or series of the corporation beneficially owned by the interested stockholder; or

- the receipt by the interested stockholder of the benefit of any loss, advances, guarantees, pledges or other financial benefits by or through the corporation.

In general, Section 203 defines interested stockholder as an entity or person beneficially owning 15% or more of the outstanding voting stock of the corporation or any entity or person affiliated with or controlling or controlled by such entity or person.

**Exhibit 10.32**

## FIFTH AMENDMENT TO LEASE

1.    **PARTIES**

1.1    THIS FIFTH AMENDMENT TO LEASE (this "5th Amendment") made the 8th day of August, 2019 is between **CAPSTONE TICE BLVD LLC** ("Landlord") whose address is c/o Capstone Realty Group, LLC, 411 Hackensack Avenue, 8th Floor, Suite 800, Hackensack, New Jersey 07601 and **EAGLE PHARMACEUTICALS, INC.** ("Tenant"), whose address is 50 Tice Boulevard, Woodcliff Lake, New Jersey 07677.

2.    **STATEMENT OF FACTS**

2.1    Landlord's predecessor in interest, Mack-Cali Chestnut Ridge L.L.C. and Tenant previously entered into a Lease Agreement dated May 28, 2013 (the **"Initial Lease"**), as amended by a First Amendment to Lease dated July 1, 2013, a Second Amendment to Lease dated March 16, 2015, a Third Amendment to Lease dated May 5, 2015 and a Fourth Amendment to Lease Commencement Date Agreement dated February 10, 2016 (hereinafter collectively referred to as the **"Lease"**) covering 20,497 gross rentable square feet on the third (3rd) floor ("**Existing Premises**") consisting of (i) 9,906 gross rentable square feet on the third (3rd) floor ("**Initial Premises**"), (ii) 5,267 gross rentable square feet on the third (3rd) floor ("**1st Expansion Premises**") as set forth in the Second Amendment to Lease, and (iii) 5,324 gross rentable square feet on the third (3rd) floor ("**2nd Expansion Premises**") as set forth in the Third Amendment to Lease, all in the building located at 50 Tice Boulevard, Woodcliff Lake, New Jersey (**"Building"**); and

2.2    The Term of the Lease expires on June 30, 2020; and

2.3    Tenant desires to expand the Existing Premises by leasing 6,596 gross rentable square feet on the third (3rd) floor of the Building ("**3rd Expansion Premises**"), as shown on Exhibit A attached hereto and made a part hereof, being suites 360 and 363; and

2.4    The parties desire to extend the Term of the Lease as to the Existing Premises for a period to commence on July 1, 2020; and

2.5    The parties desire to amend certain terms of the Lease as set forth below.

3.    **AGREEMENT**

NOW, THEREFORE, in consideration of the terms, covenants and conditions hereinafter set forth, Landlord and Tenant agree as follows:

3.1    The above recitals are incorporated herein by reference.

3.2    All capitalized and non-capitalized terms used in this 5th Amendment which are not separately defined herein but are defined in the Lease shall have the meaning given to any such term in the Lease.

3.3    The Term applicable to the 3rd Expansion Premises shall commence on the Effective Date (as defined below) and shall terminate at 11:59 p.m. on June 30, 2025 ("Expiration Date").

3.4    The effective date applicable to the 3rd Expansion Premises (the "Effective Date") shall be the earlier of: (i) the day Landlord substantially completes The Work (defined in Section 3 of Exhibit B hereof) pursuant to Exhibit B, attached hereto and made part hereof, but subject to The Work passing inspection to allow for occupancy of the 3rd Expansion Premises by Tenant (such date, the "Completion Date") provided that if full occupancy is legally permitted prior to the issuance of a temporary or final certificate of occupancy the same may be issued subsequent to the Completion Date provided Landlord pursues issuance of the same in a commercially reasonable manner, or (ii) the date Tenant or anyone claiming under or through Tenant shall occupy the 3rd Expansion Premises (provided that it is understood that Tenant's entry into the 3rd Expansion Premises under Sections 13.a.-b. of Exhibit B shall not constitute occupancy of the 3rd Expansion Premises by Tenant).

Landlord estimates that the Completion Date shall be on or about one hundred fifty (150) days from the later of: (a) the issuance of permits by applicable governmental entities for The Work, to the extent so required ("Issuance of Permits")' and (b) Tenant's approval of final plans and Tenant's completion of final selections for The Work, subject to: (i) Force Majeure; (ii) delays attributable solely to Tenant, including changes to The Work or plans requested by Tenant and/or interference by Tenant and/or Tenant's employees, agents, contractors or invitees with The Work; (iii) delays attributable to waiting for governmental inspections and approvals or other municipal delays; and (iv) Punch List items as set forth in Exhibit B. Landlord agrees to use commercially reasonable efforts to cause The Work to be substantially completed within one hundred fifty (150) days from the Issuance of Permits, subject to the foregoing.

Notwithstanding the foregoing sentence, in the event that Landlord's Work is not substantially completed within one hundred fifty (150) days from the Issuance of Permits, subject to the conditions in the previous

paragraph, Landlord shall not be in default of the Lease or this 5th Amendment and the Lease, there shall be no penalties in connection therewith and this Fifth Amendment shall remain in full force and effect.

Landlord, however, shall exercise reasonable commercial efforts to advise Tenant, either in writing or orally, of Landlord's good faith estimate of the Completion Date at least ten (10) days before such estimated Completion Date. Landlord's failure to comply with the immediately preceding sentence shall neither be a breach, default or violation of the Lease by Landlord nor postpone, delay or defer the Effective Date, it being understood that Landlord's willingness to provide such estimate to Tenant is merely a courtesy and Tenant shall have no recourse against Landlord if the estimate is not furnished or if the estimate is inaccurate.

3.5     From and after the Effective Date, the following shall be effective:

a.     Landlord shall lease to Tenant and Tenant shall hire from Landlord the 3rd Expansion Premises, subject to the next sentence, in its "AS-IS" condition, as shown on Exhibit A attached hereto and made part hereof. Landlord shall have no obligation to perform any tenant improvement work or grant any tenant allowance, except as set forth in Exhibit B hereof.

b.     The Premises shall be defined as 27,093 gross rentable square feet on the third (3rd) floor of the Building and Paragraph 5 of the Basic Lease Provisions to the Lease shall be deemed amended accordingly.

c.     Tenant shall pay to Landlord an additional Security Deposit applicable to the 3rd Expansion Premises in the amount of $31,331.00, which shall be due and payable upon Tenant's execution and delivery of this Fifth Amendment. Landlord acknowledges that it is presently holding a Security Deposit in the amount of $93,542.08.

d.     In addition to the Fixed Basic Rent payable applicable to the Existing Premises, Tenant shall pay Landlord Fixed Basic Rent applicable to the 3rd Expansion Premises which shall accrue as follows and Paragraph 7 of the Basic Lease Provisions to the Lease shall be deemed amended accordingly:

| Term | ▮▮▮▮ | ▮▮▮▮ | ▮▮▮▮ |
|---|---|---|---|
| ▮▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮ |
| ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮ |
| ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮ |
| ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮ |
| ▮▮▮ | ▮▮▮ | ▮▮▮ | ▮▮ |

If the Effective Date is a day other than the first day of a calendar month, then the first Monthly Installment of Fixed Basic Rent payable by Tenant for the calendar month in which occurs the Effective Date shall be prorated.

e.     Tenant's Percentage applicable to the 3rd Expansion Premises shall be 2.81% (6,596/235,000=2.81%).

f.     Tenant shall pay Landlord, as Additional Rent, Tenant's Percentage applicable to the 3rd Expansion Premises of the increased cost to Landlord for each of the categories set forth in Exhibit G of the Initial Lease (Tax and Operating Cost Rider) over the Base Period Costs, as modified by Section 3.5g. hereof.

g.     The Calendar Year for the Base Period Costs applicable to the 3rd Expansion Premises shall be the calendar year 2020 and Paragraph 3 of the Basic Lease Provisions to the Lease shall be deemed amended accordingly.

h.     Tenant shall pay Landlord the cost of electricity consumed within the 3rd Expansion Premises in accordance with Exhibit H of the Initial Lease (Electricity Rider).

i.     The number of parking spaces as set forth in Paragraph 10 of the Basic Lease Provisions to the Lease shall be increased by twenty-six (26) unassigned parking spaces. Landlord and Tenant acknowledge and agree that Tenant is currently entitled to use a total of eight (8) covered parking spaces in the Building's garage pursuant to the Lease and separate agreements (spaces in the Building's garage are referred to as the "Covered Parking Spaces"). Tenant's existing rights to the Covered Parking Spaces are hereby consolidated into the Lease, the number of Tenant's Covered Parking Spaces as set forth in Paragraph 10 of the Basic Lease Provisions to the Lease is hereby amended to be eight (8), and all other agreements between Landlord and Tenant for use of Covered Parking Spaces are hereby terminated. In consideration for such Covered Parking Spaces, Tenant shall pay Landlord, as Additional Rent, $150.00 per space per month. Such Additional Rent shall be paid together with and in the same manner as the Fixed Basic Rent.

3.6     The Term applicable to the Existing Premises shall be extended for a period ("Extension Term") commencing on July 1, 2020 and expiring at 11:59 p.m. on the Expiration Date, and Paragraph 6 of the Basic Lease Provisions and Paragraph 11 of the Definitions to the Initial Lease shall be deemed amended accordingly.

3.7     Landlord shall have no obligation to perform any tenant improvement work in the Existing Premises or grant any tenant allowance with respect to the Existing Premises in connection with the Extension Term and Tenant hereby hires from Landlord the Existing Premises in its "AS-IS" condition for the Extension Term under the terms and conditions set forth herein.

3.8   Commencing on July 1, 2020, the following shall be effective:

    a.   The Fixed Basic Rent applicable to the Existing Premises shall be as follows and Paragraph 7 of the Basic Lease Provisions to the Initial Lease shall be deemed amended accordingly:

| | | | |
|---|---|---|---|
| ■■ | ■■■ | ■■■ ■■■■ ■ | ■■■■ ■■■■ ■ |
| ■■■ | ■■ | ■■ | ■ |
| ■■■■ | ■■■ | ■■ | ■ |
| ■■■ | ■■■ | ■■ | ■ |
| ■■■ | ■■■ | ■■ | ■ |
| ■■■ | ■■■ | ■■ | ■ |

    b.   Tenant shall continue to pay Landlord, as Additional Rent, Tenant's Percentage applicable to the Existing Premises of the increased cost to Landlord for each of the categories set forth in Exhibit G of the Initial Lease (Tax and Operating Cost Rider) over the Base Period Costs, as modified by Section 3.8d. hereof.

    c.   Tenant shall continue to pay Landlord the cost of electricity consumed within the Existing Premises in accordance with Exhibit H of the Initial Lease (Electricity Rider).

    d.   The Calendar Year applicable to the Existing Premises shall be the calendar year 2020 and Paragraph 3 of the Basic Lease Provisions to the Initial Lease shall be deemed amended accordingly. Prior to July 1, 2020, the Calendar Year shall continue to be the calendar year 2015.

3.9   As of the date hereof, Section 3.11 of the Initial Lease, as amended by Section 3.9 of the Second Amendment to Lease (together, the "Amended Section 3.11"), shall be deemed deleted in its entirety.

Notwithstanding the foregoing, subject to the provisions of this Section 3.9, Tenant shall have the option to lease from Landlord solely the following space on the third (3rd) floor (each such space defined individually as "Additional Space") at the expiration of the existing space lease for such Additional Space, subject to Landlord's right to renew and/or extend each such lease and/or to enter into direct leases with existing subtenants and subject to the rights of any existing tenant with respect to each such Additional Space: (a) Unit 317 leased by Par-Four Investment Management, LLC covering approximately 4,297 gross rentable square feet; and (b) Unit 317B leased by Sapphire Marketing L.L.C. covering approximately 2,410 rentable square feet.

If the Term of this Lease shall be in full force and effect on the expiration or termination date of the existing space lease for such Additional Space and the date upon which Tenant shall exercise the option hereinafter referred to, then, subject to Landlord's right to renew and/or extend such lease and/or enter into a direct lease with existing subtenants and subject to the rights of any existing tenant with respect to each such Additional Space, Tenant shall have the option to lease all, but not less than all of such Additional Space then being offered to Tenant on an "as-is" basis, provided Tenant gives Landlord written notice of such election to lease such additional space within ten (10) days after Tenant shall receive Landlord's notice that such Additional Space is available for leasing to Tenant ("Landlord's Availability Notice").

Landlord and Tenant shall use their best efforts, during the ten (10) day period after Tenant receives Landlord's Availability Notice to agree upon the Fixed Basic Rent to be paid by Tenant for said Additional Space. If Landlord and Tenant shall agree upon the Fixed Basic Rent during such ten (10) day period, the parties shall promptly execute an amendment to this Lease stating the Fixed Basic Rent for the Additional Space, confirming Tenant's election to lease said Additional Space and the incorporation of said Additional Space into the Premises.

If the parties are unable to agree on the Fixed Basic Rent for said Additional Space within ten (10) days after Tenant receives Landlord's Availability Notice and Tenant thereby fails or refuses to exercise this option within such ten (10) day time period (time being of the essence), then Tenant will be deemed to have declined the right to lease the subject Additional Space and in such event Tenant shall have no further rights under this Section 3.9 with respect to the Additional Space which was the subject of Landlord's Availability Notice.

If Tenant shall elect to lease said Additional Space: (w) said Additional Space shall be deemed incorporated within and part of the Premises on the date that Landlord shall notify Tenant that such Additional Space is ready for occupancy by Tenant and shall expire on the Expiration Date of the Lease, (x) the Fixed Basic Rent payable under the Lease shall be increased by the agreed amount for said Additional Space as determined in the manner set forth above, (y) Tenant's Percentage shall be proportionately increased, and (z) all other terms and provisions set forth in this Lease shall apply, except that Landlord not be required to perform any work with respect to said Additional Space or provide any tenant improvement allowance.

The option granted to Tenant under this Section 3.9 may be exercised only by Tenant, its permitted successors and assigns, and not by any subtenant or any successor to the interest of Tenant by reason of any action under the

Bankruptcy Code, or by any public officer, custodian, receiver, United States Trustee, trustee or liquidator of Tenant or substantially all of Tenant's property.

Notwithstanding the foregoing, Tenant shall have no right to exercise the option granted to Tenant hereunder if, at the time Landlord gives Tenant notice of such availability of Additional Space: (i) Tenant shall not be in occupancy of substantially all of the Premises; or (ii) the Premises or any part thereof shall be the subject of a sublease, except pursuant to a "Permitted Transfer" as defined and set forth under Section 3.11B of this 5th Amendment.

If Tenant shall have elected to exercise its option hereunder, such election shall be (at Landlord's option) deemed withdrawn if, at any time after the giving of notice of such election and prior to the occupancy of the Additional Space, Tenant shall sublease all or any part of the Premises or assign Tenant's interest in this Lease, except pursuant to a "Permitted Transfer" as defined and set forth under Section 3.11B of this 5th Amendment. Tenant shall have no right to exercise any of such options (and Landlord shall not be required to give Tenant the Landlord's Availability Notice) subsequent to the date Landlord shall have the right to deliver a notice of termination under the Lease or if Tenant has delivered the "Termination Notice" as defined and set forth under Section 3.10 of this 5th Amendment.

3.10   **TERMINATION OPTION**:

Notwithstanding anything to the contrary contained herein, Tenant shall have the option to terminate the Lease ("Termination Option") in accordance with the following terms and conditions:

a.   If Tenant desires to exercise the Termination Option, Tenant shall give Landlord irrevocable written notice ("Termination Notice") of Tenant's exercise of this Termination Option, which shall be delivered by certified mail which Termination Notice must be received by Landlord no later than the date that is two hundred and seventy (270) days prior to the Termination Date (as defined below) elected by Tenant in such Termination Notice, and which Termination Notice may be delivered to Landlord no earlier than July 1, 2023. **TIME IS OF THE ESSENCE** with respect to Landlord's receipt of the Termination Notice and all other deadlines in this Article.

b.    If Tenant gives the Termination Notice and complies with all the provisions in this Article, the Lease shall terminate at 11:59 p.m. on the date specified by Tenant in the Termination Notice (the "Termination Date"), but in no event shall the Termination Date be earlier than March 31, 2024 regardless of the date that the Termination Notice is delivered.

c.    Tenant's obligations to pay Fixed Basic Rent, Additional Rent, and any other costs or charges under this Lease, and to perform all other Lease obligations for the period up to and including the Termination Date, shall survive the termination of this Lease.

d.    Notwithstanding the foregoing, if at any time during the period on or after the date on which Tenant shall exercise its Termination Option, up to and including the Termination Date, Tenant shall be in default of this Lease, beyond any applicable notice and cure periods, then Landlord may elect, but is not obligated, to cancel and declare null and void Tenant's exercise of the Termination Option and this Lease shall continue in full force and effect for the full Term hereof unaffected by Tenant's exercise of the Termination Option.

e.   In the event Tenant exercises the Termination Option, Tenant covenants and agrees to surrender full and complete possession of the Premises to Landlord on or before the Termination Date vacant, broom-clean, in good order and condition, and, in accordance with the provisions of this Lease, and thereafter the Premises shall be free and clear of all leases, tenancies, and rights of occupancy of any entity claiming by or through Tenant.

f.    If Tenant shall fail to deliver possession of the Premises on or before the Termination Date in accordance with the terms hereof, Tenant shall be deemed to be a holdover Tenant from and after the Termination Date, and in such event all covenants and terms of Article 19 of the Lease shall apply, except that the 150% figure in Article 19 of the Lease shall be increased to 200%. Tenant shall also be liable to Landlord for all costs and expenses incurred by Landlord in securing possession of the Premises. Landlord may accept any such sums from Tenant without prejudice to Landlord's right to evict Tenant from the Premises by any lawful means.

g.    Subject to Landlord's right to cancel and declare null and void Tenant's exercise of the Termination Option pursuant to Section 3.10 d. above, if Tenant properly and timely exercises the Termination Option, the Lease shall cease and expire on the Termination Date with the same force and effect as if said Termination Date were the date originally provided in this Lease, as modified by this 5th Amendment, as the Expiration Date of the Term hereof.

h.    If the Tenant under the Lease assigns its interest in the Lease: then, from and after the date of such assignment, the Termination Option shall be deemed null and void, and neither Tenant nor the assignee shall have the right to exercise such Termination Option, provided, however, that Landlord and Tenant agree that an event that is deemed to be a Permitted Transfer pursuant to Section 6(c) of the Original Lease (as amended as provided in Section 3.11B below), shall not result in the loss of the Termination Option, which Termination Option shall continue in full force and effect and may be exercised at any time following any such occurrence.

3.11   As of the date hereof: (i) Article 31 of the Original Lease (defined in Section 2.1 of the Initial Lease dated May 28, 2013), titled "Option to Renew", which was reinstated by the Second Amendment to Lease, shall be amended so that all references to the Expiration Date in said Article 31 shall mean June 30, 2025 and all references to the Renewal Term in said Article 31 shall mean the five (5) year period beginning on July 1, 2025 and ending on June 30, 2030.

3.11A  Landlord confirms that Landlord's right to terminate the Lease or recapture any space set forth in Section 6(a) of the Original Lease does not apply to Permitted Transfers.

3.11B  The first sentence of the second paragraph of Section 6(c) of the Original Lease is hereby deleted and replaced with the following:

> Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet all or any portion of the Premises to (i) any corporation or other Entity directly or indirectly controlling or controlled by Tenant or under common control with Tenant, or (ii) any successor by merger, consolidation, corporate reorganization or acquisition of all or substantially all of the assets of Tenant (any transaction referred to in clauses (i) or (ii) hereof will be a "Permitted Transfer") provided that the net worth of any transferee of a Permitted Transfer will not be less than $100,000,000 immediately preceding the Permitted Transfer. Any other assignment or subleasing of Tenant's interest under this Lease will be subject to Landlord's approval, which approval will not be unreasonably withheld, conditioned or delayed.

3.11C  Landlord shall secure for Tenant a subordination, non-disturbance and attornment agreement recognizing Tenant's rights under the Lease (a "SNDA") from the holder of any mortgage, deed of trust or lease encumbering the Building or the property on which it is located as of the date of this 5th Amendment (which parties Landlord represents and warrants to be BVFL I FI LLC), in the form attached hereto as Exhibit D, provided that Tenant shall execute and deliver to Landlord concurrently with Tenant's execution and delivery of this 5th Amendment such SNDA. Landlord shall also secure for Tenant a SNDA from all future holders of any mortgage, deed of trust, or lease encumbering the Building or the property on which it is located at the time the same comes into existence on such holder's standard form subject to Tenant's reasonable review and comment. From and after the date of this 5th Amendment, the effectiveness of the provisions of Section 12 of the Original Lease as to any mortgage, deed of trust, or lease are subject to Landlord's compliance with the preceding requirements to deliver an SNDA for the same.

3.12  **NOTICE ADDRESSES** for the Landlord shall mean the following and Paragraph 9 of the Basic Lease Provisions to the Lease shall be deemed amended accordingly:

> **If to Landlord:**
> c/o Capstone Realty Group, LLC
> 411 Hackensack Avenue, 8th Floor, Suite 800
> Hackensack, New Jersey 07601
> Attention: Brad Gillman – Manager

3.13  No later than thirty (30) days after the determination of the Effective Date, the parties shall memorialize the Effective Date in writing.

3.14 Landlord and Tenant represent and warrant to the other that it has dealt with no broker in connection with this transaction, except for Savills Studley, Inc., and Landlord and Tenant agree to indemnify and hold the other harmless from any and all claims of any other broker arising out of or in connection with negotiations of, or entering into of, this 5th Amendment based upon any dealings that the other broker had with the indemnifying party. Landlord shall pay the commission owed to Savills Studley, Inc. pursuant to a separate written agreement between Landlord and Savills Studley, Inc.

3.15  Tenant agrees not to disclose the terms, covenants, conditions or other facts with respect to the Lease, including the Fixed Basic Rent and Additional Rent, to any person, corporation, partnership, association, newspaper, periodical or other entity, except: (i) to Tenant's accountants, advisors, or attorneys, (ii) to actual or potential investors, purchasers, acquirers, providers of financing, acquisition targets, or business counterparties of Tenant, and each of their accountants, advisors, or attorneys, or (iii) as required by law. Tenant agrees that said accountants, advisors, or attorneys (except to the extent necessary to handle any litigation concerning the Lease) shall be required to keep the terms of the Lease confidential. This non-disclosure and confidentiality agreement will be binding upon Tenant without limitation as to time, and a breach of this paragraph will constitute a material breach by Tenant under this 5th Amendment and the Lease. In addition, Tenant's employees, contractors, etc. shall keep all of the terms and conditions of the Lease, including any billing statements and/or any backup supporting those statements, confidential, subject to the same exceptions set forth in the first sentence of this Section 3.15.

3.16 Tenant, to the best of its knowledge, information and belief, as of the date hereof, hereby represents to Landlord that (i) there exists no default under the Lease either by Landlord or Tenant; (ii) Tenant is entitled to no credit, free rent or other offset or abatement of the rents due under the Lease; and (iii) there exists no offset, defense or counterclaim to Tenant's obligations under the Lease. Landlord, to the best of its knowledge, information and belief, as of the date hereof, hereby represents to Tenant that there exists no default under the Lease either by Landlord or Tenant.

3.17 Section 3.10 of the Initial Lease, Section 29 of the Original Lease, and Section 3.16 of the Second Amendment to Lease, which give the Landlord the right, subject to certain conditions, to relocate the Premises, are hereby deleted.

3.18 Except as expressly amended herein, the Lease shall remain in full force and effect as if the same had been set forth in full herein, and Landlord and Tenant hereby ratify and confirm all of the terms and conditions thereof.

3.19 This 5th Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective legal representatives, successors and permitted assigns.

3.20 Each party agrees that it will not raise or assert as a defense to any obligation under the Lease or this 5th Amendment or make any claim that the Lease or this 5th Amendment is invalid or unenforceable due to any failure of this document to comply with ministerial requirements including, but not limited to, requirements for corporate seals, attestations, witnesses, notarizations, or other similar requirements, and each party hereby waives the right to assert any such defense or make any claim of invalidity or unenforceability due to any of the foregoing.

This 5th Amendment may be executed in multiple counterparts, each of which, when assembled to include an original signature for each party contemplated to sign this 5th Amendment, will constitute a complete and fully executed original. All such fully executed counterparts will collectively constitute a single agreement. Tenant expressly agrees that if the signature of Landlord and/or Tenant on this 5th Amendment is not an original, but is a digital, mechanical or electronic reproduction (such as, but not limited to, a photocopy, fax, e-mail, PDF, Adobe image, JPEG, telegram, telex or telecopy), then such digital, mechanical or electronic reproduction shall be as enforceable, valid and binding as, and the legal equivalent to, an authentic and traditional ink-on-paper original wet signature penned manually by its signatory.

[Signature page(s) follows.]

IN WITNESS WHEREOF, Landlord and Tenant have hereunto set their hands the date and year first above written, and acknowledge one to the other that they possess the requisite authority to enter into this transaction and to sign this 5th Amendment.

LANDLORD:                    TENANT:

**CAPSTONE TICE BLVD LLC**          **EAGLE PHARMACEUTICALS, INC.**

By:   AFG Capstone Tice Blvd LLC - Manager
By:   Capstone Realty Holdings LLC - Manager


By:   __/s/ Brad Gillman_____          By:   __/s/_Pete A. Meyers_____
                                                        Name: Pete A. Meyers
                                                        Title: Chief Financial Officer


                                                        and


                                                 By:   __/s/ Brian Cahill_____
                                                        Name: Brian Cahill
                                                        Title: Vice President, Finance

5093883-11

**Exhibit 10.34**

**CERTAIN CONFIDENTIAL INFORMATION CONTAINED IN THIS DOCUMENT, MARKED BY [***], HAS BEEN OMITTED BECAUSE IT IS NOT MATERIAL AND WOULD LIKLEY CAUSE COMPETITIVE HARM TO EAGLE PHARMACEUTICALS, INC. IF PUBLICLY DISCLOSED.**

**CONFIDENTIAL** **EXECUTION VERSION**

# SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (this "Agreement") is hereby entered into and made effective as of the date it has been executed by all parties hereto (the "Effective Date") by and between Eli Lilly and Company ("Lilly") and Eagle Pharmaceuticals, Inc. ("Eagle"). Lilly and Eagle are referred to herein individually as a "*Party*" and collectively, as the "*Parties.*"

WHEREAS, Lilly owns Orange Book listed United States Patent No. 7,772,209 (the "Asserted Lilly Patent") and, in the Orange Book, the Asserted Lilly Patent has the Patent Use Code, U-1296;

WHEREAS, Lilly is the holder of New Drug Application ("NDA") No. 021462, which is approved by the Food and Drug Administration ("FDA") for the manufacture and sale of pemetrexed for injection in 100 mg/vial and 500 mg/vial dosage strengths which Lilly has marketed in the United States under the brand name ALIMTA®;

WHEREAS, Eagle is the holder of 505(b)(2) New Drug Application ("505(b)(2) NDA") No. 209472, submitted to FDA seeking approval for the manufacture and sale in the United States of generic pemetrexed for injection in a 25 mg/mL, 500 mg vial product, and containing a certification pursuant to 21 U.S.C. §355(b)(2)(A)(iv) alleging that the Asserted Lilly Patent is invalid, unenforceable and/or not infringed;

WHEREAS, Lilly contends that the Asserted Lilly Patent is valid and enforceable and that the manufacture, use, sale, offering for sale, or importation of the Eagle Product (as defined below) in the United States would infringe the Asserted Lilly Patent;

WHEREAS, Lilly and Eagle are involved in litigation in the United States District Court for the District of Delaware (the "District Court"), namely Civil Action No. 1:17-cv-01293-MSG (the "Patent Infringement Lawsuit"), concerning the alleged infringement by Eagle of the Asserted Lilly Patent resulting from the filing by Eagle of the Eagle NDA (as defined below), the related certification pursuant to 21 U.S.C. § 355(b)(2)(A)(iv), and a related Eagle allegation that the Patent Use Code U-1296 is incorrect;

WHEREAS, Lilly and Eagle are involved in litigation in the United States District Court for the District of Delaware (the "District Court"), namely Civil Action No. 1:18-cv-01121-MSG (the "Antitrust Lawsuit"), concerning an alleged antitrust violation by Lilly with respect to the Asserted Lilly Patent and its Patent Use Code listing in the Orange Book (together with the Patent Infringement Lawsuit collectively referred to herein as the "Lawsuits");

WHEREAS, the Parties desire and agree to enter into this Agreement to avoid the costs, uncertainty, and risk associated with continued litigation of these matters and to permit entry of the Eagle Product prior to the expiration of the Asserted Lilly Patent and its pediatric exclusivity upon the terms and subject to the conditions set forth herein;

WHEREAS, this Agreement is the only agreement between the Parties related to the settlement of the Lawsuits relating to the alleged infringement of the Asserted Lilly Patent with respect to the Eagle NDA and the Eagle Product and the alleged anti-competitive behavior by Lilly with respect to the Asserted Lilly Patent;

WHEREAS, no Party has received any consideration from the other Party for its entry into this Agreement other than that which is described in this Agreement; and

NOW, THEREFORE, in consideration of the mutual agreements herein contained and the consideration described herein, the sufficiency and receipt of which are hereby acknowledged, the Parties hereto, intending to be legally bound hereby, agree as follows:

## 1. DEFINITIONS

1.1 "Affiliate" means, with respect to a Party, any entity that, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such Party. For purposes of

this definition, "control" (including the terms "controlled by" and "under common control with") of a business entity means the direct or indirect ownership of more than fifty percent (50%) of the voting stock or other ownership interest in such entity; or the direct or indirect ownership of the power to direct the management and policies of the other entity by any means whatsoever.

1.2    "ALIMTA®" means pemetrexed for injection in 100 mg/vial and 500mg/vial dosage strengths that is the subject of Lilly's NDA No. 021462, and any other dosage strengths added to NDA No. 021462.

1.3    "ALIMTA® Generic Product" means a Generic Pharmaceutical Product, other than the Eagle Product, whose RLD is ALIMTA®, or any Authorized Generic Product.

1.4    "Authorized Generic Product" means a pharmaceutical product sold in the Territory pursuant to and under the Lilly NDA, but marketed without the ALIMTA® trademark or any successor trademark thereto.

1.5    "Calendar Year" means each successive period of twelve months commencing on January 1 and ending on December 31.

1.6    "Control" means, with respect to any patent right or regulatory exclusivity, the possession (whether by ownership or license) by Lilly or its Affiliates of the ability to grant to Eagle a license, waiver or other access as provided herein to such patent right or regulatory exclusivity, without violating the terms of any agreement or other arrangement with any Third Party or Eagle being obligated to pay any royalties or other consideration therefor.

1.7    "Eagle NDA" means Eagle's 505(b)(2) NDA No. 209472, submitted to FDA seeking approval for the manufacture and sale in the United States of generic pemetrexed for injection in a 25 mg/mL, 500 mg vial product, and any amendments and supplements thereto including any additional indications that are approved by the FDA for the Lilly NDA, whether approved before or after the Effective Date but not including any amendment or supplement that converts Eagle's 505(b)(2) NDA to an ANDA under 505(j).

1.8    "Eagle Product" means the NDA product that is the subject of the Eagle NDA.

1.9    "Eagle Quarter" means each of the four (4) thirteen (13) week periods with respect to the United States, commencing on January 1 of any calendar year.

1.10   "Final Court Decision" means a decision (i) by a court of competent jurisdiction, or (ii) by the United States Patent and Trademark Office in an *inter partes* review, post grant review, or other similar proceeding proceeding, in each of clauses (i) and (ii) on the merits (e.g., after a trial or summary judgment motion) of the asserted patent claims, whereby such court enters final judgment of invalidity, unenforceability and/or non-infringement (as applicable) from which no appeal (other than a petition to the United States Supreme Court for a writ of certiorari) has been or can be taken. For the avoidance of doubt, any settlement, consent judgment entered as part of any settlement, withdrawal or dismissal of any action or dispute without a decision on the merits of the asserted patent claims (whether such settlement, consent judgment, withdrawal or dismissal is with or without prejudice, and whether or not such claims may be relitigated) shall not be deemed a Final Court Decision.

1.11   "Generic Pharmaceutical Product" means any product that is the subject of an ANDA and/or any product that is the subject of a 505(b)(2) NDA.

1.12   "License Effective Date" means the earliest to occur of the following:

    (a)    February 1, 2022; and

    (b)    [***]; and

    (c)    the date that Lilly authorizes a Third Party to sell an ALIMTA® Generic Product in the Territory, other than an Authorized Generic Product as described in subsection (e) of this Section 1.12, [***]; and

    (d)    the date of a Final Court Decision in favor of a Third Party holding all of the then adjudicated claims of the Asserted Lilly Patent to be invalid, not infringed and/or unenforceable; and

    (e)    the date on which a Third Party (under license or authorization from Lilly), or Lilly or a Lilly Affiliate, first sells in the Territory an Authorized Generic Product. Lilly shall provide Eagle with written advance notice, not less than 120 days prior to the date a Third Party (under license or authorization from Lilly), or Lilly or a Lilly Affiliate is authorized to sell an Authorized Generic Product, if such date is prior to February 1, 2022. For the avoidance of doubt, this subsection shall

not apply in the event of a launch of an Authorized Generic Product by Lilly in response to an at-risk Third Party launch as described in Section 3.12; and

(f)     the date of expiration, disclaimer, abandonment, cancellation, or dedication to the public of all the claims of the Asserted Lilly Patent subject to the Appeals.

1.13    "Licensed Patents" means the Asserted Lilly Patent and any continuations, continuations-in-part, divisionals, reissues and reexaminations thereof, and any other patents owned or Controlled by Lilly or its Affiliates that are listed now or in the future in the Orange Book as covering the Lilly NDA products.

1.14    "Lilly NDA" means Lilly's NDA No. 021462 and any amendments or supplements thereto.

1.15    "Net Sales" means, with respect to the Eagle Product, the gross amount invoiced by Eagle, its Affiliates or its Sublicensee of such Product to Third Parties ("Gross Sales"), less (a) bad debts related to such Product, (b) sales returns and allowances actually paid, granted or accrued, including, trade, quantity and cash discounts, and other adjustments, including, those granted on account of price adjustments, billing errors, rejected goods, damaged or defective goods, recalls, returns, rebates, chargeback rebates, reimbursement, fees or similar payments granted or given to wholesalers or other distributors, buying groups, health care insurance carriers, pharmacy benefit management companies, health maintenance organizations, Governmental Authorities, or other institutions or health care organizations, (c) prompt pay discounts, and (d) adjustments arising from consumer discount programs or other similar programs or arising in connection with any Eagle discount or savings program. Net Sales shall be determined from books and records maintained in accordance with GAAP, as consistently applied by Eagle with respect to sales of all its drug products; for the sake of clarity, any charge or allowance identified under this Section shall be counted once. Sales and other transfer of Eagle Product between Eagle and its Affiliates will not give rise to Net Sales.

1.16    "Orange Book" means FDA's publication entitled *Approved Drug Products with Therapeutic Equivalence Evaluations*.

1.17    "Other Lilly Patents" means, other than the Licensed Patents, any other patents or patent applications owned or Controlled or licensed, now or in the future, by Lilly or any of its Affiliates that claim or cover the making, using, selling, offering for sale or importation of the Eagle Product in or for the Territory.

1.18    "Pediatric Exclusivity" means the period of Regulatory Exclusivity awarded to a drug product during which FDA may not approve another drug product pursuant to 21 U.S.C. 355a(b)-(c).

1.19    "Regulatory Exclusivity" means any grant by the FDA with respect to an NDA or ANDA that precludes final FDA approval of another application during the term of the exclusivity.

1.20    "RLD" means Reference Listed Drug, i.e., a drug that an ANDA or 505(b)(2) NDA references for investigations to show that the drug that is the subject of the ANDA or 505(b)(2) is approvable by the FDA.

1.21    "Royalty Term" means the period commencing on the License Effective Date and ending upon the earliest of the following:

(a)     the date of a Final Court Decision in favor of a Third Party holding all of the then adjudicated claims of the Asserted Lilly Patent to be invalid, non-infringed and/or unenforceable;

(b)     the date of expiration, disclaimer, abandonment, cancellation, or dedication to the public of the Asserted Lilly Patent with surviving patent term and any regulatory exclusivity attached thereto; and

(c)     May 24, 2022.

1.22    "Territory" means the United States of America, its territories, possessions, protectorates, and the Commonwealth of Puerto Rico.

1.23    "Third Party" means any entity or person that is not a Party or an Affiliate of a Party.

2.    **SETTLEMENT; DISMISSAL; RELEASE**

2.1    All of the terms and conditions set forth in this Agreement shall be binding on the Parties as of the Effective Date.

2.2    The Parties are entering into this Agreement in an effort to avoid the costs, uncertainty, and risk

associated with the continued litigation of these matters.

2.3 <u>Dismissal of Litigation</u>. Within three (3) business days after the Agreement Effective Date, the Parties shall file the Stipulations of Dismissal attached as Exhibits A and B. The Stipulations of Dismissal shall dismiss all claims and defenses with prejudice, with each Party to bear its own fees and costs. If for any reason the District Court raises an objection to either or both of the Stipulations of Dismissal as drafted or requires that the Parties modify either or both of the Stipulations of Dismissal, the Parties agree to confer promptly and in good faith in order to take action consistent with this Agreement to secure entry of the Stipulations of Dismissal as drafted or with agreed-upon modifications; provided that nothing contained herein shall be deemed to require a Party to agree to a modification of this Agreement or the Stipulations of Dismissal that materially affects the economic value of the transactions contemplated hereby.

2.4 <u>FTC Review</u>. Each Party shall submit this Agreement (including all attachments hereto) to federal antitrust agencies, *i.e.*, the U.S. Federal Trade Commission ("FTC") and U.S. Department of Justice ("DOJ") within ten (10) business days of its execution. The Parties hereby agree that they will work in good faith to resolve any related issues and endeavor to modify this Agreement in view of any objections from such federal antitrust agencies, but no Party shall be required to accept any terms that materially change or modify the purposes of this Agreement. Each Party reserves the right to communicate separately with the FTC and/or DOJ regarding such filings as it believes appropriate, provided, however, that each Party will keep the other Party reasonably informed of such communications.

2.5 <u>Release</u>. In consideration of the mutual execution of this Agreement and the mutual agreement to be legally bound by the terms hereof, Lilly and Eagle each on behalf of itself and its predecessors, successors, assigns, shareholders, officers, directors, employees, trustees, agents, representatives, licensees, licensors, parents, subsidiaries and Affiliates and all others claiming by, through and under them, hereby fully, finally, irrevocably and forever releases, relinquishes, acquits and discharges the other Party and its predecessors, successors, assigns, shareholders, officers, directors, employees, trustees, agents, representatives, licensees, licensors, parents, subsidiaries, Affiliates, customers, suppliers, importers, attorneys, manufacturers, distributors and insurers, if any, from any and all claims, demands, causes of action, liabilities, losses, all manner of actions, judgments, settlements, interest, damages, punitive damages and other damages or costs of whatever nature (including costs, expenses, and attorneys' fees), whether known or unknown, foreseen or unforeseen, certain or contingent, accruing on or before the Effective Date, arising out of, derived from, predicated upon, or relating to the Eagle Product and the Eagle NDA or its filing, the Licensed Patents and Other Lilly Patents, or the Patent Infringement Lawsuit; <u>provided</u>, <u>however</u>, that nothing herein shall prevent or impair the right of either Party to bring a proceeding in the forum set forth in Section 8.2 of this Agreement for a breach of this Agreement or any representation, warranty, or covenant herein, or with respect to any product other than the Eagle Product.

2.6 <u>Unknown Claims</u>. Each Party, on behalf of itself and its Affiliates, hereby expressly waives and relinquishes any and all provisions, rights and benefits conferred by Section 1542 of the California Civil Code, which provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN TO HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

Further, each Party, on behalf of itself and its Affiliates, expressly waives and relinquishes all rights and benefits afforded by any law in any other jurisdiction similar to Section 1542 of the California Civil Code.

2.7 <u>No Assignment of Claims</u>. Each Party represents, warrants and covenants that it has not heretofore assigned or transferred, and will not assign or otherwise transfer, to any person or entity any matters released by such Party in Section 2.5, and each such Party agrees to indemnify and hold harmless the other Party and the other persons and entities released under Section 2.5 from and against all such released matters arising from any such alleged or actual assignment or transfer.

2.8 <u>Reliance on Agreement</u>. Neither Party shall seek to rely upon or enter this Agreement or any admission herein into evidence in any proceeding other than a proceeding related to a claimed breach of this Agreement.

**3. LICENSE AND COVENANT NOT TO SUE**

3.1 Lilly and its Affiliates hereby grant to Eagle and its Affiliates a non-transferable (except as permitted under Section 8.10), non-exclusive license under the Licensed Patents to manufacture, have manufactured, use, sell, offer to sell, and import the Eagle Product in the Territory as of and following the License Effective Date provided that such foregoing license to sell shall be limited to not more than nineteen

thousand two hundred (19,200) vials of the Eagle Product in the Territory prior to April 1, 2022, but shall be unlimited thereafter. Eagle and its Affiliates shall not have any right to sublicense its rights under the foregoing license except to an exclusive (even as to Eagle) sublicensee ("Sublicensee"). Eagle and its Affiliates shall not have any right to otherwise transfer or assign any of its rights under the foregoing license, except for any assignment expressly permitted under Section 8.10.

3.2     The license rights under Section 3.1 as to the Eagle Product will begin on the License Effective Date. Eagle will not, and will cause its Affiliates not to, directly or indirectly, sell, have sold, offer to sell, or have offered for sale any of the Eagle Product in the Territory prior to the License Effective Date except as expressly permitted under Section 3.3 or 3.5.

3.3     Limited License. Subject to the terms and conditions of this Agreement, effective as of the dismissal set forth in Section 2.3, Lilly hereby grants to Eagle and its Affiliates a non-exclusive limited license (which may be sublicensed to the Sublicensee) in the Territory under the Licensed Patents, and any foreign counterparts thereto, and any other Lilly-owned patent, patent application, or intellectual property right, whether arising and/or acquired in the future or now-existing, sufficient to allow Eagle, prior to, as of and following the License Effective Date, to make, have made, import, have imported, have stored, and store the Eagle Product and otherwise take such steps in each case solely as reasonably necessary to develop inventory of, and obtain and maintain regulatory approval for, the Eagle Product for sale in the Territory as of and following the License Effective Date.

3.4     Covenant not to sue. Lilly and its Affiliates covenant not to sue, assert any claim or otherwise participate in any action or proceeding against or take any action to interfere with, Eagle and its Affiliates, the Sublicensee, and their importers, suppliers, distributors, and customers, or support or encourage any Third Party to sue, for infringement of the Licensed Patents or Other Lilly Patents with respect to Eagle's or its Affiliates' or its Sublicensee (i) making, having made, using, selling, offering for sale, distributing and importation of the Eagle Product in or for the Territory as of and following the Effective Date pursuant to the terms of this Agreement, and (ii) maintaining with FDA a "Paragraph IV Certification" for the Eagle NDA under 21 U.S.C. § 355(b)(2)(A)(iv).

Lilly shall impose the foregoing covenant not to sue on its Affiliates and any Third Party to which Lilly or any of its Affiliates may assign, license or otherwise transfer any rights to enforce the applicable Licensed Patents or Other Lilly Patents. Lilly will ensure that any and all of its Licensees also comply with this provision.

3.5     Pre-marketing Rights. Subject to the terms and conditions of this Agreement, including Sections 3.1 – 3.4, Eagle or its Sublicensee may engage in discussions with potential customers to make them aware of the upcoming availability of the Eagle Product in the Territory, engage in customary pre-launch marketing activities, other than entry into contracts with potential customers and distributors, beginning not earlier than sixty (60) days prior to the commencement of the Royalty Term, so long as such communications and other activities with potential customers and distributors make explicit that Eagle's Product will not be available for sale in the Territory prior to the License Effective Date ("Pre-Marketing"). Eagle or its Sublicensee may enter into contracts with potential customers and distributors beginning not earlier than January 2, 2022.

3.6     Covenant not to challenge Licensed Patents. Except to the extent required by law or order of a court or administrative agency of competent jurisdiction, only to the extent of any license contained in this Agreement and solely with respect to the Eagle Product, Eagle shall not, and shall cause its Affiliates (and Sublicensee, as applicable) not to: (i) challenge, dispute or contest the validity, enforceability, patentability, priority of invention or other claim to priority, or patent term adjustment of the Licensed Patents or assert non-infringement of the Licensed Patents, in any proceeding in the United States Patent and Trademark Office ("USPTO") (*e.g.*, reexamination, *inter partes* proceeding, protest, observation, comment, opposition, third-party submission, post-grant proceeding, i*nter panes* review, post grant review, covered business method review, derivation proceeding, interference or other action) or any United States court proceedings, and (ii) knowingly assist or join any proceeding with any Third Party challenging, disputing or contesting the validity, enforceability, patentability, priority of invention or other claim to priority, or patent term adjustment, or asserting non-infringement of any of the Licensed Patents. For the avoidance of doubt, nothing herein shall prevent Eagle (or its Sublicensee as applicable) (a) from maintaining a "Paragraph IV Certification" under 21 U.S.C. § 355(b)(2)(A)(iv) for the Eagle NDA, or (b) from challenging, disputing or contesting the validity, enforceability, patentability, priority of invention or other claim to priority, or patent term adjustment of the Licensed Patents or asserting non-infringement of the Licensed Patents, in the event that Lilly or its Affiliates breach this Agreement (and fail to cure such breach as set forth in this Agreement) or assert that the Eagle Product or the Eagle NDA infringes any of the Licensed Patents.

3.7 Waiver of Lilly Regulatory Exclusivity. Lilly waives, as to the Eagle NDA only, any Regulatory Exclusivity awarded to Lilly relating to pemetrexed, whether existing now or in the future, including any Pediatric Exclusivity in effect for the Lilly NDA. If requested, Lilly shall promptly provide to Eagle and the FDA a letter waiving Regulatory Exclusivity. The written consent shall be suitable for submission to the FDA and be in substantially the form set forth in Exhibit C.

3.8 Waiver of 30-month stay. Lilly acknowledges that the entry of the Parties' Stipulation of Dismissal in the Patent Infringement Lawsuit will terminate the 30-month stay of approval of the Eagle NDA that was put into effect pursuant to 21 U.S.C. § 355(c)(3)(C). For clarity, to the extent necessary, Lilly waives the 30-month stay. If requested, Lilly shall promptly provide to Eagle and the FDA a letter waiving any 30-month stay. The written consent shall be suitable for submission to the FDA and be in substantially the form set forth in Exhibit C.

3.9 Lilly Consent to Approval of Eagle NDA. Lilly hereby consents to the final FDA approval of the Eagle NDA, and the entry of the Parties' Stipulation of Dismissal shall permit the FDA to grant final regulatory approval to the Eagle NDA (subject to the Eagle NDA meeting other regulatory requirements), pursuant to 21 U.S.C. § 355(c)(3)(C)(ii)(I)(bb) and 21 C.F.R. §§ 314.107(b)(3)(iii)(B). If requested by the FDA, Lilly shall promptly provide to Eagle and the FDA written consent, pursuant to 21 C.F.R. § 314.50(i)(3), that the FDA may grant final regulatory approval to the Eagle NDA, pursuant to 21 C.F.R. §§ 314.107(b)(3)(vi). The written consent shall be suitable for submission to the FDA and be in substantially the form set forth in Exhibit D. Lilly shall promptly submit this correspondence to the FDA in connection with the Lilly NDA, and promptly confirm to Eagle that it has done so. Eagle shall then, in connection with the Eagle NDA, also submit to the FDA a copy of Lilly's correspondence to Eagle.

3.10 Lilly Regulatory Covenants. Except as required by law, directly requested by FDA or for reasons that relate to the safety and/or efficacy of any pharmaceutical product, Lilly and its Affiliates shall not: (a) initiate any activity in the Territory against the Eagle NDA or the Eagle Product for the purpose of: (i) interfering with Eagle's efforts to obtain or maintain FDA approval of the Eagle Product and the Eagle NDA or (ii) interfering with Eagle's or its Sublicensee's efforts to launch the Eagle Product in the Territory as of the License Effective Date under the terms provided by this Agreement; (b) delist ALIMTA® with the FDA; or (c) delete, remove, designate as "obsolete" or cancel any National Drug Code(s) or any other relevant code(s) for ALIMTA® from the applicable National Drug Data File maintained by First Databank (or any successor or equivalent organization) prior to the License Effective Date. Nothing in this Agreement shall be interpreted as Lilly or its Affiliates consenting to the accuracy or sufficiency of any scientific, medical, bioequivalence, regulatory, or other information contained in the Eagle NDA, and no action or activities of the FDA or any Third Party with respect to any regulatory exclusivity held by a Third Party shall be deemed a breach by Lilly or any of its Affiliates of this Section 3.11, unless Lilly initiated, supported or assisted such activity.

3.11 Eagle Covenant. Other than as expressly set forth in this Agreement, including Sections 3.3, 3.5 and 3.12, neither Eagle nor its Affiliates nor its Sublicensee shall market, offer for sale, sell, take orders for or distribute the Eagle Product in the Territory before the License Effective Date, and Eagle shall not authorize a Third Party to do the same. The Parties agree that any violation of the foregoing by Eagle or its Affiliates would cause irreparable harm to Lilly and understanding this, Eagle hereby irrevocably and unconditionally consents to immediate entry of a temporary restraining order, preliminary injunction and permanent injunction in the event such relief is needed to prevent such harm in the event of a violation or imminent threat of a violation of the foregoing by Eagle or its Affiliates or the Sublicensee or any Person acting on their behalf.

3.12 At Risk Launch by Third Party. If, prior to the License Effective Date, a Third Party, without the assistance, aid, or encouragement of Eagle, launches an ALIMTA® Generic Product in the Territory without license or authorization from Lilly, then Eagle or its Sublicensee may launch the Eagle Product in the Territory "at risk". The Parties agree that in the event of an "at risk" launch by Eagle as provided for in this paragraph, the Licenses for the Eagle Product granted in paragraphs 3.1 and 3.3 shall remain in place and the "at risk" launch by Eagle or its Sublicensee pursuant to this provision shall not be deemed a breach of this Agreement. It is expressly agreed that any sales by Eagle or its Sublicensee pursuant to any such launch would not be licensed by Lilly and that Eagle would be liable to Lilly for damages as a result of such launch in the amount of Eagle's profits on the "at risk" sales of the Eagle Product as described in this Section. It is further agreed that if, after the launch of the Eagle Product pursuant to this provision, but prior to the License Effective Date, Lilly is successful by order, agreement or otherwise in having the Third Party cease sales of its ALIMTA® Generic Product in the Territory, then Eagle or its Sublicensee shall cease sales of the Eagle Product as of the business day after the Third Party is required to cease sales of its product as notified to Eagle by Lilly (provided that Lilly also ceases sales of any Authorized Generic Product launched in response to the Third Party launch as of the same date).

3.13 [***]

**4.    PAYMENTS**

4.1    Royalty Payment. During the Royalty Term, Eagle shall pay to Lilly a royalty of 1.0 % of the Net Sales of the Eagle Product ("Royalty Rate") during each Eagle Quarter ("the Net Sales Royalty"). The Net Sales Royalty calculation will be delivered in writing by Eagle to Lilly within 45 days of each applicable Eagle Quarter, and will include the Gross Sales of the Eagle Product in the Territory during such Eagle Quarter, royalty rate applied, and the Net Sales Royalty payable with respect to such Net Sales (each, a "Net Sales Statement"). Within 45 days following the end of each applicable Eagle Quarter, Eagle will pay the Net Sales Royalty in United States dollars by wire transfer to an account designated in writing by Lilly.

4.2    Right to audit.

4.2.1    During the Royalty Term and for a period one year after expiration of the Royalty Term, Lilly will have the right, a single time, to engage an independent nationally recognized public accounting firm chosen by Lilly and reasonably acceptable to Eagle (which accounting firm will not be the external auditor of Lilly, will not have been hired or paid on a contingency basis and will have experience auditing generic pharmaceutical companies) (a "CPA Firm") to conduct an audit of Eagle for the purposes of confirming Eagle's compliance with the Net Sales Royalty provisions of this Agreement. The fees charged by the CPA Firm will be paid by Lilly unless any additional royalties owed exceed 5% of the royalties paid for the royalty period subject to the audit, in which case Eagle will pay the reasonable fees of the CPA Firm.

4.2.2    The CPA Firm will be given access to and will be permitted to examine such books and records of Eagle relating to sale of the Eagle Product as it will reasonably request, upon prior written notice having been given to Eagle, during regular business hours, for the sole purpose of determining compliance with the Net Sales Royalty provisions of this Agreement. Prior to any such examination taking place, the CPA Firm will enter into a confidentiality agreement reasonably acceptable to Eagle with respect to the information to which it is given access and will not contain in any report or otherwise disclose to Lilly or any Third Party any information labeled by Eagle as being confidential customer information regarding pricing or other competitively sensitive proprietary information.

4.2.3    If the CPA Firm concludes that Eagle has complied with the Net Sales Royalty Provisions of this Agreement, it shall confirm Eagle's compliance to Lilly and not provide a report to Lilly regarding its audit. If the CPA Firm concludes that Eagle has not complied with the Net Sales Royalty Provisions of this Agreement, Lilly and Eagle will be entitled to receive a full written report of the CPA Firm with respect to its findings and Lilly will provide, without condition or qualification, Eagle with a copy of the report, or other summary of findings, prepared by such CPA Firm promptly following Lilly's receipt of same. In the event of any dispute between Lilly and Eagle regarding the findings of any such inspection or audit, the Parties will initially attempt in good faith to resolve the dispute amicably between themselves, and if the Parties are unable to resolve such dispute within 4 weeks of delivery to both Parties of the CPA Firm's report, the Parties will agree on an internationally recognized independent certified public accounting firm (other than the CPA Firm) to resolve the dispute, and such accounting firm's determination will be binding on both Parties, absent manifest error by such accounting firm.

4.2.4    Within 60 days after completion of the CPA Firm's audit, Eagle will pay to Lilly any deficiency in the Net Sales Royalty amount determined by the CPA Firm. If the report of the CPA Firm shows that Eagle overpaid, then Eagle will be entitled to off-set such overpayment against any Net Sales Royalty then owed to Lilly. If no royalty is then owed to Lilly, then Lilly will remit such overpayment to Eagle.

4.3    Taxes. Where required by law, Eagle shall have the right to withhold applicable taxes from any payments to be made by Eagle to Lilly pursuant to this Agreement. Eagle shall provide Lilly with receipts from the appropriate taxing authority for all payments of taxes withheld and paid by Eagle to such authorities on behalf of Lilly within 60 days. Lilly shall have the right to appeal to the appropriate taxing authority any such withholding and payment of such taxes. Notwithstanding the foregoing, if Eagle assigns its payment obligations to an Affiliate or a Third Party, and such assignment results in a greater amount of withholding tax which may be subtracted from payments to Lilly than if Eagle had fulfilled its payment obligations to Lilly directly, such Affiliate or Third Party shall increase the payment to Lilly such that the amount received by Lilly after such income tax withholding is equal to the amount Lilly would have received if Eagle had fulfilled such payment obligations to Lilly directly.

4.4    No other compensation. Other than as explicitly set forth (and as applicable) in this Agreement, Eagle will not be obligated to pay any additional fees, royalties or other payments of any kind to Lilly under this Agreement.

**5. TERM / TERMINATION**

5.1 <u>Term</u>. Unless earlier terminated in accordance with the terms of this section, the term of this Agreement will commence on the Effective Date and will remain in effect until the expiration of the last to expire of the Licensed Patents and Other Lilly Patents and the waived regulatory exclusivities.

5.2 <u>Termination for Cause</u>. The Parties agree that the sale or distribution of the Eagle Product in the Territory prior to the License Effective Date, other than as set forth in Section 3.12, shall constitute a material breach, and Lilly may terminate this Agreement if Eagle fails to cure such a breach within seven (7) days of written notice thereof. In addition, Lilly or Eagle may terminate this Agreement at any time in the event that the other Party has materially breached this Agreement for any other reason and fails to cure such material breach within fifteen (15) days of written notice thereof. In the event that either Party contests the other Party's termination of this Agreement under this Section 5.2, the Parties shall both continue to perform their respective obligations under this Agreement until the resolution of any such contested termination. The Parties further agree that any breach by Eagle of their covenants set forth in Section 3.6 and Section 3.11 is a material breach of this Agreement, that any such breach must be cured by Eagle within (7) days of written notice thereof, and that in the absence of a cure, Lilly shall be entitled, in its sole discretion, to immediately terminate this Agreement.

5.3 <u>Effect of Expiration or Termination</u>. Expiration or termination of this Agreement will not relieve the Parties of any obligation accruing prior to such expiration or termination.

**6. CONFIDENTIALITY**

6.1 Except to enforce this Agreement or unless otherwise agreed to by the Parties in writing or as required by law, the Parties, their Affiliates and their respective employees, officers, directors and other representatives shall not publish or otherwise disclose the contents of this Agreement or confidential information shared pursuant to this Agreement, except that (a) each Party may disclose this Agreement (i) to its attorneys, advisors, consultants, agents, and representatives who are subject to obligations of confidentiality consistent with this Agreement and (ii) if either Party becomes required to disclose this Agreement by law, subpoena, regulation or order of a court or administrative agency, or as otherwise required by law, including reporting requirements to the U.S. Securities and Exchange Commission or by the rules or regulations of any stock exchange to which the Parties are subject, (b) Eagle may communicate with FDA on a confidential basis as of the Effective Date concerning approval of the Eagle NDA and the covenants and waivers provided for herein and, if necessary to effectuate this Agreement, provide a copy of this Agreement. In the event disclosure is required under the foregoing clause (a)(ii), the Party making such disclosure shall (1) provide the other Party with as much advance notice as reasonably practicable of the required disclosure, (2) cooperate with the other Party in an attempt to prevent or limit the disclosure, and (3) limit any disclosure to the specific purpose at issue. Notwithstanding anything contrary in this Agreement (and not subject to the limitations in the immediately preceding sentence), either Party may disclose without limitation a copy of this Agreement, including any exhibits, schedules, ancillary agreements, and amendments thereto in response to a valid request by a U.S., foreign, state, provincial, or local tax authority and the Party making such disclosure shall limit any disclosure to the specific purpose at issue and take all reasonable steps to maintain confidentiality.

6.2 Eagle shall issue a press release consistent with Exhibit E attached hereto.

**7. REPRESENTATION / WARRANTIES**

7.1 Each Party represents and warrants to the other, as of the Effective Date, that:

(a) Such Party is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has full corporate power and authority to enter into this Agreement and to carry out the provisions hereof;

(b) Such Party has taken all corporate action necessary to authorize the execution and delivery of this Agreement and the performance of its obligations under this Agreement;

(c) This Agreement has been duly executed by such Party and constitutes a valid and legally binding obligation of such Party, enforceable in accordance with its terms;

(d) The execution, delivery, and performance of this Agreement does not conflict with any agreement, instrument, or understanding, oral or written, to which such Party is bound nor violate any law or regulation of any court, governmental body, or administrative or other agency having jurisdiction over it;

(e) Such Party represents and warrants that it has been advised by its counsel of its rights and obligations under this Agreement and enters into this Agreement freely, voluntarily, and without duress; and

(f) Such Party represents and warrants that it is not relying on any promises, inducements, or representations other than those provided herein.

7.2 <u>Eagle's Representations and Warranties</u>. As of the Effective Date, Eagle represents and warrants that Eagle is the true owner of the Eagle NDA, and has received no notice or claim and knows of no reason for the assertion of any notice or claim contesting its ownership of the Eagle NDA. For any breach of this Section 7.2, Lilly shall have the immediate right to terminate this Agreement.

7.3 <u>Lilly's Representations and Warranties</u>. As of the Effective Date, Lilly represents and warrants that:

(a) it is the owner of each of the Licensed Patents (to the extent in existence as of the Effective Date) and has not assigned them. Any assignment by Lilly of its rights in any of the Licensed Patents will be subject to all obligations and terms of this Agreement, and the assignee will be bound by the terms of this Agreement. Lilly has not received any written communication challenging Lilly's ownership of any Licensed Patents;

(b) it has the authority to grant to Eagle the covenant not to sue set forth in this Agreement;

(c) it is the owner of the Lilly NDA and has full control over the Pediatric Exclusivity pertaining to the Lilly NDA;

(d) it has sole authority to waive with respect to the Eagle NDA, pursuant to Sections 3.8-3.9, any and all Regulatory Exclusivities in effect for the Lilly NDA or any other Lilly NDA relating to pemetrexed, including Lilly's NDA No. 021462, and any 30-month stay which are required to be waived to enable full approval of the Eagle NDA; and

(e) during the relevant License term and subject to Eagle's compliance with this Agreement, it will not initiate any legal, administrative, regulatory or other action against Eagle, any person involved in the production, and/or supply of any Eagle Product, or any Eagle customer or other person obtaining Eagle Product, to interfere with Eagle's ability to secure supply of, or otherwise make, use, offer to sell or sell, Eagle Product. Nothing in this section shall be construed to limit Lilly's ability to communicate with the FDA or any other regulatory or other government authority in relation to the Lilly NDA regarding health, safety or efficacy matters.

7.4 <u>Disclaimer</u>. EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, NO PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF APPLICABLE LAW.

## 8. GENERAL PROVISIONS

8.1 <u>Waiver</u>. None of the provisions of this Agreement will be considered waived by any Party unless such waiver is agreed to, in writing, by authorized agents of such Party. The failure of a Party to insist upon strict conformance to any of the terms and conditions hereof, or failure or delay to exercise any rights provided herein or by law will not be deemed a waiver of any rights of any Party.

8.2 <u>Choice of Law and Remedies</u>. This Agreement and any dispute arising out of or related to this Agreement shall be governed and interpreted in accordance with the laws of the State of Delaware without regard to conflicts of law principles. This Agreement does not limit or restrict the remedies available to any Party for the breach of another Party, and the Parties expressly reserve any and all remedies available to them, at law or in equity, for breach of this Agreement or otherwise.

8.3 <u>Costs</u>. Each Party shall each bear its own costs and legal fees associated with the negotiation and preparation of, and performance under, this Agreement and any activities related to the implementation of this Agreement.

8.4 <u>Entire Agreement</u>. This Agreement constitutes the entire agreement between the Parties relating to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, with respect to such matters.

8.5 <u>Notice</u>. All notices or other communications hereunder shall be deemed to have been duly given and made if in writing and if served by personal delivery upon a Party, if delivered by a reputable overnight express courier service (charges prepaid), or if sent by facsimile to the person at the address set forth

below, or such other address as may be designated in writing hereafter, in the same manner, by such person as follows:

If to **Lilly**:    Eli Lilly and Company
Lilly Corporate Center
Indianapolis, Indiana, 46285, USA
Attention: General Counsel

with a copy to:    Eli Lilly and Company
Lilly Corporate Center
Indianapolis, Indiana, 46285 USA
[***]

with a copy to:    [***]
Williams & Connolly LLP
725 12th Street, NW
Washington, DC 20005
Fax: [***]

If to **Eagle**:    Eagle Pharmaceuticals, Inc.
50 Tice Blvd, Suite 315
Woodcliff Lake, NJ 07677
Attention: [***]

With copy to:
[***]

with a copy to (with such copy not constituting notice):

[***]
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654

with a copy to (with such copy not constituting notice):

[***]
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022

Such notices will be deemed to have been given on the date delivered in the case of personal delivery or overnight courier or on the date actually received in the case of facsimile delivery.

8.6    <u>Severability</u>. When possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law. If, however, any provision of this Agreement is held to be invalid, illegal, or unenforceable for any reason, the Parties shall negotiate in good faith for a substitute provision to continue the intent and purpose of such invalid provisions, and the validity, legality, and enforceability of the remaining provisions shall not be in any way impaired thereby.

8.7    <u>Amendments</u>. No amendment, modification or supplement of any provisions of this Agreement shall be valid or effective unless made in writing and signed by a duly authorized officer of each Party.

8.8    <u>Descriptive Headings</u>. The captions and descriptive headings of this Agreement are for convenience only and shall be of no force or effect in construing or interpreting any of the provisions of this Agreement.

8.9    <u>Third-Party Benefit</u>. None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any Third Party.

8.10    <u>Assignment</u>. Neither Party will assign this Agreement or any part hereof or any interest herein (whether by operation of law or otherwise) without prior written notice to the other Party not less than 60 days prior to such assignment becoming effective; <u>provided</u>, <u>however</u>, that either Party may assign this Agreement without such prior notice (a) to any Affiliate of such assigning Party (for as long as such assignee remains an Affiliate of such Party); or (b) to any successor entity in the case of a merger, consolidation, change in control or sale of all or substantially all of the assets related to this Agreement. No assignment will be

valid unless the permitted assignee(s) assumes all obligations of its assignor under this Agreement. No assignment will relieve any assigning Party of responsibility for the performance of its obligations hereunder. Any purported assignment in violation of this Section 8.10 will be void. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the Parties and their respective heirs, successors and permitted assigns.

8.11   <u>Counterparts; Electronic Delivery</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, to the extent delivered by means of a telecopy machine or electronic mail (any such delivery, an "Electronic Delivery"), shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

**SIGNATURES FOLLOW ON NEXT PAGE**

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed by its duly authorized representative as of the Effective Date.

| | |
|---|---|
| **ELI LILLY AND COMPANY** | **EAGLE PHARMACEUTICALS, INC.** |
| By: | By: |
| /s/ Michael J. Harrington | /s/ Pete A. Meyers |
| Name: Michael J. Harrington | Name: Pete A. Meyers |
| Title: Senior Vice President and General Counsel | Title: CFO |
| Date:    12/13/19 | Date:    12/13/19 |

**EXHIBIT A**

**Patent Infringement Lawsuit Stipulation of Dismissal**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

ELI LILLY AND COMPANY,

        Plaintiff

        v.                 Civ. A. No. 17-cv-01293-MSG

EAGLE PHARMACEUTICALS, INC.,

        Defendant.

**STIPULATION OF DISMISSAL**

Pursuant to Rules 41(a)(1) and 41(c) of the Federal Rules of Civil Procedure, Plaintiff Eli Lilly and Company ("Lilly") and Defendant Eagle Pharmaceuticals, Inc. ("Eagle") hereby stipulate and agree that Lilly's action against Eagle and Eagle's action against Lilly, including all claims and defenses asserted by Lilly against Eagle and all claims and defenses asserted by Eagle against Lilly, are hereby dismissed with prejudice. All parties shall bear their own costs, disbursements and attorneys' fees.

Respectfully submitted,

**EXHIBIT B**

**Antitrust Lawsuit Stipulation of Dismissal**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELA WARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., | |
| Plaintiff | |
| v. | Civ. A. No. 18-cv-01121-MSG |
| ELI LILLY AND COMPANY, | |
| Defendant. | |

**STIPULATION OF DISMISSAL**

Pursuant to Rule 41(a)(1) of the Federal Rules of Civil Procedure, Plaintiff Eagle Pharmaceuticals, Inc. ("Eagle") and Defendant Eli Lilly and Company ("Lilly") hereby stipulate and agree that Eagle's claims against Lilly are hereby dismissed with prejudice. All parties shall bear their own costs, disbursements and attorneys' fees.

Respectfully submitted,

**EXHIBIT C**

**EXCLUSIVITY CORRESPONDENCE**
**RELINQUISHMENT OF ANY EXCLUSIVITY AS TO EAGLE NDA NO. 209472**

Food and Drug Administration
[insert applicable address]

RE: NDA No. 021462
PRODUCT: ALIMTA® (pemetrexed disodium) Injection 100 mg/vial and 500 mg/vial

Dear Sir or Madam:

Eli Lilly and Company ("Lilly") submits this Relinquishment of Exclusivity solely as to Eagle's 505(b)(2) NDA No. 209472 ("Eagle NDA") for pemetrexed for injection in a 25 mg/mL, 500 mg vial product. The Reference Listed Drug for the Eagle NDA is Lilly's ALIMTA® product.

The Eagle NDA was previously blocked from final FDA approval at least due to a 30-month stay, expiring on February 8, 2020, in effect by virtue of Lilly's filing of a Complaint for patent infringement against the Eagle NDA within 45 days of receipt of Eagle's Notice of Paragraph IV Certification for the Eagle NDA. On _____, this litigation was terminated pursuant to a Stipulation of Dismissal submitted by the parties to the litigation and entered by the U.S. District Court for

the District of Delaware. The parties submitted the Stipulation of Dismissal pursuant to a Settlement Agreement entered into between Lilly and Eagle. A copy of the Stipulation of Dismissal is enclosed.

Pursuant to the terms of the license, Lilly also granted to Eagle a selective waiver of any unexpired periods of pediatric and/or other statutory or regulatory exclusivities that might be listed in the Orange Book in connection with NDA 021462 for ALIMTA with respect to Eagle NDA No. 209472. Accordingly, Lilly hereby selectively waives its right to any unexpired periods of pediatric and/or other statutory or regulatory exclusivities listed in connection with NDA 021462, including any pediatric exclusivity associated with U.S. Patent No. 7,772,209, and/or any other patent(s) listed in the Orange Book in connection with NDA 021462 as such exclusivities would otherwise apply to Eagle NDA No. 209472.

For the avoidance of doubt, Lilly waives neither any 30-month stay nor any exclusivity as to any NDA or ANDA other than the Eagle NDA.

## EXHIBIT D

## CONSENT TO FINAL REGULATORY APPROVAL AS TO EAGLE NDA NO. 209472

Food and Drug Administration
[insert applicable address]

RE: NDA No. 021462
PRODUCT: ALIMTA® (pemetrexed disodium) Injection 100 mg/vial and 500 mg/vial

Dear Sir or Madam:

Eli Lilly and Company ("Lilly"), the owner of U.S. Patent No. 7,772,209 listed in the Food and Drug Administration's ("FDA's") *Approved Drug Products with Therapeutic Equivalence Evaluations* ("Orange Book") for ALIMTA®, approved under NDA No. 021462 and also held by Lilly, is writing to provide FDA with consent to grant final regulatory approval of the 505(b)(2) NDA 209472 submitted by Eagle Pharmaceuticals, Inc. (the "Eagle NDA").

The Eagle NDA was previously blocked from final FDA approval at least due to a 30-month stay, expiring on February 8, 2020, in effect by virtue of Lilly's filing of a Complaint for patent infringement against the Eagle NDA within 45 days of receipt of Eagle's Notice of Paragraph IV Certification for the Eagle NDA. On XXX, this litigation was terminated pursuant to a Stipulation of Dismissal submitted by the parties to the litigation and entered by the U.S. District Court for the District of Delaware. The parties submitted the Stipulation of Dismissal pursuant to a Settlement Agreement entered into between Lilly and Eagle. A copy of the Stipulation of Dismissal is enclosed.

FDA's regulation at 21 C.F.R. § 314.50(i)(3) provides that if a company has submitted a 505(b)(2) application to the Agency containing a Paragraph IV certification to a patent listed in the Orange Book for the Listed Drug, here ALIMTA, and "[i]f the patent owner consents to [final] approval of the 505(b)(2) application (if otherwise eligible for approval) as of a specific date, the 505(b)(2) application must contain a written statement from the patent owner that it has a licensing agreement with the applicant and that it consents to approval of the 505(b)(2) application as of a specific date." Similarly, FDA's regulation at 21 C.F.R. § 314.107(b)(3)(vi) concerning 505(b)(2) application approval provides that "[i]f before the expiration of the 30-month period . . . the patent owner or the exclusive patent licensee (or their representatives) agrees in writing that the 505(b)(2) application. . . may be approved any time on or after the date of consent, approval may be granted on or after that date."

Consistent with the Consent to Approval regulations identified above, as well as 21 C.F.R. § 314.107(e)(2), which requires prompt submission of such consent by the 505(b)(2) applicant to FDA, Lilly, the owner of U.S. Patent No. 7,772,209, hereby consents to the approval of Eagle NDA No. 209472 as of the date of this letter.

## Exhibit E

## [SEE PRESS RELEASE OF EAGLE PHARMACEUTICALS, INC. DATED DECEMBER 13, 2019]

221417333 v2

**Exhibit 10.35**

**CERTAIN CONFIDENTIAL INFORMATION CONTAINED IN THIS DOCUMENT, MARKED BY [***], HAS BEEN OMITTED BECAUSE IT IS NOT MATERIAL AND WOULD LIKLEY CAUSE COMPETITIVE HARM TO EAGLE PHARMACEUTICALS, INC. IF PUBLICLY DISCLOSED.**

***EXECUTION VERSION***

**CO-PROMOTION AGREEMENT**

**by and between**

**TYME TECHNOLOGIES, INC.**
**And**

**EAGLE PHARMACEUTICALS, INC.**

**January 7, 2020**

ARTICLE 1 DEFINITIONS 1

ARTICLE 2 RIGHTS AND OBLIGATIONS 7

2.1 **Engagement; Grant of Rights** 7

2.2 **Retention of Rights** 7

2.3 **Non-Competition; Non-Solicitation.** 8

2.4 **TYME Trademarks and Copyrights.** 8

ARTICLE 3 JOINT SALES OPERATIONS COMMITTEE 8

3.1 **Formation of the Joint Sales Operations Committee** 8

3.2 **Meetings and Minutes** 9

3.3 **Purpose of the SOC** 9

3.4 **Decision Making** 10

ARTICLE 4 EAGLE ACTIVITIES FOR THE PRODUCT 11

4.1 **Eagle Activities.** 11

4.2 **Detailing.** 11

4.3 **Compliance with Applicable Law.** 12

4.4 **Field Force Personnel Training; Product Materials.** 13

4.5 **Provisions Related to Field Force Personnel.** 15

4.6 **Responsibility for Eagle Activity Costs and Expenses** 16

4.7 **Data Sharing** 16

4.8 **Material Changes** 16

ARTICLE 5 REGULATORY, SAFETY AND SURVEILLANCE, COMMERCIAL MATTERS 16

5.1 **TYME Responsibility** 16

5.2 **Eagle Involvement** 16

5.3 **Inspections.** 16

5.4 **Pharmacovigilance** 17

5.5 **Unsolicited Requests for Medical Information** 17

5.6 **Recalls and Market Withdrawals** 17

5.7 **Certain Reporting Responsibilities** 17

5.8 **Booking of Sales Revenues** 18

5.9 **Returns** 18

5.10 **Development; Manufacturing; Distribution; Marketing** 18

ARTICLE 6       FINANCIAL PROVISIONS     18

   6.1     Promotion Fee.    18

   6.2     Reports; Payments.    19

   6.3     Taxes    19

   6.4     Recordkeeping    20

   6.5     Eagle Rights    20

ARTICLE 7       INTELLECTUAL PROPERTY    20

   7.1     Ownership of Intellectual Property.    20

   7.2     Title to Trademarks and Copyrights    20

   7.3     Protection of Trademarks and Copyrights    20

   7.4     Protection of Patent Rights    21

   7.5     Disclosure of Know-How    21

ARTICLE 8       CONFIDENTIALITY    21

   8.1     Confidential Information.    21

   8.2     Public Announcements    22

ARTICLE 9       REPRESENTATIONS AND WARRANTIES; ADDITIONAL COVENANTS    22

   9.1     Representations and Warranties of TYME    22

   9.2     Representations and Warranties of Eagle    23

   9.3     Disclaimer of Warranty    24

ARTICLE 10      INDEMNIFICATION; LIMITATIONS ON LIABILITY    24

   10.1    Indemnification by TYME    24

   10.2    Indemnification by Eagle    25

   10.3    Indemnification Procedures    25

   10.4    Limitation of Liability    25

   10.5    Insurance    25

ARTICLE 11      TERM AND TERMINATION    26

   11.1    Term    26

   11.2    Early Termination    26

   11.3    Effects of Termination    26

   11.4    Survival    26

ARTICLE 12      MISCELLANEOUS    27

   12.1    Force Majeure    27

   12.2    Assignment    27

   12.3    Severability    27

   12.4    Notices    27

   12.5    Governing Law    28

   12.6    Dispute Resolution..    28

   12.7    Waiver of Jury Trial    28

   12.8    Entire Agreement; Amendments    28

   12.9    Headings    28

   12.10   Independent Contractors    29

   12.11   Third Party Beneficiaries    29

   12.12   Waiver    29

   12.13   Cumulative Remedies    29

   12.14   Waiver of Rule of Construction    29

   12.15   Use of Names    29

   12.16   Further Actions and Documents    29

   12.17   Certain Conventions    29

   12.18   Counterparts    29

This Co-Promotion Agreement (this "**Agreement**") is entered into and dated as of January 7, 2020 (the "**Effective Date**") by and between Tyme Technologies, Inc., a Delaware corporation ("**TYME**"), and Eagle Pharmaceuticals, Inc., a Delaware corporation ("**Eagle**"). TYME and Eagle are each referred to individually as a "**Party**" and together as the "**Parties**".

<div align="center">RECITALS</div>

**WHEREAS**, TYME is an emerging biotechnology company developing cancer metabolism-based therapies and owns or otherwise controls certain intellectual property rights, clinical data and regulatory filings related to the compound SM-88 (racemetyrosine) (defined below), which is the subject of clinical development;

**WHEREAS**, Eagle is in the business of developing and commercializing drugs, primarily in the critical care and oncology areas, including through collaboration agreements;

**WHEREAS**, the Parties believe that it would be mutually beneficial to collaborate on promotional activities for the Product (defined below) and, accordingly, TYME desires that Eagle conduct certain promotional activities, and Eagle desires to conduct such activities, for the Product in the Territory;

**WHEREAS**, simultaneously with the execution and delivery of this Agreement, the Parties have entered into that certain Securities Purchase Agreement, providing for, among other things, the issuance and sale by TYME of shares of TYME common stock to Eagle in return for Eagle's upfront payment of $20 million in cash and TYME's right to receive additional milestone payments upon the achievement of certain milestones as provided therein;

**NOW, THEREFORE**, in consideration of the following mutual promises and obligations, and for other good and valuable consideration the adequacy and sufficiency of which are hereby acknowledged, the Parties agree as follows:

<div align="center">ARTICLE 1DEFINITIONS</div>

Unless otherwise defined in this Agreement, the following terms shall have the meanings provided hereunder:

1.1    "**Act**" shall mean the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq., as it may be amended from time to time, and the regulations promulgated thereunder.

1.2    "**Adverse Event**" shall mean any untoward medical occurrence in a patient or clinical investigation subject who is administered the Product, but which does not necessarily have a causal relationship with the treatment for which the Product is used. An "Adverse Event" can include any unfavorable and unintended sign (including an abnormal laboratory finding), symptom or disease temporally associated with the use of the Product, whether or not related to the Product. A pre-existing condition that worsened in severity after administration of the Product would be considered an "Adverse Event".

1.3    "**Affiliate**" shall mean, with respect to any Person, any other Person that directly or indirectly controls, is controlled by or is under common control with such Person. A Person shall be deemed to control another Person if such Person possesses the power to direct or cause the direction of the management, business and policies of such Person, whether through the ownership of fifty percent (50%) or more (or such lesser percentage which is the maximum allowed to be owned by a foreign corporation in a particular jurisdiction) of the voting securities of such Person, by contract or otherwise.

1.4    "**Agreement**" shall have the meaning set forth in the preamble to this Agreement.

1.5    "**Alliance Managers**" shall have the meaning set forth in Section 4.1.5.

1.6    "**Applicable Laws**" shall mean all applicable statutes, ordinances, regulations, codes, rules, or orders of any kind whatsoever of any Governmental Authority in the Territory pertaining to any of the activities and obligations contemplated by this Agreement, including, as applicable, the Act, the Generic Drug Enforcement Act of 1992 (21 U.S.C. § 335a et seq.), the Anti-Kickback Statute (42 U.S.C. § 1320a-7b et seq.), the Health Insurance Portability and Accountability Act of 1996, the Federal False Claims Act (31 U.S.C. §§ 3729-3733) (and applicable state false claims acts), the Physician Payments Sunshine Act, the Code, the Department of Health and Human Services Office of Inspector General Compliance Program Guidance for Pharmaceutical Manufacturers, released April 2003, the Antifraud and Abuse Amendment to the Social Security Act, the American Medical Association guidelines on gifts to physicians, generally accepted standards of good clinical practices adopted by current FDA regulations, as well as any state laws and regulations (i) impacting the promotion of pharmaceutical products, (ii) governing the provision of meals and other gifts to medical professionals, including pharmacists, or (iii) governing consumer protection and deceptive trade practices, including any state anti-kickback/fraud and abuse related laws, all as amended from time to time.

1.7    "**Business Day**" means each day of the week, excluding Saturday, Sunday or a day on which banking institutions in New York, New York, USA are closed.

1.8    "**Buyout Amount**" means $200 million.

1.9    "**Claims**" shall mean all charges, complaints, actions, suits, proceedings, hearings, investigations, claims, demands, judgments, orders, decrees, stipulations or injunctions, in each case of a Third Party (including any Governmental Authority).

1.10    "**Code**" shall mean the Code on Interactions with Healthcare Professionals promulgated by the Pharmaceutical Research and Manufacturers of America (PhRMA)/BIO, as it may be amended.

1.11    "**Commercialize**," "**Commercializing**," and "**Commercialization**" means activities directed to manufacturing, obtaining pricing and reimbursement approvals for, marketing, promoting, distributing, importing, and/or selling the Product.

1.12    "**Commercially Reasonable Efforts**" means, with respect to a Party's obligations under this Agreement, a measure of effort and resources consistent with the exercise of prudent scientific and business judgment and the reasonable practices that would typically be exerted by a similarly situated pharmaceutical or biotechnology company of comparable size and capabilities as such company for the Development or Commercialization of a pharmaceutical product with similar characteristics owned by such company at a similar stage of development or commercialization as the Product, taking

into account efficacy and safety considerations, and other relevant scientific, technical, and commercial factors, including product profile, the regulatory environment, competitiveness of the marketplace and market potential, and price and reimbursement status.

1.13    "**Compensation Report**" shall have the meaning set forth in Section 4.2.2(b).

1.14    "**Compliance Manager**" shall have the meaning set forth in Section 4.3.10.

1.15    "**Compliance Report**" shall have the meaning set forth in Section 4.2.2(c).

1.16    "**Confidential Information**" shall mean all secret, confidential, non-public or proprietary Know-How, whether provided in written, oral, graphic, video, computer or other form, provided by or on behalf of one Party to the other Party pursuant to this Agreement, including information relating to the disclosing Party's existing or proposed research, development efforts, promotional efforts, regulatory matters, patent applications or business and any other materials that have not been made available by the disclosing Party to the general public. All such information related to this Agreement disclosed by or on behalf of a Party (or its Affiliate) to the other Party (or its Affiliate) pursuant to the Confidentiality Agreement shall be deemed to be such Party's Confidential Information disclosed hereunder. For purposes of clarity, (i) TYME's Confidential Information shall include all Product Materials unless and until made available by TYME to the general public (including through Eagle) and (ii) the terms of this Agreement shall be considered Confidential Information of both Parties.

1.17    "**Confidentiality Agreement**" shall have the meaning set forth in Section 8.1.1.

1.18    "**Detail(s)**" shall mean the Product presentation during a face-to-face sales call between a Target Professional and a Sales Representative, during which a presentation of the Product's attributes, benefits, prescribing information and safety information are orally presented, for use in the Field in the Territory. Neither e-details, nor presentations made at conventions, exhibit booths, a sample drop, educational programs or speaker meetings, or similar gatherings, shall constitute a Detail.

1.19    "**Detail Report**" shall have the meaning set forth in Section 4.2.2.

1.20    "**Development**" shall mean non-clinical, pre-clinical and clinical drug discovery, research, and/or development activities, including without limitation quality assurance and quality control development, and any other activities reasonably related to or leading to the development and submission of information to a Regulatory Authority. When used as a verb, "**Develop**" means to engage in Development.

1.21    "**Dispute**" shall have the meaning set forth in Section 12.6.

1.22    "**Dollar**" or "**$**" shall mean United States dollar.

1.23    "**Eagle Activities**" shall mean any and all promotional activities (including Detailing) conducted by Eagle with respect to the Product in the Territory, as set forth in the Sales Plan or otherwise mutually agreed upon by the Parties in writing, in each case, in accordance with the terms of this Agreement.

1.24    "**Eagle Property**" shall have the meaning set forth in Section 7.1.1.

1.25    "**Eagle Quarterly Minimum Details**" for an applicable Fiscal Quarter shall mean the number established by the Operating Parameters Schedule as in effect from time to time.

1.26    "**Effective Date**" shall have the meaning set forth in the preamble to this Agreement.

1.27    "**Exclusive Detail**" shall mean a Detail for which the Product is the sole product detailed on the call.

1.28    "**Exhibit**" shall mean an exhibit attached to this Agreement.

1.29    "**FDA**" shall mean the United States Food and Drug Administration or any successor agency performing comparable functions.

1.30    "**Field**" shall mean the treatment of any and all indications for which the Product is approved in humans in the Territory.

1.31    "**Field Force Personnel**" shall mean collectively, the Sales Representatives, and any other employees of Eagle engaged in the Eagle Activities.

1.32    "**First Commercial Sale**" shall mean the first commercial sale of the Product for monetary value by TYME, one or more of its Affiliates or one or more of its licensees in an arm's length transaction to a Third Party that is not a licensee, including without limitation any final sale to a distributor or wholesaler under any non-conditional sale arrangement, of the Product in the Field in the Territory after Regulatory Approval of the Product has been granted in the Field in the Territory. For the avoidance of doubt, sales or transfers of the Product for clinical and non-clinical research and trials (including studies reasonably necessary to comply with Applicable Law or requests by a Regulatory Authority), early access programs or for compassionate or similar use, shall not be considered a First Commercial Sale.

1.33    "**Fiscal Quarter**" shall mean each successive period of three (3) calendar months commencing on January 1, April 1, July 1 and October 1.

1.34    "**Fiscal Year**" shall mean each successive period of (12) twelve months commencing on April 1 and ending on March 31st.

1.35    "**GAAP**" shall mean United States generally accepted accounting principles.

1.36    "**Governmental Authority**" shall mean any court, agency, authority, department, regulatory body or other instrumentality of any government or country or of any national, federal, state, provincial, regional, county, city or other political subdivision of any such government or any supranational organization of which any such country is a member, which has competent and binding authority to decide, mandate, regulate, enforce, or otherwise control the activities of the Parties contemplated by this Agreement.

1.37    "**Indemnified Party**" shall have the meaning set forth in Section 10.3.

1.38    "**Indemnifying Party**" shall have the meaning set forth in Section 10.3.

1.39    "**Intellectual Property**" shall have the meaning set forth in Section 7.1.2.

1.40    "**Inventions**" shall have the meaning set forth in Section 7.1.2.

1.41    "**Know-How**" shall mean information, whether or not in written form, including biological, chemical, pharmacological, toxicological, medical or clinical, analytical, quality, manufacturing, research, or sales and marketing information, including processes, methods, procedures, techniques, plans, programs and data.

1.42    "**License**" shall mean any agreement pursuant to which TYME grants to a Third Party (a "**Licensee**") a license, sublicense, or other right to any TYME Patent Rights or Regulatory Filings or Regulatory Approvals relating to the Product; *provided, however*, that a License shall not include (a) any agreement with any distributor or wholesaler that obtains solely the right to distribute the Product after purchase from TYME and (i) serves as a logistics services provider or (ii) otherwise distributes the Product to pharmacies, group purchasing organizations or similar entities, but in each case of (i) and (ii), without the right to co-market or co-promote the Product, or (b) any agreement pursuant to which TYME or any of its Affiliates grants a license or sublicense of any of its intellectual property rights (i) solely to conduct research, (ii) solely to manufacture the Product, or (iii) otherwise to service providers solely on a non-exclusive basis in the ordinary course of Development or Commercialization of the Product (e.g., material transfer agreements, distribution agreements, and consulting agreements).

1.43    "**Licensee**" has the meaning set forth in the definition of License.

1.44    "**Losses**" shall mean any and all amounts paid or payable to Third Parties with respect to a Claim (including any and all losses, damages, obligations, liabilities, fines, fees, penalties, awards, judgments, interest), together with all documented out-of-pocket costs and expenses, including attorney's fees, reasonably incurred.

1.45    "**Minimum Sales Representatives Requirement**" has the meaning set forth in the definition of Operating Parameters Schedule.

1.46    "**Multidisciplinary Detail**" shall mean a Detail call to a sales account with a multidisciplinary oncology practice, as determined by TYME.

1.47    "**Net Sales**" shall mean, for an applicable period, with respect to the Product, commencing with the First Commercial Sale, net sales as determined in accordance with GAAP, which, for the avoidance of doubt, shall comprise the gross amounts received by TYME, its Affiliates and Licensees for arm's length sales of the Product in the Field in the Territory to a Third Party (excluding any sales among TYME, its Affiliates and any Licensee), less the following deductions solely to the extent incurred or allowed with respect to such sales, and solely to the extent such deductions are in accordance with GAAP, and which are not already reflected as a deduction from the invoiced price: (a) discounts (to the extent not previously applied to such amounts received), charge-back payments, and rebates; (b) credits or allowances for damaged goods, rejections, recalls or returns of the Product; (c) freight, insurance, postage, and shipping charges for delivery of the Product, to the extent separately billed on the invoice as well as any bona fide service fee specifically incurred for the distribution of the Product; (d) taxes, customs, or duties levied on, absorbed, or otherwise imposed on the sale of the Product, as adjusted for rebates and refunds, to the extent not paid by the Third Party and only to the extent such taxes, customs, or duties are not reimbursed to the paying party, but excluding all income taxes; (e) allowances for doubtful or uncollectible amounts (provided that, such amounts shall be included in the computation of "Net Sales" to the extent subsequently collected or earned) and (f) that portion of the annual fees due under Section 9008 of the United States Patient Protection and Affordable Care Act of 2010 (Pub. L. No. 111-48) and any other fees imposed by Applicable Law. If the Product is sold by TYME, its Affiliates or Licensees through intermediaries such as agents, consignees or co-promoters who do not purchase and take title to the Product, the promotion fee will be due only on sales to those Third Parties who actually purchase and take title to the Product through such intermediaries.

If the Product is transferred to Third Parties in connection with clinical and non-clinical research and trials (including studies reasonably necessary to comply with Applicable Law), Product samples, charitable purposes, promotional purposes, early access programs, compassionate sales or use, or an indigent program or similar *bona fide* arrangements for which TYME or any of its Affiliates or Licensees for good faith business reasons receives consideration in respect thereof that is less than the average cost of goods for this Product, such consideration shall not be included in Net Sales.

1.48    "**NDA**" means a New Drug Application filed with the FDA that is required for approval for the Product in the United States, or its foreign equivalent in the Territory.

1.49    "**Operating Parameters Schedule**" means the requirements set forth in Schedule 4.1 to this Agreement, as such may, subject to the provisions of Section 3.4.2, be revised from time to time by TYME in consultation with the SOC. The Operating Parameters Schedule shall be updated no less than annually with the minimum required number of Sales Representatives (the "**Minimum Sales Representatives Requirement**") and the Eagle Quarterly Minimum Details.

1.50    "**Party**" shall have the meaning set forth in the preamble to this Agreement.

1.51    "**Patent Rights**" means (a) patents and patent applications, and any foreign counterparts thereof, (b) all divisionals, continuations, continuations-in-part of any of the foregoing, and any foreign counterparts thereof, and (c) all patents issuing on any of the foregoing, and any foreign counterparts thereof, together with all registrations, reissues, re-examinations, supplemental protection certificates, substitutions or extensions thereof, and any foreign counterparts thereof.

1.52    "**Person**" shall mean any individual, corporation, partnership, limited liability company, association, joint-stock company, trust, unincorporated organization or other entity, or government or political subdivision thereof.

1.53    "**Pivotal Clinical Study**" shall mean a human clinical study of the Product in any country on a sufficient number of subjects that is designed to establish that the Product is safe and efficacious for its intended use, and to determine warnings, precautions, and adverse reactions that are associated with the Product in the dosage range to be prescribed, which trial is intended to support Regulatory Approval of the Product, as described in 21 C.F.R. § 312.21(c), or equivalent clinical study in a country other than the United States.

1.54    "**Primary Multidisciplinary Detail**" shall mean a Multidisciplinary Detail call where the Product (i) is the first product Detailed, (ii) is emphasized more than any other product and (iii) is the primary focus of such Detail, primary focus meaning greater than [***]% of the total call time during

1.55    "**Product**" shall mean any product that contains SM-88 (racemetyrosine).

1.56    "**Product Labeling**" shall mean the labels and other written, printed or graphic matter upon (a) any container or wrapper utilized with the Product or (b) any written material accompanying the Product, including Product package inserts, in each case as approved by the FDA.

1.57    "**Product Materials**" shall have the meaning set forth in Section 4.4.1(a).

1.58    "**Product Training Materials**" shall have the meaning set forth in Section 4.4.1(a).

1.59    "**Professionals**" shall mean health care practitioners, consisting of physicians, nurse practitioners, physician assistants, pharmacists and any other medical professionals in the Territory with prescribing, formulary or dispensing authority (as authorized under Applicable Law) in the Territory for the Product.

1.60    "**Promotional Materials**" shall have the meaning set forth in Section 4.4.1(a).

1.61    "**Promotional Program**" shall mean an educational program regarding the Product conducted by a Third Party healthcare provider within TYME's approved speakers bureau for SM-88 (racemetyrosine), located in a healthcare provider office or an outside venue, all in accordance with TYME speakers bureau guidelines.

1.62    "**Quarterly Average Sales Force Size**" shall have the meaning set forth in Section 4.2.2.

1.63    "**Regulatory Approval**" shall mean any and all necessary approvals, licenses, registrations or authorizations from any Governmental Authority, in each case, necessary to Commercialize the Product in the Territory.

1.64    "**Regulatory Authority**" means any national or supranational Governmental Authority, including without limitation the FDA, that has responsibility for granting any licenses or approvals or granting pricing and/or reimbursement approvals necessary for the development, marketing, and sale of the Product in any country.

1.65    "**Regulatory Exclusivity**" means any exclusive marketing rights or data exclusivity rights conferred by any Governmental Authority under Applicable Law with respect to the Product in a country or jurisdiction in the Territory to prevent Third Parties from Commercializing the Product in such country or jurisdiction, other than a Patent Right, including without limitation orphan drug exclusivity, pediatric exclusivity and rights conferred in the U.S. under the Hatch-Waxman Act or the FDA Modernization Act of 1997.

1.66    "**Regulatory Filings**" means any and all regulatory applications, filings, modifications, amendments, supplements, revisions, reports, submissions, authorizations, and Regulatory Approvals, and associated correspondence required to Develop and Commercialize the Product in the Territory, including without limitation any reports or amendments necessary to maintain Regulatory Approvals.

1.67    "**Restricted Period**" shall have the meaning set forth in Section 2.3.1.

1.68    "**Schedule**" shall mean a schedule attached to this Agreement.

1.69    "**Sales Forecast**" shall have the meaning set forth in Section 4.1.3.

1.70    "**Sales Plan**" shall mean the written sales plan relating to promotion and Detailing of the Product in the Field in the Territory by the Sales Representatives, which shall include, without limitation, the Eagle Quarterly Minimum Details and other commercial activities geared towards achieving the Sales Forecast, that is prepared by the SOC and approved by TYME as provided in Section 3.

1.71    "**Sales Representative**" shall mean an individual employed and compensated by Eagle as a full-time employee as part of its sales forces and who engages in Detailing of the Product in the Territory, and who is also trained with respect to the Product in accordance with this Agreement (including the Product Labeling and the use of the Promotional Materials) to deliver Details for the Product in the Field in the Territory.

1.72    "**Senior Officer**" shall mean, with respect to TYME, its Chief Executive Officer and Chief Operating Officer (or such officer's designee), and with respect to Eagle, its President and Chief Operating Officer (or such officer's designee). From time to time, each Party may change its Senior Officer by giving written notice to the other Party.

1.73    "**SM-88 (racemetyrosine)**" means TYME's SM-88 (racemetyrosine) novel oral therapy. SM-88 (D,L-alpha-metyrosine; racemetyrosine [USAN]) is a proprietary modified dysfunctional tyrosine derivative.

1.74    "**Specialty**" means a sales account's primary oncology specialty designation, as reasonably determined by TYME.

1.75    "**SOC**" shall have the meaning set forth in Section 3.1.

1.76    "**Target Launch Date**" shall mean the date selected by TYME, in its sole discretion, and of which TYME has provided notice to Eagle in writing at least nine (9) months in advance thereof, for the initial Commercialization of the Product in the Territory.

1.77    "**Target Professionals**" shall mean, with respect to the Product, one of the specifically identified community and/or hospital-based Professionals to be called upon by a Sales Representative based upon the Sales Plan. "Target Professionals" shall exclude key thought leaders as identified on Schedule 1.77 to this Agreement, which Schedule shall be prepared and provided by TYME prior to the Target Launch Date.

1.78    "**Term**" shall have the meaning set forth in Section 11.1.

1.79    "**Territory**" shall mean the United States of America and its territories and possessions.

1.80    "**Third Party(ies)**" shall mean any person or entity other than TYME and Eagle and their respective Affiliates.

1.81 "**TYME Trademarks and Copyrights**" shall mean the logos, trade dress, slogans, domain names and housemarks of TYME or any of its Affiliates as may appear on any Product Materials or Product Labeling, in each case, as may be updated from time to time by TYME.

## ARTICLE 2   RIGHTS AND OBLIGATIONS

2.1    **Engagement; Grant of Rights**. During the Term, subject to the terms and conditions of this Agreement, TYME hereby grants to Eagle the non-exclusive right to Detail and promote the Product in the Territory in the Field, and to conduct the Eagle Activities in accordance with the terms and conditions of this Agreement. Notwithstanding the foregoing, TYME retains and reserves the right for TYME and its Affiliates to promote the Product in the Territory and to grant the non-exclusive right to Detail and/or promote the Product in the Territory to any other Third Party in its sole discretion. Eagle shall have no other rights relating to the Product, except as specifically set forth in this Agreement. Eagle's rights and obligations under this Section 2.1 are non-transferable, non-assignable, and non-delegable. Eagle shall not subcontract the Eagle Activities with any Third Party (including any contract sales force). For clarity, Eagle shall not have any other license rights hereunder except as expressly set forth in this Section 2.1, nor any rights to sublicense any rights hereunder.

2.2    **Retention of Rights**. Except with respect to the limited rights granted to Eagle to conduct the Eagle Activities for the Product in the Territory in the Field pursuant to Section 2.1, TYME retains all rights in and to the Product. TYME shall have the sole right, as between the Parties, to Develop and Commercialize the Product, including without limitation, determining the marketing and regulatory strategies for seeking (if and when appropriate) Regulatory Approvals and Regulatory Exclusivity in the Territory for Product in the Field, filing for such Regulatory Approvals and Regulatory Exclusivity for Product in the Territory, preparing, submitting, and maintaining any and all Regulatory Filings and Regulatory Approvals for Product in the Field in the Territory, and seeking any necessary Regulatory Approvals of Regulatory Authorities for Product Labeling and Promotional Materials to be used in connection with Commercializing Product in the Field in the Territory. TYME shall solely own and control any and all Regulatory Approvals and any and all other Regulatory Filings submitted in connection with seeking and maintaining Regulatory Approvals for the Product in the Field in the Territory. As between the Parties, TYME shall be responsible for all costs and expenses incurred by TYME in connection with the foregoing activities. Without limiting the generality of the foregoing (and without limiting TYME's retained rights set forth in Section 2.1), TYME specifically retains the following rights (and Eagle and its Affiliates shall have no rights to the following, except as set forth below in this Section 2.2):

2.2.1    responsibility for all decisions regarding regulatory submissions and for all communications that relate to any Regulatory Approvals or other Regulatory Filings prior to and after any Regulatory Approval with respect to the Product in the Field in the Territory;

2.2.2    responsibility for the manufacture and distribution of the Product, and any future development of the Product;

2.2.3    responsibility, except as expressly set forth herein, for interactions with any Governmental Authority, including but not limited to FDA, with respect to the Product (provided that, Eagle shall retain the right to respond to communications or inquiries from Governmental Authorities in connection with the conduct of any Eagle Activities);

2.2.4    responsibility for creation and final approval of all Product Materials content (including submission of Promotional Materials to FDA's Office of Prescription Drug Promotion) with respect to the conduct of the Eagle Activities for the Product, except as expressly set forth herein;

2.2.5    selling and booking all sales of the Product;

2.2.6    responsibility for the Product's overall commercial strategy, including marketing, payer strategy, pricing, regulatory and other government affairs; and

2.2.7    responsibility for handling all safety related activities related to the Product as set forth in ARTICLE 5 (including submitting all safety reports and interacting with Governmental Authorities with respect thereto) and initiating and managing any Product recalls.

For clarity, except as provided in Sections 2.1 or 2.4, Eagle shall not acquire any license or other intellectual property interest, by implication or otherwise, in any technology, Know-How or other Intellectual Property owned or controlled by TYME or any of its Affiliates, and TYME is not providing any such technology, Know-How or other Intellectual Property, or any assistance related thereto, to Eagle for any use other than for the mutual benefit of the Parties as expressly contemplated hereby.

2.3    **Non-Competition; Non-Solicitation**.

2.3.1    **Non-Competition**. During the Term of this Agreement and through and including the first anniversary of the date of Termination of this Agreement (the "**Restricted Period**"), neither Eagle nor its Affiliates shall, directly or indirectly, market, detail, offer for sale, sell, or promote any oncology product in the Territory that is targeting an indication for which SM-88 (racemetyrosine) is approved other than the sales of the Product in accordance with the terms and conditions of this Agreement without TYME's prior written consent, which shall be given or withheld within its sole discretion.

2.3.2    **Non-Solicitation**. During Restricted Period, neither Eagle nor TYME (nor any of their respective Affiliates) shall directly or indirectly solicit for hire or employ as an employee, consultant or otherwise, any employee, consultant or other professional personnel of the other Party who has had direct involvement with the SOC, Eagle Activities under this Agreement or TYME's Commercialization activities for the Product, without the other Party's prior written consent, which shall not be unreasonably withheld; provided, however, that this restriction shall not apply to: (a) conducting any general solicitation not specifically targeted at any such employee; or (b) hiring any employee who responds to such general advertising or who approaches such Party or its Affiliates without any solicitation or inducement to leave the employ of such other Party or its Affiliates.

2.4    **TYME Trademarks and Copyrights**.

2.4.1    Eagle shall have the non-exclusive right to use the TYME Trademarks and Copyrights solely on Product Materials in order to perform the Eagle Activities and solely in accordance with the terms and conditions of this Agreement. TYME shall promptly notify Eagle of any updates or changes to the TYME Trademarks and Copyrights on the Product Materials, and Eagle shall thereafter solely use such updated Product Materials in performing its obligations under this Agreement. Eagle shall promptly notify TYME upon becoming aware of any violation of this Section 2.4.1.

2.4.2    Eagle shall follow all instructions and guidelines of TYME (of which TYME shall provide Eagle copies) in connection with the use of any TYME Trademarks and Copyrights, and, if TYME reasonably objects to the manner in which any such TYME Trademarks and Copyrights are being used, Eagle shall immediately cease the use of any such TYME Trademarks and Copyrights in such manner upon written notice from TYME thereof. Without

limiting the foregoing, Eagle shall also adhere to at least the same quality control provisions as companies in the pharmaceutical industry adhere to for their own trademarks and copyrights. In all cases, Eagle shall use the TYME Trademarks and Copyrights with the necessary trademark (and copyright, as applicable) designations, and shall use the TYME Trademarks and Copyrights in a manner that does not derogate from TYME's rights in the TYME Trademarks and Copyrights. Eagle shall not at any time during the Term knowingly do or allow to be done any act or thing which will in any way impair or diminish the rights of TYME in or to the TYME Trademarks and Copyrights. All goodwill and improved reputation generated by Eagle's use of the TYME Trademarks and Copyrights shall inure to the benefit of TYME, and any use of the TYME Trademarks and Copyrights by Eagle shall cease at the end of the Term. Eagle shall have no rights under this Agreement in or to the TYME Trademarks and Copyrights except as specifically provided herein. During the Term, Eagle shall not contest the ownership of the TYME Trademarks and Copyrights, their validity, or the validity of any registration therefor. During the Term, Eagle shall not knowingly register and/or use any marks (including in connection with any domain names) that are confusingly similar to the TYME Trademarks and Copyrights.

## ARTICLE 3    JOINT SALES OPERATIONS COMMITTEE

3.1    **Formation of the Joint Sales Operations Committee**. As soon as practicable, but no later than nine (9) months prior to the Target Launch Date, the Parties shall form a joint sales operations committee ("**SOC**") whose responsibilities during the Term shall be to oversee the activities set forth in Section 3.3. The SOC shall consist of no more than seven (7) members, with four (4) members designated by TYME and three (3) members designated by Eagle, each with suitable seniority and relevant experience and expertise to enable such person to address matters falling within the purview of the SOC; provided, that each Party may also have up to three (3) observers present at any SOC meeting. All meetings of the SOC shall be chaired by one of the four representatives from TYME. From time to time, each Party may change any of its representatives on the SOC by giving written notice to the other Party. The SOC shall determine a meeting schedule; provided that in any event, meetings shall be conducted no less frequently than quarterly by teleconference or in person, or as otherwise agreed by the Parties. In person meetings shall occur at such places as mutually agreed by the Parties. Employees or consultants of either Party that are not representatives of the Parties on the SOC may attend meetings of the SOC as one of a Party's designated observers; provided that, such attendees (i) shall not participate in the decision-making process of the SOC, and (ii) are bound by obligations of confidentiality and non-disclosure equivalent to those set forth in ARTICLE 8.

3.2    **Meetings and Minutes**. Meetings of the SOC may be called by either Party on no less than thirty (30) days' prior notice during the Term. Each Party shall make all proposals for agenda items and shall provide all appropriate information with respect to such proposed items at least ten (10) days in advance to the applicable meeting; provided that under exigent circumstances requiring input by the SOC, a Party may provide its agenda items to the other Party within a shorter period of time in advance of the meeting, or may propose that there not be a specific agenda for that particular meeting, so long as the other Party consents to such later addition of such agenda items or the absence of a specific agenda for such meeting, such consent not to be unreasonably withheld. Members may participate in a meeting of the SOC by means of a conference telephone or other communications equipment allowing all persons participating in the meeting to hear each other. Participation by such means shall constitute presence in person at the meeting. The chairperson shall prepare and circulate for review and approval of the Parties minutes of each meeting within thirty (30) days after the meeting. Each Party shall bear its own costs for its members to attend such meetings.

3.3    **Purpose of the SOC**. The purposes of the SOC shall be to, subject to Section 3.4:

3.3.1    provide a forum to discuss and coordinate the Parties' activities under this Agreement, in particular sales performance and metrics, and, subject to Section 3.4.2, develop, update, amend and approve the Sales Plan, including the identification of sales accounts;

3.3.2    provide a forum to discuss and coordinate the promotion of the Product in the Territory;

3.3.3    provide a forum to discuss Product Materials (it being understood that the SOC shall not have the right to approve such Product Materials);

3.3.4    provide a forum for discussing the annual Sales Forecast and revisions thereto (it being understood that TYME retains the right to update the Sales Forecast as described in Section 4.1.3);

3.3.5    provide a forum for reviewing, updating and agreeing on revisions to the Operating Parameters Schedule, including without limitation, to update the Eagle Quarterly Minimum Details and the Minimum Sales Representatives Requirement;

3.3.6    facilitate the flow of information and otherwise promote the communications and collaboration within and among the Parties relating to this Agreement and the promotion of the Product;

3.3.7    discuss planning and implementation of all Eagle Activities, including but not limited to training of Sales Representatives and development and implementation of policies and procedures for conduct of Promotional Programs and Details and Sales Representatives' interactions with sales accounts;

3.3.8    decide on the acceptable form of and review and discuss the Detail Reports and reports of Net Sales;

3.3.9    review and discuss the Compensation Reports and the incentive compensation matters described in Section 4.1.4, including any applicable adjustments to Product-related sales goals and targets of the Sales Representatives proposed by TYME (it being understood that Eagle shall retain final decision-making authority with respect to such matters but shall give good faith consideration to TYME's feedback with respect thereto);

3.3.10    review and discuss any matters brought to its attention by either Party's Alliance Manager;

3.3.11    discuss the Promotional Materials matters described in Section 4.4.1(a);

3.3.12    discuss supply or distribution issues relating to the Product;

3.3.13    act as a first level escalation to address disagreements or disputes between the Parties;

3.3.14    form and oversee any sub-committee or working group in furtherance of the activities contemplated by this Agreement;

3.3.15    decide on the acceptable form of and review and discuss the Compliance Reports; and

3.3.16 perform such other responsibilities as may be mutually agreed upon by the Parties in writing from time to time; provided, however, for clarity the SOC shall have no authority to amend or modify any provisions of this Agreement and no authority to waive or definitively interpret the provisions of this Agreement.

In connection with the SOC meetings contemplated under Section 3.2 (but in any event, no less frequently than each Fiscal Quarter), Tyme shall provide Eagle with a written summary of its material Development and Commercialization strategies and activities with respect to the Product in the Territory since the last SOC meeting or Fiscal Quarter, as applicable, including the results of such activities, and a description of its then-current marketing plans, marketing campaigns and Product-related messaging with key opinion leaders, except and to the extent such information is subject to confidentiality or similar restrictions on disclosure imposed by contractual, regulatory or similar requirements.

3.4 **Decision Making**.

3.4.1 **Quorum; Voting**. Meetings of the SOC shall occur only if at least one (1) representative of each Party is present at the meeting. Each Party shall have one (1) vote. The SOC shall use good faith efforts to reach consensus on all matters properly brought before it. If the SOC does not reach unanimous consensus on an issue at a meeting, or within a period of 30 days thereafter, then the SOC shall submit in writing the respective positions of the Parties to the Senior Officers of the Parties. Such Senior Officers shall use good faith efforts to resolve promptly such matter, which good faith efforts shall include at least one (1) teleconference between such Senior Officers within 30 days after the SOC's submission of such matter to them. Any final decision mutually agreed to in writing by the Senior Officers shall be conclusive and binding on the Parties. If the Senior Officers are not able to agree on the resolution of any such issue within 30 days after such issue was first referred to them, then, except with respect to those disputes that are expressly subject to arbitration pursuant to Section 12.6: (i) Eagle shall have the right to conclusively determine all matters related to the incentive compensation of the Sales Representatives and (ii) subject to Section 3.4.2, TYME shall have the right to conclusively determine all other matters; provided, however, for clarity, that such determination and any related activities comply with the terms and conditions of this Agreement. Notwithstanding anything to the contrary in the foregoing, for the avoidance of doubt, any such determination shall not amend, modify or waive any provisions of this Agreement or definitively interpret the provisions of this Agreement.

3.4.2 **Eagle Approvals**. Any proposed change or amendment to the (a) Operating Parameters Schedule or (b) Sales Plan that would (i) increase Eagle's percentage of the sales force requirements above the percentage provided in the Operating Parameters Schedule (as may be subsequently amended by mutual agreement of the Parties), (ii) increase the number of Eagle Quarterly Minimum Requirements (as such requirements may be updated by mutual agreement of the Parties), (iii) increase the number of Sales Representatives from the number agreed to prior to the Target Launch Date (or as otherwise agreed by mutual agreement of the Parties) or (iv) without duplication of items (i) – (iii) hereof, materially increase Eagle's costs associated with conducting any Eagle Activities other than Detailing shall, in each case of (a) and (b), require the written approval of Eagle (which approval shall not be unreasonably withheld). The initial Sales Plan developed by the SOC to be in effect at the Target Launch Date, which shall set forth the commercial activities geared towards achieving the Sales Forecast, including, without limitation the Eagle Quarterly Minimum Details and the target number of Promotional Programs, shall be developed by the SOC, approved by TYME and require the written approval of Eagle (which Eagle approval shall not be unreasonably withheld).

## ARTICLE 4   EAGLE ACTIVITIES FOR THE PRODUCT

4.1 **Eagle Activities**.

4.1.1 **General**. Eagle shall conduct the Eagle Activities for the Product in the Field in the Territory in accordance with this Agreement, including, without limitation, in accordance with the then-current Sales Plan.

4.1.2 **Sales Representatives**. Without limiting the generality of the foregoing, Eagle shall hire, and continuing throughout the remainder of the Term, shall maintain, a sales force with responsibility to Detail the Product in the Territory in accordance with the terms of the Operating Parameters Schedule. Eagle shall have such sales force in place by such time specified in the Operating Parameters Schedule in order to appropriately train on the Product prior to Target Launch Date. The Sales Representatives and their managers shall have the qualifications and meet the criteria set forth in Schedule 4.1.2 hereto, which schedule shall be jointly developed and mutually agreed by TYME and Eagle within 180 days of the execution and delivery of this Agreement.

4.1.3 **Sales Forecast**.

(a) No later than three (3) months prior to the Target Launch Date, TYME shall develop a forecast of reasonably expected Net Sales of the Product in the Territory in the Field for a one (1) year period, including projected quarterly Net Sales (the "**Sales Forecast**"). Thereafter, each Fiscal Year of the Term, TYME shall prepare an annual Sales Forecast for such period. The Sales Forecast shall be updated by TYME from time to time as appropriate, discussed at the SOC, and comprise part of the Sales Plan.

(b) On a quarterly basis, the SOC shall review actual Fiscal Year-to-date Net Sales performance compared to the Sales Forecast.

4.1.4 **Target Incentive Compensation**. Prior to the Target Launch Date, Eagle shall develop an incentive compensation package for each Sales Representative that derives an appropriate portion of target incentive compensation from achieving target sales of the Product, subject to TYME's review and comment prior to implementation of the incentive plan. On at least a quarterly basis, the Parties shall meet, through the SOC, to review the target incentive compensation and the actual incentive compensation paid out to the Sales Representatives to discuss, in good faith, any appropriate adjustments to the sales targets and goals related to the Product.

4.1.5 **Alliance Managers**. Each Party shall appoint a person who shall oversee interactions between the Parties for all matters related to this Agreement, and any related agreements between the Parties (each an "**Alliance Manager**"). The Alliance Managers shall endeavor to ensure clear and responsive communication between the Parties and the effective exchange of information, and shall serve as a single point of contact for all matters arising under this Agreement. The Alliance Managers shall have the right to attend all SOC meetings and, if applicable, subcommittee meetings as non-voting participants and may bring to the attention of the SOC or, if applicable, the subcommittee, any matters or issues either of them reasonably believes should be discussed, and shall have such other responsibilities as the Parties may mutually agree in writing. Each Party may designate different Alliance Managers by notice in writing to the other Party.

4.2 **Detailing**.

4.2.1  **Detail Requirements**. Commencing promptly upon completion of training of the Field Force Personnel that are engaged in Detailing the Product as described in Section 4.4.1 (but on the condition that Promotional Materials have been approved and delivered), Eagle shall deploy its Field Force Personnel that are engaged in Detailing to Detail the Product in accordance with the terms of this Agreement, including without limitation, the requirements for reach, frequency and position of the Product in the Detail provided in the Operating Parameters Schedule and the requirements of the then-current Sales Plan as updated from time to time. From time to time, Field Force Personnel shall organize and coordinate on the presentation of Promotional Programs as developed by the SOC and included in the then-current Sales Plan; however, except as set forth in this Agreement, without the prior written consent of TYME (not to be unreasonably withheld, delayed or conditioned), Eagle shall not conduct any Eagle Activities, other than Detailing, with respect to any Product. The Promotional Program requirements, guidelines and TYME approved speaker bureau will be provided to Eagle prior to initiation of the Promotional Programs.

4.2.2  **Records and Reports**.

(a)  Eagle shall keep accurate and complete records, consistent with pharmaceutical industry standards, of each Detail and its obligations hereunder in connection therewith. Such records shall be kept for the longer of (i) five (5) years after the end of the Fiscal Year to which they relate and (ii) such period of time as required by Applicable Laws. Within 15 days following the end of each Fiscal Quarter during the Term, Eagle shall provide TYME with a written report (each a "**Detail Report**"), setting out (1) the quarterly average number of Sales Representatives during such Fiscal Quarter (calculated by taking the sum of the number of Sales Representatives employed by Eagle (or its affiliates) that have incentive compensation packages that comply with the terms of Section 4.1.4 on each Business Day of the Fiscal Quarter divided by the number of Business Days in such Fiscal Quarter) (the "**Quarterly Average Sales Force Size**"), (2) the aggregate actual number of Details for the Product made by its Sales Representatives during such Fiscal Quarter, (3) the aggregate number of Exclusive Details, (4) the aggregate number of Multidisciplinary Details, (5) the number of Primary Multidisciplinary Details, and (6) the number of Details broken down by the name of the Target Professionals and such professional's Specialty. Through the SOC, the Parties shall agree on a mutually acceptable form of Detail Report.

(b)  Within 30 days following the end of each Fiscal Quarter during the Term, Eagle shall provide TYME with a written report (each a "**Compensation Report**"), which describes (i) the details of the incentive compensation package of each Sales Representative as it relates to the Product and (ii) the actual incentive compensation payouts for each Sales Representatives as described in Section 4.1.4. Through the SOC, the Parties shall agree on a mutually acceptable form of Compensation Report.

(c)  Within 30 days following the end of each Fiscal Quarter during the Term, Eagle shall provide TYME with a written report (each a "**Compliance Report**"), which sets out a summary of any compliance-related disciplinary actions relating to any Field Force Personnel that are engaged in Detailing and any associated remedial actions. Through the SOC, the Parties shall agree on a mutually acceptable form of Compliance Report.

(d)  TYME shall have the right, at its own expense, during normal business hours and upon reasonable prior notice, through an independent third party, reasonably acceptable to Eagle, and upon execution of a confidentiality agreement reasonably satisfactory to Eagle in form and substance, to inspect the applicable records and books maintained by Eagle relating to the Eagle Activities solely for purposes of verifying Eagle's compliance with the terms of this Agreement. For purposes of clarity, any such inspection right described in this Section 4.2.2(d) shall be limited to only those books and records of Eagle that are applicable to Eagle's performance of its obligations under this Agreement and may be conducted no more than once per calendar year. Where necessary, on reasonable request, TYME's inspection rights shall include interviewing Sales Representatives and other employees of Eagle. Eagle shall reasonably cooperate in any such inspection conducted by TYME. TYME shall treat all information subject to review under this Section 4.2.2(d) in accordance with the confidentiality provisions of this Agreement.

4.3  **Compliance with Applicable Law**.

4.3.1  In conducting the Eagle Activities hereunder, Eagle shall, and shall require all Field Force Personnel to, comply in all respects with Applicable Laws. In addition, TYME shall, and shall require all of its sales representatives to, comply in all respects with Applicable Laws in connection with its Development or Commercialization (including promotion and Detailing) of the Product in the Territory.

4.3.2  Neither Eagle or Field Force Personnel, nor TYME, its Affiliates or their respective licensees, shall offer, pay, solicit or receive any remuneration to or from any Professionals (including Target Professionals), in order to induce referrals of or purchase of the Product.

4.3.3  In performing the activities contemplated by this Agreement, neither Eagle or Field Force Personnel, nor TYME, its Affiliates or their respective licensees, shall make any payment, either directly or indirectly, of money or other assets to government or political party officials, officials of international public organizations, candidates for public office, or representatives of other businesses or persons acting on behalf of any of the foregoing where such payment would constitute violation of any Applicable Law. In addition, neither Eagle nor TYME shall make any payment, either directly or indirectly, to officials if such payment is for the purpose of unlawfully influencing decisions or actions with respect to the subject matter of this Agreement.

4.3.4  No employee of Eagle or its Affiliates shall have authority to give any direction, either written or oral, relating to the making of any commitment by TYME or its agents to any Third Party in violation of terms of this or any other provision of this Agreement

4.3.5  Neither Eagle nor TYME shall undertake any activity under or in connection with this Agreement which violates any Applicable Law.

4.3.6  TYME shall ensure that any patient assistance program used in connection with the Product (and the services performed thereby in connection with the Product) shall be operated in accordance with Applicable Law. Notwithstanding the immediately preceding sentence, TYME shall have no liability with respect to any breach or non-compliance with Applicable Law relating to any patient assistance program used in connection with the Product to the extent caused by the act or omission of any Field Force Personnel, which act or omission is not in compliance with the terms of this Agreement, Applicable Law or instructions of TYME.

4.3.7  TYME shall ensure that government-insured patients do not receive co-pay support from TYME with respect to the Product.

4.3.8  TYME shall ensure that its donations to, and interactions with, any 501(c)(3) charitable foundation that provides co-pay assistance to government-insured patients with respect to the Product are in full compliance with all Applicable Laws.

4.3.9  If, during the Term, Eagle becomes aware of a material violation or failure to comply with Applicable Law or the terms of this Agreement by a member of the Field Force Personnel that are engaged in Detailing, it shall promptly, but no later than two (2) Business Days after it becomes aware, notify TYME of such violation and, as promptly as possible thereafter, shall notify the steps it has taken or intends to take to remediate such violation.

4.3.10.  As would be practicable, but no less than six (6) months prior to Target Launch Date, each Party shall appoint a representative to act as its compliance manager under this Agreement, each of which shall be routinely responsible for advising such Party on compliance matters and has suitable seniority and other relevant experience and expertise (each, a "**Compliance Manager**"). From time to time, each Party may change its Compliance Manager by giving written notice to the other Party. The Compliance Managers shall serve as a key point of contact between the Parties for compliance-related matters. Each Compliance Manager shall facilitate the resolution of any compliance issue with the Compliance Manager of the other Party. The Compliance Managers shall use good faith efforts to reach consensus on all compliance matters. If the Compliance Managers do not reach consensus on an issue promptly, then such issue shall be submitted to dispute resolution process described in Section 12.6. Upon the reasonable request of TYME from time to time, Eagle shall deliver to TYME copies of Eagle's compliance program policies and compliance training materials which are applicable to the Field Force Personnel's promotion of the Product. Other than as expressly stated herein, Eagle shall not be required to modify its compliance policies or practices in connection with the compliance-related provisions herein.

4.4    **Field Force Personnel Training; Product Materials**.

4.4.1    **Training, Training Materials and Promotional Materials**.

(a)    Subject to the terms of this Section 4.4.1, TYME shall prepare and control the content of (i) all Product training materials for Field Force Personnel (the "**Product Training Materials**") and (ii) all Product marketing and educational materials (the "**Promotional Materials**") (the Product Training Materials and the Promotional Materials, collectively, the "**Product Materials**"). TYME shall be solely responsible for ensuring that the Product Materials prepared and approved by it are in compliance with the Regulatory Approval for the Product, the Product Labeling and Applicable Law. Once approved by TYME, the content of the Product Materials shall be provided by TYME to Eagle in advance of the Eagle Activities to allow for Eagle to review such content and provide verbal feedback to TYME in advance of use of the Product Materials. Within 15 days of receipt of such Product Materials, Eagle shall verbally provide to TYME any comments and/or proposed revisions to such Product Materials, which comments and revisions TYME shall reasonably consider so long as TYME deems such suggestions are acceptable in the promotion of the Product; provided that in any event, to the extent that TYME reasonably believes that such changes are not in compliance with Applicable Law, the Regulatory Approval for the Product or the applicable Product Labeling, then TYME shall not be required to incorporate any such suggestions from Eagle in the Product Materials. In the event of any disagreement between the Parties regarding any feedback received from Eagle with respect to the Product Materials, TYME shall have the right to conclusively determine such matter; provided that, Eagle shall not be required to use any Product Materials that it reasonably believes violate Applicable Law. If Eagle has provided comments to TYME on the Product Materials and TYME accepts some or all of such comments, then, once revised, TYME shall provide to Eagle the revised versions of such Product Materials for further review by Eagle, in accordance with the terms and timelines of this Section 4.4.1(a) above. Eagle shall use only Product Materials approved by TYME in the performance of Eagle Activities under this Agreement. The content of Product Materials shall not be modified or changed by Eagle or Field Force Personnel at any time without the prior written approval of TYME in each instance. TYME shall be responsible for the costs and expenses of creation and development of the Product Materials and Eagle shall be responsible for the costs and expense of reproduction, printing and delivery of the Product Materials to and for Eagle. The information regarding the Product that is provided by Eagle or Field Force Personnel as part of the Eagle Activities shall not deviate from the Product Materials. The Parties shall coordinate the production and delivery of Product Materials to allow sufficient internal and field force review time to accommodate scheduled training meetings and distribution to Field Force Personnel that are engaged in Detailing. In the event that TYME incurs costs and expenses for which Eagle is responsible under this Section 4.4.1, TYME may deduct such amounts from the payments due under Section 6.1 and shall include a description thereof in the applicable report under Section 6.2. The Parties shall collaborate to finalize the Product Materials in accordance with this Section 4.4.1(a) in advance of the Target Launch Date.

(b)    By no later than six (6) months prior to the Target Launch Date, the Parties shall collaborate to plan and schedule training for the Sales Representatives at a mutually acceptable time(s) and date(s), including a launch meeting for the Sales Representatives at a mutually acceptable location. TYME shall lead such initial training and Eagle shall cooperate with any reasonable requests of TYME in order to support such training. The costs and expenses of such launch meeting shall be the responsibility of Eagle. All other training costs and expenses shall be the responsibility of Eagle. After the initial training, the Parties shall collaborate to provide additional training at such frequency, times and places as the circumstances warrant and the Parties mutually agree, but no less frequently than quarterly with at least three (3) live, in-person training sessions annually. Eagle shall have the right, but not the obligation, to conduct such additional training itself, provided that the Eagle trainers have been trained by TYME, and provided further that TYME shall have the right to attend such training upon reasonable notice by TYME to Eagle. Eagle shall certify in writing to TYME that all Field Force Personnel have completed the training described in this Section 4.4.1(b).

(c)    Eagle and all Field Force Personnel that are engaged in Eagle Activities shall comply with the applicable provisions of the Code, and shall be trained on Eagle's compliance policies, including those that are consistent with the applicable provisions of Sec. 1128B(b) of the Social Security Act and the American Medical Association Ethical Guidelines for Gifts to Physicians from Industry (which such training may have been accomplished prior to the Term), prior to commencing any Eagle Activities. Eagle agrees that it shall train any employee or agent of Eagle who is involved in performing the activities contemplated by this Agreement on anti-corruption and anti-bribery at its own expense.

(d)    Field Force Personnel that are engaged in Detailing shall conduct the Eagle Activities only after having undergone the training described in this Section 4.4 and, without limiting the foregoing, no Field Force Personnel member shall Detail the Product without having undergone such training. Subject to the foregoing, Eagle shall have the responsibility for on-going training of its Field Force Personnel that are engaged in Detailing in accordance with customary practice in the pharmaceutical industry, provided that TYME shall be entitled to approve all such training objectives and content.

4.4.2    **Ownership of Product Materials**. As between the Parties, TYME shall own all right, title and interest in and to any Product Materials (and all content contained therein) and any Product Labeling (and all content contained therein), including applicable copyrights and trademarks (other than any name, trademark, trade name or logo of Eagle or its Affiliates that may appear on such Product materials or Product Labeling), and to the extent Eagle (or any of its Affiliates) obtains or otherwise has a claim to any of the foregoing, Eagle hereby assigns (and shall cause any applicable Affiliate to assign) all of its right, title and interest in and to such Product Materials (and content) and Product Labeling (and content) (other than any name, trademark, trade name or logo of Eagle or its Affiliates that may appear on such Product materials or Product Labeling) to TYME and Eagle agrees to (and shall cause its applicable Affiliate to) execute all documents and take all actions as are reasonably requested by TYME to vest title to such Product Materials (and content) and Product Labeling (and content) in TYME (or its designated Affiliate).

4.5    **Provisions Related to Field Force Personnel**.

4.5.1    **Activities of Field Force Personnel**. Eagle hereby agrees and acknowledges that the following shall apply with respect to itself and the Field Force Personnel that are engaged in Detailing:

(a)    Eagle shall instruct and cause the Field Force Personnel that are engaged in Detailing to use only the Product Labeling and, subject to the terms of Section 4.4, Product Materials approved by TYME for the conduct of the Eagle Activities for the Product and consistent with

Applicable Laws. Eagle shall instruct the Field Force Personnel that are engaged in Detailing to, and shall monitor (in accordance with Eagle's standard practice) the Field Force Personnel that are engaged in Detailing, in order to ensure that such Field Force Personnel limit their claims of efficacy and safety for such Product to those claims which are consistent with and do not exceed the Product Labeling and any Promotional Materials.

(b)    Eagle shall instruct the Field Force Personnel that are engaged in Detailing to conduct the Eagle Activities for the Product, and shall monitor and audit (in accordance with Eagle's standard practice) the Field Force Personnel that are engaged in Detailing so that such personnel conduct the Eagle Activities for such Product in adherence in all respects with Applicable Laws.

(c)    Eagle shall instruct the Field Force Personnel that are engaged in Detailing regarding provisions of this Agreement applicable to Details of the Product, including Section 4.2 and this Section 4.5.1.

(d)    Eagle acknowledges and agrees that TYME will not maintain or procure any worker's compensation, healthcare, or other insurance for or on behalf of the Field Force Personnel, all of which shall be Eagle's sole responsibility.

(e)    Eagle acknowledges and agrees that all Field Force Personnel are employees of Eagle and are not, and are not intended to be treated as, employees of TYME or any of its Affiliates, and that such individuals are not, and are not intended to be, eligible to participate in any benefits programs or in any "employee benefit plans" (as such term is defined in section 3(3) of the Employee Retirement Income Security Act of 1974, as amended) that are sponsored by TYME or any of its Affiliates or that are offered from time to time by TYME or its Affiliates to their own employees. All matters of compensation, benefits and other terms of employment for any such Field Force Personnel shall be solely a matter between Eagle and such individual. TYME shall not be responsible to Eagle, or to the Field Force Personnel, for any compensation, expense reimbursements or benefits (including vacation and holiday remuneration, healthcare coverage or insurance, life insurance, severance or termination of employment benefits, pension or profit-sharing benefits and disability benefits), payroll-related taxes or withholdings, or any governmental charges or benefits (including unemployment and disability insurance contributions or benefits and workmen's compensation contributions or benefits) that may be imposed upon or be related to the performance by Eagle or such individuals of this Agreement, all of which shall be the sole responsibility of Eagle, even if it is subsequently determined by any Governmental Authority that any such individual may be an employee or a common law employee of TYME or any of its Affiliates or is otherwise entitled to such payments and benefits.

(f)    Eagle shall be solely responsible for the acts or omissions of the Field Force Personnel that are not in compliance with Applicable Law and the terms of this Agreement while performing any of the activities under this Agreement. Eagle shall be solely responsible and liable for all probationary and termination actions taken by it, as well as for the formulation, content and dissemination (including content) of all employment policies and rules (including written probationary and termination policies) applicable to its employees.

4.5.2    **Termination of Employment; Cessation of Eagle Activities**. If any Field Force Personnel leaves the employ of Eagle (or any of its Affiliates), or otherwise ceases to conduct the Eagle Activities for the Product, Eagle shall, to the extent consistent with, and in a manner similar to, its practices with respect to departures of the sales representatives or other field force personnel, as applicable, promoting, marketing or detailing other products for Eagle, account for, and shall cause such departing Field Force Personnel to return to Eagle and delete from his/her computer files (to the extent such materials or information have been provided in, or converted into, electronic form) all materials relating to the Product that have been provided to such individual, including the Product Materials and account level information, including all copies of the foregoing.

4.5.3    **Discipline**. If TYME has a reasonable basis for believing any member of the Field Force Personnel that are engaged in Detailing has violated any Applicable Laws, or failed to comply with this Agreement, then TYME shall notify Eagle of the alleged violation and Eagle shall promptly investigate the matter and, if the allegation turns out to be true, shall take the appropriate remedial action. Subject to the foregoing, Eagle shall be solely responsible for taking any disciplinary actions in connection with its Field Force Personnel that are engaged in Detailing. If, at any time, TYME has any other compliance-related concerns regarding any Field Force Personnel Detailing, TYME's Compliance Manager shall notify Eagle's Compliance Manager of such concerns in writing and the Compliance Managers shall discuss and resolve such matters pursuant to Section 4.3.10.

4.6    **Responsibility for Eagle Activity Costs and Expenses**. Other than as expressly set out herein, Eagle shall be solely responsible for any and all costs and expenses incurred by Eagle or any of its Affiliates in connection with the conduct of the Eagle Activities for the Product hereunder, including all costs and expenses in connection with Sales Representatives, including salaries, bonuses, employment benefits, travel expenses and other expenses, credentialing, licensing, providing benefits, deducting federal, state and local payroll taxes, and paying workers' compensation premiums, unemployment insurance contributions and any other payments required by Applicable Laws to be made on behalf of employees.

4.7    **Data Sharing**. Without limiting the information that Eagle shall provide to TYME hereunder, including, without limitation, the reports deliverable under Section 4.2 hereof, TYME shall provide to Eagle certain information relating to the sale, Commercialization, marketing and promotion of the Product, as may be mutually agreed by the Parties from time to time, for use by Eagle and the Field Force Personnel in connection with the Eagle Activities. The timing of the delivery of such information shall be mutually agreed upon by the Parties, acting reasonably.

4.8    **Material Changes**. Eagle acknowledges no Product is available for Commercialization as of the date hereof and that the service levels and requirements of Eagle and its personnel under this Article IV and the accompanying

Schedules are based on the Parties' current expectations regarding SM-88 (racemetyrosine)'s approval pathway in pancreatic cancer. Should SM-88 (racemetyrosine) be approved in additional or different indications, a new Product or class of Product becomes available for Commercialization, or there is otherwise a material change in TYME's requirements hereunder, the Parties agree to amend the Operating Parameters Schedule in good faith to address such development. For the avoidance of doubt, the Parties agree that any such amendment will be made in good faith to preserve the spirit and service levels established hereunder for such new indications or changes. Any disputes arising from this Section 4.8 or amendments to the Operating Parameters Schedule incident thereto that are not resolved by the Senior Officers pursuant to Section 3.4.1 shall be governed by Section 12.6.

## ARTICLE 5   REGULATORY, SAFETY AND SURVEILLANCE, COMMERCIAL MATTERS

5.1    **TYME Responsibility**. As between the Parties, except as expressly set out herein, all regulatory matters regarding the Product shall be the responsibility of TYME, including responsibility for all communications with Governmental Authorities, including but not limited to the FDA, related to the Product, and TYME shall have sole responsibility to seek and/or obtain any necessary approvals of any Product Labeling and the Promotional Materials used in connection with the Product, and for determining whether the same requires approval. As between the Parties, TYME shall be responsible for any reporting of matters regarding the manufacture, sale or promotion of the Product (including Adverse Events) to or with the FDA and other relevant Regulatory Authorities, in accordance with Applicable Laws. TYME shall maintain, at its cost, the Regulatory Approvals for the Product and shall comply with all

Applicable Law relevant to the conduct of TYME's business with respect to the Product or pursuant to this Agreement, including, without limitation, all applicable requirements under the Act.

5.2    **Eagle Involvement**. Except as expressly permitted herein, Eagle shall not, without TYME's prior written consent, correspond or communicate with the FDA or with any other Governmental Authority concerning the Product, or otherwise take any action concerning any Regulatory Approval or other authorization under which the Product is marketed or sold. If not prohibited by any Government Authority or Applicable Law, Eagle shall provide to TYME, promptly upon receipt, copies of any communication from the FDA or other Governmental Authority related to the Product. If not prohibited by any Government Authority or Applicable Law, TYME has the right to review and comment on Eagle's draft responses to any Governmental Authorities relevant to Detail of the Product prior to Eagle's issuance of such response; and Eagle agrees to consider any comments or suggestions from TYME in good faith.

5.3    **Inspections**.

5.3.1    If not prohibited by any Government Authority or Applicable Law, Eagle shall notify TYME immediately upon receipt of any notice of inspection or investigation by any Governmental Authority related to or that Eagle reasonably believes may impact any aspect of the Eagle Activities. If not prohibited by any Government Authority or Applicable Law, TYME shall have the right to have a representative present at any such portion of the inspection involving any Eagle Activities. In such cases, Eagle shall (i) keep TYME fully informed of the progress and status of any such inspection or investigation, (ii) prior to undertaking any action pursuant to this Section 5.3.1, notify TYME of the inspection or investigation, and disclose to TYME in writing the Governmental Authorities' assertions, findings and related results of such inspection or investigation pertaining to the Eagle Activities, and (iii) provide full disclosure to TYME with respect to any action undertaken or proposed to be undertaken pursuant to this Section 5.3.1 prior to acting as it pertains to the Eagle Activities. In addition, if such findings or the Governmental Authority requests or suggests that Eagle should change any aspect of the Eagle Activities, the Parties shall work together to make any such modification; provided, however, that notwithstanding anything to the contrary herein, Eagle shall not be required to engage in any Eagle Activities to the extent any finding or Government Authority has requested or suggested that Eagle may not engage in such activity.

5.3.2    If not prohibited by any Government Authority or Applicable Law, TYME shall notify Eagle immediately upon receipt of any notice of inspection or investigation by any Governmental Authority related to or that TYME reasonably believes may impact any aspect of the Eagle Activities. In such cases, TYME shall (i) keep Eagle fully informed of the progress and status of any such inspection or investigation, (ii) disclose to Eagle in writing the Governmental Authorities' assertions, findings and related results of such inspection or investigation pertaining to the Product or its promotion, and (iii) provide full disclosure to Eagle with respect to any action undertaken or proposed to be undertaken pursuant to this Section 5.3.2 prior to acting as it pertains to the Eagle Activities. In addition, if such findings or the Governmental Authority requests or suggests that Eagle should change any aspect of the Eagle Activities, the Parties shall work together to make any such modification; provided, however, that notwithstanding anything to the contrary herein, Eagle shall not be required to engage in any Eagle Activities to the extent any finding or Government Authority has requested or suggested that Eagle may not engage in such activity.

5.4    **Pharmacovigilance**. Subject to the terms of this Agreement, no later than six (6) months prior to the Target Launch Date, TYME and Eagle (under the guidance of their respective pharmacovigilance departments, or equivalent thereof) shall identify and finalize the responsibilities the Parties shall employ to protect patients and promote their well-being in a separate safety data exchange agreement ("**Pharmacovigilance Agreement**"). These responsibilities shall include mutually acceptable guidelines and procedures for the receipt, investigation, recordation, communication and exchange (as between the Parties) of safety information, such as Adverse Events, lack of efficacy, misuse/abuse, and any other information concerning the safety of the Product. Such guidelines and procedures will be in accordance with, and enable the Parties and their Affiliates to fulfill, regulatory reporting obligations to Governmental Authorities. For the avoidance of doubt, such guidelines and procedures shall provide that any Eagle Sales Representative, Field Force Personnel or Eagle Affiliate that becomes aware of an Adverse Event shall follow all TYME policies and procedures regarding Adverse Event reporting, including TYME's Adverse Event Reporting standard operating procedure, which shall be provided to Eagle for training prior to the Target Launch Date. The Pharmacovigilance Agreement shall provide that: (i) TYME shall be responsible for all pharmacovigilance activities regarding the Product, including signal detection, medical surveillance, risk management, medical literature review and monitoring, Adverse Event reporting and responses to Governmental Authority requests or enquiries, and shall provide information related thereto to Eagle, and (ii) in the event Eagle receives safety information regarding the Product, or information regarding any safety-related regulatory request or inquiry, Eagle shall notify TYME as soon as practicable, but, in any event, within the timelines set forth in the Pharmacovigilance Agreement.

5.5    **Unsolicited Requests for Medical Information**. Eagle shall direct to TYME any unsolicited requests for off-label medical information from health care professionals with respect to the Product promptly following receipt by Eagle (but in no event later than two (2) days after receipt). TYME shall, within two (2) days following receipt of any such request from Eagle, address any such requests directly.

5.6    **Recalls and Market Withdrawals**. As between the Parties, TYME shall have the sole right to determine whether to implement, and to implement, a recall, field alert, withdrawal or other corrective action related to the Product. TYME shall bear the cost and expense of any such recall, field alert, withdrawal or other corrective action. Each Party shall promptly (but in any case, not later than one (1) day after) notify the other Party in writing of any order, request or directive of a court or other Governmental Authority to recall or withdraw the Product.

5.7    **Certain Reporting Responsibilities**. Notwithstanding the foregoing provisions of this ARTICLE 5, each Party shall be responsible for its own federal, state and local government pricing reporting and payment transparency reporting in the Territory arising from its Product promotional activities and related expenditures pursuant to Applicable Law. It is the intention of the Parties that any payments or transfer of value by a Party as it relates to the Product shall constitute transfers of value by that Party and such Party shall be responsible for the reporting described in the immediately preceding sentence. However, if a Party is deemed to have provided any payments or transfers of value to a Third Party on behalf of the other Party as it relates to the Product, then such Party shall provide to the other Party, in a format reasonably acceptable to such other Party, the data and other information on a timely basis (i.e., in the case of manual reporting of such data and other information, within 30 days following the end of each Fiscal Quarter, and, in the case of automated reporting of such data and other information, on a periodic basis during each Fiscal Quarter as reasonably requested by such other Party) for such other Party's reporting under the Physician Payments Sunshine Act and other Applicable Laws.

5.8    **Booking of Sales Revenues**. TYME shall retain ownership of the rights to the Product and record on its books all revenues from sales of the Product. TYME shall be exclusively responsible for accepting and filling purchase orders, billing, and returns with respect to the Product. If Eagle receives an order for the Product, it shall promptly transmit such order to TYME (or its designee) for acceptance or rejection. TYME shall have sole responsibility for shipping, distribution and warehousing of the Product, and for the invoicing and billing of purchasers of the Product and for the collection of receivables resulting from the sales of the Product in the Territory.

5.9    **Returns**. Eagle is not authorized to accept any Product returns. Eagle shall advise any customer who attempts to return any Product to Eagle (or its Affiliates) that such Product must be shipped by the customer to the facility designated by TYME from time to time (and in accordance with other

instructions provided by TYME) TYME shall provide to Eagle written instructions as to how Eagle should handle any Product that is actually physically returned to Eagle. Eagle shall take no other actions with respect to such return without the prior written consent of TYME.

5.10    **Development; Manufacturing; Distribution**; **Marketing**. TYME shall have the sole authority to Develop, Commercialize, manufacture, package, label, warehouse, sell and distribute the Product in the Territory. TYME shall use Commercially Reasonable Efforts to Develop and Commercialize at least one (1) Product in the Field in the Territory. Following the acceptance of the NDA for SM-88 (racemetyrosine) by the FDA and no later than 90 days prior to the Target Launch Date, TYME shall use Commercially Reasonable Efforts to cause sufficient quantities of Product to be available in inventory to promptly fill orders throughout the Territory and otherwise meet the forecasted demand for Product in the Territory. If, despite such efforts, there is insufficient supply of Product to meet demand, then TYME shall use Commercially Reasonable Efforts to promptly address such insufficiency. TYME shall contractually require (and shall use commercially reasonable efforts to enforce such contractual provisions) that all Product is manufactured, shipped, sold and distributed in accordance with all Product specifications and all Applicable Law and that its contract manufacturers and/or suppliers of Product operate their facilities in accordance with Applicable Law. TYME shall ensure that all Product Labeling complies with the applicable Regulatory Approval for the Product and Applicable Law. Other than as set forth in this Agreement, TYME shall be responsible for all marketing of the Product in the Territory.

## ARTICLE 6    FINANCIAL PROVISIONS

6.1    **Promotion Fee**.

6.1.1    **Calculation of Promotion Fee**.

(a)    Subject to Section 6.1.2, commencing with the Fiscal Quarter following the First Commercial Sale, as consideration for the Eagle Activities performed by Eagle, TYME shall pay Eagle a promotion fee based on Net Sales during the Term, calculated by multiplying fifteen percent (15%) by Net Sales of all Product in the Territory in each Fiscal Quarter.

(b)    At any time after the date hereof, TYME shall have the right to terminate Eagle's right to Detail and Promote the Product in the Territory in the Field upon a payment to Eagle of all accrued, earned but unpaid promotion fee amounts plus the Buyout Amount.

6.1.2    **Adjustment of Promotion Fee**. In the event that Eagle fails to satisfy the Eagle Quarterly Minimum Details for the Product or fails to demonstrate Commercially Reasonable Efforts to execute on other aspects of the Sales Plan then in effect for a period of two (2) consecutive Fiscal Quarters, the promotion fee payable by TYME pursuant to Section 6.1.1(a) shall be reduced to twelve percent (12%) for subsequent Fiscal Quarters and Eagle shall continue to receive such reduced promotion fee until such Fiscal Quarter in which Eagle satisfies the Eagle Quarterly Minimum Details for the Product or demonstrates Commercially Reasonable Efforts to execute on other aspects of the Sales Plan, as the case may be. Eagle's failure to meet the Eagle Quarterly Minimum Details or to demonstrate Commercially Reasonable Efforts to execute on other aspects of the Sales Plan then in effect for the Product for a period of four (4) consecutive Fiscal Quarters shall be deemed a material breach of this Agreement (it being understood that a failure to meet the Eagle Quarterly Minimum Details or to demonstrate Commercially Reasonable Efforts to execute on other aspects of the Sales Plan then in effect for the Product for any period less than four consecutive Fiscal Quarters shall not alone be deemed a material breach of this Agreement). For the avoidance of doubt, notwithstanding anything to the contrary herein, such material breach of this Agreement shall give rise to TYME's immediate ability to terminate the Agreement pursuant to Section 11.2.2 and shall not be subject to any cure period.

6.2    **Reports; Payments**.

6.2.1    **Quarterly Reports and Payments**. Within fifteen (15) Business Days after the end of each Fiscal Quarter during the Term, TYME shall provide to Eagle a written report setting forth in reasonable detail the calculation of the Net Sales for such Fiscal Quarter and the promotion fee payable in respect of such Net Sales in accordance with Section 6.1, including the number of units of the Product shipped to patients in the Territory during such Fiscal Quarter, together with an itemized list of such units by Target Professional writing the applicable prescription. Within sixty (60) days after the end of each Fiscal Quarter during the Term, TYME shall pay to Eagle the undisputed portion of the promotion fee payable in respect of such Net Sales in accordance with Section 6.1. If this Agreement terminates or expires during a Fiscal Quarter, the promotion fee payable to Eagle under Section 6.1 shall be calculated only on the Net Sales that occurred during prior to the effective date of such termination or expiration in such Fiscal Quarter.

6.2.2    **Monthly Estimate Reports**. Within fifteen (15) Business Days of the end of each month within each Fiscal Quarter, TYME shall provide to Eagle a written report setting forth TYME's good faith estimate of the Net Sales and the estimated promotion fee payable in respect of such Net Sales for each of such calendar month and the Fiscal Quarter-to-date period, together with its good faith estimates of each of the items described in Section 6.2.1 above. The Parties acknowledge and agree that the monthly reports shall only set forth TYME's good faith estimates of the items contained therein and are being provided to Eagle for information purposes only and shall not be determinative of the any amounts due hereunder.

6.2.3    **Payment Adjustments**. If new information becomes available after the close of a Fiscal Quarter under the process described in Section 6.2.1 that would adjust the amount of recognized Net Sales or payments under this Agreement, such adjustments shall be made in the Fiscal Quarter they become available. Additions or deductions in payments resulting from any adjustments shall be applied to the next regularly scheduled quarterly payment.

6.2.4    **Disputes**. Promptly upon receipt of the quarterly or monthly reports described in this Section 6.2, Eagle shall review such reports and, in the event that Eagle disputes any of the items described in such report, Eagle shall promptly notify TYME of any such disputes. The Parties shall meet promptly thereafter to attempt to resolve such disputes.

6.2.5    **Manner of Payment**. All payments under this Agreement shall be made in US Dollars by wire transfer or Automated Clearing House to a bank account designated in writing by Eagle or TYME, as applicable, which shall be designated at least five (5) Business Days before such payment is due.

6.2.6    **Late Payments**. If Eagle does not receive payment of any sum due to it on or before the due date, simple interest shall thereafter accrue on the sum due to Eagle from the due date until the date of payment at the prime rate published in the Wall Street Journal on the due date plus two percent (2.0%) per annum or the maximum rate allowable by Applicable Law, whichever is less. Notwithstanding the foregoing, if the reason for any late payment is resulting from or arising out of any act or omission on the part of Eagle, including, but not limited to, any delay providing the payment instructions pursuant to Section 6.2.5, such interest shall not accrue. For clarity, any payments due from adjustments under Section 6.2.3 shall not be considered late payments.

6.3 **Taxes**. To the extent TYME is required to deduct and withhold taxes from any payment to Eagle, TYME shall pay the amounts of such taxes to the proper Governmental Authority in a timely manner and promptly transmit to Eagle an official tax receipt or other evidence of timely payment sufficient to enable Eagle to claim the payment of such taxes as a deduction or tax credit. Eagle may provide to TYME any tax forms that may be reasonably necessary in order for TYME to not withhold tax and TYME shall dispense with withholding, as applicable. TYME shall provide Eagle with reasonable assistance to enable the recovery, as permitted by Applicable Laws, of withholding taxes.

6.4 **Recordkeeping**.    Each Party shall maintain complete and accurate books and records in sufficient detail, in accordance with GAAP (to the extent applicable and in accordance with the Agreement) and all Applicable Law, to enable verification of the performance of such Party's obligations under this Agreement and any payments due to a Party under this Agreement. Unless otherwise specified herein, the books and records for a given Fiscal Year of the Term shall be maintained for a period of three (3) years after the end of such Fiscal Year or longer if required by Applicable Law.

6.5 **Eagle Rights**. Eagle shall have the right, at its own expense, during normal business hours and upon reasonable prior notice, through an independent certified public accountant reasonably acceptable to Tyme, and upon execution of a confidentiality agreement reasonably satisfactory to TYME in form and substance, to inspect the applicable records and books maintained by TYME solely for purposes of verifying the accuracy of Net Sales amounts reported by TYME pursuant to Section 6.2.1 hereof and the fees payable by TYME to Eagle under this Agreement in respect of such amounts. For clarity, such inspection right described in this Section 6.5 shall be limited to only those books and records of payment reports and amounts owed to Eagle as a result of Tyme's achievement of Net Sales of the Product in the Territory under this Agreement and (i) may be conducted no more than once per calendar year, (ii) may only cover the most recently completed Fiscal Year and the two (2) years prior to such Fiscal Year, and (iii) may not be conducted in March through June of any given Fiscal Year. Disputes, if any, must be submitted to TYME within sixty (60) days after the completion of such inspection. TYME shall reasonably cooperate in any such inspection or audit conducted by Eagle. Eagle shall treat all information subject to review under this Section 6.5 in accordance with the confidentiality provisions of this Agreement.

## ARTICLE 1   INTELLECTUAL PROPERTY

1.1 **Ownership of Intellectual Property**.

1.1.1 **Eagle Property**. TYME acknowledges that Eagle owns or is licensed to use certain Know-How relating to proprietary sales and marketing information, methods and plans that has been independently developed or licensed by Eagle (such Know-How, the "**Eagle Property**"). The Parties agree that any improvement, enhancement or modification made, discovered, conceived, or reduced to practice by Eagle to any Eagle Property in performing its activities pursuant to this Agreement which is not primarily related to the Product, or which is not otherwise derived from the Confidential Information of TYME, shall be deemed Eagle Property. Eagle hereby grants to TYME a fully paid-up, royalty free, non-transferable, non-exclusive perpetual license (with a limited right to sub-license to its Affiliates) to any Eagle Property that appears on, embodied on or contained in Product Materials or Product Labeling solely for use in connection with TYME's promotion or other Commercialization of the Product in the Territory.

1.1.2 **TYME Property**. Subject to the terms of Section 7.1.1, TYME shall have and retain sole and exclusive right, title and interest in and to all inventions, developments, discoveries, writings, trade secrets, Know-How, methods, practices, procedures, designs, improvements and other technology, whether or not patentable or copyrightable, and any patent applications, patents, or copyrights based thereon (collectively, "**Intellectual Property**") relating to the Product that are (i) owned or controlled by TYME as of the Effective Date, (ii) made, discovered, conceived, reduced to practice or generated by TYME (or its employees or representatives) during the Term, or (iii) made, discovered, conceived, reduced to practice or generated by Eagle (or its employees or representatives) in performing its activities pursuant to this Agreement to the extent primarily related to the Product or which is otherwise derived from the Confidential Information of TYME ("**Inventions**"). Eagle agrees to assign, and hereby does assign, to TYME (and shall cause its Affiliates and its and their respective employees and other representatives to assign to TYME) any and all right, title and interest that Eagle (or any such Affiliates, employees or other representatives) may have in or to any Invention. For clarity, any and all Inventions and any information contained therein or related thereto shall constitute Confidential Information of TYME.

1.2 **Title to Trademarks and Copyrights**. The ownership, and all goodwill from the use, of any TYME Trademarks and Copyrights shall at all times vest in and inure to the benefit of TYME, and Eagle shall assign, and hereby does assign, any rights it may have in the foregoing to TYME. Eagle shall not, directly or indirectly, adopt, apply for or acquire any trademarks, trade names, or domain names that include or are confusingly similar to any of the TYME Trademarks and Copyrights.

1.3 **Protection of Trademarks and Copyrights**. As between the Parties, TYME shall have the sole right (but not the obligation), as determined by TYME in its sole discretion, to (i) maintain the TYME Trademarks and Copyrights and/or (ii) protect, enforce and defend the TYME Trademarks and Copyrights. Eagle shall give notice to TYME of any infringement of, or challenge to, the validity or enforceability of the TYME Trademarks and Copyrights promptly after learning of such infringement or challenge. If TYME institutes an action against Third Party infringers or takes action to defend the TYME Trademarks and Copyrights, Eagle shall reasonably cooperate with TYME, at TYME's cost and expense. Any recovery obtained by TYME as a result of such proceeding or other actions, whether obtained by settlement or otherwise, shall be retained by TYME. Eagle shall not have any right to institute any action to defend or enforce the TYME Trademarks and Copyrights.

1.4 **Protection of Patent Rights**. As between the Parties, TYME shall have the sole right (but not the obligation), as determined by TYME in its sole discretion, to (i) prosecute and maintain the TYME Patent Rights and/or (ii) protect, enforce and defend the TYME Patent Rights. Eagle shall give notice to TYME of any misappropriation or infringement of, or challenge to, the validity or enforceability of the TYME Patent Rights promptly after learning of such misappropriation or infringement or challenge. If TYME institutes an action against Third Party infringers or takes action to stop the misappropriation or infringement of the TYME Patent Rights, Eagle shall reasonably cooperate with TYME, at TYME's cost and expense. Any recovery obtained by TYME as a result of such proceeding or other actions, whether obtained by settlement or otherwise, shall be retained by TYME. Eagle shall not have any right to institute any action to defend or enforce the TYME Patent Rights.

1.5 **Disclosure of Know-How**. For clarity, the Parties hereby agree and acknowledge that to the extent that either Party hereto has disclosed, or in the future discloses, to the other Party any Know-How or other Intellectual Property of such Party or its Affiliates pursuant to this Agreement, the other Party shall not acquire any ownership rights in such Know-How or other Intellectual Property by virtue of this Agreement or otherwise, and as between the Parties, all ownership rights therein shall remain with the disclosing Party (or its Affiliate).

## ARTICLE 2   CONFIDENTIALITY

2.1 **Confidential Information**.

2.1.1    **Confidentiality and Non-Use**. Each Party agrees that, during the Term and for a period of five (5) years thereafter, it shall keep confidential and shall not publish or otherwise disclose and shall not use for any purpose other than as provided for in this Agreement (which includes the exercise of its rights or performance of any obligations hereunder) any Confidential Information furnished to it by or on behalf of the other Party pursuant to this Agreement, except to the extent expressly authorized by this Agreement or otherwise agreed in writing by the Parties. Without limiting the foregoing, each Party shall use at least the same standard of care as it uses to protect its own Confidential Information to ensure that its employees, agents, consultants and contractors do not disclose or make any unauthorized use of such Confidential Information. Each Party shall promptly notify the other upon discovery of any unauthorized use or disclosure of the other's Confidential Information. Any and all information and materials disclosed by a Party pursuant to the Confidentiality Agreement between the Parties dated June 25, 2019 (the "**Confidentiality Agreement**") shall be deemed Confidential Information disclosed pursuant to this Agreement. The foregoing confidentiality and non-use obligations shall not apply to any portion of the other Party's Confidential Information that the receiving Party can demonstrate by competent tangible evidence:

(a)    was already known to the receiving Party or its Affiliate, other than under an obligation of confidentiality, at the time of disclosure to the receiving Party;

(b)    was generally available to the public or otherwise part of the public domain at the time of its disclosure to the receiving Party;

(c)    became generally available to the public or otherwise part of the public domain after its disclosure and other than through any act or omission of the receiving Party or its Affiliates in breach of this Agreement;

(d)    was disclosed to the receiving Party or its Affiliate by a Third Party who has a legal right to make such disclosure and who did not obtain such information directly or indirectly from the other Party (or its Affiliate); or

(e)    was independently discovered or developed by the receiving Party or its Affiliate without access to or aid, application, use of the other Party's Confidential Information, as evidenced by a contemporaneous writing.

2.1.2    **Authorized Disclosure**. Notwithstanding the obligations set forth in Section 8.1.1, a Party may disclose the other Party's Confidential Information and the terms of this Agreement to the extent:

(a)    such disclosure is reasonably necessary (x) to comply with the requirements of Governmental Authorities; or (y) for the prosecuting or defending litigation as contemplated by this Agreement;

(b)    such disclosure is reasonably necessary to its Affiliates, employees, agents, consultants and contractors on a need-to-know basis for the sole purpose of performing its obligations or exercising its rights under this Agreement; provided that in each case, the disclosees are bound by obligations of confidentiality and non-use consistent with those contained in this Agreement and the disclosing Party shall be liable for any failures of such disclosees to abide by such obligations of confidentiality and non-use; or

(c)    such disclosure is reasonably necessary to comply with Applicable Laws, including regulations promulgated by applicable securities exchanges, court order, administrative subpoena or order.

Notwithstanding the foregoing, in the event a Party is required to make a disclosure of the other Party's Confidential Information pursuant to Section 8.1.2(a) or 8.1.2(c), such Party shall, if permitted, promptly notify the other Party of such required disclosure and shall use reasonable efforts to assist the other Party (at the other Party's cost) in obtaining, a protective order preventing or limiting the required disclosure.

2.2    **Public Announcements**. No public announcement or statements (including presentations to investor meetings and customer updates) concerning the existence of or terms of this Agreement or incorporating the marks of the other Party or their respective Affiliates shall be made, either directly or indirectly, by either Party or a Party's Affiliates, without first obtaining the written approval of the other Party and agreement upon the nature, text and timing of such announcement or disclosure. Either Party shall have the right to make any such public announcement or other disclosure required by Applicable Law after such Party has provided to the other Party a copy of such announcement or disclosure and an opportunity to comment thereon and the disclosing Party shall reasonably consider the other Party's comments. Each Party agrees that it shall cooperate fully with the other with respect to all disclosures regarding this Agreement to the Securities Exchange Commission and any other Governmental Authorities, including requests for confidential treatment of proprietary information of either Party included in any such disclosure. Once any written statement is approved for disclosure by the Parties or information is otherwise made public in accordance with this Section 8.2, either Party may make a subsequent public disclosure of the same contents of such statement in the same context as such statement without further approval of the other Party. Notwithstanding anything to the contrary contained herein, in no event shall either Party disclose any financial information of the other without the prior written consent of such other Party, unless such financial information already has been publicly disclosed by the Party owning the financial information or otherwise has been made part of the public domain by no breach of a Party of its obligations under this ARTICLE 8.

## ARTICLE 3   REPRESENTATIONS AND WARRANTIES; ADDITIONAL COVENANTS

3.1    **Representations and Warranties of TYME**. TYME represents and warrants to Eagle as of the Effective Date that:

3.1.1    it is a corporation duly organized and validly existing under the laws of the state or other jurisdiction of its incorporation;

3.1.2    the execution, delivery and performance of this Agreement by it has been duly authorized by all requisite corporate action;

3.1.3    it has the power and authority to execute and deliver this Agreement and to perform its obligations hereunder;

3.1.4    this Agreement constitutes a legal, valid and binding obligation enforceable against it in accordance with its terms, subject to the effects of bankruptcy, insolvency or other laws of general application affecting the enforcement of creditor rights, judicial principles affecting the availability of specific performance and general principles of equity (whether enforceability is considered a proceeding at law or equity);

3.1.5    the execution, delivery and performance of this Agreement by TYME does not require the consent of any Person (including under any agreement with a Third Party) or the authorization of (by notice or otherwise) any Governmental Authority including the FDA;

3.1.6    there is no action, suit or proceeding pending or, to the knowledge of TYME, threatened, against TYME or any of its Affiliates, or to the knowledge of TYME, any Third Party acting on their behalf, which would be reasonably expected to impair, restrict or prohibit the ability of TYME or

3.1.7    it has no knowledge of any information relating to the safety or efficacy of the Product or any communications with any Governmental Authority, which would reasonably be expected to materially impair, restrict, prohibit or affect TYME's ability to perform its obligations and enjoy the benefits of this Agreement;

3.1.8    it is in compliance in all material respects with all Applicable Laws applicable to the subject matter of this Agreement;

3.1.9    it is not a party to any agreement or arrangement with any Third Party or under any obligation or restriction agreement (including any outstanding order, judgment or decree of any court or administrative agency) which in any way limits or conflicts with its ability to execute and deliver this Agreement and to fulfill any of its obligations under this Agreement;

3.1.10    it is currently conducting a Pivotal Clinical Study for SM-88 (racemetyrosine) though its TYME-88-Panc trial and SM-88 (racemetyrosine) is also being studied in the Pancreatic Cancer Action Network adaptive Phase II/III trial known as Precision Promise℠, which TYME believes can serve as a Pivotal Clinical Study; however, TYME does not currently have an NDA for SM-88 (racemetyrosine) accepted by the FDA;

3.1.11    neither TYME nor any of its personnel (i) have been debarred under the 21 U.S.C. § 335a, (ii) are excluded, debarred, suspended, or otherwise ineligible to participate in the federal health care programs or in federal procurement or nonprocurement programs, (iii) are convicted of a criminal offense that falls within the ambit of the federal statute providing for mandatory exclusion from participation in federal health care programs but has not yet been excluded, debarred, suspended, or otherwise declared ineligible to participate in those programs, (iv) are listed on the HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://oig.hhs.gov) or (v) are listed on the General Services Administration's List of Parties Excluded from Federal Programs (available through the Internet at hhtp://epls.arnet.gov). If, during the Term, TYME or any of its personnel becomes or is the subject of a proceeding that could lead to, as applicable, (i) debarment under 21 U.S.C. § 335a, (ii) exclusion, debarment, suspension or ineligibility to participate in the federal health care programs or in federal procurement or nonprocurement programs, (iii) convicted (or conviction) of a criminal offense that falls within the ambit of the federal statute providing for mandatory exclusion from participation in federal healthcare programs, (iv) listed (or listing) on the HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://oig.hhs.gov) or (v) listed (or listing) on the General Services Administration's List of Parties Excluded from Federal Programs (available through the Internet at hhtp://epls.arnet.gov), TYME shall immediately notify Eagle, and Eagle shall have the option to prohibit such Person from performing work relating to this Agreement or the Product; and

9.1.12    the Product Materials provided by TYME to Eagle for the conduct of Eagle Activities are, and shall be, compliant with the Regulatory Approval for the Product, the Product Labeling and Applicable Law.

3.2    **Representations and Warranties of Eagle**. Eagle represents and warrants to TYME as of the Effective Date that:

3.2.1    it is a corporation duly organized and validly existing under the laws of the state or other jurisdiction of its incorporation;

3.2.2    the execution, delivery and performance of this Agreement by it has been duly authorized by all requisite corporate action;

3.2.3    it has the power and authority to execute and deliver this Agreement and to perform its obligations hereunder;

3.2.4    this Agreement constitutes a legal, valid and binding obligation enforceable against it in accordance with its terms, subject to the effects of bankruptcy, insolvency or other laws of general application affecting the enforcement of creditor rights, judicial principles affecting the availability of specific performance and general principles of equity (whether enforceability is considered a proceeding at law or equity);

3.2.5    the execution, delivery and performance of this Agreement by Eagle does not require the consent of any Person or the authorization of (by notice or otherwise) any Governmental Authority or the FDA;

3.2.6    there is no action, suit or proceeding pending or, to the knowledge of Eagle, threatened, against Eagle or any of its Affiliates, or to the knowledge of Eagle, any Third Party acting on their behalf, which would be reasonably expected to impair, restrict or prohibit the ability of TYME or Eagle to perform its obligations and enjoy the benefits of this Agreement;

3.2.7    it is in compliance in all material respects with all Applicable Laws applicable to the subject matter of this Agreement;

3.2.8    it is not a party to any agreement or arrangement with any Third Party or under any obligation or restriction agreement (including any outstanding order, judgment or decree of any court or administrative agency) which in any way limits or conflicts with its ability to execute and deliver this Agreement and to fulfill any of its obligations under this Agreement;

3.2.9    it has no knowledge of any information relating to any communications with any Governmental Authority, which would reasonably be expected to materially impair, restrict, prohibit or affect Eagle's ability to perform its obligations and enjoy the benefits of this Agreement;

3.2.10    neither Eagle nor any of its personnel (i) have been debarred under the 21 U.S.C. § 335a, (ii) are excluded, debarred, suspended, or otherwise ineligible to participate in the federal health care programs or in Federal procurement or nonprocurement programs, (iii) are convicted of a criminal offense that falls within the ambit of the federal statute providing for mandatory exclusion from participation in federal health care programs but has not yet been excluded, debarred, suspended, or otherwise declared ineligible to participate in those programs, (iv) are listed on the HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://oig.hhs.gov) or (v) are listed on the General Services Administration's List of Parties Excluded from Federal Programs (available through the Internet at hhtp://epls.arnet.gov). If, during the Term, Eagle or any of its personnel become or are the subject of a proceeding that could lead to, as applicable, (i) debarment under 21 U.S.C. § 335a, (ii) exclusion, debarment, suspension or ineligibility to participate in the federal health care programs or in Federal procurement or nonprocurement programs, (iii) convicted (or conviction) of a criminal offense that falls within the ambit of the federal statute providing for mandatory exclusion from participation in federal healthcare programs, (iv) listed (or listing) on the HHS/OIG List of Excluded Individuals/Entities (available through the Internet at http://oig.hhs.gov) or (v) listed (or listing) on the General Services Administration's List of Parties Excluded from Federal Programs (available through the Internet at hhtp://epls.arnet.gov), Eagle shall immediately notify TYME, and TYME shall have the option to prohibit such Person from performing work under this Agreement; and

3.2.11    all Field Force Personnel that are engaged in Detailing are, and shall be, licensed to the extent required and in accordance with all Applicable Laws.

3.3    **Disclaimer of Warranty**. EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS AGREEMENT, TYME (AND ITS AFFILIATES) AND EAGLE (AND ITS AFFILIATES) MAKE NO REPRESENTATIONS AND NO WARRANTIES, EXPRESS OR IMPLIED, EITHER IN FACT OR BY OPERATION OF LAW, BY STATUTE OR OTHERWISE, AND TYME (AND ITS AFFILIATES) AND EAGLE (AND ITS AFFILIATES) EACH SPECIFICALLY DISCLAIM ANY OTHER REPRESENTATIONS AND WARRANTIES, WHETHER WRITTEN OR ORAL, EXPRESS, STATUTORY OR IMPLIED, INCLUDING ANY WARRANTY OF QUALITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR USE OR PURPOSE OR ANY WARRANTY AS TO THE VALIDITY OF ANY INTELLECTUAL PROPERTY OR THE NON-INFRINGEMENT OF ANY INTELLECTUAL PROPERTY RIGHTS OF THIRD PARTIES.

## ARTICLE 4   INDEMNIFICATION; LIMITATIONS ON LIABILITY

4.1    **Indemnification by TYME**. TYME shall defend, indemnify and hold harmless Eagle and its Affiliates and its and their respective officers, directors, employees, agents, representatives, successors and assigns from and against all Claims, and all associated Losses, to the extent incurred or suffered by any of them to the extent resulting from or arising out of (a) any misrepresentation or breach of any representations, warranties, agreements or covenants of TYME under this Agreement, (b) the negligence, willful misconduct or violation of Applicable Laws by TYME (or any of its Affiliates or its or their respective officers, directors, employees, agents or representatives), (c) the misappropriation or infringement of the intellectual property rights of any Third Party in connection with the Product, including from the use of the TYME Trademarks and Copyrights on Product Labeling or Product Materials in accordance with this Agreement, or (d) the Development and Commercialization of the Product by or on behalf of TYME, its Affiliates and any of their respective licensees, including the death or personal injury to any person related to use of the Product; except in each case to the extent any such Claims, and all associated Losses, are caused by an item for which Eagle is obligated to indemnify TYME pursuant to Section 10.2.

4.2    **Indemnification by Eagle**. Eagle shall defend, indemnify and hold harmless TYME and its Affiliates and its and their respective officers, directors, employees, agents, representatives, successors and assigns from and against all Claims and all associated Losses, to the extent incurred or suffered by any of them to the extent resulting from or arising out of (a) any misrepresentation or breach of any representations, warranties, agreements or covenants of Eagle under this Agreement, (b) the negligence, willful misconduct, or violation of Applicable Laws by Eagle (or any of its Affiliates or its and their respective officers, directors, employees, agents or representatives) or (c) labor disputes, Equal Employment Opportunity Commission charges or employment-related claims arising from or related to Eagle's employees; except in each case to the extent any such Claims, and all associated Losses, are caused by an item for which TYME is obligated to indemnify Eagle pursuant to Section 10.1.

4.3    **Indemnification Procedures**. The Party seeking indemnification under Section 10.1 or 10.2, as applicable (the "**Indemnified Party**") shall give prompt notice to the Party against whom indemnity is sought (the "**Indemnifying Party**") of the assertion or commencement of any Claim in respect of which indemnity may be sought under Section 10.1 or 10.2, as applicable, and shall provide the Indemnifying Party such information with respect thereto that the Indemnifying Party may reasonably request. The failure to give such notice shall relieve the Indemnifying Party of any liability hereunder only to the extent that the Indemnifying Party has suffered actual prejudice thereby. The Indemnifying Party shall assume and control the defense and settlement of any such action, suit or proceeding at its own expense; provided, however, if the Indemnified Party is TYME, it shall assume and control the defense and settlement of any such action, suit or proceeding. The Indemnified Party shall, if requested by the Indemnifying Party, cooperate in all reasonable respects in such defense, at the Indemnifying Party's expense. The Indemnified Party shall be entitled at its own expense to participate in such defense and to employ separate counsel for such purpose. For so long as the Indemnifying Party is diligently defending any proceeding pursuant to this Section 10.3, the Indemnifying Party shall not be liable under Section 10.1 or 10.2, as applicable, for any settlement effected without its consent. No Party shall enter into any compromise or settlement which commits the other Party to take, or to forbear to take, any action without the other Party's prior written consent (unless such compromise or settlement includes no payments by the Indemnified Party, an unconditional release of, and no admission of liability by, the Indemnified Party from all liability in respect of such Claim).

4.4    **Limitation of Liability**. NOTWITHSTANDING ANY OTHER PROVISION CONTAINED HEREIN (OTHER THAN AS SET FORTH IN THE SECOND SENTENCE OF THIS SECTION 10.4), IN NO EVENT SHALL TYME (OR ITS AFFILIATES) OR EAGLE (OR ITS AFFILIATES) BE LIABLE TO THE OTHER OR ANY OF THE OTHER PARTY'S AFFILIATES FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES (INCLUDING LOST PROFITS) SUFFERED OR INCURRED BY SUCH OTHER PARTY OR ITS AFFILIATES THAT ARISE OUT OF OR RELATE TO THIS AGREEMENT OR IN CONNECTION WITH A BREACH OR ALLEGED BREACH OF THIS AGREEMENT, WHETHER IN CONTRACT, TORT, STRICT LIABILITY OR OTHERWISE, AND REGARDLESS OF ANY NOTICE OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING SENTENCE SHALL NOT LIMIT (1) THE OBLIGATIONS OF EITHER PARTY TO INDEMNIFY THE OTHER PARTY FROM AND AGAINST THIRD PARTY CLAIMS UNDER SECTION 10.1 OR 10.2, AS APPLICABLE, OR (2) DAMAGES AVAILABLE FOR A PARTY'S BREACH OF THE NON-COMPETE AND NON-SOLICIT OBLIGATIONS IN SECTION 2.3 AND THE CONFIDENTIALITY AND NON-USE OBLIGATIONS IN ARTICLE 8.

4.5    **Insurance**. Each Party acknowledges and agrees that during the Term, it shall maintain, through purchase or self-insurance, adequate insurance, including products liability coverage and comprehensive general liability insurance, adequate to cover its obligations under this Agreement and which are consistent with normal business practices of prudent companies similarly situated. Each Party shall provide reasonable written proof of the existence of such insurance to the other Party upon request. TYME does not and will not maintain or procure any worker's compensation, healthcare, or other insurance for or on behalf of any Field Force Personnel, all of which shall be Eagle's sole responsibility. For clarity, the insurance requirements of this Section 10.5 shall not be construed to create a limit of either Party's liability with respect to its indemnification obligations under this ARTICLE 10.

## ARTICLE 5   TERM AND TERMINATION

5.1    **Term**. This Agreement shall become effective as of the Effective Date and, unless earlier terminated as provided in this ARTICLE 11, will continue for ten (10) years (the "**Term**").

5.2    <u>**Early Termination**</u> . A Party shall have the right to terminate this Agreement before the end of the Term as follows:

5.2.1    by Eagle at its sole discretion and for any reason or no reason, upon twelve (12) months written notice to TYME given any time after the second (2nd) anniversary of the First Commercial Sale of the Product in the Territory;

5.2.2    by a Party upon written notice to the other Party in the event of a material breach of this Agreement by such other Party where such breach is not cured (if able to be cured) within 60 days following such other Party's receipt of written notice of such breach (and any such termination shall become effective at the end of such 60-day period unless the breaching Party has cured such breach prior to the expiration of such 60-day period), provided, however, for the avoidance of doubt such 60-day period shall not apply for termination relating to a material breach arising under Section 6.1.2 of this Agreement;

5.2.3    by either Party upon 90 days' written notice to the other Party following the withdrawal of the Product from the market by TYME (or the decision by TYME to withdraw the Product from the market) due to (i) any decision, judgment, ruling or other requirement of the FDA, or (ii) material safety concern;

5.2.4    by TYME pursuant to Section 6.1.1(b); and

5.2.5    by a Party immediately upon written notice to the other Party upon the filing or institution of bankruptcy, reorganization, liquidation or receivership proceedings with respect to such other Party, or upon an assignment of a substantial portion of the assets for the benefit of creditors by such other Party, or in the event a receiver or custodian is appointed for such other Party's business or a substantial portion of such other Party's business is subject to attachment or similar process; provided, however, in the case of any involuntary bankruptcy proceeding such right to terminate shall only become effective if the Party consents to the involuntary bankruptcy or such proceeding is not dismissed within ninety (90) days after the filing thereof.

5.3    **Effects of Termination**. Upon the expiration or effective date of termination of this Agreement, (i) all rights and obligations of both Parties hereunder shall immediately terminate, subject to any survival as set forth in Section 11.4, (ii) Eagle, at TYME's direction, shall immediately return to TYME or destroy in accordance with all Applicable Laws all Product Materials, reports and other tangible items provided by or on behalf of TYME to Eagle or otherwise developed or obtained by Eagle pursuant to the terms of this Agreement (other than Eagle Property) (and at the request of TYME, Eagle shall certify destruction of such materials if Eagle does not to return such materials to TYME), (iii) Eagle shall immediately cease all Eagle Activities with respect to the Product, and (iv) each of TYME and Eagle shall, at the other Party's direction, either return to such other Party or destroy all Confidential Information of such other Party. Notwithstanding the foregoing, each Party may retain archival copies of any Confidential Information to the extent required by law, regulation or professional standards or copies of Confidential Information created pursuant to the automatic backing-up of electronic files where the delivery or destruction of such files would cause undue hardship to the receiving Party, so long as any such archival or electronic file back-up copies are accessible only to its legal or IT personnel, provided that such Confidential Information shall continue to be subject to the terms of this Agreement.

5.4    **Survival**. Termination or expiration of this Agreement shall be without prejudice to any rights that shall have accrued to the benefit of any Party prior to such termination or expiration. Notwithstanding any expiration or termination of this Agreement, such expiration or termination shall not relieve any Party from obligations which are expressly or by implication intended to survive expiration or termination, including Sections 2.3, 4.4.2, 5.7, 5.9, 6.2.4, 6.2.5, 10.1, 10.2, 10.3, 10.4, 11.3 and 11.4, Articles 7, 8 and 12 (to the extent applicable to implementation of the survival of the preceding Sections and Articles) and, solely as it relates to the last Fiscal Quarter, Sections 6.1, 6.2 and 6.3, which shall survive and be in full force and effect.

## ARTICLE 6    MISCELLANEOUS

6.1    **Force Majeure**. Neither Party shall be held liable to the other Party nor be deemed to have defaulted under or breached this Agreement for failure or delay in performing any obligation under this Agreement (other than any failure to make payments owed under this Agreement) to the extent such failure or delay is caused by or results from causes beyond the reasonable control of the affected Party, potentially including, embargoes, war, acts of war (whether war be declared or not), acts of terrorism, insurrections, riots, civil commotions, strikes, lockouts or other labor disturbances, fire, floods, or other acts of God, or acts, omissions or delays in acting by any Governmental Authority. The affected Party shall notify the other Party of such force majeure circumstances as soon as reasonably practicable, and shall promptly undertake all reasonable efforts necessary to cure such force majeure circumstances and re-commence its performance hereunder as soon as practicable.

6.2    **Assignment**. Except as provided in this Section 12.2, this Agreement may not be assigned or otherwise transferred, nor may any rights or obligations hereunder be assigned or transferred, by either Party, without the written consent of the other Party (such consent not to be unreasonably withheld); provided that a merger, sale of stock or comparable transaction shall not constitute an assignment. In the event either Party desires to make such an assignment or other transfer of this Agreement or any rights or obligations hereunder, such Party shall deliver a written notice to the other Party requesting the other Party's written consent in accordance with this Section 12.2, and the other Party shall provide such Party written notice of its determination whether to provide such written consent within 30 days following its receipt of such written notice from such Party. Notwithstanding the foregoing, (a) either Party may, without the other Party's consent, assign this Agreement and its rights and obligations hereunder in whole or in part to an Affiliate; and (b) either Party may assign this Agreement to a successor in interest in connection with the sale or other transfer of all or substantially all of such Party's assets or rights relating to the Product; provided that such assignee shall remain subject to all of the terms and conditions hereof in all respects and shall assume all obligations of such Party hereunder whether accruing before or after such assignment. Any permitted assignee shall assume all assigned obligations of its assignor under this Agreement. Any attempted assignment not in accordance with this Section 12.2 shall be void. This Agreement shall be binding on, and inure to the benefit of, each Party, and its permitted successors and assigns.

6.3    **Severability**. If any one or more of the provisions contained in this Agreement is held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby, unless the absence of the invalidated provision(s) adversely affects the substantive rights of the Parties. The Parties shall in such an instance use reasonable efforts to replace the invalid, illegal or unenforceable provision(s) with valid, legal and enforceable provision(s) which, insofar as practical, implement the purposes of this Agreement.

6.4    **Notices**. All notices which are required or permitted hereunder shall be in writing and sufficient if delivered personally, sent by e-mail (and promptly confirmed by personal delivery, registered or certified mail or overnight courier), sent by nationally-recognized overnight courier, or sent by registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

if to TYME, to:

Tyme Technologies, Inc.
17 State Street – 7th Floor
New York, NY 10004
Attention: Chief Executive Officer
E-Mail: [***]

With a copy to:
Tyme Technologies, Inc.
17 State Street – 7th Floor
New York, NY 10004
Attention: Chief Legal Officer
E-Mail: [***]

if to Eagle, to:                    Eagle Pharmaceuticals, Inc.
                                    50 Tice Boulevard
                                    Woodcliff Lake, NJ 07677
                                    Attention: Executive Vice President & General Counsel
                                    E-Mail: [***]

                                    With a copy to:
                                    Eagle Pharmaceuticals, Inc.
                                    50 Tice Boulevard
                                    Woodcliff Lake, NJ 07677
                                    Attention: Chief Operating Officer & President
                                    E-Mail: [***]

or to such other address(es) as the Party to whom notice is to be given may have furnished to the other Party in writing in accordance herewith. Any such notice shall be deemed to have been given: (a) when delivered if personally delivered; (b) on the Business Day after dispatch if sent by nationally-recognized overnight courier; or (c) on the fifth (5th) Business Day following the date of mailing, if sent by mail.

6.5     **Governing Law**. This Agreement and any and all matters arising directly or indirectly herefrom shall be governed by and construed and enforced in accordance with the internal laws of the State of Delaware applicable to agreements made and to be performed entirely in such state, including its statutes of limitation but without giving effect to the conflict of law principles thereof.

6.6     **Dispute Resolution**. If a dispute arises between the Parties in connection with or relating to this Agreement or any document or instrument delivered in connection herewith that (a) is expressly reserved for resolution pursuant to this Section 12.6 or (b) is outside of the decision-making authority of the SOC pursuant to Section 3.4 (a "**Dispute**"), then the Dispute shall be submitted to and finally settled by binding arbitration by JAMS under its Comprehensive Arbitration Rules and Procedures. A Dispute settled by an arbitrator shall be conducted by three arbitrators, each having ten years of experience in the pharmaceutical industry and also shall have served as an arbitrator at least three times prior to their service as an arbitrator in this arbitration. Within ten (10) days of commencement of an arbitration each Party shall select one (1) arbitrator and together select a third arbitrator who shall serve as a neutral arbitrator. The two designated arbitrators shall select a third neutral arbitrator within ten (10) days of their selection if the Parties cannot agree on the third arbitrator. If the two arbitrators cannot agree on selection of a third arbitrator within ten (10) days of their appointment, JAMS shall do so in accordance with its rules. The fees of the arbitrator(s) and JAMS shall be paid by the losing Party, which shall be designated by the arbitrator(s). If the arbitrator(s) is unable to designate a losing Party, it shall so state and the fees shall be split equally by the Parties. The arbitrator(s) is hereby empowered to award any remedy allowed by Law, including money damages, prejudgment interest and attorneys' fees, and to grant final, complete, interim or interlocutor relief, including injunctive relief. The Parties hereby submit to the exclusive jurisdiction of the federal and state courts located in Wilmington, Delaware for the purposes of an order to compel arbitration, for preliminary relief in aid of arbitration and for a preliminary injunction to maintain the status quo or prevent irreparable harm prior to the appointment of the arbitrators and to the non-exclusive jurisdiction of such courts for the enforcement of any ward issued hereunder.

6.7     **Waiver of Jury Trial**. EACH OF THE PARTIES HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

6.8     **Entire Agreement; Amendments**. This Agreement, together with the Schedules and Exhibits hereto, contains the entire understanding of the Parties with respect to the subject matter hereof. Any other express or implied agreements and understandings, negotiations, writings and commitments, either oral or written, in respect to the subject matter hereof (including the Confidentiality Agreement, but solely with respect to information which is deemed Confidential Information hereunder) are superseded by the terms of this Agreement. The Exhibits and Schedules to this Agreement are incorporated herein by reference and shall be deemed a part of this Agreement. This Agreement may be amended, or any term hereof modified, only by a written instrument duly executed by authorized representative(s) of both Parties hereto.

6.9     **Headings**. The captions to the several Articles, Sections and subsections hereof are not a part of this Agreement, but are merely for convenience to assist in locating and reading the several Articles and Sections hereof.

6.10    **Independent Contractors**. It is expressly agreed that Eagle and TYME shall be independent contractors and that the relationship between the two Parties shall not constitute a partnership, joint venture or agency. Neither Eagle nor TYME shall have the authority to make any statements, representations or commitments of any kind, or to take any action, which shall be binding on the other Party, without the prior written consent of the other Party.

6.11    **Third Party Beneficiaries**. Except as set forth in ARTICLE 10, no Person other than TYME or Eagle (and their respective Affiliates and permitted successors and assignees hereunder) shall be deemed an intended beneficiary hereunder or have any right to enforce any obligation of this Agreement.

6.12    **Waiver**. The waiver by either Party hereto of any right hereunder, or of any failure of the other Party to perform, or of any breach by the other Party, shall not be deemed a waiver of any other right hereunder or of any other breach by or failure of such other Party whether of a similar nature or otherwise.

6.13    **Cumulative Remedies**. No remedy referred to in this Agreement is intended to be exclusive, but each shall be cumulative and in addition to any other remedy referred to in this Agreement or otherwise available under law.

6.14    **Waiver of Rule of Construction**. Each Party has had the opportunity to consult with counsel in connection with the review, drafting and negotiation of this Agreement. Accordingly, the rule of construction that any ambiguity in this Agreement shall be construed against the drafting Party shall not apply.

6.15    **Use of Names**. Except as otherwise provided herein, neither Party shall have any right, express or implied, to use in any manner the name or other designation of the other Party or any other trade name, trademark or logo of the other Party for any purpose in connection with the performance of this

6.16    **Further Actions and Documents**. Each Party agrees to execute, acknowledge and deliver all such further instruments, and to do all such further acts, as may be reasonably necessary or appropriate to carry out the intent and purposes of this Agreement.

6.17    **Certain Conventions**. Any reference in this Agreement to an Article, Section, subsection, paragraph, clause, or Exhibit shall be deemed to be a reference to an Article, Section, subsection, paragraph, clause, or Exhibit, of or to, as the case may be, this Agreement, unless otherwise indicated. Unless the context of this Agreement otherwise requires, (a) words of any gender include each other gender, (b) words such as "herein", "hereof", and "hereunder" refer to this Agreement as a whole and not merely to the particular provision in which such words appear, (c) words using the singular shall include the plural, and vice versa, (d) whenever any provision of this Agreement uses the term "including" (or "includes"), such term shall be deemed to mean "including without limitation" (or "includes without limitations"), and (e) references to any Articles or Sections include Sections and subsections that are part of the references' Article or Section (e.g., a section numbered "Section 2.2.1" would be part of "Section 2.2", and references to "ARTICLE 2" or "Section 2.2" would refer to material contained in the subsection described as "Section 2.2.1").

6.18    **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Counterparts may be delivered via facsimile or electronic mail (including pdf) and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes and shall have the same force and effect as original signatures.

*[signature page follows]*

**IN WITNESS WHEREOF,** the Parties have executed this Agreement as of the Effective Date.

**TYME TECHNOLOGIES, INC.**

By: /s/ Steve Hoffman
Name: Steve Hoffman
Title: Chief Executive Officer

**EAGLE PHARMACEUTICALS, INC.**

By: /s/ Pete A. Meyers
Name: Pete A. Meyers
Title: Chief Financial Officer

[*Signature Page to Co-Promotion Agreement*]

Schedule 1.77
Exclusions from "Target Professionals"

Key Thought Leaders:

[***]

**Schedule 4.1**
**Operating Parameters Schedule**

(As in effect January 7, 2020)

**Sales Force**:

- Eagle shall provide an adequate sales force, as defined below under Sales Force Requirements, to call on community and hospital based health care providers. TYME will continue to be the exclusive contact with key opinion leaders and key academic researchers, who will be defined prior to the SM-88 launch.
- Sales Force Requirements:
  - o Eagle will be responsible for having sufficient SM-88 representatives to cover 25% of the Sales Force Requirements
    - § Eagle will have the sales representatives in place in time for appropriate training at least 90 days prior to the Target Launch Date
    - § The Eagle SM-88 sales representatives will have separate accounts from the TYME representatives as identified in the Sales Plan (as such term is defined in the Agreement)
    - § The Eagle SM-88 accounts will be identified prior to the acceptance of the NDA by the FDA
    - § The percentage of the Sales Force Requirement covered by the Eagle SM-88 representatives will be reviewed with the Sale Operations Committee, as defined below, after the initial 6 months following launch and may be increased upon committee agreement, however coverage over 25% of the Sales Force Requirements shall require the consent of Eagle
  - o The total sales force for SM-88 will be sized based on the following Sales Force Requirements:
    - § Reach: The key assumption is that the sales representatives will be detailing SM-88 to [***] Target Professionals (as defined in the Agreement) per week per representative, with the accounts to be identified prior to acceptance of the NDA by the FDA
      - Frequency: The accounts will be tiered based on Pancreatic Cancer patient volume. Accounts and the tiering will be defined prior to the acceptance of the NDA by the FDA. [***]
    - § The Sales Force Size requirement may be modified if there is a shift in reach and/or account tiering, which will be reviewed by the Sales Operations Committee, as defined in the Agreement
  - o TYME maintains the right to, on a reasonable basis, have its personnel accompany an Eagle sales representative during a detail, following appropriate advance notice
  - o Position of SM-88 in the Eagle detail: SM-88 must be considered the first call position for at least [***] of the calls for a multi-disciplinary oncologist account. SM-88 will be the sole detail for all calls that are focused on a gastrointestinal oncologist
  - o Minimum Sales Representatives Requirement: initial requirement and time period to which it will be applicable will be determined by TYME by reference to the Sales Force Requirements no later than three months prior to NDA filing
  - o Eagle Quarterly Minimum Details: initial requirement and time period to which it will be applicable will be determined by TYME by reference to the Sales Force Requirements no later than three months prior to NDA filing

**Training:**

- TYME will be responsible for training the Eagle sales force and for the creation of all sales training materials used by the Eagle team. As this material will be regulatory compliant, no changes can be made by Eagle without the written consent of TYME.
- Eagle sales representatives and their sales management will be required to complete mandatory training before detailing SM-88 to an account. This training will need to be completed prior to launch date of SM-88 with follow up quarterly training. Prior to the launch of SM-88, the training will be a live training. Subsequently, there will be at least 3 live trainings per year and the other training can be fulfilled via webcast. The training will include but is not limited to:
  - o Disease state education
  - o Current treatment education
  - o SM-88 clinical data education
  - o SM-88 prescribing information training
  - o SM-88 approved promotional materials
  - o Adverse Event Reporting
  - o Sales skills training
  - o Compliance training

**Promotional Programs:**

- In compliance with the PhRMA code and other guidelines (i.e. State guidelines), Eagle sales representatives will execute on promotional programs, utilizing the TYME approved presentation
- Eagle will be responsible for the delivery of the promotional programs to its SM-88 accounts and the cost associated with delivering the

- programs
- The target number of promotional programs will be defined prior to launch and will be discussed at the Sales Operations Committee; Promotional Programs will be addressed in the Sales Plan (as updated from time to time)

**Operating Principles:**

- TYME also retains the right to have sales representatives promoting SM-88 and/or engaging in other co-promotion agreements, the co-promotion arrangement with Eagle shall not be exclusive
- Eagle is responsible for all costs associated with its sales force. This includes, but is not limited to:
  - o Cash compensation (salary and incentives)
  - o Benefits
  - o Travel and related expenses
  - o Training expenses, including but not limited to meeting facility, travel and lodging, meals, print materials, contests, awards
  - o Sales detail print materials
  - o Delivery of promotional programs

**Schedule 4.1.2**
**<u>Qualifications and Criteria for Sales Representatives and their managers</u>**

[TO BE JOINTLY DEVELOPED AND MUTUALLY AGREED BY TYME AND EAGLE]

Exhibit 21.1

**Subsidiaries of Eagle Pharmaceuticals, Inc.**

| Name of Subsidiary | Jurisdiction of Incorporation |
| --- | --- |
| Eagle Biologics, Inc. (formerly Arsia Therapeutics, Inc.) | Delaware |
| Eagle Research Lab Limited | Malta |

**Exhibit 23.1**

<u>Consent of Independent Registered Public Accounting Firm</u>

Eagle Pharmaceuticals, Inc.
Woodcliff Lake, New Jersey

We hereby consent to the incorporation by reference in the Registration Statement on Form S--3 (Nos. 333-234742 and 333-202592) and Form S-8 (Nos. 333-228876, 333-216839, 333-213683, 333-206729 and 333-194056) of Eagle Pharmaceuticals, Inc. (the "Company") of our reports dated March 2, 2020, relating to the consolidated financial statements, and the effectiveness of the Company's internal control over financial reporting, which appear in this Form 10-K.

/s/ BDO USA, LLP
Woodbridge, New Jersey
March 2, 2020

**Exhibit 31.1**

## Certification of Principal Executive Officer

I, Scott Tarriff, certify that:

1. I have reviewed this annual report on Form 10-K of Eagle Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 2, 2020

/s/ Scott Tarriff

Scott Tarriff
Chief Executive Officer
(Principal Executive Officer)

**Exhibit 31.2**

### Certification of Principal Financial and Accounting Officer

I, Pete A. Meyers, certify that:

1. I have reviewed this annual report on Form 10-K of Eagle Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 2, 2020

/s/ Pete A. Meyers

Pete A. Meyers
Chief Financial Officer
(Principal Accounting and Financial Officer)

**Exhibit 32.1**

## Certification Pursuant to

## 18 U.S.C. Section 1350,

## As Adopted Pursuant to

## Section 906 of the Sarbanes-Oxley Act of 2002

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), **Scott Tarriff**, President and Chief Executive Officer of Eagle Pharmaceuticals, Inc. (the "Company"), and **Pete A. Meyers**, Chief Financial Officer of the Company, each hereby certifies that, to the best of his knowledge:

1.      The Company's Annual Report on Form 10-K for the period ended December 31, 2019 (the "Annual Report"), to which this Certification is attached as Exhibit 32.1, fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act, and

2.      The information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**Dated: March 2, 2020**

/s/ Scott Tarriff                     /s/ Pete A. Meyers

Scott Tarriff                     Pete A. Meyers

Chief Executive Officer              Chief Financial Officer

(Principal Executive Officer)           (Principal Financial and Accounting Officer)

This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Eagle Pharmaceuticals, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing.

# EXHIBIT 7

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒  **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2020**
**or**

☐  **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____ .

**Commission File Number 001-36306**

# Eagle Pharmaceuticals, Inc.
(Exact Name of Registrant as Specified in its Charter)

| **Delaware** | **2834** | **20-8179278** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**50 Tice Boulevard, Suite 315**
**Woodcliff Lake, NJ 07677**
**(201) 326-5300**
(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Trading symbol** | **Name of each exchange on which registered** |
|---|---|---|
| Common stock, $0.001 par value per share | EGRX | The Nasdaq Global Market |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes o No x

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes o No x

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes x  No o

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  Yes x  No o

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in 12b-2 of the Exchange Act.

| Large accelerated filer | Accelerated filer | Non-accelerated filer | Smaller reporting company |
|---|---|---|---|
| ☐ | ☒ | ☐ | ☐ |
| Emerging growth company ☐ | | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. o

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No  x

The aggregate market value of voting Common Stock held by non-affiliates of the registrant was approximately $514,326,120 computed by reference to the last reported sale price of $55.68 per share as reported by The Nasdaq Global Market, as of the last business day of the registrant's most recently completed second fiscal quarter, June 30, 2020. This calculation does not reflect a determination that certain persons are affiliates of the registrant for any other purpose.

The number of shares outstanding of the registrant's common stock, $0.001 par value per share, as of February 25, 2021 was 13,217,284 shares.

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the definitive proxy statement for our 2021 annual meeting of stockholders, which is to be filed within 120 days after the end of the fiscal year ended December 31, 2020, are incorporated by reference into Part III of this Form 10-K, to the extent described in Part III.

Case 1:24-cv-00064-JLH    Document 471    Filed 08/07/26    Page 490 of 942 PageID #: 15711

**Eagle Pharmaceuticals, Inc.**

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K, or Annual Report, includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, or the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act. All statements other than statements of historical fact contained in this Annual Report are forward-looking statements. In some cases, you can identify forward-looking statements by terminology such as "may," "could," "will," "would," "should," "expect," "plan,", "anticipate," "believe," "estimate," "intend," "predict," "seek," "contemplate," "project," "continue," "potential," "ongoing" or the negative of these terms or other comparable terminology, although not all forward-looking statements contain these identifying words. These forward-looking statements include, but are not limited to, statements about:

- the impact of the ongoing coronavirus 2019, or COVID-19, pandemic on our business and operations, results of operations and financial performance including: disruption in the sales of our marketed products; delays, interruptions or other adverse effects to clinical trials and patient enrollment; delays in regulatory review; manufacturing and supply chain interruptions; and the adverse effects on healthcare systems and disruption of the global economy overall;
- the potential benefits and commercial potential of rapidly infused bendamustine RTD, or Bendeka, Ryanodex® (dantrolene sodium), or Ryanodex, and bendamustine ready-to-dilute, or RTD, 500ml solution, or Belrapzo for approved indications and any expanded uses;
- the commercial potential of additional indications for our products;
- sales of our products in various markets worldwide, pricing for our products, level of insurance coverage and reimbursement for our products, timing regarding development and regulatory approvals for our products or for additional indications or in additional territories;
- future expansion of our commercial organization and transition to third-parties in certain jurisdictions to perform sales, marketing and distribution functions;
- the initiation, timing, design, progress and results of our preclinical studies and clinical trials, and our research and development program;
- our ability to obtain and maintain regulatory approval of our products and product candidates, and any related restrictions, limitations, and/or warnings in the label of an approved product;
- our plans to research, develop and commercialize our products and product candidates and our ability to successfully commercialize our products and product candidates;
- our ability to attract collaborators with development, regulatory and commercialization expertise;
- the size and growth potential of the markets for our products and product candidates, and our ability to serve those markets;
- the diversion of healthcare resources away from the conduct of clinical trials as a result of the ongoing COVID-19 pandemic, including the diversion of hospitals and doctor offices serving as locations for administration of our products, including Bendeka and hospital staff supporting the conduct of such administration;
- the interruption of key clinical trial activities, such as clinical trial site monitoring, due to limitations on travel, quarantines or social distancing protocols imposed or recommended by federal or state governments, employers and others in connection with the ongoing COVID-19 pandemic;
- the rate and degree of market acceptance of our products;
- our ability to significantly grow our commercial sales and marketing organization, whether alone or with potential future collaborators;
- the performance of our strategic collaborators and success of our current strategic collaborations;
- regulatory developments in the United States and foreign countries;
- the performance of our third-party suppliers and manufacturers;
- the success of competing drugs that are or become available;
- the retention of key scientific or management personnel;
- our ability to obtain additional funding for our operations;

- our ability to obtain, maintain, protect and enhance intellectual property rights and proprietary technologies and operate our business without infringing the intellectual property rights and proprietary technology of third parties;

- our ability to prevent or minimize the effects of Paragraph IV patent litigation;

- our expectations regarding anticipated future costs, operating expenses and capital requirements;

- our expectations regarding our abbreviated new drug application, or ANDA, and the related complete response letter for for vasopressin; and

- our expectations regarding our fulvestrant (EA-114) product candidate; next step is to submit formal protocol for clinical study.

Any forward-looking statements in this Annual Report reflect our current views with respect to future events or to our future financial performance and involve known and unknown risks, uncertainties, assumptions and other factors described under the "Risk Factors" section and elsewhere in this Annual Report, that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. Given these uncertainties, you should not place undue reliance on these forward-looking statements.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this report, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements as predictions of future events. Except as required by law, we assume no obligation to update or revise these forward-looking statements for any reason, even if new information becomes available in the future.

This Annual Report also contains estimates, projections and other information concerning our industry, our business, and the markets for certain diseases, including data regarding the estimated size of those markets, and the incidence and prevalence of certain medical conditions. Information that is based on estimates, forecasts, projections, market research or similar methodologies is inherently subject to uncertainties and actual events or circumstances may differ materially from events and circumstances reflected in this information. Unless otherwise expressly stated, we obtained this industry, business, market and other data from reports, research surveys, studies and similar data prepared by market research firms and other third parties, industry, medical and general publications, government data and similar sources.

## NOTE REGARDING COMPANY REFERENCES

References to the "Company," "Eagle Pharmaceuticals," "Eagle," "we," "us" or "our" mean Eagle Pharmaceuticals, Inc., a Delaware corporation, together with its subsidiaries. References to "Eagle Biologics" mean Eagle Biologics, Inc. and references to "Eagle Research Labs" means Eagle Research Labs Limited.

## NOTE REGARDING TRADEMARKS

All trademarks, trade names and service marks appearing in this Annual Report are the property of their respective owners. Solely for convenience, trademarks and trade names referred to in this Annual Report may appear without the ® or TM symbols.

## SUMMARY RISK FACTORS

Our business faces significant risks and uncertainties of which investors should be aware before making a decision to invest in our common stock. If any of the following risks are realized, our business, financial condition and results of operations could be materially and adversely affected. You should carefully review and consider the full discussion of our risk factors set forth under the caption "Risk Factors" in Item 1A in Part I of this Annual Report on Form 10-K. Some of the more significant risks include the following:

a.  The COVID-19 pandemic could adversely impact our business, including the marketing, sale and commercialization of our products, our supply chain, our clinical trials, our liquidity and access to capital markets and our business development activities.

b.  We face significant competition from other biotechnology and pharmaceutical companies, and our operating results will suffer if we fail to compete effectively.

c.  Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.

d.  Changes in tax laws or regulations that are applied adversely to us or our customers may have a material adverse effect on our business, cash flow, financial condition or results of operations.

e.  Current and future legislation and regulations may increase the difficulty and cost for us to commercialize our product candidates and affect the prices we may obtain for our products.

f.  If we cannot sustain profitability, our business, prospects, operating results and financial condition would be materially harmed.

g.  If we fail to obtain additional financing, we could be forced to delay, reduce or eliminate our product development programs.

h.  We may sell additional equity or incur debt to fund our operations, which may result in dilution to our stockholders and impose restrictions on our business.

i.  We cannot give any assurance that we will receive regulatory approval for our product candidates, which is necessary before they can be commercialized.

j.  If we are unable to differentiate our products or product candidates from branded reference drugs or existing generic therapies for similar treatments, or if the FDA or other applicable regulatory authorities approve generic products that compete with any of our products or product candidates, the ability to successfully commercialize our product candidates would be adversely affected.

k.  Clinical development is a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results. Failure can occur at any stage of clinical development.

l.  Delays in clinical trials are common and have many causes, and any delay could result in increased costs to us and could jeopardize or delay our ability to obtain regulatory approval and commence product sales. We may also find it difficult to enroll patients in our clinical trials, which could delay or prevent development of our product candidates.

m.  An NDA submitted under Section 505(b)(2) subjects us to the risk that we may be subject to a patent infringement lawsuit that would delay or prevent the review or approval of our product candidates.

n.  Our commercial success depends upon attaining significant market acceptance of our products and product candidates, if approved, among physicians, nurses, pharmacists, patients and the medical community.

o.  A substantial portion of our total revenues is derived from sales of a limited number of products.

p.  We rely on third parties to conduct our preclinical studies and clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines, we may not be able to obtain regulatory approval for or commercialize our product candidates and our business could be substantially harmed.

q.  We rely on limited sources of supply for our products and product candidates, and any disruption in the chain of supply may impact production and sales of our products and cause delay in developing and commercializing our product candidates.

r.  Our future success depends on our ability to retain key executives and to attract, retain and motivate qualified personnel.

s.  We rely significantly on information technology and any failure, inadequacy, interruption or security lapse of that technology, including any cybersecurity incidents, could harm our ability to operate our business effectively.

t.  If we are unable to obtain or protect intellectual property rights related to any of our product candidates, we may not be able to compete effectively in our market.

u.  Our drug development strategy relies heavily upon the 505(b)(2) regulatory pathway, which requires us to certify that we do not infringe upon third-party patents covering approved drugs. Such certifications typically result in third-party claims of intellectual property infringement, the defense of which will be costly and time consuming, and an unfavorable outcome in any litigation may prevent or delay our development and commercialization efforts which would harm our business.

v.  Our stock price may continue to fluctuate significantly.

w.  There is no assurance that our share repurchase program will result in repurchases of our common stock or enhance long term stockholder value.

**EAGLE PHARMACEUTICALS, INC.**

**ANNUAL REPORT ON FORM 10-K**

**For the fiscal year ended December 31, 2020**

**Part I**                                                                                      Page

Item 1.     Business                                                                              7
Item 1A.    Risk Factors                                                                        30
Item 1B.    Unresolved Staff Comments                                                           62
Item 2.     Properties                                                                          62
Item 3.     Legal Proceedings                                                                   62
Item 4.     Mine Safety Disclosures                                                             62

**Part II**

Item 5.     Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities                                                                 63
Item 6.     Selected Financial Data                                                             65
Item 7.     Management's Discussion and Analysis of Financial Condition and Results of Operations    66
Item 7A.    Quantitative and Qualitative Disclosures About Market Risk                          81
Item 8.     Financial Statements and Supplementary Data                                         82
Item 9.     Changes and Disagreements with Accountants on Accounting and Financial Disclosure   83
Item 9A.    Controls and Procedures                                                             84
Item 9B     Other Information                                                                   87

**Part III**

Item 10.    Directors, Executive Officers and Corporate Governance                              87
Item 11.    Executive Compensation                                                              87
Item 12.    Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters    87
Item 13.    Certain Relationships and Related Transactions, and Director Independence           87
Item 14.    Principal Accounting Fees and Services                                              87

**Part IV**

Item 15.    Exhibits and Financial Statement Schedules                                          88
Item 16.    Form 10-K Summary                                                                   91
            Signatures

5

**PART I**

**Item 1. Business**

**Company Overview**

*Organization*

We are a pharmaceutical company registered at and with principal offices at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677. We also have a research and development facility in Cambridge, Massachusetts.

*Business*

We are an integrated pharmaceutical company focused on finding ways to help medicines do more for patients. Along with our collaborators, we have the capabilities to take a molecule from preclinical research through regulatory approval and into the marketplace, including development, manufacturing and commercialization of our products and product candidates. Our business model applies our scientific expertise, proprietary research-based insights and marketplace proficiency to identify challenging-to-treat diseases of the central nervous system or metabolic critical care therapeutic areas as well as in oncology. By focusing on patients' unmet needs, we strive to provide healthcare professionals with urgently needed treatment solutions that are designed to improve patient care and outcomes and create near- and long-term value for our stakeholders, including patients and healthcare providers and our employees, marketing partners, collaborators and stockholders.

Our science-based business model has a proven track record with the U.S. Food and Drug Administration, or FDA, with approval and commercial launches of three products: Ryanodex (dantrolene sodium), or Ryanodex, bendamustine ready-to-dilute, or RTD, 500ml solution, or Belrapzo, and rapidly infused bendamustine RTD, or Bendeka. We market our products through marketing partners and/or our internal direct sales force. We market Ryanodex and Belrapzo, and Teva Pharmaceutical Industries Ltd., or Teva, markets Bendeka through its subsidiary, Cephalon, Inc., or Cephalon. Reflecting further expansion of our oncology portfolio, in February 2020, we received final FDA approval for Pemfexy, a branded alternative to Alimta for metastatic non-squamous non-small cell lung cancer and malignant pleural mesothelioma. We expect to launch Pemfexy in early 2022.

With several pipeline projects underway and the potential for up to five product launches over the next several years, we believe we have many growth opportunities ahead. We believe that each of our pipeline projects currently has the potential to enter the market as a first-in-class, first-to-file, first-to-market or best-in-class product. In particular, we are applying our expertise to conduct novel research regarding the potential for Ryanodex to address conditions including Alzheimer's disease, traumatic brain injury/concussion, nerve agent exposure and acute radiation syndrome. In addition, our clinical development program includes a strategic partnership with Tyme Technologies, Inc., or Tyme, for Tyme's product candidate for the treatment of patients with pancreatic or other advanced cancers, SM-88, as well as investigations of compounds such as EA-114 (our fulvestrant product candidate) for patients with HR-positive advanced breast cancer. Other products in development include Vasopressin, our first-to-file Abbreviated New Drug Application, or ANDA, that references Endo International plc's Vasostrict indicated to increase blood pressure in adults with vasodilatory shock who remain hypotensive despite fluids and catecholamines; and EA-111, a new chemical entity and next-generation ryanodine receptor antagonist, in an intramuscular formulation that that would allow for easier and more rapid administration in emergency situations (military and civilian).

**Recent Developments**

Vasopressin - FDA

On February 2, 2021, we announced that the U.S. Food and Drug Administration, or FDA, issued a complete response letter, or CRL, for our ANDA for vasopressin. Eagle has now had two conversations with FDA regarding the CRL and expects to have an additional meeting with FDA in the near-term. Importantly, Eagle has completed an extensive amount of developmental work and continues to do so for its first-to-file polypeptide, where brand sales of the product are over $700 million annually. In its communication with the Company, FDA restated that it has prioritized Eagle's ANDA, and that the ANDA has also been flagged as a COVID-19 priority by FDA. Eagle believes it can fully respond to the questions raised. There is one additional short duration study that will need to be completed and analyzed. The study will be run either in mid-February or mid-March. Based on similar studies previously run on the Company's vasopressin product, Eagle expects the results will be satisfactory. In addition, the Company expects it will have 180 days of exclusivity for vasopressin.

6

Vasopressin - Patent litigation

On February 2, 2021, we also announced that our ongoing patent suit with Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Endo Par Innovation Company, LLC, or together, Par, is now scheduled to begin on July 7, 2021. Eagle remains confident about this litigation given that Par's asserted patents claim a formulation with a pH of 3.7-3.9 and Eagle's proposed ANDA product specifies a pH outside of that range. The Company is confident that its ANDA will be approved in a reasonable timeframe.

### Executive Officer Transitions

#### Chief Medical Officer

Effective July 31, 2020, Adrian J. Hepner, M.D., Ph.D. resigned as our Executive Vice President and Chief Medical Officer. On July 31, 2020, we entered into a consulting agreement with Dr. Hepner, or the Consulting Agreement. Pursuant to the Consulting Agreement, Dr. Hepner will provide consulting services to us until July 31, 2021, unless earlier terminated, or the Consulting Period. In consideration of Dr. Hepner's provision of consulting services, we have agreed to pay Dr. Hepner (i) a weekly retainer of $8,000 for 20 hours of services each week for the first six months of the Consulting Period and (ii) a weekly retainer of $4,000 for 10 hours of services each week for the remaining six months of the Consulting Period. We will also continue to pay the employer portion of Dr. Hepner's COBRA medical continuation benefits until January 31, 2022.

On October 29, 2020, Judith Ng-Cashin, M.D. was appointed as our Chief Medical Officer.

#### Chief Financial Officer

As of October 29, 2020, Pete Meyers ceased to serve as our Chief Financial Officer. In connection with his departure, Mr. Meyers received the severance compensation provided for under our previously disclosed Amended and Restated Severance Benefit Plan and Mr. Meyers' participation agreement thereunder, for a non-change in control covered termination.

On October 29, 2020, Brian Cahill was appointed as our Chief Financial Officer. Mr. Cahill has served as our Vice President of Finance since January 2018 and previously served as our Corporate Controller from October 2016 to December 2017. On December 18, 2020, in connection with his new role, the compensation committee of our board of directors approved an annual base salary for Mr. Cahill of $380,000 effective as of October 29, 2020 and a target annual bonus for fiscal year 2021 set at 60% of his base salary, with the amount of his bonus to be determined by the compensation committee based on our achievement of our annual corporate objectives established by the compensation committee. The compensation committee also approved equity grants to Mr. Cahill of 5,000 restricted stock units and 10,000 stock options.

### Change in Independent Registered Public Accounting Firm

On September 25, 2020, the Audit Committee of the Board of Directors approved the engagement of Ernst & Young, LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2020, and dismissed BDO USA, LLP, as our current independent registered public accounting firm.

### Complete Response Letter for NDA for Ryanodex

On August 7, 2020, we received a Complete Response Letter for its NDA for Ryanodex for the treatment of exertional heat stroke, or EHS; we decided that we will no longer pursue this indication in order to direct our resources to other product candidates.

### Other 2020 Events

On February 10, 2020, we received final approval from the FDA for our novel product PEMFEXY™ (pemetrexed for injection), a branded alternative to ALIMTA®.

On January 13, 2020, we issued a press release announcing that the Company and the University of Pennsylvania had agreed on terms of a new exclusive worldwide license agreement for the development of dantrolene sodium for the potential treatment of people living with Alzheimer's disease, including an agreement to fund additional research and provisions regarding commercialization of products developed under the license.

On January 7, 2020, Tyme Technologies, Inc. and Eagle Pharmaceuticals announced a strategic collaboration to advance oral SM-88 for the treatment of patients with cancer. SM-88 is an investigational agent in two Phase 2 studies for pancreatic cancer and in a Phase 2 study for prostate cancer. Data is expected in 2021.

7

On January 6, 2020, we issued a press release announcing a new research agreement with NorthShore University HealthSystem in Evanston, Illinois, focused on studying Ryanodex for traumatic brain injury (TBI) in animal models. TBI can acutely cause brain lesions that result in direct tissue damage that may prompt apoptotic cell mechanisms for several weeks post-injury, which may lead to worsened long-term outcomes. Disruption of certain intracellular mechanisms may affect cell functioning and survival.

### Pemfexy Billing Code

On July 9, 2020, we announced that the Centers for Medicare & Medicaid Services, or CMS, had established a unique, product-specific billing code for Pemfexy. The new Healthcare Common Procedure Coding System, or J-code, became effective on October 1, 2020.

We expect that the new HCPCS code will provide coding clarity to outpatient facilities and physicians who administer Pemfexy, facilitating access for patients and reimbursement from Medicare, Medicaid and commercial insurance.

### Share Repurchase Program

On March 17, 2020, we announced that our Board approved a share repurchase program, or the Share Repurchase Program, providing for the repurchase of up to an aggregate of $160.0 million of our outstanding common stock. The Share Repurchase Program replaces our existing share repurchase program, or the Previous Share Repurchase Program, which was announced on October 30, 2018 and was terminated in connection with the Board's approval of the Share Repurchase Program. At termination, we had repurchased approximately $68.0 million of our outstanding common stock under the Previous Share Repurchase Program.

Under the Share Repurchase Program, we are authorized to repurchase shares through open market purchases, privately-negotiated transactions, accelerated share repurchases or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. The repurchases have no time limit and may be suspended or discontinued completely at any time. The specific timing and amount of repurchases will vary based on available capital resources and other financial and operational performance, market conditions, securities law limitations, and other factors. The repurchases will be made using our cash resources.

On September 23, 2020, the Company's Board of Directors approved a $25.0 million accelerated share repurchase ("ASR") transaction with JPMorgan Chase Bank, National Association ("JP Morgan") as part of the Company's existing $160.0 million share repurchase program. The specific number of shares to be repurchased pursuant to the ASR was based on the average of the daily volume weighted average share prices of the Company's common stock, less a discount, during the term of the ASR program. Under the terms of the Company's agreement with JP Morgan, the Company paid $25.0 million to JP Morgan on September 24, 2020, and received 550,623 shares, representing the notional amount of the ASR, based on the average of the daily volume weighted average share prices of the Company's common stock, less a discount, during the term of the ASR, which was $45.40. The ASR was completed in the fourth quarter of 2020.

As of December 31, 2020, we have repurchased an aggregate of 3,682,176 shares of common stock for an aggregate of $206.9 million pursuant to our share repurchase programs in effect since August 2016.

### COVID-19 Business Update

In response to the ongoing COVID-19 pandemic, we have taken and continue to take active measures designed to address and mitigate the impact of the COVID-19 pandemic on its business, such as remote working policies, facilitating management's daily communication to address employee and business concerns and providing frequent updates to the Board. We anticipate that the COVID-19 pandemic may have an impact on the clinical development timeline for EA-114. We anticipate that the COVID-19 pandemic will continue to delay our supply chain and marketing and sales efforts for certain of its products, including Bendeka, although it is not currently expected that any disruption would be material. The COVID-19 pandemic and associated lockdowns have resulted in a decrease in healthcare utilization broadly and specifically lead to a continuing reduction in the utilization of physician-administered oncology products including Belrapzo and Bendeka. In addition, the COVID-19 pandemic has delayed the timing of ongoing litigation, including the litigation with Par Pharmaceutical, Inc. and its affiliated entities with respect to Vasopressin, and we anticipate that such delays will continue for the duration of the pandemic. While we have experienced variable financial impacts to date, the ongoing COVID-19 pandemic, including the global economic slowdown, government measures taken in response thereto, the overall disruption of global healthcare systems and

8

other risks and uncertainties associated with the pandemic, could materially adversely affect our business, financial condition, results of operations and growth prospects. We continue to closely monitor the COVID-19 pandemic as we evaluate and evolve our business plans and response strategy. The impact of the COVID-19 pandemic on our business and financial condition is more fully described below in Item 7 - Management's Discussion and Analysis of Financial Condition and Results of Operations - *Trends and Uncertainties*.

We have built an internal commercial team consisting of 46 direct sales representatives, support staff and management who are a part of our independent commercial organization.

**Our Competitive Strengths**
**Our Purpose**

We believe that many currently available critical care and oncology injectable drugs and biopharmaceuticals have suboptimal characteristics that do not meet the needs of patients, physicians, nurses or pharmacists. These characteristics can impact safety, shelf life, convenience, waste, cost, and ease of use by practitioners and pharmacy staff. For instance, existing drugs may be packaged inefficiently or come in formulations that require reconstitution or dilution, or which are otherwise difficult or inconvenient to prepare, and which could expose workers to cytotoxic compounds and can result in dosing errors. This can also lead to wasted quantities of drug, inefficiencies in staff time and constrained work flow, reduced shelf life and the need for multiple dosing of individual patients to complete treatment. Likewise the viscosity of many biologic products requires them to be delivered intravenously often in time consuming and sometimes painful treatments for patients. We believe there is a large and unmet market for developing injectable drugs that address the specific needs of patients, physicians, nurses and pharmacists to simplify their use, reduce waste and lower healthcare costs.

We have and continue to engage physicians, nurses, pharmacists and key opinion leaders, to identify specific products where the characteristics described above present opportunities for product improvement. We evaluate the product opportunities presented by the stakeholders and determine whether or not they conform to our research and development planning. A key aspect of our evaluation is the intellectual property landscape for each product opportunity, including our ability to avoid infringing existing patents and the potential patentability of our modified version of the drug. We utilize our experienced team of formulators with extensive experience with injectable pharmaceuticals, and a track record of success in product development, regulatory relations, and quality assurance to develop improved products.

Because our products are differentiated from the branded reference drugs, we believe we are able to avoid infringing existing patents covering the branded reference drug allowing us to enter the existing market before applicable generic drugs, which may be subject to protracted patent litigation that delays market entry. Protracted litigation is a significant barrier to entry for competitors seeking approval of an ANDA referencing the branded reference product, and our early entry into the market leads to less price erosion due to constrained competition. Our patent holdings include over 30 owned or exclusively-licensed U.S. issued patents and over 10 filed U.S. patent applications, as well as several patents and patent applications that have been filed in various worldwide territories, that we believe protect or will protect, as applicable the market value of our current portfolio of products. We believe that other potential barriers to entry for our competitors consist of the following:

- our early entry into the market allows us to influence usage patterns when fewer, if any, competitors exist and allows us to market our products as improved versions of the branded reference drug prior to or concurrent with any generic entry, thereby giving us the opportunity to capture significant market share at this early stage. We believe that such early entry into the market will limit later conversions into generic versions of the branded reference drugs, allowing us to maintain market share and favorable pricing;
- the potential for seven years of exclusivity upon approval of a 505(b)(2) NDA that receives orphan drug status; and
- the potential for three years of regulatory exclusivity for our future product candidates upon approval, if any, of a 505(b)(2) NDA supported by new clinical investigations (other than bioequivalence and bioavailability studies) essential to approval of the application.

Our product portfolio is focused around our external partnerships (e.g., Symbio and Tyme); our Pemetrexed project, with an expected launch in 2022; our Ryanodex related development projects; our vasopressin ANDA that is currently being litigated; and our Fulvestrant project that is expected to yield a new approach to drug delivery.

We believe that we can leverage our formulation and development expertise to achieve improved product attributes in terms of potential for longer stability, shorter infusion times, less waste and/or ease and safety of use for healthcare professionals and

9

achieve longer commercial duration compared to generic competitors. We believe that our products may offer certain benefits as compared to existing injectable drugs which may include one or more of the following:

- improved safety through elimination of reconstitution in the pharmacy or in the acute care setting;
- reduction in the number of injections required;
- reduction in the volume of drug needed to be injected, potentially expanding the application to additional medical situations;
- reduction in the amount of diluent required to administer the drug;
- reduction in drug waste;
- reduction in drug infusion time; and
- potential label expansion to include additional indications.

**Our Strategy**

Our goal is to be a leading specialty pharmaceutical company. Our strategy to achieve this goal includes:

*Strengthen our product portfolio.* We intend to continue to strengthen our product portfolio with continued investment in research and development activities. We will continue to develop our current product portfolio and leverage our expertise to identify new products with suboptimal characteristics that present us with significant opportunity for revenue generation. In addition to our internal efforts, we will opportunistically in-license or acquire product candidates that fit our therapeutic areas of focus and meet our rigorous evaluation process.

*Retain commercial rights in the United States and selectively partner outside of the United States.* In general, we believe that we can cost-effectively commercialize our products in the United States internally or through a contracted sales force and selected commercial arrangements, and thereby retain the commercial value of these products. We have established a small, contract specialty sales force focusing on GPOs, hospital systems and key stakeholders in acute care settings, primarily hospitals. Outside of the United States, we may utilize partners for the commercialization of our products.

*Continue to build a robust intellectual property portfolio.* Our patent estate includes over 30 owned or exclusively-licensed U.S. issued patents and over 10 filed U.S. patent applications, as well as several that have been filed in various worldwide territories, that protect or will protect, as applicable the market value of our approved and pipeline products. We intend to continue to build our patent portfolio by filing for patent protection on new developments with respect to our product candidates that will not infringe patents that cover the branded reference drugs. We expect that these will, if issued, allow us to list our own patents in the Orange Book, to which potential competitors will be required to certify upon submission of their applications referencing our products, if approved.

**Our Products and Product Portfolio**

***Belrapzo and Bendeka (Licensed to Teva and SymBio) for Chronic Lymphocytic Leukemia ("CLL") and Non-Hodgkin's Lymphoma ("NHL")***

*Overview*

Bendamustine is an alkylating agent approved for use in CLL, and indolent B-cell NHL, that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen (which we refer to herein as the NHL indication).

*U.S. Marketed Bendamustine Products*

Teva currently markets its lyophilized bendamustine product under the trade name Treanda®. Teva ceased distribution of Treanda® liquid on March 30, 2016.

*Limitations of Marketed Bendamustine Products*

Treanda® is a lyophilized powder that requires reconstitution in water prior to use. A 500 mL intravenous (IV) administration is used over 30 or 60 minutes for CLL and NHL patients, respectively. The product is sold in single use vials creating an opportunity for product waste in certain applications.

10

*Eagle's Solution: Belrapzo and Bendeka*

The Belrapzo and Bendeka liquid formulations eliminate the need to reconstitute the drug prior to use, relative to the lyophilized presentation of Treanda®. As a result, we believe that relative to the lyophilized presentation of Treanda® there is less potential for dosing errors, less exposure to cytotoxic powders and a more efficient work flow.

Additionally, admixtures prepared with Bendeka contain lower sodium as compared with Treanda® which could be of benefit to the predominantly elderly, renally impaired and cardiovascular compromised patients. Also, Bendeka is available in a multi-use vial, which allows infusion centers and hospitals to avoid needless waste of unused drug remaining after procedures with single use vials.

*Belrapzo*

On May 15, 2018, the FDA granted final approval for Belrapzo, a ready-to-dilute ("RTD"), multi-dose liquid with extended drug stability for use with a 500mL intravenous, or IV, infusion bag.

*Teva License- Bendeka*

Bendeka is the same RTD, multi-dose liquid formulation as Belrapzo, with extended drug stability, but for use with a 50 mL IV infusion bag, which enables it to be administered in a shorter time-period than current drugs on the market and represents a label expansion from Belrapzo. We received orphan drug designation for Bendeka for CLL and NHL in July 2014. We entered into the Cephalon License to market this product. *See License Agreements - Cephalon License Agreement, below.*

**Ryanodex® for Malignant Hyperthermia**

*Overview*

Dantrolene was first introduced to the U.S. market in 1979 and is currently the only drug approved to treat a rare genetic disorder called malignant hyperthermia ("MH"). There are only 500 to 800 cases of MH in the United States each year, qualifying dantrolene for orphan drug designation. This disease is triggered when a patient with this genetic predisposition has a surgical procedure and is exposed to certain inhaled anesthetics or the muscle relaxant, succinylcholine. When this exposure occurs, a metabolic response can be triggered in the patient resulting in an episode of MH that can be fatal if not treated immediately. Because dantrolene is the only approved drug available to treat MH, the Joint Commission on Accreditation of Healthcare Organizations, (the "Joint Commission") requires that all hospitals stock vials of this product at all times, generally in the operating room area.

*Currently-Preexisitng Dantrolene Products for MH*

The two preexisting injectable dantrolene drugs on the market for the treatment of MH, Dantrium® and Revonto®, are offered in a vial containing 20mg of lyophilized powder that requires mixing with 60mL of sterile water.

*Limitations of Dantrium® and Revonto®*

When an MH crisis occurs during surgery, the surgical procedure is immediately discontinued and the anesthesiologist and others in the operating room quickly begin reconstituting dantrolene, often at the same time as performing other resuscitative efforts, in order to administer the drug to the patient as an IV push. Based on recommendations from the Malignant Hyperthermia Association of the United States ("MHAUS"), the recognized authority on treating MH in the United States, the recommended dose is 2.5mg/kg or higher. It is critically important that the drug be administered as rapidly as possible, as MH symptoms include tachycardia, elevated blood pressure, raised $CO_2$ levels and very high body temperature levels. If not treated immediately, the disease can be fatal.

Because of the dosing required in adult patients to reverse the MH symptoms and the current formulations of Dantrium® and Revonto®, it is often necessary to reconstitute 10 to 20 vials of dantrolene. As the current formulations are also poorly water soluble, this process generally takes up to 15 to 20 minutes at a point when time is critical and the patient is extremely unstable. Furthermore, the volume of diluent required to reconstitute Dantrium® and Revonto® means that the adult patient receives a significant volume of fluid (600mL to 1,200mL) as an IV infusion, which on occasion can result in detrimental secondary physiological consequences for the patient, such as pulmonary edema and extravasation, which can lead to tissue necrosis.

11

*Eagle's Solution: Ryanodex®*

We have developed a differentiated formulation of dantrolene sodium that was approved by the FDA in July 2014 and is currently sold under the brand name, Ryanodex®, for the treatment of MH. The presentation is a 5ml vial containing 250mg of dantrolene sodium in lyophilized powder form.

We believe that the immediate benefits of our Ryanodex® formulation are clinically significant in critical care situations. Specifically, Ryanodex® reduces the amount of time to reconstitute and administer dantrolene from 15 to 20 minutes with Dantrium® and Revonto®, to 1 minute, as the anesthesiologist will be able to mix and administer a dose of 250mg from a single vial of Ryanodex® in contrast to mixing and administering up to 12 or more vials of Dantrium® or Revonto®. A recent retrospective study conducted by MHAUS demonstrated that every 15-minute delay in treating MH resulted in a 7.8% increase in patient complications.

**EP-4104 Ryanodex® (dantrolene sodium) for the treatment of organophosphate exposure** *(Nerve Agents)*

Organophosphates are a class of chemicals that include potent pesticides and chemical weapons, known as nerve agents. Acute intoxication with organophospates may result in severe consequences, including brain damage and death. Eagle is currently evaluating Ryanodex for the treatment of brain damage secondary to nerve agent (NA) exposure. If approved, Ryanodex would represent the first product available for this indication.

*Limitations of Current Therapies*

While the standard treatment of atropine and oxime is essential after exposure to a nerve agent, these drugs are not neuroprotective. There are currently no FDA-approved products that treat acute intoxication with organophospates that may result in severe consequences, including brain damage and death.

*Eagle's Solution: Ryanodex*

Ryanodex's presentation will initially be an injectable suspension. We believe that Ryanodex may provide significant benefits over the current standard of care, which may not be readily available in most settings.

*EP-4104 Clinical Development and Regulatory Status*

In May 2019, we announced positive results of our study to evaluate the neuroprotective effects of Ryanodex secondary to NA exposure, conducted with the United States Army Medical Research Institute of Chemical Defense, the nation's leading science and technology laboratory in the area of medical chemical countermeasures research and development. The study results showed a p-value of 0.04 or less compared to the control group in six critical areas of the brain. We believe these results demonstrate the neuroprotective effects of Ryanodex. It has been hypothesized that nerve agent poisoning triggers intracellular calcium release in the body. The study data supports the proposed mechanism of action of Ryanodex, which modulates intracellular calcium in different organs including the brain.

On December 16, 2019, we announced that the FDA has granted orphan drug designation (ODD) for Ryanodex®(dantrolene sodium) for the treatment of organophosphate exposure. On August 8, 2020, we submitted a Special Protocol Assessment, or SPA, to the FDA for Ryanodex for the treatment of brain damage secondary to nerve agent exposure. We are initiating dose ranging studies in another animal model using IV administration with arm using an intermuscular formulation of EA-111. We expect the preliminary results from these studies will allow us to update our SPA with the FDA. If approved, Ryanodex would represent the first product available for this indication.

**EP-5101 (PEMFEXY™) for Lung Cancer**

EP-5101 is an IV-administered cancer agent indicated for locally advanced or metastatic non-small cell lung cancer and mesothelioma. We have developed EP-5101 as a ready-to-use/dilute liquid form of pemetrexed that will be available in a 25mg/mL per vial. Because our product will be available in liquid form, product reconstitution will not be required, making EP-5101 a preferred formulation under the Joint Commission guidelines.

*Currently-Marketed Pemetrexed Product*

12

The branded form of a pemetrexed product is marketed by Eli Lilly and Company ("Lilly") as Alimta. Alimta is approved for use to treat non-small cell lung cancer and mesothelioma. Alimta's lyophilized formulation utilizes pemetrexed disodium. The product presentations for Alimta are 100mg and 500mg single use vials containing lyophilized power that must be reconstituted before patient administration. Once mixed, Alimta must be used within 24 hours due to product stability concerns. According to Lilly, worldwide sales of Alimta for the 2020 calendar year were approximately $2.3 billion.

*Limitations of Alimta*

Alimta, a lyophilized pemetrexed disodium formulation requiring reconstitution, adds time to administration, presents cytotoxic safety issues for healthcare professionals administering the drug and the potential for dosing errors. Because reconstitution of Alimta is generally not performed until the patient has cleared all tests necessary to receive the drug, this process contributes to a significant amount of time spent by such patients in infusion clinics. Additionally, this method of administration limits the number of patients that may be treated on any given day by such clinics. Furthermore, as with any oncology drug, cytotoxic vapors released through reconstitution can be potentially harmful to pharmacists, physicians and nurses. Moreover, dosing errors may occur during reconstitution, as incorrect amounts of diluent may be used. As a result, lyophilized formulations are less preferred by the Joint Commission as compared to an RTD product.

*Eagle's Solution: EP-5101 (PEMFEXY™)*

EP-5101 is an RTD liquid formulation of pemetrexed. As an RTD liquid formulation, EP-5101 will not require additional time for reconstitution and may avoid certain safety concerns to healthcare professionals, including reducing exposure to the drug's cytotoxic vapors during reconstitution by healthcare providers, and potential dosing errors during mixing. This could allow for a more efficient work flow within the infusion clinic and may result in an opportunity to reduce office staff and see more patients each day.

*EP-5101 (PEMFEXY™) Development and Regulatory Status*

We submitted an NDA for EP-5101 on December 30, 2016 for use in non-small cell lung cancer and mesothelioma. On October 27, 2017, we were granted tentative approval for EP-5101 by the FDA. On December 13, 2019, we reached a settlement agreement with Lilly related to Pemfexy. The agreement provides for a release of all claims by the parties and allows for an initial entry of Pemfexy into the market on February 1, 2022 and a subsequent uncapped entry on April 1, 2022. On February 10, 2020, we received final approval from the FDA for Pemfexy. We expect to launch Pemfexy in early 2022

**EGL-5385-C-1701 (fulvestrant) for Breast Cancer**

Fulvestrant is an injectable estrogen receptor antagonist. It is used for the treatment of hormone receptor positive advanced breast cancer for post-menopausal women whose disease has progressed following treatment with prior endocrine therapy.

*Currently-Marketed Fulvestrant Products*

The branded form of fulvestrant is Faslodex, a 500mg injectable product marketed by AstraZeneca plc. Worldwide sales of Faslodex were $1 billion in 2018, which included U.S. sales of $537 million.

*Limitations of Faslodex*

Faslodex is administered in two deep intramuscular injections of high viscosity product per dose of treatment (5 ml each) over 1-2 minutes into each buttock. The procedure is painful and Faslodex injection reactions have been associated with peripheral nerve adverse reactions, including risk of damaging the sciatic nerve.

*Eagle's Solution: EGL-5385-C-1701*

On August 5, 2019, we announced a clinical development plan to support the submission of a NDA for our fulvestrant formulation. Our original formulation of fulvestrant was studied in a clinical trial conducted in 2018 in healthy post-menopausal women. A detailed review of the study data led to the hypothesis that the unique properties of our formulation would potentially allow for greater inhibition of estrogen receptors. Based on this hypothesis, we completed additional work designed to further enhance our proprietary drug formulation. We met with the FDA and mutually agreed to a clinical program that could provide an efficient approval pathway for our fulvestrant formulation. The main goal of the clinical research program is

13

to determine if the unique properties of our fulvestrant formulation will result in greater inhibition of estrogen receptors, potentially leading to improved efficacy outcomes, including lower disease progression rates, compared to current treatment options.

On December 9, 2019, we announced that we had commenced dosing in a pilot clinical study to assess the unique characteristics of our fulvestrant product candidate, which has the potential to enhance estrogen receptorER, inhibition and improve patient outcomes.

### Additional Products in our Portfolio

#### Vasopressin

Vasopressin injection is indicated to increase blood pressure in adults with vasodilatory shock who remain hypotensive despite fluids and catecholamines. We filed an ANDA in April 2018 for a generic version of VASOSTRICT® (vasopressin IV solution (infusion), which variously covers either vasopressin-containing pharmaceutical compositions or methods of using a vasopressin-containing dosage form to increase blood pressure in humans. On February 2, 2021, we announced that the FDA had issued a CRL for our ANDA for vasopressin. We have had conversations with FDA regarding the CRL, pursuant to which FDA restated that it has prioritized our ANDA, and that the ANDA has is also been flagged as a COVID-19 priority by FDA. We believe we can fully respond to the questions raised. There is one additional short duration study that will need to be completed and analyzed. The study will be run either in mid-February or mid-March. Based on similar studies previously run on our vasopressin product, we expect the results will be satisfactory. In addition, we expects we will have 180 days of exclusivity.

In May 2018, the NDA owner filed a lawsuit against us within the 45-day deadline to invoke a 30-month stay of FDA approval pursuant to the Hatch-Waxman legislative scheme. In August 2018, we filed an answer and a counterclaim for non-infringement and invalidity of asserted patents, and filed an amended answer and counterclaims on October 30, 2019. The court issued a Markman ruling on July 1, 2019. On December 20, 2019, Par dismissed with prejudice claims of three of the patents asserted against us, and the Court entered an Order reflecting that dismissal on December 27, 2019. The trial is scheduled to begin on July 7, 2021.

#### Other Opportunities

We are pursuing several additional potential products and product indications that address broad indications such as oncology, emergency medicine, infectious diseases and others. We intend to use our novel and well-developed methods to identify ideal development candidates and to commercialize improved formulations of widely prescribed therapeutics.

In addition to our internal efforts, in January 2016 we entered into an agreement with the United States Army Medical Research Institute of Chemical Defense, or AMRI, to jointly develop and manufacture several select and complex parenteral drug products for registration and subsequent commercialization in the United States.

Under the terms of the agreement, AMRI will develop and initially provide cGMP manufacturing and analytical support for the registration of the new product candidates. We will be responsible for advancing the product candidates through clinical trials and regulatory submissions.

### Sales and Marketing

Other than products subject to existing commercialization arrangements, we commercialize our product portfolio in the United States with our commercial organization. Ryanodex and Belrapzo are marketed by our internal commercial team consisting of 46 direct sales representatives, support staff and management.

### Major Customer

We are dependent on our commercial partner, Teva, to market and sell Bendeka. As a result, our future revenues are highly dependent on our collaboration and distribution arrangement with Teva.

Teva markets Bendeka through the Cephalon License. Pursuant to that license agreement, Teva pays us a royalty based on net sales of the product and also purchases the product from us. A disruption in this arrangement caused by, among other things, a supply disruption, loss of exclusivity or the launch of a superior product would have a material adverse effect on our financial position, results of operations and cash flows.

14

The total revenues and accounts receivables broken down by major customers as a percentage of the total are as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **2018** |
| **Net revenues** | | | |
| Cephalon, Inc. (Teva) - See Revenue Recognition | 67 % | 77 % | 75 % |
| Other | 33 % | 23 % | 25 % |
| | 100 % | 100 % | 100 % |

**Manufacturing**

We do not own any manufacturing facilities. The manufacture of sterile injectables is highly reliant on very complex sterile techniques and personnel aseptic techniques which present significant challenges and requires specialized expertise. Further, sterile processes have a high level of scrutiny by regulatory agencies. Consequently, we utilize a network of third party manufacturers for production of our products. All manufacturers are monitored and evaluated by our quality department to assess compliance with regulatory requirements and our internal quality standards and benchmarks.

**Intellectual Property and Exclusivity**

We strive to protect and enhance the proprietary technologies that we believe are important to our business. We seek to obtain and maintain patents for any patentable aspects of our products or product candidates, their methods of use and any other inventions that are important to our business model and maintaining a competitive advantage over generic competitors. Our success will depend significantly on our ability to obtain and maintain patent and other proprietary protection for commercially important technology, inventions and know-how related to our business, defend and enforce our patents, maintain our licenses to use intellectual property owned by third parties, preserve the confidentiality of our trade secrets and operate without infringing the valid and enforceable patents and other proprietary rights of third parties. We also rely on know-how, continuing technological innovation and in-licensing opportunities to develop, strengthen, and maintain our proprietary position in the fields targeted by our products and product candidates.

**Patents and Patent Applications**

We are the exclusive licensee under our license with Lyotropic to a family of patents and applications that relate to low volume formulations of dantrolene, and methods of treatment using dantrolene. There are eight issued U.S. patents, and several pending U.S. patent applications, along with foreign counterparts that include both issued patents and pending applications. The issued U.S. patents cover low volume formulations of dantrolene in reconstitutable and in ready to use liquid form. We expect that the issued patents will expire no later than July 1, 2025.

We are the sole owner of over 10 issued patents, several pending U.S. patent applications, and multiple patents and/or corresponding foreign filings for patent applications in a number of jurisdictions covering various formulations and methods of use of bendamustine. We are currently prosecuting these applications, which, if issued, would expire between 2031 and 2033.

We are the owner of U.S. Patent No. 8,431,539 expiring July 20, 2031 and covering daptomycin.

Eagle also has a patent portfolio of issued and/or pending U.S. patent applications and corresponding foreign patent application in a range of countries that cover its biologics platform technologies. We are the sole owner of U.S. Patent Nos. 9,833,513, 9,913,905 and 9,925,263 expiring between 2034 and 2036.

**Trade Secrets and Proprietary Information**

Trade secrets play an important role in protecting our products and provide protection beyond patents and regulatory exclusivity. The scale-up and commercial manufacture of our products involves processes, custom equipment, and in-process and release analytical techniques that we believe are unique to us. We also seek to preserve the integrity and confidentiality of our proprietary technology and processes by maintaining physical security of our premises and physical and electronic security of our information technology systems. While we have confidence in these security measures, individuals, organizations and

15

systems, agreements or security measures may be breached, and we may not have adequate remedies for any breach. In addition, our proprietary technology and processes may otherwise become known or be independently discovered by competitors. To the extent that our employees, consultants, scientific advisors, contractors or any future collaborators use intellectual property owned by others in their work for us, disputes may arise as to the rights in related or resulting know-how and inventions. We seek to protect our proprietary information, including our trade secrets and proprietary know-how, by requiring third parties with whom we contract for services related to our products, including manufacturing services to agree to terms in our agreements with such third parties that protect our confidential and trade secret information. We also require our employees, consultants and other advisors to execute proprietary information and confidentiality agreements upon the commencement of their employment or engagement. These agreements generally provide that all confidential information developed or made known during the course of the relationship with us be kept confidential and not be disclosed to third parties except in specific circumstances. In the case of our employees, the agreements also typically provide that all inventions resulting from work performed for us, utilizing our property or relating to our business and conceived or completed during employment shall be our exclusive property to the extent permitted by law. Where appropriate, agreements we obtain with our consultants also typically contain similar assignment of invention obligations. Further, we require confidentiality agreements from entities that receive our confidential data or materials.

**License Agreements**

*License Agreement with Lyotropic Therapeutics, Inc.*

In October 2008, we entered into a license and sublicense agreement with Lyotropic Therapeutics, Inc., ("Lyotropic"), under which we were granted an exclusive license under Lyotropic's intellectual property rights relating to dantrolene, and an exclusive worldwide sublicense under certain nanocrystal technology relating to a formulation of dantrolene licensed by Alkermes, Inc. (as successor in interest to Elan Pharma International Limited), or Alkermes, to Lyotropic under an August 2004 license agreement between Alkermes and Lyotropic.

*Development and License Agreement with Robert One, LLC (bendamustine)*

In March 2008 we entered into a development and license agreement with Robert One, LLC ("Robert One") in which Robert One assigned to us certain patents relating to bendamustine and four additional 505(b)(2) products and/or ANDA products under development (the "Robert One (bendamustine) Subject Products") and granted us an exclusive, sub-licensable, license under Robert One's intellectual property rights to develop make, use, sell and import Robert One (bendamustine) Subject Products worldwide (excluding China) with respect to bendamustine and other 505(b)(2) product applications and in North America with respect to ANDA product applications.

Under the terms of this Agreement no further milestone payments are due to Robert One. We are required to make royalty payments based on gross profits of sales of the Robert One (bendamustine) Subject Products by us and our affiliates in the Territory (i) at 10%, pursuant to an amendment in 2013, for bendamustine products and (ii) at 50% for products, other than bendamustine products, that achieve regulatory approval and are commercialized on the basis of a 505(b)(2) application (provided that we are entitled to recoup all of our expenses related to the development of a product commercialized under a 505(b)(2) application prior to splitting the profits we receive from such product), and (iii) at 30% with respect to products, other than bendamustine products, that are commercialized on the basis of an ANDA application. Our royalty obligations continue on a product-by-product basis until the later of ten years after the first commercial sale of each Robert One (bendamustine) Subject Product and the expiration of the last valid claim covering such Robert One (bendamustine) Subject Product, subject to certain reductions in the event that there is no valid patent claim covering the manufacture, use, import or sale of such Robert One (bendamustine) Subject Product in a country in the territory.

*Development and License Agreement with Robert One, LLC (pemetrexed)*

In February 2009 we entered into a development and license agreement with Robert One, in which Robert One assigned to us certain patents relating to pemetrexed and four additional 505(b)(2) products and/or ANDA products under development ("the Robert One 2009 Subject Products") and granted us an exclusive, sub-licensable, license under Robert One's intellectual property rights to develop make, use, sell and import Robert One 2009 Subject Products worldwide (excluding China) with respect to pemetrexed and other 505(b)(2) product applications and in North America with respect to ANDA product applications.

Under the terms of this Agreement no further milestone payments are due to Robert One. We are required to make royalty

16

payments based on gross profits of sales of the Robert One 2009 Subject Product by us and our affiliates in the Territory (i) at 25% for pemetrexed parental formulation (ii) at 50% for Robert One 2009 Subject Products other than pemetrexed that achieve regulatory approval and are commercialized on the basis of a 505(b)(2) application (provided that we are entitled to recoup all of our expenses related to the development of a product commercialized under a 505(b)(2) application prior to splitting the profits we receive from such product), and (iii) at 30% with respect to Robert One 2009 Subject Products other than pemetrexed that are commercialized on the basis of an ANDA application. Our royalty obligations continue on a product-by-product basis until the later of ten years after the first commercial sale of each Robert One 2009 Subject Product and the expiration of the last valid claim covering such Robert One 2009 Subject Product, subject to certain reductions in the event that there is no valid patent claim covering the manufacture, use, import or sale of such Robert One 2009 Subject Product in a country in the territory.

*Cephalon License Agreement*

On February 13, 2015, we submitted an NDA to the FDA for Bendeka which was approved by the FDA on December 8, 2015. Also, on February 13, 2015, we entered into the Cephalon License with Cephalon, for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. Subsequently, with our consent , Cephalon assigned to Teva Pharmaceuticals International GmbH, orTPIG, all of Cephalon's rights and obligations under the Cephalon License. Accordingly, all references to "Cephalon" or to the "Cephalon License" and the related supply agreements for Bendeka should be read and construed as references to TPIG and to the license agreement and supply agreements for Bendeka to which we and TPIG are now parties. Pursuant to the terms of the Cephalon License, Cephalon is responsible for all U.S. commercial activities for the product including promotion and distribution, and we are responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies. Additionally, under the terms of the Cephalon License, we received an upfront cash payment of $30 million, a $15 million milestone payment in January 2016 in connection with the FDA approval of Bendeka in December 2015, a $40 million milestone in the fourth quarter of 2016 in connection with the receipt of the J-Code for Bendeka and in the first quarter of 2017, Bendeka reached $500 million in cumulative net sales, triggering an additional $25 million sales-based milestone payment. In addition, the royalty payments of 20% of net sales of the product that we were entitled to receive increased to 25% on receipt of the J-Code. In connection with the Cephalon License, hawse have entered into a supply agreement with Cephalon, pursuant to which we are responsible for supplying product to Cephalon.

On April 13, 2019, we and Teva entered into an amendment to the Cephalon License, amending the terms of the License Agreement to increase the U.S. royalty paid to us and re-allocate certain litigation expenses. Pursuant to the Amendment, beginning on October 1, 2019,our royalty payment increased from 25% to 30% of Bendeka net United States sales. The royalty rate increased by one percentage point on October 1, 2020, and will continue to increase by one percentage point on each anniversary of October 1, 2019 until it reaches 32%, and it will remain at 32% thereafter. The Amendment also extends the U.S. royalty term for Bendeka until it is no longer sold in the United States. The previous royalty term was set to expire in 2025. The extended term coincides with the bendamustine patents with expiries through 2033. Pursuant to the amendment, we will continue to be responsible for the manufacture of Bendeka for the U.S. market for so long as it is sold in the United States. Pursuant to the amendment, we have also agreed to assume a portion of Bendeka-related patent litigation expenses.

In March 2019, we received an upfront cash payment of $9.0 million upon execution of an amendment to the Cephalon License to terminate Teva's obligation to pay future milestones and royalties on Bendeka sales outside of the U.S.

*Cephalon Settlement*

On February 13, 2015, we entered into the Cephalon Settlement Agreement with Cephalon, in connection with the Cephalon License, pursuant to which the parties agreed to settle the pending patent infringement claims against each other regarding Cephalon's US Patent No. 8,791,270, under which we agreed to enter into a Consent Judgment regarding the '270 patent. As part of the Cephalon Settlement Agreement, Cephalon has agreed to waive its orphan drug exclusivities for the treatment of patients with CLL and patients with NHL.

*SymBio Product Collaboration and License Agreement*

On September 20, 2017, we entered into the SymBio License with SymBio for the rights to develop and commercialize EP-3101 and Bendeka, or collectively, the Products, in Japan. Under the SymBio License, SymBio is responsible for all development of the Products in Japan and for obtaining and maintaining all regulatory approvals of the Products in Japan. SymBio will bear all costs of development of the Products in Japan except that, if Japanese regulatory authorities require a certain clinical study to be conducted as a condition for approving one of the Products in Japan, we would share 50% of the out-

17

of-pocket costs of that clinical study up to a specified dollar amount as a reduction to future royalty payments. Based on our assessment of the probability of additional costs, we have not deferred revenue on the SymBio License. SymBio will also be responsible, at its sole cost, for all marketing, promotion, distribution and sales of the Products in Japan and is obligated to launch the Products and meet certain minimum detailing, promotion and marketing commitments in connection with commercialization of the Products in Japan.

SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma ("MCL"), and as a first line treatment of low-grade NHL and MCL. Under the SymBio License, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

Pursuant to the terms of the SymBio License, Eagle and SymBio will enter into a separate supply agreement, under which we will be responsible for manufacturing and supplying the Products to SymBio for development and commercialization in Japan. After a period of time following launch of a Product, SymBio will have the right to assume the responsibility for manufacturing of the Products in and for Japan. Under the SymBio License, we will retain the right to control the prosecution, maintenance and enforcement of our patents covering the Products, both inside and outside of Japan.

Under the SymBio License, we earned an upfront non-refundable cash payment of $12.5 million in the third quarter of 2017 and a $5.0 million milestone payment in the third quarter of 2020 when SymBio, received regulatory approval for TREAKISYM from the Pharmaceuticals and Medical Devices Agency, or PMDA, in Japan. We are eligible to receive a milestone payment upon achievement of certain cumulative net sales of the Products in Japan. We will also receive tiered, low double-digit royalties on net sales of the Products in Japan for so long as there are patents covering the Products in Japan or regulatory exclusivity for the Products in Japan. Potential payments to Eagle could reach $10 to $25 million per year in royalties and milestones.

On September 23, 2020, we announced that SymBio had received approval for Treakisym RTD liquid formulation in Japan. The approval covered all indications for which TREAKISYM is currently approved (low-grade non-Hodgkin's lymphoma, mantle cell lymphoma, and chronic lymphocytic leukemia). Approval for the additional indication of relapsed-refractory diffuse large B cell lymphoma currently under review by the PMDA, which could create another large market opportunity beyond the current indications. SymBio expects to launch the Treakisym RTD product in the first quarter of 2021, after obtaining marketing authorization.

**Competition**

The pharmaceutical and biotechnology industries are intensely competitive and subject to rapid and significant technological change. Our competitors include organizations such as major multinational pharmaceutical companies, established biotechnology companies, specialty pharmaceutical companies and generic drug companies. Many of our competitors have greater financial and other resources than we have, such as more commercial resources, larger research and development staffs and more extensive marketing and manufacturing organizations. As a result, these companies may obtain marketing approval more rapidly than we are able and may be more effective in selling and marketing their products. Smaller or early stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large, established companies.

Our competitors may succeed in developing, acquiring or licensing on an exclusive basis technologies and drug products that are more effective or less costly than products that we are currently selling through partners or developing or that we may develop, which could render our products obsolete and noncompetitive. We expect any products that we develop and commercialize to compete on the basis of, among other things, efficacy, safety, convenience of administration and delivery, price and the availability of reimbursement from government and other third-party payors. We also expect to face competition in our efforts to identify appropriate collaborators or partners to help commercialize our product portfolio in our target commercial markets.

**Government Regulation**

*FDA Approval Process for Drugs*

In the United States, pharmaceutical products are subject to extensive regulation by the FDA. The Federal Food, Drug and Cosmetic Act ("FDCA"), and in the case of biologics, the Public Health Service Act ("PHSA") and other federal and state

18

statutes and regulations, govern, among other things, the research, development, testing, manufacture, storage, recordkeeping, approval, labeling, promotion and marketing, distribution, post-approval monitoring and reporting, sampling, and import and export of pharmaceutical products. Failure to comply with applicable FDA or other requirements may subject a company to a variety of administrative or judicial sanctions, such as FDA refusal to approve pending applications, clinical holds, warning or untitled letters, product recalls, product seizures, total or partial suspension of production or distribution, withdrawal of product from the market, injunctions, fines, civil penalties and criminal prosecution.

FDA approval is required before any new unapproved drug biologic or dosage form, including a new use of a previously approved drug, can be marketed in the United States. The process required by the FDA before a new drug may be marketed in the United States generally involves:
- completion of pre-clinical laboratory and animal testing and formulation studies in compliance with the FDA's current good laboratory practice ("cGLP") regulations;
- submission to the FDA of an Investigational New Drug ("IND") application for human clinical testing which must become effective before human clinical trials may begin in the United States;
- approval by an independent institutional review board ("IRB") at each clinical trial site before each trial may be initiated;
- performance of adequate and well-controlled human clinical trials in accordance with current good clinical practices ("cGCP") to establish the safety and efficacy of the proposed drug product for each intended use;
- satisfactory completion of an FDA pre-approval inspection of the facility or facilities at which the product is manufactured to assess compliance with the FDA's cGMP regulations to assure that the facilities, methods and controls are adequate to preserve the drug's identity, strength, quality and purity;
- submission to the FDA of an NDA or BLA;
- satisfactory completion of a potential review by an FDA advisory committee, if applicable; and
- FDA review and approval of the NDA or BLA.

The preclinical and clinical testing and approval process takes many years and the actual time required to obtain approval, if any, may vary substantially based upon the type, complexity and novelty of the product or disease.

Preclinical tests include laboratory evaluation of product chemistry, formulation and toxicity, as well as animal studies to assess the characteristics and potential safety and efficacy of the product. The conduct of the preclinical tests must comply with federal regulations and requirements, including cGLPs. The results of preclinical testing are submitted to the FDA as part of an IND application along with other information, including information about product chemistry, manufacturing and controls and a proposed clinical trial protocol. Long-term preclinical tests, such as animal tests of reproductive toxicity and carcinogenicity, may continue after the IND application is submitted.

The IND application automatically becomes effective 30 days after receipt by the FDA, unless the FDA, within the 30-day time period, raises concerns or questions relating to one or more proposed clinical trials and places the clinical trial on a clinical hold, including concerns that human research subjects will be exposed to unreasonable health risks. In such a case, the IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin. A separate submission to an existing IND application must also be made for each successive clinical trial conducted during product development. Further, an independent IRB, covering each site proposing to conduct the clinical trial must review and approve the plan for any clinical trial and informed consent information for subjects before the trial commences at that site and it must monitor the study until completed. The FDA, the IRB, or the sponsor may suspend a clinical trial at any time on various grounds, including a finding that the subjects or patients are being exposed to an unacceptable health risk or for failure to comply with the IRB's requirements, or may impose other conditions. Clinical trials involve the administration of the investigational new drug to healthy volunteers or patients under the supervision of a qualified investigator in accordance with cGCP requirements, which include the requirement that all research subjects provide their informed consent in writing for their participation in any clinical trial. Sponsors of clinical trials generally must register and report, at the NIH-maintained website ClinicalTrials.gov, key parameters of certain clinical trials. For purposes of an NDA submission and approval, human clinical trials are typically conducted in the following sequential phases, which may overlap or be combined:

Phase 1:     In Phase 1, through the initial introduction of the drug into healthy human subjects or patients, the drug is tested to assess metabolism, pharmacokinetics, pharmacological actions, side effects associated with increasing doses, and, if possible, early evidence on effectiveness.

Phase 2:     Phase 2 usually involves trials in a limited patient population to determine the effectiveness of the drug for a particular indication, dosage tolerance and optimum dosage, and to identify common adverse effects and safety risks.

19

Phase 3:    Phase 3 trials are undertaken to obtain the additional information about clinical efficacy and safety in a larger number of patients, typically at geographically dispersed clinical trial sites, to permit the FDA to evaluate the overall benefit-risk relationship of the drug and to provide adequate information for the labeling of the drug. In most cases, the FDA requires two adequate and well controlled Phase 3 clinical trials to demonstrate the efficacy of the drug. A single Phase 3 trial with other confirmatory evidence may be sufficient in rare instances where the study is a large multicenter trial demonstrating internal consistency and a statistically persuasive finding of a clinically meaningful effect on mortality, irreversible morbidity or prevention of a disease with a potentially serious outcome and confirmation of the result in a second trial would be practically or ethically impossible.

After completion of the required clinical testing, an application is prepared and submitted to the FDA. FDA approval of the NDA is required before marketing of the product may begin in the United States. The NDA must include the results of all preclinical, clinical and other testing and a compilation of data relating to the product's pharmacology, chemistry, manufacture and controls. Under federal law, the submission of most applications is subject to a substantial application user fee, and the manufacturer and/or sponsor under an approved application is also subject to annual product and establishment user fees.

The FDA has 60 days from its receipt of an NDA to determine whether the application will be accepted for filing based on the agency's threshold determination that it is sufficiently complete to permit substantive review. The FDA may request additional information rather than accept an application for filing. In this event, the application must be resubmitted with the additional information and is subject to payment of additional user fees. The resubmitted application is also subject to review before the FDA accepts it for filing. Once the submission is accepted for filing, the FDA begins an in-depth substantive review. Under PDUFA the FDA has agreed to certain performance goals in the review of NDAs through a two-tiered classification system, Standard Review and Priority Review. Priority Review designation is given to drugs that offer major advances in treatment, or provide a treatment where no adequate therapy exists. The FDA endeavors to review applications subject to Standard Review within ten to twelve months, whereas the FDA's goal is to review Priority Review applications within six to eight months, depending on whether the drug is a new molecular entity.

The FDA may refer applications for novel drug products or drug products which present difficult questions of safety or efficacy to an advisory committee for review, evaluation and recommendation as to whether the application should be approved and under what conditions.

Before approving an NDA, the FDA will typically inspect one or more clinical sites to assure compliance with cGCP requirements. Additionally, the FDA will inspect the facility or the facilities at which the drug is manufactured. The FDA will not approve the product unless it determines that the manufacturing process and facilities are in compliance with cGMP requirements and are adequate to assure consistent production of the product within required specifications and the application contains data that provide substantial evidence that the drug is safe and effective in the indication studied.

After the FDA evaluates the NDA and the manufacturing facilities, it issues either an approval letter or a complete response letter to indicate that the review cycle for an application is complete and that the application is not ready for approval. A tentative approval is issued to a 505(b)(2) NDA if the sponsor must await the expiration of an Orange Book listed patent covering the reference product. A complete response letter generally outlines the deficiencies in the submission and may require substantial additional testing, or information, in order for the FDA to reconsider the application. Even with submission of this additional information, the FDA may ultimately decide that an application does not satisfy the regulatory criteria for approval. If, or when, the deficiencies have been addressed to the FDA's satisfaction in a resubmission of the application, the FDA will issue an approval letter. An approval letter authorizes commercial marketing of the drug with specific prescribing information for specific indications.

As a condition of NDA or BLA approval, the FDA may require a Risk Evaluation and Mitigation Strategies ("REMS") program to help ensure that the benefits of the drug outweigh the potential risks. If the FDA determines a REMS program is necessary during review of the application, the drug sponsor must agree to the REMS plan at the time of approval. A REMS program may be required to include various elements, such as a medication guide or patient package insert, a communication plan to educate healthcare providers of the drug's risks, limitations on who may prescribe or dispense the drug, or other elements to assure safe use, such as special training or certification for prescribing or dispensing, dispensing only under certain circumstances, special monitoring and the use of patient registries. In addition, the REMS must include a timetable to periodically assess the strategy. The requirement for a REMS program can materially affect the potential market and profitability of a drug.

Moreover, product approval may require substantial post-approval testing and surveillance to monitor the drug's safety or

20

efficacy, and the FDA has the authority to prevent or limit further marketing of a product based on the results of these post-marketing programs. Once granted, product approvals may be withdrawn if compliance with regulatory standards is not maintained or problems are identified following initial marketing. Drugs may be marketed only for the approved indications and in accordance with the provisions of the approved label, and, even if the FDA approves a product, it may limit the approved indications for use for the product or impose other conditions, including labeling or distribution restrictions or other risk-management mechanisms.

Further changes to some of the conditions established in an approved application, including changes in indications, labeling, or manufacturing processes or facilities, require submission and FDA approval of a new NDA or NDA supplement before the change can be implemented, which may require us to develop additional data or conduct additional pre-clinical studies and clinical trials. An NDA supplement for a new indication typically requires clinical data similar to that in the original application, and the FDA uses the similar procedures in reviewing supplements as it does in reviewing original applications.

*Post-Approval Requirements*

Once an NDA is approved, a product will be subject to pervasive and continuing regulation by the FDA, including, among other things, requirements relating to drug listing and registration, recordkeeping, periodic reporting, product sampling and distribution, adverse event reporting and advertising, marketing and promotion, including standards and regulations for direct to consumer advertising, off-label promotion, industry-sponsored scientific and educational activities and promotional activities involving the internet. Drugs may be marketed only for the approved indications and in accordance with the provisions of the approved labeling. While physicians may prescribe for off-label uses, manufacturers may only promote for the approved indications and in accordance with the provisions of the approved label. However, companies may share truthful and not misleading information that is otherwise consistent with a product's FDA approved labeling. The FDA and other agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses, and a company that is found to have improperly promoted off-label uses may be subject to significant liability.

In addition, quality-control, drug manufacture, packaging and labeling procedures must continue to conform to cGMPs after approval. Drug manufacturers and certain of their subcontractors are required to register their establishments with the FDA and certain state agencies. Registration with the FDA subjects entities to periodic unannounced and announced inspections by the FDA and these state agencies, during which the agency inspects manufacturing facilities to assess compliance with cGMPs. Accordingly, manufacturers must continue to expend time, money, and effort in the areas of production and quality-control to maintain compliance with cGMPs. Regulatory authorities may withdraw product approvals or request product recalls if a company fails to comply with regulatory standards, if it encounters problems following initial marketing, or if previously unrecognized problems are subsequently discovered. The FDA may also impose a REMS requirement on a drug already on the market if the FDA determines, based on new safety information, that a REMS is necessary to ensure that the drug's benefits outweigh its risks. In addition, regulatory authorities may take other enforcement action, including, among other things, warning letters, the seizure of products, injunctions, consent decrees placing significant restrictions on or suspending manufacturing operations, refusal to approve pending applications or supplements to approved applications, civil penalties and criminal prosecution.

In addition, the distribution of prescription pharmaceuticals is subject to the Prescription Drug Marketing Act ("PDMA") which regulates the distribution of drugs and drug samples at the federal level, and sets minimum standards for the registration and regulation of drug distributors by the states. A growing majority of states also impose certain drug pedigree requirements on the sale and distribution of prescription drugs.

The FDA may require post-approval studies and clinical trials if the FDA finds that scientific data, including information regarding related drugs, deem it appropriate. The purpose of such studies would be to assess a known serious risk or signals of serious risk related to the drug or to identify an unexpected serious risk when available data indicate the potential for a serious risk. The FDA may also require a labeling change if it becomes aware of new safety information that it believes should be included in the labeling of a drug.

*The Hatch-Waxman Amendments*

*ANDA Approval Process*

The Hatch-Waxman Act, established abbreviated FDA approval procedures for drugs that are shown to be equivalent to proprietary drugs previously approved by the FDA through its NDA process. Approval to market and distribute these drugs is

21

obtained by filing an ANDA with the FDA. An ANDA is a comprehensive submission that contains, among other things, data and information pertaining to the active pharmaceutical ingredient, drug product formulation, specifications and stability of the generic drug, as well as analytical methods, manufacturing process validation data and quality control procedures. Premarket applications for generic drugs are termed abbreviated because they generally do not include preclinical and clinical data to demonstrate safety and effectiveness. Instead, a generic applicant must demonstrate that its product is bioequivalent to the innovator drug. In certain situations, an applicant may obtain ANDA approval of a generic product with a strength or dosage form that differs from a referenced innovator drug pursuant to the filing and approval of an ANDA Suitability Petition. The FDA will approve the generic product as suitable for an ANDA application if it finds that the generic product does not raise new questions of safety and effectiveness as compared to the innovator product. A product is not eligible for ANDA approval if the FDA determines that it is not equivalent to the referenced innovator drug, if it is intended for a different use, or if it is not subject to an approved Suitability Petition. However, such a product might be approved under an NDA, with supportive data from clinical trials.

*505(b)(2) NDAs*

As an alternative path to FDA approval for modifications to formulations or uses of products previously approved by the FDA, an applicant may submit an NDA under Section 505(b)(2) of the FDCA. Section 505(b)(2) was enacted as part of the Hatch-Waxman Amendments and permits the filing of an NDA where at least some of the information required for approval comes from studies not conducted by, or for, the applicant. If the 505(b)(2) applicant can establish that reliance on FDA's previous findings of safety and effectiveness is scientifically appropriate, it may eliminate the need to conduct certain preclinical or clinical studies of the new product. The FDA may also require companies to perform additional studies or measurements, including clinical trials, to support the change from the approved branded reference drug. The FDA may then approve the new product candidate for all, or some, of the label indications for which the branded reference drug has been approved, as well as for any new indication sought by the 505(b)(2) applicant.

*Orange Book Listing*

In seeking approval for a drug through an NDA, including a 505(b)(2) NDA, applicants are required to list with the FDA certain patents whose claims cover the applicant's product. Upon approval of an NDA, each of the patents listed in the application for the drug is then published in the Orange Book. Any applicant who files an ANDA seeking approval of a generic equivalent version of a drug listed in the Orange Book or a 505(b)(2) NDA referencing a drug listed in the Orange Book must certify to the FDA that (1) no patent information on the drug product that is the subject of the application has been submitted to the FDA; (2) such patent has expired; (3) the date on which such patent expires; or (4) such patent is invalid or will not be infringed upon by the manufacture, use or sale of the drug product for which the application is submitted. This last certification is known as a paragraph IV certification. A notice of the paragraph IV certification must be provided to each owner of the patent that is the subject of the certification and to the holder of the approved NDA to which the ANDA or 505(b)(2) application refers. The applicant may also elect to submit a "section viii" statement certifying that its proposed label does not contain (or carves out) any language regarding the patented method-of-use rather than certify to a listed method-of-use patent.

If the reference NDA holder and patent owners assert a patent challenge directed to one of the Orange Book listed patents within 45 days of the receipt of the paragraph IV certification notice, the FDA is prohibited from approving the application until the earlier of 30 months from the receipt of the paragraph IV certification expiration of the patent, settlement of the lawsuit or a decision in the infringement case that is favorable to the applicant. The ANDA or 505(b)(2) application also will not be approved until any applicable non-patent exclusivity listed in the Orange Book for the branded reference drug has expired as described in further detail below.

*Non-Patent Exclusivity*

In addition to patent exclusivity, the holder of the NDA for the listed drug may be entitled to a period of non-patent exclusivity, during which the FDA cannot approve an ANDA or 505(b)(2) application that relies on the listed drug. For example, a pharmaceutical manufacturer may obtain five years of non-patent exclusivity upon NDA approval of a new chemical entity, or NCE, which is a drug that contains an active moiety that has not been approved by FDA in any other NDA. An "active moiety" is defined as the molecule or ion responsible for the drug substance's physiological or pharmacological action. During the five year exclusivity period, the FDA cannot accept for filing any ANDA seeking approval of a generic version of that drug or any 505(b)(2) NDA for the same active moiety and that relies on the FDA's findings regarding that drug, except that FDA may accept an application for filing after four years if the follow-on applicant makes a paragraph IV certification.

22

A drug, including one approved under Section 505(b)(2), may obtain a three-year period of exclusivity for a particular condition of approval, or change to a marketed product, such as a new formulation for a previously approved product, if one or more new clinical studies (other than bioavailability or bioequivalence studies) was essential to the approval of the application and was conducted/sponsored by the applicant. Should this occur, the FDA would be precluded from approving any ANDA or 505(b)(2) application for the protected modification until after that three-year exclusivity period has run. However, unlike NCE exclusivity, the FDA can accept an application and begin the review process during the exclusivity period.

*Orphan Drug Designation and Exclusivity*

The Orphan Drug Act provides incentives for the development of products intended to treat rare diseases or conditions. Under the Orphan Drug Act, the FDA may grant orphan designation to a drug or biological product intended to treat a rare disease or condition, which is generally a disease or condition that affects fewer than 200,000 individuals in the United States, or more than 200,000 individuals in the United States and for which there is no reasonable expectation that the cost of developing and making a drug or biological product available in the United States for this type of disease or condition will be recovered from sales of the product. If a sponsor demonstrates that a drug is intended to treat rare diseases or conditions, the FDA will grant orphan designation for that product for the orphan disease indication. Orphan designation must be requested before submitting an NDA. After the FDA grants orphan product designation, the identity of the therapeutic agent and its potential orphan use are disclosed publicly by the FDA. Orphan drug designation, however, does not convey any advantage in, or shorten the duration of, the regulatory review and approval process.

Orphan drug designation provides manufacturers with research grants, tax credits and eligibility for orphan drug exclusivity. If a product that has orphan drug designation subsequently receives the first FDA approval of the active moiety for that disease or condition for which it has such designation, the product is entitled to orphan drug exclusivity, which for seven years prohibits the FDA from approving another product with the same active ingredient for the same indication, except in limited circumstances. If a drug designated as an orphan product receives marketing approval for an indication broader than the orphan indication for which it received the designation, it will not be entitled to orphan drug exclusivity. Orphan exclusivity will not bar approval of another product under certain circumstances, including if a subsequent product with the same active ingredient for the same indication is shown to be clinically superior to the approved product on the basis of greater efficacy or safety, or providing a major contribution to patient care, or if the company with orphan drug exclusivity is not able to meet market demand. Further, the FDA may approve more than one product for the same orphan indication or disease as long as the products contain different active ingredients. Moreover, competitors may receive approval of different products for the indication for which the orphan product has exclusivity or obtain approval for the same product but for a different indication for which the orphan product has exclusivity. As a result, even if one of our product candidates receives orphan exclusivity, we may still be subject to competition. Orphan exclusivity also could block the approval of one of our products for seven years if a competitor obtains approval of the same drug or if our product candidate is determined to be contained within the competitor's product for the same indication or disease.

*International Regulation*

In addition to regulations in the United States, we are and will be subject to a variety of foreign regulations regarding development, approval, commercial sales and distribution of our products. Whether or not we obtain FDA approval for a product, we must obtain the necessary approvals by the comparable regulatory authorities of foreign countries before we can commence clinical trials or marketing of the product in those countries. The approval process varies from country to country and can involve additional product testing and additional review periods, and the time may be longer or shorter than that required to obtain FDA approval. The requirements governing, among other things, the conduct of clinical trials, product licensing, pricing and reimbursement vary greatly from country to country. Regulatory approval in one country does not ensure regulatory approval in another, but a failure or delay in obtaining regulatory approval in one country may negatively impact the regulatory process in others. If we fail to comply with applicable foreign regulatory requirements, we may be subject to fines, suspension or withdrawal of regulatory approvals, product recalls, seizure of products, operating restrictions and criminal prosecution.

*Other Healthcare Laws and Compliance Requirements*

In the United States, the research, manufacturing, distribution, marketing, sale and promotion of drug products and medical devices are subject to numerous regulations by various federal, state and local authorities in addition to the FDA including, but not limited to, the U.S. Federal Communications Commission, the U.S. Department of Justice, the U.S. Department of Health and Human Services ("HHS") and its various enforcement divisions, such as the Centers for Medicare & Medicaid Services

23

("CMS"), the Office of Inspector General ("OIG"), the Office for Human Research Protections ("OHRP"), and the Office of Research Integrity ("ORI"), state Attorneys General, state Medicaid Fraud Control Units, or MFCUs, and other state and local government agencies. Healthcare laws and regulations that may govern our business include the following.

The federal Anti-Kickback Statute prohibits, among other things, any person or entity, including a prescription drug manufacturer, or a party acting on its behalf, from knowingly and willfully soliciting, receiving, offering or paying any remuneration, directly or indirectly, overtly or covertly, in cash or in kind to induce in return for either the referral of an individual, or the purchase, recommendation, leasing, ordering or furnishing of a good, facility, item, or service, for which payment may be made in whole or in part under a federal healthcare program such as the Medicare and Medicaid programs. This statute has been interpreted broadly to apply to, among other things, arrangements between pharmaceutical manufacturers, on one hand, and prescribers, purchasers, and formulary managers, on the other. The term "remuneration" expressly includes kickbacks, bribes or rebates and also has been broadly interpreted to include anything of value, including for example, gifts, discounts, the furnishing of supplies or equipment, credit arrangements, payments of cash, waivers of payments, ownership interests and providing anything at less than its fair market value. There are a number of statutory exceptions and regulatory safe harbors, which are narrowly drawn, protecting certain business arrangements from prosecution. Failure to meet all of the requirements of a particular applicable statutory exception or safe harbor does not make the conduct per se illegal under the federal Anti-Kickback Statute. Instead, the legality of the arrangement will be evaluated on a case-by-case basis based on a cumulative review of all of its facts and circumstances. Our practices may not meet all of the criteria for safe harbor protection from federal Anti-Kickback Statute liability in all cases. Additionally, the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010 (collectively, the "ACA"), among other things, amended the intent standard under the federal Anti-Kickback Statute such that a person or entity no longer needs to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation. The ACA also provided that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act (discussed below). Further, many states have adopted laws similar to the federal Anti-Kickback Statute, and some of these state laws may be broader in scope in that some of these state laws extend to all payors and may not contain safe harbors.

Federal civil and criminal false claims laws, including the federal civil False Claims Act, and civil monetary penalty laws, which prohibit, among other things, any person or entity from knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval by the federal government or knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim to the federal government. The "*qui tam*" provisions of the federal civil False Claims Act allow a private individual to bring a civil action on behalf of the federal government alleging that the defendant has submitted a false claim to the federal government, and potentially to share in any monetary recovery. In recent years, the number of suits brought by private individuals has increased dramatically. In addition, various states have enacted false claims laws analogous to the federal civil False Claims Act. Many of these state laws are broader in scope and apply to all payors, and therefore, are not limited to only those claims submitted to the federal government. There are many potential bases for liability under the federal civil False Claims Act. Liability arises, primarily, when an entity knowingly submits, or causes another to submit, a false claim for reimbursement to the federal government. The federal civil False Claims Act has been used to assert liability on the basis of kickbacks and other improper referrals, improperly reported government pricing metrics such as Best Price or Average Manufacturer Price, and improper promotion of off-label uses not expressly approved by the FDA in a drug's label. Our future activities relating to the reporting of discount and rebate information and other information affecting federal, state and third party reimbursement of our products, and the sale and marketing of our products and our service arrangements or data purchases, among other activities, may be subject to scrutiny under these laws.

Also, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") created several additional federal civil and criminal statutes that prohibit healthcare fraud and false statements relating to healthcare matters. The healthcare fraud statute prohibits knowingly and willfully executing a scheme to defraud any healthcare benefit program, including private third-party payors. The false statements statute prohibits knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items or services. Like the federal Anti-Kickback Statute, the ACA amended certain of these federal criminal statutes such that a person or entity no longer needs to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation.

In addition, we may be subject to, or our marketing activities may be limited by, data privacy and security regulation by both the federal government and the states in which we conduct our business. HIPAA and its implementing regulations established uniform standards for certain "covered entities," which are certain healthcare providers, health plans and healthcare clearinghouses, as well as their business associates, which are independent contractors or agents of covered entities that receive

24

or obtain protected health information in connection with providing a service on behalf of a covered entity, as well as their covered subcontractors, governing the conduct of specified electronic healthcare transactions and protecting the security and privacy of protected health information. The American Recovery and Reinvestment Act of 2009, commonly referred to as the economic stimulus package, included the Health Information Technology for Economic and Clinical Health Act ("HITECH"), which expanded certain of HIPAA's privacy and security standards. Among other things, HITECH makes HIPAA's security standards and certain privacy standards directly applicable to business associates. HITECH also created four new tiers of civil monetary penalties, amended HIPAA to make civil and criminal penalties directly applicable to business associates, and gave state attorneys general new authority to file civil actions for damages or injunctions in federal courts to enforce the federal HIPAA laws and seek attorneys' fees and costs associated with pursuing federal civil actions.

Additionally, federal transparency laws, including the federal Physician Payments Sunshine Act created under Section 6002 of the ACA and its implementing regulations require that certain manufacturers of drugs, devices, biologics, and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) report annually to CMS information related to "payments or other transfers of value" made or distributed to physicians (defined to include doctors of medicine, dentists, optometrists, podiatrists and chiropractors), generally, with some exceptions, and teaching hospitals, or to entities or individuals at the request of, or designated on behalf of, physicians and teaching hospitals. Applicable manufacturers and applicable group purchasing organizations must also report annually to the CMS certain ownership and investment interests held by physicians (as defined above) and their immediate family members. Beginning in 2022, applicable manufacturers also will be required to report such information regarding its payments and other transfers of value to physician assistants, nurse practitioners, clinical nurse specialists, anesthesiologist assistants, certified registered nurse anesthetists and certified nurse midwives during the previous year.

There are also an increasing number of analogous state laws that require manufacturers to file reports with states on pricing and marketing information, such as tracking and reporting of gifts, compensations, other remuneration and items of value provided to health care professionals and health care entities. Many of these laws contain ambiguities as to what is required to comply with the laws. Several states have also enacted legislation requiring pharmaceutical companies to, among other things, establish and implement commercial compliance programs, file periodic reports with the state, make periodic public disclosures on sales, marketing, pricing, clinical trials and other activities and/or register their sales representatives. Certain state laws also regulate manufacturers' use of identifiable data. These laws may affect our sales, marketing and other promotional activities by imposing administrative and compliance burdens. In addition, given the lack of clarity with respect to these laws and their implementation, our reporting actions could be subject to the penalty provisions of the pertinent state and federal authorities.

If our operations are found to be in violation of any of the health regulatory laws described above or any other laws that apply to us, we may be subject to penalties, including significant administrative, criminal and civil monetary penalties, damages, fines, imprisonment, disgorgement, contractual damages, reputational harm, exclusion from participation in government healthcare programs, integrity obligations, injunctions, recall or seizure of products, total or partial suspension of production, denial or withdrawal of pre-marketing product approvals, private qui tam actions brought by individual whistleblowers in the name of the government or refusal to allow us to enter into supply contracts, including government contracts and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations. We are unable to predict whether we would be subject to actions under these laws or the impact of such actions. However, the cost of defending such claims, as well as any sanctions imposed, could adversely affect our financial performance.

To the extent that any of our products are sold in a foreign country, we also may be subject to similar foreign laws and regulations, which may include, for instance, the U.S. Foreign Corrupt Practices Act, the U.K. Anti-Bribery Act, applicable post-marketing requirements, including safety surveillance, anti-fraud and abuse laws and implementation of corporate compliance programs and reporting of payments or transfers of value to healthcare professionals.

*Third-Party Payor Coverage and Reimbursement*

The commercial success of our approved product portfolio, as well as our pre-clinical and clinical product portfolio, if and when approved, will depend, in part, upon the availability of coverage and adequate reimbursement from third-party payors at the federal, state and private levels. Patients who are prescribed treatments for their conditions and providers performing the prescribed services generally rely on third-party payors to reimburse all or part of the associated healthcare costs. In the United States, third-party payors often rely upon Medicare coverage policy and payment limitations in setting their own coverage and reimbursement policies. However, decisions regarding the extent of coverage and amount of reimbursement to be provided for any product candidates that we develop will be made on a payor-by-payor basis. Sales of our product portfolio will therefore

25

depend substantially, both domestically and abroad, on the extent to which the costs of our product portfolio will be paid by health maintenance, managed care, pharmacy benefit, and/or similar healthcare management organizations, or are reimbursed by government health administration authorities, such as Medicare and Medicaid, private health coverage insurers and other third-party payors. The market for our product portfolio will depend significantly on access to third-party payors' formularies, or lists of treatments for which third-party payors provide coverage and reimbursement.

Also, third-party payors are developing increasingly sophisticated methods of controlling healthcare costs. Further, coverage and reimbursement for therapeutic products can differ significantly from payor to payor. As a result, the coverage determination process will require us to provide scientific and clinical support for the use of our products to each payor separately, with no assurance that adequate coverage and reimbursement will be obtained. The cost of pharmaceuticals and medical devices continues to generate substantial governmental and third-party payor scrutiny. We expect that the pharmaceutical industry will experience continued pricing pressures due to the trend toward managed healthcare, the increasing influence of managed care organizations and additional legislative and administrative proposals. Our results of operations and business could be adversely affected by current and future third-party payor policies as well as healthcare legislative and administrative reforms.

Some third-party payors also require pre-approval of coverage for new or innovative devices or drug therapies before they will reimburse healthcare providers who use such therapies. While we cannot predict whether any proposed cost-containment measures will be adopted or otherwise implemented in the future, these requirements or any announcement or adoption of such proposals could have a material adverse effect on our ability to obtain adequate prices for our product portfolio and to operate profitably.

In international markets, reimbursement and healthcare payment systems vary significantly by country, and many countries have instituted price ceilings on specific products and therapies. There can be no assurance that our products will be considered medically reasonable and necessary for a specific indication, that our products will be considered cost-effective by third-party payors, that an adequate level of reimbursement will be available or that the third-party payors' reimbursement policies will not adversely affect our ability to sell our products profitably.

*Healthcare Reform*

In the United States and foreign jurisdictions, the legislative landscape continues to evolve. There have been a number of legislative and regulatory changes to the healthcare system that will likely affect our future operations. In particular, there have been and continue to be a number of initiatives at the United States federal and state levels that seek to reduce healthcare costs, improve access, and improve quality.

By way of example, in March 2010, the ACA was passed, which significantly changed health care financing by both governmental and private insurers. The provisions of the ACA of importance to the pharmaceutical and biotechnology industry included, among others, the following:

- an annual, nondeductible fee on any entity that manufactures or imports certain branded prescription drugs and biologic agents, apportioned among these entities according to their market share in certain government healthcare programs;
- an increase in the statutory minimum rebates a manufacturer must pay under the Medicaid Drug Rebate Program to 23.1% and 13% of the average manufacturer price for most branded and generic drugs, respectively;
- new methodologies by which rebates owed by manufacturers under the Medicaid Drug Rebate Program are calculated for drugs that are inhaled, infused, instilled, implanted or injected, and for drugs that are line extension products;
- a new Medicare Part D coverage gap discount program, in which manufacturers must now agree to offer 70% point-of-sale discounts to negotiated prices of applicable brand drugs to eligible beneficiaries during their coverage gap period, as a condition for the manufacturer's outpatient drugs to be covered under Medicare Part D;
- extension of manufacturers' Medicaid rebate liability to covered drugs dispensed to individuals who are enrolled in Medicaid managed care organizations, unless the drug is subject to discounts under the 340B drug discount program;
- expansion of eligibility criteria for Medicaid programs by, among other things, allowing states to offer Medicaid coverage to additional individuals and by adding new mandatory eligibility categories for certain individuals with income at or below 133% of the Federal Poverty Level thereby potentially increasing manufacturers' Medicaid rebate liability;
- expansion of the entities eligible for discounts under the Public Health Service pharmaceutical pricing program;
- expansion of healthcare fraud and abuse laws, including the federal civil False Claims Act and the federal Anti-Kickback Statute, new government investigative powers, and enhanced penalties for noncompliance;

26

- a licensure framework for follow-on biologic products;
- a new Patient-Centered Outcomes Research Institute to oversee, identify priorities in, and conduct comparative clinical effectiveness research, along with funding for such research;
- new requirements under the federal Physician Payments Sunshine Act for manufacturers to report information related to payments and other transfers of value made to physicians, as defined by such law, and teaching hospitals as well as ownership or investment interests held by physicians and their immediate family members; and,
- a new requirement to annually report certain drug samples that manufacturers and distributors provide to licensed practitioners, or to pharmacies of hospitals or other healthcare entities.

There have been executive, judicial and Congressional challenges to certain aspects of the ACA. For example, President Trump signed several Executive Orders and other directives designed to delay the implementation of certain provisions of the ACA or otherwise circumvent some of the requirements for health insurance mandated by the ACA. Concurrently, Congress considered legislation to repeal or repeal and replace all or part of the ACA. While Congress has not passed comprehensive repeal legislation, several bills affecting the implementation of certain taxes under the ACA have been signed into law. For example, the Tax Cuts and Jobs Act of 2017, or the Tax Act, included a provision which repealed, effective January 1, 2019, the tax-based shared responsibility payment imposed by the ACA on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate". Additionally, the 2020 federal spending package permanently eliminated, effective January 1, 2020, the ACA-mandated "Cadillac" tax on high-cost employer-sponsored health coverage and medical device tax and, effective January 1, 2021, also eliminated the health insurer tax. The Bipartisan Budget Act of 2018, or the BBA, among other things, amended the ACA, effective January 1, 2019, to close the coverage gap in most Medicare drug plans, commonly referred to as the "donut hole". On December 14, 2018, a Texas U.S. District Court Judge ruled that ACA is unconstitutional in its entirety because the "individual mandate" was repealed by Congress as part of the Tax Act. Additionally, on December 18, 2019, the U.S. Court of Appeals for the 5th Circuit upheld the District Court ruling that the individual mandate was unconstitutional and remanded the case back to the District Court to determine whether the remaining provisions of the ACA are invalid as well. The U.S. Supreme Court is currently reviewing this case, but it is unknown when a decision will be reached. Although the U.S. Supreme Court has yet ruled on the constitutionality of the ACA, on January 28, 2021, President Biden issued an executive order to initiate a special enrollment period from February 15, 2021 through May 15, 2021 for purposes of obtaining health insurance coverage through the ACA marketplace. The executive order also instructs certain governmental agencies to review and reconsider their existing policies and rules that limit access to healthcare, including among others, reexamining Medicaid demonstration projects and waiver programs that include work requirements, and policies that create unnecessary barriers to obtaining access to health insurance coverage through Medicaid or the ACA. It is unclear how the Supreme Court ruling, other such litigation, and the healthcare reform measures of the Biden administration will impact ACA.

Other healthcare legislative changes have been proposed and adopted since the ACA was enacted. For example, in August 2011, the President signed into law the Budget Control Act of 2011, which, among other things, created the Joint Select Committee on Deficit Reduction to recommend proposals in spending reductions to Congress. The Joint Select Committee on Deficit Reduction did not achieve its targeted deficit reduction of at least $1.2 trillion for the years 2013 through 2021, triggering the legislation's automatic reductions to several government programs. These reductions include aggregate reductions to Medicare payments to providers of up to 2% per fiscal year, which went into effect on April 1, 2013 and, following passage of subsequent legislation, including the BBA, will remain in effect through 2030, except for a temporary suspension from May 1, 2020 through March 31, 2021 due to COVID-19, unless additional Congressional action is taken. Additionally, in January 2013, President Obama signed into law the American Taxpayer Relief Act of 2012, which, among other things, further reduced Medicare payments to several providers, including hospitals, imaging centers, and cancer treatment centers, and increased the statute of limitations period for the government to recover overpayments to providers from three to five years. These new laws may result in additional reductions in Medicare and other healthcare funding, which could have a material adverse effect on our customers and accordingly, our financial operations.

We expect that additional state and federal healthcare reform measures will be adopted in the future. For example, there has been increasing legislative and enforcement interest in the United States with respect to specialty drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drugs. For example, the Trump administration used several means to propose or implement drug pricing reform, including through federal budget proposals, executive orders and policy initiatives. For example, on July 24, 2020 and September 13, 2020, the Trump administration announced several executive orders related to prescription drug pricing that attempt to implement several of the administration's proposals. The FDA also released a final rule, effective November 30, 2020, implementing a portion of the

27

importation executive order providing guidance for states to build and submit importation plans for drugs from Canada. Further, on November 20, 2020, HHS finalized a regulation removing safe harbor protection for price reductions from pharmaceutical manufacturers to plan sponsors under Part D, either directly or through pharmacy benefit managers, unless the price reduction is required by law. The implementation of the rule has been delayed by the Biden administration from January 1, 2022 to January 1, 2023 in response to ongoing litigation. The rule also creates a new safe harbor for price reductions reflected at the point-of-sale, as well as a new safe harbor for certain fixed fee arrangements between pharmacy benefit managers and manufacturers, the implementation of which have also been delayed pending review by the Biden administration until March 22, 2021. On November 20, 2020, CMS issued an interim final rule implementing President Trump's Most Favored Nation executive order, which would tie Medicare Part B payments for certain physician-administered drugs to the lowest price paid in other economically advanced countries, effective January 1, 2021. On December 28, 2020, the United States District Court in Northern California issued a nationwide preliminary injunction against implementation of the interim final rule. However, it is unclear whether the Biden administration will work to reverse these measures or pursue similar policy initiatives. At the state level, legislatures have increasingly passed legislation and implemented regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing. Any additional healthcare reform measures could further constrain our business and/or limit the amounts that federal and state governments will pay for healthcare products and services, which could result in reduced demand for our product portfolio or additional pricing pressures. Further, it is possible that additional governmental action is taken in response to the COVID-19 pandemic.

*Other Regulatory Requirements*

We are also subject to various laws and regulations regarding laboratory practices, the experimental use of animals, and the use and disposal of hazardous or potentially hazardous substances in connection with our research. In each of these areas, as above, the FDA and other government agencies have broad regulatory and enforcement powers, including, among other things, the ability to levy fines and civil penalties, suspend or delay issuance of approvals, seize or recall products, and withdraw approvals, any one or more of which could have a material adverse effect on us.

**Human Capital Management**

As of December 31, 2020, we had a total of 106 employees. None of our employees are represented by a labor union or subject to a collective bargaining agreement. We have not experienced any work stoppage and consider our relations with our employees to be good.

Our human capital resources objectives include, as applicable, identifying, recruiting, retaining, incentivizing and integrating our existing and future employees, advisors and consultants. In addition to competitive base salaries, the other competitive benefits that we provide to employees include equity and cash incentive plans, retirement benefits, and paid vacation. The principal purposes of these employee benefits are to attract, retain, reward and motivate our personnel and to provide long-term incentives that align the interests of employees with the interests of our stockholders.

**Corporate Information**

We were incorporated in Delaware in January 2007. Our principal executive offices are located at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677, and our telephone number is (201) 326-5300.

**Available Information**

Our corporate website address is www.eagleus.com. Information contained on or accessible through our website is not a part of this Annual Report on Form 10-K, and the inclusion of our website address in this Annual Report on Form 10-K is an inactive textual reference only. We make our Annual Reports on Form 10-K, Quarterly reports on Form 10-Q, Current Reports on Form 8-K and all amendments to those reports available free of charge on our website as soon as reasonably practicable after we file such reports with, or furnish such reports to, the Securities and Exchange Commission, or SEC. You can access our filings through the SEC's internet site: www.sec.gov.

**Item 1A. Risk Factors**

*Investing in our common stock involves a high degree of risk. Investors should consider carefully the risks and uncertainties described below in addition to the other information included or incorporated by reference in this Annual Report on Form 10-K, as well as our other public filings with the Securities and Exchange Commission. If any of the following risks actually occur, our business, financial condition or results of operations would likely suffer. In that case, the trading price of our common stock could fall. In addition to the risk factors identified under the captions below, the operation and results of our business are subject to risks and uncertainties identified elsewhere in this Annual Report on Form 10-K as well as general risks and uncertainties such as those relating to general economic conditions and demand in the market for our products.*

**Risks Related to Our Financial Condition and Need for Additional Capital**

An investment in our securities involves a high degree of risk. Our business is subject to risks and events that, if they occur, could adversely affect our financial condition and results of operations and the trading price of our securities.

***The COVID-19 pandemic could adversely impact our business, including the marketing, sale and commercialization of our products, our supply chain, our clinical trials, our liquidity and access to capital markets and our business development activities.***

In March 2020, the World Health Organization declared COVID-19 a global pandemic and the United States declared a national emergency with respect to COVID-19. The COVID-19 pandemic has resulted in authorities implementing aggressive actions, and they may from time to time take additional actions, to reduce the spread of the disease, including limiting non-essential gatherings of people, ceasing all non-essential travel, ordering certain businesses and government agencies to cease non-essential operations at physical locations and issuing "shelter-in-place" orders which direct individuals to shelter at their places of residence (subject to limited exceptions). In mid-March 2020, we implemented work-from-home policies which are still in place for the majority of our employees. Our work-from-home policies may negatively impact productivity or disrupt our business, the magnitude of which will continue to depend, in part, on the length of this continued remote working arrangement and other limitations on our ability to conduct our business in the ordinary course. We expect to work from home in the near future and will closely follow the guidance from federal and state authorities, including the Centers for Disease Control and Prevention and the New Jersey Department of Health, in deciding when to transition back to working in our offices. The effects of government actions and our policies and those of third parties to reduce the spread and ameliorate the impact of COVID-19 may negatively impact productivity and our ability to market and sell our products, cause disruptions to our supply chain and ongoing and future clinical trials and impair our ability to execute our business development strategy. These and other disruptions in our operations and the global economy could negatively impact our business, operating results and financial condition.

The marketing, sale and commercialization of our products have been adversely impacted and may continue to be adversely impacted by COVID-19 and actions taken to slow its spread and ameliorate its impact. We saw a variable impact on our product revenues in 2020 due to the COVID-19 pandemic and also experienced variable impacts on our business and financial condition as a result of the pandemic. We are expecting the impact on our near-term financial results to continue for the duration of the pandemic. Other parts of our business have been, and continue to be, impacted by the outbreak. For example, patients have postponed and we expect will continue to postpone visits to healthcare provider facilities, certain healthcare providers have temporarily closed their offices or are restricting patient visits, healthcare provider employees may become generally unavailable and there could be disruptions in the operations of payors, distributors, logistics providers and other third parties that are necessary for our products to be prescribed, reimbursed and administered to patients. For example, we have continued to observe a reduction in the number of Bendeka patients visiting infusion centers, hospitals and clinics for intravenous administration of Bendeka due to interruptions in healthcare services, and the patients' inability to visit administration sites and desire to avoid contact with infected individuals. In addition, our sales and marketing teams have been working remotely and our virtual initiatives with respect to marketing and supporting the sale and administration of our products have not been as effective as our in-person sales and marketing activities. We cannot predict when we will be able to resume in-person sales and marketing activities.

Quarantines, shelter-in-place, safer-at-home and similar government orders, or the perception that such orders, shutdowns or other restrictions on the conduct of business operations could be re-implemented or could continue to occur, related to COVID-19 or other infectious diseases could impact personnel at third-party manufacturing facilities upon which we rely, or the availability or cost of materials, which could disrupt the supply chain for our products. In particular, some of our suppliers of certain materials used in the production of our drug products are located in regions that continue to be subject to COVID-19-related actions and policies that limit the conduct of normal business operations. To the extent our suppliers and service

29

providers are unable to comply with their obligations under our agreements with them or they are otherwise unable to deliver or are delayed in delivering goods and services to us due to the COVID-19 pandemic, our ability to continue meeting commercial demand for our products in the United States or advancing development of our product candidates may become impaired. At this time, we consider our inventories on hand to be sufficient to meet our commercial requirements.

In addition, our clinical trials have been affected by COVID-19. Clinical site initiation and patient enrollment has been delayed due to prioritization of hospital resources toward COVID-19. Current or potential patients in our ongoing or planned clinical trials have chosen to not enroll, not participate in follow-up clinical visits or drop out of the trial as a precaution against contracting COVID-19. Further, some patients may not be able to comply with clinical trial protocols if quarantines continue to impede patient movement or interrupt healthcare services. Some clinical sites in the United States have slowed or stopped further enrollment of new patients in clinical trials, denied access to site monitors or otherwise curtailed certain operations. For example, the clinical trial timelines for certain of our product candidates, including EA-114 (our fulvestrant product candidate), have been delayed given difficulties with patient enrollment resulting from the COVID-19 pandemic, and we expect that clinical trial timelines will continue to be delayed for the duration of the pandemic.. Similarly, our ability to recruit and retain principal investigators and site staff who, as healthcare providers, may have heightened exposure to COVID-19, has been and may continue to be adversely impacted. These events could delay our clinical trials, increase the cost of completing our clinical trials and negatively impact the integrity, reliability or robustness of the data from our clinical trials.

The spread of COVID-19 and actions taken to reduce its spread and ameliorate its impact may also materially affect us economically. As a result of the COVID-19 pandemic and actions taken to slow its spread and ameliorate its impact, the global credit and financial markets have experienced extreme volatility and disruptions, including diminished liquidity and credit availability, declines in consumer confidence, declines in economic growth, increases in unemployment rates and uncertainty about economic stability. If the equity and credit markets deteriorate, it may make any additional debt or equity financing more difficult, more costly or more dilutive. While the potential economic impact brought by, and the duration of, the COVID-19 pandemic may be difficult to assess or predict, there could continue to be a significant disruption of global financial markets, reducing our ability to access capital, which could negatively affect our liquidity and financial position or our business development activities.

The COVID-19 pandemic continues to rapidly evolve. The extent to which COVID-19 continues to impact the marketing, sale and commercialization of our products, our supply chain, our clinical trials, our access to capital and our business development activities, depends on future developments, which are highly uncertain and cannot be predicted with confidence, such as the ultimate geographic spread of the pandemic, the duration of the pandemic and the efforts by governments and business to contain it, business closures or business disruptions, any re-opening plans, additional closures and spikes or surges in COVID-19 infection, and the impact on the economy and capital markets.

***Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.***

Under legislation enacted in 2017, informally titled the Tax Cuts and Jobs Act ("Tax Act") as modified by the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), federal net operating losses incurred in tax years beginning after December 31, 2017, may be carried forward indefinitely, but the deductibility of such federal net operating losses in tax years beginning after December 31, 2020, is limited to 80% of taxable income. It is uncertain if and to what extent various states will conform to the Tax Act, or the CARES Act. In addition, under Sections 382 and 383 of the Internal Revenue Code of 1986, as amended, or the Code, if a corporation undergoes an "ownership change," generally defined as a greater than 50% change (by value) in its equity ownership over a three year period, the corporation's ability to use its pre-change net operating loss carryforwards and other pre-change tax attributes, such as research tax credits, to offset its post-change income or taxes may be limited. In addition, we may experience ownership changes in the future as a result of subsequent shifts in our stock ownership. As a result, if we earn net taxable income, our ability to use our pre-change net operating loss carryforwards to offset U.S. federal taxable income may be subject to limitations, which could potentially result in increased future tax liability to us. In addition, at the state level, there may be periods during which the use of net operating loss carryforwards is suspended or otherwise limited, which could accelerate or permanently increase state taxes owed.

***If we cannot sustain profitability, our business, prospects, operating results and financial condition would be materially harmed.***

We have focused primarily on developing a broad product portfolio and currently have final regulatory approval for a limited number of products. Some of our product candidates will require substantial additional development time and resources before we would be able to receive regulatory approvals, implement commercialization strategies and begin generating revenue from product sales. Although we had net income of $12.0 million for the year ended December 31, 2020, $14.3 million for the year

30

ended December 31, 2019 and $31.9 million for the year ended December 31, 2018, we incurred significant net losses prior to 2015.

We have devoted most of our financial resources to product development and may not generate significant revenue from sales of our product candidates in the near-term, if ever. As of December 31, 2020, we commercialize the following main products, Ryanodex, Belrapzo and Bendeka.

Because of the numerous risks and uncertainties associated with pharmaceutical product development, we are unable to fully predict the timing or amount of our expenses, but we expect to continue to incur substantial expenses, which we expect to increase as we expand our development activities and product portfolio. As a result of the foregoing, we may incur losses and negative cash flows in the future. We believe that our existing cash and cash equivalents, together with interest thereon and expected operating cash flows, are sufficient to fund our future operations and debt costs for a minimum of twelve months.

### If we fail to obtain additional financing, we could be forced to delay, reduce or eliminate our product development programs.

Developing pharmaceutical products, including conducting preclinical studies and clinical trials, is expensive. We expect our development expenses to substantially increase in connection with our ongoing activities, particularly as we advance our clinical programs, both internally and through our external joint development agreements, such as with AMRI. Changing circumstances beyond our control may cause us to consume capital more rapidly than we currently anticipate. For example, our product commercialization or development efforts could encounter technical or other difficulties that could increase our development costs more than we expect. In any event, we may require additional capital prior to obtaining regulatory approval for, or commercializing, any additional product candidates.

In addition, attempting to secure additional financing may divert our management from our day-to-day activities, which may adversely affect our ability to develop and commercialize additional product candidates. We cannot guarantee that future financing will be available in sufficient amounts or on terms acceptable to us, if at all. If we are unable to raise additional capital when required or on acceptable terms, we may be required to:

- significantly delay, scale back or discontinue the development or commercialization of our product candidates;

- seek corporate partners for our products and product candidates at an earlier stage than otherwise would be desirable or on terms that are less favorable than might otherwise be available;

- relinquish or license on unfavorable terms, our rights to technologies or products, or to product candidates that we otherwise would seek to develop or commercialize ourselves; or

- significantly curtail, or cease, operations.

The occurrence of any of these factors could have a material adverse effect on our business, operating results and prospects.

### We may sell additional equity or incur debt to fund our operations, which may result in dilution to our stockholders and impose restrictions on our business.

In order to raise additional funds to support our operations, we may sell additional equity or incur debt, which could adversely impact our stockholders, as well as our business. The sale of additional equity or convertible debt securities would result in the issuance of additional shares of our capital stock and dilution to all of our stockholders. The incurrence of indebtedness results in increased fixed payment obligations. In addition, the incurrence of indebtedness also results in certain restrictive covenants, such as limitations on our ability to incur additional debt, limitations on our ability to acquire, sell or license intellectual property rights and other operating restrictions that could adversely impact our ability to conduct our business. On November 8, 2019, we entered into the Second Amended and Restated Credit Agreement, or the Revised Credit Agreement, with JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, which replaced our prior credit agreement. The terms and amounts borrowed under the Revised Credit Agreement includes a drawn term loan of $40 million and an undrawn revolving credit facility of $110 million. The schedule of principal payments for the new term loan facility has been extended until November 8, 2022.

We may not have enough available cash or be able to raise additional funds on satisfactory terms, if at all, through equity or debt financings to repay our indebtedness at the time any such repayment is required (causing a default under such indebtedness), which could have a material adverse effect on our business, financial condition and results of operations.

### Changes in tax laws or regulations that are applied adversely to us or our customers may have a material adverse effect on

31

*our business, cash flow, financial condition or results of operations our business, cash flow, financial condition or results of operations our business, cash flow, financial condition or results of operations.*

New income, sales and use or other tax laws or regulations could be enacted at any time, which could adversely affect our business operations and financial performance. Further, existing tax laws and regulations could be interpreted, modified or applied adversely to us. For example, the Tax Act enacted many significant changes to the U.S. tax laws. Future guidance from the Internal Revenue Service and other tax authorities with respect to the Tax Act may affect us, and certain aspects of the Tax Act could be repealed or modified in future legislation. For example, the CARES Act modified certain provisions of the Tax Act. In addition, it is uncertain if and to what extent various states will conform to the Tax Act, the CARES Act, or any newly enacted federal tax legislation. Changes in corporate tax rates, the realization of net operating losses, and other deferred tax assets relating to our operations, the taxation of foreign earnings, and the deductibility of expenses under the Tax Act or future reform legislation could have a material impact on the value of our deferred tax assets and could increase our future U.S. tax expense.

## Risks Related to Regulatory Approval

*We cannot give any assurance that we will receive regulatory approval for our product candidates, which is necessary before they can be commercialized.*

Our business and future success are substantially dependent on our ability to successfully and timely develop, obtain regulatory approval for, and commercialize our product candidates. Any delay or setback in the development of any of these product candidates could adversely affect our business. For example, on August 7, 2020, we received a CRL for our NDA for Ryanodex for the treatment of EHS. We decided that we will no longer pursue this indication in order to direct our resources to other product candidates. In addition, on February 2, 2021, we announced that the FDA had issued a CRL for our ANDA for vasopressin. Although we believe that this submission addresses the Complete Response Letter received in July 2017. Although we believe that we can fully respond to the questions raised, we may receive another CRL, rather than approval, for this ANDA. Our planned development, approval and commercialization of any product candidates may fail to be completed in a timely manner or at all. The FDA or other foreign regulatory agency may refuse or delay approval of our product candidates for failure to collect sufficient clinical or animal safety data and require us or our collaborators to conduct additional clinical or animal safety studies, which may cause lengthy delays and increased costs to our programs. We cannot provide assurance that we will be able to obtain approval for any of our product candidates from the FDA or any foreign regulatory authority or that we will obtain such approval in a timely manner. If we do not obtain regulatory approval of new products or additional indications for existing products, or are significantly delayed or limited in doing so, our revenue growth will be adversely affected, we may experience surplus inventory, or our business may be materially harmed and we may need to significantly curtail operations.

*If we are unable to differentiate our products or product candidates from branded reference drugs or existing generic therapies for similar treatments, or if the FDA or other applicable regulatory authorities approve generic products that compete with any of our products or product candidates, the ability to successfully commercialize our product candidates would be adversely affected.*

Our strategy is to enter the market no later than the first generic to the applicable branded reference drug. We expect to compete against branded reference drugs and to compete with their generic counterparts that will be sold for a lower price. Although we believe that our products and product candidates will be clinically differentiated from branded reference drugs and their generic counterparts, if any, it is possible that such differentiation will not impact our market position. If we are unable to achieve significant differentiation for our products or product candidates against other drugs, the opportunity for our products and product candidates to achieve premium pricing and be commercialized successfully would be adversely affected.

In addition to existing branded reference drugs and the related generic products, the FDA or other applicable regulatory authorities may approve generic products that compete directly with our products or product candidates, if approved. Once an NDA, including a 505(b)(2) application, is approved, the product covered thereby becomes a "listed drug" which can, in turn, be cited by potential competitors in support of approval of an ANDA. The Federal Food, Drug and Cosmetic Act ("FDCA"), FDA regulations and other applicable regulations and policies provide incentives to manufacturers to create modified, non-infringing versions of a drug to facilitate the approval of an ANDA for generic substitutes. These manufacturers might only be required to conduct a relatively inexpensive study to show that their product has the same active ingredient(s), dosage form, strength, route of administration and conditions of use or labeling as our products or product candidates and that the generic product is bioequivalent to ours, meaning it is absorbed in the body at the same rate and to the same extent as our products or product candidates. These generic equivalents, which must meet the same quality standards as branded pharmaceuticals, would be significantly less costly than ours to bring to market and companies that produce generic equivalents are generally able to offer their products at lower prices. Thus, after the introduction of a generic competitor, a significant percentage of the sales of

32

any branded product is typically lost to the generic product. Accordingly, competition from generic equivalents of our products or product candidates would materially adversely impact our ability to successfully commercialize our product candidates or negatively impact our ability to gain market acceptance and market share for our products.

***If the FDA does not conclude that our product candidates satisfy the requirements for the regulatory approval, or if the requirements for approval of any of our product candidates are not as we expect, the approval pathway for our product candidates will likely take significantly longer, cost significantly more and encounter significantly greater complications and risks than anticipated, and in any case may not be successful.***

We intend to seek FDA approval through the 505(b)(2) regulatory pathway for those small molecule product candidates described in this Annual Report on Form 10-K.

The Drug Price Competition and Patent Term Restoration Act of 1984, also known as the Hatch-Waxman Act, added Section 505(b)(2) to the FDCA. Section 505(b)(2) permits the filing of an NDA where at least some of the information required for approval comes from studies that were not conducted by or for the applicant.

If the FDA does not allow us to pursue the regulatory pathway for our product candidates as anticipated, we may need to conduct additional clinical trials, provide additional data and information and meet additional standards for regulatory approval. If this were to occur, the time and financial resources required to obtain FDA approval for our product candidates would likely substantially increase. Moreover, the inability to pursue such regulatory pathway could result in new competitive products reaching the market faster than our product candidates, which could materially adversely impact our competitive position and prospects. Even if we are allowed to pursue our chosen regulatory pathway for a product candidate, we cannot assure you that we will receive the requisite or timely approvals for commercialization of such product candidate.

In addition, we expect that our competitors will file citizens' petitions with the FDA in an attempt to persuade the FDA that our product candidates, or the clinical studies that support their approval, contain deficiencies. Such actions by our competitors could delay or even prevent the FDA from approving any NDA that we submit.

***Clinical development is a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results. Failure can occur at any stage of clinical development.***

Clinical testing, even when utilizing the 505(b)(2) pathway or its equivalent, is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure can occur at any time during the clinical trial process, even with active ingredients that have previously been approved by the FDA as safe and effective. The results of preclinical studies and early clinical trials of our product candidates may not be predictive of the results of later stage clinical trials. A number of companies in the biopharmaceutical industry have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier trials.

Our product candidates are in various stages of development, from early stage to late stage. Clinical trial failures may occur at any stage and may result from a multitude of factors both within and outside our control, including flaws in formulation, adverse safety or efficacy profile and flaws in trial design, among others. If the trials result in negative or inconclusive results, we or our collaborators may decide, or regulators may require us, to discontinue trials of the product candidates or conduct additional clinical trials or preclinical studies. In addition, data obtained from trials and studies are susceptible to varying interpretations, and regulators may not interpret our data as favorably as we do, which may delay, limit or prevent regulatory approval. For these reasons, our future clinical trials may not be successful.

We do not know whether any future clinical trials we may conduct will demonstrate consistent or adequate efficacy and safety to obtain regulatory approval to market our product candidates. If any product candidate for which we are conducting clinical trials is found to be unsafe or lack efficacy, we will not be able to obtain regulatory approval for it. If we are unable to bring any of our current or future product candidates to market, our business would be materially harmed and our ability to create long-term stockholder value will be limited.

***Delays in clinical trials are common and have many causes, and any delay could result in increased costs to us and could jeopardize or delay our ability to obtain regulatory approval and commence product sales. We may also find it difficult to enroll patients in our clinical trials, which could delay or prevent development of our product candidates.***

We may experience delays in clinical trials of our product candidates. Our planned clinical trials may not begin on time, have an effective design, enroll a sufficient number of patients or be completed on schedule, if at all. Our clinical trials can be delayed for a variety of reasons, including:

- inability to raise or delays in raising funding necessary to initiate or continue a trial;

- delays in obtaining regulatory approval to commence a trial;

33

- delays in reaching agreement with the FDA on final trial design;

- imposition of a clinical hold for safety reasons or following an inspection of our clinical trial operations or trial sites by the FDA or other regulatory authorities;

- delays in reaching agreement on acceptable terms with prospective contract research organizations, or CROs, and clinical trial sites, or failure by such CROs to carry out the clinical trial at each site in accordance with the terms of our agreements with them;

- delays in obtaining required institutional review board, or IRB, approval at each site;

- difficulties or delays in having patients complete participation in a trial or return for post-treatment follow-up;

- clinical sites electing to terminate their participation in one of our clinical trials, which would likely have a detrimental effect on subject enrollment;

- delays related to the COVID-19 pandemic, which may result in clinical site closures, delays to patient enrollment, patients discontinuing their treatment or follow up visits or changes to trial protocols;

- time required to add new clinical sites; or

- delays by our contract manufacturers to produce and deliver sufficient supply of clinical trial materials.

If initiation or completion of our planned clinical trials is delayed for any of the above reasons or other reasons, our development costs may increase, our regulatory approval process could be delayed and our ability to commercialize and commence sales of our product candidates could be materially harmed, which could have a material adverse effect on our business.

In addition, identifying and qualifying patients to participate in clinical trials of our product candidates is critical to our success. The timing of our clinical trials depends on the speed at which we can recruit patients to participate in testing our product candidates as well as completion of required follow-up periods. We may not be able to identify, recruit and enroll a sufficient number of patients, or those with required or desired characteristics or to complete our clinical trials in a timely manner. Patient enrollment and completion of the trials is affected by factors including:

- severity of the disease under investigation;

- design of the trial protocol;

- size of the patient population;

- eligibility criteria for the trial in question;

- perceived risks and benefits of the product candidate under trial;

- proximity and availability of clinical trial sites for prospective patients;

- availability of competing therapies and clinical trials;

- efforts to facilitate timely enrollment in clinical trials;

- patient referral practices of physicians; and

- ability to monitor patients adequately during and after treatment.

***Our products or product candidates may cause adverse effects or have other properties that could delay or prevent their regulatory approval or limit the scope of any approved label or market acceptance, or result in significant negative consequences following marketing approval, if any.***

As with many pharmaceutical and biological products, treatment with our products or product candidates may produce undesirable side effects or adverse reactions or events. Although our products or product candidates containing active ingredients that have already been approved and the side effects arising from the use of the active ingredient or class of drug in our products or product candidates are generally known, our products or product candidates may still cause undesirable side effects. These could be attributed to the active ingredient or class of drug or to our unique formulation of such products or product candidates, or other potentially harmful characteristics. Such characteristics could cause us, our IRBs, clinical trial sites, the FDA or other regulatory authorities to interrupt, delay or halt clinical trials and could result in a more restrictive label or the delay, denial or withdrawal of regulatory approval, which may harm our business, financial condition and prospects significantly.

34

Further, if any of our products cause serious or unexpected side effects after receiving market approval, a number of potentially significant negative consequences could result, including:

- regulatory authorities may withdraw their approval of the product or impose restrictions on its distribution;

- the FDA may require implementation of a Risk Evaluation and Mitigation Strategy, or REMS;

- regulatory authorities may require the addition of labeling statements, such as warnings or contraindications;

- we may be required to change the way the product is administered or conduct additional clinical studies;

- we could be sued and held liable for harm caused to patients; or

- our reputation may suffer.

Any of these events could prevent us from achieving or maintaining market acceptance of the affected product or product candidate and could substantially increase the costs of commercializing our products and product candidates.

***The regulatory approval processes of the FDA and comparable foreign authorities are lengthy, time-consuming and inherently unpredictable, and if we are ultimately unable to obtain regulatory approval for our product candidates, our business will be substantially harmed.***

The time required to obtain approval by the FDA and comparable foreign authorities is unpredictable but typically takes many years following the commencement of clinical trials and depends upon numerous factors, including the substantial discretion of the regulatory authorities. In addition, approval policies, regulations or the type and amount of clinical data necessary to gain approval may change during the course of a product candidate's clinical development and may vary among jurisdictions. To date, we have obtained regulatory approval for five NDA products, but no BLA products, and we have multiple NDA product candidates in advanced stages of development and other exploratory candidates under development. However, it is possible that none of our existing product candidates or any product candidates we may seek to develop in the future will ever obtain regulatory approval in the United States or other jurisdictions.

Our product candidates could fail to receive regulatory approval for many reasons, including the following:

- the FDA or comparable foreign regulatory authorities may disagree that our changes to branded reference drugs or existing biologic drugs meet the criteria for our chosen regulatory pathway or foreign regulatory pathways;

- we may be unable to demonstrate to the satisfaction of the FDA or comparable foreign regulatory authorities that a product candidate is safe and effective or comparable to its branded reference product for its proposed indication;

- the results of any clinical trials we conduct may not meet the level of statistical significance required by the FDA or comparable foreign regulatory authorities for approval;

- we may be unable to demonstrate that a product candidate's clinical and other benefits outweigh its safety risks;

- the FDA or comparable foreign regulatory authorities may fail to approve the manufacturing processes or facilities of third party manufacturers with which we contract for clinical and commercial supplies; and

- the approval policies or regulations of the FDA or comparable foreign regulatory authorities may change significantly in a manner rendering our clinical data insufficient for approval.

This lengthy approval process as well as the unpredictability of future clinical trial results may result in our failing to obtain regulatory approval to market our product candidates, which would harm our business, results of operations and prospects significantly.

In addition, even if we were to obtain approval, regulatory authorities may approve any of our product candidates for fewer or more limited indications than we request, may grant approval contingent on the performance of costly post-marketing clinical trials or may approve a product candidate with a label that does not include the labeling claims necessary or desirable for the successful commercialization of that product candidate. Any of the foregoing scenarios could harm the commercial prospects for our product candidates.

We have limited experience using the 505(b)(2) regulatory pathway to submit an NDA or any similar drug approval filing to the FDA, and we cannot be certain that any of our product candidates will receive regulatory approval. There can be no assurance that the FDA will ultimately approve any submitted NDA by us in a timely fashion. For example, in March of 2016 we received a CRL from the FDA with respect to our NDA for EP-6101, and we elected not to pursue the application further or seek to exploit EP-6101 for various reasons. On August 7, 2020, we received a CRL for our NDA for Ryanodex for the treatment of EHS, and we decided that we will no longer pursue this indication in order to direct our resources to other product candidates. In addition, on February 2, 2021, we announced that the FDA had issued a CRL for our ANDA for vasopressin.

35

Although we believe that we can fully respond to the questions raised in the CRL, we may receive another CRL, rather than approval, for this ANDA.

The failure to receive regulatory approvals for our product candidates could have a material adverse effect on our business, financial condition and operations. Even if we successfully obtain regulatory approvals to market one or more of our product candidates, our revenue will be dependent, to a significant extent, upon the size of the markets in the territories for which we gain regulatory approval. If the markets for patients or indications that we are targeting are not as significant as we estimate, we may not generate significant revenue from sales of such products, if approved.

***An NDA submitted under Section 505(b)(2) subjects us to the risk that we may be subject to a patent infringement lawsuit that would delay or prevent the review or approval of our product candidates.***

Some of our product candidates will be submitted to the FDA for approval under Section 505(b)(2) of the FDCA. Section 505(b)(2) permits the submission of an NDA where at least some of the information required for approval comes from studies that were not conducted by, or for, the applicant and on which the applicant has not obtained a right of reference. The 505(b)(2) application would enable us to reference published literature and/or the FDA's previous findings of safety and effectiveness for the branded reference drug. For NDAs submitted under Section 505(b)(2) of the FDCA, the patent certification and related provisions of the Hatch-Waxman Act apply. In accordance with the Hatch-Waxman Act, such NDAs may be required to include certifications, known as paragraph IV certifications, that certify that any patents listed in the Patent and Exclusivity Information Addendum of the FDA's publication, Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the Orange Book, with respect to any product referenced in the 505(b)(2) application, are invalid, unenforceable or will not be infringed by the manufacture, use or sale of the product that is the subject of the 505(b)(2) NDA.

Under the Hatch-Waxman Act, the holder of patents that the 505(b)(2) application references may file a patent infringement lawsuit after receiving notice of the paragraph IV certification. Filing of a patent infringement lawsuit against the filer of the 505(b)(2) applicant within 45 days of the patent owner's receipt of notice triggers a one-time, automatic, 30-month stay of the FDA's ability to approve the 505(b)(2) NDA, unless patent litigation is resolved in the favor of the paragraph IV filer or the patent expires before that time. Accordingly, we may invest a significant amount of time and expense in the development of one or more product candidates only to be subject to significant delay and patent litigation before such product candidates may be commercialized, if at all. For example, we have been, and may in the future be, subject to litigation brought in connection with our filing of a 505(b)(2) NDA. In addition, a 505(b)(2) application will not be approved until any non-patent exclusivity, such as exclusivity for obtaining approval of a new chemical entity, or NCE, listed in the Orange Book for the referenced product has expired. The FDA may also require us to perform one or more additional clinical studies or measurements to support the change from the branded reference drug, which could be time-consuming and could substantially delay our achievement of regulatory approvals for such product candidates. The FDA may also reject our future 505(b)(2) submissions and require us to file such submissions under Section 505(b)(1) of the FDCA, which would require us to provide extensive data to establish safety and effectiveness of the drug for the proposed use and could cause delay and be considerably more expensive and time-consuming. These factors, among others, may limit our ability to successfully commercialize our product candidates.

Companies that produce branded reference drugs routinely bring litigation against abbreviated new drug application, or ANDA, or 505(b)(2) applicants that seek regulatory approval to manufacture and market generic and reformulated forms of their branded products. These companies often allege patent infringement or other violations of intellectual property rights as the basis for filing suit against an ANDA or 505(b)(2) applicant. For example, we are currently involved in an ongoing patent case with Par related to our ANDA for vasopressin, which is scheduled for trial on July 7, 2021. Likewise, patent holders may bring patent infringement suits against companies that are currently marketing and selling their approved generic or reformulated products.

Litigation to enforce or defend intellectual property rights is often complex and often involves significant expense and can delay or prevent introduction or sale of our product candidates. If patents are held to be valid and infringed by our product candidates in a particular jurisdiction, we would, unless we could obtain a license from the patent holder, be required to cease selling in that jurisdiction and may need to relinquish or destroy existing stock in that jurisdiction. There may also be situations where we use our business judgment and decide to market and sell our approved products, notwithstanding the fact that allegations of patent infringement(s) have not been finally resolved by the courts, which is known as an "at-risk launch." The risk involved in doing so can be substantial because the remedies available to the owner of a patent for infringement may include, among other things, damages measured by the profits lost by the patent owner and not necessarily by the profits earned by the infringer. In the case of a willful infringement, the definition of which is subjective, such damages may be increased up to three times. Moreover, because of the discount pricing typically involved with bioequivalent and, to a lesser extent, 505(b)(2), products, patented branded products generally realize a substantially higher profit margin than bioequivalent and, to a lesser extent, 505(b)(2), products, resulting in disproportionate damages compared to any profits earned by the infringer. An

36

adverse decision in patent litigation could have a material adverse effect on our business, financial position and results of operations and could cause the market value of our common stock to decline.

***The FDA and other regulatory agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses.***

If we are found to have improperly promoted off-label uses of our products or product candidates, if approved, we may become subject to significant liability. Such enforcement has become more common in the industry. The FDA and other regulatory agencies strictly regulate the promotional claims that may be made about prescription products, such as our product candidates, if approved. In particular, a product may not be promoted for uses that are not approved by the FDA or such other regulatory agencies as reflected in the product's approved labeling. However, we may share truthful and not misleading information that is otherwise consistent with our products' FDA approved labeling. If we receive marketing approval for our product candidates for our proposed indications, physicians may nevertheless use our products for their patients in a manner that is inconsistent with the approved label, if the physicians personally believe in their professional medical judgment it could be used in such manner. However, if we are found to have promoted our products for any off-label uses, the federal government could levy civil, criminal and administrative penalties, and seek fines against us. The FDA or other regulatory authorities could also request that we enter into a consent decree or a corporate integrity agreement, or seek a permanent injunction against us under which specified promotional conduct is monitored, changed or curtailed. If we cannot successfully manage the promotion of our product candidates, if approved, we could become subject to significant liability, which would materially adversely affect our business and financial condition.

***Our business is subject to extensive regulatory requirements and our approved product and product candidates that obtain regulatory approval will be subject to ongoing and continued regulatory review, which may result in significant expense and limit our ability to commercialize such products.***

Even after a product is approved, we remain subject to ongoing FDA and other regulatory requirements governing the labeling, packaging, storage, distribution, safety surveillance, advertising, promotion, import, export, record-keeping and reporting of safety and other post-market information. The holder of an approved NDA is obligated to monitor and report adverse events, or AEs, and any failure of a product to meet the specifications in the application. The holder of an approved NDA must also submit new or supplemental applications and obtain FDA approval for certain changes to the approved product, product labeling or manufacturing process. Advertising and promotional materials must comply with FDA rules and are subject to FDA review, in addition to other potentially applicable federal and state laws. In addition, the FDA may impose significant restrictions on the approved indicated uses for which the product may be marketed or on the conditions of approval. For example, a product's approval may contain requirements for potentially costly post-approval studies and surveillance to monitor the safety and efficacy of the product, or the imposition of a REMS program.

Manufacturers of drug products and their facilities are subject to payment of user fees and continual review and periodic inspections by the FDA and other regulatory authorities for compliance with current good manufacturing practices, or cGMP, and adherence to commitments made in the drug application. If we or a regulatory agency discovers previously unknown problems with a product, such as AEs of unanticipated severity or frequency, or problems with the facility where the product is manufactured, a regulatory agency may impose restrictions relative to that product or the manufacturing facility, including requiring product recall, notice to physicians, withdrawal of the product from the market or suspension of manufacturing.

If we or our products or product candidates or our manufacturing facilities fail to comply with applicable regulatory requirements, a regulatory agency may:

- issue warning letters or untitled letters asserting that we are in violation of the law;

- impose restrictions on the marketing or manufacturing of the product;

- seek an injunction or impose civil, criminal and/or administrative penalties, damages, assess monetary fines, require disgorgement, consider exclusion from participation in Medicare, Medicaid and other federal health care programs and require curtailment or restructuring of our operations;

- suspend or withdraw regulatory approval;

- suspend any ongoing clinical trials;

- refuse to approve a pending application or supplements to an application submitted by us;

- seize product; or

- refuse to allow us to enter into government contracts.

37

Similar post-market requirements may apply in foreign jurisdictions in which we may seek approval of our products. Any government investigation of alleged violations of law could require us to expend significant time and resources in response and could generate negative publicity. The occurrence of any event or penalty described above may inhibit our ability to commercialize our products and generate revenues.

In addition, the FDA's regulations, policies or guidance may change and new or additional statutes or government regulations in the United States and other jurisdictions may be enacted that could prevent or delay regulatory approval of our product candidates or further restrict or regulate post-approval activities. For example, the Food and Drug Administration Safety and Innovation Act, or FDASIA, requires the FDA to issue new guidance on permissible forms of Internet and social media promotion of regulated medical products, and the FDA may soon specify new restrictions on this type of promotion. We cannot predict the likelihood, nature or extent of adverse government regulation that may arise from pending or future legislation or administrative action, either in the United States or abroad. If we are not able to achieve and maintain regulatory compliance, we may not be permitted to market our products and/or product candidates, which would adversely affect our ability to generate revenue and achieve or maintain profitability.

***Our employees, independent contractors, principal investigators, consultants, commercial partners and vendors may engage in misconduct or other improper activities, including non-compliance with regulatory standards and requirements and insider trading.***

We are exposed to the risk that our employees, independent contractors, principal investigators, consultants, commercial partners and vendors may engage in fraudulent conduct or other illegal activity. Misconduct by these parties could include intentional, reckless and/or negligent conduct that violates (1) the laws of the FDA and similar foreign regulatory bodies, including those laws requiring the reporting of true, complete and accurate information to such regulatory bodies; (2) health care laws and regulations, including fraud and abuse laws of the United States and similar foreign fraudulent misconduct laws; and (3) laws requiring the reporting of financial information or data accurately. Specifically, the promotion, sales and marketing of health care items and services, as well as certain business arrangements in the health care industry are subject to extensive laws designed to prevent misconduct, including fraud, kickbacks, self-dealing and other abusive practices. These laws may restrict or prohibit a wide range of pricing, discounting, marketing, structuring and commission(s), certain customer incentive programs and other business arrangements generally. Activities subject to these laws also involve the improper use of information obtained in the course of patient recruitment for clinical trials. It is not always possible to identify and deter employee and other third-party misconduct. The precautions we take to detect and prevent inappropriate conduct may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to comply with these laws. If any such actions are instituted against us, and we are not successful in defending ourselves, those actions could have a significant impact on our business, including the imposition of civil, criminal and administrative penalties, damages, monetary fines, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings, and curtailment of our operations, any of which could adversely affect our ability to operate our business and our results of operations.

***Any relationships with health care professionals, principal investigators, consultants, customers (actual and potential) and third party payors, in addition to our general business operations, are and will continue to be subject, directly or indirectly, to federal and state health care fraud and abuse laws, marketing expenditure tracking and disclosure, or sunshine laws, government price reporting and health information privacy and security laws. If we are unable to comply, or have not fully complied, with such laws, we could face penalties, including, without limitation, civil, criminal and administrative penalties, damages, monetary fines, disgorgement, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings and curtailment or restructuring of our operations.***

Our business operations and activities may be directly, or indirectly, subject to various federal, state and local fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute and the federal civil False Claims Act. These laws may impact, among other things, our current activities with principal investigators and research subjects, as well as current, proposed and future sales, marketing and education programs. In addition, we may be subject to patient data privacy and security regulation by the federal government, state governments and foreign jurisdictions in which we conduct our business, as well as transparency requirements. The U.S. healthcare laws and regulations that may affect our ability to operate include, but are not limited to:

- the federal Anti-Kickback Statute, which prohibits, among other things, knowingly and willfully soliciting, receiving, offering or paying any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind, to induce, or in return for, either the referral of an individual, or the purchase, lease, order or recommendation of any good, facility, item or service for which payment may be made, in whole or in part, under a

federal health care program, such as the Medicare and Medicaid programs. The Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, or collectively, ACA, among other things, amends the intent requirement of the federal Anti-Kickback Statute and criminal healthcare fraud statutes such that a person or entity no longer needs to have actual knowledge of this statute or specific intent to violate it. In addition, the ACA provides that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act;

- federal civil and criminal false claims laws, including the federal civil False Claims Act, and civil monetary penalty laws, which prohibit and impose penalties for, among other things, individuals or entities knowingly presenting, or causing to be presented, claims for payment or approval from the federal government including Medicare, Medicaid or certain other governmental health care programs that are false or fraudulent or knowingly making or causing to be made a false statement to improperly avoid, decrease or conceal an obligation to pay money to the federal government;

- the federal Health Insurance Portability and Accountability Act of 1996, or HIPAA, which created additional federal civil and criminal statutes that prohibit knowingly and willfully executing, or attempting to execute, a scheme to defraud any health care benefit program or obtain, by means of false or fraudulent pretenses, representations or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, regardless of the payor (e.g., public or private) and knowingly and willfully falsifying, concealing or covering up by any trick or device a material fact or making any materially false statements in connection with the delivery of, or payment for, health care benefits, items or services relating to health care matters;

- HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, or HITECH, and their respective implementing regulations, which impose requirements on certain health care providers, health plans and health care clearinghouses, known as covered entities, as well as their respective business associates, independent contractors or agents of covered entities that perform services for them that involve the use, or disclosure of, individually identifiable health information as well as their covered subcontractors, relating to the privacy, security and transmission of individually identifiable health information without appropriate authorization;

- the federal Physician Payments Sunshine Act, created under Section 6002 of the ACA, and its implementing regulations, which requires certain manufacturers of drugs, devices, biologicals and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) to report annually to the United States Department of Health and Human Services' Centers for Medicare & Medicare Services, or CMS, information related to payments or other transfers of value made to physicians (defined to include doctors, dentists, optometrists, podiatrists and chiropractors) and teaching hospitals, as well as ownership and investment interests held by such physicians and their immediate family members. Beginning in 2022, applicable manufacturers also will be required to report such information regarding its payments and other transfers of value to physician assistants, nurse practitioners, clinical nurse specialists, anesthesiologist assistants, certified registered nurse anesthetists and certified nurse midwives during the previous year;

- federal consumer protection and unfair competition laws, which broadly regulate marketplace activities and activities that potentially harm consumers;

- federal government price reporting laws, changed by ACA to, among other things, increase the minimum Medicaid rebates owed by most manufacturers under the Medicaid Drug Rebate Program and offer such rebates to additional populations, that require us to calculate and report complex pricing metrics to government programs, where such reported prices may be used in the calculation of reimbursement and/or discounts on our marketed drugs. Participation in these programs and compliance with the applicable requirements may subject us to potentially significant discounts on our products, increased infrastructure costs and potentially limit our ability to offer certain marketplace discounts;

- the Foreign Corrupt Practices Act, a United States law which regulates certain financial relationships with foreign government officials (which could include, for example, certain medical professionals); and

- state law equivalents of each of the above federal laws, such as anti-kickback, false claims, consumer protection and unfair competition laws which may apply to our business practices, including but not limited to, research, distribution, sales and marketing arrangements as well as submitting claims involving health care items or services reimbursed by any third party payors, including commercial insurers; state laws that require pharmaceutical companies to comply with the pharmaceutical industry's voluntary compliance guidelines and the relevant compliance guidance promulgated by the federal government that otherwise restricts payments that may be made to health care providers; state laws that require drug manufacturers to file reports with states regarding marketing information, such as the tracking and reporting of gifts, compensations and other remuneration and items of value provided to health care professionals and

39

entities (compliance with such requirements may require investment in infrastructure to ensure that tracking is performed properly, and some of these laws result in the public disclosure of various types of payments and relationships, which could potentially have a negative effect on our business and/or increase enforcement scrutiny of our activities), and drug pricing; state and local laws that require the registration of pharmaceutical sales representatives; and state laws governing the privacy and security of health information in certain circumstances, many of which differ from each other in significant ways, thus complicating compliance efforts.

In addition, any sales of our products or product candidates once commercialized outside the United States will also likely subject us to foreign equivalents of the health care laws mentioned above, among other foreign laws.

Efforts to ensure that our business arrangements will comply with applicable health care laws may involve substantial costs. It is possible that governmental and enforcement authorities will conclude that our business practices may not comply with current or future statutes, regulations or case law interpreting applicable fraud and abuse or other health care laws and regulations. If our operations are found to be in violation of any of the laws described above or any other governmental regulations that apply to us, we may be subject to, without limitation, significant civil, criminal and administrative penalties, damages, monetary fines, disgorgement, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings and curtailment or restructuring of our operations, any of which could adversely affect our ability to operate.

*We are required to obtain regulatory approval for each of our products in each jurisdiction in which we intend to market such products, and the inability to obtain such approvals would limit our ability to realize their full market potential.*

In order to market products outside of the United States, we must comply with numerous and varying regulatory requirements of other countries regarding safety and efficacy. Clinical trials conducted in one country may not be accepted by regulatory authorities in other countries, and regulatory approval in one country does not mean that regulatory approval will be obtained in any other country. However, the failure to obtain regulatory approval in one jurisdiction may adversely impact our ability to obtain regulatory approval in another jurisdiction. Approval processes vary among countries and can involve additional product testing and validation and additional administrative review periods. Seeking foreign regulatory approval could result in difficulties and costs for us and require additional non-clinical studies or clinical trials which could be costly and time consuming. Regulatory requirements can vary widely from country to country and could delay or prevent the introduction of our products in those countries. If we fail to comply with regulatory requirements in international markets or to obtain and maintain required approvals, or if regulatory approval in international markets is delayed, our target market will be reduced and our ability to realize the full market potential of our products will be harmed.

*If we fail to develop, acquire or in-license other product candidates or products, our business and prospects will be limited.*

Our long-term growth strategy is to develop and commercialize a portfolio of product candidates in addition to our existing product candidates. We may also acquire or in-license such product candidates. Although we have internal research and development capacity that we believe will enable us to make improvements to existing compounds or active ingredients, we do not have internal drug discovery capabilities to identify and develop entirely new chemical entities or compounds. As a result, our primary means of expanding our pipeline of product candidates is to develop improved formulations and delivery methods for existing FDA-approved products and/or select and acquire or in-license product candidates for the treatment of therapeutic indications that complement or augment our current targets, or that otherwise fit into our development or strategic plans on terms that are acceptable to us. Developing new formulations of existing products or identifying, selecting and acquiring or in-licensing promising product candidates requires substantial technical, financial and human resources expertise. Efforts to do so may not result in the actual development, acquisition or in-license of a particular product candidate, potentially resulting in a diversion of our management's time and the expenditure of our resources with no resulting benefit. If we are unable to add additional product candidates to our pipeline, our long-term business and prospects will be limited.

### Risks Related to Commercialization of Our Products and Product Candidates

*Our commercial success depends upon attaining significant market acceptance of our products and product candidates, if approved, among physicians, nurses, pharmacists, patients and the medical community.*

Even if we obtain regulatory approval for our product candidates, our products and product candidates may not gain market acceptance among physicians, nurses, pharmacists, patients, the medical community or third party payors, which is critical to commercial success. Market acceptance of our products and any product candidate for which we receive approval depends on a number of factors, including:

- the timing of market introduction of the product candidate as well as competitive products;

- the clinical indications for which the product candidate is approved;

- the convenience and ease of administration to patients of the product candidate;

- the potential and perceived advantages of such product candidate over alternative treatments;

- the cost of treatment in relation to alternative treatments, including any similar generic treatments;

- the availability of coverage and adequate reimbursement by third party payors and government authorities;

- relative convenience and ease of administration;

- any negative publicity related to our or our competitors' products that include the same active ingredient;

- the prevalence and severity of adverse side effects, including limitations or warnings contained in a product's FDA-approved labeling; and

- the effectiveness of sales and marketing efforts.

Even if a potential product displays a favorable efficacy and safety profile in preclinical studies and clinical trials, market acceptance of the product will not be known until after it is launched. If our products or product candidates, if approved, fail to achieve an adequate level of acceptance by physicians, nurses, pharmacists, patients and the medical community, we will be unable to generate significant revenues, and we may not become or remain profitable.

*Guidelines and recommendations published by government agencies can reduce the use of our products and product candidates.*

Government agencies promulgate regulations and guidelines applicable to certain drug classes which may include our products and product candidates that we are developing. Recommendations of government agencies may relate to such matters as usage, dosage, route of administration and use of concomitant therapies. Regulations or guidelines suggesting the reduced use of certain drug classes which may include our products and product candidates that we are developing or the use of competitive or alternative products as the standard of care to be followed by patients and health care providers could result in decreased use of our product candidates or negatively impact our ability to gain market acceptance and market share.

*If we are unable to successfully conduct our sales and marketing capabilities or if our commercial partners do not adequately perform, the commercial opportunity for our products may be diminished.*

We have a commercial organization to promote certain of our approved products in the United States. The cost of maintaining such an organization may exceed the benefits, and there are significant risks involved in building and managing a sales organization, including our ability to hire, retain and incentivize qualified individuals, generate sufficient sales leads, provide adequate training to sales and marketing personnel and effectively manage a geographically dispersed sales and marketing team. In addition, we may not be successful in commercializing our products despite such commercial organization.

We and any other commercialization partner we engage in the future may not be able to attract, hire, train and retain qualified sales and sales management personnel. If we or our future partners, if any, are not successful in maintaining an effective number of qualified sales personnel, our ability to effectively market and promote our products may be impaired.

The efforts of our partners in many instances would likely be outside our control. If any future partner is unsuccessful in their efforts, or we are unable to maintain such commercial partnerships or to effectively establish alternative arrangements for our products, our business could be adversely affected.

*A substantial portion of our total revenues is derived from sales of a limited number of products.*

We derive a substantial portion of our revenue from royalties derived from the sales of one product: Bendeka. This product is sold by our partner Teva Pharmaceuticals. During the year ended December 31, 2020, Bendeka accounted for approximately 61% of our total revenue. The sale of our products can be significantly influenced by the efforts of our partners, which are out of our control, as well as market conditions and regulatory actions. We may experience decreases in the sale of our products in the future as a result of actions taken by our competitors, such as price reductions or entry into the market for competing products, or as a result of regulatory actions related to our products or competing products, which could have a material impact on our results of operations and financial condition.

*If we obtain approval to commercialize any approved products outside of the United States, a variety of risks associated with international operations could materially adversely affect our business.*

We may enter into agreements with third parties to market our products outside the United States. We expect that we will be subject to additional risks related to entering into international business relationships, including:

- different regulatory requirements for drug approvals in foreign countries;

- differing payor reimbursement regimes, governmental payors or patient self-pay systems and price controls;

41

- reduced protection for intellectual property rights;

- unexpected changes in tariffs, trade barriers and regulatory requirements;

- economic weakness, including inflation, or political instability in particular foreign economies and markets;

- compliance with tax, employment, immigration and labor laws for employees living or traveling abroad;

- foreign taxes, including withholding of payroll taxes;

- foreign currency fluctuations, which could result in increased operating expenses and reduced revenue, and other obligations incident to doing business in another country;

- workforce uncertainty in countries where labor unrest is more common than in the United States;

- production shortages resulting from any events affecting raw material supply or manufacturing capabilities abroad; and

- business interruptions resulting from geopolitical actions, including war and terrorism, or natural disasters including earthquakes, typhoons, floods and fires or public health issues or pandemics including the coronavirus.

***We face significant competition from other biotechnology and pharmaceutical companies, and our operating results will suffer if we fail to compete effectively.***

The biopharmaceutical industries are intensely competitive and subject to rapid and significant technological change. Many of our competitors both in the United States and internationally, include major multinational pharmaceutical companies, biotechnology companies and universities and other research institutions. For example, Ryanodex, and products with dantrolene sodium as the API, is currently marketed in the United States by, among others, Endo International plc, Impax Laboratories, Inc., Hikma Pharmaceuticals, LLC, US WorldMeds, LLC, Mylan Institutional, LLC, and Elite Laboratories, Inc. While our formulations of this product is distinct, and we believe improvements, compared to those competitors mentioned, competition from these products on factors such as price and availability effect our commercial efforts. Additionally, we must compete with alternative drug treatments (as opposed to alternative formulations) for many of the indications that our products are approved to treat.

Many of our competitors have substantially greater financial, technical and other resources, such as larger research and development staff and experienced marketing and manufacturing organizations. Mergers and acquisitions in the biotechnology and pharmaceutical industries may result in even more resources being concentrated in our competitors. As a result, these companies may obtain regulatory approval more rapidly than we are able and may be more effective in selling and marketing their products as well. Smaller or early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large, established companies. Competition may increase further as a result of advances in the commercial applicability of technologies and greater availability of capital for investment in these industries. Our competitors may succeed in developing, acquiring or licensing on an exclusive basis drug products or drug delivery technologies that are more effective or less costly than our products or any product candidate that we are currently developing or that we may develop. In addition, our competitors may file citizens' petitions with the FDA in an attempt to persuade the FDA that our products, or the clinical studies that support their approval, contain deficiencies. Such actions by our competitors could delay or even prevent the FDA from approving any application we submit.

We believe that our ability to successfully compete will depend on, among other things:

- the efficacy and safety of our products and product candidates, including as relative to marketed products and product candidates in development by third parties;

- the time it takes for our product candidates to complete clinical development and receive marketing approval;

- the ability to maintain a good relationship with regulatory authorities;

- the ability to commercialize and market any of our product candidates that receive regulatory approval;

- the price of our products, including in comparison to branded or generic competitors;

- whether coverage and adequate levels of reimbursement are available under private and governmental health insurance plans, including Medicare;

- the ability to protect intellectual property rights related to our products and product candidates;

- the ability to manufacture on a cost-effective basis and sell commercial quantities of our products and product candidates that receive regulatory approval; and

42

- acceptance of any of our products and product candidates that receive regulatory approval by physicians and other health care providers.

If our competitors market products that are more effective, safer or less expensive than our products or product candidates, or that reach the market sooner than our product candidates, we may enter the market too late in the cycle and may not achieve commercial success. In addition, the biopharmaceutical industry is characterized by rapid technological change. Because we have limited research and development capabilities, it may be difficult for us to stay abreast of the rapid changes in each technology. If we fail to stay at the forefront of technological change, we may be unable to compete effectively. Technological advances or products developed by our competitors may render our technologies, products or product candidates obsolete, less competitive or not economical.

***We could incur substantial costs and disruption to our business and delays in the launch of our product candidates if our competitors and/or collaborators bring legal actions against us, which could harm our business and operating results.***

We cannot predict whether our competitors or potential competitors, some of whom we collaborate with, may bring legal actions against us based on our research, development and commercialization activities, as well as any product candidates or products resulting from these activities, claiming, among other things, infringement of their intellectual property rights, breach of contract or other legal theories. If we are forced to defend any such lawsuits, whether they are with or without merit or are ultimately determined in our favor, we may face costly litigation and diversion of technical and management personnel. These lawsuits could hinder our ability to enter the market early with our product candidates and thereby hinder our ability to influence usage patterns when fewer, if any, of our potential competitors have entered such market, which could adversely impact our potential revenue from such product candidates or negatively impact our ability to gain market acceptance and market share for our products. We are currently involved in various ongoing litigation matters, as discussed elsewhere in this Annual Report on Form 10-K.

Some of our competitors have substantially greater resources than we do and could be able to sustain the cost of litigation to a greater extent and for longer periods of time than we could. Furthermore, an adverse outcome of a dispute may require us: to pay damages, potentially including treble damages and attorneys' fees, if we are found to have willfully infringed a party's patent or other intellectual property rights; to cease making, licensing or using products that are alleged to incorporate or make use of the intellectual property of others; to expend additional development resources to reformulate our products or prevent us from marketing a certain drug; and to enter into potentially unfavorable royalty or license agreements in order to obtain the rights to use necessary technologies. Royalty or licensing agreements, if required, may be unavailable on terms acceptable to us, or at all.

***If we are unable to achieve and maintain adequate levels of coverage and reimbursement for our products or product candidates, if approved, their commercial success may be severely hindered.***

Successful sales of our products and any other approved product candidates depend on the availability of adequate coverage and reimbursement from third party payors. Patients who are prescribed medications for the treatment of their conditions generally rely on third party payors to reimburse all or part of the costs associated with their prescription drugs. Adequate coverage and reimbursement from governmental health care programs, such as Medicare and Medicaid, and commercial payors is critical to new product acceptance. In the United States, third-party payors often rely upon Medicare coverage policy and payment limitations in setting their own coverage and reimbursement policies. However, decisions regarding the extent of coverage and amount of reimbursement to be provided for any product candidates that we develop will be made on a payor-by-payor basis. Coverage decisions may depend upon clinical and economic standards that disfavor new drug products when more established or lower cost therapeutic alternatives are already available or subsequently become available. Reimbursement by a third party payor may depend upon a number of factors, including but not limited to, the third party payor's determination that use of a product is: a covered benefit under its health plan; safe, effective, and medically necessary; appropriate for the specific patient; cost-effective; and/or neither cosmetic, experimental, nor investigational.

Assuming we obtain coverage for a given product, the resulting reimbursement payment rates might not be adequate or may require co-payments that patients find unacceptably high. Patients are unlikely to use our products unless coverage is provided and reimbursement is adequate to cover a significant portion of the cost of our products.

In addition, the market for our products and our product candidates will depend significantly on access to third party payors' drug formularies, or lists of medications for which third party payors provide coverage and reimbursement. The industry competition to be included in such formularies often leads to downward pricing pressures on pharmaceutical companies. Also, third party payors may refuse to include a particular branded drug in their formularies or otherwise restrict patient access through formulary controls or otherwise to a branded drug when a less costly generic equivalent or other alternative is available.

Further, coverage policies and third-party payor reimbursement rates may change at any time. Therefore, even if favorable coverage and reimbursement status is attained, less favorable coverage policies and reimbursement rates may be implemented

43

in the future. Third party payors, whether foreign or domestic, or governmental or commercial, are developing increasingly sophisticated methods of controlling health care costs. In addition, in the United States, no uniform policy requirement for coverage and reimbursement for drug products exists among third party payors. Therefore, coverage and reimbursement for drug products can differ significantly from payor to payor. As a result, the coverage determination process is often a time-consuming and costly process that could require us to provide scientific, clinical and cost effectiveness support for the use of our products to each payor separately, with no assurance that coverage and adequate reimbursement will be applied consistently or obtained in the first instance. Even if we obtain coverage for a given product, the resulting reimbursement payment rates might not be adequate for us to achieve or sustain profitability.

Further, we believe that future coverage and reimbursement will likely be subject to increased restrictions both in the United States and in international markets. Third party coverage and reimbursement for our commercial products, and our pre-clinical and clinical product candidates for which we may receive regulatory approval, may not be available or adequate in either the United States or international markets, which could have a material adverse effect on our business, results of operations, financial condition and prospects.

***Current and future legislation may increase the difficulty and cost for us to commercialize our product candidates and affect the prices we may obtain for our products.***

The United States and some foreign jurisdictions are considering, or have enacted, a number of legislative and regulatory proposals to change the health care system in ways that could affect our ability to sell our products and our product candidates profitably, once they are approved for sale. Among policy makers and payors in the United States and elsewhere, there is significant interest in promoting changes in health care systems with the stated goals of containing health care costs, improving quality and/or expanding access. In the United States, the pharmaceutical industry has been a particular focus of these efforts and has been significantly affected by major legislative initiatives.

By way of example, in March 2010, the ACA was passed, which significantly changed health care financing by both governmental and private insurers. There have been executive, judicial and Congressional challenges to certain aspects of the ACA. For example, the Trump administration signed several Executive Orders and other directives designed to delay the implementation of certain provisions of the ACA or otherwise circumvent some of the requirements for health insurance mandated by the ACA. Concurrently, Congress considered legislation to repeal or repeal and replace all or part of the ACA. While Congress has not passed comprehensive repeal legislation, several bills affecting the implementation of certain taxes under the ACA have been signed into law. For example, the Tax Cuts and Jobs Act of 2017, or Tax Act, included a provision which repealed, effective January 1, 2019, the tax-based shared responsibility payment imposed by the ACA on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate." Additionally, the 2020 federal spending package permanently eliminated, effective January 1, 2020, the ACA-mandated "Cadillac" tax on high-cost employer-sponsored health coverage and medical device tax and, effective January 1, 2021, also eliminated the health insurer tax. The Bipartisan Budget Act of 2018, or the BBA, among other things, amended the ACA, effective January 1, 2019, to increase from 50 percent to 70 percent the point-of-sale discount that is owed by pharmaceutical manufacturers who participate in Medicare Part D and to close the coverage gap in most Medicare drug plans, commonly referred to as the "donut hole." On December 14, 2018, a Texas U.S. District Court Judge ruled that ACA is unconstitutional in its entirety because the "individual mandate" was repealed by Congress as part of the Tax Act. On December 18, 2019, the U.S. Court of Appeals for the 5th Circuit upheld the District Court ruling that the individual mandate was unconstitutional and remanded the case back to the District Court to determine whether the remaining provisions of the ACA are invalid as well. The U.S. Supreme Court is currently reviewing this case, but it is unknown when a decision will be reached. Although the U.S. Supreme Court has yet ruled on the constitutionality of the ACA, on January 28, 2021, President Biden issued an executive order to initiate a special enrollment period from February 15, 2021 through May 15, 2021 for purposes of obtaining health insurance coverage through the ACA marketplace. The executive order also instructs certain governmental agencies to review and reconsider their existing policies and rules that limit access to healthcare, including among others, reexamining Medicaid demonstration projects and waiver programs that include work requirements, and policies that create unnecessary barriers to obtaining access to health insurance coverage through Medicaid or the ACA. It is unclear how the Supreme Court ruling, other such litigation, and the healthcare reform measures of the Biden administration will impact ACA and our business. We cannot predict how future federal or state legislative or administrative changes relating to healthcare reform will affect our business.

In addition, other legislative changes have been proposed and adopted since the ACA was enacted. For example, in August 2011, President Obama signed into law the Budget Control Act of 2011, which, among other things, created the Joint Select Committee on Deficit Reduction to recommend proposals for spending reductions to Congress. The Joint Select Committee on Deficit Reduction did not achieve its targeted deficit reduction of at least $1.2 trillion for the years 2013 through 2021, triggering the legislation's automatic reductions to several government programs. These reductions include aggregate reductions to Medicare payments to providers of up to 2% per fiscal year, which went into effect on April 1, 2013 and, following passage

44

of the Bipartisan Budget Act of 2015 as well as other legislative amendments, including the BBA, will remain in effect through 2030, except for a temporary suspension from May 1, 2020 through March 31, 2021 due to the COVID-19 pandemic, unless additional Congressional action is taken. Additionally, in January 2013, President Obama signed into law the American Taxpayer Relief Act of 2012, which, among other things, further reduced Medicare payments to several providers and increased the statute of limitations period for the government to recover overpayments to providers from three to five years.

Additionally, there has been increasing legislative and enforcement interest in the United States with respect to drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries and proposed and adopted federal and state legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drugs. For example, the Trump administration used several means to propose or implement drug pricing reform, including through federal budget proposals, executive orders and policy initiatives. For example, on July 24, 2020 and September 13, 2020, the Trump administration announced several executive orders related to prescription drug pricing that attempt to implement several of the administration's proposals. The FDA also released a final rule, effective November 30, 2020, implementing a portion of the importation executive order providing guidance for states to build and submit importation plans for drugs from Canada. Further, on November 20, 2020, HHS finalized a regulation removing safe harbor protection for price reductions from pharmaceutical manufacturers to plan sponsors under Part D, either directly or through pharmacy benefit managers, unless the price reduction is required by law. The implementation of the rule has been delayed by the Biden administration from January 1, 2022 to January 1, 2023 in response to ongoing litigation. The rule also creates a new safe harbor for price reductions reflected at the point-of-sale, as well as a new safe harbor for certain fixed fee arrangements between pharmacy benefit managers and manufacturers, the implementation of which have also been delayed pending review by the Biden administration until March 22, 2021. On November 20, 2020, CMS issued an interim final rule implementing President Trump's Most Favored Nation executive order, which would tie Medicare Part B payments for certain physician-administered drugs to the lowest price paid in other economically advanced countries, effective January 1, 2021. On December 28, 2020, the United States District Court in Northern California issued a nationwide preliminary injunction against implementation of the interim final rule. However, it is unclear whether the Biden administration will work to reverse these measures or pursue similar policy initiatives. At the state level, legislatures have increasingly passed legislation and implemented regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing. The full impact of these laws, as well as other new laws and reform measures that may be proposed and adopted in the future remains uncertain, but may result in additional reductions in Medicare and other health care funding, or higher production costs which could have a material adverse effect on our customers and, accordingly, our financial operations. Further, it is possible that additional governmental action is taken in response to the COVID-19 pandemic.

.

## Risks Related to Our Reliance on Third Parties

*We rely on third parties to conduct our preclinical studies and clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines, we may not be able to obtain regulatory approval for or commercialize our product candidates and our business could be substantially harmed.*

We have relied upon and plan to continue to rely upon third party contract research organizations (each a "CRO") to monitor and manage data for our preclinical and clinical programs. We rely on these parties for execution of our preclinical studies and clinical trials, and control only certain aspects of their activities. Nevertheless, we are responsible for ensuring that each of our trials is conducted in accordance with the applicable protocol, legal, regulatory and scientific standards and our reliance on the CROs does not relieve us of our regulatory responsibilities. We and our CROs are required to comply with FDA regulations and other laws regarding current good clinical practice (" GCP"), which are also required by the Competent Authorities of the Member States of the European Economic Area and comparable foreign regulatory authorities in the form of International Council for Harmonization, or ICH, guidelines for all of our products in clinical development. Regulatory authorities enforce GCP through periodic inspections of trial sponsors, principal investigators and trial sites. If we or any of our CROs fail to comply with applicable GCP, the clinical data generated in our clinical trials may be deemed unreliable and the FDA or comparable foreign regulatory authorities may require us to perform additional clinical trials before approving our marketing applications. We cannot assure you that upon inspection by a given regulatory authority, such regulatory authority will determine that any of our clinical trials comply with GCP regulations. In addition, our clinical trials must be conducted with product produced under cGMP regulations. While we have agreements governing activities of our CROs, we have limited influence over their actual performance. In addition, portions of the clinical trials for our product candidates are expected to be conducted outside of the United States, which will make it more difficult for us to monitor CROs and perform visits of our clinical trial sites and will force us to rely heavily on CROs to ensure the proper and timely conduct of our clinical trials and compliance with applicable regulations, including GCP. Failure to comply with applicable regulations in the conduct of the

45

clinical trials for our product candidates may require us to repeat clinical trials, which would delay the regulatory approval process.

Some of our CROs have an ability to terminate their respective agreements with us if, among other reasons, it can be reasonably demonstrated that the safety of the subjects participating in our clinical trials warrants such termination, if we make a general assignment for the benefit of our creditors or if we are liquidated. If any of our relationships with these third party CROs terminate, we may not be able to enter into arrangements with alternative CROs or to do so on commercially reasonable terms. In addition, our CROs are not our employees, and except for remedies available to us under our agreements with such CROs, we cannot control whether or not they devote sufficient time and resources to our preclinical and clinical programs. If CROs do not successfully carry out their contractual duties or obligations or meet expected deadlines, if they need to be replaced or if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols, regulatory requirements or for other reasons, our clinical trials may be extended, delayed or terminated and we may not be able to obtain regulatory approval for or successfully commercialize our product candidates. Consequently, our results of operations and the commercial prospects for our product candidates would be harmed, our costs could increase substantially and our ability to generate revenue could be delayed significantly.

Switching or adding additional CROs involves additional cost and requires management time and focus. In addition, there is a natural transition period when a new CRO commences work. As a result, delays occur, which can materially impact our ability to meet our desired clinical development timelines. Though we carefully manage our relationships with our CROs, there can be no assurance that we will not encounter challenges or delays in the future or that these delays or challenges will not have a material adverse impact on our business, financial condition and prospects.

***If any of our current strategic collaborators fail to perform their obligations or terminate their agreements with us, the development and commercialization of the product candidates under such agreements could be delayed or terminated and our business could be substantially harmed.***

In 2015, we entered into the Cephalon License, with Cephalon (Teva) for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. Pursuant to the terms of the Cephalon License, as has been amended from time to time,
Teva is responsible for all U.S. commercial activities for the product including promotion and distribution, and we are responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies.

This strategic collaboration may not be scientifically or commercially successful due to a number of important factors, including the following:

- If we fail to maintain any regulatory approvals, or otherwise materially breach the agreement, we may not receive all anticipated royalty payments;
- Cephalon has significant discretion in determining the efforts and resources that it will apply to their strategic collaboration with us. The timing and amount of any cash payments, and royalties that we may receive under such agreements will depend on, among other things, the efforts, allocation of resources and the commercialization of our product by Cephalon under the Cephalon License;
- Cephalon currently markets a competitive bendamustine product, Treanda®, in the United States. In addition, it is possible that Cephalon may develop and commercialize, either alone or with others, or be acquired by a company that has, products that are similar to or competitive with the product candidates that they license from us;
- Cephalon may change the focus of their commercialization efforts or pursue higher-priority programs;
- Cephalon may terminate its strategic collaboration with us on short notice, which could make it difficult for us to attract new strategic collaborators or adversely affect how we are perceived in the scientific and financial communities;
- Cephalon has the right to maintain or defend our intellectual property rights licensed to them in their territories, and, although we may have the right to assume the maintenance and defense of our intellectual property rights if they do not, our ability to do so may be compromised by our strategic collaborators' acts or omissions; and
- Cephalon may not comply with all applicable regulatory requirements, or fail to report safety data in accordance with all applicable regulatory requirements;
- If Cephalon fails to effectively commercialize our product, we may not be able to replace them with another collaborator, and,
- If our agreement with Cephalon terminates, we are required to pay them a portion of our future profits on the product.
  Any of these events could have a material adverse effect on our business, results of operations and our ability to achieve future profitability, and could cause our stock price to decline.

46

*We rely on third parties to manufacture commercial supplies of our products and clinical supplies of our product candidates, and we intend to rely on third parties to manufacture commercial supplies of any other approved products. The commercialization of any of our products could be stopped, delayed or made less profitable if those third parties fail to provide us with sufficient quantities of product or fail to do so at acceptable quality levels or prices or fail to maintain or achieve satisfactory regulatory compliance.*

We do not own any manufacturing facilities, and we do not currently, and do not expect in the future, to independently conduct any aspects of our product manufacturing and testing, or other activities related to the clinical development and commercialization of our product candidates. We currently rely, and expect to continue to rely, on third parties with respect to these items, and control only certain aspects of their activities.

Any of these third parties may terminate their engagements with us at any time. If we need to enter into alternative arrangements, it could delay our product candidate development and product commercialization activities. Our reliance on these third parties reduces our control over these activities but does not relieve us of our responsibility to ensure compliance with all required legal, regulatory and scientific standards and any applicable trial protocols. If these third parties do not successfully carry out their contractual duties, meet expected deadlines or conduct our studies in accordance with regulatory requirements or our stated study plans and protocols, we will not be able to complete, or may be delayed in completing, clinical trials required to support future regulatory submissions and approval of our product candidates.

Our products and product candidates are highly reliant on very complex sterile techniques and personnel aseptic techniques. The facilities used by our third-party manufacturers to manufacture our products and product candidates must be approved by the applicable regulatory authorities pursuant to inspections that will be conducted after we submit our NDA to the FDA. If any of our third-party manufacturers cannot successfully manufacture material that conforms to our specifications and the applicable regulatory authorities' strict regulatory requirements, or pass regulatory inspection, they will not be able to secure or maintain regulatory approval for the manufacturing facilities. In addition, we have no control over the ability of third-party manufacturers to maintain adequate quality control, quality assurance and qualified personnel. Quality problems in manufacturing are linked to a majority of shortages of sterile injectable drugs. Some of the largest manufacturers of sterile injectable drugs have had serious quality problems leading to the temporary voluntary closure or renovations of major production facilities. Further, as we scale up manufacturing of our product candidates and conduct required stability testing, product packaging, equipment and process-related issues may require refinement or resolution in order for us to proceed with our planned clinical trials and obtain regulatory approval for commercialization of our product candidates. In the future, for example, we may identify impurities in the product manufactured for us for commercial supply, which could result in increased scrutiny by the regulatory agencies, delays in our clinical program and regulatory approval, increases in our operating expenses, or failure to obtain or maintain approval for our product candidates. If the FDA or any other applicable regulatory authority does not approve these facilities to manufacture our products or if they withdraw any such approval in the future, or if our suppliers or third-party manufacturers decide they no longer want to manufacture our products, we may need to find alternative manufacturing facilities, which would significantly impact our ability to develop, obtain regulatory approval for or market our products or product candidates.

More generally, manufacturers of pharmaceutical products often encounter difficulties in production, particularly in scaling up and validating initial production. These problems include difficulties with production costs and yields, quality control, including stability of the product, quality assurance testing, shortages of qualified personnel, as well as compliance with strictly enforced federal, state and foreign regulations. Additionally, our manufacturers may experience manufacturing difficulties due to resource constraints or as a result of labor disputes or unstable political environments. If our manufacturers were to encounter any of these difficulties, or otherwise fail to comply with their contractual obligations, our ability to make product candidates available for clinical trials and development purposes or to further commercialize our products or product candidates in the United States would be jeopardized. Any delay or interruption in our ability to meet commercial demand may result in the loss of potential revenues and could adversely affect our ability to gain market acceptance for approved products. In addition, any delay or interruption in the supply of clinical trial supplies could delay the completion of clinical trials, increase the costs associated with maintaining clinical trial programs and, depending upon the period of delay, require us to commence new clinical trials at additional expense or terminate clinical trials completely. Additionally, if supply from one approved manufacturer is interrupted, there could be a significant disruption in commercial supply. Regulatory agencies may also require additional studies if a new manufacturer is relied upon for commercial production. Switching manufacturers may involve substantial costs and is likely to result in a delay in our desired clinical and commercial timelines.

The occurrence of any of these factors could have a material adverse effect on our business, results of operations, financial condition and prospects.

*The design, development, manufacture, supply, and distribution of our products and product candidates is highly regulated and technically complex.*

All entities involved in the preparation of therapeutics for clinical trials or commercial sale, including our existing contract manufacturers for our products and product candidates, are subject to extensive regulation. Components of a finished therapeutic product approved for commercial sale or used in late-stage clinical trials must be manufactured in accordance with cGMP and equivalent foreign standards. These regulations govern manufacturing processes and procedures (including record keeping) and the implementation and operation of quality systems to control and assure the quality of investigational products and products approved for sale. Poor control of production processes can lead to the introduction of adventitious agents or other contaminants, or to inadvertent changes in the properties or stability of our products or product candidates that may not be detectable in final product testing. The development, manufacture, supply, and distribution of our products, as well as our other product candidates, is highly regulated and technically complex. We, along with our third-party providers, must comply with all applicable regulatory requirements of the FDA and foreign authorities.

We, or our contract manufacturers, must supply all necessary documentation in support of our regulatory filings for our products and product candidates on a timely basis and must adhere to the FDA's good laboratory practices, or GLP, and cGMP regulations enforced by the FDA through its facilities inspection program, and the equivalent standards of the regulatory authorities in other countries. Any failure by our third-party manufacturers to comply with cGMP or failure to scale-up manufacturing processes, including any failure to deliver sufficient quantities of product candidates in a timely manner, could lead to a delay in, or failure to obtain, regulatory approval of any of our product candidates. Our facilities and quality systems and the facilities and quality systems of some or all of our third-party contractors must also pass a pre-approval inspection for compliance with the applicable regulations as a condition of regulatory approval of our product candidates or any of our other potential products. In addition, the regulatory authorities in any country may, at any time, audit or inspect a manufacturing facility involved with the preparation of our product candidates or our other potential products or the associated quality systems for compliance with the regulations applicable to the activities being conducted. If these facilities and quality systems do not pass a pre-approval plant inspection, FDA approval of our product candidates, or the equivalent approvals in other jurisdictions, will not be granted.

Regulatory authorities also may, at any time following approval of a product for sale, audit our manufacturing facilities or those of our third-party contractors. If any such inspection or audit identifies a failure to comply with applicable regulations or if a violation of our product specifications or applicable regulations occurs independent of such an inspection or audit, we or the relevant regulatory authority may require remedial measures that may be costly and/or time-consuming for us or a third party to implement and that may include the temporary or permanent suspension of a clinical trial or commercial sales or the temporary or permanent closure of a facility. Any such remedial measures imposed upon us or third parties with whom we contract could materially harm our business. If we or any of our third-party manufacturers fail to maintain regulatory compliance, the FDA can impose regulatory sanctions including, among other things, refusal to approve a pending application for a new drug product or biological product or revocation of a pre-existing approval. As a result, our business, financial condition and results of operations may be materially harmed.

***We rely on limited sources of supply for our products and product candidates, and any disruption in the chain of supply may impact production and sales of our products and cause delay in developing and commercializing our product candidates.***

We currently have relationships with only one third party for the manufacture of each of our most advanced products and product candidates. Because of the unique equipment and process for manufacturing our products transferring manufacturing activities to an alternate supplier would be a time-consuming and costly endeavor, and there are only a limited number of manufacturers that we believe are capable of performing this function for us. Switching finished drug suppliers may involve substantial cost and could result in a delay in our desired clinical and commercial timelines. If any of these single-source manufacturers breaches or terminates their agreements with us, we would need to identify an alternative source for the manufacture and supply of product candidates to us for the purposes of our development and commercialization of the applicable products. Identifying an appropriately qualified source of alternative supply for any one or more of these product candidates could be time consuming, and we may not be able to do so without incurring material delays in the development and commercialization of our product candidates, which could harm our financial position and commercial potential for our products. Any alternative vendor would also need to be qualified through an NDA supplement which could result in further delay. The FDA or other regulatory agencies outside of the United States may also require additional studies if we appoint a new manufacturer for supply of our product candidates that differs from the manufacturer used for clinical development of such product candidates. For our other product candidates, we expect that only one supplier will initially be qualified as a vendor with the FDA. If supply from the approved vendor is interrupted, there could be a significant disruption in commercial supply.

Additionally, if the COVID-19 pandemic continues to persist for an extended period of time and begins to impact essential distribution systems such as FedEx and postal delivery, we could experience disruptions to our supply chain and operations, and associated delays in the manufacturing and supply of our products, which would adversely impact our ability to deliver products to clinical trial sites or to generate sales of and revenues from our approved products.

These factors could cause the delay of clinical trials, regulatory submissions, required approvals or commercialization of our product candidates, cause us to incur higher costs and prevent us from commercializing them successfully. Furthermore, if our suppliers fail to deliver the required commercial quantities of components and active pharmaceutical ingredient on a timely basis and at commercially reasonable prices, and we are unable to secure one or more replacement suppliers capable of production at a substantially equivalent cost, our clinical trials may be delayed or we could lose potential revenue.

***We may not be successful in establishing development and commercialization collaborations which could adversely affect, and potentially prohibit, our ability to develop our product candidates.***

Because developing pharmaceutical products, conducting clinical trials, obtaining regulatory approval, establishing manufacturing capabilities and marketing approved products are expensive, we are exploring collaborations with third parties outside of the United States that have more resources and experience. We may, however, be unable to advance the development of our products and product candidates in territories outside of the United States, which may limit the market potential for this product candidate.

In situations where we enter into a development and commercial collaboration arrangement for a product candidate, we may also seek to establish additional collaborations for development and commercialization in territories outside of those addressed by the first collaboration arrangement for such product candidate. There are a limited number of potential partners, and we expect to face competition in seeking appropriate partners. We have entered into collaboration and promotion agreements with third parties, such as the agreement with AMRI, but there is no assurance these arrangements will be successful. If we are unable to enter into any future development and commercial collaborations and/or sales and marketing arrangements on acceptable terms, if at all, we may be unable to successfully develop and seek regulatory approval for our product candidates and/or effectively market and sell future approved products, if any, in all of the territories outside of the United States where it may otherwise be valuable to do so.

***We may not be successful in maintaining development and commercialization collaborations, and any partner may not devote sufficient resources to the development or commercialization of our product candidates or may otherwise fail in development or commercialization efforts, which could adversely affect our ability to develop certain of our product candidates and our financial condition and operating results.***

On January 7, 2020, we and Tyme announced a strategic collaboration to advance oral SM-88 for the treatment of patients with cancer. If we are able to establish additional collaboration arrangements, any such collaborations, in addition to the collaboration with Tyme, may not ultimately be successful, which could have a negative impact on our business, results of operations, financial condition and prospects. If we partner with a third party for development and commercialization of a product or product candidate, including Tyme, we can expect to relinquish some or all of the control over the future success of that product or product candidate to the third party. It is possible that a partner may not devote sufficient resources to the development or commercialization of our product candidate or may otherwise fail in development or commercialization efforts, in which event the development and commercialization of such product candidate could be delayed or terminated and our business could be substantially harmed. In addition, the terms of any collaboration or other arrangement that we establish may not prove to be favorable to us or may not be perceived as favorable, which may negatively impact the trading price of our common stock. In some cases, we may be responsible for continuing development of a product candidate or research program under a collaboration, and the payment we receive from our partner may be insufficient to cover the cost of this development. Moreover, collaborations and sales and marketing arrangements are complex and time consuming to negotiate, document and implement, and they may require substantial resources to maintain.

We may be subject to a number of additional risks associated with our collaborations with third parties, the occurrence of which could cause collaboration arrangements to fail. Conflicts may arise between us and our partners, such as conflicts concerning the interpretation of clinical data, the achievement of milestones, the interpretation of financial provisions or the ownership of intellectual property developed during the collaboration. If any such conflicts arise, a partner could act in its own self-interest, which may be adverse to our interests. Any such disagreement between us and a partner could result in one or more of the following, each of which could delay or prevent the development or commercialization of our product candidates and harm our business:

- reductions in the payment of royalties or other payments we believe are due pursuant to the applicable collaboration arrangement;
- actions taken by a partner inside or outside our collaboration which could negatively impact our rights or benefits under our collaboration; and
- unwillingness on the part of a partner to keep us informed regarding the progress of its development and commercialization activities or to permit public disclosure of the results of those activities.

***If we are unable to maintain our group purchasing organization, ("GPO"), relationships, our revenues could decline and future profitability could be jeopardized.***

49

Most of the end-users of injectable pharmaceutical products have relationships with GPOs whereby such GPOs provide such end-users access to a broad range of pharmaceutical products from multiple suppliers at competitive prices and, in certain cases, exercise considerable influence over the drug purchasing decisions of such end-users. Hospitals and other end-users contract with the GPO of their choice for their purchasing needs. We currently derive, and expect to continue to derive, a large percentage of our revenue from end-user customers that are members of a small number of GPOs. Maintaining strong relationships with these GPOs will require us to continue to be a reliable supplier, remain price competitive and comply with FDA regulations. The GPOs with whom we have relationships may have relationships with companies that sell competing products, and such GPOs may earn higher margins from these products or combinations of competing products or may prefer products other than ours for other reasons. If we are unable to maintain our GPO relationships, sales of our products and revenue could decline.

*We rely on a limited number of pharmaceutical wholesalers to distribute our products.*

As is typical in the pharmaceutical industry, we rely upon pharmaceutical wholesalers in connection with the distribution of our products. A significant amount of our products are sold to end-users under GPO pricing arrangements through a limited number of pharmaceutical wholesalers. If we are unable to maintain our business relationships with these pharmaceutical wholesalers on commercially acceptable terms, it could have a material adverse effect on our sales and may prevent us from achieving profitability.

*Our approved products may not achieve expected levels of market acceptance.*

Even if we are able to obtain regulatory approvals for our product candidates, the success of those products is dependent upon market acceptance. Levels of market acceptance for our product candidates could be affected by several factors, including:

- the availability of alternative products from our competitors;
- the price of our products relative to those of our competitors;
- the timing of our market entry;
- the ability to market our products effectively at the retail level;
- the perception of patients and the healthcare community, including third-party payors, regarding the safety efficacy and benefits of our drug products compared to those of competing products; and
- the acceptance of our products by government and private formularies.

Some of these factors are not within our control, and our products may not achieve expected levels of market acceptance. Additionally, continuing and increasingly sophisticated studies of the proper utilization, safety and efficacy of pharmaceutical products are being conducted by the industry, government agencies and others which may call into question the utilization, safety and efficacy of previously marketed products. In some cases, studies have resulted, and may in the future result, in the discontinuance of product marketing or other risk management programs such as the need for a patient registry.

**Risks Related to Our Business Operations and Industry**

*Our future success depends on our ability to retain key executives and to attract, retain and motivate qualified personnel.*

We are highly dependent on the principal members of our executive team, which include our Chief Executive Officer, Chief Financial Officer, Chief Medical Officer, and President and Chief Operating Officer. The loss of these executives' services may adversely impact the achievement of our objectives. Any of our executive officers could leave our employment at any time, as all of our employees are "at will" employees. Recruiting and retaining other qualified employees for our business, including scientific and technical personnel, will also be critical to our success. There is currently a shortage of skilled executives in our industry, which is likely to continue. As a result, competition for skilled personnel is intense and the turnover rate can be high. We may not be able to attract and retain personnel on acceptable terms given the competition among numerous pharmaceutical companies for individuals with similar skill sets. In addition, failure to succeed in clinical studies may make it more challenging to recruit and retain qualified personnel. The inability to recruit key executives or the loss of the services of any executive or key employee might impede the progress of our development and commercialization objectives.

*We will need to expand our organization, and we may experience difficulties in managing this growth, which could disrupt our operations.*

As of December 31, 2020, we had a total of 106 employees in the United States. As our company matures, we expect to expand our employee base to increase our managerial, scientific and engineering, operational, sales, marketing, financial and other resources and to hire more consultants and contractors. Future growth would impose significant additional responsibilities on our management, including the need to identify, recruit, maintain, motivate and integrate additional employees, consultants and contractors. Also, our management may need to divert a disproportionate amount of its attention away from our day-to-day activities and devote a substantial amount of time to managing these growth activities.

50

We may not be able to effectively manage the expansion of our operations which may result in weaknesses in our infrastructure and give rise to operational mistakes, loss of business opportunities, loss of employees and reduced productivity among remaining employees. Future growth could require significant capital expenditures and may divert financial resources from other projects, such as the development of our existing or future product candidates. If our management is unable to effectively manage our growth, our expenses may increase more than expected, our ability to generate and/or grow revenue could be reduced and we may not be able to implement our business strategy. Our future financial performance and our ability to sell our products and commercialize our product candidates, if approved, and compete effectively will depend, in part, on our ability to effectively manage any future growth.

*We face potential product liability, and, if successful claims are brought against us, we may incur substantial liability.*

The use of our product candidates in clinical trials (if any), and the sale of our products and any product candidates for which we obtain marketing approval, exposes us to the risk of product liability claims. Product liability claims might be brought against us by consumers, health care providers, pharmaceutical companies or others selling or otherwise coming into contact with our products, other approved future products and our product candidates. If we cannot successfully defend against product liability claims, we could incur substantial liability and costs. In addition, regardless of merit or eventual outcome, product liability claims may result in:

- impairment of our business reputation;

- withdrawal of clinical study participants;

- costs due to related litigation;

- distraction of management's attention from our primary business;

- substantial monetary awards to patients or other claimants;

- the inability to commercialize our product candidates; and

- decreased demand for our products and our product candidates, if approved for commercial sale.

Our current product liability insurance coverage may not be sufficient to reimburse us for any expenses or losses we may suffer. Moreover, insurance coverage is becoming increasingly expensive and in the future we may not be able to maintain insurance coverage at a reasonable cost or in sufficient amounts to protect us against losses due to liability. On occasion, large judgments have been awarded in class action lawsuits based on drugs that had unanticipated adverse effects. A successful product liability claim or series of claims brought against us could cause our stock price to decline and, if judgments exceed our insurance coverage, could adversely affect our results of operations and business.

*We rely significantly on information technology and any failure, inadequacy, interruption or security lapse of that technology, including any cybersecurity incidents, could harm our ability to operate our business effectively.*

Despite the implementation of security measures, our internal computer systems and those of third parties with which we contract are vulnerable to damage from cyber-attacks, computer viruses, unauthorized access, natural disasters, terrorism, war and telecommunication and electrical failures. System failures, accidents or security breaches could cause interruptions in our operations, and could result in a material disruption of our product development and clinical activities and business operations, in addition to possibly requiring substantial expenditures of resources to remedy. Cybersecurity attacks in particular are evolving and include, but are not limited to, malicious software, attempts to gain unauthorized access to data and other electronic security breaches that could lead to disruptions in systems, misappropriation of our confidential or otherwise protected information and corruption of data. The loss, theft or sabotage of product development or clinical trial data could result in delays in our regulatory approval efforts and significantly increase our costs to recover or reproduce the data. To the extent that any disruption or security breach were to result in a loss of, or damage to, our data or applications, or inappropriate disclosure of confidential or proprietary information, we could incur liability and our development programs and the development of our product candidates could be delayed.

*Business interruptions could delay us in the process of developing our product candidates and could disrupt our sales of any products we may sell.*

Our headquarters are located in Woodcliff Lake, New Jersey. If we encounter any disruptions to our operations at this building or if it were to shut down for any reason, including by fire, natural disaster, such as a hurricane, tornado or severe storm, power outage, systems failure, labor dispute or other unforeseen disruption, then we may be prevented from effectively operating our business. We do not carry insurance for natural disasters and we may not carry sufficient business interruption insurance to compensate us for losses that may occur. Any losses or damages we incur could have a material adverse effect on our business operations.

51

***We may be constrained by our obligations under our Credit Agreement to operate our business to its full potential.***

Our Revised Credit Agreement contains customary representations and warranties and customary affirmative and negative covenants, including, among other things, restrictions on indebtedness, liens, investments, mergers, dispositions, prepayment of other indebtedness and dividends and other distributions. Under the terms of the Revised Credit Agreement, we are required to comply with (a) a maximum senior secured net leverage ratio, (b) a maximum total net leverage ratio and (c) a minimum fixed charge coverage ratio. These terms may restrict our ability to operate our business in the manner we deem most effective or desirable, and may restrict our ability to fund our operations through new public offerings of our common stock or strengthen our candidate development pipeline through acquisitions or licenses which cause us to exceed our maximum senior secured net leverage ratio.

Although we have not currently drawn on the Revised Credit Agreement, failure to comply with the representations and warranties or affirmative and negative covenants could constitute an event of default which, if continued beyond the cure period, would allow the administrative agent, at the request of or with the consent of the lenders holding a majority of the loans and commitments under the facility, to terminate the commitments of the lenders to make further loans and declare all the obligations of the loan parties under the Revised Credit Agreement to be immediately due and payable, either of which could harm our business.

### Risks Related to Our Intellectual Property

***If we are unable to obtain or protect intellectual property rights related to any of our product candidates, we may not be able to compete effectively in our market.***

We rely upon a combination of patents, trade secret protection and confidentiality agreements to protect the intellectual property related to our products and our product candidates. The strength of patents in the biotechnology and pharmaceutical field involves complex legal and scientific questions and can be uncertain. The patent applications that we own or in-license may fail to result in issued patents with claims that cover the products in the United States or in foreign countries or territories. If this were to occur, early generic competition could be expected against our products and our product candidates in development. There may be relevant prior art relating to our patents and patent applications which could invalidate a patent or prevent a patent from issuing based on a pending patent application. In particular, because the active pharmaceutical ingredients in many of our product candidates have been on the market as separate products for many years, it is possible that these products have previously been used off-label in such a manner that such prior usage would affect the validity of our patents or our ability to obtain patents based on our patent applications.

Even if patents do successfully issue, third parties may challenge their validity, enforceability or scope, which may result in such patents being narrowed or invalidated. Any adverse outcome in these types of matters could result in one or more generic versions of our products being launched before the expiration of the listed patents, which could adversely affect our ability to successfully execute our business strategy to increase sales of our products and would negatively impact our financial condition and results of operations, including causing a significant decrease in our revenues and cash flows.

Furthermore, even if they are unchallenged, our patents and patent applications may not adequately protect our intellectual property or prevent others from designing around our claims. If the patent applications we hold with respect to our products or product candidates fail to issue or if their breadth or strength of protection is threatened, it could dissuade companies from collaborating with us to develop them and threaten our ability to commercialize our product candidates. We cannot offer any assurances about which, if any, patents will issue or whether any issued patents will be found not invalid and not unenforceable or will go unthreatened by third parties. Further, if we encounter delays in regulatory approvals, the period of time during which we could market our product candidates under patent protection could be reduced. If third parties have filed such patent applications, an interference proceeding in the United States can be provoked by a third party or instituted by us to determine who was the first to invent any of the subject matter covered by the patent claims of our applications.

In addition to the protection afforded by patents, we rely on trade secret protection and confidentiality agreements to protect proprietary know-how that is not patentable, processes for which patents are difficult to enforce and any other elements of our drug development and reformulation processes that involve proprietary know-how, information or technology that is not covered by patents. For example, we maintain trade secrets with respect to certain of the formulation and manufacturing techniques related to our products and our product candidates. Although we generally require all of our employees to assign their inventions to us, and all of our employees, consultants, advisors and any third parties who have access to our proprietary know-how, information or technology to enter into confidentiality agreements, we cannot provide any assurances that all such agreements have been duly executed or that our trade secrets and other confidential proprietary information will not be disclosed or that competitors will not otherwise gain access to our trade secrets or independently develop substantially equivalent information and techniques. We also seek to preserve the integrity and confidentiality of our data and trade secrets

by maintaining physical security of our premises and physical and electronic security of our information technology systems. While we have confidence in these individuals, organizations and systems, agreements or security measures may be breached, and we may not have adequate remedies for any breach. In addition, our trade secrets may otherwise become known or be independently discovered by competitors. Additionally, if the steps taken to maintain our trade secrets are deemed inadequate, we may have insufficient recourse against third parties for misappropriating the trade secret. In addition, others may independently discover our trade secrets and proprietary information. For example, the FDA, as part of its Transparency Initiative, is currently considering whether to make additional information publicly available on a routine basis, including information that we may consider to be trade secrets or other proprietary information, and it is not clear at the present time how the FDA's disclosure policies may change in the future, if at all.

Our ability to obtain patents is highly uncertain because, to date, some legal principles remain unresolved, there has not been a consistent policy regarding the breadth or interpretation of claims allowed in patents in the United States and the specific content of patents and patent applications that are necessary to support and interpret patent claims is highly uncertain due to the complex nature of the relevant legal, scientific and factual issues. Changes in either patent laws or interpretations of patent laws in the United States and other countries may diminish the value of our intellectual property or narrow the scope of our patent protection. For example, on September 16, 2011, the Leahy-Smith America Invents Act, or the Leahy-Smith Act, was signed into law. The Leahy-Smith Act includes a number of significant changes to United States patent law. These include provisions that affect the way patent applications will be prosecuted and may also affect patent litigation. The United States Patent and Trademark Office, or USPTO, has developed new and untested regulations and procedures to govern the full implementation of the Leahy-Smith Act, and many of the substantive changes to patent law associated with the Leahy-Smith Act, and in particular, the first to file provisions, only became effective in March 2013. The Leahy-Smith Act has also introduced procedures making it easier for third-parties to challenge issued patents, as well as to intervene in the prosecution of patent applications. Finally, the Leahy-Smith Act contains new statutory provisions that still require the USPTO to issue new regulations for their implementation and it may take the courts years to interpret the provisions of the new statute. Accordingly, it is too early to tell what, if any, impact the Leahy-Smith Act will have on the operation of our business and the protection and enforcement of our intellectual property. However, the Leahy-Smith Act and its implementation could increase the uncertainties and costs surrounding the prosecution of our patent applications and the enforcement or defense of our issued patents. An inability to obtain, enforce and defend patents covering our proprietary technologies would materially and adversely affect our business prospects and financial condition.

Further, the laws of some foreign countries do not protect proprietary rights to the same extent or in the same manner as the laws of the United States. As a result, we may encounter significant problems in protecting and defending our intellectual property both in the United States and abroad. For example, if the issuance to us, in a given country, of a patent covering an invention is not followed by the issuance, in other countries, of patents covering the same invention, or if any judicial interpretation of the validity, enforceability, or scope of the claims in, or the written description or enablement in, a patent issued in one country is not similar to the interpretation given to the corresponding patent issued in another country, our ability to protect our intellectual property in those countries may be limited. Changes in either patent laws or in interpretations of patent laws in the United States and other countries may materially diminish the value of our intellectual property or narrow the scope of our patent protection. If we are unable to prevent material disclosure of the non-patented intellectual property related to our technologies to third parties, and there is no guarantee that we will have any such enforceable trade secret protection, we may not be able to establish or maintain a competitive advantage in our market, which could materially adversely affect our business, results of operations and financial condition.

***Our drug development strategy relies heavily upon the 505(b)(2) regulatory pathway, which requires us to certify that we do not infringe upon third-party patents covering approved drugs. Such certifications typically result in third-party claims of intellectual property infringement, the defense of which will be costly and time consuming, and an unfavorable outcome in any litigation may prevent or delay our development and commercialization efforts which would harm our business.***

Litigation or other proceedings to enforce or defend intellectual property rights are often complex in nature, may be very expensive and time-consuming, may divert our management's attention from other aspects of our business and may result in unfavorable outcomes that could adversely impact our ability to launch and market our product candidates, or to prevent third parties from competing with our products and product candidates.

There is a substantial amount of litigation, both within and outside the United States, involving patent and other intellectual property rights in the biotechnology and pharmaceutical industries, including patent infringement lawsuits, interferences, oppositions and inter party reexamination proceedings before the USPTO. Numerous United States and foreign issued patents and pending patent applications, which are owned by third parties, exist in the fields in which we and our collaborators are developing product candidates. As the biotechnology and pharmaceutical industries expand and more patents are issued, the risk increases that our product candidates may be subject to claims of infringement of the patent rights of third parties.

53

In particular, our commercial success depends in large part on our avoiding infringement of the patents and proprietary rights of third parties for existing approved drug products. Because we utilize the 505(b)(2) regulatory pathway for the approval of our products and product candidates, we rely in whole or in part on studies conducted by third parties related to those approved drug products. As a result, upon filing with the FDA for approval of our product candidates, we will be required to certify to the FDA that either: (1) there is no patent information listed in the FDA's Orange Book with respect to our NDA; (2) the patents listed in the Orange Book have expired; (3) the listed patents have not expired, but will expire on a particular date and approval is sought after patent expiration; or (4) the listed patents are invalid or will not be infringed by the manufacture, use or sale of our proposed drug product. When we submit a paragraph IV certification to the FDA, a notice of the paragraph IV certification must also be sent to the patent owner once our 505(b)(2) NDA is accepted for filing by the FDA. The third party may then initiate a lawsuit against us to defend the patents identified in the notice. The filing of a patent infringement lawsuit within 45 days of receipt of the notice automatically prevents the FDA from approving our NDA until the earliest of 30 months or the date on which the patent expires, the lawsuit is settled, or the court reaches a decision in the infringement lawsuit in our favor. If the third party does not file a patent infringement lawsuit within the required 45-day period, our NDA will not be subject to the 30-month stay.

In addition to paragraph IV litigation noted above, third-party owners of patents may generally assert that we are employing their proprietary technology without authorization. There may be third-party patents or patent applications with claims to materials, formulations, methods of manufacture or methods for treatment related to the use or manufacture of our products and/or our product candidates. Because patent applications can take many years to issue, there may be currently pending or subsequently filed patent applications which may later result in issued patents that may be infringed by our products or product candidates. If any third-party patents were held by a court of competent jurisdiction to cover aspects of our product candidates, including the formulation, method of use, any method or process involved in the manufacture of any of our product candidates, any molecules or intermediates formed during such manufacturing process or any other attribute of the final product itself, the holders of any such patents may be able to block our ability to commercialize our product candidates unless we obtain a license under the applicable patents, or until such patents expire. In either case, such a license may not be available on commercially reasonable terms or at all.

Parties making claims against us may request and/or obtain injunctive or other equitable relief, which could effectively block our ability to further develop and commercialize one or more of our product candidates on a temporary or permanent basis. Defense of these claims, regardless of their merit, would involve substantial litigation expense and would be a substantial diversion of employee resources from our business. In the event of a successful claim of infringement against us, we may have to pay substantial damages, including treble damages and attorneys' fees for willful infringement, obtain one or more licenses from third parties, pay royalties or redesign our infringing products or manufacturing processes, which may be impossible or require substantial time and monetary expenditure. We cannot predict whether any such license would be available at all or whether it would be available on commercially reasonable terms. Furthermore, even in the absence of litigation, we may need to obtain licenses from third parties to advance our research, manufacture clinical trial supplies or allow commercialization of our product candidates. We may fail to obtain any of these licenses at a reasonable cost or on reasonable terms, if at all. In that event, we would be unable to further develop and commercialize one or more of our product candidates, which could harm our business significantly. We cannot provide any assurances that third party patents do not exist which might be enforced against our products, resulting in either an injunction prohibiting our sales, or, with respect to our sales, an obligation on our part to pay royalties and/or other forms of compensation to third parties.

***If we fail to comply with our obligations in the agreements under which we license rights to technology from third parties, or if the license agreements are terminated for other reasons, we could lose license rights that are important to our business.***

We are a party to a number of technology licenses that are important to our business and expect to enter into additional licenses in the future. Our existing license agreements impose, and we expect that future license agreements will impose, on us, various development, regulatory and/or commercial diligence obligations, payment of milestones and/or royalties and other obligations. Additionally, one of our existing license agreements is a sublicense from a third party who is not the original licensor of the intellectual property at issue. Under these agreements, we must rely on our licensor to comply with their obligations under the primary license agreements under which such third party obtained rights in the applicable intellectual property, where we may have no relationship with the original licensor of such rights. If our licensors fail to comply with their obligations under these upstream license agreements, the original third-party licensor may have the right to terminate the original license, which may terminate our sublicense. If this were to occur, we would no longer have rights to the applicable intellectual property unless we are able to secure our own direct license with the owner of the relevant rights, which we may not be able to do at a reasonable cost or on reasonable terms, which may impact our ability to continue to develop and commercialize our product candidates and companion diagnostic incorporating the relevant intellectual property. If we fail to comply with our obligations under our license agreements, or we are subject to a bankruptcy or insolvency, the licensor may have the right to terminate the license. In the event that any of our important technology licenses were to be terminated by the licensor, we would likely cease further

54

development of the related program or be required to spend significant time and resources to modify the program to not use the rights under the terminated license.

***We may be involved in lawsuits to protect or enforce our patents or the patents of our licensors, which could be expensive, time consuming and unsuccessful.***

Competitors may infringe our patents or the patents of our licensors. To counter infringement or unauthorized use, we may be required to file infringement claims, which can be expensive and time-consuming. In addition, in an infringement proceeding, a court may decide that a patent of ours or our licensors is not valid or is unenforceable, or may refuse to stop the other party from using the technology at issue on the grounds that our patents do not cover the technology in question. An adverse result in any litigation or defense proceedings could put one or more of our patents at risk of being invalidated or interpreted narrowly and could put our patent applications at risk of not being issued.

Interference proceedings provoked by third parties or brought by us may be necessary to determine the priority of inventions with respect to our patents or patent applications or those of our collaborators or licensors. An unfavorable outcome could require us to cease using the related technology or to attempt to license rights to it from the prevailing party. Our business could be harmed if the prevailing party does not offer us a license on commercially reasonable terms. Our defense of litigation or interference proceedings may fail and, even if successful, may result in substantial costs and distract our management and other employees. We may not be able to prevent, alone or with our licensors, misappropriation of our intellectual property rights, particularly in countries where the laws may not protect those rights as fully as in the United States.

Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation. There could also be public announcements of the results of hearings, motions or other interim proceedings or developments. If securities analysts or investors perceive these results to be negative, it could have a material adverse effect on the price of our common stock.

***The patents and the patent applications that we have covering our products are limited to specific formulations, methods of use and processes, and our market opportunity for our products and our product candidates may be limited by the lack of patent protection for the active ingredients and by competition from other formulations and delivery methods that may be developed by competitors.***

Patent protection on the active ingredients in our currently marketed products (Ryanodex, Bendeka, Argatroban and Non-Alcohol Docetaxel Injection) has expired, and there is therefore no composition of matter patent protection available for the active ingredient in such products. This is also the case with respect to our other product candidates. We have obtained, and continue to seek to obtain patent protection of other aspects of our products and our product candidates, including specific formulations, methods of use and processes, which may not be as effective as composition of matter coverage in preventing workarounds by competitors. As a result, generic products that do not infringe the claims of our issued patents covering formulations, methods of use and processes are, or may be, available while we are marketing our products. Competitors who obtain the requisite regulatory approval could be able to commercialize products with the same active ingredients as our product candidates so long as the competitors do not infringe any process, use or formulation patents that we have developed for our products, subject to any regulatory exclusivity we may be able to obtain for our products.

The number of patents and patent applications covering products containing the same active ingredient as our products and our product candidates indicates that competitors have sought to develop and may seek to commercialize competing formulations that may not be covered by our patents and patent applications. The commercial opportunity for our products and our product candidates could be significantly harmed if competitors are able to develop and commercialize alternative formulations of our products and our product candidates that are different from ours and do not infringe our issued patents covering our products.

***Ryanodex® (dantrolene sodium), Belrapzo, and Bendeka ® among other products have been approved by the FDA, and we anticipate that other product candidates will be approved by the FDA in the future. Once our products are on the market, one or more third parties may also challenge the patents that we control covering our products, which could result in the invalidation or unenforceability of some or all of the relevant patent claims of our issued patents covering our products. Obtaining and maintaining our patent protection depends on compliance with various procedural, document submission, fee payment and other requirements imposed by governmental patent agencies, and our patent protection could be reduced or eliminated for non-compliance with these requirements.***

Ryanodex, Belrapzo, and Bendeka, among other of our products, have been approved by the FDA, and we anticipate that other product candidates will be approved by the FDA in the future. One or more third parties may also challenge the patents that we control covering our products in court or the USPTO, which could result in the invalidation or unenforceability of some or all of the relevant patent claims of our issued patents covering our products.

55

If we or one of our licensing partners initiated legal proceedings against a third party to enforce a patent covering one of our products or product candidates, the defendant could counterclaim that the patent covering our product or product candidate is invalid and/or unenforceable. In patent litigation in the United States, defendant counterclaims alleging invalidity and/or unenforceability are common, and there are numerous grounds upon which a third party can assert invalidity or unenforceability of a patent. Third parties may also raise similar claims before administrative bodies in the United States or abroad, even outside the context of litigation. Such mechanisms include re-examination, post grant review, and equivalent proceedings in foreign jurisdictions (e.g., opposition proceedings). Such proceedings could result in revocation or amendment to our patents in such a way that they no longer cover our products or product candidates. The outcome following legal assertions of invalidity and unenforceability is unpredictable. With respect to the validity question, for example, we cannot be certain that there is no invalidating prior art, of which we, our patent counsel and the patent examiner were unaware during prosecution. If a defendant were to prevail on a legal assertion of invalidity and/or unenforceability, we would lose at least part, and perhaps all, of the patent protection on our products or product candidates. Such a loss of patent protection could have a material adverse impact on our business.

Periodic maintenance fees on any issued patent are due to be paid to the USPTO and foreign patent agencies in several stages over the lifetime of the patent. The USPTO and various foreign governmental patent agencies require compliance with a number of procedural, documentary, fee payment and other similar provisions during the patent application process. While an inadvertent lapse can in many cases be cured by payment of a late fee or by other means in accordance with the applicable rules, there are situations in which non-compliance can result in abandonment or lapse of the patent or patent application, resulting in partial or complete loss of patent rights in the relevant jurisdiction. Non-compliance events that could result in abandonment or lapse of a patent or patent application include, but are not limited to, failure to respond to official actions within prescribed time limits, non-payment of fees and failure to properly legalize and submit formal documents. If we or our licensors that control the prosecution and maintenance of our licensed patents fail to maintain the patents and patent applications covering our products and product candidates, our competitors might be able to enter the market, which would have a material adverse effect on our business, financial condition and results of operations.

***We may be subject to claims that our employees, consultants or independent contractors have wrongfully used or disclosed confidential information of third parties.***

We employ individuals who were previously employed at other biotechnology or pharmaceutical companies. We may be subject to claims that we or our employees, consultants or independent contractors have inadvertently or otherwise used or disclosed confidential information of our employees' former employers or other third parties. We may also be subject to claims that former employers or other third parties have an ownership interest in our patents. Litigation may be necessary to defend against these claims. There is no guarantee of success in defending these claims, and if we are successful, litigation could result in substantial cost and be a distraction to our management and other employees.

***We may be subject to claims challenging the inventorship or ownership of our patents and other intellectual property.***

We may also be subject to claims that former employees, collaborators or other third parties have an ownership interest in our patents or other intellectual property. We may be subject to ownership disputes in the future arising, for example, from conflicting obligations of consultants or others who are involved in developing our products or product candidates and companion diagnostic. Litigation may be necessary to defend against these and other claims challenging inventorship or ownership. If we fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights, such as exclusive ownership of, or right to use, valuable intellectual property. Such an outcome could have a material adverse effect on our business, financial condition and results of operations. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees.

***Intellectual property rights do not necessarily address all potential threats to our competitive advantage.***

The degree of future protection afforded by our intellectual property rights is uncertain because intellectual property rights have limitations, and may not adequately protect our business or permit us to maintain our competitive advantage. The following examples are illustrative:

- others may be able to make compounds that are similar to our products or product candidates but that are not covered by the claims of the patents that we own or have exclusively licensed;

- we or our licensors or future collaborators might not have been the first to make the inventions covered by the issued patent or pending patent application that we own or have exclusively licensed;

- we or our licensors or future collaborators might not have been the first to file patent applications covering certain of our inventions;

- others may independently develop similar or alternative technologies or duplicate any of our technologies without infringing our intellectual property rights;

- it is possible that our pending patent applications will not lead to issued patents;

- issued patents that we own or have exclusively licensed may be held invalid or unenforceable as a result of legal challenges by our competitors;

- our competitors might conduct research and development activities in countries where we do not have patent rights and then use the information learned from such activities to develop competitive products for sale in our major commercial markets;

- we may not develop additional proprietary technologies that are patentable; and

- the patents of others may have an adverse effect on our business, financial condition and results of operations.

Should any of these events occur, they could significantly harm our business, results of operations and prospects.

**Risks Related to Ownership of Our Common Stock**

*Our stock price may continue to fluctuate significantly.*

The trading price of our common stock has fluctuated significantly in the past and is likely to continue to be volatile. Our stock price could be subject to wide fluctuations in response to a variety of factors, including the following:

- any delay in filing an NDA for any of our product candidates and any adverse development or perceived adverse development with respect to the FDA's review of that NDA;

- failure to successfully execute our commercialization strategy with respect to our approved products or any other approved product in the future;

- adverse results or delays in clinical trials, if any;

- significant lawsuits, including patent or stockholder litigation;

- inability to obtain additional funding;

- failure to successfully develop and commercialize our product candidates;

- changes in the structure of healthcare payment systems;

- changes in laws or regulations applicable to our product candidates;

- inability to obtain adequate product supply for our product candidates, or the inability to do so at acceptable prices;

- unanticipated serious safety concerns related to the use of our products or any of our product candidates;

- adverse regulatory decisions;

- introduction of new products or technologies by our competitors;

- entry into new markets by our competitors;

- failure to meet or exceed product development or financial projections we provide to the public;

- failure to meet or exceed the estimates and projections of the investment community;

- the perception of the pharmaceutical industry by the public, legislatures, regulators and the investment community;

- announcements of significant acquisitions, strategic partnerships, joint ventures or capital commitments by us or our competitors;

- disputes or other developments relating to proprietary rights, including patents, litigation matters and our ability to obtain patent protection for our technologies;

- additions or departures of key scientific or management personnel;

- changes in the market valuations of similar companies;

- sales of our common stock by us or our stockholders in the future;

- the trading volume of our common stock;

57

- changes in the collective short interest in our common stock; and

- additional repurchases of our common stock, if any, pursuant to our current share repurchase program.

The stock market in general, and The Nasdaq Stock Market, or Nasdaq, in particular, has experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of listed companies. Broad market and industry factors may negatively affect the market price of our common stock, regardless of our actual operating performance.

In addition, the market price of our shares of common stock could be subject to wide fluctuations in response to many risk factors listed in this section, and others beyond our control, including:

- actual or anticipated fluctuations in our financial condition and operating results;

- actual or anticipated changes in our growth rate relative to our competitors;

- announcements of significant acquisitions, strategic partnerships, joint ventures, collaborations, or capital commitments;

- issuance of new or updated research or reports by securities analysts;

- fluctuations in the valuation of companies perceived by investors to be comparable to us;

- share price and volume fluctuations attributable to short interest positions and/or inconsistent trading volume levels of our shares;

- disputes or other developments related to proprietary rights, including patents, litigation matters, and our ability to obtain patent protection for our technologies;

- announcement or expectation of additional debt or equity financing efforts;

- sales of our common stock by us, our insiders or our other stockholders;

- impacts of the COVID-19 pandemic, and

- general economic and market conditions.

These and other market and industry factors may cause the market price and demand for our common stock to fluctuate substantially, regardless of our actual operating performance, which may limit or prevent investors from readily selling their shares of common stock and may otherwise negatively affect the liquidity of our common stock. In addition, the stock market in general, and Nasdaq and biopharmaceutical companies in particular, have experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of these companies. In the past, when the market price of a stock has been volatile, holders of that stock have instituted securities class action litigation against the company that issued the stock. For example, in May 2016, we became party to a federal securities class action lawsuit, and although it was dismissed in October 2017, we incurred substantial costs defending such lawsuit. Such lawsuit, as well as similar lawsuits instituted in the future, could result in substantial additional costs to us and could also divert the time and attention of our management.

***Our principal stockholders and management own a significant percentage of our stock and will be able to exert significant control over matters subject to stockholder approval.***

As of December 31, 2020, our executive officers, directors, 5% or greater stockholders and their affiliates beneficially own a significant percentage of our voting stock. These stockholders will have the ability to influence us through this ownership position. These stockholders may be able to influence all matters requiring stockholder approval. For example, these stockholders, acting together, may be able to influence elections of directors, amendments of our organizational documents or approval of any merger, sale of assets or other major corporate transaction. This may prevent or discourage unsolicited acquisition proposals or offers for our common stock that you may believe are in your best interest as one of our stockholders.

***We have incurred significant costs as a result of operating as a public company, and our management is required to devote substantial time to new compliance initiatives.***

As a public company, we incur significant ongoing legal, accounting and other expenses.

For example, we are subject to the reporting requirements of the Exchange Act, which require, among other things, that we file with the SEC, annual, quarterly and current reports with respect to our business and financial condition. We have incurred and will continue to incur costs associated with the preparation in filing of these reports. In addition, the Sarbanes-Oxley Act, as well as rules subsequently implemented by the SEC, and Nasdaq have imposed various other requirements on public companies

58

and we have incurred and will continue to incur costs associated with compliance with such requirements. In July 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act, or the Dodd-Frank Act, was enacted. There are significant corporate governance and executive compensation related provisions in the Dodd-Frank Act that required the SEC to adopt additional rules and regulations in these areas such as "say on pay" and proxy access. Stockholder activism, the current political environment and the current high level of government intervention and regulatory reform may lead to substantial new regulations and disclosure obligations, which may lead to additional compliance costs and impact (in ways we cannot currently anticipate) the manner in which we operate our business. Our management and other personnel need to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations increase our legal and financial compliance costs and make some activities more time-consuming and costly. For example, we expect these rules and regulations to make it more difficult and more expensive for us to obtain director and officer liability insurance and we may be required to incur substantial costs to maintain our current levels of such coverage.

*Sales of a substantial number of shares of our common stock in the public market by our existing stockholders could cause our stock price to fall.*

Sales of a substantial number of shares of our common stock by our existing stockholders in the public market or the perception that these sales might occur, could depress the market price of our common stock and could impair our ability to raise capital through the sale of additional equity securities. We are unable to predict the effect that such sales may have on the prevailing market price of our common stock.

As of February 25, 2021 we had 13,217,284 shares of common stock outstanding, all of which, other than shares held by our directors and certain officers, are eligible for sale in the public market, subject in some cases to compliance with the requirements of Rule 144, including volume limitations and manner of sale requirements.

In addition, shares issued upon exercise of vested options are eligible for sale. Sales of stock by these stockholders could have a material adverse effect on the trading price of our common stock..

*Future issuances of our common stock or rights to purchase our common stock, including pursuant to our equity incentive plans, could result in additional dilution of the percentage ownership of our stockholders and could cause our stock price to fall.*

We expect that significant additional capital will be needed in the future to continue our planned operations. To the extent we raise additional capital by issuing equity securities, our stockholders may experience substantial dilution. We may sell common stock, convertible securities or other equity securities in one or more transactions at prices and in a manner we determine from time to time. If we sell common stock, convertible securities or other equity securities in more than one transaction, investors may be materially diluted by subsequent sales. These sales may also result in material dilution to our existing stockholders, and new investors could gain rights superior to our existing stockholders.

Pursuant to our 2014 Equity Incentive Plan, ("the 2014 Plan"), our management is authorized to grant stock options and other equity-based awards to our employees, directors and consultants. The number of shares available for future grant under the 2014 Plan will automatically increase each year by 6% of all shares of our capital stock outstanding as of December 31 of the prior calendar year, subject to the ability of our board of directors to take action to reduce the size of the increase in any given year. Currently, we plan to register the increased number of shares available for issuance under the 2014 Plan each year. If our board of directors elects to increase the number of shares available for future grant by the maximum amount each year, our stockholders may experience additional dilution, which could cause our stock price to fall.

*We are at risk of securities class action and similar litigation.*

In the past, securities class action litigation has often been brought against a company following a decline in the market price of its securities. This risk is especially relevant for us because pharmaceutical companies have experienced significant stock price volatility in recent years. On May 31, 2016, a federal securities class action suit was brought against us seeking compensatory damages in connection with, among other things, the CRL we received with respect to our NDA for EP-6101. Such lawsuit was dismissed with prejudice in August 2017, however, any similar litigation in the future, could result in substantial cost and a diversion of management's attention and resources, which could harm our business.

*We do not intend to pay cash dividends on our common stock so any returns will be limited to the value of our stock.*

We have never declared or paid any cash dividend on our common stock. We currently anticipate that we will retain future earnings for the development, operation and expansion of our business and do not anticipate declaring or paying any cash dividends for the foreseeable future. Any future determinations to pay cash dividends will be made at the discretion of our board of directors, subject to applicable laws, and will depend on a number of factors, including our financial condition, results of operations, capital requirements, contractual restrictions (such as our Credit Facility), general business conditions, and any

59

other factors that our board of directors may deem relevant. Any return to stockholders will therefore be limited to the appreciation of their stock.

***There is no assurance that our Share Repurchase Program will result in repurchases of our common stock or enhance long term stockholder value.***

Repurchases of our common stock pursuant to our Share Repurchase Program could affect our stock price and increase its volatility and will reduce the market liquidity for our stock. The existence of a share repurchase program could also cause our stock price to be higher than it would be in the absence of such a program. Additionally, any future repurchases would diminish our cash reserves, which could impact our ability to pursue possible future strategic opportunities and acquisitions. There can be no assurance that any stock repurchases will, in fact, occur, or, if they occur, that they will enhance stockholder value.

***Provisions in our amended and restated certificate of incorporation and bylaws, as well as provisions of Delaware law, could make it more difficult for a third party to acquire us or increase the cost of acquiring us, even if doing so would benefit our stockholders or remove our current management.***

Some provisions of our charter documents and Delaware law may have anti-takeover effects that could discourage an acquisition of us by others, even if an acquisition would be beneficial to our stockholders and may prevent attempts by our stockholders to replace or remove our current management. These provisions include:

- authorizing the issuance of "blank check" preferred stock, the terms of which may be established and shares of which may be issued without stockholder approval;

- limiting the removal of directors by the stockholders;

- creating a classified board of directors;

- prohibiting stockholder action by written consent, thereby requiring all stockholder actions to be taken at a meeting of our stockholders;

- eliminating the ability of stockholders to call a special meeting of stockholders; and

- establishing advance notice requirements for nominations for election to the board of directors or for proposing matters that can be acted upon at stockholder meetings.

These provisions may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors, which is responsible for appointing the members of our management. In addition, we are subject to Section 203 of the Delaware General Corporation Law, which generally prohibits a Delaware corporation from engaging in any of a broad range of business combinations with an interested stockholder for a period of three years following the date on which the stockholder became an interested stockholder, unless such transactions are approved by our board of directors. This provision could have the effect of delaying or preventing a change of control, whether or not it is desired by or beneficial to our stockholders. Further, other provisions of Delaware law may also discourage, delay or prevent someone from acquiring us or merging with us.

***Our amended and restated bylaws provide that the Court of Chancery of the State of Delaware is the exclusive forum for certain disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees.***

Our amended and restated bylaws provide that the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for any derivative action or proceeding brought on behalf of the Company, any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Company to the Company or the Company's stockholders, any action asserting a claim arising pursuant to any provision of the Delaware General Corporation Law or any action asserting a claim governed by the internal affairs doctrine. This forum selection provision does not apply to suits brought to enforce a duty or liability created by the Securities Act or the Exchange Act or any claim for which the federal courts have exclusive jurisdiction.

This forum selection provision may limit a stockholder's ability to bring certain claims in a judicial forum that it finds favorable for disputes with us or any of our directors, officers, other employees or stockholders, which may discourage lawsuits with respect to such claims, although our stockholders will not be deemed to have waived our compliance with federal securities laws and the rules and regulations thereunder. If a court were to find this forum selection provision to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could adversely affect our business and financial condition.

60

**Item 1B. Unresolved Staff Comments**

None.
**Item 2. Properties**

As of December 31, 2020 we conducted all of our commercial operations for Eagle Pharmaceuticals, Inc. at our 27,093 square foot leased office space located at 50 Tice Boulevard, Suite 315, Woodcliff Lake, NJ 07677. The lease will expire in June 2025.

As of December 31, 2020, we conducted all of our non-outsourced operations at a leased space located at 47 Moulton St. Cambridge, MA 02138. The lease will expire in April 2024.

We consider our current facilities suitable and adequate to meet our current needs.

**Item 3. Legal Proceedings**

The disclosures under Note 13. Legal Proceedings in the Consolidated Financial Statements included in Part IV, Item 15 of this report are incorporated into this Part I, Item 3 by reference.

**Item 4. Mine Safety Disclosures**

Not applicable.

61

**PART II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

Our common stock has been listed on The Nasdaq Global Market under the symbol "EGRX" since February 12, 2014. Prior to that date, there was no public trading market for our common stock.

*Record Holders*

As of February 25, 2021, we had 4 holders of record of our common stock. The actual number of shareholders is greater than this number of record holders and includes shareholders who are beneficial owners but whose shares are held in street name by brokers and other nominees. This number of holders of record also does not include shareholders whose shares may be held in trust by other entities. The closing price per share of our common stock on February 25, 2021 was $45.78.

*Dividends*

We have never declared or paid a cash dividend on our common stock. We currently intend to retain any future earnings and do not expect to pay any dividends in the foreseeable future. In addition, our Credit Facility imposes contractual restrictions on us with respect to paying cash dividends. Any future determinations to pay cash dividends will be made at the discretion of our board of directors, subject to applicable laws, and will depend on a number of factors, including our financial condition, results of operations, capital requirements, contractual restrictions, general business conditions, and any other factors that our board of directors may deem relevant.

*Stock Performance Graph*

*The following information shall not be deemed to be "soliciting material" or to be "filed" with the SEC or subject to Regulation 14A or 14C under the Securities Exchange Act of 1934, as amended, ("the Exchange Act"), or to the liabilities of Section 18 of the Exchange Act, and will not be deemed to be incorporated by reference into any filing of Eagle Pharmaceuticals, Inc. under the Exchange Act or the Securities Act of 1933, as amended, ("the Securities Act"), except to the extent we specifically incorporate it by reference into such filing.*

The following graph shows a five year comparison from December 31, 2015 through December 31, 2020 of the cumulative total return for our common stock, and the Nasdaq Composite Index and The Nasdaq Biotechnology Index. The graph assumes that $100 was invested at the market close on December 31, 2015 in the common stock of Eagle Pharmaceuticals, Inc, the Nasdaq Composite Index and the Nasdaq Biotechnology Index. The stock price performance of the following graph is not necessarily indicative of future stock price performance.

**Comparison of 5 year Cumulative Total Return**
**Assumes initial investment $100**
**December 31, 2020**



| Company / Index | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 |
|---|---|---|---|---|---|---|
| Eagle Pharmaceuticals, Inc | $ 100 | $ 89 | $ 60 | $ 45 | $ 68 | $ 53 |
| Nasdaq Composite | $ 100 | $ 108 | $ 138 | $ 133 | $ 179 | $ 258 |
| NASDAQ Biotechnology | $ 100 | $ 78 | $ 95 | $ 86 | $ 107 | $ 134 |

*Recent Sales of Unregistered Securities*

Pursuant to a Warrant to Purchase Common Stock, dated September 2018, the Company issued a warrant to FoxKiser LLP to purchase 7,467 shares of the Company's common stock at an exercise price of $66.96 per share in connection with certain services rendered to the Company. This warrant was issued in reliance on an exemption from registration under Section 4(a)(2) of the Securities Act of 1933, as amended.

*Issuer Purchases of Equity Securities*

**Share Repurchase Program**

On March 17, 2020, we announced that our Board approved a share repurchase program, or the Share Repurchase Program, providing for the repurchase of up to an aggregate of $160.0 million of the Company's outstanding common stock. The Share Repurchase Program replaces the Previous Share Repurchase Program, which was announced on October 30, 2018 and was terminated in connection with the Board's approval of the Share Repurchase Program. At termination, we had repurchased approximately $68.0 million of our outstanding common stock under the Previous Share Repurchase Program.

Under the Share Repurchase Program, we are authorized to repurchase shares through open market purchases, privately-negotiated transactions, accelerated share repurchases or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Securities Exchange Act of 1934, as amended. The repurchases have no time limit and may be suspended or discontinued completely at any time. The specific timing and amount of repurchases will vary based on available capital resources and other financial and operational performance, market conditions, securities law limitations, and other factors. The repurchases will be made using our cash resources.

On September 23, 2020, the Company's Board of Directors approved a $25.0 million accelerated share repurchase ("ASR") transaction with JPMorgan Chase Bank, National Association ("JP Morgan") as part of the Company's existing $160.0 million share repurchase program. The specific number of shares to be repurchased pursuant to the ASR is based on the average of the daily volume weighted average share prices of the Company's common stock, less a discount, during the term of the ASR program. Under the terms of the Company's agreement with JP Morgan, the Company paid $25.0 million to JP Morgan on September 24, 2020, and received 550,623 shares, representing the notional amount of the ASR, based on the average of the daily volume weighted average share prices of the Company's common stock, less a discount, during the term of the ASR, which was $45.40. The ASR was completed in the fourth quarter of 2020.

The following table provides information about purchases of our equity securities during the three months ended December 31, 2020:

| Period | Total Number of Shares Purchased (1)(2)(3)(4)(5) | Average Price Paid per Share | Total Number of Shares Purchased as Part Publicly Announced Plans or Programs | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Programs |
|---|---|---|---|---|
| | | | | (dollars in thousands) |
| October 1, 2020 to October 31, 2020 | — | $ — | — | 131,998 |
| November 1, 2020 to November 30, 2020 | 44,806 | $ 45.40 | 44,806 | 126,998 |
| December 1, 2020 to December 31, 2020 | 42,819 | $ 46.71 | 42,819 | 124,997 |
| **Total** | 87,625 | $ 46.04 | 87,625 | |

(1) All shares repurchased by us during the three months ended December 31, 2020 were repurchased pursuant to the Share Repurchase Program, described above.

*Securities Authorized for Issuance Under Equity Compensation Plans*

Information about securities authorized for issuance under our equity compensation plans is incorporated herein by reference to Item 12 of Part III of this annual report on Form 10-K.

**Item 6. Selected Financial Data**

The following table sets forth our selected financial data for the periods and as of the dates indicated. The following selected financial data should be read in conjunction with our audited financial statements and the related notes thereto included elsewhere in this Annual Report on Form 10-K and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of this Annual Report on Form 10-K.

The statement of operations data for the years ended December 31, 2020, 2019, 2018, 2017, and 2016 and the balance sheet data as of December 31, 2020, 2019, 2018, 2017 and 2016, are derived from our audited consolidated financial statements. Our audited consolidated financial statements have been prepared in U.S. dollars in accordance with U.S. GAAP.

Our historical results for any prior period are not necessarily indicative of results to be expected in any future period.

64

| Statement of Operations Data: | Year Ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2020 | 2019 | 2018 | 2017 | 2016 |
| | (in thousands except share and per share amounts) | | | | |
| Total revenue | $ 187,802 | $ 195,892 | $ 213,312 | $ 236,707 | $ 189,482 |
| Cost of product sales | 33,647 | 47,891 | 42,374 | 33,714 | 35,785 |
| Cost of royalty revenue | 11,818 | 13,006 | 19,542 | 23,472 | 19,521 |
| Research and development | 30,785 | 36,810 | 44,419 | 32,607 | 28,289 |
| Selling, general and administrative | 78,598 | 76,370 | 60,509 | 71,416 | 53,329 |
| Income from operations | 32,954 | 21,815 | 36,616 | 73,990 | 53,351 |
| Income tax provision (benefit) | 10,688 | 7,685 | 2,135 | 21,002 | (28,026) |
| Net income attributable to common stockholders | 11,989 | 14,313 | 31,903 | 51,943 | 81,453 |
| Earnings per share- basic | $ 0.89 | $ 1.04 | $ 2.16 | $ 3.44 | $ 5.24 |
| Earnings per share- diluted | $ 0.87 | $ 1.01 | $ 2.09 | $ 3.27 | $ 4.96 |
| Weighted average common shares outstanding- basic | 13,481,525 | 13,754,516 | 14,768,625 | 15,102,890 | 15,533,681 |
| Weighted average common shares outstanding-diluted | 13,771,393 | 14,138,733 | 15,278,651 | 15,908,211 | 16,434,104 |

| Balance Sheet Data: | December 31, | | | | |
|---|---|---|---|---|---|
| | 2020 | 2019 | 2018 | 2017 | 2016 |
| | (in thousands) | | | | |
| Cash and cash equivalents | $ 103,155 | $ 109,775 | $ 78,791 | $ 114,657 | $ 52,820 |
| Accounts receivable | 51,117 | 48,004 | 66,486 | 53,821 | 42,194 |
| Total assets | 253,190 | 254,554 | 238,603 | 270,060 | 214,320 |
| Total current liabilities | 38,085 | 38,823 | 39,686 | 47,302 | 40,965 |
| Long-term debt, less current portion | 25,135 | 33,557 | 38,155 | 42,905 | — |
| Retained earnings (Accumulated deficit) | 84,489 | 72,500 | 58,187 | 26,284 | (25,659) |
| Total stockholders' equity | $ 186,011 | $ 179,174 | $ 160,762 | $ 179,144 | $ 151,226 |

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis of financial condition and results of operations is provided to enhance the understanding of, and should be read in conjunction with, Part I, Item 1, "Business" and Item 8, "Financial Statements and Supplementary Data." For information on risks and uncertainties related to our business that may make past performance not indicative of future results, or cause actual results to differ materially from any forward-looking statements, see "Special Note Regarding Forward-Looking Statements," and Part I, Item 1A, "Risk Factors."*

**Overview**

We are an integrated pharmaceutical company focused on finding ways to help medicines do more for patients. Along with our collaborators, we have the capabilities to take a molecule from preclinical research through regulatory approval and into the marketplace, including development, manufacturing and commercialization of our products and product candidates. Our business model applies our scientific expertise, proprietary research-based insights and marketplace proficiency to identify challenging-to-treat diseases of the central nervous system or metabolic critical care therapeutic areas as well as in oncology. By focusing on patients' unmet needs, we strive to provide healthcare professionals with urgently needed treatment solutions that are designed to improve patient care and outcomes and create near- and long-term value for our stakeholders, including patients and healthcare providers and our employees, marketing partners, collaborators and stockholders.

Our science-based business model has a proven track record with the U.S. Food and Drug Administration, or FDA, approval and commercial launches of three products: Ryanodex, Belrapzo and Bendeka. We market our products through marketing partners and/or our internal direct sales force. We market Ryanodex and Belrapzo, and Teva markets Bendeka through its subsidiary, Cephalon, Inc. Reflecting further expansion of our oncology portfolio, in February 2020, we received final FDA approval for Pemfexy, a branded alternative to Alimta for metastatic non-squamous non-small cell lung cancer and malignant pleural mesothelioma. We expect to launch Pemfexy in early 2022.

With several pipeline projects underway and the potential for up to five or more product launches over the next several years, we believe we have many growth opportunities ahead. We believe that each of our pipeline projects currently has the potential to enter the market as a first-in-class, first-to-file or best-in-class product. In particular, we are applying our expertise to conduct novel research regarding the potential for Ryanodex to address conditions including Alzheimer's disease, traumatic brain injury/concussion, nerve agent exposure and acute radiation syndrome. In addition, our clinical development program includes a strategic partnership with Tyme for SM-88, a product candidate for the treatment of patients with pancreatic or other advanced cancers, as well as investigations of compounds such as EA-114 and our Fulvestrant product candidate for patients with HR-positive advanced breast cancer. Other products in development include Vasopressin, our first-to-file Abbreviated New Drug Application, or ANDA, that references Endo International plc's Vasostrict indicated to increase blood pressure in adults with vasodilatory shock who remain hypotensive despite fluids and catecholamines; and EA-111, a new chemical entity and next-generation ryanodine receptor antagonist, in an intramuscular formulation that that would allow for easier and more rapid administration in emergency situations (military and civilian).

**Recent Developments**

***Vasopressin - FDA***

On February 2, 2021, we announced that the U.S. Food and Drug Administration, or FDA, issued a complete response letter, or CRL, for our ANDA for vasopressin. Eagle has now had two conversations with FDA regarding the CRL and expects to have an additional meeting with FDA in the near-term. Importantly, Eagle has completed an extensive amount of developmental work and continues to do so for its first-to-file polypeptide, where brand sales of the product are over $700 million annually. In its communication with the Company, FDA restated that it has prioritized Eagle's ANDA, and that the ANDA has also been flagged as a COVID-19 priority by FDA. Eagle believes it can fully respond to the questions raised. There is one additional short duration study that will need to be completed and analyzed. The study will be run in mid-March. Based on similar studies previously run on our vasopressin product, we expect the results will be satisfactory. In addition, we expect we will have a 180 day period of exclusivity for Vasopressin.

***Vasopressin - Patent litigation***

On February 2, 2021, we also announced that our ongoing patent suit with Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Endo Par Innovation Company, LLC, or together, Par, is now scheduled to begin on July 7, 2021. Eagle remains confident about this litigation given that Par's asserted patents claim a formulation with a pH of 3.7-3.9 and Eagle's proposed ANDA product specifies a pH outside of that range. The Company is confident that its ANDA will be approved in a reasonable timeframe.

***Complete Response Letter for NDA for Ryanodex***

On August 7, 2020, we received a Complete Response Letter for our NDA for Ryanodex for the treatment of exertional heat stroke, or EHS; we decided that we will no longer pursue this indication in order to direct our resources to other product candidates.

***Executive Officer Transitions***
*Chief Medical Officer*

Effective July 31, 2020, Adrian J. Hepner, M.D., Ph.D. resigned as our Executive Vice President and Chief Medical Officer. On July 31, 2020, we entered into a consulting agreement with Dr. Hepner, or the Consulting Agreement. Pursuant to the

66

Consulting Agreement, Dr. Hepner will provide consulting services to us until July 31, 2021, unless earlier terminated, or the Consulting Period. In consideration of Dr. Hepner's provision of consulting services, we have agreed to pay Dr. Hepner (i) a weekly retainer of $8,000 for 20 hours of services each week for the first six months of the Consulting Period and (ii) a weekly retainer of $4,000 for 10 hours of services each week for the remaining six months of the Consulting Period. We will also continue to pay the employer portion of Dr. Hepner's COBRA medical continuation benefits until January 31, 2022.

On October 29, 2020, Judith Ng-Cashin, M.D. was appointed as our Chief Medical Officer.

*Chief Financial Officer*
As of October 29, 2020, Pete Meyers ceased to serve as our Chief Financial Officer. In connection with his departure, Mr. Meyers received the severance compensation provided for under our previously disclosed Amended and Restated Severance Benefit Plan and Mr. Meyers' participation agreement thereunder, for a non-change in control covered termination.

On October 29, 2020, Brian Cahill was appointed as our Chief Financial Officer. Mr. Cahill has served as our Vice President of Finance since January 2018 and previously served as our Corporate Controller from October 2016 to December 2017. O
n December 18, 2020, in connection with his new role, the compensation committee of our board of directors approved an annual base salary for Mr. Cahill of $380,000 effective as of October 29, 2020 and a target annual bonus for fiscal year 2021 set at 60% of his base salary, with the amount of his bonus to be determined by the compensation committee based on our achievement of our annual corporate objectives established by the compensation committee. The compensation committee also approved equity grants to Mr. Cahill of 5,000 restricted stock units and 10,000 stock options.

### Change in Independent Registered Public Accounting Firm
On September 25, 2020, the Audit Committee of the Board of Directors approved the engagement of Ernst & Young, LLP as our independent registered public accounting firm for the fiscal year ending December 31, 2020, and dismissed BDO USA, LLP, as our current independent registered public accounting firm.

### COVID-19 Business Update

In response to the ongoing COVID-19 pandemic, we have taken and continue to take active measures designed to address and mitigate the impact of the COVID-19 pandemic on its business, such as remote working policies, facilitating management's daily communication to address employee and business concerns and providing frequent updates to the Board. We anticipate that the COVID-19 pandemic may have an impact on the clinical development timeline for EA-114. We anticipate that the COVID-19 pandemic will continue to delay our supply chain and marketing and sales efforts for certain of its products, including Bendeka, although it is not currently expected that any disruption would be material. The COVID-19 pandemic and associated lockdowns have resulted in a decrease in healthcare utilization broadly and specifically lead to a continuing reduction in the utilization of physician-administered oncology products including Belrapzo and Bendeka. In addition, the COVID-19 pandemic has delayed the timing of ongoing litigation, including the litigation with Par Pharmaceutical, Inc. and its affiliated entities with respect to Vasopressin, and we anticipate that such delays will continue for the duration of the pandemic. While we have experienced variable financial impacts to date, the ongoing COVID-19 pandemic, including the global economic slowdown, government measures taken in response thereto, the overall disruption of global healthcare systems and other risks and uncertainties associated with the pandemic, could materially adversely affect our business, financial condition, results of operations and growth prospects. We continue to closely monitor the COVID-19 pandemic as we evaluate and evolve our business plans and response strategy. The impact of the COVID-19 pandemic on our business and financial condition is more fully described below in *Trends and Uncertainties*.

**Financial Operations Overview**

### Revenue

Our revenue consists of product sales, royalty revenue and license and other revenue.

*Product Sales*. Through December 31, 2020, we have recognized revenues from product sales of Bendeka, Argatroban, Ryanodex and Belrapzo. Sales of Bendeka were made to our commercial partner, Teva, while Argatroban was sold directly to our commercial partners, Chiesi USA, Inc. ("Chiesi") and Sandoz AG, or Sandoz. Sales to our commercial partners are typically made at little or no profit for resale. Ryanodex and Belrapzo were sold directly to wholesalers, hospitals and surgery centers through a third-party logistics partner.

We typically enter into agreements with group purchasing organizations acting on behalf of their hospital members, in connection with the hospitals' purchases of our direct commercial products. Based on these agreements, most of our hospital customers have contracted prices for products and volume-based rebates on product purchases. These amounts are estimated

and recorded at the time of sale. In the case of discounted pricing, we typically pay a chargeback, representing the difference between the price invoiced to the wholesaler and the customer contract price.

*Royalty Revenue.* We recognize revenue from royalties based on a percentage of Teva's net sales of Bendeka and Sandoz's and Chiesi's gross profits of Argatroban, both net of discounts, returns and allowances incurred by our commercial partners. Royalty revenue is recognized as earned in accordance with contract terms when it can be reasonably estimated and collectability is reasonably assured.

*License and Other Revenue.* Our revenues may either be in the form of the recognition of deferred revenues upon milestone achievement for which cash has already been received or recognition of revenue upon milestone achievement for which the payment is reasonably assured to be received in the future.

The primary factors that determine our revenues derived from Bendeka are:

- the level of orders submitted by our commercial partner, Teva;
- the rate at which Teva can convert the current market to Bendeka;
- the level of institutional demand for Bendeka;
- unit sales prices charged by Teva, net of any sales reserves; and
- the level of orders submitted by wholesalers, hospitals and surgery centers.

The primary factors that may determine our revenues derived from Argatroban are:

- the level of orders submitted by our commercial partners, Sandoz and Chiesi;
- the level of institutional demand for Argatroban; and
- unit sales prices charged by Sandoz and Chiesi, net of any sales reserves.

The primary factors that may determine our revenues derived from Ryanodex, Belrapzo and our future products are:

- the effectiveness of our sales force;
- the level of orders submitted by wholesalers, hospitals and surgery centers;
- the level of institutional demand for our products; and
- unit sales prices, net of any sales reserves.

### *Cost of Revenues*

Cost of revenue consists of the costs associated with producing our products for our commercial partners. In particular, our cost of revenue includes production costs of our products paid to a contract manufacturing organization coupled with shipping and customs charges, cost of royalty and the amortization of intangible assets. Cost of revenue may also include the effects of product recalls, if applicable.

### *Research and Development*

Costs for research and development are charged to expenses as incurred and include: employee-related expenses including salaries, benefits, travel and stock-based compensation expense for research and development personnel; expenses incurred under agreements with contract research organizations, contract manufacturing organizations and service providers that assist in conducting clinical and preclinical studies; costs associated with preclinical activities and development activities; costs associated with regulatory operations; and depreciation expense for assets used in research and development activities.

Costs for certain development activities, such as clinical studies, are recognized based on an evaluation of the progress to completion of specific tasks using data such as patient enrollment, clinical site activations, or information provided to the Company by its vendors on their actual costs incurred. Payments for these activities are based on the terms of the individual arrangements, which may differ from the patterns of costs incurred, and are reflected in the consolidated financial statements as prepaid expenses or accrued expenses as deemed appropriate. Recoveries of previously recognized research and development expenses from third parties are recorded as a reduction to research and development expense in the period it becomes realizable.

### *Selling, General and Administrative*

Selling, general and administrative costs consist of employee-related costs including salaries, benefits and other related costs, stock-based compensation for executive, finance, sales and operations personnel. Selling, general and administrative expenses also include facility and related costs, professional fees for legal, consulting, tax and accounting services, insurance, selling, marketing, market research, advisory board and key opinion leaders, depreciation and general corporate expenses.

*Income Taxes*

We account for income taxes using the liability method in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 740, "Income Taxes," or ASC 740. Deferred tax assets and liabilities are determined based on temporary differences between financial reporting and tax bases of assets and liabilities and are measured by applying enacted rates and laws to taxable years in which differences are expected to be recovered or settled. Further, the effect on deferred tax assets and liabilities of a change in tax rates is recognized in income (loss) in the period that the rate changes. A valuation allowance is required when it is "more likely than not" that all or a portion of deferred tax assets will not be realized. ASC 740 also prescribes a comprehensive model for how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that it has taken or expects to take on a tax return, including a decision whether to file or not file a return in a particular jurisdiction. We recognize any interest and penalties accrued related to unrecognized tax benefits as income tax expense. The provision for income taxes was based on the applicable federal and state tax rates for those periods. The effective tax rate for the years ended December 31, 2020, 2019 and 2018 reflect items such as the impact of a valuation allowance established and adjusted for the fair value adjustments on our investment in Tyme, certain non-deductible executive compensation, changes in state filing positions partially offset by credits for research and development activity.

**Results of Operations**

*Comparison of Years Ended December 31, 2020 and December 31, 2019*

*Revenues*

| | Year Ended December 31, | | (Decrease) |
|---|---|---|---|
| | **2020** | **2019** | |
| | (in thousands) | | |
| Product sales, net | $ 72,323 | $ 73,989 | $ (1,666) |
| Royalty revenue | 110,479 | 112,903 | (2,424) |
| License and other revenue | 5,000 | 9,000 | (4,000) |
| Total revenue | $ 187,802 | $ 195,892 | $ (8,090) |

Product sales decreased $1.7 million in the year ended December 31, 2020, primarily driven by decreases in product sales of Bendeka of $15.7 million coupled with decreases in Belrapzo's product sales of $2.1 million primarily due to volume decreases. In addition, the COVID-19 pandemic and associated lockdowns have resulted in a decrease in healthcare utilization broadly and specifically have led to a reduction in the utilization of physician-administered oncology products including Belrapzo and Bendeka. The decreased sales were partially offset by increases in product sales of Ryanodex of $15.2 million due to higher volume coupled with product sales of $0.9 million from the 2020 product launch of Treakisym.

Royalty revenue decreased $2.4 million in the year ended December 31, 2020 as a result of decreases in royalties on Teva's sales of Bendeka of $1.1 million and royalties on sales of Argatroban of $1.3 million.

Our license and other revenue decreased $4.0 million in the year ended December 31, 2020 as compared to the year ended December 31, 2019. In 2019, we received an upfront cash payment of $9.0 million upon execution of an amendment to the Bendeka License Agreement, dated March 29, 2019 to terminate Teva's obligation to pay future milestones and royalties on Bendeka sales outside of the U.S. In 2020, we received a $5.0 million milestone payment earned in the three months ended September 30, 2020 from SymBio upon regulatory approval of Treakisym ready-to-dilute (250 ml) liquid bendamustine formulation from the Pharmaceuticals and Medical Devices Agency in Japan.

*Cost of Revenue*

| | Year Ended December 31, | | (Decrease) |
|---|---|---|---|
| | **2020** | **2019** | |
| | (in thousands) | | |
| Cost of product sales | $ 33,647 | $ 47,891 | $ (14,244) |
| Cost of royalty revenue | 11,818 | 13,006 | (1,188) |
| Total cost of revenue | $ 45,465 | $ 60,897 | $ (15,432) |

69

Cost of product sales decreased $14.2 million in the year ended December 31, 2020, primarily as a result of decreased product sales of Belrapzo and Bendeka, partially offset by increased product sales of Ryanodex and the 2020 product launch of Treakisym.

Cost of royalty revenue decreased $1.2 million in the year ended December 31, 2020 primarily as a result of a decrease in royalty revenue on Teva's sales of Bendeka.

*Research and Development*

The table below details our research and development expenses by significant project for the periods presented.

| | Year Ended December 31, | | | | Increase / (Decrease) | |
| | 2020 | | 2019 | | | |
| | (in thousands) | | | | | |
|---|---|---|---|---|---|---|
| Fulvestrant "EGL-5385-C-1701" | $ | 6,802 | $ | 5,053 | $ | 1,749 |
| Vasopressin | | 4,727 | | 7,779 | | (3,052) |
| Ryanodex EHS "EP-4104" | | 1,972 | $ | 5,192 | | (3,220) |
| All other projects | | 4,586 | $ | 3,980 | | 606 |
| Salary and other personnel related | $ | 12,698 | $ | 14,806 | | (2,108) |
| Research and development | $ | 30,785 | $ | 36,810 | $ | (6,025) |

The decrease primarily resulted from a decrease in clinical study project spending for vasopressin and Ryanodex for EHS indication, and employee-related costs, primarily stock compensation expense. This decrease was partially offset by increased spend related to our EGL-5385-C-1701 (our fulvestrant formulation) initiative.

*Selling, General and Administrative*

| | Year Ended December 31, | | | | Increase | |
| | 2020 | | 2019 | | | |
| | (in thousands) | | | | | |
|---|---|---|---|---|---|---|
| Selling, general and administrative | $ | 78,598 | $ | 76,370 | $ | 2,228 |

The increase is primarily related to $2.5 million of costs related to the collaboration with Tyme, coupled with $4.5 million increase in stock compensation. These increases were partially offset by travel and entertainment expense which decreased by $2.0 million primarily due to Covid-19 restrictions on travel coupled with a decrease in external legal fees related to ongoing litigation matters of $3.2 million.

*Other (Expense) Income, net*

| | Year Ended December 31, | | | | (Decrease) / Increase | |
| | 2020 | | 2019 | | | |
| | (in thousands) | | | | | |
|---|---|---|---|---|---|---|
| Interest income | $ | 562 | $ | 2,169 | $ | (1,607) |
| Interest expense | | (2,577) | | (2,686) | | 109 |
| Other (expense) income | | (8,262) | | 700 | | (8,962) |
| Total other (expense) income, net | $ | (10,277) | $ | 183 | $ | (10,460) |

Interest income decreased primarily due to lower interest rates associated with money market funds as compared to the year ended December 31, 2019.

Interest expense decreased primarily due to lower total long-term debt outstanding due to recurring principal payments required by the Revised Credit Agreement.

70

Our other (expense) income, net increased $9.0 million for the year ended December 31, 2020 as compared to the year ended December 31, 2019. This increase is related to fair value adjustments on equity investment in Tyme in the amount of $5.3 million and the related fair value adjustments related to the final settlement of the $25.0 million ASR transaction with JPMorgan as part of the Company's Share Repurchase Program. The Company determined the ASR contained a forward contract and therefore the Company recorded fair value adjustments on the accelerated share repurchase agreement in the amount of $3.0 million in the year ended December 31, 2020. The increase in other expense is also related to our settlement agreement in December 2019 with Lilly for $0.7 million.

*Provision for income taxes*

| | Year Ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2020 | | 2019 | |
| | (in thousands) | | | |
| *Provision for income taxes* | $ | 10,688 | $ | 7,685 |
| Effective tax rate | | 47 % | | 35 % |

Our provision for income taxes was based on the applicable federal and state tax rates for those periods. The effective tax rate for the year ended December 31, 2020 reflects the impact of a valuation allowance established on the deferred tax asset for an unrealized capital loss in our investment in Tyme, certain non-deductible executive compensation, non-deductible nature of the fair value adjustment of our ASR agreement and changes in state filing positions partially offset by credits for research and development activity. The effective tax rate for the year ended December 31, 2019 reflects the impact of certain non-deductible executive compensation partially offset by credits for research and development activity.

*Net Income*

Net income for the year ended December 31, 2020 was $12.0 million as compared to a net income of $14.3 million for the year ended December 31, 2019, as a result of the factors discussed above.

*Comparison of Years Ended December 31, 2019 and December 31, 2018*

| | Year Ended December 31, | | | | Increase / (Decrease) | |
| --- | --- | --- | --- | --- | --- | --- |
| | 2019 | | 2018 | | | |
| | (in thousands) | | | | | |
| Product sales, net | $ | 73,989 | $ | 70,385 | $ | 3,604 |
| Royalty revenue | | 112,903 | | 142,927 | | (30,024) |
| License and other revenue | | 9,000 | | — | | 9,000 |
| Total revenue | $ | 195,892 | $ | 213,312 | $ | (17,420) |

Product sales increased $3.6 million in the year ended December 31, 2019, primarily driven by increases in product sales of Belrapzo of $6.8 million, which was due to volume increases and Bendeka of $6.4 million, which was also due to volume increases. The increased sales were partially offset by decreases in product sales of Ryanodex of $7.2 million due to lower volume on a low reorder cycle period and the discontinuation of Non-Alcohol Docetaxel Injection in September 2018 that resulted in a negative impact to revenues of $2.6 million.

Royalty revenue decreased $30.0 million in the year ended December 31, 2019 as a result of decreases in royalties on Teva's sales of Bendeka of $23.2 million and royalties on sales of Argatroban of $6.8 million.

License and other revenue for the year ended December 31, 2019 represents an upfront cash payment of $9.0 million upon execution of an amendment to the Cephalon License to terminate Teva's obligation to pay future milestones and royalties on Bendeka sales outside of the U.S.

*Cost of Revenue*

| | Year Ended December 31, | | | | Increase / (Decrease) | |
|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | | |
| | (in thousands) | | | | | |
| Cost of product sales | $ | 47,891 | $ | 42,374 | $ | 5,517 |
| Cost of royalty revenue | | 13,006 | | 19,542 | | (6,536) |
| Total cost of revenue | $ | 60,897 | $ | 61,916 | $ | (1,019) |

Cost of product sales increased $5.5 million in the year ended December 31, 2019, primarily as a result of increased product sales of Belrapzo and Bendeka, partially offset by the discontinuation of Non-Alcohol Docetaxel Injection in September 2018 and decreased product sales of Ryanodex and Argatroban.

Cost of royalty revenue decreased $6.5 million in the year ended December 31, 2019 due to the decrease in royalty revenue for Bendeka and Argatroban.

*Research and Development*

| | Year Ended December 31, | | | | (Decrease) / Increase | |
|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | | |
| | (in thousands) | | | | | |
| Fulvestrant "EGL-5385-C-1701" | $ | 5,053 | $ | 21,687 | $ | (16,634) |
| Ryanodex EHS "EP-4104" | | 5,192 | | 3,845 | | 1,347 |
| Vasopressin | | 7,779 | | 1,029 | | 6,750 |
| All other projects | | 3,980 | | 4,437 | | (457) |
| Salary and other personnel related | | 14,806 | | 13,421 | | 1,385 |
| Total research and development | $ | 36,810 | $ | 44,419 | $ | (7,609) |

The decrease primarily resulted from a decrease in project spending for EGL-5385-C-1701 (our fulvestrant formulation) relating to the clinical study which completed randomization of 600 subjects in the first half of 2018. This decrease was partially offset by increased spend related to our vasopressin injection ANDA filing and spending on the resubmitted NDA for Ryanodex® (dantrolene sodium for injectable suspension) for the treatment of EHS.

*Selling, General and Administrative*

| | Year Ended December 31, | | | | Increase | |
|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | | |
| | (in thousands) | | | | | |
| Selling, general and administrative | $ | 76,370 | $ | 60,509 | $ | 15,861 |

This increase is primarily related to an increase of $9.6 million in external legal fees related to ongoing litigation matters, increased compensation costs, including stock compensation expense, of $6.6 million and $0.6 million increase in professional fees. These increases were partially offset by a decrease of $0.9 million in sales and marketing direct costs.

*Other income (expense), net*

| | Year Ended December 31, | | | | Increase | |
|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | | |
| | (in thousands) | | | | | |
| Interest income | $ | 2,169 | $ | 158 | $ | 2,011 |
| Interest expense | | (2,686) | | (2,736) | | 50 |
| Other Income | | 700 | | — | | 700 |
| Total other income, net | $ | 183 | $ | (2,578) | $ | 2,761 |

72

Interest income increased $2.0 million primarily due to our short term investing initiatives with cash on hand throughout 2019 as compared to 2018.

Interest expense decreased primarily due to lower total long-term debt outstanding due to recurring principal payments required by the Revised Credit Agreement.

Other income represents an amount we received pursuant to a settlement agreement executed in December 2019 with Lilly related to the Company's product, PEMFEXY™ (pemetrexed for injection), a branded alternative to ALIMTA®. The agreement provides for a release of all claims by the parties related to an antitrust complaint filed by the Company and an alleged patent infringement based on the filing of the Company's 505(b)(2) NDA. The Settlement also allows for an initial entry of PEMFEXY™ into the market (equivalent to approximately a three week supply of current ALIMTA® utilization) on February 1, 2022 and a subsequent uncapped entry on April 1, 2022.

*Provision for income taxes*

|  | Year Ended December 31, | |
|  | **2019** | **2018** |
|  | **(in thousands)** | |
| *Provision for income taxes* | $ 7,685 | $ 2,135 |
| Effective tax rate | 35 % | 6 % |

The provision for income taxes was based on the applicable federal and state tax rates for those periods. The effective tax rate for 2019 reflects the impact of certain non-deductible executive compensation partially offset by credits for research and development activity. The effective tax rate for 2018 reflects tax benefits related to stock option exercises in the period as well as credits for research and development activity partially offset by the impact of certain non-deductible executive compensation.

### Net Income

Net income for the year ended December 31, 2019 was $14.3 million as compared to a net income of $31.9 million for the year ended December 31, 2018, as a result of the factors discussed above.

### Liquidity and Capital Resources

Our primary uses of cash are to fund working capital requirements, including repayment of debt, product development costs, operating expenses as well as repurchases of our common stock. Cash and cash equivalents were $103.2 million, and $109.8 million as of December 31, 2020 and December 31, 2019, respectively.

For the year ended December 31, 2020, we recorded net income of $12.0 million. As of December 31, 2020, we had a working capital surplus of $128.0 million. For the year ended December 31, 2019, we recorded net income of $14.3 million.

We believe that future cash flows from operations will be sufficient to fund our currently anticipated working capital requirements for at least the next twelve months.

The COVID-19 pandemic has disrupted and continues to disrupt the U.S. healthcare system, global economies and global capital markets. There are significant uncertainties surrounding the full extent and duration of the impact of the COVID-19 pandemic on our business and operations. We have experienced variable financial impacts to date, as a result of the COVID-19 pandemic and the ongoing pandemic could have a material adverse impact on our financial condition and results of operations in the future, including our ability to obtain financing when and if needed. The impact of COVID-19 on our business and financial condition is more fully described below in *Trends and Uncertainties.*

*Operating Activities:*

Net cash provided by operating activities for the year ended December 31, 2020 was $49.5 million. Net income for the same period was $12.0 million before non-cash adjustments of approximately $36.7 million from deferred income taxes, depreciation, amortization of intangible assets, stock-based compensation expense, fair value adjustments on equity investment, fair value adjustments on ASR, and amortization of debt issuance costs and other items. Net changes in working capital decreased cash provided from operating activities by approximately $0.8 million, due to an increase in accounts receivable of $3.1 million, an increase in inventory of $1.5 million, a decrease in accrued expenses and other liabilities of $4.4 million,

73

coupled with a decrease in prepaid expenses and other current assets of $11.4 million, and an increase in accounts payable of $0.8 million. The total amount of accounts receivable as of December 31, 2020 was approximately $51.1 million. Receivables from our product sales have payment terms ranging from 30 to 75 days with select extended terms to wholesalers on initial purchases of product launch quantities. Our receivables from royalty revenue are due 45-days from the end of the quarter.

Net cash provided by operating activities for the year ended December 31, 2019 was $56.0 million. Net income for the same period was $14.3 million before non-cash adjustments of approximately $27.3 million from deferred income taxes, depreciation, amortization of intangible assets, stock-based compensation expense, and amortization of debt issuance costs.
Net changes in working capital increased cash provided from operating activities by $14.4 million, due to a decrease in accounts receivable of $18.5 million primarily due to Belrapzo launch in 2018, a decrease in inventory of $1.7 million, an increase in accrued expenses and other liabilities of $4.1 million, partially offset by an increase in other assets of $0.6 million, a decrease in prepaid expenses and other current assets of $4.8 million, and a decrease in accounts payable of $4.5 million.
The total amount of accounts receivable at December 31, 2019 was approximately $48.0 million.

Net cash provided by operating activities for the year ended December 31, 2018 was $52.4 million. Net income for the same period was $31.9 million offset by non-cash adjustments of approximately $28.4 million from deferred income taxes, depreciation, amortization of intangible assets, stock-based compensation expense, amortization of debt issuance costs, change in fair value of contingent consideration, asset impairment charge and fair value adjustment related to restructuring. Net changes in working capital decreased cash provided from operating activities by $7.9 million, due to an increase in accounts receivable of $12.7 million, an increase in inventory of $5.6 million, an increase in accrued expenses and other liabilities of $8.1 million, an increase in other assets of $0.6 million partially offset by a decrease in prepaid expenses and other current assets of $4.8 million, and a decrease in accounts payable of $2.1 million. The total amount of accounts receivable at December 31, 2018 was approximately $66.5 million, which included approximately $25.3 million from product sales, $35.7 million from royalty income, and $5.5 million related to cost reimbursements.

*Investing Activities:*

During the years ended December 31, 2020, 2019 and 2018, we invested $0.7 million, $0.8 million, and $0.1 million, respectively, for the purchase of property and equipment.

Net cash used in investing activities for the year December 31, 2020 primarily was $17.5 million related to our purchase of 10 million restricted shares of Tyme's common stock.

*Financing Activities:*

Net cash used in financing activities for the year ended December 31, 2020 was $37.9 million, as a result of $5.0 million of principal payments for debt required by the Company's Second Amended and Restated Credit Agreement with JPMorgan Chase Bank, N.A., as administrative agent and the lenders party thereto, or the Revised Credit Agreement, $35.0 million in payments related to the repurchases of our common stock, $1.5 million of payments associated with employee withholding tax upon vesting of stock-based awards, partially offset by $3.7 million of proceeds from common stock exercises of employee stock options.

Net cash used in financing activities for the year ended December 31, 2019 was $24.2 million, primarily resulting from principal payments for debt required by the Revised Credit Agreement of $6.0 million and payments related to the repurchases of our common stock of $18.0 million.

Net cash used in financing activities for the year ended December 31, 2018 was $88.1 million, primarily resulting from a $15 million payment of contingent consideration in connection with our acquisition of Arsia Therapeutics, Inc. in 2018, $73.1 million in cash settlements on repurchases of common stock, $3.7 million payment of debt financing costs and a $4.9 million payment of employee withholding tax for net option exercises. This was offset by the issuance of common stock for stock option exercises of $8.6 million.

**Trends and Uncertainties**

*Impact of the COVID-19 Pandemic*

The COVID-19 pandemic has resulted in authorities implementing aggressive actions. Government authorities in the United States have recommended or imposed various social distancing, quarantine, and isolation measures on large portions of the population, and similar measures have also been taken in many other countries around the world. Both the COVID-19

74

pandemic and the containment and mitigation efforts related to the pandemic have had a serious adverse impact on the U.S. economy and the economies of other countries around the world, the severity and duration of which are uncertain. The extent of and timing for such lifting of government restrictions remains uncertain as the COVID-19 pandemic continues to evolve. There is no guarantee that prior or new restrictions will not be reinstated in response to the continued spread of COVID-19.

During the year ended December 31, 2020, we have experienced a variable impact on our business and financial condition due to the COVID-19 pandemic, which impacts include a decrease in revenue from sales of Belrapzo resulting, in part, from a decrease in inventory stocking and utilization rates, as well as a decrease in research and development expenses partially resulting from preclinical program delays. We also incurred an insignificant amount of incremental administrative costs related to the COVID-19 pandemic. The COVID-19 pandemic, including containment and mitigation measures, has impacted, and is expected to continue to impact, our business and operations in a number of ways, including:

- *Day-to-Day Operations*: Since mid-March 2020, our employees, including customer-facing employees, have been working remotely. The duration and extent of these restrictions are uncertain. We have developed plans to resume in-person work practices as we determine it to be safe to do so and pending relevant health authority guidance. We expect to incur additional expenses in 2021 related to the impact of the COVID-19 pandemic on our operations, including procurement of personal protective equipment for our employees and updates to our facilities to align with safety protocols.

- *Manufacturing and Supply Chain:* We are working closely with our commercial partners and third-party manufacturers to mitigate potential disruptions as a result of the COVID-19 pandemic by continuing to monitor the supply and availability of Bendeka, Ryanodex and Belrapzo for the patients who rely on these products. We anticipate that the COVID-19 pandemic will continue to delay our supply chain and marketing and sales efforts for certain of our products, including Bendeka, although it is not currently expected that any disruption would be material. If the COVID-19 pandemic continues to persist for an extended period of time and impacts essential distribution systems such as FedEx and postal delivery, we could experience future disruptions to our supply chain and operations, and associated delays in the manufacturing and our clinical supply, which would adversely impact our development activities.

- *Marketing and Sale of Products*: In addition to the impact on our product revenues resulting in a decrease in sales from Belrapzo, driven, in part, by the COVID-19 pandemic, we have also observed a reduction in the number of Bendeka patients visiting infusion centers, hospitals and clinics for intravenous administration of Bendeka due to interruptions in healthcare services, and the patients' inability to visit administration sites as well as desire to avoid contact with infected individuals. In addition, our sales and marketing teams have been working remotely and our virtual initiatives with respect to marketing and supporting the sale and administration of our products have not been as effective as our in-person sales and marketing activities.

- *Liquidity and Capital Resources*: We believe that future cash flows from operations will be sufficient to fund our currently anticipated working capital requirements for the next 12 months. While the COVID-19 pandemic has not had, and we do not expect it to have, a material adverse effect on our liquidity, the situation continues to rapidly evolve and has already resulted in a significant disruption of global financial markets. If the disruption persists or deepens, we could experience an inability to access additional capital when and if needed. If we are unable to obtain funding, we could be forced to delay, reduce or eliminate distribution of our commercialized products, product portfolio expansion or some or all of our research and development programs, which would adversely affect our business prospects. We expect to use be able to obtain any future funding under the terms of the Revised Credit Agreement, for general corporate purposes and any strategic acquisitions.

- *Regulatory Activities*: We may experience further delays in the timing of NDA review and/or our interactions with FDA due to, for example, absenteeism by governmental employees, inability to conduct planned physical inspections related to regulatory approval, or the diversion of FDA's efforts and attention to approval of other therapeutics or other activities related to the COVID-19 pandemic, which could further delay approval decisions with respect to regulatory submissions or obtain new product approvals.

- *Clinical Development Timelines:* The clinical trial timelines for certain of our product candidates, including EA-114 (our fulvestrant product candidate), have been delayed given difficulties with limited patient enrollment resulting from the impact of the COVID-19 pandemic, and we expect that our clinical trial timelines will continue to be impacted for the duration of the pandemic.

There are significant uncertainties surrounding the extent and duration of the impact of the COVID-19 pandemic on our business and operations. We continue to evaluate the impact of the COVID-19 pandemic on our operating results and financial condition. The COVID-19 pandemic has had a variable impact our results of operations during the year ended December 31, 2020 and, it could have a material adverse impact on our financial condition and results of operations in the future.

**Contractual Obligations**

Our future material contractual obligations include the following (in thousands):

| Obligation | Total | | 2021 | | 2022 | | 2023 | | 2024 | | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Operating leases (1) | $ | 5,720 | $ | 1,391 | $ | 1,423 | $ | 1,455 | $ | 1,038 | $ | 413 |
| Credit facility | | 34,000 | | 8,000 | | 26,000 | | — | | — | | — |
| Purchase obligations (2) | | 68,644 | | 68,644 | | — | | — | | — | | — |
| Total obligations | $ | 108,364 | $ | 78,035 | $ | 27,423 | $ | 1,455 | $ | 1,038 | $ | 413 |

(1) We lease our corporate office location. On August 8, 2019, we amended the lease for our corporate office location in order to rent additional office space and extend the term of our existing lease to June 30, 2025. The Company also leases its lab space under a lease agreement that expires on April 30, 2024. Rental expense was $1,323, $1,146, and $571, for the year ended December 31, 2020, 2019, and 2018, respectively. The remaining future lease payments under the operating leases, exclusive of any renewal option periods, are $5,720 as of December 31, 2020, payable monthly through June 30, 2025 and April 30, 2024.

(2) As of December 31, 2020, the Company has purchase obligations in the amount of $68,644 which represents the contractual commitments under contract manufacturing and supply agreements with suppliers. The obligation under the supply agreement is primarily for finished product, inventory, and research and development.

## Recent Accounting Pronouncements

*Recent Accounting Pronouncements - Not Yet Adopted*

In March 2020, the FASB issued Update 2020-04 Reference Rate Reform (Topic 848), Facilitation of the Effects of Reference Rate Reform on Financial Reporting to provide temporary optional guidance to ease the potential burden in accounting for reference rate reform. The amendments in Update 2020-04 are elective and apply to all entities that have contracts, hedging relationships, and other transactions that reference LIBOR, formerly known as the London Interbank Offered Rate,

or another reference rate expected to be discontinued due to reference rate reform. The new guidance provides optional expedients, including; (1) Simplify accounting analyses under current GAAP for contract modifications, such as modifications of contracts within the scope of Topic 470, Debt, that will be accounted for by prospectively adjusting the effective interest rate, as if any modification was not substantial. That is, the original contract and the new contract shall be accounted for as if they were not substantially different from one another; (2) Simplify the assessment of hedge effectiveness and allow hedging relationships affected by reference rate reform to continue; (3) Allow a one-time election to sell or transfer debt securities classified as held to maturity before January 1, 2020 that reference a rate affected by reference rate reform. The amendments are effective for all entities from the beginning of an interim period that includes the issuance date of the ASU. An entity may elect to apply the amendments prospectively through December 31, 2022. The adoption of ASU 2020-4 is not expected to have a material impact on the Company's financial position or results of operations.

*Recently Adopted Accounting Pronouncements*

In June 2016, the FASB issued ASU 2016-13, Financial Instruments - Credit Losses which requires financial assets measured at amortized cost basis to be presented at the net amount expected to be collected. This standard is effective for fiscal years beginning after December 15, 2019 and the Company adopted the standard effective January 1, 2020. The adoption of ASU 2016-13 had no material impact on the Company's financial position and results of operations.

## Off-Balance Sheet Arrangements

We do not have any off-balance sheet arrangements that have, or are reasonably likely to have, a current or future material effect on our financial condition, changes in financial condition, revenue or expenses, results of operations, liquidity, capital expenditures or capital resources.

## Impact of Inflation

While it is difficult to accurately measure the impact of inflation due to the imprecise nature of the estimates required, we believe the effects of inflation, if any, on our results of operations and financial condition have been immaterial.

## Critical Accounting Policies and Estimates

Our management's discussion and analysis of our financial condition and results of operations is based on our financial

76

statements, which have been prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). The preparation of these financial statements requires us to make estimates and judgments that affect our reported assets and liabilities, revenues and expenses, and other financial information. Actual results may differ significantly from these estimates under different assumptions and conditions. In addition, our reported financial condition and results of operations could vary due to a change in the application of a particular accounting standard.

We regard an accounting estimate or assumption underlying our financial statements as a "critical accounting estimate" where:

- the nature of the estimate or assumption is material due to the level of subjectivity and judgment necessary to account for highly uncertain matters or the susceptibility of such matters to change; and

- the impact of the estimates and assumptions on financial condition or operating performance is material.

Our significant accounting policies are more fully described in Note 2 to our financial statements included in this Annual Report on Form 10-K. Not all of these significant accounting policies, however, require that we make estimates and assumptions that we believe are "critical accounting estimates." We have discussed our accounting policies with the audit committee of our board of directors, and we believe that our estimates relating to revenue recognition described below are "critical accounting estimates."

*Revenue Recognition*

Revenue is recognized when a customer obtains control of promised goods or services, in an amount that reflects the consideration which the entity expects to receive in exchange for those goods or services. To determine revenue recognition for arrangements that an entity determines are within the scope of ASC 606, the Company performs the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. The Company only applies the five-step model to contracts when it is probable that the entity will collect the consideration it is entitled to in exchange for the goods or services it transfers to the customer. At contract inception, once the contract is determined to be within the scope of ASC 606, the Company assesses the goods or services promised within each contract and determines those that are performance obligations, and assesses whether each promised good or service is distinct. The Company then recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when (or as) the performance obligation is satisfied. Sales, value add, and other taxes collected on behalf of third parties are excluded from revenue.

*Product revenue -* The Company recognizes net revenue on sales to its commercial partners and to end users. In each instance, revenue is generally recognized when the customer obtains control of the Company's product, which occurs at a point in time, and may be upon shipment or upon delivery based on the contractual shipping terms of a contract.

Revenue on sales to commercial partners relates to Argatroban and Bendeka. Sales to our commercial partners are presented gross because the Company is primarily responsible for fulfilling the promise to provide the product, is responsible to ensure that the product is produced in accordance with the related supply agreement and bears risk of loss while the inventory is in-transit to the commercial partner.

Revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring products or services to a customer. To the extent the transaction price includes variable consideration, the Company estimates the amount of variable consideration that should be included in the transaction price utilizing the expected value method to which the Company expects to be entitled. As such, revenue on sales to end users for Belrapzo and Ryanodex are recorded net of chargebacks, rebates, returns, prompt pay discounts, wholesaler fees and other deductions. Our products are contracted with a limited number of oncology distributors and hospital buying groups with narrow differences in ultimate realized contract prices used to estimate our chargeback and rebate reserves. The Company has a product returns policy on some of its products that allows the customer to return pharmaceutical products within a specified period of time both prior to and subsequent to the product's expiration date. The Company's estimate of the provision for returns is analyzed quarterly and is based upon many factors, including historical experience of actual returns and analysis of the level of inventory in the distribution channel, if any. The Company has terms on sales of Ryanodex by which the Company does not accept returns. Variable consideration is included in the transaction price if, in the Company's judgment, it is probable that a significant future reversal of cumulative revenue under the contract will not occur. Estimates of variable consideration are made using the expected value method and determination of whether to include estimated amounts in the transaction price are based largely on an assessment of the Company's anticipated performance and all information (historical, current and forecasted) that is reasonably available. The Company believes that the estimates it has established are reasonable based upon current facts and circumstances. Applying different judgments to the same facts and circumstances could result in the estimated amounts to vary.

77

*Components of Gross-to-Net (GTN) Estimates*

<u>Chargebacks</u>: Chargebacks are discounts that occur when certain contracted customers, including group purchasing organizations ("GPOs"), public health service institutions and federal government entities purchasing via the Federal Supply Schedule, purchase from the Company's distributors. The Company's distributors purchase product from us at invoice price, then resell the product to certain contracted customers on the basis of prices negotiated between us and the providers. The difference between the distributors' purchase price and the typically lower certain contracted customers' purchase price is refunded to the distributors through a chargeback credit. We record estimates for these chargebacks at the time of sale as deductions from gross revenues, with corresponding adjustments to our accounts receivable reserves and allowances.

<u>Commercial and Medicaid Rebates</u>: The Company contracts with government agencies or collectively, third-party payors, so that Belrapzo and Ryanodex will be eligible for purchase by, or partial or full reimbursement from, such third-party payors. The Company estimates the rebates it will provide to third-party payors and deducts these estimated amounts from total gross product revenues at the time the revenues are recognized. These reserves are recorded in the same period in which the revenue is recognized, resulting in a reduction of product revenue and the establishment of a current liability. The current liability is included in accrued expenses on the consolidated balance sheets. The Company estimates the rebates that it will provide to third-party payors based upon (i) the Company's contracts with these third-party payors, (ii) the government mandated discounts applicable to government-funded programs, (iii) a range of possible outcomes that are probability-weighted for the estimated payer mix, and (iv) information obtained from the Company's distributors.

The information that the Company also considers when establishing its rebate reserves are purchases by customers, projected annual sales for customers, actual rebates payments made, processing time lags, and for indirect rebates, the level of inventory in the distribution channel that will be subject to indirect rebates. We do not provide incentives designed to increase shipments to our customers that we believe would result in out-of-the-ordinary course of business inventory for them. The Company regularly reviews and monitors estimated or actual customer inventory information at its largest distributors for its key products to ascertain whether customer inventories are in excess of ordinary course of business levels.

<u>Product Returns</u>: The Company's distributors have the right to return unopened unprescribed Belrapzo during certain time periods around the period beginning prior to the labeled expiration date and ending after the labeled expiration date. The Company estimates future product returns on sales of Belrapzo based on: (i) data provided to the Company by its distributors (including weekly reporting of distributors' sales and inventory held by distributors that provided the Company with visibility into the distribution channel in order to determine what quantities were sold to retail pharmacies and other providers), (ii) information provided to the Company from retail pharmacies, (iii) data provided to the Company by a third-party data provider which collects and publishes prescription data, and other third parties, (iv) historical industry information regarding return rates for similar pharmaceutical products, (v) the estimated remaining shelf life of Belrapzo previously shipped and currently being shipped to distributors and (vi) contractual agreements intended to limit the amount of inventory maintained by the Company's distributors. These reserves are recorded in the same period the related revenue is recognized, resulting in a reduction of product revenue and the establishment of a current liability which is included in accrued expenses and other current liabilities on the consolidated balance sheets.

The Company's provision for product returns based on the factors noted above generally encompass a time range from 12 to 48 months after revenue is recognized. Additionally, we consider other factors when estimating our current period return provision, including levels of inventory in the distribution channel, significant market changes that may impact future expected returns, and actual product returns, and may record additional provisions for specific returns that it believes are not covered by the historical rates. The Company's commercial returns policy and terms with certain customers also states that certain products are sold as non-returnable.

<u>Wholesaler fees and other incentives</u>: The Company generally provides invoice discounts on Belrapzo and Ryanodex sales to its distributors for prompt payment and fees for distribution services, such as fees for certain data that distributors provide to the Company. The payment terms for sales to distributors generally include a 2% discount for prompt payment which is generally defined in invoice terms as a range from 15 to 45 days, while the fees for distribution services are based on contractual rates agreed with the respective distributors. Based on historical data, the Company expects its distributors to earn these discounts and fees, and deducts the full amount of these discounts and fees from its gross product revenues and accounts receivable at the time such revenues are recognized.

*Other GTN considerations*

We may at our discretion provide price adjustments due to various competitive factors. There are circumstances under which we may not provide price adjustments to certain customers as a matter of business strategy, and consequently may lose future sales volume to competitors and risk a greater level of product returns.

As detailed above, we have the experience and access to relevant information that we believe are necessary to reasonably estimate the amounts of such deductions from gross revenues. Some of the assumptions we use for certain of these estimates

78

are based on information received from third parties, such as wholesale customer inventories and market data, or other market factors beyond our control. The estimates that are most critical to the establishment of these reserves, and therefore, would have the largest impact if these estimates were not accurate, are estimates related to contract sales volumes, average contract pricing, customer inventories and return volumes. We regularly review the information related to these estimates and adjust our reserves accordingly, if and when actual experience differs from previous estimates. With the exception of the product returns allowance, the ending balances of accounts receivable reserves and allowances generally are processed during a two-month to four-month period.

<div style="text-align:center">79</div>

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

Market risk is the risk of change in fair value of a financial instrument due to changes in interest rates, equity prices, creditworthiness, financing, exchange rates or other factors. We are exposed to market risk related to changes in interest rates. As of December 31, 2020, we had cash and cash equivalents of $103.2 million held primarily in money market mutual funds. Our primary exposure to market risk is interest rate sensitivity, which is affected by changes in the general level of U.S. interest rates, however, due to the short-term duration of our money market mutual funds and the low risk profile of our investments, an immediate one percent change in interest rates would not have a material effect on the fair market value of our portfolio.

Our exposure to interest rate risk also relates to our variable-rate indebtedness associated with our Revised Credit Agreement. As of December 31, 2020 and 2019, the aggregate principal amount of such variable-rate indebtedness was $34.0 million and $39.0 million, respectively. Borrowings under the Revised Credit Agreement may from time to time bear interest at variable rates, which rates are further described in Note 6. Debt in the Consolidated Financial Statements included in Part IV, Item 15 of this report. As of December 31, 2020 and 2019, a hypothetical 1% increase in the applicable rate would not have a material effect on the incremental annual interest expense related to our variable-rate debt borrowings.

We are monitoring the ongoing impacts of the COVID-19 pandemic on our business. While the full extent of the economic impact brought by, and the duration of, the COVID-19 pandemic is difficult to assess or predict, the impact on the global financial markets may reduce our ability to access capital, which could negatively impact our long-term liquidity.

80

**Item 8. Financial Statements and Supplementary Data**

Our Financial Statements and Supplementary Data and the Reports of Independent Registered Public Accounting Firms appear beginning on page F-1 attached to this Annual Report on Form 10-K.

81

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Not Applicable.

82

**Item 9A. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

As of December 31, 2020, an evaluation was conducted under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and Rule 15d-15(e) of the Exchange Act). Based on this evaluation, such officers have concluded that our disclosure controls and procedures were effective as of December 31, 2020. Management has concluded that our consolidated financial statements included in this Annual Report on Form 10-K fairly present, in all material respects, our financial condition, results of operations and cash flows for the periods presented therein.

**Management's Annual Report on Internal Control Over Financial Reporting**

The management of Eagle Pharmaceuticals, Inc. ("Eagle") has prepared, and is responsible for, Eagle's financial statements and related footnotes. These financial statements have been prepared in conformity with U.S. generally accepted accounting principles. Eagle's management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Securities Exchange Act of 1934 as a process designed by, or under the supervision of the Company's principal executive and principal financial officers and effected by the Company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of Eagle's assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of Eagle are being made only in accordance with authorizations of management and directors of Eagle; and

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of Eagle's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. Eagle's management conducted an assessment of the Company's internal control over financial reporting as of December 31, 2020 based upon the criteria established in "Internal Control - Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework). Based on this assessment, our management has concluded that, as of December 31, 2020, our internal control over financial reporting was effective.

Ernst & Young, LLP, the independent registered public accounting firm that audits our consolidated financial statements, has issued its attestation report on the Company's internal control over financial reporting as of December 31, 2020. This attestation report appears below.

/s/ Scott Tarriff
Chief Executive Officer and Director
(Principal Executive Officer)

/s/ Brian Cahill

Chief Financial Officer
(Principal Accounting and Financial Officer)

**Changes in Internal Control Over Financial Reporting**

There have been no changes in the Company's internal control over financial reporting during the quarter ended December 31, 2020 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Eagle Pharmaceuticals, Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited Eagle Pharmaceuticals' internal control over financial reporting as of December 31, 2020, based on criteria established in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), (the COSO criteria). In our opinion, Eagle Pharmaceuticals (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2020, based on the COSO criteria**.**

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheet of the Company as of December 31, 2020, and the related consolidated statements of income, changes in stockholders' equity and cash flows for the period year December 31, 2020 and the related notes and our report dated March 4, 2021 expressed an unqualified opinion thereon.

**Basis for Opinion**
The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young, LLP

Stamford, Connecticut

March 4, 2021

85

**Item 9B. Other information.**

None.

<div align="center">

**PART III**

</div>

We will file a definitive proxy statement for our 2021 Annual Meeting of Stockholders, or the 2021 Proxy Statement, with the SEC, pursuant to Regulation 14A, not later than 120 days after the end of our fiscal year. Accordingly, certain information required by Part III has been omitted under General Instruction G(3) to Form 10-K. Only those sections of the 2021 Proxy Statement that specifically address the items set forth herein are incorporated by reference.

**Item 10. Directors, Executive Officers and Corporate Governance**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 11. Executive Compensation**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 13.    Certain Relationships and Related Transactions and Director Independence**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 14. Principal Accountant Fees and Services**

The information required by this item is incorporated by reference to our definitive proxy statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

<div align="center">

86

</div>

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules**

**(a) Documents filed as part of this report.**

The following documents are filed as part of this report:

**1. Financial Statements**

See Index to Financial Statements at Item 8 herein.

**2. Financial Statement Schedules**

Financial statement schedules have been omitted in this report because they are not applicable, not required under the instructions, or the information requested is set forth in the financial statements or related notes thereto.

**3. Exhibits**

The exhibits listed in the below index to exhibits are filed as part of, or incorporated by reference into, this report.

| Exhibit Number | | Description |
|---|---|---|
| 3.1 | | Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.2 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 3.2 | | Amended and Restated Bylaws (incorporated by reference to Exhibit 3.4 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 4.1 | | Form of Common Stock Certificate of the Registrant (incorporated by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 4.2 | | Third Amended and Restated Investor Rights Agreement, dated April 11, 2013, by and among the Registrant and certain of its stockholders (incorporated by reference to Exhibit 4.2 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 4.3 | | Description of securities Description of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934. pursuant to Section 12 of the Securities Exchange Act of 1934. (incorporated by reference to Exhibit 4.3 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 2, 2020). |
| 10.1 | † | Form of Indemnification Agreement by and between the Registrant and its directors and officers (incorporated by reference to Exhibit 10.1 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.2 | † | Eagle Pharmaceuticals, Inc. 2007 Incentive Compensation Plan and Form of Stock Option Agreement thereunder (incorporated by reference to Exhibit 10.2 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), as amended December 15, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |
| 10.3 | † | Eagle Pharmaceuticals, Inc. 2014 Equity Incentive Plan, as amended and restated, and Form of Stock Option Agreement, Notice of Exercise and Stock Option Grant Notice thereunder (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015), as amended with an additional form of Stock Option Agreement (incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |
| 10.4 | † | Eagle Pharmaceuticals, Inc. 2014 Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.4 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 22, 2014) |
| 10.5 | † | Eagle Pharmaceuticals, Inc. Non-Employee Director Compensation Policy (incorporated by reference to Exhibit 10.5 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 22, 2014) |
| 10.6 | † | Employment Agreement by and between the Registrant and Scott Tarriff dated March 8, 2007, as amended (incorporated by reference to Exhibit 10.6 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |

87

| 10.7 | † | Offer Letter by and between the Registrant and Adrian Hepner dated December 11, 2014 (incorporated by reference to Exhibit 10.7 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 15, 2017) as amended by entry into the Eagle Pharmaceuticals, Inc. Officer Severance Benefit Plan on April 29, 2016 (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.8 | | Lease Agreement between the Registrant and Mack-Cali Chestnut Ridge L.L.C. dated May 28, 2013, as amended on July 1, 2013 (incorporated by reference to Exhibit 10.10 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on March 16, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K , SEC File No. 001-36306, filed March 20, 2015) |
| 10.9 | * | Development and License Agreement, by and between the Registrant and SciDose, LLC, dated September 24, 2007, as amended March 18, 2008, May 22, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.11(a) to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.10 | * | Development and License Agreement, by and between the Registrant and SciDose, LLC, dated June 12, 2007, as amended March 18, 2008, March 25, 2008, December 3, 2008, May 22, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.11(b) to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on August 5, 2015 (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.11 | * | License and Sublicense Agreement, by and between the Registrant and Lyotropic Therapeutics, Inc., dated October 16, 2008 (incorporated by reference to Exhibit 10.12 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.12 | * | License and Development Agreement, by and between the Registrant and The Medicines Company, effective as of September 24, 2009, as amended January 2010 and September 1, 2012 (incorporated by reference to Exhibit 10.13 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.13 | * | Supply Agreement, by and between the Registrant and The Medicines Company, dated September 24, 2009 (incorporated by reference to Exhibit 10.14 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.14 | * | Agreement for the Supply of Argatroban and Topotecan, by and between the Registrant and Cipla Limited, dated December 14, 2012, as amended August 30, 2013 (incorporated by reference to Exhibit 10.15 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.15 | * | Supply and Distribution Agreement, by and between the Registrant and Sandoz AG, dated January 28, 2013 (incorporated by reference to Exhibit 10.16 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.16 | * | Development and License Agreement, by and between the Registrant and Robert One, LLC (bendamustine), dated March 18, 2008, as amended November 11, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.17 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.17 | * | Development and License Agreement, by and between the Registrant and Robert One, LLC (pemetrexed), dated February 13, 2009, as amended May 22, 2009, December 23, 2010 and July 16, 2013 (incorporated by reference to Exhibit 10.18 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on August 5, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.18 | * | Exclusive License Agreement, by and between the Registrant and Cephalon, Inc., dated February 13, 2015 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q/A, SEC File No. 001-36306, filed February 12, 2016) |
| 10.19 | * | Settlement and License Agreement, by and between the Registrant and Cephalon, Inc., dated February 13, 2015 (incorporated by reference to Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed May 15, 2015) |
| 10.20 | † | Eagle Pharmaceuticals, Inc. Officer Severance Benefit Plan (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015), as amended and restated by the Eagle Pharmaceuticals, Inc. Amended and Restated Severance Benefit Plan (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 16, 2019). |
| 10.21 | † | Form of Letter Agreement (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |
| 10.22 | * | License Agreement, by and between the Registrant and Teikoku Pharma USA, Inc., dated October 13, 2015 (incorporated by reference to Exhibit 10.23 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 29, 2016) |
| 10.23 | * | Co-Promotion Agreement, by and between the Registrant and Spectrum Pharmaceuticals, Inc., dated November 4, 2015 (incorporated by reference to Exhibit 10.23 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 29, 2016) |
| 10.24 | † | Offer Letter by and between the Registrant and David Pernock dated January 2, 2017 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 19, 2016) |

| 10.25 | | Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated January 26, 2017 (incorporated by reference to Exhibit 10.26 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 15, 2017) as amended and restated by the Amended and Restated Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated August 8, 2017 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 9, 2017), and as amended and restated by the Second Amended and Restated Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated November 8, 2019 (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed November 12, 2019). |
| 10.26 | | Amendment to License and Sublicense Agreement, by and between the Registrant and Lyotropic Therapeutics, Inc., dated August 3, 2016 (incorporated by reference to Exhibit 10.27 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 15, 2017) |
| 10.27 | * | Product Collaboration and License Agreement, by and between the Registrant and SymBio Pharmaceuticals Limited, effective as of September 19, 2017 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed November 8, 2017) |
| 10.28 | † | Form of Restricted Stock Unit Grant Package (2014 Equity Incentive Plan) (incoporated by reference to Exhibit 10.3 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 26, 2018) |
| 10.29 | (1) † | Form of Performance Stock Unit Grant Package (2014 Equity Incentive Plan) |
| 10.30 | (1) † + | Form of Performance Stock Unit Grant Package (2014 Equity Incentive Plan) |
| 10.31 | | Stock Purchase Agreement, dated as of November 10, 2016, by and among Eagle Pharmaceuticals, Inc., Arsia Therapeutics, LLC, Arsia Therapeutics, Inc., Amy Schulman, as the Seller Representative, and each person that executed a joinder to the Purchase Agreement (incorporated herein by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed with the Commission on November 14, 2016) ), as amended by Amendment No. 1 to Stock Purchase Agreement, dated as of February 8, 2018 (incorporated herein by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K, SEC File No. 001-36306, filed with the Commission on February 14, 2018) |
| 10.32 | | Fifth Amendment to Lease Agreement between the Registrant and CAPSTONE TICE BLVD LLC. dated as of August 8, 2019 (incorporated by reference to Exhibit 10.32 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 2, 2020). |
| 10.33 | | Fourth Amendment to Exclusive License Agreement, by and between the Registrant and Teva Pharmaceuticals International GmbH, dated April 12, 2019 (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q filed on May 7, 2019). |
| 10.34 | + | Settlement Agreement, by and between the Registrant and Eli Lilly and Company, dated December 13, 2019 (incorporated by reference to Exhibit 10.34 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 2, 2020). |
| 10.35 | + | Co-Promotion Agreement with Tyme Technologies, Inc., dated January 7, 2020 (incorporated by reference to Exhibit 10.35 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 2, 2020). |
| 10.36 | | Securities Purchase Agreement, between the Registrant and Tyme Technologies, Inc., dated January 7, 2020 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on January 8, 2020). |
| 10.37 | † | Consulting Agreement between the Registrant and Adrian J. Hepner, M.D., Ph.D. dated July 31, 2020 (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 8-K, SEC File No. 001-36306, filed November 2, 2020). |
| 21.1 | (1) | List of subsidiaries of Eagle Pharmaceuticals, Inc. |
| 23.1 | (1) | Consent of Ernst & Young, LLP, an Independent Registered Public Accounting Firm |
| 23.2 | (1) | Consent of BDO USA, LLP, an Independent Registered Public Accounting Firm |
| 24.1 | | Power of Attorney (incorporated by reference to this signature page of this Annual Report on Form 10-K) |
| 31.1 | (1) | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 31.2 | (1) | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 32.1 | (2) | Certifications of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | | iXBRL Instance Document – the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |

89

| | |
|---|---|
| 101.SCH | iXBRL Taxonomy Extension Schema |
| 101.CAL | iXBRL Taxonomy Extension Calculation Linkbase |
| 101.DEF | iXBRL Taxonomy Extension Definition Linkbase |
| 101.LAB | iXBRL Taxonomy Extension Labels Linkbase |
| 101.PRE | iXBRL Taxonomy Extension Presentation Linkbase |
| 104 | Cover Page Interactive Data File, formatted as Inline XBRL, contained in Exhibit 101 attachments |

†Management contract or compensatory plan or arrangement.

　*Confidential treatment granted as to certain portions, which portions are omitted and filed separately with the Securities and Exchange Commission.

+Certain portions of the exhibit (indicated by asterisks) have been omitted pursuant to Item 601(b)(10)(iv) of Regulation S-K..

(1) Filed herewith.

(2) Furnished (and not filed) herewith pursuant to Item 601 (b)(32)(ii) of Regulation S-K.


**Item 16. Form 10-K Summary**
None.

<div align="center">

**SIGNATURES**

</div>

　　Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on March 4, 2021.


**EAGLE PHARMACEUTICALS, INC.**

By:　　<u>/s/ Scott Tarriff</u>
　　　　Scott Tarriff
　　　　Chief Executive Officer
　　　　(Principal Executive Officer)


　　Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.


<div align="center">

**POWER OF ATTORNEY**

</div>

　　KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Scott Tarriff and Brian Cahill, and each of them, his true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or either of them, or their or his substitutes or substitute, may lawfully do or cause to be done by virtue hereof.

<div align="center">

90

</div>

| Signature | Title | Date |
|---|---|---|
| /S/ SCOTT TARRIFF<br>Scott Tarriff | Chief Executive Officer and Director<br>(Principal Executive Officer) | March 4, 2021 |
| /S/ BRIAN CAHILL<br>Brian Cahill | Chief Financial Officer<br>(Principal Accounting and Financial Officer) | March 4, 2021 |
| /S/ MICHAEL GRAVES<br>Michael Graves | Chairman of the Board of Directors | March 4, 2021 |
| /S/ STEVEN RATOFF<br>Steven Ratoff | Member of the Board of Directors | March 4, 2021 |
| /S/ JENNIFER K. SIMPSON<br>Jennifer K. Simpson | Member of the Board of Directors | March 4, 2021 |
| /S/ ROBERT L. GLENNING<br>Robert L. Glenning | Member of the Board of Directors | March 4, 2021 |
| /S/ RICHARD A. EDLIN<br>Richard A. Edlin | Member of the Board of Directors | March 4, 2021 |

91

**INDEX TO FINANCIAL STATEMENTS OF**
**EAGLE PHARMACEUTICALS, INC.**

**APPENDIX A**

| | **Page** |
|---|---|
| Report of Independent Registered Public Accounting Firm– Ernst & Young, LLP | F-2 |
| Report of Independent Registered Public Accounting Firm – BDO USA, LLP | F- 4 |
| Consolidated Balance Sheets as of December 31, 2020 and 2019 | F- 5 |
| Consolidated Statements of Income for the Years Ended December 31, 2020, 2019 and 2018 | F- 6 |
| Consolidated Statements of Changes in Stockholders' Equity for the Years Ended December 31, 2020, 2019 and 2018 | F- 7 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2020, 2019 and 2018 | F- 8 |
| Notes to Consolidated Financial Statements | F- 10 |

F- 1

**Report of Independent Registered Public Accounting Firm** – Ernst & Young, LLP

To the Shareholders and the Board of Directors of Eagle Pharmaceuticals, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheet of Eagle Pharmaceuticals, Inc. (the Company) as of December 31, 2020, the related consolidated statements of income, changes in stockholders' equity and cash flows for the year ended December 31, 2020, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2020, and the results of its operations and its cash flows for the period ended in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2020, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission "(2013 framework)" and our report dated March 4, 2021 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the account or disclosures to which it relates.

F- 2

***Revenue Recognition - Chargebacks***

| | |
|---|---|
| *Description of the Matter* | At December 31, 2020, the Company recorded an allowance for chargebacks totaling $2.3 million. As described in Note 2 of the consolidated financial statements, the Company recognizes revenues from product sales net of allowances for chargebacks. These allowances are recorded in the period when the related sales occur and are based on the estimated amounts to be claimed which are not known at the point of sale. Chargebacks are estimated based on assumptions about the third-party payors and contracted prices to be paid by those payors.<br><br>Given the estimation uncertainty involved, auditing the allowance for chargebacks was complex. A higher degree of auditor judgment was required to evaluate the mix of third-party payors and applicable contract prices assumed by management to determine the amount of the allowance. |
| *How We Addressed the Matter in Our Audit* | We obtained an understanding, evaluated the design and tested the operating effectiveness of internal controls over the Company's process for estimating its chargeback reserve, including controls over management's review of significant assumptions used to calculate the estimates such as the mix of third-party payors and applicable contract prices.<br><br>To test the Company's estimated allowance for chargebacks, our audit procedures included, among others, testing the accuracy and completeness of the underlying data used in the Company's analyses and evaluating the assumptions described above. We compared the assumed payor mix used to calculate the estimate to actual historical data and compared the assumed contract prices to executed agreements with the applicable payors. We also analyzed the effect of reasonable changes in assumptions on the amounts recorded. We assessed the historical accuracy of management's estimate and performed analytical procedures to assess the correlation of monthly sales to distributors and monthly chargeback claims. We tested credit memos issued subsequent to year-end for recording in the proper period. |

/s/ Ernst & Young, LLP

We have served as the Company's auditor since 2020.

Stamford, Connecticut
March 4, 2021

F- 3

**Report of Independent Registered Public Accounting Firm** – BDO USA, LLP

Board of Directors and Stockholders
Eagle Pharmaceuticals, Inc.
Woodcliff Lake, New Jersey

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheet of Eagle Pharmaceuticals, Inc. and subsidiaries (the "Company") as of December 31, 2019, the related consolidated statements of income, changes in stockholders' equity and cash flows for each of the two years in the period ended December 31, 2019, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2019, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

**Change in Accounting Principles**

On January 1, 2019, the Company adopted Accounting Standards Update 2016-02, *Leases*. The effects of the adoption are described in Note 2 to the consolidated financial statements.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ BDO USA, LLP

We served as the Company's auditor from 2007 to 2020.

Woodbridge, New Jersey
March 2, 2020

F- 4

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED BALANCE SHEETS**
**(In thousands, except share amounts)**

| | | December 31, 2020 | | December 31, 2019 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | $ | 103,155 | $ | 109,775 |
| Accounts receivable, net | | 51,117 | | 48,004 |
| Inventories | | 8,075 | | 6,566 |
| Prepaid expenses and other current assets | | 3,718 | | 15,104 |
| Total current assets | | 166,065 | | 179,449 |
| Property and equipment, net | | 2,077 | | 2,202 |
| Intangible assets, net | | 12,917 | | 15,583 |
| Goodwill | | 39,743 | | 39,743 |
| Deferred tax asset, net | | 15,180 | | 13,669 |
| Other assets | | 17,208 | | 3,908 |
| Total assets | $ | 253,190 | $ | 254,554 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 6,268 | $ | 5,462 |
| Accrued expenses and other liabilities | | 23,817 | | 28,361 |
| Current portion of long-term debt | | 8,000 | | 5,000 |
| Total current liabilities | | 38,085 | | 38,823 |
| | | | | |
| Other long-term liabilities | | 3,959 | | 3,000 |
| Long-term debt, less current portion | | 25,135 | | 33,557 |
| Total liabilities | | 67,179 | | 75,380 |
| | | | | |
| **Commitments and contingencies** | | | | |
| | | | | |
| **Stockholders' equity:** | | | | |
| Preferred stock, 1,500,000 shares authorized and no shares issued or outstanding as of December 31, 2020 and 2019 | | — | | — |
| Common stock, $0.001 par value; 50,000,000 shares authorized; 16,739,203 and 16,537,846 shares issued as of December 31, 2020 and 2019, respectively | | 17 | | 17 |
| Additional paid in capital | | 305,403 | | 278,518 |
| Retained earnings | | 84,489 | | 72,500 |
| Treasury stock, at cost, 3,682,176 and 2,907,687 shares as of December 31, 2020 and 2019, respectively | | (203,898) | | (171,861) |
| Total stockholders' equity | | 186,011 | | 179,174 |
| Total liabilities and stockholders' equity | $ | 253,190 | $ | 254,554 |

See accompanying notes to consolidated financial statements

F- 5

**EAGLE PHARMACEUTICALS, INC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except share and per share amounts)**

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2020** | | **2019** | | **2018** |
| **Revenue:** | | | | | | |
| Product sales, net | $ | 72,323 | $ | 73,989 | $ | 70,385 |
| Royalty revenue | | 110,479 | | 112,903 | | 142,927 |
| License and other revenue | | 5,000 | | 9,000 | | — |
| Total revenue | | 187,802 | | 195,892 | | 213,312 |
| **Operating expenses:** | | | | | | |
| Cost of product sales | | 33,647 | | 47,891 | | 42,374 |
| Cost of royalty revenue | | 11,818 | | 13,006 | | 19,542 |
| Research and development | | 30,785 | | 36,810 | | 44,419 |
| Selling, general and administrative | | 78,598 | | 76,370 | | 60,509 |
| Restructuring charge | | — | | — | | 7,911 |
| Asset impairment charge | | — | | — | | 2,704 |
| Change in fair value of contingent consideration | | — | | — | | (763) |
| Total operating expenses | | 154,848 | | 174,077 | | 176,696 |
| Income from operations | | 32,954 | | 21,815 | | 36,616 |
| Interest income | | 562 | | 2,169 | | 158 |
| Interest expense | | (2,577) | | (2,686) | | (2,736) |
| Other (expense) income | | (8,262) | | 700 | | — |
| Total other (expense) income, net | | (10,277) | | 183 | | (2,578) |
| **Income before income tax provision** | | 22,677 | | 21,998 | | 34,038 |
| Income tax provision | | 10,688 | | 7,685 | | 2,135 |
| **Net income** | $ | 11,989 | $ | 14,313 | $ | 31,903 |
| Earnings per share: | | | | | | |
| Basic | $ | 0.89 | $ | 1.04 | $ | 2.16 |
| Diluted | $ | 0.87 | $ | 1.01 | $ | 2.09 |
| Weighted average number of common shares outstanding: | | | | | | |
| Basic | | 13,481,525 | | 13,754,516 | | 14,768,625 |
| Diluted | | 13,771,393 | | 14,138,733 | | 15,278,651 |

See accompanying notes to consolidated financial statements

F- 6

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
(In thousands)

| | Common Stock | | Additional Paid-In Capital | Treasury Stock | Retained Earnings | Total Stockholders' Equity |
| --- | --- | --- | --- | --- | --- | --- |
| | Number of Shares | Amount | | | | |
| **Balance at December 31, 2017** | **16,089** | **$ 16** | **$ 233,639** | **$ (80,795)** | **$ 26,284** | **$ 179,144** |
| Stock-based compensation expense | — | — | 19,082 | — | — | 19,082 |
| Issuance of common stock upon exercise of stock option grants | 415 | 1 | 8,614 | — | — | 8,615 |
| Payments for employee net option exercises | — | — | (4,877) | — | — | (4,877) |
| Common stock repurchases | — | — | — | (73,105) | — | (73,105) |
| Net income | — | — | — | — | 31,903 | 31,903 |
| **Balance at December 31, 2018** | **16,504** | **$ 17** | **$ 256,458** | **$ (153,900)** | **$ 58,187** | **$ 160,762** |
| Stock-based compensation expense | — | — | 21,998 | — | — | 21,998 |
| Issuance of common stock upon exercise of stock option grants | 34 | — | 260 | — | — | 260 |
| Payment of employee withholding tax upon vesting of stock-based awards | — | — | (198) | — | — | (198) |
| Common stock repurchases | — | — | — | (17,961) | — | (17,961) |
| Net income | — | — | — | — | 14,313 | 14,313 |
| **Balance at December 31, 2019** | **16,538** | **$ 17** | **$ 278,518** | **$ (171,861)** | **$ 72,500** | **$ 179,174** |
| Stock-based compensation expense | — | — | 24,756 | — | — | 24,756 |
| Issuance of common stock upon exercise of stock option grants | 149 | — | 3,654 | — | — | 3,654 |
| Payment of employee withholding tax upon vesting of stock-based awards | — | — | (1,525) | — | — | (1,525) |
| Issuance of common stock related to vesting of restricted stock | 52 | — | — | — | — | — |
| Common stock repurchases | — | — | — | (32,037) | — | (32,037) |
| Net income | — | — | — | — | 11,989 | 11,989 |
| **Balance at December 31, 2020** | **16,739** | **$ 17** | **$ 305,403** | **$ (203,898)** | **$ 84,489** | **$ 186,011** |

See accompanying notes to consolidated financial statements

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In thousands)

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2020 | 2019 | 2018 |
| **Cash flows from operating activities:** | | | |
| Net income | $ 11,989 | $ 14,313 | $ 31,903 |
| Adjustments to reconcile net income to net cash provided by operating activities: | | | |
| Deferred income taxes | (1,511) | 152 | (2,468) |
| Depreciation expense | 872 | 972 | 1,155 |
| Amortization expense of right-of-use assets | 1,228 | 1,159 | — |
| Amortization expense of intangible assets | 2,666 | 2,520 | 2,515 |
| Stock-based compensation expense | 24,756 | 21,998 | 19,082 |
| Change in fair value of contingent consideration | — | — | (763) |
| Fair value adjustments on equity investment | 5,300 | — | — |
| Amortization of debt issuance costs | 419 | 480 | 376 |
| Fair value adjustments on settled accelerated share repurchase agreement | 2,962 | — | — |
| Asset impairment charge | — | — | 2,704 |
| Non-cash restructuring charge | — | — | 5,769 |
| **Changes in operating assets and liabilities which provided (used) cash:** | | | |
| Accounts receivable | (3,113) | 18,481 | (12,665) |
| Inventories | (1,509) | 1,739 | (5,556) |
| Prepaid expenses and other current assets | 11,386 | (4,841) | 4,838 |
| Other assets | (2,325) | (599) | (570) |
| Accounts payable | 806 | (4,455) | (2,064) |
| Accrued expenses and other liabilities | (4,429) | 4,067 | 8,128 |
| Net cash provided by operating activities | 49,497 | 55,986 | 52,384 |
| **Cash flows from investing activities:** | | | |
| Purchase of property and equipment | (747) | (777) | (133) |
| Purchase of equity investment security | (17,500) | — | — |
| Net cash used in investing activities | (18,247) | (777) | (133) |
| **Cash flows from financing activities:** | | | |
| Repurchases of common stock | (34,999) | (17,961) | (73,105) |
| Payment of contingent consideration | — | — | (15,000) |
| Proceeds from existing revolving credit facility | 110,000 | — | — |
| Repayment of existing revolving credit facility | (110,000) | — | — |
| Payment of debt | (5,000) | (6,000) | (3,750) |
| Payment of debt financing costs | — | (326) | — |
| Payment of employee withholding tax upon vesting of stock-based awards | (1,525) | (198) | — |
| Payments for employee net option exercises | — | — | (4,877) |
| Proceeds from common stock option exercises | 3,654 | 260 | 8,615 |
| Net cash used in financing activities | (37,870) | (24,225) | (88,117) |
| **Net (decrease) increase in cash and cash equivalents** | (6,620) | 30,984 | (35,866) |

See accompanying notes to consolidated financial statements

F- 8

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In thousands)

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **2018** |
| Cash and cash equivalents at beginning of period | 109,775 | 78,791 | 114,657 |
| Cash and cash equivalents at end of period | $ 103,155 | $ 109,775 | $ 78,791 |
| | | | |
| **Supplemental disclosures of cash flow information:** | | | |
| **Cash paid during the period for:** | | | |
| Income taxes, net | $ 6,428 | $ 6,673 | $ 2,281 |
| Interest | 2,224 | 2,478 | 2,084 |
| Right-of-use asset obtained in exchange for lease obligation - lease amendment | 855 | 3,716 | — |

See accompanying notes to consolidated financial statements

F- 9

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(In thousands, except share and per share amounts)**

## 1. Organization and Business

Eagle Pharmaceuticals, Inc. (the "Company", "Eagle", or "we") is an integrated pharmaceutical company focused on finding ways to help medicines do more for patients. Eagle and our collaborators have the capabilities to take a molecule from preclinical research through regulatory approval and into the marketplace, including development, manufacturing and commercialization. Our business model applies our scientific expertise, proprietary research-based insights and marketplace proficiency to identify challenging-to-treat diseases of the central nervous system or metabolic critical care therapeutic areas as well as in oncology. By focusing on patients' unmet needs, Eagle strives to provide healthcare professionals with urgently needed treatment solutions that are designed to improve patient care and outcomes and create near- and long-term value for our stakeholders, including patients and healthcare providers and our employees, marketing partners, collaborators and investors.

Our science-based business model has a proven track record with U.S. Food and Drug Administration ("FDA") approval and commercial launches of three products: Ryanodex® (dantrolene sodium) ("Ryanodex"), bendamustine ready-to-dilute ("RTD") 500ml solution ("Belrapzo"), and rapidly infused bendamustine RTD ("Bendeka"). We market our products through marketing partners and/or our internal direct sales force. Eagle markets Ryanodex and Belrapzo, and Teva Pharmaceutical Industries Ltd. ("Teva") markets Bendeka through its subsidiary Cephalon, Inc.

Reflecting further expansion of our oncology portfolio, in February 2020, we received final FDA approval for Pemfexy® ("Pemfexy") and in July 2020, we announced that the Centers for Medicare & Medicaid Services ("CMS") had established a unique, product-specific billing code for Pemfexy, effective on October 1, 2020. Pemfexy, our novel pemetrexed product, is a branded alternative to Alimta® for metastatic non-squamous non-small cell lung cancer and malignant pleural mesothelioma. The conversion from tentative to a final approval follows the Company's settlement agreement reached with Eli Lilly and Company ("Lilly") on December 13, 2019. This agreement provides for a release of all claims by the parties and allows for an initial entry of Pemfexy into the market (equivalent to approximately a three-week supply of current Alimta utilization) on February 1, 2022, and a subsequent uncapped entry on April 1, 2022.

We view our operation and manage our business as one reporting segment because we have a single management team that reports to the Chief Executive Officer that comprehensively manages the entire business. The Company does not operate separate lines of business with respect to its products or product candidates. Accordingly, the Company has one reportable segment.

*Share Repurchase Program*

As of December 31, 2020, the Company had repurchased an aggregate of 3,682,176 shares of common stock for an aggregate of $206.9 million pursuant to the Company's share repurchase programs in effect since August 2016. Refer to Note 7. "Common Stock and Stock-Based Compensation" for further details.

*Long-term Debt*

On November 8, 2019, the Company entered into the Second Amended and Restated Credit Agreement (the "Revised Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") and the lenders party thereto, which replaced the Company's existing credit agreement, dated as of August 8, 2017 (the "Amended Credit Agreement"). Refer to Note 6. "Debt" for further details.

*Significant License and Collaboration Agreements* - Refer to Note 9. "License and Collaboration Agreements" for further details.

*SymBio License Agreement*

On September 20, 2017, the Company entered into a Product Collaboration and License Agreement, effective as of September 19, 2017, (the "SymBio License Agreement") with SymBio Pharmaceuticals Limited ("SymBio") for the rights to develop and commercialize the Company's bendamustine hydrochloride ready-to-dilute injection product and rapid infusion injection product (collectively, the "Products") in Japan. SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma ("MCL"), and as a first line treatment of low-grade NHL and MCL. Under the SymBio License Agreement, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

F- 10

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

*Bendeka*

In March 2018, the FDA approved a second manufacturing site for Bendeka.

On May 15, 2018, the FDA granted final approval for Eagle's ready-to-dilute bendamustine hydrochloride solution in a 500ml admixture for the treatment of patients with chronic lymphocytic leukemia ("CLL") and patients with indolent B-cell non-Hodgkin lymphoma ("NHL") that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.

On March 24, 2016 the FDA denied the Company's request for seven years of orphan drug exclusivity in the U.S., for Bendeka. In April 2016, the Company filed a lawsuit against the FDA arguing that Bendeka is entitled to orphan drug exclusivity as a matter of law (see Note 13. Legal Proceedings). On July 2, 2014, the FDA granted the Company orphan drug designations for Bendeka for the treatment of CLL and indolent B-cell NHL. The designations were based on a plausible hypothesis that Bendeka is "clinically superior" to a drug previously approved for the same indications. Generally, an orphan-designated drug is eligible for seven years of marketing exclusivity for the orphan-designated indications upon approval of the drug for those indications. On June 8, 2018, the U.S. District Court for the District of Columbia (the "Court") issued a decision requiring the FDA to grant seven years of orphan drug exclusivity ("ODE") in the U.S., for Bendeka, and on July 8, 2018 the FDA granted such ODE through December 2022.  In addition, on July 8, 2018, the FDA submitted a Motion to Alter or Amend the Judgement Pursuant to Rule 59(e), pursuant to which the FDA requested the Court amend its decision to make clear that the decision does not affect any applications referencing TREANDA.  The FDA's motion was denied by the Court on August 1, 2018 on the grounds that FDA was seeking an inappropriate advisory opinion.  On February 20, 2019, the FDA issued a decision in favor of the Company, regarding the scope of exclusivity for Bendeka. Pursuant to the decision, no bendamustine product (including generic versions of TREANDA) may launch in the United States until December 7, 2022 unless it is clinically superior to Bendeka. The Company expects to vigorously pursue the scope of its exclusivity grant.

As of March 29, 2019, the Company and Teva Pharmaceutical Industries Ltd. ("Teva") executed an amendment to the Cephalon License Agreement to terminate Teva's obligation to pay future milestones and royalties on Bendeka sales outside of the U.S., which included an upfront cash payment of $9 million that was recorded as License and other revenue on the consolidated statements of income.

On April 13, 2019, the Company and Teva entered into an Amendment to the Cephalon License Agreement ("Cephalon License", amending the terms of the License Agreement to increase the U.S. royalty paid to the Company and re-allocated certain litigation expenses. Pursuant to the Amendment, beginning on October 1, 2019, the Company's royalty payment has increased from 25% to 30% of Bendeka net U.S. sales. The royalty rate will increase by one percentage point on each anniversary of October 1, 2019 until it reaches 32%, and it will remain at 32% thereafter. The Amendment also extends the U.S. royalty term for Bendeka until it is no longer sold in the United States. The previous U.S. royalty term was set to expire in 2025. The extended term coincides with the bendamustine patents with expiries through 2033. Pursuant to the amendment, Eagle will continue to be responsible for the manufacture of Bendeka for the U.S. market for so long as it is sold in the United States.

*Ryanodex*

On October 3, 2018, the Company announced that it entered into an agreement with the United States Army Medical Research Institute of Chemical Defense, the nation's leading science and technology laboratory in the area of medical chemical countermeasures research and development, to conduct a study to evaluate the neuroprotective effects of Ryanodex® (dantrolene sodium).

On May 7, 2019, the Company announced positive results of its study to evaluate the neuroprotective effects of Ryanodex secondary to nerve agent exposure, conducted with the United States Army Medical Research Institute of Chemical Defense.

On December 16, 2019, we announced that the FDA has granted orphan drug designation (ODD) for Ryanodex®(dantrolene sodium) for the treatment of organophosphate exposure. Organophosphates are a class of chemicals that include potent pesticides and chemical weapons, known as nerve agents. Acute intoxication with organophospates may result in severe consequences, including brain damage and death. About 2,700 people in the United States are treated for accidental exposure to

F- 11

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

organophosphate pesticides every year. Eagle is currently evaluating Ryanodex for the treatment of brain damage secondary to nerve agent exposure. If approved, Ryanodex would represent the first product available for this indication.

On January 6, 2020, we issued a press release announcing a new research agreement with NorthShore University HealthSystem in Evanston, Illinois, focused on studying Ryanodex for traumatic brain injury (TBI) in animal models. TBI can acutely cause brain lesions that result in direct tissue damage that may prompt apoptotic cell mechanisms for several weeks post-injury, which may lead to worsened long-term outcomes. Disruption of certain intracellular mechanisms may affect cell functioning and survival.

*Fulvestrant*

On October 30, 2018, the Company announced that the Company's fulvestrant formulation has not met the primary pharmacokinetic endpoint evaluating the bioequivalence of the Company's formulation compared to Faslodex in its open label, randomized, pharmacokinetic and safety study conducted in 600 healthy female volunteers across multiple U.S. sites.On May 7, 2019, the Company announced positive results of its study to evaluate the neuroprotective effects of Ryanodex secondary to nerve agent exposure, conducted with the United States Army Medical Research Institute of Chemical Defense.

*Vasopressin*

On April 16, 2018, the Company announced the FDA's acceptance of the Company's ANDA filing for vasopressin injection, 1ml. This product is the generic version of Endo International plc's original Vasostrict® formulation, which is indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines. On February 2, 2021, the Company announced that the FDA issued a complete response letter, or CRL, for the Company's ANDA for vasopressin.

*PEMFEXY*

On December 13, 2019, we reached a settlement agreement with Eli Lilly and Company related to the Company's novel product, PEMFEXY™ (pemetrexed for injection), a branded alternative to ALIMTA®. The agreement provides for a release of all claims by the parties and allows for an initial entry of PEMFEXY™ into the market (equivalent to approximately a three week supply of current ALIMTA®utilization) on February 1, 2022 and a subsequent uncapped entry on April 1, 2022.

On February 10, 2020, we announced that it has received final approval from the FDA for its novel product, PEMFEXY™ (pemetrexed for injection), a branded alternative to ALIMTA®.

*Tyme*

On January 7, 2020, Tyme Technologies, Inc. and the Company announced a strategic collaboration to advance oral SM-88 for the treatment of patients with cancer. SM-88 is an investigational agent in two Phase 2 studies for pancreatic cancer and in a Phase 2 study for prostate cancer. Data is expected in 2021.

F- 12

**2. Summary of Significant Accounting Policies**

*Significant Risks and Uncertainties*

In response to the ongoing COVID-19 pandemic, the Company has taken and continues to take active measures designed to address and mitigate the impact of the COVID-19 pandemic on its business, such as remote working policies, facilitating management's periodic communication to address employee and business concerns and providing frequent updates to the Company's Board of Directors ("Board"). The Company anticipates that the COVID-19 pandemic may also have an impact on the clinical development timelines for certain of its clinical programs, such as EA-114. The Company also anticipates that the COVID-19 pandemic may have an impact on the Company's supply chain. The COVID-19 pandemic and associated lockdowns have resulted in a decrease in healthcare utilization broadly and specifically lead to a continuing reduction in the utilization of physician-administered oncology products including Belrapzo and Bendeka. In addition, the COVID-19 pandemic has delayed the timing of ongoing litigation, including the litigation with Par (as defined below) with respect to Vasopressin, and the Company anticipates that such delays will continue for the duration of the pandemic. The extent to which the COVID-19 pandemic will continue to impact the Company's business, its clinical development and regulatory efforts, its supply chain and sales efforts, its corporate development objectives and the value of, and market for, its common stock will depend on future developments that are highly uncertain and cannot be predicted with confidence at this time, such as the ultimate duration of the pandemic, travel restrictions, quarantines, social distancing and business closure requirements in the United States, and other countries, and the effectiveness of actions taken globally to contain and treat the disease. The global economic slowdown, the overall disruption of global healthcare systems and other risks and uncertainties associated with the pandemic have impacted the Company's operations and could have a material adverse effect on the Company's business, financial condition, results of operations and growth prospects.

In addition, the Company is subject to other challenges and risks specific to its business and its ability to execute on its business plan and strategy, as well as risks and uncertainties common to companies in the pharmaceutical industry with research and development operations, including, without limitation, risks and uncertainties associated with: delays or problems in obtaining clinical supply; obtaining regulatory approval of its product candidates; loss of single source suppliers or failure to comply with manufacturing regulations; identifying, acquiring or in-licensing additional products or product candidates; product development and the inherent uncertainty of clinical success; the challenges of protecting and enhancing its intellectual property rights; and the challenges of complying with applicable regulatory requirements. In addition, as the ongoing COVID-19 pandemic affects the Company's business and results of operations, it may also have the effect of heightening many of the other risks and uncertainties discussed above.

*Use of Estimates*

These financial statements are presented in U.S. dollars and are prepared in accordance with U.S. GAAP. The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported in the financial statements including disclosure of contingent assets and contingent liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period and accompanying notes. The Company's critical accounting policies are those that are both most important to the Company's financial condition and results of operations and require the most difficult, subjective or complex judgments on the part of management in their application, often as a result of the need to make estimates about the effect of matters that are inherently uncertain. The Company anticipates that the COVID-19 pandemic will continue to disrupt the Company's supply chain and marketing and sales efforts for certain of its products, including Bendeka, although it is not currently expected that any disruption would be significant. As of the date of issuance of these financial statements, the Company is not aware of any specific event or circumstance that would require the Company to update its estimates, assumptions and judgments or revise the carrying value of its assets or liabilities. Because of the uncertainty of factors surrounding the estimates or judgments used in the preparation of the financial statements, actual results may materially vary from these estimates, and any such differences may be material to the Company's financial statements.

Revenue from sales of products is recognized at the point where the customer obtains control of the goods and we satisfy our performance obligation, which generally is at the time we ship the product to the customer. Provisions for rebates, discounts, and returns are established in the same period the related sales are recognized. Significant judgments must be made in determining the transaction price for our sales of products related to anticipated rebates, discounts and returns. Refer below for further details.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

*Cash and Cash Equivalents*

The Company considers all highly liquid investments with an original maturity of three months or less to be cash equivalents. All cash and cash equivalents are held in United States financial institutions. The carrying amount of cash and cash equivalents approximates its fair value due to its short-term nature..

*Fair Value Measurements*

U.S. GAAP establishes a framework for measuring fair value under generally accepted accounting principles and enhances disclosures about fair value measurements. Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Valuation techniques used to measure fair value must maximize the use of observable inputs and minimize the use of unobservable inputs. The standard describes the following fair value hierarchy based on three levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value:

- Level 1: Quoted prices in active markets for identical assets or liabilities.
- Level 2: Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.
- Level 3: Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

The fair value of interest-bearing cash, cash equivalents, accounts receivable and accounts payable approximate fair value due to their life being short term in nature, and are classified as Level 1 for all periods presented.

The following tables present the Company's hierarchy for its assets measured at fair value as of December 31, 2020 and 2019:

| | December 31, 2020 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | **Total** | | **Level 1** | | **Level 2** | | **Level 3** |
| **Assets:** | | | | | | | |
| Money market funds | $ | 79,682 | $ | 79,682 | $ | — | $ | — |
| Investment in Tyme | | 12,200 | | 12,200 | | — | | — |
| **Total financial assets** | $ | 91,882 | $ | 91,882 | $ | — | $ | — |

| | December 31, 2019 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Total | | Level 1 | | Level 2 | | Level 3 |
| **Assets:** | | | | | | | |
| Money market funds | $ | 85,625 | $ | 85,625 | $ | — | $ | — |
| **Total financial assets** | $ | 85,625 | $ | 85,625 | $ | — | $ | — |

The Company recognizes transfers between levels within the fair value hierarchy, if any, at the end of each quarter. There were no transfers in or out of Level 1, Level 2 or Level 3 during the years ended December 31, 2020 and 2019, respectively.

Our investment in restricted shares of common stock of Tyme Technologies, Inc. ("Tyme") are classified as Level 1. Refer to Note 9, "License and Collaboration Agreements" for further details.

F- 14

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The fair value of debt is classified as Level 2 for the periods presented and approximates its fair value due to the variable interest rate.

### Intangible Assets

*Other Intangible Assets, Net*

Finite-lived intangible assets are measured at their respective fair values on the date they were recorded at the date of subsequent adjustments of fair value and stated net of accumulated amortization. The fair values assigned to the Company's intangible assets are based on reasonable estimates and assumptions given available facts and circumstances. The Company amortizes its definite-lived intangible assets using either the straight-line or accelerated method, based on the useful life of the asset over which it is expected to be consumed utilizing expected undiscounted future cash flows.

The Company will evaluate the potential impairment of intangible assets if events or changes in circumstances indicate that the carrying amount of the assets may not be fully recoverable or that the useful lives of these assets are no longer appropriate. Events giving rise to impairment are an inherent risk in our industry and many factors cannot be predicted. Factors that we consider in deciding when to perform an impairment review include significant changes in our forecasted projections for the asset or asset group for reasons including, but not limited to, significant under-performance of a product in relation to expectations, significant changes or planned changes in our use of the assets, significant negative industry or economic trends, and new or competing products that enter the marketplace. The impairment test would be based on a comparison of the undiscounted cash flows expected to be generated from the use of the asset group and its eventual disposition to the carrying value of the asset group. If impairment is indicated, the asset is written down by the amount by which the carrying value of the asset exceeds the related fair value of the asset with the related impairment charge recognized within the statements of income.

*Goodwill*

Goodwill represents the excess of purchase price over the fair value of net assets acquired in the Eagle Biologics acquisition described in Note 11. Goodwill is not amortized, but is evaluated for impairment on an annual basis, in the fourth quarter, or more frequently if events or changes in circumstances indicate that the fair value of the reporting unit's goodwill is less than it's carrying amount. The Company did not identify any impairment to goodwill during the periods presented.

### Acquisition-Related Contingent Consideration

Contingent consideration related to a business combination is recorded on the acquisition date at the estimated fair value of the contingent payments. The acquisition date fair value is measured based on the consideration expected to be transferred using probability-weighted assumptions and discounted back to present value. The discount rate used is determined at the time of the acquisition in accordance with accepted valuation methods. The fair value of the acquisition-related contingent consideration is re-measured at the estimated fair value at each reporting period with the change in fair value recognized as income or expense in the consolidated statements of income.

### Concentration of Major Customers and Vendors

The Company is dependent on its commercial partner to market and sell Bendeka; therefore, the Company's future revenues are highly dependent on the collaboration and distribution arrangement with Teva.

Teva markets Bendeka through a license agreement with the Company. Pursuant to that license agreement, Teva pays the Company a royalty based on net sales of the product and also purchases the product from the Company. A disruption in this arrangement, caused by, among other things, a supply disruption, loss of exclusivity or the launch of a superior product would have a material adverse effect of the Company's financial position, results of operations and cash flows.

F- 15

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The total revenues and accounts receivables broken down by major customers as a percentage of the total are as follows:

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2020** | **2019** | **2018** |
| **Net revenues** | | | |
| Cephalon, Inc. (Teva) - See Revenue Recognition | 67 % | 77 % | 75 % |
| Other | 33 % | 23 % | 25 % |
|  | 100 % | 100 % | 100 % |

|  | December 31, | |
| --- | --- | --- |
|  | **2020** | **2019** |
| **Accounts receivable** | | |
| Cephalon, Inc. (Teva) - See Revenue Recognition | 58 % | 80 % |
| Other | 42 % | 20 % |
|  | 100 % | 100 % |

*Inventories*

Inventories are recorded at the lower of cost or net realizable value, with cost determined on a first-in first-out basis. The Company periodically reviews the composition of its inventories in order to identify obsolete, slow-moving or otherwise non-saleable items. If non-saleable items are observed and there are no alternate uses for the inventories, the Company will record a write-down to net realizable value in the period that the decline in value is first recognized.

*Property and Equipment*

Property and equipment are stated at cost. Depreciation is recorded over the estimated useful lives of the assets utilizing the straight-line method. Leasehold improvements are being amortized over the shorter of their useful lives or the lease term.

*Research and Development Expense*

Costs for research and development are charged to expense as incurred and include; employee-related expenses including salaries, benefits, travel and stock-based compensation expense for research and development personnel; expenses incurred under agreements with contract research organizations, contract manufacturing organizations and service providers that assist in conducting clinical and preclinical studies; costs associated with preclinical activities and development activities, costs associated with regulatory operations; and depreciation expense for assets used in research and development activities.

Costs for certain development activities, such as clinical studies, are recognized based on an evaluation of the progress to completion of specific tasks using data such as patient enrollment, clinical site activations, or information provided to the Company by its vendors on their actual costs incurred. Payments for these activities are based on the terms of the individual arrangements, which may differ from the patterns of costs incurred, and are reflected in the consolidated financial statements as prepaid expenses or accrued expenses as deemed appropriate.

*Advertising and Marketing*

Advertising and marketing costs are expensed as incurred. Advertising and marketing costs were $2.7 million, $2.4 million, and $3.3 million for the year ended December 31, 2020, 2019, and 2018, respectively.

*Income Taxes*

The Company accounts for income taxes using the liability method in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC"), Topic 740 - Income Taxes ("ASC 740"). Deferred tax assets and liabilities are determined based on temporary differences between financial reporting and tax bases of assets and liabilities and

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

are measured by applying enacted rates and laws to taxable years in which differences are expected to be recovered or settled. Further, the effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that the rate changes. A valuation allowance is required when it is "more likely than not" that all or a portion of deferred tax assets will not be realized. ASC 740 also prescribes a comprehensive model for how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that the company has taken or expects to take on a tax return, including a decision whether to file or not file a return in a particular jurisdiction. We recognize any interest and penalties accrued related to unrecognized tax benefits as income tax expense.

*Revenue Recognition*

Revenue is recognized when a customer obtains control of promised goods or services, in an amount that reflects the consideration which the entity expects to receive in exchange for those goods or services. To determine revenue recognition for arrangements that an entity determines are within the scope of ASC 606, the Company performs the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. The Company only applies the five-step model to contracts when it is probable that the entity will collect the consideration it is entitled to in exchange for the goods or services it transfers to the customer. At contract inception, once the contract is determined to be within the scope of ASC 606, the Company assesses the goods or services promised within each contract and determines those that are performance obligations, and assesses whether each promised good or service is distinct. The Company then recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when (or as) the performance obligation is satisfied. Sales, value add, and other taxes collected on behalf of third parties are excluded from revenue.

*Product revenue* - The Company recognizes net revenue on sales to its commercial partners and to end users. In each instance, revenue is generally recognized when the customer obtains control of the Company's product, which occurs at a point in time, and may be upon shipment or upon delivery based on the contractual shipping terms of a contract. Receivables from our product sales have payment terms ranging from 30 to 75 days with select extended terms to wholesalers on initial purchases of product launch quantities.

Revenue on sales to commercial partners relates primarily to Bendeka. Sales to our commercial partners are presented gross because the Company is primarily responsible for fulfilling the promise to provide the product, is responsible to ensure that the product is produced in accordance with the related supply agreement and controls the inventory while in-transit to the commercial partner.

Revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring products or services to a customer. To the extent the transaction price includes variable consideration, the Company estimates the amount of variable consideration that should be included in the transaction price generally utilizing the expected value method to which the Company expects to be entitled. As such, revenue on sales to end users for Belrapzo and Ryanodex are recorded net of chargebacks, rebates, returns, prompt pay discounts, wholesaler fees and other deductions. Our products are contracted with a limited number of oncology distributors and hospital buying groups with narrow differences in ultimate realized contract prices used to estimate our allowance for chargebacks and rebate reserves. The Company has a product returns policy on some of its products that allows the customer to return pharmaceutical products within a specified period of time both prior to and subsequent to the product's expiration date. The Company's estimate of the provision for returns is analyzed quarterly and is based upon many factors, including historical experience of actual returns and analysis of the level of inventory in the distribution channel, if any. The Company has terms on sales of Ryanodex by which the Company does not accept returns. Variable consideration is included in the transaction price if, in the Company's judgment, it is probable that a significant future reversal of cumulative revenue under the contract will not occur. Estimates of variable consideration are made generally using the expected value method and determination of whether to include estimated amounts in the transaction price are based largely on an assessment of the Company's anticipated performance and all information (historical, current and forecasted) that is reasonably available. The Company believes that the estimates it has established are reasonable based upon current facts and circumstances. Applying different judgments to the same facts and circumstances could result in the estimated amounts to vary.

F- 17

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

*Components of Gross-to-Net (GTN) Estimates*

<u>Chargebacks</u>: Chargebacks are discounts that occur when certain contracted customers, including group purchasing organizations ("GPOs"), public health service institutions and federal government entities purchasing via the Federal Supply Schedule, purchase from the Company's distributors. The Company's distributors purchase product from us at invoice price, then resell the product to certain contracted customers on the basis of prices negotiated between us and the providers. The difference between the distributors' purchase price and the typically lower certain contracted customers' purchase price is refunded to the distributors through a chargeback credit. We record estimates for these chargebacks at the time of sale as deductions from gross revenues, with corresponding adjustments to our accounts receivable reserves and allowances.

The provision for chargebacks is the most significant provision in the context of the Company's gross-to-net adjustments in the determination of net revenue. Chargebacks are estimated based on payer mix and contracted price, adjusted for current period assumptions.

<u>Commercial and Medicaid Rebates</u>: The Company contracts with government agencies or collectively, third-party payors, so that Belrapzo and Ryanodex will be eligible for purchase by, or partial or full reimbursement from, such third-party payors. The Company estimates the rebates it will provide to third-party payors and deducts these estimated amounts from total gross product revenues at the time the revenues are recognized. These reserves are recorded in the same period in which the revenue is recognized, resulting in a reduction of product revenue and the establishment of a current liability. The current liability is included in accrued expenses and other current liabilities on the consolidated balance sheets. The Company estimates the rebates that it will provide to third-party payors based upon (i) the Company's contracts with these third-party payors, (ii) the government mandated discounts applicable to government-funded programs, (iii) a range of possible outcomes that are probability-weighted for the estimated payer mix, and (iv) information obtained from the Company's distributors.

The information that the Company also considers when establishing its rebate reserves are purchases by customers, projected annual sales for customers, actual rebates payments made, processing time lags, and for indirect rebates, the level of inventory in the distribution channel that will be subject to indirect rebates. We do not provide incentives designed to increase shipments to our customers that we believe would result in out-of-the-ordinary course of business inventory for them. The Company regularly reviews and monitors estimated or actual customer inventory information at its largest distributors for its key products to ascertain whether customer inventories are in excess of ordinary course of business levels.

<u>Product Returns</u>: The Company's distributors have the right to return unopened unprescribed Belrapzo during certain time periods around the period beginning prior to the labeled expiration date and ending after the labeled expiration date. The Company estimates future product returns on sales of Belrapzo based on: (i) data provided to the Company by its distributors (including weekly reporting of distributors' sales and inventory held by distributors that provided the Company with visibility into the distribution channel in order to determine what quantities were sold to retail pharmacies and other providers), (ii) information provided to the Company from retail pharmacies, (iii) data provided to the Company by a third-party data provider which collects and publishes prescription data, and other third parties, (iv) historical industry information regarding return rates for similar pharmaceutical products, (v) the estimated remaining shelf life of Belrapzo previously shipped and currently being shipped to distributors and (vi) contractual agreements intended to limit the amount of inventory maintained by the Company's distributors. These reserves are recorded in the same period the related revenue is recognized, resulting in a reduction of product revenue and the establishment of a current liability which is included in accrued expenses and other current liabilities on the consolidated balance sheets.

The Company's provision for product returns based on the factors noted above generally encompass a time range from 12 to 48 months after revenue is recognized. Additionally, we consider other factors when estimating our current period return provision, including levels of inventory in the distribution channel, significant market changes that may impact future expected returns, and actual product returns, and may record additional provisions for specific returns that it believes are not covered by the historical rates. The Company's commercial returns policy and terms with certain customers also states that certain products are sold as non-returnable.

<u>Wholesaler fees and other incentives</u>: The Company generally provides invoice discounts on Belrapzo and Ryanodex sales to its distributors for prompt payment and fees for distribution services, such as fees for certain data that distributors provide to the Company. The payment terms for sales to distributors generally include a 2% discount for prompt payment which is generally defined in invoice terms as a range from 15 to 45 days, while the fees for distribution services are based on contractual rates

F- 18

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

agreed with the respective distributors. Based on historical data, the Company expects its distributors to earn these discounts and fees, and deducts the full amount of these discounts and fees from its gross product revenues and accounts receivable at the time such revenues are recognized.

*Other GTN considerations*

We may at our discretion provide price adjustments due to various competitive factors. There are circumstances under which we may not provide price adjustments to certain customers as a matter of business strategy, and consequently may lose future sales volume to competitors and risk a greater level of product returns.

As detailed above, we have the experience and access to relevant information that we believe are necessary to reasonably estimate the amounts of such deductions from gross revenues. Some of the assumptions we use for certain of these estimates are based on information received from third parties, such as wholesale customer inventories and market data, or other market factors beyond our control. The estimates that are most critical to the establishment of these reserves, and therefore, would have the largest impact if these estimates were not accurate, are estimates related to contract sales volumes, average contract pricing, customer inventories and return volumes. We regularly review the information related to these estimates and adjust our reserves accordingly, if and when actual experience differs from previous estimates. With the exception of the product returns allowance, the ending balances of accounts receivable reserves and allowances generally are processed during a two-month to four-month period.

The Company recorded product sales, net as follows:

|  | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | 2020 | | 2019 | | 2018 | |
|  | (in thousands) | | | | | |
| Bendeka | $ | 15,439 | $ | 31,182 | $ | 24,568 |
| Belrapzo | | 27,527 | | 29,665 | | 22,853 |
| Ryanodex | | 28,268 | | 13,039 | | 20,195 |
| Other | | 1,089 | | 103 | | 2,769 |
| Product Sales, net | $ | 72,323 | $ | 73,989 | $ | 70,385 |

The following table provides a summary roll-forward of the Company's net product revenue allowances and related reserves and allowances for the years ended December 31, 2020 and 2019, on the consolidated balance sheets (in thousands).

|  | Chargebacks | | Commercial Rebates | | Medicaid Rebates | | Product Returns | | Wholesaler Fees and Other Incentives | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance at December 31, 2018** | $ | 6,032 | $ | 1,789 | $ | 319 | $ | 705 | $ | 3,614 | $ | 12,459 |
| Provisions / Adjustments | | 12,599 | | 946 | | 678 | | 1,929 | | 7,670 | | 23,822 |
| Charges processed / Payments | | (15,643) | | (1,604) | | (430) | | (231) | | (9,273) | | (27,181) |
| **Balance at December 31, 2019** | $ | 2,988 | $ | 1,131 | $ | 567 | $ | 2,403 | $ | 2,011 | | $9,100 |
| Provisions / Adjustments | | 20,368 | | 1,243 | | 484 | | (391) | | 8,526 | | 30,230 |
| Charges processed / Payments | | (21,067) | | (602) | | (367) | | (346) | | (5,146) | | (27,528) |
| **Balance at December 31, 2020** | $ | 2,289 | $ | 1,772 | $ | 684 | $ | 1,666 | $ | 5,391 | | $11,802 |

Such net product revenue allowances and reserves are included within accounts receivable, net and accrued expenses and other current liabilities within the consolidated balance sheets.

F- 19

*Royalty Revenue* — The Company recognizes revenue from license arrangements with its commercial partners' net sales of products. Royalties are recognized as earned in accordance with contract terms when they can be reasonably estimated and collectability is reasonably assured. The Company's commercial partners are obligated to report their net product sales and the resulting royalty due to the Company within 25 days for Bendeka from the end of each quarter. Based on historical product sales, royalty receipts and other relevant information, the Company accrues royalty revenue each quarter and subsequently determines a true-up when it receives royalty reports from its commercial partners. Historically, these true-up adjustments have been immaterial. Our receivables from royalty revenue are due 45-days from the end of the quarter.

*License and other revenue* — The Company analyzes each element of its licensing agreements to determine the appropriate revenue recognition. The terms of the license agreement may include payment to us of non-refundable up-front license fees, milestone payments if specified objectives are achieved, and/or royalties on product sales. The Company recognizes revenue from upfront payments at a point in time, typically upon fulfilling the delivery of the associated intellectual property to the customer.

If the contract contains a single performance obligation, the entire transaction price is allocated to the single performance obligation. Contracts that contain multiple performance obligations require an allocation of the transaction price based on the estimated relative standalone selling prices of the promised products or services underlying each performance obligation. The Company determines standalone selling prices based on the price at which the performance obligation is sold separately. If the standalone selling price is not observable through past transactions, the Company estimates the standalone selling price taking into account available information such as market conditions and internally approved pricing guidelines related to the performance obligations.

The Company recognizes sales-based milestone payments as revenue upon the achievement of the cumulative sales amount specified in the contract in accordance with ASC 606-10-55-65. For those milestone payments which are contingent on the occurrence of particular future events, the Company determined that these need to be considered for inclusion in the calculation of total consideration from the contract as a component of variable consideration using the most-likely amount method. As such, the Company assesses each milestone to determine the probability and substance behind achieving each milestone. Given the inherent uncertainty of the occurrence of these future events, the Company will not recognize revenue from the milestone until there is not a high probability of a reversal of revenue, which typically occurs near or upon achievement of the event.

When determining the transaction price of a contract, an adjustment is made if payment from a customer occurs either significantly before or significantly after performance, resulting in a significant financing component. Applying the practical expedient in paragraph 606-10-32-18, the Company does not assess whether a significant financing component exists if the period between when the Company performs its obligations under the contract and when the customer pays is one year or less. None of the Company's contracts contained a significant financing component as of December 31, 2020.

***Stock-Based Compensation***

The Company accounts for stock-based compensation using the fair value provisions of ASC 718, Compensation - Stock Compensation that requires the recognition of compensation expense, using a fair-value based method, for costs related to all stock-based payments including stock options and restricted stock. This topic requires companies to estimate the fair value of the stock-based awards on the date of grant for options issued to employees and directors and record expense over the employees' service periods, which are generally the vesting period of the equity awards.

The Company accounts for stock-based compensation by measuring and recognizing compensation expense for all stock-based payments made to employees and directors based on estimated grant date fair values. The straight-line method is used to allocate compensation cost to reporting periods over each optionee's requisite service period, which is generally the vesting period. The fair value of the Company's stock-based awards to employees and directors is estimated using the Black-Scholes option valuation model, or Black-Scholes model. The Black-Scholes model requires the input of subjective assumptions, including the expected stock price volatility, the calculation of expected term, forfeitures and the fair value of the underlying common stock on the date of grant, among other inputs. The risk-free interest rate is determined with the implied yield currently available for zero-coupon U.S. government issues with a remaining term approximating the expected life of the options.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

*Earnings Per Share*

Basic earnings per common share is computed using the weighted average number of shares outstanding during the period. Diluted earnings per share is computed in a manner similar to the basic earnings per share, except that the weighted-average number of shares outstanding is increased to include all common shares, including those with the potential to be issued by virtue of warrants, options, convertible debt and other such convertible instruments. Diluted earnings per share contemplate a complete conversion to common shares of all convertible instruments only if they are dilutive in nature with regards to earnings per share, as calculated under the treasury method.

The anti-dilutive common shares equivalents outstanding at December 31, 2020, 2019, and 2018 were as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2020** | **2019** | **2018** |
| Options | 2,767,501 | 2,454,077 | 1,824,728 |
| Restricted stock units | 207,177 | — | — |
| Total | 2,974,678 | 2,454,077 | 1,824,728 |

The following table sets forth the computation for basic and diluted net income per share for December 31, 2020, 2019, and 2018:

| | Year Ended December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | **2020** | | **2019** | | **2018** | |
| **Numerator** | | | | | | |
| Numerator for basic and diluted earnings per share-net income | $ | 11,989 | | 14,313 | $ | 31,903 |
| **Denominator** | | | | | | |
| Basic weighted average common shares outstanding | | 13,481,525 | | 13,754,516 | | 14,768,625 |
| Dilutive effect of stock options | | 289,868 | | 384,217 | | 510,026 |
| Diluted weighted average common shares outstanding | | 13,771,393 | | 14,138,733 | | 15,278,651 |
| **Basic net income per share** | | | | | | |
| Basic net income per share | $ | 0.89 | $ | 1.04 | $ | 2.16 |
| **Diluted net income per share** | | | | | | |
| Diluted net income per share | $ | 0.87 | $ | 1.01 | $ | 2.09 |

*Recent Accounting Pronouncements*

*Recent Accounting Pronouncements - Not Yet Adopted*

In March 2020, the FASB issued Update 2020-04 Reference Rate Reform (Topic 848), Facilitation of the Effects of Reference Rate Reform on Financial Reporting to provide temporary optional guidance to ease the potential burden in accounting for reference rate reform. The amendments in Update 2020-04 are elective and apply to all entities that have contracts, hedging relationships, and other transactions that reference LIBOR, formerly known as the London Interbank Offered Rate,
or another reference rate expected to be discontinued due to reference rate reform. The new guidance provides optional expedients, including; (1) Simplify accounting analyses under current GAAP for contract modifications, such as modifications of contracts within the scope of Topic 470, Debt, that will be accounted for by prospectively adjusting the effective interest rate, as if any modification was not substantial. That is, the original contract and the new contract shall be accounted for as if they were not substantially different from one another; (2) Simplify the assessment of hedge effectiveness and allow hedging relationships affected by reference rate reform to continue; (3) Allow a one-time election to sell or transfer debt securities classified as held to maturity before January 1, 2020 that reference a rate affected by reference rate reform. The amendments are effective for all entities from the beginning of an interim period that includes the issuance date of the ASU. An entity may elect

F- 21

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

to apply the amendments prospectively through December 31, 2022. The adoption of ASU 2020-4 is not expected to have a material impact on the Company's financial position or results of operations.

*Recently Adopted Accounting Pronouncements*

The Company adopted FASB ASU No. 2016-02,"Leases (Topic 842)"("ASU 2016-02") as of January 1, 2019 to increase transparency and comparability among organizations, which included recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. Lessees are required to recognize a lease liability, which represents the discounted obligation to make future minimum lease payments, and a corresponding right-of-use asset on the balance sheet for most leases. The Company adopted ASU 2016-02 using the modified retrospective approach and did not recognized a cumulative-effect adjustment to the opening balance of Retained earnings. The Company elected a number of optional practical expedients permitted under the transition guidance within the new standard, which among other things, allowed us to carry forward the historical lease classification and that permits lease agreements that are twelve months or less to be excluded from the balance sheet. The primary impact upon adoption was the recognition, on a discounted basis, of the Company's minimum commitments under noncancelable operating leases as right of use assets and obligations on the consolidated balance sheets, of approximately $3 million. The Company may enter into future long-term lease agreements or exercise renewal options contained in existing lease agreements that could have a material impact on the right of use assets and obligations reflected on the consolidated balance sheets. Refer to Note 5 - Balance Sheet Accounts for further details.

In June 2016, the FASB issued ASU 2016-13, Financial Instruments - Credit Losses which requires financial assets measured at amortized cost basis to be presented at the net amount expected to be collected. This standard is effective for fiscal years beginning after December 15, 2019 and the Company adopted the standard effective January 1, 2020. The adoption of ASU 2016-13 had no material impact on the Company's financial position and results of operations.

### CARES Act

On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was signed into U.S. federal law, which is aimed at providing emergency assistance and health care for individuals, families, and businesses affected by the COVID-19 pandemic and generally supporting the U.S. economy. The CARES Act, among other things, includes provisions related to refundable payroll tax credits, deferment of the employer portion of social security payments, net operating loss carryback periods, modifications to the net interest deduction limitations, and technical corrections to tax depreciation methods for qualified improvement property. Reimbursement was not sought by the Company. The CARES Act has not had, and the Company does not currently expect it to have, a material impact on the Company's financial statements at this time.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

**3. Inventories**

Inventories consist of the following:

|  | December 31, | | | |
|---|---|---|---|---|
|  | **2020** | | **2019** | |
| Raw materials | $ | 3,515 | $ | 2,460 |
| Work in process |  | 2,589 |  | 3,243 |
| Finished products |  | 1,971 |  | 863 |
|  | $ | 8,075 | $ | 6,566 |

F- 23

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

### 4. Property and Equipment, net

Property and equipment consists of the following:

| | December 31, | | Estimated Useful Life (years) |
|---|---|---|---|
| | **2020** | **2019** | |
| Furniture and fixtures | $ 1,476 | $ 1,188 | 7 |
| Office equipment | 1,152 | 1,094 | 3 |
| Equipment | 3,485 | 3,095 | 7 |
| Leasehold improvements | 1,155 | 1,144 | 2 |
| | 7,268 | 6,521 | |
| Less accumulated depreciation | (5,191) | (4,319) | |
| Property and equipment, net | $ 2,077 | $ 2,202 | |

Depreciation expense related to property and equipment amounted to $872 and $972 for the year ended December 31, 2020 and 2019, respectively.

F- 24

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

### 5. Balance Sheet Accounts

*Prepaid and Other Current Assets*

Prepaid and other current assets consist of the following:

|  | December 31, | | |
|---|---|---|---|
|  | **2020** | | **2019** |
| Advances to commercial manufacturers | $ | 660 | $ | 2,462 |
| Prepaid FDA user fee and advances to CROs |  | 1,262 |  | 6,345 |
| Prepaid insurance |  | 191 |  | 191 |
| Prepaid income taxes |  | — |  | 4,661 |
| All other |  | 1,605 |  | 1,445 |
| Total Prepaid expenses and other current assets | $ | 3,718 | $ | 15,104 |

*Accrued Expenses and Other Liabilities*

Accrued expenses and other liabilities consist of the following:

|  | December 31, | | |
|---|---|---|---|
|  | **2020** | | **2019** |
| Royalties payable to commercial partners | $ | 5,996 | $ | 6,004 |
| Accrued research & development |  | 2,724 |  | 1,686 |
| Accrued professional fees |  | 2,370 |  | 1,926 |
| Accrued salary and other compensation |  | 4,686 |  | 8,083 |
| Accrued product sales reserves |  | 4,966 |  | 8,364 |
| All other |  | 3,075 |  | 2,298 |
| Total Accrued expenses and other liabilities | $ | 23,817 | $ | 28,361 |

*Leases*

In February 2016, the FASB issued ASU 2016-02, Leases (Topic 842) in order to increase transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet. ASU 2016-02 requires a lessee to recognize a liability to make lease payments (the lease liability) and a right-of-use ("ROU") asset representing its right to use the underlying asset for the lease term on the balance sheet.

A lease is a contract, or part of a contract, that conveys the right to control the use of explicitly or implicitly identified property, plant or equipment in exchange for consideration. Control of an asset is conveyed to the Company if the Company obtains the right to obtain substantially all of the economic benefits of the asset or the right to direct the use of the asset. The Company recognizes ROU assets and lease liabilities at the lease commencement date based on the present value of future, fixed lease payments over the term of the arrangement. ROU assets are amortized on a straight-line basis over the term of the lease. Lease liabilities accrete to yield and are reduced at the time when the lease payment is payable to the vendor.

In accordance with Topic 842, leases are measured at present value using the rate implicit in the lease or, if the implicit rate is not determinable, the lessee's incremental borrowing rate. As the implicit rate is not typically available, the Company uses its incremental borrowing rate based on the information available at the lease commencement date to determine the present value of future lease payments. The implicit borrowing rate approximates the rate the Company would pay to borrow on a collateralized basis over a similar term and amount equal to the lease payments in similar economic environment.

The Company leases office space in Woodcliff Lake, New Jersey for its principal office under an amended lease agreement through June 2025. The Company also leases a lab space in Cambridge, Massachusetts under a lease agreement through April

F- 25

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

2024. Both the Company leases are classified as operating leases and have remaining lease terms ranging from 3.33 years to 4.5 years. The principal office and the lab space leases include renewal option to extend the lease for up to 5 years. Furthermore, the Company has not elected the practical expedient to separate lease and non-lease components for all classes of underlying assets.

The table below summarizes the Company's total lease costs included in the consolidated financial statements, as well as other required quantitative disclosures (in thousands):

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2020** | | **2019** | |
| Operating lease cost | $ | 1,323 | $ | 1,146 |
| Total lease cost | $ | 1,323 | $ | 1,146 |
| | | | | |
| **Other information:** | | | | |
| Cash paid for amounts included in the measurement of lease liabilities | | | | |
| Operating cash flows for operating leases | $ | 1,323 | $ | 952 |
| Right-of-use assets obtained in exchange for new operating lease liabilities | $ | 855 | $ | 3,716 |
| Weighted-average remaining lease term - operating leases | | 4.1 years | | 5.0 years |
| Weighted-average discount rate - operating leases | | 6.0 % | | 6.0 % |

The table below presents the maturity of lease liabilities on an annual basis for the remaining years for the Company's two lease agreements (in thousands):

| Year Ending December 31, | **Operating Leases** | |
| --- | --- | --- |
| 2021 | $ | 1,391 |
| 2022 | | 1,423 |
| 2023 | | 1,455 |
| 2024 | | 1,038 |
| 2025 | | 413 |
| Thereafter | | — |
| Total | | 5,720 |
| Less: present value discount | | (638) |
| Present value of lease liabilities | $ | 5,082 |
| | | |
| **Balance Sheet Classification at December 31:** | | |
| Current lease liabilities | $ | 1,123 |
| Long-term lease liabilities | | 3,959 |
| Total lease liabilities | $ | 5,082 |

**6. Debt**

On November 8, 2019, the Company entered into the Second Amended and Restated Credit Agreement (the "Revised Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") and the lenders party thereto, which replaced the Company's existing credit agreement, dated as of August 8, 2017 (the "Amended Credit Agreement"). The terms

and amounts borrowed under the Revised Credit Agreement includes a drawn term loan of $40 million and a undrawn revolving credit facility of $110 million. The schedule of principal payments for the new term loan facility has been extended until November 8, 2022. The Company classified the current portion of long-term debt of $8 million on the consolidated balance sheet as of December 31, 2020. Per the terms of the Revised Credit Agreement, the Company is limited in its ability to pay dividends. As of December 31, 2020, the Company was in compliance with each of the senior secured net leverage ratio; total net leverage ratio; and fixed charge coverage ratio covenants.

The new term loan facility shall bear interest at the Adjusted LIBOR (equal to (a) the LIBOR for such Interest Period multiplied by (b) the Statutory Reserve Rate as established by Board of Governors of the Federal Reserve System of the United States of America) for the Interest Period in effect for such Borrowing plus the Applicable Rate as described below. The Agent and the Company may amend the Revised Credit Agreement to replace the LIBOR with a Benchmark Replacement, described below.

Loans under the Revised Credit Agreement bear interest at a rate equal to either (a) the LIBOR rate, plus an applicable margin ranging from 2.25% to 3.0% per annum, based upon the total net leverage ratio (as defined in the Revised Credit Agreement), or (b) the Benchmark Replacement which is defined as the greatest of the prime lending rate, or the NYFRB Rate (the rate for a federal funds transaction) in effect on such day plus ½ of 1% or the Adjusted LIBO Rate for a one month Interest Period on such day plus 1% plus an applicable margin ranging from 1.25% to 2.0% per annum, based upon the total net leverage ratio.  The Company is required to pay a commitment fee on the unused portion of the new revolving credit facility in the Revised Credit Agreement at a rate ranging from 0.35% to 0.45% per annum based upon the total net leverage ratio.

As of December 31, 2020, the Company had $0.9 million of unamortized deferred debt issuance costs in its consolidated balance sheets.

| Debt Maturities | At December 31, 2020 |
|---|---:|
| 2021 | $          8,000 |
| 2022 | 26,000 |
| Total | $        34,000 |

On August 8, 2017, the Company entered into an Amended and Restated Credit Agreement (the "Amended Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") and the lenders party thereto, which amended and restated the Company's then existing credit agreement, dated as of January 26, 2017.  The Amended Credit Agreement provided for a 3-year $50 million revolving credit facility and a 3-year $100 million term loan facility (which are collectively referred to as the "Amended Credit Facility"). The Amended Credit Facility was subject to certain financial covenants.

On the date of the amendment, $50 million of the term loan facility was drawn, and none of the revolving credit facility had been drawn. The Amended Credit Facility included a $5 million letter of credit subfacility.  Loans under the Amended Credit Facility bore interest, at the Company's option, at a rate equal to either (a) the LIBOR rate, plus an applicable margin ranging from 2.25% to 3.0% per annum, based upon the total net leverage ratio (as defined in the Amended Credit Agreement), or (b) the prime lending rate, plus an applicable margin ranging from 1.25% to 2.0% per annum, based upon the total net leverage ratio.  The Company was required to pay a commitment fee on the unused portion of the Amended Credit Facility at a rate ranging from 0.35% to 0.45% per annum based upon the total net leverage ratio.  The Company was permitted to terminate or reduce the revolving commitments or term commitments of the lenders and to make voluntary prepayments at any time subject to break funding payments. The Company was required to make mandatory prepayments of outstanding indebtedness under the Amended Credit Agreement (a) upon receipt of proceeds from certain sales, transfers or other dispositions, casualty and other condemnation events and the incurrence of certain indebtedness other than indebtedness permitted, subject to customary reinvestment exceptions and (b) in the case that the aggregate amount of all outstanding loans and letters of credit issued under the Amended Credit Facility exceed the aggregate commitment of all lenders under the Amended Credit Facility. The Company

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

was obligated to repay the term loan facility on the last day of each March, June, September and December in an aggregate principal amount equal to 2.5% during the term of the loan.

## 7. Common Stock and Stock-Based Compensation

**Common Stock**

On March 17, 2020, the Company, announced that its Board approved a new share repurchase program, or the Share Repurchase Program, providing for the repurchase of up to an aggregate of $160.0 million of the Company's outstanding common stock. The Share Repurchase Program replaced the Company's then existing share repurchase program, or the Previous Share Repurchase Program, which was announced on October 30, 2018 and was terminated in connection with the Board's approval of the Share Repurchase Program. At termination, the Company had repurchased approximately $68.0 million of the Company's outstanding common stock under the Previous Share Repurchase Program.

Under the Share Repurchase Program, the Company is authorized to repurchase shares through open market purchases, privately-negotiated transactions, accelerated share repurchases or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. The repurchases have no time limit and may be suspended or discontinued completely at any time. The specific timing and amount of repurchases will vary based on available capital resources and other financial and operational performance, market conditions, securities law limitations, and other factors. The repurchases will be made using the Company's cash resources.

On September 23, 2020, the Company's Board of Directors approved a $25.0 million accelerated share repurchase ("ASR") transaction with JPMorgan Chase Bank, National Association ("JP Morgan") as part of the Company's existing $160.0 million share repurchase program. The specific number of shares to be repurchased pursuant to the ASR is based on the average of the daily volume weighted average share prices of the Company's common stock, less a discount, during the term of the ASR program. Under the terms of the Company's agreement with JP Morgan, the Company paid $25.0 million to JP Morgan on September 24, 2020, and received 550,623 shares, representing the notional amount of the ASR, based on the average of the daily volume weighted average share prices of the Company's common stock, less a discount, during the term of the ASR, which was $45.40. The ASR was completed in the fourth quarter of 2020. The Company determined the ASR contained a forward contract and therefore the Company recorded fair value adjustments on the accelerated share repurchase agreement in the amount of $3.0 million which was a loss recorded in Other expense on our consolidated statements of operations in the year ended December 31, 2020.

As of December 31, 2020, the Company had repurchased an aggregate of 3,682,176 shares of common stock for an aggregate of $206.9 million pursuant to the Company's share repurchase programs in effect since August 2016.

We repurchased the following shares of common stock with cash resources:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2020** | **2019** | **2018** |
| Shares of common stock repurchased | 774,489 | 317,429 | 1,348,563 |
| Cash paid for repurchases of common stock | $ 34,999 | $ 17,961 | $ 73,105 |

**Stock-Based Compensation**

In December 2007, the Company's board of directors approved the 2007 Incentive Compensation Plan (the "2007 Plan") enabling the Company to grant multiple stock-based awards to employees, directors and consultants, the most common being stock options and restricted stock awards. In November 2013, the Company's board of directors approved the 2014 Equity Incentive Plan (the "2014 Plan") which became effective on February 11, 2014. The 2007 Plan was terminated upon the effectiveness of the 2014 Plan and all shares available for issuance under the 2007 Plan were made available under the 2014 Plan. The 2014 Plan provides for the awards of incentive stock options, non-qualified stock options, restricted stock, restricted stock units and other stock-based awards. Awards generally vest equally over a period of four years from grant date. Vesting is accelerated under a change in control of the Company or in the event of death or disability to the recipient. In the event of termination, any unvested shares or options are forfeited. At the Company's annual meeting of stockholders held on August 4,

F- 28

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

2015, the stockholders approved an amendment to the 2014 Plan to, among other things, increase the number of shares of common stock authorized for issuance thereunder by 500,000 shares. After accounting for such increase, and as of such amendment, the Company has reserved and made available 1,934,193 shares of common stock for issuance under the 2014 Plan.

During the year ended December 31, 2018, the Company introduced a new long-term incentive program with the objective to better align the share-based awards granted to management with the Company's focus on improving total shareholder return over the long-term. The share-based awards granted under this long-term incentive program consist of time-based stock options, time-based restricted stock units ("RSUs") and performance-based stock units ("PSUs"). PSUs are comprised of awards that vest upon achievement of certain share price appreciation conditions. These share-based awards expired in January 2021.

*Stock Options*

The fair value of stock options granted to employees, directors, and consultants is estimated using the following assumptions:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2020** | **2019** | **2018** |
| Risk-free interest rate | 0.37% - 1.65% | 1.42% - 2.61% | 2.30% - 3.07% |
| Volatility | 54.89% - 55.51% | 40.83% - 50.73% | 43.76% |
| Expected term (in years) | 5.50 - 6.08 years | 1.51 - 9.41 years | 5.50 - 6.08 years |
| Expected dividend yield | 0.0% | 0.0% | 0.0% |

The following table summarizes information about stock option activity related to the 2014 Plan:

| | Number of Stock Option Shares | Weighted Average Exercise Price (Per Share) | Non-Exercisable | Exercisable |
|---|---|---|---|---|
| **Outstanding at December 31, 2018** | **2,556,365** | **$ 62.78** | **1,074,456** | **1,481,909** |
| Granted | 628,133 | $ 44.28 | | |
| Exercised | (23,032) | $ 10.33 | | |
| Forfeited or expired | (65,305) | | | |
| **Outstanding at December 31, 2019** | **3,096,161** | **$ 59.29** | **1,070,054** | **2,026,107** |
| Granted | 762,200 | $ 55.76 | | |
| Exercised | (149,473) | $ 24.43 | | |
| Forfeited or expired | (376,998) | $ 66.71 | | |
| **Outstanding at December 31, 2020** | **3,331,890** | **$ 59.20** | **1,028,142** | **2,303,748** |

The weighted-average grant-date fair value of options granted during the year ended December 31, 2020, 2019, and 2018 was $28.98, $22.18, and $26.73, respectively. As of December 31, 2020, there was $19,447 unrecognized stock-based compensation expense related to stock options that is expected to be recognized over a weighted average period of 2.7 years. The total intrinsic value of options exercised during the year ended December 31, 2020 was $3,383.

The weighted average contractual terms of options outstanding as of December 31, 2020, 2019, and 2018 was 6.1, 6.8, and 7.3 years, respectively.

The aggregate pre-tax intrinsic value of options outstanding as of December 31, 2020, 2019, and 2018 was $11.6 million, $31.9 million, and $10.7 million, respectively.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

*RSUs*

Each vested time-based RSU represents the right of a holder to receive one of the Company's common shares. The fair value of each RSU granted was estimated based on the trading price of the Company's common shares on the date of grant.

The following table summarizes information about RSU activity related to the 2014 Plan:

| | Number of Restricted Stock Units | | Weighted Average Grant Date Fair Value (Per Share) |
|---|---|---|---|
| **Non-vested at December 31, 2018** | **54,219** | **$** | **59.02** |
| Granted | 211,829 | $ | 42.17 |
| Vested | (13,555) | $ | 59.02 |
| Forfeited | (1,278) | $ | 52.19 |
| **Non-vested at December 31, 2019** | **251,215** | **$** | **44.84** |
| Granted | 236,450 | $ | 59.48 |
| Vested | (79,420) | $ | 46.78 |
| Forfeited | (79,849) | $ | 52.76 |
| **Non-vested at December 31, 2020** | **328,396** | **$** | **53.09** |

As of December 31, 2020, there was $10,945 of unrecognized stock-based compensation expense related to non-vested RSUs that is expected to be recognized over a weighted average period of 2.7 years.

*PSUs*

The fair value of PSUs granted to employees was estimated using a monte carlo simulation model. Inputs used in the calculation include a risk-free interest rate of 2.06%, an expected volatility of 47%, contractual term of 3 years, and no expected dividend yield.

The following table summarizes information about PSU activity related to the 2014 Plan:

| | Number of Performance Stock Units | | Weighted Average Grant Date Fair Value (Per Share) |
|---|---|---|---|
| **Non-vested at December 31, 2018** | **117,219** | **$** | **90.19** |
| Granted | — | $ | — |
| Vested | — | $ | — |
| Forfeited | (1,038) | $ | 90.19 |
| **Non-vested at December 31, 2019** | **116,181** | **$** | **90.19** |
| Granted | — | $ | — |
| Vested | — | $ | — |
| Forfeited | (18,431) | $ | 90.19 |
| **Non-vested at December 31, 2020** | **97,750** | **$** | **90.19** |

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The Company recognized stock-based compensation in its consolidated statements of income for the year ended December 31, 2020, 2019, and 2018 as follows:

|  | Year Ended December 31, | | | | | |
|  | 2020 | | 2019 | | 2018 | |
|---|---|---|---|---|---|---|
| Stock options | $ | 17,694 | $ | 16,394 | $ | 15,333 |
| PSUs | | 1,635 | | 3,062 | | 3,059 |
| RSUs | | 5,427 | | 2,542 | | 690 |
| Stock-based compensation expense | $ | 24,756 | $ | 21,998 | $ | 19,082 |
| | | | | | | |
| Selling, general and administrative | $ | 22,074 | $ | 17,556 | $ | 15,068 |
| Research and development | | 2,682 | | 4,442 | | 4,014 |
| Stock-based compensation expense | $ | 24,756 | $ | 21,998 | $ | 19,082 |

F- 31

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

**8. Income Taxes**

The components of our provision from income taxes is as follows:

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2020** | | **2019** | | **2018** |
| Current: | | | | | | |
| Federal | $ | 10,140 | $ | 6,689 | $ | 4,137 |
| State | | 2,059 | | 844 | | 466 |
| | $ | 12,199 | $ | 7,533 | $ | 4,603 |
| Deferred: | | | | | | |
| Federal | | (1,227) | | 392 | | (2,565) |
| State | | (284) | | (240) | | 97 |
| | $ | (1,511) | $ | 152 | $ | (2,468) |
| | | | | | | |
| Provision for income taxes | $ | 10,688 | $ | 7,685 | $ | 2,135 |

The reconciliation of the statutory U.S. Federal income tax rate to the Company's effective income tax rate is as follows;

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2020** | **2019** | **2018** |
| Federal statutory tax rate | 21 % | 21 % | 21 % |
| State income taxes, net of federal benefit | 6 % | 2 % | 1 % |
| Tax benefit on stock option exercises, net of forfeitures | 4 % | 1 % | (11)% |
| R&D tax credits and Orphan Drug credits | (2)% | (2)% | (7)% |
| Limitation on executive compensation | 9 % | 10 % | 3 % |
| Change in valuation allowance | 9 % | 4 % | — % |
| Other | — % | (1)% | (1)% |
| **Effective tax rate** | 47 % | 35 % | 6 % |

F- 32

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amount of assets and liabilities for financial reporting and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets were as follows:

| | December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Deferred tax assets | | |
| Net operating loss carryforward | $ 841 | $ 243 |
| Stock based compensation | 12,015 | 10,647 |
| Other asset - equity investment with readily determined fair value | 1,771 | — |
| Inventories | 2,338 | 1,539 |
| Employee-related expenses | 51 | 51 |
| Prepaid R&D expenses | 479 | 620 |
| Intangible assets | 708 | 662 |
| ROU asset | 1,154 | 925 |
| Research and development tax credit carryforwards | 86 | — |
| Other | 737 | 1,017 |
| Total deferred tax assets | 20,180 | 15,704 |
| | | |
| Deferred tax liabilities | | |
| Installment sale - Malta | 483 | — |
| Prepaid expenses | 43 | 43 |
| Fixed assets | 315 | 203 |
| Lease liability | 1,092 | 838 |
| Other | — | — |
| Total deferred tax liabilities | 1,933 | 1,084 |
| Valuation allowance | (3,067) | (951) |
| **Net deferred tax assets** | $ 15,180 | $ 13,669 |

In July 2006, the Financial Accounting Standards Board ("FASB") issued ASC 740-10, Uncertainty in Income Taxes, which defines the threshold for recognizing the benefits of tax-return positions in the financial statements as "more-likely-than-not" to be sustained by the taxing authorities. This statement also requires explicit disclosure requirements about a Company's uncertainties related to their income tax position, including a detailed roll forward of tax benefits taken that do not qualify for financial statement recognition.

The Company files income tax returns in the U.S. federal jurisdiction and several states. Given that the company has incurred tax losses in most years since its inception, all of the Company's tax years are effectively open to examination. The Company is under audit by the Internal Revenue Service and three states tax jurisdiction as of December 31, 2020. The Company has no amount recorded for any unrecognized tax benefits as of December 31, 2020. The Company regularly evaluates its tax positions for additional unrecognized tax benefits and associated interest and penalties, if applicable. There are many factors that are considered when evaluating these tax positions including: interpretation of tax laws, recent tax litigation on a position, past audit or examination history, and subjective estimates and assumptions.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

**9. License and Collaboration Agreements**

*License Agreements*

On February 13, 2015, the Company submitted a New Drug Application or NDA to the FDA for Bendeka, which was approved by the FDA on December 7, 2015. Also, on February 13, 2015, the Company entered into the Cephalon License for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. Pursuant to the terms of the Cephalon License, Cephalon will be responsible for all U.S. commercial activities for the product including promotion and distribution, and the Company is responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies. In connection with the Cephalon License, the Company has entered into a supply agreement with Cephalon, pursuant to which the Company is responsible for supplying product to Cephalon. As of March 29, 2019, the Company and TPIG executed an amendment to the Cephalon License Agreement to terminate Teva's obligation to pay future milestones and royalties on Bendeka sales outside of the U.S., which included an upfront cash payment of $9 million that was recorded as License and other revenue on the consolidated statements of income. On April 13, 2019, we announced an expansion of our Cephalon License.  Under the terms of the revised agreement, beginning on October 1, 2019, Eagle's royalty payment has increased from 25% to 30% of Bendeka net U.S. sales.   The royalty rate will increase by one percentage point on each anniversary of October 1, 2019 until it reaches 32%, and it will remain at 32% thereafter.  The revised agreement also extends the U.S. Bendeka royalty term until it is no longer sold in the United States. The previous U.S. royalty term was set to expire in 2025.

On September 20, 2017, the Company entered into a Product Collaboration and License Agreement, effective as of September 19, 2017, (the "SymBio License Agreement") with SymBio Pharmaceuticals Limited ("SymBio") for the rights to develop and commercialize the Company's bendamustine hydrochloride ready-to-dilute injection product and rapid infusion injection product (collectively, the "Products") in Japan. Under the License Agreement, SymBio is responsible for all development of the Products in Japan and for obtaining and maintaining all regulatory approvals of the Products in Japan. SymBio will bear all costs of development of the Products in Japan except that, if Japanese regulatory authorities require a certain clinical study to be conducted as a condition for approving one of the Products in Japan, Eagle would share 50% of the out-of-pocket costs of that clinical study up to a specified dollar amount as a reduction to future royalty payments. Based on the Company's assessment of the probability of additional costs, we have not deferred revenue on the SymBio License Agreement. SymBio is also responsible, at its sole cost, for all marketing, promotion, distribution and sales of the Products in Japan and is obligated to launch the Products and meet certain minimum detailing, promotion and marketing commitments in connection with commercialization of the Products in Japan.

SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma ("MCL"), and as a first line treatment of low-grade NHL and MCL. Under the SymBio License Agreement, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

Pursuant to the terms of the SymBio License Agreement, the Company and SymBio will enter into a separate supply agreement, under which the Company will be responsible for manufacturing and supplying the Products to SymBio for development and commercialization in Japan. After a period of time following launch of a Product, SymBio will have the right to assume the responsibility for manufacturing of the Products in and for Japan. Under the SymBio License Agreement, the Company will retain the right to control the prosecution, maintenance and enforcement of the Company's patents covering the Products, both inside and outside of Japan.

The Company has entered into several product development agreements with development partners whereby the Company acquired the exclusive rights in the United States and, in most cases, worldwide rights to a total of thirty-three products for ten years following first commercial sale of each product. The Company will share varying percentages of the profits after, in most cases, recapturing development, legal and certain operating costs, from the sales of the products with the development partners if the products are commercialized. The Company expenses these costs as incurred.

F- 34

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The Company earned a $5.0 million milestone in the year ended December 31, 2020 when its marketing partner, SymBio Pharmaceuticals Limited, received regulatory approval for TREAKISYM ready-to-dilute (250 ml) liquid bendamustine formulation from the Pharmaceuticals and Medical Devices Agency in Japan.

*Collaboration with Tyme*

On January 7, 2020, Tyme and the Company announced a strategic collaboration to advance SM-88, an oral product candidate for the treatment of patients with cancer. SM-88 is an investigational agent in two Phase II studies, one for pancreatic cancer and another for prostate cancer.

Under the terms of the related agreements, Tyme is entitled to receive up to a total $40.0 million as follows:
(a) an initial $20.0 million upfront payment. In return, we received 10 million restricted shares of Tyme's common stock at $2.00 per share. The Company is contractually restricted from selling its investment in Tyme for up to three years; and
(b) a second potential $20.0 million milestone payment upon the earlier of  (i) the successful completion of a pivotal trial in pancreatic cancer or (ii) FDA approval of SM-88 in any cancer indication within the United States. Upon occurrence of such milestone event, this payment would be split into a $10.0 million one-time milestone cash payment and a $10.0 million additional investment in Tyme's preferred stock. The preferred shares will be convertible into common stock with a conversion price at a 15% premium to the then-prevailing common stock market price per share.

Under the terms of a related co-promotion agreement, we would be responsible for 25% of the promotional sales effort of SM-88 and would receive 15% royalty on the net revenues of SM-88 in the United States. Tyme is be responsible for clinical development, regulatory approval, commercial strategy, marketing, reimbursement and manufacturing of SM-88. Tyme retains the remaining 85% of net U.S. revenues and reserves the right to repurchase our U.S. co-promotion right for $200.0 million.

Under the terms of the agreement, the initial $20.0 million paid to Tyme, was accounted for as a $17.5 million readily determinable fair value equity investment based on the closing price per share of Tyme's common stock on January 7, 2020. The remainder was treated as an upfront collaboration payment of $2.5 million that was recorded as selling, general and administrative expense in the first quarter of 2020. The investment in Tyme represents approximately 9% of the total shares outstanding of Tyme's common stock.
As of December 31, 2020, the Company included its investment in Tyme in Other Assets (non-current) on its consolidated balance sheet. For the year ended December 31, 2020, the fair value adjustments for the equity investment was a loss of $5.3 million which was recorded in other income (expense) on our consolidated statements of operations.

**10. Commitments**

Our future material contractual obligations include the following:

| Obligation | Total | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| Operating leases (1) | $ 5,720 | $ 1,391 | $ 1,423 | $ 1,455 | $ 1,038 | $ 413 |
| Credit facility | 34,000 | 8,000 | 26,000 | — | — | — |
| Purchase obligations (2) | 68,644 | 68,644 | — | — | — | — |
| Total obligations | $ 108,364 | $ 78,035 | $ 27,423 | $ 1,455 | $ 1,038 | $ 413 |

(1) We lease our corporate office location. On August 8, 2019, we amended the lease for our corporate office location in order to rent additional office space and extend the term of our existing lease to June 30, 2025. The Company also leases its lab space under a lease agreement that expires on April 30, 2024. Rental expense was $1,323, $1,146, and $571, for the years ended December 31, 2020, 2019, and 2018, respectively. The remaining future lease payments

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

under the operating leases, exclusive of any renewal option periods, are $5,720 as of December 31, 2020, payable monthly through June 30, 2025 and April 30, 2024.

(2) As of December 31, 2020, the Company has purchase obligations in the amount of $68,644 which represents the contractual commitments under contract manufacturing and supply agreements with suppliers. The obligation under the supply agreement is primarily for finished product, inventory, and research and development.

## 11. Related Party Transactions

During the year ended December 31, 2018, the Company obtained legal services from Greenberg Traurig, LLP in exchange for $0.2 million. Richard A. Edlin, a member of the Company's Board, is an attorney and shareholder of Greenberg Traurig, LLP.

On May 10, 2019, Hudson Executive Capital LP ("Hudson Capital") sold 100,000 shares of the Company's common stock and the Company purchased those 100,000 shares in a block trade at a price of $56.14 per share. Douglas Braunstein is the Managing Partner of Hudson Capital and was a member of Eagle's Board of Directors at the time of the transaction.

## 12. Intangible Assets, Net

The gross carrying amounts and net book value of our intangible assets are as follows:

| | Useful Life (In Years) | Gross Carrying Amount | Accumulated Amortization | Accumulated Impairment Charges | Net Book Value |
|---|---|---|---|---|---|
| | | | December 31, 2020 | | |
| Ryanodex intangible | 20 | $ 15,000 | $ (3,500) | $ — | $ 11,500 |
| Developed technology | 5 | 8,100 | (6,683) | — | 1,417 |
| Total | | $ 23,100 | $ (10,183) | $ — | $ 12,917 |

| | Useful Life (In Years) | Gross Carrying Amount | Accumulated Amortization | Accumulated Impairment Charge | Net Book Value |
|---|---|---|---|---|---|
| | | | December 31, 2019 | | |
| Ryanodex intangible | 20 | 15,000 | (2,454) | — | 12,546 |
| Developed technology | 5 | 8,100 | (5,063) | — | 3,037 |
| Total | | $ 23,100 | $ (7,517) | $ — | $ 15,583 |

Amortization expense amounted to $2.7 million, $2.5 million, and $2.5 million, for the year ended December 31, 2020, 2019, and 2018, respectively.

*Impairment Assessment*

The Company reviews the recoverability of its finite-lived intangible assets and long-lived assets for indicators of impairments. Events or circumstances that may require an impairment assessment include negative clinical trial results, a significant decrease in the market price of the asset, or a significant adverse change in legal factors or the manner in which the asset is used. If such indicators are present, the Company assess the recoverability of affected assets by determining if the carrying value of such assets is less than the sum of the undiscounted future cash flows of the assets. If such assets are found to not be recoverable, the Company measures the amount of the impairment by comparing to the carrying value of the assets to the fair value of the assets. The Company determined that no indicators of impairment of finite-lived intangible assets or long-lived assets existed at December 31, 2020 and 2019.

F- 36

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

*Intangible Asset Impairment*

On June 30, 2018, the Company implemented a restructuring initiative based on its assessment of the current product portfolio and made a decision to discontinue manufacture and distribution of Non-Alcohol Docetaxel Injection. The Company ceased selling the product by September 30, 2018. As a result, the Company recognized a pre-tax, non-cash asset impairment charge of $2.7 million during the year ended December 31, 2018.

*Estimated Amortization Expense for Intangible Assets*

Based on definite-lived intangible assets recorded as of December 31, 2020, and assuming that the underlying assets will not be impaired and that the Company will not change the expected lives of the assets, future amortization expenses are estimated as follows:

| | Estimated Amortization Expense | |
|---|---|---|
| Year Ending December 31, | | |
| 2021 | $ | 2,622 |
| 2022 | | 1,369 |
| 2023 | | 1,570 |
| 2024 | | 1,898 |
| All other | | 5,458 |
| Total estimated amortization expense | $ | 12,917 |

### 13. Legal Proceedings

In addition to the below legal proceedings, from time to time, the Company may be a party to litigation and subject to claims incident to the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, the Company currently believes that the final outcome of these ordinary course matters, or matters discussed below, will not have a material adverse effect on the Company's business nor has the Company recorded any loss in connection with these matters because the Company believes that loss is neither probable nor estimable. Regardless of the outcome, litigation can have an adverse impact on the Company because of defense and settlement costs, diversion of management resources and other factors.

**Commercial Litigation**

*In Re: Taxotere (Docetaxel)*

On February 1, 2017, the Company was named as a defendant, among various other manufacturers, in several product liability suits that are consolidated in the U.S. District Court for the Eastern District of Louisiana as part of MDL 2740 (Civil Action No 2:16 md-2740), or the Multidistrict Litigation. The claims are for personal injuries allegedly arising out of the use of docetaxel.

In March 2017, the Company reached agreements in principle with the Plaintiffs' Steering Committee in this matter to voluntarily dismiss the Company from all of the lawsuits in which it was named and from the master complaint. The Company is in the process of working with the other parties in this matter to have it removed from the Multidistrict litigation entirely.  As part of the agreement, in the event a case is brought in the future with facts that justify the Company's inclusion, the plaintiffs reserved the right to include the Company in such matter.  The plaintiffs have filed several additional lawsuits since the parties' agreement in principle to dismiss, and the Company is in the process of working with plaintiffs to explore the possibility of dismissing those lawsuits.

*Eagle v. Azar*

On April 27, 2016, the Company filed an action in the U.S. District Court for the District of Columbia (the "District Court") against the FDA and other federal defendants seeking an order requiring the FDA to recognize orphan drug exclusivity for Bendeka for the treatment of CLL and indolent B-cell NHL. On June 8, 2018, the District Court issued a decision requiring the

FDA to recognize seven years of orphan drug exclusivity in the U.S. for Bendeka, and on July 6, 2018 the FDA recognized such ODE until December 7, 2022. In addition, on July 6, 2018, the FDA submitted a Motion to Alter or Amend the Judgement Pursuant to Rule 59(e), pursuant to which the FDA requested that the District Court amend its decision to make clear that the decision does not affect any applications referencing TREANDA. The FDA's motion was denied by the District Court on August 1, 2018 on the grounds that the FDA had not satisfied the standard for altering or amending the judgment. The FDA and two intervenors appealed the District Court's final judgment to the U.S. Court of Appeals for the District of Columbia Circuit (the "Court of Appeals"). Oral arguments occurred on October 17, 2019, and on February 20, 2019, the FDA issued a decision in favor of the Company, regarding the scope of exclusivity for Bendeka. On March 13, 2020, a panel of the Court of Appeals affirmed the District Court's decision.

FDA filed a petition for rehearing *en banc* on May 27, 2020, which was denied on August 17, 2020. The deadline for the FDA to file a petition for writ of certiorari with the Supreme Court was January 14, 2021, and Eagle is not aware that any petition was filed and has not received service of any such petition. Pursuant to the District Court's decision, no bendamustine product used to treat the same indications (including generic versions of TREANDA) may launch in the United States until December 7, 2022 unless it is clinically superior to Bendeka.

*Eagle v. Eli Lilly*

On August 24, 2017, the Company filed an antitrust complaint in the United States District Court for the District of New Jersey ("New Jersey District Court") against Eli Lilly and Company ("Lilly").  The complaint alleges that Lilly engaged in anticompetitive conduct which restrained competition by delaying and blocking the Company's launch of a competing pemetrexed injection product (to compete with Lilly's Alimta). Lilly accepted service and answered the complaint on October 27, 2017. Lilly also filed a motion to transfer this case to Delaware on October 27, 2017. The Company filed a motion to oppose such transfer on November 6, 2017. On July 20, 2018, the New Jersey District Court transferred the case to Delaware. On November 27, 2018, the Delaware Court stayed the case at least until conclusion of the Pemfexy™ patent trial described below. On December 16, 2019, the Delaware Court entered the Company and Lilly's stipulation dismissing this case with prejudice.

*Cipla v. Eagle*

On April 16, 2020, Cipla Limited ("Cipla") filed a request for arbitration against Eagle with the London Court of International Arbitration. The request alleges that Eagle's refusal to take delivery of several batches of Argatroban finished drug product constitutes a breach of the Company and Cipla's December 14, 2012 supply agreement. Eagle believes that allegations in the demand for arbitration are without merit and intends to vigorously defend itself in the arbitration, which was scheduled for June 2021, has been rescheduled for November 2021.

**Patent Litigation**

*Eli Lilly and Company v. Eagle Pharmaceuticals, Inc. (Pemfexy™ (Pemetrexed))*

On August 14, 2017, Lilly filed suit against the Company in the United States District Court for the Southern District of Indiana (the "Indiana Suit").  Lilly alleged patent infringement based on the filing of the Company's 505(b)(2) NDA seeking approval to manufacture and sell the Company's EP-5101.  EP-5101, if finally approved by FDA, will be a branded alternative to Alimta®.

On September 8, 2017, Eagle moved to dismiss the Indiana Suit for improper venue. On September 11, 2017, Lilly voluntarily dismissed the Indiana Suit. It then filed a complaint in the United States District Court for the District of Delaware, alleging similar patent infringement claims (the "Delaware Suit"). Eagle answered and filed various counterclaims in the Delaware Suit on October 3, 2017. Lilly answered Eagle's counterclaims on October 24, 2017. On May 31, 2018, Eagle filed a Motion for Judgment on the Pleadings, which the Court denied on October 26, 2018. On January 23, 2019, the Court held a Markman hearing. Trial took place from October 28, 2019 to October 31, 2019 and continued on December 12, 2019 through December 13, 2019. On December 13, 2019, the Company and Lilly settled this litigation. The settlement agreement provides for a release of all claims by the parties and allows for an initial entry of Pemfexy into the market (equivalent to approximately a three week

supply of current Alimta utilization) on February 1, 2022 and a subsequent uncapped entry on April 1, 2022. On December 16, 2019, the District Court entered the Company and Lilly's stipulation dismissing this case with prejudice.

*Eagle Pharmaceuticals, Inc. and ScinoPharm Taiwan, Ltd. v. Shilpa Medicare Ltd. (Pemfexy)*

On December 23, 2020, the Company, along with ScinoPharm Taiwan Ltd. (together, "Eagle") brought suit against Shilpa Medicare Limited in the United States District Court for the District of New Jersey. Eagle alleges infringement based on the filing of Shilpa's NDA seeking approval to manufacture and sell Pemetrexed injection prior to the expiration of U.S. Patent No. 9,604,990. Shilpa has accepted service, and its answer to the complaint is due by March 29, 2021 This suit is pending.

*Eagle Pharmaceuticals, Inc., et al. v. Slayback Pharma Limited Liability Company; Eagle Pharmaceuticals, Inc., et al. v. Apotex Inc. and Apotex Corp.; Eagle Pharmaceuticals, Inc., et al. v. Fresenius Kabi USA, LLC; Eagle Pharmaceuticals, Inc., et al. v. Mylan Laboratories Limited; Eagle Pharmaceuticals, Inc. et al. v. Hospira, Inc; Eagle Pharmaceuticals, Inc. et al. v. Lupin, Ltd. and Lupin Pharmaceuticals, Inc.; Teva Pharmaceuticals Int'l GmbH et al v. Aurobindo Pharma Ltd., Aurobindo Pharma USA, Inc., and Eugia Pharma Specialities Ltd. - (Bendeka®)*

Bendeka, which contains bendamustine hydrochloride, is an alkylating drug that is indicated for the treatment of patients with chronic lymphocytic leukemia, as well as for the treatment of patients with indolent B-cell non-Hodgkin's lymphoma that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen. Slayback Pharma Limited Liability Company ("Slayback"), Apotex Inc. and Apotex Corp. ("Apotex"), Fresenius Kabi USA, LLC ("Fresenius"), Mylan Laboratories Limited ("Mylan"), Lupin, Ltd. and Lupin Pharmaceuticals, Inc. ("Lupin"), and Aurobindo Pharma, Ltd, Aurobindo Pharma USA, Inc., and Eugia Pharma Specialities Ltd ("Aurobindo") have filed Abbreviated New Drug Applications ("ANDA's") referencing Bendeka® that include challenges to one or more of the Bendeka® Orange Book-listed patents. Hospira, Inc. ("Hospira") filed a 505(b)(2) NDA.

The Company, Cephalon, Inc. and/or Teva Pharmaceuticals International GMBH (together the "Patentees"), filed separate suits against Slayback, Apotex, Fresenius, Mylan, Hospira, Lupin, and Aurobindo in the United States District Court for the District of Delaware on August 16, 2017 (Slayback ("Slayback I")), August 18, 2017 (Apotex), August 24, 2017 (Fresenius), December 12, 2017 (Mylan), January 19, 2018 (Slayback ("Slayback II")), July 19, 2018 (Hospira), and July 2, 2019 (Lupin) and May 11, 2020 (Aurobindo). In these Complaints, the Patentees allege infringement of the challenged patents, namely U.S. Patent Nos. 8,791,270 and 9,572,887 against Slayback (Slayback I and Slayback II), and of U.S. Patent Nos. 8,609,707, 8,791,270, 9,000,021, 9,034,908, 9,144,568, 9,265,831, 9,572,796, 9,572,797, 9,572,887, 9,579,384, 9,597,397, 9,597,398, 9,597,399 against Fresenius, Apotex, and Mylan, and of U.S. Patent Nos. 9,572,887, 10,010,533, 9,034,908, 9,144,568, 9,597,397, 9,597,398, 9,597,399, 9,000,021, 9,579,384 against Hospira, and of U.S. Patent Nos. 8,609,707, 9,000,021, 9,034,908, 9,144,568, 9,265,831, 9,572,796, 9,572,797, 9,572,887, 9,579,384, 9,597,397, 9,597,398, 9,597,399, 10,010,533, and 10,052,385 against Lupin and of U.S. Patent Nos. 8,609,707, 9,265,831, 9,572,796, 9,572,797, 9,034,908, 9,144,568, 9,572,887, 9,597,397, 9,597,398, 9,597,399, 9,000,021, 9,579,384, 10,010,533, and 10,052,385 against Aurobindo. The parties stipulated to dismiss without prejudice U.S. Patent No. 8,791,270 as to Apotex, Fresenius and Mylan on July 24, 2018, August 2, 2018, and August 3, 2018, respectively. Slayback, Apotex, Fresenius, and Mylan answered their Complaints and some filed various counterclaims on September 29, 2017 (Slayback I), February 12, 2018 (Slayback II), November 27, 2017, September 15, 2017, and February 14, 2018, respectively. The Patentees answered the Slayback I, Slayback II, Fresenius, and Apotex counterclaims on October 20, 2017, March 5, 2018, October 6, 2017, and December 18, 2017, respectively. On October 15, 2018, the Patentees filed a suit against Fresenius and Mylan in the United States District Court for the District of Delaware, alleging patent infringement of U.S. Patent Nos. 10,010,533 and 10,052,385. The Slayback I, Slayback II, Apotex, Fresenius and Mylan cases have been consolidated for all purposes (the "Consolidated Bendeka Litigation"), and a bench trial in these cases was held September 9-19, 2019. On April 27, 2020, the district court held that the asserted patents are valid and infringed by Slayback, Apotex, Fresenius and Mylan. On July 6, 2020, the district court entered a final judgment reflecting this decision, stating that pursuant to 35 U.S.C. § 271(e)(4)(A), the FDA shall not approve Apotex's, Fresenius's, Mylan's, or Slayback's ANDA products on a date which is earlier than January 28, 2031, and enjoining Apotex, Fresenius, Mylan, and Slayback from commercially manufacturing, using, offering to sell, or selling within the US or importing into the US, their ANDA products before that date. On August 4, 2020, Apotex, Fresenius, and Mylan appealed this final judgment, and filed their opening briefs

F- 39

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

on November 4, 2020. Plaintiffs responsive appeal brief was filed on February 12, 2021. Defendents' reply briefs are due April 5, 2021.

Hospira filed a motion to dismiss, which was fully briefed on November 16, 2018. On December 16, 2019, the United States District Court for the District of Delaware denied Hospira's motion to dismiss with respect to U.S. Patent No. 9,572,887 and granted that motion with respect to the remaining patents. On December 15, 2020, the Court held a claim construction hearing, ruling in the Company's favor on all claim terms. Trial is scheduled for November 15, 2021. The case remains pending.

On March 10, 2020, the parties filed a stipulation and order of dismissal without prejudice as to Lupin, which the Court entered March 11, 2020.

Aurobindo Answered the Complaint on July 20, 2020. The parties exchanged initial disclosures on December 11, 2020. Trial is scheduled for July 18, 2022.

The FDA is stayed from approving Aurobindo's ANDA, and Hospira's 505(b)(2) application, until the earlier of (1) October 6, 2022 and December 7, 2020 respectively (the "30-month stay dates"); and (2) a court decision that each of the challenged patents is not infringed, invalid, or unenforceable. The 30-month stay dates may be shortened or lengthened if either party to the action fails to reasonably cooperate in expediting the action.

*Eagle Pharmaceuticals, Inc. v. Slayback Pharma Limited Liability Company*

Slayback filed an ANDA referencing Eagle's Belrapzo NDA. Slayback's ANDA includes challenges to one or more of the Belrapzo Orange Book-listed patents. On September 20, 2018, the Company filed a suit against Slayback in the United States District Court for the District of Delaware, alleging patent infringement of U.S. Patent Nos. 8,609,707, 9,265,831, 9,572,796, 9,572,797 and 10,010,533. On October 10, 2018, Slayback answered the Complaint and filed various counterclaims. On October 31, 2018, the Company answered Slayback's counterclaims. Pursuant to a stipulation between the parties, Slayback is bound by any final judgment entered in the Consolidated Bendeka Litigation. This case is currently stayed.

*Eagle Pharmaceuticals, Inc. v. Slayback Pharma Limited Liability Company*

Slayback filed a 505(b)(2) NDA referencing Eagle's Belrapzo NDA. Slayback's NDA includes challenges to one or more of the Belrapzo Orange Book-listed patents. On December 11, 2018, the Company filed a suit against Slayback in the United States District Court for the District of Delaware, alleging patent infringement of U.S. Patent Nos. 9,265,831, 9,572,796, 9,572,797, and 10,010,533. On January 4, 2019, Slayback filed a motion for judgment on the pleadings. On May 9, 2019, the United States District Court for the District of Delaware granted Slayback's motion for judgment on the pleadings. On July 23, 2019, the Company filed an appeal of this decision with the United States Court of Appeals for the Federal Circuit. On May 8, 2020, the Federal Circuit upheld the district court's decision.

*Par Pharmaceutical, Inc. et al. v. Eagle Pharmaceuticals, Inc. (Vasopressin)*

On May 31, 2018, Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Endo Par Innovation Company, LLC (together, "Par") filed suit against the Company in the United States District Court for the District of Delaware. Par alleged patent infringement based on the filing of the Company's ANDA seeking approval to manufacture and sell the Company's vasopressin product. The Company's vasopressin product, if approved by FDA, will be an alternative to Vasostrict, which is indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines. The Company answered the complaint on August 6, 2018, and filed an amended answer and counterclaims on October 30, 2019. The court issued a Markman ruling on July 1, 2019. On December 20, 2019, Par dismissed with prejudice claims of three of the patents asserted against Eagle, and the Court entered an Order reflecting that dismissal on December 27, 2019. Mediation took place on March 3, 2020. On April 17, 2020, the Company submitted a letter requesting leave to file a motion for summary judgment of non-infringement. Par's responsive letter was submitted on May 8, 2020. On May 18, 2020, the court said it would hear non-infringement arguments at trial and not through summary judgment. Fact discovery ended in October 2019, and expert discovery ended in February 2020. Due to the COVID-19 pandemic, the trial,

F- 40

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

which was scheduled to begin May 18, 2020, has been rescheduled to begin on July 7, 2021. The 30-month stay of FDA approval expired on October 17, 2020. This suit is pending.

On December 7, 2020, Par filed a separate suit against the Company in the United States District Court for the District of New Jersey, asserting patent infringement of U.S. Patent No. 10,844,435, based on the filing of the Company's ANDA seeking approval to manufacture and sell the Company's vasopressin product. Eagle's response to the complaint is due by March 1, 2021. This suit is pending.

*Eagle Pharmaceuticals, Inc. et al. v. Accord (Argatroban)*

On March 27, 2019, the Company and Chiesi filed suit against Accord Healthcare, Inc. ("Accord") in the United States District Court for the District of New Jersey (the "New Jersey suit") and in the United States District Court for the Middle District of North Carolina (the "North Carolina suit") (together "the suits"). The suits alleged patent infringement based on Accord's 505(b)(2) NDA seeking approval to manufacture and sell Accord's proposed argatroban product. On May 21, 2019, the Company and Chiesi voluntarily dismissed the North Carolina suit. On July 10, 2019, Accord moved for judgment on the pleadings in the New Jersey suit. On June 30, 2020, the district court held a settlement conference. On October 7, 2020, the Magistrate Judge held a status conference. On October 8, 2020, Accord withdrew its July 10, 2019 motion for judgment on the pleadings. The parties submitted a proposed discovery plan to the Court in the New Jersey suit on October 27, 2020. The Court has not set a schedule or trial date. The New Jersey suit remains pending.

F- 41

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

**14. Restructuring**

As part of its ongoing organizational review, the Company engaged in a restructuring initiative to rationalize its product portfolio and focus its physical sites. These measures included the discontinuation of manufacture and distribution of Non-Alcohol Docetaxel Injection in June 2018 and plans to rationalize research and development operations. Charges consist of inventory and related reserves, certain asset impairment charges related to property and equipment, and personnel related costs. The restructuring costs of $7,911 for the year ended December 31, 2018 has been recorded to Restructuring charge on the Consolidated Statements of Income. The Company also recorded an asset impairment charge for the remaining Intangible asset for Non-Alcohol Docetaxel Injection of $2,704 as well as an adjustment to remove the contingent consideration of $763 on the related line items in the Statements of Income for the year ended December 31, 2018. The Company does not expect to incur additional expenses related to this restructuring initiative. There was no liability remaining for the restructuring as of December 31, 2018.

F- 42

**Eagle Pharmaceuticals, Inc.**
**Performance Stock Unit Grant Notice (2014 Equity Incentive Plan)**

Eagle Pharmaceuticals, Inc. (the "*Company*"), pursuant to its 2014 Equity Incentive Plan (as amended, the "*Plan*"), hereby awards to Participant a Performance Stock Unit Award for the number of shares of the Company's Common Stock ("*Performance Stock Units*") set forth below (the "*Award*"). The Award is subject to all of the terms and conditions as set forth in this notice of grant (this "*Performance Stock Unit Grant Notice*"), and the Performance Stock Unit Award Agreement (the "*Award Agreement*") (which is attached hereto) and the Plan, both of which are incorporated herein in their entirety. Capitalized terms not explicitly defined herein shall have the meanings set forth in the Plan or the Award Agreement. In the event of any conflict between the terms in this Performance Stock Unit Grant Notice or the Award Agreement and the Plan, the terms of the Plan shall control.

Participant:
Date of Grant:
Vesting Commencement Date:
Target Number of Performance Stock Units:
Maximum Number of Performance Stock Units:

**Vesting Schedule:** See Exhibit A hereto.

**Issuance Schedule:** Subject to any Capitalization Adjustment, one share of Common Stock (or its cash equivalent, at the discretion of the Company) will be issued for each Performance Stock Unit that vests at the time set forth in Section 6 of the Award Agreement.

**Additional Terms/Acknowledgements:** Participant acknowledges receipt of, and understands and agrees to, this Performance Stock Unit Grant Notice, the Award Agreement and the Plan. Participant further acknowledges that as of the Date of Grant, this Performance Stock Unit Grant Notice, the Award Agreement and the Plan set forth the entire understanding between Participant and the Company regarding the acquisition of the Common Stock pursuant to the Award specified above and supersede all prior oral and written agreements on the terms of this Award (including, but not limited to, the Eagle Pharmaceuticals, Inc. Severance Benefit Plan and any Equity Award Vesting Acceleration Benefit Letter Agreement between Participant and the Company), with the exception, if applicable, of (i) restricted stock unit awards or options previously granted and delivered to Participant and (ii) any compensation recovery policy that is adopted by the Company or is otherwise required by applicable law.

By accepting this Award, Participant acknowledges having received and read the Performance Stock Unit Grant Notice, the Award Agreement and the Plan and agrees to all of the terms and conditions set forth in these documents. Participant consents to receive Plan documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

**Eagle Pharmaceuticals, Inc. Participant:**
By:
Signature Signature
Title: Date:
Date:

**Attachments**: Award Agreement

1

**Attachment I**
**Eagle Pharmaceuticals, Inc.**
**2014 Equity Incentive Plan**
**Performance Stock Unit Award Agreement**

Pursuant to the Performance Stock Unit Grant Notice (the "*Grant Notice*") and this Performance Stock Unit Award Agreement (the "*Agreement*"), Eagle Pharmaceuticals, Inc. (the "*Company*") has awarded you ("*Participant*") a Performance Stock Unit Award (the "*Award*") pursuant to the Company's 2014 Equity Incentive Plan (as amended, the "*Plan*") for the number of Performance Stock Units/shares indicated in the Grant Notice. Capitalized terms not explicitly defined in this Agreement or the Grant Notice shall have the same meanings given to them in the Plan. The terms of your Award, in addition to those set forth in the Grant Notice, are as follows.

1.  **Grant of the Award.** This Award represents the right to be issued on a future date one (1) share of Common Stock for each Performance Stock Unit that vests on the applicable vesting date(s) (subject to any adjustment under Section 3 below) as indicated in the Grant Notice. As of the Date of Grant, the Company will credit to a bookkeeping account maintained by the Company for your benefit (the "*Account*") the number of Performance Stock Units/shares of Common Stock subject to the Award. Notwithstanding the foregoing, the Company reserves the right to issue you the cash equivalent of Common Stock, in part or in full satisfaction of the delivery of Common Stock in connection with the vesting of the Performance Stock Units, and, to the extent applicable, references in this Agreement and the Grant Notice to Common Stock issuable in connection with your Performance Stock Units will include the potential issuance of its cash equivalent pursuant to such right. This Award was granted in consideration of your services to the Company.

2.  **Vesting.** Subject to the limitations contained herein, your Award will vest, if at all, in accordance with the vesting schedule provided in the Grant Notice. Except as otherwise set forth in Exhibit A attached hereto, vesting will cease upon the termination of your Continuous Service and the Performance Stock Units credited to the Account that were not vested on the date of such termination will be forfeited at no cost to the Company and you will have no further right, title or interest in or to such Award or the shares of Common Stock to be issued in respect of such portion of the Award.

3.  **Number of Shares.** The number of Performance Stock Units (including the Target Number of Performance Stock Units and the Maximum Number of Performance Stock Units set forth in the Grant Notice) subject to your Award may be adjusted from time to time for Capitalization Adjustments, as provided in the Plan. Any additional Performance Stock Units, shares, cash or other property that becomes subject to the Award pursuant to this Section 3, if any, shall be subject, in a manner determined by the Board, to the same forfeiture restrictions, restrictions on transferability, and time and manner of delivery as applicable to the other Performance Stock Units and shares covered by your Award. Notwithstanding the provisions of this Section 3, no fractional shares or rights for fractional shares of Common Stock shall be created pursuant to this Section 3. Any fraction of a share will be rounded down to the nearest whole share.

4.  **Securities Law Compliance**. You may not be issued any Common Stock under your Award unless the shares of Common Stock underlying the Performance Stock Units are either (i) then registered under the Securities Act, or (ii) the Company has determined that such issuance would be exempt from the registration requirements of the Securities Act. Your Award must also comply with other applicable laws and regulations governing the Award, and you shall not receive such Common Stock if the Company determines that such receipt would not be in material compliance with such laws and regulations.

5.  **Transfer Restrictions**. Prior to the time that shares of Common Stock have been delivered to you, you may not transfer, pledge, sell or otherwise dispose of this Award or the shares issuable in respect of your Award, except as expressly provided in this Section 5. For example, you may not use shares that may be issued in respect of your Performance Stock Units as security for a loan. The restrictions on transfer set forth herein will lapse upon delivery to you of shares in respect of your vested Performance Stock Units.

**Death**. Your Award is transferable by will and by the laws of descent and distribution. At your death, vesting of your Award will cease and your executor or administrator of your estate shall be entitled to receive, on behalf of your estate, any Common Stock or other consideration that vested but was not issued before your death.

**Domestic Relations Orders.** Upon receiving written permission from the Board or its duly authorized designee, and provided that you and the designated transferee enter into transfer and other agreements required by the Company, you may transfer your right to receive the distribution of Common Stock or other consideration hereunder,

Exhibit 10-29

pursuant to a domestic relations order, marital settlement agreement or other divorce or separation instrument as permitted by applicable law that contains the information required by the Company to effectuate the transfer. You are encouraged to discuss the proposed terms of any division of this Award with the Company General Counsel prior to finalizing the domestic relations order or marital settlement agreement to verify that you may make such transfer, and if so, to help ensure the required information is contained within the domestic relations order or marital settlement agreement.

1. **Date of Issuance.**

The issuance of shares in respect of the Performance Stock Units is intended to comply with Treasury Regulations Section 1.409A-1(b)(4) and will be construed and administered in such a manner. Subject to the satisfaction of the Withholding Obligation set forth in Section 11 of this Agreement, in the event one or more Performance Stock Units vests, the Company shall issue to you one (1) share of Common Stock for each Performance Stock Unit that vests on the applicable vesting date(s) (subject to any adjustment under Section 3 above, and subject to any different provisions in the Grant Notice). Each issuance date determined by this paragraph is referred to as an "*Original Issuance Date*".

If the Original Issuance Date falls on a date that is not a business day, delivery shall instead occur on the next following business day. In addition, if:

i. the Original Issuance Date does not occur (1) during an "open window period" applicable to you, as determined by the Company in accordance with the Company's then-effective policy on trading in Company securities, or (2) on a date when you are otherwise permitted to sell shares of Common Stock on an established stock exchange or stock market (including but not limited to under a previously established written trading plan that meets the requirements of Rule 10b5-1 under the Exchange Act and was entered into in compliance with the Company's policies (a "*10b5-1 Arrangement*")), *and*

ii. either (1) a Withholding Obligation does not apply, or (2) the Company decides, prior to the Original Issuance Date, (A) not to satisfy the Withholding Obligation by withholding shares of Common Stock from the shares otherwise due, on the Original Issuance Date, to you under this Award, and (B) not to permit you to enter into a "same day sale" commitment with a broker-dealer pursuant to Section 11 of this Agreement (including but not limited to a commitment under a 10b5-1 Arrangement) and (C) not to permit you to pay your Withholding Obligation in cash,

then the shares that would otherwise be issued to you on the Original Issuance Date will not be delivered on such Original Issuance Date and will instead be delivered on the first business day when you are not prohibited from selling shares of the Company's Common Stock in the open public market, but in no event later than December 31 of the calendar year in which the Original Issuance Date occurs (that is, the last day of your taxable year in which the Original Issuance Date occurs), or, if and only if permitted in a manner that complies with Treasury Regulations Section 1.409A-1(b)(4), no later than the date that is the 15th day of the third calendar month of the applicable year following the year in which the shares of Common Stock under this Award are no longer subject to a "substantial risk of forfeiture" within the meaning of Treasury Regulations Section 1.409A-1(d).

The form of delivery (*e.g.*, a stock certificate or electronic entry evidencing such shares) shall be determined by the Company.

1. **Dividends.** You shall receive no benefit or adjustment to your Award with respect to any cash dividend, stock dividend or other distribution that does not result from a Capitalization Adjustment; provided, however, that this sentence will not apply with respect to any shares of Common Stock that are delivered to you in connection with your Award after such shares have been delivered to you.

2. **Restrictive Legends.** The shares of Common Stock issued in respect of your Award shall be endorsed with appropriate legends as determined by the Company.

3. **Execution of Documents.** You hereby acknowledge and agree that the manner selected by the Company by which you indicate your consent to your Grant Notice is also deemed to be your execution of your Grant Notice and of this Agreement. You further agree that such manner of indicating consent may be relied upon as your signature for establishing your execution of any documents to be executed in the future in connection with your Award.

4. **Award not a Service Contract.**

Nothing in this Agreement (including, but not limited to, the vesting of your Award or the issuance of the shares in respect of your Award), the Plan or any covenant of good faith and fair dealing that may be found implicit in this Agreement or the Plan shall: (i) confer upon you any right to continue in the employ or service of, or affiliation with, the Company or an Affiliate; (ii) constitute any promise or commitment by the Company or an Affiliate regarding the fact or nature of future positions, future work assignments, future compensation or any other term or condition of employment or

3

affiliation; (iii) confer any right or benefit under this Agreement or the Plan unless such right or benefit has specifically accrued under the terms of this Agreement or Plan; or (iv) deprive the Company of the right to terminate you at will and without regard to any future vesting opportunity that you may have.

By accepting this Award, you acknowledge and agree that the right to continue vesting in the Award pursuant to the vesting schedule provided in the Grant Notice may not be earned unless (in addition to any other conditions described in the Grant Notice and this Agreement) you continue as an employee, director or consultant at the will of the Company and affiliate, as applicable (not through the act of being hired, being granted this Award or any other award or benefit) and that the Company has the right to reorganize, sell, spin-out or otherwise restructure one or more of its businesses or Affiliates at any time or from time to time, as it deems appropriate (a "*reorganization*"). You acknowledge and agree that such a reorganization could result in the termination of your Continuous Service, or the termination of Affiliate status of your employer and the loss of benefits available to you under this Agreement, including but not limited to, the termination of the right to continue vesting in the Award. You further acknowledge and agree that this Agreement, the Plan, the transactions contemplated hereunder and the vesting schedule set forth herein or any covenant of good faith and fair dealing that may be found implicit in any of them do not constitute an express or implied promise of continued engagement as an employee or consultant for the term of this Agreement, for any period, or at all, and shall not interfere in any way with the Company's right to terminate your Continuous Service at any time, with or without your cause or notice, or to conduct a reorganization.

1. **Withholding Obligation.**

(a) On each vesting date, and on or before the time you receive a distribution of the shares of Common Stock in respect of your Performance Stock Units, and at any other time as reasonably requested by the Company in accordance with applicable tax laws, you hereby authorize any required withholding from the Common Stock issuable to you and/or otherwise agree to make adequate provision, including in cash, for any sums required to satisfy the federal, state, local and foreign tax withholding obligations of the Company or any Affiliate that arise in connection with your Award (the "*Withholding Obligation*").

(b) By accepting this Award, you acknowledge and agree that the Company or any Affiliate may, in its sole discretion, satisfy all or any portion of the Withholding Obligation relating to your Performance Stock Units by any of the following means or by a combination of such means: (i) causing you to pay any portion of the Withholding Obligation in cash; (ii) withholding from any compensation otherwise payable to you by the Company; (iii) withholding shares of Common Stock from the shares of Common Stock issued or otherwise issuable to you in connection with the Award with a Fair Market Value (measured as of the date shares of Common Stock are issued pursuant to Section 6) equal to the amount of such Withholding Obligation; provided, however, that the number of such shares of Common Stock so withheld will not exceed the amount necessary to satisfy the Withholding Obligation using the maximum statutory withholding rates for federal, state, local and foreign tax purposes, including payroll taxes, that are applicable to supplemental taxable income; and *provided*, further, that to the extent necessary to qualify for an exemption from application of Section 16(b) of the Exchange Act, if applicable, such share withholding procedure will be subject to the express prior approval of the Board or the Company's Compensation Committee; and/or (iv) permitting or requiring you to enter into a "same day sale" commitment, if applicable, with a broker-dealer that is a member of the Financial Industry Regulatory Authority (a "*FINRA Dealer*"), pursuant to this authorization and without further consent, whereby you irrevocably elect to sell a portion of the shares to be delivered in connection with your Performance Stock Units to satisfy the Withholding Obligation and whereby the FINRA Dealer irrevocably commits to forward the proceeds necessary to satisfy the Withholding Obligation directly to the Company and/or its Affiliates. Unless the Withholding Obligation is satisfied, the Company shall have no obligation to deliver to you any Common Stock or any other consideration pursuant to this Award.

(c) In the event the Withholding Obligation arises prior to the delivery to you of Common Stock or it is determined after the delivery of Common Stock to you that the amount of the Withholding Obligation was greater than the amount withheld by the Company, you agree to indemnify and hold the Company harmless from any failure by the Company to withhold the proper amount.

1. **Tax Consequences.** The Company has no duty or obligation to minimize the tax consequences to you of this Award and shall not be liable to you for any adverse tax consequences to you arising in connection with this Award. You are hereby advised to consult with your own personal tax, financial and/or legal advisors regarding the tax consequences of this Award and by signing the Grant Notice, you have agreed that you have done so or knowingly and voluntarily declined to do so. You understand that you (and not the Company) shall be responsible

4

for your own tax liability that may arise as a result of this investment or the transactions contemplated by this Agreement.

2. **Unsecured Obligation.** Your Award is unfunded, and as a holder of a vested Award, you shall be considered an unsecured creditor of the Company with respect to the Company's obligation, if any, to issue shares or other property pursuant to this Agreement. You shall not have voting or any other rights as a stockholder of the Company with respect to the shares to be issued pursuant to this Agreement until such shares are issued to you pursuant to Section 6 of this Agreement. Upon such issuance, you will obtain full voting and other rights as a stockholder of the Company. Nothing contained in this Agreement, and no action taken pursuant to its provisions, shall create or be construed to create a trust of any kind or a fiduciary relationship between you and the Company or any other person.

3. **Notices**. Any notice or request required or permitted hereunder shall be given in writing (including electronically) and will be deemed effectively given upon receipt or, in the case of notices delivered by mail by the Company to you, five (5) days after deposit in the United States mail, postage prepaid, addressed to you at the last address you provided to the Company. The Company may, in its sole discretion, decide to deliver any documents related to participation in the Plan and this Award by electronic means or to request your consent to participate in the Plan by electronic means. By accepting this Award, you consent to receive such documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

4. **Headings**. The headings of the Sections in this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement or to affect the meaning of this Agreement.

5. **Miscellaneous**.

The rights and obligations of the Company under your Award shall be transferable by the Company to any one or more persons or entities, and all covenants and agreements hereunder shall inure to the benefit of, and be enforceable by, the Company's successors and assigns.

You agree upon request to execute any further documents or instruments necessary or desirable in the sole determination of the Company to carry out the purposes or intent of your Award.

You acknowledge and agree that you have reviewed your Award in its entirety, have had an opportunity to obtain the advice of counsel prior to executing and accepting your Award and fully understand all provisions of your Award.

This Agreement shall be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or national securities exchanges as may be required.

All obligations of the Company under the Plan and this Agreement shall be binding on any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation, or otherwise, of all or substantially all of the business and/or assets of the Company.

1. **Governing Plan Document**. Your Award is subject to all the provisions of the Plan, the provisions of which are hereby made a part of your Award, and is further subject to all interpretations, amendments, rules and regulations which may from time to time be promulgated and adopted pursuant to the Plan. Your Award (and any compensation paid or shares issued under your Award) is subject to recoupment in accordance with The Dodd–Frank Wall Street Reform and Consumer Protection Act and any implementing regulations thereunder, any clawback policy adopted by the Company and any compensation recovery policy otherwise required by applicable law. No recovery of compensation under such a clawback policy will be an event giving rise to a right to voluntarily terminate employment upon a resignation for "good reason," or for a "constructive termination" or any similar term under any plan of or agreement with the Company.

2. **Effect on Other Employee Benefit Plans.** The value of the Award subject to this Agreement shall not be included as compensation, earnings, salaries, or other similar terms used when calculating benefits under any employee benefit plan (other than the Plan) sponsored by the Company or any Affiliate except as such plan otherwise expressly provides. The Company expressly reserves its rights to amend, modify, or terminate any or all of the employee benefit plans of the Company or any Affiliate.

3. **Severability**. If all or any part of this Agreement or the Plan is declared by any court or governmental authority to be unlawful or invalid, such unlawfulness or invalidity shall not invalidate any portion of this Agreement or the Plan not declared to be unlawful or invalid. Any Section of this Agreement (or part of such a Section) so declared to be unlawful or invalid shall, if possible, be construed in a manner which will give effect to the terms of such Section or part of a Section to the fullest extent possible while remaining lawful and valid.

5

4. **Other Documents**. You hereby acknowledge receipt or the right to receive a document providing the information required by Rule 428(b)(1) promulgated under the Securities Act. In addition, you acknowledge receipt of the Company's policy permitting certain individuals to sell shares only during certain "window" periods and the Company's insider trading policy, in effect from time to time.

5. **Amendment.** This Agreement may not be modified, amended or terminated except by an instrument in writing, signed by you and by a duly authorized representative of the Company. Notwithstanding the foregoing, this Agreement may be amended solely by the Board by a writing which specifically states that it is amending this Agreement, so long as a copy of such amendment is delivered to you, and provided that, except as otherwise expressly provided in the Plan, no such amendment materially adversely affecting your rights hereunder may be made without your written consent. Without limiting the foregoing, the Board reserves the right to change, by written notice to you, the provisions of this Agreement in any way it may deem necessary or advisable to carry out the purpose of the Award as a result of any change in applicable laws or regulations or any future law, regulation, ruling, or judicial decision, provided that any such change shall be applicable only to rights relating to that portion of the Award which is then subject to restrictions as provided herein.

6. **Compliance with Section 409A of the Code**. This Award is intended to be exempt from the application of Section 409A of the Code, including but not limited to by reason of complying with the "short-term deferral" rule set forth in Treasury Regulation Section 1.409A-1(b)(4) and any ambiguities herein shall be interpreted accordingly. Notwithstanding the foregoing, if it is determined that the Award fails to satisfy the requirements of the short-term deferral rule and is otherwise not exempt from, and determined to be deferred compensation subject to Section 409A of the Code, this Award shall comply with Section 409A to the extent necessary to avoid adverse personal tax consequences and any ambiguities herein shall be interpreted accordingly. If it is determined that the Award is deferred compensation subject to Section 409A and you are a "Specified Employee" (within the meaning set forth in Section 409A(a)(2)(B)(i) of the Code) as of the date of your "Separation from Service" (as defined in Section 409A), then the issuance of any shares that would otherwise be made upon the date of your Separation from Service or within the first six (6) months thereafter will not be made on the originally scheduled date(s) and will instead be issued in a lump sum on the date that is six (6) months and one day after the date of the Separation from Service, with the balance of the shares issued thereafter in accordance with the original vesting and issuance schedule set forth above, but if and only if such delay in the issuance of the shares is necessary to avoid the imposition of adverse taxation on you in respect of the shares under Section 409A of the Code. Each installment of shares that vests is intended to constitute a "separate payment" for purposes of Treasury Regulation Section 1.409A-2(b)(2).

\* \* \* \* \*

This Performance Stock Unit Award Agreement shall be deemed to be signed by the Company and the Participant upon the signing by the Participant of the Performance Stock Unit Grant Notice to which it is attached.

6

**Exhibit A**
**Performance Vesting Terms**

The Performance Stock Units awarded hereunder shall vest, if at all, based on the Company's Relative TSR Ranking (as defined below) during the Performance Period (as defined below), subject to the terms and conditions of the Plan, the Grant Notice, the Agreement and this Exhibit A. Capitalized terms not explicitly defined in this Exhibit A shall have the same meanings given to them in the Plan, the Grant Notice or the Agreement, as applicable.

1. **Determination of Number of Earned Performance Stock Units.** The number of Performance Stock Units that shall be entitled to vest based on the Company's Relative TSR Ranking (the "*Earned Performance Stock Units*") shall be determined in accordance with the following table, with linear interpolation used to determine the number of Earned Performance Stock Units between the applicable achievement levels if the Company's Relative TSR Ranking is greater than the 25th percentile, but less than the 90th percentile, in each case with the resulting number rounded to the nearest whole number; *provided, however*, that notwithstanding anything to the contrary in this Exhibit A, if the Company's Total Stockholder Return (as defined below) is below 0%, the number of Earned Performance Stock Units may not exceed 100% of the Target Number of Performance Stock Units (as set forth in the Grant Notice). For clarity, (i) no Performance Stock Units shall be eligible to vest if the Company's Relative TSR Ranking is below the 25th percentile and (ii) the total number of Earned Performance Stock Units may not exceed the Maximum Number of Performance Stock Units (as set forth in the Grant Notice).

|  | Company's Relative TSR Ranking | Number of Earned Performance Stock Units (% of Target Number of Performance Stock Units) |
|---|---|---|
| Maximum | 90th percentile or above | 200% |
| Target | 50th percentile | 100% |
| Threshold | 25th percentile | 50% |
|  | Below 25th percentile | 0% |

1. **Vesting Date.** Subject to Section 3 below, the Earned Performance Stock Units shall vest on the date that the Committee (as defined below) certifies the Company's Relative TSR Ranking and determines the number of Earned Performance Stock Units (which will be as soon as administratively practicable following the end of the Performance Period, but in no event later than March 1, 2024). A Participant must remain in Continuous Service with the Company through the end of the Performance Period in order to receive any Earned Performance Stock Units, except as otherwise provided in Section 3 below.

2. **Change in Control and Covered Termination.** Notwithstanding anything to the contrary in this Exhibit A, if a Change in Control occurs during the Performance Period, then:

   i. The number of Earned Performance Stock Units shall be determined by the Committee in accordance with Section 1 above (and for purposes of this Exhibit A, such number shall be the "*CIC Earned Performance Stock Units*"); *provided, however*, that (x) solely for purposes of determining the Total Stockholder Return of the Company, "Ending Share Price" shall mean the Fair Market Value of the per-share of Common Stock consideration received by the Company's stockholders in such Change in Control, and (y) solely for purposes of determining the Total Stockholder Return of the other Index Companies (and which companies constitute the Index Companies), the term "Performance Period" as it appears in the definition of "Ending Share Price" shall mean the period commencing on (and including) February 1, 2021 and ending on (and including) the last trading day prior to such Change in Control, provided that the Board shall have the discretion to use any date within the five trading day period prior to such Change in Control;

   ii. If, in connection with such Change in Control, the Award is assumed, substituted for, or continued by the surviving or acquiring company (or its parent entity), then the CIC Earned Performance Stock Units shall vest on the last day of the Performance Period (i.e., February 1, 2024), subject to the Participant's Continuous Service through such vesting date; *provided, however*, that if the Participant incurs a Covered Termination (as defined below) within one month prior to or within twelve months following the closing date of such Change in Control, but prior to February 1, 2024, then the CIC Earned Performance Stock Units shall vest on the date of such Covered Termination or upon the closing date of such Change in Control, if later; and

   iii. If, in connection with such Change in Control, the Award is not assumed, substituted for, or continued by the surviving or acquiring company (or its parent entity), then, subject to the

7

Participant's Continuous Service through the closing date of such Change in Control, the CIC Earned Performance Stock Units shall vest effective immediately prior to, but subject to the consummation of, such Change in Control.

3. **Termination of Performance Stock Units.** Any Performance Stock Units subject to the Award, to the extent unvested and outstanding, shall automatically terminate and be forfeited, without the payment of any consideration to Participant, on the earlier of (i) the date of termination of the Participant's Continuous Service (after giving effect to any accelerated vesting in the event of a Covered Termination) or (ii) the date that any Earned Performance Stock Units or CIC Earned Performance Stock Units, as applicable, become vested.

4. **Definitions.** For purposes of this <u>Exhibit A</u>, the following definitions shall apply to the capitalized terms set forth below (except as otherwise specified in this <u>Exhibit A</u>).

    a. "*Cause*" shall have the meaning ascribed to such term in any written employment agreement, offer letter or similar agreement between the Participant and the Company defining such term, and, in the absence of such agreement, has the meaning ascribed to such term in the Plan. The determination of whether a termination is with or without Cause shall be made by the Company in its sole and exclusive judgment and discretion.

    b. "*Committee*" shall mean the Compensation Committee of the Board.

    c. "*Covered Termination*" shall mean a termination of Participant's employment with the Company that is due to (i) a termination by the Company without Cause (and other than as a result of the Participant's death or Disability) or (ii) the Participant's resignation for Good Reason.

    d. "*Disability*" shall mean the Participant satisfies (i) the requirements for benefits under the Company's long-term disability plan, as determined by the third-party long-term disability insurance carrier or (ii) if the Company does not have a long-term disability plan, the requirements for Social Security disability benefits, as determined by the Social Security Administration.

    e. "*Ending Share Price*" shall mean the average of the daily closing prices per share of an Index Company's common stock, as reported on the stock exchange or market on which such stock is listed, for the thirty (30) Trading Days ending on (and including) the last Trading Day of the Performance Period, as adjusted for any dividends per share that have an ex-dividend date during the Performance Period, assuming the reinvestment of such dividends as of the applicable ex-dividend date.

    f. "*Good Reason*" for the Participant's resignation shall mean, notwithstanding the meaning ascribed to such term (or similar term) in any written agreement between the Participant and the Company, that one or more of the following are undertaken by the Company (or successor to the Company, if applicable) without the Participant's express written consent:

        i. a material reduction in the Participant's annual base salary, which the Participant agrees is a reduction of at least 10% of the Participant's base salary (unless pursuant to a salary reduction program applicable generally to the Company's similarly situated employees);

        ii. a material diminution in the Participant's authority, duties, or responsibilities, including, solely if the Participant is the Company's Chief Executive Officer, a requirement that the Participant report to a corporate officer or employee instead of reporting directly to the board of directors of the Company (or, if applicable, the successor to the Company or similar governing body if such successor is an entity other than a corporation);

        iii. a relocation of the Participant's principal place of employment with the Company (or successor to the Company, if applicable) to a place that increases the Participant's one-way commute by more than fifty (50) miles as compared to the Participant's then-current principal place of employment immediately prior to such relocation (excluding regular travel in the ordinary course of business), provided that if the Participant's principal place of employment is the Participant's personal residence, this clause (iii) shall not apply; or

        iv. a material breach by the Company of any terms of the Award or any other material written agreement between the Participant and the Company concerning the terms and conditions of the Participant's employment with the Company.

In addition, in each case (i) through (iv) described above, in order for the Participant's resignation to be deemed to have been for Good Reason, the Participant must first give the Company written notice of the action or omission giving rise to "Good Reason" within thirty (30) days after the first occurrence thereof, the Company must fail to reasonably cure such action or omission within thirty (30) days after receipt of such notice (the "*Cure Period*"), and the Participant's resignation must be effective not later than thirty (30) days after the expiration of such Cure Period.

8

a. "*Index Company*" shall mean the Company and each of the other companies in the S&P 600 Biotechnology Select Index for the entirety of the period beginning on the date that is thirty (30) trading days preceding February 1, 2021 and ending on the last day of the Performance Period.

a. "*Initial Share Price*" shall mean the average of the daily closing prices per share of an Index Company's common stock, as reported on the stock exchange or market on which such stock is listed, for the thirty (30) Trading Days prior to the Date of Grant, as adjusted for any dividends per share that have an ex-dividend date during the Performance Period, assuming the reinvestment of such dividends as of the applicable ex-dividend date.

b. "*Performance Period*" shall mean the period commencing on (and including) February 1, 2021 and ending on (and including) February 1, 2024. Notwithstanding the foregoing, the Performance Period may be treated as ending earlier than February 1, 2024 for certain purposes pursuant to Section 3(a)(i) as a result of the occurrence of a Change in Control prior to February 1, 2024.

c. "*Relative TSR Ranking*" shall be determined by ranking the Index Companies from the highest to the lowest according to their respective Total Stockholder Returns and then calculating the Company's percentile ranking within the Index Companies as follows:

where:

"P" represents the Company's percentile ranking within the Index Companies, which shall be rounded to the nearest whole percentile by application of regular rounding;

"N" represents the number of Index Companies; and

"R" represents the Company's ranking among the Index Companies.

For example, if there are 10 Index Companies (including the Company) and the Company's Total Stockholder Return ranks 3rd, the Company's Relative TSR Ranking is equal to the 70th percentile.

a. "*Total Stockholder Return*" shall mean the Ending Share Price divided by the Initial Share Price, minus one (1).

b. "*Trading Day*" shall mean any day on which the stock exchange or market on which shares of an Index Company's common stock is listed is open for trading.

9

Exhibit 10-30

**Eagle Pharmaceuticals, Inc.**
**Performance Stock Unit Grant Notice (2014 Equity Incentive Plan)**

Eagle Pharmaceuticals, Inc. (the "***Company***"), pursuant to its 2014 Equity Incentive Plan (as amended, the "***Plan***"), hereby awards to Participant a Performance Stock Unit Award for the number of shares of the Company's Common Stock ("***Performance Stock Units***") set forth below (the "***Award***"). The Award is subject to all of the terms and conditions as set forth in this notice of grant (this "***Performance Stock Unit Grant Notice***"), and the Performance Stock Unit Award Agreement (the "***Award Agreement***") (which is attached hereto) and the Plan, both of which are incorporated herein in their entirety. Capitalized terms not explicitly defined herein shall have the meanings set forth in the Plan or the Award Agreement. In the event of any conflict between the terms in this Performance Stock Unit Grant Notice or the Award Agreement and the Plan, the terms of the Plan shall control.

Participant:
Date of Grant:
Vesting Commencement Date:
Target Number of Performance Stock Units:
Maximum Number of Performance Stock Units:

**Vesting Schedule:** See Exhibit A hereto.

**Issuance Schedule:** Subject to any Capitalization Adjustment, one share of Common Stock (or its cash equivalent, at the discretion of the Company) will be issued for each Performance Stock Unit that vests at the time set forth in Section 6 of the Award Agreement.

**Additional Terms/Acknowledgements:** Participant acknowledges receipt of, and understands and agrees to, this Performance Stock Unit Grant Notice, the Award Agreement and the Plan. Participant further acknowledges that as of the Date of Grant, this Performance Stock Unit Grant Notice, the Award Agreement and the Plan set forth the entire understanding between Participant and the Company regarding the acquisition of the Common Stock pursuant to the Award specified above and supersede all prior oral and written agreements on the terms of this Award (including, but not limited to, the Eagle Pharmaceuticals, Inc. Severance Benefit Plan and any Equity Award Vesting Acceleration Benefit Letter Agreement between Participant and the Company), with the exception, if applicable, of (i) restricted stock unit awards or options previously granted and delivered to Participant and (ii) any compensation recovery policy that is adopted by the Company or is otherwise required by applicable law.

By accepting this Award, Participant acknowledges having received and read the Performance Stock Unit Grant Notice, the Award Agreement and the Plan and agrees to all of the terms and conditions set forth in these documents. Participant consents to receive Plan documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.

**Eagle Pharmaceuticals, Inc. Participant:**
By:
Signature Signature
Title: Date:
Date:

**Attachments**: Award Agreement

1

**Attachment I**
**Eagle Pharmaceuticals, Inc.**
**2014 Equity Incentive Plan**
**Performance Stock Unit Award Agreement**

Pursuant to the Performance Stock Unit Grant Notice (the "*Grant Notice*") and this Performance Stock Unit Award Agreement (the "*Agreement*"), Eagle Pharmaceuticals, Inc. (the "*Company*") has awarded you ("*Participant*") a Performance Stock Unit Award (the "*Award*") pursuant to the Company's 2014 Equity Incentive Plan (as amended, the "*Plan*") for the number of Performance Stock Units/shares indicated in the Grant Notice. Capitalized terms not explicitly defined in this Agreement or the Grant Notice shall have the same meanings given to them in the Plan. The terms of your Award, in addition to those set forth in the Grant Notice, are as follows.

1. **Grant of the Award.** This Award represents the right to be issued on a future date one (1) share of Common Stock for each Performance Stock Unit that vests on the applicable vesting date(s) (subject to any adjustment under Section 3 below) as indicated in the Grant Notice. As of the Date of Grant, the Company will credit to a bookkeeping account maintained by the Company for your benefit (the "*Account*") the number of Performance Stock Units/shares of Common Stock subject to the Award. Notwithstanding the foregoing, the Company reserves the right to issue you the cash equivalent of Common Stock, in part or in full satisfaction of the delivery of Common Stock in connection with the vesting of the Performance Stock Units, and, to the extent applicable, references in this Agreement and the Grant Notice to Common Stock issuable in connection with your Performance Stock Units will include the potential issuance of its cash equivalent pursuant to such right. This Award was granted in consideration of your services to the Company.

2. **Vesting.** Subject to the limitations contained herein, your Award will vest, if at all, in accordance with the vesting schedule provided in the Grant Notice. Except as otherwise set forth in Exhibit A attached hereto, vesting will cease upon the termination of your Continuous Service and the Performance Stock Units credited to the Account that were not vested on the date of such termination will be forfeited at no cost to the Company and you will have no further right, title or interest in or to such Award or the shares of Common Stock to be issued in respect of such portion of the Award.

3. **Number of Shares.** The number of Performance Stock Units (including the Target Number of Performance Stock Units and the Maximum Number of Performance Stock Units set forth in the Grant Notice) subject to your Award may be adjusted from time to time for Capitalization Adjustments, as provided in the Plan. Any additional Performance Stock Units, shares, cash or other property that becomes subject to the Award pursuant to this Section 3, if any, shall be subject, in a manner determined by the Board, to the same forfeiture restrictions, restrictions on transferability, and time and manner of delivery as applicable to the other Performance Stock Units and shares covered by your Award. Notwithstanding the provisions of this Section 3, no fractional shares or rights for fractional shares of Common Stock shall be created pursuant to this Section 3. Any fraction of a share will be rounded down to the nearest whole share.

4. **Securities Law Compliance**. You may not be issued any Common Stock under your Award unless the shares of Common Stock underlying the Performance Stock Units are either (i) then registered under the Securities Act, or (ii) the Company has determined that such issuance would be exempt from the registration requirements of the Securities Act. Your Award must also comply with other applicable laws and regulations governing the Award, and you shall not receive such Common Stock if the Company determines that such receipt would not be in material compliance with such laws and regulations.

5. **Transfer Restrictions**. Prior to the time that shares of Common Stock have been delivered to you, you may not transfer, pledge, sell or otherwise dispose of this Award or the shares issuable in respect of your Award, except as expressly provided in this Section 5. For example, you may not use shares that may be issued in respect of your Performance Stock Units as security for a loan. The restrictions on transfer set forth herein will lapse upon delivery to you of shares in respect of your vested Performance Stock Units.

**Death**. Your Award is transferable by will and by the laws of descent and distribution. At your death, vesting of your Award will cease and your executor or administrator of your estate shall be entitled to receive, on behalf of your estate, any Common Stock or other consideration that vested but was not issued before your death.

**Domestic Relations Orders.** Upon receiving written permission from the Board or its duly authorized designee, and provided that you and the designated transferee enter into transfer and other agreements required by the Company, you may transfer your right to receive the distribution of Common Stock or other consideration hereunder, pursuant to a domestic relations order, marital settlement agreement or other divorce or separation instrument as permitted by applicable law that contains the information required by the Company to effectuate the transfer. You are encouraged to discuss the proposed terms of any division of this Award with the Company General Counsel prior to finalizing the domestic relations order or marital settlement agreement to verify that you may make such transfer, and if so, to help ensure the required information is contained within the domestic relations order or marital settlement agreement.

1. **Date of Issuance.**

2

Exhibit 10-30

The issuance of shares in respect of the Performance Stock Units is intended to comply with Treasury Regulations Section 1.409A-1(b)(4) and will be construed and administered in such a manner. Subject to the satisfaction of the Withholding Obligation set forth in Section 11 of this Agreement, in the event one or more Performance Stock Units vests, the Company shall issue to you one (1) share of Common Stock for each Performance Stock Unit that vests on the applicable vesting date(s) (subject to any adjustment under Section 3 above, and subject to any different provisions in the Grant Notice). Each issuance date determined by this paragraph is referred to as an "***Original Issuance Date***".

If the Original Issuance Date falls on a date that is not a business day, delivery shall instead occur on the next following business day. In addition, if:

    i.    the Original Issuance Date does not occur (1) during an "open window period" applicable to you, as determined by the Company in accordance with the Company's then-effective policy on trading in Company securities, or (2) on a date when you are otherwise permitted to sell shares of Common Stock on an established stock exchange or stock market (including but not limited to under a previously established written trading plan that meets the requirements of Rule 10b5-1 under the Exchange Act and was entered into in compliance with the Company's policies (a "***10b5-1 Arrangement***")), *and*

    ii.    either (1) a Withholding Obligation does not apply, or (2) the Company decides, prior to the Original Issuance Date, (A) not to satisfy the Withholding Obligation by withholding shares of Common Stock from the shares otherwise due, on the Original Issuance Date, to you under this Award, and (B) not to permit you to enter into a "same day sale" commitment with a broker-dealer pursuant to Section 11 of this Agreement (including but not limited to a commitment under a 10b5-1 Arrangement) and (C) not to permit you to pay your Withholding Obligation in cash,

<u>then</u> the shares that would otherwise be issued to you on the Original Issuance Date will not be delivered on such Original Issuance Date and will instead be delivered on the first business day when you are not prohibited from selling shares of the Company's Common Stock in the open public market, but in no event later than December 31 of the calendar year in which the Original Issuance Date occurs (that is, the last day of your taxable year in which the Original Issuance Date occurs), or, <u>if and only if</u> permitted in a manner that complies with Treasury Regulations Section 1.409A-1(b)(4), no later than the date that is the 15th day of the third calendar month of the applicable year following the year in which the shares of Common Stock under this Award are no longer subject to a "substantial risk of forfeiture" within the meaning of Treasury Regulations Section 1.409A-1(d).

The form of delivery (*e.g.*, a stock certificate or electronic entry evidencing such shares) shall be determined by the Company.

1. **Dividends.** You shall receive no benefit or adjustment to your Award with respect to any cash dividend, stock dividend or other distribution that does not result from a Capitalization Adjustment; provided, however, that this sentence will not apply with respect to any shares of Common Stock that are delivered to you in connection with your Award after such shares have been delivered to you.

2. **Restrictive Legends.** The shares of Common Stock issued in respect of your Award shall be endorsed with appropriate legends as determined by the Company.

3. **Execution of Documents.** You hereby acknowledge and agree that the manner selected by the Company by which you indicate your consent to your Grant Notice is also deemed to be your execution of your Grant Notice and of this Agreement. You further agree that such manner of indicating consent may be relied upon as your signature for establishing your execution of any documents to be executed in the future in connection with your Award.

4. **Award not a Service Contract**.

Nothing in this Agreement (including, but not limited to, the vesting of your Award or the issuance of the shares in respect of your Award), the Plan or any covenant of good faith and fair dealing that may be found implicit in this Agreement or the Plan shall: (i) confer upon you any right to continue in the employ or service of, or affiliation with, the Company or an Affiliate; (ii) constitute any promise or commitment by the Company or an Affiliate regarding the fact or nature of future positions, future work assignments, future compensation or any other term or condition of employment or affiliation; (iii) confer any right or benefit under this Agreement or the Plan unless such right or benefit has specifically accrued under the terms of this Agreement or Plan; or (iv) deprive the Company of the right to terminate you at will and without regard to any future vesting opportunity that you may have.

By accepting this Award, you acknowledge and agree that the right to continue vesting in the Award pursuant to the vesting schedule provided in the Grant Notice may not be earned unless (in addition to any other conditions described in the Grant Notice and this Agreement) you continue as an employee, director or consultant at the will of the Company and affiliate, as applicable (not through the act of being hired, being granted this Award or any other award or benefit) and that the Company has the right to reorganize, sell, spin-out or otherwise restructure one or more of its businesses or Affiliates at any time or from time to time, as it deems appropriate (a "***reorganization***"). You acknowledge and agree that such a reorganization could result in the termination of your Continuous Service, or the termination of Affiliate status of your employer and the loss of benefits available to you under this Agreement, including but not limited to, the termination of the right to continue vesting in the Award. You further acknowledge and agree that this Agreement, the Plan, the transactions

3

contemplated hereunder and the vesting schedule set forth herein or any covenant of good faith and fair dealing that may be found implicit in any of them do not constitute an express or implied promise of continued engagement as an employee or consultant for the term of this Agreement, for any period, or at all, and shall not interfere in any way with the Company's right to terminate your Continuous Service at any time, with or without your cause or notice, or to conduct a reorganization.

1. **Withholding Obligation.**

(a) On each vesting date, and on or before the time you receive a distribution of the shares of Common Stock in respect of your Performance Stock Units, and at any other time as reasonably requested by the Company in accordance with applicable tax laws, you hereby authorize any required withholding from the Common Stock issuable to you and/or otherwise agree to make adequate provision, including in cash, for any sums required to satisfy the federal, state, local and foreign tax withholding obligations of the Company or any Affiliate that arise in connection with your Award (the "*Withholding Obligation*").

(b) By accepting this Award, you acknowledge and agree that the Company or any Affiliate may, in its sole discretion, satisfy all or any portion of the Withholding Obligation relating to your Performance Stock Units by any of the following means or by a combination of such means: (i) causing you to pay any portion of the Withholding Obligation in cash; (ii) withholding from any compensation otherwise payable to you by the Company; (iii) withholding shares of Common Stock from the shares of Common Stock issued or otherwise issuable to you in connection with the Award with a Fair Market Value (measured as of the date shares of Common Stock are issued pursuant to Section 6) equal to the amount of such Withholding Obligation; provided, however, that the number of such shares of Common Stock so withheld will not exceed the amount necessary to satisfy the Withholding Obligation using the maximum statutory withholding rates for federal, state, local and foreign tax purposes, including payroll taxes, that are applicable to supplemental taxable income; and *provided*, further, that to the extent necessary to qualify for an exemption from application of Section 16(b) of the Exchange Act, if applicable, such share withholding procedure will be subject to the express prior approval of the Board or the Company's Compensation Committee; and/or (iv) permitting or requiring you to enter into a "same day sale" commitment, if applicable, with a broker-dealer that is a member of the Financial Industry Regulatory Authority (a "*FINRA Dealer*"), pursuant to this authorization and without further consent, whereby you irrevocably elect to sell a portion of the shares to be delivered in connection with your Performance Stock Units to satisfy the Withholding Obligation and whereby the FINRA Dealer irrevocably commits to forward the proceeds necessary to satisfy the Withholding Obligation directly to the Company and/or its Affiliates. Unless the Withholding Obligation is satisfied, the Company shall have no obligation to deliver to you any Common Stock or any other consideration pursuant to this Award.

(c) In the event the Withholding Obligation arises prior to the delivery to you of Common Stock or it is determined after the delivery of Common Stock to you that the amount of the Withholding Obligation was greater than the amount withheld by the Company, you agree to indemnify and hold the Company harmless from any failure by the Company to withhold the proper amount.

1. **Tax Consequences.** The Company has no duty or obligation to minimize the tax consequences to you of this Award and shall not be liable to you for any adverse tax consequences to you arising in connection with this Award. You are hereby advised to consult with your own personal tax, financial and/or legal advisors regarding the tax consequences of this Award and by signing the Grant Notice, you have agreed that you have done so or knowingly and voluntarily declined to do so. You understand that you (and not the Company) shall be responsible for your own tax liability that may arise as a result of this investment or the transactions contemplated by this Agreement.
2. **Unsecured Obligation.** Your Award is unfunded, and as a holder of a vested Award, you shall be considered an unsecured creditor of the Company with respect to the Company's obligation, if any, to issue shares or other property pursuant to this Agreement. You shall not have voting or any other rights as a stockholder of the Company with respect to the shares to be issued pursuant to this Agreement until such shares are issued to you pursuant to Section 6 of this Agreement. Upon such issuance, you will obtain full voting and other rights as a stockholder of the Company. Nothing contained in this Agreement, and no action taken pursuant to its provisions, shall create or be construed to create a trust of any kind or a fiduciary relationship between you and the Company or any other person.
3. **Notices**. Any notice or request required or permitted hereunder shall be given in writing (including electronically) and will be deemed effectively given upon receipt or, in the case of notices delivered by mail by the Company to you, five (5) days after deposit in the United States mail, postage prepaid, addressed to you at the last address you provided to the Company. The Company may, in its sole discretion, decide to deliver any documents related to participation in the Plan and this Award by electronic means or to request your consent to participate in the Plan by electronic means. By accepting this Award, you consent to receive such documents by electronic delivery and to participate in the Plan through an on-line or electronic system established and maintained by the Company or another third party designated by the Company.
4. **Headings**. The headings of the Sections in this Agreement are inserted for convenience only and shall not be deemed to constitute a part of this Agreement or to affect the meaning of this Agreement.
5. **Miscellaneous**.

4

The rights and obligations of the Company under your Award shall be transferable by the Company to any one or more persons or entities, and all covenants and agreements hereunder shall inure to the benefit of, and be enforceable by, the Company's successors and assigns.

You agree upon request to execute any further documents or instruments necessary or desirable in the sole determination of the Company to carry out the purposes or intent of your Award.

You acknowledge and agree that you have reviewed your Award in its entirety, have had an opportunity to obtain the advice of counsel prior to executing and accepting your Award and fully understand all provisions of your Award.

This Agreement shall be subject to all applicable laws, rules, and regulations, and to such approvals by any governmental agencies or national securities exchanges as may be required.

All obligations of the Company under the Plan and this Agreement shall be binding on any successor to the Company, whether the existence of such successor is the result of a direct or indirect purchase, merger, consolidation, or otherwise, of all or substantially all of the business and/or assets of the Company.

1. **Governing Plan Document**. Your Award is subject to all the provisions of the Plan, the provisions of which are hereby made a part of your Award, and is further subject to all interpretations, amendments, rules and regulations which may from time to time be promulgated and adopted pursuant to the Plan. Your Award (and any compensation paid or shares issued under your Award) is subject to recoupment in accordance with The Dodd–Frank Wall Street Reform and Consumer Protection Act and any implementing regulations thereunder, any clawback policy adopted by the Company and any compensation recovery policy otherwise required by applicable law. No recovery of compensation under such a clawback policy will be an event giving rise to a right to voluntarily terminate employment upon a resignation for "good reason," or for a "constructive termination" or any similar term under any plan of or agreement with the Company.

2. **Effect on Other Employee Benefit Plans.** The value of the Award subject to this Agreement shall not be included as compensation, earnings, salaries, or other similar terms used when calculating benefits under any employee benefit plan (other than the Plan) sponsored by the Company or any Affiliate except as such plan otherwise expressly provides. The Company expressly reserves its rights to amend, modify, or terminate any or all of the employee benefit plans of the Company or any Affiliate.

3. **Severability**. If all or any part of this Agreement or the Plan is declared by any court or governmental authority to be unlawful or invalid, such unlawfulness or invalidity shall not invalidate any portion of this Agreement or the Plan not declared to be unlawful or invalid. Any Section of this Agreement (or part of such a Section) so declared to be unlawful or invalid shall, if possible, be construed in a manner which will give effect to the terms of such Section or part of a Section to the fullest extent possible while remaining lawful and valid.

4. **Other Documents**. You hereby acknowledge receipt or the right to receive a document providing the information required by Rule 428(b)(1) promulgated under the Securities Act. In addition, you acknowledge receipt of the Company's policy permitting certain individuals to sell shares only during certain "window" periods and the Company's insider trading policy, in effect from time to time.

5. **Amendment.** This Agreement may not be modified, amended or terminated except by an instrument in writing, signed by you and by a duly authorized representative of the Company. Notwithstanding the foregoing, this Agreement may be amended solely by the Board by a writing which specifically states that it is amending this Agreement, so long as a copy of such amendment is delivered to you, and provided that, except as otherwise expressly provided in the Plan, no such amendment materially adversely affecting your rights hereunder may be made without your written consent. Without limiting the foregoing, the Board reserves the right to change, by written notice to you, the provisions of this Agreement in any way it may deem necessary or advisable to carry out the purpose of the Award as a result of any change in applicable laws or regulations or any future law, regulation, ruling, or judicial decision, provided that any such change shall be applicable only to rights relating to that portion of the Award which is then subject to restrictions as provided herein.

6. **Compliance with Section 409A of the Code**. This Award is intended to be exempt from the application of Section 409A of the Code, including but not limited to by reason of complying with the "short-term deferral" rule set forth in Treasury Regulation Section 1.409A-1(b)(4) and any ambiguities herein shall be interpreted accordingly. Notwithstanding the foregoing, if it is determined that the Award fails to satisfy the requirements of the short-term deferral rule and is otherwise not exempt from, and determined to be deferred compensation subject to Section 409A of the Code, this Award shall comply with Section 409A to the extent necessary to avoid adverse personal tax consequences and any ambiguities herein shall be interpreted accordingly. If it is determined that the Award is deferred compensation subject to Section 409A and you are a "Specified Employee" (within the meaning set forth in Section 409A(a)(2)(B)(i) of the Code) as of the date of your "Separation from Service" (as defined in Section 409A), then the issuance of any shares that would otherwise be made upon the date of your Separation from Service or within the first six (6) months thereafter will not be made on the originally scheduled date(s) and will instead be issued in a lump sum on the date that is six (6) months and one day after the date of the Separation from Service, with the balance of the shares issued thereafter in accordance with the original vesting and issuance schedule set forth above, but if and only if such delay in the issuance of the shares is necessary to avoid the imposition of adverse

5

taxation on you in respect of the shares under Section 409A of the Code. Each installment of shares that vests is intended to constitute a "separate payment" for purposes of Treasury Regulation Section 1.409A-2(b)(2).

\* \* \* \* \*

This Performance Stock Unit Award Agreement shall be deemed to be signed by the Company and the Participant upon the signing by the Participant of the Performance Stock Unit Grant Notice to which it is attached.

6

Exhibit 10-30

**Exhibit A**
**Performance Vesting Terms**

The Performance Stock Units awarded hereunder shall vest, if at all, based on the Company's achievement of the Milestones (as defined below) during the Performance Period (as defined below), subject to the terms and conditions of the Plan, the Grant Notice, the Agreement and this Exhibit A. Capitalized terms not explicitly defined in this Exhibit A shall have the same meanings given to them in the Plan, the Grant Notice or the Agreement, as applicable.

1. **Determination of Number of Earned Performance Stock Units.** The number of Performance Stock Units that shall be entitled to vest based on the Company's achievement of the Milestones (the "*Earned Performance Stock Units*") shall be determined in accordance with the following table, with each specified Milestone as defined in Section 6 below. For clarity, (i) the following table sets forth, for each specified Milestone, the percentage of the Target Number of Performance Stock Units (as set forth in the Grant Notice) that will qualify as Earned Performance Stock Units if such Milestone is achieved and (ii) the total number of Earned Performance Stock Units may not exceed the Maximum Number of Performance Stock Units (as set forth in the Grant Notice).

| Achievement of Milestone | Number of Earned Performance Stock Units (% of Target Number of Performance Stock Units) |
|---|---|
| Fulvestrant FDA Approval Milestone | [X]% |
| Vasopressin Cumulative Sales Milestone | [X]% |
| PEMFEXY Cumulative Sales Milestone | [X]% |

1. **Vesting Date.** Subject to Section 3 below, the Earned Performance Stock Units shall vest on the date that the Committee (as defined below) certifies the Company's achievement of the Milestones and determines the number of Earned Performance Stock Units (which will be as soon as administratively practicable following the end of the Performance Period, but in no event later than [DATE]). A Participant must remain in Continuous Service through the end of the Performance Period in order to receive any Earned Performance Units, except as otherwise provided in Section 3 below.

2. **Change in Control and Covered Termination.**

    a. Notwithstanding anything to the contrary in this Exhibit A, if a Change in Control occurs during the Performance Period, then the Target Number of Performance Stock Units (as set forth in the Grant Notice) shall vest effective immediately prior to, but subject to the consummation of, such Change in Control, subject to the Participant's Continuous Service through the closing date of such Change in Control; *provided, however*, that if (i) all of the Milestones have been achieved as of the date of such Change in Control or (ii) the sale (or other applicable transaction) price per share of the Common Stock in such Change in Control is at least $[X], then the Maximum Number of Performance Stock Units (as set forth in the Grant Notice) shall vest effective immediately prior to, but subject to the consummation of, such Change in Control, subject to the Participant's Continuous Service through the closing date of such Change in Control.

    b. Notwithstanding anything to the contrary in this Exhibit A, if the Participant incurs a Covered Termination (as defined below) prior to the date any Performance Stock Units have vested in accordance with the terms of this Exhibit A, then the number of Earned Performance Stock Units, if any, shall be determined in accordance with Section 1 above based on whether the Milestones have been achieved as of the date of such Covered Termination, and any such Earned Performance Stock Units shall vest on the date of such Covered Termination. Notwithstanding the foregoing, if the Participant's Covered Termination occurs within the one month period prior to the closing of a Change in Control, the Participant shall be treated as remaining in Continuous Service as of the closing date of such Change in Control for purposes of Section 3(b) and shall be eligible to receive vesting of Performance Stock Units as described in 3(a) above, rather than the treatment described in this Section 3(b).

3. **Termination of Performance Stock Units.** Any Performance Stock Units subject to the Award, to the extent unvested and outstanding, shall automatically terminate and be forfeited, without the payment of any consideration to Participant, on the earlier of (i) the date of termination of the Participant's Continuous Service (after giving effect to any accelerated vesting in the event of a Covered Termination) or (ii) the date that any Earned Performance Stock Units become vested.

4. **Definitions.** For purposes of this Exhibit A, the following definitions shall apply to the capitalized terms set forth below.

    a. "*Cause*" shall have the meaning ascribed to such term in any written employment agreement, offer letter or similar agreement between the Participant and the Company defining such term, and, in the absence of such agreement, has the meaning ascribed to such term in the Plan. The determination of whether a termination is with or without Cause shall be made by the Company in its sole and exclusive judgment and discretion.

    b. "*Committee*" shall mean the Compensation Committee of the Board.

7

c. "***Covered Termination***" shall mean a termination of Participant's employment with the Company that is due to (i) a termination by the Company without Cause (and other than as a result of the Participant's death or Disability) or (ii) the Participant's resignation for Good Reason.

d. "***Disability***" shall mean the Participant satisfies (i) the requirements for benefits under the Company's long-term disability plan, as determined by the third-party long-term disability insurance carrier or (ii) if the Company does not have a long-term disability plan, the requirements for Social Security disability benefits, as determined by the Social Security Administration.

e. "***Fulvestrant FDA Approval Milestone***" shall mean the first approval by the U.S. Food and Drug Administration (or any successor entity thereto), on or prior to the last day of the Performance Period, for the commercial sale and marketing of Fulvestrant in the U.S. by the Company.

f. "***Good Reason***" for the Participant's resignation shall mean, notwithstanding the meaning ascribed to such term (or similar term) in any written agreement between the Participant and the Company, that one or more of the following are undertaken by the Company (or successor to the Company, if applicable) without the Participant's express written consent:

    i. a material reduction in the Participant's annual base salary, which the Participant agrees is a reduction of at least 10% of the Participant's base salary (unless pursuant to a salary reduction program applicable generally to the Company's similarly situated employees);

    ii. a material diminution in the Participant's authority, duties, or responsibilities, including, solely if the Participant is the Company's Chief Executive Officer, a requirement that the Participant report to a corporate officer or employee instead of reporting directly to the board of directors of the Company (or, if applicable, the successor to the Company or similar governing body if such successor is an entity other than a corporation);

    iii. a relocation of the Participant's principal place of employment with the Company (or successor to the Company, if applicable) to a place that increases the Participant's one-way commute by more than fifty (50) miles as compared to the Participant's then-current principal place of employment immediately prior to such relocation (excluding regular travel in the ordinary course of business), provided that if the Participant's principal place of employment is the Participant's personal residence, this clause (iii) shall not apply; or

    iv. a material breach by the Company of any terms of the Award or any other material written agreement between the Participant and the Company concerning the terms and conditions of the Participant's employment with the Company.

In addition, in each case (i) through (iv) described above, in order for the Participant's resignation to be deemed to have been for Good Reason, the Participant must first give the Company written notice of the action or omission giving rise to "Good Reason" within thirty (30) days after the first occurrence thereof, the Company must fail to reasonably cure such action or omission within thirty (30) days after receipt of such notice (the "***Cure Period***"), and the Participant's resignation must be effective not later than thirty (30) days after the expiration of such Cure Period.

a. "***Milestone***" shall mean the Fulvestrant FDA Approval Milestone, the Vasopressin Cumulative Sales Milestone or the PEMFEXY Cumulative Sales Milestone, as applicable.

b. "***PEMFEXY Cumulative Sales Milestone***" shall mean a total of at least $[XXX] in net sales (as defined by U.S. GAAP) of PEMFEXY™ by the Company during the Performance Period.

c. "***Performance Period***" shall mean the period commencing on (and including) [DATE] and ending on (and including) [DATE].

d. "***Vasopressin Cumulative Sales Milestone***" shall mean a total of at least $[XXX] in net sales (as defined by U.S. GAAP) of Vasopressin by the Company during the Performance Period.

8

Exhibit 21.1

**Subsidiaries of Eagle Pharmaceuticals, Inc.**

| **Name of Subsidiary** | **Jurisdiction of Incorporation** |
| --- | --- |
| Eagle Biologics, Inc. (formerly Arsia Therapeutics, Inc.) | Delaware |
| Eagle Research Lab Limited | Malta |

**Exhibit 23.1**

<u>Consent of Independent Registered Public Accounting Firm</u>

We consent to the incorporation by reference in the following Registration Statements:

(1) Registration Statement on Form S-3 No. 333-234742 and 333-202592 of Eagle Pharmaceuticals, Inc., and

(2) Registration Statements on Form S-8 Nos. 333-228876, 333-216839, 333-213683, 333-206729 and 333-194056 Eagle Pharmaceuticals, Inc.

of our reports dated March 4, 2021, with respect to the consolidated financial statements of Eagle Pharmaceuticals, Inc. and the effectiveness of internal control over financial reporting of Eagle Pharmaceuticals, Inc. included in this Annual Report (Form 10-K) of Eagle Pharmaceuticals for the year ended December 31, 2020.

/s/ Ernst & Young, LLP

Stamford, Connecticut
March 4, 2021

Exhibit 23.2

<u>Consent of Independent Registered Public Accounting Firm</u>

Eagle Pharmaceuticals, Inc.

Woodcliff Lake, New Jersey

We hereby consent to the incorporation by reference in the Registration Statements on Form S-3 (Nos. 333-234742 and 333-202592) and Form S-8 (Nos. 333-228876, 333-216839, 333-213683, 333-206729 and 333-194056) of Eagle Pharmaceuticals, Inc. (the "Company") of our report dated March 2, 2020, relating to the consolidated financial statements which appears in this Form 10-K.

/s/ BDO USA, LLP

Woodbridge, New Jersey

March 4, 2021

**Exhibit 31.1**

## Certification of Principal Executive Officer

I, Scott Tarriff, certify that:

1. I have reviewed this annual report on Form 10-K of Eagle Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 4, 2021

/s/ Scott Tarriff

Scott Tarriff
Chief Executive Officer
(Principal Executive Officer)

**Exhibit 31.2**

### Certification of Principal Financial and Accounting Officer

I, Brian Cahill, certify that:

1. I have reviewed this annual report on Form 10-K of Eagle Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 4, 2021

/s/ Brian Cahill

Brian Cahill
Chief Financial Officer
(Principal Accounting and Financial Officer)

**Exhibit 32.1**

## Certification Pursuant to

## 18 U.S.C. Section 1350,

## As Adopted Pursuant to

## Section 906 of the Sarbanes-Oxley Act of 2002

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), **Scott Tarriff**, President and Chief Executive Officer of Eagle Pharmaceuticals, Inc. (the "Company"), and **Brian Cahill**, Chief Financial Officer of the Company, each hereby certifies that, to the best of his knowledge:

**1.** The Company's Annual Report on Form 10-K for the period ended December 31, 2020 (the "Annual Report"), to which this Certification is attached as Exhibit 32.1, fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act, and

**2.** The information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**Dated: March 4, 2021**

/s/ Scott Tarriff                    /s/ Brian Cahill

Scott Tarriff                    Brian Cahill

Chief Executive Officer            Chief Financial Officer

(Principal Executive Officer)          (Principal Financial and Accounting Officer)

This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Eagle Pharmaceuticals, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing.

EXHIBIT 8

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒    **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2021**
**or**

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____ .**

**Commission File Number 001-36306**

# Eagle Pharmaceuticals, Inc.
(Exact Name of Registrant as Specified in its Charter)

| **Delaware** | **2834** | **20-8179278** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**50 Tice Boulevard, Suite 315**
**Woodcliff Lake, NJ 07677**
**(201) 326-5300**
(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Trading symbol** | **Name of each exchange on which registered** |
|---|---|---|
| Common stock, $0.001 par value per share | EGRX | The Nasdaq Global Market |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes o No x

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes o No x

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes x  No o

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).  Yes x  No o

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in 12b-2 of the Exchange Act.

| Large accelerated filer | Accelerated filer | Non-accelerated filer | Smaller reporting company |
|---|---|---|---|
| ☐ | ☒ | ☐ | ☐ |

Emerging growth company   ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. o

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. x

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No  x

The aggregate market value of voting Common Stock held by non-affiliates of the registrant was approximately $437,105,101 computed by reference to the last reported sale price of $42.80 per share as reported by The Nasdaq Global Market, as of the last business day of the registrant's most recently completed second fiscal quarter, June 30, 2021. This calculation does not reflect a determination that certain persons are affiliates of the registrant for any other purpose.

The number of shares outstanding of the registrant's common stock, $0.001 par value per share, as of February 28, 2022 was 12,697,101 shares.

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the definitive proxy statement for our 2022 annual meeting of shareholders, which is to be filed within 120 days after the end of the fiscal year ended December 31, 2021, are incorporated by reference into Part III of this Form 10-K, to the extent described in Part III.

**Eagle Pharmaceuticals, Inc.**

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K, or Annual Report, includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, or the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act. All statements other than statements of historical fact contained in this Annual Report are forward-looking statements. In some cases, you can identify forward-looking statements by terminology such as "may," "could," "will," "would," "should," "expect," "plan,", "anticipate," "believe," "estimate," "intend," "predict," "seek," "contemplate," "project," "continue," "potential," "ongoing" or the negative of these terms or other comparable terminology, although not all forward-looking statements contain these identifying words. These forward-looking statements include, but are not limited to, statements about:

- the potential benefits and commercial potential of our approved products, including rapidly infused bendamustine RTD, or Bendeka, Ryanodex® (dantrolene sodium), or Ryanodex, and bendamustine ready-to-dilute, or RTD, 500ml solution, or Belrapzo, TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride, PEMFEXY™, and vasopressin, for approved indications and any expanded uses;
- the commercial potential of additional indications for our products;
- sales of our products in various markets worldwide, pricing for our products, level of insurance coverage and reimbursement for our products, timing regarding development and regulatory approvals for our products or for additional indications or in additional territories;
- future expansion of our commercial organization and transition to third-parties in certain jurisdictions to perform sales, marketing and distribution functions;
- the initiation, timing, design, progress and results of our preclinical studies and clinical trials, and our research and development programs;
- our ability to obtain and maintain regulatory approval of our products and product candidates, and any related restrictions, limitations, and/or warnings in the label of an approved product;
- our plans to research, develop and commercialize our products and product candidates and our ability to successfully commercialize our products and product candidates;
- our ability to attract collaborators with development, regulatory and commercialization expertise;
- the size and growth potential of the markets for our products and product candidates, and our ability to serve those markets;
- the impact of the ongoing coronavirus 2019, or COVID-19, pandemic on our business and operations, results of operations and financial performance including: disruption in the sales of our marketed products; delays, interruptions or other adverse effects to clinical trials and patient enrollment, or interruptions to key clinical trial activities such as clinical trial site monitoring, due to limitations on travel, quarantines or social distancing protocols imposed or recommended by federal or state governments, employers or others; delays in regulatory review; manufacturing and supply chain interruptions; and the adverse effects on healthcare systems and disruption of the global economy overall;
- the diversion of healthcare resources away from the conduct of clinical trials as a result of the ongoing COVID-19 pandemic, including the diversion of hospitals and doctor offices serving as locations for administration of our products, including Bendeka and hospital staff supporting the conduct of such administration;
- the rate and degree of market acceptance of our products;
- our ability to significantly grow our commercial sales and marketing organization, whether alone or with potential future collaborators;
- the performance of our strategic collaborators and success of our current strategic collaborations;
- regulatory developments in the United States and foreign countries;
- the performance of our third-party suppliers and manufacturers;
- the success of competing drugs that are or become available;
- the retention of key scientific or management personnel;
- our ability to obtain additional funding for our operations;

- our ability to obtain, maintain, protect and enhance intellectual property rights and proprietary technologies and operate our business without infringing the intellectual property rights and proprietary technology of third parties;
- our ability to prevent or minimize the effects of litigation; and
- our expectations regarding anticipated future costs, operating expenses and capital requirements.

Any forward-looking statements in this Annual Report reflect our current views with respect to future events or to our future financial performance and involve known and unknown risks, uncertainties, assumptions and other factors described under the "Risk Factors" section and elsewhere in this Annual Report, that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. Given these uncertainties, you should not place undue reliance on these forward-looking statements.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this report, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements as predictions of future events. Except as required by law, we assume no obligation to update or revise these forward-looking statements for any reason, even if new information becomes available in the future.

This Annual Report also contains estimates, projections and other information concerning our industry, our business, and the markets for certain diseases, including data regarding the estimated size of those markets, and the incidence and prevalence of certain medical conditions. Information that is based on estimates, forecasts, projections, market research or similar methodologies is inherently subject to uncertainties and actual events or circumstances may differ materially from events and circumstances reflected in this information. Unless otherwise expressly stated, we obtained this industry, business, market and other data from reports, research surveys, studies and similar data prepared by market research firms and other third parties, industry, medical and general publications, government data and similar sources.

## NOTE REGARDING COMPANY REFERENCES

References to the "Company," "Eagle Pharmaceuticals," "Eagle," "we," "us" or "our" mean Eagle Pharmaceuticals, Inc., a Delaware corporation, together with its subsidiaries. References to "Eagle Biologics" mean Eagle Biologics, Inc. and references to "Eagle Research Labs" means Eagle Research Labs Limited.

## NOTE REGARDING TRADEMARKS

All trademarks, trade names and service marks appearing in this Annual Report are the property of their respective owners. Solely for convenience, trademarks and trade names referred to in this Annual Report may appear without the ® or TM symbols, but such references are not intended to indicate in any way that the Company will not assert, to the fullest extent under applicable law, its rights or the rights of the applicable licensor to these trademarks and trade names. The Company does not intend its use or display of other entities' trade names, trademarks or service marks to imply a relationship with, or endorsement or sponsorship of the Company by, any other entity.

**SUMMARY RISK FACTORS**

Our business faces significant risks and uncertainties of which investors should be aware before making a decision to invest in our common stock. If any of the following risks are realized, our business, financial condition and results of operations could be materially and adversely affected. You should carefully review and consider the full discussion of our risk factors set forth under the caption "Risk Factors" in Item 1A in Part I of this Annual Report on Form 10-K. Some of the more significant risks include the following:

a. If we cannot sustain profitability, our business, prospects, operating results and financial condition would be materially harmed.

b. We face significant competition from other biotechnology and pharmaceutical companies, and our operating results will suffer if we fail to compete effectively.

c. If we are unable to successfully conduct our sales and marketing capabilities or if our commercial partners do not adequately perform, the commercial opportunity for our products may be diminished.

d. If we fail to obtain additional financing, we could be forced to delay, reduce or eliminate our product development programs.

e. We may sell additional equity or incur additional debt to fund our operations, which may result in dilution to our stockholders and impose restrictions on our business.

f. We cannot give any assurance that we will receive regulatory approval for our product candidates, which is necessary before they can be commercialized.

g. Current and future legislation and regulations may increase the difficulty and cost for us to commercialize our product candidates and affect the prices we may obtain for our products.

h. If we are unable to differentiate our products or product candidates from branded reference drugs or existing generic therapies for similar treatments, or if the FDA or other applicable regulatory authorities approve generic products that compete with any of our products or product candidates, the ability to successfully commercialize our product candidates would be adversely affected.

i. Clinical development is a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results. Failure can occur at any stage of clinical development.

j. Delays in clinical trials are common and have many causes, and any delay could result in increased costs to us and could jeopardize or delay our ability to obtain regulatory approval and commence product sales. We may also find it difficult to enroll patients in our clinical trials, which could delay or prevent development of our product candidates.

k. Our drug development strategy relies heavily upon the 505(b)(2) regulatory pathway, which requires us to certify that we do not infringe upon third-party patents covering approved drugs. Such certifications typically result in third-party claims of intellectual property infringement, the defense of which will be costly and time consuming, and which may delay or prevent the review or approval of our product candidates; in addition, an unfavorable outcome in any litigation may prevent or delay our development and commercialization efforts which would harm our business.

l. Our commercial success depends upon attaining significant market acceptance of our products and product candidates, if approved, among physicians, nurses, pharmacists, patients and the medical community.

m. A substantial portion of our total revenues is derived from sales of a limited number of products.

n. The COVID-19 pandemic has adversely impacted, and may continue to adversely impact, our business, including the marketing, sale and commercialization of our products, our supply chain, our clinical trials, our liquidity and access to capital markets and our business development activities.

o. We rely on third parties to conduct our preclinical studies and clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines, we may not be able to obtain regulatory approval for or commercialize our product candidates and our business could be substantially harmed.

p. We rely on limited sources of supply for our products and product candidates, and any disruption in the chain of supply may impact production and sales of our products and cause delay in developing and commercializing our product candidates.

q. Our future success depends on our ability to retain key executives and to attract, retain and motivate qualified personnel.

r. Failure or perceived failure to comply with existing or future laws, regulations, contracts, self-regulatory schemes, standards, and other obligations related to data privacy and security (including security incidents) could harm our business. Compliance or the actual or perceived failure to comply with such obligations could negatively affect our operating results and business..

s. If we are unable to obtain or protect intellectual property rights related to any of our product candidates, we may not be able to compete effectively in our market.

t. Our stock price may continue to fluctuate significantly.

u. There is no assurance that our share repurchase program will result in repurchases of our common stock or enhance stockholder value.

v. Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.

w.  Changes in tax laws or regulations that are applied adversely to us or our customers may have a material adverse effect on our business, cash flow, financial condition or results of operations.

w.  Changes in tax laws or regulations that are applied adversely to us or our customers may have a material adverse effect on our business, cash flow, financial condition or results of operations.

**EAGLE PHARMACEUTICALS, INC.**

**ANNUAL REPORT ON FORM 10-K**

**For the fiscal year ended December 31, 2021**

**Part I**

|  |  | Page |
|---|---|---|
| Item 1. | Business | 7 |
| Item 1A. | Risk Factors | 30 |
| Item 1B. | Unresolved Staff Comments | 65 |
| Item 2. | Properties | 65 |
| Item 3. | Legal Proceedings | 65 |
| Item 4. | Mine Safety Disclosures | 65 |

**Part II**

| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 66 |
|---|---|---|
| Item 6. | Reserved | 68 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 68 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 82 |
| Item 8. | Financial Statements and Supplementary Data | 83 |
| Item 9. | Changes and Disagreements with Accountants on Accounting and Financial Disclosure | 84 |
| Item 9A. | Controls and Procedures | 85 |
| Item 9B | Other Information | 88 |
| Item 9C | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 88 |

**Part III**

| Item 10. | Directors, Executive Officers and Corporate Governance | 88 |
|---|---|---|
| Item 11. | Executive Compensation | 88 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 88 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 88 |
| Item 14. | Principal Accounting Fees and Services | 88 |

**Part IV**

| Item 15. | Exhibits and Financial Statement Schedules | 89 |
|---|---|---|
| Item 16. | Form 10-K Summary | 92 |
|  | Signatures |  |

6

**PART I**

**Item 1. Business**

**Company Overview**

*Organization*

We are a pharmaceutical company registered at and with principal offices at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677. We also have a research and development facility in Cambridge, Massachusetts and an office space in Palm Beach Gardens, Florida.

*Business*

We are a fully integrated pharmaceutical company with research and development, clinical, manufacturing and commercial expertise. We are committed to developing innovative medicines that result in meaningful improvements in patients' lives. Our commercialized products include RYANODEX®, BENDEKA®, BELRAPZO®, TREAKISYM®, and PEMFEXY™ and our oncology and CNS/metabolic critical care pipeline includes product candidates we believe have the potential to address underserved therapeutic areas across multiple disease states.

**Recent Developments**

**PEMFEXY**

On February 1, 2022, we announced the commercial availability of our novel product PEMFEXY™ (pemetrexed for injection) in the United States. A branded alternative to ALIMTA®, PEMFEXY is a ready-to-use liquid with a unique J-code approved to treat nonsquamous non-small cell lung cancer and mesothelioma.

Previously, in February 2020, Eagle received final approval from the U.S. Food and Drug Administration, or FDA, of our New Drug Application, or NDA, for PEMFEXY, following the settlement agreement of patent litigation with Eli Lilly and Company (NYSE: LLY) in December 2019. The agreement provided for a release of all claims by the parties and allowed for an initial entry of PEMFEXY into the market (equivalent to approximately a three-week supply of ALIMTA utilization) on February 1, 2022 and a subsequent uncapped entry on April 1, 2022. Under the settlement agreement, we will pay a royalty equal to one percent of the net sales of PEMFEXY during the royalty term, which will end no later than May 24, 2022.

**Landiolol**

On January 31, 2022, we announced that AOP Orphan Pharmaceuticals GmbH, or AOP Orphan, a privately owned Austrian company devoted to the treatment of rare and special diseases, had engaged with the FDA to obtain alignment on the content and format of the pre-clinical and clinical data required to support a NDA seeking approval of Landiolol. Previously, in August 2021, we entered into a licensing agreement with AOP Orphan for the commercial rights to Landiolol in the United States. Landiolol is a novel therapeutic product candidate that is expected to be developed for the short-term reduction of ventricular rate in patients with supraventricular tachycardia, including atrial fibrillation and atrial flutter. See License Agreements - AOP Orphan License Agreement, below.

**Vasopressin**

On January 18, 2022, we announced the commercial availability of our recently approved product, vasopressin, an A-rated generic alternative to Vasostrict®, with 180 days of marketing exclusivity. The commercial launch follows the FDA's approval in December 2021 of our abbreviated new drug application, or ANDA, for vasopressin, a product that is indicated for use to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines.

**TREAKISYM**

Our bendamustine franchise continues to grow, including the launch of the TREAKISYM ready-todilute, or RTD, formulation by Symbio in Japan in the first quarter of 2021. In addition, Symbio is expected to seek approval in Japan of the rapid infusion, or RI, (50ml) liquid formulation.

**Fulvestrant**

Based on discussions with the FDA, we reformulated and plan to commence human pilot studies of our fulvestrant product candidate for the treatment of HR+/HER- advanced breast cancer shortly.

7

*CAL02*

We are preparing to begin clinical trials for CAL02, a novel approach to the treatment of severe bacterial pneumonia, later in 2022.

*Executive Officer Transitions*

On September 27, 2021, our board of directors appointed Scott Tarriff as our President and Michael Moran as our Executive Vice President, Chief Commercial Officer. In addition, David Pernock, our former President and Chief Operating Officer since January 2017, was appointed as Executive Vice President, Operations.

On December 27, 2021, Judith Ng-Cashin, M.D., ceased to serve as our Executive Vice President, Chief Medical Officer. We are currently in search for a replacement.

On December 31, 2021, David Pernock, ceased to serve as our Executive Vice President, Operations.

*Other Events*

On January 26, 2022, Tyme Technologies, Inc., or Tyme, announced the discontinuation of the Phase 2 clinical trial of SM-88 with methoxsalen, phenytoin, and sirolimus in patients with metastatic pancreatic cancer. On February 11, 2022, Tyme stated SM-88 is being evaluated in a Phase 2clinical trial evaluating SM-88 in breast cancer (HR+/HER2-), as well as continuing enrollment of a Phase 2 study in high-risk metastatic sarcomas. Previously, in January 2020, we and Tyme had announced a strategic collaboration to advance oral SM-88 for the treatment of patients with cancer.

*Share Repurchase Program*

In March 2020, our board of directors approved our current share repurchase program, or the Share Repurchase Program, providing for the repurchase of up to an aggregate of $160.0 million of our outstanding common stock. As of December 31, 2021, we have repurchased an aggregate of 4,111,622 shares of common stock for an aggregate of $228.1 million pursuant to our share repurchase programs in effect since August 2016.

*COVID-19 Business Update*

In response to the ongoing COVID-19 pandemic, we have taken and continue to take active measures designed to address and mitigate the impact of the COVID-19 pandemic on our business, such as remote working policies, facilitating management's daily communication to address employee and business concerns and providing frequent updates to the Board. We anticipate that the COVID-19 pandemic may have an impact on the clinical development timeline for EA-114, our fulvestrant product candidate. We anticipate that the COVID-19 pandemic will continue to delay our supply chain and marketing and sales efforts for certain of our products, including Bendeka, although it is not currently expected that any further disruption would be material. The COVID-19 pandemic and associated lockdowns have resulted in a decrease in healthcare utilization broadly and have specifically led to a continuing reduction in the utilization of physician-administered oncology products including Belrapzo and Bendeka. While we have experienced variable financial impacts to date, the ongoing COVID-19 pandemic, including government measures taken in response thereto, the overall disruption of global healthcare systems and other risks and uncertainties associated with the pandemic, could materially adversely affect our business, financial condition, results of operations and growth prospects. We continue to closely monitor the COVID-19 pandemic as we evaluate and evolve our business plans and response strategy. The impact of the COVID-19 pandemic on our business and financial condition is more fully described below in Item 7 - Management's Discussion and Analysis of Financial Condition and Results of Operations - Trends and Uncertainties. See also Item 1A – Risk Factors - The COVID-19 pandemic could adversely impact our business, including the marketing, sale and commercialization of our products, our supply chain, our clinical trials, our liquidity and access to capital markets and our business development activities.

**Our Competitive Strengths**
**Our Purpose**

We believe that many currently available critical care and oncology injectable drugs and biopharmaceuticals have suboptimal characteristics that do not meet the needs of patients, physicians, nurses or pharmacists. These characteristics can impact safety, shelf life, convenience, waste, cost, and ease of use by practitioners and pharmacy staff. For instance, existing drugs may be packaged inefficiently or come in formulations that require reconstitution or dilution, or which are otherwise difficult or inconvenient to prepare, and which could expose workers to cytotoxic compounds and can result in dosing errors. This can also

8

lead to wasted quantities of drug, inefficiencies in staff time and constrained work flow, reduced shelf life and the need for multiple dosing of individual patients to complete treatment. Likewise the viscosity of many biologic products requires them to be delivered intravenously often in time consuming and sometimes painful treatments for patients. We believe there is a large and unmet market for developing injectable drugs that address the specific needs of patients, physicians, nurses and pharmacists to simplify their use, reduce waste and lower healthcare costs.

We have and continue to engage physicians, nurses, pharmacists and key opinion leaders, to identify specific products where the characteristics described above present opportunities for product improvement. We evaluate the product opportunities presented by the stakeholders and determine whether or not they conform to our research and development planning. A key aspect of our evaluation is the intellectual property landscape for each product opportunity, including our ability to avoid infringing existing patents and the potential patentability of our modified version of the drug. We utilize our experienced team of formulators with extensive experience with injectable pharmaceuticals, and a track record of success in product development, regulatory relations, and quality assurance to develop improved products.

Because our products are differentiated from the branded reference drugs, we believe we are able to avoid infringing existing patents covering the branded reference drug allowing us to enter the existing market before applicable generic drugs, which may be subject to protracted patent litigation that delays market entry. Protracted litigation is a significant barrier to entry for competitors seeking approval of an ANDA referencing the branded reference product, and our early entry into the market leads to less price erosion due to constrained competition. Our patent holdings include over 30 owned or exclusively-licensed U.S. issued patents and over 10 filed U.S. patent applications, as well as several patents and patent applications that have been filed in various worldwide territories, that we believe protect or will protect, as applicable the market value of our current portfolio of products. We believe that other potential barriers to entry for our competitors consist of the following:

- our early entry into the market allows us to influence usage patterns when fewer, if any, competitors exist and allows us to market our products as improved versions of the branded reference drug prior to or concurrent with any generic entry, thereby giving us the opportunity to capture significant market share at this early stage. We believe that such early entry into the market will limit later conversions into generic versions of the branded reference drugs, allowing us to maintain market share and favorable pricing;
- the potential for seven years of exclusivity upon approval of a 505(b)(2) NDA that receives orphan drug status; and
- the potential for three years of regulatory exclusivity for our future product candidates upon approval, if any, of a 505(b)(2) NDA supported by new clinical investigations (other than bioequivalence and bioavailability studies) essential to approval of the application.

Our product portfolio is focused around our external partnerships (e.g., Teva, Symbio and Tyme); our vasopressin and Pemfexy products, with commercial launches for each product in early 2022; our Ryanodex related development projects; and our Fulvestrant project that is expected to yield a new approach to drug delivery.

We believe that we can leverage our formulation and development expertise to achieve improved product attributes in terms of potential for longer stability, shorter infusion times, less waste and/or ease and safety of use for healthcare professionals and achieve longer commercial duration compared to generic competitors. We believe that our products may offer certain benefits as compared to existing injectable drugs which may include one or more of the following:

- improved safety through elimination of reconstitution in the pharmacy or in the acute care setting;
- reduction in the number of injections required;
- reduction in the volume of drug needed to be injected, potentially expanding the application to additional medical situations;
- reduction in the amount of diluent required to administer the drug;
- reduction in drug waste;
- reduction in drug infusion time; and
- potential label expansion to include additional indications.

**Our Strategy**

Our goal is to be a leading specialty pharmaceutical company. Our strategy to achieve this goal includes:

*Strengthen our product portfolio.*We intend to continue to strengthen our product portfolio with continued investment in research and development activities and other business development opportunities. We will continue to develop our current

9

product portfolio and leverage our expertise to identify new products with suboptimal characteristics that present us with significant opportunity for revenue generation. In addition to our internal efforts, we plan to opportunistically in-license or acquire product candidates that meet our rigorous evaluation process, fit our therapeutic areas of focus and match our commercial, regulatory and development expertise. Any in-licensing or product acquisitions are excepted to be funded through cash and cash equivalents, in combination with issuances of our common stock, borrowings under our Credit Agreement or other debt arrangements, or other means. See "Liquidity and Capital Resources."

*Retain commercial rights in the United States and selectively partner outside of the United States.* In general, we believe that we can cost-effectively commercialize our products in the United States internally or through a contracted sales force and selected commercial arrangements, and thereby retain the commercial value of these products. We have established a small, contract specialty sales force focusing on group purchasing organizations, or GPOs, hospital systems and key stakeholders in acute care settings, primarily hospitals. Outside of the United States, we may utilize partners for the commercialization of our products.

*Continue to build a robust intellectual property portfolio.* Our patent estate includes over 30 owned or exclusively-licensed U.S. issued patents and over 10 filed U.S. patent applications, as well as several that have been filed in various worldwide territories, that protect or will protect, as applicable the market value of our approved and pipeline products. We intend to continue to build our patent portfolio by filing for patent protection on new developments with respect to our product candidates that will not infringe patents that cover the branded reference drugs. We expect that these will, if issued, allow us to list our own patents in the Orange Book, to which potential competitors will be required to certify upon submission of their applications referencing our products, if approved.

**Our Products and Product Portfolio**

***Belrapzo, Bendeka (Licensed to Teva) and Treakisym (Licensed to SymBio) for Chronic Lymphocytic Leukemia and Non-Hodgkin's Lymphoma***

*Overview*

Bendamustine is an alkylating agent approved for use in chronic lymphocytic leukemia, or CLL, and indolent B-cell non-hodgkin's lymphoma, or NHL, that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen (which we refer to herein as the NHL indication).

*U.S. Marketed Bendamustine Products*

Teva currently markets its lyophilized bendamustine product under the trade name Treanda®. Teva ceased distribution of Treanda® liquid on March 30, 2016.

*Limitations of Marketed Bendamustine Products*

Treanda® is a lyophilized powder that requires reconstitution in water prior to use. A 500 mL intravenous (IV) administration is used over 30 or 60 minutes for CLL and NHL patients, respectively. The product is sold in single use vials creating an opportunity for product waste in certain applications.

*Eagle's Solution: Belrapzo and Bendeka*

The Belrapzo and Bendeka liquid formulations eliminate the need to reconstitute the drug prior to use, relative to the lyophilized presentation of Treanda®. As a result, we believe that relative to the lyophilized presentation of Treanda® there is less potential for dosing errors, less exposure to cytotoxic powders and a more efficient work flow.

Additionally, admixtures prepared with Bendeka contain lower sodium as compared with Treanda® which could be of benefit to the predominantly elderly, renally impaired and cardiovascular compromised patients. Also, Bendeka is available in a multi-use vial, which allows infusion centers and hospitals to avoid needless waste of unused drug remaining after procedures with single use vials.

10

*Belrapzo*

On May 15, 2018, the FDA granted final approval for Belrapzo, a ready-to-dilute, or RTD, multi-dose liquid with extended drug stability for use with a 500mL IV infusion bag.

*License agreement with Cephalon*

Bendeka is the same RTD, multi-dose liquid formulation as Belrapzo, with extended drug stability, but for use with a 50 mL IV infusion bag, which enables it to be administered in a shorter time-period than current drugs on the market and represents a label expansion from Belrapzo. We received orphan drug designation for Bendeka for CLL and NHL in July 2014. We entered into the Cephalon License to market this product. *See License Agreements - Cephalon License Agreement, below.*

*License agreement with SymBio*

On September 20, 2017, we entered into a product collaboration and license agreement, effective as of September 19, 2017 (the "SymBio License Agreement"), with SymBio Pharmaceuticals Limited, or SymBio, for the rights to develop and commercialize our bendamustine hydrochloride ready-to-dilute injection product and rapid infusion injection product in Japan. SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma, or MCL, and as a first line treatment of low-grade NHL and MCL. Under the SymBio License Agreement, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

**Ryanodex® for Malignant Hyperthermia**

*Overview*

Dantrolene was first introduced to the U.S. market in 1979 and is currently the only drug approved to treat a rare genetic disorder called malignant hyperthermia, or MH. There are only estimated to be 500 to 800 cases of MH in the United States each year, qualifying dantrolene for orphan drug designation. This disease is triggered when a patient with this genetic predisposition has a surgical procedure and is exposed to certain inhaled anesthetics or the muscle relaxant, succinylcholine. When this exposure occurs, a metabolic response can be triggered in the patient resulting in an episode of MH that can be fatal if not treated immediately. Because dantrolene is the only approved drug available to treat MH, the Joint Commission on Accreditation of Healthcare Organizations, or the Joint Commission, requires that all hospitals stock vials of this product at all times, generally in the operating room area.

*Currently-Preexisitng Dantrolene Products for MH*

The two preexisting injectable dantrolene drugs on the market for the treatment of MH, Dantrium® and Revonto®, are offered in a vial containing 20mg of lyophilized powder that requires mixing with 60mL of sterile water.

*Limitations of Dantrium® and Revonto®*

When an MH crisis occurs during surgery, the surgical procedure is immediately discontinued and the anesthesiologist and others in the operating room quickly begin reconstituting dantrolene, often at the same time as performing other resuscitative efforts, in order to administer the drug to the patient as an IV push. Based on recommendations from the Malignant Hyperthermia Association of the United States, or MHAUS, the recognized authority on treating MH in the United States, the recommended dose is 2.5mg/kg or higher. It is critically important that the drug be administered as rapidly as possible, as MH symptoms include tachycardia, elevated blood pressure, raised $CO_2$ levels and very high body temperature levels. If not treated immediately, the disease can be fatal.

Because of the dosing required in adult patients to reverse the MH symptoms and the current formulations of Dantrium® and Revonto®, it is often necessary to reconstitute 10 to 20 vials of dantrolene. As the current formulations are also poorly water soluble, this process generally takes up to 15 to 20 minutes at a point when time is critical and the patient is extremely unstable. Furthermore, the volume of diluent required to reconstitute Dantrium® and Revonto® means that the adult patient receives a significant volume of fluid (600mL to 1,200mL) as an IV infusion, which on occasion can result in detrimental secondary physiological consequences for the patient, such as pulmonary edema and extravasation, which can lead to tissue necrosis.

11

*Eagle's Solution: Ryanodex®*

We have developed a differentiated formulation of dantrolene sodium that was approved by the FDA in July 2014 and is currently sold under the brand name, Ryanodex®, for the treatment of MH. The presentation is a 5ml vial containing 250mg of dantrolene sodium in lyophilized powder form.

We believe that the immediate benefits of our Ryanodex® formulation are clinically significant in critical care situations. Specifically, Ryanodex® reduces the amount of time to reconstitute and administer dantrolene from 15 to 20 minutes with Dantrium® and Revonto®, to 1 minute, as the anesthesiologist are able to mix and administer a dose of 250mg from a single vial of Ryanodex® in contrast to mixing and administering up to 12 or more vials of Dantrium® or Revonto®. A recent retrospective study conducted by MHAUS demonstrated that every 15-minute delay in treating MH resulted in a 7.8% increase in patient complications.

**EP-4104 Ryanodex® (dantrolene sodium) for the treatment of organophosphate exposure** *(Nerve Agents)*

Organophosphates are a class of chemicals that include potent pesticides and chemical weapons, known as nerve agents. Acute intoxication with organophospates may result in severe consequences, including brain damage and death. Eagle is currently evaluating Ryanodex for the treatment of brain damage secondary to nerve agent, or NA, exposure. If approved, Ryanodex would represent the first product available for this indication.

*Limitations of Current Therapies*

While the standard treatment of atropine and oxime is essential after exposure to a nerve agent, these drugs are not neuroprotective. There are currently no FDA-approved products that treat acute intoxication with organophospates that may result in severe consequences, including brain damage and death.

*Eagle's Solution: Ryanodex*

Ryanodex's presentation would initially be an injectable suspension. We believe that Ryanodex may provide significant benefits over the current standard of care, which may not be readily available in most settings.

*EP-4104 Clinical Development and Regulatory Status*

In May 2019, we announced positive results of our study to evaluate the neuroprotective effects of Ryanodex secondary to NA exposure, conducted with the United States Army Medical Research Institute of Chemical Defense, the nation's leading science and technology laboratory in the area of medical chemical countermeasures research and development. The study results showed a p-value of 0.04 or less compared to the control group in six critical areas of the brain. We believe these results demonstrate the neuroprotective effects of Ryanodex. It has been hypothesized that nerve agent poisoning triggers intracellular calcium release in the body. The study data supports the proposed mechanism of action of Ryanodex, which modulates intracellular calcium in different organs including the brain.

On December 16, 2019, we announced that the FDA granted orphan drug designation, or ODD, for Ryanodex® (dantrolene sodium) for the treatment of organophosphate exposure. On August 8, 2020, we submitted a Special Protocol Assessment, or SPA, to the FDA for Ryanodex for the treatment of brain damage secondary to nerve agent exposure. We are initiating dose ranging studies in another animal model using IV administration using an intermuscular formulation of EA-111. We expect the preliminary results from these studies, if positive, will allow us to update our SPA with the FDA. If approved, Ryanodex would represent the first product available for this indication..

**PEMFEXY™ for Lung Cancer**

PEMFEXY is an IV-administered cancer agent indicated for locally advanced or metastatic non-small cell lung cancer and mesothelioma. We have developed PEMFEXY as a ready-to-use/dilute liquid form of pemetrexed that is available in a 25mg/mL per vial. Because our product is available in liquid form, product reconstitution is not required, making EP-5101 a preferred formulation under the Joint Commission guidelines.

12

*Currently-Marketed Pemetrexed Product*

The branded form of a pemetrexed product is marketed by Eli Lilly and Company, or Lilly, as Alimta. Alimta is approved for use to treat non-small cell lung cancer and mesothelioma. Alimta's lyophilized formulation utilizes pemetrexed disodium. The product presentations for Alimta are 100mg and 500mg single use vials containing lyophilized powder that must be reconstituted before patient administration. Once mixed, Alimta must be used within 24 hours due to product stability concerns. According to Lilly, worldwide sales of Alimta for the 2020 calendar year were approximately $2.3 billion.

*Limitations of Alimta*

Alimta, a lyophilized pemetrexed disodium formulation requiring reconstitution, adds time to administration, presents cytotoxic safety issues for healthcare professionals administering the drug and the potential for dosing errors. Because reconstitution of Alimta is generally not performed until the patient has cleared all tests necessary to receive the drug, this process contributes to a significant amount of time spent by such patients in infusion clinics. Additionally, this method of administration limits the number of patients that may be treated on any given day by such clinics. Furthermore, as with any oncology drug, cytotoxic vapors released through reconstitution can be potentially harmful to pharmacists, physicians and nurses. Moreover, dosing errors may occur during reconstitution, as incorrect amounts of diluent may be used. As a result, lyophilized formulations are less preferred by the Joint Commission as compared to an RTD product.

*Eagle's Solution: PEMFEXY™*

PEMFEXY is an RTD liquid formulation of pemetrexed. As an RTD liquid formulation, PEMFEXY will not require additional time for reconstitution and may avoid certain safety concerns to healthcare professionals, including reducing exposure to the drug's cytotoxic vapors during reconstitution by healthcare providers, and potential dosing errors during mixing. This could allow for a more efficient work flow within the infusion clinic and may result in an opportunity to reduce office staff and see more patients each day.

*PEMFEXY™ Development and Regulatory Status*

We submitted an NDA for PEMFEXY on December 30, 2016 for use in non-small cell lung cancer and mesothelioma. On October 27, 2017, we were granted tentative approval for PEMFEXY by the FDA. On December 13, 2019, we reached a settlement agreement with Lilly related to Pemfexy. The agreement provided for a release of all claims by the parties and allowed for an initial entry of Pemfexy into the market on February 1, 2022 and a subsequent uncapped entry on April 1, 2022. On February 10, 2020, we received final approval from the FDA for Pemfexy. Following such approval, on February 1, 2022 we announced the commercial availability of Pemfexy in the United States.

**EA-114 (fulvestrant) for Breast Cancer**

Fulvestrant is an injectable estrogen receptor antagonist. It is used for the treatment of hormone receptor positive advanced breast cancer for post-menopausal women whose disease has progressed following treatment with prior endocrine therapy.

*Currently-Marketed Fulvestrant Products*

The branded form of fulvestrant is Faslodex, a 500mg injectable product marketed by AstraZeneca plc. Worldwide sales of Faslodex were $1 billion in 2018, which included U.S. sales of $537 million.

*Limitations of Faslodex*

Faslodex is administered in two deep intramuscular injections of high viscosity product per dose of treatment (5 ml each) over 1-2 minutes into each buttock. The procedure is painful and Faslodex injection reactions have been associated with peripheral nerve adverse reactions, including risk of damaging the sciatic nerve.

*Eagle's Solution: EA-114*

On August 5, 2019, we announced a clinical development plan to support the submission of a NDA for our fulvestrant formulation. Our original formulation of fulvestrant was studied in a clinical trial conducted in 2018 in healthy post-menopausal women. A detailed review of the study data led to the hypothesis that the unique properties of our formulation would potentially allow for greater inhibition of estrogen receptors. Based on this hypothesis, we completed additional work designed to further

13

enhance our proprietary drug formulation. We met with the FDA and mutually agreed to a clinical program that could provide an efficient approval pathway for our fulvestrant formulation. The main goal of the clinical research program was to determine if the unique properties of our fulvestrant formulation would result in greater inhibition of estrogen receptors, potentially leading to improved efficacy outcomes, including lower disease progression rates, compared to current treatment options.

On December 9, 2019, we announced that we had commenced dosing in a pilot clinical study to assess the unique characteristics of our fulvestrant product candidate, which has the potential to enhance estrogen receptorER, inhibition and improve patient outcomes.

Based on discussions with the FDA, we reformulated and plan to commence human pilot studies of our fulvestrant product candidate for the treatment of HR+/HER- advanced breast cancer shortly.

*Other Opportunities*

We are pursuing several additional potential products and product indications that address broad indications such as oncology, emergency medicine, infectious diseases and others. We intend to use our novel and well-developed methods to identify ideal development candidates and to commercialize improved formulations of widely prescribed therapeutics.

**Sales and Marketing**

Other than products subject to existing commercialization arrangements, we commercialize our product portfolio in the United States and Japan with our commercial organization. Ryanodex and Belrapzo are marketed by our internal commercial team consisting of 44 direct sales representatives, support staff and management.

**Major Customer**

We are dependent on our commercial partner, Teva, to market and sell Bendeka. As a result, our future revenues are highly dependent on our collaboration and distribution arrangement with Teva.

Teva markets Bendeka through the Cephalon License. Pursuant to that license agreement, Teva pays us a royalty based on net sales of the product and also purchases the product from us. A disruption in this arrangement caused by, among other things, a supply disruption, loss of exclusivity or the launch of a superior product would have a material adverse effect on our financial position, results of operations and cash flows.

The total revenues and accounts receivables broken down by major customers as a percentage of the total are as follows:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2021** | **2020** | **2019** |
| **Net revenues** | | | |
| Cephalon, Inc. (Teva) - See Revenue Recognition | 66 % | 67 % | 77 % |
| Other | 34 % | 33 % | 23 % |
|  | 100 % | 100 % | 100 % |

**Manufacturing**

We do not own any manufacturing facilities. The manufacture of sterile injectables is highly reliant on very complex sterile techniques and personnel aseptic techniques which present significant challenges and requires specialized expertise. Further, sterile processes have a high level of scrutiny by regulatory agencies. Consequently, we utilize a network of third party manufacturers for production of our products. All manufacturers are monitored and evaluated by our quality department to assess compliance with regulatory requirements and our internal quality standards and benchmarks.

**Intellectual Property and Exclusivity**

We strive to protect and enhance the proprietary technologies that we believe are important to our business. We seek to obtain and maintain patents for any patentable aspects of our products or product candidates, their methods of use and any other inventions that are important to our business model and maintaining a competitive advantage over generic competitors. Our success will depend significantly on our ability to obtain and maintain patent and other proprietary protection for commercially

14

important technology, inventions and know-how related to our business, defend and enforce our patents, maintain our licenses to use intellectual property owned by third parties, preserve the confidentiality of our trade secrets and operate without infringing the valid and enforceable patents and other proprietary rights of third parties. We also rely on know-how, continuing technological innovation and in-licensing opportunities to develop, strengthen, and maintain our proprietary position in the fields targeted by our products and product candidates.

**Patents and Patent Applications**

We are the exclusive licensee under our license with Lyotropic to a family of patents and applications that relate to low volume formulations of dantrolene, and methods of treatment using dantrolene. There are eight issued U.S. patents, and several pending U.S. patent applications, along with foreign counterparts that include both issued patents and pending applications. The issued U.S. patents cover low volume formulations of dantrolene in reconstitutable and in ready to use liquid form. We expect that the issued patents will expire no later than July 1, 2025.

We are the sole owner of over 10 issued patents, several pending U.S. patent applications, and multiple patents and/or corresponding foreign filings for patent applications in a number of jurisdictions covering various formulations and methods of use of bendamustine. We are currently prosecuting these applications, which, if issued, would expire between 2031 and 2033.

We are the owner of U.S. Patent No. 8,431,539 expiring July 20, 2031 and covering daptomycin.

We also have a patent portfolio of issued and/or pending U.S. patent applications and corresponding foreign patent application in a range of countries that cover our biologics platform technologies. We are the sole owner of U.S. Patent Nos. 9,833,513, 9,913,905 and 9,925,263 expiring between 2034 and 2036.

**Trade Secrets and Proprietary Information**

Trade secrets play an important role in protecting our products and provide protection beyond patents and regulatory exclusivity. The scale-up and commercial manufacture of our products involves processes, custom equipment, and in-process and release analytical techniques that we believe are unique to us. We also seek to preserve the integrity and confidentiality of our proprietary technology and processes by maintaining physical security of our premises and physical and electronic security of our information technology systems. While we have confidence in these security measures, individuals, organizations and systems, agreements or security measures may be breached, and we may not have adequate remedies for any breach. In addition, our proprietary technology and processes may otherwise become known or be independently discovered by competitors. To the extent that our employees, consultants, scientific advisors, contractors or any future collaborators use intellectual property owned by others in their work for us, disputes may arise as to the rights in related or resulting know-how and inventions. We seek to protect our proprietary information, including our trade secrets and proprietary know-how, by requiring third parties with whom we contract for services related to our products, including manufacturing services to agree to terms in our agreements with such third parties that protect our confidential and trade secret information. We also require our employees, consultants and other advisors to execute proprietary information and confidentiality agreements upon the commencement of their employment or engagement. These agreements generally provide that all confidential information developed or made known during the course of the relationship with us be kept confidential and not be disclosed to third parties except in specific circumstances. In the case of our employees, the agreements also typically provide that all inventions resulting from work performed for us, utilizing our property or relating to our business and conceived or completed during employment shall be our exclusive property to the extent permitted by law. Where appropriate, agreements we obtain with our consultants also typically contain similar assignment of invention obligations. Further, we require confidentiality agreements from entities that receive our confidential data or materials.

**License Agreements**

*License Agreement with Lyotropic Therapeutics, Inc.*

In October 2008, we entered into a license and sublicense agreement with Lyotropic Therapeutics, Inc., or Lyotropic, under which we were granted an exclusive license under Lyotropic's intellectual property rights relating to dantrolene, and an exclusive worldwide sublicense under certain nanocrystal technology relating to a formulation of dantrolene licensed by Alkermes, Inc. (as successor in interest to Elan Pharma International Limited), or Alkermes, to Lyotropic under an August 2004 license agreement between Alkermes and Lyotropic.

15

*Development and License Agreement with Robert One, LLC (bendamustine)*

In March 2008 we entered into a development and license agreement with Robert One, LLC, or Robert One in which Robert One assigned to us certain patents relating to bendamustine and four additional 505(b)(2) products and/or ANDA products under development, or the Robert One (bendamustine) Subject Products, and granted us an exclusive, sub-licensable, license under Robert One's intellectual property rights to develop make, use, sell and import Robert One (bendamustine) Subject Products worldwide (excluding China) with respect to bendamustine and other 505(b)(2) product applications and in North America with respect to ANDA product applications.

Under the terms of this agreement, no further milestone payments are due to Robert One. We are required to make royalty payments based on gross profits of sales of the Robert One (bendamustine) Subject Products by us and our affiliates in the Territory (i) at 10%, pursuant to an amendment in 2013, for bendamustine products and (ii) at 50% for products, other than bendamustine products, that achieve regulatory approval and are commercialized on the basis of a 505(b)(2) application (provided that we are entitled to recoup all of our expenses related to the development of a product commercialized under a 505(b)(2) application prior to splitting the profits we receive from such product), and (iii) at 30% with respect to products, other than bendamustine products, that are commercialized on the basis of an ANDA application. Our royalty obligations continue on a product-by-product basis until the later of ten years after the first commercial sale of each Robert One (bendamustine) Subject Product and the expiration of the last valid claim covering such Robert One (bendamustine) Subject Product, subject to certain reductions in the event that there is no valid patent claim covering the manufacture, use, import or sale of such Robert One (bendamustine) Subject Product in a country in the territory.

*Development and License Agreement with Robert One, LLC (pemetrexed)*

In February 2009 we entered into a development and license agreement with Robert One, in which Robert One assigned to us certain patents relating to pemetrexed and four additional 505(b)(2) products and/or ANDA products under development ("the Robert One 2009 Subject Products") and granted us an exclusive, sub-licensable, license under Robert One's intellectual property rights to develop make, use, sell and import Robert One 2009 Subject Products worldwide (excluding China) with respect to pemetrexed and other 505(b)(2) product applications and in North America with respect to ANDA product applications.

Under the terms of this Agreement no further milestone payments are due to Robert One. We are required to make royalty payments based on gross profits of sales of the Robert One 2009 Subject Product by us and our affiliates in the Territory (i) at 25% for pemetrexed parental formulation (ii) at 50% for Robert One 2009 Subject Products other than pemetrexed that achieve regulatory approval and are commercialized on the basis of a 505(b)(2) application (provided that we are entitled to recoup all of our expenses related to the development of a product commercialized under a 505(b)(2) application prior to splitting the profits we receive from such product), and (iii) at 30% with respect to Robert One 2009 Subject Products other than pemetrexed that are commercialized on the basis of an ANDA application. Our royalty obligations continue on a product-by-product basis until the later of ten years after the first commercial sale of each Robert One 2009 Subject Product and the expiration of the last valid claim covering such Robert One 2009 Subject Product, subject to certain reductions in the event that there is no valid patent claim covering the manufacture, use, import or sale of such Robert One 2009 Subject Product in a country in the territory.

*Cephalon License Agreement*

On February 13, 2015, we submitted an NDA to the FDA for Bendeka which was approved by the FDA on December 8, 2015. Also, on February 13, 2015, we entered into the Cephalon License with Cephalon, for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. Subsequently, with our consent, Cephalon assigned to Teva Pharmaceuticals International GmbH, or TPIG, all of Cephalon's rights and obligations under the Cephalon License. TPIG is responsible for preforming Cephalon's obligations and has Cephalon's rights under the agreement.. Pursuant to the terms of the Cephalon License, TPIG is responsible for all U.S. commercial activities for the product including promotion and distribution, and we are responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies. Additionally, under the terms of the Cephalon License, we received an upfront cash payment of $30 million, a $15 million milestone payment in January 2016 in connection with the FDA approval of Bendeka in December 2015, a $40 million milestone in the fourth quarter of 2016 in connection with the receipt of the J-Code for Bendeka and in the first quarter of 2017, Bendeka reached $500 million in cumulative net sales, triggering an additional $25 million sales-based milestone payment. In addition, the royalty payments of 20% of net sales of the product that we were entitled to receive increased to 25% on receipt of

16

the J-Code. In connection with the Cephalon License, we have entered into a supply agreement with TPIG, pursuant to which we are responsible for supplying product to TPIG.

On April 13, 2019, we and Teva entered into an amendment to the Cephalon License, amending the terms of the License Agreement to increase the U.S. royalty paid to us and re-allocate certain litigation expenses. Pursuant to the Amendment, beginning on October 1, 2019,our royalty payment increased from 25% to 30% of Bendeka net United States sales. The royalty rate increased by one percentage point on October 1, 2020, and will continue to increase by one percentage point on each anniversary of October 1, 2019 until it reaches 32%, and it will remain at 32% thereafter. The Amendment also extends the U.S. royalty term for Bendeka until it is no longer sold in the United States. The previous royalty term was set to expire in 2025. The extended term coincides with the bendamustine patents with expiries through 2033. Pursuant to the amendment, we will continue to be responsible for the manufacture of Bendeka for the U.S. market for so long as it is sold in the United States. Pursuant to the amendment, we have also agreed to assume a portion of Bendeka-related patent litigation expenses.

In March 2019, we received an upfront cash payment of $9.0 million upon execution of an amendment to the Cephalon License to terminate Teva's obligation to pay future milestones and royalties on Bendeka sales outside of the U.S.

*Cephalon Settlement*

On February 13, 2015, we entered into the Cephalon Settlement Agreement with Cephalon, in connection with the Cephalon License, pursuant to which the parties agreed to settle the pending patent infringement claims against each other regarding Cephalon's US Patent No. 8,791,270, under which we agreed to enter into a Consent Judgment regarding the '270 patent. As part of the Cephalon Settlement Agreement, Cephalon has agreed to waive its orphan drug exclusivities for the treatment of patients with CLL and patients with NHL.

*SymBio Product Collaboration and License Agreement*

On September 20, 2017, we entered into the SymBio License with SymBio for the rights to develop and commercialize EP-3101 and Bendeka, or collectively, the Products, in Japan. Under the SymBio License, SymBio is responsible for all development of the Products in Japan and for obtaining and maintaining all regulatory approvals of the Products in Japan. SymBio bears all costs of development of the Products in Japan except that, if Japanese regulatory authorities require a certain clinical study to be conducted as a condition for approving one of the Products in Japan, we would share 50% of the out-of-pocket costs of that clinical study up to a specified dollar amount as a reduction to future royalty payments. Based on our assessment of the probability of additional costs, we have not deferred revenue on the SymBio License. SymBio will also be responsible, at its sole cost, for all marketing, promotion, distribution and sales of the Products in Japan and is obligated to launch the Products and meet certain minimum detailing, promotion and marketing commitments in connection with commercialization of the Products in Japan.

SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma, or MCL, and as a first line treatment of low-grade NHL and MCL. Under the SymBio License, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

Pursuant to the terms of the SymBio License, we and SymBio will enter into a separate supply agreement, under which we will be responsible for manufacturing and supplying the Products to SymBio for development and commercialization in Japan. After a period of time following launch of a Product, SymBio will have the right to assume the responsibility for manufacturing of the Products in and for Japan. Under the SymBio License, we will retain the right to control the prosecution, maintenance and enforcement of our patents covering the Products, both inside and outside of Japan.

Under the SymBio License, we earned an upfront non-refundable cash payment of $12.5 million in the third quarter of 2017 and a $5.0 million milestone payment in the third quarter of 2020 when SymBio, received regulatory approval for TREAKISYM from the Pharmaceuticals and Medical Devices Agency, or PMDA, in Japan. We are eligible to receive a milestone payment upon achievement of certain cumulative net sales of the Products in Japan. We will also receive tiered, low double-digit royalties on net sales of the Products in Japan for so long as there are patents covering the Products in Japan or regulatory exclusivity for the Products in Japan. Potential payments to us could reach $10 to $25 million per year in royalties and milestones.

17

On September 23, 2020, we announced that SymBio had received approval for Treakisym RTD liquid formulation in Japan. The approval covered all indications for which TREAKISYM is currently approved (low-grade non-Hodgkin's lymphoma, mantle cell lymphoma, and chronic lymphocytic leukemia). Approval for the additional indication of relapsed-refractory diffuse large B cell lymphoma currently under review by the PMDA, which could create another large market opportunity beyond the current indications.

*Combioxin License Agreement*

In August 2021, we entered into a license agreement with Combioxin, SA, or Combioxin, under which we were granted exclusive, worldwide development and commercialization rights to CAL02, a novel first-in-class antitoxin agent ready for Phase 2b/3 clinical trial development for the treatment of severe pneumonia in combination with traditional antibacterial drugs. We are solely responsible for the development, regulatory, manufacturing and commercialization activities of CAL02. Combioxin will assist us in transitioning the manufacturing and supply of CAL02 to the Company.

Under the terms of the agreement, we made an upfront payment of $10 million. We may pay to Combioxin up to $105 million upon achievement of certain development, regulatory and sales based milestone payments plus royalty payments at royalty rates ranging in low double digit percentages on the net sales of all products sold, subject to certain adjustments as provided in the agreement. The Company is also obligated to make certain payments based upon amounts received by sublicensees under the agreement.

*License agreement with AOP Orphan License Agreement*

In August 2021, we entered into a licensing agreement with AOP Orphan, a privately owned Austrian company devoted to the treatment of rare and special diseases, for the commercial rights to its product, Landiolol in the United States. Landiolol, a leading hospital emergency use product, is currently approved in Europe for the treatment of non-compensatory sinus tachycardia and tachycardic supraventricular arrhythmias. We will support the submission of a NDA by AOP Orphan to the FDA seeking approval for Landiolol for the short term reduction of ventricular rate in patients with supraventricular tachycardia, including atrial fibrillation and atrial flutter.

Under the terms of the agreement, we made an upfront payment of $5 million. We may pay to AOP Orphan additional amounts upon achievement of certain regulatory milestone payments plus profit share payments, subject to certain adjustments as provided in the agreement. We also entered into a supply agreement at the same time as the licensing agreement.

**Competition**

The pharmaceutical and biotechnology industries are intensely competitive and subject to rapid and significant technological change. Our competitors include organizations such as major multinational pharmaceutical companies, established biotechnology companies, specialty pharmaceutical companies and generic drug companies. Many of our competitors have greater financial and other resources than we have, such as more commercial resources, larger research and development staffs and more extensive marketing and manufacturing organizations. As a result, these companies may obtain marketing approval more rapidly than we are able and may be more effective in selling and marketing their products. Smaller or early stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large, established companies.

Our competitors may succeed in developing, acquiring or licensing on an exclusive basis technologies and drug products that are more effective or less costly than products that we are currently selling through partners or developing or that we may develop, which could render our products obsolete and noncompetitive. We expect any products that we develop and commercialize to compete on the basis of, among other things, efficacy, safety, convenience of administration and delivery, price and the availability of reimbursement from government and other third-party payors. We also expect to face competition in our efforts to identify appropriate collaborators or partners to help commercialize our product portfolio in our target commercial markets.

**Government Regulation**

*FDA Approval Process for Drugs*

In the United States, pharmaceutical products are subject to extensive regulation by the FDA. The Federal Food, Drug and Cosmetic Act, or FDCA, and in the case of biologics, the Public Health Service Act, or PHSA, and other federal and state statutes and regulations, govern, among other things, the research, development, testing, manufacture, storage, recordkeeping, approval, labeling, promotion and marketing, distribution, post-approval monitoring and reporting, sampling, and import and export of pharmaceutical products. Failure to comply with applicable FDA or other requirements may subject a company to a variety of administrative or judicial sanctions, such as FDA refusal to approve pending applications, clinical holds, warning or untitled letters, product recalls, product seizures, total or partial suspension of production or distribution, withdrawal of product from the market, injunctions, fines, civil penalties and criminal prosecution.

FDA approval is required before any new unapproved drug biologic or dosage form, including a new use of a previously approved drug, can be marketed in the United States. The process required by the FDA before a new drug may be marketed in the United States generally involves:

- completion of pre-clinical laboratory and animal testing and formulation studies in compliance with the FDA's current good laboratory practice, or cGLP, regulations;
- submission to the FDA of an Investigational New Drug, or IND, application for human clinical testing which must become effective before human clinical trials may begin in the United States;
- approval by an independent institutional review board, or IRB, at each clinical trial site before each trial may be initiated;
- performance of adequate and well-controlled human clinical trials in accordance with current good clinical practices, or cGCP, to establish the safety and efficacy of the proposed drug product for each intended use;
- satisfactory completion of an FDA pre-approval inspection of the facility or facilities at which the product is manufactured to assess compliance with the FDA's cGMP regulations to assure that the facilities, methods and controls are adequate to preserve the drug's identity, strength, quality and purity;
- submission to the FDA of an NDA or BLA;
- satisfactory completion of a potential review by an FDA advisory committee, if applicable; and
- FDA review and approval of the NDA or BLA.

The preclinical and clinical testing and approval process takes many years and the actual time required to obtain approval, if any, may vary substantially based upon the type, complexity and novelty of the product or disease.

Preclinical tests include laboratory evaluation of product chemistry, formulation and toxicity, as well as animal studies to assess the characteristics and potential safety and efficacy of the product. The conduct of the preclinical tests must comply with federal regulations and requirements, including cGLPs. The results of preclinical testing are submitted to the FDA as part of an IND application along with other information, including information about product chemistry, manufacturing and controls and a proposed clinical trial protocol. Long-term preclinical tests, such as animal tests of reproductive toxicity and carcinogenicity, may continue after the IND application is submitted.

The IND application automatically becomes effective 30 days after receipt by the FDA, unless the FDA, within the 30-day time period, raises concerns or questions relating to one or more proposed clinical trials and places the clinical trial on a clinical hold, including concerns that human research subjects will be exposed to unreasonable health risks. In such a case, the IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin. A separate submission to an existing IND application must also be made for each successive clinical trial conducted during product development. Further, an independent IRB, covering each site proposing to conduct the clinical trial must review and approve the plan for any clinical trial and informed consent information for subjects before the trial commences at that site and it must monitor the study until completed. The FDA, the IRB, or the sponsor may suspend a clinical trial at any time on various grounds, including a finding that the subjects or patients are being exposed to an unacceptable health risk or for failure to comply with the IRB's requirements, or may impose other conditions. Clinical trials involve the administration of the investigational new drug to healthy volunteers or patients under the supervision of a qualified investigator in accordance with cGCP requirements, which include the requirement that all research subjects provide their informed consent in writing for their participation in any clinical trial. Sponsors of clinical trials generally must register and report, at the NIH-maintained website ClinicalTrials.gov, key parameters of certain clinical trials. For purposes of an NDA submission and approval, human clinical trials are typically conducted in the following sequential phases, which may overlap or be combined:

19

Phase 1:    In Phase 1, through the initial introduction of the drug into healthy human subjects or patients, the drug is tested to assess metabolism, pharmacokinetics, pharmacological actions, side effects associated with increasing doses, and, if possible, early evidence on effectiveness.

Phase 2:    Phase 2 usually involves trials in a limited patient population to determine the effectiveness of the drug for a particular indication, dosage tolerance and optimum dosage, and to identify common adverse effects and safety risks.

Phase 3:    Phase 3 trials are undertaken to obtain the additional information about clinical efficacy and safety in a larger number of patients, typically at geographically dispersed clinical trial sites, to permit the FDA to evaluate the overall benefit-risk relationship of the drug and to provide adequate information for the labeling of the drug. In most cases, the FDA requires two adequate and well controlled Phase 3 clinical trials to demonstrate the efficacy of the drug. A single Phase 3 trial with other confirmatory evidence may be sufficient in rare instances where the study is a large multicenter trial demonstrating internal consistency and a statistically persuasive finding of a clinically meaningful effect on mortality, irreversible morbidity or prevention of a disease with a potentially serious outcome and confirmation of the result in a second trial would be practically or ethically impossible.

After completion of the required clinical testing, an application is prepared and submitted to the FDA. FDA approval of the NDA is required before marketing of the product may begin in the United States. The NDA must include the results of all preclinical, clinical and other testing and a compilation of data relating to the product's pharmacology, chemistry, manufacture and controls. Under federal law, the submission of most applications is subject to a substantial application user fee, and the manufacturer and/or sponsor under an approved application is also subject to annual product and establishment user fees.

The FDA has 60 days from its receipt of an NDA to determine whether the application will be accepted for filing based on the agency's threshold determination that it is sufficiently complete to permit substantive review. The FDA may request additional information rather than accept an application for filing. In this event, the application must be resubmitted with the additional information and is subject to payment of additional user fees. The resubmitted application is also subject to review before the FDA accepts it for filing. Once the submission is accepted for filing, the FDA begins an in-depth substantive review. Under PDUFA the FDA has agreed to certain performance goals in the review of NDAs through a two-tiered classification system, Standard Review and Priority Review. Priority Review designation is given to drugs that offer major advances in treatment, or provide a treatment where no adequate therapy exists. The FDA endeavors to review applications subject to Standard Review within ten to twelve months, whereas the FDA's goal is to review Priority Review applications within six to eight months, depending on whether the drug is a new molecular entity.

The FDA may refer applications for novel drug products or drug products which present difficult questions of safety or efficacy to an advisory committee for review, evaluation and recommendation as to whether the application should be approved and under what conditions.

Before approving an NDA, the FDA will typically inspect one or more clinical sites to assure compliance with cGCP requirements. Additionally, the FDA will inspect the facility or the facilities at which the drug is manufactured. The FDA will not approve the product unless it determines that the manufacturing process and facilities are in compliance with cGMP requirements and are adequate to assure consistent production of the product within required specifications and the application contains data that provide substantial evidence that the drug is safe and effective in the indication studied.

After the FDA evaluates the NDA and the manufacturing facilities, it issues either an approval letter or a complete response letter to indicate that the review cycle for an application is complete and that the application is not ready for approval. A tentative approval is issued to a 505(b)(2) NDA if the sponsor must await the expiration of an Orange Book listed patent covering the reference product. A complete response letter generally outlines the deficiencies in the submission and may require substantial additional testing, or information, in order for the FDA to reconsider the application. Even with submission of this additional information, the FDA may ultimately decide that an application does not satisfy the regulatory criteria for approval. If, or when, the deficiencies have been addressed to the FDA's satisfaction in a resubmission of the application, the FDA will issue an approval letter. An approval letter authorizes commercial marketing of the drug with specific prescribing information for specific indications.

As a condition of NDA or BLA approval, the FDA may require a Risk Evaluation and Mitigation Strategies ("REMS") program to help ensure that the benefits of the drug outweigh the potential risks. If the FDA determines a REMS program is necessary during review of the application, the drug sponsor must agree to the REMS plan at the time of approval. A REMS program may be required to include various elements, such as a medication guide or patient package insert, a communication plan to educate

healthcare providers of the drug's risks, limitations on who may prescribe or dispense the drug, or other elements to assure safe use, such as special training or certification for prescribing or dispensing, dispensing only under certain circumstances, special monitoring and the use of patient registries. In addition, the REMS must include a timetable to periodically assess the strategy. The requirement for a REMS program can materially affect the potential market and profitability of a drug.

Moreover, product approval may require substantial post-approval testing and surveillance to monitor the drug's safety or efficacy, and the FDA has the authority to prevent or limit further marketing of a product based on the results of these post-marketing programs. Once granted, product approvals may be withdrawn if compliance with regulatory standards is not maintained or problems are identified following initial marketing. Drugs may be marketed only for the approved indications and in accordance with the provisions of the approved label, and, even if the FDA approves a product, it may limit the approved indications for use for the product or impose other conditions, including labeling or distribution restrictions or other risk-management mechanisms.

Further changes to some of the conditions established in an approved application, including changes in indications, labeling, or manufacturing processes or facilities, require submission and FDA approval of a new NDA or NDA supplement before the change can be implemented, which may require us to develop additional data or conduct additional pre-clinical studies and clinical trials. An NDA supplement for a new indication typically requires clinical data similar to that in the original application, and the FDA uses the similar procedures in reviewing supplements as it does in reviewing original applications.

*Post-Approval Requirements*

Once an NDA is approved, a product will be subject to pervasive and continuing regulation by the FDA, including, among other things, requirements relating to drug listing and registration, recordkeeping, periodic reporting, product sampling and distribution, adverse event reporting and advertising, marketing and promotion, including standards and regulations for direct to consumer advertising, off-label promotion, industry-sponsored scientific and educational activities and promotional activities involving the internet. Drugs may be marketed only for the approved indications and in accordance with the provisions of the approved labeling. While physicians may prescribe for off-label uses, manufacturers may only promote for the approved indications and in accordance with the provisions of the approved label. However, companies may share truthful and not misleading information that is otherwise consistent with a product's FDA approved labeling. The FDA and other agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses, and a company that is found to have improperly promoted off-label uses may be subject to significant liability.

In addition, quality-control, drug manufacture, packaging and labeling procedures must continue to conform to cGMPs after approval. Drug manufacturers and certain of their subcontractors are required to register their establishments with the FDA and certain state agencies. Registration with the FDA subjects entities to periodic unannounced and announced inspections by the FDA and these state agencies, during which the agency inspects manufacturing facilities to assess compliance with cGMPs. Accordingly, manufacturers must continue to expend time, money, and effort in the areas of production and quality-control to maintain compliance with cGMPs. Regulatory authorities may withdraw product approvals or request product recalls if a company fails to comply with regulatory standards, if it encounters problems following initial marketing, or if previously unrecognized problems are subsequently discovered. The FDA may also impose a REMS requirement on a drug already on the market if the FDA determines, based on new safety information, that a REMS is necessary to ensure that the drug's benefits outweigh its risks. In addition, regulatory authorities may take other enforcement action, including, among other things, warning letters, the seizure of products, injunctions, consent decrees placing significant restrictions on or suspending manufacturing operations, refusal to approve pending applications or supplements to approved applications, civil penalties and criminal prosecution.

In addition, the distribution of prescription pharmaceuticals is subject to the Drug Supply Chain Security Act requirements for medicine identification, tracing and verification, among others, that are designed to detect and remove counterfeit, stolen, contaminated or otherwise potentially harmful drugs from the U.S. drug supply chain. A growing majority of states also impose certain drug pedigree requirements on the sale and distribution of prescription drugs.

The FDA may require post-approval studies and clinical trials if the FDA finds that scientific data, including information regarding related drugs, deem it appropriate. The purpose of such studies would be to assess a known serious risk or signals of serious risk related to the drug or to identify an unexpected serious risk when available data indicate the potential for a serious risk. The FDA may also require a labeling change if it becomes aware of new safety information that it believes should be included in the labeling of a drug.

21

*The Hatch-Waxman Amendments*

*ANDA Approval Process*

The Hatch-Waxman Act established abbreviated FDA approval procedures for drugs that are shown to be equivalent to proprietary drugs previously approved by the FDA through its NDA process. Approval to market and distribute these drugs is obtained by filing an ANDA with the FDA. An ANDA is a comprehensive submission that contains, among other things, data and information pertaining to the active pharmaceutical ingredient, drug product formulation, specifications and stability of the generic drug, as well as analytical methods, manufacturing process validation data and quality control procedures. Premarket applications for generic drugs are termed abbreviated because they generally do not include preclinical and clinical data to demonstrate safety and effectiveness. Instead, a generic applicant must demonstrate that its product is bioequivalent to the innovator drug. In certain situations, an applicant may obtain ANDA approval of a generic product with a strength or dosage form that differs from a referenced innovator drug pursuant to the filing and approval of an ANDA Suitability Petition. The FDA will approve the generic product as suitable for an ANDA application if it finds that the generic product does not raise new questions of safety and effectiveness as compared to the innovator product. A product is not eligible for ANDA approval if the FDA determines that it is not equivalent to the referenced innovator drug, if it is intended for a different use, or if it is not subject to an approved Suitability Petition. However, such a product might be approved under an NDA, with supportive data from clinical trials.

*505(b)(2) NDAs*

As an alternative path to FDA approval for modifications to formulations or uses of products previously approved by the FDA, an applicant may submit an NDA under Section 505(b)(2) of the FDCA. Section 505(b)(2) was enacted as part of the Hatch-Waxman Amendments and permits the filing of an NDA where at least some of the information required for approval comes from studies not conducted by, or for, the applicant. If the 505(b)(2) applicant can establish that reliance on FDA's previous findings of safety and effectiveness is scientifically appropriate, it may eliminate the need to conduct certain preclinical or clinical studies of the new product. The FDA may also require companies to perform additional studies or measurements, including clinical trials, to support the change from the approved branded reference drug. The FDA may then approve the new product candidate for all, or some, of the label indications for which the branded reference drug has been approved, as well as for any new indication sought by the 505(b)(2) applicant.

*Orange Book Listing*

In seeking approval for a drug through an NDA, including a 505(b)(2) NDA, applicants are required to list with the FDA certain patents whose claims cover the applicant's product. Upon approval of an NDA, each of the patents listed in the application for the drug is then published in the Orange Book. Any applicant who files an ANDA seeking approval of a generic equivalent version of a drug listed in the Orange Book or a 505(b)(2) NDA referencing a drug listed in the Orange Book must certify to the FDA that (1) no patent information on the drug product that is the subject of the application has been submitted to the FDA; (2) such patent has expired; (3) the date on which such patent expires; or (4) such patent is invalid or will not be infringed upon by the manufacture, use or sale of the drug product for which the application is submitted. This last certification is known as a paragraph IV certification. A notice of the paragraph IV certification must be provided to each owner of the patent that is the subject of the certification and to the holder of the approved NDA to which the ANDA or 505(b)(2) application refers. The applicant may also elect to submit a "section viii" statement certifying that its proposed label does not contain (or carves out) any language regarding the patented method-of-use rather than certify to a listed method-of-use patent.

If the reference NDA holder and patent owners assert a patent challenge directed to one of the Orange Book listed patents within 45 days of the receipt of the paragraph IV certification notice, the FDA is prohibited from approving the application until the earlier of 30 months from the receipt of the paragraph IV certification expiration of the patent, settlement of the lawsuit or a decision in the infringement case that is favorable to the applicant. The ANDA or 505(b)(2) application also will not be approved until any applicable non-patent exclusivity listed in the Orange Book for the branded reference drug has expired as described in further detail below.

*Non-Patent Exclusivity*

In addition to patent exclusivity, the holder of the NDA for the listed drug may be entitled to a period of non-patent exclusivity, during which the FDA cannot approve an ANDA or 505(b)(2) application that relies on the listed drug. For example, a pharmaceutical manufacturer may obtain five years of non-patent exclusivity upon NDA approval of a new chemical entity, or

22

NCE, which is a drug that contains an active moiety that has not been approved by FDA in any other NDA. An "active moiety" is defined as the molecule or ion responsible for the drug substance's physiological or pharmacological action. During the five year exclusivity period, the FDA cannot accept for filing any ANDA seeking approval of a generic version of that drug or any 505(b)(2) NDA for the same active moiety and that relies on the FDA's findings regarding that drug, except that FDA may accept an application for filing after four years if the follow-on applicant makes a paragraph IV certification.

A drug, including one approved under Section 505(b)(2), may obtain a three-year period of exclusivity for a particular condition of approval, or change to a marketed product, such as a new formulation for a previously approved product, if one or more new clinical studies (other than bioavailability or bioequivalence studies) was essential to the approval of the application and was conducted/sponsored by the applicant. Should this occur, the FDA would be precluded from approving any ANDA or 505(b)(2) application for the protected modification until after that three-year exclusivity period has run. However, unlike NCE exclusivity, the FDA can accept an application and begin the review process during the exclusivity period.

*Orphan Drug Designation and Exclusivity*

The Orphan Drug Act provides incentives for the development of products intended to treat rare diseases or conditions. Under the Orphan Drug Act, the FDA may grant orphan designation to a drug or biological product intended to treat a rare disease or condition, which is generally a disease or condition that affects fewer than 200,000 individuals in the United States, or more than 200,000 individuals in the United States and for which there is no reasonable expectation that the cost of developing and making a drug or biological product available in the United States for this type of disease or condition will be recovered from sales of the product. If a sponsor demonstrates that a drug is intended to treat rare diseases or conditions, the FDA will grant orphan designation for that product for the orphan disease indication. Orphan designation must be requested before submitting an NDA. After the FDA grants orphan product designation, the identity of the therapeutic agent and its potential orphan use are disclosed publicly by the FDA. Orphan drug designation, however, does not convey any advantage in, or shorten the duration of, the regulatory review and approval process.

Orphan drug designation provides manufacturers with research grants, tax credits and eligibility for orphan drug exclusivity. If a product that has orphan drug designation subsequently receives the first FDA approval of the active moiety for that disease or condition for which it has such designation, the product is entitled to orphan drug exclusivity, which for seven years prohibits the FDA from approving another product with the same active ingredient for the same indication, except in limited circumstances. If a drug designated as an orphan product receives marketing approval for an indication broader than the orphan indication for which it received the designation, it will not be entitled to orphan drug exclusivity. Orphan exclusivity will not bar approval of another product under certain circumstances, including if a subsequent product with the same active ingredient for the same indication is shown to be clinically superior to the approved product on the basis of greater efficacy or safety, or providing a major contribution to patient care, or if the company with orphan drug exclusivity is not able to meet market demand. Further, the FDA may approve more than one product for the same orphan indication or disease as long as the products contain different active ingredients. Moreover, competitors may receive approval of different products for the indication for which the orphan product has exclusivity or obtain approval for the same product but for a different indication for which the orphan product has exclusivity. As a result, even if one of our product candidates receives orphan exclusivity, we may still be subject to competition. Orphan exclusivity also could block the approval of one of our products for seven years if a competitor obtains approval of the same drug or if our product candidate is determined to be contained within the competitor's product for the same indication or disease.

*International Regulation*

In addition to regulations in the United States, we are and will be subject to a variety of foreign regulations regarding development, approval, commercial sales and distribution of our products. Whether or not we obtain FDA approval for a product, we must obtain the necessary approvals by the comparable regulatory authorities of foreign countries before we can commence clinical trials or marketing of the product in those countries. The approval process varies from country to country and can involve additional product testing and additional review periods, and the time may be longer or shorter than that required to obtain FDA approval. The requirements governing, among other things, the conduct of clinical trials, product licensing, pricing and reimbursement vary greatly from country to country. Regulatory approval in one country does not ensure regulatory approval in another, but a failure or delay in obtaining regulatory approval in one country may negatively impact the regulatory process in others. If we fail to comply with applicable foreign regulatory requirements, we may be subject to fines, suspension or withdrawal of regulatory approvals, product recalls, seizure of products, operating restrictions and criminal prosecution.

23

*Other Healthcare Laws and Compliance Requirements*

In the United States, the research, manufacturing, distribution, marketing, sale and promotion of drug products and medical devices are subject to numerous regulations by various federal, state and local authorities in addition to the FDA including, but not limited to, the U.S. Federal Communications Commission, the U.S. Department of Justice, the U.S. Department of Health and Human Services, or HHS, and its various enforcement divisions, such as the Centers for Medicare & Medicaid Services, or CMS, the Office of Inspector General, or OIG, the Office for Human Research Protections, or OHRP, and the Office of Research Integrity, or ORI, state Attorneys General, state Medicaid Fraud Control Units, or MFCUs, and other state and local government agencies. Healthcare laws and regulations that may govern our business include the following.

The federal Anti-Kickback Statute prohibits, among other things, any person or entity, including a prescription drug manufacturer, or a party acting on its behalf, from knowingly and willfully soliciting, receiving, offering or paying any remuneration, directly or indirectly, overtly or covertly, in cash or in kind to induce in return for either the referral of an individual, or the purchase, recommendation, leasing, ordering or furnishing of a good, facility, item, or service, for which payment may be made in whole or in part under a federal healthcare program such as the Medicare and Medicaid programs. This statute has been interpreted broadly to apply to, among other things, arrangements between pharmaceutical manufacturers, on one hand, and prescribers, purchasers, and formulary managers, on the other. The term "remuneration" expressly includes kickbacks, bribes or rebates and also has been broadly interpreted to include anything of value, including for example, gifts, discounts, the furnishing of supplies or equipment, credit arrangements, payments of cash, waivers of payments, ownership interests and providing anything at less than its fair market value. There are a number of statutory exceptions and regulatory safe harbors, which are narrowly drawn, protecting certain business arrangements from prosecution. Failure to meet all of the requirements of a particular applicable statutory exception or safe harbor does not make the conduct per se illegal under the federal Anti-Kickback Statute. Instead, the legality of the arrangement will be evaluated on a case-by-case basis based on a cumulative review of all of its facts and circumstances. Our practices may not meet all of the criteria for safe harbor protection from federal Anti-Kickback Statute liability in all cases. Additionally, the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010, or collectively, the ACA, among other things, amended the intent standard under the federal Anti-Kickback Statute such that a person or entity no longer needs to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation. The ACA also provided that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act (discussed below). Further, many states have adopted laws similar to the federal Anti-Kickback Statute, and some of these state laws may be broader in scope in that some of these state laws extend to all payors and may not contain safe harbors.

Federal civil and criminal false claims laws, including the federal civil False Claims Act, and civil monetary penalty laws, which prohibit, among other things, any person or entity from knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval by the federal government or knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim to the federal government. The "*qui tam*" provisions of the federal civil False Claims Act allow a private individual to bring a civil action on behalf of the federal government alleging that the defendant has submitted a false claim to the federal government, and potentially to share in any monetary recovery. In recent years, the number of suits brought by private individuals has increased dramatically. In addition, various states have enacted false claims laws analogous to the federal civil False Claims Act. Many of these state laws are broader in scope and apply to all payors, and therefore, are not limited to only those claims submitted to the federal government. There are many potential bases for liability under the federal civil False Claims Act. Liability arises, primarily, when an entity knowingly submits, or causes another to submit, a false claim for reimbursement to the federal government. The federal civil False Claims Act has been used to assert liability on the basis of kickbacks and other improper referrals, improperly reported government pricing metrics such as Best Price or Average Manufacturer Price, and improper promotion of off-label uses not expressly approved by the FDA in a drug's label. Our future activities relating to the reporting of discount and rebate information and other information affecting federal, state and third party reimbursement of our products, and the sale and marketing of our products and our service arrangements or data purchases, among other activities, may be subject to scrutiny under these laws.

Also, the Health Insurance Portability and Accountability Act of 1996, or HIPAA, created several additional federal civil and criminal statutes that prohibit healthcare fraud and false statements relating to healthcare matters. The healthcare fraud statute prohibits knowingly and willfully executing a scheme to defraud any healthcare benefit program, including private third-party payors. The false statements statute prohibits knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items or services. Like the federal Anti-Kickback Statute, the ACA amended certain of these federal criminal statutes such that a person or entity no longer needs to have actual knowledge of the statute or specific intent to violate it in order to

24

have committed a violation.

In addition, we may be subject to, or our marketing activities may be limited by, data privacy and security regulation by both the federal government and the states in which we conduct our business. HIPAA and its implementing regulations established uniform standards for certain "covered entities," which are certain healthcare providers, health plans and healthcare clearinghouses, as well as their business associates, which are independent contractors or agents of covered entities that receive or obtain protected health information in connection with providing a service on behalf of a covered entity, as well as their covered subcontractors, governing the conduct of specified electronic healthcare transactions and protecting the security and privacy of protected health information. The American Recovery and Reinvestment Act of 2009, commonly referred to as the economic stimulus package, included the Health Information Technology for Economic and Clinical Health Act, or HITECH, which expanded certain of HIPAA's privacy and security standards. Among other things, HITECH makes HIPAA's security standards and certain privacy standards directly applicable to business associates. HITECH also created four new tiers of civil monetary penalties, amended HIPAA to make civil and criminal penalties directly applicable to business associates, and gave state attorneys general new authority to file civil actions for damages or injunctions in federal courts to enforce the federal HIPAA laws and seek attorneys' fees and costs associated with pursuing federal civil actions.

Additionally, federal transparency laws, including the federal Physician Payments Sunshine Act created under Section 6002 of the ACA and its implementing regulations require that certain manufacturers of drugs, devices, biologics, and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) report annually to CMS information related to "payments or other transfers of value" made or distributed to physicians (defined to include doctors of medicine, dentists, optometrists, podiatrists and chiropractors), generally, with some exceptions, other healthcare professionals (such as physician assistants and nurse practitioners), and teaching hospitals, or to entities or individuals at the request of, or designated on behalf of, physicians and teaching hospitals. Applicable manufacturers and applicable group purchasing organizations must also report annually to the CMS certain ownership and investment interests held by physicians (as defined above) and their immediate family members.

There are also an increasing number of analogous state laws that require manufacturers to file reports with states on pricing and marketing information, such as tracking and reporting of gifts, compensations, other remuneration and items of value provided to health care professionals and health care entities. Many of these laws contain ambiguities as to what is required to comply with the laws. Several states have also enacted legislation requiring pharmaceutical companies to, among other things, establish and implement commercial compliance programs, file periodic reports with the state, make periodic public disclosures on sales, marketing, pricing, clinical trials and other activities and/or register their sales representatives. Certain state laws also regulate manufacturers' use of identifiable data. These laws may affect our sales, marketing and other promotional activities by imposing administrative and compliance burdens. In addition, given the lack of clarity with respect to these laws and their implementation, our reporting actions could be subject to the penalty provisions of the pertinent state and federal authorities.

If our operations are found to be in violation of any of the health regulatory laws described above or any other laws that apply to us, we may be subject to penalties, including significant administrative, criminal and civil monetary penalties, damages, fines, imprisonment, disgorgement, contractual damages, reputational harm, exclusion from participation in government healthcare programs, integrity obligations, injunctions, recall or seizure of products, total or partial suspension of production, denial or withdrawal of pre-marketing product approvals, private qui tam actions brought by individual whistleblowers in the name of the government or refusal to allow us to enter into supply contracts, including government contracts and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations. We are unable to predict whether we would be subject to actions under these laws or the impact of such actions. However, the cost of defending such claims, as well as any sanctions imposed, could adversely affect our financial performance.

To the extent that any of our products are sold in a foreign country, we also may be subject to similar foreign laws and regulations, which may include, for instance, the U.S. Foreign Corrupt Practices Act, the U.K. Anti-Bribery Act, applicable post-marketing requirements, including safety surveillance, anti-fraud and abuse laws and implementation of corporate compliance programs and reporting of payments or transfers of value to healthcare professionals.

*Third-Party Payor Coverage and Reimbursement*

The commercial success of our approved product portfolio, as well as our pre-clinical and clinical product portfolio, if and when approved, will depend, in part, upon the availability of coverage and adequate reimbursement from third-party payors at the federal, state and private levels. Patients who are prescribed treatments for their conditions and providers performing the

25

prescribed services generally rely on third-party payors to reimburse all or part of the associated healthcare costs. In the United States, third-party payors often rely upon Medicare coverage policy and payment limitations in setting their own coverage and reimbursement policies. However, decisions regarding the extent of coverage and amount of reimbursement to be provided for any product candidates that we develop will be made on a payor-by-payor basis. Sales of our product portfolio will therefore depend substantially, both domestically and abroad, on the extent to which the costs of our product portfolio will be paid by health maintenance, managed care, pharmacy benefit, and/or similar healthcare management organizations, or are reimbursed by government health administration authorities, such as Medicare and Medicaid, private health coverage insurers and other third-party payors. The market for our product portfolio will depend significantly on access to third-party payors' formularies, or lists of treatments for which third-party payors provide coverage and reimbursement.

Also, third-party payors are developing increasingly sophisticated methods of controlling healthcare costs. Further, coverage and reimbursement for therapeutic products can differ significantly from payor to payor. As a result, the coverage determination process will require us to provide scientific and clinical support for the use of our products to each payor separately, with no assurance that adequate coverage and reimbursement will be obtained. The cost of pharmaceuticals and medical devices continues to generate substantial governmental and third-party payor scrutiny. We expect that the pharmaceutical industry will experience continued pricing pressures due to the trend toward managed healthcare, the increasing influence of managed care organizations and additional legislative and administrative proposals. Our results of operations and business could be adversely affected by current and future third-party payor policies as well as healthcare legislative and administrative reforms.

Some third-party payors also require pre-approval of coverage for new or innovative devices or drug therapies before they will reimburse healthcare providers who use such therapies. While we cannot predict whether any proposed cost-containment measures will be adopted or otherwise implemented in the future, these requirements or any announcement or adoption of such proposals could have a material adverse effect on our ability to obtain adequate prices for our product portfolio and to operate profitably.

In international markets, reimbursement and healthcare payment systems vary significantly by country, and many countries have instituted price ceilings on specific products and therapies. There can be no assurance that our products will be considered medically reasonable and necessary for a specific indication, that our products will be considered cost-effective by third-party payors, that an adequate level of reimbursement will be available or that the third-party payors' reimbursement policies will not adversely affect our ability to sell our products profitably.

*Healthcare Reform*

In the United States and foreign jurisdictions, the legislative landscape continues to evolve. There have been a number of legislative and regulatory changes to the healthcare system that will likely affect our future operations. In particular, there have been and continue to be a number of initiatives at the United States federal and state levels that seek to reduce healthcare costs, improve access, and improve quality.

By way of example, in March 2010, the ACA was passed, which significantly changed health care financing by both governmental and private insurers. The provisions of the ACA of importance to the pharmaceutical and biotechnology industry included, among others, the following:

- an annual, nondeductible fee on any entity that manufactures or imports certain branded prescription drugs and biologic agents, apportioned among these entities according to their market share in certain government healthcare programs;
- an increase in the statutory minimum rebates a manufacturer must pay under the Medicaid Drug Rebate Program to 23.1% and 13% of the average manufacturer price for most branded and generic drugs, respectively;
- new methodologies by which rebates owed by manufacturers under the Medicaid Drug Rebate Program are calculated for drugs that are inhaled, infused, instilled, implanted or injected, and for drugs that are line extension products;
- a new Medicare Part D coverage gap discount program, in which manufacturers must now agree to offer 70% point-of-sale discounts to negotiated prices of applicable brand drugs to eligible beneficiaries during their coverage gap period, as a condition for the manufacturer's outpatient drugs to be covered under Medicare Part D;
- extension of manufacturers' Medicaid rebate liability to covered drugs dispensed to individuals who are enrolled in Medicaid managed care organizations, unless the drug is subject to discounts under the 340B drug discount program;
- expansion of eligibility criteria for Medicaid programs by, among other things, allowing states to offer Medicaid coverage to additional individuals and by adding new mandatory eligibility categories for certain individuals with income at or below 133% of the Federal Poverty Level thereby potentially increasing manufacturers' Medicaid rebate

26

liability;

- expansion of the entities eligible for discounts under the Public Health Service pharmaceutical pricing program;
- expansion of healthcare fraud and abuse laws, including the federal civil False Claims Act and the federal Anti-Kickback Statute, new government investigative powers, and enhanced penalties for noncompliance;
- a licensure framework for follow-on biologic products;
- a new Patient-Centered Outcomes Research Institute to oversee, identify priorities in, and conduct comparative clinical effectiveness research, along with funding for such research;
- new requirements under the federal Physician Payments Sunshine Act for manufacturers to report information related to payments and other transfers of value made to physicians, as defined by such law, and teaching hospitals as well as ownership or investment interests held by physicians and their immediate family members; and,
- a new requirement to annually report certain drug samples that manufacturers and distributors provide to licensed practitioners, or to pharmacies of hospitals or other healthcare entities.

There have been executive, judicial and Congressional challenges to certain aspects of the ACA. For example, President Trump signed several Executive Orders and other directives designed to delay the implementation of certain provisions of the ACA or otherwise circumvent some of the requirements for health insurance mandated by the ACA. Concurrently, Congress considered legislation to repeal or repeal and replace all or part of the ACA. While Congress has not passed comprehensive repeal legislation, several bills affecting the implementation of certain taxes under the ACA have been signed into law. For example, the Tax Cuts and Jobs Act of 2017, or the Tax Act, included a provision which repealed, effective January 1, 2019, the tax-based shared responsibility payment imposed by the ACA on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate". Additionally, the 2020 federal spending package permanently eliminated, effective January 1, 2020, the ACA-mandated "Cadillac" tax on high-cost employer-sponsored health coverage and medical device tax and, effective January 1, 2021, also eliminated the health insurer tax. The Bipartisan Budget Act of 2018, or the BBA, among other things, amended the ACA, effective January 1, 2019, to close the coverage gap in most Medicare drug plans, commonly referred to as the "donut hole". On June 17, 2021, the U.S. Supreme Court dismissed a challenge on procedural grounds that argued the ACA is unconstitutional in its entirety because the "individual mandate" was repealed by Congress. Thus, the ACA will remain in effect in its current form. Prior to the U.S. Supreme Court ruling,, on January 28, 2021, President Biden issued an executive order that initiated a special enrollment period for purposes of obtaining health insurance coverage through the ACA marketplace. The executive order also instructed certain governmental agencies to review and reconsider their existing policies and rules that limit access to healthcare, including among others, reexamining Medicaid demonstration projects and waiver programs that include work requirements, and policies that create unnecessary barriers to obtaining access to health insurance coverage through Medicaid or the ACA. It is possible that the ACA will be subject to judicial or Congressional challenges in the future. It is unclear how such challenges and the healthcare reform measures of the Biden administration will impact ACA.

Other healthcare legislative changes have been proposed and adopted since the ACA was enacted. For example, in August 2011, the President signed into law the Budget Control Act of 2011, which, among other things, created the Joint Select Committee on Deficit Reduction to recommend proposals in spending reductions to Congress. The Joint Select Committee on Deficit Reduction did not achieve its targeted deficit reduction of at least $1.2 trillion for the years 2013 through 2021, triggering the legislation's automatic reductions to several government programs. These reductions include aggregate reductions to Medicare payments to providers of up to 2% per fiscal year, which went into effect on April 1, 2013 and, following passage of subsequent legislation, will remain in effect through 2031, except for a temporary suspension from

We expect that additional state and federal healthcare reform measures will be adopted in the future. For example, there has been increasing legislative and enforcement interest in the United States with respect to specialty drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries, Presidential executive orders, and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drugs. For example, the Trump administration used several means to propose or implement drug pricing reform, including through federal budget proposals, executive orders and policy initiatives. For example, on July 24, 2020 and September 13, 2020, the Trump administration announced several executive orders related to prescription drug pricing that attempt to implement several of the administration's proposals. The FDA also released a final rule and related guidance in September 2020 implementing a portion of the importation executive order providing pathways for states to build and submit importation plans for drugs from Canada. Further, on November 20, 2020, HHS finalized a regulation removing safe harbor protection for price reductions from pharmaceutical manufacturers to plan sponsors under Part D, either directly or through pharmacy benefit managers, unless the price reduction is required by law. The implementation of the rule has been delayed by the Biden administration from January 1, 2022 to January 1, 2023 in response to ongoing litigation. The rule also creates a new

27

safe harbor for price reductions reflected at the point-of-sale, as well as a new safe harbor for certain fixed fee arrangements between pharmacy benefit managers and manufacturers, the implementation of which have also been delayed until January 1, 2023. On November 20, 2020, CMS issued an interim final rule implementing President Trump's Most Favored Nation executive order, which would tie Medicare Part B payments for certain physician-administered drugs to the lowest price paid in other economically advanced countries, effective January 1, 2021. As a result of litigation challenging the Most Favored Nation model, on December 27, 2021, CMS published a final rule that rescinded the Most Favored Nation model interim final rule. In July 2021, the Biden administration released an executive order, "Promoting Competition in the American Economy," with multiple provisions aimed at prescription drugs. In response to Biden's executive order, on September 9, 2021, HHS released a Comprehensive Plan for Addressing High Drug Prices that outlines principles for drug pricing reform and sets out a variety of potential legislative policies that Congress could pursue as well as potential administrative actions HHS can take to advance these principles. No legislation or administrative actions have been finalized to implement these principles. It is unclear whether these or similar policy initiatives will be implemented in the future. At the state level, legislatures have increasingly passed legislation and implemented regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing. Any additional healthcare reform measures could further constrain our business and/or limit the amounts that federal and state governments will pay for healthcare products and services, which could result in reduced demand for our product portfolio or additional pricing pressures. Further, it is possible that additional governmental action is taken in response to the COVID-19 pandemic.

*Other Regulatory Requirements*

We are also subject to various laws and regulations regarding laboratory practices, the experimental use of animals, and the use and disposal of hazardous or potentially hazardous substances in connection with our research. In each of these areas, as above, the FDA and other government agencies have broad regulatory and enforcement powers, including, among other things, the ability to levy fines and civil penalties, suspend or delay issuance of approvals, seize or recall products, and withdraw approvals, any one or more of which could have a material adverse effect on us.

Data Privacy and Security Laws

In the ordinary course of our business, we may process personal or sensitive data. Accordingly, we are, or may become, subject to numerous data privacy and security obligations, including federal, state, local, and foreign laws, regulations, guidance, and industry standards related to data privacy, security, and protection. Such obligations may include, without limitation, the Federal Trade Commission Act, the California Consumer Privacy Act of 2018, or CCPA, the European Union's General Data Protection Regulation 2016/679, or EU GDPR, the EU GDPR as it forms part of United Kingdom, or UK, law by virtue of section 3 of the European Union (Withdrawal) Act 2018, or UK GDPR, and the ePrivacy Directive. In addition, several states within the United States have enacted or proposed data privacy laws. For example, Virginia passed the Consumer Data Protection Act, and Colorado passed the Colorado Privacy Act.

The CCPA and EU GDPR are examples of the increasingly stringent and evolving regulatory frameworks related to personal data processing that may increase our compliance obligations and exposure for any noncompliance. For example, the CCPA imposes obligations on covered businesses to provide specific disclosures related to a business's collection, use, and disclosure of personal data and to respond to certain requests from California residents related to their personal data (for example, requests to know of the business's personal data processing activities, to delete the individual's personal data, and to opt out of certain personal data disclosures). Also, the CCPA provides for civil penalties and a private right of action for certain data breaches which may include an award of statutory damages. In addition, the California Privacy Rights Act of 2020, CPRA, effective January 1, 2023, will expand the CCPA. The CPRA will, among other things, give California residents the ability to limit use of certain sensitive personal data, establish restrictions on personal data retention, expand the types of data breaches that are subject to the CCPA's private right of action, and establish a new California Privacy Protection Agency to implement and enforce the new law. U.S. federal and state consumer protection laws require us to publish statements that accurately and fairly describe how we handle personal data and choices individuals may have about the way we handle their personal data.

Foreign data privacy and security laws (including but not limited to the EU GDPR and UK GDPR) impose significant and complex compliance obligations on entities that are subject to those laws. As one example, the EU GDPR applies to any company established in the EEA and to companies established outside the EEA that process personal data in connection with the offering of goods or services to data subjects in the EEA or the monitoring of the behavior of data subjects in the EEA. These obligations may include limiting personal data processing to only what is necessary for specified, explicit, and legitimate

28

purposes; requiring a legal basis for personal data processing; requiring the appointment of a data protection officer in certain circumstances; increasing transparency obligations to data subjects; requiring data protection impact assessments in certain circumstances; limiting the collection and retention of personal data; increasing rights for data subjects; formalizing a heightened and codified standard of data subject consents; requiring the implementation and maintenance of technical and organizational safeguards for personal data; mandating notice of certain personal data breaches to the relevant supervisory authority(ies) and affected individuals; and mandating the appointment of representatives in the UK and/or the EU in certain circumstances.

## Human Capital Management

As of December 31, 2021, we had a total of 102 employees. None of our employees are represented by a labor union or subject to a collective bargaining agreement. We have not experienced any work stoppage and consider our relations with our employees to be good.

We have built an internal commercial team consisting of 36 direct sales representatives, support staff and management who are a part of our independent commercial organization.

Our human capital resources objectives include, as applicable, identifying, recruiting, retaining, incentivizing and integrating our existing and future employees, advisors and consultants. In addition to competitive base salaries, the other competitive benefits that we provide to employees include equity and cash incentive plans, retirement benefits, and paid vacation. The principal purposes of these employee benefits are to attract, retain, reward and motivate our personnel and to provide long-term incentives that align the interests of employees with the interests of our stockholders.

## Corporate Information

We were incorporated in Delaware in January 2007. Our principal executive offices are located at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677, and our telephone number is (201) 326-5300.

## Available Information

Our corporate website address is www.eagleus.com. Information contained on or accessible through our website is not a part of this Annual Report on Form 10-K, and the inclusion of our website address in this Annual Report on Form 10-K is an inactive textual reference only. We make our Annual Reports on Form 10-K, Quarterly reports on Form 10-Q, Current Reports on Form 8-K and all amendments to those reports available free of charge on our website as soon as reasonably practicable after we file such reports with, or furnish such reports to, the Securities and Exchange Commission, or SEC. You can access our filings through the SEC's internet site: www.sec.gov.

29

**Item 1A. Risk Factors**

*Investing in our common stock involves a high degree of risk. Investors should consider carefully the risks and uncertainties described below in addition to the other information included or incorporated by reference in this Annual Report on Form 10-K, as well as our other public filings with the Securities and Exchange Commission. If any of the following risks actually occur, our business, financial condition or results of operations would likely suffer. In that case, the trading price of our common stock could fall. In addition to the risk factors identified under the captions below, the operation and results of our business are subject to risks and uncertainties identified elsewhere in this Annual Report on Form 10-K as well as general risks and uncertainties such as those relating to general economic conditions and demand in the market for our products.*

**Risks Related to Our Financial Condition and Need for Additional Capital**

An investment in our securities involves a high degree of risk. Our business is subject to risks and events that, if they occur, could adversely affect our financial condition and results of operations and the trading price of our securities.

***The COVID-19 pandemic has adversely impacted, and may continue to adversely impact, our business, including the marketing, sale and commercialization of our products, our supply chain, our clinical trials, our liquidity and access to capital markets and our business development activities.***

The ongoing COVID-19 pandemic has adversely impacted, and may continue to adversely impact, our business. In mid-March 2020, we implemented work-from-home policies which are still in place for the majority of our employees. Our work-from-home policies may negatively impact productivity or disrupt our business, the magnitude of which will continue to depend, in part, on the length of this continued remote working arrangement and other limitations on our ability to conduct our business in the ordinary course. During the second quarter of 2021, we developed and implemented plans to resume in-person work practices while adhering to relevant health authority guidance. The effects of government actions and our policies and those of third parties to reduce the spread and ameliorate the impact of COVID-19 may negatively impact productivity and our ability to market and sell our products, cause disruptions to our supply chain and ongoing and future clinical trials and impair our ability to execute our business development strategy. These and other disruptions in our operations and the global economy could negatively impact our business, operating results and financial condition.

The marketing, sale and commercialization of our products have been adversely impacted and may continue to be adversely impacted by COVID-19 and actions taken to slow its spread and ameliorate its impact. We saw a variable impact on our product revenues in 2020 due to the COVID-19 pandemic and also experienced variable impacts on our business and financial condition as a result of the pandemic. We are expecting the impact on our near-term financial results to continue for the duration of the pandemic. Other parts of our business have been, and continue to be, impacted by the outbreak. For example, patients have postponed and we expect will continue to postpone visits to healthcare provider facilities, certain healthcare providers have temporarily closed their offices or are restricting patient visits, healthcare provider employees may become generally unavailable and there could be disruptions in the operations of payors, distributors, logistics providers and other third parties that are necessary for our products to be prescribed, reimbursed and administered to patients. For example, we have continued to observe a reduction in the number of Bendeka patients visiting infusion centers, hospitals and clinics for intravenous administration of Bendeka due to interruptions in healthcare services, and the patients' inability to visit administration sites and desire to avoid contact with infected individuals. In addition, our sales and marketing teams have been working remotely and our virtual initiatives with respect to marketing and supporting the sale and administration of our products have not been as effective as our in-person sales and marketing activities. We cannot predict when we will be able to resume in-person sales and marketing activities.

Quarantines, shelter-in-place, safer-at-home and similar government orders, or the perception that such orders, shutdowns or other restrictions on the conduct of business operations could be re-implemented or could continue to occur, related to COVID-19 or other infectious diseases could impact personnel at third-party manufacturing facilities upon which we rely, or the availability or cost of materials, which could disrupt the supply chain for our products. In particular, some of our suppliers of certain materials used in the production of our drug products are located in regions that continue to be subject to COVID-19-related actions and policies that limit the conduct of normal business operations. To the extent our suppliers and service providers are unable to comply with their obligations under our agreements with them or they are otherwise unable to deliver or are delayed in delivering goods and services to us due to the COVID-19 pandemic, our ability to continue meeting commercial demand for our products in the United States or advancing development of our product candidates may become impaired. At this time, we consider our inventories on hand to be sufficient to meet our commercial requirements.

In addition, our clinical trials have been affected by COVID-19. Clinical site initiation and patient enrollment has been delayed due to prioritization of hospital resources toward COVID-19. Current or potential patients in our ongoing or planned clinical trials have chosen to not enroll, not participate in follow-up clinical visits or drop out of the trial as a precaution against contracting COVID-19. Further, some patients may not be able to comply with clinical trial protocols if quarantines continue to impede patient movement or interrupt healthcare services. Some clinical sites in the United States have slowed or stopped further enrollment of new patients in clinical trials, denied access to site monitors or otherwise curtailed certain operations. For example, the clinical trial timelines for certain of our product candidates, including EA-114 (our fulvestrant product candidate), have been delayed given difficulties with patient enrollment resulting from the COVID-19 pandemic, and we expect that clinical trial timelines will continue to be delayed for the duration of the pandemic. Similarly, our ability to recruit and retain principal investigators and site staff who, as healthcare providers, may have heightened exposure to COVID-19, has been and may continue to be adversely impacted. These events could delay our clinical trials, increase the cost of completing our clinical trials and negatively impact the integrity, reliability or robustness of the data from our clinical trials.

The spread of COVID-19 and actions taken to reduce its spread and ameliorate its impact may also materially affect us economically. As a result of the COVID-19 pandemic and actions taken to slow its spread and ameliorate its impact, the global credit and financial markets have experienced extreme volatility and disruptions, including diminished liquidity and credit availability, declines in consumer confidence, declines in economic growth, increases in unemployment rates and uncertainty about economic stability. If the equity and credit markets deteriorate, it may make any additional debt or equity financing more difficult, more costly or more dilutive. While the potential economic impact brought by, and the duration of, the COVID-19 pandemic may be difficult to assess or predict, there could continue to be a significant disruption of global financial markets, reducing our ability to access capital, which could negatively affect our liquidity and financial position or our business development activities.

The COVID-19 pandemic continues to rapidly evolve. The extent to which COVID-19 continues to impact the marketing, sale and commercialization of our products, our supply chain, our clinical trials, our access to capital and our business development activities, depends on future developments, which are highly uncertain and cannot be predicted with confidence, such as the ultimate geographic spread of the pandemic, the duration of the pandemic and the efforts by governments and business to contain it, business closures or business disruptions, any re-opening plans, additional closures and spikes or surges in COVID-19 infection, and the impact on the economy and capital markets.

***If we cannot achieve or sustain profitability, our business, prospects, operating results and financial condition would be materially harmed.***

We have focused primarily on developing a broad product portfolio and currently have final regulatory approval for a limited number of products. Some of our product candidates will require substantial additional development time and resources before we would be able to receive regulatory approvals, implement commercialization strategies and begin generating revenue from product sales. We had net loss of $8.6 million for the year ended December 31, 2021, and net income of $12.0 million for the year ended December 31, 2020, $14.3 million for the year ended December 31, 2019, and $31.9 million for the year ended December 31, 2018, respectively, and we incurred significant net losses prior to 2015.

We have devoted most of our financial resources to product development and may not generate significant revenue from sales of our product candidates in the near-term, if ever.

Because of the numerous risks and uncertainties associated with pharmaceutical product development, we are unable to fully predict the timing or amount of our expenses, but we expect to continue to incur substantial expenses, which we expect to increase as we expand our development activities and product portfolio. As a result of the foregoing, we may incur losses and negative cash flows in the future.

***If we fail to obtain additional financing, we could be forced to delay, reduce or eliminate our product development programs.***

Developing pharmaceutical products, including conducting preclinical studies and clinical trials, is expensive. We expect our development expenses to substantially increase in connection with our ongoing activities, particularly as we advance our clinical programs, both internally and through our external joint development agreements. Changing circumstances beyond our control may cause us to consume capital more rapidly than we currently anticipate. For example, our product commercialization or development efforts could encounter technical or other difficulties that could increase our development costs more than we expect. In any event, we may require additional capital prior to obtaining regulatory approval for, or commercializing, any additional product candidates.

In addition, attempting to secure additional financing may divert our management from our day-to-day activities, which may adversely affect our ability to develop and commercialize additional product candidates. We cannot guarantee that future financing will be available in sufficient amounts or on terms acceptable to us, if at all. If we are unable to raise additional capital when required or on acceptable terms, we may be required to:

- significantly delay, scale back or discontinue the development or commercialization of our product candidates;

- seek corporate partners for our products and product candidates at an earlier stage than otherwise would be desirable or on terms that are less favorable than might otherwise be available;

- relinquish or license on unfavorable terms, our rights to technologies or products, or to product candidates that we otherwise would seek to develop or commercialize ourselves; or

- significantly curtail, or cease, operations.

The occurrence of any of these factors could have a material adverse effect on our business, operating results and prospects.

***We may sell additional equity or incur debt to fund our operations, which may result in dilution to our stockholders and impose restrictions on our business.***

In order to raise additional funds to support our operations, we may sell additional equity or incur debt, which could adversely impact our stockholders, as well as our business. The sale of additional equity or convertible debt securities would result in the issuance of additional shares of our capital stock and dilution to all of our stockholders. The incurrence of indebtedness results in increased fixed payment obligations. In addition, the incurrence of indebtedness also results in certain restrictive covenants, such as limitations on our ability to incur additional debt, limitations on our ability to acquire, sell or license intellectual property rights and other operating restrictions that could adversely impact our ability to conduct our business. On November 8, 2019, we entered into the Second Amended and Restated Credit Agreement, or the Revised Credit Agreement, with JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, which replaced our prior credit agreement. The terms and amounts borrowed under the Revised Credit Agreement includes a drawn term loan of $40 million and an undrawn revolving credit facility of $110 million. The schedule of principal payments for the new term loan facility has been extended until November 8, 2022.

We may not have enough available cash or be able to raise additional funds on satisfactory terms, if at all, through equity or debt financings to repay our indebtedness at the time any such repayment is required (causing a default under such indebtedness), which could have a material adverse effect on our business, financial condition and results of operations.

***Changes in tax laws or regulations that are applied adversely to us or our customers may have a material adverse effect on our business, cash flow, financial condition or results of operations.***

New income, sales and use or other tax laws or regulations could be enacted at any time, which could adversely affect our business operations and financial performance. Further, existing tax laws and regulations could be interpreted, modified or applied adversely to us. These events could require us to pay additional taxes on a prospective or retroactive basis, as well as penalties, interest and other costs for past amounts deemed to be due. New laws, or laws that are changed, modified or newly interpreted or applied, also could increase our compliance, operating and other costs, as well as the costs of our products. For example, the Tax Act enacted many significant changes to the U.S. tax laws, some of which were further modified by the Coronavirus Aid, Relief, and Economic Security Act, and may be modified in the future by the current or a future presidential administration. In addition, it is uncertain if and to what extent various states will conform to current federal law, or any newly enacted federal tax legislation. Changes in corporate tax rates, the realization of net operating losses, and other deferred tax assets relating to our operations, the taxation of foreign earnings, and the deductibility of expenses could have a material impact on the value of our deferred tax assets and could increase our future tax expense.

***Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.***

Under current law, federal net operating losses incurred in tax years beginning after December 31, 2017, may be carried forward indefinitely, but the deductibility of such federal net operating losses in tax years beginning after December 31, 2020, is limited to 80% of taxable income. It is uncertain if and to what extent various states will conform to federal law. In addition, under Sections 382 and 383 of the Internal Revenue Code of 1986, as amended, or the Code, if a corporation undergoes an "ownership change," generally defined as a greater than 50% change (by value) in its equity ownership over a three year period, the corporation's ability to use its pre-change net operating loss carryforwards and other pre-change tax attributes, such as

32

research tax credits, to offset its post-change income or taxes may be limited. In addition, we may experience ownership changes in the future as a result of subsequent shifts in our stock ownership. As a result, if we earn net taxable income, our ability to use our pre-change net operating loss carryforwards to offset U.S. federal taxable income may be subject to limitations, which could potentially result in increased future tax liability to us. In addition, at the state level, there may be periods during which the use of net operating loss carryforwards is suspended or otherwise limited, which could accelerate or permanently increase state taxes owed.

**Risks Related to Regulatory Approval**

*We cannot give any assurance that we will receive regulatory approval for our product candidates, which is necessary before they can be commercialized.*

Our business and future success are substantially dependent on our or our collaborators' ability to successfully and timely develop, obtain regulatory approval for, and commercialize our product candidates. Any delay or setback in the development of any of these product candidates could adversely affect our business. For example, on August 7, 2020, we received a CRL for our NDA for Ryanodex for the treatment of EHS. We decided that we will no longer pursue this indication in order to direct our resources to other product candidates. In addition, on January 26, 2022, Tyme announced the discontinuation of SM-88 with methoxsalen, phenytoin, and sirolimus in a trial for metastatic pancreatic cancer. Our planned development, approval and commercialization of any product candidates may fail to be completed in a timely manner or at all. The FDA or other foreign regulatory agency may refuse or delay approval of our product candidates for failure to collect sufficient clinical or animal safety data and require us or our collaborators to conduct additional clinical or animal safety studies, which may cause lengthy delays and increased costs to our programs. We cannot provide assurance that we will be able to obtain approval for any of our product candidates from the FDA or any foreign regulatory authority or that we will obtain such approval in a timely manner. If we do not obtain regulatory approval of new products or additional indications for existing products, or are significantly delayed or limited in doing so, our revenue growth will be adversely affected, we may experience surplus inventory, or our business may be materially harmed and we may need to significantly curtail operations.

*If we are unable to differentiate our products or product candidates from branded reference drugs or existing generic therapies for similar treatments, or if the FDA or other applicable regulatory authorities approve generic products that compete with any of our products or product candidates, the ability to successfully commercialize our product candidates would be adversely affected.*

Our strategy is to enter the market no later than the first generic to the applicable branded reference drug. We expect to compete against branded reference drugs and to compete with their generic counterparts that will be sold for a lower price. Although we believe that our products and product candidates will be clinically differentiated from branded reference drugs and their generic counterparts, if any, it is possible that such differentiation will not impact our market position. If we are unable to achieve significant differentiation for our products or product candidates against other drugs, the opportunity for our products and product candidates to achieve premium pricing and be commercialized successfully would be adversely affected.

In addition to existing branded reference drugs and the related generic products, the FDA or other applicable regulatory authorities may approve generic products that compete directly with our products or product candidates, if approved. Once an NDA, including a 505(b)(2) application, is approved, the product covered thereby becomes a "listed drug" which can, in turn, be cited by potential competitors in support of approval of an ANDA. The FDCA, FDA regulations and other applicable regulations and policies provide incentives to manufacturers to create modified, non-infringing versions of a drug to facilitate the approval of an ANDA for generic substitutes. These manufacturers might only be required to conduct a relatively inexpensive study to show that their product has the same active ingredient(s), dosage form, strength, route of administration and conditions of use or labeling as our products or product candidates and that the generic product is bioequivalent to ours, meaning it is absorbed in the body at the same rate and to the same extent as our products or product candidates. These generic equivalents, which must meet the same quality standards as branded pharmaceuticals, would be significantly less costly than ours to bring to market and companies that produce generic equivalents are generally able to offer their products at lower prices. Thus, after the introduction of a generic competitor, a significant percentage of the sales of any branded product is typically lost to the generic product. Accordingly, competition from generic equivalents of our products or product candidates would materially adversely impact our ability to successfully commercialize our product candidates or negatively impact our ability to gain market acceptance and market share for our products.

*If the FDA does not conclude that our product candidates satisfy the requirements for the regulatory approval, or if the requirements for approval of any of our product candidates are not as we expect, the approval pathway for our product candidates will likely take significantly longer, cost significantly more and encounter significantly greater complications and risks than anticipated, and in any case may not be successful.*

We intend to seek FDA approval through the 505(b)(2) regulatory pathway for those small molecule product candidates described in this Annual Report on Form 10-K.

The Drug Price Competition and Patent Term Restoration Act of 1984, also known as the Hatch-Waxman Act, added Section 505(b)(2) to the FDCA. Section 505(b)(2) permits the filing of an NDA where at least some of the information required for approval comes from studies that were not conducted by or for the applicant.

If the FDA does not allow us to pursue the regulatory pathway for our product candidates as anticipated, we may need to conduct additional clinical trials, provide additional data and information and meet additional standards for regulatory approval. If this were to occur, the time and financial resources required to obtain FDA approval for our product candidates would likely substantially increase. Moreover, the inability to pursue such regulatory pathway could result in new competitive products reaching the market faster than our product candidates, which could materially adversely impact our competitive position and prospects. Even if we are allowed to pursue our chosen regulatory pathway for a product candidate, we cannot assure you that we will receive the requisite or timely approvals for commercialization of such product candidate.

In addition, we expect that our competitors will file citizens' petitions with the FDA in an attempt to persuade the FDA that our product candidates, or the clinical studies that support their approval, contain deficiencies. Such actions by our competitors could delay or even prevent the FDA from approving any NDA that we submit.

*Clinical development is a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results. Failure can occur at any stage of clinical development.*

Clinical testing, even when utilizing the 505(b)(2) pathway or its equivalent, is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure can occur at any time during the clinical trial process, even with active ingredients that have previously been approved by the FDA as safe and effective. The results of preclinical studies and early clinical trials of our product candidates may not be predictive of the results of later stage clinical trials. A number of companies in the biopharmaceutical industry have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier trials.

Our product candidates are in various stages of development, from early stage to late stage. Clinical trial failures may occur at any stage and may result from a multitude of factors both within and outside our control, including flaws in formulation, adverse safety or efficacy profile and flaws in trial design, among others. If the trials result in negative or inconclusive results, we or our collaborators may decide, or regulators may require us, to discontinue trials of the product candidates or conduct additional clinical trials or preclinical studies. In addition, data obtained from trials and studies are susceptible to varying interpretations, and regulators may not interpret our data as favorably as we do, which may delay, limit or prevent regulatory approval. For these reasons, our future clinical trials may not be successful.

We do not know whether any future clinical trials we may conduct will demonstrate consistent or adequate efficacy and safety to obtain regulatory approval to market our product candidates. If any product candidate for which we are conducting clinical trials is found to be unsafe or lack efficacy, we will not be able to obtain regulatory approval for it. If we are unable to bring any of our current or future product candidates to market, our business would be materially harmed and our ability to create long-term stockholder value will be limited.

*Delays in clinical trials are common and have many causes, and any delay could result in increased costs to us and could jeopardize or delay our ability to obtain regulatory approval and commence product sales. We may also find it difficult to enroll patients in our clinical trials, which could delay or prevent development of our product candidates.*

We may experience delays in clinical trials of our product candidates. Our planned clinical trials may not begin on time, have an effective design, enroll a sufficient number of patients or be completed on schedule, if at all. Our clinical trials can be delayed for a variety of reasons, including:

- inability to raise or delays in raising funding necessary to initiate or continue a trial;

- delays in obtaining regulatory approval to commence a trial;

- delays in reaching agreement with the FDA on final trial design;

- imposition of a clinical hold for safety reasons or following an inspection of our clinical trial operations or trial sites by the FDA or other regulatory authorities;

- delays in reaching agreement on acceptable terms with prospective contract research organizations, or CROs, and clinical trial sites, or failure by such CROs to carry out the clinical trial at each site in accordance with the terms of our agreements with them;

- delays in obtaining required institutional review board, or IRB, approval at each site;

34

- difficulties or delays in having patients complete participation in a trial or return for post-treatment follow-up;

- clinical sites electing to terminate their participation in one of our clinical trials, which would likely have a detrimental effect on subject enrollment;

- delays related to the COVID-19 pandemic, which may result in clinical site closures, delays to patient enrollment, patients discontinuing their treatment or follow up visits or changes to trial protocols;

- time required to add new clinical sites; or

- delays by our contract manufacturers to produce and deliver sufficient supply of clinical trial materials.

If initiation or completion of our planned clinical trials is delayed for any of the above reasons or other reasons, our development costs may increase, our regulatory approval process could be delayed and our ability to commercialize and commence sales of our product candidates could be materially harmed, which could have a material adverse effect on our business.

In addition, identifying and qualifying patients to participate in clinical trials of our product candidates is critical to our success. The timing of our clinical trials depends on the speed at which we can recruit patients to participate in testing our product candidates as well as completion of required follow-up periods. We may not be able to identify, recruit and enroll a sufficient number of patients, or those with required or desired characteristics or to complete our clinical trials in a timely manner. Patient enrollment and completion of the trials is affected by factors including:

- severity of the disease under investigation;

- design of the trial protocol;

- size of the patient population;

- eligibility criteria for the trial in question;

- perceived risks and benefits of the product candidate under trial;

- proximity and availability of clinical trial sites for prospective patients;

- availability of competing therapies and clinical trials;

- efforts to facilitate timely enrollment in clinical trials;

- patient referral practices of physicians; and

- ability to monitor patients adequately during and after treatment.

***Our products or product candidates may cause adverse effects or have other properties that could delay or prevent their regulatory approval or limit the scope of any approved label or market acceptance, or result in significant negative consequences following marketing approval, if any.***

As with many pharmaceutical and biological products, treatment with our products or product candidates may produce undesirable side effects or adverse reactions or events. Although our products or product candidates containing active ingredients that have already been approved and the side effects arising from the use of the active ingredient or class of drug in our products or product candidates are generally known, our products or product candidates may still cause undesirable side effects. These could be attributed to the active ingredient or class of drug or to our unique formulation of such products or product candidates, or other potentially harmful characteristics. Such characteristics could cause us, our IRBs, clinical trial sites, the FDA or other regulatory authorities to interrupt, delay or halt clinical trials and could result in a more restrictive label or the delay, denial or withdrawal of regulatory approval, which may harm our business, financial condition and prospects significantly.

Further, if any of our products cause serious or unexpected side effects after receiving market approval, a number of potentially significant negative consequences could result, including:

- regulatory authorities may withdraw their approval of the product or impose restrictions on its distribution;

- the FDA may require implementation of a Risk Evaluation and Mitigation Strategy, or REMS;

- regulatory authorities may require the addition of labeling statements, such as warnings or contraindications;

- we may be required to change the way the product is administered or conduct additional clinical studies;

- we could be sued and held liable for harm caused to patients; or

35

- our reputation may suffer.

Any of these events could prevent us from achieving or maintaining market acceptance of the affected product or product candidate and could substantially increase the costs of commercializing our products and product candidates.

***The regulatory approval processes of the FDA and comparable foreign authorities are lengthy, time-consuming and inherently unpredictable, and if we are ultimately unable to obtain regulatory approval for our product candidates, our business will be substantially harmed.***

The time required to obtain approval by the FDA and comparable foreign authorities is unpredictable but typically takes many years following the commencement of clinical trials and depends upon numerous factors, including the substantial discretion of the regulatory authorities. In addition, approval policies, regulations or the type and amount of clinical data necessary to gain approval may change during the course of a product candidate's clinical development and may vary among jurisdictions. To date, we have obtained regulatory approval for five NDA products, but no BLA products, and we have multiple NDA product candidates in advanced stages of development and other exploratory candidates under development. However, it is possible that none of our existing product candidates or any product candidates we may seek to develop in the future will ever obtain regulatory approval in the United States or other jurisdictions.

Our product candidates could fail to receive regulatory approval for many reasons, including the following:

- the FDA or comparable foreign regulatory authorities may disagree that our changes to branded reference drugs or existing biologic drugs meet the criteria for our chosen regulatory pathway or foreign regulatory pathways;

- we may be unable to demonstrate to the satisfaction of the FDA or comparable foreign regulatory authorities that a product candidate is safe and effective or comparable to its branded reference product for its proposed indication;

- the results of any clinical trials we conduct may not meet the level of statistical significance required by the FDA or comparable foreign regulatory authorities for approval;

- we may be unable to demonstrate that a product candidate's clinical and other benefits outweigh its safety risks;

- the FDA or comparable foreign regulatory authorities may fail to approve the manufacturing processes or facilities of third party manufacturers with which we contract for clinical and commercial supplies; and

- the approval policies or regulations of the FDA or comparable foreign regulatory authorities may change significantly in a manner rendering our clinical data insufficient for approval.

This lengthy approval process as well as the unpredictability of future clinical trial results may result in our failing to obtain regulatory approval to market our product candidates, which would harm our business, results of operations and prospects significantly.

In addition, even if we were to obtain approval, regulatory authorities may approve any of our product candidates for fewer or more limited indications than we request, may grant approval contingent on the performance of costly post-marketing clinical trials or may approve a product candidate with a label that does not include the labeling claims necessary or desirable for the successful commercialization of that product candidate. Any of the foregoing scenarios could harm the commercial prospects for our product candidates.

We have limited experience using the 505(b)(2) regulatory pathway to submit an NDA or any similar drug approval filing to the FDA, and we cannot be certain that any of our product candidates will receive regulatory approval. There can be no assurance that the FDA will ultimately approve any submitted NDA by us in a timely fashion. For example, in March of 2016 we received a CRL from the FDA with respect to our NDA for EP-6101, and we elected not to pursue the application further or seek to exploit EP-6101 for various reasons. On August 7, 2020, we received a CRL for our NDA for Ryanodex for the treatment of EHS, and we decided that we will no longer pursue this indication in order to direct our resources to other product candidates.

The failure to receive regulatory approvals for our product candidates could have a material adverse effect on our business, financial condition and operations. Even if we successfully obtain regulatory approvals to market one or more of our product candidates, our revenue will be dependent, to a significant extent, upon the size of the markets in the territories for which we gain regulatory approval. If the markets for patients or indications that we are targeting are not as significant as we estimate, we may not generate significant revenue from sales of such products, if approved.

36

***An NDA submitted under Section 505(b)(2) subjects us to the risk that we may be subject to a patent infringement lawsuit that would delay or prevent the review or approval of our product candidates.***

Some of our product candidates will be submitted to the FDA for approval under Section 505(b)(2) of the FDCA. Section 505(b)(2) permits the submission of an NDA where at least some of the information required for approval comes from studies that were not conducted by, or for, the applicant and on which the applicant has not obtained a right of reference. The 505(b)(2) application would enable us to reference published literature and/or the FDA's previous findings of safety and effectiveness for the branded reference drug. For NDAs submitted under Section 505(b)(2) of the FDCA, the patent certification and related provisions of the Hatch-Waxman Act apply. In accordance with the Hatch-Waxman Act, such NDAs may be required to include certifications, known as paragraph IV certifications, that certify that any patents listed in the Patent and Exclusivity Information Addendum of the FDA's publication, Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the Orange Book, with respect to any product referenced in the 505(b)(2) application, are invalid, unenforceable or will not be infringed by the manufacture, use or sale of the product that is the subject of the 505(b)(2) NDA.

Under the Hatch-Waxman Act, the holder of patents that the 505(b)(2) application references may file a patent infringement lawsuit after receiving notice of the paragraph IV certification. Filing of a patent infringement lawsuit against the filer of the 505(b)(2) applicant within 45 days of the patent owner's receipt of notice triggers a one-time, automatic, 30-month stay of the FDA's ability to approve the 505(b)(2) NDA, unless patent litigation is resolved in the favor of the paragraph IV filer or the patent expires before that time. Accordingly, we may invest a significant amount of time and expense in the development of one or more product candidates only to be subject to significant delay and patent litigation before such product candidates may be commercialized, if at all. For example, we have been, and may in the future be, subject to litigation brought in connection with our filing of a 505(b)(2) NDA. In addition, a 505(b)(2) application will not be approved until any non-patent exclusivity, such as exclusivity for obtaining approval of a new chemical entity, or NCE, listed in the Orange Book for the referenced product has expired. The FDA may also require us to perform one or more additional clinical studies or measurements to support the change from the branded reference drug, which could be time-consuming and could substantially delay our achievement of regulatory approvals for such product candidates. The FDA may also reject our future 505(b)(2) submissions and require us to file such submissions under Section 505(b)(1) of the FDCA, which would require us to provide extensive data to establish safety and effectiveness of the drug for the proposed use and could cause delay and be considerably more expensive and time-consuming. These factors, among others, may limit our ability to successfully commercialize our product candidates.

Companies that produce branded reference drugs routinely bring litigation against abbreviated new drug application, or ANDA, or 505(b)(2) applicants that seek regulatory approval to manufacture and market generic and reformulated forms of their branded products. These companies often allege patent infringement or other violations of intellectual property rights as the basis for filing suit against an ANDA or 505(b)(2) applicant. For example, we were involved in a patent case with Par related to our ANDA for vasopressin. Likewise, patent holders may bring patent infringement suits against companies that are currently marketing and selling their approved generic or reformulated products.

Litigation to enforce or defend intellectual property rights is often complex and often involves significant expense and can delay or prevent introduction or sale of our product candidates. If patents are held to be valid and infringed by our product candidates in a particular jurisdiction, we would, unless we could obtain a license from the patent holder, be required to cease selling in that jurisdiction and may need to relinquish or destroy existing stock in that jurisdiction. There may also be situations where we use our business judgment and decide to market and sell our approved products, notwithstanding the fact that allegations of patent infringement(s) have not been finally resolved by the courts, which is known as an "at-risk launch." The risk involved in doing so can be substantial because the remedies available to the owner of a patent for infringement may include, among other things, damages measured by the profits lost by the patent owner and not necessarily by the profits earned by the infringer. In the case of a willful infringement, the definition of which is subjective, such damages may be increased up to three times. Moreover, because of the discount pricing typically involved with bioequivalent and, to a lesser extent, 505(b)(2), products, patented branded products generally realize a substantially higher profit margin than bioequivalent and, to a lesser extent, 505(b)(2), products, resulting in disproportionate damages compared to any profits earned by the infringer. An adverse decision in patent litigation could have a material adverse effect on our business, financial position and results of operations and could cause the market value of our common stock to decline.

***The FDA and other regulatory agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses.***

If we are found to have improperly promoted off-label uses of our products or product candidates, if approved, we may become subject to significant liability. Such enforcement has become more common in the industry. The FDA and other regulatory agencies strictly regulate the promotional claims that may be made about prescription products, such as our product candidates, if approved. In particular, a product may not be promoted for uses that are not approved by the FDA or such other regulatory agencies as reflected in the product's approved labeling. However, we may share truthful and not misleading information that is

otherwise consistent with our products' FDA approved labeling. If we receive marketing approval for our product candidates for our proposed indications, physicians may nevertheless use our products for their patients in a manner that is inconsistent with the approved label, if the physicians personally believe in their professional medical judgment it could be used in such manner. However, if we are found to have promoted our products for any off-label uses, the federal government could levy civil, criminal and administrative penalties, and seek fines against us. The FDA or other regulatory authorities could also request that we enter into a consent decree or a corporate integrity agreement, or seek a permanent injunction against us under which specified promotional conduct is monitored, changed or curtailed. If we cannot successfully manage the promotion of our product candidates, if approved, we could become subject to significant liability, which would materially adversely affect our business and financial condition.

***Our business is subject to extensive regulatory requirements and our approved product and product candidates that obtain regulatory approval will be subject to ongoing and continued regulatory review, which may result in significant expense and limit our ability to commercialize such products.***

Even after a product is approved, we remain subject to ongoing FDA and other regulatory requirements governing the labeling, packaging, storage, distribution, safety surveillance, advertising, promotion, import, export, record-keeping and reporting of safety and other post-market information. The holder of an approved NDA is obligated to monitor and report adverse events, or AEs, and any failure of a product to meet the specifications in the application. The holder of an approved NDA must also submit new or supplemental applications and obtain FDA approval for certain changes to the approved product, product labeling or manufacturing process. Advertising and promotional materials must comply with FDA rules and are subject to FDA review, in addition to other potentially applicable federal and state laws. In addition, the FDA may impose significant restrictions on the approved indicated uses for which the product may be marketed or on the conditions of approval. For example, a product's approval may contain requirements for potentially costly post-approval studies and surveillance to monitor the safety and efficacy of the product, or the imposition of a REMS program.

Manufacturers of drug products and their facilities are subject to payment of user fees and continual review and periodic inspections by the FDA and other regulatory authorities for compliance with current good manufacturing practices, or cGMP, and adherence to commitments made in the drug application. If we or a regulatory agency discovers previously unknown problems with a product, such as AEs of unanticipated severity or frequency, or problems with the facility where the product is manufactured, a regulatory agency may impose restrictions relative to that product or the manufacturing facility, including requiring product recall, notice to physicians, withdrawal of the product from the market or suspension of manufacturing.

If we or our products or product candidates or our manufacturing facilities fail to comply with applicable regulatory requirements, a regulatory agency may:

- issue warning letters or untitled letters asserting that we are in violation of the law;

- impose restrictions on the marketing or manufacturing of the product;

- seek an injunction or impose civil, criminal and/or administrative penalties, damages, assess monetary fines, require disgorgement, consider exclusion from participation in Medicare, Medicaid and other federal health care programs and require curtailment or restructuring of our operations;

- suspend or withdraw regulatory approval;

- suspend any ongoing clinical trials;

- refuse to approve a pending application or supplements to an application submitted by us;

- seize product; or

- refuse to allow us to enter into government contracts.

Similar post-market requirements may apply in foreign jurisdictions in which we may seek approval of our products. Any government investigation of alleged violations of law could require us to expend significant time and resources in response and could generate negative publicity. The occurrence of any event or penalty described above may inhibit our ability to commercialize our products and generate revenues.

In addition, the FDA's regulations, policies or guidance may change and new or additional statutes or government regulations in the United States and other jurisdictions may be enacted that could prevent or delay regulatory approval of our product candidates or further restrict or regulate post-approval activities. We cannot predict the likelihood, nature or extent of adverse government regulation that may arise from pending or future legislation or administrative action, either in the United States or abroad. If we are not able to achieve and maintain regulatory compliance, we may not be permitted to market our products and/or product candidates, which would adversely affect our ability to generate revenue and achieve or maintain profitability.

38

***Our employees, independent contractors, principal investigators, consultants, commercial partners and vendors may engage in misconduct or other improper activities, including non-compliance with regulatory standards and requirements and insider trading.***

We are exposed to the risk that our employees, independent contractors, principal investigators, consultants, commercial partners and vendors may engage in fraudulent conduct or other illegal activity. Misconduct by these parties could include intentional, reckless and/or negligent conduct that violates (1) the laws of the FDA and similar foreign regulatory bodies, including those laws requiring the reporting of true, complete and accurate information to such regulatory bodies; (2) health care laws and regulations, including fraud and abuse laws of the United States and similar foreign fraudulent misconduct laws; and (3) laws requiring the reporting of financial information or data accurately. Specifically, the promotion, sales and marketing of health care items and services, as well as certain business arrangements in the health care industry are subject to extensive laws designed to prevent misconduct, including fraud, kickbacks, self-dealing and other abusive practices. These laws may restrict or prohibit a wide range of pricing, discounting, marketing, structuring and commission(s), certain customer incentive programs and other business arrangements generally. Activities subject to these laws also involve the improper use of information obtained in the course of patient recruitment for clinical trials. It is not always possible to identify and deter employee and other third-party misconduct. The precautions we take to detect and prevent inappropriate conduct may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to comply with these laws. If any such actions are instituted against us, and we are not successful in defending ourselves, those actions could have a significant impact on our business, including the imposition of civil, criminal and administrative penalties, damages, monetary fines, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings, and curtailment of our operations, any of which could adversely affect our ability to operate our business and our results of operations.

***Any relationships with health care professionals, principal investigators, consultants, customers (actual and potential) and third party payors, in addition to our general business operations, are and will continue to be subject, directly or indirectly, to federal and state health care fraud and abuse laws, marketing expenditure tracking and disclosure, or sunshine laws, government price reporting and health information privacy and security laws. If we are unable to comply, or have not fully complied, with such laws, we could face penalties, including, without limitation, civil, criminal and administrative penalties, damages, monetary fines, disgorgement, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings and curtailment or restructuring of our operations.***

Our business operations and activities may be directly, or indirectly, subject to various federal, state and local fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute and the federal civil False Claims Act. These laws may impact, among other things, our current activities with principal investigators and research subjects, as well as current, proposed and future sales, marketing and education programs. In addition, we may be subject to patient data privacy and security regulation by the federal government, state governments and foreign jurisdictions in which we conduct our business, as well as transparency requirements. The U.S. healthcare laws and regulations that may affect our ability to operate include, but are not limited to:

- the federal Anti-Kickback Statute, which prohibits, among other things, knowingly and willfully soliciting, receiving, offering or paying any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind, to induce, or in return for, either the referral of an individual, or the purchase, lease, order or recommendation of any good, facility, item or service for which payment may be made, in whole or in part, under a federal health care program, such as the Medicare and Medicaid programs. The Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, or collectively, ACA, among other things, amends the intent requirement of the federal Anti-Kickback Statute and criminal healthcare fraud statutes such that a person or entity no longer needs to have actual knowledge of this statute or specific intent to violate it. In addition, the ACA provides that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act;

- federal civil and criminal false claims laws, including the federal civil False Claims Act, and civil monetary penalty laws, which prohibit and impose penalties for, among other things, individuals or entities knowingly presenting, or causing to be presented, claims for payment or approval from the federal government including Medicare, Medicaid or certain other governmental health care programs that are false or fraudulent or knowingly making or causing to be made a false statement to improperly avoid, decrease or conceal an obligation to pay money to the federal government;

- the federal Health Insurance Portability and Accountability Act of 1996, or HIPAA, which created additional federal civil and criminal statutes that prohibit knowingly and willfully executing, or attempting to execute, a scheme to defraud any health care benefit program or obtain, by means of false or fraudulent pretenses, representations or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, regardless of the payor (e.g., public or private) and knowingly and willfully falsifying, concealing or covering up by any trick or device a material fact or making any materially false statements in connection with the delivery of, or payment for, health care benefits, items or services relating to health care matters;

- HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, or HITECH, and their respective implementing regulations, which impose requirements on certain health care providers, health plans and health care clearinghouses, known as covered entities, or business associates, as well as their respective business associates, independent contractors or agents of covered entities that perform services for them that involve the use, or disclosure of, individually identifiable health information as well as their covered subcontractors, relating to the privacy, security and transmission of individually identifiable health information without appropriate authorization;

- the federal Physician Payments Sunshine Act, created under Section 6002 of the ACA, and its implementing regulations, which requires certain manufacturers of drugs, devices, biologicals and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) to report annually to the United States Department of Health and Human Services' Centers for Medicare & Medicare Services, or CMS, information related to payments or other transfers of value made to physicians (defined to include doctors, dentists, optometrists, podiatrists and chiropractors), other healthcare professionals (such as physician assistants an nurse practitioners), and teaching hospitals, as well as ownership and investment interests held by such physicians and their immediate family members;

- federal consumer protection and unfair competition laws, which broadly regulate marketplace activities and activities that potentially harm consumers;

- federal government price reporting laws, changed by ACA to, among other things, increase the minimum Medicaid rebates owed by most manufacturers under the Medicaid Drug Rebate Program and offer such rebates to additional populations, that require us to calculate and report complex pricing metrics to government programs, where such reported prices may be used in the calculation of reimbursement and/or discounts on our marketed drugs. Participation in these programs and compliance with the applicable requirements may subject us to potentially significant discounts on our products, increased infrastructure costs and potentially limit our ability to offer certain marketplace discounts;

- the Foreign Corrupt Practices Act, a United States law which regulates certain financial relationships with foreign government officials (which could include, for example, certain medical professionals); and

- state law equivalents of each of the above federal laws, such as anti-kickback, false claims, consumer protection and unfair competition laws which may apply to our business practices, including but not limited to, research, distribution, sales and marketing arrangements as well as submitting claims involving health care items or services reimbursed by any third party payors, including commercial insurers; state laws that require pharmaceutical companies to comply with the pharmaceutical industry's voluntary compliance guidelines and the relevant compliance guidance promulgated by the federal government that otherwise restricts payments that may be made to health care providers; state laws that require drug manufacturers to file reports with states regarding marketing information, such as the tracking and reporting of gifts, compensations and other remuneration and items of value provided to health care professionals and entities (compliance with such requirements may require investment in infrastructure to ensure that tracking is performed properly, and some of these laws result in the public disclosure of various types of payments and relationships, which could potentially have a negative effect on our business and/or increase enforcement scrutiny of our activities), and drug pricing; state and local laws that require the registration of pharmaceutical sales representatives; and state laws governing the privacy and security of health information in certain circumstances, many of which differ from each other in significant ways, thus complicating compliance efforts.

In addition, any sales of our products or product candidates once commercialized outside the United States will also likely subject us to foreign equivalents of the health care laws mentioned above, among other foreign laws.

Efforts to ensure that our business arrangements will comply with applicable health care laws may involve substantial costs. It is possible that governmental and enforcement authorities will conclude that our business practices may not comply with current or future statutes, regulations or case law interpreting applicable fraud and abuse or other health care laws and regulations. If our operations are found to be in violation of any of the laws described above or any other governmental regulations that apply to us, we may be subject to, without limitation, significant civil, criminal and administrative penalties,

40

damages, monetary fines, disgorgement, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings and curtailment or restructuring of our operations, any of which could adversely affect our ability to operate.

*We are required to obtain regulatory approval for each of our products in each jurisdiction in which we intend to market such products, and the inability to obtain such approvals would limit our ability to realize their full market potential.*

In order to market products outside of the United States, we must comply with numerous and varying regulatory requirements of other countries regarding safety and efficacy. Clinical trials conducted in one country may not be accepted by regulatory authorities in other countries, and regulatory approval in one country does not mean that regulatory approval will be obtained in any other country. However, the failure to obtain regulatory approval in one jurisdiction may adversely impact our ability to obtain regulatory approval in another jurisdiction. Approval processes vary among countries and can involve additional product testing and validation and additional administrative review periods. Seeking foreign regulatory approval could result in difficulties and costs for us and require additional non-clinical studies or clinical trials which could be costly and time consuming. Regulatory requirements can vary widely from country to country and could delay or prevent the introduction of our products in those countries. If we fail to comply with regulatory requirements in international markets or to obtain and maintain required approvals, or if regulatory approval in international markets is delayed, our target market will be reduced and our ability to realize the full market potential of our products will be harmed.

*If we fail to develop, acquire or in-license other product candidates or products, our business and prospects will be limited.*

Our long-term growth strategy is to develop and commercialize a portfolio of product candidates in addition to our existing product candidates. We may also acquire or in-license such product candidates, such as the license agreements we entered into with Combioxin for CAL02 and with AOP Orphan for Landiolol. Although we have internal research and development capacity that we believe will enable us to make improvements to existing compounds or active ingredients, we do not have internal drug discovery capabilities to identify and develop entirely new chemical entities or compounds. As a result, our primary means of expanding our pipeline of product candidates is to develop improved formulations and delivery methods for existing FDA-approved products and/or select and acquire or in-license product candidates for the treatment of therapeutic indications that complement or augment our current targets, or that otherwise fit into our development or strategic plans on terms that are acceptable to us. Developing new formulations of existing products or identifying, selecting and acquiring or in-licensing promising product candidates requires substantial technical, financial and human resources expertise. Efforts to do so may not result in the actual development, acquisition or in-license of a particular product candidate, potentially resulting in a diversion of our management's time and the expenditure of our resources with no resulting benefit. If we are unable to add additional product candidates to our pipeline, our long-term business and prospects will be limited.

**Risks Related to Commercialization of Our Products and Product Candidates**

*Our commercial success depends upon attaining significant market acceptance of our products and product candidates, if approved, among physicians, nurses, pharmacists, patients and the medical community.*

Even if we obtain regulatory approval for our product candidates, our products and product candidates may not gain market acceptance among physicians, nurses, pharmacists, patients, the medical community or third party payors, which is critical to commercial success. Market acceptance of our products and any product candidate for which we receive approval depends on a number of factors, including:

- the timing of market introduction of the product candidate as well as competitive products;
- the clinical indications for which the product candidate is approved;
- the convenience and ease of administration to patients of the product candidate;
- the potential and perceived advantages of such product candidate over alternative treatments;
- the cost of treatment in relation to alternative treatments, including any similar generic treatments;
- the availability of coverage and adequate reimbursement by third party payors and government authorities;
- relative convenience and ease of administration;
- any negative publicity related to our or our competitors' products that include the same active ingredient;
- the prevalence and severity of adverse side effects, including limitations or warnings contained in a product's FDA-approved labeling; and
- the effectiveness of sales and marketing efforts.

41

Even if a potential product displays a favorable efficacy and safety profile in preclinical studies and clinical trials, market acceptance of the product will not be known until after it is launched. If our products or product candidates, if approved, fail to achieve an adequate level of acceptance by physicians, nurses, pharmacists, patients and the medical community, we will be unable to generate significant revenues, and we may not become or remain profitable.

*Guidelines and recommendations published by government agencies can reduce the use of our products and product candidates.*

Government agencies promulgate regulations and guidelines applicable to certain drug classes which may include our products and product candidates that we are developing. Recommendations of government agencies may relate to such matters as usage, dosage, route of administration and use of concomitant therapies. Regulations or guidelines suggesting the reduced use of certain drug classes which may include our products and product candidates that we are developing or the use of competitive or alternative products as the standard of care to be followed by patients and health care providers could result in decreased use of our product candidates or negatively impact our ability to gain market acceptance and market share.

*If we are unable to successfully conduct our sales and marketing capabilities or if our commercial partners do not adequately perform, the commercial opportunity for our products may be diminished.*

We have a commercial organization to promote certain of our approved products in the United States. The cost of maintaining such an organization may exceed the benefits, and there are significant risks involved in building and managing a sales organization, including our ability to hire, retain and incentivize qualified individuals, generate sufficient sales leads, provide adequate training to sales and marketing personnel and effectively manage a geographically dispersed sales and marketing team. In addition, we may not be successful in commercializing our products despite such commercial organization.

We and any other commercialization partner we engage in the future may not be able to attract, hire, train and retain qualified sales and sales management personnel. If we or our future partners, if any, are not successful in maintaining an effective number of qualified sales personnel, our ability to effectively market and promote our products may be impaired.

The efforts of our partners in many instances would likely be outside our control. If any future partner is unsuccessful in their efforts, or we are unable to maintain such commercial partnerships or to effectively establish alternative arrangements for our products, our business could be adversely affected.

*A substantial portion of our total revenues is derived from sales of a limited number of products.*

We derive a substantial portion of our revenue from royalties derived from the sales of one product: Bendeka. This product is sold by our partner Teva Pharmaceuticals. During the year ended December 31, 2021, Bendeka accounted for approximately 66% of our total revenue. The sale of our products can be significantly influenced by the efforts of our partners, which are out of our control, as well as market conditions and regulatory actions. We may experience decreases in the sale of our products in the future as a result of actions taken by our competitors, such as price reductions or entry into the market for competing products, or as a result of regulatory actions related to our products or competing products, which could have a material impact on our results of operations and financial condition.

*If we obtain approval to commercialize any approved products outside of the United States, a variety of risks associated with international operations could materially adversely affect our business.*

We may enter into agreements with third parties to market our products outside the United States. We expect that we will be subject to additional risks related to entering into international business relationships, including:

- different regulatory requirements for drug approvals in foreign countries;

- differing payor reimbursement regimes, governmental payors or patient self-pay systems and price controls;

- reduced protection for intellectual property rights;

- unexpected changes in tariffs, trade barriers and regulatory requirements;

- economic weakness, including inflation, or political instability in particular foreign economies and markets;

- compliance with tax, employment, immigration and labor laws for employees living or traveling abroad;

- foreign taxes, including withholding of payroll taxes;

- foreign currency fluctuations, which could result in increased operating expenses and reduced revenue, and other obligations incident to doing business in another country;

- workforce uncertainty in countries where labor unrest is more common than in the United States;

- production shortages resulting from any events affecting raw material supply or manufacturing capabilities abroad; and

42

- business interruptions resulting from geopolitical actions, including war and terrorism, or natural disasters including earthquakes, typhoons, floods and fires or public health issues or pandemics including the coronavirus.

***We face significant competition from other biotechnology and pharmaceutical companies, and our operating results will suffer if we fail to compete effectively.***

The biopharmaceutical industries are intensely competitive and subject to rapid and significant technological change. Many of our competitors both in the United States and internationally, include major multinational pharmaceutical companies, biotechnology companies and universities and other research institutions. For example, Ryanodex, and products with dantrolene sodium as the API, is currently marketed in the United States by, among others, Endo International plc, Impax Laboratories, Inc., Hikma Pharmaceuticals, LLC, US WorldMeds, LLC, Mylan Institutional, LLC, and Elite Laboratories, Inc. While our formulations of this product is distinct, and we believe improvements, compared to those competitors mentioned, competition from these products on factors such as price and availability effect our commercial efforts. Additionally, we must compete with alternative drug treatments (as opposed to alternative formulations) for many of the indications that our products are approved to treat.

Many of our competitors have substantially greater financial, technical and other resources, such as larger research and development staff and experienced marketing and manufacturing organizations. Mergers and acquisitions in the biotechnology and pharmaceutical industries may result in even more resources being concentrated in our competitors. As a result, these companies may obtain regulatory approval more rapidly than we are able and may be more effective in selling and marketing their products as well. Smaller or early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large, established companies. Competition may increase further as a result of advances in the commercial applicability of technologies and greater availability of capital for investment in these industries. Our competitors may succeed in developing, acquiring or licensing on an exclusive basis drug products or drug delivery technologies that are more effective or less costly than our products or any product candidate that we are currently developing or that we may develop. In addition, our competitors may file citizens' petitions with the FDA in an attempt to persuade the FDA that our products, or the clinical studies that support their approval, contain deficiencies. Such actions by our competitors could delay or even prevent the FDA from approving any application we submit.

We believe that our ability to successfully compete will depend on, among other things:

- the efficacy and safety of our products and product candidates, including as relative to marketed products and product candidates in development by third parties;

- the time it takes for our product candidates to complete clinical development and receive marketing approval;

- the ability to maintain a good relationship with regulatory authorities;

- the ability to commercialize and market any of our product candidates that receive regulatory approval;

- the price of our products, including in comparison to branded or generic competitors;

- whether coverage and adequate levels of reimbursement are available under private and governmental health insurance plans, including Medicare;

- the ability to protect intellectual property rights related to our products and product candidates;

- the ability to manufacture on a cost-effective basis and sell commercial quantities of our products and product candidates that receive regulatory approval; and

- acceptance of any of our products and product candidates that receive regulatory approval by physicians and other health care providers.

If our competitors market products that are more effective, safer or less expensive than our products or product candidates, or that reach the market sooner than our product candidates, we may enter the market too late in the cycle and may not achieve commercial success. In addition, the biopharmaceutical industry is characterized by rapid technological change. Because we have limited research and development capabilities, it may be difficult for us to stay abreast of the rapid changes in each technology. If we fail to stay at the forefront of technological change, we may be unable to compete effectively. Technological advances or products developed by our competitors may render our technologies, products or product candidates obsolete, less competitive or not economical.

***We could incur substantial costs and disruption to our business and delays in the launch of our product candidates if our competitors and/or collaborators bring legal actions against us, which could harm our business and operating results.***

We cannot predict whether our competitors or potential competitors, some of whom we collaborate with, may bring legal actions against us based on our research, development and commercialization activities, as well as any product candidates or

43

products resulting from these activities, claiming, among other things, infringement of their intellectual property rights, breach of contract or other legal theories. If we are forced to defend any such lawsuits, whether they are with or without merit or are ultimately determined in our favor, we may face costly litigation and diversion of technical and management personnel. These lawsuits could hinder our ability to enter the market early with our product candidates and thereby hinder our ability to influence usage patterns when fewer, if any, of our potential competitors have entered such market, which could adversely impact our potential revenue from such product candidates or negatively impact our ability to gain market acceptance and market share for our products. We are currently involved in various ongoing litigation matters, as discussed elsewhere in this Annual Report on Form 10-K.

Some of our competitors have substantially greater resources than we do and could be able to sustain the cost of litigation to a greater extent and for longer periods of time than we could. Furthermore, an adverse outcome of a dispute may require us: to pay damages, potentially including treble damages and attorneys' fees, if we are found to have willfully infringed a party's patent or other intellectual property rights; to cease making, licensing or using products that are alleged to incorporate or make use of the intellectual property of others; to expend additional development resources to reformulate our products or prevent us from marketing a certain drug; and to enter into potentially unfavorable royalty or license agreements in order to obtain the rights to use necessary technologies. Royalty or licensing agreements, if required, may be unavailable on terms acceptable to us, or at all.

*If we are unable to achieve and maintain adequate levels of coverage and reimbursement for our products or product candidates, if approved, their commercial success may be severely hindered.*

Successful sales of our products and any other approved product candidates depend on the availability of adequate coverage and reimbursement from third party payors. Patients who are prescribed medications for the treatment of their conditions generally rely on third party payors to reimburse all or part of the costs associated with their prescription drugs. Adequate coverage and reimbursement from governmental health care programs, such as Medicare and Medicaid, and commercial payors is critical to new product acceptance. In the United States, third-party payors often rely upon Medicare coverage policy and payment limitations in setting their own coverage and reimbursement policies. However, decisions regarding the extent of coverage and amount of reimbursement to be provided for any product candidates that we develop will be made on a payor-by-payor basis. Coverage decisions may depend upon clinical and economic standards that disfavor new drug products when more established or lower cost therapeutic alternatives are already available or subsequently become available. Reimbursement by a third party payor may depend upon a number of factors, including but not limited to, the third party payor's determination that use of a product is: a covered benefit under its health plan; safe, effective, and medically necessary; appropriate for the specific patient; cost-effective; and/or neither cosmetic, experimental, nor investigational.

Assuming we obtain coverage for a given product, the resulting reimbursement payment rates might not be adequate or may require co-payments that patients find unacceptably high. Patients are unlikely to use our products unless coverage is provided and reimbursement is adequate to cover a significant portion of the cost of our products.

In addition, the market for our products and our product candidates will depend significantly on access to third party payors' drug formularies, or lists of medications for which third party payors provide coverage and reimbursement. The industry competition to be included in such formularies often leads to downward pricing pressures on pharmaceutical companies. Also, third party payors may refuse to include a particular branded drug in their formularies or otherwise restrict patient access through formulary controls or otherwise to a branded drug when a less costly generic equivalent or other alternative is available.

Further, coverage policies and third-party payor reimbursement rates may change at any time. Therefore, even if favorable coverage and reimbursement status is attained, less favorable coverage policies and reimbursement rates may be implemented in the future. Third party payors, whether foreign or domestic, or governmental or commercial, are developing increasingly sophisticated methods of controlling health care costs. In addition, in the United States, no uniform policy requirement for coverage and reimbursement for drug products exists among third party payors. Therefore, coverage and reimbursement for drug products can differ significantly from payor to payor. As a result, the coverage determination process is often a time-consuming and costly process that could require us to provide scientific, clinical and cost effectiveness support for the use of our products to each payor separately, with no assurance that coverage and adequate reimbursement will be applied consistently or obtained in the first instance. Even if we obtain coverage for a given product, the resulting reimbursement payment rates might not be adequate for us to achieve or sustain profitability.

Further, we believe that future coverage and reimbursement will likely be subject to increased restrictions both in the United States and in international markets. Third party coverage and reimbursement for our commercial products, and our pre-clinical and clinical product candidates for which we may receive regulatory approval, may not be available or adequate in either the United States or international markets, which could have a material adverse effect on our business, results of operations, financial condition and prospects.

44

***Current and future legislation may increase the difficulty and cost for us to commercialize our product candidates and affect the prices we may obtain for our products.***

The United States and some foreign jurisdictions are considering, or have enacted, a number of legislative and regulatory proposals to change the health care system in ways that could affect our ability to sell our products and our product candidates profitably, once they are approved for sale. Among policy makers and payors in the United States and elsewhere, there is significant interest in promoting changes in health care systems with the stated goals of containing health care costs, improving quality and/or expanding access. In the United States, the pharmaceutical industry has been a particular focus of these efforts and has been significantly affected by major legislative initiatives.

By way of example, in March 2010, the ACA was passed, which significantly changed health care financing by both governmental and private insurers. There have been executive, judicial and Congressional challenges to certain aspects of the ACA. For example, the Trump administration signed several Executive Orders and other directives designed to delay the implementation of certain provisions of the ACA or otherwise circumvent some of the requirements for health insurance mandated by the ACA. Concurrently, Congress considered legislation to repeal or repeal and replace all or part of the ACA. While Congress has not passed comprehensive repeal legislation, several bills affecting the implementation of certain taxes under the ACA have been signed into law. For example, the Tax Cuts and Jobs Act of 2017, or Tax Act, included a provision which repealed, effective January 1, 2019, the tax-based shared responsibility payment imposed by the ACA on certain individuals who fail to maintain qualifying health coverage for all or part of a year that is commonly referred to as the "individual mandate." Additionally, the 2020 federal spending package permanently eliminated, effective January 1, 2020, the ACA-mandated "Cadillac" tax on high-cost employer-sponsored health coverage and medical device tax and, effective January 1, 2021, also eliminated the health insurer tax. The Bipartisan Budget Act of 2018, or the BBA, among other things, amended the ACA, effective January 1, 2019, to increase from 50 percent to 70 percent the point-of-sale discount that is owed by pharmaceutical manufacturers who participate in Medicare Part D and to close the coverage gap in most Medicare drug plans, commonly referred to as the "donut hole." On June 17, 2021, the U.S. Supreme Court dismissed a challenge on procedural grounds that argued the ACA is unconstitutional in its entirety because the "individual mandate" was repealed by Congress. Thus, the ACA will remain in effect in its current form. Prior to the U.S. Supreme Court ruling, on January 28, 2021, President Biden issued an executive order that initiated a special enrollment for purposes of obtaining health insurance coverage through the ACA marketplace. The executive order also instructed certain governmental agencies to review and reconsider their existing policies and rules that limit access to healthcare, including among others, reexamining Medicaid demonstration projects and waiver programs that include work requirements, and policies that create unnecessary barriers to obtaining access to health insurance coverage through Medicaid or the ACA. It is possible that the ACA will be subject to judicial or Congressional challenges in the future. It is unclear how such challenges and the healthcare reform measures of the Biden administration will impact ACA and our business. We cannot predict how future federal or state legislative or administrative changes relating to healthcare reform will affect our business.

In addition, other legislative changes have been proposed and adopted since the ACA was enacted. For example, in August 2011, President Obama signed into law the Budget Control Act of 2011, which, among other things, created the Joint Select Committee on Deficit Reduction to recommend proposals for spending reductions to Congress. The Joint Select Committee on Deficit Reduction did not achieve its targeted deficit reduction of at least $1.2 trillion for the years 2013 through 2021, triggering the legislation's automatic reductions to several government programs. These reductions include aggregate reductions to Medicare payments to providers of up to 2% per fiscal year, which went into effect on April 1, 2013 and, following passage of the Bipartisan Budget Act of 2015 as well as certain legislative amendments, will remain in effect through 2031, except for a temporary suspension from May 1, 2020 through March 31, 2022 due to the COVID-19 pandemic, unless additional Congressional action is taken. Under current legislation the actual reduction in Medicare payments will vary from 1% in 2022 to up to 3% in the final fiscal year of this sequester. On March 11, 2021, President Biden signed the American Rescue Plan Act of 2021 into law, which eliminates the statutory Medicaid drug rebate cap, currently set at 100% of a drug's average manufacturer price, for single source and innovator multiple source drugs, beginning January 1, 2024. Additionally, in January 2013, President Obama signed into law the American Taxpayer Relief Act of 2012, which, among other things, further reduced Medicare payments to several providers and increased the statute of limitations period for the government to recover overpayments to providers from three to five years.

Additionally, there has been increasing legislative and enforcement interest in the United States with respect to drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries, Presidential executive orders, and proposed and adopted federal and state legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drugs. For example, the Trump administration used several means to propose or implement drug pricing reform, including through federal budget proposals, executive orders and policy initiatives. For example, on July 24, 2020 and September 13, 2020, the Trump administration announced several executive orders related to prescription drug pricing that attempt to implement several of the administration's proposals. The FDA also released a final rule and guidance in September

2020, implementing a portion of the importation executive order providing guidance for states to build and submit importation plans for drugs from Canada. Further, on November 20, 2020, HHS finalized a regulation removing safe harbor protection for price reductions from pharmaceutical manufacturers to plan sponsors under Part D, either directly or through pharmacy benefit managers, unless the price reduction is required by law. The implementation of the rule has been delayed by the Biden administration from January 1, 2022 to January 1, 2023 in response to ongoing litigation. The rule also creates a new safe harbor for price reductions reflected at the point-of-sale, as well as a new safe harbor for certain fixed fee arrangements between pharmacy benefit managers and manufacturers, the implementation of which have also been delayed until January 1, 2023. On November 20, 2020, CMS issued an interim final rule implementing President Trump's Most Favored Nation executive order, which would tie Medicare Part B payments for certain physician-administered drugs to the lowest price paid in other economically advanced countries, effective January 1, 2021. . As a result of litigation challenging the Most Favored Nation model, on December 27, 2021, CMS published a final rule that rescinded the Most Favored Nation model interim final rule. In July 2021, the Biden administration released an executive order, "Promoting Competition in the American Economy," with multiple provisions aimed at prescription drugs. In response to Biden's executive order, on September 9, 2021, HHS released a Comprehensive Plan for Addressing High Drug Prices that outlines principles for drug pricing reform and sets out a variety of potential legislative policies that Congress could pursue as well as potential administrative actions HHS can take to advance these principles. No legislation or administrative actions have been finalized to implement these principles. It is unclear whether these or similar policy initiatives will be implemented in the future. At the state level, legislatures have increasingly passed legislation and implemented regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing. The full impact of these laws, as well as other new laws and reform measures that may be proposed and adopted in the future remains uncertain, but may result in additional reductions in Medicare and other health care funding, or higher production costs which could have a material adverse effect on our customers and, accordingly, our financial operations. Further, it is possible that additional governmental action is taken in response to the COVID-19 pandemic.

## Risks Related to Our Reliance on Third Parties

***We rely on third parties to conduct our preclinical studies and clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines, we may not be able to obtain regulatory approval for or commercialize our product candidates and our business could be substantially harmed.***

We have relied upon and plan to continue to rely upon third party CROs to monitor and manage data for our preclinical and clinical programs. We rely on these parties for execution of our preclinical studies and clinical trials, and control only certain aspects of their activities. Nevertheless, we are responsible for ensuring that each of our trials is conducted in accordance with the applicable protocol, legal, regulatory and scientific standards and our reliance on the CROs does not relieve us of our regulatory responsibilities. We and our CROs are required to comply with FDA regulations and other laws regarding current good clinical practice, or GCP, which are also required by the Competent Authorities of the Member States of the European Economic Area and comparable foreign regulatory authorities in the form of International Council for Harmonization, or ICH, guidelines for all of our products in clinical development. Regulatory authorities enforce GCP through periodic inspections of trial sponsors, principal investigators and trial sites. If we or any of our CROs fail to comply with applicable GCP, the clinical data generated in our clinical trials may be deemed unreliable and the FDA or comparable foreign regulatory authorities may require us to perform additional clinical trials before approving our marketing applications. We cannot assure you that upon inspection by a given regulatory authority, such regulatory authority will determine that any of our clinical trials comply with GCP regulations. In addition, our clinical trials must be conducted with product produced under cGMP regulations. While we have agreements governing activities of our CROs, we have limited influence over their actual performance. In addition, portions of the clinical trials for our product candidates are expected to be conducted outside of the United States, which will make it more difficult for us to monitor CROs and perform visits of our clinical trial sites and will force us to rely heavily on CROs to ensure the proper and timely conduct of our clinical trials and compliance with applicable regulations, including GCP. Failure to comply with applicable regulations in the conduct of the clinical trials for our product candidates may require us to repeat clinical trials, which would delay the regulatory approval process.

Some of our CROs have an ability to terminate their respective agreements with us if, among other reasons, it can be reasonably demonstrated that the safety of the subjects participating in our clinical trials warrants such termination, if we make a general assignment for the benefit of our creditors or if we are liquidated. If any of our relationships with these third party CROs terminate, we may not be able to enter into arrangements with alternative CROs or to do so on commercially reasonable terms. In addition, our CROs are not our employees, and except for remedies available to us under our agreements with such CROs, we cannot control whether or not they devote sufficient time and resources to our preclinical and clinical programs. If CROs do not successfully carry out their contractual duties or obligations or meet expected deadlines, if they need to be replaced or if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols,

46

regulatory requirements or for other reasons, our clinical trials may be extended, delayed or terminated and we may not be able to obtain regulatory approval for or successfully commercialize our product candidates. Consequently, our results of operations and the commercial prospects for our product candidates would be harmed, our costs could increase substantially and our ability to generate revenue could be delayed significantly.

Switching or adding additional CROs involves additional cost and requires management time and focus. In addition, there is a natural transition period when a new CRO commences work. As a result, delays occur, which can materially impact our ability to meet our desired clinical development timelines. Though we carefully manage our relationships with our CROs, there can be no assurance that we will not encounter challenges or delays in the future or that these delays or challenges will not have a material adverse impact on our business, financial condition and prospects.

***If any of our current strategic collaborators fail to perform their obligations or terminate their agreements with us, the development and commercialization of the product candidates under such agreements could be delayed or terminated and our business could be substantially harmed.***

In 2015, we entered into the Cephalon License, with Cephalon (Teva) for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. Pursuant to the terms of the Cephalon License, as has been amended from time to time,
Teva is responsible for all U.S. commercial activities for the product including promotion and distribution, and we are responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies.

This strategic collaboration may not be scientifically or commercially successful due to a number of important factors, including the following:

- If we fail to maintain any regulatory approvals, or otherwise materially breach the agreement, we may not receive all anticipated royalty payments;
- Cephalon has significant discretion in determining the efforts and resources that it will apply to their strategic collaboration with us. The timing and amount of any cash payments, and royalties that we may receive under such agreements will depend on, among other things, the efforts, allocation of resources and the commercialization of our product by Cephalon under the Cephalon License;
- Cephalon currently markets a competitive bendamustine product, Treanda®, in the United States. In addition, it is possible that Cephalon may develop and commercialize, either alone or with others, or be acquired by a company that has, products that are similar to or competitive with the product candidates that they license from us;
- Cephalon may change the focus of their commercialization efforts or pursue higher-priority programs;
- Cephalon may terminate its strategic collaboration with us on short notice, which could make it difficult for us to attract new strategic collaborators or adversely affect how we are perceived in the scientific and financial communities;
- Cephalon has the right to maintain or defend our intellectual property rights licensed to them in their territories, and, although we may have the right to assume the maintenance and defense of our intellectual property rights if they do not, our ability to do so may be compromised by our strategic collaborators' acts or omissions; and
- Cephalon may not comply with all applicable regulatory requirements, or fail to report safety data in accordance with all applicable regulatory requirements;
- If Cephalon fails to effectively commercialize our product, we may not be able to replace them with another collaborator, and,
- If our agreement with Cephalon terminates, we are required to pay them a portion of our future profits on the product.
  Any of these events could have a material adverse effect on our business, results of operations and our ability to achieve future profitability, and could cause our stock price to decline.

***We may not be successful in maintaining development and commercialization collaborations, and any partner may not devote sufficient resources to the development or commercialization of our product candidates or may otherwise fail in development or commercialization efforts, which could adversely affect our ability to develop certain of our product candidates and our financial condition and operating results.***

We have entered in licensing and/or collaboration agreements with third parties, including our license agreement with AOP Orphan for Landiolol and our strategic collaboration with Tyme to advance oral SM-88 for the treatment of patients with cancer. If we are able to establish additional collaboration arrangements, any such collaborations, in addition to our current license and collaboration agreements, may not ultimately be successful, which could have a negative impact on our business, results of operations, financial condition and prospects. If we partner with a third party for development and commercialization

47

of a product or product candidate, we can expect to relinquish some or all of the control over the future success of that product or product candidate to the third party. It is possible that a partner may not devote sufficient resources to the development or commercialization of our product candidate or may otherwise fail in development or commercialization efforts, in which event the development and commercialization of such product candidate could be delayed or terminated and our business could be substantially harmed. In addition, the terms of any collaboration or other arrangement that we establish may not prove to be favorable to us or may not be perceived as favorable, which may negatively impact the trading price of our common stock. In some cases, we may be responsible for continuing development of a product candidate or research program under a collaboration, and the payment we receive from our partner may be insufficient to cover the cost of this development. Moreover, collaborations and sales and marketing arrangements are complex and time consuming to negotiate, document and implement, and they may require substantial resources to maintain.

We may be subject to a number of additional risks associated with our collaborations with third parties, the occurrence of which could cause collaboration arrangements to fail. Conflicts may arise between us and our partners, such as conflicts concerning the interpretation of clinical data, the achievement of milestones, the interpretation of financial provisions or the ownership of intellectual property developed during the collaboration. If any such conflicts arise, a partner could act in its own self-interest, which may be adverse to our interests. Any such disagreement between us and a partner could result in one or more of the following, each of which could delay or prevent the development or commercialization of our product candidates and harm our business:

- reductions in the payment of royalties or other payments we believe are due pursuant to the applicable collaboration arrangement;

- actions taken by a partner inside or outside our collaboration which could negatively impact our rights or benefits under our collaboration; and

- unwillingness on the part of a partner to keep us informed regarding the progress of its development and commercialization activities or to permit public disclosure of the results of those activities.

***We rely on third parties to manufacture commercial supplies of our products and clinical supplies of our product candidates, and we intend to rely on third parties to manufacture commercial supplies of any other approved products. The commercialization of any of our products could be stopped, delayed or made less profitable if those third parties fail to provide us with sufficient quantities of product or fail to do so at acceptable quality levels or prices or fail to maintain or achieve satisfactory regulatory compliance.***

We do not own any manufacturing facilities, and we do not currently, and do not expect in the future, to independently conduct any aspects of our product manufacturing and testing, or other activities related to the clinical development and commercialization of our product candidates. We currently rely, and expect to continue to rely, on third parties with respect to these items, and control only certain aspects of their activities.

Any of these third parties may terminate their engagements with us at any time. If we need to enter into alternative arrangements, it could delay our product candidate development and product commercialization activities. Our reliance on these third parties reduces our control over these activities but does not relieve us of our responsibility to ensure compliance with all required legal, regulatory and scientific standards and any applicable trial protocols. If these third parties do not successfully carry out their contractual duties, meet expected deadlines or conduct our studies in accordance with regulatory requirements or our stated study plans and protocols, we will not be able to complete, or may be delayed in completing, clinical trials required to support future regulatory submissions and approval of our product candidates.

Our products and product candidates are highly reliant on very complex sterile techniques and personnel aseptic techniques. The facilities used by our third-party manufacturers to manufacture our products and product candidates must be approved by the applicable regulatory authorities pursuant to inspections that will be conducted after we submit our NDA to the FDA. If any of our third-party manufacturers cannot successfully manufacture material that conforms to our specifications and the applicable regulatory authorities' strict regulatory requirements, or pass regulatory inspection, they will not be able to secure or maintain regulatory approval for the manufacturing facilities. In addition, we have no control over the ability of third-party manufacturers to maintain adequate quality control, quality assurance and qualified personnel. Quality problems in manufacturing are linked to a majority of shortages of sterile injectable drugs. Some of the largest manufacturers of sterile injectable drugs have had serious quality problems leading to the temporary voluntary closure or renovations of major production facilities. Further, as we scale up manufacturing of our product candidates and conduct required stability testing, product packaging, equipment and process-related issues may require refinement or resolution in order for us to proceed with

our planned clinical trials and obtain regulatory approval for commercialization of our product candidates. In the future, for example, we may identify impurities in the product manufactured for us for commercial supply, which could result in increased scrutiny by the regulatory agencies, delays in our clinical program and regulatory approval, increases in our operating expenses, or failure to obtain or maintain approval for our product candidates. If the FDA or any other applicable regulatory authority does not approve these facilities to manufacture our products or if they withdraw any such approval in the future, or if our suppliers or third-party manufacturers decide they no longer want to manufacture our products, we may need to find alternative manufacturing facilities, which would significantly impact our ability to develop, obtain regulatory approval for or market our products or product candidates.

More generally, manufacturers of pharmaceutical products often encounter difficulties in production, particularly in scaling up and validating initial production. These problems include difficulties with production costs and yields, quality control, including stability of the product, quality assurance testing, shortages of qualified personnel, as well as compliance with strictly enforced federal, state and foreign regulations. Additionally, our manufacturers may experience manufacturing difficulties due to resource constraints or as a result of labor disputes or unstable political environments. If our manufacturers were to encounter any of these difficulties, or otherwise fail to comply with their contractual obligations, our ability to make product candidates available for clinical trials and development purposes or to further commercialize our products or product candidates in the United States would be jeopardized. Any delay or interruption in our ability to meet commercial demand may result in the loss of potential revenues and could adversely affect our ability to gain market acceptance for approved products. In addition, any delay or interruption in the supply of clinical trial supplies could delay the completion of clinical trials, increase the costs associated with maintaining clinical trial programs and, depending upon the period of delay, require us to commence new clinical trials at additional expense or terminate clinical trials completely. Additionally, if supply from one approved manufacturer is interrupted, there could be a significant disruption in commercial supply. Regulatory agencies may also require additional studies if a new manufacturer is relied upon for commercial production. Switching manufacturers may involve substantial costs and is likely to result in a delay in our desired clinical and commercial timelines.

The occurrence of any of these factors could have a material adverse effect on our business, results of operations, financial condition and prospects.

***The design, development, manufacture, supply, and distribution of our products and product candidates is highly regulated and technically complex.***

All entities involved in the preparation of therapeutics for clinical trials or commercial sale, including our existing contract manufacturers for our products and product candidates, are subject to extensive regulation. Components of a finished therapeutic product approved for commercial sale or used in late-stage clinical trials must be manufactured in accordance with cGMP and equivalent foreign standards. These regulations govern manufacturing processes and procedures (including record keeping) and the implementation and operation of quality systems to control and assure the quality of investigational products and products approved for sale. Poor control of production processes can lead to the introduction of adventitious agents or other contaminants, or to inadvertent changes in the properties or stability of our products or product candidates that may not be detectable in final product testing. The development, manufacture, supply, and distribution of our products, as well as our other product candidates, is highly regulated and technically complex. We, along with our third-party providers, must comply with all applicable regulatory requirements of the FDA and foreign authorities.

We, or our contract manufacturers, must supply all necessary documentation in support of our regulatory filings for our products and product candidates on a timely basis and must adhere to the FDA's good laboratory practices, or GLP, and cGMP regulations enforced by the FDA through its facilities inspection program, and the equivalent standards of the regulatory authorities in other countries. Any failure by our third-party manufacturers to comply with cGMP or failure to scale-up manufacturing processes, including any failure to deliver sufficient quantities of product candidates in a timely manner, could lead to a delay in, or failure to obtain, regulatory approval of any of our product candidates. Our facilities and quality systems and the facilities and quality systems of some or all of our third-party contractors must also pass a pre-approval inspection for compliance with the applicable regulations as a condition of regulatory approval of our product candidates or any of our other potential products. In addition, the regulatory authorities in any country may, at any time, audit or inspect a manufacturing facility involved with the preparation of our product candidates or our other potential products or the associated quality systems for compliance with the regulations applicable to the activities being conducted. If these facilities and quality systems do not pass a pre-approval plant inspection, FDA approval of our product candidates, or the equivalent approvals in other jurisdictions, will not be granted.

Regulatory authorities also may, at any time following approval of a product for sale, audit our manufacturing facilities or those of our third-party contractors. If any such inspection or audit identifies a failure to comply with applicable regulations or if a violation of our product specifications or applicable regulations occurs independent of such an inspection or audit, we or the relevant regulatory authority may require remedial measures that may be costly and/or time-consuming for us or a third party to

49

implement and that may include the temporary or permanent suspension of a clinical trial or commercial sales or the temporary or permanent closure of a facility. Any such remedial measures imposed upon us or third parties with whom we contract could materially harm our business. If we or any of our third-party manufacturers fail to maintain regulatory compliance, the FDA can impose regulatory sanctions including, among other things, refusal to approve a pending application for a new drug product or biological product or revocation of a pre-existing approval. As a result, our business, financial condition and results of operations may be materially harmed.

***We rely on limited sources of supply for our products and product candidates, and any disruption in the chain of supply may impact production and sales of our products and cause delay in developing and commercializing our product candidates.***

We currently have relationships with only one third party for the manufacture of each of our most advanced products and product candidates. Because of the unique equipment and process for manufacturing our products transferring manufacturing activities to an alternate supplier would be a time-consuming and costly endeavor, and there are only a limited number of manufacturers that we believe are capable of performing this function for us. Switching finished drug suppliers may involve substantial cost and could result in a delay in our desired clinical and commercial timelines. If any of these single-source manufacturers breaches or terminates their agreements with us, we would need to identify an alternative source for the manufacture and supply of product candidates to us for the purposes of our development and commercialization of the applicable products. Identifying an appropriately qualified source of alternative supply for any one or more of these product candidates could be time consuming, and we may not be able to do so without incurring material delays in the development and commercialization of our product candidates, which could harm our financial position and commercial potential for our products. Any alternative vendor would also need to be qualified through an NDA supplement which could result in further delay. The FDA or other regulatory agencies outside of the United States may also require additional studies if we appoint a new manufacturer for supply of our product candidates that differs from the manufacturer used for clinical development of such product candidates. For our other product candidates, we expect that only one supplier will initially be qualified as a vendor with the FDA. If supply from the approved vendor is interrupted, there could be a significant disruption in commercial supply.

Additionally, if the COVID-19 pandemic continues to persist for an extended period of time and impacts essential distribution systems, we could continue to experience disruptions to our supply chain and operations, and associated delays in the manufacturing and supply of our products, which would adversely impact our ability to deliver products to clinical trial sites or to generate sales of and revenues from our approved products.

These factors could cause the delay of clinical trials, regulatory submissions, required approvals or commercialization of our product candidates, cause us to incur higher costs and prevent us from commercializing them successfully. Furthermore, if our suppliers fail to deliver the required commercial quantities of components and active pharmaceutical ingredient on a timely basis and at commercially reasonable prices, and we are unable to secure one or more replacement suppliers capable of production at a substantially equivalent cost, our clinical trials may be delayed or we could lose potential revenue.

***We may not be successful in establishing development and commercialization collaborations which could adversely affect, and potentially prohibit, our ability to develop our product candidates.***

Because developing pharmaceutical products, conducting clinical trials, obtaining regulatory approval, establishing manufacturing capabilities and marketing approved products are expensive, we are exploring collaborations with third parties outside of the United States that have more resources and experience. We may, however, be unable to advance the development of our products and product candidates in territories outside of the United States, which may limit the market potential for this product candidate.

In situations where we enter into a development and commercial collaboration arrangement for a product candidate, we may also seek to establish additional collaborations for development and commercialization in territories outside of those addressed by the first collaboration arrangement for such product candidate. There are a limited number of potential partners, and we expect to face competition in seeking appropriate partners. We have entered into collaboration and promotion agreements with third parties, but there is no assurance these arrangements will be successful. If we are unable to enter into any future development and commercial collaborations and/or sales and marketing arrangements on acceptable terms, if at all, we may be unable to successfully develop and seek regulatory approval for our product candidates and/or effectively market and sell future approved products, if any, in all of the territories outside of the United States where it may otherwise be valuable to do so.

***If we are unable to maintain our GPO, relationships, our revenues could decline and future profitability could be jeopardized.***

Most of the end-users of injectable pharmaceutical products have relationships with GPOs whereby such GPOs provide such end-users access to a broad range of pharmaceutical products from multiple suppliers at competitive prices and, in certain cases, exercise considerable influence over the drug purchasing decisions of such end-users. Hospitals and other end-users contract

50

with the GPO of their choice for their purchasing needs. We currently derive, and expect to continue to derive, a large percentage of our revenue from end-user customers that are members of a small number of GPOs. Maintaining strong relationships with these GPOs will require us to continue to be a reliable supplier, remain price competitive and comply with FDA regulations. The GPOs with whom we have relationships may have relationships with companies that sell competing products, and such GPOs may earn higher margins from these products or combinations of competing products or may prefer products other than ours for other reasons. If we are unable to maintain our GPO relationships, sales of our products and revenue could decline.

### We rely on a limited number of pharmaceutical wholesalers to distribute our products.

As is typical in the pharmaceutical industry, we rely upon pharmaceutical wholesalers in connection with the distribution of our products. A significant amount of our products are sold to end-users under GPO pricing arrangements through a limited number of pharmaceutical wholesalers. If we are unable to maintain our business relationships with these pharmaceutical wholesalers on commercially acceptable terms, it could have a material adverse effect on our sales and may prevent us from achieving profitability.

### Our approved products may not achieve expected levels of market acceptance.

Even if we are able to obtain regulatory approvals for our product candidates, the success of those products is dependent upon market acceptance. Levels of market acceptance for our product candidates could be affected by several factors, including:

- the availability of alternative products from our competitors;
- the price of our products relative to those of our competitors;
- the timing of our market entry;
- the ability to market our products effectively at the retail level;
- the perception of patients and the healthcare community, including third-party payors, regarding the safety efficacy and benefits of our drug products compared to those of competing products; and
- the acceptance of our products by government and private formularies.

Some of these factors are not within our control, and our products may not achieve expected levels of market acceptance. Additionally, continuing and increasingly sophisticated studies of the proper utilization, safety and efficacy of pharmaceutical products are being conducted by the industry, government agencies and others which may call into question the utilization, safety and efficacy of previously marketed products. In some cases, studies have resulted, and may in the future result, in the discontinuance of product marketing or other risk management programs such as the need for a patient registry.

### Risks Related to Our Business Operations and Industry

### Our future success depends on our ability to retain key executives and to attract, retain and motivate qualified personnel.

We are highly dependent on the principal members of our executive team, which include our Chief Executive Officer and President, Chief Financial Officer, Chief Medical Officer, and Chief Commercial Officer. We are currently searching for a new Chief Medical Officer, which position is currently vacant. The loss of these executives' services may adversely impact the achievement of our objectives. Any of our executive officers could leave our employment at any time, as all of our employees are "at will" employees. Recruiting and retaining other qualified employees for our business, including scientific and technical personnel, will also be critical to our success. There is currently a shortage of skilled executives in our industry, which is likely to continue. As a result, competition for skilled personnel is intense and the turnover rate can be high. We may not be able to attract and retain personnel on acceptable terms given the competition among numerous pharmaceutical companies for individuals with similar skill sets. In addition, failure to succeed in clinical studies may make it more challenging to recruit and retain qualified personnel. The inability to recruit key executives or the loss of the services of any executive or key employee might impede the progress of our development and commercialization objectives.

### We will need to expand our organization, and we may experience difficulties in managing this growth, which could disrupt our operations.

As of December 31, 2021, we had a total of 102 employees in the United States. As our company matures, we expect to expand our employee base to increase our managerial, scientific and engineering, operational, sales, marketing, financial and other resources and to hire more consultants and contractors. Future growth would impose significant additional responsibilities on our management, including the need to identify, recruit, maintain, motivate and integrate additional employees, consultants and contractors. Also, our management may need to divert a disproportionate amount of its attention away from our day-to-day activities and devote a substantial amount of time to managing these growth activities.

We may not be able to effectively manage the expansion of our operations which may result in weaknesses in our infrastructure and give rise to operational mistakes, loss of business opportunities, loss of employees and reduced productivity among

51

remaining employees. Future growth could require significant capital expenditures and may divert financial resources from other projects, such as the development of our existing or future product candidates. If our management is unable to effectively manage our growth, our expenses may increase more than expected, our ability to generate and/or grow revenue could be reduced and we may not be able to implement our business strategy. Our future financial performance and our ability to sell our products and commercialize our product candidates, if approved, and compete effectively will depend, in part, on our ability to effectively manage any future growth.

***We face potential product liability, and, if successful claims are brought against us, we may incur substantial liability.***

The use of our product candidates in clinical trials (if any), and the sale of our products and any product candidates for which we obtain marketing approval, exposes us to the risk of product liability claims. Product liability claims might be brought against us by consumers, health care providers, pharmaceutical companies or others selling or otherwise coming into contact with our products, other approved future products and our product candidates. If we cannot successfully defend against product liability claims, we could incur substantial liability and costs. In addition, regardless of merit or eventual outcome, product liability claims may result in:

- impairment of our business reputation;

- withdrawal of clinical study participants;

- costs due to related litigation;

- distraction of management's attention from our primary business;

- substantial monetary awards to patients or other claimants;

- the inability to commercialize our product candidates; and

- decreased demand for our products and our product candidates, if approved for commercial sale.

Our current product liability insurance coverage may not be sufficient to reimburse us for any expenses or losses we may suffer. Moreover, insurance coverage is becoming increasingly expensive and in the future we may not be able to maintain insurance coverage at a reasonable cost or in sufficient amounts to protect us against losses due to liability. On occasion, large judgments have been awarded in class action lawsuits based on drugs that had unanticipated adverse effects. A successful product liability claim or series of claims brought against us could cause our stock price to decline and, if judgments exceed our insurance coverage, could adversely affect our results of operations and business.

***We are subject to stringent and changing obligations related to data privacy and security. Our actual or perceived failure to comply with such obligations could lead to regulatory investigations or actions; litigation; fines and penalties; disruptions of our business operations; reputational harm; loss of revenue or profits; and other adverse business consequences.***

In the ordinary course of business, we collect, receive, store, process, generate, use, transfer, disclose, make accessible, protect, secure, dispose of, transmit, and share (commonly known as processing) personal data and other sensitive information, including proprietary and confidential business data, trade secrets, intellectual property, data we collect about participants in connection with clinical trials, and sensitive third-party data. Our data processing activities subject us to numerous data privacy and security obligations, such as various laws, regulations, guidance, industry standards, external and internal privacy and security policies, contracts, and other obligations that govern the processing of personal data by us and on our behalf.

In the United States, federal, state, and local governments have enacted numerous data privacy and security laws, including data breach notification laws, personal data privacy laws, and consumer protection laws. For example, the federal Health Insurance Portability and Accountability Act of 1996, or HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act, or HITECH, imposes specific requirements relating to the privacy, security, and transmission of individually identifiable health information. Additionally, the California Consumer Privacy Act of 2018, or CCPA, imposes obligations on covered businesses. These obligations include, but are not limited to, providing specific disclosures in privacy notices and affording California residents certain rights related to their personal data. The CCPA allows for statutory fines for noncompliance (up to $7,500 per violation) and a private right of action for certain data breaches. Although the CCPA exempts some data processed in the context of clinical trials, the CCPA may increase compliance costs and potential liability with respect to other personal data we may maintain about California residents. In addition, it is anticipated that the California Privacy Rights Act of 2020, or CPRA, effective January 1, 2023, will expand the CCPA. The CPRA establishes a new California Privacy Protection Agency to implement and enforce the CPRA, which could increase the risk of enforcement. Other states have enacted data privacy laws. For example, Virginia passed the Consumer Data Protection Act, and Colorado passed the Colorado Privacy Act, both of which become effective in 2023. In addition, data privacy and security laws have been proposed at the federal, state, and local levels in recent years, which could further complicate compliance efforts.

52

Outside the United States, an increasing number of laws, regulations, and industry standards apply to data privacy and security. For example, the European Union's General Data Protection Regulation, or EU GDPR, and the United Kingdom's GDPR, or UK GDPR, impose strict requirements for processing personal data. For example, under the EU GDPR, government regulators may impose temporary or definitive bans on data processing, as well as fines of up to 20 million euros or 4% of annual global revenue, whichever is greater. Further, individuals may initiate litigation related to the processing of their personal data.

Certain jurisdictions have enacted data localization laws and cross-border personal data transfer laws, which could make it more difficult to transfer information across jurisdictions (such as transferring or receiving personal data that originates in the EU or in other foreign jurisdictions). Existing mechanisms that facilitate cross-border personal data transfers may change or be invalidated. For example, absent appropriate safeguards or other circumstances, the EU GDPR generally restricts the transfer of personal data to countries outside of the European Economic Area, or EEA, that the European Commission does not consider to provide an adequate level of data privacy and security, such as the United States. The European Commission released a set of "Standard Contractual Clauses," or SCCs, that are designed to be a valid mechanism to facilitate personal data transfers out of the EEA to these jurisdictions. Currently, these SCCs are a valid mechanism to transfer personal data outside of the EEA, but there exists some uncertainty regarding whether the SCCs will remain a valid mechanism. Additionally, the SCCs impose additional compliance burdens, such as conducting transfer impact assessments to determine whether additional security measures are necessary to protect the at-issue personal data. In addition, Switzerland and the UK similarly restrict personal data transfers outside of those jurisdictions to countries, such as the United States, that do not provide an adequate level of personal data protection, and certain countries outside Europe (e.g., China) have also passed or are considering laws requiring local data residency or otherwise impeding the transfer of personal data across borders, any of which could increase the cost and complexity of doing business.

If we cannot implement a valid compliance mechanism for cross-border data transfers, we may face increased exposure to regulatory actions, substantial fines, and injunctions against processing or transferring personal data from Europe or other foreign jurisdictions. The inability to import personal data to the United States could significantly and negatively impact our business operations, including by limiting our ability to conduct clinical trial activities; limiting our ability to collaborate with parties that are subject to such cross-border data transfer or localization laws; or requiring us to increase our personal data processing capabilities and infrastructure in foreign jurisdictions at significant expense.

Our obligations related to data privacy and security are quickly changing in an increasingly stringent fashion, creating some uncertainty as to the effective future legal framework. Additionally, these obligations may be subject to differing applications and interpretations, which may be inconsistent or conflict among jurisdictions. Preparing for and complying with these obligations requires significant resources and may necessitate changes to our information technologies, systems, and practices and to those of any third parties that process personal data on our behalf. Although we endeavor to comply with all applicable data privacy and security obligations, we may at times fail (or be perceived to have failed) to do so. Moreover, despite our efforts, our personnel or third parties upon whom we rely may fail to comply with such obligations, which could negatively impact our business operations and compliance posture. For example, any failure by a third-party processor to comply with applicable law, regulations, or contractual obligations could result in adverse effects, including inability to or interruption in our ability to operate our business and proceedings against us by governmental entities or others.

If we fail, or are perceived to have failed, to address or comply with data privacy and security obligations, we could face significant consequences. These consequences may include, but are not limited to, government enforcement actions (e.g., investigations, fines, penalties, audits, inspections, and similar); litigation (including class-related claims); additional reporting requirements and/or oversight; bans on processing personal data; orders to destroy or not use personal data; and imprisonment of company officials.

Any of these events could have a material adverse effect on our reputation, business, or financial condition, including but not limited to: interruptions in our business operations; inability to process personal data or to operate in certain jurisdictions; limited ability to develop or commercialize our products; expenditure of time and resources to defend any claim or inquiry; adverse publicity; or revision or restructuring of our operations.

***If our information technology systems or sensitive information, or those of third parties upon which we rely, are or were compromised, we could experience adverse consequences resulting from such compromise, including, but not limited to, regulatory investigations or actions; litigation; fines and penalties; disruptions of our business operations; reputational harm; loss of revenue or profits; loss of customers or sales; and other adverse consequences.***

53

In the ordinary course of our business, we may process proprietary, confidential, and sensitive data, including personal data (such as health-related data), intellectual property, and trade secrets (collectively, sensitive information). We may rely upon third-party service providers and technologies to operate critical business systems to process sensitive information in a variety of contexts, including, without limitation, third-party providers of cloud-based infrastructure, encryption and authentication technology, employee email, and other functions. Our ability to monitor these third parties' information security practices is limited, and these third parties may not have adequate information security measures in place. We may share or receive sensitive information with or from third parties.

Cyberattacks, malicious internet-based activity, and online and offline fraud are prevalent and continue to increase. These threats are becoming increasingly difficult to detect. These threats come from a variety of sources, including traditional computer "hackers," threat actors, personnel (such as through theft or misuse), sophisticated nation states, and nation-state-supported actors. Some actors now engage and are expected to continue to engage in cyber-attacks, including, without limitation, nation-state actors for geopolitical reasons and in conjunction with military conflicts and defense activities. We and the third parties upon which we rely may be subject to a variety of evolving threats, including, but not limited to, social-engineering attacks (including through phishing attacks), malicious code (such as viruses and worms), malware (including as a result of advanced persistent threat intrusions), denial-of-service attacks (such as credential stuffing), personnel misconduct or error, ransomware attacks, supply-chain attacks, software bugs, server malfunctions, software or hardware failures, loss of data or other information technology assets, adware, telecommunications failures, and other similar threats.

Ransomware attacks, including by organized criminal threat actors, nation-states, and nation-state-supported actors, are becoming increasingly prevalent and severe and can lead to significant interruptions in our operations, loss of data and income, reputational harm, and diversion of funds. Extortion payments may alleviate the negative impact of a ransomware attack, but we may be unwilling or unable to make such payments due to, for example, applicable laws or regulations prohibiting such payments. Similarly, supply-chain attacks have increased in frequency and severity, and we cannot guarantee that third parties and infrastructure in our supply chain or our third-party partners' supply chains have not been compromised or that they do not contain exploitable defects or bugs that could result in a breach of or disruption to our information technology systems or the third-party information technology systems that support us and our business operations. The COVID-19 pandemic and our remote workforce poses increased risks to our information technology systems and data, as more of our employees work from home, utilizing network connections outside our premises. Future or past business transactions (such as acquisitions or integrations) could expose us to additional cybersecurity risks and vulnerabilities, as our systems could be negatively affected by vulnerabilities present in acquired or integrated entities' systems and technologies.

Any of the previously identified or similar threats could cause a security incident or other interruption. A security incident or other interruption could result in unauthorized, unlawful, or accidental acquisition, modification, destruction, loss, alteration, encryption, disclosure of, or access to our sensitive information. A security incident or other interruption could disrupt our ability (and that of third parties upon whom we rely) to operate our business.

We may expend significant resources or modify our business activities (including our clinical trial activities) to try to protect against security incidents. Certain data privacy and security obligations may require us to implement and maintain specific security measures, industry-standard or reasonable security measures to protect our information technology systems and sensitive information.

While we have implemented security measures designed to protect against security incidents, there can be no assurance that these measures will be effective. We may be unable in the future to detect vulnerabilities in our information technology systems because such threats and techniques change frequently, are often sophisticated in nature, and may not be detected until after a security incident has occurred. Despite our efforts to identify and remediate vulnerabilities, if any, in our information technology systems, our efforts may not be successful. Further, we may experience delays in developing and deploying remedial measures designed to address any such identified vulnerabilities.

Applicable data privacy and security obligations may require us to notify relevant stakeholders of security incidents. Such disclosures are costly, and the disclosures or the failure to comply with such requirements could lead to adverse consequences. If we (or a third party upon whom we rely) experience a security incident or are perceived to have experienced a security incident, we may experience adverse consequences. These consequences may include: government enforcement actions (for example, investigations, fines, penalties, audits, and inspections); additional reporting requirements and/or oversight; restrictions on processing sensitive information (including personal data); litigation (including class claims); indemnification obligations; negative publicity; reputational harm; monetary fund diversions; interruptions in our operations (including availability of data); financial loss; and other similar harms. Security incidents and attendant consequences may negatively

impact our ability to grow and operate our business. Our contracts may not contain limitations of liability, and even where they do, there can be no assurance that limitations of liability in our contracts are sufficient to protect us from liabilities, damages, or claims related to our data privacy and security obligations.

***Business interruptions could delay us in the process of developing our product candidates and could disrupt our sales of any products we may sell.***

Our headquarters are located in Woodcliff Lake, New Jersey. If we encounter any disruptions to our operations at this building or if it were to shut down for any reason, including by fire, natural disaster, such as a hurricane, tornado or severe storm, power outage, systems failure, labor dispute or other unforeseen disruption, then we may be prevented from effectively operating our business. We do not carry insurance for natural disasters and we may not carry sufficient business interruption insurance to compensate us for losses that may occur. Any losses or damages we incur could have a material adverse effect on our business operations.

***We may be constrained by our obligations under our Revised Credit Agreement to operate our business to its full potential.***

Our Revised Credit Agreement contains customary representations and warranties and customary affirmative and negative covenants, including, among other things, restrictions on indebtedness, liens, investments, mergers, dispositions, prepayment of other indebtedness and dividends and other distributions. Under the terms of the Revised Credit Agreement, we are required to comply with (a) a maximum senior secured net leverage ratio, (b) a maximum total net leverage ratio and (c) a minimum fixed charge coverage ratio. These terms may restrict our ability to operate our business in the manner we deem most effective or desirable, and may restrict our ability to fund our operations through new public offerings of our common stock or strengthen our candidate development pipeline through acquisitions or licenses which cause us to exceed our maximum senior secured net leverage ratio.

Failure to comply with the representations and warranties or affirmative and negative covenants could constitute an event of default which, if continued beyond the cure period, would allow the administrative agent, at the request of or with the consent of the lenders holding a majority of the loans and commitments under the facility, to terminate the commitments of the lenders to make further loans and declare all the obligations of the loan parties under the Revised Credit Agreement to be immediately due and payable, either of which could harm our business.

**Risks Related to Our Intellectual Property**
***If we are unable to obtain or protect intellectual property rights related to any of our product candidates, we may not be able to compete effectively in our market.***

We rely upon a combination of patents, trade secret protection and confidentiality agreements to protect the intellectual property related to our products and our product candidates. The strength of patents in the biotechnology and pharmaceutical field involves complex legal and scientific questions and can be uncertain. The patent applications that we own or in-license may fail to result in issued patents with claims that cover the products in the United States or in foreign countries or territories. If this were to occur, early generic competition could be expected against our products and our product candidates in development. There may be relevant prior art relating to our patents and patent applications which could invalidate a patent or prevent a patent from issuing based on a pending patent application. In particular, because the active pharmaceutical ingredients in many of our product candidates have been on the market as separate products for many years, it is possible that these products have previously been used off-label in such a manner that such prior usage would affect the validity of our patents or our ability to obtain patents based on our patent applications.

Even if patents do successfully issue, third parties may challenge their validity, enforceability or scope, which may result in such patents being narrowed or invalidated. Any adverse outcome in these types of matters could result in one or more generic versions of our products being launched before the expiration of the listed patents, which could adversely affect our ability to successfully execute our business strategy to increase sales of our products and would negatively impact our financial condition and results of operations, including causing a significant decrease in our revenues and cash flows.

Furthermore, even if they are unchallenged, our patents and patent applications may not adequately protect our intellectual property or prevent others from designing around our claims. If the patent applications we hold with respect to our products or product candidates fail to issue or if their breadth or strength of protection is threatened, it could dissuade companies from collaborating with us to develop them and threaten our ability to commercialize our product candidates. We cannot offer any assurances about which, if any, patents will issue or whether any issued patents will be found not invalid and not unenforceable or will go unthreatened by third parties. Further, if we encounter delays in regulatory approvals, the period of time during which we could market our product candidates under patent protection could be reduced. If third parties have filed such patent

applications, an interference proceeding in the United States can be provoked by a third party or instituted by us to determine who was the first to invent any of the subject matter covered by the patent claims of our applications.

In addition to the protection afforded by patents, we rely on trade secret protection and confidentiality agreements to protect proprietary know-how that is not patentable, processes for which patents are difficult to enforce and any other elements of our drug development and reformulation processes that involve proprietary know-how, information or technology that is not covered by patents. For example, we maintain trade secrets with respect to certain of the formulation and manufacturing techniques related to our products and our product candidates. Although we generally require all of our employees to assign their inventions to us, and all of our employees, consultants, advisors and any third parties who have access to our proprietary know-how, information or technology to enter into confidentiality agreements, we cannot provide any assurances that all such agreements have been duly executed or that our trade secrets and other confidential proprietary information will not be disclosed or that competitors will not otherwise gain access to our trade secrets or independently develop substantially equivalent information and techniques. We also seek to preserve the integrity and confidentiality of our data and trade secrets by maintaining physical security of our premises and physical and electronic security of our information technology systems. While we have confidence in these individuals, organizations and systems, agreements or security measures may be breached, and we may not have adequate remedies for any breach. In addition, our trade secrets may otherwise become known or be independently discovered by competitors. Additionally, if the steps taken to maintain our trade secrets are deemed inadequate, we may have insufficient recourse against third parties for misappropriating the trade secret. In addition, others may independently discover our trade secrets and proprietary information.

Our ability to obtain patents is highly uncertain because, to date, some legal principles remain unresolved, there has not been a consistent policy regarding the breadth or interpretation of claims allowed in patents in the United States and the specific content of patents and patent applications that are necessary to support and interpret patent claims is highly uncertain due to the complex nature of the relevant legal, scientific and factual issues. Changes in either patent laws or interpretations of patent laws in the United States and other countries may diminish the value of our intellectual property or narrow the scope of our patent protection. For example, on September 16, 2011, the Leahy-Smith America Invents Act, or the Leahy-Smith Act, was signed into law. The Leahy-Smith Act includes a number of significant changes to United States patent law. These include provisions that affect the way patent applications will be prosecuted and may also affect patent litigation. The United States Patent and Trademark Office, or USPTO, has developed new and untested regulations and procedures to govern the full implementation of the Leahy-Smith Act, and many of the substantive changes to patent law associated with the Leahy-Smith Act, and in particular, the first to file provisions, only became effective in March 2013. The Leahy-Smith Act has also introduced procedures making it easier for third-parties to challenge issued patents, as well as to intervene in the prosecution of patent applications. Finally, the Leahy-Smith Act contains new statutory provisions that still require the USPTO to issue new regulations for their implementation and it may take the courts years to interpret the provisions of the new statute. Accordingly, it is too early to tell what, if any, impact the Leahy-Smith Act will have on the operation of our business and the protection and enforcement of our intellectual property. However, the Leahy-Smith Act and its implementation could increase the uncertainties and costs surrounding the prosecution of our patent applications and the enforcement or defense of our issued patents. An inability to obtain, enforce and defend patents covering our proprietary technologies would materially and adversely affect our business prospects and financial condition.

Further, the laws of some foreign countries do not protect proprietary rights to the same extent or in the same manner as the laws of the United States. As a result, we may encounter significant problems in protecting and defending our intellectual property both in the United States and abroad. For example, if the issuance to us, in a given country, of a patent covering an invention is not followed by the issuance, in other countries, of patents covering the same invention, or if any judicial interpretation of the validity, enforceability, or scope of the claims in, or the written description or enablement in, a patent issued in one country is not similar to the interpretation given to the corresponding patent issued in another country, our ability to protect our intellectual property in those countries may be limited. Changes in either patent laws or in interpretations of patent laws in the United States and other countries may materially diminish the value of our intellectual property or narrow the scope of our patent protection. If we are unable to prevent material disclosure of the non-patented intellectual property related to our technologies to third parties, and there is no guarantee that we will have any such enforceable trade secret protection, we may not be able to establish or maintain a competitive advantage in our market, which could materially adversely affect our business, results of operations and financial condition.

***Our drug development strategy relies heavily upon the 505(b)(2) regulatory pathway, which requires us to certify that we do not infringe upon third-party patents covering approved drugs. Such certifications typically result in third-party claims of intellectual property infringement, the defense of which will be costly and time consuming, and an unfavorable outcome in any litigation may prevent or delay our development and commercialization efforts which would harm our business.***

Litigation or other proceedings to enforce or defend intellectual property rights are often complex in nature, may be very expensive and time-consuming, may divert our management's attention from other aspects of our business and may result in

56

unfavorable outcomes that could adversely impact our ability to launch and market our product candidates, or to prevent third parties from competing with our products and product candidates.

There is a substantial amount of litigation, both within and outside the United States, involving patent and other intellectual property rights in the biotechnology and pharmaceutical industries, including patent infringement lawsuits, interferences, oppositions and inter party reexamination proceedings before the USPTO. Numerous United States and foreign issued patents and pending patent applications, which are owned by third parties, exist in the fields in which we and our collaborators are developing product candidates. As the biotechnology and pharmaceutical industries expand and more patents are issued, the risk increases that our product candidates may be subject to claims of infringement of the patent rights of third parties.

In particular, our commercial success depends in large part on our avoiding infringement of the patents and proprietary rights of third parties for existing approved drug products. Because we utilize the 505(b)(2) regulatory pathway for the approval of our products and product candidates, we rely in whole or in part on studies conducted by third parties related to those approved drug products. As a result, upon filing with the FDA for approval of our product candidates, we will be required to certify to the FDA that either: (1) there is no patent information listed in the FDA's Orange Book with respect to our NDA; (2) the patents listed in the Orange Book have expired; (3) the listed patents have not expired, but will expire on a particular date and approval is sought after patent expiration; or (4) the listed patents are invalid or will not be infringed by the manufacture, use or sale of our proposed drug product. When we submit a paragraph IV certification to the FDA, a notice of the paragraph IV certification must also be sent to the patent owner once our 505(b)(2) NDA is accepted for filing by the FDA. The third party may then initiate a lawsuit against us to defend the patents identified in the notice. The filing of a patent infringement lawsuit within 45 days of receipt of the notice automatically prevents the FDA from approving our NDA until the earliest of 30 months or the date on which the patent expires, the lawsuit is settled, or the court reaches a decision in the infringement lawsuit in our favor. If the third party does not file a patent infringement lawsuit within the required 45-day period, our NDA will not be subject to the 30-month stay.

In addition to paragraph IV litigation noted above, third-party owners of patents may generally assert that we are employing their proprietary technology without authorization. There may be third-party patents or patent applications with claims to materials, formulations, methods of manufacture or methods for treatment related to the use or manufacture of our products and/or our product candidates. Because patent applications can take many years to issue, there may be currently pending or subsequently filed patent applications which may later result in issued patents that may be infringed by our products or product candidates. If any third-party patents were held by a court of competent jurisdiction to cover aspects of our product candidates, including the formulation, method of use, any method or process involved in the manufacture of any of our product candidates, any molecules or intermediates formed during such manufacturing process or any other attribute of the final product itself, the holders of any such patents may be able to block our ability to commercialize our product candidates unless we obtain a license under the applicable patents, or until such patents expire. In either case, such a license may not be available on commercially reasonable terms or at all.

Parties making claims against us may request and/or obtain injunctive or other equitable relief, which could effectively block our ability to further develop and commercialize one or more of our product candidates on a temporary or permanent basis. Defense of these claims, regardless of their merit, would involve substantial litigation expense and would be a substantial diversion of employee resources from our business. In the event of a successful claim of infringement against us, we may have to pay substantial damages, including treble damages and attorneys' fees for willful infringement, obtain one or more licenses from third parties, pay royalties or redesign our infringing products or manufacturing processes, which may be impossible or require substantial time and monetary expenditure. We cannot predict whether any such license would be available at all or whether it would be available on commercially reasonable terms. Furthermore, even in the absence of litigation, we may need to obtain licenses from third parties to advance our research, manufacture clinical trial supplies or allow commercialization of our product candidates. We may fail to obtain any of these licenses at a reasonable cost or on reasonable terms, if at all. In that event, we would be unable to further develop and commercialize one or more of our product candidates, which could harm our business significantly. We cannot provide any assurances that third party patents do not exist which might be enforced against our products, resulting in either an injunction prohibiting our sales, or, with respect to our sales, an obligation on our part to pay royalties and/or other forms of compensation to third parties.

***If we fail to comply with our obligations in the agreements under which we license rights to technology from third parties, or if the license agreements are terminated for other reasons, we could lose license rights that are important to our business.***

We are a party to a number of technology licenses that are important to our business and expect to enter into additional licenses in the future. Our existing license agreements impose, and we expect that future license agreements will impose, on us, various development, regulatory and/or commercial diligence obligations, payment of milestones and/or royalties and other obligations. Additionally, one of our existing license agreements is a sublicense from a third party who is not the original licensor of the intellectual property at issue. Under these agreements, we must rely on our licensor to comply with their obligations under the

primary license agreements under which such third party obtained rights in the applicable intellectual property, where we may have no relationship with the original licensor of such rights. If our licensors fail to comply with their obligations under these upstream license agreements, the original third-party licensor may have the right to terminate the original license, which may terminate our sublicense. If this were to occur, we would no longer have rights to the applicable intellectual property unless we are able to secure our own direct license with the owner of the relevant rights, which we may not be able to do at a reasonable cost or on reasonable terms, which may impact our ability to continue to develop and commercialize our product candidates and companion diagnostic incorporating the relevant intellectual property. If we fail to comply with our obligations under our license agreements, or we are subject to a bankruptcy or insolvency, the licensor may have the right to terminate the license. In the event that any of our important technology licenses were to be terminated by the licensor, we would likely cease further development of the related program or be required to spend significant time and resources to modify the program to not use the rights under the terminated license.

***We may be involved in lawsuits to protect or enforce our patents or the patents of our licensors, which could be expensive, time consuming and unsuccessful.***

Competitors may infringe our patents or the patents of our licensors. To counter infringement or unauthorized use, we may be required to file infringement claims, which can be expensive and time-consuming. In addition, in an infringement proceeding, a court may decide that a patent of ours or our licensors is not valid or is unenforceable, or may refuse to stop the other party from using the technology at issue on the grounds that our patents do not cover the technology in question. An adverse result in any litigation or defense proceedings could put one or more of our patents at risk of being invalidated or interpreted narrowly and could put our patent applications at risk of not being issued.

Interference proceedings provoked by third parties or brought by us may be necessary to determine the priority of inventions with respect to our patents or patent applications or those of our collaborators or licensors. An unfavorable outcome could require us to cease using the related technology or to attempt to license rights to it from the prevailing party. Our business could be harmed if the prevailing party does not offer us a license on commercially reasonable terms. Our defense of litigation or interference proceedings may fail and, even if successful, may result in substantial costs and distract our management and other employees. We may not be able to prevent, alone or with our licensors, misappropriation of our intellectual property rights, particularly in countries where the laws may not protect those rights as fully as in the United States.

Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation. There could also be public announcements of the results of hearings, motions or other interim proceedings or developments. If securities analysts or investors perceive these results to be negative, it could have a material adverse effect on the price of our common stock.

***The patents and the patent applications that we have covering our products are limited to specific formulations, methods of use and processes, and our market opportunity for our products and our product candidates may be limited by the lack of patent protection for the active ingredients and by competition from other formulations and delivery methods that may be developed by competitors.***

Patent protection on the active ingredients in our currently marketed products (Ryanodex, Bendeka, Argatroban and Non-Alcohol Docetaxel Injection) has expired, and there is therefore no composition of matter patent protection available for the active ingredient in such products. This is also the case with respect to our other product candidates. We have obtained, and continue to seek to obtain patent protection of other aspects of our products and our product candidates, including specific formulations, methods of use and processes, which may not be as effective as composition of matter coverage in preventing workarounds by competitors. As a result, generic products that do not infringe the claims of our issued patents covering formulations, methods of use and processes are, or may be, available while we are marketing our products. Competitors who obtain the requisite regulatory approval could be able to commercialize products with the same active ingredients as our product candidates so long as the competitors do not infringe any process, use or formulation patents that we have developed for our products, subject to any regulatory exclusivity we may be able to obtain for our products.

The number of patents and patent applications covering products containing the same active ingredient as our products and our product candidates indicates that competitors have sought to develop and may seek to commercialize competing formulations that may not be covered by our patents and patent applications. The commercial opportunity for our products and our product candidates could be significantly harmed if competitors are able to develop and commercialize alternative formulations of our products and our product candidates that are different from ours and do not infringe our issued patents covering our products.

***Ryanodex® (dantrolene sodium), Belrapzo, Bendeka, Pemfexy and vasopressin among other products have been approved by the FDA, and we anticipate that other product candidates will be approved by the FDA in the future. Once our products are on the market, one or more third parties may also challenge the patents that we control covering our products, which could result in the invalidation or unenforceability of some or all of the relevant patent claims of our issued patents covering***

58

*our products. Obtaining and maintaining our patent protection depends on compliance with various procedural, document submission, fee payment and other requirements imposed by governmental patent agencies, and our patent protection could be reduced or eliminated for non-compliance with these requirements.*

Ryanodex, Belrapzo, Bendeka, Pemfexy and vasopressin, among other of our products, have been approved by the FDA, and we anticipate that other product candidates will be approved by the FDA in the future. One or more third parties may also challenge the patents that we control covering our products in court or the USPTO, which could result in the invalidation or unenforceability of some or all of the relevant patent claims of our issued patents covering our products.

If we or one of our licensing partners initiated legal proceedings against a third party to enforce a patent covering one of our products or product candidates, the defendant could counterclaim that the patent covering our product or product candidate is invalid and/or unenforceable. In patent litigation in the United States, defendant counterclaims alleging invalidity and/or unenforceability are common, and there are numerous grounds upon which a third party can assert invalidity or unenforceability of a patent. Third parties may also raise similar claims before administrative bodies in the United States or abroad, even outside the context of litigation. Such mechanisms include re-examination, post grant review, and equivalent proceedings in foreign jurisdictions (e.g., opposition proceedings). Such proceedings could result in revocation or amendment to our patents in such a way that they no longer cover our products or product candidates. The outcome following legal assertions of invalidity and unenforceability is unpredictable. With respect to the validity question, for example, we cannot be certain that there is no invalidating prior art, of which we, our patent counsel and the patent examiner were unaware during prosecution. If a defendant were to prevail on a legal assertion of invalidity and/or unenforceability, we would lose at least part, and perhaps all, of the patent protection on our products or product candidates. Such a loss of patent protection could have a material adverse impact on our business.

Periodic maintenance fees on any issued patent are due to be paid to the USPTO and foreign patent agencies in several stages over the lifetime of the patent. The USPTO and various foreign governmental patent agencies require compliance with a number of procedural, documentary, fee payment and other similar provisions during the patent application process. While an inadvertent lapse can in many cases be cured by payment of a late fee or by other means in accordance with the applicable rules, there are situations in which non-compliance can result in abandonment or lapse of the patent or patent application, resulting in partial or complete loss of patent rights in the relevant jurisdiction. Non-compliance events that could result in abandonment or lapse of a patent or patent application include, but are not limited to, failure to respond to official actions within prescribed time limits, non-payment of fees and failure to properly legalize and submit formal documents. If we or our licensors that control the prosecution and maintenance of our licensed patents fail to maintain the patents and patent applications covering our products and product candidates, our competitors might be able to enter the market, which would have a material adverse effect on our business, financial condition and results of operations.

***We may be subject to claims that our employees, consultants or independent contractors have wrongfully used or disclosed confidential information of third parties.***

We employ individuals who were previously employed at other biotechnology or pharmaceutical companies. We may be subject to claims that we or our employees, consultants or independent contractors have inadvertently or otherwise used or disclosed confidential information of our employees' former employers or other third parties. We may also be subject to claims that former employers or other third parties have an ownership interest in our patents. Litigation may be necessary to defend against these claims. There is no guarantee of success in defending these claims, and if we are successful, litigation could result in substantial cost and be a distraction to our management and other employees.

***We may be subject to claims challenging the inventorship or ownership of our patents and other intellectual property.***

We may also be subject to claims that former employees, collaborators or other third parties have an ownership interest in our patents or other intellectual property. We may be subject to ownership disputes in the future arising, for example, from conflicting obligations of consultants or others who are involved in developing our products or product candidates and companion diagnostic. Litigation may be necessary to defend against these and other claims challenging inventorship or ownership. If we fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights, such as exclusive ownership of, or right to use, valuable intellectual property. Such an outcome could have a material adverse effect on our business, financial condition and results of operations. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees.

***Intellectual property rights do not necessarily address all potential threats to our competitive advantage.***

The degree of future protection afforded by our intellectual property rights is uncertain because intellectual property rights have limitations, and may not adequately protect our business or permit us to maintain our competitive advantage. The following examples are illustrative:

59

- others may be able to make compounds that are similar to our products or product candidates but that are not covered by the claims of the patents that we own or have exclusively licensed;

- we or our licensors or future collaborators might not have been the first to make the inventions covered by the issued patent or pending patent application that we own or have exclusively licensed;

- we or our licensors or future collaborators might not have been the first to file patent applications covering certain of our inventions;

- others may independently develop similar or alternative technologies or duplicate any of our technologies without infringing our intellectual property rights;

- it is possible that our pending patent applications will not lead to issued patents;

- issued patents that we own or have exclusively licensed may be held invalid or unenforceable as a result of legal challenges by our competitors;

- our competitors might conduct research and development activities in countries where we do not have patent rights and then use the information learned from such activities to develop competitive products for sale in our major commercial markets;

- we may not develop additional proprietary technologies that are patentable; and

- the patents of others may have an adverse effect on our business, financial condition and results of operations.

Should any of these events occur, they could significantly harm our business, results of operations and prospects.


**Risks Related to Ownership of Our Common Stock**

*Our stock price may continue to fluctuate significantly.*

The trading price of our common stock has fluctuated significantly in the past and is likely to continue to be volatile. Our stock price could be subject to wide fluctuations in response to a variety of factors, including the following:

- any delay in filing an NDA for any of our product candidates and any adverse development or perceived adverse development with respect to the FDA's review of that NDA;

- failure to successfully execute our commercialization strategy with respect to our approved products or any other approved product in the future;

- adverse results or delays in clinical trials, if any;

- significant lawsuits, including patent or stockholder litigation;

- inability to obtain additional funding;

- failure to successfully develop and commercialize our product candidates;

- changes in the structure of healthcare payment systems;

- changes in laws or regulations applicable to our product candidates;

- inability to obtain adequate product supply for our product candidates, or the inability to do so at acceptable prices;

- unanticipated serious safety concerns related to the use of our products or any of our product candidates;

- adverse regulatory decisions;

- introduction of new products or technologies by our competitors;

- entry into new markets by our competitors;

- failure to meet or exceed product development or financial projections we provide to the public;

- failure to meet or exceed the estimates and projections of the investment community;

- issuance of new or updated research or reports by securities analysts;

- fluctuations in the valuation of companies perceived by investors to be comparable to us;

- the perception of the pharmaceutical industry by the public, legislatures, regulators and the investment community;

60

- announcements of significant acquisitions, strategic partnerships, joint ventures or capital commitments by us or our competitors;

- disputes or other developments relating to proprietary rights, including patents, litigation matters and our ability to obtain patent protection for our technologies;

- additions or departures of key scientific or management personnel;

- changes in the market valuations of similar companies;

- sales of our common stock by us or our stockholders in the future;

- the trading volume of our common stock;

- changes in the collective short interest in our common stock;

- additional repurchases of our common stock, if any, pursuant to our current share repurchase program.

- impacts of the COVID-19 pandemic, and

- general economic and market conditions.

These and other market and industry factors may cause the market price and demand for our common stock to fluctuate substantially, regardless of our actual operating performance, which may limit or prevent investors from readily selling their shares of common stock and may otherwise negatively affect the liquidity of our common stock. In addition, the stock market in general, and Nasdaq and biopharmaceutical companies in particular, have experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of these companies. In the past, when the market price of a stock has been volatile, holders of that stock have instituted securities class action litigation against the company that issued the stock. For example, in May 2016, we became party to a federal securities class action lawsuit, and although it was dismissed in October 2017, we incurred substantial costs defending such lawsuit. Such lawsuit, as well as similar lawsuits instituted in the future, could result in substantial additional costs to us and could also divert the time and attention of our management.

*Our principal stockholders and management own a significant percentage of our stock and will be able to exert significant control over matters subject to stockholder approval.*

As of December 31, 2021, our executive officers, directors, 5% or greater stockholders and their affiliates beneficially own a significant percentage of our voting stock. These stockholders will have the ability to influence us through this ownership position. These stockholders may be able to influence all matters requiring stockholder approval. For example, these stockholders, acting together, may be able to influence elections of directors, amendments of our organizational documents or approval of any merger, sale of assets or other major corporate transaction. This may prevent or discourage unsolicited acquisition proposals or offers for our common stock that you may believe are in your best interest as one of our stockholders.

*Sales of a substantial number of shares of our common stock in the public market by our existing stockholders could cause our stock price to fall.*

Sales of a substantial number of shares of our common stock by our existing stockholders in the public market or the perception that these sales might occur, could depress the market price of our common stock and could impair our ability to raise capital through the sale of additional equity securities. We are unable to predict the effect that such sales may have on the prevailing market price of our common stock.

As of February 28, 2022 we had 12,697,101 shares of common stock outstanding, all of which, other than shares held by our directors and certain officers, are eligible for sale in the public market, subject in some cases to compliance with the requirements of Rule 144, including volume limitations and manner of sale requirements.

In addition, shares issued upon exercise of vested options are eligible for sale. Sales of stock by these stockholders could have a material adverse effect on the trading price of our common stock..

*Future issuances of our common stock or rights to purchase our common stock, including in connection with potential business development transactions we may determine to pursue and/or pursuant to our equity incentive plans, could result in additional dilution of the percentage ownership of our stockholders and could cause our stock price to fall.*

Sales of a substantial number of shares of our common stock in the public market could occur at any time. These sales, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of our common stock.

61

We expect that significant additional capital will be needed in the future to continue our planned operations and/or in connection with potential business development transactions we may determine to pursue. To the extent we raise additional capital or pursue potential business development transactions by issuing equity securities, our stockholders may experience substantial dilution. We currently have on file with the SEC a shelf registration statement, which allows us to offer and sell certain registered securities, such as common stock, preferred stock, debt securities and warrants, from time to time pursuant to one or more offerings at prices and terms to be determined at the time of sale. We may sell common stock, convertible securities or other equity or debt securities in one or more transactions at prices and in a manner we determine from time to time. If we sell common stock, convertible securities or other equity or debt securities in more than one transaction, investors may be materially diluted by subsequent sales. These sales may also result in material dilution to our existing stockholders, and new investors could gain rights superior to our existing stockholders.

Pursuant to our 2014 Equity Incentive Plan, or the 2014 Plan, our management is authorized to grant stock options and other equity awards to our employees, directors and consultants. We have issued a significant number of stock options and other equity awards under the 2014 Plan. The shares underlying these awards are registered on a Form S-8 registration statement. As a result, upon vesting these shares can be freely exercised and sold in the public market upon issuance, subject to volume limitations applicable to affiliates. The exercise of options and the subsequent sale of the underlying common stock could cause a decline in our stock price. These sales also might make it difficult for us to sell equity securities in the future at a time and at a price that we deem appropriate. In addition, the number of shares available for future grant under the 2014 Plan will automatically increase each year by 6% of all shares of our capital stock outstanding as of December 31 of the prior calendar year, subject to the ability of our board of directors to take action to reduce the size of the increase in any given year. Currently, we plan to register the increased number of shares available for issuance under the 2014 Plan each year. If our board of directors elects to increase the number of shares available for future grant by the maximum amount each year, our stockholders may experience additional dilution, which could cause our stock price to fall.

***We do not intend to pay cash dividends on our common stock so any returns will be limited to the value of our stock.***

We have never declared or paid any cash dividend on our common stock. We currently anticipate that we will retain future earnings for the development, operation and expansion of our business and do not anticipate declaring or paying any cash dividends for the foreseeable future. Any future determinations to pay cash dividends will be made at the discretion of our board of directors, subject to applicable laws, and will depend on a number of factors, including our financial condition, results of operations, capital requirements, contractual restrictions (such as our Revised Credit Agreement), general business conditions, and any other factors that our board of directors may deem relevant. Any return to stockholders will therefore be limited to the appreciation of their stock.

***There is no assurance that our Share Repurchase Program will result in repurchases of our common stock or enhance long term stockholder value.***

Repurchases of our common stock pursuant to our Share Repurchase Program could affect our stock price and increase its volatility and will reduce the market liquidity for our stock. The existence of a share repurchase program could also cause our stock price to be higher than it would be in the absence of such a program. Additionally, any future repurchases would diminish our cash reserves, which could impact our ability to pursue possible future strategic opportunities and acquisitions. There can be no assurance that any stock repurchases will, in fact, occur, or, if they occur, that they will enhance stockholder value.

***Provisions in our amended and restated certificate of incorporation and amended and restated bylaws, as well as provisions of Delaware law, could make it more difficult for a third party to acquire us or increase the cost of acquiring us, even if doing so would benefit our stockholders or remove our current management.***

Some provisions of our charter documents and Delaware law may have anti-takeover effects that could discourage an acquisition of us by others, even if an acquisition would be beneficial to our stockholders and may prevent attempts by our stockholders to replace or remove our current management. These provisions include:

- authorizing the issuance of "blank check" preferred stock, the terms of which may be established and shares of which may be issued without stockholder approval;

- limiting the removal of directors by the stockholders;

- creating a classified board of directors;

- prohibiting stockholder action by written consent, thereby requiring all stockholder actions to be taken at a meeting of our stockholders;

- eliminating the ability of stockholders to call a special meeting of stockholders; and

- establishing advance notice requirements for nominations for election to the board of directors or for proposing matters that can be acted upon at stockholder meetings.

These provisions may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors, which is responsible for appointing the members of our management. In addition, we are subject to Section 203 of the Delaware General Corporation Law, which generally prohibits a Delaware corporation from engaging in any of a broad range of business combinations with an interested stockholder for a period of three years following the date on which the stockholder became an interested stockholder, unless such transactions are approved by our board of directors. This provision could have the effect of delaying or preventing a change of control, whether or not it is desired by or beneficial to our stockholders. Further, other provisions of Delaware law may also discourage, delay or prevent someone from acquiring us or merging with us.

***Our amended and restated bylaws provide that the Court of Chancery of the State of Delaware is the exclusive forum for certain disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees.***

Our amended and restated bylaws provide that the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for any derivative action or proceeding brought on behalf of the Company, any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Company to the Company or the Company's stockholders, any action asserting a claim arising pursuant to any provision of the Delaware General Corporation Law or any action asserting a claim governed by the internal affairs doctrine. This forum selection provision does not apply to suits brought to enforce a duty or liability created by the Securities Act or the Exchange Act or any claim for which the federal courts have exclusive jurisdiction.

This forum selection provision may limit a stockholder's ability to bring certain claims in a judicial forum that it finds favorable for disputes with us or any of our directors, officers, other employees or stockholders, which may discourage lawsuits with respect to such claims, although our stockholders will not be deemed to have waived our compliance with federal securities laws and the rules and regulations thereunder. If a court were to find this forum selection provision to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could adversely affect our business and financial condition.

**General Risk Factors**

***We are at risk of securities class action and similar litigation***.

In the past, securities class action litigation has often been brought against a company following a decline in the market price of its securities. This risk is especially relevant for us because pharmaceutical companies have experienced significant stock price volatility in recent years. On May 31, 2016, a federal securities class action suit was brought against us seeking compensatory damages in connection with, among other things, the CRL we received with respect to our NDA for EP-6101. Such lawsuit was dismissed with prejudice in August 2017, however, any similar litigation in the future, could result in substantial cost and a diversion of management's attention and resources, which could harm our business.

***We have incurred significant costs as a result of operating as a public company, and our management is required to devote substantial time to new compliance initiatives.***

As a public company, we incur significant ongoing legal, accounting and other expenses.

For example, we are subject to the reporting requirements of the Exchange Act, which require, among other things, that we file with the SEC, annual, quarterly and current reports with respect to our business and financial condition. We have incurred and will continue to incur costs associated with the preparation in filing of these reports. In addition, the Sarbanes-Oxley Act, as well as rules subsequently implemented by the SEC, and Nasdaq have imposed various other requirements on public companies and we have incurred and will continue to incur costs associated with compliance with such requirements. In July 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act, or the Dodd-Frank Act, was enacted. There are significant corporate governance and executive compensation related provisions in the Dodd-Frank Act that required the SEC to adopt additional rules and regulations in these areas such as "say on pay" and proxy access. Stockholder activism, the current political environment and the current high level of government intervention and regulatory reform may lead to substantial new regulations and disclosure obligations, which may lead to additional compliance costs and impact (in ways we cannot currently anticipate) the manner in which we operate our business. Our management and other personnel need to devote a substantial

63

amount of time to these compliance initiatives. Moreover, these rules and regulations increase our legal and financial compliance costs and make some activities more time-consuming and costly. For example, we expect these rules and regulations to make it more difficult and more expensive for us to obtain director and officer liability insurance and we may be required to incur substantial costs to maintain our current levels of such coverage.

64

**Item 1B. Unresolved Staff Comments**

None.
**Item 2. Properties**

As of December 31, 2021, we had approximately 30,000 square feet of leased office space. Our corporate headquarters is located in Woodcliff Lake, New Jersey and consists of approximately 27,093 square feet of office space under a lease that will expire in June 2025.

We also lease 2,505 square feet of office space in Palm Beach Gardens, Florida under a lease that will expire in October 2024.

We also lease laboratory space located in Cambridge, Massachusetts under a lease that will expire in April 2024.

We consider our current facilities suitable and adequate to meet our current needs.

**Item 3. Legal Proceedings**

The disclosures under Note 13. Legal Proceedings in the Consolidated Financial Statements included in Part IV, Item 15 of this report are incorporated into this Part I, Item 3 by reference.

**Item 4. Mine Safety Disclosures**

Not applicable.

**PART II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

Our common stock has been listed on The Nasdaq Global Market under the symbol "EGRX" since February 12, 2014. Prior to that date, there was no public trading market for our common stock.

*Record Holders*

As of February 28, 2022, we had 2 holders of record of our common stock. The actual number of shareholders is greater than this number of record holders and includes shareholders who are beneficial owners but whose shares are held in street name by brokers and other nominees. This number of holders of record also does not include shareholders whose shares may be held in trust by other entities. The closing price per share of our common stock on February 28, 2022 was $47.39.

*Dividends*

We have never declared or paid a cash dividend on our common stock. We currently intend to retain any future earnings and do not expect to pay any dividends in the foreseeable future. In addition, our Revised Credit Agreement imposes contractual restrictions on us with respect to paying cash dividends. Any future determinations to pay cash dividends will be made at the discretion of our board of directors, subject to applicable laws, and will depend on a number of factors, including our financial condition, results of operations, capital requirements, contractual restrictions, general business conditions, and any other factors that our board of directors may deem relevant.

*Stock Performance Graph*

*The following information shall not be deemed to be "soliciting material" or to be "filed" with the SEC or subject to Regulation 14A or 14C under the Securities Exchange Act of 1934, as amended, or the Exchange Act, or to the liabilities of Section 18 of the Exchange Act, and will not be deemed to be incorporated by reference into any filing of Eagle Pharmaceuticals, Inc. under the Exchange Act or the Securities Act of 1933, as amended, or the Securities Act, except to the extent we specifically incorporate it by reference into such filing.*

The following graph shows a five year comparison from December 31, 2016 through December 31, 2021 of the cumulative total return for our common stock, and the Nasdaq Composite Index and The Nasdaq Biotechnology Index. The graph assumes that $100 was invested at the market close on December 31, 2016 in the common stock of Eagle Pharmaceuticals, Inc, the Nasdaq Composite Index and the Nasdaq Biotechnology Index. The stock price performance of the following graph is not necessarily indicative of future stock price performance.

66

**Comparison of 5 year Cumulative Total Return**
**Assumes initial investment $100**
**December 31, 2021**



| Company / Index | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 | 12/31/21 |
|---|---|---|---|---|---|---|
| Eagle Pharmaceuticals, Inc | $ 100 | $ 67 | $ 51 | $ 76 | $ 59 | $ 64 |
| Nasdaq Composite | $ 100 | $ 128 | $ 123 | $ 167 | $ 240 | $ 293 |
| NASDAQ Biotechnology | $ 100 | $ 121 | $ 110 | $ 136 | $ 171 | $ 172 |

*Recent Sales of Unregistered Securities*

None.

*Issuer Purchases of Equity Securities*

***Share Repurchase Program***

On March 17, 2020, we announced that our Board approved a share repurchase program, or the Share Repurchase Program, providing for the repurchase of up to an aggregate of $160.0 million of our outstanding common stock. The Share Repurchase Program replaced our previous share repurchase program, which was announced on October 30, 2018 and was terminated in connection with the Share Repurchase Program. At termination, we had repurchased approximately $68.0 million of our outstanding common stock under our previous share repurchase program.

Under the Share Repurchase Program, we are authorized to repurchase shares through open market purchases, privately-negotiated transactions, accelerated share repurchases or otherwise in accordance with applicable federal securities laws,

67

including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Securities Exchange Act of 1934, as amended. The repurchases have no time limit and may be suspended or discontinued completely at any time. The specific timing and amount of repurchases will vary based on available capital resources and other financial and operational performance, market conditions, securities law limitations, and other factors. The repurchases will be made using our cash resources.

On September 23, 2020, our board of directors approved a $25.0 million accelerated share repurchase transaction, or ASR Program, with JPMorgan Chase Bank, National Association, or JP Morgan, as part of the Share Repurchase Program. The specific number of shares to be repurchased pursuant to the ASR Program was based on the average of the daily volume weighted average share prices of our common stock, less a discount, during the term of the ASR Program. Under the terms of the ASR Program with JP Morgan, we paid $25.0 million to JP Morgan on September 24, 2020, and received 550,623 shares, representing the notional amount of the ASR, based on the average of the daily volume weighted average share prices of our common stock, less a discount, during the term of the ASR, which was $45.40. The ASR Program was completed in the fourth quarter of 2020.

The following table provides information about purchases of our equity securities during the three months ended December 31, 2021:

| Period | Total Number of Shares Purchased (1)(2)(3)(4)(5) | Average Price Paid per Share | Total Number of Shares Purchased as Part Publicly Announced Plans or Programs | Approximate Dollar Value of Shares that May Yet Be Purchased Under the Programs |
|---|---|---|---|---|
| | | | | (dollars in thousands) |
| October 1, 2021 to October 31, 2021 | 31,185 | $ 55.96 | 31,185 | 110,687 |
| November 1, 2021 to November 30, 2021 | — | $ — | — | 110,687 |
| December 1, 2021 to December 31, 2021 | 138,896 | $ 49.67 | 138,896 | 103,788 |
| **Total** | 170,081 | $ 50.83 | 170,081 | |

(1) All shares repurchased by us during the three months ended December 31, 2021 were repurchased pursuant to the Share Repurchase Program, described above.

*Securities Authorized for Issuance Under Equity Compensation Plans*
Information about securities authorized for issuance under our equity compensation plans is incorporated herein by reference to Item 12 of Part III of this annual report on Form 10-K.

**Item 6. Reserved**

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis of financial condition and results of operations is provided to enhance the understanding of, and should be read in conjunction with, Part I, Item 1, "Business" and Item 8, "Financial Statements and Supplementary Data." For information on risks and uncertainties related to our business that may make past performance not indicative of future results, or cause actual results to differ materially from any forward-looking statements, see "Special Note Regarding Forward-Looking Statements," and Part I, Item 1A, "Risk Factors."*

## Overview

We are an integrated pharmaceutical company focused on finding ways to help medicines do more for patients. Along with our collaborators, we have the capabilities to take a molecule from preclinical research through regulatory approval and into the marketplace, including development, manufacturing and commercialization of our products and product candidates. Our business model applies our scientific expertise, proprietary research-based insights and marketplace proficiency to identify challenging-to-treat diseases of the central nervous system or metabolic critical care therapeutic areas as well as in oncology. By focusing on patients' unmet needs, we strive to provide healthcare professionals with urgently needed treatment solutions that are designed to improve patient care and outcomes and create near- and long-term value for our stakeholders, including patients and healthcare providers and our employees, marketing partners, collaborators and stockholders.

Our science-based business model has a proven track record with the U.S. Food and Drug Administration, or FDA, approval and commercial launches of three products: Ryanodex, Belrapzo and Bendeka. We market our products through marketing partners and/or our internal direct sales force. We market Ryanodex and Belrapzo, and Teva markets Bendeka through its subsidiary, Cephalon, Inc. RIn February 2020, we received final FDA approval for PEMFEXY™ (pemetrexed for injection) , a branded alternative to Alimta for metastatic non-squamous non-small cell lung cancer and malignant pleural mesothelioma. On February 1, 2022, we announced the commercial availability of PEMFEXY™ in the United States.

With several pipeline projects underway and the potential for product launches over the next few years, we believe we have many growth opportunities ahead. We believe that each of our pipeline projects currently has the potential to enter the market as a first-in-class, first-to-file or best-in-class product. In particular, we are applying our expertise to conduct novel research regarding the potential for Ryanodex to address conditions including nerve agent, acute radiation syndrome, traumatic brain injury/concussion and Alzheimer's disease as well as investigations of compounds such as EA-114 (our fulvestrant product candidate) for patients with HR-positive advanced breast cancer. Our clinical development program also includes a license agreement with Combioxin, SA under which the Company was granted exclusive, worldwide development commercialization rights to CAL02, a novel first-in-class antitoxin agent for Phase 2b/3 development for the treatment of severe pneumonia in combination with traditional antibacterial drugs and a license agreement with AOP Orphan, for the commercial rights to its product, landiolol in the United States. Landiolol is a leading hospital emergency use product, which is currently approved in Europe for the treatment of non-compensatory sinus tachycardia and tachycardic supraventricular arrhythmias.

## Recent Developments

### *PEMFEXY*

On February 1, 2022, we announced the commercial availability of our novel product PEMFEXY™ (pemetrexed for injection). A branded alternative to ALIMTA®, Eagle's PEMFEXY is a ready-to-use liquid with a unique J-code approved to treat nonsquamous non-small cell lung cancer and mesothelioma.

In February 2020, Eagle received final approval from the U.S. Food and Drug Administration of its New Drug Application for PEMFEXY, following the settlement agreement of patent litigation with Eli Lilly and Company (NYSE: LLY) in December 2019. The agreement provided for a release of all claims by the parties and allows for an initial entry of PEMFEXY into the market (equivalent to approximately a three-week supply of current ALIMTA utilization) on February 1, 2022 and a subsequent uncapped entry on April 1, 2022.

### *Landiolol*

On January 31, 2022, we announced that AOP Orphan Pharmaceuticals GmbH, Member of the AOP Health Group, ("AOP Health"), with whom we entered into a licensing agreement in August 2021, has engaged with the U.S. Food and Drug Administration ("FDA") to obtain alignment on the content and format of the pre-clinical and clinical data required to support a new drug application ("NDA") seeking approval of Landiolol, a novel therapeutic, for the short-term reduction of ventricular rate in patients with supraventricular tachycardia, including atrial fibrillation and atrial flutter.

In August 2021, Eagle entered into a licensing agreement with AOP Health, a privately owned Austrian company devoted to the treatment of rare and special diseases, for the commercial rights to Landiolol in the United States.

### *Vasopressin*

On January 18, 2022, we announced the commercial availability of our recently approved product, vasopressin, an A-rated generic alternative to Vasostrict®, with 180 days of marketing exclusivity.

69

On December 15, 2021, the FDA approved Eagle's abbreviated new drug application ("ANDA") for vasopressin, a product that is indicated for use to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines.

### TREAKISYM

As of January 5, 2022, Eagle's bendamustine franchise continues to grow, including the launch of the TREAKISYM ready-todilute ("RTD") formulation in Japan in the first quarter of 2021. Together with a potential approval of the rapid infusion ("RI") (50ml) liquid formulation.

### Fulvestrant

As of January 5, 2022, based on discussions with the FDA, we reformulated and plan to commence human pilot studies of our fulvestrant product candidate for the treatment of HR+/HER- advanced breast cancer shortly.

### CAL02

As of January 5, 2022, we were preparing to begin clinical trials for CAL02, a novel approach to the treatment of severe bacterial pneumonia, later in 2022.

### Executive Officer Transitions

On September 27, 2021, our board of directors appointed Scott Tarriff as our President and Michael Moran as our Executive Vice President, Chief Commercial Officer. In addition, David Pernock, our former President and Chief Operating Officer since January 2017, was appointed as Executive Vice President, Operations.

On December 27, 2021, Judith Ng-Cashin, M.D., ceased to serve as our Executive Vice President, Chief Medical Officer. We are currently in search for a replacement.

On December 31, 2021, David Pernock, ceased to serve as our Executive Vice President, Operations.

### COVID-19 Business Update

In response to the ongoing COVID-19 pandemic, we have taken and continue to take active measures designed to address and mitigate the impact of the COVID-19 pandemic on its business, such as remote working policies, facilitating management's daily communication to address employee and business concerns and providing frequent updates to the Board. We anticipate that the COVID-19 pandemic may have an impact on the clinical development timeline for EA-114. We anticipate that the COVID-19 pandemic will continue to delay our supply chain and marketing and sales efforts for certain of its products, including Bendeka, although it is not currently expected that any disruption would be material. The COVID-19 pandemic and associated lockdowns have resulted in a decrease in healthcare utilization broadly and specifically lead to a continuing reduction in the utilization of physician-administered oncology products including Belrapzo and Bendeka. In addition, the COVID-19 pandemic has delayed the timing of ongoing litigation, including the litigation with Par Pharmaceutical, Inc. and its affiliated entities with respect to Vasopressin, and we anticipate that such delays will continue for the duration of the pandemic. While we have experienced variable financial impacts to date, the ongoing COVID-19 pandemic, including the global economic slowdown, government measures taken in response thereto, the overall disruption of global healthcare systems and other risks and uncertainties associated with the pandemic, could materially adversely affect our business, financial condition, results of operations and growth prospects. We continue to closely monitor the COVID-19 pandemic as we evaluate and evolve our business plans and response strategy. The impact of the COVID-19 pandemic on our business and financial condition is more fully described below in *Trends and Uncertainties*.

### Financial Operations Overview

#### Revenue

Our revenue consists of product sales, royalty revenue and license and other revenue.

*Product Sales.* As of December 31, 2021, we have recognized revenues from product sales of Bendeka, Treakisym, Ryanodex and Belrapzo. Sales of Bendeka and Treakisym were made to our commercial partners, Teva and SymBio, respectively. Sales to our commercial partners are typically made at little or no profit for resale. Ryanodex and Belrapzo were sold directly to wholesalers, hospitals and surgery centers through a third-party logistics partner.

We typically enter into agreements with group purchasing organizations acting on behalf of their hospital members, in connection with the hospitals' purchases of our direct commercial products. Based on these agreements, most of our hospital

70

customers have contracted prices for products and volume-based rebates on product purchases. These amounts are estimated and recorded at the time of sale. In the case of discounted pricing, we typically pay a chargeback, representing the difference between the price invoiced to the wholesaler and the customer contract price.

*Royalty Revenue.* We recognize revenue from royalties based on a percentage of Teva's net sales of Bendeka and SymBio's net sales of Treakisym. Royalty revenue is recognized as earned in accordance with contract terms when it can be reasonably estimated and collectability is reasonably assured.

*License and Other Revenue.* Our revenues may either be in the form of the recognition of deferred revenues upon milestone achievement for which cash has already been received or recognition of revenue upon milestone achievement for which the payment is reasonably assured to be received in the future.

The primary factors that determine our revenues derived from Bendeka are:

- the level of orders submitted by our commercial partner, Teva;
- the rate at which Teva can convert the current market to Bendeka;
- the level of institutional demand for Bendeka;
- unit sales prices charged by Teva, net of any sales reserves; and
- the level of orders submitted by wholesalers, hospitals and surgery centers.

The primary factors that may determine our revenues derived from TREAKISYM are:

- the level of orders submitted by our commercial partner, Symbioi;
- the level of institutional demand for TREAKISYM; and
- unit sales prices charged by Symbio, net of any sales reserves.

The primary factors that may determine our revenues derived from Ryanodex, Belrapzo and our future products are:

- the effectiveness of our sales force;
- the level of orders submitted by wholesalers, hospitals and surgery centers;
- the level of institutional demand for our products; and
- unit sales prices, net of any sales reserves.

### *Cost of Revenues*

Cost of revenue consists of the costs associated with producing our products for our commercial partners. In particular, our cost of revenue includes production costs of our products paid to a contract manufacturing organization coupled with shipping and customs charges, cost of royalty and the amortization of intangible assets. Cost of revenue may also include the effects of product recalls, if applicable.

### *Research and Development*

Costs for research and development are charged to expenses as incurred and include: employee-related expenses including salaries, benefits, travel and stock-based compensation expense for research and development personnel; expenses incurred under agreements with contract research organizations, contract manufacturing organizations and service providers that assist in conducting clinical and preclinical studies; costs associated with preclinical activities and development activities; costs associated with regulatory operations; and depreciation expense for assets used in research and development activities.

Costs for certain development activities, such as clinical studies, are recognized based on an evaluation of the progress to completion of specific tasks using data such as patient enrollment, clinical site activations, or information provided to us by our vendors on their actual costs incurred. Payments for these activities are based on the terms of the individual arrangements, which may differ from the patterns of costs incurred, and are reflected in the consolidated financial statements as prepaid expenses or accrued expenses as deemed appropriate. Recoveries of previously recognized research and development expenses from third parties are recorded as a reduction to research and development expense in the period it becomes realizable.

### *Selling, General and Administrative*

Selling, general and administrative costs consist of employee-related costs including salaries, benefits and other related costs, stock-based compensation for executive, finance, sales and operations personnel. Selling, general and administrative expenses also include facility and related costs, professional fees for legal, consulting, tax and accounting services, insurance, selling, marketing, market research, advisory board and key opinion leaders, depreciation and general corporate expenses.

71

*Income Taxes*

We account for income taxes using the liability method in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 740, "Income Taxes," or ASC 740.  Deferred tax assets and liabilities are determined based on temporary differences between financial reporting and tax bases of assets and liabilities and are measured by applying enacted rates and laws to taxable years in which differences are expected to be recovered or settled.  Further, the effect on deferred tax assets and liabilities of a change in tax rates is recognized in income (loss) in the period that the rate changes.  A valuation allowance is required when it is "more likely than not" that all or a portion of deferred tax assets will not be realized. ASC 740 also prescribes a comprehensive model for how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that it has taken or expects to take on a tax return, including a decision whether to file or not file a return in a particular jurisdiction.  We recognize any interest and penalties accrued related to unrecognized tax benefits as income tax expense. The benefit (provision) for income taxes was based on the applicable federal and state tax rates for those periods. The effective tax rate for the years ended December 31, 2021, 2020 and 2019 reflect items such as the impact of a valuation allowance established and adjusted for the fair value adjustments on our investment in Tyme, certain non-deductible executive compensation, changes in state filing positions partially offset by credits for research and development activity.

## Results of Operations

*Comparison of Years Ended December 31, 2021 and December 31, 2020*

*Revenues*

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **(Decrease)** | |
| | (in thousands) | | | | | |
| Product sales, net | $ | 65,023 | $ | 72,323 | $ | (7,300) |
| Royalty revenue | | 106,523 | | 110,479 | | (3,956) |
| License and other revenue | | — | | 5,000 | | (5,000) |
| Total revenue | $ | 171,546 | $ | 187,802 | $ | (16,256) |

Product sales decreased $7.3 million in the year ended December 31, 2021, primarily driven by decreases in product sales of Bendeka of $4.3 million, Belrapzo of $3.8 million, due to price decreases and Ryanodex of $3.0 million, due to volume decreases. In addition, the COVID-19 pandemic and associated lockdowns have resulted in a decrease in healthcare utilization broadly and specifically have led to a reduction in the utilization of physician-administered oncology products including Belrapzo and Bendeka. These decreases were partially offset by $3.9 million in product sales of Treakisym, following the launch of Treakisym RTD in Japan by Symbio in the first quarter of 2021.

Royalty revenue decreased $4.0 million in the year ended December 31, 2021 primarily as a result of lower royalties on Teva's sales of Bendeka of $7.7 million, which were partially offset by new royalties on Symbio's sales of Treakisym of $4.2 million.

License and other revenue reflects a $5.0 million milestone payment that we earned during 2020 when SymBio received regulatory approval for Treakisym RTD bendamustine formulation from the Pharmaceuticals and Medical Devices Agency in Japan.

*Cost of Revenue*

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **(Decrease)** | |
| | (in thousands) | | | | | |
| Cost of product sales | $ | 31,528 | $ | 33,647 | $ | (2,119) |
| Cost of royalty revenue | | 10,652 | | 11,818 | | (1,166) |
| Total cost of revenue | $ | 42,180 | $ | 45,465 | $ | (3,285) |

Cost of product sales decreased $2.1 million in the year ended December 31, 2021, primarily as a result of decreased product sales of Bendeka, Ryanodex, and Belrapzo, each related to lower unit sales, partially offset by increased product sales of

72

Treakisym resulting from product unit sales, following the launch of Treakisym RTD in Japan by Symbio in the first quarter of 2021.

Cost of royalty revenue decreased $1.2 million in the year ended December 31, 2021 primarily as a result of a decrease in royalty revenue on Teva's sales of Bendeka, coupled with lower cost of royalty associated with Belrapzo and the ending of royalties related to Argatroban.

### *Research and Development*

The table below details our research and development expenses by significant project for the periods presented.

| | Year Ended December 31, | | | | | Increase / (Decrease) | |
|---|---|---|---|---|---|---|---|
| | 2021 | | 2020 | | | | |
| | (in thousands) | | | | | | |
| Fulvestrant | $ | 7,016 | $ | 6,802 | $ | | 214 |
| Vasopressin | | 6,976 | | 4,727 | | | 2,249 |
| Ryanodex related projects | | 1,692 | | 2,865 | | | (1,173) |
| CAL02 / Combioxin | | 10,334 | | — | | | 10,334 |
| Landilol / AOP | | 5,005 | | — | | | 5,005 |
| Pemfexy | | 2,211 | | 608 | | | 1,603 |
| All other projects | | 3,014 | | 3,085 | | | (71) |
| Salary and other personnel related | | 15,027 | | 12,698 | | | 2,329 |
| Research and development | $ | 51,275 | $ | 30,785 | $ | | 20,490 |

The increase primarily resulted from a $10.0 million upfront payment related to our license agreement with Combioxin, a $5.0 million upfront payment related our licensing agreement with AOP Orphan, a $2.3 million increase in development cost for vasopressin, a $1.6 million increase related to Pemfexy, coupled with a $2.0 million total increase in salaries, bonuses, and severance, included with Salary and other personnel related costs.

### *Selling, General and Administrative*

| | Year Ended December 31, | | | | | (Decrease) | |
|---|---|---|---|---|---|---|---|
| | 2021 | | 2020 | | | | |
| | (in thousands) | | | | | | |
| Selling, general and administrative | $ | 75,322 | $ | 78,598 | $ | | (3,276) |

The decrease is primarily related to lower stock compensation expense of $5.2 million, the non-recurrence of $2.5 million of costs related to the collaboration with Tyme in 2020, partially offset by increased expense related to salaries and bonuses of $2.3 million and ongoing litigation matters of $1.9 million.

### *Other (Expense) Income, net*

| | Year Ended December 31, | | | | | (Decrease) / Increase | |
|---|---|---|---|---|---|---|---|
| | 2021 | | 2020 | | | | |
| | (in thousands) | | | | | | |
| Interest income | $ | 560 | $ | 562 | $ | | (2) |
| Interest expense | | (1,635) | | (2,577) | | | 942 |
| Other (expense) income | | (6,242) | | (8,262) | | | 2,020 |
| Total other (expense) income, net | $ | (7,317) | $ | (10,277) | $ | | 2,960 |

Interest income decreased primarily due to lower interest rates associated with money market funds as compared to the year ended December 31, 2020.

Interest expense decreased primarily due to lower total long-term debt outstanding due to recurring principal payments required by the Revised Credit Agreement. This decrease is primarily due to lower borrowings from our revolving credit facility during 2021 as compared to the year ended December 31, 2020.

73

Our other (expense) income, net decreased $2.0 million for the year ended December 31, 2021 as compared to the year ended December 31, 2020. The $6.2 million expense amount for the year ended December 31, 2021 primarily resulted from fair value adjustments on equity investment in Tyme. The $8.3 million expense amount for the year ended December 31, 2020 related to fair value adjustments on equity investment in Tyme in the amount of $5.3 million and the related fair value adjustments related to the final settlement of the $25.0 million ASR transaction with JPMorgan. We determined the ASR contained a forward contract and therefore we recorded fair value adjustments on unsettled accelerated share repurchase agreement in the amount of $3.0 million in the year ended December 31, 2020.

*Provision for income taxes*

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2021 | 2020 |
| | (in thousands) | |
| Provision for income taxes | $ (4,079) | $ (10,688) |
| Effective tax rate | (90)% | 47 % |

Our provision for income taxes was based on the applicable federal and state tax rates for those periods. The effective tax rate for the year ended December 31, 2021, reflects certain non-deductible executive compensation, tax effect on stock options exercises, net of forfeitures and valuation allowance established on the deferred tax asset for an unrealized capital loss in our investment in Tyme partially offset by credits for research and development activities. The effective tax rate for the year ended December 31, 2020, reflects the impact of a valuation allowance established on the deferred tax asset for an unrealized capital loss in our investment in Tyme, certain non-deductible executive compensation, non-deductible nature of the fair value adjustment of our ASR agreement and changes in state filing positions partially offset by credits for research and development activities.

*Net (Loss) Income*

Net loss for the year ended December 31, 2021 was $8.6 million as compared to a net income of $12.0 million for the year ended December 31, 2020, as a result of the factors discussed above.

*Comparison of Years Ended December 31, 2020 and December 31, 2019*

*Revenues*

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | 2020 | 2019 | (Decrease) |
| | (in thousands) | | |
| Product sales, net | $ 72,323 | $ 73,989 | $ (1,666) |
| Royalty revenue | 110,479 | 112,903 | (2,424) |
| License and other revenue | 5,000 | 9,000 | (4,000) |
| Total revenue | $ 187,802 | $ 195,892 | $ (8,090) |

Product sales decreased $1.7 million in the year ended December 31, 2020, primarily driven by decreases in product sales of Bendeka of $15.7 million coupled with decreases in Belrapzo's product sales of $2.1 million primarily due to volume decreases. In addition, the COVID-19 pandemic and associated lockdowns have resulted in a decrease in healthcare utilization broadly and specifically have led to a reduction in the utilization of physician-administered oncology products including Belrapzo and Bendeka. The decreased sales were partially offset by increases in product sales of Ryanodex of $15.2 million due to higher volume coupled with product sales of $0.9 million from the 2020 product launch of Treakisym.

Royalty revenue decreased $2.4 million in the year ended December 31, 2020 as a result of decreases in royalties on Teva's sales of Bendeka of $1.1 million and royalties on sales of Argatroban of $1.3 million.

Our license and other revenue decreased $4.0 million in the year ended December 31, 2020 as compared to the year ended December 31, 2019. In 2019, we received an upfront cash payment of $9.0 million upon execution of an amendment to the Bendeka License Agreement, dated March 29, 2019 to terminate Teva's obligation to pay future milestones and royalties on Bendeka sales outside of the U.S. In 2020, we received a $5.0 million milestone payment earned in the three months ended

74

September 30, 2020 from SymBio upon regulatory approval of Treakisym ready-to-dilute (250 ml) liquid bendamustine formulation from the Pharmaceuticals and Medical Devices Agency in Japan.

*Cost of Revenue*

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2020 | | 2019 | | (Decrease) | |
| | (in thousands) | | | | | |
| Cost of product sales | $ | 33,647 | $ | 47,891 | $ | (14,244) |
| Cost of royalty revenue | | 11,818 | | 13,006 | | (1,188) |
| Total cost of revenue | $ | 45,465 | $ | 60,897 | $ | (15,432) |

Cost of product sales decreased $14.2 million in the year ended December 31, 2020, primarily as a result of decreased product sales of Belrapzo and Bendeka, partially offset by increased product sales of Ryanodex and the 2020 product launch of Treakisym.

Cost of royalty revenue decreased $1.2 million in the year ended December 31, 2020 primarily as a result of a decrease in royalty revenue on Teva's sales of Bendeka.

*Research and Development*

The table below details our research and development expenses by significant project for the periods presented.

| | Year Ended December 31, | | | | Increase / | |
|---|---|---|---|---|---|---|
| | 2020 | | 2019 | | (Decrease) | |
| | (in thousands) | | | | | |
| Fulvestrant | $ | 6,802 | $ | 5,053 | $ | 1,749 |
| Vasopressin | | 4,727 | | 7,779 | | (3,052) |
| Ryanodex related projects | | 1,972 | $ | 5,192 | | (3,220) |
| All other projects | | 4,586 | $ | 3,980 | | 606 |
| Salary and other personnel related | $ | 12,698 | $ | 14,806 | | (2,108) |
| Research and development | $ | 30,785 | $ | 36,810 | $ | (6,025) |

The decrease primarily resulted from a decrease in clinical study project spending for vasopressin and Ryanodex for EHS indication, and employee-related costs, primarily stock compensation expense. This decrease was partially offset by increased spend related to Fulvestrant.

*Selling, General and Administrative*

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2020 | | 2019 | | Increase | |
| | (in thousands) | | | | | |
| Selling, general and administrative | $ | 78,598 | $ | 76,370 | $ | 2,228 |

The increase is primarily related to $2.5 million of costs related to the collaboration with Tyme, coupled with $4.5 million increase in stock compensation. These increases were partially offset by travel and entertainment expense which decreased by $2.0 million primarily due to Covid-19 restrictions on travel coupled with a decrease in external legal fees related to ongoing litigation matters of $3.2 million.

75

*Other (Expense) Income, net*

|  | Year Ended December 31, | | (Decrease) / Increase |
|  | 2020 | 2019 | |
| --- | ---: | ---: | ---: |
|  | (in thousands) | | |
| Interest income | $ 562 | $ 2,169 | $ (1,607) |
| Interest expense | (2,577) | (2,686) | 109 |
| Other (expense) income | (8,262) | 700 | (8,962) |
| Total other (expense) income, net | $ (10,277) | $ 183 | $ (10,460) |

Interest income decreased primarily due to lower interest rates associated with money market funds as compared to the year ended December 31, 2019.

Interest expense decreased primarily due to lower total long-term debt outstanding due to recurring principal payments required by the Revised Credit Agreement.

Our other (expense) income, net increased $9.0 million for the year ended December 31, 2020 as compared to the year ended December 31, 2019. This increase is related to fair value adjustments on equity investment in Tyme in the amount of $5.3 million and the related fair value adjustments related to the final settlement of the $25.0 million ASR transaction with JPMorgan as part of the Company's Share Repurchase Program. The Company determined the ASR contained a forward contract and therefore the Company recorded fair value adjustments on the accelerated share repurchase agreement in the amount of $3.0 million in the year ended December 31, 2020. The increase in other expense is also related to our settlement agreement in December 2019 with Lilly for $0.7 million.

*Provision for income taxes*

|  | Year Ended December 31, | |
|  | 2020 | 2019 |
| --- | ---: | ---: |
|  | (in thousands) | |
| *Provision for income taxes* | $ 10,688 | $ 7,685 |
| Effective tax rate | 47 % | 35 % |

Our provision for income taxes was based on the applicable federal and state tax rates for those periods. The effective tax rate for the year ended December 31, 2020 reflects the impact of a valuation allowance established on the deferred tax asset for an unrealized capital loss in our investment in Tyme, certain non-deductible executive compensation, non-deductible nature of the fair value adjustment of our ASR agreement and changes in state filing positions partially offset by credits for research and development activity. The effective tax rate for the year ended December 31, 2019 reflects the impact of certain non-deductible executive compensation partially offset by credits for research and development activity.

*Net Income*

Net income for the year ended December 31, 2020 was $12.0 million as compared to a net income of $14.3 million for the year ended December 31, 2019, as a result of the factors discussed above.

**Liquidity and Capital Resources**

Our principal sources of liquidity are our cash and cash equivalents, cash flows from operations and availability of borrowing under our revolving credit facility. Our primary uses of cash are to fund working capital requirements, including repayment of debt, product development costs, operating expenses as well as repurchases of our common stock. Cash and cash equivalents were $97.7 million, and $103.2 million as of December 31, 2021 and December 31, 2020, respectively.

For the year ended December 31, 2021, we recorded net loss of $8.6 million. As of December 31, 2021, we had a working capital surplus of $98.2 million. For the year ended December 31, 2020, we recorded net income of $12.0 million.

We believe that our cash and cash equivalents and future cash flows from operations will be sufficient to fund our currently anticipated working capital requirements for at least the next twelve months. We believe we will be able to meet our expected future cash and working capital requirements through a combination of cash flows from operations, cash and cash equivalents, availability of borrowings under our revolving credit facility and additional funding in the capital markets, if needed.

76

The COVID-19 pandemic has disrupted and continues to disrupt the U.S. healthcare system, global economies and global capital markets. There are significant uncertainties surrounding the full extent and duration of the impact of the COVID-19 pandemic on our business and operations. We have experienced variable financial impacts to date, as a result of the COVID-19 pandemic and the ongoing pandemic could have a material adverse impact on our financial condition and results of operations in the future, including our ability to obtain financing when and if needed. The impact of COVID-19 on our business and financial condition is more fully described below in *Trends and Uncertainties.*

*Operating Activities:*

Net cash provided by operating activities for the year ended December 31, 2021 was $28.2 million. Net loss for the same period was $8.6 million more than offset by the net of non-cash adjustments of approximately $27.3 million from deferred income taxes, depreciation expense, noncash operating lease expense related to right-of-use assets, amortization expense of intangible assets, convertible promissory note related credit losses, stock-based compensation expense, fair value adjustments on equity investment, amortization of debt issuance costs, fair value adjustments related to derivative instrument, and accretion of discount on convertible promissory note. Net changes in working capital increased cash from operating activities by approximately $9.5 million, due to changes in working capital accounts. The total amount of accounts receivable as of December 31, 2021 was approximately $41.1 million, which included $15.0 million related to product sales and $26.1 million related to royalty revenue. Receivables from our product sales have payment terms ranging from 30 to 70 days with select extended terms to wholesalers on initial purchases of product launch quantities. Our receivables from royalty revenue are due 45 days from the end of the quarter or year end.

Net cash provided by operating activities for the year ended December 31, 2020 was $49.5 million. Net income for the same period was $12.0 million before non-cash adjustments of approximately $36.7 million from deferred income taxes, depreciation expense, noncash operating lease expense related to right-of-use assets, amortization expense of intangible assets, stock-based compensation expense, fair value adjustments on equity investment, amortization of debt issuance costs and fair value adjustments on settled accelerated share repurchase agreement. Net changes in working capital decreased cash provided from operating activities by approximately $0.8 million, due to an increase in accounts receivable of $3.1 million, an increase in inventory of $1.5 million, a decrease in accrued expenses and other liabilities of $4.4 million, coupled with a decrease in prepaid expenses and other current assets of $11.4 million, and an increase in accounts payable of $0.8 million. The total amount of accounts receivable as of December 31, 2020 was approximately $51.1 million. Receivables from our product sales have payment terms ranging from 30 to 75 days with select extended terms to wholesalers on initial purchases of product launch quantities. Our receivables from royalty revenue are due 45-days from the end of the quarter.

Net cash provided by operating activities for the year ended December 31, 2019 was $56.0 million. Net income for the same period was $14.3 million before non-cash adjustments of approximately $27.3 million from deferred income taxes, depreciation expense, noncash operating lease expense related to right-of-use assets, amortization expense of intangible assets, stock-based compensation expense, and amortization of debt issuance costs. Net changes in working capital increased cash provided from operating activities by $14.4 million, due to a decrease in accounts receivable of $18.5 million primarily due to Belrapzo launch in 2018, a decrease in inventory of $1.7 million, an increase in accrued expenses and other liabilities of $4.1 million, partially offset by an increase in other assets of $0.6 million, a decrease in prepaid expenses and other current assets of $4.8 million, and a decrease in accounts payable of $4.5 million. The total amount of accounts receivable at December 31, 2019 was approximately $48.0 million.

*Investing Activities:*

During the years ended December 31, 2021, 2020 and 2019, we invested $0.3 million, $0.7 million, and $0.8 million, respectively, for the purchase of property and equipment.

Net cash used in investing activities for the year December 31, 2021 primarily was as a result of $5.0 million of investment to purchase a convertible promissory note of a privately held clinical-stage biotechnology company.

Net cash used in investing activities for the year December 31, 2020 primarily was $17.5 million related to our purchase of 10 million restricted shares of Tyme's common stock.

*Financing Activities:*

Net cash used by financing activities for the year ended December 31, 2021 was $28.4 million, as a result of $8.0 million of principal payments for outstanding debt under our Revised Credit Agreement with JPMorgan Chase Bank, N.A., as administrative agent and the lenders party thereto, or the Credit Agreement, $21.2 million in payments related to the repurchases of our common stock, $1.6 million of payments associated with employee withholding tax upon vesting of stock-based awards, partially offset by $2.4 million of proceeds from common stock exercises of employee stock options.

Net cash used in financing activities for the year ended December 31, 2020 was $37.9 million, as a result of $5.0 million of principal payments for debt required by the Company's Second Amended and Restated Credit Agreement with JPMorgan Chase Bank, N.A., as administrative agent and the lenders party thereto, or the Revised Credit Agreement, $35.0 million in payments related to the repurchases of our common stock, $1.5 million of payments associated with employee withholding tax upon vesting of stock-based awards, partially offset by $3.7 million of proceeds from common stock exercises of employee stock options.

Net cash used in financing activities for the year ended December 31, 2019 was $24.2 million, primarily resulting from principal payments for debt required by the Revised Credit Agreement of $6.0 million and payments related to the repurchases of our common stock of $18.0 million.

**Trends and Uncertainties**

*Impact of the COVID-19 Pandemic*

The COVID-19 pandemic has resulted in authorities implementing aggressive actions. Government authorities in the United States have recommended or imposed various social distancing, quarantine, and isolation measures on large portions of the population, and similar measures have also been taken in many other countries around the world. While many of these governmental restrictions have begun to be lifted, the timing and extent to which such orders and restrictions will be removed remains uncertain. Both the COVID-19 pandemic and the containment and mitigation efforts related to the pandemic have had a serious adverse impact on the U.S. economy and the economies of other countries around the world, the severity and duration of which are uncertain. There is no guarantee that prior or new restrictions will not be reinstated in response to the continued spread of COVID-19.

During the year ended December 31, 2021, we have experienced a variable impact on our business and financial condition due to the COVID-19 pandemic, which impacts include a decrease in revenue from sales of Belrapzo resulting, in part, from a decrease in inventory stocking and utilization rates, as well as a decrease in research and development expenses partially resulting from preclinical program delays. We also incurred an insignificant amount of incremental administrative costs related to the COVID-19 pandemic. The COVID-19 pandemic, including containment and mitigation measures, has impacted, and is expected to continue to impact, our business and operations in a number of ways, including:

- *Day-to-Day Operations*: Since mid-March 2020, certain of our employees, including customer-facing employees, had been primarily working remotely. The duration and extent of these restrictions are anticipated to be eased in the short term. During the second quarter of 2021, we developed and implemented plans to resume in-person work practices while adhering to relevant health authority guidance. We may incur additional expenses in 2022 related to the impact of the COVID-19 pandemic on our operations, including updates to our facilities to align with safety protocols.
- *Manufacturing and Supply Chain:* We are working closely with our commercial partners and third-party manufacturers to mitigate potential disruptions as a result of the COVID-19 pandemic by continuing to monitor the supply and availability of Bendeka, Ryanodex and Belrapzo for the patients who rely on these products. We anticipate that the COVID-19 pandemic will continue to delay our supply chain and marketing and sales efforts for certain of our products, including Bendeka, although it is not currently expected that any disruption would be material. If the COVID-19 pandemic continues to persist for an extended period of time and impacts essential distribution systems such as FedEx and postal delivery, we could experience future disruptions to our supply chain and operations, and associated delays in the manufacturing and our clinical supply, which would adversely impact our development activities.
- *Marketing and Sale of Products*: In addition to the impact on our product revenues resulting in a decrease in sales from Belrapzo, driven, in part, by the COVID-19 pandemic, we have also observed a reduction in the number of Bendeka patients visiting infusion centers, hospitals and clinics for intravenous administration of Bendeka due to interruptions in healthcare services, and the patients' inability to visit administration sites as well as desire to avoid contact with infected individuals. In addition, our sales and marketing teams have been working remotely and our virtual initiatives with respect to marketing and supporting the sale and administration of our products have not been as effective as our in-person sales and marketing activities.

78

- *Liquidity and Capital Resources*: We believe that our cash and cash equivalents and availability of borrowings under our Credit Agreement will be sufficient to fund our currently anticipated working capital requirements for at least the next twelve months. While the COVID-19 pandemic has not had, and we do not expect it to have, a material adverse effect on our liquidity, the situation continues to rapidly evolve and has already resulted in a significant disruption of global financial markets. If the disruption persists or deepens, we could experience an inability to access additional capital when and if needed. If we are unable to obtain funding, we could be forced to delay, reduce or eliminate distribution of our commercialized products, product portfolio expansion or some or all of our research and development programs, which would adversely affect our business prospects. We expect to be able to obtain future funding under the terms of the Credit Agreement, for general corporate purposes and any strategic acquisitions.
- *Regulatory Activities*: We may experience further delays in the timing of NDA review and/or our interactions with FDA due to, for example, absenteeism by governmental employees, inability to conduct planned physical inspections related to regulatory approval, or the diversion of FDA's efforts and attention to approval of other therapeutics or other activities related to the COVID-19 pandemic, which could further delay approval decisions with respect to regulatory submissions or obtain new product approvals.
- *Clinical Development Timelines:* The clinical trial timelines for certain of our product candidates have been delayed given difficulties with limited patient enrollment resulting from the impact of the COVID-19 pandemic, and we expect that our clinical trial timelines will continue to be impacted for the duration of the pandemic.

There are significant uncertainties surrounding the extent and duration of the impact of the COVID-19 pandemic on our business and operations. We continue to evaluate the impact of the COVID-19 pandemic on our operating results and financial condition. The COVID-19 pandemic has had a variable impact on our results of operations during the year ended December 31, 2021 and, it could have a material adverse impact on our financial condition and results of operations in the future.

**Contractual Obligations**

Our future material contractual obligations include the following (in thousands):

| Obligation | Total | | 2022 | | 2023 | | 2024 | | 2025 |
|---|---|---|---|---|---|---|---|---|---|
| Operating leases (1) | $ | 4,329 | $ | 1,423 | $ | 1,455 | $ | 1,038 | $ | 413 |
| Credit facility | | 26,000 | | 26,000 | | — | | — | | — |
| Purchase obligations (2) | | 69,549 | | 69,549 | | — | | — | | — |
| Total obligations | $ | 99,878 | $ | 96,972 | $ | 1,455 | $ | 1,038 | $ | 413 |

(1) We lease our corporate office location. On August 8, 2019, we amended the lease for our corporate office location in order to rent additional office space and extend the term of our existing lease to June 30, 2025. The Company also leases its lab space under a lease agreement that expires on April 30, 2024. We also lease office space located in Palm Beach Gardens, FL. The new lease agreement commenced on November 1, 2021 and will expire 36 months from the lease commencement date, which is October 31, 2024. Rental expense was $1,407, $1,323, and $1,146, for the year ended December 31, 2021, 2020, and 2019, respectively. The remaining future lease payments under the operating leases, exclusive of any renewal option periods, are $4,329 as of December 31, 2021, payable monthly.

(2) As of December 31, 2021, the Company has purchase obligations in the amount of $69,549 which represents the contractual commitments under contract manufacturing and supply agreements with suppliers. The obligation under the supply agreement is primarily for finished product, inventory, and research and development.

**Recent Accounting Pronouncements**

*Recent Accounting Pronouncements - Not Yet Adopted*

In March 2020, the FASB issued Update 2020-04 Reference Rate Reform (Topic 848), Facilitation of the Effects of Reference Rate Reform on Financial Reporting to provide temporary optional guidance to ease the potential burden in accounting for reference rate reform. The amendments in Update 2020-04 are elective and apply to all entities that have contracts, hedging relationships, and other transactions that reference LIBOR, formerly known as the London Interbank Offered Rate, or another reference rate expected to be discontinued due to reference rate reform. The new guidance provides optional expedients, including; (1) Simplify accounting analyses under current GAAP for contract modifications, such as modifications of contracts within the scope of Topic 470, Debt, that will be accounted for by prospectively adjusting the effective interest rate, as if any modification was not substantial. That is, the original contract and the new contract shall be accounted for as if they were not substantially different from one another; (2) Simplify the assessment of hedge effectiveness and allow hedging relationships affected by reference rate reform to continue; (3) Allow a one-time election to sell or transfer debt securities

79

classified as held to maturity before January 1, 2020 that reference a rate affected by reference rate reform. The amendments are effective for all entities from the beginning of an interim period that includes the issuance date of the ASU. An entity may elect to apply the amendments prospectively through December 31, 2022. The adoption of ASU 2020-4 is not expected to have a material impact on the Company's financial position or results of operations.

**Critical Accounting Policies and Estimates**

The preparation of financial statements in conformity with U.S. GAAP requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses and other financial information. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. The amount of assets and liabilities reported in our consolidated balance sheets and the amounts reported in our consolidated statements of operations are affected by estimates and assumptions, which are used for, but not limited to, the accounting for revenue recognition. The accounting estimates discussed below involve a significant level of estimation uncertainty and have had or are reasonably likely to have a material impact on our financial condition or results of operations. Actual results could differ materially from our estimates. For additional accounting policies, see Note 2 to our Consolidated Financial Statements—*Summary of Significant Accounting Policies*.

*Revenue Recognition*

Revenue is recognized when a customer obtains control of promised goods or services, in an amount that reflects the consideration which the entity expects to receive in exchange for those goods or services. To determine revenue recognition for arrangements that an entity determines are within the scope of ASC 606, the Company performs the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. The Company only applies the five-step model to contracts when it is probable that the entity will collect the consideration it is entitled to in exchange for the goods or services it transfers to the customer. At contract inception, once the contract is determined to be within the scope of ASC 606, the Company assesses the goods or services promised within each contract and determines those that are performance obligations, and assesses whether each promised good or service is distinct. The Company then recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when (or as) the performance obligation is satisfied. Sales, value add, and other taxes collected on behalf of third parties are excluded from revenue.

*Product revenue* - The Company recognizes net revenue on sales to its commercial partners and to end users. In each instance, revenue is generally recognized when the customer obtains control of the Company's product, which occurs at a point in time, and may be upon shipment or upon delivery based on the contractual shipping terms of a contract.

Revenue on sales to commercial partners relates to Bendeka and Treakisym. Sales to our commercial partners are presented gross because the Company is primarily responsible for fulfilling the promise to provide the product, is responsible to ensure that the product is produced in accordance with the related supply agreement and bears risk of loss while the inventory is in-transit to the commercial partner.

Revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring products or services to a customer. To the extent the transaction price includes variable consideration, the Company estimates the amount of variable consideration that should be included in the transaction price utilizing the expected value method to which the Company expects to be entitled. As such, revenue on sales to end users for Belrapzo and Ryanodex are recorded net of certain deductions. Our products are contracted with a limited number of oncology distributors and hospital buying groups with narrow differences in ultimate realized contract prices used to estimate our chargeback and rebate reserves. Variable consideration is included in the transaction price if, in the Company's judgment, it is probable that a significant future reversal of cumulative revenue under the contract will not occur. Estimates of variable consideration are made using the expected value method and determination of whether to include estimated amounts in the transaction price are based largely on an assessment of the Company's anticipated performance and all information (historical, current and forecasted) that is reasonably available. The Company believes that the estimates it has established are reasonable based upon current facts and circumstances. Applying different judgments to the same facts and circumstances could result in the estimated amounts to vary.

80

*Components of Gross-to-Net (GTN) Estimates*

<u>Chargebacks</u>: Chargebacks are discounts that occur when certain contracted customers, including group purchasing organizations, or GPOs, public health service institutions and federal government entities purchasing via the Federal Supply Schedule, purchase from the Company's distributors. The Company's distributors purchase product from us at invoice price, then resell the product to certain contracted customers on the basis of prices negotiated between us and the providers. The difference between the distributors' purchase price and the typically lower certain contracted customers' purchase price is refunded to the distributors through a chargeback credit. We record estimates for these chargebacks at the time of sale as deductions from gross revenues, with corresponding adjustments to our accounts receivable allowances.

81

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

Market risk is the risk of change in fair value of a financial instrument due to changes in interest rates, equity prices, creditworthiness, financing, exchange rates or other factors. We are exposed to market risk related to changes in interest rates. As of December 31, 2021, we had cash and cash equivalents of $97.7 million held primarily in money market mutual funds. Our primary exposure to market risk is interest rate sensitivity, which is affected by changes in the general level of U.S. interest rates, however, due to the short-term duration of our money market mutual funds and the low risk profile of our investments, an immediate one percent change in interest rates would not have a material effect on the fair market value of our portfolio.

Our exposure to interest rate risk also relates to our variable-rate indebtedness associated with our Revised Credit Agreement. As of December 31, 2021 and 2020, the aggregate principal amount of such variable-rate indebtedness was $26.0 million and $34.0 million, respectively. Borrowings under the Revised Credit Agreement may from time to time bear interest at variable rates, which rates are further described in Note 6. Debt in the Consolidated Financial Statements included in Part IV, Item 15 of this report. As of December 31, 2021 and 2020, a hypothetical 1% increase in the applicable rate would not have a material effect on the incremental annual interest expense related to our variable-rate debt borrowings.

82

**Item 8. Financial Statements and Supplementary Data**

Our Financial Statements and Supplementary Data are set forth in Item 15 of Part IV of this Annual Report on Form 10-K.

83

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except share and per share amounts)**

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Not Applicable.

84

**Item 9A. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

As of December 31, 2021, an evaluation was conducted under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and Rule 15d-15(e) of the Exchange Act). Based on this evaluation, such officers have concluded that our disclosure controls and procedures were effective as of December 31, 2021. Management has concluded that our consolidated financial statements included in this Annual Report on Form 10-K fairly present, in all material respects, our financial condition, results of operations and cash flows for the periods presented therein.

85

**Management's Annual Report on Internal Control Over Financial Reporting**

The management of Eagle Pharmaceuticals, Inc. ("Eagle") has prepared, and is responsible for, Eagle's financial statements and related footnotes. These financial statements have been prepared in conformity with U.S. generally accepted accounting principles. Eagle's management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Securities Exchange Act of 1934 as a process designed by, or under the supervision of the Company's principal executive and principal financial officers and effected by the Company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of Eagle's assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of Eagle are being made only in accordance with authorizations of management and directors of Eagle;

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of Eagle's assets that could have a material effect on the financial statements; and

- Eagle's management must also disclose any material weaknesses identified.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. Eagle's management conducted an assessment of the Company's internal control over financial reporting as of December 31, 2021 based upon the criteria established in "Internal Control - Integrated Framework" issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 Framework). Based on this assessment, our management has concluded that, as of December 31, 2021, our internal control over financial reporting was effective.

Ernst & Young, LLP, the independent registered public accounting firm that audits our consolidated financial statements, has issued its attestation report on the Company's internal control over financial reporting as of December 31, 2021. This attestation report appears below.

/s/ Scott Tarriff
President, Chief Executive Officer and Director
(Principal Executive Officer)

/s/ Brian Cahill

Chief Financial Officer
(Principal Accounting and Financial Officer)

**Changes in Internal Control Over Financial Reporting**

There have been no changes in the Company's internal control over financial reporting during the quarter ended December 31, 2021 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

86

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and the Board of Directors of Eagle Pharmaceuticals, Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited Eagle Pharmaceuticals, Inc.'s internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control— Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), (the COSO criteria). In our opinion, Eagle Pharmaceuticals, Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2021, based on the COSO criteria.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2021 and 2020, and the related consolidated statements of operations, comprehensive (loss) income, changes in stockholders' equity and cash flows for each of the two years in the period ended December 31, 2021 and the related notes and our report dated March 7, 2022 expressed an unqualified opinion thereon.

**Basis for Opinion**
The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young, LLP

Stamford, Connecticut

March 7, 2022

87

**Item 9B. Other information.**

None.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections.**

Not applicable.

## PART III

We will file a definitive proxy statement for our 2022 Annual Meeting of Stockholders, or the 2022 Proxy Statement, with the SEC, pursuant to Regulation 14A, not later than 120 days after the end of our fiscal year. Accordingly, certain information required by Part III has been omitted under General Instruction G(3) to Form 10-K. Only those sections of the 2022 Proxy Statement that specifically address the items set forth herein are incorporated by reference.

**Item 10. Directors, Executive Officers and Corporate Governance**

The information required by this item is incorporated by reference to our 2022 Proxy Statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 11. Executive Compensation**

The information required by this item is incorporated by reference to our 2022 Proxy Statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this item is incorporated by reference to our 2022 Proxy Statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 13.    Certain Relationships and Related Transactions and Director Independence**

The information required by this item is incorporated by reference to our 2022 Proxy Statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

**Item 14. Principal Accountant Fees and Services**

The information required by this item is incorporated by reference to our 2022 Proxy Statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

88

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules**

**(a) Documents filed as part of this report.**

The following documents are filed as part of this report:

### 1. Consolidated Financial Statements

|  | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm– Ernst & Young, LLP; Stamford, CT - PCAOB ID # 42 | F-2 |
| Report of Independent Registered Public Accounting Firm – BDO USA, LLP; Stamford, CT - PCAOB ID # 243 | F- 4 |
| Consolidated Balance Sheets as of December 31, 2021 and 2020 | F- 5 |
| Consolidated Statements of Operations for the Years Ended December 31, 2021, 2020 and 2019 | F- 6 |
| Consolidated Statements of Comprehensive (Loss) Income for the Years ended December 31, 2021, 2020, 2019 | F-7 |
| Consolidated Statements of Changes in Stockholders' Equity for the Years Ended December 31, 2021, 2020 and 2019 | F- 8 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2021, 2020 and 2019 | F- 9 |
| Notes to Consolidated Financial Statements | F- 11 |

### 2. Financial Statement Schedules

Financial statement schedules have been omitted in this report because they are not applicable, not required under the instructions, or the information requested is set forth in the financial statements or related notes thereto.

### 3. Exhibits

The exhibits listed in the below index to exhibits are filed as part of, or incorporated by reference into, this report.

| Exhibit Number | | Description |
|---|---|---|
| 3.1 | | Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.2 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 3.2 | | Amended and Restated Bylaws (incorporated by reference to Exhibit 3.4 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 4.1 | | Form of Common Stock Certificate of the Registrant (incorporated by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 4.2 | | Description of securities Description of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934. pursuant to Section 12 of the Securities Exchange Act of 1934. (incorporated by reference to Exhibit 4.3 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 2, 2020). |
| 10.1 | † | Form of Indemnification Agreement by and between the Registrant and its directors and officers (incorporated by reference to Exhibit 10.1 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.2 | † | Eagle Pharmaceuticals, Inc. 2007 Incentive Compensation Plan and Form of Stock Option Agreement thereunder (incorporated by reference to Exhibit 10.2 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), as amended December 15, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |
| 10.3 | † | Eagle Pharmaceuticals, Inc. 2014 Equity Incentive Plan, as amended and restated, and Form of Stock Option Agreement, Notice of Exercise and Stock Option Grant Notice thereunder (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015), as amended with an additional form of Stock Option Agreement (incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |
| 10.4 | † | Eagle Pharmaceuticals, Inc. 2014 Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.4 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 22, 2014) |

| 10.5 | † | Eagle Pharmaceuticals, Inc. Non-Employee Director Compensation Policy (incorporated by reference to Exhibit 10.5 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 22, 2014) |
| 10.6 | † | Employment Agreement by and between the Registrant and Scott Tarriff dated March 8, 2007, as amended (incorporated by reference to Exhibit 10.6 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 10.7 | | Lease Agreement between the Registrant and Mack-Cali Chestnut Ridge L.L.C. dated May 28, 2013, as amended on July 1, 2013 (incorporated by reference to Exhibit 10.10 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on March 16, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K , SEC File No. 001-36306, filed March 20, 2015) |
| 10.8 | * | Development and License Agreement, by and between the Registrant and SciDose, LLC, dated September 24, 2007, as amended March 18, 2008, May 22, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.11(a) to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.9 | * | Development and License Agreement, by and between the Registrant and SciDose, LLC, dated June 12, 2007, as amended March 18, 2008, March 25, 2008, December 3, 2008, May 22, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.11(b) to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on August 5, 2015 (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.10 | * | License and Sublicense Agreement, by and between the Registrant and Lyotropic Therapeutics, Inc., dated October 16, 2008 (incorporated by reference to Exhibit 10.12 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.11 | * | License and Development Agreement, by and between the Registrant and The Medicines Company, effective as of September 24, 2009, as amended January 2010 and September 1, 2012 (incorporated by reference to Exhibit 10.13 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.12 | * | Supply Agreement, by and between the Registrant and The Medicines Company, dated September 24, 2009 (incorporated by reference to Exhibit 10.14 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.13 | * | Agreement for the Supply of Argatroban and Topotecan, by and between the Registrant and Cipla Limited, dated December 14, 2012, as amended August 30, 2013 (incorporated by reference to Exhibit 10.15 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.14 | * | Supply and Distribution Agreement, by and between the Registrant and Sandoz AG, dated January 28, 2013 (incorporated by reference to Exhibit 10.16 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.15 | * | Development and License Agreement, by and between the Registrant and Robert One, LLC (bendamustine), dated March 18, 2008, as amended November 11, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.17 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.16 | * | Development and License Agreement, by and between the Registrant and Robert One, LLC (pemetrexed), dated February 13, 2009, as amended May 22, 2009, December 23, 2010 and July 16, 2013 (incorporated by reference to Exhibit 10.18 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on August 5, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.17 | * | Exclusive License Agreement, by and between the Registrant and Cephalon, Inc., dated February 13, 2015 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q/A, SEC File No. 001-36306, filed February 12, 2016) |
| 10.18 | * | Settlement and License Agreement, by and between the Registrant and Cephalon, Inc., dated February 13, 2015 (incorporated by reference to Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed May 15, 2015) |
| 10.19 | † | Eagle Pharmaceuticals, Inc. Officer Severance Benefit Plan (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015), as amended and restated by the Eagle Pharmaceuticals, Inc. Amended and Restated Severance Benefit Plan (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 16, 2019). |
| 10.20 | † | Form of Letter Agreement (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |
| 10.21 | * | License Agreement, by and between the Registrant and Teikoku Pharma USA, Inc., dated October 13, 2015 (incorporated by reference to Exhibit 10.23 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 29, 2016) |
| 10.22 | * | Co-Promotion Agreement, by and between the Registrant and Spectrum Pharmaceuticals, Inc., dated November 4, 2015 (incorporated by reference to Exhibit 10.23 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 29, 2016) |

90

| 10.23 | | Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated January 26, 2017 (incorporated by reference to Exhibit 10.26 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 15, 2017) as amended and restated by the Amended and Restated Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated August 8, 2017 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 9, 2017), and as amended and restated by the Second Amended and Restated Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated November 8, 2019 (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed November 12, 2019). |
| 10.24 | | Amendment to License and Sublicense Agreement, by and between the Registrant and Lyotropic Therapeutics, Inc., dated August 3, 2016 (incorporated by reference to Exhibit 10.27 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 15, 2017) |
| 10.25 | * | Product Collaboration and License Agreement, by and between the Registrant and SymBio Pharmaceuticals Limited, effective as of September 19, 2017 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed November 8, 2017) |
| 10.26 | † | Form of Restricted Stock Unit Grant Package (2014 Equity Incentive Plan) (incoporated by reference to Exhibit 10.3 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 26, 2018) |
| 10.27 | † | Form of Performance Stock Unit Grant Package (2014 Equity Incentive Plan) (incorporated by reference to Exhibit 10.29 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 5, 2021). |
| 10.28 | † + | Form of Performance Stock Unit Grant Package (2014 Equity Incentive Plan) (incorporated by reference to Exhibit 10.30 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 5, 2021). |
| 10.29 | | Stock Purchase Agreement, dated as of November 10, 2016, by and among Eagle Pharmaceuticals, Inc., Arsia Therapeutics, LLC, Arsia Therapeutics, Inc., Amy Schulman, as the Seller Representative, and each person that executed a joinder to the Purchase Agreement (incorporated herein by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed with the Commission on November 14, 2016) ), as amended by Amendment No. 1 to Stock Purchase Agreement, dated as of February 8, 2018 (incorporated herein by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K, SEC File No. 001-36306, filed with the Commission on February 14, 2018) |
| 10.30 | | Fifth Amendment to Lease Agreement between the Registrant and CAPSTONE TICE BLVD LLC. dated as of August 8, 2019 (incorporated by reference to Exhibit 10.32 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 2, 2020). |
| 10.31 | | Fourth Amendment to Exclusive License Agreement, by and between the Registrant and Teva Pharmaceuticals International GmbH, dated April 12, 2019 (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q filed on May 7, 2019). |
| 10.32 | + | Settlement Agreement, by and between the Registrant and Eli Lilly and Company, dated December 13, 2019 (incorporated by reference to Exhibit 10.34 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 2, 2020). |
| 10.33 | + | Co-Promotion Agreement with Tyme Technologies, Inc., dated January 7, 2020 (incorporated by reference to Exhibit 10.35 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 2, 2020). |
| 10.34 | | Securities Purchase Agreement, between the Registrant and Tyme Technologies, Inc., dated January 7, 2020 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on January 8, 2020). |
| 10.35 | | License Agreement between the Registrant and Combioxin SA, dated August 19, 2021 (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed November 9, 2021) |
| 10.36 | | License Agreement between the Registrant and AOP Orphan Pharmaceuticals GmbH, dated August 6, 2021 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed November 9, 2021). |
| 21.1 | (1) | List of subsidiaries of Eagle Pharmaceuticals, Inc. |
| 23.1 | (1) | Consent of Ernst & Young, LLP, an Independent Registered Public Accounting Firm |
| 23.2 | (1) | Consent of BDO USA, LLP, an Independent Registered Public Accounting Firm |
| 24.1 | | Power of Attorney (incorporated by reference to this signature page of this Annual Report on Form 10-K) |
| 31.1 | (1) | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 31.2 | (1) | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 32.1 | (2) | Certifications of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |

91

| 101.INS | iXBRL Instance Document – the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | iXBRL Taxonomy Extension Schema |
| 101.CAL | iXBRL Taxonomy Extension Calculation Linkbase |
| 101.DEF | iXBRL Taxonomy Extension Definition Linkbase |
| 101.LAB | iXBRL Taxonomy Extension Labels Linkbase |
| 101.PRE | iXBRL Taxonomy Extension Presentation Linkbase |
| 104 | Cover Page Interactive Data File, formatted as Inline XBRL, contained in Exhibit 101 attachments |

†Management contract or compensatory plan or arrangement.

 *Confidential treatment granted as to certain portions, which portions are omitted and filed separately with the Securities and Exchange Commission.

+Certain portions of the exhibit (indicated by asterisks) have been omitted pursuant to Item 601(b)(10)(iv) of Regulation S-K..

(1) Filed herewith.

(2) Furnished (and not filed) herewith pursuant to Item 601 (b)(32)(ii) of Regulation S-K.

**Item 16. Form 10-K Summary**
None.

<div align="center">

**SIGNATURES**

</div>

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on March 7, 2022.

**EAGLE PHARMACEUTICALS, INC.**

By:    /s/ Scott Tarriff
Scott Tarriff
President and Chief Executive Officer
(Principal Executive Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

<div align="center">

**POWER OF ATTORNEY**

</div>

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Scott Tarriff and Brian Cahill, and each of them, his true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or either of them, or their or his substitutes or substitute, may lawfully do or cause to be done by virtue hereof.

<div align="center">

92

</div>

| Signature | Title | Date |
|---|---|---|
| /S/ SCOTT TARRIFF<br>Scott Tarriff | President, Chief Executive Officer and Director<br>(Principal Executive Officer) | March 7, 2022 |
| /S/ BRIAN CAHILL<br>Brian Cahill | Chief Financial Officer<br>(Principal Accounting and Financial Officer) | March 7, 2022 |
| /S/ MICHAEL GRAVES<br>Michael Graves | Chairman of the Board of Directors | March 7, 2022 |
| /S/ STEVEN RATOFF<br>Steven Ratoff | Member of the Board of Directors | March 7, 2022 |
| /S/ JENNIFER K. SIMPSON<br>Jennifer K. Simpson | Member of the Board of Directors | March 7, 2022 |
| /S/ ROBERT L. GLENNING<br>Robert L. Glenning | Member of the Board of Directors | March 7, 2022 |
| /S/ RICHARD A. EDLIN<br>Richard A. Edlin | Member of the Board of Directors | March 7, 2022 |
| /S/ LUCIANA BORIO<br>Luciana Borio | Member of the Board of Directors | March 7, 2022 |

93

**INDEX TO FINANCIAL STATEMENTS OF
EAGLE PHARMACEUTICALS, INC.**

**APPENDIX A**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm– Ernst & Young, LLP | F-2 |
| Report of Independent Registered Public Accounting Firm – BDO USA, LLP | F- 4 |
| Consolidated Balance Sheets as of December 31, 2021 and 2020 | F- 5 |
| Consolidated Statements of Operations for the Years Ended December 31, 2021, 2020 and 2019 | F- 6 |
| Consolidated Statements of Comprehensive (Loss) Income for the Years ended December 31, 2021, 2020, 2019 | F-7 |
| Consolidated Statements of Changes in Stockholders' Equity for the Years Ended December 31, 2021, 2020 and 2019 | F- 8 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2021, 2020 and 2019 | F- 9 |
| Notes to Consolidated Financial Statements | F- 11 |

F- 1

**Report of Independent Registered Public Accounting Firm** – Ernst & Young, LLP

To the Shareholders and the Board of Directors of Eagle Pharmaceuticals, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Eagle Pharmaceuticals, Inc. (the Company) as of December 31, 2021 and 2020, the related consolidated statements of operations, comprehensive (loss) income, changes in stockholders' equity and cash flows for each of the two years in the period ended December 31, 2021, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2021 and 2020, and the results of its operations and its cash flows for each of the two years in the period ended December 31, 2021, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2021, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated March 7, 2022 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matter**

The critical audit matter communicated below is a matter arising from the current period audit of the financial statements that was communicated or required to be communicated to the audit committee and that: (1) relates to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of the critical audit matter does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the account or disclosure to which it relates.

F- 2

***Revenue Recognition - Chargebacks***

*Description of the Matter*  At December 31, 2021, the Company recorded an allowance for chargebacks totaling $3.8 million. As described in Note 2 of the consolidated financial statements, the Company recognizes revenues from product sales net of allowances for chargebacks. These allowances are recorded in the period when the related sales occur and are based on the estimated amounts to be claimed which are not known at the point of sale. Chargebacks are estimated based on assumptions about the third-party payors and contracted prices to be paid by those payors.

Given the estimation uncertainty involved, auditing the allowance for chargebacks was complex. A higher degree of auditor judgment was required to evaluate the mix of third-party payors and applicable contract prices assumed by management to determine the amount of the allowance.

*How We Addressed the Matter in Our Audit*  We obtained an understanding, evaluated the design and tested the operating effectiveness of internal controls over the Company's process for estimating its allowance for chargebacks, including controls over management's review of significant assumptions used to calculate the estimates such as the mix of third-party payors and applicable contract prices.

To test the Company's estimated allowance for chargebacks, our audit procedures included, among others, testing the accuracy and completeness of the underlying data used in the Company's analyses and evaluating the assumptions described above. We compared the assumed payor mix used to calculate the estimate to actual historical data and compared the assumed contract prices to executed agreements with the applicable payors. We also analyzed the effect of reasonable changes in assumptions on the amounts recorded. We assessed the historical accuracy of management's estimate. We tested credit memos issued subsequent to year-end for recording in the proper period.

/s/ Ernst & Young, LLP

We have served as the Company's auditor since 2020.

Stamford, Connecticut
March 7, 2022

F- 3

**Report of Independent Registered Public Accounting Firm** – BDO USA, LLP

Board of Directors and Stockholders
Eagle Pharmaceuticals, Inc.
Woodcliff Lake, New Jersey

**Opinion on the Consolidated Financial Statements**

We have audited the accompanying consolidated balance sheet of Eagle Pharmaceuticals, Inc. and subsidiaries (the "Company") as of December 31, 2019, the related consolidated statements of operations, comprehensive (loss) income, changes in stockholders' equity and cash flows for the year ended December 31, 2019, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2019, and the results of its operations and its cash flows for the year ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ BDO USA, LLP

We served as the Company's auditor from 2007 to 2020.

Woodbridge, New Jersey
March 2, 2020

F- 4

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED BALANCE SHEETS**
(In thousands, except share amounts)

| | | December 31, 2021 | | December 31, 2020 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current assets:** | | | | |
| Cash and cash equivalents | $ | 97,659 | $ | 103,155 |
| Accounts receivable, net | | 41,149 | | 51,117 |
| Inventories | | 21,908 | | 8,075 |
| Prepaid expenses and other current assets | | 11,890 | | 3,718 |
| Total current assets | | 172,606 | | 166,065 |
| Property and equipment, net | | 1,636 | | 2,077 |
| Intangible assets, net | | 10,671 | | 12,917 |
| Goodwill | | 39,743 | | 39,743 |
| Deferred tax asset, net | | 18,798 | | 15,180 |
| Other assets | | 10,278 | | 17,208 |
| Total assets | $ | 253,732 | $ | 253,190 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| **Current liabilities:** | | | | |
| Accounts payable | $ | 16,431 | $ | 6,268 |
| Accrued expenses and other liabilities | | 32,338 | | 23,817 |
| Short-term debt | | 25,607 | | 8,000 |
| Total current liabilities | | 74,376 | | 38,085 |
| | | | | |
| Other long-term liabilities | | 2,903 | | 3,959 |
| Long-term debt | | — | | 25,135 |
| Total liabilities | | 77,279 | | 67,179 |
| | | | | |
| **Commitments and contingencies** | | | | |
| | | | | |
| **Stockholders' equity:** | | | | |
| Preferred stock, 1,500,000 shares authorized and no shares issued or outstanding as of December 31, 2021 and 2020 | | — | | — |
| Common stock, $0.001 par value; 50,000,000 shares authorized; 16,903,034 and 16,739,203 shares issued as of December 31, 2021 and 2020, respectively | | 17 | | 17 |
| Additional paid in capital | | 325,779 | | 305,403 |
| Accumulated other comprehensive loss | | (94) | | — |
| Retained earnings | | 75,862 | | 84,489 |
| Treasury stock, at cost, 4,111,622 and 3,682,176 shares as of December 31, 2021 and 2020, respectively | | (225,111) | | (203,898) |
| Total stockholders' equity | | 176,453 | | 186,011 |
| Total liabilities and stockholders' equity | $ | 253,732 | $ | 253,190 |

See accompanying notes to consolidated financial statements

F- 5

**EAGLE PHARMACEUTICALS, INC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except share and per share amounts)**

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2021 | | 2020 | | 2019 |
| **Revenue:** | | | | | | |
| Product sales, net | $ | 65,023 | $ | 72,323 | $ | 73,989 |
| Royalty revenue | | 106,523 | | 110,479 | | 112,903 |
| License and other revenue | | — | | 5,000 | | 9,000 |
| Total revenue | | 171,546 | | 187,802 | | 195,892 |
| **Operating expenses:** | | | | | | |
| Cost of product sales | | 31,528 | | 33,647 | | 47,891 |
| Cost of royalty revenue | | 10,652 | | 11,818 | | 13,006 |
| Research and development | | 51,275 | | 30,785 | | 36,810 |
| Selling, general and administrative | | 75,322 | | 78,598 | | 76,370 |
| Total operating expenses | | 168,777 | | 154,848 | | 174,077 |
| Income from operations | | 2,769 | | 32,954 | | 21,815 |
| Interest income | | 560 | | 562 | | 2,169 |
| Interest expense | | (1,635) | | (2,577) | | (2,686) |
| Other (expense) income | | (6,242) | | (8,262) | | 700 |
| Total other (expense) income, net | | (7,317) | | (10,277) | | 183 |
| **(Loss) income before income tax provision** | | (4,548) | | 22,677 | | 21,998 |
| Income tax provision | | (4,079) | | (10,688) | | (7,685) |
| **Net (loss) income** | $ | (8,627) | $ | 11,989 | $ | 14,313 |
| (Loss) Earnings per common share: | | | | | | |
| Basic | $ | (0.66) | $ | 0.89 | $ | 1.04 |
| Diluted | $ | (0.66) | $ | 0.87 | $ | 1.01 |
| Weighted average number of common shares outstanding: | | | | | | |
| Basic | | 13,051,095 | | 13,481,525 | | 13,754,516 |
| Diluted | | 13,051,095 | | 13,771,393 | | 14,138,733 |

See accompanying notes to consolidated financial statements

F- 6

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF COMPREHENSIVE (LOSS) INCOME**
**(In thousands)**

|  | Year Ended December 31, | | |
|  | 2021 | 2020 | 2019 |
|---|---|---|---|
| Net (loss) income | $ (8,627) | $ 11,989 | $ 14,313 |
| Other comprehensive loss, net of tax: |  |  |  |
| Unrealized loss for convertible promissory note | (94) | — | — |
| Total other comprehensive loss | (94) | — | — |
| Comprehensive (loss) income | $ (8,721) | $ 11,989 | $ 14,313 |

See accompanying notes to consolidated financial statements

F- 7

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
(In thousands)

| | Common Stock | | Additional Paid-In Capital | Treasury Stock | Accumulated Other Comprehensive Loss | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| | Number of Shares | Amount | | | | | |
| **Balance at December 31, 2018** | **16,504** | **$ 17** | **$ 256,458** | **$ (153,900)** | **$ —** | **$ 58,187** | **$ 160,762** |
| Stock-based compensation expense | — | — | 21,998 | — | — | — | 21,998 |
| Issuance of common stock upon exercise of stock option grants | 34 | — | 260 | — | — | — | 260 |
| Payment of employee withholding tax upon vesting of stock-based awards | — | — | (198) | — | — | — | (198) |
| Common stock repurchases | — | — | — | (17,961) | — | — | (17,961) |
| Net income | — | — | — | — | — | 14,313 | 14,313 |
| **Balance at December 31, 2019** | **16,538** | **$ 17** | **$ 278,518** | **$ (171,861)** | **$ —** | **$ 72,500** | **$ 179,174** |
| Stock-based compensation expense | — | — | 24,756 | — | — | — | 24,756 |
| Issuance of common stock upon exercise of stock option grants | 149 | — | 3,654 | — | — | — | 3,654 |
| Payment of employee withholding tax upon vesting of stock-based awards | — | — | (1,525) | — | — | — | (1,525) |
| Issuance of common stock related to vesting of restricted stock | 52 | — | — | — | — | — | — |
| Common stock repurchases | — | — | — | (32,037) | — | — | (32,037) |
| Net income | — | — | — | — | — | 11,989 | 11,989 |
| **Balance at December 31, 2020** | **16,739** | **$ 17** | **$ 305,403** | **$ (203,898)** | **$ —** | **$ 84,489** | **$ 186,011** |
| Stock-based compensation expense | — | — | 19,555 | — | — | — | 19,555 |
| Issuance of common stock upon exercise of stock option grants | 101 | — | 2,398 | — | — | — | 2,398 |
| Issuance of common stock related to vesting of restricted stock | 63 | — | (1,577) | — | — | — | (1,577) |
| Common stock repurchases | — | — | — | (21,213) | — | — | (21,213) |
| Other comprehensive loss | — | — | — | — | (94) | — | (94) |
| Net loss | — | — | — | — | — | (8,627) | (8,627) |
| **Balance at December 31, 2021** | **16,903** | **$ 17** | **$ 325,779** | **$ (225,111)** | **$ (94)** | **$ 75,862** | **$ 176,453** |

See accompanying notes to consolidated financial statements

F- 8

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In thousands)

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| **Cash flows from operating activities:** | | | |
| Net (loss) income | $ (8,627) | $ 11,989 | $ 14,313 |
| Adjustments to reconcile net (loss) income to net cash provided by operating activities: | | | |
| Deferred income taxes | (3,618) | (1,511) | 152 |
| Depreciation expense | 764 | 872 | 972 |
| Noncash operating lease expense related to right-of-use assets | 1,046 | 1,228 | 1,159 |
| Amortization expense of intangible assets | 2,996 | 2,666 | 2,520 |
| Convertible promissory note related credit losses | 758 | — | — |
| Stock-based compensation expense | 19,555 | 24,756 | 21,998 |
| Fair value adjustments on equity investment | 6,170 | 5,300 | — |
| Amortization of debt issuance costs | 472 | 419 | 480 |
| Fair value adjustments on settled accelerated share repurchase agreement | — | 2,962 | — |
| Fair value adjustments related to derivative instrument | (686) | — | — |
| Accretion of discount on convertible promissory note | (148) | — | — |
| **Changes in operating assets and liabilities which provided (used) cash:** | | | |
| Accounts receivable | 9,529 | (3,113) | 18,481 |
| Inventories | (13,833) | (1,509) | 1,739 |
| Prepaid expenses and other current assets | (2,770) | 11,386 | (4,841) |
| Other assets | (1,321) | (2,325) | (599) |
| Accounts payable | 10,162 | 806 | (4,455) |
| Accrued expenses and other liabilities | 7,770 | (4,429) | 4,067 |
| Net cash provided by operating activities | 28,219 | 49,497 | 55,986 |
| **Cash flows from investing activities:** | | | |
| Purchase of equity investment security | — | (17,500) | — |
| Purchase of property and equipment | (323) | (747) | (777) |
| Purchase of convertible promissory note | (5,000) | — | — |
| Net cash used in investing activities | (5,323) | (18,247) | (777) |
| **Cash flows from financing activities:** | | | |
| Repurchases of common stock | (21,213) | (34,999) | (17,961) |
| Proceeds from existing revolving credit facility | — | 110,000 | — |
| Repayment of existing revolving credit facility | — | (110,000) | — |
| Payment of debt | (8,000) | (5,000) | (6,000) |
| Payment of debt financing costs | — | — | (326) |
| Payment of employee withholding tax upon vesting of stock-based awards | (1,577) | (1,525) | (198) |
| Proceeds from common stock option exercises | 2,398 | 3,654 | 260 |
| Net cash used in financing activities | (28,392) | (37,870) | (24,225) |

See accompanying notes to consolidated financial statements

F- 9

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In thousands)

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2021** | **2020** | **2019** |
| Net (decrease) increase in cash and cash equivalents | (5,496) | (6,620) | 30,984 |
| Cash and cash equivalents at beginning of period | 103,155 | 109,775 | 78,791 |
| Cash and cash equivalents at end of period | $ 97,659 | $ 103,155 | $ 109,775 |
| | | | |
| **Supplemental disclosures of cash flow information:** | | | |
| **Cash paid during the period for:** | | | |
| Income taxes, net | $ 10,005 | $ 6,428 | $ 6,673 |
| Interest | 1,197 | 2,224 | 2,478 |
| Right-of-use asset obtained in exchange for lease obligation, inclusive of a lease amendment | 270 | 855 | 3,716 |

See accompanying notes to consolidated financial statements

F- 10

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(In thousands, except share and per share amounts)**

## 1. Organization and Business

Eagle Pharmaceuticals, Inc. (the "Company", "Eagle", or "we") is an integrated pharmaceutical company focused on finding ways to help medicines do more for patients. We and our collaborators have the capabilities to take a molecule from preclinical research through regulatory approval and into the marketplace, including development, manufacturing and commercialization. Our business model applies our scientific expertise, proprietary research-based insights and marketplace proficiency to identify challenging-to-treat diseases of the central nervous system or metabolic critical care therapeutic areas as well as in oncology. By focusing on patients' unmet needs, we strive to provide healthcare professionals with urgently needed treatment solutions that are designed to improve patient care and outcomes and create near- and long-term value for our stakeholders, including patients and healthcare providers and our employees, marketing partners, collaborators and investors. Our science-based business model has a proven track record with the U.S. Food and Drug Administration ("FDA") approval and commercial launches of three products: Ryanodex® (dantrolene sodium) ("Ryanodex"), bendamustine ready-to-dilute ("RTD") 500ml solution ("Belrapzo"), and rapidly infused bendamustine RTD ("Bendeka"). We market our products through marketing partners and/or our internal direct sales force. We market Ryanodex and Belrapzo, and Teva Pharmaceutical Industries Ltd. ("Teva") markets Bendeka through its subsidiary Cephalon, Inc. SymBio Pharmaceuticals Limited, or SymBio, markets Treakisym, a RTD product, in Japan. Reflecting further expansion of our oncology portfolio, in February 2020, we received final FDA approval for Pemfexy, a branded alternative to Alimta for metastatic non-squamous non-small cell lung cancer and malignant pleural mesothelioma.

In December 2021, the FDA approved our first-to-file Abbreviated New Drug Application, or, ANDA for vasopressin, that references Endo International plc's Vasostrict indicated to increase blood pressure in adults with vasodilatory shock who remain hypotensive despite fluids. Par Pharmaceutical, Inc. ("Par"), subsidiary of Endo International plc then unilaterally withdrew its request that the U.S. District Court for the District of Delaware issue a temporary restraining order and preliminary injunction preventing the launch of our approved vasopressin product. The FDA then determined that we have maintained our 180 days of marketing exclusivity for our approved ANDA for vasopressin. We launched vasopressin in 2022.

Reflecting further expansion of our oncology portfolio, in February 2020, we received final FDA approval for Pemfexy® ("Pemfexy") and in July 2020, we announced that the Centers for Medicare & Medicaid Services ("CMS") had established a unique, product-specific billing code for Pemfexy, effective on October 1, 2020. Pemfexy, our novel pemetrexed product, is a branded alternative to Alimta® for metastatic non-squamous non-small cell lung cancer and malignant pleural mesothelioma. The conversion from tentative to a final approval follows the Company's settlement agreement reached with Eli Lilly and Company ("Lilly") on December 13, 2019. This agreement provides for a release of all claims by the parties and allows for an initial entry of Pemfexy into the market (equivalent to approximately a three-week supply of current Alimta utilization) on February 1, 2022, and a subsequent uncapped entry on April 1, 2022.

*Segment Information*

The Company operates in one reportable business segment because we have a single management team that reports to the Chief Executive Officer, the chief operating decision maker, who comprehensively manages the entire business. The Company does not operate separate lines of business with respect to its products or product candidates. Accordingly, the Company has one reportable segment.

*Share Repurchase Program*

As of December 31, 2021, the Company had repurchased an aggregate of 4,111,622 shares of common stock for an aggregate of $228.1 million pursuant to the Company's share repurchase programs in effect since August 2016. Refer to Note 7. "Common Stock and Stock-Based Compensation" for further details.

*Long-term Debt*

On November 8, 2019, the Company entered into the Second Amended and Restated Credit Agreement (the "Revised Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") and the lenders party thereto, which replaced the Company's existing credit agreement, dated as of August 8, 2017 (the "Amended Credit Agreement"). Refer to Note 6. "Debt" for further details.

*Significant License and Collaboration Agreements* - Refer to Note 9. "License and Collaboration Agreements" for further details.

*SymBio License Agreement*

On September 20, 2017, the Company entered into a Product Collaboration and License Agreement, effective as of September 19, 2017, (the "SymBio License Agreement") with SymBio Pharmaceuticals Limited ("SymBio") for the rights to develop and commercialize the Company's bendamustine hydrochloride ready-to-dilute injection product and rapid infusion injection product (collectively, the "Products") in Japan. SymBio currently markets in Japan TREAKISYM®, a lyophilized powder formulation of bendamustine hydrochloride indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma ("MCL"), and as a first line treatment of low-grade NHL and MCL. Under the SymBio License Agreement, SymBio may continue to market TREAKISYM® in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

*Combioxin License Agreement*

In August 2021, the Company entered into a license agreement with Combioxin, SA ("Combioxin") under which the Company was granted exclusive, worldwide development and commercialization rights to CAL02, a novel first-in-class antitoxin agent ready for Phase 2b/3 development for the treatment of severe pneumonia in combination with traditional antibacterial drugs. The Company will be solely responsible for the development, regulatory, manufacturing and commercialization activities of CAL02. Combioxin will assist the Company in transitioning the manufacturing and supply of CAL02 to the Company.

*AOP Orphan License Agreement*

In August 2021, the Company entered into a licensing agreement with AOP Orphan Pharmaceuticals GmbH ("AOP Orphan"), a privately owned Austrian company devoted to the treatment of rare and special diseases, for the commercial rights to its product, Landiolol in the United States. Landiolol, a leading hospital emergency use product, is currently approved in Europe for the treatment of non-compensatory sinus tachycardia and tachycardic supraventricular arrhythmias. The Company will support the submission of a new drug application by AOP Orphan to the FDA seeking approval for Landiolol for the short term reduction of ventricular rate in patients with supraventricular tachycardia, including atrial fibrillation and atrial flutter.

*Products and Product Candidates Overview*

*Bendeka*

In March 2018, the FDA approved a second manufacturing site for Bendeka.

On May 15, 2018, the FDA granted final approval for Eagle's ready-to-dilute bendamustine hydrochloride solution in a 500ml admixture for the treatment of patients with chronic lymphocytic leukemia ("CLL") and patients with indolent B-cell non-Hodgkin lymphoma ("NHL") that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.

On March 24, 2016 the FDA denied the Company's request for seven years of orphan drug exclusivity in the U.S., for Bendeka. In April 2016, the Company filed a lawsuit against the FDA arguing that Bendeka is entitled to orphan drug exclusivity as a matter of law (see Note 13. Legal Proceedings). On July 2, 2014, the FDA granted the Company orphan drug designations for Bendeka for the treatment of CLL and indolent B-cell NHL. The designations were based on a plausible hypothesis that Bendeka is "clinically superior" to a drug previously approved for the same indications. Generally, an orphan-designated drug is eligible for seven years of marketing exclusivity for the orphan-designated indications upon approval of the drug for those indications. On June 8, 2018, the U.S. District Court for the District of Columbia (the "Court") issued a decision requiring the FDA to grant seven years of orphan drug exclusivity ("ODE") in the U.S., for Bendeka, and on July 8, 2018 the FDA granted such ODE through December 2022.  In addition, on July 8, 2018, the FDA submitted a Motion to Alter or Amend the Judgement Pursuant to Rule 59(e), pursuant to which the FDA requested the Court amend its decision to make clear that the decision does not affect any applications referencing TREANDA.  The FDA's motion was denied by the Court on August 1, 2018 on the grounds that FDA was seeking an inappropriate advisory opinion.  On February 20, 2019, the FDA issued a decision in favor of the Company, regarding the scope of exclusivity for Bendeka. Pursuant to the decision, no bendamustine product (including generic versions of TREANDA) may launch in the United States until December 7, 2022 unless it is clinically superior to Bendeka. The Company expects to vigorously pursue the scope of its exclusivity grant.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

As of March 29, 2019, the Company and Teva Pharmaceutical Industries Ltd. ("Teva") executed an amendment to the Cephalon License Agreement to terminate Teva's obligation to pay future milestones and royalties on Bendeka sales outside of the U.S., which included an upfront cash payment of $9 million that was recorded as License and other revenue on the consolidated statements of operations.

On April 13, 2019, the Company and Teva entered into an Amendment to the Cephalon License Agreement ("Cephalon License", amending the terms of the License Agreement to increase the U.S. royalty paid to the Company and re-allocated certain litigation expenses. Pursuant to the Amendment, beginning on October 1, 2019, the Company's royalty payment has increased from 25% to 30% of Bendeka net U.S. sales. The royalty rate will increase by one percentage point on each anniversary of October 1, 2019 until it reaches 32%, and it will remain at 32% thereafter. The Amendment also extends the U.S. royalty term for Bendeka until it is no longer sold in the United States. The previous U.S. royalty term was set to expire in 2025. The extended term coincides with the bendamustine patents with expiries through 2033. Pursuant to the amendment, Eagle will continue to be responsible for the manufacture of Bendeka for the U.S. market for so long as it is sold in the United States.

*Ryanodex*

On October 3, 2018, the Company announced that it entered into an agreement with the United States Army Medical Research Institute of Chemical Defense, the nation's leading science and technology laboratory in the area of medical chemical countermeasures research and development, to conduct a study to evaluate the neuroprotective effects of Ryanodex® (dantrolene sodium).

On May 7, 2019, the Company announced positive results of its study to evaluate the neuroprotective effects of Ryanodex secondary to nerve agent exposure, conducted with the United States Army Medical Research Institute of Chemical Defense.

On December 16, 2019, we announced that the FDA has granted orphan drug designation (ODD) for Ryanodex®(dantrolene sodium) for the treatment of organophosphate exposure. Organophosphates are a class of chemicals that include potent pesticides and chemical weapons, known as nerve agents. Acute intoxication with organophospates may result in severe consequences, including brain damage and death. About 2,700 people in the United States are treated for accidental exposure to organophosphate pesticides every year. Eagle is currently evaluating Ryanodex for the treatment of brain damage secondary to nerve agent exposure. If approved, Ryanodex would represent the first product available for this indication.

On January 6, 2020, we issued a press release announcing a new research agreement with NorthShore University HealthSystem in Evanston, Illinois, focused on studying Ryanodex for traumatic brain injury (TBI) in animal models. TBI can acutely cause brain lesions that result in direct tissue damage that may prompt apoptotic cell mechanisms for several weeks post-injury, which may lead to worsened long-term outcomes. Disruption of certain intracellular mechanisms may affect cell functioning and survival.

*Fulvestrant*

On October 30, 2018, the Company announced that the Company's fulvestrant formulation has not met the primary pharmacokinetic endpoint evaluating the bioequivalence of the Company's formulation compared to Faslodex in its open label, randomized, pharmacokinetic and safety study conducted in 600 healthy female volunteers across multiple U.S. sites. On May 7, 2019, the Company announced positive results of its study to evaluate the neuroprotective effects of Ryanodex secondary to nerve agent exposure, conducted with the United States Army Medical Research Institute of Chemical Defense.

*PEMFEXY*

On February 1, 2022, the Company announced the commercial availability of its novel product PEMFEXY™ (pemetrexed for injection) in the United States. A branded alternative to ALIMTA®, PEMFEXY is a ready-to-use liquid with a unique J-code, approved to treat nonsquamous non-small cell lung cancer and mesothelioma.

Previously, in February 2020, the Company received final approval from the FDA of its NDA for PEMFEXY, following the settlement agreement of patent litigation with Eli Lilly and Company (NYSE: LLY) in December 2019. The agreement provided for a release of all claims by the parties and allowed for an initial entry of PEMFEXY into the market (equivalent to approximately a three-week supply of ALIMTA utilization) on February 1, 2022 and a subsequent uncapped entry on April 1,

F- 13

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

2022. Under the settlement agreement, we will pay a royalty equal to one percent of the net sales of PEMFEXY during the royalty term, which will end no later than May 24, 2022.

*Tyme*

On January 7, 2020, Tyme Technologies, Inc. and the Company announced a strategic collaboration to advance oral SM-88 for the treatment of patients with cancer. SM-88 was an investigational agent in two Phase 2 studies for pancreatic cancer and in a Phase 2 study for prostate cancer.

On January 26, 2022, Tyme announced the discontinuation of SM-88 with methoxsalen, phenytoin, and sirolimus in a trial for metastatic pancreatic cancer. On February 11, 2022, Tyme stated SM-88 is being evaluated in a Phase II study evaluating SM-88 in breast cancer (HR+/HER2-), as well as continuing enrollment of a Phase II study in high-risk metastatic sarcomas.

F- 14

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

**2. Summary of Significant Accounting Policies**

*Significant Risks and Uncertainties*

In response to the ongoing COVID-19 pandemic, we have taken and continue to take active measures designed to address and mitigate the impact of the COVID-19 pandemic on our business, such as remote working policies, facilitating management's periodic communication to address employee and business concerns and providing frequent updates to our Board of Directors ("Board"). During the second quarter of 2021, we implemented a plan to reopen our office to allow employees to return to the office, with a focus on employee safety and optimal work environment. Our management continues to monitor and evaluate such plans as the pandemic continues to evolve. We anticipate that the COVID-19 pandemic may also have an impact on the clinical development timelines for certain of our clinical programs. We also anticipate that the COVID-19 pandemic may have an impact on our supply chain. The COVID-19 pandemic and associated lockdowns have resulted in a decrease in healthcare utilization broadly and specifically lead to a continuing reduction in the utilization of physician-administered oncology products including Belrapzo and Bendeka. In addition, the COVID-19 pandemic has delayed the timing of certain litigation and we anticipate that such delays will continue for the duration of the pandemic. The extent to which the COVID-19 pandemic will continue to impact our business, clinical development and regulatory efforts, supply chain and sales efforts, corporate development objectives and the value of, and market for, our common stock will depend on future developments that are highly uncertain and cannot be predicted with confidence at this time, such as the ultimate duration of the pandemic, travel restrictions, quarantines, social distancing and business closure requirements in the United States, and other countries, and the effectiveness of actions taken globally to contain and treat the disease. The global economic slowdown, the overall disruption of global healthcare systems and other risks and uncertainties associated with the pandemic have impacted our operations and could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

In addition, we are subject to other challenges and risks specific to our business and our ability to execute on our business plan and strategy, as well as risks and uncertainties common to companies in the pharmaceutical industry with research and development operations, including, without limitation, risks and uncertainties associated with: delays or problems in obtaining clinical supply; obtaining regulatory approval of product candidates; loss of single source suppliers or failure to comply with manufacturing regulations; identifying, acquiring or in-licensing additional products or product candidates; product development and the inherent uncertainty of clinical success; the challenges of protecting and enhancing intellectual property rights; and the challenges of complying with applicable regulatory requirements. In addition, as the ongoing COVID-19 pandemic affects our business and results of operations, it may also have the effect of heightening many of the other risks and uncertainties discussed above.

*Use of Estimates*

These financial statements are presented in U.S. dollars and are prepared in accordance with U.S. GAAP. The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported in the financial statements including disclosure of contingent assets and contingent liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period and accompanying notes. Our critical accounting policies are those that are both most important to our financial condition and results of operations and require the most difficult, subjective or complex judgments on the part of management in their application, often as a result of the need to make estimates about the effect of matters that are inherently uncertain. We anticipate that the COVID-19 pandemic will continue to disrupt our supply chain and marketing and sales efforts for certain of our products, including Bendeka, although it is not currently expected that any disruption would be significant. As of the date of issuance of these financial statements, we are not aware of any specific event or circumstance that would require us to update our estimates, assumptions and judgments or revise the carrying value of our assets or liabilities. Because of the uncertainty of factors surrounding the estimates or judgments used in the preparation of the financial statements, actual results may materially vary from these estimates, and any such differences may be material to our financial statements.

Revenue from sales of products is recognized at the point where the customer obtains control of the goods and we satisfy our performance obligation, which generally is at the time we ship the product to the customer. Provisions for chargebacks, rebates, discounts, and returns are established in the same period the related sales are recognized. Significant judgments must be made in determining the transaction price for our sales of products related to anticipated rebates, discounts and returns. Refer below for further details.

F- 15

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

*Reclassifications*

Certain reclassifications have been made to prior year amounts to conform with the current year presentation, including for amounts related to accounts receivable, net and prepaid expenses and other current assets. None of the amounts pertaining to the reclassifications were significant.

*Cash and Cash Equivalents*

The Company considers cash and cash equivalents to be highly liquid investments with an original maturity of three months or less from the date of purchase. All cash and cash equivalents are held in United States financial institutions. The carrying amount of cash and cash equivalents approximates its fair value due to its short-term nature.

We, at times, maintain balances with financial institutions in excess of the Federal Deposit Insurance Corporation limit.

*Fair Value Measurements*

U.S. GAAP establishes a framework for measuring fair value under generally accepted accounting principles and enhances disclosures about fair value measurements. Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Valuation techniques used to measure fair value must maximize the use of observable inputs and minimize the use of unobservable inputs. The standard describes the following fair value hierarchy based on three levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value:
- Level 1: Quoted prices in active markets for identical assets or liabilities.
- Level 2: Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.
- Level 3: Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

The fair value of interest-bearing cash, cash equivalents, accounts receivable and accounts payable approximate fair value due to their life being short term in nature, and are classified as Level 1 for all periods presented.

F- 16

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The following tables present the Company's hierarchy for its assets measured at fair value as of December 31, 2021 and 2020:

| | December 31, 2021 | | | |
| | Total | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Money market funds | $ 57,357 | $ 57,357 | $ — | $ — |
| Convertible promissory note | 4,021 | — | — | 4,021 |
| Embedded derivative asset in convertible promissory note | 962 | — | — | 962 |
| Investment in Tyme | 6,030 | 6,030 | — | — |
| **Total financial assets** | $ 68,370 | $ 63,387 | $ — | $ 4,983 |

| | December 31, 2020 | | | |
| | Total | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Money market funds | $ 79,682 | $ 79,682 | $ — | $ — |
| Investment in Tyme | 12,200 | 12,200 | | |
| **Total financial assets** | $ 91,882 | $ 91,882 | $ — | $ — |

The Company recognizes transfers between levels within the fair value hierarchy, if any, at the end of each quarter. There were no transfers in or out of Level 1, Level 2 or Level 3 during the years ended December 31, 2021 and 2020, respectively.

Our investment in the convertible promissory note and the embedded derivative are classified as Level 3. We analyzed and assessed the embedded derivative feature contained in the convertible promissory note agreement. We used a probability factor to value the embedded derivative asset based on management's best estimate, including the principal and estimated accrued interest among other contractual terms. The convertible promissory note is accounted for as available for sale. The convertible promissory note is reported at fair value with unrealized gains and losses included in Accumulated other comprehensive income (loss). Refer to Note 14, Convertible Promissory Note for further details.

Our investment in restricted shares of common stock of Tyme Technologies, Inc. ("Tyme") are classified as Level 1. Refer to Note 9, "License and Collaboration Agreements" for further details.

The fair value of debt is classified as Level 2 for the periods presented and approximates its fair value due to the variable interest rate.

*Intangible Assets*

Finite-lived intangible assets are measured at their respective fair values on the date they were recorded at the date of subsequent adjustments of fair value and stated net of accumulated amortization. The fair values assigned to the Company's intangible assets are based on reasonable estimates and assumptions given available facts and circumstances. The Company amortizes its definite-lived intangible assets using either the straight-line or accelerated method, based on the useful life of the asset over which it is expected to be consumed utilizing expected undiscounted future cash flows.

The Company reviews the recoverability of its finite-lived intangible assets and long-lived assets for indicators of impairments. Events or circumstances that may require an impairment assessment significant changes in our forecasted projections for the asset or asset group for reasons including, but not limited to, significant under-performance of a product in relation to

F- 17

**EAGLE PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(In thousands, except as indicated and share and per share amounts)**

expectations, significant changes or planned changes in our use of the assets, significant negative industry or economic trends, and new or competing products that enter the marketplace. If such indicators are present, the Company assesses the recoverability of affected assets by determining if the carrying value of such assets is less than the sum of the undiscounted future cash flows of the assets. If such assets are found to not be recoverable, the Company measures the amount of the impairment by comparing the carrying value of the assets to the fair value of the assets. The Company determined that no indicators of impairment of finite-lived intangible assets or long-lived assets existed as of December 31, 2021.

*Goodwill*

Goodwill represents the excess of purchase price over the fair value of net assets acquired in the Eagle Biologics acquisition. Goodwill is not amortized, but is evaluated for impairment on an annual basis, in the fourth quarter, or more frequently if events or changes in circumstances indicate that the fair value of the reporting unit's goodwill is less than it's carrying amount. The Company performed a qualitative annual test for goodwill as of October 1, 2021. During the year ended December 31, 2021, the Company concluded that no impairment exists.

*Concentration of Major Customers and Vendors*

The Company is dependent on its commercial partner to market and sell Bendeka; therefore, the Company's future revenues are highly dependent on the collaboration and distribution arrangement with Teva.

Teva markets Bendeka through a license agreement with the Company. Pursuant to that license agreement, Teva pays the Company a royalty based on net sales of the product and also purchases the product from the Company. A disruption in this arrangement, caused by, among other things, a supply disruption, loss of exclusivity or the launch of a superior product would have a material adverse effect of the Company's financial position, results of operations and cash flows.

The total revenues and accounts receivables broken down by major customers as a percentage of the total are as follows:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2021** | **2020** | **2019** |
| **Net revenues** | | | |
| Cephalon, Inc. (Teva) - See Revenue Recognition | 66 % | 67 % | 77 % |
| Other | 34 % | 33 % | 23 % |
| | 100 % | 100 % | 100 % |

| | December 31, | |
| --- | --- | --- |
| | **2021** | **2020** |
| **Accounts receivable** | | |
| Cephalon, Inc. (Teva) - See Revenue Recognition | 63 % | 58 % |
| Other | 37 % | 42 % |
| | 100 % | 100 % |

*Inventories*

Inventories are recorded at the lower of cost and net realizable value, with cost determined on a first-in first-out basis. The Company periodically reviews the composition of its inventories in order to identify obsolete, slow-moving or otherwise non-saleable items. If non-saleable items are observed and there are no alternate uses for the inventories, the Company will record a write-down to net realizable value in the period that the decline in value is first recognized.

*Property and Equipment*

Property and equipment are stated at cost. Depreciation is recorded over the estimated useful lives of the assets utilizing the straight-line method. Leasehold improvements are being amortized over the shorter of their useful lives or the lease term.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

*Research and Development Expense*

Costs for research and development are charged to expense as incurred and include; employee-related expenses including salaries, benefits, travel and stock-based compensation expense for research and development personnel; expenses incurred under agreements with contract research organizations, contract manufacturing organizations and service providers that assist in conducting clinical and preclinical studies; costs associated with preclinical activities and development activities, costs associated with regulatory operations; and depreciation expense for assets used in research and development activities.

Costs for certain development activities, such as clinical studies, are recognized based on an evaluation of the progress to completion of specific tasks using data such as patient enrollment, clinical site activations, or information provided to the Company by its vendors on their actual costs incurred. Payments for these activities are based on the terms of the individual arrangements, which may differ from the patterns of costs incurred, and are reflected in the consolidated financial statements as prepaid expenses or accrued expenses as deemed appropriate.

*Advertising and Marketing*

Advertising and marketing costs are expensed as incurred. Advertising and marketing costs were $2.6 million, $2.7 million, and $2.4 million for the year ended December 31, 2021, 2020, and 2019, respectively.

*Income Taxes*

The Company accounts for income taxes using the liability method in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC"), Topic 740 - Income Taxes ("ASC 740"). Deferred tax assets and liabilities are determined based on temporary differences between financial reporting and tax bases of assets and liabilities and are measured by applying enacted rates and laws to taxable years in which differences are expected to be recovered or settled. Further, the effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that the rate changes. A valuation allowance is required when it is "more likely than not" that all or a portion of deferred tax assets will not be realized. ASC 740 also prescribes a comprehensive model for how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that the company has taken or expects to take on a tax return, including a decision whether to file or not file a return in a particular jurisdiction. We recognize any interest and penalties accrued related to unrecognized tax benefits as income tax expense.

*Revenue Recognition*

Revenue is recognized when a customer obtains control of promised goods or services, in an amount that reflects the consideration which the entity expects to receive in exchange for those goods or services. To determine revenue recognition for arrangements that an entity determines are within the scope of ASC 606, the Company performs the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. The Company only applies the five-step model to contracts when it is probable that the entity will collect the consideration it is entitled to in exchange for the goods or services it transfers to the customer. At contract inception, once the contract is determined to be within the scope of ASC 606, the Company assesses the goods or services promised within each contract and determines those that are performance obligations, and assesses whether each promised good or service is distinct. The Company then recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when (or as) the performance obligation is satisfied. Sales, value add, and other taxes collected on behalf of third parties are excluded from revenue.

*Product revenue* - The Company recognizes net revenue on sales to its commercial partners and to end users. In each instance, revenue is generally recognized when the customer obtains control of the Company's product, which occurs at a point in time, and may be upon shipment or upon delivery based on the contractual shipping terms of a contract. Receivables from our product sales have payment terms ranging from 30 to 75 days with select extended terms to wholesalers on initial purchases of product launch quantities.

Revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring products or services to a customer. To the extent the transaction price includes variable consideration, the Company estimates the amount of variable consideration that should be included in the transaction price generally utilizing the expected value method to which

F- 19

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

the Company expects to be entitled. As such, revenue on sales to end users for Belrapzo and Ryanodex are recorded net of chargebacks, rebates, returns, prompt pay discounts, wholesaler fees and other deductions. Our products are contracted with a limited number of oncology distributors and hospital buying groups with narrow differences in ultimate realized contract prices used to estimate our allowance for chargebacks and rebate reserves. The Company has a product returns policy on some of its products that allows the customer to return pharmaceutical products within a specified period of time both prior to and subsequent to the product's expiration date. The Company's estimate of the provision for returns is analyzed quarterly and is based upon many factors, including historical experience of actual returns and analysis of the level of inventory in the distribution channel, if any. The Company has terms on sales of Ryanodex by which the Company does not accept returns. Variable consideration is included in the transaction price if, in the Company's judgment, it is probable that a significant future reversal of cumulative revenue under the contract will not occur. Estimates of variable consideration are made generally using the expected value method and determination of whether to include estimated amounts in the transaction price are based largely on an assessment of the Company's anticipated performance and all information (historical, current and forecasted) that is reasonably available. The Company believes that the estimates it has established are reasonable based upon current facts and circumstances. Applying different judgments to the same facts and circumstances could result in the estimated amounts to vary.

*Components of Gross-to-Net (GTN) Estimates*

<u>Chargebacks</u>: Chargebacks are discounts that occur when certain contracted customers, including group purchasing organizations ("GPOs"), public health service institutions and federal government entities purchasing via the Federal Supply Schedule, purchase from the Company's distributors. The Company's distributors purchase product from us at invoice price, then resell the product to certain contracted customers on the basis of prices negotiated between us and the providers. The difference between the distributors' purchase price and the typically lower certain contracted customers' purchase price is refunded to the distributors through a chargeback credit. We record estimates for these chargebacks at the time of sale as deductions from gross revenues, with corresponding adjustments to our accounts receivable reserves and allowances.

The provision for chargebacks is the most significant provision in the context of the Company's gross-to-net adjustments in the determination of net revenue. Chargebacks are estimated based on payer mix and contracted price, adjusted for current period assumptions.

<u>Commercial and Medicaid Rebates</u>: The Company contracts with government agencies or collectively, third-party payors, so that Belrapzo and Ryanodex will be eligible for purchase by, or partial or full reimbursement from, such third-party payors. The Company estimates the rebates it will provide to third-party payors and deducts these estimated amounts from total gross product revenues at the time the revenues are recognized. These reserves are recorded in the same period in which the revenue is recognized, resulting in a reduction of product revenue and the establishment of a current liability. The current liability is included in accrued expenses and other current liabilities on the consolidated balance sheets. The Company estimates the rebates that it will provide to third-party payors based upon (i) the Company's contracts with these third-party payors, (ii) the government mandated discounts applicable to government-funded programs, (iii) a range of possible outcomes that are probability-weighted for the estimated payer mix, and (iv) information obtained from the Company's distributors.

The information that the Company also considers when establishing its rebate reserves are purchases by customers, projected annual sales for customers, actual rebates payments made, processing time lags, and for indirect rebates, the level of inventory in the distribution channel that will be subject to indirect rebates. We do not provide incentives designed to increase shipments to our customers that we believe would result in out-of-the-ordinary course of business inventory for them. The Company regularly reviews and monitors estimated or actual customer inventory information at its largest distributors for its key products to ascertain whether customer inventories are in excess of ordinary course of business levels.

<u>Product Returns</u>: The Company's provision for product returns based on the factors noted above generally encompass a time range from 12 to 48 months after revenue is recognized. The Company's distributors have the right to return unopened unprescribed Belrapzo during certain time periods around the period beginning prior to the labeled expiration date and ending after the labeled expiration date. The Company estimates future product returns on sales of Belrapzo based on: (i) data provided to the Company by its distributors (including weekly reporting of distributors' sales and inventory held by distributors that provided the Company with visibility into the distribution channel in order to determine what quantities were sold to retail pharmacies and other providers), (ii) data provided to the Company by a third-party data provider which collects and publishes prescription data, and other third parties, (iii) historical industry information regarding return rates for similar pharmaceutical products, (iv) the estimated remaining shelf life of Belrapzo previously shipped and currently being shipped to distributors and

F- 20

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

(v) contractual agreements intended to limit the amount of inventory maintained by the Company's distributors. These reserves are recorded in the same period the related revenue is recognized, resulting in a reduction of product revenue and the establishment of a current liability which is included in accrued expenses and other current liabilities on the consolidated balance sheets.

Wholesaler fees and other incentives: The Company generally provides invoice discounts on Belrapzo and Ryanodex sales to its distributors for prompt payment and fees for distribution services, such as fees for certain data that distributors provide to the Company. The payment terms for sales to distributors generally include a 2% discount for prompt payment which is generally defined in invoice terms as a range from 15 to 45 days, while the fees for distribution services are based on contractual rates agreed with the respective distributors. Based on historical data, the Company expects its distributors to earn these discounts and fees, and deducts the full amount of these discounts and fees from its gross product revenues and accounts receivable at the time such revenues are recognized.

The Company recorded product sales, net as follows:

|  | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
|  | **2021** | | **2020** | | **2019** | |
|  | (in thousands) | | | | | |
| Bendeka | $ | 11,167 | $ | 15,439 | $ | 31,182 |
| Belrapzo | | 23,728 | | 27,527 | | 29,665 |
| Ryanodex | | 25,271 | | 28,268 | | 13,039 |
| Other | | 4,857 | | 1,089 | | 103 |
| Product sales, net | $ | 65,023 | $ | 72,323 | $ | 73,989 |

The following table provides a summary roll-forward of the Company's net product revenue allowances and related reserves for the years ended December 31, 2021 and 2020, on the consolidated balance sheets (in thousands):

|  | Chargebacks | | Commercial Rebates | | Medicaid Rebates | | Product Returns | | Wholesaler Fees and Other Incentives | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Balance at December 31, 2019** | $ | 2,988 | $ | 1,131 | $ | 567 | $ | 2,403 | $ | 2,011 | $ | 9,100 |
| Provisions / Adjustments | | 20,368 | | 1,243 | | 484 | | (391) | | 8,526 | | 30,230 |
| Charges processed / Payments | | (21,067) | | (602) | | (367) | | (346) | | (5,146) | | (27,528) |
| **Balance at December 31, 2020** | $ | 2,289 | $ | 1,772 | $ | 684 | $ | 1,666 | $ | 5,391 | $ | 11,802 |
| Provisions / Adjustments | | 27,402 | | 3,042 | | 268 | | 2,531 | | 9,650 | | 42,893 |
| Charges processed / Payments | | (25,852) | | (2,838) | | (332) | | (2,674) | | (13,070) | | (44,766) |
| **Balance at December 31, 2021** | $ | 3,839 | $ | 1,976 | $ | 620 | $ | 1,523 | $ | 1,971 | $ | 9,929 |

Such net product revenue allowances and reserves are included within accounts receivable, net and accrued expenses and other current liabilities within the consolidated balance sheets.

*Royalty Revenue* — The Company recognizes revenue from license arrangements with its commercial partners' net sales of products. Royalties are recognized as earned in accordance with contract terms when they can be reasonably estimated and collectability is reasonably assured. The Company's commercial partners are obligated to report their net product sales and the resulting royalty due to the Company within 25 days from the end of each quarter. Based on historical product sales, royalty receipts and other relevant information, the Company accrues royalty revenue each quarter and subsequently determines a true-up when it receives royalty reports from its commercial partners. Historically, these true-up adjustments have been immaterial. Our receivables from royalty revenue are due 45-days from the end of the quarter.

F- 21

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

*License and other revenue* — The Company analyzes each element of its licensing agreements to determine the appropriate revenue recognition. The terms of the license agreement may include payment to us of non-refundable up-front license fees, milestone payments if specified objectives are achieved, and/or royalties on product sales. The Company recognizes revenue from upfront payments at a point in time, typically upon fulfilling the delivery of the associated intellectual property to the customer.

If the contract contains a single performance obligation, the entire transaction price is allocated to the single performance obligation. Contracts that contain multiple performance obligations require an allocation of the transaction price based on the estimated relative standalone selling prices of the promised products or services underlying each performance obligation. The Company determines standalone selling prices based on the price at which the performance obligation is sold separately. If the standalone selling price is not observable through past transactions, the Company estimates the standalone selling price taking into account available information such as market conditions and internally approved pricing guidelines related to the performance obligations.

The Company recognizes sales-based milestone payments as revenue upon the achievement of the cumulative sales amount specified in the contract in accordance with ASC 606-10-55-65. For those milestone payments which are contingent on the occurrence of particular future events, the Company determined that these need to be considered for inclusion in the calculation of total consideration from the contract as a component of variable consideration using the most-likely amount method. As such, the Company assesses each milestone to determine the probability and substance behind achieving each milestone. Given the inherent uncertainty of the occurrence of these future events, the Company will not recognize revenue from the milestone until there is not a high probability of a reversal of revenue, which typically occurs near or upon achievement of the event.

When determining the transaction price of a contract, an adjustment is made if payment from a customer occurs either significantly before or significantly after performance, resulting in a significant financing component. Applying the practical expedient in paragraph 606-10-32-18, the Company does not assess whether a significant financing component exists if the period between when the Company performs its obligations under the contract and when the customer pays is one year or less. None of the Company's contracts contained a significant financing component as of December 31, 2021.

### Stock-Based Compensation

The Company utilize stock-based compensation in the form of stock options, restricted stock units ("RSUs") and performance-based stock units ("PSUs"), each of which may be granted separately or in tandem with other awards.

Compensation expense is recognized in the Consolidated Statements of operations based on the estimated fair value of the awards at grant date ratably over the requisite service period, which generally equals the vesting period of the award.

The grant-date fair value of stock awards is based upon the underlying price of the stock on the date of grant. The grant-date fair value of stock option awards must be determined using an option pricing model. The Company uses the Black-Scholes option pricing formula for determining the grant-date fair value of such awards. Option pricing models require the use of estimates and assumptions as to (a) the expected term of the option, (b) the expected volatility of the price of the underlying stock and (c) the risk-free interest rate for the expected term of the option.

The Company may also grant performance-based stock awards to employees from time-to-time in form of market condition or performance condition. The grant-date fair value of awards that vest based on achievement of certain market condition are determined using a Monte Carlo simulation technique. The grant-date fair value of awards that vest based on achievement of certain performance condition are determined using the accelerated attribution method once it is probable that the performance condition will be achieved.

### Earnings Per Share

Basic earnings per common share is computed using the weighted average number of shares outstanding during the period. Diluted earnings per share is computed in a manner similar to the basic earnings per share, except that the weighted-average number of shares outstanding is increased to include all common shares, including those with the potential to be issued by virtue of options. Diluted earnings per share contemplate a complete conversion to common shares of all convertible instruments only if they are dilutive in nature with regards to earnings per share, as calculated under the treasury method.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The anti-dilutive common shares equivalents outstanding at December 31, 2021, 2020, and 2019 were as follows:

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2021** | **2020** | **2019** |
| Options | 2,336,586 | 2,767,501 | 2,454,077 |
| Restricted stock units | 98,416 | 207,177 | — |
| Total | 2,435,002 | 2,974,678 | 2,454,077 |

The following table sets forth the computation for basic and diluted net (loss) income per share for December 31, 2021, 2020, and 2019:

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2021** | **2020** | **2019** |
| **Numerator** | | | |
| Numerator for basic and diluted earnings per share-net (loss) income | $ (8,627) | 11,989 | $ 14,313 |
| **Denominator** | | | |
| Basic weighted average common shares outstanding | 13,051,095 | 13,481,525 | 13,754,516 |
| Dilutive effect of stock options | — | 289,868 | 384,217 |
| Diluted weighted average common shares outstanding | 13,051,095 | 13,771,393 | 14,138,733 |
| **Basic net (loss) income per share** | | | |
| Basic net (loss) income per share | $ (0.66) | $ 0.89 | $ 1.04 |
| **Diluted net (loss) income per share** | | | |
| Diluted net (loss) income per share | $ (0.66) | $ 0.87 | $ 1.01 |

All potentially dilutive items were excluded from the diluted share calculation for the year ended December 31, 2021 because their effect would have been anti-dilutive, as the Company was in a loss position.

***Recent Accounting Pronouncements***

*Recent Accounting Pronouncements - Not Yet Adopted*

In March 2020, the FASB issued Update 2020-04 Reference Rate Reform (Topic 848), Facilitation of the Effects of Reference Rate Reform on Financial Reporting to provide temporary optional guidance to ease the potential burden in accounting for reference rate reform. The amendments in Update 2020-04 are elective and apply to all entities that have contracts, hedging relationships, and other transactions that reference LIBOR, formerly known as the London Interbank Offered Rate,

or another reference rate expected to be discontinued due to reference rate reform. The new guidance provides optional expedients, including; (1) Simplify accounting analyses under current GAAP for contract modifications, such as modifications of contracts within the scope of Topic 470, Debt, that will be accounted for by prospectively adjusting the effective interest rate, as if any modification was not substantial. That is, the original contract and the new contract shall be accounted for as if they were not substantially different from one another; (2) Simplify the assessment of hedge effectiveness and allow hedging relationships affected by reference rate reform to continue; (3) Allow a one-time election to sell or transfer debt securities classified as held to maturity before January 1, 2020 that reference a rate affected by reference rate reform. The amendments are effective for all entities from the beginning of an interim period that includes the issuance date of the ASU. An entity may elect to apply the amendments prospectively through December 31, 2022. The adoption of ASU 2020-4 is not expected to have a material impact on the Company's financial position or results of operations.

***CARES Act***

On March 27, 2020, the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") was signed into U.S. federal law, which is aimed at providing emergency assistance and health care for individuals, families, and businesses affected by the

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

COVID-19 pandemic and generally supporting the U.S. economy. The CARES Act, among other things, includes provisions related to refundable payroll tax credits, deferment of the employer portion of social security payments, net operating loss carryback periods, modifications to the net interest deduction limitations, and technical corrections to tax depreciation methods for qualified improvement property. Reimbursement was not sought by the Company. The CARES Act has not had, and the Company does not currently expect it to have, a material impact on the Company's financial statements at this time.

F- 24

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

**3. Inventories**

The Company's inventory balance consists of the following:

| | December 31, | | | |
|---|---|---|---|---|
| | **2021** | | **2020** | |
| Raw materials | $ | 7,317 | $ | 3,515 |
| Work-in-process | | 9,666 | | 2,589 |
| Finished goods | | 4,925 | | 1,971 |
| | $ | 21,908 | $ | 8,075 |

F- 25

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

**4. Property and Equipment, net**

Property and equipment consists of the following:

| | December 31, | | Estimated Useful Life (years) |
|---|---|---|---|
| | **2021** | **2020** | |
| Furniture and fixtures | $ 1,525 | $ 1,476 | 7 |
| Office equipment | 1,077 | 1,152 | 3 |
| Equipment | 3,834 | 3,485 | 7 |
| Leasehold improvements | 1,155 | 1,155 | 2 |
| | 7,591 | 7,268 | |
| Less accumulated depreciation | (5,955) | (5,191) | |
| Property and equipment, net | $ 1,636 | $ 2,077 | |

Depreciation expense was $764 and $872 for the years ended December 31, 2021 and 2020, respectively.

F- 26

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

### 5. Balance Sheet Accounts

*Prepaid expenses and Other Current Assets*

Prepaid and other current assets consist of the following:

| | December 31, | | |
| --- | --- | --- | --- |
| | **2021** | | **2020** |
| Advances to commercial manufacturers | $ 942 | $ | 660 |
| Prepaid FDA user fee and advances to CROs | 1,108 | | 1,262 |
| Prepaid insurance | 196 | | 191 |
| Prepaid income taxes | 1,173 | | — |
| Convertible promissory note, net | 5,312 | | — |
| All other | 3,159 | | 1,605 |
| Total Prepaid expenses and other current assets | $ 11,890 | $ | 3,718 |

*Accrued Expenses and Other Liabilities*

Accrued expenses and other liabilities consist of the following:

| | December 31, | | |
| --- | --- | --- | --- |
| | **2021** | | **2020** |
| Royalties payable to commercial partners | $ 5,085 | $ | 5,996 |
| Accrued research & development | 4,100 | | 2,724 |
| Accrued professional fees | 2,013 | | 2,370 |
| Accrued salary and other compensation | 8,466 | | 4,686 |
| Accrued product sales reserves | 4,390 | | 4,966 |
| Current portion of lease liability | 1,309 | | 1,123 |
| All other | 6,975 | | 1,952 |
| Total Accrued expenses and other liabilities | $ 32,338 | $ | 23,817 |

*Leases*

We lease office space in Woodcliff Lake, New Jersey for our principal office under an amended lease agreement through June 2025. We also lease a lab space in Cambridge, Massachusetts under a lease agreement through April 2024, and a new office space located in Palm Beach Gardens, FL. The new lease agreement commenced on November 1, 2021 and will expire 36 months from the lease commencement date, which is October 31, 2024. All of our leases are classified as operating leases and have remaining lease terms of approximately 3.1 years. The principal office and the lab space leases include renewal options to extend the lease for up to 5 years. Furthermore, we have not elected the practical expedient to separate lease and non-lease components for all classes of underlying assets.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The table below summarizes the Company's total lease costs included in the consolidated financial statements, as well as other required quantitative disclosures (in thousands):

| | As of December 31, | | | |
|---|---|---|---|---|
| | July 13, 1905 | | July 12, 1905 | |
| Operating lease cost | $ | 1,407 | $ | 1,323 |
| Total lease cost | $ | 1,407 | $ | 1,323 |
| | | | | |
| **Other information:** | | | | |
| Cash paid for amounts included in the measurement of lease liabilities | | | | |
| Operating cash flows for operating leases | $ | 1,407 | $ | 1,323 |
| Right-of-use assets obtained in exchange for new operating lease liabilities | $ | 270 | $ | 855 |
| Weighted-average remaining lease term - operating leases | | 3.1 years | | 4.1 years |
| Weighted-average discount rate - operating leases | | 6.0 % | | 6.0 % |

| Year Ending December 31, | Operating Leases |
|---|---|
| 2022 | 1,423 |
| 2023 | 1,455 |
| 2024 | 1,038 |
| 2025 | 413 |
| Thereafter | — |
| Total | 4,329 |
| Less: present value discount | (116) |
| Present value of lease liabilities | $ 4,213 |
| | |
| **Balance Sheet Classification as of December 31, 2021** | |
| Current lease liabilities (included with Accrued expenses and other liabilities) | $ 1,309 |
| Long-term lease liabilities (included with Other long-term liabilities) | 2,904 |
| Total lease liabilities | $ 4,213 |

### 6. Debt

On November 8, 2019, the Company entered into the Second Amended and Restated Credit Agreement (the "Revised Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Agent") and the lenders party thereto, which replaced the Company's existing credit agreement, dated as of August 8, 2017 (the "Amended Credit Agreement"). The terms and amounts borrowed under the Revised Credit Agreement includes a drawn term loan of $40 million and a undrawn revolving credit facility of $110 million. The schedule of principal payments for the new term loan facility has been extended until November 8, 2022. The Company classified the current portion of long-term debt of $26 million on the consolidated balance sheet as of December 31, 2021. Per the terms of the Revised Credit Agreement, the Company is limited in its ability to pay dividends. As of December 31, 2021, the Company was in compliance with each of the senior secured net leverage ratio; total net leverage ratio; and fixed charge coverage ratio covenants.

The new term loan facility shall bear interest at the Adjusted LIBOR (equal to (a) the LIBOR for such Interest Period multiplied by (b) the Statutory Reserve Rate as established by Board of Governors of the Federal Reserve System of the United States of

F- 28

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

America) for the Interest Period in effect for such Borrowing plus the Applicable Rate as described below. The Agent and the Company may amend the Revised Credit Agreement to replace the LIBOR with a Benchmark Replacement, described below.

Loans under the Revised Credit Agreement bear interest at a rate equal to either (a) the LIBOR rate, plus an applicable margin ranging from 2.25% to 3.0% per annum, based upon the total net leverage ratio (as defined in the Revised Credit Agreement), or (b) the Benchmark Replacement which is defined as the greatest of the prime lending rate, or the NYFRB Rate (the rate for a federal funds transaction) in effect on such day plus ½ of 1% or the Adjusted LIBO Rate for a one month Interest Period on such day plus 1% plus an applicable margin ranging from 1.25% to 2.0% per annum, based upon the total net leverage ratio.  The Company is required to pay a commitment fee on the unused portion of the new revolving credit facility in the Revised Credit Agreement at a rate ranging from 0.35% to 0.45% per annum based upon the total net leverage ratio.

As of December 31, 2021, the Company had $0.4 million of unamortized deferred debt issuance costs in its consolidated balance sheets.

| Debt Maturities | As of December 31, 2021 |
|---|---|
| 2022 | $ 26,000 |
| Total | $ 26,000 |

### 7. Common Stock and Stock-Based Compensation

**Common Stock**

On March 17, 2020, the Company, announced that its Board approved a new share repurchase program, or the Share Repurchase Program, providing for the repurchase of up to an aggregate of $160.0 million of the Company's outstanding common stock. The Share Repurchase Program replaced the Company's then existing share repurchase program, or the Previous Share Repurchase Program, which was announced on October 30, 2018 and was terminated in connection with the Board's approval of the Share Repurchase Program. At termination, the Company had repurchased approximately $68.0 million of the Company's outstanding common stock under the Previous Share Repurchase Program.

Under the Share Repurchase Program, the Company is authorized to repurchase shares through open market purchases, privately-negotiated transactions, accelerated share repurchases or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. The repurchases have no time limit and may be suspended or discontinued completely at any time. The specific timing and amount of repurchases will vary based on available capital resources and other financial and operational performance, market conditions, securities law limitations, and other factors. The repurchases will be made using the Company's cash resources.

On September 23, 2020, the Company's Board of Directors approved a $25.0 million accelerated share repurchase ("ASR") transaction with JPMorgan Chase Bank, National Association ("JP Morgan") as part of the Company's existing $160.0 million share repurchase program. The specific number of shares to be repurchased pursuant to the ASR is based on the average of the daily volume weighted average share prices of the Company's common stock, less a discount, during the term of the ASR program. Under the terms of the Company's agreement with JP Morgan, the Company paid $25.0 million to JP Morgan on September 24, 2020, and received 550,623 shares, representing the notional amount of the ASR, based on the average of the daily volume weighted average share prices of the Company's common stock, less a discount, during the term of the ASR, which was $45.40. The ASR was completed in the fourth quarter of 2020. The Company determined the ASR contained a forward contract and therefore the Company recorded fair value adjustments on the accelerated share repurchase agreement in the amount of $3.0 million which was a loss recorded in Other expense on our consolidated statements of operations in the year ended December 31, 2020.

As of December 31, 2021, the Company had repurchased an aggregate of 4,111,622 shares of common stock for an aggregate of $228.1 million pursuant to the Company's share repurchase programs in effect since August 2016.

F- 29

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

We repurchased the following shares of common stock with cash resources:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2021** | **2020** | **2019** |
| Shares of common stock repurchased | 429,446 | 774,489 | 317,429 |
| Cash paid for repurchases of common stock | $ 21,213 | $ 34,999 | $ 17,961 |

**Stock-Based Compensation**

In December 2007, the Company's board of directors approved the 2007 Incentive Compensation Plan (the "2007 Plan") enabling the Company to grant multiple stock-based awards to employees, directors and consultants, the most common being stock options and restricted stock awards. In November 2013, the Company's board of directors approved the 2014 Equity Incentive Plan (the "2014 Plan") which became effective on February 11, 2014. The 2007 Plan was terminated upon the effectiveness of the 2014 Plan and all shares available for issuance under the 2007 Plan were made available under the 2014 Plan. The 2014 Plan provides for the awards of incentive stock options, non-qualified stock options, restricted stock, restricted stock units and other stock-based awards. Awards generally vest equally over a period of four years from grant date. Vesting is accelerated under a change in control of the Company or in the event of death or disability to the recipient. In the event of termination, any unvested shares or options are forfeited. At the Company's annual meeting of stockholders held on August 4, 2015, the stockholders approved an amendment to the 2014 Plan to, among other things, increase the number of shares of common stock authorized for issuance thereunder by 500,000 shares. After accounting for such increase, and as of such amendment, the Company has reserved and made available 1,934,193 shares of common stock for issuance under the 2014 Plan.

During the year ended December 31, 2018, the Company introduced a new long-term incentive program with the objective to better align the share-based awards granted to management with the Company's focus on improving total shareholder return over the long-term. The share-based awards granted under this long-term incentive program consist of time-based stock options, time-based restricted stock units ("RSUs") and performance-based stock units ("PSUs"). PSUs are comprised of awards that vest upon achievement of certain share price appreciation conditions. These share-based awards expired in January 2021.

*Stock Options*

The fair value of stock options granted to employees, directors, and consultants is estimated using the following assumptions:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2021** | **2020** | **2019** |
| Risk-free interest rate | 0.51% - 1.26% | 0.37% - 1.65% | 1.42% - 2.61% |
| Volatility | 52.87% - 60.02% | 54.89% - 55.51% | 40.83% |
| Expected term (in years) | 5.50 - 6.08 years | 5.50 - 6.08 years | 1.51 - 9.41 years |
| Expected dividend yield | 0.0% | 0.0% | 0.0% |

The following table summarizes information about stock option activity related to the 2014 Plan:

| | Number of Stock Option Shares | Weighted Average Exercise Price (Per Share) | Non-Exercisable | Exercisable |
| --- | --- | --- | --- | --- |
| **Outstanding at December 31, 2019** | 3,096,161 | $ 59.29 | 1,070,054 | 2,026,107 |
| Granted | 762,200 | $ 55.76 | | |
| Exercised | (149,473) | $ 24.43 | | |
| Forfeited or expired | (376,998) | $ 66.71 | | |
| **Outstanding at December 31, 2020** | 3,331,890 | $ 59.20 | 1,028,142 | 2,303,748 |
| Granted | 114,000 | $ 46.74 | | |
| Exercised | (122,847) | $ 27.64 | | |
| Forfeited or expired | (508,165) | $ 62.00 | | |
| **Outstanding at December 31, 2021** | 2,814,878 | $ 58.51 | 472,916 | 2,341,962 |

The weighted-average grant-date fair value of options granted during the year ended December 31, 2021, 2020, and 2019 was $23.62, $28.98, and $22.18, respectively. As of December 31, 2021, there was $8,853 unrecognized stock-based compensation expense related to stock options that is expected to be recognized over a weighted average period of 2.0 years. The total intrinsic value of options exercised during the year ended December 31, 2021 was $2,434.

The weighted average contractual terms of options outstanding as of December 31, 2021, 2020, and 2019 was 5.2, 6.1, and 6.8 years, respectively.

The aggregate pre-tax intrinsic value of options outstanding as of December 31, 2021, 2020, and 2019 was $13.8 million, $11.6 million, and $31.9 million, respectively.

*RSUs*

Each vested time-based RSU represents the right of a holder to receive one of the Company's common shares. The fair value of each RSU granted was estimated based on the trading price of the Company's common shares on the date of grant.

The following table summarizes information about RSU activity related to the 2014 Plan:

| | Number of Restricted Stock Units | Weighted Average Grant Date Fair Value (Per Share) | |
|---|---|---|---|
| Non-vested at December 31, 2019 | 251,215 | $ | 44.84 |
| Granted | 236,450 | $ | 59.48 |
| Vested | (79,420) | $ | 46.78 |
| Forfeited | (79,849) | $ | 52.76 |
| Non-vested at December 31, 2020 | 328,396 | $ | 53.09 |
| Granted | 106,600 | $ | 48.55 |
| Vested | (95,523) | $ | 52.26 |
| Forfeited | (76,167) | $ | 52.29 |
| Non-vested at December 31, 2021 | 263,306 | $ | 51.77 |

As of December 31, 2021, there was $7,562 of unrecognized stock-based compensation expense related to non-vested RSUs

F- 30

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

that is expected to be recognized over a weighted average period of 2.3 years.

*PSUs*

During the first quarter of 2018, we introduced a new long-term incentive program with the objective to better align the stock-based awards granted to management with our focus on improving total shareholder return over the long-term. The stock-based awards granted under this long-term incentive program consist of time-based stock options, time-based RSUs and PSUs. PSUs are comprised of awards: i) that would have vested upon achievement of certain share price appreciation conditions or ii) that would have vested upon achievement of certain milestone events. These PSUs expired in the first quarter of 2021.

During the first quarter of 2021, 97,750 market condition PSUs expired. We also granted 99,500 market condition PSUs based on our total shareholder return ("TSR") relative to the TSR of each member of the S&P Biotechnology Select Industry Index (the defined peer group) with a weighted-average grant date fair value of $71.09 per respective PSU. The fair value of PSUs granted to employees was estimated using a Monte Carlo simulation model. Inputs used in the calculation include a risk-free interest rate of 0.18%, an expected volatility of 44%, contractual term of 3 years, and no expected dividend yield.

During the first quarter of 2021, we also granted 59,500 performance based (milestones) PSUs with grant date fair value of $49.32 using our closing stock price on the date of the grant. These PSUs will vest (if earned) from 0% to 200% of target number granted based on the achievement of one or more of three milestones related to i) regulatory approval of Fulvestrant ("EA-114"), ii) sales of Pemfexy and; iii) sales of Vasopressin, respectively. The contractual term of these awards is 3 years. We estimated 0% probability of achievement for the year ended December 31, 2021.

The following table summarizes information about PSU activity related to the 2014 Plan:

| | Number of Performance Stock Units | Weighted Average Grant Date Fair Value (Per Share) | |
|---|---|---|---|
| **Non-vested at December 31, 2019** | **116,181** | **$** | **90.19** |
| Granted | — | $ | — |
| Vested | — | $ | — |
| Forfeited | (18,431) | $ | 90.19 |
| **Non-vested at December 31, 2020** | **97,750** | **$** | **90.19** |
| Granted | 159,000 | $ | 62.94 |
| Vested | — | $ | — |
| Forfeited | (119,450) | $ | 84.90 |
| **Non-vested at December 31, 2021** | **137,300** | **$** | **63.24** |

F- 31

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The Company recognized stock-based compensation in its consolidated statements of operations for the year ended December 31, 2021, 2020, and 2019 as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2019** | |
| Stock options | $ | 11,521 | $ | 17,694 | $ | 16,394 |
| PSUs | | 2,729 | | 1,635 | | 3,062 |
| RSUs | | 5,305 | | 5,427 | | 2,542 |
| Stock-based compensation expense | $ | 19,555 | $ | 24,756 | $ | 21,998 |
| Selling, general and administrative | $ | 16,873 | $ | 22,074 | $ | 17,556 |
| Research and development | | 2,682 | | 2,682 | | 4,442 |
| Stock-based compensation expense | $ | 19,555 | $ | 24,756 | $ | 21,998 |

F- 32

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

**8. Income Taxes**

The components of our provision from income taxes is as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2021** | | **2020** | | **2019** | |
| Current: | | | | | | |
| Federal | $ | 6,912 | $ | 10,140 | $ | 6,689 |
| State | | 785 | | 2,059 | | 844 |
| | $ | 7,697 | $ | 12,199 | $ | 7,533 |
| Deferred: | | | | | | |
| Federal | | (3,030) | | (1,227) | | 392 |
| State | | (588) | | (284) | | (240) |
| | $ | (3,618) | $ | (1,511) | $ | 152 |
| | | | | | | |
| Provision for income taxes | $ | 4,079 | $ | 10,688 | $ | 7,685 |

The reconciliation of the statutory U.S. Federal income tax rate to the Company's effective income tax rate is as follows;

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2021** | **2020** | **2019** |
| U.S. Federal statutory tax rate | 21 % | 21 % | 21 % |
| State income taxes, net of federal benefit | (1)% | 6 % | 2 % |
| Tax effect on stock option exercises, net of forfeitures | (44)% | 4 % | 1 % |
| R&D tax credits and Orphan Drug credits | 31 % | (2)% | (2)% |
| Limitation on executive compensation | (60)% | 9 % | 10 % |
| Change in valuation allowance | (40)% | 9 % | 4 % |
| Foreign rate differential | 4 % | (1)% | (2)% |
| Other | (1)% | 1 % | 1 % |
| **Effective tax rate** | (90)% | 47 % | 35 % |

The effective tax rate for the year ended December 31, 2021, reflects certain non-deductible executive compensation, tax effect on stock option exercises, net of forfeitures and valuation allowance established on the deferred tax asset for an unrealized capital loss in our investment in Tyme partially offset by credits for research and development activities.

F- 33

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amount of assets and liabilities for financial reporting and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets were as follows:

|  | December 31, | | | |
| --- | --- | --- | --- | --- |
|  | **2021** | | **2020** | |
| Deferred tax assets | | | | |
| Net operating loss carryforward | $ | 1,563 | $ | 841 |
| Stock based compensation | | 10,405 | | 12,015 |
| Other asset - equity investment with readily determined fair value | | 3,190 | | 1,771 |
| Inventories | | 2,123 | | 2,338 |
| Employee-related expenses | | 1,240 | | 51 |
| Intangible assets | | 4,207 | | 708 |
| Right-of-use liability | | 962 | | 1,154 |
| R&D tax credit carryforwards | | 329 | | 86 |
| Other | | 1,489 | | 1,216 |
| Total deferred tax assets | | 25,508 | | 20,180 |
| | | | | |
| Deferred tax liabilities | | | | |
| Installment sale - Malta | | 485 | | 483 |
| Prepaid expenses | | 45 | | 43 |
| Fixed assets | | 300 | | 315 |
| Lease liability | | 921 | | 1,092 |
| Total deferred tax liabilities | | 1,751 | | 1,933 |
| Valuation allowance | | (4,959) | | (3,067) |
| **Net deferred tax assets** | $ | 18,798 | $ | 15,180 |

In July 2006, the Financial Accounting Standards Board ("FASB") issued ASC 740-10, Uncertainty in Income Taxes, which defines the threshold for recognizing the benefits of tax-return positions in the financial statements as "more-likely-than-not" to be sustained by the taxing authorities. This statement also requires explicit disclosure requirements about a Company's uncertainties related to their income tax position, including a detailed roll forward of tax benefits taken that do not qualify for financial statement recognition.

The Company files income tax returns in the U.S. federal jurisdiction and several states. The Company is under audit by the Internal Revenue Service and three states tax jurisdiction as of December 31, 2021. The Company has no amount recorded for any unrecognized tax benefits as of December 31, 2021. The Company regularly evaluates its tax positions for additional unrecognized tax benefits and associated interest and penalties, if applicable. There are many factors that are considered when evaluating these tax positions including: interpretation of tax laws, recent tax litigation on a position, past audit or examination history, and subjective estimates and assumptions.

As of December 31, 2021, the Company has a net operating loss ("NOL") carryforward in Malta of $4.5 million which has no expiration date and can be carried forward indefinitely until utilized.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

### 9. License and Collaboration Agreements

*License Agreements*

*License agreement with Combioxin*

In August 2021, we entered into a license agreement with Combioxin, SA under which the Company was granted exclusive, worldwide development and commercialization rights to CAL02, a novel first-in-class antitoxin agent ready for Phase 2b/3 development for the treatment of severe pneumonia in combination with traditional antibacterial drugs. The Company will be solely responsible for the development, regulatory, manufacturing and commercialization activities of CAL02. Combioxin will assist the Company in transitioning the manufacturing and supply of CAL02 to the Company.

Under the terms of the agreement, we paid $10 million as upfront license consideration that was expensed immediately as research and development and is reflected within the operating activities of the condensed consolidated statements of cash flows. The Company may pay to Combioxin up to $105 million upon achievement of certain development, regulatory and sales based milestone payments plus royalty payments at royalty rates ranging in low double digit percentages on the net sales of all products sold, subject to certain adjustments as provided in the agreement. The Company is also obligated to make certain payments based upon amounts received by sublicensees under the agreement.

*License agreement with AOP Orphan*

In August 2021, we entered into a licensing agreement with AOP Orphan Pharmaceuticals GmbH ("AOP Orphan"), a privately owned Austrian company devoted to the treatment of rare and special diseases, for the commercial rights to its product, landiolol in the United States. Landiolol, a leading hospital emergency use product, is currently approved in Europe for the treatment of non-compensatory sinus tachycardia and tachycardic supraventricular arrhythmias. We will support the submission of a new drug application ("NDA") by AOP Orphan to the FDA seeking approval for landiolol for the short term reduction of ventricular rate in patients with supraventricular tachycardia ("SVT"), including atrial fibrillation and atrial flutter.

Under the terms of the agreement, we paid $5 million as upfront license consideration that was expensed immediately as research and development and is reflected within the operating activities of the condensed consolidated statements of cash flows. The Company may pay to AOP Orphan up to $25 million upon achievement of certain regulatory milestone payments plus profit share payments, subject to certain adjustments as provided in the agreement. We also entered into a supply agreement at the same time as the licensing agreement.

*Collaboration with Tyme*

On January 7, 2020, Tyme and we announced a strategic collaboration to advance SM-88, an oral product candidate for the treatment of patients with cancer. SM-88 was an investigational agent in two Phase II studies, one for pancreatic cancer and another for prostate cancer.

On January 26, 2022, Tyme announced the discontinuation of SM-88 with methoxsalen, phenytoin, and sirolimus in a trial for metastatic pancreatic cancer. On February 11, 2022, Tyme stated SM-88 is being evaluated in a Phase II study evaluating SM-88 in breast cancer (HR+/HER2-), as well as continuing enrollment of a Phase II study in high-risk metastatic sarcomas

Under the terms of a related co-promotion agreement, we would be responsible for 25% of the promotional sales effort of SM-88 and would receive 15% royalty on the net revenues of SM-88 in the United States. Tyme is responsible for clinical development, regulatory approval, commercial strategy, marketing, reimbursement and manufacturing of SM-88. Tyme retains the remaining 85% of net U.S. revenues and reserves the right to repurchase our U.S. co-promotion right for $200.0 million.

Our equity investment in Tyme is included in Other assets on our consolidated balance sheet. For the years ended December 31, 2021 and 2020, the fair value adjustments for the equity investment was a loss of $6.2 million and a loss of $5.3 million, respectively. These adjustments were recorded in Other (expense) income on our consolidated statements of operations.

F- 35

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

### 10. Commitments

Our future material contractual obligations include the following:

| Obligation | Total | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|
| Operating leases (1) | $ 4,329 | $ 1,423 | $ 1,455 | $ 1,038 | $ 413 |
| Credit facility | 26,000 | 26,000 | — | — | — |
| Purchase obligations (2) | 69,549 | 69,549 | — | — | — |
| Total obligations | $ 99,878 | $ 96,972 | $ 1,455 | $ 1,038 | $ 413 |

(1) We lease our corporate office location. On August 8, 2019, we amended the lease for our corporate office location in order to rent additional office space and extend the term of our existing lease to June 30, 2025. The Company also leases its lab space under a lease agreement that expires on April 30, 2024. We also lease office space located in Palm Beach Gardens, FL. The new lease agreement commenced on November 1, 2021 and will expire 36 months from the lease commencement date, which is October 31, 2024. Rental expense was $1,407, $1,323, and $1,146, for the years ended December 31, 2021, 2020, and 2019, respectively. The remaining future lease payments under the operating leases, exclusive of any renewal option periods, are $4,329 as of December 31, 2021, payable monthly.

| | December 31, 2021 |
|---|---|
| Total operating lease payments | $ 4,329 |
| Less: imputed interest | (116) |
| Total lease liabilities | $ 4,213 |

(2) As of December 31, 2021, the Company has purchase obligations in the amount of $69,549 which represents the contractual commitments under contract manufacturing and supply agreements with suppliers. The obligation under the supply agreement is primarily for finished product, inventory, and research and development.

### 11. Related Party Transaction

On May 10, 2019, Hudson Executive Capital LP ("Hudson Capital") sold 100,000 shares of the Company's common stock and the Company purchased those 100,000 shares in a block trade at a price of $56.14 per share. Douglas Braunstein is the Managing Partner of Hudson Capital and was a member of Eagle's Board of Directors at the time of the transaction.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

## 12. Intangible Assets, Net

The gross carrying amounts and net book value of our intangible assets are as follows:

| | Useful Life (In Years) | Gross Carrying Amount | Accumulated Amortization | Accumulated Impairment Charges | Net Book Value |
|---|---|---|---|---|---|
| | | | **December 31, 2021** | | |
| Ryanodex intangible | 18.5 | $ 15,000 | $ (5,079) | $ — | $ 9,921 |
| Developed technology | 5 | 8,100 | (8,100) | — | — |
| Vasopressin Milestone | 1 | 750 | — | — | 750 |
| Total | | $ 23,850 | $ (13,179) | $ — | $ 10,671 |

| | Useful Life (In Years) | Gross Carrying Amount | Accumulated Amortization | Accumulated Impairment Charge | Net Book Value |
|---|---|---|---|---|---|
| | | | **December 31, 2020** | | |
| Ryanodex intangible | 20 | 15,000 | (3,500) | — | 11,500 |
| Developed technology | 5 | 8,100 | (6,683) | — | 1,417 |
| Total | | $ 23,100 | $ (10,183) | $ — | $ 12,917 |

Amortization expense amounted to $3.0 million, $2.7 million, and $2.5 million, for the year ended December 31, 2021, 2020, and 2019, respectively.

*Estimated Useful Lives*

The Company reviews the estimated useful lives of its intangible assets on a periodic basis. The review indicated that the actual life of the Ryanodex intangible asset was shorter than the estimated useful life used for amortization purposes in the Company's financial statements. As a result, the estimated useful life of the Ryanodex related intangible assets was shortened from 2036 to 2025. The change in the estimated useful life is considered a change in accounting estimate and will result in changes to the Company's amortization expense prospectively. As of December 31, 2021, the net carrying value of the Ryanodex related intangible assets was $9.9 million. The effect of this change in estimate increased the 2021 amortization expense by $0.4 million.

*Impairment Assessment*

The Company reviews the recoverability of its finite-lived intangible assets and long-lived assets for indicators of impairments. Events or circumstances that may require an impairment assessment include negative clinical trial results, a significant decrease in the market price of the asset, or a significant adverse change in legal factors or the manner in which the asset is used. If such indicators are present, the Company assess the recoverability of affected assets by determining if the carrying value of such assets is less than the sum of the undiscounted future cash flows of the assets. If such assets are found to not be recoverable, the Company measures the amount of the impairment by comparing to the carrying value of the assets to the fair value of the assets. The Company determined that no indicators of impairment of finite-lived intangible assets or long-lived assets existed at December 31, 2021 and 2020.

*Estimated Amortization Expense for Intangible Assets*

Based on definite-lived intangible assets recorded as of December 31, 2021, and assuming that the underlying assets will not be impaired and that the Company will not change the expected lives of the assets, future amortization expenses are estimated as follows:

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

|  | Estimated Amortization Expense |
|---|---|
| Year Ending December 31, | |
| 2022 | 3,073 |
| 2023 | 2,785 |
| 2024 | 2,511 |
| 2025 | 2,302 |
| All other | — |
| Total estimated amortization expense | $ 10,671 |

### 13. Legal Proceedings

In addition to the below legal proceedings, from time to time, we may be a party to litigation and subject to claims incident to the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, we currently believe that the final outcome of these ordinary course matters, or matters discussed below, will not have a material adverse effect on our business nor have we recorded any loss in connection with these matters because we believe that loss is neither probable nor estimable. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

**Commercial Litigation**

*Cipla v. Eagle*

On April 16, 2020, Cipla Limited ("Cipla") filed a request for arbitration against Eagle with the London Court of International Arbitration. The request alleges that Eagle's refusal to take delivery of several batches of Argatroban finished drug product constitutes a breach of the parties' December 14, 2012 supply agreement. Eagle believes that the allegations against it are without merit and is vigorously defending itself in the Arbitration, which is scheduled for April 2022.

**Patent Litigation**

*Eagle Pharmaceuticals, Inc., et al. v. Slayback Pharma Limited Liability Company; Eagle Pharmaceuticals, Inc., et al. v. Apotex Inc. and Apotex Corp.; Eagle Pharmaceuticals, Inc., et al. v. Fresenius Kabi USA, LLC; Eagle Pharmaceuticals, Inc., et al. v. Mylan Laboratories Limited; Eagle Pharmaceuticals, Inc. et al. v. Hospira, Inc; Eagle Pharmaceuticals, Inc. et al. v. Lupin, Ltd. and Lupin Pharmaceuticals, Inc.; Teva Pharmaceuticals Int'l GmbH et al v. Aurobindo Pharma Ltd., Aurobindo Pharma USA, Inc., and Eugia Pharma Specialities Ltd.; Teva Pharmaceuticals Int'l GmbH et al v. Accord Healthcare Inc., Accord Healthcare Ltd., and Intas Pharmaceuticals Ltd.; Teva Pharmaceuticals Int'l GmbH et al v. Dr. Reddy's Laboratories, Ltd., and Dr. Reddy's Laboratories, Inc. - (BENDEKA®)*

Bendeka, which contains bendamustine hydrochloride, is an alkylating drug that is indicated for the treatment of patients with chronic lymphocytic leukemia, as well as for the treatment of patients with indolent B-cell non-Hodgkin's lymphoma that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen. Slayback Pharma Limited Liability Company ("Slayback"), Apotex Inc. and Apotex Corp. ("Apotex"), Fresenius Kabi USA, LLC ("Fresenius"), Mylan Laboratories Limited ("Mylan"), Lupin, Ltd. and Lupin Pharmaceuticals, Inc. ("Lupin"), and Aurobindo Pharma, Ltd, Aurobindo Pharma USA, Inc., and Eugia Pharma Specialities Ltd ("Aurobindo") have filed Abbreviated New Drug Applications ("ANDA's") referencing Bendeka® that include challenges to one or more of the Bendeka® Orange Book-listed patents. Hospira, Inc. ("Hospira") filed a 505(b)(2) NDA.

We, Cephalon, Inc. and/or Teva Pharmaceuticals International GMBH (together the "Patentees"), filed separate suits against Slayback, Apotex, Fresenius, Mylan, Hospira, Lupin, and Aurobindo in the United States District Court for the District of Delaware on August 16, 2017 (Slayback ("Slayback I")), August 18, 2017 (Apotex), August 24, 2017 (Fresenius), December 12, 2017 (Mylan), January 19, 2018 (Slayback ("Slayback II")), July 19, 2018 (Hospira), and July 2, 2019 (Lupin) and May 11, 2020 (Aurobindo). In these Complaints, the Patentees allege infringement of the challenged patents, namely U.S. Patent Nos.

F- 38

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

8,791,270 and 9,572,887 against Slayback (Slayback I and Slayback II), and of U.S. Patent Nos. 8,609,707, 8,791,270, 9,000,021, 9,034,908, 9,144,568, 9,265,831, 9,572,796, 9,572,797, 9,572,887, 9,579,384, 9,597,397, 9,597,398, 9,597,399 against Fresenius, Apotex, and Mylan, and of U.S. Patent Nos. 9,572,887, 10,010,533, 9,034,908, 9,144,568, 9,597,397, 9,597,398, 9,597,399, 9,000,021, 9,579,384 against Hospira, and of U.S. Patent Nos. 8,609,707, 9,000,021, 9,034,908, 9,144,568, 9,265,831, 9,572,796, 9,572,797, 9,572,887, 9,579,384, 9,597,397, 9,597,398, 9,597,399, 10,010,533, and 10,052,385 against Lupin and of U.S. Patent Nos. 8,609,707, 9,265,831, 9,572,796, 9,572,797, 9,034,908, 9,144,568, 9,572,887, 9,597,397, 9,597,398, 9,597,399, 9,000,021, 9,579,384, 10,010,533, and 10,052,385 against Aurobindo. The parties stipulated to dismiss without prejudice U.S. Patent No. 8,791,270 as to Apotex, Fresenius and Mylan on July 24, 2018, August 2, 2018, and August 3, 2018, respectively. Slayback, Apotex, Fresenius, and Mylan answered their Complaints and some filed various counterclaims on September 29, 2017 (Slayback I), February 12, 2018 (Slayback II), November 27, 2017, September 15, 2017, and February 14, 2018, respectively. The Patentees answered the Slayback I, Slayback II, Fresenius, and Apotex counterclaims on October 20, 2017, March 5, 2018, October 6, 2017, and December 18, 2017, respectively. On October 15, 2018, the Patentees filed a suit against Fresenius and Mylan in the United States District Court for the District of Delaware, alleging patent infringement of U.S. Patent Nos. 10,010,533 and 10,052,385. The Slayback I, Slayback II, Apotex, Fresenius and Mylan cases have been consolidated for all purposes (the "Consolidated Bendeka Litigation"), and a bench trial in these cases was held September 9-19, 2019. On April 27, 2020, the district court held that the asserted patents are valid and infringed by Slayback, Apotex, Fresenius and Mylan. On July 6, 2020, the district court entered a final judgment reflecting this decision, stating that pursuant to 35 U.S.C. § 271(e)(4)(A), the FDA shall not approve Apotex's, Fresenius's, Mylan's, or Slayback's ANDA products on a date which is earlier than January 28, 2031, and enjoining Apotex, Fresenius, Mylan, and Slayback from commercially manufacturing, using, offering to sell, or selling within the US or importing into the US, their ANDA products before that date. On August 4, 2020, Apotex, Fresenius, and Mylan appealed this final judgment, and filed their opening briefs on November 4, 2020. Plaintiffs' responsive appeal brief was filed on February 12, 2021. Defendants' reply briefs were filed April 5, 2021. On August 2, 2021, Fresenius's appeal was dismissed pursuant to a settlement agreement reached with Patentees. Oral argument for the remaining defendants occurred on August 3, 2021. On August 13, 2021, the appeals court affirmed the trial court's decision. The mandate was issued on October 22, 2021. Apotex filed a petition for certiorari on December 14, 2021, which the Supreme Court denied on February 22, 2022.

Hospira filed a motion to dismiss, which was fully briefed on November 16, 2018. On December 16, 2019, the United States District Court for the District of Delaware denied Hospira's motion to dismiss with respect to U.S. Patent No. 9,572,887 and granted that motion with respect to the remaining patents. On December 15, 2020, the Court held a claim construction hearing, ruling in our favor on all claim terms. Fact discovery closed on April 1, 2021. Expert discovery is ongoing. Trial has been rescheduled for April 25, 2022. The case remains pending.

Patentees filed suit against Hospira, Inc. on November 16, 2021. Patentees have asserted U.S. Patent No. 11,103,483. Hospira filed its Answer on December 8, 2021. Scheduling for the case is ongoing. The parties submitted disputed scheduling proposals on February 15, 2022, a decision on which is currently pending before the Court.

On March 10, 2020, the parties filed a stipulation and order of dismissal without prejudice as to Lupin, which the Court entered March 11, 2020.

Aurobindo answered the Complaint on July 20, 2020. The parties exchanged initial disclosures on December 11, 2020. Plaintiffs provided their infringement contentions on March 12, 2021. On October 20, 2021, the Court entered a stipulation of dismissal based on a settlement between the parties

Patentees filed suit against Dr. Reddy's Laboratories on May 13, 2021. Patentees have asserted U.S. Patent Nos. 8,609,707, 9,265,831, 9,572,796, 9,572,797, 9,034,908, 9,144,568, 9,572,887, 9,597,397, 9,597,398, 9,597,399, 9,000,021, 9,579,384, 10,010,533, and 10,052,385. Dr. Reddy's answer was filed August 16, 2021. On December 27, 2021, Dr. Reddy's moved for judgment on the pleadings, seeking a dismissal of all patents except the '887 patent. On January 27, 2022, the Court entered an agreed stipulation by the parties dismissing all patents except the '887. On February 8, 2022, consistent with that stipulation, Patentees filed an Amended Complaint removing the dismissed patents and adding U.S. Patent No 11,103,483. Dr. Reddy's filed its Answer and Counterclaims to that Amended Complaint on February 22, 2022. Patentees' Counterclaim Answer is due March 15, 2022.Fact discovery is ongoing, and the case is set for trial on May 1, 2023.

Patentees filed suit against Accord Healthcare on June 29, 2021. Patentees have asserted U.S. Patent Nos. 8,609,707, 9,265,831, 9,572,796, 9,572,797, 9,034,908, 9,144,568, 9,572,887, 9,597,397, 9,597,398, 9,597,399, 9,000,021, 9,579,384,

F- 39

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

10,010,533, and 10,052,385. On January 13, 2022, Accord filed a Motion to Dismiss for failure to state a claim. On January 26, 2022, Patentees filed a First Amended Complaint, removing all patents except the '887 patent and additionally asserting U.S. Patent No. 11,103,483. Accord filed its Answer and Counterclaims to that Amended Complaint on February 10, 2022. On February 28, 2022, Patentees filed their Answer to Accord's Counterclaims. Scheduling for the case is ongoing and a proposed schedule is due to the Court on March 16, 2022

*Eagle Pharmaceuticals, Inc. v. Slayback Pharma Limited Liability Company - (*Belrapzo®)

Slayback filed an ANDA referencing Eagle's Belrapzo NDA. Slayback's ANDA includes challenges to one or more of the Belrapzo Orange Book-listed patents. On September 20, 2018, the Company filed a suit against Slayback in the United States District Court for the District of Delaware, alleging patent infringement of U.S. Patent Nos. 8,609,707, 9,265,831, 9,572,796, 9,572,797 and 10,010,533. On October 10, 2018, Slayback answered the Complaint and filed various counterclaims. On October 31, 2018, the Company answered Slayback's counterclaims. Pursuant to a stipulation between the parties, Slayback is bound by any final judgment entered in the Consolidated Bendeka Litigation. This case is currently stayed.

*Eagle Pharmaceuticals, Inc. v. Slayback Pharma Limited Liability Company, Apotex, Inc. and Apotex Corp.,*
*Celerity Pharmaceuticals, LLC - (BELRAPZO®)*

Slayback, Apotex, and Celerity Pharmaceuticals, LLC ("Celerity") filed NDAs referencing Eagle's Belrapzo NDA. The Company filed suits against Slayback, Apotex, and Celerity in the United States District Court for the District of Delaware on August 31, 2021 (Slayback and Apotex) and on January 11, 2022 (Celerity) alleging infringement of U.S. Patent No. 11,103,483. On September 22, 2021, both Slayback and Apotex filed their Answers. The suit against Slayback and Apotex is set for trial on October 26, 2022, and fact discovery is ongoing. On February 2, 2022, Celerity moved to dismiss the pending complaint. In response, the Company filed an Amended Complaint on March 1, 2022. Celerity's response is due March 15, 2022.

*Par Pharmaceutical, Inc. et al. v. Eagle Pharmaceuticals, Inc. (Vasopressin)*

On May 31, 2018, Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Endo Par Innovation Company, LLC (together, "Par") filed suit against the Company in the United States District Court for the District of Delaware. Par alleged patent infringement based on the filing of the Company's ANDA seeking approval to manufacture and sell the Company's vasopressin product. The Company's vasopressin product, if approved by FDA, will be an alternative to Vasostrict, which is indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines. The Company answered the complaint on August 6, 2018, and filed an amended answer and counterclaims on October 30, 2019. The court issued a Markman ruling on July 1, 2019. On December 20, 2019, Par dismissed with prejudice claims of three of the patents asserted against Eagle, and the Court entered an Order reflecting that dismissal on December 27, 2019. Mediation took place on March 3, 2020. On April 17, 2020, we submitted a letter requesting leave to file a motion for summary judgment of non-infringement. Par's responsive letter was submitted on May 8, 2020. On May 18, 2020, the court said it would hear non-infringement arguments at trial and not through summary judgment. Fact discovery ended in October 2019, and expert discovery ended in February 2020. Due to the COVID-19 pandemic, the trial, which was scheduled to begin May 18, 2020, was rescheduled to and occurred on July 7-9, 2021. Post-trial briefing was submitted on July 28, 2021. The Court issued an opinion on August 31, 2021 and entered a final judgment of non-infringement in favor of Eagle on September 16, 2021. Par filed a Notice of Appeal of the final judgment on September 22, 2021, and the appeal was docketed with the United States Court of Appeals for the Federal Circuit on September 23, 2021. Par filed its principal appeal brief on December 6, 2021, Eagle filed its responsive appeal brief on February 1, 2022, and Par filed its reply appeal brief on February 22, 2022. The 30-month stay of FDA approval expired on October 17, 2020. The FDA approved Eagle's ANDA on December 15, 2021. On December 16, 2021, Par filed an emergency motion for temporary restraining order and preliminary injunction in the district court to enjoin Eagle from launching its product, but Par voluntarily withdrew the motion on December 20, 2021.
Eagle commercially launched its ANDA product in January 2022. This suit is pending.

On December 7, 2020, Par filed a separate suit against us in the United States District Court for the District of New Jersey, asserting patent infringement of U.S. Patent No. 10,844,435, based on the filing of our ANDA seeking approval to manufacture and sell our vasopressin product. Eagle moved to dismiss Par's complaint on March 2, 2021. On March 22, 2021, Par amended its complaint to additionally assert U.S. Patent No. 10,920,278, and on April 5, 2021, Eagle moved to dismiss Par's amended complaint. This suit is pending.

F- 40

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

### 14. Convertible Promissory Note

During the first quarter of 2021, we invested $5 million in a convertible promissory note ("the note") of a privately held clinical-stage biotechnology company (the "issuer"). The note bears an 8% annual interest rate and has an 18-month term. The issuer is not required to make any principal or interest payments until the end of the term. The note, along with any accrued interest, may automatically convert into equity securities of the issuer under either a financing event or a change in control event as defined in the convertible promissory note agreement. The issuer's product development efforts could encounter technical or other difficulties that could increase their development costs more than expected. The issuer will likely require additional capital prior to obtaining certain regulatory approval or to be able to repay the convertible promissory note with accrued interest at the end of the term.

The following table summarizes the amounts recorded and activity during the year ended December 31, 2021;

| | Initial | Fair Value Adjustments to the note | Accretion of Discount | Estimated Credit Loss | Interest Income | Fair Value Adjustment to Embedded Derivative | December 31, 2021 |
|---|---|---|---|---|---|---|---|
| **Fair value of the note** | $ 5,000 | $ (94) | $ — | $ — | $ — | $ — | $ 4,906 |
| **Discount on the note** | (276) | — | 149 | — | — | — | (127) |
| **Estimated Credit Loss** | — | — | — | (758) | — | — | (758) |
| **Convertible Promissory Note, net** | $ 4,724 | $ (94) | $ 149 | $ (758) | $ — | $ — | $ 4,021 |
| | | | | | | | |
| **Embedded Derivative** | $ 276 | $ — | $ — | $ — | $ — | $ 686 | $ 962 |
| | | | | | | | |
| **Interest Receivable** | $ — | $ — | $ — | $ — | $ 329 | $ — | $ 329 |
| | | | | | | | |
| **Total in Other Current Assets** | $ 5,000 | $ (94) | $ 149 | $ (758) | $ 329 | $ 686 | $ 5,312 |

F- 41

**Exhibit 21.1**

**Subsidiaries of Eagle Pharmaceuticals, Inc.**

| Name of Subsidiary | Jurisdiction of Incorporation |
|---|---|
| Eagle Biologics, Inc. (formerly Arsia Therapeutics, Inc.) | Delaware |
| Eagle Research Lab Limited | Malta |

**Exhibit 23.1**

<u>Consent of Independent Registered Public Accounting Firm</u>

We consent to the incorporation by reference in the following Registration Statements:

   (1)  Registration Statement on Form S-3 No. 333-234742 and 333-202592 of Eagle Pharmaceuticals, Inc., and

   (2) Registration Statements on Form S-8 Nos. 333-228876, 333-216839, 333-213683, 333-206729 and 333-194056 Eagle Pharmaceuticals, Inc.

of our reports dated March 7, 2022, with respect to the consolidated financial statements of Eagle Pharmaceuticals, Inc. and the effectiveness of internal control over financial reporting of Eagle Pharmaceuticals, Inc. included in this Annual Report (Form 10-K) of Eagle Pharmaceuticals for the year ended December 31, 2021.

/s/ Ernst & Young, LLP

Stamford, Connecticut
March 7, 2022

Exhibit 23.2

<u>Consent of Independent Registered Public Accounting Firm</u>

Eagle Pharmaceuticals, Inc.

Woodcliff Lake, New Jersey

We hereby consent to the incorporation by reference in the Registration Statements on Form S-3 (Nos. 333-234742 and 333-202592) and Form S-8 (Nos. 333-228876, 333-216839, 333-213683, 333-206729 and 333-194056) of Eagle Pharmaceuticals, Inc. (the "Company") of our report dated March 2, 2020, relating to the consolidated financial statements which appears in this Form 10-K.

/s/ BDO USA, LLP

Woodbridge, New Jersey

March 7, 2022

**Exhibit 31.1**

## Certification of Principal Executive Officer

I, Scott Tarriff, certify that:

1. I have reviewed this Annual Report on Form 10-K of Eagle Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

    (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 7, 2022

/s/ Scott Tarriff

Scott Tarriff
President and Chief Executive Officer
(Principal Executive Officer)

**Exhibit 31.2**

### Certification of Principal Financial and Accounting Officer

I, Brian Cahill, certify that:

1. I have reviewed this Annual Report on Form 10-K of Eagle Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 7, 2022

/s/ Brian Cahill

Brian Cahill
Chief Financial Officer
(Principal Financial and Accounting Officer)

**Exhibit 32.1**

**Certification Pursuant to**

**18 U.S.C. Section 1350,**

**As Adopted Pursuant to**

**Section 906 of the Sarbanes-Oxley Act of 2002**

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), **Scott Tarriff**, President and Chief Executive Officer of Eagle Pharmaceuticals, Inc. (the "Company"), and **Brian Cahill**, Chief Financial Officer of the Company, each hereby certifies that, to the best of his knowledge:

1.   The Company's Annual Report on Form 10-K for the period ended December 31, 2021 (the "Annual Report"), to which this Certification is attached as Exhibit 32.1, fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act, and

2.    The information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**Dated: March 7, 2022**

/s/ Scott Tarriff                  /s/ Brian Cahill
Scott Tarriff              Brian Cahill
Chief Executive Officer        Chief Financial Officer
(Principal Executive Officer)        (Principal Financial and Accounting Officer)

This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Eagle Pharmaceuticals, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing.

EXHIBIT 9

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2022**
**or**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from _____ to _____ .**

**Commission File Number 001-36306**

# Eagle Pharmaceuticals, Inc.
(Exact Name of Registrant as Specified in its Charter)

| **Delaware** | **2834** | **20-8179278** |
|---|---|---|
| (State or Other Jurisdiction of Incorporation or Organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**50 Tice Boulevard, Suite 315**
**Woodcliff Lake, NJ 07677**
**(201) 326-5300**
(Address, Including Zip Code, and Telephone Number, Including Area Code, of Registrant's Principal Executive Offices)

**Securities registered pursuant to Section 12(b) of the Act:**

| **Title of each class** | **Trading symbol** | **Name of each exchange on which registered** |
|---|---|---|
| Common stock, $0.001 par value per share | EGRX | The Nasdaq Global Market |

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes o No x

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes o No x

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes x  No o

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   Yes x  No o

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in 12b-2 of the Exchange Act.

| Large accelerated filer | Accelerated filer | Non-accelerated filer | Smaller reporting company |
|---|---|---|---|
| ☐ | ☒ | ☐ | ☐ |

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. o

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. x

If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. o

Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to § 240.10D-1(b). o

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No x

The aggregate market value of voting Common Stock held by non-affiliates of the registrant was approximately $412,548,056 computed by reference to the last reported sale price of $44.43 per share as reported by The Nasdaq Global Market, as of the last business day of the registrant's most recently completed second fiscal quarter, June 30, 2022. This calculation does not reflect a determination that certain persons are affiliates of the registrant for any other purpose.

The number of shares outstanding of the registrant's common stock, $0.001 par value per share, as of March 16, 2023 was 13,084,243 shares.

<div align="center">**DOCUMENTS INCORPORATED BY REFERENCE:**</div>

Portions of the definitive proxy statement for our 2023 annual meeting of stockholders, which is to be filed within 120 days after the end of the fiscal year ended December 31, 2022, are incorporated by reference into Part III of this Form 10-K, to the extent described in Part III.

**Eagle Pharmaceuticals, Inc.**

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K, or Annual Report, includes forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, or the Securities Act and Section 21E of the Securities Exchange Act of 1934, as amended, or the Exchange Act. All statements other than statements of historical fact contained in this Annual Report are forward-looking statements. In some cases, you can identify forward-looking statements by terminology such as "may," "could," "will," "would," "should," "expect," "plan,", "anticipate," "believe," "estimate," "intend," "predict," "seek," "contemplate," "project," "continue," "potential," "ongoing," "prospects," "outlook," "goal" or the negative of these terms or other comparable terminology, although not all forward-looking statements contain these identifying words. These forward-looking statements include, but are not limited to, statements about:

- statements related to our expectations with respect to the potential benefits to us from our acquisition of Acacia Pharma;
- the potential benefits and commercial potential of our approved products, including rapidly infused bendamustine ready-to-dilute ("RTD"), or Bendeka, Treakisym, Ryanodex® (dantrolene sodium), or Ryanodex, bendamustine ready-to-dilute 500ml solution, or Belrapzo, BARHEMSYS®, BYFAVO®, PEMFEXY®, and vasopressin, for approved indications and any expanded uses;
- statements related to our expectations with respect to our investment in Enalare Therapeutics, Inc., or Enalare, including with respect to the anticipated financial impact on us of the agreement with Enalare, potential benefits to us, the achievement of related milestones and timing thereof, our potential further investment in Enalare pursuant to the terms of the agreement, the commercial potential of Enalare's product candidates and Enalare's development program, including with respect to current and future clinical trials and timing thereof, and expectations regarding our future growth and the expansion of our growth possibilities as a result of the investment in Enalare;
- the commercial potential of additional indications for our products;
- sales of our products in various markets worldwide, pricing for our products, level of insurance coverage and reimbursement for our products, timing regarding development and regulatory approvals for our products or for additional indications or in additional territories;
- future expansion of our commercial organization and transition to third-parties in certain jurisdictions to perform sales, marketing and distribution functions;
- the number and timing of potential product launches, development initiatives or new indications for the Company's product candidates, and the commercial potential of additional indications for our products;
- the initiation, timing, design, progress and results of our preclinical studies and clinical trials, and our research and development programs;
- our ability to obtain and maintain regulatory approval of our products and product candidates, and any related restrictions, limitations, and/or warnings in the label of an approved product;
- our plans to research, develop and commercialize our products and product candidates and our ability to successfully commercialize our products and product candidates;
- our ability to conduct a strategic transaction/acquisition on expected timing, favorable terms or at all;
- our ability to attract collaborators with development, regulatory and commercialization expertise;
- the size and growth potential of the markets for our products and product candidates, and our ability to serve those markets;
- the impact of the coronavirus 2019, or COVID-19, pandemic on our business and operations, results of operations and financial performance including: disruption in the sales of our marketed products; delays, interruptions or other adverse effects to clinical trials and patient enrollment; delays in regulatory review; manufacturing and supply chain interruptions; and the adverse effects on healthcare systems, volatility of the financial and credit markets and disruption of the global economy overall;
- the impact of geopolitical events, such as the ongoing conflict between Russia and Ukraine and related sanctions, and macroeconomic conditions, such as rising inflation and interest rates and uncertainty in credit and financial markets, on our business and operations, results operations and financial performance;
- the diversion of healthcare resources away from the conduct of clinical trials as a result of the COVID-19 pandemic, including the diversion of hospitals and doctor offices serving as locations for administration of our products, including Bendeka and hospital staff supporting the conduct of such administration;
- the rate and degree of market acceptance of our products;
- our ability to significantly grow our commercial sales and marketing organization, whether alone or with potential future collaborators;
- the performance of our strategic collaborators and success of our current strategic collaborators;
- regulatory developments in the United States and foreign countries;

- the performance of our third-party suppliers and manufacturers;
- the success of competing drugs that are or become available;
- the retention of key scientific or management personnel;
- our ability to obtain additional funding for our operations;
- our ability to obtain, maintain, protect and enhance intellectual property rights and proprietary technologies and operate our business without infringing the intellectual property rights and proprietary technology of third parties;
- our ability to prevent or minimize the effects of litigation and other contingencies; and
- our expectations regarding anticipated future costs, operating expenses and capital requirements.

Any forward-looking statements in this Annual Report reflect our current views with respect to future events or to our future financial performance and involve known and unknown risks, uncertainties, assumptions and other factors described under the "Risk Factors" section and elsewhere in this Annual Report, that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. Given these uncertainties, you should not place undue reliance on these forward-looking statements.

In addition, statements that "we believe" and similar statements reflect our beliefs and opinions on the relevant subject. These statements are based upon information available to us as of the date of this report, and while we believe such information forms a reasonable basis for such statements, such information may be limited or incomplete, and our statements should not be read to indicate that we have conducted an exhaustive inquiry into, or review of, all potentially available relevant information. These statements are inherently uncertain and investors are cautioned not to unduly rely upon these statements as predictions of future events. Except as required by law, we assume no obligation to update or revise these forward-looking statements for any reason, even if new information becomes available in the future.

This Annual Report also contains estimates, projections and other information concerning our industry, our business, and the markets for certain diseases, including data regarding the estimated size of those markets, and the incidence and prevalence of certain medical conditions. Information that is based on estimates, forecasts, projections, market research or similar methodologies is inherently subject to uncertainties and actual events or circumstances may differ materially from events and circumstances reflected in this information. Unless otherwise expressly stated, we obtained this industry, business, market and other data from reports, research surveys, studies and similar data prepared by market research firms and other third parties, industry, medical and general publications, government data and similar sources.

## NOTE REGARDING COMPANY REFERENCES

References to the "Company," "Eagle Pharmaceuticals," "Eagle," "we," "us" or "our" mean Eagle Pharmaceuticals, Inc., a Delaware corporation, together with its subsidiaries, references to "Eagle Biologics" mean Eagle Biologics, Inc., "Eagle Research Lab" means Eagle Research Lab Limited, and reference to "Acacia Pharma" mean Acacia Pharma Group plc.

## NOTE REGARDING TRADEMARKS

All trademarks, trade names and service marks appearing in this Annual Report are the property of their respective owners. Solely for convenience, trademarks and trade names referred to in this Annual Report may appear without the ® or TM symbols, but such references are not intended to indicate in any way that the Company will not assert, to the fullest extent under applicable law, its rights or the rights of the applicable licensor to these trademarks and trade names. The Company does not intend its use or display of other entities' trade names, trademarks or service marks to imply a relationship with, or endorsement or sponsorship of the Company by, any other entity.

## SUMMARY RISK FACTORS

Our business faces significant risks and uncertainties of which investors should be aware before making a decision to invest in our common stock. If any of the following risks are realized, our business, financial condition and results of operations could be materially and adversely affected. You should carefully review and consider the full discussion of our risk factors set forth under the caption "Risk Factors" in Item 1A in Part I of this Annual Report on Form 10-K. Some of the more significant risks include the following:

a.  If we cannot sustain profitability, our business, prospects, operating results and financial condition would be materially harmed.
b.  We face significant competition from other biotechnology and pharmaceutical companies, and our operating results will suffer if we fail to compete effectively.
c.  If we are unable to successfully conduct our sales and marketing capabilities or if our commercial partners do not adequately perform, the commercial opportunity for our products may be diminished.
d.  If we fail to obtain additional financing, we could be forced to delay, reduce or eliminate our product development programs.
e.  We may sell additional equity or incur additional debt to fund our operations, which may result in dilution to our stockholders and impose restrictions on our business.
f.  We cannot give any assurance that we will receive regulatory approval for our product candidates, which is necessary before they can be commercialized.
g.  Current and future legislation and regulations may increase the difficulty and cost for us to commercialize our product candidates and affect the prices we may obtain for our products.
h.  If we are unable to differentiate our products or product candidates from branded reference drugs or existing generic therapies for similar treatments, or if the FDA or other applicable regulatory authorities approve generic products that compete with any of our products or product candidates, the ability to successfully commercialize our product candidates would be adversely affected.
i.  Clinical development is a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results. Failure can occur at any stage of clinical development.
j.  Delays in clinical trials are common and have many causes, and any delay could result in increased costs to us and could jeopardize or delay our ability to obtain regulatory approval and commence product sales. We may also find it difficult to enroll patients in our clinical trials, which could delay or prevent development of our product candidates.
k.  Our commercial success depends upon attaining significant market acceptance of our products and product candidates, if approved, among physicians, nurses, pharmacists, patients and the medical community.
l.  A substantial portion of our total revenues is derived from sales of a limited number of products.
m.  The COVID-19 pandemic has adversely impacted, and may continue to adversely impact, our business, including the marketing, sale and commercialization of our products, our supply chain, our clinical trials, our liquidity and access to capital markets and our business development activities.
n.  We rely on third parties to conduct our preclinical studies and clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines, we may not be able to obtain regulatory approval for or commercialize our product candidates and our business could be substantially harmed.
o.  We rely on limited sources of supply for our products and product candidates, and any disruption in the chain of supply may impact production and sales of our products and cause delay in developing and commercializing our product candidates.
p.  We may engage in strategic transactions to acquire assets, businesses, or rights to products, product candidates or technologies or form collaborations or make investments in other companies or technologies that could harm our operating results, dilute our stockholders' ownership, increase our debt, or cause us to incur significant expense.
q.  We may fail to realize all of the anticipated benefits of the Acacia Pharma acquisition, those benefits may take longer to realize than expected, or we may encounter integration difficulties.
r.  Our future success depends on our ability to retain key executives and to attract, retain and motivate qualified personnel.
s.  We are subject to stringent and changing obligations related to data privacy and security. Our actual or perceived failure to comply with such obligations could lead to regulatory investigations or actions; litigation; fines and penalties; disruptions of our business operations; reputational harm; loss of revenue or profits; and other adverse business consequences.
t.  If we are unable to obtain or protect intellectual property rights related to any of our product candidates, we may not be able to compete effectively in our market.
u.  Our stock price may continue to fluctuate significantly.
v.  There is no assurance that our Share Repurchase Program will result in repurchases of our common stock or enhance long term stockholder value.
w.  Changes in tax laws or regulations that are applied adversely to us or our customers may have a material adverse effect on our business, cash flow, financial condition or results of operations.
x.  Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.

**EAGLE PHARMACEUTICALS, INC.**

**ANNUAL REPORT ON FORM 10-K**

**For the fiscal year ended December 31, 2022**

**Part I** | | Page
--- | --- | ---
Item 1. | Business | 6
Item 1A. | Risk Factors | 33
Item 1B. | Unresolved Staff Comments | 71
Item 2. | Properties | 71
Item 3. | Legal Proceedings | 71
Item 4. | Mine Safety Disclosures | 71
**Part II** | |
Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 72
Item 6. | Reserved | 74
Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 74
Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 90
Item 8. | Financial Statements and Supplementary Data | 91
Item 9. | Changes and Disagreements with Accountants on Accounting and Financial Disclosure | 92
Item 9A. | Controls and Procedures | 93
Item 9B | Other Information | 97
Item 9C | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 97
**Part III** | |
Item 10. | Directors, Executive Officers and Corporate Governance | 97
Item 11. | Executive Compensation | 97
Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 97
Item 13. | Certain Relationships and Related Transactions, and Director Independence | 97
Item 14. | Principal Accountant Fees and Services | 97
**Part IV** | |
Item 15. | Exhibits and Financial Statement Schedules | 98
Item 16. | Form 10-K Summary | 101
 | Signatures |

5

**PART I**

**Item 1. Business**

**Company Overview**

*Organization*

We are a pharmaceutical company registered at and with principal offices at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677. We also have a research and development facility in Cambridge, Massachusetts, office space in Palm Beach Gardens, Florida and Indianapolis, Indiana.

*Business*

We are a fully integrated pharmaceutical company with research and development, clinical, manufacturing and commercial expertise. We are committed to developing innovative medicines that result in meaningful improvements in patients' lives.

Our science-based business model has a proven track record with the U.S. Food and Drug Administration ("FDA") approval and commercial launches of six products: PEMFEXY® (pemetrexed for injection), vasopressin, an A-rated generic alternative to Vasostrict®, Ryanodex® (dantrolene sodium) ("Ryanodex"), bendamustine RTD 500ml solution ("Belrapzo"), rapidly infused bendamustine RTD ("Bendeka") and bendamustine ready-to-dilute and rapidly infused RTD in Japan ("Treakisym"). We market our products through marketing partners and/or our internal direct sales force. We market PEMFEXY, vasopressin, Ryanodex and Belrapzo, and Teva Pharmaceutical Industries Ltd. ("Teva") markets Bendeka through its subsidiary Cephalon, Inc. SymBio Pharmaceuticals Limited ("SymBio"), markets Treakisym, a RTD product, in Japan.

We acquired Acacia Pharma as of June 9, 2022, which added two FDA approved new chemical entities with patent protection, BARHEMSYS® (amisulpride for injection) and BYFAVO® (remimazolam for injection). The addition of these two products expands our presence in the acute care space.

With several pipeline projects underway and the potential for product launches over the next few years, we believe we have many growth opportunities ahead. We believe that each of our pipeline projects currently has the potential to enter the market as a first-in-class, first-to-file or best-in-class product. In particular, we are applying our expertise to conduct novel research regarding the potential for Ryanodex to address conditions including nerve agent, acute radiation syndrome, traumatic brain injury/concussion and Alzheimer's disease as well as investigations of compounds such as EA-114 (our fulvestrant product candidate) for patients with HR-positive advanced breast cancer. Our clinical development program also includes a license agreement with Combioxin, SA under which we were granted exclusive, worldwide development commercialization rights to CAL02, a novel first-in-class anti-infective agent for Phase 2b/3 development for the treatment of severe pneumonia in combination with traditional antibacterial drugs and a license agreement with AOP Health Group ("AOP Orphan"), for the commercial rights to its product, landiolol in the United States. Landiolol is a leading hospital emergency use product, which is currently approved in Europe for the treatment of non-compensatory sinus tachycardia and tachycardic supraventricular arrhythmias. Landiolol is not currently approved in the United States. We supported the submission of a NDA in the second quarter of 2022 by AOP Orphan to the FDA seeking approval for landiolol for the short term reduction of ventricular rate in patients with SVT, including atrial fibrillation and atrial flutter.

**Recent Developments**

*Discontinuance of Vasopressin*

During the first quarter of 2023, we gave notice to customers and the FDA that it was withdrawing from the vasopressin market. Inventory on hand and in the distribution channel is expected to be depleted by the end of the second quarter of 2023.

*Third Amended and Restated Credit Agreement*

On November 1, 2022, we entered into the Third Amended and Restated Credit Agreement (the "Third Amended Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Administrative Agent") and the lenders party thereto, which replaced our prior credit agreement, dated as of November 8, 2019 (the "the Second Amended Credit Agreement"). The terms and amounts borrowed under the Third Amended Credit Agreement include a drawn term loan of $50 million and a $100 million revolving credit facility of which $15.0 million was drawn on November 1, 2022. In addition, approximately $35.4 million of the proceeds of the credit facility were used to refinance all amounts outstanding under the

6

Second Amended Credit Agreement, and we used the remaining proceeds to repay certain indebtedness of our wholly-owned subsidiary, Acacia Pharma, and for other corporate purposes. All amounts outstanding under the Third Amended Credit Agreement shall be due and payable on October 31, 2025, unless otherwise accelerated or extended pursuant to the terms of the Third Amended Credit Agreement.

### Enalare Investment

On August 8, 2022, we and Enalare Therapeutics Inc. ("Enalare") entered into a Securities Purchase Agreement, pursuant to which we have committed to provide equity investments of up to $55 million in Enalare, subject to the completion of certain development milestones (the "Purchase Agreement"). Concurrently with the execution of the Purchase Agreement, we, Enalare and holders of all of the outstanding capital stock, and any securities or options exercisable for capital stock, of Enalare (the "Securityholders") entered into a Security Purchase Option Agreement, pursuant to which we were granted an option (the "Purchase Option") to acquire all of the remaining outstanding shares of Enalare other than those that we already own, subject to the terms and conditions of the agreement (the "Option Agreement"). The term of the Purchase Option (the "Option Period") commenced on August 8, 2022 and will end upon the earlier of (x) 90 days following FDA authorization to begin a Phase 3 clinical study for a Product Candidate or (y) June 30, 2027. Pursuant to the terms of the Option Agreement, Enalare shall not initiate Phase 3 pivotal studies prior to the end of the Option Period and we shall have reasonable access to all relevant data and documents following the Phase 3 Milestone (as defined in the Option Agreement).

ENA-001 is an investigational, new chemical entity being developed by Enalare as an agnostic respiratory stimulant for multiple patient populations experiencing acute respiratory depression. The initial targeted indications include post-operative respiratory depression; community drug overdose; and Apnea of Prematurity, a common condition in preterm infants. FDA granted Orphan Drug Designation to ENA-001 for the treatment of Apnea of Prematurity ("AoP"). AoP is a development disorder attributed to immaturity of the pulmonary system characterized by either cessation of breathing for more than 20 seconds or cessation of breathing that lasts less than 20 seconds but is accompanied by either bradycardia or hypoxemia.

### Acacia Acquisition

On June 9, 2022, we completed the acquisition of Acacia Pharma Group plc ("Acacia"), formerly a public company organized under the laws of England and Wales, through an offer of approximately $76 million in cash and 516,024 shares of our common stock for the entire issued and to be issued share capital of Acacia by means of a court sanctioned scheme of arrangement under Part 26 of the UK Companies Act 2006. The acquisition added two FDA approved currently marketed, acute care, hospital products, both of which are new chemical entities with strong patent protection:
* BARHEMSYS (amisulpride for injection), the first and only antiemetic approved by the FDA for rescue treatment of postoperative nausea and vomiting, after failed prophylaxis, and
* BYFAVO (remimazolam for injection), indicated for the induction and maintenance of procedural sedation in adults undergoing procedures lasting 30 minutes or less.

### Landiolol

On June 1, 2022, we announced that AOP Orphan, with whom we entered into a licensing agreement in August 2021, submitted an NDA to the FDA for landiolol, a short-acting, intravenous ("IV"), cardio-selective beta-1 adrenergic blocker product candidate. The submission seeks approval for landiolol for the short-term reduction of ventricular rate in patients with supraventricular tachycardia ("SVT"), including atrial fibrillation and atrial flutter. The FDA's decision with respect to approval is expected in mid-2023. Patient enrollment for a study of pediatric patients with supraventricular tachycardia is underway in Europe.

### PEMFEXY

In December 2022, the FDA approved an additional indication for PEMFEXY (pemetrexed injection) in combination with pembrolizumab and platinum chemotherapy for the initial treatment of patients with metastatic, non-squamous, non-small cell lung cancer with no EGFR or ALK genomic tumor aberrations. In December 2022, we also amended our agreement with Robert One to amend the applicable royalty rates due by us on Gross Profits derived from the Robert One 2009 Subject Products to (i) thirty percent with respect to a 505(b)(2) application; (ii) thirty percent with respect to an ANDA application; and (iii) with respect to pemetrexed parenteral formulation, (a) ten percent on Gross Profits greater than $85,000,000 and (b) twelve percent on Gross Profits greater than $115,000,000. In addition, under the terms of the amendment, no royalty payment is due on Gross Profits derived from pemetrexed parenteral formulation that are less than $85,000,000. In exchange for the foregoing amended royalty rates, we made a one-time lump sum payment of $15,000,000 to Robert One on January 3, 2023. See "*Business—License Agreements—Development and License Agreement with Robert One, LLC (pemetrexed)*."

7

On February 1, 2022, we announced the commercial availability of our novel product PEMFEXY® (pemetrexed for injection). A branded alternative to ALIMTA®, Eagle's PEMFEXY is a ready-to-use liquid with a unique J-code approved to treat nonsquamous non-small cell lung cancer and mesothelioma.

*CAL02*

We submitted an IND to the FDA for CAL02, a novel first-in-class anti-infective agent for the treatment of severe community-acquired bacterial pneumonia ("SCABP"). The IND filing includes a protocol for a global Phase 2 study to evaluate the efficacy and safety of CAL02 when added to standard of care therapy in patients with SCABP.

We expect to start a Phase 2b/3 clinical trial for CAL02 patients later in 2023, during pneumonia season. In August 2021, we entered into a license agreement with Combioxin SA under which we were granted exclusive, worldwide development and commercialization rights to CAL02, a novel approach to the treatment of severe bacterial pneumonia.

*Bendeka Settlement*

On December 9, 2022, we entered into a definitive settlement agreement, or the Accord Settlement Agreement, with Accord Healthcare Inc., or Accord, relating to our product BENDEKA® (rapidly infused bendamustine hydrochloride). This settlement resolves patent litigation brought by us and our marketing partners Teva Pharmaceuticals International, GmbH and Cephalon, Inc. relating to the alleged infringement of Orange Book listed United States Patent Nos. 8,609,707; 9,265,831; 9,572,796; 9,572,797; 9,034,908; 9,144,568; 9,572,887; 9,597,397; 9,597,398; 9,597,399; 9,000,021; 9,579,384; 10,052,385; 10,010,533; and 11,103,483, or the Asserted Patents, with respect to Accord's 505(b)(2) NDA, No. 215749. Pursuant to the terms of the Accord Settlement Agreement, we will grant Accord a license to market Accord's product made under NDA No. 215749 in the United States beginning on January 17, 2028 (subject to FDA approval), or earlier under certain circumstances. Additionally, in accordance with the Agreement, the parties will terminate all ongoing litigation among us, Teva Pharmaceuticals International, GmbH and Cephalon, Inc. and Accord regarding BENDEKA® and the Asserted Patents pending in the United States District Court for the District of Delaware. The Agreement is confidential and subject to review by the U.S. Federal Trade Commission and the U.S. Department of Justice.

On April 19, 2022, we entered into a definitive settlement agreement, or the Hospira Settlement Agreement, with Hospira, Inc., or Hospira, relating to our product BENDEKA® (rapidly infused bendamustine hydrochloride). This settlement resolves patent litigation brought by us and our marketing partners Teva Pharmaceuticals International, GmbH and Cephalon, Inc. relating to the alleged infringement of Orange Book listed United States Patent Nos. 11,103,483 and 9,572,887, or the Asserted Patents, with respect to Hospira's 505(b)(2) NDA, No. 211530. Pursuant to the terms of the Hospira Settlement Agreement, we will grant Hospira a license to market Hospira's product made under NDA No. 211530 in the United States beginning on January 17, 2028 (subject to FDA approval), or earlier under certain circumstances. Additionally, in accordance with the Agreement, the parties will terminate all ongoing litigation among us, Teva Pharmaceuticals International, GmbH and Cephalon, Inc. and Hospira regarding the Asserted Patents pending in the United States District Court for the District of Delaware. The Agreement is confidential and subject to review by the U.S. Federal Trade Commission and the U.S. Department of Justice.

*TREAKISYM*

Our bendamustine franchise continues to grow, including the launch of the TREAKISYM rapid infusion, or RI (50ml) liquid formulation by SymBio in Japan in the first quarter of 2022, and the RTD formulation in the first quarter of 2021.

*Share Repurchase Program*

On August 9, 2016, we announced a share repurchase program approved by our board of directors authorizing the repurchase of up to $75.0 million of our common stock (the "2016 Repurchase Program"). On August 9, 2017, we announced a new share repurchase program approved by the board, which authorized the repurchase up to an additional $100 million of our outstanding common stock (the "2017 Repurchase Program"). Under the 2016 Repurchase Program and the 2017 Share Repurchase Program, we were authorized to repurchase shares through open market purchases, privately-negotiated transactions or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. On October 30, 2018, our board of directors approved a new share repurchase program providing for the repurchase of up to $150 million of our outstanding common stock, consisting of (i) up to $50 million in repurchases pursuant to an accelerated share repurchase agreement (the "ASR") with JPMorgan Chase Bank, N.A., and (ii) up to $100 million in additional repurchases (the "2018 Repurchase Program"). In connection with its approval of the 2018 Repurchase Program, our board of directors terminated the 2016 Repurchase Program and 2017 Repurchase Program. In March 2020, our board of directors approved our current share repurchase program (the "2020 Repurchase Program" and, together with the 2016 Repurchase Program, 2017 Repurchase Program and 2018 Repurchase Program, the "Share Repurchase Program") providing for the repurchase of up to an aggregate of $160.0 million of our outstanding common stock. The 2020 Repurchase Program replaced our 2018 Repurchase Program, which was terminated in connection with the 2020 Repurchase

Program. At termination, we had repurchased approximately $68.0 million of our outstanding common stock under the 2018 Share Repurchase Program. As of December 31, 2022, we have repurchased an aggregate of 4,552,730 shares of common stock for an aggregate of $246.1 million pursuant to our share repurchase programs in effect since August 2016.

*COVID-19 and Macroeconomic Environment Business Update*

In response to the COVID-19 pandemic, we have taken and continue to take active measures designed to address and mitigate the impact of the COVID-19 pandemic on its business, such as remote working policies, facilitating management's daily communication to address employee and business concerns and providing frequent updates to the Board. While we have experienced variable financial and operational impacts to date, the COVID-19 pandemic, including the global economic slowdown, government measures taken in response thereto, the overall disruption of global healthcare systems and other risks and uncertainties associated with the pandemic, could materially adversely affect our business, financial condition, results of operations and growth prospects. We continue to monitor COVID-19 as we evaluate and evolve our business plans and response strategy. The impact of the COVID-19 pandemic on our business and financial condition is more fully described below in *Trends and Uncertainties*.

In addition, we continue to monitor the impacts of other global and worsening macroeconomic conditions, such as global geopolitical tension, increasing inflation and interest rates, exchange rate fluctuations, supply chain disruptions and increases in commodity, energy and fuel prices.

The U.S. government and other nations have imposed significant restrictions on most companies' ability to do business in Russia as a result of the ongoing military conflict between Russia and Ukraine. It is not possible to predict the broader or longer-term consequences of this conflict, which could include further sanctions, embargoes, regional instability, geopolitical shifts and adverse effects on macroeconomic conditions, security conditions, currency exchange rates and financial markets. Such geopolitical instability and uncertainty could have a negative impact on our ability to further expand our business and to otherwise generate revenues and develop our product candidates. In addition, a significant escalation or expansion of economic disruption or the conflict's current scope could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

**Our Competitive Strengths**

**Our Purpose**

We believe that many currently available critical care and oncology injectable drugs and biopharmaceuticals have suboptimal characteristics that do not meet the needs of patients, physicians, nurses or pharmacists. These characteristics can impact safety, shelf life, convenience, waste, cost, and ease of use by practitioners and pharmacy staff. For instance, existing drugs may be packaged inefficiently or come in formulations that require reconstitution or dilution, or which are otherwise difficult or inconvenient to prepare, and which could expose workers to cytotoxic compounds and can result in dosing errors. This can also lead to wasted quantities of drug, inefficiencies in staff time and constrained work flow, reduced shelf life and the need for multiple dosing of individual patients to complete treatment. Likewise the viscosity of many biologic products requires them to be delivered intravenously often in time consuming and sometimes painful treatments for patients. We believe there is a large and unmet market for developing injectable drugs that address the specific needs of patients, physicians, nurses and pharmacists to simplify their use, reduce waste and lower healthcare costs.

We have and continue to engage physicians, nurses, pharmacists and key opinion leaders, to identify specific products where the characteristics described above present opportunities for product improvement. We evaluate the product opportunities presented by the stakeholders and determine whether or not they conform to our research and development planning. A key aspect of our evaluation is the intellectual property landscape for each product opportunity, including our ability to avoid infringing existing patents and the potential patentability of our modified version of the drug. We utilize our experienced team of formulators with extensive experience with injectable pharmaceuticals, and a track record of success in product development, regulatory relations, and quality assurance to develop improved products.

Because our products are differentiated from the branded reference drugs, we believe we are able to avoid infringing existing patents covering the branded reference drug allowing us to enter the existing market before applicable generic drugs, which may be subject to protracted patent litigation that delays market entry. Protracted litigation is a significant barrier to entry for competitors seeking approval of an ANDA referencing the branded reference product, and our early entry into the market leads to less price erosion due to constrained competition. Our patent holdings include over 30 owned or exclusively-licensed U.S. issued patents and over 30 filed U.S. patent applications, as well as several patents and patent applications that have been filed

9

in various worldwide territories, that we believe protect or will protect, as applicable the market value of our current portfolio of products. We believe that other potential barriers to entry for our competitors consist of the following:

- our early entry into the market allows us to influence usage patterns when fewer, if any, competitors exist and allows us to market our products as improved versions of the branded reference drug prior to or concurrent with any generic entry, thereby giving us the opportunity to capture significant market share at this early stage. We believe that such early entry into the market will limit later conversions into generic versions of the branded reference drugs, allowing us to maintain market share and favorable pricing;
- the potential for seven years of exclusivity upon approval of a 505(b)(2) NDA that receives orphan drug status; and
- the potential for three years of regulatory exclusivity for our future product candidates upon approval, if any, of a 505(b)(2) NDA supported by new clinical investigations (other than bioequivalence and bioavailability studies) essential to approval of the application.

Our product portfolio is focused around our external partnerships (e.g., Teva, and SymBio); our PEMFEXY product, our newly acquired products BARHEMSYS and BYFAVO from Acacia acquisition; our Ryanodex related development program; and our Fulvestrant development program that is expected to yield a new approach to drug delivery if successful.

We believe that we can leverage our formulation and development expertise to achieve improved product attributes in terms of potential for longer stability, shorter infusion times, less waste and/or ease and safety of use for healthcare professionals and achieve longer commercial duration compared to generic competitors. We believe that our products may offer certain benefits as compared to existing injectable drugs which may include one or more of the following:

- improved safety through elimination of reconstitution in the pharmacy or in the acute care setting;
- reduction in the number of injections required;
- reduction in the volume of drug needed to be injected, potentially expanding the application to additional medical situations;
- reduction in the amount of diluent required to administer the drug;
- reduction in drug waste;
- reduction in drug infusion time; and
- potential label expansion to include additional indications.

**Our Strategy**

Our goal is to be a leading specialty pharmaceutical company. Our strategy to achieve this goal includes:

*Strengthen our product portfolio.* We intend to continue to strengthen our product portfolio with continued investment in research and development activities and other business development opportunities. We will continue to develop our current product portfolio and leverage our expertise to identify new products with suboptimal characteristics that present us with significant opportunity for revenue generation. In addition to our internal efforts, we plan to opportunistically in-license or acquire product candidates that meet our rigorous evaluation process, fit our therapeutic areas of focus and match our commercial, regulatory and development expertise. Any in-licensing or product acquisitions are excepted to be funded through cash and cash equivalents, in combination with issuances of our common stock, borrowings under our Third Amended Credit Agreement or other debt arrangements, or other means. See "Liquidity and Capital Resources."

*Retain commercial rights in the United States and selectively partner outside of the United States.* In general, we believe that we can cost-effectively commercialize our products in the United States internally or through a contracted sales force and selected commercial arrangements, and thereby retain the commercial value of these products. We have established a small, contract specialty sales force focusing on group purchasing organizations, ("GPOs"), hospital systems and key stakeholders in acute care settings, primarily hospitals. Outside of the United States, we may utilize partners for the commercialization of our products.

*Continue to build a robust intellectual property portfolio.* Our patent estate includes over 70 owned or exclusively-licensed U.S. issued patents and over 30 filed U.S. patent applications, as well as several that have been filed in various worldwide territories, that protect or will protect, as applicable the market value of our approved and pipeline products. We intend to continue to build our patent portfolio by filing for patent protection on new developments with respect to our product candidates that will not infringe patents that cover the branded reference drugs. We expect that these will, if issued, allow us to list our own patents in the Orange Book, to which potential competitors will be required to certify upon submission of their applications referencing

10

our products, if approved.

**Our Products and Product Portfolio**

BARHEMSYS® and BYFAVO®

*Overview*
On June 9, 2022, we acquired all of the outstanding share capital of Acacia, which added two FDA approved new chemical entities with patent protection to our product portfolio, BARHEMSYS® (amisulpride for injection) and BYFAVO® (remimazolam for injection). The addition of these two products expands our presence in the acute care space, and we believe that our hospital-based salesforce will have success commercializing these assets.

BARHEMSYS (amisulpride for injection), is the first and only antiemetic approved by the FDA for rescue treatment of postoperative nausea and vomiting, after failed prophylaxis. BYFAVO (remimazolam for injection), is indicated for the induction and maintenance of procedural sedation in adults undergoing procedures lasting 30 minutes or less.

*Competitive U.S. Marketed Products;*
Fresenius Kabi supplies Propofol globally and Pfizer currently markets Midazolam. See "*Business—Competition*" and "*Risk Factors — We face significant competition from other biotechnology and pharmaceutical companies, and our operating results will suffer if we fail to compete effectively*."

*Limitations of Competitive U.S. Marketed Products,*
Propofol is fast acting but significant safety issues include the need of an anesthesiologist to continuously monitor with no reversal agent.

Midazolam has a better safety profile than Propofol but has slower onset for sedation and offset for recovery.

*Eagle's Solution:*
BARHEMSYS is the first and only FDA-approved product for Post Operative Nausea and Vomiting ("PONV") rescue after failed prophylaxis. It is a selective dopamine D2 /D3 antagonist with a broad, differentiated label. PONV is a common complication of surgery, occurring in approximately 30% of all surgical patients and 80% of high-risk patients. PONV is associated with the use of anesthetic gases and opioid painkillers and is particularly common following gynecological, abdominal, breast, eye, and ear operations, especially those lasting an hour or more. PONV can delay hospital discharge; result in re-admission after in-patient procedures; and lead to day-case patients being admitted to the hospital, all of which can result in significantly increased healthcare costs. By reducing these risks, we believe BARHEMSYS offers the potential for significant economic savings to hospitals and ambulatory centers. BARHEMSYS is the only drug with an FDA-approved indication to treat patients who have failed PONV prophylaxis. It has an established safety profile and efficacy demonstrated in multiple well-controlled clinical studies. BARHEMSYS is nonsedating, a common complaint of standard antiemetic agents. Patients experiencing PONV who were treated in a pivotal clinical trial and failed prophylaxis were treated with BARHEMSYS. These patients were observed to have shorter post-anesthesia care ("PACU") and hospital stays than patients who were not.

BYFAVO is a rapid onset/offset procedural sedative with an established safety and efficacy profile. Additional benefits include predictability and a readily available reversal agent. BYFAVO has a compelling commercial opportunity, addressing a clear unmet need. There has been no innovation in the sedation space for over 20 years. Customers seek a fast onset, titratability, and rapid recovery for quick discharge, and we believe shorter procedure times should support increased procedural volumes. BYFAVO has a broad label and we believe has potential health economic benefits and may enable shorter procedure times and greater patient throughput. It is indicated for procedural sedation in adults in procedures lasting 30 minutes or less and has a substantial clinical data package demonstrating efficacy and safety in colonoscopies and bronchoscopies, including the most challenging patients.

BARHEMSYS and BYFAVO are sold directly to wholesalers, hospitals and surgery centers through a third-party logistics partner.

Commercial factors impacting our revenues derived from BARHEMSYS and BYFAVO are:
- the effectiveness of our sales force;
- the level of orders submitted by wholesalers, hospitals and surgery centers;
- the level of institutional demand for our products;
- unit sales prices, net of any sales reserves;
- the diversion of management attention to integration matters;
- difficulties in achieving anticipated business opportunities and growth prospects from the acquisition;
- difficulties in assimilating employees; and

11

- potential unknown liabilities, adverse consequences, unforeseen increased expenses or other unanticipated problems associated with the transaction.

**Belrapzo, Bendeka (Licensed to Teva) and Treakisym (Licensed to SymBio) for Chronic Lymphocytic Leukemia and Non-Hodgkin's Lymphoma**

*Overview*

Bendamustine is an alkylating agent approved for use in chronic lymphocytic leukemia, or CLL, and indolent B-cell non-hodgkin's lymphoma, or NHL, that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen (which we refer to herein as the NHL indication).

*Competitive U.S. Marketed Bendamustine Products*

Teva currently markets its lyophilized bendamustine product under the trade name Treanda®. Teva ceased distribution of Treanda® liquid on March 30, 2016. See "*Business—Competition*" and "*Risk Factors—We face significant competition from other biotechnology and pharmaceutical companies, and our operating results will suffer if we fail to compete effectively*."

*Limitations of Competitive U.S. Marketed Bendamustine Products*

Treanda® is a lyophilized powder that requires reconstitution in water prior to use. A 500 mL intravenous (IV) administration is used over 30 or 60 minutes for CLL and NHL patients, respectively. The product is sold in single use vials creating an opportunity for product waste in certain applications.

*Eagle's Solution: Belrapzo and Bendeka*

The Belrapzo and Bendeka liquid formulations eliminate the need to reconstitute the drug prior to use, relative to the lyophilized presentation of Treanda®. As a result, we believe that relative to the lyophilized presentation of Treanda® there is less potential for dosing errors, less exposure to cytotoxic powders and a more efficient work flow.

Additionally, admixtures prepared with Bendeka contain lower sodium as compared with Treanda® which could be of benefit to the predominantly elderly, renally impaired and cardiovascular compromised patients. Also, Bendeka is available in a multi-use vial, which allows infusion centers and hospitals to avoid needless waste of unused drug remaining after procedures with single use vials.

*Belrapzo*

On May 15, 2018, the FDA granted final approval for Belrapzo, a ready-to-dilute, or RTD, multi-dose liquid with extended drug stability for use with a 500mL IV infusion bag.

*License agreement with Cephalon*

Bendeka is the same RTD, multi-dose liquid formulation as Belrapzo, with extended drug stability, but for use with a 50 mL IV infusion bag, which enables it to be administered in a shorter time-period than current drugs on the market and represents a label expansion from Belrapzo. We received orphan drug designation for Bendeka for CLL and NHL in July 2014. We entered into the Cephalon License to market this product. *See License Agreements - Cephalon License Agreement, below.*

*License agreement with SymBio*

On September 20, 2017, we entered into a product collaboration and license agreement, effective as of September 19, 2017 (the "SymBio License Agreement"), with SymBio Pharmaceuticals Limited, or SymBio, for the rights to develop and commercialize our bendamustine hydrochloride ready-to-dilute injection product and rapid infusion injection product in Japan. SymBio currently markets in Japan TREAKISYM, which was originally a lyophilized powder formulation of bendamustine hydrochloride. It is indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma, or MCL, as a first line treatment of low-grade NHL and MCL, and for relapsed-refractory diffuse large B cell lymphoma. Under the SymBio License Agreement, SymBio may continue to market TREAKISYM in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

*Ryanodex® for Malignant Hyperthermia*

*Overview*

Dantrolene was first introduced to the U.S. market in 1979 and is currently the only drug approved to treat a rare genetic disorder called malignant hyperthermia, or MH. There are only estimated to be 500 to 800 cases of MH in the United States each year, qualifying dantrolene for orphan drug designation. This disease is triggered when a patient with this genetic predisposition has a surgical procedure and is exposed to certain inhaled anesthetics or the muscle relaxant, succinylcholine. When this exposure occurs, a metabolic response can be triggered in the patient resulting in an episode of MH that can be fatal if not treated immediately. Because dantrolene is the only approved drug available to treat MH, the Joint Commission on Accreditation of Healthcare Organizations, or the Joint Commission, requires that all hospitals stock vials of this product at all times, generally in the operating room area.

*Competitive U.S. Marketed Products for MH*
The two preexisting injectable dantrolene drugs on the U.S. market for the treatment of MH, Dantrium® and Revonto®, are offered in a vial containing 20mg of lyophilized powder that requires mixing with 60mL of sterile water. See "*Business—Competition*" and "*Risk Factors—We face significant competition from other biotechnology and pharmaceutical companies, and our operating results will suffer if we fail to compete effectively*."

*Limitations of Competitive U.S. Marketed Products*
When an MH crisis occurs during surgery, the surgical procedure is immediately discontinued and the anesthesiologist and others in the operating room quickly begin reconstituting dantrolene, often at the same time as performing other resuscitative efforts, in order to administer the drug to the patient as an IV push. Based on recommendations from the Malignant Hyperthermia Association of the United States, or MHAUS, the recognized authority on treating MH in the United States, the recommended dose is 2.5mg/kg or higher. It is critically important that the drug be administered as rapidly as possible, as MH symptoms include tachycardia, elevated blood pressure, raised $CO_2$ levels and very high body temperature levels. If not treated immediately, the disease can be fatal.

Because of the dosing required in adult patients to reverse the MH symptoms and the current formulations of Dantrium® and Revonto®, it is often necessary to reconstitute 10 to 20 vials of dantrolene. As the current formulations are also poorly water soluble, this process generally takes up to 15 to 20 minutes at a point when time is critical and the patient is extremely unstable. Furthermore, the volume of diluent required to reconstitute Dantrium® and Revonto® means that the adult patient receives a significant volume of fluid (600mL to 1,200mL) as an IV infusion, which on occasion can result in detrimental secondary physiological consequences for the patient, such as pulmonary edema and extravasation, which can lead to tissue necrosis.

*Eagle's Solution: Ryanodex®*

We have developed a differentiated formulation of dantrolene sodium that was approved by the FDA in July 2014 and is currently sold under the brand name, Ryanodex®, for the treatment of MH. The presentation is a 5ml vial containing 250mg of dantrolene sodium in lyophilized powder form.

We believe that the immediate benefits of our Ryanodex® formulation are clinically significant in critical care situations. Specifically, Ryanodex® reduces the amount of time to reconstitute and administer dantrolene from 15 to 20 minutes with Dantrium® and Revonto®, to 1 minute, as the anesthesiologist are able to mix and administer a dose of 250mg from a single vial of Ryanodex® in contrast to mixing and administering up to 12 or more vials of Dantrium® or Revonto®. A recent retrospective study conducted by MHAUS demonstrated that every 15-minute delay in treating MH resulted in a 7.8% increase in patient complications.

**EP-4104 Ryanodex® (dantrolene sodium) for the treatment of organophosphate exposure** *(Nerve Agents)*

Organophosphates are a class of chemicals that include potent pesticides and chemical weapons, known as nerve agents. Acute intoxication with organophospates may result in severe consequences, including brain damage and death. Eagle is currently evaluating Ryanodex for the treatment of brain damage secondary to nerve agent, or NA, exposure. If approved, Ryanodex would represent the first product available for this indication.

13

*Limitations of Current Therapies*

While the standard treatment of atropine and oxime is essential after exposure to a nerve agent, these drugs are not neuroprotective. There are currently no FDA-approved products that treat acute intoxication with organophospates that may result in severe consequences, including brain damage and death.

*Eagle's Solution: Ryanodex*

Ryanodex's presentation would initially be an injectable suspension. We believe that Ryanodex may provide significant benefits over the current standard of care, which may not be readily available in most settings.

*EP-4104 Clinical Development and Regulatory Status*

In May 2019, we announced positive results of our study to evaluate the neuroprotective effects of Ryanodex secondary to NA exposure, conducted with the United States Army Medical Research Institute of Chemical Defense, the nation's leading science and technology laboratory in the area of medical chemical countermeasures research and development. The study results showed a p-value of 0.04 or less compared to the control group in six critical areas of the brain. We believe these results demonstrate the neuroprotective effects of Ryanodex. It has been hypothesized that nerve agent poisoning triggers intracellular calcium release in the body. The study data supports the proposed mechanism of action of Ryanodex, which modulates intracellular calcium in different organs including the brain.

On December 16, 2019, we announced that the FDA granted orphan drug designation, or ODD, for Ryanodex® (dantrolene sodium) for the treatment of organophosphate exposure. On August 8, 2020, we submitted a Special Protocol Assessment, or SPA, to the FDA for Ryanodex for the treatment of brain damage secondary to nerve agent exposure. We are initiating dose ranging studies in another animal model using IV administration using an intermuscular formulation of EA-111. We expect the preliminary results from these studies, if positive, will allow us to update our SPA with the FDA. If approved, Ryanodex would represent the first product available for this indication.

**PEMFEXY® for Lung Cancer**

PEMFEXY is an IV-administered cancer agent indicated for locally advanced or metastatic non-small cell lung cancer and mesothelioma. We have developed PEMFEXY as a ready-to-use/dilute liquid form of pemetrexed that is available in a 25mg/mL per vial. Because our product is available in liquid form, product reconstitution is not required, making EP-5101 a preferred formulation under the Joint Commission guidelines.

*Competitive U.S. Marketed Pemetrexed Product*

The branded form of a pemetrexed product is marketed by Eli Lilly and Company, or Lilly, as Alimta. Alimta is approved for use to treat non-small cell lung cancer and mesothelioma. Alimta's lyophilized formulation utilizes pemetrexed disodium. The product presentations for Alimta are 100mg and 500mg single use vials containing lyophilized powder that must be reconstituted before patient administration. Once mixed, Alimta must be used within 24 hours due to product stability concerns. See "*Business—Competition*" and "*Risk Factors—We face significant competition from other biotechnology and pharmaceutical companies, and our operating results will suffer if we fail to compete effectively*."

*Limitations of Competitive U.S. Marketed Product*

Alimta, a lyophilized pemetrexed disodium formulation requiring reconstitution, adds time to administration, presents cytotoxic safety issues for healthcare professionals administering the drug and the potential for dosing errors. Because reconstitution of Alimta is generally not performed until the patient has cleared all tests necessary to receive the drug, this process contributes to a significant amount of time spent by such patients in infusion clinics. Additionally, this method of administration limits the number of patients that may be treated on any given day by such clinics. Furthermore, as with any oncology drug, cytotoxic vapors released through reconstitution can be potentially harmful to pharmacists, physicians and nurses. Moreover, dosing errors may occur during reconstitution, as incorrect amounts of diluent may be used. As a result, lyophilized formulations are less preferred by the Joint Commission as compared to an RTD product.

14

*Eagle's Solution: PEMFEXY®*

PEMFEXY is an RTD liquid formulation of pemetrexed. As an RTD liquid formulation, PEMFEXY will not require additional time for reconstitution and may avoid certain safety concerns to healthcare professionals, including reducing exposure to the drug's cytotoxic vapors during reconstitution by healthcare providers, and potential dosing errors during mixing. This could allow for a more efficient work flow within the infusion clinic and may result in an opportunity to reduce office staff and see more patients each day.

We submitted an NDA for PEMFEXY on December 30, 2016 for use in non-small cell lung cancer and mesothelioma. On October 27, 2017, we were granted tentative approval for PEMFEXY by the FDA. On December 13, 2019, we reached a settlement agreement with Lilly related to PEMFEXY. The agreement provided for a release of all claims by the parties and allowed for an initial entry of PEMFEXY into the market on February 1, 2022 and a subsequent uncapped entry on April 1, 2022. On February 10, 2020, we received final approval from the FDA for PEMFEXY. Following such approval, on February 1, 2022 we announced the commercial availability of PEMFEXY in the United States.

### EA-114 (fulvestrant) for Breast Cancer

Fulvestrant is an injectable estrogen receptor antagonist. It is used for the treatment of hormone receptor positive advanced breast cancer for post-menopausal women whose disease has progressed following treatment with prior endocrine therapy.

*Competitive U.S. Marketed Product*

The branded form of fulvestrant is Faslodex, a 500mg injectable product marketed by AstraZeneca plc. See "*Business—Competition*" and "*Risk Factors— We face significant competition from other biotechnology and pharmaceutical companies, and our operating results will suffer if we fail to compete effectively.*"

*Limitations of Competitive U.S. Marketed Product*

Faslodex is administered in two deep intramuscular injections of high viscosity product per dose of treatment (5 ml each) over 1-2 minutes into each buttock. The procedure is painful and Faslodex injection reactions have been associated with peripheral nerve adverse reactions, including risk of damaging the sciatic nerve.

*Eagle's Solution: EA-114*

On August 5, 2019, we announced a clinical development plan to support the submission of a NDA for our fulvestrant formulation. Our original formulation of fulvestrant was studied in a clinical trial conducted in 2018 in healthy post-menopausal women. A detailed review of the study data led to the hypothesis that the unique properties of our formulation would potentially allow for greater inhibition of estrogen receptors. Based on this hypothesis, we completed additional work designed to further enhance our proprietary drug formulation. We met with the FDA and mutually agreed to a clinical program that could provide an efficient approval pathway for our fulvestrant formulation. The main goal of the clinical research program was to determine if the unique properties of our fulvestrant formulation would result in greater inhibition of estrogen receptors, potentially leading to improved efficacy outcomes, including lower disease progression rates, compared to current treatment options.

On December 9, 2019, we announced that we had commenced dosing in a pilot clinical study to assess the unique characteristics of our fulvestrant product candidate, which has the potential to enhance estrogen receptorER, inhibition and improve patient outcomes.

Based on discussions with the FDA, we reformulated and plan to commence human pilot studies of our fulvestrant product candidate for the treatment of HR+/HER- advanced breast cancer shortly.

### Other Opportunities

We are pursuing several additional potential products and product indications that address broad indications such as oncology, emergency medicine, infectious diseases and others. We intend to use our novel and well-developed methods to identify ideal development candidates and to commercialize improved formulations of widely prescribed therapeutics.

15

**Sales and Marketing**

Other than products subject to existing commercialization arrangements, we commercialize our product portfolio in the United States and Japan with our commercial organization. Ryanodex, Belrapzo, BARHEMSYS, BYFAVO, and PEMFEXY are marketed by our internal commercial team consisting of 55 direct sales representatives, and other support staff and management. During the first quarter of 2023, we decided to exit the vasopressin market by discontinuing all related manufacturing and halting sales beyond current inventory levels. Inventory on hand and in the distribution channel is expected to be depleted by the end of the second quarter of 2023.

**Major Customer**

We are dependent on our commercial partner, Teva, to market and sell Bendeka. As a result, our future revenues are highly dependent on our collaboration and distribution arrangement with Teva.

Teva markets Bendeka through the Cephalon License. Pursuant to that license agreement, Teva pays us a royalty based on net sales of the product and also purchases the product from us. A disruption in this arrangement caused by, among other things, a supply disruption, loss of exclusivity or the launch of a superior product would have a material adverse effect on our financial position, results of operations and cash flows.

The total revenues broken down by major customers as a percentage of the total are as follows:

|  | Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2022** | **2021** | **2020** |
| **Total revenues** | | | |
| Teva | 33 % | 66 % | 67 % |
| Customer A | 19 % | 7 % | 10 % |
| Customer B | 12 % | 9 % | 5 % |
| Customer C | 12 % | 4 % | 2 % |
| Customer D | 9 % | 8 % | 9 % |
| Other | 15 % | 6 % | 7 % |
|  | 100 % | 100 % | 100 % |

**Manufacturing**

We do not own any manufacturing facilities. The manufacture of sterile injectables is highly reliant on very complex sterile techniques and personnel aseptic techniques which present significant challenges and requires specialized expertise. Further, sterile processes have a high level of scrutiny by regulatory agencies. Consequently, we utilize a network of third party manufacturers for production of our products. All manufacturers are monitored and evaluated by our quality department to assess compliance with regulatory requirements and our internal quality standards and benchmarks.

**Intellectual Property and Exclusivity**

We strive to protect and enhance the proprietary technologies that we believe are important to our business. We seek to obtain and maintain patents for any patentable aspects of our products or product candidates, their methods of use and any other inventions that are important to our business model and maintaining a competitive advantage over generic competitors. Our success will depend significantly on our ability to obtain and maintain patent and other proprietary protection for commercially important technology, inventions and know-how related to our business, defend and enforce our patents, maintain our licenses to use intellectual property owned by third parties, preserve the confidentiality of our trade secrets and operate without infringing the valid and enforceable patents and other proprietary rights of third parties. We also rely on know-how, continuing technological innovation and in-licensing opportunities to develop, strengthen, and maintain our proprietary position in the fields targeted by our products and product candidates.

**Patents and Patent Applications**

We are the exclusive licensee under our license with Lyotropic to a family of patents that relate to low volume formulations of dantrolene, and methods of treatment using dantrolene. There are ten issued U.S. patents, along with issued foreign counterpart

16

patents. The issued U.S. patents cover low volume formulations of dantrolene in reconstitutable and in ready to use liquid form. We expect that the issued patents will expire no later than July 1, 2025.

We are the exclusive licensee in the United States under our license with AOP Orphan Pharmaceuticals GmbH to U.S. families of patents and applications that relate to landiolol, for which AOP Orphan has submitted an NDA to the FDA seeking approval for the short-term reduction of ventricular rate in patients with supraventricular tachycardia ("SVT"), including atrial fibrillation and atrial flutter. There are three issued U.S. patents, along with a pending U.S. application. We expect that the issued patents will expire no earlier than 2027.

We are the sole owner of over 15 issued U.S. patents, four pending U.S. patent applications, and multiple corresponding foreign patents and/or corresponding foreign filings for patent applications in a number of jurisdictions covering various formulations and methods of use of bendamustine. We are currently prosecuting these applications, which, if issued, would expire between 2031 and 2033.

We are the owner of U.S. Patent No. 8,431,539 expiring July 20, 2031 and covering daptomycin.

We are the sole owner of one issued U.S. patent and five pending U.S. patent applications, as well as several foreign patents and/or foreign patent applications, covering various formulations and/or methods of use of pemetrexed. We expect that the issued patents will expire between 2031 and 2036.

Our wholly owned subsidiary, Acacia Pharma, is the sole owner of Orange-Book listed U.S. Pat. No. 9,084,765; 9,545,426; 9,889,118; 10,525,033; and 11,357,753, covering approved indications for BARHEMSYS (amisulpride), as well as U.S. Pat. No. 8,686,019; 9,119,836; 10,085,970; and 10,322,106 covering additional methods of use of amisulpride. Acacia Pharma also owns three pending U.S. patent applications and multiple corresponding foreign patents and/or applications in a number of jurisdictions covering various methods of use of amisulpride. We expect that the granted and pending cases will expire between 2031 and 2041.

Acacia is also the exclusive licensee under a license with Paion UK Limited to over 15 issued U.S. patents and four U.S. pending patent applications relating to methods of use and formulations of remimazolam besylate salts, processes of making remimazolam, orally inhaled and nasal drug products comprising remimazolam or its salt forms, and use of remimazolam or its salt forms for general anesthesia. The issued patents are set to expire between 2027 and 2034. Further, Acacia is the licensee of one issued U.S. patent (U.S. Patent No. 8,642,588, expiring August 27, 2029) that relates to remimazolam esylate salts and the method of use thereof.

We are the exclusive licensee under our license with Combioxin S.A. to families of patents and applications that relate to CAL02, a liposomal agent that is currently in development for the treatment of severe pneumonia. There is one issued U.S. patent, along with issued foreign counterpart patents. Additional U.S. and foreign patent applications are pending. We expect that the issued patents will expire no earlier than 2033.

We also have a patent portfolio of issued and/or pending U.S. patent applications and corresponding foreign patent application in a range of countries that cover our biologics platform technologies. We are the sole owner of U.S. Patent Nos. 9,833,513, 9,913,905, 9,925,263, 10,821,183, 10,821,184, 10,179,172, 10,646,571, 10,849,977, and 11,471,479 expiring between 2034 and 2036.

**Trade Secrets and Proprietary Information**

Trade secrets play an important role in protecting our products and provide protection beyond patents and regulatory exclusivity. The scale-up and commercial manufacture of our products involves processes, custom equipment, and in-process and release analytical techniques that we believe are unique to us. We also seek to preserve the integrity and confidentiality of our proprietary technology and processes by maintaining physical security of our premises and physical and electronic security of our information technology systems. While we have confidence in these security measures, individuals, organizations and systems, agreements or security measures may be breached, and we may not have adequate remedies for any breach. In addition, our proprietary technology and processes may otherwise become known or be independently discovered by competitors. To the extent that our employees, consultants, scientific advisors, contractors or any future collaborators use intellectual property owned by others in their work for us, disputes may arise as to the rights in related or resulting know-how and inventions. We seek to protect our proprietary information, including our trade secrets and proprietary know-how, by requiring third parties with whom we contract for services related to our products, including manufacturing services to agree to

17

terms in our agreements with such third parties that protect our confidential and trade secret information. We also require our employees, consultants and other advisors to execute proprietary information and confidentiality agreements upon the commencement of their employment or engagement. These agreements generally provide that all confidential information developed or made known during the course of the relationship with us be kept confidential and not be disclosed to third parties except in specific circumstances. In the case of our employees, the agreements also typically provide that all inventions resulting from work performed for us, utilizing our property or relating to our business and conceived or completed during employment shall be our exclusive property to the extent permitted by law. Where appropriate, agreements we obtain with our consultants also typically contain similar assignment of invention obligations. Further, we require confidentiality agreements from entities that receive our confidential data or materials.

**License Agreements**

*License Agreement with Lyotropic Therapeutics, Inc.*

In October 2008, we entered into a license and sublicense agreement with Lyotropic Therapeutics, Inc., or Lyotropic, under which we were granted an exclusive license under Lyotropic's intellectual property rights relating to dantrolene, and an exclusive worldwide sublicense under certain nanocrystal technology relating to a formulation of dantrolene licensed by Alkermes, Inc. (as successor in interest to Elan Pharma International Limited), or Alkermes, to Lyotropic under an August 2004 license agreement between Alkermes and Lyotropic.

*Development and License Agreement with Robert One, LLC (bendamustine)*

In March 2008 we entered into a development and license agreement with Robert One, LLC, or Robert One in which Robert One assigned to us certain patents relating to bendamustine and four additional 505(b)(2) products and/or ANDA products under development, or the Robert One (bendamustine) Subject Products, and granted us an exclusive, sub-licensable, license under Robert One's intellectual property rights to develop make, use, sell and import Robert One (bendamustine) Subject Products worldwide (excluding China) with respect to bendamustine and other 505(b)(2) product applications and in North America with respect to ANDA product applications.

Under the terms of this agreement, no further milestone payments are due to Robert One. We are required to make royalty payments based on gross profits of sales of the Robert One (bendamustine) Subject Products by us and our affiliates in the Territory (i) at 10%, pursuant to an amendment in 2013, for bendamustine products and (ii) at 50% for products, other than bendamustine products, that achieve regulatory approval and are commercialized on the basis of a 505(b)(2) application (provided that we are entitled to recoup all of our expenses related to the development of a product commercialized under a 505(b)(2) application prior to splitting the profits we receive from such product), and (iii) at 30% with respect to products, other than bendamustine products, that are commercialized on the basis of an ANDA application. Our royalty obligations continue on a product-by-product basis until the later of ten years after the first commercial sale of each Robert One (bendamustine) Subject Product and the expiration of the last valid claim covering such Robert One (bendamustine) Subject Product, subject to certain reductions in the event that there is no valid patent claim covering the manufacture, use, import or sale of such Robert One (bendamustine) Subject Product in a country in the territory.

*Development and License Agreement with Robert One, LLC (pemetrexed)*

In February 2009 we entered into a development and license agreement with Robert One, in which Robert One assigned to us certain patents relating to pemetrexed and four additional 505(b)(2) products and/or ANDA products under development ("the Robert One 2009 Subject Products") and granted us an exclusive, sub-licensable, license under Robert One's intellectual property rights to develop make, use, sell and import Robert One 2009 Subject Products worldwide (excluding China) with respect to pemetrexed and other 505(b)(2) product applications and in North America with respect to ANDA product applications. On December 9, 2022, we entered into an amendment to the development and license agreement.

Under the original terms of the development and license agreement, we were required to make royalty payments on Gross Profits (as defined in the agreement) derived from the Robert One 2009 Subject Products at rates equal to (i) fifty percent with respect to a 505(b)(2) application; (ii) thirty percent with respect to an ANDA application; and (iii) twenty-five percent with respect to pemetrexed parenteral formulation. Under the terms of the amendment agreement, the applicable royalty rates due by us on Gross Profits (as defined in the agreement) derived from the Robert One 2009 Subject Products were amended to (i) thirty percent with respect to a 505(b)(2) application; (ii) thirty percent with respect to an ANDA application; and (iii) with respect to pemetrexed parenteral formulation, (a) ten percent on Gross Profits greater than $85,000,000 and (b) twelve percent on Gross Profits greater than $115,000,000. In addition, under the terms of the amendment, no royalty payment is due on Gross Profits

18

derived from pemetrexed parenteral formulation that are less than $85,000,000. In exchange for the foregoing amended royalty rates, we made a one-time lump sum payment of $15,000,000 to Robert One on January 3, 2023.

*License Agreement with Cephalon*

On February 13, 2015, we submitted an NDA to the FDA for Bendeka which was approved by the FDA on December 8, 2015. Also, on February 13, 2015, we entered into the Cephalon License with Cephalon, for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. Subsequently, with our consent, Cephalon assigned to Teva Pharmaceuticals International GmbH, or TPIG, all of Cephalon's rights and obligations under the Cephalon License. TPIG is responsible for preforming Cephalon's obligations and has Cephalon's rights under the agreement.. Pursuant to the terms of the Cephalon License, TPIG is responsible for all U.S. commercial activities for the product including promotion and distribution, and we are responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies. Additionally, under the terms of the Cephalon License, we received an upfront cash payment of $30 million, a $15 million milestone payment in January 2016 in connection with the FDA approval of Bendeka in December 2015, a $40 million milestone in the fourth quarter of 2016 in connection with the receipt of the J-Code for Bendeka and in the first quarter of 2017, Bendeka reached $500 million in cumulative net sales, triggering an additional $25 million sales-based milestone payment. In addition, the royalty payments of 20% of net sales of the product that we were entitled to receive increased to 25% on receipt of the J-Code. In connection with the Cephalon License, we have entered into a supply agreement with TPIG, pursuant to which we are responsible for supplying product to TPIG.

On April 13, 2019, we and Teva entered into an amendment to the Cephalon License, amending the terms of the License Agreement to increase the U.S. royalty paid to us and re-allocate certain litigation expenses. Pursuant to the Amendment, beginning on October 1, 2019,our royalty payment increased from 25% to 30% of Bendeka net United States sales. The royalty rate increased by one percentage point on October 1, 2020, and will continue to increase by one percentage point on each anniversary of October 1, 2019 until it reaches 32%, and it will remain at 32% thereafter. The Amendment also extends the U.S. royalty term for Bendeka until it is no longer sold in the United States. The previous royalty term was set to expire in 2025. The extended term coincides with the bendamustine patents with expiries through 2033. Pursuant to the amendment, we will continue to be responsible for the manufacture of Bendeka for the U.S. market for so long as it is sold in the United States. Pursuant to the amendment, we have also agreed to assume a portion of Bendeka-related patent litigation expenses.

In March 2019, we received an upfront cash payment of $9.0 million upon execution of an amendment to the Cephalon License to terminate Teva's obligation to pay future milestones and royalties on Bendeka sales outside of the U.S.

*Cephalon Settlement*

On February 13, 2015, we entered into the Cephalon Settlement Agreement with Cephalon, in connection with the Cephalon License, pursuant to which the parties agreed to settle the pending patent infringement claims against each other regarding Cephalon's US Patent No. 8,791,270, under which we agreed to enter into a Consent Judgment regarding the '270 patent. As part of the Cephalon Settlement Agreement, Cephalon has agreed to waive its orphan drug exclusivities for the treatment of patients with CLL and patients with NHL.

*Product Collaboration and License Agreement with SymBio*

On September 20, 2017, we entered into the SymBio License with SymBio for the rights to develop and commercialize EP-3101 and Bendeka, or collectively, the Products, in Japan. Under the SymBio License, SymBio is responsible for all development of the Products in Japan and for obtaining and maintaining all regulatory approvals of the Products in Japan. SymBio bears all costs of development of the Products in Japan except that, if Japanese regulatory authorities require a certain clinical study to be conducted as a condition for approving one of the Products in Japan, we would share 50% of the out-of-pocket costs of that clinical study up to a specified dollar amount as a reduction to future royalty payments. Based on our assessment of the probability of additional costs, we have not deferred revenue on the SymBio License. SymBio will also be responsible, at its sole cost, for all marketing, promotion, distribution and sales of the Products in Japan and is obligated to launch the Products and meet certain minimum detailing, promotion and marketing commitments in connection with commercialization of the Products in Japan.

SymBio currently markets in Japan TREAKISYM, which was originally a lyophilized powder formulation of bendamustine hydrochloride. It is indicated for CLL, relapsed or refractory low-grade NHL, mantle cell lymphoma, or MCL, as a first line treatment of low-grade NHL and MCL, and for relapsed-refractory diffuse large B cell lymphoma. Under the SymBio License,

19

SymBio may continue to market TREAKISYM in Japan and SymBio will be permitted to develop and market certain other bendamustine hydrochloride products in Japan for limited indications.

Pursuant to the terms of the SymBio License, we and SymBio will enter into a separate supply agreement, under which we will be responsible for manufacturing and supplying the Products to SymBio for development and commercialization in Japan. After a period of time following launch of a Product, SymBio will have the right to assume the responsibility for manufacturing of the Products in and for Japan. Under the SymBio License, we will retain the right to control the prosecution, maintenance and enforcement of our patents covering the Products, both inside and outside of Japan.

Under the SymBio License, we earned an upfront non-refundable cash payment of $12.5 million in the third quarter of 2017 and a $5.0 million milestone payment in the third quarter of 2020 when SymBio, received regulatory approval for TREAKISYM from the Pharmaceuticals and Medical Devices Agency, or PMDA, in Japan. We are eligible to receive a milestone payment upon achievement of certain cumulative net sales of the Products in Japan. We will also receive tiered, low double-digit royalties on net sales of the Products in Japan for so long as there are patents covering the Products in Japan or regulatory exclusivity for the Products in Japan. Potential payments to us could reach $10 to $25 million per year in royalties and milestones.

On September 23, 2020, we announced that SymBio had received approval for Treakisym RTD liquid formulation in Japan. The approval covered all indications for which TREAKISYM was approved for at the time (low-grade non-Hodgkin's lymphoma, mantle cell lymphoma, and chronic lymphocytic leukemia). Approval for the additional indication of relapsed-refractory diffuse large B cell lymphoma was also granted.

*License Agreement with Combioxin*

In August 2021, we entered into a license agreement with Combioxin, SA, or Combioxin, under which we were granted exclusive, worldwide development and commercialization rights to CAL02, a novel first-in-class anti-infective agent ready for Phase 2b/3 clinical trial development for the treatment of severe pneumonia in combination with traditional antibacterial drugs. We are solely responsible for the development, regulatory, manufacturing and commercialization activities of CAL02. Combioxin will assist us in transitioning the manufacturing and supply of CAL02 to the Company.

Under the terms of the agreement, we made an upfront payment of $10 million. We may pay to Combioxin up to $105 million upon achievement of certain development, regulatory and sales based milestone payments plus royalty payments at royalty rates ranging in low double digit percentages on the net sales of all products sold, subject to certain adjustments as provided in the agreement. The Company is also obligated to make certain payments based upon amounts received by sublicensees under the agreement.

*License agreement with AOP Orphan*

In August 2021, we entered into a licensing agreement with AOP Orphan, a privately owned Austrian company devoted to the treatment of rare and special diseases, for the commercial rights to its product, Landiolol in the United States. Landiolol, a leading hospital emergency use product, is currently approved in Europe for the treatment of non-compensatory sinus tachycardia and tachycardic supraventricular arrhythmias. We will support the submission of a NDA by AOP Orphan to the FDA seeking approval for Landiolol for the short term reduction of ventricular rate in patients with supraventricular tachycardia, including atrial fibrillation and atrial flutter. On June 1, 2022, we announced that AOP Orphan, with whom we entered into a licensing agreement in August 2021, submitted an NDA to the FDA for landiolol, a short-acting, intravenous ("IV"), cardio-selective beta-1 adrenergic blocker [product candidate]. The submission seeks approval for landiolol for the short-term reduction of ventricular rate in patients with supraventricular tachycardia ("SVT"), including atrial fibrillation and atrial flutter. The FDA's decision with respect to approval is expected in mid-2023. Patient enrollment for a study of pediatric patients with supraventricular tachycardia is underway in Europe.

Under the terms of the agreement, we made an upfront payment of $5 million. We may pay to AOP Orphan additional amounts upon achievement of certain regulatory milestone payments plus profit share payments, subject to certain adjustments as provided in the agreement. We also entered into a supply agreement at the same time as the licensing agreement.

**Enalare Transaction**

On August 8, 2022, we entered into a Securities Purchase Agreement with and Enalare, pursuant to which we have committed to provide equity investments of up to $55 million in Enalare (the "Purchase Agreement"). Concurrently with the execution of the Purchase Agreement, we, Enalare and holders of all of the outstanding capital stock, and any securities or options exercisable for capital stock, of Enalare (the "Securityholders") entered into a Security Purchase Option Agreement, pursuant to

20

which we have the option (the "Purchase Option") to acquire all of the remaining outstanding shares of Enalare other than those already owned by us subject to the terms and conditions of the agreement (the "Option Agreement").

### *The Securities Purchase Agreement*

Pursuant to the Purchase Agreement, we made two initial equity investments of $12.5 million each (the "Initial Investment") in Enalare on August 8, 2022 and February 8, 2023, respectively, pursuant to which we acquired 24,902 shares of Enalare common stock, par value $0.0001 per share (the "Enalare Common Stock") on August 8, 2022. The Initial Investment is expected to support the research, development and commercialization of Enalare's lead compound, ENA001, an agnostic respiratory stimulant for post-surgery respiratory depression. The Purchase Agreement further provides that upon the achievement of certain milestones, we will be required to make two additional equity investments in Enalare, each in an aggregate amount of $15 million. The first $15 million investment shall occur upon the dosing of the first patient in a Phase 2 human clinical trial of any product containing the active ingredient ENA-001 (a "Product Candidate") (such investment, the "First Milestone Share Purchase"). If the First Milestone Share Purchase occurs, we would receive a number of shares representing approximately 9.8% of Enalare in exchange for the additional $15 million payment. The second $15 million investment shall occur when patient enrollment in the Phase 2 human clinical trial of a Product Candidate reaches 50% (the "Second Milestone Share Purchase" and, together with the First Milestone Share Purchase, the "Milestone Share Purchases"). If the Second Milestone Share Purchase occurs, we would receive a number of shares representing 9.5% of Enalare in exchange for the second additional $15 million payment. Should the completion of the Milestone Share Purchases occur, we would own approximately 33% of Enalare's outstanding Enalare Common Stock.

We may terminate the Purchase Agreement following the closing of our second $12.5 million investment at any time in our sole and absolute discretion with thirty (30) days' written notice to Enalare.

### *The Security Purchase Option Agreement*

Pursuant to the Option Agreement, we have the option (but not the obligation) to acquire, in whole, all of the outstanding shares of Enalare other than those already owned by us (i) via a direct acquisition option or (ii) by entering into a definitive agreement with Enalare containing the terms, covenants and conditions set forth in the term sheet attached as Exhibit A to the Option Agreement, in each case for an amount equal to approximately $100 million to $175 million in the aggregate plus additional amounts as set forth in the agreement. The term of the Purchase Option (the "Option Period") commenced on August 8, 2022 and will end upon the earlier of (x) 90 days following the U.S. Food and Drug Administration ("FDA") communication of proceed to clinical for a Phase 3 clinical study for a Product Candidate or (y) June 30, 2027. Enalare shall not initiate Phase 3 pivotal studies prior to the end of the Option Period and we shall have reasonable access to all relevant data and documents following the Phase 3 Milestone (as defined in the Option Agreement).

Pursuant to the Option Agreement, if a Priority Review Voucher were to be granted with respect to the first Product Candidate, ("PRV"), we would be required to pay to the Enalare stockholders at the time of closing 9-12% of all proceeds received from the sale of any such PRV. If we were to use the PRV, if any, for an application, we would be required to pay to the Enalare stockholders at the time of closing an agreed dollar amount.

We may terminate the Option Agreement at any time in our sole and absolute discretion with thirty (30) days' written notice to Enalare.

### Competition

The pharmaceutical and biotechnology industries are intensely competitive and subject to rapid and significant technological change. Our competitors include organizations such as major multinational pharmaceutical companies, established biotechnology companies, specialty pharmaceutical companies and generic drug companies. For example, Ryanodex, and products with dantrolene sodium as the API, is currently marketed in the United States by, among others, Endo International plc, Impax Laboratories, Inc., Hikma Pharmaceuticals, LLC, US WorldMeds, LLC, Mylan Institutional, LLC, and Elite Laboratories, Inc. Many of our competitors have greater financial and other resources than we have, such as more commercial resources, larger research and development staffs and more extensive marketing and manufacturing organizations. As a result, these companies may obtain marketing approval more rapidly than we are able and may be more effective in selling and marketing their products. Smaller or early stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large, established companies.

Our competitors may succeed in developing, acquiring or licensing on an exclusive basis technologies and drug products that are more effective or less costly than products that we are currently selling through partners or developing or that we may develop, which could render our products obsolete and noncompetitive. We expect any products that we develop and commercialize to compete on the basis of, among other things, efficacy, safety, convenience of administration and delivery, price and the availability of reimbursement from government and other third-party payors. We also expect to face competition in our efforts to identify appropriate collaborators or partners to help commercialize our product portfolio in our target

commercial markets. See "*Risk Factors—We face significant competition from other biotechnology and pharmaceutical companies, and our operating results will suffer if we fail to compete effectively.*"

**Government Regulation**

*FDA Approval Process for Drugs*

In the United States, pharmaceutical products are subject to extensive regulation by the FDA. The Federal Food, Drug and Cosmetic Act, or FDCA, and in the case of biologics, the Public Health Service Act, or PHSA, and other federal and state statutes and regulations, govern, among other things, the research, development, testing, manufacture, storage, recordkeeping, approval, labeling, promotion and marketing, distribution, post-approval monitoring and reporting, sampling, and import and export of pharmaceutical products. Failure to comply with applicable FDA or other requirements may subject a company to a variety of administrative or judicial sanctions, such as FDA refusal to approve pending applications, clinical holds, warning or untitled letters, product recalls, product seizures, total or partial suspension of production or distribution, withdrawal of product from the market, injunctions, fines, civil penalties and criminal prosecution.

FDA approval is required before any new unapproved drug biologic or dosage form, including a new use of a previously approved drug, can be marketed in the United States. The process required by the FDA before a new drug may be marketed in the United States generally involves:

- completion of pre-clinical laboratory and animal testing and formulation studies in compliance with the FDA's current good laboratory practice, or cGLP, regulations;
- submission to the FDA of an Investigational New Drug, or IND, application for human clinical testing which must become effective before human clinical trials may begin in the United States;
- approval by an independent institutional review board, or IRB, at each clinical trial site before each trial may be initiated;
- performance of adequate and well-controlled human clinical trials in accordance with current good clinical practices, or cGCP, to establish the safety and efficacy of the proposed drug product for each intended use;
- satisfactory completion of an FDA pre-approval inspection of the facility or facilities at which the product is manufactured to assess compliance with the FDA's cGMP regulations to assure that the facilities, methods and controls are adequate to preserve the drug's identity, strength, quality and purity;
- submission to the FDA of an NDA or BLA;
- satisfactory completion of a potential review by an FDA advisory committee, if applicable; and
- FDA review and approval of the NDA or BLA.

The preclinical and clinical testing and approval process takes many years and the actual time required to obtain approval, if any, may vary substantially based upon the type, complexity and novelty of the product or disease.

Preclinical tests include laboratory evaluation of product chemistry, formulation and toxicity, as well as animal studies to assess the characteristics and potential safety and efficacy of the product. The conduct of the preclinical tests must comply with federal regulations and requirements, including cGLPs. The results of preclinical testing are submitted to the FDA as part of an IND application along with other information, including information about product chemistry, manufacturing and controls and a proposed clinical trial protocol. Long-term preclinical tests, such as animal tests of reproductive toxicity and carcinogenicity, may continue after the IND application is submitted.

The IND application automatically becomes effective 30 days after receipt by the FDA, unless the FDA, within the 30-day time period, raises concerns or questions relating to one or more proposed clinical trials and places the clinical trial on a clinical hold, including concerns that human research subjects will be exposed to unreasonable health risks. In such a case, the IND sponsor and the FDA must resolve any outstanding concerns before the clinical trial can begin. A separate submission to an existing IND application must also be made for each successive clinical trial conducted during product development. Further, an independent IRB, covering each site proposing to conduct the clinical trial must review and approve the plan for any clinical trial and informed consent information for subjects before the trial commences at that site and it must monitor the study until completed. The FDA, the IRB, or the sponsor may suspend a clinical trial at any time on various grounds, including a finding that the subjects or patients are being exposed to an unacceptable health risk or for failure to comply with the IRB's requirements, or may impose other conditions. Clinical trials involve the administration of the investigational new drug to healthy volunteers or patients under the supervision of a qualified investigator in accordance with cGCP requirements, which include the requirement that all research subjects provide their informed consent in writing for their participation in any clinical trial. Sponsors of clinical trials generally must register and report, at the NIH-maintained website ClinicalTrials.gov, key

22

parameters of certain clinical trials. For purposes of an NDA submission and approval, human clinical trials are typically conducted in the following sequential phases, which may overlap or be combined:

Phase 1:    In Phase 1, through the initial introduction of the drug into healthy human subjects or patients, the drug is tested to assess metabolism, pharmacokinetics, pharmacological actions, side effects associated with increasing doses, and, if possible, early evidence on effectiveness.

Phase 2:    Phase 2 usually involves trials in a limited patient population to determine the effectiveness of the drug for a particular indication, dosage tolerance and optimum dosage, and to identify common adverse effects and safety risks.

Phase 3:    Phase 3 trials are undertaken to obtain the additional information about clinical efficacy and safety in a larger number of patients, typically at geographically dispersed clinical trial sites, to permit the FDA to evaluate the overall benefit-risk relationship of the drug and to provide adequate information for the labeling of the drug. In most cases, the FDA requires two adequate and well controlled Phase 3 clinical trials to demonstrate the efficacy of the drug. A single Phase 3 trial with other confirmatory evidence may be sufficient in rare instances where the study is a large multicenter trial demonstrating internal consistency and a statistically persuasive finding of a clinically meaningful effect on mortality, irreversible morbidity or prevention of a disease with a potentially serious outcome and confirmation of the result in a second trial would be practically or ethically impossible.

After completion of the required clinical testing, an application is prepared and submitted to the FDA. FDA approval of the NDA is required before marketing of the product may begin in the United States. The NDA must include the results of all preclinical, clinical and other testing and a compilation of data relating to the product's pharmacology, chemistry, manufacture and controls. Under federal law, the submission of most applications is subject to a substantial application user fee, and the manufacturer and/or sponsor under an approved application is also subject to annual product and establishment user fees.

The FDA has 60 days from its receipt of an NDA to determine whether the application will be accepted for filing based on the agency's threshold determination that it is sufficiently complete to permit substantive review. The FDA may request additional information rather than accept an application for filing. In this event, the application must be resubmitted with the additional information and is subject to payment of additional user fees. The resubmitted application is also subject to review before the FDA accepts it for filing. Once the submission is accepted for filing, the FDA begins an in-depth substantive review. Under PDUFA the FDA has agreed to certain performance goals in the review of NDAs through a two-tiered classification system, Standard Review and Priority Review. Priority Review designation is given to drugs that offer major advances in treatment, or provide a treatment where no adequate therapy exists. The FDA endeavors to review applications subject to Standard Review within ten to twelve months, whereas the FDA's goal is to review Priority Review applications within six to eight months, depending on whether the drug is a new molecular entity.

The FDA may refer applications for novel drug products or drug products which present difficult questions of safety or efficacy to an advisory committee for review, evaluation and recommendation as to whether the application should be approved and under what conditions.

Before approving an NDA, the FDA will typically inspect one or more clinical sites to assure compliance with cGCP requirements. Additionally, the FDA will inspect the facility or the facilities at which the drug is manufactured. The FDA will not approve the product unless it determines that the manufacturing process and facilities are in compliance with cGMP requirements and are adequate to assure consistent production of the product within required specifications and the application contains data that provide substantial evidence that the drug is safe and effective in the indication studied.

After the FDA evaluates the NDA and the manufacturing facilities, it issues either an approval letter or a complete response letter to indicate that the review cycle for an application is complete and that the application is not ready for approval. A tentative approval is issued to a 505(b)(2) NDA if the sponsor must await the expiration of an Orange Book listed patent covering the reference product. A complete response letter generally outlines the deficiencies in the submission and may require substantial additional testing, or information, in order for the FDA to reconsider the application. Even with submission of this additional information, the FDA may ultimately decide that an application does not satisfy the regulatory criteria for approval. If, or when, the deficiencies have been addressed to the FDA's satisfaction in a resubmission of the application, the FDA will issue an approval letter. An approval letter authorizes commercial marketing of the drug with specific prescribing information for specific indications.

As a condition of NDA or BLA approval, the FDA may require a Risk Evaluation and Mitigation Strategies ("REMS") program

23

to help ensure that the benefits of the drug outweigh the potential risks. If the FDA determines a REMS program is necessary during review of the application, the drug sponsor must agree to the REMS plan at the time of approval. A REMS program may be required to include various elements, such as a medication guide or patient package insert, a communication plan to educate healthcare providers of the drug's risks, limitations on who may prescribe or dispense the drug, or other elements to assure safe use, such as special training or certification for prescribing or dispensing, dispensing only under certain circumstances, special monitoring and the use of patient registries. In addition, the REMS must include a timetable to periodically assess the strategy. The requirement for a REMS program can materially affect the potential market and profitability of a drug.

Moreover, product approval may require substantial post-approval testing and surveillance to monitor the drug's safety or efficacy, and the FDA has the authority to prevent or limit further marketing of a product based on the results of these post-marketing programs. Once granted, product approvals may be withdrawn if compliance with regulatory standards is not maintained or problems are identified following initial marketing. Drugs may be marketed only for the approved indications and in accordance with the provisions of the approved label, and, even if the FDA approves a product, it may limit the approved indications for use for the product or impose other conditions, including labeling or distribution restrictions or other risk-management mechanisms.

Further changes to some of the conditions established in an approved application, including changes in indications, labeling, or manufacturing processes or facilities, require submission and FDA approval of a new NDA or NDA supplement before the change can be implemented, which may require us to develop additional data or conduct additional pre-clinical studies and clinical trials. An NDA supplement for a new indication typically requires clinical data similar to that in the original application, and the FDA uses the similar procedures in reviewing supplements as it does in reviewing original applications.

*Post-Approval Requirements*

Once an NDA is approved, a product will be subject to pervasive and continuing regulation by the FDA, including, among other things, requirements relating to drug listing and registration, recordkeeping, periodic reporting, product sampling and distribution, adverse event reporting and advertising, marketing and promotion, including standards and regulations for direct to consumer advertising, off-label promotion, industry-sponsored scientific and educational activities and promotional activities involving the internet. Drugs may be marketed only for the approved indications and in accordance with the provisions of the approved labeling. While physicians may prescribe for off-label uses, manufacturers may only promote for the approved indications and in accordance with the provisions of the approved label. However, companies may share truthful and not misleading information that is otherwise consistent with a product's FDA approved labeling. The FDA and other agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses, and a company that is found to have improperly promoted off-label uses may be subject to significant liability.

In addition, quality-control, drug manufacture, packaging and labeling procedures must continue to conform to cGMPs after approval. Drug manufacturers and certain of their subcontractors are required to register their establishments with the FDA and certain state agencies. Registration with the FDA subjects entities to periodic unannounced and announced inspections by the FDA and these state agencies, during which the agency inspects manufacturing facilities to assess compliance with cGMPs. Accordingly, manufacturers must continue to expend time, money, and effort in the areas of production and quality-control to maintain compliance with cGMPs. Regulatory authorities may withdraw product approvals or request product recalls if a company fails to comply with regulatory standards, if it encounters problems following initial marketing, or if previously unrecognized problems are subsequently discovered. The FDA may also impose a REMS requirement on a drug already on the market if the FDA determines, based on new safety information, that a REMS is necessary to ensure that the drug's benefits outweigh its risks. In addition, regulatory authorities may take other enforcement action, including, among other things, warning letters, the seizure of products, injunctions, consent decrees placing significant restrictions on or suspending manufacturing operations, refusal to approve pending applications or supplements to approved applications, civil penalties and criminal prosecution.

In addition, the distribution of prescription pharmaceuticals is subject to the Drug Supply Chain Security Act requirements for medicine identification, tracing and verification, among others, that are designed to detect and remove counterfeit, stolen, contaminated or otherwise potentially harmful drugs from the U.S. drug supply chain. A growing majority of states also impose certain drug pedigree requirements on the sale and distribution of prescription drugs.

The FDA may require post-approval studies and clinical trials if the FDA finds that scientific data, including information regarding related drugs, deem it appropriate. The purpose of such studies would be to assess a known serious risk or signals of serious risk related to the drug or to identify an unexpected serious risk when available data indicate the potential for a serious

24

risk. The FDA may also require a labeling change if it becomes aware of new safety information that it believes should be included in the labeling of a drug.

*The Hatch-Waxman Amendments*

*ANDA Approval Process*

The Hatch-Waxman Act established abbreviated FDA approval procedures for drugs that are shown to be equivalent to proprietary drugs previously approved by the FDA through its NDA process. Approval to market and distribute these drugs is obtained by filing an ANDA with the FDA. An ANDA is a comprehensive submission that contains, among other things, data and information pertaining to the active pharmaceutical ingredient, drug product formulation, specifications and stability of the generic drug, as well as analytical methods, manufacturing process validation data and quality control procedures. Premarket applications for generic drugs are termed abbreviated because they generally do not include preclinical and clinical data to demonstrate safety and effectiveness. Instead, a generic applicant must demonstrate that its product is bioequivalent to the innovator drug. In certain situations, an applicant may obtain ANDA approval of a generic product with a strength or dosage form that differs from a referenced innovator drug pursuant to the filing and approval of an ANDA Suitability Petition. The FDA will approve the generic product as suitable for an ANDA application if it finds that the generic product does not raise new questions of safety and effectiveness as compared to the innovator product. A product is not eligible for ANDA approval if the FDA determines that it is not equivalent to the referenced innovator drug, if it is intended for a different use, or if it is not subject to an approved Suitability Petition. However, such a product might be approved under an NDA, with supportive data from clinical trials.

*505(b)(2) NDAs*

As an alternative path to FDA approval for modifications to formulations or uses of products previously approved by the FDA, an applicant may submit an NDA under Section 505(b)(2) of the FDCA. Section 505(b)(2) was enacted as part of the Hatch-Waxman Amendments and permits the filing of an NDA where at least some of the information required for approval comes from studies not conducted by, or for, the applicant. If the 505(b)(2) applicant can establish that reliance on FDA's previous findings of safety and effectiveness is scientifically appropriate, it may eliminate the need to conduct certain preclinical or clinical studies of the new product. The FDA may also require companies to perform additional studies or measurements, including clinical trials, to support the change from the approved branded reference drug. The FDA may then approve the new product candidate for all, or some, of the label indications for which the branded reference drug has been approved, as well as for any new indication sought by the 505(b)(2) applicant.

*Orange Book Listing*

In seeking approval for a drug through an NDA, including a 505(b)(2) NDA, applicants are required to list with the FDA certain patents whose claims cover the applicant's product. Upon approval of an NDA, each of the patents listed in the application for the drug is then published in the Orange Book. Any applicant who files an ANDA seeking approval of a generic equivalent version of a drug listed in the Orange Book or a 505(b)(2) NDA referencing a drug listed in the Orange Book must certify to the FDA that (1) no patent information on the drug product that is the subject of the application has been submitted to the FDA; (2) such patent has expired; (3) the date on which such patent expires; or (4) such patent is invalid or will not be infringed upon by the manufacture, use or sale of the drug product for which the application is submitted. This last certification is known as a paragraph IV certification. A notice of the paragraph IV certification must be provided to each owner of the patent that is the subject of the certification and to the holder of the approved NDA to which the ANDA or 505(b)(2) application refers. The applicant may also elect to submit a "section viii" statement certifying that its proposed label does not contain (or carves out) any language regarding the patented method-of-use rather than certify to a listed method-of-use patent.

If the reference NDA holder and patent owners assert a patent challenge directed to one of the Orange Book listed patents within 45 days of the receipt of the paragraph IV certification notice, the FDA is prohibited from approving the application until the earlier of 30 months from the receipt of the paragraph IV certification expiration of the patent, settlement of the lawsuit or a decision in the infringement case that is favorable to the applicant. The ANDA or 505(b)(2) application also will not be approved until any applicable non-patent exclusivity listed in the Orange Book for the branded reference drug has expired as described in further detail below.

25

*Non-Patent Exclusivity*

In addition to patent exclusivity, the holder of the NDA for the listed drug may be entitled to a period of non-patent exclusivity, during which the FDA cannot approve an ANDA or 505(b)(2) application that relies on the listed drug. For example, a pharmaceutical manufacturer may obtain five years of non-patent exclusivity upon NDA approval of a new chemical entity, or NCE, which is a drug that contains an active moiety that has not been approved by FDA in any other NDA. An "active moiety" is defined as the molecule or ion responsible for the drug substance's physiological or pharmacological action. During the five year exclusivity period, the FDA cannot accept for filing any ANDA seeking approval of a generic version of that drug or any 505(b)(2) NDA for the same active moiety and that relies on the FDA's findings regarding that drug, except that FDA may accept an application for filing after four years if the follow-on applicant makes a paragraph IV certification.

A drug, including one approved under Section 505(b)(2), may obtain a three-year period of exclusivity for a particular condition of approval, or change to a marketed product, such as a new formulation for a previously approved product, if one or more new clinical studies (other than bioavailability or bioequivalence studies) was essential to the approval of the application and was conducted/sponsored by the applicant. Should this occur, the FDA would be precluded from approving any ANDA or 505(b)(2) application for the protected modification until after that three-year exclusivity period has run. However, unlike NCE exclusivity, the FDA can accept an application and begin the review process during the exclusivity period.

*Orphan Drug Designation and Exclusivity*

The Orphan Drug Act provides incentives for the development of products intended to treat rare diseases or conditions. Under the Orphan Drug Act, the FDA may grant orphan designation to a drug or biological product intended to treat a rare disease or condition, which is generally a disease or condition that affects fewer than 200,000 individuals in the United States, or more than 200,000 individuals in the United States and for which there is no reasonable expectation that the cost of developing and making a drug or biological product available in the United States for this type of disease or condition will be recovered from sales of the product. If a sponsor demonstrates that a drug is intended to treat rare diseases or conditions, the FDA will grant orphan designation for that product for the orphan disease indication. Orphan designation must be requested before submitting an NDA. After the FDA grants orphan product designation, the identity of the therapeutic agent and its potential orphan use are disclosed publicly by the FDA. Orphan drug designation, however, does not convey any advantage in, or shorten the duration of, the regulatory review and approval process.

Orphan drug designation provides manufacturers with research grants, tax credits and eligibility for orphan drug exclusivity. If a product that has orphan drug designation subsequently receives the first FDA approval of the active moiety for that disease or condition for which it has such designation, the product is entitled to orphan drug exclusivity, which for seven years prohibits the FDA from approving another product with the same active ingredient for the same indication, except in limited circumstances. If a drug designated as an orphan product receives marketing approval for an indication broader than the orphan indication for which it received the designation, it will not be entitled to orphan drug exclusivity. Orphan exclusivity will not bar approval of another product under certain circumstances, including if a subsequent product with the same active ingredient for the same indication is shown to be clinically superior to the approved product on the basis of greater efficacy or safety, or providing a major contribution to patient care, or if the company with orphan drug exclusivity is not able to meet market demand. Further, the FDA may approve more than one product for the same orphan indication or disease as long as the products contain different active ingredients. Moreover, competitors may receive approval of different products for the indication for which the orphan product has exclusivity or obtain approval for the same product but for a different indication for which the orphan product has exclusivity. As a result, even if one of our product candidates receives orphan exclusivity, we may still be subject to competition. Orphan exclusivity also could block the approval of one of our products for seven years if a competitor obtains approval of the same drug or if our product candidate is determined to be contained within the competitor's product for the same indication or disease.

*International Regulation*

In addition to regulations in the United States, we are and will be subject to a variety of foreign regulations regarding development, approval, commercial sales and distribution of our products. Whether or not we obtain FDA approval for a product, we must obtain the necessary approvals by the comparable regulatory authorities of foreign countries before we can commence clinical trials or marketing of the product in those countries. The approval process varies from country to country and can involve additional product testing and additional review periods, and the time may be longer or shorter than that required to obtain FDA approval. The requirements governing, among other things, the conduct of clinical trials, product licensing, pricing and reimbursement vary greatly from country to country. Regulatory approval in one country does not ensure

regulatory approval in another, but a failure or delay in obtaining regulatory approval in one country may negatively impact the regulatory process in others. If we fail to comply with applicable foreign regulatory requirements, we may be subject to fines, suspension or withdrawal of regulatory approvals, product recalls, seizure of products, operating restrictions and criminal prosecution.

*Other Healthcare Laws and Compliance Requirements*

In the United States, the research, manufacturing, distribution, marketing, sale and promotion of drug products and medical devices are subject to numerous regulations by various federal, state and local authorities in addition to the FDA including, but not limited to, the U.S. Federal Communications Commission, the U.S. Department of Justice, the U.S. Department of Health and Human Services, or HHS, and its various enforcement divisions, such as the Centers for Medicare & Medicaid Services, or CMS, the Office of Inspector General, or OIG, the Office for Human Research Protections, or OHRP, and the Office of Research Integrity, or ORI, state Attorneys General, state Medicaid Fraud Control Units, or MFCUs, and other state and local government agencies. Healthcare laws and regulations that may govern our business include the following.

The federal Anti-Kickback Statute prohibits, among other things, any person or entity, including a prescription drug manufacturer, or a party acting on its behalf, from knowingly and willfully soliciting, receiving, offering or paying any remuneration, directly or indirectly, overtly or covertly, in cash or in kind to induce in return for either the referral of an individual, or the purchase, recommendation, leasing, ordering or furnishing of a good, facility, item, or service, for which payment may be made in whole or in part under a federal healthcare program such as the Medicare and Medicaid programs. This statute has been interpreted broadly to apply to, among other things, arrangements between pharmaceutical manufacturers, on one hand, and prescribers, purchasers, and formulary managers, on the other. The term "remuneration" expressly includes kickbacks, bribes or rebates and also has been broadly interpreted to include anything of value, including for example, gifts, discounts, the furnishing of supplies or equipment, credit arrangements, payments of cash, waivers of payments, ownership interests and providing anything at less than its fair market value. There are a number of statutory exceptions and regulatory safe harbors, which are narrowly drawn, protecting certain business arrangements from prosecution. Failure to meet all of the requirements of a particular applicable statutory exception or safe harbor does not make the conduct per se illegal under the federal Anti-Kickback Statute. Instead, the legality of the arrangement will be evaluated on a case-by-case basis based on a cumulative review of all of its facts and circumstances. Our practices may not meet all of the criteria for safe harbor protection from federal Anti-Kickback Statute liability in all cases. Additionally, the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010, or collectively, the ACA, among other things, amended the intent standard under the federal Anti-Kickback Statute such that a person or entity no longer needs to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation. The ACA also provided that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act (discussed below). Further, many states have adopted laws similar to the federal Anti-Kickback Statute, and some of these state laws may be broader in scope in that some of these state laws extend to all payors and may not contain safe harbors.

Federal civil and criminal false claims laws, including the federal civil False Claims Act, and civil monetary penalty laws, which prohibit, among other things, any person or entity from knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval by the federal government or knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim to the federal government. The "*qui tam*" provisions of the federal civil False Claims Act allow a private individual to bring a civil action on behalf of the federal government alleging that the defendant has submitted a false claim to the federal government, and potentially to share in any monetary recovery. In recent years, the number of suits brought by private individuals has increased dramatically. In addition, various states have enacted false claims laws analogous to the federal civil False Claims Act. Many of these state laws are broader in scope and apply to all payors, and therefore, are not limited to only those claims submitted to the federal government. There are many potential bases for liability under the federal civil False Claims Act. Liability arises, primarily, when an entity knowingly submits, or causes another to submit, a false claim for reimbursement to the federal government. The federal civil False Claims Act has been used to assert liability on the basis of kickbacks and other improper referrals, improperly reported government pricing metrics such as Best Price or Average Manufacturer Price, and improper promotion of off-label uses not expressly approved by the FDA in a drug's label. Our future activities relating to the reporting of discount and rebate information and other information affecting federal, state and third party reimbursement of our products, and the sale and marketing of our products and our service arrangements or data purchases, among other activities, may be subject to scrutiny under these laws.

Also, the Health Insurance Portability and Accountability Act of 1996, or HIPAA, created several additional federal civil and criminal statutes that prohibit healthcare fraud and false statements relating to healthcare matters. The healthcare fraud statute

27

prohibits knowingly and willfully executing a scheme to defraud any healthcare benefit program, including private third-party payors. The false statements statute prohibits knowingly and willfully falsifying, concealing or covering up a material fact or making any materially false, fictitious or fraudulent statement in connection with the delivery of or payment for healthcare benefits, items or services. Like the federal Anti-Kickback Statute, the ACA amended certain of these federal criminal statutes such that a person or entity no longer needs to have actual knowledge of the statute or specific intent to violate it in order to have committed a violation.

In addition, we may be subject to, or our marketing activities may be limited by, data privacy and security regulation by both the federal government and the states in which we conduct our business. HIPAA and its implementing regulations established uniform standards for certain "covered entities," which are certain healthcare providers, health plans and healthcare clearinghouses, as well as their business associates, which are independent contractors or agents of covered entities that receive or obtain protected health information in connection with providing a service on behalf of a covered entity, as well as their covered subcontractors, governing the conduct of specified electronic healthcare transactions and protecting the security and privacy of protected health information. The American Recovery and Reinvestment Act of 2009, commonly referred to as the economic stimulus package, included the Health Information Technology for Economic and Clinical Health Act, or HITECH, which expanded certain of HIPAA's privacy and security standards. Among other things, HITECH makes HIPAA's security standards and certain privacy standards directly applicable to business associates. HITECH also created four new tiers of civil monetary penalties, amended HIPAA to make civil and criminal penalties directly applicable to business associates, and gave state attorneys general new authority to file civil actions for damages or injunctions in federal courts to enforce the federal HIPAA laws and seek attorneys' fees and costs associated with pursuing federal civil actions.

Additionally, federal transparency laws, including the federal Physician Payments Sunshine Act created under Section 6002 of the ACA and its implementing regulations require that certain manufacturers of drugs, devices, biologics, and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) report annually to CMS information related to "payments or other transfers of value" made or distributed to physicians (defined to include doctors of medicine, dentists, optometrists, podiatrists and chiropractors), generally, with some exceptions, other healthcare professionals (such as physician assistants and nurse practitioners), and teaching hospitals, or to entities or individuals at the request of, or designated on behalf of, physicians and teaching hospitals. Applicable manufacturers and applicable group purchasing organizations must also report annually to the CMS certain ownership and investment interests held by physicians (as defined above) and their immediate family members.

There are also an increasing number of analogous state laws that require manufacturers to file reports with states on pricing and marketing information, such as tracking and reporting of gifts, compensations, other remuneration and items of value provided to health care professionals and health care entities. Many of these laws contain ambiguities as to what is required to comply with the laws. Several states have also enacted legislation requiring pharmaceutical companies to, among other things, establish and implement commercial compliance programs, file periodic reports with the state, make periodic public disclosures on sales, marketing, pricing, clinical trials and other activities and/or register their sales representatives. Certain state laws also regulate manufacturers' use of identifiable data. These laws may affect our sales, marketing and other promotional activities by imposing administrative and compliance burdens. In addition, given the lack of clarity with respect to these laws and their implementation, our reporting actions could be subject to the penalty provisions of the pertinent state and federal authorities.

If our operations are found to be in violation of any of the health regulatory laws described above or any other laws that apply to us, we may be subject to penalties, including significant administrative, criminal and civil monetary penalties, damages, fines, imprisonment, disgorgement, contractual damages, reputational harm, exclusion from participation in government healthcare programs, integrity obligations, injunctions, recall or seizure of products, total or partial suspension of production, denial or withdrawal of pre-marketing product approvals, private qui tam actions brought by individual whistleblowers in the name of the government or refusal to allow us to enter into supply contracts, including government contracts and the curtailment or restructuring of our operations, any of which could adversely affect our ability to operate our business and our results of operations. We are unable to predict whether we would be subject to actions under these laws or the impact of such actions. However, the cost of defending such claims, as well as any sanctions imposed, could adversely affect our financial performance.

To the extent that any of our products are sold in a foreign country, we also may be subject to similar foreign laws and regulations, which may include, for instance, the U.S. Foreign Corrupt Practices Act, the U.K. Anti-Bribery Act, applicable post-marketing requirements, including safety surveillance, anti-fraud and abuse laws and implementation of corporate compliance programs and reporting of payments or transfers of value to healthcare professionals.

*Third-Party Payor Coverage and Reimbursement*

The commercial success of our approved product portfolio, as well as our pre-clinical and clinical product portfolio, if and when approved, will depend, in part, upon the availability of coverage and adequate reimbursement from third-party payors at the federal, state and private levels. Patients who are prescribed treatments for their conditions and providers performing the prescribed services generally rely on third-party payors to reimburse all or part of the associated healthcare costs. In the United States, third-party payors often rely upon Medicare coverage policy and payment limitations in setting their own coverage and reimbursement policies. However, decisions regarding the extent of coverage and amount of reimbursement to be provided for any product candidates that we develop will be made on a payor-by-payor basis. Sales of our product portfolio will therefore depend substantially, both domestically and abroad, on the extent to which the costs of our product portfolio will be paid by health maintenance, managed care, pharmacy benefit, and/or similar healthcare management organizations, or are reimbursed by government health administration authorities, such as Medicare and Medicaid, private health coverage insurers and other third-party payors. Coverage policies and third-party payor reimbursement rates may change at any time. Therefore, even if favorable coverage and reimbursement status is attained, less favorable coverage policies and reimbursement rates may be implemented in the future. The market for our product portfolio will depend significantly on access to third-party payors' formularies, or lists of treatments for which third-party payors provide coverage and reimbursement.

Also, third-party payors are developing increasingly sophisticated methods of controlling healthcare costs. Further, coverage and reimbursement for therapeutic products can differ significantly from payor to payor. As a result, the coverage determination process will require us to provide scientific and clinical support for the use of our products to each payor separately, with no assurance that adequate coverage and reimbursement will be obtained. The cost of pharmaceuticals and medical devices continues to generate substantial governmental and third-party payor scrutiny. We expect that the pharmaceutical industry will experience continued pricing pressures due to the trend toward managed healthcare, the increasing influence of managed care organizations and additional legislative and administrative proposals. Our results of operations and business could be adversely affected by current and future third-party payor policies as well as healthcare legislative and administrative reforms.

Some third-party payors also require pre-approval of coverage for new or innovative devices or drug therapies before they will reimburse healthcare providers who use such therapies. While we cannot predict whether any proposed cost-containment measures will be adopted or otherwise implemented in the future, these requirements or any announcement or adoption of such proposals could have a material adverse effect on our ability to obtain adequate prices for our product portfolio and to operate profitably.

In international markets, reimbursement and healthcare payment systems vary significantly by country, and many countries have instituted price ceilings on specific products and therapies. There can be no assurance that our products will be considered medically reasonable and necessary for a specific indication, that our products will be considered cost-effective by third-party payors, that an adequate level of reimbursement will be available or that the third-party payors' reimbursement policies will not adversely affect our ability to sell our products profitably.

*Healthcare Reform*

In the United States and foreign jurisdictions, the legislative landscape continues to evolve. There have been a number of legislative and regulatory changes to the healthcare system that will likely affect our future operations. In particular, there have been and continue to be a number of initiatives at the United States federal and state levels that seek to reduce healthcare costs, improve access, and improve quality.

By way of example, in March 2010, the ACA was passed, which significantly changed health care financing by both governmental and private insurers. The provisions of the ACA of importance to the pharmaceutical and biotechnology industry included, among others, the following:

- an annual, nondeductible fee on any entity that manufactures or imports certain branded prescription drugs and biologic agents, apportioned among these entities according to their market share in certain government healthcare programs;
- an increase in the statutory minimum rebates a manufacturer must pay under the Medicaid Drug Rebate Program to 23.1% and 13% of the average manufacturer price for most branded and generic drugs, respectively;
- new methodologies by which rebates owed by manufacturers under the Medicaid Drug Rebate Program are calculated for drugs that are inhaled, infused, instilled, implanted or injected, and for drugs that are line extension products;
- a new Medicare Part D coverage gap discount program, in which manufacturers must now agree to offer 70% point-of-sale discounts to negotiated prices of applicable brand drugs to eligible beneficiaries during their coverage gap period,

29

as a condition for the manufacturer's outpatient drugs to be covered under Medicare Part D;

- extension of manufacturers' Medicaid rebate liability to covered drugs dispensed to individuals who are enrolled in Medicaid managed care organizations, unless the drug is subject to discounts under the 340B drug discount program;
- expansion of eligibility criteria for Medicaid programs by, among other things, allowing states to offer Medicaid coverage to additional individuals and by adding new mandatory eligibility categories for certain individuals with income at or below 133% of the Federal Poverty Level thereby potentially increasing manufacturers' Medicaid rebate liability;
- expansion of the entities eligible for discounts under the Public Health Service pharmaceutical pricing program;
- expansion of healthcare fraud and abuse laws, including the federal civil False Claims Act and the federal Anti-Kickback Statute, new government investigative powers, and enhanced penalties for noncompliance;
- a licensure framework for follow-on biologic products;
- a new Patient-Centered Outcomes Research Institute to oversee, identify priorities in, and conduct comparative clinical effectiveness research, along with funding for such research;
- new requirements under the federal Physician Payments Sunshine Act for manufacturers to report information related to payments and other transfers of value made to physicians, as defined by such law, and teaching hospitals as well as ownership or investment interests held by physicians and their immediate family members; and,
- a new requirement to annually report certain drug samples that manufacturers and distributors provide to licensed practitioners, or to pharmacies of hospitals or other healthcare entities.

There have been executive, judicial and Congressional challenges to certain aspects of the ACA. For example, President Trump signed several Executive Orders and other directives designed to delay the implementation of certain provisions of the ACA or otherwise circumvent some of the requirements for health insurance mandated by the ACA. For example, on June 17, 2021, the U.S. Supreme Court dismissed a challenge on procedural grounds that argued the ACA is unconstitutional in its entirety because the "individual mandate" was repealed by Congress. Prior to the U.S. Supreme Court ruling,, on January 28, 2021, President Biden issued an executive order that initiated a special enrollment period for purposes of obtaining health insurance coverage through the ACA marketplace. The executive order also instructed certain governmental agencies to review and reconsider their existing policies and rules that limit access to healthcare, including among others, reexamining Medicaid demonstration projects and waiver programs that include work requirements, and policies that create unnecessary barriers to obtaining access to health insurance coverage through Medicaid or the ACA. In addition, on August 16, 2022, President Biden signed the Inflation Reduction Act of 2022, or IRA, into law, which among other things, extends enhanced subsidies for individuals purchasing health insurance coverage in ACA marketplaces through plan year 2025. The IRA also eliminates the "donut hole" under the Medicare Part D program beginning in 2025 by significantly lowering the beneficiary maximum out-of-pocket cost and creating a new manufacturer discount program. It is possible that the ACA will be subject to judicial or Congressional challenges in the future. It is unclear how such challenges and any additional healthcare reform measures of the Biden administration will impact ACA.

Other healthcare legislative changes have been proposed and adopted since the ACA was enacted. For example, in August 2011, the President signed into law the Budget Control Act of 2011, which, among other things, created the Joint Select Committee on Deficit Reduction to recommend proposals in spending reductions to Congress. The Joint Select Committee on Deficit Reduction did not achieve its targeted deficit reduction of at least $1.2 trillion for the years 2013 through 2021, triggering the legislation's automatic reductions to several government programs. These reductions include aggregate reductions to Medicare payments to providers of up to 2% per fiscal year, which went into effect on April 1, 2013 and, following passage of subsequent legislation, will remain in effect through 2031. Under current legislation the actual reduction in Medicare payments will vary from 1% in 2022 to up to 4% in the final fiscal year of this sequester.

We expect that additional state and federal healthcare reform measures will be adopted in the future. For example, there has been increasing legislative and enforcement interest in the United States with respect to specialty drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries, Presidential executive orders, and proposed and enacted federal and state legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drugs. For example, in July 2021, the Biden administration released an executive order, "Promoting Competition in the American Economy," with multiple provisions aimed at prescription drugs. In response to Biden's executive order, on September 9, 2021, HHS released a Comprehensive Plan for Addressing High Drug Prices that outlines principles for drug pricing reform and sets out a variety of potential legislative policies that Congress could pursue as well as potential administrative actions HHS can take to advance these principles. In addition, the IRA, among other things, (i) directs HHS to negotiate the price of certain high-expenditure, single-source drugs and biologics covered under Medicare, and subject drug manufacturers to civil monetary penalties and a potential excise tax by offering a price that is not equal to or less than the

30

negotiated "maximum fair price" for such drugs and biologics under the law, and (ii) imposes rebates with respect to certain drugs and biologics covered under Medicare Part B or Medicare Part D to penalize price increases that outpace inflation. The IRA permits HHS to implement many of these provisions through guidance, as opposed to regulation, for the initial years. These provisions will take effect progressively starting in fiscal year 2023, although they may be subject to legal challenges. It is currently unclear how the IRA will be implemented but is likely to have a significant impact on the pharmaceutical industry. Further, the Biden administration released an additional executive order on October 14, 2022, directing HHS to submit a report on how the Center for Medicare and Medicaid Innovation can be further leveraged to test new models for lowering drug costs for Medicare and Medicaid beneficiaries. It is unclear whether this executive order or similar policy initiatives will be implemented in the future. At the state level, legislatures have increasingly passed legislation and implemented regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing. Any additional healthcare reform measures could further constrain our business and/or limit the amounts that federal and state governments will pay for healthcare products and services, which could result in reduced demand for our product portfolio or additional pricing pressures.

*Other Regulatory Requirements*

We are also subject to various laws and regulations regarding laboratory practices, the experimental use of animals, and the use and disposal of hazardous or potentially hazardous substances in connection with our research. In each of these areas, as above, the FDA and other government agencies have broad regulatory and enforcement powers, including, among other things, the ability to levy fines and civil penalties, suspend or delay issuance of approvals, seize or recall products, and withdraw approvals, any one or more of which could have a material adverse effect on us.

Data Privacy and Security Laws

In the ordinary course of our business, we may process personal or sensitive data. Accordingly, we are, or may become, subject to numerous data privacy and security obligations, including federal, state, local, and foreign laws, regulations, guidance, and industry standards related to data privacy, security, and protection. Such obligations may include, without limitation, the Federal Trade Commission Act, the California Consumer Privacy Act of 2018, or CCPA, the European Union's General Data Protection Regulation 2016/679, or EU GDPR, the EU GDPR as it forms part of United Kingdom, or UK, law by virtue of section 3 of the European Union (Withdrawal) Act 2018, or UK GDPR, and the ePrivacy Directive. In addition, several states within the United States have enacted or proposed data privacy laws. For example, Virginia passed the Consumer Data Protection Act, and Colorado passed the Colorado Privacy Act.

The CCPA and EU GDPR are examples of the increasingly stringent and evolving regulatory frameworks related to personal data processing that may increase our compliance obligations and exposure for any noncompliance. For example, the CCPA imposes obligations on covered businesses to provide specific disclosures related to a business's collection, use, and disclosure of personal data and to respond to certain requests from California residents related to their personal data (for example, requests to know of the business's personal data processing activities, to delete the individual's personal data, and to opt out of certain personal data disclosures). Also, the CCPA provides for civil penalties and a private right of action for certain data breaches which may include an award of statutory damages. In addition, the California Privacy Rights Act of 2020, CPRA, effective January 1, 2023, will expand the CCPA. The CPRA will, among other things, give California residents the ability to limit use of certain sensitive personal data, establish restrictions on personal data retention, expand the types of data breaches that are subject to the CCPA's private right of action, and establish a new California Privacy Protection Agency to implement and enforce the new law. U.S. federal and state consumer protection laws require us to publish statements that accurately and fairly describe how we handle personal data and choices individuals may have about the way we handle their personal data.

Foreign data privacy and security laws (including but not limited to the EU GDPR and UK GDPR) impose significant and complex compliance obligations on entities that are subject to those laws. As one example, the EU GDPR applies to any company established in the EEA and to companies established outside the EEA that process personal data in connection with the offering of goods or services to data subjects in the EEA or the monitoring of the behavior of data subjects in the EEA. These obligations may include limiting personal data processing to only what is necessary for specified, explicit, and legitimate purposes; requiring a legal basis for personal data processing; requiring the appointment of a data protection officer in certain circumstances; increasing transparency obligations to data subjects; requiring data protection impact assessments in certain circumstances; limiting the collection and retention of personal data; increasing rights for data subjects; formalizing a heightened and codified standard of data subject consents; requiring the implementation and maintenance of technical and organizational safeguards for personal data; mandating notice of certain personal data breaches to the relevant supervisory

31

authority(ies) and affected individuals; and mandating the appointment of representatives in the UK and/or the EU in certain circumstances.

**Human Capital Management**

As of December 31, 2022, we had a total of 134 employees in the United States and one employee in the United Kingdom. None of our employees are represented by a labor union or subject to a collective bargaining agreement. We have not experienced any work stoppage and consider our relations with our employees to be good.

We have built an internal commercial team consisting of 55 direct sales representatives, and other support staff and management who are a part of our independent commercial organization.

Our human capital resources objectives include, as applicable, identifying, recruiting, retaining, incentivizing and integrating our existing and future employees, advisors and consultants. In addition to competitive base salaries, the other competitive benefits that we provide to employees include equity and cash incentive plans, retirement benefits, and paid vacation. The principal purposes of these employee benefits are to attract, retain, reward and motivate our personnel and to provide long-term incentives that align the interests of employees with the interests of our stockholders.

**Corporate Information**

We were incorporated in Delaware in January 2007. Our principal executive offices are located at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677, and our telephone number is (201) 326-5300.

**Available Information**

Our corporate website address is www.eagleus.com. Information contained on or accessible through our website is not a part of this Annual Report on Form 10-K, and the inclusion of our website address in this Annual Report on Form 10-K is an inactive textual reference only. We make our Annual Reports on Form 10-K, Quarterly reports on Form 10-Q, Current Reports on Form 8-K and all amendments to those reports available free of charge on our website as soon as reasonably practicable after we file such reports with, or furnish such reports to, the Securities and Exchange Commission, or SEC. You can access our filings through the SEC's internet site: www.sec.gov.

32

**Item 1A. Risk Factors**

   *Investing in our common stock involves a high degree of risk. Investors should consider carefully the risks and uncertainties described below in addition to the other information included or incorporated by reference in this Annual Report on Form 10-K, as well as our other public filings with the Securities and Exchange Commission. If any of the following risks actually occur, our business, financial condition or results of operations would likely suffer. In that case, the trading price of our common stock could fall. In addition to the risk factors identified under the captions below, the operation and results of our business are subject to risks and uncertainties identified elsewhere in this Annual Report on Form 10-K as well as general risks and uncertainties such as those relating to general economic conditions and demand in the market for our products.*

   *An investment in our securities involves a high degree of risk. Our business is subject to risks and events that, if they occur, could adversely affect our financial condition and results of operations and the trading price of our securities.*

**Risks Related to Our Financial Condition and Need for Additional Capital**

*The COVID-19 pandemic has adversely impacted, and may continue to adversely impact, our business, including the marketing, sale and commercialization of our products, our supply chain, our clinical trials, our liquidity and access to capital markets and our business development activities. In addition, our business, financial condition and results of operations have been and may in the future be adversely affected by macroeconomic conditions and by geopolitical events.*

The COVID-19 pandemic has adversely impacted, and may continue to adversely impact, our business. In mid-March 2020, we implemented work-from-home policies which are still in place for the majority of our employees. Our work-from-home policies may negatively impact productivity or disrupt our business, the magnitude of which will continue to depend, in part, on the length of this continued remote working arrangement and other limitations on our ability to conduct our business in the ordinary course. During the second quarter of 2021, we developed and implemented plans to resume in-person work practices while adhering to relevant health authority guidance. The effects of government actions and our policies and those of third parties to reduce the spread and ameliorate the impact of COVID-19 may negatively impact productivity and our ability to market and sell our products, cause disruptions to our supply chain and ongoing and future clinical trials and impair our ability to execute our business development strategy. These and other disruptions in our operations and the global economy could negatively impact our business, operating results and financial condition.

The marketing,sale and commercialization of our products have previously been adversely impacted by COVID-19 and actions taken to slow its spread and ameliorate its impact. For example, in 2020 we saw a variable impact on our product revenues in 2020 due to the COVID-19 pandemic and also experienced variable impacts on our business and financial condition as a result of the pandemic. Other parts of our business have been, and continue to be, impacted by the outbreak. For example, patients have postponed and we expect will continue to postpone visits to healthcare provider facilities, certain healthcare providers have temporarily closed their offices or are restricting patient visits, healthcare provider employees may become generally unavailable and there could be disruptions in the operations of payors, distributors, logistics providers and other third parties that are necessary for our products to be prescribed, reimbursed and administered to patients. For example, we have continued to observe a reduction in the number of Bendeka patients visiting infusion centers, hospitals and clinics for intravenous administration of Bendeka due to interruptions in healthcare services, and the patients' inability to visit administration sites and desire to avoid contact with infected individuals. In addition, our sales and marketing teams have been working remotely and our virtual initiatives with respect to marketing and supporting the sale and administration of our products have not been as effective as our in-person sales and marketing activities. We cannot predict when we will be able to resume in-person sales and marketing activities.

Quarantines, shelter-in-place, safer-at-home and similar government orders, or the perception that such orders, shutdowns or other restrictions on the conduct of business operations could be re-implemented or could continue to occur, related to COVID-19 or other infectious diseases could impact personnel at third-party manufacturing facilities upon which we rely, or the availability or cost of materials, which could disrupt the supply chain for our products. In particular, some of our suppliers of certain materials used in the production of our drug products are located in regions that continue to be subject to COVID-19-related actions and policies that limit the conduct of normal business operations. To the extent our suppliers and service providers are unable to comply with their obligations under our agreements with them or they are otherwise unable to deliver or are delayed in delivering goods and services to us due to the COVID-19 pandemic, our ability to continue meeting commercial demand for our products in the United States or advancing development of our product candidates may become impaired.

In addition, our clinical trials may be affected by epidemics, pandemics or other disruptions. For example, from 2020 to 2022, clinical site initiation and patient enrollment was delayed due to prioritization of hospital resources toward COVID-19. As a

33

result, the clinical trial timelines for certain of our product candidates, including EA-114 (our fulvestrant product candidate), have been delayed given difficulties with patient enrollment resulting from the COVID-19 pandemic, and we expect that clinical trial timelines will continue to be delayed for the duration of the pandemic. Similarly, our ability to recruit and retain principal investigators and site staff who, as healthcare providers, may have heightened exposure to COVID-19, has been and may continue to be adversely impacted. These events could delay our clinical trials, increase the cost of completing our clinical trials and negatively impact the integrity, reliability or robustness of the data from our clinical trials.

The extent to which consequences of the COVID-19 pandemic continue to impact the marketing, sale and commercialization of our products, our supply chain, our clinical trials, our access to capital and our business development activities continues to be uncertain, including with respect to negative impacts on the economy and capital markets.

In addition, our financial condition, results of operations, business and cash flow may be negatively affected by general economic, industry and market conditions in the global economy and in the global financial markets, such as rising inflation and interest rates, increased costs of goods, supply chain disruptions and uncertainty about economic stability and the financial markets. The global economy has experienced extreme volatility and disruptions from international conflicts, terrorism or other geopolitical events, such as the ongoing conflict between Russian and Ukraine, and related sanctions and other economic disruptions or concerns.  On February 24, 2022, Russia initiated significant military action against Ukraine. In response, the United States and certain other countries imposed significant sanctions and trade actions against Russia and could impose further sanctions, trade restrictions, and other retaliatory actions if the conflict continues or worsens. It is not possible to predict the broader consequences of the conflict, including related geo-political tensions, and the measures and retaliatory actions that will be taken by the United States and other countries in respect thereof, as well as any countermeasures or retaliatory actions Russia may take in response, are likely to cause regional instability and geo-political shifts and could materially adversely affect global trade, currency exchange rates, regional economies, and the global economy. Additional actions that we or others may take in response to the conflict could increase our costs, disrupt our supply chain, impair our ability to raise or access additional capital when needed on acceptable terms, if at all, or otherwise adversely affect our business, financial condition, and results of operations.

There can be no assurance that further deterioration in credit and financial markets and confidence in economic conditions will not occur. A severe or prolonged economic downturn could result in a variety of risks to our business, including weakened demand for our products or products or our partners and our ability to raise additional capital when needed on acceptable terms, if at all. A weak or declining economy could also strain our suppliers, possibly resulting in supply disruption. If the equity and credit markets deteriorate, it may make any necessary debt or equity financing more difficult, more costly, and more dilutive. Failure to secure any necessary financing in a timely manner and on favorable terms could impair our ability to achieve our growth strategy, could harm our financial performance and stock price and could require us to delay or abandon our plans and programs. In addition, there is a risk that our current or future service providers, manufacturers or other collaborators may not survive such difficult economic times, which could directly affect our ability to attain our operating goals on schedule and on budget. We cannot anticipate all of the ways in which the current economic climate and financial market conditions could adversely impact our business.

***If we cannot sustain profitability, our business, prospects, operating results and financial condition would be materially harmed.***

We have focused primarily on developing a broad product portfolio and currently have final regulatory approval for a limited number of products. Some of our product candidates will require substantial additional development time and resources before we would be able to receive regulatory approvals, implement commercialization strategies and begin generating revenue from product sales. We had net income of $35.6 million for the year ended December 31, 2022, and net loss of $8.6 million for the year ended December 31, 2021, and net income of $12.0 million for the year ended December 31, 2020, respectively.

We have devoted most of our financial resources to product development and may not generate significant revenue from sales of our product candidates in the near-term, if ever.

Because of the numerous risks and uncertainties associated with pharmaceutical product development, we are unable to fully predict the timing or amount of our expenses, but we expect to continue to incur substantial expenses, which we expect to increase as we expand our development activities and product portfolio. As a result of the foregoing, we may incur losses and negative cash flows in the future.

34

*If we fail to obtain additional financing, we could be forced to delay, reduce or eliminate our product development programs.*

Developing pharmaceutical products, including conducting preclinical studies and clinical trials, is expensive. We expect our development expenses to substantially increase in connection with our ongoing activities, particularly as we advance our clinical programs, both internally and through our external joint development agreements. Changing circumstances beyond our control may cause us to consume capital more rapidly than we currently anticipate. For example, our product commercialization or development efforts could encounter technical or other difficulties that could increase our development costs more than we expect. In any event, we may require additional capital prior to obtaining regulatory approval for, or commercializing, any additional product candidates.

In addition, attempting to secure additional financing may divert our management from our day-to-day activities, which may adversely affect our ability to develop and commercialize additional product candidates. We cannot guarantee that future financing will be available in sufficient amounts or on terms acceptable to us, if at all. If we are unable to raise additional capital when required or on acceptable terms, we may be required to:

- significantly delay, scale back or discontinue the development or commercialization of our product candidates;

- seek corporate partners for our products and product candidates at an earlier stage than otherwise would be desirable or on terms that are less favorable than might otherwise be available;

- relinquish or license on unfavorable terms, our rights to technologies or products, or to product candidates that we otherwise would seek to develop or commercialize ourselves; or

- significantly curtail, or cease, operations.

The occurrence of any of these factors could have a material adverse effect on our business, operating results and prospects.

*We may sell additional equity or incur debt to fund our operations, which may result in dilution to our stockholders and impose restrictions on our business.*

In order to raise additional funds to support our operations, we may sell additional equity or incur debt, which could adversely impact our stockholders, as well as our business. The sale of additional equity or convertible debt securities would result in the issuance of additional shares of our capital stock and dilution to all of our stockholders. The incurrence of indebtedness results in increased fixed payment obligations. In addition, the incurrence of indebtedness also results in certain restrictive covenants, such as limitations on our ability to incur additional debt, limitations on our ability to acquire, sell or license intellectual property rights and other operating restrictions that could adversely impact our ability to conduct our business.

On November 1, 2022, we entered into the Third Amended and Restated Credit Agreement, or the Third Amended Credit Agreement, with JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, which replaced our prior credit agreement. The terms and amounts borrowed under the Third Amended Credit Agreement includes a drawn term loan of $50 million and a revolving credit facility of $100 million, of which $15.0 million was drawn on November 1, 2022. All amounts outstanding under the Third Amended Credit Agreement shall be due and payable on October 31, 2025, unless otherwise accelerated or extended pursuant to the terms of the Third Amended Credit Agreement.

We may not have enough available cash or be able to raise additional funds on satisfactory terms, if at all, through equity or debt financings to repay our indebtedness at the time any such repayment is required (causing a default under such indebtedness), which could have a material adverse effect on our business, financial condition and results of operations.

*Changes in tax laws or regulations that are applied adversely to us or our customers may have a material adverse effect on our business, cash flow, financial condition or results of operations.*

New income, sales and use or other tax laws or regulations could be enacted at any time, which could adversely affect our business operations and financial performance. Further, existing tax laws and regulations could be interpreted, modified or applied adversely to us. These events could require us to pay additional taxes on a prospective or retroactive basis, as well as penalties, interest and other costs for past amounts deemed to be due. New laws, or laws that are changed, modified or newly interpreted or applied, also could increase our compliance, operating and other costs, as well as the costs of our products. For example, recent legislation in the United States, commonly referred to as the Inflation Reduction Act, enacts a minimum tax equal to 15 percent of the adjusted financial statement income of certain large U.S. corporations for tax years beginning after December 31, 2022, as well as a one percent excise tax on stock repurchases imposed on public corporations making such

35

repurchases after December 31, 2022. Further, the Tax Act enacted many significant changes to the U.S. tax laws, some of which were further modified by the Coronavirus Aid, Relief, and Economic Security Act, and may be modified in the future by the current or a future presidential administration. Among other changes, the Tax Act amended the Code to require that certain research and experimental expenditures be capitalized and amortized over five years if incurred in the United States or fifteen years if incurred in foreign jurisdictions for tax years beginning after December 31, 2021. Although the U.S. Congress has considered legislation that would defer, modify, or repeal the capitalization and amortization requirement, there is no assurance that such changes will be made. If the requirement is not deferred, repealed or otherwise modified, it may increase our cash taxes and effective tax rate. In addition, it is uncertain if and to what extent various states will conform to current federal law, or any newly enacted federal tax legislation. Changes in corporate tax rates, the realization of net operating losses, and other deferred tax assets relating to our operations, the taxation of foreign earnings, and the deductibility of expenses could have a material impact on the value of our deferred tax assets and could increase our future tax expense.

***Our ability to use our net operating loss carryforwards and certain other tax attributes may be limited.***

Under current law, federal net operating losses incurred in tax years beginning after December 31, 2017, may be carried forward indefinitely, but the deductibility of such federal net operating losses in tax years beginning after December 31, 2020, is limited to 80% of taxable income. It is uncertain if and to what extent various states will conform to federal law. In addition, under Sections 382 and 383 of the Internal Revenue Code of 1986, as amended, or the Code, if a corporation undergoes an "ownership change," generally defined as a greater than 50% change (by value) in its equity ownership over a three year period, the corporation's ability to use its pre-change net operating loss carryforwards and other pre-change tax attributes, such as research tax credits, to offset its post-change income or taxes may be limited. In addition, we may experience ownership changes in the future as a result of subsequent shifts in our stock ownership. As a result, our ability to use our pre-change net operating loss carryforwards to offset U.S. federal taxable income may be subject to limitations, which could potentially result in increased future tax liability to us. In addition, at the state level, there may be periods during which the use of net operating loss carryforwards is suspended or otherwise limited, which could accelerate or permanently increase state taxes owed.

## Risks Related to Regulatory Approval

***We cannot give any assurance that we will receive regulatory approval for our product candidates, which is necessary before they can be commercialized.***

Our business and future success are substantially dependent on our or our collaborators' ability to successfully and timely develop, obtain regulatory approval for, and commercialize our product candidates. Any delay or setback in the development of any of these product candidates could adversely affect our business. For example, on August 7, 2020, we received a CRL for our NDA for Ryanodex for the treatment of EHS. We decided that we will no longer pursue this indication in order to direct our resources to other product candidates. In addition, on January 26, 2022, Tyme announced the discontinuation of SM-88 with methoxsalen, phenytoin, and sirolimus in a trial for metastatic pancreatic cancer. Our planned development, approval and commercialization of any product candidates may fail to be completed in a timely manner or at all. The FDA or other foreign regulatory agency may refuse or delay approval of our product candidates for failure to collect sufficient clinical or animal safety data and require us or our collaborators to conduct additional clinical or animal safety studies, which may cause lengthy delays and increased costs to our programs. We cannot provide assurance that we will be able to obtain approval for any of our product candidates from the FDA or any foreign regulatory authority or that we will obtain such approval in a timely manner. If we do not obtain regulatory approval of new products or additional indications for existing products, or are significantly delayed or limited in doing so, our revenue growth will be adversely affected, we may experience surplus inventory, or our business may be materially harmed and we may need to significantly curtail operations.

***If we are unable to differentiate our products or product candidates from branded reference drugs or existing generic therapies for similar treatments, or if the FDA or other applicable regulatory authorities approve generic products that compete with any of our products or product candidates, the ability to successfully commercialize our product candidates would be adversely affected.***

Our strategy is to enter the market no later than the first generic to the applicable branded reference drug. We expect to compete against branded reference drugs and to compete with their generic counterparts that will be sold for a lower price. Although we believe that our products and product candidates will be clinically differentiated from branded reference drugs and their generic counterparts, if any, it is possible that such differentiation will not impact our market position. If we are unable to achieve significant differentiation for our products or product candidates against other drugs, the opportunity for our products and product candidates to achieve premium pricing and be commercialized successfully would be adversely affected.

36

In addition to existing branded reference drugs and the related generic products, the FDA or other applicable regulatory authorities may approve generic products that compete directly with our products or product candidates, if approved. Once an NDA, including a 505(b)(2) application, is approved, the product covered thereby becomes a "listed drug" which can, in turn, be cited by potential competitors in support of approval of an ANDA. The FDCA, FDA regulations and other applicable regulations and policies provide incentives to manufacturers to create modified, non-infringing versions of a drug to facilitate the approval of an ANDA for generic substitutes. These manufacturers might only be required to conduct a relatively inexpensive study to show that their product has the same active ingredient(s), dosage form, strength, route of administration and conditions of use or labeling as our products or product candidates and that the generic product is bioequivalent to ours, meaning it is absorbed in the body at the same rate and to the same extent as our products or product candidates. These generic equivalents, which must meet the same quality standards as branded pharmaceuticals, would be significantly less costly than ours to bring to market and companies that produce generic equivalents are generally able to offer their products at lower prices. Thus, after the introduction of a generic competitor, a significant percentage of the sales of any branded product is typically lost to the generic product. Accordingly, competition from generic equivalents of our products or product candidates would materially adversely impact our ability to successfully commercialize our product candidates or negatively impact our ability to gain market acceptance and market share for our products.

*If the FDA does not conclude that our product candidates satisfy the requirements for the regulatory approval, or if the requirements for approval of any of our product candidates are not as we expect, the approval pathway for our product candidates will likely take significantly longer, cost significantly more and encounter significantly greater complications and risks than anticipated, and in any case may not be successful.*

We intend to seek FDA approval through the 505(b)(2) regulatory pathway for those small molecule product candidates described in this Annual Report on Form 10-K.

The Drug Price Competition and Patent Term Restoration Act of 1984, also known as the Hatch-Waxman Act, added Section 505(b)(2) to the FDCA. Section 505(b)(2) permits the filing of an NDA where at least some of the information required for approval comes from studies that were not conducted by or for the applicant.

If the FDA does not allow us to pursue the regulatory pathway for our product candidates as anticipated, we may need to conduct additional clinical trials, provide additional data and information and meet additional standards for regulatory approval. If this were to occur, the time and financial resources required to obtain FDA approval for our product candidates would likely substantially increase. Moreover, the inability to pursue such regulatory pathway could result in new competitive products reaching the market faster than our product candidates, which could materially adversely impact our competitive position and prospects. Even if we are allowed to pursue our chosen regulatory pathway for a product candidate, we cannot assure you that we will receive the requisite or timely approvals for commercialization of such product candidate.

In addition, we expect that our competitors will file citizens' petitions with the FDA in an attempt to persuade the FDA that our product candidates, or the clinical studies that support their approval, contain deficiencies. Such actions by our competitors could delay or even prevent the FDA from approving any NDA that we submit.

*Clinical development is a lengthy and expensive process with an uncertain outcome, and results of earlier studies and trials may not be predictive of future trial results. Failure can occur at any stage of clinical development.*

Clinical testing, even when utilizing the 505(b)(2) pathway or its equivalent, is expensive and can take many years to complete, and its outcome is inherently uncertain. Failure can occur at any time during the clinical trial process, even with active ingredients that have previously been approved by the FDA as safe and effective. The results of preclinical studies and early clinical trials of our product candidates may not be predictive of the results of later stage clinical trials. A number of companies in the biopharmaceutical industry have suffered significant setbacks in advanced clinical trials due to lack of efficacy or adverse safety profiles, notwithstanding promising results in earlier trials.

Our product candidates are in various stages of development, from early stage to late stage. Clinical trial failures may occur at any stage and may result from a multitude of factors both within and outside our control, including flaws in formulation, adverse safety or efficacy profile and flaws in trial design, among others. If the trials result in negative or inconclusive results, we or our collaborators may decide, or regulators may require us, to discontinue trials of the product candidates or conduct additional clinical trials or preclinical studies. For example, on January 26, 2022, our collaboration partner Tyme announced the discontinuation of the Phase 2 clinical trial of SM-88 with methoxsalen, phenytoin, and sirolimus in patients with metastatic pancreatic cancer. In addition, data obtained from trials and studies are susceptible to varying interpretations, and regulators may not interpret our data as favorably as we do, which may delay, limit or prevent regulatory approval. For these reasons, our future clinical trials may not be successful.

We do not know whether any future clinical trials we may conduct will demonstrate consistent or adequate efficacy and safety to obtain regulatory approval to market our product candidates. If any product candidate for which we are conducting clinical

37

trials is found to be unsafe or lack efficacy, we will not be able to obtain regulatory approval for it. If we are unable to bring any of our current or future product candidates to market, our business would be materially harmed and our ability to create long-term stockholder value will be limited.

***Delays in clinical trials are common and have many causes, and any delay could result in increased costs to us and could jeopardize or delay our ability to obtain regulatory approval and commence product sales. We may also find it difficult to enroll patients in our clinical trials, which could delay or prevent development of our product candidates.***

We may experience delays in clinical trials of our product candidates. Our planned clinical trials may not begin on time, have an effective design, enroll a sufficient number of patients or be completed on schedule, if at all. Our clinical trials can be delayed for a variety of reasons, including:

- inability to raise or delays in raising funding necessary to initiate or continue a trial;

- delays in obtaining regulatory approval to commence a trial;

- delays in reaching agreement with the FDA on final trial design;

- imposition of a clinical hold for safety reasons or following an inspection of our clinical trial operations or trial sites by the FDA or other regulatory authorities;

- delays in reaching agreement on acceptable terms with prospective contract research organizations, or CROs, and clinical trial sites, or failure by such CROs to carry out the clinical trial at each site in accordance with the terms of our agreements with them;

- delays in obtaining required institutional review board, or IRB, approval at each site;

- difficulties or delays in having patients complete participation in a trial or return for post-treatment follow-up;

- clinical sites electing to terminate their participation in one of our clinical trials, which would likely have a detrimental effect on subject enrollment;

- delays related to the COVID-19 pandemic or other health epidemics, which may result in clinical site closures, delays to patient enrollment, patients discontinuing their treatment or follow up visits or changes to trial protocols;

- time required to add new clinical sites; or

- delays by our contract manufacturers to produce and deliver sufficient supply of clinical trial materials.

If initiation or completion of our planned clinical trials is delayed for any of the above reasons or other reasons, our development costs may increase, our regulatory approval process could be delayed and our ability to commercialize and commence sales of our product candidates could be materially harmed, which could have a material adverse effect on our business.

In addition, identifying and qualifying patients to participate in clinical trials of our product candidates is critical to our success. The timing of our clinical trials depends on the speed at which we can recruit patients to participate in testing our product candidates as well as completion of required follow-up periods. We may not be able to identify, recruit and enroll a sufficient number of patients, or those with required or desired characteristics or to complete our clinical trials in a timely manner. Patient enrollment and completion of the trials is affected by factors including:

- severity of the disease under investigation;

- design of the trial protocol;

- size of the patient population;

- eligibility criteria for the trial in question;

- perceived risks and benefits of the product candidate under trial;

- proximity and availability of clinical trial sites for prospective patients;

- availability of competing therapies and clinical trials;

- efforts to facilitate timely enrollment in clinical trials;

- patient referral practices of physicians; and

- ability to monitor patients adequately during and after treatment.

38

***Our products or product candidates may cause adverse effects or have other properties that could delay or prevent their regulatory approval or limit the scope of any approved label or market acceptance, or result in significant negative consequences following marketing approval, if any.***

As with many pharmaceutical and biological products, treatment with our products or product candidates may produce undesirable side effects or adverse reactions or events. Although our products or product candidates containing active ingredients that have already been approved and the side effects arising from the use of the active ingredient or class of drug in our products or product candidates are generally known, our products or product candidates may still cause undesirable side effects. These could be attributed to the active ingredient or class of drug or to our unique formulation of such products or product candidates, or other potentially harmful characteristics. Such characteristics could cause us, our IRBs, clinical trial sites, the FDA or other regulatory authorities to interrupt, delay or halt clinical trials and could result in a more restrictive label or the delay, denial or withdrawal of regulatory approval, which may harm our business, financial condition and prospects significantly.

Further, if any of our products cause serious or unexpected side effects after receiving market approval, a number of potentially significant negative consequences could result, including:

- regulatory authorities may withdraw their approval of the product or impose restrictions on its distribution;

- the FDA may require implementation of a Risk Evaluation and Mitigation Strategy, or REMS;

- regulatory authorities may require the addition of labeling statements, such as warnings or contraindications;

- we may be required to change the way the product is administered or conduct additional clinical studies;

- we could be sued and held liable for harm caused to patients; or

- our reputation may suffer.

Any of these events could prevent us from achieving or maintaining market acceptance of the affected product or product candidate and could substantially increase the costs of commercializing our products and product candidates.

***The regulatory approval processes of the FDA and comparable foreign authorities are lengthy, time-consuming and inherently unpredictable, and if we are ultimately unable to obtain regulatory approval for our product candidates, our business will be substantially harmed.***

The time required to obtain approval by the FDA and comparable foreign authorities is unpredictable but typically takes many years following the commencement of clinical trials and depends upon numerous factors, including the substantial discretion of the regulatory authorities. In addition, approval policies, regulations or the type and amount of clinical data necessary to gain approval may change during the course of a product candidate's clinical development and may vary among jurisdictions. To date, we have obtained regulatory approval for five NDA products, but no BLA products, and we have multiple NDA product candidates in advanced stages of development and other exploratory candidates under development. However, it is possible that none of our existing product candidates or any product candidates we may seek to develop in the future will ever obtain regulatory approval in the United States or other jurisdictions.

Our product candidates could fail to receive regulatory approval for many reasons, including the following:

- the FDA or comparable foreign regulatory authorities may disagree that our changes to branded reference drugs or existing biologic drugs meet the criteria for our chosen regulatory pathway or foreign regulatory pathways;

- we may be unable to demonstrate to the satisfaction of the FDA or comparable foreign regulatory authorities that a product candidate is safe and effective or comparable to its branded reference product for its proposed indication;

- the results of any clinical trials we conduct may not meet the level of statistical significance required by the FDA or comparable foreign regulatory authorities for approval;

- we may be unable to demonstrate that a product candidate's clinical and other benefits outweigh its safety risks;

- the FDA or comparable foreign regulatory authorities may fail to approve the manufacturing processes or facilities of third party manufacturers with which we contract for clinical and commercial supplies; and

- the approval policies or regulations of the FDA or comparable foreign regulatory authorities may change significantly in a manner rendering our clinical data insufficient for approval.

This lengthy approval process as well as the unpredictability of future clinical trial results may result in our failing to obtain regulatory approval to market our product candidates, which would harm our business, results of operations and prospects significantly.

39

In addition, even if we were to obtain approval, regulatory authorities may approve any of our product candidates for fewer or more limited indications than we request, may grant approval contingent on the performance of costly post-marketing clinical trials or may approve a product candidate with a label that does not include the labeling claims necessary or desirable for the successful commercialization of that product candidate. Any of the foregoing scenarios could harm the commercial prospects for our product candidates.

We have limited experience using the 505(b)(2) regulatory pathway to submit an NDA or any similar drug approval filing to the FDA, and we cannot be certain that any of our product candidates will receive regulatory approval. There can be no assurance that the FDA will ultimately approve any submitted NDA by us in a timely fashion. For example, in March of 2016 we received a CRL from the FDA with respect to our NDA for EP-6101, and we elected not to pursue the application further or seek to exploit EP-6101 for various reasons. On August 7, 2020, we received a CRL for our NDA for Ryanodex for the treatment of EHS, and we decided that we will no longer pursue this indication in order to direct our resources to other product candidates.

The failure to receive regulatory approvals for our product candidates could have a material adverse effect on our business, financial condition and operations. Even if we successfully obtain regulatory approvals to market one or more of our product candidates, our revenue will be dependent, to a significant extent, upon the size of the markets in the territories for which we gain regulatory approval. If the markets for patients or indications that we are targeting are not as significant as we estimate, we may not generate significant revenue from sales of such products, if approved.

***An NDA submitted under Section 505(b)(2) subjects us to the risk that we may be subject to a patent infringement lawsuit that would delay or prevent the review or approval of our product candidates.***

Some of our product candidates will be submitted to the FDA for approval under Section 505(b)(2) of the FDCA. Section 505(b)(2) permits the submission of an NDA where at least some of the information required for approval comes from studies that were not conducted by, or for, the applicant and on which the applicant has not obtained a right of reference. The 505(b)(2) application would enable us to reference published literature and/or the FDA's previous findings of safety and effectiveness for the branded reference drug. For NDAs submitted under Section 505(b)(2) of the FDCA, the patent certification and related provisions of the Hatch-Waxman Act apply. In accordance with the Hatch-Waxman Act, such NDAs may be required to include certifications, known as paragraph IV certifications, that certify that any patents listed in the Patent and Exclusivity Information Addendum of the FDA's publication, Approved Drug Products with Therapeutic Equivalence Evaluations, commonly known as the Orange Book, with respect to any product referenced in the 505(b)(2) application, are invalid, unenforceable or will not be infringed by the manufacture, use or sale of the product that is the subject of the 505(b)(2) NDA.

Under the Hatch-Waxman Act, the holder of patents that the 505(b)(2) application references may file a patent infringement lawsuit after receiving notice of the paragraph IV certification. Filing of a patent infringement lawsuit against the filer of the 505(b)(2) applicant within 45 days of the patent owner's receipt of notice triggers a one-time, automatic, 30-month stay of the FDA's ability to approve the 505(b)(2) NDA, unless patent litigation is resolved in the favor of the paragraph IV filer or the patent expires before that time. Accordingly, we may invest a significant amount of time and expense in the development of one or more product candidates only to be subject to significant delay and patent litigation before such product candidates may be commercialized, if at all. For example, we have been, and may in the future be, subject to litigation brought in connection with our filing of a 505(b)(2) NDA. In addition, a 505(b)(2) application will not be approved until any non-patent exclusivity, such as exclusivity for obtaining approval of a new chemical entity, or NCE, listed in the Orange Book for the referenced product has expired. The FDA may also require us to perform one or more additional clinical studies or measurements to support the change from the branded reference drug, which could be time-consuming and could substantially delay our achievement of regulatory approvals for such product candidates. The FDA may also reject our future 505(b)(2) submissions and require us to file such submissions under Section 505(b)(1) of the FDCA, which would require us to provide extensive data to establish safety and effectiveness of the drug for the proposed use and could cause delay and be considerably more expensive and time-consuming. These factors, among others, may limit our ability to successfully commercialize our product candidates.

Companies that produce branded reference drugs routinely bring litigation against abbreviated new drug application, or ANDA, or 505(b)(2) applicants that seek regulatory approval to manufacture and market generic and reformulated forms of their branded products. These companies often allege patent infringement or other violations of intellectual property rights as the basis for filing suit against an ANDA or 505(b)(2) applicant. For example, we were involved in a patent case with a subsidiary of Endo related to our ANDA for vasopressin. Likewise, patent holders may bring patent infringement suits against companies that are currently marketing and selling their approved generic or reformulated products.

Litigation to enforce or defend intellectual property rights is often complex and often involves significant expense and can delay or prevent introduction or sale of our product candidates. If patents are held to be valid and infringed by our product candidates in a particular jurisdiction, we would, unless we could obtain a license from the patent holder, be required to cease

40

selling in that jurisdiction and may need to relinquish or destroy existing stock in that jurisdiction. There may also be situations where we use our business judgment and decide to market and sell our approved products, notwithstanding the fact that allegations of patent infringement(s) have not been finally resolved by the courts, which is known as an "at-risk launch." The risk involved in doing so can be substantial because the remedies available to the owner of a patent for infringement may include, among other things, damages measured by the profits lost by the patent owner and not necessarily by the profits earned by the infringer. In the case of a willful infringement, the definition of which is subjective, such damages may be increased up to three times. Moreover, because of the discount pricing typically involved with bioequivalent and, to a lesser extent, 505(b)(2), products, patented branded products generally realize a substantially higher profit margin than bioequivalent and, to a lesser extent, 505(b)(2), products, resulting in disproportionate damages compared to any profits earned by the infringer. An adverse decision in patent litigation could have a material adverse effect on our business, financial position and results of operations and could cause the market value of our common stock to decline.

***The FDA and other regulatory agencies actively enforce the laws and regulations prohibiting the promotion of off-label uses.***

If we are found to have improperly promoted off-label uses of our products or product candidates, if approved, we may become subject to significant liability. Such enforcement has become more common in the industry. The FDA and other regulatory agencies strictly regulate the promotional claims that may be made about prescription products, such as our product candidates, if approved. In particular, a product may not be promoted for uses that are not approved by the FDA or such other regulatory agencies as reflected in the product's approved labeling. However, we may share truthful and not misleading information that is otherwise consistent with our products' FDA approved labeling. If we receive marketing approval for our product candidates for our proposed indications, physicians may nevertheless use our products for their patients in a manner that is inconsistent with the approved label, if the physicians personally believe in their professional medical judgment it could be used in such manner. However, if we are found to have promoted our products for any off-label uses, the federal government could levy civil, criminal and administrative penalties, and seek fines against us. The FDA or other regulatory authorities could also request that we enter into a consent decree or a corporate integrity agreement, or seek a permanent injunction against us under which specified promotional conduct is monitored, changed or curtailed. If we cannot successfully manage the promotion of our product candidates, if approved, we could become subject to significant liability, which would materially adversely affect our business and financial condition.

***Our business is subject to extensive regulatory requirements and our approved product and product candidates that obtain regulatory approval will be subject to ongoing and continued regulatory review, which may result in significant expense and limit our ability to commercialize such products.***

Even after a product is approved, we remain subject to ongoing FDA and other regulatory requirements governing the labeling, packaging, storage, distribution, safety surveillance, advertising, promotion, import, export, record-keeping and reporting of safety and other post-market information. The holder of an approved NDA is obligated to monitor and report adverse events, or AEs, and any failure of a product to meet the specifications in the application. The holder of an approved NDA must also submit new or supplemental applications and obtain FDA approval for certain changes to the approved product, product labeling or manufacturing process. Advertising and promotional materials must comply with FDA rules and are subject to FDA review, in addition to other potentially applicable federal and state laws. In addition, the FDA may impose significant restrictions on the approved indicated uses for which the product may be marketed or on the conditions of approval. For example, a product's approval may contain requirements for potentially costly post-approval studies and surveillance to monitor the safety and efficacy of the product, or the imposition of a REMS program.

Manufacturers of drug products and their facilities are subject to payment of user fees and continual review and periodic inspections by the FDA and other regulatory authorities for compliance with current good manufacturing practices, or cGMP, and adherence to commitments made in the drug application. If we or a regulatory agency discovers previously unknown problems with a product, such as AEs of unanticipated severity or frequency, or problems with the facility where the product is manufactured, a regulatory agency may impose restrictions relative to that product or the manufacturing facility, including requiring product recall, notice to physicians, withdrawal of the product from the market or suspension of manufacturing.

If we or our products or product candidates or our manufacturing facilities fail to comply with applicable regulatory requirements, a regulatory agency may:

- issue warning letters or untitled letters asserting that we are in violation of the law;

- impose restrictions on the marketing or manufacturing of the product;

- seek an injunction or impose civil, criminal and/or administrative penalties, damages, assess monetary fines, require disgorgement, consider exclusion from participation in Medicare, Medicaid and other federal health care programs and require curtailment or restructuring of our operations;

41

- suspend or withdraw regulatory approval;

- suspend any ongoing clinical trials;

- refuse to approve a pending application or supplements to an application submitted by us;

- seize product; or

- refuse to allow us to enter into government contracts.

Similar post-market requirements may apply in foreign jurisdictions in which we may seek approval of our products. Any government investigation of alleged violations of law could require us to expend significant time and resources in response and could generate negative publicity. The occurrence of any event or penalty described above may inhibit our ability to commercialize our products and generate revenues.

In addition, the FDA's regulations, policies or guidance may change and new or additional statutes or government regulations in the United States and other jurisdictions may be enacted that could prevent or delay regulatory approval of our product candidates or further restrict or regulate post-approval activities. We cannot predict the likelihood, nature or extent of adverse government regulation that may arise from pending or future legislation or administrative action, either in the United States or abroad. If we are not able to achieve and maintain regulatory compliance, we may not be permitted to market our products and/or product candidates, which would adversely affect our ability to generate revenue and achieve or maintain profitability.

*Our employees, independent contractors, principal investigators, consultants, commercial partners and vendors may engage in misconduct or other improper activities, including non-compliance with regulatory standards and requirements and insider trading.*

We are exposed to the risk that our employees, independent contractors, principal investigators, consultants, commercial partners and vendors may engage in fraudulent conduct or other illegal activity. Misconduct by these parties could include intentional, reckless and/or negligent conduct that violates (1) the laws of the FDA and similar foreign regulatory bodies, including those laws requiring the reporting of true, complete and accurate information to such regulatory bodies; (2) health care laws and regulations, including fraud and abuse laws of the United States and similar foreign fraudulent misconduct laws; and (3) laws requiring the reporting of financial information or data accurately. Specifically, the promotion, sales and marketing of health care items and services, as well as certain business arrangements in the health care industry are subject to extensive laws designed to prevent misconduct, including fraud, kickbacks, self-dealing and other abusive practices. These laws may restrict or prohibit a wide range of pricing, discounting, marketing, structuring and commission(s), certain customer incentive programs and other business arrangements generally. Activities subject to these laws also involve the improper use of information obtained in the course of patient recruitment for clinical trials. It is not always possible to identify and deter employee and other third-party misconduct. The precautions we take to detect and prevent inappropriate conduct may not be effective in controlling unknown or unmanaged risks or losses or in protecting us from governmental investigations or other actions or lawsuits stemming from a failure to comply with these laws. If any such actions are instituted against us, and we are not successful in defending ourselves, those actions could have a significant impact on our business, including the imposition of civil, criminal and administrative penalties, damages, monetary fines, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings, and curtailment of our operations, any of which could adversely affect our ability to operate our business and our results of operations.

*Any relationships with health care professionals, principal investigators, consultants, customers (actual and potential) and third party payors, in addition to our general business operations, are and will continue to be subject, directly or indirectly, to federal and state health care fraud and abuse laws, marketing expenditure tracking and disclosure, or sunshine laws, government price reporting and health information privacy and security laws. If we are unable to comply, or have not fully complied, with such laws, we could face penalties, including, without limitation, civil, criminal and administrative penalties, damages, monetary fines, disgorgement, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings and curtailment or restructuring of our operations.*

Our business operations and activities may be directly, or indirectly, subject to various federal, state and local fraud and abuse laws, including, without limitation, the federal Anti-Kickback Statute and the federal civil False Claims Act. These laws may impact, among other things, our current activities with principal investigators and research subjects, as well as current, proposed and future sales, marketing and education programs. In addition, we may be subject to patient data privacy and security regulation by the federal government, state governments and foreign jurisdictions in which we conduct our business, as well as transparency requirements. The U.S. healthcare laws and regulations that may affect our ability to operate include, but are not limited to:

42

- the federal Anti-Kickback Statute, which prohibits, among other things, knowingly and willfully soliciting, receiving, offering or paying any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind, to induce, or in return for, either the referral of an individual, or the purchase, lease, order or recommendation of any good, facility, item or service for which payment may be made, in whole or in part, under a federal health care program, such as the Medicare and Medicaid programs. The Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010, or collectively, ACA, among other things, amends the intent requirement of the federal Anti-Kickback Statute and criminal healthcare fraud statutes such that a person or entity no longer needs to have actual knowledge of this statute or specific intent to violate it. In addition, the ACA provides that the government may assert that a claim including items or services resulting from a violation of the federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the federal civil False Claims Act;

- federal civil and criminal false claims laws, including the federal civil False Claims Act, and civil monetary penalty laws, which prohibit and impose penalties for, among other things, individuals or entities knowingly presenting, or causing to be presented, claims for payment or approval from the federal government including Medicare, Medicaid or certain other governmental health care programs that are false or fraudulent or knowingly making or causing to be made a false statement to improperly avoid, decrease or conceal an obligation to pay money to the federal government;

- the federal Health Insurance Portability and Accountability Act of 1996, or HIPAA, which created additional federal civil and criminal statutes that prohibit knowingly and willfully executing, or attempting to execute, a scheme to defraud any health care benefit program or obtain, by means of false or fraudulent pretenses, representations or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, regardless of the payor (e.g., public or private) and knowingly and willfully falsifying, concealing or covering up by any trick or device a material fact or making any materially false statements in connection with the delivery of, or payment for, health care benefits, items or services relating to health care matters;

- HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009, or HITECH, and their respective implementing regulations, which impose requirements on certain health care providers, health plans and health care clearinghouses, known as covered entities, or business associates, as well as their respective business associates, independent contractors or agents of covered entities that perform services for them that involve the use, or disclosure of, individually identifiable health information as well as their covered subcontractors, relating to the privacy, security and transmission of individually identifiable health information without appropriate authorization;

- the federal Physician Payments Sunshine Act, created under Section 6002 of the ACA, and its implementing regulations, which requires certain manufacturers of drugs, devices, biologicals and medical supplies for which payment is available under Medicare, Medicaid or the Children's Health Insurance Program (with certain exceptions) to report annually to the United States Department of Health and Human Services' Centers for Medicare & Medicare Services, or CMS, information related to payments or other transfers of value made to physicians (defined to include doctors, dentists, optometrists, podiatrists and chiropractors), other healthcare professionals (such as physician assistants an nurse practitioners), and teaching hospitals, as well as ownership and investment interests held by such physicians and their immediate family members;

- federal consumer protection and unfair competition laws, which broadly regulate marketplace activities and activities that potentially harm consumers;

- federal government price reporting laws, changed by ACA to, among other things, increase the minimum Medicaid rebates owed by most manufacturers under the Medicaid Drug Rebate Program and offer such rebates to additional populations, that require us to calculate and report complex pricing metrics to government programs, where such reported prices may be used in the calculation of reimbursement and/or discounts on our marketed drugs. Participation in these programs and compliance with the applicable requirements may subject us to potentially significant discounts on our products, increased infrastructure costs and potentially limit our ability to offer certain marketplace discounts;

- the Foreign Corrupt Practices Act, a United States law which regulates certain financial relationships with foreign government officials (which could include, for example, certain medical professionals); and

- state law equivalents of each of the above federal laws, such as anti-kickback, false claims, consumer protection and unfair competition laws which may apply to our business practices, including but not limited to, research, distribution, sales and marketing arrangements as well as submitting claims involving health care items or services reimbursed by any third party payors, including commercial insurers; state laws that require pharmaceutical companies to comply with the pharmaceutical industry's voluntary compliance guidelines and the relevant compliance guidance promulgated

43

by the federal government that otherwise restricts payments that may be made to health care providers; state laws that require drug manufacturers to file reports with states regarding marketing information, such as the tracking and reporting of gifts, compensations and other remuneration and items of value provided to health care professionals and entities (compliance with such requirements may require investment in infrastructure to ensure that tracking is performed properly, and some of these laws result in the public disclosure of various types of payments and relationships, which could potentially have a negative effect on our business and/or increase enforcement scrutiny of our activities), and drug pricing; state and local laws that require the registration of pharmaceutical sales representatives; and state laws governing the privacy and security of health information in certain circumstances, many of which differ from each other in significant ways, thus complicating compliance efforts.

In addition, any sales of our products or product candidates once commercialized outside the United States will also likely subject us to foreign equivalents of the health care laws mentioned above, among other foreign laws.

Efforts to ensure that our business arrangements will comply with applicable health care laws may involve substantial costs. It is possible that governmental and enforcement authorities will conclude that our business practices may not comply with current or future statutes, regulations or case law interpreting applicable fraud and abuse or other health care laws and regulations. If our operations are found to be in violation of any of the laws described above or any other governmental regulations that apply to us, we may be subject to, without limitation, significant civil, criminal and administrative penalties, damages, monetary fines, disgorgement, imprisonment, possible exclusion from participation in Medicare, Medicaid and other federal health care programs, integrity obligations, contractual damages, reputational harm, diminished profits and future earnings and curtailment or restructuring of our operations, any of which could adversely affect our ability to operate.

### *We are required to obtain regulatory approval for each of our products in each jurisdiction in which we intend to market such products, and the inability to obtain such approvals would limit our ability to realize their full market potential.*

In order to market products outside of the United States, we must comply with numerous and varying regulatory requirements of other countries regarding safety and efficacy. Clinical trials conducted in one country may not be accepted by regulatory authorities in other countries, and regulatory approval in one country does not mean that regulatory approval will be obtained in any other country. However, the failure to obtain regulatory approval in one jurisdiction may adversely impact our ability to obtain regulatory approval in another jurisdiction. Approval processes vary among countries and can involve additional product testing and validation and additional administrative review periods. Seeking foreign regulatory approval could result in difficulties and costs for us and require additional non-clinical studies or clinical trials which could be costly and time consuming. Regulatory requirements can vary widely from country to country and could delay or prevent the introduction of our products in those countries. If we fail to comply with regulatory requirements in international markets or to obtain and maintain required approvals, or if regulatory approval in international markets is delayed, our target market will be reduced and our ability to realize the full market potential of our products will be harmed.

### *If we fail to develop, acquire or in-license other product candidates or products, our business and prospects will be limited.*

Our long-term growth strategy is to develop and commercialize a portfolio of product candidates in addition to our existing product candidates. We may also acquire or in-license such product candidates, such as the license agreements we entered into with Combioxin for CAL02 and with AOP Orphan for Landiolol and our acquisition of the rights to BARHEMSYS and BYFAVO. Although we have internal research and development capacity that we believe will enable us to make improvements to existing compounds or active ingredients, we do not have internal drug discovery capabilities to identify and develop entirely new chemical entities or compounds. As a result, our primary means of expanding our pipeline of product candidates is to develop improved formulations and delivery methods for existing FDA-approved products and/or select and acquire or in-license product candidates for the treatment of therapeutic indications that complement or augment our current targets, or that otherwise fit into our development or strategic plans on terms that are acceptable to us. Developing new formulations of existing products or identifying, selecting and acquiring or in-licensing promising product candidates requires substantial technical, financial and human resources expertise. Efforts to do so may not result in the actual development, acquisition or in-license of a particular product candidate, potentially resulting in a diversion of our management's time and the expenditure of our resources with no resulting benefit. If we are unable to add additional product candidates to our pipeline, our long-term business and prospects will be limited.

### Risks Related to Commercialization of Our Products and Product Candidates

### *Our commercial success depends upon attaining significant market acceptance of our products and product candidates, if approved, among physicians, nurses, pharmacists, patients and the medical community.*

Even if we obtain regulatory approval for our product candidates, our products and product candidates may not gain market acceptance among physicians, nurses, pharmacists, patients, the medical community or third party payors, which is critical to

44

commercial success. Market acceptance of our products and any product candidate for which we receive approval depends on a number of factors, including:

- the timing of market introduction of the product candidate as well as competitive products;

- the clinical indications for which the product candidate is approved;

- the convenience and ease of administration to patients of the product candidate;

- the potential and perceived advantages of such product candidate over alternative treatments;

- the cost of treatment in relation to alternative treatments, including any similar generic treatments;

- the availability of coverage and adequate reimbursement by third party payors and government authorities;

- relative convenience and ease of administration;

- any negative publicity related to our or our competitors' products that include the same active ingredient;

- the prevalence and severity of adverse side effects, including limitations or warnings contained in a product's FDA-approved labeling; and

- the effectiveness of sales and marketing efforts.

Even if a potential product displays a favorable efficacy and safety profile in preclinical studies and clinical trials, market acceptance of the product will not be known until after it is launched. If our products or product candidates, if approved, fail to achieve an adequate level of acceptance by physicians, nurses, pharmacists, patients and the medical community, we will be unable to generate significant revenues, and we may not become or remain profitable. For example, in the first quarter of 2023 we decided to exit the vasopressin market by discontinuing all related manufacturing and halting sales beyond current inventory levels that are expected to be depleted by the end of the second quarter of 2023.

*Guidelines and recommendations published by government agencies can reduce the use of our products and product candidates.*

Government agencies promulgate regulations and guidelines applicable to certain drug classes which may include our products and product candidates that we are developing. Recommendations of government agencies may relate to such matters as usage, dosage, route of administration and use of concomitant therapies. Regulations or guidelines suggesting the reduced use of certain drug classes which may include our products and product candidates that we are developing or the use of competitive or alternative products as the standard of care to be followed by patients and health care providers could result in decreased use of our product candidates or negatively impact our ability to gain market acceptance and market share.

*If we are unable to successfully conduct our sales and marketing capabilities or if our commercial partners do not adequately perform, the commercial opportunity for our products may be diminished.*

We have a commercial organization to promote certain of our approved products in the United States. The cost of maintaining such an organization may exceed the benefits, and there are significant risks involved in building and managing a sales organization, including our ability to hire, retain and incentivize qualified individuals, generate sufficient sales leads, provide adequate training to sales and marketing personnel and effectively manage a geographically dispersed sales and marketing team. In addition, we may not be successful in commercializing our products despite such commercial organization.

We and any other commercialization partner we engage in the future may not be able to attract, hire, train and retain qualified sales and sales management personnel. If we or our future partners, if any, are not successful in maintaining an effective number of qualified sales personnel, our ability to effectively market and promote our products may be impaired.

The efforts of our partners in many instances would likely be outside our control. If any future partner is unsuccessful in their efforts, or we are unable to maintain such commercial partnerships or to effectively establish alternative arrangements for our products, our business could be adversely affected.

*A substantial portion of our total revenues is derived from sales of a limited number of products.*

We derive a substantial portion of our revenue from royalties derived from the sales of one product: Bendeka. This product is sold by our partner Teva Pharmaceuticals. During the year ended December 31, 2022, Bendeka accounted for approximately 33% of our total revenue. The sale of our products can be significantly influenced by the efforts of our partners, which are out of our control, as well as market conditions and regulatory actions. We may experience decreases in the sale of our products in the future as a result of actions taken by our competitors, such as price reductions or entry into the market for competing products, or as a result of regulatory actions related to our products or competing products, which could have a material impact on our results of operations and financial condition.

45

***If we obtain approval to commercialize any approved products outside of the United States, a variety of risks associated with international operations could materially adversely affect our business.***

We may enter into agreements with third parties to market our products outside the United States. We expect that we will be subject to additional risks related to entering into international business relationships, including:

- different regulatory requirements for drug approvals in foreign countries;

- differing payor reimbursement regimes, governmental payors or patient self-pay systems and price controls;

- reduced protection for intellectual property rights;

- unexpected changes in tariffs, trade barriers and regulatory requirements;

- economic weakness, including inflation, or political instability in particular foreign economies and markets;

- compliance with tax, employment, immigration and labor laws for employees living or traveling abroad;

- foreign taxes, including withholding of payroll taxes;

- foreign currency fluctuations, which could result in increased operating expenses and reduced revenue, and other obligations incident to doing business in another country;

- workforce uncertainty in countries where labor unrest is more common than in the United States;

- production shortages resulting from any events affecting raw material supply or manufacturing capabilities abroad; and

- business interruptions resulting from geopolitical actions, including war and terrorism, or natural disasters including earthquakes, typhoons, floods and fires or public health issues or pandemics including the coronavirus.

***We face significant competition from other biotechnology and pharmaceutical companies, and our operating results will suffer if we fail to compete effectively.***

The biopharmaceutical industries are intensely competitive and subject to rapid and significant technological change. Many of our competitors both in the United States and internationally, include major multinational pharmaceutical companies, biotechnology companies and universities and other research institutions. For example, Ryanodex, and products with dantrolene sodium as the API, is currently marketed in the United States by, among others, Endo International plc, Impax Laboratories, Inc., Hikma Pharmaceuticals, LLC, US WorldMeds, LLC, Mylan Institutional, LLC, and Elite Laboratories, Inc. While our formulations of this product is distinct, and we believe improvements, compared to those competitors mentioned, competition from these products on factors such as price and availability effect our commercial efforts. Additionally, we must compete with alternative drug treatments (as opposed to alternative formulations) for many of the indications that our products are approved to treat.

Many of our competitors have substantially greater financial, technical and other resources, such as larger research and development staff and experienced marketing and manufacturing organizations. Mergers and acquisitions in the biotechnology and pharmaceutical industries may result in even more resources being concentrated in our competitors. As a result, these companies may obtain regulatory approval more rapidly than we are able and may be more effective in selling and marketing their products as well. Smaller or early-stage companies may also prove to be significant competitors, particularly through collaborative arrangements with large, established companies. Competition may increase further as a result of advances in the commercial applicability of technologies and greater availability of capital for investment in these industries. Our competitors may succeed in developing, acquiring or licensing on an exclusive basis drug products or drug delivery technologies that are more effective or less costly than our products or any product candidate that we are currently developing or that we may develop. In addition, our competitors may file citizens' petitions with the FDA in an attempt to persuade the FDA that our products, or the clinical studies that support their approval, contain deficiencies. Such actions by our competitors could delay or even prevent the FDA from approving any application we submit.

We believe that our ability to successfully compete will depend on, among other things:

- the efficacy and safety of our products and product candidates, including as relative to marketed products and product candidates in development by third parties;

- the time it takes for our product candidates to complete clinical development and receive marketing approval;

- the ability to maintain a good relationship with regulatory authorities;

- the ability to commercialize and market any of our product candidates that receive regulatory approval;

- the price of our products, including in comparison to branded or generic competitors;

46

- whether coverage and adequate levels of reimbursement are available under private and governmental health insurance plans, including Medicare;

- the ability to protect intellectual property rights related to our products and product candidates;

- the ability to manufacture on a cost-effective basis and sell commercial quantities of our products and product candidates that receive regulatory approval; and

- acceptance of any of our products and product candidates that receive regulatory approval by physicians and other health care providers.

If our competitors market products that are more effective, safer or less expensive than our products or product candidates, or that reach the market sooner than our product candidates, we may enter the market too late in the cycle and may not achieve commercial success. In addition, the biopharmaceutical industry is characterized by rapid technological change. Because we have limited research and development capabilities, it may be difficult for us to stay abreast of the rapid changes in each technology. If we fail to stay at the forefront of technological change, we may be unable to compete effectively. Technological advances or products developed by our competitors may render our technologies, products or product candidates obsolete, less competitive or not economical.

*We could incur substantial costs and disruption to our business and delays in the launch of our product candidates if our competitors and/or collaborators bring legal actions against us, which could harm our business and operating results.*

We cannot predict whether our competitors or potential competitors, some of whom we collaborate with, may bring legal actions against us based on our research, development and commercialization activities, as well as any product candidates or products resulting from these activities, claiming, among other things, infringement of their intellectual property rights, breach of contract or other legal theories. For example, in the first quarter of 2023, Curia Global, Inc. ("Curia") filed a demand for arbitration against us for breach of contract, account stated and breach of the implied covenant of good faith and fair dealing arising from our supply agreement with Curia relating to vasopressin, seeking damages in excess of $76.7 million. In addition, Curia filed an action against us in New York State Court, claiming breach of contract and account stated arising from our supply agreement with Curia relating to PEMFEXY, seeking damages in excess of $4.2 million. We cannot assure we will be successful in defending such claims. If we are forced to defend any such lawsuits, whether they are with or without merit or are ultimately determined in our favor, we may face costly litigation and diversion of technical and management personnel. These lawsuits could hinder our ability to enter the market early with our product candidates and thereby hinder our ability to influence usage patterns when fewer, if any, of our potential competitors have entered such market, which could adversely impact our potential revenue from such product candidates or negatively impact our ability to gain market acceptance and market share for our products. We are currently involved in various ongoing litigation matters, as discussed elsewhere in this Annual Report on Form 10-K.

Some of our competitors have substantially greater resources than we do and could be able to sustain the cost of litigation to a greater extent and for longer periods of time than we could. Furthermore, an adverse outcome of a dispute may require us: to pay damages, potentially including treble damages and attorneys' fees, if we are found to have willfully infringed a party's patent or other intellectual property rights; to cease making, licensing or using products that are alleged to incorporate or make use of the intellectual property of others; to expend additional development resources to reformulate our products or prevent us from marketing a certain drug; and to enter into potentially unfavorable royalty or license agreements in order to obtain the rights to use necessary technologies. Royalty or licensing agreements, if required, may be unavailable on terms acceptable to us, or at all.

*If we are unable to achieve and maintain adequate levels of coverage and reimbursement for our products or product candidates, if approved, their commercial success may be severely hindered.*

Successful sales of our products and any other approved product candidates depend on the availability of adequate coverage and reimbursement from third party payors. Patients who are prescribed medications for the treatment of their conditions generally rely on third party payors to reimburse all or part of the costs associated with their prescription drugs. Adequate coverage and reimbursement from governmental health care programs, such as Medicare and Medicaid, and commercial payors is critical to new product acceptance. In the United States, third-party payors often rely upon Medicare coverage policy and payment limitations in setting their own coverage and reimbursement policies. However, decisions regarding the extent of coverage and amount of reimbursement to be provided for any product candidates that we develop will be made on a payor-by-payor basis. Coverage decisions may depend upon clinical and economic standards that disfavor new drug products when more established or lower cost therapeutic alternatives are already available or subsequently become available. Reimbursement by a third party payor may depend upon a number of factors, including but not limited to, the third party payor's determination that use of a product is: a covered benefit under its health plan; safe, effective, and medically necessary; appropriate for the specific patient; cost-effective; and/or neither cosmetic, experimental, nor investigational.

47

Assuming we obtain coverage for a given product, the resulting reimbursement payment rates might not be adequate or may require co-payments that patients find unacceptably high. Patients are unlikely to use our products unless coverage is provided and reimbursement is adequate to cover a significant portion of the cost of our products.

In addition, the market for our products and our product candidates will depend significantly on access to third party payors' drug formularies, or lists of medications for which third party payors provide coverage and reimbursement. The industry competition to be included in such formularies often leads to downward pricing pressures on pharmaceutical companies. Also, third party payors may refuse to include a particular branded drug in their formularies or otherwise restrict patient access through formulary controls or otherwise to a branded drug when a less costly generic equivalent or other alternative is available.

Further, coverage policies and third-party payor reimbursement rates may change at any time. Therefore, even if favorable coverage and reimbursement status is attained, less favorable coverage policies and reimbursement rates may be implemented in the future. Third party payors, whether foreign or domestic, or governmental or commercial, are developing increasingly sophisticated methods of controlling health care costs. In addition, in the United States, no uniform policy requirement for coverage and reimbursement for drug products exists among third party payors. Therefore, coverage and reimbursement for drug products can differ significantly from payor to payor. As a result, the coverage determination process is often a time-consuming and costly process that could require us to provide scientific, clinical and cost effectiveness support for the use of our products to each payor separately, with no assurance that coverage and adequate reimbursement will be applied consistently or obtained in the first instance. Even if we obtain coverage for a given product, the resulting reimbursement payment rates might not be adequate for us to sustain profitability.

Further, we believe that future coverage and reimbursement will likely be subject to increased restrictions both in the United States and in international markets. Third party coverage and reimbursement for our commercial products, and our pre-clinical and clinical product candidates for which we may receive regulatory approval, may not be available or adequate in either the United States or international markets, which could have a material adverse effect on our business, results of operations, financial condition and prospects.

***Current and future legislation may increase the difficulty and cost for us to commercialize our product candidates and affect the prices we may obtain for our products.***

The United States and some foreign jurisdictions are considering, or have enacted, a number of legislative and regulatory proposals to change the health care system in ways that could affect our ability to sell our products and our product candidates profitably, once they are approved for sale. Among policy makers and payors in the United States and elsewhere, there is significant interest in promoting changes in health care systems with the stated goals of containing health care costs, improving quality and/or expanding access. In the United States, the pharmaceutical industry has been a particular focus of these efforts and has been significantly affected by major legislative initiatives.

By way of example, in March 2010, the ACA was passed, which significantly changed health care financing by both governmental and private insurers. There have been executive, judicial and Congressional challenges to certain aspects of the ACA. For example, on June 17, 2021, the U.S. Supreme Court dismissed a challenge on procedural grounds that argued the ACA is unconstitutional in its entirety because the "individual mandate" was repealed by Congress. Prior to the U.S. Supreme Court ruling, on January 28, 2021, President Biden issued an executive order that initiated a special enrollment for purposes of obtaining health insurance coverage through the ACA marketplace. The executive order also instructed certain governmental agencies to review and reconsider their existing policies and rules that limit access to healthcare, including among others, reexamining Medicaid demonstration projects and waiver programs that include work requirements, and policies that create unnecessary barriers to obtaining access to health insurance coverage through Medicaid or the ACA. On August 16, 2022, President Biden signed the Inflation Reduction Act of 2022, or IRA, into law, which among other things, extends enhanced subsidies for individuals purchasing health insurance coverage in ACA marketplaces through plan year 2025. The IRA also eliminates the "donut hole" under the Medicare Part D program beginning in 2025 by significantly lowering the beneficiary maximum out-of-pocket cost and through a newly established manufacturer discount program. It is possible that the ACA will be subject to judicial or Congressional challenges in the future. It is unclear how such challenges and the healthcare reform measures of the Biden administration will impact ACA and our business. We cannot predict how future federal or state legislative or administrative changes relating to healthcare reform will affect our business.

In addition, other legislative changes have been proposed and adopted since the ACA was enacted. For example, in August 2011, President Obama signed into law the Budget Control Act of 2011, which, among other things, created the Joint Select Committee on Deficit Reduction to recommend proposals for spending reductions to Congress. The Joint Select Committee on Deficit Reduction did not achieve its targeted deficit reduction of at least $1.2 trillion for the years 2013 through 2021, triggering the legislation's automatic reductions to several government programs. These reductions include aggregate reductions to Medicare payments to providers of up to 2% per fiscal year, which went into effect on April 1, 2013 and, following passage of the Bipartisan Budget Act of 2015 as well as certain legislative amendments, will remain in effect through 2031 unless

48

additional Congressional action is taken. Under current legislation the actual reduction in Medicare payments will vary from 1% in 2022 to up to 3% in the final fiscal year of this sequester. On March 11, 2021, President Biden signed the American Rescue Plan Act of 2021 into law, which eliminates the statutory Medicaid drug rebate cap, currently set at 100% of a drug's average manufacturer price, for single source and innovator multiple source drugs, beginning January 1, 2024. Additionally, in January 2013, President Obama signed into law the American Taxpayer Relief Act of 2012, which, among other things, further reduced Medicare payments to several providers and increased the statute of limitations period for the government to recover overpayments to providers from three to five years.

Additionally, there has been increasing legislative and enforcement interest in the United States with respect to drug pricing practices. Specifically, there have been several recent U.S. Congressional inquiries, Presidential executive orders, and proposed and adopted federal and state legislation designed to, among other things, bring more transparency to drug pricing, review the relationship between pricing and manufacturer patient programs, and reform government program reimbursement methodologies for drugs. . For example, the former U.S. Presidential administration used several means to propose or implement drug pricing reform, including through federal budget proposals, executive orders and policy initiatives. For example, in May 2019, the Centers for Medicare & Medicaid Services, or CMS, issued a final rule to allow Medicare Advantage Plans the option of using step therapy for Part B drugs beginning on January 1, 2020. The final rule codified a CMS policy change that was effective January 1, 2019. In a final rule issued by CMS on December 31, 2020, CMS established a broader definition for a "line extension" drug such that the line extension of the initial brand name listed drug would not need to be an oral solid dosage form. This final rule may impact the rebate amounts associated with our products and negatively affect the commercial success of our products. Additionally, on December 2, 2020, CMS published changes to the Medicare Physician Fee Schedule for Calendar Year 2021 that also may adversely impact the coverage and reimbursement of our products. Under the changes, CMS assigned certain 505(b)(2) drug products to existing multiple source drug codes because, according to CMS, some drug products approved under the 505(b)(2) pathway share similar labeling and uses with generic drugs that are assigned to multiple source drug codes. CMS noted that this change was consistent with efforts to "curb drug prices" and encourages competition among products that are described by one billing code and share similar labeling. Additionally, in July 2021, the Biden administration released an executive order, "Promoting Competition in the American Economy," with multiple provisions aimed at prescription drugs. In response to Biden's executive order, on September 9, 2021, HHS released a Comprehensive Plan for Addressing High Drug Prices that outlines principles for drug pricing reform and sets out a variety of potential legislative policies that Congress could pursue as well as potential administrative actions HHS can take to advance these principles. No legislation or administrative actions have been finalized to implement these principles. In addition, the IRA, among other things, (1) directs HHS to negotiate the price of certain single-source drugs and biologics covered under Medicare and (2) imposes rebates under Medicare Part B and Medicare Part D to penalize price increases that outpace inflation. These provisions will take effect progressively starting in fiscal year 2023, although they may be subject to legal challenges. It is currently unclear how the IRA will be implemented but is likely to have a significant impact on the pharmaceutical industry. Further, the Biden administration released an additional executive order on October 14, 2022, directing HHS to submit a report on how the Center for Medicare and Medicaid Innovation can be further leveraged to test new models for lowering drug costs for Medicare and Medicaid beneficiaries. It is unclear whether these or similar policy initiatives will be implemented in the future. At the state level, legislatures have increasingly passed legislation and implemented regulations designed to control pharmaceutical and biological product pricing, including price or patient reimbursement constraints, discounts, restrictions on certain product access and marketing cost disclosure and transparency measures, and, in some cases, designed to encourage importation from other countries and bulk purchasing. The full impact of these laws, as well as other new laws and reform measures that may be proposed and adopted in the future remains uncertain, but may result in additional reductions in Medicare and other health care funding, or higher production costs which could have a material adverse effect on our customers and, accordingly, our financial operations. Further, it is possible that additional governmental action is taken in response to the COVID-19 pandemic.

**Risks Related to Our Reliance on Third Parties**

***We rely on third parties to conduct our preclinical studies and clinical trials. If these third parties do not successfully carry out their contractual duties or meet expected deadlines, we may not be able to obtain regulatory approval for or commercialize our product candidates and our business could be substantially harmed.***

We have relied upon and plan to continue to rely upon third party CROs to monitor and manage data for our preclinical and clinical programs. We rely on these parties for execution of our preclinical studies and clinical trials, and control only certain aspects of their activities. Nevertheless, we are responsible for ensuring that each of our trials is conducted in accordance with the applicable protocol, legal, regulatory and scientific standards and our reliance on the CROs does not relieve us of our regulatory responsibilities. We and our CROs are required to comply with FDA regulations and other laws regarding current good clinical practice, or GCP, which are also required by the Competent Authorities of the Member States of the European Economic Area and comparable foreign regulatory authorities in the form of International Council for Harmonization, or ICH, guidelines for all of our products in clinical development. Regulatory authorities enforce GCP through periodic inspections of trial sponsors, principal investigators and trial sites. If we or any of our CROs fail to comply with applicable GCP, the clinical

49

data generated in our clinical trials may be deemed unreliable and the FDA or comparable foreign regulatory authorities may require us to perform additional clinical trials before approving our marketing applications. We cannot assure you that upon inspection by a given regulatory authority, such regulatory authority will determine that any of our clinical trials comply with GCP regulations. In addition, our clinical trials must be conducted with product produced under cGMP regulations. While we have agreements governing activities of our CROs, we have limited influence over their actual performance. In addition, portions of the clinical trials for our product candidates are expected to be conducted outside of the United States, which will make it more difficult for us to monitor CROs and perform visits of our clinical trial sites and will force us to rely heavily on CROs to ensure the proper and timely conduct of our clinical trials and compliance with applicable regulations, including GCP. Failure to comply with applicable regulations in the conduct of the clinical trials for our product candidates may require us to repeat clinical trials, which would delay the regulatory approval process.

Some of our CROs have an ability to terminate their respective agreements with us if, among other reasons, it can be reasonably demonstrated that the safety of the subjects participating in our clinical trials warrants such termination, if we make a general assignment for the benefit of our creditors or if we are liquidated. If any of our relationships with these third party CROs terminate, we may not be able to enter into arrangements with alternative CROs or to do so on commercially reasonable terms. In addition, our CROs are not our employees, and except for remedies available to us under our agreements with such CROs, we cannot control whether or not they devote sufficient time and resources to our preclinical and clinical programs. If CROs do not successfully carry out their contractual duties or obligations or meet expected deadlines, if they need to be replaced or if the quality or accuracy of the clinical data they obtain is compromised due to the failure to adhere to our clinical protocols, regulatory requirements or for other reasons, our clinical trials may be extended, delayed or terminated and we may not be able to obtain regulatory approval for or successfully commercialize our product candidates. Consequently, our results of operations and the commercial prospects for our product candidates would be harmed, our costs could increase substantially and our ability to generate revenue could be delayed significantly.

Switching or adding additional CROs involves additional cost and requires management time and focus. In addition, there is a natural transition period when a new CRO commences work. As a result, delays occur, which can materially impact our ability to meet our desired clinical development timelines. Though we carefully manage our relationships with our CROs, there can be no assurance that we will not encounter challenges or delays in the future or that these delays or challenges will not have a material adverse impact on our business, financial condition and prospects.

*If any of our current strategic collaborators fail to perform their obligations or terminate their agreements with us, the development and commercialization of the product candidates under such agreements could be delayed or terminated and our business could be substantially harmed.*

In 2015, we entered into the Cephalon License, with Cephalon (Teva) for U.S. and Canadian rights to Bendeka for treatment of patients with CLL and patients with NHL. Pursuant to the terms of the Cephalon License, as has been amended from time to time,

Teva is responsible for all U.S. commercial activities for the product including promotion and distribution, and we are responsible for obtaining and maintaining all regulatory approvals and conducting post-approval clinical studies.

This strategic collaboration may not be scientifically or commercially successful due to a number of important factors, including the following:

- If we fail to maintain any regulatory approvals, or otherwise materially breach the agreement, we may not receive all anticipated royalty payments;
- Cephalon has significant discretion in determining the efforts and resources that it will apply to their strategic collaboration with us. The timing and amount of any cash payments, and royalties that we may receive under such agreements will depend on, among other things, the efforts, allocation of resources and the commercialization of our product by Cephalon under the Cephalon License;
- Cephalon currently markets a competitive bendamustine product, Treanda®, in the United States. In addition, it is possible that Cephalon may develop and commercialize, either alone or with others, or be acquired by a company that has, products that are similar to or competitive with the product candidates that they license from us;
- Cephalon may change the focus of their commercialization efforts or pursue higher-priority programs;
- Cephalon may terminate its strategic collaboration with us on short notice, which could make it difficult for us to attract new strategic collaborators or adversely affect how we are perceived in the scientific and financial communities;
- Cephalon has the right to maintain or defend our intellectual property rights licensed to them in their territories, and, although we may have the right to assume the maintenance and defense of our intellectual property rights if they do not, our ability to do so may be compromised by our strategic collaborators' acts or omissions; and

50

- Cephalon may not comply with all applicable regulatory requirements, or fail to report safety data in accordance with all applicable regulatory requirements;
- If Cephalon fails to effectively commercialize our product, we may not be able to replace them with another collaborator, and,
- If our agreement with Cephalon terminates, we are required to pay them a portion of our future profits on the product.
  Any of these events could have a material adverse effect on our business, results of operations and our ability to achieve future profitability, and could cause our stock price to decline.

***We may not be successful in maintaining development and commercialization collaborations, and any partner may not devote sufficient resources to the development or commercialization of our product candidates or may otherwise fail in development or commercialization efforts, which could adversely affect our ability to develop certain of our product candidates and our financial condition and operating results.***

We have entered in licensing and/or collaboration agreements with third parties, including our license agreement with AOP Orphan for Landiolol and our strategic collaboration with Tyme (now merged with Syros) to advance oral SM-88 for the treatment of patients with cancer. If we are able to establish additional collaboration arrangements, any such collaborations, in addition to our current license and collaboration agreements, may not ultimately be successful, which could have a negative impact on our business, results of operations, financial condition and prospects. If we partner with a third party for development and commercialization of a product or product candidate, we can expect to relinquish some or all of the control over the future success of that product or product candidate to the third party. It is possible that a partner may not devote sufficient resources to the development or commercialization of our product candidate or may otherwise fail in development or commercialization efforts, in which event the development and commercialization of such product candidate could be delayed or terminated and our business could be substantially harmed. In addition, the terms of any collaboration or other arrangement that we establish may not prove to be favorable to us or may not be perceived as favorable, which may negatively impact the trading price of our common stock. In some cases, we may be responsible for continuing development of a product candidate or research program under a collaboration, and the payment we receive from our partner may be insufficient to cover the cost of this development. Moreover, collaborations and sales and marketing arrangements are complex and time consuming to negotiate, document and implement, and they may require substantial resources to maintain.

We may be subject to a number of additional risks associated with our collaborations with third parties, the occurrence of which could cause collaboration arrangements to fail. Conflicts may arise between us and our partners, such as conflicts concerning the interpretation of clinical data, the achievement of milestones, the interpretation of financial provisions or the ownership of intellectual property developed during the collaboration. If any such conflicts arise, a partner could act in its own self-interest, which may be adverse to our interests. Any such disagreement between us and a partner could result in one or more of the following, each of which could delay or prevent the development or commercialization of our product candidates and harm our business:

- reductions in the payment of royalties or other payments we believe are due pursuant to the applicable collaboration arrangement;

- actions taken by a partner inside or outside our collaboration which could negatively impact our rights or benefits under our collaboration; and

- unwillingness on the part of a partner to keep us informed regarding the progress of its development and commercialization activities or to permit public disclosure of the results of those activities.

***We rely on third parties to manufacture commercial supplies of our products and clinical supplies of our product candidates, and we intend to rely on third parties to manufacture commercial supplies of any other approved products. The commercialization of any of our products could be stopped, delayed or made less profitable if those third parties fail to provide us with sufficient quantities of product or fail to do so at acceptable quality levels or prices or fail to maintain or achieve satisfactory regulatory compliance.***

We do not own any manufacturing facilities, and we do not currently, and do not expect in the future, to independently conduct any aspects of our product manufacturing and testing, or other activities related to the clinical development and commercialization of our product candidates. We currently rely, and expect to continue to rely, on third parties with respect to these items, and control only certain aspects of their activities.

51

Any of these third parties may terminate their engagements with us at any time. If we need to enter into alternative arrangements, it could delay our product candidate development and product commercialization activities. Our reliance on these third parties reduces our control over these activities but does not relieve us of our responsibility to ensure compliance with all required legal, regulatory and scientific standards and any applicable trial protocols. If these third parties do not successfully carry out their contractual duties, meet expected deadlines or conduct our studies in accordance with regulatory requirements or our stated study plans and protocols, we will not be able to complete, or may be delayed in completing, clinical trials required to support future regulatory submissions and approval of our product candidates.

Our products and product candidates are highly reliant on very complex sterile techniques and personnel aseptic techniques. The facilities used by our third-party manufacturers to manufacture our products and product candidates must be approved by the applicable regulatory authorities pursuant to inspections that will be conducted after we submit our NDA to the FDA. If any of our third-party manufacturers cannot successfully manufacture material that conforms to our specifications and the applicable regulatory authorities' strict regulatory requirements, or pass regulatory inspection, they will not be able to secure or maintain regulatory approval for the manufacturing facilities. In addition, we have no control over the ability of third-party manufacturers to maintain adequate quality control, quality assurance and qualified personnel. Quality problems in manufacturing are linked to a majority of shortages of sterile injectable drugs. Some of the largest manufacturers of sterile injectable drugs have had serious quality problems leading to the temporary voluntary closure or renovations of major production facilities. Further, as we scale up manufacturing of our product candidates and conduct required stability testing, product packaging, equipment and process-related issues may require refinement or resolution in order for us to proceed with our planned clinical trials and obtain regulatory approval for commercialization of our product candidates. In the future, for example, we may identify impurities in the product manufactured for us for commercial supply, which could result in increased scrutiny by the regulatory agencies, delays in our clinical program and regulatory approval, increases in our operating expenses, or failure to obtain or maintain approval for our product candidates. If the FDA or any other applicable regulatory authority does not approve these facilities to manufacture our products or if they withdraw any such approval in the future, or if our suppliers or third-party manufacturers decide they no longer want to manufacture our products, we may need to find alternative manufacturing facilities, which would significantly impact our ability to develop, obtain regulatory approval for or market our products or product candidates.

More generally, manufacturers of pharmaceutical products often encounter difficulties in production, particularly in scaling up and validating initial production. These problems include difficulties with production costs and yields, quality control, including stability of the product, quality assurance testing, shortages of qualified personnel, as well as compliance with strictly enforced federal, state and foreign regulations. Additionally, our manufacturers may experience manufacturing difficulties due to resource constraints or as a result of labor disputes or unstable political environments. If our manufacturers were to encounter any of these difficulties, or otherwise fail to comply with their contractual obligations, our ability to make product candidates available for clinical trials and development purposes or to further commercialize our products or product candidates in the United States would be jeopardized. Any delay or interruption in our ability to meet commercial demand may result in the loss of potential revenues and could adversely affect our ability to gain market acceptance for approved products. In addition, any delay or interruption in the supply of clinical trial supplies could delay the completion of clinical trials, increase the costs associated with maintaining clinical trial programs and, depending upon the period of delay, require us to commence new clinical trials at additional expense or terminate clinical trials completely. Additionally, if supply from one approved manufacturer is interrupted, there could be a significant disruption in commercial supply. Regulatory agencies may also require additional studies if a new manufacturer is relied upon for commercial production. Switching manufacturers may involve substantial costs and is likely to result in a delay in our desired clinical and commercial timelines.

The occurrence of any of these factors could have a material adverse effect on our business, results of operations, financial condition and prospects.

***The design, development, manufacture, supply, and distribution of our products and product candidates is highly regulated and technically complex.***

All entities involved in the preparation of therapeutics for clinical trials or commercial sale, including our existing contract manufacturers for our products and product candidates, are subject to extensive regulation. Components of a finished therapeutic product approved for commercial sale or used in late-stage clinical trials must be manufactured in accordance with cGMP and equivalent foreign standards. These regulations govern manufacturing processes and procedures (including record keeping) and the implementation and operation of quality systems to control and assure the quality of investigational products and products approved for sale. Poor control of production processes can lead to the introduction of adventitious agents or other contaminants, or to inadvertent changes in the properties or stability of our products or product candidates that may not be detectable in final product testing. The development, manufacture, supply, and distribution of our products, as well as our other product candidates, is highly regulated and technically complex. We, along with our third-party providers, must comply with all applicable regulatory requirements of the FDA and foreign authorities.

We, or our contract manufacturers, must supply all necessary documentation in support of our regulatory filings for our products and product candidates on a timely basis and must adhere to the FDA's good laboratory practices, or GLP, and cGMP regulations enforced by the FDA through its facilities inspection program, and the equivalent standards of the regulatory authorities in other countries. Any failure by our third-party manufacturers to comply with cGMP or failure to scale-up manufacturing processes, including any failure to deliver sufficient quantities of product candidates in a timely manner, could lead to a delay in, or failure to obtain, regulatory approval of any of our product candidates. Our facilities and quality systems and the facilities and quality systems of some or all of our third-party contractors must also pass a pre-approval inspection for compliance with the applicable regulations as a condition of regulatory approval of our product candidates or any of our other potential products. In addition, the regulatory authorities in any country may, at any time, audit or inspect a manufacturing facility involved with the preparation of our product candidates or our other potential products or the associated quality systems for compliance with the regulations applicable to the activities being conducted. If these facilities and quality systems do not pass a pre-approval plant inspection, FDA approval of our product candidates, or the equivalent approvals in other jurisdictions, will not be granted.

Regulatory authorities also may, at any time following approval of a product for sale, audit our manufacturing facilities or those of our third-party contractors. If any such inspection or audit identifies a failure to comply with applicable regulations or if a violation of our product specifications or applicable regulations occurs independent of such an inspection or audit, we or the relevant regulatory authority may require remedial measures that may be costly and/or time-consuming for us or a third party to implement and that may include the temporary or permanent suspension of a clinical trial or commercial sales or the temporary or permanent closure of a facility. Any such remedial measures imposed upon us or third parties with whom we contract could materially harm our business. If we or any of our third-party manufacturers fail to maintain regulatory compliance, the FDA can impose regulatory sanctions including, among other things, refusal to approve a pending application for a new drug product or biological product or revocation of a pre-existing approval. As a result, our business, financial condition and results of operations may be materially harmed.

***We rely on limited sources of supply for our products and product candidates, and any disruption in the chain of supply may impact production and sales of our products and cause delay in developing and commercializing our product candidates.***

We currently have relationships with only one third party for the manufacture of each of our most advanced products and product candidates. Because of the unique equipment and process for manufacturing our products transferring manufacturing activities to an alternate supplier would be a time-consuming and costly endeavor, and there are only a limited number of manufacturers that we believe are capable of performing this function for us. Switching finished drug suppliers may involve substantial cost and could result in a delay in our desired clinical and commercial timelines. If any of these single-source manufacturers breaches or terminates their agreements with us, we would need to identify an alternative source for the manufacture and supply of product candidates to us for the purposes of our development and commercialization of the applicable products. Identifying an appropriately qualified source of alternative supply for any one or more of these product candidates could be time consuming, and we may not be able to do so without incurring material delays in the development and commercialization of our product candidates, which could harm our financial position and commercial potential for our products. Any alternative vendor would also need to be qualified through an NDA supplement which could result in further delay. The FDA or other regulatory agencies outside of the United States may also require additional studies if we appoint a new manufacturer for supply of our product candidates that differs from the manufacturer used for clinical development of such product candidates. For our other product candidates, we expect that only one supplier will initially be qualified as a vendor with the FDA. If supply from the approved vendor is interrupted, there could be a significant disruption in commercial supply.

These factors could cause the delay of clinical trials, regulatory submissions, required approvals or commercialization of our product candidates, cause us to incur higher costs and prevent us from commercializing them successfully. Furthermore, if our suppliers fail to deliver the required commercial quantities of components and active pharmaceutical ingredient on a timely basis and at commercially reasonable prices, and we are unable to secure one or more replacement suppliers capable of production at a substantially equivalent cost, our clinical trials may be delayed or we could lose potential revenue.

***We may not be successful in establishing development and commercialization collaborations which could adversely affect, and potentially prohibit, our ability to develop our product candidates.***

Because developing pharmaceutical products, conducting clinical trials, obtaining regulatory approval, establishing manufacturing capabilities and marketing approved products are expensive, we are exploring collaborations with third parties outside of the United States that have more resources and experience. We may, however, be unable to advance the development of our products and product candidates in territories outside of the United States, which may limit the market potential for this product candidate.

In situations where we enter into a development and commercial collaboration arrangement for a product candidate, we may also seek to establish additional collaborations for development and commercialization in territories outside of those addressed

by the first collaboration arrangement for such product candidate. There are a limited number of potential partners, and we expect to face competition in seeking appropriate partners. We have entered into collaboration and promotion agreements with third parties, but there is no assurance these arrangements will be successful. If we are unable to enter into any future development and commercial collaborations and/or sales and marketing arrangements on acceptable terms, if at all, we may be unable to successfully develop and seek regulatory approval for our product candidates and/or effectively market and sell future approved products, if any, in all of the territories outside of the United States where it may otherwise be valuable to do so.

*If we are unable to maintain our GPO, relationships, our revenues could decline and future profitability could be jeopardized.*

Most of the end-users of injectable pharmaceutical products have relationships with GPOs whereby such GPOs provide such end-users access to a broad range of pharmaceutical products from multiple suppliers at competitive prices and, in certain cases, exercise considerable influence over the drug purchasing decisions of such end-users. Hospitals and other end-users contract with the GPO of their choice for their purchasing needs. We currently derive, and expect to continue to derive, a large percentage of our revenue from end-user customers that are members of a small number of GPOs. Maintaining strong relationships with these GPOs will require us to continue to be a reliable supplier, remain price competitive and comply with FDA regulations. The GPOs with whom we have relationships may have relationships with companies that sell competing products, and such GPOs may earn higher margins from these products or combinations of competing products or may prefer products other than ours for other reasons. If we are unable to maintain our GPO relationships, sales of our products and revenue could decline.

*We rely on a limited number of pharmaceutical wholesalers to distribute our products.*

As is typical in the pharmaceutical industry, we rely upon pharmaceutical wholesalers in connection with the distribution of our products. A significant amount of our products are sold to end-users under GPO pricing arrangements through a limited number of pharmaceutical wholesalers. If we are unable to maintain our business relationships with these pharmaceutical wholesalers on commercially acceptable terms, it could have a material adverse effect on our sales and may prevent us from achieving profitability.

*Our approved products may not achieve expected levels of market acceptance.*

Even if we are able to obtain regulatory approvals for our product candidates, the success of those products is dependent upon market acceptance. Levels of market acceptance for our product candidates could be affected by several factors, including:

- the availability of alternative products from our competitors;
- the price of our products relative to those of our competitors;
- the timing of our market entry;
- the ability to market our products effectively at the retail level;
- the perception of patients and the healthcare community, including third-party payors, regarding the safety efficacy and benefits of our drug products compared to those of competing products; and
- the acceptance of our products by government and private formularies.

Some of these factors are not within our control, and our products may not achieve expected levels of market acceptance. Additionally, continuing and increasingly sophisticated studies of the proper utilization, safety and efficacy of pharmaceutical products are being conducted by the industry, government agencies and others which may call into question the utilization, safety and efficacy of previously marketed products. In some cases, studies have resulted, and may in the future result, in the discontinuance of product marketing or other risk management programs such as the need for a patient registry.

**Risks Related to Our Business Operations and Industry**

*We may engage in strategic transactions to acquire assets, businesses, or rights to products, product candidates or technologies or form collaborations or make investments in other companies or technologies that could harm our operating results, dilute our stockholders' ownership, increase our debt, or cause us to incur significant expense.*

As part of our business strategy, we may engage in additional strategic transactions to expand and diversify our product pipeline, including through the acquisition of assets, businesses, or rights to products, product candidates or technologies or through strategic alliances or collaborations, similar to our acquisition of Acacia and investment in Enalare. We may not identify suitable strategic transactions, or complete such transactions in a timely manner, on a cost-effective basis, or at all. Moreover, we may devote resources to potential opportunities that are never completed or we may incorrectly judge the value or worth of such opportunities. Even if we successfully execute a strategic transaction, we may not be able to realize the anticipated benefits of such transaction, may incur additional debt or assume unknown or contingent liabilities in connection therewith, and may experience losses related to our investments in such transactions. Integration of an acquired company or assets into our existing business may not be successful and may disrupt ongoing operations, require the hiring of additional personnel and the implementation of additional internal systems and infrastructure, and require management resources that

54

would otherwise focus on developing our existing business. Even if we are able to achieve the long-term benefits of a strategic transaction, our expenses and short-term costs may increase materially and adversely affect our liquidity. Any of the foregoing could have a detrimental effect on our business, results of operations and financial condition.

In addition, potential future strategic transactions may entail numerous operational, financial and legal risks, including:

- incurrence of substantial debt, dilutive issuances of securities or depletion of cash to pay for acquisitions;
- exposure to known and unknown liabilities, including possible intellectual property infringement claims, violations of laws, tax liabilities and commercial disputes;
- higher than expected acquisition and integration costs;
- difficulty in integrating operations and personnel of any acquired business;
- increased amortization expenses or, in the event that we write-down the value of acquired assets, impairment losses;
- impairment of relationships with key suppliers or customers of any acquired business due to changes in management and ownership;
- inability to retain personnel, customers, distributors, vendors and other business partners integral to an in-licensed or acquired product, product candidate or technology;
- potential failure of the due diligence processes to identify significant problems, liabilities or other shortcomings or challenges;
- entry into indications or markets in which we have no or limited direct prior development or commercial experience and where competitors in such markets have stronger market positions; and
- other challenges associated with managing an increasingly diversified business.

If we are unable to successfully manage any strategic transaction in which we may engage, our ability to develop and commercialize new products and continue to expand and diversify our product pipeline may be limited.

***We may fail to realize all of the anticipated benefits of the Acacia acquisition, those benefits may take longer to realize than expected, or we may encounter integration difficulties.***

Our ability to realize the anticipated benefits of our Acacia acquisition will depend, to a large extent, on our ability to continue integrating Acacia and BARHEMSYS and BYFAVO, into our business and realize anticipated growth opportunities and synergies. We have devoted and will need to continue to devote significant management attention and resources to integrating these products into our business. The process may be disruptive to our business and the expected benefits may not be achieved within the anticipated time frame, or at all. The failure to meet the challenges involved and to realize the anticipated benefits of the transaction could adversely affect our business, financial condition and results of operations.

Our ability to realize the anticipated benefits of the transaction is expected to entail numerous material potential difficulties, including, among others:

- the effectiveness of our sales force;
- the level of orders submitted by wholesalers, hospitals and surgery centers;
- the level of institutional demand for our products;
- unit sales prices, [net of any sales reserves ];
- the diversion of management attention to integration matters;
- difficulties in achieving anticipated business opportunities and growth prospects from the acquisition;
- difficulties in assimilating employees; and
- potential unknown liabilities, adverse consequences, unforeseen increased expenses or other unanticipated problems associated with the transaction.

Many of these factors are outside of our control, and any one of them could result in increased costs, decreased expected revenues and further diversion of management time and energy, which could materially impact our business, financial condition and results of operations.

In addition, we now possess not only the rights to BARHEMSYS and BYFAVO, but also certain corresponding liabilities and obligations, including the contractual liabilities and regulatory obligations that we have assumed upon closing of the transaction, including certain post-marketing commitments. Failure to satisfy any such requirements could delay our realization of, or prevent us from ever realizing, the anticipated benefits from the transaction. Further, it is possible that undisclosed, contingent, or other liabilities or problems may arise in the future of which we were previously unaware. These undisclosed liabilities could have an adverse effect on our business, financial condition and results of operations.

55

All of these factors could decrease or delay the expected accretive effect of the transaction and negatively impact our stock price. As a result, it cannot be assured that our Acacia acquisition will result in the full realization of the benefits anticipated from the transaction within the anticipated time frames or at all.

In addition, we may not realize some or all of the anticipated benefits of our investment in Enalare. Our ability to realize the anticipated benefits of our investment in Enalare will depend, to a large extent, on potential FDA submission, partnership with Biomedical Advanced Research and Development Authority and Orphan Drug Designation of ENA-001. There is no assurance that these development programs and regulatory activities will be completed successfully. In addition, pursuant to the terms of the Purchase Agreement, we are obligated to further invest in Enalare, including two additional $15.0 million milestone payments upon achievement of the milestones specified in the Purchase Agreement. The first $15.0 million investment shall occur upon the dosing of the first patient in a Phase 2 human clinical trial of any product containing the active ingredient ENA-001. The second $15.0 million investment shall occur when patient enrollment in the Phase 2 human clinical trial of a Product Candidate reaches 50%. We also have the option to acquire all of the remaining outstanding shares of Enalare other than those already owned by us subject to the terms and conditions of the agreement. Given our rights and obligations under the Enalare agreement, we may forego or delay pursuit of other opportunities that may have proven to have greater commercial potential. In addition, we may forego our option to acquire Enalare. There is no assurance that Enalare's development programs will be successful and that the milestones will be achieved in the expected timeframe, or at all, or that we will exercise the option to purchase the remaining Enalare shares if and when such option were to become available. All of these factors could negatively impact our stock price.

***We may expend our resources to pursue a particular product, product candidate or indication and fail to capitalize on product candidates or indications that may be more profitable or for which there is a greater likelihood of success.***

We focus on products, research programs and product candidates for specific indications. As a result, we may forgo or delay pursuit of opportunities with other product candidates or for other indications that later prove to have greater commercial potential.

For example, in connection with our acquisition of Acacia, we paid to the Acacia securityholders (i) cash consideration of approximately $76 million, and (ii) 516,024 shares of our common stock. We may never realize the anticipated benefits of the acquisition of Acacia and by investing our resources in BARHEMSYS and BYFAVO, we may be required to forgo or delay other opportunities.

In addition, we and our collaboration partners have previously commenced clinical trials that were not successful for a number of reasons, including inconsistent or negative data and difficulties identifying qualified patients. Our resource allocation decisions may cause us to fail to capitalize on viable commercial products or profitable market opportunities. Our spending on current and future research and development programs and product candidates for specific indications may not yield any commercially viable products.

Notwithstanding our large investments to date and anticipated future expenditures in proprietary technologies for both small-molecule and gene therapy drug discovery, to date we have been granted marketing authorization for a limited number of commercial products and have only recently achieved profitability. We may never realize a return on investment. We may not be able to successfully renew or satisfy the ongoing requirements of our current marketing authorizations for our current products and we may never successfully develop any other marketable drugs or indications using our scientific approach. As a result of pursuing the development of product candidates using our proprietary technologies, we may fail to develop product candidates or address indications based on other scientific approaches that may offer greater commercial potential or for which there is a greater likelihood of success. Research programs to identify new product candidates require substantial technical, financial and human resources. These research programs may initially show promise in identifying potential product candidates, yet fail to yield product candidates for clinical development.

If we do not accurately evaluate the commercial potential or target market for a particular product candidate, we may relinquish valuable rights to that product candidate through collaboration, licensing or other royalty arrangements in cases in which it would have been more advantageous for us to retain sole development and commercialization rights to such product candidate. Further, even if we could successfully develop new products or indications, we may make a strategic decision to discontinue development of a product candidate or indication if, for example, we believe commercialization will be difficult relative to the standard of care or we prefer to pursue other opportunities in our pipeline. For example, in the first quarter of 2023 we decided to exit the vasopressin market by discontinuing all related manufacturing and halting sales beyond current inventory levels that are expected to be depleted by the end of the second quarter of 2023.

***Our future success depends on our ability to retain key executives and to attract, retain and motivate qualified personnel.***

We are highly dependent on the principal members of our executive team, which include our Chief Executive Officer and President, and Chief Financial Officer. We are currently searching for a new Chief Medical Officer, which position is currently

56

vacant. The loss of these executives' services may adversely impact the achievement of our objectives. Any of our executive officers could leave our employment at any time, as all of our employees are "at will" employees. Recruiting and retaining other qualified employees for our business, including scientific and technical personnel, will also be critical to our success. There is currently a shortage of skilled executives in our industry, which is likely to continue. As a result, competition for skilled personnel is intense and the turnover rate can be high. We may not be able to attract and retain personnel on acceptable terms given the competition among numerous pharmaceutical companies for individuals with similar skill sets. In addition, failure to succeed in clinical studies may make it more challenging to recruit and retain qualified personnel. The inability to recruit key executives or the loss of the services of any executive or key employee might impede the progress of our development and commercialization objectives.

*We will need to expand our organization, and we may experience difficulties in managing this growth, which could disrupt our operations.*

As of December 31, 2022, we had a total of 134 employees in the United States and one employee in the United Kingdom. As our company matures, we expect to expand our employee base to increase our managerial, scientific and engineering, operational, sales, marketing, financial and other resources and to hire more consultants and contractors. Future growth would impose significant additional responsibilities on our management, including the need to identify, recruit, maintain, motivate and integrate additional employees, consultants and contractors. Also, our management may need to divert a disproportionate amount of its attention away from our day-to-day activities and devote a substantial amount of time to managing these growth activities.

We may not be able to effectively manage the expansion of our operations which may result in weaknesses in our infrastructure and give rise to operational mistakes, loss of business opportunities, loss of employees and reduced productivity among remaining employees. Future growth could require significant capital expenditures and may divert financial resources from other projects, such as the development of our existing or future product candidates. If our management is unable to effectively manage our growth, our expenses may increase more than expected, our ability to generate and/or grow revenue could be reduced and we may not be able to implement our business strategy. Our future financial performance and our ability to sell our products and commercialize our product candidates, if approved, and compete effectively will depend, in part, on our ability to effectively manage any future growth

*We face potential product liability, and, if successful claims are brought against us, we may incur substantial liability.*

The use of our product candidates in clinical trials (if any), and the sale of our products and any product candidates for which we obtain marketing approval, exposes us to the risk of product liability claims. Product liability claims might be brought against us by consumers, health care providers, pharmaceutical companies or others selling or otherwise coming into contact with our products, other approved future products and our product candidates. If we cannot successfully defend against product liability claims, we could incur substantial liability and costs. In addition, regardless of merit or eventual outcome, product liability claims may result in:

- impairment of our business reputation;
- withdrawal of clinical study participants;
- costs due to related litigation;
- distraction of management's attention from our primary business;
- substantial monetary awards to patients or other claimants;
- the inability to commercialize our product candidates; and
- decreased demand for our products and our product candidates, if approved for commercial sale.

Our current product liability insurance coverage may not be sufficient to reimburse us for any expenses or losses we may suffer. Moreover, insurance coverage is becoming increasingly expensive and in the future we may not be able to maintain insurance coverage at a reasonable cost or in sufficient amounts to protect us against losses due to liability. On occasion, large judgments have been awarded in class action lawsuits based on drugs that had unanticipated adverse effects. A successful product liability claim or series of claims brought against us could cause our stock price to decline and, if judgments exceed our insurance coverage, could adversely affect our results of operations and business.

*We are subject to stringent and changing obligations related to data privacy and security. Our actual or perceived failure to comply with such obligations could lead to regulatory investigations or actions; litigation; fines and penalties; disruptions of our business operations; reputational harm; loss of revenue or profits; and other adverse business consequences.*

57

In the ordinary course of business, we collect, receive, store, process, generate, use, transfer, disclose, make accessible, protect, secure, dispose of, transmit, and share (commonly known as processing) personal data and other sensitive information, including proprietary and confidential business data, trade secrets, intellectual property, data we collect about participants in connection with clinical trials, and sensitive third-party data. Our data processing activities subject us to numerous data privacy and security obligations, such as various laws, regulations, guidance, industry standards, external and internal privacy and security policies, contracts, and other obligations that govern the processing of personal data by us and on our behalf.

In the United States, federal, state, and local governments have enacted numerous data privacy and security laws, including data breach notification laws, personal data privacy laws, and consumer protection laws. For example, the federal Health Insurance Portability and Accountability Act of 1996, or HIPAA, as amended by the Health Information Technology for Economic and Clinical Health Act, or HITECH, imposes specific requirements relating to the privacy, security, and transmission of individually identifiable health information. Additionally, the California Consumer Privacy Act of 2018, or CCPA, imposes obligations on covered businesses. These obligations include, but are not limited to, providing specific disclosures in privacy notices and affording California residents certain rights related to their personal data. The CCPA allows for statutory fines for noncompliance (up to $7,500 per violation) and a private right of action for certain data breaches. Although the CCPA exempts some data processed in the context of clinical trials, the CCPA may increase compliance costs and potential liability with respect to other personal data we may maintain about California residents. In addition, it is anticipated that the California Privacy Rights Act of 2020, or CPRA, effective January 1, 2023, will expand the CCPA. The CPRA establishes a new California Privacy Protection Agency to implement and enforce the CPRA, which could increase the risk of enforcement. Other states have enacted data privacy laws. For example, Virginia passed the Consumer Data Protection Act, and Colorado passed the Colorado Privacy Act, both of which become effective in 2023. In addition, data privacy and security laws have been proposed at the federal, state, and local levels in recent years, which could further complicate compliance efforts.

Outside the United States, an increasing number of laws, regulations, and industry standards apply to data privacy and security. For example, the European Union's General Data Protection Regulation, or EU GDPR, and the United Kingdom's GDPR, or UK GDPR, impose strict requirements for processing personal data. For example, under the EU GDPR, government regulators may impose temporary or definitive bans on data processing, as well as fines of up to 20 million euros or 4% of annual global revenue, whichever is greater. Further, individuals may initiate litigation related to the processing of their personal data.

Certain jurisdictions have enacted data localization laws and cross-border personal data transfer laws, which could make it more difficult to transfer information across jurisdictions (such as transferring or receiving personal data that originates in the EU or in other foreign jurisdictions). Existing mechanisms that facilitate cross-border personal data transfers may change or be invalidated. For example, absent appropriate safeguards or other circumstances, the EU GDPR generally restricts the transfer of personal data to countries outside of the European Economic Area, or EEA, that the European Commission does not consider to provide an adequate level of data privacy and security, such as the United States. The European Commission released a set of "Standard Contractual Clauses," or SCCs, that are designed to be a valid mechanism to facilitate personal data transfers out of the EEA to these jurisdictions. Currently, these SCCs are a valid mechanism to transfer personal data outside of the EEA, but there exists some uncertainty regarding whether the SCCs will remain a valid mechanism. Additionally, the SCCs impose additional compliance burdens, such as conducting transfer impact assessments to determine whether additional security measures are necessary to protect the at-issue personal data. In addition, Switzerland and the UK similarly restrict personal data transfers outside of those jurisdictions to countries, such as the United States, that do not provide an adequate level of personal data protection, and certain countries outside Europe (e.g., China) have also passed or are considering laws requiring local data residency or otherwise impeding the transfer of personal data across borders, any of which could increase the cost and complexity of doing business.

If we cannot implement a valid compliance mechanism for cross-border data transfers, we may face increased exposure to regulatory actions, substantial fines, and injunctions against processing or transferring personal data from Europe or other foreign jurisdictions. The inability to import personal data to the United States could significantly and negatively impact our business operations, including by limiting our ability to conduct clinical trial activities; limiting our ability to collaborate with parties that are subject to such cross-border data transfer or localization laws; or requiring us to increase our personal data processing capabilities and infrastructure in foreign jurisdictions at significant expense.

Our obligations related to data privacy and security are quickly changing in an increasingly stringent fashion, creating some uncertainty as to the effective future legal framework. Additionally, these obligations may be subject to differing applications and interpretations, which may be inconsistent or conflict among jurisdictions. Preparing for and complying with these obligations requires significant resources and may necessitate changes to our information technologies, systems, and practices and to those of any third parties that process personal data on our behalf. Although we endeavor to comply with all applicable

data privacy and security obligations, we may at times fail (or be perceived to have failed) to do so. Moreover, despite our efforts, our personnel or third parties upon whom we rely may fail to comply with such obligations, which could negatively impact our business operations and compliance posture. For example, any failure by a third-party processor to comply with applicable law, regulations, or contractual obligations could result in adverse effects, including inability to or interruption in our ability to operate our business and proceedings against us by governmental entities or others.

If we fail, or are perceived to have failed, to address or comply with data privacy and security obligations, we could face significant consequences. These consequences may include, but are not limited to, government enforcement actions (e.g., investigations, fines, penalties, audits, inspections, and similar); litigation (including class-related claims); additional reporting requirements and/or oversight; bans on processing personal data; orders to destroy or not use personal data; and imprisonment of company officials.

Any of these events could have a material adverse effect on our reputation, business, or financial condition, including but not limited to: interruptions in our business operations; inability to process personal data or to operate in certain jurisdictions; limited ability to develop or commercialize our products; expenditure of time and resources to defend any claim or inquiry; adverse publicity; or revision or restructuring of our operations.

*If our information technology systems or sensitive information, or those of third parties upon which we rely, are or were compromised, we could experience adverse consequences resulting from such compromise, including, but not limited to, regulatory investigations or actions; litigation; fines and penalties; disruptions of our business operations; reputational harm; loss of revenue or profits; loss of customers or sales; and other adverse consequences.*

In the ordinary course of our business, we may process proprietary, confidential, and sensitive data, including personal data (such as health-related data), intellectual property, and trade secrets (collectively, sensitive information). We may rely upon third-party service providers and technologies to operate critical business systems to process sensitive information in a variety of contexts, including, without limitation, third-party providers of cloud-based infrastructure, encryption and authentication technology, employee email, and other functions. Our ability to monitor these third parties' information security practices is limited, and these third parties may not have adequate information security measures in place. We may share or receive sensitive information with or from third parties.

Cyberattacks, malicious internet-based activity, and online and offline fraud are prevalent and continue to increase. These threats are becoming increasingly difficult to detect. These threats come from a variety of sources, including traditional computer "hackers," threat actors, personnel (such as through theft or misuse), sophisticated nation states, and nation-state-supported actors. Some actors now engage and are expected to continue to engage in cyber-attacks, including, without limitation, nation-state actors for geopolitical reasons and in conjunction with military conflicts and defense activities. We and the third parties upon which we rely may be subject to a variety of evolving threats, including, but not limited to, social-engineering attacks (including through phishing attacks), malicious code (such as viruses and worms), malware (including as a result of advanced persistent threat intrusions), denial-of-service attacks (such as credential stuffing), personnel misconduct or error, ransomware attacks, supply-chain attacks, software bugs, server malfunctions, software or hardware failures, loss of data or other information technology assets, adware, telecommunications failures, and other similar threats.

Ransomware attacks, including by organized criminal threat actors, nation-states, and nation-state-supported actors, are becoming increasingly prevalent and severe and can lead to significant interruptions in our operations, loss of data and income, reputational harm, and diversion of funds. Extortion payments may alleviate the negative impact of a ransomware attack, but we may be unwilling or unable to make such payments due to, for example, applicable laws or regulations prohibiting such payments. Similarly, supply-chain attacks have increased in frequency and severity, and we cannot guarantee that third parties and infrastructure in our supply chain or our third-party partners' supply chains have not been compromised or that they do not contain exploitable defects or bugs that could result in a breach of or disruption to our information technology systems or the third-party information technology systems that support us and our business operations. The COVID-19 pandemic and our continuing remote workforce poses increased risks to our information technology systems and data, as more of our employees work from home, utilizing network connections outside our premises. Future or past business transactions (such as acquisitions or integrations) could expose us to additional cybersecurity risks and vulnerabilities, as our systems could be negatively affected by vulnerabilities present in acquired or integrated entities' systems and technologies.

Any of the previously identified or similar threats could cause a security incident or other interruption. A security incident or other interruption could result in unauthorized, unlawful, or accidental acquisition, modification, destruction, loss, alteration,

59

encryption, disclosure of, or access to our sensitive information. A security incident or other interruption could disrupt our ability (and that of third parties upon whom we rely) to operate our business.

We may expend significant resources or modify our business activities (including our clinical trial activities) to try to protect against security incidents. Certain data privacy and security obligations may require us to implement and maintain specific security measures, industry-standard or reasonable security measures to protect our information technology systems and sensitive information.

While we have implemented security measures designed to protect against security incidents, there can be no assurance that these measures will be effective. We may be unable in the future to detect vulnerabilities in our information technology systems because such threats and techniques change frequently, are often sophisticated in nature, and may not be detected until after a security incident has occurred. Despite our efforts to identify and remediate vulnerabilities, if any, in our information technology systems, our efforts may not be successful. Further, we may experience delays in developing and deploying remedial measures designed to address any such identified vulnerabilities.

Applicable data privacy and security obligations may require us to notify relevant stakeholders of security incidents. Such disclosures are costly, and the disclosures or the failure to comply with such requirements could lead to adverse consequences. If we (or a third party upon whom we rely) experience a security incident or are perceived to have experienced a security incident, we may experience adverse consequences. These consequences may include: government enforcement actions (for example, investigations, fines, penalties, audits, and inspections); additional reporting requirements and/or oversight; restrictions on processing sensitive information (including personal data); litigation (including class claims); indemnification obligations; negative publicity; reputational harm; monetary fund diversions; interruptions in our operations (including availability of data); financial loss; and other similar harms. Security incidents and attendant consequences may negatively impact our ability to grow and operate our business. Our contracts may not contain limitations of liability, and even where they do, there can be no assurance that limitations of liability in our contracts are sufficient to protect us from liabilities, damages, or claims related to our data privacy and security obligations.

*Business interruptions could delay us in the process of developing our product candidates and could disrupt our sales of any products we may sell.*

Our headquarters are located in Woodcliff Lake, New Jersey. If we encounter any disruptions to our operations at this building or if it were to shut down for any reason, including by fire, natural disaster, such as a hurricane, tornado or severe storm, power outage, systems failure, labor dispute or other unforeseen disruption, then we may be prevented from effectively operating our business. We do not carry insurance for natural disasters and we may not carry sufficient business interruption insurance to compensate us for losses that may occur. Any losses or damages we incur could have a material adverse effect on our business operations.

*We may be constrained by our obligations under our Third Amended Credit Agreement to operate our business to its full potential.*

On November 1, 2022, we entered into the Third Amended and Restated Credit Agreement (the "Third Amended Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Administrative Agent") and the lenders party thereto, which replaced our prior credit agreement, dated as of November 8, 2019 (the "Second Amended Credit Agreement"). The terms and amounts borrowed under the Third Amended Credit Agreement includes a drawn term loan of $50 million and a $100 million revolving credit facility of which $15.0 million was drawn on November 1, 2022. In addition, approximately $35.4 million of the proceeds of the credit facility were used to refinance all amounts outstanding under the Second Amended Credit Agreement. All amounts outstanding under the Third Amended Credit Agreement shall be due and payable on October 31, 2025, unless otherwise accelerated or extended pursuant to the terms of the Third Amended Credit Agreement.

Our Third Amended Credit Agreement contains customary representations and warranties and customary affirmative and negative covenants applicable to us and our consolidated subsidiaries, including, among other things, restrictions on indebtedness, liens, investments, mergers, dispositions, prepayment of other indebtedness and dividends and other distributions. Under the terms of the Third Amended Credit Agreement, we are required to comply with (a) a maximum total net leverage ratio, (b) a fixed charge coverage ratio and (c) a minimum liquidity covenant. These terms may restrict our ability to operate our business in the manner we deem most effective or desirable, and may restrict our ability to fund our operations through new offerings of our common stock or strengthen our candidate development pipeline through acquisitions or licenses which would cause us to exceed our maximum senior secured net leverage ratio.

60

Failure to comply with the representations and warranties or affirmative and negative covenants could constitute an event of default which, if continued beyond any applicable cure period, would allow the Administrative Agent, at the request of or with the consent of the lenders holding a majority of the loans and commitments under the facility, to terminate the commitments of the lenders to make further loans and declare all the obligations of the loan parties under the Third Amended Credit Agreement to be immediately due and payable, either of which could harm our business.

In addition, our obligations under the Third Amended Credit Agreement are secured by a pledge of substantially all of our assets. If we are unable to pay our obligations when due, the Administrative Agent on behalf of the lenders could proceed to protect and enforce their rights under the Third Amended Credit Agreement, including by foreclosure on the assets securing our obligations under the Third Amended Credit Agreement). The foregoing would materially and adversely affect our business.

**Risks Related to Our Intellectual Property**

***If we are unable to obtain or protect intellectual property rights related to any of our product candidates, we may not be able to compete effectively in our market.***

We rely upon a combination of patents, trade secret protection and confidentiality agreements to protect the intellectual property related to our products and our product candidates. The strength of patents in the biotechnology and pharmaceutical field involves complex legal and scientific questions and can be uncertain. The patent applications that we own or in-license may fail to result in issued patents with claims that cover the products in the United States or in foreign countries or territories. If this were to occur, early generic competition could be expected against our products and our product candidates in development. There may be relevant prior art relating to our patents and patent applications which could invalidate a patent or prevent a patent from issuing based on a pending patent application. In particular, because the active pharmaceutical ingredients in many of our product candidates have been on the market as separate products for many years, it is possible that these products have previously been used off-label in such a manner that such prior usage would affect the validity of our patents or our ability to obtain patents based on our patent applications.

Even if patents do successfully issue, third parties may challenge their validity, enforceability or scope, which may result in such patents being narrowed or invalidated. Any adverse outcome in these types of matters could result in one or more generic versions of our products being launched before the expiration of the listed patents, which could adversely affect our ability to successfully execute our business strategy to increase sales of our products and would negatively impact our financial condition and results of operations, including causing a significant decrease in our revenues and cash flows.

Furthermore, even if they are unchallenged, our patents and patent applications may not adequately protect our intellectual property or prevent others from designing around our claims. If the patent applications we hold with respect to our products or product candidates fail to issue or if their breadth or strength of protection is threatened, it could dissuade companies from collaborating with us to develop them and threaten our ability to commercialize our product candidates. We cannot offer any assurances about which, if any, patents will issue or whether any issued patents will be found not invalid and not unenforceable or will go unthreatened by third parties. Further, if we encounter delays in regulatory approvals, the period of time during which we could market our product candidates under patent protection could be reduced. If third parties have filed such patent applications, an interference proceeding in the United States can be provoked by a third party or instituted by us to determine who was the first to invent any of the subject matter covered by the patent claims of our applications.

In addition to the protection afforded by patents, we rely on trade secret protection and confidentiality agreements to protect proprietary know-how that is not patentable, processes for which patents are difficult to enforce and any other elements of our drug development and reformulation processes that involve proprietary know-how, information or technology that is not covered by patents. For example, we maintain trade secrets with respect to certain of the formulation and manufacturing techniques related to our products and our product candidates. Although we generally require all of our employees to assign their inventions to us, and all of our employees, consultants, advisors and any third parties who have access to our proprietary know-how, information or technology to enter into confidentiality agreements, we cannot provide any assurances that all such agreements have been duly executed or that our trade secrets and other confidential proprietary information will not be disclosed or that competitors will not otherwise gain access to our trade secrets or independently develop substantially equivalent information and techniques. We also seek to preserve the integrity and confidentiality of our data and trade secrets by maintaining physical security of our premises and physical and electronic security of our information technology systems. While we have confidence in these individuals, organizations and systems, agreements or security measures may be breached, and we may not have adequate remedies for any breach. In addition, our trade secrets may otherwise become known or be independently discovered by competitors. Additionally, if the steps taken to maintain our trade secrets are deemed inadequate, we may have insufficient recourse against third parties for misappropriating the trade secret. In addition, others may independently discover our trade secrets and proprietary information.

61

Our ability to obtain patents is highly uncertain because, to date, some legal principles remain unresolved, there has not been a consistent policy regarding the breadth or interpretation of claims allowed in patents in the United States and the specific content of patents and patent applications that are necessary to support and interpret patent claims is highly uncertain due to the complex nature of the relevant legal, scientific and factual issues. Changes in either patent laws or interpretations of patent laws in the United States and other countries may diminish the value of our intellectual property or narrow the scope of our patent protection. For example, on September 16, 2011, the Leahy-Smith America Invents Act, or the Leahy-Smith Act, was signed into law. The Leahy-Smith Act includes a number of significant changes to United States patent law. These include provisions that affect the way patent applications will be prosecuted and may also affect patent litigation. The United States Patent and Trademark Office, or USPTO, has developed new and untested regulations and procedures to govern the full implementation of the Leahy-Smith Act, and many of the substantive changes to patent law associated with the Leahy-Smith Act, and in particular, the first to file provisions, only became effective in March 2013. The Leahy-Smith Act has also introduced procedures making it easier for third-parties to challenge issued patents, as well as to intervene in the prosecution of patent applications. Finally, the Leahy-Smith Act contains new statutory provisions that still require the USPTO to issue new regulations for their implementation and it may take the courts years to interpret the provisions of the new statute. Accordingly, it is too early to tell what, if any, impact the Leahy-Smith Act will have on the operation of our business and the protection and enforcement of our intellectual property. However, the Leahy-Smith Act and its implementation could increase the uncertainties and costs surrounding the prosecution of our patent applications and the enforcement or defense of our issued patents. An inability to obtain, enforce and defend patents covering our proprietary technologies would materially and adversely affect our business prospects and financial condition.

Further, the laws of some foreign countries do not protect proprietary rights to the same extent or in the same manner as the laws of the United States. As a result, we may encounter significant problems in protecting and defending our intellectual property both in the United States and abroad. For example, if the issuance to us, in a given country, of a patent covering an invention is not followed by the issuance, in other countries, of patents covering the same invention, or if any judicial interpretation of the validity, enforceability, or scope of the claims in, or the written description or enablement in, a patent issued in one country is not similar to the interpretation given to the corresponding patent issued in another country, our ability to protect our intellectual property in those countries may be limited. Changes in either patent laws or in interpretations of patent laws in the United States and other countries may materially diminish the value of our intellectual property or narrow the scope of our patent protection. If we are unable to prevent material disclosure of the non-patented intellectual property related to our technologies to third parties, and there is no guarantee that we will have any such enforceable trade secret protection, we may not be able to establish or maintain a competitive advantage in our market, which could materially adversely affect our business, results of operations and financial condition.

***Our drug development strategy relies heavily upon the 505(b)(2) regulatory pathway, which requires us to certify that we do not infringe upon third-party patents covering approved drugs. Such certifications typically result in third-party claims of intellectual property infringement, the defense of which will be costly and time consuming, and an unfavorable outcome in any litigation may prevent or delay our development and commercialization efforts which would harm our business.***

Litigation or other proceedings to enforce or defend intellectual property rights are often complex in nature, may be very expensive and time-consuming, may divert our management's attention from other aspects of our business and may result in unfavorable outcomes that could adversely impact our ability to launch and market our product candidates, or to prevent third parties from competing with our products and product candidates.

There is a substantial amount of litigation, both within and outside the United States, involving patent and other intellectual property rights in the biotechnology and pharmaceutical industries, including patent infringement lawsuits, interferences, oppositions and inter party reexamination proceedings before the USPTO. Numerous United States and foreign issued patents and pending patent applications, which are owned by third parties, exist in the fields in which we and our collaborators are developing product candidates. As the biotechnology and pharmaceutical industries expand and more patents are issued, the risk increases that our product candidates may be subject to claims of infringement of the patent rights of third parties.

In particular, our commercial success depends in large part on our avoiding infringement of the patents and proprietary rights of third parties for existing approved drug products. Because we utilize the 505(b)(2) regulatory pathway for the approval of our products and product candidates, we rely in whole or in part on studies conducted by third parties related to those approved drug products. As a result, upon filing with the FDA for approval of our product candidates, we will be required to certify to the FDA that either: (1) there is no patent information listed in the FDA's Orange Book with respect to our NDA; (2) the patents listed in the Orange Book have expired; (3) the listed patents have not expired, but will expire on a particular date and approval is sought after patent expiration; or (4) the listed patents are invalid or will not be infringed by the manufacture, use or sale of our proposed drug product. When we submit a paragraph IV certification to the FDA, a notice of the paragraph IV certification must also be sent to the patent owner once our 505(b)(2) NDA is accepted for filing by the FDA. The third party may then initiate a lawsuit against us to defend the patents identified in the notice. The filing of a patent infringement lawsuit within

45 days of receipt of the notice automatically prevents the FDA from approving our NDA until the earliest of 30 months or the date on which the patent expires, the lawsuit is settled, or the court reaches a decision in the infringement lawsuit in our favor. If the third party does not file a patent infringement lawsuit within the required 45-day period, our NDA will not be subject to the 30-month stay.

In addition to paragraph IV litigation noted above, third-party owners of patents may generally assert that we are employing their proprietary technology without authorization. There may be third-party patents or patent applications with claims to materials, formulations, methods of manufacture or methods for treatment related to the use or manufacture of our products and/or our product candidates. Because patent applications can take many years to issue, there may be currently pending or subsequently filed patent applications which may later result in issued patents that may be infringed by our products or product candidates. If any third-party patents were held by a court of competent jurisdiction to cover aspects of our product candidates, including the formulation, method of use, any method or process involved in the manufacture of any of our product candidates, any molecules or intermediates formed during such manufacturing process or any other attribute of the final product itself, the holders of any such patents may be able to block our ability to commercialize our product candidates unless we obtain a license under the applicable patents, or until such patents expire. In either case, such a license may not be available on commercially reasonable terms or at all.

Parties making claims against us may request and/or obtain injunctive or other equitable relief, which could effectively block our ability to further develop and commercialize one or more of our product candidates on a temporary or permanent basis. Defense of these claims, regardless of their merit, would involve substantial litigation expense and would be a substantial diversion of employee resources from our business. In the event of a successful claim of infringement against us, we may have to pay substantial damages, including treble damages and attorneys' fees for willful infringement, obtain one or more licenses from third parties, pay royalties or redesign our infringing products or manufacturing processes, which may be impossible or require substantial time and monetary expenditure. We cannot predict whether any such license would be available at all or whether it would be available on commercially reasonable terms. Furthermore, even in the absence of litigation, we may need to obtain licenses from third parties to advance our research, manufacture clinical trial supplies or allow commercialization of our product candidates. We may fail to obtain any of these licenses at a reasonable cost or on reasonable terms, if at all. In that event, we would be unable to further develop and commercialize one or more of our product candidates, which could harm our business significantly. We cannot provide any assurances that third party patents do not exist which might be enforced against our products, resulting in either an injunction prohibiting our sales, or, with respect to our sales, an obligation on our part to pay royalties and/or other forms of compensation to third parties.

***If we fail to comply with our obligations in the agreements under which we license rights to technology from third parties, or if the license agreements are terminated for other reasons, we could lose license rights that are important to our business.***

We are a party to a number of technology licenses that are important to our business and expect to enter into additional licenses in the future. Our existing license agreements impose, and we expect that future license agreements will impose, on us, various development, regulatory and/or commercial diligence obligations, payment of milestones and/or royalties and other obligations. Additionally, one of our existing license agreements is a sublicense from a third party who is not the original licensor of the intellectual property at issue. Under these agreements, we must rely on our licensor to comply with their obligations under the primary license agreements under which such third party obtained rights in the applicable intellectual property, where we may have no relationship with the original licensor of such rights. If our licensors fail to comply with their obligations under these upstream license agreements, the original third-party licensor may have the right to terminate the original license, which may terminate our sublicense. If this were to occur, we would no longer have rights to the applicable intellectual property unless we are able to secure our own direct license with the owner of the relevant rights, which we may not be able to do at a reasonable cost or on reasonable terms, which may impact our ability to continue to develop and commercialize our product candidates and companion diagnostic incorporating the relevant intellectual property. If we fail to comply with our obligations under our license agreements, or we are subject to a bankruptcy or insolvency, the licensor may have the right to terminate the license. In the event that any of our important technology licenses were to be terminated by the licensor, we would likely cease further development of the related program or be required to spend significant time and resources to modify the program to not use the rights under the terminated license.

***We may be involved in lawsuits to protect or enforce our patents or the patents of our licensors, which could be expensive, time consuming and unsuccessful.***

Competitors may infringe our patents or the patents of our licensors. To counter infringement or unauthorized use, we may be required to file infringement claims, which can be expensive and time-consuming. In addition, in an infringement proceeding, a court may decide that a patent of ours or our licensors is not valid or is unenforceable, or may refuse to stop the other party from using the technology at issue on the grounds that our patents do not cover the technology in question. An adverse result in

63

any litigation or defense proceedings could put one or more of our patents at risk of being invalidated or interpreted narrowly and could put our patent applications at risk of not being issued.

Interference proceedings provoked by third parties or brought by us may be necessary to determine the priority of inventions with respect to our patents or patent applications or those of our collaborators or licensors. An unfavorable outcome could require us to cease using the related technology or to attempt to license rights to it from the prevailing party. Our business could be harmed if the prevailing party does not offer us a license on commercially reasonable terms. Our defense of litigation or interference proceedings may fail and, even if successful, may result in substantial costs and distract our management and other employees. We may not be able to prevent, alone or with our licensors, misappropriation of our intellectual property rights, particularly in countries where the laws may not protect those rights as fully as in the United States.

Furthermore, because of the substantial amount of discovery required in connection with intellectual property litigation, there is a risk that some of our confidential information could be compromised by disclosure during this type of litigation. There could also be public announcements of the results of hearings, motions or other interim proceedings or developments. If securities analysts or investors perceive these results to be negative, it could have a material adverse effect on the price of our common stock.

*The patents and the patent applications that we have covering our products are limited to specific formulations, methods of use and processes, and our market opportunity for our products and our product candidates may be limited by the lack of patent protection for the active ingredients and by competition from other formulations and delivery methods that may be developed by competitors.*

Patent protection on the active ingredients in our currently marketed products (Ryanodex, Bendeka, Argatroban and Non-Alcohol Docetaxel Injection) has expired, and there is therefore no composition of matter patent protection available for the active ingredient in such products. This is also the case with respect to our other product candidates. We have obtained, and continue to seek to obtain patent protection of other aspects of our products and our product candidates, including specific formulations, methods of use and processes, which may not be as effective as composition of matter coverage in preventing workarounds by competitors. As a result, generic products that do not infringe the claims of our issued patents covering formulations, methods of use and processes are, or may be, available while we are marketing our products. Competitors who obtain the requisite regulatory approval could be able to commercialize products with the same active ingredients as our product candidates so long as the competitors do not infringe any process, use or formulation patents that we have developed for our products, subject to any regulatory exclusivity we may be able to obtain for our products.

The number of patents and patent applications covering products containing the same active ingredient as our products and our product candidates indicates that competitors have sought to develop and may seek to commercialize competing formulations that may not be covered by our patents and patent applications. The commercial opportunity for our products and our product candidates could be significantly harmed if competitors are able to develop and commercialize alternative formulations of our products and our product candidates that are different from ours and do not infringe our issued patents covering our products.

*Ryanodex® (dantrolene sodium), Belrapzo, Bendeka, and PEMFEXY among other products have been approved by the FDA, and we anticipate that other product candidates will be approved by the FDA in the future. Once our products are on the market, one or more third parties may also challenge the patents that we control covering our products, which could result in the invalidation or unenforceability of some or all of the relevant patent claims of our issued patents covering our products. Obtaining and maintaining our patent protection depends on compliance with various procedural, document submission, fee payment and other requirements imposed by governmental patent agencies, and our patent protection could be reduced or eliminated for non-compliance with these requirements.*

Ryanodex, Belrapzo, Bendeka, and PEMFEXY, among other of our products, have been approved by the FDA, and we anticipate that other product candidates will be approved by the FDA in the future. One or more third parties may also challenge the patents that we control covering our products in court or the USPTO, which could result in the invalidation or unenforceability of some or all of the relevant patent claims of our issued patents covering our products.

If we or one of our licensing partners initiated legal proceedings against a third party to enforce a patent covering one of our products or product candidates, the defendant could counterclaim that the patent covering our product or product candidate is invalid and/or unenforceable. In patent litigation in the United States, defendant counterclaims alleging invalidity and/or unenforceability are common, and there are numerous grounds upon which a third party can assert invalidity or unenforceability of a patent. Third parties may also raise similar claims before administrative bodies in the United States or abroad, even outside the context of litigation. Such mechanisms include re-examination, post grant review, and equivalent proceedings in foreign jurisdictions (e.g., opposition proceedings). Such proceedings could result in revocation or amendment to our patents in such a way that they no longer cover our products or product candidates. The outcome following legal assertions of invalidity and unenforceability is unpredictable. With respect to the validity question, for example, we cannot be certain that there is no

64

invalidating prior art, of which we, our patent counsel and the patent examiner were unaware during prosecution. If a defendant were to prevail on a legal assertion of invalidity and/or unenforceability, we would lose at least part, and perhaps all, of the patent protection on our products or product candidates. Such a loss of patent protection could have a material adverse impact on our business.

Periodic maintenance fees on any issued patent are due to be paid to the USPTO and foreign patent agencies in several stages over the lifetime of the patent. The USPTO and various foreign governmental patent agencies require compliance with a number of procedural, documentary, fee payment and other similar provisions during the patent application process. While an inadvertent lapse can in many cases be cured by payment of a late fee or by other means in accordance with the applicable rules, there are situations in which non-compliance can result in abandonment or lapse of the patent or patent application, resulting in partial or complete loss of patent rights in the relevant jurisdiction. Non-compliance events that could result in abandonment or lapse of a patent or patent application include, but are not limited to, failure to respond to official actions within prescribed time limits, non-payment of fees and failure to properly legalize and submit formal documents. If we or our licensors that control the prosecution and maintenance of our licensed patents fail to maintain the patents and patent applications covering our products and product candidates, our competitors might be able to enter the market, which would have a material adverse effect on our business, financial condition and results of operations.

***We may be subject to claims that our employees, consultants or independent contractors have wrongfully used or disclosed confidential information of third parties.***

We employ individuals who were previously employed at other biotechnology or pharmaceutical companies. We may be subject to claims that we or our employees, consultants or independent contractors have inadvertently or otherwise used or disclosed confidential information of our employees' former employers or other third parties. We may also be subject to claims that former employers or other third parties have an ownership interest in our patents. Litigation may be necessary to defend against these claims. There is no guarantee of success in defending these claims, and if we are successful, litigation could result in substantial cost and be a distraction to our management and other employees.

***We may be subject to claims challenging the inventorship or ownership of our patents and other intellectual property.***

We may also be subject to claims that former employees, collaborators or other third parties have an ownership interest in our patents or other intellectual property. We may be subject to ownership disputes in the future arising, for example, from conflicting obligations of consultants or others who are involved in developing our products or product candidates and companion diagnostic. Litigation may be necessary to defend against these and other claims challenging inventorship or ownership. If we fail in defending any such claims, in addition to paying monetary damages, we may lose valuable intellectual property rights, such as exclusive ownership of, or right to use, valuable intellectual property. Such an outcome could have a material adverse effect on our business, financial condition and results of operations. Even if we are successful in defending against such claims, litigation could result in substantial costs and be a distraction to management and other employees.

***Intellectual property rights do not necessarily address all potential threats to our competitive advantage.***

The degree of future protection afforded by our intellectual property rights is uncertain because intellectual property rights have limitations, and may not adequately protect our business or permit us to maintain our competitive advantage. The following examples are illustrative:

- others may be able to make compounds that are similar to our products or product candidates but that are not covered by the claims of the patents that we own or have exclusively licensed;

- we or our licensors or future collaborators might not have been the first to make the inventions covered by the issued patent or pending patent application that we own or have exclusively licensed;

- we or our licensors or future collaborators might not have been the first to file patent applications covering certain of our inventions;

- others may independently develop similar or alternative technologies or duplicate any of our technologies without infringing our intellectual property rights;

- it is possible that our pending patent applications will not lead to issued patents;

- issued patents that we own or have exclusively licensed may be held invalid or unenforceable as a result of legal challenges by our competitors;

- our competitors might conduct research and development activities in countries where we do not have patent rights and then use the information learned from such activities to develop competitive products for sale in our major commercial markets;

65

- we may not develop additional proprietary technologies that are patentable; and

- the patents of others may have an adverse effect on our business, financial condition and results of operations.

Should any of these events occur, they could significantly harm our business, results of operations and prospects.

**Risks Related to Ownership of Our Common Stock**

*Our stock price may continue to fluctuate significantly.*

The trading price of our common stock has fluctuated significantly in the past and is likely to continue to be volatile. Our stock price could be subject to wide fluctuations in response to a variety of factors, including the following:

- any delay in filing an NDA for any of our product candidates and any adverse development or perceived adverse development with respect to the FDA's review of that NDA;

- failure to successfully execute our commercialization strategy with respect to our approved products or any other approved product in the future;

- adverse results or delays in clinical trials, if any;

- significant lawsuits, including patent or stockholder litigation;

- inability to obtain additional funding;

- failure to successfully develop and commercialize our product candidates;

- changes in the structure of healthcare payment systems;

- changes in laws or regulations applicable to our product candidates;

- inability to obtain adequate product supply for our product candidates, or the inability to do so at acceptable prices;

- unanticipated serious safety concerns related to the use of our products or any of our product candidates;

- adverse regulatory decisions;

- introduction of new products or technologies by our competitors;

- entry into new markets by our competitors;

- failure to meet or exceed product development or financial projections we provide to the public;

- failure to meet or exceed the estimates and projections of the investment community;

- issuance of new or updated research or reports by securities analysts;

- fluctuations in the valuation of companies perceived by investors to be comparable to us;

- the perception of the pharmaceutical industry by the public, legislatures, regulators and the investment community;

- announcements of significant acquisitions, strategic partnerships, joint ventures or capital commitments by us or our competitors;

- disputes or other developments relating to proprietary rights, including patents, litigation matters and our ability to obtain patent protection for our technologies;

- additions or departures of key scientific or management personnel;

- changes in the market valuations of similar companies;

- sales of our common stock by us or our stockholders in the future;

- the trading volume of our common stock;

- changes in the collective short interest in our common stock;

- additional repurchases of our common stock, if any, pursuant to our current share repurchase program; and

- general economic, industry and market conditions, including the impacts thereon of inflation and rising interest rates, COVID-19, Russia's invasion of Ukraine and global geopolitical tensions.

66

These and other market and industry factors may cause the market price and demand for our common stock to fluctuate substantially, regardless of our actual operating performance, which may limit or prevent investors from readily selling their shares of common stock and may otherwise negatively affect the liquidity of our common stock. In addition, the stock market in general, and Nasdaq and biopharmaceutical companies in particular, have experienced extreme price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of these companies. In the past, when the market price of a stock has been volatile, holders of that stock have instituted securities class action litigation against the company that issued the stock. For example, in May 2016, we became party to a federal securities class action lawsuit, and although it was dismissed in October 2017, we incurred substantial costs defending such lawsuit. Such lawsuit, as well as similar lawsuits instituted in the future, could result in substantial additional costs to us and could also divert the time and attention of our management.

***Our principal stockholders and management own a significant percentage of our stock and will be able to exert significant control over matters subject to stockholder approval.***

As of December 31, 2022, our executive officers, directors, 5% or greater stockholders and their affiliates beneficially own a significant percentage of our voting stock. These stockholders will have the ability to influence us through this ownership position. These stockholders may be able to influence all matters requiring stockholder approval. For example, these stockholders, acting together, may be able to influence elections of directors, amendments of our organizational documents or approval of any merger, sale of assets or other major corporate transaction. This may prevent or discourage unsolicited acquisition proposals or offers for our common stock that you may believe are in your best interest as one of our stockholders.

***Sales of a substantial number of shares of our common stock in the public market by our existing stockholders could cause our stock price to fall.***

Sales of a substantial number of shares of our common stock by our existing stockholders in the public market or the perception that these sales might occur, could depress the market price of our common stock and could impair our ability to raise capital through the sale of additional equity securities. We are unable to predict the effect that such sales may have on the prevailing market price of our common stock.

As of March 16, 2023 we had 13,084,243 shares of common stock outstanding, all of which are eligible for sale in the public market, other than shares held by our directors and certain officers which are subject in some cases to compliance with the requirements of Rule 144, including volume limitations and manner of sale requirements.

In addition, shares issued upon exercise of vested options are eligible for sale. Sales of stock by these stockholders could have a material adverse effect on the trading price of our common stock..

***Future issuances of our common stock or rights to purchase our common stock, including in connection with potential business development transactions we may determine to pursue and/or pursuant to our equity incentive plans, could result in additional dilution of the percentage ownership of our stockholders and could cause our stock price to fall.***

Sales of a substantial number of shares of our common stock in the public market could occur at any time. These sales, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of our common stock.

We expect that significant additional capital will be needed in the future to continue our planned operations and/or in connection with potential business development transactions we may determine to pursue. To the extent we raise additional capital or pursue potential business development transactions by issuing equity securities, our stockholders may experience substantial dilution. We currently have on file with the SEC a shelf registration statement, which allows us to offer and sell certain registered securities, such as common stock, preferred stock, debt securities and warrants, from time to time pursuant to one or more offerings at prices and terms to be determined at the time of sale. We may sell common stock, convertible securities or other equity or debt securities in one or more transactions at prices and in a manner we determine from time to time. If we sell common stock, convertible securities or other equity or debt securities in more than one transaction, investors may be materially diluted by subsequent sales. These sales may also result in material dilution to our existing stockholders, and new investors could gain rights superior to our existing stockholders.

Pursuant to our 2014 Equity Incentive Plan, or the 2014 Plan, our management is authorized to grant stock options and other equity awards to our employees, directors and consultants. We have issued a significant number of stock options and other equity awards under the 2014 Plan. The shares underlying these awards are registered on a Form S-8 registration statement. As a result, upon vesting these shares can be freely exercised and sold in the public market upon issuance, subject to volume limitations applicable to affiliates. The exercise of options and the subsequent sale of the underlying common stock could cause a decline in our stock price. These sales also might make it difficult for us to sell equity securities in the future at a time and at a

price that we deem appropriate. In addition, the number of shares available for future grant under the 2014 Plan will automatically increase each year by 6% of all shares of our capital stock outstanding as of December 31 of the prior calendar year, subject to the ability of our board of directors to take action to reduce the size of the increase in any given year. Currently, we plan to register the increased number of shares available for issuance under the 2014 Plan each year. If our board of directors elects to increase the number of shares available for future grant by the maximum amount each year, our stockholders may experience additional dilution, which could cause our stock price to fall.

***We do not intend to pay cash dividends on our common stock so any returns will be limited to the value of our stock.***

We have never declared or paid any cash dividend on our common stock. We currently anticipate that we will retain future earnings for the development, operation and expansion of our business and do not anticipate declaring or paying any cash dividends for the foreseeable future. Any future determinations to pay cash dividends will be made at the discretion of our board of directors, subject to applicable laws, and will depend on a number of factors, including our financial condition, results of operations, capital requirements, contractual restrictions (such as our Third Amended Credit Agreement), general business conditions, and any other factors that our board of directors may deem relevant. Any return to stockholders will therefore be limited to the appreciation of their stock.

***There is no assurance that our Share Repurchase Program will result in repurchases of our common stock or enhance long term stockholder value.***

Repurchases of our common stock pursuant to our Share Repurchase Program could affect our stock price and increase its volatility and will reduce the market liquidity for our stock. The existence of a share repurchase program could also cause our stock price to be higher than it would be in the absence of such a program. Additionally, any future repurchases would diminish our cash reserves, which could impact our ability to pursue possible future strategic opportunities and acquisitions. There can be no assurance that any stock repurchases will, in fact, occur, or, if they occur, that they will enhance stockholder value.

***Provisions in our amended and restated certificate of incorporation and amended and restated bylaws, as well as provisions of Delaware law, could make it more difficult for a third party to acquire us or increase the cost of acquiring us, even if doing so would benefit our stockholders or remove our current management.***

Some provisions of our charter documents and Delaware law may have anti-takeover effects that could discourage an acquisition of us by others, even if an acquisition would be beneficial to our stockholders and may prevent attempts by our stockholders to replace or remove our current management. These provisions include:

- authorizing the issuance of "blank check" preferred stock, the terms of which may be established and shares of which may be issued without stockholder approval;

- limiting the removal of directors by the stockholders;

- creating a classified board of directors;

- prohibiting stockholder action by written consent, thereby requiring all stockholder actions to be taken at a meeting of our stockholders;

- eliminating the ability of stockholders to call a special meeting of stockholders; and

- establishing advance notice requirements for nominations for election to the board of directors or for proposing matters that can be acted upon at stockholder meetings.

These provisions may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors, which is responsible for appointing the members of our management. In addition, we are subject to Section 203 of the Delaware General Corporation Law, which generally prohibits a Delaware corporation from engaging in any of a broad range of business combinations with an interested stockholder for a period of three years following the date on which the stockholder became an interested stockholder, unless such transactions are approved by our board of directors. This provision could have the effect of delaying or preventing a change of control, whether or not it is desired by or beneficial to our stockholders. Further, other provisions of Delaware law may also discourage, delay or prevent someone from acquiring us or merging with us.

***Our amended and restated bylaws provide that the Court of Chancery of the State of Delaware is the exclusive forum for certain disputes between us and our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers or employees.***

Our amended and restated bylaws provide that the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for any derivative action or proceeding brought on behalf of the Company, any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Company to the Company or the Company's

68

stockholders, any action asserting a claim arising pursuant to any provision of the Delaware General Corporation Law or any action asserting a claim governed by the internal affairs doctrine. This forum selection provision does not apply to suits brought to enforce a duty or liability created by the Securities Act or the Exchange Act or any claim for which the federal courts have exclusive jurisdiction.

This forum selection provision may limit a stockholder's ability to bring certain claims in a judicial forum that it finds favorable for disputes with us or any of our directors, officers, other employees or stockholders, which may discourage lawsuits with respect to such claims, although our stockholders will not be deemed to have waived our compliance with federal securities laws and the rules and regulations thereunder. If a court were to find this forum selection provision to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could adversely affect our business and financial condition.

**General Risk Factors**

*We are at risk of securities class action and similar litigation*.

In the past, securities class action litigation has often been brought against a company following a decline in the market price of its securities. This risk is especially relevant for us because pharmaceutical companies have experienced significant stock price volatility in recent years. On May 31, 2016, a federal securities class action suit was brought against us seeking compensatory damages in connection with, among other things, the CRL we received with respect to our NDA for EP-6101. Such lawsuit was dismissed with prejudice in August 2017, however, any similar litigation in the future, could result in substantial cost and a diversion of management's attention and resources, which could harm our business.

*Unstable market, economic and geopolitical conditions may have serious adverse consequences on our business, financial condition and stock price.*

The global credit and financial markets have experienced extreme volatility and disruptions, including as a result of inflation and rising interest rates, COVID-19, Russia's invasion of Ukraine and global geopolitical tension, and may experience disruptions in the future. These disruptions can result in severely diminished liquidity and credit availability, increase in inflation, declines in consumer confidence, declines in economic growth, increases in unemployment rates and uncertainty about economic stability. There can be no assurance that further deterioration in credit and financial markets and confidence in economic conditions will not occur. Our general business strategy may be adversely affected by any such economic downturn, volatile business environment, higher inflation, or continued unpredictable and unstable market conditions. If the current equity and credit markets deteriorate, it may make any necessary debt or equity financing more difficult, more costly and more dilutive. Failure to secure any necessary financing in a timely manner and on favorable terms could have a material adverse effect on our operations, growth strategy, financial performance and stock price and could require us to delay or abandon clinical development plans. In addition, there is a risk that one or more of our current service providers, manufacturers and other partners may not survive an economic downturn or rising inflation, which could directly affect our ability to attain our operating goals on schedule and on budget.

Other international and geopolitical events could also have a serious adverse impact on our business. For instance, in February 2022, Russia initiated military action against Ukraine. In response, the United States and certain other countries imposed significant sanctions and trade actions against Russia and could impose further sanctions, trade restrictions, and other retaliatory actions. While we cannot predict the broader consequences, the conflict and retaliatory and counter-retaliatory actions could materially adversely affect global trade, currency exchange rates, inflation, regional economies, and the global economy, which in turn may increase our costs, disrupt our supply chain, impair our ability to raise or access additional capital when needed on acceptable terms, if at all, or otherwise adversely affect our business, financial condition, and results of operations.

*We have incurred significant costs as a result of operating as a public company, and our management is required to devote substantial time to new compliance initiatives.*

As a public company, we incur significant ongoing legal, accounting and other expenses.

For example, we are subject to the reporting requirements of the Exchange Act, which require, among other things, that we file with the SEC, annual, quarterly and current reports with respect to our business and financial condition. We have incurred and will continue to incur costs associated with the preparation in filing of these reports. In addition, the Sarbanes-Oxley Act, as well as rules subsequently implemented by the SEC, and Nasdaq have imposed various other requirements on public companies and we have incurred and will continue to incur costs associated with compliance with such requirements. In July 2010, the Dodd-Frank Wall Street Reform and Consumer Protection Act, or the Dodd-Frank Act, was enacted. There are significant corporate governance and executive compensation related provisions in the Dodd-Frank Act that required the SEC to adopt

69

additional rules and regulations in these areas such as "say on pay" and proxy access. Stockholder activism, the current political environment and the current high level of government intervention and regulatory reform may lead to substantial new regulations and disclosure obligations, which may lead to additional compliance costs and impact (in ways we cannot currently anticipate) the manner in which we operate our business. Our management and other personnel need to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations increase our legal and financial compliance costs and make some activities more time-consuming and costly. For example, we expect these rules and regulations to make it more difficult and more expensive for us to obtain director and officer liability insurance and we may be required to incur substantial costs to maintain our current levels of such coverage.

70

additional rules and regulations in these areas such as "say on pay" and proxy access. Stockholder activism, the current political environment and the current high level of government intervention and regulatory reform may lead to substantial new regulations and disclosure obligations, which may lead to additional compliance costs and impact (in ways we cannot currently anticipate) the manner in which we operate our business. Our management and other personnel need to devote a substantial amount of time to these compliance initiatives. Moreover, these rules and regulations increase our legal and financial compliance costs and make some activities more time-consuming and costly. For example, we expect these rules and regulations to make it more difficult and more expensive for us to obtain director and officer liability insurance and we may be required to incur substantial costs to maintain our current levels of such coverage.

**Item 1B. Unresolved Staff Comments**

None.

**Item 2. Properties**

As of December 31, 2022, we had approximately 30,000 square feet of leased office space. Our corporate headquarters is located in Woodcliff Lake, New Jersey and consists of approximately 27,093 square feet of office space under a lease that will expire in June 2025.

We also lease 2,505 square feet of office space in Palm Beach Gardens, Florida under a lease that will expire in October 2024.

We also lease 6,070 square feet of office space in Indianapolis, Indiana under a lease that will expire in November 2023.

We also lease laboratory space located in Cambridge, Massachusetts under a lease that will expire in April 2024.

We consider our current facilities suitable and adequate to meet our current needs.

**Item 3. Legal Proceedings**

The disclosures under Note 13. Legal Proceedings in the Consolidated Financial Statements included in Part IV, Item 15 of this report are incorporated into this Part I, Item 3 by reference.

**Item 4. Mine Safety Disclosures**

Not applicable.

71

**PART II**

**Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities**

**Market Information**

Our common stock has been listed on The Nasdaq Global Market under the symbol "EGRX" since February 12, 2014. Prior to that date, there was no public trading market for our common stock.

*Record Holders*

As of March 16, 2023, we had 2 holders of record of our common stock. The actual number of shareholders is greater than this number of record holders and includes shareholders who are beneficial owners but whose shares are held in street name by brokers and other nominees. This number of holders of record also does not include shareholders whose shares may be held in trust by other entities. The closing price per share of our common stock on March 16, 2023 was $26.47.

*Dividends*

We have never declared or paid a cash dividend on our common stock. We currently intend to retain any future earnings and do not expect to pay any dividends in the foreseeable future. In addition, our Third Amended Credit Agreement imposes contractual restrictions on us with respect to paying cash dividends. Any future determinations to pay cash dividends will be made at the discretion of our board of directors, subject to applicable laws, and will depend on a number of factors, including our financial condition, results of operations, capital requirements, contractual restrictions, general business conditions, and any other factors that our board of directors may deem relevant.

*Stock Performance Graph*

*The following information shall not be deemed to be "soliciting material" or to be "filed" with the SEC or subject to Regulation 14A or 14C under the Securities Exchange Act of 1934, as amended, or the Exchange Act, or to the liabilities of Section 18 of the Exchange Act, and will not be deemed to be incorporated by reference into any filing of Eagle Pharmaceuticals, Inc. under the Exchange Act or the Securities Act of 1933, as amended, or the Securities Act, except to the extent we specifically incorporate it by reference into such filing.*

The following graph shows a five year comparison from December 31, 2017 through December 31, 2022 of the cumulative total return for our common stock, and the Nasdaq Composite Index and The Nasdaq Biotechnology Index. The graph assumes that $100 was invested at the market close on December 31, 2017 in the common stock of Eagle Pharmaceuticals, Inc, the Nasdaq Composite Index and the Nasdaq Biotechnology Index. The stock price performance of the following graph is not necessarily indicative of future stock price performance.

72



### Comparison of 5 year Cumulative Total Return
### Assumes initial investment $100
### December 31, 2022

| Company / Index | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 | 12/31/21 | 12/31/22 |
|---|---|---|---|---|---|---|
| Eagle Pharmaceuticals, Inc | $ 100 | $ 51 | $ 76 | $ 59 | $ 64 | $ 55 |
| Nasdaq Composite | $ 100 | $ 123 | $ 167 | $ 240 | $ 293 | $ 147 |
| NASDAQ Biotechnology | $ 100 | $ 110 | $ 136 | $ 171 | $ 172 | $ 126 |

*Recent Sales of Unregistered Securities*

None.

*Issuer Purchases of Equity Securities*

### Share Repurchase Program

On August 9, 2016, we announced the 2016 Repurchase Program authorizing the repurchase of up to $75.0 million of our common stock. On August 9, 2017, we announced the 2017 Repurchase Program authorizing the repurchase up to an additional $100 million of our outstanding common stock. Under the 2016 Repurchase Program and the 2017 Share Repurchase Program, we were authorized to repurchase shares through open market purchases, privately-negotiated transactions or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. On October 30, 2018, our board of directors approved the 2018 Repurchase Program authorizing the repurchase of up to $150 million of our outstanding common stock, consisting of (i) up to $50 million in repurchases pursuant to an ASR with JPMorgan Chase Bank, N.A., and (ii) up to $100 million in additional repurchases. In connection with its approval of the 2018 Repurchase Program, our board of directors terminated the 2016 Repurchase Program and 2017 Repurchase Program. On March 17, 2020, we announced that our board of directors the Repurchase Program providing for the repurchase of up to an

aggregate of $160.0 million of our outstanding common stock. The 2020 Repurchase Program replaced our 2018 Repurchase Program, which was terminated in connection with the 2020 Repurchase Program. At termination, we had repurchased approximately $68.0 million of our outstanding common stock under our the 2018 Share Repurchase Program. As of December 31, 2022, we have repurchased an aggregate of 4,552,730 shares of common stock for an aggregate of $246.1 million pursuant to our Share Repurchase Program in effect since August 2016 .

Under the 2020 Repurchase Program, we are authorized to repurchase shares through open market purchases, privately-negotiated transactions, accelerated share repurchases or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Securities Exchange Act of 1934, as amended. The repurchases have no time limit and may be suspended or discontinued completely at any time. The specific timing and amount of repurchases varies based on available capital resources and other financial and operational performance, market conditions, securities law limitations, and other factors. We expect to fund repurchases using our cash resources.

On September 23, 2020, our board of directors approved a $25.0 million accelerated share repurchase transaction, or ASR Program, with JPMorgan Chase Bank, National Association, or JP Morgan, as part of the 2020 Repurchase Program. The specific number of shares to be repurchased pursuant to the ASR Program was based on the average of the daily volume weighted average share prices of our common stock, less a discount, during the term of the ASR Program. Under the terms of the ASR Program with JP Morgan, we paid $25.0 million to JP Morgan on September 24, 2020, and received 550,623 shares, representing the notional amount of the ASR, based on the average of the daily volume weighted average share prices of our common stock, less a discount, during the term of the ASR, which was $45.40. The ASR Program was completed in the fourth quarter of 2020.

We did not make any purchases of our equity securities during the three months ended December 31, 2022. Approximately $86 million remained available for future purchases of our equity securities as of December 31, 2022.

*Securities Authorized for Issuance Under Equity Compensation Plans*

Information about securities authorized for issuance under our equity compensation plans is incorporated herein by reference to Item 12 of Part III of this annual report on Form 10-K.

**Item 6. Reserved**

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*The following discussion and analysis of financial condition and results of operations is provided to enhance the understanding of, and should be read in conjunction with, Part I, Item 1, "Business" and Item 8, "Financial Statements and Supplementary Data." For information on risks and uncertainties related to our business that may make past performance not indicative of future results, or cause actual results to differ materially from any forward-looking statements, see "Special Note Regarding Forward-Looking Statements," and Part I, Item 1A, "Risk Factors."*

74

**Overview**

We are an integrated pharmaceutical company focused on finding ways to help medicines do more for patients. Along with our collaborators, we have the capabilities to take a molecule from preclinical research through regulatory approval and into the marketplace, including development, manufacturing and commercialization of our products and product candidates. Our business model applies our scientific expertise, proprietary research-based insights and marketplace proficiency to identify challenging-to-treat diseases of the central nervous system or metabolic critical care therapeutic areas as well as in oncology. By focusing on patients' unmet needs, we strive to provide healthcare professionals with urgently needed treatment solutions that are designed to improve patient care and outcomes and create near- and long-term value for our stakeholders, including patients and healthcare providers and our employees, marketing partners, collaborators and stockholders.

Our science-based business model has a proven track record with the U.S. Food and Drug Administration, or FDA, approval and commercial launches of six products: PEMFEXY, vasopressin (discontinued in 2023), Treakisym, Ryanodex, Belrapzo and Bendeka. We acquired Acacia Pharma as of June 9, 2022, which added two FDA approved products, BARHEMSYS and BYFAVO, to our portfolio. We market our products through marketing partners and/or our internal direct sales force. We market Ryanodex and Belrapzo, and Teva markets Bendeka through its subsidiary, Cephalon, Inc. SymBio markets Treakisym in Japan. BARHEMSYS and BYFAVO are marketed to hospitals in the acute care space through our internal direct sales force.

With several pipeline projects underway and the potential for product launches over the next few years, we believe we have many growth opportunities ahead. We believe that each of our pipeline projects currently has the potential to enter the market as a first-in-class, first-to-file or best-in-class product. In particular, we are applying our expertise to conduct novel research regarding the potential for Ryanodex to address conditions including nerve agent, acute radiation syndrome, traumatic brain injury/concussion and Alzheimer's disease as well as investigations of compounds such as EA-114 (our fulvestrant product candidate) for patients with HR-positive advanced breast cancer. Our clinical development program also includes a license agreement with Combioxin, SA under which we were granted exclusive, worldwide development commercialization rights to CAL02, a novel first-in-class anti-infective agent for Phase 2b/3 development for the treatment of severe pneumonia in combination with traditional antibacterial drugs and a license agreement with AOP Orphan, for the commercial rights to its product, landiolol in the United States. Landiolol is a leading hospital emergency use product, which is currently approved in Europe for the treatment of non-compensatory sinus tachycardia and tachycardic supraventricular arrhythmias. Landiolol is not currently approved in the United States. We supported the submission of a NDA in the second quarter of 2022 by AOP Orphan to the FDA seeking approval for landiolol for the short term reduction of ventricular rate in patients with SVT, including atrial fibrillation and atrial flutter.

**Recent Developments**

*Discontinuance of Vasopressin*

During the first quarter of 2023, the Company gave notice to customers and the FDA that it was withdrawing from the vasopressin market. Inventory on hand and in the distribution channel is expected to be depleted by the end of the second quarter of 2023.

*Third Amended and Restated Credit Agreement*

On November 1, 2022, we entered into the Third Amended and Restated Credit Agreement (the "Third Amended Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Administrative Agent") and the lenders party thereto, which replaced our prior credit agreement, dated as of November 8, 2019 (the "Second Amended Credit Agreement"). The terms and amounts borrowed under the Third Amended Credit Agreement include a drawn term loan of $50 million and a $100 million revolving credit facility of which $15.0 million was drawn on November 1, 2022. In addition, approximately $35.4 million of the proceeds of the credit facility were used to refinance all amounts outstanding under the Second Amended Credit Agreement, [and we currently intend to use the remaining proceeds to repay certain indebtedness of our wholly-owned subsidiary, Acacia Pharma, and for other corporate purposes. All amounts outstanding under the Third Amended Credit Agreement shall be due and payable on October 31, 2025, unless otherwise accelerated or extended pursuant to the terms of the Third Amended Credit Agreement.

*Enalare Investment*

On August 8, 2022, we and Enalare Therapeutics Inc. ("Enalare") entered into a Securities Purchase Agreement, pursuant to which we have committed to provide equity investments of up to $55 million in Enalare, subject to the completion of certain development milestones (the "Purchase Agreement"). Concurrently with the execution of the Purchase Agreement, we, Enalare and holders of all of the outstanding capital stock, and any securities or options exercisable for capital stock, of Enalare (the "Securityholders") entered into a Security Purchase Option Agreement, pursuant to which we were granted an option (the

75

"Purchase Option") to acquire all of the remaining outstanding shares of Enalare other than those that we already own, subject to the terms and conditions of the agreement (the "Option Agreement"). The term of the Purchase Option (the "Option Period") commenced on August 8, 2022 and will end upon the earlier of (x) 90 days following FDA authorization to begin a Phase 3 clinical study for a Product Candidate or (y) June 30, 2027. Pursuant to the terms of the Option Agreement, Enalare shall not initiate Phase 3 pivotal studies prior to the end of the Option Period and we shall have reasonable access to all relevant data and documents following the Phase 3 Milestone (as defined in the Option Agreement).

ENA-001 is an investigational, new chemical entity being developed by Enalare as an agnostic respiratory stimulant for multiple patient populations experiencing acute respiratory depression. The initial targeted indications include post-operative respiratory depression; community drug overdose; and Apnea of Prematurity, a common condition in preterm infants. FDA granted Orphan Drug Designation to ENA-001 for the treatment of Apnea of Prematurity ("AoP"). AoP is a development disorder attributed to immaturity of the pulmonary system characterized by either cessation of breathing for more than 20 seconds or cessation of breathing that lasts less than 20 seconds but is accompanied by either bradycardia or hypoxemia.

### *Acacia Acquisition*

On June 9, 2022, we completed the acquisition of Acacia Pharma Group plc ("Acacia"), formerly a public company organized under the laws of England and Wales, through an offer of approximately $76 million in cash and 516,024 shares of our common stock for the entire issued and to be issued share capital of Acacia by means of a court sanctioned scheme of arrangement under Part 26 of the UK Companies Act 2006. The acquisition added two FDA approved currently marketed, acute care, hospital products, both of which are new chemical entities with strong patent protection:

- BARHEMSYS (amisulpride for injection), the first and only antiemetic approved by the FDA for rescue treatment of postoperative nausea and vomiting, after failed prophylaxis, and
- BYFAVO (remimazolam for injection), indicated for the induction and maintenance of procedural sedation in adults undergoing procedures lasting 30 minutes or less.

### *Landiolol*

On June 1, 2022, we announced that AOP Orphan, with whom we entered into a licensing agreement in August 2021, submitted an NDA to the FDA for landiolol, a short-acting, intravenous ("IV"), cardio-selective beta-1 adrenergic blocker product candidate. The submission seeks approval for landiolol for the short-term reduction of ventricular rate in patients with supraventricular tachycardia ("SVT"), including atrial fibrillation and atrial flutter. The FDA's decision with respect to approval is expected in mid-2023. Patient enrollment for a study of pediatric patients with supraventricular tachycardia is underway in Europe.

### *PEMFEXY*

In December 2022, the FDA approved an additional indication for PEMFEXY (pemetrexed injection) in combination with pembrolizumab and platinum chemotherapy for the initial treatment of patients with metastatic, non-squamous, non-small cell lung cancer with no EGFR or ALK genomic tumor aberrations. In December 2022, we also amended our agreement with Robert One to amend the applicable royalty rates due by us on Gross Profits derived from the Robert One 2009 Subject Products to (i) thirty percent with respect to a 505(b)(2) application; (ii) thirty percent with respect to an ANDA application; and (iii) with respect to pemetrexed parenteral formulation, (a) ten percent on Gross Profits greater than $85,000,000 and (b) twelve percent on Gross Profits greater than $115,000,000. In addition, under the terms of the amendment, no royalty payment is due on Gross Profits derived from pemetrexed parenteral formulation that are less than $85,000,000. In exchange for the foregoing amended royalty rates, we made a one-time lump sum payment of $15,000,000 to Robert One on January 3, 2023. See "*Business—License Agreements—Development and License Agreement with Robert One, LLC (pemetrexed)*."

On February 1, 2022, we announced the commercial availability of our novel product PEMFEXY® (pemetrexed for injection). A branded alternative to ALIMTA®, Eagle's PEMFEXY is a ready-to-use liquid with a unique J-code approved to treat nonsquamous non-small cell lung cancer and mesothelioma.

### *CAL02*

In November 2022, the FDA accepted Eagle's IND application for CAL02. The Phase 2 study is expected to begin enrollment of approximately 276 patients with severe community-acquired pneumonia at approximately 120 sites worldwide beginning in 2023.

76

*BENDEKA*

On December 9, 2022, we entered into a definitive settlement agreement, or the Accord Settlement Agreement, with Accord Healthcare Inc., or Accord, relating to our product BENDEKA® (rapidly infused bendamustine hydrochloride). This settlement resolves patent litigation brought by us and our marketing partners Teva Pharmaceuticals International, GmbH and Cephalon, Inc. relating to the alleged infringement of Orange Book listed United States Patent Nos. 8,609,707; 9,265,831; 9,572,796; 9,572,797; 9,034,908; 9,144,568; 9,572,887; 9,597,397; 9,597,398; 9,597,399; 9,000,021; 9,579,384; 10,052,385; 10,010,533; and 11,103,483, or the Asserted Patents, with respect to Accord's 505(b)(2) NDA, No. 215749. Pursuant to the terms of the Accord Settlement Agreement, we will grant Accord a license to market Accord's product made under NDA No. 215749 in the United States beginning on January 17, 2028 (subject to FDA approval), or earlier under certain circumstances. Additionally, in accordance with the Agreement, the parties will terminate all ongoing litigation among us, Teva Pharmaceuticals International, GmbH and Cephalon, Inc. and Accord regarding BENDEKA® and the Asserted Patents pending in the United States District Court for the District of Delaware. The Agreement is confidential and subject to review by the U.S. Federal Trade Commission and the U.S. Department of Justice.

On April 19, 2022, we entered into a definitive settlement agreement, or the Hospira Settlement Agreement, with Hospira, Inc., or Hospira, relating to our product BENDEKA® (rapidly infused bendamustine hydrochloride). This settlement resolves patent litigation brought by us and our marketing partners Teva Pharmaceuticals International, GmbH and Cephalon, Inc. relating to the alleged infringement of Orange Book listed United States Patent Nos. 11,103,483 and 9,572,887, or the Asserted Patents, with respect to Hospira's 505(b)(2) NDA, No. 211530. Pursuant to the terms of the Hospira Settlement Agreement, we will grant Hospira a license to market Hospira's product made under NDA No. 211530 in the United States beginning on January 17, 2028 (subject to FDA approval), or earlier under certain circumstances. Additionally, in accordance with the Agreement, the parties will terminate all ongoing litigation among us, Teva Pharmaceuticals International, GmbH and Cephalon, Inc. and Hospira regarding the Asserted Patents pending in the United States District Court for the District of Delaware. The Agreement is confidential and subject to review by the U.S. Federal Trade Commission and the U.S. Department of Justice.

*TREAKISYM*

Eagle's bendamustine franchise continues to grow, including the launch of the TREAKISYM rapid infusion ("RI") (50ml) liquid formulation in the first quarter of 2022, and the launch of the ready-todilute ("RTD") formulation in Japan in the first quarter of 2021.

*COVID-19 and Macroeconomic Environment Business Update*

In response to the COVID-19 pandemic, we have taken measures designed to address and mitigate the impact of the COVID-19 pandemic on our business, such as remote working policies, facilitating management's daily communication to address employee and business concerns and providing frequent updates to the Board. We anticipate that the COVID-19 pandemic may have an impact on the clinical development timeline for EA-114. We anticipate that the COVID-19 pandemic may continue to delay our supply chain and marketing and sales efforts for certain of our products, including Bendeka, although it is not currently expected that any disruption would be material. The COVID-19 pandemic have resulted in a decrease in healthcare utilization broadly and specifically lead to a continuing reduction in the utilization of physician-administered oncology products including Belrapzo and Bendeka. While we have experienced variable financial impacts to date, the COVID-19 pandemic, including the global economic slowdown, government measures taken in response thereto, the overall disruption of global healthcare systems and other risks and uncertainties associated with the pandemic, could materially adversely affect our business, financial condition, results of operations and growth prospects. We continue to monitor COVID-19 as we evaluate and evolve our business plans. The impact of the COVID-19 pandemic on our business and financial condition is more fully described below in *Trends and Uncertainties*. In addition, we continue to monitor the impacts of other global and worsening macroeconomic conditions, such as global geopolitical tension, increasing inflation and interest rates, exchange rate fluctuations, supply chain disruptions and increases in commodity, energy and fuel prices. The U.S. government and other nations have imposed significant restrictions on most companies' ability to do business in Russia as a result of the ongoing military conflict between Russia and Ukraine. It is not possible to predict the broader or longer-term consequences of this conflict, which could include further sanctions, embargoes, regional instability, geopolitical shifts and adverse effects on macroeconomic conditions, security conditions, currency exchange rates and financial markets. Such geopolitical instability and uncertainty could have a negative impact on our ability to further expand our business and to otherwise generate revenues and develop our product candidates. In addition, a significant escalation or expansion of economic disruption or the conflict's current scope could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

**Financial Operations Overview**

*Revenue*

Our revenue consists of product sales, royalty revenue and license and other revenue.

77

*Product Sales.* We have recognized revenues from product sales of Bendeka, Treakisym, Ryanodex, Belrapzo, BARHEMSYS and BYFAVO. Sales of Bendeka and Treakisym were made to our commercial partners, Teva and SymBio, respectively. Sales to our commercial partners are typically made at little or no profit for resale. PEMFEXY, vasopressin, Ryanodex, Belrapzo, BARHEMSYS and BYFAVO were sold directly to wholesalers, hospitals and surgery centers through a third-party logistics partner.

We typically enter into agreements with group purchasing organizations acting on behalf of their hospital members, in connection with the hospitals' purchases of our direct commercial products. Based on these agreements, most of our hospital customers have contracted prices for products and volume-based rebates on product purchases. These amounts are estimated and recorded at the time of sale. In the case of discounted pricing, we typically pay a chargeback, representing the difference between the price invoiced to the wholesaler and the customer contract price.

*Royalty Revenue.* We recognize revenue from royalties based on a percentage of Teva's net sales of Bendeka and SymBio's net sales of Treakisym. Royalty revenue is recognized as earned in accordance with contract terms when it can be reasonably estimated and collectability is reasonably assured.

*License and Other Revenue.* Our revenues may either be in the form of the recognition of deferred revenues upon milestone achievement for which cash has already been received or recognition of revenue upon milestone achievement for which the payment is reasonably assured to be received in the future.

The primary factors that determine our revenues derived from Bendeka are:
- the level of orders submitted by our commercial partner, Teva;
- the rate at which Teva can convert the current market to Bendeka;
- the level of institutional demand for Bendeka;
- unit sales prices charged by Teva, net of any sales reserves; and
- the level of orders submitted by wholesalers, hospitals and surgery centers.

The primary factors that may determine our revenues derived from TREAKISYM are:
- the level of orders submitted by our commercial partner, SymBio;
- the level of institutional demand for TREAKISYM; and
- unit sales prices charged by SymBio, net of any sales reserves.

The primary factors that may determine our revenues derived from Ryanodex, Belrapzo and our future products are:
- the effectiveness of our sales force;
- the level of orders submitted by wholesalers, hospitals and surgery centers;
- the level of institutional demand for our products; and
- unit sales prices, net of any sales reserves.

### Cost of Revenues

Cost of revenue consists of the costs associated with producing our products for our commercial partners. In particular, our cost of revenue includes production costs of our products paid to a contract manufacturing organization coupled with shipping and customs charges, cost of royalty and the amortization of intangible assets. Cost of revenue may also include the effects of product recalls, if applicable.

### Research and Development

Costs for research and development are charged to expenses as incurred and include: employee-related expenses including salaries, benefits, travel and stock-based compensation expense for research and development personnel; expenses incurred under agreements with contract research organizations, contract manufacturing organizations and service providers that assist in conducting clinical and preclinical studies; costs associated with preclinical activities and development activities; costs associated with regulatory operations; and depreciation expense for assets used in research and development activities.

Costs for certain development activities, such as clinical studies, are recognized based on an evaluation of the progress to completion of specific tasks using data such as patient enrollment, clinical site activations, or information provided to us by our vendors on their actual costs incurred. Payments for these activities are based on the terms of the individual arrangements, which may differ from the patterns of costs incurred, and are reflected in the consolidated financial statements as prepaid expenses or accrued expenses as deemed appropriate. Recoveries of previously recognized research and development expenses from third parties are recorded as a reduction to research and development expense in the period it becomes realizable.

78

*Selling, General and Administrative*

Selling, general and administrative costs consist of employee-related costs including salaries, benefits and other related costs, stock-based compensation for executive, finance, sales and operations personnel. Selling, general and administrative expenses also include facility and related costs, professional fees for legal, consulting, tax and accounting services, insurance, selling, marketing, market research, advisory board and key opinion leaders, depreciation and general corporate expenses.

*Income Taxes*

We account for income taxes using the liability method in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 740, "Income Taxes," or ASC 740.  Deferred tax assets and liabilities are determined based on temporary differences between financial reporting and tax bases of assets and liabilities and are measured by applying enacted rates and laws to taxable years in which differences are expected to be recovered or settled.  Further, the effect on deferred tax assets and liabilities of a change in tax rates is recognized in income (loss) in the period that the rate changes.  A valuation allowance is required when it is "more likely than not" that all or a portion of deferred tax assets will not be realized. ASC 740 also prescribes a comprehensive model for how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that it has taken or expects to take on a tax return, including a decision whether to file or not file a return in a particular jurisdiction.  We recognize any interest and penalties accrued related to unrecognized tax benefits as income tax expense. The benefit (provision) for income taxes was based on the applicable federal and state tax rates for those periods. The effective tax rate for the years ended December 31, 2022, 2021 and 2020 reflect items such as the impact of a valuation allowance established and adjusted for the fair value adjustments on our investment in Syros, certain non-deductible executive compensation, changes in state filing positions partially offset by credits for research and development activity.

**Results of Operations**

*Comparison of Years Ended December 31, 2022 and December 31, 2021*

*Revenues*

|  | Year Ended December 31, | | Increase (Decrease) |
|---|---|---|---|
|  | **2022** | **2021** |  |
|  | (in thousands) | | |
| Product sales, net | $ 214,536 | $ 65,023 | $ 149,513 |
| Royalty revenue | 98,266 | 106,523 | (8,257) |
| License and other revenue | 3,808 | — | 3,808 |
| Total revenue | $ 316,610 | $ 171,546 | $ 145,064 |

Product sales increased $149.5 million in the year ended December 31, 2022. The increase was primarily attributable to product sales of PEMFEXY and vasopressin, which each launched in the first quarter of 2022, which combined for $130.6 million of product sales, net. We also had higher product sales of Belrapzo of $9.9 million, Ryanodex of $4.9 million, Bendeka of $1.8 million due to volume increases.

Royalty revenue decreased $8.3 million in the year ended December 31, 2022 primarily as a result of lower royalties on Teva's sales of BENDEKA of $12.3 million, which were partially offset by royalties on SymBio's sales of Treakisym of $4.0 million.

During 2022, we recorded $3.8 million of other revenue for a cumulative sales milestone on sales of Treakisym in Japan by our marketing partner, SymBio.

79

*Cost of Revenue*

| | Year Ended December 31, | | Increase (Decrease) |
| | 2022 | 2021 | |
| | (in thousands) | | |
|---|---|---|---|
| Cost of product sales | $ 85,458 | $ 31,528 | $ 53,930 |
| Cost of royalty revenue | 9,478 | 10,652 | (1,174) |
| Total cost of revenue | $ 94,936 | $ 42,180 | $ 52,756 |

Cost of product sales increased $53.9 million in the year ended December 31, 2022. This was primarily attributable to the product launches of PEMFEXY and vasopressin in 2022, which combined for cost of sales of $41.2 million in 2022, as well as an increase of $3.0 million for Belrapzo and $1.0 million for Bendeka related to higher unit sales. We also recorded $8.3 million of amortization expenses related to intangible assets acquired with Acacia Pharma in June 2022 and related to the intangible asset recognized for the Robert One PEMFEXY in fourth quarter of 2022.

Cost of royalty revenue decreased $1.2 million in the year ended December 31, 2022, primarily as a result of a decrease in royalty revenue on Teva's sales of Bendeka. Partially offset by higher cost of royalty associated with Treakisym.

*Research and Development*

The table below details our research and development expenses by significant project for the periods presented.

| | Year Ended December 31, | | (Decrease) Increase |
| | 2022 | 2021 | |
| | (in thousands) | | |
|---|---|---|---|
| Fulvestrant | $ 6,608 | $ 7,016 | $ (408) |
| Vasopressin | (591) | 6,976 | (7,567) |
| CAL02 / Combioxin | 11,009 | 10,334 | 675 |
| Landiolol / AOP | 756 | 5,005 | (4,249) |
| PEMFEXY | — | 2,211 | (2,211) |
| All other projects | 2,548 | 4,706 | (2,158) |
| Salary and other personnel related expenses | 13,758 | 15,027 | (1,269) |
| Research and development | $ 34,088 | $ 51,275 | $ (17,187) |

The decrease of $17.2 million primarily reflecting the non-recurrence of a $10.0 million upfront payment related to our license agreement with Combioxin SA for CAL02, a $5.0 million upfront payment related to our licensing agreement with AOP Orphan for landiolol, lower headcount cost of $1.3 million, lower spend of vasopressin of $7.6 million, RYANODEX and EA111 of $3.1 million and PEMFEXY of $2.2 million. This was partially offset by $11.0 million of CMC and clinical expenses on our CAL02 program.

*Selling, General and Administrative*

| | Year Ended December 31, | | Increase |
| | 2022 | 2021 | |
| | (in thousands) | | |
|---|---|---|---|
| Selling, general and administrative | $ 106,626 | $ 75,322 | $ 31,304 |

The increase of $31.3 million is primarily reflects $16.6 million of higher professional fees which primarily resulted from our Acacia and Enalare transactions, $6.9 million of severance related to the acquisition of Acacia post-acquisition expense, and increased sales and marketing expense which includes increased headcount costs of $3.8 million and increased marketing costs of $5.9 million associated with BARHEMSYS, BYFAVO and PEMFEXY. This was partially offset by $2.9 million of lower stock-based compensation expense.

80

*Total Other Expense, net*

| | Year Ended December 31, | | | | | Net Change | |
| | 2022 | | 2021 | | | | |
| | (in thousands) | | | | | | |
|---|---|---|---|---|---|---|---|
| Interest income | $ | 271 | $ | 560 | $ | | (289) |
| Interest expense | | (4,045) | | (1,635) | | | (2,410) |
| Other expense | | (15,753) | | (6,242) | | | (9,511) |
| Total other expense, net | $ | (19,527) | $ | (7,317) | $ | | (12,210) |

Interest income decreased $0.3 million. This decrease was primarily due to the impairment of $0.5 million of interest receivable associated with the convertible promissory note which was impaired during the third quarter 2022.

Interest expense increased $2.4 million. This increase was due to higher outstanding debt during 2022.

Other expense increased $9.5 million. The change was primarily due to a $7.0 million loss related to forward contract settled and $5.0 million loss related to write-off on our investment in Avelas during 2022, partially offset by lower fair value adjustments on our investment in Syros of $1.7 million and loss related to foreign exchange of $0.4 million.

*Provision for income taxes*

| | Year Ended December 31, | | | |
| | 2022 | | 2021 | |
| | (in thousands) | | | |
|---|---|---|---|---|
| Provision for income taxes | $ | (25,791) | $ | (4,079) |
| Effective tax rate | | 42 % | | (90)% |

Our provision for income taxes was based on the applicable federal and state tax rates for those periods. The effective tax rate for the year ended December 31, 2022, reflects the impact of certain non-deductible executive compensation and the impact of certain non-deductible costs from the acquisition of Acacia, partially offset by credits for research and development activity. The effective tax rate for the year ended December 31, 2021, reflects certain non-deductible executive compensation, tax effect on stock options exercises, net of forfeitures and valuation allowance established on the deferred tax asset for an unrealized capital loss in our investment in Syros partially offset by credits for research and development activities.

*Net Income (Loss)*

Net income for the year ended December 31, 2022 was $35.6 million as compared to a net loss of $8.6 million for the year ended December 31, 2021, as a result of the factors discussed above.

*Comparison of Years Ended December 31, 2021 and December 31, 2020*

*Revenues*

| | Year Ended December 31, | | | | | (Decrease) | |
| | 2021 | | 2020 | | | | |
| | (in thousands) | | | | | | |
|---|---|---|---|---|---|---|---|
| Product sales, net | $ | 65,023 | $ | 72,323 | $ | | (7,300) |
| Royalty revenue | | 106,523 | | 110,479 | | | (3,956) |
| License and other revenue | | — | | 5,000 | | | (5,000) |
| Total revenue | $ | 171,546 | $ | 187,802 | $ | | (16,256) |

Product sales decreased $7.3 million in the year ended December 31, 2021, primarily driven by decreases in product sales of Bendeka of $4.3 million, Belrapzo of $3.8 million, due to price decreases and Ryanodex of $3.0 million, due to volume decreases. In addition, the COVID-19 pandemic and associated lockdowns have resulted in a decrease in healthcare utilization broadly and specifically have led to a reduction in the utilization of physician-administered oncology products including

81

Belrapzo and Bendeka. These decreases were partially offset by $3.9 million in product sales of Treakisym, following the launch of Treakisym RTD in Japan by SymBio in the first quarter of 2021.

Royalty revenue decreased $4.0 million in the year ended December 31, 2021 primarily as a result of lower royalties on Teva's sales of Bendeka of $7.7 million, which were partially offset by new royalties on SymBio's sales of Treakisym of $4.2 million.

License and other revenue reflects a $5.0 million milestone payment that we earned during 2020 when SymBio received regulatory approval for Treakisym RTD bendamustine formulation from the Pharmaceuticals and Medical Devices Agency in Japan.

*Cost of Revenue*

| | Year Ended December 31, | | (Decrease) |
|---|---|---|---|
| | **2021** | **2020** | |
| | (in thousands) | | |
| Cost of product sales | $ 31,528 | $ 33,647 | $ (2,119) |
| Cost of royalty revenue | 10,652 | 11,818 | (1,166) |
| Total cost of revenue | $ 42,180 | $ 45,465 | $ (3,285) |

Cost of product sales decreased $2.1 million in the year ended December 31, 2021, primarily as a result of decreased product sales of Bendeka, Ryanodex, and Belrapzo, each related to lower unit sales, partially offset by increased product sales of Treakisym resulting from product unit sales, following the launch of Treakisym RTD in Japan by SymBio in the first quarter of 2021.

Cost of royalty revenue decreased $1.2 million in the year ended December 31, 2021 primarily as a result of a decrease in royalty revenue on Teva's sales of Bendeka, coupled with lower cost of royalty associated with Belrapzo and the ending of royalties related to Argatroban.

*Research and Development*

The table below details our research and development expenses by significant project for the periods presented.

| | Year Ended December 31, | | Increase / (Decrease) |
|---|---|---|---|
| | **2021** | **2020** | |
| | (in thousands) | | |
| Fulvestrant | $ 7,016 | $ 6,802 | $ 214 |
| Vasopressin | 6,976 | 4,727 | 2,249 |
| Ryanodex related projects | 1,692 | 2,865 | (1,173) |
| CAL02 / Combioxin | 10,334 | — | 10,334 |
| Landiolol / AOP | 5,005 | — | 5,005 |
| PEMFEXY | 2,211 | 608 | 1,603 |
| All other projects | 3,014 | 3,085 | (71) |
| Salary and other personnel related | 15,027 | 12,698 | 2,329 |
| Research and development | $ 51,275 | $ 30,785 | $ 20,490 |

The increase primarily resulted from a $10.0 million upfront payment related to our license agreement with Combioxin, a $5.0 million upfront payment related our licensing agreement with AOP Orphan, a $2.3 million increase in development cost for vasopressin, a $1.6 million increase related to PEMFEXY, coupled with a $2.0 million total increase in salaries, bonuses, and severance, included with Salary and other personnel related costs.

82

*Selling, General and Administrative*

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2021 | | 2020 | | (Decrease) |
| | | (in thousands) | | | | |
| Selling, general and administrative | $ | 75,322 | $ | 78,598 | $ | (3,276) |

The decrease is primarily related to lower stock compensation expense of $5.2 million, the non-recurrence of $2.5 million of costs related to the collaboration with Syros in 2020, partially offset by increased expense related to salaries and bonuses of $2.3 million and ongoing litigation matters of $1.9 million.

*Other (Expense) Income, net*

| | | Year Ended December 31, | | | | (Decrease) / Increase |
|---|---|---|---|---|---|---|
| | | 2021 | | 2020 | | |
| | | (in thousands) | | | | |
| Interest income | $ | 560 | $ | 562 | $ | (2) |
| Interest expense | | (1,635) | | (2,577) | | 942 |
| Other (expense) income | | (6,242) | | (8,262) | | 2,020 |
| Total other (expense) income, net | $ | (7,317) | $ | (10,277) | $ | 2,960 |

Interest income decreased primarily due to lower interest rates associated with money market funds as compared to the year ended December 31, 2020.

Interest expense decreased primarily due to lower total long-term debt outstanding due to recurring principal payments required by the Revised Credit Agreement. This decrease is primarily due to lower borrowings from our revolving credit facility during 2021 as compared to the year ended December 31, 2020.

Our other (expense) income, net decreased $2.0 million for the year ended December 31, 2021 as compared to the year ended December 31, 2020. The $6.2 million expense amount for the year ended December 31, 2021 primarily resulted from fair value adjustments on equity investment in Syros. The $8.3 million expense amount for the year ended December 31, 2020 related to fair value adjustments on equity investment in Syros in the amount of $5.3 million and the related fair value adjustments related to the final settlement of the $25.0 million ASR transaction with JPMorgan. We determined the ASR contained a forward contract and therefore we recorded fair value adjustments on unsettled accelerated share repurchase agreement in the amount of $3.0 million in the year ended December 31, 2020.

*Provision for income taxes*

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | 2021 | | 2020 |
| | | (in thousands) | | |
| Provision for income taxes | $ | (4,079) | $ | (10,688) |
| Effective tax rate | | (90)% | | 47 % |

Our provision for income taxes was based on the applicable federal and state tax rates for those periods. The effective tax rate for the year ended December 31, 2021, reflects certain non-deductible executive compensation, tax effect on stock options exercises, net of forfeitures and valuation allowance established on the deferred tax asset for an unrealized capital loss in our investment in Syros partially offset by credits for research and development activities. The effective tax rate for the year ended December 31, 2020, reflects the impact of a valuation allowance established on the deferred tax asset for an unrealized capital loss in our investment in Syros, certain non-deductible executive compensation, non-deductible nature of the fair value adjustment of our ASR agreement and changes in state filing positions partially offset by credits for research and development activities.

*Net (Loss) Income*

Net loss for the year ended December 31, 2021 was $8.6 million as compared to a net income of $12.0 million for the year ended December 31, 2020, as a result of the factors discussed above.

83

**Liquidity and Capital Resources**

Our principal sources of liquidity are our cash and cash equivalents, cash flows from operations and availability of borrowing under our revolving credit facility. Our primary uses of cash are to fund working capital requirements, including repayment of debt, product development costs, operating expenses as well as repurchases of our common stock. Cash and cash equivalents were $55.3 million, and $97.7 million as of December 31, 2022 and December 31, 2021, respectively.

For the year ended December 31, 2022, we recorded net income of $35.6 million. As of December 31, 2022, we had a working capital surplus of $77.7 million. For the year ended December 31, 2021, we recorded net loss of $8.6 million.

We believe that our cash and cash equivalents and future cash flows from operations will be sufficient to fund our currently anticipated working capital requirements for at least the next twelve months. We believe we will be able to meet our expected future cash and working capital requirements through a combination of cash flows from operations, cash and cash equivalents, availability of borrowings under our revolving credit facility and additional funding in the capital markets, if needed.

The COVID-19 pandemic has disrupted the U.S. healthcare system, global economies and global capital markets. There are significant uncertainties surrounding the full extent and duration of the impact of the COVID-19 pandemic on our business and operations. We have experienced variable financial impacts to date, as a result of the COVID-19 pandemic and the pandemic could have a material adverse impact on our financial condition and results of operations in the future, including our ability to obtain financing when and if needed. The impact of COVID-19 on our business and financial condition is more fully described below in *Trends and Uncertainties.*

In addition, we continue to monitor the impacts of other global and worsening macroeconomic conditions, such as global geopolitical tension, increasing inflation and interest rates, exchange rate fluctuations, supply chain disruptions and increases in commodity, energy and fuel prices. The U.S. government and other nations have imposed significant restrictions on most companies' ability to do business in Russia as a result of the ongoing military conflict between Russia and Ukraine. It is not possible to predict the broader or longer-term consequences of this conflict, which could include further sanctions, embargoes, regional instability, geopolitical shifts and adverse effects on macroeconomic conditions, security conditions, currency exchange rates and financial markets. Such geopolitical instability and uncertainty could have a negative impact on our ability to further expand our business and to otherwise generate revenues and develop our product candidates. In addition, a significant escalation or expansion of economic disruption or the conflict's current scope could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

*Operating Activities:*

Net cash provided by operating activities for the year ended December 31, 2022 was $50.7 million. Net income for the same period was $35.6 million more than offset by the net of non-cash adjustments of approximately $31.5 million from deferred income taxes, depreciation expense, noncash operating lease expense related to right-of-use assets, amortization expense of intangible assets, convertible promissory note related credit losses, stock-based compensation expense, fair value adjustments on equity investment, amortization of debt issuance costs, fair value adjustments related to derivative instrument, gain on fair value adjustments related to debt and loss on write-off of promissory note. Net changes in working capital decreased cash from operating activities by approximately $16.4 million, due to changes in working capital accounts. The total amount of accounts receivable as of December 31, 2022 was approximately $72.4 million, which included $48.7 million related to product sales and $23.7 million related to royalty revenue. Receivables from our product sales have payment terms ranging from 30 to 70 days with select extended terms to wholesalers on initial purchases of product launch quantities. Our receivables from royalty revenue are due 45 days from the end of the quarter or year end.

Net cash provided by operating activities for the year ended December 31, 2021 was $28.2 million. Net loss for the same period was $8.6 million more than offset by the net of non-cash adjustments of approximately $27.3 million from deferred income taxes, depreciation expense, noncash operating lease expense related to right-of-use assets, amortization expense of intangible assets, convertible promissory note related credit losses, stock-based compensation expense, fair value adjustments on equity investment, amortization of debt issuance costs, fair value adjustments related to derivative instrument, and accretion of discount on convertible promissory note. Net changes in working capital increased cash from operating activities by approximately $9.5 million, due to changes in working capital accounts. The total amount of accounts receivable as of December 31, 2021 was approximately $41.1 million, which included $15.0 million related to product sales and $26.1 million related to royalty revenue. Receivables from our product sales have payment terms ranging from 30 to 70 days with select extended terms to wholesalers on initial purchases of product launch quantities. Our receivables from royalty revenue are due 45 days from the end of the quarter or year end.

Net cash provided by operating activities for the year ended December 31, 2020 was $49.5 million. Net income for the same period was $12.0 million before non-cash adjustments of approximately $36.7 million from deferred income taxes, depreciation

84

expense, noncash operating lease expense related to right-of-use assets, amortization expense of intangible assets, stock-based compensation expense, fair value adjustments on equity investment, amortization of debt issuance costs and fair value adjustments on settled accelerated share repurchase agreement. Net changes in working capital decreased cash provided from operating activities by approximately $0.8 million, due to an increase in accounts receivable of $3.1 million, an increase in inventory of $1.5 million, a decrease in accrued expenses and other liabilities of $4.4 million, coupled with a decrease in prepaid expenses and other current assets of $11.4 million, and an increase in accounts payable of $0.8 million. The total amount of accounts receivable as of December 31, 2020 was approximately $51.1 million. Receivables from our product sales have payment terms ranging from 30 to 70 days with select extended terms to wholesalers on initial purchases of product launch quantities. Our receivables from royalty revenue are due 45-days from the end of the quarter.

*Investing Activities:*

During the years ended December 31, 2022, 2021 and 2020, we invested $0.2 million, $0.3 million, and $0.7 million, respectively, for the purchase of property and equipment.

Net cash used in investing activities for the year December 31, 2022 was $86.8 million, primarily as a result of our acquisition of Acacia Pharma pursuant to which we paid cash consideration of approximately $74.2 million, coupled with an equity investment in Enalare of $12.5 million.

Net cash used in investing activities for the year December 31, 2021 primarily was as a result of $5.0 million of investment to purchase a convertible promissory note of a privately held clinical-stage biotechnology company.

Net cash used in investing activities for the year December 31, 2020 primarily was $17.5 million related to our purchase of 10 million restricted shares of Syros's common stock.

*Financing Activities:*

Net cash used in financing activities for the year December 31, 2022 was $6.2 million, as a result of $52.2 million of principal payments for debt required by our Second Amended Credit Agreement, $18.0 million in payments related to the repurchases of our common stock, $1.4 million of payments associated with employee withholding tax upon vesting of stock-based awards, partially offset by $30.0 million from a drawdown from our revolving credit facility under the Third Amended Credit Agreement, net $15.0 million of revolver repayments coupled with $50.0 million of new debt net of $1.4 million of debt financing costs, and $1.7 million in proceeds received from the exercise of employee stock options.

Net cash used by financing activities for the year ended December 31, 2021 was $28.4 million, as a result of $8.0 million of principal payments for outstanding debt under our Revised Credit Agreement with JPMorgan Chase Bank, N.A., as administrative agent and the lenders party thereto, or the Credit Agreement, $21.2 million in payments related to the repurchases of our common stock, $1.6 million of payments associated with employee withholding tax upon vesting of stock-based awards, partially offset by $2.4 million of proceeds from common stock exercises of employee stock options.

Net cash used in financing activities for the year ended December 31, 2020 was $37.9 million, as a result of $5.0 million of principal payments for debt required by the Company's Second Amended and Restated Credit Agreement with JPMorgan Chase Bank, N.A., as administrative agent and the lenders party thereto, or the Revised Credit Agreement, $35.0 million in payments related to the repurchases of our common stock, $1.5 million of payments associated with employee withholding tax upon vesting of stock-based awards, partially offset by $3.7 million of proceeds from common stock exercises of employee stock options.

**Trends and Uncertainties**

*Impact of the COVID-19 Pandemic*

The COVID-19 pandemic has resulted in authorities implementing aggressive actions. Government authorities in the United States have recommended or imposed various social distancing, quarantine, and isolation measures on large portions of the population, and similar measures have also been taken in many other countries around the world. While many of these governmental restrictions have begun to be lifted, the timing and extent to which such orders and restrictions will be removed remains uncertain. Both the COVID-19 pandemic and the containment and mitigation efforts related to the pandemic have had a serious adverse impact on the U.S. economy and the economies of other countries around the world, the severity and duration of which are uncertain. There is no guarantee that prior or new restrictions will not be reinstated in response to the continued spread of COVID-19.

During the year ended December 31, 2022, we have experienced a variable impact on our business and financial condition due to the COVID-19 pandemic. We also incurred an insignificant amount of incremental administrative costs related to the COVID-19 pandemic. The COVID-19 pandemic, including containment and mitigation measures, has impacted, and is expected to continue to impact, our business and operations in a number of ways, including:

- *Day-to-Day Operations*: During the second quarter of 2021, we developed and implemented plans to resume in-person work practices while adhering to relevant health authority guidance, for certain of our employees, including customer-facing employees, that had been primarily working remotely. We may incur additional expenses in 2023 related to the impact of the COVID-19 pandemic on our operations, including updates to our facilities to align with safety protocols.
- *Manufacturing and Supply Chain:* We are working closely with our commercial partners and third-party manufacturers to mitigate potential disruptions as a result of the COVID-19 pandemic by continuing to monitor the supply and availability of Bendeka, Ryanodex, Belrapzo, Treskysim, PEMFEXY, BARHEMSYS, and BYFAVO for the patients who rely on these products. We anticipate that the COVID-19 pandemic may continue to delay our supply chain and marketing and sales efforts for certain of our products, including Bendeka, although it is not currently expected that any disruption would be material.
- *Marketing and Sale of Products*: In addition to the impact on our product revenues resulting in a decrease in sales from Belrapzo, driven, in part, by the COVID-19 pandemic, we have also observed a reduction in the number of Bendeka patients visiting infusion centers, hospitals and clinics for intravenous administration of Bendeka due to interruptions in healthcare services, and the patients' inability to visit administration sites as well as desire to avoid contact with infected individuals. In addition, our sales and marketing teams have been working remotely and our virtual initiatives with respect to marketing and supporting the sale and administration of our products have not been as effective as our in-person sales and marketing activities.
- *Liquidity and Capital Resources*: We believe that our future cash and cash equivalents and availability of borrowings under our Third Amended Credit Agreement flows from operations will be sufficient to fund our currently anticipated working capital requirements for the next 12 months. We have based this estimate on assumptions that may prove to be wrong While the COVID-19 pandemic has not had, and we do not expect it to have, a material adverse effect on our liquidity, the situation continues to evolve and has already resulted in a significant disruption of global financial markets. If the disruption persists or deepens, we could experience an inability to access additional capital when and if needed. If we are unable to obtain funding, we could be forced to delay, reduce or eliminate distribution of our commercialized products, product portfolio expansion or some or all of our research and development programs, which would adversely affect our business prospects. We expect to be able to obtain future funding under the terms of the Third Amended Credit Agreement, for general corporate purposes and any strategic acquisitions.
- *Regulatory Activities*: We may experience further delays in the review and/or our interactions with FDA due to, for example, absenteeism by governmental employees, inability to conduct planned physical inspections related to regulatory approval, or the diversion of FDA's efforts and attention to approval of other therapeutics or other activities related to the COVID-19 pandemic, which could further delay approval decisions with respect to regulatory submissions or obtain new product approvals.
- *Clinical Development Timelines:* The clinical trial timelines for certain of our product candidates have been delayed given difficulties with limited patient enrollment resulting from the impact of the COVID-19 pandemic, and we expect that our clinical trial timelines will continue to be impacted for the duration of the pandemic.

There are significant uncertainties surrounding the extent and duration of the impact of the COVID-19 pandemic on our business and operations. We continue to evaluate the impact of the COVID-19 pandemic on our operating results and financial condition. The COVID-19 pandemic has had a variable impact on our results of operations during the year ended December 31, 2022 and, it could have a material adverse impact on our financial condition and results of operations in the future.

In addition, the U.S. government and other nations have imposed significant restrictions on most companies' ability to do business in Russia as a result of the ongoing military conflict between Russia and Ukraine. It is not possible to predict the broader or longer-term consequences of this conflict, which could include further sanctions, embargoes, regional instability, geopolitical shifts and adverse effects on macroeconomic conditions, security conditions, currency exchange rates and financial markets. Such geopolitical instability and uncertainty could have a negative impact on our ability to further expand our business and to otherwise generate revenues and develop our product candidates. In addition, a significant escalation or expansion of economic disruption or the conflict's current scope could have a material adverse effect on our business, financial condition, results of operations and growth prospects.

We continue to monitor the impacts of other global and worsening macroeconomic conditions, such as global geopolitical tension, increasing inflation and interest rates, exchange rate fluctuations, supply chain disruptions and increases in commodity, energy and fuel prices.

**Contractual Obligations**

Our future material contractual obligations include the following (in thousands):

| Obligation | Total | | 2023 | | 2024 | | 2025 | | Beyond |
|---|---|---|---|---|---|---|---|---|---|
| Operating leases (1) | $ | 3,207 | $ | 1,672 | $ | 1,122 | $ | 413 | $ | — |
| Credit facility and Term loans (2) | | 63,750 | | 6,250 | | 10,000 | | 47,500 | | — |
| Investment in Enalare (3) | | 12,500 | | 12,500 | | — | | — | | — |
| Purchase obligations (4) | | 87,501 | | 87,501 | | — | | — | | — |
| Total obligations | $ | 166,958 | $ | 107,923 | $ | 11,122 | $ | 47,913 | $ | — |

(1) We lease our corporate office location. On August 8, 2019, we amended the lease for our corporate office location in order to rent additional office space and extend the term of our existing lease to June 30, 2025. The Company also leases its lab space under a lease agreement that expires on April 30, 2024. We also lease office space located in Palm Beach Gardens, FL. The new lease agreement commenced on November 1, 2021 and will expire 36 months from the lease commencement date, which is October 31, 2024. Rental expense was $1,507, $1,407, and $1,323, for the year ended December 31, 2022, 2021, and 2020, respectively. The remaining future lease payments under the operating leases, exclusive of any renewal option periods, are $3,207 as of December 31, 2022, payable monthly.

(2) Refer to the Consolidated Financial Statements Note 6, "Debt" for further information regarding our Credit Agreement and Term Loans.

(3) We invested $12.5 million in Enalare at the time of entering the agreement in August 2022, and we are contractually obligated to invest another $12.5 million six months after August 2022. Refer to the Consolidated Financial Statements Note 11, "Investment in Enalare Therapeutics Inc." for further details.

(4) As of December 31, 2022, the Company has purchase obligations in the amount of $87,501 which represents the contractual commitments under contract manufacturing and supply agreements with suppliers. The obligation under the supply agreement is primarily for finished product, inventory, and research and development.

**Recent Accounting Pronouncements**

In March 2020, the FASB issued *Update 2020-04 Reference Rate Reform (Topic 848), Facilitation of the Effects of Reference Rate Reform on Financial Reporting* to provide temporary optional guidance to ease the potential burden in accounting for reference rate reform. The amendments in Update 2020-04 are elective and apply to all entities that have contracts, hedging relationships, and other transactions that reference LIBOR, formerly known as the London Interbank Offered Rate, or another reference rate expected to be discontinued due to reference rate reform. The new guidance provides optional expedients, including; (1) Simplify accounting analyses under current GAAP for contract modifications, such as modifications of contracts within the scope of Topic 470, Debt, that will be accounted for by prospectively adjusting the effective interest rate, as if any modification was not substantial. That is, the original contract and the new contract shall be accounted for as if they were not substantially different from one another; (2) Simplify the assessment of hedge effectiveness and allow hedging relationships affected by reference rate reform to continue; (3) Allow a one-time election to sell or transfer debt securities classified as held to maturity before January 1, 2020 that reference a rate affected by reference rate reform. The amendments are effective for all entities from the beginning of an interim period that includes the issuance date of the ASU. An entity may elect to apply the amendments prospectively through December 31, 2022. The adoption of ASU 2020-4 is not expected to have a material impact on our financial position or results of operations.

In October 2021, the FASB issued ASU 2021-08, *Business Combinations (Topic 805): Accounting for Contract Assets and Contract Liabilities from Contracts with Customers*, which requires an acquirer to recognize and measure contract assets and liabilities acquired in a business combination in accordance with Revenue from Contracts with Customers (Topic 606) rather than adjust them to fair value at the acquisition date. This accounting standard update will be effective for public business entities in fiscal years beginning after December 15, 2022, including interim periods within those fiscal years; therefore for us beginning in the first quarter of 2023. We are currently evaluating the impact of this accounting standard, but do not expect it to have a material impact on our condensed consolidated financial statements.

In March 2022, the FASB issued ASU 2022-01, *Derivatives and Hedging (Topic 801): Fair Value Hedging – Portfolio Layer Method*, which expands the current single-layer hedging model to allow multiple-layer hedges of a single closed portfolio of prepayable financial assets or one or more beneficial interests secured by a portfolio of prepayable financial instruments under the method. This accounting standards update will be effective for public business entities in fiscal years beginning after

87

December 15, 2022, including interim periods within those fiscal years; therefore for us beginning in the first quarter of 2023. We are currently evaluating the impact of this accounting standard, but do not expect it to have a material impact on our condensed consolidated financial statements.

There are other new accounting pronouncements issued by the FASB that we have adopted or will adopt, as applicable. We do not believe any of these accounting pronouncements have had, or will have, a material impact on our condensed consolidated financial statements or disclosures.

**Critical Accounting Policies and Estimates**

The preparation of financial statements in conformity with U.S. GAAP requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenues and expenses and other financial information. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. The amount of assets and liabilities reported in our consolidated balance sheets and the amounts reported in our consolidated statements of operations are affected by estimates and assumptions, which are used for, but not limited to, the accounting for revenue recognition. The accounting estimates discussed below involve a significant level of estimation uncertainty and have had or are reasonably likely to have a material impact on our financial condition or results of operations. Actual results could differ materially from our estimates. For additional accounting policies, see Note 2 to our Consolidated Financial Statements—*Summary of Significant Accounting Policies.*

*Revenue Recognition*

Revenue is recognized when a customer obtains control of promised goods or services, in an amount that reflects the consideration which the entity expects to receive in exchange for those goods or services. To determine revenue recognition for arrangements that an entity determines are within the scope of ASC 606, the Company performs the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. The Company only applies the five-step model to contracts when it is probable that the entity will collect the consideration it is entitled to in exchange for the goods or services it transfers to the customer. At contract inception, once the contract is determined to be within the scope of ASC 606, the Company assesses the goods or services promised within each contract and determines those that are performance obligations, and assesses whether each promised good or service is distinct. The Company then recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when (or as) the performance obligation is satisfied. Sales, value add, and other taxes collected on behalf of third parties are excluded from revenue.

*Product revenue* - The Company recognizes net revenue on sales to its commercial partners and to end users. In each instance, revenue is generally recognized when the customer obtains control of the Company's product, which occurs at a point in time, and may be upon shipment or upon delivery based on the contractual shipping terms of a contract.

Revenue on sales to commercial partners relates to Bendeka and Treakisym. Sales to our commercial partners are presented gross because the Company is primarily responsible for fulfilling the promise to provide the product, is responsible to ensure that the product is produced in accordance with the related supply agreement and bears risk of loss while the inventory is in-transit to the commercial partner.

Revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring products or services to a customer. To the extent the transaction price includes variable consideration, the Company estimates the amount of variable consideration that should be included in the transaction price utilizing the expected value method to which the Company expects to be entitled. As such, revenue on sales to end users for Belrapzo, vasopressin, PEMFEXY and Ryanodex are recorded net of certain deductions. Our products are contracted with a limited number of oncology distributors and hospital buying groups with narrow differences in ultimate realized contract prices used to estimate our chargeback and rebate reserves. Variable consideration is included in the transaction price if, in the Company's judgment, it is probable that a significant future reversal of cumulative revenue under the contract will not occur. Estimates of variable consideration are made using the expected value method and determination of whether to include estimated amounts in the transaction price are based largely on an assessment of the Company's anticipated performance and all information (historical, current and forecasted) that is reasonably available. The Company believes that the estimates it has established are reasonable based upon current facts and circumstances. Applying different judgments to the same facts and circumstances could result in the estimated amounts to vary.

88

*Components of Gross-to-Net (GTN) Estimates*

<u>Chargebacks</u>: Chargebacks are discounts that occur when certain contracted customers, including group purchasing organizations, or GPOs, public health service institutions and federal government entities purchasing via the Federal Supply Schedule, purchase from the Company's distributors. The Company's distributors purchase product from us at invoice price, then resell the product to certain contracted customers on the basis of prices negotiated between us and the providers. The difference between the distributors' purchase price and the typically lower certain contracted customers' purchase price is refunded to the distributors through a chargeback credit. We record estimates for these chargebacks at the time of sale as deductions from gross revenues, with corresponding adjustments to our accounts receivable allowances.

*Business Combinations*

We account for acquired businesses using the acquisition method of accounting, which requires that assets acquired and liabilities assumed be recorded at the date of acquisition at their respective fair values. The consolidated financial statements and results of operations reflect an acquired business after the completion of the acquisition. The fair value of the consideration paid is assigned to the underlying net assets of the acquired business based on their respective fair values as determined using a market participant concept. Any excess of the purchase price over the fair value of net assets and other identifiable intangible assets acquired is recorded as goodwill.

The estimated fair value of acquired intangible assets was determined using the "income approach," which is a valuation technique that provides an estimate of the fair value of an asset based on market participant expectations of the cash flows an asset would generate over its remaining useful life. The assumptions, including the expected projected cash flows, utilized in the purchase price allocation and in determining the purchase price are based on management's best estimates as of the closing date of the acquisition. Some of the more significant assumptions inherent in the development of the intangible asset valuations included the estimated net cash flows for each year for each asset (including relevant market size and market share), the appropriate discount rate to select in order to measure the risk inherent in each future cash flow stream, as well as other factors. For these and other reasons, actual results may vary significantly from estimated results.

For additional information regarding our estimates, including quantitative impacts on our financial results, see Note 2 to our Consolidated Financial Statements - *Summary of Significant Accounting Policies*

89

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk**

Market risk is the risk of change in fair value of a financial instrument due to changes in interest rates, equity prices, creditworthiness, financing, exchange rates or other factors. We are exposed to market risk related to changes in interest rates. As of December 31, 2022, we had cash and cash equivalents of $55.3 million held primarily in money market mutual funds. Our primary exposure to market risk is interest rate sensitivity, which is affected by changes in the general level of U.S. interest rates, however, due to the short-term duration of our money market mutual funds and the low risk profile of our investments, an immediate one percent change in interest rates would not have a material effect on the fair market value of our portfolio.

Our exposure to interest rate risk also relates to our variable-rate indebtedness associated with our Third Amended Credit Agreement. As of December 31, 2022 and 2021, the aggregate principal amount of such variable-rate indebtedness was $63.8 million and $26.0 million, respectively. Borrowings under the Third Amended Credit Agreement may from time to time bear interest at variable rates, which rates are further described in Note 6. Debt in the Consolidated Financial Statements included in Part IV, Item 15 of this report. As of December 31, 2022 and 2021, a hypothetical 1% increase in the applicable rate would not have a material effect on the incremental annual interest expense related to our variable-rate debt borrowings.

90

**Item 8. Financial Statements and Supplementary Data**

Our Financial Statements and Supplementary Data are set forth in Item 15 of Part IV of this Annual Report on Form 10-K.

91

**Item 9. Changes in and Disagreements with Accountants on Accounting and Financial Disclosure**

Not Applicable.

92

**Item 9A. Controls and Procedures.**

**Evaluation of Disclosure Controls and Procedures**

Our disclosure controls and procedures are designed to ensure that information required to be disclosed by us in the reports that we file or submit under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act is accumulated and communicated to our management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

As of December 31, 2022, an evaluation was conducted under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures (as defined in Rule 13a-15(e) and Rule 15d-15(e) of the Exchange Act). Based on this evaluation, such officers have concluded that our disclosure controls and procedures were effective as of December 31, 2022. Management has concluded that our consolidated financial statements included in this Annual Report on Form 10-K fairly present, in all material respects, our financial condition, results of operations and cash flows for the periods presented therein.

**Management's Annual Report on Internal Control Over Financial Reporting**

The management of Eagle Pharmaceuticals, Inc. ("Eagle") has prepared, and is responsible for, Eagle's financial statements and related footnotes. These financial statements have been prepared in conformity with U.S. generally accepted accounting principles. Eagle's management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is defined in Rule 13a-15(f) or 15d-15(f) promulgated under the Securities Exchange Act of 1934 as a process designed by, or under the supervision of the Company's principal executive and principal financial officers and effected by the Company's board of directors, management, and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:

- pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of Eagle's assets;

- provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of Eagle are being made only in accordance with authorizations of management and directors of Eagle;

- provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of Eagle's assets that could have a material effect on the financial statements; and

- Eagle's management must also disclose any material weaknesses identified.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management (with the participation of the principal executive officer and principal accounting and financial officer) conducted an evaluation of the effectiveness of the Company's internal control over financial reporting as of December 31, 2022 based on the framework in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

The scope of management's assessment of the effectiveness of internal control over financial reporting excluded the business of Acacia Pharma Group plc ("Acacia"), which the Company acquired in a business combination on June 9, 2022, and is included in our consolidated financial statements as of and for the year ended December 31, 2022. The Acacia business represented approximately 3.6% of total assets (excluding goodwill and intangible assets), 1.7% of total liabilities, 0.5% of total revenues, and 3.5% of total operating expenses, each as reflected in our consolidated financial statements as of and for the year ended December 31, 2022.

Based on this evaluation, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2022.

The financial statements and internal control over financial reporting have been audited by Ernst & Young, LLP, an independent registered public accounting firm. Ernst & Young's reports with respect to fairness of the presentation of the financial statements, and the effectiveness of internal control over financial reporting, are included herein.

/s/ Scott Tarriff
President, Chief Executive Officer and Director
(Principal Executive Officer)


/s/ Brian Cahill

Chief Financial Officer
(Principal Accounting and Financial Officer)

94

**Changes in Internal Control Over Financial Reporting**

There were no changes in our internal control over financial reporting identified in connection with the evaluation required by Rule 13a-15(d) and 15d-15(d) of the Exchange Act that occurred during the quarter ended December 31, 2022 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Eagle Pharmaceuticals, Inc.

**Opinion on Internal Control Over Financial Reporting**

We have audited Eagle Pharmaceuticals, Inc.'s internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control— Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework), (the COSO criteria). In our opinion, Eagle Pharmaceuticals, Inc. (the Company) maintained, in all material respects, effective internal control over financial reporting as of December 31, 2022, based on the COSO criteria.

As indicated in the accompanying Management's Annual Report on Internal Control Over Financial Reporting, management's assessment of and conclusion on the effectiveness of internal control over financial reporting did not include the internal controls of Acacia Pharma Group plc, which is included in the 2022 consolidated financial statements of the Company and constituted 3.6% and 1.7% of total assets (excluding goodwill and intangible assets) and total liabilities, respectively, as of December 31, 2022 and 0.5% and 3.5% of revenues and operating expenses, respectively, for the year then ended. Our audit of internal control over financial reporting of the Company also did not include an evaluation of the internal control over financial reporting of Acacia Pharma Group plc.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated balance sheets of the Company as of December 31, 2022 and 2021, and the related consolidated statements of operations, comprehensive income (loss), changes in stockholders' equity and cash flows for each of the three years in the period ended December 31, 2022 and the related notes and our report dated March 23, 2023 expressed an unqualified opinion thereon.

**Basis for Opinion**

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control Over Financial Reporting. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects.

Our audit included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, testing and evaluating the design and operating effectiveness of internal control based on the assessed risk, and performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

**Definition and Limitations of Internal Control Over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

/s/ Ernst & Young LLP

Stamford, Connecticut

March 23, 2023

96

**Item 9B. Other information.**

None.

**Item 9C. Disclosure Regarding Foreign Jurisdictions that Prevent Inspections.**

Not applicable.

<div align="center">

**PART III**

</div>

We will file a definitive proxy statement for our 2023 Annual Meeting of Stockholders, or the 2023 Proxy Statement, with the SEC, pursuant to Regulation 14A, not later than 120 days after the end of our fiscal year. Accordingly, certain information required by Part III has been omitted under General Instruction G(3) to Form 10-K. Only those sections of the 2023 Proxy Statement that specifically address the items set forth herein are incorporated by reference.

**Item 10. Directors, Executive Officers and Corporate Governance**

The information required by this item is incorporated by reference to our 2023 Proxy Statement to be filed pursuant to Regulation 14A within 120 days after the end of the fiscal year covered by this Annual Report on Form 10-K.

We have adopted a Code of Business Conduct and Ethics (the "Code of Conduct") applicable to all of our employees, officers and directors. The Code of Conduct is available on our website at www.eagleus.com at [insert where found]. The nominating and corporate governance committee of our Board is responsible for overseeing the Code of Conduct and must approve any waivers of the Code of Conduct for employees, executive officers and directors. We intend to satisfy the disclosure requirements under Item 5.05 of the SEC Form 8-K regarding an amendment to, or waiver from, a provision of our Code of Conduct by posting such information on our website at the website address and location specified above. Information contained on, or that can be accessed through, our website is not incorporated by reference into this Annual Report on Form 10-K, and you should not consider information on our website to be part of this Annual Report on Form 10-K.

**Item 11. Executive Compensation**

The information required by this item is incorporated by reference to our 2023 Proxy Statement under the section entitled "Executive Compensation," and is incorporated herein by reference.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this item is incorporated by reference to our 2023 Proxy Statement under the section entitled "Executive Compensation—Non-Employee Director Compensation," and the information required by this item with respect to security ownership of certain beneficial owners and management is to be included in our 2023 Proxy Statement under the section entitled "Security Ownership of Certain Beneficial Owners and Management," and the information required by this item with respect to security ownership of certain beneficial owners and management is to be included in our 2023 Proxy Statement under the section entitled "Security Ownership of Certain Beneficial Owners and Management" and in each case is incorporated herein by reference.

**Item 13.     Certain Relationships and Related Transactions and Director Independence**

The information required by this item is incorporated by reference to our 2023 Proxy Statement under the sections entitled "Related-Person Transactions Policy and Procedures—Certain Related-Person Transactions" and "Information Regarding the Board of Directors and Corporate Governance—Independence of the Board of Directors" and is incorporated herein by reference.

**Item 14. Principal Accountant Fees and Services**

The information required by this item is incorporated by reference to our 2023 Proxy Statement to under the section entitled "Proposal 2—Ratification of Selection of Independent Registered Public Accounting Firm" and is incorporated herein by reference.

<div align="center">

97

</div>

**PART IV**

**Item 15. Exhibits and Financial Statement Schedules**

**(a) Documents filed as part of this report.**

The following documents are filed as part of this report:

### 1. Consolidated Financial Statements

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm– Ernst & Young, LLP; Stamford, CT - PCAOB ID # 42 | F-2 |
| Consolidated Balance Sheets as of December 31, 2022 and 2021 | F- 4 |
| Consolidated Statements of Operations for the Years Ended December 31, 2022, 2021 and 2020 | F- 5 |
| Consolidated Statements of Comprehensive Income (Loss) for the Years ended December 31, 2022, 2021, 2020 | F-7 |
| Consolidated Statements of Changes in Stockholders' Equity for the Years Ended December 31, 2022, 2021 and 2020 | F- 7 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2022, 2021 and 2020 | F- 8 |
| Notes to Consolidated Financial Statements | F- 10 |

### 2. Financial Statement Schedules

Financial statement schedules have been omitted in this report because they are not applicable, not required under the instructions, or the information requested is set forth in the financial statements or related notes thereto.

### 3. Exhibits

The exhibits listed in the below index to exhibits are filed as part of, or incorporated by reference into, this report.

| Exhibit Number | | Description |
|---|---|---|
| 2.1 | | Scheme Document, dated April 26, 2022 (incorporated herein by reference to Exhibit 99.1 to the Company's Current Report on Form 8-K, SEC File No. 001-36306, filed with the Commission on April 27, 2022). |
| 2.2 | | Co-operation Agreement, dated March 27, 2022, by and between Eagle Pharmaceuticals, Inc. and Acacia Pharma Group plc. (incorporated herein by reference to Exhibit 2.2 to the Company's Current Report on Form 8-K, SEC File No. 001-36306, filed with the Commission on March 28, 2022). |
| 3.1 | | Amended and Restated Certificate of Incorporation (incorporated by reference to Exhibit 3.2 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 3.2 | | Amended and Restated Bylaws (incorporated by reference to Exhibit 3.4 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 4.1 | | Form of Common Stock Certificate of the Registrant (incorporated by reference to Exhibit 4.1 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 4.2 | | Description of securities Description of securities registered pursuant to Section 12 of the Securities Exchange Act of 1934. pursuant to Section 12 of the Securities Exchange Act of 1934. (incorporated by reference to Exhibit 4.3 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 2, 2020). |
| 10.1 | † | Form of Indemnification Agreement by and between the Registrant and its directors and officers (incorporated by reference to Exhibit 10.1 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.2 | † | Eagle Pharmaceuticals, Inc. 2007 Incentive Compensation Plan and Form of Stock Option Agreement thereunder (incorporated by reference to Exhibit 10.2 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), as amended December 15, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |

98

| 10.3 | † | Eagle Pharmaceuticals, Inc. 2014 Equity Incentive Plan, as amended and restated, and Form of Stock Option Agreement, Notice of Exercise and Stock Option Grant Notice thereunder (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015), as amended with an additional form of Stock Option Agreement (incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |
|---|---|---|
| 10.4 | † | Eagle Pharmaceuticals, Inc. 2014 Employee Stock Purchase Plan (incorporated by reference to Exhibit 10.4 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 22, 2014) |
| 10.5 | † | Eagle Pharmaceuticals, Inc. Non-Employee Director Compensation Policy (incorporated by reference to Exhibit 10.5 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 22, 2014) |
| 10.6 | † | Employment Agreement by and between the Registrant and Scott Tarriff dated March 8, 2007, as amended (incorporated by reference to Exhibit 10.6 to the Registrant's Registration Statement on Form S-1/A, SEC File No. 333-192984, filed January 28, 2014) |
| 10.7 | | Lease Agreement between the Registrant and Mack-Cali Chestnut Ridge L.L.C. dated May 28, 2013, as amended on July 1, 2013 (incorporated by reference to Exhibit 10.10 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on March 16, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K , SEC File No. 001-36306, filed March 20, 2015) |
| 10.8 | * | Development and License Agreement, by and between the Registrant and SciDose, LLC, dated September 24, 2007, as amended March 18, 2008, May 22, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.11(a) to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.9 | * | Development and License Agreement, by and between the Registrant and SciDose, LLC, dated June 12, 2007, as amended March 18, 2008, March 25, 2008, December 3, 2008, May 22, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.11(b) to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on August 5, 2015 (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) |
| 10.10 | * | License and Sublicense Agreement, by and between the Registrant and Lyotropic Therapeutics, Inc., dated October 16, 2008 (incorporated by reference to Exhibit 10.12 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.11 | * | License and Development Agreement, by and between the Registrant and The Medicines Company, effective as of September 24, 2009, as amended January 2010 and September 1, 2012 (incorporated by reference to Exhibit 10.13 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.12 | * | Supply Agreement, by and between the Registrant and The Medicines Company, dated September 24, 2009 (incorporated by reference to Exhibit 10.14 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.13 | * | Agreement for the Supply of Argatroban and Topotecan, by and between the Registrant and Cipla Limited, dated December 14, 2012, as amended August 30, 2013 (incorporated by reference to Exhibit 10.15 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.14 | * | Supply and Distribution Agreement, by and between the Registrant and Sandoz AG, dated January 28, 2013 (incorporated by reference to Exhibit 10.16 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.15 | * | Development and License Agreement, by and between the Registrant and Robert One, LLC (bendamustine), dated March 18, 2008, as amended November 11, 2009 and July 16, 2013 (incorporated by reference to Exhibit 10.17 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013) |
| 10.16 | * | Development and License Agreement, by and between the Registrant and Robert One, LLC (pemetrexed), dated February 13, 2009, as amended May 22, 2009, December 23, 2010 and July 16, 2013 (incorporated by reference to Exhibit 10.18 to the Registrant's Registration Statement on Form S-1, SEC File No. 333-192984, filed December 20, 2013), and as amended on August 5, 2015 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015) as further amended by the Amendment to Development and Licensing Agreement, by and between the Company and Robert One, LLC, dated December 9, 2022 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed on December 14, 2022) |
| 10.17 | * | Exclusive License Agreement, by and between the Registrant and Cephalon, Inc., dated February 13, 2015 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q/A, SEC File No. 001-36306, filed February 12, 2016) |
| 10.18 | * | Settlement and License Agreement, by and between the Registrant and Cephalon, Inc., dated February 13, 2015 (incorporated by reference to Exhibit 10.3 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed May 15, 2015) |
| 10.19 | † | Eagle Pharmaceuticals, Inc. Officer Severance Benefit Plan (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 10, 2015), as amended and restated by the Eagle Pharmaceuticals, Inc. Amended and Restated Severance Benefit Plan (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 16, 2019), as amended and restated by the Amended and Restated Severance Benefit Plan, effective as of December 9, 2022 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed on December 9, 2022) |
| 10.20 | † | Form of Letter Agreement (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed December 21, 2015) |

| 10.21 | * | License Agreement, by and between the Registrant and Teikoku Pharma USA, Inc., dated October 13, 2015 (incorporated by reference to Exhibit 10.23 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 29, 2016) |
|---|---|---|
| 10.22 | * | Co-Promotion Agreement, by and between the Registrant and Spectrum Pharmaceuticals, Inc., dated November 4, 2015 (incorporated by reference to Exhibit 10.23 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 29, 2016) |
| 10.23 | | Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated January 26, 2017 (incorporated by reference to Exhibit 10.26 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 15, 2017) as amended and restated by the Amended and Restated Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated August 8, 2017 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed August 9, 2017), and as amended and restated by the Second Amended and Restated Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated November 8, 2019 (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed November 12, 2019). as amended and restated by the Third Amended and Restated Credit Agreement, by and among the Registrant, JPMorgan Chase Bank, N.A., as administrative agent, and the lenders party thereto, dated November 1, 2022 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed on November 3, 2022) |
| 10.24 | | Amendment to License and Sublicense Agreement, by and between the Registrant and Lyotropic Therapeutics, Inc., dated August 3, 2016 (incorporated by reference to Exhibit 10.27 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 15, 2017) |
| 10.25 | * | Product Collaboration and License Agreement, by and between the Registrant and SymBio Pharmaceuticals Limited, effective as of September 19, 2017 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed November 8, 2017) |
| 10.26 | † | Form of Restricted Stock Unit Grant Package (2014 Equity Incentive Plan) (incoported by reference to Exhibit 10.3 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed February 26, 2018) |
| 10.27 | † | Form of Performance Stock Unit Grant Package (2014 Equity Incentive Plan) (incorporated by reference to Exhibit 10.29 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 5, 2021). |
| 10.28 | † + | Form of Performance Stock Unit Grant Package (2014 Equity Incentive Plan) (incorporated by reference to Exhibit 10.30 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 5, 2021). |
| 10.29 | | Stock Purchase Agreement, dated as of November 10, 2016, by and among Eagle Pharmaceuticals, Inc., Arsia Therapeutics, LLC, Arsia Therapeutics, Inc., Amy Schulman, as the Seller Representative, and each person that executed a joinder to the Purchase Agreement (incorporated herein by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K filed with the Commission on November 14, 2016) ), as amended by Amendment No. 1 to Stock Purchase Agreement, dated as of February 8, 2018 (incorporated herein by reference to Exhibit 2.1 to the Company's Current Report on Form 8-K, SEC File No. 001-36306, filed with the Commission on February 14, 2018) |
| 10.30 | | Fifth Amendment to Lease Agreement between the Registrant and CAPSTONE TICE BLVD LLC. dated as of August 8, 2019 (incorporated by reference to Exhibit 10.32 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 2, 2020). |
| 10.31 | | Fourth Amendment to Exclusive License Agreement, by and between the Registrant and Teva Pharmaceuticals International GmbH, dated April 12, 2019 (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q filed on May 7, 2019). |
| 10.32 | + | Settlement Agreement, by and between the Registrant and Eli Lilly and Company, dated December 13, 2019 (incorporated by reference to Exhibit 10.34 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 2, 2020). |
| 10.33 | + | Co-Promotion Agreement with Tyme Technologies, Inc., dated January 7, 2020 (incorporated by reference to Exhibit 10.35 to the Registrant's Annual Report on Form 10-K, SEC File No. 001-36306, filed March 2, 2020). |
| 10.34 | | Securities Purchase Agreement, between the Registrant and Tyme Technologies, Inc., dated January 7, 2020 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K filed on January 8, 2020). |
| 10.35 | | License Agreement between the Registrant and Combioxin SA, dated August 19, 2021 (incorporated by reference to Exhibit 10.1 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed November 9, 2021) |
| 10.36 | | License Agreement between the Registrant and AOP Orphan Pharmaceuticals GmbH, dated August 6, 2021 (incorporated by reference to Exhibit 10.2 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed November 9, 2021). |
| 10.37 | | Lock-up Agreement, dated March 27, 2022, by and between Eagle Pharmaceuticals, Inc. and Cosmo Pharmaceuticals N.V. (incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed on March 28, 2022). |

| 10.38 | | Guaranty Agreement to Loan Agreement, by and among the Registrant, Acacia Pharma Limited and Cosmo Technologies Ltd., dated June 9, 2022 (incorporated by reference to Exhibit 10.3 to the Registrant's Current Report on Form 10-Q, SEC File No. 001-36306, filed on August 9, 2022 |
|---|---|---|
| 10.39 | | Securities Purchase Agreement, by and between the Registrant and Enalare Therapeutics Inc., dated August 8, 2022 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed on August 9, 2022) |
| 10.40 | | Security Purchase Option Agreement, by and between the Registrant, Enalare Therapeutics Inc. and the other parties thereto, dated August 8, 2022 (incorporated by reference to Exhibit 10.2 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed on August 9, 2022) |
| 10.41 | | Settlement and License Agreement, by and between Teva Pharmaceuticals International GmbH and Cephalon, Inc. and the Registrant and Hospira, Inc., dated April 18, 2022 (incorporated by reference to Exhibit 10.4 to the Registrant's Quarterly Report on Form 10-Q, SEC File No. 001-36306, filed on November 9, 2022 |
| 10.42 | | Amendment to Development and Licensing Agreement, by and between the Company and Robert One, LLC, dated December 9, 2022 (incorporated by reference to Exhibit 10.1 to the Registrant's Current Report on Form 8-K, SEC File No. 001-36306, filed on December 14, 2022) |
| 21.1 | (1) | List of subsidiaries of Eagle Pharmaceuticals, Inc. |
| 23.1 | (1) | Consent of Ernst & Young, LLP, an Independent Registered Public Accounting Firm |
| 24.1 | | Power of Attorney (incorporated by reference to this signature page of this Annual Report on Form 10-K) |
| 31.1 | (1) | Certification of Chief Executive Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 31.2 | (1) | Certification of Chief Financial Officer pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Securities Exchange Act of 1934, as amended. |
| 32.1 | (2) | Certifications of Chief Executive Officer and Chief Financial Officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 101.INS | | iXBRL Instance Document – the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document. |
| 101.SCH | | iXBRL Taxonomy Extension Schema |
| 101.CAL | | iXBRL Taxonomy Extension Calculation Linkbase |
| 101.DEF | | iXBRL Taxonomy Extension Definition Linkbase |
| 101.LAB | | iXBRL Taxonomy Extension Labels Linkbase |
| 101.PRE | | iXBRL Taxonomy Extension Presentation Linkbase |
| 104 | | Cover Page Interactive Data File, formatted as Inline XBRL, contained in Exhibit 101 attachments |

†Management contract or compensatory plan or arrangement.

 *Confidential treatment granted as to certain portions, which portions are omitted and filed separately with the Securities and Exchange Commission.

+Certain portions of the exhibit (indicated by asterisks) have been omitted pursuant to Item 601(b)(10)(iv) of Regulation S-K..

(1) Filed herewith.

(2) Furnished (and not filed) herewith pursuant to Item 601 (b)(32)(ii) of Regulation S-K.

**Item 16. Form 10-K Summary**
None.

<div align="center">SIGNATURES</div>

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized, on March 23, 2023.

**EAGLE PHARMACEUTICALS, INC.**

By:    /s/ Scott Tarriff
Scott Tarriff
President and Chief Executive Officer
(Principal Executive Officer)

<div align="center">101</div>

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the registrant and in the capacities and on the dates indicated.

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Scott Tarriff and Brian Cahill, and each of them, his true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him and in his name, place and stead, in any and all capacities, to sign any and all amendments (including post-effective amendments) to this report, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents, and each of them, full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully to all intents and purposes as he might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact and agents, or either of them, or their or his substitutes or substitute, may lawfully do or cause to be done by virtue hereof.

| Signature | Title | Date |
|---|---|---|
| /S/ SCOTT TARRIFF<br>Scott Tarriff | President, Chief Executive Officer and Director<br>(Principal Executive Officer) | March 23, 2023 |
| /S/ BRIAN CAHILL<br>Brian Cahill | Chief Financial Officer<br>(Principal Accounting and Financial Officer) | March 23, 2023 |
| /S/ MICHAEL GRAVES<br>Michael Graves | Chairman of the Board of Directors | March 23, 2023 |
| /S/ STEVEN RATOFF<br>Steven Ratoff | Member of the Board of Directors | March 23, 2023 |
| /S/ JENNIFER K. SIMPSON<br>Jennifer K. Simpson | Member of the Board of Directors | March 23, 2023 |
| /S/ ROBERT L. GLENNING<br>Robert L. Glenning | Member of the Board of Directors | March 23, 2023 |
| /S/ RICHARD A. EDLIN<br>Richard A. Edlin | Member of the Board of Directors | March 23, 2023 |
| /S/ LUCIANA BORIO<br>Luciana Borio | Member of the Board of Directors | March 23, 2023 |

103

**INDEX TO FINANCIAL STATEMENTS OF**
**EAGLE PHARMACEUTICALS, INC.**

**APPENDIX A**

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm– Ernst & Young, LLP | F-2 |
| Consolidated Balance Sheets as of December 31, 2022 and 2021 | F- 4 |
| Consolidated Statements of Operations for the Years Ended December 31, 2022, 2021 and 2020 | F- 5 |
| Consolidated Statements of Comprehensive Income (Loss) for the Years ended December 31, 2022, 2021, 2020 | F-7 |
| Consolidated Statements of Changes in Stockholders' Equity for the Years Ended December 31, 2022, 2021 and 2020 | F- 7 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2022, 2021 and 2020 | F- 8 |
| Notes to Consolidated Financial Statements | F- 10 |

**Report of Independent Registered Public Accounting Firm**

To the Stockholders and the Board of Directors of Eagle Pharmaceuticals, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated balance sheets of Eagle Pharmaceuticals, Inc. (the Company) as of December 31, 2022 and 2021, the related consolidated statements of operations, comprehensive income (loss), changes in stockholders' equity and cash flows for each of the three years in the period ended December 31, 2022, and the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company at December 31, 2022 and 2021, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2022, in conformity with U.S. generally accepted accounting principles.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2022, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework) and our report dated March 23, 2023 expressed an unqualified opinion thereon.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

**Critical Audit Matters**

The critical audit matters communicated below are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Revenue Recognition - Chargebacks*

F- 1

| | |
|---|---|
| *Description of the Matter* | At December 31, 2022, the Company recorded an allowance for chargebacks totaling $23.6 million. As described in Note 2 of the consolidated financial statements, the Company recognizes revenues from product sales net of allowances for chargebacks. These allowances are recorded in the period when the related sales occur and are based on the estimated amounts to be claimed which are not known at the point of sale. Chargebacks are estimated based on assumptions about the third-party payors and contracted prices to be paid by those payors. |
| | Given the estimation uncertainty involved, auditing the allowance for chargebacks was complex. A higher degree of auditor judgment was required to evaluate the mix of third-party payors and applicable contract prices assumed by management to determine the amount of the allowance. |
| *How We Addressed the Matter in Our Audit* | We obtained an understanding, evaluated the design and tested the operating effectiveness of internal controls over the Company's process for estimating its allowance for chargebacks, including controls over management's review of significant assumptions used to calculate the estimates such as the mix of third-party payors and applicable contract prices. |
| | To test the Company's estimated allowance for chargebacks, our audit procedures included, among others, testing the accuracy and completeness of the underlying data used in the Company's analyses and evaluating the assumptions described above. We compared the assumed payor mix used to calculate the estimate to actual historical data and compared the assumed contract prices to executed agreements with the applicable payors. We also analyzed the effect of reasonable changes in assumptions on the amounts recorded. We assessed the historical accuracy of management's estimate. We tested credit memos issued subsequent to year-end for recording in the proper period. |

### *Valuation of Intangible Assets Acquired in a Business Combination*

| | |
|---|---|
| *Description of the Matter* | On June 9, 2022, the Company completed the acquisition of all the outstanding share capital of Acacia Pharma Group plc (the "Acquisition"). The Company accounted for the acquisition as a business combination using the acquisition method of accounting for total consideration of approximately $100.4 million, which included cash consideration of $76.7 million as disclosed in Notes 1 and 15 to the consolidated financial statements. The purchase price was allocated to the assets acquired and liabilities assumed using the fair values determined by management as of the acquisition date. |
| | Auditing the Company's valuation for the acquired intangible assets required complex auditor judgment due to the significant estimation uncertainty in determining the fair value of the intangible assets of $108.0 million. The significant assumptions used to estimate the fair value of the intangible assets acquired included relevant market size, market share and discount rate. These significant assumptions are forward-looking and could be affected by future economic and market conditions. |
| *How We Addressed the Matter in Our Audit* | We obtained an understanding, evaluated the design and tested the operating effectiveness of internal controls over the Company's accounting for the acquisition. For example, we tested controls over management's review of the valuation of the intangible assets, including management's review of the significant assumptions used in the valuation models. |

F- 2

To test the estimated fair value of the intangible assets, our audit procedures included, among others, testing the significant assumptions described above, and testing the completeness and accuracy of the underlying data used by the Company. We compared the significant assumptions used by management to current industry and market data, and other relevant factors that would affect the significant assumptions. In addition, we involved internal valuation specialists to assist in evaluating certain assumptions, such as the discount rate, and methodologies used in the fair value estimates. To evaluate the discount rate, we independently developed a range of estimates and compared our estimates to those used by management.

/s/ Ernst & Young LLP

We have served as the Company's auditor since 2020.

Stamford, Connecticut
March 23, 2023

F- 3

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED BALANCE SHEETS**
(In thousands, except share amounts)

| | December 31, 2022 | December 31, 2021 |
|---|---|---|
| **ASSETS** | | |
| **Current assets:** | | |
| Cash and cash equivalents | $ 55,321 | $ 97,659 |
| Accounts receivable, net | 72,439 | 41,149 |
| Inventories | 47,794 | 21,908 |
| Prepaid expenses and other current assets | 13,200 | 11,890 |
| Total current assets | 188,754 | 172,606 |
| Property and equipment, net | 1,168 | 1,636 |
| Intangible assets, net | 118,327 | 10,671 |
| Goodwill | 45,033 | 39,743 |
| Deferred tax asset | 27,146 | 18,798 |
| Other assets | 25,732 | 10,278 |
| Total assets | $ 406,160 | $ 253,732 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | |
| **Current liabilities:** | | |
| Accounts payable | $ 18,993 | $ 16,431 |
| Accrued expenses and other liabilities | 85,844 | 32,338 |
| Short-term debt | 6,250 | 25,607 |
| Total current liabilities | 111,087 | 74,376 |
| | | |
| Other long-term liabilities | 5,297 | 2,903 |
| Long-term debt | 56,216 | — |
| Total liabilities | 172,600 | 77,279 |
| | | |
| **Commitments and contingencies** | | |
| | | |
| **Stockholders' equity:** | | |
| Preferred stock, 1,500,000 shares authorized and no shares issued or outstanding as of December 31, 2022 and 2021 | — | — |
| Common stock, $0.001 par value; 50,000,000 shares authorized; 17,569,375 and 16,903,034 shares issued as of December 31, 2022 and 2021, respectively | 18 | 17 |
| Additional paid in capital | 366,265 | 325,779 |
| Accumulated other comprehensive loss | (1,112) | (94) |
| Retained earnings | 111,504 | 75,862 |
| Treasury stock, at cost, 4,552,730 and 4,111,622 shares as of December 31, 2022 and 2021, respectively | (243,115) | (225,111) |
| Total stockholders' equity | 233,560 | 176,453 |
| Total liabilities and stockholders' equity | $ 406,160 | $ 253,732 |

See accompanying notes to consolidated financial statements

F- 4

**EAGLE PHARMACEUTICALS, INC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except share and per share amounts)**

| | | Year Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | **2022** | | **2021** | | **2020** |
| **Revenue:** | | | | | | |
| Product sales, net | $ | 214,536 | $ | 65,023 | $ | 72,323 |
| Royalty revenue | | 98,266 | | 106,523 | | 110,479 |
| License and other revenue | | 3,808 | | — | | 5,000 |
| Total revenue | | 316,610 | | 171,546 | | 187,802 |
| **Operating expenses:** | | | | | | |
| Cost of product sales | | 85,458 | | 31,528 | | 33,647 |
| Cost of royalty revenue | | 9,478 | | 10,652 | | 11,818 |
| Research and development | | 34,088 | | 51,275 | | 30,785 |
| Selling, general and administrative | | 106,626 | | 75,322 | | 78,598 |
| Total operating expenses | | 235,650 | | 168,777 | | 154,848 |
| Income from operations | | 80,960 | | 2,769 | | 32,954 |
| Interest income | | 271 | | 560 | | 562 |
| Interest expense | | (4,045) | | (1,635) | | (2,577) |
| Other expense | | (15,753) | | (6,242) | | (8,262) |
| Total other expense, net | | (19,527) | | (7,317) | | (10,277) |
| **Income (loss) before income tax provision** | | 61,433 | | (4,548) | | 22,677 |
| Income tax provision | | (25,791) | | (4,079) | | (10,688) |
| **Net income (loss)** | $ | 35,642 | $ | (8,627) | $ | 11,989 |
| Earnings (Loss) per common share: | | | | | | |
| Basic | $ | 2.76 | $ | (0.66) | $ | 0.89 |
| Diluted | $ | 2.73 | $ | (0.66) | $ | 0.87 |
| Weighted average number of common shares outstanding: | | | | | | |
| Basic | | 12,933,896 | | 13,051,095 | | 13,481,525 |
| Diluted | | 13,065,494 | | 13,051,095 | | 13,771,393 |

See accompanying notes to consolidated financial statements

F- 5

**EAGLE PHARMACEUTICALS, INC.**

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**

**(In thousands)**

|  | Year Ended December 31, | | |
|  | 2022 | 2021 | 2020 |
|---|---|---|---|
| Net income (loss) | $ 35,642 | $ (8,627) | $ 11,989 |
|  |  |  |  |
| Other comprehensive income (loss), net of tax: |  |  |  |
| Foreign currency translation | (1,112) | — | — |
| Unrealized gain (loss) for convertible promissory note and other | 94 | (94) | — |
|  |  |  |  |
| Total other comprehensive (loss) | (1,018) | (94) | — |
|  |  |  |  |
| Comprehensive income (loss) | $ 34,624 | $ (8,721) | $ 11,989 |

See accompanying notes to consolidated financial statements

F- 6

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CHANGES IN STOCKHOLDERS' EQUITY**
(In thousands)

| | Common Stock | | Additional Paid-In Capital | Treasury Stock | Accumulated Other Comprehensive Loss | Retained Earnings | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|
| | Number of Shares | Amount | | | | | |
| **Balance at December 31, 2019** | **16,538** | **$ 17** | **$ 278,518** | **$ (171,861)** | **$ —** | **$ 72,500** | **$ 179,174** |
| Stock-based compensation expense | — | — | 24,756 | — | — | — | 24,756 |
| Issuance of common stock upon exercise of stock option grants | 149 | — | 3,654 | — | — | — | 3,654 |
| Payment of employee withholding tax upon vesting of stock-based awards | — | — | (1,525) | — | — | — | (1,525) |
| Issuance of common stock related to vesting of restricted stock | 52 | — | — | — | — | — | — |
| Common stock repurchases | — | — | — | (32,037) | — | — | (32,037) |
| Net income | — | — | — | — | — | 11,989 | 11,989 |
| **Balance at December 31, 2020** | **16,739** | **$ 17** | **$ 305,403** | **$ (203,898)** | **$ —** | **$ 84,489** | **$ 186,011** |
| Stock-based compensation expense | — | — | 19,555 | — | — | — | 19,555 |
| Issuance of common stock upon exercise of stock option grants | 101 | — | 2,398 | — | — | — | 2,398 |
| Issuance of common stock related to vesting of restricted stock | 63 | — | (1,577) | — | — | — | (1,577) |
| Common stock repurchases | — | — | — | (21,213) | — | — | (21,213) |
| Other comprehensive loss | — | — | — | — | (94) | — | (94) |
| Net loss | — | — | — | — | — | (8,627) | (8,627) |
| **Balance at December 31, 2021** | **16,903** | **$ 17** | **$ 325,779** | **$ (225,111)** | **$ (94)** | **$ 75,862** | **$ 176,453** |
| Stock-based compensation expense | — | — | 16,451 | — | — | — | 16,451 |
| Issuance of common stock upon exercise of stock option grants | 76 | — | 1,747 | — | — | — | 1,747 |
| Issuance of common stock related to business acquisition | 516 | 1 | 23,644 | — | — | — | 23,645 |
| Issuance of common stock related to vesting of restricted stock units | 74 | — | (1,356) | — | — | — | (1,356) |
| Common stock repurchases | — | — | — | (18,004) | — | — | (18,004) |
| Other comprehensive loss | — | — | — | — | (1,018) | — | (1,018) |
| Net income | — | — | — | — | — | 35,642 | 35,642 |
| **Balance at December 31, 2022** | **17,569** | **$ 18** | **$ 366,265** | **$ (243,115)** | **$ (1,112)** | **$ 111,504** | **$ 233,560** |

See accompanying notes to consolidated financial statements

F- 7

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In thousands)

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| **Cash flows from operating activities:** | | | |
| Net income (loss) | $ 35,642 | $ (8,627) | $ 11,989 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Deferred income taxes | (8,324) | (3,618) | (1,511) |
| Depreciation expense | 646 | 764 | 872 |
| Noncash operating lease expense related to right-of-use assets | 1,243 | 1,046 | 1,228 |
| Amortization expense of intangible assets | 11,378 | 2,996 | 2,666 |
| Convertible promissory note related credit losses | — | 758 | — |
| Stock-based compensation expense | 16,451 | 19,555 | 24,756 |
| Fair value adjustments on equity investment | 4,457 | 6,170 | 5,300 |
| Amortization of debt issuance costs | 469 | 472 | 419 |
| Fair value adjustments on settled accelerated share repurchase agreement | — | — | 2,962 |
| Fair value adjustments related to derivative instrument | 962 | (686) | — |
| Gain on fair value adjustments related to debt | (263) | — | — |
| Accretion of discount on convertible promissory note | — | (148) | — |
| Loss on write-off of promissory note | 4,444 | — | — |
| **Changes in operating assets and liabilities which provided (used) cash:** | | | |
| Accounts receivable | (30,832) | 9,529 | (3,113) |
| Inventories | (8,339) | (13,833) | (1,509) |
| Prepaid expenses and other current assets | (5,155) | (2,770) | 11,386 |
| Accounts payable | 2,966 | 10,162 | 806 |
| Accrued expenses and other liabilities | 43,580 | 7,770 | (4,429) |
| Other assets and other long-term liabilities, net | (18,624) | (1,321) | (2,325) |
| Net cash provided by operating activities | 50,701 | 28,219 | 49,497 |
| **Cash flows from investing activities:** | | | |
| Purchase of Acacia, net of cash acquired | (74,152) | — | — |
| Purchase of equity investment security | (12,500) | — | (17,500) |
| Purchase of property and equipment | (178) | (323) | (747) |
| Purchase of convertible promissory note | — | (5,000) | — |
| Net cash used in investing activities | (86,830) | (5,323) | (18,247) |
| **Cash flows from financing activities:** | | | |
| Repurchases of common stock | (18,004) | (21,213) | (34,999) |
| Proceeds from existing revolving credit facility | 30,000 | — | 110,000 |
| Repayment of existing revolving credit facility | (15,000) | — | (110,000) |
| Debt proceeds | 50,000 | — | — |
| Payment of debt | (52,236) | (8,000) | (5,000) |

See accompanying notes to consolidated financial statements

F- 8

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF CASH FLOWS**
(In thousands)

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| Payment of debt financing costs | (1,360) | — | — |
| Payment of employee withholding tax upon vesting of stock-based awards | (1,356) | (1,577) | (1,525) |
| Payments for employee net option exercises | — | — | — |
| Proceeds from common stock option exercises | 1,747 | 2,398 | 3,654 |
| Net cash used in financing activities | (6,209) | (28,392) | (37,870) |
| **Net decrease in cash and cash equivalents** | (42,338) | (5,496) | (6,620) |
| **Cash and cash equivalents at beginning of period** | 97,659 | 103,155 | 109,775 |
| **Cash and cash equivalents at end of period** | $ 55,321 | $ 97,659 | $ 103,155 |
| | | | |
| **Supplemental disclosures of cash flow information:** | | | |
| **Cash paid during the period for:** | | | |
| Income taxes, net | $ 28,410 | $ 10,005 | $ 6,428 |
| Interest | 1,726 | 1,197 | 2,224 |
| Right-of-use asset obtained in exchange for lease obligation, inclusive of a lease amendment | — | 270 | 855 |

See accompanying notes to consolidated financial statements

F- 9

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
**(In thousands, except share and per share amounts)**

**1. Organization and Business**

Eagle Pharmaceuticals, Inc. (the "Company", "Eagle", or "we") is an integrated pharmaceutical company focused on finding ways to help medicines do more for patients. We and our collaborators have the capabilities to take a molecule from preclinical research through regulatory approval and into the marketplace, including development, manufacturing and commercialization. Our business model applies our scientific expertise, proprietary research-based insights and marketplace proficiency to identify challenging-to-treat diseases of the central nervous system or metabolic critical care therapeutic areas as well as in oncology. By focusing on patients' unmet needs, we strive to provide healthcare professionals with urgently needed treatment solutions that are designed to improve patient care and outcomes and create near- and long-term value for our stakeholders, including patients and healthcare providers and our employees, marketing partners, collaborators and investors. Our science-based business model has a proven track record with the U.S. Food and Drug Administration ("FDA") approval and commercial launches of six products: PEMFEXY® (pemetrexed for injection), vasopressin, an A-rated generic alternative to Vasostrict®, Ryanodex® (dantrolene sodium) ("Ryanodex"), bendamustine ready-to-dilute ("RTD") 500ml solution ("Belrapzo"), and rapidly infused bendamustine RTD ("Bendeka") and bendamustine ready-to-dilute and rapidly infused RTD in Japan ("Treakisym"). We market our products through marketing partners and/or our internal direct sales force. We market PEMFEXY, vasopressin, Ryanodex and Belrapzo, and Teva Pharmaceutical Industries Ltd. ("Teva") markets Bendeka through its subsidiary Cephalon, Inc. SymBio Pharmaceuticals Limited ("SymBio"), markets Treakisym, a RTD product, in Japan.

On June 9, 2022, we acquired all of the outstanding share capital of Acacia Pharma Group plc ("Acacia"), which added two FDA approved new chemical entities with patent protection, BARHEMSYS® (amisulpride for injection) and BYFAVO® (remimazolam for injection). Refer to Note 15 for further details.

*Segment Information*

The Company operates in one reportable business segment because we have a single management team that reports to the Chief Executive Officer, the chief operating decision maker, who comprehensively manages the entire business. The Company does not operate separate lines of business with respect to its products or product candidates. Accordingly, the Company has one reportable segment.

F- 10

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

**2. Summary of Significant Accounting Policies**

*Business combinations and Asset Acquisitions*

The Company evaluates acquisitions of assets and other similar transactions to assess whether or not the transaction should be accounted for as a business combination or asset acquisition by first applying a screen test to determine if substantially all of the fair value of the gross assets acquired is concentrated in a single identifiable asset or group of similar identifiable assets. If the screen test is met, the transaction is accounted for as an asset acquisition. If the screen test is not met, further determination is required as to whether or not the Company has acquired inputs and processes that have the ability to create outputs, which would meet the requirements of a business. If determined to be a business combination, the Company accounts for the transaction under the acquisition method of accounting as indicated in ASU 2017-01, Business Combinations (Topic 805): Clarifying the Definition of a Business, which requires the acquiring entity in a business combination to recognize the fair value of all assets acquired, liabilities assumed, and any non-controlling interest in the acquiree and establishes the acquisition date as the fair value measurement point. Accordingly, the Company recognizes assets acquired and liabilities assumed in business combinations, including contingent assets and liabilities, and non-controlling interest in the acquiree based on the fair value estimates as of the date of acquisition.

In accordance with ASC 805, Business Combinations, the Company recognizes and measures goodwill as of the acquisition date, as the excess of the fair value of the consideration paid over the fair value of the identified net assets acquired.

If determined to be an asset acquisition, the Company accounts for the transaction under ASC 805-50, which requires the acquiring entity in an asset acquisition to recognize assets acquired and liabilities assumed based on the cost to the acquiring entity on a relative fair value basis, which includes transaction costs in addition to consideration given. No gain or loss is recognized as of the date of acquisition unless the fair value of non-cash assets given as consideration differs from the assets' carrying amounts on the acquiring entity's books. Consideration transferred that is non-cash will be measured based on either the cost (which shall be measured based on the fair value of the consideration given) or the fair value of the assets acquired and liabilities assumed, whichever is more reliably measurable. Goodwill is not recognized in an asset acquisition and any excess consideration transferred over the fair value of the net assets acquired is allocated to the identifiable assets based on relative fair values.

*Use of Estimates*

These financial statements are presented in U.S. dollars and are prepared in accordance with U.S. GAAP. The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported in the financial statements including disclosure of contingent assets and contingent liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period and accompanying notes. Our critical accounting policies are those that are both most important to our financial condition and results of operations and require the most difficult, subjective or complex judgments on the part of management in their application, often as a result of the need to make estimates about the effect of matters that are inherently uncertain. As of the date of issuance of these financial statements, we are not aware of any specific event or circumstance that would require us to update our estimates, assumptions and judgments or revise the carrying value of our assets or liabilities. Because of the uncertainty of factors surrounding the estimates or judgments used in the preparation of the financial statements, actual results may materially vary from these estimates, and any such differences may be material to our financial statements.

Revenue from sales of products is recognized at the point where the customer obtains control of the goods and we satisfy our performance obligation, which generally is at the time we ship the product to the customer. Provisions for chargebacks, rebates, discounts, and returns are established in the same period the related sales are recognized. Significant judgments must be made in determining the transaction price for our sales of products related to anticipated rebates, discounts and returns. Refer below for further details.

F- 11

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

*Reclassifications*

Certain reclassifications have been made to prior year amounts to conform with the current year presentation in certain notes to these consolidated financial statements.

*Cash and Cash Equivalents*

The Company considers cash and cash equivalents to be highly liquid investments with an original maturity of three months or less from the date of purchase. All cash and cash equivalents are held in United States financial institutions. The carrying amount of cash and cash equivalents approximates its fair value due to its short-term nature.

We, at times, maintain balances with financial institutions in excess of the Federal Deposit Insurance Corporation limit.

*Fair Value Measurements*

U.S. GAAP establishes a framework for measuring fair value under generally accepted accounting principles and enhances disclosures about fair value measurements. Fair value is defined as the exchange price that would be received for an asset or paid to transfer a liability (an exit price) in the principal or most advantageous market for the asset or liability in an orderly transaction between market participants on the measurement date. Valuation techniques used to measure fair value must maximize the use of observable inputs and minimize the use of unobservable inputs. The standard describes the following fair value hierarchy based on three levels of inputs, of which the first two are considered observable and the last unobservable, that may be used to measure fair value:

- Level 1: Quoted prices in active markets for identical assets or liabilities.
- Level 2: Inputs other than Level 1 that are observable, either directly or indirectly, such as quoted prices for similar assets or liabilities; quoted prices in markets that are not active; or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.
- Level 3: Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

The fair value of interest-bearing cash, cash equivalents, accounts receivable and accounts payable approximate fair value due to their life being short term in nature, and are classified as Level 1 for all periods presented.

F- 12

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The following tables present the Company's hierarchy for its assets measured at fair value as of December 31, 2022 and 2021:

| | December 31, 2022 | | | |
| | Total | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Money market funds | $ 47,567 | $ 47,567 | $ — | $ — |
| Investment in Syros Pharmaceuticals, Inc. ("Syros") | 1,573 | 1,573 | — | — |
| Investment in Enalare Therapeutics, Inc. | 8,438 | — | — | 8,438 |
| Acquisition rights of Enalare Therapeutics, Inc. | 8,125 | — | — | 8,125 |
| | | | | |
| **Liability:** | | | | |
| Forward Liability | 4,063 | — | — | 4,063 |

| | December 31, 2021 | | | |
| | Total | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| **Assets:** | | | | |
| Money market funds | $ 57,357 | $ 57,357 | $ — | $ — |
| Convertible promissory note | 4,021 | — | — | 4,021 |
| Embedded derivative asset in convertible promissory note | 962 | — | — | 962 |
| Investment in Syros | 6,030 | 6,030 | | |

The Company recognizes transfers between levels within the fair value hierarchy, if any, at the end of each quarter. There were no transfers in or out of Level 1, Level 2 or Level 3 during the years ended December 31, 2022 and 2021, respectively.

Our investment in Enalare Therapeutics Inc., ("Enalare"), acquisition right and forward liability were classified as Level 3. We analyzed and assessed the contractual obligation to invest another $12.5 million within six months from August 2022, along with the purchase option included within the Securities Purchase Agreement ("SPA"). We used a probability factor to value the asset related to the acquired acquisition rights based on management's best estimate, including the probability of completion of certain development milestones. The equity stake was accounted for as non-readily determinable fair value ("non-RDFV") investment. The equity investment, acquisition right and forward liability was reported at fair value as of December 31, 2022. Refer to Note 11, *Investment in Enalare Therapeutics Inc.* for further information.

Our investment in restricted shares of common stock of Syros Pharmaceuticals, Inc. ("Syros"), following the merger of Tyme Technologies, Inc. ("Tyme") and Syros on September 16, 2022, are classified as Level 1. Refer to Note 9, *License and Collaboration Agreements* for further details.

As of December 31, 2021, our investment in the convertible promissory note and the embedded derivative were classified as Level 3. We analyzed and assessed the embedded derivative feature contained in the convertible promissory note agreement. We used a probability factor to value the embedded derivative asset based on management's best estimate, including the principal and estimated accrued interest among other contractual terms. The convertible promissory note was accounted for as

available for sale. The convertible promissory note was reported at fair value with unrealized gains and losses included in Accumulated other comprehensive income (loss). Refer to Note 14, *Convertible Promissory Note* for further details.

Refer to Note 15. *Business Acquisition* for details regarding fair value measurements in connection with our acquisition of Acacia.

The fair value of debt is classified as Level 2 for the periods presented and approximates its fair value due to the variable interest rate.

### *Intangible Assets*

Finite-lived intangible assets are measured at their respective fair values on the date they were recorded at the date of subsequent adjustments of fair value and stated net of accumulated amortization. The fair values assigned to the Company's intangible assets are based on reasonable estimates and assumptions given available facts and circumstances. The Company amortizes its definite-lived intangible assets using either the straight-line or accelerated method, based on the useful life of the asset over which it is expected to be consumed utilizing expected undiscounted future cash flows.

The Company reviews the recoverability of its finite-lived intangible assets and long-lived assets for indicators of impairments. Events or circumstances that may require an impairment assessment significant changes in our forecasted projections for the asset or asset group for reasons including, but not limited to, significant under-performance of a product in relation to expectations, significant changes or planned changes in our use of the assets, significant negative industry or economic trends, and new or competing products that enter the marketplace. If such indicators are present, the Company assesses the recoverability of affected assets by determining if the carrying value of such assets is less than the sum of the undiscounted future cash flows of the assets. If such assets are found to not be recoverable, the Company measures the amount of the impairment by comparing the carrying value of the assets to the fair value of the assets. The Company determined that no indicators of impairment of finite-lived intangible assets or long-lived assets existed as of December 31, 2022.

### *Goodwill*

Goodwill represents the excess of purchase price over the fair value of net assets acquired in the Eagle Biologics and Acacia acquisition. Goodwill is not amortized, but is evaluated for impairment on an annual basis, in the fourth quarter, or more frequently if events or changes in circumstances indicate that the fair value of the reporting unit's goodwill is less than it's carrying amount. The Company performed a qualitative annual test for goodwill as of October 1, 2022. During the year ended December 31, 2022, the Company concluded that no impairment exists.

### *Concentration of Major Customers and Vendors*

The Company is exposed to risks associated with extending credit to customers related to the sale of products. The Company does not require collateral to secure amounts due from its customers. The Company uses an expected loss methodology to calculate allowances for trade receivables. The Company's measurement of expected credit losses is based on relevant information about past events, including historical experience, current conditions, and reasonable and supportable forecasts that affect the collectability of the reported amount. The Company does not currently have a material allowance for collectible trade receivables.

Further, the Company is dependent on its commercial partner to market and sell Bendeka; therefore, the Company's future revenues are highly dependent on the collaboration and distribution arrangement with Teva.

Teva markets Bendeka through a license agreement with the Company. Pursuant to that license agreement, Teva pays the Company a royalty based on net sales of the product and also purchases the product from the Company. A disruption in this arrangement, caused by, among other things, a supply disruption, loss of exclusivity or the launch of a superior product would have a material adverse effect of the Company's financial position, results of operations and cash flows.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The total revenues and accounts receivables broken down by major customers as a percentage of the total are as follows:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2022** | **2021** | **2020** |
| **Total revenues** | | | |
| Teva - See *Revenue Recognition* | 33 % | 66 % | 67 % |
| Customer A | 19 % | 7 % | 10 % |
| Customer B | 12 % | 9 % | 5 % |
| Customer C | 12 % | 4 % | 2 % |
| Customer D | 9 % | 8 % | 9 % |
| Other | 15 % | 6 % | 7 % |
|  | 100 % | 100 % | 100 % |

|  | December 31, | |
|---|---|---|
|  | **2022** | **2021** |
| **Accounts receivable** | | |
| Teva - See *Revenue Recognition* | 31 % | 63 % |
| Customer A | 1 % | 13 % |
| Customer B | 57 % | 13 % |
| Customer C | 5 % | 2 % |
| Customer D | 2 % | 2 % |
| Other | 4 % | 7 % |
|  | 100 % | 100 % |

*Inventories*

Inventories are recorded at the lower of cost and net realizable value, with cost determined on a first-in first-out basis. The Company periodically reviews the composition of its inventories in order to identify obsolete, slow-moving or otherwise non-saleable items. If non-saleable items are observed and there are no alternate uses for the inventories, the Company will record a write-down to net realizable value in the period that the decline in value is first recognized.

*Property and Equipment*

Property and equipment are stated at cost. Depreciation is recorded over the estimated useful lives of the assets utilizing the straight-line method. Leasehold improvements are being amortized over the shorter of their useful lives or the lease term.

*Research and Development Expense*

Costs for research and development are charged to expense as incurred and include; employee-related expenses including salaries, benefits, travel and stock-based compensation expense for research and development personnel; expenses incurred under agreements with contract research organizations, contract manufacturing organizations and service providers that assist in conducting clinical and preclinical studies; costs associated with preclinical activities and development activities, costs associated with regulatory operations; and depreciation expense for assets used in research and development activities.

Costs for certain development activities, such as in licensing intellectual property related to new projects, clinical studies, are recognized based on an evaluation of the progress to completion of specific tasks using data such as patient enrollment, clinical site activations, or information provided to us by our vendors on their actual costs incurred. Payments for these activities are based on the terms of the individual arrangements, which may differ from the patterns of costs incurred, and are reflected in the consolidated financial statements as prepaid expenses or accrued expenses as deemed appropriate. Recoveries of previously

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

recognized research and development expenses from third parties are recorded as a reduction to research and development expense in the period it becomes realizable.

*Advertising and Marketing*

Advertising and marketing costs are expensed as incurred. Advertising and marketing costs were $8.5 million, $2.6 million, and $2.7 million for the year ended December 31, 2022, 2021, and 2020, respectively.

*Income Taxes*

We account for income taxes using the liability method in accordance with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC"), Topic 740 - Income Taxes ("ASC 740").  Deferred tax assets and liabilities are determined based on temporary differences between financial reporting and tax bases of assets and liabilities and are measured by applying enacted rates and laws to taxable years in which differences are expected to be recovered or settled.  Further, the effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that the rate changes. A valuation allowance is required when it is "more likely than not" that all or a portion of deferred tax assets will not be realized. ASC 740 also prescribes a comprehensive model for how a company should recognize, measure, present and disclose in its financial statements uncertain tax positions that the company has taken or expects to take on a tax return, including a decision whether to file or not file a return in a particular jurisdiction. We recognize any interest and penalties accrued related to unrecognized tax benefits as income tax expense.

*Revenue Recognition*

Revenue is recognized when a customer obtains control of promised goods or services, in an amount that reflects the consideration which the entity expects to receive in exchange for those goods or services. To determine revenue recognition for arrangements that an entity determines are within the scope of ASC 606, the Company performs the following five steps: (i) identify the contract(s) with a customer; (ii) identify the performance obligations in the contract; (iii) determine the transaction price; (iv) allocate the transaction price to the performance obligations in the contract; and (v) recognize revenue when (or as) the entity satisfies a performance obligation. The Company only applies the five-step model to contracts when it is probable that the entity will collect the consideration it is entitled to in exchange for the goods or services it transfers to the customer. At contract inception, once the contract is determined to be within the scope of ASC 606, the Company assesses the goods or services promised within each contract and determines those that are performance obligations, and assesses whether each promised good or service is distinct. The Company then recognizes as revenue the amount of the transaction price that is allocated to the respective performance obligation when (or as) the performance obligation is satisfied. Sales, value add, and other taxes collected on behalf of third parties are excluded from revenue.

*Product revenue* - The Company recognizes net revenue on sales to its commercial partners and to end users. In each instance, revenue is generally recognized when the customer obtains control of the Company's product, which occurs at a point in time, and may be upon shipment or upon delivery based on the contractual shipping terms of a contract. Receivables from our product sales have payment terms ranging from 30 to 75 days with select extended terms to wholesalers on initial purchases of product launch quantities.

Revenue is measured as the amount of consideration the Company expects to receive in exchange for transferring products or services to a customer. To the extent the transaction price includes variable consideration, the Company estimates the amount of variable consideration that should be included in the transaction price generally utilizing the expected value method to which the Company expects to be entitled. As such, revenue on sales to end users for vasopressin, PEMFEXY, Belrapzo, Ryanodex, BARHEMSYS, and BYFAVO are recorded net of chargebacks, rebates, returns, prompt pay discounts, wholesaler fees and other deductions. Our products are contracted with a limited number of oncology distributors and hospital buying groups with narrow differences in ultimate realized contract prices used to estimate our allowance for chargebacks and rebate reserves. The Company has a product returns policy on some of its products that allows the customer to return pharmaceutical products within a specified period of time both prior to and subsequent to the product's expiration date. The Company's estimate of the provision for returns is analyzed quarterly and is based upon many factors, including historical experience of actual returns and analysis of the level of inventory in the distribution channel, if any. The Company has terms on sales of Ryanodex by which the Company does not accept returns. Variable consideration is included in the transaction price if, in the Company's judgment, it is probable that a significant future reversal of cumulative revenue under the contract will not occur. Estimates of variable consideration are made generally using the expected value method and determination of whether to include estimated amounts

F- 16

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

in the transaction price are based largely on an assessment of the Company's anticipated performance and all information (historical, current and forecasted) that is reasonably available. The Company believes that the estimates it has established are reasonable based upon current facts and circumstances. Applying different judgments to the same facts and circumstances could result in the estimated amounts to vary.

*Components of Gross-to-Net (GTN) Estimates*

Chargebacks: Chargebacks are discounts that occur when certain contracted customers, including group purchasing organizations ("GPOs"), public health service institutions and federal government entities purchasing via the Federal Supply Schedule, purchase from the Company's distributors. The Company's distributors purchase product from us at invoice price, then resell the product to certain contracted customers on the basis of prices negotiated between us and the providers. The difference between the distributors' purchase price and the typically lower certain contracted customers' purchase price is refunded to the distributors through a chargeback credit. We record estimates for these chargebacks at the time of sale as deductions from gross revenues, with corresponding adjustments to our accounts receivable reserves and allowances.

The provision for chargebacks is the most significant provision in the context of the Company's gross-to-net adjustments in the determination of net revenue. Chargebacks are estimated based on payer mix and contracted price, adjusted for current period assumptions.

Commercial and Medicaid Rebates: The Company contracts with government agencies or collectively, third-party payors, so that vasopressin, PEMFEXY, Belrapzo, Ryanodex, BARHEMSYS, and BYFAVO will be eligible for purchase by, or partial or full reimbursement from, such third-party payors. The Company estimates the rebates it will provide to third-party payors and deducts these estimated amounts from total gross product revenues at the time the revenues are recognized. These reserves are recorded in the same period in which the revenue is recognized, resulting in a reduction of product revenue and the establishment of a current liability. The current liability is included in accrued expenses and other current liabilities on the consolidated balance sheets. The Company estimates the rebates that it will provide to third-party payors based upon (i) the Company's contracts with these third-party payors, (ii) the government mandated discounts applicable to government-funded programs, (iii) a range of possible outcomes that are probability-weighted for the estimated payer mix, and (iv) information obtained from the Company's distributors.

The information that the Company also considers when establishing its rebate reserves are purchases by customers, projected annual sales for customers, actual rebates payments made, processing time lags, and for indirect rebates, the level of inventory in the distribution channel that will be subject to indirect rebates. We do not provide incentives designed to increase shipments to our customers that we believe would result in out-of-the-ordinary course of business inventory for them. The Company regularly reviews and monitors estimated or actual customer inventory information at its largest distributors for its key products to ascertain whether customer inventories are in excess of ordinary course of business levels.

Product Returns: The Company's provision for product returns based on the factors noted above generally encompass a time range from 12 to 48 months after revenue is recognized. The Company's distributors have the right to return unopened unprescribed vasopressin, PEMFEXY, Belrapzo, BARHEMSYS, and BYFAVO during certain time periods around the period beginning prior to the labeled expiration date and ending after the labeled expiration date. The Company estimates future product returns on sales of vasopressin, PEMFEXY, Belrapzo, BARHEMSYS, and BYFAVO based on: (i) data provided to the Company by its distributors (including weekly reporting of distributors' sales and inventory held by distributors that provided the Company with visibility into the distribution channel in order to determine what quantities were sold to retail pharmacies and other providers), (ii) data provided to the Company by a third-party data provider which collects and publishes prescription data, and other third parties, (iii) historical industry information regarding return rates for similar pharmaceutical products, (iv) the estimated remaining shelf life of vasopressin, PEMFEXY, Belrapzo, BARHEMSYS, and BYFAVO previously shipped and currently being shipped to distributors and (v) contractual agreements intended to limit the amount of inventory maintained by the Company's distributors. These reserves are recorded in the same period the related revenue is recognized, resulting in a reduction of product revenue and the establishment of a current liability which is included in accrued expenses and other current liabilities on the consolidated balance sheets.

Wholesaler fees and other incentives: The Company generally provides invoice discounts on vasopressin, PEMFEXY, Belrapzo, Ryanodex, BARHEMSYS, and BYFAVO sales to its distributors for prompt payment and fees for distribution services, such as fees for certain data that distributors provide to the Company. The payment terms for sales to distributors

F- 17

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

generally include a 2% discount for prompt payment which is generally defined in invoice terms as a range from 15 to 45 days, while the fees for distribution services are based on contractual rates agreed with the respective distributors. Based on historical data, the Company expects its distributors to earn these discounts and fees, and deducts the full amount of these discounts and fees from its gross product revenues and accounts receivable at the time such revenues are recognized. In certain cases, the Company may record the fees as accrued expenses if the Company expects that the fees will be paid rather than deducted by the distributor.

The Company recorded product sales, net as follows:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| | (in thousands) | | |
| PEMFEXY | $ 67,479 | $ — | $ — |
| Vasopressin | 63,159 | — | — |
| Bendeka | 12,992 | 11,167 | 15,439 |
| Belrapzo | 33,667 | 23,728 | 27,527 |
| Ryanodex | 30,164 | 25,271 | 28,268 |
| Other | 7,075 | 4,857 | 1,089 |
| Product sales, net | $ 214,536 | $ 65,023 | $ 72,323 |

The following table provides a summary roll-forward of the Company's net product revenue allowances and related reserves for the years ended December 31, 2022 and 2021, on the consolidated balance sheets (in thousands):

| | Chargebacks | Commercial Rebates | Medicaid Rebates | Product Returns | Wholesaler Fees and Other Incentives | Total |
|---|---|---|---|---|---|---|
| **Balance at December 31, 2020** | $ 2,289 | $ 1,772 | $ 684 | $ 1,666 | $ 5,391 | $ 11,802 |
| Provisions / Adjustments | 27,402 | 3,042 | 268 | 2,531 | 9,650 | 42,893 |
| Charges processed / Payments | (25,852) | (2,838) | (332) | (2,674) | (13,070) | (44,766) |
| **Balance at December 31, 2021** | $ 3,839 | $ 1,976 | $ 620 | $ 1,523 | $ 1,971 | $ 9,929 |
| Provisions / Adjustments | 118,575 | 28,109 | 1,722 | 4,893 | 34,505 | 187,804 |
| Charges processed / Payments | (98,807) | (9,399) | (368) | (365) | (21,892) | (130,831) |
| **Balance at December 31, 2022** | $ 23,607 | $ 20,686 | $ 1,974 | $ 6,051 | $ 14,584 | $ 66,902 |

Such net product revenue allowances and reserves are included within accounts receivable, net and accrued expenses and other current liabilities within the consolidated balance sheets.

*Royalty Revenue* — The Company recognizes revenue from license arrangements with its commercial partners' net sales of products. Royalties are recognized as earned in accordance with contract terms when they can be reasonably estimated and collectability is reasonably assured. The Company's commercial partners are obligated to report their net product sales and the resulting royalty due to the Company within 25 days from the end of each quarter. Based on historical product sales, royalty receipts and other relevant information, the Company accrues royalty revenue each quarter and subsequently determines a true-up when it receives royalty reports from its commercial partners. Historically, these true-up adjustments have been immaterial. Our receivables from royalty revenue are due 45-days from the end of the quarter..

*License and other revenue* — The Company analyzes each element of its licensing agreements to determine the appropriate revenue recognition. The terms of the license agreement may include payment to us of non-refundable up-front license fees,

F- 18

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

milestone payments if specified objectives are achieved, and/or royalties on product sales. The Company recognizes revenue from upfront payments at a point in time, typically upon fulfilling the delivery of the associated intellectual property to the customer.

If the contract contains a single performance obligation, the entire transaction price is allocated to the single performance obligation. Contracts that contain multiple performance obligations require an allocation of the transaction price based on the estimated relative standalone selling prices of the promised products or services underlying each performance obligation. The Company determines standalone selling prices based on the price at which the performance obligation is sold separately. If the standalone selling price is not observable through past transactions, the Company estimates the standalone selling price taking into account available information such as market conditions and internally approved pricing guidelines related to the performance obligations.

The Company recognizes sales-based milestone payments as revenue upon the achievement of the cumulative sales amount specified in the contract in accordance with ASC 606-10-55-65. For those milestone payments which are contingent on the occurrence of particular future events, the Company determined that these need to be considered for inclusion in the calculation of total consideration from the contract as a component of variable consideration using the most-likely amount method. As such, the Company assesses each milestone to determine the probability and substance behind achieving each milestone. Given the inherent uncertainty of the occurrence of these future events, the Company will not recognize revenue from the milestone until there is not a high probability of a reversal of revenue, which typically occurs near or upon achievement of the event.

When determining the transaction price of a contract, an adjustment is made if payment from a customer occurs either significantly before or significantly after performance, resulting in a significant financing component. Applying the practical expedient in paragraph 606-10-32-18, the Company does not assess whether a significant financing component exists if the period between when the Company performs its obligations under the contract and when the customer pays is one year or less. None of the Company's contracts contained a significant financing component as of December 31, 2022.

### Stock-Based Compensation

The Company utilizes stock-based compensation in the form of stock options, restricted stock units ("RSUs") and performance-based stock units ("PSUs"), each of which may be granted separately or in tandem with other awards.

Compensation expense is recognized in the Consolidated Statements of operations based on the estimated fair value of the awards at grant date ratably over the requisite service period, which generally equals the vesting period of the award.

The grant-date fair value of stock awards is based upon the underlying price of the stock on the date of grant. The grant-date fair value of stock option awards must be determined using an option pricing model. The Company uses the Black-Scholes option pricing formula for determining the grant-date fair value of such awards. Option pricing models require the use of estimates and assumptions as to (a) the expected term of the option, (b) the expected volatility of the price of the underlying stock and (c) the risk-free interest rate for the expected term of the option.

The Company may also grant performance-based stock awards to employees from time-to-time in form of market condition or performance condition. The grant-date fair value of awards that vest based on achievement of certain market condition are determined using a Monte Carlo simulation technique. The grant-date fair value of awards that vest based on achievement of certain performance condition are determined using the accelerated attribution method once it is probable that the performance condition will be achieved.

### Earnings Per Share

Basic earnings per common share is computed using the weighted average number of shares outstanding during the period. Diluted earnings per share is computed in a manner similar to the basic earnings per share, except that the weighted-average number of shares outstanding is increased to include all common shares, including those with the potential to be issued by virtue of options. Diluted earnings per share contemplate a complete conversion to common shares of all convertible instruments only if they are dilutive in nature with regards to earnings per share, as calculated under the treasury method.

F- 19

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The anti-dilutive common shares equivalents outstanding at December 31, 2022, 2021, and 2020 were as follows:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2022** | **2021** | **2020** |
| Options | 2,273,590 | 2,336,586 | 2,767,501 |
| Restricted stock units | 235,860 | 98,416 | 207,177 |
| Total | 2,509,450 | 2,435,002 | 2,974,678 |

The following table sets forth the computation for basic and diluted net income (loss) per share for December 31, 2022, 2021, and 2020:

|  | Year Ended December 31, | | |
|---|---|---|---|
|  | **2022** | **2021** | **2020** |
| **Numerator** | | | |
| Numerator for basic and diluted earnings per share-net income (loss) | $ 35,642 | (8,627) $ | 11,989 |
| **Denominator** | | | |
| Basic weighted average common shares outstanding | 12,933,896 | 13,051,095 | 13,481,525 |
| Dilutive effect of stock options | 131,598 | — | 289,868 |
| Diluted weighted average common shares outstanding | 13,065,494 | 13,051,095 | 13,771,393 |
| **Basic net income (loss) per share** | | | |
| Basic net income (loss) per share | $ 2.76 | $ (0.66) | $ 0.89 |
| **Diluted net income (loss) per share** | | | |
| Diluted net income (loss) per share | $ 2.73 | $ (0.66) | $ 0.87 |

All potentially dilutive items were excluded from the diluted share calculation for the year ended December 31, 2021 because their effect would have been anti-dilutive, as the Company was in a loss position.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

## 3. Inventories

The Company's inventory balance consists of the following:

|  | December 31, | |
|---|---|---|
|  | **2022** | **2021** |
| Raw materials | $ 12,348 | $ 7,317 |
| Work-in-process | 14,064 | 9,666 |
| Finished goods | 21,382 | 4,925 |
|  | $ 47,794 | $ 21,908 |

F- 21

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

**4. Property and Equipment, net**

Property and equipment consists of the following:

| | December 31, | | Estimated Useful Life (years) |
|---|---|---|---|
| | **2022** | **2021** | |
| Furniture and fixtures | $ 1,525 | $ 1,525 | 7 |
| Office equipment | 1,077 | 1,077 | 3 |
| Equipment | 4,012 | 3,834 | 7 |
| Leasehold improvements | 1,155 | 1,155 | 2 |
| | 7,769 | 7,591 | |
| Less accumulated depreciation | (6,601) | (5,955) | |
| Property and equipment, net | $ 1,168 | $ 1,636 | |

Depreciation expense was $646 and $764 for the years ended December 31, 2022 and 2021, respectively.

F- 22

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

### 5. Balance Sheet Accounts

*Prepaid expenses and Other Current Assets*

Prepaid and other current assets consist of the following:

| | December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Advances to commercial manufacturers | $ 5,464 | $ 2,354 |
| Prepaid FDA user fee and advances to CROs | 3,022 | 1,108 |
| Prepaid insurance | 258 | 196 |
| Prepaid income taxes | 90 | 1,173 |
| Prepaid R&D | 106 | — |
| Convertible promissory note, net | — | 5,312 |
| Pass-through receivables | 1,001 | 347 |
| All other | 3,259 | 1,400 |
| Total Prepaid expenses and other current assets | $ 13,200 | $ 11,890 |

*Accrued Expenses and Other Liabilities*

Accrued expenses and other liabilities consist of the following:

| | December 31, | |
| --- | --- | --- |
| | **2022** | **2021** |
| Royalties payable to commercial partners | $ 7,205 | $ 5,085 |
| Accrued research & development | 1,549 | 4,100 |
| Accrued professional fees | 5,541 | 2,013 |
| Accrued salary and other compensation | 5,293 | 8,466 |
| Accrued product sales reserves | 33,000 | 4,390 |
| Current portion of lease liability | 1,534 | 1,309 |
| Inventory received but not invoiced | 6,779 | 6,177 |
| Income taxes payable | 5,182 | — |
| Forward liability related to Enalare | 4,063 | — |
| PEMFEXY royalty buy-down payable | 15,000 | — |
| All other | 698 | 798 |
| Total Accrued expenses and other liabilities | $ 85,844 | $ 32,338 |

*Leases*

We lease office space in Woodcliff Lake, New Jersey for our principal office under an amended lease agreement through June 2025. We also lease a lab space in Cambridge, Massachusetts under a lease agreement through April 2024, office space located in Indianapolis, Indiana through November 2023, and an office space located in Palm Beach Gardens, Florida. All of our leases are classified as operating leases and have remaining lease terms of approximately 2.0 years. The principal office and the lab space leases include renewal options to extend the lease for up to 5 years. Furthermore, we have not elected the practical expedient to separate lease and non-lease components for all classes of underlying assets.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The table below summarizes the Company's total lease costs included in the consolidated financial statements, as well as other required quantitative disclosures (in thousands):

| | As of December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2022** | | **2021** | |
| Operating lease cost | $ | 1,507 | $ | 1,407 |
| Total lease cost | $ | 1,507 | $ | 1,407 |
| | | | | |
| **Other information:** | | | | |
| Cash paid for amounts included in the measurement of lease liabilities | | | | |
| Operating cash flows for operating leases | $ | 1,507 | $ | 1,407 |
| Right-of-use assets obtained in exchange for new operating lease liabilities | $ | — | $ | 270 |
| Weighted-average remaining lease term - operating leases | | 2.1 years | | 3.1 years |
| Weighted-average discount rate - operating leases | | 6.0 % | | 6.0 % |

**Balance Sheet Classification as of December 31, 2022**

| | | |
| --- | --- | --- |
| Current lease liabilities (included with Accrued expenses and other liabilities) | $ | 1,534 |
| Long-term lease liabilities (included with Other long-term liabilities) | | 1,508 |
| Total lease liabilities | $ | 3,042 |

**6. Debt**

On November 1, 2022, we entered into the Third Amended and Restated Credit Agreement, which replaced the Second Amended Credit Agreement. The terms and amounts borrowed under the Third Amended Credit Agreement includes a drawn term loan of $50 million and a $100 million revolving credit facility of which $15 million was drawn on November 1, 2022. On the effective date for the Third Amended Credit Agreement, we borrowed $15 million under the revolving credit facility and $50 million under the term loan facility. Approximately $35.4 million of the proceeds of the credit facility were used to refinance all amounts outstanding under the Second Amended Credit Agreement, to repay €25 million indebtedness of Acacia, and for other corporate purposes. All amounts outstanding under the Third Amended Credit Agreement shall be due and payable on October 31, 2025, unless otherwise accelerated or extended pursuant to the terms of the Third Amended Credit Agreement.

The Third Amended Credit Agreement contains customary representations and warranties and customary affirmative and negative covenants applicable to us and our consolidated subsidiaries, including, among other things, restrictions on indebtedness, liens, investments, mergers, dispositions, prepayment of other indebtedness and dividends and other distributions. Under the terms of the Third Amended Credit Agreement, we are required to comply with (a) a maximum total net leverage ratio, (b) a fixed charge coverage ratio and (c) a minimum liquidity covenant. As of December 31, 2022, we were in compliance with total net leverage ratio; fixed charge coverage ratio; and liquidity covenants.

Loans under the Third Amended Credit Agreement bear interest, at our option, at a rate equal to either (a) the SOFR rate, plus a credit adjustment spread, plus an applicable margin ranging from 2.50% to 3.25% per annum, based upon the total net leverage ratio (as defined in the Third Amended Credit Agreement), or (b) the prime lending rate, plus an applicable margin ranging from 1.50% to 2.25% per annum, based upon the total net leverage ratio. We are required to pay a commitment fee on the unused portion of the new revolving credit facility in the Third Amended Credit Agreement at a rate ranging from 0.38% to 0.48% per annum based upon the total net leverage ratio.

The term loan facility payments will be made in quarterly installments in an amount equal to $1.25 million per fiscal quarter for each fiscal quarter ended after the closing date for the Third Amended Credit Agreement through the fiscal quarter ended

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

September 30, 2023, and in an amount equal to $2.5 million per fiscal quarter for each fiscal quarter thereafter. As of December 31, 2022, we classified debt related to term loan of $6.25 million as current on our consolidated balance sheet.

As of June 9, 2022, upon closing of our acquisition of Acacia Pharma Group plc ("Acacia"), we guaranteed a term loan facility, dated as of January 10, 2020, by and between Acacia Pharma Limited ("APL"), a direct subsidiary of Acacia, and Cosmo Technologies Ltd. (the "Term Loan Facility"). The Term Loan Facility provides for up to €25 million in loans, all of which were drawn as of closing of the acquisition. The term loan facility bears an annual interest rate of 9% with periodic payments through September 30, 2025. See Note 15 *Business Acquisition* for further information on our acquisition of Acacia Pharma. The guarantee provided that we shall guarantee the punctual performance by APL of APL's obligations pursuant to the terms of the Term Loan Facility (as amended) and that we will immediately on demand pay any amount owed by APL under the Term Loan Facility (as amended) as if we were the principal obligor in the event that such amount is not paid by APL.

On November 8, 2019, we entered into the Second Amended and Restated Credit Agreement (the "Prior Credit Agreement"), with JPMorgan Chase Bank, N.A., as administrative agent (the "Administrative Agent") and the lenders party thereto. The terms and amounts borrowed under the Prior Credit Agreement includes a drawn term loan of $40 million and a revolving credit facility of $110 million.

During the third quarter of 2022, we drew down $15 million from our revolving credit facility under the Second Amended Credit Agreement.

The term loan facility under the Second Credit Agreement bore interest at the Adjusted LIBOR (equal to (a) the LIBOR for such Interest Period multiplied by (b) the Statutory Reserve Rate as established by Board of Governors of the Federal Reserve System of the United States of America) for the interest period in effect for such borrowing plus the applicable rate as described below.

Loans under the Second Credit Agreement bore interest at a rate equal to either (a) the LIBOR rate, plus an applicable margin ranging from 2.25% to 3.0% per annum, based upon the total net leverage ratio (as defined in the Prior Credit Agreement), or (b) the Benchmark Replacement which is defined as the greatest of the prime lending rate, or the NYFRB Rate (the rate for a federal funds transaction) in effect on such day plus ½ of 1% or the Adjusted LIBO Rate for a one month Interest Period on such day plus 1% plus an applicable margin ranging from 1.25% to 2.0% per annum, based upon the total net leverage ratio.

We were required to pay a commitment fee on the unused portion of the new revolving credit facility in the Prior Credit Agreement at a rate ranging from 0.35% to 0.45% per annum based upon the total net leverage ratio.

As of December 31, 2022, the Company had $1.3 million of unamortized deferred debt issuance costs in its consolidated balance sheets.

| Debt Maturities | As of December 31, 2022 |
|---|---|
| 2023 | $ 6,250 |
| 2024 | 10,000 |
| 2025 | 47,500 |
| Total | $ 63,750 |

F- 25

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

**7. Common Stock and Stock-Based Compensation**

**Common Stock**

On March 17, 2020, the Company, announced that its Board approved a new share repurchase program, or the Share Repurchase Program, providing for the repurchase of up to an aggregate of $160.0 million of the Company's outstanding common stock. The Share Repurchase Program replaced the Company's then existing share repurchase program, or the Previous Share Repurchase Program, which was announced on October 30, 2018 and was terminated in connection with the Board's approval of the Share Repurchase Program. At termination, the Company had repurchased approximately $68.0 million of the Company's outstanding common stock under the Previous Share Repurchase Program.

Under the Share Repurchase Program, the Company is authorized to repurchase shares through open market purchases, privately-negotiated transactions, accelerated share repurchases or otherwise in accordance with applicable federal securities laws, including through Rule 10b5-1 trading plans and under Rule 10b-18 of the Exchange Act. The repurchases have no time limit and may be suspended or discontinued completely at any time. The specific timing and amount of repurchases varies based on available capital resources and other financial and operational performance, market conditions, securities law limitations, and other factors. The repurchases are made using the Company's cash resources.

On September 23, 2020, the Company's Board of Directors approved a $25.0 million accelerated share repurchase ("ASR") transaction with JPMorgan Chase Bank, National Association ("JP Morgan") as part of the Company's existing $160.0 million share repurchase program. The specific number of shares to be repurchased pursuant to the ASR is based on the average of the daily volume weighted average share prices of the Company's common stock, less a discount, during the term of the ASR program. Under the terms of the Company's agreement with JP Morgan, the Company paid $25.0 million to JP Morgan on September 24, 2020, and received 550,623 shares, representing the notional amount of the ASR, based on the average of the daily volume weighted average share prices of the Company's common stock, less a discount, during the term of the ASR, which was $45.40. The ASR was completed in the fourth quarter of 2020. The Company determined the ASR contained a forward contract and therefore the Company recorded fair value adjustments on the accelerated share repurchase agreement in the amount of $3.0 million which was a loss recorded in Other expense on our consolidated statements of operations in the year ended December 31, 2020.

As of December 31, 2022, the Company had repurchased an aggregate of 4,552,730 shares of common stock for an aggregate of $246.1 million pursuant to the Company's share repurchase programs in effect since August 2016.

We repurchased the following shares of common stock with cash resources:

| | Year Ended December 31, | | |
|---|---|---|---|
| | **2022** | **2021** | **2020** |
| Shares of common stock repurchased | 441,108 | 429,446 | 774,489 |
| Cash paid for repurchases of common stock | $ 18,004 | $ 21,213 | $ 34,999 |

**Stock-Based Compensation**

In December 2007, the Company's board of directors approved the 2007 Incentive Compensation Plan (the "2007 Plan") enabling the Company to grant multiple stock-based awards to employees, directors and consultants, the most common being stock options and restricted stock awards. In November 2013, the Company's board of directors approved the 2014 Equity Incentive Plan (the "2014 Plan") which became effective on February 11, 2014. The 2007 Plan was terminated upon the effectiveness of the 2014 Plan and all shares available for issuance under the 2007 Plan were made available under the 2014 Plan. The 2014 Plan provides for the awards of incentive stock options, non-qualified stock options, restricted stock, restricted stock units and other stock-based awards. Awards generally vest equally over a period of four years from grant date. Vesting is accelerated under a change in control of the Company or in the event of death or disability to the recipient. In the event of termination, any unvested shares or options are forfeited. At the Company's annual meeting of stockholders held on August 4, 2015, the stockholders approved an amendment to the 2014 Plan to, among other things, increase the number of shares of common stock authorized for issuance thereunder by 500,000 shares. After accounting for such increase, and as of such

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

amendment, the Company has reserved and made available 1,934,193 shares of common stock for issuance under the 2014 Plan.

During the year ended December 31, 2018, the Company introduced a new long-term incentive program with the objective to better align the share-based awards granted to management with the Company's focus on improving total shareholder return over the long-term. The share-based awards granted under this long-term incentive program consist of time-based stock options, time-based restricted stock units ("RSUs") and performance-based stock units ("PSUs").

*Stock Options*

The fair value of stock options granted to employees, directors, and consultants is estimated using the following assumptions:

| | Year Ended December 31, | | |
| --- | --- | --- | --- |
| | **2022** | **2021** | **2020** |
| Risk-free interest rate | 1.47% - 4.3% | 0.51% - 1.26% | 0.37% - 1.65% |
| Volatility | 45.59% - 51.31% | 52.87% - 60.02% | 54.89% |
| Expected term (in years) | 5.50 - 6.08 years | 5.50 - 6.08 years | 5.50 - 6.08 years |
| Expected dividend yield | 0.0% | 0.0% | 0.0% |

The following table summarizes information about stock option activity related to the 2014 Plan:

| | Number of Stock Option Shares | Weighted Average Exercise Price (Per Share) | Non-Exercisable | Exercisable |
| --- | --- | --- | --- | --- |
| **Outstanding at December 31, 2020** | **3,331,890** | **$  59.20** | **1,028,142** | **2,303,748** |
| Granted | 114,000 | $  46.74 | | |
| Exercised | (122,847) | $  27.64 | | |
| Forfeited or expired | (508,165) | $  62.00 | | |
| **Outstanding at December 31, 2021** | **2,814,878** | **$  58.51** | **472,916** | **2,341,962** |
| Granted | 139,700 | $  44.15 | | |
| Exercised | (91,255) | $  25.74 | | |
| Forfeited or expired | (437,490) | $  62.89 | | |
| **Outstanding at December 31, 2022** | **2,425,833** | **$  57.51** | **310,622** | **2,115,211** |

The weighted-average grant-date fair value of options granted during the year ended 2022, 2021, and 2020 was $20.49, $23.62, and $28.98, respectively. As of December 31, 2022, there was $4.9 million unrecognized stock-based compensation expense related to stock options that is expected to be recognized over a weighted average period of 1.8 years. The total intrinsic value of options exercised during the year ended December 31, 2022 was $1.7 million.

The weighted average contractual terms of options outstanding as of December 31, 2022, 2021, and 2020 was 5.0, 5.2, and 6.1 years, respectively.

The aggregate pre-tax intrinsic value of options outstanding as of December 31, 2022, 2021, and 2020 was $2.5 million, $13.8 million, and $11.6 million, respectively.

*RSUs*

Each vested time-based RSU represents the right of a holder to receive one of the Company's common shares. The fair value of each RSU granted was estimated based on the trading price of the Company's common shares on the date of grant.

F- 27

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The following table summarizes information about RSU activity related to the 2014 Plan:

| | Number of Restricted Stock Units | | Weighted Average Grant Date Fair Value (Per Share) |
|---|---|---|---|
| **Non-vested at December 31, 2020** | **328,396** | **$** | **53.09** |
| Granted | 106,600 | $ | 48.55 |
| Vested | (95,523) | $ | 52.26 |
| Forfeited | (76,167) | $ | 52.29 |
| **Non-vested at December 31, 2021** | **263,306** | **$** | **51.77** |
| Granted | 148,000 | $ | 47.75 |
| Vested | (103,148) | $ | 51.39 |
| Forfeited | (38,995) | $ | 50.57 |
| **Non-vested at December 31, 2022** | **269,163** | **$** | **49.88** |

As of December 31, 2022, there was $7.6 million of unrecognized stock-based compensation expense related to non-vested RSUs that is expected to be recognized over a weighted average period of 2.5 years.

*PSUs*

During the first quarter of 2022, we granted 228.2 thousand market condition PSUs based on our total shareholder return ("TSR") relative to the TSR of each member of the S&P Biotechnology Select Industry Index (the defined peer group) with a weighted-average grant date fair value of $70.45 for the CEO and $58.43 for other executives per respective PSU. The fair value of PSUs granted to employees was estimated using a Monte Carlo simulation model. Inputs used in the calculation include a risk-free interest rate of 1.6%, an expected volatility of 41%, contractual term of 3 years, and no expected dividend yield.

The fair value of market condition PSUs granted to employees was estimated using a Monte Carlo simulation model. Inputs used in the calculation are described above.

The fair value of performance condition PSUs granted to employees was estimated based on the trading price of our common stock on the date of grant adjusted for probability of achievement of the performance conditions as described above.

We did not recognize any expense for performance based PSUs granted to employees based on our estimated probability of achievement as described above.

During the first quarter of 2021, 97,750 market condition PSUs expired. We also granted 99,500 market condition PSUs based on our total shareholder return ("TSR") relative to the TSR of each member of the S&P Biotechnology Select Industry Index (the defined peer group) with a weighted-average grant date fair value of $71.09 per respective PSU. The fair value of PSUs granted to employees was estimated using a Monte Carlo simulation model. Inputs used in the calculation include a risk-free interest rate of 0.18%, an expected volatility of 44%, contractual term of 3 years, and no expected dividend yield.

During the first quarter of 2021, we also granted 59,500 performance based (milestones) PSUs with grant date fair value of $49.32 using our closing stock price on the date of the grant. These PSUs will vest (if earned) from 0% to 200% of target number granted based on the achievement of one or more of three milestones related to i) regulatory approval of Fulvestrant ("EA-114"), ii) sales of PEMFEXY and; iii) sales of vasopressin, respectively. The contractual term of these awards is 3 years. We estimated 0% probability of achievement for the year ended December 31, 2022.

F- 28

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The following table summarizes information about PSU activity related to the 2014 Plan:

| | Number of Performance Stock Units | | Weighted Average Grant Date Fair Value (Per Share) |
|---|---|---|---|
| **Non-vested at December 31, 2020** | **97,750** | **$** | **90.19** |
| Granted | 159,000 | $ | 62.94 |
| Vested | — | $ | — |
| Forfeited | (119,450) | $ | 84.90 |
| **Non-vested at December 31, 2021** | **137,300** | **$** | **63.24** |
| Granted | 228,200 | $ | 63.93 |
| Vested | — | $ | — |
| Forfeited | (46,400) | $ | 59.27 |
| **Non-vested at December 31, 2022** | **319,100** | **$** | **63.96** |

The Company recognized stock-based compensation in its consolidated statements of operations for the year ended December 31, 2022, 2021, and 2020 as follows:

| | Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2022** | | **2021** | | **2020** | |
| Stock options | $ | 6,714 | $ | 11,521 | $ | 17,694 |
| PSUs | | 4,665 | | 2,729 | | 1,635 |
| RSUs | | 5,072 | | 5,305 | | 5,427 |
| Stock-based compensation expense | $ | 16,451 | $ | 19,555 | $ | 24,756 |
| Selling, general and administrative | $ | 14,001 | $ | 16,873 | $ | 22,074 |
| Research and development | | 2,450 | | 2,682 | | 2,682 |
| Stock-based compensation expense | $ | 16,451 | $ | 19,555 | $ | 24,756 |

F- 29

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

## 8. Income Taxes

The components of our provision from income taxes is as follows:

| | Year Ended December 31, | | |
| | 2022 | 2021 | 2020 |
|---|---|---|---|
| **Current:** | | | |
| Federal | $ 30,933 | $ 6,912 | $ 10,140 |
| State | 3,181 | 785 | 2,059 |
| | $ 34,114 | $ 7,697 | $ 12,199 |
| **Deferred:** | | | |
| Federal | (7,607) | (3,030) | (1,227) |
| State | (740) | (588) | (284) |
| Foreign | 24 | — | — |
| | $ (8,323) | $ (3,618) | $ (1,511) |
| | | | |
| Provision for income taxes | $ 25,791 | $ 4,079 | $ 10,688 |

The reconciliation of the statutory U.S. Federal income tax rate to the Company's effective income tax rate is as follows:

| | Year Ended December 31, | | |
| | 2022 | 2021 | 2020 |
|---|---|---|---|
| U.S. Federal statutory tax rate | 21 % | 21 % | 21 % |
| State income taxes, net of federal benefit | 3 % | (1)% | 6 % |
| Tax effect on stock option exercises, net of forfeitures | 2 % | (44)% | 4 % |
| R&D tax credits and Orphan Drug credits | (1)% | 31 % | (2)% |
| Limitation on executive compensation | 3 % | (60)% | 9 % |
| Change in valuation allowance | 13 % | (40)% | 9 % |
| Transaction costs | 3 % | — | — |
| Foreign rate differential | (2)% | 4 % | (1)% |
| Other | — | (1)% | 1 % |
| **Effective tax rate** | 42 % | (90)% | 47 % |

The effective tax rate for the year ended December 31, 2022, reflects the impact of certain non-deductible executive compensation and the impact of certain non-deductible costs from the acquisition of Acacia, partially offset by credits for research and development activity.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amount of assets and liabilities for financial reporting and the amounts used for income tax purposes. Significant components of the Company's deferred tax assets were as follows:

|  | December 31, | | |
|---|---|---|---|
|  | **2022** | | **2021** |
| Deferred tax assets |  | | |
| Net operating loss carryforward | $ | 46,996 | $  1,563 |
| Stock based compensation |  | 9,875 | 10,405 |
| Other asset - equity investment with readily determined fair value |  | 4,197 | 3,190 |
| Inventories |  | 3,405 | 2,123 |
| Employee-related expenses |  | 205 | 1,240 |
| Intangible assets |  | 4,559 | 4,207 |
| Right-of-use liability |  | 688 | 962 |
| R&D tax credit carryforwards |  | 471 | 329 |
| Capitalized R&D |  | 7,579 | — |
| Other |  | 3,659 | 1,489 |
| Total deferred tax assets |  | 81,634 | 25,508 |
|  |  | | |
| Deferred tax liabilities |  | | |
| Installment sale - Malta |  | 484 | 485 |
| Prepaid expenses |  | 59 | 45 |
| Fixed assets |  | 255 | 300 |
| Lease liability |  | 648 | 921 |
| Intangible assets |  | 18,530 | — |
| Inventory |  | 2,981 | — |
| Other |  | 247 | — |
| Total deferred tax liabilities |  | 23,204 | 1,751 |
| Valuation allowance |  | (35,101) | (4,959) |
| **Net deferred tax assets** | $ | 23,329 | $  18,798 |

In July 2006, the Financial Accounting Standards Board ("FASB") issued ASC 740-10, Uncertainty in Income Taxes, which defines the threshold for recognizing the benefits of tax-return positions in the financial statements as "more-likely-than-not" to be sustained by the taxing authorities. This statement also requires explicit disclosure requirements about a Company's uncertainties related to their income tax position, including a detailed roll forward of tax benefits taken that do not qualify for financial statement recognition.

The Company files income tax returns in the U.S. federal jurisdiction and several states. The Company is under audit by the Internal Revenue Service and three states tax jurisdiction as of December 31, 2022. Acacia Pharma Group and Acacia Pharma Inc. have not been historically audited by the IRS or HMRC. For Acacia Pharma Inc., the federal statute of limitations remains open for tax years 2015 onward. The statute remains open for five states, with 2018 being the earliest open year. For Acacia Pharma Group Plc and Acacia Pharma Limited, the 2021 tax year remains open until the end of 2023. The Company has no amount recorded for any unrecognized tax benefits as of December 31, 2022. The Company regularly evaluates its tax positions for additional unrecognized tax benefits and associated interest and penalties, if applicable. There are many factors that are considered when evaluating these tax positions including: interpretation of tax laws, recent tax litigation on a position, past audit or examination history, and subjective estimates and assumptions.

As of December 31, 2022, the Company has a net operating loss ("NOL") carryforward in Malta of $5.5 million which has no expiration date and can be carried forward indefinitely until utilized. Acacia Pharma Group (U.K.) has net operating loss

F- 31

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

carryforwards of $167 million that will not expire. Acacia Pharma Inc. has net operating loss carryforwards of $6.5 million that will expire and $12 million that will not expire.

As of December 31, 2022 the Company has not performed a 382 study to evaluate the use of the net operating losses of Acacia Pharma Inc. A full valuation allowance has been placed against both the federal and state loss carryforwards.

During the year ended December 31, 2022, the valuation allowance for deferred tax assets increased by $30.1 million. This increase mainly relates to the acquisition of Acacia in which there are deferred tax assets in excess of deferred tax liabilities. The Company has determined that is it more likely than not that these assets will not be fully realized based on a current evaluation of expected future taxable income and Acacia is in a cumulative loss position.

F- 32

**EAGLE PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(In thousands, except as indicated and share and per share amounts)**

### 9. License and Collaboration Agreements

*License Agreements*

*License agreement with Combioxin*

In August 2021, we entered into a license agreement with Combioxin, SA under which the Company was granted exclusive, worldwide development and commercialization rights to CAL02, a novel first-in-class anti-infective agent ready for Phase 2b/3 development for the treatment of severe pneumonia in combination with traditional antibacterial drugs. The Company will be solely responsible for the development, regulatory, manufacturing and commercialization activities of CAL02. Combioxin will assist the Company in transitioning the manufacturing and supply of CAL02 to the Company.

Under the terms of the agreement, we paid $10 million as upfront license consideration that was expensed immediately as research and development and is reflected within the operating activities of the consolidated statements of cash flows as of December 31, 2021. The Company may pay to Combioxin up to $105 million upon achievement of certain development, regulatory and sales based milestone payments plus royalty payments at royalty rates ranging in low double digit percentages on the net sales of all products sold, subject to certain adjustments as provided in the agreement. The Company is also obligated to make certain payments based upon amounts received by sublicensees under the agreement.

*License agreement with AOP Orphan*

In August 2021, we entered into a licensing agreement with AOP Orphan Pharmaceuticals GmbH ("AOP Orphan"), a privately owned Austrian company devoted to the treatment of rare and special diseases, for the commercial rights to its product, landiolol in the United States. Landiolol, a leading hospital emergency use product, is currently approved in Europe for the treatment of non-compensatory sinus tachycardia and tachycardic supraventricular arrhythmias. We supported the submission of a new drug application ("NDA") in the second quarter of 2022 by AOP Orphan to the FDA seeking approval for landiolol for the short term reduction of ventricular rate in patients with supraventricular tachycardia ("SVT"), including atrial fibrillation and atrial flutter.

Under the terms of the agreement, we paid a $5 million upfront license consideration that was expensed immediately as research and development and is reflected within the operating activities of the consolidated statements of cash flows as of December 31, 2021. We may pay to AOP Orphan up to $25 million upon achievement of certain regulatory milestone payments plus profit share payments, subject to certain adjustments as provided in the agreement. We also entered into a supply agreement at the same time as the licensing agreement.

*Collaboration with Tyme (now merged with Syros)*

On January 7, 2020, Tyme Technologies, Inc. ("Tyme") and we announced a strategic collaboration to advance SM-88, an oral product candidate for the treatment of patients with cancer. SM-88 is an investigational agent in two Phase II studies, one for pancreatic cancer and another for prostate cancer.

In September 2022, Syros announced the closing of its merger with Tyme pursuant to which Syros acquired Tyme. The combined company is known as Syros going forward.

Under the terms of a related co-promotion agreement, we would be responsible for 25% of the promotional sales effort of SM-88 and would receive 15% royalty on the net revenues of SM-88 in the United States. Syros is responsible for clinical development, regulatory approval, commercial strategy, marketing, reimbursement and manufacturing of SM-88. Syros retains the remaining 85% of net U.S. revenues and reserves the right to repurchase our U.S. co-promotion right for $200.0 million.

Our equity investment in Syros is included in Other assets on our consolidated balance sheet. For the years ended December 31, 2022, 2021, and 2020, the fair value adjustments for the equity investment were a loss of $4.5 million, a loss of $6.2 million and a loss of $5.3 million, respectively. These adjustments were recorded in Other (expense) income on our consolidated statements of operations.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

## 10. Commitments

Our future material contractual obligations include the following:

| Obligation | Total | | 2023 | | 2024 | | 2025 | | Beyond |
|---|---|---|---|---|---|---|---|---|---|
| Operating leases (1) | $ | 3,207 | $ | 1,672 | $ | 1,122 | $ | 413 | $ | — |
| Credit facility and Term loans (2) | | 63,750 | | 6,250 | | 10,000 | | 47,500 | | — |
| Investment in Enalare (3) | | 12,500 | | 12,500 | | — | | — | | — |
| Purchase obligations (4) | | 87,501 | | 87,501 | | — | | — | | — |
| Total obligations | $ | 166,958 | $ | 107,923 | $ | 11,122 | $ | 47,913 | $ | — |

(1) We lease our corporate office location. The term of our existing lease expires on June 30, 2025. We also lease our lab space under a lease agreement through April 2024, office space located in Indianapolis, Indiana through November 2023, and an office space in Palm Beach Gardens, Florida, through October 31, 2024. Rental expense was $1,507, $1,407, and $1,323, for the years ended December 31, 2022, 2021, and 2020, respectively. The remaining future lease payments under the operating leases, exclusive of any renewal option periods, are $3,207 as of December 31, 2022, payable monthly.

| | December 31, 2022 |
|---|---|
| Total operating lease payments | $ 3,207 |
| Less: imputed interest | (165) |
| Total lease liabilities | $ 3,042 |

(2) Refer to Note 6, "Debt" for further information regarding our Credit Agreement and Term Loans.

(3) We invested $12.5 million in Enalare at the time of entering the agreement in August 2022, and we are contractually obligated to invest another $12.5 million six months after August 2022. Refer to Note 11, *Investment in Enalare Therapeutics Inc.* for further details.

(4) As of December 31, 2022, the Company has purchase obligations in the amount of $87.5 million which represents the contractual commitments under contract manufacturing and supply agreements with suppliers. The obligation under the supply agreement is primarily for finished product, inventory, and research and development.

## 11. Investment in Enalare Therapeutics Inc.

On August 8, 2022, we and Enalare entered into a Securities Purchase Agreement ("SPA"), pursuant to the terms of the SPA, we invested $12.5 million in August 2022 and an additional $12.5 million in February 2023. We may also invest an additional $30 million, subject to the completion of certain development milestones. Concurrently with the execution of the SPA, we also entered into a Security Purchase Option Agreement ("SPOA"), pursuant to which we were granted an option to acquire all of the remaining outstanding shares of Enalare, subject to the terms and conditions of the agreement. The term of the Purchase Option (the "Option Period") commenced on August 8, 2022 and will end upon the earlier of (x) 90 days following the FDA communication of proceed to clinical for a Phase 3 clinical study for a Product Candidate or (y) June 30, 2027. Enalare shall not initiate Phase 3 pivotal studies prior to the end of the Option Period and we shall have reasonable access to all relevant data and documents following the Phase 3 Milestone (as defined in the Option Agreement).

We recorded an equity investment in the amount of $8.4 million, an asset related to the acquisition right in the amount of $8.1 million and a forward liability of $4.1 million related to the contractual obligation to invest another $12.5 million within six months from August 2022 in accordance with ASC 321 *Investments – Equity Securities*. We used a probability factor to

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

value the asset related to the acquired acquisition rights based on management's best estimate, including the probability of completion of certain development milestones. The equity stake was accounted for as an non-RDFV investment. The equity investment, acquisition right, and forward liability was reported at fair value as of December 31, 2022.

Summarized financial information of our investment and equity ownership in Enalare for the year ended December 31, 2022 is presented below:

| | Beginning balance as of January 1, 2022 | Additions during period | Adjustments | Ending balance as of December 31, 2022 |
|---|---|---|---|---|
| Non-RDFV Investment (Other assets) | $ — | $ 8,438 | $ — | $ 8,438 |
| Acquisition Rights (Other assets) | — | 8,125 | — | 8,125 |
| Forward Liability (Accrued expenses and other liabilities) | — | (4,063) | — | (4,063) |
| Total, net | $ — | $ 12,500 | $ — | $ 12,500 |

## 12. Intangible Assets, Net

The gross carrying amounts and net book value of our intangible assets are as follows:

| | Useful Life (In Years) | December 31, 2022 | | | |
|---|---|---|---|---|---|
| | | Gross Carrying Amount | Accumulated Amortization | Accumulated Impairment Charges | Net Book Value |
| BARHEMSYS intangible *(1)* | 9 | $ 70,319 | $ (4,462) | $ — | $ 65,857 |
| BYFAVO intangible *(1)* | 9 | 33,714 | (1,989) | — | 31,725 |
| Ryanodex intangible *(2)* | 9 | 15,000 | (7,402) | — | 7,598 |
| PEMFEXY intangible *(3)* | 2 | 15,000 | (1,888) | — | 13,112 |
| Vasopressin Milestone *(4)* | 1 | 750 | (715) | — | 35 |
| Total | | $ 134,783 | $ (16,456) | $ — | $ 118,327 |

| | Useful Life (In Years) | December 31, 2021 | | | |
|---|---|---|---|---|---|
| | | Gross Carrying Amount | Accumulated Amortization | Accumulated Impairment Charge | Net Book Value |
| Ryanodex intangible *(2)* | 9 | $ 15,000 | $ (5,079) | $ — | $ 9,921 |
| Developed technology | 5 | 8,100 | (8,100) | — | — |
| Vasopressin Milestone *(4)* | 1 | 750 | — | — | 750 |
| Total | | $ 23,850 | $ (13,179) | $ — | $ 10,671 |

*(1)* Represents intangible assets acquired in the Acacia Pharma acquisition as detailed in Note 15.
*(2)* Represents a one-time payment made to reduce the royalties payable to a third party on Ryanodex net sales.
*(3)* Represents a one-time payment made to reduce the royalties payable to a third party on PEMFEXY net sales.
*(4)* Represents milestone paid to a third party upon FDA approval of vasopressin.

F- 35

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

Amortization expense amounted to $11.4 million, $3.0 million, and $2.7 million, for the year ended December 31, 2022, 2021, and 2020, respectively.

*Estimated Useful Lives*

The Company reviews the estimated useful lives of its intangible assets on a periodic basis. During 2021, the review indicated that the actual life of the Ryanodex intangible asset was shorter than the estimated useful life used for amortization purposes in the Company's financial statements. As a result, the estimated useful life of the Ryanodex related intangible assets was shortened from 2036 to 2025. The change in the estimated useful life is considered a change in accounting estimate and resulted in changes to the Company's amortization expense prospectively. As of December 31, 2021, the net carrying value of the Ryanodex related intangible assets was $9.9 million. The effect of this change in estimate increased the 2021 amortization expense by $0.4 million.

*Impairment Assessment*

The Company reviews the recoverability of its finite-lived intangible assets and long-lived assets for indicators of impairments. Events or circumstances that may require an impairment assessment include negative clinical trial results, a significant decrease in the market price of the asset, or a significant adverse change in legal factors or the manner in which the asset is used. If such indicators are present, the Company assess the recoverability of affected assets by determining if the carrying value of such assets is less than the sum of the undiscounted future cash flows of the assets. If such assets are found to not be recoverable, the Company measures the amount of the impairment by comparing to the carrying value of the assets to the fair value of the assets. The Company determined that no indicators of impairment of finite-lived intangible assets or long-lived assets existed at December 31, 2022 and 2021.

*Estimated Amortization Expense for Intangible Assets*

Based on definite-lived intangible assets recorded as of December 31, 2022, and assuming that the underlying assets will not be impaired and that the Company will not change the expected lives of the assets, future amortization expenses are estimated as follows:

|  | Estimated Amortization Expense |
|---|---|
| Year Ending December 31, | |
| 2023 | 21,916 |
| 2024 | 19,770 |
| 2025 | 13,908 |
| 2026 | 11,606 |
| 2027 | 11,606 |
| Thereafter | 39,521 |
| Total estimated amortization expense | $ 118,327 |

**13. Legal Proceedings**

In addition to the below legal proceedings, from time to time, we may be a party to litigation and subject to claims incident to the ordinary course of business. Although the results of litigation and claims cannot be predicted with certainty, we currently believe that the final outcome of these ordinary course matters, or matters discussed below, will not have a material adverse effect on our business nor have we recorded any loss in connection with these matters because we believe that loss is neither probable nor estimable. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

**Commercial Litigation**

*Curia's Claims in Arbitration and Litigation*

On January 23, 2023, Curia Global, Inc. ("Curia") filed a demand for arbitration against Eagle ("the Company") with the American Arbitration Association (the "Arbitration"). Curia makes claims for breach of contract, account stated and breach of the implied covenant of good faith and fair dealing arising from the parties' supply agreement relating to the vasopressin product. Curia seeks damages in excess of $76.7 million. On February 28, 2023, Curia and its subsidiary Curia New Mexico, LLC filed an action against the Company in New York State Court, making claims for breach of contract and account stated arising from the parties' supply agreement relating to the PEMFEXY product (the "NY Action"). Curia seeks damages in excess of $4.2 million. The Company believes it has meritorious defenses to all of Curia's claims and intends to defend this Arbitration and the NY Action vigorously. The Company cannot assure that it will be successful in defending against such claims.

*In Re: Taxotere (Docetaxel)*

Beginning in May 2022, the Company was named as a defendant, among various other manufacturers, in several product liability suits that are consolidated in the U.S. District Court for the Eastern District of Louisiana as part of MDL 3023 (Civil Action No 22-1347 H(5)), or the Multidistrict Litigation. The claims are for personal injuries allegedly arising out of the use of docetaxel.

**Patent Litigation**

*Eagle Pharmaceuticals, Inc., et al. v. Slayback Pharma Limited Liability Company; Eagle Pharmaceuticals, Inc., et al. v. Apotex Inc. and Apotex Corp.; Eagle Pharmaceuticals, Inc., et al. v. Fresenius Kabi USA, LLC; Eagle Pharmaceuticals, Inc., et al. v. Mylan Laboratories Limited; Eagle Pharmaceuticals, Inc. et al. v. Hospira, Inc; Eagle Pharmaceuticals, Inc. et al. v. Lupin, Ltd. and Lupin Pharmaceuticals, Inc.; Teva Pharmaceuticals Int'l GmbH et al v. Aurobindo Pharma Ltd., Aurobindo Pharma USA, Inc., and Eugia Pharma Specialities Ltd.; Teva Pharmaceuticals Int'l GmbH et al v. Accord Healthcare Inc., Accord Healthcare Ltd., and Intas Pharmaceuticals Ltd.; Teva Pharmaceuticals Int'l GmbH et al v. Dr. Reddy's Laboratories, Ltd., and Dr. Reddy's Laboratories, Inc. - (Bendeka®)*

Bendeka, which contains bendamustine hydrochloride, is an alkylating drug that is indicated for the treatment of patients with chronic lymphocytic leukemia, as well as for the treatment of patients with indolent B-cell non-Hodgkin's lymphoma that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen. Slayback Pharma Limited Liability Company ("Slayback"), Apotex Inc. and Apotex Corp. ("Apotex"), Fresenius Kabi USA, LLC ("Fresenius"), Mylan Laboratories Limited ("Mylan"), Lupin, Ltd. and Lupin Pharmaceuticals, Inc. ("Lupin"), and Aurobindo Pharma, Ltd, Aurobindo Pharma USA, Inc., and Eugia Pharma Specialities Ltd ("Aurobindo") have filed Abbreviated New Drug Applications ("ANDA's") referencing Bendeka® that include challenges to one or more of the Bendeka® Orange Book-listed patents. Hospira, Inc. ("Hospira") filed a 505(b)(2) NDA.

We, Cephalon, Inc. and/or Teva Pharmaceuticals International GMBH (together the "Patentees"), filed separate suits against Slayback, Apotex, Fresenius, Mylan, Hospira, Lupin, and Aurobindo in the United States District Court for the District of Delaware on August 16, 2017 (Slayback ("Slayback I")), August 18, 2017 (Apotex), August 24, 2017 (Fresenius), December 12, 2017 (Mylan), January 19, 2018 (Slayback ("Slayback II")), July 19, 2018 (Hospira), and July 2, 2019 (Lupin) and May 11, 2020 (Aurobindo). In these Complaints, the Patentees allege infringement of the challenged patents, namely U.S. Patent Nos. 8,791,270 and 9,572,887 against Slayback (Slayback I and Slayback II), and of U.S. Patent Nos. 8,609,707, 8,791,270, 9,000,021, 9,034,908, 9,144,568, 9,265,831, 9,572,796, 9,572,797, 9,572,887, 9,579,384, 9,597,397, 9,597,398, 9,597,399 against Fresenius, Apotex, and Mylan, and of U.S. Patent Nos. 9,572,887, 10,010,533, 9,034,908, 9,144,568, 9,597,397, 9,597,398, 9,597,399, 9,000,021, 9,579,384 against Hospira, and of U.S. Patent Nos. 8,609,707, 9,000,021, 9,034,908, 9,144,568, 9,265,831, 9,572,796, 9,572,797, 9,572,887, 9,579,384, 9,597,397, 9,597,398, 9,597,399, 10,010,533, and 10,052,385 against Lupin and of U.S. Patent Nos. 8,609,707, 9,265,831, 9,572,796, 9,572,797, 9,034,908, 9,144,568, 9,572,887, 9,597,397, 9,597,398, 9,597,399, 9,000,021, 9,579,384, 10,010,533, and 10,052,385 against Aurobindo. The parties stipulated to dismiss without prejudice U.S. Patent No. 8,791,270 as to Apotex, Fresenius and Mylan on July 24, 2018, August 2, 2018, and August 3, 2018, respectively. Slayback, Apotex, Fresenius, and Mylan answered their Complaints and some filed various counterclaims on September 29, 2017 (Slayback I), February 12, 2018 (Slayback II), November 27, 2017, September 15, 2017, and February 14, 2018, respectively. The Patentees answered the Slayback I, Slayback II, Fresenius, and Apotex

F- 37

**EAGLE PHARMACEUTICALS, INC.**

**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**(In thousands, except as indicated and share and per share amounts)**

counterclaims on October 20, 2017, March 5, 2018, October 6, 2017, and December 18, 2017, respectively. On October 15, 2018, the Patentees filed a suit against Fresenius and Mylan in the United States District Court for the District of Delaware, alleging patent infringement of U.S. Patent Nos. 10,010,533 and 10,052,385. The Slayback I, Slayback II, Apotex, Fresenius and Mylan cases have been consolidated for all purposes (the "Consolidated Bendeka Litigation"), and a bench trial in these cases was held September 9-19, 2019. On April 27, 2020, the district court held that the asserted patents are valid and infringed by Slayback, Apotex, Fresenius and Mylan. On July 6, 2020, the district court entered a final judgment reflecting this decision, stating that pursuant to 35 U.S.C. § 271(e)(4)(A), the FDA shall not approve Apotex's, Fresenius's, Mylan's, or Slayback's ANDA products on a date which is earlier than January 28, 2031, and enjoining Apotex, Fresenius, Mylan, and Slayback from commercially manufacturing, using, offering to sell, or selling within the US or importing into the US, their ANDA products before that date. On August 4, 2020, Apotex, Fresenius, and Mylan appealed this final judgment, and filed their opening briefs on November 4, 2020. Plaintiffs' responsive appeal brief was filed on February 12, 2021. Defendants' reply briefs were filed April 5, 2021. On August 2, 2021, Fresenius's appeal was dismissed pursuant to a settlement agreement reached with Patentees. Oral argument for the remaining defendants occurred on August 3, 2021. On August 13, 2021, the appeals court affirmed the trial court's decision. The mandate was issued on October 22, 2021. Apotex filed a petition for certiorari on December 14, 2021, which the Supreme Court denied on February 22, 2022.

Hospira filed a motion to dismiss, which was fully briefed on November 16, 2018. On December 16, 2019, the United States District Court for the District of Delaware denied Hospira's motion to dismiss with respect to U.S. Patent No. 9,572,887 and granted that motion with respect to the remaining patents. On December 15, 2020, the Court held a claim construction hearing, ruling in our favor on all claim terms. Fact discovery closed on April 1, 2021. Expert discovery ended on February 10, 2022. The parties reached a settlement on April 19, 2022, resulting in dismissal of the action.

Patentees filed suit against Hospira, Inc. on November 16, 2021. Patentees have asserted U.S. Patent No. 11,103,483. Hospira filed its Answer on December 8, 2021. The parties reached a settlement on April 19, 2022, resulting in dismissal of the action.

On March 10, 2020, the parties filed a stipulation and order of dismissal without prejudice as to Lupin, which the Court entered March 11, 2020.

Aurobindo answered the Complaint on July 20, 2020. The parties exchanged initial disclosures on December 11, 2020. Plaintiffs provided their infringement contentions on March 12, 2021. On October 20, 2021 the Court entered a stipulation of dismissal based on a settlement between the parties.

Patentees filed suit against Dr. Reddy's Laboratories on May 13, 2021. Patentees have asserted U.S. Patent Nos. 8,609,707, 9,265,831, 9,572,796, 9,572,797, 9,034,908, 9,144,568, 9,572,887, 9,597,397, 9,597,398, 9,597,399, 9,000,021, 9,579,384, 10,010,533, and 10,052,385. Dr. Reddy's answer was filed August 16, 2021. On December 27, 2021, Dr. Reddy's moved for judgment on the pleadings, seeking a dismissal of all patents except the '887 patent. On January 27, 2022, the Court entered an agreed stipulation by the parties dismissing all patents except the '887. On February 8, 2022, consistent with that stipulation, Patentees filed an Amended Complaint removing the dismissed patents and adding U.S. Patent No 11,103,483. Dr. Reddy's filed its Answer and Counterclaims to that Amended Complaint on February 22, 2022. Patentees' filed their Counterclaim Answer on March 15, 2022. A claim construction hearing was held on September 15, 2022, and the case is set for trial on May 1, 2023.

Patentees filed suit against Accord Healthcare on June 29, 2021. Patentees have asserted U.S. Patent Nos. 8,609,707, 9,265,831, 9,572,796, 9,572,797, 9,034,908, 9,144,568, 9,572,887, 9,597,397, 9,597,398, 9,597,399, 9,000,021, 9,579,384, 10,010,533, and 10,052,385. On January 13, 2022, Accord filed a Motion to Dismiss for failure to state a claim. On January 26, 2022, Patentees filed a First Amended Complaint, removing all patents except the '887 patent and additionally asserting U.S. Patent No. 11,103,483. Accord filed its Answer and Counterclaims to that Amended Complaint on February 10, 2022. On February 28, 2022, Patentees filed their Answer to Accord's Counterclaims. On March 29, 2022, the Court entered a schedule and consolidated this case with the above Dr. Reddy's case. The parties reached a settlement on December 9, 2022, resulting in dismissal of the action.

*Eagle Pharmaceuticals, Inc. v. Slayback Pharma Limited Liability Company - (Belrapzo®)*

Slayback filed an ANDA referencing Eagle's Belrapzo NDA. Slayback's ANDA includes challenges to one or more of the Belrapzo Orange Book-listed patents. On September 20, 2018, the Company filed a suit against Slayback in the United States

F- 38

District Court for the District of Delaware, alleging patent infringement of U.S. Patent Nos. 8,609,707, 9,265,831, 9,572,796, 9,572,797 and 10,010,533. On October 10, 2018, Slayback answered the Complaint and filed various counterclaims. On October 31, 2018, the Company answered Slayback's counterclaims. Pursuant to a stipulation between the parties, Slayback is bound by any final judgment entered in the Consolidated Bendeka Litigation. This case is currently stayed. On January 24, 2023, the parties submitted a proposed judgment consistent with that stipulation, which the Court entered on January 25, 2023.

*Eagle Pharmaceuticals, Inc. v. Slayback Pharma Limited Liability Company, Apotex, Inc. and Apotex Corp., Celerity Pharmaceuticals, LLC - (Belrapzo®)*

Slayback, Apotex, and Celerity Pharmaceuticals, LLC ("Celerity") filed NDAs referencing Eagle's Belrapzo NDA. The Company filed suits against Slayback, Apotex, and Celerity in the United States District Court for the District of Delaware on August 31, 2021 (Slayback and Apotex) and on January 11, 2022 (Celerity) alleging infringement of U.S. Patent No. 11,103,483. On September 22, 2021, both Slayback and Apotex filed their Answers. On September 29, 2022, trial was held in the suit against Slayback and Apotex. On October 25, 2022, the Court issued its opinion and entered a judgment of non-infringement with respect to Slayback and Apotex. The Company filed a notice of appeal on October 26, 2022. The appeal is ongoing. On February 2, 2022, Celerity moved to dismiss the pending complaint. In response, the Company filed an Amended Complaint on March 1, 2022. Celerity filed its answer to the Company's Amended Complaint on March 22, 2022. On April 19, 2022, Celerity moved for judgment on the pleadings. On June 24, 2022, the Court entered a schedule coordinated with the above Accord and Dr. Reddy's cases. A claim construction hearing was held on September 15, 2022. On October 28, 2022, the parties filed a proposed stipulated judgment of non-infringement, which the Court entered that day.

*Eagle Pharmaceuticals, Inc. v. Accord Healthcare Inc., Accord Healthcare Ltd., and Intas Pharmaceuticals Ltd. - (Belrapzo®)*

Accord filed an NDA referencing Eagle's Belrapzo NDA. Accord's NDA includes challenges to one or more of the Belrapzo Orange Book-listed patents. On May 27, 2022, the Company filed a suit against Accord in the United States District Court for the District of Delaware, alleging patent infringement of U.S. Patent Nos. 8,609,707, 9,265,831, 9,572,796, 9,572,797, 10,010,533, and 11,103,483. On July 6, 2022 the Company filed a First Amended Complaint, removing all patents except the '483 patent. Accord filed its Answer and Counterclaims on July 20, 2022. The Company filed its Answer to Accord's Counterclaims August 9, 2022. On September 20, 2022, the Court entered a schedule consolidating this case with the above Accord and Dr. Reddy's cases. On November 18, 2022, the parties filed a proposed stipulated judgment of non-infringement, which was entered by the Court on November 21, 2022.

*Eagle Pharmaceuticals, Inc. & SymBio Pharmaceuticals Ltd. v. Towa Pharmaceutical Co., Ltd.; Eagle Pharmaceuticals, Inc. & SymBio Pharmaceuticals Ltd. v. Pfizer Japan Inc. - (Treakisym)*

The Company, together with its exclusive licensee SymBio Pharmaceuticals Ltd. ("SymBio"), initiated lawsuits in the Tokyo District Court against Towa Pharmaceutical Co., Ltd. ("Towa") on December 16, 2022 and against Pfizer Japan Inc. ("Pfizer") on December 26, 2022 for patent infringement of Eagle's Japanese Patent No. 6570601 for TREAKISYM injection solution 100 mg/4mL (bendamustine hydrochloride hydrate). In their complaint, Eagle and SymBio sought remedies that include an injunction against the manufacture or sale of Towa and Pfizer's generic products and compensation for damages. Towa and Pfizer answered the complaint. A first hearing occurred before the Tokyo District Court in the Towa infringement action on February 6, 2023, in which the Court determined a timetable for the case. In the Towa action, the parties will give technical presentation before the judges and experts on October 30, 2023, and the court will reveal its view on infringement and validity on November 20, 2023. A first hearing is also scheduled before the Tokyo District Court in the Pfizer infringement action on April 25, 2023.

*Par Pharmaceutical, Inc. et al. v. Eagle Pharmaceuticals, Inc. (Vasopressin)*

On May 31, 2018, Par Pharmaceutical, Inc., Par Sterile Products, LLC, and Endo Par Innovation Company, LLC (together, "Par") filed suit against the Company in the United States District Court for the District of Delaware. Par alleged patent infringement based on the filing of the Company's ANDA seeking approval to manufacture and sell the Company's vasopressin product. The Company's vasopressin product is an alternative to Vasostrict, which is indicated to increase blood pressure in adults with vasodilatory shock (e.g., post-cardiotomy or sepsis) who remain hypotensive despite fluids and catecholamines. The Company answered the complaint on August 6, 2018, and filed an amended answer and counterclaims on October 30, 2019.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The court issued a Markman ruling on July 1, 2019. On December 20, 2019, Par dismissed with prejudice claims of three of the patents asserted against Eagle, and the Court entered an Order reflecting that dismissal on December 27, 2019. Mediation took place on March 3, 2020. On April 17, 2020, we submitted a letter requesting leave to file a motion for summary judgment of non-infringement. Par's responsive letter was submitted on May 8, 2020. On May 18, 2020, the court said it would hear non-infringement arguments at trial and not through summary judgment. Fact discovery ended in October 2019, and expert discovery ended in February 2020. Due to the COVID-19 pandemic, the trial, which was scheduled to begin May 18, 2020, was rescheduled to and occurred on July 7-9, 2021. Post-trial briefing was submitted on July 28, 2021. The Court issued an opinion on August 31, 2021 and entered a final judgment of non-infringement in favor of Eagle on September 16, 2021. Par filed a Notice of Appeal of the final judgment on September 22, 2021, and the appeal was docketed with the United States Court of Appeals for the Federal Circuit on September 23, 2021. Par filed its principal appeal brief on December 6, 2021, Eagle filed its responsive appeal brief on February 1, 2022, and Par filed its reply appeal brief on February 22, 2022. Oral argument occurred before the Federal Circuit on July 7, 2022. On August 18, 2022, the Federal Circuit affirmed the District Court's finding of non-infringement, and on September 26, 2022, the Federal Circuit issued the formal mandate. The FDA approved Eagle's ANDA on December 15, 2021. On December 16, 2021, Par filed an emergency motion for temporary restraining order and preliminary injunction in the district court to enjoin Eagle from launching its product, but Par voluntarily withdrew the motion on December 20, 2021. Eagle commercially launched its ANDA product in January 2022. The 30-month stay of FDA approval expired on October 17, 2020.

On December 7, 2020, Par filed a separate suit against us in the United States District Court for the District of New Jersey, asserting patent infringement of U.S. Patent No. 10,844,435, based on the filing of our ANDA seeking approval to manufacture and sell our vasopressin product. Eagle moved to dismiss Par's complaint on March 2, 2021. On March 22, 2021, Par amended its complaint to additionally assert U.S. Patent No. 10,920,278, and on April 5, 2021, Eagle moved to dismiss Par's amended complaint. Before the Court ruled on Eagle's Motion to Dismiss, on May 9, 2022, Par provided notice of the dismissal of the action under Rule 41(a)(1)(A)(i), and the Court granted the dismissal of the action on May 10, 2022.

F- 40

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

## 14. Convertible Promissory Note

During the first quarter of 2021, we invested $5 million in a convertible promissory note (the "note") of a privately held clinical-stage biotechnology company (the "issuer"). The note bore an 8% annual interest rate and had an 18-month term. The issuer is not required to make any principal or interest payments until the end of the term. The note, along with any accrued interest, may automatically convert into equity securities of the issuer under either a financing event or a change in control event as defined in the convertible promissory note agreement. The issuer's product development efforts could encounter technical or other difficulties that could increase their development costs more than expected.

The issuer did not have sufficient cash and was unable to obtain additional capital to be able to repay the convertible promissory note with accrued interest at the end of the term. During 2022, we impaired the note, accrued interest, as well as the value of the embedded derivative related to the equity conversion feature contained in the note.

The following table summarizes the amounts recorded and activity during the year ended December 31, 2022;

| | December 31, 2021 | Fair Value Adjustments to the note | Accretion of Discount | Estimated Credit Loss | Interest Income | Fair Value Adjustment to Embedded Derivative | December 31, 2022 |
|---|---|---|---|---|---|---|---|
| **Fair value of the note** | $ 4,906 | $ (4,906) | $ — | $ — | $ — | $ — | $ — |
| **Discount on the note** | (127) | — | 127 | — | — | — | — |
| **Estimated Credit Loss** | (758) | — | — | 758 | — | — | — |
| **Convertible Promissory Note, net** | $ 4,021 | $ (4,906) | $ 127 | $ 758 | $ — | $ — | $ — |
| | | | | | | | |
| **Embedded Derivative** | $ 962 | $ — | $ — | $ — | $ — | $ (962) | $ — |
| | | | | | | | |
| **Interest Receivable** | $ 329 | $ — | $ — | $ (329) | $ — | $ — | $ — |
| | | | | | | | |
| **Total in Other Current Assets** | $ 5,312 | $ (4,906) | $ 127 | $ 429 | $ — | $ (962) | $ — |

F- 41

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The following table summarizes the amounts recorded and activity during the year ended December 31, 2021;

| | Initial | Fair Value Adjustments to the note | Accretion of Discount | Estimated Credit Loss | Interest Income | Fair Value Adjustment to Embedded Derivative | December 31, 2021 |
|---|---|---|---|---|---|---|---|
| **Fair value of the note** | $ 5,000 | $ (94) | $ — | $ — | $ — | $ — | $ 4,906 |
| **Discount on the note** | (276) | — | 149 | — | — | — | (127) |
| **Estimated Credit Loss** | — | — | — | (758) | — | — | (758) |
| **Convertible Promissory Note, net** | $ 4,724 | $ (94) | $ 149 | $ (758) | $ — | $ — | $ 4,021 |
| | | | | | | | |
| **Embedded Derivative** | $ 276 | $ — | $ — | $ — | $ — | $ 686 | $ 962 |
| | | | | | | | |
| **Interest Receivable** | $ — | $ — | $ — | $ — | $ 329 | $ — | $ 329 |
| | | | | | | | |
| **Total in Other Current Assets** | $ 5,000 | $ (94) | $ 149 | $ (758) | $ 329 | $ 686 | $ 5,312 |

### 15. Business Acquisition

On June 9, 2022, we completed our acquisition of the entire issued share capital of Acacia Pharma for cash consideration and common stock totaling 94.7 million euros, the equivalent of 0.90 euros per share, and an aggregate of 516,024 shares of our common stock. Each shareholder of Acacia Pharma received 0.68 euros in cash and 0.0049 shares of our common stock. Acacia Pharma is a hospital pharmaceutical company focused on the development and commercialization of new products aimed at improving the care of patients undergoing significant treatments such as surgery and other invasive procedures. The transaction was entered to expand our current portfolio of FDA approved hospital products with the addition of BARHEMSYS and BYFAVO.

We evaluated the Business Acquisition under ASC 805, Business Combinations and ASU 2017-01, Business Combinations: Clarifying the Definition of a Business. We concluded that substantially all of the fair value of the gross assets acquired is not concentrated in a single identifiable asset or a group of similar identifiable assets. The transaction does not pass the screen test and thus management performed an assessment to determine if the acquired entities met the definition of a business. For the assessment, management considered whether it has acquired (i) inputs, (ii) processes, and (iii) outputs. Under ASC 805, to be considered a business, a set of activities and assets is required to have only the first two of the three elements, which together are or will be used in the future to create outputs. Management determined that the acquired entities met the definition of a business since we acquired inputs, processes capable of producing outputs and outputs.

Therefore, the acquisition has been accounted for under the acquisition method of accounting. Under the acquisition method, the total purchase price of the acquisition is allocated to the net tangible and identifiable intangible assets acquired and liabilities assumed based on the fair values as of the date of the acquisition.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

The acquisition-date fair value of the consideration totaled $100.4 million, summarized as follows (in thousands):

|  | Fair Value of Consideration |
|---|---|
| Cash consideration | $ 76,708 |
| Fair value of Eagle common stock issued | 23,645 |
|  | $ 100,353 |

The purchase price allocation resulted in the amounts being allocated to the assets acquired and liabilities assumed at the acquisition date based upon their respective fair values summarized below. The determination of fair value was finalized in the fourth quarter of 2022. During the year ended December 31, 2022, we recorded certain measurement period adjustments, which are summarized below. The impact of these measurement period adjustments were recorded as an increase to goodwill, increasing the goodwill balance to $5.3 million.

The following table presents the allocation of the purchase price to the estimated fair values of the assets acquired and liabilities assumed as of the acquisition date (in thousands):

|  | Preliminary Purchase Price Allocation as of acquisition date | Measurement Period Adjustments | Purchase Price Allocation |
|---|---|---|---|
| Cash | $ 2,556 | $ — | $ 2,556 |
| Net working capital, excluding cash | (2,158) | — | (2,158) |
| Inventory | 26,942 | (9,394) | 17,548 |
| Intangible assets | 104,000 | 4,000 | 108,000 |
| Debt | (28,503) | 1,844 | (26,659) |
| Deferred tax liability, net | (4,536) | 311 | (4,225) |
| Fair value of net assets acquired | 98,301 | (3,239) | 95,062 |
| Goodwill | 3,315 | 1,976 | 5,291 |
|  | $ 101,616 | $ (1,263) | $ 100,353 |

The estimated fair value of acquired intangible assets was determined using the "income approach," which is a valuation technique that provides an estimate of the fair value of an asset based on market participant expectations of the cash flows an asset would generate over its remaining useful life. The inventory acquired was valued at expected profit margins for the acquired products. The fair value of working capital acquired approximates its book value. The fair value of debt acquired was based on the present value of future cash outflows using the net present value approach and applying an interest rate that is considered to be a market participant equivalent rate. The assumptions, including the expected projected cash flows, utilized in the purchase price allocation and in determining the purchase price were based on management's best estimates as of the close date of the acquisition on June 9, 2022.

Some of the more significant assumptions inherent in the development of the intangible asset valuations included the estimated net cash flow for each year for each asset (including relevant marker size and market share), the appropriate discount rate to select in order to measure the risk inherent in each future cash flow stream, as well as other factors.

We incurred approximately $12.6 million in acquisition-related expenses, which were included in selling, general and administrative expenses in the consolidated statements of operations for the year ended December 31, 2022. These expenses primarily consist of legal fees and success fees paid to third party advisors. The results of Acacia Pharma operations have been included in our consolidated statements of operations beginning on the acquisition date. The acquired business contributed revenues of $1.6 million and net loss of $15.8 million to us for the period from June 9, 2022 to December 31, 2022.

The goodwill recorded related to the acquisition is the excess of the fair value of the consideration transferred by the acquirer over the fair value of the net identifiable assets acquired and liabilities assumed at the date of acquisition. The goodwill recorded is not deductible for tax purposes.

**EAGLE PHARMACEUTICALS, INC.**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS (Continued)**
**(In thousands, except as indicated and share and per share amounts)**

*Pro Forma Financial Information:*

The following table provides unaudited pro forma financial information for the years ended December 31, 2022 and 2021 as if the acquisition of Acacia Pharma had occurred as of January 1, 2021:

|  | Year Ended December 31, | |
|---|---|---|
|  | **2022** | **2021** |
| Total revenue | $ 317,792 | $ 172,709 |
| Net income (loss) | $ 19,189 | $ (92,886) |

These amounts have been calculated after applying our accounting policies.

The pro forma results above include the impact of the following adjustments, as necessary: additional amortization expense relating to assets acquired; interest and other financing costs relating to the acquisition transaction; and the elimination of one-time or nonrecurring items. The one-time or nonrecurring items eliminated were primarily comprised of inventory fair value step-up adjustments; transaction costs, as well as certain Acacia-related share based payment charges and employee compensation expenses.

The pro forma results do not include any anticipated cost savings or other effects of the planned integration of Acacia Pharma. Accordingly, the pro forma results above are not necessarily indicative of the results that would have been if the acquisition had occurred on the dates indicated, nor are the pro forma results indicative of results which may occur in the future.

F- 44

**Exhibit 21.1**

**Subsidiaries of Eagle Pharmaceuticals, Inc.**

| Name of Subsidiary | Jurisdiction of Incorporation |
|---|---|
| Eagle Biologics, Inc. (formerly Arsia Therapeutics, Inc.) | Delaware |
| Eagle Research Lab Limited | Malta |
| Acacia Pharma Group plc | United Kingdom |
| Acacia Pharma Limited | United Kingdom |
| Acacia Pharma Inc | Delaware |

**Exhibit 23.1**

**Consent of Independent Registered Public Accounting Firm**

We consent to the incorporation by reference in the following Registration Statements:

(1) Registration Statements on Form S-3 Nos. 333-234742, 333-202592 and 333-267827 of Eagle Pharmaceuticals, Inc., and

(2) Registration Statements on Form S-8 Nos. 333-263869, 333-228876, 333-216839, 333-213683, 333-206729 and 333-194056 of Eagle Pharmaceuticals, Inc.

of our reports dated March 23, 2023, with respect to the consolidated financial statements of Eagle Pharmaceuticals, Inc. and the effectiveness of internal control over financial reporting of Eagle Pharmaceuticals, Inc. included in this Annual Report (Form 10-K) of Eagle Pharmaceuticals, Inc. for the year ended December 31, 2022.

/s/ Ernst & Young LLP

Stamford, Connecticut
March 23, 2023

**Exhibit 31.1**

## Certification of Principal Executive Officer

I, Scott Tarriff, certify that:

1. I have reviewed this Annual Report on Form 10-K of Eagle Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 23, 2023

/s/ Scott Tarriff

Scott Tarriff
President and Chief Executive Officer
(Principal Executive Officer)

**Exhibit 31.2**

## Certification of Principal Financial and Accounting Officer

I, Brian Cahill, certify that:

1. I have reviewed this Annual Report on Form 10-K of Eagle Pharmaceuticals, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

   (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

   (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

   (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date: March 23, 2023

/s/ Brian Cahill

Brian Cahill
Chief Financial Officer
(Principal Financial and Accounting Officer)

**Exhibit 32.1**

### Certification Pursuant to

### 18 U.S.C. Section 1350,

### As Adopted Pursuant to

### Section 906 of the Sarbanes-Oxley Act of 2002

Pursuant to the requirement set forth in Rule 13a-14(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Section 1350 of Chapter 63 of Title 18 of the United States Code (18 U.S.C. §1350), **Scott Tarriff**, President and Chief Executive Officer of Eagle Pharmaceuticals, Inc. (the "Company"), and **Brian Cahill**, Chief Financial Officer of the Company, each hereby certifies that, to the best of his knowledge:

1. The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2022 (the "Annual Report"), to which this Certification is attached as Exhibit 32.1, fully complies with the requirements of Section 13(a) or Section 15(d) of the Exchange Act, and

2. The information contained in the Annual Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

**Dated: March 23, 2023**

/s/ Scott Tarriff                 /s/ Brian Cahill

Scott Tarriff                 Brian Cahill

Chief Executive Officer         Chief Financial Officer

(Principal Executive Officer)         (Principal Financial and Accounting Officer)

This certification accompanies the Form 10-K to which it relates, is not deemed filed with the Securities and Exchange Commission and is not to be incorporated by reference into any filing of Eagle Pharmaceuticals, Inc. under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended (whether made before or after the date of the Form 10-K), irrespective of any general incorporation language contained in such filing.