**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC, <br><br> Plaintiffs, <br> v. <br> APOTEX INC., AND APOTEX CORP, <br><br> Defendants. | C.A. No. 24-64-JLH <br> **(CONSOLIDATED)** <br> **JURY TRIAL DEMANDED** <br> ▆▆▆▆▆▆▆▆ |
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC, <br><br> Plaintiffs, <br> v. <br> SLAYBACK PHARMA LLC, <br><br> Defendant. | C.A. No. 24-65-JLH <br> **(CONSOLIDATED)** <br> **JURY TRIAL DEMANDED** <br> ▆▆▆▆▆▆▆▆ |

## DECLARATION OF MATTHEW T. MESSINA IN SUPPORT DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT OF DAMAGES (VOL. 3 –EXHIBITS 11 - 23)

Neal C. Belgam (No. 2721)
Daniel A. Taylor (No. 6934)
SMITH KATZENSTEIN & JENKINS LLP
1000 N. West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

Attorneys for Defendants
*Slayback Pharma LLC*

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants*
*Apotex Inc. and Apotex Corp.*

Dated: June 5, 2026

# EXHIBIT 11
# REDACTED IN ITS ENTIRETY

EXHIBIT 12



## Eagle Delays Third Quarter 2023 Results and Conference Call

November 9, 2023

WOODCLIFF LAKE, N.J., Nov. 09, 2023 (GLOBE NEWSWIRE) -- Eagle Pharmaceuticals, Inc. (Nasdaq: EGRX) ("Eagle" or the "Company") today announced that it will be delaying the release of its third quarter 2023 results and investor conference call, previously scheduled for today, Thursday, November 9, 2023. The Company currently anticipates filing a Form 12b-25, Notification of Late Filing, with the Securities and Exchange Commission no later than one business day after the due date of its Quarterly Report on Form 10-Q for the third quarter ended September 30, 2023 (the "Form 10-Q"), and expects to file its Form 10-Q by November 14, 2023, prior to the expiration of the extension period provided by Rule 12b-25 under the Securities Exchange Act of 1934.

The Company requires more time to review potential adjustments relating to the reporting of sales of PEMFEXY® prior to filing its Form 10-Q. In addition, the Company expects to revise its previously disclosed 2023 full year guidance downward.

"We remain confident in the strength of our business and our outlook for 2024, and we look forward to reporting on our commercial portfolio, progress on our pipeline and other initiatives," stated Scott Tarriff, President and CEO of Eagle.

### Third Quarter Fiscal Year 2023 Earnings Conference Call

The Company will reschedule its third quarter 2023 financial results call at a time to be announced.

### About Eagle Pharmaceuticals, Inc.

Eagle is a fully integrated pharmaceutical company with research and development, clinical, manufacturing and commercial expertise. Eagle is committed to developing innovative medicines that result in meaningful improvements in patients' lives. Eagle's commercialized products include PEMFEXY®, RYANODEX®, BENDEKA®, BELRAPZO®, TREAKISYM® (Japan), and BYFAVO® and BARHEMSYS® through its wholly owned subsidiary Acacia Pharma Inc. Eagle's oncology and CNS/metabolic critical care pipeline includes product candidates with the potential to address underserved therapeutic areas across multiple disease states, and the company is focused on developing medicines with the potential to become part of the personalized medicine paradigm in cancer care. Additional information is available on Eagle's website at  www.eagleus.com.

### Forward-Looking Statements

This press release contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended, and other securities law. Forward-looking statements are statements that are not historical facts. Words and phrases such as "anticipated," "forward," "will," "would," "could," "may," "remain," "potential," "prepare," "expected," "believe," "plan," "near future," "belief," "guidance," and similar expressions are intended to identify forward-looking statements. These statements include, but are not limited to, the Company's expectations with respect to the timing of its SEC filings, including the Form 12b-25 and the Form 10-Q, and the anticipated release of financial results for the third quarter ended September 30, 2023, expectations with respect to the anticipated reporting of financial and business results, including potential adjustments related to the reporting of sales for PEMFEXY®, and statements and expectations regarding the Company's financial projections and guidance, including anticipated financial performance for 2023, the strength of the Company's business, pipeline and other initiatives and the potential of the Company's pipeline and product candidates to address underserved therapeutic areas across multiple disease states. All of such statements are subject to certain risks and uncertainties, many of which are difficult to predict and generally beyond the Company's control, that could cause actual results to differ materially from those expressed in, or implied or projected by, the forward-looking information and statements. Such risks and uncertainties include, but are not limited to: the impacts of the post- COVID-19 environment and geopolitical factors such as the conflicts between Russia and Ukraine and Gaza and Israel; delay in or failure to obtain regulatory approval of the Company's or its partners' product candidates and successful compliance with FDA, European Medicines Agency and other governmental regulations applicable to product approvals; changes in the regulatory environment; the uncertainties and timing of the regulatory approval process; whether the Company can successfully market and commercialize its product candidates; the success of the Company's relationships with its partners; the outcome of litigation involving any of its products or that may have an impact on any of its products; the strength and enforceability of the Company's intellectual property rights or the rights of third parties; competition from other pharmaceutical and biotechnology companies and the potential for competition from generic entrants into the market; unexpected safety or efficacy data observed during clinical trials; clinical trial site activation or enrollment rates that are lower than expected; the risks inherent in drug development and in conducting clinical trials; risks inherent in estimates or judgments relating to the Company's critical accounting policies, or any of the Company's estimates or projections, which may prove to be inaccurate; unanticipated factors in addition to the foregoing that may impact the Company's financial and business projections and guidance and may cause the Company's actual results and outcomes to materially differ from its projections and guidance; and those risks and uncertainties identified in the "Risk Factors" sections of the Company's Annual Report on Form 10-K for the year ended December 31, 2022, filed with the Securities and Exchange Commission (the "SEC") on March 23, 2023, the Company's Quarterly Reports on Form 10-Q for the quarter ended March 31, 2023, filed with the SEC on May 9, 2023, and for the quarter ended June 30, 2023, filed with the SEC on August 8, 2023, and its other subsequent filings with the SEC. Readers are cautioned not to place undue reliance on these forward-looking statements. All forward-looking statements contained in this press release speak only as of the date on which they were made. Except to the extent required by law, the Company undertakes no obligation to update such statements to reflect events that occur or circumstances that exist after the date on which they were made.

### Investor Relations for Eagle Pharmaceuticals, Inc.:

Lisa M. Wilson
In-Site Communications, Inc.
T: 212-452-2793
E: lwilson@insitecony.com

### Public Relations for Eagle Pharmaceuticals, Inc.:

Faith Pomeroy-Ward
T: 817-807-8044
E: faith@eagleus.com

EXHIBIT 13

Case 1:24-cv-00064-JLH Document 474 Filed 08/07/26 Page 7 of 188 PageID #: 16183

NT 10-Q 1 tm2330390-1_nt10q.htm NT 10-Q

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

**FORM 12b 25**

| | |
|---|---|
| SEC FILE NUMBER | 001-36306 |
| CUSIP NUMBER | 269796108 |

## NOTIFICATION OF LATE FILING

*(Check One)*:  ☐·Form 10-K    ☐ Form 20-F    ☐ Form 11-K    ☒ Form 10-Q    ☐ Form 10-D    ☐ Form N-CEN    ☐ Form N-CSR

For Period Ended: **September 30, 2023**
☐ Transition Report on Form 10-K
☐ Transition Report on Form 20-F
☐ Transition Report on Form 11-K
☐ Transition Report on Form 10-Q

For the transition period ended:

> *Read Instruction (on back page) Before Preparing Form. Please Print or Type.*
> **Nothing in this form shall be construed to imply that the Commission has verified any information contained herein.**

If the notification relates to a portion of the filing checked above, identify the Item(s) to which the notification relates:

## PART I    REGISTRANT INFORMATION

**Eagle Pharmaceuticals, Inc.**

Full Name of Registrant

**N/A**

Former Name if Applicable

**50 Tice Boulevard, Suite 315**

Address of Principal Executive Office *(Street and Number)*

**Woodcliff Lake, NJ 07677**

City, State and Zip Code

## PART II    RULES 12b 25(b) AND (c)

If the subject report could not be filed without unreasonable effort or expense and the registrant seeks relief pursuant to Rule 12b-25(b), the following should be completed. (Check box if appropriate)

    (a)   The reasons described in reasonable detail in Part III of this form could not be eliminated without unreasonable effort or expense;

☒    (b)   The subject annual report, semi-annual report, transition report on Form 10-K, Form 20-F, Form 11-K, Form N-CEN or Form N-CSR, or portion thereof, will be filed on or before the fifteenth calendar day following the prescribed due date; or the subject quarterly report or transition report on Form 10-Q or subject distribution report on Form 10-D, or portion thereof, will be filed on or before the fifth calendar day following the prescribed due date; and

    (c)   The accountant's statement or other exhibit required by Rule 12b-25(c) has been attached if applicable.

## PART III - NARRATIVE

State below in reasonable detail the reasons why Forms 10-K, 20-F, 11-K, 10-Q, 10-D, N-CEN, N-CSR, or the transition report or portion thereof, could not be filed within the prescribed time period.

Eagle Pharmaceuticals, Inc. (the "Company") is filing this Notification of Late Filing on Form 12b-25 with respect to its Quarterly Report on Form 10-Q for the quarter ended September 30, 2023 (the "Form 10-Q"). The Company is unable to file its Form 10-Q within the prescribed time period without unreasonable effort or expense primarily because it requires additional time to complete its review of potential adjustments relating to the reporting of sales of PEMFEXY®.

As a result of the foregoing, the Company needs additional time to finalize its financial statements and related disclosures to be included in the Form 10-Q. The Company expects to file the Form 10-Q within the 5 calendar day extension provided by Rule 12b-25 of the Securities Exchange Act of 1934, as amended, but can provide no assurance that it will be able to file by such time.

## PART IV - OTHER INFORMATION

(1)    Name and telephone number of person to contact in regard to this notification.

| **Scott Tariff** | **201** | **326-5300** |
|---|---|---|
| (Name) | (Area Code) | (Telephone Number) |

(2)    Have all other periodic reports required under Section 13 or 15(d) of the Securities Exchange Act of 1934 or Section 30 of the Investment Company Act of 1940 during the preceding 12 months or for such shorter period that the registrant was required to file such report(s) been filed? If answer is no, identify report(s). ☒ Yes ☐ No

(3)    Is it anticipated that any significant change in results of operations from the corresponding period for the last fiscal year will be reflected by the earnings statements to be included in the subject report or portion thereof? ☒ Yes ☐ No

If so: attach an explanation of the anticipated change, both narratively and quantitatively, and, if appropriate, state the reasons why a reasonable estimate of the results cannot be made.

Revenue for the three months ended September 30, 2023 is expected to decrease compared to the three months ended September 30, 2022, primarily driven by decreases in BENDEKA® and TREAKISYM® royalties, a reduction of approximately $15.0 million in net product sales for vasopressin (which was discontinued in the first quarter of 2023), and lower net product sales for BELRAPZO® and RYANODEX®.

In addition, the Company is reviewing and expects potential adjustments to reserves for returns and price adjustments of approximately $15.0 million to $20.0 million. These potential adjustments primarily relate to returns and a price adjustment for PEMFEXY® substantially stemming from slower-than-anticipated pull-through from one wholesale customer predominantly due to expiry of inventory.

R&D expense for the three months ended September 30, 2023 is expected to increase compared to the three months ended September 30, 2022, primarily due to higher spend related to the BYFAVO® and BARHEMSYS® pediatric studies, the CAL02 clinical trial, EA-114 projects and personnel-related costs. SG&A expense for the three months ended September 30, 2023 is expected to increase compared to the three months ended September 30, 2022, primarily due to marketing costs for BARHEMSYS and BYFAVO, personnel-related costs including increases in sales and marketing headcount and severance costs.

Net loss for the three months ended September 30, 2023 is expected to increase compared to the three months ended September 30, 2022, primarily due to the factors discussed above.

The foregoing expectations are based on preliminary unaudited financial information and subject to change in connection with the completion of the reporting process and preparation of the Company's financial statements, and actual results may vary significantly from the foregoing expectations.

**Cautionary Note Regarding Forward-Looking Statements**

This Form 12b-25 contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. The words "anticipate," "will," "expect" "potential," and similar terms and phrases are used in this Form 12b-25 to identify forward-looking statements, including statements regarding the Company's ability to file the Form 10-Q within the time period prescribed by Rule 12b-25 and the Company's expectations regarding its financial results, including the expectation that there will be no material changes to the expectations set forth herein. Many factors could cause actual results and future events to differ materially from the forward-looking statements, including, among other things, the completion of the preparation of the financial statements and procedures related to the Company's financial reporting, the discovery of additional information, and the risks and uncertainties set forth in the sections entitled "Risk Factors" in the Company's Annual Report on Form 10-K  for the year ended December 31, 2022, and in its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2023 and June 30, 2023, as well as subsequent filings with the SEC. These forward-looking statements are based on management's expectations as of the date of this filing. Readers are cautioned not to put undue reliance on forward-looking statements, and the Company assumes no obligation and does not intend to update or revise these forward-looking statements other than as required by applicable law. The Company does not give any assurance that it will achieve its expectations.

Case 1:24-cv-00064-JLH   Document 474   Filed 08/07/26   Page 10 of 188 PageID #: 16186

**Eagle Pharmaceuticals, Inc.**
(Name of Registrant as Specified in Charter)

has caused this notification to be signed on its behalf by the undersigned hereunto duly authorized.

Date: November 9, 2023

By:      /s/ Scott Tarriff
Name:  Scott Tarriff
Title:    Chief Executive Officer

---

## ATTENTION

**Intentional misstatements or omissions of fact constitute Federal Criminal Violations (See 18 U.S.C. 1001).**

# EXHIBIT 14
# REDACTED IN ITS ENTIRETY

EXHIBIT 15



# Eagle Pharmaceuticals Announces Receipt of Notification of Deficiency from Nasdaq Regarding Requirement to Timely File Quarterly Report on Form 10-Q

November 29, 2023

WOODCLIFF LAKE, N.J., Nov. 29, 2023 (GLOBE NEWSWIRE) -- Eagle Pharmaceuticals, Inc. (Nasdaq: EGRX) (the "Company") today announced that it received a notice (the "Notice") on November 27, 2023 from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq") advising the Company that it is not currently in compliance with Nasdaq's continued listing requirements under the Nasdaq Listing Rule 5250(c)(1) (the "Rule"), which requires timely filing of all required periodic financial reports with the Securities and Exchange Commission (the "SEC"), as a result of the Company's failure to file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2023 (the "Form 10-Q") within the prescribed timeframe.

The Notice provides that the Company has 60 calendar days from the date of the Notice, or until January 26, 2024, to submit to Nasdaq a plan to regain compliance with the Rule. If Nasdaq accepts the plan, Nasdaq may grant the Company an exception of up to 180 calendar days from the due date of the Form 10-Q, or until May 7, 2024, to regain compliance. The Company may be able to regain compliance with the Rule by filing the Form 10-Q with the SEC (and any other reports required to be filed) before the end of any such exception period. If the Company fails to regain compliance prior to the expiration of any such exception period or if Nasdaq does not accept the plan of compliance, Nasdaq will issue a determination indicating that the Company is subject to delisting. If that occurs, the Company may request a hearing before a Hearing Panel to review the determination. However, there can be no assurance that Nasdaq will accept such plan or grant an exception period, that any hearing would be successful, or that the Company will be able to regain compliance within the deadline or any exception period that may be granted or maintain compliance with the other continued listing requirements set forth in the Nasdaq Listing Rules.

**About Eagle Pharmaceuticals, Inc.**

Eagle is a fully integrated pharmaceutical company with research and development, clinical, manufacturing and commercial expertise. Eagle is committed to developing innovative medicines that result in meaningful improvements in patients' lives. Eagle's commercialized products include PEMFEXY®, RYANODEX®, BENDEKA®, BELRAPZO®, TREAKISYM® (Japan), and BYFAVO® and BARHEMSYS® through its wholly owned subsidiary Acacia Pharma Inc. Eagle's oncology and CNS/metabolic critical care pipeline includes product candidates with the potential to address underserved therapeutic areas across multiple disease states, and the company is focused on developing medicines with the potential to become part of the personalized medicine paradigm in cancer care. Additional information is available on Eagle's website at www.eagleus.com.

**Forward-Looking Statements Disclaimer**

This press release contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended, and other securities law. Forward-looking statements are statements that are not historical facts. Words and phrases such as "anticipated," "forward," "will," "would," "could," "may," "remain," "potential," "prepare," "expected," "believe," "plan," "and similar expressions are intended to identify forward-looking statements. These statements include, but are not limited to, statements with respect to: statements relating to the Company's SEC filings and the timing thereof, the potential submission of a plan to Nasdaq and the potential for Nasdaq to accept such plan or grant the Company an exception period or the success of any hearing process, and the Company's ability to regain compliance with the Nasdaq continued listing standards. All of such statements are subject to certain risks and uncertainties, many of which are difficult to predict and generally beyond the Company's control, that could cause actual results to differ materially from those expressed in, or implied or projected by, the forward-looking information and statements. Such risks and uncertainties include, but are not limited to: the completion of the review and preparation of the Company's financial statements and the timing thereof, the discovery of additional information, further delays in the Company's financial reporting, including as a result of unanticipated factors, the possibility that the Company is unable to regain compliance with, or thereafter continue to comply with, the Nasdaq Listing Rules, or experience violations of additional Nasdaq Listing Rules, the possibility that the Nasdaq may delist the Company's securities and the risks and uncertainties set forth in the sections entitled "Risk Factors" in the Company's Annual Report on Form 10-K for the year ended December 31, 2022, and in its Quarterly Reports on Form 10-Q for the quarters ended March 31, 2023 and June 30, 2023, as well as subsequent filings with the SEC. The Company does not give any assurance that it will achieve its expectations. Readers are cautioned not to place undue reliance on forward-looking statements. All forward-looking statements contained in this press release speak only as of the date on which they were made. Except to the extent required by law, the Company undertakes no obligation to update such statements to reflect events that occur or circumstances that exist after the date on which they were made.

**Investor Relations Contacts:**

Lisa Wilson
In-Site Communications, Inc.
917-543-9932
lwilson@insitecony.com

Timothy McCarthy, CFA
917-679-9282
tim@lifesciadvisors.com

EXHIBIT 16



## Eagle Pharmaceuticals Announces Management Change

November 29, 2023

*– CEO and Founder Scott Tarriff Retires –*

*– Chairman Michael Graves to Serve as Interim Executive Chairman –*

WOODCLIFF LAKE, N.J., Nov. 29, 2023 (GLOBE NEWSWIRE) -- Eagle Pharmaceuticals, Inc. (Nasdaq: EGRX) ("Eagle" or the "Company") today announced a change in management. Effective immediately Scott Tarriff, Founder, President and Chief Executive Officer of the Company, has announced his resignation and retirement from his positions with the Company as President, Chief Executive Officer and Director on the Company's Board of Directors. Michael Graves, Eagle Pharmaceuticals' Chairman of the Board, has assumed the role of Interim Executive Chairman of the Board to lead the management team through this transition. The Company will institute a CEO search for Mr. Tarriff's successor.

Michael ("Mike") Graves has served as a member of Eagle's Board of Directors since November 2013 and as Chairman of the Board since June 2016. Mr. Graves has extensive board experience and is currently Executive Chairman of the Board of Directors of Nanocopoeia, Inc. and a member of the Board of Managers of TopRx, LLC, both privately held companies. Mr. Graves previously served on the Board of Directors of RiboCor, Inc. From 2007 to 2011, Mr. Graves served as the Chief Executive Officer and President of Paddock Laboratories, Inc., a pharmaceutical company engaged in the manufacture, distribution and marketing of bioequivalent generic pharmaceuticals and specialty over-the-counter pharmaceutical products. From 2005 to 2006, Mr. Graves served as President of the Generic Products Division at Par Pharmaceutical Companies, Inc., a publicly-traded developer, manufacturer and marketer of specialty pharmaceuticals. While at Par, Mr. Graves progressed through a series of executive roles across marketing and sales, business development, corporate development and strategic planning, until his promotion to President of the Generic Products Division in 2005. Mr. Graves holds a B.S. from State University College of New York at Buffalo.

Michael Graves commented, "I look forward to leading the Company during this transition. We will institute an executive search to recruit a permanent replacement for a Chief Executive Officer."

### About Eagle Pharmaceuticals, Inc.

Eagle is a fully integrated pharmaceutical company with research and development, clinical, manufacturing and commercial expertise. Eagle is committed to developing innovative medicines that result in meaningful improvements in patients' lives. Eagle's commercialized products include PEMFEXY®, RYANODEX®, BENDEKA®, BELRAPZO®, TREAKISYM® (Japan), and BYFAVO® and BARHEMSYS® through its wholly owned subsidiary Acacia Pharma Inc. Eagle's oncology and CNS/metabolic critical care pipeline includes product candidates with the potential to address underserved therapeutic areas across multiple disease states, and the company is focused on developing medicines with the potential to become part of the personalized medicine paradigm in cancer care. Additional information is available on Eagle's website at www.eagleus.com.

### Forward-Looking Statements

This press release contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended, and other securities law. Forward-looking statements are statements that are not historical facts. Words and phrases such as "anticipated," "forward," "will," "would," "could," "may," "remain," "potential," "prepare," "expected," "believe," "plan," "near future," "belief," "guidance," and similar expressions are intended to identify forward-looking statements. These statements include, but are not limited to, statements with respect to the Company's expectations with respect to the management transition, including the Company's search for a new chief executive officer, and the potential of the Company's pipeline and product candidates to address underserved therapeutic areas across multiple disease states and the potential of its product candidates. All such statements are subject to certain risks and uncertainties, many of which are difficult to predict and generally beyond the Company's control, that could cause actual results to differ materially from those expressed in, or implied or projected by, the forward-looking information and statements. Such risks and uncertainties include, but are not limited to: the Company's reporting of financial and business results, the impacts of the post- COVID-19 environment and geopolitical factors such as the conflicts between Russia and Ukraine and Gaza and Israel; delay in or failure to obtain regulatory approval of the Company's or its partners' product candidates and successful compliance with FDA, European Medicines Agency and other governmental regulations applicable to product approvals; changes in the regulatory environment; the uncertainties and timing of the regulatory approval process; whether the Company can successfully market and commercialize its product candidates; the success of the Company's relationships with its partners; the outcome of litigation involving any of its products or that may have an impact on any of its products; the strength and enforceability of the Company's intellectual property rights or the rights of third parties; competition from other pharmaceutical and biotechnology companies and the potential for competition from generic entrants into the market; unexpected safety or efficacy data observed during clinical trials; clinical trial site activation or enrollment rates that are lower than expected; the risks inherent in drug development and in conducting clinical trials; risks inherent in estimates or judgments relating to the Company's critical accounting policies, or any of the Company's estimates or projections, which may prove to be inaccurate; the Company's ability to maintain its listing on the Nasdaq Stock Market; unanticipated factors in addition to the foregoing that may impact the Company's financial and business projections and guidance and may cause the Company's actual results and outcomes to materially differ from its projections and guidance; and those risks and uncertainties identified in the "Risk Factors" sections of the Company's Annual Report on Form 10-K for the year ended December 31, 2022, filed with the Securities and Exchange Commission (the "SEC") on March 23, 2023, the Company's Quarterly Reports on Form 10-Q for the quarter ended March 31, 2023, filed with the SEC on May 9, 2023, and for the quarter ended June 30, 2023, filed with the SEC on August 8, 2023, and its other subsequent filings with the SEC. Readers are cautioned not to place undue reliance on these forward-looking statements. All forward-looking statements contained in this press release speak only as of the date on which they were made. Except to the extent required by law, the Company undertakes no obligation to update such statements to reflect events that occur or circumstances that exist after the date on which they were made.

### Investor Relations Contacts:

Lisa Wilson
In-Site Communications, Inc.
917-543-9932

lwilson@insitecony.com

Timothy McCarthy, CFA
917-679-9282
tim@lifesciadvisors.com

EXHIBIT 17

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION

**Washington, D.C. 20549**

---

# FORM 8-K

---

### CURRENT REPORT
### Pursuant to Section 13 or 15(d)
### of the Securities Exchange Act of 1934

**Date of Report (Date of earliest event reported): December 12, 2023**

---

# Eagle Pharmaceuticals, Inc.
**(Exact Name of Registrant as Specified in its Charter)**

---

| | | |
|---|---|---|
| **Delaware** | **001 36306** | **20 8179278** |
| **(State or Other Jurisdiction** | **(Commission** | **(IRS Employer** |
| **of Incorporation)** | **File Number)** | **Identification No.)** |

| | |
|---|---|
| **50 Tice Boulevard, Suite 315** | |
| **Woodcliff Lake, NJ** | **07677** |
| **(Address of Principal Executive Offices)** | **(Zip Code)** |

**Registrant's telephone number, including area code: (201) 326-5300**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Stock, par value $0.001 per share | EGRX | The Nasdaq Stock Market LLC |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 2.02**          **Results of Operations and Financial Condition.**

The information appearing below under Item 4.02 is incorporated herein by reference.

**Item 4.02**          **Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

On December 12, 2023, the Audit Committee (the "Audit Committee") of the Board of Directors of Eagle Pharmaceuticals, Inc. (the "Company"), based on the recommendation of, and after consultation with, the Company's management concluded that the Company's previously issued unaudited interim condensed consolidated financial statements for the quarter ended June 30, 2023 (the "Non-Reliance Period"), as previously filed with the SEC, should no longer be relied upon and should be restated due to the matters described below. The Company's management and the Audit Committee have discussed the matters disclosed in this current report on Form 8-K with Ernst & Young LLP, the Company's independent registered public accounting firm.

As previously disclosed in the Company's Form NT 10-Q filed on November 9, 2023 (the "NT 10-Q"), the Company, in the course of preparing its interim financial statements for the quarter ended September 30, 2023, determined that it was necessary to review potential adjustments primarily relating to reserves for PEMFEXY® returns and price adjustments estimated in the amount of $15.0 million to $20.0 million (the "Estimated Adjustment Amount").

During its review, the Company discovered that reserves recorded in its financial statements for the quarter ended June 30, 2023 primarily relating to returns and price adjustments for PEMFEXY® did not reflect certain information that should have been considered at the time the Company prepared its financial statements for the quarter ended June 30, 2023. Had that information been considered, such reserves for the quarter ended June 30, 2023 would have increased, which would have reduced the Company's net product sales for the quarter ended June 30, 2023 by a corresponding amount. The expected increase in reserves for the quarter ended June 30, 2023 represents a portion of the Estimated Adjustment Amount. The Company is in the process of determining which portions of the Estimated Adjustment Amount will be allocated between the quarter ended June 30, 2023 and the quarter ended September 30, 2023. The Estimated Adjustment Amount takes into account other reserve corrections in the Non-Reliance Period. At this time, the Company has not fully completed its review, and the expected financial statement impacts are preliminary and subject to change.

As a result of the foregoing, the Company has identified material weaknesses in its internal control over financial reporting that existed as of June 30, 2023 and has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of June 30, 2023. Based on this assessment, the Company's disclosure controls and procedures were ineffective as of June 30, 2023. The Company is continuing to evaluate its internal control over financial reporting and will report its remediation plan and further information regarding the material weaknesses in an amendment to its previously filed Form 10-Q for the quarter ended June 30, 2023.

The Company intends to file an amendment to its previously filed Form 10-Q for the quarter ended June 30, 2023, which will include restated unaudited condensed consolidated financial statements for the three and six months ended June 30, 2023. The Company is continuing to assess the Estimated Adjustment Amount and any other potential items for correction as needed. Any previously issued or filed reports, press releases, earnings releases, stockholder communications, investor presentations or other communications describing the Company's financial statements, financial results and other related financial information covering such period and any information related to the matters described above, should no longer be relied upon. In addition, the Company previously disclosed that it expected to revise its previously disclosed full year 2023 guidance downward and accordingly, such guidance should no longer be relied upon. The Company continues to work diligently on its review and preparation of the Form 10-Q for the quarter ended September 30, 2023.

The foregoing expectations are based on preliminary unaudited financial information and subject to change in connection with the completion of the reporting process and preparation of the Company's financial statements, and actual results may vary significantly from the foregoing expectations.

In addition, under the terms of the Third Amended and Restated Credit Agreement (the "Credit Agreement") among the Company, the lenders party thereto and JPMorgan Chase Bank, N.A., as administrative agent (the "Administrative Agent"), the Company was required to deliver to the Administrative Agent and lenders, by not later than November 14, 2023, quarterly financial statements certified by one of its officers as presenting fairly in all material respects the financial condition and results of operations of the Company and its consolidated subsidiaries for the fiscal quarter ended September 30, 2023 (the "September 2023 Financials") pursuant to a covenant requiring delivery of quarterly financials within 45 days of the end of each of the first three fiscal quarters of each fiscal year. The Company failed to timely deliver the September 2023 Financials, which such failure constituted a default under the Credit Agreement, subject to a 30-day cure period ending December 14, 2023. The Company failed to timely deliver the September 2023 Financials and accordingly failed to cure such default within the 30-day cure period, which gave rise to an event of default under the Credit Agreement.

Further, in connection with the restatement of the financial statements for the quarter ended June 30, 2023 (the "June 2023 Financials"), the Company has concluded that the June 2023 Financials previously delivered to the Administrative Agent and lenders did not present fairly in all material respects the financial condition and results of operations of the Company and its consolidated subsidiaries for the reasons described above and were not prepared in accordance with generally accepted accounting principles, which gave rise to an event of default under the Credit Agreement.

During the continuance of an event of default, the Administrative Agent may, with the consent of the required lenders, and shall, at the request of the required lenders, by notice to the Company, terminate undrawn commitments, declare the loans then outstanding to be due and payable in full and/or exercise other remedies available to it, among other things. In addition, the Company's obligations under the Credit Agreement are secured by a pledge of substantially all of the Company's assets. If the Company is unable to pay its obligations, the Administrative Agent on behalf of the lenders could proceed to protect and enforce their rights under the Credit Agreement, including by foreclosure on the assets securing the Company's obligations under the Credit Agreement. The foregoing would materially and adversely affect the Company's business and financial condition.

The Company is in the process of seeking waivers of, and amendments related to, the foregoing events of default under the Credit Agreement. However, there can be no assurance that the Company will be able to obtain such waivers or amendments.

**Forward-Looking Statements**

This current report on Form 8-K contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended, and other securities law. Forward-looking statements are statements that are not historical facts. Words and phrases such as "anticipated," "forward," "will," "would," "could," "may," "intend," "remain," "potential," "prepare," "expected," "believe," "plan," "seek," "continue," "estimate," "and similar expressions are intended to identify forward-looking statements. These statements include, but are not limited to, statements with respect to: the expected adjustments to the Company's financial statements, including the estimated amount and impact of adjustments on the Company's financial statements, expectations with respect to the Company's guidance, expectations with respect to the Company's internal control over financial reporting and disclosure controls and procedures and related remediation, the potential for additional adjustments to the Company's financial statements, the Company's expectations with respect to its events of default under the Credit Agreement and its ability to seek waivers or amendments related thereto, the potential actions that the Administrative Agent on behalf of the lenders could take to protect and enforce their rights under the Credit Agreement, and the expected filing of an amendment to the Company's Form 10-Q for the quarter ended June 30, 2023 and a Form 10-Q for the quarter ended September 30, 2023. All of such statements are subject to certain risks and uncertainties, many of which are difficult to predict and generally beyond the Company's control, that could cause actual results to differ materially from those expressed in, or implied or projected by, the forward-looking information and statements. Such risks and uncertainties include, but are not limited to: the completion of the review and preparation of the Company's financial statements and internal control over financial reporting and disclosure controls and procedures and the timing thereof; the discovery of additional information; further delays in the Company's financial reporting, including as a result of unanticipated factors; the Company's ability to obtain necessary waivers or amendments to the Credit Agreement; the possibility that the Company is unable to regain compliance with, or thereafter continue to comply with, the Nasdaq Listing Rules, or experience violations of additional Nasdaq Listing Rules; the possibility that the Nasdaq may delist the Company's securities; the Company's ability to remediate material weaknesses in its internal control over financial reporting; the Company's ability to recruit and hire a new Chief Executive Officer; the impacts of the post- COVID-19 environment and geopolitical factors such as the conflicts between Russia and Ukraine and Gaza and Israel; delay in or failure to obtain regulatory approval of the Company's or its partners' product candidates and successful compliance with Federal Drug Administration, European Medicines Agency and other governmental regulations applicable to product approvals; changes in the regulatory environment; the uncertainties and timing of the regulatory approval process; whether the Company can successfully market and commercialize its products; the success of the Company's relationships with its partners; the outcome of litigation; the strength and enforceability of the Company's intellectual property rights or the rights of third parties; competition from other pharmaceutical and biotechnology companies and the potential for competition from generic entrants into the market; unexpected safety or efficacy data observed during clinical trials; clinical trial site activation or enrollment rates that are lower than expected; the risks inherent in drug development and in conducting clinical trials; risks inherent in estimates or judgments relating to the Company's critical accounting policies, or any of the Company's estimates or projections, which may prove to be inaccurate; unanticipated factors in addition to the foregoing that may impact the Company's financial and business projections and guidance and may cause the Company's actual results and outcomes to materially differ from its estimates, projections and guidance; and those risks and uncertainties identified in the "Risk Factors" sections of the Company's Annual Report on Form 10-K for the year ended December 31, 2022, filed with the Securities and Exchange Commission (the "SEC") on March 23, 2023, the Company's Quarterly Reports on Form 10-Q for the quarter ended March 31, 2023, filed with the SEC on May 9, 2023, and for the quarter ended June 30, 2023, filed with the SEC on August 8, 2023, and its other subsequent filings with the SEC. Readers are cautioned not to place undue reliance on these forward-looking statements. All forward-looking statements contained in this current report on Form 8-K speak only as of the date on which they were made. Except to the extent required by law, the Company undertakes no obligation to update such statements to reflect events that occur or circumstances that exist after the date on which they were made.

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: December 15, 2023

**EAGLE PHARMACEUTICALS, INC.**

By: /s/ Brian Cahill
Brian Cahill
*Chief Financial Officer*

EXHIBIT 18



## Eagle Pharmaceuticals Announces Receipt of Notification of Deficiency from Nasdaq Regarding Requirement to Timely File Annual Report on Form 10-K

April 12, 2024

WOODCLIFF LAKE, N.J., April 12, 2024 (GLOBE NEWSWIRE) -- Eagle Pharmaceuticals, Inc. (Nasdaq: EGRX) (the "Company") today announced that it received a notice (the "Notice") on April 8, 2024 from the Listing Qualifications Department of The Nasdaq Stock Market LLC ("Nasdaq") advising the Company that due to the Company's failure to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2023 (the "Form 10-K"), with the Securities and Exchange Commission (the "SEC"), the Company is not in compliance with Nasdaq's continued listing requirements under Nasdaq Listing Rule 5250(c)(1) (the "Rule"), which requires the timely filing of all required periodic reports with the SEC.

As previously disclosed, on November 27, 2023, the Company received a separate delinquency notification (the "Initial Notice") from the Listing Qualifications Department of Nasdaq advising the Company that due to the failure to timely file its Quarterly Report on Form 10-Q for the quarter ended September 30, 2023 (the "Form 10-Q"), the Company is not in compliance with the Rule. In the Initial Notice, Nasdaq provided the Company 60 days, or until January 26, 2024, to submit to Nasdaq a plan to regain compliance with the Rule (the "Plan"). On February 8, 2024, following timely submission of the Plan, Nasdaq notified the Company that it was granted an extension of 180 calendar days from the due date of the Form 10-Q, or until May 13, 2024, to regain compliance with the Rule.

The Company must submit an update to the Plan by April 23, 2024, to include the Company's plans to file the Form 10-K, and the Company plans to include in such update that the Company believes it is unlikely that it will file the Form 10-Q or the Form 10-K by the May 13, 2024, extension deadline. Pursuant to the Initial Notice, if the Company fails to regain compliance prior to the expiration of such extension period, Nasdaq would provide written notification that the Company's securities would be subject to delisting. However, in response to the Company's updated Plan, Nasdaq may determine that the Company will not be able to become current in its filing obligations by the May 13, 2024, extension deadline and could accelerate the issuance of a delisting notice. In the event the Company receives such a delisting notice, the Company may request a hearing before an independent Nasdaq Hearings Panel (the "Panel"). The hearing request would automatically stay any suspension or delisting action for 22 calendar days from the date of the delisting notification. In connection with the hearing request, the Company may request that the stay be extended through the conclusion of the hearings process and the expiration of any additional extension period granted by the Panel following the hearing.

There can be no assurance that any hearing would be successful, that an extended stay or additional extension would be granted, that the Company will be able to regain compliance with the Rule or maintain compliance with the other continued listing requirements set forth in the Nasdaq Listing Rules or that the Company will be able to continue its listing on Nasdaq.

**About Eagle Pharmaceuticals, Inc.**

Eagle is a fully integrated pharmaceutical company with research and development, clinical, manufacturing and commercial expertise. Eagle is committed to developing innovative medicines that result in meaningful improvements in patients' lives. Eagle's commercialized products include PEMFEXY®, RYANODEX®, BENDEKA®, BELRAPZO®, TREAKISYM® (Japan), and BYFAVO® and BARHEMSYS® through its wholly owned subsidiary Acacia Pharma Inc. Eagle's oncology and CNS/metabolic critical care pipeline includes product candidates with the potential to address underserved therapeutic areas across multiple disease states, and the company is focused on developing medicines with the potential to become part of the personalized medicine paradigm in cancer care. Additional information is available on Eagle's website at www.eagleus.com.

**Forward-Looking Statements Disclaimer**

This press release contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended, and other securities law. Forward-looking statements are statements that are not historical facts. Words and phrases such as "anticipated," "forward," "will," "would," "could," "may," "intend," "remain," "potential," "prepare," "expected," "believe," "plan," "seek," "continue," "estimate," "and similar expressions are intended to identify forward-looking statements. These statements include, but are not limited to, statements with respect to: statements relating to the Company's SEC filings and the timing thereof, any plans or updates to plans to regain compliance that the Company may submit to Nasdaq, the potential to obtain any additional extensions or stays from Nasdaq, the Company's ability to regain or maintain compliance with the Nasdaq Listing Rules or continue its listing on Nasdaq, and the outcome of any hearing process, the Company's internal control controls and procedures and related remediation, the expected restatement of financial statements, the time and effort required to complete the Company's financial statements, expectations with respect to filings with the SEC and the timing and content thereof, and the Company's expectations regarding its financial results. All of such statements are subject to certain risks and uncertainties, many of which are difficult to predict and generally beyond the Company's control, that could cause actual results to differ materially from those expressed in, or implied or projected by, the forward-looking information and statements. Such risks and uncertainties include, but are not limited to: the completion of the review and preparation of the Company's financial statements and internal control over financial reporting and disclosure controls and procedures and the timing thereof; the discovery of additional information; further delays in the Company's financial reporting, including as a result of unanticipated factors; the Company's ability to comply with its obligations under its credit agreement; the possibility that the Company will be unable to regain compliance with, or thereafter continue to comply with, the Nasdaq Listing Rules, or experience violations of additional Nasdaq Listing Rules; the possibility that the Nasdaq may delist the Company's securities; the Company's ability to remediate material weaknesses in its internal control over financial reporting; the Company's ability to recruit and hire a new Chief Executive Officer and new Chief Financial Officer; the ability of the Company to realize the anticipated benefits of its plan designed to improve operational efficiencies and realign its sales and marketing expenditures and the potential impacts thereof; the impacts of the post- COVID-19 environment and geopolitical factors such as the conflicts between Russia and Ukraine and Gaza and Israel; delay in or failure to obtain regulatory approval of the Company's or its partners' product candidates and successful compliance with Federal Drug Administration, European Medicines Agency and other governmental regulations applicable to product approvals; changes in the regulatory environment; the uncertainties and timing of the regulatory approval process; whether the Company can successfully market and commercialize its products; the success of the Company's relationships with its partners; the outcome of litigation; the strength and enforceability of the Company's intellectual property rights or the rights of third parties; competition from other pharmaceutical and biotechnology companies and competition from generic entrants into the market; unexpected safety or efficacy data observed during clinical trials; clinical trial site activation or enrollment rates that are lower than expected; the risks inherent in drug development and

in conducting clinical trials; risks inherent in estimates or judgments relating to the Company's critical accounting policies, or any of the Company's estimates or projections, which may prove to be inaccurate; unanticipated factors in addition to the foregoing that may impact the Company's financial and business projections and guidance and may cause the Company's actual results and outcomes to materially differ from its estimates, projections and guidance; and those risks and uncertainties identified in the "Risk Factors" sections of the Company's Annual Report on Form 10-K for the year ended December 31, 2022, filed with the SEC on March 23, 2023, the Company's Quarterly Reports on Form 10-Q for the quarter ended March 31, 2023, filed with the SEC on May 9, 2023, and for the quarter ended June 30, 2023, filed with the SEC on August 8, 2023, and its other subsequent filings with the SEC. Readers are cautioned not to place undue reliance on these forward-looking statements. All forward-looking statements contained in this press release speak only as of the date on which they were made. Except to the extent required by law, the Company undertakes no obligation to update such statements to reflect events that occur or circumstances that exist after the date on which they were made.

**Investor Relations Contact**

**Investor Relations for Eagle Pharmaceuticals, Inc.:**
Lisa M. Wilson
In-Site Communications, Inc.
212-452-2793
lwilson@insitecony.com

Timothy McCarthy, CFA
917-679-9282
tim@lifesciadvisors.com

EXHIBIT 19



## Eagle Pharmaceuticals Announces Receipt of Delisting Notification from Nasdaq

May 22, 2024

WOODCLIFF LAKE, N.J., May 22, 2024 (GLOBE NEWSWIRE) -- Eagle Pharmaceuticals, Inc. (Nasdaq: EGRX) (the "Company" or "Eagle") today announced that it received a notice (the "Notice") on May 20, 2024, from the Listing Qualifications Department (the "Staff") of The Nasdaq Stock Market LLC ("Nasdaq") advising the Company that it has initiated a process to delist the Company's securities from Nasdaq because the Company had not filed its Form 10-Q for the quarter ended September 30, 2023 (the "Q3 2023 Form 10-Q") and its Form 10-K for the year ended December 31, 2023 (the "2023 Form 10-K") by May 13, 2024. The Notice further advises the Company that, pursuant to Nasdaq Listing Rule 5810(d)(2), the Company's failure to timely file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2024 (the "Q1 2024 Form 10-Q") serves as an additional and separate basis for delisting.

Unless the Company requests a hearing to appeal the delisting process by May 28, 2024, trading of the Company's common stock will be suspended from The Nasdaq Capital Market at the opening of business on May 30, 2024, and will subsequently be removed from listing. Accordingly, the Company intends to timely request a hearing before a Nasdaq Hearings Panel (the "Panel"). The hearing request will automatically stay the suspension of the Company's common stock for 15 calendar days from the date of the request, or 22 calendar days from the date of the Notice if the request is filed on May 28, 2024. In connection with the hearing request, the Company intends to request that the stay be extended through the conclusion of the hearings process and the expiration of any additional extension period granted by the Panel following the hearing. In that regard, pursuant to the Nasdaq Listing Rules, the Panel may grant an additional extension period not to exceed 360 days from the initial due date of the Q3 2023 Form 10-Q.

There can be no assurance that any hearing before the Panel would be successful, that an extended stay or additional extension would be granted, that the Company will be able to regain compliance with the Rule or maintain compliance with the other continued listing requirements set forth in the Nasdaq Listing Rules or that the Company will be able to continue its listing on Nasdaq.

As previously disclosed, on November 27, 2023, the Company received a delinquency notification from the Staff advising the Company that due to the failure to timely file its Q3 2023 Form 10-Q, the Company is not in compliance with Nasdaq's continued listing requirements under Nasdaq Listing Rule 5250(c)(1) (the "Rule"). In accordance with Nasdaq rules, following timely submission by the Company of a compliance plan, Nasdaq granted the Company until May 13, 2024, to regain compliance with the Rule. On April 8, 2024, the Company received an additional notice from Nasdaq advising the Company that due to the Company's failure to timely file its 2023 Form 10-K, the Company is not in compliance with the Rule. On May 10, 2024, the Company filed a Notification of Late Filing on Form 12b-25 with respect to its Q1 2024 Form 10-Q.

### About Eagle Pharmaceuticals, Inc.

Eagle is a fully integrated pharmaceutical company with research and development, clinical, manufacturing and commercial expertise. Eagle is committed to developing innovative medicines that result in meaningful improvements in patients' lives. Eagle's commercialized products include PEMFEXY®, RYANODEX®, BENDEKA®, BELRAPZO®, TREAKISYM® (Japan), and BYFAVO® and BARHEMSYS® through its wholly owned subsidiary Acacia Pharma Inc. Eagle's oncology and CNS/metabolic critical care pipeline includes product candidates with the potential to address underserved therapeutic areas across multiple disease states, and the company is focused on developing medicines with the potential to become part of the personalized medicine paradigm in cancer care. Additional information is available on Eagle's website at www.eagleus.com.

### Forward-Looking Statements Disclaimer

This press release contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended, and other securities law. Forward-looking statements are statements that are not historical facts. Words and phrases such as "anticipated," "forward," "will," "would," "could," "may," "intend," "remain," "potential," "prepare," "expected," "believe," "plan," "seek," "continue," "estimate," and similar expressions are intended to identify forward-looking statements. These statements include, but are not limited to, statements with respect to: the Company's SEC filings and the timing thereof, any requests or communications the Company may submit to Nasdaq for a hearing, appeal, stay or otherwise, the potential to obtain any additional extensions or stays from Nasdaq, and the Company's ability to regain or maintain compliance with the Nasdaq Listing Rules or continue its listing on Nasdaq, and the outcome of any hearing process, the Company's internal control over financial reporting and disclosure controls and procedures and related remediation, the expected restatement of financial statements, the time and effort required to complete the Company's financial statements, expectations with respect to filings with the SEC and the timing and content thereof, and the Company's expectations regarding its financial results. All of such statements are subject to certain risks and uncertainties, many of which are difficult to predict and generally beyond the Company's control, that could cause actual results to differ materially from those expressed in, or implied or projected by, the forward-looking information and statements. Such risks and uncertainties include, but are not limited to: the completion of the review and preparation of the Company's financial statements and internal control over financial reporting and disclosure controls and procedures and the timing thereof; the discovery of additional information; further delays in the Company's financial reporting, including as a result of unanticipated factors; the Company's ability to comply with its obligations under its credit agreement; the possibility that the Company will be unable to regain compliance with, or thereafter continue to comply with, the Nasdaq Listing Rules, or experience violations of additional Nasdaq Listing Rules; the possibility that Nasdaq may delist the Company's securities; the Company's ability to remediate material weaknesses in its internal control over financial reporting; the Company's ability to recruit and hire a new Chief Executive Officer and new Chief Financial Officer; the ability of the Company to realize the anticipated benefits of its plan designed to improve operational efficiencies and realign its sales and marketing expenditures and the potential impacts thereof; the impacts of the post- COVID-19 environment and geopolitical factors such as the conflicts between Russia and Ukraine and Hamas and Israel; delay in or failure to obtain regulatory approval of the Company's or its partners' product candidates and successful compliance with Federal Drug Administration, European Medicines Agency and other governmental regulations applicable to product approvals; changes in the regulatory environment; the uncertainties and timing of the regulatory approval process; whether the Company can successfully market and commercialize its products; the success of the Company's relationships with its partners; the outcome of litigation; the strength and enforceability of the Company's intellectual property rights or the rights of third parties; competition from other pharmaceutical and biotechnology companies and competition from generic entrants into the market; unexpected safety or efficacy data observed during clinical trials; clinical trial site activation or enrollment rates that are lower

than expected; the risks inherent in drug development and in conducting clinical trials; risks inherent in estimates or judgments relating to the Company's critical accounting policies, or any of the Company's estimates or projections, which may prove to be inaccurate; unanticipated factors in addition to the foregoing that may impact the Company's financial and business projections and guidance and may cause the Company's actual results and outcomes to materially differ from its estimates, projections and guidance; and those risks and uncertainties identified in the "Risk Factors" sections of the Company's Annual Report on Form 10-K for the year ended December 31, 2022, filed with the SEC on March 23, 2023, the Company's Quarterly Reports on Form 10-Q for the quarter ended March 31, 2023, filed with the SEC on May 9, 2023, and for the quarter ended June 30, 2023, filed with the SEC on August 8, 2023, and its subsequent filings with the SEC. Readers are cautioned not to place undue reliance on these forward-looking statements. All forward-looking statements contained in this press release speak only as of the date on which they were made. Except to the extent required by law, the Company undertakes no obligation to update such statements to reflect events that occur or circumstances that exist after the date on which they were made.

**Investor Relations Contact**

Timothy McCarthy, CFA
917-679-9282
tim@lifesciadvisors.com

Lisa M. Wilson
212-452-2793
lwilson@insitecony.com

EXHIBIT 20



## Eagle Announces Update on Delisting from Nasdaq and SEC Deregistration

November 15, 2024

WOODCLIFF LAKE, N.J., Nov. 15, 2024 (GLOBE NEWSWIRE) -- **Eagle Pharmaceuticals, Inc.** (Nasdaq and OTCMKTS: EGRX) (the "Company" or "Eagle") today announced that it has notified The Nasdaq Stock Market, LLC ("Nasdaq") of its intent to file its own Form 25 (Notification of Removal of Listing) with the U.S. Securities and Exchange Commission (the "SEC") to complete the previously-disclosed process to delist the Company's common stock, par value $0.001 per share (the "Common Stock"), from the Nasdaq Global Market in advance of Nasdaq's anticipated filing of a Form 25 with the SEC.

As previously disclosed, the Common Stock was suspended from trading on Nasdaq as of October 3, 2024, pursuant to a final delisting notice sent to the Company by the Listing Qualifications Department of Nasdaq due to the Company's inability to regain compliance with Nasdaq Listing Rule 5250(c)(1). The Common Stock has been trading on the OTC Expert Market since October 4, 2024 in connection with its suspension from trading on Nasdaq. The Company currently anticipates that it will file its own Form 25 with the SEC on or after November 25, 2024, which would complete the process for delisting its Common Stock from Nasdaq when the Form 25 becomes effective no earlier than ten days thereafter. The Form 25 would also serve to deregister the Common Stock under Section 12(b) of the Securities Exchange Act of 1934, as amended, effective 90 days thereafter, which would reduce certain SEC reporting obligations.

### About Eagle Pharmaceuticals, Inc.

Eagle is a fully integrated pharmaceutical company with research and development, clinical, manufacturing and commercial expertise. Eagle is committed to developing innovative medicines that result in meaningful improvements in patients' lives. Eagle's commercialized products include PEMFEXY®, RYANODEX®, BENDEKA®, BELRAPZO®, TREAKISYM® (Japan), and BYFAVO® and BARHEMSYS® through its wholly owned subsidiary Acacia Pharma Inc. Eagle's oncology and CNS/metabolic critical care pipeline includes product candidates with the potential to address underserved therapeutic areas across multiple disease states, and the company is focused on developing medicines with the potential to become part of the personalized medicine paradigm in cancer care. Additional information is available on Eagle's website at www.eagleus.com.

### Forward-Looking Statements

This press release contains "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended, and other securities law. Forward-looking statements are statements that are not historical facts. Words and phrases such as "anticipated," "forward," "will," "would," "could," "may," "intend," "remain," "regain," "maintain," "potential," "prepare," "expected," "believe," "plan," "seek," "continue," "goal," "estimate," and similar expressions are intended to identify forward-looking statements. These statements include, but are not limited to, statements with respect to the Company's plans with respect to the delisting and deregistration of its Common Stock and the timing thereof. All of such statements are subject to certain risks and uncertainties, many of which are difficult to predict and generally beyond the Company's control, which could cause actual results to differ materially from those expressed in, or implied or projected by, the forward-looking information and statements. Such risks and uncertainties include, but are not limited to: the completion of the review and preparation of the Company's financial information and internal control over financial reporting and disclosure controls and procedures and the timing thereof; the discovery of additional information; further delays in the Company's financial reporting, including as a result of unanticipated factors; the Company's ability to obtain resolution with respect to the events of default under its Third Amended and Restated Credit Agreement, as amended; the Company's ability to obtain financing and the timing and potential terms thereof; whether the objectives of the Company's review of potential financing and other alternatives will be achieved, the terms, structure, benefits and costs of any arrangement or transaction resulting therefrom, and whether any transaction will be consummated at all; the extent to which the rights under the Company's stockholder rights agreement become exercisable, if at all; the risk that the Company's review of potential financing and other alternatives and its announcement could have an adverse effect on the ability of the Company to retain customers and retain and hire key personnel and maintain relationships with customers, suppliers, employees, stockholders and other relationships and on its operating results and business generally; the risk that the Company's review of potential financing and other alternatives could divert the attention and time of the Company's management; the costs resulting from the review of potential financing and other alternatives; the risk of the Company potentially seeking protection under bankruptcy laws; the possibility that the Company will be unable to re-list its common stock on the Nasdaq or another exchange and, if re-listed, the possibility that the Company thereafter will be unable to comply with the listing rules of such exchange; the limitations on trading of the Company's common stock related to the Company's trading on the OTC Expert Market; the impact on the price of the Company's common stock and the Company's reputation; the Company's ability to remediate material weaknesses in its internal control over financial reporting; the Company's ability to recruit and hire a new Chief Executive Officer and retain key personnel; the ability of the Company to realize the anticipated benefits of its plan designed to improve operational efficiencies and realign its sales and marketing expenditures and the impacts thereof; the Company's reliance on third parties to manufacture commercial supplies of its products and clinical supplies of its product candidates; the impacts of geopolitical factors such as the conflicts between Russia and Ukraine and Hamas, Iran and Israel; delay in or failure to obtain regulatory approval of the Company's or its partners' product candidates and successful compliance with Federal Drug Administration, European Medicines Agency and other governmental regulations applicable to product approvals; changes in the regulatory environment; the uncertainties and timing of the regulatory approval process; whether the Company can successfully market and commercialize its products; the success of the Company's relationships with its partners; the outcome of litigation and other legal proceedings and the risk of additional litigation and legal proceedings, including with respect to the matters referenced herein; the strength and enforceability of the Company's intellectual property rights or the rights of third parties; competition from other pharmaceutical and biotechnology companies and competition from generic entrants into the market; unexpected safety or efficacy data observed during clinical trials; clinical trial site activation or enrollment rates that are lower than expected; the risks inherent in drug development and in conducting clinical trials; risks inherent in estimates or judgments relating to the Company's critical accounting policies, or any of the Company's estimates or projections, which may prove to be inaccurate; unanticipated factors in addition to the foregoing that may impact the Company's financial and business projections and may cause the Company's actual results and outcomes to materially differ from its estimates and projections; and those risks and uncertainties identified in the "Risk Factors" sections of the Company's Annual Report on Form 10-K for the year ended December 31, 2022, filed with the SEC on March 23, 2023, the Company's Quarterly Reports on Form 10-Q for the quarter ended March 31, 2023, filed with the SEC on May 9, 2023, and for the quarter ended June 30, 2023, filed with the SEC on August 8, 2023, and its subsequent filings with the SEC. Readers are cautioned not to place undue reliance on these

forward-looking statements. All forward-looking statements contained in this press release speak only as of the date on which they were made. Except to the extent required by law, the Company undertakes no obligation to update such statements to reflect events that occur or circumstances that exist after the date on which they were made.

**Investor Relations Contact**

Lisa M. Wilson
T: 212-452-2793
E: lwilson@insitecony.com

Timothy McCarthy, CFA
T: 917-679-9282
E: tim@lifesciadvisors.com

# EXHIBIT 21
# REDACTED IN ITS ENTIRETY

# EXHIBIT 22
# REDACTED IN ITS
# ENTIRETY

# EXHIBIT 23

James E. Cecchi
Donald A. Ecklund
Kevin G. Cooper
CARELLA, BYRNE, CECCHI,
   BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
jcecchi@carellabyrne.com
decklund@carellabyrne.com
kcooper@carellabyrne.com

*Liaison Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NICHOLAS MILLER, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> EAGLE PHARMACEUTICALS, INC., SCOTT TARRIFF, and BRIAN CAHILL, <br><br> Defendants. | Case No. 2:23-CV-23011-JKS-MAH <br><br> **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION AND OVERVIEW ......................................... 1

II.     JURISDICTION AND VENUE ................................................................... 5

III.    PARTIES ..................................................................................................... 6

IV.     BACKGROUND ......................................................................................... 8

        A.      Since Its February 2022 Launch Pemfexy Was Critically
                Important To Eagle's Business ........................................................8

        B.      Demand For Pemfexy Plummeted As Initial Stocking Ceased
                And Generic Competitors Entered The Market .................................12

V.      DEFENDANTS SECRETLY IMPLEMENTED A CHANNEL
        STUFFING SCHEME FOR PEMFEXY AND FALSIFIED EAGLE'S
        FINANCIAL STATEMENTS..................................................................... 14

        A.      In Q2 2022 Defendants Began Their "Buy And Hold" Program
                To Deceptively Boost Pemfexy Revenue ...........................................15

        B.      Eagle Admits That Its Financial Reporting For Pemfexy Sales
                Did Not Comply With GAAP And Must Be Restated.......................20

        C.      GAAP Accounting Rules Prohibited Recognition Of Revenue
                From The Pemfexy Channel Stuffing ...............................................24

VI.     MATERIALLY FALSE AND MISLEADING STATEMENTS
        ISSUED DURING THE CLASS PERIOD................................................ 29

        A.      August 9, 2022, Eagle Q2 2022 Results ...........................................29

        B.      November 7-9, 2022, Eagle Q3 2022 Results....................................33

        C.      March 13-23, 2023, Eagle Q4 And Full Year 2022 Results..............38

        D.      May 9, 2023, Eagle Q1 2023 Results................................................43

        E.      August 8, 2023, Eagle Q2 2023 Results ...........................................45

VII.    THE TRUTH IS REVEALED, CAUSING LARGE DECLINES IN
        EAGLE'S STOCK PRICE ....................................................................... 50

i

A.    Eagle's Q1 2023 Results Revealed Dwindling Cash And Growing Debt, Exacerbated By The Sham Pemfexy Sales ................50

B.    On November 9, 2023, Eagle Announced Delayed Q3 2023 Results To Review Its Accounting For Pemfexy Sales ......................53

C.    On November 29, 2023, Eagle Announced The "Resignation" Of Defendant Tarriff................................................................55

D.    Eagle's Business Languished As New Management Spent Months Evaluating The Falsified Financial Statements ....................55

E.    On October 2, 2024, Eagle Revealed That Its Financial Statements From Q2 2022 Forward Should Not Be Relied Upon......61

VIII.  POST-CLASS PERIOD EVENTS ................................................................ 63

A.    Defendant Tarriff's Court Filings Reveal The SEC's Investigation ................................................................................63

B.    Eagle Dismisses Its External Auditor Ernst & Young LLP................66

C.    Eagle Delists Its Stock From The NASDAQ And Ceases SEC Reporting ..................................................................................67

IX.  ADDITIONAL SCIENTER ALLEGATIONS ............................................. 68

A.    Defendant Tarriff Directly Carried Out The Channel Stuffing Scheme And Ignored Repeated Warnings Not To ..............................68

B.    Defendants Tarriff And Cahill Had In-Depth Knowledge Of Eagle's Pemfexy Accounting And Customer Inventories .................69

C.    Defendant Tarriff Sold At Least $1.8 Million Of Eagle Stock During The Class Period ................................................................71

D.    Material Amounts Of Defendants' Incentive Compensation Depended On Pemfexy Sales And Eagle's Stock Price......................75

E.    Defendants Had A Motive To Reduce The Deficit From Tarriff's Aggressive 2Q 2022 Financial Guidance...........................................77

F.    Defendant Tarriff Was Desperate To Increase Pemfexy Sales, Even Resorting To Illegal And Unethical Conduct ..........................79

G.      Defendants Tarriff And Cahill Both "Resigned" Under Suspect
        Circumstances ...................................................................................81

H.      The Allegations In The Moran Complaint Are Highly Reliable ........82

X.      CLASS ACTION ALLEGATIONS.............................................................. 87

XI.     LOSS CAUSATION ..................................................................................... 89

XII.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-
        ON-THE-MARKET DOCTRINE) ................................................................ 89

XIII.   NO SAFE HARBOR ..................................................................................... 92

XIV.    FIRST CLAIM.............................................................................................. 92

XV.     SECOND CLAIM ......................................................................................... 93

XVI.    PRAYER FOR RELIEF ................................................................................ 94

XVII.   JURY TRIAL DEMANDED.......................................................................... 94

## EXHIBIT LIST

Exhibit 1 –   Certification of Lead Plaintiff Evans Associates I, LLC

Exhibit 2 –   Certification of Additional Named Plaintiff Nicholas Miller

Exhibit 3 –   Certification of Additional Named Plaintiff Liyu Wang

Exhibit 4 –   Certification of Additional Named Plaintiff Joanna Pluta

Exhibit 5 –   Complaint And Demand For Jury Trial, *Moran v. Eagle
              Pharmaceuticals, Inc.*, D.N.J. Case No. 2:23-cv-03761, Dkt No. 1
              (the "Moran Complaint")

Lead plaintiff Evans Associates I, LLC ("Lead Plaintiff") and additional named plaintiffs Nicholas Miller, Liyu Wang, and Joanna Pluta (together, "Plaintiffs), individually and on behalf of all others similarly situated, by and through their attorneys, allege the following based upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by Defendant Eagle Pharmaceuticals, Inc. ("Eagle" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases, media reports, presentations, and conference calls issued and disseminated by Eagle; (c) review and analysis of documents filed in other legal actions involving Eagle and/or Defendant Scott Tarriff; (d) consultation with an accounting expert; (e) interviews with former employees of Eagle; and (f) review of other information concerning Eagle.

## I.  NATURE OF THE ACTION AND OVERVIEW

1. This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased the publicly traded common stock of Eagle between August 9, 2022 and October 1, 2024, both dates inclusive (the "Class Period"), and who were damaged thereby. Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to

1

pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.      Eagle has failed its most basic duties to investors, and is a company mired in the after-effects of an accounting fraud directly conceived and implemented by its former CEO, Defendant Scott Tarriff. Eagle's board carried out an internal investigation into Tarriff's fraud, forced him to resign, and reserved the right to terminate him with cause if he did not resign. Eagle has admitted that its financial statements do not comply with GAAP and has told investors and the SEC not to rely on its financial statements. Eagle has likewise admitted to material weaknesses in its internal controls over financial reporting, and that such controls were ineffective. Despite repeated promises that it would correct the falsified financial statements Eagle has failed to do so, though it is now more than 18 months since the Company forced Tarriff's departure following its internal investigation.

3.      Since pressuring Tarriff to resign, Eagle has fired at least 36% of its employees, dismissed its external auditors, delisted its stock from the NASDAQ, and deregistered its securities with the SEC to avoid providing *any* disclosures to shareholders (*i.e.* "going dark"). Eagle's stock has lost over 90% of its value from its Class Period highs. Evidently, Eagle is a company with deep-rooted problems, and Tarriff's fraud has proven difficult to unravel. While Eagle has thus far avoided disclosing the full truth of the fraud, the Company's former third highest-ranking

officer, whom Tarriff himself called an "exceptional sales leader with a lengthy record of success in this industry," has come forward to correct the record in a whistleblower lawsuit that credibly recounts Tarriff's scheme in vivid detail.

4.      During the Class Period, Eagle was a pharmaceutical company engaged in research and development, clinical, manufacturing and commercial operations. Eagle had eight FDA-approved products including Pemfexy. Pemfexy is Eagle's brand name for its pemetrexed (the medication's generic name) for intravenous injection product. Pemfexy, and pemetrexed more generally, is a chemotherapy medication used to treat certain cancers.

5.      Eagle began selling Pemfexy in February 2022, and it quickly became one of the Company's most important products, if not the most important product. In the first quarter of 2022 ("Q1 2022") Eagle reported $37.2 million in Pemfexy revenue, constituting 41.3% of Eagle's total product sales and 32.1% of total revenue reported for the quarter, and making Pemfexy Eagle's best-selling product. As such, Eagle's Pemfexy sales were of critical importance to the Company and its investors.

6.      However, much of the Q1 2022 Pemfexy sales were from customers' initial stocking orders, which ceased in Q2 2022. Making matters worse, in May 2022 the original FDA-approved pemetrexed product, Eli Lilly & Company's ("Eli Lilly") Alimta, lost regulatory exclusivity, allowing cheaper generic pemetrexed products into the market, and exacerbating the decline in Eagle's Pemfexy sales.

3

7.      To boost Eagle's rapidly falling Pemfexy sales, Defendants secretly carried out a fraudulent "channel stuffing" scheme to inflate Eagle's reported Pemfexy revenue. Channel stuffing is a well-known practice in which a company reports inflated sales by sending a distribution channel (such as a wholesaler or retailer) more products than it wants to purchase or is able to sell.

8.      As was later revealed in a lawsuit by Eagle's former Chief Commercial Officer, Michael Moran, against the Company and Defendant Tarriff, in Q2 2022 Eagle paid drug wholesalers to accept large shipments of Pemfexy that were unlikely to be sold to end users before the medicine's expiration, and which the wholesalers were entitled to return to Eagle free of charge. Defendants internally referred to this scheme as the "Inventory Guarantee Supply Program" or the "Buy and Hold" program. According to Moran's complaint, based on his first-hand knowledge of the relevant events, this Pemfexy channel stuffing scheme was conceived and implemented directly by Defendant Tarriff.

9.      Eagle has now admitted that in Q2 2022 it improperly "recognized revenue upon delivery to a wholesale customer," and that all of its published financial statements from Q2 2022 forward "were not prepared in accordance with GAAP" and "should no longer be relied upon and should be restated." According to Defendant Tarriff's counsel, "Eagle . . . conducted an internal investigation into the PEMFEXY inventory issue, and as a result the Company pressured Mr. Tarriff to

4

resign," and according to Eagle its board of directors was considering terminating Tarriff with cause. A few months after Defendant Tarriff's forced resignation, Defendant Cahill, then Eagle's CFO, also suddenly "resigned," with no permanent successor in place.

10.     Eagle's stock price reached highs over $40 per share during the Class Period, and Defendant Tarriff sold at least $1.8 million of his Eagle stock at prices of $13.87 to $21.52 per share. In the months following Eagle's October 2, 2024 admission that its financial statements from Q2 2022 forward cannot be relied upon, Eagle's stock traded for less than $1.00 per share.

11.     As a result of Defendants' misleading statements and omissions, and the resulting precipitous decline in the market value of Eagle's common stock, Plaintiffs and other Class members have suffered significant damages.

## II.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

14.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). The alleged misstatements

5

entered and subsequent damages took place within this judicial district. Eagle's principal executive offices are located in this District at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey. Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.

15. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

16. Lead Plaintiff Evans Associates I, LLC, as set forth in the attached certification (**Exhibit 1**), purchased publicly traded Eagle common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17. Plaintiff Nicholas Miller, as set forth in the attached certification (**Exhibit 2**), purchased publicly traded Eagle common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18. Plaintiff Liyu Wang, as set forth in the attached certification (**Exhibit 3**), purchased publicly traded Eagle common stock during the Class Period, and

6

suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19. Plaintiff Joanna Pluta, as set forth in the attached certification (**Exhibit 4**), purchased publicly traded Eagle common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

20. Defendant Eagle Pharmaceuticals, Inc. is incorporated in Delaware and maintains its principal executive offices at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey. During the Class Period, Eagle's common stock was listed and traded on the NASDAQ under the ticker symbol "EGRX".

21. Defendant Scott Tarriff founded Eagle in January 2007, serving as its Chief Executive Officer and a member of its board of directors ("Board") from that time until his forced resignation in November 2023. Prior to joining Eagle, Defendant Tarriff served as CEO of Par Pharmaceutical Companies, Inc. ("Par Pharmaceutical"), where he was also sued for securities fraud relating to manipulation of that company's financial statements. *See* D.N.J. Case No. 06-cv-3226 (PGS). Defendant Tarriff previously served as a board member at other pharmaceutical industry companies including Synthetic Biologics, Inc., Ziopharm Oncology, Inc., and Clinical Data, Inc. Defendant Tarriff holds a B.S. in marketing and an M.B.A.

22.     Defendant Brian Cahill was Eagle's Chief Financial Officer during the Class Period until his purported resignation in March 2024. Defendant Cahill joined Eagle in October 2016 as Corporate Controller, became Vice President of Finance in January 2018, and became CFO in October 2020. Prior to joining Eagle Defendant Cahill served as Corporate Controller at Aralez Pharmaceutical Companies, Inc. and at Par Pharmaceutical, where he had broad responsibility for matters including technical accounting, management and SEC reporting, and revenue controls. Before joining Par Pharmaceutical, Defendant Cahill worked at PricewaterhouseCoopers LLP. Defendant Cahill holds a B.S. in Accounting and is a Certified Public Accountant.

23.     Defendant Tarriff and Defendant Cahill are together referred to as the "Individual Defendants."

## IV.     BACKGROUND

### A.     Since Its February 2022 Launch Pemfexy Was Critically Important To Eagle's Business

24.     Pemfexy is a form of pemetrexed, an intravenously-administered cancer agent indicated for locally advanced or metastatic non-small cell lung cancer and mesothelioma. Pemfexy is a branded competitor to the original FDA-approved pemetrexed product, Eli Lilly's Alimta. Alimta is sold in powder form and must be reconstituted into a liquid before use, whereas Pemfexy is sold as a ready-to-dilute liquid.

8

25.     Eagle submitted a New Drug Application to the FDA for Pemfexy in December 2016, and Eli Lilly sued Eagle for patent infringement in August 2017. In December 2019 Eli Lilly and Eagle reached a settlement agreement which allowed for a limited-quantity initial entry of Pemfexy into the market on February 1, 2022, and subsequent uncapped entry on April 1, 2022. In February 2020 Eagle received final approval from the FDA for Pemfexy. Eli Lilly's period of regulatory exclusivity for Alimta, based on its patents and appliable laws and regulations, was due to expire on or about May 24, 2022. During the period of regulatory exclusivity no other pemetrexed products could be sold without Eli Lilly's consent.

26.     Leading up to and after Pemfexy's launch, Defendants set high expectations for its commercial success and importance to Eagle's business. For example, at the JP Morgan Healthcare Conference on January 12, 2022, Defendant Tarriff stated that the launch of Pemfexy, combined with the launch of Eagle's vasopressin product (a generic version of Par Pharmaceutical's Vasostrict, indicated to increase blood pressure in adults with vasodilatory shock), was expected to double Eagle's revenue and profitability in 2022. Referring to the 2022 sales figures for the competing vasopressin and pemetrexed products, Defendant Tarriff stated:

> between vasopressin, which was about $800 million last 12 months and PEMFEXY, which is $1.3 billion last 12 months, we're launching now into more than $2 billion of exclusivity. And when Brian [Cahill] and I say that we believe that our revenue is going to double or more than double and that our profitability is going to then more than double, if we look at the consensus from the analysts, our earnings should be more

9

like a triple that we've taken into account all of these unknowns, right? There's quite a bit of probably in our numbers upside in PEMFEXY.

27. On February 1, 2022, Eagle issued a press release announcing the commercial availability of Pemfexy, stating that the "ALIMTA® U.S. market totaled $1.2 billion for the twelve months ended September 30, 2021" and that the Pemfexy "[l]aunch [is] expected to drive significant revenue growth in 2022."

28. In Eagle's March 7, 2022 investor call to report Q4 2021 results, Defendant Tarriff stated regarding vasopressin and Pemfexy that "[l]eading up to these launches, we have been guiding that we expect to double our revenue and more than double our earnings in '22. And we believe that we are comfortably well ahead of that run rate." Defendant Tarriff also stated that "I think PEMFEXY, as you look out over a number of years is probably going to be the stronger of the 2 products because of the way the drugs [sic] reimbursed. And so we're pretty confident that PEMFEXY will be a significant part of the company."

29. Defendants set and maintained very high prices for Pemfexy. Medicine information website Drugs.com listed a retail price of $4,657.67 per 20 mL vial of Pemfexy in early 2025, which was corroborated by similar prices listed on the website GoodRx.com. Defendants appear to have marketed Pemfexy with similarly high retail prices throughout the Class Period.

30. As alleged in the complaint filed by Eagle Chief Commercial Officer Michael Moran against Eagle and Defendant Tarriff (**Exhibit 5**, the "Moran

10

Complaint"), Eagle's settlement agreement with Eli Lilly allowed Eagle to sell "19,200 vials of PEMFEXY between February 1, 2020 and March 31, 2022," and "[i]n the first two months of eligibility, Defendant Eagle sold all 19,200 vials of PEMFEXY." Moran Complaint ¶¶33-34.

31.    When Eagle reported its Q1 2022 results on May 9, 2022, it disclosed that Pemfexy was the Company's top-selling product, with $37.2 million of revenue for the quarter, accounting for 41.3% of reported product sales and 32.1% of total reported revenue.

32.    Pemfexy remained important to Eagle's business throughout the Class Period. Since its launch in February 2022, Pemfexy accounted for $109.8 million of Eagle's reported revenue over the Q1 2022 through Q2 2023 period (as of the date of filing of the instant complaint, Eagle has not disclosed financial results for any periods after Q2 2023). This represents 36.2% of Eagle's reported product sales, and 24.5% of Eagle's total reported revenue for that period. The following table presents certain information relating to Eagle's Pemfexy sales and other financial metrics, as reported in Eagle's consolidated statements of operations (all numbers in thousands):

|  | Q1 2022 | Q2 2022 | Q3 2022 | Q4 2022 | Q1 2023 | Q2 2023 |
|---|---|---|---|---|---|---|
| Net income | $44,058 | -$9,450 | -$7,131 | $8,165 | $5,750 | $5,164 |
| Total revenue | $115,874 | $74,136 | $65,901 | $60,699 | $66,305 | $64,646 |
| Product sales revenue, net | $90,088 | $49,201 | $38,036 | $37,161 | $46,221 | $42,993 |
| Pemfexy net product sales | $37,182 | $16,504 | $1,700 | $12,100 | $22,948 | $19,400 |

11

33.     The large reported Pemfexy sales were all the more important given Eagle's deteriorating financial position over that period, with a substantial decrease in cash and increase in debt. The following table presents certain information as reported in Eagle's consolidated balance sheets (all numbers in thousands):

|  | 3/31/2022 | 6/30/2022 | 9/30/2022 | 12/31/2022 | 3/31/2023 | 6/30/2023 |
|---|---|---|---|---|---|---|
| Cash and cash equivalents | $69,522 | $36,562 | $15,384 | $55,321 | $21,897 | $15,354 |
| Total debt | $23,725 | $49,861 | $61,392 | $62,466 | $76,329 | $70,193 |

**B.     Demand For Pemfexy Plummeted As Initial Stocking Ceased And Generic Competitors Entered The Market**

34.     As shown above, Pemfexy sales fell from $37.2 million in Q1 2022 to $16.5 million in Q2 2022, and even further to $1.7 million in Q3 2022.

35.     With the expiration of Alimta's regulatory exclusivity on or about May 24, 2022, multiple generic pemetrexed products soon entered the market. The FDA's website lists a dozen pemetrexed products with Abbreviated New Drug Application approval dates of May 25, 2022, from companies such as Dr. Reddy's Laboratories Limited, Hospira Inc., and Qilu Pharmaceutical Corporation Ltd.

36.     Further decreasing demand for Pemfexy was that wholesalers and other customers had made large initial stocking purchases of Pemfexy in Q1 2022 shortly following its launch, and still had substantial inventory on hand in Q2 2022. During the Class Period, information available on Eagle's website listed four "wholesalers"

12

of Pemfexy: AmeriSource Bergen (now known as Cencora), Cardinal Health, McKesson, and Morris & Dickson.

37.    On Eagle's May 9, 2022 earnings call an analyst asked "on PEMFEXY . . . thinking about sort of the second quarter, how much of the demand in the first quarter was the sort of stocking versus actual patient demand?" Defendant Tarriff acknowledged the first quarter stocking, while also touting "pretty good pull-through," *i.e.* sales from wholesalers or other distribution channels to end users, stating "[s]o as typical, you spend the first period of time in a launch in stocking. We've had some pretty good pull-through, and that pull-through will continue to build and sales will continue to build."

38.    As alleged in the Moran Complaint, in April 2022 Moran "explained to Defendant Tarriff and [Eagle's Executive Vice President for Marketing, John] Kimmet that Defendant Eagle customers had advised him and/or his sales team that they already had months' worth of non-moving inventory of PEMFEXY product on hand, and therefore, could not purchase any more product." Moran Complaint ¶76.

39.    With respect to generic competition, by May 9, 2022, Moran and others had advised Tarriff that once the exclusivity period ended, Eagle's "customers would not be purchasing more PEMFEXY for the foreseeable future." *Id.* ¶135.

40.    The rapid decline in demand for Pemfexy is confirmed by court filings in a breach of contract lawsuit brought against Eagle by the company that it hired to

13

manufacture Pemfexy, Curia Global Inc. ("Curia"). As alleged in Curia's complaint, in March 2022 Eagle submitted a Firm Period Forecast committing to purchase 18 batches of Pemfexy from April through September 2022. However, Eagle submitted purchase orders for only seven batches during that period, resulting in a deficit of 11 batch orders. With the batch orders priced at $365,575 each, Curia claimed over $4 million in damages. As Eagle admitted in its memorandum in support of its partial motion to dismiss, "Eagle needed less product due to changes in market demand."

41.     Defendants acknowledged currently declining demand for Pemfexy, while touting a future rebound, when reporting Eagle's Q2 2022 results. In Eagle's August 9, 2022 conference call to discuss Q2 2022 results, Defendant Tarriff stated:

> As this market matures, we believe many of our customers are highly likely to use a generic form of ALIMTA through the end of this year. This is due to the way that generics are reimbursed in the first 6 months of their life cycle. Thereafter, we expect the dynamics in the market will allow many of these customers to transition their demand back to PEMFEXY, starting in the first quarter of '23. As of today, we believe that we will sell more PEMFEXY in 2023 than we had in 2022.

## V.      DEFENDANTS SECRETLY IMPLEMENTED A CHANNEL STUFFING SCHEME FOR PEMFEXY AND FALSIFIED EAGLE'S FINANCIAL STATEMENTS

42.     Throughout the Class Period Defendants knew, but concealed from investors, that they had carried out a channel stuffing scheme to create illusory "sales" of Pemfexy that was likely to be returned to Eagle without payment. Due to

14

this scheme, Eagle's reported financial results violated Generally Accepted Accounting Principles and were materially false and misleading.

**A.      In Q2 2022 Defendants Began Their "Buy And Hold" Program To Deceptively Boost Pemfexy Revenue**

43.      As revealed by Eagle's former Chief Commercial Officer, Michael Moran, in 2Q 2022 Defendants carried out a Pemfexy channel stuffing scheme to inflate Eagle's revenue. As shown *infra*, Moran's allegations are highly reliable—he was an executive officer at Eagle reporting directly to Defendant Tarriff, he has first-hand knowledge of key facts, and Eagle's own subsequent admissions corroborate his claims of falsified accounting for purported Pemfexy sales.

44.      As summarized by Moran:

> Starting in and around the second quarter of its fiscal year 2022, Defendant Eagle dramatically inflated its financial results to the market and investors by stuffing the channel with excess inventory at the end of the quarter by making purported "sales" to wholesalers far exceeding any demand. Defendants then reported these "sales" as "revenue" for product that had not been paid for, likely would never be paid for, but rather returned to Defendant Eagle the following year. Defendants further agreed to pay the wholesalers for these purported "sales" even though all they did was hold their product and then return it. Thus, these reported "sales" and "revenue" were a complete sham.

Moran Complaint ¶2.

45.      "This scheme by Defendant Eagle, led by its President, CEO and Founder Defendant Tarriff, was referred to as the Company's '*Buy and Hold*' or '*Inventory Guarantee Purchase Program*' i.e., channel stuffing program." *Id.* ¶3.

15

46.     In early 2022, "cognizant of the impending displacement of PEMFEXY and desperate to increase the Company's revenues, Defendant Tarriff began exerting pressure on the Company's sales team to force more product into the channel when it was already full." *Id.* ¶40. "[Moran] voiced his concerns, telling Defendant Tarriff that the Company needed to be careful not to 'stuff the channel'." *Id.*

47.     The scheme began to take shape when, "[o]n or about April 8, 2022, Defendant Tarriff held a meeting with [Moran] and Kimmet." *Id.* ¶73. According to the Moran Complaint:

> Defendant Tarriff and Kimmet discussed the concept of implementing a "Buy and Hold" or "Inventory Guarantee Supply Program", i.e., an unlawful channel stuffing program. The basis of these agreements would be to highly incentivize customers to "buy and hold" the product by improper means, which included, *inter alia*, Defendant Eagle offering that the customers: (i) simply accept shipment of the product(s) from Defendant Eagle without ever paying for it; (ii) hold onto the product; (iii) then return the product to Defendant Eagle the following year; AND (iv) be paid by Defendant Eagle for merely "holding" the product in their distribution centers for nine (9) months or longer. Defendants then intended to report these as purported "sales" and "revenue" to Defendant Eagle in its public filings.

*Id.* ¶75.

48.     "In response, [Moran] explained to Defendant Tarriff and Kimmet that Defendant Eagle customers had advised him and/or his sales team that they already had months' worth of non-moving inventory of PEMFEXY product on hand, and therefore, could not purchase any more product." *Id.* ¶76. "[Moran] voiced serious concerns that such a 'Buy and Hold' or 'Inventory Guarantee Purchase Program'

16

would constitute an illegal form of channel stuffing." *Id.* ¶77. "Defendant Tarriff ignored [Moran] and instead directed that he and his sales team stuff the channel with PEMFEXY." *Id.* ¶78. Moran, "however, refused to do so." *Id.* ¶79.

49.     "On or about April 21, 2022, Defendant Tarriff demanded a Teams meeting with [Moran's] direct reports to hear directly from them what customers were saying to them." *Id.* ¶80. "[Moran's] team corroborated all the points [Moran] had provided to Defendant Tarriff for the last several weeks." *Id.* ¶81. "Enraged, Defendant Tarriff decided that he was going to do it himself." *Id.* ¶82. "Defendant Tarriff instructed [Moran] and his team to stand down with ALL Community Oncology companies." *Id.* ¶83. "Defendant Tarriff and Kimmet would work with the Community Oncology customers to sell PEMFEXY," while "[Moran] and his team's sales of PEMFEXY would be limited to 340b Hospital businesses (where Medicaid rates would apply and the price of PEMFEXY was less than one-third the cost as compared to the Community Oncology rate per vial)." *Id.*

50.     "Defendant Tarriff directed each Regional Director to send to Kimmet the TOP five Community Oncology customers in their regions for review by Defendant Tarriff and Kimmet," and "[o]n or about April 23, 2022, [Moran's] Regional Directors provided them with their top five customers." *Id.* ¶¶84-85. "On or about April 25, 2022, a tracker was created and was to be updated with any progress Kimmet and Defendant Tarriff had in their sales of PEMFEXY." *Id.* ¶86.

17

51.     "Defendant Tarriff created a list of Defendant Eagle's largest customers and his close personal friends who were industry leaders at the largest U.S. wholesalers to convince them to 'Buy and Hold' Defendants' non-moving PEMFEXY so that Defendant Eagle could make the numbers they had projected to the Street." *Id.* ¶100. "[Moran] was advised that Defendant Tarriff and Kimmet would pitch to the customers that they should 'buy and hold' the product for several months." *Id.* ¶102. "[Moran] was further advised that Defendant Tarriff began talks with wholesalers to try and convince them to 'buy and hold' the product because most customers won't buy direct from a manufacturer; instead, they use wholesalers." *Id.* ¶103. "But wholesalers are likewise VERY careful not to buy 'too much' product, i.e., unlawfully 'stuffing the channel'," and "[i]n fact, in response to Defendants' efforts to 'channel stuff', Defendants received communications from some of their wholesaler employees raising such concerns." *Id.* ¶104.

52.     "By June 2022, desperate to inflate the Company's 'sales' and 'revenue' for the quarter, Defendant Tarriff called upon his largest customers and close personal friends, at least two of whom were industry leaders at two of the largest U.S. wholesalers, including Wholesaler A and Wholesaler B, to facilitate stuffing the channel with Defendants' non-moving PEMFEXY." *Id.* ¶116. As detailed in the Moran Complaint:

> As part of Defendant Eagle's Buy and Hold or Inventory Guarantee
> Purchase Program, on June 30, 2022, the last day of Q2 2022,

18

> Defendant Eagle entered into a "sale" (signed 3½ months later and backdated to June 29, 2022) with Wholesaler A with whom Defendant Tarriff had a close personal relationship, where in exchange for agreeing to purchase AND accept thousands of vials of PEMFEXY at the Wholesaler A distribution center before midnight that night, Defendant Eagle provided them with terms that indicated that no bona fide sale had occurred; in reality, Defendant Eagle was effectively paying Wholesaler A to merely hold product so that Defendant Eagle could report false, inflated revenue numbers to the Street, i.e., channel stuffing.

*Id.* ¶117. Under the terms of the purported sale, "(i) Wholesaler A could return the product later without ever paying for it, (ii) Defendant Eagle would pay Wholesaler A for merely 'Buying and Holding' the product, and (iii) the product could be returned to Defendant Eagle without ever being paid for and the product would then likely be destroyed." *Id.* ¶118.

53.     Additional facts revealed by Moran likewise show the sham nature of the purported sale. "Wholesaler A already had a HUGE, non-moving, aging inventory of PEMFEXY because the competing generic products had come into the market and displaced the Company's far more expensive branded product, PEMFEXY, which sold for thousands of dollars (WAC) per single dose vial." *Id.* ¶119. "At its current 'Run Rate' (the rate at which the product was selling) at the time of the purported sale, it would have taken Wholesaler A YEARS to use up the supply of PEMFEXY it had already purchased from Defendant Eagle – FAR beyond PEMFEXY's shelf-life." *Id.* ¶120.

19

54.     Defendants also implemented their channel stuffing scheme through a second wholesaler in Q2 2022. "Another wholesaler who engaged in this 'Buy and Hold' scheme with Defendant Eagle included Wholesaler B, whose Chairman, President and CEO is also Defendant Tarriff's close personal friend." *Id.* ¶121. Defendant Tarriff initially encountered resistance from the wholesaler for this second sham sale:

> Defendant Tarriff was asking Wholesaler B to buy millions of dollars' worth of inventory even though Wholesaler B's inventory was NOT moving. One of Wholesaler B's executives stated, "*it would NOT be compliant if we purchased more PEMFEXY because we still have many months of non-moving inventory on hand.*" Thus, Wholesaler B made it clear to the Defendants that it could not purchase more PEMFEXY at that time because it would constitute unlawful channel stuffing.

*Id.* ¶122. "Nevertheless, Defendants got Wholesaler B to buy more PEMFEXY" under the "'Buy and Hold' program terms." *Id.* ¶123.

55.     "In the second quarter of 2022 alone, using their 'Buy and Hold' scheme, Defendants 'sold' millions of dollars of non-moving inventory to its customers, including Wholesalers A and B, totaling at least $28.8 million dollars." *Id.* ¶124.

> **B.      Eagle Admits That Its Financial Reporting For Pemfexy Sales Did Not Comply With GAAP And Must Be Restated**

56.     In a November 9, 2023 SEC filing, Eagle stated that it would be delayed in reporting Q3 2023 results, that "the Company is reviewing and expects potential adjustments to reserves for returns and price adjustments of approximately $15.0

million to $20.0 million," and that "[t]hese potential adjustments primarily relate to returns and a price adjustment for PEMFEXY® substantially stemming from slower-than-anticipated pull-through from one wholesale customer predominantly due to expiry of inventory."

57.     In a subsequent SEC filing on December 15, 2023, Eagle admitted that its Q2 2023 financial statements did not comply with GAAP, should not be relied on, and must be restated, and that it had material weaknesses in its internal controls over financial reporting and that such controls were ineffective, stating in relevant part:

> On December 12, 2023, the Audit Committee (the "Audit Committee") of the Board of Directors of Eagle Pharmaceuticals, Inc. (the "Company"), based on the recommendation of, and after consultation with, the Company's management concluded that the Company's previously issued unaudited interim condensed consolidated financial statements for the quarter ended June 30, 2023 (the "Non-Reliance Period"), as previously filed with the SEC, should no longer be relied upon and should be restated due to the matters described below.
>
> *     *     *
>
> During its review, the Company discovered that reserves recorded in its financial statements for the quarter ended June 30, 2023 primarily relating to returns and price adjustments for PEMFEXY® did not reflect certain information that should have been considered at the time the Company prepared its financial statements for the quarter ended June 30, 2023. Had that information been considered, such reserves for the quarter ended June 30, 2023 would have increased, which would have reduced the Company's net product sales for the quarter ended June 30, 2023 by a corresponding amount.
>
> *     *     *

21

As a result of the foregoing, the Company has identified material weaknesses in its internal control over financial reporting that existed as of June 30, 2023 and has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of June 30, 2023. Based on this assessment, the Company's disclosure controls and procedures were ineffective as of June 30, 2023.

*     *     *

Further, in connection with the restatement of the financial statements for the quarter ended June 30, 2023 (the "June 2023 Financials"), the Company has concluded that the June 2023 Financials previously delivered to the Administrative Agent and lenders did not present fairly in all material respects the financial condition and results of operations of the Company and its consolidated subsidiaries for the reasons described above and were not prepared in accordance with generally accepted accounting principles, which gave rise to an event of default under the Credit Agreement.

58.    Finally, after almost a year of further review, in an October 2, 2024 SEC filing, Eagle admitted that its financial statements for Q2 2022 through Q1 2023 also did not comply with GAAP, should not be relied on, and must be restated, and that it had material weaknesses in its internal controls over financial reporting and that such controls were ineffective, stating in relevant part:

On September 27, 2024, the Audit Committee (the "Audit Committee") of the Board of Directors of the Company, based on the recommendation of, and after consultation with, the Company's management, concluded that revenue previously recognized related to a sale of PEMFEXY in the second quarter of 2022 did not meet certain criteria of Financial Accounting Standards Board Accounting Standards Codification Topic 606 – *Revenue from Contracts with Customers,* when originally recorded. The Company previously recognized revenue upon delivery to a wholesale customer but has now determined that revenue from this transaction should be deferred and

22

recognized in later periods to the extent certain criteria have been achieved. As a result, the Audit Committee determined that the Company's audited financial statements for the fiscal year ended December 31, 2022, and unaudited financial statements for the quarters ended June 30, 2022, September 30, 2022, and March 31, 2023 (collectively, the "Non-Reliance Period"), as previously filed with the SEC, should no longer be relied upon and should be restated.

\* \* \*

As a result of the foregoing, the Company expects to conclude that one or more material weaknesses related to the foregoing matters existed in the Company's internal control over financial reporting and that the Company's disclosure controls and procedures were not effective for each of the fiscal periods within the Non-Reliance Period, and as of September 30, 2023 and December 31, 2023. In addition, as previously disclosed, the Company has identified material weaknesses in its internal control over financial reporting that existed as of June 30, 2023 and concluded that the Company's disclosure controls and procedures were ineffective as of June 30, 2023.

\* \* \*

Further, in connection with the non-reliance determination described in Item 4.02, the Company has concluded that the financial statements for the fiscal periods within the Non-Reliance Period previously delivered to the Administrative Agent and the Lenders did not present fairly in all material respects the financial condition and results of operations of the Company and its consolidated subsidiaries for the reasons described above and were not prepared in accordance with GAAP, which gave rise to an event of default under the Credit Agreement.

59. As of the date of this complaint, not only has Eagle yet to publicly disclose any restated financial results for the periods Q2 2022 through Q2 2023, it has also failed to publish financial results for any subsequent period, leaving the

23

Company's investors in the dark as to the true state of its business over the last three years.

### C. GAAP Accounting Rules Prohibited Recognition Of Revenue From The Pemfexy Channel Stuffing

60. Defendants' recognition of revenue from the Pemfexy channel stuffing scheme violated Generally Accepted Accounting Principles ("GAAP") designed to ensure that a company only recognizes revenue "in an amount that reflects the consideration to which the entity expects to be entitled." This analysis takes into account "all relevant facts and circumstances," including the existence and terms of any right by the customer to return the product without payment. Where the facts indicate it is likely the customer will return the product without payment, GAAP prohibits recognition of revenue.

61. Eagle generally recognized revenue from sales of Pemfexy upon product shipment or delivery to customers, which in many cases were wholesalers and not the drug's end user. Eagle's reported revenue did not equal the amount of cash it received from product sales, but rather depended on assumptions that Defendants chose to use concerning the consideration to which Eagle would eventually be entitled. Eagle did not recognize as revenue the full retail list price of the Pemfexy it shipped or delivered. As stated in Eagle's 2Q 2022 Form 10-Q, "revenue on sales to end users for . . . Pemfexy . . . are recorded net of chargebacks, rebates, returns, prompt pay discounts, wholesaler fees and other deductions."

62. SEC Regulation S-X (17 C.F.R. § 210.1-01 *et seq.*) governs "the form and content of and requirements for financial statements." 17 C.F.R. § 210.1-01(a)(1). Annual reports on SEC Form 10-K and quarterly reports on SEC Form 10-Q are required to include financial statements meeting the requirements of Regulation S-X. Under Regulation S-X, financial statements must comply with GAAP, and "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading." 17 C.F.R. § 210.4-01(a)(1).

63. The Financial Accounting Standards Board maintains the Accounting Standards Codification ("ASC"), which organizes and codifies U.S. GAAP. ASC 606, titled Revenue from Contracts with Customers, "specifies the accounting for revenue from contracts with customers," and "establishes principles for reporting useful information to users of financial statements about the nature, amount, timing, and uncertainty of revenue and cash flows arising from the entity's contracts with customers." ASC 606-10-05-1; ASC 606-10-05-2.

64. The "core principle" of ASC 606 "is that an entity recognizes revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services." ASC 606-10-05-3. "An entity shall consider the terms of

25

the contract and all relevant facts and circumstances when applying this guidance." ASC 606-10-10-3.

65. Under ASC 606-10-32-1, "When (or as) a performance obligation is satisfied, an entity shall recognize as revenue the amount of the transaction price (which excludes estimates of variable consideration that are constrained in accordance with paragraphs 606-10-32-11 through 32-13) that is allocated to that performance obligation."

66. Under ASC 606-10-32-2:

> An entity shall consider the terms of the contract and its customary business practices to determine the transaction price. The transaction price is the amount of consideration to which an entity expects to be entitled in exchange for transferring promised goods or services to a customer, excluding amounts collected on behalf of third parties (for example, some sales taxes). The consideration promised in a contract with a customer may include fixed amounts, variable amounts, or both.

67. "If the consideration promised in a contract includes a variable amount, an entity shall estimate the amount of consideration to which the entity will be entitled in exchange for transferring the promised goods or services to a customer." ASC 606-10-32-5.

68. "An amount of consideration can vary because of discounts, rebates, refunds, credits, price concessions, incentives, performance bonuses, penalties, or other similar items. The promised consideration also can vary if an entity's entitlement to the consideration is contingent on the occurrence or nonoccurrence of

a future event. For example, an amount of consideration would be variable if . . . a

product was sold with a right of return." ASC 606-10-32-6.

69.    Under ASC 606-10-32-11:

An entity shall include in the transaction price some or all of an amount
of variable consideration estimated in accordance with paragraph 606-
10-32-8 only to the extent that it is probable that a significant reversal
in the amount of cumulative revenue recognized will not occur when
the uncertainty associated with the variable consideration is
subsequently resolved.

70.    Probable means that the future event or events are likely to occur. ASC

606-10-20.

71.    Under ASC 606-10-32-12:

In assessing whether it is probable that a significant reversal in the
amount of cumulative revenue recognized will not occur once the
uncertainty related to the variable consideration is subsequently
resolved, an entity shall consider both the likelihood and the magnitude
of the revenue reversal. Factors that could increase the likelihood or the
magnitude of a revenue reversal include, but are not limited to, any of
the following:

a. The amount of consideration is highly susceptible to factors
outside the entity's influence. Those factors may include volatility
in a market, the judgment or actions of third parties, weather
conditions, and a high risk of obsolescence of the promised good or
service.

b. The uncertainty about the amount of consideration is not expected
to be resolved for a long period of time.

c. The entity's experience (or other evidence) with similar types of
contracts is limited, or that experience (or other evidence) has
limited predictive value.

27

d. The entity has a practice of either offering a broad range of price concessions or changing the payment terms and conditions of similar contracts in similar circumstances.

e. The contract has a large number and broad range of possible consideration amounts.

72. ASC 606-10-55-23 provides:

To account for the transfer of products with a right of return (and for some services that are provided subject to a refund), an entity should recognize all of the following:

a. Revenue for the transferred products in the amount of consideration to which the entity expects to be entitled (therefore, revenue would not be recognized for the products expected to be returned)

b. A refund liability

c. An asset (and corresponding adjustment to cost of sales) for its right to recover products from customers on settling the refund liability.

73. Similarly, ASC 606-10-55-25 provides in relevant part, "For any amounts received (or receivable) for which an entity does not expect to be entitled, the entity should not recognize revenue when it transfers products to customers but should recognize those amounts received (or receivable) as a refund liability."

74. Under these GAAP provisions, Eagle was prohibited from recognizing revenue from the Pemfexy channel stuffing scheme because the facts strongly indicated that most or all of the Pemfexy "sold" in this manner would be returned without payment. As revealed by Eagle's former Chief Commercial Officer: (i)

28

Eagle's wholesaler customers did not want the additional Pemfexy but were pressured into accepting it by Defendant Tarriff; (ii) the sale terms provided that the customers did not have to pay, that Eagle would in fact pay the customers, and that the customers could simply return the Pemfexy free of charge; and (iii) the customers already had large inventories of Pemfexy that was not being sold to end users at a rate fast enough to justify additional purchases—at the then-present rate of sales the additional Pemfexy would expire before Wholesaler A could sell its existing inventory.

## VI. MATERIALLY FALSE AND MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A. August 9, 2022, Eagle Q2 2022 Results

75. The Class Period begins on August 9, 2022. That morning, Eagle published a press release titled "Eagle Pharmaceuticals Reports Second Quarter 2022 Results." Eagle also filed a copy of the press release with the SEC as an exhibit to a Form 8-K signed by Defendant Tarriff. The press release contained false and misleading financial metrics, including "Q2 2022 PEMFEXY product sales were $16.5 million."

76. Under the heading "Financial Highlights," the press release stated:

- Total revenue for Q2 2022 was $74.1 million, compared to $48.1 million in Q2 2021, primarily reflecting product sales of vasopressin and PEMFEXY.

29

- Q2 2022 net loss was $(9.5) million, or $(0.74) per basic and diluted share, compared to net income of $3.6 million, or $0.28 per basic and $0.27 diluted share, in Q2 2021.
- Q2 2022 adjusted non-GAAP net income was $20.3 million, or $1.58 per basic and $1.56 per diluted share, compared to adjusted non-GAAP net income of $12.4 million, or $0.95 per basic and $0.93 diluted share, in Q2 2021.

77.    The press release contained the following financial statement information:

**EAGLE PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**
**(In thousands, except share and per share amounts)**

|  | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
|  | 2022 | 2021 | 2022 | 2021 |
| **Revenue:** | | | | |
| Product sales, net | $ 49,201 | $ 19,621 | $ 139,289 | $ 36,741 |
| Royalty revenue | 24,935 | 28,503 | 50,721 | 52,632 |
| Total revenue | 74,136 | 48,124 | 190,010 | 89,373 |
| **Operating expenses:** | | | | |
| Cost of product sales | 21,171 | 7,907 | 46,347 | 16,349 |
| Cost of royalty revenue | 2,493 | 2,850 | 5,072 | 5,263 |
| Research and development | 11,437 | 9,911 | 17,545 | 24,199 |
| Selling, general and administrative | 36,832 | 16,636 | 59,014 | 36,515 |
| Total operating expenses | 71,933 | 37,304 | 127,978 | 82,326 |
| Income from operations | 2,203 | 10,820 | 62,032 | 7,047 |
| Interest income | 244 | 163 | 398 | 198 |
| Interest expense | (552) | (422) | (918) | (844) |
| Other (expense) income | (7,763) | (5,013) | (9,720) | 487 |
| Total other (expense) income, net | (8,071) | (5,272) | (10,240) | (159) |
| (Loss) income before income tax provision | (5,868) | 5,548 | 51,792 | 6,888 |
| Income tax provision | (3,582) | (1,936) | (17,184) | (3,697) |
| Net (loss) income | $ (9,450) | $ 3,612 | $ 34,608 | $ 3,191 |
| (Loss) earnings per share attributable to common stockholders: | | | | |
| Basic | $ (0.74) | $ 0.28 | $ 2.71 | $ 0.24 |
| Diluted | $ (0.74) | $ 0.27 | $ 2.67 | $ 0.24 |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 12,836,116 | 13,108,998 | 12,773,727 | 13,116,370 |
| Diluted | 12,836,116 | 13,262,164 | 12,951,788 | 13,293,920 |

78.    Also on the morning of August 9, 2022, Eagle held its earnings call to present Q2 2022 results. On that call Defendants presented false and misleading

30

financial metrics, including Defendant Tarriff's statement that "[o]ur customers have

embraced PEMFEXY, as evidenced from our first half sales of $54 million."

79.     On the earnings call Defendant Cahill stated:

In the second quarter of 2022, total revenue was $74.1 million compared to $48.1 million in 2Q of 2021, primarily reflecting continued revenue from sales of vasopressin and PEMFEXY. Product sales during the second quarter were $49.2 million compared to $19.6 million in 2Q of 2021. Vasopressin sales were $11.3 million and PEMFEXY sales were $16.5 million in the second quarter of 2022.

80.     Defendant Cahill also stated on the earnings call:

Net loss for the second quarter of 2022 was $9.5 million or $0.74 per basic and diluted shares compared to net income of $3.6 million or $0.28 per basic and $0.27 per diluted share in the prior year period. Adjusted non-GAAP net income for the second quarter of 2022 was $20.3 million or $1.58 and per basic and $1.56 per diluted share compared to adjusted non-GAAP net income of $12.4 million or $0.95 per basic and $0.93 per diluted share in the prior year period.

81.     Later on August 9, 2022, Eagle filed its quarterly report on SEC Form

10-Q for Q2 2022, which was signed by Defendants Tarriff and Cahill. The Form 10-

Q contained false and misleading financial metrics. For example, under the heading

"Revenues," the Form 10-Q stated:

Our product sales increased $29.6 million during the three months ended June 30, 2022 as compared to the three months ended June 30, 2021. The increase was primarily attributable to product sales of $16.5 million for Pemfexy and $11.3 million for vasopressin during the during the three months ended June 30, 2022, which launched in the first quarter of 2022.

31

82.     The Form 10-Q presented the following financial statement information:

| EAGLE PHARMACEUTICALS, INC. | | | | | | | |
| CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED) | | | | | | | |
| (In thousands, except share and per share amounts) | | | | | | | |

| | Three Months Ended June 30, | | | | Six Months Ended June 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2022 | | 2021 | | 2022 | | 2021 |
| **Revenue:** | | | | | | | | |
| Product sales, net | $ | 49,201 | $ | 19,621 | $ | 139,289 | $ | 36,741 |
| Royalty revenue | | 24,935 | | 28,503 | | 50,721 | | 52,632 |
| Total revenue | | 74,136 | | 48,124 | | 190,010 | | 89,373 |
| **Operating expenses:** | | | | | | | | |
| Cost of product sales | | 21,171 | | 7,907 | | 46,347 | | 16,349 |
| Cost of royalty revenue | | 2,493 | | 2,850 | | 5,072 | | 5,263 |
| Research and development | | 11,437 | | 9,911 | | 17,545 | | 24,199 |
| Selling, general and administrative | | 36,832 | | 16,636 | | 59,014 | | 36,515 |
| Total operating expenses | | 71,933 | | 37,304 | | 127,978 | | 82,326 |
| Income from operations | | 2,203 | | 10,820 | | 62,032 | | 7,047 |
| Interest income | | 244 | | 163 | | 398 | | 198 |
| Interest expense | | (552) | | (422) | | (918) | | (844) |
| Other (expense) income | | (7,763) | | (5,013) | | (9,720) | | 487 |
| Total other (expense) income, net | | (8,071) | | (5,272) | | (10,240) | | (159) |
| **(Loss) income before income tax provision** | | (5,868) | | 5,548 | | 51,792 | | 6,888 |
| Income tax provision | | (3,582) | | (1,936) | | (17,184) | | (3,697) |
| **Net (loss) income** | $ | (9,450) | $ | 3,612 | $ | 34,608 | $ | 3,191 |
| (Loss) earnings per share attributable to common stockholders: | | | | | | | | |
| Basic | $ | (0.74) | $ | 0.28 | $ | 2.71 | $ | 0.24 |
| Diluted | $ | (0.74) | $ | 0.27 | $ | 2.67 | $ | 0.24 |
| Weighted average number of common shares outstanding: | | | | | | | | |
| Basic | | 12,836,116 | | 13,108,998 | | 12,773,727 | | 13,116,370 |
| Diluted | | 12,836,116 | | 13,262,164 | | 12,951,788 | | 13,293,920 |

83.     The 10-Q also stated under the heading "Changes in Internal Control over Financial Reporting" that:

> On June 9, 2022, Eagle completed the acquisition of Acacia. Eagle has extended its oversight and monitoring processes that support our internal control over financial reporting, as well as its disclosure controls and procedures, to include Acacia's operations. Eagle is continuing to integrate the acquired operations of Acacia. There were no other changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended June 30, 2022 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

32

84.     The statements identified in ¶¶75-83 were materially false and misleading because, as Defendants knew or recklessly disregarded, Eagle lacked effective internal control over financial reporting, and due to the financial results' inclusion of "revenue" from the Pemfexy channel stuffing scheme in violation of GAAP, for Q2 2022 and for the first half of 2022 revenue from Pemfexy sales was materially overstated, causing corresponding misstatements in related metrics including product sales revenue, total revenue, net (loss) income, and (loss) earnings per share.

**B.     November 7-9, 2022, Eagle Q3 2022 Results**

85.     On the morning of November 7, 2022, Eagle published a press release titled "Eagle Pharmaceuticals Reports Third Quarter 2022 Results." Eagle also filed a copy of the press release with the SEC as an exhibit to a Form 8-K signed by Defendant Tarriff. The press release contained false and misleading financial metrics, including:

- Nine-month 2022 net income was $2.41 per basic and $2.38 per diluted share
- Nine-month 2022 adjusted non-GAAP earnings per diluted share1 more than doubled to $6.69 from full year 2021 adjusted non-GAAP earnings per diluted share, outperforming any full year in the Company's history
- Nine-month 2022 revenue of $255.9 million exceeds full year 2021 revenue of $171.5 million
- Nine-month 2022 net sales of vasopressin and PEMFEXY combined totaled $114.9 million

86.    The  press  release  contained  the  following  financial  statement

information:

**EAGLE PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**
**(In thousands, except share and per share amounts)**

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
|  | 2022 | 2021 | 2022 | 2021 |
| **Revenue:** | | | | |
| Product sales, net | $ 38,086 | $ 12,124 | $ 177,375 | $ 48,865 |
| Royalty revenue | 24,007 | 27,729 | 74,728 | 80,361 |
| License and other revenue | 3,808 | — | 3,808 | — |
| Total revenue | 65,901 | 39,853 | 255,911 | 129,226 |
| **Operating expenses:** | | | | |
| Cost of product sales | 20,869 | 5,486 | 67,216 | 21,835 |
| Cost of royalty revenue | 2,782 | 2,773 | 7,854 | 8,036 |
| Research and development | 9,326 | 23,289 | 26,871 | 47,488 |
| Selling, general and administrative | 23,462 | 18,482 | 82,476 | 54,997 |
| Total operating expenses | 56,439 | 50,030 | 184,417 | 132,356 |
| Income (loss) from operations | 9,462 | (10,177) | 71,494 | (3,130) |
| Interest income | (444) | 197 | (46) | 395 |
| Interest expense | (1,147) | (396) | (2,065) | (1,240) |
| Other expense | (7,916) | (2,284) | (17,636) | (1,797) |
| Total other expense, net | (9,507) | (2,483) | (19,747) | (2,642) |
| **(Loss) income before income tax (provision) benefit** | (45) | (12,660) | 51,747 | (5,772) |
| Income tax (provision) benefit | (3,468) | 7,038 | (20,652) | 3,341 |
| **Net (loss) income** | $ (3,513) | $ (5,622) | $ 31,095 | $ (2,431) |
| (Loss) earnings per share attributable to common stockholders: | | | | |
| Basic | $ (0.27) | $ (0.43) | $ 2.41 | $ (0.19) |
| Diluted | $ (0.27) | $ (0.43) | $ 2.38 | $ (0.19) |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 13,166,931 | 13,077,298 | 12,906,235 | 13,103,203 |
| Diluted | 13,166,931 | 13,077,298 | 13,051,311 | 13,103,203 |

87.    Also on the morning of November 7, 2022, Eagle held its earnings call

to present Q3 2022 results. On that call Defendants presented false and misleading

financial metrics, including Defendant Tarriff's statement that "[f]or the year-to-date,

we have sold $114.9 million of vasopressin and PEMFEXY combined."

34

88.     On the morning of November 9, 2022, Eagle published a press release

titled "Correcting & Replacing: Eagle Pharmaceuticals Reports Third Quarter 2022

Results." Eagle also filed a copy of the press release with the SEC as an exhibit to a

Form 8-K signed by Defendant Tarriff. As explained in the Form 8-K, the November

9 press release was issued "to correct errors" contained in the November 7 press

release financial information including "references to third quarter GAAP net loss

(updated from $(3.5) million to $(7.1) million), third quarter GAAP net loss per basic

and diluted share (updated from $(0.27) to $(0.54)), and nine-month 2022 GAAP net

income per basic share (updated from $2.41 to $2.13) and per diluted share (updated

from $2.38 to $2.11)."

89.     The updated press release contained false and misleading financial

metrics, including:

- Nine-month 2022 net income was $2.13 per basic and $2.11 per diluted share
- Nine-month 2022 adjusted non-GAAP earnings per diluted share more than doubled to $6.69 from full year 2021 adjusted non-GAAP earnings per diluted share, outperforming any full year in the Company's history
- Nine-month 2022 revenue of $255.9 million exceeds full year 2021 revenue of $171.5 million
- Nine-month 2022 net sales of vasopressin and PEMFEXY combined totaled $114.9 million

90.     The press release contained the following financial statement

information:

35

**EAGLE PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**
(In thousands, except share and per share amounts)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2022 | 2021 | 2022 | 2021 |
| **Revenue:** | | | | |
| Product sales, net | $ 38,086 | $ 12,124 | $ 177,375 | $ 48,865 |
| Royalty revenue | 24,007 | 27,729 | 74,728 | 80,361 |
| License and other revenue | 3,808 | — | 3,808 | — |
| Total revenue | 65,901 | 39,853 | 255,911 | 129,226 |
| **Operating expenses:** | | | | |
| Cost of product sales | 20,869 | 5,486 | 67,216 | 21,835 |
| Cost of royalty revenue | 2,782 | 2,773 | 7,854 | 8,036 |
| Research and development | 9,326 | 23,289 | 26,871 | 47,488 |
| Selling, general and administrative | 23,462 | 18,482 | 82,476 | 54,997 |
| Total operating expenses | 56,439 | 50,030 | 184,417 | 132,356 |
| Income (loss) from operations | 9,462 | (10,177) | 71,494 | (3,130) |
| Interest income | (444) | 197 | (46) | 395 |
| Interest expense | (1,147) | (396) | (2,065) | (1,240) |
| Other expense | (11,534) | (2,284) | (21,254) | (1,797) |
| Total other expense, net | (13,125) | (2,483) | (23,365) | (2,642) |
| **(Loss) income before income tax (provision) benefit** | (3,663) | (12,660) | 48,129 | (5,772) |
| Income tax (provision) benefit | (3,468) | 7,038 | (20,652) | 3,341 |
| **Net (loss) income** | $ (7,131) | $ (5,622) | $ 27,477 | $ (2,431) |
| (Loss) earnings per share attributable to common stockholders: | | | | |
| Basic | $ (0.54) | $ (0.43) | $ 2.13 | $ (0.19) |
| Diluted | $ (0.54) | $ (0.43) | $ 2.11 | $ (0.19) |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 13,166,931 | 13,077,298 | 12,906,235 | 13,103,203 |
| Diluted | 13,166,931 | 13,077,298 | 13,051,311 | 13,103,203 |

91.     Later on November 9, 2022, Eagle filed its quarterly report on SEC Form 10-Q for Q3 2022, which was signed by Defendants Tarriff and Cahill. The Form 10-Q contained false and misleading financial metrics. For example, under the heading "Revenues," the Form 10-Q stated:

> Our product sales increased $128.5 million in the nine months ended September 30, 2022 as compared to the nine months ended September 30, 2021. The increase was primarily attributable to product sales of Pemfexy and vasopressin, which each launched in the first quarter of 2022, which combined for $114.9 million of product sales, net.

36

92.    The Form 10-Q presented the following financial statement information:

| | | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
| **EAGLE PHARMACEUTICALS, INC.** **CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)** **(In thousands, except share and per share amounts)** | | | | | |
| | | 2022 | 2021 | 2022 | 2021 |
| **Revenue:** | | | | | |
| Product sales, net | $ | 38,086 $ | 12,124 $ | 177,375 $ | 48,865 |
| Royalty revenue | | 24,007 | 27,729 | 74,728 | 80,361 |
| License and other revenue | | 3,808 | — | 3,808 | — |
| Total revenue | | 65,901 | 39,853 | 255,911 | 129,226 |
| **Operating expenses:** | | | | | |
| Cost of product sales | | 20,869 | 5,486 | 67,216 | 21,835 |
| Cost of royalty revenue | | 2,782 | 2,773 | 7,854 | 8,036 |
| Research and development | | 9,326 | 23,289 | 26,871 | 47,488 |
| Selling, general and administrative | | 23,462 | 18,482 | 82,476 | 54,997 |
| Total operating expenses | | 56,439 | 50,030 | 184,417 | 132,356 |
| Income (loss) from operations | | 9,462 | (10,177) | 71,494 | (3,130) |
| Interest income | | (444) | 197 | (46) | 395 |
| Interest expense | | (1,147) | (396) | (2,065) | (1,240) |
| Other expense | | (11,534) | (2,284) | (21,254) | (1,797) |
| Total other expense, net | | (13,125) | (2,483) | (23,365) | (2,642) |
| **(Loss) income before income tax (provision) benefit** | | (3,663) | (12,660) | 48,129 | (5,772) |
| Income tax (provision) benefit | | (3,468) | 7,038 | (20,652) | 3,341 |
| Net (loss) income | $ | (7,131) $ | (5,622) $ | 27,477 $ | (2,431) |
| (Loss) earnings per share attributable to common stockholders: | | | | | |
| Basic | $ | (0.54) $ | (0.43) $ | 2.13 $ | (0.19) |
| Diluted | $ | (0.54) $ | (0.43) $ | 2.11 $ | (0.19) |
| Weighted average number of common shares outstanding: | | | | | |
| Basic | | 13,166,931 | 13,077,298 | 12,906,235 | 13,103,203 |
| Diluted | | 13,166,931 | 13,077,298 | 13,051,311 | 13,103,203 |

93.    The 10-Q also stated under the heading "Changes in Internal Control over Financial Reporting" that:

> On June 9, 2022, we completed the acquisition of Acacia. We have extended our oversight and monitoring processes that support our internal control over financial reporting, as well as our disclosure controls and procedures, to include Acacia's operations. We continue

to integrate the acquired operations of Acacia. There were no other changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended September 30, 2022 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

94. The statements identified in ¶¶85-93 were materially false and misleading because, as Defendants knew or recklessly disregarded, Eagle lacked effective internal control over financial reporting, and due to the financial results' inclusion of "revenue" from the Pemfexy channel stuffing scheme in violation of GAAP, for the nine months ended September 30, 2022 revenue from Pemfexy sales was materially overstated, causing corresponding misstatements in related metrics including product sales revenue, total revenue, net (loss) income, and (loss) earnings per share.

### C. March 13-23, 2023, Eagle Q4 And Full Year 2022 Results

95. On March 13, 2023, Eagle published a press release titled "Eagle Pharmaceuticals Reports Fourth Quarter and Full Year 2022 Results." Eagle also filed a copy of the press release with the SEC as an exhibit to a Form 8-K signed by Defendant Tarriff. The press release contained false and misleading financial metrics, including "FY 2022 net sales of PEMFEXY® totaled $67.5 million."

96. Under the heading "Financial Highlights," the press release stated:

- Total revenue for the 12 months ended December 31, 2022 was $316.6 million, compared to $171.5 million, in 2021, an increase of 84.6%.

38

- Net income for the 12 months ended December 31, 2022 was $35.6 million, or $2.76 per basic and $2.73 per diluted share, compared to net loss of $(8.6) million, or $(0.66) per basic and diluted share, in 2021.
- Adjusted non-GAAP net income for the 12 months ended December 31, 2022 was $101.8 million, or $7.87 per basic and $7.79 per diluted share, compared to $22.3 million, or $1.71 per basic and $1.68 per diluted share, in 2021.

97.    The press release contained the following financial statement information:

**EAGLE PHARMACEUTICALS, INC.**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
**(In thousands, except share and per share amounts)**

| | Three Months Ended December 31, | | Year Ended December 31, | |
|---|---|---|---|---|
| | 2022 (unaudited) | 2021 (unaudited) | 2022 | 2021 |
| **Revenue:** | | | | |
| Product sales, net | $ 37,161 | $ 16,158 | $ 214,536 | $ 65,023 |
| Royalty revenue | 23,538 | 26,162 | 98,266 | 106,523 |
| License and other revenue | — | — | 3,808 | — |
| Total revenue | 60,699 | 42,320 | 316,610 | 171,546 |
| **Operating expenses:** | | | | |
| Cost of product sales | 18,242 | 9,693 | 85,458 | 31,528 |
| Cost of royalty revenue | 1,624 | 2,616 | 9,478 | 10,652 |
| Research and development | 7,217 | 3,787 | 34,088 | 51,275 |
| Selling, general and administrative | 24,150 | 20,325 | 106,626 | 75,322 |
| Total operating expenses | 51,233 | 36,421 | 235,650 | 168,777 |
| Income from operations | 9,466 | 5,899 | 80,960 | 2,769 |
| Interest income | 317 | 165 | 271 | 560 |
| Interest expense | (1,980) | (395) | (4,045) | (1,635) |
| Other income (expense) | 5,501 | (4,445) | (15,753) | (6,242) |
| Total other income (expense), net | 3,838 | (4,675) | (19,527) | (7,317) |
| **Income (loss) before income tax provision** | 13,304 | 1,224 | 61,433 | (4,548) |
| Income tax provision | (5,139) | (7,420) | (25,791) | (4,079) |
| **Net income (loss)** | $ 8,165 | $ (6,196) | $ 35,642 | $ (8,627) |
| Earnings (loss) per common share: | | | | |
| Basic | $ 0.63 | $ (0.48) | $ 2.76 | $ (0.66) |
| Diluted | $ 0.62 | $ (0.48) | $ 2.73 | $ (0.66) |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 13,015,976 | 12,896,471 | 12,933,896 | 13,051,095 |
| Diluted | 13,124,218 | 12,896,471 | 13,065,494 | 13,051,095 |

98.    Also on the morning of March 13, 2023, Eagle held its earnings call to present full year 2022 and Q4 2022 results. On that call Defendants presented false and misleading financial metrics, including Defendant Tarriff's statement that "[i]n '22, PEMFEXY net sales reached $67 million."

99.    On the earnings call Defendant Cahill stated:

Full year 2022 revenue was $316.6 million, compared to $171.5 million in 2021. Net product sales during the fourth quarter of 2022 were $37.2 million compared to $16.2 million in Q4 of 2021. Full year 2022 net product sales were $214.5 million compared to $65 million in '21. Vasopressin net product sales were $3.6 million and PEMFEXY net product sales were $12.1 million in the fourth quarter of '22. For the full year '22, vasopressin net product sales were $63.2 million and PEMFEXY sales were $67.5 million.

100.    Defendant Cahill also stated on the earnings call:

For the full year 2022, net income totaled $35.6 million or $2.76 per basic and $2.73 per diluted share compared to a net loss of $8.6 million or $0.66 per basic and diluted share in 2021. Adjusted non-GAAP net income for the fourth quarter of 2022 was $14.4 million or $1.11 per basic and $1.10 per diluted share, compared to adjusted non-GAAP net income of $11 million or $0.85 per basic and $0.83 per diluted share in the prior year quarter. For the full year 2022, adjusted non-GAAP net income totaled $101.8 million or $7.87 per basic and $7.79 per diluted share compared to adjusted non-GAAP net income of $22.3 million or $1.71 per basic and $1.68 per diluted share in 2021.

101.    On March 17, 2023, Eagle filed with the SEC a Notification of Late Filing, signed by Defendant Tarriff, stating that:

Eagle Pharmaceuticals, Inc. (the "Company") is filing this Notification of Late Filing on Form 12b-25 with respect to its Annual Report on Form 10-K for the year ended December 31, 2022 (the "Form 10-K"). The Company is unable to file its Form 10-K within the prescribed time

40

period without unreasonable effort or expense because it requires additional time to complete the preparation of its financial statements and assessment of the Company's internal control over financial reporting, including as it relates to a business combination that occurred during 2022. As a result of the foregoing, Ernst & Young, LLP, the Company's independent registered public accounting firm, has not yet completed its audit procedures.

102. On March 23, 2023, Eagle filed its annual report on SEC Form 10-K for 2022, which was signed by Defendants Tarriff and Cahill. The Form 10-K contained false and misleading financial metrics. For example, under the heading "Revenues," the Form 10-K stated:

Product sales increased $149.5 million in the year ended December 31, 2022. The increase was primarily attributable to product sales of PEMFEXY and vasopressin, which each launched in the first quarter of 2022, which combined for $130.6 million of product sales, net.

103. The Form 10-K stated "[t]he Company recorded product sales, net as follows:"

The Company recorded product sales, net as follows:

| | | Year Ended December 31, | | | | |
| | | 2022 | | 2021 | | 2020 |
| | | | (in thousands) | | | |
| PEMFEXY | $ | 67,479 | $ | — | $ | — |
| Vasopressin | | 63,159 | | — | | — |
| Bendeka | | 12,992 | | 11,167 | | 15,439 |
| Belrapzo | | 33,667 | | 23,728 | | 27,527 |
| Ryanodex | | 30,164 | | 25,271 | | 28,268 |
| Other | | 7,075 | | 4,857 | | 1,089 |
| Product sales, net | $ | 214,536 | $ | 65,023 | $ | 72,323 |

104. The Form 10-K presented the following financial statement information:

41

**EAGLE PHARMACEUTICALS, INC**
**CONSOLIDATED STATEMENTS OF OPERATIONS**
(In thousands, except share and per share amounts)

| | | Year Ended December 31, | |
| --- | ---: | ---: | ---: |
| | 2022 | 2021 | 2020 |
| **Revenue:** | | | |
| Product sales, net | $ 214,536 | $ 65,023 | $ 72,323 |
| Royalty revenue | 98,266 | 106,523 | 110,479 |
| License and other revenue | 3,808 | — | 5,000 |
| Total revenue | 316,610 | 171,546 | 187,802 |
| **Operating expenses:** | | | |
| Cost of product sales | 85,458 | 31,528 | 33,647 |
| Cost of royalty revenue | 9,478 | 10,652 | 11,818 |
| Research and development | 34,088 | 51,275 | 30,785 |
| Selling, general and administrative | 106,626 | 75,322 | 78,598 |
| Total operating expenses | 235,650 | 168,777 | 154,848 |
| Income from operations | 80,960 | 2,769 | 32,954 |
| Interest income | 271 | 560 | 562 |
| Interest expense | (4,045) | (1,635) | (2,577) |
| Other expense | (15,753) | (6,242) | (8,262) |
| Total other expense, net | (19,527) | (7,317) | (10,277) |
| **Income (loss) before income tax provision** | 61,433 | (4,548) | 22,677 |
| Income tax provision | (25,791) | (4,079) | (10,688) |
| **Net income (loss)** | $ 35,642 | $ (8,627) | $ 11,989 |
| Earnings (Loss) per common share: | | | |
| Basic | $ 2.76 | $ (0.66) | $ 0.89 |
| Diluted | $ 2.73 | $ (0.66) | $ 0.87 |
| Weighted average number of common shares outstanding: | | | |
| Basic | 12,933,896 | 13,051,095 | 13,481,525 |
| Diluted | 13,065,494 | 13,051,095 | 13,771,393 |

105.    Under the heading "Management's Annual Report on Internal Control Over Financial Reporting," the Form 10-K stated "[t]he management of Eagle Pharmaceuticals, Inc. ('Eagle') has prepared, and is responsible for, Eagle's financial statements and related footnotes. These financial statements have been prepared in conformity with U.S. generally accepted accounting principles." Under the same heading, the Form 10-K continued:

42

Management (with the participation of the principal executive officer and principal accounting and financial officer) conducted an evaluation of the effectiveness of the Company's internal control over financial reporting as of December 31, 2022 based on the framework in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission.

\* \* \*

Based on this evaluation, management concluded that the Company's internal control over financial reporting was effective as of December 31, 2022.

The "Management's Annual Report on Internal Control Over Financial Reporting" section was signed by Defendant Tarriff in his capacity as Eagle's Principal Executive Officer, and by Defendant Cahill in his capacity as Eagle's Principal Accounting and Financial Officer.

106. The statements identified in ¶¶95-100 and 102-105 were materially false and misleading because, as Defendants knew or recklessly disregarded, Eagle lacked effective internal control over financial reporting, and due to the financial results' inclusion of "revenue" from the Pemfexy channel stuffing scheme in violation of GAAP, for 2022 revenue from Pemfexy sales was materially overstated, causing corresponding misstatements in related metrics including product sales revenue, total revenue, net (loss) income, and (loss) earnings per share.

### D.      May 9, 2023, Eagle Q1 2023 Results

107. On May 9, 2023, Eagle published a press release titled "Eagle Pharmaceuticals Reports First Quarter 2023 Results." Eagle also filed a copy of the

43

press release with the SEC as an exhibit to a Form 8-K signed by Defendant Tarriff.

The press release contained the following financial statement information:

| | | Three Months Ended March 31, | | Twelve Months Ended March 31, | Twelve Months Ended December 31, |
|---|---|---|---|---|---|
| **EAGLE PHARMACEUTICALS, INC.** RECONCILIATION OF GAAP NET INCOME (LOSS) TO ADJUSTED NON-GAAP EBITDA (UNAUDITED) (In thousands) | | | | | |
| | | 2023 | 2022 | 2023 | 2022 |
| Net income (loss) - GAAP | $ | 5,750 $ | 44,058 $ | (2,666) $ | 35,642 |
| Add back: | | | | | |
| Interest expense, net of interest income | | 1,304 | 212 | 4,866 | 3,774 |
| Income tax provision | | 4,481 | 13,602 | 16,670 | 25,791 |
| Depreciation and amortization expense | | 5,552 | 908 | 16,668 | 12,024 |
| Add back: | | | | | |
| Stock-based compensation expense | | 4,639 | 4,295 | 16,795 | 16,451 |
| Fair value adjustments on equity investment | | 403 | 2,530 | 2,330 | 4,457 |
| Convertible promissory note related adjustments | | — | 36 | 4,206 | 4,242 |
| Fair value adjustments related to derivative instruments | | (77) | (608) | 8,496 | 7,965 |
| Foreign currency exchange gain | | (90) | — | (737) | (647) |
| Gain on euro debt | | — | — | (264) | (264) |
| Legal Settlement | | — | 300 | — | 300 |
| Acquisition related costs | | — | 1,490 | 11,632 | 13,122 |
| Inventory step-up | | 320 | — | 866 | 546 |
| Debt issuance cost | | — | — | 258 | 258 |
| Severance | | 43 | 49 | 8,445 | 8,451 |
| Adjusted Non-GAAP EBITDA | $ | 22,325 $ | 66,872 $ | 87,565 $ | 132,112 |

108. Also on May 9, 2023, Eagle held its earnings call to present Q1 2023 results. On that call Defendants presented false and misleading financial metrics, including Defendant Tarriff's statement that "[d]uring the first quarter of '23, PEMFEXY net product sales totaled $22.9 million, and we believe we are well on our way to surpassing the $67 million recorded for the full year of 2022." Discussing Pemfexy later in the call, Defendant Tarriff similarly referred to "the $67 million that we sold in all of last year."

44

109.    Later on May 9, 2023, Eagle filed its quarterly report on SEC Form 10-Q for Q1 2023, which was signed by Defendants Tarriff and Cahill. The 10-Q stated under the heading "Changes in Internal Control over Financial Reporting" that:

> No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the three months ended March 31, 2023 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

110.    The statements identified in ¶¶107-109 were materially false and misleading because, as Defendants knew or recklessly disregarded, Eagle lacked effective internal control over financial reporting, and due to the financial results' inclusion of "revenue" from the Pemfexy channel stuffing scheme in violation of GAAP, for the twelve months ended March 31, 2023 and for full year 2022 Pemfexy sales were materially overstated, causing corresponding misstatements in related metrics including net income (loss).

###    E.    August 8, 2023, Eagle Q2 2023 Results

111.    On August 8, 2023, Eagle published a press release titled "Eagle Pharmaceuticals Reports Second Quarter 2023 Results." Eagle also filed a copy of the press release with the SEC as an exhibit to a Form 8-K signed by Defendant Tarriff. The press release contained false and misleading financial metrics, including the following:

45

**EAGLE PHARMACEUTICALS, INC.**
**RECONCILIATION OF GAAP ONCOLOGY GROSS PROFIT TO**
**ADJUSTED ONCOLOGY NON-GAAP GROSS PROFIT (UNAUDITED)**
**(In thousands)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| Revenue: | | | | |
| PEMFEXY™ | $ 19,400 | $ 16,504 | $ 42,348 | $ 53,686 |
| BELRAPZO® | 6,848 | 8,131 | 13,198 | 14,080 |
| BENDEKA® | 3,780 | 3,497 | 6,174 | 8,050 |
| TREAKISYM | 728 | 812 | 2,083 | 2,266 |
| Oncology product sales, net | $ 30,756 | $ 28,944 | $ 63,803 | $ 78,082 |
| | | | | |
| BENDEKA® | 20,485 | 22,969 | 39,380 | 46,792 |
| TREAKISYM | 1,168 | 1,966 | 2,357 | 3,929 |
| Oncology royalty revenue | $ 21,653 | $ 24,935 | $ 41,737 | $ 50,721 |
| | | | | |
| Oncology Total Revenue | $ 52,409 | $ 53,879 | $ 105,540 | $ 128,803 |
| | | | | |
| Oncology cost of product sales | 10,466 | 12,653 | 20,146 | 25,340 |
| Oncology cost of royalty revenue | — | 2,493 | — | 5,072 |
| Oncology Gross Profit | $ 41,943 | $ 38,733 | $ 85,394 | $ 98,391 |
| Adjustments: | | | | |
| Oncology cost of product revenues: | | | | |
| Oncology amortization expense | 1,867 | — | 3,714 | — |
| Adjusted Oncology Non-GAAP Gross Profit | $ 43,810 | $ 38,733 | $ 89,108 | $ 98,391 |

112. The press release contained the following financial statement information:

46

**EAGLE PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**
**(In thousands, except share and per share amounts)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2023 | 2022 | 2023 | 2022 |
| **Revenue:** | | | | |
| Product sales, net | $ 42,993 | $ 49,201 | $ 89,214 | $ 139,289 |
| Royalty revenue | 21,653 | 24,935 | 41,737 | 50,721 |
| Total revenue | 64,646 | 74,136 | 130,951 | 190,010 |
| **Operating expenses:** | | | | |
| Cost of product sales | 16,858 | 21,171 | 34,158 | 46,347 |
| Cost of royalty revenue | — | 2,493 | — | 5,072 |
| Research and development | 9,833 | 11,437 | 19,105 | 17,545 |
| Selling, general and administrative | 27,651 | 36,832 | 55,611 | 59,014 |
| Total operating expenses | 54,342 | 71,933 | 108,874 | 127,978 |
| Income from operations | 10,304 | 2,203 | 22,077 | 62,032 |
| Interest income | 195 | 244 | 407 | 398 |
| Interest expense | (1,448) | (552) | (2,964) | (918) |
| Other income (expense), net | 247 | (7,763) | 9 | (9,720) |
| Total other expense, net | (1,006) | (8,071) | (2,548) | (10,240) |
| **Income (loss) before income tax provision** | 9,298 | (5,868) | 19,529 | 51,792 |
| Income tax provision | (4,134) | (3,582) | (8,615) | (17,184) |
| **Net income (loss)** | $ 5,164 | $ (9,450) | $ 10,914 | $ 34,608 |
| Earnings (loss) per share attributable to common stockholders: | | | | |
| Basic | $ 0.39 | $ (0.74) | $ 0.83 | $ 2.71 |
| Diluted | $ 0.39 | $ (0.74) | $ 0.83 | $ 2.67 |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 13,090,852 | 12,836,116 | 13,075,090 | 12,773,727 |
| Diluted | 13,154,599 | 12,836,116 | 13,151,107 | 12,951,788 |

113. Also on August 8, 2023, Eagle held its earnings call to present Q2 2023 results. On that call Defendants presented false and misleading financial metrics, including Defendant Tarriff's statement that "[f]or fiscal year '22, we more than tripled non-GAAP earnings to just shy of $8 per share compared to '21, which was driven by approximately $230 million of gross profit in '22, excluding amortization expense. Adjusted non-GAAP EBITDA grew more than 350% to $132 million for the fiscal year '22 compared to '21."

114. Defendant Tarriff also stated on the earnings call, "[g]ross profit, excluding amortization expense in our oncology business was $43.8 million in the second quarter of '23, up from $38.7 million in the second quarter of last year, representing an impressive gross margin of 84% and 72%, respectively."

115. On the earnings call Defendant Cahill stated:

In the second quarter of 2023, total revenue was $64.6 million compared to $74.1 million in Q2 of 2022. Net product sales during the second quarter of '23 totaled $43 million compared to $49.2 million in Q2 of '22. PEMFEXY net product sales were $19.4 million in the second quarter of 2023 compared to $16.5 million in the second quarter of 2022.

116. Defendant Cahill also stated on the earnings call that "[n]et income for the second quarter of '23 was $5.2 million or $0.39 per basic and diluted share compared to a net loss of $9.5 million or $0.74 loss per basic and diluted share in the prior year quarter."

117. Later on August 8, 2023, Eagle filed its quarterly report on SEC Form 10-Q for Q2 2023, which was signed by Defendants Tarriff and Cahill. The Form 10-Q presented the following financial statement information:

48

**EAGLE PHARMACEUTICALS, INC.**
**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS (UNAUDITED)**
**(In thousands, except share and per share amounts)**

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| --- | --- | --- | --- | --- |
| | 2023 | 2022 | 2023 | 2022 |
| **Revenue:** | | | | |
| Product sales, net | $ 42,993 | $ 49,201 | $ 89,214 | $ 139,289 |
| Royalty revenue | 21,653 | 24,935 | 41,737 | 50,721 |
| Total revenue | 64,646 | 74,136 | 130,951 | 190,010 |
| **Operating expenses:** | | | | |
| Cost of product sales | 16,858 | 21,171 | 34,158 | 46,347 |
| Cost of royalty revenue | — | 2,493 | — | 5,072 |
| Research and development | 9,833 | 11,437 | 19,105 | 17,545 |
| Selling, general and administrative | 27,651 | 36,832 | 55,611 | 59,014 |
| Total operating expenses | 54,342 | 71,933 | 108,874 | 127,978 |
| Income from operations | 10,304 | 2,203 | 22,077 | 62,032 |
| Interest income | 195 | 244 | 407 | 398 |
| Interest expense | (1,448) | (552) | (2,964) | (918) |
| Other income (expense), net | 247 | (7,763) | 9 | (9,720) |
| Total other expense, net | (1,006) | (8,071) | (2,548) | (10,240) |
| Income (loss) before income tax provision | 9,298 | (5,868) | 19,529 | 51,792 |
| Income tax provision | (4,134) | (3,582) | (8,615) | (17,184) |
| Net income (loss) | $ 5,164 | $ (9,450) | $ 10,914 | $ 34,608 |
| Earnings (loss) per share attributable to common stockholders: | | | | |
| Basic | $ 0.39 | $ (0.74) | $ 0.83 | $ 2.71 |
| Diluted | $ 0.39 | $ (0.74) | $ 0.83 | $ 2.67 |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 13,090,852 | 12,836,116 | 13,075,090 | 12,773,727 |
| Diluted | 13,154,599 | 12,836,116 | 13,151,107 | 12,951,788 |

118. The 10-Q also stated under the heading "Changes in Internal Control over Financial Reporting" that:

> No change in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) occurred during the three months ended June 30, 2023 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

119. The statements identified in ¶¶111-118 were materially false and misleading because, as Defendants knew or recklessly disregarded, Eagle lacked

49

effective internal control over financial reporting, and due to the financial results' inclusion of "revenue" from the Pemfexy channel stuffing scheme in violation of GAAP, for the three and six months ended June 30, 2022 revenue from Pemfexy sales was materially overstated, causing corresponding misstatements in related metrics including product sales revenue, total revenue, net (loss) income, and (loss) earnings per share.

## VII. THE TRUTH IS REVEALED, CAUSING LARGE DECLINES IN EAGLE'S STOCK PRICE

### A. Eagle's Q1 2023 Results Revealed Dwindling Cash And Growing Debt, Exacerbated By The Sham Pemfexy Sales

120. As discussed *supra*, Eagle published its press release reporting Q1 2023 results on the morning of May 9, 2023, before the open of the regular stock market trading session. The press release revealed that from December 31, 2022 to March 31, 2023 Eagle's cash and cash equivalents had been reduced from $55.3 million to $21.9 million, and its total debt had increased from $62.5 million to $76.3 million, signaling to investors the potential for significant near-term liquidity problems. Over the same period Eagle's accounts receivable (*i.e.*, "sales" for which it had recognized revenue but not collected cash) grew from $72.4 million to $115.0 million, as the sham Pemfexy sales had remained on Eagle's balance sheet for months.

121. This news of Eagle's seriously deteriorating financial condition was a materialization of the risk concealed by Defendants' Pemfexy channel stuffing

scheme and falsified financial statements. Eagle's recognition of revenue from Pemfexy sales in Q2 2022 for which it did not, and was unlikely to ever, collect cash payment created heightened risks to the Company's liquidity, which Defendants had concealed from investors.

122.   On this news, Eagle's stock price fell $3.88 per share as compared to the prior day closing price, or 13.3%, to close at $25.29 per share on May 9, 2023.

123.   Also on May 9, 2023, after the close of the regular stock market trading session, Eagle filed its Form 10-Q for Q1 2023 with the SEC, which confirmed Eagle's rapidly deteriorating liquidity and the financial results reported in Eagle's press release earlier in the day. This confirmation was significant because, as discussed *supra*: (i) Eagle's most recent prior Form 10-Q, for Q3 2022, reported significantly different financial results than Eagle's original Q3 2022 earnings press release, which had to be corrected; and (ii) Eagle's most recent prior earnings release, for Q4 2022 in March 2023, was followed by a disclosure days later that Eagle could not timely file its annual report due to ongoing review of its financial statements.

124.   As the market continued to react to Eagle's Q1 2023 results, as confirmed by its Form 10-Q, Eagle's stock price fell $4.18 per share as compared to the prior day closing price, or 16.5%, to close at $21.11 per share on May 10, 2023. Over May 9-10, 2023, Eagle's stock lost 27.6% of its value, and remained at similar levels over the next few weeks.

51

125. On May 24, 2023 analysts at Cantor Fitzgerald published a note about Eagle titled "Management Catch Up Reinforces Sell Off Post 1Q23 Earnings Overdone," commenting on a recent interview they had with Eagle's "management," and on the sharp decline in Eagle's share price following its release of Q1 2023 results. The note stated that "[w]ith EGRX stock down ~28.0% (vs -0.3% for the NBI [NASDAQ Biotechnology Index]) since reporting earnings on 5/8/2023, we sat down with EGRX management to take a deeper dive into the quarter and the path ahead." The note attributed the decline in Eagle's share price to "cash concerns" and "the optics of a cash crunch," while apparently accepting misleading assurances from Eagle's management that the Company would be able to collect on its accounts receivable such that the deterioration in Eagle's liquidity was "merely a timing issue."

126. The note stated in relevant part:

> The largest concern we walked away from the quarter with was around the balance sheet and cash flows during the quarter; however, a meaningful part of the 1Q23 cash flow weakness was driven by the timing of working capital flows, which are expected to reverse in the coming quarters. EGRX cash and cash equivalents were $21.9MM as of 3/31/2023, well below the very healthy balance we have come to expect from EGRX. For reference, cash and equivalents were ~$55.3MM as of 12/31/2022. Operating cash outflow in 1Q23 was $33.5MM, which we believe raised some concern given the $21.9MM cash balance.
>
> We do not have a concern of EGRX running out of cash in the near term, and in 1Q23, accounts receivable grew $42.5MM, giving way to what looked like a significant cash burn. We believe that is merely a timing issue and expect EGRX to collect on those accounts receivable in the coming quarters, and thus reversing the optics of a cash crunch

52

at EGRX which we believe has contributed meaningfully to the sell post earnings.

* * *

While the sell off post earnings is overdone in our view, we fundamentally remain on the sidelines as we await better visibility on the revenue trajectory of the company in the midterm. That said, we do believe the recent stock weakness is more likely due to the cash concerns described above, which we expect to improve.

**B.** **On November 9, 2023, Eagle Announced Delayed Q3 2023 Results To Review Its Accounting For Pemfexy Sales**

127. On November 8, 2023, Eagle published a press release titled "Eagle Pharmaceuticals to Host Third Quarter 2023 Financial Results on November 9, 2023." The press release stated that "the Company will release its third quarter 2023 financial results on Thursday, November 9, 2023, before the market opens," and that "Scott Tarriff, President and Chief Executive Officer, and Brian Cahill, Chief Financial Officer, will host a conference call to discuss the results" at 8:30 a.m. ET on November 9.

128. Only one day later, on the morning of November 9, 2023, before the open of the regular stock market trading session, Eagle published a press release titled "Eagle Delays Third Quarter 2023 Results and Conference Call." Eagle also filed a copy of the press release with the SEC as an exhibit to a Form 8-K signed by Defendant Tarriff. The press release stated that Eagle "will be delaying the release of its third quarter 2023 results and investor conference call," and that it anticipated late

53

filing its Form 10-Q for Q3 2023 by November 14, 2023. The press release further stated that "[t]he Company requires more time to review potential adjustments relating to the reporting of sales of PEMFEXY® prior to filing its Form 10-Q. In addition, the Company expects to revise its previously disclosed 2023 full year guidance downward."

129. On this news, Eagle's share price fell $4.16 as compared to the prior day closing price, or 30.4%, to close at $9.54 per share on November 9, 2023.

130. On November 9, 2023, after the close of the regular stock market trading session, Eagle filed with the SEC a Form 12b-25 Notification of Late Filing, signed by Defendant Tarriff, stating that "[t]he Company is unable to file its Form 10-Q within the prescribed time period without unreasonable effort or expense primarily because it requires additional time to complete its review of potential adjustments relating to the reporting of sales of PEMFEXY®." The filing further stated that "the Company is reviewing and expects potential adjustments to reserves for returns and price adjustments of approximately $15.0 million to $20.0 million. These potential adjustments primarily relate to returns and a price adjustment for PEMFEXY® substantially stemming from slower-than-anticipated pull-through from one wholesale customer predominantly due to expiry of inventory."

### C. On November 29, 2023, Eagle Announced The "Resignation" Of Defendant Tarriff

131. On the morning of November 29, 2023, before the open of the regular stock market trading session, Eagle published a press release titled "Eagle Pharmaceuticals Announces Management Change." Eagle also filed a copy of the press release with the SEC as an exhibit to a Form 8-K signed by Defendant Cahill. The press release stated that:

> Effective immediately Scott Tarriff, Founder, President and Chief Executive Officer of the Company, has announced his resignation and retirement from his positions with the Company as President, Chief Executive Officer and Director on the Company's Board of Directors. Michael Graves, Eagle Pharmaceuticals' Chairman of the Board, has assumed the role of Interim Executive Chairman of the Board to lead the management team through this transition. The Company will institute a CEO search for Mr. Tarriff's successor.

132. The Form 8-K further disclosed that "[a]fter consideration of various alternatives, including termination with or without cause, the Board accepted Mr. Tarriff's resignation."

133. On this news, Eagle's share price fell $2.55 as compared to the prior day closing price, or 31.0%, to close at $5.68 per share on November 29, 2023.

### D. Eagle's Business Languished As New Management Spent Months Evaluating The Falsified Financial Statements

134. On December 15, 2023 Eagle filed with the SEC a Form 8-K signed by Defendant Cahill. The filing revealed that Eagle's financial statements for Q2 2023 were not compliant with GAAP, should not be relied on, and need to be restated, and

that Eagle had material weaknesses in its internal controls over financial reporting

and that such controls were ineffective. The filing stated:

> On December 12, 2023, the Audit Committee (the "Audit Committee") of the Board of Directors of Eagle Pharmaceuticals, Inc. (the "Company"), based on the recommendation of, and after consultation with, the Company's management concluded that the Company's previously issued unaudited interim condensed consolidated financial statements for the quarter ended June 30, 2023 (the "Non-Reliance Period"), as previously filed with the SEC, should no longer be relied upon and should be restated due to the matters described below. The Company's management and the Audit Committee have discussed the matters disclosed in this current report on Form 8-K with Ernst & Young LLP, the Company's independent registered public accounting firm.
>
> As previously disclosed in the Company's Form NT 10-Q filed on November 9, 2023 (the "NT 10-Q"), the Company, in the course of preparing its interim financial statements for the quarter ended September 30, 2023, determined that it was necessary to review potential adjustments primarily relating to reserves for PEMFEXY® returns and price adjustments estimated in the amount of $15.0 million to $20.0 million (the "Estimated Adjustment Amount").
>
> During its review, the Company discovered that reserves recorded in its financial statements for the quarter ended June 30, 2023 primarily relating to returns and price adjustments for PEMFEXY® did not reflect certain information that should have been considered at the time the Company prepared its financial statements for the quarter ended June 30, 2023. Had that information been considered, such reserves for the quarter ended June 30, 2023 would have increased, which would have reduced the Company's net product sales for the quarter ended June 30, 2023 by a corresponding amount. The expected increase in reserves for the quarter ended June 30, 2023 represents a portion of the Estimated Adjustment Amount. The Company is in the process of determining which portions of the Estimated Adjustment Amount will be allocated between the quarter ended June 30, 2023 and the quarter ended September 30, 2023. The Estimated Adjustment Amount takes

56

into account other reserve corrections in the Non-Reliance Period. At this time, the Company has not fully completed its review, and the expected financial statement impacts are preliminary and subject to change.

As a result of the foregoing, the Company has identified material weaknesses in its internal control over financial reporting that existed as of June 30, 2023 and has re-evaluated the effectiveness of the Company's disclosure controls and procedures as of June 30, 2023. Based on this assessment, the Company's disclosure controls and procedures were ineffective as of June 30, 2023. The Company is continuing to evaluate its internal control over financial reporting and will report its remediation plan and further information regarding the material weaknesses in an amendment to its previously filed Form 10-Q for the quarter ended June 30, 2023.

The Company intends to file an amendment to its previously filed Form 10-Q for the quarter ended June 30, 2023, which will include restated unaudited condensed consolidated financial statements for the three and six months ended June 30, 2023. The Company is continuing to assess the Estimated Adjustment Amount and any other potential items for correction as needed. Any previously issued or filed reports, press releases, earnings releases, stockholder communications, investor presentations or other communications describing the Company's financial statements, financial results and other related financial information covering such period and any information related to the matters described above, should no longer be relied upon. In addition, the Company previously disclosed that it expected to revise its previously disclosed full year 2023 guidance downward and accordingly, such guidance should no longer be relied upon. The Company continues to work diligently on its review and preparation of the Form 10-Q for the quarter ended September 30, 2023.

135. The Form 8-K further disclosed that Eagle's financial statements for Q2 2023 "did not present fairly in all material respects the financial condition and results of operations of the Company and its consolidated subsidiaries for the reasons

57

described above and were not prepared in accordance with generally accepted accounting principles."

136. On February 29, 2024 Eagle filed with the SEC a Form 8-K signed by Defendant Cahill. The filing stated that Eagle's Board had approved a "Realignment Plan" that was "designed to improve operational efficiencies and realign the Company's sales and marketing expenditures" and was "expected to reduce the Company's current workforce by approximately 36%." Eagle disclosed that it was "initiating implementation of the Realignment Plan effective immediately."

137. On March 8, 2024, Eagle filed with the SEC a Form 8-K signed by Interim Principal Executive Officer Michael Graves. The filing stated that "[o]n March 8, 2024, Brian Cahill resigned from his position as Chief Financial Officer of Eagle Pharmaceuticals, Inc. . . . , effective immediately." No permanent successor had been identified, instead "Steven Ratoff, a member of the Board and Chair of the Audit Committee of the Board . . . , was appointed Interim Chief Financial Officer, Principal Financial Officer and Principal Accounting Officer of the Company, effective immediately, to serve until such time as a new Chief Financial Officer commences employment."

138. Shortly thereafter, on March 18, 2024, Eagle filed with the SEC a Form 12b-25 Notification of Late Filing, revealing that Eagle would be unable to timely file its Form 10-K annual report for 2023, stating that:

The Company is unable to file the 2023 Form 10-K within the prescribed time period without unreasonable effort or expense primarily due to the circumstances described below.

As previously disclosed, the Company intends to restate its financial statements for the three and six months ended June 30, 2023, the review and preparation of which is currently ongoing. In addition, the Company's review and preparation of its financial statements for the quarter ended September 30, 2023 remains ongoing. Due to the time and effort devoted to the matters relating to such prior periods, the Company is delayed in its reporting and review process for the fiscal year ended December 31, 2023. Accordingly, the Company does not expect to complete the preparation and filing of the 2023 Form 10-K by the prescribed due date or within the extended time period permitted by Rule 12b-25.

139. On May 10, 2024, Eagle filed with the SEC another Form 12b-25 Notification of Late Filing, revealing that Eagle would be unable to timely file its Form 10-Q quarterly report for Q1 2024, stating that:

The Company is unable to file the Q1 2024 Form 10-Q within the prescribed time period without unreasonable effort or expense primarily due to the circumstances described below.

As previously disclosed, the Company intends to restate its financial statements for the three and six months ended June 30, 2023, the review and preparation of which are currently ongoing. In addition, the Company's review and preparation of its financial statements for the quarter ended September 30, 2023 and year ended December 31, 2023 remain ongoing. Due to the time and effort devoted to these matters, the Company is delayed in its reporting and review process for the quarter ended March 31, 2024. Accordingly, the Company does not expect to complete the preparation and filing of the Q1 2024 Form 10-Q by the prescribed due date or within the extended time period permitted by Rule 12b-25.

140. On August 5, 2024, Eagle filed with the SEC a Form 8-K stating that in connection with Eagle's plan to maintain its stock's listing on the NASDAQ, "the Company is planning to file with the SEC a comprehensive Form 10-K, including restated financial statements for the period ended June 30, 2023, financial statements for the period ended September 30, 2023 and financial statements for the period ended December 31, 2023 by" September 30, 2024.

141. On August 9, 2024, Eagle filed with the SEC yet another Form 12b-25 Notification of Late Filing, revealing that Eagle would be unable to timely file its Form 10-Q quarterly report for Q2 2024, stating that:

> The Company is unable to file the Q2 2024 Form 10-Q within the prescribed time period without unreasonable effort or expense primarily due to the circumstances described below.
>
> As previously disclosed, the Company intends to restate its financial statements for the three and six months ended June 30, 2023, the review and preparation of which are currently ongoing. In addition, the Company's review and preparation of its financial statements for the quarter ended September 30, 2023, the year ended December 31, 2023 and the quarter ended March 31, 2024 remain ongoing. Due to the time and effort devoted to these matters, the Company is delayed in its reporting and review process for the quarter ended June 30, 2024.

The filing also reiterated that "the Company is planning to file with the SEC a comprehensive Annual Report on Form 10-K, including restated unaudited condensed consolidated financial information for the period ended June 30, 2023, unaudited condensed consolidated financial information for the period ended

60

September 30, 2023 and audited financial statements for the period ended December 31, 2023 by" September 30, 2024.

142.   On August 27, 2024, Eagle filed with the SEC a Form 8-K reiterating that "the Company is planning to file with the SEC a comprehensive Form 10-K, including restated financial information for the period ended June 30, 2023, financial information for the period ended September 30, 2023 and financial statements for the period ended December 31, 2023 by" September 30, 2024.

143.   As of the date of filing the instant complaint (more than 18 months after Eagle first admitted that its financial statements for Q2 2023 were not compliant with GAAP, should not be relied on, and need to be restated), the Company still has not publicly disclosed any restated financial statements.

### E.   On October 2, 2024, Eagle Revealed That Its Financial Statements From Q2 2022 Forward Should Not Be Relied Upon

144.   On the morning of October 2, 2024, before the open of the regular stock market trading session, Eagle filed with the SEC a Form 8-K signed by Interim Principal Executive Officer Michael Graves. The filing revealed that Eagle's financial statements dating all the way back to Q2 2022 were not compliant with GAAP, should not be relied on, and need to be restated, and that Eagle had material weaknesses in its internal controls over financial reporting and that such controls were ineffective. The filing stated:

61

On September 27, 2024, the Audit Committee (the "Audit Committee") of the Board of Directors of the Company, based on the recommendation of, and after consultation with, the Company's management, concluded that revenue previously recognized related to a sale of PEMFEXY in the second quarter of 2022 did not meet certain criteria of Financial Accounting Standards Board Accounting Standards Codification Topic 606 – *Revenue from Contracts with Customers*, when originally recorded. The Company previously recognized revenue upon delivery to a wholesale customer but has now determined that revenue from this transaction should be deferred and recognized in later periods to the extent certain criteria have been achieved. As a result, the Audit Committee determined that the Company's audited financial statements for the fiscal year ended December 31, 2022, and unaudited financial statements for the quarters ended June 30, 2022, September 30, 2022, and March 31, 2023 (collectively, the "Non-Reliance Period"), as previously filed with the SEC, should no longer be relied upon and should be restated. The Company's management and the Audit Committee have discussed the matters disclosed in this current report on Form 8-K with Ernst & Young LLP ("EY"), the Company's independent registered public accounting firm.

\* \* \*

As a result of the foregoing, the Company expects to conclude that one or more material weaknesses related to the foregoing matters existed in the Company's internal control over financial reporting and that the Company's disclosure controls and procedures were not effective for each of the fiscal periods within the Non-Reliance Period, and as of September 30, 2023 and December 31, 2023. In addition, as previously disclosed, the Company has identified material weaknesses in its internal control over financial reporting that existed as of June 30, 2023 and concluded that the Company's disclosure controls and procedures were ineffective as of June 30, 2023. The Company is continuing to evaluate its internal control over financial reporting and its remediation plan with respect thereto.

The Company is completing its review of the foregoing matters and any other potential items for correction as needed. The Company has not yet determined the impact in each quarter and will re-evaluate the net

62

revenue recognized related to certain sales of PEMFEXY, beginning in the second quarter of 2022 and through the Non-Reliance Period. Any previously issued or filed reports, press releases, earnings releases, stockholder communications, investor presentations or other communications describing the Company's financial statements, financial results and other related financial information covering the Non-Reliance Period and any information related to the foregoing matters, should no longer be relied upon.

145.   The Form 8-K further disclosed that Eagle's financial statements dating back to Q2 2022 "did not present fairly in all material respects the financial condition and results of operations of the Company and its consolidated subsidiaries for the reasons described above and were not prepared in accordance with GAAP."

146.   On this news, Eagle's share price fell $1.42 as compared to the prior day closing price, or 39.9%, to close at $2.14 per share on October 2, 2024. Eagle's share price continued to fall over the next two trading days. On October 3, 2024, Eagle's share price fell by $0.15 (7.0%), to close at $1.99. On October 4, 2024, the stock fell by another $1.09 (54.8%), closing at $0.90. In total, over October 2-4, 2024, Eagle's share price fell by $2.66, losing 74.7% of its value, as the market reacted to Eagle's October 2, 2024 disclosures.

## VIII.   POST-CLASS PERIOD EVENTS

### A.   Defendant Tarriff's Court Filings Reveal The SEC's Investigation

147.   As revealed by court filings in litigation by Defendant Tarriff against Eagle seeking advancement of his legal expenses (*Tarriff v. Eagle Pharmaceuticals,*

63

*Inc.*, Delaware Chancery Court Case No. 2024-1189), for over a year the SEC has been conducting an investigation into the matters at issue in the instant action.

148.  According to Tarriff's complaint filed November 20, 2024 ("Tarriff Complaint"):

> On July 13, 2023, a former employee of the Company filed a whistleblower complaint in federal court against the Company and Mr. Tarriff alleging that the Company, under Mr. Tarriff's leadership, had engaged in accounting and financial reporting misconduct (the "Whistleblower Action"). In December 2023, a class action was filed against the Company and Mr. Tariff [sic] in federal court arising out of the same alleged misconduct. *See* Class Action Complaint, *Miller v. Eagle Pharmaceuticals, Inc., et al.*, C.A. 2:23-cv-23011 (D.N.J. Dec. 11, 2023) (the "Securities Class Action"). And in parallel, the Securities & Exchange Commission (the "SEC") commenced an investigation into the alleged issues raised in the Whistleblower Action and underlying the claims asserted in the Securities Class Action (the "SEC Investigation").

Tarriff Complaint ¶3.

149.  "In October 2023, following the filing of the Whistleblower Action, the Company received an information request from the SEC. The ongoing SEC Investigation has focused on accounting issues similar to those alleged in the Whistleblower Action, and concerns conduct from 2022 and 2023." *Id.* ¶25. "The accounting and financial reporting issues raised in both proceedings [the SEC Investigation and the Whistleblower Action] concern Company-wide policies, practices, and activities. The accounting issues raised in the proceedings center around the revenue recognition for one of Eagle's products." *Id.* ¶28. "These

64

accounting matters are the subject of documents produced in the SEC Investigation," and "some of the SEC document requests directed to the Company have specifically sought information about Mr. Tarriff." *Id.*

150. As revealed in Defendant Tarriff's Motion To Compel filed on December 30, 2024, "the SEC Investigation remains ongoing. In October of this year, the SEC began interviewing individuals affiliated with the Company."

151. The Transmittal Affidavit of Joseph L. Christensen, counsel to Defendant Tarriff, filed in support of Tarriff's motion for summary judgment on January 13, 2025, lists exhibits including an October 11, 2023 "SEC Subpoena directed to Eagle Pharmaceuticals, Inc.," and a March 25, 2024 "SEC Subpoena directed to Eagle Pharmaceuticals, Inc." Those exhibits are listed as confidential on the docket and filed under seal, and so are not available to Plaintiffs in the instant action.

152. The Declaration of Jeremiah Williams filed January 13, 2025 ("Williams Decl."), states that he is "a litigation partner at Ropes & Gray LLP," and "the lead counsel for . . . Scott Tarriff in the Securities and Exchange Commission's . . . ongoing investigation of Eagle." Williams Decl. ¶1. "The SEC Investigation involved the same PEMFEXY inventory issue that was at the center of the Whistleblower Action, so the SEC Investigation exposed Mr. Tarriff to potential liability." *Id.* ¶3. "The SEC issued a document subpoena to Mr. Tarriff on January 8,

65

2025. The SEC staff said that they also intend to take testimony from Mr. Tarriff." *Id.* ¶9.

153. As stated in Defendant Tarriff's Opening Brief In Support Of Motion For Summary Judgment filed January 21, 2025, "[o]n October 11, 2023, the SEC sent the Company a subpoena targeted to the topics of the Whistleblower Action." Further, "The accounting issues raised in the proceedings center around the revenue recognition for PEMFEXY."

**B.     Eagle Dismisses Its External Auditor Ernst & Young LLP**

154. On November 27, 2024, Eagle filed with the SEC a Form 8-K stating that "[o]n November 21, 2024, Eagle . . . dismissed Ernst & Young LLP ('EY'), the Company's previous independent registered public accounting firm." The Form 8-K further stated that "as previously disclosed, the Audit Committee concluded that the Company's audited consolidated financial statements for the fiscal year ended December 31, 2022 and EY's audit report thereon . . . should no longer be relied upon and the financial statements should be restated."

155. The 8-K further disclosed that "the Company has identified material weaknesses in its internal control over financial reporting" and that "EY notified the Company that due to those material weaknesses, EY would need to expand the scope of its audit procedures on the financial statements as of and for the years ended

66

December 31, 2023 and 2022 (as restated) which were not completed prior to EY's dismissal."

### C. Eagle Delists Its Stock From The NASDAQ And Ceases SEC Reporting

156. Although Eagle had repeatedly stated, as recently as August 27, 2024, that it intended to file with the SEC by September 30, 2024 a Form 10-K for 2023 including restated financial statements, shortly after the end of the Class Period, Eagle implemented a plan to cease making public SEC filings. This practice is referred to as "going dark."

157. On November 15, 2024, Eagle announced that it planned to delist its publicly traded stock from the NASDAQ stock exchange, which would "also serve to deregister the Common Stock under Section 12(b) of the Securities Exchange Act of 1934, as amended, effective 90 days thereafter, which would reduce certain SEC reporting obligations." On November 26, 2024, Eagle filed with the SEC a Form 25, Notification of Removal From Listing And/Or Registration Under Section 12(b) Of The Securities Exchange Act Of 1934, to delist its shares from the NASDAQ stock exchange.

158. On November 27, 2024, Eagle filed with the SEC multiple Post-Effective Amendments to its Registration Statements previously filed with the SEC, along with a Registration Withdrawal Request, in order to deregister its securities with the SEC. On January 24, 2025, Eagle filed with the SEC a Form 15,

Certification And Notice Of Termination Of Registration Under Section 12(b) Of The Securities Exchange Act Of 1934 Or Suspension Of Duty To File Reports Under Sections 13 And 15(d) Of The Securities Exchange Act of 1934.

159. Eagle has not made any public SEC filings since January 24, 2025.

## IX. ADDITIONAL SCIENTER ALLEGATIONS

### A. Defendant Tarriff Directly Carried Out The Channel Stuffing Scheme And Ignored Repeated Warnings Not To

160. As set forth above (*see supra* Part V.A) and in the Moran Complaint, Defendant Tarriff created and personally implemented the Pemfexy channel stuffing scheme. As further set forth above and in the Moran Complaint, Moran repeatedly warned Defendant Tarriff not to engage in channel stuffing for Pemfexy, but Tarriff ignored these warnings and did so anyway.

161. Even when Moran made an internal whistleblower complaint regarding Tarriff's actions in June 2022, this did not cause Defendant Tarriff to cease his misconduct. As explained by Moran, "[b]y late June 2022, [Moran] made a further internal whistleblower complaint against Defendants [Eagle and Tarriff] to the Company's Head of Human Resources Tracy Straley regarding what he reasonably believed to be violations of law, rule and/or public policy." Moran Complaint ¶140. "HR Straley advised [Moran] that since she already had a meeting scheduled with Defendant Tarriff and GC Debski, she would report his complaints to them right away." *Id.* ¶148. "[Moran] never heard back from Head of HR Straley, General

68

Counsel/Chief Compliance Officer Debski or anyone else at Defendant Eagle regarding his complaints." *Id.* ¶149. Instead "on July 15, 2022, within just a few short weeks of having reported the additional disclosures, Defendants terminated [Moran's] employment in retaliation for his blowing the whistle on them." *Id.* ¶151.

162.  It is highly likely that Moran's termination was ordered by Defendant Tarriff. In a Form 8-K filed with the SEC on July 18, 2022 that was signed by Defendant Tarriff, Eagle announced that "[o]n July 15, 2022, Michael Moran separated as Executive Vice President, Chief Commercial Officer of Eagle Pharmaceuticals, Inc."  Because Moran was a senior executive reporting directly to Defendant Tarriff, he likely could only be terminated by Defendant Tarriff or by the Board. Defendant Tarriff was one of Eagle's seven directors in 2022. It is highly unlikely that Board members other than Tarriff made the decision to fire Moran, seeing as the Board later initiated an internal investigation into Moran's allegations and as a result pressured Tarriff to resign. The strongest inference from these facts is that Defendant Tarriff terminated Moran in an attempt to conceal Tarriff's fraud.

**B.  Defendants Tarriff And Cahill Had In-Depth Knowledge Of Eagle's Pemfexy Accounting And Customer Inventories**

163.  As alleged herein, Defendants Tarriff and Cahill repeatedly held themselves out as knowledgeable regarding Eagle's Pemfexy sales, customers' Pemfexy inventory levels, and Eagle's financial reporting for Pemfexy sales, as they often discussed these issues in detail in Eagle's SEC filings, investor conference calls,

69

and other public statements. The following additional statements further show the Individual Defendants' knowledge of these subjects.

164. On Eagle's November 7, 2022 conference call for Q3 2022 results, Defendant Cahill stated, "PEMFEXY sales were $1.7 million in the third quarter of 2021. PEMFEXY product sales were compressed for the quarter as we see customers working through launch order quantities. Actual PEMFEXY sales volume by customers was as much as 4x that of reported sales as trade inventory was reduced."

165. At the JP Morgan Healthcare Conference on January 10, 2023, Defendant Tarriff stated:

> We had inventory in the system that needed to be worked out with some customers. We have other customers buying inventory in anticipation of having a strong Q1. So those 2 things need to balance out. But if you look at the out movement, the actual usage of PEMFEXY to the end customer, that equates to about $8 million in Q4, as I stated with the expectation being that number will double.

166. On Eagle's May 9, 2023 conference call for Q1 2023 results, Defendant Cahill stated:

> PEMFEXY's net product sales were $22.9 million in the first quarter of 2023 compared to $37.2 million in the first quarter of 2022. We record revenue on delivery of our products to our direct customers, primarily wholesalers, which estimates the current and near-term needs of the wholesaler channel for our growing product. As we continue to capture more share of the pemetrexed market, customer inventory levels may be higher than for similar established products.

167. On Eagle's August 8, 2023 conference call for Q2 2023 results, Defendant Tarriff stated:

70

It's important to look at our balance sheet and receivables as well. The bulk of our receivables relate to PEMFEXY at the end of the second quarter. For this product, we received the majority of our orders near the end of the quarter because contract pricing is mostly adjusted quarterly, large quantities of products are purchased near the end of the quarter producing this result. This trend is likely to continue into the near future.

**C.    Defendant Tarriff Sold At Least $1.8 Million Of Eagle Stock During The Class Period**

168. Defendant Tarriff sold substantial amounts of Eagle's publicly traded common stock while knowing the concealed facts about his Pemfexy channel stuffing scheme. These sales were out of line with Tarriff's recent trading history.

169. Prior to the Class Period, the last time Defendant Tarriff reported selling Eagle stock was more than three years earlier, on April 1, 2019.

170. Defendant Tarriff did not report any purchases of Eagle stock during the Class Period.

171. Defendant Tarriff reported, in an SEC Schedule 13G/A filed February 14, 2023, beneficial ownership of Eagle stock in the following amounts as of December 31, 2022:

(i)    353,788 shares of Common Stock owned directly by him,

(ii)   176,361 shares of Common Stock held by Janney Montgomery Scott LLC CUST FBO Scott Tarriff IRA for the Benefit of Mr. Tarriff (the "IRA Trust"), of which Mr. Tarriff is a trustee and, as such, may be

71

deemed to share voting and dispositive power with respect to all shares held by the IRA Trust,

(iii) options to purchase 987,410 shares of Common Stock exercisable within 60 days of December 31, 2022,

(iv) 23,275 shares of Common Stock underlying restricted stock units ("RSUs") that will vest within 60 days of December 31, 2022 and

(v) 992,623 shares of Common Stock held by the Tarriff 2016 Generation Skipping Exempt Family Trust DTD 12/28/2016 (the "Family Trust") for the benefit of Mr. Tarriff's spouse and three children, of which Mr. Graves is the trustee, and as such, while Mr. Tarriff may be deemed to share voting and dispositive power with respect to all shares held by the Family Trust, Mr. Tarriff disclaims beneficial ownership with respect to such shares in the Family Trust, except to the extent of his pecuniary interest therein.

172. Defendant Tarriff reported the following Class Period sales of Eagle stock:

72

| Date | Shares | Price | Proceeds |
|---|---|---|---|
| 5/11/2023 | 15,000 | $20.71 | $310,650.00 |
| 5/12/2023 | 3,131 | $19.69 | $61,649.39 |
| 5/12/2023 | 11,869 | $20.42 | $242,364.98 |
| 5/15/2023 | 14,800 | $21.06 | $311,688.00 |
| 5/15/2023 | 200 | $21.52 | $4,304.00 |
| 5/16/2023 | 15,000 | $19.98 | $299,700.00 |
| 10/2/2023 | 9,511 | $15.23 | $144,852.53 |
| 10/3/2023 | 10,024 | $14.41 | $144,445.84 |
| 10/3/2023 | 710 | $15.11 | $10,728.10 |
| 11/1/2023 | 10,925 | $13.82 | $150,983.50 |
| 11/2/2023 | 10,694 | $13.87 | $148,325.78 |
| **TOTAL** | 101,864 | | $1,829,692.12 |

173. Defendant Tarriff reported, in an SEC Schedule 13G/A filed March 18, 2024, beneficial ownership of Eagle stock in the following amounts as of December 31, 2023:

(i)     257,511 shares of Common Stock owned directly by him,

(ii)    176,361 shares of Common Stock held by Janney Montgomery Scott LLC CUST FBO Scott Tarriff IRA for the Benefit of Mr. Tarriff (the "IRA Trust"), of which Mr. Tarriff is a trustee and, as such, may be deemed to share voting and dispositive power with respect to all shares held by the IRA Trust,

(iii)   options to purchase 1,020,800 shares of Common Stock exercisable as of December 31, 2023 or within 60 days of December 31, 2023,

73

(iv) 23,275 shares of Common Stock underlying restricted stock units ("RSUs") that will vest within 60 days of December 31, 2023 and

(v) 992,623 shares of Common Stock held by the Tarriff 2016 Generation Skipping Exempt Family Trust DTD 12/28/2016 (the "Family Trust"), of which Mr. Thomas is the trustee, and as such, while Mr. Tarriff may be deemed to share voting and dispositive power with respect to all shares held by the Family Trust, Mr. Tarriff disclaims beneficial ownership with respect to such shares in the Family Trust, except to the extent of his pecuniary interest therein.

174. The only change to Defendant Tarriff's reported ownership of Eagle stock from December 31, 2022 to December 31, 2023 (as opposed to options granted to him by Eagle), was a decrease of 96,277 shares owned directly by him, roughly equivalent to the 101,864 shares he reported selling in 2023.

175. The 101,864 shares sold represent 28.8% of his 353,788 directly held shares as of December 31, 2022, and 6.7% of the 1,522,772 total shares that were held by him directly, by his IRA Trust, and by his Family Trust.

176. Defendant Tarriff's SEC filings reporting his Eagle stock sales in October and November of 2023 state that "[t]hese transactions were made pursuant to a Rule 10b5-1 trading plan adopted by the Reporting Person on June 15, 2023." A 10b5-1 plan is a written agreement in which a corporate insider sets forth the

74

timing and quantity of future stock sales. SEC Rule 10b5-1 (17 C.F.R. § 240.10b5-1) provides an affirmative defense to claims of insider trading in violation of Rule 10b-5 and Exchange Act Section 10(b) where multiple strict requirements are met. Among those requirements are that the insider adopt the plan "[b]efore becoming aware of the [material nonpublic] information" at issue. 17 C.F.R. § 240.10b5-1(c)(A). Defendant Tarriff's 10b5-1 plan was adopted on June 15, 2023, when he knew of the Pemfexy channel stuffing scheme, which was material nonpublic information, so the affirmative defense provided by Rule 10b5-1 does not apply.

### D. Material Amounts Of Defendants' Incentive Compensation Depended On Pemfexy Sales And Eagle's Stock Price

177. As reported in Eagle's proxy statement filed with the SEC on May 1, 2023, material amounts of the incentive compensation for Defendants Tarriff and Cahill depended on Pemfexy sales and Eagle's stock price, giving them motives to artificially inflate those metrics.

178. In 2022 Defendant Tarriff received a base salary of $848,640 and Defendant Cahill received a base salary of $395,200, however this constituted only a small proportion of their overall compensation. Eagle reported that Tarriff's base salary was only 8% of his 2022 total direct compensation mix, with the remainder being "At-Risk" and in the form of performance-vesting stock units ("PSUs"), restricted stock units ("RSUs"), and a cash annual performance bonus. Eagle reported that Cahill's base salary was only 14% of his 2022 total direct compensation mix.

75

179.   Eagle paid 2022 cash annual performance bonuses to Tarriff and Cahill of $636,705 and $177,840, respectively, equivalent to 75% of their target annual performance bonuses. The criteria for awarding annual performance bonuses were weighted 10% to "Product Sales," which included as one of four goals "[o]btaining or exceeding the PEMFEXY® product sales goal for 2022 of $156.1 million." Another 10% of the criteria for awarding annual performance bonuses depended on "Earnings," with an "Adjusted Non-GAAP EPS Target" of $9.28, and an "Adjusted Non-GAAP EBITDA Target" of $160 million. "Pemfexy" separately accounted for an additional 10% weight, with the goal to "[i]nitiate commercial launch and generate revenue."

180.   The value of Eagle's stock-based compensation, consisting of RSUs and PSUs, to Defendants Tarriff and Cahill was directly dependent on Eagle's stock price. For 2022, 75% of such stock-based compensation was in the form of PSUs, the vesting of which depended in substantial part on Eagle's stock price performance. Specifically, "[t]he PSUs are eligible to vest based on [Eagle's] total shareholder return relative to the S&P 600 Biotech Select Index over the three year performance period." In February 2022 Eagle granted PSUs and RSUs to Defendants Tarriff and Cahill with total target grant date value of $7.0 million and $1.6 million, respectively.

76

### E. Defendants Had A Motive To Reduce The Deficit From Tarriff's Aggressive 2Q 2022 Financial Guidance

181. In Eagle's investor conference calls, Defendant Tarriff repeatedly discussed Eagle's financial guidance, and the importance of meeting or exceeding that guidance. In particular, Defendant Tarriff's comments throughout early 2022 led investors to expect strong financial results for Eagle in Q2 2022, driven in substantial part by strong Pemfexy sales. In Eagle's March 7, 2022 investor call to report Q4 2021 results, Defendant Tarriff stated that:

> In terms of Q2, we have no contractual limit on PEMFEXY volume. But right now, we're expecting a little less COVID cases. So vasopressin volume would come down a bit. Based on current trends, we believe Q2 revenue and earnings should be around the same as Q1, although it's too soon to have complete certitude as pricing in these markets can be variable. We will provide an update as we have more visibility.

182. On May 9, 2022, Eagle reported Q1 2023 revenue of $115.9 million, and non-GAAP net income of $4.04 per diluted share.

183. Also on May 9, 2022 Eagle held a conference call to report its Q1 2022 results, with Defendant Tarriff stating that, "[w]e still have exclusivity for both vasopressin and PEMFEXY . . . we are seeing significant acceptance of PEMFEXY in the marketplace."

184. On the May 9, 2022 call, a Willaim Blair & Company analyst asked, "You obviously have the volume limits for Q1. Is there any commentary you can

77

give on what you're seeing so far in Q2?" Defendant Tarriff responded in relevant

part:

> In terms of PEMFEXY, we spent the Q1 with those limited [vials] that
> we had and putting those into distribution. And now we're going
> through the process of pulling that all through, and we're getting great
> feedback. It's a great product, right? I think we invented product in
> PEMFEXY that has significant advantages in the marketplace, and it's
> being accepted well. And we think that PEMFEXY will probably have
> a good life cycle over a couple of years here. So we're very excited
> about both as the PEMFEXY market builds.

185. As discussed *supra*, Pemfexy sales promptly and substantially declined

after Q1 2022 as wholesalers ceased making initial stocking orders, and as generic

pemetrexed products entered the market beginning on or around May 25, 2022.

However, at no point prior to Eagle's publication of its Q2 2022 results on August

9, 2022 did Defendants "provide an update" regarding expected Q2 revenue and

earnings as Defendant Tarriff had stated they would in his March 7, 2022 remarks.

As such, prior to August 9, 2022, Tarriff's statement that "Q2 revenue and earnings

should be around the same as Q1" remained Defendants' most recent public

statement about expected levels of Q2 2022 revenue and earnings.

186. In notes published on August 9, 2022, reporting on Eagle's Q2 2022

results, analysts from both Piper Sandler and William Blair noted that Eagle's $74.1

million of revenue and $1.56 per share of non-GAAP diluted earnings per share for

Q2 2022 fell far short of analyst consensus estimates of $117.0 million in revenue

and $3.36 non-GAAP diluted earnings per share (which were roughly in line with

Eagle's Q1 2022 reported results). Following Eagle's publication of its Q2 2022 results, the Company's stock price fell by 14.5%, showing the market's negative reaction to the earnings miss, which would have been substantially worse without the revenue fraudulently reported from the Pemfexy channel stuffing scheme.

187.   As explained by Eagle's former Chief Commercial Officer, "the artificial 'revenue' created by the channel stuffing 'Buy and Hold' scheme allowed Defendant Eagle to present itself as coming far closer to its own projections and the estimates of analysts who follow the Company than was actually the case." Moran Complaint ¶130.

### F.   Defendant Tarriff Was Desperate To Increase Pemfexy Sales, Even Resorting To Illegal And Unethical Conduct

188.   According to the Moran Complaint, in addition to the Pemfexy channel stuffing scheme Defendant Tarriff engaged in other forms of unethical and illegal conduct, illustrating the extreme lengths he was willing to go to in a desperate effort to increase Pemfexy sales.

189.   First, with Defendant Tarriff's direction and approval, Eagle decided to try to increase Pemfexy sales by implementing a program of unnecessary "Medical Focus Groups" where Eagle would pay attendees, despite repeated objections from Moran and others that such conduct was prohibited (by, *inter alia*, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)). Moran Complaint ¶¶43-60. According to the U.S. Department of Health and Human Services, the Anti-Kickback Statute:

79

is a criminal law that prohibits the knowing and willful payment of "remuneration" to induce or reward patient referrals or the generation of business involving any item or service payable by the Federal health care programs (e.g., drugs, supplies, or health care services for Medicare or Medicaid patients). Remuneration includes anything of value and can take many forms besides cash, such as free rent, expensive hotel stays and meals, and excessive compensation for medical directorships or consultancies. In some industries, it is acceptable to reward those who refer business to you. However, in the Federal health care programs, paying for referrals is a crime.

190. Second, over Moran's objections, Defendant Tarriff and Eagle's Marketing EVP Kimmet flew around the country by private jet to "wine and dine" "prescribers and other [Health Care Personnel] in the Community Oncology business . . . to convince them to buy PEMFEXY." *Id.* ¶¶87-94. Such conduct also potentially violates the Anti-Kickback Statute, among other laws.

191. Third, in connection with a June 3, 2022 meeting in Chicago of the American Society of Clinical Oncology attended by Moran, Defendant Tarriff, and members of Eagle's sales team, Eagle co-sponsored a cocktail reception "with no medical education exchange; just free alcohol for HCPs (prospective customers/prescribers of their products, including PEMFEXY)." *Id.* ¶¶107-11. Again, such conduct potentially violates the Anti-Kickback Statute, among other laws. When Moran asked Defendant Tarriff "how did this get approved?", Tarriff dismissed his concerns and "stormed away aggravated that [Moran] had raised yet another compliance issue." *Id.* ¶¶110-11.

80

### G. Defendants Tarriff And Cahill Both "Resigned" Under Suspect Circumstances

192. On November 29, 2023, Eagle abruptly announced Defendant Tarriff's "resignation" effectively immediately, with no permanent successor in place, and stated that "[a]fter consideration of various alternatives, including termination with or without cause, the Board accepted Mr. Tarriff's resignation." As later revealed in the Declaration of Defendant Tarriff's counsel, Jeremiah Williams, filed in the *Tarriff v. Eagle* case, "Eagle had conducted an internal investigation into the PEMFEXY inventory issue, and as a result the Company pressured Mr. Tarriff to resign his roles as Chief Executive Officer . . . , President, and member of the Board of Directors." Williams Decl. ¶3.

193. Eagle's "internal investigation into the PEMFEXY inventory issue" that led to the Company pressuring Tarriff to resign and considering terminating him with cause, came shortly after: (i) the filing of the Moran Complaint in July 2023 that revealed Tarriff's role masterminding the Pemfexy channel stuffing scheme; (ii) Eagle's receipt of the SEC's October 11, 2023 subpoena requesting information about the same subjects; and (iii) Eagle's own November 9, 2023 disclosure that "the Company is reviewing and expects potential adjustments to reserves for returns and price adjustments of approximately $15.0 million to $20.0 million," which "primarily relate to returns and a price adjustment for PEMFEXY."

194. Defendant Cahill also "resigned" under suspect circumstances. On

81

March 8, 2024, Eagle announced his resignation "effective immediately," when no permanent successor had been identified. Like Tarriff, Defendant Cahill's purported resignation came in the midst of an SEC investigation into the Pemfexy channel stuffing scheme. That scheme was carried out while Cahill, as Eagle's CFO and Principal Accounting and Financial Officer, signed off on and was responsible for the accuracy of the Company's financial statements.

### H. The Allegations In The Moran Complaint Are Highly Reliable

195. As discussed *supra*, Moran's allegations have been corroborated in substantial part by Eagle's own internal investigation and subsequent public disclosures, as well as by the existence of the SEC investigation into the matters alleged in Moran's complaint.

196. Further showing the reliability of Moran's allegations, Defendants' own public statements show that Moran was well-positioned to have first-hand knowledge of Defendants' misconduct.

197. Until his termination, Moran was a high-level executive at Eagle and a member of its management team. Prior to joining Eagle in 2016, Moran served as field vice president, sales, at GlaxoSmithKline, and before that held various positions with increasing responsibility at Reliant Pharmaceuticals, Muro and Astra Zeneca. Moran holds a B.S. in business management from the State University of

82

New York at Empire and completed the Transformational Leadership for Executives program at the University of Pennsylvania Wharton School of Business.

198. Defendants touted Eagle's hiring of Moran in a February 4, 2016 press release titled "Eagle Pharmaceuticals Announces Appointment of Michael Moran as U.S. Head of Sales," referring to him as "a seasoned sales executive in the pharmaceuticals industry." The press release quoted Defendant Tarriff stating "Mike is an exceptional sales leader with a lengthy record of success in this industry, and we are very pleased to have him aboard," and that "Eagle will have about 50 people selling our products and Mike will be coordinating this activity on a national scale." From the time Moran joined Eagle he reported directly to Defendant Tarriff. Moran Complaint ¶26.

199. Moran quickly rose through the ranks at Eagle. The Company's 2015 annual report filed with the SEC on July 12, 2016 listed his title as "Vice President, Sales" under the heading "Executive Officers & Management Team." An Eagle press release dated November 2, 2020, listed Moran as "Executive Vice President, Sales, Business Development and Government Affairs" and a member of its "executive team." On October 1, 2021 Eagle filed a SEC Form 8-K announcing that "[o]n September 27, 2021, the Board appointed Michael Moran as the Company's Executive Vice President, Chief Commercial Officer, effective immediately, in which position he will serve as the Company's principal operating officer." Eagle's

proxy statement filed with the SEC on May 1, 2023 lists Moran as one of only three "named executive officers" for 2022, alongside Defendants Tarriff and Cahill.

200. Commensurate with his position, Defendants gave Moran significant responsibility at Eagle. For example, Moran is the signatory for Eagle on a License Agreement with Combioxin SA, dated August 19, 2021, under which Eagle was to pay at least $10 million. Moran was entrusted to publicly represent the Company, as one of the presenters at Eagle's March 31, 2022 investor update call. Similarly, Eagle quoted Moran in a March 28, 2022 press release regarding the Company's agreement to acquire Acacia Pharma Group plc.

201. Moran's position among Eagle's very top executives was likewise reflected in his compensation. In 2021, the last full year of his employment with Eagle, he received a base salary of $397,000, an above-target cash performance bonus of $418,540, and stock awards that Eagle reported valued at $987,362. Eagle reported Moran's total compensation for 2021 as $1,857,933.

202. Defendants were quick to settle Moran's lawsuit, and never answered his complaint. Moran filed suit on July 13, 2023, and his counsel sent Eagle a service waiver request on July 18, 2023. Eagle, through its counsel, waived service on July 27, 2023. Moran's process server personally served Defendant Tarriff on August 8, 2023. Counsel for Eagle informed the court on December 18, 2023 that "the parties

84

have fully resolved this matter," and a stipulation of dismissal signed by counsel for all parties was filed on December 26, 2023.

203. It appears that Eagle and Defendant Tarriff have required Moran to agree to non-disclosure as a condition of their settlement. When counsel for Plaintiffs in the instant action contacted Moran's counsel of record, Moran's counsel stated that she would not speak with Plaintiffs' counsel regarding the matter.

204. Moran's credibility and aspects of the Moran Complaint's allegations are further supported by interviews with Moran's former colleagues at Eagle.

205. Former Employee 1 ("FE1") worked at Eagle from March 2016 to June 2023 as a Regional Sales Director, and as a National Sales Director from July 2023 to March 2024. FE1 reported directly to Moran prior to Moran's termination in July 2022. According to FE1, Moran "operates with the utmost integrity."

206. Former Employee 2 ("FE2") worked at Eagle from April 2017 to April 2024 as a Senior Regional Sales Director. FE2 reported directly to Moran prior to Moran's termination in July 2022. FE2 has known Moran for over 20 years, including in previous roles where they worked at other companies. According to FE2, Moran was "always very professional," and "knows the business very well." FE2 stated that "[i]f there were ever a situation I needed advice on, If I needed to understand the regulations and ethics that corral what we do, he was always helpful."

207. Dawn Vallone served as a Senior Regional Sales Director at Eagle from

85

April 2017 until on or about May 2, 2022, in which role she reported directly to Moran. Vallone described Moran as "an absolutely stellar individual" who is "Mensa-level intelligent" and "knows how to run every facet of a business," and stated that she had never worked for anyone else so talented.

208. Vallone confirmed that, although Moran had generally been the leader of the sales department, that changed in 2Q 2022 when Tarriff and John Kimmet suddenly started to take the lead, which made Vallone uncomfortable.

209. Vallone confirmed the Microsoft Teams meeting discussed in paragraphs 81-83 of the Moran Complaint, which took place on or about April 21, 2022, and was attended by Defendant Tarriff, John Kimmet, Moran, Vallone, and other members of Moran's team. Vallone remembers thinking that the meeting was highly unusual because she had never been in a meeting where Tarriff and Kimmet talked to her before. The meeting was also unusual because Moran, who was usually a commanding presence, was mostly in the background while Tarriff and Kimmet ran the meeting. Vallone confirmed that Tarriff stated in that meeting that he would sell Pemfexy himself, and further stated that he and Kimmet were going on a "road show," travelling to potential customers to try to sell Pemfexy.

210. Vallone found the meeting shocking and strange. After this meeting Vallone knew something was very wrong at Eagle, and that is when she decided that she would leave Eagle, quitting approximately 10 days later to take a new job at

86

another company.

211.   Vallone confirmed that while she was at Eagle in 2Q 2022, customers were not ordering Pemfexy, in part because customers like CVS Specialty pharmacy were already full of Pemfexy inventory.

## X.   CLASS ACTION ALLEGATIONS

212.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities who purchased the publicly traded common stock of Eagle between August 9, 2022 and October 1, 2024, both dates inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, any entity in which Defendants have or had a controlling interest, and any trust of which the Individual Defendants are the settler or which is for the benefit of the Individual Defendants and/or member(s) of their immediate family.

213.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Eagle's shares actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class.

87

Millions of Eagle shares were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Eagle or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

214. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

215. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

216. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Eagle; and

88

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

217. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. LOSS CAUSATION

218. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class.

219. During the Class Period, Plaintiffs and the Class purchased Eagle's publicly traded common stock at artificially inflated prices. The price of Eagle's publicly traded common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed and/or materialized, causing investors' losses.

## XII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

220. The market for Eagle's shares was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements

and/or failures to disclose, Eagle's shares traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased the Company's shares relying upon the integrity of the market price of Eagle's shares and market information relating to Eagle, and have been damaged thereby.

221. During the Class Period, the artificial inflation of Eagle's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Eagle's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Eagle and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

222. At all relevant times, the market for Eagle's shares was an efficient market for the following reasons, among others:

90

(a) Eagle shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Eagle filed periodic public reports with the SEC;

(c) Eagle regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services, investor conferences, and other public disclosures; and

(d) Eagle was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.

223. As a result of the foregoing, the market for Eagle's shares promptly digested current information regarding Eagle from all publicly available sources and reflected such information in Eagle's share price. Under these circumstances, all purchasers of Eagle's shares during the Class Period suffered similar injury through their purchase of Eagle's shares at artificially inflated prices and a presumption of reliance applies.

## XIII. NO SAFE HARBOR

224. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Eagle who knew that the statement was false when made.

## XIV. FIRST CLAIM

### Violation of Section 10(b) of The Exchange Act and
### Rule 10b-5(b) Promulgated Thereunder
### <u>Against All Defendants</u>

225. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

92

226. During the Class Period, as set forth herein, Defendants Eagle, Tarriff, and Cahill made untrue statements of material facts and/or omitted to state material facts necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading, in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

227. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's shares during the Class Period.

## XV.  SECOND CLAIM

### Violation of Section 20(a) of The Exchange Act
### <u>Against The Individual Defendants</u>

228. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

229. Defendants Tarriff and Cahill acted as controlling persons of Eagle within the meaning of Section 20(a) of the Exchange Act as alleged herein.

230. The Individual Defendants directly or indirectly induced the acts constituting the violations of Section 10(b) of the Exchange Act and Rule 10b-5 by Eagle, and did not act in good faith.

231. As a direct and proximate result of the wrongful conduct of the Individual Defendants, Plaintiffs and other members of the Class suffered damages

in connection with their respective purchases and sales of the Company's shares during the Class Period.

## XVI. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     Such other and further relief as the Court may deem just and proper.

## XVII. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: July 11, 2025

Respectfully submitted,

By: _/s/ James E. Cecchi_
**CARELLA, BYRNE, CECCHI, BRODY & AGNELLO, P.C.**
James E. Cecchi
Donald A. Ecklund
Kevin G. Cooper
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
decklund@carellabyrne.com
kcooper@carellabyrne.com

_Liaison Counsel for Plaintiffs_

**GLANCY PRONGAY & MURRAY LLP**
Robert V. Prongay (_pro hac vice_)
Garth Spencer (_pro hac vice_)
1925 Century Park East
Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
rprongay@glancylaw.com
gspencer@glancylaw.com

_Lead Counsel for Plaintiffs_

Jack I. Zwick
225 Broadway, Suite 1440
New York, New York 10007
Telephone: (212) 385-1900
jack@zwickfirm.com

_Additional Counsel for Plaintiffs_

95

# Exhibit 1

## SWORN CERTIFICATION OF PLAINTIFF EVANS ASSOCIATES I, LLC
*MILLER V. EAGLE PHARMACEUTICALS, INC.* SECURITIES LITIGATION

I, Eric D. Evans, as Manager of Evans Associates I, LLC, certify that:

1. I have reviewed the complaint, adopt its allegations, and authorize its filing, on behalf of Evans Associates I, LLC.

2. I am duly authorized to institute legal action on behalf of Evans Associates I, LLC against Eagle Pharmaceuticals, Inc. and other defendants.

3. Evans Associates I, LLC did not purchase the Eagle Pharmaceuticals, Inc. securities that are the subject of this action at the direction of plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws.

4. I and Evans Associates I, LLC are willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

5. The transactions of Evans Associates I, LLC in Eagle Pharmaceuticals, Inc. stock (EGRX) during the Class Period set forth in the complaint are reflected in the attached schedule.

6. Neither I nor Evans Associates I, LLC have sought to serve, nor served, as a representative party on behalf of a class under the federal securities laws during the last three years.

7. Neither I nor Evans Associates I, LLC will accept any payment for serving as a representative party, except to receive our pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

July 10, 2025
Date

Eric D. Evans, Manager
Evans Associates I, LLC

**Evans Associates I, LLC's Transactions in Eagle Pharmaceuticals Inc. (EGRX)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 11/9/2023 | Bought | 5,000 | $12.1491 |
| 11/9/2023 | Bought | 5,000 | $11.5791 |
| 11/9/2023 | Bought | 1,605 | $9.8800 |
| 11/9/2023 | Bought | 3,395 | $9.7200 |
| 11/14/2023 | Bought | 252 | $8.9300 |
| 11/14/2023 | Bought | 2,230 | $8.9700 |
| 11/15/2023 | Bought | 3,000 | $8.6900 |
| 11/15/2023 | Bought | 1,239 | $8.6396 |
| 11/29/2023 | Sold | -500 | $8.0000 |
| 11/29/2023 | Sold | -2,000 | $7.7700 |
| 11/29/2023 | Sold | -2,235 | $7.0000 |
| 11/29/2023 | Sold | -5 | $7.0000 |
| 12/15/2023 | Sold | -6,981 | $4.6972 |
| 3/8/2024 | Sold | -650 | $5.9000 |
| 3/11/2024 | Sold | -9,350 | $6.0600 |
| 7/10/2024 | Bought | 3,731 | $5.9800 |
| 8/14/2024 | Bought | 9,267 | $4.0500 |
| 8/26/2024 | Sold | -5,121 | $4.7503 |
| 8/26/2024 | Sold | -181 | $4.6800 |
| 8/26/2024 | Sold | -2,610 | $4.6258 |
| 8/26/2024 | Sold | -100 | $4.6000 |
| 8/26/2024 | Sold | -2,212 | $4.5814 |
| 8/26/2024 | Sold | -2,574 | $4.5537 |
| 8/26/2024 | Sold | -100 | $4.5300 |
| 8/26/2024 | Sold | -100 | $4.5500 |

# Exhibit 2

Docusign Envelope ID: 43480E7C-799C-456B-BF38-CE59634DC129

# SWORN CERTIFICATION OF PLAINTIFF NICHOLAS MILLER
## *MILLER V. EAGLE PHARMACEUTICALS, INC.* SECURITIES LITIGATION

I, Nicholas Miller, certify that:

1.   I have reviewed the complaint, adopt its allegations, and authorize its filing on my behalf.

2.   I did not purchase the Eagle Pharmaceuticals, Inc. securities that are the subject of this action at the direction of plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws.

3.   I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.   My transactions in Eagle Pharmaceuticals, Inc. stock (EGRX) during the Class Period set forth in the complaint are reflected in the attached schedule.

5.   I have not sought to serve, nor served, as a representative party on behalf of a class under the federal securities laws during the last three years.

6.   I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.


7/7/2025
_____
Date

_____
Nicholas Miller

Docusign Envelope ID: 43480E7C-799C-456B-BE28-CE59634DC129

# Nicholas Miller's Transactions in Eagle Pharmaceuticals, Inc. (EGRX)

## Account 1

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 8/8/2023 | Bought | 50 | $22.8200 |

## Account 2

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 8/8/2023 | Bought | 16 | $23.0261 |

# Exhibit 3

Docusign Envelope ID: 3C809C80-3637-46C7-84C3-A3F109DD5754

# SWORN CERTIFICATION OF PLAINTIFF LIYU WANG
## *MILLER V. EAGLE PHARMACEUTICALS, INC.* SECURITIES LITIGATION

I, Liyu Wang, certify that:

1. I have reviewed the complaint, adopt its allegations, and authorize its filing on my behalf.

2. I did not purchase the Eagle Pharmaceuticals, Inc. securities that are the subject of this action at the direction of plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Eagle Pharmaceuticals, Inc. stock (EGRX) during the Class Period set forth in the complaint are reflected in the attached schedule.

5. I have not sought to serve, nor served, as a representative party on behalf of a class under the federal securities laws during the last three years.

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

7/8/2025

_____
Date

_____
Liyu Wang

Docusign Envelope ID: 3C809C80-3627-46C7-84C3-A3F199DD5754

**Liyu Wang's Transactions in Eagle Pharmaceuticals, Inc. (EGRX)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 11/17/2023 | Bought | 100 | $8.9600 |
| 11/17/2023 | Bought | 200 | $8.9500 |
| 11/17/2023 | Bought | 900 | $8.9700 |
| 12/13/2023 | Sold | -397 | $5.0100 |
| 12/13/2023 | Sold | -800 | $5.0100 |
| 12/13/2023 | Sold | -1 | $5.0100 |
| 12/13/2023 | Sold | -2 | $5.0200 |

# Exhibit 4

## SWORN CERTIFICATION OF PLAINTIFF JOANNA PLUTA
### *MILLER V. EAGLE PHARMACEUTICALS, INC.* SECURITIES LITIGATION

I, Joanna Pluta, certify that:

1.  I have reviewed the complaint, adopt its allegations, and authorize its filing on my behalf.

2.  I did not purchase the Eagle Pharmaceuticals, Inc. securities that are the subject of this action at the direction of plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws.

3.  I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.  My transactions in Eagle Pharmaceuticals, Inc. stock (EGRX) during the Class Period set forth in the complaint are reflected in the attached schedule.

5.  I have not sought to serve, nor served, as a representative party on behalf of a class under the federal securities laws during the last three years.

6.  I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

7/11/2025
_____
Date

DocuSigned by:

*Joanna Pluta*
B36E7E32C44E448...
_____
Joanna Pluta

Docusign Envelope ID: F733E69D-55B5-4F90-9224-1C75717E7677

**Joanna Pluta's Transactions in Eagle Pharmaceuticals, Inc. (EGRX)**

| Date | Transaction Type | Quantity | Unit Price |
|---|---|---|---|
| 12/2/2022 | Bought | 71 | $36.8900 |
| 1/5/2024 | Sold | -71 | $5.2300 |

# Exhibit 5

**WATANABE EMPLOYMENT LAW GROUP, PLLC**
Laura A. Watanabe, Esq.
405 Lexington Avenue, 9th Floor
New York, New York 10174
(203) 644-5262
LWatanabe@welgpllc.com

**McMORAN O'CONNOR BRAMLEY & BURNS, PC**
A Professional Corporation
Michael F. O'Connor, Esq. Bar No. 047401995
Ramshorn Executive Centre
Bldg D. Suite D-1
2399 Hwy 34
Manasquan, New Jersey 08736
(732) 223-7711
moconnor@mcmoranlaw.com

Attorneys for Plaintiff,
Michael Moran

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

-----------------------------------------------------------------------X
MICHAEL MORAN,                                  :
                                                :   Civil Action No.
                          Plaintiff,            :
                                                :   **COMPLAINT AND**
        -against-                               :   **DEMAND FOR JURY TRIAL**
                                                :
EAGLE PHARMACEUTICALS, INC. and SCOTT           :
TARRIFF,                                        :
                                                :
                          Defendants.           :
-----------------------------------------------------------------------X

Plaintiff Michael Moran ("Plaintiff"), residing at 37 Longbow Circle, Spencerport, New York, by and through his undersigned counsel, brings this action against Defendants Eagle Pharmaceuticals, Inc. ("Defendant Eagle" or "Company"), with a principal place of business at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677, and Scott Tarriff ("Tarriff") (jointly "Defendants"), in which he alleges and states as follows:

## STATEMENT OF THE CASE

1. This is an action for damages for Defendants' unlawful termination of Plaintiff's employment in retaliation for Plaintiff's "blowing the whistle" on Defendants' unlawful and/or unethical business practices in violation of the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19-1, et seq. ("CEPA") and New Jersey common law.

2. Starting in and around the second quarter of its fiscal year 2022, Defendant Eagle dramatically inflated its financial results to the market and investors by stuffing the channel with excess inventory at the end of the quarter by making purported "sales" to wholesalers far exceeding any demand. Defendants then reported these "sales" as "revenue" for product that had not been paid for, likely would never be paid for, but rather returned to Defendant Eagle the following year. Defendants further agreed to pay the wholesalers for these purported "sales" even though all they did was hold their product and then return it. Thus, these reported "sales" and "revenue" were a complete sham.

3. This scheme by Defendant Eagle, led by its President, CEO and Founder Defendant Tarriff, was referred to as the Company's "*Buy and Hold*" or "*Inventory Guarantee Purchase Program*" i.e., channel stuffing program.

4. Upon information and belief, at no time did Defendants disclose that: (1) they were artificially inflating Defendant Eagle's results through channel stuffing; (2) the channel stuffing would contribute to a buildup in excess wholesaler inventory levels, reducing future wholesaler demand; or (3) excess wholesaler inventory posed a material risk to the Company's future sales and earnings. Thus, in addition to allowing Defendant Eagle to report false and/or misleading financial results, the artificial "revenue" created by this "Buy and Hold" channel stuffing scheme

2

allowed Defendant Eagle to present itself as coming far closer to its own projections and the estimates of analysts who follow the Company than was actually the case.

5.      Within a few weeks of Plaintiff requesting that a formal investigation be conducted to address Defendants' unlawful and/or unethical business practices after having refused to engage in such conduct and having raised such complaints to Defendant Tarriff and others, on July 15, 2022, by email, Plaintiff was unlawfully terminated by Defendants as its Chief Commercial Officer in retaliation for his refusal to participate in and/or complaining about what Plaintiff reasonably believed constitute violation(s) of law, rules and/or public policy, including but not limited to, Sections 17(a)(1) of the Securities Act of 1933 [15 U.S.C. §77(q)(a)(1)], Sections 17(a)(2) and 17(a)(3) of the Securities Act of 1933 [15 U.S.C. §§77(a)(2), §77a(a)(3)] (referred to collectively as the "Securities Act of 1933"); Section 10(b) of the Securities Exchange Act of 1934 [15 U.S.C. §78(b)] and Rule 10b-5 Promulgated thereunder [17 C.F.R.§240.10b-5] of the Securities Exchange Act of 1934 (referred to as the "Securities Exchange Act of 1934"); the Sarbanes-Oxley Act of 2002; the Anti-Kickback Statute, found in Section 1128B(b) of the Social Security Act ("Anti-Kickback Statute"); the Generally Accepted Accounting Principles ("GAAP"), including Staff Accounting Bulletin No. 101 ("SAB 101"); Pharmaceutical Research and Manufacturers of America ("PhRMA") Code on Interactions with Health Care Professionals effective as of January 1, 2022 (referred to hereinafter as the "PhRMA Code"); and the Department of Health and Human Services Office of Inspector General's ("OIG") pharmaceutical regulations and/or guidelines, and in breach of Plaintiff's 2016 Employment Agreement.

## JURISDICTION AND VENUE

6.      This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

3

7.   The amount in controversy exceeds the amount of $75,000 exclusive of interest and costs.

8.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because significant activities associated with the claims occurred in this District and the effects of Defendants' unlawful conduct as alleged herein continue to be felt in this State.

## PARTIES

9.   Plaintiff is an adult individual and is a citizen and resident of the United States. Plaintiff resides in the State of New York.

10.   At all times relevant to this Complaint, Plaintiff was an "employee" of Defendants within the meaning of the statutes that form the basis of this action (or as defined in CEPA at N.J.S.A. 34:19-2b), and is entitled to the protection of that law.

11.   Defendant Eagle is and was at all relevant times a Delaware incorporated, publicly traded company, with its headquarters located at 50 Tice Boulevard, Suite 315, Woodcliff Lake, New Jersey 07677.

12.   Defendant Eagle is engaged in an industry affecting interstate commerce and regularly conducts business in this State and throughout the United States.

13.   At all relevant times, Defendant Eagle's securities were registered with the Securities Exchange Commission ("SEC") pursuant to Section 12(b) of the Exchange Act and its common stock is actively traded on the Nasdaq Stock Market.

14.   At all relevant times, Defendant Eagle acted by and through its authorized agents, servants, and/or employees acting within the course and scope of their employment with Defendant Eagle and in furtherance of Defendant Eagle's business, including Defendant Tarriff.

4

15. At all relevant times, Defendant Eagle acted as an "employer" within the meaning of the statutes that form the basis of this action.

16. Defendant Tarriff is an adult individual and is a citizen and resident of the United States. Upon information and belief, Defendant Tarriff resides in the State of Florida and/or Colorado.

17. At all relevant times, Defendant Tarriff was Defendant Eagle's Founder, Chief Executive Officer, President, and a minority shareholder of the Company.

18. At all relevant times, Defendant Tarriff controlled Defendant Eagle's operations and finances, and made all significant business decisions for the Company. Defendant Tarriff also made all final significant personnel decisions, including hiring and firing employees, setting employee compensation, setting employee policies, and determining employees' job titles.

19. At all relevant times, Defendant Tarriff supervised and controlled the activities of Plaintiff.

20. At all relevant times, Defendant Tarriff acted as an "employer" within the meaning of the statutes that form the basis of this action.

21. Defendants Eagle and Tarriff are "employers" as defined in CEPA at N.J.S.A. 34:19-2a and subject to CEPA's provisions.

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

### I. Background

22. Eagle Pharmaceuticals, Inc. is a fully integrated biotechnology pharmaceutical company with research and development, clinical, manufacturing, and commercial capabilities, which focuses particularly on developing and commercializing injectable products primarily in metabolic critical care and oncology in the United States.

23.    Defendant Eagle was founded by Defendant Tarriff on January 2, 2007.

24.    On January 20, 2016, Defendants offered Plaintiff a position at Defendant Eagle as its Vice President of Sales.

25.    On January 20, 2016, Defendant Eagle and Plaintiff entered into an employment agreement (the "2016 Employment Agreement"), which governed the terms and conditions of Plaintiff's employment with Defendant Eagle.

26.    According to the 2016 Employment Agreement:

(a)    Plaintiff's initial job title was Vice President-Sales reporting directly to Defendant Tarriff.

(b)    Plaintiff's initial Base Salary was $250,000 annually, to be reviewed on an annual basis and adjusted by Defendant Eagle to reflect his performance and responsibilities.

(c)    Plaintiff was initially eligible to receive a target cash bonus of 40% of his salary for performance.

(d)    Plaintiff was entitled to a car allowance of $1,100 per month.

(e)    Plaintiff and his eligible dependents were eligible for the Company's health insurance program, and Plaintiff was eligible to participate in the Company's 401(k) plan, life insurance plan, and long-term disability plan.

(f)    In consideration for his entering into the 2016 Employment Agreement and as an inducement to join the Company, Defendants granted Plaintiff options to purchase 10,000 shares of Defendant Eagle common stock at an exercise equal to market price on the date of approval by the Board of Directors. Those options vested over a four (4) year period at 25% per year.

6

(g) Further, upon termination, Plaintiff was "entitled to receive an amount equal to [Plaintiff's]-then-current monthly Base Salary payable for a period of twelve (12) months plus a pro-rata portion of [his] annual bonus for the performance period in which [his] termination occurs, calculated based upon the number of days that [he] w[as] employed during the performance year, payable in equal installments...."

27. Given his outstanding job performance throughout his tenure, Plaintiff received several promotions, assumed greater responsibilities, and thus, per the terms of his 2016 Employment Agreement, received several increases in his Base Salary, bonuses, and equity entitlements to reflect his exceptional job performance.

28. At the time of his termination on July 15, 2022, Plaintiff held the position of Chief Commercial Officer. Plaintiff's Base Salary had increased to $474,040, with a Target Cash Bonus that had increased from 40% to at least 60% of his Base Salary or more, i.e., thus totaling at least $284,424. As of July 15, 2022, Plaintiff's annual compensation was $758,464, plus equity interest(s), including having been granted 7,500 Shares of EGRX stock, thus constituting a total annual compensation in excess of $1.1 million dollars.

## II. Plaintiff Was Slated to Become Defendant Eagle's President Until He Refused to Engage in and Complained of Defendants' Unlawful/Unethical Business Practices

29. Up until he refused to engage in and complained of Defendants' unlawful and/or unethical business practices, Plaintiff was regarded as an exemplary employee.

30. Indeed, Defendant Tarriff touted Plaintiff as "a key employee to make the Company go forward and grow" and Plaintiff was slated to become the new President of Defendant Eagle.

7

31.     However, that dramatically changed in the months leading up to Plaintiff's termination, as Defendants became increasingly desperate to inflate Defendant Eagle's sales, revenues, and overall financial outlook to their investors and the market and Plaintiff refused to engage in and complained about Defendants' unlawful and/or unethical business practices, which Plaintiff reasonably believed were in violation of laws, rules and/or public policy.

## III.    Initial Launch of PEMFEXY Brought Much Needed Revenues for Defendant Eagle in the First Quarter of 2022

32.     On February 1, 2022, Defendant Eagle launched PEMFEXY, a ready-to-use liquid with a unique J-code approved to treat nonsquamous non-small cell lung cancer and mesothelioma, as a branded alternative to Eli Lilly and Company's product, ALITMA US, which generated annual revenue for Eli Lily's Year End September 30, 2021, totaling $1.2 billion dollars.

33.     Defendant Eagle entered into a patent litigation settlement agreement with Eli Lilly, which limited its initial entry of PEMFEXY into the market to the sale of 19,200 vials of PEMFEXY between February 1, 2020 and March 31, 2022, and a subsequent uncapped entry as of April 1, 2022.

34.     In the first two months of eligibility, Defendant Eagle sold all 19,200 vials of PEMFEXY.

35.     Despite a limited launch, PEMFEXY Net Sales were reported at $37.2 million dollars and Total Revenue for Defendant Eagle was reported at $115.9 million dollars for the Company's first quarter of 2022.

36.     The initial launch of the branded product PEMFEXY brought much needed revenue for Defendant Eagle in the first quarter of 2022.

37.    PEMFEXY accounted for nearly a third of Defendant Eagle's Total Revenue for its first quarter 2022.

38.    During the Earnings Call on May 9, 2022, Defendant Tarriff boasted to the press and to its investors that Defendant Eagle was: "Well on [its] way to the best year in our company's history", which he largely attributed to its PEMFEXY sales, adding that "We still have exclusivity for…PEMFEXY" and "We are seeing significant acceptance of PEMFEXY in the market."

39.    But, at that time, what Defendant Tarriff knew but did not disclose to the market and to Defendant Eagle's investors was that this "exclusivity" for PEMFEXY would abruptly end when competing generic products that were about to be launched in a matter of weeks by other providers would displace PEMFEXY as a result of how generics are reimbursed in the first 6-12 months of their life cycle.

## IV.    Given the Impending Displacement of PEMFEXY, Tarriff Put Tremendous Pressure on Plaintiff and His Team to Stuff the Channel with Excess Inventory

### A.    Defendants Ignored Plaintiff's Warnings Against Engaging in "Unfair Practices"

40.    Against this backdrop, cognizant of the impending displacement of PEMFEXY and desperate to increase the Company's revenues, Defendant Tarriff began exerting pressure on the Company's sales team to force more product into the channel when it was already full. Plaintiff voiced his concerns, telling Defendant Tarriff that the Company needed to be careful not to "stuff the channel."

41.    On February 3, 2022, Plaintiff also sent an email to his team with copies to Defendant Tarriff and Defendant Eagle's General Counsel and Chief Compliance Officer Ryan Debski messaging the importance of not engaging in "unfair practices" (compliance issues), to be unwavering in their integrity, and to *"lead from the front with integrity, as patients' lives depend*

*on us.*" Indeed, along with his email, Plaintiff forwarded a copy of a press release regarding a pharmaceutical distributor that agreed to pay a $13 million dollar settlement resulting from an alleged violation of the Anti-Kickback Statute, which involved, *inter alia*, "upfront pay [that] *"either were not attributable to identifiable sales of pharmaceutical products or were purported rebates that the customers had not actually earned.*"" Plaintiff sent this as a reminder to his team but more importantly to make clear to Defendant Tarriff and Defendant Eagle's General Counsel/Chief Compliance Officer that they shouldn't put themselves in compromising positions with their wholesalers by trying to "stuff the channel."

42.    Defendants ignored Plaintiff's concerns.

    B.    Plaintiff Was Directed to Step Away After He Raised Compliance Concerns Regarding Defendants Creating Unnecessary Medical Focus Groups to Pay Defendant Tarriff's Billion-Dollar Friend's Company ("Company A") to <u>Give Them Access to Its Oncology Customers</u>

43.    Three days later, on February 6, 2022, there was a Teams meeting. Plaintiff was asked to join the call.

44.    Defendant Tarriff had enlisted one of his billion-dollar friends who is a major player in the Oncology space, Company A's Founder and Chief Executive Officer, to find a way to get Defendants in front of the most important decision makers in the Community Oncology market.

45.    Apparently, Defendant Tarriff and Company A's CEO had struck a deal. Plaintiff was advised that Defendant Tarriff had given Company A's CEO substantial monies to fund his Company A's newest software project. By doing so, Company A's CEO could tell other pharmaceutical companies that Defendant Eagle used this service. In turn, Company A's CEO agreed to assist Defendants with promoting the sale of Defendant Eagle's new product(s) PEMFEXY.

10

46.     To that end, Defendant Eagle's Executive Vice President, Marketing John Kimmet ("Kimmet") was instructed by Defendant Tarriff to get a small group of Company A employees to assist in putting together Medical Focus groups supposedly to understand what health care professionals ("HCPs") thought about the Company's PEMFEXY product offering.

47.     In the February 6, 2022 meeting, one of the medical staff at Company A stated that they (Company A) needed to find a way to charge Defendant Eagle for getting their (Company A) "friends in the community oncology businesses" to say yes to using Defendant Eagle's product. The way Company A wanted to do this was to have paid speaker bureau like conferences and to pay each attendee to come listen to what a great product PEMFEXY was. This, of course, would not only violate the PhRMA Code but Plaintiff also had reason to believe that it violated the OIG's regulations and the Anti-Kickback Statute in that it prohibits the knowing and willful offer, payment, solicitation, or receipt of any remuneration (as well as HCPs soliciting or receiving remuneration) in cash or in kind, to induce or "in return for referring an individual for the furnishing or arranging for the furnishing of any item or service for which payment may be made."

48.     When Company A finished presenting their proposal, Plaintiff told them they didn't need the Medical Focus groups because Defendant Eagle had already performed this qualitative research with a vendor months ago and had this insight. In response, the Company A doctor said to Plaintiff: *"Mike - We are just trying to find a simple way that you guys can pay us for our ability to get you in front of the best docs to buy your drug."*

49.     Having reason to believe that such conduct violated the Anti-Kickback Statute, OIG guidelines, other pharmaceutical regulations, and/or the PhRMA Code, Plaintiff pushed back on this approach, advising Defendant Tarriff and others that this was not within compliance parameters. In response, while they claimed Plaintiff's compliance concerns would be addressed,

11

that was not true. Defendant Tarriff was upset that Plaintiff wasn't on board with Company A's proposal.

50. As a result of raising his compliance concerns, Defendant Tarriff pulled Plaintiff from the Medical Focus Group work and told Kimmet to run it. Kimmet, however, had zero experience and didn't know what to do.

51. On February 11, 2022, despite Plaintiff's compliance concerns, a meeting was held with Kimmet and Company A and they worked out a plan to hold these speaker events. Plaintiff was unaware of this until Dr. Michael Greenberg (VP of Medical Affairs for Eagle) called Plaintiff to tell him.

52. Following an agreement reached between Defendant Eagle and Company A to move forward with the Medical Focus groups, Kimmet contacted Defendant Eagle medical staff to request their assistance and they unequivocally told him "*NO - WE CANNOT DO THIS KIND OF MEETING.*"

53. On February 17, 2022, Dr. Michael Greenberg from Medical Affairs called Plaintiff upset. Dr. Greenberg relayed to Plaintiff that Kimmet had instructed him that he needed to partake in these Speaker Programs for PEMFEXY. Dr. Greenberg called his supervisor Dr. Valentin Curt and they along with Plaintiff discussed it and ALL agreed that these were inappropriate programs, and something needed to be done to stop them before they began.

54. Plaintiff then wrote a correspondence to Defendant Eagle's General Counsel and Chief Compliance Officer Ryan Debski to explain why these programs were not compliant and should not be permitted to proceed. GC Debski called Plaintiff very angry, accusing Plaintiff of having "thrown him under the bus" by copying (and further involving) Defendant Tarriff on such compliance issues.

55. Plaintiff told GC Debski he was just being transparent to the situation and that Defendants needed to stop the program as soon as possible.

56. On February 28, 2022, GC Debski sent an email to Plaintiff, Defendant Tarriff, and Kimmet claiming that they had a "revamped" program for Company A to use and he was looking for Defendant Tarriff's approval.

57. On March 1, 2022, Defendant Tarriff approved the email from GC Debski to move forward with the Company A speaker programs, despite the fact that Plaintiff was on Defendant Eagle's Compliance Committee, and thus, pursuant to, *inter alia*, Defendant Eagle's Employee Handbook and Compliance and Ethics policies, including its Code of Business Conduct and Ethics, Corporate Compliance Program Charter, and Corporate Compliance Committee Charter, Plaintiff should have been included in any resolution of the compliance issues to ensure that such programs and what prompted running these Speaker programs in the first place were in full compliance with, *inter alia*, the Anti-Kickback Statute, the PhRMA Code, OIG's guidelines and/or other pharmaceutical regulations.

58. Instead, Defendant Tarriff directed Plaintiff to stay out of it and "to let Kimmet handle this and go back to your product launches of Vasopressin and PEMFEXY."

59. The Company A employees worked with Kimmet and Company A and built out many "focus groups," from which they learned nothing new (not surprisingly).

60. From that point forward, Defendant Tarriff and GC Debski became distant with Plaintiff.

        C.     Defendant Tarriff Continued to Exert Pressure, Pre-Releasing Q1 2022 Earnings BEFORE the Quarter Closed, Which Included "Revenues" that Did Not Yet Exist

61. Defendant Tarriff continued to exert further pressure on Plaintiff and his sales team.

13

62. On or about March 4, 2022, there was a meeting with Defendant Tarriff, Chief Financial Officer Brian Cahill, Plaintiff, and others to discuss Defendant Eagle's first quarter 2022 earnings. Defendant Tarriff insisted that Defendant Eagle release its earnings before the first quarter closed by representing what the Company's final earnings for the quarter would be before they even knew what they would be. And so, they apparently did.

63. Defendant Eagle pre-released the Company's estimated earnings to analysts before the first quarter had closed.

64. On or about March 21, 2022, Defendant Tarriff called a follow up meeting. During this meeting, Defendant Tarriff was insistent they meet the numbers that Defendants had pre-released, which meant the Company had to sell 3,000 cartons more of Vasopressin because PEMFEXY was capped out at 19,200 vials, and they had already sold ALL of them. All of the major distributors were full with Vasopressin and COVID had subsided so there wasn't a huge need for this product at that time, but Defendant Tarriff was insistent they must sell more and told them to find a way.

65. Upon information and belief, on March 31, 2022, Defendant Eagle sold 3,000 cartons of Vasopressin to a large and quite prominent Group Purchasing Organization ("GPO") to store in their warehouse. In return, Defendants agreed to provide a very heavy discount and rebate. The 3,000 cartons of inventory would last the GPO months.

66. But in order for Defendant Eagle to recognize this "revenue" in the first quarter of 2022, the product needed to be shipped AND delivered on March 31, 2022. Defendant Eagle made the customer stay late to accept product, which arrived late on the evening of March 31, 2022, by a local trucking company. Defendant Eagle also agreed to pay the shipping costs for the customer to ship the product from where it was initially delivered on March 31, 2022 (so that the sale would

14

Case 2:24-cv-00164-MAH    Document 4745    Filed 08/07/25    Page 161 of 188 PageID: 4
16337
Case 2:23-cv-03761-EP-ESK    Document 1    Filed 07/13/23    Page 15 of 37 PageID: 15

be recognized by Defendant Eagle as "revenue" for that quarter) to their local distribution branches in the middle of April 2022.

67.    Upon information and belief, the Wholesalers Acquisition Cost ("WAC") sales for this product enabled Defendant Eagle to meet the first quarter 2022 numbers it had pre-released and/or promised to analysts earlier that month.

**V.    Defendant Tarriff Removed Plaintiff and His Team from Community Oncology PEMFEXY Sales and Took Over Those "Sales" After Plaintiff Refused to Stuff the Channel with Excess Inventory**

        A.    Defendant Tarriff Becomes Actively Involved in PEMFEXY Sales

68.    Defendant Tarriff was upset every moment of every day in the second quarter of 2022.

69.    Defendant Tarriff began to obsess because while the government, specifically the Centers for Medicare and Medicaid Services ("CMS"), was supposed to post the rate(s) at which PEMFEXY would be reimbursed by February 1, 2022, as of the start of the second quarter (April 2022), CMS still had not posted the reimbursement schedules. Defendant Tarriff demanded that Plaintiff or one of his team members keep him up to date regarding the CMS reimbursement schedules.

70.    At that time, Defendant Eagle's customers didn't want to move forward with purchasing the extremely expensive branded PEMFEXY per vial unless they could see the government's posting on the reimbursement rate to them for the Company's product.

71.    Defendant Tarriff was furious.

72.    As a result, and highly concerned that this would drastically impact the Company's second quarter 2022 performance, Defendant Tarriff inserted himself in the day-to-day customer activities concerning the sale of PEMFEXY.

15

   B. April 8, 2022 Meeting to Discuss Non-Compliant Use of Net Cost Recovery ("NCR") Models and the "Buy and Hold" Scheme

73. On or about April 8, 2022, Defendant Tarriff held a meeting with Plaintiff and Kimmet.

74. During the meeting, Defendant Tarriff and Kimmet started to discuss new aggregate agreements, which Plaintiff knew would not increase end customer pull-through but was going to be done to obtain access to opinion leaders in the Oncology space.

75. Defendant Tarriff and Kimmet discussed the concept of implementing a "Buy and Hold" or "Inventory Guarantee Supply Program", i.e., an unlawful channel stuffing program. The basis of these agreements would be to highly incentivize customers to "buy and hold" the product by improper means, which included, *inter alia*, Defendant Eagle offering that the customers: (i) simply accept shipment of the product(s) from Defendant Eagle without ever paying for it; (ii) hold onto the product; (iii) then return the product to Defendant Eagle the following year; AND (iv) be paid by Defendant Eagle for merely "holding" the product in their distribution centers for nine (9) months or longer. Defendants then intended to report these as purported "sales" and "revenue" to Defendant Eagle in its public filings.

76. In response, Plaintiff explained to Defendant Tarriff and Kimmet that Defendant Eagle customers had advised him and/or his sales team that they already had months' worth of non-moving inventory of PEMFEXY product on hand, and therefore, could not purchase any more product.

77. Given the foregoing, Plaintiff voiced serious concerns that such a "Buy and Hold" or "Inventory Guarantee Purchase Program" would constitute an illegal form of channel stuffing, i.e., selling product to customers who did not need and would not use the product for a significant

16

period of time (i.e., for greater than 30-75 days), if ever. In this regard, Plaintiff had reason to believe that such a program and Defendants' stated intention to report such unlawful channel stuffing as "sales" and "revenue" would constitute fraud and/or be in violation of, *inter alia*, the Securities Act of 1933, the Securities Exchange Act of 1934, the Anti-Kickback Statute, the Sarbanes-Oxley Act, the PhRMA Code, the OIG guidelines, pharmaceutical regulations and/or public policy.

78.    Defendant Tarriff ignored Plaintiff and instead directed that he and his sales team stuff the channel with PEMFEXY.

79.    Plaintiff, however, refused to do so.

C.    When Plaintiff Refused to Stuff the Channel, Defendant Tarriff Took Over the Community Oncology PEMFEXY Sales

80.    On or about April 21, 2022, Defendant Tarriff demanded a Teams meeting with Plaintiff's direct reports to hear directly from them what customers were saying to them. Apparently, Defendant Tarriff was hoping to get a different answer from the sales team than the one he received from his Chief Commercial Officer (Plaintiff).

81.    But Plaintiff's team corroborated all the points Plaintiff had provided to Defendant Tarriff for the last several weeks.

82.    Enraged, Defendant Tarriff decided that he was going to do it himself. In Defendant Tarriff's words, "*I don't have to be a sales guy to sell this product.*" But, of course, that wasn't true. Because per the PhRMA Code, before an individual can sell such a product, they should be fully trained and certified, which neither Defendant Tarriff nor Kimmet were.

83.    Nevertheless, Defendant Tarriff instructed Plaintiff and his team to stand down with ALL Community Oncology companies. Defendant Tarriff and Kimmet would work with the

Community Oncology customers to sell PEMFEXY. Plaintiff and his team's sales of PEMFEXY would be limited to 340b Hospital businesses (where Medicaid rates would apply and the price of PEMFEXY was less than one-third the cost as compared to the Community Oncology rate per vial).

84.     Defendant Tarriff directed each Regional Director to send to Kimmet the TOP five Community Oncology customers in their regions for review by Defendant Tarriff and Kimmet.

85.     On or about April 23, 2022, Plaintiff's Regional Directors provided them with their top five customers.

86.     On or about April 25, 2022, a tracker was created and was to be updated with any progress Kimmet and Defendant Tarriff had in their sales of PEMFEXY.

> D.     Following the Earlier Agreement Apparently Struck Between Defendant Tarriff and Company A, Company A's CEO Flew Defendant Tarriff and Kimmet Around the U.S. on His Private Jet and Introduced Them to Top Players, which Included HCPs in the Community Oncology Business

87.     Following the earlier agreement apparently struck between Defendant Tarriff and Company A and/or its Founder and CEO, Company A's CEO chartered his private jet plan for Defendant Tarriff and Kimmet, flying them around the U.S. and introducing them to several top players, which included prescribers and other HCPs in the Community Oncology business, to wine and dine them, so as to convince them to buy PEMFEXY.

88.     Plaintiff told Defendant Tarriff that this plan was ill-advised and the Defendants should not engage in such unlawful and/or unethical business practices. Defendant Tarriff dismissed Plaintiff's concerns.

89. But, by this time, Plaintiff and his team had already been directed by Defendant Tarriff to stand down on selling PEMFEXY to Community Oncology customers. Defendant Tarriff, Kimmet and Company A's CEO would handle these "deals." And so, Defendants did.

E. First Jet Plane Trip Using Non-Compliant NCR Model Sales Pitch Fails

90. In or around late April 2022, Company A's CEO chartered his private jet for Defendant Tarriff and Kimmet and flew them around the U.S. to speak directly with top customers to try and get PEMFEXY "deals signed."

91. Upon information and belief, during these meetings, Defendants employed at least one non-compliant tactic which Plaintiff had reason to believe was in violation of, *inter alia*, OIG guidelines/pharmaceutical regulations, the PhRMA Code and/or public policy, in their attempts to generate PEMFEXY "sales", which included improperly using a Net Cost Recovery ("NCR") Model to convince customers, many of whom were HCPs, including prescribers, of the financial rewards they would realize by prescribing the product.

92. Upon information and belief, Defendants pitched these customers/HCPs discounts and focused on the financials of the deal, using "net cost recovery" as the major selling point, in essence showing customers "how they could make money on this product." This, of course, would be in violation of, *inter alia*, OIG guidelines/regulations, the PhRMA Code and/or public policy, which makes clear that in discussing the efficacy of using one drug over another with customers, and particularly HCPs, such discussions are to be centered around the patients' care and treatment (here, patients with lung cancer or mesothelioma) and what drug would best serve their patients' needs, and NOT on how much money the customer/HCPs will make per vial if they purchase PEMFEXY to administer to their patients rather than ALITMA (Eli Lilly's competing branded product) or one of the generic drugs.

19

93.     After visiting several customers, Defendant Tarriff got some empty promises. But none of the customers/HCPs purchased any PEMFEXY.

94.     Defendant Tarriff became more frustrated than ever.

## VI.     Defendant Tarriff's Early May 2022 Meeting with Plaintiff's Sales Team

95.     In early May 2022, Defendant Tarriff called another meeting of Plaintiff's sales team. He wanted to get feedback from the sales team as to what they were hearing from customers in response to his and Kimmet's initial PEMFEXY sales efforts.

96.     Defendant Tarriff wasn't happy with what he heard. The feedback that Plaintiff and his team were receiving were statements to the effect of: *"Why the hell are you circumventing the system by having your President/CEO meet with our top leaders?"*

97.     Needless to say, Defendant Tarriff's decision to end-run long-standing business relationships and sales protocol by going around the sales representatives and meeting directly with their customers' top executives was creating havoc for Plaintiff and his sales team.

98.     In response, Defendant Tarriff retorted: *"I don't care how upset they are. If I have to get on a plane [again] myself to do it, that's what I'll do."* And so he did.

## VII.     Defendants Implemented Their "Buy and Hold" or "Inventory Guarantee Purchase Program" and Took Another Jet Trip to Visit Customers in a Further Attempt to Stuff the Channel

99.     When their initial tactics failed to yield the numbers that he needed to show analysts and investors, Defendant Tarriff decided to implement the "Buy and Hold" or Inventory Guarantee Purchase Program" scheme to stuff the channel with the non-moving PEMFEXY and then Defendant Eagle would improperly report the purported "sales" in its public filings as constituting "sales" and "revenues", notwithstanding Plaintiff's objections and reason to believe that it would violate, *inter alia*, the Securities Act of 1933, the Securities Exchange Act of 1934, GAAP SAB

20

101, the Sarbanes-Oxley Act, the Anti-Kickback Statute, OIG guidelines/pharmaceutical regulations, the PhRMA Code and/or public policy.

100.     Defendant Tarriff directed Plaintiff and others to put together a list of their top customers. From those lists, Defendant Tarriff created a list of Defendant Eagle's largest customers and his close personal friends who were industry leaders at the largest U.S. wholesalers to convince them to "Buy and Hold" Defendants' non-moving PEMFEXY so that Defendant Eagle could make the numbers they had projected to the Street.

101.     Defendant Tarriff told Kimmet they needed five or six big customers. Defendant Tarriff wanted these "select customers" to buy thousands of vials of PEMFEXY in June 2022 to boost Defendant Eagle's sales revenue even though they knew the product wasn't moving and their customers wouldn't need the product until at least next year, i.e., sometime in 2023.

102.     To overcome this, Plaintiff was advised that Defendant Tarriff and Kimmet would pitch to the customers that they should "buy and hold" the product for several months, which of course organizations generally won't do because it would constitute unlawful channel stuffing in violation of, *inter alia*, the above-referenced federal laws, GAAP, and/or public policy.

103.     Plaintiff was further advised that Defendant Tarriff began talks with wholesalers to try and convince them to "buy and hold" the product because most customers won't buy direct from a manufacturer; instead, they use wholesalers.

104.     But wholesalers are likewise VERY careful not to buy "too much" product, i.e., unlawfully "stuffing the channel." In fact, in response to Defendants' efforts to "channel stuff", Defendants received communications from some of their wholesaler employees raising such concerns.

21

105. Nevertheless, upon information and belief, Defendant Tarriff continued to put pressure on a handful of customers, and in turn, asked them to put pressure on the wholesalers, especially a few of the largest U.S. wholesalers to engage in their "Buy and Hold" scheme.

106. Defendant Tarriff and Kimmet again chartered Company A's CEO's private jet to make further efforts to stuff the channel.

## VIII.   Defendants Continued to Engage in Non-Compliant Business Practices

A.   June 3, 2022 American Society of Clinical Oncology ("ASCO") Reception/Free Alcohol for HCPs Without Medical Agenda

107. Upon information and belief, Defendants continued to engage in non-compliant business practices in an effort to push "sales."

108. For example, on or about June 3, 2022, Defendant Tarriff, Plaintiff and members of his sales team attended the ASCO Meeting in Chicago.

109. While at this meeting, Plaintiff learned that Defendant Eagle and Company A were cosponsoring a cocktail reception at the Trump International Hotel and Tower in Chicago from 9:00 p.m. until 12:00 a.m. (CST), with no medical education exchange; just free alcohol for HCPs (prospective customers/prescribers of their products, including PEMFEXY).

110. Because Plaintiff had reason to believe that this would violate, *inter alia*, the Anti-Kickback Statute, OIG regulations, guidelines, the PhRMA Code, and/or public policy, Plaintiff asked Defendant Tarriff "how did this get approved?" as Plaintiff never saw this come through Defendant Eagle's Compliance Committee. Defendant Tarriff said "*Don't worry about it. Ryan [the General Counsel] knows and it's fine.*" In addition to Plaintiff reasonably believing that this was in violation of laws, rules, regulations and/or public policy, this also was in violation of, *inter*

22

*alia*, Defendant Eagle's Employee Handbook, including its Compliance and Ethics policies and procedures.

111. Defendant Tarriff then stormed away aggravated that Plaintiff had raised yet another compliance issue.

> B. Continued Use of NCR Models in Violation of Compliance Regulations and Codes in Effort to Convince Customers/HCPs to Purchase PEMFEXY

112. After returning from the ASCO meeting, Defendant Tarriff was on the warpath yelling every day, being very snarky with Plaintiff, trying to instigate a fight with him every time they spoke.

113. On or about June 10, 2022, Chief Financial Officer Brian Cahill and Kimmet requested that the PEMFEXY ASP be given to Kimmet. The "ASP", or average selling price, is the submission to the federal government, which determines the reimbursement rate of the product that a facility will be able to obtain for using the product. However, per the PhRMA Code and other OIG pharmaceutical guidelines and regulations, this information should only EVER be provided to people in the organization that are NOT dealing with end customers. Therefore, neither Kimmet nor Defendant Tarriff should have been provided with such information nor should they have been using it to convince customers/HCPs to buy the product because they would make money based on the reimbursement rate(s).

114. Yet, upon information and belief, Kimmet (and Defendant Tarriff) continued to use and discuss NCR models with HCPs even though Kimmet was the head of marketing, which Plaintiff reasonably believed to be in violation of, *inter alia*, the Anti-Kickback Statute, OIG pharmaceutical guidelines and regulations, the PhRMA Code, and/or public policy. Notably, at or around that time, the Net Cost Recovery to its customers, i.e., how much Defendant Eagle's

customers/HCPs would have made off prescribing PEMFEXY to their patients, would be a quite substantial profit for the customers (i.e., thousands of dollars per vial).

115. And again, upon information and belief, Kimmet was never certified to speak on behalf of the product yet continued to do so in what Plaintiff reasonably believed was in violation of, *inter alia*, the OIG regulations, PhRMA Code and Defendant Eagle's Employee Handbook and Compliance and Ethics policies.

## IX. Defendants Implemented the "Inventory Guarantee Purchase Program" or "Buy and Hold" Scheme to Unlawfully Stuff the Channel to Inflate Defendant Eagle's Numbers

116. By June 2022, desperate to inflate the Company's "sales" and "revenue" for the quarter, Defendant Tarriff called upon his largest customers and close personal friends, at least two of whom were industry leaders at two of the largest U.S. wholesalers, including Wholesaler A and Wholesaler B, to facilitate stuffing the channel with Defendants' non-moving PEMFEXY.

117. As part of Defendant Eagle's Buy and Hold or Inventory Guarantee Purchase Program, on June 30, 2022, the last day of Q2 2022, Defendant Eagle entered into a "sale" (signed 3½ months later and backdated to June 29, 2022) with Wholesaler A with whom Defendant Tarriff had a close personal relationship, where in exchange for agreeing to purchase AND accept thousands of vials of PEMFEXY at the Wholesaler A distribution center before midnight that night, Defendant Eagle provided them with terms that indicated that no bona fide sale had occurred; in reality, Defendant Eagle was effectively paying Wholesaler A to merely hold product so that Defendant Eagle could report false, inflated revenue numbers to the Street, i.e., channel stuffing.

118. Upon information and belief, Defendant Eagle intended to and did report this as "revenue" for the second quarter of 2022 even though there was no revenue for this purported

24

"sale" because (i) Wholesaler A could return the product later without ever paying for it, (ii) Defendant Eagle would pay Wholesaler A for merely "Buying and Holding" the product, and (iii) the product could be returned to Defendant Eagle without ever being paid for and the product would then likely be destroyed.

119.    At the time of this purported "sale", Wholesaler A already had a HUGE, non-moving, aging inventory of PEMFEXY because the competing generic products had come into the market and displaced the Company's far more expensive branded product, PEMFEXY, which sold for thousands of dollars (WAC) per single dose vial.

120.    At its current "Run Rate" (the rate at which the product was selling) at the time of the purported sale, it would have taken Wholesaler A YEARS to use up the supply of PEMFEXY it had already purchased from Defendant Eagle – FAR beyond PEMFEXY's shelf-life, thus further establishing that this purported "sale" was a complete sham.

121.    Another wholesaler who engaged in this "Buy and Hold" scheme with Defendant Eagle included Wholesaler B, whose Chairman, President and CEO is also Defendant Tarriff's close personal friend.

122.    Defendant Tarriff was asking Wholesaler B to buy millions of dollars' worth of inventory even though Wholesaler B's inventory was NOT moving. One of Wholesaler B's executives stated, "*it would NOT be compliant if we purchased more PEMFEXY because we still have many months of non-moving inventory on hand.*" Thus, Wholesaler B made it clear to the Defendants that it could not purchase more PEMFEXY at that time because it would constitute unlawful channel stuffing.

123.    Nevertheless, Defendants got Wholesaler B to buy more PEMFEXY. Notably, in addition to agreeing to provide Wholesaler B with the above-noted "Buy and Hold" program terms,

25

upon information and belief, Defendant Eagle agreed that the original inventory that Wholesaler B ordered back on or about February 1, 2022 (the dating product), would have additional days dating on the remaining inventory that they still had.

124. In the second quarter of 2022 alone, using their "Buy and Hold" scheme, Defendants "sold" millions of dollars of non-moving inventory to its customers, including Wholesalers A and B, totaling at least $28.8 million dollars.

125. As a result of such channel stuffing efforts by Defendants, Defendant Eagle closed the second quarter of 2022 and Defendant Tarriff reaffirmed that the Company would hit the number it had projected to the Street.

**X.    "Buy and Hold" Channel Stuffing Scheme Greatly Inflated Eagle's "Revenue"**

126. Upon information and belief, through this Channel Stuffing scheme, Defendant Eagle was able to greatly inflate the revenue it reported to the SEC and the public in 10-Q and 8-K filings.

127. For the second quarter of 2022, Defendant Eagle reported $74.1 million in revenue compared to $48.1 million, an increase of $26 million for the second quarter of 2021 and a loss of ($0.74) per share.

128. Upon information and belief, without the $28.8 million in artificial "revenue" from the channel stuffing of the above two wholesalers alone, Defendant Eagle would have reported revenue of approximately $45.3 million, a decline of about $2.8 million from the same quarter in 2021, and a greater loss than reported.

129. Instead, Defendant Tarriff boasted that "WE DID IT! We met our quarter's obligations for the reporting to the Street!"

130.     Thus, in addition to allowing Defendant Eagle to report what Plaintiff reasonably believed would constitute fraud, i.e., false and/or misleading results in its Press Releases and SEC filings, the artificial "revenue" created by the channel stuffing "Buy and Hold" scheme allowed Defendant Eagle to present itself as coming far closer to its own projections and the estimates of analysts who follow the Company than was actually the case.

131.     Yet, even with the unlawful channel stuffing, as reflected in the Earnings Press Release to its 8-K dated August 8, 2022, the $1.56 adjusted non-GAAP net income per fully diluted share that Defendant Eagle reported was 53.60% below the consensus estimate of $3.36 per share.

132.     Without what, upon information and belief, would constitute artificial revenue(s), that adjusted non-GAAP net income per share would have been even more dramatically below estimated Earnings Per Share ("EPS"), which would have been particularly problematic given the tandem announcement that Defendant Eagle had made a $25 million investment in another pharmaceutical company (Acacia Pharma Group plc).

## XI.     Defendants Knowingly Failed to Disclose and/or Concealed the Terms of the Buy and Hold Scheme to the Public and/or Its Investors

133.     In short, upon information and belief, Defendants have engaged and continue to engage in a scheme to deceive the investing public about the true value of Defendant Eagle's stock. Defendants falsely reassured the public and investors in statements and/or filings that Defendant Eagle was continuing to enjoy strong demand for its product and earning received revenues, when Defendants knew the opposite to be true.

134.     As the Founder, President, Chief Executive Officer and a minority shareholder, and having devised the fraudulent scheme, Defendant Tarriff stood to personally gain from engaging

in this "Buy and Hold" scheme or "Inventory Guarantee Product Program" and failing to disclose and/or concealing to the investing public the true value of Defendant Eagle's stock.

135.   Indeed, Defendant Tarriff knew when he stated during Defendant Eagle's May 9, 2022 Earnings Call that "We still have exclusivity for…PEMFEXY" and "We are seeing significant acceptance of PEMFEXY in the market" that those statements were false and/or misleading statements because he already knew and had been advised by Plaintiff and others that Defendant Eagle was losing its exclusivity in a couple of weeks and its customers would not be purchasing more PEMFEXY for the foreseeable future once that occurred.

136.   Moreover, because all the risks of ownership of any excess non-moving inventory did not pass to these wholesalers, i.e., Wholesalers A and B upon shipment of the goods, GAAP, specifically under Staff Accounting Bulletin No. 101 ("SAB 101"), which represent the interpretations and practices followed by the Division of Corporation Finance and the Office of the Chief Accountant in administering the disclosure requirements of the Federal securities laws and "revenue recognition", Defendant Eagle was not permitted to recognize revenue from such transactions at the time of shipment. Nevertheless, upon information and belief, Defendant Eagle improperly recorded revenue from these shipments upon shipment to these wholesalers for Q2 2022 contrary to GAAP.

137.   Upon information and belief, as part of this "Buy and Hold" or "Inventory Guarantee Product Program", Defendants knowingly misled the public and investors in numerous ways, including, among other things: (i) by failing to disclose or concealing the fact that Defendant Eagle had not been paid by wholesalers, including Wholesaler A and Wholesaler B for at least $28.8 million dollars' worth of PEMFEXY, and instead, claiming those monies as the Company's "sales" and/or "revenues" to Defendant Eagle for the second quarter of 2022 in public securities

filings and otherwise; (ii) by failing to disclose or concealing the fact that Defendant Eagle claimed approximately $28.8 million dollars' worth of PEMFEXY as Company "sales" and/or "revenues" in public securities filings for the second quarter of 2022 and otherwise even though the wholesalers could return the product without ever paying for the product(s); (iii) by failing to disclose or concealing the fact that Defendant Eagle would actually pay the wholesalers for doing nothing more than holding the product and then returning it - after which the product(s) would likely be destroyed, and yet had been claimed in public securities filings and otherwise as constituting "sales" and/or "revenues." for the second quarter of 2022; (iv) by stating that PEMFEXY still had exclusivity in the market when Defendant Tarriff knew that Defendant Eagle would lose its' exclusivity in about two weeks; (v) by failing to disclose or concealing in Defendant Eagle's public filings, including its 10Q for Q2 2022 (and since then), the terms of its Buy and Hold Scheme or Inventory Guarantee Purchase Program; and upon information and belief, (vi) by continuing to engage in such conduct, thus firmly establishing the knowing and willfulness of Defendants' conduct.

## XII. Plaintiff Internally Complained and Reported Defendants' Violations of Law, Rules and/or Public Policy Resulting in Plaintiff's Unlawful Termination

### A. Defendants Failed and/or Refused to Investigate or Take Prompt and Remedial Action

138. As set forth more fully above, since at least February 2022, Plaintiff voiced concerns to Defendant Tarriff, General Counsel and Chief Compliance Officer Debski and others on numerous occasions regarding what Plaintiff had reason to believe would constitute violations of law, rule and/or public policy, including but not limited to, the Securities Act of 1933, the Securities and Exchange Act of 1934, the Sarbanes-Oxley Act, the Anti-Kickback Statute, the

29

PhRMA Code, and the OIG guidelines and/or other pharmaceutical regulations. Yet, Defendants did nothing to properly address same.

139. To the contrary, in response to Plaintiff's complaints and/or refusing to engage in such conduct, Defendant Tarriff pushed him aside and took over the Company's Community-based PEMFEXY sales along with EVP Marketing Kimmet and then unlawfully terminated him.

140. By late June 2022, Plaintiff made a further internal whistleblower complaint against Defendants to the Company's Head of Human Resources Tracy Straley regarding what he reasonably believed to be violations of law, rule and/or public policy as set forth above.

141. Having just left a meeting with Defendant Tarriff and others where Tarriff had totally lost it and blown up at the meeting, Plaintiff reported to Head of Human Resources Straley how he believed that Defendant Tarriff had become completely unhinged over the past several months. Plaintiff began to recount for HR Straley what he reasonably believed to constitute, *inter alia*, the above-referenced violation(s) of law(s), rule(s) and/or public policy, channel stuffing and other unlawful and/or non-compliant conduct that Defendants continued to engage in over the past several months.

142. Plaintiff told HR Straley how he had: (i) advised Defendants not to engage in such unlawful and/or non-compliant conduct as set forth above; (ii) requested that they stop engaging in such conduct; and (iii) objected to and refused to participate in such conduct. Plaintiff further explained to her how all his reporting to Defendant Tarriff and others had fallen upon deaf ears.

143. Rather, as a result of Plaintiff reporting this to his supervisor (and others), objecting to it, and/or refusing to engage in such conduct, Defendants began pulling Plaintiff off work assignments, subjecting him to a hostile work environment, and that other affirmative efforts were being taken by Defendants to force Plaintiff out of the Company.

30

144. Knowing what the consequences would be for lodging such a formal complaint against the Company and Defendant Tarriff, HR Straley asked Plaintiff: *"Do you REALLY want to do this?"* HR Straley went on to explain that because Plaintiff was reporting it to her, per the Company's policies and procedures, she would, in turn, be duty bound to report it to her boss GC Debski. Plaintiff indicated that he understood what the consequences would likely be for him but felt compelled to come forward.

145. HR Straley asked Plaintiff whether rather than report his complaints to Defendants, "Do you want me to go to Defendant Tarriff and GC Debski and ask them to give you a severance package?"

146. Plaintiff said "NO", these compliance issues need to be properly addressed.

147. HR Straley said to Plaintiff *"You know that I can't protect you."*

148. In response, Plaintiff indicated that he understood but that these compliance issues needed to be addressed. HR Straley advised Plaintiff that since she already had a meeting scheduled with Defendant Tarriff and GC Debski, she would report his complaints to them right away and would get back to him regarding same.

149. But, of course, Plaintiff never heard back from Head of HR Straley, General Counsel/Chief Compliance Officer Debski or anyone else at Defendant Eagle regarding his complaints.

> B. Defendants Unlawfully Terminated Plaintiff for Refusing to Engage in and/or Reporting What Plaintiff Reasonably Believed to Violations of Law, Rule and/or Public Policy

150. Rather than investigate and take prompt and remedial action to properly address Plaintiff's complaints in accordance with the Company's Employee Handbook, Defendants unlawfully terminated Plaintiff's employment.

31

151.    As both Plaintiff and HR Straley had predicted, on July 15, 2022, within just a few short weeks of having reported the additional disclosures, Defendants terminated Plaintiff's employment in retaliation for his blowing the whistle on them.

152.    By email dated July 15, 2022, Defendants unlawfully terminated Plaintiff's employment, claiming that his employment was terminated for "Cause."

153.    Defendants manufactured false, pre-textual reasons to unlawfully terminate his employment.

154.    The July 15th Email termination for "Cause" claimed, *inter alia*, that Plaintiff failed to implement an effective marketing strategy or plan to maximize key growth drivers, revenues, etc.

155.    That, of course, was patently false.

156.    In the first quarter of 2022, prior to Defendants' involvement in and what was reasonably believed to constitute efforts to stuff the channel in the second quarter of 2022, as a result of Plaintiff's and his team's efforts, Defendant Eagle had the best quarter of financial performance in the Company's history. This included Vasopressin unit sales at 122% of plan; Ryanodex unit sales at 198% of plan; and PEMFEXY unit sales were 19,200 vials against a budget of 19,200, thus, at 100% of plan (the most that could be sold in that quarter given the agreement between Eli Lilly and Defendant Eagle).

157.    Indeed, despite Defendants' refusal to increase production, Plaintiff and his team were still able to sell the amount of product that was available in the first quarter of 2022 and created $4.04 earnings per share in just one quarter.  This was TWICE what Defendant Eagle earned for an entire year in 2021.

158. Plaintiff's numerous promotions, raises, increases in bonuses, and accolades awarded to him throughout his tenure further refute any purported termination for "Cause."

159. Rather, Plaintiff was retaliated against, which included being denied his promotion as President, and instead unlawfully terminated because of his reporting, objecting to, and/or refusal to engage in what he reasonably believed to constitute violation(s) of law, rule and/or public policy as set forth more fully herein, including but not limited to channel stuffing, and his internal complaints regarding same.

160. Furthermore, if, as Defendants claimed, Plaintiff's performance was so deficient as to rise to the level of a "Cause" termination, surely, in advance of doing so, Defendants would have followed their own policies and procedures by issuing warnings and/or providing written notice regarding same in accordance with Defendant Eagle's Employee Handbook. But they did not.

161. Rather, by email transmission, Defendants terminated Plaintiff on the heels of his formally reporting what he reasonably believed was in violation of law, rule and/or public policy.

162. Moreover, the causal connection between the adverse action(s) taken against Plaintiff and the objections made and/or refusal(s) by Plaintiff to engage in said unlawful conduct is self-evident. Both the temporal proximity and Defendant Tarriff's removal of Plaintiff from duties and responsibilities relating to the sale and promotion of PEMFEXY as a direct result of his complaints to Defendants and refusal to engage in such conduct, and then terminating Plaintiff as a result of his refusing to implement the Buy and Hold "marketing strategy or plan to maximize key growth drivers, revenues, etc." make it abundantly clear that Plaintiff was retaliated against in violation of CEPA.

163.   In retaliating against Plaintiff, Defendants acted with malice and in willful disregard of Plaintiff's rights.

164.   Plaintiff has suffered significant financial losses and economic harm as a proximate result of Defendants' actions, including, among other damages, a denied promotion (with commensurate earnings), lost wages, lost bonus(es), lost future income, and an obligation for attorneys' fees and costs in having to pursue this action.

165.   Plaintiff has also suffered and continues to suffer mental anguish and severe emotional distress as a proximate result of the actions of Defendants.

166.   Defendants acted with the intent of causing or in reckless disregard of the probability that their actions would cause Plaintiff severe emotional distress.

## XIII.   Defendant Eagle Materially Breached the Terms of the 2016 Employment Agreement by Failing and/or Refusing to Pay Plaintiff the Severance Pay and Benefits Set Forth Therein

167.   Separately, per the terms of his 2016 Employment Agreement, Plaintiff was entitled to severance and related benefits at the time of his termination – regardless of the reason or basis for his termination.

168.   Yet, despite Plaintiff demanding that Defendants, *inter alia*: (i) honor the terms of the 2016 Employment Agreement and make payment to him for his severance and other unpaid wages and compensation totaling no less than $626,771.79; and (ii) reinstate any and all benefits or other entitlements to which Plaintiff was entitled, Defendants have refused to do so.

169.   To date, Defendant Eagle has refused to adhere to the terms set forth in the 2016 Employment Agreement, and therefore, is in material breach of said Agreement.

170.   Thus, in addition to the other damages suffered by him for which Defendants shall be fully liable, Plaintiff is entitled to severance in the amount of twelve months' pay ($474,040.00)

34

plus a pro rata bonus totaling at least 60% of his then current annual compensation (approximately $152,731.79), totaling at least $626,771.79, plus accruing interest as a result of Defendants' material breach of the 2016 Employment Agreement.

## COUNT I
### Conscientious Employee Protection Act, N.J.S.A 34:19-1 et seq.
### (Defendants Eagle and Tarriff)

171.    Plaintiff repeats and realleges the allegations of paragraph 1 through 170 as if fully set forth herein.

172.    Plaintiff disclosed to a supervisor (and others) an activity, policy, or practice of the Defendants that he reasonably believed was fraudulent and/or in violation of a law, rule, regulation promulgated pursuant to law, and/or public policy.

173.    In disclosing said action(s) to his supervisor (and others), Plaintiff engaged in protected activity under CEPA.

174.    Plaintiff objected to and/or refused to participate in an activity, policy or practice which he reasonably believed was fraudulent and/or in violation of law, rule or regulation promulgated pursuant to law, and/or public policy.

175.    In objecting to said action(s), Plaintiff engaged in protected activity under CEPA, N.J.S.A. 34:19-1 to -8.

176.    As a proximate result of Plaintiff's disclosures, objections and/or refusal to engage in such acts, Defendants retaliated against Plaintiff by, *inter alia*, substantially limiting his duties and responsibilities, creating a hostile work environment, not promoting him as President of Defendant Eagle, and instead unlawfully terminating his employment.

177.    As a direct result of Defendants' retaliatory actions, Plaintiff has sustained, *inter alia*: (i) loss of earnings, including base pay and bonus payments, equity interest; (ii) loss of benefits; (iii) a loss of future earning power; (iv) severe emotional and psychological distress; (v) loss of self-esteem; (vi) loss of reputation and opportunity for career advancement; and (vii) an obligation for attorneys' fees and costs of bringing this action.

178.    Plaintiff is now suffering and will continue to suffer monetary and other damages unless and until this Court grants the relief requested herein.

## COUNT II
### Breach of Contract (Defendant Eagle)

179.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 178 as if fully set forth herein.

180.    The 2016 Employment Agreement is a valid, enforceable, and binding contract supported by the mutual exchange of promises between Plaintiff and Defendant Eagle in which Defendant Eagle had obligations upon the termination of Plaintiff's employment.

181.    Per the terms of the contract, Defendant Eagle agreed that upon his termination, Plaintiff was "entitled to receive an amount equal to [Plaintiff's]-then-current monthly Base Salary payable for a period of twelve (12) months plus a pro-rata portion of your annual bonus for the performance period in which your termination occurs, calculated based upon the number of days that you were employed during the performance year, payable in equal installments...."

182.    Yet, to date, despite the terms of the 2016 Employment Agreement, Defendant Eagle has materially breached those contractual obligations by failing to honor and perform said terms as set forth above and in the 2016 Employment Agreement, thereby causing Plaintiff to lose income, suffer diminished earning capacity, and suffer consequential damages.

36

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against Defendants jointly and severally:

a.    Enjoining future violations of CEPA by Defendants;

b.    Ordering appropriate equitable relief;

c.    Awarding compensatory, consequential and punitive damages;

d.    Awarding Plaintiff reasonable attorneys' fees and costs pursuant to CEPA;

and

e.    Entering such other and further relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues.

Dated: July 13, 2023

> **WATANABE EMPLOYMENT LAW GROUP, PLLC**
>
> Laura A. Watanabe
> 405 Lexington Avenue, 9th Floor
> New York, New York 10174
> (203) 644-5262
> *Pending Pro Hac Vice Admission*
>
> **MCMORAN, O'CONNOR, BRAMLEY & BURNS, P.C.**
>
> By: _____
> Michael F. O'Connor Bar No. 047401995
> Ramshorn Executive Centre
> 2399 Highway 34 Suite D-1
> Manasquan, New Jersey 08736
> (732) 223-7711
> *Attorneys for Plaintiff Michael Moran*

37

## CERTIFICATE OF SERVICE

I, Kenneth L. Dorsney, hereby certify that on June 5, 2026, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed.

I further certify that on the same date the attached document was electronically mailed to the following person(s):

Daniel M. Silver
Alexandra M. Joyce
MCCARTER & ENGLISH, LLP
405 N. King St., 8th Floor
Wilmington, DE 19801
dsilver@mccarter.com
ajoyce@mccarter.com
eaglelitigation@mccarter.com

*Attorneys for Plaintiff*

Marc N. Zubik
Alex Grabowski
Kenneth Schuler
Michelle Chin
Nathan Fuller
Manuela Burek
Hanna Bondarowicz
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
marc.zubick@lw.com
alex.grabowski@lw.com
kenneth.schuler@lw.com
michelle.chin@lw.com
nathan.fuller@law.com
manuela.burek@lw.com
hanna.bondarowicz@lw.com

Ramya Sri Vallabhaneni
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 100200
ramya.vallabhaneni@lw.com

Brett M. Sandford
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
brett.sandford@lw.com

*Attorneys for Plaintiff*

Kelly A. Welsh
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004
kelly.welsh@lw.com
EAGLEBENDAMUSTINELITIGATION.LWTE
AM@lw.com

*Attorneys for Plaintiff*


Dated: June 5, 2026


    */s/ Kenneth L. Dorsney*
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants*
*Apotex Inc. and Apotex Corp.*

## U.S. District Court

## District of Delaware

## Notice of Electronic Filing

The following transaction was entered by Dorsney, Kenneth on 6/5/2026 at 6:09 PM EDT and filed on 6/5/2026

| | |
|---|---|
| **Case Name:** | Eagle Pharmaceuticals, Inc. v. Apotex Inc. et al |
| **Case Number:** | 1:24-cv-00064-JLH |
| **Filer:** | Apotex Corp. |
| **Document Number:** | 372 |

**Docket Text:**

**[SEALED] DECLARATION of Matthew T. Messina in support of Defendants' Motion for Summary Judgment of Partial Damages (Vol. 3 of 4 - Exhibits 11-23)) re (368 in 1:24-cv-00064-JLH) Opening Brief in Support, (374 in 1:24-cv-00065-JLH) Opening Brief in Support, by Apotex Corp., Apotex Inc.. (Dorsney, Kenneth)**

| | |
|---|---|
| **Case Name:** | Eagle Pharmaceuticals, Inc. v. Slayback Pharma LLC |
| **Case Number:** | 1:24-cv-00065-JLH |
| **Filer:** | Apotex Corp. |
| | Apotex Inc. |
| **Document Number:** | 380 |

**Docket Text:**

**[SEALED] DECLARATION of Matthew T. Messina in support of Defendants' Motion for Summary Judgment of Partial Damages (Vol. 3 of 4 - Exhibits 11-23)) re (368 in 1:24-cv-00064-JLH) Opening Brief in Support, (374 in 1:24-cv-00065-JLH) Opening Brief in Support, by Apotex Corp., Apotex Inc.. (Dorsney, Kenneth)**

**1:24-cv-00064-JLH Notice has been electronically mailed to:**

Alex M. Grabowski     alex.grabowski@lw.com, alex-grabowski-8992@ecf.pacerpro.com

Alexandra M. Joyce     ajoyce@mccarter.com, amiller@mccarter.com, jwhitt@eagleus.com, Linda.Smith@lw.com

Brett M. Sandford     brett.sandford@lw.com

Christopher B. Ferenc     christopher.ferenc@katten.com, dawn.el-khoury@katten.com

Cortlan S. Hitch     chitch@morrisjames.com

Daniel M. Silver     dsilver@mccarter.com, amiller@mccarter.com, cgrazer@mccarter.com, dchase@mccarter.com, kford@mccarter.com

Deepro Murkerjee    deepro.mukerjee@katten.com

Jitendra Malik    jitty.malik@katten.com

Joseph M. Janusz    joe.janusz@katten.com

Kelly Welsh    kelly.welsh@lw.com

Kenneth Laurence Dorsney    kdorsney@morrisjames.com, CHitch@morrisjames.com, ippara@morrisjames.com

Lance A. Soderstrom    lance.soderstrom@katten.com, dawn.el-khoury@katten.com

Manuela Burek    manuela.burek@lw.com

Marc N. Zubick    marc.zubick@lw.com

Matthew T. Messina    matthew.messina@katten.com, courtalertchi@katten.com

Rachel L. Schweers    rachel.schweers@katten.com, dawn.el-khoury@katten.com

**1:24-cv-00064-JLH Filer will deliver document by other means to:**

**1:24-cv-00065-JLH Notice has been electronically mailed to:**

Ajay Kayal    akayal@windelsmarx.com

Alan H. Pollack    apollack@windelsmarx.com

Alex M. Grabowski    alex.grabowski@lw.com, alex-grabowski-8992@ecf.pacerpro.com

Alexandra M. Joyce    ajoyce@mccarter.com, amiller@mccarter.com, jwhitt@eagleus.com, Linda.Smith@lw.com

Andrew J. Miller    amiller@windelsmarx.com

Audrey R. Sparschu    asparschu@windelsmarx.com

Brett M. Sandford    brett.sandford@lw.com

Daniel Taylor    dtaylor@skjlaw.com, dtpatent@recap.email, mdaughton@skjlaw.com

Daniel E. Forchheimer    dforchheimer@windelsmarx.com

Daniel M. Silver    dsilver@mccarter.com, amiller@mccarter.com, cgrazer@mccarter.com, dchase@mccarter.com, kford@mccarter.com

Hanna Bondarowicz    hanna.bondarowicz@lw.com

Jason A. Lief    jlief@windelsmarx.com

Kelly Welsh    kelly.welsh@lw.com

Kiersten A. Fowler    kfowler@windelsmarx.com, rsalvador@windelsmarx.com

Manuela Burek     manuela.burek@lw.com

Marc N. Zubick     marc.zubick@lw.com

Neal C. Belgam     nbelgam@skjlaw.com, mdaughton@skjlaw.com, vkm@skjlaw.com

Robyn H. Ast-Gmoser     rast-gmoser@windelsmarx.com

**1:24-cv-00065-JLH Filer will deliver document by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1079733196 [Date=6/5/2026] [FileNumber=6232233-0]
[e3584774ef0ccf43350d4b3c75892e6fe24424e9f3574ca5e4c2d130f419b585c327
d235617ab91f6d3f4ab275cd8ca95ba3b2c04facd1fae4df7da39c68ffab]]