**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>APOTEX INC. AND APOTEX CORP.,<br><br>Defendants. | REDACTED PUBLIC VERSION FILED AUGUST 7, 2026<br><br>C.A. No. 24-64-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>███████ <br>████████ <br>█████████ |
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC,<br><br>Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>████████ <br>█████████ |

**DECLARATION OF ALEX GRABOWSKI IN SUPPORT OF PLAINTIFFS  EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB 1 LLC'S *DAUBERT* MOTION TO EXCLUDE THE OPINIONS OF DEFENDANTS' EXPERT,  DAVID BUGAY**

I, Alex Grabowski, declare as follows:

1.      I am an attorney at the law firm of Latham & Watkins LLP and counsel for Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC ("Eagle") in the above-captioned case.  I am admitted to practice before the Court *pro hac vice*.

2.      I make this declaration in support of Eagle's *Daubert* Motion to Exclude the Opinions of Apotex Inc. and Apotex Corp.'s ("Apotex's") and Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s ("Slayback's") Invalidity Expert, David Bugay.

3.      I have personal knowledge of the facts set forth in this declaration, and if called as a witness, could and would competently testify thereto.

4.      Attached as **Exhibit 1** is a true and correct copy of excerpts of the Markman Hearing Transcript, dated January 30, 2025.

5.      Attached as **Exhibit 2** is a true and correct copy of excerpts of the Expert Report of David E. Bugay, dated February 6, 2026.

6.      Attached as **Exhibit 3** is a true and correct copy of excerpts of the Deposition Transcript of David E. Bugay, dated May 27, 2026.

7.      Attached as **Exhibit 4** is a true and correct copy of WO 2010/036702 A1 (Drager) (APOBENDA64_043947).

8.      Attached as **Exhibit 5** is a true and correct copy of a certified translation of German Democratic Republic Patent No. 159289 (Olthoff) provided by Defendants (APOBENDA64_043753).

I declare under penalty of perjury that the foregoing is true and correct.

June 5, 2026                                    /s/_____
                                                          Alex Grabowski

1

# Exhibit 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC., )
)
Plaintiff, )
) C.A. No. 24-64-JLH
v. )
)
APOTEX INC. and APOTEX CORP., )
)
Defendant. )
- - - - - - - - - - - - - - - -
EAGLE PHARMACEUTICALS, INC., )
)
Plaintiff, ) C.A. No. 24-65-JLH
)
v. )
)
SLAYBACK PHARMA LLC, )
)
Defendant. )
- - - - - - - - - - - - - - - -
EAGLE PHARMACEUTICALS, INC., )
)
Plaintiff, ) C.A. No. 24-66-JLH
)
v. )
)
BAXTER HEALTHCARE CORPORATION, )
)
Defendant. )

J. Caleb Boggs Courthouse
844 North King Street
Wilmington, Delaware

Thursday, January 30, 2025
10:02 a.m.
Markman Hearing

BEFORE: THE HONORABLE JENNIFER L. HALL, U.S.D.C.J.

APPEARANCES:

McCARTER & ENGLISH, LLP
BY: DANIEL M. SILVER, ESQUIRE
BY: WYLEY S. PROCTOR, ESQUIRE

-and-

LATHAM & WATKINS LLP
BY: DANIEL G. BROWN, ESQUIRE
BY: ALEX GRABOWSKI, ESQUIRE
BY: KELLY ANNE WELSH, ESQUIRE

For the Plaintiff

POTTER ANDERSON & CORROON LLP
BY: PHILIP A. ROVNER, ESQUIRE

-and-

DECHERT LLP
BY: MARTIN BLACK, ESQUIRE
BY: JUDAH BELLIN, ESQUIRE
BY: AMANDA K. ANTONS, Ph.D.
BY: NOAH M. LEIBOWITZ, ESQUIRE

For the Defendant
Baxter Healthcare

MORRIS JAMES LLP
BY: CORTLAN S. HITCH, ESQUIRE

-and-

KATTEN MUCHIN ROSENMAN
BY: CHRISTOPHER B. FERENC, ESQUIRE

For the Apotex Defendants

SMITH KATZENSTEIN & JENKINS LLP
BY: DANIEL A. TAYLOR, ESQUIRE

-and-

WINDELS MARX
BY: JASON A. LIEF, ESQUIRE

For the Slayback Defendant

*** PROCEEDINGS ***

DEPUTY CLERK: All rise. Court is now in session. The Honorable Jennifer Hall presiding.

THE COURT: Please be seated. Good morning, everyone.

ALL COUNSEL: Good morning, Your Honor.

THE COURT: We're here today for a Markman hearing. This is *Eagle Pharmaceuticals vs. Apotex* and *Slayback*.

Let's go ahead and put our appearances on the record.

MR. SILVER: Good morning, Your Honor. Dan Silver from McCarter & English on behalf of Eagle. And I'm joined today by my partner, Wyley Proctor, my co-counsel in the Baxter case. And then also by co-counsel from Latham & Watkins, Dan Brown, Alex Grabowski and Kelly Welsh, who are my co-counsel in the Apotex and Slayback cases.

THE COURT: All right. Very good.

MR. SILVER: We also have Jacob Whitt present for Eagle as well.

THE COURT: All right. Good to see you. Thanks for coming.

MR. ROVNER: Good morning, Your Honor. Phil Rovner from Potter Anderson & Corroon on behalf of Defendant, Baxter Healthcare, in the 26 case. With me is my co-counsel from the Dechert firm, Martin Black, Judah Bellin Noah Leibowitz, Amanda Antons.

And also with us is in-house counsel from Baxter, Laura DeMoor.

Just to let you know, Mr. Black and Mr. Bellin will be presenting argument on behalf of all three Defendants.

THE COURT: Great. Thank you very much.

MR. HITCH: Good morning, Your Honor. On behalf of Apotex, it's Cortlan Hitch from Morris James. And joining me today is Christopher Ferenc from Katten.

THE COURT: Okay.

MR. TAYLOR: And good morning, Your Honor. This is Daniel Taylor from Smith Katzenstein & Jenkins on behalf of Slayback. And with me is Jason Lief of Windels Marx.

Thank you.

MR. BLACK: Your Honor, if I might address the Court briefly?

THE COURT: Sure.

MR. BLACK: Martin Black, as just introduced. I'm here for Baxter. You didn't call us initially, but we're the third case on the list.

THE COURT: Yes.

MR. BLACK: Just for clarification, we represent

9

construction is the appropriate construction, especially in these two cases, which are going to go to a jury. It's consistent with the claim structure and the claim language. It acknowledges that "comprising" has a meaning. And whatever the meaning of "consisting" is is the meaning that Your Honor will give to it, but we don't need to tie that back into the meaning of "comprising." And we think the straightforward plain and ordinary meaning will avoid jury confusion.

The problem with -- one of the problems with Defendants' proposed construction is that it attempts to import a negative limitation to define -- which is disfavored, and we know that from the *Nippon vs. Sarepta* case from Judge Williams a couple years ago. But that's a well-established precept of claim construction.

And so the problem with their construction, in addition to the negative limitation, is it's entirely unprecedented. They haven't cited to Your Honor, despite the clear, plain and ordinary meaning of "comprising," they haven't cited to Your Honor a single case that has done what they're urging the Court to do here. They're asking the Court to go out on a limb and read in this negative limitation.

And there certainly have been cases that have "comprising" in the preamble and "consisting" in a

10

limitation that have not done what Defendants are urging the Court to do here. So we think it's improper for that reason.

And, again, it departs from the plain and ordinary meaning. And there's no basis for doing so. There's no lexicography. There's no disclaimer.

So Defendants say this language is necessary, but that's a straw man. Nowhere is Eagle arguing that the "comprising" phrase expands the "consisting of" term.

We'll talk about "consisting" and what it means as a matters of law, but we're not going to use the "comprising" phrase to drive a Mack truck through it, Your Honor. We understand that they are separate claim terms and they should both be construed. And we've committed to that in our brief, and I suspect Your Honor will hold us to that.

THE COURT: So, yeah. So let's just -- so let's get into that and see if we can understand exactly what the argument is.

So I take it there's a dispute because one or more of the Defendants' products has got stuff in it that isn't in -- specified in the claim right now.

MR. SILVER: Correct.

THE COURT: Correct? Right.

And I took that from the motion that I ruled on earlier this week.

11

So can it have another fluid in the product --

MR. SILVER: I don't think --

THE COURT: -- and still infringe?

MR. SILVER: I don't think there's a per se prohibition on any other fluid. And the reason I say that, Your Honor, again, if we go back and look at the claim, the element below the pharmaceutically acceptable fluid is a stabilizing amount of antioxidant. There are well-known antioxidants that are in a fluid form that would be -- could be added to the composition.

And so I think what -- the question that Your Honor poses, I think gets to the heart of the issue. But, really, it's more of an infringement issue because we have to look at a particular formulation, what's in it, in what amount. What is the function of the various excipients that are in there. And then assess does it fall within the scope of the claim or is it outside the scope of the claim?

And I think that's very common in cases, Your Honor. From our perspective, just to put our cards on the table, these claim constructions are not in any way dispositive, in our view. It is just a question of: How are we going to convey it to the jury? What do our experts need to do? How can we present it in a way that's understandable?

Without, of course, any inability for Your Honor

12

to give the jury any necessary clarification in later instructions.

THE COURT: So just to be -- and -- well, I'm going to give a clarification later. I'm just going to tell you that right now.

MR. SILVER: Okay.

THE COURT: But what I'm hoping to work out today is: What are the legal consequences of the way this claim is drafted?

Because I can give -- I can pick one or the other side for claim construction, but we're just going to be in the same issue where we're playing word games with the jury later. And what I don't want to do is play word games.

So if I have to list a paragraph of a claim construction explaining exactly what this means, I'm fine doing that. But we need to decide today legally what this means so we can move forward.

So that's where I'm coming from. And I don't mean to catch you off guard, because I know you've split up the way the terms are being argued.

So let me just ask you this: Can it have another pharmaceutically acceptable fluid in it that is not listed here?

Is that your position?

MR. SILVER: Again, I think it would depend on

13

what it is, in what amount and at what function.

THE COURT:  Okay.

MR. SILVER:  Like if there's a molecule of water as an impurity, does that take it outside the scope of the claim?

THE COURT:  Put the impurity aside.  Say it's got ten percent -- well, I'm just trying to see what the metes and bounds of your argument are.

If it's got ten percent water in it, would that be in the claim or out of the claim?

MR. SILVER:  I would defer to Mr. Brown on that --

THE COURT:  Okay.

MR. SILVER:  -- Your Honor, because that's more the "consisting of" term.

THE COURT:  Okay.

MR. SILVER:  But I -- again, I think this probably, as with all claim constructions, then gets given to the experts.  And then there may be some dispute between them as to what -- you know, what's fair game and what's outside the scope of the claims.

So I don't know that we can get absolute precision today, and I don't know that it's fair to expect us at this fairly early stage of the case to draw firm lines in the sand when we haven't gotten samples of their

14

products, and tested them and whatnot.

THE COURT:  I understand.

MR. SILVER:  So, Your Honor, I think, you know, reading between the lines, I think most of the action here is going to be on the "consisting of" issue.  So I'll just wrap up on "comprising."

My point is simply that "comprising" is a stand-alone term in the claim.  It should be given its plain and ordinary meaning.  Whatever the definition of "consisting of" or "consists of" is, Your Honor can clarify that to the jury.

But we shouldn't have a situation, just objectively -- even as a lawyer, it's somewhat confusing to throw in this negative limitation at the end of the construction.  I can only imagine for a lay jury.

We just don't think it's helpful.  We think it injects confusion, and it's not necessary.  And, again, it's unprecedented.  No one's ever done it.

THE COURT:  Thank you very much.

MR. SILVER:  Thank you, Your Honor.

THE COURT:  Should we hear the next -- can we hear the "consisting of" thing now?

I think it might be better because I really do think --

MR. SILVER:  Sure.

15

THE COURT:  -- these should all get resolved together.

Is that okay with you, Mr. Black?

MR. BLACK:  Yeah.  I was going to suggest that actually.

THE COURT:  All right.

MR. BROWN:  Thank you, Your Honor.

So, as I think we covered a minute ago -- I lost my -- there are two differences between the parties, the language of the parties' construction.

Defendants propose putting in "as ingredients" on the end of the claim -- of the "consisting of" claim term.  And the Plaintiffs propose including the language on the exceptions within the claim construction itself.

I want to start with Defendants' issue on the "as ingredients," and I want to go back to the claim structure for a minute.  I think this will help get to the heart of Your Honor's question.

So if we look at where "as ingredients" goes, it would go at the end of this phrase that begins with the yellow highlighting.  And we would submit, first of all, it just doesn't go there.  You would -- you're putting "as ingredients" being excluded and then you have "and another ingredient."  It's sort of implicitly confusing.

But I think starting from the topic of -- so I'd

16

like to start with, I guess, the legal issue of that term.  And that's very simple.

Under *Phillips*, you look at three things.  You look at the claim language, specification, prosecution history.  It doesn't come from any of those places.  It's not -- they're not alleging that it's a term of art in the pharmaceutical field, that somebody would know that it means a particular thing.

And so it appears to be surplusage pulled from the case law, but that case law isn't in the specific context of this invention and this patent where we have the specification, prosecution history and everything else.

So going on to the practical aspects, which I think was where the heart of Your Honor's question came from, we think that "as ingredients" is really a Trojan horse.  They seem to be using it in their briefing for two purposes.  Neither of which is proper.

The first purpose is to go back upstream and vitiate the "comprising" language at the introduction and basically say, There cannot be an additional ingredient of any kind in the liquid composition.  That seems to be their position.

The second position, which is also unfounded, is the "put in" argument, that it's -- as I am interpreting.  I'm not sure I interpret the brief entirely.

25

Antioxidant is a function. Fluid is not a function.

Do you mean solvent?

MR. BROWN: I think -- we haven't proposed putting solvent in the claim construction, but I think, you know, as you looked at, for example, the prosecution history that's discussed in there, when you -- I think that actually is very instructive, if you read through the entirety of what was included.

Where the *Drager* reference disclosed lots of things. It disclosed the -- but, particularly, it disclosed a polar aprotic solvent as a critical aspect of the invention.

It also disclosed antioxidants. It disclosed a bunch of variety of other ingredients that you could put in there.

And when we made the amendment, going to "consisting of," and putting pharmaceutically acceptable fluid into the claim and putting "consisting of," we only talked about that solvent.

THE COURT: I agree with you on that.

MR. BROWN: Yeah.

THE COURT: I think you're right about that. But you made a choice to say "consisting of," and so it seems to me you can't have other solvents.

26

You agree you can't have other solvents?

MR. BROWN: We can't have other solvents, subject to the known exceptions. So if they're an impurity or if they fall within the known exceptions to "consisting of," you know, if you have like every -- every solvent has some water in it. Every solvent has -- you know, if you get the material data sheet or something for -- you know, for one of these things. You know, ethanol is going to have, you know, 4.7 percent water, whatever it's known to have.

Those things are within the impurity exception or the -- unrelated to the claim element exception.

THE COURT: Okay. So I think we've got our first sort of fence off.

Cannot have other solvents in the infringing product; right?

So if the person of ordinary skill in the art understands that, even something with some impurities is still PEG, then that's fine. That can be in the product.

But you can't have another solvent that's not in here. Can't have DMSO.

MR. BROWN: You can't have DMSO, correct. The only hesitation I have is -- you know, is the antioxidant a solvent. Is the -- the way I look at the claim is you -- and this is consistent with the *Amgen* case.

You look at the elements. And you go down the

27

list of things, and you see if you have the thing. And if you have -- if I can go back -- so if I have a pharmaceutically acceptable fluid consisting of these things, I've met that element. If I have an antioxidant -- if I have something else that's there for a different -- performing a different function, you don't then go back and ask: Well, is the antioxidant also a pharmaceutically acceptable fluid, or a solvent or something like that.

No, it's there. It's its own component that's separate from that.

And so that's why we phrased the construction as it is, which is we know what "consisting of" is. This is a question of fact. It's a Stage 2 infringement question. And, you know, we don't even know, you know, all the details of what we may find when we do testing of Defendants' product, et cetera.

And so this is actually fairly normal in pharmaceutical formulation cases where you have, you know, a pH adjusting agent. And there's a fact question about, you know, is -- you know, what components --

THE COURT: A hundred percent, and I'm fully familiar with that. I guess the difference here is, again, you're referring to stuff by its function, and fluid is not a function.

MR. BROWN: I think -- I mean, I would suggest

28

that pharmaceutically acceptable fluid, I would suggest that it is a function, that it is -- if you look -- in fact, if we go forward to -- you know, here's the one that says in Example 1. Table 1 shows that bendamustine, when dissolved in a concentration of about 10 milligrams per milliliter in a pharmaceutically acceptable fluid, such as ethanol and propylene glycol, and containing a stabilizing amount of chloride salt, such as choline chloride.

So, here, the fluid is holding the other components. That's its -- that is its function. It's dissolving the other components.

Similarly, I think this is --

THE COURT: Is a solvent.

So you're saying solvent now?

MR. BROWN: Yes.

THE COURT: Okay.

MR. BROWN: It is functioning as a solvent.

THE COURT: I don't -- and by the way, I'm not -- I don't mean to be hard on the attorneys. I think you and Mr. Silver have presented the best possible argument one could make.

This patent -- I've seen patents like this before. We all have. This is a poorly drafted patent, and I'm trying to make sense of it. You're explaining it very well, what your position is to me, but it's challenging.

65

bound rendering this indefinite.

Other than the specification itself and the prosecution history, they haven't even put in evidence of that. There's nothing about what a POSA would understand the inherent bounds to be. They clearly haven't met that burden.

So even, if Your Honor thinks, Oh, this isn't a typo, and, frankly, I think, given the wording in Exhibit 6, that's, you know, not supported. But even if Your Honor thinks this isn't a typo, it's clearly not meeting their clear and convincing burden of what a POSA would understand inherently to support.

THE COURT: Okay. Thank you very much.

MR. GRABOWSKI: Thank you, Your Honor.

THE COURT: I have some thoughts, but I want to take a couple minutes just to make sure I express them clearly, especially in a case like this. It's probably better to be precise.

So why don't you give me a little time. I don't think I need much time. Maybe let's take a 15-minute recess. And if I need a little more time, I'll have somebody let you know.

DEPUTY CLERK: All rise.

(Recess was taken.)

DEPUTY CLERK: All rise.

66

THE COURT: Hi. Please be seated.

Okay. I've got some thoughts that I wanted to convey while everything is fresh in my mind, because I've got 300 other cases that need my attention and I'll forget. So I wanted to give you what I can give you today.

So, just at the outset, I don't think there's a reasonable debate that these claims are a mess. I agree with counsel about that. We have very, very skilled attorneys on both sides arguing, and I appreciated hearing from everyone today. Everyone did the best that they could with these claims. It is not counsel in this room's fault that the claims are the way they are, but they are a mess.

And so the question is: What we're going to do about it?

So starting with Terms 1 and 2, everybody in this room knows what "consisting of" and "comprising" means. We all know that. We've got proposed constructions from both sides, but neither clarifies what the real issue is here, which is: How do these claim elements fit together.

And the mess we're in in this respect is compounded by the fact that the patent is internally inconsistent about what it means when it talks about a pharmaceutically acceptable fluid.

So I'll just say the record, here's where we found, things that seem to support the proposition that the

67

fluid, when it's referred to, includes additional things that aren't necessarily a solvent. So, for example, the abstract. We have the portion we talked about during the hearing today, which is Column 2, Line 65 to Column 3 to 5. We have Column 4, Lines 30 to 39. We have Column 5, Lines 36 to 46. We have Column 5, Lines 52 to 61. And we have Column 6, Lines 20 to 27.

And then we've also got portions of the patent where it talks about the stabilizer being a separate aspect or separate element. We've got Column 2, Lines 1 to 7. Column 4, Lines 45 to 53. Column 7, Lines 25 to 35. Column 8, Lines 26 to 34. And Column 9, Lines 15 to 19.

So what do we do about this?

I agree with Defendants, in the abstract, that you can't have in the product another fluid that is a pharmaceutically acceptable fluid that is not on the list and still infringe. I agree with them.

That said, I'm not willing to say, at this point, that a product that has, for example, liquid Vitamin E as an antioxidant doesn't infringe because it's a liquid. Because the patent claim expressly allows for an antioxidant as a separate element.

I think Plaintiff agreed today, and I think we all agree that there can't be another solvent system that's not on the list of pharmaceutically acceptable fluids. But

68

I'm not going to say that the use of an antioxidant, that someone might characterize as a solvent because it's capable of dissolving a solid, would take a product outside of the scope of the claims.

I'm not going to allow the jury to decide the issue of whether a substance is "unrelated to this element" or "unrelated to the invention." That's not something that's within the province of the jury.

I think that impurities that are normally associated with a component are included in the scope of the term. I think we all agree on that. We just have a dispute about whether or not to tell it to the jury.

And so what do we take from all of this? I think the only thing we can do is to ultimately give the jury a narrative that explains how the "comprising" and "consisting" elements fit together. But it's premature for us to work on that until I understand what the parties' positions are.

And, of course, I understand that the Court is to construe claims without reference to the accused products. But the Court also only needs to construe claim terms to the extent there's a dispute, and I don't have an understanding about what the dispute is here still.

And doing it right now or adopting one or the other's party's proposed constructions right now is just

69

going to invite word games in front of the jury. And I have no interest in doing that.

So the bottom line here is that we all know what comprising and consisting of are. Adopting one or the other side's proposals is not going to help. It's just going to invite word games later.

So what we're going to do is we're going to hear what the parties have to say about it at summary judgment. And then, to the extent there's a dispute about what to tell the jury, we will deal with it at the jury instructions.

So that's Terms 1 and 2.

So for Term 3, the Court agrees with Plaintiff. The Court can correct typographical errors if the correction is not subject to reasonable debate based on consideration of the claim language and the specification. And the prosecution history does not suggest a different interpretation of the claims. And I find that both of those factors are met.

The prosecution history shows that the correction is not subject to reasonable debate, as was discussed here at the hearing today. There was an original claim that claimed "from about 20 milligrams per mill to about 60 milligrams per mL and a dependent claim that claimed about 25 milligrams per mL." The claims were amended. It's clear from the prosecution history that the

70

patentee was incorporating the dependent claim "about 25 milligrams per mL," but just forgot to delete the "from."

It would be a different situation if the claim said more than about 25 and less than about 60 and just deleted the 60 part, but that's just not what happened here.

And, also, I note that "from about 25 milligrams per mL" doesn't make any sense in the context of the patent, and a person of skill in the art would understand that the word "from" was included accidentally during prosecution and needs to be deleted.

And that's all I had to say.

Is there anything else we need to address today?

MR. SILVER: Nothing from Plaintiffs, Your Honor. Thank you.

MR. BLACK: Nothing from Baxter. Nothing from the Defendants, Your Honor.

THE COURT: All right. It was great to see everyone. Have a lovely weekend.

DEPUTY CLERK: All rise.

(Court was concluded at 11:56 a.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Heather M. Triozzi

Certified Merit and Real-Time Reporter

U.S. District Court

65:11, 69:25
**clearly** [12] - 20:22, 21:2, 23:11, 31:1, 32:17, 34:4, 35:17, 45:9, 64:15, 65:5, 65:10, 65:17
**CLERK** [4] - 3:3, 65:23, 65:25, 70:19
**client** [1] - 5:10
**closed** [5] - 34:21, 35:7, 36:9, 37:6, 40:3
**co** [4] - 3:15, 3:16, 3:18, 4:2
**co-counsel** [4] - 3:15, 3:16, 3:18, 4:2
**colon** [1] - 36:25
**Column** [15] - 19:4, 19:5, 20:20, 50:17, 67:4, 67:5, 67:6, 67:7, 67:10, 67:11, 67:12
**combination** [1] - 41:8
**combinations** [1] - 21:8
**combined** [1] - 41:10
**coming** [2] - 3:23, 12:18
**comma** [1] - 60:3
**comment** [1] - 42:3
**committed** [1] - 10:14
**common** [2] - 7:6, 11:18
**communication** [1] - 59:10
**company** [1] - 49:3
**complete** [1] - 57:24
**complex** [1] - 33:25
**complexity** [1] - 7:19
**component** [5] - 17:10, 23:22, 27:9, 52:16, 68:10
**components** [5] - 27:20, 28:10, 28:11, 38:9, 51:13
**composed** [1] - 35:13
**composition** [13] - 8:5, 11:10, 16:21, 18:23, 45:4, 46:17, 47:6, 47:7, 49:20, 51:12, 53:3, 55:11
**compositions** [2] - 19:10, 22:8
**compound** [1] - 60:3
**compounded** [1] - 66:21
**compounds** [2] - 52:1, 52:2
**comprising** [30] - 6:8, 6:18, 7:5, 7:8, 7:12,

8:5, 8:11, 8:21, 9:4, 9:7, 9:19, 9:25, 10:9, 10:12, 14:6, 14:7, 16:19, 18:15, 19:24, 33:23, 34:7, 34:11, 34:14, 35:21, 36:23, 39:21, 40:2, 66:16, 68:15, 69:4
**comprising - consisting** [1] - 35:21
**computing** [1] - 59:9
**conceded** [1] - 35:6
**concentrated** [4] - 57:13, 59:19, 59:21, 63:7
**concentration** [9] - 28:5, 53:3, 55:11, 55:19, 57:25, 59:18, 62:22, 63:5, 63:7
**concept** [1] - 46:21
**concepts** [3] - 8:9, 35:4, 35:22
**concerned** [1] - 40:21
**concluded** [1] - 70:20
**concrete** [1] - 43:17
**confident** [1] - 6:21
**conflict** [3] - 5:3, 5:7, 5:13
**confuse** [1] - 17:18
**confusing** [4] - 6:20, 14:13, 15:24, 44:4
**confusion** [3] - 7:22, 9:9, 14:17
**connection** [1] - 5:25
**Connolly** [1] - 23:18
**consequence** [4] - 39:25, 42:15, 42:22, 42:23
**consequences** [1] - 12:8
**consider** [3] - 22:4, 52:1, 62:14
**consideration** [1] - 69:14
**considered** [2] - 44:24, 51:8
**consist** [1] - 36:10
**consistent** [8] - 9:3, 26:24, 38:2, 54:9, 55:16, 57:1, 59:15, 64:12
**consistently** [4] - 61:2, 64:4, 64:23
<mark>**consisting**</mark> [40] - 6:9, 6:18, 7:5, 7:7, 9:5, 9:25, 10:9, 10:10, 13:15, 14:5, 14:10, 14:22, 15:12, 25:18, 25:19, 25:24, 26:4,

27:3, 27:12, 33:23, 34:14, 34:22, 35:7, 35:19, 35:21, 36:9, 36:24, 37:5, 38:3, 39:21, 39:22, 39:23, 40:3, 42:14, 42:21, 51:7, 66:16, 68:16, 69:4
**consists** [2] - 14:10, 38:4
**consolidated** [1] - 5:5
**construction** [25] - 7:4, 9:1, 9:11, 9:15, 9:16, 12:11, 12:15, 14:15, 15:10, 15:14, 17:22, 17:25, 23:3, 25:5, 27:11, 34:6, 34:24, 34:25, 40:13, 41:23, 42:9, 42:20, 43:2, 54:2
**Construction** [2] - 34:4, 34:18
**constructions** [4] - 11:20, 13:18, 66:17, 68:25
**construe** [3] - 37:2, 68:20, 68:21
**construed** [1] - 10:14
**contained** [1] - 55:4
**containing** [13] - 8:3, 8:4, 8:5, 19:9, 20:19, 20:21, 28:7, 46:24, 47:5, 47:6, 47:7
**contains** [5] - 18:13, 18:14, 18:17, 47:5, 53:1
**contending** [1] - 29:24
**content** [1] - 34:3
**context** [7] - 16:11, 20:2, 24:16, 30:21, 32:5, 42:16, 70:7
**convey** [2] - 11:22, 66:3
**convincing** [2] - 64:25, 65:11
**CORP** [1] - 1:7
**CORPORATION** [1] - 1:17
**correct** [15] - 10:22, 10:23, 18:5, 26:21, 51:17, 53:1, 56:2, 56:14, 60:9, 60:20, 62:4, 62:6, 64:11, 69:13
**correcting** [1] - 53:12
**Correction** [2] - 56:14, 56:17
**correction** [6] - 53:14, 60:10, 61:24, 64:7, 69:13, 69:20

**corrections** [6] - 56:23, 56:24, 60:11, 60:14, 61:15, 61:16
**corresponding** [7] - 20:15, 21:3, 50:14, 53:5, 53:8, 54:5, 57:24
**Corroon** [1] - 3:25
**CORROON** [1] - 2:8
**Cortlan** [1] - 4:11
**CORTLAN** [1] - 2:16
**counsel** [9] - 3:15, 3:16, 3:18, 4:2, 4:4, 38:11, 44:17, 66:8, 66:11
**COUNSEL** [1] - 3:7
**counsel 's** [1] - 47:17
**counted** [1] - 44:18
**counterargument** [1] - 23:14
**country** [2] - 17:4, 47:1
**counts** [1] - 17:5
**couplable** [1] - 59:9
**couple** [7] - 9:14, 34:2, 46:12, 56:8, 56:9, 63:12, 65:16
**course** [2] - 11:25, 68:19
**COURT** [89] - 1:1, 3:5, 3:8, 3:19, 3:22, 4:9, 4:13, 4:20, 4:24, 5:4, 5:14, 5:22, 6:4, 6:13, 6:16, 10:16, 10:23, 11:3, 12:3, 12:7, 13:2, 13:6, 13:13, 13:16, 14:2, 14:19, 14:21, 15:1, 15:6, 19:1, 19:4, 19:7, 20:7, 21:14, 22:12, 22:24, 23:1, 24:8, 24:13, 24:23, 25:21, 25:23, 26:12, 27:21, 28:13, 28:16, 28:18, 29:2, 29:6, 30:9, 30:13, 31:5, 31:7, 31:19, 31:23, 32:2, 32:21, 32:25, 36:1, 36:13, 36:15, 37:22, 38:11, 38:23, 40:25, 41:25, 43:10, 44:9, 44:11, 44:14, 46:9, 47:3, 47:10, 48:10, 49:6, 49:12, 51:10, 51:18, 51:21, 52:10, 52:13, 52:20, 57:7, 62:13, 63:9, 65:13, 65:15, 66:1, 70:17
**Court** [31] - 3:3, 4:19, 5:16, 8:23, 9:21,

9:22, 10:2, 38:2, 51:4, 51:6, 53:1, 53:9, 56:9, 58:4, 58:17, 60:9, 60:20, 60:21, 61:14, 61:16, 61:18, 62:11, 68:19, 68:21, 69:12, 69:13, 70:20, 70:25
**Courthouse** [1] - 1:19
**Courts** [1] - 58:7
**cover** [3] - 37:7, 37:8, 61:9
**covered** [2] - 15:8, 51:12
**covers** [1] - 37:7
**craft** [1] - 33:25
**create** [1] - 47:14
**created** [2] - 34:16, 45:7
**creates** [1] - 38:4
**critical** [1] - 25:12
**cut** [2] - 56:8, 57:17
**cuts** [2] - 53:4, 53:21

## D

**Dan** [3] - 3:13, 3:17, 6:6
**DANIEL** [3] - 2:2, 2:5, 2:22
**Daniel** [1] - 4:15
**data** [1] - 26:7
**dead** [1] - 24:24
**deal** [5] - 6:1, 33:14, 34:9, 34:11, 69:10
**debate** [5] - 53:15, 58:24, 66:7, 69:14, 69:20
**DECHERT** [1] - 2:11
**Dechert** [1] - 4:2
**decide** [6] - 7:15, 12:16, 23:3, 42:18, 50:25, 68:5
**decline** [1] - 62:11
**Defendant** [5] - 1:8, 1:13, 2:14, 2:25, 4:1
**defendant** [1] - 1:18
**defendants** [1] - 15:11
**Defendants** [17] - 2:20, 4:8, 5:1, 7:11, 8:19, 8:22, 10:1, 10:7, 29:10, 45:6, 55:25, 56:12, 56:21, 57:9, 64:24, 67:14, 70:16
**Defendants '** [8] - 7:21, 9:11, 10:20, 15:15, 18:5, 27:15, 29:8, 63:20
**defer** [1] - 13:11

# Exhibit 2
# Filed Under Seal

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>APOTEX INC., AND APOTEX CORP,<br><br>Defendants. | **HIGHLY CONFIDENTIAL**<br>**OUTSIDE ATTORNEY EYES ONLY**<br><br>C.A. No. 24-64-JLH |
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SLAYBACK PHARMA LLC,<br><br>Defendant. | C.A. No. 24-65-JLH |
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BAXTER HEALTHCARE CORPORATION,<br><br>Defendant. | C.A. No. 24-66-JLH |

## EXPERT REPORT OF DAVID E. BUGAY, PH.D., ON INVALIDITY
## <u>ON BEHALF OF DEFENDANTS</u>

*HIGHLY CONFIDENTIAL*
*OUTSIDE ATTORNEY EYES ONLY*

TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................... 6

II.    COMPENSATION AND PRIOR TESTIMONY ...................................... 7

III.   QUALIFICATIONS ............................................................................... 8

IV.    MATERIALS CONSIDERED .............................................................. 13

V.     SUMMARY OF OPINIONS ................................................................ 13

VI.    LEGAL STANDARDS ......................................................................... 14

       A.     ANTICIPATION ........................................................................ 14

       B.     OBVIOUSNESS ........................................................................ 15

VII.   A PERSON OF ORDINARY SKILL IN THE ART ............................... 18

VIII.  THE PATENTS & ASSERTED CLAIMS ............................................. 19

       A.     The '214 Patent ......................................................................... 19

              1.     Asserted Claims ............................................................... 20

              2.     Prosecution History.......................................................... 21

       B.     The '248 Patent ......................................................................... 24

              1.     Asserted Claims ............................................................... 25

              2.     Prosecution History.......................................................... 27

       C.     The '783 Patent ......................................................................... 29

              1.     Prosecution History.......................................................... 30

IX.    CLAIM CONSTRUCTION .................................................................. 35

X.     TECHNICAL BACKGROUND ............................................................ 36

       A.     Active Pharmaceutical Ingredients (Drug Substance) and Stability .................... 36

       B.     API – Bendamustine (Nitrogen Mustards) ................................. 37

       C.     Parenteral Formulations ............................................................ 41

              1.     Solvent / Co-Solvent Systems............................................ 43

*HIGHLY CONFIDENTIAL*
*OUTSIDE ATTORNEY EYES ONLY*

2.    Oxidative degradation was known in parenteral formulations ................. 46

3.    Excipients in formulations may also undergo oxidative degradation ....... 48

4.    Antioxidants were routinely used for prevention of oxidative degradation ................................................................................................ 52

D.    Stability and Impurities Considerations ................................................. 53

E.    Analytical Testing for Quantifying Impurities In Parenteral Formulations .......... 54

XI.    SCOPE AND CONTENT OF PRIOR ART .................................................... 56

A.    Prior Art References ............................................................................... 56

1.    Drager 2009 .................................................................................. 56

2.    Drager '006 .................................................................................. 62

3.    Brittain 2006 ................................................................................ 63

4.    Olthoff 1983 ................................................................................. 66

5.    Kasraian 1999 .............................................................................. 68

6.    Waterman 2002 / Waterman 2008 ............................................... 71

7.    Rowe 2006 / Rowe 2009 .............................................................. 75

8.    FDA Inactive Ingredients Database ............................................. 78

9.    '620 Patent (Sklar) ....................................................................... 78

10.    '906 Patent (von Stetten) ............................................................. 80

B.    The Prior Art Teaches a Liquid Bendamustine-Containing Composition Having a Bendamustine Concentration of About 25 mg/mL .............................. 81

C.    The Prior Art Teaches Liquid-Bendamustine Compositions with PEG And Optionally With Additional Co-Solvents ............................................. 82

D.    The Prior Art Teaches Liquid-Bendamustine Compositions with A Stabilizing Amount of Antioxidant ........................................................ 84

E.    The Prior Art Teaches Liquid-Bendamustine Compositions That Are Stable Over Typical Commercial Storage Periods, Including 15 Months ...................... 86

*HIGHLY CONFIDENTIAL*
*OUTSIDE ATTORNEY EYES ONLY*

F.   A POSA Would Have Been Motivated to Enhance Stability of Bendamustine Formulations and Would Have Had a Reasonable Expectation of Success in Doing So ................................................................................................. 88

XII. INVALIDITY OF THE '214 PATENT ................................................................. 92

A.   Claims 1-9 of the '214 Patent are Anticipated by Drager ...................................... 92

1.   Claims 1 and 6 ........................................................................................ 93

2.   Claims 2 and  7 ....................................................................................... 99

3.   Claims 3 and 8 ...................................................................................... 100

4.   Claim 4 .................................................................................................. 101

5.   Claims 5 and 9 ...................................................................................... 102

B.   Claims 1-9 of the '214 Patent Are Invalid as Obvious Over Drager ................. 103

C.   Claims 1-9 of the '214 Patent are Invalid as Obvious Over Olthoff In View of Kasraian ............................................................................................................... 104

1.   Claims 1 and 6 ...................................................................................... 105

2.   Claims 2 and 7 ...................................................................................... 120

3.   Claims 3 and 8 ...................................................................................... 121

4.   Claim 4 .................................................................................................. 122

5.   Claims 5 and 9 ...................................................................................... 123

XIII. INVALIDITY OF THE '248 PATENT ............................................................... 124

A.   Claims 1-11, 15 and 20 of the '248 Patent are Anticipated by Drager ............... 124

1.   Claims 1 and 8 ...................................................................................... 125

2.   Claims 2 and 9 ...................................................................................... 131

3.   Claims 3 and 10 .................................................................................... 133

4.   Claim 4 .................................................................................................. 133

5.   Claims 5, 11, 15 and 20 ....................................................................... 134

6.   Claims 6 and 7 ...................................................................................... 136

*HIGHLY CONFIDENTIAL*
*OUTSIDE ATTORNEY EYES ONLY*

B.      Claims 1-11, 15 and 20 of the '248 Patent Are Invalid as Obvious Over Drager .................................................................................................. 137

C.      Claims 1-11, 15 and 20 of the '248 Patent are Invalid as Obvious Over Olthoff In View of Kasraian ................................................................. 138

      1.    Claims 1 and 8 ............................................................................. 139

      2.    Claims 2 and 9 ............................................................................. 152

      3.    Claims 3 and 10 ........................................................................... 153

      4.    Claim 4 ......................................................................................... 154

      5.    Claims 5, 11, 15 and 20 ............................................................... 155

      6.    Claims 6 and 7 ............................................................................. 156

XIV.    SECONDARY CONSIDERATIONS HAVE NOT BEEN ESTABLISHED ............... 158

A.      Nexus ......................................................................................................... 158

B.      Unexpected Results .................................................................................... 158

C.      Satisfaction of a Long Felt, Unmet Need ................................................. 159

D.      Teaching Away .......................................................................................... 159

E.      Failure of Others and Copying ................................................................. 160

XV. CONCLUSION .......................................................................................................... 161

XVI.    MISCELLANEOUS .................................................................................................. 161

*HIGHLY CONFIDENTIAL*
*OUTSIDE ATTORNEY EYES ONLY*

> It is not necessary to determine the mechanism of the degradation reaction. In most cases, it is necessary only to follow some property of degradation and to linearize this function. Either the amount of intact drug or the amount of a formed degradation product may be followed. It usually is impractical to determine the exact order of the reaction. With assay errors in the range of 2 to 5%, at least 50% decomposition must occur before the reaction order can be determined. As the loss with pharmaceuticals generally is less, zero-order kinetics should be assumed, unless the reaction order is known from previous work.

226.    For at least these reasons, it is my opinion that the POSA would have been motivated to use an antioxidant in a pharmaceutical parenteral composition containing bendamustine, knowing that it is susceptible to oxidative degradation, and potentially also modifying the pH to increase the stability of the composition.

227.    The POSA would have had predictable results in using an antioxidant in a liquid bendamustine-containing composition to increase the stability of the composition and would have therefore had a reasonable expectation of success in doing so.

## XII.    INVALIDITY OF THE '214 PATENT[9]

### A.    Claims 1-9 of the '214 Patent are Anticipated by Drager

228.    Drager is expressly directed to "[s]table, liquid formulations of bendamustine have been discovered and reported herein." Drager, p. 3, ll. 6. Drager teaches that its liquid formulations solve the same problem purported solved by the '214, i.e., by purportedly solving the prior art problem associated with time consuming and expensive reconstitution of powdered bendamustine compositions by providing "formulations of bendamustine that do not require lyophilization and/or reconstitution." Compare id. p. 2, at 8-9 with '214 patent at col. 2:18-27 ("The inventive

---

[9] *See* Footnote 2, above. It is further my understanding that Defendants have also argued that the Asserted Claims are indefinite, lack written description or are not enabled. I have not been asked to nor am I offering any opinions with regard to these arguments and for the purposes of my analysis have treated the claims as directed to a liquid bendamustine composition containing bendamustine, PEG and an antioxidant, as discussed further herein.

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEY EYES ONLY

240.    In addition, Claims 19-21 of Drager are specific to amounts or ranges that overlap with the asserted claim concentrations of bendamustine, including "about 5 mg/ml to about 200 mg/ml" (Claim 19), "about 5 mg/ml to about 120 mg/ml" (Claim 20), "at least about 5 mg/ml" (Claim 21).

c.    **"a pharmaceutically acceptable fluid consisting of polyethylene glycol"**

241.    It is my understanding that during the claim construction hearing, counsel for Eagle informed the Court that the scope of the claims potentially included the use of additional pharmaceutically acceptable fluids not listed in the claims:

> THE COURT: So let me just ask you this: Can it have another pharmaceutically acceptable fluid in it that is not listed here? Is that your position?
>
> EAGLE'S COUNSEL: Again, I think it would depend on what it is, in what amount and at what function.

1/30/2025 Markman Hr'g. Tr. at 12:21-13:1. My opinions regarding anticipation are offered under the assumption that the claims allow for the use of additional fluids not expressly listed in the claims, based upon the arguments presented by Eagle during the claim construction process. With this assumption, it is my opinion that this element would be anticipated by Drager.

242.    Drager discloses "stable formulations of bendamustine can be obtained by mixing a polar aprotic solvent . . . with a non-aqueous polar protic solvent or mixture of nonaqueous polar protic solvents."  Drager at p. 4, ll. 1-3. Thus, Drager expressly discloses liquid bendamustine-containing compositions containing a mixture of two "pharmaceutically acceptable fluids," one of which meets the claimed "pharmaceutically acceptable fluid." For example, Drager expressly discloses the use of polyethylene glycol as a pharmaceutically acceptable nonaqueous polar protic solvent. *Id.* at p. 4, ll. 1-9.

*HIGHLY CONFIDENTIAL*
*OUTSIDE ATTORNEY EYES ONLY*

243. Drager further discloses compositions containing "hydrophilic polymers (e.g., polyethylene glycols (PEG 300, PEG 400)". Drager, p. 8, ll.1-2. Thus, a POSA would further understand that Drager discloses Liquid bendamustine-containing compositions containing PEG as a hydrophilic polymer.

### d. "a stabilizing amount of antioxidant"

244. This element is disclosed by Drager.

245. Drager expressly discloses Liquid bendamustine-containing compositions containing pharmaceutically acceptable antioxidants. *Id.* at p. 7, ll. 26-30. Indeed, Drager claims numerous liquid-bendamustine compositions comprising an antioxidant. *See*, *e.g.*, Claim 18 ("[t]he formulation of claim 1, further comprising a pharmaceutically acceptable antioxidant."); Claim 38 (claiming liquid pharmaceutical formulation comprising bendamustine, polyalkylene glycol and "**an antioxidant**, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof.") *Id.* at claim 38; *see also id.* at p. 7, ll. 29-31 (disclosing liquid bendamustine composition comprising the antioxidant niacinamide); *id.* at Fig. 2 and p. 10, ll. 10-15, Table II (disclosing purity of bendamustine compositions comprising niacinamide as more that 95% purity when stored at 5° C for 12 months). It is my opinion that a POSA would include the antioxidant in the LBCC in a "stabilizing amount" which the '214 patent defines as "those amounts which increase or enhance the stability of bendamustine." '214 patent, col. 4:5-8.

246. Drager specifically claims "[t]he formulation of claim 1, further comprising a pharmaceutically acceptable antioxidant." Drager, at 15, ll. 12-13.

### e. "wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as

*HIGHLY CONFIDENTIAL*
*OUTSIDE ATTORNEY EYES ONLY*

solubility, and above all, remarkably high chemical stability for the preparation of injection solutions." *Id.*

### 1. Claims 1 and 6

270. Claims 1 and 6 recite:

> 1. A sterile vial containing a liquid bendamustine-containing composition comprising about 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, wherein the bendamustine concentration in the composition is from about 25 mg/mL; a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and a stabilizing amount of an antioxidant, wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C to about 25° C.

> 6. A liquid bendamustine-containing composition comprising 100 mg of bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, in a pharmaceutically acceptable fluid; wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol; and wherein the bendamustine concentration in the pharmaceutically acceptable fluid is from about 25 mg/mL, wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response, as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C to about 25° C.

271. It is my opinion that these claims are invalid as obvious over Olthoff in combination with Kasraian 1999.

### a. "Sterile vial containing a liquid bendamustine-containing composition" / "liquid bendamustine-containing composition"

272. These claim elements are disclosed by Olthoff.

273. Olthoff discloses that sterile Liquid bendamustine-containing compositions such as those claimed in the '214 patent. See, e.g., Olthoff at 2 (describing "stable medical preparations of bendamustine hydrochloride" noting that they must be produced in "sterile" form.).

105

Dated: February 6, 2026

_____
David E. Bugay

# Exhibit 3
# Filed Under Seal

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Transcript of David E. Bugay, Ph.D.

Conducted on May 27, 2026

1 (1 to 4)

---

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------x

EAGLE PHARMACEUTICALS, INC.
AND EAGLE SUB 1 LLC,
      Plaintiffs

v.          CA No. 24-64-JLH

APOTEX INC., AND APOTEX CORP.,
      Defendants
---------------------------------------

EAGLE PHARMACEUTICALS, INC. AND
EAGLE SUB 1 LLC.,
      Plaintiffs

v.          CA No. 24-65-JLH

SLAYBACK PHARMA LLC AND AZURITY
PHARMACEUTICALS, INC.,
      Defendants
---------------------------------------

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Videotaped deposition of

DAVID E. BUGAY, Ph.D.

WASHINGTON, DC

WEDNESDAY, MAY 27, 2026

9:07 a.m. EASTERN TIME

Job No.: 632656

Pages: 1 - 122

Reported by: Lisa V. Feissner, RDR, CRR, CLR

---

**Page 2**

Videotaped deposition of DAVID E. BUGAY, Ph.D.,

held at the offices of:

KATTEN MUCHIN ROSENMAN, LLP

1919 PENNSYLVANIA AVENUE, NW

9TH FLOOR

WASHINGTON, DC 20006

202.625.3500

Pursuant to Notice, before Lisa V. Feissner,
RDR, CRR, CLR, Notary Public.

---

**Page 3**

A P P E A R A N C E S:

ON BEHALF OF PLAINTIFF:

    ALEX GRABOWSKI, ESQUIRE

    LATHAM & WATKINS

    330 North Wabash Avenue

    Suite 2800

    Chicago, IL 60611

    312.876.6556

    alex.grabowski@lw.com

ON BEHALF OF THE APOTEX DEFENDANTS:

    CHRISTOPHER B. FERENC, ESQUIRE

    KATTEN MUCHIN ROSENMAN, LLP

    1919 Pennsylvania Avenue NW

    Washington, DC 20006

    202.625.3647

    christopher.ferenc@katten.com

A L S O   P R E S E N T:

    ADAM SCHUMAN, Videographer

---

**Page 4**

C O N T E N T S

EXAMINATION OF DAVID E. BUGAY, Ph.D.    PAGE

  By Mr. Grabowski    6

  By Mr. Ferenc    118

E X H I B I T S

(Attached to transcript)

| BUGAY DEPOSITION EXHIBIT | | PAGE |
|---|---|---|
| Ex. 1 | Expert Report of David E. Bugay, Ph.D., on Invalidity on Behalf of Defendants | 11 |
| Ex. 2 | Reply Expert Report of David E. Bugay, Ph.D., on Invalidity on Behalf of Defendants | 11 |
| Ex. 3 | Curriculum vitae | 16 |
| Ex. 4 | EAGLEBEN-SA_00002115 - EAGLEBEN-SA_00002127 | 39 |
| Ex. 5 | EAGLEBEN-SA_00354077 - EAGLEBEN-SA_00354091 | 40 |
| Ex. 6 | APOBENDA64_047263 - APOBENDA64_047270 | 66 |
| Ex. 7 | APOBENDA64_043753 - APOBENDA64_043762 | 71 |
| Ex. 8 | APOBENDA64_010259 - APOBENDA64_010267 | 72 |
| Ex. 9 | APOBENDA64_043947 - APOBENDA64_043974 | 83 |
| Ex. 10 | APOBENDA64_012694 - APOBENDA64_012705 | 85 |

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David E. Bugay, Ph.D.
Conducted on May 27, 2026

14 (53 to 56)

---

53

MR. FERENC: Objection, form.

A   In generalities, yes.

Q   The next claim element is, a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol, right?

MR. FERENC: Objection, form.

A   That's read correctly.

Q   Then the next claim element is, a stabilizing amount of antioxidant.

Correct?

MR. FERENC: Objection, form.

A   That's the next phrase.

Q   And then finally, there is the impurities clause we talked about earlier, right?

A   That's the next phrase.

Q   Okay.  I'd like to go back, then, to page 92, footnote 9 that we were talking about earlier.

So you say that in your analysis, you've treated the claims as directed to a liquid bendamustine composition containing bendamustine, PEG, and an antioxidant, correct?

A   Yes.

---

54

Q   Now, if we look at claim 1, the pharmaceutically acceptable fluid limitation has some other optional solvents, right?

MR. FERENC: Objection, form.

A   Yes.

Q   So if the bendamustine composition contained one of those as well, say ethanol, would that fall within or without the claims, assuming it met every other limitation?

MR. FERENC: Objection, form, outside the scope.

A   I focused with regard to PEG, as I state in that footnote.  So did not have opinions with regard to the other components, ethanol, benzyl alcohol, and glycofurol.  I don't recall expressing opinions on those in my reports.

Q   Do you have an opinion on whether a solvent not listed there, such as hypothetically dimethylacetamide, would take it in or out of the claims?

MR. FERENC: Objection, form, incomplete hypothetical.

A   Well, I understand, if we look at paragraph 241, that the Markman hearing considered that other liquids could be incorporated into the

---

55

pharmaceutical fluid.  That's the assumption I made throughout my analysis.

Q   Do you have any opinion on which specific fluids may or may not be included in the claims?

MR. FERENC: Objection, form.

A   I did not carry out opinions that far, no.

Q   Do you have any opinion on whether the amount of a specific fluid makes a difference whether it could or could not be included in the claims?

MR. FERENC: Objection, form.

A   I did not go that far with my opinions.

Q   I'd like to look at paragraph 87 of your report, please.

You state there that a POSA working on developing an IV or injectable would have known that the aim of developing the formulation is to develop a formulation suitable for approval from regulatory agencies, right?

A   In general, yes.  Your general reading, yes.

Q   The asserted patents don't require that the claimed composition be approvable by

---

56

regulatory agencies, correct?

MR. FERENC: Objection, form.

A   The claim doesn't explicitly point that out, but yet the overall objective of developing a pharmaceutical product is for approval and administration to patients.

Q   The claims don't require a particular pH of the formulation, correct?

MR. FERENC: Objection, form.

A   I don't recall opining on pH.

Q   So you didn't conduct any analysis to determine what the pH of the claimed compositions might ultimately be, right?

MR. FERENC: Objection, form.

A   I don't recall any opinions with respect to pH.

Q   I'd like to look at paragraph 307 of your opening report.

The first sentence states that, there is nothing in the specification of the asserted patents that suggests the impurity profile was anything more than an inherent property of the liquid bendamustine compositions recited by the claims.

Right?

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David E. Bugay, Ph.D.
Conducted on May 27, 2026

20 (77 to 80)

---

77

Formation of degradation products in, and then it lists ethanol solution and propylene glycol solution at various times and temperatures, correct?

A  That is correct.

Q  The table has entries that are dashes and entries that say "without," along with a couple other entries as well, right?

A  Correct.

Q  What is your understanding of what the dash entry means?

A  That either it was not tested or undetectable.

Q  What is your understanding of what "without" means?

A  It was without degradation.

Q  Is there a difference between undetectable and without degradation?

MR. FERENC:  Objection, form.

A  Well, I made the assumption that when it said "without," then that is a tested condition where any degradant was below detection limit.  So it wasn't observable.

Q  I guess -- do you have an understanding of the difference between the dash and the

---

78

"without" entries?

A  I made the assumption that it was either not run or less than LOD, limit of detection.  Sorry.

Q  Wouldn't "without" also be less than the limit of detection?

MR. FERENC:  Objection, form.

A  As I explained before, yes, potentially.

Q  So you think the dashes and the "withouts" may mean the same thing?

MR. FERENC:  Objection, form.

A  As I said, I'm not sure whether it means that they didn't test it or that it was below LOD.  But the "without" I definitely consider as below LOD.

I did define LOD, right?  Yeah, okay. Sorry.

Q  The conclusion that Olthoff draws immediately below this table is that, For pharmacological and manufacturing reasons, monohydric alcohols are not very suitable for the production of injection solutions.

Right?

A  It states that.

Q  Monohydric alcohols would include

---

79

ethanol, correct?

A  Yes.

Q  Based on your interpretation of the table, there was no degradation in any ethanol solution that was run, correct?

MR. FERENC:  Objection, form.

A  My interpretation was that it was below the limit of detection in consideration of the chromatography.

Q  Let me -- that's fair.

Based on your interpretation of the table on page 5 of Olthoff, there was no detectable degradation in any ethanol solution that was run, correct?

MR. FERENC:  Objection, form.

A  Given the TLC methodology, then in light of that, then the ethanol solutions that were run or tested appeared to show no observable degradation.

Q  You mentioned the TLC methodology there. What about the TLC methodology was relevant to that?

A  TLC is not being as sensitive, in my utilization of it, as compared to, for instance, HPLC or UHPLC.

---

80

Q  Do you know -- strike that.

Do you understand why, if there was no observable degradation in the ethanol solutions, Olthoff nevertheless concludes that ethanol is not suitable?

MR. FERENC:  Objection, form.

A  I didn't render an opinion there.  It's improper for me to speculate.

Q  Have you ever used thin-layer chromatography for a pharmaceutical stability study?

A  My practice experimentally has been dominated with HPLC and UHPLC.  I don't recall any TLC.

But again, this is from how many years ago.  So...

Q  Olthoff doesn't investigate any formulations that contain polyethylene glycol, right?

MR. FERENC:  Objection, form.

A  Doesn't -- he does not explicitly call out PEG in a formulation.

Q  So none of the formulations that Olthoff made and tested used PEG, correct?

MR. FERENC:  Objection, form.

---

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David E. Bugay, Ph.D.
Conducted on May 27, 2026

21 (81 to 84)

81

A   Did not use PEG, but PEG is a considered formulation liquid, being a polyol that's called out.

Q   So Olthoff mentions polyols, correct?

A   Yes.

Q   Olthoff doesn't specifically mention polyethylene glycol, correct?

MR. FERENC:  Objection, form.

A   Well, when I see polyol, I think of polyethylene glycol.  Are those words spelled out?  No.

Q   Polyethylene glycol is a type of polyol.  Is that right?

MR. FERENC:  Objection, form.

A   It is a member of the class of polyols.

Q   And Olthoff discusses the class of polyols generally, not polyethylene glycol specifically, right?

MR. FERENC:  Objection, form.

A   Well, as I read polyols, I consider that bucket and PEG being in that bucket.  So I do read it as including PEG.  I don't see that two words typed out, but as I read it, I consider it.

Q   There are other polyols besides PEG, right?

82

A   Yes.

Q   Do you know how many other polyols there are besides PEG?

A   I haven't formulated or thought through that list.  But we also have to keep in mind which are pharmaceutically relevant.

Q   Do you know how many polyols other than PEG are pharmaceutically relevant?

A   I didn't make that assessment for this matter.

MR. GRABOWSKI:  We've been going a while now, I think it's almost lunchtime.

MR. FERENC:  We have lunch set up for everybody.

VIDEOGRAPHER:  We are going off the record.  The time is 12:12 p.m.

(Recess from 12:12 p.m. until 1:00 p.m.)

VIDEOGRAPHER:  We are back on the record.  The time is 1:00 p.m.

BY MR. GRABOWSKI:

Q   Welcome back, Dr. Bugay.

A   Thank you.

Q   Did you discuss the substance of your testimony with counsel during the break?

A   I did not.

83

Q   One time I just hope someone is going say yes to that so I can see what happens.

A   That would be interesting.

MR. FERENC:  Lawyers love the rules.

MR. GRABOWSKI:  Could we have this marked as Bugay Exhibit 9.

(Exhibit Bugay-9 marked for identification and attached to the transcript.)

BY MR. GRABOWSKI:

Q   Dr. Bugay, you've been handed what's been marked as Exhibit 9, Bates numbers APOBENDA64_043947 through 043974.  Do you recognize Exhibit 9?

A   Yes, I do.

Q   And Exhibit 9 is the Drager 2009 reference you discuss in your report, correct?

A   That is correct.

Q   Your report discusses two different Drager references, right?

A   Yes.  2009 and '006, yeah.

Q   There are certain times where the report just refers to Drager and doesn't specify either, right?

A   Yes, but I believe when a specific quote is made, it properly cites one or the other

84

documents.  I believe that's the common case.

Q   Is there a difference between the two versions of Drager for purposes of your opinions?

MR. FERENC:  Objection, form.

A   I didn't opine on differences between the two; I just considered the two.

Q   Fair to say that your opinions with respect to Drager 2009 apply equally to Drager '006?

MR. FERENC:  Objection, form.

A   Like I said before, I believe I call out specifics.  I didn't make any generalizations like that, that I recall.

Q   Let's, as an example, look at paragraph 196 and 197 of your report.  So looking at paragraph 196, you state, Drager, without specifying, discloses something, and then you cite to a column and line number, correct?

A   Right.

Q   Am I to understand that that reference to Drager is Drager '006?

MR. FERENC:  Objection, form.

A   Can I have a copy of '006, and we can --

Q   You can.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David E. Bugay, Ph.D.
Conducted on May 27, 2026

23 (89 to 92)

89

Q   So is it fair to say, then, that your opinions in XII-A are based on a combination of Drager 2009 and Drager '006?

MR. FERENC:  Objection, form, mischaracterizes the document.  The document speaks for itself.

A   There's explicit callouts.  I didn't read each document in a vacuum.  So there is that collective knowledge.

Q   Do you have an understanding that anticipation and obviousness are judged over combinations of one or more specific prior art references?

MR. FERENC:  Objection, form, calls for a legal conclusion.

A   I understand that it's a consideration of prior art, whether that's one or more publications, documents, et cetera.

Q   Which prior art reference or references are you offering invalidity opinions based on in section XII-A?

MR. FERENC:  Objection, form.  The report speaks for itself.

A   Well, clearly 2009 is called out.  Now, whether '006 may have had similar language or not,

90

I don't recall whether I picked something up from 2009 or '006.  But clearly, there are callouts for 2009.

Q   All right.  So you are certainly offering an opinion in section XII-A with respect to at least Drager 2009, correct?

MR. FERENC:  Objection, form.

A   In section XII.A, there's clearly reference to 2009 Drager.

Q   Can you tell me whether you are also offering an opinion in section XII.A with respect to Drager '006?

MR. FERENC:  Objection, form, asked and answered, mischaracterizes the document.

A   There are similarities.  I don't recall whether I was thinking of 2009 or '006 at any particular time of writing this section.  But I clearly call out 2009.

Q   All right.  I'd like to look at page 103 now.

A   Page 103?

Q   Yes.

A   Okay.  Thank you.

Q   This is section XII.B of your report, correct?  Table of contents might be the quickest

91

way to check it.

A   Yes.  Thank you.

Q   I don't believe that this section specifically cites either version of Drager.  Can you confirm that for me?

MR. FERENC:  Objection, form.  The document speaks for itself.

A   No, I disagree with that.  If you look at paragraph 267, the fifth line down, it calls out section XII.A.2, XII.A.3, and if you look back to those sections, there's specific reference to Drager 2009.

Let me finish this section, please.

But again, I consider this no different than my previous answer of Drager was in my collective -- Drager 2009, Drager '006 were collectively in my head, in my knowledge and that.  But I do have a couple of explicit callouts to one.

Q   Can we please look at section XIII.A starting on page 124.

And section XIII.A is also about anticipation by Drager, this time of the '248 patent, correct?

MR. FERENC:  Objection, form.

92

A   Calls out specific claims of the '248 anticipated by Drager.

Q   And is your answer for XIII.A about which Drager is at issue the same as for XII.A and XII.B?

MR. FERENC:  Objection, form.

A   Yes, I would consider it that way.  There's a callout to 2009, but again, I have that collective knowledge.

Q   And last, could we go to paragraph 137, please.

A   Paragraph --

Q   I'm sorry, page 137.

A   Okay.

Q   Thank you.

And this is the beginning of section XIII.B, correct?

A   Yes.

Q   And this is also talking about the invalidity of the '248 patent over Drager, correct?

A   Correct.

Q   Is your answer about which Drager this is the same as it has been for the past three sections of Drager we have looked at?

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David E. Bugay, Ph.D.
Conducted on May 27, 2026

24 (93 to 96)

93

MR. FERENC:  Objection, form.

A  Yes.

Q  As we sit here today, are you aware of any differences between Drager 2009 and Drager '006 that are relevant to your opinions?

MR. FERENC:  Objection, form.

A  I did not make that comparison.

Q  I'd like to look at paragraph 202 of your opening report, please.

And in paragraph 202, you state, Accordingly, Drager discloses liquid bendamustine-containing compositions having a pharmaceutically acceptable fluid consisting of polyethylene glycol and methods of using the same to treat leukemia.

Correct?

A  That is correct.

Q  Do you have an understanding of what "consisting of" means in the context of patent law?

MR. FERENC:  Objection, form.

A  I'm not a lawyer, as you know.

My interpretation, "consisting of" means that it is a component thereof.  So here -- yeah.

Q  Drager uses the term "aprotic solvents,"

94

correct?

A  Yes.

Q  Do you have an understanding of what an aprotic solvent is, as the term is used in Drager?

A  Yes.

Q  What is your understanding of what an aprotic solvent is, as the term is used in Drager?

A  A solvent that does not readily give up a proton or a hydrogen.

Q  Does Drager require the use of an aprotic solvent in all of its formulations?

MR. FERENC:  Objection, form.

A  I don't recall rendering an opinion on that.  If I -- yeah.  If I did, could you point me to that?  I don't recall doing that.

Q  I don't think you did one way or the other.  I'm just double-checking before I say that.

I don't have anywhere to point you to, so we can move on.

Could we turn to the '214 patent briefly, please, the claims again.

Looking at claim 1, the pharmaceutically acceptable fluid limitation, it lists polyethylene glycol and propylene glycol, ethanol, benzyl

95

alcohol, and glycofurol, correct?

A  Those five compounds are listed there where it's optional for four of them.

Q  Do you have an understanding of whether the five listed compounds here are protic or aprotic, as Drager uses the term?

MR. FERENC:  Objection, form.

A  Drager calls out nonaqueous polar protic solvent, and ethanol would fall in that category.

Q  Do you have an understanding of whether polyethylene glycol is a protic solvent?

MR. FERENC:  Objection, form.

A  Yes.

Q  Is polyethylene glycol a protic solvent?

A  Yes.

Q  Do you have an understanding of whether benzyl alcohol is a protic solvent?

MR. FERENC:  Objection, form.

A  I don't recall Drager calling out benzyl alcohol, so I'm not sure if he would classify it that way.  I don't recall him calling that out.

I don't think I made that assessment.

Q  Do you know whether glycofurol is a protic solvent?

MR. FERENC:  Objection, form.

96

A  I don't recall making an opinion on that either.

Q  Did you form an opinion as to whether poly- -- strike that.

Did you form an opinion as to whether propylene glycol is a protic solvent?

MR. FERENC:  Objection, form.

A  Drager 2009 does list the propylene glycol as a nonaqueous polar protic solvent there on page 4.

Q  Drager 2009 includes a number of exemplary formulations, correct?

MR. FERENC:  Objection, form.

A  Sorry.  Just a minute, please.

Yes, it does.

Q  None of those formulations contain polyethylene glycol, correct?

A  None of the formulations utilize polyethylene glycol, yet I note that Drager 2009 does make specific reference to PEG there on page 4, as I discussed before, but also with respect to two claims, 54 and 61, being a polyalkylene glycol, PEG, that is.

And so it's in the consideration of a reader of this reference.

97

Q   And claim 54 depends from claim 53, correct?

A   It does.

Q   And claim 53 depends from claim 50, correct?

A   Yes.

Q   Drager 2009 doesn't include any stability data for any formulations containing polyethylene glycol, correct?

MR. FERENC:  Objection, form.

A   Drager 2009 speaks to stability but not specifically to a formulation containing PEG.  But one would understand you can equally apply the stability considerations to another formulation.

Q   How would a POSA know that you can apply stability considerations between formulations like that?

MR. FERENC:  Objection, form.

A   I think it's fair to say, or in my opinion, that stability considerations are a universally accepted, known, and expected aspect of drug development with regard to the regulatory approval of a medicinal product.

And so from that perspective, it's understood, stability testing.

98

Q   Surely, though, you couldn't take stability data from one formulation and apply it to any other, regardless of the changes that had been made between those two formulations, right?

MR. FERENC:  Objection, form, incomplete hypothetical.

A   Stability testing for a pharmaceutical product is just that. It's for that product, okay. So we test it for that explicit product, and the expectation by regulatory agencies is with respect to that product.

So I would never look to try to interchange from one formulation to another.

Q   So the stability --

A   Stability data. Sorry.

Q   So the stability data for formulations in here that don't contain PEG would not be applicable to formulations that do contain PEG.

Is that right?

A   I think I've answered that already in that stability testing is with respect to the particular product, its formulation, its inherent properties.

And so the concept is universal and is considered across different formulations, but the

99

actual data is going to be potentially different for one formulation versus another, potentially.

Q   So there's no information in Drager, either Drager, about stability for formulations that contain PEG, correct?

MR. FERENC:  Objection, form.

A   I didn't assess that, but the fact that stability is discussed and knowing that stability is required, and there is that commonality, whether PEG is formulated -- used in the formulation or not.

Q   So because stability is a known requirement and the inventors in Drager assert that these formulations would be stable, a POSA would understand that they are?

MR. FERENC:  Objection, form.

A   As I stated before, it's the objective to have a stable product.  It's the expectation to have a stable product by regulatory bodies.  So that's what formulators are trying to achieve.

And stability is a consideration in that objective.

Q   And I guess what I'm trying to understand is, how would a POSA, looking at Drager, know that a formulation with PEG in it

100

would be stable when there's no data on formulations with PEG in it?

MR. FERENC:  Objection, form, incomplete hypothetical.

A   Well, a formulator understands the availability of PEG for parenteral formulations, properties of PEG, and that the objective is to generate a stable formulation, and for that matter, going into a PG, propylene glycol formulation, for example, or a DMA formulation, it's the same objective, but you need to do the explicit testing to know how stable it is and whether adjustments have to be made.

Q   Would a POSA know how to do that sort of stability testing for a formulation containing PEG?

MR. FERENC:  Objection, form.

A   As I described, the POSA description, as we spoke about this morning, it included analytical chemistry and specifically called out HPLC.

So yes.

I was going to call out the paragraph.  But we spoke about it earlier.

Q   I think it's paragraph 41, if you want

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY
Transcript of David E. Bugay, Ph.D.
Conducted on May 27, 2026

26 (101 to 104)

to just double-check that for me.

A   Better memory than I.

You are correct.  Thank you.

Q   Is that sort of stability testing routinely done as a part of pharmaceutical development?

MR. FERENC:  Objection, form.

A   I don't think I would use the word "routine."  What I would use is, it is the expectation, not only of the formulator but of the regulatory review process, to be assessing stability.

Q   Have you ever been involved in a filing -- I guess back that up.

Have you ever been involved in the filing of an ANDA or an NDA?

A   Yes.

Q   Have you ever worked on a project where an ANDA or an NDA was filed that didn't involve stability testing?

MR. FERENC:  Objection, form.

A   I cannot recall any regulatory filing that I've worked on that did not have stability included.

Q   Drager -- both Dragers have a definition of "stable," correct?

MR. FERENC:  Objection, form.

A   Yes.  They both speak to stability thresholds.

Q   And I'm looking at the bottom of page 4 of Drager 2009, starting at line probably 28, As used herein.

Do you see that?

A   I do.

Q   And there, Drager 2009 defines "stable" as no more than about a 10 percent loss of bendamustine under typical commercial storage conditions.

Correct?

A   In that sentence.  But the next sentence, it goes to 5 percent loss.

Q   He describes -- strike that.

Drager describes a 5 percent loss as more preferable, correct?

MR. FERENC:  Objection, form.

A   Yeah, the next sentence does speak to more preferably no more than about 5 percent loss of bendamustine.

Q   But a loss of, say, 8 percent would still meet the definition of "stable" as Drager

provides it, correct?

MR. FERENC:  Objection, form.

A   Well, I didn't opine on this, but just from a matter of, 8 is lower than 10.  So it's considered to be in that range, just at its face value.

Q   And 8 percent loss would not meet the stability limitations of the asserted patents, though, correct?

MR. FERENC:  Objection to form.

A   Well, I didn't make that assessment, so I didn't render an opinion on that.  But I recognize the stability character -- description in claim 1.

Q   And claim 1 requires no more than 5 percent, right?

A   About -- I'm sorry.  About 5 percent, yeah, on a peak area basis.

Q   And we can agree that 8 percent is more than about 5 percent?

A   That is correct.

Q   Drager reviewed Olthoff's stability data, correct?

MR. FERENC:  Objection, form.

A   I don't recall that section.  Can you

point it out, if you don't mind?

Q   Sure.  It starts on for Drager 2009, page 2, line 10.

A   Could I stop for a minute?

Q   Absolutely.

A   Okay.  Are we back on?

Q   Yes.

A   Yes.  Drager 2009, page 2, line 10, makes reference to the GDR Patent 159289, which is the Olthoff.

Q   And Drager attempted to reproduce the stability data from Olthoff, correct?

MR. FERENC:  Objection, form.

A   Can you re-ask again.

Q   Drager attempted to reproduce the stability data from Olthoff, correct?

MR. FERENC:  Objection, form.

A   I didn't opine on that.  So I didn't read the two with respect to that question.

Q   We can turn to page 3.

A   Okay.

Q   And page 3, paragraph starting at line 8, Experiments to produce.

Do you see that?

A   Mm-hmm.

Transcript of David E. Bugay, Ph.D.
Conducted on May 27, 2026

105

Q    This is a discussion of Olthoff's experiments regarding propylene glycol preparations, correct?

MR. FERENC:  Objection, form.

A    Okay.  Yes.  It makes a reference to Olthoff, right.

Q    And Drager states, the results described in -- well, strike that.

It's referencing GDR Patent 159289, correct?

A    Yeah, that's Olthoff.

Q    Okay.  So it states that, Unfortunately, the results described in Olthoff were not reproducible.

Correct?

A    It states that here in Drager 2009.

Q    You didn't offer an opinion on how that might affect a POSA's view of Olthoff, correct?

MR. FERENC:  Objection, form.

A    I did not.

Q    I'd like to talk a little bit about antioxidants, but leave Drager out for the moment.

Your report doesn't identify any commercial formulations in the prior art that contain both bendamustine and an antioxidant,

106

correct?

MR. FERENC:  Objection, form.

A    In combination in the same document, no.  But in consideration of the multitude of prior references, both topics are discussed.  By "topics," API and antioxidant.

Q    Looking specifically at Drager, am I correct that, in your opinion, the only formulations Drager 2009 discloses that contain an antioxidant are those with niacinamide?

MR. FERENC:  Objection, form.

A    I don't recall rendering an opinion on Drager and whether a specific antioxidant was used or not.  Maybe I'm mistaken.

Q    Look at paragraph 207, page 85, citing 7, lines 29 to 31 of Drager.

A    Could you go back and re-read from where to where?

Q    So it's -- you're citing at the top of page 85, and you're citing to page 7, lines 29 to 31.

A    Okay.  I'm sorry.

Drager 2009 does refer to claims about antioxidants as well as -- yeah, claim 48, formulation comprising bendamustine, polyalkylene

107

glycol and an antioxidant, and the sentence goes on.

And then, as you pointed out, thank you, at page 7 with the -- specifically calling out the niacinamide on page 7, correct.

Sorry for that delay.

Q    And the only -- strike that.

Do any of the exemplary formulations in Drager contain an antioxidant?

MR. FERENC:  Objection, form.

A    I do not recall seeing that the formulations call out an antioxidant, specific antioxidant.

Q    And you offer the opinion that niacinamide is an antioxidant, but Drager does not identify it as such, correct?

MR. FERENC:  Objection, form.

A    Niacinamide is clearly called out as an antioxidant with regard to Waterman, to the earlier one.  But I don't seem to recall that it was called out that way in Drager.

Q    Since we're around here, could you look briefly at paragraph 204 of your report, please.  Do you see the table there showing PEGs and the other solvents with OH groups at moles per liter?

108

A    Yes.

Q    You describe the molecular weights and density is well-known from the prior art, correct?

A    Yes.

Q    Do you know where that data was sourced from?

A    I don't recall, sitting here today.  They're common terms that -- for some, I could, like ethanol, figure out the molecular weight as I sit here, yeah.

Q    Do you recall doing anything to confirm the accuracy of that data?

MR. FERENC:  Objection, form.

A    I don't recall.

Q    Could we look at paragraph 267 of your opening report, please.  And I'm looking five lines down, the sentence starting, Moreover, a POSA.

Do you see that?

A    Okay.

Q    And it states, Moreover, a POSA would understand that a stabilizing amount of monothioglycerol would always be included in any formulation, as that claim term is defined in the specification.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Transcript of David E. Bugay, Ph.D.
Conducted on May 27, 2026

121

**PEG-based formulation that employs an antioxidant.**

MR. FERENC:  Thank you, Dr. Bugay.  No further questions.

MR. GRABOWSKI:  Give me just one moment.

I have no further questions.  Thank you for your time.

VIDEOGRAPHER:  We are going off the record.  The time is 2:35 p.m.

(Transcript orders discussed.)

COURT REPORTER:  Thank you.  That's all I need.

(Off the record at 2:38 p.m.)

122

C E R T I F I C A T E

I, Lisa V. Feissner, RDR, CRR, CLR, do hereby certify that the witness was first duly sworn by me and that I was authorized to and did report said proceedings.

I further certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; that reading and signing was not requested; that I am neither attorney nor counsel for, nor related to or employed by, any of the parties to the action in which this deposition was taken; and that I have no interest, financial or otherwise, in this case.

IN WITNESS WHEREOF, I have hereunto set my hand this 31st day of MAY, 2026.

_____
Lisa V. Feissner, RDR, CRR, CLR

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

# Exhibit 4

(12) INTERNATIONAL APPLICATION PUBLISHED UNDER THE PATENT COOPERATION TREATY (PCT)

(19) World Intellectual Property Organization
International Bureau

(43) International Publication Date
1 April 2010 (01.04.2010)

**PCT**

(10) International Publication Number
**WO 2010/036702 A1**

(51) International Patent Classification:
*A61K 9/08* (2006.01)    *A61K 31/4184* (2006.01)
*A61K 47/20* (2006.01)

(21) International Application Number:
PCT/US2009/058023

(22) International Filing Date:
23 September 2009 (23.09.2009)

(25) Filing Language: English

(26) Publication Language: English

(30) Priority Data:
61/100,074    25 September 2008 (25.09.2008)    US

(71) Applicant *(for all designated States except US)*:
**CEPHALON, INC.** [US/US]; 4 1 Moores Road, P.O.
Box 401 1, Frazer, Pennsylvania 19355 (US).

(72) Inventors; and
(75) Inventors/Applicants *(for US only)*: **DRAGER,** Antho-
ny, S. [US/US]; 16 Doral Ct., Thorndale, Pennsylvania
19372 (US). **LABELL,** Rachel, Y. [US/US]; 561 N.
Sandy Hill Road, Coatesville, Pennsylvania 19320 (US).

PATEL, Piyush, R. [US/US]; 716 Scott Lane, Walling-
ford, Pennsylvania 19086 (US).

(74) **Agent:** DARKES, Paul, R.; Cephalon, Inc., 4 1 Moores
Road, P.O. Box 401 1, Frazer, Pennsylvania 19355 (US).

(81) **Designated States** *(unless otherwise indicated, for every
kind of national protection available)*: AE, AG, AL, AM,
AO, AT, AU, AZ, BA, BB, BG, BH, BR, BW, BY, BZ,
CA, CH, CL, CN, CO, CR, CU, CZ, DE, DK, DM, DO,
DZ, EC, EE, EG, ES, FI, GB, GD, GE, GH, GM, GT,
HN, HR, HU, ID, IL, IN, IS, JP, KE, KG, KM, KN, KP,
KR, KZ, LA, LC, LK, LR, LS, LT, LU, LY, MA, MD,
ME, MG, MK, MN, MW, MX, MY, MZ, NA, NG, NI,
NO, NZ, OM, PE, PG, PH, PL, PT, RO, RS, RU, SC, SD,
SE, SG, SK, SL, SM, ST, SV, SY, TJ, TM, TN, TR, TT,
TZ, UA, UG, US, UZ, VC, VN, ZA, ZM, ZW.

(84) **Designated States** *(unless otherwise indicated, for every
kind of regional protection available)*: ARIPO (BW, GH,
GM, KE, LS, MW, MZ, NA, SD, SL, SZ, TZ, UG, ZM,
ZW), Eurasian (AM, AZ, BY, KG, KZ, MD, RU, TJ,
TM), European (AT, BE, BG, CH, CY, CZ, DE, DK, EE,
ES, **FI,** FR, GB, GR, HR, HU, IE, IS, **IT, LT,** LU, LV,
MC, MK, MT, NL, NO, PL, **PT,** RO, SE, SI, SK, SM,

*[Continued on next page]*

(54) Title: LIQUID FORMULATIONS OF BENDAMUSTINE

(57) **Abstract:** Stable liquid formula-
tions of bendamustine, and pharma-
ceutically acceptable salts thereof,
and polar aprotic solvents, are de-
scribed.

**Bendamustine Purity at 25 °C**



**WO 2010/036702 A1** |IIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIIII|

TR), OAPI (BF, BJ, CF, CG, CI, CM, GA, GN, GQ, GW, ML, MR, NE, SN, TD, TG).

**Published:**

— with international search report (Art. 21(3))

— before the expiration of the time limit for amending the claims and to be republished in the event of receipt of amendments (Rule 48.2(h))

APOBENDA64_043948

WO 2010/036702        PCT/US2009/058023

- 1 -

# LIQUID FORMULATIONS OF BENDAMUSTINE

## TECHNICAL FIELD OF THE INVENTION

**The** present invention relates to liquid formulations of bendamustine, and the pharmaceutical salts thereof.

## BACKGROUND OF THE INVENTION

Bendamustine, (4-{5-[bis(2-chloroethyl)amino]- 1-methyl-2-benzimidazolyl}butyric acid

Bendamustine

is an atypical structure with a benzimidazole ring, which structure includes an active nitrogen mustard. Bendamustine was initially synthesized in 1963 in the German Democratic Republic and was available from 1971 to 1992 in that location under the name Cytostasan®. Since that time, it has been marketed in Germany under the tradename Ribomustin®. It is currently available for use in the United States under the tradename Treanda® (Cephalon, Inc., Frazer, PA). It has been widely used to treat chronic lymphocytic leukemia, Hodgkin's disease, non-Hodgkin's lymphoma, multiple myeloma, and breast cancer.

Like other nitrogen mustards, bendamustine hydrolyzes in aqueous solution, with the major degradant being the primary alcohol HPl *(See* U.S. Application No. 11/330,868, the entirety of which is incorporated herein):

In light of its instability in aqueous solution, bendamustine is currently supplied as a lyophilized powder for injection. Just prior to its infusion, the medical practitioner reconstitutes the powder with Sterile Water for Injection. Reconstitution should yield a clear, colorless to pale yellow solution and the powder should completely dissolve in about 5

APOBENDA64_043949

- 2 -

minutes. If particulate matter is observed, the reconstituted product should not be used and should be discarded. The reconstituted product is then transferred to a 0.9% Sodium Chloride Injection infusion bag within 30 minutes of reconstitution. This admixture should be a clear and colorless to slightly yellow solution. If the admixture comprises particulate matter or is discolored, it should be discarded and a fresh sample prepared.

The reconstitution of the bendamustine lyophilized powder is time consuming and cumbersome. Moreover, lyophilization of solids on a commercial scale requires specialized equipment and incurs significant expense. As such, formulations of bendamustine that do not require lyophilization and/or reconstitution are needed.

Solutions of bendamustine hydrochloride in anhydrous propylene glycol, prepared under an inert gas atmosphere, have been reported (GDR Patent 159289). It was reported that analysis of these solutions using thin-layer chromatography, eluting with butanol/acetic acid/water (4:1:5) and detection with Dragendorff reagent and UV (360 nm) did not suggest any decomposition. Curiously, however, commercial development of propylene glycol formulations have heretofore not been reported. Thus, improved liquid formulations of bendamustine are still needed.

## SUMMARY OF THE INVENTION

The present invention is directed to liquid pharmaceutical formulations comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, and a polar aprotic solvent. Certain preferred embodiments include liquid pharmaceutical formulations comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, a polar aprotic solvent, and a non-aqueous polar protic solvent. Methods of making and using the formulations of the present invention are also described, as are methods of treating cancer using the claimed formulations.

## BRIEF DESCRIPTION OF THE DRAWINGS

Figure 1 is a graph of a stability analysis of bendamustine in various solvents at 25°C.

Figure 2 is a graph of a stability analysis of bendamustine in various solvents at 5°C.

Figure 3 is a graph of bendamustine purity, over time, in 99% propylene glycol, at 5°C and at 25°C.

APOBENDA64_043950

- 3 -

Figure 4 shows the mean + standard deviation concentration-versus-time profiles of bendamustine in male Cynomolgus monkeys (N=4) administered single 3 mg/kg bolus intravenous doses of bendamustine hydrochloride in 3 different formulations.

**DETAILED DESCRIPTION OF THE INVENTION**

Stable, liquid formulations of bendamustine have been discovered and are reported herein.

Experiments to produce commercially viable propylene glycol preparations have been performed. Unfortunately, the results described in GDR Patent 159289 were not reproducible. Solutions of bendamustine in 99% propylene glycol degraded to non-bendamustine products over a time equivalent to commercial storage. Two of the impurities were identified as propylene glycol esters of bendamustine. As such, a 100% propylene glycol commercial formulation of bendamustine is not feasible for pharmaceutical purposes.

It has been determined that pharmaceutically acceptable liquid formulations of bendamustine, and the pharmaceutically acceptable salts thereof, in particular the hydrochloride salt, can be prepared by combining bendamustine, or the pharmaceutically acceptable salt thereof, with a polar aprotic solvent or mixture of polar aprotic solvents. Polar, aprotic solvents are known in the art and include, for example, 1-methyl-2-pyrrolidone, 1,3-dimethyl-2-imidazolidinone, dimethylacetamide, dimethyl sulfoxide, acetone, tetrahydrofuran, 1,4-dioxane, acetonitrile, dimethyl formamide, propylene carbonate. *See also, e.g.,* Florence Mottu, et al. *Organic solvents for pharmaceutical parenterals and embolic liquids: A review of toxicity data,* PDA J. Pharma. Sci. & Tech. vol 54, no.6, 456-469 (Nov.-Dec. 2000). Particularly preferred polar aprotic solvents include dimethylacetamide, dimethyl sulfoxide, and mixtures thereof.

Without wishing to be held to any particular theory, it is believed that polar, aprotic solvents are sufficiently non-nucleophilic towards bendamustine such that polar aprotic solvent-bendamustine adducts do not form over the course of typical commercial storage conditions. Typical commercial storage conditions include time periods of, for example, about 30 days, about 90 days, about 180 days, and about 365 days (about 1 month, about 3 months, about 6 months, and about 1 year). Typical commercial storage conditions also include temperatures of about 23°C (ambient room temperature) and refrigerated temperatures below ambient room temperature, for example, about 5°C. Preferably, the liquid formulations of the present invention are stored at refrigerated temperatures.

- 4 -

It has also been discovered that stable formulations of bendamustine can be obtained by mixing a polar aprotic solvent, or a mixture of polar aprotic solvents, with a non-aqueous polar protic solvent or mixture of nonaqueous polar protic solvents. Pharmaceutically acceptable nonaqueous polar protic solvents are known in the art and include alkyl alcohols, for example, ethanol, ethylene glycol, propylene glycol, butylene glycol, glycerin, polysorbates, for example TWEEN 20, TWEEN 40, and TWEEN 80, and cyclodextrins (such as hydroxypropyl- -cyclodextrin), polyalkylene glycols, such as polyethylene glycol, polypropylene glycol, and polybutylene glycol, and primary amides such as niacinamide.

Such formulations will typically comprise 90% or less, by volume of the formulation, of the nonaqueous polar protic solvent. In other preferred embodiments, formulations will comprise between about 20% and about 85%, by volume of the formulation, of the nonaqueous polar protic solvent. In still other embodiments, formulations will comprise between about 30% and about 70%, by volume of the formulation, of the nonaqueous polar protic solvent. In most preferred embodiments, formulations will comprise about 80%, about 67% or about 34%, by volume of the formulation, of the nonaqueous polar protic solvent.

Alternatively, formulations of the present invention will comprise 10 moles per liter, or less, of the nonaqueous polar protic solvent. Preferably, formulations of the present invention will comprise between about 4 moles per liter to about 9.5 moles per liter, of the nonaqueous polar protic solvent. In certain embodiments, formulations will comprise about 9.1 moles per liter of the nonaqueous polar protic solvent. In other embodiments, formulations will comprise about 4.6 moles per liter, of the nonaqueous polar protic solvent.

While not wishing to be held to any particular theory, it is believed that while nonaqueous polar protic solvents are of sufficient nucleophilicity to form potentially undesirable polar protic solvent-bendamustine adducts, such adducts will not form during typical commercial storage if the concentration of the polar protic solvent is kept within the scope of the present invention.

Liquid formulations of the present invention are stable over the course of a typical commercial storage period. As used herein, "stable" is defined as no more than about a 10% loss of bendamustine under typical commercial storage conditions. Preferably, formulations of the present inventions will have no more than about a 10% loss of bendamustine, more preferably, no more than about a 5% loss of bendamustine, under typical commercial storage conditions.

APOBENDA64_043952

WO 2010/036702                                                    PCT/US2009/058023

- 5 -

Bendamustine converts to non-bendamustine products (i.e., "degrades") upon exposure to certain nucleophiles, for example, water and alkyene glycols such as propylene glycol. Exposure of bendamustine to water can produce "HPl," which is undesirable.

(HPl)

Another undesirable compound that bendamustine can convert to over time is "BMl dimer."

(BMl dimer)

Still another undesirable compound that bendamustine can convert to over time is "DCE."

(DCE)

Upon exposure to an alkylene glycol, for example, propylene glycol, esters of bendamustine can form, e.g., PG-I and PG-2.

PG-I                                        PG-2

In preferred embodiments of the present invention, analysis of formulations of the present invention will exhibit 1.50% or less of DCE, as determined by HPLC analysis, after

APOBENDA64_043953

- 6 -

about 1 year (about 365 days) at about 5°C. More preferably, the formulations will exhibit 1.0% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5°C. Even more preferably, the formulations will exhibit 0.5% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5°C. Most preferably, the formulations will exhibit about 0.1% or less of DCE, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5°C.

In other embodiments of the present invention, analysis of the formulations will exhibit about 0.4% or less of HP1, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5°C. Preferably, the formulations will exhibit about 0.10% or less of HP1, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5°C.

In certain other embodiments of the present invention, analysis of the formulations will exhibit about 0.70% or less of BM1 dimer, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5°C. Preferably, the formulations will exhibit about 0.30% or less of dimer, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5°C. In most preferred embodiments, the formulations will exhibit about 0.10% or less of BM1 dimer, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5°C.

In those embodiments of the present invention comprising alkylene glycol as the nonaqueous polar protic solvent, analysis of those formulations will exhibit 1.5% or less of alkylene glycol esters of bendamustine, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5°C. For example, in those embodiments comprising propylene glycol, analysis of those formulations will exhibit 1.5% or less of propylene glycol esters PG-1 and PG-2, as determined by HPLC analysis, after about 1 year (about 365 days) at about 5°C.

Analysis of the liquid formulations of the present invention can be performed using techniques known in the art, including, for example, HPLC, gas chromatography, and NMR. After exposure to typical commercial storage conditions, analysis of the formulations of the present invention will indicate that the formulation contains no less than about 90% of the amount of bendamustine present prior to exposure to the storage conditions. Preferably, analysis will indicate that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to the storage conditions.

In preferred embodiments of the present invention, analysis of the formulations of the present invention will indicate that the formulation contains no less than about 90% of the

APOBENDA64_043954

- 7 -

amount of bendamustine present prior to exposure to storage conditions that include temperatures of about 5°C and time periods of about 30 days (about 1 month) to about 365 days (about 1 year). Preferably, analysis of the formulations of the present invention will indicate that the formulation contains no less than about 90% of the amount of bendamustine present prior to exposure to storage conditions that include temperatures of about 5°C and time periods of about 30 days (about 1 month), about 90 days (about 3 months), and about 180 days (about 6 months). Preferably, analysis will indicate that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to storage conditions that include temperatures of about 5°C and time periods of about 30 days (about 1 month) to about 365 days (about 1 year). More preferably, analysis will indicate that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to storage conditions that include temperatures of about 5°C and time periods of about 30 days (about 1 month), about 90 days (about 3 months), and about 180 days (about 6 months).

Formulations of the present invention can comprise pharmaceutically useful concentrations of bendamustine, or a pharmaceutically acceptable salt thereof. Useful concentrations include concentrations ranging from about 5 mg/mL to about 200 mg/mL. Preferably, the concentration of bendamustine, or a pharmaceutically acceptable salt thereof, ranges from about 5 mg/mL to about 120 mg/mL. Preferred concentrations include about 5 mg/mL, about 10 mg/mL, about 20 mg/mL, about 30 mg/mL, about 40 mg/mL, about 50 mg/mL, about 60 mg/mL, about 100 mg/mL and about 200 mg/mL of bendamustine, or a pharmaceutically acceptable salt thereof. Greater than 200 mg/ml of bendamustine, or a pharmaceutically acceptable salt thereof, for example, greater than about 300 mg/mL, are also within the scope of the present invention, as are saturated solutions of bendamustine, or a pharmaceutically acceptable salt thereof.

As used herein, the term "about" is defined as ± 10%, preferably ± 5%,

In addition to comprising a polar aprotic solvent, or mixture of polar aprotic solvents, and optionally, a nonaqueous polar protic solvent, or mixture of solvents, formulations of the present invention may further comprise other pharmaceutically acceptable excipients. Pharmaceutically acceptable excipients are known in the art and include, for example, antioxidants (e.g., tocopherol (Vitamin E), ascorbic acid, methyl paraben, butylhydroxyanisole (BHA), butylhydroxytoluene (BHT), and propyl gallate), surfactants, (e.g., polysorbates (TWEEN 20, TWEEN 40, TWEEN 80)), lipids (e.g., dimyristoylphophatidylcholine (DMPC), Dimyristoylphosphatidylglycerol (DMPG), distearoylphophatidylglycerol (DSPG), fillers

APOBENDA64_043955

- 8 -

(e.g., mannitol), organic acids (e.g., citric acid, lactic acid, benzoic acid), hydrophilic polymers (e.g., polyethylene glycols (PEG 300, PEG 400), complexing agents (e.g., niacinamide, nicotinic acid, creatine, cyclodextrins), and preservatives (e.g., benzyl alcohol).

Also within the scope of the invention are methods of treating diseases, such as, for example, chronic lymphocytic leukemia, Hodgkin's disease, non-Hodgkin's lymphoma, multiple myeloma, or breast cancer, with a pharmaceutical formulation of the present invention. These methods comprise administering to the patient a therapeutically effective amount of a preparation prepared from a pharmaceutical formulation of the present invention. The term "therapeutically effective amount," as used herein, refers to the amount determined to be required to produce the physiological effect intended and associated with a given drug, as measured according to established pharmacokinetic methods and techniques, for the given administration route. Appropriate and specific therapeutically effective amounts can be readily determined by the attending diagnostician, as one skilled in the art, by the use of conventional techniques. The effective dose will vary depending upon a number of factors, including the type and extent of progression of the disease or disorder, the overall health status of the particular patient, the relative biological efficacy of the compound selected, the formulation of the active agent with appropriate excipients, and the route of administration.

The liquid formulations of bendamustine described herein are intended to be administered via injection, for example, they may be administered subcutaneously, intracutaneously, intravenously, intramuscularly, intra-articularly, intrasynovially, intrasternally, intrathecally, intralesionally, intracranially or via infusion. In a typical preparation, the volume of the liquid formulation of the present invention needed for the required dose can be aseptically withdrawn and transferred to an infusion bag of 0.9% Sodium Chloride (or other pharmaceutically acceptable intravenous solution) for injection. After transfer, the contents of the infusion bag are thoroughly mixed. Administration by intravenous infusion is typically provided over a time period of from about 30 to about 60 minutes. Previously described lyophilized formulations of bendamustine required reconstitution of the lyophilized bendamustine prior to mixture with the acceptable intravenous solution before infusion.

It is envisioned that the pharmaceutical formulations and preparations of the present invention can be administered in combination with one or more anti-neoplastic agents where the anti-neoplastic agent is given prior to, concurrently with, or subsequent to the administration of the formulation or preparation of the present invention. Pharmaceutically

APOBENDA64_043956

- 9 -

acceptable anti-neoplastic agents are known in the art. Preferred anti-neoplastic agents are those disclosed in co-pending U.S. Application No. 11/330,868, filed January 12, 2006, the entirety of which is incorporated herein by reference.

EXAMPLES

*Solubility and stability of Bendamustine hydrochloride in polar aprotic solvents*

Equilibrium solubility was determined for solvents including l-methyl-2-pyrrolidone (NMP), l,3-dimethyl-2-imidazolidinone (DMI), dimethylacetamide (DMA), dimethyl sulfoxide (DMSO), acetone, tetrahydrofuran (THF), dimethylformamide (DMF), and propylene carbonate (PC). The solubility of bendamustine hydrochloride was also determined for two solutions, 25 mg/mL niacinamide in DMA and 66% DMA/ 34% propylene glycol (PG). A saturated solution of bendamustine hydrochloride was made in triplicate for each solvent or solution and mixed on a Lab-Quake with gentle mixing and low shear for 3 days at room temperature. A sample of each suspension was put into a microcentrifuge tube and spun at 10,000 rpm for 5 min on an Eppendorf microcentrifuge. The supernatant was removed and put into a clean vial. Each solution was diluted with sample solvent: 50% NMP/ 50% 0.1% trifluoroacetic acid in water. A reverse phase method for bendamustine hydrochloride was used to determine the concentration of each sample calculated from a standard. Analysis was performed within 18 hours of preparation of the diluted sample. The solubilities are listed in Table I below. Each value is an average of three samples.

Table I

| Sample* | % Purity | Assay (mg/mL) |
|---|---|---|
| NMP | 99.1 | 104.0 |
| DMI | 98.5 | 75.8 |
| DMSO | 99.5 | 311.7 |
| DMF | 99.6 | 71.8 |
| 66% DMA/34%PG | 99.5 | 110.1 |
| DMA | 99.4 | 56.2 |
| PC | 98.7 | 7.7 |
| Niacinamide/DMA | 99.2 | 61.3 |

* acetone and THF have no measurable solubility of bendamustine.

The three replicates were combined and mixed well and then pipetted into amber HPLC vials and placed in stability chambers at 25°C and 5°C. All the samples were clear and colorless except for the DMI sample which was clear and yellow. The 25°C stability leveled out from about 180 days (about 6 months) to about 365 days (about 12 months, about 1 year).

APOBENDA64_043957

WO 2010/036702                                                PCT/US2009/058023

- 10 -

At 5°C, all solutions had a purity greater than 90%. The analysis of stability samples can be seen in the graphs of Figures 1 and 2.

Table II

*Impurity profile of certain liquid formulations of Bendamustine HCl after storage at 5 °C for about 12 months*

| Formulation | DCE (Area %) | HP1 (Area %) | BM1 dimer (Area %) | PG-1 (Area %) | PG-2 (Area %) |
|---|---|---|---|---|---|
| Niacinamide/DMA | 1.40 | 0.08 | 0.06 | ND | ND |
| DMA | 1.10 | 0.08 | 0.05 | ND | ND |
| 66%DMA/34%PG | 0.12 | 0.08 | 0.06 | 1.09 | 0.27 |
| DMF | 0.07 | 0.11 | 0.07 | ND | ND |
| NMP | 0.90 | 0.10 | ND | ND | ND |
| DMSO | 0.04 | 0.38 | 0.70 | ND | ND |

*ND = not detected*

Analysis conducted using reverse phase HPLC with 50% NMP/ 50% 0.1% trifluoroacetic acid in water as the running solvent.

As can be seen in Figure 3, bendamustine (BM1) in 99% propylene glycol degrades significantly when stored at 25°C for less than 100 days. After storage at 5°C for about 365 days, the purity of the bendamustine is about 80% or less.

*Pharmacokinetic Study of Formulations in Monkey*

4 fasted (18 to 23 hr), drug-naive male cynomolgus monkeys consecutively received single 3-mg/kg bolus intravenous doses of bendamustine hydrochloride prepared from 3 different formulations. The formulations evaluated in the study included:
1) TREANDA (lyophilized mixture of bendamustine hydrochloride and mannitol; 25 mg (bendamustine hydrochloride) vials; 2) a 66% dimethylacetamide (DMA)/34% propylene glycol (PG) (w/w) solution (90 mg (bendamustine hydrochloride)/mL stock); and 3) a 100% DMA solution (45 mg (bendamustine hydrochloride)/mL stock). The lyophilized powder and

APOBENDA64_043958

- 11 -

stock solutions of bendamustine hydrochloride were constituted or diluted with 0.9% saline, as appropriate, to give solutions of 3 mg bendamustine hydrochloride/ml, just prior to dose administration. The resulting solutions were administered as a bolus via a saphenous vein at a fixed volume of 1.0 mL/kg. There was at least a 7-day washout period separating successive doses. During all 3 phases of dosing, blood samples for pharmacokinetic profiling of bendamustine and its 2 active circulating metabolites, -hydroxybendamustine (M3) and /-<ies-methylbendamustine (M4), were collected via a femoral vein immediately prior to dosing and at preselected timepoints through 12 hr postdose. Concentrations of bendamustine, M3 and M4 in plasma samples were determined using a validated high-performance liquid chromatography method with tandem mass spectrometric detection (LC-MS/MS) as follows. Bendamustine and the M3 and M4 metabolites are extracted from plasma by protein precipitation using acetonitrile. After the extraction, the aliquoted sample is acidified with 1% formic acid and bendamustine with an added carbon in the carboxylic acid chain is added as an internal standard. The samples are evaporated to dryness and the residue is reconstituted with an acetonitrile/water/formic acid/ammonium formate mixture. The sample is injected into an HPLC system with LC/MS/MS detection using a Phenomenex Synergi Max-RP column with an acetonitrile/water/formic acid/ammonium formate mobile phase. Pharmacokinetic analyses were performed using noncompartmental methods.

After single bolus intravenous doses of bendamustine hydrochloride to male cynomolgus monkeys, the shapes of the mean plasma concentration-versus-time profiles of bendamustine were similar in each of the 3 formulations (See Figure 4). In all cases, the highest observed plasma levels of bendamustine were achieved at 0.083 hr postdose (ie, the first sampling time after dose administration) and subsequent removal of the compound from plasma occurred in a bi-phasic manner that was characterized by an initial rapid distribution phase and a somewhat slower terminal phase of drug elimination. The harmonic mean $t_{1/2}$ of the terminal phase was approximately 0.6 hr for each formulation (See Table III).

In addition to the similarities in the shapes of the mean plasma concentration-versus-time profiles, the 3 formulations were also similar with respect to bendamustine systemic exposure (i.e., $C_{max}$ and AUC). Specifically, the respective mean values of $C_{max}$ and $AUC_{0^-}$ for bendamustine were 6037 ng/mL and 2314 ng•hr/mL for the TREANDA formulation, 7380 ng/mL and 2854 ng•hr/mL for the 66% DMA/34% PG formulation and 6209 ng/mL and 2372 ng•hr/mL for the 100% DMA formulation. Plasma clearance (CL) and volume of distribution ($V_2$ and $V_{ss}$) for bendamustine were also comparable between each of the 3 formulations (See

APOBENDA64_043959

WO 2010/036702                                                    PCT/US2009/058023

- 12 -

Table III).  In Table III, $t_{max}$, hr is given as Median [range], *tm,* hr is given as the Harmonic Mean, $\lambda_z$, $hr^{-1}$ is the slope of line in elimination phase used to calculate half-life, and $MRT_{0-\infty}$ is the mean residence time.

In summary, the pharmacokinetic profiles of bendamustine, M3 and M4 for the 2 liquid formulations of bendamustine hydrochloride were qualitatively and quantitatively similar to those obtained for the TREANDA formulation after single bolus intravenous doses to monkeys.

Table III shows the mean +/- Standard Deviation pharmacokinetic parameters of bendamustine in male Cynomolgus monkeys (N=4) administered single 3mg/kg bolus intravenous doses of bendamustine hydrochloride in the three different formulations.

Table III

| | Formulation | | |
|---|---|---|---|
| Parameter | TREANDA | 66% DMA/34% PG | 100% DMA |
| Co, ng/mL | 8664 ± 3841 | 10716 ± 2033 | 8956 ±1965 |
| $C_{n13x}$, ng/mL | 6037 ± 2456 | 7380 ± 1170 | 6209 ±1300 |
| W , hr | 0.083 [0.083 for all] | 0.083 [0.083 for all] | 0.083 [0.083 for all] |
| AUCo-t, ng*hr/mL | 2313 ± 800 | 2853 ± 398 | 2371 ± 535 |
| AUC $_{0-\infty}$, ng*hr/mL | 2314 ± 800 | 2854 ± 398 | 2372 ± 535 |
| $K$ hr4 | 1.220 ± 0.1 1 1 | 1.295 ± 0.108 | 1.092 ± 0.219 |
| ti/2, hr | 0.57 | 0.54 | 0.63 |
| CL, L/hr/kg | 1.27 ± 0.40 | 0.96 ± 0.14 | 1.18 ± 0.27 |
| Vz, L/kg | 1.04 ± 0.36 | 0.74 ± 0.05 | 1.17 ± 0.44 |
| $V_{ss}$, L/kg | 0.34 ± 0.11 | 0.26 ± 0.05 | 0.30 ± 0.04 |
| MRT $_{0-\infty}$, h r | 0.26 ± 0.02 | 0.27 ± 0.02 | 0.26 ± 0.03 |

*In-Use Studies of Formulations*

Admixtures in 0.9% sodium chloride (500 mL bag) were prepared at a high dose (360 mg bendamustine hydrochloride) and purity was determined over time at room temperature for up to 8 hours using HPLC, using a Zorbax Bonus-RP column with a gradient from 93% 0.1% trifluoroacetic acid in water (Mobil Phase A)/ 7% 0.1% trifluoroacetic acid in acetonitrile (Mobile Phase B) to 10% Mobil Phase A/90% Mobil Phase B.

APOBENDA64_043960

WO 2010/036702                                                                PCT/US2009/058023

- 13 -

The 66% DMA/34% PG formulation had a concentration of bendamustine hydrochloride of 90 mg/g, so 4 rnL was injected into a 500 rnL bag of saline, inverted 10 times and sampled at room temperature for 8 hours. After 8 hours the purity was 95.4%. This is within the label requirements for dosing Treanda. This formulation of the present invention could be used for up to 8 hours at room temperature. By way of contrast, reconstituted Treanda can only be stored at room temperature for up to 3 hours.

The 100% DMA formulation had a concentration of 45 mg/g, so 8 mL was injected into a 500 mL bag of saline, inverted 10 times, and sampled at room temperature for 4 hours. After 4 hours the purity was 97.9%. This formulation of the present invention could be used for more than 4 hours at room temperature.

The comparative Treanda admixture purity was 95.0% after 4 hours at 25°C.

As those skilled in the art will appreciate, numerous modifications and variations of the present invention are possible in view of the above teachings. It is therefore understood that within the scope of the appended claims, the invention can be practiced otherwise than as specifically described herein, and the scope of the invention is intended to encompass all such variations.

APOBENDA64_043961

WO 2010/036702                                                                PCT/US2009/058023

- 14 -

**What is Claimed:**

1. A liquid pharmaceutical formulation comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, and a polar aprotic solvent.

2. The formulation of claim 1, wherein the polar aprotic solvent is l-methyl-2-pyrrolidone, l,3-dimethyl-2-imidazolidinone, dimethylacetamide, dimethyl sulfoxide, acetone, tetrahydrofuran, 1,4-dioxane, acetonitrile, dimethyl formamide, propylene carbonate, or a mixture thereof.

3. The formulation of claim 1, wherein the polar aprotic solvent is dimethylacetamide, dimethyl sulfoxide, or a mixture thereof.

4. The formulation of claim 1, further comprising a non-aqueous polar protic solvent.

5. The formulation of claim 4, wherein the non-aqueous polar protic solvent is an alcohol, a polyalkylene glycol, an amide, or a mixture thereof.

6. The formulation of claim 4, wherein the non-aqueous polar protic solvent is an alcohol.

7. The formulation of claim 6, wherein the alcohol is a glycol.

8. The formulation of claim 7, wherein the glycol is ethylene glycol, propylene glycol, butylene glycol, or a mixture thereof.

9. The formulation of claim 6, wherein the alcohol is a cyclodextrin.

10. The formulation of claim 9, wherein the cyclodextrin is hydroxypropyl- -cyclodextrin.

11. The formulation of claim 4, wherein the formulation comprises 90% or less, by volume of the formulation, of the non-aqueous polar protic solvent.

12. The formulation of claim 4, wherein the formulation comprises about 20% to about 85%, by volume of the formulation, of the non-aqueous polar protic solvent.

APOBENDA64_043962

WO 2010/036702                                                    PCT/US2009/058023

- 15 -

13. The formulation of claim 4, wherein the formulation comprises about 30% to about 70%, by volume of the formulation, of the non-aqueous polar protic solvent.

14. The formulation of claim 4, wherein the formulation comprises about 80%, by volume of the formulation, of the non-aqueous polar protic solvent.

15. The formulation of claim 4, wherein the formulation comprises about 67%, by volume of the formulation, of the non-aqueous polar protic solvent.

16. The formulation of claim 4, wherein the formulation comprises about 34%, by volume of the formulation, of the non-aqueous polar protic solvent.

17. The formulation of claim 4, wherein the polar aprotic solvent is dimethylacetamide and the nonaqueous polar protic solvent is propylene glycol.

18. The formulation of claim 1, further comprising a pharmaceutically acceptable antioxidant.

19. The formulation of claim 1, comprising about 5 mg/ml to about 200 mg/mL of bendamustine, or the pharmaceutically acceptable salt thereof.

20. The formulation of claim 1, comprising about 5 mg/ml to about 120 mg/mL of bendamustine, or the pharmaceutically acceptable salt thereof.

21. The formulation of claim 1, comprising at least about 5 mg/mL of bendamustine, or the pharmaceutically acceptable salt thereof.

22. The formulation of claim 1, comprising at least about 40 mg/mL of bendamustine, or the pharmaceutically acceptable salt thereof.

23. The formulation of claim 1, comprising at least about 60 mg/mL of bendamustine, or the pharmaceutically acceptable salt thereof.

24. The formulation of claim 1, comprising at least about 80 mg/mL of bendamustine, or the pharmaceutically acceptable salt thereof.

APOBENDA64_043963

- 16 -

25. The formulation of claim 1, comprising at least about 100 mg/mL of bendamustine, or the pharmaceutically acceptable salt thereof.

26. The formulation of claim 1, comprising at least about 200 mg/mL of bendamustine, or the pharmaceutically acceptable salt thereof.

27. The formulation of claim 1, wherein the formulation is stable at about 5 $^0$C for about 30 days to about 365 days.

28. The formulation of claim 1, wherein the formulation is stable at about 5 $^0$C for at least about 30 days.

29. The formulation of claim 1, wherein the formulation is stable at about 5 $^0$C for at least about 90 days.

30. The formulation of claim 1, wherein the formulation is stable at about 5 $^0$C for at least about 180 days.

31. The formulation of claim 1, wherein analysis of the formulation indicates that the formulation contains no less than about 90% of the amount of bendamustine present prior to exposure to storage conditions.

32. The formulation of claim 1, wherein analysis of the formulation indicates that the formulation contains no less than about 95% of the amount of bendamustine present prior to exposure to storage conditions.

33. The formulation of any one of claims 31 and 32 where the storage conditions are about 5°C for about 30 days to about 365 days.

34. The formulation of any one of claims 31 and 32 where the storage conditions are about 5°C for at least about 30 days.

35. The formulation of any one of claims 31 and 32 where the storage conditions are about 5°C for at least about 90 days.

APOBENDA64_043964

WO 2010/036702                                                      PCT/US2009/058023

- 17 -

36. The formulation of any one of claims 31 and 32, where the storage conditions are about 5°C for at least about 180 days.

37. The formulation of any one of claims 1 and 4, further comprising at least one pharmaceutically acceptable excipient.

38. The formulation of any one of claims 1 and 4, further comprising an antioxidant, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer, a complexing agent, a preservative, or a combination thereof.

39. The formulation of any one of claims 1 and 4, further comprising at least one anti-neoplastic agent.

40. The formulation of claim 4, wherein the formulation comprises 10 moles per liter, or less, of the non-aqueous polar protic solvent.

41. The formulation of claim 4, wherein the formulation comprises between about 4 to about 9.5 moles per liter of the non-aqueous polar protic solvent.

42. The formulation of claim 4, wherein the formulation comprises about 9.1 moles per liter of the non-aqueous polar protic solvent.

43. The formulation of claim 4, wherein the formulation comprises about 4.6 moles per liter of the non-aqueous polar protic solvent.

44. The formulation of claim 4, wherein the formulation comprises 90% or less, by volume of the formulation, of the non-aqueous polar protic solvent.

45. The formulation of any of claims 1 and 4, comprising about 0.4% or less of HPl.

46. The formulation of any of claims 1 and 4, comprising about 0.1% or less of HPl.

47. The formulation of any of claims 1 and 4, comprising about 1.5% of less of DCE.

APOBENDA64_043965

- 18 -

48. The formulation of any of claims 1 and 4, comprising about 0.7% or less of BMl dimer.

49. The formulation of claim 17, comprising about 1.5% or less of PG-I, PG-2, or a combination thereof.

50. A method of preparing an injectable formulation of bendamustine, or a pharmaceutically acceptable salt thereof, comprising:

providing a liquid pharmaceutical formulation comprising bendamustine, or a pharmaceutically acceptable salt thereof, and a nonaqueous solvent;

diluting the liquid pharmaceutical formulation with a pharmaceutically acceptable injectable diluent.

51. The method of claim 50, wherein the nonaqueous solvent is a polar aprotic solvent.

52. The method of claim 51, wherein the polar aprotic solvent is l-methyl-2-pyrrolidone, l,3-dimethyl-2-imidazolidinone, dimethylacetamide, dimethyl sulfoxide, acetone, tetrahydrofuran, 1,4-dioxane, acetonitrile, dimethyl formamide, propylene carbonate, or a mixture thereof.

53. The method of claim 50, wherein the liquid pharmaceutical formulation further comprising a non-aqueous polar protic solvent.

54. The method of claim 53, wherein the nonaqueous polar protic solvent is an alcohol, a polyalkylene glycol, a primary amide, or a mixture thereof.

55. The method of claim 50 wherein the pharmaceutically acceptable injectable diluent is Sodium Chloride Injection.

56. A method of treating cancer comprising

identifying a patient in need of treatment of cancer;

providing a liquid pharmaceutical formulation comprising a therapeutically effective amount of bendamustine, or a pharmaceutically acceptable salt thereof, and nonaqueous solvent;

APOBENDA64_043966

WO 2010/036702                                                                    PCT/US2009/058023

- 19 -

diluting the liquid pharmaceutical formulation with a pharmaceutically acceptable injectable diluent to form a pharmaceutical preparation;

administering the pharmaceutical preparation to the patient in need of treatment.

57. The method of claim 56, wherein the cancer is chronic lymphocytic leukemia, Hodgkin's disease, non-Hodgkin's lymphoma, multiple myeloma, or breast cancer.

58. The method of claim 56, wherein the nonaqueous solvent is a polar aprotic solvent.

59. The method of claim 58, wherein the polar aprotic solvent is l-methyl-2-pyrrolidone, l,3-dimethyl-2-imidazolidinone, dimethylacetamide, dimethyl sulfoxide, acetone, tetrahydrofuran, 1,4-dioxane, acetonitrile, dimethyl formamide, propylene carbonate, or a mixture thereof.

60. The method of claim 56, wherein the liquid pharmaceutical formulation further comprising a non-aqueous polar protic solvent.

61. The method of claim 60, wherein the nonaqueous polar protic solvent is an alcohol, a polyalkylene glycol, a primary amide, or a mixture thereof.

62. The method of claim 56, wherein the pharmaceutically acceptable injectable diluent is Sodium Chloride Injection.

APOBENDA64_043967

WO 2010/036702                                                                 PCT/US2009/058023

FIG. 1

**Bendamustine Purity at 25 °C**



1/4

APOBENDA64_043968

WO 2010/036702                                                        PCT/US2009/058023

# FIG. 2



2/4

APOBENDA64_043969

WO 2010/036702                                                                                    PCT/US2009/058023

FIG. 3



BM1 Purity in 99% Propylene glycol

APOBENDA64_043970

WO 2010/036702                                                                    PCT/US2009/058023

FIG. 4



APOBENDA64_043971

# INTERNATIONAL SEARCH REPORT

| | International application No |
|---|---|
| | PCT/US2009/058023 |

## A. CLASSIFICATION OF SUBJECT MATTER

INV.    A61K9/08        A61K47/20        A61K31/4184

According to International Patent Classification (IPC) or to both national classification and IPC

## B. FIELDS SEARCHED

Minimum documentation searched (classification system followed by classification symbols)

A61K

Documentation searched other than minimum documentation to the extent that such documents are included in the fields searched

Electronic data base consulted during the international search (name of data base and, where practical, search terms used)

EPO-Internal    , WPI Data

## C. DOCUMENTS CONSIDERED TO BE RELEVANT

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No |
|---|---|---|
| X | WO 2006/076620 A2 (CEPHALON INC [US]; BRITTAIN JASON EDWARD [US]; FRANKLIN JOE CRAIG [US]) 20 July 2006 (2006-07-20) page 2, line 1 - line 9 page 24, line 2 - line 13 | 1-62 |
| X | DD 159 289 A1 (OLTHOFF UWE; REICHARDT KARIN; JACOB JOERG) 2 March 1983 (1983-03-02) cited in the application page 2, paragraph 2 page 4, paragraph 2 example 1 | 1-62 |
| | -/- | |

| X | Further documents are listed in the continuation of Box C | X | See patent family annex |
|---|---|---|---|

\* Special categories of cited documents

"A" document defining the general state of the art which is not considered to be of particular relevance

'E' earlier document but published on or after the international filing date

'L' document which may throw doubts on priority claim(s) or which is cited to establish the publication date of another citation or other special reason (as specified)

'O' document referring to an oral disclosure, use, exhibition or other means

'P' document published prior to the international filing date but later than the priority date claimed

'T' later document published after the international filing date or priority date and not in conflict with the application but cited to understand the principle or theory underlying the invention

'X' document of particular relevance, the claimed invention cannot be considered novel or cannot be considered to involve an inventive step when the document is taken alone

'Y' document of particular relevance, the claimed invention cannot be considered to involve an inventive step when the document is combined with one or more other such documents, such combination being obvious to a person skilled in the art

'&' document member of the same patent family

| Date of the actual completion of the international search | Date of mailing of the international search report |
|---|---|
| 1 February 2010 | 08/02/2010 |

| Name and mailing address of the ISA/ | Authorized officer |
|---|---|
| European Patent Office, P B 5818 Patentlaan 2 NL - 2280 HV Rijswijk Tel (+31-70) 340-2040, Fax (+31-70) 340-3016 | Hedegaard, Anette |

Form PCT/ISA/210 (second sheet) (April 2005)

APOBENDA64_043972

## INTERNATIONAL SEARCH REPORT

| | International application No |
|---|---|
| | PCT/US2009/058023 |

**C(Continuation).    DOCUMENTS CONSIDERED TO BE RELEVANT**

| Category* | Citation of document, with indication, where appropriate, of the relevant passages | Relevant to claim No. |
|---|---|---|
| A | US 5 162 115 A (PIETRONIGRO DENNIS D [US]) 10 November 1992 (1992-11-10) column 2, line 34 - line 39 column 3, line 23 - line 35 column 4, line 2 - line 10 column 5, line 28 ----- | 1-62 |
| E | WO 2009/120386 A2 (CEPHALON INC [US]; COOPER MARTIN IAN [GB]; COURVOISIER LAURENT D [US];) 1 October 2009 (2009-10-01) page 27; table 2 ----- | 1-62 |

Form PCTVISA/210 (continuation of second sheet) (April 2005)

APOBENDA64_043973

## INTERNATIONAL SEARCH REPORT

Information on patent family members

| | | International application No |
|---|---|---|
| | | PCT/US2009/058023 |

| Patent document cited in search report | | Publication date | Patent family member(s) | | Publication date |
|---|---|---|---|---|---|
| WO 2006076620 | A2 | 20-07-2006 | AR | 052877 A1 | 11-04-2007 |
| | | | AU | 2006204817 A1 | 20-07-2006 |
| | | | BR | PI0606332 A2 | 17-11-2009 |
| | | | CA | 2593582 A1 | 20-07-2006 |
| | | | EA | 200701511 A1 | 28-12-2007 |
| | | | EP | 1863452 A2 | 12-12-2007 |
| | | | JP | 2008526991 T | 24-07-2008 |
| | | | KR | 20070094848 A | 21-09-2007 |
| | | | US | 2006159713 A1 | 20-07-2006 |
| DD 159289 | A1 | 02-03-1983 | NONE | | |
| US 5162115 | A | 10-11-1992 | NONE | | |
| WO 2009120386 | A2 | 01-10-2009 | US | 2009264488 A1 | 22-10-2009 |

Form PCT/ISA/210 (patent family annex) (April 2005)

APOBENDA64_043974

# Exhibit 5

**(19) GERMAN DEMOCRATIC REPUBLIC**

# PATENT DESCRIPTION

**Utility model**

Granted under § 5 para. 1 of the Patent Law Amendment Act

ISSN  0433-6461        (11)   **1592 89**

Int.Cl.$^3$        3(51)  **A 61 K 31/41**
                              A 61 K   9/08

## OFFICE FOR INNOVATIONS AND PATENTS

Published in the version submitted by the applicant

(21)   WP A 61 K/ 2304 291            (22) 06/01/1981      (44) 03/02/1983

(71)   VEB JENAPHARM, JENA;DD;
(72)   OLTHOFF, UWE,DR. DIPL.-CHEM.;REICHARDT, KARIN;JACOB, JOERG,DR.;DD;
(73)   see (72)
(74)   VEB JENAPHARM, BFS, 6900 JENA, OTTO-SCHOTT-STR. 13

(54)   **METHOD FOR THE PRODUCTION OF STABLE INJECTION SOLUTIONS OF N-LOST COMPOUNDS**

(57) The invention involves a method for producing injection solutions for medical treatment. The aim is to produce a stable and ready-to-use injection solution of N-lost compounds by bypassing the technical solution as a dry ampoule. The N-lost derivatives are dissolved in accordance with the invention in concentrations of 25 mg/mL to 100 mg/mL in a mono- or polyhydric alcohol, in particular 1,2-propylene glycol, the dissolution, wherein bottling and storage of the solutions are carried out under an inert gas. Before injection, the solutions are diluted to the desired concentration with an aqueous injection vehicle.

9 pages

[hw:] *31*

APOBENDA64_043753

APOBENDA64_043754

_ 1 _                    [stamp:] 230429 1

Field of use of the invention

The invention relates to a method for producing
injection solutions for use in medical treatment.

Characteristics of the known technical solutions

N-lost compounds have been used as highly effective
cytostatic agents for several years. It is estimated
that lots can be used in the treatment of 70% of all
treated malignant tumors. More recent research has been
directed, among other things, towards synthesizing a
multivalent antagonist type from this compound group.
In these trials and in-depth pharmacological and
clinical tests, the compound bendamustine hydrochloride
(trial designation IMET 3393) synthesized by OZEGOWSKI
and KREBS in 1963 was selected from a larger number of
compounds (BRUNS, KNÖLL). Bendamustine hydrochloride is
- [1-methyl-5-bis(beta-chloroethyl)aminobenzimidazole-
(2)]-butyric acid hydrochloride. The compound was
introduced in 1971 as a pharmaceutical preparation
under the trademark CYTOSTASAN$^R$ (0.025 g bendamustine
hydrochloride per dry ampoule) in the treatment of
hemoblastoses, especially in chronic lymphadenosis,
lymphoreticulosis, lymphogranulomatosis, and in
reticulosis.

[stamp:] – 01 JUN. 1981 * 938209

APOBENDA64_043755

– 2 –    **[stamp:] 230429 1**

Bendamustine hydrochloride is a relatively unstable compound. In aqueous solutions, almost complete hydrolysis of the lost-halogen groups occurs after a short time. Therefore, the injection solutions can only be prepared shortly before the injection. Kinetic studies on the chloride hydrolysis of the N-lost group of bendamustine hydrochloride showed a reaction sequence in acidic and neutral solutions that could be calculated according to pseudo-first order of reaction for a follow-up reaction of the symmetrical dihalide compound (U. OLTHOFF, Abstr. Congr. Pharm. Hung. VI, Budapest 1974, p. 72). The elimination of chloride and protons from the ß-chloroethyl groups occurs completely and at a very high rate, independently of the pH and the buffer systems used. Bendamustine hydrochloride even outperforms the particularly reactive solutes N-methyl-lost, chlorambucil and uracil-lost. These data explain the particular difficulties in producing stable medical preparations of bendamustine hydrochloride.

According to GDR patent specification WP 80 967, the N-lost derivative bendamustine hydrochloride must be produced in a sterile, non-suspended form and in a crystal form suitable for rapid dissolution. The form of preparation is a dry ampoule containing a mixture of 25 mg bendamustine hydrochloride and 175 mg ascorbic acid. Before use, the contents of the ampoule must be dissolved in water for injection. The ascorbic acid is used to produce a powder mixture that can be bottled, and to ensure the shelf life and pH value of the injection solution. In addition, the shelf life of the dry mixture should also be achieved. According to the available test results, the rate of hydrolysis is not affected by the addition of ascorbic acid.
The pH of a bendamustine hydrochloride solution, which is in the range of 2.4 to 3.0, is not significantly altered by the addition of ascorbic acid. The ascorbic acid additive therefore does not meet the requirements for a stabilizer. After some time in storage, bendamustine hydrochloride, as a solid substance, shows

APOBENDA64_043756

– 3 –                **[stamp:] 230429 1**

a pink to brownish-red discoloration that starts from the surface of the substance and, after a longer period of time, makes the entire substance unsuitable for the production of pharmaceutical preparations. The mixture with ascorbic acid also shows this effect.

Furthermore, it was suggested to lyophilize the aqueous solution of the substance bendamustine hydrochloride and to dissolve it in water or sodium chloride solution before use (manufacturing method of ZIMET, pharmaceutical expert opinion IfAr/No. 180/80). The lyophilisate obtained (25 mg/ampoule) has significant disadvantages for a technological manufacturing process. In particular, the extreme hygroscopicity and the need to carry out the process under an inert gas make it difficult to realize technologically. Furthermore, during the production of the preparation, clear signs of decomposition were detected in the range of 5 to 10% of the active ingredient. It is also unsatisfactory to find large quantities of microparticles after dissolving the lyophilisate, which indicates further instability of the system.

The disadvantage of the extreme hygroscopicity of the lyophilisate can be remedied by adding polyols that are solid at room temperature, in particular mannitol. However, in addition to the high technological effort, the disadvantages of considerable decomposition and the occurrence of undissolved microparticles still exist.

Aim of the invention

The aim of the invention is to produce a stable and ready-to-use injection solution of N-lost compounds by bypassing the technical solution as a dry ampoule.

APOBENDA64_043757

– 4 –          [stamp:] 230429 1

Explanation of the essence of the invention

The technical solutions known to date have involved either filling the injection preparation as a powder with the addition of a stabilizer or other excipients, or as a lyophilisate, possibly with the addition of excipients. These measures make it impossible or very difficult to produce a suitable injection preparation. The dry fillings obtained in this way are characterized by inadequate chemical and physical stability. Furthermore, lyophilization requires a considerable amount of additional technical effort, which can prove to be capacity-limiting.

It has now been surprisingly found that the active substance bendamustine hydrochloride in monohydric alcohols, glycols, and other polyhydric alcohols exhibits sufficient solubility and, above all, remarkably high chemical stability for the preparation of injection solutions. The stability of the solutions prepared according to the invention is unexpected because compounds with extreme hydrolysis sensitivity are usually also sensitive to other solvents containing OH groups. In the case of alcohols or polyols, such reactions are known as alcoholysis.

It has now been found that N-lost compounds of the bendamustine hydrochloride type do not undergo an alcoholysis reaction. The use of water-free solvents is a prerequisite for avoiding decomposition due to the high sensitivity to hydrolysis. Under these conditions, bendamustine hydrochloride, for example, is chemically stable over long periods of time in the group of solvents mentioned and does not form the mono- and dihydroxy or alkoxy derivatives known from aqueous solutions.

To investigate the stability, bendamustine hydrochloride was dissolved in ethanol and 1,2-propylene glycol at a concentration of 25 mg/ml and the solution was stored at room temperature and at elevated temperatures (50 °C, 75 °C, 130 °C) [text cut off]

APOBENDA64_043758

– 5 –    [stamp:] 230429 1

using a specific thin-layer layer chromatographic method (application amount corresponds to 0.025 mg bendamustine hydrochloride, silica gel G, eluent: butanol/acetic acid/water 4:1:5, detection UV 360 nm or Dragendorff reagent) for the formation of fission products. Findings:

Formation of degradation products in:

| Time | Ethanol solution | | Propylene glycol solution | | |
|---|---|---|---|---|---|
| | 25°C | 50 °C | 25°C | 75 °C | 130°C |
| 0.5 h | – | – | – | – | (traces) |
| 1 h | – | – | – | without | – |
| 1.5 h | – | – | – | – | (traces) |
| 2 h | – | – | – | without | low decomposition |
| 5 h | without | without | – | without | – |
| 7 h | without | without | – | – | – |
| 24 h | without | – | – | – | – |
| 8 weeks | without | – | without | – | – |

For pharmacological and manufacturing reasons, monohydric alcohols are not very suitable for the production of injection solutions. 1,2-propylene glycol is used more frequently. The solubilities of bendamustine hydrochloride in some of the solvents used are about 25 °C

| | |
|---|---|
| Ethanol abs. | approx. 50 mg/mL |
| Propylene glycol | approx. 125 mg/mL and |
| Glycerol | approx. 50 mg/mL. |

In the previously known injection forms of bendamustine hydrochloride, 25 mg of active ingredient is used in 10 mL of solvent. It is now proposed to dissolve the active substance in polyols, in particular in 1.2-propylene glycol, and to fill it into ampoules in order to ensure a simplified manufacturing technology, improved stability of the active substance during the preparation of the solutions and their storage, as well as simplified handling during the preparation of the ready-to-inject solution. Immediately before the intended injection, the pole solution is diluted by

APOBENDA64_043759

– 6 –                  [stamp:] 230429 1

adding a suitable aqueous diluent (sodium chloride solution or water for injection) so that the solution to be used contains only about 10% polyol, or even less. The polyol solutions can be diluted with the specified diluents as desired without any disadvantage for the active substance. The wide range of possible variations in the polyol content and the dilution offer further advantages for the selection of an optimal, particularly well-tolerated injection preparation. In addition to sensitivity to hydrolysis, the effects of light and atmospheric oxygen are to be considered as further stability factors. Dry preparations and solutions slowly discolor to pink or brown when exposed to light and air. The solutions in alcohols and polyols, which are stored in well-sealed ampoules away from light, show no signs of discoloration. However, it is recommended that the preparation, bottling and storage of the solutions be carried out under an inert gas, such as argon or nitrogen.

Exemplary embodiments
Example 1:


Bendamustine hydrochloride is dissolved in 1,2-propylene glycol in a concentration of 2.5 g/100 mL under stirring in an inert gas atmosphere. The solution is filtered through a suitable filter device, if necessary after being heated to 50 °C, until it is free of suspended matter and germ-free. 1.0 mL of the solution is dispensed into a 10 mL ampoule, the ampoule is filled with inert gas and fused. Immediately before injection, 9.0 mL of the intended diluent is to be added to the opened ampoule. After shaking, the solution is ready for injection.


Example 2:


5.0 g bendamustine hydrochloride is dissolved in 100 mL ethanol under the conditions mentioned in example 1, filtered, and dispensed into ampoules. The ampoules must be stored at temperatures between +15 °C and

APOBENDA64_043760

– 7 –          [stamp:] 230429 1

+25 °C.

APOBENDA64_043761

– 8 –    **[stamp:] 230429 1**

<u>Claim of invention</u>

1. Method for the production of stable injection solutions of N-lost compounds, characterized in that N-lost derivatives in concentrations of 25 mg/mL up to 100 mg/mL are dissolved in an anhydrous monohydric or polyhydric alcohol (polyol), the dissolving, wherein bottling and storage of the solution are carried out under an inert gas, and the solution being diluted with an aqueous injection vehicle in a ratio of 1:5 to 1:20 prior to medical use.

2. Method according to point 1, characterized in that benzimidazole-lost, in particular bendamustine hydrochloride, is used as the active ingredient.

3. Method according to point 1, characterized in that 1,2-propylene glycol is used in particular as the polyol.

APOBENDA64_043762

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing documents were caused to be served on June 5, 2026, on the following counsel in the manner indicated:

### VIA EMAIL:

Kenneth L. Dorsney
Cortlan S. Hitch
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
kdorsney@morrisjames.com
chitch@morrisjames.com

Deepro R. Mukerjee
Lance A. Soderstrom
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Center
New York, NY 10020-1605
Deepro.mukerjee@katten.com
Lance.soderstrom@katten.com

Jitendra Malik
Joseph M. Janusz
KATTEN MUCHIN ROSENMAN LLP
550 South Tyron Street, Suite 2900
Charlotte, NC 28202
Jitty.malik@katten.com
Joe.janusz@katten.com

Christopher B. Ferenc
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Avenue, NW Suite 800
Washington, DC 20006
Christopher.ferenc@katten.com

ME1\61334417.v1

Rachel L. Schweers
Matthew T. Messina
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661
Rachel.schweers@katten.com
Matthew.messina@katten.com

*Attorneys for Defendants Apotex, Inc. and Apotex Corp.*

Neal C. Belgam
Daniel A. Taylor
SMITH KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
nbelgam@skjlaw.com
dtaylor@skjlaw.com

Jason A. Lief
Alan H. Pollack
Audrey R. Sparschu
WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, NY 10019
jlief@windelsmarx.com
apollack@windelsmarx.com
asparschu@windelsmarx.com

Andrew Miller
Ajay Kayal
Robyn Ast-Gmoser
Kiersten Fowler
Daniel Forchheimer
WINDELS MARX LANE & MITTENDORF, LLP
One Giralda Farms
Madison, NJ 07940
amiller@windelsmarx.com
akayal@windelsmarx.com
rast-gmoser@windelsmarx.com
kfowler@windelsmarx.com
dforchheimer@windelsmarx.com

*Attorneys for Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

*/s/ Alexandra M. Joyce*
Alexandra M. Joyce (#6428)

ME1\61334417.v1