**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC, <br><br> Plaintiffs, <br><br> v. <br><br> APOTEX INC. and APOTEX CORP., <br><br> Defendants. | REDACTED PUBLIC VERSION FILED AUGUST 7, 2026 <br><br> C.A. No. 24-64-JLH (CONSOLIDATED) <br><br> **JURY TRIAL DEMANDED** <br><br> ██████████████████ |
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC, <br><br> Plaintiffs, <br><br> v. <br><br> SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC., <br><br> Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED) <br><br> **JURY TRIAL DEMANDED** <br><br> ██████████████████ |

**PLAINTIFFS EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB 1 LLC'S OPPOSITION TO DEFENDANTS' JOINT *DAUBERT* MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' TESTING EXPERT, DR. JEFFREY KITTENDORF**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ....................................................................................................1

II.  LEGAL STANDARD.............................................................................................3

III. DR. KITTENDORF'S TESTING AND OPINIONS are admissible ...............................4

    A.   Defendants' Criticisms Go To Weight, Not Admissibility.....................................4

    B.   Dr. Kittendorf's HPLC Analysis Is Reliable ...........................................................8

    C.   Dr. Kittendorf's Opinions About The 15-Month Limitation Are
        Reasonable ...................................................................................................11

IV.  CONCLUSION..........................................................................................................12

# TABLE OF AUTHORITIES[1]

## CASES

*Alcoa, Inc. v. Alcan Rolled Prods.-Ravenswood LLC*,
No. 06-451, 2020 WL 433856 (D. Del. Jan. 28, 2020) ............................................................. 12

*Barry v. DePuy Synthes Cos.*,
164 F.4th 896 (Fed. Cir. 2026) ............................................................................................ 11

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
No. 15-152, 2018 WL 4691047 (D. Del. Sept. 28, 2018) ........................................................ 11

*Cirba Inc. v. VMware, Inc.*,
No. 19-742, 2023 WL 3151853 (D. Del. Apr. 18, 2023) ............................................................ 3

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) .......................................................................................................... 4, 8

*Hollins v. Walmart Inc.*,
No. 2:19-cv-05526, 2021 WL 3748315 (C.D. Cal. Aug. 17, 2021)........................................... 9

*Karlo v. Pittsburgh Glass Works, LLC*,
849 F.3d 61 (3d Cir. 2017) ................................................................................................... 5

*Puma Biotechnology, Inc. v. AstraZeneca Pharms. LP*,
723 F. Supp. 3d 327 (D. Del. 2024) .................................................................................. 4, 6, 9

*Schneider ex rel. Estate of Schneider v. Fried*,
320 F.3d 396 (3d Cir. 2003) ................................................................................................. 3

*Shire Development v. Cadila Healthcare*,
No. 10-581-KAJ, D.I. 453 (D. Del. Sept. 16, 2016)................................................................ 8

*Shire ViroPharma Inc. v. CSL Behring LLC*,
No. 17-414, 2021 WL 1227097 (D. Del. Mar. 31, 2021)...................................................... 5, 8

*TQ Delta, LLC v. 2Wire, Inc.*,
373 F. Supp. 3d 509 (D. Del. 2019) ................................................................................... 4, 7

*United States v. Trala*,
162 F. Supp. 2d 336 (D. Del. 2001) ...................................................................................... 9

*Willis Elec. Co. v. Polygroup Ltd.*,
166 F.4th 1363 (Fed. Cir. 2026) .......................................................................................... 11

---

[1] All internal citations and quotations are omitted and all emphasis is added unless otherwise specified.

*Wonderland Switzerland AG v. Evenflo Co.*,
No. 20-727, 2023 WL 5574139 (D. Del. Jan. 5, 2023) ................................................................ 3

**TABLE OF EXHIBITS**

| Ex. | Description |
|---|---|
| 1 | Expert Report of Jeffrey Kittendorf, Ph.D., C.A. No. 24-cv-64 (2/5/2026) |
| 2 | Expert Report of Jeffrey Kittendorf, Ph.D., C.A. No. 24-cv-65 (2/5/2026) |
| 3 | Deposition Transcript of Jeffrey Kittendorf, Ph.D., C.A. No. 24-cv-65 (4/28/2026) |
| 4 | High-Performance Liquid Chromatography (HPLC): Principles, Applications, Versatality, Efficiency, Innovation and Comparative Analysis in Modern Analytical Chemistry and In Pharmaceutical Sciences, EAGLEBEN-SA_00369902 |
| 5 | 2024 Annual Report (APOBENDA64_053609) |
| 6 | 3.2.P.8.1 Stability Summary and Conclusion (SLAY-VIVMUS0009579) |
| 7 | 2023 Annual Report (SLAY-VIVMUS0010634) |
| 8 | Reply Expert Report of Jeffrey Kittendorf, Ph.D., C.A. No. 24-cv-65 (4/13/2026) |
| 9 | Rebuttal Expert Report of Brian Smith, Ph.D., C.A. No. 24-cv-65 (3/15/2026) |
| 10 | Practical HPLC Method Development, Second Edition (EAGLEBEN-SA_00373969) |
| 11 | Long Term Stability Study Report (APOBENDA64_053963) |
| 12 | Long Term Stability Study Report (APOBENDA64_053959) |
| 13 | Long Term Stability Study Report (APOBENDA64_053967) |
| 14 | Finished Product Specification (APOBENDA64_007958) |

## I.    INTRODUCTION

Defendants provide no basis to exclude the testimony of Plaintiffs Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC's ("Eagle") testing expert, Dr. Jeffrey Kittendorf.  Defendants do not challenge his qualifications.  Nor could they.  Dr. Kittendorf is a highly qualified analytical chemist with over 30 years of experience in the field.  In this case, Dr. Kittendorf performed reliable testing to develop opinions that are highly relevant to Defendant Apotex and Slayback's infringement of U.S. Patent Nos. 11,872,214 and 12,138,248 (collectively, "the Asserted Patents").

Each Defendant submitted to the U.S. Food and Drug Administration ("FDA") stability data generated by high-performance liquid chromatography ("HPLC") showing that the impurities in their accused liquid bendamustine products are a small fraction of the 5% limit set forth in the Asserted Claims.  Each Defendant has also represented to the FDA that their methods generate reliable, accurate, and reproducible results.  Those data alone are sufficient to prove infringement.

Yet, Defendants now argue that, because their methods use a slightly different wavelength than the 223 nm recited in the Asserted Claims, Dr. Kittendorf's analysis is allegedly unreliable for not undergoing a full validation.  Defendants are wrong.  While the existing data is sufficient to show infringement, Dr. Kittendorf performed a set of straightforward bridging experiments to test Defendants' Accused Products at both 223 nm and their preferred wavelengths to identify the total amount of impurities, and determined whether the measurements at the different wavelengths materially impact the identified amount of impurities.  To do so, Dr. Kittendorf reviewed and adopted the "reliable" analytical methods Defendants submitted to the FDA, verified his system suitability to carry out those methods, prepared all standards and samples in accordance with Defendants' respective methods, and performed the HPLC analysis on those samples, simultaneously collecting data at the two wavelengths.  For each product, the results demonstrated that the measured impurities are virtually identical at each wavelength.  Neither Defendant offers

1

any competing HPLC testing to show that its product is allegedly ***not*** stable. Indeed, the FDA would not permit Defendants to sell those products for their full approved shelf lives if they were above the 5% impurity limit at 15 months.

Nor does either Defendant contest the validity of HPLC as an analytical technique. That is hardly surprising, as each Defendant chose HPLC as the method with which to support their proposed shelf lives to FDA. And HPLC is regarded as the gold standard in analytical chemistry. In short, Dr. Kittendorf has vast expertise, employed an admittedly valid scientific technique, and used Defendants' HPLC methods to perform his bridging study to demonstrate that the minor wavelength change was inconsequential. His testimony is amply justified under *Daubert*.

None of Defendants' arguments—that Dr. Kittendorf's HPLC method was "novel," lacks validation, is inaccurate, underestimates the impurities, and failed to identify all impurities— warrant a different result. At most, Defendants raise a series of quibbles that are incorrect, irrelevant, and fodder for cross-examination.

Dr. Kittendorf's testing is sufficiently reliable because he described his testing methodologies in detail and specifically explained why it is reliable. Defendants' criticisms that Dr. Kittendorf added a detection wavelength of 223 nm and used a peak area response to quantify the amount of impurities are misplaced because the Asserted Claims specifically require those parameters. Defendants also waived any criticisms that these parameters are improper by never disclosing any validity challenge predicated on either the 223 nm detection wavelength or peak area response limitations. And, even if these criticisms had merit (they do not), they go to the weight of Dr. Kittendorf's opinions, not their admissibility.

Dr. Kittendorf's opinions regarding the 15-month stability limitation are also reasonable and scientifically sound. Defendants' argument to the contrary contradicts fundamental science

2

and is a matter for cross-examination. Dr. Kittendorf used sound, FDA-grounded methodologies, applied them to the Accused Products, and reported reproducible results at the claimed wavelength. Defendants' disagreements with Dr. Kittendorf's assumptions are classic jury questions, and the cases on which Defendants rely, which involved fundamentally unreliable or irrelevant test methods, are readily inapt.

Thus, Eagle respectfully requests the Court deny Defendants' motion.

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 and *Daubert* assign the Court a "gatekeeping" role designed to keep unreliable and irrelevant expert opinion from the jury. The *Daubert* inquiry "embodies a trilogy of restrictions on expert testimony: qualification, reliability, and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). "Rule 702 has a liberal policy of admissibility, as the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court." *Cirba Inc. v. VMware, Inc.*, No. 19-742, 2023 WL 3151853, at *1 (D. Del. Apr. 18, 2023) (cleaned up). While the offering party has the burden to prove admissibility of the expert's proffered testimony by a preponderance of the evidence, "the rejection of expert testimony is the exception rather than the rule." *Wonderland Switzerland AG v. Evenflo Co.*, No. 20-727, 2023 WL 5574139, at *5 (D. Del. Jan. 5, 2023).

Objections about the assumptions made, degree of validation performed, or inferences drawn from reliable data go to the weight of the testimony, not its admissibility. *Puma Biotechnology, Inc. v. AstraZeneca Pharms. LP*, 723 F. Supp. 3d 327, 357 (D. Del. 2024); *TQ Delta, LLC v. 2Wire, Inc.*, 373 F. Supp. 3d 509, 527 (D. Del. 2019). Such opinions are properly addressed through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993).

3

## III.   DR. KITTENDORF'S TESTING AND OPINIONS ARE ADMISSIBLE

### A.   Defendants' Criticisms Go To Weight, Not Admissibility

Defendants do not challenge Dr. Kittendorf's qualifications or the fit of his opinions. Instead, they dispute whether the results of his testing are correct. That is no basis for exclusion.

First, Defendants do not challenge Dr. Kittendorf's qualifications. *See generally* C.A. No. 24-64-JLH, D.I. 348.[2]  Nor could they; Dr. Kittendorf is highly qualified. He received his Ph.D. in Medicinal Chemistry from the University of Michigan College of Pharmacy in 2004, and then completed a National Institutes of Health Postdoctoral Fellowship at the University of Michigan Life Sciences Institute. Ex. 1 ¶¶ 11, 13; Ex. 2 ¶¶ 11, 13.  In 2009, he co-founded PharmaForensics Laboratories, LLC, where he provides chemical, biochemical, and pharmaceutical analyses, including HPLC analysis, to characterize and quantify impurities in drug products. Ex. 1 ¶ 15; Ex. 2 ¶ 15.  He has authored or co-authored at least 20 publications and has received numerous honors. Ex. 1 ¶ 19; Ex. 2 ¶ 19.  He is an Adjunct Associate Professor at the University of Michigan College of Pharmacy. Ex. 1 ¶ 17; Ex. 2 ¶ 17.  His professional experience includes performing HPLC analyses of drug samples to determine purity and concentration, and using HPLC to isolate and assess the purity of degradation products derived from drug formulations—the exact impurity analysis at issue here. Ex. 1 ¶¶ 15-16; Ex. 2 ¶¶ 15-16; Ex. 3 at 31:16-24.  Dr. Kittendorf is thus undisputedly qualified.

Second, Dr. Kittendorf's testing is sufficiently reliable. As this Court has explained, "to satisfy the 'reliability' requirement, the expert testimony [must] be based on the methods and procedures of science, not on subjective belief and unsupported speculation." *Puma*, 723 F. Supp. 3d at 357. "The standard for reliability is not that high," and "[e]ach aspect of the expert's opinion

---

[2] Defendants' joint opening brief was simultaneously filed in C.A. No. 24-65-JLH as D.I. 351.

must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules." *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 81 (3d Cir. 2017). "Importantly, the rule does not require the party proffering the expert to demonstrate the 'correctness' of the expert's opinion." *Shire ViroPharma Inc. v. CSL Behring LLC*, No. 17-414, 2021 WL 1227097, at *4 (D. Del. Mar. 31, 2021). Rather, the party need only demonstrate the expert's opinion "bears adequate indicia of reliability." *Id.* Thus, where "the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility." *Id.*

There is no dispute on that score—HPLC is a well-established analytical technique that is predicated on the "methods and procedures of science, not on subjective belief and unsupported speculation." *Puma*, 723 F. Supp. 3d at 357; *see* Ex. 1 ¶ 26. "HPLC is often considered to be the gold standard in analytical technology due to its incredibly high resolution and accuracy." Ex. 4 at -903. Indeed, as Dr. Kittendorf explained, the FDA routinely requires and/or accepts HPLC testing for purposes of analyzing stability—the very issue the relevant claim limitation addresses. *See* Ex. 1 ¶ 30; Ex. 2. ¶ 30. To be sure, Apotex and Slayback both submitted HPLC methods that they represented to FDA generate accurate and reliable results *and* data from those techniques to support their requests for extended shelf lives for their Accused Products. *See* Ex. 5 at -614; Ex. 6; Ex. 7 at -648. In short, there is no dispute that Dr. Kittendorf utilized a sufficiently reliable scientific technique.

Nor is there any credible dispute as to the fit of Dr. Kittendorf's opinions. As this Court has explained, "the 'fit' requirement goes primarily to relevance and ensures that the evidence or testimony [helps] the trier of fact to understand the evidence or to determine a fact in issue." *Puma*, 723 F. Supp. 3d at 357. Here, as Defendants concede, "[a]ll claims-in-suit require total impurities

5

resulting from the degradation of the bendamustine . . . less than about 5% ***peak area response***, as determined by ***HPLC*** at a wavelength of ***223 nm***." D.I. 348 at 2. In short, the claims require both HPLC and peak area response. *Id.* This is precisely what Dr. Kittendorf tested and opines upon. Notably, none of Defendants' experts offer competing impurity measurements or independent evaluations of their products. As such, Defendants offer no true basis for excluding testing that actually measured the impurities in the Accused Products. Dr. Kittendorf's use of the parameters recited in the claims at the wavelength cited in the claims irrefutably fits with the relevant infringement inquiry. Again, Defendants do not contend otherwise. *See id.*, *passim.*

Whether Dr. Kittendorf "selected the appropriate test" or "validated" the transferred test method to Defendants' liking "is not a matter of admissibility, but of weight and credibility." *TQ Delta*, 373 F. Supp. 3d 509 at 527. *TQ Delta* is instructive. There, "Defendant disagree[d] with the value of [the expert's] tests," disputing "whether [he] selected the appropriate test or configured his test appropriately." *Id.* The court found the expert's "methodology to be reliable" despite the disagreement "as to the existence of standard industry testing," as "Defendant may challenge [the expert's] opinions through cross-examination and the presentation of contrary evidence." *Id.* So, too, here. Dr. Kittendorf used an undisputedly reliable testing methodology (HPLC), and whether that test should have been validated, or whether another test is more appropriate, are issues that Defendants can explore on cross-examination at trial. *See id.*

The same is true for Defendants' incorrect assertions that "there was no determination of accuracy" and that the "results are irrelevant" because not every impurity is identified. D.I. 348 at 3, 6. Dr. Kittendorf repeatedly explained the accuracy of the results of his testing, including that for each HPLC experiment that he conducted, he also ran a known bendamustine standard injection to determine the percent recovery of each sample, which he explained would be expected

6

to fall between 95 and 105 percent recovery—which it did.  *See, e.g.*, Ex. 1 ¶ 46; Ex. 2 ¶¶ 39, 50; Ex. 3 at 81:6-82:6, 168:14-24.  That standard injection step independently corroborates that Dr. Kittendorf used a reliable technique and obtained reliable results.  *See id.*

Defendants' argument regarding an alleged lack of impurity identification is also incorrect, misleading, and at most goes to weight.  D.I. 348 at 6 (arguing that Dr. Kittendorf "did not perform experiments to identify the analytes that he separated in his HPLC experiments and does not know what they are").  Dr. Kittendorf explained that he ***did*** identify four major bendamustine impurities, and that, in any event, his testing was "a comprehensive most-impurities-counted type of analysis."  Ex. 3 at 55:3-14, 60:25-61:9.  In other words, the amount of total impurities that Dr. Kittendorf measured in the Accused Products includes impurities from the degradation of the bendamustine and represents the ***upper limit*** of impurities.  Even if the unidentified impurities were not degradants of bendamustine (a position for which Defendants provide no evidence), that simply means that the measurement of impurities—which is already well below the claimed 5% limitation for both of Defendants' products—would be even lower.  *See* Ex. 1 ¶ 50; Ex. 2 ¶ 54.  That Defendants are unsatisfied with "the degree of relevance or accuracy" of Dr. Kittendorf's testing "may go to the testimony's weight, but not its admissibility."  *Shire*, 2021 WL 1227097, at *4.

Defendants' reliance on *Shire Development v. Cadila Healthcare* is misplaced.  The court in *Cadila* disregarded the testing results because one step in the expert's melting point experiment may have fundamentally changed whether the compound of interest was hydrated or not, which "is an important consideration in the melting point inquiry."  No. 10-581-KAJ, D.I. 453 at 34-35, ¶ 69 (D. Del. Sept. 16, 2016).  Here, there is no dispute that Dr. Kittendorf tested unchanged samples of the Accused Products and detected actual impurity peaks emerging from degradation of bendamustine in those samples.  *See* Ex. 1 ¶¶ 3-5; Ex. 2 ¶¶ 3-5; D.I. 348 at 1.  As discussed

above, the question of whether every single impurity peak is a specific degradant of bendamustine goes to the weight of evidence, not its admissibility. *See Daubert*, 509 U.S. at 596.

### B.    Dr. Kittendorf's HPLC Analysis Is Reliable

Given that Dr. Kittendorf's testing and opinions satisfy the minimum requirements for admissibility, Defendants' arguments at best go to "correctness" or "accuracy," which are issues for cross-examination. Defendants argue that "Dr. Kittendorf used a novel HPLC method" that required full validation. *See* D.I. 348 at 2-4. This is neither accurate nor relevant to admissibility. *Daubert* merely requires that an expert used a technique of science; there is no dispute that HPLC is a reliable technique for analyzing impurities. *See supra* at 5. Defendants cite no authority suggesting that an expert must perform testing to the level of an official FDA regulatory submission for that testing to be admissible in a patent infringement case.[3] *See* D.I. 348 at 3-4, 6-7. That is not the law—the *Daubert* inquiry simply requires that the opinions at issue be the product of "methods and procedures of science," not "subjective belief and unsupported speculation." *Puma*, 723 F. Supp. 3d at 357.

Defendants are wrong in any event. Despite their "novel" designation, Dr. Kittendorf did not develop a new HPLC method from scratch; he used methods predicated on Defendants' respective FDA-approved testing methods. As Defendants acknowledge, the only changes that Dr. Kittendorf made were to add another detection wavelength (223 nm) to their chosen wavelength and to use the claim's required peak area response quantitation method.[4] D.I. 348 at

---

[3] *Hollins v. Walmart Inc.* is inapposite. No. 2:19-cv-05526, 2021 WL 3748315 (C.D. Cal. Aug. 17, 2021). Not only is it not binding on this Court, it was also decided in an entirely distinct context: summary judgment on a preemption issue, involving food product labeling, which requires—by federal regulation—specific analysis for compliance. *See id.* at *1. That is plainly not the case here.

[4] Defendants allege Dr. Kittendorf used "a different column than the one specified in the validated Apotex method," but he explained the "difference" is a matter of form over function because the

8

3.    When a testing method, like the HPLC methods that Dr. Kittendorf used, is "related to established reliable methods," then "this is yet another factor that weighs in favor of a finding of reliability within the meaning of *Daubert*." *United States v. Trala*, 162 F. Supp. 2d 336, 348 (D. Del. 2001).

Notably, Dr. Kittendorf found that changing the wavelength alone did not meaningfully affect the results; they remained essentially the same. *See* Ex. 1 ¶ 51; Ex. 2 ¶ 51. Defendants offer no competing data to suggest otherwise. *See generally* D.I. 348. Instead, they raise one argument that changing the wavelength *could* affect absorption, requiring full re-validation. *See id.* at 3. Setting aside that this assertion is conclusory, spectulative, and unsupported, Dr. Kittendorf explained the nuances of HPLC method transfers, validation requirements, and wavelength variation effects in this specific case. *See* Ex. 8 ¶¶ 20-23, 35-40; Ex. 3 at 40:13-18, 67:13-22, 84:13-22, 85:15-17, 90:19-91:16. While Dr. Kittendorf acknowledged that the FDA would require Slayback, for example, to re-validate its method if it made material changes, Defendants ignore that Dr. Kittendorf ran the methods as Defendants' validated them and merely added an *additional* wavelength to his dual-wavelength detector. *See* Ex. 1 ¶¶ 33-46; Ex. 2 ¶¶ 34-50; Ex. 3 at 123:10-16. The peak area response issue merely involves how the *resulting data is quantitated*—not how the experiment is run. *See* Ex. 1 ¶ 47; Ex. 2 ¶ 51; Ex. 8 ¶ 33. And, in any event, the differences between the purpose of Dr. Kittendorf's testing in this case and the official, regulatory purpose of any testing that Defendants would submit to the FDA renders Defendants' criticisms simply issues for cross-examination. *See* Ex. 3 at 67:13-22, 90:19-91:16. Notably, Defendants do not suggest that 223 nm is itself an unreliable or irrelevant wavelength choice; nor could they—it is recited by

---

two columns are "essentially the same" given "[c]hemistry column dimensions, protocol size, [and] vendor recommendations." Ex. 3 at 174:8-175:4. This is more fodder for cross-examination.

the Asserted Claims.  In fact, Slayback's expert, Dr. Brian Smith, acknowledged that using any other wavelength is "irrelevant to the patent claims that require testing at 223 nm."  Ex. 9 ¶ 70 n.3.

Defendants' criticism about the use of the peak area response method is equally misplaced.[5] First, peak area response is a valid and common method to quantify impurities.  *See, e.g.*, Ex. 10 at -006, -007.  Second, the claims indisputably ***require*** "peak area response."  D.I. 348 at 2. Defendants argue that the assumption allegedly underlying Dr. Kittendorf's methodology (i.e., that all relative response factors are equal) "is demonstrably wrong,"  *id.* at 5, but Defendants admit both that (i) "peak area response" requires that the absorptivities, or response factors, "be the same for all analytes" and (ii) the claims require using "peak area response."  *Id.* at 2, 4.  Therefore, any criticism of Dr. Kittendorf's use of "peak area response" is irrelevant and misleading.  Again, Defendants advanced no validity argument based on either claim element, and their criticisms are entirely irrelevant.  Even if accepted, whether the results of Dr. Kittendorf's testing are "wrong" goes to weight, not admissibility.  *See, e.g.*, *Barry v. DePuy Synthes Cos.*, 164 F.4th 896, 912 (Fed. Cir. 2026) ("[T]he purported flaws the district court found in [the expert's] survey and methodology, go to the weight the jury might accord to that evidence and not to its admissibility."); *Willis Elec. Co. v. Polygroup Ltd.*, 166 F.4th 1363, 1373-74 (Fed. Cir. 2026) ("We previously explained the question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court."); *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 15-152, 2018 WL 4691047, at *4 (D. Del. Sept. 28, 2018) ("[W]here the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the

---

[5] Eagle moved to exclude Dr. Smith's opinions relating to the peak area response method because he fundamentally misunderstands the claim requirements. *See* D.I. 383.  To the extent Defendants rely on Dr. Smith's opinions for support, Eagle incorporates the arguments in that briefing here.

10

court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder.")).

Moreover, Dr. Kittendorf's testing protocols resulted in consistent and repeatable measurements. Specifically, he performed the experiments using three sample runs, all of which produced consistent results. Ex. 1, Tables B1-4; Ex. 2, Tables B1-4. Comparing his measurements to Defendants' own measurements submitted to FDA underscores there is no material difference in results. For example, Apotex's long-term stability data submitted to the FDA shows total impurities in the range of 0.29% to 0.42% at 36 months when measured at 254 nm, *see* Exs. 11-13, while Dr. Kittendorf measured the total impurities in Apotex's samples to be 0.46% at 254 nm and 0.79% at 223 nm. Ex. 1 ¶ 50. Any disagreement that Defendants may raise goes to weight, not admissibility.

### C.    Dr. Kittendorf's Opinions About The 15-Month Limitation Are Reasonable

Defendants contend that "Dr. Kittendorf identified no methodology that would allow a POSA to extrapolate testing data from a single time point to beyond 15 months." D.I. 348 at 6. That is irrelevant for purposes of whether his opinions are admissible under *Daubert* and Rule 702.

First, the *Daubert* inquiry does not concern the person of ordinary skill in the art, or POSA. Rather, the primary purpose of *Daubert* is to ensure that the ***jury*** is presented with relevant and reliable expert testimony. *Alcoa, Inc. v. Alcan Rolled Prods.-Ravenswood LLC*, No. 06-451, 2020 WL 433856, at *3 (D. Del. Jan. 28, 2020). Whether Dr. Kittendorf sufficiently described a method "that would allow a POSA to extrapolate testing data," D.I. 348 at 6, is both outside the scope of Dr. Kittendorf's role and irrelevant for the jury's consideration of the infringement issue.

Second, Dr. Kittendorf's "extrapolation" of testing results of Apotex's Accused Product at 13 to 15 months is reasonable in this context and stems from a proper and valid understanding of the science at hand. As a threshold matter, Dr. Kittendorf explained that testing precisely at 15

11

months was not feasible because of the samples Apotex produced and the case schedule.  Ex. 3 at 235:3-9.  Indeed, it took almost a year and a half from Eagle's initial request for samples to receive them, and those received were manufactured too recently to have been stored for the required time.  *See* Ex. 1 ¶ 52.  Defendants should not be permitted to improperly delay production of their product and then seek to exclude the resulting testing on the ground that it was performed slightly before the 15-month mark.

Moreover, as Dr. Kittendorf explained, the two-month difference between the testing point and the claim limitation is *de minimis* and immaterial from a scientific perspective.  Dr. Kittendorf's opinion that there is no meaningful difference in impurity levels expected between 13 and 15 months is supported by his education, training, and experience, as well as by Apotex's own stability data and specifications, which demonstrate that total impurities are no more than 1.9% throughout the product's 36-month shelf life.  *See* Ex. 14 at -962.  Because Dr. Kittendorf's measurements at 13 months (less than 1%) are far below both the 1.9% specification and the about 5% claim limitation, it defies reason to suggest that impurities would spike above 5% in the two months between testing and the 15-month limitation and then drop back below 1.9% by the next time point to ensure compliance with Apotex's FDA representations.  Indeed, Defendants offer no scientific basis to suggest that impurity levels could dramatically increase and decrease in the span of two months.  *See generally* D.I. 348.  None exists.

At bottom, Defendants' extrapolation argument is a factual dispute about the inferences to be drawn from reliable test data.  This is precisely the kind of issue reserved for cross-examination and jury determination, not exclusion at the *Daubert* stage.  *See Daubert*, 509 U.S. at 596.

## IV.    CONCLUSION

Eagle respectfully requests that the Court deny Defendants' *Daubert* motion to exclude Dr. Kittendorf's opinions and testing.

Dated: July 1, 2026


OF COUNSEL:

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
Michelle Chin
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
kenneth.schuler@lw.com
marc.zubick@lw.com
alex.grabowski@lw.com
michelle.chin@lw.com

Brett M. Sandford
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 9411
(415) 391-0600
brett.sandford@lw.com

Ramya Sri Vallabhaneni
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
ramya.vallabhaneni@lw.com

Kelly A. Welsh
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
kelly.welsh@lw.com

MCCARTER & ENGLISH, LLP

*/s/ Alexandra M. Joyce*
Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiffs*

13