**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>APOTEX INC., AND APOTEX CORP,<br><br>Defendants. | C.A. No. 24-64-JLH<br><br>**(CONSOLIDATED)**<br><br>**JURY TRIAL DEMANDED**<br><br>██████████████ |
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC.,<br><br>Defendants. | C.A. No. 24-65-JLH<br><br>**(CONSOLIDATED)**<br><br>**JURY TRIAL DEMANDED**<br><br>██████████████ |

**<ins>DECLARATION OF MATTHEW T. MESSINA IN SUPPORT OF
DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS EAGLE
PHARMACEUTICALS, INC. AND EAGLE SUB1 LLC'S
DAUBERT MOTION TO EXCLUDE
THE OPINIONS OF DEFENDANTS' EXPERT DR. DAVID BUGAY</ins>**

Neal C. Belgam (No. 2721)
Daniel A. Taylor (No. 6934)
SMITH KATZENSTEIN & JENKINS LLP
1000 N. West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

*Attorneys for Defendants*
*Slayback Pharma LLC and*
*Azurity Pharmaceuticals, Inc.*

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants*
*Apotex Inc. and Apotex Corp.*

Dated: July 1, 2026

I, Matthew T. Messina, declare as follows:

1.      I am an attorney with the law firm Katten Muchin Rosenman LLP and counsel to Defendants Apotex Inc. and Apotex Corp. (together, "Apotex") in the above-captioned matter. I make this declaration in support of Defendants' Brief in Opposition to Plaintiffs' *Daubert* Motion to Exclude the Opinions of Defendants' Expert Dr. David Bugay.

2.      Attached as **Exhibit 1** is a true and correct copy of excerpts of the Opening Expert Report of David E. Bugay, Ph.D., dated February 6, 2026.

3.      Attached as **Exhibit 2** is a true and correct copy of excerpts of the *Markman* hearing transcript in this matter, dated January 20, 2025.

4.      Attached as **Exhibit 3** is a true and correct copy of excerpts of the Reply Expert Report of David E. Bugay, Ph.D., dated April 17, 2026.


                       */s/ Matthew T. Messina*
                           Matthew T. Messina

1

EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>APOTEX INC., AND APOTEX CORP,<br><br>Defendants. | **HIGHLY CONFIDENTIAL<br>OUTSIDE ATTORNEY EYES ONLY**<br><br>C.A. No. 24-64-JLH |
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SLAYBACK PHARMA LLC,<br><br>Defendant. | C.A. No. 24-65-JLH |
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BAXTER HEALTHCARE CORPORATION,<br><br>Defendant. | C.A. No. 24-66-JLH |

**EXPERT REPORT OF DAVID E. BUGAY, PH.D., ON INVALIDITY
<u>ON BEHALF OF DEFENDANTS</u>**

*HIGHLY CONFIDENTIAL*
*OUTSIDE ATTORNEY EYES ONLY*

## I.    INTRODUCTION

1.    At the request of counsel for Apotex Inc. and Apotex Corp. (collectively "Apotex"), Baxter Healthcare Corporation ("Baxter") and Slayback Pharma LLC ("Slayback") (Apotex, Baxter and Slayback collectively "Defendants"), I hereby submit this Expert Report pursuant to Fed. R. Civ. P. 26(a)(2)(B) ("Report") regarding the invalidity of U.S. Patent No. 11,844,783 ("the '783 patent"), U.S. Patent No. 11,872,214 ("the '214 patent") and U.S. Patent No. 12,138,248 ("the '248 patent") ("the Asserted Patents").  I understand that Plaintiffs Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC ("Eagle" or "Plaintiffs") asserts claims 1-9 of the '214 patent and claims 1-11, 15, and 20 of the '248 patent ("the Asserted Claims")[1] against Defendants in this litigation.

2.    In this report, I provide my expert opinions on the invalidity of the Asserted Claims as anticipated under 35 U.S.C. § 102 and as obvious in view of the prior art under 35 U.S.C. § 103, as well as the relevant technical background.[2]

3.    For the reasons stated in this Report, in my opinion, the asserted claim including claims 1-9 of the '214 patent and claims 1-11, 15, and 20 of the '248 patent ("the Asserted Claims") are invalid, and therefore not infringed, for the reasons provided herein.  This Report provides the bases for my opinions, information considered by me in forming my opinions, my qualifications, and compensation for my services.

4.    If called upon to testify at trial, I expect to testify, *inter alia*, about the following:

---

[1] Plaintiffs' Final Infringement Contentions and Chart for Defendants, dated October 10, 2025, includes claims 1, 3 and 6-10 of the '783 patent, claims 1-9 of the '214 patent and claims 1-11, 15, and 20 of the '248 patent. *See* Plaintiff Eagle Pharmaceuticals, Inc.'s and Eagle Sub1 LLC's Final Infringement Chart for (i) Defendants Apotex Inc. and Apotex Corp., (ii) Baxter Healthcare Corporation and (iii) Slayback Pharma, Inc., each dated October 10, 2025, Exhibits 1, 2 & 3.  Eagle dropped the '783 patent from this case on January 30, 2026. *See* D.I., 304 Stipulation and [Proposed Order] of Dismissal U.S. Patent No. 11,844, 783, filed January 30, 2026. To the extent that Eagle amends or modifies or in any way changes its infringement contentions or charts as asserted against Apotex, I reserve the right to amend or supplement my opinions as presented in this case.

[2] I have not been asked to provide an opinion as to whether the Asserted Claims are invalid as indefinite or lacking written description or enablement, and nothing in my report should be construed as an admission that the claims are not invalid as indefinite or lacking written description or enablement.

*HIGHLY CONFIDENTIAL*
*OUTSIDE ATTORNEY EYES ONLY*

20.     I have previously been qualified, and testified, as an expert witness in the United States in the areas described above and in particular in the areas of pharmaceutical chemistry, formulation performance, analytical methods, stability studies, and polymorphism.

21.     As reflected by my education, research, and experience discussed above, and further reflected in my CV, I consider myself to be an expert in analytical chemistry, pharmaceutical chemistry, and performance testing of pharmaceutical formulations.

22.     I have reviewed the Asserted Patents, including the claims (asserted and unasserted) and each of the prosecution histories. The subject matter of the Asserted Patents is well within my expertise.

## IV.     MATERIALS CONSIDERED

23.     To the extent not referenced in this report, **Exhibit B** includes a list of materials I considered[3] in forming and providing my opinions in this report, in addition to my experience, education and training.  Included in this list are the Asserted Patents (which I reviewed in their entirety including all of the asserted and unasserted claims) and their associated file histories (which I also reviewed in their entirety). Throughout this report, I cite portions of these documents. These citations are intended only as examples, and I reserve the right to rely on any portions of these documents in addition to those cited in this report.

## V.     SUMMARY OF OPINIONS

24.     As discussed in detail in the following sections, it is my opinion that the Asserted Claims of the Asserted Patents are invalid as anticipated.

25.     It is also my opinion that the Asserted Claims of the Asserted Patents are invalid for obviousness.

---

[3] In addition, Exhibit B includes the named "Short Cites" for the references cited herein.

*HIGHLY CONFIDENTIAL*
*OUTSIDE ATTORNEY EYES ONLY*

240.    In addition, Claims 19-21 of Drager are specific to amounts or ranges that overlap with the asserted claim concentrations of bendamustine, including "about 5 mg/ml to about 200 mg/ml" (Claim 19), "about 5 mg/ml to about 120 mg/ml" (Claim 20), "at least about 5 mg/ml" (Claim 21).

### c.    "a pharmaceutically acceptable fluid consisting of polyethylene glycol"

241.    It is my understanding that during the claim construction hearing, counsel for Eagle informed the Court that the scope of the claims potentially included the use of additional pharmaceutically acceptable fluids not listed in the claims:

> THE COURT: So let me just ask you this: Can it have another pharmaceutically acceptable fluid in it that is not listed here? Is that your position?
>
> EAGLE'S COUNSEL: Again, I think it would depend on what it is, in what amount and at what function.

1/30/2025 Markman Hr'g. Tr. at 12:21-13:1. My opinions regarding anticipation are offered under the assumption that the claims allow for the use of additional fluids not expressly listed in the claims, based upon the arguments presented by Eagle during the claim construction process. With this assumption, it is my opinion that this element would be anticipated by Drager.

242.    Drager discloses "stable formulations of bendamustine can be obtained by mixing a polar aprotic solvent . . . with a non-aqueous polar protic solvent or mixture of nonaqueous polar protic solvents." Drager at p. 4, ll. 1-3. Thus, Drager expressly discloses liquid bendamustine-containing compositions containing a mixture of two "pharmaceutically acceptable fluids," one of which meets the claimed "pharmaceutically acceptable fluid." For example, Drager expressly discloses the use of polyethylene glycol as a pharmaceutically acceptable nonaqueous polar protic solvent. *Id.* at p. 4, ll. 1-9.

*HIGHLY CONFIDENTIAL*
*OUTSIDE ATTORNEY EYES ONLY*

337.    Indeed, Drager's first claim recites: "A liquid pharmaceutical formulation comprising bendamustine, or a pharmaceutically acceptable salt or prodrug thereof, and a polar aprotic solvent." Drager, at p. 14, ll. 1-3.

> **b.    "wherein the bendamustine concentration … is about 25 mg/ml."**

338.    This element is disclosed by Drager.

339.    Drager discloses liquid bendamustine-containing compositions having about 25 mg/mL of bendamustine within the disclosed ranges and referenced "about" concentrations of Drager. For example, Drager states "Preferably, the concentration of bendamustine, or a pharmaceutically acceptable salt thereof, ranges from about **5 mg/mL to about 120 mg/mL**. Preferred concentrations include about 5 mg/mL, *about 10 mg/mL, about 20 mg/mL, about 30 mg/mL,* about 40 mg/mL, about 50 mg/mL, about 60 mg/mL, about 100 mg/mL…." *Id.* at p. 7, ll. 17-20. Drager expressly discloses that the term "about" "is defined as +/- 5%. Accordingly, Drager discloses the claimed concentrations of bendamustine.

340.    In addition, Claims 19-21 of Drager are specific to amounts or ranges that overlap with the asserted claim concentrations of bendamustine, including "about 5 mg/ml to about 200 mg/ml" (Claim 19), "about 5 mg/ml to about 120 mg/ml" (Claim 20), "at least about 5 mg/ml" (Claim 21).

> **c.    "pharmaceutically acceptable fluid consisting of polyethylene glycol"**

341.    It is my understanding that during the claim construction hearing, counsel for Eagle informed the Court that the scope of the claims potentially included the use of additional pharmaceutically acceptable fluids not listed in the claims:

> THE COURT: So let me just ask you this: Can it have another pharmaceutically acceptable fluid in it that is not listed here? Is that your position?

127

*HIGHLY CONFIDENTIAL*
*OUTSIDE ATTORNEY EYES ONLY*

> EAGLE'S COUNSEL: Again, I think it would depend on what it is, in what amount and at what function.

1/30/2025 Markman Hr'g. Tr. at 12:21-13:1. Thus, to the extent that the claims allow for the use of additional fluids not listed in the claims, then it is my opinion that this element would be anticipated by Drager.

342.    Drager discloses "stable formulations of bendamustine can be obtained by mixing a polar aprotic solvent . . . with a non-aqueous polar protic solvent or mixture of nonaqueous polar protic solvents." Drager at p. 4, ll. 1-3. Thus, Drager expressly discloses liquid bendamustine-containing compositions containing a mixture of two "pharmaceutically acceptable fluids," one of which meets the claimed "pharmaceutically acceptable fluid." For example, Drager expressly discloses the use of polyethylene glycol as a pharmaceutically acceptable nonaqueous polar protic solvent. *Id.* at p. 4, ll. 1-9.

343.    Drager further discloses compositions containing "hydrophilic polymers (e.g., polyethylene glycols (PEG 300, PEG 400)". Drager, p. 8, ll.1-2. Thus, a POSA would further understand that Drager discloses Liquid bendamustine-containing compositions containing PEG as a hydrophilic polymer.

### d.    "a stabilizing amount of antioxidant"

344.    This element is disclosed by Drager.

345.    Drager expressly discloses Liquid bendamustine-containing compositions containing pharmaceutically acceptable antioxidants. *Id.* at p. 7, ll. 26-30. Indeed, Drager claims numerous liquid-bendamustine compositions comprising an antioxidant. *See*, *e.g.*, Claim 18 ("[t]he formulation of claim 1, further comprising a pharmaceutically acceptable antioxidant."); Claim 38 (claiming liquid pharmaceutical formulation comprising bendamustine, polyalkylene glycol and "**an antioxidant**, a surfactant, a lipid, a filler, an organic acid, a hydrophilic polymer,

128

*HIGHLY CONFIDENTIAL*
*OUTSIDE ATTORNEY EYES ONLY*

would have been motivated to make obvious modifications to the prior art bendamustine compositions disclosed in the prior art and arrive at the compositions recited in the Asserted Claims with a reasonable expectation of success. Accordingly, it is my opinion that there is no evidence of failure or others or copying sufficient to support any objective indicia of non-obviousness. I expressly reserve the right to respond to any such evidence or opinions offered by Eagle and/or its experts in rebuttal to this report.

461.    To the extent that Eagle relies on any additional or different evidence of secondary considerations, I reserve the right to respond to supplement and amend my opinions and report and address any such evidence.

## XV.    CONCLUSION

462.    For the reasons discussed above, it is my opinion that each of the Asserted Claims is invalid under 35 U.S.C. §102 and 35 U.S.C. §103. As such, for all the reasons above, it is my opinion that Claims 1-9 of the '214 patent, and Claims 1-11, 15 and 20 of the '248 patent, are each invalid as anticipated and for those reasons, not infringed by any of Defendants' Bendamustine NDA Products.  It is further my opinion that Claims 1-9 of the '214 patent, and Claims 1-11, 15 and 20 of the '248 patent, are each invalid as obvious and for those reasons, not infringed by any of Defendants' Bendamustine NDA Products.

## XVI.    MISCELLANEOUS

463.    I reserve the right to supplement my report in light of any additional fact discovery or opinions by Plaintiffs' experts. I also reserve the right to testify in rebuttal to the testimony of witnesses appearing for Plaintiffs in this case.

464.    If I testify at trial, I may rely on exhibits and visual aids to demonstrate the basis for my opinions, including animations, demonstratives, enlargements of actual exhibits, or other

*HIGHLY CONFIDENTIAL*
*OUTSIDE ATTORNEY EYES ONLY*

information as a tutorial and/or to illustrate my opinions. I have not yet prepared such exhibits or

visual aids but expect that I may do so.

Dated: February 6, 2026

_____
David E. Bugay

EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


EAGLE PHARMACEUTICALS, INC.,      )
                                  )
                Plaintiff,        )
                                  ) C.A. No. 24-64-JLH
v.                                )
                                  )
APOTEX INC. and APOTEX CORP.,     )
                                  )
                Defendant.        )
- - - - - - - - - - - - - - - - -
EAGLE PHARMACEUTICALS, INC.,      )
                                  )
                Plaintiff,        ) C.A. No. 24-65-JLH
                                  )
v.                                )
                                  )
SLAYBACK PHARMA LLC,              )
                                  )
                Defendant.        )
- - - - - - - - - - - - - - - - -
EAGLE PHARMACEUTICALS, INC.,      )
                                  )
                Plaintiff,        ) C.A. No. 24-66-JLH
                                  )
v.                                )
                                  )
BAXTER HEALTHCARE CORPORATION,    )
                                  )
                Defendant.        )


                                  J. Caleb Boggs Courthouse
                                  844 North King Street
                                  Wilmington, Delaware

                                  Thursday, January 30, 2025
                                  10:02 a.m.
                                  Markman Hearing


BEFORE:  THE HONORABLE JENNIFER L. HALL, U.S.D.C.J.

APPEARANCES:

    McCARTER & ENGLISH, LLP
    BY:  DANIEL M. SILVER, ESQUIRE
    BY:  WYLEY S. PROCTOR, ESQUIRE

        -and-

    LATHAM & WATKINS LLP
    BY:  DANIEL G. BROWN, ESQUIRE
    BY:  ALEX GRABOWSKI, ESQUIRE
    BY:  KELLY ANNE WELSH, ESQUIRE

           For the Plaintiff

    POTTER ANDERSON & CORROON LLP
    BY:  PHILIP A. ROVNER, ESQUIRE

        -and-

    DECHERT LLP
    BY:  MARTIN BLACK, ESQUIRE
    BY:  JUDAH BELLIN, ESQUIRE
    BY:  AMANDA K. ANTONS, Ph.D.
    BY:  NOAH M. LEIBOWITZ, ESQUIRE

           For the Defendant
           Baxter Healthcare

    MORRIS JAMES LLP
    BY:  CORTLAN S. HITCH, ESQUIRE

        -and-

    KATTEN MUCHIN ROSENMAN
    BY:  CHRISTOPHER B. FERENC, ESQUIRE

           For the Apotex Defendants

    SMITH KATZENSTEIN & JENKINS LLP
    BY:  DANIEL A. TAYLOR, ESQUIRE

        -and-

    WINDELS MARX
    BY:  JASON A. LIEF, ESQUIRE

           For the Slayback Defendant

So can it have another fluid in the product --

MR. SILVER:  I don't think --

THE COURT:  -- and still infringe?

MR. SILVER:  I don't think there's a per se prohibition on any other fluid.  And the reason I say that, Your Honor, again, if we go back and look at the claim, the element below the pharmaceutically acceptable fluid is a stabilizing amount of antioxidant.  There are well-known antioxidants that are in a fluid form that would be -- could be added to the composition.

And so I think what -- the question that Your Honor poses, I think gets to the heart of the issue.  But, really, it's more of an infringement issue because we have to look at a particular formulation, what's in it, in what amount.  What is the function of the various excipients that are in there.  And then assess does it fall within the scope of the claim or is it outside the scope of the claim?

And I think that's very common in cases, Your Honor.  From our perspective, just to put our cards on the table, these claim constructions are not in any way dispositive, in our view.  It is just a question of:  How are we going to convey it to the jury?  What do our experts need to do?  How can we present it in a way that's understandable?

Without, of course, any inability for Your Honor

to give the jury any necessary clarification in later instructions.

THE COURT:  So just to be -- and -- well, I'm going to give a clarification later.  I'm just going to tell you that right now.

MR. SILVER:  Okay.

THE COURT:  But what I'm hoping to work out today is:  What are the legal consequences of the way this claim is drafted?

Because I can give -- I can pick one or the other side for claim construction, but we're just going to be in the same issue where we're playing word games with the jury later.  And what I don't want to do is play word games.

So if I have to list a paragraph of a claim construction explaining exactly what this means, I'm fine doing that.  But we need to decide today legally what this means so we can move forward.

So that's where I'm coming from.  And I don't mean to catch you off guard, because I know you've split up the way the terms are being argued.

So let me just ask you this:  Can it have another pharmaceutically acceptable fluid in it that is not listed here?

Is that your position?

MR. SILVER:  Again, I think it would depend on

what it is, in what amount and at what function.

THE COURT:  Okay.

MR. SILVER:  Like if there's a molecule of water as an impurity, does that take it outside the scope of the claim?

THE COURT:  Put the impurity aside.  Say it's got ten percent -- well, I'm just trying to see what the metes and bounds of your argument are.

If it's got ten percent water in it, would that be in the claim or out of the claim?

MR. SILVER:  I would defer to Mr. Brown on that --

THE COURT:  Okay.

MR. SILVER:  -- Your Honor, because that's more the "consisting of" term.

THE COURT:  Okay.

MR. SILVER:  But I -- again, I think this probably, as with all claim constructions, then gets given to the experts.  And then there may be some dispute between them as to what -- you know, what's fair game and what's outside the scope of the claims.

So I don't know that we can get absolute precision today, and I don't know that it's fair to expect us at this fairly early stage of the case to draw firm lines in the sand when we haven't gotten samples of their

THE COURT:  Hi.  Please be seated.

Okay.  I've got some thoughts that I wanted to convey while everything is fresh in my mind, because I've got 300 other cases that need my attention and I'll forget. So I wanted to give you what I can give you today.

So, just at the outset, I don't think there's a reasonable debate that these claims are a mess.  I agree with counsel about that.  We have very, very skilled attorneys on both sides arguing, and I appreciated hearing from everyone today.  Everyone did the best that they could with these claims.  It is not counsel in this room's fault that the claims are the way they are, but they are a mess.

And so the question is:  What we're going to do about it?

So starting with Terms 1 and 2, everybody in this room knows what "consisting of" and "comprising" means. We all know that.  We've got proposed constructions from both sides, but neither clarifies what the real issue is here, which is:  How do these claim elements fit together.

And the mess we're in in this respect is compounded by the fact that the patent is internally inconsistent about what it means when it talks about a pharmaceutically acceptable fluid.

So I'll just say the record, here's where we found, things that seem to support the proposition that the

fluid, when it's referred to, includes additional things that aren't necessarily a solvent. So, for example, the abstract. We have the portion we talked about during the hearing today, which is Column 2, Line 65 to Column 3 to 5. We have Column 4, Lines 30 to 39. We have Column 5, Lines 36 to 46. We have Column 5, Lines 52 to 61. And we have Column 6, Lines 20 to 27.

And then we've also got portions of the patent where it talks about the stabilizer being a separate aspect or separate element. We've got Column 2, Lines 1 to 7. Column 4, Lines 45 to 53. Column 7, Lines 25 to 35. Column 8, Lines 26 to 34. And Column 9, Lines 15 to 19.

So what do we do about this?

I agree with Defendants, in the abstract, that you can't have in the product another fluid that is a pharmaceutically acceptable fluid that is not on the list and still infringe. I agree with them.

That said, I'm not willing to say, at this point, that a product that has, for example, liquid Vitamin E as an antioxidant doesn't infringe because it's a liquid. Because the patent claim expressly allows for an antioxidant as a separate element.

I think Plaintiff agreed today, and I think we all agree that there can't be another solvent system that's not on the list of pharmaceutically acceptable fluids. But

I'm not going to say that the use of an antioxidant, that someone might characterize as a solvent because it's capable of dissolving a solid, would take a product outside of the scope of the claims.

I'm not going to allow the jury to decide the issue of whether a substance is "unrelated to this element" or "unrelated to the invention."  That's not something that's within the province of the jury.

I think that impurities that are normally associated with a component are included in the scope of the term.  I think we all agree on that.  We just have a dispute about whether or not to tell it to the jury.

And so what do we take from all of this?  I think the only thing we can do is to ultimately give the jury a narrative that explains how the "comprising" and "consisting" elements fit together.  But it's premature for us to work on that until I understand what the parties' positions are.

And, of course, I understand that the Court is to construe claims without reference to the accused products.  But the Court also only needs to construe claim terms to the extent there's a dispute, and I don't have an understanding about what the dispute is here still.

And doing it right now or adopting one or the other's party's proposed constructions right now is just

going to invite word games in front of the jury. And I have no interest in doing that.

So the bottom line here is that we all know what comprising and consisting of are. Adopting one or the other side's proposals is not going to help. It's just going to invite word games later.

So what we're going to do is we're going to hear what the parties have to say about it at summary judgment. And then, to the extent there's a dispute about what to tell the jury, we will deal with it at the jury instructions.

So that's Terms 1 and 2.

So for Term 3, the Court agrees with Plaintiff. The Court can correct typographical errors if the correction is not subject to reasonable debate based on consideration of the claim language and the specification. And the prosecution history does not suggest a different interpretation of the claims. And I find that both of those factors are met.

The prosecution history shows that the correction is not subject to reasonable debate, as was discussed here at the hearing today. There was an original claim that claimed "from about 20 milligrams per mill to about 60 milligrams per mL and a dependent claim that claimed about 25 milligrams per mL." The claims were amended. It's clear from the prosecution history that the

patentee was incorporating the dependent claim "about 25 milligrams per mL," but just forgot to delete the "from."

It would be a different situation if the claim said more than about 25 and less than about 60 and just deleted the 60 part, but that's just not what happened here.

And, also, I note that "from about 25 milligrams per mL" doesn't make any sense in the context of the patent, and a person of skill in the art would understand that the word "from" was included accidentally during prosecution and needs to be deleted.

And that's all I had to say.

Is there anything else we need to address today?

MR. SILVER:  Nothing from Plaintiffs, Your Honor.  Thank you.

MR. BLACK:  Nothing from Baxter.  Nothing from the Defendants, Your Honor.

THE COURT:  All right.  It was great to see everyone.  Have a lovely weekend.

DEPUTY CLERK:  All rise.

(Court was concluded at 11:56 a.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Heather M. Triozzi
Certified Merit and Real-Time Reporter
U.S. District Court

EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>APOTEX INC., AND APOTEX CORP,<br><br>Defendants. | **HIGHLY CONFIDENTIAL<br>OUTSIDE ATTORNEY EYES ONLY**<br><br>C.A. No. 24-64-JLH |
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>SLAYBACK PHARMA LLC,<br><br>Defendant. | C.A. No. 24-65-JLH |
| EAGLE PHARMACEUTICALS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>BAXTER HEALTHCARE CORPORATION,<br><br>Defendant. | C.A. No. 24-66-JLH |

**REPLY EXPERT REPORT OF DAVID E. BUGAY, PH.D., ON INVALIDITY
<u>ON BEHALF OF DEFENDANTS</u>**

## I.    INTRODUCTION

1.      At the request of counsel for Apotex Inc. and Apotex Corp. (collectively "Apotex"), Baxter Healthcare Corporation ("Baxter") and Slayback Pharma LLC ("Slayback") (Apotex, Baxter and Slayback collectively "Defendants"), I previously submitted my Opening Expert Report on Invalidity ("Opening Report") in this matter. I have now reviewed the Rebuttal Expert Report of Dr. Elizabeth Topp, Ph.D. ("Topp Report" or "Rebuttal Report"), served on behalf of Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC ("Eagle" or "Plaintiffs"). I submit this Reply Expert Report ("Reply Report") in response to Dr. Topp's Rebuttal Report.

2.      After review of Dr. Topp's Rebuttal Report, my opinions as set forth in my Opening Report remain unchanged. Nothing in the Rebuttal Report undermines my conclusions that Claims 1–9 of U.S. Patent No. 11,872,214 ("the '214 patent") and Claims 1–11, 15, and 20 of U.S. Patent No. 12,138,248 ("the '248 patent") (collectively, "the Asserted Claims") are invalid as anticipated under 35 U.S.C. § 102 and as obvious under 35 U.S.C. § 103.

3.      This Reply Report addresses the new opinions raised in Dr. Topp's Rebuttal Report and is not intended to restate the entirety of my Opening Report, which I incorporate by reference. Rather, this Reply Report explains why Dr. Topp's criticisms are incorrect, incomplete, or based on flawed assumptions, and why the invalidity opinions set forth in my Opening Report remain sound.

4.      If called upon to testify at trial, I expect to testify about the matters discussed in this Reply Report, in my Opening Report, and in rebuttal to any opinions offered by Eagle's experts.

1

## II.   MATERIALS CONSIDERED

5.   In forming the opinions set forth in this Reply Report, I reviewed and considered the materials listed in Exhibit A to this Reply Report, Exhibit B to my Opening Report, as well as Dr. Topp's Rebuttal Report, dated March 16, 2026, and the materials cited therein.

## III.   LEGAL STANDARDS

6.   As stated in my Opening Report, I have been informed of the relevant legal standards governing invalidity, anticipation, and obviousness. *See* Opening Report, Section VI.

## IV.   PERSON OF ORDINARY SKILL IN THE ART ("POSA")

7.   I understand that Dr. Topp adopted the definition of a person of ordinary skill in the art ("POSA") with respect to different, but related, bendamustine patents in a different case. *See Eagle Pharms. Inc. v. Slayback Pharma LLC*, C.A. No. 21-1256-CFC (D. Del. Sept. 29, 2022); *see also Eagle Pharms., Inc. v. Slayback Pharma LLC*, No. 21-1256-CFC-JLH, 2022 WL 14460937 at *3 (D. Del. Oct. 25, 2022), *aff'd*, No. 2023-1110, 2024 WL 163341 (Fed. Cir. Jan. 16, 2024); *see* Topp Rebuttal Rep. ¶¶ 52–56. Dr. Topp noted that the definition of a POSA provided in my Opening Report is a similar definition. *See* Topp Rebuttal Report at ¶ 55. My opinions regarding the invalidity of the Asserted Claims do not change under the definition adopted by Dr. Topp in providing her opinions in this case.

## V.   SUMMARY OF OPINIONS

8.   Dr. Topp's Rebuttal Report does not change my opinions regarding the invalidity of the Asserted Claims. In summary, Dr. Topp's criticisms fail for the following principal reasons.

9.   First, Dr. Topp repeatedly mischaracterizes the disclosures of the prior art, including Drager, Olthoff, and the secondary references, by reading them in isolation and failing to consider them as a POSA would have understood them at the time.

2

10.     Second, Dr. Topp improperly narrows the scope of the prior art's teachings by, for example, demanding that Drager expressly pair PEG with an antioxidant in a single working example, rather than crediting the POSA with the ability to combine the express disclosures and claims within Drager itself and with the background knowledge available to a POSA.

11.     Third, Dr. Topp's arguments regarding the Olthoff/Kasraian combination ignore or dismiss the express teachings of Olthoff regarding the use of polyols, including polyethylene glycol, for liquid bendamustine formulations, and discount the POSA's background knowledge concerning the routine use of antioxidants to address oxidative degradation in PEG-based formulations.

12.     Fourth, Dr. Topp's secondary considerations opinions are unsupported, lack nexus, and do not overcome the obviousness established in my Opening Report.

13.     I address each of these below.

## VI.     DRAGER ANTICIPATES THE ASSERTED CLAIMS OF THE '214 AND '248 PATENTS

### A.  BENDAMUSTINE CONCENTRATION

14.     Dr. Topp opines that Drager does not disclose the claimed concentration of bendamustine (about 25 mg/mL) because Drager's preferred concentrations do not specifically list 25 mg/mL and because, in her view, Drager's disclosed range is insufficiently specific to anticipate. *See, e.g.*, Topp Rebuttal Report at ¶¶ 187–90. I disagree.

15.     As explained in my Opening Report, Drager discloses a preferred concentration range of "about 5 mg/mL to about 120 mg/mL" and lists "preferred concentrations" including about 20 mg/mL and about 30 mg/mL. Drager further defines "about" as "+/- 5%." *See, e.g.*, Opening Report at ¶¶ 129, 197, 238–40, 339. The claimed concentration of "about 25 mg/mL" falls squarely within Drager's disclosed range and between two expressly enumerated preferred

3

temperature, as well as at increased temperatures (50°C, 75°C, 130°C)" over extended periods. *See, e.g.*, *id.* at ¶ 159.

44.     Moreover, Olthoff's claims are directed to methods for producing "stable injection solutions" with specific concentrations for medical use, including for the treatment of leukemia. *See, e.g.*, *id.* at ¶¶ 156, 277, 280, 416.  A reference directed to producing stable injection solutions of a known anti-cancer compound for human medical use is not limited to "process convenience," as Dr. Topp suggests. Nothing in Olthoff states or implies that its liquid formulations were intended to be transient or unsuitable for clinical storage. Put simply, Olthoff provides the requisite information and motivation necessary to arrive at the claimed compositions with a reasonable expectation of success. As Dr. Topp readily admits, "the solubility work necessary to confirm and optimize PEG-only formulations falls squarely within the routine skill set of a POSA[.]" *See, e.g.*, Topp Rebuttal Report at ¶ 371.

## B.  OLTHOFF DISCLOSES PEG

45.     Dr. Topp opines that Olthoff does not teach PEG for use with bendamustine because Olthoff's working example uses propylene glycol and ethanol rather than PEG. *See, e.g.*, Topp Rebuttal Report at ¶ 242. I disagree.

46.     As explained in my Opening Report, Olthoff's claims are directed to dissolving N-mustard compounds in "an anhydrous monohydric or polyhydric alcohol (polyol)" at concentrations of 25 mg/mL to 100 mg/mL. *See, e.g.*, Opening Report at ¶ 443. It was well-known and understood at the time of the invention that "polyhydric alcohols" or "polyols" includes polyethylene glycol since the terminal hydroxyl groups make it function as a polyhydric alcohol. *See, e.g.*, *id.* at ¶ 279. Olthoff further discloses that bendamustine "exhibits sufficient solubility in monohydric alcohols, glycols, and other polyhydric alcohols." *See, e.g.*, *id.* Indeed, I understand

11

that the court in a prior litigation found as a factual matter that Olthoff disclosed PEG for use with bendamustine. *See, e.g.*, *id.*

47.    Dr. Topp's insistence that Olthoff does not teach PEG because its working example uses PG conflates a preferred embodiment with the full scope of the reference's disclosure. A POSA would not ignore the express claim language and broader disclosures of a reference simply because the working example used a different solvent from the same class.

48.    Moreover, Dr. Topp does not meaningfully respond to the prior court's findings that Olthoff expressly disclosed the use of PEG. *See, e.g.*, Topp Rebuttal Report at ¶ 244. Rather, Dr. Topp seems to suggest that Olthoff does not disclose a PEG-based bendamustine formulation that meets the impurity limitations of the Asserted Claims. *See, e.g.*, *id.* at ¶ 245. This opinion makes no sense and contradicts her opinion that "the solubility work necessary to confirm and optimize PEG-only formulations falls squarely within the routine skill set of a POSA[.]" *See, e.g.*, *id.* at ¶ 371. Olthoff sufficiently teaches the suitability of PEG for a liquid bendamustine formulation. A POSA would have been motivated to select and use PEG to develop a liquid formulation of bendamustine because, as Dr. Topp concedes, it was well within routine skill to do so.  Indeed, the specification suggests that a PEG-only liquid bendamustine composition did not readily degrade beyond 3% at room temperature after 15 days. *See, e.g.*, '214 Patent, Example 3. This is consistent with Olthoff's disclosure that PEG is suitable for use in a liquid bendamustine composition.

## C.  MOTIVATION TO INCLUDE AN ANTIOXIDANT

49.    Dr. Topp argues that a POSA would not have been motivated to include an antioxidant in a liquid bendamustine formulation, contending that (1) the secondary references relied upon in my Opening Report (Waterman 2002, Waterman 2008, Rowe 2006, Rowe 2009, and Kasraian 1999) provide only "generic" antioxidant teachings, (2) these references do not address

### G. ABSENCE OF SIMULTANEOUS INVENTION

95.     Dr. Topp notes that I did not opine in my Opening Report that the secondary consideration of "simultaneous invention" exists or otherwise shows the Asserted Claims would have been obvious. *See, e.g.*, Topp Rebuttal Report at ¶ 331. I disagree.

96.     The absence of an opinion regarding simultaneous invention in my Opening Report is not evidence of non-obviousness. Simultaneous invention is one of several potential secondary considerations, and its absence is not probative of the obviousness or non-obviousness of the claimed invention. The prior art case for invalidity does not depend on whether others independently developed the same formulation.

### XI.     CONCLUSION

97.     For the reasons discussed above and in my Opening Report, my opinions regarding the invalidity of the Asserted Claims remain unchanged. Dr. Topp's Rebuttal Report does not undermine the conclusion that Claims 1–9 of the '214 patent and Claims 1–11, 15, and 20 of the '248 patent are invalid as anticipated under 35 U.S.C. § 102 and as obvious under 35 U.S.C. § 103.

98.     Nothing in Dr. Topp's Rebuttal Report changes my opinion that the prior art—including Drager, Olthoff, Kasraian 1999, and the background references discussed in my Opening Report—discloses, teaches, or renders obvious each and every element of the Asserted Claims, and that a POSA would have been motivated to combine the prior art teachings with a reasonable expectation of success.

99.     Dr. Topp's secondary considerations evidence does not overcome the strong case of obviousness. The alleged objective indicia lack sufficient nexus to the claimed inventions and, in any event, do not outweigh the prior art's express disclosures, the POSA's background knowledge, and the predictable results of combining known elements using known techniques.

25

Dated:  April 17, 2026

_____
David E. Bugay