# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC, <br><br> Plaintiffs, <br><br> v. <br><br> APOTEX INC. and APOTEX CORP., <br><br> Defendants. | REDACTED PUBLIC VERSION FILED AUGUST 7, 2026 <br><br> C.A. No. 24-64-JLH (CONSOLIDATED) <br><br> **JURY TRIAL DEMANDED** <br><br>  |
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC, <br><br> Plaintiffs, <br><br> v. <br><br> SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC., <br><br> Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED) <br><br> **JURY TRIAL DEMANDED** <br><br>  |

**DECLARATION OF BRETT M. SANDFORD IN SUPPORT OF PLAINTIFFS EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB 1 LLC'S OPPOSITION TO DEFENDANTS' JOINT *DAUBERT* MOTION TO EXCLUDE THE OPINIONS OF PLAINTIFFS' DAMAGES EXPERT, DR. CHRISTOPHER VELLTURO**

I, Brett M. Sandford, declare as follows:

1.    I am an attorney at the law firm of Latham & Watkins LLP and counsel for Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC ("Eagle") in the above-captioned case.  I am admitted to practice before the Court *pro hac vice*.

2.    I make this declaration in support of Eagle's Opposition to Defendants' Joint *Daubert* Motion to Exclude the Opinions of Plaintiffs' Damages Expert, Dr. Christopher Vellturo.

3.    I have personal knowledge of the facts set forth in this declaration, and if called as a witness, could and would competently testify thereto.

4.    Attached as **Exhibit 1** is a true and correct copy of excerpts of the Expert Report of Christopher A. Vellturo, Ph.D., C.A. No. 24-cv-64, dated March 6, 2026.

5.    Attached as **Exhibit 2** is a true and correct copy of excerpts of the Reply Expert Report of Christopher A. Vellturo, Ph.D., C.A. No. 24-cv-64, dated April 13, 2026.

6.    Attached as **Exhibit 3** is a true and correct copy of excerpts of the Expert Report of Christopher A. Vellturo, Ph.D., C.A. No. 24-cv-65, dated March 6, 2026.

7.    Attached as **Exhibit 4** is a true and correct copy of excerpts of the Reply Expert Report of Christopher A. Vellturo, Ph.D., C.A. No. 24-cv-65, dated April 13, 2026.

8.    Attached as **Exhibit 5** is a true and correct copy of excerpts of the Deposition Transcript of Christopher A. Vellturo, Ph.D., C.A. No. 24-cv-65, dated April 28, 2026.

9.    Attached as **Exhibit 6** is a true and correct copy of excerpts of the Opening Expert Report of Dr. Bernhardt Trout, Ph.D., C.A. No. 24-cv-64, dated February 6, 2026.

10.    Attached as **Exhibit 7** is a true and correct copy of excerpts of the Opening Expert Report of Dr. Bernhardt Trout, Ph.D., C.A. No. 24-cv-65, dated February 6, 2026

11.      Attached as **Exhibit 8** is a true and correct copy of excerpts of the Expert Report of Dr. George Korenko, Ph.D., C.A. No. 24-cv-64, dated March 16, 2026.

12.      Attached as **Exhibit 9** is a true and correct copy of excerpts of the Deposition Transcript of Dr. George Korenko, C.A. No. 24-cv-64, dated May 26, 2026.

13.      Attached as **Exhibit 10** is a true and correct copy of excerpts of the Expert Report of James Malackowski, C.A. No. 24-cv-65, dated March 16, 2026.

14.      Attached as **Exhibit 11** is a true and correct copy of excerpts of the Deposition Transcript of James Malackowski, C.A. No. 24-cv-65, dated April 15, 2026.

15.      Attached as **Exhibit 12** is a true and correct copy of Production Document with Bates No. EAGLEBEN-SA_00375590.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: July 1, 2026                              */s/ Brett M. Sandford*
                                                  Brett M. Sandford

# EXHIBIT 1
# FILED UNDER SEAL
# REDACTED IN ITS ENTIRETY

# HIGHLY CONFIDENTIAL

# – CONTAINS HIGHLY CONFIDENTIAL INFORMATION OF APOTEX

# EXHIBIT 2
# FILED UNDER SEAL REDACTED IN ITS ENTIRETY

# HIGHLY CONFIDENTIAL

# – CONTAINS HIGHLY CONFIDENTIAL INFORMATION OF APOTEX

# EXHIBIT 3
# FILED UNDER SEAL

# HIGHLY CONFIDENTIAL – CONTAINS HIGHLY CONFIDENTIAL INFORMATION OF SLAYBACK

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1, LLC.,**<br><br>  **PLAINTIFFS,**<br><br><br><br> **V.**<br><br><br><br> **SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC.,**<br><br>  **DEFENDANTS.** | **C.A. NO. 24-65-JLH**<br><br>**(CONSOLIDATED)**<br><br>**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY** |

# EXPERT REPORT OF CHRISTOPHER A. VELLTURO, PH.D.

I.    OVERVIEW ..................................................................................................................... 1

      A.    QUALIFICATIONS AND EXPERIENCE ...................................................................... 1

      B.    STATEMENT OF ASSIGNMENT ................................................................................ 1

      C.    DOCUMENTS/MATERIALS CONSIDERED ............................................................... 2

      D.    EXHIBITS ............................................................................................................... 3

      E.    SUMMARY OF CONCLUSIONS ................................................................................ 3

II.   BACKGROUND ............................................................................................................... 7

      A.    RELEVANT ENTITIES ............................................................................................. 7

            1.    Eagle .......................................................................................................... 7

            2.    Teva ........................................................................................................... 8

            3.    Apotex ........................................................................................................ 8

            4.    Baxter ........................................................................................................ 9

            5.    Slayback ..................................................................................................... 9

      B.    CHRONIC LYMPHOCYTIC LEUKEMIA (CLL) ....................................................... 10

            1.    Symptoms ................................................................................................. 10

            2.    Treatments ................................................................................................ 12

      C.    NON-HODGKIN LYMPHOMA (NHL) .................................................................... 13

            1.    Symptoms ................................................................................................. 14

            2.    Treatments ................................................................................................ 15

      D.    OVERVIEW OF THE LIQUID BENDAMUSTINE MARKETPLACE ............................... 16

            1.    Bendamustine Dosage Formulations ....................................................... 16

            2.    Demand for Liquid Bendamustine Products ............................................ 17

            3.    Supply of Bendamustine Products ........................................................... 19

      E.    PHARMACEUTICAL INDUSTRY CONTEXT ............................................................ 23

            1.    Buy-and-Bill Procurement ....................................................................... 23

            2.    Insurance Coverage .................................................................................. 26

            3.    Generic Competition ................................................................................ 28

III.  THE ASSERTED PATENTS AND EAGLE'S INFRINGEMENT CLAIMS .................... 31

      A.    U.S. PATENT NO. 11,872,214 ("THE '214 PATENT") ......................................... 31

      B.    U.S. PATENT NO. 12,138,248 ("THE '248 PATENT") ......................................... 31

IV.   DAMAGES METHODOLOGY OVERVIEW .................................................................... 32

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

**V.     LOST PROFIT DAMAGES** ................................................................................................. **34**

    A.     *PANDUIT* FACTOR 1: DEMAND FOR THE PATENTED PRODUCTS ................................................ 34

    B.     *PANDUIT* FACTOR 2: ABSENCE OF NON-INFRINGING SUBSTITUTES .......................................... 38

    C.     *PANDUIT* FACTOR 3: MANUFACTURING/MARKETING CAPABILITY TO EXPLOIT DEMAND.............. 46

    D.     PANDUIT FACTOR 4: QUANTIFICATION OF LOST PROFITS ....................................................... 50

        1.     *Quantification of Lost Profits Attributable to Slayback's Infringement* ......................................... 50

        2.     *Summary* .......................................................................................................................... 65

**VI.     REASONABLE ROYALTY DAMAGES (IN THE ALTERNATIVE TO LOST PROFITS)** ............ **65**

    A.     OVERVIEW .......................................................................................................................... 65

    B.     INITIAL CONDITIONS AND PARAMETERS................................................................................ 67

        1.     *Date of Hypothetical Negotiation* ..................................................................................... 67

        2.     *Parties to the Hypothetical Negotiation* ............................................................................ 67

        3.     *Nature of the Hypothetical License* .................................................................................. 67

        4.     *Patent Validity, Enforceability, and Infringement* .............................................................. 68

        5.     *Full Information, Reasonable Foresight, and Consistency of Forecasts* ................................. 68

    C.     *GEORGIA-PACIFIC* FACTOR 15 .............................................................................................. 69

        1.     *Eagle's Minimum Willingness to Accept*........................................................................... 72

        2.     *Slayback's Maximum Willingness to Pay*.......................................................................... 73

        3.     *Conclusion: Georgia-Pacific Factor 15 Analysis*................................................................ 74

    D.     CONSIDERATION OF THE REMAINING *GEORGIA-PACIFIC* FACTORS ......................................... 74

        1.     ███████████████ .......................................................................................... 75

        2.     ███████████████ .......................................................................................... 79

        3.     *Georgia-Pacific Factor 1 Conclusion* ............................................................................... 79

    E.     CONCLUSIONS ON REASONABLE ROYALTY FOR THE ASSERTED PATENTS ................................ 98

    F.     COMPUTATION OF REASONABLE ROYALTY DAMAGES ........................................................... 99

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

## I. OVERVIEW

### A. Qualifications and Experience

1. I am the founder and president of Quantitative Economic Solutions, LLC, a microeconomic consulting firm. I received a Doctor of Philosophy degree (Ph.D.) in Economics from the Massachusetts Institute of Technology in Cambridge, Massachusetts in 1989. My fields of specialization include industrial organization and econometrics. My curriculum vitae, which lists my testimony for the last four years and my publications, is attached as Exhibit 1.

2. I have extensive experience in the valuation of intellectual property and in the assessment of economic injury/damages sustained as a result of copyright, trademark, and/or patent infringement. Industries that I have studied in this context include: pharmaceutical products, medical devices, over-the-counter medications and instruments, consumer products, computer hardware and software, semiconductors, and many others.

3. I have studied the pharmaceutical industry extensively and along a number of dimensions. From an intellectual property standpoint, I have analyzed patent infringement damages issues (including lost profits, price erosion, and reasonable royalties), commercial success and nexus, and irreparable harm. I have also studied the pharmaceutical industry in the context of merger reviews in the United States and abroad, in private antitrust actions, and in the context of contract disputes. I have previously served as an expert in damages assessment, economics generally, statistics/econometrics, and as an expert on the pharmaceutical industry in particular. In addition, I have designed licensing programs for patent holders on several occasions, including programs for intellectual property relating to pharmaceuticals.

### B. Statement of Assignment

4. I have been retained by counsel for Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC (collectively "Eagle" or "Plaintiffs") in connection with the above captioned litigation.[1] I have been asked to perform an economic analysis to assess the appropriate measure and quantum of damages to Eagle as a result of the infringement of claims 1-9 of U.S. Patent No. 11,872,214 ("the '214 patent") and claims 1-6, 8-11, 15, and 20 of U.S. Patent No. 12,138,248 ("the '248 patent")

---

[1] QES is being compensated for my time spent on this matter at an hourly rate of $1,250, which is my customary rate. Payment is not contingent on the outcome of this matter. QES is also compensated for the time spent on this matter by persons working at my direction. Those rates are lower than my hourly rate.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                                 1

14. **Lost Profits Damages.**  A reasonable hypothesis in situations where an incumbent pharmaceutical brand faces infringing competitive pharmaceutical products is that the supplier of the incumbent product may sustain harm in the form of "lost profits."  Such lost profits can be driven by two related dynamics.



- Factor 1 (demand for the patented product): ███████████████ ███████████████████████████████████ ███████████████████████

- Factor 2 (absence of acceptable non-infringing substitutes): ██████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████

- Factor 3 (manufacturing and marketing capacity): ███████████████ ████████████████████████████████████████ ████████████████████████████████████████

- Factor 4 (quantification of lost profits): █████████████████████ ███████████████████████████

16. Under Factor 4, my analysis of Eagle's aggregate lost profits ████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ █████████████████████████████████████

[4] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F. 2d 1152 (6th Cir. 1978).

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

17. ██████████████████████████████████████████████

██████████

- ██████████████████████████████████████████
  ████████████████████████

██████████████████████████████████████
████████████████████

██████████████████████████████████████
██████████████████

████████████████████████████
██████████████

████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████



18. **<u>Reasonable Royalty Damages.</u>**  In the event that the finder of fact determines lost profits should not be awarded, I have also undertaken a reasonable royalty damages assessment.  I understand reasonable royalty damages are generally assessed under the framework of a "hypothetical negotiation" at which the parties sit down on the eve of first infringement to negotiate a license via which the patentee grants rights to the infringer to practice the patent(s)-at-issue.  In the present case, I understand that the application of this framework yields ██████████ ████████████████████████████████████████████.  Under this framework, I evaluate the fifteen factors enumerated in *Georgia-Pacific Corporation v. United States Plywood Corporation* (the "*Georgia-Pacific* Factors").[7]

19. Under *Georgia-Pacific* Factor 15, the central focus of the hypothetical negotiation would be Eagle's expected sales and profits for Belrapzo and royalties associated with Bendeka that the Accused

---

[5] ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████

[7] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).



- ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████ This measure forms the bottom of the Edgeworth Box.

- ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████

20. ███████████████████████████████████ I assess the remaining *Georgia-Pacific* Factors to determine where relative to the bounds the reasonable royalty rate would fall. █
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████

21. Applied to Slayback's ████████████████████████████
████████████████████████████████████████████████
██████████████.

**Figure 2: Reasonable Royalty Damages Summary**
**Q1 2024 – Q3 2025**
*($ millions)*
*Source: Exhibits 7, 8*



22.   I discuss the bases for these opinions in the remainder of this report.  In Section II, I provide background relevant to my economic analyses, including about the present parties, relevant marketplace, and the pharmaceutical industry more broadly.  In Section III, I provide my understanding of the Asserted Patents and Eagle's infringement allegations.  In Section IV, I provide an overview of the framework for my damages analysis.  In Sections V and VI, I provide my lost profits and reasonable royalty damages assessments, respectively.

## II.   BACKGROUND

### A.   Relevant Entities

#### 1.   Eagle

23.   Eagle is a pharmaceutical company focused on critical care and oncology treatments.[8]  It is headquartered in New Jersey and has facilities and offices in Massachusetts and Indiana.[9]  Eagle became a publicly traded company on February 12, 2014.[10]

24.   Eagle's portfolio includes ███████████████████████████████████████ ██████  ███████████████:

- ████████████████████████████████████████████████████████
███████████████████████████████████.

███████████████████████████████████████████████████████████████
██████████████.

████████████████████████████████████████████████.

---

[8] EAGLEBEN-SA_00366636 at 636; EAGLEBEN-SA_00364462 at 468.
[9] EAGLEBEN-SA_00363514 at 542.
[10] EAGLEBEN-SA_00367201 at 201.
[11] EAGLEBEN-SA_00366641 at 641-642; EAGLEBEN-SA_00366638 at 638-639; EAGLEBEN-SA_00364462 at 468.
[12] EAGLEBEN-SA_00366641 at 641-642.
[13] EAGLEBEN-SA_00366641 at 641-642; EAGLEBEN-SA_00364462 at 468.
[14] EAGLEBEN-SA_00366641 at 641-642.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

61.    Belrapzo is available as a 100 mg/4 ml (or 25 mg/ml) ready-to-dilute intravenous solution and does not require reconstitution.[149]  Belrapzo's recommended dosage for CLL is "100 mg/m² administered intravenously over 30 minutes on Days 1 and 2 of a 28-day cycle, up to 6 cycles" and "120 mg/m² administered intravenously over 60 minutes on Days 1 and 2 of a 21-day cycle, up to 8 cycles" for NHL.[150]

### b.  Bendeka

62.    Bendeka is a bendamustine hydrochloride injection approved for the treatment of CLL and indolent B-cell NHL that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.[151]  Bendeka was approved by the FDA in December 2015.[152]

63.    Bendeka was developed by Eagle Pharmaceuticals.[153]  ████████████████████████ ████████████████████████████████████████ ██████████████████  Bendeka is currently distributed by Teva.[155]

64.    Bendeka is available in as a 100 mg/4 ml (25 mg/ml) ready-to-use intravenous solution formulation.[156]  Bendeka's recommended dosage is "100 mg/m² administered intravenously over 10 minutes on Days 1 and 2 of a 28-day cycle for CLL, up to 6 cycles" and "120 mg/m² administered intravenously over 10 minutes on Days 1 and 2 of a 21-day cycle, up to 8 cycles" for NHL.[157]

### c.  Treanda

65.    Treanda is a bendamustine hydrochloride product approved for the treatment of CLL and indolent B cell NHL that has progressed during or within six months of treatment with rituximab or a rituximab-containing regimen.[158]  Treanda is manufactured by Cephalon.[159]

---

[149] EAGLEBEN-SA_00368145 at 145; EAGLEBEN-SA_00057716 at 717.
[150] EAGLEBEN-SA_00364280 at 280.
[151] EAGLEBEN-SA_00364307 at 307.
[152] EAGLEBEN-SA_00364303 at 303, 306.
[153] EAGLEBEN-SA_00364303 at 303.
[154] EAGLEBEN-SA_00072300 at 301, 307-308, 325-326.  Teva acquired Cephalon in 2011.  *See,* EAGLEBEN-SA_00367601 at 601.
[155] *See, e.g.,* EAGLEBEN-SA_00368077 at 078.
[156] EAGLEBEN-SA_00364307 at 307.
[157] EAGLEBEN-SA_00364307 at 307.
[158] EAGLEBEN-SA_00364156 at 156.
[159] EAGLEBEN-SA_00368133 at 133.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

### C. *Georgia-Pacific* Factor 15[406]

179. As noted above, I begin my assessment of the *Georgia-Pacific* Factors with Factor 15. Before proceeding to the details of my analysis of Factor 15, I explain my general approach to analyzing this Factor and the impact of the circumstances of the present case on this analysis.

180.  As the licensor, the patentee would not be willing to accept less in royalties than the expected financial cost of granting such a license.[408] Correspondingly, as the licensee, the infringer would consider the royalties relative to the expected additional value it would have anticipated realizing as a direct result of having access to the invention taught by the patent(s)-in-suit. [409] Reasonable parties at the negotiating table would have considered these figures as important benchmarks in the likely outcome of their licensing negotiation. One can imagine that the lowest amount the patentee would accept could, in certain situations, be higher than the most the licensee would be willing to pay. This is particularly likely in situations where the presence of the licensee could generate price competition that would further harm the licensor's business. [410]

181. Indeed, ███████████████████████ in the case of a hypothetical negotiation between a patentee producer of a branded pharmaceutical and a manufacturer of an infringing generic equivalent is inherently complicated by the fact that the business model of the brand producer is, to a significant extent, based on its possession of patent protection for its products, while that of the generic manufacturer is, by definition, based on the absence of such protection. Brand producers seek to utilize patent protection to secure a return on their investments in research and

---

[406] This Factor is: "The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee - who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention - would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license."

[407] ████████████████████████████████████████████
█
█

[410] In general, this potential problem can be mitigated to some degree by the setting of a substantial per-unit royalty, which would factor into the licensee's incremental costs, and thus, its pricing decisions.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

development; to that end, they typically invest in promotion of the innovative products they commercialize for at least some period of time, and seek to maintain supra-competitive pricing at least as long as there is no available generic competitor.  Generic manufacturers generally compete on price relative to the branded product and other generic entrants, and do not typically invest in the promotion their products to physicians and consumers to the same degree.

182.  A simple thought experiment shows that, while generic manufacturers' products can be profitable, the overall profitability of a drug is greater when it is offered only as a branded product than when generic versions are introduced.  Brand manufacturers are free, if they choose, to implement a "generic" business model by abandoning promotion and cutting price; the fact that they do not do so implies that they have found that such a business model would be less profitable than their "brand" business model.  The existence of licenses granted by brand producers to generic manufacturers (including licenses involving Eagle and certain generic manufacturers discussed under Factor 1, below) does not contradict this conclusion, as such licenses are invariably granted under conditions of uncertainty regarding the validity, enforceability, and/or infringement of the brand producer's patents, not under the conditions of validity and infringement assumed here.

183.  One way of viewing a hypothetical negotiation between a patentee producer of a branded pharmaceutical and a manufacturer of an infringing generic equivalent is to conclude that the [REDACTED].  Another way of characterizing this situation is that the parties disagree over the nature of the licensed use of the patent(s)-in-suit: the generic manufacturer desires a license to sell a generic equivalent of the branded product, while the branded producer would only be willing to contemplate a possible license under which only the branded product continues to be marketed and sold, with the generic manufacturer being licensed to produce some of the branded units.  As an economic matter, such a license could be mutually acceptable only if the generic manufacturer has a cost advantage in manufacture and/or distribution.

184.  I understand that in such situations courts have upheld reasonable royalty damages awards in excess of the maximum the infringer would have been willing to pay for a license to the patents-

in-suit, and I have sought to compensate the patentee through the reasonable royalty. [411]
Following these principles, ███████████████████████████████████████
██████████████████████████████████████████████████████████████
███████████████████████████ I derive this royalty as the minimum dollars per unit Eagle would have charged Slayback for a license under which Eagle would be compensated for the specific impact described in Section V.D – i.e., the impact on Eagle's profitability due to its expected loss of unit sales to Slayback. Since this is the royalty Eagle would have required in order to be compensated for Slayback's continued infringing sales, it largely governs the remainder of my *Georgia-Pacific* analysis.

185. Under Factor 15, I also consider Slayback's maximum willingness to pay. First, I recognize that



186. I also note that, since the hypothetical negotiation would result in a royalty sufficient to compensate Eagle and that would not further degrade the branded price, I model the royalty rate in dollars per unit rather than as a percentage of net sales. I do this because a percentage royalty could not ensure Slayback would charge a price that would enable branded Belrapzo to price as it would in the absence of additional competitors (and thus compensate Eagle while allowing it to continue implementing its branded product pricing model).

---

[411] *Monsanto Co. v. Ralph,* 382 F.3d 1374 (Fed. Cir. 2004).

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

1. ██████████████████████████████████

187.  The minimum royalty Eagle would have been willing to accept at the hypothetical negotiation would be ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████

188.  ██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████

189.  ██████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████ ██████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

190.  ███████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████  Because the hypothetical negotiation is meant to reflect, to the extent reasonable, the parties' ex ante expectations, I first discount the profits Eagle would expect to lose to Slayback and Slayback's actual infringing units to the hypothetical negotiation date to account for time and uncertainty. █

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

---

412 ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

negotiation date.[413] ████████████████████████████████████

████████ ████████████████████████████████████████

████████████████████████████████████

191.  █████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████

### 2.  Slayback's Maximum Willingness to Pay

192.  From the perspective of Slayback, it is faced with the option of taking a license to the Asserted Patents and making its projected sales of the licensed product (Vivimusta), or forgoing all the incremental revenue/profits associated with doing so.  As a matter of economics, Slayback would therefore be willing to pay ████████████████████████████

193.  █████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████

███████████████

194.  █████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████-  ███████████████████████

███████████████████████████████████████████

---

[413] EAGLEBE-SA_00368131 at 131. ████████████████████████████
████████████████████████████████████████████.  ██████████
[414]  Exhibit 23.  ████████████████████████████████████
█████████████████████████████████████████████████
*see* Exhibit 14.
[415] SLAY-VIVMUS0226486.  ████████████████████████████

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



195. ███████████████████████████████████████

### 3. Conclusion: *Georgia-Pacific* Factor 15 Analysis

196. In Figure 14 below, I summarize my conclusions as to ██████████████████ ███████████████████████████████████████ ████████████. These form the boundaries of the Edgeworth Box.

**Figure 14: Hypothetical Negotiation ████████**
*Sources: Exhibits 22, 23*



| | |
|---|---|
| **Eagle Minimum Willingness to Accept per Unit** | ████ |
| **Slayback Maximum Willingness to Pay per Unit** | ████ |

197. In the next section, I evaluate the remaining *Georgia-Pacific* Factors to determine where relative to this starting point a reasonable royalty rate would most likely fall.

### D. Consideration of the Remaining *Georgia-Pacific* Factors

198. In this section, I consider the remaining *Georgia-Pacific* Factors in the context of the present hypothetical negotiation. In particular, I evaluate the relevant considerations raised under each

---

[416] *See* Exhibits 9, 23. ████████████████████████████ ██████████; *see, e.g.*, EAGLEBEN-SA_00363437.
[417] I understand ████████████████████████████████████████ ████████████████████. EAGLEBE-SA_00368131 at 131.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

Factor and whether they suggest any adjustment to the rates derived under my consideration of Factor 15 may be warranted.

**Factor 1: The royalties received by the patentee for the licensing of the patents-in-suit, proving or tending to prove an established royalty.**

199. I understand that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

1.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



201. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[418] *See, e.g.,* Plaintiffs Eagle Pharmaceuticals, Inc.'s and Eagle Sub1 LLC's Second Supplemental Objections and Responses to Slayback Pharma LLC and Azurity Pharmaceuticals Inc.'s Second Set of Interrogatories (No. 4), December 3, 2025, pp. 12, 47.

[419] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* EAGLEBEN-SA_00367601 at 601.

[420] EAGLEBEN-SA_00072300 at 300, 305; EAGLEBEN-SA_00367655; EAGLEBEN-SA_00366546 at 555-556.

[421] EAGLEBEN-SA_00072300 at 301. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* EAGLEBEN-SA_00072300 at 368-369; EAGLEBEN-SA_00364180.

[422] *See, e.g.,* EAGLEBEN-SA_00365443 at 474-476. *See also* EAGLEBEN-SA_00333070 at 070.

[423] EAGLEBEN-SA_00367662.

[424] EAGLEBEN-SA_00072300 at 307.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



202.

203.

---

425 EAGLEBEN-SA_00072300 at 305, 308; EAGLEBEN-SA_00364204 at 205; EAGLEBEN-SA_00364180 at 181.

426 EAGLEBEN-SA_00072300 at 312.

427 EAGLEBEN-SA_00072300 at 305, 360-362.

428 EAGLEBEN-SA_00367462 at 463; EAGLEBEN-SA_00367460 at 461.

429 *See* EAGLEBEN-SA_00072300 at 305, 360; EAGLEBEN-SA_00368093 at 093; EAGLEBEN-SA_00368106 at 106; Trout Opening Report, § 415.

430 EAGLEBEN-SA_00072300 at 325-326.

431 Trout Opening Report, § XV.

432 EAGLEBEN-SA_00072300 at 318, 321.



204.

205.

206.

207.

[433] EAGLEBEN-SA_00072300 at 330-331.
[434] *See, e.g.*, Eagle SEC Form 10-K (2017), pp. 18-19 (available at EAGLEBEN-SA_00365443 at 474-476).
[435] EAGLEBEN-SA_00072300 at 331.
[436] *See* EAGLEBEN-SA_0347562, EAGLEBEN-SA_00347565, EAGLEBEN-SA_00072401, EAGLEBEN-SA_00347573.
[437] EAGLEBEN-SA_0347562 at 562.
[438] EAGLEBEN-SA_00345611 at 784.
[439] EAGLEBEN-SA_00345611 at 785.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



208.

---

[440] EAGLEBEN-SA_00345611 at 790-791.
[441] EAGLEBEN-SA_00345611 at 785; EAGLEBEN-SA_00072300 at 303.
[442] EAGLEBEN-SA_00345611 at 790-791.
[443] EAGLEBEN-SA_00347565 at 565-566.
[444] EAGLEBEN-SA_00347565 at 566.
[445] EAGLEBEN-SA_00347573 at 573-574.
[446] EAGLEBEN-SA_00072401 at 401-402.
[447] EAGLEBEN-SA_00072401 at 401-402.
[448] Exhibit 10.
[449] Exhibits 10, 11.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



450 ███████████████████████ *see* Exhibit 11.
451 EAGLEBEN-SA_00333070 at 070.
452 EAGLEBEN-SA_00333070 at 070, 074-076, 078, 085, 091.
453 EAGLEBEN-SA_00333048 at 048.
454 EAGLEBEN-SA_00333048 at 048, 051-052, 055.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



216.

217.

218.

---

455 EAGLEBEN-SA_00072300 at 301.
456 EAGLEBEN-SA_00072300 at 301.
457 EAGLEBEN-SA_00072300 at 301.
458 ███████████████████████████████████████. EAGLEBEN-SA_00072300 at 366.
459 EAGLEBEN-SA_00072300 at 301.



219. ███████████████████████████████████████

220. ███████████████████████████████████████

[460] *See* Section II.D.3.
[461] EAGLEBEN-SA_00072300 at 321.
[462] EAGLEBEN-SA_00072300 at 322.

221.    ██████████████████████████████████████████

██████████████████████████████████████████████

--------

463 EAGLEBEN-SA_00366841 at 867.
464 EAGLEBEN-SA_00365311 at 403-404.  EAGLEBEN-SA_00366644 at 728-729, 733-734. █████████

see EAGLEBEN-SA_00365311 at 373-375.



222. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████

223. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

---

[465] Trout Opening Report ¶¶ 409-416.
[466] Trout Opening Report ¶¶ 409-416.
[467] Trout Opening Report ¶¶ 417-419.
[468] Trout Opening Report ¶¶ 417-419.
[469] Trout Opening Report ¶ 418.
[470] Trout Opening Report ¶ 420; EAGLEBEN-SA_00072300 at 366. ████████████████████████
████████████████████████████████████
[471] ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



224.

---

472 EAGLEBEN-SA_00072401 at 401-402.
473 EAGLEBEN-SA_00072401 at 401-402.
474 ████████████████████████████████████████████████████████████████████████. *See* Exhibits 7, 8.

**Factor 2: The rates paid by the licensee for the use of other patents comparable to the patent-in-suit.**

225. ██████████████████████████████████████████████████████████

██████████████████████████████████████████████ ████████████

███████████████████████████████████████

**Factor 3: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.**

226. ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██

227. ████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

**Factor 4: The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.**

228. ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████



[475] Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc's Fourth Supplemental Response to Plaintiff's Common Interrogatories (No. 7), November 4, 2025, pp. 3, 27.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY



**Factor 5: The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are the inventor and promoter.**

231. Slayback's Vivimusta is a product that directly competes with Belrapzo and Bendeka in the liquid bendamustine marketplace.  As such, Slayback and Eagle have a competitive commercial relationship at the hypothetical negotiation.  As discussed above, ████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ █████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████ █████████████████████████████████████████████ ███████████████████████████████████████████ ██████████████████████████████



**Factor 14: The opinion testimony of qualified experts.**

265. ██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██

**E. Conclusions on Reasonable Royalty for the Asserted Patents**

266. At the outset of my *Georgia-Pacific* analysis, I evaluated Factor 15. As discussed, I found that
██████████████████████████████████████████████████████████
████████████████████████████████████████████

267. Under my consideration of the remaining *Georgia-Pacific* Factors, I find that most factors called for
██████████████████████████████████████████████. Further I find that

---

[536] *Compare* Exhibits 9, 14. *See also* Mathew Deposition, pp. 148-149.

[537] ██████████████████████████████████████████████████████████
████████████ *See* Exhibit 22-A.

████████████████████████████████████████████████████████████

████████████████████████████

268.  To determine the reasonable royalty rate per unit the parties would have agreed to, I refer back to the results of my Edgeworth Box analysis.  Given ████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████  I reserve the right to update these amounts to reflect supplemental data production if asked to do so and in accordance with the Court's schedule.[539]

**F.  Computation of Reasonable Royalty Damages**

269.  As shown in Exhibit 21, ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████  ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████.  I report these results in Exhibit 8.

---

[538] ██████████████████████████.  *See* Exhibits 7, 8.

[539] Additionally, I reserve the right, if requested by the Court or finder of fact, to calculate and offer an opinion regarding an appropriate post-verdict ongoing royalty.

[540] ████████████████████████████████████████████████████████
████████████████████████████  *See* Exhibit 22-A.

[541] Exhibit 7.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

March 6, 2026

Christopher A. Vellturo, Ph.D.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

100



**Highly Confidential - Attorneys' Eyes Only**

quantitative economic solutions, LLC

**Highly Confidential - Attorneys' Eyes Only**

quantitative economic solutions, LLC

**Highly Confidential - Attorneys' Eyes Only**

**q**uantitative **e**conomic **s**olutions, LLC



**Highly Confidential - Attorneys' Eyes Only**

**q**uantitative **e**conomic **s**olutions, LLC



Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only

quantitative economic solutions, LLC

**Highly Confidential – Attorneys' Eyes Only**                Page 1 of 3                quantitative economic solutions, LLC



**Highly Confidential – Attorneys' Eyes Only**                     Page 3 of 3                     **q**uantitative **e**conomic **s**olutions, LLC



**Highly Confidential – Attorneys' Eyes Only**

**q**uantitative **e**conomic **s**olutions, LLC

# EXHIBIT 4
# FILED UNDER SEAL

# HIGHLY CONFIDENTIAL – CONTAINS HIGHLY CONFIDENTIAL INFORMATION OF SLAYBACK

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1, LLC., <br><br> PLAINTIFFS, <br><br><br> V. <br><br><br><br> SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC., <br><br> DEFENDANTS. | C.A. NO. 24-65-JLH <br><br> (CONSOLIDATED) <br><br> HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY |

# REPLY EXPERT REPORT OF CHRISTOPHER A. VELLTURO, PH.D.

I.    OVERVIEWS ..................................................................................................................... 1

    A.    QUALIFICATIONS AND EXPERIENCE ........................................................................ 1

    B.    STATEMENT OF ASSIGNMENT ................................................................................... 1

    C.    DOCUMENTS/MATERIALS CONSIDERED .................................................................. 2

    D.    EXHIBITS ................................................................................................................. 2

    E.    SUMMARY OF CONCLUSIONS .................................................................................. 2

II.    OVERVIEW OF MR. MALACKOWSKI'S REPORT ........................................... 6

III.    REPLY TO MR. MALACKOWSKI'S REPORT ..................................................... 9

    A.    MR. MALACKOWSKI IMPROPERLY EXPANDS THE "RELEVANT MARKET" .................. 9

    B.    MR. MALACKOWSKI UNDERSTATES EAGLE'S LOST PROFITS ................................. 16

        1.    Mr. Malackowski's Agrees that Panduit Factors 1 and 3 are Met .................. 16

        2.    Mr. Malackowski's Consideration of Panduit Factor 2 .................................. 16

        3.    Mr. Malackowski Understates Eagle's Lost Profits Under His Scenario A ...... 19

        4.    Mr. Malackowski Understates Eagle's Lost Profits Under His Scenario B ...... 21

        5.    Mr. Malackowski Improperly Disregards Price Erosion ................................. 22

    C.    MR. MALACKOWSKI'S CRITIQUES OF MY QUANTIFICATION OF LOST PROFITS DAMAGES ARE WRONG ............ 24

        1.    Mr. Malackowski Incorrectly Claims That I "Improperly Exclude[] Powder Bendamustine Products" ................................. 24

        2.    Mr. Malackowski's Claim That my "Lost Profits Opinions are Defective and Unreliable" is Wrong and Unsupported ...... 24

        3.    Mr. Malackowski Incorrectly Claims That Vivimusta Did Not Cause Belrapzo and Bendeka Price Erosion .................... 26

    D.    MR. MALACKOWSKI IGNORES DAMAGES RELATED TO THE BLUE OWL AGREEMENT ......................................... 28

    E.    MR. MALACKOWSKI'S REASONABLE ROYALTY ASSESSMENT ................................. 29

        1.    Mr. Malackowski's Cost Approach ................................................................. 29

        2.    Mr. Malackowski's Income Approach .............................................................. 33

        3.    Mr. Malackowski's Market Approach .............................................................. 33

        4.    Mr. Malackowski's Consideration of the Georgia-Pacific Factors .................. 45

        5.    Mr. Malackowski's ████████████████████ .................................................... 56

    F.    MR. MALACKOWSKI'S INCORRECT CRITIQUES OF MY REASONABLE ROYALTY ANALYSIS ................................... 57

        1.    Mr. Malackowski's Critiques of my Edgeworth Box Analysis Are Flawed ...... 57

        2.    Mr. Malackowski's Critiques Regarding My Evaluation of License Agreements ................................. 59

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

## I. OVERVIEWS

### A. Qualifications and Experience

1. I am the founder and president of Quantitative Economic Solutions, LLC, a microeconomic consulting firm. I received a Doctor of Philosophy degree (Ph.D.) in Economics from the Massachusetts Institute of Technology in Cambridge, Massachusetts in 1989. My fields of specialization include industrial organization and econometrics. My curriculum vitae, which lists my testimony for the last four years and my publications, is attached as Exhibit 1. I also provide more information about my background and experience in Section I to my Opening Report.

### B. Statement of Assignment

2. I have been retained by counsel for Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC (collectively "Eagle" or "Plaintiffs") in connection with the above captioned litigation.[1] I previously submitted an expert report in this case, dated February 6, 2026 ("Vellturo Opening Report" or "my Opening Report")[2] in which I was asked to perform an economic analysis as to the damages sustained by Eagle due to Defendants' Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.'s (collectively "Defendants" or "Slayback") infringement of claims 1-9 of U.S. Patent No. 11,872,214 ("the '214 patent") and claims 1-6, 8-11, 15, and 20 of U.S. Patent No. 12,138,248 ("the '248 patent") (collectively, the "Asserted Patents"). Specifically, I understand that Eagle alleges that Slayback infringes the Asserted Patents via their making, using, selling, and offering for sale of Slayback's FDA-approved liquid bendamustine product ("Vivimusta," the "Accused Product," or "Slayback's liquid bendamustine product").[3]

3. On March 16, 2026, Slayback served expert reports including from Mr. James Malackowski (the "Malackowski Report").[4] In his report, Mr. Malackowski responded to certain opinions in my Opening Report. In this reply report, I respond to the opinions in the Malackowski Report.

---

[1] QES is being compensated for my time spent on this matter at an hourly rate of $1,250, which is my customary rate. Payment is not contingent on the outcome of this matter. QES is also compensated for the time spent on this matter by persons working at my direction. Those rates are lower than my hourly rate.

[2] On March 6, 2026, I submitted a supplemental opening report which primarily (1) updates certain footnotes to add Bates numbers for publicly available documents; and (2) adds citations to certain deposition testimony and exhibits that were not available as of the date of my original report (February 6, 2026). I did not change any opinion in my supplemental report. For ease of reference in this report, I collectively refer to this supplemental report and my original report as "my Opening Report" and the "Vellturo Opening Report" as paragraph and section numbers remained unchanged between both reports.

[3] EAGLEBEN-SA_00364331 at 331, 334.

[4] Expert Report of James Malackowski, March 16, 2026.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

15. With respect to reasonable royalty damages, Mr. Malackowski opines that the parties would agree to a ███████████████ of net sales of Vivimusta. Mr. Malackowski purports to arrive at this rate by implementing the Cost Approach, Income Approach (although he does not compute a royalty rate under this approach), and Market Approach. ███████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████ Mr. Malackowski's assessment fails to compensate Eagle for the impact from continued competition with Slayback, and the resulting impact on Eagle's profits. None of the royalty rates that he considers properly accounts for this competitive harm, and his approaches suffer from significant additional flaws.

16. First, under his Market Approach, Mr. Malackowski relies on █████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████. His analysis also ignores my understanding that the Asserted Patents are relatively more valuable than other patents licensed in the ███████

███████████████

17. To corroborate the ███ per-patent royalty rate he derived from the ██████████████████████, Mr. Malackowski assesses eight third-party agreements and, ultimately, relies on the royalty rate from two of them: (1) 2006 Chen-Bridgetech Agreement, and (2) 2013 Johns Hopkins-Signpath Agreement.[5] These agreements are radically different from the license resulting from the hypothetical negotiation. Mr. Malackowski ignores the technical comparability requirement and fails to establish economic comparability. Even if comparability were established, Mr. Malackowski undertakes no analysis to adjust for the differences between the hypothetical license and these agreements or to assess the value of the Asserted Patents relative to any of the patents licensed in the third-party agreements.

18. ███████████████████████████████████████████████████████████████ ███████████

███████████████████████████████████████████████████████████████ ███████████.

---

[5] I understand that Eagle is filing a motion to preclude Mr. Malackowski from relying on these eight third-party agreements because they were not produced during fact discovery or otherwise disclosed in response to Eagle's Interrogatory No. 7.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████

19.   Mr. Malackowski also assesses the *Georgia-Pacific* Factors, but fails to explain how his conclusions on each Factor affect the royalty rates from his Market and Cost Approaches.  He concludes his assessment of each Factor by noting whether it would favor the licensor (Eagle) or licensee (Slayback) but does not explain how it would impact the royalty rate(s) from his approaches. Further, his evaluation of the *Georgia-Pacific* Factors discounts the competitive dynamics underlying the hypothetical license, resulting in understated reasonable royalties to Eagle.

20.   Mr. Malackowski's criticisms of my reasonable royalty assessment are also without merit.  Many of his criticisms are the same critiques leveled at my lost profits analysis and thus fail for the same reasons.  Mr. Malackowski also makes several criticisms specific to my reasonable royalty analysis, including:

- Mr. Malackowski criticizes the bounds on my ████████████████, claiming that my willingness to accept metric inherits the same alleged flaws from my lost profits analysis.  As I discuss in this report, Mr. Malackowski's criticisms of my lost profits analysis lack merit.  He also criticizes my ███████████ analysis by arguing that I fail to apportion my reasonable royalty benchmarks, but he fails to show any further incremental apportionment is required.

- Mr. Malackowski asserts that I should have used the ████████████████████ ████████████████████████████ and that I fail to apportion the royalty rate I rely on. However, Mr. Malackowski ignores that the royalty rate that would exist as of the hypothetical negotiation (and presently) is ██████████████████████ ████████████████████████████████████████ ██████████████████████ including the contributions from the Asserted Patents. And, as explained in my Opening Report, I understand the Asserted Patents provide most of the value attributable to the intellectual property licensed in the ███████████████

- Mr. Malackowski faults me for not considering third-party agreements.  Such an analysis was not necessary because there is an undisputedly comparable license to which Eagle is a party that covers the Asserted Patents: the ██████████████████████.  Further, the third-

party agreements that Mr. Malackowski relies on are not economically or technically comparable to the hypothetical negotiation license for the Asserted Patents.

- Mr. Malackowski claims that I fail to consider ████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████

21.   In sum, the various assertions and critiques in Mr. Malackowski's report lack merit.  They do not alter my opinion that Eagle is entitled to damages in the form of lost profits totaling ████████ ██████████████████████████████████████████████ █████████████████████ I discuss the bases for these opinions in the remainder of this report.[7]

## II.    OVERVIEW OF MR. MALACKOWSKI'S REPORT

22.   Mr. Malackowski's stated assignment was to "analyze certain accounting, financial, economic, marketing, and other business information to determine the measure and amount of damages due Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC."[8]  He begins by summarizing certain facts and law that he claims are relevant to assessing damages in this case.[9]  Then, Mr. Malackowski presents his affirmative lost profits and reasonable royalty damages estimates.

23.   For lost profits, Mr. Malackowski performs calculations under two scenarios: Scenario A, where "the market is limited to liquid bendamustine products," and Scenario B, where "the market includes both liquid and powder formulations of bendamustine."[10]

24.   Under Scenario A, Mr. Malackowski largely adopts my lost profits methodology but diverges in two significant ways.  ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██ ██████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████

---

[6] Vellturo Opening Report, § I.E.
[7] Vellturo Opening Report, Figure 13, ¶ 269.
[8] Malackowski Report, p. 3.
[9] Malackowski Report, §§ 1-7.
[10] Malackowski Report, p. 42.
[11] Malackowski Report, §§ 8.2, 8.3.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

████████████████████████████████████ ████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████ ██████████████████████████████████████████████████████

████████████████████████████████████████

30. With respect to lost profits based on ███████████, Mr. Malackowski claims that I "improperly" grouped Vivimusta with Baxter's and Apotex's liquid bendamustine products[23] because "Vivimusta had little, if any, influence on the pricing of Belrapzo or Bendeka."[24]

31. With respect to lost profits based on the ████████████████, Mr. Malackowski argues that Slayback's alleged infringement was not the reason that Eagle executed the ████████████████. He also claims that I ignored ██████████████████████████████████████ ████████████████████████████████████████

32. <mark>Finally, Mr. Malackowski expresses several disagreements with my reasonable royalty opinions. First, while he agrees the</mark> ████████████████████ <mark>is a comparable license, Mr. Malackowski claims that I used the wrong royalty rate and also failed to apportion the royalty rate.[26] He also contends that both the</mark> ██████████████████████████████████ ██████████████████████████████████████ ████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████ █████████████████████████████████████ ████████████████████████████████████████

---

[20] Malackowski Report, p. 80.
[21] Malackowski Report, § 12.2.2.
[22] Malackowski Report, § 12.2.4.
[23] Malackowski Report, § 12.3.2.
[24] Malackowski Report, § 12.3.1.
[25] Malackowski Report, § 12.4.4.
[26] <mark>Malackowski Report, § 12.5.1.</mark>
[27] <mark>Malackowski Report, pp. 94-95.</mark>
[28] <mark>Malackowski Report, pp. 94-95.</mark>

device an acceptable substitute," because a product "which lacks the advantages of the patented product can hardly be termed a substitute acceptable to the customer who wants those advantages."[84] Thus, it remains my opinion and understanding that non-bendamustine treatments for CLL and NHL are not acceptable substitutes for Belrapzo.

52. Second, I disagree with Mr. Malackowski's assertion that powder bendamustine products are acceptable non-infringing alternatives to Belrapzo. As explained above, Mr. Malackowski ignores that these products are not "acceptable" alternatives because they require reconstitution before administration and lack the benefits of the patented liquid bendamustine products. Here, too, Mr. Malackowski does not cite to an alternative understanding responding to the opinions of Drs. Attia and Ashraf or the principle of economic revealed preference, all of which show that powder bendamustine is not an acceptable substitute for Belrapzo.

53. Lastly, as noted above, the evidence presented by Mr. Malackowski at best indicates a limited degree of competition between liquid and powder bendamustine products. Even accepting Mr. Malackowski's claim that these products compete (which I do not), that is not sufficient to determine that one is an acceptable alternative for the other.[85]

54. As discussed in Section III.A above, Mr. Malackowski's characterization of the "but-for" marketplace is overly broad. The evidence, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Mr. Malackowski fails to adequately respond to this evidence.[88]

55. In sum, none of Mr. Malackowski's opinions lead me to change my finding that *Panduit* Factor 2 is met because there are no available and acceptable non-infringing alternatives to Belrapzo.

---

[84] Vellturo Opening Report, ¶ 116; *Standard Havens Products, Inc., v. Gencor Industries,* Inc., 953 F.2d 1360 (Fed. Cir. 1992), citing *TWM Mfg. Co., Inc. v. Dura Corp.,* 789 F.2d 895, 901, 229 USPQ 525, 529 (Fed. Cir. 1986).

[85] Vellturo Opening Report, ¶ 116; *Standard Havens Products, Inc., v. Gencor Industries,* Inc., 953 F.2d 1360 (Fed. Cir. 1992), citing *TWM Mfg. Co., Inc. v. Dura Corp.,* 789 F.2d 895, 901, 229 USPQ 525, 529 (Fed. Cir. 1986).

[86] *See, e.g.*, Mathew Deposition, pp. 114-119, Exhibit 14. *See also* Mathew Deposition, pp. 120-125, Exhibit 15.

[87] Section III.A; Vellturo Opening Report, ¶ 155-157.

[88] Malackowski Report, § 8.1.2.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY                                                                18

parameters as those I analyzed to assess economic comparability in my Opening Report, and they do not change my opinions on comparability or on Mr. Malackowski's flawed Market Approach.[169]

        **a.** ████████████████████████

100.   As discussed in my Opening Report, the ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████

101.   Mr. Malackowski analyzes the ████████████████████████████████ ████████████████████████████████████ ████████████ ████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████.

102.   Mr. Malackowski's analysis is incomplete, and he overlooks several key components of the ████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████

      ■  ████████████████████████████████████ ████████████████████████

      ■  ████████████████████████████████████ ████████████████████████████████

      ■  ████████████████████████████████████ ████████████████████

---

[169] *See, e.g.*, Vellturo Opening Report, ¶¶ 206-230.

[170] Malackowski Report, § 10.3.2.

[171] This ████████████████████ were not directly related to the validity, enforceability, or infringement of the Asserted Patents.  EAGLEBEN-SA_00072300 at 366.  *See also* Vellturo Opening Report, ¶ 223.

[172] Vellturo Opening Report, ¶ 226.

[173] I also note that, the hypothetical license has a presumption of validity and infringement of the Asserted Patents, but the Eagle-Cephalon Agreement does not require such an assumption.  Mr. Malackowski appears to acknowledge this difference, but as with all the other factors present in the Eagle-Cephalon agreement that would exert downward pressure on the Eagle-Cephalon royalty rate, Mr. Malackowski does nothing with this fact.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

103. Mr. Malackowski also relies on the ███████████████████████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████ ███ ████████████ ████████████████████████████████ and would be the informative rate the parties would consider to determine comparable royalty benchmarks.

104. Further, █████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████ ██ ███████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████████.

105. In addition, as specified above, the █████████████████████ ████████████████████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████ █ Mr. Malackowski does not account for the impact of this on his royalty rate estimate.

106. Because Mr. Malackowski did not address or attempt to account for any of the additional value to Eagle or ██████████████████████████████████████

[174] Vellturo Opening Report, ¶¶ 229-230.
[175] *See, e.g.,* EAGLEBEN-SA_00375256; EAGLEBEN-SA_00374833.
[176] Vellturo Opening Report, ¶ 221.

███████████████████████████████████████████████████

████████████ Mr. Malackowski undertakes further assessment of the ████████████ under *Georgia-Pacific* Factor 1, which I address below in my response to his *Georgia-Pacific* analyses.

### b. Third-Party Agreements

107. Mr. Malackowski considers eight "potentially comparable" third-party agreements that he obtained from databases, which he then limits to two third-party agreements: (1) the 2006 Chen-Bridgetech Agreement, and (2) the 2013 Johns Hopkins-Signpath Agreement. Mr. Malackowski then evaluates these two agreements for comparability to the hypothetical license, concludes they are comparable, and opines that the royalty rates in each of these agreements corroborate his ultimate ████████████████████████████████████.[177]

108. I disagree with Mr. Malackowski that these third-party agreements would be informative at the hypothetical negotiation.[178] These third-party agreements would not be considered at the hypothetical negotiation because they are neither economically nor technically comparable to the hypothetical license to the Asserted Patents. As discussed in detail below, these agreements do not pertain to the facts of this case, do not relate to the technology at issue, and do not involve either party to the hypothetical negotiation.

109. Further, Mr. Malackowski's search parameters for finding these third-party agreements shows that they are divorced from the facts of this case. For example, Mr. Malackowski used broad search parameters such as "Oncology" and "Formulation," which are much broader than the specific technology at issue in this case: bendamustine (liquid bendamustine, in particular). This lack of filtering rigor caused him to identify agreements that are far removed from the facts of this case.

110. Even if these third-party agreements were sufficiently comparable, Mr. Malackowski fails to compare the value of the Asserted Patents to the value of their licensed patents and applications. Nor does he consider the profitability of the products commercialized under these agreements or any other commercial considerations that would have undergirded the negotiation of those agreements.

---

[177] Malackowski Report, § 3.3.
[178] I understand that Eagle is filing a motion to preclude Mr. Malackowski from relying on these eight third-party agreements because they were not produced during fact discovery or otherwise disclosed in response to Eagle's Interrogatory No. 7.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

negotiation. Thus, given that his starting point is unreliable, Mr. Malackowski's conclusions from the *Georgia-Pacific* Factors are also flawed and unreliable.

147. Further, when assessing the *Georgia-Pacific* Factors, Mr. Malackowski does not provide any quantitative or qualitative incremental adjustments to his baseline royalty rates from the Market or Cost Approach. In other words, Mr. Malackowski does not actually analyze the factors relative to his starting range or evaluate whether a given factor puts upward or downward pressure *relative to* his baseline rate(s). Instead, he analyzes the *Georgia-Pacific* factors in a vacuum, simply determining whether each factor favors the licensee or licensor, and ultimately concluding that his "evaluation" ▮▮▮▮▮▮▮▮▮▮▮▮[226] without actually explaining why that is true or what it means for a Factor to favor a licensee or licensor as it applies to his royalty rates from the Market and Cost Approaches. This further highlights that Mr. Malackowski's reasonable royalty assessment is unreliable and provides no meaningful insight into how the parties to the hypothetical negotiation would have negotiated the reasonable royalty for a license to the Asserted Patents.

> **Factor 1: The royalties received by the patentee for the licensing of the patent-in-suit, proving or tending to prove an established royalty.**

148. Under Factor 1, Mr. Malackowski summarizes his conclusions from his Market Approach and makes additional observations. I address each in turn below.

149. Mr. Malackowski asserts the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ – are not related to the Asserted Patents.[227] Specifically, he states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ I disagree.

150. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[226] Malackowski Report, § 11.2.
[227] Malackowski Report, § 11.1.1.
[228] Malackowski Report, § 11.1.1.

151. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████ There is no indication in this provision that █████████████████

███████████████████ as Mr. Malackowski claims.  Notwithstanding, from an economics

perspective, ██████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████.

152.  Next, Mr. Malackowski allegedly apportions ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████  As discussed below,

this approach is fundamentally flawed, unreliable, and not tied to the facts of this case.

153.  First, Mr. Malackowski provides no basis for assuming that ███████████████████

███████████████████  He neither relies on technical input nor cites any evidence to

support his assumption.  Mr. Malackowski's assumption is inconsistent with my understanding

that each claim covers a different invention and, thus, all else equal, one invention will be more

valuable than another. ██████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████  His assumption is also inconsistent with the

---

[229] *See, e.g.,* EAGLEBEN-SA_00375590.
[230] Malackowski Report, § 11.1.1.
[231] *See, e.g.,* EAGLEBEN-SA_00376523 at 526. ████████████████

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

facts of this case.  For example, my understanding from Dr. Trout is that the Asserted Patents are

███████████████████████████████████████████████████████████████████████████████████████

154.  Second, as I explain in the previous section, Mr. Malackowski does not consider the impact of the

████████████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████  I incorporate by reference

my discussion of these factors into this section.

> **Factor 3: The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.**

155.  Mr. Malackowski concludes that the ████████████████████████████████████████████

██████████████████████████████████████████████████  I disagree.

156.  As an initial matter, this is an example of Mr. Malackowski analyzing a *Georgia-Pacific* factor in a vacuum instead of as an incremental consideration relative to his own starting range and conclusions from the Market and/or Cost Approach.  In other words, he does not explain what it means that this factor "favor the licensee" or how that impacts his reasonable royalty benchmarks.  Thus, his conclusion from this Factor (and for his other *Georgia-Pacific* Factors that supposedly favor one party over the other) is conclusory and vague.

157.  Nonetheless, as I explain in my Opening Report, the ████████████████████████████

████████████████████████████████████████████████████████████████████████████████████████

██[3]  Even if Mr. Malackowski were correct that this factor would "tend to favor the licensee" at the hypothetical negotiation, my ultimate opinions would not change.

> **Factor 5: The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are the inventor and promoter.**

158.  Mr. Malackowski does not opine that Eagle and Slayback are not competitors in the marketplace.  Nor could he.  As discussed in my Opening Report, and throughout this reply report, there is

---

[232] Malackowski Report, § 11.1.3.
[233] Vellturo Opening Report, ¶ 227.

significant evidence showing that Eagle and Slayback directly compete in the liquid bendamustine marketplace.

159.   A competitive commercial relationship typically places an upward pressure on the royalty rate in the hypothetical license.  Indeed, Mr. Malackowski concludes that, in this case, Factor 5 will tend to favor the licensor (Eagle) in the hypothetical negotiation.[234]  While I agree that Factor 5 will favor Eagle at the hypothetical negotiation, Mr. Malackowski understates the degree of upward impact.

160.   Mr. Malackowski claims that ███████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████ █ ████████████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████████████████████████████████████
█████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████
███████████████████████████████████████████████████████
█████████████████████████████████████████ █ █████████████
███████████████████████████████████████████████
████████████████████████████ █ ████████████████████████████
███████████████████████████████████████████████████
█████████████████████████████████████████████████████
██████████ █ ████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████
████████████████████████

[234] Malackowski Report, § 11.1.5.
[235] Malackowski Report, § 11.1.5.
[236] Section **Error! Reference source not found.**.
[237] Malackowski Report, § 11.1.5.
[238] Section III.A.

161.   As with the other Factors, Mr. Malackowski fails to adequately explain how ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████

162.   Further, because his reasonable royalty rate is incorrectly bounded by his royalties from his Market and Cost Approaches, Factor 5 should tell Mr. Malackowski that his benchmark royalties are understated and do not sufficiently compensate Eagle for the competitive impact from granting Slayback a license to the Asserted Patents.  Indeed, his Market and Cost Approaches do not account for ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████    Thus, under Mr. Malackowski's various approaches, Eagle would be left worse off than if it did not grant the license to Slayback.  He does not explain why a rational, profit-maximizing company would be willing to accept less in royalty fees than the expected cost of granting a license (in this case, the profits lost to a competitor).  They would not.

> **Factor 9: The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.**
>
> **Factor 10: The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.**

163.   Mr. Malackowski concludes that these Factors would "tend to favor the licensee" (here Slayback).[239]  I disagree.[240]

164.   Mr. Malackowski asserts that he is "aware of no record evidence that the formulations change bendamustine's mechanism of action, clinical efficacy, or dosing.  The active ingredient, dose, and

---

[239] Malackowski Report, §§ 11.1.9, 11.1.10.

[240] I note that Mr. Malackowski does not cite a technical expert to support several of his understandings, although I note that he relies on Dr. Brandt in other areas of his report.

HIGHLY CONFIDENTIAL — ATTORNEYS' EYES ONLY

### 2. Mr. Malackowski's Critiques Regarding My Evaluation of License Agreements

188. Mr. Malackowski's next set of critiques relate to my assessment of the licenses I discuss under *Georgia-Pacific* Factors 1 and 12, as well as critiques concerning my lack of consideration for certain agreements. I discuss these below.

189. First, Mr. Malackowski faults me for purportedly failing to properly apportion the royalty rate from ████████████████████████████████ I disagree. As I explain in my Opening Report, I understand from Dr. Trout that ████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████ ████████████████████ In contrast, Mr. Malackowski did not rely on any technical input to analyze this agreement. Further, in my Opening Report, I noted the difference in intellectual property granted between the hypothetical license and ████████████ ████████ as one factor that would exert downward pressure on the royalty rate for the hypothetical license. I also accounted for this difference in my Opening Report by explaining that this downward pressure is offset by the numerous factors that would exert significant upward pressure on the royalty rate for the hypothetical license, which suggest that reliance on the observed rate as a proxy for the reasonable royalty rate would be appropriate and conservative.

190. Further, ██████████ agreed to ████████████████████ ████████████████████████████████████ ██████████ However, to be conservative, I ultimately do not ████████████████. In addition, the royalty rate that I derive ████████████████████████ ████████████████████████████████ ████████████ Eagle would still not be fully compensated for the competitive harm a license to Slayback would cause.

191. Mr. Malackowski also claims that I should have used the ████████████████ ████████████ I disagree. As I explain above, the royalty rate

---

[268] Malackowski Report, § 12.5.1.
[269] Vellturo Opening Report, ¶ 222.
[270] Vellturo Opening Report, ¶ 223.
[271] Malackowski Report, § 12.5.1.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

192.  Next, Mr. Malackowski criticizes my conclusion that ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████  But Mr.

Malackowski does not purport to analyze, and certainly does not conclude, that any of these

agreements are comparable.  In any event, I disagree with his opinions.  As I previously explained,

██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████.

193.  ██████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████

194.  Mr. Malackowski also faults me for not considering third-party agreements, stating that "[r]oyalty

rates that are customary in the pharmaceutical industry for formulary technologies are not limited

to those reflected in license agreements entered by Eagle."[273]  This criticism is unfounded for

several reasons.  First, as I explain elsewhere in this report, ███████████████████████  is a

---

[272] Malackowski Report, § 12.5.2.
[273] Malackowski Report, § 12.7.

comparable license that provides insight as to the royalty rate the parties would consider when negotiating a license to the Asserted Patents. Thus, I had no reason to consult third-party agreements, particularly where, as here, the agreements I allegedly ignored have no bearing on the facts of this case. Second, Mr. Malackowski's criticism is ███████████████████████ ███████████████████████ in response to Eagle's Interrogatory No. 7 regarding damages. Third, third-party agreements (which Mr. Malackowski assumes would be called for under Factor 12) can only be probative to the reasonable royalty if they are sufficiently comparable to the hypothetical license. As discussed in Section III.E.3.b above, I have seen no evidence that such agreements exist, and the third-party agreements that Mr. Malackowski relies on are not economically or technically comparable to the hypothetical license. Thus, they would not be informative at the hypothetical negotiation.

195. In sum, I disagree with Mr. Malackowski's reasonable royalty opinions, which do not alter my reasonable royalty opinions. Nor do his opinions change my ultimate conclusion that Eagle and Slayback would have agreed to a reasonable royalty rate of █████████, which corresponds with the █████████████████████████████████, and that in no event would the parties agree to a royalty rate lower than the ██████████████████████████████ ████████ ██████████████████████████████████████████████████ ████████████████████████████

---

[274] Vellturo Opening Report, ¶ 268.
[275] Vellturo Opening Report, ¶ 269, Exhibit 7.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

April 13, 2026

Christopher A. Vellturo, Ph.D.

HIGHLY CONFIDENTIAL —
ATTORNEYS' EYES ONLY

# EXHIBIT 5
# FILED UNDER SEAL

# HIGHLY CONFIDENTIAL – CONTAINS HIGHLY CONFIDENTIAL INFORMATION OF SLAYBACK



**Planet Depos**
We Make It *Happen*™

<span style="color:red">**CONFIDENTIAL**</span>

# Transcript of Christopher A. Vellturo, Ph.D.

**Date:** April 28, 2026
**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Slayback Pharma/Azurity Pharma

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

CONFIDENTIAL

Transcript of Christopher A. Vellturo, Ph.D.
Conducted on April 28, 2026

1 (1 to 4)

**Page 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - x

EAGLE PHARMACEUTICALS,        :

INC., and EAGLE SUB 1 LLC,    :

       Plaintiff,           : Case No.

    v.                      : 1:24-CV-00065-JLH

SLAYBACK PHARMA LLC and        :

AZURITY PHARMACEUTICALS,       :

INC.,                          :

       Defendants.             :

- - - - - - - - - - - - - - x

          * DESIGNATED CONFIDENTIAL *

       REMOTE VIDEOTAPED DEPOSITION of

       CHRISTOPHER A. VELLTURO, Ph.D.

          Tuesday, April 28, 2026

             7:38 a.m. CST

Job No.: 630608

Pages: 1 - 132

Stenographically Reported By:

Michelle M. Yohler, CSR, RMR, CRR

**Page 2**

Videotaped deposition of CHRISTOPHER A. VELLTURO, Ph.D., held remotely pursuant to notice before Michelle M. Yohler, a Certified Shorthand Reporter, Registered Professional Reporter, Registered Merit Reporter, Certified Realtime Reporter, CSR No. 84-4531, in and for the State of Illinois.

**Page 3**

         A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

    MR. BRETT M. SANDFORD

    LATHAM & WATKINS, LLP

    505 Montgomery Street, Suite 2000

    San Francisco, California 94111-6538

    415.391.0600

    brett.sandford@lw.com

ON BEHALF OF THE DEFENDANTS:

    MR. DANIEL E. FORCHHEIMER

    WINDELS MARX LANE & MITTENDORF

    180 Park Avenue

    Florham Park, New Jersey 07932-1054

    973.966.3284

    dforchheimer@windelsmarx.com

ALSO PRESENT:

    Kate Derwin, Technician

    Dan Lohaus, Videographer

**Page 4**

          E X A M I N A T I O N S

WITNESS                                      PAGE

CHRISTOPHER A. VELLTURO, PH.D.

    By Mr. Forchheimer........................    6


          E X H I B I T S

EXHIBITS                                     PAGE

No. 1    Expert Report of Christopher A.

         Vellturo, Ph.D......................    23

No. 2    Opening Report Exhibits.............    27

No. 3    Reply Expert Report of

         Christopher A. Vellturo, Ph.D.......    28

No. 4    Reply Report Exhibits...............    28

No. 5    Eagle Q1 2023 Oncology POA March

         22, 2023 Slide Deck

         EAGLEBEN-SA_00344611 to 344762......    47

No. 6    Eagle Oncology NSM:  Day 1 March

         5, 2024 Slide Deck

         EAGLEBEN-SA_00344400 to 344610......    58

No. 7    Spreadsheet

         EAGLEBEN-SA_00002385................   106

CONFIDENTIAL

Transcript of Christopher A. Vellturo, Ph.D.
Conducted on April 28, 2026

28 (109 to 112)



royalties owed right and --

Q Understood.

A Yeah.

MR. FORCHHEIMER: I'm going to move on to a new topic, so can we maybe take a break?

THE VIDEOGRAPHER: Stand by. We are now going off the record. The time is 10:33 a.m.

(WHEREUPON, a recess was had.)

THE VIDEOGRAPHER: We are now going back on the record. The time is 10:42 a.m.

BY MR. FORCHHEIMER:

Q Welcome back. Dr. Vellturo, I want to talk and move on to your reasonable royalties opinions.

Correct me if I'm wrong, but I believe you opine that



**113**

Q Understood. But I'm just -- I'm asking -- strike that.

Do you understand that the

A Yes.

Q

**115**

Q

**114**

**116**

CONFIDENTIAL

Transcript of Christopher A. Vellturo, Ph.D.
Conducted on April 28, 2026

30 (117 to 120)





121

[REDACTED]

Q Did you look at any third-party license agreements that you deemed either comparable or not comparable in connection with your opinions?

A Well, I certainly review the licenses that are available in a case, but when I have [REDACTED]

Having received Mr. Malackowski's report, I went back and looked at the two licenses that he deemed as comparable, and in my reply report, I provide a laundry list of reasons why they're not.

Q When you saw that Mr. Malackowski relied on those two license agreements, were you able to obtain those license agreements from a database?

A I believe so. I think I saw them. Or at least I saw a version of them.

Q Okay. But you would -- you retrieved them

122

yourself or your team retrieved them?

A That's my understanding, yes.

Q And do you have access to the databases that Dr. -- that Mr. Malackowski identified that he searched for -- searched for these license agreements?

A Yeah, my -- I'm familiar with those databases. They're subscription-based, and I think -- I think we have a subscription to them.

Q Are those -- are those something that you regularly -- strike that. I'm mumbling a little bit.

Are those databases databases that you regularly use in your course of serving as an expert --

A No.

Q -- in patent cases?

A No, I use them in situations like this where people do searches like the one I just -- I described, and I usually use this to, you know, understand where that came from. But as an affirmative approach in a litigation context, I really don't use those databases.

With one -- with one small exception; sometimes I'll use them to try and unpack what the

123

structure of licenses look like, whether they are lump-sum or running royalty and the like, but that's about it.

And I didn't use them for that here because I have the existing agreement.

Q Sorry. My dog is making noise if you hear that.

A I don't want multiple questioners so...

Q I'll do my best. Give me one second.

If you can turn to your expert report Exhibit 22.

A Yes.

Q And this is titled: [REDACTED]

Q And this is -- am I correct that this document or this page shows how you calculated your [REDACTED] per unit?

A Yes.

Q Okay. And if you look at Lines 1 and 2 in this chart, you have at the "Total" column for Belrapzo lost profits, you have [REDACTED]

124

that right?

A I see those numbers, yes.

Q Where did those numbers come from?

A [REDACTED]

Q And that's your lost profits analysis?

A Right.

Q [REDACTED]

CONFIDENTIAL

Transcript of Christopher A. Vellturo, Ph.D.
Conducted on April 28, 2026

33 (129 to 132)

THE VIDEOGRAPHER: Thank you. Stand by. This marks the end of today's deposition of Dr. Christopher Vellturo. We are now going off the record. The time is 11:16 a.m.

(WHEREUPON, discussion was had off the record.)

(WHEREUPON, the deposition was concluded at 11:17 a.m. CST.)

ACKNOWLEDGMENT OF DEPONENT

I, CHRISTOPHER A. VELLTURO, Ph.D., do hereby acknowledge that I have read and examined the foregoing testimony and the same is a true, correct, and complete transcription of the testimony given by me and any corrections appear on the attached errata sheet signed by me.

_____   _____
(SIGNATURE)              (DATE)

CERTIFICATE OF REPORTER

I, MICHELLE M. YOHLER, a Certified Shorthand Reporter within and for the County of Will, State of Illinois, do hereby certify:

That previous to the commencement of the examination of the witness, the witness was duly sworn to testify the whole truth concerning the matters herein;

That the foregoing deposition transcript was reported stenographically by me, was thereafter reduced to typewriting under my personal direction and constitutes a true record of the testimony given and the proceedings had;

That the said deposition was taken remotely before me at the time and place specified;

That I am not a relative or employee or attorney or counsel, nor a relative or employee of such attorney or counsel for any of the parties hereto, nor interested directly or indirectly in the outcome of this action.

IN WITNESS WHEREOF, I do hereunto set my hand and affix my seal of office at Chicago, Illinois, this 1st day of May, 2026.

Michelle M. Yohler, CSR, RMR, CRR
Certified Shorthand Reporter
CSR No.: 84-4531

# Exhibit 6
# Filed Under Seal

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>APOTEX INC., AND APOTEX CORP.,<br><br>Defendants. | C.A. No. 24-64-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC, AND AZURITY PHARMACEUTICALS, INC.<br><br>Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |
| EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB1 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BAXTER HEALTHCARE CORPORATION,<br><br>Defendant. | C.A. No. 24-66-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |

**OPENING EXPERT REPORT OF DR. BERNHARDT TROUT, PH.D.**

**TABLE OF CONTENTS**

I.     BACKGROUND AND QUALIFICATIONS ...................................................................1

        A.      Introduction........................................................................................................1

        B.      Education and Experience...................................................................................2

        C.      Compensation ....................................................................................................4

        D.      Expert Testimony in Last Four Years ................................................................4

II.     MATERIALS CONSIDERED ...................................................................................5

III.     PERSON OF ORDINARY SKILL IN THE ART.........................................................5

IV.     LEGAL STANDARDS ...............................................................................................7

        A.      Infringement......................................................................................................8

        B.      Claim Construction ...........................................................................................9

        C.      Claim Types ....................................................................................................13

        D.      Claim Interpretation ........................................................................................13

V.     THE ASSERTED PATENTS ....................................................................................14

VI.     TECHNICAL BACKGROUND................................................................................16

VII.     ASSERTED CLAIMS ..............................................................................................20

        A.      Overview.........................................................................................................20

        B.      Claim Structure ...............................................................................................24

        C.      Specification ....................................................................................................26

        D.      Prosecution History.........................................................................................47

        E.      Extrinsic Evidence ..........................................................................................56

VIII.     EAGLE'S PATENTED BELRAPZO® PRODUCT.....................................................56

IX.     TEVA'S BENDEKA® PRODUCT ...........................................................................57

X.     APOTEX'S NDA PRODUCT...................................................................................58

        A.      Description of Composition..............................................................................59

B.    Shelf Life & Impurities ........................................................................60

XI.    SLAYBACK'S NDA PRODUCT ......................................................................61

A.    Description of Composition ..................................................................61

B.    Shelf Life & Impurities ........................................................................63

XII.    BAXTER'S NDA PRODUCT..........................................................................63

A.    Description of Composition ..................................................................64

B.    Shelf Life & Impurities ........................................................................66

XIII.    DEFENDANTS INFRINGE THE ASSERTED PATENTS ..............................66

A.    "pharmaceutically acceptable fluid" ....................................................67

1.    ████████████████████████████████████████

████    ████████████████████████████████████

████    ████████████████████████████████████

████    ████████████████████████████████████

B.    "wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C." ..........................................123

XIV.    BELRAPZO® AND BENDEKA® PRACTICE THE ASSERTED PATENTS ............123

A.    Belrapzo® and Bendeka® Embody the Asserted Patents ...................124

1.    Liquid Bendamustine-Containing Composition ......................125

2.    Bendamustine or a Pharmaceutically Acceptable Salt Thereof...............127

3.    Concentration ..........................................................................129

4.    Composition .............................................................................129

5.    Impurity Profile........................................................................137

B.    Discussion...............................................................................................139

          1.       "pharmaceutically acceptable fluid" .........................................................139

          2.       "wherein the total impurities resulting from the degradation of the
                   bendamustine is less than about 5% peak area response as
                   determined by HPLC at a wavelength of 223 nm after at least
                   about 15 months at a temperature of about 5° C. to about 25° C." ..........140

XV.    THE RELATIVE VALUE OF THE ASSERTED PATENTS ......................................146

XVI.   CLAIM CHARTS SHOWING THAT BENDEKA® AND BELRAPZO®
       PRACTICE THE ASSERTED PATENTS ......................................................................153

       A.       U.S. Patent No. 11,872,214 ...............................................................................153

       B.       U.S. Patent No. 12,138,248 ...............................................................................158

## I.    Background and Qualifications

### A.    Introduction

1.    I have been retained by counsel for Plaintiffs Eagle Pharmaceuticals, Inc. and Eagle Sub 1 LLC ("Eagle") to provide technical assistance and expert opinions in the above-captioned litigations.   I understand these litigations are related to Eagle's patents and Belrapzo® (bendamustine hydrochloride) drug product, among other things.  Specifically, I understand that Defendants Apotex Inc. and Apotex Corp. (collectively, "Apotex"), Slayback Pharma LLC and Azurity Pharmaceuticals, Inc. (collectively, "Slayback), and Baxter Healthcare Corp. ("Baxter") (each collectively a "Defendant" and together "Defendants") market and sell versions of Belrapzo® (bendamustine hydrochloride) that were approved through the United States Food and Drug Administration's ("FDA's") 505(b)(2) New Drug Application ("NDA") process (each Defendant's "NDA Product" collectively "Defendants' NDA Products").

2.    I understand that Eagle currently asserts that each Defendant's NDA Product infringes certain claims of U.S. Patent No. 11,872,214 (the "'214 patent") and U.S. Patent No. 12,138,248 (collectively, the "Asserted Patents").  I understand that the Asserted Patents share the same specification.   The claims of the Asserted Patents that I understand Eagle asserts each Defendant infringes (the "Asserted Claims") are identified in the table below.

| Asserted Patent[1] | Asserted Claims |
|---|---|
| U.S. Patent No. 11,872,214 | 1-9 |
| U.S. Patent No. 12,138,248 | 1-6, 8-11, 15, 20 |

---

[1] I understand that U.S. Patent No. 11,844,783 (the "'783 patent") is no longer asserted in these cases. *See* C.A. No. 24-64, D.I. 305; C.A. No. 24-65, D.I. 294; C.A. No. 24-66, D.I. 252.  I offer no opinions on the '783 patent.

1

expressly recited.  To the extent sodium hydroxide is present at all, it resides in the open "comprising" portion of the claim as a pH adjuster and is unrelated to the solvent element. Accordingly, each product remains a liquid bendamustine-containing composition that satisfies every element of the asserted claims, including the pharmaceutically acceptable fluid limitation as Defendants propose to construe it.

226.  Additionally, as noted previously, Defendants' labels expressly state that when included in the composition, sodium hydroxide is used to adjust the acidity of polyethylene glycol 400 NF.  EAGLEBEN-SA_00363817 (Apotex Label 4/2024) at -828;  EAGLEBEN-SA_00363910 (Slayback Label 2/2024) at -924; EAGLEBEN-SA_00363860 (Baxter Label 2/2024) at -875.  The PEG 400 so treated expressly remains "polyethylene glycol 400," as each label identifies the vehicle as "polyethylene glycol 400" in the same Description section that notes sodium hydroxide's pH-adjustment role.  *Id.*  Thus, per the Defendants' labels, the only "ingredients" in their pharmaceutically acceptable fluids are PEG 400 and ethanol.

### 2. Even If The Sodium Hydroxide Is Part of the Pharmaceutically Acceptable Fluid, Defendants' NDA Products Still Infringe

227.  I have been informed that there are two legal "exceptions" to the "consisting of"/"consists of" claim language for (1) impurities normally associated with the component (the "Impurities Exception"); (2) substances unrelated to the element (the "Unrelated Exception").

228.  I have also concluded that the Defendants' products satisfy each exception under both proposed constructions.  Eagle's proposed construction explicitly includes a reference to the exceptions, and I understand and have been informed that even though Defendants do not include such a reference in their proposed construction, they acknowledge that both exceptions are recognized with regard to "consisting of" claim limitations.  Thus, my conclusions below are applicable regardless of which construction may be adopted.

about 25° C. in Belrapzo®.  Final Pretrial Order in *Eagle Pharms., Inc. v. Slayback Pharma LLC*, et al., C.A. No. 21-1256-CFC-JLH (D.  Del.), D.I. 107, Ex. 1 at ¶ 32.

408.    Since I understand that the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. in Belrapzo® and Bendeka®, I understand the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. in Belrapzo® and Bendeka®.

## XV.    THE RELATIVE VALUE OF THE ASSERTED PATENTS



411.    There are ███████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████

412.    There are ████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████  █  ████████████████    ████████    ████████████████

███████████████████████████████████████████████████████████

████████████████    ████████    ████████████████    ████████

████████████████    ████████    ████████████████    ████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████

██    ████████████████████████████████████████████████████.

147

Case 1:24-cv-00064-JLH   Document 484   Filed 08/07/26   Page 89 of 171 PageID #: 16694



148



414.

415.

416.

417. In my opinion, for the reasons described throughout this report, the inventions claimed in the Asserted Patents— █████████████████████████████████████ —are foundational and enabling patents. They disclose and claim the critical formulation components that makes a ready-to-dilute, long-term storage-stable liquid bendamustine feasible for commercial products like Belrapzo® and Bendeka®—namely, liquid bendamustine-containing compositions with less than about 5% total impurities after at least about 15 months at about 5-25°C using specific non-aqueous solvent systems and antioxidants at therapeutically relevant concentrations. Those are precisely the stability and formulation attributes that enable a commercially viable, refrigerator-stable ready-to-dilute product and obviate lyophilization and complicated reconstitution steps. A POSA would view the inventions claimed in the Asserted Patents as the technical bedrock, and thus as foundational and enabling relative to later innovations. Indeed, as I discuss in this report, at least three companies—Apotex, Slayback, and Baxter—all use this important technology in their infringing liquid bendamustine products.

418. The specification expressly frames the invention as long-term storage-stable liquid compositions "substantially free of impurities" after the claimed aging at 5-25°C and emphasizes their ready-to-dilute character, which is the key advance for Belrapzo® and Bendeka®'s formulation profile. Similarly, a POSA would recognize that the ████████████████ advances presuppose and build upon these formulation attributes, providing an incremental benefit. Short-duration infusions at clinically relevant doses require a stable, concentrated liquid drug with controlled impurities, acceptable osmolality/viscosity, and dilution compatibility furnished by the formulation patents.

419. From a POSA's perspective, ███████████████████████████ ████████████████████ —claim treatment methods that reduce infusion volume and time by

151

administering bendamustine in about 120 mL or less over about 10-15 minutes, to address clinical needs such as sodium/fluid restriction and improved patient tolerance.  Those method claims explicitly rely on using concentrated liquid bendamustine compositions with predominantly PEG-based solvents and optionally an antioxidant that remain in solution at the higher concentrations and smaller volumes—*i.e.*, the very liquid bendamustine formulation platform disclosed and claimed in the formulation family—so that therapeutic doses can be delivered without precipitation or instability during short infusions.  Stated plainly, the inventions claimed in the rapid-administration patents presuppose the existence of a stable, concentrated, non-aqueous ready-to-dilute formulation; without that foundational formulation, the claimed small-volume (*e.g.*, 50-100 mL) and short-time (e.g., ≤10-15 minutes) administration regimens could not be practiced reliably at clinically required doses because bendamustine would exceed solubility and/or degrade in aqueous diluents.  Accordingly, a POSA would view the formulation patents as the technical bedrock and enabling technology for the later rapid-administration method claims, not vice versa.

420.  ███████████████████        ██████████████████████████—the '270 patent—discloses and claims lyophilized formulations and associated degradation control for that dosage form.  From a POSA's perspective, I understand from Dr. Ashraf and Dr. Attia that liquid bendamustine products (e.g., Belrapzo and Bendeka) are preferred over lyophilized bendamustine products because the former has advantages that the latter does not, such as that lyophilized bendamustine products must be reconstituted before use.  The disadvantages with lyophilized bendamustine products further shows that the Asserted Patents are relatively more valuable than the inventions claimed in the '270 patent.  In my opinion, a POSA would view the Asserted Patents as more foundational, enabling, and relatively more valuable than the '270 patent.

Dated: __2/6/26__

_____
Dr. Bernhardt L. Trout, Ph.D.

# Exhibit 7
# Filed Under Seal

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>APOTEX INC., AND APOTEX CORP.,<br><br>Defendants. | C.A. No. 24-64-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC, AND AZURITY PHARMACEUTICALS, INC.<br><br>Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |
| EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB1 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>BAXTER HEALTHCARE CORPORATION,<br><br>Defendant. | C.A. No. 24-66-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |

**OPENING EXPERT REPORT OF DR. BERNHARDT TROUT, PH.D.**

**TABLE OF CONTENTS**

I.    BACKGROUND AND QUALIFICATIONS ...................................................................1

    A.    Introduction...................................................................................................1

    B.    Education and Experience.............................................................................2

    C.    Compensation ...............................................................................................4

    D.    Expert Testimony in Last Four Years ..........................................................4

II.    MATERIALS CONSIDERED .....................................................................................5

III.    PERSON OF ORDINARY SKILL IN THE ART.........................................................5

IV.    LEGAL STANDARDS .................................................................................................7

    A.    Infringement..................................................................................................8

    B.    Claim Construction .......................................................................................9

    C.    Claim Types ................................................................................................13

    D.    Claim Interpretation ...................................................................................13

V.    THE ASSERTED PATENTS......................................................................................14

VI.    TECHNICAL BACKGROUND..................................................................................16

VII.    ASSERTED CLAIMS ................................................................................................20

    A.    Overview.....................................................................................................20

    B.    Claim Structure...........................................................................................24

    C.    Specification ...............................................................................................26

    D.    Prosecution History....................................................................................47

    E.    Extrinsic Evidence ......................................................................................56

VIII.    EAGLE'S PATENTED BELRAPZO® PRODUCT...................................................56

IX.    TEVA'S BENDEKA® PRODUCT ............................................................................57

X.    APOTEX'S NDA PRODUCT.....................................................................................58

    A.    Description of Composition.........................................................................59

i

B.      Shelf Life & Impurities ..........................................................................60

XI.    SLAYBACK'S NDA PRODUCT ....................................................................61

A.      Description of Composition.....................................................................61

B.      Shelf Life & Impurities ..........................................................................63

XII.   BAXTER'S NDA PRODUCT..........................................................................63

A.      Description of Composition.....................................................................64

B.      Shelf Life & Impurities ..........................................................................66

XIII.  DEFENDANTS INFRINGE THE ASSERTED PATENTS .............................66

A.      "pharmaceutically acceptable fluid"........................................................67

    1.      ███████████████████████████████
            ███████████████████████████
            ████████████████████████████
            █████████████████████ ..........................................................115

B.      "wherein the total impurities resulting from the degradation of the
        bendamustine is less than about 5% peak area response as determined by
        HPLC at a wavelength of 223 nm after at least about 15 months at a
        temperature of about 5° C. to about 25° C."........................................123

XIV.   BELRAPZO® AND BENDEKA® PRACTICE THE ASSERTED PATENTS ............123

A.      Belrapzo® and Bendeka® Embody the Asserted Patents ...................124

    1.      Liquid Bendamustine-Containing Composition ......................................125

    2.      Bendamustine or a Pharmaceutically Acceptable Salt Thereof...............127

    3.      Concentration..........................................................................129

    4.      Composition............................................................................129

    5.      Impurity Profile.......................................................................137

B.      Discussion...................................................................................139

1.    "pharmaceutically acceptable fluid" .........................................................139

2.    "wherein the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C." ..........140

XV.    THE RELATIVE VALUE OF THE ASSERTED PATENTS .......................................146

XVI.    CLAIM CHARTS SHOWING THAT BENDEKA® AND BELRAPZO® PRACTICE THE ASSERTED PATENTS........................................................................153

A.    U.S. Patent No. 11,872,214................................................................................153

B.    U.S. Patent No. 12,138,248................................................................................158

## I.    Background and Qualifications

### A.    Introduction

1.    I have been retained by counsel for Plaintiffs Eagle Pharmaceuticals, Inc. and Eagle Sub 1 LLC ("Eagle") to provide technical assistance and expert opinions in the above-captioned litigations.    I understand these litigations are related to Eagle's patents and Belrapzo® (bendamustine hydrochloride) drug product, among other things.    Specifically, I understand that Defendants Apotex Inc. and Apotex Corp. (collectively, "Apotex"), Slayback Pharma LLC and Azurity Pharmaceuticals, Inc. (collectively, "Slayback), and Baxter Healthcare Corp. ("Baxter") (each collectively a "Defendant" and together "Defendants") market and sell versions of Belrapzo® (bendamustine hydrochloride) that were approved through the United States Food and Drug Administration's ("FDA's") 505(b)(2) New Drug Application ("NDA") process (each Defendant's "NDA Product" collectively "Defendants' NDA Products").

2.    I understand that Eagle currently asserts that each Defendant's NDA Product infringes certain claims of U.S. Patent No. 11,872,214 (the "'214 patent") and U.S. Patent No. 12,138,248 (collectively, the "Asserted Patents").    I understand that the Asserted Patents share the same specification.    The claims of the Asserted Patents that I understand Eagle asserts each Defendant infringes (the "Asserted Claims") are identified in the table below.

| Asserted Patent[1] | Asserted Claims |
|---|---|
| U.S. Patent No. 11,872,214 | 1-9 |
| U.S. Patent No. 12,138,248 | 1-6, 8-11, 15, 20 |

---

[1] I understand that U.S. Patent No. 11,844,783 (the "'783 patent") is no longer asserted in these cases.  *See* C.A. No. 24-64, D.I. 305; C.A. No. 24-65, D.I. 294; C.A. No. 24-66, D.I. 252.  I offer no opinions on the '783 patent.

1

about 25° C. in Belrapzo®.  Final Pretrial Order in *Eagle Pharms., Inc. v. Slayback Pharma LLC,* et al., C.A. No. 21-1256-CFC-JLH (D.  Del.), D.I. 107, Ex. 1 at ¶ 32.

408.    Since I understand that the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. in Belrapzo® and Bendeka®, I understand the total impurities resulting from the degradation of the bendamustine is less than about 5% peak area response as determined by HPLC at a wavelength of 223 nm after at least about 15 months at a temperature of about 5° C. to about 25° C. in Belrapzo® and Bendeka®.

## XV.    THE RELATIVE VALUE OF THE ASSERTED PATENTS

409.



411.    There are █████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

412.    There are ████████████████████████████████

████████████████████████████████████████████████████

████████    █    ████████████████████    ████████    ████████████████

████████████████████████████████████████████████████

████████████████    ████████    ████████████████    ████████

████████████████    ████████    ████████████████    ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████

413.    ██████████████████████████████████████████





414.

E

417.    In my opinion, for the reasons described throughout this report, the inventions claimed in the Asserted Patents—███████████████████████████████████████—are foundational and enabling patents. They disclose and claim the critical formulation components that makes a ready-to-dilute, long-term storage-stable liquid bendamustine feasible for commercial products like Belrapzo® and Bendeka®—namely, liquid bendamustine-containing compositions with less than about 5% total impurities after at least about 15 months at about 5-25°C using specific non-aqueous solvent systems and antioxidants at therapeutically relevant concentrations. Those are precisely the stability and formulation attributes that enable a commercially viable, refrigerator-stable ready-to-dilute product and obviate lyophilization and complicated reconstitution steps. A POSA would view the inventions claimed in the Asserted Patents as the technical bedrock, and thus as foundational and enabling relative to later innovations. Indeed, as I discuss in this report, at least three companies—Apotex, Slayback, and Baxter—all use this important technology in their infringing liquid bendamustine products.

418.    The specification expressly frames the invention as long-term storage-stable liquid compositions "substantially free of impurities" after the claimed aging at 5-25°C and emphasizes their ready-to-dilute character, which is the key advance for Belrapzo® and Bendeka®'s formulation profile. Similarly, a POSA would recognize that the ██████████████ advances presuppose and build upon these formulation attributes, providing an incremental benefit. Short-duration infusions at clinically relevant doses require a stable, concentrated liquid drug with controlled impurities, acceptable osmolality/viscosity, and dilution compatibility furnished by the formulation patents.

419.    From a POSA's perspective, ████████████████████████████████████████ ██████████████████—claim treatment methods that reduce infusion volume and time by

151

administering bendamustine in about 120 mL or less over about 10-15 minutes, to address clinical needs such as sodium/fluid restriction and improved patient tolerance. Those method claims explicitly rely on using concentrated liquid bendamustine compositions with predominantly PEG-based solvents and optionally an antioxidant that remain in solution at the higher concentrations and smaller volumes—*i.e.*, the very liquid bendamustine formulation platform disclosed and claimed in the formulation family—so that therapeutic doses can be delivered without precipitation or instability during short infusions. Stated plainly, the inventions claimed in the rapid-administration patents presuppose the existence of a stable, concentrated, non-aqueous ready-to-dilute formulation; without that foundational formulation, the claimed small-volume (*e.g.*, 50-100 mL) and short-time (e.g., ≤10-15 minutes) administration regimens could not be practiced reliably at clinically required doses because bendamustine would exceed solubility and/or degrade in aqueous diluents. Accordingly, a POSA would view the formulation patents as the technical bedrock and enabling technology for the later rapid-administration method claims, not vice versa.

420. ███████████████████████████████████████████████—the '270 patent—discloses and claims lyophilized formulations and associated degradation control for that dosage form. From a POSA's perspective, I understand from Dr. Ashraf and Dr. Attia that liquid bendamustine products (e.g., Belrapzo and Bendeka) are preferred over lyophilized bendamustine products because the former has advantages that the latter does not, such as that lyophilized bendamustine products must be reconstituted before use. The disadvantages with lyophilized bendamustine products further shows that the Asserted Patents are relatively more valuable than the inventions claimed in the '270 patent. In my opinion, a POSA would view the Asserted Patents as more foundational, enabling, and relatively more valuable than the '270 patent.

Dated: __2/6/26__          _____

Dr. Bernhardt L. Trout, Ph.D.

# EXHIBIT 8
# FILED UNDER SEAL
# REDACTED IN ITS ENTIRETY

# HIGHLY CONFIDENTIAL – CONTAINS HIGHLY CONFIDENTIAL INFORMATION OF APOTEX

# EXHIBIT 9
# FILED UNDER SEAL REDACTED IN ITS ENTIRETY

# HIGHLY CONFIDENTIAL – CONTAINS HIGHLY CONFIDENTIAL INFORMATION OF APOTEX

# EXHIBIT 10
# FILED UNDER SEAL

# HIGHLY CONFIDENTIAL – CONTAINS HIGHLY CONFIDENTIAL INFORMATION OF SLAYBACK



**EAGLE PHARMACEUTICALS, INC, AND EAGLE SUB1 LLC.**

**V.**

**SLAYBACK PHARMA LLC AND AZURITY PHARMACEUTICALS, INC.**

Civil Action No. 1:24-cv-00065-JLH

United States District Court for the District of Delaware

---

**EXPERT REPORT OF JAMES MALACKOWSKI**

**March 16, 2026**

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**INTELLECTUAL CAPITAL EQUITY**

| | | |
|---|---|---|
| 1 | FIRM BACKGROUND AND QUALIFICATIONS | 1 |
| 2 | ASSIGNMENT | 3 |
| 3 | SUMMARY OF OPINIONS | 4 |
| | 3.1 My Affirmative Opinions Concerning Eagle's Damages | 4 |
| | 3.2 Evaluation of the Vellturo Report | 6 |
| 4 | THE PARTIES | 7 |
| | 4.1 Plaintiff - Eagle Pharmaceuticals, Inc. | 7 |
| | 4.2 Plaintiff – Eagle Sub1 LLC | 10 |
| | 4.3 Defendant – Slayback Pharma LLC | 10 |
| | 4.4 Defendant – Azurity Pharmaceuticals, Inc | 10 |
| 5 | EAGLE LITIGATION INVOLVING BENDAMUSTINE PATENTS | 11 |
| | 5.1 Pending Litigation | 11 |
| | 5.2 Prior Litigation | 14 |
| 6 | THE ASSERTED PATENTS | 17 |
| | 6.1 The '214 Patent | 17 |
| | 6.2 The '248 Patent | 18 |
| | 6.3 Purported Benefits and Advantages of the Asserted Patents | 18 |
| 7 | THE BENDAMUSTINE PRODUCTS MARKET | 20 |
| | 7.1 FDA Approved Treatments for CLL and NHL | 20 |
| | 7.2 FDA-Approved Bendamustine Products | 23 |
| | 7.3 Evidence Supporting Inclusion of Powder Products in Market Definition | 28 |
| | 7.4 Quarterly Unit-Sales Based Market Shares of Bendamustine Products | 32 |
| | 7.5 Factors Influencing Sales of Bendamustine Products | 35 |
| | 7.6 Conclusions Concerning Vivimusta® and the Bendamustine Product Market | 38 |
| 8 | QUANTIFICATION OF EAGLE'S LOST PROFITS | 40 |
| | 8.1 The Panduit-Test | 40 |
| | 8.2 Quantification of Lost Profits Under Scenario A: Only Liquid Products | 42 |
| | 8.3 Quantification of Lost Profits Under Scenario B – Liquid & Powder Products | 45 |
| | 8.4 Price Erosion | 48 |
| 9 | REASONABLE ROYALTY FRAMEWORK | 49 |
| | 9.1 Reasonable Royalty Approach | 49 |
| | 9.2 Hypothetical Negotiation Parameters | 50 |
| | 9.3 Royalty Base | 51 |
| | 9.4 Royalty Rate | 52 |
| 10 | QUANTITATIVE VALUATION FACTORS | 52 |
| | 10.1 The Cost Approach | 52 |
| | 10.2 The Income Approach | 54 |
| | 10.3 The Market Approach | 55 |
| 11 | REASONABLE ROYALTY DETERMINATION | 67 |
| | 11.1 The Georgia-Pacific Factors | 67 |
| | 11.2 Reasonable Royalty Conclusion | 76 |
| 12 | EVALUATION OF THE VELLTURO REPORT | 77 |
| | 12.1 Dr. Vellturo's Market Analysis Improperly Excludes Powder Bendamustine Products | 77 |
| | 12.2 Dr. Vellturo's Lost Profits Opinions are Defective and Unreliable | 79 |
| | 12.3 Dr. Vellturo's ███████ Opinions Are Defective and Unreliable | 85 |
| | 12.4 Dr. Vellturo's Opinions Re: The ██████████ Are Defective and Unreliable | 88 |
| | 12.5 Dr. Vellturo Fails to Properly Evaluate Eagle License Agreements | 92 |
| | 12.6 Dr. Vellturo's ███████ Analyses Are Defective and Unreliable | 94 |
| | 12.7 Dr. Vellturo Fails to Consider Customary Royalty Rates | 95 |
| | 12.8 Dr. Vellturo Fails to Consider ██ ███ ██ ████████ | 96 |
| 13 | PREJUDGMENT INTEREST | 96 |
| 14 | SIGNATURE | 97 |

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## 1      FIRM BACKGROUND AND QUALIFICATIONS

I am the Chief Intellectual Property Officer (CIPO) of J.S. Held LLC and the firm's Intellectual Property (IP) Practice Leader.  I am also a Co-founder and Senior Managing Director of Ocean Tomo, LLC, a part of J.S. Held.  Ocean Tomo provides Financial Expert, Management Consulting, Advisory, and Specialty Services focused on matters involving IP and other intangible assets.  Practice offerings address economic damage calculations and testimony; technical and intangible asset valuation; strategy and risk management consulting; debt and equity private placement; and IP brokerage.  With more than 100 offices globally, J.S. Held assists clients – corporations, insurers, law firms, governments, and institutional investors – on complex technical, scientific, and financial matters across all assets and value at risk.[1]

Along with Supreme Court Justice Stephen Breyer, I was inducted into the IP Hall of Fame in 2022, chosen by the IP Hall of Fame Academy from a long list of nominees put forward by the global IP community.  I was recognized by the Academy in 2022 with the Q. Todd Dickinson Award, which honors those who have made significant contributions to IP as a business asset.  My inclusion into the IP Hall of Fame follows annual recognition since 2007 by leading industry publications as one of the "World's Leading IP Strategists."  Significantly, I have been listed among "50 Under 45" by IP Law & Business™; included in the National Law Journal's inaugural list of 50 Intellectual Property Trailblazers & Pioneers; and named as one of "The Most Influential People in IP" by Managing Intellectual Property™.  I was named as one of 50 individuals, companies, and institutions that framed the first 50 issues of IAM Magazine as well as one of 60 leading global Economics Expert Witnesses by the same publication in 2014.  In 2011, I was selected by the World Economic Forum as one of less than twenty members of the Network of Global Agenda Councils to focus on questions of IP policy.  In 2013, I was inducted into the Chicago Area Entrepreneurship Hall of Fame by the Institute for Entrepreneurial Studies at the University of Illinois at Chicago College of Business Administration.  In 2018, I joined the Standards Development Organization Board of the Licensing Executives Society (USA & Canada), Inc. governing voluntary consensus-based professional practices that are guided in their development by the American National Standards Institute's (ANSI's) Essential Requirements.  LES standards are designed to encourage and teach consensus practices in many of the business process aspects of intellectual capital management.

On more than one hundred occasions, I have served as an expert in U.S. Federal Court, U.S. Bankruptcy Court, State Court, Court of Chancery, the Ontario Superior Court of Justice, the U.S. Patent and Trademark Office Patent Trial and Appeal Board, and global arbitrations on questions relating to intellectual property economics including the subject of valuation, reasonable royalty, lost profits, price erosion, commercial success, corrective advertising, creditor allocations, Hatch Waxman Act market exclusivity, business significance of licensing terms including RAND obligations, venture financing including expected risk / return, and equities of a potential injunction.  My experience extends to matters of general business valuation and commercial disputes, both domestic and foreign.  I have publicly addressed policy issues affecting

---

[1] J.S. Held, its affiliates and subsidiaries are not certified public accounting firm(s) and do not provide audit or attest services.  J.S. Held is not a law firm and does not provide legal advice.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

### 11.1.13 Factor No. 13: The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

Factor No. 13 extends the analysis performed in Factors No. 8 and No. 11 and relates to the portion of the realizable profit that should be attributed to non-patented elements. Analysis of this factor is sometimes related to the Income Approach in the context of intellectual property valuation. The Income Approach attempts to value an asset by measuring the benefits derived from use of the asset.[505]

Apportioning profits from Vivimusta® sales to the Asserted Patents requires consideration of the value or the API – bendamustine. As set forth in Section 7.2, bendamustine was first synthesized in Germany in the early 1960s.[506] Bendamustine was first introduced in Europe in the 1990s and in the U.S. in 2001.[507] Bendamustine was first FDA approved in 2008 for CLL and certain B-cell NHL under the brand name Treanda®.[508] The 2008 date of first FDA approval is before the earliest priority date of Eagle's 19 formulation patents listed in **Appendix 10.1**. Given that Vivimusta® is prescribed for the therapeutic effect provided by bendamustine, the majority of Vivimusta®'s profits is attributable to bendamustine.

Apportioning profits from Vivimusta® sales also requires consideration of the contributions of Slayback and Azurity to its commercialization. Slayback/Azurity have been and continue to be responsible for obtaining regulatory approvals, promotional and sales efforts, and overseeing manufacturing and/or distribution. With respect to promotional and sales efforts, Slayback has 70 sales-related employees in two teams.[509] Slayback's strategic accounts team communicates with oncology product distributors and certain other economically significant customers.[510] Slayback's institutional sales team communicates with other customers, including hospitals and community oncology centers with the sales team communicating with specific locations Vivimusta® will be used.[511]

I would also note that the concept of apportionment was presumably considered by the parties to the various licenses discussed in Section 10.3. As a result, the issue of apportionment has largely been considered through my evaluation of the terms of these comparable third-party licenses as well as the ▮▮▮▮▮▮ ▮▮▮▮▮▮ In addition, I understand that when the Market Approach is utilized, apportionment to the smallest salable patent-practicing unit is not required.[512] I also understand that "otherwise comparable

---

[505] Slottje, Daniel, Economic Damages in Intellectual Property, 2006, pp. 291 – 293.

[506] "Bendamustine: An old drug for a potential new indication," Cancer Research, Statistics, and Treatment, p. 156.

[507] "Bendamustine: An old drug for a potential new indication," Cancer Research, Statistics, and Treatment, p. 156.

[508] https://www.accessdata.fda.gov/drugsatfda_docs/label/2008/022303lbl.pdf.

[509] Defendants' Supp. Resp. to Plaintiff's 3rd Common Rogs. (Nos. 12-13), September 23, 2025, p. 6.

[510] Defendants' Supp. Resp. to Plaintiff's 3rd Common Rogs. (Nos. 12-13), September 23, 2025, p. 4.

[511] Defendants' Supp. Resp. to Plaintiff's 3rd Common Rogs. (Nos. 12-13), September 23, 2025, p. 4.

[512] *Commonwealth Sci. & Indus. Research Organization v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015), cert. denied, 136 S. Ct. 2530, 195 L. Ed. 2d 859 (2016).

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

**INTELLECTUAL CAPITAL EQUITY**

licenses are not inadmissible solely because they express the royalty rate as a percentage of total revenues, rather than in terms of the smallest salable unit."[513]

### 11.1.14   Factor No. 14: The opinion testimony of qualified experts.

The extent to which I have considered the opinion testimony of qualified experts is reflected throughout this report.  I reserve the right to supplement my opinions upon the review of other expert reports and testimony that are provided after the date of this report.

### 11.1.15   Factor No. 15: The royalty that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee – who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention – would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

Factor 15 describes the integration of the other factors within the willing buyer/willing seller hypothetical negotiation framework.  As the name implies, the parties in the negotiation are presumed to be willing.  They both seek, as businesspeople, to reach an agreement.  The consideration and circumstances discussed throughout this report would frame the hypothetical negotiation.

As set forth above, in determining the reasonable royalty due Eagle for Slayback/Azurity's alleged non-licensed use of the Asserted Patents, I utilized common methods of valuing intangible assets, including the Cost Approach and the Market Approach, and I considered the *Georgia-Pacific* factors.

#### 11.1.15.1   Royalty Indicated by The Cost Approach



---

[513] *Commonwealth Sci. & Indus. Research Organization v. Cisco Sys., Inc.*, 809 F.3d 1295, 1303 (Fed. Cir. 2015), cert. denied, 136 S. Ct. 2530, 195 L. Ed. 2d 859 (2016).

[514] https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2022/212209Orig1s000ltr.pdf; Appendix 4.2.

[515]

[516]

[517] Defendants' Fifth Supplemental Response to Interrogatories (No. 7), December 5, 2025, p. 15.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

INTELLECTUAL CAPITAL EQUITY

## 14    SIGNATURE

Respectfully submitted,

_____

James E. Malackowski

March 16, 2026

_____

Date

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# EXHIBIT 11
# FILED UNDER SEAL

# HIGHLY CONFIDENTIAL – CONTAINS HIGHLY CONFIDENTIAL INFORMATION OF SLAYBACK



**Planet Depos**
*We Make It Happen™*

<span style="color:darkred">**HIGHLY CONFIDENTIAL**</span>

# Transcript of James Malackowski

**Date:** April 15, 2026
**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Slayback Pharma/Azurity Pharma

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

## 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

---------------------------x

EAGLE PHARMACEUTICALS,       :

INC. and EAGLE SUB1 LLC,     :

          Plaintiffs,   :  Case No.

   v.                   :  1:24-CV-00065-JLH

SLAYBACK PHARMA LLC and       :

AZURITY PHARMACEUTICALS,      :

INC.,                         :

          Defendants.  :

---------------------------x


          **HIGHLY CONFIDENTIAL**


    Videotaped Deposition of JAMES MALACKOWSKI

              Chicago, Illinois

          Wednesday, April 15, 2026

              8:41 a.m. CST




Job No.:  629327

Pages:  1 - 264

Reported Stenographically by:

Tiffany M. Pietrzyk, CSR RPR CRR

## 2

    Videotaped deposition of JAMES MALACKOWSKI, held

at the location of:


          OCEAN TOMO, LLC

          200 West Madison Street

          Chicago, Illinois 60606

          312.327.4400




    Pursuant to notice, before Tiffany M. Pietrzyk, a

Certified Shorthand Reporter in the States of

California, Illinois, and Texas, Registered

Professional Reporter, Certified Realtime Reporter,

and a Notary Public in and for the State of

Illinois.

## 3

          A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFFS:

     BRETT M. SANDFORD, ESQUIRE

     LATHAM & WATKINS LLP

     140 Scott Drive

     Menlo Park, California 94025

     650.328.4600


ON BEHALF OF THE DEFENDANTS:

     DANIEL E. FORCHHEIMER, ESQUIRE (via Zoom)

     ROBYN AST-GMOSER, ESQUIRE

     WINDELS MARX LANE & MITTENDORF LLP

     180 Park Avenue

     Florham Park, New Jersey 07932-1054

     973.966.3284


ALSO PRESENT:

     Karlo Papa

     Erin Schuppert, Planet Depos Videographer

## 4

          C O N T E N T S

EXAMINATION OF JAMES MALACKOWSKI          PAGE

  By Mr. Sandford                         8


          E X H I B I T S

     (Attached to transcript.)

DEPOSITION EXHIBITS                       PAGE

Exhibit 1    Expert Report of James          11

             Malackowski, dated 3/16/26

Exhibit 2    Errata to Expert Report of      12

             James Malackowski, dated

             4/12/26

Exhibit 3    Azurity Pharmaceuticals          48

             presentation entitled

             "Bendamustine Module," dated

             11/20/23, Bates number

             SLAY-VIVMUS0218279 through

             8292

Exhibit 4    Marketing materials, Bates       54

             number SLAY-VIVMUS0009765

             through 770

Exhibit 5    Marketing materials, Bates       55

             number SLAY-VIVMUS0010350

             through 377

**25**

A. Correct.

Q. Not offering any legal opinions in this case?

A. Correct.

Q. And at least as of now, you haven't earned any technical degrees; is that fair?

A. Yes.

Q. And you're not an engineer; right?

A. Not as I would use that term. I don't have a degree in engineering.

Q. And you're not holding yourself out as one of what's called ordinary skill of the art in the patents that are asserted in this case; right?

A. Correct.

Q. And just at a high level, you're not offering any technical opinions in this case; is that fair?

A. Not as I would use that term. In a litigation, technical opinions are reserved for the technical experts, which we've already discussed.

Q. And you're not a medical practitioner, an oncologist, pharmacist, clinician, anything in that field; fair?

A. Fair.

Q. And so you're not offering any -- call them

**26**

clinical or medical opinions in this case; is that accurate?

A. Yes, sir.

Q. Okay. At a high level, what were you asked to do in this case? What was your assignment?

A. To become familiar with the record in anticipation of a review of plaintiff's damage expert report, Dr. Vellturo, and then to provide my comments on his work, as well as if appropriate, my own independent opinion as to damages, assuming liability is found.

Q. And you're familiar with Dr. Vellturo before this case; right?

A. I am. Chris and I have known each other for decades.

Q. Is it fair to say that you disagree with his opinions, his methodology, but you're not contesting his qualifications as an expert in the field of economics or IP valuation, patent damages; correct?

A. Correct.

Q. And when you performed your work in this case, you assumed that the asserted claims of the asserted patents are enforceable, valid, and infringed by Slayback's Vivimusta product; right?

A. Correct.

**27**

Q. And that's a common assumption that damages experts make in basically every patent damages case; fair?

A. Liability is a common assumption, yes.

Q. And so you're not offering any opinions on validity or infringement; correct?

A. Correct.

Q. And I don't believe I saw any analysis or opinions relating to what are referred to as secondary considerations of non-obviousness or sometimes it's called objective indicia of non-obviousness; right?

A. I am not. Certainly not as it relates to this matter.

Q. And that includes a subcomponent of that analysis called a nexus. You don't offer any opinions in your report related to whether a sufficient nexus exists between the objective evidence and the asserted claims; is that fair?

A. Not with respect to whether or not the claims at issue are embodied within the accused product, certainly not.

Q. Okay. Let's talk about the scope of the claims a little bit.

You've read the patents, including the

**28**

claims; right, sir?

A. I have.

Q. Okay. And just at a high level, can you just give me your lay understanding of what the inventions are or the alleged inventions claimed in those patents?

A. Yes. It's described within my report and obviously the patents and the specifications themself. But generally speaking, it relates to a formulation or a method of administering bendamustine with certain solvents and/or stabilizers.

Q. Now, just to kind of walk through, there's multiple claims asserted in this case; is that your understanding?

A. Yes, sir.

Q. And understanding you're not a lawyer, you understand that each claim in a patent recites a different invention with a different scope; fair?

A. By definition, yes.

Q. And therefore, all else equal, one patent will not have the same value -- well, I'm going to restate that.

All else equal, one patent claim will not carry the same value as another patent claim; is

261

A. Well, by definition, if it's around 500,000 now, 500,001 is between your bookends.

Q. Okay. And you can't give me any more of a specificity on that?

A. I really don't know what I'm going to be asked to do.

Q. Who are the folks that -- from your team that worked on this report with you? If you can just identify them.

A. Sure. Carlo, who's joining us today; Robert McSorley, who's a managing director; Nikki Tavasoli, who is a manager; and there were others who, at time to time, would help with certain research or QCs.

Q. Okay. And just generally, where do their rates fall?

A. Mr. McSorley is 7 to 800. Nikki is probably 400. Carlo is probably 150 to 250ish.

Q. And do you know approximately how much time they collectively have spent working on this case?

A. Not specifically, only that the cumulative effect of that is the approximate $500,000 number I gave you.

Q. Your CV is attached as Appendix 1 to your report.

Is that still accurate and up to date?

262

A. I've had one deposition since then in the matter of Aerosonic versus Joby on eVTOL aircraft. Nothing related to this.

Q. Okay. Did you speak with anyone other than the lawyers at Windels Marx or Slayback's local counsel in this case to prepare for your deposition today?

A. No.

Q. Okay. In your report, you state you're a named inventor on over 20 patents?

A. True.

Q. You don't include any opinions or discussions about those patents in your report; right?

A. True.

Q. You don't intend to offer any opinions about the substance of those patents at trial; fair?

A. True.

MR. SANDFORD: Okay. No further questions.

THE WITNESS: Thank you. Very professional.

MS. AST-GMOSER: No questions on behalf of --

I'm sorry, Dan. Go ahead.

MR. FORCHHEIMER: No questions on our end.

THE VIDEOGRAPHER: All right. Stand by.

263

This marks the end of the deposition of James Malackowski. We are going off the record. The time is 14:43.

(Off the record at 2:43 p.m.)

264

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, Tiffany M. Pietrzyk, CSR RPR CRR, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was not requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 18th of April, 2026.

My commission expires:

February 28th, 2028

# Exhibit 12

DEPARTMENT OF HEALTH & HUMAN SERVICES
Centers for Medicare & Medicaid Services
7500 Security Boulevard,
Baltimore, Maryland 21244



### Centers for Medicare & Medicaid Services (CMS) Healthcare Common Procedure Coding System (HCPCS) Application Summaries and Coding Determinations

### First Quarter, 2025 HCPCS Coding Cycle

This document presents a summary of each HCPCS Level II code application and CMS' coding determination for each application processed in CMS' First Quarter 2025 Drug and Biological HCPCS Level II code application review cycle. Each individual summary includes the request number; topic/issue; summary of the applicant's submission as written by the applicant with occasional non-substantive editorial changes made by CMS; and CMS' final HCPCS Level II coding determination. All new coding actions will be effective July 1, 2025, unless otherwise indicated.

The HCPCS Level II coding determinations below will also be included in the July 2025 HCPCS Quarterly Update, pending publication by CMS in the coming weeks at: https://www.cms.gov/Medicare/Coding/HCPCSReleaseCodeSets/HCPCS-Quarterly-Update.

For inquiries regarding coverage, please contact to the insurer(s) in whose jurisdiction(s) claim(s) would be filed. Specifically, contact the Medicaid agency in the state in which a Medicaid claim is filed, the individual private insurance entity, the Department of Veterans Affairs, or, for local Medicare coverage determinations, contact the Medicare contractor in the jurisdiction the claim would be filed. For detailed information describing CMS' national coverage determination process, refer to information published at https://www.cms.gov/Medicare/Coverage/DeterminationProcess and https://www.cms.gov/Center/Special-Topic/Medicare-Coverage-Center.

CMS has a long-standing convention to assign dose descriptors in the smallest amount that could be billed in multiple units to accommodate a variety of doses and support streamlined billing. This long-standing policy makes coding more robust and facilitates accurate payment and reporting of the exact dose administered, as only 999 units can appear on a claim line for Medicare fee-for-service using the CMS-1500 form. In addition, CMS will use the generic or chemical name if there are no other similar chemical products on the market. If there are multiple products on the market with the same generic or chemical name, CMS will further distinguish a new code by using the brand name. CMS generally creates codes for products themselves, without specifying a route of administration in the code descriptor, as there might be multiple routes of administration for the same product. Drugs that fall under this category should be billed with either JA modifier for the intravenous infusion of the drug or billed with JB modifier for subcutaneous injection of the drug. The dose descriptors assigned to codes established in this quarterly coding cycle are in alignment with these policies.

1

EAGLEBEN-SA_00375590

# Table of Contents

Final determinations for the First Quarter 2025 Drug and Biological HCPCS Level II coding applications.

1.  Bupivacaine Hydrochloride with Epinephrine - HCP241028MX0DP ........................ 4
2.  BLUDIGO - HCP241220N2VVA ................................................................................... 5
3.  Tepylute - HCP250101PGYN0 .................................................................................... 6
4.  BIZENGRI® - HCP241231CBG1T ............................................................................. 7
5.  OPUVIZ™ - HCP2412319PBHR ................................................................................. 8
6.  Lenmeldy™ - HCP241217X32RA .............................................................................. 9
7.  BEIZRAY - HCP241231R2UJU ................................................................................. 10
8.  Vancomycin Hydrocholoride for Injection - HCP241226RN106 ............................. 11
9.  VYALEV® - HCP241218YNWMD ........................................................................... 13
10. Lutrate Depot - HCP250102CKW2K ......................................................................... 14
11. AUCATZYL® - HCP241126WA5QX ........................................................................ 15
12. VYLOY® - HCP241218QPPXD ................................................................................. 17
13. UNLOXCYT - HCP241216Y3FVW ........................................................................... 18
14. ZIIHERA - HCP241127EFBHL .................................................................................. 19
15. HYMPAVZI® - HCP241216Y9GAF ........................................................................... 20
16. OPDIVO Qvantig™ - HCP24123141KB8 .................................................................. 21
17. IMULDOSA™ - HCP241209A9FPV .......................................................................... 22
18. SELARSDI™ (Subcutaneous) - HCP241218AJ636 ................................................... 23
19. SELARSDI™ (Intravenous) - HCP241218W7VAY .................................................... 24
20. YESINTEK™ (Subcutaneous) - HCP250101YW19B ................................................. 25
21. YESINTEK™ (Intravenous) - HCP250101HG1GC .................................................... 26
22. STEQEYMA® (Subcutaneous) - HCP2501023GYAQ ................................................ 27
23. STEQEYMA® (Intravenous) - HCP250102PJLDX .................................................... 28
24. Cocaine Hydrochloride Nasal Solution- HCP241231FJA2V ..................................... 29
25. AmchoThick™ - HCP24122426V9E .......................................................................... 30
26. AmnioPlast 3™ - HCP2412241J5G8 .......................................................................... 31
27. AmchoPlast EXCEL™ - HCP241224MG6TY ............................................................ 32
28. AéroGuard™ - HCP241230KY1YH ........................................................................... 33
29. NéoGuard™ - HCP241230KUBRU ............................................................................ 34
30. Membrane Wrap-Lite™ - HCP241226T3DG2 ........................................................... 35
31. Duograft AA™ - HCP2412194JX89 ........................................................................... 36
32. duoGRAFT AC™ - HCP2412196XWA4 .................................................................... 37
33. triGRAFT FT™ - HCP241219L49KH ........................................................................ 38
34. Renew™ FT Matrix - HCP2412209YPUJ ................................................................... 39

2

EAGLEBEN-SA_00375591

35. AmnioDefend™ FT Matrix - HCP241220DEN08 ................................................... 40

36. AdvoGraft One - HCP250102E1LLX.................................................................. 41

37. AdvoGraft Membrane Dual - HCP250102EGVK1 .................................................. 42

38. Matrix HD Allograft Dermis, Non-Fenestrated - HCP250102Y6FWB ..................... 43

39. HCPCS Level II Codes for Various FDA Approvals under the 505(b)(2) or Biologics License Application (BLA) Pathways and Products "Not Otherwise Classified" - HCP220517FAENJ ................................................................................................ 44

40. Appendix A: HCPCS Level II Codes for Products Approved by the FDA Under the 505(b)(2) NDA or BLA Pathways and Products "Not Otherwise Classified" .......... 46

3

EAGLEBEN-SA_00375592

**Bupivacaine Hydrochloride with Epinephrine - HCP241028MX0DP**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify bupivacaine hydrochloride (HCl) with epinephrine.

Applicant's suggested language: JXXXX, "Injection, bupivacaine with epinephrine, 0.5 mg"

**Summary of Applicant's Submission**

Myers and Stauffer submitted a request to establish a new HCPCS Level II code to identify bupivacaine HCl with epinephrine. Bupivacaine HCl with epinephrine was approved by the Food and Drug Administration (FDA) under a New Drug Application (NDA) on October 3, 1972. Bupivacaine HCl with epinephrine is indicated in adults for the production of local or regional anesthesia or analgesia for surgery, dental and oral surgery procedures, diagnostic and therapeutic procedures, and for obstetrical procedures. The dosage of bupivacaine HCl with epinephrine administered varies with the anesthetic procedure, the area to be anesthetized, the vascularity of the tissues, the number of neuronal segments to be blocked, the depth of anesthesia and degree of muscle relaxation required, the duration of anesthesia desired, individual tolerance, and the physical condition of the individual. Routes of administration include infiltration, perineural, caudal, and epidural. Bupivacaine HCl with epinephrine injection is a clear, colorless solution available as 0.25%, 0.5%, and 0.75% single- and multiple-dose vials.

**CMS Final HCPCS Coding Determination**

It is our understanding that bupivacaine HCl with epinephrine, a local or regional anesthesia or analgesia for surgery, would generally be used in a procedure reported with a HCPCS Level I, Current Procedural Terminology (CPT®) code. We have not identified a specific need for this item to be separately paid, since we believe that a particular payer may elect to pay for the service in which this product is used. For instance, Medicare would typically reflect the costs of the supply in the payment for the procedure, if it is used, and as such it would not be separately payable.

4

EAGLEBEN-SA_00375593

**BLUDIGO - HCP241220N2VVA**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify BLUDIGO.

Applicant's suggested language: JXXXX, "indigotindisulfonate sodium injection, 8 mg/mL"

**Summary of Applicant's Submission**

Provepharm, Inc. submitted a request to establish a new HCPCS Level II code to identify BLUDIGO (indigotindisulfonate sodium injection). BLUDIGO was approved by the Food and Drug Administration (FDA) under a 505(b)(2) New Drug Application (NDA) on July 8, 2022. BLUDIGO is indicated for use in adults as a visualization aid in the cystoscopic assessment of the integrity of the ureters following urological and gynecological open, robotic, or endoscopic surgical procedures. BLUDIGO is excreted by the kidney through tubular secretion and enhances visualization of the ureteral orifices by its deep blue color. The recommended dose is 5 mL given intravenously over 1 minute. BLUDIGO 40 mg/5 mL (8 mg/mL) is a dark blue or bluish-purple solution supplied in a carton of 5 single-dose amber glass ampules.

**CMS Final HCPCS Coding Determination**

1. Establish a new HCPCS Level II code J9220, "Injection, indigotindisulfonate sodium, 1 mg"

   Effective July 1, 2025

2. Discontinue HCPCS Level II code C9300, "Injection, indigotindisulfonate sodium, 1 mg"

   Effective June 30, 2025

5

EAGLEBEN-SA_00375594

**Tepylute - HCP250101PGYN0**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify Tepylute.

Applicant's suggested language: JXXXX, "Injection, thiotepa (Tepylute), 1 mg"

**Summary of Applicant's Submission**

Shorla Oncology submitted a request to establish a new HCPCS Level II code to identify Tepylute (thiotepa). Tepylute was approved by the Food and Drug Administration (FDA) under a 505(b)(2) New Drug Application (NDA) on June 25, 2024. Tepylute is an alkylating agent indicated for the treatment of adenocarcinoma of the breast or ovary. Tepylute is an alkylating drug of the polyfunctional type, related chemically and pharmacologically to the nitrogen mustard. The radiomimetic action of Tepylute is believed to occur through the release of ethyleneimine radicals which, like irradiation, disrupt the bonds of DNA. One of the principal bond disruptions is initiated by alkylation of guanine at the N-7 position, which severs the linkage between the purine base and the sugar and liberates alkylated guanines.

**CMS Final HCPCS Coding Determination[1]**

Establish a new HCPCS Level II code J9341, "Injection, thiotepa (tepylute), 1 mg"

---

[1] Please refer to Appendix A for additional HCPCS Level II coding actions regarding thiotepa.

6

EAGLEBEN-SA_00375595

**BIZENGRI® - HCP241231CBG1T**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify BIZENGRI®.

Applicant's suggested language: JXXXX, "Injection, zenocutuzumab-zbco, 375 mg"

**Summary of Applicant's Submission**

Partner Therapeutics, Inc. submitted a request to establish a new HCPCS Level II code to identify BIZENGRI® (zenocutuzumab-zbco). BIZENGRI® was approved by the Food and Drug Administration (FDA) under a 351(a) Biologics License Application (BLA) on December 4, 2024. BIZENGRI® is a bispecific human epidermal growth factor receptor (HER) (HER2 and HER3) directed antibody indicated for adults with advanced, unresectable or metastatic non-small cell lung cancer harboring a neuregulin 1 (NRG1) gene fusion with disease progression on or after prior systemic therapy and adults with advanced, unresectable or metastatic pancreatic adenocarcinoma harboring a NRG1 gene fusion with disease progression on or after prior systemic therapy.  BIZENGRI® binds to the extracellular domains of HER2 and HER3 which are expressed on the surface of cells, including tumor cells, inhibiting HER2:HER3 dimerization and preventing NRG1 binding to HER3. The recommended dosage of BIZENGRI® is 750 mg as an intravenous infusion every 2 weeks until disease progression or unacceptable toxicity. BIZENGRI® is administered as an intravenous infusion, after dilution, over 4 hours.  BIZENGRI® is a sterile, clear to slightly opalescent, colorless to slightly yellow, preservative-free injection for intravenous infusion in single-dose vials. Each BIZENGRI® vial contains 375 mg/18.75 mL of zenocutuzumab-zbco at a concentration of 20 mg/mL.

**CMS Final HCPCS Coding Determination**

Establish a new HCPCS Level II code J9382, "Injection, zenocutuzumab-zbco, 1 mg"

7

EAGLEBEN-SA_00375596

**OPUVIZ™ - HCP2412319PBHR**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify OPUVIZ™.

Applicant's suggested language: XXXXX, "Injection, aflibercept-yszy, biosimilar, 1mg"

**Summary of Applicant's Submission**

Samsung Bioeps submitted a request to establish a new HCPCS Level II code for OPUVIZ™ (aflibercept-yszy). OPUVIZ™ was approved by the Food and Drug Administration (FDA) under a 351(k) Biologics License Application (BLA) pathway on May 20, 2024. OPUVIZ™ is a biosimilar to EYLEA® (aflibercept). OPUVIZ™ is indicated for the treatment of individuals with neovascular (wet) age-related macular degeneration, macular edema following retinal vein occlusion, diabetic macular edema, and diabetic retinopathy. OPUVIZ™ is administered by intravitreal injection, and dosing varies by indication. OPUVIZ™ is a clear, colorless to pale yellow solution that is supplied as a 2 mg (0.05 mL of 40 mg/mL) solution in a single-dose vial.

**CMS Final HCPCS Coding Determination**

Establish a new HCPCS Level II code Q5153, "Injection, aflibercept-yszy (opuviz), biosimilar, 1 mg"

8

EAGLEBEN-SA_00375597

**Lenmeldy™ - HCP241217X32RA**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify Lenmeldy™.

Applicant's suggested language: JXXXX, "Injection, atidarsagene autotemcel, per treatment"

**Summary of Applicant's Submission**

Orchard Therapeutics submitted a request to establish a new HCPCS Level II code to identify Lenmeldy™ (atidarsagene autotemcel). Lenmeldy™ was approved by the Food and Drug Administration (FDA) under a 351(a) Biologics License Application (BLA) pathway on March 18, 2024. Lenmeldy™ is indicated for the treatment of individuals with pre-symptomatic late infantile, pre-symptomatic early juvenile, or early symptomatic early juvenile metachromatic leukodystrophy (MLD). Lenmeldy™ is intended for one-time administration via an autologous stem cell transplant procedure and consists of autologous CD34+ cells, containing hematopoietic stem cells, transduced with a lentiviral vector encoding the human arylsulfatase A gene. Lenmeldy™ is composed of one to eight infusion bags which contain 2 to 11.8 x 10^6 cells/mL (1.8 to 11.8 x 10^6 CD34+ cells/mL) suspended in cryopreservation solution. Dosing of Lenmeldy™ is determined based on the number of CD34+ cells in the infusion bag(s) per kilogram of body weight and the MLD disease subtype.

**CMS Final HCPCS Coding Determination**

Establish a new HCPCS Level II code J3391, "Injection, atidarsagene autotemcel, per treatment"

9

EAGLEBEN-SA_00375598

**BEIZRAY - HCP241231R2UJU**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify BEIZRAY.

Applicant's suggested language: JXXXX, "Injection, docetaxel (beizray), 1 mg"

**Summary of Applicant's Submission**

Zhuhai Beihai Biotech Co., Ltd., submitted a request to establish a new HCPCS Level II code to identify BEIZRAY (docetaxel). BEIZRAY was approved by the Food and Drug Administration (FDA) under a 505(b)(2) New Drug Application (NDA) on October 23, 2024. BEIZRAY is indicated for the treatment of individuals with breast cancer, non-small cell lung cancer, castration-resistant prostate cancer, gastric adenocarcinoma, and squamous cell carcinoma of the head and neck. Per the FDA label, BEIZRAY has "different administration instructions from other docetaxel products." BEIZRAY is supplied as a kit consisting of two single dose vials each containing docetaxel 80 mg/4 mL, and one single dose vial of intravenous solution stabilizer that is 50 mL of 25% human albumin solution for infusion.

**CMS Final HCPCS Coding Determination**

Establish a new HCPCS Level II code J9174, "Injection, docetaxel (beizray), 1 mg"

10

EAGLEBEN-SA_00375599

**Vancomycin Hydrocholoride for Injection - HCP241226RN106**

**Topic/Issue**

Request to revise existing HCPCS Level II code J3371, "Injection, vancomycin hcl (mylan), not therapeutically equivalent to J3370, 500 mg" so the unit descriptor instead reads "250 mg" to further describe Vancomycin Hydrocholoride for Injection.

Applicant's suggested language: J3371, "Injection, vancomycin hcl (mylan) not therapeutically equivalent to J3370, 250 mg"

**Summary of Applicant's Submission**

Mylan Pharmaceuticals Inc. submitted a request to revise existing HCPCS Level II code J3371 to further define the unit descriptor for Vancomycin Hydrochloride for Injection. Vancomycin Hydrochloride for Injection was first approved by the Food and Drug Administration (FDA) under a 505(b)(2) New Drug Application (NDA) on July 10, 2018, for the following strengths: 250 mg/vial; 750 mg/vial, 1.25 g/vial; and 1.5 g/vial. On June 26, 2024, the FDA approved a 505(b)(2) supplemental NDA for two additional strengths, 1.75 g/vial and 2 g/vial. Vancomycin Hydrochloride for Injection is indicated for the treatment of individuals with serious or severe infections caused by susceptible strains of methicillin-resistant ($\beta$-lactam-resistant) staphylococci; for individuals allergic to penicillin, who cannot receive or who have failed to respond to other drugs, including the penicillins or cephalosporins; individuals with infections caused by vancomycin-susceptible organisms that are resistant to other antimicrobial drugs; and as initial therapy of individuals when methicillin-resistant staphylococci are suspected, but after susceptibility data are available, therapy should be adjusted accordingly. Vancomycin Hydrochloride for Injection is supplied as single-dose vials containing vancomycin hydrochloride (HCl), United States Pharmacopeia equivalent to 250 mg, 750 mg, 1.25 g, 1.5 g, 1.75 g or 2 g of vancomycin base. Note, the 250 mg/vial strength is not marketed. The current HCPCS Level II code descriptor of J3371, "Injection, vancomycin hcl (mylan) not therapeutically equivalent to J3370, 500 mg" allows billing in units of 500 mg and thus does not accommodate doses of the available strengths. Single-dose vials of 250 mg, 750 mg, 1.25 g, and 1.75 g cannot be accurately billed in units of 500 mg.

**CMS Final HCPCS Coding Determination[2]**

1.  Establish a new HCPCS Level II code J3374, "Injection, vancomycin hydrochloride (mylan) not therapeutically equivalent to j3373, 10 mg"

    Effective July 1, 2025

2.  Discontinue HCPCS Level II code J3371, "Injection, vancomycin hcl (mylan) not therapeutically equivalent to j3370, 500 mg"

    Effective June 30, 2025

---

[2] Please refer to Appendix A for additional HCPCS Level II coding actions regarding vancomycin.

11

EAGLEBEN-SA_00375600

CMS has a long-standing convention to assign dose descriptors in the smallest amount that could be billed in multiple units to accommodate a variety of doses and support streamlined billing. This long-standing policy makes coding more robust and facilitates accurate payment and reporting of the exact dose administered, as only 999 units can appear on a claim line for Medicare fee-for-service using the CMS-1500 form.

12

EAGLEBEN-SA_00375601

**VYALEV® - HCP241218YNWMD**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify VYALEV®.

Applicant's suggested language: JXXXX, "VYALEV (foscarbidopa/foslevodopa), for subcutaneous infusion, per 12 mg foscarbidopa and 240 mg foslevodopa"

**Summary of Applicant's Submission**

AbbVie submitted a request to establish a new HCPCS Level II code to identify VYALEV® (foscarbidopa/foslevodopa) for subcutaneous infusion. VYALEV® was approved by the Food and Drug Administration (FDA) under a New Drug Application (NDA) on October 16, 2024. VYALEV® is indicated for the treatment of motor fluctuations in adults with advanced Parkinson's disease (PD). VYALEV® is a pro-drug combination of foscarbidopa (carbidopa monophosphate) and foslevodopa (levodopa monophosphate) [ratio 1:20] in a solution intended to be administered as a 24 hour/day continuous subcutaneous infusion in individuals with advanced PD, using the VYAFUSER™ pump. VYALEV® is prescribed by a health care provider and may be self-administered in the individual's home. Initial doses may be furnished in the hospital outpatient or health care provider office settings to titrate the dosage for the individual. The recommended starting infusion rate of VYALEV® is determined by converting the daytime levodopa intake to levodopa equivalents (LE), and then increasing it to account for a 24-hour administration. The dose may be adjusted to reach a clinical response that maximizes the functional "on" time and minimizes the number and duration of "off" episodes and "on" episodes with troublesome dyskinesia. The maximum recommended daily dose of VYALEV® is 3,525 mg of the foslevodopa component (approximately 2,500 mg LE) administered over 24 hours. VYALEV® is supplied as a carton of 7 single-dose glass vials filled with approximately 10 mL of solution.

**CMS Final HCPCS Coding Determination**

Establish a new HCPCS Level II code J7356, "Injection, foscarbidopa 0.25 mg/foslevodopa 5 mg"

13

EAGLEBEN-SA_00375602

**Lutrate Depot - HCP250102CKW2K**

**Topic/Issue**

Request to revise existing HCPCS Level II code J1954, "Injection, leuprolide acetate for depot suspension (cipla), 7.5 mg" to include the brand name (Lutrate Depot) instead of the marketing company name (Cipla).

Applicant's suggested language: J1954, "For injection, Leuprolide Acetate for depot suspension, (Lutrate Depot), 7.5 mg"

**Summary of Applicant's Submission**

Cipla Pharmaceuticals (Cipla) submitted a request to revise existing HCPCS Level II code J1954 to include the brand name (Lutrate Depot) instead of the marketing company name (Cipla). Lutrate Depot (leuprolide acetate) was approved by the Food and Drug Administration (FDA) under a 505(b)(2) New Drug Application (NDA) on August 28, 2018. While Cipla will retain the NDA, Avyxa Pharmaceuticals became the marketing entity effective January 1, 2025. Lutrate Depot is indicated for palliative treatment of advanced prostate cancer. Due to different release characteristics, the dosage strengths are not additive and must be selected based upon the desired dosing schedule. Lutrate Depot is a depot suspension that is dosed at 22.5 mg that is administered for 3 months as a single intramuscular injection every 12 weeks. Lutrate Depot is packaged in a single-dose vial as a kit with a prefilled syringe containing diluent and a MixJect® transfer device. Lutrate Depot is a gonadotropin-releasing hormone agonist, acts as an inhibitor of gonadotropin secretion. In humans, administration of leuprolide acetate results in an initial increase in circulating levels of luteinizing hormone (LH) and follicle stimulating hormone (FSH), leading to a transient increase in levels of the gonadal steroids (testosterone and dihydrotestosterone in male individuals, and estrone and estradiol in pre-menopausal individuals). However, continuous administration of leuprolide acetate results in decreased levels of LH and FSH. In males, testosterone is reduced to below castrate threshold. In pre-menopausal females, estrogens are reduced to post-menopausal concentrations. These decreases occur within two to four weeks after initiation of treatment. Long-term studies have shown that continuation of therapy with leuprolide acetate maintains testosterone below the castrate level for more than five years.

**CMS Final HCPCS Coding Determination**

Revise existing HCPCS Level II code J1954, "Injection, leuprolide acetate for depot suspension (cipla), 7.5 mg" to instead read "Injection, leuprolide acetate for depot suspension (lutrate depot), 7.5 mg"

14

EAGLEBEN-SA_00375603

**AUCATZYL® - HCP241126WA5QX**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify AUCATZYL®.

Applicant's suggested language: JXXXX, "Obecabtagene autoleucel, up to 410 million CD19 CAR-positive viable T cells, per therapeutic dose"

**Summary of Applicant's Submission**

Autolus Therapeutics plc submitted a request to establish a new HCPCS Level II code to identify AUCATZYL® (obecabtagene autoleucel) suspension for intravenous infusion. AUCATZYL® was approved by the Food and Drug Administration (FDA) under a 351(a) Biologics License Application (BLA) on November 8, 2024. AUCATZYL® is a fast off-rate CD19-directed genetically modified autologous chimeric antigen receptor (CAR)-T cell immunotherapy, with tumor burden-guided dosing, indicated for the treatment of adults with relapsed or refractory (R/R) B cell precursor acute lymphoblastic leukemia (B-ALL). AUCATZYL® is specifically designed to overcome the limitations in clinical activity and safety compared to currently available CD19 CAR-T cell therapies for the treatment of adult R/R B-ALL. The CAR in AUCATZYL®'s distinct immune-modulating mechanism of action is constructed using a differentiated 4-1BB co-stimulatory domain with a unique, proprietary low affinity, fast off-rate CAT hybridoma-derived CD19 single-chain variable fragment (CAT19 binding domain). Further, AUCATZYL® is specifically designed to follow a manageable, personalized tumor burden-guided dosing schedule based on the level of disease present in each individual's bone marrow (BM) to minimize immune-related toxicity associated with increased tumor burden, namely severe cytokine release syndrome and high rates of severe immune effector cell-associated neurotoxicity syndrome. AUCATZYL® is supplied as a cryopreserved autologous cell suspension packaged in 3 to 5 infusion bags overall containing a cell dispersion of the total recommended tumor burden-guided dose of $410 \times 10^6$ CD19 CAR-positive viable T cells for the single AUCATZYL® treatment. The first dose (administered on day 1) is determined by the individual's BM disease burden within 7 days prior to lymphodepletion; the second dose (administered on day 10 [± 2]) is tailored for a total dose of $410 \times 10^6$ CAR-T cells to complete the single treatment of AUCATZYL®.

**CMS Final HCPCS Coding Determination[3]**

1. Establish a new HCPCS Level II code Q2058, "Obecabtagene autoleucel, 10 up to 400 million cd19 car-positive viable t cells, including leukapheresis and dose preparation procedures, per infusion"

   Effective July 1, 2025

2. Discontinue HCPCS Level II code C9301, "Obecabtagene autoleucel, up to 400 million cd19 car-positive viable t cells, including leukapheresis and dose preparation procedures, per therapeutic dose"

---

[3] Updated on April 30, 2025 to revise HCPCS Level II code Q2058 from "per therapeutic dose" to instead read "per infusion" and to adjust the dosage to read "10 up to 400 million." Additional language was added on how to appropriately bill for AUCATZYL®.

15

Effective June 30, 2025

AUCATZYL® has a total recommended dose of 410 x 10^6 CD19 chimeric antigen receptor (CAR)-positive viable T cells for split dose administration.  The treatment regimen consists of a split dose infusion: the first infusion on day one and, in most cases, a second infusion on day ten (+/-2 days).  Depending on the percentage of bone marrow blasts, the first infusion could be either 10 x 10^6 administered from syringe or 100 x10^6 administered from one infusion bag.  Then, the second infusion could be either 400 x10^6 administered from two infusion bags or 310 x10^6 administered from one syringe and one infusion bag.  To facilitate billing for each infusion individually and to take into account all possible infusions of the split dose (based on the FDA approved labeling), the description is "10 up to 400 million cd19 car-positive viable t cells" which should be used to bill for each of the two infusions of the treatment regimen.

For each infusion of the split dose regimen, the unit quantity on the claim line is 1 (a total of 2 billing units for the complete regimen of 2 infusions). Should a second infusion not be furnished, the hospital should not submit a claim to Medicare. Since the product is not a "single-dose container" based on the FDA-approved label, the JW/JZ modifier policy does not apply, and the modifiers are not necessary for billing.  Specifically, no modifier is necessary for an administered infusion, and it is not appropriate to bill Medicare for a second infusion that was not administered using the JW modifier on the claim submission.

16

EAGLEBEN-SA_00375605

**VYLOY® - HCP241218QPPXD**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify VYLOY®.

Applicant's suggested language: JXXXX, "Injection, zolbetuximab-clzb, 1mg"

**Summary of Applicant's Submission**

Astellas submitted a request to establish a new HCPCS Level II code to identify VYLOY® (zolbetuximab-clzb). VYLOY® was approved by the Food and Drug Administration (FDA) under a 351(a) Biologics License Application (BLA) on October 18, 2024. VYLOY® is a claudin (CLDN) 18.2-directed cytolytic antibody and is indicated in combination with fluoropyrimidine- and platinum-containing chemotherapy for the first-line treatment of adults with locally advanced unresectable or metastatic human epidermal growth factor receptor 2-negative gastric or gastroesophageal junction adenocarcinoma whose tumors are CLDN 18.2 positive as determined by an FDA-approved test. VYLOY® is administered by intravenous infusion only (not administered as an intravenous push or bolus). The recommended first dose of VYLOY® is 800 mg/m$^2$, followed by 600 mg/m$^2$ every 3 weeks, or 400 mg/m$^2$ every 2 weeks. This 100 mg lyophilized powder is packaged in a single-dose vial.

**CMS Final HCPCS Coding Determination[4]**

1. Establish a new HCPCS Level II code J1326, "Injection, zolbetuximab-clzb, 2 mg"

   Effective July 1, 2025

2. Discontinue HCPCS Level II code C9303, "Injection, zolbetuximab-clzb, 1 mg"

   Effective June 30, 2025

---

[4] Updated on April 7, 2025, to revise the HCPCS Level II code C9303, "Injection, zolbetuximab-clzb, 2 mg" to instead read "Injection, zolbetuximab-clzb, 1 mg".

17

EAGLEBEN-SA_00375606

## UNLOXCYT - HCP241216Y3FVW

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify UNLOXCYT.

Applicant's suggested language: JXXXX, "Injection, cosibelimab-ipdl, 1mg"

**Summary of Applicant's Submission**

Checkpoint Therapeutics, Inc. submitted a request to establish a new HCPCS Level II code to identify UNLOXCYT (cosibelimab-ipdl). UNLOXCYT was approved by the Food and Drug Administration (FDA) under a 351(a) Biologics License Application (BLA) on December 13, 2024. UNLOXCYT is a programmed death-ligand 1 (PD-L1) blocking antibody, indicated for the treatment of adults with metastatic cutaneous squamous cell carcinoma (CSCC) or locally advanced CSCC who are not candidates for curative surgery or curative radiation. UNLOXCYT is a high-affinity, human immunoglobulin G monoclonal antibody that binds to PD-L1 and blocks the PD-L1 interaction with the PD-1 and B7-1 receptors. The recommended dosage of UNLOXCYT is 1,200 mg as an intravenous infusion over 60 minutes every 3 weeks. UNLOXCYT is supplied as a 300 mg/5 mL (60 mg/mL) solution in a single-dose vial for infusion.

**CMS Final HCPCS Coding Determination**

Establish a new HCPCS Level II code J9275, "Injection, cosibelimab-ipdl, 2 mg"

18

EAGLEBEN-SA_00375607

**ZIIHERA - HCP241127EFBHL**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify ZIIHERA.

Applicant's suggested language: JXXXX, "Injection, zanidatamab-hrii, 1 mg"

**Summary of Applicant's Submission**

Jazz Pharmaceuticals submitted a request to establish a new HCPCS Level II code to identify ZIIHERA (zanidatamab-hrii). ZIIHERA was approved by the Food and Drug Administration (FDA) under a 351(a) Biologics License Application (BLA) on November 20, 2024. ZIIHERA is a bispecific human epidermal growth factor receptor 2 (HER2)-directed antibody that binds to two extracellular sites on HER2. ZIIHERA is indicated for the treatment of adults with previously treated, or metastatic HER2-positive immunohistochemical 3+ biliary tract cancer, as detected by an FDA-approved test. Binding of ZIIHERA with HER2 results in internalization, leading to a reduction of the receptor on the tumor cell surface. The recommended dose of ZIIHERA is 20 mg/kg, administered as an intravenous infusion once every 2 weeks until disease progression or unacceptable toxicity. ZIIHERA is supplied in a single-dose vial containing 300 mg lyophilized powder for reconstitution.

**CMS Final HCPCS Coding Determination**

1. Establish a new HCPCS Level II code J9276, "Injection, zanidatamab-hrii, 2 mg"

   Effective July 1, 2025

2. Discontinue HCPCS Level II code C9302, "Injection, zanidatamab-hrii, 2 mg

   Effective June 30, 2025

19

EAGLEBEN-SA_00375608

**HYMPAVZI® - HCP241216Y9GAF**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify HYMPAVZI®.

Applicant's suggested language: JXXXX, "Injection, marstacimab-hncq, 1 mg"

**Summary of Applicant's Submission**

Pfizer Inc. submitted a request to establish a new HCPCS Level II code to identify HYMPAVZI® (marstacimab-hncq). HYMPAVZI® was approved by the Food and Drug Administration (FDA) under a 351(a) Biologics License Application (BLA) on October 11, 2024. HYMPAVZI® is a tissue factor pathway inhibitor antagonist that directly integrates into the coagulation cascade to restore balance, allowing for stable blood clot formation and hemostasis. HYMPAVZI® is indicated for routine prophylaxis to prevent or reduce the frequency of bleeding episodes in individuals 12 years of age and older with hemophilia A (congenital factor VIII deficiency) without factor VIII inhibitors, or hemophilia B (congenital factor IX deficiency) without factor IX inhibitors. HYMPAVZI® is administered by subcutaneous injection, once weekly, at any time of the day. The recommended dose of HYMPAVZI® is 300 mg (loading dose) on day 1, and 150 mg (maintenance dose) on day 8 and weekly thereafter on the same day each week. If more than one injection is required to deliver a complete dose, each injection should be administered at a different injection site. A dose adjustment to 300 mg weekly can be considered in individuals weighing greater than or equal to 50 kg when control of bleeding events is judged to be inadequate by the healthcare provider. The safety and efficacy of HYMPAVZI® at doses above 300 mg weekly have not been sufficiently established. HYMPAVZI® is supplied as a single-dose 150 mg/mL (1 mL) prefilled pen.

**CMS Final HCPCS Coding Determination**

1. Establish a new HCPCS Level II code J7172, "Injection, marstacimab-hncq, 0.5 mg"

   Effective July 1, 2025

2. Discontinue HCPCS Level II code C9304, "Injection, marstacimab-hncq, 0.5 mg"

   Effective June 30, 2025

20

EAGLEBEN-SA_00375609

**OPDIVO Qvantig™ - HCP24123141KB8**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify OPDIVO Qvantig™.

Applicant's suggested language: JXXXX, "Injection, nivolumab and hyaluronidase-nvhy, per 10 mg"

**Summary of Applicant's Submission**

Bristol Myers Squibb submitted a request to establish a new HCPCS Level II code to identify OPDIVO Qvantig™ (nivolumab and hyaluronidase-nvhy). OPDIVO Qvantig™ was approved by the Food and Drug Administration (FDA) under a 351(a) Biologics License Application (BLA) on December 27, 2024. OPDIVO Qvantig™ is indicated for the treatment of individuals with various tumor types, including renal cell carcinoma, melanoma, non-small cell lung cancer, squamous cell carcinoma of the head and neck, urothelial carcinoma, colorectal cancer, hepatocellular carcinoma, esophageal cancer, gastric cancer, gastroesophageal junction cancer, and esophageal adenocarcinoma. OPDIVO Qvantig™ is administered by a healthcare provider as a subcutaneous injection. OPDIVO Qvantig™ is supplied as an individually packaged single-dose vial providing 600 mg nivolumab and 10,000 units hyaluronidase per 5 mL (120 mg/ 2,000 units per mL).

**CMS Final HCPCS Coding Determination**

Establish a new HCPCS Level II code J9289, "Injection, nivolumab, 2 mg and hyaluronidase-nvhy"

21

EAGLEBEN-SA_00375610

**IMULDOSA™ - HCP241209A9FPV**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify IMULDOSA™.

Applicant's suggested language: QXXXX, "Injection, ustekinumab-srlf (imuldosa), 1mg"

**Summary of Applicant's Submission**

Accord Biopharma submitted a request to establish a new HCPCS Level II code to identify IMULDOSA™ (ustekinumab-srlf). IMULDOSA™ was approved by the Food and Drug Administration (FDA) under a 351(k) Biologics License Application (BLA) on October 10, 2024. IMULDOSA™ is biosimilar to STELARA® (ustekinumab). IMULDOSA™ is indicated for the treatment of individuals 6 years of age and older with moderate to severe plaque psoriasis who are candidates for phototherapy or systemic therapy and active psoriatic arthritis. IMULDOSA™ is also indicated for the treatment of adults with moderately to severely active Crohn's disease and ulcerative colitis. The recommended dose is based on body weight. The route of administration for IMULDOSA™ is either intravenous or subcutaneous, or both, depending on the indications for which it is being used as per the label. IMULDOSA™ injection is supplied as individually packaged, single-dose prefilled syringes or single-dose vials.

**CMS Final HCPCS Coding Determination**

Establish a new HCPCS Level II code Q5098, "Injection, ustekinumab-srlf (imuldosa), biosimilar, 1 mg"

CMS generally creates codes for products themselves, without specifying a route of administration in the code descriptor, as there might be multiple routes of administration for the same product. Drugs that fall under this category should be billed with either the JA modifier for the intravenous infusion of the drug or billed with the JB modifier for subcutaneous injection of the drug.

22

EAGLEBEN-SA_00375611

**SELARSDI™ (Subcutaneous) - HCP241218AJ636**

**Topic/Issue**

Request to revise existing HCPCS Level II code Q9998, "Injection, ustekinumab-aekn (selarsdi), 1 mg" to distinguish SELARSDI™ subcutaneous (SC) injection from SELARSDI™ intravenous (IV) infusion.

Applicant's suggested language: Q9998, "Injection, ustekinumab-aekn (selarsdi), biosimilar, subcutaneous, 1 mg"

**Summary of Applicant's Submission**

Teva Pharmaceuticals, Inc. submitted a request to revise existing HCPCS Level II code Q9998 to distinguish SELARSDI™ (SC) injection from SELARSDI™ (IV) infusion. SELARSDI™ (ustekinumab-aekn) was approved by the Food and Drug Administration (FDA) under a 351(k) Biologics License Application (BLA) on April 16, 2024. SELARSDI™ (SC) is indicated for the treatment of individuals with moderate to severe plaque psoriasis who are candidates for phototherapy or systemic therapy, adults with active psoriatic arthritis, adults with moderately to severe active Crohn's disease, and adults with moderately to severe active ulcerative colitis. SELARSDI™ (SC) is also indicated for treating individuals 6 years and older with moderate to severe plaque psoriasis, who are candidates for phototherapy or systemic therapy and active psoriatic arthritis. The recommended dosage of SELARSDI™ (SC) varies based on indication as well as the weight of the individual. SELARSDI™ (SC) is packaged in a 45 mg/0.5 mL single-dose prefilled syringe and a 90 mg/mL single-dose prefilled syringe.

**CMS Final HCPCS Coding Determination**

Revise existing HCPCS Level II code Q9998, "Injection, ustekinumab-aekn (selarsdi), 1 mg" to instead read "Injection, ustekinumab-aekn (selarsdi), biosimilar, 1 mg"

CMS agrees that it is appropriate to revise the existing HCPCS Level II code Q9998 to add the word "biosimilar" to the language. CMS generally creates codes for products themselves, without specifying a route of administration in the code descriptor, as there might be multiple routes of administration for the same product. Drugs that fall under this category should be billed with either the JA modifier for the intravenous infusion of the drug or billed with the JB modifier for subcutaneous injection of the drug.

23

EAGLEBEN-SA_00375612

**SELARSDI™ (Intravenous) - HCP241218W7VAY**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify SELARSDI™ for intravenous (IV) infusion.

Applicant's suggested language: QXXXX, "Injection, ustekinumab-aekn (selarsdi), biosimilar, intravenous, 1 mg"

**Summary of Applicant's Submission**

Teva Pharmaceuticals, Inc. submitted a request to establish a new HCPCS Level II code to identify SELARSDI™ (ustekinumab-aekn) for IV infusion. SELARSDI™ was approved by the Food and Drug Administration (FDA) under a 351(k) Biologics License Application (BLA) on October 18, 2024. A new code is necessary to distinguish SELARSDI™ (ustekinumab-aekn) IV infusion from SELARSDI™ (ustekinumab-aekn) subcutaneous injection, which is the subject of another HCPCS Level II code application in this quarterly cycle. SELARSDI™ (IV) is a human interleukin -12 and -23 antagonist for IV infusion. SELARSDI™ (IV) is indicated for treating adults with moderately to severe active Crohn's disease and adults with moderate to severe active ulcerative colitis. The recommended dosage of SELARSDI™ (IV) varies based on indication as well as the weight of the individual.

**CMS Final HCPCS Coding Determination**

Revise existing HCPCS Level II code Q9998, "Injection, ustekinumab-aekn (selarsdi), 1 mg" to instead read "Injection, ustekinumab-aekn (selarsdi), biosimilar, 1 mg"

CMS agrees that it is appropriate to revise the existing HCPCS Level II code Q9998 to add the word "biosimilar" to the language. CMS generally creates codes for products themselves, without specifying a route of administration in the code descriptor, as there might be multiple routes of administration for the same product. Drugs that fall under this category should be billed with either the JA modifier for the intravenous infusion of the drug or billed with the JB modifier for subcutaneous injection of the drug.

24

EAGLEBEN-SA_00375613

**YESINTEK™ (Subcutaneous) - HCP250101YW19B**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify YESINTEK™ for subcutaneous (SC) injection.

Applicant's suggested language: QXXXX, "Injection, ustekinumab-kfce (yesintek), subcutaneous, 1 mg"

**Summary of Applicant's Submission**

Biocon Biologics submitted a request to establish a new HCPCS Level II code to identify YESINTEK™ (ustekinumab-kfce) for SC injection. YESINTEK™ was approved by the Food and Drug Administration (FDA) under a 351(k) Biologics License Application (BLA) on November 29, 2024. YESINTEK™ is single source drug product indicated for the treatment of individuals with moderate to severe plaque psoriasis (PsO) who are candidates for phototherapy or systemic therapy; active psoriatic arthritis (PsA); moderately to severely active Crohn's disease; or moderately to severely active ulcerative colitis. It is also indicated for treating individuals 6 years and older with moderate PsO, who are candidates for phototherapy or systemic therapy, or active PsA. The recommended dosage of YESINTEK™ varies based on the indication as well as the individual's weight. YESINTEK™ is administered via intravenous infusion or SC injection.

**CMS Final HCPCS Coding Determination**

Establish a new HCPCS Level II code Q5100, "Injection, ustekinumab-kfce (yesintek), biosimilar, 1 mg"

CMS generally creates codes for products themselves, without specifying a route of administration in the code descriptor, as there might be multiple routes of administration for the same product. Drugs that fall under this category should be billed with either the JA modifier for the intravenous infusion of the drug or billed with the JB modifier for subcutaneous injection of the drug.

25

EAGLEBEN-SA_00375614

**YESINTEK™ (Intravenous) - HCP250101HG1GC**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify YESINTEK™ for intravenous (IV) infusion.

Applicant's suggested language: QXXXX, "Injection, Ustekinumab-kfce (yesintek), intravenous, 1 mg"

**Summary of Applicant's Submission**

Biocon Biologics submitted a request to establish a new HCPCS Level II code to identify YESINTEK™ (ustekinumab-kfce) for IV infusion. YESINTEK™ was approved by the Food and Drug Administration (FDA) under a 351(k) Biologics License Application (BLA) on November 29, 2024. YESINTEK™ is a single source drug product indicated for the treatment of individuals with moderate to severe plaque psoriasis who are candidates for phototherapy or systemic therapy; active psoriatic arthritis; moderately to severely active Crohn's disease; or moderately to severely active ulcerative colitis. It is also indicated for treating individuals 6 years and older with moderate to severe plaque psoriasis, who are candidates for phototherapy or systemic therapy, or active psoriatic arthritis. The recommended dosage of YESINTEK™ varies based on the indication as well as the individual's weight. YESINTEK™ is administered via IV infusion or subcutaneous injection.

**CMS Final HCPCS Coding Determination**

Establish a new HCPCS Level II code Q5100, "Injection, ustekinumab-kfce (yesintek), biosimilar, 1 mg"

CMS generally creates codes for products themselves, without specifying a route of administration in the code descriptor, as there might be multiple routes of administration for the same product. Drugs that fall under this category should be billed with either the JA modifier for the intravenous infusion of the drug or billed with the JB modifier for subcutaneous injection of the drug.

26

**STEQEYMA® (Subcutaneous) - HCP2501023GYAQ**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify STEQEYMA® for subcutaneous (SC) injection.

Applicant's suggested language: QXXXX, "Ustekinumab-stba (steqeyma), biosimilar, for subcutaneous injection, 1 mg"

**Summary of Applicant's Submission**

CELLTRION Inc. submitted a request to establish a new HCPCS Level II code to identify STEQEYMA® (ustekinumab-stba) for SC injection. STEQEYMA® was approved by the Food and Drug Administration (FDA) under a 351(k) Biologics License Application (BLA) on December 17, 2024. STEQEYMA® is a biosimilar to STELARA® (ustekinumab). STEQEYMA® (SC) is a human interleukin-12 and -23 antagonist indicated for the treatment of adults with moderate to severe plaque psoriasis who are candidates for phototherapy or systemic therapy, active psoriatic arthritis, moderately to severely active Crohn's disease, and moderately to severely active ulcerative colitis. STEQEYMA® is also approved for individuals 6 years and older with moderate to severe plaque psoriasis, who are candidates for phototherapy or systemic therapy, and individuals with active psoriatic arthritis. While STEQEYMA® has been approved with both intravenous (IV) and SC dosage forms, CELLTRION is requesting a unique HCPCS Level II code for STEQEYMA® (SC) to distinguish it from the IV induction dosage form. The recommended dosage will vary by the weight of the individual. STEQEYMA® (SC) is not interchangeable with STEQEYMA® (IV) and cannot be substituted as an induction dose for Crohn's disease or ulcerative colitis. STELARA®, the reference product for STEQEYMA®, as well as other STELARA® biosimilars, have separate HCPCS codes for IV and SC formulations, therefore, in addition to the clinical need as described above, to reduce provider and beneficiary confusion, two HCPCS Level II codes would be recommended.

**CMS Final HCPCS Coding Determination**

Establish a new HCPCS Level II code Q5099, "Injection, ustekinumab-stba (steqeyma), biosimilar, 1 mg"

CMS generally creates codes for products themselves, without specifying a route of administration in the code descriptor, as there might be multiple routes of administration for the same product. Drugs that fall under this category should be billed with either the JA modifier for the intravenous infusion of the drug or billed with the JB modifier for subcutaneous injection of the drug.

27

EAGLEBEN-SA_00375616

**STEQEYMA® (Intravenous) - HCP250102PJLDX**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify STEQEYMA® for intravenous (IV) infusion.

Applicant's suggested language: QXXXX, "Ustekinumab-stba (steqeyma), biosimilar, for intravenous injection, 1 mg"

**Summary of Applicant's Submission**

CELLTRION Inc. submitted a request to establish a new HCPCS Level II code to identify STEQEYMA® (ustekinumab-stba) for IV infusion. STEQEYMA® was approved by the Food and Drug Administration (FDA) under a 351(k) Biologics License Application (BLA) on December 17, 2024. STEQEYMA® is a biosimilar to STELARA® (ustekinumab). STEQEYMA® is a human interleukin-12 and -23 antagonist indicated for the treatment of adults with moderate to severe plaque psoriasis who are candidates for phototherapy or systemic therapy, active psoriatic arthritis, moderately to severely active Crohn's disease, and moderately to severely active ulcerative colitis. STEQEYMA® is also approved for individuals 6 years and older with moderate to severe plaque psoriasis, who are candidates for phototherapy or systemic therapy, and individuals with active psoriatic arthritis. While STEQEYMA® has been approved with both IV and subcutaneous (SC) dosage forms, CELLTRION is requesting a unique HCPCS Level II code for STEQEYMA® (IV) as it is only recommended for use as the initial induction dose for adults with Crohn's disease or ulcerative colitis. The recommended dosage will vary by the weight of the individual. STEQEYMA® (IV) is available in a 130 mg/26 mL (5 mg/mL) solution in a single-dose vial. Given that STEQEYMA® (IV) is a larger loading dose compared to SC maintenance dosing, only used in limited indications, and only approved as an infused induction dose, it should have a unique HCPCS Level II code to distinguish it from STEQEYMA® (SC), which has very different strengths and utility. STELARA®, the reference product for STEQEYMA®, as well as other STELARA® biosimilars, have separate HCPCS Level II codes for IV and SC formulations, therefore, in addition to the clinical need as described above, to reduce provider and beneficiary confusion, two HCPCS Level II codes would be recommended.

**CMS Final HCPCS Coding Determination**

Establish a new HCPCS Level II code Q5099, "Injection, ustekinumab-stba (steqeyma), biosimilar, 1 mg"

CMS generally creates codes for products themselves, without specifying a route of administration in the code descriptor, as there might be multiple routes of administration for the same product. Drugs that fall under this category should be billed with either the JA modifier for the intravenous infusion of the drug or billed with the JB modifier for subcutaneous injection of the drug.

28

EAGLEBEN-SA_00375617

## Cocaine Hydrochloride Nasal Solution- HCP241231FJA2V

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify Cocaine hydrochloride nasal solution.

Applicant's suggested language: XXXXX, "Solution, cocaine hydrochloride, 1 mg"

**Summary of Applicant's Submission**

LXO Group submitted a request to establish a new HCPCS Level II code to identify Cocaine hydrochloride nasal solution. Cocaine hydrochloride nasal solution was approved by the Food and Drug Administration (FDA) under a 505(b)(2) New Drug Application (NDA) on December 14, 2017. Cocaine hydrochloride nasal solution is a single source drug administered to adults for the induction of local anesthesia of the mucous membranes when performing diagnostic procedures and surgeries on or through the nasal cavities. The method of action for cocaine hydrochloride is to prevent conduction in nerve fibers by reversibly blocking sodium channels and preventing the transient rise in sodium conductance. The recommended dose of cocaine hydrochloride nasal solution is two soaked cottoned pledgets placed in each nasal cavity, equivalent to 40 mg cocaine hydrochloride per pledget, for a total dose of 160 mg for four pledgets. The route of administration is intranasal. Cocaine hydrochloride nasal solution is a clear, green-colored liquid available in a dosage strength of 160 mg/4 mL (40 mg/mL or 4%) in a single-use bottle, equivalent to 142.4 mg/4 mL (35.6 mg/mL) cocaine free-base.

**CMS Final HCPCS Coding Determination**

It is our understanding that Cocaine hydrochloride nasal solution would generally be used in a procedure reported with a HCPCS Level I, Current Procedural Terminology (CPT®) code. We have not identified a specific need for this supply to be separately paid, since we believe that a particular payer may elect to pay for the service in which this product is used. For instance, Medicare would typically reflect the costs of the product in the payment for the procedure, if it is used, and as such it would not be separately payable.

29

EAGLEBEN-SA_00375618

**AmchoThick™ - HCP24122426V9E**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify AmchoThick™.

Applicant's suggested language: XXXXX, "AmchoThick™, per square centimeter"

**Summary of Applicant's Submission**

Cellution Biologics, LLC submitted a request to establish a new HCPCS Level II code to identify AmchoThick™.  AmchoThick™ is regulated as a human cell, tissue, or cellular or tissue-based product (HCT/P) solely under section 361 of the Public Health Service (PHS) Act and 21 CFR part 1271 when intended for use as a "barrier and cover." AmchoThick™ is a minimally manipulated, dehydrated, human amnion chorion amnion membrane allograft. AmchoThick™ is intended for homologous use. It acts as a barrier and provides protective coverage for acute and chronic wounds from the surrounding environment.  The allograft is processed using aseptic techniques and terminally sterilized by gamma irradiation to meet a sterility assurance level of 10-6. AmchoThick™ is for topical application. It can be applied to a wound or injury site using sterile forceps following wound preparation. AmchoThick™ is supplied in a sealed, single-use sterile double-pouched package consisting of a primary aluminum polyester and a secondary aluminum pouch. Allografts must be stored in a clean and dry environment at ambient room temperature before application. AmchoThick™ is available in various sizes and configuration sheets.

**CMS Final HCPCS Coding Determination**

After review of the Food and Drug Administration's (FDA's) Tissue Reference Group (TRG) letter submitted by the applicant, AmchoThick™, "when intended for use as a barrier and cover appears to meet the criteria for regulation solely under section 361 of the PHS Act and the regulations in 21 CFR part 1271." As a result of our review of the TRG's feedback, CMS has decided to:

Establish a new HCPCS Level II code Q4368, "Amchothick, per square centimeter"

This coding determination applies to the AmchoThick™ product described in the application and accompanying FDA TRG letter dated October 3, 2024, when intended for use as a "barrier and cover."

30

EAGLEBEN-SA_00375619

**AmnioPlast 3™ - HCP2412241J5G8**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify AminoPlast 3™.

Applicant's suggested language: XXXXX, "AmnioPlast 3™, per square centimeter"

**Summary of Applicant's Submission**

Cellution Biologics, LLC submitted a request to establish a new HCPCS Level II code to identify AmnioPlast 3™. AmnioPlast 3™ is regulated as a human cell, tissue, or cellular or tissue-based product (HCT/P) solely under section 361 of the Public Health Service (PHS) Act and 21 CFR part 1271 when intended for use as a "cover and barrier." AmnioPlast 3™ is a minimally manipulated, decellularized, dehydrated, tri-layer amnion membrane allograft intended for homologous use. It is designed for use as a biological ocular cover. It acts as a barrier and provides protective coverage from the surrounding environment following repair or reconstruction procedures for ocular diseases and/or abnormalities. The allograft is processed using aseptic techniques and terminally sterilized by gamma irradiation to meet a sterility assurance level of 10-6. AmnioPlast 3™ is packaged in a hermetically sealed primary aluminum-PVC foil pouch and a secondary aluminum foil pouch. The dosage of AmnioPlast 3™ is measured in square centimeters, depending on the size of the wound, and it can be reapplied as needed. AmnioPlast 3™ must be stored in a clean, dry environment at ambient room temperature before application. It is supplied in various sizes and configuration sheets.

**CMS Final HCPCS Coding Determination**

After review of the Food and Drug Administration's (FDA's) Tissue Reference Group (TRG) letter submitted by the applicant, AmnioPlast 3™, "when intended for use as a cover and barrier appears to meet the criteria for regulation solely under section 361 of the PHS Act and the regulations in 21 CFR part 1271." As a result of our review of the TRG's feedback, CMS has decided to:

Establish a new HCPCS Level II code Q4369, "Amnioplast 3, per square centimeter"

This coding determination applies to the AmnioPlast 3™ product described in the application and accompanying FDA TRG letter dated October 3, 2024, when intended for use as a "cover and barrier."

31

**AmchoPlast EXCEL™ - HCP241224MG6TY**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify AmchoPlast EXCEL™.

Applicant's suggested language: XXXXX, "AmchoPlast EXCEL™, per square centimeter"

**Summary of Applicant's Submission**

Cellution Biologics, LLC submitted a request to establish a new HCPCS Level II code to identify AmchoPlast EXCEL™. AmchoPlast EXCEL™ is regulated as a human cell, tissue, or cellular or tissue-based product (HCT/P) solely under section 361 of the Public Health Service (PHS) Act and 21 CFR part 1271 when intended for use as a "barrier and cover." AmchoPlast EXCEL™ is a minimally manipulated, dehydrated, human amnion chorion membrane allograft for homologous use. It acts as a barrier and provides protective coverage for acute and chronic wounds from the surrounding environment. AmchoPlast EXCEL™ is sterile and supplied in a single-use package for topical application. AmchoPlast EXCEL™ is processed using aseptic techniques and chemically sterilized. It is supplied in a sealed, sterile double-pouched package consisting of a primary aluminum polyester pouch and a secondary aluminum pouch. Allografts must be stored in a clean and dry environment at ambient room temperature before application. AmchoPlast EXCEL™ is available in various sizes.

**CMS Final HCPCS Coding Determination**

After review of the Food and Drug Administration's (FDA's) Tissue Reference Group (TRG) letter submitted by the applicant, AmchoPlast EXCEL™, "when intended for use as a barrier and cover appears to meet the criteria for regulation solely under section 361 of the PHS Act and the regulations in 21 CFR part 1271." As a result of our review of the TRG's feedback, CMS has decided to:

Establish a new HCPCS Level II code Q4372, "Amchoplast excel, per square centimeter"

This coding determination applies to the AmchoPlast EXCEL™ product described in the application and accompanying FDA TRG letter dated September 16, 2024, when intended for use as a "barrier and cover."

32

EAGLEBEN-SA_00375621

**AéroGuard™ - HCP241230KY1YH**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify AéroGuard™.

Applicant's suggested language: QXXXX, "AéroGuard™, per square centimeter"

**Summary of Applicant's Submission**

C5 Biomedical, LLC submitted a request to establish a new HCPCS Level II code to identify AéroGuard™. AéroGuard™ is regulated as a human cell, tissue, or cellular or tissue-based product (HCT/P) solely under section 361 of the Public Health Service (PHS) Act and 21 CFR part 1271 when intended for use as a "covering" or "barrier." AéroGuard™ is a sterile, dehydrated single-layer human amniotic membrane allograft product derived from donated, healthy human birth tissue. The allograft product is aseptically processed using minimal manipulation and terminally sterilized to a sterility assurance level of 10-6. AéroGuard™ is intended for homologous use as a protective wound covering or barrier for acute and chronic wounds. It is available in various sizes and configuration sheets.

**CMS Final HCPCS Coding Determination**

After review of the Food and Drug Administration's (FDA's) Tissue Reference Group (TRG) letter submitted by the applicant, AéroGuard™, "when intended for use as a 'covering' or 'barrier,'... appear[s] to meet the criteria for regulation solely under section 361 of the PHS Act and the regulations in 21 CFR part 1271." As a result of our review of the TRG's feedback, CMS has decided to:

Establish a new HCPCS Level II code Q4370, "Aeroguard, per square centimeter"

This coding determination applies to the AéroGuard™ product described in the application and accompanying FDA TRG letter dated October 3, 2024, when intended as a "covering" or "barrier."

33

EAGLEBEN-SA_00375622

**NéoGuard™ - HCP241230KUBRU**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify NéoGuard™.

Applicant's suggested language: QXXXX, "NéoGuard™, per square centimeter"

**Summary of Applicant's Submission**

C5 Biomedical, LLC submitted a request to establish a new HCPCS Level II code to identify NéoGuard™. NéoGuard™ is regulated as a human cell, tissue, or cellular or tissue-based product (HCT/P) solely under section 361 of the Public Health Service (PHS) Act and 21 CFR part 1271 when intended for use as a "covering" or "barrier." NéoGuard™ is a sterile, dehydrated double-layer human amniotic membrane allograft product derived from donated, healthy human birth tissue. The allograft product is aseptically processed using minimal manipulation and terminally sterilized to a sterility assurance level of 10-6. NéoGuard™ is intended for homologous use as a protective wound covering or barrier. It is available in various sizes and configuration sheets.

**CMS Final HCPCS Coding Determination**

After review of the Food and Drug Administration's (FDA's) Tissue Reference Group (TRG) letter submitted by the applicant, NéoGuard™, "when intended for use as a 'covering' or 'barrier,' … appear[s] to meet the criteria for regulation solely under section 361 of the PHS Act and the regulations in 21 CFR part 1271." As a result of our review of the TRG's feedback, CMS has decided to:

Establish a new HCPCS Level II code Q4371, "Neoguard, per square centimeter"

This coding determination applies to the NéoGuard™ product described in the application and accompanying FDA TRG letter dated October 3, 2024, when intended as a "covering" or "barrier."

34

EAGLEBEN-SA_00375623

**Membrane Wrap-Lite™ - HCP241226T3DG2**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify Membrane Wrap-Lite™.

The applicant did not submit any suggested language.

**Summary of Applicant's Submission**

BioLab Holdings, Inc. submitted a request to establish a new HCPCS Level II code to identify Membrane Wrap-Lite™. Membrane Wrap-Lite™ is regulated as a human cell, tissue, or cellular or tissue-based product (HCT/P) solely under section 361 of the Public Health Service (PHS) Act and 21 CFR part 1271 when intended for use as a "barrier" and "cover." Membrane Wrap-Lite™ dosage is per square centimeter. This product is indicated for chronic and acute wounds. After preparation of the wound site, the human amnion single layer allograft is applied to the wound surface by a licensed health care provider and secured in place by their choice of fixation. Reapplication is determined by the clinician. The route of administration is topical, applying the product on the wound base. This product serves as a protective covering from the surrounding environment. It is available in various sizes to be used by the clinician. The product comes in a double pouch for aseptic presentation of the packaged product onto the sterile field.  The inner pouch is both sterile and has a moisture barrier. The outer pouch is a peel pouch for aseptic presentation to the sterile field and is transparent on one side to allow for visualization of the contents.

**CMS Final HCPCS Coding Determination**

After review of the Food and Drug Administration's (FDA's) Tissue Reference Group (TRG) letter submitted by the applicant, Membrane Wrap-Lite™, "when intended for use as a 'barrier' and 'cover,' appear[s] to meet all the criteria for regulation solely under section 361 of the PHS Act and the regulations in 21 CFR part 1271." As a result of our review of the TRG's feedback, CMS has decided to:

Establish a new HCPCS Level II code Q4373, "Membrane wrap-lite, per square centimeter"

This coding determination applies to the Membrane Wrap-Lite™ product described in the application and accompanying FDA TRG letter dated December 19, 2024, when intended for use as a "barrier" and "cover."

35

EAGLEBEN-SA_00375624

**Duograft AA™ - HCP2412194JX89**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify Duograft AA™.

Applicant's suggested language: XXXXX, "Duograft AA, per square centimeter"

**Summary of Applicant's Submission**

RegenTX Partners submitted a request to establish a new HCPCS Level II code to identify Duograft AA™. Duograft AA™ is regulated as a human cell, tissue, or cellular or tissue-based product (HCT/P) solely under section 361 of the Public Health Service (PHS) Act and 21 CFR part 1271 when intended for use as a "barrier or cover." Duograft AA™ is a dehydrated dual-layer amniotic membrane allograft that is intended to act as a barrier or protective cover at the local site of injury or surgical site. Duograft AA™ is supplied in various-sized sheets.

**CMS Final HCPCS Coding Determination**

After review of the Food and Drug Administration's (FDA's) Tissue Reference Group (TRG) letter submitted by the applicant, Duograft AA™, "when intended as a barrier or cover, appears to meet the criteria for regulation solely under section 361 of the PHS Act and the regulations in 21 CFR part 1271." As a result of our review of the TRG's feedback, CMS has decided to:

Establish a new HCPCS Level II code Q4376, "Duograft aa, per square centimeter"

This coding determination applies to the Duograft AA product described in the application and accompanying FDA TRG letter dated October 3, 2024, when intended for use as a "barrier or cover."

36

EAGLEBEN-SA_00375625

**duoGRAFT AC™ - HCP2412196XWA4**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify duoGRAFT AC™.

Applicant's suggested language: XXXXX, "duoGRAFT AC, per square centimeter"

**Summary of Applicant's Submission**

RegenTX Partners LLC submitted a request for a new HCPCS Level II code to identify duoGRAFT AC™. duoGRAFT AC™ is regulated as a human cell, tissue, or cellular or tissue-based product (HCT/P) solely under section 361 of the Public Health Service (PHS) Act and 21 CFR part 1271 when intended for use as a "barrier or cover." duoGRAFT AC™ is a dehydrated full-thickness placental membrane allograft that is processed using a proprietary processing technology to ensure all naturally occurring components of birth tissue remain intact through processing. duoGRAFT AC™ is a multi-layer graft that contains the amnion, chorion as well as the important intermediate layer/spongy layer of the placenta. duoGRAFT AC™ is intended to act as a barrier or protective cover at the local site of injury or surgical site. The human amniotic membrane is a thin collagenous membrane derived from the submucosa of the placenta, the area in which the human fetus grows and develops within the mother's uterus, and is a basement membrane comprised of collagen layers and an extracellular stromal matrix. duoGRAFT AC™ is supplied in sheets of various sizes.

**CMS Final HCPCS Coding Determination**

After review of the Food and Drug Administration's (FDA's) Tissue Reference Group (TRG) letter submitted by the applicant, duoGRAFT AC™, "when intended for use as a barrier or cover, appears to meet the criteria for regulation solely under section 361 of the PHS Act and the regulations in 21 CFR part 1271." As a result of our review of the TRG's feedback, CMS has decided to:

Establish a new HCPCS Level II code Q4375, "Duograft ac, per square centimeter"

This coding determination applies to the duoGRAFT AC product described in the application and accompanying FDA TRG letter dated October 3, 2024, when intended for use as a "barrier or cover."

37

EAGLEBEN-SA_00375626

**triGRAFT FT™ - HCP241219L49KH**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify triGRAFT FT™.

Applicant's suggested language: XXXXX, "triGRAFT FT, per square centimeter"

**Summary of Applicant's Submission**

RegenTX Partners submitted a request to establish a new HCPCS Level II code to identify triGRAFT FT™. triGRAFT FT™ is regulated as a human cell, tissue, or cellular or tissue-based product (HCT/P) solely under section 361 of the Public Health Service (PHS) Act and 21 CFR part 1271 when intended for use as a "barrier or cover." triGRAFT FT™ is a dehydrated triple-layer placental membrane for which its three layers consist of amnion, spongy layer, and chorion. triGRAFT FT™ is intended to act as a barrier or protective cover at the local site of injury or surgical site. triGRAFT FT™ retains the placental membrane's natural structure and relevant characteristics. The placental membrane adheres closely to its underlying surface as a cover protecting wounds and may help prevent the formation of dead space on the wound. triGRAFT FT™ is supplied in sheets of various sizes.

**CMS Final HCPCS Coding Determination**

After review of the Food and Drug Administration's (FDA's) Tissue Reference Group (TRG) letter submitted by the applicant, triGRAFT FT™, "when intended as a barrier or cover, appears to meet the criteria for regulation solely under section 361 of the PHS Act and the regulations in 21 CFR part 1271." As a result of our review of the TRG's feedback, CMS has decided to:

Establish a new HCPCS Level II code Q4377, "Trigraft ft, per square centimeter"

This coding determination applies to the triGRAFT FT™ product described in the application and accompanying FDA TRG letter dated October 3, 2024, when intended for use as a "barrier or cover."

38

**Renew™ FT Matrix - HCP2412209YPUJ**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify Renew™ FT Matrix.

Applicant's suggested language:  QXXXX, "Renew™ FT Matrix, per cm2"

**Summary of Applicant's Submission**

Sequence LifeScience, Inc. submitted a request to establish a new HCPCS Level II code to identify Renew™ FT Matrix. Renew™ FT Matrix is regulated as a human cell, tissue, or cellular or tissue-based product (HCT/P) solely under section 361 of the Public Health Service (PHS) Act and 21 CFR part 1271 when intended for use as a "barrier or wound cover." Renew™ FT Matrix is a full-thickness minimally manipulated human placental membrane product derived from donated placental tissues that retain the structural and functional characteristics of the tissues. The final product is dehydrated, packaged in different-size sheets, and terminally sterilized by irradiation. Renew™ FT Matrix is composed of extracellular matrix proteins and serves as a natural, biological barrier or wound cover. The typical population receiving treatment includes individuals with chronic full-thickness ulcers and other skin defects where a biological barrier or cover is required. Renew™ FT Matrix is ordered by a licensed physician for individual use. The dosage is per centimeter square, depending on the size of the injury or site of application. Renew™ FT Matrix is supplied in various sizes and configuration sheets and is stored at ambient room temperature (15-30° C or 59-86° F).

**CMS Final HCPCS Coding Determination**

After review of the Food and Drug Administration's (FDA's) Tissue Reference Group (TRG) letter submitted by the applicant, Renew™ FT Matrix, "when intended for use as a 'barrier or wound cover,' appears to meet the criteria for regulation solely under section 361 of the PHS Act and the regulations in 21 CFR part 1271." As a result of our review of the TRG's feedback, CMS has decided to:

Establish a new HCPCS Level II code Q4378, "Renew ft matrix, per square centimeter"

This coding determination applies to the Renew™ FT Matrix product described in the application and accompanying FDA TRG letter dated December 19, 2024, when intended for use as a "barrier or wound cover."

39

EAGLEBEN-SA_00375628

**AmnioDefend™ FT Matrix - HCP241220DEN08**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify AmnioDefend™ FT Matrix.

Applicant's suggested language: QXXXX, "AmnioDefend™ Matrix, per cm2"

**Summary of Applicant's Submission**

Sequence LifeScience, Inc. submitted a request to establish a new HCPCS Level II code to identify AmnioDefend™ FT Matrix. AmnioDefend™ FT Matrix is regulated as a human cell, tissue, or cellular or tissue-based product (HCT/P) solely under section 361 of the Public Health Service (PHS) Act and 21 CFR part 1271 when intended for use as a "barrier or wound cover." AmnioDefend™ FT Matrix consists of all three layers of the placental membranes including amnion, intermediate layer, and chorion. It is a minimally manipulated human placental membrane product derived from donated placental tissues that retain the structural and functional characteristics of the tissues. The final product is dehydrated, packaged in different-size sheets, and terminally sterilized by irradiation. AmnioDefend™ FT Matrix is composed of extracellular matrix proteins and serves as a natural, biological barrier or wound cover. The typical population receiving treatment includes individuals who require a barrier or wound cover for acute and chronic wounds. AmnioDefend™ FT Matrix is ordered by a licensed physician for individual use. The dosage is per centimeter square, depending on the size of the injury or site of application. AmnioDefend™ FT Matrix is supplied in various size and configuration sheets and is stored at ambient temperature (15-30° C or 59-86° F).

**CMS Final HCPCS Coding Determination**

After review of the Food and Drug Administration's (FDA's) Tissue Reference Group (TRG) letter submitted by the applicant, AmnioDefend™ FT Matrix, "when intended for use as a 'barrier or wound cover,' appears to meet the criteria for regulation solely under section 361 of the PHS Act and the regulations in 21 CFR part 1271." As a result of our review of the TRG's feedback, CMS has decided to:

Establish a new HCPCS Level II code Q4379, "Amniodefend ft matrix, per square centimeter"

This coding determination applies to the AmnioDefend™ FT Matrix product described in the application and accompanying FDA TRG letter dated December 19, 2024, when intended for use as a "barrier or wound cover."

40

EAGLEBEN-SA_00375629

**AdvoGraft One - HCP250102E1LLX**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify AdvoGraft One.

Applicant's suggested language: XXXXX, "AdvoGraft One, per sq cm"

**Summary of Applicant's Submission**

RMBB Health submitted a request to establish a new HCPCS Level II code to identify AdvoGraft One. AdvoGraft One is regulated as a human cell, tissue, or cellular or tissue-based product (HCT/P) solely under section 361 of the Public Health Service (PHS) Act and 21 CFR part 1271 when intended for use as a "barrier and cover." AdvoGraft One, a single-layer amniotic membrane. It is derived from processed human placental tissue and consists of a dehydrated sheet of amniotic and/or chorionic membrane. Donated tissue is cleaned, soaked, washed, spread and dried, cut, and sterilized with irradiation. AdvoGraft One is intended for use as a barrier and cover for acute and chronic wounds. AdvoGraft One is ordered and used by a licensed physician for individual use. The membrane is available in various sizes. The product is stored at ambient room temperature (15-30° C).

**CMS Final HCPCS Coding Determination**

After review of the Food and Drug Administration's (FDA's) Tissue Reference Group (TRG) letter submitted by the applicant, AdvoGraft One, "when intended for use as a barrier and cover, appear[s] to meet the criteria for regulation solely under section 361 of the PHS Act and the regulations in 21 CFR part 1271." As a result of our review of the TRG's feedback, CMS has decided to:

Establish a new HCPCS Level II code Q4380, "Advograft one, per square centimeter"

This coding determination applies to the AdvoGraft One product described in the application and accompanying FDA TRG letter dated November 3, 2024, when intended for use as a "barrier and cover."

41

EAGLEBEN-SA_00375630

**AdvoGraft Membrane Dual - HCP250102EGVK1**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify AdvoGraft Membrane Dual.

Applicant's suggested language: XXXXX, "AdvoGraft Membrane Dual, per sq cm"

**Summary of Applicant's Submission**

RMBB Health submitted a request to establish a new HCPCS Level II code to identify AdvoGraft Membrane Dual. AdvoGraft Dual is regulated as a human cell, tissue, or cellular or tissue-based product (HCT/P) solely under section 361 of the Public Health Service (PHS) Act and 21 CFR part 1271 when intended for use as a "barrier and cover." AdvoGraft Membrane Dual is a dual-layer amniotic membrane derived from processed human placental tissue. Donated tissue is cleaned, soaked, washed, spread, dried, cut, and sterilized with irradiation. AdvoGraft Membrane Dual is intended for use as a biological barrier to provide protective coverage from the surrounding environment for acute and chronic wounds. The allograft is a dehydrated sheet of amniotic and/or chorionic membrane and is intended for use by or on the order of a licensed physician for single-patient use on a single occasion. The membrane is available in various sizes and is stored at ambient room temperature (15–30° C).

**CMS Final HCPCS Coding Determination**

After review of the Food and Drug Administration's (FDA's) Tissue Reference Group (TRG) letter submitted by the applicant, AdvoGraft Dual, "when intended for us as a barrier and cover, appear[s] to meet the criteria for regulation solely under section 361 of the PHS Act and the regulations in 21 CFR part 1271." As a result of our review of the TRG's feedback, CMS has decided to:

Establish a new HCPCS Level II code Q4382, "Advograft dual, per square centimeter"

This coding determination applies to the AdvoGraft Dual product described in the application and accompanying FDA TRG letter dated November 3, 2024, when intended for use as a "barrier and cover."

42

EAGLEBEN-SA_00375631

**Matrix HD Allograft Dermis, Non-Fenestrated - HCP250102Y6FWB**

**Topic/Issue**

Request to establish a new HCPCS Level II code to identify Matrix HD Allograft Dermis, Non-Fenestrated.

Applicant's suggested language: QXXXX, "Matrix HD Allograft Dermis, Non-Fenestrated, per square centimeter"

**Summary of Applicant's Submission**

Royal Wound-X submitted a request to establish a new HCPCS Level II code to identify Matrix HD Allograft Dermis, Non-Fenestrated. Matrix HD Allograft Dermis is regulated as a human cell, tissue, or cellular or tissue-based product (HCT/P) solely under section 361 of the Public Health Service (PHS) Act and 21 CFR part 1271 when intended for use as a "wound cover for various wounds including diabetic foot ulcers and burns." Matrix HD Allograft Dermis, Non-Fenestrated is intended as a wound cover to help repair, replace, reconstruct, or supplement damaged soft tissue in acute and chronic wounds including diabetic foot ulcers and burns. The wound cover barrier will protect the wounds from the surrounding environment. Following standard wound preparation, Matrix HD Allograft Dermis, Non-Fenestrated can be applied directly to the wound. Matrix HD Allograft Dermis, Non-Fenestrated is a single-use product, packaged in a primary film-Tyvek® pouch and a secondary film-Tyvek® pouch, and sterilized with gamma irradiation of 10-6. Matrix HD Allograft Dermis, Non-Fenestrated is available in multiple sizes.

**CMS Final HCPCS Coding Determination[5]**

After review of the Food and Drug Administration's (FDA's) Tissue Reference Group (TRG) letter submitted by the applicant, Matrix HD Allograft Dermis, "when intended for use as a 'wound cover for various wounds including diabetic foot ulcers and burns', appears to meet the criteria for regulation solely under section 361 of the PHS Act and the regulations in 21 CFR part 1271." As a result of our review of the TRG's feedback, CMS has decided to assign:

Existing HCPCS Level II code Q4345, "Matrix hd allograft dermis, per square centimeter" to describe Matrix HD Allograft Dermis, Non-Fenestrated.

This coding determination applies to the Matrix HD Allograft Dermis product described in the application and accompanying FDA TRG letter dated March 2, 2021, when intended for use as a "wound cover for various wounds including diabetic foot ulcers and burns."

---

[5] Updated on May 12, 2025 to assign existing HCPCS Level II code Q4345, as Matrix HD Allograft Dermis was previously assigned Q4345 effective October 1, 2024, and a new HCPCS Level II code would be redundant.

43

EAGLEBEN-SA_00375632

**HCPCS Level II Codes for Various FDA Approvals under the 505(b)(2) or Biologics License Application (BLA) Pathways and Products "Not Otherwise Classified" - HCP220517FAENJ**

CMS has been reviewing its approach for establishing HCPCS Level II codes to identify products approved under the 505(b)(2) New Drug Application (NDA) or the Biologics License Application (BLA) pathways after October 2003. These products are not rated as therapeutically equivalent to their reference listed drug in the Food and Drug Administration's (FDA) Orange Book[6], and are therefore considered single source products. Also, this effort will help reduce use of the not otherwise classified (NOC) codes.

In order to conform with the general approach used for the assignment of products paid under section 1847A of the Social Security Act (the Act) to HCPCS Level II codes as described at the following CMS link: https://www.cms.gov/files/document/frequently-asked-questions-single-source-drugs-and-biologicals.pdf. CMS is making several code changes, including manufacturer specific codes to identify products approved under separate 505(b)(2) NDA or BLA pathways. Since the products are approved under separate 505(b)(2) NDAs and are not rated as therapeutically equivalent by the FDA in the Orange Book, they are single source drugs based on the statutory definition of "single source drug" in section 1847A(c)(6) of the Act. Because these are single source drugs, there is a programmatic need for each product to have a unique billing and payment code.

In cases where certain products meet the statutory definition of "multiple source drug" in section 1847A(c)(6) of the Act, CMS will remove the brand name of the drug from any existing HCPCS Level II code as needed as it will accommodate any associated generic product(s), if approved and marketed, that are rated as therapeutically equivalent.

Due to the complexity and nuanced nature of the differences between each product, we encourage providers to rely on the Average Sales Price (ASP) HCPCS-National Drug Code (NDC) crosswalk[7] to identify the correct billing and payment code for each applicable product.

**CMS Final HCPCS Coding Determination**

Establish thirteen new HCPCS Level II codes, revise one existing HCPCS Level II code, and discontinue seven HCPCS Level II codes to either separately identify products approved by the FDA after October 2003, and not rated as therapeutically equivalent to a reference listed product in an existing code, or to more accurately identify multiple source products accordingly.

See Appendix A for a complete list of new HCPCS Level II codes that we are establishing. We will be accepting feedback on the language in the code descriptors for each code in an upcoming biannual public meeting.

---

[6] The FDA's Orange Book, officially entitled, *Approved Drug Products With Therapeutic Equivalence Evaluations,* identifies drug products approved on the basis of safety and effectiveness by the FDA, and is published at the following FDA link: https://www.accessdata.fda.gov/scripts/cder/ob/index.cfm.
[7] The ASP crosswalks are maintained by CMS on a quarterly basis to support ASP-based Medicare Part B payments only. The quarterly ASP crosswalks are published at the following CMS link:https://www.cms.gov/medicare/medicare-part-b-drug-average-sales-price/2022-asp-drug-pricing-files.

44

EAGLEBEN-SA_00375633

CMS intends to continue our review in subsequent HCPCS Level II code application quarterly cycles to separately identify products approved under the 505(b)(2) NDA or the BLA pathways after October 2003, and not rated as therapeutically equivalent to a reference listed product in an existing code, as well as products that have been "not otherwise classified."

45

EAGLEBEN-SA_00375634

**Appendix A: HCPCS Level II Codes for Products Approved by the FDA Under the 505(b)(2) NDA or BLA Pathways and Products "Not Otherwise Classified"**

| HCPCS Code | Action | Long Descriptor |
|---|---|---|
| J0165 | Add | Injection, epinephrine, not otherwise specified, 0.1 mg |
| J0166 | Add | Injection, epinephrine (bpi), not therapeutically equivalent to j0165, 0.1 mg |
| J0167 | Add | Injection, epinephrine (hospira), not therapeutically equivalent to j0165, 0.1 mg |
| J0168 | Add | Injection, epinephrine (international medication systems), not therapeutically equivalent to j0165, 0.1 mg |
| J0169 | Add | Injection, epinephrine (adrenalin), not therapeutically equivalent to j0165, 0.1 mg |
| J0171* | Delete | Injection, adrenalin, epinephrine, 0.1 mg |
| J0173* | Delete | Injection, epinephrine (belcher), not therapeutically equivalent to j0171, 0.1 mg |
| J0616 | Add | Injection, metoprolol tartrate, 1 mg |
| J0618 | Add | Injection, calcium chloride, 2 mg |
| J1163 | Add | Injection, diltiazem hydrochloride, 0.5 mg |
| J2310* | Delete | Injection, naloxone hydrochloride, per 1 mg |
| J2311* | Delete | Injection, naloxone hydrochloride (zimhi), 1 mg |
| J2312** | Add | Injection, naloxone hydrochloride, not otherwise specified, 0.01 mg |
| J2313** | Add | Injection, naloxone hydrochloride (zimhi), 0.01 mg |
| J3370* | Delete | Injection, vancomycin hcl, 500 mg |
| J3372* | Delete | Injection, vancomycin hcl (xellia), not therapeutically equivalent to j3370, 500 mg |
| J3373** | Add | Injection, vancomycin hydrochloride, 10 mg |
| J3375** | Add | Injection, vancomycin hydrochloride (xellia), not therapeutically equivalent to j3373, 10 mg |
| J9292 | Revise | From "Injection, pemetrexed (avyxa), not therapeutically equivalent to j9305, 10 mg" to instead read "Injection, pemetrexed dipotassium, 10 mg" |
| J9340* | Delete | Injection, thiotepa, 15 mg |
| J9342** | Add | Injection, thiotepa, not otherwise specified, 1 mg |

*The effective date for the discontinuation of this code is June 30, 2025.

**The dose descriptor is being reduced because CMS has a long-standing convention to assign dose descriptors in the smallest amount that could be billed in multiple units to accommodate a variety of doses and support streamlined billing. This long-standing policy makes coding more robust and facilitates accurate payment and reporting of the exact dose administered, as only 999 units can appear on a claim line for Medicare fee-for-service using the CMS-1500 form.

46

EAGLEBEN-SA_00375635

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing documents were caused to be served on July 1, 2026, on the following counsel in the manner indicated:

**VIA EMAIL:**

Kenneth L. Dorsney
Cortlan S. Hitch
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
kdorsney@morrisjames.com
chitch@morrisjames.com

Deepro R. Mukerjee
Lance A. Soderstrom
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Center
New York, NY 10020-1605
Deepro.mukerjee@katten.com
Lance.soderstrom@katten.com

Jitendra Malik
Joseph M. Janusz
KATTEN MUCHIN ROSENMAN LLP
550 South Tyron Street, Suite 2900
Charlotte, NC 28202
Jitty.malik@katten.com
Joe.janusz@katten.com

Christopher B. Ferenc
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Avenue, NW Suite 800
Washington, DC 20006
Christopher.ferenc@katten.com

Rachel L. Schweers
Matthew T. Messina
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661
Rachel.schweers@katten.com
Matthew.messina@katten.com

*Attorneys for Defendants Apotex, Inc. and Apotex Corp.*

ME1\61693533.v1

Neal C. Belgam
Daniel A. Taylor
SMITH KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
nbelgam@skjlaw.com
dtaylor@skjlaw.com

Jason A. Lief
Alan H. Pollack
Audrey R. Sparschu
WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, NY 10019
jlief@windelsmarx.com
apollack@windelsmarx.com
asparschu@windelsmarx.com

Andrew Miller
Ajay Kayal
Robyn Ast-Gmoser
Kiersten Fowler
Daniel Forchheimer
WINDELS MARX LANE & MITTENDORF, LLP
One Giralda Farms
Madison, NJ 07940
amiller@windelsmarx.com
akayal@windelsmarx.com
rast-gmoser@windelsmarx.com
kfowler@windelsmarx.com
dforchheimer@windelsmarx.com

*Attorneys for Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

*/s/ Alexandra M. Joyce*
Alexandra M. Joyce (#6423)

ME1\61693533.v1