**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC, <br><br> Plaintiffs, <br><br> v. <br><br> APOTEX INC. AND APOTEX CORP., <br><br> Defendants. | REDACTED PUBLIC VERSION FILED AUGUST 7, 2026 <br><br> C.A. No. 24-64-JLH (CONSOLIDATED) <br><br> **JURY TRIAL DEMANDED** <br><br>  |
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC, <br><br> Plaintiffs, <br><br> v. <br><br> SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC, <br><br> Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED) <br><br> **JURY TRIAL DEMANDED** <br><br>  |

**PLAINTIFFS EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB 1 LLC'S
OMNIBUS ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS'
MOTIONS FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT**

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     NATURE AND STAGE OF THE PROCEEDINGS ..........................................2

III.    LEGAL STANDARD............................................................................................3

IV.     ARGUMENT..........................................................................................................3

       A.     Defendants' Literal Non-Infringement Arguments Fail Because Sodium Hydroxide is Not Part of the "Pharmaceutically Acceptable Fluid" .......................4

       B.     Fact Issues Preclude Summary Judgment Under the Court's Guidance................19

       C.     Defendants Infringe Under the Doctrine of Equivalents ......................................35

V.      CONCLUSION.....................................................................................................41

i

# TABLE OF AUTHORITIES[1]

## CASES

*AFG Indus., Inc. v. Cardinal IG Co., Inc.*,
  375 F.3d 1367 (Fed. Cir. 2004) ...................................................................................... 3

*Amgen Inc. v. Amneal Pharms. LLC*,
  945 F.3d 1368 (Fed. Cir. 2020) ................................................................................ 10, 11

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313, 1346 (Fed. Cir. 2003) ............................................................................26

*Azurity Pharms. Inc., v. Alkem Lab'ys Ltd.*,
  582 F. Supp. 3d 192 (D. Del. 2022) ................................................................... 36, 37, 40

*Becton Dickinson & Co. v. Tyco Healthcare Grp. LP*,
  No. 02-1694, 2008 WL 11383361 (D. Del. Sept. 11, 2008) ......................................... 17

*Biagro W. Sales, Inc. v. Grow More, Inc.*,
  423 F.3d 1296 (Fed. Cir. 2005) ..................................................................................... 39

*Bicon, Inc. v. Straumann Co.*,
  441 F.3d 945 (Fed. Cir. 2006) ....................................................................................... 11

*Bletz v. Corrie*,
  974 F.3d 306 (3d Cir. 2020) ............................................................................................ 3

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ........................................................................................................ 8

*Conoco, Inc. v. Energy & Env't Int'l, L.C.*,
  460 F.3d 1349 (Fed. Cir. 2006) ................................................................................ 24, 35

*Corteva Agriscience LLC v. Monsanto Co.*,
  No. 22-1046, 2023 WL 6066643 (D. Del. Sept. 18, 2023) ........................................... 18

*Eagle Pharms., Inc. v. Hospira, Inc.*,
  No. 18-1074 (D. Del. Dec. 28, 2020) ............................................................................ 34

*Extang Corp. v. Truck Accessories Grp., LLC*,
  No. 19-923, 2022 WL 610443 (D. Del. Feb. 18, 2022) ................................................ 20

*Ferring B.V. v. Watson Lab'ys., Inc.*,
  764 F.3d 1401 (Fed. Cir. 2014) ..................................................................................... 26

---

[1] All emphasis added, and internal citations and quotations omitted, unless otherwise noted.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
535 U.S. 722 (2002) ........................................................................................................... 38

*Hockerson–Halberstadt, Inc. v. Converse Inc.*,
183 F.3d 1369 (Fed. Cir. 1999) ......................................................................................... 16

*Instituform Techs., Inc. v. CAT Contracting, Inc.*,
385 F.3d 1360 (Fed. Cir. 2004) ......................................................................................... 39

*Kyocera Wireless Corp. v. Int'l Trade Comm'n*,
545 F.3d 1340 (Fed. Cir. 2008) ......................................................................................... 16

*Microwave Vision, S.A. v. ETS-Lindgren Inc.*,
209 F. Supp. 3d 1322 (D. Del. 2016) ................................................................................ 17

*Mirror Worlds Techs., LLC v. Meta Platforms, Inc.*,
122 F.4th 860 (Fed. Cir. 2024) ........................................................................................... 8

*Moore U.S.A., Inc. v. Standard Reg. Co.*,
229 F.3d 1091 (Fed. Cir. 2000) ......................................................................................... 37

*Multilayer Stretch Cling Films Holdings, Inc. v. Berry Plastics Corp.*,
831 F.3d 1350 (Fed. Cir. 2016) ......................................................................................... 37

*Norian Corp. v. Stryker Corp.*,
363 F.3d 1321 (Fed. Cir. 2004) ......................................................................................... 30

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008) ................................................................................... 3, 4, 9

*Pall Corp. v. Micron Separations, Inc.*,
66 F.3d 1211 (Fed. Cir. 1995) ............................................................................................. 3

*Philips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ....................................................................................... 9, 18

*Ravgen, Inc. v. Natera, Inc.*,
No. 20-692, 2024 WL 116317 (W.D. Tex. Jan. 10, 2024) ................................................ 10

*Recro Gainesville LLC v. Actavis Lab'ys FL, Inc.*,
No. 14-1118, 2017 WL 1064883 (D. Del. Feb. 24, 2017) ........................................... 36, 40

*Shire Dev. Inc. v. Cadila Healthcare Ltd.*,
No. 10-581, 2015 WL 4596410 (D. Del. July 28, 2015), *aff'd sub nom.*,
688 F. App'x 912 (Fed. Cir. 2017) .................................................................................... 29

*Trustees of Columbia Univ. in City of New York v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cir. 2016) ......................................................................................... 18

*Vectura Ltd. v. GlaxoSmithKline LLC*,
   No. 1:16-cv-00638, 2018 WL 4700222 (D. Del. Oct. 1, 2018) .................................................. 5

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*,
   212 F.3d 1377 (Fed. Cir. 2000) .................................................................................. 36, 37, 38

*W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*,
   No. 11-515, 2014 WL 3950663 (D. Del. Aug. 8, 2014)...................................................... 15, 16

**RULES**

Fed. R. Civ. P. 56(a) ................................................................................................................ 3, 22

## I.    INTRODUCTION

Defendants Apotex Inc. and Apotex Corp. (together, "Apotex") and Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc. (together, "Slayback") (collectively, "Defendants") have each failed to show that they are entitled to summary judgment of non-infringement.  To the contrary, there is no genuine dispute that both of Defendants' products infringe claims 1-9 and 1-6, 8-11, 15, and 20 (together, "the Asserted Claims") of Plaintiffs Eagle Pharmaceuticals, Inc.'s and Eagle Sub1 LLC's (collectively "Eagle" or "Plaintiffs") U.S. Patent Nos. 11,872,214 ("the '214 Patent") and 12,138,248 ("the '248 Patent") (together, "the Asserted Patents") respectively.  *See* C.A. No. 24-64, D.I. 340, C.A. No. 24-65, D.I. 364.  Defendants each seek summary judgment on the theory that the addition of sodium hydroxide to their respective pharmaceutical formulations during manufacturing moves those formulations outside of the Asserted Patents' claims because the term "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol" allegedly excludes sodium hydroxide.  Defendants' arguments fail as a matter of law.  The "pharmaceutically acceptable fluid" term excludes only unlisted solvents—not every unlisted excipient, as Defendants appear to contend.  Sodium hydroxide is a pH adjuster, not a solvent, and thus, is not excluded from the scope of the claims.

This understanding of the "pharmaceutically acceptable fluid" term is consistent with the guidance the Court provided at the *Markman* hearing.  There, the Court made clear that the term excluded other solvent systems, but was "unwilling" at that time to find that it also excluded other types of fluid excipients (let alone solids like sodium hydroxide).  To the extent the Court now sees fit to offer additional guidance, Eagle respectfully requests that the Court clarify that the "pharmaceutically acceptable fluid" term excludes only solvents and not other excipients.  Such a construction aligns with the claims, which recite liquid bendamustine containing compositions

1

"comprising" various elements and list only solvents in the "pharmaceutically acceptable fluid" limitation; the specification, which likewise uses the term to refer to solvents; and the prosecution history, which shows the term was added to exclude unlisted polar aprotic solvents in overcoming a prior art rejection.

Should the Court decline to find that Defendants' products infringe as a matter of law, numerous genuine disputes of material fact preclude summary judgment of non-infringement.  In addition to whether sodium hydroxide is a solvent, as discussed above, a jury could reasonably conclude that sodium hydroxide is a solid, not a fluid; that sodium hydroxide is ███████████ ████████████████████████████; that pH-adjusted PEG remains PEG (one of the enumerated solvents); and that even if the Court determines that the sodium hydroxide is part of the "pharmaceutically acceptable fluid," one or both of the two legal exceptions to the closed nature of the "consisting of" transitional phrase apply.  Finally, even if the Court determines that Defendants' products do not literally infringe because of sodium hydroxide, Eagle has properly put forward evidence that they still infringe under the doctrine of equivalents.

## II.    NATURE AND STAGE OF THE PROCEEDINGS

Eagle sued Apotex and Slayback, alleging infringement of the Asserted Patents, which cover liquid formulations of the anti-cancer drug bendamustine.  The cases against Apotex (C.A. No. 24-64) and Slayback (C.A. No. 24-65) were consolidated on June 27, 2025 (D.I. 156).[2]  A *Markman* hearing was held on January 31, 2025 (D.I. 92); the Court deferred construction of the "comprising" and "consisting of" terms to summary judgment or jury instructions.  *See* C.A. No. 24-64, D.I. 111; Ex. 1 ¶ 51.  Expert discovery closed on May 11, 2026.

---

[2] All docket citations to consolidated case No. 24-64 unless otherwise stated.

## III.    LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine issue of material fact is one that could lead a reasonable jury to find in favor of the nonmoving party."  *Bletz v. Corrie*, 974 F.3d 306, 308 (3d Cir. 2020).  "The court must review the record as a whole, draw all reasonable inferences in favor of the nonmoving party, and must not 'weigh the evidence or make credibility determinations.'"  *Id*. at 308.  "[A] trial court cannot reach a conclusive finding of noninfringement if the record shows some evidence supporting a finding of noninfringement and some evidence to the contrary."  *AFG Indus., Inc. v. Cardinal IG Co., Inc*., 375 F.3d 1367, 1371 (Fed. Cir. 2004).

## IV.    ARGUMENT

"Literal infringement is found when every limitation of a claim is met in the accused structure."  *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1217 (Fed. Cir. 1995). Defendants' motions depend on the argument that the term "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol, and glycofurol" purportedly excludes a formulation in which ██████████████████ ███████████████████████  That argument fails because sodium hydroxide is not subject to the "pharmaceutically acceptable fluid" limitation.  The claim language, when properly considered as a whole, limits the "pharmaceutically acceptable fluid" to solvents, and sodium hydroxide is not a solvent; it is a pH adjuster.  The Court already gave significant guidance on the meaning of "pharmaceutically acceptable fluid" during the *Markman* hearing; Defendants ignore that guidance entirely.   To the extent the Court's guidance is insufficient to resolve the infringement dispute, the Court should further construe "pharmaceutically acceptable fluid" and clarify that it does not exclude sodium hydroxide.  *O2 Micro Int'l Ltd. v. Beyond Innovation Tech.*

3

*Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."). Further, even if the Court does not find, as Eagle requested (*see* No. 24-64, D.I. 340; No. 24-65, D.I. 364), that Defendants' products infringe as a matter of law, there are, at a minimum, disputed issues of fact that preclude summary judgment of non-infringement.

### A.    Defendants' Literal Non-Infringement Arguments Fail Because Sodium Hydroxide is Not Part of the "Pharmaceutically Acceptable Fluid"

#### 1.    Defendants' Arguments Ignore the Court's Claim Construction Guidance

The "pharmaceutically acceptable fluid" is limited to "polyethylene glycol and optionally, one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol." D.I. 363, Ex. 1 at cl. 6; D.I. 363, Ex. 2 at cls. 8 and 11. The Court provided explicit guidance on the scope of this term at the *Markman* hearing. First, as the Court acknowledged, the limitation as a whole is plainly directed to solvents, and thus "there can't be another ***solvent system*** that's not on the list of pharmaceutically acceptable fluids." *See* CCOF ¶ 1; C.A. No. 24-65, D.I. 387, Ex. 5 at 67:23-25; D.I. 363, Ex. 1 at cl. 6; D.I. 363, Ex. 2 at cls. 8 and 11. The Court further stated: "I think we all agree that there can't be another solvent system that's not on the list of pharmaceutically acceptable fluids. But I'm not going to say that the use of an antioxidant, that someone might characterize as a solvent because it's capable of dissolving a solid, would take a product outside of the scope of the claims." C.A. No. 24-65, D.I. 387, Ex. 5 at 67:23-68:4; CCOF ¶ 1.

Yet Defendants nevertheless advance arguments that ignore the Court's guidance. They argue that: (1) sodium hydroxide dissolved in their solvent systems allegedly becomes part of the "fluid," and thus is part of the "pharmaceutically acceptable fluid," and (2) because sodium hydroxide is not one of the five claimed ingredients in the "consisting of" limitation, there is no literal infringement. C.A. No. 24-65, D.I. 347 at 14-15; D.I. 361 at 4. These arguments are

baseless.[3]  They ignore the Court's clear guidance that the "pharmaceutically acceptable fluid" limitation does not exclude other excipients, or even all other fluids.  Rather, the Court drew a distinction between solvent and non-solvent fluids.  As explained above, the Court recognized that other *solvent systems* could not be present.  *Supra* at 4.  Conversely, the Court was unwilling to exclude other fluid excipients that played non-solvent roles.  C.A. No. 24-65, D.I. 387, Ex. 5 at 67:18-22 ("That said, I'm not willing to say, at this point, that a product that has, for example, liquid Vitamin E as an antioxidant doesn't infringe because it's a liquid.").  Sodium hydroxide is not a solvent, and thus it is irrelevant whether it is enumerated as one of the solvents in the "pharmaceutically acceptable fluid" because that term does not exclude non-solvent ingredients— any such excipients are permitted pursuant to the "comprising" claim language.  Indeed, "'[c]omprising' is a term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." *Vectura Ltd. v. GlaxoSmithKline LLC*, No. 1:16-cv-00638, 2018 WL 4700222, at *4 (D. Del. Oct. 1, 2018) (rejecting "Defendants ['argument] that 'composite active particles' must be formed by a 'uniform' blend of 'only additive particles and active particles,' and no carrier particles" because "[t]his limitation appears in a 'comprising' claim," and "[t]hus, the claimed 'composite active particles' may contain carrier particles, absent a teaching or disclaimer to the contrary.").

There can be no genuine dispute that sodium hydroxide is not a solvent. CCOF ¶ 2. Eagle's expert, ██████████████████████ Apotex's expert, and FDA itself all agree on this point. Eagle's formulation expert, Dr. Bernhardt Trout, offers the opinion that sodium hydroxide "is a solid and a pH adjustor, not a solvent and thus not part of the pharmaceutically acceptable fluid

---

[3] Whether sodium hydroxide is a fluid or part of the "pharmaceutically acceptable fluid" is also predicated on multiple disputed facts, as addressed below. *See infra* § IV.B.1.

limitation of the Asserted Claims."  C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶¶ 204-05.  Dr. Trout

confirmed this through reference to the pharmaceutical literature, which consistently describes

sodium hydroxide as a pH adjustor, not a solvent.  *Id.* at ¶211; *see also* D.I. 351, Ex. 1 at -719.

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████  Defendants' labels also describe

sodium hydroxide as a pH adjuster, not a solvent.  D.I. 342, Ex. 23 at -828 ("***0.08 mg sodium

hydroxide is used to adjust the acidity of polyethylene glycol 400 NF***."); C.A. No. 24-65, D.I.

387, Ex. 2 at -924 ("***Sodium hydroxide is used to adjust pH of polyethylene glycol 400***.").  Even

Apotex's non-infringement expert, Dr. Dyar confirmed the same, describing sodium hydroxide as

a "non-solvent ingredient[]."  D.I. 342, Ex. 7 at 173:20-174:2.

████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

6

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████.   Such broad agreement is unsurprising, when even FDA regulations specifically classify sodium hydroxide as a "pH control agent" and a processing aid, but not as a solvent.  D.I. 342, Ex. 14, 21 CFR § 184.1763.

████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████

████████████████████████████████████████   "Sodium hydroxide occurs as a white or nearly white fused *mass*.  It is available in small pellets, flakes, sticks, and other shapes or forms.  It is *hard and brittle* and shows a crystalline fracture."  D.I. 351, Ex. 1 at -719.  At the temperatures recited in the Asserted Claims, sodium hydroxide is indisputably a solid, and even if

7

dissolved in Defendants' products, it remains a solid—a solute dissolved in a solvent system consisting of PEG and ethanol.  CCOF ¶ 3; Ex. 2 at ¶¶ 33-36; Ex. 1 at ¶ 78.  Just as the salt in seawater is a solute that does not itself qualify as a solvent.[4]  To the extent that Dr. Sinko truly claims otherwise, he should have presented evidence that sodium hydroxide—a substance that is "hard and brittle" with a melting point of 323°C—can function as a solvent at room temperature, a notion that would defy physics.  D.I. 351, Ex. 1 at -719-20.

Indeed, Dr. Sinko cites the same source—*the Handbook of Pharmaceutical Excipients*— to support his opinions (C.A. No. 24-65, D.I. 365-1, Ex. 5 ¶ 140), but ignores that it does not classify sodium hydroxide as a solvent.  Further, he has no meaningful response to ███████████

███████████████████████████████████████████████████████████████████████

███████████      In the face of the literature ██████████████████████████████████, not to mention the evidence of Eagle's expert and FDA's own regulations, the conclusory assertion of Slayback's expert is insufficient to create a genuine dispute that sodium hydroxide is not a solvent. *See* Ex. 3 at 59:2-7, 103:3-18 (███████████████████████████████████████

███████████████████████████████████ but later arguing that sodium hydroxide could be considered a solvent within the Vivimusta product); *see generally* C.A. No. 24-65, D.I. 365-1, Ex. 5 ¶¶ 177-78, 181-83 ¶¶ 177-78, 181-83; *see also Mirror Worlds Techs., LLC v. Meta Platforms, Inc.*, 122 F.4th 860, 875 (Fed. Cir. 2024) ("It is well-established that unsupported expert opinions do not create a genuine issue of material fact."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 328 (1986) (White, J., concurring) ("It is not enough to move for summary

---

[4] C.A. No. 24-65, D.I. 378-1, Ex. 29 at 84 ("For example, when sodium chloride (a solid) is mixed with water, the resultant solution is a liquid.  Consequently, water is referred to as the solvent and sodium chloride as the solute.").

judgment without supporting the motion in any way or with a conclusory assertion[.]"). Thus the "pharmaceutically acceptable fluid" limitation does not exclude the use of sodium hydroxide.

**2.** <u>If the Court's Guidance Does Not Resolve the Infringement Question, the Court Should Further Construe the "pharmaceutically acceptable fluid" Limitation</u>

To the extent the Court's guidance does not resolve the question of whether sodium hydroxide is part of the "pharmaceutically acceptable fluid" limitation, additional claim construction is needed given the parties' "fundamental dispute." *O2 Micro Int'l*, 521 F.3d at 1362. Indeed, the Court noted that it might clarify its ruling in the context of summary judgment proceedings. C.A. No. 24-65, D.I. 387, Ex. 5 at 67:18-69:10. The appropriate construction is straightforward; the intrinsic and extrinsic evidence make plain that the entirety of the "pharmaceutically acceptable fluid" term excludes ***other solvents***, not every other excipient that could be combined with the solvents in the claimed composition.

Importantly, the claim language and structure confirm that construction. *Philips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms."). The claims list five possible "pharmaceutically acceptable fluids": polyethylene glycol, propylene glycol, ethanol, benzyl alcohol, and glycofurol. There is no dispute that each of these five is a solvent. Eagle's expert confirmed it. Ex. 2 ¶ 110; Ex. 1 ¶ 49. Apotex's non-infringement expert agreed, describing the claims as requiring a "'pharmaceutically acceptable fluid' consisting of polyethylene glycol and optionally one or more of" ***the other solvents***." D.I. 342, Ex. 7 at 156:11-17. Slayback's non-infringement expert similarly agreed that the claims "list PEG and then optionally a choice of ***other solvents***." Ex. 3 at 64:13-17. Thus, the excipients listed in the "pharmaceutically acceptable fluid" limitation are all solvents. CCOF ¶ 4.

Notably, the Asserted Claims each provide an additional requirement that underscores that the element at issue is limited to solvents.  Thus, each of the claims recites:

> bendamustine, or a pharmaceutically acceptable salt thereof, and a stabilizing amount of an antioxidant, *in* a pharmaceutically acceptable fluid; wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol . . .

D.I. 363, Ex. 1 at cl. 6; D.I. 363, Ex. 2 at cls. 8 and 11.  The wording plainly conveys to a POSA that the antioxidant and bendamustine are dissolved in the solvents recited in the "pharmaceutically acceptable fluid" limitation.  Ex. 1 ¶¶ 28-29, 89; Ex. 2 ¶¶ 71-72 *see* C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 117, 223-24.  Notably, neither Defendant even addresses this language.  *See e.g.*, Ex. 1 ¶ 76; Ex. 2 ¶¶ 24, 105-06.

Conversely, the broader structure of the Asserted Claims recites a "liquid bendamustine-containing composition *comprising*."  D.I. 363, Ex. 1 at cl. 6; *see also* D.I. 363, Ex. 2 at cls. 8 and 11.  This indicates that the claims are generally open, including to other fluid excipients.  *See Amgen Inc. v. Amneal Pharms. LLC*, 945 F.3d 1368, 1378-79 (Fed. Cir. 2020) (holding that the use of the "comprising" transition phrase reinforces the conclusion that the claim did not foreclose binders and diluents in addition to those recited in limitations that included the phrase "consisting of"); *see also Ravgen, Inc. v. Natera, Inc.*, No. 20-692, 2024 WL 116317, at *2 (W.D. Tex. Jan. 10, 2024) (concluding that under the proper construction, "the Markush groups of the asserted claims are closed, but the claims do not exclude a second agent, whether or not the second agent falls within the claimed Markush group").

This "comprising" term becomes meaningless if, as Defendants appear to argue, any excipient dissolved in a fluid would be excluded by the "pharmaceutically acceptable fluid" limitation.  Indeed, the claims specifically list an antioxidant as a separate element from the "pharmaceutically acceptable fluid," despite the fact that any such antioxidant would either be a

10

fluid or a solid dissolved in a solvent system.  D.I. 363, Ex. 1 at cl. 6; D.I. 363, Ex. 2 at cl. 8, 11; C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶¶ 134, 138 Bendamustine is likewise claimed as a separate element, despite the fact that it is dissolved in the solvent system.  Both the antioxidants and bendamustine would be excluded from the claims under Defendants' reading, in direct contradiction with the claim language.  Such a reading cannot be correct.  *See Amgen*, 945 F.3d at 1378-79.  Indeed, Dr. Dyar could not identify a single excipient that would be permissible under the "comprising" portion of the claim if his reading of "consisting of" were adopted.  Ex. 40 at 81:8-83:20.  This inability to identify any component that "comprising" would permit is itself proof that Defendants' construction renders the term surplusage—a result that is impermissible as a matter of claim construction.  *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) (claims must be construed to give meaning to all terms).

While Defendants argue that the specification's statement that "pharmaceutically acceptable fluid is non-aqueous and may be, but is not necessarily, a solvent for the bendamustine or salt thereof" forecloses the possibility of the "pharmaceutically acceptable fluid" being limited to solvents (C.A. No. 24-65, D.I. 347 at 4, 13-14; D.I. 361 at 2, 5, 10, 11, 13), that ignores the context of the claims.  *See* D.I. 363, Ex. 2 at 3:39-41.  Based on the foregoing, it is clear that regardless of how the "pharmaceutically acceptable fluid" may function in some embodiments, the claims here are specific to the "pharmaceutically acceptable fluid" functioning as a solvent, as they only list solvents and cover non-solvent components of the formulation as separate claim limitations.

The balance of the specification also underscores that the "pharmaceutically acceptable fluid" limitation merely excludes unclaimed solvents.  For example, the specification states that the "pharmaceutically acceptable fluid" "*is*" the solvent.  *See, e.g.*, D.I. 363, Ex. 1 at 3:42-43

11

("Within this aspect, the pharmaceutically acceptable fluid _**is**_ propylene glycol (PG) or polyethylene glycol (PEG)."), 3:43-45 ("In other embodiments of the invention however, the pharmaceutically acceptable fluid _**is**_ a mixture of PEG and PG.") (emphases added).  In contrast, the specification uses "includes" or "contains" for other components dissolved in the fluid.  *See, e.g.*, *id*. at 3:1-8 ("In accordance with one aspect of the invention there are provided long term storage stable bendamustine-containing compositions **including**: a) bendamustine or a pharmaceutically acceptable salt thereof; and b) a pharmaceutically acceptable fluid including i) PEG, PG or mixtures thereof; and ii) a stabilizing amount of an antioxidant.").  The fact that other components may be included in the "pharmaceutically acceptable fluid" does not change the fact that the only components of the "pharmaceutically acceptable fluid" as claimed are PEG and the optional co-solvents as set forth in the claim.  Indeed, Dr. Trout explains that if there was another component that was added into the "pharmaceutically acceptable fluid," like sodium hydroxide, a POSA would understand it to be another component of the overall liquid bendamustine-containing composition, and not part of the "pharmaceutically acceptable fluid" itself.  C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 134.

Beyond the grammar and structure with which the specification refers to the "pharmaceutically acceptable fluid," its functional descriptions further confirm that the claimed "pharmaceutically acceptable fluid" refers to solvents.  First, the specification explains that for the "pharmaceutically acceptable fluid" to be "sufficient" for use, it must contain the "amount which allows the bendamustine to be _**dissolved**_ or dispersed[5] to a degree which renders the liquid

---

[5] While the specification uses the phrase "dissolved or dispersed," all eight experimental examples in the patent describe bendamustine fully dissolved in the pharmaceutically acceptable fluid to form a clear solution, and none discloses a dispersion.  D.I. 363, Ex. 1 at Examples 1-8 ('214 patent); C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶¶ 119-130.  Moreover, as explained below, a POSA would understand that for a parenteral injectable product like the claimed compositions, the

composition ready for use."  D.I. 363, Ex. 1 at 6:30-33.  Thus, the specification shows that the "pharmaceutically acceptable fluid" is the solvent because its purpose is to *dissolve* the bendamustine so that the injectable formulation is ready for use or ready for dilution.  *See id.* Additionally, in every experimental example disclosed in the patent, the "pharmaceutically acceptable fluid" is the medium in which bendamustine is "dissolved" to a stated concentration, proving the same.  C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶¶ 119-130; D.I. 363, Ex. 1 at Examples 1-8.

Second, the specification demonstrates that the claimed bendamustine liquid compositions are to be infused intravenously and thus, must be solutions.  D.I. 363, Ex. 1 at 5:25-39.  Indeed, a POSA would understand that for the claimed liquid bendamustine formulations to be safe for administration by such an infusion, the bendamustine and any solid excipients would have to be fully dissolved, as any particulate matter in the solution could lead to serious adverse patient effects, including death.  C.A. No 24-65, D.I. 373-1, Ex. 25 ¶ 219; *see* Ex. 4 at -823 ("All articles intended for parenteral administration shall be prepared in a manner designed to exclude particulate matter as defined in Particulate Matter in Injections <788> and other foreign matter."); Ex. 5 at -810 ("Today, it is recognized that the presence of particles in solution, particularly if injected intravenously, can be harmful.").  A POSA would have considered a risk of solid particles in the liquid concentrate formulation to be unacceptable, since such particles could fail to dissolve completely in the admixed solution for infusion.  C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 219.  Further, it is well known that parenteral products "must be free from visible particulate matter"

---

bendamustine must be fully dissolved—particulate matter in an IV formulation poses serious patient safety risks, including death.  *See infra* at 13; C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 219. In any event, whether the "pharmaceutically acceptable fluid" dissolves or disperses the bendamustine, its function remains the same: serving as the liquid medium that renders the composition ready for dilution.  D.I. 363, Ex. 1 at 6:30-33.

and that "freedom from . . . visible particulate contamination must be maintained throughout the shelf life of the product." Ex. 6 at -654. Accordingly, a POSA would understand in reviewing the elements of the claim that the "pharmaceutically acceptable fluid" must be the solvent for the bendamustine and other excipients. C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶¶ 109, 219.

Third, the specification identifies that "preferred pharmaceutically acceptable fluids" are solvents, such as "PG, PEG or ethanol." D.I. 363, Ex. 1 at 4:59-60. By identifying the "preferred pharmaceutically acceptable fluids" exclusively as solvents, the specification confirmed that this claim element addresses the *solvent system*, and that not every component may be dissolved within that system or used transiently to condition it. C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 115. Similarly, the specification also confirms that in preferred embodiments, the pharmaceutically acceptable fluid consists of a mixture of solvents in amounts that always add up to 100%.

> In other embodiments of the invention however, the pharmaceutically acceptable fluid is a mixture of PEG and PG. For example, the pharmaceutically acceptable fluid can include about **50% PEG and about 50% PG**. Alternatively, pharmaceutically acceptable fluid includes about **95% PEG and about 5% PG**. The amount of PEG and PG can also be varied within the ranges, i.e. the **ratio of PEG:PG** in the pharmaceutically acceptable fluid can range from about **95:5 to about 50:50**. Within this range, is a pharmaceutically acceptable fluid containing about **75% PEG and about 25% PG**, and preferably **80% PEG and 20% PG**. In another embodiment, a pharmaceutically acceptable fluid can include about **85% PEG and about 15% PG** while another preferred pharmaceutically acceptable fluid includes about **90% PEG and about 10% PG**. The molecular weight of the PEG will be within the range of pharmaceutically acceptable weights although PEG 400 is preferred in many aspects of the invention.

D.I. 363, Ex. 1 at 3:43-61. Dr. Trout also explains that this is exactly how solvent systems are conventionally expressed: as ratios of constituent solvents totaling 100%. C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 116.

The prosecution history, too, supports that the "pharmaceutically acceptable fluid"

14

limitation is limited to solvents.  Indeed, the limitation was added specifically to exclude certain solvents in a prior art reference.  The original claims in the '214 patent required that the liquid bendamustine containing composition comprise polyethylene glycol.  C.A. No. 24-65, D.I. 366-1, Ex 12 at -1105.  The Examiner then rejected the claims over WO 2010/036702 to Drager ("Drager"), reasoning that Drager already taught liquid bendamustine formulations comprising polyethylene glycol.  *Id.* at -1173.  However, Drager also required additional "polar aprotic solvents."  D.I. 359, Ex. 4 at 2:18-20.  In response to the Examiner's rejection, Eagle amended the claims to require "pharmaceutically acceptable fluid consisting of" a defined group of polar protic solvents to distinguish from Drager's disclosure of polar aprotic solvents.  *Id.* at -1173, -1272; *see also id.* at -1274-76.  The addition of the "consisting of" claim language was meant to limit the solvent to *__only__* the listed polar protic solvents in order to carve out the inclusion of any polar aprotic solvents disclosed in Drager.  The Examiner agreed, and in fact, separately confirmed that "pharmaceutically acceptable fluid" referred to "the liquid *carrier* for the ultimate dosage form," *i.e.*, the solvent system.  *Id.* at -1899-90; *see also id*. at -1904 (noting that the solvent was limited to "liquid polyethylene glycol, propylene glycol, ethanol or mixtures thereof"); C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶¶ 151, 294.

In response to the foregoing, Defendants wrongly point to the word "fluid" in isolation, ignoring the remaining context of the claim language, specification, and prosecution history.  Indeed, Slayback's proposed understanding of the term improperly divorces the term "fluid" from the claim as a whole, relying on the notion that ███████████████████████████████ ███████████████████████████████ C.A. No. 24-65, D.I. 347 at 14-15; *see W.L. Gore & Assocs., Inc. v. C.R. Bard, Inc.*, No. 11-515, 2014 WL 3950663, at *4 (D. Del. Aug. 8, 2014) ("Focusing on the *claim language* is particularly crucial here, in order to honor

15

the Federal Circuit's instruction that '[p]roper claim construction . . . *demands interpretation of the entire claim in context*, not a single element in isolation.' *Hockerson–Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999); *see also Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1347 (Fed. Cir. 2008) (warning against 'interpret[ing] claim terms in a vacuum, devoid of the context of the claim as a whole').").  Slayback ignores that the claim itself does not recite "fluid" in isolation—it recites a full limitation listing only solvents, while other non-solvent excipients are listed elsewhere in the claim.  *See W.L. Gore*, 2014 WL 3950663, at *4 (holding that claim construction demands interpretation of the entire claim in context, not just a claim term in a vacuum).

Apotex's argument suffers from the same defect.

Every excipient is either a fluid or dissolved in the "pharmaceutically acceptable fluid," so that understanding would swallow the "comprising" nature of the "liquid bendamustine-containing composition," rendering its transitional phrase surplusage.  Indeed, Dr. Dyar's own analogy undermines Apotex's position.

But Dr. Dyar's analogy proves Eagle's

---

[6] Indeed, one is left to wonder how Apotex determined that the "bendamustine and antioxidant"—both of which are dissolved in the PEG and ethanol mixture—do not likewise form part of the "pharmaceutically acceptable fluid."

16

point: no one contends that the salt in salt water is a "solvent"—it is a solute dissolved in a solvent. Just as salt changes certain properties of water (alkalinity, boiling point) without becoming the solvent itself,

Dyar's analogy thus confirms the solute/solvent distinction: PEG is the solvent, and sodium hydroxide is a non-solvent ingredient dissolved in it.

The "pharmaceutically acceptable fluid" limitation must be read in the context of the full claim language, which lists five substances that indisputably are solvents. Defendants' motion relies on an implicit construction that would improperly enlarge the limitation to substances that are not solvents or even fluids. That implied construction is legally improper, and on that basis alone, Defendants' argument fails.[7]

Defendants also rely on extrinsic evidence in the form of an abandoned patent application, but that reliance is misplaced. CCOF ¶ 5. Defendants cite U.S. Patent Publication No. 2013/0210879 (the "'879 Publication") and U.S. Patent Application No. 13/767,672 (the "'672 Application") to support their argument that sodium hydroxide somehow is part of the "pharmaceutically acceptable fluid." C.A. No. 24-65, D.I. 347 at 5; D.I. 361 at 13. Defendants argue that since that unrelated patent specification recited "[s]ome more preferred formulations

---

[7] Defendants' argument effectively repeats their proposed construction of the claim limitation at issue, which the Court rejected. *See* Ex. 25 at 18:10-17, 36:15-19, 67:14-68:4. Defendants' summary judgment motions thus are little more than a transparent and improper motion for reconsideration. *See Becton Dickinson & Co. v. Tyco Healthcare Grp. LP*, No. 02-1694, 2008 WL 11383361, at *2 (D. Del. Sept. 11, 2008) (denying a motion for a new trial and equating it to a "motion for reconsideration of [the] claim construction ruling" because the defendant's "briefing rehashes for the fifth time the same arguments that the court has already considered and rejected"); *Microwave Vision, S.A. v. ETS-Lindgren Inc.*, 209 F. Supp. 3d 1322, 1328-29 (D. Del. 2016) ("In the present summary judgment motion, ETS argues to the contrary [of the claim construction], again. . . . Indeed, its entire motion turns on whether Claim 12 definitively links function to structure. Since the Court already decided that precise issue, rehashing it here constitutes reconsideration.").

17

include: . . . a "pharmaceutically acceptable fluid including i) polyethylene glycol and propylene glycol; ii) sodium hydroxide . . .  and iii) a stabilizing amount of thioglycerol," that sodium hydroxide must be a "pharmaceutically acceptable fluid" in the context of the Asserted Claims. *See* C.A. No. 24-65, D.I. 365-1, Ex. 7 at [0056] to [0059].  However, a separate, abandoned application and publication of a different invention (with an additional inventor) that does not claim priority to the same provisional applications is hardly pertinent evidence in construing the claim language at issue—let alone controlling with regard to the particular language of the Asserted Claims in these Asserted Patents.  *Corteva Agriscience LLC v. Monsanto Co.*, No. 22-1046, 2023 WL 6066643, at *5 (D. Del. Sept. 18, 2023) (citing *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 811 F.3d 1359, 1369 (Fed. Cir. 2016) for the "finding that constructions of claim terms across patents need not be the same where the patents at issue were from two separate families, claimed two different inventions, listed only one inventor in common, were filed years apart, and did not result from the same patent application").  Claim construction focuses on the precise language of the claims at issue in light of its intrinsic evidence—not ***extrinsic*** evidence that does not involve the same claim term.  *See Philips*, 415 F.3d at 1313-14 (requiring consideration of "the context of the particular claim in which the disputed term appears" because "the context in which a term is used in the asserted claim can be highly instructive").  If anything, this extrinsic evidence demonstrates that these inventors could have explicitly included sodium hydroxide in the "pharmaceutically acceptable fluid" limitation of the Asserted Patents but did not.

Apotex makes the additional argument the inventors understood that "while polyethylene glycol may serve as a solvent in the fluid, excipients that change the properties of the solvent are a necessary part of a PAF."  D.I. 361 at 13.  Apotex cites no legal support for such an argument.

18

And indeed, whether another excipient changes the properties of the formulation is irrelevant to the question of whether that excipient is part of the solvent system.  Any excipient included in a formulation is going to affect a property of that formulation.  Otherwise it would not be included. If that were the standard, the "pharmaceutically acceptable fluid" limitation would exclude any additional excipients.  Sodium hydroxide is a separate manufacturing aid, used as a pH adjuster, that falls within the open "comprising" preamble of the Asserted Claims.  Not to mention, a POSA would not consider sodium hydroxide to be part of (or pertinent to) the "pharmaceutically acceptable fluid" element, because the Asserted Claims do not claim or mention sodium hydroxide, much like how the Asserted Claims also do not mention other formulation components that may also be present in a liquid bendamustine-containing composition.  Ex. 2 ¶ 62.

Ultimately, this extrinsic evidence does not change that the structure and context of the Asserted Claims, the specification of the Asserted Patents, and the prosecution history showing how the "pharmaceutically acceptable fluid" term was added all clearly demonstrate that the term excludes solvents, not all excipients dissolved in the "pharmaceutically acceptable fluid."

### B.      Fact Issues Preclude Summary Judgment Under the Court's Guidance

Even if the Court does not find that Defendants' products meet the properly construed "pharmaceutically acceptable fluid" limitation as a matter of law, Eagle has, at least, demonstrated factual disputes sufficient to preclude summary judgment of non-infringement.

#### 1.      Sodium Hydroxide is A Solid, Not A Fluid

A reasonable jury could conclude that while the agreed construction of the smaller term "pharmaceutically acceptable fluid" requires a "*fluid*," sodium hydroxide is a solid, not a fluid, and the Court should deny summary judgment on that basis alone.  CCOF ¶ 3; D.I. 351, Ex. 1 at - 719 ("Sodium hydroxide occurs as a white or nearly white fused mass.").  ███████████

███     own documents all confirm this fact.  ██████████; D.I. 342,



█████████████████████████ C.A. No. 24-65, D.I. 347 at 6-7. █████████

█████████████████████████ a reasonable jury could conclude that Defendants' arguments are wrong. *See Extang Corp. v. Truck Accessories Grp., LLC*, No. 19-923, 2022 WL 610443, at \*2-4 (D. Del. Feb. 18, 2022) (denying partial summary judgment of infringement because "[a] reasonable jury [] could reject" the supporting argument, particularly in view of the plain and ordinary meaning).

A jury *also* reasonably could conclude that at best, sodium hydroxide is a solute that is dissolved in PEG and ethanol and thus does not fall under the "pharmaceutically acceptable fluid" limitation as a whole. *See* C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶¶ 63-64, 272. Indeed, given that it is the scientific truth, a jury would be entirely justified in making such a determination. A solute, once dissolved, does not become the solvent—it is dissolved in the solvent or solvent system. C.A. No. 24-65, D.I. 378-1, Ex. 29 at 84 ("In discussing solutions it is often convenient to call one

---

8 ████████████████████████████████████████████████████████████

component the solvent and the others solutes. The component of a solution whose physical state is preserved when the solution is formed is known as the solvent."). That issue likewise precludes the grant of summary judgment.

For example, the specification defines "pharmaceutically acceptable fluid," as a "fluid which is suitable for pharmaceutical use." D.I. 363, Ex. 1 at 2:56-58; C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 112. As such, a POSA would understand that non-liquid components, such as *solid* sodium hydroxide, cannot constitute part of the "pharmaceutically acceptable fluid." *Id.* ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 324. Dissolution cannot transform a solid—here, sodium hydroxide—into a "fluid." Ex. 2 ¶ 34; Ex 1 ¶ 117; *see* Ex. 11 at -476 (███████████████████████████

██████████████████████████████); *cf.* C.A. No. 24-65, D.I. 365-1, Ex, 5 ¶¶ 53-54 (conflating melting with dissolution). If such a thing was possible, that would mean that bendamustine itself (also a solid dissolved in PEG) is part of the "pharmaceutically acceptable fluid," thus rendering the claim structure nonsensical. *See supra* § IV.A.2.

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ C.A. No 24-65, D.I. 347 at 6-7.

These positions are mutually exclusive as a matter of basic chemistry. ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

21

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████ requires weighing competing expert testimony and evaluating the scientific evidence — precisely the type of credibility determination that is inappropriate at summary judgment.

### 2.    Sodium Hydroxide Is Not A Solvent

The Court should also deny summary judgment because a jury could conclude that the "pharmaceutically acceptable fluid" limitation as a whole is directed to solvents, and sodium hydroxide is not a solvent.  For the reasons addressed above, Eagle has plainly demonstrated that sodium hydroxide is not a solvent and thus does not fall within the "pharmaceutically acceptable fluid" term's exclusion of unenumerated solvents.  *See supra* at § IV.A.1-2.  To the extent that the Court concludes that a fact question remains on that score, Eagle has, at a minimum, put forward sufficient evidence to show a genuine dispute of material fact that precludes summary judgment in Defendants' favor.

### 3.    ████████████████████████████████████████

The Court should deny Defendants' summary judgment motion because it is predicated on the sodium hydroxide in Defendants' products, but ████████████████████████████ ███████████████████████████████████████████████████

Notably, the patents at issue are composition claims—they are neither method of manufacture nor product-by-process claims.  *See* D.I. 363, Ex. 1 at cl. 6 ("A liquid bendamustine containing composition . . ."); *see also* Ex. 1 ¶ 84; Ex. 2 ¶ 73.

When sodium hydroxide is added ██████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████    C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶¶ 251-52.

Given that backdrop, a reasonable jury could reject Defendants' non-infringement argument because ████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████    *See* C.A. No. 24-65, D.I. 387, Ex. 3 at 92:3-93:3; *see also* D.I. 363, Ex. 6 ¶ 169 (stating that "a POSA would understand that Apotex's NDA Product includes a 'pharmaceutically acceptable fluid' containing at least . . . sodium hydroxide" but failing to provide any independent testing to confirm this theory).  Further,

█████████████████████████████    ███████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████    *Id.* ¶ 335 ███████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

23



C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 335.

At best, that conclusory assertion creates a genuine issue of fact for trial.

    **4.**    <u>Sodium Hydroxide Is An "Impurity"</u>

This Court should deny Defendants' motions because ████████████████ ████████████████████████████████., there is a genuine dispute over whether it is an impurity such that the "consisting of" transitional phrase does not exclude it from the claim scope.  As the Federal Circuit explained, "impurities that a person of ordinary skill in the relevant art would ordinarily associate with a component on the 'consisting of' list do not exclude the accused product or process from infringement."  *Conoco, Inc. v. Energy & Env't Int'l, L.C.*, 460 F.3d 1349, 1360 (Fed. Cir. 2006).  Here, the parties disagree as to whether sodium hydroxide is an impurity or "structurally or functionally relates" to the "pharmaceutically acceptable fluid."  C.A.

No. 24-65, D.I. 347 at 10; D.I. 361 at 8-9; C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶¶ 232-262.  Apotex contends that the "impurities" exception does not apply in this situation because sodium hydroxide is a "functional excipient and part of the [pharmaceutically acceptable fluid], just as in the '879 Publication."   D.I. 361 at 8.

Slayback argues that the "impurities" exception does not apply ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.  Defendants are incorrect, for at least two reasons.

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ ██████ ████ █ ████ ████ ████ ████ ████████████████████████████████████████████████████████████████████████ C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 233; *see* C.A. No. 24-65, D.I. 365-1, Ex. 5 ¶ 152; Ex. 16 ¶¶ 113-14.  ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

███████████████████████████ Moreover, sodium is associated with PEG 400 itself because sodium hydroxide is routinely used as a catalyst in the production of PEG 400.  C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶¶ 244-250.  ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

Ex. 41 at -331-32; *Conoco*, 460 F.3d at 1360.

Impurities may "occur naturally, be added intentionally, or be introduced inadvertently." *Conoco*, 460 F.3d at 1360 ("the intentional addition of a component does not change its status as an 'impurity[']"); *see also* Ex. 17 at -089; Ex. 13 at -489 (explaining that impurities may arise in the final drug product "from several sources"); D.I. 365, Ex. 12.  █████████████████

████████████████████████████████████████████████████

████████████████ *See Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1346 (Fed. Cir. 2003) ("[I]n the product patent context, differences in process are meaningless[.]"); *Ferring B.V. v. Watson Lab'ys., Inc.*, 764 F.3d 1401, 1409 (Fed. Cir. 2014) (holding that "[t]he infringement evaluation is concerned only with the final [product]").

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████. CCOF ¶¶ 6-7; C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶¶ 253-254.  ████████████

████████████████████████████████████████████████████

██████████████████████████. Ex. 18 at -707 (explaining that "[t]he oxidizability of PEGs results from the presence of primary hydroxyl groups, which are readily deprotonated under the action of bases.").  █████ ████████████████████████████████  ████████████████

---

[9] PEG can undergo oxidative degradation, forming formic acid, which is an impurity in PEG.  *See*



███████████████████████████████████████████████████████ C.A. No, 24-65, D.I. 373-1, Ex. 25 ¶¶ 241, 248-252; *see e.g.,* Ex. 19 at -459 ("Analyzing Inorganic Anions and Cations: Many pharmaceuticals may contain residual inorganic ions from the manufacturing process, such as sulfate, chloride, or sodium. IC is ideal for identifying and quantifying these impurities to ensure they are within acceptable limits."). ██████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████ *See* C.A. No. 24-65, D.I. 365-1, Ex. 5 ¶ 135; Ex. 3 at 42:12-43:9; *see also* Ex. 16 ¶¶ 174, 176.

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████ warranting denial of the subject motions.

**5.**   A Genuine Issue Exists as to Whether ████████████████████

A reasonable jury also could conclude that the ████████████████████████ ████████████████████ which is one of the eligible solvents in the "pharmaceutically acceptable fluid" limitation.  PEG is a neutral, nonionic polyether whose identity is defined by its polymer backbone and molecular weight distribution.  Ex. 23 at -596; Ex. 22 at 588-93.  The

---

*generally* Ex. 18; Ex. 21 at -483.  Sodium hydroxide neutralizes these acidic impurities during manufacture, █████████████████████████████████.  C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶¶ 241, 248-252.

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████ *Supra* §§ IV.A.2, IV.B.3-4; *see also* C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 291.

Defendants provide no meaningful response.  Ex. 2 ¶ 56; Ex. 1 ¶¶ 186, 189; D.I. 342, Ex. 3 ¶ 211.  That is because they cannot.  █████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████ Defendants' labels also confirm this fact.  *See* D.I. 342, Ex. 22 at -848-49; D.I. 342, Ex. 23 at -828; C.A. No. 24-65 D.I. 387, Ex. 1 at -946-47; C.A. No. 24-65 D.I. 387, Ex. 2 at -924.

In the face of such statements, Defendants rely on recycled arguments.  ████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████ *Supra* §§ IV.B.3-4; *see also* C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 291.

Again, that is not the case.  *Supra* § IV.B.4.  Thus, while Defendants dispute the issue, ██████████████████████████████████████████ And PEG is of course one of the eligible solvents listed in the subject limitation.  *See* disc. *supra* at §§ IV.A.1-2, IV.B.3-4. However, at the very least, there is a genuine dispute as to whether a POSA would understand that

28



**6.** ███████████ is "Unrelated" to the Pharmaceutically Acceptable Fluid

This Court should alternatively deny Defendants' motion because ███████████ ███████████████████████████████████████████, a genuine dispute of fact exists as to whether it is unrelated to the pertinent claim element and thus not excluded by the "consisting of" term. The "unrelated" exception means that while the term "consisting of" does limit a claim or element, it does not exclude "substances ***unrelated*** to said element." *Shire Dev. Inc. v. Cadila Healthcare Ltd.*, No. 10-581, 2015 WL 4596410, at \*7 (D. Del. July 28, 2015), *aff'd sub nom.*, 688 F. App'x 912 (Fed. Cir. 2017) (construing "consisting of" and related terms as "exclusionary terms specifying that the element contains only what is expressly set forth in a recited list, but not excluding impurities and substances unrelated to said element"). ███████████████████ ███████████████████████████████████ it is not for the reasons explained above—the "unrelated" exception similarly applies here.

Defendants contend that ███████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

C.A. No. 24-65, D.I. 347 at 17. Similarly, Apotex asserts that

Defendants are incorrect.

First, where, as here, the "consisting of" term modifies a limitation, the question is whether the additional ***component*** is "unrelated to the element" and not the "***invention***" as a whole. *See Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1331-32 (Fed. Cir. 2004). As such the "unrelated" exception applies to the "***pharmaceutically acceptable fluid***" and not the ***entire invention*** because

the "consisting of" phrase is nested within the "pharmaceutically acceptable fluid" limitation of the claim, and not in the preamble with the "comprising" phrase, which would result in the "unrelated" exception applying to the entire invention. D.I. 363, Ex. 1 at cl. 6 ('214 patent) ("A liquid bendamustine-containing composition <u>comprising</u> . . . wherein the **pharmaceutically acceptable fluid** <u>consists of</u> polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol"). Therefore, the "unrelated" inquiry should focus on  "*pharmaceutically acceptable fluid*" *element*—not the *entire invention*. *see also* C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 263.

Second,

. CCOF ¶ 9; C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶¶ 264-266; D.I. 366, Ex. 17 at -018, -021 (listing polyethylene glycol as the vehicle for bendamustine dissolution); disc. *supra* at §§ IV.A.1-2. Thus, the "pharmaceutically acceptable fluid" limitation is related to solubility based on the structure of the claim and the specification as a whole. C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶¶ 103-105, 110, 115, 117.

Trout Opening ¶¶ 203-05, 214.

*Id.*

Apotex argues that the '879 Publication allegedly supports the assertion that sodium hydroxide was identified as "a necessary ingredient of the PAF, functioning to obtain a pH of from

30

about 6.5 for the polyethylene glycol." D.I. 361 at 7; C.A. No. 24-65, D.I. 365-1, Ex. 7 at [0060]-[0062]. But putting aside its irrelevance, that would only create a disputed issue of fact. And it is entirely irrelevant—the mere fact that the '879 Publication mentioned the use of sodium hydroxide to adjust the pH of PEG by functioning to neutralize the trace acidity does not make it related to the function of the "pharmaceutically acceptable fluid" recited in the Asserted Claims, which is to dissolve other components and contribute to the liquid medium's solvation mechanisms. Moreover, as discussed above in § IV.A, a separate, abandoned application and publication of a different invention (with a different inventor) that does not claim priority to the same provisional applications lacks relevance to the Asserted Claims in these Asserted Patents. Apotex also cites

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ However, like above, the fact that Eagle mentions ████████

██████████████████████████████ does not make it related to the function of the "pharmaceutically acceptable fluid," which again, is to dissolve other components and contribute to the liquid medium's solvation mechanisms.

Finally, ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ Initially, it wrongly assumes that the "unrelated" exception applies to the claimed subject matter as a whole. It does not. *See* disc. *supra* at §§ IV.B.6.

Further, even if the unrelated exception applied to the entire *invention*, which it does not, ██████████████████████████████ would still be unrelated to the claimed liquid bendamustine-containing composition. C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 283. This is because ████████

31

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████

████████████████████████████████████████████████ summary judgment is precluded.

**7.**    Slayback's Additional Argument Concerning ████████████████████ ████████████████ Raises Many of the Same Factual Questions

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████ This argument fails for multiple independent reasons, each of which at minimum raises a genuine issue of material fact.

First, ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████,

Ex. 25 at ¶ 326; *see also* Ex. 30 at -154 (██████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████

    ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

██████

    ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

33

34

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████  ████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████

## C.    Defendants Infringe Under the Doctrine of Equivalents

---



When literal infringement is not established, a patentee can use the doctrine of equivalents to claim "insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Azurity Pharms. Inc., v. Alkem Lab'ys Ltd.*, 582 F. Supp. 3d 192, 196 (D. Del. 2022). A plaintiff may rely on factual evidence of insubstantial differences to prove infringement under the doctrine of equivalents. *Id.* at 196-97. Additionally, infringement can be proved by doctrine of equivalents if the accused product "performs substantially the same function in substantially the same way to obtain substantially the same result as the claim limitation." *Recro Gainesville LLC v. Actavis Lab'ys FL, Inc.*, No. 14-1118, 2017 WL 1064883, at *4 (D. Del. Feb. 24, 2017). Apotex argues that Eagle may not assert infringement by equivalents because the "consisting of" phrase is inherently narrow language that categorically bars this infringement theory. D.I. 361 at 15-16. Both Defendants also argue that prosecution history estoppel bars Eagle from asserting infringement under the doctrine of equivalents. *Id.* at 15-16; C.A. No. 24-65, D.I. 347at 18-20 . Both arguments fail.

### 1.    Apotex's Contention that Eagle is Legally Barred from Asserting Infringement Under the Doctrine of Equivalents is Unavailing

Apotex contends that the doctrine of equivalents is unavailable because the "consisting of" limitation is "inherently narrow." D.I. 361 at 15-16. Controlling case law explicitly holds otherwise. For example, in *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, which Apotex cites in supports of its argument (*id*. at 16), the Federal Circuit found that the "the drafter's choice of the phrase 'consisting of' does not foreclose infringement under the doctrine of equivalents." 212 F.3d 1377, 1383 (Fed. Cir. 2000). The Court reasoned that a jury may reasonably determine that a product infringes a "consisting of" limitation by equivalents where the equivalent is "insubstantially different" from the claim's specific limitation. *Id.* Similarly, in *Azurity Pharms*., this Court denied a motion for judgment on the pleadings seeking non-infringement of a

36

"consisting of" claim. 582 F. Supp. 3d at 197. The Court noted that a patentee can use the doctrine of equivalents to claim "insubstantial alterations that were not captured in drafting the original patent claim but which could be created through trivial changes." *Id.* at 196. Thus, a plaintiff may rely on factual evidence of insubstantial differences to prove infringement under the doctrine of equivalents. *Id.* at 196-97. That is exactly what Eagle is doing in this case.

Apotex's other cited cases are inapposite. For example, in *Moore U.S.A., Inc. v. Standard Reg. Co.*, the Federal Circuit noted that the claim limitation at issue, "majority of the lengths," was "not entitled to a scope of equivalents" because allowing the applicant's proposed construction would "allow what is undisputedly a minority (*i.e.*, 47.8%) to be equivalent to a majority," which would vitiate the requirements of the limitation. 229 F.3d 1091, 1106 (Fed. Cir. 2000). Moreover, the court noted that it would "defy logic to conclude that a minority—the very antithesis of a majority—could be insubstantially different from a claim limitation requiring a majority[.]" *Id.* In contrast, here, Eagle is not proposing to vitiate a claim limitation. Rather, it is proposing to use the doctrine of equivalents to capture a formulation containing a minor amount of an additional component of an entirely different type and purpose from those enumerated in the consisting of limitation.

As to Apotex's other cases, in *Multilayer Stretch Cling Films Holdings, Inc. v. Berry Plastics Corp.*, the Federal Circuit found that the patentee's use of the term "consisting of" restricted the scope of its claims to the listed resins because, unlike here, there was "nothing in the prosecution history" indicating that the Markush group was not closed to the four resins cited in the claim. 831 F.3d 1350, 1361 (Fed. Cir. 2016). And in *Vehicular Techs. Corp.*, the Federal Circuit found that the claim language "expressly require[d] two springs," and as such, the patentee's use of "consisting of" emphasized the "claim's specific limitation to a concentric spring

37

structure." 212 F.3d at 1382-3. Again, here, Eagle's claim language is not so limiting. *Supra* § IV.A.2. Thus, Eagle is properly entitled to assert infringement under the doctrine of equivalents.

> **2.**      Prosecution History Estoppel Does Not Bar Eagle's Assertion of Infringement Under the Doctrine of Equivalents

Both Apotex and Slayback contend that Eagle cannot assert infringement by equivalents due to prosecution history estoppel. Specifically, Defendants claim that Eagle made a "narrowing" amendment during the prosecution of the '214 patent to overcome a rejection. D.I. 361 at 15-16; C.A. No. 24-65, D.I. 347 at 18. Defendants' arguments fail because the equivalent allegedly excluded here, a formulation comprising NaOH, was tangential to the purpose of the amendment, which was to exclude additional solvents. CCOF ¶ 10; *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 740-41 (2002) ("The equivalent may have been unforeseeable at the time of the application; the rationale underlying the amendment may bear no more than a tangential relation to the equivalent in question; or there may be some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question. In those cases the patentee can overcome the presumption that prosecution history estoppel bars a finding of equivalence.").[11]

As discussed above, Eagle amended its claims to add the "pharmaceutically acceptable fluid consisting of" limitation specifically to distinguish Drager's polar aprotic solvents from the claimed polar protic solvents. *See supra* at § IV.A.2. Eagle made no suggestion that the "consisting of" amendment excluded other types of components, such as pH adjusters. *See* C.A. No. 24-65, D.I. 366-1, Ex. 12 at -1274-76. Non-solvent components were simply irrelevant to the

---

[11] Slayback argues that the foreseeability exception of *Festo* does not apply because, Eagle allegedly knew that "the phrase 'pharmaceutically acceptable fluid' ███████████████ ███████ C.A. No. 24-65, D.I. 347 at 19. As Eagle is not asserting the applicability of the foreseeability exception, Slayback's argument on this point is irrelevant.

Drager rejection, and any exclusion of non-solvent components, such as NaOH, was tangential to the purpose of the amendment. *See Instituform Techs., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1370 (Fed. Cir. 2004) (finding amendment to be tangentially related to the accused equivalent where the reason for the amendment and the equivalent concerned different aspects of the invention).

Subsequent office actions confirmed this understanding. When the Examiner rejected the claims over *Brittain* (Ex. 27), the "pharmaceutically acceptable fluid" was characterized as "the liquid carrier for the ultimate dosage form." C.A. No. 24-65, D.I. 367-1, Ex. 12 at -1904. This common understanding between the applicant and the Examiner further shows that this element and the related amendment addressed the identity of the solvents in the formulation, not the presence of non-solvent components, which were tangential to the purpose of the amendment. Thus, prosecution history estoppel does not bar Eagle's assertion of equivalent infringement.

In an effort to rebut the clear tangentiality of Eagle's amendment, Slayback relies on *Biagro W. Sales, Inc. v. Grow More, Inc.*; but that does not save its argument. 423 F.3d 1296 (Fed. Cir. 2005). In *Biagro*, the Federal Circuit rejected tangentiality where "the reason for the amendment and the asserted equivalent relate to the concentration." *Id.* at 1306. The patentee had narrowed the concentration range to overcome prior art, and the accused equivalent was a different concentration falling within the surrendered range. *Id.* There, the amendment and the equivalent concerned the very same claim parameter, but that is not true here. Eagle narrowed the solvent list to specific polar protic solvents, and the equivalent at issue is a trace pH-adjustment residue that serves an entirely different function (acidity conditioning) in an entirely different category (non-solvent excipient). *Biagro* is therefore inapposite, and the inclusion of sodium hydroxide is tangential to the purpose of Eagle's amendment, to exclude unenumerated solvents. Thus, Eagle

39

is not precluded as a matter of law from asserting equivalent infringement.

**3.**    Because Eagle Is Entitled to Assert Equivalent Infringement, Further Fact Issues Preclude Summary Judgment

A plaintiff may rely on factual evidence of insubstantial differences to prove infringement under the doctrine of equivalents. *Azurity Pharms*. 582 F. Supp. 3d at 196-97.  However, assuming that sodium hydroxide is part of the "pharmaceutically acceptable fluid"—a premise Eagle vigorously disputes—a POSA would nonetheless understand that a PEG 400 solvent adjusted with sodium hydroxide is equivalent to PEG 400 as recited in the independent claims of the '214 Patent and the '248 Patent*. Supra* § IV.B.3-4.  Eagle's expert, Dr. Trout, explains that a POSA would understand that any differences between PEG 400 not adjusted with sodium hydroxide and PEG 400 that has interacted with small amounts of sodium hydroxide for pH control are insubstantial in both its chemical identity and its formulation performance.  C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶¶ 289-91.  As discussed above, Defendants' own labels ███████████████████████ ████████████████████████████████████  *See supra* at § IV.B.5.  At a minimum, there are genuine disputes of material fact regarding whether any differences would be insubstantial to a POSA that make summary judgment improper.

Additionally, plaintiffs may show infringement by equivalents if the accused product "performs substantially the same function in substantially the same way to obtain substantially the same result as the claim limitation." *Recro Gainesville*, 2017 WL 1064883, at *4.  Here, in both PEG 400 and PEG 400 that has been pH-adjusted with sodium hydroxide, the PEG 400 solvent serves the same function, acting as the pharmaceutically acceptable carrier for bendamustine.  C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 294.  Sodium hydroxide does not introduce a new solvent function—it merely adjusts acidity.  *Id.*; D.I. 351, Ex. 1 at -719 ("Sodium hydroxide is widely used in pharmaceutical formulations to adjust the pH of solutions.").  Moreover, both adjusted and

unadjusted PEG 400 function in the same way, solubilizing bendamustine using the same mechanisms of solvation and miscibility.  C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 295.  When sodium hydroxide is added, it neutralizes trace acidity in the PEG matrix, it does not alter the polyether structure or the solvation mechanism of PEG.  C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶¶ 71-76; Ex. 12 at -240; Ex. 28 at -286; Ex. 29 at -657-59.  Thus, by providing the same function in the same way, they achieve the same result: a "continuous liquid medium that dissolves and carries bendamustine (and antioxidant) through manufacture, storage, and dilution."  C.A. No. 24-65, D.I. 373-1, Ex. 25 ¶ 302.  Thus, Defendants' accused NDA products infringe the '214 Patent and '248 Patent under doctrine of equivalents.  At the very least, Defendants cannot prove no genuine dispute of material fact exists because they fail to address Eagle's evidence of insubstantial differences or any differences in the function, way, and result between the claims and the accused NDA products.

## V.    CONCLUSION

Defendants have failed to demonstrate they are entitled to summary judgment, and their motions should be denied.

Dated: July 1, 2026

OF COUNSEL:

Kenneth G. Schuler
Marc N. Zubick
Alex Grabowski
Michelle Chin
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
(312) 876-7700
kenneth.schuler@lw.com
marc.zubick@lw.com
alex.grabowski@lw.com
michelle.chin@lw.com

Brett M. Sandford
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 9411
(415) 391-0600
brett.sandford@lw.com

Ramya Sri Vallabhaneni
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
(212) 906-1200
ramya.vallabhaneni@lw.com

Kelly A. Welsh
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
kelly.welsh@lw.com

MCCARTER & ENGLISH, LLP

*/s/ Alexandra M. Joyce*

Daniel M. Silver (#4758)
Alexandra M. Joyce (#6423)
405 N. King Street, 8th Floor
Wilmington, DE 19801
(302) 984-6300
dsilver@mccarter.com
ajoyce@mccarter.com

*Attorneys for Plaintiffs*

42

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing documents were caused to be served on July 1, 2026, on the following counsel in the manner indicated:

**VIA EMAIL:**
Kenneth L. Dorsney
Cortlan S. Hitch
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
kdorsney@morrisjames.com
chitch@morrisjames.com

Deepro R. Mukerjee
Lance A. Soderstrom
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Center
New York, NY 10020-1605
Deepro.mukerjee@katten.com
Lance.soderstrom@katten.com

Jitendra Malik
Joseph M. Janusz
KATTEN MUCHIN ROSENMAN LLP
550 South Tyron Street, Suite 2900
Charlotte, NC 28202
Jitty.malik@katten.com
Joe.janusz@katten.com

Christopher B. Ferenc
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Avenue, NW Suite 800
Washington, DC 20006
Christopher.ferenc@katten.com

Rachel L. Schweers
Matthew T. Messina
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661
Rachel.schweers@katten.com
Matthew.messina@katten.com

*Attorneys for Defendants Apotex, Inc. and Apotex Corp.*

ME1\61693533.v1

Neal C. Belgam
Daniel A. Taylor
SMITH KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
nbelgam@skjlaw.com
dtaylor@skjlaw.com

Jason A. Lief
Alan H. Pollack
Audrey R. Sparschu
WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, NY 10019
jlief@windelsmarx.com
apollack@windelsmarx.com
asparschu@windelsmarx.com

Andrew Miller
Ajay Kayal
Robyn Ast-Gmoser
Kiersten Fowler
Daniel Forchheimer
WINDELS MARX LANE & MITTENDORF, LLP
One Giralda Farms
Madison, NJ 07940
amiller@windelsmarx.com
akayal@windelsmarx.com
rast-gmoser@windelsmarx.com
kfowler@windelsmarx.com
dforchheimer@windelsmarx.com

*Attorneys for Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

/s/ Alexandra M. Joyce
Alexandra M. Joyce (#6423)

ME1\61693533.v1