**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>APOTEX INC. and APOTEX CORP.,<br><br>Defendants. | REDACTED PUBLIC VERSION FILED AUGUST 7, 2026<br><br>C.A. No. 24-64-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>████████████ |
| EAGLE PHARMACEUTICALS, INC. and EAGLE SUB1 LLC,<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC and AZURITY PHARMACEUTICALS, INC.,<br><br>Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>██████████ |

**DECLARATION OF RAMYA VALLABHANENI IN SUPPORT OF PLAINTIFFS
EAGLE PHARMACEUTICALS, INC. AND EAGLE SUB 1 LLC'S OMNIBUS
ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTIONS FOR
<u>SUMMARY JUDGMENT OF NON-INFRINGEMENT</u>**

I, Ramya Vallabhaneni, declare as follows:

1.      I am an attorney at the law firm of Latham & Watkins LLP and counsel for Eagle Pharmaceuticals, Inc. and Eagle Sub1 LLC ("Eagle") in the above-captioned case.  I am admitted to practice before the Court *pro hac vice*.

2.      I make this declaration in support of Eagle's Omnibus Answering Brief in Opposition to Defendants' Motions for Summary Judgment of Non-Infringement.

3.      I have personal knowledge of the facts set forth in this declaration, and if called as a witness, could and would competently testify thereto.

4.      Attached as **Exhibit 1** is a true and correct copy of excerpts of the Reply Expert Report of Dr. Bernhardt Trout for Apotex Inc. and Apotex Corp. ("Apotex"), dated April 13, 2026.

5.      Attached as **Exhibit 2** is a true and correct copy of excerpts of the Reply Expert Report of Dr. Bernhardt Trout for Slayback Pharma LLC and Azurity Pharmaceuticals, Inc. ("Slayback"), dated April 13, 2026.

6.       Attached as **Exhibit 3** is a true and correct copy of excerpts of the deposition transcript of Dr. Patrick Sinko, dated April 16, 2026.

7.      Attached as **Exhibit 4** is a true and correct copy of excerpts of USP 33 <Injections>, EAGLEBEN-SA_00263816.

8.      Attached as **Exhibit 5** is a true and correct copy of excerpts of USP 32 <Injections>, EAGLEBEN-SA_00263808.

9.      Attached as **Exhibit 6** is a true and correct copy of excerpts of Remington: The Science and Practice of Pharmacy, 21st Edition, EAGLEBEN-SA_00361644.

10.     Attached as **Exhibit 7** is a true and correct copy of excerpts of Eagle's Raw Material Specification from Zydus, EAGLEBEN-SA_00343483.

1

11.      Attached as **Exhibit 8** is a true and correct copy of Apotex's Raw Material Specification for Sodium Hydroxide, APOBENDA64_007398.

12.      Attached as **Exhibit 9** is a true and correct copy of Section 3.2.P.4.4 of Slayback's New Drug Application, SLAY-VIVMUS0005646.

13.      Attached as **Exhibit 10** is a true and correct copy of the CordenPharma specification report for sodium hydroxide in Slayback's NDA product, SLAYVIVMUS0010975.

14.      Attached as **Exhibit 11** is a true and correct copy of excerpts of the Engineering Batch Study Report of Slayback's NDA product, SLAY-VIVMUS0016473.

15.      Attached as **Exhibit 12** is a true and correct copy of excerpts of the Elements of Organic Chemistry by Henry Zimmerman, EAGLEBEN-SA_00288234.

16.      Attached as **Exhibit 13** is a true and correct copy of the ICH Harmonised Guideline for Elemental Impurities, Q3D(R2), EAGLEBEN-SA_00361489.

17.      Attached as **Exhibit 14** is a true and correct copy of excerpts of the Elemental Impurities Evaluation Report for Apotex's NDA product, APOBENDA64_001127.

18.      Attached as **Exhibit 15** is a true and correct copy of excerpts of Section 3.2.P.4 of Slayback's NDA, SLAY-VIVMUS0001235.

19.      Attached as **Exhibit 16** is a true and correct copy of excerpts of the Supplemental Rebuttal Expert Report of Dr. S. Craig Dyar, dated March 27, 2026.

20.      Attached as **Exhibit 17** is a true and correct copy of excerpts of USP 232 <Elemental Impurities>, EAGLEBEN-SA_00362089.

21.      Attached as **Exhibit 18** is a true and correct copy of excerpts of Catalytic Oxidative Deformylation of Polyethylene Glycols with the Participation of Molecular Oxygen, A. M. Sakharov et al., EAGLEBEN-SA_00361705.

22.     Attached as **Exhibit 19** is a true and correct copy of Ion Chromatography for Detecting Impurities in Pharmaceuticals, a Conquer Science webpage, EAGLEBEN-SA_00361459.

23.     Attached as **Exhibit 20** is a true and correct copy of excerpts of Section 3.2.P.4 of Slayback's NDA, SLAY-VIVMUS0005640.

24.     Attached as **Exhibit 21** is a true and correct copy of excerpts of "Degradation of polyethylene glycol. A study of the reaction mechanism in a model molecule: Tetraethylene glycol," Jens Glastrup, EAGLEBEN-SA_00361483.

25.     Attached as **Exhibit 22** is a true and correct copy of excerpts of the Handbook of Pharmaceutical Excipients, EAGLEBEN-SA_00315043.

26.     Attached as **Exhibit 23** is a true and correct copy of excerpts of "Laboratory Synthesis of Polyethylene Glycol Derivatives," J. Milton Harris, EAGLEBEN-SA_00361593.

27.     Attached as **Exhibit 24** is a true and correct copy of excerpts of Appendix A to Dr. Bernhardt Trout's Opening Expert Report for Apotex, dated February 6, 2026.

28.     Attached as **Exhibit 25** is a true and correct copy of excerpts of the Markman Hearing Transcript, dated January 20, 2025.

29.     Attached as **Exhibit 26** is a true and correct copy of excerpts of Section 3.2.P.2 of Eagle's NDA, EAGLEBEN-SA_00014305.

30.     Attached as **Exhibit 27** is a true and correct copy of United States Patent Application Publication 2006/0159713 ("Brittain"), EAGLEBEN-SA_00091744.

31.     Attached as **Exhibit 28** is a true and correct copy of excerpts of "Introduction to Chemistry," Tracy Poulsen, EAGLEBEN-SA_00076285.

32.     Attached as **Exhibit 29** is a true and correct copy of excerpts of "Chemistry," seventh edition, by Steven S. Zumdahl and Susan A. Zumdahl, EAGLEBEN-SA_00362257.

33.     Attached as **Exhibit 30** is a true and correct copy of excerpts of "WHO Technical Report Series: WHO Expert Committee On Specifications For Pharmaceutical Preparations," thirty-ninth report, EAGLEBEN-SA_00362105.

34.     Attached as **Exhibit 31** is a true and correct copy of excerpts of the deposition transcript of Dr. Srikanth Sundaram, dated November 20, 2025.

35.     Attached as **Exhibit 32** is a true and correct copy of excerpts of Slayback's Pre-IND Meeting Briefing Book, SLAY-VIVMUS0007125.

36.     Attached as **Exhibit 33** is a true and correct copy of excerpts of Highlights of Prescribing Information for XIFYRM, EAGLEBEN-SA_00376497.

37.     Attached as **Exhibit 34** is a true and correct copy of Section 3.2.P.4.1 of Slayback's NDA, SLAY-VIVMUS0005624.

38.     Attached as **Exhibit 35** is a true and correct copy of Section 3.2.P.4.1 of Slayback's NDA, SLAY-VIVMUS0005629.

39.     Attached as **Exhibit 36** is a true and correct copy of the CordenPharma Certificate of Analysis for Slayback's NDA for Lot Number 6D04087, SLAY-VIVMUS0016144.

40.     Attached as **Exhibit 37** is a true and correct copy of the CordenPharma Specification Report dated May 2022 for Slayback's NDA product, SLAY-VIVMUS0011233.

41.     Attached as **Exhibit 38** is a true and correct copy of the MSN Raw Material Certificate of Analysis for sodium hydroxide, APOBENDA64_002120.

42.     Attached as **Exhibit 39** is a true and correct copy of excerpts of Section 3.2.P.2.1 of Slayback's NDA, SLAY-VIVMUS0000513.

43.    Attached as **Exhibit 40** is a true and correct copy of excerpts of the deposition transcript of Dr. S. Craig Dyar, dated May 11, 2026.

44.    Attached as **Exhibit 41** is a true and correct copy of excerpts of the CRODA Certificate of Analysis for Super Refined PEG 400, EAGLEBEN-SA_00131330.

I declare under penalty of perjury that the foregoing is true and correct.


July 1, 2026                                          */s/* Ramya Vallabhaneni
                                                     Ramya Vallabhaneni

# EXHIBIT 1
# REDACTED IN ITS ENTIRETY

# Exhibit 2

**HIGHLY CONFIDENTIAL - CONTAINS HIGHLY CONFIDENTIAL INFORMATION OF SLAYBACK**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>SLAYBACK PHARMA LLC, AND AZURITY PHARMACEUTICALS, INC.<br><br>Defendants. | C.A. No. 24-65-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |

**REPLY REPORT OF DR. BERNHARDT TROUT, PH.D.**

"consisting of" language, subject to the legal exceptions for impurities and substances unrelated to that element.  Trout Main Body of Opening Report ¶¶ 42, 104.

## IV.    TECHNICAL BACKGROUND

23.    Dr. Sinko devotes the entirety of his "Scientific Background" section to establishing general principles of chemistry—states of matter, dissolution, conservation of mass, and acid-base chemistry—that, while uncontroversial in isolation, are irrelevant to the dispositive non-infringement argument Slayback raises in this case:  whether sodium hydroxide is the "pharmaceutically acceptable fluid" as that term is used in the Asserted Claims and therefore falls outside the scope of the "consisting of" limitation.  Sinko Rebuttal Report ¶¶ 40-42.  Dr. Sinko's Scientific Background is designed to support a single flawed premise:  ██████████████

███████████████████████████████████████

████████████████████████████  Sinko Rebuttal Report ¶¶ 53, 56, 121-126.  This premise fundamentally misunderstands the Asserted Claims, which define the "pharmaceutically acceptable fluid" not by physical state but by function—specifically, the solvent function of dissolving bendamustine to create a stable, ready-to-dilute liquid composition.  Trout Main Body of Opening Report ¶¶ 114, 131-132; Trout Rebuttal Report ¶¶ 32, 38.

24.    As I explained in my Main Body of my Opening Report, a POSA would understand that the "pharmaceutically acceptable fluid" recited in the Asserted Claims refers to the solvent/ co-solvent system used to dissolve bendamustine and other excipients for stable liquid pharmaceutical compositions.  Trout Main Body of Opening Report ¶¶ 131-132.  The specification expressly defines a "pharmaceutically acceptable fluid" as "a fluid which is suitable for pharmaceutical use" and further explains that for the fluid to be "sufficient" for use, it must contain the "amount which allows the bendamustine to be dissolved."  Trout Rebuttal Report ¶ 44; '214 patent at 2:56-58, 6:30-33.  The Asserted Claims limit the pharmaceutically acceptable fluid by

7

"consisting of" language to polyethylene glycol, propylene glycol, ethanol, benzyl alcohol, and glycofurol—all of which are solvents for bendamustine. (Trout Main Body of Opening Report ¶ 134; Trout Rebuttal Report ¶¶ 48, 68).  Nothing in Dr. Sinko's general chemistry tutorial addresses this claim-specific context.

### A.  States of Matter and the Definition of Fluids

25.  Dr. Sinko devotes extensive discussion in his report to the definitions of "solids," "liquids," and "fluids," asserting that a POSA would define a fluid as "a substance that flows" and that, ███████████████████████████████████████████████ ████████████████████████████  Sinko Rebuttal Report ¶¶ 41-49.  Dr. Sinko's reliance on general dictionary definitions and physics textbooks misses the point.  The relevant inquiry under the Asserted Claims is not whether a given substance "flows" in the abstract; it is what function that substance serves in the claimed formulation.

26.  I have previously explained that the "pharmaceutically acceptable fluid" is a specific claim element referring to the solvent system, not a general descriptor of any substance in a liquid or flowing state.  Trout Main Body of Opening Report ¶¶ 132, 134; Trout Rebuttal Report ¶¶ 22, 43.  The Asserted Claims use the word "liquid" in the preamble ("liquid bendamustine-containing composition") to describe the physical state of the overall composition, and the phrase "pharmaceutically acceptable fluid" in the claim body to identify the solvent system.  A POSA would understand the distinction between these two terms, as the specification, prosecution history, and Slayback's own documents all confirm.  Trout Rebuttal Report ¶¶ 38, 63, 112.

27.  Dr. Sinko's citations to sources such as The American Heritage College Dictionary, the Oxford Thesaurus of English, Sears' College Physics, and Landau's Fluid Mechanics are not relevant because none of those general references addresses the specific claim term "pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more

8

expect labels and FDA classifications to reflect that characterization.  They do not.  The FDA

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

███████████.  Trout Main Body of Opening Report ¶¶ 202-207; Sinko Rebuttal Report ¶ 72.

32.     Furthermore, the fact that ████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

Trout Main Body of Opening Report ¶ 272.  The solvent dissolves; the solute is dissolved.  Dr.

Sinko's own framework confirms this: he acknowledges the solute/solvent distinction and the

convention that "the component of a solution whose physical state is preserved during solution

formation is known as the solvent." Sinko Rebuttal Report ¶ 51.  ██████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████

**B.**     ████████████████████████████████████████████

33.     Dr. Sinko's discussion of pharmaceutical dosage forms, solutions, and the

dissolution process is similarly misdirected.  Sinko Rebuttal Report ¶¶ 50-56.  ███████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████         Sinko Rebuttal Report ¶¶ 52-53.  ████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

███████████████████████

34.     ████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████     Trout Main Body of Opening Report ¶¶ 133-134.   The Asserted Claims expressly recite that bendamustine is "in" the pharmaceutically acceptable fluid, not that it "is" the pharmaceutically acceptable fluid.   Trout Main Body of Opening Report ¶ 134; Trout Rebuttal Report ¶ 32.   ████████████████████████

████████████████████████████████████████████████████

██████

35.     As I have previously explained, the fact that various components of the liquid bendamustine formulation are dissolved in the pharmaceutically acceptable fluid does not fundamentally redefine what the pharmaceutically acceptable fluid is—a solvent or solvent system.  Trout Main Body of Opening Report ¶¶ 132-133.  The pharmaceutically acceptable fluid is always the solvent; anything dissolved in it does redefine what the pharmaceutically acceptable fluid is in the context of the Asserted Claims.  Trout Main Body of Opening Report ¶ 133.

36.     Dr. Sinko's reliance on Bancroft's 1935 article ("All liquid solutions are mixtures of liquids") and Goodwin's 2002 article comparing dissolution to melting are similarly irrelevant to the claim construction question at hand.  Sinko Rebuttal Report ¶¶ 53-54.  These references address the physical chemistry of phase transitions; they do not speak to the functional classification of formulation components within a patented pharmaceutical composition.  A POSA analyzing the Asserted Claims would classify components by their role in the formulation—

12

<mark>solvent, active ingredient, antioxidant, pH adjuster—not merely by their physical state after mixing.</mark>  Trout Rebuttal Report ¶¶ 66-68; Trout Main Body of Opening Report ¶ 132.

C.    ████████████████████████████████████████████████████

█    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

38.    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████

█    ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████.  Many formulation variables—including pH, temperature, ionic strength, and surfactant levels—can influence solubility without themselves

13

███████████████████████████████████████████████████

███████████████████████████████████ Trout Opening Report Appendix B ¶¶ 116, 130.

### G.    PEG 400 and the Role of pH Adjustment

55.    Dr. Sinko's discussion of PEG's properties, including that PEG-400 is a commonly used liquid version of PEG and that PEG is known to contain certain acidic impurities such as acetic acid and formic acid, is consistent with my own discussion of PEG chemistry.  Sinko Rebuttal Report ¶¶ 69-70.  I agree that PEG is known to contain certain acidic impurities that develop during manufacture, and that ████████████████████████████

██████████████████████████████ Sinko Rebuttal Report ¶ 70;

Trout Main Body of Opening Report ¶¶ 257, 280. ████████████████████

████████████████████████████████████████████████

██  ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

22

62.    Third, Dr. Sinko places great emphasis on the Abandoned Patent Application Publication (U.S. Patent Publication No. 2013/0210879), asserting that Eagle ███████████ ████████████████████████████████████████████████████████████ ██████████████ "[t]he current patents-in-suit do not claim or mention sodium hydroxide at all." Sinko Rebuttal Report ¶ 86.  This argument is misleading for the reasons I addressed in the Main Body of my Opening Report.  Trout Main Body of Opening Report ¶¶ 310-317.  Indeed, Dr. Sinko even notes the '879 Publication is a separate application that does not claim priority to the same provisional application as the Asserted Patents.  Sinko Rebuttal Report ¶ 86.  The fact that the '879 Publication discussed the use of sodium hydroxide to adjust the pH of PEG does not mean that the Asserted Claims were intended to cover or exclude sodium hydroxide as a component of the "pharmaceutically acceptable fluid."  Rather, sodium hydroxide is a pH adjuster—a separate formulation component that falls within the open "comprising" preamble of the Asserted Claims. Trout Main Body of Opening Report ¶¶ 314-317.  That the Asserted Claims "do not claim or mention sodium hydroxide" is entirely consistent with the fact that a POSA would not consider sodium hydroxide to be part of (or pertinent to) the "pharmaceutically acceptable fluid" element, just as the Asserted Claims do not mention other formulation components that might be present (such as nitrogen headspace gas or specific container materials) that may also be present in a liquid bendamustine composition.

63.    Fourth, Dr. Sinko asserts that during prosecution of the '707 Patent, "███████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ Trout Main Body of Opening

25

fluid also does not redefine the pharmaceutically acceptable fluid to include ingredients that are not fluids." Trout Main Body of Opening Report ¶ 133.

71.    The claim structure reinforces this understanding. Independent Claim 6 of the '214 patent and Claim 8 of the '248 patent recite bendamustine and an antioxidant "in a pharmaceutically acceptable fluid; wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol." Trout Main Body of Opening Report ¶ 134. The "in a pharmaceutically acceptable fluid" language tells a POSA that other components (bendamustine, antioxidant) are in the fluid— they are solutes dissolved in the solvent. The "consists of" language then tells a POSA what the fluid is—PEG and optionally one or more of the listed co-solvents. Trout Main Body of Opening Report ¶ 134. Thus, if there is another component that is added in to the pharmaceutically acceptable fluid, like sodium hydroxide, a POSA would understand it to be another component of the composition, not part of the pharmaceutically acceptable fluid. Trout Main Body of Opening Report ¶ 134.

72.    Moreover, because the overall composition "comprises" various components, and the pharmaceutically acceptable fluid sub-element "consists of" a limited set of solvents, ███ ████████████████████████████████████ —if present and not performing the solvent role— fall within the open "comprising" aspect of the composition and outside the specific solvent element. Trout Main Body of Opening Report ¶ 224. This is precisely how a POSA would classify Slayback's NDA Product: PEG 400 and ethanol are the pharmaceutically acceptable fluid; sodium hydroxide, monothioglycerol, and bendamustine are other components dissolved in that fluid. Trout Main Body of Opening Report ¶ 222.

30

73.      Before turning to Dr. Sinko's specific arguments, I note at the outset that the Asserted Claims are composition claims.  They are not method of manufacture claims or product-by-process claims.  What matters for purposes of infringement is the composition of Slayback's NDA Product at the time of making, using, offering for sale, selling, and/or importing—not how or when individual ingredients are added during an intermediate manufacturing step.  Trout Main Body of Opening Report ¶ 197. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████  The infringement analysis compares the finished product to the claims, and the finished product is a sterile, clear solution in a vial containing PEG 400 and ethanol as the solvent system, with bendamustine, monothioglycerol, and the residues of pH adjustment dissolved therein.  Trout Main Body of Opening Report ¶¶ 175–184, 197.

74.      I understand from counsel for Eagle that where a patent claim is directed to a finished pharmaceutical product—rather than a method of manufacture—the relevant comparison for infringement purposes is the composition of the product in its final form.  Independent Claim 1 of the '214 patent recites "[a] sterile vial containing a liquid bendamustine-containing composition"—language that describes a finished product that has been filled into a sterile vial, sealed, and is ready for clinical use (i.e., withdrawal, dilution, and subsequent intravenous administration).  Trout Main Body of Opening Report ¶¶ 80-81; '214 patent, Claim 1.  A POSA reading the claim language in view of the specification would conclude that the claim refers to a final product packaged in a sterile vial ready for dilution and administration—not an intermediate manufacturing step.  The same is true for Claim 1 of the '248 patent, which recites "[a] sterile

31

the Asserted Claims.  Trout Main Body of Opening Report ¶¶ 213-214.  Indeed, the FDA treats pH adjusters differently from other inactive ingredients: under 21 CFR § 201.100(b)(5)(iii), "ingredients added to adjust the pH or to make the drug isotonic" need only "be declared by name and a statement of their effect"—precisely the form that Slayback's Label uses for sodium hydroxide.  Trout Main Body of Opening Report ¶ 213.  This separate regulatory treatment confirms that the FDA recognizes pH adjusters as functionally distinct from the solvent system.

78.    Indeed, Slayback is well aware of these labeling and regulatory requirements and how to comply with them—

████████████████████████████████████████████████████

███████████████████████████████████

79.     Second, Dr. Sinko asserts that sodium hydroxide is an "inactive ingredient" or "excipient" that is "part of the formulation" and that "[i]nactive ingredients or excipients are not the same thing as degradants or impurities."  Sinko Rebuttal Report ¶ 72.  I do not dispute that sodium hydroxide is deliberately added to the formulation.  But the question is not whether sodium hydroxide is "part of the formulation" in a general regulatory sense—the question is whether it is part of the specific claim element "pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol." Trout Main Body of Opening Report ¶¶ 132, 199.  For the reasons I have explained, sodium hydroxide is a pH adjuster that falls within the open "comprising" preamble of the Asserted Claims, not the "consisting of" limitation that applies only to the solvent system.  Trout Main Body of Opening Report ¶¶ 134, 224.

80.     Third, Dr. Sinko emphasizes that the Slayback NDA Product is a "clear solution" in which "every other inactive ingredient" is dissolved.  Sinko Rebuttal Report ¶ 77.  I agree that Slayback's NDA Product is a clear solution.  That is entirely consistent with my opinion.  A clear solution is exactly what one would expect from a liquid bendamustine-containing composition in which the API, antioxidant, and pH adjuster are all dissolved in the pharmaceutically acceptable fluid (the PEG 400/ethanol solvent system).  Trout Main Body of Opening Report ¶¶ 133, 179. That the sodium hydroxide is dissolved in the solution does not make it part of the solvent system, any more than the dissolved bendamustine or the dissolved monothioglycerol are part of the solvent system.  Trout Main Body of Opening Report ¶¶ 133-134.  ███████████████████

██████████████████████████████████████████████████████

94. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████ This confuses two different questions. The first question—whether pH adjustment improves stability—is uncontested. I agree that adjusting the pH of the PEG can improve the stability of the bendamustine formulation. Trout Main Body of Opening Report ¶ 275. The second question—whether an ingredient's impact on stability makes it part of the solvent system—is the one that matters for claim construction, and the answer is no. Trout Main Body of Opening Report ¶ 278. The antioxidant monothioglycerol also has a "long-lasting impact" on stability, yet Dr. Sinko does not contend it is part of the pharmaceutically acceptable fluid. Trout Main Body of Opening Report ¶ 278. The "consisting of" limitation in the Asserted Claims identifies the solvent system by its solvation function, not by which ingredients affect stability.

95. Dr. Sinko argues that ██████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████

██ ████████████████████████████████████████████

███████████████████████████████████████████████████████

42

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████

   ██    ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

**D.**     **Sodium Hydroxide Falls Within the Impurity Exception to "Consisting Of"**

98.    Dr. Sinko argues that sodium hydroxide cannot be an impurity because it is an "inactive ingredient" deliberately added to the formulation, and that inactive ingredients and

fluid, the entirety of ██████████████ falls within the impurity exception, and the Slayback NDA Product would still satisfy the "consisting of" limitation, in light of the impurity exception.

E.    **Sodium Hydroxide Is Unrelated to the "Pharmaceutically Acceptable Fluid" Limitation**

103.    Dr. Sinko argues that sodium hydroxide is "related" to the "pharmaceutically acceptable fluid consisting of" limitation for two reasons: ████████████████████████ ██████████████ (2) because sodium hydroxide improves the stability of the formulation. Sinko Rebuttal Report ¶¶ 155-160. Both arguments fail.

104.    Again, the claims at issue are not method of manufacturing claims or product-by-process claims, and ██████████████████████████████████████████ ████████████████████████ And even the updated Slayback label indicates that the sodium hydroxide is used to modify the pH of PEG 400—which remains PEG 400.

105.    Dr. Sinko's first argument also is circular. He contends that sodium hydroxide is "related" to the claim's "fluid" limitation ████████████████████████ ████████████████████████████████████████████ ████████████████████████ As I have explained, the "pharmaceutically acceptable fluid" is a specific claim element referring to the solvent system, ████████████████████████ ██████████ Trout Main Body of Opening Report ¶ 132; Trout Rebuttal Report ¶ 43. Indeed, if ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████ Trout Main Body of Opening Report ¶¶ 133-134; Sinko Rebuttal Report ¶¶ 55-56 (acknowledging that solids dissolved in a fluid

become fluid themselves).   But the Asserted Claims expressly recite bendamustine and the antioxidant as separate elements from the pharmaceutically acceptable fluid, confirming that being dissolved in, ████████ a liquid does not make a substance part of the "pharmaceutically acceptable fluid" element.  Trout Main Body of Opening Report ¶¶ 105, 132, 134; Trout Rebuttal Report ¶¶ 30, 68.  Dr. Sinko's reasoning would collapse the claim's carefully drawn distinctions among the API, the antioxidant, and the solvent system, rendering the nested "consisting of" limitation meaningless.  The "unrelated" inquiry asks whether sodium hydroxide performs the solvent function that defines the "pharmaceutically acceptable fluid" element—not whether it ██████████████████████████████ Trout Main Body of Opening Report ¶¶ 264, 271. Sodium hydroxide does not perform a solvent function; it performs a pH-conditioning function. Trout Main Body of Opening Report ¶ 272.

106.    Dr. Sinko's second argument—that sodium hydroxide is "related" because it improves stability—improperly conflates separate claim elements.  Sinko Rebuttal Report ¶¶ 157-160.  The Asserted Claims contain three distinct compositional elements: (1) bendamustine, (2) a pharmaceutically acceptable fluid consisting of the enumerated solvents, and (3) a stabilizing amount of an antioxidant.  Trout Main Body of Opening Report ¶ 131.  The claims then recite a stability limitation as a property of a claimed composition. Stability is addressed by the antioxidant element and the total-impurities limitation—not by the "pharmaceutically acceptable fluid" element.  Trout Main Body of Opening Report ¶ 278.  If every component that "relates to" stability were deemed part of the pharmaceutically acceptable fluid, then the antioxidant monothioglycerol—which unquestionably improves stability—would also be part of the fluid, an assertion Dr. Sinko does not advance.  Trout Main Body of Opening Report ¶ 278.  This point is particularly telling because ████████████████████████████████████

47

████████████████—and it directly contributes to stability, yet Dr. Sinko does not contend that monothioglycerol is part of the "pharmaceutically acceptable fluid consisting of" the enumerated solvents. If Dr. Sinko's reasoning were correct—████████████████████████████—then monothioglycerol would be subject to the same analysis. ████████████████████████████

████████████████████████████████████

████████████████████████████ What determines the pharmaceutically acceptable fluid is the solvent function. Trout Main Body of Opening Report ¶¶ 132, 278.

107. Moreover, sodium hydroxide is not necessary for the stability of the claimed formulations. As Dr. Sundaram (an inventor solely on the abandoned '879 Publication) testified, if the PEG arrives at the right pH, the formulation is stable on its own without the addition of NaOH. Sundaram Dep. Tr. at 140:7-14. NaOH is only needed to condition PEG lots that have suboptimal incoming pH due to variable levels of acidic impurities from PEG manufacturing. Trout Main Body of Opening Report ¶ 275. The purpose of the NaOH addition is to ensure that the PEG—the actual solvent—is in a pH range where its acidic impurities do not catalyze ester degradation of bendamustine. Trout Main Body of Opening Report ¶ 275. This is a conditioning step applied to the solvent, not a redefinition of the solvent itself. A POSA would understand that a substance used to condition the properties of a solvent is not thereby transformed into the solvent, any more than a water treatment chemical added to purify water becomes part of the water itself.

108. Dr. Sinko's reliance on the Abandoned Patent Application Publication's description of sodium hydroxide as contributing to stability is also not relevant. Sinko Rebuttal Report ¶¶ 142, 158. As I have explained, the '879 Publication is a separate application that does not share the

48

same priority chain as the Asserted Patents and was ultimately abandoned.  Trout Main Body of Opening Report ¶¶ 310-317.  More fundamentally, that sodium hydroxide affects the pH environment of the formulation—and that pH in turn affects stability—does not make sodium hydroxide "related to" the solvent element of the claims any more than the antioxidant's effect on stability makes it "related to" the solvent element.  Trout Main Body of Opening Report ¶ 278.  The "unrelated" exception examines whether the additional component performs the function of the claim element, and sodium hydroxide does not perform a solvent function.  Trout Main Body of Opening Report ¶¶ 264-271.

### F. "Pharmaceutically Acceptable Fluid" Refers to the Solvent System

109.  Dr. Sinko argues that the term "pharmaceutically acceptable fluid" should not be limited to solvents and that, ███████████████████████████████████

███████████  Sinko Rebuttal Report ¶¶ 161-173.  Both contentions are incorrect.

#### 1. Opinion Is Consistent with the Agreed Construction and Court's Guidance During *Markman* Hearing

110.  As a threshold matter, my opinion that the "pharmaceutically acceptable fluid" in the Asserted Claims refers to the solvent system is not a new or additional claim construction.  Trout Main Body of Opening Report § VII.  The phrase "pharmaceutically acceptable fluid" is part of a limitation that recites:  "a pharmaceutically acceptable fluid consisting of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol" / "wherein the pharmaceutically acceptable fluid consists of polyethylene glycol and optionally one or more of propylene glycol, ethanol, benzyl alcohol and glycofurol."  A POSA would understand that each of propylene glycol, ethanol, benzyl alcohol and glycofurol is a solvent for bendamustine.  *See, e.g.*, '214 Patent at Examples 1-8; Trout Main Body of Opening Report ¶¶ 110, 113, 120.  Thus, the intrinsic evidence (the claim  language, specification, and prosecution history) confirm

49

to a POSA that given the agreed construction of "pharmaceutically acceptable fluid," the claim limitation at issue recites the solvent PEG and "optionally one or more of" the other recited solvents (propylene glycol, ethanol, benzyl alcohol and glycofurol). Trout Main Body of Opening Report § VII.A-E. Thus, my opinions are not a new or additional claim construction, but a faithful application of the agreed construction of "pharmaceutically acceptable fluid" to the entire claim limitation at issue.

111. Moreover, my opinions also reflect a technical application of how a POSA would apply the agreed construction—"a fluid which is suitable for pharmaceutical use"—to the specific claim language and other intrinsic evidence. *See* C.A. No. 24-64, D.I. 98 at 3 & D.I. 180 & 182. I understand from counsel for Eagle that the Court's claim construction does not foreclose expert testimony/opinions explaining how the construed terms would apply to the accused products. Trout Main Body of Opening Report ¶¶ 27-28. Rather, the purpose of expert testimony/opinions at the infringement stage is to bridge the gap between the legal meaning of the claim terms and the technical facts of the accused products. Trout Main Body of Opening Report ¶¶ 104-105. That is precisely what I did. I apply the agreed construction of "a fluid which is suitable for pharmaceutical use" to the specific technical facts of Apotex's NDA Product, informed by the intrinsic evidence including the specification and prosecution history, and conclude that it infringes the Asserted Claims. Trout Main Body of Opening Report ¶¶ 104-134.

112. Further, I have reviewed the transcript of the *Markman* hearing in this case, and during that hearing, the Court recognized that applying the "consisting of" and "comprising" claim terms to particular formulation components is a factual inquiry appropriate for expert analysis. Trout Rebuttal Report ¶¶ 18, 120-123. The Court expressly stated that it would not adopt either party's proposed constructions of "a liquid bendamustine-containing composition comprising" or

50

143.

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████████████        ██████████████████████████████████

██████████████████████████████        ████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████.

███        ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████.

67

adjuster that alters the acid-base environment of the solvent—not that NaOH itself participates in solvation as a co-solvent.  Trout Main Body of Opening Report ¶ 271.

148.    Moreover, the solubility difference Dr. Sinko identifies is irrelevant to infringement because there is no solubility issue with Slayback's NDA Product.  Sinko Rebuttal Report ¶¶ 178-181.  ██████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

Sinko Rebuttal Report ¶ 178.

149.    █████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

█████████████████████████████████████████████

150.    █████████████████████████████████████

████████████████████████████████████████████████

[REDACTED]

151.    Dr. Sinko cites references involving NaOH as a solvent for cellulose (Yan, Budtova) and for phenol extraction (Li).  Sinko Rebuttal Report ¶¶ 177, 183.  These references are irrelevant.  The Yan and Budtova references describe [REDACTED]

[REDACTED]

[REDACTED] Trout Opening Report Appendix B ¶ 55.  At such high concentrations, NaOH can disrupt hydrogen bonding networks in cellulose—an entirely different mechanism than pH adjustment in a PEG-based pharmaceutical formulation.  *See* Budtova at 6, 11, 17, 24; Yan at 791.  The Li reference involves liquid-liquid extraction of phenol by toluene in the presence of NaOH—again, an entirely different context with no relevance to the question of whether trace NaOH used for pH adjustment in a PEG-based formulation functions as a co-solvent.

152.    Moreover, the quality of the Yan reference itself calls into question what the article even means when it refers to NaOH as part of a "solvent system."  Yan is replete with typographical and grammatical errors that make its precise meaning difficult to discern.  For example, the article states that cellulose solubility "at temperature of 4 °C and below is quit

70

presence independently precludes infringement.    Sinko Rebuttal Report ¶¶ 206-215.    This argument fails for the reasons I have addressed in my Opening Report and Rebuttal Report and as further explained below.

159.    As a threshold matter, Dr. Sinko's assertion that Slayback's NDA Product contains

████████████████████████████████████████████████████████████████████████

████████    Again, the Asserted Claims are composition claims—they are neither method of manufacture claims nor product-by-process claims.    The relevant inquiry is what the product contains as sold, not what processing steps occurred during manufacture.

160.    Slayback's December 2022 label states: "Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg dehydrated alcohol, and q.s. to 1 mL polyethylene glycol 400." EAGLEBEN-SA_00363932 (Slayback Label 12/2022).  The revised 2024 label states: "Each milliliter contains 25 mg of bendamustine hydrochloride equivalent to 22.7 mg of bendamustine, 5 mg of monothioglycerol, 39.45 mg (5% v/v) of absolute alcohol, and q.s. to 1 mL polyethylene glycol 400. Sodium hydroxide is used to adjust pH of polyethylene glycol 400."    EAGLEBEN-SA_00363910 (Slayback Label 2/2024).

161.    Neither Slayback's December 2022 label nor its revised 2024 label states that Slayback's NDA Product ████████████████████████████    The 2024 label identifies sodium hydroxide only by its function—"used to adjust pH of polyethylene glycol 400"—and lists it separately from the quantitative composition.    The 2022 label does not reference sodium hydroxide at all.  ██████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████    Gonti Tr. 120:10-20.

162.

163.

165.    Even setting aside the labeling and regulatory record, ██████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████████████████████████████████████

166.    ████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████



The Asserted Claims, which are directed to pharmaceutical compositions containing these very excipients, necessarily contemplate this reality. A POSA would not read the claims to exclude

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

### J.    Slayback's NDA Product Also Infringes Under the Doctrine of Equivalents

173.    Dr. Sinko argues that even if ████████████ does not literally preclude infringement, the doctrine of equivalents cannot save Eagle's infringement case because (1) prosecution history estoppel bars the doctrine, and (2) there is no equivalence on the merits. Sinko Rebuttal Report ¶¶ 190-205. I disagree on both points.

174.    As an initial matter, as I explained in my Opening Report, there is literal infringement of each Asserted Claim. Trout Main Body of Opening Report ¶¶ 198-227. The doctrine of equivalents analysis is presented as an alternative argument in the event the Court were to conclude that ████████████████████████████████████████—a conclusion I do not agree with. Trout Main Body of Opening Report ¶¶ 289-300.

175.    Regarding prosecution history estoppel, Dr. Sinko contends that the narrowing amendment adding the "consisting of" limitation creates a presumption of estoppel that bars the doctrine of equivalents. Sinko Rebuttal Report ¶¶ 191-195. As I explained in my Opening Report, even if a presumption of estoppel arises, it is rebutted here because the amendment was tangential to the accused equivalent. Trout Main Body of Opening Report ¶¶ 289-293.

176.    I understand from counsel for Eagle that the tangential-relation exception applies when the reason for the narrowing amendment is peripheral, or only tangentially related, to the equivalent in question, and that a narrowing amendment does not surrender equivalents that were

80

Dated: _____4-13-26_____    _____
                                      Dr. Bernhardt L. Trout, Ph.D.

# Exhibit 3

**HIGHLY CONFIDENTIAL - CONTAINS HIGHLY CONFIDENTIAL INFORMATION OF SLAYBACK**



## Transcript of Patrick Sinko, Ph.D.

**Date:** April 16, 2026

**Case:** Eagle Pharmaceuticals, Inc., et al. -v- Slayback Pharma/Azurity Pharma

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

Transcript of Patrick Sinko, Ph.D.
Conducted on April 16, 2026

1 (1 to 4)

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
----------------------------------------x
EAGLE PHARMACEUTICALS, INC. and
EAGLE SUB1 LLC,

    Plaintiffs,

    -against-   C.A. No:
    24-65-JLH (CONSOLIDATED)

SLAYBACK PHARMA LLC and AZURITY
PHARMACEUTICALS, INC.,

    Defendants.
----------------------------------------x

    VIDEOTAPED DEPOSITION of PATRICK SINKO, Ph.D., taken by the Plaintiff, pursuant to Notice, held at Le Meridien Hotel 120 West 57th Street New York, NY 10019, on April 16, 2026, at 9:06 a.m., before a Notary Public of the State of New York.

*********************************************

## Page 2

A P P E A R A N C E S:

LATHAM & WATKINS
    Attorneys for Plaintiff
    330 North Wabash Avenue, Suite 2800
    Chicago, IL 60611
BY:   MARC N. ZUBICK, ESQ.
    marc.zubick@lw.com
    KELLY ANNE WELSH, ESQ.
    kelly.welsh@lw.com

WINDELS MARX LANE & MITTENDORF, LLP
    Attorneys for Defendant
    156 West 56th Street
    New York, NY 10019
BY:   JASON A. LIEF, ESQ.
    jlief@windelsmarx.com

ALSO PRESENT:

NAADIRAH MOORE-Videographer

## Page 3

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Patrick Sinko, Ph.D. | Marc Zubick | 5 |

EXHIBITS

| SINKO | DESCRIPTION | PAGE |
|---|---|---|
| Ex. 1 | Expert Report of Dr. Patrick Sinko Regarding Non-Infringement | 17 |
| Ex. 2 | EAGLEBEN-Sa_00363910-931 | 26 |
| Ex. 3 | EAGLEBEN-Sa_00363932-953 | 27 |
| Ex. 4 | EAGLEBEN-Sa_00361850-855 | 48 |
| Ex. 5 | EAGLEBEN-Sa_00002115-127 | 62 |
| Ex. 6 | Handbook of Pharmaceutical Expedients Excerpts | 65 |
| Ex. 7 | Slay-Vivmus0010979-080 | 85 |
| Ex. 8 | Slay-Vimus0000472-474 | 99 |
| Ex. 9 | Slay-Vivmus0000012-017 | 107 |
| Ex. 10 | Slay-Vivmus0000243-321 | 109 |
| Ex. 11 | Slay-Vivmus0000691-728 | 117 |
| Ex. 12 | Cellulose Document | 120 |
| Ex. 13 | Article Entitled Extraction of Phenol By Tolune in the Presence of Sodium Hydroxide | 127 |
| Ex. 14 | Article Entitled Solubility of Organic Hydrochlorides By S.F. Kramer and G.L. Flynn | 135 |
| Ex. 15 | Ich Guidelines For Elemental Impurities | 141 |
| Ex. 16 | Slay-Vivmus0001899-927 | 147 |

(Exhibits retained by Reporter.)

## Page 4

THE VIDEOGRAPHER: Please stand by. Here begins media one in the video deposition of Dr. Patrick Sinko in the matter of Eagle Pharmaceuticals Inc. et al. V Slayback Pharma/Azurity Pharmaceuticals, Inc., in the United State District Court for the District of Delaware, case number 24-65-JLH. Today's date is April 16, 2026. The time on the video monitor is 9:06 a.m. The videographer today is Naadirah Moore representing Planet Depos, headquartered at 451 Hungerford Drive, Suite 400, Rockville, Maryland, 20850. The video deposition is taking place at 120 West 57th Street, New York, New York, 10019.

    Would counsel please voice identify themselves and state whom they represent, and if you haven't, please clip your mic to your chest.

    MR. ZUBICK: Marc Zubick from Latham and Watkins, representing plaintiff. With me is my colleague, Kelly Welsh.

    MR. LIEF: Jason Lief from Windels Marx, on behalf of the defendant and the witness.

    THE VIDEOGRAPHER: The court reporter

29

see that?

A.    Yes, I do.

Q.    And it has a picture of bendamustine, right?

A.    The structure, that's correct.

Q.    And there's a paragraph under that, and about halfway through that paragraph there's a sentence that starts "Each milliliter".  Do you see that?

A.    Yes, I do.

Q.    And there's a sentence that says:

"Each milliliter contains 25 milligrams bendamustine hydrochloride equivalent to 22.7 milligrams of bendamustine, five milligrams of monothioglycerol, 39.45 milligrams (five percent volume per volume of absolute alcohol) and QS to 1 milliliter polyethylene glycol 400."

Do you see that?

A.    Yes, I do.

Q.    Did I read that correctly?

A.    You did.

Q.    And then following that, there's another sentence.  It says:

"Sodium hydroxide is used to adjust pH polyethylene glycol 400."

Correct?

30

A.    That is correct.

Q.    And if you look at the 2022 label, Sinko Exhibit 3, the sentence starting "Each milliliter" appears, but it does not have the sentence about sodium hydroxide, correct?

A.    I see.  Right.  So that sentence is on page 16, and it does not include the sodium hydroxide sentence.

Q.    And that's something that you're aware of from your work in this case, that changed, right?

A.    That's correct.

Q.    Okay.  And we'll talk about that change later today, but I want to just talk about the two sentences now that appear on Sinko Exhibit 2, okay?

A.    Okay.

Q.    So first of all, what does QS to 1 milliliter mean?

A.    QS means add a sufficient amount.  It could be QS or QS AD, and it basically means for the PEG 400, you would add sufficient volume to get a total volume of 1 mill.

Q.    Now, it doesn't give an exact amount of PEG that it takes to do that, right?

A.    That is correct.

Q.    And that's not unusual in pharmaceutical formulation to then just say QS for one of the

31

excipients and give the exact amounts for the others, right?

MR. LIEF:  Objection to the form.

A.    Yeah.  It depends on what the excipient is and what it's, you know, primary or its functions are in a formulation, but QS is commonly used, you know, to either a volume, an amount or a pH or whatever, you know, because it's trying to hit some sort of -- some sort of target.

Q.    Have you done the math in the course of your work in this case to have an understanding of how much of the volume of vivimusta is made up of PEG?

A.    Actually, no, I've not.

Q.    Are you able to do it looking at this sentence on Sinko Exhibit 2?

A.    No.  I mean there are -- there are factors.  Yeah, no, I couldn't do it on the fly, for sure.

Q.    Do you have any understanding as to whether there is more PEG than ethanol in vivimusta?

A.    No.  I mean I couldn't make that -- I wouldn't want to make that assumption or calculation on the fly.  Maybe.  Because they're giving everything in amounts, right, and you don't know densities or volumes of the powders, if you want to call them that, the dry ingredients.  So yeah, it would be difficult to make

32

that leap without knowing, I'm a scientist.  I try to be careful about calculations, so I don't want to guess.

Q.    I don't want you to guess, and he doesn't want you to guess, but you don't know sitting here today?

MR. LIEF:  Objection to the form.

A.    No, I've not done that calculation, so I mean, I guess I could do it, but I haven't done it, you know...

Q.    Okay.  Does PEG contain water?

MR. LIEF:  Objection to the form.

A.    So it -- it depends on how -- how you're referring to it.  You know, PEG could contain water.  You know, it wouldn't be, let's say, the main thing.  The main thing would be PEG -- PEG as a product.  You know, we, for example, use PEG because it has a very high attraction for water, which makes it actually very good for a lot of the applications I've use it for, right.  And so is there some water?  I'm sure there is some water in PEG, just because I think that's the nature.  You'd have to look at like, for example, you know, the Croda label, whoever is making it, and see what they, you know, potentially limit it to in their formulations.

Q.    If we look back at page 15 of Sinko Exhibit 2,

33

there's a picture of the bendamustine molecule we saw, right?

A.    That's correct.

Q.    And in fact I think it's bendamustine HCl.

And when you see PEG, if you look up PEG on Wikipedia, it's got a picture and it's got brackets because, you know, there's a whole range of the lengths of the PEG chains.  The average for PEG 400 is 400, right?

A.    That's correct.

Q.    This is the -- it's the absolute limit of my chemistry, but I got that right.  Now in practical use though, if I buy PEG from Croda, there's inherently going to be some amount of water in it, right?

MR. LIEF:  Objection to the form.

Speculation.

A.    So I have not looked at the -- as I mentioned, I haven't look at Croda label.  I would suspect that there may be, but I think you have to actually look at the label and see, you know, what they may include or what they may not include.  But there's probably going to be some, but I've not actually looked at that or the degree.  Depending on the type of, you know, grade of the PEG, there may be more, there may be less or there may be none.  I don't know, yeah.

34

Q.    Are you familiar with -- this is going to invite jokes, but are you familiar with ethanol outside of this litigation as a pharmaceutical excipient?

A.    Yes, I am.  I mean in, you know, compounding pharmacy and we've used it all the time, yeah.

Q.    And are you familiar with the phrase on page 15 of Sink Exhibit 2 is absolute ethanol.

Are you familiar with absolute ethanol?

A.    Yes, I am.

Q.    That's sometimes called dehydrated ethanol as well, right?

A.    That's correct.

Q.    Are you familiar with the term azeotropic ethanol?

A.    I've not used that term.

Q.    Having heard the term from me, do you know what that term means?

A.    Azeotropic?

Q.    Yes.

A.    No.  Actually I -- if I've heard it in the past, I'm not really focused on it.  I mean, but like, dehydrated alcohol, absolute alcohol or absolute ethanol, those are terms commonly used in pharmacy, but I'm not really aware -- I don't think on the other one.

Q.    And what it refers to when you call something

35

absolute alcohol or absolute ethanol or dehydrated ethanol, is that more water has been removed from the ethanol, correct?

A.    That is correct.

Q.    So back to my example before, if we look up ethanol on Wikipedia, it will be a chemical structure, but in reality, there's going to be impurities in the ethanol, including water, correct?

MR. LIEF:  Objection to the form.

A.    Well, there's going to be something in the ethanol, other than water.  I'm not sure of other -- I've never studied if there's other impurities in ethanol.  But, you know, water is something, for sure, you know, because water can have certain properties that in pharmacy, you know, we take care, you know, to take out as much as we can when needed, when you need like an absolute ethanol.

Q.    And this is something again, we'd look at the manufacturing spec sheet to see what's in it, right?

A.    That's true, yes.

Q.    Now absolute alcohol still has some water in it, correct?

A.    Yes, I -- but I don't know to what degree.  I've not really recently spent time looking that up.  I mean in the past I know I have, but not recently.  So

36

there's probably some.  I don't know what the limits are for -- I haven't looked up USP, absolute ethanol to see what their limitations are on having it still be considered that, but having some water in it so...

Q.    Among your opinions in this case, this is not your only opinion -- it is among many opinions -- you point to

Q.    If you go back to Sinko Exhibit 2, which is the 2024 vivimusta label, I want you to go back to those two sentence we were looking at, "each milliliter" and the second sentence starting "sodium hydroxide".  Are you there?

A.    Yes, I'm there.

Q.    Okay.  The first excipient that's mentioned in those two sentences is bendamustine hydrochloride, correct?

MR. LIEF:  Objection to the form.

A.    No, bendamustine is the API, not an excipient.

Q.    Fair enough.  The first ingredient in vivimusta

Transcript of Patrick Sinko, Ph.D.
Conducted on April 16, 2026

---

**37**

that's mentioned is bendamustine hydrochloride, correct?

**A.    That is correct.**

Q.    Now that sentence does not state the purpose or function of the bendamustine hydrochloride in vivimusta, correct?

**A.    Can you repeat that question?**

Q.    Absolutely. I hope that's implicit. If you need something repeated, clarified, anything like that, you tell me.

That sentence, does not itself give the purpose or function of the bendamustine hydrochloride in vivimusta, correct?

**A.    No. What it's -- what it is describing is the amount in a certain volume. So basically in essence it's giving a concentration, you know, of the API or active pharmaceutical ingredient, you know, in that sentence.**

Q.    The next ingredient in vivimusta that's mentioned is the monothioglycerol, correct?

**A.    That is correct.**

Q.    And similarly, there is no purpose or function in that sentence given for monothioglycerol, correct?

**A.    They just list an amount per volume, so that's correct.**

Q.    Same answer for absolute alcohol, correct?

---

**38**

**A.    That would be correct.**

Q.    And same answer for PEG 400, correct?

**A.    That is -- well, they don't list an amount here. So what they're -- but they -- they -- they -- it's the QS language. So they basically -- yeah, it's a little bit different, right. But they're asking -- or telling you to add, you know, PEG 400 to get to that 1 mil. It's a little bit different.**

Q.    Right. But that sentence gives no purpose or function to the PEG 400 vivimusta, correct?

**A.    Sure, that's correct.**

Q.    Now the next sentence that starts with "sodium hydroxide," this does describe the function of sodium hydroxide in vivimusta, correct?

**A.    So it does describe a function to adjust the pH, but I think the key here is where you can make an analogy to the sentence before. It's, you know -- a -- you know, a person of skill, a pharmacist or whoever would understand that, you know, the QS of the prior sentence applied to an amount would also be a QS when you're talking about adjusting pH. So it's the same concept, you know, from -- you know, in my opinion, at least.**

Q.    It's the same concept in the sense that it gives an amount or --

---

**39**

**A.    No, that's it's the QS. It's the -- you know, you're -- you're basically, if you're adjusting pH, you know, you're adding a sufficient amount. Once again it's not listing an amount, but you're adding a sufficient amount, just like with PEG, you're adding a sufficient amount, but it's not telling you exactly how much.**

Q.    Right. But in terms of the function, this sentence describes explicitly the function of sodium hydroxide in vivimusta, correct?

**A.    Yes, it does. And I think that was one of the -- we were talking about the -- you know, the labels, and**



**--**

---

**40**



Q.    Sitting here today, are you aware of any inaccuracies on the label for vivimusta, which is Sinko Exhibit 2?

MR. LIEF: Objection to the form.

**A.    Not that I'm aware of.**

MR. ZUBICK: It's 10 o'clock. Why don't we take a 5, 10 minute break.

MR. LIEF: Sure.

THE VIDEOGRAPHER: The time is now 9:59 a.m. we are going off the record.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: We are back on the record. The time is now 10:16 a.m.

BY MR. ZUBICK:

Q.    Welcome back, Dr. Sinko.

**A.    Thank you.**

Q.    Okay. Is it your belief that an excipient that is added intentionally cannot constitute an impurity?

**A.    That's correct.**

Q.    Is it your belief that reaction products from excipients that are added intentionally cannot

Transcript of Patrick Sinko, Ph.D.
Conducted on April 16, 2026

constitute impurities?

MR. LIEF: Objection to the form.

A.    I guess it would depend on the nature of the reaction product. So there might be a situation where if a reaction is occurring, it could be considered an impurity.

Q.    What would help you draw that line between when the reaction product constituted impurity or not? And let me ask the full question.

What would help you draw the line between whether or not the reaction product, from an excipient that was intentionally added to a drug product, would or would not constitute an impurity?

MR. LIEF: Objection. Incomplete hypothetical.

A.    Well, if you have an intentionally added excipient, sorry. All excipient are intentionally added. If have you an excipient or an active ingredient that is intentionally added, and, you know, it has some function and it's whatever, improving the performance of the compound -- of the drug product, you know, if the degradant or the impurity or whatever it may be was identified as something potentially toxic, or something -- you know, it depends on the API or the formulation, right. I mean, there are some reaction products that could be quite toxic. But if it's not toxic or if it's somehow transformed and something else that either has a useful function or a non-harmful function, it just may not be considered, you know, as a degradant or an impurity.

Q.    Are sodium ions toxic in pharmaceutical formulations?

A.    Well, of course, they could be at high enough concentration, right; the dose makes the poison, so to speak. But typically, with almost all formulations I've seen or come across, you know, they're not.

Q.    And we can agree there are some sodium ions in

Q.    We talked earlier about the use of catalysts for manufacturing PEG. Do you recall that?

A.    Yes, I do.

Q.    Have you ever heard of the use of sodium hydroxide as a catalyst to manufacture PEG?

A.    No, I have not.

Q.    If sodium hydroxide were used as a catalyst to manufacture PEG, there could be sodium ions as a result, correct?

MR. LIEF: Objection. Incomplete hypothetical.

A.    Well, if it was used, and like I said, I've not seen that before, but if sodium hydroxide could be used as a catalyst, and if it was not removed during the manufacturing process, I guess it could still be present.

Q.    Okay. So if that were to occur, if sodium hydroxide were used as a catalyst, and the sodium ions remains in the PEG after that -- you with me so far?

A.    Yeah. In other words they didn't remove the catalyst, you're saying.

Q.    Yep.

A.    Okay.

Q.    Would you consider those sodium ions an impurity in the PEG?

MR. LIEF: Same objection.

A.    So I guess it depends on the context. I think if you're -- if you're looking at, for example, some compendial or some organization, you know, that may classify that sodium that way, maybe. But in this product, would it be considered, as long as there was not a toxic concentration, which I don't know if it would be or not. As a catalyst, you usually require very little, but -- and then secondly, you know, it's in a different form, meaning that, you know, it's reacting, especially with PEG, it's reacting with the acids making these kind of buffer systems, and so, you know, from what I've seen, at least in this case, the impurities from some of the reports that I very briefly glanced at, okay, sodium was never listed as an impurity. So from that perspective, I would say, no, unless for some reason, during the manufacturing process the catalyst was -- very high concentration wasn't removed, then maybe, just because the FDA may be concerned that, for example, it might be toxic.

Q.    Are there any other factors you used to define impurity other than toxicity?

A.    Possibly. Once again depends on the context, right. So for example, like I said, in this case, I've not seen sodium listed as an impurity like in the patent or whatever, but I've also seen Dr. Trout's report where he cites, which I was not aware of, via certain type of compendial organization type, where they might be concerned, depending on the application of it. But other factors, yeah, there's quality standards, you know, and it depends on the product and its quality standard, and those are usually dictated, let's say

Transcript of Patrick Sinko, Ph.D.
Conducted on April 16, 2026



you're -- what it is is a POSA would say that you're adding,

Q.    Right. Okay. I'm trying to ask a very precise question. If you need more detail, please ask for it.
A.    Sure.
Q.

Q.    We talked earlier about monothioglycerol. Do you remember that?
A.    Yes, I do.
Q.    And not in any great detail. But that is a product that you're familiar with outside of this litigation, right?
A.    That's correct.
Q.    What is monothioglycerol typically used for in drug formulation?
A.    Where I've seen it's typically an antioxidant.
Q.    Do you know whether monothioglycerol is a solid or liquid at room temperature?
A.    I believe it's a liquid.
Q.    Would you consider monothioglycerol a fluid?
A.    Yes, I would.
Q.    Now you recall the claims at issue in this case contain the term pharmaceutically acceptable fluid, right?

A.    That's correct.
Q.    That's the source of some discussion in your expert report and Dr. Trout's reports as well.
    Is monothioglycerol a pharmaceutically acceptable fluid as that term is used in the patents?
    MR. LIEF: Objection. Legal.
A.    Well, as used in the patents, I would say no, because it doesn't follow the consisting of. It's actually a separate claim element. But broadly speaking, you know, it's a liquid, so it's a fluid, and it's used in pharmaceutical products. But outside the definition in the patents, you know, someone would say it's acceptable to use in a pharmaceutical formulation.
Q.    When bendamustine is dissolved in PEG, you would consider it to be a fluid, correct?
A.    That's correct.
Q.    Is a solution of bendamustine dissolved in PEG, a pharmaceutically acceptable fluid as that term is used in the patent?
    MR. LIEF: Objection to form. Can I hear that back?
    (Whereupon, the record was read by the reporter.)
A.    So as defined in the patent, the pharmaceutically acceptable fluid is -- you know, is the

PEG, and, well, I guess there's some other optional ones that you put, but you just focused on PEG, so that would be the pharmaceutically acceptable fluid.

Q. Right, and I think you're talking about the claims.

A. That's right.

Q. I don't want you to get twisted here. A moment ago you were talking about the definition of pharmaceutically acceptable fluid in the spec.
Do you remember that?

MR. LIEF: Objection.

A. Sure.

Q. And thinking about the way the term is used in the specification, would a solution of bendamustine dissolved in PEG, be a pharmaceutically acceptable fluid?

MR. LIEF: Objection to the form. Same objection.

A. In the spec you're saying?

Q. Yes.

MR. LIEF: Same objection.

A. No. I think the pharmaceutically acceptable fluid, you know, would be in this case the PEG. You're dissolving the bendamustine in the pharmaceutically acceptable fluid.

Q. Now, you are aware there's different types of claims, and by that I mean, it could be to a drug product, it could be to method of manufacture, or method of treatment, right?

A. Sure.

Q. The claims at issue in this case are not to method of manufacture, correct?

MR. LIEF: Objection.

A. I believe that's correct.

Q. So you understand that infringement is determined by the product vivimusta itself, correct?

MR. LIEF: Objection. Form.

A. Yes. Well comparing it to the claim.

Q. Fair enough. But what we compare to the claims will be the vivimusta product on the shelf, correct?

A. That's my understanding.

(Whereupon, EAGLEBEN-SA_00002115-127 was marked as Sinko Exhibit 5, for identification, as of this date.)

BY MR. ZUBICK:

Q. And just let me know when you're ready, Dr. Sinko.

A. Yeah, I'm ready.

Q. You've seen Sinko Exhibit 5 before, correct?

A. Yes, I have.

Q. And this is one of the patents-in-suit?

A. That's correct.

Q. And you reviewed this patent on the course of your working this case, correct?

A. Yes, I did.

Q. Can I have you turn to the page ending in 127, which is column 14. That's where the claims start.
Let me know when you're there.

A. Sure. I'm there.

Q. Now, the only claim element that you address in the scope of your expert report with regard to infringement is the issue surrounding NaOH and the consisting of limitation, correct?

MR. LIEF: Objection to form.

A. Yeah, that's the major one. That's correct.

Q. Okay. You, yourself don't offer the opinion that vivimusta doesn't meet any of the other claim limitations, correct?

A. ████████████████████████████
████████████████████████████
████████████████████████
██ ███████████████████
████████████████████
██ ██████████████

Q. ████████████████████
████████████████████████
████████████
██████████████████ you don't offer the opinion that vivimusta doesn't infringe any of the other claim limitations, excluding the NaOH consisting of issue, correct?

MR. LIEF: Objection to the form.

A. Yeah, I think my primary opinion is the consisting of claim element.

Q. Now, if you look at the consisting of language, which is around line 7, column 14, Sinko Exhibit 5, it goes onto list PEG and then optionally a choice of other solvents, correct?

A. That is correct.

Q. Are you familiar with all of those solvents outside of this litigation?

MR. LIEF: Objection to the form.

A. Generally, yes. I'm not sure how much I've worked with glycofurol, but the others I've worked with, yes.

Q. Are all of these five known to be pharmaceutically acceptable solvents, with regard to

65

pharmaceutical formulations?

MR. LIEF: Objection to the form. Incomplete hypothetical.

A.    **Well actually, like I said, I didn't specifically, you know, research that, but like I said I've seen the propylene glycol and ethanol, like I said, used. I don't remember the glycofurol, so I can't say, but I think the others are.**

MR. ZUBICK: You can put that aside for now.

(Whereupon, Handbook of Pharmaceutical Expedients Excerpts was marked as Sinko Exhibit 6, for identification, as of this date.)

BY MR. ZUBICK:

Q.    Dr. Sinko, you've been handed Sinko Exhibit 6. Which is some excerpts from the Handbook of Pharmaceutical Excipients, correct?

A.    **That is correct.**

Q.    And if you look this is the sixth edition, correct?

A.    **That's correct.**

Q.    And if you turn forward to sort of the -- whatever this page is called, the title page, you could see the sixth edition is published 2009, right?

A.    **That's correct.**

66

Q.    So this was available as of the priority date of the patents-in-suit, correct?

A.    **That is correct.**

Q.    Now you've cited to the Handbook of Pharmaceutical Excipients in your expert report, correct?

A.    **Yes, I believe so.**

Q.    So if you turn forward, the first entry we have is for alcohol. Do you see that?

A.    **Yes, I do.**

Q.    Okay. Alcohol is also referred to as ethanol in the context of pharmaceutical formulation, right?

A.    **That is correct.**

Q.    And sort of as we talked about before, it shows a structural formula which is the underlying molecule, right?

A.    **That is correct.**

Q.    And you can see the functional category lists antimicrobial preservative, disinfectant, skin penetrant, and solvent, correct?

A.    **That is correct.**

Q.    And solvent is how it's used in vivimusta, correct?

A.    **Yes. I believe it's one of the co-solvents.**

Q.    And if you look under number 7 on the page

67

we're on, it actually say, explicitly, although ethanol is primarily used as a solvent, right?

A.    **Section 7 you're saying?**

Q.    Yes, as in number 7.

A.    **I see it. Yes, I see that.**

Q.    And that's your experience, right, that ethanol is primarily used in pharmaceutical formulations as a solvent, correct?

MR. LIEF: Objection to the form.

A.    **Yes. In pharmaceutical formulations, it's typically used as a solvent.**

Q.    Now if you look under number 8 description, do you see that?

A.    **8 description. Yes, I see that.**

Q.    And it says in the BP 2009, the term ethanol, used without other qualification, refers to ethanol containing greater than or equal to 99.5 percent volume per volume of the ethanol molecular formula; correct?

A.    **Yes, distinguishing ethanol. I see that, yes.**

Q.    And below that, it has a similar sentence addressing anhydrous ethanol, right?

A.    **Let's see, I see it defines alcohol. Oh, I see, next paragraph, also anhydrous alcohol -- ethanol.**

Q.    If you go to the next column, there's a similar discussion for dehydrated alcohol, right?

68

A.    **That's correct.**

Q.    And none of these are 100 percent, right?

MR. LIEF: Objection to form.

A.    **Well, I mean, they could be, because it all says greater than or equal to, so they could be, but they have to be at least whatever that lower value is.**

Q.    Right, that's fair. None of these specification are 100 percent, correct?

MR. LIEF: Same objection to form.

A.    **None of the specifications say it has to be 100 percent, but it could be.**

Q.    Okay. And a POSA would understand that these -- that that number between, say, 99.5 and 100, that may contain impurities like water, right?

MR. LIEF: Objection to the form.

A.    **Well, it contains something other than -- than the ethanol.**

Q.    Okay. If you go to number 13 on page 18. Let me know when you're there.

A.    **Okay.**

Q.    And under -- if you read the method of manufacture to yourself, it talks about getting to the ethanol 95 percent volume per volume by fractional distillation, right?

A.    **Let me just review it.**



Page 93

experimental test of that as part of your work in this case, correct?

A.    No.  No.

Q.    So returning to Sinko Exhibit 7,

Page 94

Q.

Page 95

Q.    Can you go to paragraph 154 of your expert report? Let me know when you're there.

A.    154?

Q.    Yes.

A.    Okay.

Q.    Can you read -- read as much as you need, but I want to ask you about two sentences.  It's the second and third sentence of that paragraph.  So again, read as much as you need; let me know when you're ready.

A.    Okay.

Q.    So in the second sentence you're talking about

A.    That is correct.

Q.    And you have a sentence you say:

        Do you see that?

A.    That's correct.

Page 96

Q.



Q.     Right.  And these are the scientists who prepared the vivimusta NDA, correct?

A.     That is correct.

Q.

Q.     Do you know whether parties need to be honest in their submissions to the FDA?

A.     They'd better be.  I think so.

Q.

Q.     Earlier we looked at the Handbook of Pharmaceutical Excipients.  Do you remember that?

A.     Yes, I do.

Q.     And it listed various functions for the

105

different ingredients we looked at. Do you remember that?

A.    Yes, that's correct.

Q.    Do you think the Handbook of Pharmaceutical Excipients entries you looked at were incomplete?

A.    Well, I think the -- the answer is yes, depending on the context. ████████████████ ████████████████████ So they don't list that there. I don't know why they don't list that there. But -- so is it incomplete? I think with respect to the really important issues, okay, such as, you know, its composition, its purity, its physical chemical properties, all those things, I think it is complete because it's very -- it's exhaustive. But when it comes to descriptive terms like their functions, it doesn't reflect what's known in the field. Sometimes it does, sometimes it doesn't.

Q. ████████████████

106

████████████████

107

Q. ████████████████

MR. ZUBICK:  Exhibit 9.  You can put that aside.

(Whereupon, SLAY-VIVMUS0000012-017 was

108

marked as Sinko Exhibit 9, for identification, as of this date.)

BY MR. ZUBICK:

Q.    So I don't think we need to spend too long on this one, Dr. Sinko, but this is ████████



MR. ZUBICK:  All right.  I'm told lunch is here, so why don't we take a break.  45 minutes, 1 o'clock.

THE VIDEOGRAPHER:  We're going off the record.  The time is now 12:14 p.m.

(Whereupon, a luncheon recess was taken from 12:14 p.m. to 1:05 p.m.)

THE VIDEOGRAPHER:  Stand by.  We are back on the record.  The time is now 2:05 p.m.  Sorry.  1:05 p.m.

BY MR. ZUBICK:

Q.    Welcome back, Dr. Sinko.

A.    Thank you.

MR. ZUBICK:  I'm sorry, it's only 1:05.  Let's ask the court reporter to mark as Sinko 10 document Bates number starting with SLAY-VIVMUS0000243.

(Whereupon, SLAY-VIVMUS0000243-321 was marked as Sinko Exhibit 10, for identification, as of this date.)

BY MR. ZUBICK:

Q.    I'm just going to keep doing it, the alarm is going to go off and I'm still going to be looking at the document.

All right.  Dr. Sinko, do you recognize Exhibit 10?

A.    Yes, I do.

Q.    Exhibit 10 is



169

record. The time is now 2:54 p.m.

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER: Stand by. We are back on the record. The time is now 3:05 p.m.

BY MR. ZUBICK:

Q. Welcome back, Dr. Sinko. Home stretch. I know you reviewed the court's Markman order in this case, right?

A. **Yeah, I may have. I actually don't recall.**

Q. Okay. Did you review the transcripts from the claim construction hearing?

A. **If I did, it was a long time ago. I don't really recall.**

Q. If you did, it would appear on your materials considered, though, right?

A. **Yes, it would be.**

MR. ZUBICK: Okay. Subject to anything from counsel your counsel, no further questions from me. That you very much for your time.

MR. LIEF: Nothing.

THE VIDEOGRAPHER: This marks the end of the deposition of Dr. Patrick Sinko. The time on the record is now 3:06 p.m.

THE REPORTER: Would you both like a rough draft?

170

MR. ZUBICK: Yeah, that would be great.

MR. LIEF: Yeah, same.

(Time Noted: 3:06 p.m.)

171

ACKNOWLEDGMENT

STATE OF NEW YORK    )
                                          :ss
COUNTY OF            )

I, PATRICK SINKO, hereby certify that I have read the transcript of my testimony taken under oath in my deposition of the 16th day of April, 2026; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

_____

PATRICK SINKO, Ph.D.

Signed and subscribed to before me, this               day of              , 2026.

_____

Notary Public, State of New York

172

CERTIFICATE

STATE OF NEW YORK    )
                                ) ss.:
COUNTY OF QUEENS )

I, BROOKE E. PERRY, a Notary Public within and for the State of New York, do hereby certify:

That PATRICK SINKO, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 16th day of April, 2026.

*Brooke E. Perry*
_____

BROOKE E. PERRY

# Exhibit 4



# W T S
## ARTICLE DELIVERY



**WTS Number: 280131**

**Order #172565**

**ASAP**

**Request Date:** 06/17/2021 01:28pm

**Requester:** Maria Jamass - Latham & Watkins
**Phone:** 2129061200
**Reference:** 80850-051330-0029
**Delivery email: Theresa.Sanchez@lw.com**

**Maxcost: 75**

**Instructions:** **Needed by end of day today - please let me (maria.jamass@lw.com) know if that is not feasible. But Please email scans toTheresa.Sanchez@lw.com, as I will be offiline after 5pm EST**

**Citation:**

1 U.S. PHARMACOPEIA <1> Injections 37 (33d ed. released Nov. 1, 2009, official May 1, 2010) (USP 33)

**Library/Supplier:** Ebling Library
Stacks
QV 738 AA1 P5u

**WTS staff contact: Christy**

**ISSN/ISBN/OCLC:** 0195-7996

**Base Service Fee:** $15        **Rush fee:** $60.00

**Copyright:** WTS will pay copyright royalties and bill me:$_____pages:_____

**Shipping:** $_____        **Research:** $_____    **Supplier:** $_____

## THIS IS NOT AN INVOICE

EAGLEBEN-SA_00263816

**2010**

**USP 33** | THE UNITED STATES PHARMACOPEIA

**NF 28** | THE NATIONAL FORMULARY

**Reissue** | NEW AND REVISED OFFICIAL TEXT SINCE THE SECOND SUPPLEMENT TO *USP 32–NF 27*

*By authority of the United States Pharmacopeial Convention, meeting at Washington, D.C., March 9–13, 2005. Prepared by the Council of Experts and published by the Board of Trustees*

*Official from October 1, 2010*

The designation on the cover of this publication, "USP NF 2010," is for ease of identification only. The complete official compendia, *USP 33–NF 28 Reissue*, is composed of:

- *USP 32–NF 27* and its *Supplements*
- *USP 33–NF 28 Reissue New and Revised Official Text Since the Second Supplement to USP 32–NF 27*
- *First Supplement to the USP 33–NF 28 Reissue*
- *Second Supplement to the USP 33–NF 28 Reissue*

THE UNITED STATES PHARMACOPEIAL CONVENTION
12601 Twinbrook Parkway, Rockville, MD  20852

EAGLEBEN-SA_00263817

## SIX-MONTH IMPLEMENTATION GUIDELINE

The *United States Pharmacopeia–National Formulary* and its supplements become official **six months** after being released to the public. The *USP–NF*, which is released on November 1 of each year, becomes official on May 1 of the following year.

This six-month implementation timing gives users more time to bring their methods and procedures into compliance with new and revised *USP–NF* requirements.

The table below describes the new official dates. The 2009 *USP 32–NF 27,* and the supplements and *Interim Revision Announcements (IRAs)* to that edition, will be official until October 1, 2010, at which time the *USP 33–NF 28 Reissue* becomes official.

| Publication | Release Date | Official Date | Official Until |
|---|---|---|---|
| USP 33–NF 28 Reissue | April 1, 2010 | October 1, 2010 | May 1, 2011 (except as superseded by supplements, *IRAs,* and *Revision Bulletins*) |
| First Supplement to the USP 33–NF 28 Reissue | April 1, 2010 | October 1, 2010 | May 1, 2011 (except as superseded by *Second Supplement, IRAs,* and *Revision Bulletins*) |
| Second Supplement to the USP 33–NF 28 Reissue | June 30, 2010 | February 1, 2011 | May 1, 2011 (except as superseded by *IRAs* and *Revision Bulletins*) |
| USP 34–NF 29 | Nov. 1, 2010 | May 1, 2011 | May 1, 2012 (except as superseded by supplements, *IRAs,* and *Revision Bulletins*) |

*IRAs* will continue to become official on the first day of the second month of the *Pharmacopeial Forum (PF)* issue in which they are published as final. For instance, *IRAs* published as final in the May–June *PF* (issue 3) will become official on June 1. This table gives the details of the *IRAs* that will apply to *USP 32–NF 27* and *USP 33–NF 28.*

| IRA | Release Date | Official Date | Revises |
|---|---|---|---|
| Jan. 1, 2010 *IRA, PF* 36(1) | Jan. 1, 2010 | Feb. 1, 2010 | *USP 32–NF 27* and its supplements |
| Mar. 1, 2010 *IRA, PF* 36(2) | Mar. 1, 2010 | April 1, 2010 | *USP 32–NF 27* and its supplements |
| May 1, 2010 *IRA, PF* 36(3) | May 1, 2010 | June 1, 2010 | *USP 32–NF 27* and its supplements |
| July 1, 2010 *IRA, PF* 36(4) | July 1, 2010 | Aug. 1, 2010 | *USP 32–NF 27* and its supplements |
| Sept. 1, 2010 *IRA, PF* 36(5) | Sept. 1, 2010 | Oct. 1, 2010 | *USP 33–NF 28 Reissue* and its supplements |
| Nov. 1, 2010 *IRA, PF* 36(6) | Nov. 1, 2010 | Dec. 1, 2010 | *USP 33–NF 28 Reissue* and its supplements |
| Jan. 1, 2011 *IRA, PF* 37(1) | Jan. 1, 2011 | Feb. 1, 2011 | *USP 33–NF 28 Reissue* and its supplements |
| Mar. 1, 2011 *IRA, PF* 37(2) | Mar. 1, 2011 | April 1, 2011 | *USP 33–NF 28 Reissue* and its supplements |

*Revision Bulletins* published on the USP website will become official on the date specified on the *Revision Bulletin*

## NOTICE AND WARNING

*Concerning U.S. Patent or Trademark Rights*—The inclusion in *The United States Pharmacopeia* or in the *National Formulary* of a monograph on any drug in respect to which patent or trademark rights may exist shall not be deemed, and is not intended as, a grant of, or authority to exercise, any right or privilege protected by such patent or trademark. All such rights and privileges are vested in the patent or trademark owner, and no other person may exercise the same without express permission, authority, or license secured from such patent or trademark owner.

*Concerning Use of* USP *or* NF *Text*—Attention is called to the fact that *USP* and *NF* text is fully copyrighted. Authors and others wishing to use portions of the text should request permission to do so from the Secretary of the USPC Board of Trustees.

Copyright © 2010 The United States Pharmacopeial Convention
12601 Twinbrook Parkway, Rockville, MD 20852

*All rights reserved.*

ISSN: 0195-7996

ISBN: 1-889788-83-3

Printed in the United States by United Book Press, Inc., Baltimore, MD

EAGLEBEN-SA_00263818

# General Chapters

## General Tests and Assays

## General Requirements for Tests and Assays

## ⟨1⟩ INJECTIONS

### INTRODUCTION

Parenteral articles are preparations intended for injection through the skin or other external boundary tissue, rather than through the alimentary canal, so that the active substances they contain are administered, using gravity or force, directly into a blood vessel, organ, tissue, or lesion. Parenteral articles are prepared scrupulously by methods designed to ensure that they meet Pharmacopeial requirements for sterility, pyrogens, particulate matter, and other contaminants, and, where appropriate, contain inhibitors of the growth of microorganisms. An Injection is a preparation intended for parenteral administration and/or for constituting or diluting a parenteral article prior to administration.

### NOMENCLATURE AND DEFINITIONS

### Nomenclature*

The following nomenclature pertains to five general types of preparations, all of which are suitable for, and intended for, parenteral administration. They may contain buffers, preservatives, or other added substances.

1. *[DRUG] Injection*—Liquid preparations that are drug substances or solutions thereof.
2. *[DRUG] for Injection*—Dry solids that, upon the addition of suitable vehicles, yield solutions conforming in all respects to the requirements for *Injections*.
3. *[DRUG] Injectable Emulsion*—Liquid preparations of drug substances dissolved or dispersed in a suitable emulsion medium.
4. *[DRUG] Injectable Suspension*—Liquid preparations of solids suspended in a suitable liquid medium.
5. *[DRUG] for Injectable Suspension*—Dry solids that, upon the addition of suitable vehicles, yield preparations conforming in all respects to the requirements for *Injectable Suspensions*.

### Definitions

#### PHARMACY BULK PACKAGE

A *Pharmacy bulk package* is a container of a sterile preparation for parenteral use that contains many single doses. The contents are intended for use in a pharmacy admixture program and are restricted to the preparation of admixtures for infusion or, through a sterile transfer device, for the filling of empty sterile syringes.

The closure shall be penetrated only one time after constitution with a suitable sterile transfer device or dispensing set which allows measured dispensing of the contents. The *Pharmacy bulk package* is to be used only in a suitable work area such as a laminar flow hood (or an equivalent clean air compounding area).

Designation as a *Pharmacy bulk package* is limited to preparations from *Nomenclature* categories 1, 2, or 3 as defined above. *Pharmacy bulk packages*, although containing more than one single dose, are exempt from the multiple-dose container volume limit of 30 mL and the requirement that they contain a substance or suitable mixture of substances to prevent the growth of microorganisms.

Where a container is offered as a *Pharmacy bulk package*, the label shall (a) state prominently "Pharmacy Bulk Pack-

---

*This nomenclature has been adopted by the USP Drug Nomenclature Committee for implementation by supplemental revisions of *USP 23–NF 18*. For currently official monograph titles in the form *Sterile [DRUG]* that have not yet been revised, the following nomenclature continues in use in this Pharmacopeia: (1) medicaments or solutions or emulsions thereof suitable for injection, bearing titles of the form *[DRUG] Injection*; (2) dry solids or liquid concentrates containing no buffers, diluents, or other added substances, and which, upon the addition of suitable solvents, yield solutions conforming in all respects to the requirements for Injections, and which are distinguished by titles of the form *Sterile [DRUG]*; (3) preparations the same as those described under (2) except that they contain one or more buffers, diluents, or other added substances, and which are distinguished by titles of the form *[DRUG] for Injection*; (4) solids which are suspended in a suitable fluid medium and which are not to be injected intravenously or into the spinal canal, distinguished by titles of the form *Sterile [DRUG] Suspension*; and (5) dry solids which, upon the addition of suitable vehicles, yield preparations conforming in all respects to the requirements for Sterile Suspensions, and which are distinguished by titles of the form *Sterile [DRUG] for Suspension*.

EAGLEBEN-SA_00263819

age—Not for direct infusion," (b) contain or refer to information on proper techniques to help assure safe use of the product, and (c) bear a statement limiting the time frame in which the container may be used once it has been entered, provided it is held under the labeled storage conditions.

### LARGE- AND SMALL-VOLUME INJECTIONS

Where used in this Pharmacopeia, the designation *Large-volume intravenous solution* applies to a single-dose injection that is intended for intravenous use and is packaged in containers labeled as containing more than 100 mL. The designation *Small-volume Injection* applies to an Injection that is packaged in containers labeled as containing 100 mL or less.

### BIOLOGICS

The Pharmacopeial definitions for sterile preparations for parenteral use generally do not apply in the case of the biologics because of their special nature and licensing requirements (see *Biologics* 〈1041〉).

## INGREDIENTS

### Vehicles and Added Substances

**Aqueous Vehicles**—The vehicles for aqueous Injections meet the requirements of the *Pyrogen Test* 〈151〉 or the *Bacterial Endotoxins Test* 〈85〉, whichever is specified. *Water for Injection* generally is used as the vehicle, unless otherwise specified in the individual monograph. Sodium chloride may be added in amounts sufficient to render the resulting solution isotonic; and *Sodium Chloride Injection,* or *Ringer's Injection,* may be used in whole or in part instead of *Water for Injection,* unless otherwise specified in the individual monograph. For conditions applying to other adjuvants, see *Added Substances* in this chapter.

**Other Vehicles**—Fixed oils used as vehicles for nonaqueous Injections are of vegetable origin, are odorless or nearly so, and have no odor suggesting rancidity. They meet the requirements of the test for *Solid paraffin* under *Mineral Oil,* the cooling bath being maintained at 10°, have a *Saponification Value* between 185 and 200 (see *Fats and Fixed Oils* 〈401〉), have an *Iodine Value* between 79 and 141 (see *Fats and Fixed Oils* 〈401〉), and meet the requirements of the following tests.

*Unsaponifiable Matter* (see *Fats and Fixed Oils* 〈401〉): not more than 1.5%.

*Acid Value* (see *Fats and Fixed Oils* 〈401〉):    not more than 0.2.

*Peroxide Value* (see *Fats and Fixed Oils* 〈401〉):    not more than 5.0.

*Water, Method Ic* 〈921〉:    not more than 0.1%.

*Limit of Copper, Iron, Lead, and Nickel*—[NOTE—The test for nickel is not required if the oil has not been subjected to hydrogenation, or a nickel catalyst has not been used in processing.] Proceed as directed in the section *Trace Metals* under *Fats and Fixed Oils* 〈401〉. Not more than 1 ppm of copper is found; not more than 1 ppm of iron is found; not more than 1 ppm of lead is found; and not more than 1 ppm of nickel is found.

Synthetic mono- or diglycerides of fatty acids may be used as vehicles, provided they are liquid and remain clear when cooled to 10° and have an *Iodine Value* of not more than 140 (see *Fats and Fixed Oils* 〈401〉).

These and other nonaqueous vehicles may be used, provided they are safe, in the volume of Injection administered, and also provided they do not interfere with the therapeutic efficacy of the preparation or with its response to prescribed assays and tests.

**Added Substances**—Suitable substances may be added to preparations intended for injection to increase stability or usefulness, unless proscribed in the individual monograph, provided they are harmless in the amounts administered and do not interfere with the therapeutic efficacy or with the responses to the specified assays and tests. No coloring agent may be added, solely for the purpose of coloring the finished preparation, to a solution intended for parenteral administration (see also *Added Substances* under *General Notices* and *Antimicrobial Effectiveness Testing* 〈51〉).

Observe special care in the choice and use of added substances in preparations for injection that are administered in a volume exceeding 5 mL. The following maximum limits prevail unless otherwise directed: for agents containing mercury and the cationic, surface-active compounds, 0.01%; for chlorobutanol, cresol, phenol, and similar types of substances, 0.5%; and for sulfur dioxide, or an equivalent amount of the sulfite, bisulfite, or metabisulfite of potassium or sodium, 0.2%.

A suitable substance or mixture of substances to prevent the growth of microorganisms must be added to preparations intended for injection that are packaged in multiple-dose containers, regardless of the method of sterilization employed, unless one of the following conditions prevails: (1) there are different directions in the individual monograph; (2) the substance contains a radionuclide with a physical half-life of less than 24 hours; and (3) the active ingredients are themselves antimicrobial. Such substances are used in concentrations that will prevent the growth of or kill microorganisms in the preparations for injection. Such substances also meet the requirements of *Antimicrobial Effectiveness Testing* 〈51〉 and *Antimicrobial Agents—Content* 〈341〉. Sterilization processes are employed even though such substances are used (see also *Sterilization and Sterility Assurance of Compendial Articles* 〈1211〉). The air in the container may be evacuated or be displaced by a chemically inert gas. Where specified in a monograph, information regarding sensitivity of the article to oxygen is to be provided in the labeling.

## LABELS AND LABELING

### Labeling

NOTE—See definitions of "label" and "labeling" in *Labeling* in the section *Preservation, Packaging, Storage, and Labeling* of the *General Notices and Requirements.*

The label states the name of the preparation; in the case of a liquid preparation, the percentage content of drug or amount of drug in a specified volume; in the case of a dry preparation, the amount of *active* ingredient; the route of administration; a statement of storage conditions and an expiration date; the name and place of business of the manufacturer, packer, or distributor; and an identifying lot number. The lot number is capable of yielding the complete manufacturing history of the specific package, including all manufacturing, filling, sterilizing, and labeling operations.

Where the individual monograph permits varying concentrations of active ingredients in the large-volume parenteral, the concentration of each ingredient named in the official title is stated as if part of the official title, e.g., Dextrose Injection 5%, or Dextrose (5%) and Sodium Chloride (0.2%) Injection.

The labeling includes the following information if the complete formula is not specified in the individual monograph: (1) In the case of a liquid preparation, the percentage content of each ingredient or the amount of each ingredient in a specified volume, except that ingredients added to adjust to a given pH or to make the solution isotonic may be declared by name and a statement of their

EAGLEBEN-SA_00263820

effect; and (2) in the case of a dry preparation or other preparation to which a diluent is intended to be added before use, the amount of each ingredient, the composition of recommended diluent(s) [the name(s) alone, if the formula is specified in the individual monograph], the amount to be used to attain a specific concentration of active ingredient and the final volume of solution so obtained, a brief description of the physical appearance of the constituted solution, directions for proper storage of the constituted solution, and an expiration date limiting the period during which the constituted solution may be expected to have the required or labeled potency if it has been stored as directed.

Containers for Injections that are intended for use as dialysis, hemofiltration, or irrigation solutions and that contain a volume of more than 1 L are labeled to indicate that the contents are not intended for use by intravenous infusion.

Injections intended for veterinary use are labeled to that effect.

The container is so labeled that a sufficient area of the container remains uncovered for its full length or circumference to permit inspection of the contents.

### STRENGTH AND TOTAL VOLUME FOR SINGLE- AND MULTIPLE-DOSE INJECTABLE DRUG PRODUCTS

For single-dose and multiple-dose injectable drug products, the strength per total volume should be the primary and prominent expression on the principal display panel of the label, followed in close proximity by strength per mL enclosed by parentheses. For containers holding a volume of less than 1 mL, the strength per fraction of a mL should be the only expression of strength. Strength per single mL should be expressed as mg/mL, not mg/1 mL.

The following formats are acceptable for contents of greater than 1 mL:
Total strength/total volume: 500 mg/10 mL
Strength/mL: 50 mg/mL
   or
Total strength/total volume: 25,000 Units/5 mL
Strength/mL: 5,000 Units/mL
The following format is acceptable for contents of less than 1 mL: 12.5 mg/0.625 mL
There are, however, some exceptions to expressing strength per total volume. In certain cases, the primary and prominent expression of the total drug content per container would not be effective in preventing medication errors (e.g., insulin). An example is the use of lidocaine or other similar drugs used as a local anesthetic where the product is ordered and administered by percentage (e.g., 1%, 2%) or a local anesthetic in combination with epinephrine that is expressed as a ratio (e.g., 1 : 100,000). In such cases, the total strength should be expressed: for example, 1% (100 mg/10 mL). Dry solids, which need to be reconstituted, should follow the same format, with the exception that only the total strength of the drug should be listed, not the strength/total volume or strength/mL.

### Aluminum in Large-Volume Parenterals (LVPs), Small-Volume Parenterals (SVPs), and Pharmacy Bulk Packages (PBPs) Used in Total Parenteral Nutrition (TPN) Therapy

(a) The aluminum content of LVPs used in TPN therapy must not exceed 25 µg per L (µg/L).
(b) The package insert of LVPs used in TPN therapy must state that the drug product contains no more than 25 µg of aluminum per L. This information must be contained in the "Precautions" section of the labeling of all LVPs used in TPN therapy.
(c) If the maximum amount of aluminum in SVPs and PBPs is 25 µg per L (µg/L) or less, instead of stating the exact amount of aluminum that each contains, as in paragraph (d), the immediate container label for SVPs and PBPs used in the preparation of TPN parenterals (with exceptions as noted below) may state: "Contains no more than 25 µg/L of aluminum". If the SVP or PBP is a lyophilized powder, the immediate container label may state the following: "When reconstituted in accordance with the package insert instructions, the concentration of aluminum will be no more than 25 µg/L".
(d) The maximum level of aluminum at expiry must be stated on the immediate container label of all SVPs and PBPs used in the preparation of TPN parenterals and injectable emulsions. The aluminum content must be stated as follows: "Contains no more than __ µg/L of aluminum". The immediate container label of all SVPs and PBPs that are lyophilized powder used in the preparation of TPN solutions must contain the following statement: "When reconstituted in accordance with the package insert instructions, the concentration of aluminum will be no more than __ µg/L." This maximum amount of aluminum must be stated as the highest one of the following three levels:
  (1) The highest level for the batches produced during the last three years
  (2) The highest level for the latest five batches
  (3) The maximum level in terms of historical levels, but only until completion of production of the first five batches after July 26, 2004.

The package insert for all LVPs, SVPs, and PBPs used in the preparation of TPN products must contain a warning statement. This warning must be contained in the "Warning" section of the labeling and must state the following: "WARNING: This product contains aluminum that may be toxic. Aluminum may reach toxic levels with prolonged parenteral administration if kidney function is impaired. Premature neonates are particularly at risk because their kidneys are immature, and they require large amounts of calcium and phosphate solutions that contain aluminum. Research indicates that patients with impaired kidney function, including premature neonates, who receive parenteral levels of aluminum at greater than 4 to 5 µg per kg per day accumulate aluminum at levels associated with central nervous system and bone toxicity. Tissue loading may occur at even lower rates of administration of TPN products."

**Change to read:**

### PACKAGING

### Containers for Injections

Containers, including the closures, for preparations for injections do not interact physically or chemically with the preparations in any manner to alter the strength, quality, or purity beyond the official requirements under the ordinary or customary conditions of handling, shipment, storage, sale, and use. The container is made of material that permits inspection of the contents. The type of glass preferable for each parenteral preparation is usually stated in the individual monograph. Unless otherwise specified in the individual monograph, plastic containers may be used for packaging injections (see *Containers—Plastics* ⟨661⟩).

For definitions of single-dose and multiple-dose containers, see *Containers* in the *General Notices and Requirements.* Containers meet the requirements under *Containers—Glass* ⟨660⟩ and *Containers—Plastics* ⟨661⟩.

Containers are closed or sealed in such a manner as to prevent contamination or loss of contents. Validation of container integrity must demonstrate no penetration of mi-

EAGLEBEN-SA_00263821

crobial contamination or chemical or physical impurities. In addition, the solutes and the vehicle must maintain their specified total and relative quantities or concentrations when exposed to anticipated extreme conditions of manufacturing and processing, and storage, shipment, and distribution. Closures for multiple-dose containers permit the withdrawal of the contents without removal or destruction of the closure. The closure permits penetration by a needle and, upon withdrawal of the needle, closes at once, protecting the container against contamination. Validation of the multiple-dose container integrity must include verification that such a package prevents microbial contamination or loss of product contents under anticipated conditions of multiple entry and use.

Piggyback containers are usually intravenous infusion containers used to administer a second infusion through a connector of some type or an injection port on the administration set of the first fluid, thereby avoiding the need for another injection site on the patient's body. Piggyback containers are also known as secondary infusion containers.

## Potassium Chloride for Injection Concentrate

The use of a black closure system on a vial (e.g., a black flip-off button and a black ferrule to hold the elastomeric closure) or the use of a black band or series of bands above the constriction on an ampul is prohibited, except for *Potassium Chloride for Injection Concentrate.*

## Neuromuscular Blocking and Paralyzing Agents

All injectable preparations of neuromuscular blocking agents and paralyzing agents must be packaged in vials with a cautionary statement printed on the ferrules or cap overseals. Both the container cap ferrule and the cap overseal must bear in black or white print (whichever provides the greatest color contrast with the ferrule or cap color) the words: "Warning: Paralyzing Agent" or "Paralyzing Agent" (depending on the size of the closure system). Alternatively, the overseal may be transparent and without words, allowing for visualization of the warning labeling on the closure ferrule.

## Containers for Sterile Solids

Containers, including the closures, for dry solids intended for parenteral use do not interact physically or chemically with the preparation in any manner to alter the strength, quality, or purity beyond the official requirements under the ordinary or customary conditions of handling, shipment, storage, sale, and use.

A container for a sterile solid permits the addition of a suitable solvent and withdrawal of portions of the resulting solution or suspension in such manner that the sterility of the product is maintained.

Where the *Assay* in a monograph provides a procedure for the *Assay preparation,* in which the total withdrawable contents are to be withdrawn from a single-dose container with a hypodermic needle and syringe, the contents are to be withdrawn as completely as possible into a dry hypodermic syringe of a rated capacity not exceeding three times the volume to be withdrawn and fitted with a 21-gauge needle not less than 2.5 cm (1 inch) in length, with care being taken to expel any air bubbles, and discharged into a container for dilution and assay.

## Volume in Container

Each container of an injection is filled with sufficient excess of the labeled "size" or that volume which is to be withdrawn. See *Injections* under *Pharmaceutical Dosage Forms* ⟨1151⟩.

### DETERMINATION OF VOLUME OF INJECTION IN CONTAINERS

Suspensions and emulsions must be shaken before withdrawal of the contents and before the determination of the density. Oily and viscous preparations may be warmed according to the instructions on the label, if necessary, and thoroughly shaken immediately before removing the contents. The contents are then cooled to 20°–25°C before measuring the volume.

**Single-Dose Containers**—Select 1 container if the volume of the container is 10 mL or more, 3 containers if the nominal volume is more than 3 mL and less than 10 mL, or 5 containers if the nominal volume is 3 mL or less. Take up individually the total contents of each container selected into a dry syringe of a capacity not exceeding three times the volume to be measured and fitted with a 21-gauge needle not less than 2.5 cm (1 inch) in length. Expel any air bubbles from the syringe and needle, and then discharge the contents of the syringe, without emptying the needle, into a standardized, dry cylinder (graduated to contain rather than to deliver the designated volumes) of such size that the volume to be measured occupies at least 40% of its graduated volume. Alternatively, the volume of the contents in mL may be calculated as the mass, in g, divided by the density. For containers with a nominal volume of 2 mL or less, the contents of a sufficient number of containers may be pooled to obtain the volume required for the measurement, provided that a separate, dry syringe assembly is used for each container. The contents of containers holding 10 mL or more may be determined by means of opening them and emptying the contents directly into the graduated cylinder or tared beaker.

The volume is not less than the nominal volume in the case of containers examined individually or, in the case of containers with a nominal volume of 2 mL or less, is not less than the sum of the nominal volumes of the containers taken collectively.

**Multi-Dose Containers**—For Injections in multiple-dose containers labeled to yield a specific number of doses of a stated volume, select 1 container, and proceed as directed for single-dose containers, using the same number of separate syringe assemblies as the number of doses specified. The volume is such that each syringe delivers not less than the stated dose.

**Injections in Cartridges or Prefilled Syringes**—Select 1 container if the volume is 10 mL or more, 3 containers if the nominal volume is more than 3 mL and less than 10 mL, or 5 containers if the nominal volume is 3 mL or less. If necessary, fit the containers with the accessories required for their use (needle, piston, syringe) and transfer the entire contents of each container without emptying the needle into a dry tared beaker by slowly and constantly depressing the piston. Determine the volume in mL, calculated as the mass, in g, divided by the density.

The volume measured for each of the containers is not less than the nominal volume.

**Large-Volume Intravenous Solutions**—For intravenous solutions, select 1 container. Transfer the contents into a dry measuring cylinder of such a capacity that the volume to be determined occupies at least 40% of the nominal volume of the cylinder. Measure the volume transferred.

The volume is not less than the nominal volume.

## Labeling on Ferrules and Cap Overseals

Only cautionary statements are to appear on the top (circle) surface of the ferrule or cap overseal of a vial containing an injectable product. A cautionary statement is one in-

EAGLEBEN-SA_00263822

tended to prevent an imminent life-threatening situation if the injectable drug is used inappropriately. Examples of such statements include but are not limited to the following: "Warning", "Dilute Before Using", "Paralyzing Agent", "I.M. Use Only", and "Chemotherapy".

The text must be in contrasting color and conspicuous under ordinary conditions of use. The cautionary statement may appear solely on the ferrule, provided the cap overseal is constructed so as to allow the cautionary statement beneath the cap to be readily legible.

Identifying numbers or letters, such as code numbers, lot numbers, etc., may appear on the side (skirt) surface of the ferrule on vials containing injectable products. The appearance of such identifying data on the skirt surface of the ferrule, placed where it does not detract from, or interfere with, the cautionary statement on the top surface, should be considered to be a beneficial attribute of the in-process quality control of a product throughout the manufacturing process. Any anticounterfeiting scheme must not detract from or interfere with the cautionary statements.

Under no circumstances would advertising such as company names, logos, or product names be permitted to appear on the top (circle) surface of any ferrule or cap overseal.▪(Indefinitely postponed)▪(RB 29-Jul-2009)

### Packaging and Storage

The volume of injection in single-dose containers provides the amount specified for parenteral administration at one time and in no case is more than sufficient to permit the withdrawal and administration of 1 L.

Preparations intended for intraspinal, intracisternal, or peridural administration are packaged only in single-dose containers.

Unless otherwise specified in the individual monograph, a multiple-dose container contains a volume of Injection sufficient to permit the withdrawal of not more than 30 mL.

The following injections are exempt from the 1-L restriction of the foregoing requirements relating to packaging:

1. Injections packaged for extravascular use as irrigation solutions or peritoneal dialysis solutions
2. Injections packaged for intravascular use as parenteral nutrition or as replacement or substitution fluid to be administered continuously during hemofiltration

Injections packaged for intravascular use that may be used for intermittent, continuous, or bolus replacement fluid administration during hemodialysis or other procedures, unless excepted above, must conform to the 1-L restriction.

Injections labeled for veterinary use are exempt from packaging and storage requirements concerning the limitation to single-dose containers and the limitation on the volume of multiple-dose containers.

### FOREIGN AND PARTICULATE MATTER

All articles intended for parenteral administration shall be prepared in a manner designed to exclude particulate matter as defined in *Particulate Matter in Injections* ⟨788⟩ and other foreign matter. Each final container of all parenteral preparations shall be inspected to the extent possible for the presence of observable foreign and particulate matter (hereafter termed "visible particulates") in its contents. The inspection process shall be designed and qualified to ensure that every lot of all parenteral preparations is essentially free from visible particulates. Qualification of the inspection process shall be performed with reference to particulates in the visible range of a type that might emanate from the manufacturing or filling process. Every container whose contents show evidence of visible particulates shall be rejected. The inspection for visible particulates may take place when inspecting for other critical defects, such as cracked or defec-

tive containers or seals, or when characterizing the appearance of a lyophilized product.

Where the nature of the contents or the container-closure system permits only limited capability for the inspection of the total contents, the 100% inspection of a lot shall be supplemented with the inspection of constituted (e.g., dried) or withdrawn (e.g., dark amber container) contents of a sample of containers from the lot.

All large-volume Injections for single-dose infusion and small-volume Injections are subject to the light obscuration or microscopic procedures and limits for subvisible particulate matter set forth in *Particulate Matter In Injections* ⟨788⟩, unless otherwise specified in the individual monograph. An article packaged as both a large-volume and a small-volume Injection meets the requirements set forth for small-volume Injections where the container is labeled as containing 100 mL or less, if the individual monograph states a test for *Particulate Matter* ⟨788⟩; it meets the requirements set forth for large-volume Injections for single-dose infusion where the container is labeled as containing more than 100 mL. Injections administered exclusively by the intramuscular or subcutaneous route or packaged and labeled for use as irrigating solutions or packaged and labeled for use as irrigating solutions are exempt from requirements for *Particulate Matter* ⟨788⟩.

### STERILITY

**Sterility Tests**—Preparations for injection meet the requirements under *Sterility Tests* ⟨71⟩.

### CONSTITUTED SOLUTIONS

Dry solids from which constituted solutions are prepared for injection bear titles of the form *[DRUG] for Injection*. Because these dosage forms are constituted at the time of use by the health care practitioner, tests and standards pertaining to the solution as constituted for administration are not included in the individual monographs on sterile dry solids or liquid concentrates. However, in the interest of assuring the quality of injection preparations as they are actually administered, the following nondestructive tests are provided for demonstrating the suitability of constituted solutions when they are prepared just prior to use.

**Completeness and Clarity of Solution**—Constitute the solution as directed in the labeling supplied by the manufacturer for the sterile dry dosage form.

**A:** The solid dissolves completely, leaving no visible residue as undissolved matter.

**B:** The constituted solution is not significantly less clear than an equal volume of the diluent or of Purified Water contained in a similar vessel and examined similarly.

**Particulate Matter**—Constitute the solution as directed in the labeling supplied by the manufacturer for the sterile dry dosage form: the solution is essentially free from particles of foreign matter that can be observed on visual inspection.

# ⟨11⟩ USP REFERENCE STANDARDS

USP Reference Standards are highly characterized specimens of drug substances, excipients, reportable impurities, degradation products, compendial reagents, and performance calibrators.

They are explicitly required in many Pharmacopeial assays and tests and are provided solely for such use. Assessment

EAGLEBEN-SA_00263823

# Exhibit 5



# W  T  S
## ARTICLE DELIVERY



**WTS Number: 280130**

**Order #172565**

# ASAP

**Request Date:** 06/17/2021 01:28pm

**Requester:** Maria Jamass - Latham & Watkins
**Phone:** 2129061200
**Reference:** 80850-051330-0029
**Delivery email: Theresa.Sanchez@lw.com**

**Maxcost: 75**

**Instructions:** **Needed by end of day today - please let me (maria.jamass@lw.com) know if that is not feasible. But Please email scans toTheresa.Sanchez@lw.com, as I will be offiline after 5pm EST**

**Citation:**

1 U.S. PHARMACOPEIA <1> Injections 34 (32d ed. official May 1, 2009) (USP 32)

**Library/Supplier:** Ebling Library
Stacks
QV 738 AA1 P5u

**WTS staff contact: Christy**

**ISSN/ISBN/OCLC:** 0195-7996

**Base Service Fee:** $15      **Rush fee:** $60.00

**Copyright:** WTS will pay copyright royalties and bill me:$_____pages:_____

**Shipping:** $_____      **Research:** $_____      **Supplier:** $_____

## THIS IS NOT AN INVOICE

EAGLEBEN-SA_00263808

# 2009

## USP 32

# THE UNITED STATES PHARMACOPEIA

## NF 27

# THE NATIONAL FORMULARY

## Volume 1

*By authority of the United States Pharmacopeial Convention, meeting at Washington, D.C., March 9–13, 2005. Prepared by the Council of Experts and published by the Board of Trustees*

*Official from May 1, 2009*

The designation on the cover of this publication, "USP NF 2009," is for ease of identification only. The publication contains two separate compendia: *The United States Pharmacopeia*, Thirty-Second Revision, and *The National Formulary*, Twenty-Seventh Edition.

THE UNITED STATES PHARMACOPEIAL CONVENTION
12601 Twinbrook Parkway, Rockville, MD  20852

EAGLEBEN-SA_00263809

## SIX-MONTH IMPLEMENTATION GUIDELINE

The *United States Pharmacopeia–National Formulary* and its *Supplements* become official **six months** after being released to the public. The *USP–NF*, which is released on November 1 of each year, becomes official on May 1 of the following year.

This change was adopted to give users more time to bring their methods and procedures into compliance with new and revised *USP–NF* requirements.

The table below describes the new official dates. The 2008 *USP31–NF26*, and the *Supplements* and *Interim Revision Announcements* (*IRAs*) to that edition, will be official until May 1, 2009, at which time the *USP32–NF27* becomes official.

| Publication | Release Date | Official Date | Official Until |
|---|---|---|---|
| *USP32–NF27* | Nov. 1, 2008 | May 1, 2009 | May 1, 2010 (except as superceded by *Supplements, IRAs,* and *Revision Bulletins*) |
| *First Supplement* | Feb. 1, 2009 | Aug. 1, 2009 | May 1, 2010 (except as superceded by *Second Supplement, IRAs,* and *Revision Bulletins*) |
| *Second Supplement* | June 1, 2009 | Dec. 1, 2009 | May 1, 2010 (except as superceded by *IRAs* and *Revision Bulletins*) |
| *USP33–NF28* | Nov. 1, 2009 | May 1, 2010 | May 1, 2011 (except as superceded by *Supplements, IRAs,* and *Revision Bulletins*) |

*IRAs* will continue to become official on the first day of the second month of the *Pharmacopeial Forum* (*PF*) issue in which they are published as final. For instance, *IRAs* published as final in the May-June *PF* (issue 3) will become official on June 1. This table gives the details of the *IRAs* that will apply to *USP31–NF26* and *USP32–NF27*.

| IRA* | Release Date | Official Date | Revises |
|---|---|---|---|
| Jan. 1, 2009 *IRA, PF* 35(1) | Jan. 1, 2009 | Feb. 1, 2009 | *USP31–NF26* and its *Supplements* |
| Mar. 1, 2009 *IRA, PF* 35(2) | Mar. 1, 2009 | April 1, 2009 | *USP31–NF26* and its *Supplements* |
| May 1, 2009 *IRA, PF* 35(3) | May 1, 2009 | June 1, 2009 | *USP32–NF27* |
| July 1, 2009 *IRA, PF* 35(4) | July 1, 2009 | Aug. 1, 2009 | *USP32–NF27* and *First Supplement* |
| Sept. 1, 2009 *IRA, PF* 35(5) | Sept. 1, 2009 | Oct. 1, 2009 | *USP32–NF27* and *First Supplement* |
| Nov. 1, 2009 *IRA, PF* 35(6) | Nov. 1, 2009 | Dec. 1, 2009 | *USP32–NF27* and its *Supplements* |
| Jan. 1, 2010 *IRA, PF* 36(1) | Jan. 1, 2010 | Feb. 1, 2010 | *USP32–NF27* and its *Supplements* |
| Mar. 1, 2010 *IRA, PF* 36(2) | Mar. 1, 2010 | April 1, 2010 | *USP32–NF27* and its *Supplements* |

*NOTE—Beginning January 1, 2007, USP ceased identifying *IRAs* numerically (*First, Second,* etc.) and instead now designates them by the date on which they are published.

*Revision Bulletins* published on the USP website will continue to become official immediately upon publication, unless the *Revision Bulletin* specifies otherwise.

Revisions that contain a specific official date shall continue to become official upon such specified date, which supercedes the general official date for the publication.

For more information about the change in official dates, please visit the USP website at http://www.usp.org.

## NOTICE AND WARNING

*Concerning U.S. Patent or Trademark Rights*—The inclusion in *The United States Pharmacopeia* or in the *National Formulary* of a monograph on any drug in respect to which patent or trademark rights may exist shall not be deemed, and is not intended as, a grant of, or authority to exercise, any right or privilege protected by such patent or trademark. All such rights and privileges are vested in the patent or trademark owner, and no other person may exercise the same without express permission, authority, or license secured from such patent or trademark owner.

*Concerning Use of USP or NF Text*—Attention is called to the fact that *USP* and *NF* text is fully copyrighted. Authors and others wishing to use portions of the text should request permission to do so from the Secretary of the USPC Board of Trustees.

Copyright © 2008 The United States Pharmacopeial Convention
12601 Twinbrook Parkway, Rockville, MD 20852

*All rights reserved.*

ISSN: 0195-7996
ISBN: 1-889788-69-2

Printed in the United States by United Book Press, Baltimore, Maryland

EAGLEBEN-SA_00263810

# General Chapters

## General Tests and Assays

## General Requirements for Tests and Assays

## ⟨1⟩ INJECTIONS

### INTRODUCTION

Parenteral articles are preparations intended for injection through the skin or other external boundary tissue, rather than through the alimentary canal, so that the active substances they contain are administered, using gravity or force, directly into a blood vessel, organ, tissue, or lesion. Parenteral articles are prepared scrupulously by methods designed to ensure that they meet Pharmacopeial requirements for sterility, pyrogens, particulate matter, and other contaminants, and, where appropriate, contain inhibitors of the growth of microorganisms. An Injection is a preparation intended for parenteral administration and/or for constituting or diluting a parenteral article prior to administration.

### NOMENCLATURE AND DEFINITIONS

#### Nomenclature*

The following nomenclature pertains to five general types of preparations, all of which are suitable for, and intended for, paren-

---

*This nomenclature has been adopted by the USP Drug Nomenclature Committee for implementation by supplemental revisions of *USP 23-NF 18*. For currently official monograph titles in the form *Sterile [DRUG]* that have not yet been revised, the following nomenclature continues in use in this Pharmacopeia: (1) medicaments or solutions or emulsions thereof suitable for injection, bearing titles of the form *[DRUG] Injection*; (2) dry solids or liquid concentrates containing no buffers, diluents, or other added substances, and which, upon the addition of suitable solvents, yield solutions conforming in all respects to the requirements for Injections, and which are distinguished by titles of the form *Sterile [DRUG]*; (3) preparations the same as those described under (2) except that they contain one or more buffers, diluents, or other added substances, and which are distinguished by titles of the form *[DRUG] for Injection*; (4) solids which are suspended in a suitable fluid medium and which are not to be injected intravenously or into the spinal canal, distinguished by titles of the form *Sterile [DRUG] Suspension*; and (5) dry solids which, upon the addition of suitable vehicles, yield preparations conforming in all respects to the requirements for Sterile Suspensions, and which are distinguished by titles of the form *Sterile [DRUG] for Suspension*.

---

teral administration. They may contain buffers, preservatives, or other added substances.

1. *[DRUG] Injection*—Liquid preparations that are drug substances or solutions thereof.
2. *[DRUG] for Injection*—Dry solids that, upon the addition of suitable vehicles, yield solutions conforming in all respects to the requirements for *Injections*.
3. *[DRUG] Injectable Emulsion*—Liquid preparations of drug substances dissolved or dispersed in a suitable emulsion medium.
4. *[DRUG] Injectable Suspension*—Liquid preparations of solids suspended in a suitable liquid medium.
5. *[DRUG] for Injectable Suspension*—Dry solids that, upon the addition of suitable vehicles, yield preparations conforming in all respects to the requirements for *Injectable Suspensions*.

### Definitions

#### PHARMACY BULK PACKAGE

A *Pharmacy bulk package* is a container of a sterile preparation for parenteral use that contains many single doses. The contents are intended for use in a pharmacy admixture program and are restricted to the preparation of admixtures for infusion or, through a sterile transfer device, for the filling of empty sterile syringes.

The closure shall be penetrated only one time after constitution with a suitable sterile transfer device or dispensing set which allows measured dispensing of the contents. The *Pharmacy bulk package* is to be used only in a suitable work area such as a laminar flow hood (or an equivalent clean air compounding area).

Designation as a *Pharmacy bulk package* is limited to preparations from *Nomenclature* categories 1, 2, or 3 as defined above. *Pharmacy bulk packages*, although containing more than one single dose, are exempt from the multiple-dose container volume limit of 30 mL and the requirement that they contain a substance or suitable mixture of substances to prevent the growth of microorganisms.

Where a container is offered as a *Pharmacy bulk package*, the label shall (a) state prominently "Pharmacy Bulk Package—Not for direct infusion," (b) contain or refer to information on proper techniques to help assure safe use of the product, and (c) bear a statement limiting the time frame in which the container may be used once it has been entered, provided it is held under the labeled storage conditions.

#### LARGE- AND SMALL-VOLUME INJECTIONS

Where used in this Pharmacopeia, the designation *Large-volume intravenous solution* applies to a single-dose injection that is intended for intravenous use and is packaged in containers labeled as containing more than 100 mL. The designation *Small-volume Injection* applies to an Injection that is packaged in containers labeled as containing 100 mL or less.

EAGLEBEN-SA_00263811

### BIOLOGICS

The Pharmacopeial definitions for sterile preparations for parenteral use generally do not apply in the case of the biologics because of their special nature and licensing requirements (see *Biologics* (1041)).

## INGREDIENTS

### Vehicles and Added Substances

**Aqueous Vehicles**—The vehicles for aqueous Injections meet the requirements of the *Pyrogen Test* (151) or the *Bacterial Endotoxins Test* (85), whichever is specified. *Water for Injection* generally is used as the vehicle, unless otherwise specified in the individual monograph. Sodium chloride may be added in amounts sufficient to render the resulting solution isotonic; and *Sodium Chloride Injection*, or *Ringer's Injection*, may be used in whole or in part instead of *Water for Injection*, unless otherwise specified in the individual monograph. For conditions applying to other adjuvants, see *Added Substances* in this chapter.

**Other Vehicles**—Fixed oils used as vehicles for nonaqueous Injections are of vegetable origin, are odorless or nearly so, and have no odor suggesting rancidity. They meet the requirements of the test for *Solid paraffin* under *Mineral Oil*, the cooling bath being maintained at 10° have a *Saponification Value* between 185 and 200 (see *Fats and Fixed Oils* (401)), have an *Iodine Value* between 79 and 141 (see *Fats and Fixed Oils* (401)), and meet the requirements of the following tests.

*Unsaponifiable Matter*—Reflux on a steam bath 10 mL of the oil with 15 mL of sodium hydroxide solution (1 in 6) and 30 mL of alcohol, with occasional shaking until the mixture becomes clear. Transfer the solution to a shallow dish, evaporate the alcohol on a steam bath, and mix the residue with 100 mL of water: a clear solution results.

*Free Fatty Acids*—The free fatty acids in 10 g of oil require for neutralization not more than 2.0 mL of 0.020 N sodium hydroxide (see *Fats and Fixed Oils* (401)).

Synthetic mono- or diglycerides of fatty acids may be used as vehicles, provided they are liquid and remain clear when cooled to 10° and have an *Iodine Value* of not more than 140 (see *Fats and Fixed Oils* (401)).

These and other nonaqueous vehicles may be used, provided they are safe in the volume of Injection administered, and also provided they do not interfere with the therapeutic efficacy of the preparation or with its response to prescribed assays and tests.

**Added Substances**—Suitable substances may be added to preparations intended for injection to increase stability or usefulness, unless proscribed in the individual monograph, provided they are harmless in the amounts administered and do not interfere with the therapeutic efficacy or with the responses to the specified assays and tests. No coloring agent may be added, solely for the purpose of coloring the finished preparation, to a solution intended for parenteral administration (see also *Added Substances* under *General Notices* and *Antimicrobial Effectiveness Testing* (51)).

Observe special care in the choice and use of added substances in preparations for injection that are administered in a volume exceeding 5 mL. The following maximum limits prevail unless otherwise directed: for agents containing mercury and the cationic, surface-active compounds, 0.01%; for chlorobutanol, cresol, phenol, and similar types of substances, 0.5%; and for sulfur dioxide, or an equivalent amount of the sulfite, bisulfite, or metabisulfite of potassium or sodium, 0.2%.

A suitable substance or mixture of substances to prevent the growth of microorganisms must be added to preparations intended for injection that are packaged in multiple-dose containers, regardless of the method of sterilization employed, unless one of the following conditions prevails: (1) there are different directions in the individual monograph; (2) the substance contains a radionuclide with a physical half-life of less than 24 hours; and (3) the active ingredients are themselves antimicrobial. Such substances are used in concentrations that will prevent the growth of or kill microorganisms in the preparations for injection. Such substances also meet the requirements of *Antimicrobial Effectiveness Testing* (51) and *Antimicrobial Agents—Content* (341). Sterilization processes are employed even though such substances are used (see also *Sterilization and Sterility Assurance of Compendial Articles* (1211). The air in the container may be evacuated or be displaced by a chemically inert gas. Where specified in a monograph, information regarding sensitivity of the article to oxygen is to be provided in the labeling.

## LABELS AND LABELING

### Labeling

NOTE—See definitions of "label" and "labeling" in *Labeling* in the section *Preservation, Packaging, Storage, and Labeling* of the *General Notices and Requirements*.

The label states the name of the preparation; in the case of a liquid preparation, the percentage content of drug or amount of drug in a specified volume; in the case of a dry preparation, the amount of active ingredient; the route of administration; a statement of storage conditions and an expiration date; the name and place of business of the manufacturer, packer, or distributor; and an identifying lot number. The lot number is capable of yielding the complete manufacturing history of the specific package, including all manufacturing, filling, sterilizing, and labeling operations.

Where the individual monograph permits varying concentrations of active ingredients in the large-volume parenteral, the concentration of each ingredient named in the official title is stated as if part of the official title, e.g., Dextrose Injection 5%, or Dextrose (5%) and Sodium Chloride (0.2%) Injection.

The labeling includes the following information if the complete formula is not specified in the individual monograph: (1) In the case of a liquid preparation, the percentage content of each ingredient or the amount of each ingredient in a specified volume, except that ingredients added to adjust to a given pH or to make the solution isotonic may be declared by name and a statement of their effect; and (2) in the case of a dry preparation or other preparation to which a diluent is intended to be added before use, the amount of each ingredient, the composition of recommended diluent(s) [the name(s) alone, if the formula is specified in the individual monograph], the amount to be used to attain a specific concentration of active ingredient and the final volume of solution so obtained, a brief description of the physical appearance of the constituted solution, directions for proper storage of the constituted solution, and an expiration date limiting the period during which the constituted solution may be expected to have the required or labeled potency if it has been stored as directed.

Containers for Injections that are intended for use as dialysis, hemofiltration, or irrigation solutions and that contain a volume of more than 1 L are labeled to indicate that the contents are not intended for use by intravenous infusion.

Injections intended for veterinary use are labeled to that effect.

The container is so labeled that a sufficient area of the container remains uncovered for its full length or circumference to permit inspection of the contents.

### STRENGTH AND TOTAL VOLUME FOR SINGLE- AND MULTIPLE-DOSE INJECTABLE DRUG PRODUCTS

For single-dose and multiple-dose injectable drug products, the strength per total volume should be the primary and prominent expression on the principal display panel of the label, followed in close proximity by strength per mL enclosed by parentheses. For containers holding a volume of less than 1 mL, the strength per fraction of a mL should be the only expression of strength. Strength per single mL should be expressed as mg/mL, not mg/1 mL.

The following formats are acceptable for contents of greater than 1 mL:

Total strength/total volume: 500 mg/10 mL.
Strength/mL = 50 mg/mL.

or

Total strength/total volume: 25,000 Units/5 mL.

Strength/mL: 5,000 Units/mL.

The following format is acceptable for contents of less than 1 mL.: 12.5 mg/0.625 mL

There are, however, some exceptions to expressing strength per total volume. In certain cases, the primary and prominent expression of the total drug content per container would not be effective in preventing medication errors (e.g., insulin). An example is the use of lidocaine or other similar drugs used as a local anesthetic where the product is ordered and administered by percentage (e.g., 1%, 2%) or a local anesthetic in combination with epinephrine that is expressed as a ratio (e.g., 1:100,000). In such cases, the total strength should be expressed: for example, 1% (100 mg/10 mL). Dry solids, which need to be reconstituted, should follow the same format, with the exception that only the total strength of the drug should be listed, not the strength/total volume or strength/mL.

[Official February 1, 2009]

## Aluminum in Large-Volume Parenterals (LVPs), Small-Volume Parenterals (SVPs), and Pharmacy Bulk Packages (PBPs) Used in Total Parenteral Nutrition (TPN) Therapy

(a) The aluminum content of LVPs used in TPN therapy must not exceed 25 µg per L (µg/L).

(b) The package insert of LVPs used in TPN therapy must state that the drug product contains no more than 25 µg of aluminum per L. This information must be contained in the "Precautions" section of the labeling of all LVPs used in TPN therapy.

(c) If the maximum amount of aluminum in SVPs and PBPs is 25 µg per L (µg/L) or less, instead of stating the exact amount of aluminum that each contains, as in paragraph (d), the immediate container label for SVPs and PBPs used in the preparation of TPN parenterals (with exceptions as noted below) may state: "Contains no more than 25 µg/L of aluminum". If the SVP or PBP is a lyophilized powder, the immediate container label may state the following: "When reconstituted in accordance with the package insert instructions, the concentration of aluminum will be no more than 25 µg/L".

(d) The maximum level of aluminum at expiry must be stated on the immediate container label of all SVPs and PBPs used in the preparation of TPN parenterals and injectable emulsions. The aluminum content must be stated as follows: "Contains no more than ___ µg/L of aluminum". The immediate container label of all SVPs and PBPs that are lyophilized powder used in the preparation of TPN solutions must contain the following statement: "When reconstituted in accordance with the package insert instructions, the concentration of aluminum will be no more than ___ µg/L." This maximum amount of aluminum must be stated as the highest one of the following three levels:

(1) The highest level for the batches produced during the last three years.

(2) The highest level for the latest five batches.

(3) The maximum level in terms of historical levels, but only until completion of production of the first five batches after July 26, 2004.

The package insert for all LVPs, SVPs, and PBPs used in the preparation of TPN products must contain a warning statement. This warning must be contained in the "Warning" section of the labeling and must state the following: "WARNING: This product contains aluminum that may be toxic. Aluminum may reach toxic levels with prolonged parenteral administration if kidney function is impaired. Premature neonates are particularly at risk because their kidneys are immature, and they require large amounts of calcium and phosphate solutions that contain aluminum. Research indicates that patients with impaired kidney function, including premature neonates, who receive parenteral levels of aluminum at greater than 4 to 5 µg per kg per day accumulate aluminum at levels associated

with central nervous system and bone toxicity. Tissue loading may occur at even lower rates of administration of TPN products."

## PACKAGING

### Containers for Injections

Containers, including the closures, for preparations for injections do not interact physically or chemically with the preparations in any manner to alter the strength, quality, or purity beyond the official requirements under the ordinary or customary conditions of handling, shipment, storage, sale, and use. The container is made of material that permits inspection of the contents. The type of glass preferable for each parenteral preparation is usually stated in the individual monograph. Unless otherwise specified in the individual monograph, plastic containers may be used for packaging injections (see *Containers—Plastics* ⟨661⟩).

For definitions of single-dose and multiple-dose containers, see *Containers* in the *General Notices and Requirements*. Containers meet the requirements under *Containers—Glass* ⟨660⟩ and *Containers—Plastics* ⟨661⟩.

Containers are closed or sealed in such a manner as to prevent contamination or loss of contents. Validation of container integrity must demonstrate no penetration of microbial contamination or chemical or physical impurities. In addition, the solute and the vehicle must maintain their specified total and relative quantities or concentrations when exposed to anticipated extreme conditions of manufacturing and processing, and storage, shipment, and distribution. Closures for multiple-dose containers permit the withdrawal of the contents without removal or destruction of the closure. The closure permits penetration by a needle and, upon withdrawal of the needle, closes at once, protecting the container against contamination. Validation of the multiple-dose container integrity must include verification that such a package prevents microbial contamination or loss of product contents under anticipated conditions of multiple entry and use.

Piggyback containers are usually intravenous infusion containers used to administer a second infusion through a connector of some type or an injection port on the administration set of the first fluid, thereby avoiding the need for another injection site on the patient's body. Piggyback containers are also known as secondary infusion containers.

### Potassium Chloride for Injection Concentrate

The use of a black closure system on a vial (e.g., a black flip-off button and a black ferrule to hold the elastomeric closure) or the use of a black band or series of bands above the constriction on an ampul is prohibited, except for *Potassium Chloride for Injection Concentrate*.

### Neuromuscular Blocking and Paralyzing Agents

All injectable preparations of neuromuscular blocking agents and paralyzing agents must be packaged in vials with a cautionary statement printed on the ferrules or cap overseals. Both the container cap ferrule and the cap overseal must bear in black or white print (whichever provides the greatest color contrast with the ferrule or cap color) the words: "Warning: Paralyzing Agent" or "Paralyzing Agent" (depending on the size of the closure system). Alternatively, the overseal may be transparent and without words, allowing for visualization of the warning labeling on the closure ferrule.

### Containers for Sterile Solids

Containers, including the closures, for dry solids intended for parenteral use do not interact physically or chemically with the preparation in any manner to alter the strength, quality, or purity beyond the official requirements under the ordinary or customary conditions of handling, shipment, storage, sale, and use.

EAGLEBEN-SA_00263813

34    (1) Injections / *General Requirements*                                    *USP 32*

A container for a sterile solid permits the addition of a suitable solvent and withdrawal of portions of the resulting solution or suspension in such manner that the sterility of the product is maintained.

Where the *Assay* in a monograph provides a procedure for the *Assay preparation*, in which the total withdrawable contents are to be withdrawn from a single-dose container with a hypodermic needle and syringe, the contents are to be withdrawn as completely as possible into a dry hypodermic syringe of a rated capacity not exceeding three times the volume to be withdrawn and fitted with a 21-gauge needle not less than 2.5 cm (1 inch) in length, with care being taken to expel any air bubbles, and discharged into a container for dilution and assay.

## Volume in Container

Each container of an injection is filled with sufficient excess of the labeled "size" or that volume which is to be withdrawn. See *Injections* under *Pharmaceutical Dosage Forms* (1151).

### DETERMINATION OF VOLUME OF INJECTION IN CONTAINERS

Suspensions and emulsions must be shaken before withdrawal of the contents and before the determination of the density. Oily and viscous preparations may be warmed according to the instructions on the label, if necessary, and thoroughly shaken immediately before removing the contents. The contents are then cooled to 20°–25°C before measuring the volume.

**Single-Dose Containers**—Select 1 container if the volume of the container is 10 mL or more, 3 containers if the nominal volume is more than 3 mL and less than 10 mL, or 5 containers if the nominal volume is 3 mL or less. Take up individually the total contents of each container selected into a dry syringe of a capacity not exceeding three times the volume to be measured and fitted with a 21-gauge needle not less than 2.5 cm (1 inch) in length. Expel any air bubbles from the syringe and needle, and then discharge the contents of the syringe, without emptying the needle, into a standardized, dry cylinder (graduated to contain rather than to deliver the designated volumes) of such size that the volume to be measured occupies at least 40% of its graduated volume. Alternatively, the volume of the contents in mL may be calculated as the mass, in g, divided by the density. For containers with a nominal volume of 2 mL or less, the contents of a sufficient number of containers may be pooled to obtain the volume required for the measurement, provided that a separate, dry syringe assembly is used for each container. The contents of containers holding 10 mL or more may be determined by means of opening them and emptying the contents directly into the graduated cylinder or tared beaker.

The volume is not less than the nominal volume in the case of containers examined individually or, in the case of containers with a nominal volume of 2 mL or less, is not less than the sum of the nominal volumes of the containers taken collectively.

**Multi-Dose Containers**—For Injections in multiple-dose containers labeled to yield a specific number of doses of a stated volume, select 1 container, and proceed as directed for single-dose containers, using the same number of separate syringe assemblies as the number of doses specified. The volume is such that each syringe delivers not less than the stated dose.

**Injections in Cartridges or Prefilled Syringes**—Select 1 container if the volume is 10 mL or more, 3 containers if the nominal volume is more than 3 mL and less than 10 mL, or 5 containers if the nominal volume is 3 mL or less. If necessary, fit the containers with the accessories required for their use (needle, piston, syringe) and transfer the entire contents of each container without emptying the needle into a dry tared beaker by slowly and constantly depressing the piston. Determine the volume in mL, calculated as the mass, in g, divided by the density.

The volume measured for each of the containers is not less than the nominal volume.

**Large-Volume Intravenous Solutions**—For intravenous solutions, select 1 container. Transfer the contents into a dry measuring cylinder of such a capacity that the volume to be determined occupies at least 40% of the nominal volume of the cylinder. Measure the volume transferred.

The volume is not less than the nominal volume.

## Labeling on Ferrules and Cap Overseals

Only cautionary statements are to appear on the top (circle) surface of the ferrule or cap overseal of a vial containing an injectable product. A cautionary statement is one intended to prevent an imminent life-threatening situation if the injectable drug is used inappropriately. Examples of such statements include but are not limited to the following: "Warning", "Dilute Before Using", "Paralyzing Agent", "I.M. Use Only", and "Chemotherapy".

The text must be in contrasting color and conspicuous under ordinary conditions of use. The cautionary statement may appear solely on the ferrule, provided the cap overseal is constructed so as to allow the cautionary statement beneath the cap to be readily legible.

Identifying numbers or letters, such as code numbers, lot numbers, etc., may appear on the side (skirt) surface of the ferrule on vials containing injectable products. The appearance of such identifying data on the skirt surface of the ferrule placed where it does not detract from, or interfere with, the cautionary statement on the top surface, should be considered to be a beneficial attribute of the in process quality control of a product throughout the manufacturing process. Any anticounterfeiting scheme must not detract from or interfere with the cautionary statements.

Under no circumstances would advertising such as company names, logos, or product names be permitted to appear on the top (circle) surface of any ferrule or cap overseal.

(Official February 1, 2000)

## Packaging and Storage

The volume of injection in single-dose containers provides the amount specified for parenteral administration at one time and in no case is more than sufficient to permit the withdrawal and administration of 1 L.

Preparations intended for intraspinal, intracisternal, or peridural administration are packaged only in single-dose containers.

Unless otherwise specified in the individual monograph, a multiple-dose container contains a volume of Injection sufficient to permit the withdrawal of not more than 30 mL.

The following injections are exempt from the 1-L restriction of the foregoing requirements relating to packaging:

1. Injections packaged for extravascular use as irrigation solutions or peritoneal dialysis solutions.
2. Injections packaged for intravascular use as parenteral nutrition or as replacement or substitution fluid to be administered continuously during hemofiltration.

Injections packaged for intravascular use that may be used for intermittent, continuous, or bolus replacement fluid administration during hemodialysis or other procedures, unless excepted above, must conform to the 1-L restriction.

Injections labeled for veterinary use are exempt from packaging and storage requirements concerning the limitation to single-dose containers and the limitation on the volume of multiple-dose containers.

## FOREIGN AND PARTICULATE MATTER

All articles intended for parenteral administration shall be prepared in a manner designed to exclude particulate matter as defined in *Particulate Matter in Injections* (788) and other foreign matter. Each final container of all parenteral preparations shall be inspected to the extent possible for the presence of observable foreign and particulate matter (hereafter termed "visible particulates") in its contents. The inspection process shall be designed and qualified to ensure that every lot of all parenteral preparations is essentially free from visible particulates. Qualification of the inspection process shall be performed with reference to particulates in the visible range of a type that might emanate from the manufacturing or filling process. Every container whose contents shows evidence of visible par

ticulates shall be rejected. The inspection for visible particulates may take place when inspecting for other critical defects, such as cracked or defective containers or seals, or when characterizing the appearance of a lyophilized product.

Where the nature of the contents or the container-closure system permits only limited capability for the inspection of the total contents, the 100% inspection of a lot shall be supplemented with the inspection of constituted (e.g., dried) or withdrawn (e.g., dark amber container) contents of a sample of containers from the lot.

All large-volume Injections for single-dose infusion and small-volume Injections are subject to the light obscuration or microscopic procedures and limits for subvisible particulate matter set forth in *Particulate Matter In Injections* ⟨788⟩, unless otherwise specified in the individual monograph. An article packaged as both a large-volume and a small-volume Injection meets the requirements set forth for small-volume Injections where the container is labeled as containing 100 mL or less, if the individual monograph states a test for *Particulate Matter* ⟨788⟩; it meets the requirements set forth for large-volume Injections for single-dose infusion where the container is labeled as containing more than 100 mL. Injections administered exclusively by the intramuscular or subcutaneous route or packaged and labeled for use as irrigating solutions are exempt from requirements for *Particulate Matter* ⟨788⟩.

## STERILITY

**Sterility Tests**—Preparations for injection meet the requirements under *Sterility Tests* ⟨71⟩.

## CONSTITUTED SOLUTIONS

Dry solids from which constituted solutions are prepared for injection bear titles of the form *[DRUG] for Injection.* Because these dosage forms are constituted at the time of use by the health care practitioner, tests and standards pertaining to the solution as constituted for administration are not included in the individual monographs on sterile dry solids or liquid concentrates. However, in the interest of assuring the quality of injection preparations as they are actually administered, the following nondestructive tests are provided for demonstrating the suitability of constituted solutions when they are prepared just prior to use.

**Completeness and Clarity of Solution**—Constitute the solution as directed in the labeling supplied by the manufacturer for the sterile dry dosage form.

**A:** The solid dissolves completely, leaving no visible residue as undissolved matter.

**B:** The constituted solution is not significantly less clear than an equal volume of the diluent or of Purified Water contained in a similar vessel and examined similarly.

**Particulate Matter**—Constitute the solution as directed in the labeling supplied by the manufacturer for the sterile dry dosage form: the solution is essentially free from particles of foreign matter that can be observed on visual inspection.

# ⟨11⟩ USP REFERENCE STANDARDS

USP Reference Standards are highly characterized specimens of drug substances, excipients, reportable impurities, degradation products, compendial reagents, and performance calibrators.

They are explicitly required in many Pharmacopeial assays and tests and are provided solely for such use. Assessment of the suitability for use in other application(s) tests with the purchaser.

## AUTHORITY FOR ESTABLISHMENT AND RELEASE

USP Reference Standards are established and released under the authority of the USPC Board of Trustees upon recommendation of the USP Reference Standards Expert Committee, which approves each lot as being suitable for use in its compendial applications. For some Reference Standards a preliminary review and approval is sought from other Expert Committees of the Council of Experts.

The distribution of controlled substances is subject to the regulations and licensing provisions of the Drug Enforcement Administration of the Department of Justice.

Industry Advisory Panels and other expert groups (such as Project Teams) may be assembled to advise USP on various aspects of the Reference Standards Program.

## HISTORY

Future availability of the first USP Reference Standards was announced in 1926 (*USP X*) "... In order to facilitate the adoption of the biological assay standards of the Pharmacopoeia, and to provide a greater degree of uniformity in their application." The list of USP Reference Standards that in 1936 comprised 6 items has grown to almost 1650 in 2004, and the collection has tracked the progress in pharmaceutical sciences: The first vitamins (Cod Liver Oil) and the first enzyme (Pepsin) in 1936; the first sulfonamide (Sulfanilamide) and the first hormones (Insulin; Posterior Pituitary) in 1942; the first performance standards (Melting Point Standards) in 1947, the first penicillin (Penicillin G Sodium) in 1950; the first recombinant-DNA technology protein (Insulin Human) in 1985, etc.

The continuous increase in the number of USP Reference Standards (over 100 new standards are being developed yearly) reflects not only the increase in the number of monographs and General Chapters, but also the development and extensive use of modern analytical methodology (such as chromatography, spectrophotometry, biological and biochemical assays, etc.) which require measurements relative to a reference standard.

## NOMENCLATURE

Standards designated as USP Reference Standards (USP RS) are, with a few exceptions, required for use in *USP–NF* monographs or General Chapters. The exceptions include current lots of USP and NF Reference Standards for which uses are no longer specified in the current *USP* or *NF* but for which sufficient demand remains (upon depletion of the current lots, future lots will be designated as Authentic Substances), Reference Standards specified in monographs developed by USP that are not intended for publication in the *USP–NF*, Reference Standards specified in the current edition of the *Food Chemicals Codex* (labeled with an additional designation "FCC"), and Fluoride Dentifrices (evaluated and distributed by agreement with the FDA and the Cosmetics, Toiletries, and Fragrances Association). A USP Reference Standard required in a monograph or General Chapter proposed in *Pharmacopeial Forum* may be released in advance of the official date of the proposed *PF* revision.

Reference Standards currently labeled as "NF Reference Standards" will eventually all be designated and labeled as "USP Reference Standards" pursuant to the consolidation of *USP* and *NF* within the USPC as of January 2, 1975. Meanwhile, where a USP Reference Standard is called for, the corresponding substance labeled as an "NF Reference Standard" may be used.

As a service, the USPC tests and distributes additional Authentic Substances (designated by AS) not currently required for use in a USP monograph or General Chapter. These also are provided under the supervision of the USP Reference Standards Expert Committee. They are highly characterized samples of chemicals, including substances of abuse, which are collaboratively tested and made availa-

EAGLEBEN-SA_00263815

# Exhibit 6



Bonus CD-ROM
Available!
See Back Cover
for More Details

# emin

# The Science and Practice of Pharmacy

## 21st EDITION

WILLIAMS &

EAGLEBEN-SA_00361644



**2 1**ST EDITION

# *Remington*

# The Science and Practice of Pharmacy

EAGLEBEN-SA_00361645



# THIS PAGE IS INTENTIONALLY LEFT BLANK

EAGLEBEN-SA_00361646



## 21ST EDITION

# Remington

## The Science and Practice of Pharmacy



LIPPINCOTT WILLIAMS & WILKINS
A **Wolters Kluwer** Company
Philadelphia · Baltimore · New York · London
Buenos Aires · Hong Kong · Sydney · Tokyo

EAGLEBEN-SA_00361647

Editor: David Troy
Managing Editor: Matthew J. Hauber

Lippincott Williams & Wilkins

351 West Camden Street
Baltimore, Maryland 21201-2436 USA

227 East Washington Square
Philadelphia, PA 19106

All rights reserved. This book is protected by copyright. No part of this book may be reproduced in any form or by any means, including photocopying, or utilized by any information storage and retrieval system without written permission from the copyright owner.

The publisher is not responsible (as a matter of product liability, negligence or otherwise) for any injury resulting from any material contained herein. This publication contains information relating to general principles of medical care which should not be construed as specific instructions for individual patients. Manufacturer's product information and package inserts should be reviewed for current information, including contraindications, dosages and precautions.

Printed in the United States of America

Entered according to Act of Congress, in the year 1885 by Joseph P Remington, in the Office of the Librarian of Congress, at Washington DC

Copyright 1889, 1894, 1905, 1907, 1917, by Joseph P Remington

Copyright 1926, 1936, by the Joseph P Remington Estate

Copyright 1948, 1951, by the Philadelphia College of Pharmacy and Science

Copyright 1956, 1960, 1965, 1970, 1975, 1980, 1985, 1990, 1995, by the Philadelphia College of Pharmacy and Science

Copyright 2000, 2005, by the University of the Sciences in Philadelphia

All Rights Reserved
Library of Congress Catalog Card Information is available
ISBN 0-683-306472

*The publishers have made every effort to trace the copyright holders for borrowed material. If they have inadvertently overlooked any, they will be pleased to make the necessary arrangements at the first opportunity.*

*The use of structural formulas from USAN and the USP Dictionary of Drug Names is by permission of The USP Convention. The Convention is not responsible for any inaccuracy contained herein.*

*Notice—This text is not intended to represent, nor shall it be interpreted to be, the equivalent of or a substitute for the official United States Pharmacopeia (USP) and/or the National Formulary (NF). In the event of any difference or discrepancy between the current official USP or NF standards of strength, quality, purity, packaging and labeling for drugs and representations of them herein, the context and effect of the official compendia shall prevail.*

To purchase additional copies of this book call our customer service department at **(800) 638-3030** or fax orders to **(301) 824-7390**. International customers should call **(301) 714-2324**.

02 03 04
2 3 4 5 6 7 8 9 10

EAGLEBEN-SA_00361648

CHAPTER **41**

# Parenteral Preparations

## Michael J Akers, PhD

Parenteral (Gk, *para enteron*, beside the intestine) dosage forms differ from all other drug dosage forms because they are injected directly into body tissue through the primary protective system of the human body, the skin, and mucous membranes. They must be exceptionally pure and free from physical, chemical, and biological contaminants. These requirements place a heavy responsibility on the pharmaceutical industry to practice current good manufacturing practices (cGMPs) in the manufacture of parenteral dosage forms and upon pharmacists and other health care professionals to practice good aseptic practices (GAPs) in dispensing them for administration to patients.

Certain pharmaceutical agents, particularly peptides, proteins, and many chemotherapeutic agents, can only be given parenterally because they are inactivated in the gastrointestinal tract when given by mouth. Parenterally administered drugs are relatively unstable and generally high potent drugs that require strict control of their administration to the patient. Because of the advent of biotechnology, parenteral products have grown in number and usage around the world.

This chapter will focus on the unique characteristics of parenteral dosage forms and the basic principles for formulating, packaging, manufacturing, and controlling the quality of these unique products. The references and bibliography at the end of this chapter contain the most up-to-date texts, book chapters, and review papers on parenteral product formulation, manufacture, and quality control.

## OVERVIEW OF UNIQUE CHARACTERISTICS OF PARENTERAL DOSAGE FORMS

Parenteral products are unique from any other type of pharmaceutical dosage form for the following reasons:

- All products must be sterile.
- All products must be free from pyrogenic (endotoxin) contamination.
- Injectable solutions must be free from visible particulate matter. This includes reconstituted sterile powders.
- Products should be isotonic although strictness of isotonicity depends on the route of administration. Products to be administered into the cerebrospinal fluid must be isotonic. Ophthalmic products, while not parenteral, also must be isotonic. Products to be administered by bolus injection by routes other than intravenous (IV) essentially should be isotonic or at least very close to isotonicity. IV infusions must be isotonic.

*The author recognizes the long time contributions of Dr. Kenneth Avis. Dr. Avis died in January 1999. Dr. Avis authored this chapter in Remington since 1965. To honor his memory, the author has maintained most of his organization of this chapter with new material and revised information added where appropriate.*

- All products must be stable (not only chemically and physically like all other dosage forms, but also "stable" microbiologically, ie, sterility, freedom from pyrogenic and visible particulate contamination must be maintained throughout the shelflife of the product).
- Products must be compatible (if applicable) with IV diluents, delivery systems, and other drug products co-administered.

## FORMULATION PRINCIPLES

Parenteral drugs are formulated as solutions, suspensions, emulsions, liposomes, microspheres, nanosystems, and powders to be reconstituted as solutions. This section will describe the components that are commonly used in parenteral formulations focusing on solutions and freeze-dried products. General guidance also will be provided on appropriate selection of the finished sterile dosage form and initial approaches used to develop the optimal parenteral formulation.

## VEHICLES

**WATER**—Since most liquid injections are quite dilute, the component present in the highest proportion is the vehicle. The vehicle of greatest importance for parenteral products is water. Water of suitable quality for compounding and rinsing product contact surfaces may be prepared either by distillation or by reverse osmosis, to meet United States Pharmacopeia (USP) specifications for Water for Injection (WFI). Only by these two methods is it possible to separate adequately various liquid, gas, and solid contaminating substances from water. These two methods for preparation of WFI and specifications for WFI are discussed later in this chapter. With the possible exception of freeze-drying, there is no unit operation more important and none more costly to install and operate than the one for the preparation of WFI.

**WATER-MISCIBLE VEHICLES**—A number of solvents that are miscible with water have been used as a portion of the vehicle in the formulation of parenterals. These solvents are used primarily to solubilize certain drugs in an aqueous vehicle and to reduce hydrolysis. The most important solvents in this group are ethyl alcohol, liquid polyethylene glycol, and propylene glycol. Ethyl alcohol is used particularly in the preparation of solutions of cardiac glycosides and the glycols in solutions of barbiturates, certain alkaloids, and certain antibiotics. Such preparations usually are given intramuscularly. There are limitations with the amount of these co-solvents that can be administered because of toxicity concerns, greater potential for hemolysis, and potential for drug precipitation at the site of injection.[1] Formulation scientists needing to use one or more of these solvents must consult the literature (eg, reference [2]) and toxicologists to ascertain the maximum amount of co-solvents

EAGLEBEN-SA_00361654

Ideally, no parenteral combination should be administered unless it has been studied thoroughly to determine its effect on the therapeutic value and the safety of the combination. However, such an ideal situation may not exist. Nevertheless, it is the responsibility of the pharmacist to be as familiar as possible with the physical, chemical, and therapeutic aspects of parenteral combinations and to exercise the best possible judgment as to whether or not the specific combination extemporaneously prescribed is suitable for use in a patient.

## GENERAL CONSIDERATIONS

An inherent requirement for parenteral preparations is that they be of the very best quality and provide the maximum safety for the patient. Further, the constant adherence to high moral and professional ethics on the part of the responsible persons are the ingredients most vital to achieving the desired quality in the products prepared.

## Types of Processes

The preparation of parenteral products may be categorized as small-scale dispensing, usually one unit at a time, or large-scale manufacturing, in which hundreds of thousands of units may constitute one lot of product. The former category illustrates the type of processing that is done in early clinical phase manufacturing or in institutions such as hospital pharmacies. The latter category is typical of the processing done in the later clinical phase and commercial manufacturing in the pharmaceutical industry. Wherever they are made, parenteral products must be subjected to the same basic practices of current Good Manufacturing Practices (cGMPs) and good aseptic processing essential for the preparation of a safe and effective sterile product of highest quality, but the methods used must be modified appropriately for the scale of operation.

The small-scale preparation and dispensing of parenteral products might use sterile components in their preparation. Therefore, the overall process focuses on maintaining rather than achieving sterility in the process steps. In the hospital setting, the final product might have a shelf life measured in hours. However, the extensive movement of patients out of the hospital to home care has modified hospital dispensing of parenteral products, wherein multiple units are made for a given patient, and a shelf life of 30 days or more is required. Such products are sometimes made in hospital pharmacies but increasingly in centers set up to provide this service. A discussion of such processing can be found in the USP general chapter <1206>.

This chapter emphasizes the preparation of parenteral products from nonsterile components in the highly technologically advanced plants of the pharmaceutical industry, using cGMP principles. In the pursuit of cGMP, consideration should be given to:

1. Ensuring that the personnel responsible for assigned duties are capable and qualified to perform them
2. Ensuring that ingredients used in compounding the product have the required identity, quality, and purity
3. Validating critical processes to be sure that the equipment used and the processes followed will ensure that the finished product will have the qualities expected
4. Maintaining a production environment suitable for performing the critical processes required, addressing such matters as orderliness, cleanliness, asepsis, and avoidance of cross contamination
5. Confirming through adequate quality-control procedures that the finished products have the required potency, purity, and quality
6. Establishing through appropriate stability evaluation that the drug products will retain their intended potency, purity, and quality until the established expiration date
7. Ensuring that processes always are carried out in accord with established, written procedures
8. Providing adequate conditions and procedures for the prevention of mix-ups

9. Establishing adequate procedures, with supporting documentation, for investigating and correcting failures or problems in production or quality control
10. Providing adequate separation of quality-control responsibilities from those of production to ensure independent decision-making

The pursuit of cGMP is an ongoing effort that must flex with new technological developments and new understanding of existing principles. Because of the extreme importance of quality in health care of the public, the US Congress has given the responsibility of regulatory scrutiny over the manufacture and distribution of drug products to the FDA (see Chapter 48 for more detail regarding the new drug approval process). Therefore, the operations of the pharmaceutical industry are subject to the oversight of the FDA and, with respect to manufacturing practices, to the application of the cGMPs. These regulations are discussed more fully in Chapter 51 (*Quality Assurance and Control*).

In concert with the pursuit of cGMPs, the pharmaceutical industry has shown initiative and innovation in the extensive technological development and improvement in quality, safety, and effectiveness of parenteral dosage forms in recent years. Examples include developments in:

* Modular facility design and construction
* Container and closure cleaning, siliconization (if applicable), and sterilization
* Sterilization technologies
* Filling technologies
* Aseptic processing technology including barrier isolator technology
* Freeze-drying technologies including automated loading and unloading
* Control of particulate matter
* Automation in weight checking, inspection technologies, and labeling and finishing operations

## GENERAL MANUFACTURING PROCESS

The preparation of a parenteral product may be considered to encompass four general areas:

1. Procurement and accumulation of all components in a warehouse area until released to manufacturing
2. Processing the dosage form in appropriately designed and operated facilities
3. Packaging and labeling in a quarantine area to ensure integrity and completion of the product
4. Controlling the quality of the product throughout the process

Procurement encompasses selecting and testing according to specifications of the raw-material ingredients and the containers and closures for the primary and secondary packages. Microbiological purity, in the form of bioburden and endotoxin levels, has become standard requirements for raw materials.

Processing includes cleaning containers and equipment to validated specifications, compounding the solution (or other dosage form), filtering the solution, sanitizing or sterilizing the containers and equipment, filling measured quantities of product into the sterile containers, stoppering (either completely or partially for products to be freeze-dried), freeze-drying, terminal sterilization if possible, and final sealing of the final primary container.

Packaging normally consists of the labeling and cartoning filled and sealed primary containers. The control of quality begins with the incoming supplies, being sure that specifications are met. Careful control of labels is vitally important as errors in labeling can be dangerous for the consumer. Each step of the process involves checks and tests to be sure that the required specifications at the respective step are being met. Labeling and final packaging operations are becoming more automated.

The quality control unit is responsible for reviewing the batch history and performing the release testing required to clear the product for shipment to users. A common FDA citation for potential violation of cGMP is the lack of oversight by the quality control unit in batch testing and review and approval of results.

EAGLEBEN-SA_00361658

# Exhibit 7
# Filed Under Seal

# EXHIBIT 8
# REDACTED IN ITS ENTIRETY

# EX. 9

# FILED UNDER SEAL

# EX. 10
# FILED UNDER SEAL

# EX. 11

# FILED UNDER SEAL

# Exhibit 12



Elements of Organic Chemistry

Henry Zimmerman / Isaak Zimmerman

EAGLEBEN-SA_00288234

# Contents

EAGLEBEN-SA_00288235

**Specific example:**

Ethyl acetate
Acetic acid
Ethyl alcohol

The mechanism for the specific example just given is illustrated in Figure 15.8. Notice that it is the reverse of the esterification mechanism shown in Figure 15.5.

## B Alkaline Hydrolysis of Esters: Saponification

The hydrolysis of esters may also take place by treatment of the ester with an aqueous solution of a strong base such as sodium hydroxide, NaOH. The product of this reaction is a carboxylate salt, and the reaction is referred to as *saponification* (Latin: sapo = soap) because the sodium salt of long chain fatty acids is a soap. We have discussed this particular reaction previously, in section 14.14A, so we will show only a general equation for the reaction here.

**General Equation:**

Ester
Carboxylate salt (a soap)

The mechanism of base-catalyzed hydrolysis, which is also of the nucleophilic substitution type, is shown in Figure 15.9.

(1) Attack by OH⁻ nucleophile on electron-deficient carbonyl carbon
(2) Elimination of OR′
(3) Proton transfer to :OR′
Soap

Figure 15.9 Mechanism of base-catalyzed hydrolysis of esters

## C Alcoholysis: Transesterification

Alcoholysis is the reaction between an ester and an alcohol in the presence of a strong acid catalyst to give an equilibrium mixture with another ester and alcohol. This reaction is also sometimes referred to as ester interchange, or **transesterification**.

The alcoholysis of polyvinyl acetate, $[-CH_2CH(OOCCH_3)-]_n$, a thermoplastic high polymer used in latex paints, to polyvinyl alcohol (PVA), $[-CH_2CHOH-]_n$, a polymer used in making floor tiles, is an example of the practical value of this reaction.

Methanol
Polyvinyl alcohol
Methyl acetate
Polyvinyl acetate

The mechanism for the reaction is identical to that of the acid-catalyzed hydrolysis of esters and the acid-catalyzed esterification of acids.

## D Ammonolysis

Ammonolysis is the reaction of esters with ammonia to give amides.

Ester
Ammonia
Amide

This reaction involves the nucleophilic addition of ammonia on the ester followed by the elimination of an alcohol molecule to give the substitution product. The mechanism is similar to that of the basic hydrolysis of esters. The amide group,  , is widely distributed in nature, especially in protein molecules.

## E Reduction of Esters

In addition to nucleophilic substitution reactions, esters, like carboxylic acids, undergo another type of reaction, which is reduction to primary alcohols. They are reduced by lithium aluminum hydride, $LiAlH_4$, a powerful reducing

EAGLEBEN-SA_00288240

# Exhibit 13

**ICH**
harmonisation for better health

INTERNATIONAL COUNCIL FOR HARMONISATION OF TECHNICAL REQUIREMENTS FOR PHARMACEUTICALS FOR HUMAN USE

## ICH HARMONISED GUIDELINE

## GUIDELINE FOR ELEMENTAL IMPURITIES

# Q3D(R2)

Final version

Adopted on 26 April 2022

*This Guideline has been developed by the appropriate ICH Expert Working Group and has been subject to consultation by the regulatory parties, in accordance with the ICH Process. At Step 4 of the Process the final draft is recommended for adoption to the regulatory bodies of ICH regions.*

EAGLEBEN-SA_00361489

ICH Q3D(R2) Guideline

### 3.4    Parenteral Products

Parenteral drug products with maximum daily volumes up to 2 liters may use the maximum daily volume to calculate permissible concentrations from PDEs.  For products whose daily volumes, as specified by labeling and/or established by clinical practice, may exceed 2 liters (e.g., saline, dextrose, total parenteral nutrition, solutions for irrigation), a 2-liter volume may be used to calculate permissible concentrations from PDEs. (Ref. 4)

### 4.    ELEMENT CLASSIFICATION

The elements included in this guideline have been placed into three classes based on their toxicity (PDE) and likelihood of occurrence in the drug product.  The likelihood of occurrence is derived from several factors including:  probability of use in pharmaceutical processes, probability of being a co-isolated impurity with other elemental impurities in materials used in pharmaceutical processes, and the observed natural abundance and environmental distribution of the element.  For the purposes of this guideline, an element with low natural abundance refers to an element with a reported natural abundance of $\leq 1$ atom/$10^6$ atoms of silicon (Ref. 5).  The classification scheme is intended to focus the risk assessment on those elements that are the most toxic but also have a reasonable probability of inclusion in the drug product (see Table 5.1).  The elemental impurity classes are:

**Class 1**:  The elements, As, Cd, Hg, and Pb, are human toxicants that have limited or no use in the manufacture of pharmaceuticals.  Their presence in drug products typically comes from commonly used materials (e.g., mined excipients).  Because of their unique nature, these four elements require evaluation during the risk assessment, across all potential sources of elemental impurities and routes of administration.  The outcome of the risk assessment will determine those components that may require additional controls which may in some cases include testing for Class 1 elements.  It is not expected that all components will require testing for Class 1 elemental impurities; testing should only be applied when the risk assessment identifies it as the appropriate control to ensure that the PDE will be met.

**Class 2**:  Elements in this class are generally considered as route-dependent human toxicants.  Class 2 elements are further divided in sub-classes 2A and 2B based on their relative likelihood of occurrence in the drug product.

- **Class 2A** elements have relatively high probability of occurrence in the drug product and thus require risk assessment across all potential sources of elemental impurities and routes of administration (as indicated).  The class 2A elements are: Co, Ni and V.

- **Class 2B** elements have a reduced probability of occurrence in the drug product related to their low abundance and low potential to be co-isolated with other materials.  As a result, they may be excluded from the risk assessment unless they are intentionally added during the manufacture of drug substances, excipients or other components of the drug product.  The elemental impurities in class 2B include: Ag, Au, Ir, Os, Pd, Pt, Rh, Ru, Se and Tl.

**Class 3:** The elements in this class have relatively low toxicities by the oral route of administration (high PDEs, generally > 500 µg/day) but may require consideration in the risk assessment for inhalation and parenteral routes.  For oral routes of administration, unless these elements are intentionally added, they do not need to be considered during the risk assessment.  For parenteral and inhalation products, the potential for inclusion of these elemental impurities should be evaluated during the risk assessment, unless the route specific PDE is above 500 µg/day.  The elements in this class include: Ba, Cr, Cu, Li, Mo, Sb, and Sn.

**Other elements:**  Some elemental impurities for which PDEs have not been established due to their low inherent toxicity and/or differences in regional regulations are not addressed in this guideline.  If these elemental impurities are present or included in the drug product they are addressed by other guidelines and/or regional regulations and practices that may be applicable for particular elements (e.g., Al for compromised renal function; Mn and Zn for patients with compromised hepatic function), or quality considerations (e.g., presence of W impurities in therapeutic proteins) for the final drug product.  Some of the elements considered include:  Al, B, Ca, Fe, K, Mg, Mn, Na, W and Zn.

EAGLEBEN-SA_00361496

# EXHIBIT 14
# REDACTED IN ITS ENTIRETY

# EX. 15
# FILED UNDER SEAL

# EXHIBIT 16
# REDACTED IN ITS ENTIRETY

# Exhibit 17

# ⟨232⟩ ELEMENTAL IMPURITIES—LIMITS

## INTRODUCTION

This general chapter specifies limits for the amounts of elemental impurities in drug products. Elemental impurities include catalysts and environmental contaminants that may be present in drug substances, excipients, or drug products. These impurities may occur naturally, be added intentionally, or be introduced inadvertently (e.g., by interactions with processing equipment and the container closure system). When elemental impurities are known to be present, have been added, or have the potential for introduction, assurance of compliance to the specified levels is required. A risk-based control strategy may be appropriate when analysts determine how to assure compliance with this standard. Due to the ubiquitous nature of arsenic, cadmium, lead, and mercury, they (at the minimum) must be considered in the risk assessment. Regardless of the approach used, compliance with the limits specified is required for all drug products unless otherwise specified in an individual monograph or excluded in paragraph three of this introduction.

The drug products containing purified proteins and polypeptides (including proteins and polypeptides produced from recombinant or non-recombinant origins), their derivatives, and products of which they are components (e.g., conjugates) are within the scope of this chapter, as are drug products containing synthetically produced polypeptides, polynucleotides, and oligosaccharides.

This chapter does not apply to radiopharmaceuticals, vaccines, cell metabolites, DNA products, allergenic extracts, cells, whole blood, cellular blood components or blood derivatives including plasma and plasma derivatives, dialysate solutions not intended for systemic circulation, and elements that are intentionally included in the drug product for therapeutic benefit. This chapter does not apply to products based on genes (gene therapy), cells (cell therapy), and tissue (tissue engineering).

The limits presented in this chapter do not apply to excipients and drug substances, except where specified in this chapter or in the individual monograph. However, elemental impurity levels present in drug substances and excipients must be known, documented, and made available upon request.

This chapter does not apply to articles intended only for veterinary use. Requirements listed in this chapter also do not apply to total parenteral nutritions (TPNs) and dialysates. Dietary supplements and their ingredients are addressed in *Elemental Contaminants in Dietary Supplements* ⟨2232⟩.

## SPECIATION

The determination of the oxidation state, organic complex, or combination is termed speciation. Each of the elemental impurities has the potential to be present in differing oxidation or complexation states. However, arsenic and mercury are of particular concern because of the differing toxicities of their inorganic and complexed organic forms.

The arsenic limits are based on the inorganic (most toxic) form. Arsenic can be measured using a total-arsenic procedure under the assumption that all arsenic contained in the material under test is in the inorganic form. Where the limit is exceeded using a total-arsenic procedure, it may be possible to show via a procedure that quantifies the different forms that the inorganic form meets the specification.

The mercury limits are based upon the inorganic ($2^+$) oxidation state. The methyl mercury form (most toxic) is rarely an issue for pharmaceuticals. Thus, the limit was established assuming the most common (mercuric) inorganic form. Limits for articles that have the potential to contain methyl mercury (e.g., materials derived from fish) are to be provided in the monograph.

## ROUTES OF EXPOSURE

The toxicity of an elemental impurity is related to its extent of exposure (bioavailability). The extent of exposure has been determined for each of the elemental impurities of interest for three routes of administration: oral, parenteral, and inhalational. These limits are based on chronic exposure. Consider the oral permissible daily exposures (PDEs) in *Table 1*, as a starting point in developing specific PDEs for other routes of administration except where otherwise stated in the individual monograph. [NOTE—The routes of administration of drug products are defined in *Pharmaceutical Dosage Forms* ⟨1151⟩.]

## DRUG PRODUCTS

The limits described in the second through fourth columns of *Table 1* are the base daily dose PDEs of the elemental impurities of interest for a drug product taken by a patient according to indicated routes of administration.

### Parenteral Products

Parenteral drug products with maximum daily volumes up to 2 L may use the maximum daily volume to calculate permissible concentrations from PDEs. For products whose daily volumes, as specified by labeling and/or established by clinical prac-

EAGLEBEN-SA_00362089

tice, may exceed 2 L (e.g., saline, dextrose, TPNs, solutions for irrigation), a 2-L volume may be used to calculate permissible concentrations from PDEs.

**Table 1. Elemental Impurities for Drug Products**

| Element | Oral Daily Dose PDE[a] ($\mu$g/day) | Parenteral Daily Dose PDE ($\mu$g/day) | Inhalational Daily Dose PDE ($\mu$g/day) |
|---|---|---|---|
| Cadmium | 5 | 2 | 2 |
| Lead | 5 | 5 | 5 |
| Inorganic arsenic[a] | 15 | 15 | 2 |
| Inorganic mercury[a] | 30 | 3 | 1 |
| Iridium | 100 | 10 | 1 |
| Osmium | 100 | 10 | 1 |
| Palladium | 100 | 10 | 1 |
| Platinum | 100 | 10 | 1 |
| Rhodium | 100 | 10 | 1 |
| Ruthenium | 100 | 10 | 1 |
| Chromium | 11000 | 1100 | 3 |
| Molybdenum | 3000 | 1500 | 10 |
| Nickel | 200 | 20 | 5 |
| Vanadium | 100 | 10 | 1 |
| Copper | 3000 | 300 | 30 |

[a] See *Speciation* section.

## Options for Demonstrating Compliance

### DRUG PRODUCT ANALYSIS OPTION

The results obtained from the analysis of a typical dosage unit, scaled to a maximum daily dose, are compared to the *Daily Dose PDE*.

$$\textit{Daily Dose PDE} \geq \text{measured value } (\mu g/g) \times \text{maximum daily dose } (g/day)$$

The measured amount of each impurity is NMT the *Daily Dose PDE*, unless otherwise stated in the individual monograph.

### SUMMATION OPTION

Separately add the amounts of each elemental impurity (in $\mu$g/g) present in each of the components of the drug product:

$$\textit{Daily Dose PDE} \geq [\Sigma^M_1 (C_M \times W_M)] \times D_D$$

$M$ = each ingredient used to manufacture a dosage unit
$C_M$ = element concentration in component (drug substance or excipient) ($\mu$g/g)
$W_M$ = weight of component in a dosage unit (g/dosage unit)
$D_D$ = number of units in the maximum daily dose (unit/day)

The result of the summation of each impurity is NMT the *Daily Dose PDE*, unless otherwise stated in the individual monograph. Before products can be evaluated using this option, the manufacturer must ensure that additional elemental impurities cannot be inadvertently added through the manufacturing process or via the container closure system over the shelf life of the product.

### INDIVIDUAL COMPONENT OPTION

For drug products with a daily dose of NMT 10 g, if all drug substances and excipients in a formulation meet the concentration limits shown in *Table 2*, then these components may be used in any proportion. No further calculation is necessary. While elemental impurities derived from the manufacturing process or the container closure system are not specifically provided for in the *Individual Component Option*, it is expected that the drug product manufacturer will ensure that these sources do not contribute significantly to the total content of elemental impurities.

EAGLEBEN-SA_00362090

**Change to read:**

# DRUG SUBSTANCE AND EXCIPIENTS

The concentration of elemental impurities in drug substances and excipients must be controlled and, where present, documented. The acceptable levels for these impurities depend on the material's ultimate use. Therefore, drug product manufacturers must determine the acceptable level of elemental impurities in the drug substances and excipients used to produce their products.

The values provided in *Table 2* are example concentration limits for components (drug substances and excipients) of drug products dosed at a maximum daily dose of 10 g/day. These values serve as default concentration limits to aid discussions between drug product manufacturers and the suppliers of the components of their drug products. [NOTE—Individual components may need to be limited at levels different from those in the table depending on monograph-specific mitigating factors.]

**Table 2. Example Concentration Limits for Components of Drug Products with a 10-g Maximum Daily Dose**

| Element | Concentration Limits ●(µg/g) ● (ERR 1-Jun-2015) for Components Used in Oral Drug Products | Concentration Limits ●(µg/g) ● (ERR 1-Jun-2015) for Components Used in Parenteral Drug Products | Concentration Limits ●(µg/g) ● (ERR 1-Jun-2015) for Components Used in Inhalation Drug Products |
|---|---|---|---|
| Cadmium | 0.5 | 0.2 | 0.2 |
| Lead | 0.5 | 0.5 | 0.5 |
| Inorganic arsenic[a] | 1.5 | 1.5 | 0.2 |
| Inorganic mercury[a] | 3 | 0.3 | 0.1 |
| Iridium | 10 | 1 | 0.1 |
| Osmium | 10 | 1 | 0.1 |
| Palladium | 10 | 1 | 0.1 |
| Platinum | 10 | 1 | 0.1 |
| Rhodium | 10 | 1 | 0.1 |
| Ruthenium | 10 | 1 | 0.1 |
| Chromium | 1100 | 110 | 0.3 |
| Molybdenum | 300 | 150 | 1 |
| Nickel | 20 | 2 | 0.5 |
| Vanadium | 10 | 1 | 0.1 |
| Copper | 300 | 30 | 3 |

[a] See *Speciation* section.

# ANALYTICAL TESTING

If, by process monitoring and supply-chain control, manufacturers can demonstrate compliance, then further testing may not be needed. When testing is done to demonstrate compliance, proceed as directed in *Elemental Impurities—Procedures* ⟨233⟩ and minimally include arsenic, cadmium, lead, and mercury in the *Target Elements* evaluation.

EAGLEBEN-SA_00362091

# Exhibit 18

*Kinetics and Catalysis, Vol. 42, No. 5, 2001, pp. 662–668. Translated from Kinetika i Kataliz, Vol. 42, No. 5, 2001, pp. 730–736.*
*Original Russian Text Copyright © 2001 by Sakharov, Mazaletskaya, Skibida.*

# Catalytic Oxidative Deformylation of Polyethylene Glycols with the Participation of Molecular Oxygen

## A. M. Sakharov, L. I. Mazaletskaya, and I. P. Skibida

*Emanuel Institute of Biochemical Physics, Russian Academy of Sciences, Moscow, 117977 Russia*

Received January 11, 2000

**Abstract**—The kinetics of oxidation of diethylene glycol, triethylene glycol, and polyethylene glycols (PEGs) with molecular weights ranging from 400 to 2000 in the presence of Cu(II) ions and bases was studied. It was found that ethylene glycols can be oxidized by molecular oxygen in anhydrous media in a temperature range of 30–60°C at anomalouosly high rates which are higher than the rates of chain-radical PEG autoxidation by several orders of magnitude. Only terminal hydroxyl groups were subjected to oxidation. The reaction occurs with the cleavage of a C–C bond and results in the formation of formic acid and a PEG with the number of $-(CH_2CH_2O)-$ groups lower than that in the parent compound by unity. The rate and selectivity of PEG oxidation were found to strongly depend on the molecular weight of the polymer; from diethylene glycol to PEG 2000, the specific rate of oxidation increased by a factor of 60 in terms of terminal hydroxyl groups. An oxidation mechanism was suggested, which involves the formation of ternary complexes $[Cu^{2+}\ A^-\ O_2]$, which undergo further degradation by a many-electron concerted mechanism to form formic acid and, probably, an unstable hemiacetal $\{RO-CH_2OH\}$. The rapid oxidative degradation of the latter leads to the formation of PEG with a lower molecular weight.

## INTRODUCTION

Previously [1], we found that the catalytic system $\{Cu(II)L_2 + base\}$ is responsible for the selective oxidation of alcohols (to aldehydes or acids) and ketones (to acids) with molecular oxygen at temperatures from 20 to 60°C; the target product yields are high (up to 90–98%). The main parameters that characterize the efficiency of catalysis by copper compounds in alkaline media, the turnover frequency TOF = 1–10 s$^{-1}$ and the turnover number TON = $10^4$, are very similar to analogous characteristics of the enzyme catalysis of oxidation processes [2].

Depending on the reaction conditions and the structure of oxidized substrates, the catalytic system $\{Cu(II)L_2 + base\}$ simulates the action of oxidase or oxygenase enzymes, and it can be considered as a biomimetic system [3].

It is well known that cytochrome P-450 is a family of monooxygenases, the main function of which consists in the catalysis of hydroxylation, epoxidation, and demethylation of various xenobiotics and steroids [4]. It is believed that the demethylation of 14α-lanosterol takes place consecutively by the oxidation of a methyl group to form an alcohol and subsequently an aldehyde. The participation of cytochrome P-450 as a catalyst in the reaction of aldehyde oxidation results in the cleavage of a C–C bond and in the formation of formic acid [5]. More recently [6], it was found that iron complexes (cytochrome P-450 models) catalyze the oxidative deformylation of aldehydes; in this case, a peroxo complex of Fe(III) acts as an active species.

Recently, we found that a new nontrivial route—oxidative deformylation—appeared in the oxidation of primary alcohols on varying the conditions of oxidation in the presence of the catalytic system $\{Cu^{2+} + base\}$. This reaction was first discovered using the oxidation of fluorinated alcohols $H(CF_2CF_2)_nCH_2OH$ as an example [7]. The oxidation of these alcohols with oxygen in the presence of ionic copper salts in aprotic solvents resulted in the simultaneous formation of formic acid and dihydroperfluoroalkanes $H(CF_2CF_2)_nH$ (to almost 100% yields under optimum conditions). An analogous oxidative deformylation reaction of polyethylene glycols (PEGs) with the formation of HCOOH as the major reaction product was reported previously [8].

This work was devoted to a study of the kinetics and mechanism of the oxidative deformylation of PEGs of different molecular weights with oxygen in the presence of the catalytic system $\{CuCl_2 + inorganic base\}$.

## EXPERIMENTAL

The oxidation of diethylene glycol (reagent grade); triethylene glycol (reagent grade); and PEGs (Merck) with molecular weights of 400, 600, 1000, 1500, and

0023-1584/01/4205-0662$25.00 © 2001 MAIK "Nauka /Interperiodica"

EAGLEBEN-SA_00361705

2000 by molecular oxygen in the presence of alkalis and copper salts was studied.

The oxidation of the ethylene glycols in solutions was performed in a gas-tight 50-ml glass reactor equipped with a mechanical stirrer with the use of a manometric system [9]. The volume of the oxidized mixture was 10 ml.

The reaction was performed at 30–60°C. A PEG (300 g/l) was added to $1 \times 10^{-4}$–$2 \times 10^{-2}$ M solutions of a copper salt (CuCl$_2$ 2H$_2$O of analytical grade) in *tert*-butanol (analytical grade), dimethylformamide (DMF; analytical grade), or acetonitrile (analytical grade). An alkali (NaOH or KOH of analytical grade from Chemapol) was introduced into the reactor as a solution or as pellets. The reactor was thoroughly purged with oxygen and heated to a specified temperature. The reaction was started at the instant the mechanical stirrer was turned on (at ~1000 rpm). The reaction rate was monitored by measuring the rates of oxygen, base, and PEG consumption.

The concentration of the alkali was determined by titration with a 0.1 M H$_2$SO$_4$ solution. The amount of consumed oxygen per unit volume of the liquid phase was expressed in mol/l. The products of PEG oxidation were analyzed by high-performance liquid chromatography (HPLC) on a Waters liquid chromatograph with UV (at $\lambda = 210$ nm) and refractometric detectors and a 5-cm ZORBAX SAX column ($4.66 \times 250$ mm; series A2783). An aqueous 0.025 M KH$_2$PO$_4$ solution was used as an eluant at a flow rate of 0.5 ml/min. Low-molecular-weight PEGs and nonacid products of their oxidation were determined by gas–liquid chromatography (GLC) (5% Silicone DC 550 on Chromaton N-AW-DMCS from Chemapol). The concentration of CO$_2$ in oxidation products was determined volumetrically by measuring the released gas amount after acidifying the solution.

## RESULTS AND DISCUSSION

Neutral PEG solutions are almost inert toward oxygen in all of the test solvents, and they can be oxidized with detectable rates at 70–90°C only in the presence of initiators [10]. At the same time, the presence of acidic OH groups, which can undergo deprotonation in sufficiently basic media, allowed us to expect the oxidation of these substrates at high rates in the presence of the catalytic system {Cu$^{2+}$+ base + O$_2$}, which was proposed previously for the oxidation of aliphatic primary alcohols [1].

Figure 1 demonstrates the kinetic curve of oxygen consumption in the reaction of PEG 600 oxidation in DMF at 30°C in the presence of CuCl$_2$ 2H$_2$O with the intermittent introduction of pelletized KOH. As can be seen in Fig. 1, PEG 600 was oxidized at room temperature at a very high rate ($w_{O_2} \sim 5 \times 10^{-4}$ mol l$^{-1}$ s$^{-1}$). The reaction rate was limited by the rate of dissolution of potassium hydroxide. The use of a finely divided alkali



**Fig. 1.** Kinetic curve of oxygen consumption in the oxidation reaction of PEG 600 (30 wt %) in DMF. [CuCl$_2$ 2H$_2$O]$_0$ = $5 \times 10^{-3}$ mol/l; [KOH]$_0$ = 0.55 mol/l; 30°C. Arrows indicate points in time at which additional amounts of pelletized KOH were introduced into the reaction mixture. The concentrations of KOH after dissolution in the reaction mixture were (*1*) 0.55, (*2*) 0.60, and (*3*) 1.00 mol/l.

in place of the pelletized alkali as a base increased the rate of oxygen consumption several times. The PEG oxidation resulted in the formation of acids as major reaction products. The consumption of oxygen was completely stopped (see Fig. 1) after the dissolution of the alkali added to the reaction mixture and its neutralization with the acids formed. The addition of fresh portions of the alkali (indicated with arrows in Fig. 1) resulted in resumed oxygen consumption at a rate almost equal to the initial rate of oxidation. The PEG conversion depends on the added amount of the alkali. At a very deep oxidation, the oxidation process was strongly inhibited because of catalyst deactivation due to the formation of an aqueous phase. Copper salts passed into the alkaline aqueous phase and formed catalytically inactive polyhydroxo compounds.

For the most part, the kinetic experiments were performed with the use of *tert*-butanol as a solvent. Although the rate of PEG oxidation in this solvent is much lower than that in DMF, the use of this solvent makes it possible to introduce an alkali into the reaction mixture not only as pellets but also as a solution and, hence, to exclude the effect of an alkali dissolution process on the kinetics of PEG oxidation.

A study of the oxidizability of PEGs with different molecular weights in the presence of bases and copper salts (Fig. 2) demonstrated that in all cases the oxidation took place at rates higher by a factor of hundreds

EAGLEBEN-SA_00361706

664
SAKHAROV *et al.*





**Fig. 2.** Kinetic curves of oxygen consumption in the oxidation of (*1*) diethylene glycol, (*2*) triethylene glycol, (*3*) PEG 400, (*4*) PEG 600, (*5*) PEG 1000, (*6*) PEG 2000, and (*7*) diethylene glycol dimethyl ether. Solvent, *tert*-butanol; [PEG] = 300 g/l; $[CuCl_2 \cdot 2H_2O]_0 = 5 \times 10^{-3}$ mol/l; $[KOH]_0 = 0.25$ mol/l; 60°C.



**Fig. 3.** Rate of oxygen consumption in the reaction of PEG oxidation at 60°C as a function of the initial concentration of (*1*) NaOH or (*2*) $CuCl_2 \cdot 2H_2O$ in *tert*-butanol: (*1*) [PEG 400] = 300 g/l and $[CuCl_2 \cdot 2H_2O]_0 = 5 \times 10^3$ mol/l; (*2*) [PEG 2000] = 300 g/l and $[NaOH]_0 = 0.25$ mol/l.

than the rates of initiated PEG autoxidation [10] at the same temperatures.

As mentioned above, a base is an important component of the catalytic system. In the absence of an alkali, copper compounds do not catalyze the oxidation of ethylene glycols under the test conditions. The oxidizability of PEGs results from the presence of primary hydroxyl groups, which are readily deprotonated under the action of bases. Diethylene glycol dimethyl ether, which is incapable of deprotonation, was not oxidized under the test conditions (Fig. 2, curve *7*). Similarly to the oxidation of primary alcohols, the highest rates of oxygen consumption were observed in the oxidation of PEGs in anhydrous media. The rate of oxygen consumption increased by a factor of dozens from water to nonaqueous solvents (DMF, acetonitrile, and *tert*-butanol).

Figure 3 (curve *1*) demonstrates the rate of oxygen consumption as a function of the amount of an alkali using the oxidation of PEG 400 as an example. It can be seen that an increase in the basicity of the solution resulted in a proportional increase in the reaction rate. This fact suggests that a PEG anionic species is the active form of the substrate in the course of oxidation. It is likely that a detectable decrease in the rate of oxidation in highly alkaline media is due to catalyst deactivation by the formation of the hydroxo complexes of Cu(II). The highest rates of oxidation were attained in DMF because this solvent exhibits the highest polarity in the absence of protonating ability. This resulted in the highest rates of substrate deprotonation and in the highest concentration of the PEG anionic species (A⁻) in this solvent.

As in the oxidation of unsubstituted low-molecular-weight primary alcohols [1], the rate of oxygen consumption by PEG solutions linearly increased with copper ion concentration within a range from 0 to $5 \times 10^{-3}$ mol/l (Fig. 3, curve *2*). The reaction rate remained almost unchanged as the copper concentration in solution was further increased, and it was limited by the rate of PEG deprotonation.

The activation energy of PEG oxidation is almost independent of the PEG molecular weight. This energy is $E_a = (10.0 \pm 1.5)$ kcal/mol for triethylene glycol and PEG 2000 within the temperature range of 30–70°C.

A study of the oxidizability of diethylene glycol, triethylene glycol, and PEGs of different molecular weights exhibited an unusual relationship between the rate of oxidation and the molecular weight. The solutions of PEGs with the same weight concentration (300 g/l) of the substrates were oxidized; thus, the con-

EAGLEBEN-SA_00361707

centrations of $-(O-CH_2-CH_2)-$ groups in the solutions were equal. In this case, the concentration of terminal hydroxyl groups in solution decreased as the molecular weight of PEGs increased.

A decrease in the rate of oxidation with increasing molecular weight of the polymer should be expected because, as mentioned above, terminal hydroxyl groups take part in the oxidation. However, on the contrary, an increase in the molecular weight of PEGs up to PEG 1000 resulted in a significant increase in the rate of oxygen consumption, as can be seen in Fig. 2 and Table 1. A more than tenfold decrease in the concentration of hydroxyl groups in solution from diethylene glycol to PEG 1000 resulted in an increase in the rate of oxygen consumption in oxidation by a factor of 4.

The effect of the degree of polymerization on the rate of oxidation can be demonstrated most clearly by a comparison between the specific rates of oxidation on a basis of 1 g-equiv of OH groups (Table 1). Table 1 indicates that the specific rate of PEG oxidation ($w_{O_2}^{sp}$) increased by a factor of 40–60 as the molecular weight of the substrate increased from 106 (diethylene glycol) to 2000.

Evidently, the observed effect results from an increase in the degree of order of solutions with increasing molecular weight of PEGs and from the ensuing increase in the degree of specific solvation of copper ions with high-molecular-weight PEGs. This solvation can be accompanied by an increase in the donating ability of the substrate anionic form coordinated to copper ions because of a decrease in the polarity of the medium. Such behavior was observed previously in the oxidation of all monohydric alcohols and monatomic ketones in the presence of the catalytic system in use [6]. Thus, it is believed that high-molecular-

weight PEGs generate the most favorably organized microenvironments. In turn, this increases the reactivity of the substrate anionic species in [$Cu^{2+}$  $A^-$] adducts toward molecular oxygen.

The rate of oxidation almost linearly increased with $O_2$ concentration in the gas phase for all PEGs. Thus, for example, the rate of PEG 600 oxidation increased by a factor of 4.5 going from air to pure oxygen.

It is likely that the oxidation of PEGs in the presence of alkali and Cu(II) ions takes place without considerable degradation of the polymer chain, as supported by the GLC analysis of the oxidation products. Thus, the oxidation of a 0.4 M PEG 600 solution in DMF did not result in the formation of low-molecular-weight PEGs (diethylene glycol, triethylene glycol, or tetraethylene glycol) even upon the consumption of 1.5 mol/l oxygen (the reaction conditions are specified in Fig. 1). The absence of polymer chain degradation was supported by data on the viscosity of solutions. Thus, the viscosity of PEG 2000 solutions in tert-butanol at a concentration of 300 g/l (0.15 mol/l) after the oxidation to a degree that corresponds to the formation of 0.07 mol/l acids even increased from 3.9 to 4.6 mPa/s (60°C). Therefore, it is believed that the oxidation of PEGs involves only terminal groups.

As mentioned above, the oxidation of PEGs resulted in the selective formation of acids. The HPLC analysis of the acids demonstrated that formic acid was formed as the main acidic product in all cases. Higher molecular weight acids were detected in insignificant amounts. Formic acid is the primary product of PEG oxidation, and it was detected at the earliest steps of the reaction. In addition to formic acid, considerable amounts of

**Table 1.** Rates of oxidation of polyethylene glycols depending on the molecular weights. [$Cu^{2+}$] = 5 × 10$^{-3}$ mol/l; [KOH]$_0$ = 0.25 mol/l; [PEG] = 300 g/l; solvent, tert-butanol; 60°C

| Substrate | Molecular weight | $w_{O_2}$ × 10$^4$, mol l$^{-1}$ s$^{-1}$ | [$-OH$], g-equiv/l | $w_{O_2}^{sp}$ × 10$^4$, s$^{-1}$ | Relative rate of oxidation |
|---|---|---|---|---|---|
| Diethylene glycol | 106 | 2.0 | 5.6 | 0.36 | 1 |
| Triethylene glycol | 150 | 3.0 | 4.0 | 0.75 | 2.1 |
| PEG 400 | 400 | 4.2 | 1.5 | 2.8 | 7.8 |
| PEG 600 | 600 | 5.3 | 1.0 | 5.3 | 14.7 |
| PEG 1000 | 1000 | 8.3 | 0.6 | 13.8 | 38.3 |
| PEG 1500 | 1500 | 7.2 | 0.4 | 18.0 | 50.0 |
| PEG 2000 | 2000 | 6.0 | 0.3 | 20.0 | 55.6 |

EAGLEBEN-SA_00361708

666                                                   SAKHAROV *et al.*



**Fig. 4.** (*1*) Amount of consumed oxygen and concentrations of (*2*) triethylene glycol, (*3*) HCOOH, and (*4*) diethylene glycol as functions of the amount of consumed KOH. Solvent, *tert*-butanol; [TEG] = 300 g/l; $[CuCl_2 \cdot 2H_2O]_0 = 5 \times 10^{-3}$ mol/l; 60°C.

$CO_2$ (as $K_2CO_3$) were detected in the reaction products. The relation $[HCOOH] = 2[K_2CO_3]$ remained unchanged in the course of oxidation in almost all cases.

**Table 2.** Diethylene glycol oxidation. A comparison between the experimental and calculated yields of ethylene glycol formation and diethylene glycol consumption. $[CuCl_2 \cdot 2H_2O]_0 = 5 \times 10^{-3}$ mol/l; $[DEG]_0 = 300$ g/l; solvent, *tert*-butanol; 50°C (KOH was added intermittently to the reaction mixture as the alkali was consumed)

| Reaction characteristics | [KOH], M | | | |
|---|---|---|---|---|
| | 0.23 | 0.65 | 0.90 | 1.80 |
| $\varnothing[O_2]$, mol/l | 0.22 | 0.55 | 0.90 | 1.45 |
| $[EG]_{expt}$, mol/l | 0.12 | 0.16 | 0.26 | 0.30 |
| [HCOOH], mol/l | 0.13 | 0.40 | 0.73 | 1.25 |
| $[K_2CO_3]$, mol/l | 0.05 | 0.10 | 0.18 | 0.25 |
| $S_{HCOOH}$, %* | 56.5 | 61.5 | 63.5 | 69.5 |
| $\varnothing[DEG]_{calc}$, mol/l | 0.1 | 0.2 | 0.36 | 0.5 |
| $[EG]_{calc}$, mol/l | 0.12 | 0.26 | 0.42 | 0.67 |

* The selectivity of HCOOH formation in mol % was determined with respect to the total alkali consumption.

Using the oxidation of diethylene glycol and triethylene glycol as examples, we found that, along with HCOOH, ethylene glycols with the number of ether groups lower than that in the parent PEG by unity were formed as main nonacid products. Figure 4 demonstrates the absorption of $O_2$ (curve *1*), the consumption of parent triethylene glycol (curve *2*), the accumulation of HCOOH (curve *3*), and the accumulation of diethylene glycol (curve *4*) in the reaction of triethylene glycol oxidation as functions of the consumed amount of KOH (the alkali was added intermittently to the reaction mixture). It can be seen in Fig. 4 that diethylene glycol and formic acid are the main products of triethylene glycol oxidation, and these products are accumulated in equal concentrations at the early stages of the process.

Similarly to triethylene glycol, the oxidation of diethylene glycol resulted in the formation of HCOOH and ethylene glycol (Table 2).

Table 2 indicates that the amount of ethylene glycol formed is close to the amount of formic acid formed only at relatively low diethylene glycol conversions (small alkali additives). It is likely that the subsequent considerable unbalance on the amounts of formed ethylene glycol and HCOOH resulted from a reasonably high rate of ethylene glycol consumption in a mixture with diethylene glycol. Table 2 also summarizes data on the amounts of $K_2CO_3$ ($CO_2$) formed and oxygen consumed as functions of the alkali amount consumed in the course of diethylene glycol oxidation.

The oxidation of ethylene glycol in nonaqueous media, as distinct from diethylene glycol and other PEGs, does not result in the formation of $CO_2$. Formic acid, the yield of which was 200% on a consumed ethylene glycol basis, was the only product of ethylene glycol oxidation under these conditions:

$$HOCH_2-CH_2OH + 3/2O_2 \xrightarrow{Cu^{2+},\ OH^-} 2HCOOH + H_2O.$$

Consequently, the formation of ethylene glycol in the oxidation of diethylene glycol (DEG) increases the selectivity for HCOOH formation in the course of diethylene glycol oxidation, as observed experimentally (see Table 2).

As stated above, $[HCOOH] = 2[K_2CO_3]$ and $\varnothing[PEG] = \varnothing[HCOOH]$ in the oxidation of all PEGs. Therefore, the amount of $K_2CO_3$ formed can serve as a measure of the amount of consumed triethylene glycol. Table 2 gives the values of $\varnothing[DEG]_{calcd}$ calculated in this manner. On the other hand, taking into account that the difference $[HCOOH] - 2[K_2CO_3]$ corresponds to the amount of formic acid formed in the oxidation of ethylene glycol and that $\varnothing[HO(CH_2CH_2O)_2H] = 2[HCOOH]$, the amount of formed ethylene glycol (EG) can be calculated by the equation

$$[EG]_{calc} = [EG]_{expt} + ([HCOOH] - 2[K_2CO_3])/2 .$$

EAGLEBEN-SA_00361709

Table 2 demonstrates that the amounts of consumed diethylene glycol and formed ethylene glycol thus calculated are close to each other. The observed difference (~20%) can be due to the fact that the amount of $CO_2$ formed in the oxidation of diethylene glycol is somewhat lower than the amount of formed HCOOH.

## Mechanism of the Catalytic Oxidation of PEGs in Alkaline Media

The above experimental data and the kinetics of oxidation of PEGs and their low-molecular-weight analogs with molecular oxygen in the presence of the catalytic system {copper compound + alkali} are inconsistent with a chain-radical mechanism of the reaction:

(1) The oxidation rates were higher than the rates of chain-radical PEG oxidation by several orders of magnitude, and they were close to the rates of enzyme oxidation with molecular oxygen at 40–60°C (TOF ~1–5 $s^{-1}$; TON > 1000).

(2) The high selectivity of oxidation accompanied by the formation of PEGs with lower molecular weights was retained up to conversions >50%.

(3) The oxidation was characterized by unusual relations between the oxidation rate ($w$) or selectivity ($S$) and the molecular weight of the polymer (an increase in $w$ and $S$ with decreasing concentration of terminal hydroxyl groups participating in the reaction) and by the fact that the rate and selectivity of oxidation strongly depended on the nature of the solvent.

(4) The activation energy of the catalytic oxidation of PEGs in alkaline solutions was calculated from the initial rates of oxidation to be $E_a$ = 10 kcal/mol, whereas $E_a$ = 22–24 kcal/mol for chain-radical autoxidation reactions [11].

The above set of experimental data suggests that the process is developed by a nonradical mechanism. By analogy with the oxidation of low-molecular-weight alcohols [1], the PEG derivatives of copper [$Cu^{2+}$ $A^-$] are the active species of the substrate. In these derivatives, the substrate anionic form $A^-$ is activated toward oxygen because of partial electron transfer to the copper ion.

In the oxidation of PEGs, as well as in the oxidation of polyols, the highest reaction rates were attained with the use of copper ions as a catalyst [12]. The addition of ortho-phenanthroline to the reaction mixture of PEG oxidation weakly affected and even somewhat decreased the efficiency of catalysis and the rate of the process, probably because of the degradation of catalyst–substrate complexes.

The oxidation in the presence of copper compounds and an alkali can simulate enzymic oxidation with molecular oxygen catalyzed by two types of enzymes—oxidases and oxygenases [1]. Copper(I) and copper(II) compounds simulate the oxidase (alcohol oxidation to carbonyl compounds) and oxygenase (alcohol oxidation to acids) functions of enzymes. The formation of acids as the main products of PEG oxygenation suggests that Cu(II) ions are catalytically active in this reaction.

Because of the structural configuration of PEGs, the anionic forms of these substrates can produce polydentate complexes with Cu(II) ions by strong ion–dipole interactions between PEG ether bonds and $Cu^{2+}$ cations [13].[1] These complexes are not prone to redox transformations, as judged from the fact that the visible spectra and absorption intensities of blue Cu(II) complexes remained unchanged under anaerobic conditions. The formation of Cu(I) was also not detected by adding ortho-phenanthroline, which forms stable bright red bis(phenanthroline) complexes with Cu(I) ions ($[Cu(o\text{-phen})_2]^+$, $\lambda_{max}$ = 430 nm [14]), to the system in the course of the reaction and under anaerobic conditions. It is also well known that Cu(II) complexes oxidize redox active compounds such as pyrocatechol [15]. However the rate of this reaction is much lower than the rate of the copper salt-catalyzed oxidation of polyethylene glycolates that have no reductive properties in alkaline solutions.

Thus, the role of $Cu^{2+}$ in the oxidative deformylation of PEGs cannot be reduced to the direct oxidation of the anionic form of the substrate followed by the reoxidation of low-valent copper species to $Cu^{2+}$ by oxygen.

It is likely that, as well as the oxidation of low monohydric alcohols, the oxidation of PEGs proceeds via a step of the formation of the ternary complexes [$Cu^{2+}$ $A^-$ $O_2$], which incorporate a catalyst, a substrate, and oxygen.

The participation of Cu(II) ions in electron transfer from the anion $A^-$ to the oxygen molecule in the ternary complex allows the reaction to proceed via a step of oxygen reduction to form a peroxo complex of Cu(II). Next, the substrate undergoes oxidation by a thermodynamically favorable many-electron mechanism.

Formally, it is believed that, at the first reaction step, a hydride ion is transferred to an oxygen atom of the peroxo complex coordinated to the copper ion with the formation of aldehyde **B** (scheme (I), step 1).

Next, this aldehyde is oxidized by the hydroperoxo complex of copper without leaving the coordination sphere of the metal by a mechanism analogous to the Baeyer–Villiger rearrangement. This results in the cleavage of a C–C bond and in the oxidative deformylation of $H(OCH_2CH_2)_nOH$ with the formation of HCOOH and a labile formaldehyde hemiacetal (**C**) (step 2) [8]. The decomposition of this hemiacetal results in the accumulation of a lower molecular weight PEG and formaldehyde. Previously [16], it was found

---

[1] The importance of the formation of polydentate complexes with the participation of a terminal OH group is evident from the fact that the oxidation of monomethylated PEG 600, as distinct from the unmethylated species, resulted in the cleavage of a polymer chain and in the formation of a wide variety of oxidation products in addition to HCOOH.

EAGLEBEN-SA_00361710

that under these conditions formaldehyde almost instantaneously undergoes condensation. The subsequent oxidation of the condensation products with oxygen does not form formic acid.

$$2.\ \mathbf{B} \longrightarrow \text{HCOOH} + \underset{\mathbf{C}}{\text{H}(\text{OCH}_2\text{CH}_2)_{n-1}\text{OCH}_2\text{OH}},$$

$$3.\ \mathbf{C} \longrightarrow \text{H}(\text{OCH}_2\text{CH}_2)_{n-1}\text{OH} + \text{HCHO} + \text{CO}_2.$$

Thus, we can state that an unusual route is observed in the reaction of PEG oxidation: direct oxidative deformylation of the substrate takes place at an extremely high rate even at room temperature. It is believed that the reaction of enzymic demethylation [5] also occurs by the direct oxidative deformylation of alcohols without a step of aldehyde formation in solution.

## ACKNOWLEDGMENTS

This work was supported by the Russian Foundation for Basic Research (project no. 96-03-32749).

## REFERENCES

1. Skibida, I.P. and Sakharov, A.M., *Ross. Khim. Zh.*, 1995, vol. 39, no. 1, p. 14; Skibida, I.P. and Sakharov, A.M., *Catal. Today*, 1996, vol. 27, p. 183.
2. Watanabe, Y., *Oxygenase and Model System*, Funabiki, T., Ed., Kluwer Academic, 1997, p. 223.
3. Breslow, R., *Acc. Chem. Res.*, 1995, vol. 28, p. 146.
4. De Montellano O.P.R., *Cytochrom P450: Structure, Mechanism, Biochemistry*, De Montellano O.P.R., Ed., New York: Plenum, 1995, p. 245.
5. Fisher, R.T., Trzaskos, J.M., Magolda, R.L., *et al.*, *J. Biol. Chem.*, 1991, vol. 266, no. 10, p. 6124.
6. Goto, Y., Wada, S., Moroshima, I., and Watanabe, Y., *J. Inorg. Biochem.*, 1998, vol. 69, no. 1, p. 241.
7. Eur. Patent 0635468 B1; US Patent 5494034.
8. Sakharov, A.M. and Skibida, I.P., *Dokl. Akad. Nauk*, 2000, vol. 372, no. 6, p. 1.
9. Sakharov, A.M. and Skibida, I.P., *Oxid. Commun.*, 1979, vol. 1, no. 1, p. 113.
10. Mazaletskii, A.B. and Vinogradova, V.G., *Research on Chemical Kinetics*, Zaikov, G.E., Ed., New York: Nova Science, 1995, p. 53.
11. Emanuel', N.M., Denisov, E.T., and Maizus, Z.K., *Tsepnye reaktsii okisleniya uglevodorodov v zhidkoi faze* (Chain Reactions of Liquid-Phase Oxidation of Hydrocarbons), Moscow: Nauka, 1965.
12. Sakharov, A.M., Silakhtaryan, N.T., and Skibida, I.P., *Kinet. Katal.*, 1996, vol. 37, no. 3, p. 393.
13. Hiraoka, M., *Crown Compounds: Properties and Applications*, Tokyo: Kodansha, 1986, p. 259.
14. Williams, R.J.P., *J. Chem. Soc.*, 1955, nos. 1–2, p. 137.
15. Demmin, T.R., Sverdloff, M.D., and Rogic, M.M., *J. Am. Chem. Soc.*, 1981, vol. 103, no. 19, p. 5795.
16. Skibida, I.P. and Sakharov, A.M., *Stud. Surf. Sci. Catal.*, 1990, vol. 55, p. 221.

EAGLEBEN-SA_00361711

# Exhibit 19



Home | Find An Instrument ⌄ | Services ⌄ | Newsroom ⌄ | About ⌄ | Cannabis Testing | Sell Your Equipment | Get A Quote | 🔍



Ion Chromatography | Pharmaceutical

# Ion Chromatography For Detecting Impurities In Pharmaceuticals

By Conquer Scientific | August 21, 2024 | No Comments

In the pharmaceutical industry, ensuring the purity of drugs is paramount. Even trace amounts of impurities can have significant effects on drug efficacy and patient safety. **Ion chromatography (IC)** is a powerful analytical technique that has become indispensable for detecting impurities in pharmaceutical products. This method is particularly effective for analyzing ionic compounds, such as anions and cations, which are common impurities in drug formulations.

## How Ion Chromatography Works

Ion chromatography operates on the principle of separating ions based on their interaction with a resin-packed column. The sample is injected into the IC system, where it is carried through the column by a liquid mobile phase. As the sample moves through the column, different ions interact with the resin at varying degrees, leading to their separation. These ions are then detected, typically using a conductivity detector, which measures the conductivity of the ions as they elute from the column.

## Applications in Pharmaceutical Analysis

Ion chromatography is highly valued in the pharmaceutical industry for its ability to detect and quantify a wide range of impurities. Common applications include:

1. **Analyzing Inorganic Anions and Cations**: Many pharmaceuticals may contain residual inorganic ions from the manufacturing process, such as sulfate, chloride, or sodium. IC is ideal for identifying and quantifying these impurities to ensure they are within acceptable limits.
2. **Determining Counterions in Salt Forms**: Many drugs are formulated as salts, where the active pharmaceutical ingredient (API) is paired with a counterion, such as chloride or sulfate. Ion chromatography is used to verify the identity and concentration of these counterions.

Search… 🔍

### Recent Posts

**Why More Labs Are Switching to Refurbished Equipment in 2026**

**Battery Materials & Clean Energy: The Role of ICP-MS in Lithium, Cobalt, and Nickel Purity Testing**

**Purity Scientific Launches Complimentary Technical Support Line to Help Laboratories Troubleshoot Analytical Instruments**

**Purity Scientific Expands Service Operations into Boston and New England, Strengthening**

Document title: Ion Chromatography for Detecting Impurities in Pharmaceuticals - Conquer Scientific
Capture URL: https://conquerscientific.com/ion-chromatography-for-detecting-impurities-in-pharmaceuticals/
Capture timestamp (UTC): Wed, 04 Feb 2026 02:55:03 GMT

Page 1 of 6

EAGLEBEN-SA_00361459



Home    Find An Instrument ⌄    Services ⌄    Newsroom ⌄    About    Cannabis Testing    Sell Your Equipment    Get A Quote    🔍

2. **Determining Counterions in Salt Forms**: Many drugs are formulated as salts, where the active pharmaceutical ingredient (API) is paired with a counterion, such as chloride or sulfate. Ion chromatography is used to verify the identity and concentration of these counterions.

3. **Detecting Organic Acids and Bases**: Certain organic acids and bases, which may be present as degradation products or impurities, can also be analyzed using IC, providing crucial information on the stability and purity of the drug.

4. **Monitoring Water Quality**: Water is a key solvent in pharmaceutical production, and its purity is critical. Ion chromatography is used to monitor the ionic composition of water to prevent contamination of drug products.

## Why Choose Conquer Scientific?

For laboratories seeking reliable, high-performance ion chromatography systems without the high cost of new equipment, **Conquer Scientific** is your trusted source. We specialize in providing used and refurbished Thermo Dionex ICS systems that are fully tested and serviced to meet your analytical needs. Whether you are looking to upgrade your current equipment or expand your capabilities, Conquer Scientific offers top-tier IC systems at competitive prices. Contact us today to find the perfect solution for your laboratory's needs.

`Ion Chromatography`    `Ic Systems`    `Pharmaceuticals`

    **Conquer Scientific**

---

Boston and New England, Strengthening Support for the World's Leading Life Sciences Market

**PFAS Detection with Ion Chromatography: The Next Generation of Analytical Methods**

What's Trending



**1** The Difference Between GC/MS and LC/MS Systems
March 21, 2023

**2** Atomic Absorption Spectrometry vs. ICP-OES: Weighing the Disadvantages
June 30, 2023

**3** Types of Mass Spectrometers and Their Uses
June 2, 2023

Recently Written

 **Why More Labs Are Switching to Refurbished Equipment in 2026**
February 2, 2026

 **Battery Materials & Clean Energy: The Role of ICP-MS in Lithium, Cobalt, and**

Home    Find An Instrument ∨    Services ∨    Newsroom ∨    About    Cannabis Testing    Sell Your Equipment    Get A Quote



**MS in Lithium, Cobalt, and Nickel Purity Testing**

December 3, 2025



**Purity Scientific Launches Complimentary Technical Support Line to Help Laboratories Troubleshoot Analytical Instruments**

December 3, 2025

Categories

Gas Chromatography

Inductively Coupled Plasma Mass Spectrometry

Press Releases

Refurbished Lab Equipment

LC/MS

PFAS Analysis

Parts & Consumables

GCMS

Pharmaceutical

Inorganic Analysis

Used Lab Equipment

Centrifuges

Drug Discovery

Liquid Chromatography

HPLC

Forensic Analysis

Tradeshow

Water Treatment

Academia

Equipo de Laboratorio

Ion Chromatography

Environmental Science

EAGLEBEN-SA_00361461

Ion Chromatography

Environmental Science

Chemical Analysis Methods

General Lab Equipment

Lab Management

Chromatography

Mass Spectrometry

Preventive Maintenance

Service & Repair

Cannabis Testing

Buy Refurbished!

Company News & Events

Tags

Analytical Chemistry

Analytical Laboratory Equipment

Boston    Buffalo

Chromatography Systems

Clean Energy Technologies

Congeladores De Laboratorio

Eco-Friendly Labs

Elemental Analysis

Environmental Analysis

Environmental Monitoring

General Lab Equipment

Icp-Oes Analysis    ICP MS

Ic Systems

Inductively Coupled Plasma Mass Spectrometry

Investigación Científica

Lab Equipment    Lab Freezers

Lab Incubators

Laboratory Equipment

Laboratory Instrumentation

Land & Expand

EAGLEBEN-SA_00361462

Laboratory Instrumentation

Land & Expand

Lithium Purity Analysis

Mass Spectrometry    New England

Pesticide Residue Testing

Pharmaceuticals    Philadelphia

Phone Support

Preventive Maintenance

Puerto Rico

Refurbished Analytical Instruments

Refurbished Ion Chromatography Systems

Regional Expansion    San Diego

Service    Service & Repair

Service Contract    Tax Advantages

Technical Support    Trace Elements

Trace Metal Analysis

Troubleshooting

Used Analytical Instruments



Previous Post
Enhancing Pesticide Residue Testing Efficiency with GCMS: Tips and Best Practices

Next Post
ICP-MS in Environmental Monitoring: Detecting Contaminants at Ultra-Trace Levels

## Recommended For You

   

Document title: Ion Chromatography for Detecting Impurities in Pharmaceuticals - Conquer Scientific
Capture URL: https://conquerscientific.com/ion-chromatography-for-detecting-impurities-in-pharmaceuticals/
Capture timestamp (UTC): Wed, 04 Feb 2026 02:55:03 GMT

EAGLEBEN-SA_00361463

 **Conquer** scientific

Home   Find An Instrument ⌄   Services ⌄   Newsroom ⌄   About   Cannabis Testing   Sell Your Equipment   Get A Quote   🔍

## Recommended For You



**Ion Chromatography**

PFAS Detection with Ion Chromatography: The Next Generation of Analytical Methods

 **Conquer Scientific**
October 13, 2025



**Ion Chromatography**

Decoding Soil Composition with Ion Chromatography for Sustainable Agriculture

 **Conquer Scientific**
April 24, 2025



**Service & Repair   Used Lab Equipment**

**Pharmaceutical**

From Bench to Bedside: Translating Lab Research into Clinical Applications

 **Conquer Scientific**
December 18, 2024

---

**About Conquer**

Since 2003, Conquer Scientific has supported researchers with quality, pre-owned laboratory instruments and expert service and support at an affordable cost.



**Newsletter Sign Up**

**Shop Our eBay Store**

**Chromatography Parts**

**Terms & Conditions**

**Privacy Policy**

**Conquer Scientific**

12778 Brookprinter Place
Poway, CA 92064
(619) 690-7300

© 2026 Conquer Scientific.

   ▶

Document title: Ion Chromatography for Detecting Impurities in Pharmaceuticals - Conquer Scientific
Capture URL: https://conquerscientific.com/ion-chromatography-for-detecting-impurities-in-pharmaceuticals/
Capture timestamp (UTC): Wed, 04 Feb 2026 02:55:03 GMT

EAGLEBEN-SA_00361464

# EX. 20
# FILED UNDER SEAL

# Exhibit 21



ELSEVIER

0141-3910(95)00225-1

*Polymer Degradation and Stability* **52** (1996) 217–222
© 1996 Elsevier Science Limited
Printed in Northern Ireland. All rights reserved
0141-3910/96/$15.00

# Degradation of polyethylene glycol. A study of the reaction mechanism in a model molecule: Tetraethylene glycol

## Jens Glastrup

*Department of Conservation, The National Museum of Denmark, Brede, DK 2800, Lyngby, Denmark*

(Received 14 September 1995; accepted 26 October 1995)

A model for the degradation of polyethylene glycol (PEG) is presented. Heating to 70°C in a current of air leads to formation of formic acid. Under dry conditions this reacts with the terminal hydroxyl group of the polyethylene glycol, resulting in formic acid esters. Under wet conditions the acid stays in solution or evaporates. © 1996 Elsevier Science Limited

## 1 INTRODUCTION

In gas chromatography polyethylene glycol (PEG, carbowax®) is known to be susceptible to degradation at elevated temperature in the presence of oxygen and water. In other industrial applications, however, polyethylene glycol is used without any consideration of this susceptibility to oxidation. In the conservation industry, practical experience shows that stabilisation can last at least 20 years, without any apparent degradation. Heating over more than two years at 65°C caused a degradation of no more than 20% of the original amount of PEG.[1]

Practical experience in the waterlogged wood laboratory has shown that PEG at relatively low temperatures, under some circumstances, has shown a remarkably fast decomposition rate. Heating the PEG 4000 for 2–4 h has in some cases led to the formation of a liquid which would not solidify after cooling. We have shown that this liquid more resembled PEG 600 than the original PEG 4000.[2] This is clearly unacceptable for a material which is used in the conservation of archaeological material.

We have continued our experiments in the laboratory with a model molecule, tetraethylene glycol (TEG) and have demonstrated that this molecule indeed decomposes very fast at 70°C. Under dry conditions no more than 20% is left after one week. Under a relative humidity of 75% this degradation proceeds somewhat slower and after one week 35% is left. Under humid conditions this degradation can be completely inhibited (no degradation is seen after one week) by some trace elements (Fe, Cu) or enhanced by others (Ni) so that the degradation rate resembles degradation under dry conditions.[3] Attempts to incorporate antioxidants have previously been made in polyethylene glycol stationary phases with limited success.[4]

The degradation products found by gas chromatographic analysis are few. During the dry reaction five reaction products were found. The identification of these products, and of the reaction mechanism leading to them, is the purpose of this article.

## 2 MATERIALS AND METHODS

### 2.1 Experimental setup

The chemical used as a model for the degradation of PEG is tetraethylene glycol (TEG, CARN 112-60-7). All degradation experiments were performed at 70°C, in an oven held at 63°C. The reaction vial was 5 ml 33-expansion borosilicate glass from Wheaton. 2.0 ml of TEG was put in the vial which was then placed in an

EAGLEBEN-SA_00361483

# Exhibit 22
# Filed Under Seal

# Handbook of Pharmaceutical Excipients

## Sixth edition

Edited by

Raymond C Rowe, Paul J Sheskey and Marian E Quinn



Dist. Delaware
No. 17-1154-CFC

**PTX-0669**

TEVABEND00293727

CONFIDENTIAL

EAGLEBEN-SA_00315043

preparation of biodegradable nanoparticles. *J Pharm Sci* 2007, 96(3): 1763–1775.

16  Jun MR *et al.* Stereoisomeric effect on reverse thermal gelation of poly(ethylene glycol)/polylactide) multiblock copolymer. *Macromolecules* 2007; 40(14): 5111–5115.

17  Jovanovic I *et al.* Preparation of smallest microparticles of poly (D,L lactide by modified precipitation method: influence of the process parameters. *Microsc Res Tech* 2008; 71(2): 86–92.

18  Cid F *et al.* Preparation and characterization of melittin-loaded poly (DL-lactic acid) or poly (DL-lactic-co-glycolic acid) microspheres made by the double emulsion method. *J Control Rel* 2005; 107(2): 310–319.

19  Marcito VP *et al.* Thermal and mechanical characterization of plasticized poly (L-lactide-co-D,L-lactide) films for food packaging. *J Therm Anal Calorim* 2006; 86(3): 707–712.

## 20  General References

Direct Corporation. *Lactel Absorbable Polymers.* http://www.direct.com/wt/direct/page name/bp (accessed 10 March 2009).

Purac Biomaterials. *Purasorb.* http://www.puracbiomaterials.com (accessed 10 March 2009)

## 21  Authors

RT Forbes, M Isreb.

## 22  Date of Revision

10 March 2009.

---



# Polyethylene Glycol

## 1  Nonproprietary Names

BP:    Macrogols

JP:    Macrogol 400
       Macrogol 1500
       Macrogol 4000
       Macrogol 6000
       Macrogol 20000

PhEur:  Macrogols

USP NF:  Polyethylene Glycol

## 2  Synonyms

*Carbowax; Carbowax Sentry; Lipoxol; Lutrol E; macrogola; PEG; Pluriol E;* polyoxyethylene glycol.

## 3  Chemical Name and CAS Registry Number

α Hydro ω hydroxypoly(oxy 1,2 ethanediyl) [25322 68 3]

## 4  Empirical Formula and Molecular Weight

$HOCH_2(CH_2OCH_2)_mCH_2OH$ where $m$ represents the average number of oxyethylene groups.

Alternatively, the general formula $H(OCH_2CH_2)_nOH$ may be used to represent polyethylene glycol, where $n$ is a number $m$ in the previous formula 1.

*See* Table 1 for the average molecular weights of typical polyethylene glycols. Note that the number that follows PEG indicates the average molecular weight of the polymer.

## 5  Structural Formula



## 6  Functional Category

Ointment base; plasticizer; solvent; suppository base; tablet and capsule lubricant.

**Table I:** Structural formula and molecular weight of typical polyethylene glycol polymers.

| Grade | m | Average molecular weight |
|---|---|---|
| PEG 200 | 4.2 | 190–210 |
| PEG 300 | 6.4 | 285 315 |
| PEG 400 | 8.7 | 380–420 |
| PEG 540 (blend) | — | 500–600 |
| PEG 600 | 13.2 | 570–613 |
| PEG 900 | 15.3 | 855–900 |
| PEG 1000 | 22.3 | 950 1050 |
| PEG 1450 | 32.5 | 1 300 1 600 |
| PEG 1540 | 28.0 36.0 | 1 300 1 600 |
| PEG 2000 | 40.0–50.0 | 1 800–2 200 |
| PEG 3000 | 60.0–75.0 | 2 700–3 300 |
| PEG 3350 | 75.7 | 3 000–3 700 |
| PEG 4000 | 69.0 84.0 | 3 000 4 800 |
| PEG 4600 | 104.1 | 4 400 4 800 |
| PEG 8000 | 181.4 | 7 000 9 000 |

## 7  Applications in Pharmaceutical Formulation or Technology

Polyethylene glycols (PEGs) are widely used in a variety of pharmaceutical formulations, including parenteral, topical, ophthalmic, oral, and rectal preparations. Polyethylene glycol has been used experimentally in biodegradable polymeric matrices used in controlled-release systems.

Polyethylene glycols are stable, hydrophilic substances that are essentially nonirritant to the skin; *see* Section 14. They do not readily penetrate the skin, although the polyethylene glycols are water soluble and are easily removed from the skin by washing, making them useful as ointment bases. Solid grades are generally employed in topical ointments, with the consistency of the base being adjusted by the addition of liquid grades of polyethylene glycol.

Mixtures of polyethylene glycols can be used as suppository bases, for which they have many advantages over fats. For example, the melting point of the suppository can be made higher to withstand exposure to warmer climates; release of the drug is not dependent upon melting point; the physical stability on storage is better; and suppositories are readily miscible with rectal fluids. Polyethylene glycols have the following disadvantages: they are

CONFIDENTIAL

518    Polyethylene Glycol

chemically more reactive than fats; greater care is needed in processing to avoid inelegant contraction holes in the suppositories; the rate of release of water soluble medications decreases with the increasing molecular weight of the polyethylene glycol; and polyethylene glycols tend to be more irritating to mucous membranes than fats.

Aqueous polyethylene glycol solutions can be used either as suspending agents or to adjust the viscosity and consistency of other suspending vehicles. When used in conjunction with other emulsifiers, polyethylene glycols can act as emulsion stabilizers.

Liquid polyethylene glycols are used as water-miscible solvents for the contents of soft gelatin capsules. However, they may cause hardening of the capsule shell by preferential absorption of moisture from gelatin in the shell.

In concentrations up to approximately 30% w/v, PEG 300 and PEG 400 have been used as the vehicle for parenteral dosage forms.

In solid-dosage formulations, higher-molecular-weight polyethylene glycols can enhance the effectiveness of tablet binders and impart plasticity to granules.[5] However, they have only limited binding action when used alone, and can prolong disintegration if present in concentrations greater than 5% w/w. When used for thermoplastic granulations,[5-7] a mixture of the powdered constituents with 10-15% w/w PEG 6000 is heated to 70-75°C. The mass becomes pastelike and forms granules if stirred while cooling. This technique is useful for the preparation of dosage forms such as lozenges when prolonged disintegration is required.

Polyethylene glycols can also be used to enhance the aqueous solubility or dissolution characteristics of poorly soluble compounds by making solid dispersions with an appropriate polyethylene glycol.[8] Animal studies have also been performed using polyethylene glycols as solvents for steroids in osmotic pumps.

In film coatings, solid grades of polyethylene glycol can be used alone for the film-coating of tablets or can be useful as hydrophilic polishing materials. Solid grades are also widely used as plasticizers in conjunction with film forming polymers.[9] The presence of polyethylene glycols in film coats, especially of liquid grades, tends to increase their water permeability and may reduce protection against low pH in enteric-coating films. Polyethylene glycols are useful as plasticizers in microencapsulated products to avoid rupture of the coating film when the microcapsules are compressed into tablets.

Polyethylene glycol grades with molecular weights of 6000 and above can be used as lubricants, particularly for soluble tablets. The lubricant action is not as good as that of magnesium stearate, and stickiness may develop if the material becomes too warm during compression. An antiadherent effect is also exerted, again subject to the avoidance of overheating.

Polyethylene glycols have been used in the preparation of urethane hydrogels, which are used as controlled-release agents. Polyethylene glycol has also been used in insulin-loaded microparticles for the oral delivery of insulin;[10-11] it has been used in inhalation preparations to improve aerosolization;[12] polyethylene glyco nanoparticles have been used to improve the oral bioavailability of cyclosporine;[13] it has been used in self-assembled polymeric nanoparticles as a drug carrier;[14] and copolymer networks of polyethylene glycol grafted with poly(methacrylic acid) have been used as bioadhesive controlled drug delivery formulations.[15]

## 8    Description

The USP32-NF27 describes polyethylene glycol as being an addition polymer of ethylene oxide and water. Polyethylene glycol grades 200-600 are liquids; grades 1000 and above are solids at ambient temperatures.

Liquid grades (PEG 200-600) occur as clear, colorless or slightly yellow-colored, viscous liquids. They have a slight but characteristic odor and a bitter, slightly burning taste. PEG 600 can occur as a solid at ambient temperatures.

Solid grades (PEG >1000) are white or off-white in color, and range in consistency from pastes to waxy flakes. They have a faint, sweet odor. Grades of PEG 6000 and above are available as free flowing milled powders.

## 9    Pharmacopeial Specifications

See Table II. See also Section 18.

**Table II:** Pharmacopeial specifications for polyethylene glycol.

| Test | JP XV | PhEur 6.0 | USP32-NF27 |
|---|---|---|---|
| Identification | + | — | — |
| Characters | — | + | — |
| Acidity or alkalinity | + | + | — |
| Appearance of solution | + [a] | — | + |
| Density 1.110–1.140 [b] | See Table IV | — | — |
| Freezing point | See Table III | See Table IV | — |
| Viscosity | — | See Table IV | See Table V |
| Average molecular weight | See Table III | — | See Table V |
| pH (5% w/v solution) | See Table III | — | 4.5–7.5 |
| Hydroxyl value | — | See Table IV | — |
| Reducing substances | | | |
| Residue on ignition | See Table III | — | ≤0.1% |
| Sulfated ash | — | ≤0.2% | — |
| Limit of ethylene glycol and diethylene glycol | ≤0.25% | ≤0.4% | ≤0.25% |
| Ethylene oxide | — | ≤1 ppm | ≤10 μg/g |
| 1,4 Dioxene | — | ≤10 ppm | ≤10 μg/g |
| Heavy metals | — | ≤20 ppm | ≤5 μg/g |
| Water | ≤1.0% | ≤2.0% | — |
| Formaldehyde | — | ≤30 ppm | — |

(a) For PEG 1500, 4000, 6000, 20000.
(b) For PEG 400.

**Table III:** Specifications from JP XV.

| Type of PEG | Average molecular weight | Freezing point (°C) | pH (5% w/v solution) | Residue on ignition |
|---|---|---|---|---|
| 400 | 380–420 | 4–8 | 4.0–7.0 | ≤0.1% |
| 1500 | | 37–41 | 4.0–7.0 | ≤0.1% |
| 4000 2600–3800 | | 53–57 | 4.0–7.5 | ≤0.2% |
| 6000 | | | | |
| 7300–9300 20000 | | 56–61 | 4.5–7.5 | ≤0.2% |
| 15000–25000 | | 56–64 | 4.5–7.5 | ≤0.2% |

## 10    Typical Properties

**Density**

1.11–1.14 g/cm³ at 25°C for liquid PEGs;
1.15–1.21 g/cm³ at 25°C for solid PEGs.

**Flash point**

182°C for PEG 200;
213°C for PEG 300;
238°C for PEG 400;
250°C for PEG 600.

**Freezing point**

<−65°C: PEG 200 sets to a glass;
−15 to −8°C for PEG 300;
4–8°C for PEG 400;
15–25°C for PEG 600.

**Melting point**

37–40°C for PEG 1000;
44–48°C for PEG 1500.

CONFIDENTIAL

TEVABEND00294273

EAGLEBEN-SA_00315589

**Table IV:** Specifications from PhEur 6.0.

| Type of PEG | Density (g/cm³) | Freezing point (°C) | Hydroxyl value | Viscosity (dynamic) [mPa s (cP)] | Viscosity (kinematic) [mm²/s (cSt)] |
|---|---|---|---|---|---|
| 300 | 1.120 | — | 340–394 | 80–105 | 71–94 |
| 400 | 1.120 | — | 264–300 | 105–130 | 92–115 |
| 600 | 1.080 | 15–25 | 178–197 | 15–20 | 13.9–18.5 |
| 1000 | 1.080 | 35–40 | 107–118 | 22–30 | 20.4–27.7 |
| 1500 | 1.080 | 42–48 | 70–80 | 34–50 | 31–46 |
| 3000 | 1.080 | 50–56 | 34–42 | 75–100 | 69–93 |
| 3350 | 1.080 | 53–57 | 30–38 | 83–120 | 76–110 |
| 4000 | 1.080 | 53–59 | 25–32 | 110–170 | 102–158 |
| 6000 | 1.080 | 55–61 | 16–22 | 200–270 | 185–250 |
| 8000 | 1.080 | 55–62 | 12–16 | 260–510 | 240–472 |
| 20000 | 1.080 | ⩾57 | — | 2700–3500 | 2500–3200 |
| 35000 | 1.080 | ⩾57 | — | 11000–14000 | 10000–13000 |

**Table V:** Specification for viscosity of polyethylene glycol of the given nominal molecular weight at 98.9 °C ± 0.3 °C from the USP32–NF27

| Type of PEG (nominal average molecular weight) | Viscosity (kinematic) [mm²/s (cSt)] |
|---|---|
| 200 | 3.9–4.8 |
| 300 | 5.4–6.4 |
| 400 | 6.8–8.0 |
| 500 | 8.3–9.6 |
| 600 | 9.9–11.3 |
| 700 | 11.5–13.0 |
| 800 | 12.5–14.5 |
| 900 | 15.0–17.0 |
| 1000 | 16.0–19.0 |
| 1100 | 18.0–22.0 |
| 1200 | 20.0–24.5 |
| 1300 | 22.0–27.5 |
| 1400 | 24–30 |
| 1450 | 25–32 |
| 1500 | 26–33 |
| 1600 | 29–36 |
| 1700 | 31–39 |
| 1800 | 33–42 |
| 1900 | 35–45 |
| 2000 | 38–49 |
| 2100 | 40–53 |
| 2200 | 43–56 |
| 2300 | 46–60 |
| 2400 | 49–65 |
| 2500 | 51–70 |
| 2600 | 54–74 |
| 2700 | 57–78 |
| 2800 | 60–83 |
| 2900 | 64–88 |
| 3000 | 67–93 |
| 3250 | 73–105 |
| 3350 | 76–110 |
| 3500 | 87–123 |
| 3750 | 99–140 |
| 4000 | 110–158 |
| 4250 | 123–177 |
| 4500 | 140–200 |
| 4750 | 155–228 |
| 5000 | 170–250 |
| 5500 | 206–315 |
| 6000 | 250–390 |
| 6500 | 295–480 |
| 7000 | 350–590 |
| 7500 | 405–735 |
| 8000 | 470–900 |

40–48 °C for PEG 1540;
45–50 °C for PEG 2000;
48–54 °C for PEG 3000;
50–58 °C for PEG 4000;

55–63 °C for PEG 6000;
60–63 °C for PEG 8000;
60–63 °C for PEG 20000.

**Moisture content** Liquid polyethylene glycols are very hygroscopic, although hygroscopicity decreases with increasing molecular weight. Solid grades, e.g. PEG 4000 and above, are not hygroscopic. *See* Figures 1, 2, and 3.

**Particle size distribution** *see* Figures 4 and 5.

**Refractive index**

$n_D^{25} = 1.459$ for PEG 200;

$n_D^{25} = 1.463$ for PEG 300;

$n_D^{25} = 1.465$ for PEG 400;

$n_D^{25} = 1.467$ for PEG 600.

**Solubility** All grades of polyethylene glycol are soluble in water and miscible in all proportions with other polyethylene glycols (after melting, if necessary). Aqueous solutions of higher molecular-weight grades may form gels. Liquid polyethylene glycols are soluble in acetone, alcohols, benzene, glycerin, and glycols. Solid polyethylene glycols are soluble in acetone, dichloromethane, ethanol (95%), and methanol; they are slightly soluble in aliphatic hydrocarbons and ether, but insoluble in fats, fixed oils, and mineral oil.

**Surface tension** Approximately 44 mN/m (44 dynes/cm) for liquid polyethylene glycols; approximately 55 mN/m (55 dynes/cm) for 10% w/v aqueous solution of solid polyethylene glycol.

**Viscosity (kinematic)** *see* Tables IV, V, and VI.

**Table VI:** Viscosity of selected polyethylene glycols at 25 °C and 99 °C.

| Type of PEG | Viscosity [mm²/s (cSt)] | |
|---|---|---|
| | 25 °C | 99 °C |
| PEG 200 | 39.9 | 4.4 |
| PEG 300 | 68.8 | 5.9 |
| PEG 400 | 90.0 | 7.4 |
| PEG 600 | 131 | 11.0 |
| PEG 1000 solid | 19.5 | — |
| PEG 2000 solid | 47 | |
| PEG 4000 solid | 180 | — |
| PEG 6000 solid | 580 | — |
| PEG 20000 solid | 6900 | |

## 11  Stability and Storage Conditions

Polyethylene glycols are chemically stable in air and in solution, although grades with a molecular weight less than 2000 are hygroscopic. Polyethylene glycols do not support microbial growth, and they do not become rancid.

Polyethylene glycols and aqueous polyethylene glycol solutions can be sterilized by autoclaving, filtration, or gamma irradiation.[16]



**520    Polyethylene Glycol**



Figure 1: Equilibrium moisture content of PEG 4000 (McKesson, Lot No. B192–8209) at 25°C.



Figure 2: Equilibrium moisture content of PEG 4000 (Dow Chemical Company) and PEG E-4000 (BASF) at 25°C.



Figure 3: Equilibrium moisture content of PEG 6000 (Dow Chemical Company) and PEG E-6000 (BASF) at 25°C.



Figure 4: Particle size distribution of PEG 4000 and PEG 6000 flakes.

Sterilization of solid grades by dry heat at 150°C for 1 hour may induce oxidation, darkening, and the formation of acidic degradation products. Ideally, sterilization should be carried out in an inert atmosphere. Oxidation of polyethylene glycols may also be inhibited by the inclusion of a suitable antioxidant.

If heated tanks are used to maintain normally solid polyethylene glycols in a molten state, care must be taken to avoid contamination with iron, which can lead to discoloration. The temperature must be kept to the minimum necessary to ensure fluidity; oxidation may occur if polyethylene glycols are exposed for long periods to temperatures exceeding 50°C. However, storage under nitrogen reduces the possibility of oxidation.

Polyethylene glycols should be stored in well-closed containers in a cool, dry place. Stainless steel, aluminum, glass, or lined steel containers are preferred for the storage of liquid grades.

## 12   Incompatibilities

The chemical reactivity of polyethylene glycols is mainly confined to the two terminal hydroxyl groups, which can be either esterified or etherified. However, all grades can exhibit some oxidizing activity owing to the presence of peroxide impurities and secondary products formed by autoxidation.

Liquid and solid polyethylene glycol grades may be incompatible with some coloring agents.

The antibacterial activity of certain antibiotics is reduced in polyethylene glycol bases, particularly that of penicillin and bacitracin. The preservative efficacy of the parabens may also be impaired owing to binding with polyethylene glycols.

Physical effects caused by polyethylene glycol bases include softening and liquefaction in mixtures with phenol, tannic acid, and salicylic acid. Discoloration of sulfonamides and dithranol can also occur, and sorbitol may be precipitated from mixtures. Plastics, such as polyethylene, phenolformaldehyde, polyvinyl chloride, and

TEVABEND00294275

CONFIDENTIAL

EAGLEBEN-SA_00315591



**Figure 5:** Particle size distribution of PEG 4000 and PEG 6000 powder.

cellulose-ester membranes (in filters) may be softened or dissolved by polyethylene glycols. Migration of polyethylene glycol can occur from tablet film coatings, leading to interaction with core components.

## 13  Method of Manufacture

Polyethylene glycol polymers are formed by the reaction of ethylene oxide and water under pressure in the presence of a catalyst.

## 14  Safety

Polyethylene glycols are widely used in a variety of pharmaceutical formulations. Generally, they are regarded as nontoxic and nonirritant materials.[17–19]

Adverse reactions to polyethylene glycols have been reported, the greatest toxicity being with glycols of low molecular weight. However, the toxicity of glycols is relatively low.

Polyethylene glycols administered topically may cause stinging, especially when applied to mucous membranes. Hypersensitivity reactions to polyethylene glycols applied topically have also been reported, including urticaria and delayed allergic reactions.[20]

The most serious adverse effects associated with polyethylene glycols are hyperosmolarity, metabolic acidosis, and renal failure[21] owing to the topical use of polyethylene glycols in burn patients.[21] Topical preparations containing polyethylene glycols should therefore be used cautiously in patients with renal failure, extensive burns, or open wounds.

Oral administration of large quantities of polyethylene glycols can have a laxative effect. Therapeutically, up to 4 L of an aqueous mixture of electrolytes and high-molecular-weight polyethylene glycol is consumed by patients undergoing bowel cleansing.[22]

Liquid polyethylene glycols may be absorbed when taken orally, but the higher-molecular-weight polyethylene glycols are not significantly absorbed from the gastrointestinal tract. Absorbed polyethylene glycol is excreted largely unchanged in the urine, although polyethylene glycols of low molecular weight may be partially metabolized.

The WHO has set an estimated acceptable daily intake of polyethylene glycols at up to 10 mg/kg body weight.[23]

In parenteral products, the maximum recommended concentration of PEG 300 is approximately 30% v/v as hemolytic effects have been observed at concentrations greater than about 40% v/v.

For animal toxicity data, see Table VII.[24]

## 15  Handling Precautions

Observe normal precautions appropriate to the circumstances and quantity of material handled. Eye protection is recommended.

## 16  Regulatory Status

Included in the FDA Inactive Ingredients Database (dental preparations; IM and IV injections; ophthalmic preparations; oral capsules, solutions, syrups, and tablets; rectal, topical, and vaginal preparations). Included in nonparenteral medicines licensed in the UK. Included in the Canadian List of Acceptable Non-medicinal Ingredients.

## 17  Related Substances

Polyoxyethylene alkyl ethers; polyethylene oxide; polyoxyethylene sorbitan fatty acid esters; polyoxyethylene stearates; suppository bases.

## 18  Comments

Polyethylene glycol is one of the materials that have been selected for harmonization by the Pharmacopeial Discussion Group. For further information see the General Information Chapter <1196> in the USP32–NF27, the General Chapter 5.8 in PhEur 6.0, along with the 'State of Work' document on the PhEur EDQM website, and also the General Information Chapter 8 in the JP XV.

A specification for polyethylene glycol is contained in the Food Chemicals Codex (FCC).[25]

## 19  Specific References

1  Mohl S, Winter G. Continuous release of rh-interferon alpha-2a from triglyceride matrices. *J Control Release* 2004; 97(1): 67–78.
2  Hacia IA *et al.* Formulation of polyethylene glycol ointment bases suitable for tropical and subtropical climates I. *Acta Pharm Hung* 1989; 59: 137–142.

**Table VII:** Animal toxicity data [LD50] for various grades of polyethylene glycol[18,9]

| PEG grade | LD50 (g/kg) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Guinea pig (oral) | Mouse (IP) | Mouse (IV) | Mouse (oral) | Rabbit (oral) | Rabbit (IV) | Rat (IP) | Rat (IV) | Rat (oral) |
| PEG 200 | — | 7.5 | — | 34 | 19.9 | — | — | — | 28.0 |
| PEG 300 | 19.6 | | | | 17.3 | | | | 27.5 |
| PEG 400 | 15.7 | 10.0 | 8.6 | 28.9 | 26.8 | — | 9.7 | 7.3 | — |
| PEG 600 | | | | 47 | | | | | 38.1 |
| PEG 1000 | — | 20 | — | — | — | — | 15.6 | — | 32 |
| PEG 1500 | 28.9 | — | — | — | 28.9 | 8 | 17.7 | — | 44.2 |
| PEG 4000 | 50.9 | — | 16 | — | 76 | — | 11.6 | — | 50 |
| PEG 6000 | 50 | | | | | | 6.8 | | |

TEVABEND00294276

EAGLEBEN-SA_00315592

522    Polyethylene Oxide

3  Kellaway IW, Marriott C. Correlations between physical and drug release characteristics of polyethylene glycol suppositories. *J Pharm Sci* 1975; 64: 1162–1166.

4  Wells JI et al. Improved wet massed tableting using plasticized binder. *J Pharm Pharmacol* 1982; 34(Suppl.): 46P.

5  Chiou WL, Riegelman S. Pharmaceutical applications of solid dispersion systems. *J Pharm Sci* 1971; 60: 1281–1302.

6  Ford JL, Rubinstein MH. Formulation and ageing of tablets prepared from indomethacin–polyethylene glycol 6000 solid dispersions. *Pharm Acta Helv* 1980; 55: 1–7.

7  Vila-Jato JL et al. The effect of the molecular weight of polyethylene glycol on the bioavailability of paracetamol–polyethylene glycol solid dispersions. *J Pharm Pharmacol* 1986; 38: 126–128.

8  Miralles MJ et al. Combined water-soluble carriers for coprecipitates of tolbutamide. *J Pharm Sci* 1982; 71: 302–304.

9  Okhamafe AO, York P. Moisture permeation mechanism of some aqueous-based film coats. *J Pharm Pharmacol* 1982; 34(Suppl.): 53P.

10  Marishita M et al. Mucosal insulin delivery systems based on complexation polymer hydrogels: effect of particle size on insulin enteral absorption. *J Control Release* 2004; 97(1): 67–78.

11  Marcel T et al. Calcium phosphate-PEG-insulin-casein (CAPIC) particles as oral delivery systems for insulin. *Int J Pharm* 2004; 277(1–2): 91–97.

12  Fugel et al. Poly(ether-anhydride) dry powder aerosols for sustained drug delivery in the lungs. *J Control Release* 2004; 96(3): 411–423.

13  Jaiswal J et al. Preparation of biodegradable cyclosporine nanoparticles by high-pressure emulsion-solvent evaporation process. *J Control Release* 2004; 96(1): 169–178.

14  Jung SW et al. Self-assembled polymeric nanoparticles of polyethylene glycol) grafted pullulan acetate as a novel drug carrier. *Arch Pharmacal Res* 2004; 27(5): 562–569.

15  Peppas NA. Devices based on intelligent biopolymers for oral protein delivery. *Int J Pharm* 2004; 277(1–2): 11–17.

16  Bhalla HL et al. Radiation sterilization of polyethylene glycols. *Int J Pharm* 1983; 17: 351–355.

17  Smyth HF et al. The toxicology of the polyethylene glycols. *J Am Pharm Assoc (Sci)* 1950; 39: 349–354.

18  Tusing TW et al. The chronic dermal toxicity of a series of polyethylene glycols. *J Am Pharm Assoc (Sci)* 1954; 43: 489–490.

19  Smyth HF et al. The chronic oral toxicology of the polyethylene glycols. *J Am Pharm Assoc (Sci)* 1955; 44: 27–30.

20  Fisher AA. Immediate and delayed allergic contact reactions to polyethylene glycol. *Contact Dermatitis* 1978; 4: 135–138.

21  Anonymous. Topical PEG in burn ointments. *FDA Drug Bull* 1982; 12: 25–26.

22  Sweetman SC, ed. *Martindale: The Complete Drug Reference*, 36th edn. London: Pharmaceutical Press, 2009; 2336.

23  FAO/WHO. Evaluation of certain food additives. Twenty-third report of the Joint FAO/WHO Expert Committee on Food Additives. *World Health Organ Tech Rep Ser* 1980; No. 648.

24  Lewis RJ, ed. *Sax's Dangerous Properties of Industrial Materials*, 11th edn. New York: Wiley, 2004; 3001.

25  *Food Chemicals Codex*, 6th edn. Bethesda, MD: United States Pharmacopeia, 2008; 779.

## 20    General References

Buggins T et al. The effects of pharmaceutical excipients on drug disposition. *Adv Drug Del Rev* 2007; 59: 1482–1503.

Donovan MD et al. Absorption of polyethylene glycols 600 through 2000: molecular weight dependence of gastrointestinal and nasal absorption. *Pharm Res* 1990; 7: 863–867.

European Directorate for the Quality of Medicines and Healthcare (EDQM). European Pharmacopoeia – State Of Work Of International Harmonisation. *Pharmeuropa* 2009; 21(1): 142–143. https://www.edqm.eu/site/614.html (accessed 5 February 2009).

Mi YI, Wood J. The application and mechanisms of polyethylene glycol 8000 on stabilizing lactate dehydrogenase during lyophilization. *PDA J Pharm Sci Technol* 2004; 58(4): 192–202.

Dow Chemical Company. Technical literature: *Carbowax and Carbowax Sentry*, March 2006.

Van Dam J, Daenens P. Molecular weight identification of polyethylene glycols in pharmaceutical preparations by gel permeation chromatography. *J Pharm Sci* 1993; 82: 938–941.

Yamaoka T et al. Distribution and tissue uptake of poly(ethylene glycol) with different molecular weights after intravenous administration to mice. *J Pharm Sci* 1994; 83: 601–606.

## 21    Author

D Walhek.

## 22    Date of Revision

3 February 2009.

---



# Polyethylene Oxide

## 1    Nonproprietary Names

USP-NF: Polyethylene Oxide

## 2    Synonyms

*Polyox; polyoxirane; polyoxirane; polyoxyethylene.*

## 3    Chemical Name and CAS Registry Number

Polyethylene oxide [25322-68-3]

## 4    Empirical Formula and Molecular Weight

See Table I.

## 5    Structural Formula

The USP32–NF27 describes polyethylene oxide as a nonionic homopolymer of ethylene oxide, represented by the formula $(CH_2CH_2O)_n$, where $n$ represents the average number of oxyethy-

lene groups. It may contain up to 3% of silicon dioxide or suitable antioxidant.

## 6    Functional Category

Mucoadhesive; coating agent; tablet binder; thickening agent.

## 7    Applications in Pharmaceutical Formulation or Technology

Polyethylene oxide can be used as a tablet binder at concentrations of 5–85%. The higher molecular weight grades provide delayed drug release via the hydrophilic matrix approach;[1,3] see Table I. Polyethylene oxide has also been shown to facilitate coarse extrusion for tableting[3] as well as being an aid in hot-melt extrusion.[4,5]

The relationship between swelling capacity and molecular weight is a good guide when selecting products for use in immediate- or sustained-release matrix formulations; see Figure 1.

CONFIDENTIAL

TEVABEND00294277

EAGLEBEN-SA_00315593

# Exhibit 23

This article was downloaded by: [University of Arizona]
On: 10 November 2012, At: 08:03
Publisher: Taylor & Francis
Informa Ltd Registered in England and Wales Registered Number: 1072954 Registered office: Mortimer House, 37-41 Mortimer Street, London W1T 3JH, UK



# Journal of Macromolecular Science, Part C

Publication details, including instructions for authors and subscription information:
http://www.tandfonline.com/loi/lmsc19

# LABORATORY SYNTHESIS OF POLYETHYLENE GLYCOL DERIVATIVES

J. Milton Harris [a]

[a] Department of Chemistry, University of Alabama in Huntsville, Huntsville, Alabama, 35899

Version of record first published: 03 Jan 2007.

**To cite this article:** J. Milton Harris (1985): LABORATORY SYNTHESIS OF POLYETHYLENE GLYCOL DERIVATIVES, Journal of Macromolecular Science, Part C, 25:3, 325-373

**To link to this article:** http://dx.doi.org/10.1080/07366578508081960

PLEASE SCROLL DOWN FOR ARTICLE

Full terms and conditions of use: http://www.tandfonline.com/page/terms-and-conditions

This article may be used for research, teaching, and private study purposes. Any substantial or systematic reproduction, redistribution, reselling, loan, sub-licensing, systematic supply, or distribution in any form to anyone is expressly forbidden.

The publisher does not give any warranty express or implied or make any representation that the contents will be complete or accurate or up to date. The accuracy of any instructions, formulae, and drug doses should be independently verified with primary sources. The publisher shall not be liable for any loss, actions, claims, proceedings, demand, or

EAGLEBEN-SA_00361593

costs or damages whatsoever of howsoever caused arising directly or indirectly in connection with or arising out of the use of this material.

Downloaded by [University of Arizona] at 08:03 10 November 2012

EAGLEBEN-SA_00361594

JMS—REV. MACROMOL. CHEM. PHYS., C25(3), 325–373 (1985)

# Laboratory Synthesis of Polyethylene Glycol Derivatives

Downloaded by [University of Arizona] at 08:03 10 November 2012

J. MILTON HARRIS
Department of Chemistry
University of Alabama in Huntsville
Huntsville, Alabama   35899

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . 326
      A.   Special Characteristics of PEG-
           Derivative Synthesis. . . . . . . . . . . . . . 327
II.   PREPARATION OF SIMPLE DERIVATIVES . . . . . . 332
      A.   Ethers. . . . . . . . . . . . . . . . . . . . . 332
      B.   Esters. . . . . . . . . . . . . . . . . . . . . 335
      C.   Amides . . . . . . . . . . . . . . . . . . . . 337
      D.   Amines . . . . . . . . . . . . . . . . . . . . 339
      E.   Acids . . . . . . . . . . . . . . . . . . . . . 341
      F.   Aldehydes. . . . . . . . . . . . . . . . . . . 343
      G.   Electrophilic Derivatives . . . . . . . . . . . 344
      H.   Miscellaneous Derivatives . . . . . . . . . . 348
III.  SYNTHESIS OF COMPLEX DERIVATIVES
      OF PEG . . . . . . . . . . . . . . . . . . . . . . 350
      A.   Protein Conjugates. . . . . . . . . . . . . . 350
      B.   Peptide Synthesis . . . . . . . . . . . . . . . 354
      C.   PEG-Bound Reagents and Catalysts . . . . . . 358
      D.   Dye Conjugates . . . . . . . . . . . . . . . . 360
      E.   Drug Conjugates. . . . . . . . . . . . . . . . 361
      F.   Solid-Bound PEG. . . . . . . . . . . . . . . . 362

      ACKNOWLEDGMENTS . . . . . . . . . . . . . . . . 366

      REFERENCES. . . . . . . . . . . . . . . . . . . . 366

Copyright © 1985 by Marcel Dekker, Inc.                    0736-6374/85/2503-0325$3.50/0

Downloaded by [University of Arizona] at 08:03 10 November 2012

# I.  INTRODUCTION

In recent years, derivatives of polyethylene glycol (PEG) have proven valuable in a variety of diverse chemical and biological endeavors.  Such applications include peptide synthesis, phase transfer catalysis, pharmaceutical modification, protein and cell purifications, polymer-bound reagents, and binding assays. Because of the great deal of interest surrounding this subject, this review will describe generally applicable laboratory methods for preparing PEG derivatives from the parent PEG.  We have largely restricted discussion to this starting material because most research laboratories interested in applications are not equipped to handle complex ethylene oxide polymerizations used in large-scale industrial preparations and because PEG and some of its ethers and esters are the only commonly available polymeric starting materials.  For the purpose of this review, PEG is defined as those polyoxyethylenes having hydroxyl endgroups and a molecular weight of 20,000 daltons or less.

The review is divided into two parts:  the synthesis of simple derivatives such as esters, and the synthesis of complex derivatives such as protein conjugates.  In general, discussion is limited to polymers having a molecular weight of at least 750 g/mol, although on occasion a reaction of oligomeric ethylene glycols is discussed if the reaction is judged to be relevant and applicable to the larger molecules.  An attempt has been made to identify all pertinent papers; the major obstacle to success in this attempt has been difficulty in discovering derivative syntheses in esoteric application papers.

In the interest of brevity, we have adopted the policy when citing a paper of giving only the name of the first author in the text.  Full references are given at the end of the text.

As a chemical shorthand, the symbol PEG-X will be used to represent a difunctional PEG derivative $XCH_2CH_2O(CH_2CH_2O)_nCH_2CH_2X$.  The symbol M-PEG-X will be used similarly for derivatives of the commonly used monomethyl ether of PEG.  More complex derivatives will be explicitly described.  Also, note that although reactions of difunctional PEG's frequently give mixtures of mono- and difunctional products and unaltered reagent, we have not indicated these mixtures of products in our equations; the reactions are written as if they go to completion.

General discussion of PEG preparation and properties are available and will not be repeated here [1—5].  A review by Topchieva of biochemical applications of PEG is also available [6].

Downloaded by [University of Arizona] at 08:03 10 November 2012

POLYETHYLENE GLYCOL DERIVATIVES                                    327

## A.  Special Characteristics of PEG-Derivative Synthesis

Most of the synthetic procedures described in this review are classical procedures directly derived from methods well established for preparing organic molecules.  The novel aspects of the work generally are encountered in purifications and in the many ingenious applications.  Significant difficulty in product purification can arise from the high water-solubility of PEG as this prevents use of the aqueous washes traditional in preparing more typical hydrophobic organic molecules.  Also, since there are only one or two reactive sites in the rather large PEG molecule, small masses of low molecular weight impurities can have relatively large molar concentrations that can affect both purifications and reactions.

Water is a particular problem as we have found all commercial PEG's to contain a few tenths of a percent of this reactive impurity (by Karl-Fischer titration).  The lower molecular weight polymers have the highest amounts of water (approximately 1.0% for PEG 750).  Drying by azeotropic distillation with benzene or toluene reduces water to less than 0.1%.  The PEG can be recovered by ether precipitation or used in benzene or toluene solution.  Another convenient method for drying PEG is to stir the polymer under vacuum at 110—120°C.

Since the great majority of the syntheses described in this review begin with PEG or M-PEG, it is important to consider the nature of these commercially available materials.  PEG's are quite pure materials, having only trace (ppm) amounts of impurities such as dioxane, salts, aldehydes, and free ethylene oxide. Levels of ethylene glycol and diethylene glycol can be as high as 0.2%.  PEG's are hygroscopic, and the manufacturing process can introduce some water; consequently, a few tenths of a percent of water are generally present.  PEG is nontoxic [7—9] and is cleared by the U.S. Food and Drug Administration for internal use in humans.  The molecular weight range is narrow; for example, PEG 8000 will vary by no more than 300 units in either direction.  With the exception of some high molecular weights, the polymers are linear.  It is difficult to prepare PEG's above 10,000 daltons, and some manufacturers make larger PEG's such as PEG 20,000 by linking two or three PEG 8000 molecules with an aromatic diepoxide.  The resulting product is somewhat different from the other PEG's in that it contains a significant amount of branched material and a hydrophobic linking group.  The Fluka PEG 20,000 is said to be a linear poly(oxythylene).

The very useful monomethyl ethers of PEG are also available in a wide range of molecular weights.  Unfortunately, these materials contain a significant amount (as much as 25%; from size

# Exhibit 24
# Filed Under Seal

**HIGHLY CONFIDENTIAL - CONTAINS HIGHLY CONFIDENTIAL INFORMATION OF APOTEX**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| EAGLE PHARMACEUTICALS, INC., AND EAGLE SUB1 LLC<br><br>Plaintiffs,<br><br>v.<br><br>APOTEX INC., AND APOTEX CORP.,<br><br>Defendants. | C.A. No. 24-64-JLH (CONSOLIDATED)<br><br>**JURY TRIAL DEMANDED**<br><br>**HIGHLY CONFIDENTIAL** |

**APPENDIX A: APOTEX ADDITIONAL EVIDENCE OF INFRINGEMENT**

**TABLE OF CONTENTS**

I.    INTRODUCTION ...................................................................................................1

II.   MATERIALS CONSIDERED ................................................................................1

III.  SUMMARY OF OPINIONS .................................................................................2

IV.   APOTEX'S NDA PRODUCT................................................................................3

      A.    Description of Composition.........................................................................3

            1.    Bendamustine Hydrochloride ...........................................................7

            2.    Polyethylene Glycol 400....................................................................8

            3.    Ethanol .............................................................................................11

            4.    Monothioglycerol.............................................................................12

            5.    Sodium Hydroxide ...........................................................................13

      B.    Manufacturing Process...............................................................................16

            1.    Sodium Hydroxide Specifications ...................................................21

            2.    Polyethylene Glycol 400 Specifications .........................................22

            3.    Ethanol Specifications .....................................................................23

      C.    Specifications..............................................................................................23

      D.    Stability Data ..............................................................................................28

V.    INFRINGEMENT................................................................................................29

      A.    Discussion ...................................................................................................29

            1.    "pharmaceutically acceptable fluid"................................................29

            2.    "wherein the total impurities resulting from the degradation of the
                  bendamustine is less than about 5% peak area response as
                  determined by HPLC at a wavelength of 223 nm after at least
                  about 15 months at a temperature of about 5° C. to about 25° C."............38

VI.    WILLFUL INFRINGEMENT ............................................................................................44

VII.   APOTEX INFRINGEMENT CLAIM CHARTS ...............................................................48

     A.    U.S. Patent No. 11,872,214........................................................................................48

     B.    U.S. Patent No. 12,138,248........................................................................................50



**11 DESCRIPTION**

Bendamustine hydrochloride is an alkylating agent. The chemical name of bendamustine hydrochloride is 1H-benzimidazole-2-butanoic acid, 5-[bis(2-chloroethyl)amino]-1 methyl-, monohydrochloride, monohydrate. Its empirical molecular formula is $C_{16}H_{21}Cl_2N_3O_2 \cdot HCl \cdot H_2O$ and the molecular weight is 412.74. Bendamustine hydrochloride contains a mechlorethamine group and a benzimidazole heterocyclic ring with a butyric acid substituent, and has the following structural formula:

Bendamustine ~~hydrochloride~~ Hydrochloride ~~injection~~ Injection for intravenous use is supplied as a sterile, clear, and colorless to yellow ready-to-dilute solution in a multiple-dose clear glass vial. Each milliliter contains 25 mg of bendamustine hydrochloride, USP, 38 mg (3.8%) absolute ethanol, 5 mg monothioglycerol, NF ~~in~~ polyethylene glycol 400, and 0.08 mg sodium hydroxide ~~is may be~~ used to adjust the acidity of polyethylene glycol 400 NF. ~~Each mL contains 25 mg Bendamustine hydrochloride, which is equivalent to 22.7 mg Bendamustine free base.~~ G

**Commented [A8]:** To Applicant: Sodium hydroxide is part of the composition, therefore "may be" should not be used.

**Formatted:** Not Strikethrough

APOBENDA64_028021 (Apotex Label Amendments 11/2022) at -036.

> **b.    PEG 400 and Ethanol Are the Only "Pharmaceutically Acceptable Fluids" in Apotex's NDA Product**

109.    Apotex's Label and NDA documents identify the solvent system as PEG 400 and ethanol, and they assign sodium hydroxide a different role. The approved labeling states: "Each milliliter contains 25 mg of bendamustine hydrochloride, USP, 38 mg (3.8%) absolute ethanol, 5 mg monothioglycerol, NF in polyethylene glycol 400, and 0.08 mg sodium hydroxide is used to adjust the acidity of polyethylene glycol 400 NF." *See* ¶ 16. The Quality Overall Summary likewise identifies PEG 400 as "solvent" and ethanol as "co-solvent," and it assigns sodium hydroxide the function "to adjust the acidity of the polyethylene glycol 400." *See* ¶ 15. These role assignments match how a POSA would classify the elements: PEG 400 and ethanol are the pharmaceutically acceptable fluid; sodium hydroxide is a pH adjuster.

110.    A POSA would understand Apotex's NDA Product includes a pharmaceutically acceptable fluid "consisting of" or that "consists of" polyethylene glycol and ethanol. Apotex does not dispute that polyethylene glycol 400 and ethanol are solvents in Apotex's NDA Product. *See* ¶¶ 15, 17. Apotex also does not dispute polyethylene glycol 400 functions as a solvent in its NDA

34

pharmaceutically acceptable fluid.  I disagree.  The Contraindications list is broad: it identifies hypersensitivity to all components of the composition, including bendamustine HCl, polyethylene glycol 400, absolute ethanol, sodium hydroxide, and monothioglycerol.  *See* APOBENDA64_036612 (12/2022 Label) at -612; APOBENDA64_010022 (4/2024 Label) at -022 ("CONTRAINDICATIONS: Bendamustine hydrochloride injection is contraindicated in patients with a history of a hypersensitivity reaction to bendamustine, polyethylene  glycol 400, absolute ethanol, sodium hydroxide and monothioglycerol."). The function of the Contraindications section is clinical screening for hypersensitivity; it does not assign, reassign, or imply pharmaceutical roles.  The composition and roles are contained in the Description on the Label and confirmed by Apotex's NDA documents. In the Description on the Label, bendamustine HCl is the active ingredient, PEG 400 and absolute ethanol are the solvent system, monothioglycerol is the antioxidant, and sodium hydroxide "is used to adjust the acidity of polyethylene glycol 400 NF." *See* ¶ 15. Apotex's Quality Overall Summary repeats those role assignments, identifying PEG 400 as "solvent," ethanol as "co-solvent," and sodium hydroxide "to adjust the acidity of the polyethylene glycol 400." *See id.*

116.    From a formulation standpoint, the pharmaceutical role turns on function and persistence in the finished solution. The pharmaceutically acceptable fluid in these claims is the continuous liquid phase that provides solvation capacity during storage and handling. In Apotex's product, that role is performed by PEG 400 (vehicle) with ethanol (co-solvent). Sodium hydroxide, though potentially present in small quantity, is a pH adjuster. The fact that, in solution, NaOH dissociates into $Na^+$ and $OH^-$ and may participate in acid–base equilibria with trace acidic species in PEG does not convert it into a solvent. Those ionic species remain solutes at low levels within a dominant PEG/ethanol continuous phase and do not form, or contribute, a separate liquid phase

36

with solvent function. Apotex's batch instructions and process descriptions reflect this reality by directing operators to add solid sodium hydroxide and "stir … until it has completely dissolved" into the PEG/ethanol mixture, after which the vehicle is still referred to as "PEG 400." *See* ¶¶ 66, 67, 68 .

### c.    Impurities

117.    As set forth in the Main Body of my Opening Report, in my opinion, the sodium hydroxide is not part of the pharmaceutically acceptable fluid element.  But even if the sodium hydroxide or its constituent parts are considered part of the pharmaceutically acceptable fluid element, a POSA would consider them to be impurities normally associated with polyethylene glycol 400.

118.    Apotex's NDA Elemental Impurities Report Certificate of Analysis for polyethylene glycol 400 states that "residual sodium" is an impurity of the polyethylene glycol 400 in Apotex's NDA Product.  *See* ¶¶ 74, 77.  Specifically, Apotex's NDA Product uses "super refined PEG 400," which is made with NaOH used as a catalyst.  *See* ¶ 77.  Residual sodium may remain in the polyethylene glycol as a result of this catalysis, and is the type of impurity a POSA would associate with PEG 400.  A POSA would understand that trace sodium present after pH adjustment is consistent with PEG manufacture and lot conditioning and does not change the identity or function of the solvent system.

119.    Apotex's NDA raw material specification for the polyethylene glycol 400 included in Apotex's NDA Product confirms that the polyethylene glycol 400 in Apotex's NDA Product is compendial grade meaning it has to be within a specific pH range of 4.5-7.5.  *See* ¶ 76.  A POSA would understand that to obtain polyethylene glycol 400 in the specified pH range it might be necessary for the manufacturer to add NaOH to the polyethylene glycol 400 to raise the pH to be within the proper specification.  *See, e.g.*, EAGLEBEN-SA_00248700 ('672 Patent App. File

37

# Exhibit 25

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

EAGLE PHARMACEUTICALS, INC., )
)
          Plaintiff, )
) C.A. No. 24-64-JLH
v. )
)
APOTEX INC. and APOTEX CORP., )
)
          Defendant. )
- - - - - - - - - - - - - - - -
EAGLE PHARMACEUTICALS, INC., )
)
          Plaintiff, ) C.A. No. 24-65-JLH
)
v. )
)
SLAYBACK PHARMA LLC, )
)
          Defendant. )
- - - - - - - - - - - - - - - -
EAGLE PHARMACEUTICALS, INC., )
)
          Plaintiff, ) C.A. No. 24-66-JLH
)
v. )
)
BAXTER HEALTHCARE CORPORATION, )
)
          Defendant. )

J. Caleb Boggs Courthouse
844 North King Street
Wilmington, Delaware

Thursday, January 30, 2025
10:02 a.m.
Markman Hearing

BEFORE:  THE HONORABLE JENNIFER L. HALL, U.S.D.C.J.

APPEARANCES:

McCARTER & ENGLISH, LLP
BY:  DANIEL M. SILVER, ESQUIRE
BY:  WYLEY S. PROCTOR, ESQUIRE

          -and-

LATHAM & WATKINS LLP
BY:  DANIEL G. BROWN, ESQUIRE
BY:  ALEX GRABOWSKI, ESQUIRE
BY:  KELLY ANNE WELSH, ESQUIRE

          For the Plaintiff

POTTER ANDERSON & CORROON LLP
BY:  PHILIP A. ROVNER, ESQUIRE

          -and-

DECHERT LLP
BY:  MARTIN BLACK, ESQUIRE
BY:  JUDAH BELLIN, ESQUIRE
BY:  AMANDA K. ANTONS, Ph.D.
BY:  NOAH M. LEIBOWITZ, ESQUIRE

          For the Defendant
          Baxter Healthcare

MORRIS JAMES LLP
BY:  CORTLAN S. HITCH, ESQUIRE

          -and-

KATTEN MUCHIN ROSENMAN
BY:  CHRISTOPHER B. FERENC, ESQUIRE

          For the Apotex Defendants

SMITH KATZENSTEIN & JENKINS LLP
BY:  DANIEL A. TAYLOR, ESQUIRE

          -and-

WINDELS MARX
BY:  JASON A. LIEF, ESQUIRE

          For the Slayback Defendant

---

*** PROCEEDINGS ***

DEPUTY CLERK:  All rise.  Court is now in session.  The Honorable Jennifer Hall presiding.

THE COURT:  Please be seated.  Good morning, everyone.

ALL COUNSEL:  Good morning, Your Honor.

THE COURT:  We're here today for a Markman hearing.  This is *Eagle Pharmaceuticals vs. Apotex* and *Slayback*.

Let's go ahead and put our appearances on the record.

MR. SILVER:  Good morning, Your Honor.  Dan Silver from McCarter & English on behalf of Eagle.  And I'm joined today by my partner, Wyley Proctor, my co-counsel in the Baxter case.  And then also by co-counsel from Latham & Watkins, Dan Brown, Alex Grabowski and Kelly Welsh, who are my co-counsel in the Apotex and Slayback cases.

THE COURT:  All right.  Very good.

MR. SILVER:  We also have Jacob Whitt present for Eagle as well.

THE COURT:  All right.  Good to see you.  Thanks for coming.

MR. ROVNER:  Good morning, Your Honor.  Phil Rovner from Potter Anderson & Corroon on behalf of Defendant, Baxter Healthcare, in the 26 case.  With me is my co-counsel from the Dechert firm, Martin Black, Judah Bellin Noah Leibowitz, Amanda Antons.

And also with us is in-house counsel from Baxter, Laura DeMoor.

Just to let you know, Mr. Black and Mr. Bellin will be presenting argument on behalf of all three Defendants.

THE COURT:  Great.  Thank you very much.

MR. HITCH:  Good morning, Your Honor.  On behalf of Apotex, it's Cortlan Hitch from Morris James.  And joining me today is Christopher Ferenc from Katten.

THE COURT:  Okay.

MR. TAYLOR:  And good morning, Your Honor.  This is Daniel Taylor from Smith Katzenstein & Jenkins on behalf of Slayback.  And with me is Jason Lief of Windels Marx.

Thank you.

MR. BLACK:  Your Honor, if I might address the Court briefly?

THE COURT:  Sure.

MR. BLACK:  Martin Black, as just introduced.  I'm here for Baxter.  You didn't call us initially, but we're the third case on the list.

THE COURT:  Yes.

MR. BLACK:  Just for clarification, we represent

17

But the way I interpret it, it's similar to the argument in the 12(c) motion that we're going to go back and look at, Oh, we put something in our manufacturing process in another country. We put something in, and we say we put that in, so that's what counts, not what's in the vial at the end of the day, due to testing, due to whatever else that may come up, and we put in evidence of what's in there or not.

That seems to be -- they're trying to hinge that and drive that in through the "as ingredients" component. And I can sort of see them arguing to the jury, Look on our label. Here's an ingredient. That says it can't have more ingredients; therefore, we're outside the claim. And so, as a practical matter, that -- we don't think that accurately states the law.

And so, for those reasons, both the legal reason that there's no basis in the intrinsic record to do it, and for the practical reason, that it seems designed to confuse the jury, vitiate another claim limitation and open up the claim to arguments that we don't think are properly and squarely addressed under the law. We don't think that that is the right construction.

Going to -- I'd like to now move to our language, which puts into the claim limitations, the two known exceptions. We would note that our claim construction

18

is identical to the one that Judge Jordan adopted in the *Shire vs. Cadila* case.

And there, I think, as we look at the totality of the intrinsic record, we think it supports both that we are correct and the Defendants' argument is not correct.

I'd like to start with the specification. And this is a section that was cited in the joint brief. I think we cited it on Page 36. They cite it, I think, on Page 26.

And I think there's some differences, as you read the specification and try to interpret what the parties are saying. There are sections where it discusses what the pharmaceutically acceptable fluid contains. And I think the word "contains" is open. That is, I guess, similar to "comprising." If you dissolve something within the pharmaceutically acceptable fluid, you could fairly say it contains that or it includes that.

Here is the only section that I saw in the specification where it tells you what the pharmaceutically acceptable fluid is. Here, it says, in one embodiment, it is propylene glycol. Where you're going to put other things into the pharmaceutically acceptable fluid, as you make the liquid composition.

But here it's telling what you it is. It is PEG in that embodiment.

19

THE COURT: Well, let me ask you. You said that was the only spot. I found some other spots.

MR. BROWN: Sure.

THE COURT: Let me ask you about Column 2 starting at Line 65 to Column 3, Line 5.

MR. BROWN: Sure. And are you in the '783?

THE COURT: I am in the '783. It says, "In accordance with one aspect of the invention, there are provided long-term storage-stable bendamustine-containing compositions, including." And then it says -- it's split into an A and B.

And the A says bendamustine. And then the B says, "A pharmaceutically acceptable fluid, including (i), PEG, PG or mixtures thereof and (ii) a stabilizing amount of an antioxidant."

That doesn't tell somebody that the antioxidant or other things are part of the pharmaceutically acceptable fluid?

MR. BROWN: So I understand how you're reading it, Your Honor. And as we read through this, you know, preparing for this, we think there's -- the way I interpret what's going on here is when they're describing what can be encompassed or included within the totality of the invention, "included" is broader. It's like "comprising." It's broader than definitional.

20

And so what is the pharmaceutically -- and even in this context, they separate out what somebody would understand to be the vehicle, which is what's being dissolved, what's -- you know, what the antioxidant and the active ingredient are being dissolved into with the antioxidant.

THE COURT: So, because the structure of the sentence, I would more read it the fluid is 1 and 2. And you're trying to say that only 1 is the fluid. That's not the most natural reading, it seems to me. I --

MR. BROWN: I do understand. I do understand what you're saying, and I do understand their argument.

We would -- because of the other sections of the specification and the way that this particular claim is drafted, directly corresponding to other sections of the specification where the antioxidant and other ingredients are pulled separately, and the fact that this is a -- this is an including. Later on in the specification, I think they use containing quite a bit.

Just below that in Column 5, Lines 39 -- 39, 40 and 54, 55. They use the words "containing." Containing is clearly broader than and can mean both what is the fluid and what is in the fluid as part of the formulation.

But I think, more importantly, when you look at the different -- the differences in how these sections of

33

it.

MR. BROWN: Thank you.

MR. BLACK: Thank you, Your Honor. Martin Black.

I'm going to start exactly where you started with the question, which is one I often think about at these Markman hearings, which is: What is it exactly that we're doing here? And most of the time, we are trying to find a proper definition for a specific term, and both sides are trying -- jockeying for position on it.

But sometimes we're talking about more basic principles about what's the function of the claim as a whole? How do the different pieces interact? And how do the legal principles that we have to deal with apply.

Most of these pharmaceutical cases are ANDA cases. They're bench trials, so the Markman process and the trial process is seamless and we don't really have this issue.

Here, we really have kind of a separate issue, which is what we're ultimately going to tell the jury. And in the Markman process, we just wanted to make sure one thing, that the two basic principles that go to how to read a comprising, consisting of claim were upheld during the Markman process. Because, ultimately, we're going to have to craft a much more complex, and nuanced and English

34

language jury instruction, which is going to be longer than a couple of words put in a box next to it.

So we're content, as long as the principles are clearly stated in the Claim Construction Order. To that end, during the process of negotiation over the claim construction, we proposed to the other side to agree that, Okay, you've got a comprising element. We don't know -- we know what that means generally. It's not a -- it's a term of art to a jury, for sure. The lawyers deal with it all the time, but it's not the way ordinary people use comprising. But we have a jury instruction to deal with that.

But we've got to take account of the fact that this is an unusual claim with a nested comprising consisting of element, which was the way they prosecuted the case. And as you pointed out, has created a very messy situation.

So we've got to have something in the Claim Construction Order and, ultimately, in the jury instruction, written at an appropriate level for the jury -- that's not really today's problem, which says that the pharmaceutically acceptable fluid is closed to the elements explicitly identified, because that is how "consisting of" has been used in the patent law for a hundred years.

They refused to add that to the construction, and so we identified it as a claim construction issue. But,

35

as I said, ultimately, we're going to have to give the jury an instruction that makes sense to them on their terms. I don't think we need to draft that today. We just want those concepts upheld.

In the briefing, as we pushed and pressed, and ultimately, in their reply brief, they conceded that, Yes, okay. Consisting is closed. You can't have another pharmaceutically acceptable fluid other than the ones -- the five that are listed in the claim.

During the argument, I heard some waffling. You asked a pointed question about water. Water is the enemy of bendamustine stability. The prior art was a wafflized powder, which was composed in water shortly before administration to the patient, because it's unstable over a period of hours.

So having water not only is an anathema to the invention, it's clearly outside the claim. You can't have 10 or 50 percent water. And the idea that they might have an expert come in and try to interpret the "consisting" element in that fashion is totally inappropriate.

So on the comprising-consisting relationship, I think the concepts are understood. There's been statements in the brief that say what the law is. We just eventually will need a jury instruction implementing that. And that's going to take a little bit more work than we can do today.

36

THE COURT: I appreciate that. Let me ask you this: So you would say -- they made the point -- let me back up.

They made the point that certain antioxidants are in fluid form. So -- and they're pharmaceutically acceptable.

So what am I going to make of that?

MR. BLACK: The only pharmaceutical -- we know one thing. The claim was closed. It's consisting of -- the pharmaceutically acceptable fluid can consist of only five things. If they can't use an antioxidant that's a pharmaceutically acceptable fluid --

THE COURT: Okay.

MR. BLACK: -- they have to use a different one.

THE COURT: So you would say cannot be another fluid.

What about the fact that we all know that the antioxidant is dissolved in the fluid? So it's not like it's sitting there in solid form.

I mean, what am I supposed to make of that?

MR. BLACK: Sure. So that's where the claim is a mess, right. And it comes from the way it was prosecuted, because it started as a general comprising claim. And they added "pharmaceutically acceptable fluid consisting of." They put a semi-colon at the end. And then they left the

bound rendering this indefinite.

Other than the specification itself and the prosecution history, they haven't even put in evidence of that. There's nothing about what a POSA would understand the inherent bounds to be. They clearly haven't met that burden.

So even, if Your Honor thinks, Oh, this isn't a typo, and, frankly, I think, given the wording in Exhibit 6, that's, you know, not supported. But even if Your Honor thinks this isn't a typo, it's clearly not meeting their clear and convincing burden of what a POSA would understand inherently to support.

THE COURT: Okay. Thank you very much.

MR. GRABOWSKI: Thank you, Your Honor.

THE COURT: I have some thoughts, but I want to take a couple minutes just to make sure I express them clearly, especially in a case like this. It's probably better to be precise.

So why don't you give me a little time. I don't think I need much time. Maybe let's take a 15-minute recess. And if I need a little more time, I'll have somebody let you know.

DEPUTY CLERK: All rise.

(Recess was taken.)

DEPUTY CLERK: All rise.

THE COURT: Hi. Please be seated.

Okay. I've got some thoughts that I wanted to convey while everything is fresh in my mind, because I've got 300 other cases that need my attention and I'll forget. So I wanted to give you what I can give you today.

So, just at the outset, I don't think there's a reasonable debate that these claims are a mess. I agree with counsel about that. We have very, very skilled attorneys on both sides arguing, and I appreciated hearing from everyone today. Everyone did the best that they could with these claims. It is not counsel in this room's fault that the claims are the way they are, but they are a mess.

And so the question is: What we're going to do about it?

So starting with Terms 1 and 2, everybody in this room knows what "consisting of" and "comprising" means. We all know that. We've got proposed constructions from both sides, but neither clarifies what the real issue is here, which is: How do these claim elements fit together.

And the mess we're in in this respect is compounded by the fact that the patent is internally inconsistent about what it means when it talks about a pharmaceutically acceptable fluid.

So I'll just say the record, here's where we found, things that seem to support the proposition that the

fluid, when it's referred to, includes additional things that aren't necessarily a solvent. So, for example, the abstract. We have the portion we talked about during the hearing today, which is Column 2, Line 65 to Column 3 to 5. We have Column 4, Lines 30 to 39. We have Column 5, Lines 36 to 46. We have Column 5, Lines 52 to 61. And we have Column 6, Lines 20 to 27.

And then we've also got portions of the patent where it talks about the stabilizer being a separate aspect or separate element. We've got Column 2, Lines 1 to 7. Column 4, Lines 45 to 53. Column 7, Lines 25 to 35. Column 8, Lines 26 to 34. And Column 9, Lines 15 to 19.

So what do we do about this?

I agree with Defendants, in the abstract, that you can't have in the product another fluid that is a pharmaceutically acceptable fluid that is not on the list and still infringe. I agree with them.

That said, I'm not willing to say, at this point, that a product that has, for example, liquid Vitamin E as an antioxidant doesn't infringe because it's a liquid. Because the patent claim expressly allows for an antioxidant as a separate element.

I think Plaintiff agreed today, and I think we all agree that there can't be another solvent system that's not on the list of pharmaceutically acceptable fluids. But I'm not going to say that the use of an antioxidant, that someone might characterize as a solvent because it's capable of dissolving a solid, would take a product outside of the scope of the claims.

I'm not going to allow the jury to decide the issue of whether a substance is "unrelated to this element" or "unrelated to the invention." That's not something that's within the province of the jury.

I think that impurities that are normally associated with a component are included in the scope of the term. I think we all agree on that. We just have a dispute about whether or not to tell it to the jury.

And so what do we take from all of this? I think the only thing we can do is to ultimately give the jury a narrative that explains how the "comprising" and "consisting" elements fit together. But it's premature for us to work on that until I understand what the parties' positions are.

And, of course, I understand that the Court is to construe claims without reference to the accused products. But the Court also only needs to construe claim terms to the extent there's a dispute, and I don't have an understanding about what the dispute is here still.

And doing it right now or adopting one or the other's party's proposed constructions right now is just

# Exhibit 26
# Filed Under Seal

EXHIBIT 27
REDACTED IN ITS ENTIRETY

# Exhibit 28



createspace — an Amazon.com company        Digital Proofer

**Introduction to Chem...**

Authored by Tracy Poulsen

8.5" x 11.0" (21.59 x 27.94 cm)
Black & White on White paper
250 pages

ISBN-13: 9781478298601
ISBN-10: 147829860X

Please carefully review your Digital Proof download for formatting, grammar, and design issues that may need to be corrected.

We recommend that you review your book three times, with each time focusing on a different aspect.

1    Check the format, including headers, footers, page numbers, spacing, table of contents, and index.

2    Review any images or graphics and captions if applicable.

3    Read the book for grammatical errors and typos.

Once you are satisfied with your review, you can approve your proof and move forward to the next step in the publishing process.

To print this proof we recommend that you scale the PDF to fit the size of your printer paper.

# Introduction to Chemistry

## Author:  Tracy Poulsen

### Supported by CK-12 Foundation

CK-12 Foundation is a non-profit organization with a mission to reduce the cost of textbook materials for the K-12 market both in the U.S. and worldwide. Using an open-content, web-based collaborative model termed the "FlexBook," CK-12 intends to pioneer the generation and distribution of high-quality educational content that will serve both as core text as well as provide an adaptive environment for learning.

Copyright © 2010, CK-12 Foundation, www.ck12.org

Except as otherwise noted, all CK-12 Content (including CK-12 Curriculum Material) is made available to Users in accordance with the Creative Commons Attribution/Non-Commercial/Share Alike 3.0 Unported (CC-by-NC-SA) License (http://creativecommons.org/licenses/by-nc-sa/3.0/), as amended and updated by Creative Commons from time to time (the "CC License"), which is incorporated herein by this reference. Specific details can be found at http://about.ck12.org/terms.



flexbook

1

www.ck12.org

JDG_BENDA_00002376

EAGLEBEN-SA_00076285

c) Is the solution acidic, basic, or neutral?

4) During the course of the day, human saliva varies between being acidic and basic. If $[OH^-]=3.16 \times 10^{-8}$ M,

   a) Find $[H^+]$

   b) What is the pH?

   c) Is the solution acidic, basic, or neutral?

5) A solution contains $4.33 \times 10^{-8}$ M hydroxide ions. What is the pH of the solution?

6) A solution contains a hydrogen ion concentration of $6.43 \times 10^{-9}$ M. What is the pH of the solution?

7) If the pH of one solution is 5 less than another solution, how does the amount of $H^+$ in each solution compare? Which has more $H^+$? How many times more?

## 8.3: Neutralization

**Objectives**

* Explain what is meant by a neutralization reaction
* Write the balanced equation for the reaction that occurs when an acid reacts with a base.

**Introduction**

Neutralization is a reaction between an acid and a base that produces water and a salt. The general reaction for the neutralization reaction is shown below.

$$\text{acid} + \text{base} \rightarrow \text{salt} + \text{water}$$

In this section, we will be writing the products of neutralization reactions.

**Neutralization Reactions**

Acids are a combination of hydrogen ions ($H^+$) and an anion. Examples include HCl, $HNO_3$, and $HC_2H_3O_2$. Bases can be a combination of metal cations and hydroxide ions, $OH^-$. Examples include NaOH, KOH, and $Mg(OH)_2$. According to the Arrhenius definitions of acids and bases, the acid will contribute the $H^+$ ion that will react to neutralize the $OH^-$ ion, contributed by the base, to produce neutral water molecules.

All acid-base reactions produce salts. The anion from the acid will combine with the cation from the base to form the ionic salt. Look at the following equations. What do they have in common?

$$HClO_4 + NaOH \rightarrow NaClO_4 + HOH$$
$$H_2SO_4 + 2\ KOH \rightarrow K_2SO_4 + 2\ HOH$$

(Note: HOH is the same as $H_2O$)

No matter what the acid or the base may be, the products of this type of reaction will always be a salt and water. The $H^+$ ion from the acid will neutralize the $OH^-$ ion from the base to form water. The other product is a salt formed when the cation of the base combines with the anion of the acid. Remember, the total charge on the salt MUST be zero. You must have the correct number of cations and anions to cancel out the charges of each.

---

**Example:** Complete the following neutralization reactions.

(a) $H_2SO_4 + Ba(OH)_2 \rightarrow$

(b) $HCOOH + Ca(OH)_2 \rightarrow$

(c) $HCl + NaOH \rightarrow$

**Solution:**

(a) The $H^+$ in $H_2SO_4$ will combine with the $OH^-$ part of $Ba(OH)_2$ to make water ($H_2O$ or HOH). The salt produced is what is formed when $Ba^{2+}$ (the cation from the base) combines with $SO_4^{2-}$ (the anion from the acid). These have charges of +2 and -2, so the formula for this compound is $BaSO_4$.

Before it is balanced, the reaction is:

$$H_2SO_4 + Ba(OH)_2 \rightarrow BaSO_4 + H_2O$$

After balancing, we get:

$$\textbf{H}_2\textbf{SO}_4 + \textbf{Ba(OH)}_2 \rightarrow \textbf{BaSO}_4 + \textbf{2 H}_2\textbf{O}$$

(b) The $H^+$ in HCOOH will combine with the $OH^-$ part of $Ca(OH)_2$ to make water ($H_2O$ or HOH). The salt produced is what is formed when $Ca^{2+}$ (the cation from the base) combines with $COOH^-$ the anion from the acid. These have charges of +2 and -1, so the formula for this compound is $Ca(COOH)_2$.

Before it is balanced, the reaction is:

$$HCOOH + Ca(OH)_2 \rightarrow Ca(COOH)_2 + H_2O$$

After balancing, we get:

$$\textbf{2 HCOOH} + \textbf{Ca(OH)}_2 \rightarrow \textbf{Ca(COOH)}_2 + \textbf{2 H}_2\textbf{O}$$

(c) The $H^+$ in HCl will combine with the $OH^-$ part of NaOH to make water ($H_2O$ or HOH). The salt produced is what is formed when $Na^+$ (the cation from the base) combines with $Cl^-$ the anion from the acid. These have charges of +1 and -1, so the formula for this compound is NaCl.

Before it is balanced, the reaction is:

$$\textbf{HCl} + \textbf{NaOH} \rightarrow \textbf{NaCl} + \textbf{H}_2\textbf{O}$$

The reaction is already balanced, so we are done.

**Lesson Summary**

* A neutralization reaction between an acid and a base will produce a salt and water.

**Vocabulary**

* Neutralization: a reaction between an acid and a base that produces water and a salt

**8.3: Review Questions**

*Write a balanced reaction for each of the following neutralization reactions:*

1) $HNO_3 + KOH \rightarrow$

2) $HClO_4 + NH_4OH \rightarrow$

3) $H_2SO_4 + NaOH \rightarrow$

4) $HNO_3 + NH_4OH \rightarrow$

5) $HF + NH_4OH \rightarrow$

6) $HC_2H_3O_2 + KOH \rightarrow$

7) $HCl + KOH \rightarrow$

JDG_BENDA_00002377

EAGLEBEN-SA_00076286

# Exhibit 29



EAGLEBEN-SA_00362257

# Chemistry

## Seventh Edition

**Steven S. Zumdahl**
*University of Illinois*

**Susan A. Zumdahl**
*University of Illinois*

**Houghton Mifflin Company**  Boston  New York

EAGLEBEN-SA_00362258

This planar structure is the one expected for three pairs of electrons around a central atom, which means that *a double bond should be counted as one effective pair* in using the VSEPR model. This makes sense because the two pairs of electrons involved in the double bond are *not* independent pairs. Both the electron pairs must be in the space between the nuclei of the two atoms to form the double bond. In other words, the double bond acts as one center of electron density to repel the other pairs of electrons. The same holds true for triple bonds. This leads us to another general rule: *For the VSEPR model, multiple bonds count as one effective electron pair.*

The molecular structure of nitrate also shows us one more important point: *When a molecule exhibits resonance, any one of the resonance structures can be used to predict the molecular structure using the VSEPR model.* These rules are illustrated in Sample Exercise 8.14.

| *Sample Exercise 8.14* | **Structures of Molecules with Multiple Bonds** |
| --- | --- |

Predict the molecular structure of the sulfur dioxide molecule. Is this molecule expected to have a dipole moment?

**Solution**

First, we must determine the Lewis structure for the $SO_2$ molecule, which has 18 valence electrons. The expected resonance structures are

To determine the molecular structure, we must count the electron pairs around the sulfur atom. In each resonance structure the sulfur has one lone pair, one pair in a single bond, and one double bond. Counting the double bond as one pair yields three effective pairs around the sulfur. According to Table 8.6, a trigonal planar arrangement is required, which yields a V-shaped molecule:

Thus the structure of the $SO_2$ molecule is expected to be V-shaped, with a 120-degree bond angle. The molecule has a dipole moment directed as shown:

Since the molecule is V-shaped, the polar bonds do not cancel.

*See Exercises 8.99 and 8.100.*

It should be noted at this point that lone pairs that are oriented at least 120 degrees from other pairs do not produce significant distortions of bond angles. For example, the angle in the $SO_2$ molecule is actually quite close to 120 degrees. We will follow the

EAGLEBEN-SA_00362657



(a)



(b)



(c)

**FIGURE 8.22**
The molecular structure of methanol. (a) The arrangement of electron pairs and atoms around the carbon atom. (b) The arrangement of bonding and lone pairs around the oxygen atom. (c) The molecular structure.

general principle that *a 120-degree angle provides lone pairs with enough space so that distortions do not occur. Angles less than 120 degrees are distorted when lone pairs are present.*

## Molecules Containing No Single Central Atom

So far we have considered molecules consisting of one central atom surrounded by other atoms. The VSEPR model can be readily extended to more complicated molecules, such as methanol ($CH_3OH$). This molecule is represented by the following Lewis structure:

$$H-\overset{\overset{\displaystyle H}{|}}{\underset{\underset{\displaystyle H}{|}}{C}}-\overset{\cdot\cdot}{\underset{\cdot\cdot}{O}}-H$$

The molecular structure can be predicted from the arrangement of pairs around the carbon and oxygen atoms. Note that there are four pairs of electrons around the carbon, which requires a tetrahedral arrangement, as shown in Fig. 8.22(a). The oxygen also has four pairs, which requires a tetrahedral arrangement. However, in this case the tetrahedron will be slightly distorted by the space requirements of the lone pairs [Fig. 8.22(b)]. The overall geometric arrangement for the molecule is shown in Fig. 8.22(c).

### Summary of the VSEPR Model

The rules for using the VSEPR model to predict molecular structure follow:

- Determine the Lewis structure(s) for the molecule.
- For molecules with resonance structures, use any of the structures to predict the molecular structure.
- Sum the electron pairs around the central atom.
- In counting pairs, count each multiple bond as a single effective pair.
- The arrangement of the pairs is determined by minimizing electron-pair repulsions. These arrangements are shown in Table 8.6.
- Lone pairs require more space than bonding pairs do. Choose an arrangement that gives the lone pairs as much room as possible. Recognize that the lone pairs may produce a slight distortion of the structure at angles less than 120 degrees.

## The VSEPR Model—How Well Does It Work?

The VSEPR model is very simple. There are only a few rules to remember, yet the model correctly predicts the molecular structures of most molecules formed from nonmetallic elements. Molecules of any size can be treated by applying the VSEPR model to each appropriate atom (those bonded to at least two other atoms) in the molecule. Thus we can use this model to predict the structures of molecules with hundreds of atoms. It does,

EAGLEBEN-SA_00362658

## CHEMICAL IMPACT

## Chemical Structure and Communication: Semiochemicals

In this chapter we have stressed the importance of being able to predict the three-dimensional structure of a molecule. Molecular structure is important because of its effect on chemical reactivity. This is especially true in biological systems, where reactions must be efficient and highly specific. Among the hundreds of types of molecules in the fluids of a typical biological system, the appropriate reactants must find and react only with each other—-they must be very discriminating. This specificity depends largely on structure. The molecules are constructed so that only the appropriate partners can approach each other in a way that allows reaction.

Another area where molecular structure is central is in the use of molecules as a means of communication. Examples of a chemical communication occur in humans in the conduction of nerve impulses across synapses, the control of the manufacture and storage of key chemicals in cells, and the senses of smell and taste. Plants and animals also use chemical communication. For example, ants lay down a chemical trail so that other ants can find a particular food supply. Ants also warn their fellow workers of approaching danger by emitting certain chemicals.



The queen bee secretes a chemical that prevents the worker bees from raising a competitive sovereign.

Molecules convey messages by fitting into appropriate receptor sites in a very specific way, which is determined by their structure. When a molecule occupies a receptor site, chemical processes are stimulated that produce the appropriate response. Sometimes receptors can be fooled, as in the use of artificial sweeteners—-molecules fit the sites on the taste buds that stimulate a "sweet" response in the brain, but they are not metabolized in the same way as natural sugars. Similar deception is useful in insect control. If an area is sprayed

however, fail in a few instances. For example, phosphine ($PH_3$), which has a Lewis structure analogous to that of ammonia,

$$H—\overset{..}{P}—H \qquad H \cdots \overset{..}{N}—H$$
$$\overset{|}{H} \qquad\qquad\quad \overset{|}{H}$$

would be predicted to have a molecular structure similar to that for $NH_3$, with bond angles of approximately 107 degrees. However, the bond angles of phosphine are actually 94 degrees. There are ways of explaining this structure, but more rules have to be added to the model.

This again illustrates the point that simple models are bound to have exceptions. In introductory chemistry we want to use simple models that fit the majority of cases; we are willing to accept a few failures rather than complicate the model. The amazing thing about the VSEPR model is that such a simple model predicts correctly the structures of so many molecules.

EAGLEBEN-SA_00362659

# Exhibit 30

**WHO Technical Report Series**
929

This report presents the recommendations of an international group of experts convened by the World Health Organization to consider matters concerning the quality assurance of pharmaceuticals and specifications for drug substances and dosage forms. Of particular relevance to drug regulatory authorities and pharmaceutical manufacturers, this report discusses the monographs on antiretrovirals proposed for inclusion in *The International Pharmacopoeia* and specifications for radiopharmaceuticals, quality specifications for antituberculosis drugs and the revision of the monograph on artemisinin derivatives, as well as quality control of reference materials, good manufacturing practices (GMP), inspection, distribution and trade and other aspects of quality assurance of pharmaceuticals, and regulatory issues.

The report is complemented by a number of annexes, including an amendment to good manufacturing practices: main principles regarding the requirement for the sampling of starting materials, guidelines on good manufacturing practices regarding water for pharmaceutical use, guidelines on the sampling of pharmaceutical products and related materials and draft guidelines for registration of fixed-dose combination medicinal products.

WHO EXPERT COMMITTEE ON SPECIFICATIONS FOR PHARMACEUTICAL PREPARATIONS

WHO Technical Report Series — 929

ISBN 92 4 120929 1



9 789241 209298

# WHO EXPERT COMMITTEE ON SPECIFICATIONS FOR PHARMACEUTICAL PREPARATIONS

Thirty-ninth report



**World Health Organization**
Geneva




EAGLEBEN-SA_00362105

The World Health Organization was established in 1948 as a specialized agency of the United Nations serving as the directing and coordinating authority for international health matters and public health. One of WHO's constitutional functions is to provide objective and reliable information and advice in the field of human health, a responsibility that it fulfils in part through its extensive programme of publications.

The Organization seeks through its publications to support national health strategies and address the most pressing public health concerns of populations around the world. To respond to the needs of Member States at all levels of development, WHO publishes practical manuals, handbooks and training material for specific categories of health workers; internationally applicable guidelines and standards; reviews and analyses of health policies, programmes and research; and state-of-the-art consensus reports that offer technical advice and recommendations for decision-makers. These books are closely tied to the Organization's priority activities, encompassing disease prevention and control, the development of equitable health systems based on primary health care, and health promotion for individuals and communities. Progress towards better health for all also demands the global dissemination and exchange of information that draws on the knowledge and experience of all WHO's Member countries and the collaboration of world leaders in public health and the biomedical sciences.

To ensure the widest possible availability of authoritative information and guidance on health matters, WHO secures the broad international distribution of its publications and encourages their translation and adaptation. By helping to promote and protect health and prevent and control disease throughout the world, WHO's books contribute to achieving the Organization's principal objective — the attainment by all people of the highest possible level of health.

---

The *WHO Technical Report Series* makes available the findings of various international groups of experts that provide WHO with the latest scientific and technical advice on a broad range of medical and public health subjects. Members of such expert groups serve without remuneration in their personal capacities rather than as representatives of governments or other bodies; their views do not necessarily reflect the decisions or the stated policy of WHO. An annual subscription to this series, comprising about six such reports, costs Sw. fr. 132.– or US$ 106.– (Sw. fr. 92.40 in developing countries). For further information, please contact Marketing and Dissemination, World Health Organization, 20 avenue Appia, 1211 Geneva 27, Switzerland (tel.: +41 22 791 2476; fax: +41 22 791 4857; email: bookorders@who.int).

EAGLEBEN-SA_00362106

*This report contains the collective views of an international group of experts and does not necessarily represent the decisions or the stated policy of the World Health Organization*

**WHO Technical Report Series**

**929**

# WHO EXPERT COMMITTEE ON SPECIFICATIONS FOR PHARMACEUTICAL PREPARATIONS

Thirty-ninth Report



**World Health Organization**

**Geneva 2005**

EAGLEBEN-SA_00362107

# 1. Introduction

## 1.1 Scope of the document

The guidance contained in this document is intended to provide information about the available specifications for water for pharmaceutical use (WPU), guidance about which quality of water to use for specific applications, such as the manufacture of active pharmaceutical ingredients (APIs) and dosage forms, and to provide guidance on the good manufacturing practice (GMP) regarding the design, installation and operation of pharmaceutical water systems. Although the focus of this document is on water for pharmaceutical applications, the guidelines may also be relevant to other industrial or specific uses where the specifications and practices can be applied.

The GMP guidance for WPU contained in this document is intended to be supplementary to the general GMP guidelines for pharmaceutical products published by WHO (*WHO Expert Committee on Specifications for Pharmaceutical Preparations. Thirty-seventh report.* Geneva, World Health Organization, 2003 (WHO Technical Report Series, No. 908), Annex 4).

This document refers to available specifications, such as the pharmacopoeias and industry guidance for the use, production, storage and distribution of water in bulk form. In order to avoid confusion it does not attempt to duplicate such material.

*Note*: This document does not cover waters for administration to patients in their formulated state or the use of small quantities of water in pharmacies to compound individually prescribed medicines.

The guidance provided in this document can be used in whole or in part as appropriate to the application under consideration.

Where subtle points of difference exist between pharmacopoeial specifications, the manufacturer will be expected to decide which option to choose in accordance with the related marketing authorization submitted to the national drug regulatory authority.

## 1.2 Background to water requirements and uses

Water is the most widely used substance, raw material or starting material in the production, processing and formulation of pharmaceutical products. It has unique chemical properties due to its polarity and hydrogen bonds. This means it is able to dissolve, absorb, adsorb or suspend many different compounds. These include contaminants that may represent hazards in themselves or that may be able to react with intended product substances, resulting in hazards to health.

41

Different grades of water quality are required depending on the route of administration of the pharmaceutical products. One source of guidance about different grades of water is the European Medicines Evaluation Agency (EMEA) *Note for guidance on quality of water for pharmaceutical use* (CPMP/QWP/158/01).

Control of the quality of water throughout the production, storage and distribution processes, including microbiological and chemical quality, is a major concern. Unlike other product and process ingredients, water is usually drawn from a system on demand, and is not subject to testing and batch or lot release before use. Assurance of quality to meet the on-demand expectation is, therefore, essential. Additionally, certain microbiological tests may require periods of incubation and, therefore, the results are likely to lag behind the water use. Control of the microbiological quality of WPU is a high priority. Some types of microorganism may proliferate in water treatment components and in the storage and distribution systems. It is very important to minimize microbial contamination by routine sanitization and taking appropriate measures to prevent microbial proliferation.

### 1.3 Applicable guides

In addition to the specific guidance provided in this document, the Bibliography lists some relevant publications that can serve as additional background material when planning, installing and using systems intended to provide WPU.

## 2. General requirements for pharmaceutical water systems

Pharmaceutical water production, storage and distribution systems should be designed, installed, commissioned, validated and maintained to ensure the reliable production of water of an appropriate quality. They should not be operated beyond their designed capacity. Water should be produced, stored and distributed in a manner that prevents unacceptable microbial, chemical or physical contamination (e.g. with dust and dirt).

The use of the systems following installation, commissioning, validation and any unplanned maintenance or modification work should be approved by the quality assurance (QA) department. If approval is obtained for planned preventive maintenance tasks, they need not be approved after implementation.

42

Water sources and treated water should be monitored regularly for quality and for chemical, microbiological and, as appropriate, endotoxin contamination. The performance of water purification, storage and distribution systems should also be monitored. Records of the monitoring results and any actions taken should be maintained for an appropriate length of time.

Where chemical sanitization of the water systems is part of the biocontamination control programme, a validated procedure should be followed to ensure that the sanitizing agent has been effectively removed.

# 3. Water quality specifications

## 3.1 General

The following requirements concern water processed, stored and distributed in bulk form. They do not cover the specification of waters formulated for patient administration. Pharmacopoeias include specifications for both bulk and dosage-form waters.

Pharmacopoeial requirements for WPU are described in national and international pharmacopoeias and limits for various contaminants are given. Companies wishing to supply multiple markets should set specifications that meet the strictest requirements from each of the relevant pharmacopoeias.

## 3.2 Drinking-water

Drinking-water should be supplied under continuous positive pressure in a plumbing system free of any defects that could lead to contamination of any product.

Drinking-water is unmodified except for limited treatment of the water derived from a natural or stored source. Examples of natural sources include springs, wells, rivers, lakes and the sea. The condition of the source water will dictate the treatment required to render it safe for human consumption (drinking). Typical treatment includes softening, removal of specific ions, particle reduction and antimicrobial treatment. It is common for drinking-water to be derived from a public water supply that may be a combination of more than one of the natural sources listed above. It is also common for public water-supply organizations to conduct tests and guarantee that the drinking-water delivered is of potable quality.

Drinking-water quality is covered by the WHO drinking-water guidelines, standards from the International Organization for

43

EAGLEBEN-SA_00362156

Standardization (ISO) and other regional and national agencies. Drinking-water should comply with the relevant regulations laid down by the competent authority.

If drinking-water is used directly in certain stages of pharmaceutical manufacture or is the feed-water for the production of higher qualities of WPU, then testing should be carried out periodically by the water user's site to confirm that the quality meets the standards required for potable water.

### 3.3 Purified water

Purified water (PW) should be prepared from a potable water source as a minimum-quality feed-water, should meet the pharmacopoeial specifications for chemical and microbiological purity, and should be protected from recontamination and microbial proliferation.

### 3.4 Highly purified water

Highly purified water (HPW) should be prepared from potable water as a minimum-quality feed-water. HPW is a unique specification for water found only in the *European Pharmacopoeia*. This grade of water must meet the same quality standard as water for injections (WFI) including the limit for endotoxins, but the water-treatment methods are not considered to be as reliable as distillation. HPW may be prepared by combinations of methods such as reverse osmosis, ultrafiltration and deionization.

### 3.5 Water for injections

Water for injections (WFI) should be prepared from potable water as a minimum-quality feed-water. WFI is not sterile water and is not a final dosage form. It is an intermediate bulk product. WFI is the highest quality of pharmacopoeial WPU.

Certain pharmacopoeias place constraints upon the permitted purification techniques as part of the specification of the WFI. *The International Pharmacopoeia* and *The European Pharmacopoeia*, for example, allow only distillation as the final purification step.

### 3.6 Other grades of water

When a specific process requires a special non-pharmacopoeial grade of water, this should be specified and should at least satisfy the pharmacopoeial requirements of the grade of WPU required for the type of dosage form or process step.

44

## 4. Application of specific waters to processes and dosage forms

Product licensing authorities define the requirement to use the specific grades of WPU for different dosage forms or for different stages in washing, preparation, synthesis, manufacturing or formulation.

The grade of water used should take into account the nature and intended use of the intermediate or finished product and the stage in the manufacturing process at which the water is used.

HPW can be used in the preparation of products when water of high quality (i.e. very low in microorganisms and endotoxins) is needed, but the process stage or product requirement does not include the constraint on the production method defined in some of the pharmacopoeial monographs for WFI.

WFI should be used in injectable product preparations, for dissolving or diluting substances or preparations for parenteral administration before use, and for sterile water for preparation of injections. WFI should also be used for the final rinse after cleaning of equipment and components that come into contact with injectable products as well as for the final rinse in a washing process in which no subsequent thermal or chemical depyrogenization process is applied.

When steam comes into contact with an injectable product in its final container, or equipment for preparing injectable products, it should conform with the specification for WFI when condensed.

## 5. Water purification methods

### 5.1 General considerations

The specifications for WPU found in compendia (e.g. pharmacopoeias) are generally not prescriptive as to permissible water purification methods other than those for WFI (refer to section 3.5).

The chosen water purification method, or sequence of purification steps, must be appropriate to the application in question. The following should be considered when selecting the water treatment method:

— the water quality specification;
— the yield or efficiency of the purification system;
— feed-water quality and the variation over time (seasonal changes);
— the reliability and robustness of the water-treatment equipment in operation;

**45**

EAGLEBEN-SA_00362158

— the availability of water-treatment equipment on the market;
— the ability to adequately support and maintain the water purification equipment; and
— the operation costs.

The specifications for water purification equipment, storage and distribution systems should take into account the following:

— the risk of contamination from leachates from contact materials;
— the adverse impact of adsorptive contact materials;
— hygienic or sanitary design, where required;
— corrosion resistance;
— freedom from leakage;
— configuration to avoid proliferation of microbiological organisms;
— tolerance to cleaning and sanitizing agents (thermal and chemical);
— the system capacity and output requirements; and
— the provision of all necessary instruments, test and sampling points to allow all the relevant critical quality parameters of the complete system to be monitored.

The design, configuration and layout of the water purification equipment, storage and distribution systems should also take into account the following physical considerations:

— the space available for the installation;
— structural loadings on buildings;
— the provision of adequate access for maintenance; and
— the ability to safely handle regeneration and sanitization chemicals.

## 5.2 Production of drinking-water

Drinking-water is derived from a raw water source such as a well, river or reservoir. There are no prescribed methods for the treatment of raw water to produce potable drinking-water from a specific raw water source.

Typical processes employed at a user plant or by a water supply authority include:

— filtration;
— softening;
— disinfection or sanitization (e.g. by sodium hypochlorite (chlorine) injection);
— iron (ferrous) removal;
— precipitation; and
— reduction of specific inorganic/organic materials.

46

EAGLEBEN-SA_00362159

The drinking-water quality should be monitored routinely. Additional testing should be considered if there is any change in the raw-water source, treatment techniques or system configuration. If the drinking-water quality changes significantly, the direct use of this water as a WPU, or as the feed-water to downstream treatment stages, should be reviewed and the result of the review documented.

Where drinking-water is derived from an "in-house" system for the treatment of raw water, the water-treatment steps used and the system configuration should be documented. Changes to the system or its operation should not be made until a review has been completed and the change approved by the QA department.

Where drinking-water is stored and distributed by the user, the storage systems must not allow degradation of the water quality before use. After any such storage, testing should be carried out routinely in accordance with a defined method. Where water is stored, its use should ensure a turnover of the stored water sufficient to prevent stagnation.

The drinking-water system is usually considered to be an "indirect impact system" and does not need to be qualified.

Drinking-water purchased in bulk and transported to the user by tanker presents special problems and risks not associated with potable water delivered by pipeline. Vendor assessment and authorized certification activities, including confirmation of the acceptability of the delivery vehicle, should be undertaken in a similar way to that used for any other starting material.

Equipment and systems used to produce drinking-water should be able to be drained and sanitized. Storage tanks should be closed with appropriately protected vents, allow for visual inspection and for being drained and sanitized. Distribution pipework should be able to be drained, or flushed, and sanitized.

Special care should be taken to control microbiological contamination of sand filters, carbon beds and water softeners. Once microorganisms have infected a system, the contamination can rapidly form biofilms and spread throughout the system. Techniques for controlling contamination such as back-flushing, chemical or thermal sanitization and frequent regeneration should be considered. Additionally, all water-treatment components should be maintained with continuous water flow to inhibit microbial growth.

47

EAGLEBEN-SA_00362160

## 5.3  Production of purified water

There are no prescribed methods for the production of PW in the pharmacopoeias. Any appropriate qualified purification technique or sequence of techniques may be used to prepare PW. Typically ion exchange, ultrafiltration and/or reverse osmosis processes are used. Distillation can also be used.

The following should be considered when configuring a water purification system:

— the feed-water quality and its variation over seasons;
— the required water-quality specification;
— the sequence of purification stages required;
— the energy consumption;
— the extent of pretreatment required to protect the final purification steps;
— performance optimization, including yield and efficiency of unit treatment-process steps;
— appropriately located sampling points designed in such a way as to avoid potential contamination; and
— unit process steps should be provided with appropriate instrumentation to measure parameters such as flow, pressure, temperature, conductivity, pH and total organic carbon.

Ambient-temperature PW systems are especially susceptible to microbiological contamination, particularly when equipment is static during periods of no or low demand for water. It is essential to consider the mechanisms for microbiological control and sanitization. The following techniques should be considered:

— maintenance of flow through water-purification equipment at all times;
— control of temperature in the system by pipeline heat exchange or plant-room cooling to reduce the risk of microbial growth (guidance value <25 °C);
— provision of ultraviolet disinfection;
— selection of water-treatment components that can be thermally sanitized; and/or
— application of chemical sanitization (including agents such as ozone).

## 5.4  Production of highly purified water

There are no prescribed methods for the production of HPW in any major pharmacopoeia, including the *European Pharmacopoeia.* Any appropriate qualified purification technique or sequence of

48

techniques may be used to prepare HPW. Typically ion exchange, ultrafiltration and/or reverse osmosis processes are used.

The guidance provided in section 5.3 for PW is equally applicable to HPW.

### 5.5 Production of water for injections

The pharmacopoeias prescribe or limit the permitted final water purification stage in the production of WFI. Distillation is the preferred technique; it is considered a more robust technique based on phase change, and in some cases, high temperature operation of the process equipment.

The following should be considered when designing a water purification system:

— the feed-water quality;
— the required water quality specification;
— the optimum generator size to avoid over-frequent start/stop cycling;
— blow-down and dump functions; and
— cool-down venting to avoid contamination ingress.

## 6. Water purification, storage and distribution systems

This section applies to WPU systems for PW, HPW and WFI. The water storage and distribution should work in conjunction with the purification plant to ensure consistent delivery of water to the user points, and to ensure optimum operation of the water purification equipment.

### 6.1 General

The storage and distribution system should be considered as a key part of the whole system, and should be designed to be fully integrated with the water purification components of the system.

Once water has been purified using an appropriate method, it can either be used directly or, more frequently, it will be fed into a storage vessel for subsequent distribution to points of use. The following text describes the requirements for storage and distribution systems.

The storage and distribution system should be configured to prevent recontamination of the water after treatment and be subjected to a

49

combination of online and offline monitoring to ensure that the appropriate water specification is maintained.

### 6.2 Materials that come into contact with systems for water for pharmaceutical use

This section applies to generation equipment for PW, HPW and WFI, and the associated storage and distribution systems.

The materials that come into contact with WPU, including pipework, valves and fittings, seals, diaphragms and instruments, should be selected to satisfy the following objectives.

- *Compatibility.* All materials used should be compatible with the temperature and chemicals used by or in the system.
- *Prevention of leaching.* All materials that come into contact with WPU should be non-leaching at the range of working temperatures.
- *Corrosion resistance.* PW, HPW and WFI are highly corrosive. To prevent failure of the system and contamination of the water, the materials selected must be appropriate, the method of jointing must be carefully controlled, and all fittings and components must be compatible with the pipework used. Appropriate sanitary-specification plastics and stainless steel materials are acceptable for WPU systems. When stainless steel is used it should be at least grade 316L. The system should be passivated after initial installation or after modification. When accelerated passivation is undertaken, the system should be thoroughly cleaned first, and the passivation process should be undertaken in accordance with a clearly defined documented procedure.
- *Smooth internal finish.* Once water has been purified it is susceptible to microbiological contamination, and the system is subject to the formation of biofilms when cold storage and distribution is employed. Smooth internal surfaces help to avoid roughness and crevices within the WPU system. Crevices are frequently sites where corrosion can commence. The internal finish should have an arithmetical average surface roughness of not greater than 0.8 micrometre arithmetical mean roughness (Ra). When stainless steel is used, mechanical and electropolishing techniques may be employed. Electropolishing improves the resistance of the stainless steel material to surface corrosion.
- *Jointing.* The selected system materials should be able to be easily jointed by welding in a controlled manner. The control of the process should include as a minimum, qualification of the operator, documentation of the welder set-up, work-session test pieces, logs of all welds and visual inspection of a defined proportions of welds.

50

EAGLEBEN-SA_00362163

- *Design of flanges or unions.* Where flanges or unions are used, they should be of a hygienic or sanitary design. Appropriate checks should be carried out to ensure that the correct seals are used and that they are fitted and tightened correctly.
- *Documentation.* All system components should be fully documented and be supported by original or certified copies of material certificates.
- *Materials.* Suitable materials that may be considered for sanitary elements of the system include 316 L (low carbon) stainless steel, polypropylene, polyvinylidenedifluoride and perfluoroalkoxy. Other materials such as unplasticized polyvinylchloride (uPVC) may be used for treatment equipment designed for less pure water such as ion exchangers and softeners.

## 6.3 System sanitization and bioburden control

Water treatment equipment, storage and distribution systems used for PW, HPW and WFI should be provided with features to control the proliferation of microbiological organisms during normal use, as well as techniques for sanitizing or sterilizing the system after intervention for maintenance or modification. The techniques employed should be considered during the design of the system and their performance proven during the commissioning and qualification activities.

Systems that operate and are maintained at elevated temperatures, in the range of 70–80 °C, are generally less susceptible to microbiological contamination than systems that are maintained at lower temperatures. When lower temperatures are required due to the water treatment processes employed or the temperature requirements for the water in use, then special precautions should be taken to prevent the ingress and proliferation of microbiological contaminants (see section 6.5.3 for guidance).

## 6.4 Storage vessel requirements

The water storage vessel used in a system serves a number of important purposes. The design and size of the vessel should take into consideration the following.

### 6.4.1 *Capacity*

The capacity of the storage vessel should be determined on the basis of the following requirements.

- It is necessary to provide a buffer capacity between the steady-state generation rate of the water-treatment equipment and the potentially variable simultaneous demand from user points.

51

EAGLEBEN-SA_00362164

- The water treatment equipment should be able to operate continuously for significant periods to avoid the inefficiencies and equipment stress that occur when the equipment cycles on and off too frequently.
- The capacity should be sufficient to provide short-term reserve capacity in the event of failure of the water-treatment equipment or inability to produce water due to a sanitization or regeneration cycle. When determining the size of such reserve capacity, consideration should be given to providing sufficient water to complete a process batch, work session or other logical period of demand.

### 6.4.2 *Contamination control considerations*

The following should be taken into account for the efficient control of contamination.

- The headspace in the storage vessel is an area of risk where water droplets and air can come into contact at temperatures that encourage the proliferation of microbiological organisms. The water distribution loop should be configured to ensure that the headspace of the storage vessel is effectively wetted by a flow of water. The use of spray ball or distributor devices to wet the surfaces should be considered.
- Nozzles within the storage vessels should be configured to avoid dead zones where microbiological contamination might be harboured.
- Vent filters are fitted to storage vessels to allow the internal level of liquid to fluctuate. The filters should be bacteria-retentive, hydrophobic and ideally be configured to allow in situ testing of integrity. Offline testing is also acceptable. The use of heated vent filters should be considered to prevent condensation within the filter matrix that might lead to filter blockage and to microbial grow-through that could contaminate the storage vessels.
- Where pressure-relief valves and bursting discs are provided on storage vessels to protect them from over-pressurization, these devices should be of a sanitary design. Bursting discs should be provided with external rupture indicators to prevent accidental loss of system integrity.

## 6.5 Requirements for water distribution pipework

The distribution of PW, HPW and WFI should be accomplished using a continuously circulating pipework loop. Proliferation of contaminants within the storage tank and distribution loop should be controlled.

52

Filtration should not usually be used in distribution loops or at take-off user points to control biocontamination. Such filters are likely to conceal system contamination.

### 6.5.1 *Temperature control and heat exchangers*

Where heat exchangers are employed to heat or cool WPU within a system, precautions should be taken to prevent the heating or cooling utility from contaminating the water. The more secure types of heat exchangers of the double tube plate or double plate and frame configuration should be considered. Where these types are not used, an alternative approach whereby the utility is maintained and monitored at a lower pressure than the WPU may be considered.

Where heat exchangers are used they should be arranged in continually circulating loops or subloops of the system to avoid unacceptable static water in systems.

When the temperature is reduced for processing purposes, the reduction should occur for the minimum necessary time. The cooling cycles and their duration should be proven satisfactory during the qualification of the system.

### 6.5.2 *Circulation pumps*

Circulation pumps should be of a sanitary design with appropriate seals that prevent contamination of the system. Where stand-by pumps are provided, they should be configured or managed to avoid dead zones trapped within the system.

### 6.5.3 *Biocontamination control techniques*

The following control techniques may be used alone or more commonly in combination.

- Maintenance of continuous turbulent flow circulation within water distribution systems reduces the propensity for the formation of biofilms. The maintenance of the design velocity for a specific system should be proven during the system qualification and the maintenance of satisfactory performance should be monitored. During the operation of a distribution system, short-term fluctuations in the flow velocity are unlikely to cause contamination problems provided that cessation of flow, flow reversal or pressure loss does not occur.
- The system design should ensure the shortest possible length of pipework.
- For ambient temperature systems, pipework should be isolated from adjacent hot pipes.

53

- Deadlegs in the pipework installation greater than 1.5 times the branch diameter should be avoided.
- Pressure gauges should be separated from the system by membranes.
- Hygienic pattern diaphragm valves should be used.
- Pipework should be laid to falls to allow drainage.
- The growth of microorganisms can be inhibited by:
  — ultraviolet radiation sources in pipework;
  — maintaining the system heated (guidance temperature 70–80 °C);
  — sanitizing the system periodically using hot water (guidance temperature >70 °C);
  — sterilizing or sanitizing the system periodically using super-heated hot water or clean steam; and
  — routine chemical sanitization using ozone or other suitable chemical agents. When chemical sanitization is used, it is essential to prove that the agent has been removed prior to using the water. Ozone can be effectively removed by using ultraviolet radiation.

## 7. Operational considerations

### 7.1 Start-up and commissioning of water systems

Planned, well-defined, successful and well-documented commissioning is an essential precursor to successful validation of water systems. The commissioning work should include setting to work, system set-up, controls loop tuning and recording of all system performance parameters. If it is intended to use or refer to commissioning data within the validation work then the quality of the commissioning work and associated data and documentation must be commensurate with the validation plan requirements.

### 7.2 Qualification

WPU, PW, HPW and WFI systems are all considered to be direct impact, quality critical systems that should be qualified. The qualification should follow the validation convention of design review or design qualification (DQ), installation qualification (IQ), operational qualification (OQ) and performance qualification (PQ).

This guidance does not define the standard requirements for the conventional validation stages DQ, IQ and OQ, but concentrates on the particular PQ approach that should be used for WPU systems to demonstrate their consistent and reliable performance. A three-phase

54

approach should be used to satisfy the objective of proving the reliability and robustness of the system in service over an extended period.

*Phase 1.* A test period of 2–4 weeks should be spent monitoring the system intensively. During this period the system should operate continuously without failure or performance deviation. The following should be included in the testing approach.

- Undertake chemical and microbiological testing in accordance with a defined plan.
- Sample the incoming feed-water daily to verify its quality.
- Sample after each step in the purification process daily.
- Sample at each point of use and at other defined sample points daily.
- Develop appropriate operating ranges.
- Develop and finalize operating, cleaning, sanitizing and maintenance procedures.
- Demonstrate production and delivery of product water of the required quality and quantity.
- Use and refine the standard operating procedures (SOPs) for operation, maintenance, sanitization and troubleshooting.
- Verify provisional alert and action levels.
- Develop and refine test-failure procedure.

*Phase 2.* A further test period of 2–4 weeks should be spent carrying out further intensive monitoring while deploying all the refined SOPs after the satisfactory completion of phase 1. The sampling scheme should be generally the same as in phase 1. Water can be used for manufacturing purposes during this phase. The approach should also:

— demonstrate consistent operation within established ranges; and
— demonstrate consistent production and delivery of water of the required quantity and quality when the system is operated in accordance with the SOPs.

*Phase 3.* Phase 3 typically runs for 1 year after the satisfactory completion of phase 2. Water can be used for manufacturing purposes during this phase which has the following objectives and features.

- Demonstrate extended reliable performance.
- Ensure that seasonal variations are evaluated.
- The sample locations, sampling frequencies and tests should be reduced to the normal routine pattern based on established procedures proven during phases 1 and 2.

55

EAGLEBEN-SA_00362168

## 7.3 Continuous system monitoring

After completion of phase 3 of the qualification programme for the WPU system, a system review should be undertaken. Following this review, a routine monitoring plan should be established based on the results of phase 3.

Monitoring should include a combination of online instrument monitoring of parameters such as flow, pressure, temperature, conductivity and total organic carbon, and offline sample testing for physical, chemical and microbiological attributes. Offline samples should be taken from points of use and specific sample points. Samples from points of use should be taken in a similar way to that adopted when the water is being used in service.

Tests should be carried out to ensure that the selected pharmacopoeia specification has been satisfied, and should include, as appropriate, determination of conductivity, pH, heavy metals, nitrates, total organic carbon, total viable count, presence of specific pathogens and endotoxins.

Monitoring data should be subject to trend analysis.

## 7.4 Maintenance of water systems

WPU systems should be maintained in accordance with a controlled, documented maintenance programme that takes into account the following:

— defined frequency for system elements;
— the calibration programme;
— SOPs for specific tasks;
— control of approved spares;
— issue of clear maintenance plan and instructions;
— review and approval of systems for use upon completion of work; and
— record and review of problems and faults during maintenance.

## 7.5 System reviews

WPU (PW, HPW and WFI) systems should be reviewed at appropriate regular intervals. The review team should comprise representatives from engineering, QA, operations and maintenance. The review should consider matters such as:

— changes made since the last review;
— system performance;
— reliability;
— quality trends;

56

EAGLEBEN-SA_00362169

— failure events;
— investigations;
— out-of-specifications results from monitoring;
— changes to the installation;
— updated installation documentation;
— log books; and
— the status of the current SOP list.

## 8. Inspection of water systems

WPU (PW, HPW and WFI) systems are likely to be the subject of regulatory inspection from time to time. Users should consider conducting routine audit and self-inspection of established water systems. This GMP guidance can be used as the basis of inspection. The following list identifies items and a logical sequence for a WPU system inspection or audit:

— a sampling and monitoring plan with a drawing of all sample points;
— the setting of monitoring alert and action levels;
— monitoring results and evaluation of trends;
— inspection of the last annual system review;
— review of any changes made to the system since the last audit and check that the change control has been implemented;
— review of deviations recorded and their investigation;
— general inspection of system for status and condition;
— review of maintenance, failure and repair logs; and
— checking calibration and standardization of critical instruments.

For an established system that is demonstrably under control, this scope of review should prove adequate.

For new systems, or systems that display instability or unreliability, the following should also be reviewed:

— performance qualification;
— operational qualification; and
— installation qualification.

### Bibliography

*WHO Guidelines for drinking-water quality,* 3rd edition. Geneva, World Health Organization, 2003.

*Water and steam systems.* International Society for Pharmaceutical Engineering, 2001. ISPE Baseline™ Pharmaceutical Engineering Guide, volume 4.

EAGLEBEN-SA_00362170

American Society of Mechanical Engineers. *Bioprocessing Equipment Standard.* ASME — BPE 2000

*Biotechnology. Equipment. Guidance on testing procedures for cleanability.* British Standards Pub lishing Ltd. BS EN 12296.

Harfst WH. Selecting piping materials for high-purity water systems. *Ultra Pure Water*, May/June 1994.

Noble PT. Transport considerations for microbial control in piping. *Journal of Pharmaceutical Science and Technology*, 1994, 48;76–85.

Baines PH. Passivation; understanding and performing procedures on austenitic stainless steel systems. *Pharmaceutical Engineering*, 1990, 10(6).

*Guide to inspections of high purity water systems.* Maryland, US Food and Drug Administration, 1993.

Tverberg JC, Kerber SJ. Effect of nitric acid passivation on the surface composition of mechanically polished type 316 L sanitary tube. *European Journal of Parenteral Sciences* 1998, 3:117–124.

*European Pharmacopoeia*: Web site for the publishers of the *European Pharmacopoeia* and supplements; http://www.pheur.org/

*US Pharmacopoeia*: Published annually; see http://www.usp.org/

European Medicines Evaluation Agency. *Note for guidance on the quality of water for pharmaceutical use.* London. CPMP/QWP/158-01.

Pharmaceutical Inspection Cooperation Scheme. *PIC/S; Inspection of Utilities; P1 009-1.* Geneva, Pharmaceutical Inspection Cooperation Scheme, 2002.

*The International Pharmacopoeia*, World Health Organization, Geneva; http://www.who.int/medicines

58

EAGLEBEN-SA_00362171

# Exhibit 31
# Filed Under Seal

# EX. 32
# FILED UNDER SEAL

# Exhibit 33

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use XIFYRM safely and effectively. See full prescribing information for XIFYRM.**

**XIFYRM (meloxicam injection), for intravenous use**
**Initial U.S. Approval: 2000**

---

**WARNING: RISK OF SERIOUS CARDIOVASCULAR AND GASTROINTESTINAL EVENTS**
*See full prescribing information for complete boxed warning.*

- **Non-steroidal anti-inflammatory drugs (NSAIDs) cause an increased risk of serious cardiovascular thrombotic events, including myocardial infarction, and stroke, which can be fatal. This risk may occur early in treatment and may increase with duration of use (5.1)**
- **XIFYRM is contraindicated in the setting of coronary artery bypass graft (CABG) surgery (4, 5.1)**
- **NSAIDs cause an increased risk of serious gastrointestinal (GI) adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal. These events can occur at any time during use and without warning symptoms. Elderly patients and patients with a prior history of peptic ulcer disease and/or GI bleeding are at greater risk for serious GI events (5.2)**

---

--------------------------INDICATIONS AND USAGE--------------------------
XIFYRM contains meloxicam, which is an NSAID, and is indicated for use in adults for the management of moderate-to-severe pain, alone or in combination with non-NSAID analgesics.

Limitation of Use
Because of delayed onset of analgesia, XIFYRM alone is not recommended for use when rapid onset of analgesia is required. (1)

----------------------DOSAGE AND ADMINISTRATION----------------------
- Use for the shortest duration consistent with individual patient treatment goals. (2)
- Recommended dosage: 30 mg once daily, administered by intravenous bolus injection over 15 seconds. (2)
- Monitor patient analgesic response and administer a short-acting, non-NSAID, immediate-release analgesic if response is inadequate. (2)
- Patients must be well hydrated before XIFYRM administration. (2)

----------------------DOSAGE FORMS AND STRENGTHS----------------------
XIFYRM (meloxicam injection), single-dose vial containing 30 mg/mL per vial. (3)

-----------------------------CONTRAINDICATIONS-----------------------------
- Known hypersensitivity to meloxicam or any components of the drug product. (4)
- History of asthma, urticaria, or other allergic-type reactions after taking aspirin or other NSAIDs. (4)
- In the setting of coronary artery bypass graft (CABG) surgery. (4)
- Moderate to severe renal insufficiency patients who are at risk for renal failure due to volume depletion. (4)

-----------------------WARNINGS AND PRECAUTIONS-----------------------
- Hepatotoxicity: Inform patients of warning signs and symptoms of hepatotoxicity. Discontinue XIFYRM immediately if abnormal liver tests persist or worsen or if clinical signs and symptoms of liver disease develop. (5.3)
- Hypertension: Patients taking some antihypertensive medications may have impaired response to these therapies when taking XIFYRM injection.

Monitor blood pressure. (5.4, 7)
- Heart Failure and Edema: Avoid use of XIFYRM in patients with severe heart failure unless benefits are expected to outweigh risk of worsening heart failure. (5.5)
- Renal Toxicity: Monitor renal function in patients with renal or hepatic impairment, heart failure, dehydration, or hypovolemia. Avoid use of XIFYRM in patients with advanced renal disease unless benefits are expected to outweigh risk of worsening renal function. (5.6)
- Anaphylactic Reactions: Seek emergency help if an anaphylactic reaction occurs. (5.7)
- Exacerbation of Asthma Related to Aspirin Sensitivity: XIFYRM is contraindicated in patients with aspirin-sensitive asthma. Monitor patients with preexisting asthma (without aspirin sensitivity). (5.8)
- Serious Skin Reactions: Discontinue XIFYRM at first appearance of skin rash or other signs of hypersensitivity. (5.9)
- Drug Reaction with Eosinophilia and Systemic Symptoms (DRESS): Discontinue and evaluate clinically. (5.10)
- Hematologic Toxicity: Monitor hemoglobin or hematocrit in patients with any signs or symptoms of anemia. (5.12, 7)
- Fetal Toxicity: Limit use of NSAIDs, including XIFYRM, between about 20 to 30 weeks in pregnancy due to the risk of renal oligohydramnios/fetal dysfunction. Avoid use of NSAIDs in women at about 30 weeks gestation and later in pregnancy due to the risks oligohydramnios/fetal renal dysfunction and premature closure of the fetal ductus arteriosus. (5.11, 8.1)

-----------------------------ADVERSE REACTIONS-----------------------------
The most common adverse reactions ($\geq$ 2% and greater than placebo) in controlled clinical trials include constipation, GGT increased, and anemia. (6)

**To report SUSPECTED ADVERSE REACTIONS, contact Azurity Pharmaceuticals, Inc. at 1-800-461-7449 or FDA at 1-800-FDA-1088 or *www.fda.gov/medwatch*.**

-----------------------------DRUG INTERACTIONS-----------------------------
- Drugs that Interfere with Hemostasis (e.g., warfarin, aspirin, SSRIs/SNRIs): Monitor patients for bleeding who are concomitantly taking XIFYRM with drugs that interfere with hemostasis. Concomitant use of XIFYRM and analgesic doses of aspirin is not generally recommended. (7)
- ACE Inhibitors, Angiotensin Receptor Blockers (ARBs), or Beta-Blockers: Concomitant use with XIFYRM may diminish the antihypertensive effect of these drugs. Monitor blood pressure. (7)
- ACE Inhibitors and ARBs: Concomitant use with XIFYRM in elderly, volume-depleted, or those with renal impairment may result in deterioration of renal function. In such high risk patients, monitor for signs of worsening renal function. (7)
- Diuretics: NSAIDs can reduce natriuretic effect of furosemide and thiazide diuretics. Monitor patients to assure diuretic efficacy including antihypertensive effects. (7)

-----------------------USE IN SPECIFIC POPULATIONS-----------------------
- Infertility: NSAIDs are associated with reversible infertility. Consider withdrawal of XIFYRM in women who have difficulties conceiving. (8.3)

**See 17 for PATIENT COUNSELING INFORMATION**

**Revised: 06/2025**

Reference ID: 5603748

EAGLEBEN-SA_00376497

**FULL PRESCRIBING INFORMATION: CONTENTS\***

**WARNING: RISK OF SERIOUS CARDIOVASCULAR AND GASTROINTESTINAL EVENTS**
**1   INDICATIONS AND USAGE**
**2   DOSAGE AND ADMINISTRATION**
**3   DOSAGE FORMS AND STRENGTHS**
**4   CONTRAINDICATIONS**
**5   WARNINGS AND PRECAUTIONS**
   5.1   Cardiovascular Thrombotic Events
   5.2   Gastrointestinal Effects- Risk of Ulceration, Bleeding, and Perforation
   5.3   Hepatotoxicity
   5.4   Hypertension
   5.5   Heart Failure and Edema
   5.6   Renal Toxicity and Hyperkalemia
   5.7   Anaphylactic Reactions
   5.8   Exacerbation of Asthma Related to Aspirin Sensitivity
   5.9   Serious Skin Reactions
   5.10  Drug Reaction with Eosinophilia and Systemic Symptoms (DRESS)
   5.11  Fetal Toxicity
   5.12  Hematologic Toxicity
   5.13  Masking of Inflammation and Fever
   5.14  Laboratory Monitoring
**6   ADVERSE REACTIONS**
   6.1   Clinical Trials Experience
   6.2   Postmarketing Experience

**7   DRUG INTERACTIONS**
**8   USE IN SPECIFIC POPULATIONS**
   8.1   Pregnancy
   8.2   Lactation
   8.3   Females and Males of Reproductive Potential
   8.4   Pediatric Use
   8.5   Geriatric Use
   8.6   Hepatic Impairment
   8.7   Renal Impairment
   8.8   Poor Metabolizers of CYP2C9 Substrates
**10  OVERDOSAGE**
**11  DESCRIPTION**
**12  CLINICAL PHARMACOLOGY**
   12.1  Mechanism of Action
   12.2  Pharmacodynamics
   12.3  Pharmacokinetics
   12.5  Pharmacogenomics
**13  NONCLINICAL  TOXICOLOGY**
   13.1   Carcinogenesis, Mutagenesis, Impairment of Fertility
**14  CLINICAL STUDIES**
**16  HOW SUPPLIED/STORAGE AND HANDLING**
**17  PATIENT COUNSELING INFORMATION**

**\*Sections or subsections omitted from the full prescribing information are not listed.**

Reference ID: 5603748

EAGLEBEN-SA_00376498

Manage patients with symptomatic and supportive care following an NSAID overdosage. There are no specific antidotes. Forced diuresis, alkalinization of urine, hemodialysis, or hemoperfusion may be employed but are not likely to be useful due to high protein binding.

There is limited experience with meloxicam overdose. In four reported cases of meloxicam overdose, patients took 6 to 11 times the highest available oral dose of meloxicam tablets (15 mg); all recovered. Cholestyramine is known to accelerate the clearance of meloxicam.

Accelerated removal of meloxicam by 4 g doses of cholestyramine given three times a day was demonstrated in a clinical trial. Administration of cholestyramine may be useful following an overdosage.

In case of an overdosage, discontinue XIFYRM therapy and contact a regional poison control center at 1-800-222-1222.

## 11    DESCRIPTION

XIFYRM (meloxicam injection) is a nonsteroidal anti-inflammatory drug (NSAID). It is a sterile clear, pale-yellow to yellow color solution, containing the active pharmaceutical ingredient meloxicam for intravenous administration. Each mL of aqueous solution contains 30 mg of meloxicam, 150 mg of hydroxypropyl betadex, 20 mg of meglumine, 60 mg of povidone and water for injection. The pH of the meloxicam injection is 8.0 to 9.5.

The meloxicam drug substance is polymorph I. It is pale yellow powder. It is soluble in dimethylformamide, slightly soluble in acetone, very slightly soluble in ethanol 96% and in methanol, and practically insoluble in water.

Meloxicam is designated chemically as 4-hydroxy-2-methyl-$N$-(5-methyl-2-thiazolyl)-2$H$-1,2-benzothiazine-3-carboxamide-1,1-dioxide. The molecular weight is 351.4. Its molecular formula is $C_{14}H_{13}N_3O_4S_2$ and the structural formula of meloxicam is:

**Figure 1:     Structural Formula of Meloxicam**

## 12    CLINICAL PHARMACOLOGY

### 12.1 Mechanism of Action

Meloxicam has analgesic, anti-inflammatory, and antipyretic properties.

The mechanism of action of meloxicam, like that of other NSAIDs, is not completely understood but involves inhibition of cyclooxygenase (COX-1 and COX-2).

Page 18 of 26

Reference ID: 5603748

EAGLEBEN-SA_00376514

# EX. 34
# FILED UNDER SEAL

# EX. 35
# FILED UNDER SEAL

# EX. 36
# FILED UNDER SEAL

# EX. 37

# FILED UNDER SEAL

# EXHIBIT 38
# REDACTED IN ITS ENTIRETY

# EX. 39
# FILED UNDER SEAL

# EXHIBIT 40
# REDACTED IN ITS ENTIRETY

# Exhibit 41
# Filed Under Seal

## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that true and correct copies of the foregoing documents were caused to be served on July 1, 2026, on the following counsel in the manner indicated:

**VIA EMAIL:**
Kenneth L. Dorsney
Cortlan S. Hitch
MORRIS JAMES LLP
3205 Avenue North Boulevard, Suite 100
Wilmington, DE 19803
kdorsney@morrisjames.com
chitch@morrisjames.com

Deepro R. Mukerjee
Lance A. Soderstrom
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Center
New York, NY 10020-1605
Deepro.mukerjee@katten.com
Lance.soderstrom@katten.com

Jitendra Malik
Joseph M. Janusz
KATTEN MUCHIN ROSENMAN LLP
550 South Tyron Street, Suite 2900
Charlotte, NC 28202
Jitty.malik@katten.com
Joe.janusz@katten.com

Christopher B. Ferenc
KATTEN MUCHIN ROSENMAN LLP
1919 Pennsylvania Avenue, NW Suite 800
Washington, DC 20006
Christopher.ferenc@katten.com

Rachel L. Schweers
Matthew T. Messina
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street
Chicago, IL 60661
Rachel.schweers@katten.com
Matthew.messina@katten.com

*Attorneys for Defendants Apotex, Inc. and Apotex Corp.*

ME1\61693533.v1

Neal C. Belgam
Daniel A. Taylor
SMITH KATZENSTEIN & JENKINS LLP
1000 West Street, Suite 1501
Wilmington, DE 19801
nbelgam@skjlaw.com
dtaylor@skjlaw.com

Jason A. Lief
Alan H. Pollack
Audrey R. Sparschu
WINDELS MARX LANE & MITTENDORF, LLP
156 West 56th Street
New York, NY 10019
jlief@windelsmarx.com
apollack@windelsmarx.com
asparschu@windelsmarx.com

Andrew Miller
Ajay Kayal
Robyn Ast-Gmoser
Kiersten Fowler
Daniel Forchheimer
WINDELS MARX LANE & MITTENDORF, LLP
One Giralda Farms
Madison, NJ 07940
amiller@windelsmarx.com
akayal@windelsmarx.com
rast-gmoser@windelsmarx.com
kfowler@windelsmarx.com
dforchheimer@windelsmarx.com

*Attorneys for Defendants Slayback Pharma LLC and Azurity Pharmaceuticals, Inc.*

/s/ Alexandra M. Joyce
Alexandra M. Joyce (#6423)

ME1\61693533.v1